**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Eugene Westmoreland, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 23-cv-1851 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Cook County Sheriff Thomas Dart, et al. | ) | Magistrate Judge Gilbert |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF ERIC DAVIS**

I, Eric Davis, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, and if called upon to testify at trial, hearing, or deposition would state, based upon my personal knowledge, the following:

1. I am the Deputy Director of the Department of Capital Planning and Policy for Cook County, Illinois. I have held this position since April 2017.

2. As the Deputy Director of the Department of Capital Planning and Policy, my duties and responsibilities include participating in the oversight of the design and construction work at the Cook County Jail and courthouses. My duties and responsibilities also include overseeing the development and implementation of Cook County's Capital Improvement Plan (CIP), which involves engaging both architects and contractors to perform that work and working with our user groups to make sure that we are accomplishing their needs within the resources available.

3. I am directly involved in matters relating to planning and compliance of the facilities of the Cook County Department of Corrections (CCDOC) with the Americans with Disabilities Act (ADA).

4. The Department of Corrections, located at 2700 S. California, Chicago, is owned by Cook County. The buildings on the campus are used for housing and fulfillment of the needs and requirements of detainees in CCDOC custody. Division 08, also known as the Residential Treatment Unit ("RTU"), is a building in the central Northwest portion of the campus, housing most wheelchair-users in CCDOC custody. The Division 08/RTU has pedestrian/material access tunnels which serve the facility at the basement level. Located within the East Tunnel Corridor of that area is an access ramp ("East RTU Ramp").

5. As part of a comprehensive, multi-contract program to assess the overall ADA/accessibility compliance of all its public safety facilities (approx. 11 mil. sq. ft.), the County has publicly advertised for and is currently seeking architectural/engineering firms to assess, design, and provide construction phase services for complete and comprehensive upgrades to the accessibility and ADA compliance of the Department of Corrections facilities, which is includes approximately 60 structures, totaling approximately 3.5 million square feet, as well as the land, outdoor recreation areas, gardens, drives, sidewalks, parking areas, etc. around them on over 100 acres of County-owned property. The period for bids on the project ended on May 22, 2024, with award of the contract by the Board of Commissioners expected approximately in January 2025. (Ex. 1, RFQ No. 2415-02093[1].)

6. The ADA renovation work for the Division 08/RTU facility would be included in the scope of RFQ No. 2415-02093. Because of the scale of the project, the County's planned upgrade program, as illustrated in the RFQ and the excerpted image below, contemplates the division of the campus into 3 "packages" for assessment, design, and construction documents, to

---

[1] A Request for Qualifications ("RFQ") is a procurement process used by Cook County to solicit detailed information from potential vendors or contractors to determine their qualifications for a specific project or service. It is particularly used when: (a) High professional skill is required; (b) Requirements are not clearly known; and/or (c) Quality is a primary factor over cost. Cook Cnty., Ill., Code of Ordinances § 34-136 (2024).

be produced by the successful AE firms. Division 08/RTU is within "Package 1," and would be handled at the same time as surrounding facilities. The scope of work for the AE firms includes assessment, design, and construction phase services; unlike similar smaller solicitations for ADA upgrades to other County facilities, because of the scope and scale of the Jail, DCPP obtained leave from the Office of the Chief Procurement Officer (OCPO) to contract for full design services. Other similar smaller assignments (5 other contracts already issued) have been divided up between a firm doing the assessment and preliminary design (or "transfer package") and final Architect/Engineer of Record services. Given the complexity and the interlocking nature of these assignments at the Jail, as exemplified by the reasons noted herein for not excerpting the RTU East Ramp from the larger program, the County expects to realize significant time and cost savings for the program through this approach.



3

Exhibit 1 Page 3

7. Given the enormous size and scope of the project, a holistic approach must be considered in the design and construction of the project, including the ADA design throughout the project. The sequence of work on a project of this size requires careful consideration and planning of each element or location, in the context of its surrounding areas and their accessibility requirements, so that the project addresses the needs for access seamlessly, and that the work can be constructed in the most expeditious, cost-effective, efficient, and safe manner.

8. The "path of travel" throughout the campus that might require ADA compliance is vast and not just limited to the East RTU ramp. The County's goal is to ensure the entire project complies with the ADA standards, not just the ramps.

9. It would be inefficient and cost prohibitive if the ramp work was not properly sequenced with other necessary work on the project that the County intends to complete in the next few years.

