Transcript of the Testimony of
**SABRINA RIVERO-CANCHOLA**

**Date:** June 5, 2017

**Case:** POLLETTA VS. DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NICHOLAS POLLETTA,           )
                             )
           Plaintiff,        )
                             )
     vs.                     ) No. 16 C 9492
                             )
THOMAS DART SHERIFF OF       )
COOK COUNTY, and COOK        )
COUNTY, ILLINOIS,            )
                             )
           Defendants.       )

    The deposition of SABRINA RIVERO-CANCHOLA,
called for examination pursuant to the Rules of
Civil Procedure for the United States District
Courts pertaining to the taking of depositions,
taken before EMILY TOMALA, CSR, a notary public
within and for the County of Cook and State of
Illinois, at 10150 South Western Avenue,
Chicago, Illinois, on the 5th day of June, 2017,
at the hour of 10:00 o'clock a.m.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 2

 1   APPEARANCES:
 2       THOMAS G. MORRISSEY, LTD.
 3       BY:  MR. THOMAS G. MORRISSEY
             MR. PATRICK W. MORRISSEY
 4       10150 South Western Avenue
         Chicago, Illinois  60643
 5       (773) 233-7900
         tgmassistant@gmail.com
 6
 7           Representing the Plaintiff;
 8       STATE'S ATTORNEY OF COOK COUNTY, ILLINOIS
 9       BY:  MR. JAMES E. NICHOLS
         50 West Washington Street
10       Room 500
         Chicago, Illinois  60602
11       (312) 603-3474
         james.nichols2@cookcountyil.gov
12
13           Representing Sheriff of Cook County;
14       STATE'S ATTORNEY OF COOK COUNTY, ILLINOIS
15       BY:  MR. DAVID R. CONDRON
         500 Richard J. Daley Center
16       Chicago, Illinois  60602
         (312) 603-3368
17       David.Condron@cookcountyil.gov
18           Representing Cook County, Illinois.
19
20
21
22
23
24

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 3

 1               I N D E X
 2   WITNESS                      EXAMINATION
 3   SABRINA RIVERO-CANCHOLA
 4     By Mr. Morrissey:             4-186
 5
 6
 7
 8
 9
10
11             E X H I B I T S
     NUMBER                      MARKED FOR ID
12   Plaintiff's Exhibit Nos. 1-7      4
13
14
15
16
17
18
19
20
21
22
23
24

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 1

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 4

```
 1              (Whereupon, Plaintiff's
 2              Exhibit Nos. 1-7 were marked
 3              for identification.)
 4              SABRINA RIVERO-CANCHOLA,
 5  having been first duly sworn, was examined and
 6  testified as follows:
 7              DIRECT EXAMINATION
 8  BY MR. MORRISSEY:
 9      Q.  Would you state your full name for the
10  record?
11      A.  Sabrina Rivero-Canchola.
12      Q.  Spell your last name, please.
13      A.  R-i-v-e-r-o, hyphen, C-a-n-c-h-o-l-a.
14          MR. NICHOLS:  Before we get into the
15  deposition, I just want to make something
16  clear for the record.  The witness and the
17  counsel for Cook County and Sheriff Dart
18  arrived here at 10:00 a.m. this morning for
19  the deposition which was noticed to begin at
20  10:00 a.m. However, plaintiff's counsel was
21  not prepared to commence the deposition at
22  10:00 a.m., so we are commencing the
23  deposition at approximately 10:42 a.m.
24          MR. MORRISSEY:  And just for the
```

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 5

```
 1  record, plaintiff about 6 weeks ago noticed
 2  up Matthew Burke to be deposed.  This matter
 3  was addressed by Judge Shadur on the status.
 4  Defense counsel asked Judge Shadur if they
 5  could substitute Ms. Canchola in place of
 6  Matt Burke, and the judge provisionally
 7  allowed that based upon certain
 8  representation by defense counsel at status.
 9  We reserve the right to depose Matt Burke if
10  necessary.  And, additionally, Judge Shadur
11  made it quite clear that to the extent that
12  Ms. Canchola cannot speak for the sheriff's
13  office, we certainly reserve the right to
14  depose Mr. Burke who is apparently the chief
15  of staff of the sheriff's office.
16  BY MR. MORRISSEY:
17      Q.  Will you please tell us, Ms. Canchola,
18  what, if anything, you reviewed prior to today's
19  deposition in regards to this litigation?
20      A.  I reviewed the documents that were
21  tendered to your office.
22      Q.  What documents were those?
23      A.  All the ones sitting right here on the
24  table, Mr. Morrissey, so grievances, orders, my
```

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 6

```
 1  emails.  Everything that had a Bates stamp, I
 2  reviewed.
 3      Q.  Did you also review Mr. Polletta's
 4  deposition transcript?
 5      A.  No, I did not.
 6      Q.  What are your responsibilities with the
 7  sheriff's office?
 8      A.  My responsibility is to make sure the
 9  sheriff's office complies with the Americans
10  With Disabilities Act.
11      Q.  Is there an interagency accommodation
12  plan committee at the Cook County Department of
13  Corrections?
14      A.  There is.
15      Q.  Who currently is on that committee?
16      A.  The makeup of the members depends on
17  the issue that will be discussed.
18      Q.  What different -- Strike that.
19          Have there been meetings in the last
20  6 months of the interagency accommodation plan
21  committee?
22      A.  There have been.
23      Q.  How many meetings in the last 6 months
24  have there been?
```

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 7

```
 1      A.  I don't recall.
 2      Q.  Are there minutes kept of those
 3  meetings?
 4      A.  There are not.
 5      Q.  In the last 6 months, what issues have
 6  been discussed at the interagency accommodation
 7  plan committee meetings?
 8          MR. NICHOLS:  Objection only to the
 9  extent that the question may call for the
10  witness to speculate.  You can answer if you
11  have any personal knowledge.
12  BY THE WITNESS:
13      A.  Any ADA issues that we were
14  experiencing along with transgender issues.
15  BY MR. MORRISSEY:
16      Q.  In the last 6 months, you mentioned
17  that there have been meetings of this committee.
18  Who has attended those meetings?
19      A.  A variety of different people.
20      Q.  Specifically who?
21      A.  Specifically people from Cermak and
22  people from the Department of Corrections.
23      Q.  What members of the Department of
24  Corrections attended meetings of this
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 2

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 8

1   interagency accommodation plan committee in the
2   last 6 months?
3       **A.    Myself and the transgender liaison.**
4       Q.    Who is the transgender liaison?
5       **A.    Diane Walsh.**
6       Q.    What is her position with the Cook
7   County Department of Corrections?
8       **A.    I do not know her specific title.**
9       Q.    What members from the Cermak staff have
10  attended accommodation plan committee meetings?
11      **A.    It varies.**
12      Q.    In the last 6 months, can you tell me
13  any members that have attended the interagency
14  accommodation plan committee meetings --
15      **A.    In the last 6 months, it has varied.**
16  **It's generally someone from medical and someone**
17  **from mental health.**
18      Q.    In the last 6 months, who from medical
19  has attended these committee meetings?
20      **A.    Generally, Dr. Elizabeth Feldman.**
21      Q.    What's her last name?
22      **A.    Feldman.**
23      Q.    In the last 6 months, how many meetings
24  have you been in with Dr. Feldman in regards to

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 9

1   ADA issues?
2       **A.    I don't recall.**
3       Q.    You also mentioned that somebody from
4   the psychology department has attended ADA
5   meetings?
6       **A.    Yes.**
7       Q.    What are their names?
8       **A.    It varies.**
9       Q.    In the last 6 months, what members from
10  either the psychiatry or psychology department
11  have attended interagency accommodation plan
12  committee meetings?
13      **A.    Dr. Gomez, Dr. Augustine, those are the**
14  **only names that I recall.**
15      Q.    When you attend -- prior to attending
16  an interagency accommodation plan committee
17  meeting, do you receive any type of alert that
18  there's going to be a meeting?
19      **A.    I receive a meeting invite.**
20      Q.    And that meeting invite, is that
21  through an email?
22      **A.    Yes, it is.**
23      Q.    Who is the person that generally plans
24  those meetings?

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 10

1       **A.    Diane Walsh.**
2       Q.    Who is Diane Walsh?
3       MR. NICHOLS:  Objection to the extent
4   the question has been asked and answered,
5   but you can answer to the extent you know.
6   BY THE WITNESS:
7       **A.    Once again, Diane Walsh is the**
8   **transgender liaison.**
9   BY MR. MORRISSEY:
10      Q.    You mentioned that the interagency
11  accommodation plan committee at times deals
12  with -- addresses ADA issues?
13      **A.    At times.**
14      Q.    In the last 6 months, have there been
15  any of these interagency committee meetings in
16  regards to ADA issues?
17      **A.    In the last 6 months, I don't recall.**
18      Q.    Is there anything that could refresh
19  your memory?
20      **A.    No.**
21      Q.    If you looked at emails from Diane
22  Walsh in regards to committee meetings, would
23  that refresh your memory?
24      **A.    No.**

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 11

1       Q.    Are there any papers or documents that
2   are generated from these meetings, interagency
3   committee meetings?
4       **A.    Diane Walsh generates a list of her**
5   **detainees that she wishes to discuss.  That's**
6   **the only document.**
7       Q.    Can you briefly describe your duties as
8   the ADA compliance officer?
9       **A.    My duties are to make sure that the**
10  **sheriff's office complies with the Americans**
11  **With Disabilities Act and all that that**
12  **encompasses.**
13      Q.    What do you do as the ADA compliance
14  officer?
15      **A.    I meet with detainees who are issued a**
16  **specific alert for an auxiliary aid.  I answer**
17  **grievances.  I arrange court transports.  I do a**
18  **variety of different things.**
19      Q.    As the ADA compliance officer, do you
20  at times develop and implement policy and
21  procedures to aid -- to assist people with
22  disabilities?
23      **A.    At times.**
24      Q.    Is there a committee or a group at the

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 3

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 12

1   Department of Corrections that's responsible for
2   developing and implementing policies and
3   procedures to accommodate people with
4   disabilities?
5       **A.   The interagency plan accommodation**
6   **committee when necessary would be the group that**
7   **would do that.**
8       Q.   In the last 6 months, have you worked
9   on any policies or procedures with the
10  Department of Corrections in regards to people
11  with disabilities?
12      **A.   Define policies and procedures.**
13      Q.   Does the sheriff's office have policies
14  and procedures?
15      MR. NICHOLS:  Objection to the extent
16      the question is vague, but you can answer.
17  BY MR. MORRISSEY:
18      Q.   Are there sheriff's policies directed
19  toward individuals that need assistance with
20  wheelchairs?
21      **A.   Sure there are.**
22      Q.   Are there written policies that address
23  procedures and policies in regards to assisting
24  wheelchair-assisted prisoners going up and down

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 13

1   the ramps at the Leighton court building?
2       MR. NICHOLS:  Objection, relevance.
3       You can answer to the extent that you know.
4   BY THE WITNESS:
5       **A.   Yes, there are, Tom.**
6   BY MR. MORRISSEY:
7       Q.   Are there written procedures and
8   policies addressing assisting prisoners who use
9   canes, crutches, and walkers going up and down
10  the ramps at the Leighton court building?
11      **A.   There are written policies addressing**
12  **assisting any detainee that needs to be**
13  **assisted.**
14      Q.   My question is specific to prisoners at
15  the Cook County Department of Corrections that
16  use canes, crutches, and walkers.  Is there any
17  specific written policy or procedure that
18  addresses assisting those individuals going up
19  and down the ramps at Leighton?
20      MR. NICHOLS:  Objection to the extent
21      the question has been asked and answered.
22      You can answer.
23
24

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 14

1   BY THE WITNESS:
2       **A.   The policy states that members will**
3   **provide assistance to detainees with**
4   **disabilities.  That could include those with**
5   **canes, crutches, and walkers.**
6   BY MR. MORRISSEY:
7       Q.   What policy are you referring to?
8       **A.   I'm referring to both policies,**
9   **sheriff's order and the general order.**
10      Q.   In the last 6 months, to your
11  knowledge, has there been any change in the
12  written policies in regards to assisting
13  prisoners who use canes, crutches, and walkers?
14      **A.   To my knowledge, no.**
15      Q.   You referred to, I believe, a general
16  order in regards to nondiscrimination on the
17  basis of disability and a sheriff's order in
18  regards to communication and interaction with
19  individuals with disabilities; is that what
20  you're referring to?
21      **A.   Correct.**
22      Q.   Are there any other general orders or
23  sheriff's orders that you're aware of that deal
24  with issues involving people with disabilities?

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 15

1       **A.   Those are the orders that I'm aware of.**
2       Q.   I'm showing you what's been marked as
3   Plaintiff's Exhibit No. 2 and ask you to take a
4   look at the general order and sheriff's order.
5   Have you had an opportunity to look at the
6   sheriff's order which is -- I'm sorry -- general
7   order 24.14.8.0?
8       **A.   I have.**
9       Q.   Have you also had a chance to look at
10  sheriff's order 11.14.35.0?
11      **A.   I have.**
12      Q.   Now, the questions that I'm asking you
13  in regards to both the general order and that
14  sheriff's order pertain to disabled individuals
15  that use either a crutch, walker, or a cane.  In
16  regards to general order 24.14.8, can you please
17  direct me in that document where it addresses
18  providing an accommodation for assistance to
19  those individuals when they go up and down the
20  ramp leading to the Leighton courthouse?
21      MR. NICHOLS:  Objection only to the
22      extent that the question is vague.  Tom,
23      what is it that you are talking about?
24

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 4

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 16

1  BY MR. MORRISSEY:
2      Q.   Do you understand the question?
3      A.   **Could you rephrase it?**
4      Q.   Sure.  Looking at the general order in
5  Exhibit No. 2, I would ask you to direct me to
6  any language in that general order that deals
7  with providing assistance or accommodation to
8  prisoners who use a cane, walker, or a crutch
9  when they go up and down the ramp leading to the
10  Leighton courthouse?
11      A.   **Well, it's right in the purpose and**
12  **policy, Tom.  It's the policy of the CCDOC to**
13  **comply with the Americans With Disabilities Act**
14  **and to not discriminate on the basis of**
15  **disability.**
16      Q.   Is there any other spot in that order
17  that deals with it?
18      A.   **That deals with nondiscrimination?  The**
19  **whole order is about that.**
20      Q.   No, specifically my question deals with
21  the Leighton ramp that leads to the court
22  building at Leighton.  Is there any language in
23  the general order specifically that deals with
24  providing assistance or accommodations to

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 17

1  prisoners that use a walker or cane or crutch to
2  ambulate?
3      A.   **It does not list an exhaustive -- a**
4  **list of auxiliary aids, but that's the purpose**
5  **and the spirit of the order is to provide**
6  **assistance.**
7      Q.   I'm going to show you -- I'll ask you
8  the same question in regards to the sheriff's
9  order which is attached to Exhibit 2, the
10  sheriff's order 11.14.35.0.  Where specifically
11  in the sheriff's order does it address providing
12  assistance or accommodation to prisoners using a
13  walker, cane, or crutch when they go up or down
14  the ramp leading to the Leighton courthouse?
15      A.   **Again, it's in the purpose and policy**
16  **that we will not discriminate on the basis of**
17  **disability, and stated in initial and immediate**
18  **considerations, members shall provide reasonable**
19  **accommodations for individuals who have mobility**
20  **disabilities including subjects who require**
21  **appropriate means of transport.**
22      Q.   Where are you reading from?
23      A.   **Section 8 of the sheriff's order.**
24      Q.   So you're at Roman numeral VIII(B); is

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 18

1  that correct?
2      A.   **Yes.**
3      Q.   Now I'm going to ask you to take a look
4  at the defendant's answer to plaintiff's
5  supplement to the complaint.  It's Exhibit
6  No. 3.  Have you seen the defendant's answer to
7  plaintiff's supplement to Mr. Polletta's
8  complaint?
9      A.   **Have I seen the document you just**
10  **handed to me?**
11      Q.   Yes.
12      A.   **I don't recall if I have seen it prior**
13  **to today.**
14      Q.   Drawing your attention to --
15      MR. NICHOLS:  One moment.  Please take
16  a few minutes to review the document.
17      MR. MORRISSEY:  Sure.  Take your time.
18  BY MR. MORRISSEY:
19      Q.   Have you had an opportunity now to
20  review the defendant's answer to the supplement?
21      A.   **Yes, I have.**
22      Q.   As the ADA compliance officer, are you
23  familiar with the 2 ramps that lead to the
24  Leighton court building?

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 19

1      A.   **I am.**
2      Q.   And are you aware that Judge Gettleman
3  found those ramps not to comply with the ADA --
4      MR. NICHOLS:  Objection to the extent
5  the question is vague.  I'm not really sure
6  how this relates.  Please rephrase.
7  BY MR. MORRISSEY:
8      Q.   Do you understand the question?
9      A.   **I wasn't present for Gettleman's order.**
10  **I'm not aware of the specific language.**
11      Q.   If we take a look at Sheriff Dart's
12  answer to number 9, he admits that he's aware
13  that Judge Gettleman found the ramp does not
14  comply with the ADA slope or landing
15  requirements?
16      MR. NICHOLS:  Objection.  I just want
17  to make it very clear for the record that
18  any admissions or any answers provided in
19  this document are from the sheriff -- from
20  Sheriff Dart's office, not Sheriff Dart in
21  his individual capacity.  So I just want to
22  make that clear for the rest of the
23  deposition.  Any references to Sheriff Dart
24  are referring to the office and not the

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 5

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 20

1  sheriff individually as there are no claims
2  against Sheriff Dart in his individual
3  capacity.
4  BY MR. MORRISSEY:
5      Q.  Can you answer the question?
6      A.  Can you repeat the question?
7      Q.  The office of the sheriff -- the answer
8  to number 9 that the office of the sheriff is
9  aware based upon Judge Gettleman's ruling in
10 Lacy vs. Dart is that the Leighton ramps do not
11 comply with the current ADA slope or landing
12 requirements, correct?
13     A.  We are aware of Gettleman's opinion.
14     Q.  Individuals or prisoners at the Cook
15 County Jail who use canes, crutches, and walkers
16 are required to go up and down those ramps when
17 they attend court at Leighton?
18     A.  At times, yes.
19     Q.  When you referred me to the sheriff's
20 order, Roman numeral VIII(B), members shall
21 provide reasonable accommodations for
22 individuals who have mobility disabilities
23 including subjects who require appropriate means
24 of transportation to and from court hearings,

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 21

1  to your knowledge, what reasonable
2  accommodations are provided to prisoners using
3  crutches, canes, and walkers going up and down
4  the ramps leading to the Leighton court
5  building?
6      A.  To my knowledge, no one that falls in
7  this category has requested an accommodation.
8      Q.  My question isn't directed to whether
9  or not a person or persons using a cane, crutch,
10 or walker has requested accommodations to go up
11 and down the ramp at Leighton.  That's not my
12 question.  My question, however, is, what
13 reasonable accommodations -- Strike that.
14     What policies and procedures are in place
15 to -- Strike that.
16     My question in regards to this issue is,
17 what reasonable accommodations are currently in
18 place in the sheriff's office for individuals
19 who use a cane, crutch, or walker when they go
20 up and down the ramps leading to the Leighton
21 courthouse?
22     MR. NICHOLS:  Objection to the extent
23 the question has been asked and answered.
24 You can answer.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 22

1  BY THE WITNESS:
2      A.  Again, Mr. Morrissey, our policies
3  provide that we will make reasonable
4  modifications to procedures, policies, services
5  to accommodate those who need an accommodation.
6  No such accommodation has been requested.
7  BY MR. MORRISSEY:
8      Q.  What procedures or policies are
9  currently in place to assist prisoners using a
10 walker, cane, or crutches when they go up and
11 down the ramps leading to the Leighton
12 courthouse?
13     MR. NICHOLS:  Objection to the extent
14 the question has been asked and answered.
15 You can answer.
16     MR. CONDRON:  I'll join.
17 BY THE WITNESS:
18     A.  Again, Mr. Morrissey, no one has made
19 such a request for an accommodation, so I can't
20 speculate at this time.
21 BY MR. MORRISSEY:
22     Q.  So are you speaking as the sheriff's
23 representative when you say apparently that at
24 the present time, there has not been any

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 23

1  procedure or policy put in place in regards to
2  providing a reasonable accommodation for
3  prisoners using either a walker, crutches, or
4  cane when they go up and down the ramps leading
5  to the Leighton courthouse?
6      MR. NICHOLS:  Objection only to the
7  extent that this deposition was noticed upon
8  Ms. Rivero-Canchola in her individual
9  capacity as an employee of the sheriff, not
10 under Rule 30(b)(6).  You can answer the
11 question to the extent that you know.
12 BY THE WITNESS:
13     A.  Well, Mr. Morrissey, you misstate my
14 previous testimony which is no such
15 accommodation has ever been requested.  There
16 are procedures in place and policies in place to
17 make reasonable modifications to any policy,
18 procedure, or service.  No such request has been
19 made of us, so we can't speculate on what we
20 would do at this time.
21 BY MR. MORRISSEY:
22     Q.  As the ADA coordinator, can you tell
23 us what -- tell us how you could provide a
24 reasonable accommodation for a person who uses a

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 6

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 24

