1         IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION
3   WILLIAM MATHIS,              )
                                  )
4             Plaintiff,          )
                                  )
5      vs.                        )   No. 24-CV-1127
                                  )
6   THOMAS DART, SHERIFF OF       )
    COOK COUNTY and COOK          )
7   COUNTY, ILLINOIS,             )
                                  )
8             Defendants.         )
9         The remote deposition of WILLIAM MATHIS,
10  called by the Defendant for examination taken
11  pursuant to notice and pursuant to the Federal
12  Rules of Civil Procedure for the United States
13  District Courts pertaining to the taking of
14  depositions, taken before Patricia A. Mache, a
15  Certified Shorthand Reporter and Notary, on
16  July 25, 2024, at the hour of 11:41 o'clock a.m.
17
18
19
20
21
22
23
24

Page 2

1  APPEARANCES:
2      THOMAS G. MORRISSEY LTD.
         MR. PATRICK MORRISSEY
3        10257 South Western Avenue
         Chicago, Illinois  60643
4        773-233-7900
5         On behalf of the Plaintiff;
6      DEVORE RADUNSKY LLC
         MR. ZACHARY STILLMAN
7      MR. JASON DEVORE
         230 West Monroe
8        Suite 230
         Chicago, Illinois  60606
9        312-300-4479
10         On behalf of the Defendants.
11
     Also Present:
12
     Nicole Bratton, law clerk for Devore
13   Radunsky LLC

Page 3

1            I N D E X
   WITNESS                    PAGE
2
   WILLIAM MATHIS
3
     Examination by MR. STILLMAN...........5, 59
4
     Examination by MR. MORRISSEY..........54 61
5

8            E X H I B I T S
9  DEPOSITION NUMBER                PAGE
10 No. 1......................23
   No. 2......................26
11 No. 3......................30
   No. 4......................40
12 No. 5......................44
   No. 6......................46
13 No. 7......................47

Page 4

1      THE COURT REPORTER:  Before we proceed, I
2  will ask counsel to agree on the record that
3  there is no objection to this Certified
4  Shorthand Reporter administering a binding oath
5  to the witness remotely.
6      Counsel, please state your name, the party
7  you represent and your agreement on the record
8  beginning with the noticing party.
9      MR. STILLMAN:  Zachary Stillman.  I represent
10 defendant Cook County and Sheriff Dart and we do
11 not object.
12     MR. MORRISSEY:  And, Zach, can you speak up
13 because it's kind of low.
14     MR. STILLMAN:  Is that better?
15     MR. MORRISSEY:  A little bit.
16     THE WITNESS:  Yeah, okay.  I can hear you a
17 little bit.
18     MR. MORRISSEY:  My name is Pat Morrissey.  I
19 represent Mr. Mathis.  I am at the jail with
20 Mr. Mathis and I consent to the remote swearing
21 in.
22        (Witness sworn.)

Page 5

1  WHEREUPON:
2         WILLIAM MATHIS,
3  called as a witness herein, having been first
4  duly sworn, was examined and testified as
5  follows:
6            EXAMINATION
7  BY MR. STILLMAN:
8    Q.  Okay, Mr. Mathis, my name is Zachary
9  Stillman.  I represent the defendants in this
10 case.
11     Have you ever given is deposition
12 before?
13   A.  No.
14   Q.  Can you hear me now a little bit right
15 now, is that better?
16   A.  It's about the same.
17   Q.  Still, still about the same?
18   A.  Yeah.  I can hear you though a little.
19   Q.  Okay.  Just let me know if you need me
20 to change anything to make it a little easier to
21 hear.
22   A.  Okay.
23   Q.  So could you please state just to start
24 your full name and spell it for the record.

Page 6

1  A. William Mathis, W I L L I A M, last
2 name M A T H I S.
3  Q. And today I'm going to be asking you a
4 series of questions. Just to make things
5 easier, we are going to go over a couple of
6 ground rules so we are on the same page as we
7 get started.
8    First, we have a court reporter today
9 as you can see. So to make life easier for her,
10 I just want to make sure that we both try to
11 keep the record as clean as possible by not
12 speaking over one another. Whenever I'm asking
13 a question, I would ask that you wait before
14 giving an answer until I'm finished if you
15 are already anticipating what the answer might
16 be. And I'll do my best to not interrupt any of
17 your answers before moving on to my next
18 question.
19  A. Okay.
20  Q. Next, whenever I ask any question,
21 please answer them verbally and refrain from any
22 kind of gesturing or pointing because that will
23 be not clear on the record. Is that okay?
24  A. Okay.

Page 7

1  Q. And then third, if you don't understand
2 any of my questions, please let me know and I
3 can try and rephrase or ask the question
4 differently. If you do answer, I am going to
5 assume that you understood the question.
6    And if there's something you don't
7 recall, don't guess, just the answer that you
8 don't recall is fine.
9    And finally, if at any time you need to
10 take a break today, totally fine. Just if we
11 have a question pending, we'll finish that
12 question up and we can figure out a break and
13 take a 5-minute, 10-minute break if we need
14 that.
15    Do you understand all these rules that
16 I've laid out today?
17  A. Yes.
18  Q. So you said you had or you hadn't given
19 a deposition before just now?
20  A. No.
21  Q. Do you go by any other names in the
22 jail?
23  A. William.
24  Q. What else do other detainees call you?

Page 8

1  A. That's it.
2  Q. What is your date of birth?
3  A.             .
4  Q. Happy belated birthday.
5  A. Thank you.
6  Q. Are you married?
7  A. No.
8  MR. STILLMAN: And then off the record.
9    (Whereupon, a discussion was had
10    off the record after which the
11    following proceedings were
12    reported:)
13 BY MR. STILLMAN:
14  Q. And did you do anything to prepare for
15 this deposition today?
16  A. Yes. I went over the paperwork I have.
17  Q. And what paperwork would that be?
18  A. The declaration and admit.
19  Q. Did you meet with anyone before the
20 deposition today?
21  A. I can't hear you.
22  Q. Did you meet with anyone in advance of
23 the deposition today?
24  A. No.

Page 9

1  Q. Did you meet with your attorney?
2  A. Yes.
3  Q. About how long did you meet with your
4 attorney before this deposition today?
5  A. About 30, 40 minutes.
6  Q. Was that a different day or was that
7 today?
8  A. Today.
9  Q. And have you reviewed any kind of video
10 of any incident in question or any kind of
11 reports other than what you described before?
12  A. No, besides the ramp video.
13  Q. Which ramp video did you review, do you
14 remember?
15  A. The Cermak ramp.
16  Q. Do you know what date that would have
17 been, like video would have been?
18  A. That is 6-20-24 and 5-23-24.
19  Q. And have you ever reviewed any ADA
20 standards or any Cook County Jail policies and
21 procedures?
22  A. Have I what now?
23  Q. Ever reviewed any like American with
24 Disabilities Act Standards?

