1           IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF ILLINOIS

3                   EASTERN DIVISION

4    _____

5    CUAUHTEMOC HERNANDEZ,

6           Plaintiff,

7        v.                          Case No.

8    THOMAS DART,                    22-cv-16970

9    Sherrif of Cook County, and

10   COOK COUNTY, ILLINOIS,

11          Defendants.

12   _____

13              VIDEOTAPED DEPOSITION OF

14               CUAUHTEMOC HERNANDEZ

15   DATE:        Thursday, September 19, 2024

16   TIME:        1:33 p.m.

17   LOCATION:    Remote Proceeding

18                Chicago, IL

19   REPORTED BY:  Carly Hemberger

20   JOB NO.:     6902929

21

22

23

24

Page 2

1    A P P E A R A N C E S

2  ON BEHALF OF PLAINTIFF CUAUHTEMOC HERNANDEZ:

3    PATRICK W. MORRISSEY, ESQUIRE (by

4    videoconference)

5    Thomas G. Morrissey LTD

6    10257 South Western Avenue

7    Chicago, IL 60643

8    pwm@morrisseylawchicago.com

9    (773) 233-7900

10

11  ON BEHALF OF DEFENDANTS THOMAS DART, Sherrif of Cook

12  County, and COOK COUNTY, ILLINOIS:

13    ZACHARY STILLMAN, ESQUIRE (by videoconference)

14    DeVore Radunsky LLC

15    230 West Monroe Street, Suite 230

16    Chicago, IL 60606

17    zstillman@devoreradunksky.com

18    (312) 300-4479

19

20  ALSO PRESENT:

21    Robert Gore, Veritext Videographer (by

22    videoconference)

23    Erin Wright, Law Clerk from DeVore Radunsky (by

24    videoconference)

Page 3

1             I N D E X

2  EXAMINATION:                           PAGE

3    By Mr. Stillman                6

4

5           E X H I B I T S

6  NO.        DESCRIPTION              PAGE

7  Exhibit 1    Plaintiff's Rule

8        26(a)(1)(A) Disclosures        18

9  Exhibit 2    US Access Board Website

10        ADA Guidelines for Ramps       41

11  Exhibit 3    Grievance 2022X02998      63

12  Exhibit 4    Non-Compliance Grievance

13        NC2203871                72

14

15

16

17

18

19

20

21

22

23

24

Page 4

1          P R O C E E D I N G S

2        THE REPORTER:  Good afternoon.  My name

3  is Carly Hemberger; I am the reporter assigned by

4  Veritext to take record of this proceeding.  We are

5  now on the record at 1:33 p.m.

6        This is the deposition of Cuauhtemoc

7  Hernandez taken in the matter of Cuauhtemoc Hernandez

8  vs. Thomas Dart, Sheriff of Cook County, and Cook

9  County, Illinois, on Thursday, September 19th of 2024,

10  in Chicago, Illinois.

11        I am a notary authorized to take

12  acknowledgments and administer oaths in Illinois.

13  Parties agree that I will swear in the witness

14  remotely.

15        Additionally, absent an objection on

16  the record before the witness is sworn, all parties

17  and the witness understand and agree that any

18  certified transcript produced from the recordings of

19  this proceeding:

20        - is intended for all uses permitted

21          under applicable procedural and

22          evidentiary rules and laws in the

23          same manner as a deposition recorded

24          by stenographic means; and

Page 5

1        - shall constitute written stipulation

2          of such.

3        This proceeding will be recorded via

4  video technology by Robert Gore.

5        At this time will everyone in

6  attendance please identify yourself for the record.

7        MR. MORRISSEY:  My name is Pat

8  Morrissey; I represent Mr. Hernandez, and I stipulate

9  to a remote deposition.

10        MR. STILLMAN:  Zach --

11        MR. HERNANDEZ:  My name is Cuauhtemoc

12  Hernandez.

13        MR. STILLMAN: Zachary Stillman,

14  representing Sheriff Dart and Cook County.  And we do

15  not object -- stipulate.

16        THE REPORTER:  Thank you.  Hearing no

17  objection, I will now swear in the witness.

18        Please raise your right hand.

19  WHEREUPON,

20          CUAUHTEMOC HERNANDEZ,

21  called as a witness and having been first duly sworn

22  to tell the truth, the whole truth, and nothing but

23  the truth, was examined and testified as follows:

24        THE REPORTER:  Proceed.

2 (Pages 2 - 5)

Page 6

1          EXAMINATION
2 BY MR. STILLMAN:
3     Q   All right. Good morning, Mr. -- well, good
4 afternoon, I guess, at this point, Mr. Hernandez.
5     A   Good afternoon.
6     Q   First of all, could you please state your
7 full name and spell it for the record?
8     A   Cuauhtemoc Hernandez. Y'all probably got it
9 misspelled, but it's C-U-A-U-H-T-E-M-O-C, with an
10 apostrophe between the C and the O. And then
11 Hernandez, H-E-R-N-A-N-D-E-Z, Hernandez.
12    Q   And have you ever given a deposition before?
13    A   Never.
14    Q   Okay. So I'm sure your attorney has gone
15 over a little bit about how this will work, and also
16 the court reporter has said a couple things. But I'll
17 just go through a couple quick ground rules here so
18 we're on the same page as we get started.
19        First of all, we have the court reporter
20 here today. So to make life easier for her, we'll
21 just try to keep the record as clean as possible by
22 not speaking over one another.
23        If I'm asking a question, I'd ask that you
24 wait to answer, even if you're already anticipating

Page 7

1 what the answer might be, until I finish the question.
2 And I'll do my best not to interrupt any of your
3 answers before asking the next question.
4        And then second, please make sure to answer
5 all questions verbally, and refrain from gesturing or
6 pointing at things, or giving, kind of, general, like,
7 "uh-huh," responses. Because that will be pretty,
8 like, nonclear on the record. Do you understand?
9     A   I understand. But I've got to make you
10 aware that I do have a speech impediment. I stutter
11 so if I stutter that's wholly -- is beyond my control.
12    Q   Okay. If either myself or our court
13 reporter here can't understand something you say,
14 we'll ask to clarify.
15    A   Well, I'm just letting you know, so.
16    Q   Yeah. I appreciate that.
17    A   I won't -- I won't let you feel like I'm
18 being ignorant or, you know --
19    Q   Yeah. No problem.
20        And then next, if you don't understand any
21 of my questions, please don't hesitate to let me know,
22 and I can try to rephrase it or ask it differently.
23 If you do answer, I'm going to assume that you
24 understood the question.

Page 8

1        And if there's something that you do not
2 recall or can't remember, don't guess. You can just
3 answer that you don't recall or don't remember.
4     A   Okay.
5     Q   Finally, if at any point today you need to
6 take a break, that's totally fine. I would just ask
7 that we finish the pending question, and then, you
8 know, you finish your answer, and then we could take a
9 break from there and figure out how long we need.
10    A   Okay --
11    Q   So do you understand these rules that I've
12 laid out for you?
13    A   Yes. Yes, Sir.
14    Q   Okay. So we can begin then.
15        And you said you've not given a deposition
16 before; correct?
17    A   No.
18    Q   When you were in jail did you go by any
19 other names?
20    A   They called me Lucky because people have a
21 hard time saying my name, my first name, Cuauhtemoc.
22        Even the staff has a hard time trying to
23 pronounce that name. They would call me either that,
24 or the last part of my name is T-E-M-O-C; I go by that

Page 9

1 name. My family calls me that. Or also they call me
2 Lucky. That's a nickname that I have for years.
3     Q   And what is your date of birth?
4     A
5     Q   Are you or have you ever been married?
6     A   No.
7        MR. STILLMAN: And then let's go off
8 the record momentarily.
9        THE VIDEOGRAPHER: We are off the
10 record at 1:38.
11        (Off the record.)
12        THE VIDEOGRAPHER: We are on the record
13 at 1:39.
14 BY MR. STILLMAN:
15    Q   Did you review any documents or meet with
16 your attorney prior to this deposition today?
17    A   No.
18    Q   Did you ever meet with Pat there -- I mean,
19 before this deposition, did you meet with him and talk
20 with him at all?
21    A   No. I spoke with him on the phone numerous
22 times. I sent him paperwork I had. We exchanged
23 paperwork here and there pertaining to the case at
24 hand, the matter. That's it. This is the first time

3 (Pages 6 - 9)

Exhibit 2 Page 3

Page 10

1 we've met in person.
2    Q   Today's the first time you met in person?
3    A   Yes. Because -- due to my difficulties
4 trying to move around. I'm doing -- I'm getting
5 spinal injections right now, and I'm seeing doctors
6 for ortho for my knee and my shoulder. I've got sleep
7 apnea as well, that I've got to follow up on. And so
8 it's hard for me to move around.
9       I'm getting disability at this time, but
10 I -- they haven't given me nothing at all, since I've
11 been released -- or my prior to my release or my
12 reincarceration. So that's basically it.
13       My plates are expired now at this point.
14 Due to that, and basically because I failed to pass
15 that, I don't have no money to do any of that. So
16 that's why I haven't been able to go visit him or go
17 see him.
18    Q   So today before this deposition, did Pat get
19 there, like, a bit of time before; did you talk at
20 all?
21    A   He came here, we spoke about, you know,
22 setting up, and that is it.
23    Q   Okay.
24       MR. MORRISSEY: Mr. Hernandez, he's not

Page 11

1 asking what we spoke about, about your case, but --
2       THE WITNESS: All right.
3 BY MR. STILLMAN:
4    Q   Did you speak to him though, I mean, about
5 this deposition, about what might happen? I mean, I
6 don't care --
7    A   We spoke about who and where I was going to
8 be asked questions; that's it.
9    Q   Okay. And then do you have any documents in
10 front of you right now?
11    A   No. I don't got no -- I mean, I got
12 documents that I wanted to show him as far as my
13 health's concerned that he'd never seen. I mean, I
14 got copies of the lawsuit; that's it. Other stuff --
15    Q   So what are you --
16    A   The questions that you had him -- that I had
17 to answer you.
18    Q   Yeah. So what do you have in front of you
19 right now then; like, medical records and a copy of
20 the lawsuit?
21    A   The medical records as far as you didn't
22 have, as far as my -- before I went and got
23 incarcerated, I had gotten in a bad accident. These
24 are probably the only records that you don't have.

Page 12

1 Other than that, just copies of the lawsuit that I've
2 got in front of -- in front of me; that's it.
3    Q   So what copies of the lawsuit do you have in
4 front of you; can I see it?
5    A   As far as the questions that you -- that are
6 concerning this. That's it.
7       MR. STILLMAN: Pat, could you tell me
8 what he has in front of him, just to speed this up.
9       MR. MORRISSEY: Mr. Hernandez, why
10 don't you read to him --
11       THE WITNESS: It's "Amended" --
12       MR. MORRISSEY: Just read to him the
13 documents you have.
14       THE WITNESS: "Plaintiff's response to
15 Sheriff's Interrogatories," "Plaintiff's Response to
16 Cook County Interrogatories," "Cook County Health
17 Hospital," you know, documents that are pertaining to
18 my health issues. That's it. And other parts of the
19 complaint. That's it.
20       MR. MORRISSEY: And he also has the
21 corridor ramp and accessibility assessment, amended
22 consolidated complaints, he's got --
23       THE WITNESS: Some of them I can barely
24 read, so.

Page 13

1       MR. MORRISSEY: -- movement history. I
2 think there's the ramps here. So that's what we have.
3 And we have pictures of the ramps. That's it.
4       MR. STILLMAN: Okay.
5       THE WITNESS: And the other ones I got
6 it from -- from the pain center, that he never got due
7 to the fact that -- this was the accident I had prior
8 from me -- not the accident.
9       I was in a second accident the day I
10 got arrested on this case, but I had a bad accident
11 before that, that I was getting treatment for that,
12 which I didn't -- the doctors there were not there the
13 whole time I was -- and that's what I was trying to
14 show him, that he don't got when he got here today.
15       That's it that I --
16 BY MR. STILLMAN:
17    Q   Okay. Do you know the names of anyone who
18 might have also had issues with the Cermak and RTU
19 tunnels and ramps?
20    A   I was in too much pain. I was having too
21 much issues with the staff as far as me moving around.
22       Some of the staff was helpful, some of them
23 were not. Some of them would tell me to get a
24 wheelchair permit, some of them -- some of them even

Page 14

1 went as far as then transporting me in a cart, because
2 they'd seen how bad I was walking.
3    Q   During your time at the Cook County Jail, or
4 after, or before, have you ever reviewed any Cook
5 County Jail policies and procedures?
6    A   I've reviewed a lot of them.  I mean, I was
7 in prison for 21 years.  So yes.
8    Q   The Cook County ones you've reviewed --
9    A   I've been incarcerated prior to this.
10 Twenty-one years I spent in prison prior to me
11 being -- getting released.  So I'm very familiar with
12 the procedures and the process.  From medical
13 agreements process -- all of that.
14    Q   And have you ever reviewed any, kind of,
15 like, ADA standards or construction guidelines?
16    A   I mean, I got into that when people kept
17 denying me -- I kept telling them to place me near --
18 put me on a medical wing or old man's deck or
19 somewhere near where I didn't have to travel so far to
20 go to court, or to Cermak, period.
21       Because I was having so much health
22 complications for my knee, my shoulder, and my back.
23 That I -- that I told them -- every time I'd seen
24 them, I told them about this since I got incarcerated.

