Transcript of the Testimony of
**ERIC DAVIS**

**Date:** June 5, 2024

**Case:** WESTMORELAND VS. DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

ERIC DAVIS
June 5, 2024

Page 130

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EUGENE WESTMORELAND,      )
                         )
          Plaintiff,     )
                         )
     vs.                 )  No. 23-cv-1851
                         )
COOK COUNTY SHERIFF      )  Day 2
THOMAS DART, et al.,     )
                         )
          Defendants.    )

        This is Day 2 of the deposition of
ERIC DAVIS, taken via Zoom videoconferencing,
called by the Plaintiff for examination, taken
pursuant to the Federal Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken
before PEGGY A. ANDERSON, a Certified Shorthand
Reporter of the State of Illinois, on June 5,
2024, at 2:00 p.m.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 131

```
 1   A P P E A R A N C E S:
 2
 3           THE LAW OFFICES OF:
             THOMAS G. MORRISSEY
 4
             BY:  MR. THOMAS G. MORRISSEY
 5                MR. PATRICK MORRISSEY
                  10257 South Western Avenue
 6                Chicago, Illinois  60643
                  (773) 233-7901
 7                tgm@morrisseylawchicago.com
 8                pwm@morrisseylawchicago.com
 9           Appeared on behalf of the
             Plaintiff;
10
11           THE LAW OFFICES OF:
             DEVORE RADUNSKY
12           BY:  MR. ZACHARY STILLMAN
                  MR. JASON DEVORE
13                230 West Monroe Street
                  Suite 230
14                Chicago, Illinois 60606
                  (312) 300-4479
15                jdevore@devoreradunsky.com
16                zstillman@devoreradunsky.com
17           Appeared on behalf of the
             Defendants.
18
19   ALSO PRESENT:
     Ms. Hannah Cohen, Law Clerk
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 132

```
 1                 I N D E X
 2   WITNESS                           PAGE
 3   ERIC DAVIS
 4   DIRECT EXAMINATION BY
     MR. MORRISSEY:                     133
 5   CROSS-EXAMINATION BY
     MR. STILLMAN:                      251
 6
 7   REDIRECT EXAMINATION BY
     MR. MORRISSEY:                     254
 8
 9
10
11                E X H I B I T S
12   MARKED                            PAGE
13   PLAINTIFF'S EXHIBIT NO. 1          142
14   PLAINTIFF'S EXHIBIT NO. 8          162
15
16
17                *******
18
19
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 1

ERIC DAVIS
June 5, 2024

Page 133

```
1              (WHEREUPON, the witness
2              was first duly sworn.)
3   WHEREUPON:
4              ERIC DAVIS,
5   called as a witness herein, having been first
6   duly sworn, was examined and testified as
7   follows:
8        D I R E C T   E X A M I N A T I O N
9        BY MR. MORRISSEY:
10       Q    Good afternoon.  Mr. Davis, I believe
11  I didn't ask you this, but can you tell me a
12  little bit about your license as an architect,
13  your licensure?
14       A    I am an Illinois licensed architect.
15       Q    And when did you become licensed as
16  an architect?
17       A    1989.
18       Q    And did you previously work for
19  Globetrotters?
20       A    In 1998, I believe it was, yes, 20 --
21  or whatever that is, 26 years ago, yeah.
22       Q    Did you ever provide architectural
23  services in the private sector for public
24  entities?
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 134

```
1        A    Most of my career has been
2   architectural services in the private sector
3   for public entities.
4        Q    Do you consider -- are you
5   qualified -- Let me rephrase the question.
6             What are your qualifications in
7   regards to an understanding of the 1991 and the
8   2010 ADA standards?
9        A    Well, there is no separate
10  certification or licensure specific to ADA, but
11  my qualifications about the ADA and
12  understanding of it are -- include licensure
13  which is the location where the ADA is
14  exercised and enforced.
15            In addition, I have taken, I believe
16  it was, an eight-part course through continuing
17  education specifically about the Americans with
18  Disabilities Act.  I have -- I also took
19  another one.  There was a course I took
20  recently in interpreting the 2010 CIP -- or ADA
21  rather specific to that.  I have also taught
22  aspects of the Americans with Disabilities Act
23  to graduate architecture students at the School
24  of the Art Institute of Chicago.
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 135

```
1        So both in terms of my professional
2   licensure in general and in specific education,
3   I have a fair degree of understanding of the
4   ADA and have for some time.
5        THE REPORTER:  Tom, can you give me
6        just one moment?
7             (WHEREUPON, the record
8             was read as requested.)
9   BY MR. MORRISSEY:
10       Q    So would you rate your understanding
11  of the ADA to be very strong?
12       A    Yes.
13       Q    In regards to this east corridor ramp
14  that's the part of the Westmoreland case, can
15  you tell me your understanding of how the 2010
16  standards define what is a ramp?
17       A    Well, you have it on your screen
18  there, but a ramp is -- as it notes, is a
19  walking surface with the slope steeper than
20  1 in 20.
21       Q    And would you agree that in regards
22  to this east corridor ramp, east corridor
23  passageway, that it would fall within the
24  definition of a ramp because it is steeper than
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 136

```
1   1 to 20?
2        A    Yes.  The east corridor, yes.
3        Q    And because it's defined as a ramp,
4   does that mean it has to -- the slope of the
5   ramp has to be less than 1 to 12 -- I'm sorry.
6   Let me ask the next question.
7             Under Section 405, it says:  Ramps
8   have the following requirements.  Under "A" it
9   says:  405.2, Slope.  Ramp's run shall have a
10  running slope not steeper than 1 to 12 inches.
11       A    Yes.
12       Q    Do you agree that that's the standard
13  for a slope for a run?
14       A    That is the limitation.
15       Q    When you say a "limitation," what do
16  you mean in regards to the 2010 standards?
17       A    So a ramp under the ADA could be
18  anywhere between a slope of 1 in 12 and a
19  slope -- generally 1 in 12 and 1 in 20.
20            In other words, if you had a section
21  of walkway that had a slope that was 1 in 16,
22  that's still a ramp.  It's not required to be
23  as steep as 1 in 12, but if it's steeper than
24  1 in 20, it's treated as a ramp.
```

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 2

1    So any sloping walking surface
2    between a slope of 1 in 20 and 1 in 12 is
3    considered a ramp in general under the ADA.
4         Q    And if a ramp has a run that's
5    steeper than 1 to 12, that would be violating
6    the 2010 standards?
7         A    That's correct.  For an area of
8    walkway that is steeper than 1 to 12, yes, that
9    would not be considered to be compliant, if a
10   compliant ramp is called for in that location.
11        Q    And if the steepness was 1 to 10,
12   would that be a significant steepness in
13   regards to the 2010 standards in regards to a
14   slope?
15        A    As far as characterizing it as
16   significant, I think that's a subjective term.
17   It would not be compliant.
18        Q    Well, I'm not -- when you say
19   something is not compliant, that means it
20   violates the 2010 ADA code, correct?
21        A    And/or any other applicable codes,
22   yeah.
23        Q    Is there anything in the 2010
24   standards or the 1991 standards that provide

1    for a -- less than a 1 to 12 steepness for a
2    ramp, ramp run?
3         A    So to be clear, if you're asking if
4    such things are allowed in buildings, that's
5    one question.  If you are asking are there
6    ramps like that that are considered compliant
7    with the ADA codes, that's another matter.  And
8    I say that because it is feasible within
9    buildings to have sections of walkways that
10   are -- and I want to be clear and complete,
11   that's why I'm saying this.
12             There may be situations in buildings
13   that have walkways that are steeper than 1 in
14   12.  But because they are not designated as an
15   accessible route, they may be allowed to be
16   steeper.  But if there are areas in the path of
17   travel that are considered to be or need to be
18   accessible and you have an area that's steeper
19   than that, then, no, it would not be allowed.
20             In other words, you can have areas
21   steeper, like in a building, but not on what's
22   called an accessible route.
23        Q    Is the RTU east corridor considered a
24   path of travel for detainees at the Cook County

1    Jail?
2         A    It's considered an accessible route,
3    yes, and it is a path of travel, yes.
4         Q    So if the path of travel had a run --
5    Let me rephrase it.
6              If the east corridor ramp has a run
7    which is steeper than 1 to 12, that would
8    violate the 1991 and the 2010 ADA standards for
9    it?
10             MR. MORRISSEY:  Was there a response,
11        Peggy?
12             THE REPORTER:  I didn't hear one.
13   BY THE WITNESS:
14        A    I said correct, yeah.
15   BY MR. MORRISSEY:
16        Q    I didn't hear you, Mr. Davis.  I'm
17   sorry.
18        A    Okay.
19        Q    Going down to Number D -- or I'm
20   sorry -- Number B under Section 405, it says:
21   405.5.
22             For a ramp, are handrails required?
23        A    In general, yes.
24        Q    And if we look at -- I'm sorry.  I

1    had the wrong section.
2              Section 505 --
3         A    Right.
4         Q    -- for handrails.  Under 505.4, as
5    far as heights, it says:  The top of the
6    gripping surface of the handrail shall be
7    34 inches minimum and 38 inches maximum
8    vertically above ramp surface.
9              Now, as an ADA expert, when it says
10   the gripping surface of a handrail shall be
11   34 inches minimum, if it's less than 34 inches
12   minimum from the ramp -- vertically from the
13   ramp's surface, would that be a violation of
14   the 2010 ADA code?
15        A    Yes.
16        Q    Why does the -- Can you provide an
17   explanation for me why the ADA 2010 code
18   requires a gripping surface for a handrail
19   shall be at minimum 34 inches vertically above
20   the ramp's surface?
21        A    So standards like this, when they are
22   developed and refined, can address a variety of
23   needs.  I would have to do some investigation
24   on the specific history of this particular

Exhibit 8 Page 3

1  item; however, I expect that that standard was
2  developed by the experts with the Department of
3  Justice in response to the specific dimensional
4  requirements of people in wheelchairs, people
5  using walkers, people using canes.
6          I suspect it is intended to
7  address -- to get the optimal location relative
8  to a variety of needs.
9      Q   So it's your understanding that for
10 all of these code requirements under -- for a
11 ramp, there's a reason behind it?
12     A   Yes.
13     Q   And the reasons are to -- are to
14 provide a universal standards so that disabled
15 people with many varieties of needs can
16 utilize, for instance, a ramp to go up and
17 down.
18          Is that fair to say?
19     A   I'm not sure it's always possible to
20 be universal, which is the term that you used,
21 but I think it's optimal, is probably a better
22 way to characterize.  But in general, yes.
23     Q   And if we look at the 505-10.1,
24 Top and Bottom Extensions at Ramps, it says:

1  Ramp handrails shall extend horizontally above
2  the landing for 12 inches minimum beyond the
3  top and bottom of the ramps -- ramp runs.  And
4  then there is a configuration right below it.
5  And it's included in Globetrotters' report,
6  which is Exhibit Number 1.
7      A   Uh-huh.
8      Q   Can you explain why for the top of a
9  ramp, why there is a need for a 12-inch minimum
10 extension of the handrail?
11     A   So -- and I'm not someone who is
12 typically using a wheelchair or a ramp or a
13 cane -- I mean, a wheel or a cane, but in
14 general, when you approach a ramp, you sort of
15 need to prepare to go up it or down it.  If you
16 need to use it in part to help steady yourself,
17 the idea is to get yourself able to be steady
18 before you proceed onto the ramp.
19          I suspect that that's an element that
20 was calculated as providing sufficient
21 opportunity for somebody in a wheelchair
22 or with a walker or with a cane to steady
23 themselves before going up or down a ramp.
24          I would note that in the case of a

1  stair, this has been altered from the '91 ADA.
2  At the bottom in the case of a stair, there
3  used to be a requirement for an extension past
4  the end of the stair and an additional distance.
5  So it would end up being like a 1 foot 11 inches,
6  and they changed it, I believe in the 2010 ADA,
7  to be just the 12 inches.
8          So it's based on the evaluation of
9  the need to steady one's self going up or down
10 a ramp or flight of stairs.
11     Q   And the reason for the -- your
12 understanding of why the 2010 ADA standards
13 require a 12-inch extension of the handrails at
14 the top and bottom of the ramp is to provide
15 the optimal opportunity for a variety of
16 wheelchair, walkers, or cane users to be able
17 to access a ramp.
18          Is that fair to say?
19     A   That's a fair paraphrasing of what I
20 said, yes.
21     Q   Did I misstate that?
22     A   No.
23     Q   Or can you perhaps state it in a more
24 professional manner than I did?

1      A   I believe I said so before.  So I'm
2  fine with your characterization of it.
3      Q   And if the extension of a handrail,
4  let's say at the bottom of a ramp, is less than
5  the minimum of 12 inches, let's say it was
6  11 inches, that would be in violation of the
7  ADA 2010 standards.
8          Is that fair to say?
9      A   Yes.
10     Q   To your understanding of the ADA 2010
11 code, does it provide any wiggle room for a
12 public entity built -- for a building built
13 after 2010 to have an extension, handrail
14 extension, of less than 12 inches at either the
15 top or the bottom of the ramps?
16     A   Allowing for possible variations due
17 to construction tolerances, which I don't know
18 if they would apply in this case, I would say
19 in general, no, that it's supposed to be
20 12 inches.
21     Q   As an architect, when you were in
22 private practice, I guess -- well, as the
23 deputy of Capital Planning with responsibility
24 for overseeing -- oversight of design and

Exhibit 8 Page 4

ERIC DAVIS
June 5, 2024

Page 145

1  construction of work at the Cook County Jail
2  and the courthouses, would you advise
3  contractors for Cook County to install a
4  handrail that was less than -- that didn't have
5  a 12-inch extension of a handrail at the bottom
6  of a ramp?
7       A   Unless there was some kind of
8  obstruction, which sometimes happens, or some
9  other physical condition that prevented that
10  from being constructed that way, no.  I would
11  say that they would need -- if there was --
12  let's say the wall turned and there was no way
13  to do that without creating another obstruction
14  or it would block a door or things like, absent
15  those kind of conditions, if it was just a
16  standard run, I would say no, it needs to be
17  12 inches.
18      Q   Are there avenues for contractors and
19  architects and engineers to seek approval of an
20  exception when designing a public building that
21  includes a ramp if there's -- if there are
22  physical obstructions that preclude the strict
23  compliance under the 2010 standards for a ramp?
24      A   So let's use this particular location

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 146

1  as an example.  Now, to be clear, I wasn't
2  working at the County when this was
3  constructed, but it would have applied in this
4  case because of the timeline of when it's
5  constructed.
6           The licensed architect designing the
7  ramp should be indicating that the handrail
8  should extend 12 inches beyond.  If there was a
9  variance or something precluding that, you
10  know, they would bring that to their attention.
11          If I was an owner, if I were in this
12  position and the architect said in the course
13  of developing or presenting the drawings, hey,
14  I understand that there's supposed to be
15  12 inches, there is this condition over here, I
16  as an architect consider it to be compliant or
17  allowable to have an exception in this case.
18  As the owner, I'm not taking a licensure
19  responsibility, I have an oversight, but the
20  licensure is really the architect of record.
21          The other piece of it is that the
22  drawings that the architect does, would in this
23  case go to the city of Chicago and the mayor's
24  office of people with disabilities during the

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 147

1  permitting process and they would review that.
2           They may have a question and say, for
3  example, hey, I'm looking at this floor plan.
4  It's showing a handrail extension is less than
5  12 inches.  What's going on?  That's a fairly
6  common circumstance in the profession.  The
7  plan reviewer may have a question.  The
8  licensed architect may make their case; and
9  then in that case, the city of Chicago, which
10  in that case would be the authority having
11  jurisdiction, may make a ruling to say we
12  consider this to be consistent with the
13  applicable laws.  That's how these things go.
14      Q   Well, my question wasn't about the
15  city of Chicago.  It was about the federal
16  government.
17          The federal government enforces ADA
18  standards, correct?
19      A   The federal government sets the
20  standards, yes.  They establish the laws.
21      Q   So my question really was directed to
22  is there any agency with the federal government
23  that during the design phase of a building, an
24  architect of record can seek out an exception

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 148

1  from one of the requirements for a ramp if
2  there is some physical obstruction that
3  precludes strict compliance under the 2010
4  standards?
5       A   There is a mechanism that the
6  Department of Justice has where they have
7  technical advisors where a practicing architect
8  can call them and ask them for their
9  interpretation, but usually when you do that --
10  and I have done that in private practice on
11  other projects.  You can ask and say, here is
12  an area that I don't understand.  My
13  interpretation is this.  Do you think I'm
14  interpreting this correctly?
15          The Department of Justice or
16  technical representative may say, yes, I think
17  it is a reasonable variation or, no, it's not.
18  However, in almost every case, I believe,
19  legally -- and you're the lawyer, I'm not -- in
20  that case they delegate the enforcement
21  responsibility to the local agency having
22  jurisdiction, just as there may be federal
23  laws, but Chicago police may arrest someone.
24          So it's a situation where they

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 5

ERIC DAVIS
June 5, 2024

Page 149

1  delegate that, but then similarly the city of
2  Chicago may turn around and consult the DOJ
3  also.
4         But, yes, there is a mechanism, an
5  ADA help line that they have that allows
6  architects to seek guidance from the Department
7  of Justice.  It's not very typical.  It's
8  usually only very unusual situations.  The
9  normal situation is for that to be handled by
10 the local permitting authority.
11        Q   Now, you have had an opportunity to
12 review the blueprints or drawings for this east
13 corridor ramp?
14        A   Yes.
15        Q   Mr. Davis, have you reviewed the
16 construction drawings for the east corridor
17 ramp?
18        A   Yes, I have.
19        Q   Do you know if the construction --
20 would you call them construction drawings or
21 the permitted drawings?  How do you describe
22 the final drawings for a project such as the
23 RTAs?
24        A   This is an ongoing source of -- I

ERIC DAVIS
June 5, 2024

Page 150

1  have discussed this several times.
2  Colloquially in the profession they are
3  referred to as construction documents.  The
4  reality is because contractors often produce
5  something that are called shop drawings, and
6  those shop drawings are actually the basis for
7  what physically gets constructed.
8         They get called construction
9  documents.  I prefer to call them contract
10 documents, but, yeah, they're colloquially
11 referred to as construction documents.
12        Q   So you have reviewed what you would
13 confirm are the contract documents for the
14 construction of the east corridor ramp?
15        A   It was a few months ago, but, yes, I
16 believe I have, yeah.
17        Q   For the top landing --
18            (WHEREUPON, an interruption
19             in the proceedings
20             occurred.)
21        THE WITNESS:  Jason, you need to mute
22    yourself.  Thank you.
23            I'm sorry, Tom.
24

ERIC DAVIS
June 5, 2024

Page 151

1  BY MR. MORRISSEY:
2         Q   For the top landing --
3         A   Yes.
4         Q   -- for the east corridor ramp --
5         A   Yes.
6         Q   -- for the construction drawings or
7  contract drawings, did it have a top landing of
8  9 inches?
9         A   I don't know if it was -- if the
10 document showed 9 inches.  I believe that
11 the -- my recollection from reviewing it was
12 that there was a variance between the top and
13 bottom elevation numbers that were provided in
14 the architectural drawings from the top and
15 bottom elevation drawings that were provided in
16 the structural drawings.  I think there was
17 some variance there.
18         Typically in an element like this
19 that was constructed out of reinforced
20 concrete, you would follow the structure
21 drawings.
22         My recollection is that there was a
23 variance in the drawings between what the
24 architectural plans were showing for the

ERIC DAVIS
June 5, 2024

Page 152

1  elevations and what the structural drawings
2  were showing for the elevations.  I don't
3  recall the 9-inch dimension that was revealed
4  in the Globetrotters' report as having been a
5  dimension that was specified.  I don't think
6  that -- I can't imagine that they would
7  stipulate 9 inches.
8         I can only speculate that the actual
9  offset turned out to be different from what
10 they thought was out there and they may have
11 extended it or, in connecting the dots, may
12 have needed to make the ramp at the top longer
13 than they had expected to do.  I don't know.
14         As I said, when I looked at the
15 drawings, there was some variance in the
16 elevations, but I don't know the construction
17 history of that part of the building.
18        Q   The top landing for the east corridor
19 ramp is 85 percent short of the required -- the
20 minimum required element for a landing.  The
21 landing has to be 60 inches minimum, correct?
22        A   I believe we discussed this
23 yesterday.  Yes, that's approximately -- yeah.
24 I don't know if it was 85 percent, but that

Exhibit 8 Page 6

ERIC DAVIS
June 5, 2024

Page 153

1  sounds about right.
2      Q   Well, if we look at Page 10 of the
3  report, I think Globetrotters calculated it as
4  85 percent short.
5          Do you see where it talks about the
6  top landing being 85 percent short of the
7  required length?  That would be 85 percent
8  short of the minimum required length for the
9  top landing, correct?
10     A   I don't know if I have the same
11 version that you do.  I need to check with --
12 because as I said, this was commissioned by
13 counsel.  The version that I have doesn't
14 include -- doesn't coincide with what you have
15 on the screen here.
16     Q   All right.  Well, this is the
17 document that was filed initially.
18     A   Okay.  I mean, I believe you.  I'm
19 just saying -- I'm looking at the version of it
20 that I have, and it's different than that.
21     Q   What document do you have?
22     A   It must have been an earlier version.
23 I don't know.
24     Q   Well, can you tell me exactly when

ERIC DAVIS
June 5, 2024

Page 154

1  you received the earlier version?
2      A   Oh, it is a draft.  I'm sorry.  This
3  is an earlier version.  I don't know when I got
4  it.
5      Q   What is the date of the draft?
6      A   I think this draft is maybe in March.
7  It's not clear to me.  What is the date on the
8  cover of yours?
9      Q   My date is April 1st.  It was
10 filed --
11     A   Oh, no, this is -- yeah, I have one
12 March 25th.  So I have the wrong one.  Okay.
13     Q   It was filed on April 6th, 2024.
14         MR. STILLMAN:  Eric, the one in
15 your -- there's the version of it that's
16 attached to your Declaration that we sent
17 you.
18         THE WITNESS:  Oh, is that the final
19 one?  Okay.  I'm sorry.
20         MR. STILLMAN:  Yeah.
21         THE WITNESS:  I had just pulled up
22 the regular version that I had.  Let me
23 look in here so I'm following the right
24 thing.

ERIC DAVIS
June 5, 2024

Page 155

1          Yeah.  Okay.  I have got the --
2  April Fools' Day.  Okay.  Okay.  I was
3  looking at the wrong one.  I'm sorry, Tom.
4  Can you ask your question again?
5  BY MR. MORRISSEY:
6      Q   Sure.  What Globetrotters found based
7  upon their LIDAR -- use of the LIDAR was that
8  the upper ramp, the landing is 85 percent short
9  of the required length for the top landing, the
10 minimum required length for the top landing.
11     A   Right.
12     Q   Wouldn't that -- wouldn't an
13 architect of record have been aware of that
14 deficiency when the project was completed?
15     A   I would expect that to be the case,
16 yeah.  I am at a loss to understand why it
17 would have been constructed this way.  I simply
18 don't know.
19     Q   And when a project of the -- the
20 magnitude of the RTU building and the east
21 corridor ramp was a project publicly stated to
22 be in excess of $84 million, my understanding
23 having litigated this issue in previous years.
24         Can you explain to me the normal

ERIC DAVIS
June 5, 2024

Page 156

1  process for Cook County to approve the
2  construction of a project at the completion to
3  make sure that it complies with all
4  requirements, code requirements, including the
5  2010 ADA standards?
6      A   So typical process, which I assume
7  would have been followed at this time, would
8  have been to have the architect of record
9  review the conditions as constructed, and
10 there's a process called final acceptance that
11 typically the architect of record would sign
12 off on saying that the building as constructed
13 is consistent with the intent of the drawings.
14         There are sometimes variations in
15 construction that occur because of what are
16 called means and methods; but as long as they
17 are following the intent, the architect would
18 typically sign off.
19         So I can only suspect that the
20 architect of record may have gone through and
21 approved it and hadn't checked this particular
22 element.  I'm only speculating.  But typically
23 the architect of record would go through to
24 verify for the owner, in this case the County,

Exhibit 8 Page 7

Page 157

1  that the building that is constructed was
2  consistent with their drawings and with their
3  intent.
4     Q   Going down a little further here for
5  the intermediate landing.  Now, I don't think
6  we discussed this before, but for a ramp that
7  has a rise above -- I'm sorry.  Let me rephrase
8  the question.
9     By going back to Page 6 of
10  Globetrotters' report, defines the requirements
11  for a ramp.  In "D" it talks about, under
12  405.6, Rise:  The rise for any ramp run shall
13  be 30 inches, and then it uses the word
14  maximum.
15     A   Yes.
16     Q   Can you tell me -- first of all,
17  explain what a rise is in relation to a ramp.
18     A   It's the vertical distance measured
19  between the bottom of the area of the ramp and
20  the top.  And when I say that, the distance
21  between the part where the ramp starts to slope
22  up and the part where the ramp stops sloping
23  up.
24     Q   In reviewing Globetrotters' report,

Page 158

1  would you agree that the east corridor ramp,
2  the rise of the east corridor ramp, greatly
3  exceeds 30 inches?
4     A   You mean the ramp overall or do you
5  mean the sections of the ramp as identified
6  here as upper and lower?
7     Q   I mean starting at the bottom of the
8  ramp to the top of the east corridor ramp, that
9  rise exceeds -- that run exceeds 30 inches?
10     A   So if you're asking is the rise
11  between the bottom landing of the ramp and the
12  top landing of the ramp greater than 30 inches,
13  yes, the rise is greater which would
14  necessitate an intermediate landing, which is I
15  think what you're asking.
16     Q   So in regards to an intermediate
17  landing, if we go to Page 10.
18     For a ramp that requires an
19  intermediate landing, the length of the landing
20  has to be a minimum of 60 inches; is that
21  correct?
22     A   Yes.
23     Q   Why does the 2010 standard, and also
24  I believe the 1991 ADA standard, require a

Page 159

1  minimum of a 60-inch length for an intermediate
2  landing?
3     A   So it's my understanding that the
4  purpose of the intermediate landing is to
5  provide a place of rest or relief for an
6  individual that is attempting to negotiate or
7  go up or down the ramp over a certain distance.
8  But beyond that, there is -- and, again, this
9  is a compromise worked out with individuals
10  that are disabled and the Department of Justice
11  and architects, et cetera, in the construction
12  of the law.
13     It is needed to provide a place of
14  rest between going up or down one section and
15  the next.  I believe it is also related to
16  having a place -- let's say you are coming down
17  a ramp and you are in a wheelchair.  If the
18  ramp was continuous, it might accelerate too
19  much and really create a hazardous condition
20  and just sort of facilitate one's ability to
21  stop and not end up rolling all the way down
22  the ramp.
23     There is a need for that in stairs,
24  and I believe it's a similar need in ramps.

Page 160

1  But it's basically to provide a place of
2  respite.  And if the person, let's say, in the
3  wheelchair needs to adjust the direction they
4  are going, they can do it on a stable level
5  platform rather than having to try and do that
6  in the middle of a ramp.
7     Q   I was going to mention that Mr. Darr,
8  the Globetrotters' lead architect, mentioned
9  that for a person that is wheelchair-assisted,
10  if they were going up the east corridor ramp
11  and got to the intermediate landing and
12  decided, well, maybe I have to go back into my
13  housing unit, the intermediate landing ought to
14  give them enough clear space to be able to turn
15  around and change the direction and go back
16  down the ramp.
17     Is that fair to say?
18     A   That's also true and that relates,
19  Tom, to what you were going through yesterday
20  in terms of the 60-inch minimum turning area in
21  toilet stalls and other areas like that.  It's
22  a relatively standard dimension that allows
23  people in wheelchairs to maneuver.  And as you
24  are relating from Mr. Darr's statement that,

Exhibit 8 Page 8

Page 161

1  yes, it would allow somebody also to turn
2  around, yes.
3      Q    So when we're talking about 60 inches
4  being the minimum length for an intermediate
5  landing, the reason that that code requirement
6  under the 2010 standard is there, based upon
7  your understanding, is to provide, again, an
8  optimal length for the intermediate landing --
9  I'm sorry.  Let me rephrase the question.
10          The reason for at least the minimum
11  of a 60-inch length for an intermediate landing
12  is to have a standard that optimizes the
13  opportunity for a whole variety of disabled
14  individuals, be they need a wheelchair or a
15  walker or a cane, to be able to navigate this
16  ramp without difficulty.
17          Is that fair to say?
18      A    I wouldn't use the word optimizes
19  because optimally it may be longer than that.
20  I believe the 60 inches is considered to be a
21  minimum.  In other words, you would need at
22  least 60 inches.  You could have a landing
23  that's 72 inches.  That might be seen as more
24  optimal.

Page 162

1          You used the word optimal, Tom, and I
2  think maybe if we said that it needs at least
3  60 inches is a better way to characterize it.
4      Q    Well, yeah, I think I misspoke.  What
5  I was referring to, and I think you agree with
6  me, that the 60-inch minimum standard for a
7  landing is there to provide at least a minimal
8  standard for a whole host of people that have
9  mobility disabilities --
10      A    I would agree with that.
11      Q    -- would you agree?
12      A    Yeah, I would agree with that, yes.
13      Q    And anything less than a 60-inch
14  minimum intermediate landing would -- would
15  be -- would not accomplish the same opportunity
16  for people in wheelchairs, walkers and canes to
17  be able to navigate a corridor which is defined
18  under the ADA as a ramp?
19      A    I agree with what you're saying.
20      Q    Going back to the handrails -- Let me
21  go back to your Declaration which is Exhibit 8
22  for a moment.
23          Now, part of your responsibilities --
24  Your Declaration in this case is Exhibit 8.  Do

Page 163

1  you have that in front of you?
2      A    Yes.
3      Q    In Paragraph 2 you say:  In part, my
4  duties and responsibilities also include the
5  overseeing, development and implementation of
6  Cook County's Capital Improvement Plan which
7  involves engaging both architects and
8  contractors to perform that work and working
9  with our user groups to make sure that we are
10  accomplishing their needs within the resources
11  available.
12          My question is on an ongoing basis in
13  regards to the Department of Corrections, your
14  responsibilities include working with the
15  Sheriff's Office to improve the accessibility
16  at the Cook County Jail.
17          Is that fair to say?
18      A    Yes.
19      Q    And part of your responsibilities,
20  when you're notified of a violation -- well,
21  let me go back a step.
22          At the Cook County Department of
23  Corrections campus, there are a few buildings
24  that were built after the 1991 ADA standards

Page 164

1  were in effect, correct?
2      A    Yes.
3      Q    And those buildings would include the
4  RTU building?
5      A    Yes.
6      Q    The Cermak Health Service facility?
7      A    Yes.
8      Q    Are there any other buildings on the
9  campus of the -- the jail campus that were
10  built after the 2000 -- after 1991?
11      A    Yes.
12      Q    What other buildings were built after
13  1991, to your knowledge?
14      A    Two of them that come to mind are
15  entry posts.  There is an entry post at post --
16  I believe it's Post 5 on the east side.  That
17  is a place where the public and staff enter the
18  DOC campus.
19          There is a similar kind on the entry
20  post on the west side, on the Sacramento side,
21  that is of the same vintage.  I believe they
22  were designed by the same architect.  They were
23  done before I came to the County.  But they are
24  clearly post 1991.

Exhibit 8 Page 9

ERIC DAVIS
June 5, 2024

Page 165

