Transcript of the Testimony of
**CARL M. DARR**

**Date:** June 3, 2024

**Case:** WESTMORELAND VS. DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

CARL M. DARR
June 3, 2024

Page 1

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EUGENE WESTMORELAND, )
)
Plaintiff, ) Case No. 23-cv-1851
)
vs. )
)
COOK COUNTY SHERIFF, )
THOMAS DART, )
et. al., )
)
Defendants. )

Deposition of CARL M. DARR, taken before ROBBIN M. OCHENKOWSKI, C.S.R., pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of Zoom depositions, commencing at 1:30 P.m., on the 3rd day of June's, A.D., 2024.

There were present at the taking of this deposition the following counsel:

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 2

1
2
3      A P P E A R A N C E S:
4
5      THOMAS G. MORRISSEY, LTD.
       by MR. THOMAS G. MORRISSEY
         MR. PATRICK W. MORRISSEY
       10257 South Western Avenue
       Chicago, Illinois 60643
       (773) 233-7901
       tgmmorrisseylawchicago.com
       pwm@morrisseylawchicago.com

         on behalf of the Plaintiff;

       DE VORE, RADUNSKY LLC
       by MR. TROY S. RADUNSKY
         MR. JASON E. DE VORE
         MR. ZACHARY G. STILLMAN
       230 West Monroe Street
       Suite 230
       Chicago, Illinois 60606
       (312) 300-4479
       tradunsky@devoreradunsky.com

         on behalf of the Defendants;

       ALSO PRESENT:
       MS. NICOLE BRITTON.



                - - - - -

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 3

1                    I N D E X
2
3      Examination by
       Mr. Morrissey                              4
4      Mr. Radunsky                               99
       Mr. Morrissey                             107
5      Mr. Radunsky                              112
       Mr. Morrissey                             113
6
7                  E X H I B I T S
                                     FIRST REFERENCED
8      Group Exhibit 1                            7
       (Mr. Carl Darr's 4-1-24 multipage report)
9
10     Exhibit 7                                 11
       (12-6-23 Corridor Ramp Accessibility Assessment)
11     Exhibit 8                                 29
       (eight-page declaration of Eric Davis)
12
13     Exhibit 10                                10
       (4-22-22 GEC response to request for qualifications)
14     Exhibit 11                                25
       (7-15-22 Cook County Government Office of Chief
15      Procurement RFQ, Architectural Engineering
        Services for the Leighton Courthouse Target Market)
16
17     CERTIFIED QUESTION                        89
18
19
20       (All exhibits were retained by counsel.)
21
22                - - - - -
23
24

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 1

CARL M. DARR
June 3, 2024

Page 4

1  MR. MORRISSEY:  Ready?
2           (Witness first duly sworn.)
3           CARL M. DARR,
4  called as a witness herein, having been first duly
5  sworn, was examined upon oral interrogatories and
6  testified as follows:
7      MR. MORRISSEY:  This is a deposition of Carl Darr
8  taken pursuant to notice and continued to today's date.
9           EXAMINATION
10  BY MR. MORRISSEY:
11      Q    Mr. Darr, I'm going to ask you a series of
12  questions this afternoon.  If at any time you don't
13  understand one of my questions, please stop me, and I'll
14  attempt to rephrase it.  Otherwise, I'll assume that you
15  understand the question.
16           If at any time you want to take a break and
17  there's no question pending, just let me know, and we'll
18  take a break.
19           Can you state your full name and spell your
20  last name, please?
21      A    My full name is Carl Magnus Darr, D-a-r-r.
22  THE REPORTER:  What is the middle name?
23  THE WITNESS:  Magnus, M-a-g-n-u-s.
24  THE REPORTER:  Thank you.

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 5

1  BY MR. MORRISSEY:
2      Q    In preparing for today's deposition, what
3  documents did you look at?
4      A    I looked at my report.  I looked at documents
5  given to me by DeVore, Radunsky.
6      Q    And what documents were those?
7      A    I think there were some plans, as -- what I call
8  as-built plans of the building.  There was a deposition
9  from Eric Davis, Mr. Kuzlik, Mr. Kuz --
10           Is that how you pronounce it?
11      Q    Kezlik.
12      A    -- Kezlik's report.
13           And I think there was a declaration by
14  Eric Davis.  Those documents.
15      Q    Okay.  Prior to the deposition, did you meet
16  with any -- anybody from the county or attorneys for the
17  county or sheriff?
18      A    I'm sorry.  Can you repeat that?
19      Q    Sure.
20           Prior to this afternoon, have you met with any
21  attorneys to prepare for the deposition?
22      A    I met with DeVore, Radunsky on Friday via Zoom.
23      Q    When you say DeVore, Radunsky --
24      A    I think Troy was on and I believe Zach was on

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 6

1  the call.
2      Q    How long did you spend with the attorneys?
3      A    About an hour and a half.
4      Q    In preparing for the deposition --
5           Was that the only time you met with them
6  concerning today's deposition?
7      A    Concerning today's deposition specifically, yes,
8  that was the only time.
9      Q    All right.  Prior to preparing your report, did
10  you talk with them or exchange any notes, documents?
11      A    Prior to preparing our report, I did speak with
12  Troy briefly, I believe, to arrange a site visit.
13           At some point we received copies of the
14  building plans.  I do not recall if that was before or
15  after we went out to the site the first time.
16      Q    After you --
17           You did an inspection in January of 2024,
18  correct?
19      A    I believe --
20           Can I look at my report --
21      Q    Sure.
22      A    -- for that, those dates?
23      Q    Sure.
24           Let me show you your report.  I'm going to show

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 7

1  you Group Exhibit No. -- I show you Group Exhibit No. 1.
2  It's a multipage report.  I think it's 23 pages.
3           Is that the report you're referring to?
4      A    Yes.
5      Q    Prior to issuing that report on April 1st, 2024,
6  did you provide any drafts to the attorneys for the
7  sheriff and county?
8      A    No.
9      Q    Now, the firm of Globetrotters, has the firm of
10  Globetrotters done any work at the department of
11  corrections prior to January of 2023?
12      A    We're involved on an 88th assessment and
13  schematic design project for the Cermak facility.  I
14  believe that started last year.
15      Q    Was there -- To your knowledge --
16           Well, let me go back one step.
17           What is your position with Globetrotters?
18      A    I'm vice-president of architecture.  I'm the
19  head of the architecture department.
20      Q    Is there a separate vice-president for
21  engineering?
22      A    There is.
23      Q    And what's that person's name?
24      A    Hynek Dvorak.

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 2

CARL M. DARR
June 3, 2024

Page 8

1  Q   Can I have a spelling for that name?
2  A   H-y-n-e-k, Dvorak, D-v-o-r-a-k.
3  Q   Now, as the head of architecture for GEC, what
4  are your responsibilities?
5  A   I have multiple responsibilities.  I have to
6  make sure staff stay busy and occupied.  I have to
7  oversee projects.  I have to deal with clients.  I have
8  to look at project schedules and budgets and work with
9  people to make sure we have that.  I am involved in some
10 projects as project manager as well.
11 Q   When you say that you have to oversee projects,
12 is that all projects that GEC is contracted for?
13 A   All projects that involve the architectural
14 department that GEC is contracted for, correct.
15     We also have ongoing projects for permanent
16 review with the city.  We also have projects involved at
17 the airport that I'm involved with as well, both
18 airports, Midway and O'Hare.
19 Q   Are you aware of a request for qualifications
20 for --
21     You mentioned that there was an ongoing project
22 for the Cermak building, correct?
23 A   I believe it started last year.  I believe we're
24 complete or near completion with the assessment report,

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 9

1  and I believe we're supposed to start schematic design
2  imminently.
3  Q   When you -- When GEC undertook the assessment
4  task for the Cermak building, did they have to submit a
5  request for qualifications with the county?
6  A   We would have either submitted a response to a
7  request for qualifications or we would have submitted a
8  response to a request for proposal.  I'm not sure if
9  this was a task order contract or a stand-alone
10 contract.  I don't remember.
11 Q   What did the -- When was the contract entered
12 into between GEC and Cook County for the Cermak building
13 to the best of your recollection?
14 A   I don't know.  The project would have come to me
15 after the contract was entered into.
16 Q   Are you aware of four other projects with Cook County
17 that GEC is currently involved with?
18 A   There's a project at Cook County Hospital
19 Professional building for a new lobby entrance, and
20 we're in negotiations for a new project at -- for Cook
21 County Hospital for a build-out of the Harrison Square
22 office space.  There may be other projects I'm not aware
23 of.  I couldn't tell you.
24 Q   Are you current --

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 10

1      (Discussion had off the record.)
2  BY MR. MORRISSEY:
3  Q   Well, I'm showing you Exhibit No. 10.
4      Can you see it on the screen?
5  A   No, not --
6  Q   Is it up?
7      Showing you Exhibit No. 10, is that on your
8  screen, Mr. Darr?
9  A   It is.
10 Q   Is this the request for qualifications that was
11 responded to by GEC on April 22nd, 2022?
12 A   Can you scroll down?
13 MR. RADUNSKY:  Can you scroll down, Tom, just so we
14 can take a look?
15 MR. PATRICK MORRISSEY:  (Indicating.)
16 BY MR. MORRISSEY:
17 Q   Let me rephrase the question.
18     Was GEC retained by Cook County and the sheriff
19 of Cook County pursuant to this request for
20 qualifications?
21 A   I assume this is the request for qualifications.
22 It's been so long.
23 MR. RADUNSKY:  You don't have to guess if you don't
24 know.

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 11

1  THE WITNESS:  Yeah, I mean, if this is a request for
2  qualifications, we do have a contract.
3  MR. RADUNSKY:  Do you have anything signed; Guys?
4  That would be helpful.
5  BY MR. MORRISSEY:
6  Q   If you look at --
7      You're familiar with the fact that Cermak --
8  I'm sorry -- that GEC issued a report in December of
9  2023 for the Cermak ramp?
10 A   I'm -- I am familiar that at some point we
11 issued an abbreviated report for the basement ramp
12 that's adjacent to the Cermak facility, yes.
13 Q   Showing you what's marked as Plaintiff's Exhibit
14 No. 7 --
15 MR. RADUNSKY:  Oh, that's what that is.  I'm sorry.
16 Okay.
17 BY MR. MORRISSEY:
18 Q   It's a document, and it states:  Corridor Ramp
19 Accessibility Assessment dated December 6th, 2023.
20     Can you look at that report?
21 A   Yeah.
22     This is our -- one of our reports.
23 Q   And if we look at Page 5 of Group Exhibit No. 7,
24 does it have the assessment per current applicable codes

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 3

CARL M. DARR
June 3, 2024

Page 12

1  introduction pursuant to RFQ Number 2215-0221?

2      A   Yes.

3      Q   And is that the same request for qualifications

4  that's identified in Exhibit No. 10?

5      A   Yes.

6      Q   And in Exhibit No. 10, would it reflect the

7  scope of the --

8      MR. RADUNSKY:  Exhibit 7 or 10?

9      MR. MORRISSEY:  Exhibit 7 is the report that was

10  done by GEC.

11     MR. RADUNSKY:  Okay.  What was 10?

12     MR. MORRISSEY:  Exhibit No. 10 --

13     THE WITNESS:  This is it.

14     MR. MORRISSEY:  -- is the request for

15  qualifications.

16     MR. RADUNSKY:  I'm sorry.

17  BY MR. MORRISSEY:

18     Q   Would the request for qualifications outline

19  what areas of the Cook County Government would be

20  assessed?

21     A   I would have to go back and read the entirety of

22  the request for qualifications.

23     Q   If we look at Page 8 of Exhibit No. 10, does

24  that indicate the scope of the services to be provided

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 13

1  by GEC?

2      A   I can only see up to the 2.2.

3      MR. PATRICK MORRISSEY:  (Indicating.)

4      THE WITNESS:  It's a general review of the scope.

5  BY MR. MORRISSEY:

6      Q   And that's for the Cermak Health Services

7  facility, correct?

8      A   Correct.

9      Q   And Exhibit 7 that is the corridor ramp

10  accessibility assessment, that was part of this request

11  for qualifications by GEC?

12     A   Yes, as part of that project.

13     Q   Has the --

14         And if we look at Exhibit No. 10, it talks

15  about a transfer package?

16     A   Correct.

17     Q   Has GEC completed the assessment on the

18  Cermak Health Services facility?

19     A   Are you referring to the assessment or the

20  transfer package?

21     Q   I'm referring to the assessment.

22     A   I believe we -- we've -- I believe we've

23  completed the assessment but we're still waiting for

24  client acceptance if I'm not mistaken.

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 14

1      Q   When you say client acceptance, who are you

2  referring to?

3      A   Cook County.

4      Q   Does that include the sheriff of Cook County?

5      A   They have some members attend the meeting.

6          I'm not sure.  I don't remember who the

7  required approval comes from.

8      Q   How many meetings have you participated in with

9  either the sheriff's office or representatives from

10  Cook County's Government from, let's say, January of

11  2022 to the present?

12     A   Myself, several.

13         But I'm not at every meeting.

14     Q   All right.  What -- When you say several, is

15  that more than three or four?

16     A   If it is, it's no more than five or six.

17     Q   And what -- do these meetings have a title or --

18     A   They're generally biweekly review meetings.

19  There were meetings at the site.  I don't know that they

20  have a specific title.

21     Q   Do representatives like Sabrina Canchola from

22  the Sheriff's Office attend?

23     A   She's been at, at least, a couple of the

24  meetings.

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 15

1      Q   Has Eric Davis?

2          You know Eric Davis, correct?

3      A   I do.

4      Q   Has he attended these meetings?

5      A   He's attended at least one of them.

6      Q   Any other representatives from GEC that twice a

7  month attend these meetings?

8      A   Sure.

9          Generally, the project manager, Amber Eisan.

10     Q   How do you spell that?

11         Is that the person --

12     A   A-m-b-e-r.  Last name is Eisan, E-i-s-a-n.

13     Q   Is that a male or a female?

14     A   Female.

15     Q   Is she an architect?

16     A   Yes.

17     Q   And she's under your direct --

18     A   Yes.

19     Q   She reports to you?

20     A   Correct.

21         Other staff members will attend depending on

22  what's going on at the time of the project.

