Transcript of the Testimony of
**CARL DARR**

**Date:** April 30, 2025

**Case:** HERNANDEZ VS. DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

**CARL DARR**
April 30, 2025

```
        IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
                  EASTERN DIVISION

CUAUHTEMOC HERNANDEZ,         )
                              )
          Plaintiff,          )
                              )
     -vs-                     ) No. 23-CV-16970
                              )
THOMAS DART, SHERIFF OF COOK  )
COUNTY, and COOK COUNTY,      )
ILLINOIS,                     )
                              )
          Defendants.         )
```

   Deposition of CARL DARR, taken before SHAHERA ALI, C.S.R., and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at Suite 230, 230 West Monroe Street, Chicago, Illinois, commencing at 2:00 o'clock p.m., on the 30th day of April, 2025.

**TOOMEY REPORTING**
312-853-0648

---

**CARL DARR**
April 30, 2025

Page 2

1   There were present at the taking of this
2   deposition the following counsel:
3       THOMAS G. MORRISSEY, LTD. by
        MR. THOMAS G. MORRISSEY
4       MR. PATRICK W. MORRISSEY
        10257 South Western Avenue
5       Chicago, Illinois  60643
        (773) 233-7901
6       tgm@morrisseylawchicago.com
        pwm@morrisseylawchicago.com
7
            on behalf of the Plaintiff;
8
        DEVORE RADUNSKY by
9       MR. JASON E. DEVORE
        230 West Monroe Street
10      Suite 230
        Chicago, Illinois  60606
11      (312) 300-4479
        jdevore@devoreradunsky.com
12
            on behalf of the Defendants.
13
                  * * * * * *

**TOOMEY REPORTING**
312-853-0648

---

**CARL DARR**
April 30, 2025

Page 3

1                 DEPOSITION OF
                    CARL DARR
2                taken April 30, 2025

3   EXAMINATION BY                              PAGE
4   MR. THOMAS G. MORRISSEY                     4
5
                    EXHIBITS
6
                                                PAGE
7
    Group Exhibit No. 4                         5
8   (Corridor Ramp Accessibility Assessment.)

    Group Exhibit 8                             12
10  (ADA 1991 Standards.)

11  Exhibit No. 5                               34
    (Tunnel Corridor Accessibility Assessment.)
12
13  (All Exhibits Retained by Counsel.)

14                * * * * * *

**TOOMEY REPORTING**
312-853-0648

Exhibit 3 Page 1

CARL DARR
April 30, 2025

Page 4

1  CARL DARR,
2 called as a witness herein, having been first duly
3 sworn, was examined upon oral interrogatories and
4 testified as follows:
5             EXAMINATION
6       By Mr. Morrissey:
7       This is the deposition of Carl Darr
8 disclosed by the defendants in this case as their
9 expert witness in regards to the Cermak ramp which I
10 think in your December 6th, 2023, report you
11 identified as the Corridor Ramp Accessibility
12 Assessment, is that correct?
13    A   I believe so, yes.
14    Q   And the other ramp that we're going to be
15 discussing today is the east corridor ramp otherwise,
16 for purposes of this deposition, called the RTU ramp
17 which was included in your Tunnel Corridor Assessment
18 report dated April 1st, 2024, is that fair to say?
19    A   Yes.
20    Q   Will you state your full name and spell it
21 for the court reporter.
22    A   Carl Magnus Darr.
23    THE REPORTER:  How do you spell the middle name?
24    THE WITNESS:  M-a-g-n-u-s.

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 5

1    MR. MORRISSEY:  Q  Since December 6th, 2023, have
2 you done a further assessment of what we call the
3 Cermak ramp which is the ramp that leads to the
4 Cermak Health Service Facility which is included --
5 actually is part of your December 6th, 2023, report?
6    A   I have not.
7    Q   Have you done any type of investigation in
8 regards to the Cermak ramp since that date?
9    MR. DEVORE:  Objection, form.  You can answer.
10    THE WITNESS:  A  No.
11    MR. MORRISSEY:  Q  Have you looked at any
12 documents since December 6th, 2023, in regards to the
13 Cermak ramp?
14    A   I've looked at my own report.
15    Q   By report, you're referring to Group Exhibit
16 4?  And I'll show you that.  Group Exhibit 4 is the
17 report dated December 6th, 2023.  Is that the report
18 you're referring to?
19    A   Yes.
20    Q   Have you received any compensation from the
21 defendants, Cook County, Cook County Sheriff or the
22 firm of DeVore Radunsky in regards to your testimony
23 today in regards to the Cermak ramp?
24    A   I'm sorry.  I need to understand the

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 6

1 question.
2    Q   Sure.
3    A   Are you asking if I've received money for
4 today's testimony?
5    Q   Let me rephrase the question.  Has the firm
6 that you work for, Globetrotters Engineering
7 Corporation, received any compensation to testify
8 today in regards to either the Cermak ramp or the RTU
9 ramp?
10    MR. DEVORE:  Objection to form.  You can answer.
11    THE WITNESS:  A  If I understand correctly, no,
12 we have not received compensation yet.
13    MR. MORRISSEY:  Q  From being disclosed an expert
14 in the Hernandez case, have you received -- when I
15 say you, I'm including Globetrotters.  Has
16 Globetrotters received any compensation?
17    A   As I understand the question, no.
18    Q   Did you review your prior deposition in the
19 Westmoreland vs. Dart case which was given on June
20 3rd, 2024?
21    A   Yes.
22    Q   And when did you review that deposition
23 testimony?
24    A   This morning.

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 7

1    Q   Was that with counsel, with your attorney?
2    A   No.
3    Q   After reviewing your deposition testimony
4 this morning in regards to the Westmoreland case
5 given on June 3rd, 2024, are there any questions that
6 you now feel you didn't fully understand?
7    A   Questions from today?
8    Q   No.  From your deposition in the Westmoreland
9 case, June 3rd, 2024.  Were there any questions or
10 answers that you provided in that deposition that you
11 felt were incorrect?
12    MR. DEVORE:  Object as to form.  You can answer.
13    THE WITNESS:  A  No.
14    MR. MORRISSEY:  Q  Is there anything, as you sit
15 here today from your deposition testimony on June
16 3rd, 2024, you would like to change or amend?
17    A   No.
18    Q   I'm showing you Group Exhibit No. 4.  It's
19 the December 6th, 2023, report that Globetrotters
20 provided in regards to the Cermak ramp.  I ask you to
21 turn to page five of your report.
22       Is it your understanding, as the defendants'
23 expert in this case, that the Cermak ramp was built
24 in or around 1998?