10. Carving out repairs just to ensure one ramp is ADA compliant without considering the overall impact on a project of this scale, in addition to subverting the desire to create seamlessly accessible paths of travel, as required by the Act, would be contrary to the overall imperative to address the needs comprehensively and completely, and to do so as quickly as possible. It also has implications beyond accessibility. For instance, since the tunnel system also serves as the location for much of the infrastructure for the various buildings across the campus (steam and hot water lines, cold water lines, sewer/waste/drain lines, data and electrical lines, etc.) there may be mechanical, electrical or plumbing that is also affected and needs to be sequenced too. Concurrent with the ADA assessment and upgrades program, the County has retained an engineering firm which is conducting an analysis and re-design of the campus HVAC systems, which likely will result in the re-routing or replacement of major infrastructure that runs through the area in question,

due to the desire to decentralize those system, for greater redundancy, and to include sustainable energy systems not yet in place.

11. As can be seen, particularly in the northwest-most portion of the campus, where Divisions 01 and 1A have been removed to make way for future fully accessible redevelopment (approx. 500,000 sq. ft.), the County has already begun extensive active related construction and demolition, including removing inaccessible legacy structures and making certain ADA improvements:



12. The campus-wide ADA upgrades program is progressing smoothly and when all construction is completed, said completed work will include the repairs noted below to the East RTU ramp. In the course of implementation and construction, the County will be working continuously with the Sheriff, including in developing the phasing plan for implementation. That will allow the County to first address those areas of greatest need, for the Sheriff's daily volume and typical operations.

13. Specifically, in relation to this case, an engineering firm used previously by the County, Globetrotters Engineering Corporation (GEC), was hired to assess the ADA compliance of the East RTU Ramp. (Ex. 2, GEC Report.)

14. In January 2024, it is my understanding that the GEC team utilized a LiDAR system, advanced technology which the County does not possess, to document the physical conditions of the East RTU ramp in three-dimensional form. The three-dimensional imagery captured the top and bottom of the ramp as well as the landings.

15. The three-dimensional imagery of GEC's LiDAR system, which captured the entire space (ramp and landings), allowed GEC to observe several violations, but GEC noted them all to be minor except for the lack of landing at the top of the ramp. The specific violations noted by GEC included:

> I. At two locations there is a deviation in the ramp floor that creates, for a short distance, a slope greater than 1:12.
> II. The intermediate landing is 5% short of the required length of five feet.
> III. Handrail extensions are shorter than the required 12" but in all cases are longer than 7.25".
> IV. At some locations, the handrails are up to ½" lower than the minimum required height.
> V. Lack of a landing, more than 9" long, at the top of the ramp.

(Ex. 2 at 3.)

16. GEC also noted a lack of Anti-ligature handrails, which are a necessary safety precaution in a jail setting.

17. GEC delivered specific recommendations for addressing the conditions on the ramp and bringing it into compliance with the ADA. These recommendations include the following:

> I. Move doors to adjacent tunnel east +/-52" as needed to provide a 60" landing.
> II. Rework the slope of the Upper Ramp with topping materials to be maximum 1:12 at all locations.
> III. Pour over the existing floor slab to shift the Lower Ramp East and extend the length of the Intermediate Landing to a minimum of 60".

      IV. In conjunction with 3, provide a maximum 1:12 slope at all portions of the Lower Ramp.
      V. Replace existing handrails with anti-ligature handrails, installed between 34 and 38" at all locations, with correct extensions.

(Ex. 2 at 16.)

18.    Although the County has not yet requested bids for repairs, it is anticipated that the repair costs will be comparable to the costs to repair the Cermak ramp in the *Walker* case[2], i.e. several hundred thousand dollars.

19.    Considering, to our knowledge, there is no precedent for an ADA upgrades program of this scale, the County cannot make a solid estimate of the timing that it will take to reach substantial completion on the project but anticipates it will take a few years.

20.    Given the scope and nature of the project, a conservative completion estimate would be 24-28 months. This estimate takes into consideration both a high-level engineering and construction sequencing approach. Carving a piece of work out of sequence is not recommended or the best practice to follow, for the reasons noted above.

21.    Piece-meal fixes applied without consideration given to "path of travel" needs, which criss-cross the area in question for multiple paths, users, and needs, will simply slow down County progress, by diverting County staff, architect, and contractor resources from implementing the comprehensive remediation of accessibility issues and violations present within CCDOC. Application of remediation without consideration of such higher-level issues poses the problem of potentially needing to redo the same work in the future, or potentially even subjects the County to additional lawsuits if issues arise.

---

[2] *Walker v. Dart, et al.*, 20-cv-00261, another matter pending before this court, currently at the Summary Judgment stage, involves an access ramp (the "Cermak ramp") located within the basement level pedestrian tunnel serving the Cermak Health Services Facility. The RTU ramp leads directly to the Cermak ramp and they are of comparable size.

7

Exhibit 1 Page 7

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on May 23, 2024   By: _____

                Eric Davis