```
 1    crutch, a walker, or cane that's going up and
 2    down the ramps leading to the Leighton
 3    courthouse?
 4             MR. CONDRON:  Objection to the extent
 5        it calls for speculation.
 6    BY THE WITNESS:
 7        A.   Once again, I would have to speculate
 8    since no such request has ever been made, but we
 9    could obtain a wheelchair and assist that person
10    up the ramp if necessary.  We could also take
11    them up the staircase through the south elevator
12    and around to the north side if their courtroom
13    is on the north side of Leighton.  There are
14    accommodations that can be made if such
15    accommodations were requested.
16    BY MR. MORRISSEY:
17        Q.   Now, you mentioned -- going back a
18    step, would it be a fair statement to say as the
19    ADA coordinator, currently there is no procedure
20    or policy in place in regard to a specific
21    accommodation for individual prisoners who use a
22    walker, cane, or crutch going up or down the
23    ramp at Leighton because there's never been a
24    request for an accommodation?
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 25

```
 1             MR. NICHOLS:  Objection, form,
 2        objection, misstates previous testimony,
 3        objection, calls for the witness to
 4        speculate.  To the extent you understand the
 5        question, you can answer.
 6    BY THE WITNESS:
 7        A.   As I previously answered, no
 8    accomodation request has ever been made
 9    regarding canes, crutches, and walkers on the
10    Leighton ramp.  If they had been made, we would
11    make reasonable modifications.
12    BY MR. MORRISSEY:
13        Q.   And you're suggesting at this
14    deposition that for prisoners -- and by
15    prisoners throughout this deposition, I'm
16    talking about canes, crutches, and walkers,
17    those type of prisoners with disabilities, that
18    prisoners that attend the courtrooms on the
19    north side of Leighton, that they could go up a
20    staircase to access the Leighton court building?
21        A.   That's incorrect.  That's not what I
22    said.  What I said is they can go up the
23    staircase and access the south side of the ramp
24    and be taken up the south side elevator and walk
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 26

```
 1    through the public areas to the north side if
 2    such a request was made.
 3        Q.   What staircase are you referring to?
 4        A.   I'm referring to the staircase on the
 5    bridge.  There's only one.
 6        Q.   And that's on the north side of the
 7    bridge; is that correct?
 8        A.   No.
 9        Q.   Where is that -- where in relation to
10    the ramps is that staircase?
11        A.   Right on the outside of the ramp, next
12    to one of the bullpens.
13        Q.   Do you know if that staircase -- how
14    many steps are there?
15        A.   I don't know.
16        Q.   Do you know if that staircase is
17    accessible for a person with disabilities?
18             MR. NICHOLS:  Objection to the extent
19        that the question calls for a legal
20        conclusion and to the extent that it calls
21        for the witness to speculate, but you can
22        answer to the extent that you know.
23    BY THE WITNESS:
24        A.   I don't know.
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 27

```
 1    BY MR. MORRISSEY:
 2        Q.   Do you know if there's railings for a
 3    person with crutches, walker, or canes to use in
 4    that staircase?
 5        A.   I don't recall.
 6        Q.   You also mentioned that a possible
 7    reasonable accommodation for the prisoners that
 8    are at issue here would be to allow those
 9    prisoners to use a wheelchair to go up and down
10    the ramps?
11        A.   Possibly.
12        Q.   As you sit here today, is there any
13    pilot program in place to provide prisoners
14    using canes, crutches, or walkers to go up the
15    ramp in a wheelchair?
16        A.   No.
17        Q.   Is there any pilot -- and by pilot, I
18    mean, any steps taken in the last 2 months by
19    pilot so we understand the terminology -- is
20    there any pilot program in place currently to
21    allow prisoners with canes, crutches, and
22    walkers to go up the staircase in proximity to
23    the ramps in order to access the Leighton court
24    building?
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 7

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 28

1    A.   No.

2    Q.   Has there been any discussion to your

3  knowledge in the sheriff's office to allow

4  prisoners who use canes, crutches, or walkers to

5  go up the ramps in a wheelchair?

6         MR. NICHOLS:  Objection to the extent

7    the question has been asked and answered.

8    You can answer.

9  BY THE WITNESS:

10   A.   We've discussed it with our attorneys.

11 BY MR. MORRISSEY:

12   Q.   When you say we, what nonlawyers have

13 you discussed it with?

14   A.   None.

15   Q.   None?

16   A.   None.

17   Q.   When you say we, do you mean you

18 include people who have a legal education that

19 are not acting in the capacity in this lawsuit

20 as an attorney?

21   A.   Correct.

22   Q.   Have you discussed that with Matt

23 Burke?

24   A.   I don't recall.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 29

1    Q.   Is Matt Burke your direct supervisor?

2    A.   Yes, he's one of them.

3    Q.   Do you know a gentleman by the name of

4  Mr. Corso (phonetic)?

5    A.   I do.

6    Q.   Is Mr. Corso employed by the sheriff?

7    A.   He is.

8    Q.   In what capacity?

9    A.   He's the deputy chief of staff.

10   Q.   Is he under Mr. Burke?

11   A.   He is.

12   Q.   Have you discussed this issue with

13 Mr. Corso?

14   A.   I have not.

15   Q.   In regards to -- is there any other

16 language in either the general order or the

17 sheriff's order in Exhibit 2 that deals with

18 providing accommodations -- reasonable

19 accommodations for prisoners using canes,

20 walkers, or crutches going up or down the ramps

21 leading to the Leighton courthouse?

22   A.   Other than the areas I already

23 indicated to you, no.

24   Q.   Now, in Exhibit 2, there's specific

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 30

1  language in regards to providing a reasonable

2  accommodation for wheelchair users going up and

3  down ramps, correct?

4         MR. NICHOLS:  Objection only to the

5    extent it's vague.  What

6    specifically -- where are we in the exhibit,

7    Tom?

8         MR. MORRISSEY:  I'm asking a general

9    question, Mr. Nichols.

10        MR. NICHOLS:  I like to be grounded

11   here in the exhibit.  If you're referring to

12   the exhibit, just specify what you're

13   talking about.

14        MR. MORRISSEY:  I'm referring to the

15   sheriff's order.

16 BY MR. MORRISSEY:

17   Q.   In the sheriff's order, it addresses

18 providing assistance to wheelchair-assisted

19 prisoners going up and down ramps, correct?

20   A.   Correct.

21   Q.   To your knowledge, why isn't there a

22 written order specifically addressing

23 individuals that use crutches, canes, walkers

24 when they go up or down ramps in Cook County

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 31

1  sheriff office facilities?

2         MR. NICHOLS:  Objection to the extent

3    the question misstates the witness' previous

4    testimony.  You can answer.

5  BY THE WITNESS:

6    A.   I don't know, Mr. Morrissey.

7  BY MR. MORRISSEY:

8    Q.   Do you know what the term alerts means

9  at the Cook County Jail?

10        MR. NICHOLS:  Objection, vague.

11 BY MR. MORRISSEY:

12   Q.   Let me rephrase it.  Are you aware that

13 in the Cook County Jail management system, there

14 are medical alerts?

15   A.   I am.

16   Q.   What are medical alerts?

17   A.   Exactly as you stated.  It's an alert

18 for medical.

19   Q.   Are you aware of the procedure when an

20 individual with a disability enters the Cook

21 County Department of Corrections?

22        MR. NICHOLS:  Objection, vague as to

23   time frame, and that's basically it.  You

24   can answer to the extent that you know.

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 8

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 32

1  BY THE WITNESS:
2      A.   As to what specifically?
3  BY MR. MORRISSEY:
4      Q.   When a person enters the jail with a
5  disability, do you know whether or not the
6  medical staff places medical alerts in the jail
7  management system?
8      A.   I know that a medical staff member
9  places the alerts.  I do not know at what stage
10 that occurs.
11     Q.   As the ADA coordinator, what, if any,
12 role do you play when a person comes into the
13 jail with a medical alert that he or she has a
14 disability?
15         MR. NICHOLS:  Objection to the extent
16     it mischaracterizes the witness' previous
17     testimony.  You can answer to the extent you
18     know.
19 BY THE WITNESS:
20     A.   With regard to what?
21 BY MR. MORRISSEY:
22     Q.   Assuming a person comes into the Cook
23 County Department of Corrections and is deaf, do
24 you receive any notification of that as the ADA

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 33

1  coordinator?
2          MR. NICHOLS:  Objection, relevance.
3  BY THE WITNESS:
4      A.   Define notification.
5  BY MR. MORRISSEY:
6      Q.   Do you have any responsibility if a
7  person comes into the jail and a medical person
8  at Cermak puts into the system the person has a
9  disability, namely, let's say, blindness or
10 deafness?
11         MR. NICHOLS:  Objection, form,
12     objection, relevance.
13 BY THE WITNESS:
14     A.   I run a query to find out what inmates
15 recently enter the jail with certain alerts.
16 BY MR. MORRISSEY:
17     Q.   And that's a query in the jail
18 management system?
19     A.   Correct.
20     Q.   How frequently as the ADA coordinator
21 do you run such a query?
22     A.   At a minimum, every day.
23     Q.   What type of query do you run in the
24 jail management system to determine whether or

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 34

1  not there are new admitees at the jail that have
2  disabilities?
3      A.   What type of query?
4      Q.   Yeah.
5      Q.   As in?
6      Q.   What do you actually do?
7      A.   I hit a button.
8      Q.   And what does that button pull up?
9      A.   It pulls up a list of inmates that are
10 deaf, blind, hard of hearing, have a wheelchair,
11 wheelchair for long distance only.
12     Q.   Where is your office at the Cook County
13 Jail?
14     A.   It's in Division 5.
15     Q.   Is that on the second floor?
16     A.   Yes, it is.
17     Q.   What do you do on a daily basis when
18 you run an inquiry to determine if there are any
19 new admitees that are deaf, blind, wheelchair,
20 or wheelchair long distance?
21     A.   I meet with all new detainees with
22 those alerts.
23     Q.   Do you make any entry in any type of
24 spreadsheet or log to reflect that a person

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 35

1  who's deaf has been admitted to the jail?
2          MR. NICHOLS:  Objection, relevance.
3  BY THE WITNESS:
4      A.   I keep a log of detainees that fit into
5  those categories, yes.
6  BY MR. MORRISSEY:
7      Q.   What do you call that log?
8          MR. NICHOLS:  Objection, relevance.
9          MR. CONDRON:  I'll join.
10 BY THE WITNESS:
11     A.   Detainee list.
12 BY MR. MORRISSEY:
13     Q.   Is there any type of computer program
14 that you place those names in?
15         MR. NICHOLS:  Objection, relevance.
16 BY THE WITNESS:
17     A.   I'm pretty sure you know the answer to
18 these questions, Mr. Morrissey, but, yes, it's
19 an Excel program.
20 BY MR. MORRISSEY:
21     Q.   And in that Excel program, it contains
22 a list only of people that are deaf, blind,
23 wheelchair, or wheelchair long distance; is that
24 correct?

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 9

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 36

```
1            MR. NICHOLS:  Objection, relevance.
2   BY THE WITNESS:
3       A.   I don't recall.
4   BY MR. MORRISSEY:
5       Q.   In addition to -- are there any other
6   categories of prisoners that you list in this
7   log in an Excel program?
8       A.   At times, I've listed prosthetic
9   devices.
10      Q.   What do you call this log or Excel
11  program?
12           MR. NICHOLS:  Objection, relevance, and
13      asked and answered.
14  BY THE WITNESS:
15      A.   As I previously stated, it's called
16  detainee list.
17  BY MR. MORRISSEY:
18      Q.   What type of information is in the
19  detainee list?
20           MR. NICHOLS:  Objection, relevance.
21  BY THE WITNESS:
22      A.   Name of detainee, booking number,
23  security classification, housing, court minutes,
24  next court date.
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 37

```
1   BY MR. MORRISSEY:
2       Q.   Why do you keep information in regards
3   to next court date for these inmates?
4            MR. NICHOLS:  Objection, relevance.
5   BY THE WITNESS:
6       A.   So that we can notify the respective
7   courthouses that they have a detainee coming
8   that may have an auxiliary aid or a need for
9   accommodation.
10  BY MR. MORRISSEY:
11      Q.   I'm showing you what's been marked as
12  Plaintiff's Exhibit No. 4.  It's a group
13  exhibit.  Before we get to Exhibit No. 4, do you
14  know a gentleman by the name of Mr. Polletta?
15      A.   I do.
16      Q.   When did you first make contact with
17  Mr. Polletta, if you recall?
18      A.   I don't recall, quite some time ago.
19      Q.   Why did you have contact with
20  Mr. Polletta?
21      A.   For the same reason I have contact with
22  all detainees, it's my job.
23      Q.   On how many occasions have you met with
24  Mr. Polletta?
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 38

```
1       A.   I don't recall.
2       Q.   When Mr. Polletta first came into the
3   Cook County Jail, did he have a medical alert?
4       A.   I don't know.  I wasn't there when he
5   first came in.
6       Q.   Looking at Group Exhibit No. 4, the
7   first sheet is a list of wheelchair-accessible
8   beds at CCDOC.  Is this a list that you
9   prepared?
10      A.   No, it's not a list that I prepared.
11      Q.   Do you know who prepared it?
12      A.   I do not.
13      Q.   The second page is inmate alerts, and
14  the name of the inmate is Nicholas Polletta.  Do
15  you see that?
16           MR. NICHOLS:  I'm just going to ask
17      that the witness be given some time to
18      review this document before you proceed.
19           MR. MORRISSEY:  I'm just going through
20      Exhibit No. 4.
21  BY MR. MORRISSEY:
22      Q.   Is that what you consider an inmate
23  alert?
24      A.   There are different types of inmate
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 39

```
1   alerts.  There are some listed on this page,
2   yes.
3       Q.   And the third page looks like various
4   court dates for Mr. Polletta, correct?
5       A.   Correct.
6       Q.   As an ADA coordinator, is this the type
7   of information that you maintain in your Excel
8   program?
9            MR. NICHOLS:  Do you understand that
10      question?
11           THE WITNESS:  Yes.
12  BY THE WITNESS:
13      A.   Some of it.
14  BY MR. MORRISSEY:
15      Q.   And the fourth page is bed assignment.
16  Do you receive information in regards to bed
17  assignment for certain disabled prisoners?
18           MR. NICHOLS:  Objection, vague,
19      objection, relevance.
20  BY THE WITNESS:
21      A.   Do I receive information?  No.  I can
22  query that data.
23
24
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 10

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 40

```
1   BY MR. MORRISSEY:
2       Q.   And you would query it in the jail
3   management system?
4            MR. NICHOLS:  Same objections.  You can
5       answer.
6   BY THE WITNESS:
7       A.   Correct.
8   BY MR. MORRISSEY:
9       Q.   Now, looking at the second page of
10  Group Exhibit No. 4 which has been Bates stamped
11  by the sheriff 0011, does this reflect at some
12  point in time there was a medical alert for
13  Mr. Polletta to have a wheelchair?
14      A.   Does this sheet reflect that?  Yes.
15      Q.   And that's on May 14, 2015?
16      A.   Yes.
17      Q.   And then he had a medical alert for a
18  wheelchair through April of 2016?
19      A.   Through April 2016?  This alert says
20  May 14, 2015, through August 6, 2015, and
21  August 12, 2015, through September 9, 2015.
22      Q.   And after August 9, 2015, did he also
23  have a medical alert for some type of assistive
24  device to walk?
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 41

```
1       A.   Yes, a walker as you can see from this
2   document, Mr. Morrissey.
3       Q.   So the walker is specified on
4   December 28; is that correct?  I'm sorry.
5   September 15, 2015, is the first time he
6   received a walker?
7       A.   Is that the first time the alert was
8   entered?  Yes.
9       Q.   And then it was entered again
10  December 28, 2016?
11      A.   Correct.  The document speaks for
12  itself.
13      Q.   And on December 29, 2016, he received
14  an alert for a cane long distance only, correct?
15      A.   Correct.
16      Q.   These alerts for a wheelchair, walker,
17  or cane long distance to your understanding are
18  made by the medical personnel at Cermak?
19      A.   Correct.  That's why they're called
20  medical alerts.
21      Q.   As an ADA coordinator, you have access
22  to this information?
23      A.   As I previously stated, yes, I do.
24      Q.   If Mr. Polletta came into the jail on
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 42