Page 10

1   A.  No.
2   Q.  What about any Cook County Jail
3 policies and procedures?
4   A.  I'm not understanding.
5   Q.  You're at the Cook County Jail right
6 now.  They have policies and procedures that
7 kind of guide different things how staff is
8 suppose to approach situations, how they operate
9 the jail.
10      Have you ever reviewed any of those
11 policies and procedures?
12  A.  No.
13  Q.  Do you know anyone, anyone else who
14 have also used the same RTU tunnels and the
15 Cermak ramp as you that have also had issues?
16  A.  Yes.
17  Q.  Do you know the names of anyone off the
18 top of your head?
19  A.  No.
20  Q.  Have you ever filed any lawsuits
21 before?
22  A.  No.
23  Q.  Have you ever been a member of a class
24 before in a lawsuit?

Page 11

1   A.  Have I what?
2   Q.  Do you remember ever being involved in
3 another class action case regarding other
4 conduct at the jail?
5   A.  Yes.
6   Q.  And what would that have been about?
7   A.  I believe it was the strip search.
8   Q.  Do you know when that would have been?
9   A.  No.
10  Q.  Was it more or less than three years
11 ago?
12  A.  It was more than three years ago.
13  Q.  Have you ever given any written
14 statements about your issues using the Cermak
15 and RTU ramps outside of your grievances?
16  A.  No.
17  Q.  In the last ten years have you been
18 convicted of any crimes?
19  A.  In the last what now?
20  Q.  Ten years.
21  A.  Have I been?
22  Q.  Convicted of any crimes?
23  A.  Yes.
24  Q.  Why are you currently incarcerated at

Page 12

1 Cook County Jail right now?
2   MR. MORRISSEY:  I object to the extent it may
3 cause him to divulge information that's
4 protected against self-incrimination.
5       You're just asking for the charges?
6   MR. STILLMAN:  Yeah, charges are fine.
7   MR. MORRISSEY:  All right.  He just wants to
8 know what you're charged with.  I don't want you
9 to go in any details of what they're accusing
10 you of doing.
11  THE WITNESS:  Aggravated discharge.
12 BY MR. STILLMAN:
13  Q.  And how long have you been -- strike
14 that.
15      Would that be aggravated discharge of a
16 firearm?
17  A.  Yes.
18  Q.  How long have you been in Cook County
19 Jail now for those charges?
20  A.  About 16 or 17 months.
21  Q.  Do you recall the date that you arrived
22 at Cook County Jail?
23  A.  4-7-23.
24  Q.  Have you been -- where have you been

Page 13

1 housed while at the Cook County Jail?
2   A.  RC Division 8, Division 5, Division 6,
3 3 North at Cermak and Division 2, Dorm 3 and
4 Dorm 2.
5   Q.  And which has been your favorite to
6 live in?
7   A.  Excuse me?
8   Q.  Which has been your preferred housing?
9   A.  Neither one.
10  Q.  When you entered the Cook County Jail,
11 were you using a cane at that time?
12  A.  No.
13  Q.  About how long after you were admitted
14 were you given a cane, or were you prescribed a
15 cane?  If you don't remember that's fine.
16  A.  Like 11-11-23.
17  Q.  And before that when you were walking
18 around the jail, you were walking around without
19 any cane?
20  A.  Just the housing, where I was housed
21 at.
22  Q.  You had a long-distance cane before
23 that or you didn't have a long-distance cane?
24  A.  No, I didn't have a long distance.

Page 14

1  Q. Can you tell me a little bit about your
2  medical history as far as your knees. You got
3  arthritis in your left knee, right?
4  A. Yes. I went to Cermak and they gave me
5  a CAT scan of my leg, my knee. And then about a
6  couple months later after I had that did, I went
7  to the doctor and he told me that my leg was --
8  my knee worse. I got arthritis in my knee and
9  it was getting "worser".
10  Q. Do you know how far back you've had
11  issues with the arthritis?
12  A. I don't. I don't know the date right
13  off hand.
14  Q. Did you ever have any arthritis?
15  A. Let me see how long. This is
16  six months, 6-2-23, that's when I started making
17  the complaints.
18  Q. Are you looking at something right now?
19  A. Yes.
20  Q. Can I ask what it is that you're
21  looking at?
22  A. These are the grievance I wrote.
23  Q. Okay. Which grievance would that be?
24  A. This is about my knee.

Page 15

1  Q. Do you know what the control number is
2  top right corner?
3  A. Which?
4  Q. Like the year X and then some more
5  numbers.
6  A. 2023 -- no, that's my number. Control
7  number --
8  MR. MORRISSEY: For the record, I think he's
9  looking at a request form.
10  MR. STILLMAN: Okay, never mind then. That's
11  fine.
12  BY MR. STILLMAN:
13  Q. Do you remember which doctor it was at
14  Cermak that told you about the arthritis in your
15  knee getting worse?
16  A. I don't remember his name.
17  Q. Was that all he told you was that the
18  arthritis was getting worse? Did he say you
19  were disabled? Did he say --
20  A. He said I had to get -- he get a bottom
21  bunk permit he gave me. He gave me the cane and
22  he said I need to have it looked at like
23  treatment and he prescribed me pain medication.
24  Q. What kind of pain medication did he

Page 16

1  prescribe you?
2  A. Ibuprofen and every time it flare up
3  they gave me endo, endo, I can't pronounce it.
4  Endo, endo -- I can't pronounce it.
5  Q. That's fine.
6  A. Endometh- --
7  Q. Were you having knee pain issues when
8  you were admitted to Cook County Jail?
9  A. Hold on. I can't hear you. They
10  moving something.
11  Q. Were you having knee pain at the time
12  that you were admitted into Cook County Jail?
13  A. No.
14  Q. When did it start getting worse?
15  A. Like a month or two after
16  incarceration.
17  Q. You had never used a cane outside of
18  jail?
19  A. No.
20  Q. Since that day that you were prescribed
21  the cane, November 27, 2023, have you been using
22  it continuously since that day?
23  A. Yes.
24  Q. Just to clarify, so your alert is for

Page 17

1  long distance as of that day? So you don't use
2  it transporting between areas in the jail,
3  right?
4  A. Yes.
5  Q. And before that you didn't have any,
6  any cane alert or you had a short distance cane
7  alert?
8  A. I had no cane.
9  Q. And you do not have a short distance
10  cane alert, is that correct?
11  A. Correct.
12  Q. So when moving around in your tier,
13  your cell dayroom, there's no cane use permitted
14  for you there, correct?
15  A. No, I have it to go back and forth to
16  the bathroom.
17  Q. To the bathroom, okay. Are you aware
18  of any policies, procedures or rules at the jail
19  regarding either use of your cane or when
20  someone should be assisting you because of your
21  use of the cane when transporting between areas?
22  A. No.
23  Q. Have you ever heard of a company called
24  Globetrotters?