Page 15

1    Q   Okay.  Yeah.  Have you ever been involved or
2 filed any other lawsuits before?
3    A   No.  Not -- not -- other than this, no.
4 When I was in IDOC I filed one lawsuit in the court of
5 claims; that's it.
6       That was due to -- it had nothing to do with
7 medical.  It had to -- it had to do with them losing
8 my personal property.  My whole box disappeared when I
9 was transferred from Galesburg to Dixon, where I spent
10 my last six years at.  That's the only lawsuit I ever
11 filed.
12    Q   So that's another lawsuit that you've filed?
13    A   That's a lawsuit -- as a matter of fact, it
14 was two.
15       There was that lawsuit, and then I filed a
16 medical pro se lawsuit as far as -- they didn't --
17 they failed to follow up medical treatment on an
18 injury I had when I had -- involved in an altercation
19 and my thumb was broken.
20       I received no medical follow-up attention
21 for that, and I filed a pro se lawsuit which they
22 denied based on the fact that I wasn't able to provide
23 a affidavit of merit and a physician report.
24       That's it.  That's the only two lawsuits I

Page 16

1 ever filed.  But this was in IDOC, not in Cook County.
2    Q   Okay.  And you were also in Division 9,
3 while you were --
4    A   Yes.  When I returned from -- I returned
5 from doing my parole time I was placed in 9.  But
6 prior to that, I was in Division 10 and then 5.
7    Q   Do you know anything about any involvement
8 with any other lawsuits other than your own; as far
9 as, you know, your --
10    A   The only lawsuit I had was how I met him.
11 So far as Division 10 went to -- to shower chairs.
12    Q   So that's another -- the shower one for
13 Division 10, you were involved in as well?
14    A   Yes.  But I'm not -- I'm not a class -- I'm
15 not the leading class member on that one.
16    Q   And then -- okay.  But that's -- so what
17 about involvement with any lawsuits?  Doesn't matter
18 if you're named or not as far class members or any
19 kind of relation --
20    A   I'm involved in a lawsuit that's going on
21 with the City as far as parking, excessive parking
22 fines and that.  And that's -- that's not been settled
23 yet, due to the fact -- I don't know why.
24       But they told me they would contact me

Page 17

1 once -- I received a card, that's it, stating that
2 they would notify me if a settlement was made.
3       But to this point, I've not received
4 nothing.  I haven't received no compensation, nothing,
5 for any of that, for any of the -- anything that I'm
6 involved in.
7    Q   So I'm not asking about compensation.  If
8 you're involved, I'm asking just any involvements.  So
9 right now we have the city parking fines one, we have
10 your IDOC lawsuit for the property, we have showers in
11 Division 10, is there anything else?
12    A   Oh.  NRC, Pinckneyville.  I'm suing -- I've
13 got lawsuits going on with them.
14    Q   How many do you have there?
15    A   One -- one in Stateville and one in
16 Pinckneyville.  One's in NRC.  Stateville and -- and
17 NRC.  This was all due to this incarceration right
18 here.
19    Q   And is there anything else related to Cook
20 County Jail?
21    A   No.  Not that I --
22    Q   Is there another case --
23    A   Not that I know of.
24    Q   Is there any involvement with Division 9 in

Page 18

1 Rogers' case, or no?
2    A   Not that I know of.  I don't know if I'm a
3 class member or anything.  I don't know if it pertains
4 to me, or if his -- applied to that case -- that class
5 case.  I don't know.
6    Q   So is it your testimony right now that you
7 have no idea if you're a class member, if you had any
8 involvement with a case involving Division 9 in the
9 showers and toilets --
10      MR. MORRISSEY:  Mr. Hernandez, I don't
11 want you to talk about things we've talked about,
12 because that's privileged.  But if you know anything
13 outside of our conversations in response to his
14 question --
15      THE WITNESS:  No, no.  I don't know
16 anything about that -- that Rogers one.  Know nothing
17 about it.
18      MR. STILLMAN:  Okay.  I'm going to put
19 an Exhibit on the screen.  It's going to be Exhibit 1.
20      (Exhibit 1 was marked for
21       identification.)
22 BY MR. STILLMAN:
23    Q   Are you able to see that?
24    A   No.  That's so small; I can't see.

Page 19

1    Q   It's small, but I can zoom in.  Are you able
2 to see it?
3    A   No.  You've got to zoom it out -- you've got
4 to --
5    Q   No.  Okay.  I'm asking can you see the
6 document?
7    A   No, I can't.
8    Q   You don't see a document on screen?  Should
9 I --
10    A   I can see a document, but I can't read it --
11    Q   Thank you.  Thank you.  I'm going to zoom in
12 now for you.  Is that better?
13    A   I need reading glasses and I --
14    Q   Is that any better?
15    A   Can I use my -- because the only reason use
16 them is for the light.  Can I use my flashlight?
17    Q   Oh.  Shit.  Wait that just changed, hold on.
18 Sorry.  Zoomed in too much.  Back on.  Sorry.
19    Yeah.  You can put on glasses.
20    A   I mean, but I don't have none.  I told --
21 they broke.  I mean, I would have to use my -- the
22 flashlight on my -- on my cellphone if that's okay, so
23 I could read it.
24    Q   I mean, I suppose, yeah.  Whatever you need

Page 20

1 to do.
2    A   Okay.  Let me just turn my phone back on.
3      THE WITNESS:  Can I use yours?
4      MR. MORRISSEY:  Sure.
5      THE WITNESS:  All right.  I got his.
6 Go ahead.
7      All right.  Go ahead.
8 BY MR. STILLMAN:
9    Q   And can you see this document?
10    A   Yeah.  I could see it now; I could read it.
11    Q   All right.  And this says -- have you ever
12 seen this document before?
13    A   No.
14    Q   For a lawsuit entitled "Kavarian Rogers vs.
15 Thomas Dart"?
16    A   No.  Never seen --
17    Q   Never heard of that?  You heard of those
18 names?
19    A   Never.  Not --
20    Q   Never heard anything about this?
21    A   No.  Somebody tried to contact me about a
22 lawsuit, and I spoke to attorney about that; I don't
23 know if it was about this.
24      MR. MORRISSEY:  Things we've talked

Page 21

1 about, Mr. Hernandez, are privileged.  So you don't
2 have to tell Mr. Stillman about conversations we've
3 had about requests or issues with lawsuits.
4      THE WITNESS:  Okay.
5 BY MR. STILLMAN:
6    Q   This is page 2 of that Exhibit 1.  That's
7 your name under G; isn't it?
8    A   Well, can you blow -- blow this up a little
9 bit more?  Because it's a little bit small.
10    Q   Yeah.  Sorry.
11    A   You've got to lower it so I could see it
12 from the beginning.
13    You said my name's where?
14    Q   This is your name, G, "Cuauhtemoc
15 Hernandez" --
16    A   Yeah.  "Cuauhtemoc Hernandez, inmate limited
17 in the ability to move from place to place,
18 incarcerated at Cook County Jail, for a period of time
19 was assigned to Division 9.  Knowledge about the
20 inaccessible showers" --
21    Q   Does that describe you?
22    A   It describes me, yeah.  I had -- I have a
23 disability -- I wasn't been able to do a lot of things
24 in Division 9 due to the fact of my health issues.  I

Page 22

1 mean, what's this got to do with anything, if I may
2 ask?
3    Q    Yeah.  Well, I'm asking if you had any
4 knowledge of your name being disclosed as a witness in
5 this case.
6          MR. MORRISSEY:  Mr. Hernandez, if it
7 relates to conversations we've had --
8          MR. STILLMAN:  Pat, this is a yes or no
9 question; it's not privileged.  He needs to answer
10 this question without you coaching him.  Thank you.
11          MR. MORRISSEY:  Mr. Stillman, if his
12 knowledge comes from conversations with counsel, I
13 think that would be privileged.
14          If you can answer the question without
15 divulging our communication, you can respond.
16          THE WITNESS:  No.  I had no knowledge
17 of this, Sir.
18 BY MR. STILLMAN:
19    Q    All right.  Thanks.  In the last ten years,
20 have you been convicted of any crimes?
21    A    The last ten years?
22    Q    Yeah.
23    A    Yes.  The gun case that I was incarcerated
24 for.

Page 23

1    Q    And what was the formal charge there?
2    A    The formal charge was habitual -- armed
3 habitual -- criminal was dropped because the judge
4 found it didn't apply to me because I didn't use it in
5 a forcible felony.  It was dropped to a possession of
6 a weapon with an enhancement of -- they enhanced it
7 due to my criminal background.  I was facing a term of
8 7 to 14.
9       That's it.  That's the only case I've got
10 prior to the last ten years.  Other than parking
11 tickets.
12          THE WITNESS:  Can I stop for a minute
13 because my leg is starting to cramp up?
14          MR. STILLMAN:  Yeah.  Go ahead.
15          MR. MORRISSEY:  Do you need to take a
16 break?
17          THE WITNESS:  Yeah.  I need to take a
18 break if possible.
19          MR. STILLMAN:  All right.  Let's do a
20 five-minute break.
21          THE VIDEOGRAPHER:  We are off the
22 record at 1:56.
23          (Off the record.)
24          THE VIDEOGRAPHER:  We are on the record

Page 24

1 at 2:03.
2 BY MR. STILLMAN:
3    Q    Do you remember what the date was that you
4 first were put into custody of Cook County Jail most
5 recently -- your most recent stay there, I mean?
6    A    I believe it was February 2, 2022, if I
7 stand correct.  As far as I recall, that's the day it
8 was.
9    Q    And where were you housed when you first
10 admitted?
11    A    Division 5.
12    Q    Where else were you housed during your time
13 at the Cook County Jail?
14    A    I went to Division 10 from there, and then I
15 stayed in Division 10 until I left; I went to do my
16 parole time.  I left to Stateville NRC, around -- I
17 don't really recall the date -- the exact date, but I
18 think it was somewhere around April 12th I believe, of
19 2022.  I don't know the exact date, but that's what I
20 recall.
21    Q    And by NRT you mean?
22    A    NRC.  Stateville NRC, the -- when they
23 process you to go back to prison.  I was there to see
24 the parole board.  And due to the parole hearing, my

Page 25

1 parole was revoked and cut in half, and I was sent
2 back to IDOC to do my remainder of my time.  That's
3 when I --
4    Q    Now -- oh.  Sorry.  Go ahead.
5    A    I went to Pinckneyville, then I returned
6 again to Cook County.  I was in Division 5 again;
7 that's when I went to Division 9 --
8    Q    So 5 -- sorry.  Go.
9    A    This was all on the same case here.
10    Q    Okay.  So 5, 10, and 9; are those the
11 divisions that you were there --
12    A    I was in Division 5, 10, and 9, and Division
13 8 RTU, until I bonded out.  And then I remained on EM
14 house arrest, which is considered a division itself.
15 I don't know what division it is, but it's considered
16 a division itself.
17       I was out on bond with the condition of EM
18 with limited movement.
19    Q    Okay.  And when you entered Cook County Jail
20 on February 2, '22, did you use mobility implement of
21 any kind at that time, like a cane?
22    A    Yes.  They issued a cane upon my arrival.
23 The doctor seen I was bad -- I was injured and gave me
24 a cane.