```
 1          I would have to check.  There may be
 2   one or more other structures on the campus that
 3   were constructed after that point.  I would
 4   have to go through the records.
 5          Q   So you identify in Exhibit 8 that
 6   there are approximately 60 buildings that
 7   encompass -- that are within the confines of
 8   the Cook County Jail campus, correct?
 9          A   That's correct.
10          Q   And other than the four facilities
11   that you just mentioned, there are -- those
12   buildings were all pre-passage of the ADA,
13   correct?
14          A   I would have to go back and look.  I
15   don't know the vintage of -- offhand the
16   vintage of divisions -- well, actually no.
17   Division 11 was built after '91, I believe.  So
18   that's another one that would be post '91.
19          I don't know about the vintage of
20   Divisions 9 and 10.  They are around that same
21   time, but I don't recall offhand whether they
22   were before or after '91.
23          So there are -- there are housing
24   units as well as the RTU as well as the entry
```

ERIC DAVIS
June 5, 2024

Page 166

```
 1   posts, that sort of thing.  I would need to go
 2   back to the records and check.
 3          Q   Are there known -- well, let me ask a
 4   preliminary question.
 5          Under the 1991 -- under the -- when
 6   the ADA was passed in 19 -- I believe it was
 7   1990, did Congress provide different
 8   requirements, code requirements, under the 1991
 9   ADA standards for buildings that were built
10   prior to 1991 and those buildings that were
11   built after 1991 for public entities such as
12   Cook County?
13          A   I believe the Department of Justice
14   issued guidance to agencies about how to
15   address pre- and post-ADA buildings.  It would
16   be logical for them to have done so.
17          Q   Based upon your general understanding
18   of the ADA for buildings that were built prior
19   to the passage of the ADA, public entities
20   still have to provide reasonable accommodations
21   for the public when using those facilities,
22   correct?
23          A   We can get into what you mean by
24   "reasonable," but there are some requirements
```

ERIC DAVIS
June 5, 2024

Page 167

```
 1   for all buildings, regardless of their vintage,
 2   and then there are other requirements for
 3   buildings based upon when they were
 4   constructed.
 5          In some cases, as you know, if they
 6   were construct -- building was constructed
 7   prior to the ADA that receive federal funding,
 8   there may have been, you know, UFAS
 9   requirements, other things.  So there are
10   different requirements for different kinds of
11   buildings.
12          Q   Well, that's correct.  So if a public
13   entity like Cook County received federal
14   funding for, like, Division 10 that was built
15   prior to 1991 but between, let's say, 1988 and
16   1991, they still would have to follow UFAS
17   standards in regards to building construction.
18          Is that what you are saying?
19          A   I would have to go back and research,
20   but that's the kind of example I'm referring
21   to.  I can't speak to the specifics of the
22   Division 10 example without investigating it.
23          Q   But in general, if the Rehab Act --
24   in general, if a public entity had not received
```

ERIC DAVIS
June 5, 2024

Page 168