23     Q   Okay.  During these joint meetings between --

24         Other than GES -- GEC, are there any outside

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 4

CARL M. DARR
June 3, 2024

Page 16

1  contractors to your knowledge that attend these
2  meetings?
3      **A.  We have one sub-consultant on that project, I**
4  **believe.**
5          **I don't believe they actually attend the**
6  **meetings.**
7      Q.  Has an architect by the name of Ellen Stoner
8  attended the meetings?
9      **A.  I'm not familiar with Ellen Stoner.**
10         **Oh, I'm sorry.  We --**
11         **You're speaking on behalf of GEC, right?**
12     Q.  I'm speaking -- There's a firm called
13  AltusWorks.
14         Are you familiar with them?
15     **A.  They are our sub-consultant.**
16     Q.  They're a consultant to GEC?
17     **A.  Yes.**
18     Q.  For how long has Altus been a consultant to GEC?
19     **A.  On this project?**
20         **I think they were part of the original contract**
21  **award.**
22     Q.  Is Ellen Stoner still with the firm or the
23  principal of the firm?
24     **A.  I don't know.**

CARL M. DARR
June 3, 2024

Page 17

1      **I didn't have direct involvement with Altus.**
2      Q.  So as a consultant, does your firm pay Altus for
3  work done on the project?
4      **A.  Yes.**
5      Q.  And what type of work has the Altus firm done on
6  the Cermak project?
7      **A.  I believe their portion -- they were responsible**
8  **for the site work and report -- contributing to the**
9  **report for the exterior approach to the building.**
10     Q.  As an overview, can you tell me what work that
11  was done by GEC at the Cermak Health facility in
12  addition to the corridor ramp to assess whether it was
13  compliant with the ADA?
14     MR. RADUNSKY:  I just want to object.
15         I mean, if you're talking about the Cermak ramp
16  case and Walker case, you know, he's here to testify
17  about the ramps in this case and not in that case, but I
18  mean, you know, I think it's not fair to him because he
19  didn't come in to answer questions about that case, but
20  I can't stop him from answering.
21         But all of these questions have been unrelated
22  to the ramps that we're talking about here today, and I
23  hope you're not using this dep, Tom, as like a way to
24  circumvent having his -- the lawyers in the Walker case

CARL M. DARR
June 3, 2024

Page 18

1  be here since he's an expert in that case as well and
2  it's not fair to them.
3          So subject to that, you can answer.
4      THE WITNESS:  Can you repeat the question?
5      MR. MORRISSEY:  Robbin, can you repeat the question?
6          (Question read.)
7          (Discussion had off the record.)
8      THE WITNESS:  As an overview, the entirety of the
9  building except select areas such as the top fourth
10  floor, which is the maintenance rooms or, you know, back
11  of the house spaces.
12  BY MR. MORRISSEY:
13     Q.  Okay.  Exhibit 10 refers to a transfer package.
14         What is -- What is a transfer package in
15  relation to this Contract 2215-0221, what does it
16  consist of?
17     **A.  It's the package of drawings and other documents**
18  **we would provide that would at a later time be completed**
19  **by another consultant.**
20     Q.  What -- Do you know was -- whether or not
21  Cook County has retained another consultant
22  architectural or engineering firm to prepare additional
23  drawings to bring the Cermak Health facility up to code?
24     **A.  No.**

CARL M. DARR
June 3, 2024

Page 19

1      Q.  No, they have not?
2      **A.  No, I do not know.**
3      Q.  Would the drawings that would -- that GEC --
4          Let me rephrase it.
5          Would the transfer package that GEC is going to
6  prepare for Cook County include drawings for the
7  renovation of the corridor ramp?
8      **A.  Yes.**
9      Q.  You mentioned that the --
10     **A.  I believe.  I believe.**
11         **I'm sorry.**
12     Q.  I'm sorry?
13     **A.  Yeah, I believe so.**
14     Q.  You mentioned that GEC is still in discussions
15  with some member or members of Cook County prior to
16  undertaking doing this transfer package?
17     **A.  Correct.**
18     Q.  Who -- To your knowledge who within your firm is
19  in contact with representatives from Cook County?
20     **A.  Amber Eisan handles the day-to-day**
21  **communications for that project.**
22     Q.  Do you know whether Ms. Eisan has been in
23  contact with Eric Davis in regards to outstanding issues
24  in regards to the Cermak facility?

Exhibit 9 Page 5

CARL M. DARR
June 3, 2024

Page 20

1    A   I do not know.

2    Q   Do you know who Ms. Eisan normally contacts at

3  Cook County in regard to issues in regards to this

4  contract?

5    A   She normally deals with, I forget the person's

6  name off the top of my head, but it's Cook County -- the

7  project representative for Cook County who works for

8  LCM.

9    Q   Do you know what LCM stands for?

10   A   Three names.  I don't remember what they are.

11   Q   Is that another outside consulting firm?

12   A   They're -- They're an architect.  I believe

13 they're an architectural firm.

14   Q   Are they a minority architectural firm?

15   A   I don't know.

16   Q   To your knowledge does Ms. Eisan communicate

17 with anybody -- any member of capital -- Cook County's

18 capital planning office?

19   A   I would have to know which members are in

20 Cook County's planning office.

21   Q   All right.  Do you know if Ms. Eisan is in

22 contact with Eric Davis at all in regards to the

23 facilities at Cermak as far as your firm's assessment of

24 it?

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 21

1    A   I know she's spoken with them or been involved

2  in discussions that have included him on occasion, but

3  beyond that, I do not know.

4    Q   Is it your understanding that GEC will do an

5  overall assessment report similar to Exhibit 7 for the

6  physical building at Cermak?

7    A   That is my understanding.

8    Q   When has that report been prepared?

9    MR. RADUNSKY:  Again, I'm going to object to all

10 these lines of questions about the Walker case and the

11 Cermak ramp and the attempt to just get all this

12 information without the other lawyers here.  I mean, you

13 haven't asked him one question about this case, not one,

14 I mean.

15        So I'm going to let him do this, but I mean, if

16 you're going to depose him in the Walker case, then

17 we're going to terminate the deposition and take this

18 transcript to the judge and let the judge decide if this

19 is a relevant form of inquiry.  We didn't bring Carl

20 here to talk about the Cermak ramp.

21        So subject to that, you can answer.

22 THE WITNESS:  I mentioned earlier, I believe our --

23 our assessment report is largely complete but hasn't

24 been accepted yet by the client.

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 22

1  BY MR. MORRISSEY:

2    Q   After the assessment report is completed and

3  accepted by Cook County, how long will it take your firm

4  to prepare a transfer package?

5    MR. RADUNSKY:  Objection; speculation.

6    THE WITNESS:  Yeah, I -- that -- there's a lot of

7  variables that go into that, staffing, clients' access,

8  clients' reviews, so I really couldn't venture other

9  than to say maybe less than a year.

10 BY MR. MORRISSEY:

11   Q   Why would it take you almost a year to do a

12 transfer package for -- under the RFQ 2215-0221?

13   A   Any number of variables come into play that can

14 not allow us to complete the transfer package at what I

15 would say we would -- the time it would take if we were

16 able to just to start and finish it.

17        There's all kinds of intermediate reviews,

18 submittals to the client that we have to wait for them

19 to review it.  It's just a process.

20   Q   Will GEC be bidding on doing the final drawings

21 to cause the Cermak infirmary building to be up to the

22 ADA Code?

23   A   I do not know.

24   Q   Similarly, will GEC be doing design drawings for

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 23

1  the corridor ramp that provides accessibility to --

2    A   I do not know.

3    Q   How much approximately has GEC been paid

4  in regards to the assessment under Proposal 2215-0221?

5    A   I do not know.

6    Q   Would that be in excess of $50,000?

7    MR. RADUNSKY:  Objection; asked and answered.

8    THE WITNESS:  Yeah, I do not know.

9  BY MR. MORRISSEY:

10   Q   Other than the assessment for the corridor ramp

11 and the Cermak Health Services facility, has GEC done

12 any other work at the Cook County Department of

13 Corrections?

14   A   In what time frame?

15   Q   Between 2019 to the present.

16   A   I believe we had a chiller replacement project

17 in the past, recent past.  I don't know the dates.

18   Q   In regards to the Leighton Court building at

19 26th and California, is GEC involved with any contract

20 to do any design or engineering or assessment work for

21 the Leighton Court building?

22   A   Yes.

23   Q   When -- How did GEC become involved in the -- as

24 a contractor for the Leighton Court building?

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 6

CARL M. DARR
June 3, 2024

Page 24

1    A   There was an arc -- either arc -- probably a
2  RFQ or maybe an RFP, it depends on the agency and the
3  nature of the procurement, and we submitted a proposal,
4  and we were selected.
5    Q   Do you know in what year GEC was selected for
6  the Leighton Court building?
7    A   I actually did a lot of the proposal, but I
8  don't -- I really do not remember when it was.
9    Q   Was it within the last year?
10   A   I think the proposal was submitted over a year
11 ago, but I could be mistaken.
12   Q   After the proposal -- Was that a propos -- Was
13 that a contract --
14        Strike that.
15        Is there a contract to do an overall assessment
16 under the ADA for the Leighton Court building?
17   A   I'm not familiar with the particulars of whether
18 there's a contract in place or not.  I believe there is.
19        I do not believe we received an NTP or ATP.
20   Q   What is an ATP?
21   A   Authorization to proceed.
22   Q   Do you know if that's required to be approved by
23 the county board?
24   A   I do not know.

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 25

1    Q   So would it refresh your memory that it might
2  have been in 2022 that --
3        I'm going to show you what now will be marked
4  as Plaintiff's Exhibit No. 11.
5        It's a document that says Cook County
6  Government Office of Chief Procurement RFQ Architectural
7  Engineering Services for the Leighton Courthouse Target
8  Market, and it's dated July 15th, 2022.
9        Does that refresh your memory about the timing
10 for this RFQ?
11   A   Vaguely.
12       It -- Obviously, the dates speak for
13 themselves.  When we actually -- When we had to respond
14 to it by, if there was an extension or not, I don't -- I
15 don't remember, but as I said, I thought the proposal
16 was made more than one year ago from today.
17   Q   All right.  And what's your understanding --
18 your proposal, GEC's proposal was accepted by the
19 procurement officer, is that fair to say?
20   A   I'm not involved in that aspect of the contract
21 award.
22   Q   Do you know whether or not the proposal has to
23 go before the county board before your firm can actually
24 actively become engaged in assessing the Leighton Court

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 26

1  building?
2    A   I'm not familiar with the procurement process
3  and especially --
4    Q   As of --
5    A   -- what's involved with the county.
6    Q   I'm sorry.
7        As of today --
8        Well, let me go back.
9        The proposal includes doing an ADA assessment
10 of the entire court building, is that fair to say?
11   A   Yes.
12   Q   And the Leighton Court building is accessible --
13       Let me rephrase it.
14       The Leighton Court building is connected to the
15 Cook County Department of Corrections through a tunnel
16 and a ramp, correct?
17   A   I do not know.
18   Q   Have you physically inspected the Leighton Court
19 building?
20   MR. RADUNSKY:  I'd just object to relevant.
21 BY MR. MORRISSEY:
22   Q   Or gone through the Leighton Court building?
23   MR. RADUNSKY:  Same objection to relevance.
24   THE WITNESS:  Only for jury duty 20 years ago.

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 27

1    MR. RADUNSKY:  Hold on one second.
2        It has absolutely nothing to do --
3        Let me get my objection out.
4        My objection to relevance is it has nothing to
5  do with the issues in this case or the ramps, none of
6  it.
7        Subject to that, you can answer.
8    THE WITNESS:  The only time I've been in Leighton is
9  for jury duty like over 20 years ago.
10 BY MR. MORRISSEY:
11   Q   As a vice-president of GEC, will you be -- will
12 your firm, once you get the go-ahead, be assessing
13 whether or not the holding cells at the Leighton
14 Courthouse are accessible?
15   A   I'm not even aware that there are holding cells
16 at Leighton Courthouse.
17   Q   Okay.  Do you have any projection when, if ever,
18 your firm will start working on assessing?
19   A   Well, at the beginning of this year, I was told
20 we'd be working on it by the end of February this year.
21   Q   Who told you that?
22       Eric Davis?
23   A   Yes.
24   Q   And since February of 2024, has Eric Davis given

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 7

CARL M. DARR
June 3, 2024

Page 28

1  you a reason why your firm hasn't proceeded to do an ADA

2  assessment at the Leighton Court building?

3      MR. RADUNSKY:  Just objection again on relevance,

4  scope.

5      THE WITNESS:  I know the contract or the -- I know

6  there's things happening with getting us started, but I

7  haven't spoken to Eric Davis since the beginning of the

8  year at least about that.

9  BY MR. MORRISSEY:

10     Q   If GEC was given the green light by Eric Davis,

11  when would be the time for your firm to start working on

12  reviewing whether or not the building is accessible or

13  not?

14     MR. RADUNSKY:  Objection to form, foundation

15  speculation.

16         You can answer.

17     THE WITNESS:  The time to start?

18     MR. RADUNSKY:  And relevance.

19     THE WITNESS:  Normally we would look at our staffing

20  and figure out when we could start.

21  BY MR. MORRISSEY:

22     Q   Okay.  Have you reviewed in preparing for

23  today's deposition Eric Davis' declaration that was

24  included in the defendant's response to our motion,

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 29

1  plaintiff's motion for a permanent injunction?

2      A   I skimmed it.

3      Q   Showing you Plaintiff's Exhibit No. 8, it's an

4  eight-page document that is headed by declaration of

5  Eric Davis, is that the document that you reviewed prior

6  to today's deposition?

7      A   I reviewed it for about 15 minutes before we

8  came down here, yes.

9      Q   Turning back to Exhibit 1, which

10  is the tunnel corridor assessability assessment for the

11  Cook County Department of Corrections campus, this is

12  the report that was prepared by you at the request of

13  defendant's counsel?

14     A   Is that a question?

15     Q   Yes.

16     A   Yes, that's correct.

17     Q   Can you tell me what you individually did in

18  preparing this assessment of the East -- I think you

19  call it the east corridor, east tunnel corridor which is

20  adjacent to the RTU building?

21     A   Well, I was present at two site visits, one of

22  which we -- myself and another person took the Lidar

23  scans.

24     MR. RADUNSKY:  L-i-d-a-r.

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 30

1      THE REPORTER:  Thanks.

2      THE WITNESS:  Then I had staff member develop the

3  scans and the photos, worked with them to collect the

4  data and wrote the report.

5  BY MR. MORRISSEY:

6      Q   Going back a bit, where did you go to college?

7      A   University of Illinois in Champaign.

8      Q   What was your major there?

9      A   Bachelor of science and architecture.

10     Q   Did you have any advanced degrees in

11  architecture?

12     A   I received my master's in architecture from

13  University of Illinois in Chicago.

14     Q   What year was that?

15     A   That would have been 1985.

16     Q   Since then have you --

17         The ADA past in, what 1990, 1991?

18     A   Roughly, yeah.

19     Q   Have you gone to any continuing education

20  courses on the ADA?