TOOMEY REPORTING
312-853-0648

Exhibit 3 Page 2

CARL DARR
April 30, 2025

Page 8

1  A   That's my understanding.
2  Q   Now, if a building, a public building, was
3  built in 1998, such as the Cermak ramp and the Cermak
4  Health Facility, was it required to conform or adhere
5  to any ADA Codes or Standards?
6  A   The ADA Codes in effect at the time would
7  apply.
8  Q   I'm going to ask you to turn to page 11 of
9  your report.  In your report you have titled
10 Historically Applicable Codes and Standards.  Do you
11 agree that the Cermak ramp was required to comply
12 with the Americans with Disability Act Accessibility
13 Guidelines (ADAAG) 1991 Standards?
14 A   Those standards as far -- To my knowledge,
15 those standards were required at that time in
16 Chicago.
17 Q   In addition to those standards in your
18 report, you list four other building codes, correct?
19 A   Correct.
20 Q   But as far as the ADA was concerned, it was
21 the ADAAG 1991 Standards that defendants were
22 required to comply with in constructing the Cermak
23 ramp?
24 A   Yes, unless another more recent ADA version

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 9

1  was in effect at the time.
2  Q   Now, in your report you have the permit date
3  for the Cermak Health Service Facility building as
4  January 19th, 1996, as being permitted on that date?
5  A   That's what the report says.
6  Q   And can you tell me where you obtained that
7  information?
8  A   I don't remember specifically, but we
9  probably would have looked it up online.  Building
10 Permit has a website where violations and permits
11 generally are -- can be accessed.
12 Q   What website are you referring to?
13 A   It's a City of Chicago.  I generally Google
14 building violations and it will come up.  I don't
15 know what the specific name is.
16 Q   At the time you were investigating the Cermak
17 ramp in the fall of 2023, did you have contact with a
18 gentleman by the name of Eric Davis within the
19 Capital Planning section of Cook County government?
20 A   I'm sorry.  Can you repeat that.
21 Q   Yes.  In preparing this report on December
22 6th, 2023, regarding the Cermak ramp, had you had any
23 prior contact with a gentleman by the name of Eric
24 Davis?

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 10

1  MR. DEVORE:  Objection, form.  You can answer.
2  THE WITNESS:  A   I have to jog my memory, but I
3  don't think I had any conversation with Eric specific
4  to this report.  I did have conversations and I
5  believe he was at the site for the Cermak ADA
6  Assessment that this was -- we were doing at the same
7  time.
8  MR. MORRISSEY:  Q   You're an architect, correct?
9  A   Correct.
10 Q   And you're in charge of the architectural
11 component of Globetrotters?
12 A   Yes.
13 Q   Is it customary that the construction plans
14 will have the date of the permit on the construction
15 drawings?
16 A   Often they have the issue for permit date
17 which is not necessarily the date of the permit
18 application.
19 Q   What is the difference?
20 A   The issue for permit is when the architect
21 will basically release them for the permit
22 application.  The city will normally go by the
23 date of the -- not the date -- well, there's the date
24 that you commence permit, the application date, and

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 11

1  that's the date the city will look to when
2  applying -- I'm sorry.  Let me rephrase that.
3       That's the date that the city generally
4  will use to determine which codes apply.
5  Q   So if the construction drawings reflect a
6  permit date of 1989, it's your understanding that the
7  City of Chicago will apply that date in regards to
8  what codes apply?
9  MR. DEVORE:  Objection.  It calls for
10 speculation.  You can answer.
11 THE WITNESS:  A   That's my understanding, yes.
12 MR. MORRISSEY:  Q   And is that your understanding
13 that that process is common in the architectural
14 field that when the government puts a date --
15 issuance date for a permit, that that's the effective
16 date for the various codes that the project has to
17 comply with?
18 MR. DEVORE:  Objection, form.  You can answer.
19 THE WITNESS:  A   That's my understanding.
20 MR. MORRISSEY:  Q   And is that why on this
21 document here, on Group Exhibit No. 4, you put the
22 permit date of January 19th, 1996, on your assessment
23 report because that's the date in which the City of
24 Chicago would follow in regards to the applicable

TOOMEY REPORTING
312-853-0648

Exhibit 3 Page 3

CARL DARR
April 30, 2025

Page 12

```
 1  building codes?
 2      A   It would be a significant date, yes.
 3      Q   Okay.
 4      A   And that's why we put it in the report.
 5      Q   Now, I'm going to refer you to Exhibit 8.
 6  Can we take a moment.
 7          (Off the record.)
 8      MR. MORRISSEY:  Q  Group Exhibit 8 are the -- Let
 9  me ask you a question.  Looking at Group Exhibit No.
10  8, are those the 1991 ADAAG Standards?
11      MR. DEVORE:  Objection, form.
12      THE WITNESS:  A  I would have to look through it.
13      MR. MORRISSEY:  Q  Well, you want to take a few
14  moments to look at it.  And I can scroll through it
15  for you.
16      A   I'm sorry.  What was the question?
17      MR. MORRISSEY:  Read back the question, please.
18        (The last question read back as requested.)
19      THE WITNESS:  A  It could be.  I don't see the
20  date on here.  It says revised 1990 -- revised July
21  1st, 1994.
22      MR. MORRISSEY:  Q  Are these the standards that
23  you refer to in your report on page 11 under the
24  Americans with Disability Accessibility Guidelines
```

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 13

```
 1  ADAAG 1991?
 2      A   Well, it would have been the 1991 copy that
 3  we had on our computers at the time when I was doing
 4  the report.
 5      Q   Okay.  The first one you have is for Section
 6  4.8.  I'm going to scroll down to 4.8 for you.
 7          I'm looking at 4.8.1.  Did you quote from
 8  the language in Group Exhibit No. 8 on page 11 in
 9  your report, 4.8.1 in regards to the general
10  requirements?
11      MR. DEVORE:  Is this Exhibit 8?
12      MR. MORRISSEY:  Yes.
13      A   Well, the language is the same as number one
14  in my report and on page 11 as is 4.8.1 on the
15  document in front of me.
16      Q   And is that true in your document on page 11,
17  you have number two 4.8.2 slope and rise.  Is that
18  the same language that you quoted?
19      A   Part of it.  I left out the first sentence in
20  the document in front of me.  It's not included in
21  what I say.
22      Q   And your language quoting 4.8.3, is that the
23  same language that's in Group Exhibit 8?
24      A   Without the matrix alternate measurement,
```

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 14

```
 1  yes, it is the same language.
 2      Q   And would the same be true in regards to
 3  handrails?  I'm sorry.  4.8.5 which you have on page
 4  11 in your report?
 5      A   So for 4.8.5 subsection two, it's generally
 6  the same.  I didn't include everything that's in the
 7  document in front of me including the matrix
 8  measurements.
 9      Q   And 4.8.5, the language that you're quoting
10  on page 11, does that come from Group Exhibit No. --
11      A   Well, for subsection five, again, it's the
12  same thing.  The language in my report matches part
13  of the language of the section in that document.  Not
14  everything in the document is included in the line in
15  my report.
16      Q   To summarize it then, under Section 4.8 ramps
17  on your report on page 11, the quotes that you took
18  for each of those sections, one through five, were
19  verbatim from Group Exhibit No. 8?
20      MR. DEVORE:  Objection, form, mischaracterizes
21  his testimony.  You can answer.
22      THE WITNESS:  A  Generally, yes.
23      MR. MORRISSEY:  Q  Is there anything on page
24  11 under Section 4.8 ramps states the following
```