```
1   December 29, 2016, as a new prisoner and had an
2   alert for a cane long distance only, you
3   wouldn't include that in your detainee list in
4   the Excel program?
5            MR. NICHOLS:  Objection.  The question
6       calls for the witness to speculate,
7       objection, form to the extent it poses an
8       incomplete hypothetical.  You can answer to
9       the extent that you know.
10  BY THE WITNESS:
11      A.   Hypothetically I don't know.
12  BY MR. MORRISSEY:
13      Q.   As a matter of practice, your Excel
14  program detainee list for new inmates who have
15  an alert for a cane, crutch, or walker normally
16  does not include those type of inmates?
17           MR. NICHOLS:  Objection, vague.
18  BY THE WITNESS:
19      A.   Normally it doesn't, but that doesn't
20  mean I can't get that information just like
21  everyone else can.
22  BY MR. MORRISSEY:
23      Q.   During that period of time when
24  Mr. Polletta -- in the summer of 2015, was
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 43

```
1   Mr. Polletta transferred at some point to the
2   RTU?
3            MR. NICHOLS:  Objection to the extent
4       that the question calls for the witness to
5       speculate.
6            MR. MORRISSEY:  I'm asking her to look
7       at Exhibit No. 4.
8   BY MR. MORRISSEY:
9       Q.   Does that reflect that in the summer of
10  2014, that Mr. Polletta was assigned on June 4,
11  2015, to Division 08-2A-81?
12           MR. NICHOLS:  Objection, form,
13      specifically the question lists 2 different
14      time frames.  Can you rephrase the question,
15      Tom?
16           MR. MORRISSEY:  Mr. Nichols, we're
17      trying to move forward as quickly as
18      possible.
19           THE WITNESS:  You initially said 2014,
20      and then you changed your question.
21           MR. MORRISSEY:  I'm sorry.
22  BY MR. MORRISSEY:
23      Q.   June 11, 2015, was Mr. Polletta
24  assigned to 08-3F-D4-26?
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 11

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 44

1  A.  According to this document which speaks
2  for itself, yes, he was.
3     Q.  And then the same day, he was assigned
4  to 08-2A-81, correct?
5     A.  According to this document, yes.
6     Q.  And that would be cell 8 in 2A?
7     A.  Correct.
8     Q.  To your knowledge -- let me rephrase.
9  Currently to your knowledge -- Strike that.
10    Do you have knowledge in regards to
11 what cells in 2A in Division 08 in the RTU
12 currently have grab bars?
13    A.  Yes, I do as do you, Mr. Morrissey,
14 because you presented a list.
15    Q.  Currently in tier block 2A, is the only
16 cell that has grab bars cell number 10?
17    A.  On cell block 2A, yes, only cell 10 has
18 grab bars.
19    Q.  So the same would have been true in
20 June of 2015, that cell block 2A, cell 8, the
21 toilet in cell 8 did not have grab bars?
22       MR. NICHOLS:  Objection to the extent
23    the question calls for the witness to
24    speculate, but you can answer to the best of

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 45

1  your ability.
2  BY THE WITNESS:
3     A.  I wasn't there in June of 2015.
4  BY MR. MORRISSEY:
5     Q.  But currently there aren't grab bars in
6  cell 8?
7       MR. NICHOLS:  Objection, asked and
8    answered.  You can answer.
9  BY THE WITNESS:
10    A.  Currently as I previously stated only
11 cell 10 has grab bars on cell block 2A.
12 BY MR. MORRISSEY:
13    Q.  And then on July 14, he was transferred
14 to 3E in the RTU -- I'm sorry.  Strike that.
15    On 7/14/2015, he was in cell block 3E
16 in the RTU, cell 2; is that correct?
17    A.  He was in cell 10 and in cell 2.
18    Q.  But between July 14, 2015, and up
19 through May 23, 2016, he was in cell 2 and 3E,
20 correct?
21    A.  On July 14, he was in cell 10-X2 and
22 then moved to cell 2.
23    Q.  And he remained in cell 2 until, I
24 guess, December 8, 2015, correct?

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 46

1     A.  No.  He remained there until May 23,
2  2016, as this document states and it speaks for
3  itself.
4     Q.  Do you have any knowledge why on
5  July 14, 2015, he was removed from cell 10 in
6  cell block 3E to cell 2?
7     A.  I do not.  I wasn't there.
8     Q.  And does cell 10 in cell block 3E, the
9  RTU, does that have grab bars?
10    A.  It does.
11    Q.  And cell 2 doesn't have grab bars?
12    A.  Are we talking about currently?
13    Q.  I'm talking about -- well, currently
14 does it have grab bars?
15    A.  Currently, cell 2 does not.
16    Q.  And you're not aware of whether or not
17 in 2015 it had grab bars?
18    A.  Correct.
19    Q.  And then in August of 2016, you are the
20 ADA coordinator, correct?
21    A.  Around that time approximately.
22    Q.  And in the RTU on the fourth floor, 4A,
23 cell 5, in August of 2016, that cell didn't have
24 grab bars around the toilet, correct?

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 47

1     A.  Cell 5, no, it did not.
2     Q.  And in August of 2016 on 3E, cell
3  number 7 didn't have grab bars around the
4  toilet?
5     A.  No, it did not.
6     Q.  In Division 8, the RTU, on 4A, cell
7  number 9 in September of 2016 didn't have grab
8  bars around the toilet?
9     A.  No, it did not.
10    Q.  And also in September of 2016, RTU,
11 cell block 36 (sic), cell 2 didn't have grab
12 bars around the toilet?
13    A.  What cell block are you referring to?
14    Q.  3E, cell 2, there were no grab bars
15 around the toilet?
16    A.  Right.  As I previously stated, it did
17 not have grab bars.
18    Q.  And that would be true also in
19 September of 2016 for 3E, cell 1?
20    A.  Correct.
21    Q.  If a person with a disability who was
22 assigned to those cells in the RTU without grab
23 bars needed to use a toilet, what accommodation
24 was provided by the sheriff?

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 12

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 48

1    MR. NICHOLS:  Objection.  The question
2  is vague as to time frame.
3  BY MR. MORRISSEY:
4    Q.  During the time period in which
5  Mr. Polletta was in the RTU in 2015 through
6  September of 2016, my question is, if
7  Mr. Polletta needed to use an accessible toilet
8  in that time frame, what accommodation was made
9  by the sheriff?
10   A.  I can only answer to the time frame
11 that I was there, and your question states the
12 time frame that I wasn't there.
13   Q.  You were there in September of 2016?
14   A.  Right, but part of your question stated
15 before that time.
16   Q.  So is it fair to say -- when did you
17 become the ADA coordinator?
18   A.  I don't recall exactly, approximately
19 late August, early September.
20   Q.  Of 2015?
21   A.  Correct.
22   Q.  Prior to August of 2015, you have no
23 awareness in regards to what reasonable
24 accommodation was provided to disabled prisoners

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 49

1  in the RTU?
2    A.  I did not state that I have no
3  awareness.  I said I wasn't there.  We provided
4  reasonable accommodations for them to come out
5  and use the dayroom toilet if they state they
6  cannot use the toilet in their cell.
7    Q.  And that was prior to you becoming the
8  ADA coordinator?
9    A.  It's ongoing.
10   Q.  And currently if a prisoner is disabled
11 in the RTU and needs to use an accessible
12 toilet, what accommodation is provided by the
13 sheriff's office?
14   A.  It depends on where they're located.
15   Q.  If they're in the RTU in cell block
16 3A -- 3E, what reasonable accommodation is
17 provided for a wheelchairbound detainee who
18 wants to use a toilet?
19   MR. NICHOLS:  Objection, relevance.
20 BY THE WITNESS:
21   A.  If they cannot use the toilet that's in
22 their cell as I previously stated, they could
23 come out and use the dayroom toilet.
24

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 50

1  BY MR. MORRISSEY:
2    Q.  Would they have to knock on the door in
3  order to access the dayroom toilet?
4    MR. NICHOLS:  Objection, relevance.
5  BY THE WITNESS:
6    A.  They would have to notify someone
7  somehow, Mr. Morrissey.
8  BY MR. MORRISSEY:
9    Q.  Have you had the opportunity to review
10 Judge Kinnelly's opinion in Flora?
11   MR. NICHOLS:  Objection, relevance.
12 BY THE WITNESS:
13   A.  I have not reviewed it.
14 BY MR. MORRISSEY:
15   Q.  Are you aware of Judge Kinnelly's
16 ruling in Flora?
17   MR. NICHOLS:  Objection, relevance.
18   MR. CONDRON:  I'll join.
19 BY THE WITNESS:
20   A.  I'm vaguely aware of it.
21 BY MR. MORRISSEY:
22   Q.  After Judge Kinnelly found that
23 knocking on the door in the RTU in order to gain
24 access to a toilet was not equivalent access for

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 51

1  a wheelchairbound detainee, to your knowledge,
2  has the sheriff changed the procedures?
3    MR. NICHOLS:  Objection, relevance, and
4    objection to the extent that the question
5    calls for the witness to speculate on the
6    judge's opinion.  You can answer to the
7    extent that you know.
8  BY THE WITNESS:
9    A.  As I previously stated, that
10 accommodation remains in place.  It's ongoing.
11 BY MR. MORRISSEY:
12   Q.  Since May 17, 2017, after Judge
13 Kinnelly issued his opinion in Flora, have you
14 been in any meetings or discussions with
15 Mr. Burke or any other supervisors in the Cook
16 County Department of Corrections to change the
17 procedure in regards to where wheelchairbound
18 detainees are housed in the RTU?
19   MR. NICHOLS:  Objection, relevance and
20   objection to the extent that the question
21   calls for privileged information.  I'll
22   instruct my client not to discuss any
23   conversations she may have had with other
24   attorneys about Judge Kinnelly's opinion.

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 13

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 52

BY MR. MORRISSEY:

Q.   In regards to -- as an ADA coordinator
for the sheriff, since May 17, 2017, to the
present, are you aware of any procedural changes
to place wheelchairbound detainees in accessible
facilities in the RTU?

MR. NICHOLS:  Objection, relevance.

BY THE WITNESS:

A.   We've had discussions with our legal
team.

BY MR. MORRISSEY:

Q.   Other than your -- when you say we, who
do you include in that?

A.   I include myself and our legal team.

Q.   Have there been any steps by the
sheriff since May 17, 2017, to place
wheelchair-assisted detainees in ADA accessible
cells in the RTU?

MR. NICHOLS:  Objection, relevance.

BY THE WITNESS:

A.   We always attempt to do that,
Mr. Morrissey.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 53

BY MR. MORRISSEY:

Q.   What attempts -- what procedural
changes have occurred since Judge Kinnelly's
opinion on May 17, 2017, to house
wheelchair-assisted detainees in ADA cells?

MR. NICHOLS:  Objection, relevance.

BY THE WITNESS:

A.   As I previously stated, we always
attempt to do that.  There have been no
procedural changes.

BY MR. MORRISSEY:

Q.   Since Judge Kinnelly ruled on May 17,
2017, have there been any procedural changes in
the RTU to place prisoners who have medical
alerts for canes, crutches, or walkers in
accessible cells in the RTU?

A.   There have been no procedural changes.

Q.   When prisoners come into the Cook
County Jail and have medical alerts for canes,
crutches, or walkers, do you meet with those
prisoners as a matter of course?

MR. NICHOLS:  Objection to the extent
the question has been asked and answered.
You can answer.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 54

BY THE WITNESS:

A.   On occasion they come up to me when I'm
in the living units which is very frequently.

BY MR. MORRISSEY:

Q.   You mentioned that when a person comes
in with either an alert for a wheelchair or a
wheelchair long distance, it's your practice and
procedure to meet with them shortly after they
enter the Cook County Jail?

MR. NICHOLS:  Objection.  The question
is vague as to time frame.

BY THE WITNESS:

A.   As I previously stated, anyone that
comes in with the specific alerts that I already
mentioned, I do meet with.

BY MR. MORRISSEY:

Q.   But the specific alerts do not include
people with canes, crutches, or walkers?

MR. NICHOLS:  Objection.  The question
is vague as to time frame.

BY THE WITNESS:

A.   As I previously answered, they're not
listed on my log.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 55

BY MR. MORRISSEY:

Q.   Are prisoners that have medical alerts
for canes, crutches, or walkers housed in
Division 10?

A.   Occasionally, yes.

Q.   Are you familiar with Division 10?

A.   I am.

Q.   Have you ever been up on the second
floor in tier 2C in Division 10?

A.   I have been on the outside of tier 2C,
yes.

Q.   Do you know whether or not the showers
in 2C have benches for disabled individuals,
fixed benches?

A.   They do not have benches.

Q.   Do you know whether the showers in 2C
have grab bars?

A.   I don't believe they do.

Q.   Do you know if the showers in 2C have
lower -- the nozzles are lower so that a
disabled person can use the shower?

A.   I don't recall.

Q.   Are there any facilities in 2C in the
showers that are handicapped accessible under

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 14

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 56

```
 1   the ADA?
 2          MR. NICHOLS:  Objection to the extent
 3       the question calls for the witness to state
 4       a legal conclusion.  You can answer.
 5   BY THE WITNESS:
 6       A.  We provide a reasonable accommodation
 7   such as shower chairs to assist detainees who
 8   need such assistance.
 9   BY MR. MORRISSEY:
10       Q.  My question is, in the physical
11   structure of the shower in 2C, are there any
12   physical features in the showers that would be
13   considered ADA compliant?
14          MR. NICHOLS:  Objection to the extent
15       the question has been asked and answered and
16       objection to the extent the question calls
17       for the witness to state a legal conclusion.
18       You can answer to the extent you know.
19   BY THE WITNESS:
20       A.  To the extent that I know, we provide
21   reasonable accommodations such as shower chairs.
22   I'm not going to make a legal conclusion on
23   whether or not the shower is accessible.
24
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 57

```
 1   BY MR. MORRISSEY:
 2       Q.  In Division 10 other than 2C, are there
 3   tiers which also house prisoners that use canes,
 4   crutches, and walkers?
 5       A.  Yes.
 6       Q.  Do you know if the other tiers in
 7   Division 10 in the showers have fixed benches in
 8   compliance with the ADA?
 9          MR. NICHOLS:  Objection to the extent
10       the question is vague as to location.
11   BY MR. MORRISSEY:
12       Q.  I'm talking about Division 10 in the
13   tiers, the showers in the tiers, do they have
14   the required fixed benches for prisoners with
15   mobility difficulties?
16          MR. NICHOLS:  Again, the question is
17       vague as to location.  I'm not sure about
18       the relevance of the question.  We can go
19       off the record and have a discussion if you
20       want.
21          THE WITNESS:  Or the accuracy of the
22       statement that fixed benches are required
23       under 2010 standards.  I believe there's
24       also a standard for roll-in showers.
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 58

```
 1   BY MR. MORRISSEY:
 2       Q.  To your knowledge, do the showers in
 3   Division 10 in the tiers have fixed benches?
 4          MR. NICHOLS:  Objection, vague as to
 5       location and objection to the extent that it
 6       calls for irrelevant testimony.  You can
 7       answer.
 8   BY THE WITNESS:
 9       A.  To my knowledge, no.
10   BY MR. MORRISSEY:
11       Q.  Do the showers in Division 10 have grab
12   bars which are compliant with the ADA?
13          MR. NICHOLS:  Same objection.  You can
14       answer.
15   BY THE WITNESS:
16       A.  To my knowledge, they do not.
17   BY MR. MORRISSEY:
18       Q.  Do the showers in Division 10 have the
19   required height for the nozzles and the faucets?
20          MR. NICHOLS:  Same objection.  You can
21       answer.
22   BY THE WITNESS:
23       A.  I don't know.
24
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 59

```
 1   BY MR. MORRISSEY:
 2       Q.  In Division 9, you're familiar with
 3   Division 9?
 4       A.  Somewhat.
 5       Q.  Are prisoners that -- are some
 6   prisoners housed in Division 9 who use canes,
 7   crutches, and walkers?
 8          MR. NICHOLS:  Objection, relevance, and
 9       there are no claims to my knowledge in this
10       case about Division 9, so I'm actually going
11       to instruct my client not to answer that.
12          MR. MORRISSEY:  Mr. Polletta was housed
13       in Division 9.
14          MR. NICHOLS:  Yes, he was housed in
15       Division 9 prior to -- prior to him
16       suffering injury.
17          MR. CONDRON:  I'll join.
18          MR. NICHOLS:  And he has no claims
19       related to Division 9 at all.  I'm going to
20       ask you to move on from Division 9.
21          MR. MORRISSEY:  Mr. Nichols, to address
22       your concern, after Mr. Polletta was injured
23       in May of 2015, he was housed in Division 9.
24       I think it's relevant to this lawsuit.  Are
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 15

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 60

```
 1    you going to withdraw your objection?
 2         MR. NICHOLS:  I'm not withdrawing my
 3    objection because shortly after that, he had
 4    his surgery, and he was moved to the RTU.
 5    So, no, I'm not withdrawing the objection.
 6    There are no claims in this lawsuit about
 7    Division 9.  Mr. Polletta is not seeking
 8    compensatory damages for his time in
 9    Division 9.  There's no basis for you to be
10    asking questions about Division 9 at all in
11    this lawsuit.  So I think you should move
12    on.
13    BY MR. MORRISSEY:
14         Q.  Did you actually see Mr. Polletta in
15    Division 9?
16         MR. NICHOLS:  Same objections.  There
17    are no allegations in this case pertaining
18    to Division 9 by Mr. Polletta.  Why are you
19    asking about Division 9 when Mr. Polletta
20    himself has not complained about it?
21         MR. MORRISSEY:  Because Mr. Polletta
22    was housed in --
23         MR. NICHOLS:  He may have been housed
24    in it, but he doesn't have a complaint about
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 61

```
 1    it.  You don't get to ask questions about
 2    whatever you want to ask, Tom.  Mr. Polletta
 3    is not even complaining about Division 9.
 4    Please stay on track.
 5    BY MR. MORRISSEY:
 6         Q.  ***Did you interact with Mr. Polletta
 7    in Division 9?
 8         MR. NICHOLS:  Again, I'm instructing
 9    my client not to answer questions about
10    Division 9.  Mr. Polletta has no claims
11    relating to Division 9.  There's no basis
12    for you to ask these questions, certainly no
13    legal basis.
14         MR. MORRISSEY:  We're going to certify
15    the question.
16    BY MR. MORRISSEY:
17         Q.  When did you talk to Mr. Polletta?
18         A.  When?
19         Q.  Yeah.
20         A.  Plenty of times, Tom, as you asked me
21    at the beginning of this deposition.
22         Q.  ***Did you ever talk to him in Division
23    9?
24         MR. NICHOLS:  Again, there's no basis
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 62

```
 1    for you to be asking any questions about
 2    Mr. Polletta's time in Division 9 when
 3    Mr. Polletta himself is not complaining
 4    about his time in Division 9.  There's no
 5    basis for you to ask these questions.
 6    There's not a single claim in his complaint
 7    about Division 9 or his time there.
 8    Mr. Polletta himself when I took his
 9    deposition made no mention of his time in
10    Division 9 or the accommodations he was
11    provided.
12         MR. MORRISSEY:  Mr. Nichols --
13         MR. NICHOLS:  I stated my objection.
14         MR. MORRISSEY:  Let me put it on the
15    record.
16         MR. NICHOLS:  You already stated you're
17    going to certify it.  Certify the question.
18         MR. MORRISSEY:  Let me state -- and if
19    you want to continue your objection, that's
20    fine, but Mr. Polletta on behalf of the
21    class has alleged that he has to ambulate
22    from his division to court, Leighton, a long
23    distance without any assistance from the
24    sheriff.  If it's certified as a class,
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 63

```
 1    that's certainly probative of the difficulty
 2    that Mr. Polletta and the people that he
 3    intends to represent have when they attend
 4    court at Leighton.  So I think that it
 5    certainly is discoverable.
 6         MR. NICHOLS:  Mr. Morrissey, while
 7    you're very creative, the reality of it is,
 8    that the extent that you want to ask
 9    questions about any punitive class members,
10    the focus of the class is their access to
11    Leighton courthouse and the navigation of
12    the ramps at Leighton.  There are no
13    allegations in this lawsuit about
14    Division 9, and to the extent that
15    Mr. Polletta is housed in Division 10,
16    certainly you can ask those questions, but
17    there's no allegation whether you're talking
18    about Mr. Polletta or the class --
19         MR. MORRISSEY:  We'll move on.  Certify
20    the question.
21         MR. NICHOLS:  Please do.
22         MR. MORRISSEY:  I don't want to waste
23    your time and my time and Ms. Canchola's
24    time.
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 16

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 64

```
1        MR. NICHOLS:  Then start the deposition
2    at the time it was noticed if you're so
3    concerned about time.
4        MR. CONDRON:  And thanks, Tom, I
5    appreciate that.  But I agree.  Let's move
6    on.
7  BY MR. MORRISSEY:
8    Q.   In Division 9, are you aware that
9  Mr. Polletta's cane was taken from him while he
10 was in Division 10?
11       MR. NICHOLS:  Objection.  The question
12   is definitely confusing.  Are you talking
13   about Division 9 or Division 10?
14       MR. MORRISSEY:  I'm sorry.  Let me
15   rephrase it.
16 BY MR. MORRISSEY:
17   Q.   Are you aware that in Division 10,
18 prisoners that have a medical alert for canes,
19 crutches, or walkers are not allowed to keep
20 those assistive devices in their cell?
21   A.   Mr. Polletta had a cane for long
22 distance, so he would not be able to keep his
23 cane in the cell.
24   Q.   Are you aware that individuals like
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 65

```
1  Mr. Polletta are not allowed to use their cane,
2  crutches, or walkers when they need to shower in
3  Division 10?
4    A.   Individuals with long distance only
5  alerts do not maintain those aids on their
6  tiers.
7    Q.   Do individuals that have an alert for
8  crutches, are they allowed to maintain their
9  crutches in their tier?
10       MR. NICHOLS:  Objection, vague as to
11   location.
12 BY MR. MORRISSEY:
13   Q.   In Division 10, prisoners that have a
14 medical alert for crutches, are they allowed to
15 maintain the crutches in their cell?
16   A.   If their crutches are for long distance
17 only, no.
18   Q.   If a prisoner has an alert for
19 crutches, is he or she allowed to maintain their
20 crutches in their cell in Division 10?
21       MR. NICHOLS:  Objection, relevance, but
22   you can answer.
23
24
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 66