Page 18

```
 1    A.  Globetrotters?  No.
 2    Q.  Have you ever reviewed any
 3  architectural or engineering reports?
 4    A.  Excuse me?
 5    Q.  Have you ever reviewed any kind of
 6  architectural or engineering reports?
 7    A.  What you mean by that?
 8    Q.  Like a report made by like an architect
 9  or an engineer about the structural or
10  mechanical details of a building or a feature of
11  a building like a ramp?
12    A.  Yes.
13    Q.  You have reviewed reports like that?
14    A.  Yes.
15    Q.  What report have you reviewed?
16    A.  The ramp, the structure of the ramp.
17    Q.  And which ramp would that be?
18    A.  It would be the Cermak ramp and the RTU
19  ramp.
20    Q.  Would that have been one report or two
21  separate reports?
22    A.  I believe it's one.
23    Q.  So you've reviewed the reports about
24  those ramps you're saying?
```

Page 19

```
 1    A.  Yes.
 2    Q.  And what do you recall about the Cermak
 3  ramp one specifically?
 4    A.  That it's too steep.
 5    Q.  Anything else?
 6    A.  And they suppose to be trying to fix it
 7  or something.
 8    Q.  What about the RTU ramp, do you
 9  remember any of the details about that one?
10    A.  No.  That steep too.
11    Q.  Are you familiar with the ramps,
12  corridors and hallways under the RTU?
13    A.  Excuse me?
14    Q.  Are you familiar with the ramps,
15  corridors and hallways under the RTU?
16    A.  No, I'm not familiar with it.
17    Q.  Have you spent time, you know, the in
18  lower level of the RTU there, the tunnel, do you
19  know?  You know what I'm talking about, under
20  the RTU, there's tunnels, there's ramps?  Have
21  you been in those areas?
22    A.  I'm not sure.
23    Q.  Have you been transported through those
24  areas --
```

Page 20

```
 1    A.  Which parts?  It goes --
 2    Q.  Just generally, not all of them.
 3  You've been in the under the -- under levels of
 4  the jail?
 5    A.  Yeah, I've been under the jail.  That's
 6  the tunnel where they walk everybody through.
 7    Q.  And you're familiar generally with that
 8  area, its existence and features, correct?
 9    A.  Yes.
10    Q.  How frequently would you say you've
11  been in those areas?
12    A.  I probably go up and down the ramps
13  like every three to four weeks.  I only go under
14  them kind of circumstance back and forth to the
15  hospital.
16    Q.  That was my next question.  So usually
17  just be medical visits that you would be
18  transporting through there?
19    A.  Correct.
20    Q.  What about court visits?
21    A.  No.  I go to outside.
22    Q.  Do you recall the last time you would
23  have been going through those tunnels?
24    A.  July 18th.
```

Page 21

```
 1    Q.  And on that occasion were you walking
 2  the tunnels yourself or were you transported via
 3  cart?
 4    A.  I was walking by myself with the cane
 5  and the officer.  They call it transporting.
 6    Q.  Do you recall there being any handrails
 7  on the ramps you've used under the RTUs?
 8    A.  Yes.
 9    Q.  Do you utilize those handrails when you
10  traverse the ramps?
11    A.  Sometimes, sometimes not because they
12  make us walk with our food too or whatever
13  paperwork we might have so it's kind of hard for
14  me to hold my paperwork and food and the cane
15  and try to balance on the rail.
16    Q.  And that would be when you're going
17  back from the hospital you would have the food
18  and the paperwork?
19    A.  Yes.
20    Q.  On the ramps under the RTU -- the ramp
21  under the RTU leading to Cermak, have you ever
22  found the steepness to be an issue?
23    A.  Yes.
24    Q.  Did you ever complain to anyone that
```

Page 22

1  you needed either a landing or handrails to help
2  you traverse that ramp?
3     A.   Multiple times.
4     Q.   Who would you have complained to?
5     A.   The sheriff, the person on the
6  transport in the cart sometime I see them
7  because I get on there.
8     Q.   And then would you have also filed any
9  grievances about that?
10    A.   Yes.
11    Q.   Whenever you've used the east RTU ramps
12  that lead into the Cermak ramp, do you know
13  which one I'm talking about, the ramp, that east
14  RTU ramp that leads up to the Cermak ramp,
15  there's one that goes, I don't know if it goes
16  up and then down or down and then up.
17        MR. STILLMAN:  Pat, do you know?
18        MR. MORRISSEY:  If you're going from RTU to
19  Cermak, I believe the RTU ramp goes up.
20        MR. STILLMAN:  Yeah, that sounds right.
21  BY MR. STILLMAN:
22    Q.   Do you know which ramp I'm referring to
23  when I say the east ramp?
24    A.   No.

Page 23

1     Q.   I'm going to show a picture.  We'll
2  call it Exhibit 1.
3          Are you able to see this?
4     A.   Yes.
5     Q.   Does this room look familiar to you?
6     A.   Yes.
7     Q.   Would it make sense to you if I told
8  you this is was the east RTU ramp that led to
9  the Cermak area?
10    A.   Yes.
11        MR. MORRISSEY:  Are we marking this as an
12  exhibit?
13        MR. STILLMAN:  Yeah, I marked that as
14  Exhibit 1.
15  BY MR. STILLMAN:
16    Q.   So when you've used this ramp you have
17  had difficulties, correct?
18    A.   Yes.
19    Q.   And have those difficulties ever caused
20  issues getting you where you need to get to?
21    A.   Yes.  It's painful.
22    Q.   Painful.  Have you ever actually been
23  held back, though, from accessing any kind of
24  services or appointments because of issues with

Page 24

1  the ramp?
2     A.   No.
3     Q.   They've always, if you've been on the
4  ramp and experienced issues and needed to stop,
5  they've either helped you or --
6     A.   No, they --
7         MR. MORRISSEY:  Mr. Mathis, let him just
8  finish the question before you --
9         MR. STILLMAN:  Thanks, Pat.
10  BY MR. STILLMAN:
11    Q.   They've either helped you or you've
12  made it up the rest of the way.  You've never
13  been turned around and stopped from proceeding
14  because you couldn't keep going, correct?
15    A.   Correct.
16    Q.   And so this ramp to confirm, you have
17  traversed this ramp before, correct?
18    A.   Yes.
19    Q.   And is there any point on this ramp
20  specifically that you find to be the most
21  trouble or is it just kind of all?
22    A.   Going up.
23    Q.   Just going up in general is just the
24  tough part?