7 (Pages 22 - 25)

Page 26

1   Q   So prior to entering the jail --
2   A   Oh.  Yes, I had a cane -- I had a cane from
3 Dixon prior to my --
4   Q   Okay.  So you were using a cane?
5   A   -- prior to my release, for long distance.
6 It was only for long distance, but that all changed
7 due to my accident I had, which I was -- kept telling
8 Division 10 about before I left to prison.
9       Then I had got in another accident the day I
10 got arrested, on February 2nd, which I told them that
11 I had complications, you know?
12   Q   Okay.  And do you know when you entered --
13 or during your time at the Cook County Jail what kind
14 of use of your cane were you permitted; did you have
15 it at all times, or did you --
16   A   I was permitted -- when I was in Division 5,
17 I was permitted to have it -- they told me I couldn't
18 have it on the deck until seeing how bad I was, and
19 they let me keep it, you know?
20       It wasn't till I got to Division 9 where
21 they took it.  I was able to keep it the whole time
22 over there but they took it in Division 10 though --
23 in Division 9; I made a mistake.
24   Q   So at different times you had more use of

Page 27

1 the cane than others; right?
2   A   Yes.  I mean, I had -- I was -- I had access
3 to it all the time except for Division 9; they said I
4 couldn't have it on me.  They took it from me as soon
5 as I got there.
6       And when I was in Stateville, they took it
7 from me there too.  When I left Stateville to go to
8 Pinckneyville -- they gave me a crutch in Stateville
9 when I got there.
10       And when I left Stateville they took it from
11 me because CO Contreras [ph] -- I don't know his
12 name -- he told me that he seen me walking finely in
13 the bullpen, so he took -- he took that cane from
14 me -- the crutch from me, and said I would get one at
15 Pinckneyville, which I never got.
16   Q   Can you tell me a little bit about your
17 medical history as far as your mobility issues and
18 your need for a cane --
19   A   Okay.  My mobility issues -- my L4 and my L5
20 been bad since I was in Dixon; they were aware of
21 this.  That's where I got issued my cane first for
22 long distance.  And they placed me near -- near the
23 tower hall near medical because I couldn't walk too
24 far or stand too long.

Page 28

1   Q   So your mobility issues are fully just,
2 like, based on your back, kind of, issues?
3   A   Yeah.  Based on that and the car accidents.
4 I had two car accidents when I got released that made
5 it worse.
6       That complicated my neck, my back, and my
7 knee.  I've got a torn meniscus that I've just found
8 out about that they had me walking on the whole time I
9 was in prison and in Cook County.  And I just found
10 that out recently.
11       They can determine whether it's a new tear
12 or a old tear, but they say it was a old tear.  And I
13 know it's old, because the whole time I was in Cook
14 County, I kept complaining about it -- about that to
15 the doctors; that I needed an x-ray for them to look
16 at my knee, because something was going on with my
17 knee.  And they did nothing.
18   Q   And did any doctor either in Cook County or
19 in Cook County Jail before you entered into county
20 jail ever tell you -- or since actually -- since you
21 were released, have you ever gotten, like, a formal
22 diagnosis, or, like, has any doctor ever told you, you
23 know, like, you're formally or you're permanently
24 disabled?

Page 29

1   A   I mean, they told me that -- I know for a
2 fact that I need a cane for long distance when I got
3 released, but that all changed due to the car
4 accident.
5       I mean, now I can't barely sit or walk.  You
6 see I had to take a break just now.  I can't barely --
7 I can't stay in a position so long; it start my
8 irritating my back, my legs, and so I got to move
9 somewhere where I'm comfortable.
10   Q   So you started using the cane you said when
11 you were in Dixon?
12   A   Yes.  I was issued a cane there for long
13 distance and I was placed near a tower hall due to
14 medical reasons -- and to health care.
15       It was all close to -- I was in building --
16 I forgot what building it was.  It was right across
17 from the tower.
18       I don't know want to say what building
19 because I don't remember the exact building.  That was
20 a long time ago; I'd like to forget all that.
21   Q   So when you entered Cook County Jail with a
22 cane, did they take it from you?
23   A   They took it from me in Division 9; that was
24 it.  I was able to use it in Division 5, 10,

8 (Pages 26 - 29)

Page 30

1 everywhere.
2     Q   I mean, did they take it and, like, issue a
3 new one, or you were able to keep the one you entered
4 the jail with?
5     A   No. I got arrested. I never -- the police
6 arrested me, never offered me no medical treatment
7 when I was stopped, nothing.
8     Q   At the time you were arrested, were you
9 using a cane?
10     A   Yes. It was in my truck.
11     Q   So, I mean, when you were -- you didn't have
12 it with you when they brought you to jail though?
13     A   No. They took me without it. They wouldn't
14 even let me go back in my truck.
15     Q   Okay. But how long till they issued one in
16 jail?
17     A   As soon as I got there. The doctors -- when
18 I seen the doctor when they screened me -- when I
19 first got there, the doctor that seen me, he gave
20 me -- he prescribed me pain medication and the cane,
21 because he'd seen bad I was walking.
22         I kept telling them even at the police
23 station that my leg hurt. Even the video -- video
24 record that my attorney had showed that I was pointing

Page 31

1 at my knee -- at my leg while being interrogated about
2 this -- about the accident.
3         And initially, the stop was over a accident.
4 They searched my vehicle, they used the excuse that
5 they couldn't -- that it was non-drivable, but
6 ironically, they pursued me for, like, four, six
7 blocks -- more than that they said.
8         But it was non-drivable. They auctioned it
9 off, actually. But they towed it due to that, and due
10 to the fact that they thought I was drunk. They
11 thought I was drunk, and when I got to the police
12 station, I wasn't drunk. They did a test, and I
13 wasn't drunk.
14         They were going to release me, but then they
15 said they found something in my vehicle. The excuse
16 they used to search my vehicle was the fact that they
17 were going to tow it. And then they needed to deem
18 that it was safe enough for them to tow it -- I don't
19 know. I don't know the excuse they used.
20         But they never -- the police never offered
21 me medical treatment when they stopped me, even though
22 they knew I was in an accident; even though I
23 complained about it, that my leg was hurting; that I
24 can tell you.

Page 32

1         That I complained to them about it in Cook
2 County; that I can tell you to. You could look toward
3 my medical slips and everything the whole time I was
4 there; that will show you that I was complaining about
5 that.
6         I fell in Division 10. They got note of
7 that too.
8     Q   Okay. Mr. Hernandez, I'm going to have to
9 ask you just to try to keep your answers a little
10 shorter, just answering the questions which you can.
11 Yeah. Just -- we're going to be here all day
12 otherwise, you know?
13     A   Okay. That's fine. I'm sorry.
14     Q   Yeah. No, no problem. I just want all of
15 us to, you know, spend our time smartly.
16     A   Okay.
17     Q   So are you aware of any policies,
18 procedures, or rules at the jail regarding whether
19 someone should have been assisting you in relation to
20 your use of cane when you were transported from one
21 place to another in jail or in tiers?
22     A   I don't -- I complained about being in pain.
23 I'm not a big baby about it, but I complained about
24 being in pain when I was in the showers; I complained

Page 33

1 about them not being accessible due to my
2 complications, and I complained about that.
3         I complained about the ramp; I complained
4 about walking, period, because of my health -- I
5 couldn't -- I was in pain.
6     Q   Okay. But are you aware of any kind of
7 policies, procedures, or rules or anything at the jail
8 mandating --
9     A   I'm aware of all of that. I'm aware of all
10 of that. I'm aware of all my rights. I filed
11 numerous grievances if you look at my master file.
12     Q   How many grievances would you say you filed?
13     A   I couldn't recall. It was a lot. It was
14 numerous grievances, numerous requests I put in. I
15 can't tell you every request of what we spoke about.
16 I know I told them I was in pain in Division
17 10 when I fell. I talked to the doctors; I hurt my
18 elbow when I was there. And I told them about that.
19         They told me I was fine; that they've seen
20 that, that they don't -- that I had nothing wrong with
21 me. That's when I went back to prison to do my parole
22 time, and then I returned.
23     Q   At the beginning of this deposition, I think
24 Pat, your attorney, had mentioned that you have a

Veritext Legal Solutions
www.veritext.com                                                              888-391-3376

Page 34

1 report in front of you right now?
2    A   A what?
3         MR. STILLMAN:  Pat, you said you had
4 one of the case studies or the report from one of the
5 ramps; right?
6         MR. MORRISSEY:  I mentioned a
7 Globetrotters report.
8         MR. STILLMAN:  Yeah.  One of the
9 Globetrotters reports.
10 BY MR. STILLMAN:
11   Q   Yeah.  Do you have that in front of you?
12   A   I assume around here.
13        MR. MORRISSEY:  Do you want him to grab
14 it?  I mean, it's put away.
15        MR. STILLMAN:  I mean, he saw it, and
16 you mentioned it as one of the documents that he
17 had --
18        MR. MORRISSEY:  Right.  I mean, all the
19 papers aren't important.  Do you want him to get it?
20 It's not visible right now.
21        MR. STILLMAN:  Yes, I'd like him to
22 grab it.
23        MR. MORRISSEY:  All right.
24        I'll grab it for you.

Page 35

1         THE WITNESS:  I've got it right here.
2 BY MR. STILLMAN:
3    Q   Have you seen this document before today?
4    A   No.
5    Q   Did you look at this document today with Pat
6 here?
7    A   No.  We didn't have time to go through all
8 of this.  He showed it to me.  I mean, I looked it up;
9 I Googled the ramps.  By the ADA standards, I know
10 they ain't in compliance to it, as far as that goes.
11   Q   What did your Google research --
12   A   I saw a picture of the ramp, and it looked
13 nothing like the ramp in -- what I had to go to when I
14 was placed -- when I had to go see the doctor, whether
15 it was medical, eye doctor, or whatever.  Or when I
16 was being processed.
17   Q   Is there anything else you found on Google
18 that would suggest the ramp wasn't compliant, or?
19   A   As far as the bathroom went, they had no
20 grab bars.  I asked them to place me in a cell with
21 grab bars.
22        Then I asked them place me on the medical
23 or, you know, old man's deck.  They told me they
24 didn't have no medical wings or old man's deck.  But

Page 36

1 they said they had room.  They kept making excuses.
2         Then they sent me to RTU; that's when I
3 returned back after I did my parole time.  And that
4 was in 9, when they didn't -- they took my cane from
5 me.  That's when it got real bad, you know?
6         Then I was placed in RTU and sick.  I
7 quarantined because somebody caught the COVID
8 upstairs.  I mean, I was there for like three, four
9 days, maybe.
10   Q   So I mean, you saw on Google you said --
11 let's just get back to the question.
12   A   Okay.
13   Q   You saw on Google a picture of a ramp, and
14 it didn't look like --
15   A   Up to -- up to ADA standards.  And it
16 looked --
17   Q   Did you look up the ADA standards on Google?
18   A   No.  I didn't look up that.  I just looked
19 up the ramps specifically.  Because I wanted to know
20 what actually ADA standard ramps looked like.
21   Q   Could you explain, like, what you searched
22 into Google in this circumstance?
23   A   I just Googled -- I Googled "what's a
24 compliant ramp based on ADA standards?"  And they -- I

Page 37

1 got a picture.  I was trying to show him, but I
2 couldn't find -- I screenshot it, and I kept a picture
3 of it on my phone.  I couldn't find it around for him,
4 but if you want to see that.
5    Q   That's fine.  But what do you remember from
6 that picture that you saw, like, what features --
7    A   I remember that --
8    Q   No, I -- can you let me finish my question
9 first before you start answering?  Thank you.
10        What features of that ramp in that picture
11 do you remember specifically thinking "oh, that
12 doesn't look like what I remember"?
13   A    I remember the grab bar was close enough to
14 grab on both sides; I know that.
15   Q   On both sides of the aisle --
16   A   The picture I'd seen, that's what it
17 appeared to be.  I don't know if I was seeing -- I
18 don't know how big it was, but the picture I'd seen
19 didn't look nothing like the picture of the ramp -- on
20 this ramp that I was going up and down.
21   Q   Okay.  And by "grab on both sides," you
22 mean, like, one person standing in the middle --
23   A   The bar -- the bar --
24   Q   I -- okay.  Let me finish.