```
 1   federal funding prior to 1991, the public
 2   entity would still have to provide reasonable
 3   accommodations for the general public when
 4   they're using a public facility, correct?
 5          A   Again, each case is specific.
 6   Another -- it's not the example that you are
 7   referring to, but sometimes the answers to how
 8   public accommodation is to be accomplished may
 9   be impacted if there are historic preservation
10   concerns or if there are existing structural
11   conditions that would inhibit a particular
12   accommodation.  It's really specific to the
13   location and time and configuration and things
14   like that.
15          But in general, you know, yes, there
16   are certain minimum requirements that they try
17   to achieve.  It's not necessarily feasible in
18   100 percent of the cases, which is why you have
19   a review process.
20          But, yeah, in general, there are sort
21   of minimum standards that you are supposed to
22   achieve or try to achieve, and there are other
23   caveats and qualifications on that as well.
24          Q   For new construction after 1991,
```

Exhibit 8 Page 10

ERIC DAVIS
June 5, 2024

Page 169

1  under the ADA, newly constructed public
2  buildings were required to comply with the 1991
3  ADX [sic] standards, correct?
4       A    1991 ADA, I think is what you meant
5  to say, yes.
6       Q    Yeah.  And for a public building that
7  was built after 2010, the 2010 ADA standards
8  would apply?
9       A    I don't recall what the specific date
10  of enactment is or the date it took effect.
11  The effective date of the 2010 standards may
12  have been in 2011, for example.  But in
13  general, yes.
14            If there was a new building built in,
15  let's say, 2013, then, yes, it should be
16  compliant with the 2010 standards.
17       Q    And clearly in regards to the RTU and
18  the RTU corridor, Globetrotters reported that
19  that they were required to comply with the 2010
20  standards?
21       A    Yes.
22       Q    And to your knowledge, the RTU
23  doesn't fall into any exemptions such as
24  historical preservation or any other exception

ERIC DAVIS
June 5, 2024

Page 170

1  to the 2010 standards?
2       A    I'm not aware of it.  It certainly
3  wouldn't fall under historic preservation
4  exception.  I believe there may be exceptions
5  of a specific nature that have to do with
6  security requirements, security operations
7  requirements, but I can't speak to those on an
8  individual basis.  I don't know what -- if
9  there are any exemptions relative to how the
10  facilities operated.  I can only tell you about
11  its physical condition.
12            And like I said, there are some
13  circumstances where because of the needs of
14  safety and security of the detainees that there
15  may be -- and I emphasize there may be exemptions
16  allowed.  But in general, no, it's supposed to
17  be compliant.
18       Q    In regards to when a ramp, because
19  the rise exceeds 30 inches, requires an
20  intermediate landing --
21       A    Yes.
22       Q    -- with a minimum length of
23  60 inches, to your knowledge, does the 2010 ADA
24  standards allow a government to have

ERIC DAVIS
June 5, 2024

Page 171

1  intermediate landing which, let's say, is
2  57 inches in length instead of the minimum of
3  60 inches by providing a reasonable
4  accommodation by pushing wheelchair members of
5  the public up or down the ramp?
6       A    To simplify matters, should the
7  intermediate landing be 60 inches?  Yes.  Is
8  57 inches the same as 60?  No.
9       Q    So my question is more focused.  For
10  a building that doesn't have to comply with the
11  Rehab Act or was built before 1991, a public
12  entity may provide a reasonable accommodation
13  when an intermediate landing for a ramp is less
14  than the 60 inches in length.
15            Is that fair to say?
16       A    I'm not sure I understand your
17  question.  Are you asking if an intermediate
18  landing on something constructed is -- we will
19  use the 57 inches -- that the public agency is
20  supposed to provide an accommodation such as
21  having somebody in a wheelchair always be
22  escorted or provide assistance to that person?
23            Is that the kind of thing that you
24  are asking?  It's not clear.

ERIC DAVIS
June 5, 2024

Page 172

1       Q    My question is assuming that, let's
2  say, a building on the Cook County correction
3  campus was built in 1980 and had a ramp that
4  was -- that the rise was greater than 30 inches
5  which required an intermediate landing and also
6  that intermediate landing was, let's say,
7  57 inches in length, would it be permissible
8  under the ADA code in 1991 for the public
9  entity to provide a reasonable accommodation
10  for a wheelchair person going up or down the
11  ramp?
12       A    I have to investigate the specific
13  condition, Tom.  I can't give you an answer
14  about -- that specific about how or what sort
15  of accommodations would be allowable for a
16  building of that vintage under the '91 version
17  of the ADA.  I would need to research that a
18  little bit.
19       Q    Okay.  Well, let's say the building
20  instead was built in 2012 and was required
21  under the 2010 standards to have an
22  intermediate landing because the rise exceeded
23  30 inches.  And let's also assume that the
24  intermediate landing length was only 57 inches.

Exhibit 8 Page 11

1 The question that I have is, does the 2010 ADA
2 code permit the public entity to an exception
3 to the requirement for 60 inches for a minimum
4 length because the public entity has a
5 procedure to provide assistance for a
6 wheelchair person going up and down the ramp?
7    A    I don't believe so, but, again, what
8 you are talking about is an operational
9 question, so I don't know if the operational
10 provision of assistance provides an allowable
11 exception.
12         I would say in terms of the facility,
13 it's not compliant.  But I don't know if that
14 operational accommodation is such that it would
15 provide an allowable exception.  I don't know.
16    Q    Do you know if the 2010 ADA code has
17 a specific provision that allows a public
18 entity, such as the sheriff in this case, to
19 have an intermediate landing that's less than
20 60 inches in length where an intermediate
21 landing is required because the rise is --
22 exceeds 30 inches?  Do you know if there is any
23 provision that provides an operational
24 exception for the Sheriff in the ADA 2010

1 standards?
2    A    I think I just answered.  The answer
3 is, no, I don't know if there is or is not.
4    Q    Where would you look to try to find
5 the answer to that question?
6    A    So -- well, first of all,
7 operationally what I would do is I would start
8 by consulting our consultant -- if there was a
9 question like that, I would start by consulting
10 with our -- team's ADA advisor, which I
11 believe you mentioned yesterday in deposition
12 is the firm of LCM, and then specifically Kate
13 Susmilch from there.
14         If I was looking for something like
15 that, realistically I -- because I'm the deputy
16 director, I probably wouldn't take the time to
17 look it up myself; I would have somebody else
18 do that.
19         However, if I was asked to do that
20 specifically, I would start by going through
21 the ADA itself, and then I probably would also
22 consult -- there are a series of guidances that
23 the DOJ provides through their Website that can
24 provide -- there are, you know, FAQ sheets.

1 There are technical consultants.  I probably
2 would consult a variety of sources to see if
3 there was something that was deemed to be
4 permissible in terms of an operational
5 accommodation.
6    Q    Has the Cook County Sheriff's office
7 ever requested you or your department in
8 Capital Planning to review whether or not
9 there's an operational exception for an
10 intermediate landing for a corridor ramp that's
11 less than 60 inches in length where an
12 intermediate landing is required because the
13 ramp has a rise of over 30 inches?
14    A    I'm not aware of a request like that
15 coming from the Sheriff.  That may have
16 occurred, but I'm not aware of it, no.  I'm not
17 aware of any requests like that.
18    Q    Has Cook County government, to your
19 knowledge, ever sought a legal opinion in
20 regards to whether or not assisting a
21 wheelchair person up and down a ramp is
22 permissible when the ramp itself was built
23 after 2011 and did not comply with the 60-inch
24 minimum length for an intermediate landing?

1    A    I'm not aware of them asking whether
2 or not that's allowable.  No, I'm not aware of
3 them asking for that.  I think that the -- if I
4 remember correctly, and I'm not an expert on
5 their operations, the desire is to maintain
6 security so that an individual would
7 automatically be escorted; but I don't know if
8 that's -- I'm not aware of a request or an
9 inquiry about whether or not that complies.
10 I'm not aware of that kind of question having
11 been asked.
12    Q    To your knowledge, has -- have you or
13 the Department of Capital Planning or anybody
14 to your knowledge in the Cook County government
15 ever been requested by the Sheriff's Office to
16 opine whether pushing wheelchair detainees up
17 and down the Cermak ramp is an exception from
18 the requirement for the Cermak ramp to be a
19 minimum of 60 inches in length?
20    A    I think this is the same question
21 that you have asked a couple of times.  I'm not
22 aware of them asking a question like this about
23 the operational side, whether or not that's
24 allowable.  I'm not aware of them asking that

Exhibit 8 Page 12

ERIC DAVIS
June 5, 2024

Page 177

1   one way or the other.
2        Q    You're the person for Cook County
3   that provides advice to users such as the
4   Sheriff in regards to complying with the ADA
5   requirements under the 2010 and the 1991
6   standards.
7             Is that fair to say?
8        A    Only regarding the facilities
9   themselves.  I don't provide advice to the
10  Sheriff on operations.
11       Q    So in regards -- you have thoroughly
12  reviewed Globetrotters' April 1st, 2024 report
13  in regards to the east corridor.
14            Is that fair to say?
15       A    I don't know how one would define
16  "thoroughly."  Have I gone through and reviewed
17  it?  Yes, I have.  I have reviewed it.
18  Thoroughly is a different question.  I don't
19  know how you would characterize that.
20       Q    As the representative for Capital
21  Planning in regards to accessibility issues, do
22  you agree with the Globetrotters' findings that
23  the top landing violates the 2010 code because
24  the length of the landing is less than

---

ERIC DAVIS
June 5, 2024

Page 178

1   60 inches?
2        A    I don't disagree with their
3   assertion.
4        Q    And do you agree with the assertion
5   of Globetrotters or the recommendation or the
6   assessment -- Let me go back a step.
7             Exhibit 8 -- I'm sorry.  Exhibit
8   Number 1, which is the -- is titled Tunnel
9   Corridor Accessibility Assessment.  As the
10  deputy of Capital Planning, is it your opinion
11  that Globetrotters did a thorough and
12  professional assessment of the east corridor
13  ramp for Cook County?
14       A    I would say in general that their
15  report seems to be pretty comprehensive, yeah.
16  I mean, I can't stipulate as to perfection.
17  But I would say it seems to be pretty thorough
18  and professional.
19       Q    As a person that's well versed in the
20  ADA, is there any -- anything in their report
21  that's Exhibit 1 that you disagree with in
22  regards to their findings in regards to the
23  areas where the east corridor ramp is out of
24  compliance with the 2010 ADA code?

---

ERIC DAVIS
June 5, 2024

Page 179

1        A    In terms of their citation of
2   elements that are not compliant, yes, I would
3   say -- I'm not aware of anything that I might
4   take issue with in terms of their analysis of
5   whether things are or are not compliant.
6        Q    What do you mean by the term
7   "element"?
8        A    There are a series of things that
9   they identify.  There's a whole group of --
10  they look at -- as you say, they look at the
11  landing, they look at the ramp, they look at
12  the landing, they look at the handrails, you
13  know, all of those elements.
14       Q    As an architect, what other elements
15  of the east corridor ramp would you expect a
16  firm like Globetrotters to have reviewed in
17  doing an assessment of the east corridor ramp
18  to determine whether it complied with the ADA
19  standards?
20       A    I'm not aware of them having missed
21  any aspect in terms of assessing the
22  accessibility of the east tunnel corridor ramp.
23  I'm not aware of anything that they're missing
24  in terms of having assessed whether or not it

---

ERIC DAVIS
June 5, 2024

Page 180

1   is accessible.
2        Q    Including six elements for the east
3   corridor ramp, Globetrotters made certain
4   findings whether or not -- for each element
5   whether the ramp was in compliance or out of
6   compliance with the ADA.
7             Is that fair to say?
8        A    They listed the six components in
9   their report, yes.
10       Q    If, hypothetically, the Globetrotters
11  found only one element to be out of compliance,
12  let's say the 12-inch extension of the
13  handrails at the top and bottom to the ramp,
14  would the ramp be out of compliance with the
15  ADA 2010 standards?
16       A    I hesitate to use -- Well, okay.  I
17  would say yes, if there was only one element
18  and they only looked at one thing and the
19  element in question was not compliant with the
20  standard that the ramp would not be considered
21  accessible, yes.
22       Q    Assuming that, hypothetically,
23  Globetrotters looked at the six elements that
24  they did on Page 10 and 11 and found only that

Exhibit 8 Page 13

ERIC DAVIS
June 5, 2024

Page 181

1  the bottom length -- the bottom handrail
2  extension and the top handrail extensions were
3  out of compliance with the minimum of 12 inches
4  per extension, would the east corridor ramp
5  still be out of compliance with the current
6  2010 standards?
7      A    Yes.
8      Q    I didn't hear it.
9      A    Yes.
10     Q    It's one of the --
11     A    Yes.
12     Q    One of the problems I find is as
13  somebody that's litigated for 45 years, being
14  on Zoom, that sometimes you don't pick up a
15  response, and probably the deponent probably
16  doesn't hear the question.  But you answered
17  affirmatively?
18     A    I answered in the affirmative, yes.
19     Q    In this case, Globetrotters, you
20  would agree, did a professional job in
21  assessing the east corridor ramp.
22          Is that fair to say?
23     A    That's fair to say.
24     Q    And they found that the top landing

ERIC DAVIS
June 5, 2024

Page 182

1  was in violation of the code.
2          They found the upper ramp was not in
3  compliance with the code because the last 4.27
4  feet of the run at the top has a rise of 4.56
5  for a slope of 1 to 11.
6          Three, they found the intermediate
7  landing was not in compliance with the minimum
8  60-inch requirement for the length because it
9  was only 57 inches, and the lower portion of
10  the floor surface is not compliant because the
11  lower 3 1/2 percent of the overall run is
12  11.7 percent steeper than permitted by the code
13  and had a slope of, I believe, 1 to 8.5 and the
14  handrails were not compliant with the ADA 2010
15  standards because the handrails, the bottom of
16  the lower -- Let me rephrase it.
17          The handrails were approximately
18  33 inches above the floor ramp at certain
19  locations which was less than the required
20  34 inches.
21          And finally, as you previously said,
22  the handrail extensions didn't meet the code
23  requirement of 12 inches minimum.
24          Is that a fair assessment by

ERIC DAVIS
June 5, 2024

Page 183

1  Globetrotters of the violations they found with
2  the -- violations of the 2010 code standards
3  under the ADA for the east corridor ramp?
4      A    I think that's a fair summary of
5  their analysis, yes.
6      Q    So as the deputy director for the
7  Cook County Capital Planning with
8  responsibilities for oversight under the ADA,
9  would you agree that the east corridor ramp
10  is -- violates the 2010 code standards under
11  the ADA?
12     A    I would say, yes, it is correct to
13  say it's not in compliance.  That's correct,
14  yes.
15     Q    As the -- in your position, have you
16  provided any guidance to the Sheriff of Cook
17  County in regards to coming into compliance
18  with the 2010 ADA standards in regards to the
19  east corridor ramp?
20     A    Have I provided them with what?  I'm
21  sorry.  I didn't quite hear everything.
22     Q    Sure.  To your knowledge, have you
23  provided any direction to the Sheriff of Cook
24  County in regards to the east corridor ramp not

ERIC DAVIS
June 5, 2024

Page 184

1  being in compliance with the 2010 ADA
2  standards?
3      A    I -- we talked about so many
4  different accessibility issues.  If you're
5  asking have I told them, hey, that RTU ramp is
6  not compliant, I don't think we've actually
7  issued any kind of, like, information or
8  anything like that.
9          In this case, I don't know -- as
10  there's litigation about it, I don't know --
11  you know, what would have been shared or not
12  shared.  I know that the counsel commissioned
13  this report.
14          So I don't recall telling them
15  specifically, hey, we have this study that says
16  it's out of compliance.  I don't know why I
17  would, because we deal with the buildings, and
18  they deal with operations.  But I don't
19  remember, like, specifically, if you want to
20  characterize it that way, you know, warning
21  them or anything.  I don't think we have done
22  anything along those lines.
23     Q    Would you agree that for a wheelchair
24  user housed in the RTU that has an

Exhibit 8 Page 14

ERIC DAVIS
June 5, 2024

Page 185

1  appointment -- Let me rephrase the question.
2      **A    Actually, Tom, if you don't mind,**
3  **could we take a brief break?  I need to use the**
4  **restroom.**
5      Q    Sure.  Do you want to come back at
6  3:30?
7      **A    Sure.**
8      Q    That's great.  We'll see you.
9      **A    Thanks.**
10                     (WHEREUPON, a short
11                     break was had.)
12  BY MR. MORRISSEY:
13      Q    The Exhibit 1, the tunnel corridor
14  report by Globetrotters, does the east tunnel
15  corridor provide a path of travel for detainees
16  that are wheelchair bound and housed in the RTU
17  building?
18          MR. STILLMAN:  I'm going to object to
19      asked and answered.
20          Go ahead.  You can answer, Eric.
21  BY THE WITNESS:
22      **A    It is a path of travel.**
23  BY MR. MORRISSEY:
24      Q    For wheelchair and other disabled

ERIC DAVIS
June 5, 2024

Page 186

1  prisoners that are housed in the RTU.
2          Is that fair to say?
3      **A    It is a path of travel for detainees,**
4  **yes.**
5      Q    And the RTU building houses, to your
6  understanding, people that are
7  wheelchair-assisted, use walkers and canes.
8          Is that fair to say also?
9      **A    It's my understanding that**
10  **individuals with those disabilities, yes, are**
11  **housed there.  Not necessarily all, but that**
12  **there are people that have disabilities there.**
13      Q    Are there people that have
14  disabilities, mobility disabilities such as
15  wheelchair, walkers and canes, do any of those
16  individuals on a daily basis use the east
17  corridor ramp to go to the Cermak infirmary?
18      **A    I don't know because I haven't**
19  **observed them myself.  My understanding is**
20  **that, yes, it is a route from the RTU to**
21  **Cermak.**
22          And there is a -- there is a short
23  tunnel between the east corridor ramp and the
24  Cermak corridor ramp.

ERIC DAVIS
June 5, 2024

Page 187

1          Is that fair to say?
2      **A    Yes.**
3      Q    Approximately how long is that -- the
4  length of that tunnel between the top of the
5  east corridor ramp and the top of the Cermak
6  corridor ramp?
7      **A    I don't know offhand.  I would have**
8  **to look on -- I would have to look into**
9  **drawings.**
10      Q    Is it less than 60 feet?
11      **A    I would say probably, yeah.**
12      Q    I believe Globetrotters, you
13  testified yesterday, found that the Cermak
14  corridor ramp violated the 2000 -- violated the
15  ADA 1991 standards because the intermediate
16  ramp was less -- the length of the intermediate
17  ramp was less than 60 inches.
18          Is that fair to say?
19      **A    I believe your question just now was**
20  **about Cermak, or is it about what the**
21  **intermediate ramp landing, what --**
22      Q    I'm sorry.  My question is directed
23  to the recommendations and findings by
24  Globetrotters in regards to the Cermak corridor

ERIC DAVIS
June 5, 2024

Page 188

1  ramp.  And the question is, it's your
2  understanding that Globetrotters found that the
3  Cermak corridor ramp also violated the 1991 ADA
4  standards?
5          MR. STILLMAN:  Objection, relevance.
6      You can answer.
7  BY THE WITNESS:
8      **A    Yeah.  Yes, I'm aware that that was**
9  **their assessment.  Yes.**
10  BY MR. MORRISSEY:
11      Q    And you testified yesterday that Cook
12  County is in the process of renovating the
13  Cermak corridor ramp.
14          Is that fair to say?
15      **A    Yes.  Yes.  For some reason when I**
16  **just say yes, it doesn't seem to come through.**
17  **I don't know what the deal is there, but yes.**
18      Q    Your Declaration, Exhibit Number 8,
19  discusses a timetable for addressing ADA
20  violations -- Well, let me rephrase the
21  question.
22          Your Declaration in this case --
23  Westmoreland, which is Exhibit Number 8,
24  discusses assessing the entire Cook County

Exhibit 8 Page 15

ERIC DAVIS
June 5, 2024

Page 189

1  corrections campus to determine whether there
2  are any ADA violations.
3          Is that fair to say?
4      A    That's correct, yes.
5      Q    And part of -- and Phase I -- Well,
6  let me rephrase it.
7          That request for qualifications is
8  broken down into three discrete parts for the
9  Cook County campus?
10     A    Yes, that's correct.
11     Q    What parts of the Cook County
12 corrections department campus is included
13 within Phase I?
14     A    To be clear, it's not a phase.  It's
15 packages.  Phase suggests that we might do one
16 before the other.
17          But if you are referring to Package 1
18 as is stipulated in the RFQ, essentially from a
19 line that runs south of the existing Cermak
20 facility, south of the RTU, north of the dorms
21 and north of Division 6, yeah.
22          So the RTU and Cermak and Division 5
23 and the connecting tunnels between Cermak,
24 Division 5 and the RTU would be included in

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 190

1  Package 1.
2      Q    In Package 1, would the RTU building
3  be included?
4      A    I believe that's what I just said,
5  yes.
6      Q    And are there known ADA violations
7  presently in regards to the RTU building?
8      A    I believe that's what we are
9  discussing here.
10     Q    Well, other than the east corridor
11 ramp, are there other known ADA violations in
12 the RTU housing building?
13     A    I have no idea, Tom, that's why we
14 were putting out the RFQ to have people look at
15 it comprehensively.
16     Q    Is the RFQ for Part 1 or Package 1
17 including the east corridor ramp?
18     A    Yes.
19     Q    Pardon?
20     A    Yes, sir.  Yes, it is.
21     Q    So Cook County is going to expend
22 more money to assess the east corridor ramp a
23 second time when Globetrotters has already done
24 a thorough analysis for the Sheriff of Cook

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 191

1  County?
2      A    We will include the information from
3  Globetrotters' assessment in the information
4  that is provided to the successful vendor for
5  Package 1 as is outlined in my remarks.  The
6  intent is to look at -- in this case, to look
7  at the east RTU ramp in the context of its
8  surroundings, both in the context as you have
9  been asking about, about a route from the RTU
10 to Cermak via the ramp, also about the route
11 from the RTU to the north on the corridor to
12 Division 5.
13          The intent is to look at it
14 comprehensively.  We would expect that they
15 would review Globetrotters' report and probably
16 include it as an attachment or some kind of
17 reference.  I would expect that the extent to
18 which they would duplicate the effort of the
19 Globetrotters' review, however, be
20 limited to reviewing what Globetrotters has
21 done.
22          We are not asking the firm to conduct
23 a full assessment a second time in this case,
24 simply to take this information and incorporate

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 192

1  it into a broader analysis of the various paths
2  of travel and the various elements that they
3  find in the surrounding context.
4      Q    Does the Package 1 RFQ also involve
5  reviewing the accessibility of the Cermak
6  corridor ramp?
7      A    Yes.  We will ask them to look at
8  that report as well, yeah.
9      Q    Does the RFQ that was issued by Cook
10 County and now is -- that the bid is -- or the date
11 for responding now is, what, today?
12     A    Today.  In the meeting immediately
13 before this meeting, Tom, it was confirmed to
14 us by the procurement department that the
15 period of submittals -- actually it's after
16 3:00 o'clock -- has ended, that they have
17 received submittals for that and that the
18 period, as I have said -- and I believe that
19 the response period ended at 3:00 o'clock, so
20 about 45 minutes ago.
21     Q    Did the RFQ specifically say that --
22 for Package 1 that the
23 architectural/engineering firm would be
24 assessing the east corridor ramp, the Cermak

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 16

Page 193

1  corridor ramp and the north corridor passageway
2  for the RTU?
3      A    It didn't specifically stipulate
4  those because it's a request for
5  qualifications.  We are looking for the
6  qualifications of the firm.
7          As the RFQ stipulates, once we have
8  identified the most qualified team for the
9  assignment for Package 1, we will share with
10 them all of the information that we have
11 available about the entire campus, building
12 floor plans, anything -- and things like the
13 analysis of the Cermak ramp and the analysis of
14 the RTU ramp, we'll provide all of that
15 information to them.
16         In the interest of brevity and
17 clarity, we are looking at this stage in the
18 process to identify the most qualified firm to
19 do that.  We are not giving them a complete
20 laundry list of every single document that we
21 would provide to them.  We are simply
22 indicating the areas so that they can
23 understand what the need is and submit their
24 response to suggest why they would be the most

Page 194

1  qualified firm.
2      Q    Digressing for a moment.  Yesterday
3  you said LCM.  You were going to call them this
4  morning to see whether or not the top
5  landing -- doors at the top landing could be
6  moved so that there would be a minimum of
7  60 inches length for the top landing of the
8  east corridor ramp.  Did you call LCM?
9      A    I looked at -- I realized that Kate
10 was the woman -- I found out this morning that
11 Kate, the woman from LCM that is our lead on
12 this project, is off on PTO today.  I believe
13 she's in Washington at the AIA convention or
14 some other conference.  I will talk to her when
15 I get back.  I didn't realize she would be out,
16 but apparently she's out today.
17     Q    Now the RFQ, did that ask people to
18 bid on specific packages?
19     A    No, it indicated we'll look at the
20 submittals and evaluate which team or firm
21 seems to make the most sense for which of the
22 packages.
23     Q    So why if -- Well, let me go back a
24 step.

Page 195

1          The notice to proceed to HDR for
2  design work of the Cermak corridor ramp has not
3  been issued?
4          MR. STILLMAN:  Objection, relevance.
5  You can answer.
6  BY THE WITNESS:
7      A    We talked about it yesterday.  In the
8  meeting, as I mentioned today that we had with
9  procurement, I spoke specifically about that
10 issue to the procurement folks, and I have been
11 assured that they will be issuing the PO within
12 the next couple of days.
13 BY MR. MORRISSEY:
14     Q    Okay.
15     A    I can't stipulate as which day it
16 will happen, but I did ask and I stressed the
17 importance of getting that out, and so we are
18 looking to have that issued here very shortly.
19     Q    So as of today, the HDR has not been
20 given the green light to begin drawings.
21     A    That's correct.
22     Q    Is that fair to say?
23     A    That's correct.
24     Q    And has there been any amendment to

Page 196

1  the contract to Globetrotters due to the fact
2  that they will not be providing preliminary
3  drawings under their contract for the east
4  corridor -- I'm sorry.  Let me rephrase the
5  question.
6          Under the transfer package,
7  Globetrotters is contractually required to
8  provide preliminary drawings for the renovation
9  of the Cermak corridor ramp.
10         Is that fair to say?
11     A    Yes, and I can tell you, Tom, that I
12 also spoke with procurement today about that
13 specific item and, in fact, I actually
14 mentioned what you put on the screen in our
15 deposition yesterday to underscore the urgency
16 of this.  And similarly, I have been assured --
17 they had a question regarding the amount of
18 board action, et cetera, and I have been
19 assured that they are going to be issuing that
20 contract modification to Globetrotters, again
21 in the next couple of days, so that they should
22 be able to proceed with the development of the
23 transfer package.  So we expect to have the
24 notice to proceed for Globetrotters here in the

Exhibit 8 Page 17

ERIC DAVIS
June 5, 2024

Page 197

1  next couple of days.
2      Q    Why is there suddenly an urgency --
3  first of all, who have you spoken to from
4  procurement in regards to the HDR notice to
5  proceed?
6      A    Deputy Chief Procurement Officer
7  Robert Stuart.
8      Q    And that was this morning?
9      A    That was this afternoon actually,
10  immediately before this -- immediately before
11  this meeting.
12      Q    Okay.
13      A    And I should note -- to be clear, it
14  is our regular meeting that we have with them
15  every two weeks.  It happened to be this
16  afternoon at 1:00 o'clock.
17      Q    Robert Stuart is -- As of today,
18  Globetrotters has not been advised that their
19  transfer package will not include the
20  preliminary drawings for the Cermak corridor
21  renovation.
22          Is that what you're saying?
23      A    No.  You're talking about two
24  different things.  You're talking about --

ERIC DAVIS
June 5, 2024

Page 198

1      Q    Well, let me -- On March 12th, 2024,
2  you were deposed in Walker.
3      A    Yeah.
4      Q    And you made this statement in
5  regards to the Globetrotters transfer package:
6  It is the drawings and specifications -- or
7  preliminary drawings and specifications --
8              (Reporter clarification.)
9          MR. MORRISSEY:  I'm sorry.  I was
10      talking away from the microphone.  All
11      right.
12  BY MR. MORRISSEY:
13      Q    On March 12th, 2024, you made this
14  statement in your deposition in regards to
15  Globetrotters transfer package:  The transfer
16  package is the drawings and specifications --
17  or preliminary drawings and specifications to
18  stipulate the elements of the design that are
19  to be constructed.  Because we are doing an
20  assessment ahead of time, we need to have
21  clarity on the assessment before we start the
22  transfer package.  So I couldn't tell you when,
23  offhand, when they started the development of
24  the transfer package.

ERIC DAVIS
June 5, 2024

Page 199

1          Did you -- Do you recall making that
2  statement in regards to the duties and
3  responsibilities of Globetrotters under their
4  contract for the Cermak corridor ramp?
5          MR. STILLMAN:  Just objection,
6      relevance.
7          You can answer.
8  BY THE WITNESS:
9      A    I believe you that you're reading my
10  transcript correctly.
11  BY MR. MORRISSEY:
12      Q    In March you said that it was
13  necessary for Globetrotters to do the
14  preliminary drawings, which would make up about
15  30 percent or more of the actual drawings to go
16  to permit for the Cermak corridor ramp.  Why is
17  that no longer the case now?
18          MR. STILLMAN:  Objection, relevance.
19  BY THE WITNESS:
20      A    I don't -- What do you mean it's no
21  longer the case?  I'm not understanding.
22  BY MR. MORRISSEY:
23      Q    Is Globetrotters still -- do they
24  still have the assignment to do the drawings

ERIC DAVIS
June 5, 2024

Page 200

1  and specifications --
2          MR. STILLMAN:  Objection, relevance.
3  BY MR. MORRISSEY:
4      Q    -- for the Cermak corridor ramp?
5      A    Tom, as I believe we discussed in
6  yesterday's deposition, because there have
7  been -- there has been a relatively
8  straightforward approach delineated in their
9  assessment relative to the ramp itself, we have
10  chosen to accelerate that portion of the scope
11  of the Cermak upgrades and proceed to the
12  architect of record services.
13          If what you're asking is are we going
14  to then have to wait until the transfer package
15  drawings of the ramp part of Cermak are
16  complete before HDR can begin, the answer is
17  no.  We feel that the drawings that they've
18  provided so far, that are in the assessment
19  report, are sufficient for HDR as the architect
20  of record for the assignment for the Cermak
21  ramp to go ahead and proceed to construction
22  documents without waiting for that portion of
23  the transfer package for Cermak that would be
24  specific to the ramp.

Exhibit 8 Page 18

ERIC DAVIS
June 5, 2024

Page 201

1    We feel that it's not necessary for
2  them to include that.  We are moving ahead with
3  that.
4      I believe that that intent has been
5  communicated to the Globetrotters team, and
6  they are simply waiting for the contract
7  modification to be executed, to be transmitted
8  to them so that they know that they, in fact,
9  have the contract for finishing the whole work
10 before they proceed to execute the transfer
11 package drawings and specifications.
12     Q    Just to be clear, is Globetrotters
13 being paid for doing the preliminary drawings
14 for the Cermak corridor ramp?
15         MR. STILLMAN:  Objection, relevance.
16 BY THE WITNESS:
17     A    Define what you mean by "preliminary
18 drawings."  They include preliminary drawings
19 in their assessment.  Do you mean the transfer
20 package drawings?
21 BY MR. MORRISSEY:
22     Q    That's correct.  The transfer package
23 you said would include drawings and
24 specifications -- or preliminary drawings and

ERIC DAVIS
June 5, 2024

Page 202

1  specifications to -- and specifications to
2  stipulate the elements of the design that are
3  to be constructed.
4      A    I believe --
5      Q    Are they still required to do that
6  under the contract?
7          MR. STILLMAN:  Objection, relevance.
8      Go ahead.
9  BY THE WITNESS:
10     A    As I tried to explain just a moment
11 ago, the drawing and specifications for the
12 ramp portion of their assignment for Cermak in
13 the transfer package, we are not going to
14 require them to go take that additional step
15 because that would delay implementation.
16     We are -- they will provide drawings
17 and specifications for the balance of the
18 upgrades that they recommend for the transfer
19 package for the entire building, and, yes,
20 technically the production of the transfer
21 package drawings and specs for the ramp itself
22 remain in their scope of work.
23     What we are saying is that they don't
24 have to complete that part of the assessment

ERIC DAVIS
June 5, 2024

Page 203

1  for the transfer package.  They can do it for
2  the rest of the building.  They don't need to
3  do it for the other because we are moving to
4  architect of record.
5  BY MR. MORRISSEY:
6      Q    So the architect of record, HDR, when
7  they receive this notice to proceed --
8      A    Yes.
9      Q    -- they will do drawings not only for
10 the Cermak corridor ramp but also to correct
11 the violations that were noted by Globetrotters
12 in their assessment of the Cermak facility?
13     A    No.
14         MR. STILLMAN:  Objection, relevance.
15 BY THE WITNESS:
16     A    No, just the ramp.  Their assignment
17 in the task order is the architect of record
18 services just for the ramp.  The rest of it is
19 proceeding in our regular process for
20 Globetrotters to complete the transfer package,
21 and that will go to an architect of record
22 firm.
23 BY MR. MORRISSEY:
24     Q    So will the permit drawings for the

ERIC DAVIS
June 5, 2024

Page 204

1  Cermak corridor ramp be issued in -- by the end
2  of 2024 and demolition beginning on the Cermak
3  corridor ramp?
4          MR. STILLMAN:  Objection, relevance.
5  BY THE WITNESS:
6      A    That is our hope and expectation.  I
7  should note in a case like this, because the
8  scope is relatively clearly defined for the
9  ramp, one of the options we are going to look
10 at is the ability of HDR to do what is called
11 self-certification, which is an accelerated
12 permit process which allows architects for
13 projects of relatively confined scope to go
14 ahead and conduct the permitting process
15 themself and to certify to the city that their
16 work is compliant.
17     We are hopeful that they will be able
18 to do that, but we need HDR to do their
19 evaluation first.  We are going to try to get
20 it done by self-certification which would
21 eliminate the need for a permit for the rest of
22 the work -- or the -- yeah, for the rest of the
23 drawings.
24         MR. STILLMAN:  Tom, how much longer

Exhibit 8 Page 19

ERIC DAVIS
June 5, 2024

Page 205

1  do you think you're going to need?
2         MR. MORRISSEY:  At least another
3  hour.
4         MR. STILLMAN:  Of course.  Of that
5  hour, do you think most of those questions
6  will be about the Westmoreland case or
7  you'll just keep asking about Cermak?
8  BY MR. MORRISSEY:
9    Q    Looking at your Declaration, which is
10 Exhibit 8, Number 7, you make a statement:
11 Given the enormous size and scope of the
12 project, a holistic approach must be considered
13 in the design and construction of the project
14 including the ADA design throughout the
15 project.  The sequence of work on a project of
16 this size requires careful consideration and
17 planning of each element or location in the
18 context of its surrounding areas and their
19 accessibility requirements so that the project
20 addresses the need for access seamlessly and
21 that the work can be constructed in the most
22 expeditious, cost-effective, efficient and safe
23 manner.
24        Number 8, it says:  The path of

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 206

1  travel throughout the campus that might require
2  ADA compliance is vast and not just limited to
3  the east RTU ramp.  The County's goal is to
4  ensure the entire project complies with the ADA
5  standards, not just the ramps.
6         Can you explain -- you previously
7  said that a path of travel for a wheelchair
8  person housed in the RTU headed to the
9  infirmary includes the east corridor ramp and
10 the Cermak corridor ramp.
11        Can you explain why it's efficient
12 and cost-effective to complete the Cermak
13 corridor ramp within the next two years and
14 hold off on assessing and addressing the east
15 corridor ramp?
16        MR. STILLMAN:  Objection, relevance.
17 BY THE WITNESS:
18   A    We have not held off assessing the
19 east corridor ramp.  The report from
20 Globetrotters, the assessment that's attached
21 to that document, is the assessment of the east
22 corridor ramp.  We haven't held off on that at
23 all.  So I don't understand your question.
24

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 207

1  BY MR. MORRISSEY:
2    Q    My question is assuming just for the
3  moment that in the next year Cook County is
4  going to renovate the Cermak corridor ramp to
5  bring it into compliance with the 1991 ADA
6  code, why doesn't Cook County at the same time
7  proceed to renovate the east corridor ramp to
8  bring it into compliance with the 2010 code?
9    A    I believe I answered that elsewhere
10 in --
11        MR. STILLMAN:  Objection, asked and
12 answered.
13        Sorry.  Go ahead.
14 BY THE WITNESS:
15   A    Yeah, I think I answered that
16 elsewhere, among other places, in element -- in
17 Item 10 in the same report.  I think the answer
18 to your question is right there.
19 BY MR. MORRISSEY:
20   Q    Well, why don't you tell me what the
21 answer is.  I'm asking in a deposition, not
22 something that was drafted.  Perhaps --
23   A    You are asking in a deposition that
24 includes what I said.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 208

1    Q    Well, what I'm asking you
2  specifically.  Why don't -- well, let me ask
3  you --
4         (Reporter clarification.)
5         MR. MORRISSEY:  I'm sorry.  I'm
6  sorry.
7  BY MR. MORRISSEY:
8    Q    Can you explain -- Let me ask some
9  preliminary questions.  Cook County knows --
10   A    You said preliminary?
11   Q    Cook County knows for certain that
12 the east corridor ramp violates the 2010 ADA
13 standards.
14        Is that clear to you?
15   A    Yes.
16   Q    And it's known by Cook County and the
17 Sheriff that on a daily basis wheelchair
18 detainees are moving from the RTU building up
19 the east corridor ramp and going down the
20 Cermak tunnel ramp to go to medical
21 appointments in the Cermak Health Service
22 building, correct?
23   A    I believe that's one of the routes
24 that's available to them.  Whether they use it

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 20

1   or not, I don't know.  I assume that they do,
2   but, yes.  Okay.  Sure.
3       Q   So on a daily basis, Cook County and
4   the Sheriff know, based upon Globetrotters'
5   assessment, that the east corridor ramp
6   violates the ADA 2000 [sic] standards for a
7   host of reasons, at least five or six
8   violations of the 2010 standards, correct?
9       A   We are aware that there are a series
10   of uncomplied elements, yes.
11       Q   And give me your projection, your
12   best-case projection, when the east corridor
13   RTU ramp will be renovated completely to comply
14   with the 2010 accessibility standards.
15       A   So I'm going to give your answer,
16   Tom, in a way that maybe saves you the trouble
17   of some other questions.
18       The assertion that we make in this
19   testimony is that it is more efficient and
20   actually quicker to take the comprehensive
21   approach toward the ADA upgrades on the
22   Department of Corrections campus through the
23   comprehensive, and if you want to use the term
24   wraparound approach, from the RFQ to do the

1   entire campus in a holistic manner.  And the
2   reason for that is you.
3       The reason for that is if we had to
4   stop and do individual procurements for each
5   element that was determined to be uncompliant,
6   it would take 50 years.  We want to address
7   this in a comprehensive way.  Because if we
8   stopped and broke out the east ramp also, you
9   would move on someplace else and we would have
10   to stop and do a design and construction for
11   that one.
12       We are looking to hire a firm to
13   assess and design and actually follow through
14   in construction for the work of the entire
15   campus.  That's also in this statement.  Okay?
16   We manage to get procurement to understand that
17   it was quicker, more efficient and more
18   cost-effective to do a wraparound approach like
19   this and to not do the preliminary design and
20   transfer package and architect of record
21   approach which we're doing at Cermak, but
22   rather to hire firms that analyze the whole
23   area and do drawings for the whole area and
24   stick around to be our architect during

1   construction for all of the renovations.
2       If we broke them out individually,
3   like what you are talking about in the case of
4   the RTU, we would be doing a disservice to
5   everyone else in the rest of the campus because
6   each piece individually, if approached and
7   designed individually, would take a lot longer,
8   as you know, to procure the design services and
9   the construction services.
10       We are trying to our best to be
11   efficient and cost-effective, and so that's why
12   we want to include the east tunnel ramp in the
13   assessment, design and construction of the
14   necessary upgrades for the entire campus.
15       Now, if we did what you are talking
16   about, Tom, we would have to stop -- and you're
17   already complaining about how long it takes HDR
18   to be under contract for the Cermak ramp.  You
19   would find yourself in a similar situation in
20   the time it takes on an individual assignment
21   for the RTU ramp.  You would then complain
22   about how long it took to get a contractor on
23   board to construct it.
24       We are attempting to be complete and

1   efficient and effective and cost-effective.  It
2   is a judgment call, but it is about -- we have
3   to look at the whole situation, not just about
4   what you happen to be suing us about on a
5   Wednesday.  Okay?  That's why.
6       Q   First and foremost, what other known
7   violations are there at the Cook County
8   Department of Corrections that had been
9   assessed by an architectural or engineering
10   firm?
11       A   I am not aware of -- I'm trying to
12   think.  I'm not aware of any others other than
13   elements as mentioned previously that have been
14   the subject of a specific assessment of the
15   holding cell areas within the Leighton
16   Courthouse.  I don't know if there had been any
17   other specific assessment of the elements.
18       I do know that in 2015 the Department
19   of Justice issued its barriers report that
20   cited a number of areas, most of which -- I
21   think perhaps all of which had been addressed
22   at this point, but there may be other -- there
23   were other buildings that they didn't cover.
24   So I'm not aware of any other assessments.

Exhibit 8 Page 21

Page 213

1  We're trying to take care of a large
2  problem in a comprehensive and efficient way.
3      Q   Has the Sheriff notified Capital
4  Planning or you that Division 10 is not
5  accessible for mobilely disabled prisoners?
6      A   I know that there are some issues.  I
7  believe it's with the showers in that case.
8  There's some issues there.
9      Again, we're trying to get -- that
10 would be the kind of thing that we would have
11 dealt with in a comprehensive way, just like we
12 are having Globetrotters do for Cermak.
13     Q   In Division 9, there are mobilely
14 disabled prisoners in Division 9 and there are
15 no handrails in the showers?
16     A   I don't recall if it's Division 9 or
17 which one it is.  I would have to look.
18         MR. STILLMAN:  Objection relevance
19     on that.  Yeah.
20 BY MR. MORRISSEY:
21     Q   Are you aware that there are no
22 benches in Division 9 for mobilely disabled
23 prisoners?
24         MR. STILLMAN:  Objection, relevance.

Page 214

1  BY THE WITNESS:
2      A   There may have been -- you say no.  I
3  mean, I don't know who makes an evaluation like
4  that.  Because your question earlier was about
5  having an architect assess it.  I don't know
6  who made that evaluation or, if so, when that
7  was done.
8  BY MR. MORRISSEY:
9      Q   Do you know if the showers in
10 Division 11 have mounted seats?
11         MR. STILLMAN:  Objection, relevance.
12 BY THE WITNESS:
13     A   I don't recall.  I would have to
14 look.
15 BY MR. MORRISSEY:
16     Q   Assuming that the RTU in the
17 dormitories do not have mounted, fixed seats in
18 the shower, will Cook County do an assessment
19 to determine that?
20     A   We will be assessing the RTU as a
21 part of the comprehensive assessment that the
22 responses were received for today in a
23 solicitation.  The RTU -- the rest of the
24 building will be included in that assess -- in

Page 215

1  the assessment.
2      Q   It's known -- would you agree that
3  Globetrotters has provided detailed reports for
4  Cook County in regards to the east corridor
5  ramp and also Cermak?
6      A   Yes.
7      Q   And both reports reflect that the --
8  both ramps are noncompliant under the ADA code,
9  correct?
10     A   Yes.
11     Q   And the Sheriff and Cook County are
12 aware of the fact that the -- both ramps,
13 Cermak and the RTU east corridor ramp, are used
14 on a daily basis by mobilely disabled prisoners
15 such as wheelchair prisoners, prisoners in
16 walkers and using canes.  And they are going to
17 proceed to wait in regards to one ramp, the
18 east corridor ramp, until there's a full
19 assessment of the entire Cook County Department
20 of Corrections campus before addressing the
21 east corridor ramp.
22         And on the other hand, because the
23 Walker case, there's a motion for a permanent
24 injunction, Cook County is going to proceed to

Page 216

1  remedy the east -- the Cermak corridor ramp
2  within the next two years.
3          Is that fair to say?
4      A   First of all, I don't know if there's
5  been a ruling on the motion that you are
6  referring to.  I can't testify about what the
7  Sheriff does or doesn't know.
8          And as far as whether or not they are
9  aware of the determination to assess the entire
10 campus, yes, they are aware of that, and
11 they're aware that we are accelerating the
12 process by having the assessment occur
13 comprehensively in through design and through
14 construction.  So they're aware of the process
15 overall, yeah.
16         They know that we're attempting to
17 get our arms around the extent of upgrades that
18 are needed in a comprehensive way.  But as far
19 as specifically what they know or don't know or
20 what one person or another or the Sheriff
21 knows, I can't testify to that.
22     Q   For the year -- in the year 2024, to
23 your knowledge, Cook County government has no
24 plans to do design drawings for the east

Exhibit 8 Page 22

ERIC DAVIS
June 5, 2024

Page 217

1  corridor ramp to be renovated to make it in
2  compliance with the ADA 2010 standards; is that
3  correct?
4      A    I think we just went through the fact
5  that we have plans to generate those drawings.
6      Q    My question is specific to the east
7  corridor ramp.
8      A    Yeah.
9      Q    In this year, 2024, are there any
10 plans or intentions to hire an architectural
11 firm to proceed to do design drawings for the
12 east corridor ramp?
13     A    Yes.  As I said --
14     Q    When --
15     A    As I said.
16     Q    When will those --
17     A    Excuse me.  Excuse me.  You want to
18 ask -- as I said, the firms that are being
19 hired under the RFQ for which solicitations
20 were submitted today, those firms will be --
21 whatever firm that is, they will be doing the
22 design drawings for the east tunnel ramp as a
23 part of their scope.
24          We are hiring a firm.  We are

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 218

1  expecting to have their contract this year,
2  yes, for an assignment that includes producing
3  the drawings, the construction drawings, for
4  these -- that will be a part of their
5  assignment.  So yes, we are hiring a firm to do
6  that with the expectations they will be hired
7  in 2024.
8      Q    The question is will there be
9  construction drawings in the year 2024 for the
10 east corridor ramp?
11     A    I would expect probably not, but even
12 if we stopped and made it instead as a task
13 order and did the approval of that, I wouldn't
14 think their drawings would be done by the end
15 of this year anyway.  And, again, we think that
16 would be an inefficient way to go about this.
17     Q    For the Cermak ramp, you, as the
18 deputy director of Capital Planning, have the
19 ability to hire HDR to do construction drawings
20 for the Cermak ramp, correct?
21     A    To be clear, and as I have testified
22 before, they are already hired.  We are just
23 making an assignment under their contract.
24     Q    Let me rephrase the question.  Cook

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 219

1  County can assign a contractor such as HDR this
2  summer to begin doing construction drawings to
3  make -- to design renovations for the east
4  corridor ramp to come into compliance with the
5  2010 ADA standards.
6      A    I'm not hearing a question.  Sorry.
7  I'm hearing a statement, not a question.
8      Q    The question is can Capital Planning
9  or Cook County hire an architectural firm to
10 begin doing construction drawings specifically
11 for the east corridor ramp this year similar to
12 what HDR is undertaking for the Cermak corridor
13 ramp?
14     A    When we give them that assignment, we
15 could give them that assignment, yes.  Then we
16 would have to then remove that scope from the
17 assignment that we just took the solicitations
18 for.
19     Q    Who would make that decision in Cook
20 County's government to -- within the near term
21 under your task program to hire an
22 architectural firm such as HDR to do
23 construction drawings for the east corridor
24 ramp?  Who makes that decision in Cook County?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 220

1      A    We have a standardized process for
2  all of the project, which are over
3  100 projects, under the task order assignment
4  mechanism whereby the project is scoped out.
5  The firm intended is consulted about what their
6  needs are in order to perform the assignment.
7  That proposal is then reviewed by our
8  consultant team.  They make a recommendation to
9  the portfolio lead, which is me.  That then
10 goes to our department director who then
11 submits it to procurement.
12          So the decision is made by the
13 department in consultation with the procurement
14 department.  Capital Planning -- so it's
15 multiple people.  It's not one person; it's
16 multiple people.
17     Q    And the group that you just described
18 has undertaken a task to perhaps hire or to
19 retain HDR to prepare construction drawings
20 this year for the east -- for the Cermak
21 corridor ramp; is that correct?
22     A    I would say the expectation is that,
23 yes, HDR would be able to complete those
24 drawings this year.

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 23

ERIC DAVIS
June 5, 2024

Page 221

1    Q    How much will it cost HDR to provide
2  construction drawings this year for the Cermak
3  corridor ramp?
4    A    I don't know offhand.
5    Q    Is it within $100,000?
6    A    I don't know offhand.  The contract
7  at HDR as 1 of 16 firms has -- is a total
8  contract of $2 million.  Generally we like to
9  keep the assignments to 150,000 or lower, but
10  if they need to be a little bit more, we are
11  allowed to go above that threshold.  The
12  intent, as the procurement name suggests, is
13  for smaller projects.
14       So is the fee probably in the 1,
15  $200,000 range?  Probably something in that
16  range.  I don't happen to know offhand what the
17  fee is for that project.
18    Q    So as of this date, June 5th, 2024,
19  you, as the deputy director of Capital
20  Planning, does not know the fee that HDR will
21  charge to do design drawings for the Cermak
22  ramp?
23    A    It would -- I would have to look at
24  it.  I may have that.  They may have submitted

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 222

1  that to me for review previously.  I would have
2  to double-check.
3    Q    In your Declaration in the Walker
4  case on February 24th -- I'm sorry -- at the
5  end of February of 2024, you represented under
6  oath that you were in negotiations with HDR in
7  regards to the fee that they would charge for
8  renovating the Cermak ramp.  Have those
9  negotiations been ongoing?
10    A    Yes.
11    Q    So in March, April, May and June, you
12  have been negotiating with HDR in regards to
13  the amount of money they are going to charge to
14  design the Cermak renovation of the tunnel --
15  the Cermak tunnel -- the Cermak corridor?
16    A    The ramp you mean.
17    Q    Well, let's use the -- let me
18  rephrase it.
19       So for the last three months, you
20  personally have been in negotiation with HDR to
21  determine a price they will charge for design
22  work for the Cermak ramp.
23       Is that fair to say?
24    A    No, the department has been.  When I

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 223

1  said "we," that's the department.  I can tell
2  you that I have looked it up and, as I said
3  yesterday, in the deposition yesterday, Tom,
4  there was an issue with HDR with one of their
5  subcontractors.
6       So when we spoke about this in March,
7  at that time it was my expectation that we were
8  close to conclusion.  Evidently there was an
9  issue after that that had to get resolved.  My
10  understanding is that has been resolved.
11       And as I'm talking to you here, I was
12  able to determine that the fee for the Cermak
13  ramp has been agreed to.  It's approximately
14  $100,000.  And as soon as we can get the
15  documents that I mentioned earlier today from
16  procurement, in a meeting they will be issued a
17  notice to proceed.  So yes --
18       (Simultaneous speaking.)
19  BY MR. MORRISSEY:
20    Q    Do you consider that fee to be
21  reasonable, $100,000 to design the Cermak ramp
22  by HDR?
23    A    For the architectural and structural
24  and other evaluations that they need to do,

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 224

1  yes, I would consider that to be a reasonable
2  fee.
3    Q    Would that be a reasonable fee for an
4  architectural firm to design the east corridor
5  ramp?
6    A    I would expect it would be in a
7  similar order of magnitude, yes.
8    Q    How much will it cost to construct
9  the -- let me rephrase the question.
10       What is the projected cost of the
11  entire project to renovate the Cermak ramp?
12    A    As I think I have discussed before, I
13  don't know the specific costs for that.  The
14  only thing -- because this is somewhat singular
15  work, the only example we have to go by in the
16  case of Cermak is the bridge into Leighton.
17  But as you know, the configuration is very
18  different.
19       So we can identify an approximate,
20  but I can't tell you right now what the cost
21  is.  What I can tell you is that -- that part
22  of the assignment for HDR will be to develop a
23  cost estimate that we will review, and as I
24  think I also mentioned, we are intending to

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 24

ERIC DAVIS
June 5, 2024

Page 225

1  deliver the replacement of the Cermak ramp by
2  our job order contracting or project or process
3  which would be relatively straightforward.
4  They will work with HDR during the course of
5  design to finalize the design and start the
6  pricing process for construction.
7      Q    Has the contract -- contractor begun
8  work as far as developing a price for the
9  Cermak ramp yet?
10     A    No, they don't have anything to go
11 by.  HDR has to do some of their work before a
12 contractor can do that.
13     Q    How long will it take for HDR to
14 provide information to a construction firm to
15 provide a cost estimate to Cook County?
16     A    I can't answer that for you at this
17 time.  When we have the kickoff meeting, they
18 will present us with a projected schedule for
19 their work, but I can't answer that for you
20 today.
21     Q    Will your kickoff meeting for HDR be
22 in July of 2024?
23     A    No, hopefully it will be next week.
24     Q    Who will be present during the

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 226

1  kickoff meeting?
2      A    I would expect, depending on the day
3  and time, one or more representatives from HDR,
4  one or more representatives from their
5  subcontractor, if there is a structural
6  engineer, for example, would be there.  We
7  would have our -- probably Kate from LCM would
8  be there.  My project director should be back
9  from Washington, so he would be there.  I may
10 or may not be at the kickoff.  There would also
11 be somebody from our job order contracting, a
12 manager, the Gordian firm, they would be there
13 as well probably for coordination sake.  So
14 yes, so roughly a half dozen to a dozen people.
15     Q    Wouldn't it be advisable to have
16 Mr. Darr from Globetrotters present?
17     A    Not necessarily.
18     Q    Well, they did the assessment.
19 Apparently the representation by you in March
20 was that you were waiting for that transfer
21 package.  I would think you would want
22 Globetrotters there.
23     A    As we said before, Tom, and I'm not
24 quite sure why you're covering this ground

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 227

1  multiple times, we are going ahead with the
2  report as presented.  I don't necessarily -- I
3  mean, it may be reasonable to have them there
4  or we may simply provide them with
5  Globetrotters' phone number to say if you have
6  any questions, here is Carl's number, you can
7  call him or the firm and they can answer
8  questions.
9          I don't necessarily know that it
10 would be required for Globetrotters to be there
11 since they had given us their assessment, but I
12 don't know why -- I mean, I don't know why it
13 would be necessarily -- I mean, necessary for
14 them to be at the kickoff for somebody else's
15 work like that, since they provided the
16 assessment.
17     Q    Now, Globetrotters provided the
18 assessment for the east corridor ramp.  Would
19 it be reasonable to hire a firm like HDR to
20 begin the design work for the ramp that is in
21 violation of the 2010 ADA standards?
22     A    I have to express exasperation
23 because this is at least the third time you've
24 asked that question.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 228

1      Q    Well, do you have an estimate or a
2  guesstimate in regards to when the east
3  corridor ramp will be constructed to make it in
4  compliance with the 2010 ADA standards?
5      A    Asked and answered.
6      Q    Was that you, Mr. Davis?
7      A    That was me.  Asked and answered.
8          MR. STILLMAN:  Okay.  I will parrot,
9      I guess, yeah.  I mean, you keep asking the
10     same things, Tom.
11 BY MR. MORRISSEY:
12     Q    How long will the east corridor ramp
13 remain not in compliance with the ADA for
14 wheelchair users at the Cook County Department
15 of Corrections?
16     A    I can't give you an answer to that
17 until the firm that we're hiring to assess and
18 design the ADA renovations gives us a schedule.
19 So I can't answer that question right now.
20     Q    If a federal judge ordered you to
21 begin design work for renovating the east
22 corridor ramp, would Cook County comply with
23 the federal judge's order?
24     A    If other cases are any example, I

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 25

Page 229

1  would assume if you made a petition to ask that
2  and at such point as the County has had an
3  opportunity to respond to that petition and if
4  upon reviewing that petition there was a
5  determination made by the judge -- because we
6  have given the reasons not to in the deposition
7  that you have in front of you. We've given our
8  reasons why we think that's not a good idea.
9  But if the federal judge said, okay, I have
10  read your objections, Cook County,
11  nevertheless, I want you to go ahead and
12  proceed with this, we would follow the law. We
13  would follow the ruling of a federal judge.
14          However, I believe we have made a
15  cogent case for why that would not be in the
16  best interest of the County or the taxpayers or
17  anybody involved.
18  Q     Do you understand that there is a law
19  passed by the state of Illinois that provides
20  compensation for individuals that are disabled,
21  that they can be compensated $4,000 for a
22  violation of the ADA? Are you aware of that?
23  A     That's why you have a business model,
24  Tom, yes.

Page 230

1  Q     And how did you become aware of the
2  passage of the Restoration Act by the state of
3  Illinois?
4  A     I think I read it in the Sun-Times.
5  I don't know. I think I read an article about
6  it in the paper. It may have been something
7  communicated. It may have been something that
8  Kate brought to my attention. I remember
9  reading something about it somewhere.
10  Q     So Cook County is aware that for each
11  person that goes up or down the east corridor
12  ramp and is in a wheelchair, walker or cane,
13  potentially Cook County and the Sheriff could
14  be liable for violating the Act and be required
15  to pay damages of $4,000?
16          MR. STILLMAN: Just objection, calls
17      for a legal opinion.
18          You can answer.
19  BY THE WITNESS:
20  A     Yeah, I'm not a lawyer, Tom. But my
21  recollection is that some form of harm has to
22  be demonstrated. But yeah. I mean, okay.
23  BY MR. MORRISSEY:
24  Q     To your knowledge, does the ADA --

Page 231

1  does the purpose of the ADA state that one of
2  the purposes is to provide equal access for
3  able-bodied and disable-bodied people to public
4  buildings?
5  A     I think it's fair to characterize
6  that that's one of the fundamental motivations
7  of the Americans with Disabilities Act,
8  specifically Title II.
9  Q     And Title II provides that the ADA
10  2010 standards and the 1991 standards are
11  intended to provide the independence to
12  mobilely disabled individuals so that they can
13  have access to public buildings just like
14  able-bodied people or similar to able-bodied
15  people?
16  A     Yes, I think that that premise that
17  you are talking about there, Tom, is enormously
18  important. It is clearly something -- I mean,
19  the ADA is civil rights law. It is about
20  fairness. It is about access. It is an
21  extremely important part. To me, it goes to
22  the American character, the need to provide
23  everybody with access to the same benefits of
24  public functions, to access to our justice

Page 232

1  system.
2          It's a very important principle and a
3  very important element of civil rights law.
4  It's something very important to me. It's
5  something that occupies a large part of my
6  professional work.
7          So, yes, I think -- so I'm aware of
8  it. It's an extremely important principle.
9  Q     And the 2010 ADA standards and the
10  1991 ADA standards are written to allow
11  mobilely disabled individuals and other
12  disabled individuals to independently access
13  public buildings?
14  A     To access buildings, period. It's
15  about the ability to interact with -- for
16  individuals to interact on an equal basis with
17  their environment.
18          It's why when I teach about the ADA,
19  one of things that I do in most classes is I
20  ask the young students to raise their hand if
21  they don't plan on getting old. And I say for
22  those people that didn't raise your hands, the
23  ADA is about you. It's about everybody. It's
24  not something that is just about those people

Exhibit 8 Page 26

ERIC DAVIS
June 5, 2024

Page 233

1  or a subsection.  It's something that is for
2  elderly, for people with disabilities, for
3  people that have been in accidents.
4          It is a really important series of
5  laws and one that I'm committed to implementing
6  in as complete a manner as possible, in some
7  cases even beyond what the ADA requires.
8          One of the things that is in the RFQ
9  is the stipulation that if one of our
10 consultants identifies something that they
11 consider that should be done that may be above
12 and beyond the ADA, something that sometimes
13 gets referred to as universal design, the
14 County wants them to bring those elements to
15 our attention so that we can consider the
16 feasibility of elements that may be beyond the
17 letter of the law.  Because this is about
18 fairness.  This is about access.  This is about
19 an equal footing.
20         One of the reasons that we do not
21 want to pull the east tunnel ramp out is that
22 it slows everything else down.  We want to do
23 all of it.  We want to do it in as an efficient
24 way as possible and as comprehensive a way as

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 234

1  possible.
2          I will say again, pulling out the
3  east tunnel ramp as another separate project,
4  there is quickly a point of diminishing returns
5  where it slows everything else down.  We are
6  trying to deal with all of it.  Okay?
7      Q    Let me ask you, the ADA is about
8  independence.
9          Isn't that fair to say?
10     A    That's fair to say, yes.
11     Q    Independence for disabled
12 individuals.
13     A    I think --
14     Q    And the disabled individual, under
15 the ADA, should not have to depend upon another
16 person to push them up or down a ramp that is
17 required under the 2010 or 1991 ADA standards
18 to be compliant with the code.
19         Is that fair to say?
20     A    I think it's fair to say that the ADA
21 and the interpretations of the ADA by the
22 profession and by the Department of Justice
23 realizes that there are situations where having
24 assistance may be a benefit to the individuals.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 235

1  I can only speak to the physical facility
2  elements of it, but I am aware that there --
3  there is a recognition that there are some
4  instances where someone may require physical
5  assistance in addition to what the building or
6  facility provides.
7      Q    Well, the east corridor ramp was
8  required to comply with the 2010 standards.
9          Isn't that fair to say?
10     A    That's fair to say.  And it's also
11 fair to say that the assessment we got
12 indicates that it doesn't.  So we need to find
13 a way to remedy that.
14     Q    And pushing a person up or down the
15 ramp doesn't comply with the 2010 or 1991
16 standards on its own, correct?
17     A    I can't speak to whether or not
18 operationally that makes a difference or
19 provides an exception.  I honestly don't know.
20 I know about the building parts.
21     Q    Well, the building aspect of it is,
22 it's still in violation of the ADA if it
23 doesn't comply with the 2010 or 1991 ADA
24 standards, correct?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 236

1      A    The building either complies or it
2  doesn't.  I think we have established in the
3  case of the east RTU ramp that it doesn't
4  comply.
5      Q    And you are not aware of any
6  exception under the 2010 or 1991 standards that
7  would provide an exception for Cook County or
8  the Sheriff to remedy the violations for the
9  east corridor ramp by simply saying, well,
10 we're just going to push wheelchair detainees
11 up and down the east corridor ramp?
12     A    I'm not aware if there is or if there
13 isn't.  My recollection is that in the course
14 of investigating the circumstances around the
15 Cermak ramp that there was an allowance, in a
16 secure environment, for a law enforcement
17 agency, in this case the Sheriff, to
18 operationally -- and, again, it's up to them --
19 to operationally require that individuals going
20 up and down the ramp be not only pushed up and
21 down but escorted.
22         I don't know whether they do that or
23 not in every instance, I can't speak to that,
24 but my recollection is that there was some

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 27

ERIC DAVIS
June 5, 2024

Page 237

1  provision in some guideline in a secure
2  environment for them to provide or require that
3  kind of escort.
4      Q    LCM was involved in the barriers
5  report?
6      A    I believe they were, yes.
7      Q    And were they involved in the
8  renovation of the bridge ramp?
9          MR. STILLMAN:  Objection, relevance.
10  BY THE WITNESS:
11      A    I don't remember if they were or not,
12  Tom.  I don't recall.
13  BY MR. MORRISSEY:
14      Q    Was LCM involved in the limited
15  Cermak renovations in 2022?
16          MR. STILLMAN:  Objection, relevance.
17  BY MR. MORRISSEY:
18      Q    I'm sorry.  2018?
19          MR. STILLMAN:  Objection, relevance.
20  BY THE WITNESS:
21      A    What are you referring to.
22  BY MR. MORRISSEY:
23      Q    Well, weren't some of the showers in
24  the Cermak building renovated in the year 2018?

ERIC DAVIS
June 5, 2024

Page 238

1          MR. STILLMAN:  Objection, relevance.
2      I think the showers just have nothing to do
3      with Westmoreland.
4          Go ahead.
5  BY THE WITNESS:
6      A    I don't think they were involved in
7  any work in the showers at all.  I could tell
8  you that they weren't under contract in their
9  current role at that time.  I don't believe
10  they were -- I don't believe they were.  But I
11  can't -- I can't say whether they were or they
12  weren't.  I don't think they were in anything
13  relative to the showers back in 2018.  I'm not
14  aware of that.
15  BY MR. MORRISSEY:
16      Q    You were provided with the plans for
17  renovation of the Leighton court building,
18  correct, after you became employed by Cook
19  County?
20      A    You mean the renovation of the
21  holding cell areas?  Yes.
22      Q    And those plans were done by an
23  architectural or engineering firm?
24      A    I believe they were done by Primera.

ERIC DAVIS
June 5, 2024

Page 239

1      Q    And Primera is an architectural or
2  engineering firm?
3      A    Yes.
4      Q    And approximate cost for those plans
5  was over seven figures?
6      A    You said that the other day.  It
7  happened -- the contract was before I came to
8  the County, but if you looked it up, I'm not
9  prepared to dispute that.
10      Q    And you started with the County when?
11      A    April of 2017.
12      Q    And as of June of 2024 -- let me ask
13  an initial question.
14          Primera identified that there were
15  accessibility issues for wheelchair people in
16  the holding areas at the Leighton Courthouse?
17          MR. STILLMAN:  Objection, relevance.
18      Go ahead.
19  BY THE WITNESS:
20      A    It was the subject of the drawings
21  that they provided, yes.
22  BY MR. MORRISSEY:
23      Q    And at least from -- at least up
24  until today's date, even though the County is

ERIC DAVIS
June 5, 2024

Page 240

1  aware that the -- let me rephrase the question.
2          Even though Primera provided
3  construction drawings for the holding cells at
4  Leighton five or six years ago, the holding
5  cells still have not been renovated, correct?
6          MR. STILLMAN:  Objection, relevance.
7  BY THE WITNESS:
8      A    We went through all of this
9  yesterday, Tom.  I answered this question
10  yesterday.
11  BY MR. MORRISSEY:
12      Q    Well, isn't that true, there still
13  hasn't been any renovation to make the holding
14  cells at Leighton accessible by Cook County?
15      A    I would refer you to my remarks
16  yesterday, yes.
17          MR. STILLMAN:  Tom, we're focused
18      back on the affidavit --
19          (Simultaneous speaking.)
20  BY MR. MORRISSEY:
21      Q    Given the fact that Cook County
22  history or practice in the past has been to
23  spend upwards of a million dollars or more to
24  make the Leighton court building accessible for

Exhibit 8 Page 28

ERIC DAVIS
June 5, 2024

Page 241

1 wheelchair detainees --
2         MR. STILLMAN:  Objection, relevance.
3 BY MR. MORRISSEY:
4     Q    -- can you explain why there should
5 be any credence that Cook County is going to
6 proceed in renovating the RTU corridor ramp in
7 the next three years?
8     A    Okay.  Let's unpack that a little
9 bit.
10        MR. STILLMAN:  Object to form.
11   Because I don't really understand what you
12   asked.  That was a long question.
13        MR. MORRISSEY:  I will ask the
14   question distinctly.
15 BY MR. MORRISSEY:
16     Q    Will Cook County prioritize
17 renovating the east corridor ramp within the
18 next two years to make it compliant with the
19 2010 ADA code?
20     A    As I said before, the intent is to
21 develop the assessment, design drawings and
22 construct the upgrades necessary for the
23 Department of Corrections campus in a
24 comprehensive and thorough and holistic way

ERIC DAVIS
June 5, 2024

Page 242

1 along the lines of what has been outlined in
2 the RFQ and in the discussions that we have had
3 about this.
4         As I have said, we consider it to be
5 inefficient to pluck out individual elements at
6 this point because of the size of the effort
7 that it also misses potentially other elements
8 that may impact a specific situation, whether
9 it's the mechanical systems as were mentioned
10 in my deposition or whether it is elements of
11 alternate paths of travel or all of the other
12 areas of the campus that need to be addressed.
13 It's a large problem.  We're attempting to be
14 holistic and complete.
15         To speak to your earlier question,
16 and I object to the characterization that there
17 is any lack of motivation to do this work.  I
18 object to any characterization that we are not
19 operating in good faith.  I object to the
20 notion that we somehow don't care or don't
21 intend to follow through.
22         I work in the Department of Capital
23 Planning.  Okay?  Our effort is to spend the
24 money that the taxpayers entrust with us in as

ERIC DAVIS
June 5, 2024

Page 243

1 effective and efficient a manner as possible.
2         So any suggestion that we're not
3 going to go forward with this, I can't support
4 that assertion in any way relative to your
5 comment about the work that was done previously
6 to assess the holding cells area.
7         As I said yesterday, it is also
8 inefficient to take a courtroom offline to
9 repair or renovate the back stage areas without
10 also looking at the courtrooms itself.
11         Unfortunately, that decision was made
12 before I got here, before my director got here.
13 It was clearly identified as being in the best
14 interest of the taxpayers to only close the
15 courtroom once and do the courtroom and the
16 holding areas and do it in a comprehensive way.
17         In order to do that, Tom, in the
18 criminal courthouse, in one of the largest
19 jurisdictions in the United States, it is a
20 very careful process of phasing the work.  It
21 doesn't happen overnight.  We are trying to do
22 it once.  We are trying to do it as efficiently
23 and effectively as possible.  But any
24 characterization of that effort that suggests

ERIC DAVIS
June 5, 2024

Page 244

1 that somehow we don't care or that it's not
2 important to us, I reject completely.
3     Q    My question is, and you didn't answer
4 it, will the east corridor ramp be completed
5 and renovated within a two-year period of time?
6         MR. STILLMAN:  Objection, asked and
7 answered.  Maybe, maybe not.
8 BY MR. MORRISSEY:
9     Q    And what is the total cost of the
10 renovations for the ADA violations at the Cook
11 County Department of Corrections?
12     A    I have absolutely no idea.  That is
13 why we are hiring firms to assess the
14 situation.  It is likely in the tens of
15 millions of dollars, if not more.
16     Q    And any decision to go forth with
17 correcting the violations, the ADA violations
18 at the Cook County Department of Corrections,
19 will be up to the Cook County Board of
20 Commissioners.
21         Is that fair to say?
22     A    The Cook County Board of
23 Commissioners approves any contracts that we
24 undertake.  They rely on the professional

Exhibit 8 Page 29

ERIC DAVIS
June 5, 2024

Page 245

1  expertise of the department, but ultimately
2  they make a decision about the hiring of both
3  design and construction firms.  They will
4  review and hopefully approve the contracts for
5  the ADA assessment that are the subject of the
6  RFQ.
7       They will also approved the contracts
8  for construction of the work.  One of the
9  things that we will look at once we have the
10 assessment, once we know the landscape of the
11 need across the campus, we may -- and that's
12 why my earlier answer was maybe, Tom, once we
13 have a feel for what the magnitude of the
14 challenge is, we may break out the actual
15 construction of some of the elements on a more
16 localized and expedient basis.
17      I can't answer that question for you
18 right now because I don't know the whole
19 picture.  But that's --
20      Q    So --
21               (Simultaneous speaking.)
22 BY THE WITNESS:
23      A    Excuse me.  That's one of the reasons
24 for doing it this way, to be as efficient -- it

ERIC DAVIS
June 5, 2024

Page 246

1  may be better to do one giant construction
2  contract, it may be better to break it up into
3  a series of smaller contracts, it may be better
4  to do a combination of the two, I don't know.
5  That's why we are hiring the firms to help us
6  with this challenge.
7  BY MR. MORRISSEY:
8       Q    To break this down, Mr. Davis, you
9  have issued an RFQ for qualifications of --
10      A    Yes.
11      Q    -- architects and engineers?
12      A    Yes.
13      Q    Any contract to proceed on Package 1,
14 2 or 3 for architectural or engineering
15 services will have to be approved by the Cook
16 County Board?
17      A    That's correct.
18      Q    And does that become part of a
19 Capital Improvement Plan?
20      A    Yes.
21      Q    And that may or may not be approved
22 by the Cook County Board?
23      A    I have been involved in nine budget
24 cycles, Tom.  The next -- I'm answering your

ERIC DAVIS
June 5, 2024

Page 247

1  question.  I have been involved in nine budget
2  cycles.  Okay?  At least seven of which have
3  been CIP's that have been submitted to the
4  board of commissioners.  The next time the
5  commissioners strike a project from the Capital
6  Improvement Plan and tell us not to go forward
7  will be the first.  Can I say they won't do it?
8  No, that's their prerogative.  But in seven
9  CIP's submitted to board, I haven't seen it.
10      Q    You said that the renovation of the
11 east corridor ramp may or may not be completed
12 in two or three years.
13      Is that fair to say?
14      A    No.  Your question was two years.
15 But yeah, two or three years it may or may not.
16 I don't know.
17      Q    Could we say that it may or may not
18 be completed in four years?
19      A    It may or may not.  I can't say one
20 way or the other right now.  As I said, we will
21 know sooner than that because we will have the
22 assessments and will understand better of a
23 best way to go forward with implementing the
24 necessary upgrades.

ERIC DAVIS
June 5, 2024

Page 248

1       Q    So assuming that the east corridor
2  ramp will not be renovated in the next four
3  years, wheelchair detainees on a daily basis
4  will be going up and down the east corridor
5  ramp to go to medical appointments at the
6  Cermak Health facility.
7       Is that your understanding?
8       A    No, that's your assumption about four
9  years.  I said it may or may not be.
10      Q    But during that period of time, until
11 Cook County decides to renovate the east
12 corridor ramp, one of the paths of travel for
13 wheelchair detainees will be the east corridor
14 ramp to go to medical appointments at Cermak.
15      Is that fair to say?
16      A    Yes.  That will be one of the paths
17 of travel, yes.
18      Q    Why is Cermak's corridor ramp
19 renovation more important than the east
20 corridor ramp?
21      A    I think more important is your term.
22 I don't agree with that characterization.
23      Q    Are they equally important,
24 renovating the Cermak corridor ramp and the RTU

Exhibit 8 Page 30

Page 249

1  east corridor ramp?
2      A    I don't know how to answer that
3  question.
4      Q    Well, the east corridor ramp, as you
5  have testified today, has multiple ADA
6  violations, correct?
7      A    Yes.
8      Q    And why then --
9           (Reporter clarification.)
10 BY MR. MORRISSEY:
11     Q    And why is Cook County prioritizing
12 the Cermak renovation of the ramp over the east
13 corridor ramp?
14     A    I reject your characterization that
15 we are prioritizing over it.  It's just the one
16 that we are doing first.
17     Q    You would -- for a wheelchair person
18 going up either the east corridor ramp or going
19 up the Cermak ramp, would you agree that both
20 of them provide the same level of difficulty to
21 navigate either ramp?
22     A    I haven't taken either ramp in a
23 wheelchair, Tom.  I'm not in a position to
24 assess whether one or the other is more

Page 250

1  difficult.
2           MR. MORRISSEY:  We will take a
3  minute, and then we might be wrapping up.
4           (WHEREUPON, a short
5           break was had.)
6  BY MR. MORRISSEY:
7      Q    During your deposition in March of
8  2024 --
9      A    Are we back on?
10     Q    We are back on.
11     A    Okay.  Thank you.
12     Q    In March of 2024, you represented
13 that renovating the Cermak ramp was one of the
14 most important projects that you were
15 supervising at the Cook County Jail.  Is that
16 still your position?
17     A    I don't know if I used the term, but
18 it's definitely an important project.
19     Q    And would you say renovating in the
20 east corridor ramp would have equal importance
21 to you as a director at the Department of
22 Capital Planning?
23     A    All ADA projects are important to me.
24     Q    Well, which ones do you prioritize?

Page 251

1  Do you prioritize the Cermak ramp over the RTU
2  ramp?
3      A    I don't know how to answer that, Tom.
4           MR. STILLMAN:  Objection, asked and
5      answered.
6  BY THE WITNESS:
7      A    No, I don't know how to answer that
8  because if -- you know, you might ask, well,
9  which is more important, renovating Cermak or
10 renovating the courthouse.  They are both
11 important.  They are all important.
12          MR. MORRISSEY:  I have nothing
13      further.  Have a good evening.
14          MR. STILLMAN:  I have a couple of
15      questions.  Just one or two.  Sorry to --
16      it should not take too long.
17     C R O S S - E X A M I N A T I O N
18          BY MR. STILLMAN:
19     Q    So, Eric, the Declaration, you had
20 said before that you didn't write it.  We had
21 written it kind of in conjunction with you; is
22 that right?
23     A    Yes.
24     Q    But none of the words in there were

Page 252

1  anything that you didn't 100 percent agree with
2  or identify as true, correct?
3      A    I reviewed all of the elements and,
4  as we discussed yesterday, it appears that
5  there was a slight variation in one of the
6  footnotes.  But, yeah, I reviewed all this, and
7  in some cases suggested alternate ways of
8  saying things.
9      Q    And then there was another -- there
10 was a line of questioning Tom was asking you
11 yesterday about whether it would make sense
12 to -- after we were talking about the movements
13 of the doors for the upper landing area, he was
14 asking if it would make sense to implement that
15 Recommendation Number 2 for using a floor
16 surface material to kind of stabilize the
17 surface.
18          Do you remember that, the slope?
19     A    Yes.
20     Q    Would it make any sense to implement
21 that Recommendation Number 2 with the floor
22 surface material to change the slope before
23 going through any of the rest of the
24 remediation efforts?

Exhibit 8 Page 31

Page 253

1     A   I'm not quite understanding your
2  question, Zach.  Would it make sense to do
3  that?  I mean, ultimately we would do all of
4  it.
5     Q   As far as you know, with all of these
6  other efforts where we discussed about the path
7  of -- the path of travel and, you know,
8  holistically considering the rest of the
9  different things needed in remediation, would
10 it make any sense to go out of the way, put on
11 that surface topper for the upper portion of
12 the ramp only, for that east RTU ramp, and then
13 go and do the rest of it, or would it make
14 sense to consider it along with the rest of the
15 project we're talked about doing?
16    A   Yeah, we would want to look at the
17 whole thing.  I do want to point out one thing
18 though, just to update Tom on something.
19       When we did discuss this yesterday
20 and you brought up the notion of moving the
21 doors at the top of the ramp -- or, I'm sorry,
22 at the -- yeah, at the bottom of the ramp
23 rather -- I'm sorry.  You know, excuse me.  At
24 the top of the ramp.  At the east end of the

Page 254

1  ramp, you talked about the notion.
2        I did look into that, Tom, since we
3  spoke yesterday.  It probably isn't feasible to
4  simply move those doors because there is a fire
5  door into a stairway that those doors might
6  block.  So I'm going to have to have an
7  architect look into it.
8        So the ability to just simply direct
9  somebody to move those doors, I did look into
10 it, but it looks likes there might be an
11 obstruction with a fire door and -- a door to a
12 fire exit stair.  So I can't just immediately
13 move on it.  You know, we did look -- I did
14 look into that.
15       MR. STILLMAN:  I have nothing else.
16      R E D I R E C T  E X A M I N A T I O N
17      BY MR. MORRISSEY:
18    Q   In regards to that -- the top landing
19 that is only 9 inches --
20    A   Because the door mullion is in the
21 way, yes.
22    Q   Globetrotters and Mr. Darr testified
23 that it can be easily corrected by relocating
24 the doors to the east.  Assuming that it can be

Page 255

1  done, will Cook County proceed to do that or do
2  we have to wait three or four years until the
3  overall assessment and plan is put out?
4     A   I reject your sarcastic comment, but
5  if you would like to flip to Page 16 of the
6  Globetrotters report that is a part of my
7  testimony, that has the diagram.
8     Q   All right.  I'm on Page 16.
9     A   Do you see the drawing of the ramp?
10    Q   I do.
11    A   Okay.  On the right-hand side where
12 it says top landing and it shows -- and it has
13 a note that says:  Move doors east to create a
14 60-inch-long landing.
15       Do you see that?
16    Q   I do.
17    A   Do you see where the red doors, that
18 would be the relocated doors, where those are
19 in the drawing?
20    Q   I don't.
21    A   Okay.  There's the black line doors
22 of the drawing -- drawing of the doors on the
23 left -- to the left on the top landing, and
24 then to the right there is red lines that

Page 256

1  indicate where the doors would be moved to.
2        Do you see that?
3     Q   I don't.  I don't have a color form
4  here.
5     A   I'm sorry.  So if you don't mind, I
6  will go ahead and share it on my screen.
7        Do you see this right here?  I can
8  make that larger if you want.  Do you see this
9  area right here?
10    Q   There's a screen there, Eric.  I
11 can't -- would you mind putting that back up on
12 the screen there?
13    A   I'm going to reshare.  Hold on a
14 second.  I got -- hand on.  I got to figure out
15 how to do this.  Hold on.  Okay.  Let me do
16 this.  Let me try this again.  Okay.
17       Yes, here we go, Declaration.  Here
18 it is.  This thing.  There's the document.  Can
19 you see this?
20       MR. STILLMAN:  Yeah.
21 BY THE WITNESS:
22    A   Do you see that, Tom?
23 BY MR. MORRISSEY:
24    Q   I'm an attorney.  So you can testify

Exhibit 8 Page 32

ERIC DAVIS
June 5, 2024

Page 257