21     A   No.

22     Q   Can you briefly describe your experience as an

23  architect with the requirements of the ADA?

24     A   You've -- My experience with requirements to the

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 31

1  IDA -- ADA, excuse me, is primarily through projects.

2  For instance, I've worked on probably 15 projects for

3  the Chicago Housing Authority that involved upgrading

4  the buildings, usually mid-rise and high-rise buildings

5  to be ADA-compliant, other projects as well.

6          Virtually every project we do requires an

7  analysis and requires compliance with the Americans with

8  Disability Guidelines.

9          And I've been involved with permanent reviews

10  and meetings to discuss the ADA.  I've read the ADA Code

11  multiple times.

12     Q   Would you hold yourself out as an expert in

13  regards to, at least, Title II, the ADA requirements for

14  public buildings?

15     A   And Title II is?

16     Q   Title II is the ADA --

17     A   Yes.

18     Q   -- as it applies to public buildings.

19     A   In terms of requirements for building elements

20  accessible routes, yes, I would consider myself an

21  expert.

22     Q   Thank you.

23         Now, prior -- you did an inspection in

24  January -- two inspections in January of 2024 of the

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 8

CARL M. DARR
June 3, 2024

Page 32

```
 1   east corridor ramp which was adjacent to the
 2   RTU building, correct?
 3       A   We did two inspections, correct.
 4       Q   Who was the other person that was with you from
 5   GEC?
 6       A   On the day of the Lidar scans, it was Max Lux,
 7   who was a junior architect at the time, and for the
 8   first review, if I remember correctly, I believe Max was
 9   with me as well, along with another person
10   Catherine Ayres.
11       THE REPORTER:  Spelling?
12   BY MR. MORRISSEY:
13       Q   Is Ms. Ayres an architect also?
14       A   She just recently graduated as an arc -- in
15   architecture.
16       THE WITNESS:  A-y-r-e-s.
17       THE REPORTER:  Thank you.
18   BY MR. MORRISSEY:
19       Q   Prior to doing the physical inspection of the
20   east corridor ramp, did you review any blueprints of the
21   RTU building?
22       A   At least, before our second visit at least, we
23   did.  I do not recall if we had that in hand at the time
24   of our first visit.
```

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 33

```
 1       Q   And in preparing your report, you had access to
 2   the blueprints for the RTU building, correct?
 3       A   We had access to limited prints.  I think
 4   they're listed at the end of the report.
 5       Q   To your knowledge having reviewed the
 6   blueprints, the RTU building was built after 2011,
 7   correct?
 8       A   If I remember correctly, the drawings were dated
 9   2010, and then so, yeah, they probably would have been
10   constructed circuit 2011.
11       Q   And the applicable ADA Code are the 2010
12   Standards, correct, for this east corridor?
13       A   If they were adopted by the City of Chicago at
14   the time, yes, they would be.  They probably would be
15   anyways.
16       Q   Well, irregardless of whether or not the City of
17   Chicago adopted the 2010 Standards for a public building
18   such as the RTU, Cook County was required to follow up
19   with 2010 Standards, correct?
20       A   Without being there at the time and
21   understanding what dates the actual ADA took effect, I
22   would say probably.
23       Q   Your report reflects that it was built in 2011,
24   correct?
```

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 34

```
 1       A   Yes, circuit 2011.
 2       Q   When you initially looked at the blueprints,
 3   specifically in regards to the east corridor, did the
 4   blueprints reflect any mechanical systems that were
 5   underneath the concrete corridor for the east ramp?
 6       A   From the blueprints we had in our possession,
 7   no, I don't believe they did.  I do not believe we had
 8   mechanical drawings for that area.
 9       Q   Did the blue --
10           By mechanical, are you referring to electrical,
11   plumbing?
12       A   Plumbing/HVAC.
13       Q   Okay.  To your knowledge do you have any
14   knowledge that there are any mechanical systems that are
15   underneath the east corridor ramp?
16       A   I don't know.
17       Q   All right.  Would you expect as an architect
18   that there are electrical, plumbing and mechanical --
19   other mechanical units --
20       A   Elements?
21       Q   -- elements, elements, that's the word,
22   elements --
23       A   I'm sorry.
24       Q   -- thank you -- that would be buried underneath
```

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 35

```
 1   the east corridor ramp that are not displayed on a
 2   blueprint?
 3       A   It's total speculation, but it wouldn't surprise
 4   me if there were.
 5       Q   Okay.  And would that be also true with the
 6   Cermak ramp, Cermak corridor ramp?
 7       MR. RADUNSKY:  Object to relevance.
 8           You can answer.
 9       THE WITNESS:  I would answer the same.  It would be
10   total speculation, but it wouldn't surprise me if there
11   were.
12   BY MR. MORRISSEY:
13       Q   As an architect, what would you need to
14   do to determine whether or not there were electrical,
15   plumbing or other mechanical HVAC systems that were
16   impacting any renovation of the east corridor ramp?
17       A   Well, there are a number of ways we obtain
18   information about existing conditions for buildings.
19           The first easiest and actually one of the most
20   certain is to refer to as-built drawings, but,
21   obviously, it's important that those drawings are
22   complete and show all work, not just the building work,
23   and maybe say, for instance, site work, utility work
24   that was done in the past.
```

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 9

CARL M. DARR
June 3, 2024

Page 36

1    Beyond that, you can have utility finding
2 services checked, but that's rarely done unless you have
3 reason to suspect something like that.  Otherwise, you
4 just discover it as a discovered condition during
5 construction.
6    Q  Do you know whether --
7    You would assume that a building of the nature
8 of the RTU, which cost in excess of $84 million of
9 taxpayer dollars, would have as-built drawings.
10    MR. RADUNSKY:  Objection to speculation, form,
11 foundation.
12    You can answer.
13    THE WITNESS:  I would assume the county would have
14 drawings of that building that were done for the
15 construction of that building at the time.
16    Whether they have drawings of other work that
17 was done before or after, I don't know.
18 BY MR. MORRISSEY:
19    Q  And, generally, to your knowledge as an
20 architect, if a building such as the RTU is put up in
21 2000 -- between near 2011 or thereafter, at the time the
22 building was completed, there should have been an
23 assessment by an architectural firm whether or not the
24 work that was done by the general contractor conforms to

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 37

1 the -- to the drawings?
2    A  Normally, in one form or another, that would be
3 part of the construction administration and close-out
4 process for -- for -- for the building.
5    Q  And as an architect, what do you call that final
6 step to make sure that a building -- that the
7 drawings -- that the construction is in conformity to
8 the drawings?
9    A  There's a punch list review.  That's kind of an
10 informal term.
11    Q  And the punch list review, would that be the
12 architect of record that would do the punch list review?
13    A  Well, based on Standard A Contract documents,
14 normally the contractor is supposed to do the punch list
15 and we're supposed to verify it.  It doesn't always
16 happen that way.
17    Q  But they, the firm that -- the architectural
18 firm that reviews the contractors' work would be the
19 architect of record?
20    MR. RADUNSKY:  When you say the architect of record,
21 you mean for the project?
22    MR. MORRISSEY:  For the project.
23    MR. RADUNSKY:  Yeah, okay.
24    You can answer.

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 38

1    THE WITNESS:  There could be multiple arrangements,
2 but that would be the normal -- that would be the normal
3 relationship.
4 BY MR. MORRISSEY:
5    Q  Is the architect of record generally the firm
6 that submits the drawings to the city or the county to
7 get approval for the permitting process?
8    A  Normally, yes.
9    Q  Do you know who, what firm was the architect of
10 record for the RTU?
11    A  I looked at it at the time, but I don't remember
12 what it was.
13    Q  Would one of the items back in 2011 or
14 thereafter that the architect of record would have
15 looked at is to make sure that the contractor complied
16 with the ADA in building the east corridor ramp?
17    A  Well --
18    MR. RADUNSKY:  Foundation, speculation.
19    You can answer.
20    THE WITNESS:  They should have looked at the work
21 and compared to the drawings to make sure that it -- it
22 matched what the drawings showed to be built.
23 BY MR. MORRISSEY:
24    Q  Is the architect of record Roula Architects,

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 39

1 R-o-u-l-a?
2    A  I don't remember offhand if that was the name in
3 the title on the drawings.
4    Q  Now, looking at your report Exhibit 1, Page -- I
5 think it begins on Page 2 or Page 3, it says, executive
6 summary.
7    Did you prepare that summary for this report?
8    A  I did.
9    Q  And then that just provides the highlights.
10    You broke it down.  You broke the east corridor
11 ramp down into various subsections, correct?
12    A  I broke down the areas we reviewed into
13 subsections, north tunnel, east tunnel, yes.
14    Q  If we go back to Exhibit No. 8, Eric Davis'
15 declaration, on Page 7, there's a footnote, and the
16 statement by -- at the end by Eric Davis is the RTU ramp
17 leads directly to the Cermak ramp and they are
18 comparable size.
19    Is that consistent with your knowledge
20 involving the relation between the RTU ramp and the
21 Cermak ramp being of comparable size?
22    A  I would have to go back and look at my report
23 for Cermak to see.  I, mean it -- I mean, I did that --
24 I don't know, remember when.  They're both ramps.

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 10

CARL M. DARR
June 3, 2024

Page 40

```
 1      Q   Okay.  Exhibit 7 is the --
 2      MR. RADUNSKY:  I was going to say, do you know how
 3  long it is?  Maybe we can make it easier for him.
 4  BY MR. MORRISSEY:
 5      Q   I believe the report, Exhibit No. 7, looks like
 6  the Cermak ramp, I think, as being 43 feet point 7 --
 7  I'm sorry -- 43.64 feet in length.
 8      MR. RADUNSKY:  What page are you looking at, Tom?
 9      MR. MORRISSEY:  I'm looking at Page 3 of 21.
10      MR. RADUNSKY:  Okay.
11      So Exhibit 7, Page 3.
12  BY MR. MORRISSEY:
13      Q   It's like the second -- It's the executive
14  summary, the second paragraph.
15      MR. RADUNSKY:  Yeah, he saw it.
16      THE WITNESS:  If I remember correctly, the east RTU
17  ramp is considerably longer.  I thought it was
18  80-something feet with the two sections.
19  BY MR. MORRISSEY:
20      Q   Okay.  All right.  Mr. Davis also says that --
21      A   Oh, we're back at that.  Okay.
22      Q   We're back at his footnote on Page 7.
23          Your understanding is that the RTU building
24  residential treatment unit houses detainees that are
```

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 41

```
 1  wheelchair-assisted?
 2      A   My familiarity with it is it houses detainees.
 3  I did see some wheelchair users going through the
 4  tunnels when we were there.  Nobody ever explained to me
 5  anything else.
 6      Q   And each time that you were physically present
 7  on the east corridor ramp, you were there each time
 8  about how many hours?
 9      A   The first time maybe an hour, and then the
10  second time one to two hours.
11      Q   Okay.  And what time of the day were you there
12  in each?
13      A   I believe they were morning to late morning.
14      Q   And while you were -- who was -- who accompanied
15  you from the sheriff's office on each day?
16      A   Khara.
17          Is that --
18      Q   Khara Coleman?
19      A   I believe so, yes.
20      THE REPORTER:  C-a-r-a?
21      THE WITNESS:  K-h --
22      MR. RADUNSKY:  K-h-a-r-a.
23      THE REPORTER:  Thanks.
24      THE WITNESS:  It's an unusual spelling.
```

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 42

```
 1          Then there was a security guard as well, but I
 2  don't know his name.
 3  BY MR. MORRISSEY:
 4      Q   Was Mr. Davis present at either --
 5      A   No.
 6      Q   -- inspection?
 7      A   No.
 8          I'm sorry.  I didn't mean to cut you off.
 9      Q   Anybody from capital planning there?
10      A   No.
11      Q   Anybody from capital planning or from the
12  sheriff's office other than the correctional office?
13      A   No.
14      Q   Now, while you were at the site on --
15          What dates do we have down here?
16          On Page 6 it says that you were at the --
17  physically inspected it on January 23rd again on
18  January 25th?
19      A   On --
20      Q   Page 6 of Exhibit No. 1.
21      A   Oh, we changed.  Okay.
22      MR. RADUNSKY:  We're back to your report.
23      THE WITNESS:  Page 6?
24          I'm sorry.  Can you repeat that?
```

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 43

```
 1  BY MR. MORRISSEY:
 2      Q   It's on Page 6 of your report on Exhibit 1.
 3          It says that you did the inspection on
 4  January 23rd and January 25th, 2024?
 5      A   Yep.
 6      Q   Each day you were there, you saw detainees in
 7  wheelchairs going up and down the east tunnel corridor,
 8  is that fair to say?
 9      A   On at least one of those dates, yeah, we did
10  observe that.
11      Q   And each day you saw detainees that were using
12  walkers go up and down the east corridor ramp?
13      A   Probably.  I don't have a specific recollection
14  of that.
15      Q   Did you also see detainees that used canes or
16  crutches going up and down the east corridor ramp?
17      A   I believe I saw people using canes or crutches.
18      Q   And each time you saw a detainee who was
19  disabled, no mobility, disabled, they were accompanied
20  by a correctional person?
21      A   Generally -- Well, in general, there was a
22  correctional person accompanying them, accompanying all
23  the detainees that traveled through the corridor.
24          Whether they were there with one -- Whether
```

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 11

## Page 44

CARL M. DARR
June 3, 2024

1  there was -- Yeah, generally, there's a correctional
2  officer accompanying any detainee going through the
3  corridor.  Generally, there were groups of people and
4  there were one or more correctional officers with them.
5      Q   Now, as an expert in the ADA, for buildings that
6  are -- were built prior to 1991, a public entity has to
7  provide reasonable accommodations, is that fair to say?
8      A   They're supposed to.
9      Q   Okay.  And for a building that's built after
10 1991, the ADA required specific adherence to the
11 ADA Code in regards to the physical structures, correct?
12     A   Yes.
13         The requirements include -- The ADA includes
14 requirements with regard to physical structure.
15     Q   And the purpose of the ADA is to allow --
16         Okay.  What is the purpose of the ADA
17 Standards, structural standards in regards to mobility
18 disabled --
19     A   Provide --
20         I'm sorry.  I didn't mean to cut tell you off.
21     Q   Go ahead.
22     A   Provide reasonably equal access for all users.
23     Q   And is it also the intent and purpose of the
24 ADA 1991 and the 2010 Standards to provide a universal