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 15

```
 1  requirements relevant to the corridor ramps, is there
 2  any language in one through five that isn't verbatim
 3  from Group Exhibit 8?
 4      A   No.  What's said on page 11 is included in
 5  page 29 on this document that's in front of me.
 6      Q   I'm going to turn to page 493 of Group
 7  Exhibit 8.  Do you see under general terminology
 8  where it has various definitions for words?
 9      A   Yes.
10      Q   And under shall it says, denotes a mandatory
11  specification or requirement.  What do you understand
12  that to mean --
13      MR. DEVORE:  Objection.
14      MR. MORRISSEY:  Q  -- in relation to the Section
15  4.8 ramps?
16      MR. DEVORE:  Objection, calls for legal
17  conclusion but to the extent you can answer you can.
18      THE WITNESS:  A  My understanding is that it's a
19  requirement that facilities would need to comply
20  with.
21      MR. MORRISSEY:  Q  And it's mandatory?
22      A   Yeah.
23      Q   Turning to page three of your report.
24  Looking at the second paragraph, your company
```

TOOMEY REPORTING
312-853-0648

Exhibit 3 Page 4

CARL DARR
April 30, 2025

Page 16

1  measured the slope as slightly shallower than one to
2  16, correct?
3      A    Correct.
4      Q    What does that mean in layman's terms?
5      A    **For every 16 inches of horizontal run,**
6  **there's basically one inch of rise on the ramp slope.**
7      Q    And if we look at paragraph two, again on
8  page three, you say the corridor ramp to be
9  approximately 43.64 feet in length and approximately
10 2.7 feet in height.
11           My question is, in relation to the Cermak
12 ramp, what do you mean by height?
13     A    **From the bottom landing to the top landing.**
14     Q    And do you use the word height and rise to
15 mean the same in your report?
16     A    **Height is the same as overall rise.**
17     Q    So for purposes of your report, the term
18 height and rise are interchangeable, is that fair to
19 say?
20          MR. DEVORE:  Objection, form.  You can go ahead.
21          THE WITNESS:  A  In this paragraph, yes.
22          MR. MORRISSEY:  Q  Now, in the third paragraph,
23 the last sentence under number one, it says the
24 existing ramp rise is approximately 2.7 feet which is

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 17

1  32.4 inches.  Do you see that?
2      A    I see it.
3      Q    And was that a precise measurement that
4  Globetrotters arrived at in measuring the Cermak
5  ramp?
6      A    **Yeah.  I mean, there would have been minimal**
7  **tolerance with the measurement device we were using.**
8      Q    What do you mean by minimum tolerance?
9      A    **So we used the lighter scanner device for**
10 **looking at this ramp.  I don't remember exactly, but**
11 **I believe that one had a tolerance of a quarter inch**
12 **every 30 feet.**
13     Q    Now, on page 11 you refer to this corridor
14 ramp as being classified as a ramp, considered a ramp
15 under the 1991 Standards, correct?
16     A    Correct.
17     Q    Why does the Cermak ramp fall under the
18 category as a ramp under the 1991 Standards?
19     A    **The floor plane has a slope greater than or**
20 **steeper than one and 20.**
21     Q    And due to the fact that the slope is steeper
22 than a one to 20, does that mean that it has to
23 follow the requirements for a ramp under the 1991
24 Standards?

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 18

1      A    **It means it shall follow the requirements for**
2  **a ramp under the standards, yes.**
3      Q    And when you use the word shall, that means
4  it's mandatory that they follow the code requirements
5  under the 1991 ADAAG Standards, correct?
6      A    **It would have been mandatory at the time for**
7  **the designer to design the ramp accordingly and for**
8  **the contractor to build the ramp accordingly, yes.**
9      Q    You also analyzed the Cermak ramp under the
10 2010 Standards, correct?
11     A    Yes.
12     Q    Under the 2010 ADAAG Standards, does the
13 Cermak ramp fall under the category of a ramp?  Let
14 me rephrase the question.
15          Under the 2010 Accessibility Standards, is
16 the Cermak corridor classified as a ramp under the
17 code?
18     A    **The slope floor section of that corridor is a**
19 **ramp under that code.**
20     Q    When the Cermak ramp was constructed after
21 1996, what was the maximum rise permitted under the
22 1991 ADAAG Standards?
23     A    **Thirty inches maximum.**
24     Q    Under the 2010 Standards provided under

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 19

1  ADAAG, what is the maximum rise for a ramp?
2      A    **Thirty inches.**
3      Q    Turn to Exhibit 4, page 15.  On page 15 of
4  your report, there's two charts, correct?
5      A    Correct.
6      Q    Why in preparing this report did you prepare
7  these two charts?
8      A    **I believe at the time we were asked to look**
9  **at historical codes as well as the current code.**
10     Q    Now, on page 15, the charts on page 15 follow
11 the 1991 ADAAG Standards which applied when the
12 Cermak ramp was constructed after 1996, correct?
13          MR. DEVORE:  Objection, form.  You can answer.
14          THE WITNESS:  A  One of the columns does list the
15 requirements -- the applicable requirements of the
16 ADAAG 1991 Standards.  That would have applied at the
17 time of construction.
18          MR. MORRISSEY:  Q  And if we look at the top
19 column, there's a column for describing different
20 features of the ramp, components of the ramp,
21 correct?
22     A    **Do you mean the different rows?**
23     Q    Yes.  The first column on the top chart has
24 various components of the ramp, correct?

TOOMEY REPORTING
312-853-0648

Exhibit 3 Page 5

CARL DARR
April 30, 2025

Page 20

1     A   It has characteristics of the ramp
2 corresponding to the description on the left, yes.
3     Q   And one of the characteristics listed is the
4 ramp rise, correct?
5     A   Correct.
6     Q   And if we go to the top of the chart, there's
7 a box saying existing, correct?
8     A   Correct.
9     Q   And then it has the 1991 ADA Standards, the
10 ADAAG 1991 Standards, is that correct?
11     A   That's the next column.
12     Q   And those are the mandatory requirements for
13 a ramp that was built after 1991 and prior to 2010,
14 correct?
15     A   Yeah.  Those are the requirements for
16 applicable under that code for when it was adopted
17 until the next code was adopted, yes.
18     Q   Okay.  And as far as the ADA is concerned, if
19 the -- as you report in your assessment, if the
20 Cermak ramp was permitted after 1996 and before 2011,
21 it was required to follow the ADAAG 1991 Standards?
22     A   Correct.
23     Q   And for the ramp rise, the maximum rise for a
24 ramp to comply with the 1991 Standards was 30 inches,