```
1  BY THE WITNESS:
2    A.   If the alert is for long distance only,
3  they do not keep those aids on the tier.  It's
4  for long distance only.
5  BY MR. MORRISSEY:
6    Q.   The question is, if they have an alert
7  for crutches, are they allowed to keep the
8  crutches in their cell?
9        MR. NICHOLS:  Objection, relevance.
10   You can answer.
11 BY THE WITNESS:
12   A.   No one has ever stated to me that they
13 haven't been allowed to keep their --
14 BY MR. MORRISSEY:
15   Q.   The question is, are they allowed to
16 to the best of your knowledge?
17       MR. NICHOLS:  Objection, relevance.
18   You can answer.
19 BY THE WITNESS:
20   A.   Yes.
21 BY MR. MORRISSEY:
22   Q.   Do you know or are you just --
23   A.   Do I know?  No one has ever -- you're
24 creating hypotheticals, Tom, that don't relate
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 67

```
1  to this lawsuit, so I don't know how to answer
2  that.
3    Q.   Let me ask, to your knowledge, are
4  individuals in Division 10 who have medical
5  alerts for crutches allowed to keep their
6  crutches in their cell?
7        MR. NICHOLS:  Objection, relevance, and
8    asked and answered.  You can answer.
9  BY THE WITNESS:
10   A.   I'm just going to say I don't know.
11 BY MR. MORRISSEY:
12   Q.   Individuals who have a medical alert --
13       MR. NICHOLS:  Ms. Canchola, would you
14   like to take a break?
15       THE WITNESS:  Sure.
16       MR. MORRISSEY:  I have a question
17   pending, James.
18       MR. NICHOLS:  We'll leave the question
19   pending and --
20       MR. MORRISSEY:  No.  Let me finish the
21   question, and then you can have your break.
22 BY MR. MORRISSEY:
23   Q.   Ms. Canchola, do you have personal
24 knowledge whether or not individuals who have a
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 17

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 68

1   medical alert for crutches are allowed to use
2   their crutches in Division 10 to shower?
3           MR. NICHOLS:  Objection, relevance,
4       objection, asked and answered.  You can
5       answer to the extent that you know.
6   BY THE WITNESS:
7       **A.   To the extent that I know if someone**
8   **uses crutches for showers, I don't know, Tom.**
9   **It's a hypothetical.**
10          MR. NICHOLS:  Let's take a quick break.
11              (Whereupon, a short break was
12              taken.)
13  BY MR. MORRISSEY:
14      Q.   Let me go back a little bit,
15  Ms. Canchola.  Going back to Exhibit No. 4, if
16  we look at page 2 which is Bates stamped 11, it
17  looks like Mr. Polletta had on May 13, 2015, a
18  medical alert for crutches.  Do you see that?
19      **A.   Correct.**
20      Q.   If you as the ADA coordinator wanted to
21  generate a list of prisoners who were assigned
22  crutches, could you do that in the jail
23  management system?
24      **A.   I could.**

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 69

1       Q.   How would you do that?
2       **A.   I would run a query.**
3       Q.   Could you also run a query in regards
4   to prisoners like Mr. Polletta that had a
5   medical alert for a cane or a cane long
6   distance?
7       **A.   For cane long distance only, I would**
8   **run a query, yes.**
9       Q.   And for cane, you could run a query?
10      **A.   I don't believe he was issued a cane,**
11  **but, yes.**
12      Q.   You could also run a query in the jail
13  management system for walkers?
14      **A.   Correct.**
15      Q.   Have you as the ADA coordinator ever
16  run a query for crutches?
17      **A.   Yes.**
18      Q.   How recently?
19      **A.   A couple weeks maybe.**
20      Q.   A couple weeks ago?
21      **A.   Uh-huh.**
22      Q.   And at whose direction did you do that?
23      **A.   At no one's direction.**
24      Q.   When you ran the query for crutches,

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 70

1   what time period did that cover?
2       **A.   Existing alerts only.**
3       Q.   What happened when you ran a query for
4   medical alerts in May of 2017?
5           MR. NICHOLS:  Objection, vague.  What
6       medical alert are we talking about?
7           MR. MORRISSEY:  For crutches.  Let me
8       rephrase it.
9   BY MR. MORRISSEY:
10      Q.   How many people -- when you ran the
11  query a couple weeks ago for a medical -- for
12  all people in the jail management system who had
13  or have crutches, how many people came up?
14      **A.   I don't recall.**
15      Q.   Was it more than 10?
16      **A.   It could be.**
17      Q.   Was it more than 20?
18          MR. NICHOLS:  Objection, asked and
19      answered.
20  BY THE WITNESS:
21      **A.   It could be.  I don't recall.**
22  BY MR. MORRISSEY:
23      Q.   Could it be more than 40?
24          MR. NICHOLS:  Objection.  Tom, she said

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 71

1       she doesn't recall.
2   BY MR. MORRISSEY:
3       Q.   And did you save that query?
4       **A.   No.**
5       Q.   Did you also run a query in regards to
6   how many prisoners -- let me go back.  When you
7   ran the query for crutches, was that current
8   detainees at the Department of Corrections?
9       **A.   Correct.**
10      Q.   And it could have been more than 10?
11          MR. NICHOLS:  Objection, asked and
12      answered.  She said she didn't know.
13          MR. MORRISSEY:  No, I don't think
14      that's correct.
15  BY THE WITNESS:
16      **A.   I don't recall how many.**
17  BY MR. MORRISSEY:
18      Q.   Was it more than 5?
19          MR. NICHOLS:  Objection, asked and
20      answered.
21  BY THE WITNESS:
22      **A.   I don't recall, Tom.  I don't recall.**
23
24

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 18

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 72

BY MR. MORRISSEY:
 Q.  Did you run a query in regards to individuals currently at the Cook County Department of Corrections who have a medical alert for walker?
 A.  I did.
 Q.  And that was 2 weeks ago?
 A.  That's not what I said.  I said a couple of weeks ago approximately.
 Q.  A couple of weeks ago, did you do a query for people with walkers?
 A.  Yes.
 Q.  How many people when you did that query a couple weeks ago were assigned walkers?
 A.  I don't recall.
 Q.  Was it more than 10?
 A.  I don't recall.
 Q.  Did you do a query in regards to prisoners currently at the Department of Corrections that used canes?
 A.  I did.
 Q.  Was it just cane or canes long distance?
 A.  It was all auxiliary aids, routine and

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 73

long distance, and I don't recall how many.
 Q.  What did you do with that report?
 A.  Nothing.
 Q.  Did you change any procedures or policies at the jail based upon that query?
 A.  No.
 Q.  Why did you do that query?
 A.  Because I wanted to.
 Q.  How long did it take you to run each of those queries?  Was it one query or multiple queries?
   MR. NICHOLS:  Objection, form.
BY MR. MORRISSEY:
 Q.  Let me rephrase the question.  In order to run the query, what did you have to do?
 A.  I have to build a query.
 Q.  How did you do that?
 A.  Would you like me to take you through the steps of building a query?
 Q.  Yes.
 A.  I'm sorry.  I can't.
 Q.  Why?
 A.  Because I need to be in front of the computer to do that.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 74

 Q.  How long did it take you to --
 A.  Not long.
 Q.  Less than 5 minutes?
 A.  I don't know.
 Q.  When you ran that query, was it just for one medical alert such as crutches, or was it multiple medical alerts?
 A.  As I just stated less than a minute ago, it was for all auxiliary aids.
 Q.  When you say all auxiliary aids, what do you mean?
 A.  You don't know what an auxiliary aid is?
 Q.  I'm not an ADA coordinator.  Could you tell me?
 A.  Well, I think you've spent enough time suing us to know what an auxiliary aid is, so a cane, a crutch, a walker, a wheelchair, it's an aid to mobility.
 Q.  For an individual -- Strike that.
    Have you ever walked between Division 10 and the ramp at the Leighton court building?
   MR. NICHOLS:  Objection, relevance.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 75

BY THE WITNESS:
 A.  Have I walked between them?
BY MR. MORRISSEY:
 Q.  Have you ever walked from Division 10 to the ramps that lead to the Leighton court building?
   MR. NICHOLS:  Objection, relevance.
BY THE WITNESS:
 A.  I have walked our entire facility.
BY MR. MORRISSEY:
 Q.  Approximately what is the distance between Division 10 and the ramps to the Leighton court building?
   MR. NICHOLS:  Objection, relevance, and to the extent that it calls for the witness to speculate.  You can answer to the extent you have any personal knowledge of the distance.
BY THE WITNESS:
 A.  I don't know.
BY MR. MORRISSEY:
 Q.  To the best of your ability, is it more than 2 blocks?
   MR. NICHOLS:  Objection, same

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 19

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 76

1  objections.  I'm going to ask the witness
2  not to speculate about that.
3          MR. MORRISSEY:  It's a question.
4          MR. NICHOLS:  I understand.  You're
5  asking the witness to speculate.
6          MR. MORRISSEY:  No, I'm not.
7  BY MR. MORRISSEY:
8      Q.   Is it over a block?
9      A.   I don't know.
10     Q.   When an individual such as Mr. Polletta
11 leaves Division 10 in order to go to the
12 Leighton court building with a cane, is there
13 any assistance given to that person?
14         MR. NICHOLS:  Objection, relevance.
15     You can answer to the extent you know.
16 BY THE WITNESS:
17     A.   Hypothetically?  We would provide
18 reasonable assistance if it was requested.
19 BY MR. MORRISSEY:
20     Q.   If Mr. Polletta -- who would he have to
21 request to get a reasonable accommodation to
22 walk from Division 10 to the Leighton court
23 building?
24     A.   The staff member that was present.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 77

1      Q.   And is there any procedure or policy in
2  place if somebody who needs a cane to walk, for
3  the sheriff's employee to provide that
4  accommodation?
5      A.   As we discussed at the beginning of
6  this deposition, the sheriff's order and the
7  general order provides that we will make
8  reasonable modifications to policies and
9  procedures to accommodate inmates with
10 disabilities.
11     Q.   Now, when prisoners go to court in a
12 wheelchair, do you do anything with your Excel
13 program to alert court facilities that they're
14 attending court?
15         MR. NICHOLS:  Objection, relevance.
16 BY THE WITNESS:
17     A.   Do I do anything with my Excel program?
18 No.
19 BY MR. MORRISSEY:
20     Q.   Let me be more specific.  When
21 prisoners go to court in wheelchairs, do you
22 generate an email to the court facilities?
23         MR. NICHOLS:  Objection, relevance.
24

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 78

1  BY THE WITNESS:
2      A.   You asked me this question before, Tom,
3  and I stated I do notify those facilities that
4  someone with a wheelchair will be coming over.
5  BY MR. MORRISSEY:
6      Q.   I'm going to show you Exhibit 6.  It's
7  a group exhibit.  Take a moment to look at it.
8  It's a group exhibit.  And part of the group
9  exhibit is a series of emails.  Do you see
10 those?
11         MR. NICHOLS:  I'll ask the witness to
12     be given a little bit of time to review
13     this.
14         MR. MORRISSEY:  Sure.  Take your time.
15 BY MR. MORRISSEY:
16     Q.   Have you had an opportunity to look at
17 that?
18     A.   Yes.
19     Q.   If we look at the second page of Group
20 Exhibit No. 6, it's Bates stamped 368.  Do you
21 recognize that document?
22     A.   I do.
23     Q.   And it's generated by you on
24 January 25, 2016?

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 79

1      A.   It is.
2      Q.   And you sent it to Angela Lewis.  Who
3  is Angela Lewis?
4      A.   She's now a commander of the sheriff's
5  office.
6      Q.   What was she in January of 2016?
7      A.   A lieutenant.
8      Q.   In what division?
9      A.   RCDC, receiving and classification.
10     Q.   And Jeff Johnsen, do you know what his
11 position was?
12     A.   What his position is?
13     Q.   In January of 2016?
14     A.   In January of 2016, he was a
15 superintendent over RCDC.
16     Q.   And Thomas Cintron, C-i-n-t-r-o-n?
17     A.   Thomas Cintron was a lieutenant.
18     Q.   In what division?
19     A.   RCDC.
20     Q.   How about Toni Calvin?
21     A.   A lieutenant in RCDC.
22     Q.   Why did you generate this email on
23 January 25, 2016?
24     A.   To notify those staff members that

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 20

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 80

1  detainees with auxiliary aids such as
2  wheelchairs would be coming over to court.
3      Q.    And you have approximately 8
4  individuals that were going to various court
5  buildings?
6      A.    Correct.
7      Q.    How did you generate those names?  From
8  what source did you generate those names?
9      A.    From my list.
10     Q.    Would that be the detainee list?
11     A.    Correct.
12     Q.    The Excel program, correct?
13     A.    Correct.
14     Q.    And your Excel program includes
15  wheelchair-assisted prisoners?
16         MR. NICHOLS:  Objection, asked and
17     answered.
18  BY MR. MORRISSEY:
19     Q.    And vision-impaired prisoners?
20         MR. NICHOLS:  Same objection, asked and
21     answered.
22  BY THE WITNESS:
23     A.    We just discussed this, Tom.  Yes, it
24  does.

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 81

1  BY MR. MORRISSEY:
2      Q.    It does not include as a matter of
3  routine prisoners that have canes or crutches?
4         MR. NICHOLS:  Objection, asked and
5     answered.  You can answer.
6  BY THE WITNESS:
7      A.    As we previously discussed, routinely
8  it does not.  At times, if they're combined with
9  wheelchairs, it might.
10  BY MR. MORRISSEY:
11     Q.    At times, do you send these messages to
12  Mr. Banks (phonetic) at the Leighton court
13  building?
14     A.    At times, I have.
15     Q.    If a prisoner from the jail goes to
16  Leighton in a wheelchair, do you include
17  Mr. Banks in the email?
18     A.    Do I include him now?
19     Q.    Yeah.
20     A.    No, I do not.
21     Q.    In the year 2016, did you include him?
22     A.    Yes, I did.
23     Q.    Is there another individual now at
24  Leighton that you include in your emails if a

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 82

1  prisoner with a wheelchair goes to Leighton?
2         MR. NICHOLS:  Objection, relevance.
3  BY THE WITNESS:
4      A.    There are other individuals, yes.
5  BY MR. MORRISSEY:
6      Q.    Who do you currently include in your
7  email if a prisoner in a wheelchair goes to
8  Leighton?
9         MR. NICHOLS:  Objection, relevance.
10  BY THE WITNESS:
11     A.    The current chief over Leighton as well
12  as any court clerk employees that may be
13  currently working there.
14  BY MR. MORRISSEY:
15     Q.    Who is the current chief at Leighton?
16         MR. NICHOLS:  Objection -- Strike that.
17     You can answer.
18  BY THE WITNESS:
19     A.    Edward Sajak (phonetic).
20  BY MR. MORRISSEY:
21     Q.    How do you spell his last name?
22     A.    I don't know.  I don't recall.
23     Q.    And he's with court services?
24     A.    Correct.

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 83

1      Q.    Each time you send an email in regards
2  to a prisoner going to an outlying court
3  building, do you always include a representative
4  from court service at the outlying court
5  building?
6         MR. NICHOLS:  Objection, relevance.
7  BY THE WITNESS:
8      A.    I include the relevant people, yes.
9  BY MR. MORRISSEY:
10     Q.    At, let's say, Bridgeview or Markham,
11  et cetera?
12         MR. NICHOLS:  Objection --
13  BY MR. MORRISSEY:
14     Q.    If a wheelchair person is going to one
15  of those court buildings?
16         MR. NICHOLS:  Objection, relevance.
17  BY THE WITNESS:
18     A.    Yes, I include the relevant people.
19  BY MR. MORRISSEY:
20     Q.    Now, are you aware of -- since the Lacy
21  litigation, are you aware that if a wheelchair
22  person attends court at Leighton, that there's a
23  procedure to bring the person directly up to
24  court?

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 21

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 84

1    MR. NICHOLS:  Objection, relevance.
2    BY THE WITNESS:
3    **A.    Sorry.  Can you rephrase that?**
4    BY MR. MORRISSEY:
5    Q.  Sure.  When a wheelchair-assisted
6    prisoner attends court at Leighton, is there a
7    procedure in which they're brought back right
8    before -- brought up right before their court
9    call at the Leighton court building?
10   MR. NICHOLS:  Objection.  The question
11   is vague as to time frame and objection,
12   relevance.
13   BY THE WITNESS:
14   **A.    Am I aware of a procedure that**
15   **detainees who use wheelchairs are brought up**
16   **before their court date -- or before their court**
17   **is called?  Yes, that happens with a lot of**
18   **different members.**
19   BY MR. MORRISSEY:
20   Q.  And is that because the holding cells
21   in Leighton are not equipped for prisoners who
22   are wheelchairbound to use the toilets?
23   MR. NICHOLS:  Objection --
24

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 85

1    BY MR. MORRISSEY:
2    Q.  Let me rephrase the question.  To your
3    knowledge, are the courtroom holding cells in
4    Leighton ADA accessible?
5    MR. NICHOLS:  Objection, relevance,
6    vague as to time frame.
7    BY THE WITNESS:
8    **A.    That's a legal conclusion that I'm not**
9    **ready to make at this time.**
10   BY MR. MORRISSEY:
11   Q.  I'm not asking you a legal conclusion.
12   **A.    You just asked me a legal question.**
13   Q.  I'm asking you, Ms. Canchola, do you
14   have knowledge whether or not there are ADA
15   compliant toilets in the holding cells behind
16   the courtrooms at Leighton?
17   MR. NICHOLS:  Objection, relevance.
18   You can answer.
19   BY THE WITNESS:
20   **A.    ADA compliant meaning complies with the**
21   **2010 standards?  I believe those buildings were**
22   **built long before those standards became**
23   **applicable, so I can't answer that question at**
24   **this time.**

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 86

1    BY MR. MORRISSEY:
2    Q.  So to your knowledge in the last 2
3    years, have the holding cells in Leighton for
4    prisoners been renovated to make them compliant
5    with the 2010 standards?
6    MR. NICHOLS:  Objection, relevance.
7    BY THE WITNESS:
8    **A.    To my knowledge since beginning my role**
9    **as ADA coordinator, they have not been.**
10   BY MR. MORRISSEY:
11   Q.  Because the holding cells in Leighton
12   are not ADA compliant, is there a procedure for
13   wheelchair prisoners to be taken directly up to
14   their court call as close to the time that their
15   case is called?
16   MR. NICHOLS:  Objection, vague as to
17   time frame, objection, relevance.
18   BY THE WITNESS:
19   **A.    I didn't say they weren't compliant**
20   **with the ADA.  I said I wasn't willing to make**
21   **that statement at this time.  But as far as**
22   **whether or not people were brought up to court**
23   **before their case is called, you have already**
24   **asked that question, and I have answered it yes.**

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 87

1    MR. NICHOLS:  Tom, we're spending a lot
2    of time here discussing Lacy.
3    MR. MORRISSEY:  Mr. Nichols --
4    MR. NICHOLS:  Ask your questions, but
5    I'm just noting it for the record.  This is
6    not Lacy.  This is Polletta.
7    BY MR. MORRISSEY:
8    Q.  In regards to prisoners in wheelchairs,
9    is part of the reason that you provide Mr. Sajak
10   or Mr. Banks previously with an email that a
11   wheelchairbound person is going to court the
12   next day is to alert him so that he can make
13   accommodations to bring wheelchairbound
14   prisoners up and back from the Leighton court
15   building as quickly as possible?
16   MR. NICHOLS:  Objection, vague as to
17   time frame and objection, relevance.  You
18   can answer.
19   BY THE WITNESS:
20   **A.    I was not employed in this capacity**
21   **when that procedure was initiated, so I can't**
22   **answer that question.**
23
24

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 22

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 88

```
1   BY MR. MORRISSEY:
2       Q.   But currently to your knowledge is
3   there a procedure in place whereby the court
4   service personnel bring wheelchairbound
5   prisoners up to their court call as quickly as
6   possible and back down to the jail because there
7   is not -- Strike that.
8           To your knowledge as the ADA coordinator,
9   is there a procedure with the sheriff in which
10  wheelchairbound detainees are transported up and
11  back from their court call at Leighton as
12  quickly as possible?
13          MR. NICHOLS:  Objection, vague as to
14      time frame, objection, relevance.  Tom, do
15      you want to clarify the time frame?
16  BY THE WITNESS:
17      A.   I've already answered this like 5
18  times, Mr. Morrissey.  Yes, there's a procedure
19  to bring them up and back as quickly as
20  possible.  The reason for that procedure I will
21  not speculate on because I wasn't there when it
22  was developed.  Can we move on now?
23  BY MR. MORRISSEY:
24      Q.   This is your deposition --
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 89

```
1       A.   Correct.  That's why I answered the
2   question.
3       Q.   In regards to prisoners that use canes
4   or walkers, when they attend court over in
5   Leighton, is there a similar procedure to
6   wheelchairbound detainees whereby they're not
7   held in the courtroom holding cells for any
8   length of time because of their disability?
9           MR. NICHOLS:  Objection, form, compound
10      question.
11  BY THE WITNESS:
12      A.   Can you rephrase?
13  BY MR. MORRISSEY:
14      Q.   Sure.  To your knowledge as the ADA
15  coordinator, are prisoners with medical alerts
16  for canes and crutches treated the same way as
17  prisoners who do not have a mobility problem
18  when they go to court at Leighton?
19          MR. NICHOLS:  Objection, form.  Do you
20      understand the question?
21          THE WITNESS:  No.
22  BY MR. MORRISSEY:
23      Q.   Sure.  You have already testified that
24  there is a distinct procedure for
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 90

```
1   wheelchairbound detainees as far as the time
2   they spend in the Leighton court building.  Now
3   I'm asking you in regards to other detainees
4   with disabilities such as detainees who have
5   canes and crutches.  In regards to those
6   individuals, are they brought up to the holding
7   cells with other able-bodied prisoners to the
8   best of your knowledge under the current
9   procedures?
10      A.   To the best of my knowledge, they are.
11      Q.   And are they held in the same holding
12  cells behind the courtroom at Leighton as
13  able-bodied prisoners?
14      A.   Speaking generally, generally I'm sure
15  they are.
16      Q.   And they're required to use the same
17  toilet facilities in the holding cells behind
18  the courtrooms as able-bodied prisoners?
19          MR. NICHOLS:  Objection.  I just want
20      to make sure that we're clear.  We're still
21      talking about people with canes, crutches,
22      and walkers?
23          MR. MORRISSEY:  That's correct.
24          THE WITNESS:  What's the question?
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 91

```
1   BY MR. MORRISSEY:
2       Q.   The question is, in regards to people
3   with canes, crutches, and walkers, they're held
4   with able-bodied prisoners in the holding cells
5   behind the courtrooms at Leighton?
6       A.   Correct.
7       Q.   And after the court's call is
8   completed, the individuals with canes, crutches,
9   and walkers are brought down -- back down to the
10  jail with the able-bodied prisoners?
11      A.   Every time?  I could not say that
12  that's exactly how it occurs every time.
13      Q.   But as a general procedure, individuals
14  with walkers, canes, and crutches are treated
15  the same way as able-bodied prisoners as far as
16  being returned back to the jail?
17          MR. CONDRON:  Objection, calls for
18      speculation, calls for a legal conclusion
19      potentially.
20          MR. NICHOLS:  I'll join in the
21      objections.  You can answer.
22  BY THE WITNESS:
23      A.   I can't speculate that that occurs
24  every single day.  I have no idea.
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 23

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 92

```
 1  BY MR. MORRISSEY:
 2      Q.  I'm not asking every single day.  But
 3  you as the ADA coordinator are not aware of any
 4  different treatment provided for inmates with
 5  walkers, canes, and crutches when they leave the
 6  lockups at Leighton and are brought back to the
 7  Cook County Jail?
 8          MR. NICHOLS:  Same objections.  You can
 9      answer to the extent that you know.
10  BY THE WITNESS:
11      A.  Different treatment with regard to
12  what?
13  BY MR. MORRISSEY:
14      Q.  In regards to they're held in the same
15  lockups behind the courtrooms at Leighton as
16  able-bodied people, correct?
17          MR. NICHOLS:  Objection, asked and
18      answered.
19  BY THE WITNESS:
20      A.  They could be.
21  BY MR. MORRISSEY:
22      Q.  When they enter into the lockups behind
23  the courtrooms at Leighton, are their crutches
24  and canes taken from them?
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 93

```
 1      A.  I don't know.
 2      Q.  At the end of the court call, are
 3  people with canes, crutches, and walkers brought
 4  down -- removed from the courtroom holding cells
 5  and brought down generally back to the jail?
 6      A.  Generally they would have to be, yes.
 7      Q.  You gave -- you prepared an affidavit
 8  in the Roberts case?
 9          MR. NICHOLS:  Objection, relevance.
10  BY THE WITNESS:
11      A.  Did I?  I don't recall.  I prepared
12  lots of affidavits.
13  BY MR. MORRISSEY:
14      Q.  I'm showing you Exhibit No. 1.  Does
15  that refresh your recollection in regards to
16  preparing an affidavit in Roberts vs. Dart?
17      A.  What would you like to know about this?
18      Q.  Is that your affidavit in the Roberts
19  case?  Is that your signature on Exhibit No. 1?
20      A.  It is.
21      Q.  In paragraph 10, it says that you at
22  times respond to grievances in regards to ADA
23  related complaints?
24      A.  It says I have personally responded to
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 94

```
 1  his grievances regarding lack of ADA compliant
 2  accommodations.
 3      Q.  Do you normally review -- Strike that.
 4          Do you normally respond to ADA
 5  grievances from prisoners?
 6      A.  From pretrial detainees, yes.
 7      Q.  As the ADA coordinator, are you
 8  familiar with the grievance process?
 9      A.  I am familiar, yes.
10      Q.  Can you briefly -- how does a prisoner
11  grieve an ADA issue?
12      A.  They fill out a grievance and submit it
13  to their social worker.
14      Q.  As the ADA coordinator, how would you
15  receive a grievance in regards to an ADA issue
16  at the jail?
17      A.  It's delivered to me.
18      Q.  Who delivers it to you?
19      A.  The mailroom.
20      Q.  Is there a procedure at the jail that
21  all ADA related grievances are delivered to you
22  as the ADA coordinator?
23      A.  Yes.
24      Q.  What do you do after receiving an ADA
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 95

```
 1  grievance?
 2      A.  Whatever is necessary to investigate
 3  the complaint and address the grievance.
 4      Q.  Do you personally then return the
 5  grievance to the disabled prisoner?
 6      A.  No.
 7      Q.  Do you sign the response for
 8  grievances?
 9      A.  I do.
10      Q.  Based upon your understanding as the
11  ADA coordinator responsible for grievances, does
12  the prisoner have a right to appeal?
13      A.  Every grievance you have a right to
14  appeal.
15      Q.  Is there a time period as far as you
16  know as far as filing a grievance?
17      A.  I believe there is.
18      Q.  What is that time period?
19      A.  I don't recall.  It's stated on the
20  grievance.
21      Q.  Is there a time period for the jail --
22  for the sheriff to respond to an appeal?
23          MR. NICHOLS:  Objection only to the
24      extent the question calls for the witness to
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 24

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 96