Page 25

1     A.   Yes.
2     Q.   So other than general pain, has using
3  this ramp caused any other actual issues or
4  injuries to you?
5     A.   Shortness of breath.  It hurts my knee
6  like going the distance up and down the ramp.
7  My knees pop in and out of place.
8     Q.   Do you know if those would be the same
9  type of issues other people would also have when
10  using that ramp when using a cane?
11    A.   I believe so.
12    Q.   Have you ever discussed those types of
13  issues are also being experienced with others?
14    A.   A couple people on the wing I been on I
15  asked did they have a hard time or did they have
16  pain going up it.
17    Q.   Do you know did any jail staff ever
18  tell you either not to use the east RTU ramp or
19  to use a different way or try to lead you a
20  different way?
21    A.   No.
22    Q.   Do you know if you ever would have used
23  this ramp and then not subsequently traversed
24  the Cermak ramp?

Page 26

1  A. What do you mean by that?
2  Q. I mean any time you would have gone
3 down this ramp, you also would have gone to
4 Cermak, correct?
5  A. Yes.
6  Q. You wouldn't have -- there would have
7 been nowhere that you would gone in the jail
8 that you would have taken the east RTU ramp and
9 then not gone to Cermak, right?
10  A. Correct.
11  Q. So I'm going to take this picture down
12 and I'm going to show another image.
13      Are you able to see that?
14  A. Yes.
15  Q. So this image we will mark Exhibit 2.
16 And does this ramp look familiar to you?
17  A. That's the Cermak room.
18  Q. That would be on the other side of the
19 ramp we were just looking at?
20  A. Yes.
21  Q. And you're familiar with this ramp,
22 you've traversed it?
23  A. Yes.
24  Q. Would you say that the issues you

Page 27

1 experience in this ramp are the same or
2 different than those that you have on the other
3 ramp?
4  A. It's the same.
5  Q. Same. So the shortness of breath, the
6 pain, yeah, correct?
7  A. Yes.
8  Q. How frequently -- I guess it's the same
9 frequency. So about like every one to
10 three months you would say you kind of end up
11 going to Cermak?
12      MR. MORRISSEY: Objection. Mischaracterizes
13 his testimony.
14      You can respond. You can answer,
15 Mr. Mathis.
16      THE WITNESS: Yes, I go there every month.
17 BY MR. STILLMAN:
18  Q. Every month, sorry. And every month
19 when you go there, other than just getting the
20 refills on the prescriptions, that's -- are you
21 getting shots when you're going?
22  A. Yes.
23  Q. And that was the drug that you couldn't
24 remember the pronunciation of, correct?

Page 28

1  A. No. The one that I can remember
2 pronunciation is the pill. When I go to the
3 hospital, the outside hospital, I get an
4 injection.
5  Q. So the injections are at the outside
6 hospital, okay, thank you.
7      Do you know the last time you were on
8 the Cermak ramp right here? Would it have been
9 the same as RTU ramp on July 18?
10  A. This is the ramp I was on July 18th.
11  Q. Yeah, you would have been on both ramps
12 July 18th, correct?
13  A. No, the other one, I don't see the
14 other one because I'm not housed in the RTU no
15 more.
16  Q. So you said before the last time you
17 saw the RTU ramp was July 18th. Would that have
18 been in reference to the Cermak ramp actually?
19  A. Yes, the Cermak ramp I seen July 18th.
20  Q. Do you know when you were last housed
21 in the RTU?
22  A. No.
23  Q. Would 2023 sound right?
24  A. Yes.

Page 29

1  Q. And when you've had issues with the
2 Cermak ramp, did you ever complain to anyone
3 around, any jail staff about those issues?
4  A. Yes.
5  Q. Did you also file grievances about
6 those issues?
7  A. Yes.
8  Q. And same, same thing with the RTU ramp,
9 when you've had these issues with the Cermak
10 ramp and the pain in your knees, shortness of
11 breath, have you ever actually been stopped or
12 prevented from accessing services or
13 appointments?
14  A. No.
15  Q. You were always able to get where you
16 need to go, correct?
17  A. Yes. Unless I just didn't feel like
18 going over because my knee was giving me
19 problems and I declined going over there.
20  Q. Going to take this down now.
21      Do you remember -- so you said
22 sometimes you might have declined going down
23 there. Do you know when you might have done
24 that?

Page 30

1   A.  No, not offhand.
2   Q.  Would it sound right that you might
3  have refused a visit to Cermak on October 31,
4  2023?
5   A.  I wouldn't know the date but --
6   Q.  I'll mark as Exhibit 3.  Are you able
7  to see that?
8   A.  It's so little I can't see what it's
9  saying.
10   Q.  Is that better?  Are you able to see
11  this though?  I can make it larger if needed.
12   A.  What I looking for?
13   Q.  Can you confirm that you can see it,
14  yes or no?
15   A.  I can see a little.
16   Q.  I will zoom in on the portion I want
17  you to look at.  I'm marking as Exhibit 3 this
18  incident report from October 31, 2023.
19      Does to sound right?  Does it look like
20  this is an incident report from 2023,
21  October 31st?
22   A.  Yes.
23   Q.  This states right here that they
24  received a refusal from you, correct?

Page 31

1   A.  Yep.
2   Q.  That was on October 31, 2023?
3   A.  Yes.
4   Q.  And do you know why you might have
5  refused on that day?
6   A.  It probably was due to the flare-up.  I
7  only refuse when I have a flare-up.
8   Q.  Would it sound right to you on
9  February 16, 2024, you might have also refused?
10   A.  Yes.
11   Q.  So when you've been injured using the
12  Cermak and RTU ramps, either pain in your knees,
13  shortness of breath, or any flare-ups that might
14  have happened after it, have you ever sought
15  treatment for those injuries?
16   A.  Well, I put in a request to see the
17  doctor before and that's when they prescribe me
18  the pills and every time he said I have a
19  flare-up, I could just let the nurse know.
20   Q.  And all these times that you have had
21  issues on the ramps and hurt your knees, you
22  never sought any kind of treatment from medical
23  help after the issues or use of the ramp,
24  correct?