Page 38

1        You mean one person standing in the middle
2   and reaching out and being able to grab both bars?
3        A   In case you were trying to balance yourself.
4   There was nothing -- we didn't have nothing to sit on;
5   nothing like that.
6        Q   Did you happen to look up if there's any
7   kind of, like, ADA guidelines or mandate on how wide,
8   like, a hallway or ramp needs to be or is able to be,
9   or --
10       A   I searched how high off the ground it's
11  supposed to be.  I don't know if this one's ADA --
12       Q   That's not what I -- Mr. Hernandez, that's
13  not what I asked you though.  I asked you did you see
14  if there's anything about the minimum wideness or
15  maximum wideness or anything about wideness of a ramp
16  as far as that would show the wingspan of a human to
17  put up the sides?
18       A   No, no.  I applied my human sense, my
19  human -- my human -- I would say just common sense.
20       Q   Okay.  Is it your -- are you saying right
21  now that you think the ADA mandates that you have to
22  be able to grab both bars on both sides?
23       A   I'm not saying that that's what it's
24  supposed to be; I'm saying that it looked like -- they

Page 39

1   looked like -- nothing like this ramp that is in Cook
2   County.
3        Q   Okay.  But I asked you what the specific
4   feature of the ramp that you thought looked like
5   it was in violation --
6        A   Well, --
7        Q   Let me finish -- that looked --
8        A   This looked like --
9        Q   Mr. Hernandez, can you let me finish the
10  question?  I asked you what the specific feature was
11  in the image that you found that you identified as
12  probably not being what you saw at Cook County;
13  what looked like it wasn't -- it was probably in
14  violation of the ADA, and you said the fact that you
15  couldn't grab both hand bars on both sides.
16       A   Right.
17       Q   So is it your testimony that you believe --
18       A   That's one of the --
19       Q   So you're saying that is an issue?
20       A   That's the issue I had.  I don't know if
21  it's in compliance with ADA standards.
22       Q   But that's not what I asked you.  I didn't
23  ask you about your issues; I asked you about the ADA
24  standards, and that's what you said you Googled.

Page 40

1        A   I Googled it, and it looked nothing like
2   this one.  That's what I'm telling you.  That's all I
3   could tell you.
4        Q   And was there anything other than the fact
5   that you couldn't grab both grab bars?
6        A   They said it was supposed to be so much off
7   the ground.
8        Q   Who's "they"?
9        A   I don't recall exactly how much off the
10  ground.  I could look at the phone if you want me to
11  look at it again.
12       Q   I'd like you to answer my questions a little
13  more pointedly and without rambling so much, because
14  it's hard to have a conversation with you.
15       A   Okay.  Sorry.
16       Q   First of all, who is "they," that you said
17  "they" say that they need to be off the ground?
18       A   Oh.  The thing that I read in there.  The
19  ADA standards.  I was reading some of it, and it said
20  it needed to somewhat -- certain off the ground, and
21  this don't look nothing like that.  That's what I'm
22  saying to you.
23       Q   What did it say needs to be a certain level
24  off the ground?

Page 41

1        A   The ramp.  That needs to be a certain level
2   off the ground, and I don't believe this one was --
3   complies with that at all.
4        Q   Okay.  One second.
5        A   I mean, you could probably look that up
6   yourself.
7        Q   Yeah.  We're going to look it up right now,
8   actually.
9            Here.  So I'm going to put Exhibit 2 up, I
10  guess, at this point.
11           (Exhibit 2 was marked for
12           identification.)
13           Okay.  Sorry about that; here we go.  I got
14  it working.
15           MR. STILLMAN:  Are you guys able to see
16  that?
17           THE WITNESS:  Not yet.
18           Yeah.  That's the same picture I'd
19  seen.
20  BY MR. STILLMAN:
21       Q   Oh.  So this is what you saw?
22       A   Yes.
23       Q   Okay.  And did you --
24       A   Something similar to that.  It was something

11 (Pages 38 - 41)

Exhibit 2 Page 11

Page 42

1  about off the ground and how long it's supposed to be.
2  Now, you compare that to the one over there and tell
3  me if it's compliant or not.  I don't know.
4      Q   So you believe this is what any ADA
5  compliant --
6      A   That's what they stated on Google.  Does it
7  look like anything in that ramp?  I don't know.
8      Q   We're going to find what you're talking
9  about here.
10      Do you know what a ramp is, Mr. Hernandez?
11      A   Yes, I know what a ramp is.
12      Q   I mean, as far as when you say it needs to
13  be a certain level off the ground, I mean, are you
14  saying a ramp has a certain maximum height or a
15  minimum height; what are you trying to say?
16      A   I'm saying it was too steep up and going up
17  and down, and it put pressure on my knee when I went
18  up and down that ramp I remember.
19      And the COs could tell me when I have
20  problems going up and down that ramp or this walkway,
21  because they see how I was walking.
22      I used to have to lean on the wall, and I
23  had to stop to take breaks.  That I could tell you.
24      Q   Have you ever heard of Globetrotters

Page 43

1  Engineering Company?
2      A   No.  No, Sir.
3      Q   So when you were in jail at the Cook County
4  Jail, how frequently would you have medical
5  appointments and have a need for --
6      A   Any time I had to go see the eye doctor,
7  physical therapy, mental health services, they're all
8  located over there in the Cermak.
9      Q   Okay.  That wasn't my question.  I asked how
10  frequently would you have medical appointments that
11  you would go over there for?  So I mean,
12      A   Any time --
13      Q   No.  So I mean timewise, you know, every
14  couple of weeks, once a month, two times a month, did
15  you have any kind of, like, quantification like that?
16      A   I don't recall how many.  It was a lot.  I
17  could tell you that.
18      Q   Okay.  So it's frequently though?  You would
19  go there frequently, quite often, multiple times a
20  month?
21      A   Multiple times, yeah -- a month, yeah.  I
22  would be -- I would see maybe medical and then it was
23  in the Cermak anything they couldn't handle whether it
24  was in regard to my health, concerning my eyesight,

Page 44

1  my -- my back, my shoulder, or my knee.
2      I'd seen the eye doctor I remember over
3  there.  They screened me over there, numerous times
4  upon my arrival there.  Upon my arrival when I was
5  incarcerated.
6      You've got to remember I was released on
7  this, and I went back in.  Then I went back and forth
8  to the penitentiary for when I did my parole time.  I
9  was in this case -- in this case alone I went to
10  Division 5 twice.  Once I went to 10, and once I went
11  to 9.
12      Q   Okay.  When you would walk down the RTU and
13  Cermak ramps, would you use the handrails?
14      A   I would use it sometimes, but like I said, I
15  got a bad right shoulder, and we got a ramp -- we got
16  to walk on the -- on the side where my right shoulders
17  at.  Depends on which way you're walking.
18      But basically, it was always you had to
19  have -- you had to grab the rail with your right hand
20  most of the time.  Because remember, you've got people
21  walking on both sides of the ramp, escorts.  Sometimes
22  they got escorts going -- some people going back, some
23  people are coming.
24      Q   I think you said before -- you might have

Page 45

1  stated if you complained a lot, but did you ever
2  complain --
3      A   I --
4      Q   Could you let me finish -- complain to the
5  officers that, you know, you needed anything, or you
6  were having issues with the ramps?
7      A   Yes.  I complained to them about everything,
8  period, and about not being able to walk, period.
9  Because this ramp alone was -- was hard walking
10  through that.
11      Some of them are similar to that one but
12  they're not like this one per se.  I thought it was,
13  like, a temporary fix; I thought they were doing
14  construction on it or something when I walked through
15  there.  I didn't -- I don't know what was going on.
16      I didn't have any problems prior to me being
17  incarcerated due to the fact that I never had any
18  health complications.  So I got released until I got
19  into this car accident.  That I could tell you.
20      Any time I was incarcerated in Cook County
21  prior to February 2nd of 2022, when I went back on
22  this gun charge.  Because I was gone for 21 years in
23  the past, prior to me being released.
24      Q   During your time -- strike that.

Veritext Legal Solutions
www.veritext.com                                        888-391-3376

Page 46

1    So when you would complain and, like, you
2 know, say, "oh, I need assistance, or I need X, Y, Z,"
3 with your issues on the ramps, did you ever receive
4 assistance?
5    A    The CO one time they took me to the PRB
6 board on the -- on the cart one time to do that for
7 the complications I had.  But they were telling me
8 that "it's not going to be like this all the time, you
9 got to get a script from the medical doctor to give
10 you a wheelchair."  And they would never do that; they
11 never gave me a script for a wheelchair.
12    I told them to put me close to the court.
13 Whenever I needed to go to court, put me on the
14 medical wing, or the old man's deck; that I could tell
15 you.  But that never -- that never happened.  They
16 kept telling me to put in for a medical and I did that
17 numerous times.
18    Q    And did they ever refuse to give you
19 assistance when you'd ask?
20    A    The COs?  Like I said, some of them were
21 nice enough to help me; some of them would take me the
22 easier -- the closest route to go to get to court, or
23 wherever I had to go.  But those -- that's because
24 they were being nice.

Page 47

1    Some of them took me, I believe, one time --
2 or -- Cermak on the cart I believe.  Like, twice I
3 went on that cart.
4    I don't know where I went, but I know one
5 time was to the PRB board specifically.  And I had to
6 go through the RTU to go see the PRB board.  I had to
7 pass through -- I don't know if it was in RTU, but I
8 remember I had to go through RTU.  They dropped me off
9 on the cart.
10    Q    And so, if they, like -- strike that.
11    So I mean --
12    A    They would try help me --
13    Q    No.  Can you let me ask the questions
14 please?  Thank you.
15    A    You could --
16    Q    Excuse me, Mr. Hernandez.  There is no
17 question asked right now, so I don't know why you're
18 answering anything.
19    MR. MORRISSEY:  Mr. Stillman, please
20 don't raise your voice.
21    MR. STILLMAN:  If you could have your
22 client answer the questions when they're asked, I'd
23 appreciate that.
24    MR. MORRISSEY:  We shouldn't be raising

Page 48

1 our voices in this.
2 BY MR. STILLMAN:
3    Q    Mr. Hernandez, the question before was, did
4 you ever have any officers refuse to assist you when
5 requested?
6    A    They told me that it wasn't going to be like
7 that all the time.  That they couldn't help me all the
8 time; that I needed a medical script.  I told you that
9 already.
10    Q    No.  So you're telling me about the times
11 that they assisted you and told you it wasn't going to
12 be like that.  I'm asking did you ever request
13 assistance, say, "oh, I'm having issues; I'm having
14 troubles" --
15    A    Yes, yes, yes.  I'm going to tell you one
16 time specifically, and then I'm going to stop there,
17 because you keep asking me the same question.
18    When I was transferred from Division 5 to
19 Division 10, I actually got into it with the CO in the
20 tunnel, and he called 10-10 on me, saying I was
21 refusing to walk.
22    And I told him, "why are you calling 10-10
23 on me, telling me I'm refusing to walk?  I'm not
24 refusing to walk; I'm telling you I got health

Page 49

1 complications."  It was to the point where I damn near
2 called it staff assault, due to the fact that I was so
3 angered, and I would rather be saying to -- I knew I
4 wouldn't have to move anyway.
5    I'd rather do that than deal with this that
6 I was going through, Sir.  And he's helping me carry
7 my property at that time, so I told him, "look, I'm
8 not denying or refusing to walk, I'm telling you I
9 cannot walk long distances without stopping, Sir.  I'm
10 not refusing to do anything."
11    And due to that, that's why I would explain
12 to him every time I went -- or any time I traveled
13 anywhere, that I have problems.
14    And I could get a witness to that, too.
15 There was only two people walking that day with me.
16 And if you want to look through -- through records, it
17 was me and another inmate.  I'm not going to tell you
18 his gang affiliation; he was a Satan Disciple.
19    Q    Okay.  So again, you know, you keep telling
20 me these stories about times when they assisted you.
21    A    Well, you asked me that.
22    Q    No, I didn't, Mr. Hernandez.  I asked you if
23 an officer ever refused to assist you.
24    A    Well, he refused that day.