```
 1   to what you --
 2        A    So this is a drawing of the ramp from
 3   the Globetrotters report.  It says:  Figure 3
 4   Plan of Recommendations.  It indicates the
 5   bottom landing, the lower ramp, the
 6   intermediate landing, the upper and the top
 7   landing.
 8            In the area where it says the top
 9   landing, there are two sets of three doors
10   indicated.  In each case there is a set of
11   double doors and a single door.  The doors on
12   the left are rendered in black lines, and
13   that's the existing doors.  And the set of
14   doors on the right are indicated in red, and
15   that's the proposed -- Globetrotters' proposed
16   new doors of moving those.
17            Do you see where this arrow that
18   says:  Move doors east to create a 60-inch-long
19   landing, and there are two arrows indicating
20   the two sets of doors?
21            Do you see that.
22        Q    Yes, but this isn't my deposition,
23   Mr. Davis.
24        A    No, no.  Okay.  Well, I want to tell
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 258

```
 1   you something.
 2            MR. STILLMAN:  Tom, you asked him to
 3        put it up.
 4   BY THE WITNESS:
 5        A    No, no.  I just want to tell you
 6   something.  What I found out since we spoke
 7   yesterday, this set of doors on the right where
 8   the arrow is pointing to this set of doors, I
 9   have learned that right there is a door, that's
10   a fire stair.
11            So while Globetrotters looked to the
12   end of the ramp here, they didn't continue
13   their investigation into the rest of the tunnel
14   and learned that, in fact, actually there is a
15   door right here that is a fire door into a
16   stair.  So they cannot simply slide the doors
17   to the east to create a 60-inch landing without
18   creating a fire hazard.
19            And if I look at the drawing here and
20   I see a regular wall that's uninterrupted, that
21   looks fine.  Upon investigation, I learned that
22   moving the doors there would create a fire
23   hazard.
24
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 259