TOOMEY REPORTING
312-853-0648

## Page 45

CARL M. DARR
June 3, 2024

1  standard to maximize the ability of disabled people to
2  independently move up and down structures like ramps?
3      A   Well, it doesn't necessarily require universal
4  design.
5      Q   Okay.  Let me rephrase the question.
6          Is it correct that the ADA Code provides
7  minimal standards for public entities to allow mobility
8  disabled individuals to independently, for instance,
9  move up and down ramps?
10     A   The ADA has requirements that set forth minimal
11 standards for people to travel, navigate the accessible
12 route.
13     Q   And to allow mobility disabled individuals to
14 independently move up and down ramps without the need
15 for reasonable accommodations?
16     A   Without the need for --
17     Q   Let me -- Let me rephrase that.
18     A   I thought it was contradictory.
19     Q   Let me rephrase it.
20         The ADA Code provides minimal standards to
21 allow disabled individuals to independently move up and
22 down ramps without assistance?
23     A   Yes.
24     Q   Now, a public entity can provide greater

TOOMEY REPORTING
312-853-0648

## Page 46

CARL M. DARR
June 3, 2024

1  structural elements to assist mobility disabled
2  individuals to move up and down ramps, they're not
3  limited by the ADA Code, correct?
4      A   Correct.
5      Q   But a public entity is required at minimum to
6  follow the standards for a ramp that are required by the
7  ADA Code?
8      A   For the construction of buildings, the ADA Code
9  sets forth minimum requirements that are supposed to be
10 followed for accessibility.
11     Q   Turn to Page 10 of your report.
12         Let's turn to --
13         And I'm looking at, I think it's, the second
14 paragraph.  It says:  GEC reviewed the following east
15 corridor -- corridor components for accessibility
16 compliance.
17         And you broke it down into six discrete
18 elements, correct?
19     A   Correct.
20     Q   Top landing, upper ramp, intermediate landing,
21 lower ramp, bottom landing and handrails, correct?
22     A   Correct.
23     Q   And specifically in regards to the top landing,
24 the top of a ramp requires a 60-inch landing, is that

TOOMEY REPORTING
312-853-0648

## Page 47

CARL M. DARR
June 3, 2024

1  correct?
2      A   That's correct.
3      Q   And a minimum of 60 inches, correct?
4      A   Correct.
5      Q   If a ramp is off by two inches point four, it
6  does not comply with the ADA Code if the building was
7  built after 1991, correct?
8      A   If it's 2.4 inches short, it doesn't comply
9  regardless.
10     Q   In regards to the top landing for the east
11 tunnel corridor, it's only nine inches long, correct?
12     A   That's correct.
13     Q   So that's a -- that violated -- you found that
14 it violated, violates the 2010 Standards, correct?
15     A   It's not in compliance with the 2010 Standards,
16 correct.
17     Q   And you did a measurement that it's 85 percent
18 short of the required length, correct?
19     A   Correct.
20     Q   Did it matter whether or not it was ten percent
21 short of the required length or 85 percent short of the
22 required length in order to be a violation of the ADA
23 2010 Standards?
24     A   Either one is a violation.

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 12

CARL M. DARR
June 3, 2024

Page 48

1    Q   And would you agree that, even if the top
2  landing was only five percent short of the 60-inch
3  requirement, that a public policy, if they knew about
4  it, would be required to remedy it if the structure was
5  built after 2010?
6    A   Well, during construction, if someone knew about
7  it, they would be required to rectify it.
8    Q   Is there any section of the ADA Standards which
9  would permit a government entity such as Cook County, if
10 they knew that the top landing of a corridor ramp was
11 five percent short of the required 60 inches for a
12 landing, to be in compliance with the ADA Code?
13   A   I'm sorry.  Can you repeat?
14       MR. RADUNSKY:  Yeah.  That's not a good question.
15          Object to form.
16 BY MR. MORRISSEY:
17   Q   Now, in your report you say the top landing can
18 easily be corrected, is that correct?
19       MR. RADUNSKY:  East, Tom?
20       MR. MORRISSEY:  The east.
21       MR. RADUNSKY:  Okay.
22 BY MR. MORRISSEY:
23   Q   The east tunnel corridor top landing can easily
24 be corrected by Cook County?

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 49

1    A   I'm not sure I'd say easily, but, yes, the wall
2  with the doors, there is space to shift it, I guess,
3  eastward is the correct direction so that you would have
4  a five-foot -- a 60-inch clear area after the top of the
5  upper ramp.
6    Q   As an architect, how difficult would it be for
7  Cook County to move, relocate the doors to the east
8  51 inches to provide the minimum required landing
9  length?
10   A   So in that specific case, normally, not
11 difficult.
12       However, there is a large heating pipe that
13 would also have to be -- the work would have to be
14 coordinated with it.  It comes out in an awkward
15 location.  I'm not sure if you can just -- So that's a
16 consideration that would complicate it a little bit at
17 least, maybe more.
18       I don't remember what the height of that pipe
19 is above the floor so that would be a consideration
20 because you have to have head room or put hand detection
21 under it, and then, also, you have to make sure that you
22 can firestop everything.
23   Q   You don't put that in your report?
24   A   No.  I -- No.

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 50

1        I was just verbalizing, articulating kind of
2  the considerations involved in moving that wall.
3    Q   In your report there's no consideration that
4  moving that pipe would be an obstacle to making the top
5  landing compliant?
6    A   If I went into the detail of all the obstacles
7  involved with each and every specific recommendation
8  here, it would be a much more lengthy report.
9    Q   But in completing -- in preparing this report,
10 you wanted to be thorough, correct, and --
11   A   Right.
12   Q   -- consider all the elements that may or may not
13 impact the -- whether or not the east corridor ramp was
14 compliant with the ADA Code, correct?
15       MR. RADUNSKY:  Object to form.  It's argumentative,
16 too.
17       You can answer.
18       THE WITNESS:  It is thorough for the report, but
19 normally those considerations would occur at the next
20 phase of the work, which would be, you know, the design.
21 BY MR. MORRISSEY:
22   Q   So without going to the next step, as an
23 architect, you don't have an opinion whether or not it's
24 feasible or not to move the doors 51 inches east to make

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 51

1  the top landing compliant with the 60-inch requirement.
2        MR. RADUNSKY:  Object to form when you say feasible.
3        You can answer.
4        THE WITNESS:  No, I do have an opinion.
5        It is feasible, but you also may be moving
6  pipes at the same time.
7  BY MR. MORRISSEY:
8    Q   The next element that you looked at was the
9  upper ramp, correct?
10   A   Correct.
11       And that's the next element in my report.
12       MR. RADUNSKY:  Just for the record, we're talking
13 east.
14       MR. MORRISSEY:  I understand.
15       MR. RADUNSKY:  Okay.
16       MR. MORRISSEY:  All these questions are directed to
17 the east tunnel.
18       MR. RADUNSKY:  Perfect.
19       Thank you.
20 BY MR. MORRISSEY:
21   Q   You also looked at another tunnel which was the
22 north tunnel, correct?
23   A   Correct.
24   Q   And your opinion was the north tunnel was

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 13

CARL M. DARR
June 3, 2024

Page 52

1  compliant because it -- the slope was greater than one
2  to 20, correct, was less than one to --
3  **A   It was shallower than one to 20, yes.**
4  Q   Yes.
5  Looking at -- Can you define what you consider
6  the upper ramp under Number 2 on Page 10?
7  **A   It's the section between the top landing and the**
8  **intermediate landing.  It's the highest slope section of**
9  **the tunnel floor.**
10 Q   From the bottom landing to the top landing, did
11 you measure the rise of that corridor ramp?
12 **A   Well, we have that data from the Lidar scan so**
13 **we would, I believe -- I don't know if I -- I don't know**
14 **if I actually somewhere stated an overall length, but I**
15 **do have --**
16 MR. RADUNSKY:  (Indicating.)
17 THE WITNESS:  Right.  The staples are coming apart.
18 It's kind of falling apart here.
19 MR. RADUNSKY:  Tom, your question was slope from top
20 to bottom, right?
21 MR. MORRISSEY:  No.
22 Rise.
23 MR. RADUNSKY:  Rise.
24 THE WITNESS:  Overall rise?

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 53

1  MR. RADUNSKY:  Yes.
2  THE WITNESS:  I know I have it in these photos here.
3  The bottom run is 29.7 inches.
4  Oh, wait.  There's a page missing.
5  And the top run is 23.16 inches.
6  So I can add them together if you want.
7  BY MR. MORRISSEY:
8  Q   So that be a total of 53 inches, the rise?
9  **A   Give or take.**
10 Q   Okay.  And --
11 **A   Can I --**
12 **These are all out of --**
13 Q   If a ramp it has a rise of 53 inches that
14 requires intermediate landing under the ADA Code --
15 **A   This ramp requires an intermediate landing, yes.**
16 **There's no disagreement on that.**
17 Q   Your Number 2 element is the upper ramp, and you
18 say the last 4.27 feet of the run has a rise of 4.56
19 inches and a slope of one to 11?
20 **A   That's correct.**
21 Q   And --
22 **A   Oh, I'm sorry.**
23 Q   -- that isn't compliant with the ADA Code, a
24 slope of one to 11, correct?

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 54

1  **A   A slope of one to 11 is steeper than a slope of**
2  **one to 12, which is the max -- maximum permitted, and so**
3  **it is not compliant.**
4  Q   Can you explain to me why a slope of -- with the
5  steepness of one to 11 would be difficult for a
6  wheelchair person to go up the ramp?
7  **A   Well, I mean, the steeper -- the steeper a slope**
8  **is, the more difficult it is.  A one to 11 slope is**
9  **permitted in certain short runs of ramp lengths.**
10 **In this case it's a short run, but it's**
11 **attached continuous with a longer run, and so you'd have**
12 **to take the overall length, and so that portion which is**
13 **one to 11 is too steep and it's not permitted; whereas,**
14 **the remainder of the top run, which I think had one to**
15 **12 or slightly shallower slope, is compliant.**
16 Q   So if an individual is self-propelling in a
17 wheelchair up the ramp, the upper 4.5 inches of that
18 ramp is steeper than permitted by the code, correct?
19 **A   Correct.**
20 Q   And for some individuals in a wheelchair, that
21 would make it more difficult for them to reach the top
22 of the landing?
23 **A   It would make it more difficult for all**
24 **individuals in a wheelchair.  Whether or not it's beyond**

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 55

1  their ability so to speak is a matter of what their
2  ability is.
3  Q   Now, you say it would be possible to add a floor
4  topping which will even out the slope, make a consistent
5  floor slope that has a one to 12 slope or shallower.
6  Can you explain how as an architect you would
7  provide that design?
8  **A   Yeah.  I think, again, I could have been a**
9  **little bit more explicit here.**
10 **The -- Because the ramp is going at a shallow**
11 **angle and a steeper angle, actually, you would have to**
12 **chop off a portion of that -- that upper four and a half**
13 **feet, let's say, and then put a floor topping on to make**
14 **it smooth but reconfigure it to be consistent with the**
15 **lower portion of the ramp which would be one and 12.**
16 Q   So would your -- if you were the architect of
17 record, one recommendation you would make is to saw cut
18 the upper 4.56 inches at the upper ramp and smooth out
19 the surface to eliminate that slope of one to 11?
20 **A   Yeah, whether you had to saw cut it out or just**
21 **jackhammer out a top portion, which would require**
22 **further investigation, but, basically, yes, remove a**
23 **section that's too steep and somehow either replace it**
24 **or top it out with materials that would have the correct**

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 14

CARL M. DARR
June 3, 2024

Page 56

1  slope.
2      Q   And as an architect, it's your opinion that
3  would be feasible?
4      A   Yes.
5      Q   Going to the next one, the intermediate landing,
6  you reviewed Mr. Kepka's, who is an architect, findings
7  in regards to the length of the intermediate landing?
8      A   I did.
9      Q   And his findings, I think, were that the length
10 was 38 inches or so, and you have it quite different,
11 you have it being like 56 inches or a little --
12 55 inches?
13     A   I thought it was -- I thought we said 57 in the
14 report.
15     Q   I'm sorry.  57, approximately 57?
16     A   Yes.
17     Q   Thank you.
18         Can you explain why two architects would come
19 up with a different measurement for the intermediate --
20     A   Well, the only thing I saw in his report was a
21 very blurry photo, but I'd say the reason is that he
22 made a mistake.
23         We show the measurement for the ramp in one of
24 these photos.  It's on the top of Page 13.

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 57

1      And I know the Type 3, but when you're on a
2  computer, you can blow it up and see where the arrow
3  starts and ends.  That measurement is roughly
4  4.7-something.
5      MR. RADUNSKY:  You're looking at the top photo of
6  Page 13 of your report?
7      THE WITNESS:  Yeah.
8      MR. RADUNSKY:  Okay.
9  BY MR. MORRISSEY:
10     Q   I'm going to pull that up in a second.
11         The -- There isn't a clear break point between
12 the intermediate landing and the upper ramp, is there,
13 for the east tunnel corridor?
14     A   Each -- Each transition between a landing and a
15 ramp in this corridor is not a distinct line.  They're
16 curved transitions so there is a little bit of
17 variation, not much, but a little bit of variation that
18 you can find between how -- where one person would start
19 and stop their measurement.
20     Q   So one architect might find it to be 52 inches
21 depending on where you measure the intermediate landing?
22     A   Yeah.
23     Q   Another might say it's 57?
24     A   Hopefully, not that much of a variance, but,

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 58

1  yes, the general idea is it's --
2      Q   And when I refer to a breakpoint, there's not a
3  clear cut (indicating) where the lower ramp stops and --
4      A   I don't think she can capture your motions.  I'm
5  just saying.
6          (Discussion had off the record.)
7  BY MR. MORRISSEY:
8      Q   There isn't a straight breakpoint --
9      A   No, there's no --
10     Q   -- between --
11     A   There's no distinct plane as there would be
12 between the intersections of two -- there's no straight
13 line, straight and distinct line as there would be
14 between the intersections of two planes, straight
15 planes.  This is -- They curve at the top and bottom of
16 each ramp.
17     Q   As a person who's an expert on the ADA Code, why
18 does the ADA Code require a minimum of 60 inches in
19 length for an intermediate landing?
20     A   Well, 60 inches is a common minimum, although
21 it's going to change soon, it's a common minimum
22 dimension used for being able to turn around in a
23 wheelchair.
24     Q   So --

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 59

1      A   So say --
2          I'm sorry.
3      Q   That would be similar to the turning radius for
4  a toilet?
5      A   Yeah.
6      Q   So that's a standard element under the ADA
7  for -- to allow a person in a wheelchair at minimum to
8  have 60 inches, correct?
9      A   To be able to turn around, yes.
10     Q   Now, you alluded to that there may be some
11 change, perspective change in the ADA Code in regards
12 to --
13     A   I know -- I haven't -- I've dealt with it on one
14 project, but, yeah, there's an increase -- I believe
15 some of the turning radiuses in toilet stalls are
16 actually going to increase.
17     Q   So that would be under the Department of Justice
18 ADA Code?
19     A   I believe so, yeah.
20     Q   So is there a proposed regulation that you've
21 reviewed as an architect?
22     A   There -- I think that that's actually in an
23 active regulation, I'd have to go back and look, but we
24 ran into with one suburban's municipalities where we had