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 21

1 correct?
2     A   Correct.
3     Q   And your report reflects the ramp rise was
4 32.4 inches, correct?
5     A   My report reflects that the ramp rise was 2.4
6 inches greater than 30 inches, yes.
7     Q   Okay.  And therefore the Cermak ramp does not
8 comply with the 1991 ADA Standards?
9     A   As my report outlines, the Cermak ramp for
10 ramp rise has never complied with any of the
11 applicable ADA Codes.
12     Q   And if we look at the lower chart on page 15,
13 you have under ADA 1991 compliance, as far as the
14 ramp rise, you have noncompliant, correct?
15     A   That's listed under every column on that
16 chart for ramp rise, yes.
17     Q   So not only does the rise of the Cermak ramp
18 not comply with the ADAAG 1991 Standards, it also
19 doesn't comply with ANSI 1992 compliance, correct?
20     A   Correct.
21     Q   What is ANSI?
22     A   ANSI, American National Standards Institute.
23 They basically have some of the ADAAG, some agencies
24 use it.  It has a lot of the building block

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 22

1 components that ADA also lists.  It's just another
2 code.
3     Q   And are those standards that generally, an
4 architect like you and your firm, comply with in
5 constructing new construction?
6     A   Right.  So certain governmental buildings,
7 for instance, will use ANSI instead of ADAAG so we'll
8 look at both of those.
9     Q   The next column over on the lower chart is
10 CBC 1992.  What is CBC 1992?
11     A   Chicago Building Code 1992, 1993, 1998
12 versions.
13     Q   And under ramp rise, the Cermak ramp that was
14 built after 1996 doesn't comply with the city code,
15 correct?
16     A   No, because the city code would have adopted
17 the 1991 Code and restated it.
18     Q   In the next column over is IAC 1997
19 compliance.  What is IAC?
20     A   Illinois Accessibility Code.
21     Q   And again for the ramp rise, the rise of 32.4
22 inches is not compliant with the Illinois
23 Accessibility Code, correct --
24     A   Correct.

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 23

1     Q   -- but it was built?
2         The final one is ANSI 1998 compliance.  Is
3 that an updated version of the 1992 ANSI?
4     A   It is but the requirement of 30 inches is the
5 same for all of these codes and in all cases the
6 existing condition was built 2.4 inches greater than
7 that.
8     Q   So there's no standard that you looked at,
9 building standard that you looked at, in doing your
10 report that the rise of the Cermak ramp complied
11 with, is that fair to say?
12     A   That's fair to say.
13     Q   In addition, you looked at the 2010
14 Standards, correct?
15     A   Correct.
16     Q   I believe it's on page seven that you
17 discussed the 2010 Standards.
18     A   Page seven or page nine?
19     Q   I think it's page seven and page nine and
20 page three.  I think three, seven and nine.  If we
21 can look at page three first, I guess.
22         All right.  Looking at page three under the
23 third paragraph, number one, your report says, per
24 Section 405.6 of the 2010 Americans with Disabilities

TOOMEY REPORTING
312-853-0648

Exhibit 3 Page 6

CARL DARR
April 30, 2025

Page 24

1  Act Accessibility Guidelines (ADAAG) and the 2009
2  American National Standards Institute, ANSI,
3  Standards A117.1, the rise for any ramp shall be a
4  maximum of 30 inches. Again, they use the word shall
5  which means mandatory, correct?
6     A   Correct.
7     Q   The existing ramp is approximately 2.7 feet,
8  which is 32.4 inches. Based upon that, it doesn't
9  comply with the 2010 Standards, correct?
10    A   Correct.
11    Q   And you also state that on page seven of your
12 report in regards to the rise in relation to the 2010
13 Standards, correct?
14    A   I'm looking here at number four. The rise
15 for any ramp run shall be 30 inches maximum. Is that
16 what you are referring to?
17    Q   That's correct. And then we can look at your
18 chart which is on page nine. And the chart says
19 basement corridor ramp assessment matrix per current
20 applicable codes and guidelines.
21        When you say per current applicable codes
22 and guidelines, what did you mean?
23    A   The codes and guidelines enforced at the time
24 I was writing this report. So I think this was 2023.

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 25

1     Q   '24 or is it '23?
2     A   '23.
3     Q   So at the time you were doing your report,
4  you looked at the 2010 ADAAG Standards, correct?
5     A   Yes, I did.
6     Q   And those 2010 Standards, ADA Standards, are
7  still applicable to the present time?
8     A   Generally. There may have been some
9  revisions but these specific requirements, as far as
10 I know, are still current.
11    Q   Okay. So in regards to the 2010 ADAAG
12 Standards, the Cermak ramp, the rise of the Cermak
13 ramp doesn't comply?
14    A   That's correct.
15    Q   Now, in addition to the height or the rise of
16 the Cermak ramp, you also analyzed the handrail,
17 correct?
18    A   I did analyze the handrail.
19    Q   In doing your investigation in the fall of
20 2023, did you talk to any of the County or Sheriff's
21 employees in regards to when that handrail was
22 installed?
23    A   I don't remember. I really don't.
24    Q   Okay. In your report, you say something

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 26

1  about that they didn't fabricate the last 12 inches
2  correctly?
3     A   Well, I think --
4     Q   I think you mentioned that they stopped short
5  of providing the 12-inch extension for the top and
6  the bottom handrail?
7     MR. DEVORE: What page? Exhibit 4, page 11, is
8  that what it is?
9     THE WITNESS: A   I have no idea.
10    MR. MORRISSEY: Q   I think if we look at page 14,
11 there's a discussion on handrails. The last
12 paragraph on page 14. You see the last sentence
13 there?
14    A   Was that a question?
15    Q   Yes. Do you see the last sentence there?
16 Because the current corridor ramp handrails are not
17 continuous and do not extend beyond the ramp, they do
18 not comply with the applicable codes.
19    A   I see that.
20    Q   Now, by the applicable codes, you're
21 referring to both the 1991 ADAAG Standards and the
22 2010 Standards, correct?
23    A   Well, this section specifically references
24 the historical standards so it would have been those

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 27

1  standards that this is contemplating referencing.
2     Q   What did you mean when you say that the
3  handrails are not continuous from the ramp?
4     A   I believe they have a slope section and
5  there's a gap and the slope section returns to the
6  wall and then there's another section. I would have
7  to reference the photos again.
8     Q   You can take a moment.
9     A   I believe the ramp turns a corner slightly
10 and so instead of having a continuous handrail around
11 the corner, there's one section attached to one wall
12 plane and another section attached to another wall
13 plane. I'm trying to see from my diagram.
14        That's not it. That's just that they stop
15 but there also was a point -- Let's see. Let me see
16 if I show that. They would require continuous
17 12-inch extensions around the corner of the wall. So
18 that's what I mean when I refer to they're not
19 continuous. So they just stop short at the corner.
20    Q   If we look at under the 1991 Standards, what
21 you said on page 11, you found that because there
22 aren't handrails that extend 12 inches beyond the
23 ramp, both the top and the bottom of the ramp, the
24 ramp is not compliant with the 1991 ADA Standards, is