```
 1      speculate --
 2  BY THE WITNESS:
 3      A.   We're given a date to respond.
 4  BY MR. MORRISSEY:
 5      Q.   To an appeal?
 6      A.   To any grievance in general.
 7      Q.   After a grievance is appealed by a
 8  prisoner, is there a procedure where the jail
 9  responds to the appeal?
10      A.   Someone would respond to the appeal,
11  yes.
12      Q.   And based upon your knowledge as the
13  ADA coordinator, if that appeal is denied, does
14  the prisoner have to do anything else prior
15  to -- in order to exhaust the administrative
16  remedies?
17           MR. NICHOLS:  Objection only to the
18      extent the question is clearly calling for a
19      legal conclusion.  To the extent that you
20      know, you can answer.
21  BY THE WITNESS:
22      A.   I don't know.
23
24
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 97

```
 1  BY MR. MORRISSEY:
 2      Q.   Have you partaken in any meetings at
 3  the jail in regards to the grievance process in
 4  the last 12 months?
 5      A.   In regards to the grievance process,
 6  no.
 7      Q.   Do you also have -- in regards to ADA
 8  related issues, do you help implement and
 9  formulate policies and procedures in regards to
10  ADA issues?
11           MR. NICHOLS:  Objection.  The question
12      has been asked and answered.  You can answer
13      again.
14  BY THE WITNESS:
15      A.   Yes, I do.
16  BY MR. MORRISSEY:
17      Q.   Who do you work with when you're
18  formulating a policy change in regards to an ADA
19  issue?
20      A.   It depends on the specific issue.
21      Q.   If it's in regards to accessibility,
22  let's say in the RTU, who would you work with in
23  formulating a new procedure?
24      A.   That's a very broad category,
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 98

```
 1  Mr. Morrissey.  In regards to what regarding
 2  accessibility?
 3      Q.   Since you have been the ADA
 4  coordinator, have you identified any areas
 5  involving the ADA which you felt needed to be
 6  addressed in a policy change at the jail?
 7      A.   Sure.
 8      Q.   What issues as the ADA coordinator have
 9  you identified that need to be addressed in
10  policy changes at the jail?
11      A.   I'm going to assert a privilege.
12      Q.   Based upon what?
13      A.   Based upon work product.
14      Q.   Let me stop you right there.
15           MR. MORRISSEY:  Mr. Nichols, will you
16      kindly tell your witness to respond to the
17      question?
18           MR. NICHOLS:  I would ask that you
19      respond to the question only to the extent
20      that you're not revealing any privileged
21      information.  That's a fair question.
22      Please respond to the best of your ability
23      without revealing any privileged
24      information.
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 99

```
 1  BY THE WITNESS:
 2      A.   To the extent that I can, I would only
 3  say we've discussed changes to policies and
 4  procedures as part of work product with our
 5  attorneys.
 6  BY MR. MORRISSEY:
 7      Q.   So I'm not going to ask you any
 8  questions in regards to your conversations with
 9  Mr. Nichols or attorneys that are of record in
10  this case or in other cases at the Cook County
11  Jail, but have you discussed within the
12  Department of Corrections policy issues which
13  you have identified in regards to disability
14  issues at the jail?
15           MR. NICHOLS:  Objection only to the
16      extent the question calls for the witness to
17      discuss privileged information.  To the
18      extent that you can answer the question
19      without revealing any privileged
20      information, please try.
21  BY THE WITNESS:
22      A.   I can't.  Those discussions took place
23  with our legal team, so it's privileged
24  information.
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 25

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 100

1  BY MR. MORRISSEY:
2      Q.   Your job in part is to implement
3  changes, policy changes in regards to disability
4  issues at the jail, correct?
5      **A.   Correct.**
6      Q.   Can you identify what policy changes
7  you have been responsible for formulating as the
8  ADA coordinator at the jail?
9          MR. NICHOLS:  Objection, vague,
10     objection to the extent the question calls
11     for privileged information.  Answer to the
12     best of your ability without revealing any
13     privileged information if you can.
14 BY THE WITNESS:
15     **A.   Since they are being formulated with
16 our legal team, I cannot answer that question at
17 this time.**
18 BY MR. MORRISSEY:
19     Q.   Let me ask you this.  Can you tell me
20 what policy changes had been formulated at your
21 request and effort which had been implemented in
22 regards to ADA issues at the Cook County Jail?
23         MR. NICHOLS:  Objection.  The question
24     is vague as to time frame and objection to

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 101

1  the extent that it calls for the witness to
2  discuss privileged information.  Answer to
3  the best of your ability without revealing
4  any privileged information.
5  BY THE WITNESS:
6      **A.   To the best of my ability, I have
7  requested that changes be made to how we note
8  certain bed assignments in C-COMS, what kind of
9  phones we use for the deaf and hard of hearing
10 population, and a variety of other topics that I
11 cannot recall all of them at this time.**
12 BY MR. MORRISSEY:
13     Q.   What changes in regards to bed
14 assignments have you formulated as the ADA
15 coordinator?  Which of them have been put in
16 place?
17     **A.   As I just stated, labeling them.**
18     Q.   What do you mean by labeling bed
19 assignments?
20     **A.   How they are labeled in the jail
21 management system.**
22     Q.   You also mentioned that you formulated
23 a policy in regards to phone usage for disabled
24 individuals at the jail?

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 102

1          MR. NICHOLS:  Objection, relevance.
2  BY MR. MORRISSEY:
3      Q.   How was that implemented?
4      **A.   That's not what I stated, Tom.**
5          MR. NICHOLS:  Objection, relevance.
6  BY MR. MORRISSEY:
7      Q.   If I misstated your answer, please
8  correct me, but you mentioned something that you
9  formulated some new procedure in regards to
10 phone usage?
11         MR. NICHOLS:  Objection, relevance.
12 BY THE WITNESS:
13     **A.   I stated that I formulated a different
14 type of phone that we would be using at the jail
15 and a procedure for recording those calls.**
16 BY MR. MORRISSEY:
17     Q.   And has that been implemented?
18         MR. NICHOLS:  Objection, relevance.
19 BY THE WITNESS:
20     **A.   It's being implemented.**
21 BY MR. MORRISSEY:
22     Q.   Did you formulate any procedures at the
23 jail that involved housing assignments for
24 disabled prisoners that have been implemented?

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 103

1          MR. NICHOLS:  Objection only to the
2      extent that the question may call for
3      privileged information.  Answer to the best
4      of your ability without revealing any
5      privileged information.
6  BY THE WITNESS:
7      **A.   We are formulating procedures with our
8  legal team, but I personally do check regularly
9  to make sure we are maximizing the number of
10 accessible beds.**
11 BY MR. MORRISSEY:
12     Q.   But as far as -- as we sit here today,
13 you're aware that they're formulating a
14 procedure for housing disabled prisoners at the
15 jail, but you're not aware at this point whether
16 it's been implemented or not; is that fair to
17 say?
18         MR. NICHOLS:  Objection to the extent
19     it mischaracterizes the witness' testimony
20     and to the extent that you're asking the
21     witness to speculate about privileged
22     information.  Answer to the best of your
23     ability without revealing any privileged
24     information.

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 26

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 104

```
 1   BY THE WITNESS:
 2       A.   We are formulating policies and
 3   procedures with our legal team.
 4   BY MR. MORRISSEY:
 5       Q.   Would that include Mr. Corso?
 6       A.   No, it would not.
 7           MR. MORRISSEY:  Let's take a minute.
 8               (Whereupon, a short break was
 9                taken.)
10   BY MR. MORRISSEY:
11       Q.   Have you formulated and implemented any
12   policy or procedure to accommodate inmates who
13   use canes or crutches going up or down the ramp
14   at Leighton?
15       A.   Have I formulated any?  No.
16       Q.   Do you know at the Cook County Jail
17   whether there's been any policies formulated to
18   change the procedure in regards to inmates with
19   canes and crutches going up and down the ramps
20   at Leighton?
21       A.   We're discussing it with our legal
22   team.
23       Q.   As a person that's in charge of
24   responding to ADA grievances, do you know
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 105

```
 1   whether or not a prisoner such as Mr. Polletta
 2   could grieve asking for the sheriff to formulate
 3   a new policy or procedure in regards to
 4   providing assistance to prisoners who use a cane
 5   or crutch or walker going up and down the ramp
 6   at Leighton?
 7           MR. NICHOLS:  Objection only to the
 8       extent that the question calls for the
 9       witness to speculate, but you can answer to
10       the best of your ability.
11   BY THE WITNESS:
12       A.   I don't understand what you're asking.
13   BY MR. MORRISSEY:
14       Q.   Sure.  The question is, could a
15   prisoner like Mr. Polletta file a grievance and
16   ask the sheriff to change his procedure in
17   regards to providing accommodations to him and
18   other similarly situated prisoners when they go
19   up and down the ramps at Leighton?
20       A.   Theoretically they could grieve
21   anything.
22       Q.   Can you grieve to your knowledge your
23   classification at the jail?
24       A.   Are you asking me if that's a
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 106

```
 1   nongrievable issue or a grievable issue or if
 2   someone can take a pen to a piece of paper and
 3   write a grievance?
 4       Q.   Good question.  Is it a grievable issue
 5   for a prisoner like Mr. Polletta to ask the
 6   sheriff to formulate a procedure providing an
 7   accommodation for prisoners who use a cane,
 8   walker, or crutch when they go up and down the
 9   ramp at Leighton?
10           MR. NICHOLS:  Objection, asked and
11       answered.  You can answer.
12   BY THE WITNESS:
13       A.   I don't know.  That's within the
14   purview of inmate services.
15   BY MR. MORRISSEY:
16       Q.   Do you know if it's possible if it's a
17   grievable issue for a prisoner to grieve his or
18   her classification at Cook County Jail?
19           MR. NICHOLS:  Objection, vague,
20       objection, relevance, objection, calls for
21       the witness to speculate.  You can answer to
22       the best of your ability.
23
24
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 107

```
 1   BY THE WITNESS:
 2       A.   Whether an inmate -- or a type of
 3   grievance is a grievable or nongrievable issue
 4   is within the purview of inmate services.
 5   BY MR. MORRISSEY:
 6       Q.   How would the prisoner know whether or
 7   not he or she can grieve asking for the sheriff
 8   to change and formulate a procedure for
 9   accommodating a prisoner going up and down the
10   ramp at Leighton with a walker or crutch or
11   cane?
12           MR. NICHOLS:  Objection to the extent
13       the question calls for the witness to
14       speculate.  To the extent that you know
15       anything about what an unknown inmate would
16       know about the grievance process, you can
17       answer.
18   BY THE WITNESS:
19       A.   How would they know whether or not they
20   can grieve an issue?  They could read their
21   handbook.  They could talk to their social
22   worker.  They could talk to their
23   superintendent.  There are a lot of different
24   vehicles for getting answers to questions.
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 27

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 108

```
1   BY MR. MORRISSEY:
2      Q.   On the grievance form itself, does the
3   grievance form itself give guidance and
4   guidelines as far as what can be grieved and
5   what is not considered a grievable matter at the
6   Cook County Jail?
7          MR. NICHOLS:  Objection.  The question
8      is vague as to time frame.  Objection.  The
9      question calls for the witness to speculate.
10     You can answer to the extent that you know.
11  BY THE WITNESS:
12     A.   To the extent that I know, I don't
13  know.  I didn't study the grievance forms,
14  Mr. Morrissey, but you have one on your table if
15  you would like to review it.
16  BY MR. MORRISSEY:
17     Q.   I'm going to show you and ask you to
18  review a grievance form that was put in by -- a
19  grievance that was put in by Mr. Polletta on
20  March 7, 2017, and it's a 2-page form.  It's
21  Plaintiff's Exhibit No. 5.  I'll hand copies to
22  your attorneys.  Take whatever time you need.
23         MR. NICHOLS:  I'm just going to note --
24         MR. MORRISSEY:  There's no question
```

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 109

```
1   pending in regards to Exhibit No. 5.
2          MR. NICHOLS:  You're about to ask some
3      questions about the exhibit.  I'm just going
4      to note an objection that I have about the
5      exhibit, Tom.  I think that's appropriate.
6      Specifically the grievance that you're
7      referring to that's dated 3/7/17, this
8      appears to be a copy that Mr. Polletta
9      provided to Mr. Morrissey.  This is not a
10     copy of the grievance that was produced by
11     Sheriff Dart in discovery.
12         THE WITNESS:  And it's illegible.
13         MR. NICHOLS:  And it's very unclear and
14     illegible, but you may proceed to ask
15     whatever questions you want about it.  I
16     also want to note that these are the only 2
17     pages within the group exhibit that are not
18     Bates stamped.
19         MR. NICHOLS:  Let me make for the
20     record that we requested in a production
21     request all Mr. Polletta's grievances, and
22     we haven't received certain grievances from
23     the sheriff's office.
24         MR. NICHOLS:  Since we're making a
```

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 110

```
1      record, those grievances have been
2      requested, and under the sheriff's
3      continuing obligation with respect to
4      Rule 26, those grievances will be tendered
5      once they are received.  So do you want to
6      proceed?
7   BY MR. MORRISSEY:
8      Q.   Looking at this document, do you see
9   under grievance guidelines and summary of
10  complaint?
11     A.   Yes.
12     Q.   And do you see under the statement:
13  Your grieved issue must meet all criteria listed
14  below in order to be assigned a control number,
15  to be appealed and/or to exhaust remedies?  Do
16  you see that line?
17     A.   Yes.
18     Q.   And under that line, it says:  The
19  grieved issue is not one of the following
20  nongrievable matters, formulation of
21  departmental policies, inmate classification
22  including designation of an inmate as a security
23  risk or protective custody inmate or decisions
24  of the inmate disciplinary hearing officer.  Do
```

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 111

```
1   you see that?
2      A.   Yes.
3      Q.   So under the grievance guidelines, a
4   prisoner could not request in a grievance the
5   sheriff to formulate a new policy; is that
6   correct?
7      A.   According to the guidelines, that's a
8   nongrievable issue.
9      Q.   And looking down on the bottom
10  left-hand corner, this form has been in use
11  since August of 2016?
12     A.   That's what it says.
13     Q.   Therefore, a gentleman like
14  Mr. Polletta could not grieve and ask the
15  sheriff to formulate a policy requiring the
16  sheriff to accommodate a person using a cane,
17  crutch, or walker going up and down the ramp at
18  Leighton?
19         MR. NICHOLS:  Objection to the extent
20     that the question calls for the witness to
21     speculate about the sheriff's grievance
22     policy and to the extent that it's clearly
23     calling for a legal conclusion.  I would ask
24     for you to rephrase the question, or I'll
```

Exhibit 11 Page 28

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 112

```
 1      instruct her not to answer that.
 2   BY MR. MORRISSEY:
 3      Q.   To your knowledge as the grievance --
 4   as the ADA coordinator for ADA issues, can a
 5   prisoner grieve -- is it a grievable offense for
 6   a prisoner to grieve and ask the sheriff to
 7   formulate a policy to accommodate a disabled
 8   person with a medical alert for a cane, walker,
 9   or crutch to go up and down the ramps at
10   Leighton?
11           MR. NICHOLS:  Objection to the extent
12      the question calls for the witness to
13      speculate about the jail's grievance policy
14      and to the extent that it's clearly calling
15      for a legal conclusion.
16           MR. MORRISSEY:  I'm asking to the best
17      of her knowledge.  I'm not asking for a
18      legal conclusion.
19   BY MR. MORRISSEY:
20      Q.   ***My question is, as the ADA
21   coordinator who was responsible for formulating
22   at times ADA issues at the jail and responding
23   to ADA issues, my question is, is it a grievable
24   issue for a prisoner to file a grievance asking
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 113

```
 1   the sheriff to formulate a policy to accommodate
 2   a disabled person assigned a cane or walker or
 3   crutches when he or she goes up and down the
 4   ramps at Leighton?
 5           MR. NICHOLS:  Same objection.  The
 6      question is clearly calling for the witness
 7      to speculate about the jail's grievance
 8      policy, and you're asking for a legal
 9      conclusion about exhaustion of
10      administrative remedies.  On that basis, I'm
11      going to instruct her not to answer.  You're
12      asking someone with no personal knowledge
13      about the grievance process to speculate
14      about the grievance process, Tom.  That's my
15      objection.
16           MR. MORRISSEY:  We're going to certify
17      the question.  She obviously has personal
18      knowledge whether it can or cannot be
19      grieved, and I respectfully ask you to allow
20      her to answer the question.
21           MR. NICHOLS:  Certify the question and
22      move on.
23
24
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 114