Page 32

1   A.  Correct.
2   Q.  Like you said in relation to your
3  request about the knee pain before any of the
4  ramp stuff, Cermak has treated and they're
5  continuing to treat your knee issues and pain
6  and injuries, correct?
7   A.  They prescribe me a pill to keep it
8  down, but it's not -- it still happens.  I still
9  continue to get flare-ups and I'm still walking
10  up and down the ramp.
11   Q.  I mean as far you know, have they come
12  up with a cure for arthritis?
13   A.  No.
14   Q.  So do you think you would get any more
15  sufficient curing of your condition outside of
16  jail?
17   A.  I wouldn't know.
18   Q.  Would you consider their continued
19  treatment and prescription of pain medications
20  to be treatment of your knee?
21   A.  Yes.
22   Q.  So they've continued treating the issue
23  with your knee, correct?
24   A.  Yes.

Page 33

1   Q.  As of June, you would actually -- you
2  reported -- do you recall seeing them and
3  actually having some improvement in your knee
4  pain?
5   A.  No.
6   Q.  In the past have you ever used officers
7  for assistance when you've had issues on the
8  ramps?
9   A.  Yes.
10   Q.  And what are the results of asking for
11  assistance, do they help?
12   A.  No.
13   Q.  Has any officer ever helped?
14   A.  Once when gout was too bad when I
15  couldn't walk, they put me on a cart and took me
16  over.
17   Q.  And that was only one time?
18   A.  Yes.
19   Q.  So you've only ever been in the cart
20  one time?
21   A.  Yes.
22   Q.  Did they ever push you on a wheelchair
23  alongside the cart, did they ever try to move
24  you that way?

Page 34

1  A.  I believe I been in a wheelchair once
2  or twice.  I'm not -- I can't remember that many
3  times, but it was all dealing with the gout,
4  when my foot swelled up.
5     Q.  Only reason you would have refused to
6  go to your medical appointments would have been
7  your flare-ups, correct?
8     A.  Correct.
9     Q.  To the best of your knowledge do you
10 know if other detainees regularly refuse to go
11 to their medical appointments as well?
12    A.  No, I'm not sure.
13    Q.  Do you know any other reason someone
14 else might refuse to go to their medical
15 appointments?
16    A.  No.
17    Q.  So do you -- strike that.
18        Do you know an inmate named Cavarian
19 Rogers?
20    A.  Who?
21    Q.  Cavarian Rogers?
22    A.  No.
23    Q.  What about Kent Elwoods?
24    A.  No.

Page 35

1     Q.  Sylvester Brinson?
2     A.  Sylvester who?
3     Q.  Brinson?
4     A.  No.
5     Q.  Tommy Love?
6     A.  I know a Tommy love.
7     Q.  How do you know Tommy love?
8     A.  I was housed with him.
9     Q.  Do you know where?
10    A.  Division 2.
11    Q.  And how recently would that have been?
12    A.  That's recently.
13    Q.  Would you consider him a friend?
14    A.  I know of him.
15    Q.  Do you know Anthony Munoz?
16    A.  No.
17    Q.  What about Antoine Pierce?
18    A.  No.
19    Q.  Carlos Martinez?
20    A.  No.
21    Q.  Rosike Phillips?
22    A.  No.
23    Q.  James Cruck?
24    A.  No.

Page 36

1     Q.  Quovotis Harris?
2     A.  No.
3     Q.  Do you know Quovotis Harris?
4     A.  No.
5     Q.  I think I asked you this earlier but do
6  you personally know anyone, any other detainees
7  that have been injured using either the east RTU
8  or Cermak ramps?
9     A.  No.
10    Q.  Do you know any other people who have
11 been -- who have had issues or injuries like
12 yours, more like, you know, not like caused
13 injuries but pain and shortness of breath?
14    A.  Not that I know of.  I don't talk to a
15 lot of people in here.
16    Q.  So when you've had troubles or
17 difficulty traversing either the Cermak or RTU
18 ramps, have you filed grievances with the jail
19 about those?
20    A.  Yes.
21    Q.  Do you know how many grievances you
22 would have filed about these ramp issues?
23    A.  Quite a few.  I don't have a specific
24 number, but quite a few.

Page 37

1     Q.  Do you know whether you would have
2  filed them?
3     A.  Back to 2023 I been filing grievance.
4     Q.  You say quite a few of them you did?
5     A.  Yes.
6     Q.  I mean more than two?
7     A.  Yes.
8     Q.  But you wouldn't have filed any more
9  than -- any in 2024, do you think?
10    A.  I filed some in 2024.
11    Q.  You did?
12    A.  Yes.
13    Q.  Do you know when you would have filed
14 them in 2024?
15    A.  Yes.
16    Q.  When would that have been?
17    A.  Probably like the beginning, a couple
18 months, a couple months ago.
19    Q.  A couple months ago you most recently
20 filed a grievance, correct?
21    A.  Correct.
22    Q.  Do you have a copy of that grievance
23 with you?
24    A.  Let me see.  Yes.

Page 38

1  Q. Do you know the control number for that
2 grievance?
3  A. 2023X18633.
4  Q. So you've got documents from 2023. I
5 was asking -- you said you filed a couple months
6 ago in 2024, though, correct?
7  A. I don't have those.
8  Q. But you think you did file it?
9  A. Yes.
10  Q. Okay. Do you have any other grievances
11 there?
12  A. About my knee and walking with the
13 cane, all these is in 2023.
14  Q. Are any of those -- so you have two or
15 three grievances there?
16  A. Excuse me?
17  Q. Right now do you have two grievances or
18 do you have three grievances in front of you?
19  A. I have two -- one, one.
20  Q. You have one grievance?
21  A. Yes.
22  Q. You don't have any noncompliant
23 grievances?
24  A. Wait, two.