13 (Pages 46 - 49)
Exhibit 2 Page 13

Page 50

1    Q    You said he carried your things.
2    A    Okay.  He helped me.  He helped me.
3  Exactly.  That was after he called 10-10 on me.  He
4  called a lieutenant per se -- or a sergeant per se;
5  they don't got no lieutenants.  A white shirt is a
6  sergeant in Cook County.  They --
7    Q    You know, I don't know if it's intentional,
8  but you're making a great case for the office --
9    A    No.  I'm making --
10    Q    -- the Sheriff's office, being great
11  employees.  I don't know it seems like they helped
12  you; they're --
13    A    I mean, they helped me after I explained to
14  them that I couldn't walk.  They called 10-10 on me --
15  yes, they did help me.
16    Q    It just seems like you can't -- I mean, is
17  there any instance where they didn't help you?  It
18  seems like they're very willing to help.
19    A    That's the only time that he tried to refuse
20  to help me, but they told me they couldn't no longer
21  do that, due to the fact that I couldn't get a medical
22  script from the doctor.  And when I go and see the
23  doctor, they would not give me a wheelchair for
24  transportation to court or anywhere that was long

Page 51

1  distance.
2    Q    So whenever you used the RTU or the Cermak
3  tunnels or ramps, did you ever actually have any
4  issues getting to your final destination; your
5  appointment, your --
6    A    Yeah.  I would have to stop on my way over
7  there sometimes.  And --
8    Q    Okay.  So when I -- again, we're going to
9  get back to the answering questions a little more
10  pointedly.
11        When I say "issues," I don't mean struggles
12  with the ramp.  I mean, like, stopping the trip.
13        Did you ever struggle with the ramp, and
14  then they were, like, "all right.  You're having an
15  issue; go back, like, you're not going to make it to
16  your appointment today."  Did that ever happen, or
17  would they assist you if you were having difficulties
18  with the ramp?
19        MR. MORRISSEY:  Objection to form.
20        You can respond.
21        THE WITNESS:  They would assist me the
22  best way they could, like I said.  They could only see
23  me so far because I didn't have a medical script for a
24  wheelchair.

Page 52

1  BY MR. STILLMAN:
2    Q    Okay.  So the question was did you ever not
3  make -- like, would they ever not let you go to your
4  appointments or your services or your ultimate
5  destination during the transport and --
6    A    One time -- one time --
7    Q    Can you let me finish the question, Mr.
8  Hernandez?
9    A    Okay.
10    Q    Yeah.  Thank you.
11        Were you ever held back from getting to an
12  appointment, a service, a destination in the jail
13  based on your issues with these ramps, with your
14  issues and struggles during the journey?
15    A    Did I ever not get to my destination?  No.
16  I got there, but I had to stop during my
17  transportation.  On my way there I had to stop and
18  rest, or I would fall behind in line.
19    Q    So when times when you would have to stop
20  and rest or when you'd fall behind in line, did that
21  prevent you from getting to an appointment, to a
22  service, to a destination?
23    A    No.
24    Q    Okay.  Thank you.  So you were never

Page 53

1  actually held back from, you know, actual access from
2  an appointment, service, any kind of amenity of the
3  jail because of struggles with the ramp?
4    A    The only time -- with the ramp, no.
5  Specifically with the ramp.
6    Q    Okay.  Thank you.  And you have images of
7  the ramps there?
8    A    I've got it in my paperwork; they're
9  somewhere in there.  If you want to I -- I'll get
10  it -- I'll --
11    Q    No.  I don't really care, honestly, about
12  the ramps right now.  We're good, I think.
13    A    Excuse me; can I use the restroom real quick
14  before --
15    Q    Yeah.  That's actually good timing.  I need
16  ten minutes.  So let's do a ten-minute break.
17        THE VIDEOGRAPHER:  All right.  We are
18  off the record at 2:39.
19        (Off the record.)
20        THE VIDEOGRAPHER:  We are on the record
21  at 2:49.
22  BY MR. STILLMAN:
23    Q    In using the Cermak or the RTU ramps, were
24  you ever actually, like, formally injured, other than,

Page 54

1  like, general pain?
2      A   Well, I suffered anxiety -- I suffered
3  anxiety.  Every time I went there, I would have to
4  explain myself, why I couldn't walk, because they
5  never gave me a wheelchair when I requested numerous
6  times at the medical -- when the COs told me to
7  request it.  They never gave me that.
8      And I would suffer pain after -- after --
9  for days after I walked -- walking through this ramp.
10  No, I can't say it was -- I could say every time I
11  walked through this ramp, I would feel pain on my
12  knee.
13      Like I said, I got a torn meniscus that I
14  just found out about that I was walking on the whole
15  time I was in prison and in Cook County.
16      Q   So just pain and anxiety then, are the only
17  things that you, kind of --
18      A   Pain -- I would feel pain afterwords when I
19  would walk through this ramp and walk, period,
20  anywhere that was long distance.
21      Q   Okay.  So pain, yes.  Like you said, pain
22  and then you said --
23      A   Pain for days --
24      Q   Okay, okay, okay.  So like I said, we're

Page 55

1  going to try and keep the answers succinct.
2      A   Okay.
3      Q   So pain and anxiety; correct?
4      A   Pain and anxiety.  Yes.
5      Q   Any other formal injuries; did you ever, you
6  know, trip and fall, did you ever scrape yourself, did
7  you ever burn your hands?
8      A   I fell in Division 10, Sir.  When I was in
9  the cell -- in my cell after I came -- I don't know if
10  it was through after I came -- I know when after I
11  walked far for -- after I came back from either
12  walking far from court or a medical appointment, I
13  don't know what it was, but I was in pain for a few
14  days, and I fell in my cell -- when I was in my cell.
15      They took me to healthcare.  It's noted --
16  it's noted that I went there.
17      Q   So when you'd feel pain after using the
18  ramp, would you seek treatment for that?
19      A   I'd seek treatment a lot of times, man.  But
20  most of the time, I was just trying to get close to
21  the courts, close to everything that I had to go to.
22      I just wanted to be placed in a cell, and I
23  kept telling them to place me in the medical unit or
24  in the old man's deck or somewhere close to the court

Page 56

1  where I don't have to walk long distances through this
2  ramp.
3      And that's all in my file, I believe.  It
4  should be in my -- in my master file.  If you look
5  to --
6      Q   All right.  So with regard -- are you going
7  to say something?
8      A   No.  I just wanted to tell you that you
9  could look through my medical records and my medical
10  notes, every time I requested healthcare and what I
11  asked them to do, and what I was feeling, and what I
12  was asking them to do; you could look at that, if you
13  have any questions or you want to see if I'm lying or
14  not.
15      Q   Did I say you were lying?
16      A   No.  I didn't say you were lying.  I'm just
17  saying, you could look at that to corroborate my
18  allegations, if you want to see that.
19      Q   All right.  So back to the pain.  When you
20  would feel pain after using either ramp, would you
21  seek treatment from them for that pain?
22      A   I would seek pain -- but it was to the point
23  where it got -- to the point where they weren't
24  listening, man.  I could tell you that much.  They

Page 57

1  didn't care -- they didn't care.
2      The police even told me, "tell them to give
3  you a medical script for a wheelchair anytime you need
4  movement to go far anywhere.  We cannot take you on
5  this cart all the time."  They told me that.  They
6  would not provide you with a wheelchair until you get
7  a medical -- I would ask them to give me a wheelchair,
8  and they would take me on a cart.
9      Sometimes -- two times I believe they told
10  me.  One was PRB board, and once I believe -- I don't
11  know where I went, but I believe it was twice that I
12  went on the cart, that I recall.  But I know for sure
13  it was once.
14      Q   All right.  So the anxiety; did you ever
15  seek treatment about that?
16      A   I was asked to talk to mental health; I
17  spoke to them, to mental health, numerous times.  I
18  think -- believe twice, two times.  But they said they
19  couldn't do nothing.
20      Q   And that would have been -- you spoke to the
21  mental health people about your anxiety about --
22      A   My anxiety as far as --
23      Q   Can you let me finish my question?  You
24  spoke to them about your use of the ramp; your anxiety

Page 58

1 related to use of the ramp, or your anxiety in
2 general?
3      A   In general.  Just being in pain in general
4 at that point in time.  Because I was in pain.  I was
5 in pain, basically -- I mean, the ramp was just one of
6 the biggest problems because it's so long.
7      Q   And would you have mentioned the ramp
8 specifically in your complaints about the anxiety?
9      A   I don't recall if I did -- I don't recall if
10 I did or not.  I know I have anxiety because I have to
11 explain myself to the CO why I couldn't keep up with
12 the line, or why I didn't have a script for a
13 wheelchair when they told me repeatedly to get it.
14      Q   And so you never received any kind of mental
15 health treatment or anything for the anxiety?
16      A   No.  No.  They would just talk to me; tell
17 me they couldn't do nothing.  They would try to get me
18 pills, but I told them "why would I take pills?
19 That's not the problem.  I'm asking you to put me in
20 the medical wing or somewhere close so I can go to
21 court and that."  It wasn't -- I'm not crazy by a
22 longshot.
23      Q   But it sounds like you just said just a
24 minute ago that you were asking to be --

Page 59

1      A   I was having anxiety.  Anxiety don't mean
2 that I'm crazy.  That's two different things between
3 crazy and having anxiety --
4      Q   Did anyone -- okay.  Again, we're going to
5 keep the answers a little more succinct.  But you just
6 said you were requesting to speak with the mental
7 health people; what do you think that would quantify
8 as?
9      A   That's because of having anxiety issues
10 based on the fact --
11      Q   But I mean --
12      A   Okay.  Can you let me finish?
13          I was having anxiety issues based on the
14 fact that they weren't doing nothing about giving me a
15 medical script to have a wheelchair.  They wouldn't do
16 nothing to place me near to the -- to the court or to
17 anywhere I needed to go; to Cermak, anywhere.
18      Q   And you think that anxiety was bad enough,
19 that it was, like, you know, debilitating?
20      A   I mean, I almost went and said one time --
21 yeah.  It was anxiety.  I had to explain myself that I
22 couldn't carry my stuff, my belongings every time I
23 moved or every time I went anywhere.
24      Q   You think you're entitled to damages for the

Page 60

1 anxiety that you suffered?
2      A   I mean, I'm not a -- I'll let the courts
3 decide that.  I'm not -- I mean --
4      Q   So other than the pain and the anxiety, you
5 never had any actual specific, definable injuries;
6 correct, from the ramp use --
7          MR. MORRISSEY:  Objection;
8 mischaracterizes testimony.
9          MR. STILLMAN:  Oh.  Okay.
10 BY MR. STILLMAN:
11      Q   Okay.  Did you ever receive any injuries
12 from the ramps?
13      A   From the ramps specifically, no.  I fell in
14 Division 10, due to the fact --
15      Q   Okay.  Is your testimony that you didn't --
16      A   No.  I never fell on the ramp.  I maybe had
17 to rest on my way over.
18      Q   All right.  So you never had any specific
19 injuries from either ramp; correct?
20          MR. MORRISSEY:  Objection, that
21 mischaracterizes testimony.
22 BY MR. STILLMAN:
23      Q   Other than the pain and the anxiety, you
24 never had any specific, definable injuries, correct,

Page 61

1 from the ramps?
2          MR. MORRISSEY:  Objection to form of
3 the question.
4          THE WITNESS:  He just objected to it,
5 so I'm not going to answer it.
6 BY MR. STILLMAN:
7      Q   You just said you never fell on the ramp;
8 you never had anything happen to you on the ramp,
9 other than general pain from use and your anxiety
10 around usage of the ramp and not getting a wheelchair;
11 is that correct?
12      A   Yes.  Or the fact that no one would listen
13 to me, yes.
14      Q   And then you're also saying right now that
15 it's your testimony that you were injured on the ramp
16 at a certain point, correct, other than that?  I mean
17 that's what you're saying; right?
18          MR. MORRISSEY:  Objection to form of
19 the question.
20          MR. STILLMAN:  I'm not -- Pat, I'm
21 having a hard time putting together your client's
22 testimony and your objections that aren't making any
23 sense, to be completely honest with you.
24          MR. MORRISSEY:  Mr. Stillman, I

Page 62

1 objected to the form of the question.
2      MR. STILLMAN: I understand, but before
3 that, I mean --
4      THE WITNESS: What's not making sense
5 to you, so I could --
6 BY MR. STILLMAN:
7   Q   Mr. Hernandez, was there ever any
8 specific -- can you define an injury you received
9 using either ramp, other than pain or anxiety?
10  A   I guess due to the fact that I was traveling
11 so far and complicated me and it -- it irritated my
12 injuries I already had. I told --
13  Q   And that caused you pain; correct?
14  A   Caused pain, yes. I said in Division 10 --
15  Q   Okay. So other than the pain -- I didn't
16 ask about Division 10; did I?
17  A   Okay. Sorry.
18  Q   Other than the pain and the anxiety, were
19 there any specific injuries from using the Cermak or
20 the RTU ramps?
21  A   No.
22  Q   Okay. Thank you.
23      Okay. I'm going to put Exhibit 3 on the
24 screen here.