```
 1   BY MR. MORRISSEY:
 2        Q    You have the ability under the task
 3   program to independently hire an architect now
 4   that there's been assessment by Globetrotters
 5   to renovate the east corridor ramp.
 6            Is that fair to say?
 7        A    I have the ability to do so, and as I
 8   have said multiple times, I don't think it's --
 9   we don't think it's wise.  I have talked with
10   the director about this.  We don't think it's
11   wise.  We think it's wise to pursue this as
12   part of the larger assessment in renovation of
13   the campus.
14        Q    And is the current proposal by HDR,
15   $102,000 to design drawings for the Cermak
16   ramp?
17        A    Yes.
18            MR. STILLMAN:  Objection, relevance.
19   BY THE WITNESS:
20        A    It is.
21            MR. MORRISSEY:  I have nothing
22   further.
23            MR. STILLMAN:  All right.
24
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 260

```
 1            IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION
 3
     EUGENE WESTMORELAND,          )
 4                                 )
             Plaintiff,            )
 5                                 )
             vs.                   )  No. 23-cv-1851
 6                                 )
     COOK COUNTY Sheriff           )  Day 2
 7   THOMAS DART, et al.,          )
                                   )
 8           Defendants.           )
 9
10            I, ERIC DAVIS, being first duly
11   sworn, on oath, say that I am the deponent in
12   the aforesaid deposition, that I have read the
13   foregoing transcripts of my deposition, Day 1,
14   June 4, 2024; and Day 2, June 5, 2024,
15   consisting of pages 1-260 inclusive, taken at
16   the aforesaid time and place and that the
17   foregoing are a true and correct transcripts of
18   my testimony so given.
19
                    _____
20                             ERIC DAVIS
21   SUBSCRIBED AND SWORN TO
     me before this _____ day
22   of _____, A.D. 2024.
23   _____, Notary Public
24
```

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 33

ERIC DAVIS
June 5, 2024

Page 261

```
 1   STATE OF ILLINOIS )
                       )  ss:
 2   COUNTY OF C O O K )
 3              I, Peggy A. Anderson, a Certified
 4   Shorthand Reporter in the State of Illinois do
 5   hereby certify:
 6              That previous to the commencement of
 7   the examination of the witness, the witness was
 8   duly sworn to testify the whole truth
 9   concerning the matters herein;
10              That the foregoing deposition
11   transcript was reported stenographically by me,
12   was thereafter reduced to typewriting under my
13   personal direction, and constitutes a true
14   record of the testimony given and the
15   proceedings had;
16              That the said deposition was taken
17   before me at the time and place specified;
18              That the said deposition was
19   adjourned as stated herein;
20              That I am not a relative or employee
21   or attorney or counsel, nor a relative or
22   employee of such attorney or counsel for any of
23   the parties hereto, nor interested directly or
24   indirectly in the course of this action.
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 262

```
 1              IN WITNESS WHEREOF, I do hereunto set
 2   my hand this 12th day of June, 2024.
 3
 4
 5
 6
 7        Peggy A. Anderson
 8        Certified Shorthand Reporter
 9        License No. 084-003813
10
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 1

A
A.D 260:22
ability
  159:20
  204:10
  218:19
  232:15
  254:8 259:2
  259:7
able 142:17
  143:16
  160:14
  161:15
  162:17
  196:22
  204:17
  220:23
  223:12
able-bodied
  231:3,14,14
absent
  145:14
absolutely
  244:12
accelerate
  159:18
  200:10
accelerated
  204:11
accelerating
  216:11
acceptance
  156:10
access 143:17
  205:20
  231:2,13,20
  231:23,24
  232:12,14
  233:18
accessibility
  163:15
  177:21
  178:9
  179:22

184:4 192:5
205:19
209:14
239:15
accessible
  138:15,18
  138:22
  139:2 180:1
  180:21
  213:5
  240:14,24
accidents
  233:3
accommod...
  166:20
  168:3
  172:15
accomplish
  162:15
accomplish...
  168:8
accomplish...
  163:10
achieve
  168:17,22
  183:18
  184:1
  187:15
Act 134:18
  134:22
  167:23
  171:11
  230:2,14
  231:7

134:10,11
134:13,20
135:4,11
136:17
137:3,20
138:7 139:8
140:9,14,17
143:1,6,12
144:7,10
147:17
149:5 156:5
158:24
162:18
163:24
165:12
166:6,9,18
167:7 169:1
169:4,7
170:23
172:8,17
173:1,16,24
174:10,21
177:4
178:20,24
179:18
180:6,15
182:14
183:3,8,11
184:18
188:19
189:18
194:19
206:24
207:5
208:12
209:6,21
215:8 217:2
219:5
227:21
228:4,13,18

229:22
230:24
231:1,9,19
232:9,10,18
232:23
233:7,12
234:7,15,17
234:20,21
235:22,23
241:19
244:10,17
245:5 249:5
250:23
addition
  133:10
  134:15
  135:5
additional
  143:4
address
  140:22
  141:7
  166:15
addressed
  192:20
addresses
  133:8,11
addressing
  188:19
adds 165:1
adhere
  132:13
adjourned
  261:19
adjust 160:3
advice 177:3
advisable
  212:21
advise 145:2
advised
  197:18
advisor

174:10
advisors
  148:7
ADX 169:3
affidavit
  207:13
affirmative
  181:18
aforesaid
  236:12
afternoon
  133:10
179:7,16
agencies
  166:14
agency
  146:17
  172:15
ago 133:21
  150:15
agree 135:21
  136:12
  158:1 162:5
  162:10,11
  162:12,19
  215:20
agreed
  223:13
ahead 185:20

198:20
200:21
201:2 202:8
204:14
207:13
227:1
229:11
238:4
239:18
AIA 194:13
al 130:7
260:7
allow 161:1
  170:24
  210:10
allowable
  146:17
allowed
  138:4,15,19
  170:16
  210:11
Allowing
  144:16
allows 149:5
  160:22
  162:17
al130:7
alternate
  242:11
altered 143:1
  181:20
amendment
  195:24
American
  231:22
Americans
  134:17,22
  231:7

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 2

amount
  196:17
  222:13
analysis
  179:4 183:5
  190:24
  192:1
  193:13,13
analyze
  210:22
And/or
  137:21
Anderson
  130:16
  261:3 262:7
answer
  172:13
  174:2,5
  181:16,18
  185:19
  208:7,9,15
  209:15
  225:16,19
  228:16,19
  230:18
  243:3
  245:12,17
  249:2 251:3
  251:7
answered
  174:2
  181:16,18
  185:19
  207:9,12,15
  225:16,19
  240:9 244:5
  251:5
answering
  246:24
answers
  168:7

anybody
  176:13
  229:17
anyway
  165:6
  182:17
apparently
  194:16
Appeared
  131:8,16
appears
  177:12
applicable
  239:11
applied 146:3
apply 144:18
  169:8
appointment
  185:1
appointme...
  148:7
  155:8,14
  156:8,11,17
  158:9
approach
  142:14
  160:8
approaches
  162:16
approached
  203:21
approval
  214:5 254:7
arms 216:17
arrest 148:23
arrow 257:17
arrows
  159:11
article 230:5
asked 174:19

239:4
approxima...
  152:23
165:6
182:17
184:24
238:23
223:23
239:1
April 154:9
154:13
155:2
177:12
221:12
134:24
136:12,16
158:1
162:10,11
162:12,19
210:10
215:20
214:5 254:7
215:23
arms 216:17
arrest 148:23
arrow 257:17
arrows
159:11
arm 134:24
article 230:5
architectural
133:22
134:2
151:14,24

212:9
217:10
219:9,22
223:22
224:6 251:4
244:6 251:4
246:22
236:11
259:3
arms 216:17
207:11
214:20
227:24
228:5,7
241:12
244:6 251:4
242:4
asking 138:3
138:5
223:13
239:1
246:16
architectu...
192:23
176:13,22
176:24
159:22
191:22
200:13
208:1 228:9
252:10,14
235:21
aspect 179:21
243:6
246:19
218:17
243:9,16
242:12
243:9,16
242:12
226:17
258:8
assessing
179:21
181:21
192:24
206:14,18
214:20
221:9

assessment
178:6,9,12
179:17
182:24
188:9 191:3
191:23
202:19
201:19
203:12
206:20,21
209:5
211:13
212:14,17
218:4,18,21
215:1,19
241:21
245:5,10
255:3 259:4
259:12
assessments
212:24
247:22
assign 219:1
assignment
193:9
199:24
200:20
202:12
206:12
211:20
216:12
218:2,20
220:5
222:12
219:14,15
219:18
220:3,6
224:22
assignments
221:9

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 34

## Page 3

ERIC DAVIS — June 5, 2024

assistance 171:22, 173:5,10, 234:24, 235:5
assisting 175:20
assume 156:6, 172:23, 209:1, 229:1
assuming 172:1, 180:22, 207:2, 214:16, 254:24
assumption 248:8
assured 195:11, 196:16,19
attached 154:16, 206:20
attachment 191:16
attempting 159:6, 211:24, 214:16, 242:13
attention 146:10, 230:8, 233:15
attorney 256:24, 261:21,22
authority 147:10, 149:10
automatica- 176:7

available 163:11, 193:11, 208:24
Avenue 131:5
avenues 145:18
aware 155:13

**B**
B 132:10, 139:20
back 157:9, 160:12,15, 162:20,21, 163:21, 165:14, 166:2, 167:19, 178:6, 185:5, 194:15,23, 226:8, 238:13, 240:18, 243:9, 250:9,10, 256:11
balance 202:17
barriers 212:19, 237:4
based 143:8, 155:6, 161:6, 166:17, 167:3, 209:4
basically 160:1
basis 150:6, 163:12
beginning 216:14, 229:12, 230:1,10, 248:3
begin 225:8
behalf 131:8
believe 133:10,20, 134:15, 143:6, 144:1, 143:18, 150:16, 151:10, 152:22, 153:18, 158:24, 159:15,24, 161:20, 164:16,21, 165:17, 166:6,13, 170:4, 173:7, 174:11, 182:13, 187:12,19, 190:12, 192:18, 194:12, 199:9, 200:5, 201:4, 202:4, 207:9, 208:23, 213:7, 229:14, 237:6, 238:9,10,24
benches 213:22
benefit 234:24
benefits 231:23
best 211:10
best-case 209:12
better 141:21, 162:3, 246:1,3
beyond 142:2, 146:8, 159:8, 143:6,12,16, 233:7,12,16
bid 192:10, 194:18
bit 133:12, 172:18, 221:10, 241:9
black 255:21, 257:12
block 165:17

254:6
blueprints 149:12
board 196:18, 211:23, 244:19,22, 246:16,22, 247:4,9
bottom 141:24, 142:3, 143:2, 143:14, 144:4,15, 145:5, 151:13,15, 157:19, 158:7,11
bound 180:13
185:16
break 185:3
188:11
brevity 193:16
bridge 224:16
237:8
brief 185:3, 186:3
bring 146:10, 207:5,8, 216:9,10,15, 217:12, 221:12, 231:4,13
brought

230:8
253:20
budget 246:23, 247:1
building 138:21, 142:12, 144:12, 145:20, 147:23, 152:17, 155:20, 156:12, 157:1, 164:4, 167:6,17, 169:20, 171:10, 172:2,16,19, 185:17, 186:5, 190:2,7, 193:11, 202:19, 203:2, 208:18,22, 214:24, 235:5,20,21, 236:1
buildings 138:4,9,12, 163:23, 164:3,8,12, 165:6,12, 166:9,10,15,18, 167:1,3,11, 169:2, 184:9,12, 201:12, 231:4,13, 232:13,14

## Page 4

ERIC DAVIS — June 5, 2024

built 144:12,20, 163:24, 164:10,12, 165:17, 166:9,11,18, 167:14, 169:7,14, 171:11, 172:3,20, 175:22
business 229:23

**C**
C 131:1, 133:8, 251:17, 254:16, 261:2
calculated 142:20, 153:3
call 148:8, 149:20, 150:9, 194:3,8, 212:2, 227:7
called 130:12, 133:5, 137:10, 138:22, 150:3, 156:10,16, 204:10
calls 230:16
campus 163:23, 164:9, 164:9,19, 165:2,8, 215:8, 238:13

209:22, 210:1,15, 211:9,14, 215:20, 216:10, 241:22, 242:12, 245:11, 259:13
canes 141:5
130:16
cap 142:13,22, 143:16
cases 167:5
220:20
cell 212:15, 212:23, 221:2, 222:8,14,15, 222:15,22, 223:4,12,21, 224:11,16, 225:1,9, 225:23
caveats 223:4,21
Cermak 164:6, 176:17,18, 186:17,21, 186:24, 187:3,13,20, 187:24, 188:3,13, 189:19,22,23, 191:10

Capital 144:23, 163:6, 175:8, 176:13, 177:20, 178:10, 183:7, 213:3, 218:18, 220:14, 221:19, 224:22, 226:9, 247:5, 250:22
care 213:11, 242:20, 244:1
career 231:1
careful 205:16, 243:20
Carl's 227:6
case 135:14, 142:24, 143:2

144:18, 146:4,17,23, 147:8,9, 148:10,20, 188:18,20, 200:20,23, 204:15, 205:1, 210:10,12, 213:18, 218:17,20, 228:24, 233:7, 252:7, 222:15,22, 223:4,12,21, 224:11,16, 225:1,9,23, 237:15,24, 240:14, 243:6, 249:23
Cermak's 248:18
153:11, 165:1, 166:2
checked
156:21
Chicago 131:6,14

170:2
certification 134:10
Certified 130:16
certify 204:15, 205:1
cetera 159:11, 196:18
challenge 245:14, 246:6
change 208:20,21, 210:21, 204:1,2, 205:7

134:24, 146:8,14, 147:9,15, 148:23, 149:2
Chief 197:6
chosen 204:15
CIP 134:20
CIP's 247:3,9
circumstance 147:6
circumstan... 170:13, 236:14
citation 179:1
cited 212:20
city 146:23, 147:9,15, 149:1
civil 130:13, 231:19, 232:3
clarification 198:8, 208:4, 249:9
clarity 193:17, 198:21
classes 231:22
clear 138:3, 138:10, 160:4,17, 171:24, 193:17, 197:13, 201:12
clearly

## Page 5

ERIC DAVIS — June 5, 2024

164:24, 169:17, 204:8, 231:18, 243:13
Clerk 131:19
close 223:8, 243:14
code 137:20, 140:14,17, 141:10, 144:11, 156:4, 161:5, 166:8, 172:8, 173:2,16, 178:24, 182:1,3,22, 183:12, 187:21, 207:8, 215:8, 234:18, 241:19
codes 137:21, 138:7
cogent 229:15
Cohen 131:19
coincide 153:14
colloquially 150:2,10
color 256:3
combination 246:4
come 164:14, 185:5, 188:16, 193:4, 219:4
coming 159:16, 215:15

183:17
commence... 261:6
comment 243:5, 255:4
commissio... 153:12
commissio... 244:20,23, 247:4,5
committed 233:5
common 147:6
communica... 201:5, 230:7
compensated 182:1,3,22, 183:2,10, 207:6,8, 215:8, 234:18, 241:19
complaining 211:17
complete 138:10, 193:19, 204:16, 234:18, 241:18
completed 155:14
completely 209:13, 244:2
completion

156:2
compliance 145:23, 148:3, 178:24, 180:5,6,11,14, 181:3,5, 182:3,7, 183:13,17, 184:1,16, 206:2, 207:5,8, 217:2, 219:4, 228:4,13, 239:11
compliant 137:9,10,17, 137:19
compromise 239:6
concerning 261:9
concerns 168:10
conclusion 223:8
concrete 151:20
condition 145:9, 155:19, 170:11
conditions 145:15, 146:18, 168:11
conduct 191:22, 194:14
configurati... 142:4

177:4
components 180:8
comprehen... 178:15, 209:20,23, 210:7, 213:2,11, 214:21, 216:18, 233:24, 243:16
comprehen... 190:15, 191:14, 216:13
compromise 239:6
consider 134:4
considerati... 205:16, 137:3,9, 136:17,23, 139:2, 167:17, 180:20, 205:12, 253:8
considered 146:15, 155:19, 170:11, 172:13
consistent 147:12, 214:3,19,23
consisting 260:15
constitutes

168:13, 224:17
confined 204:13
confines 165:7
confirm 213:11, 192:13
Congress 166:7
conjunction 251:21
connecting 152:11, 189:23, 198:19
consider 189:23, 198:19
construct 167:6, 211:23, 224:8, 241:22
constructed 145:10, 146:3,5, 150:7, 151:19, 155:21, 156:9,12, 157:1, 165:3
construction 144:17, 145:1, 149:16,19,23, 158:12, 160:10,14, 211:1,9,13, 220:19, 221:2, 225:6,14

261:13

## Page 6

ERIC DAVIS — June 5, 2024

240:3, 245:3, 245:8,15, 246:1
consult 149:2, 174:22, 175:2
consultant 245:4,7, 246:3
consultants 175:1, 233:10
consultation 220:13
consulted 220:5
consulting 174:8,9
context 191:7,8, 192:3, 205:18
continue 253:21
continuing 134:16
continuous 178:13
contract 150:9,13, 188:11,24, 189:8,11, 195:21,23, 201:22, 202:8, 207:6, 208:9,11
contracting 219:9,19,24, 225:1, 226:11
contractor 211:22, 219:1, 225:7

225:12
contractors 145:3,18, 149:2, 163:8, 174:22
contracts 244:23, 245:4,7, 248:1, 249:11, 250:15, 255:1, 260:6
convention 194:13
Cook 130:6, 138:24
convey 226:13
conversation 137:20
copy 137:20
coordination 244:11,18

238:18, 240:14,21, 241:5,16, 244:10,18
corrections 163:13,23, 189:1,12
correctly 199:10
corridor 135:13,22, 151:21, 152:11
correct 137:7,20, 152:21, 164:1, 168:5, 169:13, 194:11, 195:4, 196:8, 197:20, 199:4,16, 200:4, 201:14, 203:10, 204:1,3, 206:9,10,13,15,19, 228:15

correction 172:2
corrections 190:10,17, 190:22, 192:6,24, 209:22
correspond 193:1,1
correct 199:13, 200:20, 201:6, 203:10, 206:17
correctly 213:6, 216:2, 218:10, 219:9,11,22, 220:21, 224:3, 225:2, 241:4, 246:6
corrected 186:17,23, 254:23
correcting 244:17

250:20
259:5
cost 221:1
224:8,10,20
224:23
225:15
cost-effective 205:22
count 205:10
county 130:6
counsel 153:13
184:12
208:12,19
County 130:6
County 130:6
costs 224:13
counsel 153:13
184:12
206:15,19
206:22
207:4,7
208:12,19
county 130:6
County 130:6
145:1,3
146:2,156:1
146:13,22
162:1,217:6
217:7,12
216:3,22
221:21
225:4
231:12
234:4
247:11
248:1,4,12
248:9,11,16
248:20,24
249:18
250:8,9,11,16
209:3, 212:7
215:4,11,19

Exhibit 8 Page 35

## ERIC DAVIS — June 5, 2024 — Page 7

| | | | |
|---|---|---|---|
| 215:24 | courthouses | Darr 160:7 | 244:16 |
| 216:23 | 145:2 | 226:16 | 245:2 |
| 219:1,9,24 | courtroom | 254:22 | Declaration |
| 225:15 | 243:8,15,15 | Darr's | 154:16 |
| 228:14,22 | courtrooms | 160:24 | 162:21,24 |
| 229:2,10,16 | 243:10 | DART 130:7 | 188:18,22 |
| 230:10,13 | Courts | date 154:5,7 | 205:9 222:3 |
| 233:14 | 130:14 | 154:9 169:9 | 251:19 |
| 236:7 | cover 154:8 | 160:7 | 256:17 |
| 238:19 | 212:23 | deemed | 260:10,11 |
| 239:8,10,24 | covering | 175:3 | 261:19 |
| 240:14,21 | 226:24 | Defendants | 215:19 |
| 241:5,16 | create 159:19 | 130:8 | 220:10,13 |
| 244:11,18 | 255:13 | 131:17 | 221:24 |
| 244:19,22 | 257:18 | 260:8 | 222:24 |
| 246:16,22 | 258:17,22 | deficiency | 223:1 |
| 248:11 | creating | 155:14 | 234:24 |
| 249:1 | 145:13 | define 135:16 | 241:23 |
| 250:15 | 258:18 | 177:15 | 242:22 |
| 255:1 260:6 | credence | 201:17 | 244:11,18 |
| 261:2 | 241:5 | defined 136:3 | 245:1 |
| County's | criminal | 162:17 | 250:21 |
| 163:6 206:3 | 243:18 | 204:8 | 210:10,13 |
| 219:20 | CROSS-E... | depend | 210:19 |
| couple | 132:5 | 234:15 | 211:8,13 |
| 176:21 | current 181:5 | 157:10 | 216:13,24 |
| 195:2 | 230:11 | definitely | 217:11,22 |
| 196:21 | 239:14 | 226:2 | 219:1 |
| 197:1 | cycles 246:24 | deponent | 221:21 |
| 251:14 | 247:2 | 181:15 | 222:14,21 |
| course | | definition | 222:23 |
| 134:16,19 | **D** | 135:24 | 224:4 225:5 |
| 146:12 | D 132:1 | degree 135:13 | 225:5 |
| 205:4 225:4 | 133:8 | delay 202:15 | 227:20 |
| 236:13 | 139:19 | delegate | 228:18,21 |
| court 130:1 | 157:11 | 148:20 | 233:13 |
| 238:17 | 234:16 | 149:1 | 241:21 |
| 239:20 | dealt 213:11 | delineated | 245:8 |
| 260:1 | decided | 200:8 | 259:15 |
| courthouse | 160:12 | deliver 225:1 | deputy |
| 217:16 | decides | demolition | 130:16 |
| 239:16 | 248:11 | 204:2 | 226:17,20 |
| 243:18 | decision | demonstrat... | 242:10 |
| 251:10 | 219:19,24 | 230:22 | 257:22 |
| | 220:12 | department | 260:12,13 |
| | 243:11 | 141:2 148:6 | 261:10,16 |
| | | 261:10,16 | designing |