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 15

CARL M. DARR
June 3, 2024

Page 60

1  to increase the toilet stalls for the design.
2     Q   What project are you referring to?
3     A   It's -- It's a Pace bus transfer facility out in
4  Schaumburg.
5     Q   So as an architect why is the ADA Code
6  increasing the minimum area for intermediate landing or
7  accessibility for a turning space for a wheelchair
8  person to use a toilet facility?
9     MR. RADUNSKY:   Just object to any remedial measures.
10     You can answer.
11    THE WITNESS:  That would be speculative on my part,
12 but I assume in their wisdom they've determined that to
13 turn around in a toilet stall requires more space -- to
14 turn around comfortably in a toilet stall requires
15 additional space.
16 BY MR. MORRISSEY:
17    Q   So you have a recommendation as far as a
18 remedial recommendation for remedying this violation for
19 the intermediate ramp --
20     Can you explain that?
21     -- intermediate landing.  I'm sorry.
22    A   Yeah.  Let me look at my report.
23     Basically, to shift the lower ramp section
24 westward so that you can increase the length of the

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 61

1  intermediate landing to be at least 60 inches, and,
2  yeah, so just to shift the whole lower section westward
3  so that you end up with a longer intermediate landing.
4      So you basically have to rebuild the entirety
5  of the lower ramp section.
6     Q   Now, you mentioned just a few moments ago that,
7  depending upon where you -- where an architect decides
8  to measure the intermediate landing, it could vary
9  between, let's say, 52 inches to 57 inches in length.
10     Where in the ADA 2010 Standards does it say
11 such a variance from the 60 minimum requirement is
12 minor?
13    A   Well, I don't think I said that.  I think you
14 did.
15     I think I said that, if somebody is measuring
16 where the landing starts and stops, there's -- depending
17 on how accurate they are, you could -- you could end up
18 with some variance.
19     But, technically, it would be only where the
20 curve starts going up and where the curve starts going
21 down so just the horizontal flat area would be the
22 landing, not any portion of the sloped curve.
23    Q   My question goes back to your executive summary
24 when you talk about the -- refer to the intermediate

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 62

1  landing as being a minor violation.
2      My question specifically is; where does it
3  provide a public entity liberty to have a structural
4  element such as an intermediate landing less than
5  60 inches?
6     A   I'm sorry.  Can you repeat that?
7     MR. MORRISSEY:   Can you repeat?
8      (Question read.)
9     THE WITNESS:  Where does what --
10 BY MR. MORRISSEY:
11    Q   So my question is; you say that certain
12 violations with the exception of the -- the landing at
13 the top of the ramp are, quote-unquote, minor, and my
14 question to you as a person who is well-versed in the
15 ADA Code 2010 Standards is, where in the 2010 Standards
16 does it permit a public entity for an intermediate
17 landing, which is required, to have a landing that's
18 less than 60 inches?
19    A   The regulations don't permit any entity to have
20 a landing less than 60 inches.
21    Q   And that's true also as far as the upper ramp
22 and the lower ramp; they either comply or they don't
23 comply with the ADA Code?
24    A   For those elements, yes, they either comply or

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 63

1  do not comply with the ADA Code.
2     Q   And we're going to walk through the lower ramp
3  which is Number 4 which is on Page 11.
4      Just like the upper ramp, you mentioned that
5  the bottom of the lower ramp has a slope which is too
6  steep, correct?
7     A   It's much shorter, it's only one foot in length,
8  but, yes, there's a section that's too steep.
9     Q   So the slope is one to 8.5, correct, which the
10 requirement is, at least, one to 12 or greater, correct?
11    A   For the first part, yes, that's what we
12 measured.
13     And for the second part of your question, the
14 requirement is one to 12 or shallower, not greater.
15    Q   The bottom landing has a sufficient 60-inch
16 landing, correct, so that's --
17    A   Correct.
18    Q   -- that's in compliance with the ADA?
19     Now, the handrails you point out in Number 6
20 are required to be 12 inches at both the top and the
21 bottom of the ramps -- of the east corridor ramp,
22 correct?
23    A   Correct.
24    Q   And that would be the handrails on both sides of

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 16

**CARL M. DARR**
**June 3, 2024**

Page 64

1  the ramp, correct?
2      **A**   **Correct.**
3      Q   And in this case there are only -- they're off
4  by four and a half inches, correct?
5      **A**   **At the bottom of the ramp, they're off by four**
6  **and a half inches. At the top of the ramp, they're off**
7  **by .7 inches.**
8      Q   Okay. And why -- why does the 2010 Code and the
9  1991 EDAC Code require handrail extensions of 12 inches,
10 what purpose does that serve?
11     **A**   **Well, the code, itself, does not state a purpose**
12 **for requiring it. It just states that they're required.**
13     **I mean, the logical understanding is that, if**
14 **somebody is approaching a ramp or getting off a ramp,**
15 **they still might need to have something to hold onto.**
16     Q   Initially, we have not only the bottom ramps
17 being only 7.4 --
18     Let me rephrase the question.
19     The handrails at the bottom of the corridor are
20 only 7.4 inches in length, coupled with the fact that
21 the initial lower ramp is too steep, correct?
22     **A**   **That's correct.**
23     Q   So that that -- that, in this particular case,
24 handrails that extend 12 inches may benefit some

**CARL M. DARR**
**June 3, 2024**

Page 65

1  wheelchair users in initially moving up the ramp, is
2  that fair to say?
3      **A**   **I wouldn't disagree with that.**
4      Q   And replacing or putting accessible handrails
5  that are 12 inches for the east corridor ramp, it's
6  doable, correct, it's feasible?
7      **A**   **Yes.**
8      Q   And you also mentioned that the handrails --
9  that some portion of the handrails, they're not at the
10 required height of 30 -- minimum of 34 inches, correct?
11     **A**   **Generally, they're at -- Generally, they're at**
12 **the minimum required height, but they're not consistent**
13 **across the length of the ramp, and at times, yes, they**
14 **are too low.**
15     Q   Now, have you inspected other ramps at the
16 Cook County Jail other than the Cermak ramp in regards
17 to whether or not they have handrails?
18     **A**   **Well, we inspected the north ramp.**
19     Q   Right.
20     And did they have the non-ligature handrails on
21 the north ramp?
22     **A**   **They don't have handrails on the north ramp.**
23     Q   That's correct. I forgot.
24     My question is; to your knowledge are there any

**CARL M. DARR**
**June 3, 2024**

Page 66

1  ramps at Cook County Jail which have the non-ligature
2  handrails?
3      **A**   **I believe the Cermak ramp does.**
4      Q   And that currently isn't in compliance because
5  it doesn't have the extent -- the 12-inch extensions,
6  correct?
7      **A**   **Correct.**
8      Q   Are there --
9      MR. MORRISSEY: Can we take -- Let's see. You want
10 to take a five-minute break?
11     MR. RADUNSKY: Yeah.
12     MR. MORRISSEY: We'll take ten minutes.
13     MR. RADUNSKY: Sure.
14     (Break taken.)
15     MR. MORRISSEY: Go back on the record.
16 BY MR. MORRISSEY:
17     Q   Earlier in the dep, you said that you were
18 waiting for acceptance by your client Cook County in
19 regards to the Cermak assessment you did, is that
20 correct?
21     **A**   **Correct.**
22     Q   And am I correct that, similar to the corridor
23 ramp accessibility assessment, a report has been
24 tendered to Cook County, a written report has been

**CARL M. DARR**
**June 3, 2024**

Page 67

1  tendered to Cook County?
2      **A**   **That's my understanding, yes.**
3      Q   And what individual or individuals within
4  Cook County have to accept the report by GEC before
5  doing the transfer package?
6      **A**   **I'm not sure specifically, but we deal with, oh,**
7  **Kate Sumplet, I think at LCM, so she's their project**
8  **manager.**
9      **I think the nature of in terms of acceptance or**
10 **not is what we listed for recommendations and how they**
11 **would go about that. I think they wanted to review**
12 **that.**
13     Q   You mentioned LCM.
14     Is that the private outside consultant for
15 Cook County?
16     **A**   **Yeah, it's -- it's -- they use -- they're using**
17 **LCM as the project manager on their side of this**
18 **project.**
19     Q   And what is the role of Altus in regards to the
20 Cermak assessment?
21     **A**   **Altus?**
22     Q   Altus, yeah.
23     **A**   **Altus is our consultant.**
24     Q   And what role do they play in regards to the

Exhibit 9 Page 17

CARL M. DARR
June 3, 2024

Page 68

1  corridor ramp for Cermak and the Cermak Health Services
2  building?
3      A    As I said earlier, they were -- are or were
4  responsible for the site review and contributing
5  portions of the report for the exterior approach to the
6  building.
7      Q    Okay.  So the RFQ that you began your work for
8  the Cermak corridor ramp and the Cermak Health building
9  began sometime in the year 2022 according to Exhibit 7,
10  Page 5, is that fair to say?
11      A    Which one is Exhibit 7?
12      Q    Exhibit 7 --
13      A    Oh, here.
14          Page 5?
15      Q    Page 5.
16      A    Was that a question?
17      Q    Yes.
18          It's Exhibit 1.  It's Exhibit 1, Page 5.
19          I'm sorry.
20      A    Wait.  Not Exhibit 7?
21      Q    It's Exhibit 1.
22      MR. RADUNSKY:  Exhibit 1, your report, right there,
23  your report.
24      THE WITNESS:  Oh, you're talking about the tunnel

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 69

1  assessment?
2  BY MR. MORRISSEY:
3      Q    Yes.
4      A    Because I thought you said the Cermak
5  assessment.
6      Q    Well, my question is; the Cermak corridor ramp
7  and the Cermak Health Services facility assessment was
8  done pursuant to this RFQ Number 2215-0221?
9      A    I'm sorry.  I'm confused because then you
10  referenced Exhibit 1, which is the corridor assessment
11  for the RTU corridor.
12      Q    No.
13          What am I doing?
14          I'm sorry.
15      MR. RADUNSKY:  Exhibit 7?
16  BY MR. MORRISSEY:
17      Q    Let's go back.
18          It's Exhibit 7, Page 5.
19      A    Okay.
20      Q    So Exhibit 7, Page 5, references this RFQ
21  Number 2215-0221, and pursuant to that RFQ, GEC did an
22  assessment of both the corridor ramp and the
23  Cermak Health Services facility?
24      A    Yes.

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 70

1          I don't know if we started that in 2022, but we
2  submitted it on December 6th of 2023.
3      Q    And those reports have been tendered to the
4  project manager for Cook County, LCM, and you're waiting
5  for their approval of the recommendations, is that fair
6  to say?
7      A    Yeah, their, yeah, acceptance or approval of the
8  recommendations, yes.
9      Q    And once they approve the recommendations for
10  the corridor ramp for Cermak and the Cermak building,
11  then your firm will proceed to do a transfer package?
12      A    Right, which will include drawings and I believe
13  specifications up to 30 percent complete.
14      Q    The transfer package will include drawings for
15  both the Cermak building and the Cermak corridor ramp,
16  is that fair to say?
17      A    I believe so, yes.
18          I haven't --
19      Q    And the -- And that could take up to a year to
20  do the transfer package for Cook County?
21      MR. RADUNSKY:  Just object to the relevance of
22  Exhibit 7 and of the Cermak ramp in the Walker case.
23          You can answer.
24      THE WITNESS:  It's speculation, but, yeah, it could

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 71

1  take a year or less.
2  BY MR. MORRISSEY:
3      Q    And are you -- And once those the transfer
4  package is tendered to Cook County, are you familiar
5  with a firm called HDR Architects?
6      A    No.  I may have come across them, but I don't --
7      Q    Can you --
8          HDR Architects was identified by Eric Davis as
9  the prospective architect of record for the Cermak
10  corridor ramp.
11          My question is; your firm under the transfer
12  package is going to do 30 percent of the schematic
13  drawings for the Cermak corridor ramp as part of the
14  transfer package?
15      MR. RADUNSKY:  Same objection; relevance.
16          You can answer.
17      THE WITNESS:  We do documents that take the design
18  to 30 percent of completion.  It's referenced going from
19  start of design to having bid documents.  We take it to
20  30 percent, which typically is schematic design.
21  BY MR. MORRISSEY:
22      Q    As a layperson, why wouldn't the county say to
23  GEC do the final drawings that we can send out for
24  permitting for the Cermak ramp, why have two firms do

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 18

CARL M. DARR
June 3, 2024

Page 72

1  the same work?
2      A   Don't know.  That's just the way the RFQ is
3  structured.
4      Q   After your firm completes as part of the
5  transfer package the schematic drawings for the Cermak
6  corridor ramp, how long would you speculate it would
7  talk an architectural firm to complete the drawings as
8  an architect of record?
9      MR. RADUNSKY:  Same objection; relevance.
10     You can answer.
11     THE WITNESS:  I really don't have an understanding
12 of that, you know.  That could vary quite a bit.
13 BY MR. MORRISSEY:
14     Q   If we go back to Eric Davis' declaration in this
15 case, it's Exhibit 8.
16     A   Uh-huh.
17     Q   Let me find the spot.
18         If we look at Page 7, Paragraph 18 if you want
19 to take a look at it, in regards to this east corridor
20 ramp for the RTU, Eric Davis states that the repair or
21 renovation of the Cermak corridor ramp will cost similar
22 to the cost of making the RTU corridor ramp compliant
23 under the ADA, and he estimates it at several hundred
24 thousands of dollars.