TOOMEY REPORTING
312-853-0648

Exhibit 3 Page 7

CARL DARR
April 30, 2025

Page 28

1 that fair to say?
2    A   Well, the handrail specifically are not
3 compliant. But, yes, that would extend to the ramp
4 in general.
5    Q   Okay. And based upon the design of the ramp,
6 the Cermak ramp, it was mandatory for the defendants
7 to have 12-inch extensions beyond the ramp both at
8 the top and the bottom under the 1991?
9    A   It would have been mandatory for the ramp to
10 be designed in that manner. It would be mandatory
11 for the contractor to build it in that manner, yes.
12    Q   And is it fair to say that when you inspected
13 it in the fall of 2023, the fact that it didn't have
14 the extension of the 12-inch handrails beyond the
15 ramp, both the top and the bottom, the ramp didn't
16 comply with the 1991 ADAAG Standards?
17    A   That's fair to say.
18    Q   And because the rise when you inspected it in
19 the fall of 2023 in preparing this report, because
20 the rise of the ramp was greater than 30 inches, the
21 ramp in the fall of 2023 did not comply with the 1991
22 Standards?
23    A   I need to correct my answer on the last one.
24    Q   Sure.

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 29

1    A   That assumes that the handrails that are
2 there now were in place at the time it was
3 constructed.
4    Q   Okay. When you reviewed it in the fall of
5 2023 --
6    A   Yes.
7    Q   -- did the lack -- did the ramp have 12-inch
8 handrails that extended beyond the ramp at the bottom
9 and the top?
10    A   It did not have 12-inch extensions at the top
11 and the bottom.
12    Q   And because it didn't have the 12-inch
13 extensions beyond the bottom and the top of the ramp
14 for handrails, it didn't comply at that time in the
15 fall of 2023 with the 1991 ADAAG Standards?
16    A   The configuration that's out there right now
17 would not have complied with the 1991 Standards.
18    Q   And in addition the configuration that's
19 present with the Cermak ramp in regards to handrails
20 not extending 12 inches beyond the ramp, that doesn't
21 comply with the 2010 Accessibility Standards either?
22    A   That does not comply -- that is noncompliant
23 with the 2010 Standards.
24    Q   And both the 1991 ADA Standards and the 2010

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 30

1 Standards require for the Cermak ramp to have
2 handrails that extend 12 inches beyond the top and
3 the bottom of the ramp?
4    A   That's correct.
5    Q   When you inspected the ramp in the fall of
6 2023, did the ramp have an intermediate landing?
7    A   Let me make sure I don't get my ramps mixed
8 up. No. This ramp does not have an intermediate
9 landing.
10    Q   And given the fact that the rise of the
11 Cermak ramp exceeded the mandatory rise of 30 inches,
12 was a intermediate landing required when it was
13 built --
14    MR. DEVORE: Objection, form. You can answer.
15    MR. MORRISSEY: -- in 1996?
16    A   That's one solution that could make it
17 compliant.
18    Q   So what is an intermediate landing?
19    A   When you have a ramp run and then you have a
20 horizontal surface which leads to another ramp run,
21 basically gives somebody a place to stop for a
22 moment, even turn around, that horizontal portion of
23 the ramp is an intermediate landing.
24    Q   And there's a specification under the 1991

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 31

1 ADA Standards and the 2010 Standards in regards to
2 the dimensions of the intermediate landing?
3    A   There is.
4    Q   And it's mandatory that it would be at least
5 60 inches?
6    A   That is the measurement that is specified,
7 yes.
8    Q   Do you know when handrails were installed on
9 the Cermak ramp?
10    A   No.
11    Q   Do you know if the handrails were installed
12 after 2010?
13    A   I do not know.
14    Q   If handrails were installed after 2010, would
15 that require the Cermak ramp to comply with the 2010
16 Standards?
17    A   It would.
18    Q   Why?
19    A   It would require the handrails to comply with
20 the 2010 Standards because that's the point in time
21 where they were installed. Assuming they were
22 permitted, that would be -- I'm assuming that's when
23 they were permitted when the code was enforced.
24    Q   If handrails were installed after, let's say,

TOOMEY REPORTING
312-853-0648

Exhibit 3 Page 8

CARL DARR
April 30, 2025

Page 32

1  2011 on the Cermak ramp, would that require the
2  government to comply with the 2010 Standards for the
3  ramp?
4      MR. DEVORE:  Objection, form.  You can answer.
5      THE WITNESS:  A  If the handrails were installed
6  in 2011 or later, the 2010 ADA Standards for
7  handrails would have been applicable at the time and
8  it should have been installed accordingly.
9      MR. MORRISSEY:  Q  What about the other
10 components of the ramp.  Assuming that one component
11 of the ramp or handrails, correct -- Let me rephrase
12 the question.
13          If they put in the handrails after 2012,
14 would the ramp be compliant with the 2010 Standards
15 if the rise was 32.4 inches?
16     MR. DEVORE:  Objection, form.  You can answer.
17     THE WITNESS:  A  As I understand the question --
18     MR. MORRISSEY:  Q  Let me rephrase it.  I think
19 it's a bad question.
20          If you alter one aspect, one component of
21 a ramp for the purpose of trying to make the ramp
22 accessible, i.e., if they altered and they put in
23 handrails after 2012, does that require the building
24 owner or user to bring the entire ramp up to the 2010

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 33

1  Standards?
2      A  There's a code requirement in the rehab
3  section of the Existing Building Code when the amount
4  of renovations is greater than, I believe, 20 percent
5  of the estimated original building cost, you have to
6  bring everything into compliance, otherwise that is a
7  conversation with the building inspector.
8          It's kind of speculative because, first of
9  all, you're assuming that the person installing or
10 designing the handrail is actually aware that the
11 ramp rise is not compliant which, I guess, that would
12 be the first thing to identify.
13     Q  Well, let's assume, for argument sake, that
14 the County and the Sheriff knew when they put in
15 handrails in -- I believe it was 2022 or 2023, that
16 the rise of the ramp exceeded the mandatory 30 inches
17 and they put in handrails, were they required to make
18 the entire ramp accessible under the 2010 Standards?
19     MR. DEVORE:  Objection, incomplete hypothetical,
20 assumes facts not in evidence, but you can answer if
21 you can.
22     MR. MORRISSEY:  Q  We'll withdraw the question.
23          Let's take a five minute break.  I don't
24 think we have more than a half hour left.