```
 1   BY MR. MORRISSEY:
 2      Q.   Can a prisoner -- is it a grievable
 3   offense for a prisoner at the jail to ask the
 4   sheriff to amend a sheriff's order to require
 5   the sheriff to provide assistance to prisoners
 6   who use canes, crutches, or walkers when they go
 7   up and down the ramps at Leighton?
 8           MR. NICHOLS:  Same objections to the
 9      extent that it calls for the witness to
10      speculate.  However, to the extent that you
11      know, you can answer the question.
12   BY THE WITNESS:
13      A.   If your question, Mr. Morrissey, is can
14   they grieve that, I have seen them grieve a
15   number of items that are in the guidelines and
16   summary as things they shouldn't grieve.  So can
17   they grieve it?  Yes.
18   BY MR. MORRISSEY:
19      Q.   The issue is, is it a grievable offense
20   under the guidelines which is in front of you in
21   paragraph (sic) 5 for a prisoner to grieve
22   stating that he believes that the sheriff's
23   written orders should be amended to require the
24   sheriff's office to provide assistance to people
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 115

```
 1   with canes, crutches, or walkers when they go up
 2   and down the ramps at Leighton?
 3           MR. NICHOLS:  Objection, form,
 4      objection to the extent the question calls
 5      for the witness to speculate.  Tom,
 6      basically the form -- it says everything on
 7      the form.  I mean, if you want to speed this
 8      up, we could just stipulate to whatever it
 9      says on the form, that's what it says.  And
10      you're asking her to talk about specific
11      policies at the jail.  It's listed right
12      here.  She is not the person who handles
13      grievances or formulates grievance policies.
14      I would just ask that you don't keep asking
15      her to speculate about what's grievable and
16      what isn't.
17           MR. MORRISSEY:  So we can stipulate
18      that asking the sheriff to formulate a
19      procedure or policy in regards to
20      accommodations going up and down the ramps
21      at Leighton is not a grievable offense?
22           MR. NICHOLS:  We can stipulate that at
23      least according to this document, it appears
24      that such requests would not be labeled as a
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 29

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 116

1  grievance; however, inmates can actually
2  write whatever they want on this form about
3  any particular issue that they're having at
4  the jail.
5  BY MR. MORRISSEY:
6    Q.  Now, you mentioned that as the
7  grievance coordinator, you're aware that a
8  prisoner has the right to appeal the response to
9  a grievance?
10   **A.  I'm not a grievance coordinator.**
11   Q.  I'm not asking you -- as the ADA
12  coordinator who at times responds to ADA issues
13  contained in grievances, you're aware that a
14  prisoner has the right to appeal a response to a
15  grievance?
16      MR. NICHOLS:  Objection to the extent
17   the question is calling for the witness to
18   speculate about the grievance appeal
19   process.
20      MR. MORRISSEY:  To her knowledge.
21      MR. NICHOLS:  To the extent you have
22   any knowledge about it, you can answer.
23  BY THE WITNESS:
24   **A.  As to what time frame?**

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 117

1  BY MR. MORRISSEY:
2    Q.  From August 16 to the present if a
3  prisoner files a grievance in regards to, let's
4  say, providing an accomodation for a person with
5  a cane going up and down the ramp at Leighton
6  and it's responded to -- it's accepted as a
7  grievance and the grievance is denied by you or
8  another person who reviews the grievance, does
9  that prisoner have the right to appeal?
10      MR. NICHOLS:  Objection, form,
11   objection, the question calls for
12   speculation.  To the extent you have any
13   personal knowledge or even understand the
14   question that's been posed, you can answer.
15  BY THE WITNESS:
16   **A.  I don't know about the rights to**
17  **appeal.  I don't work for inmate services.  I**
18  **know that generally there's a right to appeal.**
19  **What type of grievances are appealable, I do not**
20  **know.**
21  BY MR. MORRISSEY:
22    Q.  Within the last 3 or 4 weeks, have you
23  physically been inside the RTU?
24   **A.  Yes.**

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 118

1    Q.  Are you inside the RTU on a daily
2  basis?
3   **A.  On a daily basis, no.**
4    Q.  At least several times a week in the
5  last month?
6   **A.  At least, yes.**
7    Q.  And inside the RTU in the last month,
8  have there been any postings in the RTU in
9  regards to the grievance procedures?
10   **A.  I don't know.**
11   Q.  What floors have you been on in the
12  last month in the RTU?
13   **A.  I've been on all the floors.**
14   Q.  In the last month, you have not -- you
15  don't recall seeing any posted notices up on any
16  of the walls in the RTU tiers that you visited
17  in regards to the grievance process?
18   **A.  My purpose for being on those floors is**
19  **to meet with detainees, not take note of the**
20  **posters.  So, no, I'm not aware of the posters.**
21   Q.  I'm going to turn you to the second
22  page of Mr. Polletta's grievance which is the
23  response and the inmate's request for an appeal.
24  Do you see that?

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 119

1   **A.  No, I don't know what page you're**
2  **referring to.**
3      MR. NICHOLS:  I'm just going to note,
4   again, the second page of this exhibit,
5   Mr. Morrissey, it appears to be nestled
6   within a group exhibit.  This is also
7   illegible.  I can't read it.  I don't know
8   what it says.
9      MR. MORRISSEY:  The grievance that he
10   filed on 3/7/17 --
11  BY MR. MORRISSEY:
12   Q.  Grievance forms are usually 2 pages,
13  two-sided?
14   **A.  What page are you referring to?**
15      MR. NICHOLS:  Do you have a cleaner
16   copy?  I don't want my witness responding to
17   this if I can't read it.  I don't know what
18   it says.
19      MR. MORRISSEY:  Let's go off the
20   record.
21         (Whereupon, a discussion was had
22          off the record.)
23      MR. MORRISSEY:  Let's go back on the
24   record.

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 30

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 120

1    MR. NICHOLS: I'm going to note for the
2  record that this page is also illegible.
3  I'm not comfortable with my witness
4  answering questions about an illegible
5  document. I have asked the attorney for the
6  plaintiff to produce a cleaner copy. He has
7  refused to do so.
8  BY MR. MORRISSEY:
9    Q.  I'm going to show you the second page
10 of Mr. Polletta's grievance from 3/7/17. Under
11 inmate request for appeal, do you see that?
12 There's some typewritten information. It says:
13 This section is to be completed by inmate,
14 inmate's request for an appeal. Do you see
15 that?
16   A.  Yes.
17   Q.  Can you read that?
18   A.  I can read those 2 lines, yes.
19   Q.  Can you read the line below it, to
20 exhaust administrative remedies -- do you know
21 what administrative remedies are?
22   MR. NICHOLS: Objection. The question
23   calls for a legal conclusion, Tom. Please
24   rephrase the question.

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 121

1    MR. MORRISSEY: Let me read the
2    statement, Mr. Nichols, before you object.
3  BY MR. MORRISSEY:
4    Q.  To exhaust administrative remedies,
5  grievance appeals must be made within 15 days
6  of -- calendar days of the date the inmate
7  received the response. An appeal must be filed
8  in all circumstances in order to exhaust
9  administrative remedies. Did I accurately read
10 that?
11   A.  You accurately read that part, yes.
12   Q.  Are you able to read that, too?
13   A.  I'm able to read the typewritten part,
14 yes.
15   Q.  And below that, there's another line:
16 Independent of the CCDOC procedure and after
17 receiving an appeal decision, if you are
18 dissatisfied with the outcome, you must submit
19 the appeal grievance to the Illinois Department
20 of Corrections, Jail and Detention Standards
21 Unit, 1301 Concordia Court, PO Box 19277,
22 Springfield, Illinois, 62794. Are you able
23 to -- did I read that accurately?
24   A.  Yes.

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 122

1    Q.  And can you read that statement also?
2  Is it legible?
3    A.  It is.
4    Q.  As an inmate coordinator at the jail,
5  do you know whether it's necessary in order to
6  exhaust your administrative remedy to appeal any
7  decision to the Illinois Department of
8  Corrections, Jail and Detention Standards Unit?
9    MR. NICHOLS: Objection, form.
10   Ms. Rivero-Canchola is not an inmate
11   coordinator. She's an ADA coordinator.
12   MR. MORRISSEY: I'm asking her as a
13   sheriff's employee.
14 BY THE WITNESS:
15   A.  You said I was the inmate coordinator,
16 Mr. Morrissey. That's not my job.
17 BY MR. MORRISSEY:
18   Q.  Well, you're an ADA coordinator.
19   A.  But you're confusing the record.
20   Q.  All right. As a sheriff's employee, as
21 the ADA coordinator, as a person that frequently
22 responds to grievances, in order to exhaust your
23 administrative remedies, is it required for the
24 inmate to appeal any decision by the Cook County

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 123

1  Jail to the Illinois Department of Corrections,
2  Jail and Detention Standards Unit?
3    MR. NICHOLS: Objection to the extent
4    the question calls for a legal conclusion
5    and to the extent you have already covered
6    this.
7    MR. MORRISSEY: I'm asking to her
8    knowledge.
9    MR. NICHOLS: You just read this
10   section into the record. I think it speaks
11   for itself.
12   MR. MORRISSEY: I'm asking to her
13   knowledge, is that required.
14   MR. NICHOLS: If you have any knowledge
15   of the jail's grievance process, you can
16   answer.
17 BY THE WITNESS:
18   A.  My knowledge is limited to what you
19 just read today, Mr. Morrissey.
20 BY MR. MORRISSEY:
21   Q.  And this form has been in existence
22 since August of 2016?
23   A.  My job is not to interpret the
24 grievance form or enter the language, so I have

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 31

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 124

1  no idea why that's in there.
2      Q.   Do you know what, if anything, the
3  Illinois Department of Corrections, Jail and
4  Detention Standards does with appeals to
5  grievances filed by inmates in the Cook County
6  Jail?
7      A.   I do not.
8      Q.   Have you been in any discussions or
9  meetings in the Cook County Jail that explain
10 this portion of the grievance appeal process?
11         MR. NICHOLS:  Objection to the extent
12     that it calls for the witness to speculate
13     and to the extent that it may call for
14     privileged information, but if you have any
15     knowledge, personal knowledge of what
16     Mr. Morrissey just asked you, you can
17     answer.
18 BY THE WITNESS:
19     A.   I have no knowledge.
20 BY MR. MORRISSEY:
21     Q.   To your ability as somebody who's in
22 the correctional setting day in and day out, if
23 a prisoner asked you what do they have to do to
24 exhaust administrative remedies after filing an

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 125

1  appeal in regards to an ADA issue, what would
2  you tell them?
3          MR. NICHOLS:  Objection, form.  The
4      question poses a hypothetical.  The question
5      is vague as to time frame and location, and
6      it calls for the witness to speculate.
7          MR. CONDRON:  I'll join.
8          MR. NICHOLS:  To the extent that you
9      have any personal knowledge of a
10     hypothetical situation that hasn't occurred,
11     feel free to answer to the best of your
12     personal knowledge.
13 BY THE WITNESS:
14     A.   If that should happen, which it hasn't
15 because in my experience inmates are pretty
16 familiar with how to exhaust their remedies, I
17 would direct them to their social worker who
18 could better answer their questions.
19 BY MR. MORRISSEY:
20     Q.   In looking at this form, do you know
21 what an inmate has to do in order to exhaust
22 their administrative remedies?
23         MR. NICHOLS:  Objection, asked and
24     answered.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 126

1  BY THE WITNESS:
2      A.   I believe the language which you just
3  read into the record speaks for itself.
4  BY MR. MORRISSEY:
5      Q.   So they would have to then go to the
6  Illinois Department of Corrections to exhaust --
7          MR. NICHOLS:  Objection, asked and
8      answered.
9  BY THE WITNESS:
10     A.   I'm going to let the language speak for
11 itself.  I have no other knowledge besides
12 what's printed in this form.
13 BY MR. MORRISSEY:
14     Q.   Do you know how long a prisoner has to
15 wait after writing to the IDOC before they have
16 exhausted their administrative remedies?
17         MR. NICHOLS:  Objection.  The witness
18     has already testified multiple times that
19     she has no personal knowledge of the
20     grievance process.  You keep asking her --
21         MR. MORRISSEY:  I think you're putting
22     words into her mouth.
23         MR. NICHOLS:  She just stated that she
24     has no personal knowledge.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 127

1  BY MR. MORRISSEY:
2      Q.   In the last 2 months, have you had any
3  conversations with -- Strike that.
4          Do you know a gentleman by the name of
5  Michael Gumm?
6      A.   Yeah, I do.
7      Q.   Is he still the ADA coordinator for
8  Cook County?
9          MR. NICHOLS:  Objection only to the
10     extent that the question calls for the
11     witness to speculate.  You can answer based
12     on your personal knowledge.
13         MR. CONDRON:  I'll join.
14 BY THE WITNESS:
15     A.   I don't know Mr. Gumm's title.
16 BY MR. MORRISSEY:
17     Q.   In the last 2 months, have you
18 discussed with Mr. Gumm the issue of providing
19 accommodations for inmates with medical alerts
20 for canes, crutches, or walkers when they
21 navigate the ramps leading to the Leighton
22 courthouse?
23     A.   Have I discussed accommodations for
24 those inmates?  No, I have not.

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 32

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 128

1    Q.   Have you had any conversations in the
2 last 2 months with Mr. Gumm in regards to ADA
3 issues at the Cook County Department of
4 Corrections or Leighton court building?
5         MR. NICHOLS:  Objection.  The question
6    is vague.  It's really overbroad as to
7    location and time frame, but to the extent
8    that you have any personal knowledge of
9    that, you can answer.
10 BY THE WITNESS:
11   A.   I've discussed the status of the
12 renovation project with Mr. Gumm, and that's it.
13 BY MR. MORRISSEY:
14   Q.   By renovation project, what do you
15 mean?
16   A.   The renovation of the Leighton
17 courthouse.
18   Q.   When did you have this discussion with
19 Mr. Gumm?
20   A.   Ongoing.
21   Q.   When was the last time you talked to
22 Mr. Gumm about renovations at the Leighton court
23 building?
24   A.   Approximately 2 weeks ago.

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 129

1    Q.   Who was present during those
2 conversations?
3         MR. NICHOLS:  Objection to the extent
4    that it may call for privileged information.
5    You can answer to the extent you know.
6         MR. CONDRON:  I'll join.
7 BY THE WITNESS:
8    A.   I don't know.  It was ongoing.  I don't
9 recall who was there for various discussions.
10 BY MR. MORRISSEY:
11   Q.   Was it a phone call, or was it in
12 person with Mr. Gumm?
13   A.   It could have been both.
14   Q.   Well, I'm asking?
15   A.   As part of my duties, I speak with
16 Mr. Gumm pretty regularly.  I don't recall.
17   Q.   Did Mr. Gumm relate to you whether or
18 not there was any work orders in place for
19 renovating the courtroom holding cells at
20 Leighton?
21         MR. NICHOLS:  Objection, form.
22 BY THE WITNESS:
23   A.   Work orders?  Such as?  Define work
24 order.

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 130

1 BY MR. MORRISSEY:
2    Q.   To your knowledge, what is the status
3 from your conversation with Mr. Gumm in regards
4 to the renovation of the holding cells at
5 Leighton?
6         MR. NICHOLS:  Objection, form.
7         MR. CONDRON:  Objection, relevance.
8 BY THE WITNESS:
9    A.   It's in progress.
10 BY MR. MORRISSEY:
11   Q.   What do you mean by in progress?
12   A.   Meaning it's in progress of getting
13 done.  It's moving forward, moving forward.
14   Q.   To your knowledge -- from your
15 conversations with Mr. Gumm, have there been any
16 conversations in regards to providing
17 accommodations for wheelchair -- Strike that.
18        Have there been any conversations with
19 Mr. Gumm in regards to providing accommodations
20 for individuals with cane or crutches going up
21 and down the ramps?
22   A.   I've had no conversations with Michael
23 Gumm specific to canes, crutches, or walkers
24 going up ramps.

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 131

1    Q.   Have you had any conversations in the
2 last month with Mr. Gumm in regards to the ramp
3 leading to the courthouse building?
4         MR. NICHOLS:  Objection, asked and
5    answered.
6 BY THE WITNESS:
7    A.   I have ongoing conversations with
8 Mr. Gumm about the status of the renovation
9 plan.
10 BY MR. MORRISSEY:
11   Q.   Specifically in regards to the ramp --
12   A.   The ramp is included in the plan,
13 Mr. Morrissey, so, yes, ongoing discussions.
14   Q.   To your knowledge, in the next 6
15 months, is the ramp going to be changed in order
16 to make it -- the slope accessible for disabled
17 prisoners?
18   A.   In the next 6 months?  You would have
19 to ask Cook County that.  I don't control the
20 time line.
21   Q.   In the next 6 months, are the holding
22 cells at Leighton going to be renovated to make
23 them accessible to people with disabilities?
24         MR. NICHOLS:  Objection only to the

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 33

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 132

```
 1      extent the question calls for a legal
 2      conclusion.
 3 BY THE WITNESS:
 4      A.   You would have to ask Cook County about
 5 the time line.
 6 BY MR. MORRISSEY:
 7      Q.   Within the next year --
 8      A.   I don't know, Mr. Morrissey.  Why do
 9 we play this game?  I don't know.  Ask Cook
10 County.
11      Q.   You have had continuous conversations
12 with Mr. Gumm.  What has he told you in regards
13 to renovation plans for the ramp and the holding
14 cells at Leighton to make them accessible for
15 people with disabilities?
16      MR. NICHOLS:  Objection, form.
17 BY THE WITNESS:
18      A.   Asked and answered.  It's in progress.
19 We're moving forward.
20 BY MR. MORRISSEY:
21      Q.   Other than a simple, it's in progress,
22 can you explain further what in progress means?
23      MR. NICHOLS:  Objection, asked and
24      answered.  She's answered this multiple
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 133

```
 1      times.
 2 BY THE WITNESS:
 3      A.   I can't.  You have to ask Cook County.
 4 I do not control the time line on the
 5 renovation.
 6      MR. MORRISSEY:  We're going to have to
 7      take a break to talk to Magistrate Kim
 8      (phonetic) in about 7 minutes.  So do you
 9      want to take a break?
10      MR. NICHOLS:  We're off the record.
11           (Whereupon, a discussion was had
12           off the record.)
13      MR. MORRISSEY:  Back on the record.
14      We're now resuming at a quarter to 2:00.
15      Mr. Condron gave us authorization to proceed
16      in his absence.  Is that right, Mr. Nichols?
17      MR. NICHOLS:  Yes.
18 BY MR. MORRISSEY:
19      Q.   Ms. Canchola, I'm going to ask you
20 again to look at Exhibit No. 5, please.  I'm
21 going to ask you to look at a grievance Bates
22 stamped 144.  It's a grievance.  It's filed by
23 Mr. Polletta on August 23, 2016.  Do you want to
24 take a moment to read the 2 pages, 144 and 145?
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 134