Page 39

1  Q. Is one of them a noncompliant
2 grievance?
3  A. What you mean by noncompliant?
4  Q. That's fine, we'll get through it.
5 Strike that question.
6     So do you ever have any issues filing
7 grievances about the ramps?
8  A. No.
9  Q. Did you ever have any grievances
10 rejected?
11  A. Yes.
12  Q. Would you consider that an issue?
13  A. Yes.
14  Q. So you did have issues filing grievance
15 at any time then?
16  A. Yes.
17  Q. So in your grievances about the ramps,
18 what issues would you have complained about?
19  A. I have problems with climbing the ramp.
20  Q. Just climbing the ramp?
21  A. Yes. And I had some like with
22 transportation. I asked for help, to take a
23 transport me over there. I used to argue with
24 the guards and tell them that I have got rode

Page 40

1 over here on one of them carts before which they
2 told me they couldn't put inmates on them but I
3 did see them.
4  Q. Do you remember making the journey to
5 and from Cermak December 10, 2023?
6  A. No.
7  Q. I will mark this exhibit I'm putting up
8 right now as Exhibit 4. I'll make it a little
9 larger.
10     Do you see the document on the screen
11 right now?
12  A. Yes.
13  Q. And is that -- what is that document,
14 do you know?
15  A. That's the grievance I wrote.
16  Q. Do you also have this grievance in
17 front of you?
18  A. Yes.
19  Q. And this grievance, does this grievance
20 concern a trip to Cermak on December 10, 2023?
21  A. Yes.
22  Q. Looking at this grievance now, do you
23 remember that trip a little more?
24  A. Yes.

Page 41

1  Q. In your grievance here, I'm going to
2 summarize a little bit, you can tell me, say yes
3 or no if how I summarize this is accurate.
4     You're essentially complaining that you
5 have an issue with the ramp, the RTU Division 8
6 ramp, and you use a cane and feels hard to move
7 up and down the ramp and not to fall down, is
8 that correct?
9  A. Yes.
10  Q. You would have used the ramp on that
11 day?
12  A. Excuse me?
13  Q. You would have utilized the ramp on
14 that day to traverse the --
15  A. Yes.
16  Q. Do you think that day you were having
17 difficulties with the cane specifically, like
18 using the cane walking around?
19  A. Yes. Was around the time they first
20 gave it to me, yes.
21  Q. So you have this grievance in front of
22 you, correct?
23  A. Yes.
24  Q. What does the second page say? Do you

11 (Pages 38 - 41)

Page 42

1 have this response page?
2   A. It say that I was observed being
3 escorted by a cart from Division 6.
4   Q. So in light of the fact that you may
5 have been on a cart that day, do you think
6 that -- why do you think you would have filed
7 this grievance that day?
8   A. That was the day that I came back and
9 they wouldn't give a cart. I was on the escort
10 like I told you before one time over there due
11 to the flare-up, but when they gave me the
12 medication when I came back they had a cane for
13 me and that's when I walked back to the
14 division.
15   Q. It says right here that detained Mathis
16 did not walk to RTU on December 10th, is that
17 right?
18   A. Yes.
19   Q. And first they say you're observed
20 being escorted by cart from Division 6 to
21 Cermak, correct?
22   A. Yes.
23   Q. And then you're evaluated and it's
24 determined that you're able to ambulate with a

Page 43

1 cane for long distances only?
2   A. Yes.
3   Q. And then you're escorted by cart back
4 to Division 6 to retrieve your property,
5 correct?
6   A. Yes.
7   Q. And then by cart again and lastly by
8 wheelchair to your new living unit, correct?
9   A. Correct.
10   Q. And did you appeal this grievance?
11   A. Yes, I did.
12   Q. And did you get a response on the
13 appeal?
14   A. Yes, I did.
15   Q. What was the response?
16   A. Please see attached grievance.
17 Grievance response.
18   Q. That would be the original response,
19 correct?
20   A. Yes.
21   Q. So the appeal response bottom of the
22 sheet, they just said the original reply is to
23 stand, or I think that's reply. Original
24 something to stand, correct?

Page 44

1   A. Correct.
2   Q. And that's -- this is your signature on
3 here?
4   A. Yes.
5   Q. And you received this grievance back
6 from them?
7   A. Yes.
8   Q. I'm going to take this down now. I'm
9 going to mark the next Exhibit 5. Share the
10 screen.
11       Are you able to see this?
12   A. Can you go to the top or something.
13   Q. Yeah, this is a light. This is the
14 tunnel here. This is the east RTU tunnel, I
15 believe.
16     MR. MORRISSEY: Is this marked as an exhibit?
17     MR. STILLMAN: Yeah, I just marked this as
18 Exhibit 5.
19     MR. MORRISSEY: Are you going to send me over
20 the exhibits so --
21     MR. STILLMAN: I'll send them all right
22 after, yeah. They all come from stuff that's
23 been raised by you guys and produced.
24     MR. MORRISSEY: Just so we -- my request is

Page 45

1 just so we have an understanding of what's been
2 discussed in this deposition to have a copy of
3 the exhibits. I appreciate it.
4     MR. STILLMAN: Yeah, I'll send it out right
5 after.
6       So I'm going to start playing this
7 exhibit.
8 BY MR. STILLMAN:
9   Q. Can you vaguely kind of recognize this
10 is that same RTU tunnel, that first picture I
11 showed you?
12   A. Yes.
13       (Video being played.)
14 BY MR. STILLMAN:
15   Q. Is that you?
16   A. Yes.
17   Q. And that would be the cart that you're
18 being transferred on, correct?
19   A. Yes.
20   Q. Okay. And that -- does it make sense
21 to you, would it be accurate to say that's
22 probably the same day as the incident referred
23 to in the grievance?
24   A. Yes.

Page 46

1  Q.  Mark as Exhibit 6 the next video and I
2  am going to skip ahead.  Here we go.
3         (Video being played.)
4  BY MR. STILLMAN:
5     Q.  Is that you?
6     A.  Yes.
7     Q.  In this video are sitting there on the
8  cart on that day?
9     A.  Yes.
10    Q.  And as we are going to see in a moment,
11  you're going to attempt to get up.  So you're
12  getting up there, correct?
13    A.  Yes.
14    Q.  At about 1:48 in the video that is.
15  And as this goes forward, I want you to tell me
16  do they make you walk to the RTU from here?
17    A.  They put the wheelchair close to the
18  door I believe.  He was trying.
19    Q.  Here they transferred you in a
20  wheelchair there, correct?
21    A.  Yeah.
22    Q.  So would you have anything to say as
23  far as the grievance being inaccurate or the
24  jail's response to the grievance being

Page 47

1  inaccurate that you didn't walk that day?
2     A.  No, I didn't walk that day.  I didn't
3  walk until I got back to my living unit.
4     Q.  Okay.
5     A.  And then I basically crawled.
6     Q.  Do you recall making the journey to and
7  from Cermak, and I know the specific date is
8  probably very hard to remember, but on
9  November 27, 2023?
10    A.  27th, no.
11    Q.  Do you have any grievances in front of
12  you that would have related to an incident on
13  November 27th?
14    A.  No.
15    Q.  I'm marking this as Exhibit 7.  Are you
16  able to see that grievance, Mr. Mathis?
17    A.  Yes.
18    Q.  Do you recognize this grievance?
19    A.  That's 12-13-23.  I have that one, yes.
20    Q.  So yeah, as you said, date of this
21  grievance is 12-13-23, correct, but the
22  incident, or the date it says is 11-27-23,
23  right?
24    A.  Yes.