Page 63

1      (Exhibit 3 was marked for
2       identification.)
3      And I'll zoom in, and I'll make it bigger
4 for you. But do you see this document; just tell me
5 you see it, please?
6   A   Zoom in --
7   Q   Okay. Mr. Hernandez, again, I just asked
8 you do you see a document on screen? I don't care if
9 you can read it or not.
10  A   I can see it. Yes, Sir.
11  Q   Okay. Thank you. Does it look like a
12 grievance, probably?
13  A   That's a grievance.
14  Q   Okay. Thank you. And it's one of your
15 grievances; correct?
16  A   Yes. Correct.
17  Q   And this says "control number 2022X02998";
18 correct?
19  A   Correct.
20  Q   You state here -- and I'm going to read it
21 and paraphrase slightly that --
22  A   Can you blow it up for me so I can read it
23 too, myself over here? Just a little bit.
24  Q   Yeah. Let me see how much I can zoom in.

Page 64

1      Is that better?
2   A   Yes.
3   Q   Okay. You say that you need a doctor
4 immediately, you have back, knee, shoulder pain which
5 make it difficult for you to walk distances. And it
6 was an issue when you moved from Division 5 to
7 Division 10.
8      It was an issue when you moved in Division
9 10 to go see prison review board on 2/16/22. And it
10 says COs escorted you in a cart. Is that correct so
11 far?
12  A   Yes.
13  Q   Then it states you were receiving spinal
14 injections, therapy, et cetera, recently prior to your
15 arrest.
16  A   Yes.
17  Q   In fact, arrangements were to be made for
18 surgery --
19  A   Yes.
20  Q   -- if conditions didn't improve, which they
21 have not.
22  A   Yes.
23  Q   "I also need a sleep apnea machine, so
24 please get me to see a doctor, so I can be properly

Page 65

1 housed or given a wheelchair, et cetera." Is that
2 right?
3   A   Yes. That's me.
4   Q   And that's your signature?
5   A   Yes.
6   Q   And that was -- it says date of the incident
7 2/16/22?
8   A   Yes.
9   Q   With the grievance being drafted on the 17th
10 of February 2022?
11  A   Yes, I believe. I don't know when I drafted
12 that.
13  Q   That would be -- I mean, that's the intended
14 use of this date.
15      But you wrote this date here; correct?
16  A   Yeah. I wrote everything on there.
17 Everything in my writing, yes.
18  Q   You at least started drafting it on February
19 17, 2022, probably; correct?
20  A   Yes, Sir.
21  Q   Okay. And then it states here that it was
22 picked up by jail staff on the 22nd of February '22;
23 correct?
24  A   Whatever -- whatever you got. I don't

Page 66

1 recall everything that I did --
2    Q    But I'm asking you -- I put this on here,
3 and I'm asking you what it says.  And --
4    A    Everything that's in my writing I wrote it.
5    Q    So do you know what this part of the
6 grievance form is for?
7    A    Yes.
8    Q    What is this part of the grievance form for?
9    Q    Where are we at?  At the bottom?
10   Q    Bottom portion.  Just Right here.
11   A    "Relief request," you mean, or what?
12   Q    No.  This very bottom portion right here
13 that I'm talking about.  Where it says,
14 "superintendent, director, designee" --
15   A    I can't see that part.  The black part --
16   Q    I'm reading it to you right now.  It says
17 Hernandez, it says "superintendent, director, designee
18 of a division/unit must review and sign all grievances
19 alleging staff use of force," blah blah blah, "staff
20 misconduct, emergency grievances."  I mean, it says
21 here this is where the jail staff picks up your
22 grievance and signs for it; is that correct?
23   A    Correct, correct, correct.
24   Q    Okay.  So this was picked up on February 22,

Page 67

1 2022; right?
2    A    I guess so.  I don't know.  I don't know
3 when they picked it up.  I put it in a box; that I
4 could tell you.
5    Q    But would they have written on it or signed
6 it before it was picked up or between the time they
7 picked it up and when you put it in the box?
8    A    I think the counselor brought it back to me
9 to talk to me about it.  But I proceeded with it.  But
10 I put it in the -- all I did was put it in the box.
11 The counselor spoke to me, and I put it back in there
12 after a response.
13   Q    All right.  Is the date right here on this
14 column right there, where it says "date CRW/platoon
15 counselor received," is it 2/22/22?
16   A    That's what the paper says, yeah.
17   Q    Okay.  Thank you.
18       I will zoom in on this one too.  Just give
19 me one second.
20       All right.  And this is the second page of
21 that grievance; correct?
22   A    Let's see.  Can you blow it up for me a
23 little bit?
24   Q    I can go a little more.  That's a little too

Page 68

1 much but --
2    A    That's fine right there.
3       Well, I can't read the --
4    Q    This is the second --
5    A    -- the handwriting --
6    Q    I can read --
7    A    -- the handwriting, I can't --
8    Q    Have I asked you to read the handwriting
9 yet?
10   A    Oh, no.
11   Q    Okay.  So, I mean, that's fine.
12       The top right here, this is still the same
13 grievance, it says "2022X02998"; is that correct?  I
14 know it's a little small, but --
15   A    Correct.  That's correct.
16   Q    Okay.  And this says "dear Mr. Hernandez,
17 thank you for bringing this issue to us.  You were
18 evaluated by provider," something, "on 2/22/22 plus
19 pain management put in place.  Did not mention apnea
20 at intake."  And then "we will" -- she needs to work
21 on her handwriting, honestly, Ms. Shebel but --
22       MR. MORRISSEY:  I think it says "no
23 order for surgery noted."
24       MR. STILLMAN:  Yeah.  That sounds about

Page 69

1 right.
2 BY MR. STILLMAN:
3    Q    Is that an accurate reading, Mr. Hernandez,
4 of the response from them?
5       MR. MORRISSEY:  Well, we didn't read
6 the last sentence.
7 BY MR. STILLMAN:
8    Q    It says "you are scheduled for PCC plus,"
9 something, " for your -- I mean, did you ever see a
10 doctor after this, your PCC for your other issues,
11 after April '22?
12   A    I've seen them a lot of times.  Yeah.  I've
13 seen them after that.  It's when I got released --
14   Q    Okay.  But was that, like, a more or less
15 accurate rendition of what that response by Ms. Susan
16 Shebel who responded to your grievance on 4/5/22
17 stated?
18   A    I guess.  I mean, because -- basically, like
19 you can't read it right now, I couldn't read it.
20 Remember, I get the last copy when it's not -- barely
21 legible to read.
22   Q    But you also just said that they came and
23 talked to you about this grievance, isn't that right?
24   A    Yes.  The counselor did.

Page 70

1   Q   Who did?
2   A   The counselor I believe did.
3   Q   And then here you signed that you received
4 the response; correct?
5   A   That's correct.
6   Q   And did you ever appeal this response?
7   A   I don't think I had time to, or if I did, --
8 I never had time to, because I was being transported
9 back and forth to do my parole time. And I was being
10 moved from Division 5 to Division 10 or -- just on the
11 third, you know?
12   Q   You --
13   A   I was always -- throughout the process, you
14 always get moved around. So you're always going to
15 get the responses late if you do get them.
16   Q   Okay. But you received the response on
17 April 11th, though, and you never --
18   A   Yes, but --
19   Q   Would that have been a time when you were
20 moving?
21   A   Let me see. 4/11? I went to prison on
22 4/12, Sir. So I guess I never got this grievance, no.
23   Q   Okay. Well, you did get it, because that's
24 your signature; correct?

Page 71

1   A   That's my signature, yes. But I --
2   Q   And then 4/11 is before 4/12; is it not?
3   A   I was -- I got to Stateville on -- I was
4 being transported to Stateville on 4/12, I believe.
5   Q   Okay. So on 4/12 you were being
6 transported. The day before 4/12 was 4/11. 4/11 is
7 the date that's on this form. Would you have been
8 present on 4/11?
9   A   I believe I was, yes. If I signed it, yes,
10 I was.
11   Q   And that is your signature?
12   A   Yeah, that's my signature. So if I signed
13 that; yeah, that's me. I don't recall everything I
14 did, Sir. I'm sorry, man.
15   Q   I'm not asking you to recall though; I'm
16 just asking you is that your signature and what date
17 that is next to it?
18   A   Yes, Sir. That is my signature. I did
19 receive that grievance. Did I appeal it? No, I
20 didn't have time to appeal it, Sir. I was on
21 transfer -- getting transferred, from what I recall.
22 I was being transferred to Stateville NRC.
23       I went there twice. I believe once was on
24 4/12 and one was on 5/12, if I stand correct.

Page 72

1   Q   All right. I'm going to put one more.
2 We'll call this Exhibit 4 on screen.
3       (Exhibit 4 was marked for
4        identification.)
5       Are you able to see this document that I've
6 put on the screen? Not read it, just can you see it?
7   A   You've got to blow that up for me --
8   Q   Okay. Again, this is fifth time I've done
9 this, and I asked you the same question every time,
10 Mr. Hernandez.
11       I'm just asking if you're able to see it --
12   A   I see the document, yes. But I can't read
13 it --
14   Q   Okay. Thank you. Thank you. That's what I
15 needed you to confirm.
16   A   Okay.
17   Q   Now I can zoom in.
18       All right. This is -- I'm going to go to
19 the second page of this document.
20       This is a grievance also; correct?
21   A   Correct.
22   Q   And the control number on this grievance has
23 an "NC" in front of it; right?
24   A   Let me see. "NC, NC" -- what does "NC"

Page 73

1 mean? Oh, yeah. Yeah, I see it. It's "NE" or "NC";
2 I don't know.
3   Q   It says "NC2203871"; is that right?
4   A   Yes. That's correct.
5   Q   Do you know what an "NC" before a grievance
6 control number means?
7   A   No, I do not.
8   Q   Would you have any reason to doubt that it
9 means non-compliant?
10   A   I don't know what it means. But go ahead.
11 Go ahead, ask the next question. I've already
12 answered --
13   Q   Well, I just asked you would you have any
14 reason to doubt that it means non-compliant?
15   A   No. I don't have no reason to believe it
16 was non-compliant, but I don't know if it was or not.
17   Q   Okay. But do you have any reason sitting
18 here today to believe that I'm misleading you that it
19 isn't non-compliant?
20   A   You tell me, Sir. I don't know.
21   Q   Okay. We're going to go to the first page,
22 I guess. This says right here "non-compliant
23 grievances"; correct?
24   A   Okay. I could see it --

Page 74

1    Q    "Non-compliant grievance code, non-grievable
2 issue"; right?
3    A    Okay.
4    Q    "Non-compliant grievance, non-comp" -- you
5 see the word "non-compliant" all over?  "NC number
6 NC20203871 [sic]."  Am I reading these accurately?
7    A    Yes, you are.
8    Q    So do you have any reason to doubt that NC
9 means non-compliant?
10    A    No.  I have no reason to doubt that.
11    Q    Okay.  Thank you.
12        And this is another one of your grievances;
13 correct?
14    A    Let me see.  Yes, Sir.
15    Q    That's the same grievance I had up just a
16 minute ago, but just it is another one that you
17 drafted; correct?
18    A    It got my name on it.  Yes, Sir, it is.
19    Q    And it says here you started drafting it on
20 9/20/22; right?
21    A    Yes.  Yes, Sir.  I was in Division 8, right,
22 3H?
23    Q    Yeah.  Well, it does say Division 8 right
24 there.  So yeah.