## ERIC DAVIS — June 5, 2024 — Page 8

| | | | |
|---|---|---|---|
| 145:20 | different | 259:10 | 157:18,20 | dollars | 146:13,22 |
| 146:6 | 152:20 | 159:7 | 159:7 | 204:23 | 149:12,16 |
| desire 176:5 | 153:20 | disabilities | distinctly | 244:15 | 150:5,6 |
| detailed | 166:7 | 134:18,22 | 241:14 | door 145:14 | 151:6,7,14 |
| 215:3 | 167:10,10 | 162:9 | District 130:1 | 254:5,11,11 | 151:15,16 |
| detainees | 177:18 | disabled | 130:1,14 | 254:20 | 152:3,12 |
| 138:24 | 184:4 | 186:14,14 | 260:1,1 | 257:11 | 151:15,16 |
| 140:4 | 197:24 | 231:7 233:2 | Division | 258:9,15,15 | 152:12,15 |
| 176:16 | 224:18 | disabled | 130:2 | doors 194:5 | 152:1,15 |
| 185:15 | 253:9 | 231:3 | 165:17 | 252:13 | 156:13 |
| 186:3 | difficult | 167:14,22 | 253:21 | 253:21 | 157:2 187:9 |
| 208:18 | 250:1 | 141:14 | 189:21,22 | 254:4,5,9 | 195:20 |
| 210:19 | difficulty | 159:10 | 189:24 | 254:24 | 196:2,3 |
| 241:1 248:3 | 161:16 | 160:13 | 191:12 | 255:13,17 | 197:20 |
| 248:13 | 249:20 | 185:24 | 213:4,13,14 | 255:18,21 | 198:6,7,16 |
| determinat... | dimension | 229:20 | 213:16,22 | 213:16,22 | 199:14 |
| 179:18 | 152:3,5 | 231:12 | 260:2 | divisions | 200:15,17 |
| 189:1 | 152:10 | 232:11,12 | 165:16 | 257:13,14 | 200:18,11 |
| 214:19 | 160:22 | 234:11,14 | DOC 164:18 | 257:16,18 | 201:18,18 |
| 222:21 | 234:11,14 | disagree | 164:18 | 257:20 | 201:20,23 |
| 223:12 | 141:3 | 178:2,21 | document | 258:22 | 201:24 |
| determined | diminishing | 151:10 | 258:7,8,16 | | 202:16,21 |
| 210:5 | 234:4 | 153:17,21 | 258:22 | dormitories | 203:9,24 |
| develop | direct 133:3 | 189:8 | 261:24 | 214:17 | 204:23 |
| 224:22 | 254:8 | 193:20 | drawing | dorms 189:20 | |
| 241:21 | directed | discuss | 206:21 | 189:23 | 204:16 |
| developed | 147:21 | 256:18 | drawn | 204:23 | 210:23 |
| 140:22 | direction | discussed | 150:1 | double | 216:24 |
| 141:2 | 165:13 | 151:1 | 150:3,9,10 | 257:11 | 217:5,11,22 |
| developing | 183:23 | 150:3,9,10 | 200:22 | double-check | 218:3,3,9 |
| 146:13 | 261:13 | 224:12 | 222:2 | 216:24 | 218:14,19 |
| 225:8 | directly | 252:4 253:6 | 223:15 | dozen 226:14 | 220:19,24 |
| development | 216:24 | doing 179:17 | draft 154:2,5 | 224:18 | 221:2,21 |
| 163:5 | director | 199:8 | 201:13 | 226:12,24 | 259:15 |
| 176:24 | 174:16 | 190:9 | 154:6 | drafted | 242:1 |
| 198:23 | 183:16 | discussions | 207:22 | 259:15 | 246:14,16 |
| DEVORE | 218:18 | 242:2 | 219:2,10 | 261:10 | 196:1 |
| 131:11,12 | 220:10 | dispute 239:9 | 200:11 | daily 133:2,6 | only 133:2,6 |
| 230:10 | disserve | 261:10 | 255:9,19,22 | | 260:10 |
| diagram | 226:8 | 211:4 | distance | drawings | 261:8 |
| 255:7 | 243:12 | 220:21 | 143:4 | 172:23 | duplicate |
| difference | | | DOJ 149:2 | 258:19 | |
| 235:18 | | | 174:23 | | |

## ERIC DAVIS — June 5, 2024 — Page 9

| | | | |
|---|---|---|---|
| 191:18 | 190:22 | effect 164:1 | 179:2,13,14 | 238:23 | equally |
| duties 163:4 | 191:7 | 169:10 | 180:2,23 | 239:2 | 248:23 |
| 199:2 | 192:24 | effective | 192:2 | 246:14 | Eric 130:11 |
| | 194:8 196:3 | 169:11 | 198:18 | engineers | 132:2 133:4 |
| **E** | 206:3,9,14 | 212:1 243:1 | 202:2 | 145:19 | 134:14 |
| E 131:1,1 | 206:19,21 | effectively | 209:10 | 145:19 | 185:20 |
| 132:1,10 | 207:7 | 243:23 | 212:13,17 | 146:11 | 251:19 |
| 133:8,8 | 208:12,19 | efficient | 213:14,16 | enormous | 256:16 |
| 251:17 | 209:5,12 | 205:22 | 235:2 242:5 | 205:11 | 260:10,19 |
| 254:16,16 | 210:8 | 206:11 | 242:7,10 | enormously | escort 237:3 |
| 254:16 | 211:12 | 209:19 | 245:15 | 231:17 | escorted |
| earlier | 215:4,13,18 | 215:17 | 252:3 | enter 164:17 | 164:17 |
| 153:22 | 215:21 | 211:11 | enter 164:17 | 176:7 | 176:7 |
| 154:1,3 | 216:1,24 | 212:1 213:2 | entire 188:24 | 236:21 | 236:21 |
| 211:4 | 217:6,12,22 | 233:23 | 193:11 | essentially | 196:6 |
| 223:15 | 218:10 | 243:1 | 203:2 | 189:18 | 189:18 |
| 242:15 | 219:3,11,23 | 245:24 | 204:4 210:1 | establish | establish |
| 245:12 | 220:20 | efficiently | 210:14 | 147:20 | 147:20 |
| easily 254:23 | 224:8 | 243:22 | 211:14 | established | established |
| east 135:13 | 227:18 | effort 191:18 | 217:9 | 236:2 | 236:2 |
| 135:22,22 | 228:2,12,21 | 242:6,23 | entry 164:15 | estimate | estimate |
| 136:2 | 230:11 | 243:2 | 164:15,19 | 224:11 | 224:11 |
| 138:23 | 233:21 | efforts | 168:6 | entities | 224:23 |
| 139:6 | 234:3 235:7 | 252:24 | 134:3 | 225:15 | 225:15 |
| 149:12,16 | 236:3,9,11 | 261:20,22 | 166:11,19 | 228:1 | 228:1 |
| 150:14 | 241:17 | enactment | entity 144:12 | et 130:7 | et 130:7 |
| 151:4 | 244:4 | 169:10 | 167:13,24 | 159:11 | 159:11 |
| 152:18 | 247:11 | encompass | 168:2 | 196:18 | 196:18 |
| 155:22 | 248:1,4,11 | 165:7 | 171:12 | EUGENE | EUGENE |
| 158:1,2,8 | 248:13,19 | ended 192:16 | 172:9 173:2 | 130:3 260:3 | 130:3 260:3 |
| 160:10 | 249:1,4,12 | 192:19 | 173:4,18 | evaluate | evaluate |
| 164:16 | 249:18 | enforced | entrust | 194:20 | 194:20 |
| 177:13 | 250:22 | 194:14 | 146:21 | evaluation | evaluation |
| 178:12,23 | 253:12,24 | element | entry 164:15 | 143:8 | 143:8 |
| 179:15,17 | 254:24 | 142:19 | 164:15,19 | 204:19 | 204:19 |
| 179:22 | 255:1,18 | 151:18 | 236:16 | 214:3,6 | 214:3,6 |
| 180:2 181:4 | 257:18 | 155:22 | environment | evaluations | evaluations |
| 181:21 | 258:17 | 156:22 | 147:17 | 223:24 | 223:24 |
| 183:9,19 | 259:5 | 179:7 180:4 | engaging | 232:16 | 232:16 |
| 183:24 | EASTERN | 180:11,17 | 232:16 | evening | evening |
| 185:18 | 130:2 260:2 | 180:19 | 231:1 | 232:7 | 232:7 |
| 186:16,23 | education | 205:17 | engineer | equal 231:2 | equal 231:2 |
| 187:5 | 134:17 | 207:16 | 226:6 | 232:16 | 232:16 |
| 190:10,17 | 135:2 | 210:5 232:3 | engineering | 232:16 | 232:3 |
| | | elements | 212:9 | 250:20 | Evidently |

## ERIC DAVIS — June 5, 2024 — Page 10

| | | | |
|---|---|---|---|
| exactly | 201:10 | 190:21 | 177:8 | fairness | 154:10,13 |
| 153:24 | executed | expert 140:9 | facility 164:3 | 231:20 | 154:18 |
| examination | 201:7 | 176:4 | 168:4 | 233:18 | 156:10 |
| 130:12 | exemptions | expertise | 168:23 | faith 242:19 | finalize 225:5 |
| 132:3,6 | 169:23 | 172:1 | 189:20 | fall 135:23 | finally |
| 261:7 | 170:9,15 | experts 141:2 | 203:12 | 169:23 | 225:22 |
| examined | exercised | explain 142:8 | 248:6 | 170:3 | 226:2 |
| 133:6 | 154:14 | 155:24 | 248:6 | 172:2 | fend 174:4 |
| example | Exhibit | 248:8 | Fact 196:11,13 | FAQ 174:24 | 181:12 |
| 146:1 147:3 | 132:13,14 | 241:16 | Fact 196:11,13 | 174:7 | 192:3 |
| 167:20,22 | 142:6 | 206:6,11 | 215:12 | 140:5 | 211:19 |
| 168:6 | 162:21,24 | 208:8 241:4 | 217:4 | 200:18 | 225:8 |
| 169:12 | 165:5 178:7 | explanation | 240:21 | 216:8,18 | 225:8 |
| 224:15 | 178:7,21 | 140:17 | 258:14 | 223:8 | feasibility |
| 245:12 | 178:7,21 | 258:14 | fair 135:3 | fan 135:16 | 177:22 |
| 229:18 | 188:18,23 | 143:18,19 | 133:16 | 168:7 | 178:22 |
| 226:24 | 205:10 | 146:8 | 183:18 | 216:17 | 180:4 |
| exasperation | existing | extended | 147:17 | February | 187:23 |
| 227:22 | 144:8 | 160:17 | 161:17 | 222:4,5 | fine 144:2 |
| exceeded | 148:6 | 152:11 | 153:17 | 201:9 | 258:22 |
| 172:22 | 199:19 | 161:17 | fairness | finding | finishing |
| exceeds 158:3 | 257:13 | extension | 163:17 | 163:17 | 201:9 |
| 159:18 | exit 254:12 | 142:10 | 222:4,5 | fire 254:4,11 | fire 254:4,11 |
| 170:19 | expect 141:1 | 143:3,13 | 177:7,14 | 254:12 | 254:12 |
| 173:22 | 155:15 | 147:18,19 | 159:11 | 258:10,15 | 258:10,15 |
| exception | 179:15 | 145:5 147:4 | 181:22,23 | 147:19,22 | 147:19,22 |
| 146:17 | 191:14,17 | extends | 182:24 | 258:8,22 | 258:8,22 |
| 147:24 | 196:23 | 181:2 | 183:4 186:2 | 168:1 | 168:1 |
| 169:24 | 218:11 | extensions | 186:8 187:1 | 191:22 | 191:22 |
| 170:4 173:2 | expectation | 141:24 | 187:18 | 228:20,23 | 228:20,23 |
| 173:11,15 | 204:6 | 182:22 | 188:14 | 229:9,13 | 229:9,13 |
| 173:24 | 220:22 | extent 191:17 | 189:3 | 193:6,18 | 193:6,18 |
| 176:17 | 216:17 | 216:17 | fee 221:14,17 | 194:1,20 | 194:1,20 |
| 176:17 | expectations | 196:2 | 216:3 | 221:20 | 203:22 |
| 235:19 | 218:6 | 231:21 | 232:3 | 223:12,20 | 223:12,20 |
| 235:19 | expected | 232:8 | 234:9 | 217:11,21 | 217:11,21 |
| exceptions | 152:13 | | 234:10,19 | feel 200:17 | 258:3 219:9 |
| 174:4 | expecting | **F** | 201:1 | 201:1 | 224:5,7 |
| excess 155:22 | 218:1 | facilitate | 233:9,10,11 | feet 182:4 | 220:5 224:4 |
| excuse | 245:16 | 159:20 | 234:11 | 187:10 | 226:12 |
| 217:17,17 | 245:23 | facilities | 244:21 187:7 | figure 256:14 | 256:12 |
| 245:23 | expeditious | 165:10 | 248:15 | 257:3 | 227:7,19 |
| 253:23 | 205:22 | 166:21 | 259:6 | figures 239:5 | 238:2 |
| execute | expend | 170:10 | fairly 147:5 | filed 153:17 | 238:23 |

Exhibit 8 Page 36

| | | | | | |
|---|---|---|---|---|---|
| 239:2 | 252:6 | 137:3 | 185:14 | 186:17 | 205:1 207:4 |
| **firm** 210:22 | **foregoing** | 139:23 | 187:12,24 | 194:23 | 208:19 |
| 217:18,20 | 260:13,17 | 141:22 | 188:2 | 199:15 | 209:15 |
| 221:7 | 261:10 | 142:14 | 190:23 | 200:21 | 215:16,24 |
| 244:13 | **foremost** | 144:19 | 191:20 | 202:8,14 | 222:13 |
| 245:3 246:5 | 221:6 | 166:17 | 196:1,7,20 | 203:13 | 227:1 |
| **first** 133:2,5 | **form** 230:21 | 167:23,24 | 196:24 | 204:13 | 236:10,19 |
| 157:16 | 241:10 | 168:3,15,20 | 197:18 | 207:13 | 241:5 243:3 |
| 174:6 197:3 | 256:5 246:5 | 169:13 | 199:5,19 | 208:20 | 248:4 |
| 204:19 | **forth** 244:16 | 170:16 | 199:3,13,23 | 218:16 | 249:18,18 |
| 212:6 216:4 | **forward** | 178:14 | 201:5,12 | 221:11 | 252:23 |
| 247:7 | 243:3 247:6 | **generally** | 203:11,20 | 224:15 | 254:6 |
| 249:16 | 247:23 | 136:19 | 206:20 | 225:10 | 256:18 |
| 260:10 | **found** 155:6 | 221:8 | 212:13 | 229:11 | **good** 133:10 |
| **five** 209:7 | 180:11,24 | **generate** | 215:3 | 238:4 | 229:8 |
| 240:4 | 181:24 | 217:5 | 226:16,22 | 239:18 | 242:19 |
| **fixed** 214:17 | 182:12,6 | **getting** | 227:10,17 | 243:3 | 251:13 |
| **flight** 143:10 | 183:1 | 195:17 | 254:22 | 244:16 | **Gordian** |
| **flip** 255:5 | 187:13 | 232:21 | 255:6 257:3 | 246:7,23 | 226:12 |
| **floor** 147:3 | 188:22 | **giant** 246:1 | 258:1 | 245:2,14 | **government** |
| 182:10,18 | 194:10 | **give** 135:5 | 259:4 | 253:10,13 | 147:16,17 |
| 193:12 | 258:6 | 160:14 | Globetrotte... | 256:6,17 | 147:19,22 |
| 252:15,21 | **four** 165:10 | 172:13 | 142:5 152:4 | **goal** 206:3 | 170:24 |
| **focused** | 217:18 | 209:11,15 | 157:10,24 | 210:16 | 175:18 |
| 171:9 | 248:2,8 | 219:14,15 | 160:8 | 230:11 | 176:14 |
| 240:17 | 255:2 | 228:16 | 177:12,22 | 231:21 | 216:23 |
| **folks** 195:10 | **given** 195:20 | 191:3,21 | 190:13,19 | 236:10 | 217:20 |
| **follow** 151:20 | 229:7 | 205:11 | 209:4 227:5 | **going** 139:19 | **graduate** |
| 167:16 | **full** 191:23 | 227:11 | 257:15 | 142:13 | 134:23 |
| 210:13 | 215:18 | 229:6,7 | 146:13 | 143:9 147:5 | **great** 185:8 |
| 229:12,13 | **functions** | 240:8 | 146:23 | 157:4,9 | 259:17 |
| 242:21 | 231:24 | 260:18 | 147:13 | 159:18 | **greater** |
| **followed** | **fundamental** | 261:14 | 160:19 | 160:19 | 158:12,13 |
| 156:7 | 231:6 | **gives** 228:18 | 156:23 | 172:10 | 172:4 |
| **following** | **funding** | **giving** 193:19 | 158:17 | 172:10 | **greatly** 158:2 |
| 136:8 | 167:7,14 | Globetrotte... | 159:7 | 173:6 | **green** 195:20 |
| 154:23 | 168:1 | 133:19 | 160:12,15 | 174:20 | **ground** |
| 156:17 | **further** 157:4 | 153:3 155:6 | 162:21 | 185:18 | 140:6,10,18 |
| **follows** 133:7 | 251:13 | 169:18 | 163:21 | 190:21 | 226:24 |
| **Fools'** 155:2 | 259:22 | 178:5,11 | 165:4,14 | 194:3 | **group** 179:9 |
| **foot** 143:5 | | 179:16 | 166:1 | 196:19 | 220:17 |
| **footing** | **G** | 180:3,10,23 | 170:16 | 200:13 | **groups** 163:9 |
| 233:19 | **G** 131:3,4 | 181:19 | 178:6 | 202:13 | 225:14 |
| **footnotes** | **general** 135:2 | 183:1 | | 204:9,19 | 228:9 |

| | | | | | |
|---|---|---|---|---|---|
| **guesstimate** | 221:16 | **help** 142:16 | 241:24 | 224:19 | 247:6 |
| 228:2 | 243:21 | 149:5 246:5 | 246:4 | 246:13 | **inches** 136:10 |
| **guidance** | **happened** | **holistically** | **hereto** 261:23 | 253:8 | 140:7,7,11 |
| 149:6 | 197:15 | 253:3 | **herein** | **honestly** | 143:17 144:5 |
| 166:1 | 239:7 | **help** 142:16 | 151:18 | 235:19 | 143:7 144:5 |
| 183:16 | **happens** | 180:16 | **hope** 204:6 | 131:6,14 | 143:7 144:5 |
| **guidances** | 145:8 | **hey** 146:13 | **hopeful** | 134:17 | 145:12 149:3 |
| 174:22 | **harm** 230:21 | **hazard** | 229:19 | 1447:7,11 | 146:2,14,20 |
| **guideline** | **hazard** | 237:14 | 230:3 260:1 | 171:2,3,7,8 | 146:13 |
| 237:1 | 258:18,23 | 184:14 | 184:15 | **imagine** | 147:5 151:18 |
| | 237:1 | 205:15 | **hopefully** | 152:6 | 147:5 151:8 |
| **H** | **H** 132:10 | 159:19 | 225:23 | **immediately** | 152:7,21 |
| **H** 132:10 | **half** 236:14 | 210:22 | 245:4 | 142:1 | 158:20 |
| **half** 236:14 | 195:19 | 218:19 | **horizontally** | 192:12 | 154:3,9,12 |
| **hand** 215:22 | 197:4 | 219:9,21 | 142:1 | 197:10,10 | 158:20 |
| 152:20 | 200:16,19 | 220:18 | **host** 162:8 | 254:12 | 161:23 |
| 256:14 | 218:6 | 209:7 | 209:7 | 163:2 | 163:2 |
| 262:2 | 204:10,18 | 259:3 | 259:3 | **impact** 242:8 | 161:23 |
| **handled** | 211:17 | **hired** 217:19 | 184:24 | **impacted** | 163:3 |
| 149:9 | 218:19 | 218:6,22 | 168:9 | 163:2 | 170:19,23 |
| **handrail** | 219:1,12,22 | **hiring** 217:24 | 186:1,11 | **implement** | 171:14,19 |
| 140:6,10,18 | 220:19,23 | 218:5 | 256:8 | 252:14,20 | 172:4,7,23 |
| 142:10 | 221:1,7,20 | 228:17 | **houses** 186:5 | **implement** | 174:8,20 |
| 144:3,13 | 222:6,12,20 | 244:13 | **housing** | 163:5 | 202:15 |
| 145:4,5 | 223:4,22 | 245:2 246:5 | 192:10 | 235:5 | 173:20,22 |
| 146:7 147:4 | 224:22 | **historic** | 165:23 | **implementi...** | 176:19 |
| 181:12 | 225:4,11,13 | 168:9 170:3 | **hypothetic...** | 175:11,13 | 178:1 181:3 |
| 182:22 | 225:21 | **historical** | 180:10,22 | 233:5 | 182:9,18,20 |
| **handrails** | 226:3 | 169:24 | | 175:19 | 182:23 |
| 123:9 | 140:4 142:1 | **history** | **I** | 176:19 | 187:17 |
| 140:4 142:1 | 259:14 | 140:24 | **idea** 142:17 | 178:1 | 194:7 |
| 143:13 | 160:22 | 152:17 | 190:13 | 231:18,21 | 254:19 |
| 162:20 | 188:13 | 190:13 | 232:2,3,4,8 | 232:2,3,4,8 | **include** |
| 172:9 | 248:6 | 200:22 | 233:4 244:2 | 233:4 244:2 | 133:14 |
| 180:13 | **hear** 139:12 | 188:20 | 248:19,21 | 248:19,21 | 135:14 |
| 182:14,15 | 139:16 | 256:13,15 | **identified** | 250:14,18 | 163:3 191:2 |
| 187:12 | 181:8,16 | **holding** | 238:21 | 250:23 | 163:3 191:2 |
| 213:15 | 183:21 | 229:16 | 239:14 | 191:16 | 163:3 191:2 |
| **hands** 231:23 | 239:16 | 238:21 | 250:9,18 | 251:9,11,11 | 163:3 191:2 |
| **Hannah** | **hearing** | 239:16 | 240:3,4,13 | **improve** | 199:19 |
| 135:11 | 243:6,16 | **holistic** | **identifies** | 163:6 | 199:19 |
| **happen** | **heights** 140:5 | 205:12 | 233:10 | **Improveme...** | 199:19 |
| 195:16 | 206:18 | 210:1 | **identify** | 163:6 | 145:5 |
| 212:4 | 206:22 | | 165:5 179:9 | 246:19 | 189:12,24 |

| | | | | | |
|---|---|---|---|---|---|
| 190:3 | 159:9 | 156:17 | 150:18 | 164:9 165:8 | 225:17,21 |
| 214:24 | 161:14 | 157:3 191:6 | 172:12 | 226:1,10 | 226:1,10 |
| **includes** | 186:10,16 | 191:13 | **investigating** | **Jason** 131:12 | 227:14 |
| 145:21 | 229:20 | 201:4 | 172:2 | 150:21 | **kind** 145:7,15 |
| 206:9 | 231:2,12 | 217:22 | 167:24 | 131:15 | 146:19 |
| 207:24 | 232:11,12 | 241:20 | 236:14 | 134:16 | 167:20 |
| 218:2 | 232:16 | **intentions** | **investigation** | **job** 181:20 | 171:23 |
| **including** | 234:12,24 | 217:10 | 248:23 | 225:2 | 176:10 |
| 156:4 180:2 | 236:19 | **interact** | 258:13,21 | 226:11 | 184:7 |
| 190:17 | **inefficient** | 232:15,16 | **involve** 192:4 | **judge** 228:20 | 191:16 |
| 205:14 | 218:16 | **interest** | **involved** | 229:5,9,13 | 213:10 |
| **inclusive** | **interest** | 193:16 | 229:17 | **judge's** | 237:3 |
| 260:15 | 193:16 | 229:16 | 237:17,14 | 228:23 | 251:21 |
| **incorporate** | **infirmary** | 243:14 | 238:6 | 251:21 | 252:16 |
| 191:24 | 186:17 | **interested** | **involves** | **judgment** | 252:16 |
| 206:9 | 206:9 | 261:23 | 163:7 | 252:16 | **King** 130:17 |
| **independe...** | **information** | **intermediate** | 221:18 | **June** 130:17 | 146:10 |
| 231:11 | 184:7 191:2 | 157:5 | 221:11 | 149:19 | 149:19 |
| 234:8,11 | 191:3,24 | 158:14,16 | 239:12 | 151:9 | 151:9 |
| **independe...** | 193:10,15 | 158:19 | 179:4 | 152:13,16 | 152:13,16 |
| 232:12 | 225:14 | 159:1,4 | 195:10 | 152:24 | 152:24 |
| 259:3 | **inhibit** | 168:11 | 260:14,14 | 153:23 | 153:23 |
| **indicate** | 168:11 | 160:11,13 | **jurisdiction** | 154:3 | 154:3 |
| 256:1 | initial 239:13 | 161:4,8,11 | 147:11 | 165:18,19 | 165:18,19 |
| **indicated** | **initially** | 162:14 | 148:22 | 167:5,8 | 167:5,8 |
| 194:19 | 153:17 | 184:7 192:9 | **jurisdictions** | 168:15 | 168:15 |
| 257:10,14 | **injunction** | 195:18 | 147:5 | 170:8 173:9 | 170:8 173:9 |
| **indicates** | 215:24 | **involve** 192:4 | **jury** 143:6 | 173:13,15 | 173:13,15 |
| 235:12 | **inquiry** 176:9 | 177:1 | 148:6 | 173:16,22 | 173:16,22 |
| 257:4 | **install** 145:3 | 171:17 | 149:7 | 174:3,24 | 174:3,24 |
| **indicating** | **instance** | 172:5,6,22 | 159:10 | 176:7 | 176:7 |
| 146:7 | 141:16 | 184:7,23 | **justice** 141:3 | 177:15,19 | 177:15,19 |
| 193:22 | 236:23 | 175:10,12 | 148:6,15 | 179:13 | 179:13 |
| 257:19 | 175:24 | 175:24 | 149:7 | 184:9,10,11 | 184:9,10,11 |
| **indirectly** | **instances** | 218:2 | 159:10 | 184:12,16 | 184:12,16 |
| 261:24 | 182:6 | 187:15,16 | **issuing** | 161:19 | 161:19 |
| **individual** | **Institute** | 187:21 191:5 | 210:2 | 179:18 | 179:18 |
| 159:6 170:8 | 235:4 | 196:19 | **item** 141:1 | 141:3 | 141:3 |
| 176:6 210:4 | **intend** | **interpretat...** | 196:13 | 184:20 | 184:20 |
| 241:14 | 242:21 | 148:9,13 | 207:17 | 186:18 | 186:18 |
| 242:5 | **intended** | **interpretat...** | | 187:7 | 187:7 |
| **individually** | 234:21 205:5 | 234:21 | **J** | 188:17 | 188:17 |
| 211:2,6,7 | **intending** | **interpreting** | **jail** 139:1 | 201:8,19,22 | 201:8,19,22 |
| **individuals** | 234:14 | 134:20 | 145:1 | 212:16,18 | 212:16,18 |
| | **intent** 156:13 | 148:14 | 163:16 | 213:6 214:3 | 213:6 214:3 |

| | | | | | |
|---|---|---|---|---|---|
| 214:5,9 | 155:8,9,10 | 159:12 | 175:11,24 | 252:10 | 204:24 |
| 216:4,7,16 | 157:5 | 229:12,18 | 176:17 | 255:21 | 255:21 |
| 216:19,19 | 158:11,12 | 231:19 | 177:24 | **lines** 184:22 | 211:7 |
| 221:4,6,16 | 158:14,17 | 233:17 | 181:1 182:8 | 162:4 | **look** 139:24 |
| 221:20 | 159:18,19 | 233:11 | 187:4,16 | 157:21 | 141:23 |
| 224:13,17 | 159:2,4 | 236:16 | 194:7 | 157:12 | 152:3 |
| 227:9,12,12 | 160:11,13 | **laws** 147:13 | **let's** 144:4,5 | **list** 193:20 | 154:23 |
| 230:5 | 161:22 | 147:20 | 143:18 | 165:8 | 165:8 |
| 235:19,20 | 161:22 | 148:23 | 159:16 | 168:3 174:4 | 168:3 174:4 |
| 236:22 | 162:7,14 | 159:16 | 160:2 | 179:10,10 | 179:10,10 |
| 245:10,18 | 170:20 | **lawyer** | 167:15 | 179:11,11 | 179:11,11 |
| 246:4 | 171:1,7,13 | 146:15 | 181:13 | 179:12 | 179:12 |
| 247:16,21 | 171:18 | 169:15 | 181:13 | 179:12 | 179:12 |
| 249:2 | 172:5,22 | **LCM** 174:12 | 172:6,9,13 | **little** 133:12 | **LiDAR** |
| 251:3,7,8 | 172:5,22 | 174:6,19,23 | 180:12 | 191:6,6,13 | 191:6,6,13 |
| 253:5,7,23 | 175:10,12 | 237:14 | 241:8 | 210:10 | 210:10 |
| 254:13 | 231:12 | **lead** 160:8 | **letter** 237:17 | 204:9 212:3 | 204:9 212:3 |
| **knowledge** | 177:23,24 | 194:11 | 231:18 | 213:17 | 213:17 |
| 164:13 | 179:11,12 | 209:9 | 220:9 | 214:14 | 214:14 |
| 169:22 | 181:24 | **learned** | **level** 160:8 | 221:23 | 221:23 |
| 178:22 | **learned** | 258:9,14,21 | 194:11 | 214:14 | 214:14 |
| 175:19 | 187:21 | **license** | 133:12 | 245:9 | 245:9 |
| 176:12,14 | 194:5,5,7 | 258:9 | 262:9 | 245:16 | 245:16 |
| 183:22 | 252:13 | **legal** 175:9 | 131:4,15 | 254:2,5,9 | 254:2,5,9 |
| 230:24 | **licensed** | **legal** 175:9 | 137:10 | 258:19 | 258:19 |
| 236:24 | 255:12,14 | 133:14,15 | 145:24 | **looked** | **looked** |
| **knows** 166:3 | 255:23 | **legally** | 185:24 | 152:14 | 152:14 |
| 190:6,11 | 257:5,6,7,9 | 148:19 | 148:24 | 152:6 | 152:6 |
| 208:16 | 257:19 | 134:10,12 | 168:13 | 180:18,23 | 180:18,23 |
| 212:6 215:2 | 258:17 | **licensure** | 135:2 | 194:9 223:2 | 194:9 223:2 |
| 208:9 | **landscape** | 133:13 | 134:10,12 | 258:11 | 258:11 |
| 208:11 | 245:6 | **Leighton** | 135:2 | **loop** 255:17 | **loop** 255:17 |
| 216:21 | **large** 213:1 | 212:15 | 134:18,10 | **lot** 136:10 | **lot** 136:10 |
| | 232:5 | 224:16 | 135:2 | 156:16 157:8 | 156:16 157:8 |
| **L** | **larger** 256:8 | **length** 153:7 | 157:8 | 187:3 174:14 | 187:3 174:14 |
| **lack** 242:17 | 259:12 | 153:8 155:9 | 159:1 161:4 | 211:17,22 | 211:17,22 |
| **landing** | 142:7 | 155:10 | 155:10 | 195:18 | 195:18 |
| 142:2 | 150:17 | **LIDAR** | 133:12 | 195:1 | 195:1 |
| 150:17 | 150:17 | 158:16,14,15 | 195:1 | 210:12 | 210:12 |
| 151:2,7 | 151:2,7 | **limited** | 191:20 | **love** 254:10 | **love** 254:10 |
| 152:18,20 | 152:18,20 | 241:12 | 206:2 | 152:12 | 152:12 |
| 152:21 | 152:21 | 170:22 | 237:14 | 258:21 | 258:21 |
| 153:6,9 | 153:6,9 | 171:2,14 | **line** 149:5 | 199:17,21 | 199:17,21 |
| | | 172:7,24 | 189:19 | | |

lower 158:6
182:9,11,16
221:9 257:5

**M**
M 133:8
251:17
254:16
magnitude
155:20
224:7
245:13
maintain
176:5
making
199:1
218:23
manage
210:16
manager
226:12
maneuver
160:23
manner
143:24
205:23
210:1 233:6
243:1
March 154:6
154:12
198:1,13
199:12
222:11
223:6
226:19
250:7,12
MARKED
132:12
material
252:16,22
matter 138:7
matters
171:6 261:9
maximum