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 73

1      Q   Do you agree with that statement?
2      A   Not specifically.
3          But I do believe that they both will cost in
4  the neighborhood of several hundred thousand.  One might
5  be quite a bit more than the other.
6      Q   As the architectural firm that did the
7  assessment, which one would cost more, the Cermak
8  corridor ramp or the RTU east corridor ramp?
9      A   Well, although they're --
10     MR. RADUNSKY:  Objection; speculation.
11     You can answer.
12     THE WITNESS:  Yeah, speculation.
13         Although, you know, what you run into once you
14 start the design can vary, but, generally, the RTU ramp
15 is considered a bit larger, there's more things to fix,
16 and you're replacing that whole lower section of the
17 ramp.  So I would say that probably would be more
18 expensive.
19         But on the other hand, there's considerations
20 in the Cermak ramp about being able to encroach kind of
21 in that doorway and resolving that landing area, and we
22 haven't ever been able to get in on the other side of
23 that door.
24 BY MR. MORRISSEY:

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 74

1      Q   For the Cermak corridor ramp, as an architect,
2  what would you estimate the time for construction of the
3  Cermak corridor ramp?
4      MR. RADUNSKY:  Objection to relevance.
5          You can answer.
6      THE WITNESS:  For the Cermak ramp, did you say?
7  BY MR. MORRISSEY:
8      Q   Yeah.
9      MR. RADUNSKY:  Same objections to relevance and
10 speculation.
11     THE WITNESS:  Again, there are so many variables in
12 terms of how agencies work, how contractors work, and
13 you also have the complication of being in a secure
14 facility, you know.
15         My guesstimate, you know, it could take four
16 months.
17 BY MR. MORRISSEY:
18     Q   And what would your estimate as far as the
19 construction time for the RTU east corridor ramp be?
20     A   Again, there's a lot of variables, including
21 whether or not you can dedicate that space solely to the
22 construction and somehow move the detainees along
23 different routes, but, generally, I mean, as a wild
24 unscientific estimate, I'd say six to eight months.

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 75

1      MR. RADUNSKY:  How much more time are you thinking?
2      MR. MORRISSEY:  Not too much.
3  BY MR. MORRISSEY:
4      Q   Going to Exhibit 9 now, it's electronic, it's
5  the request for qualifications that went out on -- it's
6  the request for qualifications which is RFQ
7  Number 2415-2093.
8          Do you have that up on your screen?
9      A   I see part of the page, yeah.
10     Q   All right.  You mentioned that your firm is
11 bidding on this contract?
12     A   Which contract?
13     Q   It's a -- contract that is to do an overall
14 assessment of the Cook County Department of Corrections.
15     A   I don't think I said we're bidding on it.
16     Q   Well, I'm sorry, not bidding.
17         You're providing -- You're submitting your
18 qualifications to Cook County?
19     A   I don't think I said that.
20     Q   I'm sorry.  Let me ask you.
21         Is GEC responding to this request for
22 qualifications?
23     A   I'm aware that we received it, and I imagine we
24 will.  It's hard to imagine we won't.

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 19

CARL M. DARR
June 3, 2024

Page 76

1    I saw something via e-mail the other day that
2  included it, but I haven't heard anything yet.
3    Q   What is your understanding about this request
4  for qualification that's 2415-02093 as far as the extent
5  of it?
6    A   The only thing I know is, I believe it's for the
7  entire campus, I believe it's broken down into three
8  parts, I believe there will be three separate firms, no
9  firm will get more than one part, it will be -- it will
10 likely be a very substantial and involved project since
11 there's so many buildings.
12   Q   Now, for the Cermak building, it's taken at
13 least a year and a half to get to the point where you've
14 submitted your assessments of the corridor and the
15 Cermak building, and you're still waiting for LCM to
16 accept your recommendations, correct?
17   A   Yeah.
18       I think -- Well, I'm not sure if it's been a
19 full year and a half, but I thought I saw in here on
20 Page 6, well, this is a corridor ramp, and it talks
21 about us visiting it on August 18th, 2023.
22       I think we actually started the project for the
23 Cermak building a couple months before that, maybe May,
24 June 2023.  So it's taken about a year.

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 77

1    Q   Okay.
2    A   I would -- I think that would probably be more
3  accurate.
4    Q   And in Mr. Davis' declaration, which is
5  Exhibit 8, he talks about the campus having upwards of
6  60 buildings to be assessed, I think.
7        Let me look and find it exactly.
8        It's on Paragraph 5:  50 structures totaling
9  3.5 million square feet as well as the land, outdoor
10 recreation area, gardens, drives, sidewalks, parking
11 areas, around not over 100 acres of county-owned
12 property.
13       Now, it's taken, at least -- would you say at
14 least a year for the Cermak assessment, and your
15 understanding is they'll break this down into three
16 separate architectural firms, correct?
17   A   That's my understanding, yes.
18   Q   How long do you think, if your firm was awarded
19 a portion of it, a third of a portion of it, how long do
20 you think it would take your firm to do such a
21 comprehensive assessment of one phase of the project?
22   MR. RADUNSKY:  Just relevance.
23   THE WITNESS:  Again, that's so -- that's very
24 speculative, you know, and depending on what -- I

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 78

1  haven't seen the specifics of the RFQ, but, yeah,
2  depending on the specifics of the RFQ and depending on
3  how the county handles it, and I think on the one hand
4  Cermak in a lot of ways was just kind of a guinea pig
5  for other assessments they want to do.
6        You know, maybe one year, maybe two years,
7  maybe three years, maybe five years.
8  BY MR. MORRISSEY:
9    Q   Okay.  Just your firm doing one-third of the
10 project --
11   A   Correct.
12   Q   -- between one and five years?
13       And then after -- is that with the transfer
14 package or without a transfer package?
15   A   So I believe, one other thing, my understanding
16 of this RFQ is that it involves one firm start to finish
17 so there's no transfer package is my understanding of
18 the RFQ.
19   Q   Okay.
20   A   That goes through the construction to the end.
21   Q   So if your firm is awarded one-third of the
22 assessment process, that would not include doing a
23 transfer package?
24   A   No, because --

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 79

1    I'm sorry.  I'll do it this way.
2        The -- It would not include it because we
3  wouldn't be awarded just the assessment, we'd be awarded
4  the full scope from assessment through design through
5  bid documents through bidding through construction
6  administration.
7    Q   Do you know why that they didn't -- why
8  Cook County didn't follow the same format for the Cermak
9  plus for qualifications?
10   MR. RADUNSKY:  Objection to speculation, relevance.
11       You can answer.
12   THE WITNESS:  I have absolutely no idea.
13 BY MR. MORRISSEY:
14   Q   So a project of this scope could take upwards of
15 five years to complete?
16   MR. RADUNSKY:  Objection.  I think that misstates
17 his testimony.
18 BY MR. MORRISSEY:
19   Q   At best.
20   MR. RADUNSKY:  You can answer.
21       Also, speculation.
22       You can answer.
23   THE WITNESS:  So a project of this type, I mean,
24 from start to finish, it could take five years or

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 20

CARL M. DARR
June 3, 2024

Page 80

1   longer.
2         But you have to realize that, you know, the
3   first part of it is we -- going to become a master plan
4   of -- of the entirety of the facilities, and, you know,
5   it depends, are they going to do one building at a time,
6   are they going to do multiple buildings at a time, are
7   they going to all the buildings at a time, are they
8   going to do all three packages at a time.
9         I mean, it's -- yeah, I really couldn't offer
10  any even wild guess about that.
11  BY MR. MORRISSEY:
12      Q   Now, as an architect, you've worked on public
13  buildings that have renovated structures to be compliant
14  with the ADA Standards on an expedited basis such as
15  your work for the McCormick Place, correct?
16      A   We've done multiple projects at McCormick Place.
17  I'm not sure which one you're referring to.
18      Q   I believe in your c.v, you mentioned --
19      A   I believe that was a Metra Station, the one I
20  did.
21      Q   Yeah.  Yeah.
22          So explain how that was expedited for the
23  Metra Station, which I guess is the South Shore Line?
24      A   Yes.

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 81

1         Jogging my memory a bit because it's been a few
2   years, but I actually was -- yeah, there was a time
3   frame they wanted it, I don't remember exactly why, but,
4   you know, there was -- there were quick decisions made
5   on -- for the design, I remember that because I did it,
6   we did kind of accelerate as best we could the drawings,
7   and there was a lot of coordination that occurred with
8   the win bidder to try to get the construction done as
9   quickly as possible.
10      Q   In considering GEC's relationship with
11  Cook County, GEC has been accepted for doing an
12  assessment of the Leighton Court building, is that fair
13  to say?
14      A   Yes.
15      Q   But your -- And that was in 2022, I think you
16  stated?
17      A   No, I don't think I stated that.
18          I don't know when we were awarded that.  I was
19  just involved in the narrative for the proposal, and I
20  don't remember when I did that.
21      Q   I believe the RFQ came on in 2022.
22      A   Yes.
23      Q   My question is; you still -- your firm is
24  still waiting for Cook County to give your firm the

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 82

1   go-ahead to do an assessment on the Leighton Court
2   building?
3       A   They made a recent addition to that contract so
4   I think that's the last thing to be worked out.
5       Q   Do you have any guesstimate when and what year
6   Cook County will do an assessment or have your firm do
7   an assessment, ADA assessment of Leighton?
8       MR. RADUNSKY:  Speculation objection.
9           You can answer.
10      THE WITNESS:  Well, on my own projections, which
11  take into account any -- our understanding of the nature
12  of Cook County is not always moving as quickly as they
13  hope, I am projecting that we will be starting and
14  having staff put time towards that project next month.
15  BY MR. MORRISSEY:
16      Q   Did the staff require county board approval?
17      A   I'm not -- I'm not sure if the award of the
18  contract -- Well, I'm not sure what state the award of
19  the contract is in offhand.  I know it's fairly close
20  for -- to us getting ATP.  I'm not sure if any of it
21  requires county board approval.
22      Q   Are you aware that several years ago another
23  architectural or engineering firm reviewed the
24  accessibility of the Leighton Court building?

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 83

1       A   No.
2       Q   That there were plans?
3       A   No.
4       Q   And that millions of dollars were expended by
5   Cook County to renovate and make it fully accessible for
6   prisoners and they never did anything?
7       MR. RADUNSKY:  Just object to form and foundation,
8   assumes facts not in evidence.
9       MR. MORRISSEY:  You were shown those --
10      MR. RADUNSKY:  Go ahead.
11          Those drawings.
12      MR. RADUNSKY:  It has nothing to do with our case.
13      THE WITNESS:  I just worked on the proposal.  I
14  haven't seen any drawings.
15      MR. RADUNSKY:  How much more time do we have?
16      MR. MORRISSEY:  We're getting there.
17      MR. RADUNSKY:  None of this is like really about our
18  case.  I mean, none of it is.  This is a fishing
19  expedition about other cases.
20      MR. MORRISSEY:  It's all in Eric Davis' declaration.
21      MR. RADUNSKY:  Then depose Eric Davis on it.  He
22  didn't write Eric Davis' declaration.  If you want to
23  talk to Eric about that over seven hours, that's
24  different, but I mean, this is not fair to Carl.  Carl

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 21

CARL M. DARR
June 3, 2024

Page 84

1  has got his opinions, and that's it. You're trying to,
2  you know, get him to testify to other matters.
3  BY MR. MORRISSEY:
4      Q   Has Cook County provided you with a
5  guesstimate --
6          Let me rephrase the question.
7          Has Eric Davis communicated to you or anybody
8  else at GEC when he expects to proceed on renovating the
9  Cermak corridor ramp to make it fully accessible for
10 mobility disabled inmates?
11     MR. RADUNSKY:  Objection; relevance, scope.  We're
12 not here to testify about the Cermak case or the Walker
13 case or the Walker ramp or the Cermak ramp.
14         You can answer.
15     THE WITNESS:  I haven't had any discussions
16 whatsoever with Eric about time frame for when they plan
17 do construction on Cermak ramp.
18 BY MR. MORRISSEY:
19     Q   Have you had any discussions with any members,
20 any employees or officials from Cook County in regards
21 to a timetable for renovating the Cermak corridor ramp?
22     MR. RADUNSKY:  Objection to relevance.
23         I mean, I'm going to let you ask like two more
24 questions on Cermak ramp.

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 85

1          I mean, this is not what we're here for, and
2  you're trying to take his deposition, Tom, without the
3  Cermak lawyers present in the Walker case, and it's just
4  totally unfair to the witness to do this, you know,
5  especially under a dep notice for the Westmoreland case.
6          You can answer the question.
7          I mean, this isn't going much further, or I'm
8  going to terminate the dep.
9      THE WITNESS:  What was the question?
10     MR. RADUNSKY:  Also, speculative.
11         You can answer.
12     THE WITNESS:  I don't remember the question.
13         (From the record above, the Reporter read
14          the following:
15          *Q  Have you had any discussions with
16          any members, any employees or officials
17          from Cook County in regards to a timetable
18          for renovating the Cermak corridor ramp?*)
19     THE WITNESS:  No, I have not.
20 BY MR. MORRISSEY:
21     Q   Have you had any discussions with any --
22         The same question in regards to the east
23 corridor ramp for the RTU.  Have you had any discussions
24 with Eric Davis or any other official from Cook County

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 86

1  in regards to a timetable to renovate the east corridor
2  ramp to make it compliant with the ADA?
3      A   No, I have not.
4      Q   You mention in your report that, at least during
5  one of your inspections, you observed some disabled
6  inmate being transported up the east corridor ramp in a
7  cart.
8          Is that fair to say?
9      A   I observed, at least, actually a couple times,
10 inmates being transported on a cart.  I don't know if
11 they were disabled or not.
12     Q   Under your report for the east corridor ramp, it
13 concludes that the ramp for multiple reasons was not in
14 compliance with the 2010 ADA Standards, is that fair to
15 say?
16     MR. RADUNSKY:  Objection; asked and answered.
17         You can answer.
18     THE WITNESS:  Correct.
19 BY MR. MORRISSEY:
20     Q   And that would also -- not only the 2010, but
21 also the 1991 ADA Standards, the east corridor ramp is
22 not in compliance with those standards either?
23     MR. RADUNSKY:  Same objection; asked and answered.
24         You can answer again.

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 87

1      THE WITNESS:  Correct.
2  BY MR. MORRISSEY:
3      Q   Given that the east corridor ramp was completed
4  or begun in 2011, based upon your understanding and
5  opinion, Cook County currently is in violation of the
6  ADA in regards to the -- that structure?
7      A   They're not in compliance with the ADA
8  in regards to that structure, that's correct.
9      Q   And have you communicated that to officials
10 within the Cook County Government or your company,
11 your -- GEC, have they communicated that it's not in
12 compliance?
13     A   No.
14         In this case, my client is DeVore, Radunsky,
15 and I've given my report to them.  I haven't spoken to
16 anyone else but them.
17     Q   Given your opinion in conclusion that the east
18 corridor ramp is noncompliant under the -- either the
19 1991 or the 2010 ADA Standards, is it permissible for
20 the Sheriff in Cook County to avoid renovating the ramp
21 by providing a correctional officer to push a wheelchair
22 person up and down the ramp?
23     A   I'm sorry.  Can you repeat that?
24     Q   I'll make it shorter.