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 34

1      MR. DEVORE:  Okay.
2  (Break.)
3      MR. MORRISSEY:  In regards to your report on
4  December 6th, 2023, in regards to the Cermak ramp, I
5  have two final questions.  First question is, since
6  the Cermak ramp was built on or about 1996 or
7  thereafter, was it required to comply with the 1991
8  ADAAG Standards?
9      A  At that time, it would have been required.
10 The ADAAG Standards would have been applicable to
11 that construction and so those requirements would be
12 required.
13     Q  The second question is, currently does the
14 Cermak ramp comply with the 1991 Standards for a
15 ramp?
16     A  No.  It is not fully compliant.
17     Q  Now, I'm going to ask you a few questions
18 about your report from April 1st, 2024.  It's Exhibit
19 No. 5.  We'll hand it to you.
20          On page four of your report dated April
21 1st, 2024, you state that the east tunnel ramp was
22 built on or after 2011, is that fair to say?
23     A  That's fair to say.
24     Q  And if the east tunnel ramp was built in 2011

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 35

1  or thereafter, was it required to comply with the
2  2010 ADAAG Standards?
3      A  I don't know if I have the exact date when
4  those standards were adopted but probably.
5      Q  As currently in use, the east tunnel ramp,
6  which for purposes of this deposition we're going to
7  refer to as the RTU ramp, is that fair to say?
8      A  I'm good with that.
9      Q  Does the RTU ramp currently comply with
10 either the 2010 ADAAG Standards or the 1991 ADAAG
11 Standards?
12     MR. DEVORE:  Objection, calls for speculation
13 regarding the exact date, but you can answer.
14     THE WITNESS:  A  It is not fully compliant with
15 those standards.
16     MR. MORRISSEY:  Q  Why not?
17     A  There are several noncompliant conditions.
18 The landing at the top is too short.  The
19 intermediate landing is too short, the handrails do
20 not have 12-inch extensions, one has approximately 11
21 some inch plus extension, the other I think has a
22 seven and a half extension at the bottom or top, and
23 then also both the top ramp has a section about four
24 feet long that's slightly too steep and the bottom

TOOMEY REPORTING
312-853-0648

Exhibit 3 Page 9

CARL DARR
April 30, 2025

Page 36

1  ramp, if I remember correctly, has a section
2  approximately one foot long.  That's too steep.
3      Q   Okay.
4      A   That's why not.
5      Q   So based upon that statement you just gave,
6  the RTU ramp as currently in use doesn't comply with
7  either the 1991 ADAAG Standards or the 2010 ADAAG
8  Standards?
9      A   Based on its existing condition today, the
10 ramp does not comply with either of those standards.
11     Q   The RTU ramp starts off in the basement of
12 the RTU building, correct?  If you look at page four
13 of your report.
14     A   It starts off at or just outside the basement
15 of the RTU building.
16     Q   And if you start at the basement of the RTU
17 building and walk, you would ascend up the RTU ramp,
18 correct?
19     A   Walking out of the basement of the RTU
20 building, there's a pair of double doors, then
21 there's a short -- there's a run of horizontal
22 corridor and then you start to ascend up the lower
23 section of the RTU ramp.
24     Q   And when you progress -- when you reach the

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 37

1  upper area of the RTU ramp, you can access the Cermak
2  Health Service Building by going down the Cermak
3  ramp, is that fair to say?
4      A   That's fair to say.
5      Q   So a person that's disabled and uses a cane,
6  crutch, or walker and is housed in the RTU housing
7  unit, one way to go to the Cermak Health Service
8  Building is to start off in the basement of the RTU
9  building and go up the RTU ramp and then walk through
10 a hallway and descend down the Cermak ramp into the
11 Cermak building, is that fair to say?
12     MR. DEVORE:  Objection, form.  That was
13 confusing.  You can answer.
14     THE WITNESS:  A  That's one way to get between
15 the RTU building and the Cermak building.  I'm not
16 sure what other ways in the tunnel or at other levels
17 there may be to get from between those two buildings.
18     MR. MORRISSEY:  Q  So to summarize my question,
19 one of the path of travel for a person using a cane,
20 crutch, or walker who's housed in the RTU building is
21 to start off at the basement of the RTU and go up the
22 RTU ramp and then descend down the Cermak ramp into
23 the Cermak building, is that fair to say?
24     MR. DEVORE:  Objection, form.  You can answer.

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 38

1      THE WITNESS:  A  There's a horizontal section of
2  corridor between the two ramps, if I remember
3  correctly.  I don't remember the distances of its
4  length but otherwise that's fair to say.
5      MR. MORRISSEY:  Q  Now, in preparing your expert
6  report for the RTU ramp on page six, you list the
7  applicable codes and standards, correct?
8      A   There is a section titled Applicable Codes
9  and Standards.
10     Q   And number one that you list here is the
11 American with Disabilities Act Accessibility
12 Guidelines, ADAAG, 2010, correct?
13     A   Correct.
14     Q   So in preparing this report, this expert
15 report, you considered the 2010 ADAAG Standards,
16 correct?
17     A   Correct.
18     Q   And those are the standards as an expert you
19 thought were applicable to the RTU ramp?
20     MR. DEVORE:  Objection, form.  You can answer.
21     THE WITNESS:  A  At the time I would have, to the
22 extent possible, verified what standards was
23 applicable, and I determined the 2010 for this report
24 was applicable.

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 39

1      MR. MORRISSEY:  Q  Now, on page ten of your
2  report, you broke down the RTU ramp or otherwise
3  called the east tunnel corridor based upon the
4  accessibility of various components of the ramp,
5  correct?
6      A   Starting on page ten and continuing to page
7  11, I do list the individual components of the ramp
8  and summarize their conditions.  And I do bring up,
9  at least in one case, whether or not it's code
10 compliant.
11     Q   Okay.  And the areas you considered for code
12 compliance were the following:  Top landing, upper
13 ramp, intermediate landing, lower ramp, bottom
14 landing and handrails, correct?
15     A   Those are the items listed, yes.
16     Q   And for the top landing, you determined that
17 the top landing was not code compliant because the
18 landing length is less than 60 inches, correct?
19     A   Right.  Now, I think we also covered this in
20 my last deposition.  But, yes, that report states the
21 landing length is less than 60 inches.
22     Q   And for a landing, the length of a landing,
23 the mandatory length of a landing needs to be at
24 least 60 inches, correct?

TOOMEY REPORTING
312-853-0648

Exhibit 3 Page 10

CARL DARR
April 30, 2025

Page 40

1  A   The minimum of 60 inches is the code
2  requirement for a landing length.
3    Q   And the top landing that you assessed for the
4  RTU was only nine inches, correct?
5    A   It's approximately nine inches between the
6  top of the ramp and the door frames.  The doors are
7  generally open.  But, yes, that's the length -- the
8  official length of the landing at that location.
9    Q   And the component that you discuss is upper
10 ramp also was not fully code compliant with the 2010
11 ADA Standards, correct?
12   A   Correct.  The slope of that ramp plane is not
13 consistent and in one location for about four feet
14 three inches, it is steeper than one and 12.  Instead
15 of one and 12, it is approximately one and 11 slope.
16   Q   And also another component was intermediate
17 landing, correct?
18   A   Correct.
19   Q   And the intermediate landing, the mandatory
20 length of an intermediate landing is 60 inches or
21 greater, correct?
22   A   Correct.  And this landing is approximately
23 three inches short of that.
24   Q   And therefore the RTU intermediate landing is