```
 1 Prior to today's deposition, did you review this
 2 grievance?
 3      A.   Yes.
 4      Q.   In this grievance, Mr. Polletta is
 5 grieving about an inaccessible holding cell in
 6 the Maywood courthouse; is that correct?
 7      A.   Correct.
 8      Q.   And it's in the basement of the Maywood
 9 courthouse.  It's 1 of the 2 bullpens in Maywood
10 that have been set aside for disabled prisoners;
11 is that correct?
12      A.   Correct.
13      Q.   Have you as the ADA coordinator ever
14 been out to examine and inspect these 2 bullpens
15 in Maywood?
16      A.   I have.
17      Q.   And as the ADA coordinator, have you
18 had the ability or the chance to review Judge
19 Gettleman's decision on May 7, 2017, in regards
20 to Maywood --
21      MR. NICHOLS:  Objection, relevance.
22      You can answer.
23
24
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 135

```
 1 BY THE WITNESS:
 2      A.   I don't recall the date of the
 3 decision, but I did review Gettleman's decision
 4 regarding Maywood.
 5 BY MR. MORRISSEY:
 6      Q.   And the court in May of 2017 found that
 7 the alterations were not -- didn't satisfy the
 8 ADA in regards to the barrier that was in front
 9 of the retaining wall; is that accurate?
10      MR. NICHOLS:  Objection, relevance.
11      You can answer to the extent you know about
12      a judge's opinion.
13 BY THE WITNESS:
14      A.   Correct, that there was inadequate
15 floor space because of the privacy screen.
16 BY MR. MORRISSEY:
17      Q.   Since the time of Judge Gettleman's
18 ruling in May of 2017, has there been any
19 attempt to modify or renovate that holding cell
20 to comply with Judge Gettleman's order?
21      A.   I don't know.  You would have to ask
22 Cook County that.
23      Q.   Have you been in any discussions with
24 nonlawyers in regards to the Maywood court
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 34

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 136

1 holding cells in the basement that were the
2 subject of Judge Gettleman's order?
3     **A.   I've discussed it with Michael Gumm.**
4     Q.   When did you have the discussion with
5 Mr. Gumm?
6     **A.   I don't recall the date.**
7     Q.   Did Mr. Gumm agree with Judge
8 Gettleman's findings?
9     **A.   I don't know.  You would have to ask**
10 **him.**
11     Q.   What did you say to Mr. Gumm, and what
12 did Mr. Gumm say to you?
13         MR. NICHOLS:  Objection, form.  You can
14     answer to the extent you recall the
15     conversation.
16 BY THE WITNESS:
17     **A.   I don't recall the specifics.  We**
18 **generally discussed Maywood.**
19 BY MR. MORRISSEY:
20     Q.   Was it during a face-to-face
21 conversation?
22     **A.   I believe so.**
23     Q.   Where was the conversation held?
24     **A.   I don't recall.**

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 137

1     Q.   Who else was present in the
2 conversation?
3     **A.   I don't think anyone else was present.**
4     Q.   You received this grievance, correct,
5 on August 25, 2016?
6     **A.   Did I receive it that day?  I don't**
7 **know.**
8     Q.   Did you respond to Mr. Polletta's
9 grievance as part of your duties as the ADA
10 coordinator?
11     **A.   I did.**
12     Q.   Was it marked as a grievance or a
13 nongrievance?
14     **A.   It's marked as a nongrievance request.**
15     Q.   Did you make the decision to mark it as
16 a nongrievance request?
17     **A.   No, I did not.**
18     Q.   Do you know what a nongrievance request
19 is?
20     **A.   No, I do not.**
21     Q.   Do you know what a grievance request
22 is?
23     **A.   A grievance is this form with a control**
24 **number on it.**

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 138

1     Q.   Now, why did you -- how did you respond
2 to Mr. Polletta's complaint that the holding
3 cell in the basement of Maywood was not
4 compliant with the ADA?
5     **A.   How did I respond?  As in what's my**
6 **response on this form?**
7     Q.   What was your response to his
8 grievance?
9     **A.   My response on this form is that his**
10 **grievance was untimely and that he did not**
11 **attend court on the date listed as the incident**
12 **date.  So I did have a separate conversation**
13 **with Mr. Polletta regarding his concerns.**
14     Q.   My issue is, in his grievance, did he
15 acknowledge that he didn't go to court that day?
16     **A.   Yes, he does.**
17     Q.   So it wasn't an issue whether actually
18 he physically went to the courtroom or not,
19 correct?
20     **A.   Actually, it was an issue because he**
21 **marked the date of incident as 8/12/16.**
22     Q.   I'm not going to quibble with you about
23 that.  Why did you say that his grievance was
24 untimely?

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 139

1     **A.   Because he did not grieve the issue**
2 **when he first began going to Maywood as a**
3 **wheelchair user.**
4     Q.   In your position as the person who
5 responds to ADA grievances, why did you
6 determine that his grievance was not timely
7 given the fact that he had continuous court
8 appearances at Maywood?
9     **A.   He did not write ongoing on this form,**
10 **Mr. Morrissey.  He wrote date of incident,**
11 **8/12/16.**
12     Q.   Why did you say that it was untimely
13 since he's been going to court in Maywood since
14 April of 2015 and never raised this as an issue?
15     **A.   Because he had never raised it as an**
16 **issue.**
17         MR. NICHOLS:  Can we go off the record?
18         MR. MORRISSEY:  No, we're still on the
19     record.
20         MR. NICHOLS:  After this question, can
21     we go off the record?
22 BY MR. MORRISSEY:
23     Q.   Your understanding, in order for
24 Mr. Polletta to grieve the accessibility of the

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 35

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 140

1  ADA holding cell in Maywood, he would have had
2  to have grieved within 15 days of his first
3  court appearance at Maywood in April of 2015?
4          MR. NICHOLS:  Objection, relevance.
5  You can answer.
6  BY THE WITNESS:
7      A.   As the form states, the inmate should
8  raise the issue 15 days -- within 15 days after
9  the event.  He had not done so.  So it was
10 untimely.  However, I did take action on his
11 concerns.
12         MR. NICHOLS:  Can we go off the record
13 very quickly?  I'll be very brief.
14         MR. MORRISSEY:  Sure.
15             (Whereupon, a discussion was had
16              off the record.)
17 BY MR. MORRISSEY:
18     Q.   So in order to grieve, Mr. Polletta
19 needed to do that within 15 days of his first
20 court appearance at Maywood?
21     A.   Clearly he grieved it, and it wasn't
22 within 15 days.  I didn't say it was
23 nongrievable.  I said it was untimely.
24     Q.   Now, he was not given a control number.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 141

1  Was that your decision, or was that the decision
2  of somebody else?
3      A.   You already asked me that.  I said it
4  was not my decision.
5      Q.   If Mr. Polletta went to court on
6  June 6, tomorrow, and again raised the issue of
7  the barrier in front of the toilet in the
8  holding cell at Maywood, would that be timely?
9          MR. NICHOLS:  Just for the record, I'm
10 going to make this clear, the defendants are
11 not disputing whether or not Mr. Polletta
12 exhausted his administrative remedies with
13 respect to court attendance at Maywood.
14 Feel free to answer whatever questions that
15 are relevant to this particular witness.
16 BY THE WITNESS:
17     A.   Timely is defined in the form, Tom, so
18 within 15 days of the event.
19 BY MR. MORRISSEY:
20     Q.   So 15 days would have been April of
21 2015?
22     A.   Within 15 days of his entering Maywood
23 as a wheelchair user if he's grieving wheelchair
24 accessibility.  So it would be within 15 days of

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 142

1  that date.  I don't know what that date is.
2      Q.   So whatever his first appearance in
3  Maywood would be the time to --
4      A.   As a wheelchair user.
5      Q.   As an ADA coordinator, do you
6  communicate with other ADA coordinators in
7  prisons and jails throughout the country?
8          MR. NICHOLS:  Objection, relevance,
9  objection to the extent it calls for
10 privileged information.  You can answer to
11 the extent you know.
12 BY THE WITNESS:
13     A.   I communicate with a lot of people from
14 other facilities.
15 BY MR. MORRISSEY:
16     Q.   Such as -- who have you talked to in
17 regards to other -- in regards to ADA issues at
18 other correctional facilities?
19         MR. NICHOLS:  Objection, relevance, and
20 objection to the extent that it calls for
21 privileged information.  You can answer to
22 the extent that you can.
23 BY THE WITNESS:
24     A.   I don't recall any names.

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 143

1  BY MR. MORRISSEY:
2      Q.   Is it your -- is it the sheriff's
3  position that for a person with a cane or crutch
4  or walker to receive an accomodation going up
5  and down the ramp at Leighton, that he or she
6  should ask the sheriff for an accommodation?
7      A.   That individual should notify a staff
8  member if they need assistance when the need for
9  accomodation isn't obvious.
10     Q.   As the ADA coordinator, what type of
11 things are obvious when a prisoner goes up or
12 down the ramp at Leighton with either a cane,
13 crutch, or walker?
14         MR. NICHOLS:  Objection.  That question
15 calls for the witness to speculate and calls
16 for a legal conclusion.
17 BY MR. MORRISSEY:
18     Q.   Let me rephrase the question.  What
19 makes it obvious when a prisoner goes up or down
20 the ramp at Leighton?
21         MR. NICHOLS:  Objection, form,
22 objection, the question calls for the
23 witness to speculate, and objection to the
24 extent that it calls for a legal conclusion.

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 36

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 144

1    You can answer to the best of your ability.
2  BY THE WITNESS:
3    **A.  I can't speculate.  That would be a**
4  **very fact-specific inquiry.**
5  BY MR. MORRISSEY:
6    Q.  Have you as an ADA coordinator within
7  the last 6 months reviewed any video of
8  prisoners with canes, walkers, or crutches going
9  up or down the Leighton ramps?
10    **A.  Yes, I have.**
11    Q.  In the last month and a half, have you
12  reviewed any videos of prisoners with canes,
13  crutches, or walkers going up or down the ramps
14  at Leighton?
15    MR. NICHOLS:  Objection, asked and
16    answered.
17  BY THE WITNESS:
18    **A.  Yes, I have.**
19  BY MR. MORRISSEY:
20    Q.  What caused you to look at videos of
21  prisoners going up and down the ramp?
22    MR. NICHOLS:  Objection to the extent
23    the question calls for privileged
24    information.  I'm going to instruct her not

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 145

1  to answer that question.
2    MR. MORRISSEY:  Go ahead.
3    MR. NICHOLS:  I'm instructing her not
4  to answer.  That's privileged.  You're
5  asking for privileged information.
6  BY MR. MORRISSEY:
7    Q.  I'm showing you a video on 4/9/2017 --
8  I'm sorry -- April 10, 2017, at 1:00 p.m. of a
9  gentleman going up the ramp at Leighton and ask
10  you if you have seen this video before?
11    MR. NICHOLS:  Just for the record, the
12    witness is watching a video playing on the
13    computer screen.
14    MR. MORRISSEY:  We're concluding that
15    video at 1:00 p.m. and 27 seconds.
16  BY MR. MORRISSEY:
17    Q.  Ms. Canchola, have you seen that video
18  before?
19    **A.  No.**
20    Q.  After looking at that video, as the ADA
21  coordinator, is it obvious that the gentleman
22  that's holding on to the wall walking up with a
23  cane needs assistance?
24    **A.  I couldn't see the video because yours**

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 146

1  **and Patrick's head was in the way, and the**
2  **screen is too tiny.**
3    Q.  We'll play it again.
4    MR. NICHOLS:  Just for the record,
5    again, the witness is watching the same
6    video.
7    MR. MORRISSEY:  This is an exhibit in
8    our currently pending motion to compel
9    before Judge Shadur.
10    MR. CONDRON:  To the extent you're
11    asking her whether he needs assistance, I'm
12    going to just object.  That calls for
13    speculation.
14  BY MR. MORRISSEY:
15    Q.  Have you had a chance to review the
16  video?
17    **A.  I have.  Thank you.**
18    Q.  As the ADA coordinator, was it obvious
19  to you that that gentleman depicted in the film
20  on 4/10/2017 at 1:00 p.m. needed assistance
21  going up and down the ramp at Leighton?
22    **A.  Needed what type of assistance?**
23    Using the word assistance --
24    **A.  Could you define the context in which**

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 147

1  **you're using that word?**
2    Q.  Other than being provided with a cane,
3  would you agree that some additional assistance
4  was necessary under the ADA to provide that
5  gentleman an accomodation going up the ramp at
6  Leighton?
7    MR. NICHOLS:  Objection.  The question
8    calls for the witness to speculate and calls
9    for a legal conclusion.  You can answer to
10    the best of your ability.
11  BY THE WITNESS:
12    **A.  From watching that video clip, I cannot**
13  **conclude that that individual was covered under**
14  **the ADA.**
15  BY MR. MORRISSEY:
16    Q.  Who makes the decision whether a person
17  with an assistive device such as a cane going up
18  a ramp which the defendant has acknowledged is
19  noncompliant with the ADA, whether or not that
20  person needs assistance or not, who makes that
21  decision?
22    **A.  Who makes the decision whether --**
23  **regarding what?**
24    Q.  Whether or not the gentleman going up

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 37

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 148

1  the ramp at 1:00 p.m. on April 10, 2017, whether
2  that person is a qualified individual under the
3  ADA?
4      A.   I don't know.  That's a legal
5  conclusion.
6      Q.   Is that a decision made by the medical
7  staff?
8      A.   I don't know.
9      Q.   Well, the medical staff determined --
10  made a determination that that gentleman needs a
11  cane?
12      MR. NICHOLS:  Objection only to the
13      extent that it mischaracterizes the video.
14      It appears that the gentleman in that video
15      did not have a DOC uniform on.  So it's
16      unclear whether or not he did process
17      through the jail or not.  I just want to
18      make that very clear for the record.  You
19      can answer to the best of your ability.
20  BY THE WITNESS:
21      A.   I don't know.  I don't even know who
22  that is.
23
24

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 149

1  BY MR. MORRISSEY:
2      Q.   Going back a moment, you said that
3  prior to a person with a cane, crutch, or a
4  walker getting assistance from the sheriff going
5  up and down the ramp, he or she would have to
6  request it from a sheriff's employee unless it
7  was obvious that there was a need for
8  assistance; is that accurate?
9      A.   Yes.
10      Q.   Is there any definition under what
11  circumstances would it be obvious that a person
12  with a cane, crutch, or walker needed
13  assistance?
14      MR. NICHOLS:  Objection, form.  The
15      question calls for the witness to speculate
16      and calls for a legal conclusion.  You can
17      answer to the extent that you know.
18  BY THE WITNESS:
19      A.   Whether the need for accommodation is
20  obvious is a very fact-specific inquiry.
21  BY MR. MORRISSEY:
22      Q.   As the ADA coordinator, have you given
23  any written instruction to sheriff's employees
24  in regards to what is obvious in regards to a

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 150

1  prisoner with a cane, crutch, or walker when he
2  or she goes up or down the ramp at Leighton?
3      A.   As I have stated, the need for
4  accommodation that's obvious would be a very
5  fact-specific inquiry.
6      Q.   Are correctional officers or sheriff's
7  court service employees trained by you
8  specifically when an assistive device is
9  required when a prisoner with a cane, crutch, or
10  walker goes up or down the ramp at Leighton?
11      A.   I don't understand your question.
12      MR. MORRISSEY:  Can you repeat the
13      question?
14      THE WITNESS:  I don't need her to
15      repeat it.  I need you to rephrase it
16      because it's confusing.
17  BY MR. MORRISSEY:
18      Q.   As the ADA coordinator, at times, do
19  you provide training to sheriff's employees?
20      A.   I do.
21      Q.   When you provide training to sheriff's
22  employees, have you provided specific training
23  in regards to the Leighton ramp?
24      A.   With regard to wheelchair users and

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 151

1  what's in the order, yes, I do.
2      Q.   By in the order, you mean the sheriff's
3  order which is part of Exhibit No. 2, correct?
4      A.   I mean both the sheriff's order and the
5  general order.
6      Q.   Have you given any specific training
7  during your training programs to sheriff's
8  employees in regards to when a prisoner with a
9  cane, crutch, or walker goes up or down the
10  ramp, specifically up or down the ramp at
11  Leighton?
12      A.   No, my training doesn't assume that
13  someone would need assistance on the ramp just
14  because they have a specific auxiliary device.
15      Q.   Do you tell in the training program
16  sheriff's employees what you consider to be
17  obvious in regards to a person with a cane,
18  crutch, or walker when he or she goes up or down
19  the ramp?
20      A.   No, I do not.
21      Q.   You mentioned that in order for a
22  prisoner assigned a cane, crutch, or walker to
23  receive some additional assistance going up or
24  down the ramp at Leighton, that it's that

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 38

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 152

```
1   prisoner's responsibility to request assistance
2   from a sheriff's employee?
3           MR. NICHOLS:  Objection,
4       mischaracterizes the witness' previous
5       testimony, objection, the question is vague
6       as to time frame, and objection to the
7       extent the question calls for the witness to
8       speculate.  You can answer.
9   BY THE WITNESS:
10      A.   If the need for accommodation is not
11  obvious, yes, they would have to request
12  assistance.
13  BY MR. MORRISSEY:
14      Q.   How would a prisoner before he or she
15  goes up the ramp at Leighton with a cane,
16  crutch, or walker request assistance from a
17  sheriff's employee?
18      A.   They could notify a staff member that's
19  present.
20      Q.   Have you provided specific training for
21  the sheriff's employees that are stationed at
22  the ramp -- the ramp at Cermak in regards to
23  when -- what to do if they're requested
24  assistance from a prisoner navigating the ramps
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 153

```
1   with a cane, crutch, or walker?
2           MR. NICHOLS:  Objection, form,
3       objection, relevance.  Do you want to
4       rephrase that question?
5   BY MR. MORRISSEY:
6       Q.   Do you understand the question?
7       A.   You just asked me about the ramp at
8   Cermak, so I have no idea.
9       Q.   Sure.  In regards to the sheriff's
10  employees that are posted at the ramp position,
11  have you given those individual sheriff's
12  employees training as far as what to do if a
13  prisoner asks for assistance going up or down
14  the ramp if they're provided a cane, crutch, or
15  walker?
16      A.   At which ramp?
17      Q.   The ramps leading to -- the 2 ramps
18  leading to the Leighton courthouse?
19      A.   The staff have all received the same
20  training.
21      Q.   So in regards to specifically the ramps
22  at Leighton, there has not been a unique or
23  specific training in regards to the ramps at
24  Leighton to the employees?
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 154

```
1           MR. NICHOLS:  Objection.  The question
2       is vague.
3   BY MR. MORRISSEY:
4       Q.   Let me rephrase it.  Considering
5   prisoners that have alerts for canes, crutches,
6   or walkers, have employees at the sheriff's
7   office received specific training in regards to
8   those individuals going up or down the ramp at
9   Leighton?
10      A.   No.
11      Q.   Approximately when did you first start
12  looking at film of inmates going up and down the
13  ramps at Leighton with canes, crutches, and
14  walkers?
15      A.   Shortly after I began as the ADA
16  coordinator.
17      Q.   And when you did that, did you see on a
18  daily basis that inmates with canes, crutches,
19  and walkers were going up and down the ramps at
20  Leighton?
21      A.   No.  Generally the video I watched was
22  a very specific targeted video.
23      Q.   And were those targeted to prisoners
24  that were with wheelchairs?
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 155

```
1       A.   Yes.
2       Q.   So when you first started, you weren't
3   looking for prisoners that were going up and
4   down the ramps with canes, crutches, and
5   walkers?
6           MR. NICHOLS:  Objection.  The question
7       is vague as to time frame.
8   BY MR. MORRISSEY:
9       Q.   In 2015 up until the spring of -- up
10  until, let's say, February of 2017, is it fair
11  to say as the ADA coordinator, you were not
12  reviewing films of people going up and down the
13  ramps at Leighton specifically to see if there
14  was any assistance given to prisoners with
15  canes, crutches, or walkers?
16      A.   No, there was not a need for such a
17  review.
18      Q.   Since March of 2017, have you reviewed
19  films of prisoners with canes, crutches, and
20  walkers going up and down the ramps at Leighton?
21      A.   Have I reviewed films?  I reviewed a
22  film.
23      Q.   Only one film you reviewed?
24      A.   Yes.
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 39

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 156

1  Q.   And what film -- what date was that
2  film?
3  A.   I don't remember.
4  Q.   Was it of a particular prisoner?
5  A.   Well, it would be of a particular
6  prisoner.  Those are the only people in the
7  films, Tom.
8  Q.   What was the date of the film?
9  A.   You just asked me that.  I don't
10  remember.
11  Q.   Who was the prisoner depicted in the
12  film?
13  A.   I have no idea.
14  Q.   What did the -- for what period of time
15  was the film that you reviewed?
16  A.   I don't know.
17  Q.   Was it more than a half hour?
18  A.   I'm not sure.
19  Q.   Did you see a person with a cane or
20  crutches going up and down the ramp?
21  A.   I saw a person with crutches.
22  Q.   And was that Mr. Grant?
23  A.   I have no idea.
24  Q.   What did you observe when you saw the

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 157

1  person with crutches going up and down the ramp?
2  A.   I observed someone lose their footing a
3  little bit and regain their footing and a staff
4  member stand by them and walk them down the
5  ramp.
6  Q.   Prior to the prisoner losing his
7  footing, did you see the correctional officer
8  assisting the person on a crutch going down the
9  ramp?
10  A.   I saw the staff member doing their job.
11  Q.   And as far as the ADA coordinator, when
12  the person was first heading down the ramp with
13  crutches in the film that you reviewed, was the
14  correctional officer holding him?
15  A.   No, he wasn't holding him.
16  Q.   And was it only at the time that he
17  started to fall or slip that the correctional
18  officer grabbed him?
19  A.   Yes.  That's when the need for
20  accommodation became obvious.
21  Q.   Did you review -- for the individual
22  that slipped, did you review the fact that he
23  went up and down the ramp about 3 times that
24  day?

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 158

1  A.   No.
2  Q.   After he slipped?
3  A.   No.
4  Q.   Was it obvious after he slipped going
5  down the ramp that he needed assistance when he
6  went up and down the ramp in the future?
7       MR. NICHOLS:  Objection as to time
8       frame.
9  BY THE WITNESS:
10  A.   It's obvious that he lost his footing
11  going down the ramp.
12  BY MR. MORRISSEY:
13  Q.   Do you know whether he was going up or
14  down the ramp when he slipped?
15  A.   I believe he was going down.
16  Q.   In regards to a person being assigned a
17  wheelchair, does that require a medical alert at
18  the jail?
19       MR. NICHOLS:  Objection, relevance.
20  BY THE WITNESS:
21  A.   In nonemergency circumstances, yes.
22  BY MR. MORRISSEY:
23  Q.   Do you know as the ADA coordinator
24  whether there was always an available wheelchair

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 159

1  at the base of the 2 ramps at Leighton?
2  A.   There's always one not far from there.
3  Q.   By not far, what do you mean?
4  A.   Meaning not far.  It doesn't take you
5  long to get there.
6  Q.   Can you tell me what distance --
7  A.   I can't.  Sorry.  I'm bad with
8  distance.
9  Q.   Could it be like a block away?
10  A.   Probably shorter.
11  Q.   Is it within the Leighton court
12  building, or is it within the jail confines that
13  there was an available wheelchair?
14  A.   I don't know if there are wheelchairs
15  in Leighton, but it would be within the jail.
16  Q.   I'm going to show you what starts on
17  April 9, 2017, at 2:45 and 55 seconds on a
18  camera film that's been turned over by the
19  sheriff's office and ask you to review this
20  video.
21       MR. NICHOLS:  Just for the record, the
22       witness is watching the video being
23       displayed on the computer screen.  And just
24       for the record, the person depicted in that

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 40

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 160

```
 1        video is not wearing a DOC uniform.
 2   BY MR. MORRISSEY:
 3        Q.   Ms. Canchola, you just watched a video
 4   on April 9, 2017, which started at 2:45:55 and
 5   concluded at 2:48:56; is that correct?
 6        A.   Correct.
 7        Q.   Have you seen this video before?
 8        A.   I have.
 9        Q.   Prior to today's deposition?
10        A.   Yes.
11        Q.   And tell me the circumstances that you
12   viewed this video.
13             MR. NICHOLS:  Only to the extent that
14        the question may call for privileged
15        information, you can answer to the extent
16        that you know and you're not disclosing
17        anything privileged.
18   BY THE WITNESS:
19        A.   I reviewed it on the advice of counsel.
20   BY MR. MORRISSEY:
21        Q.   And were you with counsel at the time
22   you reviewed it?
23             MR. NICHOLS:  Same objections.
24
```

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 161

```
 1   BY THE WITNESS:
 2        A.   Was I physically with him?  No.
 3   BY MR. MORRISSEY:
 4        Q.   Did you review it with Mr. Burke?
 5        A.   No, I did not.
 6        Q.   Did you tell Mr. Burke about this video
 7   after you reviewed it?
 8        A.   I don't think I did.
 9        Q.   Have you had any conversations with
10   Mr. Burke in regards to providing accessibility
11   for detainees going up and down the ramp at
12   Leighton with canes, crutches, and walkers?
13        A.   I believe Mr. Burke has been present
14   for our discussions with the legal department.
15        Q.   Other than Mr. Burke who's the chief of
16   staff of the sheriff and the jail, have you had
17   discussions with other nonlegal officers in the
18   sheriff's office in regards to prisoners going
19   up and down the ramps at Leighton with canes,
20   crutches, and walkers?
21        A.   No.
22        Q.   In looking at this video which started
23   at 2:45:55, was it obvious after this gentleman
24   fell going down with crutches that he needed
```

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 162

```
 1   assistance going up and down the ramp?
 2             MR. NICHOLS:  Objection to the extent
 3        the question calls for the witness to
 4        speculate and to the extent that it may call
 5        for a legal conclusion.  You can answer to
 6        the extent that you know.
 7   BY THE WITNESS:
 8        A.   It was obvious that the gentleman in
 9   the video had lost his footing, and a staff
10   member came up and ran to assist him.
11   BY MR. MORRISSEY:
12        Q.   Did you see him assist, actually help
13   him up from his fall?
14        A.   Did he physically put his hands on the
15   inmate?  No.
16        Q.   When the gentleman in that
17   video continued down the video (sic), did you
18   see any assistance being given to him by the
19   correctional officer?
20        A.   Did I see any assistance?  Yes.
21        Q.   In the video?
22        A.   Yes.
23        Q.   Was he holding him?
24        A.   I saw him talking with the inmate.
```

TOOMEY REPORTING
312-853-0648

---

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 163

```
 1   Assistance takes various forms.
 2        Q.   And when he went back up the ramp, did
 3   you see him physically helping him up the ramp?
 4        A.   I saw him verbally guiding the detainee
 5   up the ramp and walking beside him.
 6        Q.   As an ADA coordinator, could that
 7   officer, sheriff's officer be disciplined for
 8   not assisting either with a wheelchair or some
 9   cart that gentleman going up and down the ramp
10   after he fell?
11        A.   He did assist him.
12        Q.   Well, could he have been disciplined
13   for his actions depicted in the film between
14   2:45:55 and 2:48:56?
15        A.   Could he have been?
16        Q.   Yeah.
17        A.   On what grounds?
18        Q.   That he failed to provide an
19   accommodation for that prisoner going up and
20   down the ramp?
21             MR. NICHOLS:  Objection --
22   BY THE WITNESS:
23        A.   So your question assumes that he failed
24   to provide an accommodation?
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 41

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 164

```
1   BY MR. MORRISSEY:
2       Q.  Let me rephrase the question.
3       A.  Please do.
4       Q.  Ms. Canchola, did that officer based
5   upon the procedures and policies of the sheriff
6   on April 9, 2017, fail to provide an
7   accommodation for the prisoner who fell on
8   crutches?
9           MR. NICHOLS:  Objection to the extent
10      the question calls for a legal conclusion.
11  BY MR. MORRISSEY:
12      Q.  Let me rephrase it.  In regards to the
13  April 9, 2017, video which started at 2:45:55
14  and concluded at 2:48:56, was that officer who
15  was in the presence of the gentleman going up
16  and down the ramp with crutches, was he
17  following the procedures and the rules of the
18  sheriff during that period of time?
19      A.  From that video alone, I cannot make
20  that conclusion.  You were not there for the
21  dialogue.  Neither was I, Mr. Morrissey.  You
22  don't know what was said between them.
23
24
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 165