Page 48

1     Q.  And this grievance is pretty similar to
2  the last one, just issues with walking every
3  time whenever you see a doctor and with your
4  cane it's hard to get up and down, correct?
5     A.  Correct.
6     Q.  And do you have this grievance in front
7  of you or no?
8     A.  Yes.
9     Q.  Did you ever receive a response on this
10  grievance?
11    A.  Yes.
12    Q.  And what did the response from the jail
13  say about this grievance?
14    A.  It says see code above.  Grievance -- I
15  can't really read it.
16    Q.  Says grievance is a repeat submission,
17  correct?
18    A.  Yeah, it say the grievance is a repeat
19  submission of a grievance collected within the
20  last 15 calendar days.  That's what they marked
21  on it.
22    Q.  And you remember drafting this
23  grievance?
24    A.  Yes.

Page 49

1     Q.  Would you have gotten -- would that
2  have been an incident or a time when you would
3  have gone for your two shots on the day of that
4  grievance?
5     A.  Not sure.
6     Q.  Did you appeal the response --
7  actually --
8     A.  Yes.
9     Q.  And that's your signature on there that
10  you received it?
11    A.  Yes.
12    Q.  I think let's take a five-minute break
13  right now and I've only got a couple more
14  questions after that I think.
15    A.  Okay.
16        (Whereupon, a short break was
17        taken.)
18  BY MR. STILLMAN:
19    Q.  One last video we're going to look at.
20  You can see that?
21    A.  Yes.
22    Q.  Okay.  So in this video we're going to
23  move much forward.  Going to move forward now to
24  about two minutes and three seconds -- yeah, or

Page 50

1 two hours and three minutes. All right. I
2 believe you will come to shortly, yeah.
3     Confirm if this is you that comes in
4 the screen shortly. That is you?
5   A. Yes.
6   Q. And do you know what you're holding
7 there?
8   A. Lunch tray.
9   Q. And that would have been like what you
10 were talking about before that you sometimes
11 have to hold either your tray or --
12  A. Paperwork, yes, tray. I had a tray.
13  Q. And this is going upward, correct?
14  A. Yes.
15  Q. Was this a struggle to get up this ramp
16 this day?
17  A. Yes.
18  Q. Would you describe yourself as a
19 struggling in this video any more than the
20 inmate behind you?
21  A. Yes. I actually started off in front
22 of him, but the guard told me to get in front so
23 he could slow his speed down.
24  Q. Would that have been before you came in

Page 51

1 the frame here?
2   A. Yes.
3   Q. So walking here you didn't need any
4 assistance from the handrails, correct?
5   A. I was bumping back and forth.
6   Q. Can you see anything about what date
7 this would have been or can you see the top of
8 the screen here where it says?
9   A. No, I can't see the dates.
10  Q. Have you reviewed this footage before?
11  A. Yes.
12  Q. Would this have been some of the
13 footage you reviewed with Pat here?
14  A. Yes.
15  Q. And you said one of the issues you
16 complain about in your grievance is that you
17 have trouble almost falling on the ramps,
18 correct?
19  A. Yes.
20  Q. Did it -- does it look like you're
21 having difficulties almost falling here?
22  A. No.
23     MR. STILLMAN: I think I have one more thing
24 and I think I might be done. One second.

Page 52

1 BY MR. STILLMAN:
2   Q. When you were in the RTU, did you --
3 were the people on your tier mixed as far as
4 their disability alerts they might have? Were
5 there wheelchair users and cane users on the
6 same tier?
7   A. Yes.
8   Q. And would you guys be transported
9 together?
10  A. Sometimes, depending if they got
11 appointment or not. We never know our
12 appointments, they just come and get us.
13  Q. Have you ever observed another detainee
14 pushing a wheelchair, using detainee during
15 transport?
16  A. Yes.
17  Q. What about an officer pushing a
18 wheelchair?
19  A. I seen officer push a wheelchair
20 before.
21  Q. Where have you seen an officer push the
22 wheelchairs?
23  A. Same place we looking at now.
24  Q. Is that a regular thing you see or is

Page 53

1 that just sometimes?
2   A. Most time I see inmates, but I don't
3 see it all the time but normally I don't go with
4 nobody besides the people that get called from
5 other tiers and some don't have wheelchairs,
6 they ones I been with.
7   Q. And you also haven't been on --
8     (Internet connection froze.)
9   THE WITNESS: Excuse me?
10    (Whereupon, a discussion was
11     had off the record after which
12     the following proceedings were
13     reported:)
14    (The requested testimony was
15     read by the court reporter.)
16 BY MR. STILLMAN:
17  Q. You also haven't been assigned to the
18 RTU since like 2023 now, correct?
19  A. Correct.
20  Q. And you would have only seen those
21 wheelchair users from the RTU about that time,
22 right, during your transports?
23  A. During transports because they have
24 other people from other tiers they could have

Page 54

1 wheelchairs, but like I said, I randomly bump
2 into people with wheelchairs because they
3 different van that load them all when we go to
4 Stroger.
5     Q.  And have you ever pushed a detainee in
6 a wheelchair?
7     A.  Yes, I believe so.
8     Q.  Would that have been before or after
9 you had the cane alert assigned?
10    A.  Before I had the cane.
11    Q.  Have you pushed a detainee in a
12 wheelchair since you got your cane?
13    A.  I don't recall.
14    MR. STILLMAN:  No further questions.
15             EXAMINATION
16 BY MR. MORRISSEY:
17    Q.  Mr. Mathis, can you describe your
18 condition on December 10, 2023, and what you
19 were doing that day?
20    A.  2023?
21    Q.  Let me rephrase.  Do you remember
22 Mr. Stillman showing you videos of you being in
23 a cart?
24    A.  Yes.