Page 75

1    A    That's when I came back from prison.  Yes,
2 Sir, that's me.
3    Q    It says here -- and I'm going to read it and
4 paraphrase a bit.  "On 8/30/22, doctor cleared my cane
5 for long distance only, so I can get moved back to a
6 division with a cell setting.  I repeatedly told staff
7 and have not been moved.  I need to be in a cell;
8 can't sleep here.  And also have bad bowel movements
9 and take milk of magnesia."  Is that all right so far?
10    A    Yes, Sir.  That's all right.
11    Q    At times you have to wait to use the
12 restroom; it's messing up your bowel movements more,
13 and it interfered with your medication when you take
14 milk of magnesia.  You've been very patient.  Please
15 move you back to a cell setting.  Correct?
16    A    Correct.
17    Q    And for this one you didn't note, like, a
18 date of incident or time of incident or location or
19 aggrieved party; does that look right?
20    A    I mean, I was complaining about not being
21 able to use the restroom when I needed to, yes.  I
22 was --
23    Q    Do you think maybe you could -- sorry.  I
24 didn't mean to interrupt you.  But could you move a

Page 76

1 little closer to the camera also?  You're just like
2 getting blurry.  Yeah.
3        And that's your signature right there;
4 correct?
5    A    Correct, Sir.
6    Q    Okay.  And then here it states that, you
7 know, the CRWs picked it up on -- or they signed it on
8 10/3/22; correct?
9    A    Correct.
10    Q    And do you remember receiving this?
11    A    I remember speaking to the counselor,
12 Wilson.  He was very ignorant, per se; I would like to
13 say that.  He would say he couldn't help, that to put
14 in for medical, that he couldn't do nothing.  That
15 they didn't deal with housing or that I would have to
16 talk to medical or the staff.
17        And they did contact -- the staff did
18 contact somebody about placement and then they moved
19 me to a cell setting like I requested.  No matter
20 where I was, in Division 9 or anywhere.  I just --
21    Q    Why would you say -- go ahead.
22    A    I wasn't -- I just requested for them to put
23 me in a cell setting, whether it was in RTU or
24 Division 9, anywhere; put me on a medical wing, or an

Page 77

1 old's man deck, something where I could better do my
2 time with the -- with the disabilities I have.  That
3 was all I was asking.
4        Whether it was my milk of magnesia, my
5 stomach, or my walking, or whatever.  That's all I was
6 asking.
7    Q    Why would you say that the counselor was
8 ignorant?
9    A    Because he would laugh at me.  He would
10 literally, like, look at me, like -- basically, they
11 look down on you because you're a criminal; everybody,
12 because of my history and my criminal background.
13        I guess they were trying to say that I was
14 trying to manipulate the system.  I'm not a coward by
15 a longshot; I'm not running from nobody.  I didn't ask
16 to be placed in RTU.  They placed me there because
17 they took my cane in Division 9, Sir.
18        They felt that I was trying to manipulate
19 the system.  They felt everything I told them, meaning
20 my sleep apnea problems or my back problems, was a
21 lie.  I mean, they never gave me no medical scripts
22 for a wheelchair or nothing, Sir.
23        And when I got to RTU, they placed me in
24 seg; I don't know why.  They told me it was temporary;

---

Page 78

1 that I would get housed in a medical deck or somewhere
2 where I -- where I was requesting.
3      But then, when I was there for two weeks,
4 they started to treat me like I was there to be
5 segregated -- disciplining me like I was any other
6 inmate. They told me that I wasn't going to be
7 subject to that. And I complained about that.
8      And that's when they put me in RTU with
9 crazy people that didn't have no difficulties, Sir.
10 And that was a setting where I couldn't use the
11 bathroom, I would wake up having episodes due to my
12 sleep apnea, Sir.
13      That's why I was requesting to get back to a
14 cell setting rather with Division 9, or anywhere. I
15 was frustrated at that time. I would rather go to seg
16 at that point in time, Sir; it was so bad.
17      MR. STILLMAN: Could you read the -- I
18 don't even know what the question was there; he just
19 keeps talking. Could you tell me what the question
20 was there?
21      THE WITNESS: You told me the question
22 was --
23      MR. STILLMAN: No. I didn't ask you.
24 Thank you, Mr. Hernandez.

Page 79

1      THE WITNESS: Who are you asking, my
2 attorney or me?
3      MR. STILLMAN: Ms. Hemberger here.
4 Sorry.
5      THE WITNESS: Well, ask Ms. Hemberger
6 then --
7      MR. STILLMAN: Mr. Hernandez, there's
8 no question asked, why don't we --
9      THE WITNESS: Well --
10      MR. STILLMAN: Mr. Hernandez, I didn't
11 ask a question. Thank you.
12      THE WITNESS: When you speak to her,
13 address her --
14      MR. STILLMAN: Mr. Hernandez, thank
15 you.
16      THE WITNESS: "Mr. Hernandez, Mr.
17 Hernandez" --
18      MR. STILLMAN: Mr. Hernandez, no
19 question has been asked. There has been no question
20 asked; I'm not sure why you're speaking.
21      MR. MORRISSEY: Mr. Stillman, we can't
22 see anybody talking right now, because you have the
23 grievance on the screen, and all the participants are
24 not on the screen, so --

Page 80

1      MR. STILLMAN: Here we go.
2      MR. MORRISSEY: All right. I think
3 that was a confusion of why he wasn't able to
4 understand who you were talking to.
5      MR. STILLMAN: I don't think so. But
6 we'll move on --
7      THE WITNESS: Adress who you are
8 addressing, Sir. That's all I'm asking you to say.
9 Adress her by her name when you're speaking to her,
10 not -- like, you say "Mr. Hernandez," address her by
11 her name, Sir. That way it would be no confusion
12 here.
13      MR. MORRISSEY: All right. There's no
14 question pending, so he's going to have the court
15 reporter read back the question.
16      THE REPORTER: Okay. One moment for
17 our read back.
18      (The reporter repeated the record as
19      requested.)
20      THE REPORTER: Okay. We are back --
21      THE WITNESS: He looked at me --
22 BY MR. STILLMAN:
23      Q   Okay. No question has been asked, Mr.
24 Hernandez. That was a readback of the question. I

Page 81

1 did not say anything. Thank you.
2      A   Well, address to her, like I told you. Ask
3 her by her name.
4      Q   Oh my God, Mr. Hernandez --
5      A   "Mr. Hernandez," yes. Clarify that. Call
6 her by her name when you're asking her that question.
7 That's all I'm asking you to do so we won't have no
8 confusion, Sir. I'm sorry.
9      THE REPORTER: Would you like the
10 playback again?
11      MR. STILLMAN: No, no. You're fine.
12 Sorry. I'm just -- thank you -- looking for where I'm
13 going next.
14 BY MR. STILLMAN:
15      Q   Okay. I'm going to bring that grievance
16 back up. That's what I was on before -- non-compliant
17 grievance back up. All right. And this is Exhibit 4
18 back on the screen -- yeah. Exhibit 4.
19      So the third page of that; I'm going to zoom
20 in for you. This form says "reasons for grievance
21 non-compliance and/or action required"; correct?
22      A   Correct.
23      Q   This says "see above;
24 classification/placement are non-grievable issues,

---

21 (Pages 78 - 81)

Page 82

1 however your concerns were forwarded to RCDC/DWPT";
2 correct? Or --
3        MR. MORRISSEY: No. That says --
4 BY MR. STILLMAN:
5    Q   Or not DW; sorry.
6    A   Superintendent.
7    Q   Yeah. Superintendent. Sorry.
8    A   I wrote her too, as a matter of fact. I
9 wrote her prior to me getting bonded out in November.
10 And I -- I told her the issues, and they would not
11 give me no cell setting.
12        They would tell me that the only thing --
13 and the COs used to even tell me "man, the only place
14 you're going to be able to go to a cell setting over
15 here is to you get you a CPAP. And I tried to get
16 that, and they never gave me that neither.
17        They said they needed to -- they had the
18 setting on my machine. They were waiting on medical
19 records, and I don't know how long it takes for that.
20 I don't -- I don't know. I could tell you I wasn't
21 comfortable right there. Very uncomfortable, because
22 I couldn't sleep, or use the bathroom consistently
23 when I needed to use it. I'd wake up having episodes.
24    Q   And it says you received this; you signed

Page 83

1 for this non-compliant response on 10/4/22, it looks
2 like; correct?
3    A   It says 10/3, I believe. 10/3/22. Or
4 10/4 --
5    Q   All right. It says some date between the
6 1st and 10th; whether it's the 3rd the 4th --
7    A   It says 10/3 -- it says 10/3 and then it
8 says 10/4/22. I'm sorry.
9    Q   Okay. Yes. Okay. So this says 10/4/22.
10 But you agree this is your signature; you received
11 this back in October of 2022, whether it's the 4th,
12 the 3rd, whatever, it doesn't matter, but you received
13 it back; correct?
14    A   Yes, Sir. I did receive it back.
15    Q   Okay. Did you ever get a sleep apnea
16 machine?
17    A   No, I never got that. Actually, I had to
18 get a court order when I went back in to take mine in.
19    Q   And do you think you ever filed any more
20 grievances than just these regarding your issues with
21 the ramp?
22    A   I think at that time I didn't -- he kept
23 telling me that it was non-compliant; it couldn't do
24 nothing for me. So no I didn't file about the ramp or

Page 84

1 anything no more.
2        I just kept putting in a medical slip and
3 then complaining about my pain until I got bonded out
4 on 11 -- before Thanksgiving.
5        I don't remember -- recall the exact date,
6 but it was before Thanksgiving, a few days before I
7 got -- I was bonded before that, but they were being
8 processed. Got out on 11 something -- 11 -- I don't
9 recall the exact date, Sir.
10        That's when I came home on EM. Because I
11 was still on EM with a bond. They -- like, 4,000 for
12 bond and I was on EM with limited movement. I
13 actually had to get permission anytime I moved
14 anywhere three days in advance I believe, if I recall
15 right.
16        It was hard for me to go to my doctor's
17 appointments or anything I had to do.
18    Q   Earlier in this deposition, do you remember
19 how many grievances you said you probably filed about
20 this issue?
21    A   I filed numerous grievances about not being
22 able to walk, period. I don't recall whether I
23 specifically pointed this out ramp. I asked to be
24 placed near a court or anywhere I needed to go to

Page 85

1 medical, whether it was Cermak -- but I told them that
2 this ramp was one of the main things when I spoke to
3 medical.
4        They would not give me a medical slip for
5 nothing at all, Sir. The COs told me to get a
6 medical -- they tried to help me, they were trying to
7 be nice, but there was only so much they could do.
8 And they would tell me, "it's not going to be like
9 this all the time, you need to talk to medical."
10        And then when I spoke to medical, they
11 said -- when they cleared me for the cane exactly,
12 when I went back and spoke to the doctor, she cleared
13 me for the cane, Sir. I spoke to the -- to the
14 security staff with the -- that's when I'm saying that
15 the counselor was ignorant on his part. Because he
16 knew about that.
17        He could have spoke -- basically talked to
18 me and help me try to get what I needed to get. And
19 he wouldn't do that for me. He said it was out of his
20 control. And when I spoke to medical and they cleared
21 me, they say it was up to -- to placement to move me.
22        And they spoke to placement at one point in
23 time, and they told me they were looking -- looking
24 into it. But I never got nowhere, and I found it out

Page 86

1 in November, before Thanksgiving. I remember that.
2      I found it out way before that, but I was
3 waiting for them to clear everything that they had to
4 do -- that my mom had to go over there and sign forms
5 for this that occurred, Sir.
6      Q   Do you know -- do you have any reason to
7 believe that you might have filed any more grievances
8 than the two I showed you about this issue?
9      A   I don't recall, Sir. I did file -- but I
10 know I complained a lot to medical, and you could look
11 towards the notes what I was complaining about.
12 Whether it was milk of magnesia, the bathroom, the not
13 being able to walk to court back and forth; they never
14 gave me a wheelchair when I requested it.
15      At this point -- they only offered me one
16 wheelchair one time when I came back, but they never
17 gave me a medical script for it; never received it in
18 black and white.
19      I never got that, never. But I requested it
20 as many times as I requested to be placed near Cermak
21 where I needed to go long distance -- anywhere I had
22 to go long distance. And they told me --
23      Q   What's your definition of numerous?
24      A   Numerous? Any time I go into court --

Page 87

1      Q   No. I'm saying what's your -- when you say
2 "numerous," I mean, can you put a number to that?
3 What's the minimum --
4      A   I'm trying to tell you --
5      Q   No. Let me finish my question, please.
6      What is the -- like, can you give me a range
7 of numbers that you would count as numerous --
8      A   Okay. Rephrase the question -- rephrase the
9 question. When I spoke to medical --
10      Q   Is one to three of an item -- would that be
11 numerous of the item, three to four?
12      A   Oh. It's more than one to three, Sir. I'm
13 sorry.
14      Q   Oh. Numerous is more than one or three?
15      A   Yes.
16      Q   So at the beginning of this deposition, when
17 I asked you how many grievances you had filed, about
18 this issue about the ramps, you said "numerous
19 grievances, numerous requests," you used the word
20 "numerous."
21      A   About the ramp specifically, no.
22      Q   No. That was the word you used though.
23      A   Well, I'm sorry. Well, I'll rephrase that
24 for you; correct that for the record, because I didn't