140:7
157:14
mayor's
146:23
mean 136:4
136:16
142:13
153:18
158:4,5,7
166:23
178:16
179:6
199:20
201:17,19
214:3
222:16
227:3,12,13
228:9
230:22
231:18
238:20
253:3
means 137:19
156:16
meant 169:4
measured
157:18
mechanical
242:9
mechanism
148:5 149:4
220:4
medical
208:20
248:5,14
meet 182:22
meeting
192:12,13
195:8
197:11,14
223:16
225:17,21
226:1
members

171:4
motion
160:7
mentioned
160:8
165:11
174:11
195:8
196:14
212:13
223:15
224:24
242:9
methods
156:16
microphone
198:10
middle 160:6
million
213:5,13,22
215:14
231:12
232:11
mobility
162:9
186:14
model 229:23
modification
196:20
201:7
moment
135:6
162:22
194:2
202:10
207:3
money
192:21
222:13
242:24
Monroe
131:13
months
170:22

171:2 173:3
175:24
morning
176:19
181:3 182:7
182:23
MORRISS...
131:3,4,5
132:4,7
133:9 135:9
139:10,15
151:1 155:5
185:12,23
188:10
190:22
199:13
198:8,12
199:11,22
203:3
208:18
201:21
203:5
257:16
258:22
multiple
220:15,16
227:1 249:5
259:8
mute 150:21

**N**
N 131:1
132:1 133:8
133:23
137:13,17
237:22
238:15
239:22
240:11,20
241:3,13,15
244:8 246:7
name 221:12
nature 170:5
navigate
161:15
162:17
249:21
near 219:20
necessarily
161:8
186:11
226:17
227:2,9,13

motivations
231:6
mounted
214:10,17
move 210:9
254:4,9,13
255:13
257:18
moved 194:6
256:1
movements
252:12
moving 201:2
203:5
208:18
223:20
257:16
258:22
mullion
254:20
multiple
220:15,16
227:1 249:5
259:8
mute 150:21

necessary
159:6
201:1
211:14
227:13
241:22
247:24
necessitate
158:14
142:9,15,16
143:9
145:11
150:21
153:11
159:23,24
162:11
166:1
172:17
175:4
192:23
198:20
203:2
204:18,21
205:1,20
221:10
223:22
235:12
231:2
235:12
245:1
needed
152:12
159:13
216:18
228:10
needs 140:23
141:6,18
145:16
160:3 162:2
163:10
170:13
220:6
negotiate

159:6
139:19,20
222:12
220:20
222:6,9
252:15,21
229:11
new 168:24
169:14
257:16
newly 169:1
nine 246:23
247:1
noncompli...
215:8
normal 149:9
155:24
north 189:20
189:21
191:11
193:1
241:10
242:16,18
240:12 260:1
note 142:24
197:13
202:7
202:24
notes 135:18
notice 195:1
196:24
197:4 203:7
223:17
224:11
230:16
237:9,16,19
notion
240:6 241:2
244:6 251:4
259:18

number
139:19,20
220:12
205:10,24
227:5,6
252:15,21
numbers
151:13

**O**
O 133:8
251:17,17
254:16
261:2,2
192:16,19
197:16
216:12
175:16
190:16
149:24
162:12
165:15,22
163:17
197:16
260:11
241:10
242:16,18
163:15
176:15
168:3,9,14
199:5
195:14
197:12
244:1
246:8
259:18
210:15
254:1

objections
229:10
observed
186:19
obstruction
145:8,13
148:2
256:15
obstructions
145:22
occupies
232:5
occur 156:15
216:12
offhand
149:24
offense
165:15,21
offer
198:23
221:4,6,16
231:14
242:19
officer 147:4
173:8,9,14
219:3
offline 243:8
offset 152:9
okay 139:18
153:18
154:18
155:1,2,2
172:19
195:14
197:12
200:17
210:15

229:9
230:22
234:6 241:8
242:23
242:11
250:11
255:11,21
256:25,16
old 232:21
once 193:7
243:15,22
245:9,10,12
one's 143:9
159:20
ones 250:24
ongoing
149:24
152:1
162:12
197:23
241:10
operating
242:19
operational
173:8,9,14
219:3
operationally
174:7
operations
170:6 176:5
177:10
184:18
opine 176:16
opinion
175:19
197:12
230:17
opportunity
142:21

143:15
149:11
161:13
162:15
229:3
optimal
141:7,21
162:1,5
161:8,24
162:1
optimally
161:19
optimization
161:12,18
options 204:9
218:13
220:3,6
224:7 225:2
226:11
228:23
243:17
ordered
228:20
ought 160:13
outcome
261:24
261:24
outlined
191:5 242:1
overall 158:4
182:11
216:15
255:3
overnight
243:21
overseeing
144:3
163:5
oversight
144:24
146:19
183:8
owner 146:11
146:18

156:24

**P**
P 131:1,1
p.m 130:18
package
189:17
190:1,2,16
191:5 192:4
192:22
193:9 196:6
196:23
197:19
198:5,15,16
198:22,24
200:14,23
201:11,20
201:22
202:13,19
202:21
203:1,20
210:20
226:21
246:13
packages
189:15
194:18,22
Page 132:1
132:12
153:2 157:9
158:17
180:24
255:5,8
pages 260:15
paid 201:13
paper 230:6
Paragraph
163:3
paraphrasi...
215:8
Pardon
190:19
parrot 228:8
part 135:14

142:16
152:17
157:21,22
162:23
163:3,19
189:5
190:16
200:24
202:24
214:21
217:23
218:4
224:21
231:21
232:5
246:18
255:6
259:12
particular
140:24
145:24
148:2
168:11
parties
261:23
parts 189:8
189:11
235:20
passage
166:19
230:2
passageway
135:23
193:1
passed 166:6
239:19
path 138:16
138:24
139:3,4
152:14
186:1
226:5
206:7 253:3
257:7

paths 192:1
242:11
248:12,16
PATRICK
131:5
pay 230:15
Peggy 131:16
139:11
139:17
261:3 262:7
people 141:4
141:4,5,15
146:24
160:23
162:8,16
186:6,12,13
190:14
194:17
172:10
173:6
172:23
172:2
172:11
174:1
176:11
176:23
216:20
220:15
153:4,6,7
155:8
168:18
182:11,12
191:16
246:13
perform
163:8 220:6
petition
229:1,3,4
period
192:15,18
192:19
232:14
189:15
physical
145:9,22

172:7 175:4
175:22
permit 173:2
199:16
203:24
204:12,21
permitted
149:21
182:12
permitting
147:1
149:10
204:14
person 160:2
160:6
164:17
160:11
226:10
261:17
pages 207:16
Plaintiff
130:4,12
136:21
139:12
173:6
173:9,18
177:2
178:8,19
222:3,3
233:3
216:20
220:15
221:20,23
234:16
235:14
249:17
personal
261:13
personally
222:20
pertaining
130:15
178:16
prioritize
146:2

148:2
170:11
235:1,4
physically
150:7
203:24
pick 181:14
picture
149:21
245:19
piece 146:21
146:19
160:1
164:17
166:20
226:11
216:23
portfolio
220:9
portion 182:9
200:10,22
132:13,14
plan 147:3,7
163:6
232:21
146:24
247:6 255:3
257:4
pointing
258:8
police 148:23
portfolio
220:9
portion 182:9
200:10,22
132:13,14
plan 147:3,7
163:6
232:21
236:16
218:18
219:8
224:20
221:20
242:23
plans 151:24

193:12
216:24
217:5,10
238:16,22
239:4
platform
160:5
plack 242:5
PO 195:11
point 165:3
212:22
229:2 234:4
242:6
253:17
pointing
258:8
police 148:23
portfolio
220:9
portion 182:9
200:10,22
132:13,14
plan 147:3,7
163:6
232:21
position
146:12
163:15
185:13
249:23
250:16
pointing
258:8
post 164:15
164:19,16
164:20,24
218:18
219:8
post-ADA
219:6
posts 164:15
166:1
potentially
230:13

242:7
practice
144:22
148:10
168:12
practicing
148:7
pre- 166:15
pre-passage
165:12
preclude
145:23
precludes
148:3
precluding
146:9
prefer 150:9
preliminary
146:4 162:6
196:8
197:20
199:14
201:13,17
201:18,24
236:16,18
premise
232:1
152:12
153:2 157:9
prepare
142:15
220:19
prepared
239:9
prerogative
257:8
present
131:18
225:18,24
226:16
presented
227:2
presenting
146:13

presently
190:7
preservation
168:9
170:3
pretty 178:15
prevented
145:9
previous
155:23
261:6
previously
133:18
206:6
212:13
221:2 243:5
price 222:11
225:8
251:1
Primera
238:24
239:1,14
proceed
168:6
principle
232:2,8
proceeding
166:18
200:10
203:7 207:7
215:17,19
215:15
prisoners
183:13,23
215:14,15
215:15
private

133:23
134:2
144:22
148:10
148:10
probably
204:12,14
216:12,14
220:1 225:2
225:6
243:20
174:16,21
171:5
181:15,15
187:11
191:15
226:7,13
213:2
159:9,10
196:2
161:2
207:1
213:22
206:5
210:8
221:2 243:5
180:14
problem
154:9
196:12
213:2
222:1 243:5
problems
181:12
procedure
130:14
173:5
210:4
produce
150:4
producing
218:2
production
202:20
200:11,21
201:10
203:7 207:7
profession
147:6 150:2
professional
135:1
137:24
217:11
216:23
132:14
181:20
255:1
proceeding
166:18
244:24
159:5,13
proceedings
150:19
261:15
process 147:1

156:1,6,10
168:19
188:12
161:9
204:12,14
206:15
225:6
220:1 225:2
206:4 220:2
225:14
243:20
224:11
225:15,18
234:3 247:5
250:18
196:9
197:4,6
224:10
235:18
220:11,13
221:12
219:6
projects
148:11
204:13
201:3
221:13
250:14,23
proposal
220:7
259:14
projected
224:10
projection
209:11,12
providing
174:2
221:13
219:8
236:7 237:2
provide
133:22
223:18
229:19
231:9 235:6
provider
143:12
provides
173:10,23
174:23
providing
142:20
171:1 196:2
provision
173:10,17
173:23
134:3
144:12

155:14,19
156:2
194:12
205:12,13
205:15,15
195:19
206:4 220:2
225:14
239:2
220:11,13
221:17
224:1
225:14,15
225:22,23
234:3 247:5
236:7 237:2
232:19
238:7 237:2
250:18
provided
151:13,15
183:16,20
193:4
191:14
200:18
219:6
201:3
221:13
250:14,23
proposal
220:7
259:14
projected
224:10
projection
209:11,12
providing
174:2
221:13
219:8
236:7 237:2
provide
133:22
223:18
229:19
231:9 235:6
provider
143:12
provides
173:10,23
174:23
providing
142:20
171:1 196:2
provision
173:10,17
173:23
134:3
144:12

171:22
172:9 173:5
173:15
174:24
205:12,13
205:15,15
185:15
193:14,21
206:2
202:16
225:14,15
225:22,23
236:7 237:2
250:18
purchase
225:15,18
234:3 247:5
250:18
235:18
220:11,13
221:12
219:6
projects
148:11
204:13
201:3
221:13
250:14,23
proposal
220:7
259:14
provided
151:13,15
183:16,20
193:4
191:14
200:18
219:6
P10 194:12
public 133:23
144:12

Exhibit 8 Page 38

## Page 19

145:20
164:11,19
166:21
167:12,24
168:1,3,4,8
169:1,6
171:5,11,19
172:8 173:2
173:4,17
231:3,13,24
232:13
260:23
**publicly**
155:21
**pull** 233:21
**pulled** 154:21
**pulling** 234:2
**purpose**
159:4 231:1
**purposes**
231:2
**pursuant**
130:13
**pursue**
259:11
**push** 234:16
236:10
**pushed**
236:20
**pushing**
171:4
176:16
184:19
**put** 196:14
253:10
255:3 258:3
**putting**
190:14
256:11
**pwm@mor...**
131:7

**Q**

**qualificatio...**
134:6,11
168:23
189:7 193:5
193:6 246:9
**qualified**
134:5 193:8
193:18
194:1
**question**
134:5 136:6
138:5 147:2
147:7,14,21
155:4 157:8
161:9
163:12
166:4 171:9
171:17
172:1 173:1
173:4 174:5
174:9
176:10,20
176:22
177:18
180:19
181:16
181:22
187:19,22
188:1,21
196:5,17
206:23
207:2,18
214:4 217:6
218:8,24
219:6,7,8
224:9
227:24
228:19
239:13
240:1,9
241:12,14
242:15
243:3
245:17

247:1,14
249:3 253:2
**questioning**
252:10
**questions**
205:5 208:9
209:17
227:6,8
251:15
**quicker**
209:20
210:17
**quickly** 234:4
**quite** 183:21
226:24
253:1

**R**

R 131:1
133:8
251:17
254:16,16
**RADUNSKY**
131:11
**raise** 232:20
232:22
**ramp** 135:13
135:16,18
135:22,24
136:3,5,17
136:22,24
137:3,4,10
138:2,2
138:6,19
140:8,12
141:11,16
142:1,3,9
142:12,14
142:18,23
143:10,14
143:17
144:4 145:6
145:21,23
146:7 148:1

149:13,17
150:14
151:4
152:12,19
155:8,21
157:6,11,12
157:17,19
157:21,22
158:1,2,4,5
158:8,8,11
159:7,17,18
160:6,10,16
161:16
162:18
170:18
171:5,13
172:3,11
173:6
175:10,13
175:21,22
176:17,18
178:13,23
179:11,15
179:17,22
180:3,5,13
180:14,20
181:4,21
182:3,13
183:3,9,19
183:24
184:5
186:17,23
186:24
187:5,6,14
187:16,17
187:21
188:1,3,13
190:11,17
143:17
191:7,10
192:6,24
241:17

194:8 195:2
196:9 199:4
199:16
200:4,9,15
200:21,24
201:14
202:12,21
203:10,16
203:18
204:1,3,9
206:3,9,10
206:13,15
206:19,22
207:4,7
208:12,19
208:20
209:5,13
210:8
211:12,18
211:21
215:5,13,17
215:18,21
216:1 217:1
217:7,12,22
218:10,17
218:20
219:4,11,13
219:24
220:21
221:3,20,22
222:8,16,22
222:13,21
224:5,11
225:19
227:18,20
228:3,12,22
241:17

244:4
248:1,14
248:2,5,12
248:14,18
248:20,24
249:1,4,12
249:13,18
249:19,21
249:22
250:13,20
251:1,2
251:6,9
253:12,12
253:16,22
253:24
254:1 255:9
255:2,6
257:2,5
258:12
259:5,16
**ramp's** 136:9
140:13,20
**ramps** 136:7
138:6
141:24
142:3
144:16
145:5
185:1
188:20
189:6 196:4
218:24
222:18
224:9 240:1
**range** 221:15
227:1
229:10
230:4,5
260:12
**reading**
199:9 230:9
**realistically**
174:15
**reality** 150:4
**realize**
163:6
**realized**
194:9

## Page 20

**realizes**
234:23
**really** 146:20
147:21
159:19
168:12
233:4
241:1
**reason**
141:11
143:11
161:5,10
188:15
210:2,3
**reasonable**
148:17
166:20,24
168:2 171:3
171:12
172:9
223:21
224:1,3
227:3,19
**reasons**
141:13
209:7 229:6
229:8
233:20
245:23
**recall** 152:3
165:21
169:9
184:14
199:1
213:16
214:13
237:12
**receive** 167:7
203:7
**received**
154:1
167:13,24
192:17
214:22

**recognition**
235:3
**recollection**
151:11,22
230:21
236:13,24
**recommend**
202:18
**recommen...**
178:5 220:8
252:15,21
**recommen...**
179:17
**recommends**
196:3
**record** 135:7
146:20
156:16
163:13
165:13
167:17
169:17
170:18
200:12,20
203:4,6,17
203:21
220:17
228:12,22
**record** 152:2
259:12
265:22
257:14
**REDIRECT**
199:2
**reduced**
261:12
**refer** 240:15
**reference**
154:22
190:14
**referred**
150:3,11
233:13
**referring**
162:5
167:20
168:7
**reinforced**
151:19

216:6
235:3
**refined**
140:22
**reflect** 215:7
**regarding**
177:8
196:17
**regardless**
167:1
**regards**
134:7
137:13,13
137:18
137:22,24
143:11
174:4,11,13
177:4,11,13
183:17,18
178:22,22
196:6,18
200:2
201:15
202:7
203:14,20
204:4
206:16
213:1,8
214:11
237:9,16,19
238:1
239:17
240:6 241:2
259:18
258:20
**Rehab**
171:11
215:12

**reject** 244:2
249:14
255:4
**related**
160:18
**relating**
175:17
**relation**
157:17
**relative** 141:7
170:9 200:9
238:13
243:4
261:20,21
**remember**
176:4
184:19
230:8
**remove**
160:2
**rendered**
237:12
**renovate**
207:4,7
222:18
224:9 240:1
**renovated**
209:13
251:10
**renovating**
239:1
**relevance**
188:5 195:4
199:6,18
200:2
201:15
202:7
**relevant**
166:2
200:7 204:8
210:14
214:1
**relief** 159:5
**relocated**
255:18
**relocating**
251:9,10
171:11
**rely** 244:24

202:22
228:13
**remarks**
191:5
240:15
**remediation**
252:24
253:9
**remedy** 216:1
235:13,21
238:3
243:4
**renovation**
196:8
197:21

222:14
237:8
238:17,20
240:13
241:8
249:18
**renovations**
211:1 219:3
228:18
237:15
244:14
**repair** 243:9
**rephrase**
134:5 139:5
157:7 161:9
182:16
**repaired**
186:19,23
214:24
222:21
227:22
**replacement**
225:1
**report** 142:5
152:4 153:3
157:10,24
157:16,22
182:16
185:1
195:15
211:20
212:19
227:7 237:5
255:6 257:3
**reported**
169:18

## Page 21

261:11
**Reporter**
130:17
135:5
139:12
198:8 208:4
249:9 261:4
**reports** 215:3
215:7
**representat...**
229:19
**representat...**
148:16
177:20
226:3,4
**represented**
222:5
250:12
**request**
175:14
176:8 189:7
193:4
**requested**
135:8 175:7
176:15
**requests**
175:17
143:13
158:24
202:14
206:1 235:4
236:19
237:2
**required**
136:22
139:22
152:19,20
153:7,8
155:9,10
172:5,20

173:21
175:12
182:19
196:7 202:5
227:10
230:14
234:17
235:8
**requirement**
143:3 161:5
173:3
220:19
176:18
182:8,23
183:8 199:3
**requirement...**
136:8 141:4
141:10
148:1 156:4
156:4
**rest** 159:5,14
203:2,18
204:21,22
211:5
214:23
252:23
253:8,13,18
258:13
**Restoration**
230:2
**restroom**
147:8
204:20
224:20
228:19
**revealed**
152:3
**review** 147:1
149:12
156:9
168:19
175:8
**right-hand**
222:1
224:23
245:4
**reviewed**
149:15

192:11
139:10
141:3
181:15
192:19
193:24
**responses**
214:22
**responsibil...**
151:11
157:24
162:23
163:4,14,19
183:8 199:3
**responsibil...**
144:23
146:9
148:21
**RFQ** 189:18
196:14,16
**right** 140:3
142:15,22
193:7
217:19
**rigid** 186:20
**right-hand**
222:1
224:23
245:4
**rights** 231:19
234:23
**rise** 157:7,12

157:12,17
158:2,9,10
158:13
170:19
171:22
172:4,22
173:21
177:2
195:22
197:7
197:10
198:7
207:9,14
212:13
224:18
233:14,22
**RTA** 149:23
**RTU** 138:23

150:12
177:12,16
177:17
179:16
177:22,22
173:21
175:13
182:4
**Robert** 197:7
197:17
roll 208:9
238:9
rolling
159:21
room 144:11
195:17
**roughly**
226:14
**run** 136:9,13
137:4 138:2
**RFQ** 189:18
139:4,6
145:16
147:11
171:8,11
158:9 182:4
182:11
**running**
136:10
**runs** 147:3
189:19

**S**

S 131:1
132:10
251:17,17
**Sacramento**
164:20
safe 205:22
**safety** 170:14
safe 226:13
**sarcastic**
255:4
**saves** 209:16
**saying**
138:11
153:19
156:12
162:19
167:18
197:22
202:23
208:19
243:2
**says** 136:7,9
139:20
140:5,9

236:3 241:6
248:24
251:1
251:17,17
**sheet** 174:24
sheets 174:24
**sheriff** 130:6
136:19,22
157:17,24
158:9 182:4
**shop** 156:5,6
**short** 152:19
153:4,6,8
158:5
simplify
171:6
**simply**
155:17
191:24
193:21
**services**
130:16
201:6 227:4
236:9 254:4
**shortly**
153:24
**showed**
211:8,9
**showers**
213:7,15
**showing**
147:4

someplace
210:9
**somewhat**
212:3 242:8
244:14
**situations**
138:12
209:6
sit 192:13
**six** 180:2,8,23
209:7 240:4
**size** 205:11
255:23
**slide** 250:18
259:10
180:2,8,23
size 205:11
174:6
135:6
**slope** 135:19
136:4,9,10
136:13,18
137:2,14,1
137:22,24
**sloping** 137:1
156:12
**slows** 233:21
**smaller**
168:20
**sought**
175:19
sounds 153:1
139:19,20
242:15
**speaking**

144:24
184:15
205:24
255:12,13
257:3,8,18
225:18
228:18
**School**
134:23
scope 200:10
247:9
204:8,13
205:11
206:13,19
206:14
219:16
scoped 220:1
screen 135:17
146:14
196:14
256:6,10,12
seamlessly
205:20
second
190:23
191:23
**section** 136:7
136:20
139:20
140:1,2
159:14
sections
138:9 138:5
138:9,16
sector 133:23
134:2
secure 236:16
237:1
security
170:6,14
166:3
see 153:5

175:2 185:8
194:4 255:9
255:15,17
256:2,7,8
257:3,8,18
255:19
257:14,21
**seek** 145:19
147:24
148:20
**seen** 161:23
247:9
204:8,13
**self** 143:9
205:11
**self-certific...**
204:11,20
216:7,20
226:17
204:11
208:18
209:15
**sense** 194:21
252:11,14
**Sheriff's**
163:15
**seat** 154:16
**separate**
175:6
**sequence**
205:15
**series** 174:22
141:14
**second**
190:23
234:23,8
262:1
247:4 185:1
189:21
**seven** 239:5
247:2,8
share 193:9

151:24
152:2
**shows** 255:12
sic 169:3
209:6
**side** 164:16
164:20,24
174:10
255:11
**sign** 156:11
156:18
**significant**
137:12,16
**similar**
159:24
236:8,17
**RTA** 149:23
141:20
211:19
249:24
251:18
225:19
**size** 205:11
174:6
135:6
**shop** 156:5,6
**short** 152:19
153:4,6,8
158:5
simplify
171:6
**simply**
155:17
191:24
193:21
**single** 193:20
257:11
**sir** 190:20
226:11
254:9

149:9
152:2
212:3 242:8
244:14
**sit** 192:13
138:12
135:6
138:23
174:6
**sought**
175:19
**source**
149:2
**south** 131:5
139:19,20
**space** 160:14
167:21
170:23:1
237:15
236:23
242:15
speaking

## Page 22

141:24
184:15
205:24
255:12,13
257:3,8,18
225:18
228:18
**School**
134:23
**scope** 200:10
247:9
204:8,13
205:11
206:13,19
219:16
**scoped** 220:1
**screen** 135:17
146:14
196:14
256:6,10,12
**seamlessly**
205:20
**seats** 214:16
214:17
second
199:8 209:19
233:4 244:3
191:23
**Service** 164:6
208:21
**services**
130:16
**section** 136:7
136:20
139:20
140:1,2
159:14
**security**
170:6,6,14
166:3
**see** 153:5