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 22

CARL M. DARR
June 3, 2024

Page 88

1    Under the 1991 or 2010 Standards, would the
2 Sheriff and Cook County be in compliance with those
3 standards if they merely assisted a wheelchair person up
4 and down the ramp by pushing it?
5    MR. RADUNSKY:  Same --
6    Objection to form.
7    You can answer if you understand.
8    THE WITNESS:  Well, I think, in terms of compliance,
9 it would matter whether there was another alternate
10 route available to be used.
11    I'm not fully familiar with the tunnel system
12 to know that if there is an alternate ramp they can use.
13    In terms of the idea that having to use an
14 electric cart to get people from the one level to
15 another, that is not something contemplated by the
16 ADA Code.
17 BY MR. MORRISSEY:
18    Q   Is pushing a wheelchair person up or down the
19 east corridor contemplated permissible under the ADA
20 Code in 1991 or 2010 to alleviate, obviate the need of a
21 government to make the ramp compliant?
22    A   For a required accessible route, no, it is not.
23    Q   Have you communicated that to Cook County?
24    A   With regards to this ramp, I have given my

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 89

1 report to DeVore, Radunsky, and that's it.
2    Q   In regards to the Cermak corridor ramp, have you
3 communicated to Cook County, Eric Davis or any other
4 official with Cook County or the Sheriff's Office that
5 by assisting a wheelchair person up and down the Cermak
6 corridor ramp that obviates the need for Cook County to
7 renovate the ramp to make it compliant under the 1991
8 and/or 2010 ADA Standards?
9    MR. RADUNSKY:  I'm just objecting again.  I mean,
10 this is all related to the Cermak and the Walker ramp,
11 which is not relevant, and you should not answer these
12 questions.
13    I'm going to tell him to stop answering these
14 questions about the Cermak ramp because they have no
15 relevance, and I think the Court is going to agree, and,
16 you know, I'm instructing him not to answer.
17    MR. MORRISSEY:  Okay.  We'll certify the question.
18 BY MR. MORRISSEY:
19    Q   Have you as an ADA consultant for Cook County,
20 which you are on the Cermak corridor ramp and having
21 provided an opinion in this case for the east corridor
22 ramp, have you ever advised Cook County or the Sheriff
23 that merely assisting a wheelchair person up and down
24 either ramp by pushing them obviates the need for the

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 90

1 requirement under the ADA to renovate the ramp to make
2 it compliant with the codes?
3    MR. RADUNSKY:  Asked and answered multiple times,
4 like three times in the last ten minutes.
5    You can answer it again.
6    THE WITNESS:  I don't think I've ever had
7 discussions with Cook County staff about pushing inmates
8 up and down a ramp.
9 BY MR. MORRISSEY:
10    Q   All right.  Give me a few minutes.
11    Given your opinion that the east corridor ramp
12 is not compliant under the ADA Standards, is it your
13 recommendation that Cook County should defer renovating
14 that ramp for two or three years?
15    A   I don't think whether they should renovate it
16 now or in two or three years is really related to my
17 recommendations about we're just looking at the ramp in
18 terms of it being compliant or not compliant.
19    Q   Given GEC's involvement and assessment on both
20 the Cermak ramp and the RTU east corridor ramp --
21    Let me ask another question.
22    It's your understanding that for wheelchair
23 assisted detainees being transported to the Cermak
24 Health facility that the detainees go up the east

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 91

1 corridor ramp and then descend down into the Cermak
2 building through the Cermak corridor ramp?
3    A   It's my understanding that certain detainees,
4 if -- to my knowledge, detainees coming, for instance,
5 from the RTU that we were discussing, I think it's RTUA,
6 normally would go down, typically go down -- up the east
7 corridor ramp and then back down the Cermak ramp.
8    MR. RADUNSKY:  How much more do we have, Tom?  How
9 many more questions is Pat going to type for you to ask?
10 How many more?
11    How much longer are we going to go, Pat?
12    MR. PATRICK MORRISSEY:  I don't know.
13    MR. RADUNSKY:  How much longer?  You both have been
14 saying it's not going to be very much longer, and that
15 was over an hour and 15 minutes ago.  Can you just give
16 me some idea?
17    MR. MORRISSEY:  I would say we'll wrapping up in
18 15 minutes or less.
19    MR. RADUNSKY:  Perfect.  I appreciate it.
20    THE WITNESS:  Can I have another water?
21    MR. PATRICK MORRISSEY:  You want another water?
22    THE WITNESS:  Yeah.
23    (Discussion had off the record.)
24    MR. MORRISSEY:  Can I proceed, or do you want to --

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 23

CARL M. DARR
June 3, 2024

Page 92

1    MR. RADUNSKY:  Yeah, go ahead.
2    MR. MORRISSEY:  Can I proceed?
3    MR. RADUNSKY:  Go ahead.  Yes, yes, yes.
4  BY MR. RADUNSKY:
5    Q   Given that the path of travel to the Cermak
6  Health facility for a detainee housed in the RTU
7  involves going up the corridor ramp and descending down
8  the Cermak corridor ramp, does it make any sense as an
9  architect and as an ADA expert for Cook County to defer
10  for several years delaying the first ramp; i.e.; the
11  east corridor ramp, and then immediately now repairing
12  the -- and renovating the Cermak ramp?
13    MR. RADUNSKY:  Objection to form and foundation.
14  BY MR. RADUNSKY:
15    Q   Do you understand the question?
16    A   No.
17    The question is --
18    MR. RADUNSKY:  Go ahead.
19  BY MR. MORRISSEY:
20    Q   -- as a person who's well-versed in the ADA,
21  would you recommend to a client who wants to become
22  compliant with the structural elements of the ADA to
23  only renovate the -- one of the ramps, either the RTU
24  corridor ramp or the Cermak ramp, for detainees that are

---

CARL M. DARR
June 3, 2024

Page 93

1  housed in the RTU?
2    MR. RADUNSKY:  Object to form, foundation,
3  speculation.
4    You can answer.
5    THE WITNESS:  It's very speculative.
6    I mean, it depends what other considerations
7  there are, what money they have.
8    I mean, the one ramp leads to the Cermak ramp
9  but also leads to other places is my understanding.
10    You know, I think there's a difference between
11  renovating it out of an intent to try to make this as
12  accessible as possible, but, also, there's a difference
13  between that and being forced -- well, yeah, and, you
14  know, I just don't know how to answer that, I guess.
15  BY MR. MORRISSEY:
16    Q   Well, let's deal with just the east corridor
17  ramp.
18    A   Uh-huh.
19    Q   You testified or your report indicates that it's
20  an easy fix to cure the upper landing, in your report
21  you say that --
22    A   Yes.
23    Q   -- it's an easy fix?
24    A   I wouldn't disagree with that.

---

CARL M. DARR
June 3, 2024

Page 94

1    Q   Assuming that there's -- there are other
2  portions of the ramp that take longer to fix, does it
3  make any sense not to go ahead and move the doors that
4  are adjacent to the upper ramp to make an ADA-accessible
5  landing at the upper landing?
6    MR. RADUNSKY:  Object to the form.
7    You can answer.
8    THE WITNESS:  Assuming they have the resources to do
9  that, and, you know, I guess it would involve the
10  corrections department function, why wouldn't they?
11  BY MR. MORRISSEY:
12    Q   The same question in regards to the handrails.
13    Putting in handrails can be done relatively
14  soon, it wouldn't take two or three years to correct the
15  handrails so that they're at the minimum height of
16  34 inches, correct, and extending 12 inches from either
17  the top -- both, the top and the bottom, landings,
18  correct?
19    A   That, in itself, wouldn't require much.
20    However, if you later have to enlarge an
21  intermediate landing, you're going to have to replace
22  those railings again and basically throw out what you've
23  just done.
24    Q   But it could be done?

---

CARL M. DARR
June 3, 2024

Page 95

1    A   It could be done.
2    Q   Right now, well, within this year, it could be
3  done?
4    A   It could be done this year.
5    Q   And we also talked about the upper ramp area,
6  that that's off, the slope is too steep?
7    A   Yes.
8    Q   We talked about maybe saw-cutting out a portion
9  of it to make the upper portion of the ramp less steep?
10    A   Correct.
11    Q   Could that be done this year?
12    A   That's -- That's more involved than moving the
13  doors and more involved than extending the handrails and
14  would impact, I think, it seems like, the functions
15  and -- of the Corrections Department and moving
16  detainees through there?
17    So if -- if the space is empty and available
18  and they have the funding, yes, it could be done this
19  year, but I don't know in terms of the other variables
20  if that's possible.
21    Q   If the upper ramp landing was renovated within
22  the next six months, would that increase the
23  accessibility for a person in a wheelchair going up and
24  down a ramp?

Exhibit 9 Page 24

CARL M. DARR
June 3, 2024

Page 96

1     A   Maybe.  Maybe not.
2         So right now the -- yes, the doors are there,
3  but every time I've been there, they've been open, in
4  fact, I think one is broken so it can't even close, so
5  effectively, yes, they -- the door is in a place it
6  shouldn't be, but you can easily travel through the door
7  and be in a space -- you can travel through the door
8  uninhibited and be in a space that has a 60-inch flat
9  surface.
10    Q   So by doing that this year, it would enhance the
11 accessibility of an otherwise non-accessible east
12 corridor, right?
13    A   It would make it more compliant with the code
14 requirements.
15    Q   And by changing the handrails this year to be
16 the right height and extension, that also would increase
17 the accessibility in the immediate future of the east
18 corridor ramp?
19    A   It would make it more compliant with the code
20 requirements.
21    Q   And the same would be true in regards to the
22 upper ramp, the steepness of the upper ramp?
23    A   Correcting that overly steep part of the upper
24 ramp slope would make it more compliant with the code

---

CARL M. DARR
June 3, 2024

Page 97

1  requirements.
2     Q   If the current proposal -- If GEC was chosen as
3  one of the three architect engineering firms to do an
4  assessment of the Cook County campus, how would your
5  firm go about pinpointing what areas of the Cook County
6  Jail system need to be renovated first, how do you make
7  that determination?
8     A   I'm not sure what you're asking on that.
9     Q   I guess the question is; how do you -- for a
10 campus that's as large as the Cook County Jail is, how
11 does -- how do you as an architect advise a client like
12 Cook County to prioritize making accessibility
13 improvements?
14    A   That's a very complicated question.
15        The -- I mean, obviously, we would talk to the
16 client and see what priorities they have.
17        Our assessment would probably identify aspects
18 of noncompliance that are more critical or -- or larger
19 in magnitude or have more impact upon the users than
20 others, and, generally, in those cases, we would
21 encourage them to prioritize, but it's all tied in with
22 other systems often and other work they may have -- that
23 may have to be done to make those things complicated so,
24 you know, it does happen that we do prioritize things,

---

CARL M. DARR
June 3, 2024

Page 98

1  but there's a lot of considerations to go into that
2  formula basically, and it really just isn't a simple
3  formula, you know, or problem that we resolve.
4         You know, obviously, buildings with large
5  number -- or spaces with large number of users, you
6  know, might be more priority than places that get just
7  occasional use.  You know, there's just a lot of
8  variables and a lot of considerations.
9         But the first thing we would do is, work with
10 the client to do our assessment of all the buildings and
11 spaces on the exterior grounds so that we can, at least,
12 have a handle on what the problems are.
13    Q   Okay.  Given that the RTU and Cermak house
14 disabled prisoners, I mean, Cermak has people that are
15 in the infirmary because they're sick or they're
16 mobility challenged, RTU has detainees that have -- that
17 are assisted by canes, crutches, wheelchairs, given --
18 given that, would it be appropriate for Cook County to
19 prioritize the path of travel for detainees housed in
20 the RTU to go to the infirmary at Cermak by making the
21 east corridor ramp and the Cermak corridor ramp
22 accessible under the ADA Code?
23    A   Well, I don't -- I don't have full knowledge of
24 what other priorities Cook County may have at that

---

CARL M. DARR
June 3, 2024

Page 99

1  facility, but to the extent that there's a lot of users
2  that are unable to easily navigate that path, yeah, it
3  may make sense.
4     Q   And by using, you're talking about wheelchair
5  people using walkers and canes?
6     A   Blind people, yes, everybody.
7  MR. MORRISSEY:  Okay.  I have nothing further.
8  MR. RADUNSKY:  I've got some questions.
9              EXAMINATION
10 BY MR. RADUNSKY:
11    Q   Why did you look at the 2018 Building Code and
12 the 2018 Accessibility Code, and can you explain the
13 20 percent rule?
14    A   So you're talking about the Rehab Code?
15    Q   Uh-huh.
16    A   Well, those -- those codes for, I think
17 it's, 305.7 if I remember correctly.  There's a code
18 provision that would require the county to make
19 improvements to a ramp if other improvements are being
20 made to that area or other spaces that ramp serves.
21    Q   And in this case, I mean, how does that apply to
22 your opinions?
23    A   Well, it would be good to make everything fully
24 accessible as soon as possible, but in terms of the

Exhibit 9 Page 25

CARL M. DARR
June 3, 2024

Page 100

1　city's requirements, they would not necessarily require
2　correction of an existing noncompliant building until
3　other work is being done, and in that case the
4　improvements to accessibility under 305.7, I think it
5　is, state that the overall amount of the project cost
6　dedicated to upgrading accessibility or correct --
7　making accessibility corrections does not need to be
8　more than 20 percent of the overall cost.
9　　Q　All right.
10　　　　With respect to the east ramp, the lower -- the
11　lower ramp, the top landing, the upper ramp and the
12　intermediate landing you said didn't comply with the ADA
13　Code, correct?
14　　A　Yeah, I believe that's -- as long as you didn't
15　say the lower landing.
16　　Q　I did not.  I did not say the bottom landing.
17　　A　Okay.  Yes, that's correct.
18　　Q　Okay.  And I guess what I want to know, when it
19　comes to the rise over run with respect to the upper
20　ramp slope, what is the difference in the slope angle
21　between compliance and noncompliance?
22　　A　It's fairly minimal.
23　　Q　I mean --
24　　　　Go ahead.

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 101

1　　A　I would have to get my calculator out, but
2　it's -- it's, I believe, a fraction of -- of one percent
3　difference in terms of slope.
4　　Q　I mean, can you tell me like what the difference
5　in the angle is?  Is it like a difference between a
6　30-degree angle and a 50-degree angle between compliance
7　and noncompliance, or are we talking about just several
8　degrees?
9　　A　It's not even several degrees.
10　　Q　It's not even several degrees.
11　　　　And those several degrees, for instance, if
12　we're talking about the upper ramp slope on the east
13　ramp, how many feet does that noncompliance go for?
14　　A　Approximately four -- it was 4.27 feet, like
15　four and a quarter.
16　　Q　Okay.  And what about the lower ramp slope?  Can
17　you tell me what the angle of that slope would be
18　between ADA compliance and noncompliance?
19　　A　That's -- Again, that's -- that's a little
20　steeper than the -- part of the upper ramp, but it's
21　much shorter, it's only a foot long.
22　　Q　Okay.  And is there any way to tell us how steep
23　the angle is when it complies versus when it didn't
24　comply here?