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 41

1  not code compliant with the 2010 Code, correct?
2    A   The RTU ramp intermediate landing is not code
3  compliant with the ramp, minimum required ramp
4  length.
5    Q   The top landing and the intermediate landing
6  are also if -- Let me rephrase that.
7        If the 1991 ADAAG Standards were applicable
8  when the RTU ramp was constructed, the top landing
9  and the intermediate landing would not be code
10 compliant with the 1991 Standards?
11   A   The requirements for landing length in both
12 codes is the same so neither the top landing, nor the
13 intermediate landing would be compliant with either
14 code.
15   Q   The lower ramp portion is also not compliant
16 with either the 2010 Standards or the 1991 Standards
17 because it's 11.7 percent steeper than permitted by
18 either code, is that fair to say?  It's on page 11,
19 number four.
20       MR. DEVORE:  Objection, form.  You can answer.
21       THE WITNESS:  A  Yes.  So the last one foot
22 approximately of the run is steeper than one and 12.
23 It drops off to approximately one and 8.5 for that
24 bottom section of the lower ramp.

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 42

1  MR. MORRISSEY:  Q  And the handrails on the RTU
2  ramp are not compliant with either the 1991 ADAAG
3  Standards or the 2010 ADAAG Standards in part because
4  the handrail extension at the lower portion of the
5  ramp is less than 12 inches?
6        MR. DEVORE:  Objection, form.  You can answer.
7        MR. MORRISSEY:  Q  I'm sorry.  What you have in
8  your report is the handrail extensions at the lower
9  ramp of the RTU ramp is only seven foot four inches,
10 correct?  And the upper portion, the handrail
11 extensions are 11.3 inches beyond the upper ramp,
12 correct?  Under both the 1991 and the 2010 Standards,
13 the handrail extensions are not compliant with either
14 of the 1991 Standards or the 2010 Standards, is that
15 correct?
16   A   So the requirements in both codes are the
17 handrails extend 12 inches beyond the ramp and the
18 lower ramp is approximately four and a half inches
19 short.
20       The handrails at the bottom of the lower
21 ramp and at the top of the upper ramp, the handrail
22 extensions are approximately .7 inches short of that
23 requirement.
24   Q   So based upon your expert report that was

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 43

1  tendered on April 1st, 2024, the RTU ramp fails to
2  comply with either of the 1991 ADAAG Standards or the
3  2010 ADAAG Standards, is that fair to say?
4        MR. DEVORE:  Objection, form.  You can answer.
5        THE WITNESS:  A  Elements of the ramp will not be
6  compliant with either the 1991, nor the 2010 ADAAG
7  Code requirements.
8        MR. MORRISSEY:  Q  And on page 11 there's a chart
9  which summarizes the noncompliance of the RTU ramp,
10 correct; the various components that are noncompliant
11 with either the 1991 Standards or the 2010 Standards,
12 is that fair to say?
13   A   There is a matrix at the bottom of page 11
14 that summarizes or compares the existing conditions
15 to code requirements for the elements discussed, the
16 ramp elements discussed.
17   Q   Since tendering this assessment of the RTU
18 ramp on April 1st, 2024, have you or anybody in your
19 firm done any further investigation of the RTU ramp?
20   A   I don't believe so.
21   Q   Have you or Globetrotters been retained by
22 Capital Planning or Cook County or the Sheriff to
23 review any components on the Cook County Department
24 of Corrections facility in regards to whether or not

TOOMEY REPORTING
312-853-0648

Exhibit 3 Page 11

CARL DARR
April 30, 2025

Page 44

1 the buildings are accessible under the ADA?
2     MR. DEVORE:  Objection, form.  You can answer.
3     THE WITNESS:  A  I'm not sure I understand the
4 question.
5     MR. MORRISSEY:  Q  Sure.  When you were deposed
6 last time in June of 2024, there was a discussion in
7 regards to whether or not Cook County or the Sheriff
8 were going to renovate the RTU ramp.  Do you recall
9 that discussion?
10     **A  Vaguely.**
11     Q  Okay.  And there was a discussion that the
12 County and the Sheriff were going to do an overall
13 assessment of the Cook County Department of
14 Corrections entire campus to determine whether or not
15 certain buildings or other areas of the campus were
16 in compliance with the ADA.  Do you recall that?
17     **A  Yes.**
18     Q  Has your firm been contracted to do any type
19 of further assessment of the Cook County Department
20 of Corrections other than the two assessments that
21 we've looked at today, Exhibit 4 or Exhibit 5?
22     **A  We're assessing Leighton Courthouse.  I don't**
23 **know if you consider that part of the campus but**
24 **otherwise, no.**

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 45

1     Q  Okay.  What type of assessment are you
2 conducting for the Leighton Courthouse?
3     MR. DEVORE:  Objection, outside of the scope of
4 this deposition, but you can answer to the extent you
5 can.
6     **A  Globetrotters is conducting a ADA assessment**
7 **at the Leighton Courthouse.**
8     Q  Is there any other firm that's doing the
9 assessment with you?
10     MR. DEVORE:  Same objection.
11     THE WITNESS:  A  We have one sub-consultant firm
12 to help satisfy our WVE requirements.
13     MR. MORRISSEY:  Q  Is that LCN or is it --
14     **A  No.**
15     Q  What's the name of the firm?
16     **A  HUS, H-U-S, Architecture.**
17     Q  What is the dollar value of that
18 assessment --
19     MR. DEVORE:  Objection, outside the scope of this
20 deposition.
21     THE WITNESS:  A  I don't know.
22     MR. MORRISSEY:  Well, it would be within the
23 scope of an expert how he's being compensated by the
24 defendants.

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 46

1     MR. DEVORE:  It has no relation to this lawsuit.
2     MR. MORRISSEY:  Well, it certainly goes to
3 compensation of the experts.
4     MR. DEVORE:  Not for any report done in relation
5 to this lawsuit.
6     MR. MORRISSEY:  Q  How extensive is that ADA
7 assessment of the Leighton court building?
8     MR. DEVORE:  Objection, outside the scope of this
9 deposition.
10     THE WITNESS:  A  I'm not really involved in that
11 project or I'm minimally involved in that project,
12 but my understanding is it's for the entirety of the
13 building.
14     MR. MORRISSEY:  Q  Okay.  When did Globetrotters
15 begin working on that assessment?
16     MR. DEVORE:  Same objection.  You can answer.
17     THE WITNESS:  A  I believe last year.  I'm not
18 quite certain.
19     MR. MORRISSEY:  Q  Have any reports been prepared
20 for Cook County?
21     MR. DEVORE:  Same objection.
22     THE WITNESS:  I don't believe the reports are
23 completed yet.
24     MR. MORRISSEY:  Q  What governmental entity

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 47

1 hired Globetrotters?
2     MR. DEVORE:  Objection, calls for speculation,
3 scope.  Go ahead.
4     THE WITNESS:  A  I don't know what entity
5 exactly.  I believe it's part of a task order
6 contract, umbrella contract, we have with the County.
7     MR. MORRISSEY:  Q  Was there any bid process for
8 that work?
9     MR. DEVORE:  Objection.  Same objection.  It has
10 nothing to do with this case.
11     THE WITNESS:  A  I believe it would have been
12 negotiated if it was a task order, negotiated fee.
13     MR. MORRISSEY:  Q  Did Globetrotters submit a bid
14 to assess -- do an assessment, an ADA assessment, of
15 the Cook County Department of Correction campus?
16     MR. DEVORE:  Objection, form.  You can answer.
17     THE WITNESS:  A  I'm not sure what you mean by
18 bid.
19     MR. MORRISSEY:  Q  Well, was there a request for
20 qualification that was issued by Cook County or the
21 Sheriff in regards to doing an assessment of the Cook
22 County Department of Correction campus?
23     MR. DEVORE:  Objection, form.  It's after this
24 case.