```
1   BY MR. MORRISSEY:
2       Q.  Assuming he provided no physical
3   assistance for the person depicted in that
4   video, was the officer following the rules and
5   procedures of the sheriff when that gentleman
6   went down and up the ramp?
7       A.  Assuming he provided no assistance?  He
8   did provide assistance.  Did he lift the
9   detainee?  No, he did not.  And I'm not ready to
10  make the conclusion that he did not follow the
11  order without knowing what transpired between
12  those 2 individuals.
13      Q.  Do you know whether or not the sheriff
14  did anything after review of that video to
15  question the officer?
16          MR. NICHOLS:  Objection.  When you say
17      the word sheriff, who are you referring to?
18  BY MR. MORRISSEY:
19      Q.  I'm referring to the command staff at
20  the Cook County Department of Corrections.  Do
21  you know whether or not that sheriff's employee
22  was interviewed in regards to that incident?
23      A.  We were recently notified of the video,
24  and it's in progress.  We will speak with the
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 166

```
1   employee.
2       Q.  Will that be you?
3       A.  Possibly.
4       Q.  Do you know how that investigation has
5   been started?
6           MR. NICHOLS:  Objection to the extent
7       that the question calls for privileged --
8   BY MR. MORRISSEY:
9       Q.  Has there been any investigation?
10          MR. NICHOLS:  Same objection.
11  BY THE WITNESS:
12      A.  It's in progress.  I recently received
13  that video as I've already stated.
14  BY MR. MORRISSEY:
15      Q.  What has caused it to be in progress?
16      A.  I just recently received the video.
17      Q.  And how did you put in motion an
18  investigation?
19          MR. NICHOLS:  Objection to the extent
20      the question calls for privileged
21      information.  Please move on.
22  BY MR. MORRISSEY:
23      Q.  What is the name of the officer?
24      A.  I don't know.  I'm in the progress of
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 167

```
1   finding that out.
2       Q.  Is it your responsibility as the ADA
3   coordinator to review the conduct of
4   correctional officers and sheriff's employees
5   working on the bridge as far as providing
6   assistance to prisoners with canes, crutches,
7   and walkers?
8       A.  It can be at times to ensure that the
9   orders are being followed.
10      Q.  Are you also providing an investigation
11  in regards to the gentleman with the cane which
12  you just witnessed?
13      A.  No.
14          MR. NICHOLS:  Which video are we
15      talking about?
16          MR. MORRISSEY:  We're talking about the
17      prior video which she reviewed now in the
18      deposition.
19  BY THE WITNESS:
20      A.  No, I'm not.
21  BY MR. MORRISSEY:
22      Q.  Why not?
23      A.  Because in my review of that, the staff
24  member did not violate the orders.
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 42

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 168

```
1       Q.   And is there a question in regards to
2   the sheriff's employee that witnessed the person
3   on a crutch go up and down the ramp on April 9,
4   2017, at 2:45 and 55 seconds, is there any
5   question that he didn't follow the sheriff's
6   procedures that day?
7           MR. NICHOLS:  Objection, asked and
8       answered.  She's already answered this
9       question, Tom.  You can answer it again.
10  BY THE WITNESS:
11      A.   I don't know.  I need to talk with the
12  employee.
13  BY MR. MORRISSEY:
14      Q.   It's the sheriff's position that prior
15  to providing an additional accommodation for a
16  prisoner provided a cane, crutch, or walker
17  going up and down the ramp at Leighton, that that
18  person has to request assistance; is that your
19  testimony?
20          MR. NICHOLS:  Objection to form.
21  BY THE WITNESS:
22      A.   I'm not here speaking for the sheriff.
23  I'm not here speaking for the sheriff's office.
24  My position is that if the need for accomodation
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 169

```
1   is not obvious, yes, they do have to notify us.
2   BY MR. MORRISSEY:
3       Q.   Who has set that policy as far as you
4   know as the ADA coordinator that a formal
5   request -- does it have to be a formal request?
6       A.   No, it does not.
7           MR. NICHOLS:  Objection.  The question
8       is vague as to time and location.
9   BY MR. MORRISSEY:
10      Q.   Who has to set that policy and
11  procedure?  Who's responsible at the Cook County
12  Department of Corrections whereby a person
13  assigned a cane, crutch, or walker has to
14  request assistance going up and down the ramp in
15  order to get an accommodation?
16      A.   That's applicable to all persons, and I
17  believe it's within the scope of the ADA that if
18  a need for accommodation isn't obvious, it
19  should be requested.
20      Q.   If we go back to Exhibit No. 2, is it
21  also within your understanding as the ADA
22  coordinator that a prisoner -- a disabled
23  prisoner assigned to the RTU in a cell without
24  grab bars has to request to use a toilet; is
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 170

```
1   that your understanding of the ADA?
2           MR. NICHOLS:  Objection to the extent
3       that the question calls for --
4           MR. MORRISSEY:  Let me rephrase the
5       question.
6           MR. NICHOLS:  -- a legal conclusion,
7       and it's combative.
8           MR. MORRISSEY:  Let me rephrase the
9       question before you get your dander up.
10          MR. NICHOLS:  My dander is already up.
11      Too late.  Please rephrase.
12  BY MR. MORRISSEY:
13      Q.   As the ADA coordinator -- as the ADA
14  compliance officer at the Cook County Department
15  of Corrections, is it also your understanding
16  that a prisoner assigned to the RTU in one of
17  those cells that doesn't have grab bars has to
18  request to use the bathroom as far as an
19  accommodation?
20          MR. NICHOLS:  Objection, form.
21  BY THE WITNESS:
22      A.   Has to request to use the bathroom?
23  No.  There's a bathroom in their cell.
24
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 171

```
1   BY MR. MORRISSEY:
2       Q.   Let me rephrase it.
3       A.   You should.
4       Q.   As the ADA compliance officer, if a
5   person with a disability is in a cell in the RTU
6   without grab bars and needs grab bars in order
7   to use the toilet, is it the sheriff's position
8   that under the ADA, it's their responsibility to
9   request to use the dayroom bathroom?
10          MR. NICHOLS:  Objection.  The
11      question is vague as to what exactly you're
12      talking about.  The question is vague as to
13      disability, the nature of it, and it
14      requires the witness to speculate.  However,
15      you can answer to the best of your ability.
16  BY THE WITNESS:
17      A.   Generally it's the sheriff's office
18  position -- my understanding of the sheriff's
19  office position is that if someone is assigned
20  to a cell that does not have grab bars, they
21  have to request to use the bathroom in the
22  dayroom that does have grab bars.  That's a
23  reasonable accommodation in a correctional
24  environment.
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 43

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 172

```
 1  BY MR. MORRISSEY:
 2      Q.   And do you provide that training to the
 3  correctional staff in the RTU that upon request,
 4  a prisoner who's disabled and assigned to a cell
 5  without grab bars is supposed to be let out to
 6  use the dayroom bathroom?
 7      A.   That training has been provided to all
 8  staff.
 9      Q.   And that position has not faltered
10  after Judge Kinnelly's ruling; is that correct?
11          MR. NICHOLS:  Objection, relevance.
12  BY THE WITNESS:
13      A.   No, it hasn't changed.
14  BY MR. MORRISSEY:
15      Q.   And the same holds true for the
16  prisoners who use canes, crutches, and walkers
17  in regards to the Leighton ramp; they have to
18  request an accommodation from a sheriff's
19  employee if they need further assistance?
20          MR. NICHOLS:  Objection to the extent
21      the question calls for the witness to
22      speculate.  You can answer to the best of
23      your ability.
24
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 173

```
 1  BY THE WITNESS:
 2      A.   I have answered this question no less
 3  than 5 times.  If the need for accommodation is
 4  not obvious, they have to request it; otherwise,
 5  we would not know.
 6  BY MR. MORRISSEY:
 7      Q.   From the perspective of a disabled
 8  prisoner, either a person provided with a cane,
 9  crutch, or walker, how does that disabled
10  prisoner know that in order to get an
11  accommodation, additional assistance going up or
12  down the ramp at Leighton, that they have to
13  make a formal -- or a request to the
14  correctional staff or the sheriff's staff?
15          MR. NICHOLS:  Objection, form,
16      objection to the extent that the question
17      calls for the witness to speculate about
18      some unidentified person's mental state.  To
19      the extent that you have any knowledge of
20      someone else's knowledge, you can answer.
21  BY MR. MORRISSEY:
22      Q.   Let me take it back a step.  In the
23  employee handbook, is there any written
24  statement that for disabled prisoners going up
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 174

```
 1  or down the ramps at Leighton, that they should
 2  request assistance from the sheriff's office if
 3  they're going up the ramp with a cane, crutch,
 4  or walker?
 5          MR. NICHOLS:  Objection, relevance.
 6  BY THE WITNESS:
 7      A.   In the employee handbook?
 8  BY MR. MORRISSEY:
 9      Q.   No, in the inmate handbook to your
10  knowledge?
11      A.   In the inmate handbook, there's a
12  section about ADA accommodations, yes.
13      Q.   And does that provide that in the event
14  you need assistance, an accomodation going up
15  the ramp at Leighton, that you must request
16  assistance from the sheriff's office?
17      A.   No, it's not an exhaustive list of the
18  type of assistance people may need, but it
19  generally addresses the ADA and reasonable
20  accommodations will be provided.
21      Q.   As the ADA compliance officer,
22  specifically in regards to the ramps at
23  Leighton, what does the sheriff consider to be a
24  reasonable accommodation for inmates going up
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 175

```
 1  and down the ramp with canes, crutches, and
 2  walkers?
 3          MR. NICHOLS:  Objection only to the
 4      extent that Ms. Rivero-Canchola has been
 5      noticed to provide her sworn testimony in
 6      her own individual capacity as an employee
 7      of the sheriff.  She has not been noticed
 8      under Rule 30(b)(6) to give testimony
 9      binding on the office of the sheriff.  You
10      can answer the question based on your own
11      personal knowledge, but based on that
12      limitation.
13  BY THE WITNESS:
14      A.   The type of accommodation that will be
15  provided is a very fact-specific inquiry.  So I
16  would need more information before I can make
17  the determination on what kind of accommodation
18  is reasonable.
19          MR. MORRISSEY:  You're not being
20      presented for Mr. Burke.  You're not being
21      presented for the sheriff.  It was very
22      clear from Judge Shadur to the extent that
23      Ms. Canchola who you offered to substitute
24      for Mr. Burke could not answer the questions
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 44

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 176

```
 1   about reasonable accommodations for the ramp
 2   at Leighton, that you would have to produce
 3   Mr. Burke.  So if she's not in a position to
 4   answer that question, then I would kindly
 5   ask you to produce the person that was
 6   noticed.
 7       MR. NICHOLS:  No, Tom, that's not what
 8   happened.  What happened is you asked her
 9   specifically -- you prefaced your last
10   question with asking her what the office of
11   the sheriff thinks.  And you know based on
12   the nature of the deposition, this is an
13   individual capacity deposition.  She is the
14   ADA coordinator.  Sabrina has been produced
15   to talk about policies of the sheriff at the
16   jail regarding accommodations.  She's
17   answered those questions.  If you're asking
18   for binding testimony from the office of the
19   sheriff, you are going to have to serve the
20   sheriff with a Rule 30(b)(6) notice to get
21   that testimony.  She's answered all of your
22   questions today, and she will continue to
23   answer your questions.  I don't know what
24   your problem is, but just rephrase the
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 177

```
 1   question.
 2       MR. MORRISSEY:  I think we have the
 3   wrong deponent.
 4       MR. NICHOLS:  I don't think so at all.
 5       MR. MORRISSEY:  If you take a look at
 6   page 10 or 11 of the transcript in regards
 7   to our discussion, the court said --
 8       MR. NICHOLS:  I can't see the
 9   transcript.
10       MR. MORRISSEY:  Here is page 11 of
11   Judge Shadur's --
12       MR. NICHOLS:  Are we off the record or
13   on the record?
14       MR. MORRISSEY:  We're still on the
15   record.
16       MR. NICHOLS:  If we're on the record,
17   I'm going to need a copy of that transcript.
18       MR. MORRISSEY:  You have the
19   transcript, I assume.  It's a transcript
20   from --
21       MR. NICHOLS:  If you're on the record,
22   we're going to need a copy of that
23   transcript.
24       MR. MORRISSEY:  Let's go off the record
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 178

```
 1   a second.
 2           (Whereupon, a discussion was had
 3            off the record.)
 4   BY MR. MORRISSEY:
 5       Q.  We'll go to Exhibit 6.  Turning to
 6   exhibit -- before we get to Exhibit 6, under
 7   what circumstances would grab bars not be given
 8   to a person in a cell who needs a wheelchair to
 9   ambulate?
10       MR. NICHOLS:  Objection, relevance,
11   objection to the extent the question calls
12   for the witness to speculate.
13   BY MR. MORRISSEY:
14       Q.  Do you understand the question?
15       A.  No.  I don't even know what you're
16   referring to.
17       Q.  Sure.  Are there times when a prisoner
18   who's wheelchair assisted is not given a cell
19   with grab bars because he or she may be a
20   suicide risk?
21       MR. NICHOLS:  Objection, relevance,
22   objection, vague as to time frame,
23   objection, calls for the witness to
24   speculate.  You can answer.
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 179

```
 1   BY THE WITNESS:
 2       A.  A person with a wheelchair who is
 3   suicidal?
 4   BY MR. MORRISSEY:
 5       Q.  Yeah.
 6       A.  I don't know.  That's never occurred
 7   during my time with the sheriff's office that
 8   I'm aware of.
 9       Q.  Going to Exhibit No. 6, it's Bates
10   stamped 302.  In addition to doing an Excel
11   sheet as an ADA coordinator for new admitees
12   with certain disabilities, do you also keep
13   track of your contact with disabled prisoners?
14       A.  When discussing grievances, generally,
15   yes.
16       Q.  And where do you maintain those
17   records?
18       A.  In this Excel file that you have.
19       Q.  The same Excel program that you use for
20   the detainee list of people coming into the jail
21   with a wheelchair or a hearing impairment or
22   deaf?
23       A.  There's only one Excel to my knowledge,
24   so it would be the same program.
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 45

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 180

1    Q.   But is there a separate file I guess
2  would be the word?
3    A.   Yes, there's a separate file.
4    Q.   What file do you maintain your
5  grievance responses in Excel?  Is there a
6  separate file?
7    A.   Yes.  It's called grievances.  It's the
8  one that you have in front of you.
9    Q.   Is it a specific file for each
10  prisoner?
11    A.   It's not a file for each prisoner.
12  It's a spreadsheet with entries for each
13  grievance.
14    Q.   That you have responded to as the ADA
15  compliance officer?
16    A.   That I have responded to and that the
17  previous ADA compliance officer responded to.
18    Q.   Have you ever been notified that
19  Mr. Polletta was a suicide risk?
20    A.   No.
21    Q.   Have you ever been notified that
22  Mr. Polletta has inflicted injuries on himself?
23    A.   Such as?
24    Q.   I'm just asking in general.

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 181

1    A.   Generally I would say hoarding your
2  medication is inflicting injury upon yourself,
3  if you're not taking prescribed medication.
4    Q.   How would you document that a person
5  was a suicide risk?
6         MR. NICHOLS:  Objection, relevance.
7  BY THE WITNESS:
8    A.   I wouldn't.
9  BY MR. MORRISSEY:
10    Q.   That would be a medical decision
11  whether or not a person was a suicide risk or
12  not?
13    A.   It would be a mental health --
14         MR. CONDRON:  Objection to the extent
15         it calls for speculation.
16  BY MR. MORRISSEY:
17    Q.   In the jail management system, if a
18  person was a suicide risk, would that perhaps be
19  an alert?
20         MR. NICHOLS:  Objection, relevance.
21  BY THE WITNESS:
22    A.   It could be.
23
24

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 182

1  BY MR. MORRISSEY:
2    Q.   You mentioned that you're able to pull
3  up alerts for people with canes, crutches, and
4  walkers in the jail management system?
5    A.   Yes.
6    Q.   You're able to query it?
7    A.   Yes.
8    Q.   Are you able to query going back
9  6 months, prisoners that have an alert for
10  canes, crutches, or walkers?
11    A.   I can only query active.
12         MR. MORRISSEY:  Let's take 2 minutes.
13         (Whereupon, a short break was
14              taken.)
15  BY MR. MORRISSEY:
16    Q.   Ms. Canchola, as the ADA compliance
17  officer, is it obvious to you that the ramps
18  leading to the Leighton courthouse are too
19  steep?
20    A.   Is it obvious to me that they're too
21  steep?  Too steep for what?
22    Q.   Under the ADA guidelines, is it obvious
23  to you as the ADA compliance officer that the
24  ramps are too steep?

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 183

1    A.   Under what ADA guidelines?
2    Q.   Under the sloping requirements of the
3  ADA?
4         MR. CONDRON:  Objection, calls for
5         speculation.
6  BY THE WITNESS:
7    A.   Which sloping requirements?
8  BY MR. MORRISSEY:
9    Q.   I'm asking you a very basic question.
10    A.   You're asking me a very legal-based
11  question.  And as I previously stated because
12  you asked this question, the 2010 standards, I'm
13  not sure they apply to the sloping of the ramp
14  based on the date it was built.
15    Q.   As an ADA compliance person, do ramps
16  require railings?
17         MR. NICHOLS:  Objection, vague as to
18         location, objection, calls for speculation.
19  BY THE WITNESS:
20    A.   The 2010 standards, I believe they do.
21  BY MR. MORRISSEY:
22    Q.   Does it also require a leveling out of
23  the ramp?
24         MR. NICHOLS:  Same objections.  It's

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 46

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 184

```
 1      vague as to location and calls for
 2      speculation.
 3   BY MR. MORRISSEY:
 4      Q.   I'll rephrase it.  It's your position,
 5   it's fair to say, that Leighton predated the
 6   ADA?
 7      A.   I don't know.  I don't know when it was
 8   built.
 9      Q.   Was it built to your knowledge prior to
10   1992?
11           MR. NICHOLS:  Objection.  The witness
12      already testified she has no personal
13      knowledge of when the building was built.
14      Move on.
15   BY MR. MORRISSEY:
16      Q.   If a building is built prior to the
17   passage of the ADA, is there a requirement that
18   the building has to -- that the party
19   responsible for the building has to provide
20   accommodation?
21           MR. NICHOLS:  Objection only to the
22      extent the question calls for a legal
23      conclusion.
24           MR. MORRISSEY:  I have no further
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 185

```
 1   questions at this time.
 2           MR. NICHOLS:  Just one follow-up if we
 3      can just get this going very quickly, we got
 4      about 8 minutes left.
 5           MR. MORRISSEY:  If you ask any
 6      questions, we're going to have to have her
 7      come back.
 8           MR. NICHOLS:  That's fine.
 9               (Whereupon, a short break was
10               taken.)
11           MR. NICHOLS:  Just in light of the fact
12      that we're pushing up against a deadline to
13      complete this deposition, I have nothing
14      further based on your examination.  So as
15      far as I'm concerned, this deposition is
16      complete.
17           MR. CONDRON:  No questions.
18           MR. MORRISSEY:  We'll keep it open.
19           MR. NICHOLS:  I object to any
20      continuing of this deposition and to the
21      extent that you do want this deposition
22      continued and the court orders it to be
23      continued, I would just ask that it take
24      place at the Daley Center.  We have
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 186

```
 1   graciously come down to your turf for this
 2   one, and you wasted approximately by my
 3   count an hour and 20 minutes of our time, so
 4   that's it.
 5           So, obviously, you're the witness.
 6   You have the opportunity to review the
 7   transcript.  You can either waive your
 8   signature or reserve your signature.
 9           THE WITNESS:  I'll reserve.
10           MR. NICHOLS:  The witness has stated
11   she wants to reserve her signature.
12
13
14
15
16           AND FURTHER DEPONENT SAITH NOT...
17
18
19
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 187

```
 1       IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                 EASTERN DIVISION
 3   NICHOLAS POLLETTA,         )
                                )
 4       Plaintiff,             )
                                )
 5    vs.                       )  No. 16 C 9492
                                )
 6   THOMAS DART SHERIFF OF      )
     COOK COUNTY, and COOK       )
 7   COUNTY, ILLINOIS,          )
                                )
 8       Defendants.            )
 9       I, SABRINA RIVERO-CANCHOLA, being first
10   duly sworn, on oath say that I am the deponent
11   in the aforesaid deposition taken on the 5th day
12   of June 2017; that I have read the foregoing
13   transcript of my deposition, consisting of pages
14   1 through 186 inclusive, and affix my signature
15   to same.
16           _____
17                 SABRINA RIVERO-CANCHOLA
18
19   Subscribed and sworn to
     before me this      day
20   of               , 2017.
21
22   Notary Public
23
24
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 47

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 188

```
 1   STATE OF ILLINOIS    )
 2                        )  SS.
 3   COUNTY OF C O O K    )
 4        I, EMILY TOMALA,  CSR, a notary public
 5   within and for the County of Cook County and
 6   State of Illinois, do hereby certify that
 7   heretofore, to-wit, on the 5th day of June,
 8   2017, SABRINA RIVERO-CANCHOLA personally
 9   appeared before me in a cause now pending and
10   undetermined in the Circuit Court of Cook
11   County, Illinois.
12        I further certify that the said SABRINA
13   RIVERO-CANCHOLA was first duly sworn to testify
14   the truth, the whole truth and nothing but the
15   truth in the cause aforesaid; that the testimony
16   then given by said witness was reported
17   stenographically by me in the presence of the
18   said witness, and afterwards reduced to
19   typewriting by Computer-Aided Transcription, and
20   the foregoing is a true and correct transcript
21   of the testimony so given by said witness as
22   aforesaid.
23        I further certify that the signature to
24   the foregoing deposition was reserved by counsel
```

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
June 5, 2017

Page 189

```
 1   for the respective parties.
 2        I further certify that I am not counsel
 3   for nor in any way related to the parties to
 4   this suit, nor am I in any way interested in the
 5   outcome thereof.
 6        IN TESTIMONY WHEREOF:  I have hereunto
 7   set my hand and affixed my notarial seal this
 8   12th day of June, 2017.
 9
10
11
12
13
14                   EMILY TOMALA, CSR
15
16
17
18
19
20
21
22
23
24   LIC. NO. 084003736
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 48