Page 55

1     Q.  Can you explain what occurred that day?
2     A.  I had a flare-up.  My foot was swollen
3 and I couldn't put it on the ground.  I had a
4 gout flare-up.
5     Q.  And where were you when you had the
6 gout flare-up?
7     A.  Division 6.
8     Q.  And where were you brought on that day
9 you had the gout flare-up?
10    A.  To Cermak.
11    Q.  Mr. Stillman showed you video of using
12 the RTU ramp, do you remember that?
13    A.  Yes.
14    Q.  And he also showed the bottom of the
15 Cermak ramp, right?
16    A.  Yes.
17    Q.  Why were you using those two ramps on
18 that day?
19    A.  Because I had to get transferred from
20 one -- to Division 6 to the Cermak unit, to
21 the -- through the tunnel.
22    Q.  And describe your condition, your
23 ability to move around that day?
24    A.  It was poor.  I had a "swole" foot so I

Page 56

1 couldn't walk.  They kept trying to tell me that
2 if I could walk and make it down there, I could
3 be saved by the doctor.  But I couldn't, I
4 couldn't move.
5         So I kept telling the guards like I
6 need some, some type of transportation, a
7 wheelchair or something.  And they had a nurse
8 come see me and then they pull me out the tier
9 in a wheelchair.  Then they got me downstairs
10 and put me onto the cart and that's when we
11 drove me over to Cermak.
12    Q.  Who kept telling you to walk to go to
13 see the doctor -- to get to see the doctor?
14    A.  The officer.
15    Q.  What did you say in response when the
16 officer told you to walk so you can go see the
17 doctor?
18    A.  I said I can't do it.  I wouldn't be
19 able to do it.  And that's when he say get up,
20 try to move and balance myself.  Took it to the
21 door.  So he went and asked for a chair and they
22 brought the chair and got me.  That's you saw
23 the chair come back.
24    Q.  Prior to this day you've been to Cermak

Page 57

1 before, correct?
2     A.  Correct.
3     Q.  And you knew the route you would be
4 taking to get to Cermak?
5     A.  Correct.
6     Q.  And you knew you would have to go up
7 and down those ramps?
8     A.  Correct.
9     Q.  And were you in any condition to be
10 able to do that by walking with the cane on that
11 day?
12    A.  No.
13    Q.  Mr. Stillman also asked you whether you
14 had given statements in this case.  Do you
15 remember that question?
16    A.  Yes.
17    Q.  Do you remember you mentioned early on
18 in the deposition that you looked at a
19 declaration to prepare yourself for this
20 deposition.  Do you remember that?
21    A.  Yes.
22    Q.  And is the declaration accurate that
23 you reviewed in preparation for your deposition?
24    A.  Yes.

Page 58

1  Q. What is the date that you signed the
2 declaration? It might be on the second page.
3  A. 6-1-24.
4  Q. Is your signature on that declaration?
5  A. Yes, it is.
6  Q. And Mr. Stillman also -- strike that.
7     Do you remember reviewing interrogatory
8 answers in preparation for your deposition?
9  A. Yes.
10  Q. And in those answers did you also make
11 statements about moving up and down the ramps?
12  A. Yes.
13  Q. You also looked at health service
14 request forms about your complaints of knee pain
15 and leg pain, correct?
16  A. Correct.
17  Q. How many health service request forms
18 did you look at in preparation for your
19 deposition?
20  A. Two, three.
21  Q. Do you have the health service --
22 health service request forms are different than
23 grievances, correct?
24  A. Correct.

Page 59

1  Q. And you have a stack of your health
2 service request forms?
3  A. Yes.
4  Q. Can you count how many health service
5 request forms?
6  A. One, two, three, four, five, six,
7 seven, eight, nine.
8  Q. Did you review all those, Mr. Mathis,
9 in preparation for your testimony?
10  A. Yes.
11  Q. I have nothing further. Appreciate
12 your time, Mr. Mathis.
13     MR. STILLMAN: Just couple more things
14 about -- one or two questions about the
15 declaration.
16          FURTHER EXAMINATION
17 BY MR. STILLMAN:
18  Q. You have a copy of the declaration in
19 front of you right now?
20  A. Yes.
21  Q. Number eight of your declaration you
22 say that there are many people who use canes,
23 crutches and walkers at the jail. In my current
24 housing unit that holds about 49 people two

Page 60

1 people use one of these devices to ambulate. I
2 have also observed other people use canes and
3 crutches to traverse the ramp. Is that correct?
4  A. Correct.
5  Q. Are those numbers correct now, are
6 there still 49 people in your tier and two of
7 them using devices to ambulate or is it any
8 different now?
9  A. It's probably like four or five people
10 who now with canes.
11  Q. All canes or is it crutches, walkers?
12  A. No, the crutches, he move to another
13 tier but is canes, no walkers.
14  Q. And in your grievance, or in your
15 declaration you essentially complain about the
16 same things in your grievance, the difficulties
17 going up the Cermak and RTU ramps, that they're
18 steep and you made requests and you haven't been
19 able to get the help, correct?
20  A. Correct.
21  Q. And then you mention also the one time
22 you were physically unable to walk you were
23 placed on an electric cart. Would that have
24 been the one video we watched?

Page 61

1  A. Correct.
2     MR. STILLMAN: Okay. No further questions.
3          FURTHER EXAMINATION
4 BY MR. MORRISSEY:
5  Q. Mr. Mathis, since that time you used
6 the cart, have you made other requests to use
7 the cart to go up and down the ramps?
8  A. I have asked the officers, but I
9 haven't been able -- but I have asked for help.
10  Q. And what do the officers say when you
11 asked to be put on a cart to move up or down the
12 ramps?
13  A. They say they can't use the cart.
14  Q. Why, do they tell you why they can't
15 use the cart?
16  A. They say inmates not suppose to be on
17 the cart.
18  Q. Has more than one officer told you
19 that?
20  A. Yes.
21     MR. MORRISSEY: I have nothing further.
22     MR. STILLMAN: I think we're good.
23     MR. MORRISSEY: We'll waive signature.
24     THE COURT REPORTER: Did you want to order

Page 62

1 the transcript at this time?
2    MR. STILLMAN: Yes, please.
3    THE COURT REPORTER: Copy for you, Pat?
4    MR. MORRISSEY: I don't need a copy at the
5 moment. Appreciate it, though.
6         (Whereupon the deposition
7          concluded at 1:04 p.m.)

Page 63

1 STATE OF ILLINOIS   )
2                ) SS:
3 COUNTY OF DU PAGE   )
4
5   I Patricia A. Mache, being first duly sworn,
6 on oath says that she is a court reporter doing
7 business in the City of Chicago; and that she
8 reported in shorthand the proceedings of said
9 hearing, and that the foregoing is a true and
10 correct transcript of her shorthand notes so
11 taken as aforesaid, and contains the proceedings
12 given at said hearing.
13
14       *[signature]*
15       Patricia A. Mache, CSR
16       LIC. NO. 084-002229