Page 88

1 mean to say that.
2      Q   All right. So your testimony is that
3 "numerous" would not equate to two?
4      A   Yes.
5      Q   Okay. Why didn't you ever file any
6 additional grievances about the ramp issues?
7      A   Because at this point, nobody would listen
8 to me, Sir. This was one of the little things that I
9 went through that caused me pain --
10      Q   Why did none of your --
11      A   -- that caused me pain and anxiety.
12      Q   Are you done? I'm just waiting for you to
13 finish your answer.
14      A   I'm done. I'm done.
15      Q   Oh. Okay. Thank you.
16      So you never filed any more than those two
17 grievances about any ramp or movement issues; correct?
18      A   I filed just that I was having problems
19 moving around period, because I was in pain. I spoke
20 to medical about moving up and down their ramp. I
21 could tell you that. That they made note of it, I
22 don't know. Like I said, I have numerous of this --
23 from my shoulder to my back to my knee.
24      Q   And neither of those two grievances that we

Page 89

1 looked at actually even specifically mentioned any
2 transports for, like, medical -- like, using both the
3 Cermak and RTU ramps; correct? The first one was
4 about the criminal courthouse ramp; right?
5      A   Any time I went up and down any ramps that
6 made it difficult for me to walk. Yes, Sir. That's
7 all that I wrote on the grievance.
8      Q   But your grievance never specifically
9 related to the RTU and Cermak ramps; correct?
10      A   No, no. I don't recall. If it's not on
11 black and white, no. Then I didn't point that out. I
12 spoke to medical about it; I complained to staff about
13 it on my way over, on my way back. But whether --
14      Q   So you never --
15      A   -- was filed -- filed any incident report, I
16 don't know.
17      Q   So you never filed any grievances about the
18 RTU and Cermak ramp; correct?
19      A   Correct.
20      Q   Okay.
21      And then just quick -- I already you asked
22 you this kind of, but just slightly differently.
23      What aspects of these ramps do you
24 specifically -- do you know or think are non-compliant

Page 90

1  with the ADA?
2      A   I said they look like a temporary fix.
3  They're doing -- like they were having construction
4  done on it. That's what I thought.
5          I know it caused a lot of pain. I know when
6  I -- I know when I Googled it and then it looked
7  nothing like it. I know that.
8      Q   I'm sorry. What is your answer that you
9  just gave? I'm sorry. Did you answer my question
10 right there? I didn't ask about temporary
11 construction.
12     A   That was my answer to the question. That it
13 was non-compliant as far as that I know, what I
14 learned about it later on, yes. I thought it was a
15 temporary fix. Like I said to you.
16         I asked them to put me in a -- in a cell
17 which complies with ADA standards. I know I asked
18 them, the staff. They told me I could go to medical
19 and to management; that's the advice the staff gave
20 me. Or to get a script for a wheelchair, which I
21 tried to and they never gave it -- they never gave it
22 to me.
23     Q   Just tell me what you're thinking of when
24 you're talking about temporary or permanent fixes. I

Page 91

1  didn't ask you anything about a permanent or temporary
2  fix or a fix at all. I mean, the only thing I --
3      A   I mean, when you look at the ramp, it don't
4  look -- I mean, correct me if I'm right, that's for
5  people in a wheelchair; right?
6      Q   A ramp?
7      A   Yeah. That's the purpose of that; right?
8  If you have a wheelchair; right?
9      Q   I don't know; you tell me. You're the one
10 who Googled the ADA; you tell me.
11     A   I Googled it. That's the words -- we're
12 going to speak about this, because I need to know.
13     Q   Okay. So back to my question, which I had
14 to just honestly think about to get back to, because I
15 barely even remember what I'm asking with the way you
16 were answering --
17     A   You asked me whether it was in compliance
18 with ADA standards, that's what you asked me.
19     Q   No. I asked what specific features of these
20 ramps are you thinking are non-compliant with the ADA?
21 Can you tell me what aspect of the ramp?
22         MR. MORRISSEY: Objection; that's
23 already been asked and answered.
24         You can respond.

Page 92

1          THE WITNESS: One; I mean, where could
2  you rest on, if you had a problem walking to it due to
3  all my complications I had?
4  BY MR. STILLMAN:
5      Q   All right. So you're saying a resting
6  position?
7      A   I could only lean on the wall, like I said.
8  They told me -- the COs told me would I have a problem
9  going up and down this ramp, would I want to -- they
10 asked me that once or twice.
11         And I told them if I need to stop, I just
12 need to stop on the way over there, whether with this
13 ramp or another ramp, when I was walking through
14 there -- through this ramp, which irritated my leg and
15 my back and my shoulder, and caused me anxiety when I
16 had to numerously explain myself over and over.
17     Q   So all of the pain from your use of the ramp
18 was because there was no resting spot?
19     A   No. Other than me trying to lean on the
20 wall, or they allow me to stop. They literally
21 sometimes escorted me by myself going through the
22 actual tunnels, period, by walking.
23     Q   So I'm going to ask that again. So all the
24 pain and anxiety that you say were the injuries you

Page 93

1  suffered as a result of these ramps, I mean that --
2      A   And the fact that I fell --
3      Q   Can you let me finish? Thank you.
4          That's all as a result of there not being a
5  resting spot on the ramp?
6      A   Yes. The resting spot, and the fact that it
7  was too steep and too long.
8      Q   Oh. Thank you. Those are two other ones
9  that I've had to press you with four additional
10 questions to get. Thank you, Mr. Hernandez.
11         Were there issues with any railings or
12 anything; were there any --
13     A   At one point in time, I don't believe it
14 had -- it had rails. I don't remember it having the
15 rails at one point in time when I -- when I traveled
16 through the first time.
17     Q   And would you have filed grievances or
18 complaints about any of these specific details?
19     A   Like I said, at this point in time, I -- I
20 wasn't focused on that alone, I was focused more on my
21 wellbeing traveling anywhere, because I couldn't get a
22 wheelchair, Sir.
23     Q   And why do you believe you were entitled to
24 a wheelchair?

24 (Pages 90 - 93)
Exhibit 2 Page 24

Page 94

1    A   I was having problems getting anywhere,
2  walking around anywhere.  I got a back problem.
3        Remember, I had that going back prior to
4  that -- prior to my arrest.  And I got in another car
5  accident while I was arrested.  That was the reason I
6  was originally stopped for -- for this case, Sir.
7    Q   So if someone is put into a wheelchair after
8  an accident, should they always be entitled to a
9  wheelchair forever from that point?
10        MR. MORRISSEY:  Objection to form.
11        You can respond.
12        THE WITNESS:  I'm entitled to -- I
13  don't think I'm entitled to anything unless the
14  medical personnel writes the script for it.  But the
15  police told me -- the COs told me to ask them to give
16  me a wheelchair anytime I was transported long
17  distances
18  BY MR. STILLMAN:
19    Q   And doctors did see you --
20    A   They'd seen me numerous times, Sir.
21    Q   And they never gave you a wheelchair;
22  correct?
23    A   They never gave me a wheelchair.  I even
24  asked them to -- they asked me "we don't know your

Page 95

1  history, your medical -- we don't got all your medical
2  records."
3        I told them, "well, order it from Dixon; I
4  had a cane there.  And order" -- I told them, "order
5  my record from Stroger."  I told them to order my
6  medical records from the pain center that I received
7  from the first accident.  And they said they were
8  going to look into it.
9        Again, I was transferred to IDOC on April, I
10  believe, 12, when I was in Division 10.  And then I
11  returned on 8/12 I believe.
12    Q   Do you know the names of anyone else who had
13  issues with these ramps?
14    A   No.  I didn't have time for that.  I was in
15  too much pain.  I was having too much anxiety.  I
16  didn't have time to take down no names.  I wasn't
17  trying to build a case, I was just trying to get
18  medical treatment then.  You know, something.
19        Being able -- having access to a wheelchair,
20  that's all, or place me somewhere near the courts or
21  anywhere I had to go that was long distance.
22        They would go as far as taking me through
23  the shortcuts sometimes, but they would tell me "we
24  can't do this all the time; you've got to get a

Page 96

1  medical script from a doctor," which they never
2  provided me with.
3        And like I said -- like you said, the
4  non-compliance grievance is for -- due to placement.
5  They said they didn't deal with that.
6    Q   Have you ever heard -- I'm just going to
7  read you a list of names, and you're just going to
8  tell me if you've heard of these individuals or not.
9    A   Mm-hmm.
10    Q   William Mathis.
11    A   No.  Who is that; may I ask?  Is he an
12  inmate, a CO, or?
13    Q   No, you may not ask.
14        The next name is Kavarian Rogers.
15    A   I don't -- I don't know him.  I don't
16  recall.  I don't know him by name if I ever met him.
17    Q   Okay.  These are yes or no questions.  Just
18  say yes or no.  Thank you.
19        Kent Elwoods is the next name.
20    A   No.  I don't recall him neither.
21    Q   Sylvester Brinson.
22    A   No.
23    Q   Tommy Love.
24    A   No.

Page 97

1    Q   Anthony Muniz.
2    A   No.
3    Q   Antoine Pierce.
4    A   No.
5    Q   Carlos Martinez.
6    A   Carlos Martinez?  No.  I might know him --
7  like I said, I might know him by face if I encountered
8  him --
9    Q   Yeah.  I understand.
10    A   I don't ask them for their full name when I
11  meet somebody, so I'm sorry.
12    Q   Raasikh Phillips.
13    A   No.
14    Q   James Krook.
15    A   No.
16    Q   Quovotis Harris.
17    A   No.
18    Q   Joseph Smith.
19    A   No.
20    Q   Lonell Long.
21    A   No.
22    Q   Okay.
23    A   But if I met them, I might recognize them by
24  face, like I said.  Or by their -- if they went by a

Page 98

1 name other than that if I ever met them.
2        MR. STILLMAN: All right. I'm okay.
3 I'm done here, I believe.
4        Pat, do you have anything?
5        MR. MORRISSEY: I have no questions.
6 We'll waive signature. We're finished.
7        THE WITNESS: I'm done if you're done.
8        THE VIDEOGRAPHER: Okay.
9        MR. STILLMAN: All right. Thank you,
10 Mr. Hernandez.
11        THE VIDEOGRAPHER: We are off the video
12 record at 2:40 p.m. [sic]. This concludes the
13 testimony given by Cuauhtemoc Hernandez.
14        The total number of media units used
15 was two and will be retained by Veritext.
16        THE REPORTER: Okay. And while we're
17 still on the transcript record, can I get any
18 transcript orders?
19        MR. MORRISSEY: I don't need a copy.
20        MR. STILLMAN: Yep. We'll take it.
21        THE REPORTER: Okay. We are now off
22 the record at 3:40 p.m.
23        (Signature waived.)
24 //

Page 99

1        (Whereupon, at 3:40 p.m., the
2        proceeding was concluded.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 100

1        CERTIFICATE OF DEPOSITION OFFICER
2        I, CARLY HEMBERGER, the officer before whom
3 the foregoing proceedings were taken, do hereby
4 certify that any witness(es) in the foregoing
5 proceedings, prior to testifying, were duly sworn;
6 that the proceedings were recorded by me and
7 thereafter reduced to typewriting by a qualified
8 transcriptionist; that said digital audio recording of
9 said proceedings are a true and accurate record to the
10 best of my knowledge, skills, and ability; that I am
11 neither counsel for, related to, nor employed by any
12 of the parties to the action in which this was taken;
13 and, further, that I am not a relative or employee of
14 any counsel or attorney employed by the parties
15 hereto, nor financially or other *Carly Hemberger*
16 outcome of this action.
17        CARLY HEMBERGER
18        Notary Public in and for the
19        State of Illinois
20
21
22
23
24

Page 101

1        CERTIFICATE OF TRANSCRIBER
2        I, TYLER OLSEN, do hereby certify that this
3 transcript was prepared from the digital audio
4 recording of the foregoing proceeding, that said
5 transcript is a true and accurate record of the
6 proceedings to the best of my knowledge, skills, and
7 ability; that I am neither counsel for, related to,
8 nor employed by any of the parties to the action in
9 which this was taken; and, further, that I am not a
10 relative or employee of any counsel or attorney
11 employed by the parties hereto, nor financially or
12 otherwise interested in the outcome of this action.
13
14
15        TYLER OLSEN
16
17
18
19
20
21
22
23
24

26 (Pages 98 - 101)

Exhibit 2 Page 26