175:2 185:8
194:4 255:9
255:15,17
256:2,7,8
257:3,8,18
255:19
257:14,21
**seek** 145:19
147:24
148:20
**seen** 161:23
247:9
204:8,13
205:11
**self** 143:9
**self-certific...**
204:11,20
216:7,20
226:17
**sense** 194:21
252:11,14
**Sheriff's**
163:15
**seat** 154:16
**separate**
175:6
**sequence**
205:15
**series** 174:22
141:14
**second**
234:8
247:4
**seven** 239:5
**share** 193:9

256:6
152:2
**shared**
184:11,12
**sheets** 174:24
**sheriff** 130:6
136:19,22
174:22,23
173:18,24
**shop** 156:5,6
**short** 152:19
153:4,6,8
158:5
**shorter**
135:19
152:13
233:6 244:5
208:21
180:9
261:14,20
**Shorthand**
130:16
130:16
261:4,26:8
**shortly**
153:24
246:15
**showed**
211:8,9
**showers**
213:7,15
257:9
**showing**
147:4

151:24
152:2
**shows** 255:12
sic 169:3
209:6
**side** 164:16
164:20,24
174:10
255:11
**sign** 156:11
156:18
**significant**
137:12,16
**similar**
159:24
236:8,17
141:20
211:19
249:24
251:18
257:11
174:6
**simplify**
171:6
**simply**
155:17
191:24
193:21
**single** 193:20
257:11
**sir** 190:20
226:11
254:9

149:9
152:2
212:3 242:8
244:14
**situations**
138:12
209:6
**sit** 192:13
**six** 180:2,8,23
**size** 205:11
255:23
**slide** 250:18
259:10
**slope** 135:19
136:4,9,10
136:13,18
137:2,14,1
137:22,24
**sloping** 137:1
156:12
**slows** 233:21
**smaller**
168:20
**sought**
175:19
**sounds** 153:1
139:19,20
242:15

someplace
210:9
**somewhat**
212:3 242:8
244:14
212:13 242:8
244:14
soon 223:14
sooner
247:21
**sorry** 136:5
139:17,20
150:23
154:2,19
155:3 157:7
161:9 178:7
182:7
196:4 198:9
199:19,22
222:2
231:20
237:18
219:6 222:4
237:18
219:6 222:22
237:18
219:6 222:22
**sort** 142:14
166:1
168:20
**source**
149:2
**south** 131:5
139:19,20
**space** 160:14
167:21
**speak** 167:21
170:23:1
237:15
236:23
242:15
**speaking**

Exhibit 8 Page 39

ERIC DAVIS
June 5, 2024

Page 23

| | | | | |
|---|---|---|---|---|
| 223:18 | speculating | 141:14 | 143:23 | 185:18 218:12 |
| 245:21 | 156:22 | 143:12 | 229:19 | 188:5 195:4 stops 157:22 |
| **specific** | spend 240:23 | 144:7 | 230:2 231:1 | 199:5,18 straightfor... |
| 134:10,21 | 242:23 | 145:23 | 261:1,4 | 200:2 200:8 225:3 |
| 135:2 | spoke 195:9 | 147:18,20 | stated 155:21 | 201:15 Street 131:13 |
| 140:24 | 258:6 | 148:4 156:5 | 261:19 | 202:7 stressed |
| 141:3 168:5 | spoken 197:3 | 163:24 | **statement** | 203:14 195:16 |
| 168:12 | ss 261:1 | 166:9 | 160:24 | 204:4,24 strict 145:22 |
| 169:9 170:5 | **stabilize** | 167:17 | 198:4,14 | 205:4 148:3 |
| 172:12,14 | 252:16 | 168:21 | 205:6 | 206:16 strike 247:5 |
| 173:17 | stable 160:4 | 169:3,7,11 | 205:10 | 207:11 strong |
| 194:18 | staff 164:17 | 169:16,20 | 210:5 | 213:18,24 135:11 |
| 196:13 | stage 193:17 | 170:1,24 | 212:17 | 214:11 structural |
| 200:24 | 243:9 | 172:21 | **States** 130:1 | 228:8 151:16 |
| 212:14,17 | stair 143:12 | 174:1 177:6 | 130:14 | 230:16 152:1 |
| 217:6 | 143:4 | 179:19 | 243:19 | 237:9,16,19 168:10 |
| 224:13 | 254:12 | 180:15 | 260:1 | 238:1 223:23 |
| 242:8 | 258:10,16 | 181:6 | **steady** | 239:17 226:5 |
| **specifically** | stairs 143:10 | 182:15 | 142:16,17 | 240:6,17 **structure** |
| 134:17 | 159:23 | 182:13 | 142:22 | 241:2,10 151:20 |
| 174:12,20 | **stairway** | 183:2,10,18 | 143:9 | 244:6 251:4 **structures** |
| 184:15,19 | 254:5 | **steep** 136:23 | 244:6 251:4 | 165:2 |
| 192:21 | stalls 160:21 | 188:4 206:5 | 251:14,18 **Stuart** 197:7 |
| 193:3 195:9 | **standard** | 209:6,8,14 | 254:15 197:17 |
| 208:2 | 134:12 | 217:2 219:5 | 135:19,24 **students** |
| 216:19 | 141:2 | 227:21 | 136:10,23 134:23 |
| 219:10 | 145:16 | 228:4 | 137:5,8 232:20 |
| 231:8 | 158:23,24 | 231:10,10 | 138:13,16 **study** 184:15 |
| **specificatio...** | 162:6 | 232:9,10 | 138:18,21 **subcontrac...** |
| 198:6,7,16 | 162:6,8 | 235:8,16,24 | 139:7 226:5 |
| 198:17 | 180:20 | 236:6 | 182:12 **subcontrac...** |
| 200:1 | **standardized** | start 174:7,9 | 195:15 223:5 |
| 201:11,24 | 220:1 | 174:20 | 198:18 226:12 |
| 202:1,1,11 | **standards** | 198:21 | 202:2 **subjected** |
| 202:17 | 134:8 | 225:5 | **stipulated** 212:14 |
| **specifies** | 135:16 | **started** | 189:18 239:20 |
| 167:21 | 136:16 | 198:23 | **stipulates** 245:5 |
| **specified** | 239:10 | 239:10 | 193:7 **subjective** |
| 152:5 | **starting** | stick 210:24 | **stipulation** 162:1 |
| 261:17 | 158:7 | **STILLMAN** | 233:9 **submit** |
| **specs** 260:21 | starts 157:21 | 131:12 | 245:1 193:23 |
| **speculate** | state 130:17 | 132:5 | 210:4,10 **submits** |
| 152:8 | | 154:14,20 | 211:16 220:11 |
| | | | stopped **submittals** |
| | | | 210:8 192:15,17 |

ERIC DAVIS
June 5, 2024

Page 24

| | | | | |
|---|---|---|---|---|
| **submitted** | 155:6 156:3 | 210:6 211:7 | 174:10 | **testimony** | 183:4 184:6 |
| 217:20 | 163:9 | 211:7 | **technical** | 209:19 | 184:12 |
| 221:24 | 171:16 | 225:13 | 148:7,16 | 255:7 | 205:1,5 |
| 247:3,9 | 183:22 | 243:8 250:2 | 175:1 | 260:18 | 207:15,17 |
| **SUBSCRI...** | 185:5,7 | 251:16 | **technically** | 261:14 | 214:18 |
| 260:20 | 226:24 | **surface** | 202:20 | **tgm@morr...** | 214:14,15 |
| **subsection** | 231:1 | 134:15 | tell 133:11 | 131:7 | 224:24 |
| 233:1 | **successful** | 249:22 | 135:15 | **Thank** | 226:8 |
| **successful** | 137:1 140:6 | 253:24 | 149:22 | 150:22 | 229:8 230:4 |
| 191:4 | 140:8,10,13 | 157:16 | 153:24 | 250:11 | 230:5 231:5 |
| **suddenly** | 140:18,20 | 170:10 | **Thanks** | 231:16 |
| 197:2 | 211:20 | 196:11 | 185:9 | 222:19 |
| **sufficient** | 182:10 | 198:22 | **themself** | 224:14 |
| 142:20 | 252:16,17 | 204:1 | 204:15 | 234:13,20 |
| 200:19 | 252:22 | 220:23 | thing 154:24 | 236:2 238:2 |
| **suggest** | 252:22 | 223:1 | 195:7 | 238:6,12 |
| 193:24 | **surrounding** | 228:2 247:6 | 171:23 | 248:21 |
| **suggested** | 192:3 | 171:23 | 181:18 | 258:9,8,10 |
| 252:7 | 205:18 | **talking** 161:3 | 180:17 | 259:11 |
| **suggestion** | **surroundin...** | 173:2 | telling 184:14 | 224:14 |
| 243:2 | 191:8 | 197:23,24 | tens 244:14 | third 227:23 |
| **suggests** | **Susmilch** | 198:10 | term 137:16 | **THOMAS** |
| 185:11 | 174:13 | 211:3,15 | 141:20 | 130:7 131:13 |
| 221:12 | **suspect** 141:6 | 129:13 | 179:6 | things 138:4 |
| 242:16 | 142:19 | 231:17 | 209:23 | 145:14 |
| 243:3 | 156:19 | 252:12 | 219:20 | 176:1 |
| **suing** 212:4 | **sworn** 133:2 | 219:20 | 167:9 | **thorough** |
| **Suite** 131:13 | 133:6 | talks 155:5 | 200:8 | 178:11,17 |
| **summary** | 260:11,20 | 157:11 | 179:5,8 | 190:24 |
| 183:4 | 218:12 | **task** 203:17 | 193:12 | 241:24 |
| **summer** | 160:20 | 218:6 | 197:24 | **thoroughly** |
| 231:9 | **system** 232:17 | 173:12 | 177:8 | 177:11,16 |
| **Sun-Times** | 232:23 | 228:18 | 232:19 | 177:17,18 |
| 230:4 | 231:9 | 239:2 | 177:9 | **thought** |
| **supervising** | 259:2 | 179:4,21,24 | 245:9 | 152:10 |
| 250:15 | **T** | 252:8 253:9 | 163:6 | three 182:6 |
| **support** | T 132:10 | think 137:16 | 241:8 | 189:8 |
| 243:3 | 133:8,8 | 229:16 | 141:11 | 222:19 |
| **supposed** | 251:17 | 229:14 | 148:13,16 | 247:12,15 |
| 144:19 | 242:24 | 221:24 | 151:16 | 255:2 257:9 |
| 146:14 | 243:14 | 243:14 | 152:5 153:3 | **threshold** |
| 188:10 | **take** 174:16 | teach 232:18 | 154:6 157:5 | 216:1 |
| 170:16 | 179:4 185:3 | team 193:8 | 162:3,4,5 | line 135:4 |
| 171:20 | 191:24 | 194:20 | 169:4 174:2 | 176:6 |
| **sure** 141:19 | 202:14 | 201:5 220:8 | 226:21 | 165:21 |
| | 209:20 | team's | 256:24 | 176:3,20 | 168:13 |

ERIC DAVIS
June 5, 2024

Page 25

| | | | | |
|---|---|---|---|---|
| 174:16 | 160:19 | 181:2,24 | **trouble** | 241:18 | 135:3,10,15 |
| 190:23 | 162:1 | 182:4 187:4 | 209:16 | 246:4 | 141:9 |
| 191:23 | 172:13 | 187:5 194:4 | **true** 160:18 | 247:12,14 | 143:12 |
| 198:20 | 185:2 | 194:5,7 | 240:12 | 247:15 | 144:10 |
| 207:6 | 190:13 | 253:22,24 | 252:2 | 251:15 | 155:22 |
| 211:20 | 192:13 | 254:18 | 260:17 | 257:9,19,20 | 159:3 161:7 |
| 223:7 | 196:11 | 255:12,23 | **truth** 261:8 | **two-year** | 166:17 |
| 225:17 | 200:5 | 257:6,8 | **truth** 261:8 | 244:5 | 166:6,9,19 |
| 226:3 | 204:24 | **topper** | try 160:5 | **typewriting** | 188:2 |
| 227:23 | 209:16 | 253:11 | 168:16,22 | 261:12 | 199:21 |
| 238:9 244:5 | 211:16 | **total** 221:7 | 174:4 | typical 149:7 | 223:10 |
| 247:4 | 212:3 | 244:9 | 204:19 | 153:6 | 248:7 253:1 |
| 248:20 | 226:23 | **transcript** | 156:8 | **typically** | 259:12,14 |
| 260:16 | 228:10 | 199:10 | 211:10 | 142:12 | 260:23 |
| **timeline** | 230:20 | 201:11 | 212:11 | 151:18 | **undertake** |
| 146:4 | 231:17 | **transcripts** | 213:1,9 | 151:18 | 244:24 |
| **times** 150:1 | 237:12 | 260:13,17 | 234:6 | 156:11,18 | **undertaken** |
| 176:21 | 240:9,17 | **transfer** | 243:21,22 | 156:22 | 220:18 |
| 227:1 259:8 | 243:17 | 196:6,23 | | **U** | **undertaking** |
| **timetable** | 245:12 | 197:19 | **UFAS** 167:8 | 219:12 |
| 188:19 | 246:24 | 198:5,15,15 | 167:16 | **Unfortunat...** |
| **Title** 231:8,9 | 249:23 | 198:22,24 | **Uh-huh** | 243:11 |
| titled 178:8 | 251:3 | 200:14,23 | 142:7 | **uninterrup...** |
| today 192:11 | 252:10 | 201:10,19 | **ultimately** | 243:19 |
| 192:12 | 253:8 | 201:22 | 245:1 253:3 | **unit** 160:13 |
| 194:12,16 | 254:2 | 202:12,13 | **uncompliant** | **United** 130:1 |
| 195:8,19 | 256:22 | 202:20 | 210:5 | 130:14 |
| 196:12 | 257:8 | 203:1,20 | **uncompiled** | 243:19 |
| 197:17 | **top** 140:5 | 210:20 | 209:10 | 260:1 |
| 214:22 | 141:24 | 243:8 | **universal** | units 165:24 |
| 217:20 | 142:3,8 | 258:13 | 141:14 | 149:6 |
| 223:15 | 143:14 | **tunnels** | 233:13 | **unpack** 241:8 |
| 225:20 | 144:15 | 189:23 | unusual | |
| 249:5 | 150:17 | **travel** 138:17 | 146:14 | 149:8 |
| today's | 151:2,7,12 | 138:24 | 148:12 | **update** |
| 239:24 | 151:14 | 139:3,4 | 155:16 | 165:8 |
| **toilet** 160:21 | 152:12,18 | 161:1 | 191:23 | **updates** |
| told 184:5 | 153:6,9 | **turned** | 206:23 | 200:11 |
| **tolerances** | 242:11 | 145:12 | 229:18 | 202:18 |
| 144:17 | 248:12,17 | 152:9 | 211:14 | 209:21 |
| **Tom** 135:5 | 253:7 | **turning** | 247:22 | 211:14 |
| 155:3 | **treated** | 210:20 | understand... | 216:17 |
| | 177:23 | **two** 164:14 | 134:7,12 | 233:12 |
| | 180:13 | 197:15,23 | | 218:16 |
| | | 206:13 | | 205:6 238:3 | 185:21 |

ERIC DAVIS
June 5, 2024

Page 26

| | | | | |
|---|---|---|---|---|
| upper 155:8 | 141:15 | 230:14 | **walking** | 233:24,24 | 260:3 |
| 158:6 182:2 | **variety** | **violation** | 135:19 | 241:24 | **wheel** 142:13 |
| 252:13 | 140:22 | 140:13 | 137:1 | 241:24 | **wheelchair** |
| 253:11 | 141:8 | 144:6 | **walkway** | 243:4,16 | 142:12,21 |
| 261:9 | 144:6 | 143:16 | 136:21 | 142:13 | 143:16 |
| **upwards** | 143:15 | 163:20 | 137:8 | 247:24 | 143:17 |
| 240:23 | 161:13 | 182:1 | **walkways** | 253:10 | 160:3 |
| **urgency** | 175:2 | 227:21 | 138:9,13 | 160:3 | 161:14 |
| 196:15 | various 192:1 | 235:22 | **wall** 145:12 | ways 252:7 | 171:4,21 |
| 197:2 | 192:2 | **violations** | **wanted** | we'll 185:8 | 172:10 |
| use 142:16 | vast 206:2 | 183:1,2 | 138:10 | 172:10 | 173:6 |
| 145:24 | vendor 191:4 | 184:19 | 184:19 | 194:11 | 175:21 |
| 155:7 | verify 156:24 | 194:5 | 185:5 | 176:16 | 176:16 |
| 161:18 | versed | 190:11 | we're 161:3 | 184:23 |
| 178:19 | 178:19 | 209:3 | 210:21 | 206:7 |
| **version** | 180:16 | 203:18 | 211:12 | 216:16 | 208:17 |
| 180:16 | 209:8 209:22 | 217:17 | 218:17 | 209:13 |
| 185:3 186:7 | 210:6 | 231:16 | 236:10 | 218:14 |
| 208:24 | 154:4,23 | 244:17 | 229:1 | 230:12 |
| 209:23 | 172:16 | 249:6 | 232:21 | 242:12 |
| 222:17 | **vertical** | vs 130:5 | 233:23 | 243:3 |
| user 163:9 | 157:18 | 260:5 | 253:16,17 | 253:18 |
| 184:24 | **vertically** | | 256:8 | we've 184:6 |
| users 143:16 | 140:8,12,19 | **W** | wants 233:14 | 259:15 |
| 149:8 | 130:11 | wait 200:14 | 184:20 | Website |
| use 157:13 | various | 215:17 | warning | 224:15 |
| usually 148:9 | 164:21 | 255:2 | 184:20 | 249:17,23 |
| 149:8 | 165:15,16 | **waiting** | 212:5 | Wednesday |
| utilize 141:16 | 165:19 | 184:20 | week 225:23 | 160:9 186:7 |
| 149:11 | 167:1 | 226:20 | 194:13 | weeks 197:15 |
| | 172:16 | wall | 226:9 | went 217:4 |
| **V** | wall 142:22 | 146:15 | wasn't 246:1 | 160:23 |
| **variance** | 162:15 | way 141:22 | 237:23 | |
| 146:9 | 151:12,17 | 145:10,12 | 238:8,12 | wiggle |
| 151:21 | 187:14,14 | 198:2 | west 131:13 | 144:19 |
| 151:23 | 188:3 | 223:3 | Western | 259:11 |
| 152:15 | violates | 137:20 | 131:5 | we've 259:9,11 |
| **variation** | 177:23 | 199:21 | Westmorel... | witness 132:1 |
| 187:5 | 178:10 | 201:6 | 131:5 | 133:1,5 |
| 252:5 | 208:12 | 211:14 | 213:11 | 150:21 |
| **variations** | 209:6 | 162:16 | 213:14 | 176:8 |
| 144:16 | violating | 186:7,15 | 218:16 | 205:6 238:3 |
| 156:14 | 137:5 | 218:16 | 238:16 | 185:21 |
| **varieties** | | | 205:6 238:3 | |

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 40

**ERIC DAVIS**
June 5, 2024

Page 27

| | | | | | |
|---|---|---|---|---|---|
| 188:7 195:6 | 242:17,22 | 169:6 | 240:9,10,16 | 246:13 | **12th** 198:1,13 |
| 199:8,19 | 243:5,20 | 176:8 | 243:7 252:4 | 260:13 | 262:2 |
| 201:16 | 245:8 | 178:15 | 252:11 | **1-260** 260:15 | **133** 132:4 |
| 202:9 | **worked** | 187:11 | 253:19 | 1/2 182:11 | **142** 132:13 |
| 203:15 | 159:9 | 188:8 | 254:3 258:7 | **1:00** 197:16 | **150,000** |
| 204:5 | **working** | 189:21 | yesterday's | **10** 137:11 | 221:9 |
| 206:17 | 146:2 163:8 | 192:8 198:3 | 206:6 | 153:2 | **16** 136:21 |
| 207:14 | 163:14 | 204:22 | **young** 232:20 | 158:17 | 221:7 255:5 |
| 214:1,12 | **wouldn't** | 207:15 | | 165:20 | 255:8 |
| 230:19 | 155:12,12 | 213:19 | **Z** | 167:14,22 | **162** 132:14 |
| 237:10,20 | 161:18 | 216:15 | **Zach** 253:2 | 180:24 | **19** 166:6 |
| 238:5 | 170:3 | 217:8 228:9 | **ZACHARY** | 207:17 | **1980** 172:3 |
| 239:19 | 174:16 | 230:20,22 | 131:12 | 213:4 | **1988** 167:15 |
| 240:7 | 218:13 | 247:15 | **Zoom** 130:11 | **100** 168:18 | **1989** 133:17 |
| 245:22 | 226:15 | 252:6 | 181:14 | 220:3 252:1 | **1990** 166:7 |
| 251:6 | **wraparound** | 253:16,22 | 131:15 | 221:5 | **1991** 134:7 |
| 256:21 | 209:24 | 256:20 | | **102,000** | 137:24 |
| 258:4 | 210:18 | **year** 207:3 | **0** | 102,000 | 139:8 |
| 259:19 | **wrapping** | 216:22,22 | **084-003813** | **10257** 131:5 | 158:24 |
| 261:7,7 | 250:3 | 217:9 218:11 | 262:9 | **11** 143:5 | 163:24 |
| 262:1 | **write** 251:20 | 218:9,15 | | 144:6 | 164:10,13 |
| **woman** | **written** | 219:11 | **1** | 165:17 | 164:24 |
| 194:10,11 | 232:10 | 220:20,24 | **1** 132:13 | 180:24 | 166:5,8,10 |
| **word** 157:13 | 251:21 | 221:2 | 135:20 | 182:5 | 166:11 |
| 161:18 | **wrong** 140:1 | 237:24 | 136:1,5,10 | 214:10 | 167:15,16 |
| 162:1 | 154:12 | **years** 133:21 | 136:18,19 | **11.7** 182:12 | 168:1,24 |
| **words** 136:20 | 155:3 | 155:23 | 136:19,21 | **12** 136:5,10 | 169:2,4 |
| 138:20 | | 181:13 | 136:23,24 | 136:18,19 | 171:11 |
| 161:21 | **X** | 206:13 | 137:2,2,5,8 | 137:15 | 172:8 177:5 |
| 251:24 | **X** 132:1,10 | 210:6 216:2 | 137:11 | 187:15 | 187:15 |
| **work** 133:18 | 133:8 | 240:4 241:7 | 138:1,13 | 188:3 207:5 | 188:3 207:5 |
| 145:1 163:8 | 251:17 | 241:18 | 139:7 142:6 | 231:10 | 231:10 |
| 195:2 201:9 | 254:16 | 247:12,14 | 143:5 178:8 | 232:10 | 232:10 |
| 202:22 | | 247:15,18 | 178:21 | 234:17 | 234:17 |
| 204:16,22 | **Y** | 248:3,9 | 182:5,13 | 235:15,23 | 235:15,23 |
| 205:15,21 | **yeah** 133:21 | 255:2 | 185:13 | 236:6 | 236:6 |
| 210:14 | 137:22 | **yesterday** | 189:17 | **1998** 133:20 | **1998** 133:20 |
| 222:22 | 139:14 | 152:23 | 190:1,2,16 | 154:9 | 154:9 |
| 224:15 | 150:10,16 | 160:19 | 190:21 | 177:12 | 177:12 |
| 225:4,8,11 | 152:23 | 174:11 | 191:5 192:4 | | |
| 225:19 | 154:11,20 | 187:13 | 192:22 | **2** | **2** |
| 227:15,20 | 155:1,16 | 188:11 | 193:9 221:7 | **2** 130:6,10 | **2** 130:6,10 |
| 228:21 | 162:4,12 | 194:2 195:7 | 221:14 | 163:3 221:8 | 163:3 221:8 |
| 232:6 238:7 | 168:20 | 196:15 | | 145:5 | 145:5 |
| | | 223:3,3 | | 180:12 | 246:14 |

**ERIC DAVIS**
June 5, 2024

Page 28

| | | | | | | |
|---|---|---|---|---|---|---|
| 252:15,21 | 232:9 | **3** 182:11 | **505-10.**1 | **8** 132:14 | | |
| 260:6,14 | 234:17 | 246:14 | 141:23 | 162:21,24 | | |
| **2000** 130:18 | 235:8,15,23 | 257:3 | **505.4** 140:4 | 165:5 178:7 | | |
| **20** 133:20 | 236:6 | **3:00** 192:16 | **57** 171:2,8,19 | 188:18,23 | | |
| 135:20 | 241:19 | 192:19 | 172:7,24 | 205:10,24 | | |
| 136:1,19,24 | **2011** 169:12 | **3:20** 185:6 | 205:16 | **8.5** 182:13 | | |
| 137:2 | 175:23 | **30** 157:13 | **5th** 221:18 | **84** 155:22 | | |
| **200,000** | **2012** 172:20 | 158:3,9,12 | | **85** 152:19,24 | | |
| 221:15 | **2013** 169:15 | 170:19 | **6** | 153:4,6,7 | | |
| **2000** 164:10 | **2015** 212:18 | 172:4,23 | **6** 157:9 | 155:8 | | |
| 187:14 | **2017** 239:11 | 173:22 | 182:19 | | | |
| 209:6 | **2018** 237:18 | 175:13 | **60** 152:21 | **9** | | |
| **2010** 134:8 | 237:24 | 199:15 | 158:20 | **9** 151:8,10 | | |
| 134:20 | 238:13 | **300-4479** | 161:3,20,22 | 152:7 | | |
| 135:15 | **2022** 237:15 | 131:14 | 162:3 165:6 | 165:20 | | |
| 136:16 | **2024** 130:18 | 312 131:14 | 170:23 | 213:13,14 | | |
| 137:6,13,20 | 154:13 | **33** 182:18 | 171:3,7,8 | 213:16,22 | | |
| 137:23 | 177:12 | 34 140:7,11 | 171:14 | 254:19 | | |
| 139:8 | 198:1,13 | 140:11,19 | 173:3,20 | **9-inch** 152:3 | | |
| 140:14,17 | 204:2 | 182:20 | 176:19 | **91** 143:1 | | |
| 143:6,12 | 216:22 | **38** 140:7 | 178:1 | 165:17,18 | | |
| 144:7,10,13 | 217:9 218:7 | | 187:10,17 | 165:22 | | |
| 145:23 | 218:9 | **4** | 194:7 | 172:16 | | |
| 148:3 156:5 | 221:18 | **4** 260:14 | **60-inch** 159:1 | | | |
| 158:23 | 222:5 | **4,000** 229:21 | 160:20 | | | |
| 161:6 169:7 | 225:22 | 230:15 | 161:11 | | | |
| 169:7,11,16 | 239:12 | 230:19 | 162:6,13 | | | |
| 169:19 | 250:8,12 | **4.27** 182:3 | 175:23 | | | |
| 170:1,23 | 260:14,14 | **4.56** 182:4 | 182:8 | | | |
| 172:21 | 260:22 | **405** 136:7 | 258:17 | | | |
| 173:1,16,24 | 262:2 | 139:20 | **60-inch-long** | | | |
| 177:5,23 | **23-cv-1851** | **405.2** 136:9 | 255:14 | | | |
| 178:24 | 130:5 260:5 | **405.3** 139:21 | 257:18 | | | |
| 180:15 | **230** 131:13 | **405.6** 157:12 | **6060** 131:14 | | | |
| 181:6 | 131:13 | 181:13 | **60643** 131:6 | | | |
| 182:14 | **233-7901** | 192:20 | **6th** 154:13 | | | |
| 183:2,10,18 | 131:6 | | | | | |
| 184:1 207:8 | **24th** 222:4 | **5** | **7** | | | |
| 208:12 | **251** 132:5 | **5** 130:17 | **7** 205:10 | | | |
| 209:8,14 | 254 132:7 | 164:16 | **72** 161:23 | | | |
| 217:2 219:5 | **25th** 154:12 | 189:22,24 | **773** 131:6 | | | |
| 227:21 | **26** 133:21 | 191:12 | | | | |
| 228:4 | | 260:14 | **8** | | | |
| 231:10 | **3** | **50** 210:6 | | | | |
| | | **505** 140:20 | | | | |

Exhibit 8 Page 41