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 102

1　　A　I could with a calculator.
2　　Q　Okay.  I mean, can you give me a range or an
3　estimate as we're sitting here?
4　　　　And if you can't, I don't want you to do it
5　without a calculator but --
6　　A　I did look at it one time.  I thought it was
7　like in the seven to eight percent range.
8　　Q　Okay.  Seven to eight percent.
9　　　　And how many feet would that be over in terms
10　of noncompliance for the lower ramp slope?
11　　A　One foot.
12　　Q　Now, the handrails as we talked about in one
13　area, and I can't remember if it was the top or bottom,
14　it was .7 of an inch of noncompliance, that was away
15　from noncompliance, is that right?
16　　A　I believe that's at the top ramp?
17　　Q　Yeah.
18　　A　Yes.
19　　Q　Okay.
20　　A　I believe.
21　　Q　And the other -- the other -- I believe the
22　bottom portion was just several inches, right, I think
23　it was like three to four inches?
24　　A　Four and a half inches.

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 103

1　　Q　Okay.  So total noncompliance of the handrail is
2　about four to five inches?
3　　A　It's -- It's a few inches short on one end and
4　less than an inch short on the other end.
5　　Q　Okay.  Now, can you tell me what did you mean
6　when you said that these were minor deviations?  Can you
7　explain that?
8　　A　Yeah.
9　　　　I think the -- you know, the -- it appears
10　the -- the deviations of the concrete were sloppy
11　formwork and for very short lengths, I would say the
12　upper landing, in the case if the doors are ever closed,
13　that would be more egregious, but the doors are
14　generally very open, but, you know, that should be
15　corrected.
16　　　　The intermediate landing is a few inches
17　difference.  There's still room for someone to get to
18　that landing, stop and rest before they navigate the
19　upper landing even though there may not be enough for
20　them to turn around 360 degrees or 180 degrees if they
21　want to change direction.
22　　　　But, you know, in the ADA, the typical resting
23　place for a wheelchair is 30 by 36 inches.
24　　Q　So when you said that these are minor

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 26

CARL M. DARR
June 3, 2024

Page 104

1  deviations, I mean, what you meant is that these are not
2  substantial or significant deviations compared to what
3  you've seen while inspecting other things for ADA
4  compliance.
5      MR. MORRISSEY:  Objection; leading.
6  BY MR. RADUNSKY:
7      Q   You can answer.
8      A   Yeah, in the -- I would say these are --
9      Can you repeat the question?
10     Q   Sure.
11     What I'm trying to figure out is what you
12 meant -- when you said that they were minor deviations,
13 I'm assuming that that's based on your experience of
14 having inspected other ramps or other facilities for ADA
15 compliance and seen that those are significantly or
16 substantially noncompliant?
17     A   Correct.
18     I mean, I think, you know, the ADA -- well,
19 while everything should be compliant, the ADA sets forth
20 minimum requirements, but if you're a hair over one of
21 those requirements or a hair under one of those
22 requirements, that's a minor deviation.
23     Is it legal?  No.  Is it going to keep somebody
24 from necessarily being able to use the ramp?  You know,

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 105

1  that's a totally different question.
2      Q   And as we've pointed out, the east ramp did have
3  handrails?
4      A   It does.
5      Q   Okay.  And you don't --
6      Well, strike that.
7      Is it fair to say that, as the architect, when
8  there's a mass construction project like there is on
9  the -- on the Cook County campus, on the jail campus
10 here, that, typically, the sequence of the work, the
11 scheduling of the work, the coordination of the work is
12 going to be done by the general contractor?
13     A   That's correct.
14     Q   All right.  And that can done in coordination
15 with the owner?
16     A   That's correct.
17     Q   All right.  And in this case with Cook County,
18 they have a capital planning department, correct?
19     A   Correct.
20     Q   All right.  Would it make sense to you that
21 capital planning would work with a general contractor to
22 sequence and properly schedule the work, whether it's
23 improvement to the ramp or anything else on the project?
24     A   Well, I think they'll typically bid out to a

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 106

1  general contractor, but they have other consultants they
2  work with to help them plan projects and other
3  consultants they hire to help them plan projects.
4      And I think they would work -- they would
5  typically try to approach that holistically so that --
6  so that, you know, they're going to do things in a way
7  that's efficient, economical and where they won't have
8  to do one project now and then somehow modify it because
9  they didn't think about other projects that they were
10 also going to need to do.
11     Q   Have you ever seen large projects in your
12 experience where work is done out of sequence and it
13 ends up being less efficient, really costly and delays
14 the project?
15     A   Well, I've seen projects where owners end up
16 redoing recently completed work because they didn't
17 understand about other projects that were about to take
18 place.
19     Q   All right.  And sometime even when you begin a
20 project, you don't know what some -- there may be un --
21     Strike that.
22     When you're doing projects, there may be
23 unforeseen obstacles or difficulties that were not
24 initially discussed in the scope of work?

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 107

1      A   When you do projects, you often run into and
2  discover conditions.  You try hard to avoid that, but
3  because, when you do, they typically cost more money and
4  time.
5      Q   And that's what change orders are for?
6      A   Yes, that's what change orders are for.
7      Q   Right.
8      MR. RADUNSKY:  All right.  I've got nothing else.
9      MR. MORRISSEY:  I have some follow-up questions.
10         FURTHER EXAMINATION
11 BY MR. MORRISSEY:
12     Q   You mentioned the 2018 Code when your attorney
13 asked you questions.
14     Is that a city code you're referring to?
15     A   I think Troy mentioned a 2018 Code.
16     I believe we looked at --
17     I have to check the code date for what codes
18 are included.
19     MR. RADUNSKY:  It's on Page 6 of your report.
20     THE WITNESS:  We looked at the 2019 Building Code to
21 compare it to the current code.
22 BY MR. MORRISSEY:
23     Q   The building code you're referring to is the
24 City of Chicago, correct?

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 27

CARL M. DARR
June 3, 2024

Page 108

```
 1     A   Correct.
 2     Q   It's not the Federal ADA Code, which is --
 3     A   Correct.
 4         I'm sorry.  I didn't mean to interrupt.
 5     Q   Troy asked you some questions about the
 6  violations that you noted in your report for the east
 7  corridor ramp.
 8         Is it your opinion that based upon your
 9  accessibility report that it's permissible for
10  Cook County not to renovate the east corridor ramp
11  because, quote-unquote, the violations under the ADA
12  Code are minor?
13     A   Whether they're minor or major, it makes no
14  difference in terms of whether it's compliant or not.
15         But the City Code has specific requirements
16  under the Rehab Code for when an owner has to upgrade
17  noncompliant accessibility provisions.
18     Q   But the City Code doesn't trump the Federal ADA
19  Code because it's a public entity and they have to
20  comply with the law, federal law, the Supremacy Act?
21         I know you're not a lawyer.
22     MR. RADUNSKY:  Right out of law school.  Right out
23  of law school.  That was your third year.
24     THE WITNESS:  Well, it depends what you mean by
```

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 109

```
 1  trump.
 2     MR. RADUNSKY:  Objection.  Let's not go there.
 3     MR. MORRISSEY:  That's a bad word.
 4     THE WITNESS:  But at the time it was built, no, it
 5  would -- it would not have been, but it -- you know, it
 6  was approved by the city, it's existing, it doesn't
 7  matter if it's existing from 2.10, or the Rehab Code
 8  says that if you modi -- rehab that space or spaces that
 9  serves, you have to include upgrade corrections to those
10  noncompliant issues at that time.
11  BY MR. MORRISSEY:
12     Q   Right.
13         And my question is; the current existing
14  conditions for the east corridor ramp, they're not in
15  compliance as you say with the ADA --
16     A   Correct.
17     Q   -- Standards, they're in violation?
18         And, therefore, based upon your finding that
19  there's multiple violations in regards to the east
20  corridor ramp, it's your recommendation and opinion that
21  Cook County is required to renovate it under the
22  ADA Code?
23     MR. RADUNSKY:  Asked and answered.
24         You can answer again.
```

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 110

```
 1     THE WITNESS:  There's violations pretty much in
 2  every building everywhere, including ADA violations.
 3         Typically, agencies try to make improvements to
 4  stay in compliance with the code, but in terms of when
 5  they're required to do so, I think that's a different
 6  matter.
 7  BY MR. MORRISSEY:
 8     Q   You're not giving an opinion to Cook County that
 9  they don't have to proceed to renovate the east corridor
10  ramp, is that fair to say?
11     A   I'm sorry?
12     Q   You're not providing an opinion to Cook County
13  or in this case that they're not required under the ADA
14  to renovate the code violations under the ADA?
15     MR. RADUNSKY:  (Indicating.)
16     THE WITNESS:  I haven't given an opinion --
17         Oh, I'm sorry.
18     MR. RADUNSKY:  No. that's okay.
19         Just asked and answered.  That's fine.  You can
20  answer.
21     THE WITNESS:  I haven't given an opinion that
22  they're required or not required to renovate.
23  BY MR. MORRISSEY:
24     Q   Troy asked you some questions about what he
```

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 111

```
 1  classified as minor violations, and there's a slew of
 2  minor -- what you consider minor violations for the east
 3  corridor ramp.
 4         Are you making an assessment as a member of the
 5  medical community or a physical therapist in regards to
 6  whether or not a variation in the steepness of the upper
 7  ramp would or would not provide a hindrance for a
 8  wheelchair person to proceed up that ramp?
 9     A   What is the medical community?
10     Q   Well --
11     MR. RADUNSKY:  Not you.
12  BY MR. MORRISSEY:
13     Q   You're not a member of the medical --
14         You have no medical or physical therapy or any
15  other training, professional training, correct?
16     A   Correct.
17     Q   And you can't opine that being off between two
18  and four inches for the intermediate ramp would or would
19  not cause difficulty for some mobility disabled
20  individuals?
21     A   Well, I can -- I can opine that being off two or
22  four inches is -- presents less difficulty than being
23  off two or four feet.
24     Q   Yeah.  All right.  If you want to put it on that
```

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 28

Page 112

```
 1   scale.
 2        But you can't provide an opinion that being off
 3   two or four inches for the intermediate landing may
 4   cause some mobility disabled individuals to have greater
 5   difficulty going up or down the ramp?
 6        A   Well, I would -- I would say that being too
 7   steep or too shallow even minor amounts make it more
 8   difficult for any wheelchair user, but it doesn't
 9   necessarily mean that they can't make it up or down.
10        MR. MORRISSEY:  Okay.  I have nothing further.
11            Thanks.  Thanks a lot for your time.
12                  FURTHER EXAMINATION
13   BY MR. RADUNSKY:
14        Q   I just have one thing that I wanted to ask about
15   and I forgot to do this before.
16            What is a certificate of occupancy?
17        A   A certificate of occupancy is what an owner will
18   receive from the building department after they have --
19   after the building department has conducted their final
20   inspections and approved the building generally accepted
21   as -- or basically agreeing that it complies with the
22   code requirements and the project requirements.
23        Q   Would the two ramps that we're talking about
24   here today, the east ramp and the north ramp, would they
```

Page 113

```
 1   have had to undergone that level of scrutiny that you
 2   were just talking about before, they could be given a
 3   certificate of occupancy so that they can be used?
 4        A   All public buildings of this size would undergo
 5   an inspection for certificate of occupancy.
 6        Q   Who does that?  Who does the inspection, do you
 7   know?
 8        A   The city's building department.  They have --
 9   And I don't know what they did in 2010 specifically, but
10   they have several levels of enforcement and review.
11        Q   When you say the city, is it -- I mean, this is
12   Cook County so I mean, it would do still be the City of
13   Chicago or would it be county or do you know?
14        A   This would be normally the City of Chicago
15   Building Department.
16        Q   It would be.
17        MR. RADUNSKY:  Okay.  Thanks nothing else.
18                  FURTHER EXAMINATION
19   BY MR. MORRISSEY:
20        Q   You have no personal knowledge whether the
21   City of Chicago issued an occupancy permit for the
22   RTU building?
23        A   No, I have not seen a certificate of occupancy.
24        Q   You don't know what type of review was done
```

Page 114

```
 1   after the RTU east corridor ramp was completed by the
 2   City of Chicago to determine whether or not it complied
 3   with the ADA?
 4        A   No.
 5            I was not there at the time.
 6        MR. MORRISSEY:  I don't have anything further.
 7        MR. RADUNSKY:  We're going to reserve.
 8            Are you okay with reserving?
 9        THE WITNESS:  Let's reserve.
10        MR. RADUNSKY:  Reserved.
11            (Whereupon, the deposition in the
12             above-entitled cause concluded at
13             4:56 p.m.)
14
15
16
17
18                  - - - - -
19
20
21
22
23
24
```

Page 115

```
 1   STATE OF ILLINOIS  )
                        )
 2   COUNTY OF C O O K  )
 3
 4
 5        The within and foregoing deposition of the
 6   aforementioned witness was taken before ROBBIN M.
 7   OCHENKOWSKI, C.S.R., at the date and time
 8   aforementioned.
 9        There were present during the taking of the
10   deposition the previously named counsel.
11        The said witness was first duly sworn and was then
12   examined upon oral interrogatories; the questions and
13   answers were taken down in shorthand by the undersigned,
14   acting as stenographer; and the within and foregoing is
15   a true, accurate and complete record of all of the
16   questions asked of and answers made by the
17   aforementioned witness, at the time and place
18   hereinabove referred to.
19        The signature of the witness was not waived,
20   and the deposition was submitted, pursuant to the Rules
21   of the Supreme Court of Illinois.
22        The undersigned is not interested in the within
23   case, nor of kin or counsel to any of the parties.
24
```

Exhibit 9 Page 29

CARL M. DARR
June 3, 2024

Page 116

1    Witness my official signature in and for

2 Cook County, Illinois, on this 14th day of June, A.D.,

3 2024.

4

5

6

7    _____

8    ROBBIN M. OCHENKOWSKI, C.S.R.
     CSR License No. 084-002522

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 117

1    WITNESS CERTIFICATION

2

3

4    I hereby certify that I have read the foregoing

5 transcript of my deposition consisting of Pages 1

6 through 117 inclusive.  Subject to the changes set forth

7 on the preceding pages, the foregoing is a true and

8 correct transcript of my deposition taken on

9 June 3, 2024.

10

11

12

13

14

15    _____

16                     CARL M. DARR

17

18

19 SUBSCRIBED AND SWORN to

20 before me this _____day

21 of _____, A.D., 2024.

22

23 _____

24 Notary Public

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 30