TOOMEY REPORTING
312-853-0648

Exhibit 3 Page 12

CARL DARR
April 30, 2025

Page 48

1  THE WITNESS: A I believe there was, but I was
2  not involved in it.
3  MR. MORRISSEY: Q Did Globetrotters participate
4  in submitting a request for qualifications?
5  **A I believe they did, but I'm not very familiar**
6  **with it.**
7  Q Was Globetrotters awarded or determined to be
8  qualified to proceed with the request to --
9  A I'm sorry?
10 Q Was there a winning architecture or
11 engineering firm for the bid put out by Cook County
12 to do an assessment of the Cook County Department of
13 Correction campus?
14 MR. DEVORE: Objection, calls for speculation.
15 You can answer.
16 THE WITNESS: A I do not know.
17 MR. MORRISSEY: Q Who within your firm would
18 have more knowledge in regards to any type of bid put
19 in by Globetrotters in regards to doing an assessment
20 of Cook County Department of Correction campus?
21 **A The person running the Leighton County**
22 **Courthouse project, I believe, was involved in**
23 **submitting qualifications.**
24 Q And what's that person's name?

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 49

1  A Frances, F-r-a-n-c-e-s, Rovituso,
2  R-o-v-i-t-u-s-o hyphen Strange, S-t-r-a-n-g-e.
3  Q Do you know if there was three separate
4  requests for qualifications that were issued by the
5  County for that work?
6  A I don't know.
7  Q Okay. All right. Let's take a few minutes
8  break. We're almost done.
9  (Break.)
10 MR. MORRISSEY: Q In regards to the Cermak ramp,
11 did Globetrotters make a recommendation to the County
12 and the Sheriff in regards to what steps are
13 necessary to bring the Cermak ramp into compliance
14 with either the 1991 and 2010 Code?
15 **A Our report has a recommendation for a**
16 **proposed solution to make that section of the**
17 **corridor code compliant.**
18 Q And what is the recommendation?
19 **A To rebuild the ramp and increase its length**
20 **so that the slope is less than one and 20, at which**
21 **point it no longer is considered a ramp. And we do**
22 **not have the requirements for handrails for**
23 **intermediate landings, et cetera, et cetera.**
24 Q Do you know if the Cook County or the Sheriff

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 50

1  has done anything to follow Globetrotters'
2  recommendations?
3  MR. DEVORE: Objection, speculation. You can
4  answer.
5  THE WITNESS: A I do not.
6  MR. MORRISSEY: Q When I refer to Globetrotters,
7  I'm also referring to you, do you understand that?
8  A I do.
9  Q Okay. In regards to Globetrotters and
10 yourself in regards -- the same question in regards
11 to the RTU ramp. After issuing your opinion on April
12 1st, 2024, did you make any recommendations to bring
13 the east tunnel ramp or otherwise called the RTU ramp
14 into compliance with the ADA Code?
15 **A Our report contains recommendations that**
16 **would make that tunnel ramp or section of the tunnel**
17 **ramp compliant with the current code.**
18 Q Okay. I have nothing further. Thank you for
19 your time.
20 MR. DEVORE: I have nothing. We'll reserve.
21 MR. MORRISSEY: Thanks a lot.
22 THE WITNESS: Okay. Thank you.
23 MR. MORRISSEY: We're ordering regular.
24 MR. DEVORE: I'll take a copy.

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 51

1  (Whereupon, the deposition concluded at
2  3:39 p.m.).
3          * * * * * *

TOOMEY REPORTING
312-853-0648

Exhibit 3 Page 13

CARL DARR
April 30, 2025

Page 52

```
 1  STATE OF ILLINOIS     )
                          ) ss:
 2  COUNTY OF C O O K     )
 3
 4       The within and foregoing deposition of the
 5  aforementioned witness was taken before SHAHERA ALI,
 6  C.S.R., and Notary Public, at the place, date, and time
 7  aforementioned.
 8       There were present during the taking of the
 9  deposition the previously named counsel.
10       The said witness was first duly sworn and was then
11  examined upon oral interrogatories; the questions and
12  answers were taken down in shorthand by the undersigned,
13  acting as stenographer and Notary Public; and the within
14  and foregoing is a true, accurate, and complete record of
15  all of the questions asked of and answers made by the
16  aforementioned witness, at the time and place hereinabove
17  referred to.
18       The signature of the witness was not waived, and
19  the deposition was submitted, pursuant to Rules 30(e) and
20  32(d) of the Rules of Civil Procedure for the United
21  States District Court, to the deponent per copy of the
22  attached letter.
23       The undersigned is not interested in the within
24  case, nor of kin or counsel to any of the parties.
```

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 53

```
 1       Witness my official signature and seal as Notary
 2  Public in and for Cook County, Illinois, on this 15th day
 3  of May, A.D. 2025.
 4
 5
 6       _____
 7       SHAHERA ALI, C.S.R.
         License No. 084-002666
         Notary Public
 8       200 South Wacker Drive
         Suite 3100
 9       Chicago, Illinois 60606
         Phone:  (312) 853-0648
10
```



TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 54

```
 1       IN THE DISTRICT COURT OF THE UNITED STATES
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION
 3
 4  CUAUHTEMOC HERNANDEZ,   )
                            )
 5           Plaintiff,     )
                            )
 6       -vs-               ) No. 23-cv-16970
                            )
 7  THOMAS DART, SHERIFF    )
    OF COOK COUNTY, and     )
 8  COOK COUNTY, ILLINOIS,  )
 9           Defendants.
10       I, CARL DARR, being first duly sworn, on oath
11  say that I am the deponent in the aforesaid deposition
12  taken on April 30, 2025; that I have read the foregoing
13  transcript of my deposition, consisting of Pages 1
14  through 53, inclusive, and affix my signature to same.
15
16            _____
                         CARL DARR
17
18  Subscribed and sworn to
    before me this _____ day
19  of _____, _____.
20
    _____
21  Notary Public
22
23
24
```

TOOMEY REPORTING
312-853-0648

Exhibit 3 Page 14