Transcript of the Testimony of
**LONNIE HOLLIS**

**Date:** November 18, 2024

**Case:** HERNANDEZ VS. DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

LONNIE HOLLIS
November 18, 2024

Page 1

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CUAUHTEMOC HERNANDEZ,      )
                          )
        Plaintiff,        )
                          )
      -vs-                )   No. 23 CV 16970
                          )
THOMAS DART and           )
COOK COUNTY, ILLINOIS     )
                          )
        Defendants.       )

          Deposition of LONNIE HOLLIS taken before
DENNIS M. HARTNETT, CSR, pursuant to the Federal
Rules of Civil Procedure for the United States
District Courts pertaining to the taking of
depositions, at Suite 230, 230 West Monroe Street in
the City of Chicago, Cook County, Illinois,
commencing at 2:00 o'clock p.m. on the 18th day of
November A.D., 2024.

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 2

1        There were present at the taking of this
2   deposition the following counsel:
3
4
5       DEVORE RANDUNSKY
6       MR. JASON E. DEVORE
        MR. ZACHARY STILLMAN
        230 West Monroe Street
7       Suite 230
        Chicago, Illinois  60606
8       312-300-4479
        jdevore@deforeradunsky.com
9
10          on behalf of the Plaintiff;
11
12      THOMAS G. MORRISSEY, LTD.
        MR. THOMAS MORRISSEY
        MR. PATRICK MORRISSEY
13      10257 South Western Avenue
        Chicago, Illinois  60643
14      773-233-7900
15
        on behalf of the Defendant,
16        Thomas Dart;
17
18      COOK COUNTY SHERIFF'S OFFICE
        MS. KHARA COLEMAN
19      50 West Washington Street - 704
        Chicago, Illinois  60602
20      312-603-5473
        khara.coleman@ccsheriff.org.
21
22      on behalf of Defendant,
        Cook County, Illinois.
23      - - - - -
24

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 3

1            DEPOSITION OF
2            LONNIE HOLLIS
3           November 18, 2024
4
5   EXAMINATION BY:                          PAGE
6   Mr. Thomas Morrissey                        4
7   Mr. Devore                                114
8   Mr. Thomas Morrissey                      118
9               * * * * * *
10              EXHIBITS
11
12  Deposition Exhibit No.  1                    4
13  Deposition Exhibit No.  6                   34
14  Deposition Exhibit No.  4                   36
15  Deposition Exhibit No.  9                   41
16  Deposition Exhibit No. 10                   59
17  Deposition Exhibit No.  5                  111
18              * * * * * *
19
20
21
22
23
24

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 1

**LONNIE HOLLIS**
**November 18, 2024**

Page 4

```
 1                 LONNIE HOLLIS,
 2  called as a witness herein, having been first duly
 3  sworn, was examined upon oral interrogatories and
 4  testified as follows:
 5                  EXAMINATION
 6            by Mr. Thomas Morrissey:
 7     MR. THOMAS MORRISSEY:  Q  This is a Rule
 8  30(b)(6) notice that was issued on September 23rd,
 9  2024.
10            Will you please state your name and spell
11  your last name for the record.
12     A   First name is Lonnie, L-o-n-n-i-e.  Last
13  name is Hollis, H-o-l-l-i-s.
14     Q   Have you been designated by the Sheriff of
15  Cook County to address certain topics in this
16  30(b)(6) notice?
17     MR. DEVORE:  Yes.  Sorry.
18     THE WITNESS:  Yes.
19     MR. MORRISSEY:  Q  I'm showing you Exhibit 1,
20  it's a 4-page document.  I ask you to take a look at
21  that document?
22            Have you seen this document before?
23     A   No.
24     Q   Have you ever been deposed before?
```

TOOMEY REPORTING
312-853-0648

---

**LONNIE HOLLIS**
**November 18, 2024**

Page 5

```
 1     A   No.
 2     Q   So, let me give you a little background.  In
 3  a deposition, I'm going to have the opportunity to
 4  ask you questions, as the Sheriff's designee, you
 5  have to answer orally, so the Court Reporter can
 6  take down your response, otherwise, he can't take
 7  down if you shake your head or nod your head or make
 8  gestures.
 9            If you don't understand one of my
10  questions, please ask me to rephrase it, but if you
11  respond to the question, I'm going to, I'm going to
12  consider the fact you understand my question.  If,
13  at any time, during the deposition you want to take
14  a break, when there's no question pending, please
15  let us know, and we'll accommodate your needs.
16            Going back to Exhibit Number 1.  Have you
17  -- you haven't seen this document before?
18     A   No.
19     MR. MORRISSEY:  Counsel, what topics is
20  Mr. Hollis being designated to discuss on behalf of
21  the Sheriff of Cook County?
22     MR. DEVORE:  I believe, here it is.  It's 4, 5
23  -- it's  3, 4, 5 and 6, I believe, right?
24     MR. MORRISSEY:  Okay.
```

TOOMEY REPORTING
312-853-0648

---

**LONNIE HOLLIS**
**November 18, 2024**

Page 6

```
 1     MR. DEVORE:  Yeah, I'm sorry.
 2     MR. MORRISSEY:  Q  Would you like to take a few
 3  moments to look at Exhibit 1, paragraphs 3, 4, 5 and
 4  6?
 5     A   Yes
 6     Q   Have you had an opportunity now to review
 7  Exhibit 1?
 8     A   Yes.
 9     Q   In particular, topics 3 through 6?
10     A   Yes, sir.
11     Q   Mr. Hollis, where are you currently
12  employed?
13     A   Cook County Sheriff's office.
14     Q   And in what department are you assigned to?
15     A   Administration.
16     Q   How long have you been with Cook County?
17     A   Since May 2001.
18     Q   Are you a sworn officer?
19     A   I was sworn, yes.
20     Q   What was your first position with the
21  Sheriff's office?
22     A   Correctional officer.
23     Q   For how long were you a correctional
24  officer?
```

TOOMEY REPORTING
312-853-0648

---

**LONNIE HOLLIS**
**November 18, 2024**

Page 7

```
 1     A   Until 2007.
 2     Q   What divisions did you work in as a
 3  correctional officer?
 4     A   Division 1, 2, receiving, isn't a division,
 5  and 6.
 6     Q   Did you work as a tier officer in Division
 7  1?
 8     A   Yes.
 9     Q   Any other positions in Division 1, which you
10  were assigned to as a sheriff's officer, other than
11  a tier officer?
12     A   What do you mean?
13     Q   Well, there's different positions as a
14  correctional officer in Division 1, correct?
15     A   Yes.
16     Q   Other than being assigned to a tier, did you
17  have any other assignment in Division 1?
18     A   I worked door security.
19     MR. REPORTER:  I'm sorry, repeat that.
20     THE WITNESS:  Door security.  The primary entry
21  point to the building.
22     MR. MORRISSEY:  Q  In Division 1, were there
23  movement officers?
24     A   Yes.
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 2

LONNIE HOLLIS
November 18, 2024

Page 8

1    Q    Did you ever work as a movement officer?
2    A    Not that I recall.  It's a long time ago.
3    Q    In Division 2, what were your assignments?
4    A    Living unit officer, barber shop officer,
5    visiting officer.
6    Q    Does Division 2 have a movement officer?
7    A    Yes.
8    Q    Did you ever work as a movement officer?
9    A    Yeah, that was a long time ago as well.
10   Q    Did you ever move prisoners from Division 2
11   to Cermak?
12   A    Yes.
13   Q    In the RCDC, what were your
14   responsibilities?
15   A    Intake officer, booking officer.
16   Q    Any other responsibilities in the RCDC?
17   A    Tunnel, tunnel security.
18   Q    Did you ever work moving prisoners from the
19   RCDC to a living unit?
20   A    Yes.
21   Q    What living units or house units, when you
22   were working in the RCDC, did you move prisoners to?
23   A    Division 6, Division 1, Division 9,
24   Division 10.

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 9

1    Q    Did you ever move prisoners from the RCDC to
2    Cermak Health Service?
3    A    Not that I recall.
4    Q    Okay.  Did you receive a promotion in 2007?
5    A    Yes.
6    Q    What, did you become a sergeant?
7    A    Yes.
8    Q    And what housing unit?
9    A    Division 9.
10   Q    What were your responsibilities as a
11   Sergeant in Division 9?
12   A    Oversee the activity of the officers.
13   Q    And what years did you work in Division 9?
14   A    Roughly from 2007 to, I think, 2012.
15   Q    Did you ever move prisoners from Division 9
16   to Cermak --
17   A    Yes.
18   Q    -- while you were a sergeant?
19        Did Division 9 have movement officers?
20   A    Yes.
21   Q    Did you work a specific shift when you were
22   a sergeant in Division 9?
23   A    I was assigned all three shifts.  Primarily
24   afternoons, but I was on all three shifts.

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 10

1    Q    Did you supervise movement officers in
2    Division 9 who move prisoners to Cermak?
3    A    I would have to say, yeah.  Mostly, I was
4    assigned to the towers, which is the living units.
5    Q    Can you tell me, in Division 9, what were
6    the duties and responsibilities of a movement
7    officer?
8    A    To export the individuals to and from
9    various places that they have to go in the building
10   or outside the building.
11   Q    Would that include Cermak Health?
12   A    Yeah, most likely.
13   Q    When you were a sergeant, in Division 9,
14   were you responsible for training movement officers?
15   A    No.
16   Q    Do you know if movement officers, at that
17   time, between 2007 and 2012, received any specific
18   training in the role of a movement officer?
19   A    No, most of the time I believe they may have
20   learned from each other.
21   MR. REPORTER:  They may have what from each
22   other?
23   THE WITNESS:  Learned from each other.  So
24   someone who was previously doing it or if there was

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 11

1    a sergeant assigned specifically to that.
2        As I mentioned, I was assigned to the
3    living, supervising living units.
4    MR. MORRISSEY:  Q  In 2012, did you receive a
5    promotion to lieutenant status?
6    A    No, I went to another area in the jail
7    through a bidding process.
8    Q    All right.  What area of the jail did you go
9    to in 2012?
10   A    Well, I went to the central kitchen, in
11   about 2012, then I was in 3 and 8.
12   Q    When you say 3 and 8 --
13   A    They synonymous with each other, the
14   two buildings were joined with each other.
15   Q    Right.  Did 3 house females at that time?
16   A    Yes.
17   Q    And what years did you work 3 and 8?
18   A    It was probably just 2012, I believe, we had
19   a compound beginning at that point.
20   Q    Was Division 8, at that time, was that
21   Cermak Health?
22   A    Yes.
23   Q    How long were you assigned to 3, Division 3
24   and 8, in 2012?

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 3

Page 12

```
1   A   About a month, before I bid.
2   Q   And after a month, where were you assigned?
3   A   I went to Division 2.
4   Q   In Division 2, were you a sergeant?
5   A   Yes.
6   Q   What shift did you work?
7   A   11:00 to 7:00.
8   Q   11:00 p.m. to 7:00 in the morning?
9   A   Yes.
10  Q   And, to your knowledge, did Division 2 have
11  movement officers?
12  A   Yes.
13  Q   And at times did movement officers move
14  inmates from Division 2, at times, to Cermak?
15  A   Yes.
16  Q   For how long were you a sergeant in
17  Division 2?
18  A   Until 2016.
19  Q   When you were a sergeant in Division 2, and
20  the times you supervised movement officers that move
21  prisoners from Division 2 to the Cermak Clinic,
22  correct?
23  A   Yes.
24  Q   Can you tell me the path of travel that the
```

Page 13

```
1   prisoners would take with a movement officer in
2   Division 2?
3   A   Have you been to the jail before?
4       Am I allowed to ask you questions?
5   MR. MORRISSEY:  No.
6   MR. DEVORE:  No.
7   MR. MORRISSEY:  No.
8   THE WITNESS:  I'm trying to help him understand
9   how I get there.
10  MR. DEVORE:  Yeah, just objection as to form, in
11  terms of it's unclear in terms of where to start and
12  finish time frame.
13  MR. MORRISSEY:  Q  Well, is there one lawyer
14  defending the case.
15  MR. STILLMAN:  It's the two of us.
16  MR. MORRISSEY:  No, but only one person is
17  entitled to make objections during a deposition.
18  MR. STILLMAN:  For each Defendant.
19  MR. MORRISSEY:  No, no, no, this is --
20  MR. DEVORE:  I have been the only one objecting
21  so far.
22  MR. MORRISSEY:  All right.  So you will make all
23  the objections, that's fine.
24  Q   In Division 2, can you tell me the path of
```

Page 14

```
1   travel for a movement officer moving a prisoner from
2   Division 2 to Cermak?
3   A   Yes, there's a roadway that is
4   interconnected in the interior of the compound, and
5   they use the roadway to go to Cermak.
6   Q   So would it be fair to say that in
7   Division 2, back at least in the year 2016, a
8   prisoner being moved by a movement officer to Cermak
9   Health, would go outside the building and go to
10  Cermak Health?
11  MR. DEVORE:  Objection, I don't see where this
12  is inside -- it's outside the scope of the
13  notice.
14  MR. STILLMAN:  I think we have gone beyond his
15  background at this point.
16  MR. DEVORE:  I'm looking if there is something
17  in the notice that this applies to, point me to it,
18  but, otherwise, it's outside.
19  MR. MORRISSEY:  Well, it involves the training
20  of staff to accommodate individuals with
21  disabilities, canes, crutches, or walkers, number 5.
22  And the on-the-job training, which he's also
23  testified that officers train each other in regards
24  to the responsibilities of movement officers.
```

Page 15

```
1   MR. DEVORE:  Well, you're talking about
2   different time frames, you're talking about, I
3   believe it was 2012, and now we're possibly talking
4   about 2016, and I believe, and your notice has
5   three, references January 1, 2024 --
6   MR. STILLMAN:  None of your claims are relevant
7   to that time.
8   MR. DEVORE:  Let me go on.
9   MR. STILLMAN:  And it's unclear as to 4, 5, and
10  6, but I don't, this case is not in any way about
11  actions taken in 2012 or 2016.
12  MR. MORRISSEY:  Q  To your knowledge, when
13  prisoners from Division 2 are transported in the
14  period between 2023, 2022, and 2024, is the same
15  route of travel taken today as it was back in 2016?
16  MR. DEVORE:  Objection, as to scope and time
17  frame.
18  MR. MORRISSEY:  Q  You can answer.
19  MR. DEVORE:  For 2022, is that the time frame?
20  MR. MORRISSEY:  Q  Right.  2022 to 2024, can you
21  describe the path of travel for a movement officer
22  taking a prisoner from Division 2 to Cermak?
23  A   They use the roadway.
24  Q   When you say the roadway, what door or exit
```

Exhibit 11 Page 4

LONNIE HOLLIS
November 18, 2024

Page 16

1  would a movement officer take from Division 2 to
2  reach the roadway?
3      MR. DEVORE:  Same objection as to scope, but you
4  can answer, if you can.
5      THE WITNESS:  Well, there, each building has two
6  doors they could possibly leave out of, so it's
7  difficult to answer.
8      MR. MORRISSEY:  Q  Okay.  But to get to Cermak,
9  you would have to physically, from Division 2, go
10 outside the building, correct?
11     **A  Yeah, there's no tunnel.**
12     Q   Okay.  And is there a point of entrance for
13 a movement officer into the Cermak building from
14 Division 2?
15     **A  One more time with the question?**
16     Q   Sure.  If a movement officer, assigned to
17 Division 2, takes a prisoner from Division 2 to
18 Cermak, is there a point of entrance for that
19 officer into the Cermak building?
20     MR. DEVORE:  Objection as to form.  In terms of
21 what time, what time frame are we talking about?
22     MR. MORRISSEY:  The class period, 2022 to 2024.
23     THE WITNESS:  They would most likely take them
24 into the RTU.

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 17

1      MR. MORRISSEY:  Q  Why would a movement officer,
2  during the class period, and when I talk about the
3  class period, I'm talking about 2022 to the present,
4  why would a movement officer from Division 2 take a
5  prisoner outside the building and then over to the
6  RTU building in order to get to Cermak?
7      MR. DEVORE:  Objection as to scope.  If there is
8  no tunnels in Division 2, then how can that be
9  within the scope of this suit?
10     MR. MORRISSEY:  Q  You can answer.
11     MR. DEVORE:  If you can.  I, and, actually, the
12 objection is as to scope, and so if there's, again,
13 that's the objection.  You can answer, if you can.
14     THE WITNESS:  What was the question again?
15     MR. MORRISSEY:  Q  So the question is this --
16     **A  He was talking, I got distracted.**
17     Q   -- during the class period, if a prisoner
18 housed in Division 2 has to go to Cermak, you say
19 they have to exit the building, itself, why do they
20 go to the RTU building, instead of going directly to
21 Cermak?
22     **A  Because the way that they set up now, they
23 would be on the exterior of the, so the interior is
24 bounded by fencing, and if they go beyond a certain**

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 18

1  **point, they would be outside the secure area of the
2  fencing, so they have to go into the building.**
3      Q   They have to go into the RTU building?
4      **A  Yes.**
5      Q   Okay.  So the Division 2 building is
6  surrounded by a security fence?
7      **A  No, the interior of the compound.  That's
8  why I was asking if you have had been there before,
9  because it's difficult to explain, if you haven't
10 been there.**
11     Q   Okay.  So, what area of the RTU would a
12 Division 2 prisoner be taken to, prior to being
13 brought to Cermak?
14     MR. DEVORE:  Same objection.  As to scope and
15 Division 2.
16     MR. STILLMAN:  You can answer.
17     THE WITNESS:  That's also difficult to answer,
18 because there's multiple entry points into the RTU
19 that someone could chose to take.
20     MR. MORRISSEY:  Q  Would the -- when a movement
21 officer, who is given the assignment to move a
22 prisoner from Division 2 to Cermak, does he or she
23 sign out for the prisoner, is there any log that
24 they sign out on?

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 19

1      MR. DEVORE:  Objection as to scope.  And I am
2  not sure what this has to do with this case.
3      MR. MORRISSEY:  Q  You can answer.
4      MR. DEVORE:  If you know.
5      THE WITNESS:  You asked what now, do they sign
6  someone out?
7      MR. MORRISSEY:  Q  Yeah.  So how does a movement
8  officer, how does the move, how does the jail
9  communicate to a movement officer in Division 2 that
10 he or she is to take a prisoner from Division 2 to
11 Cermak?
12     **A  When you, okay, I'm having trouble tracking
13 what you, so when you say communicate, how --**
14     MR. DEVORE:  Actually, and just an objection,
15 and maybe it could be, maybe it would be easier if
16 you just asked if folks traveling from Division 2 to
17 the RTU can use the east tunnel ramp, I am just not
18 sure where you're going.
19     MR. MORRISSEY:  You know, you can't testify for
20 the witness.  So, you have got to confine your
21 objections to appropriate things.
22     MR. DEVORE:  Well, we're trying to get to
23 appropriate things, it's just going a little slow
24 and it's evident that there's some difficulty with

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 5

LONNIE HOLLIS
November 18, 2024

Page 20

1   the question.
2       MR. MORRISSEY:  Well, the case is going very
3   slow because of Defense Counsel, I might add.
4       Q   Do you understand?  How does a movement
5   officer in Division 2 get the assignment to move a
6   prisoner from Division 2 to Cermak?
7       MR. DEVORE:  Same objection, as to scope.  I
8   don't believe there's been any testimony regarding
9   Division 2 having, there being movement involving
10  Division 2 on a ramp.
11      MR. MORRISSEY:  Q  You can answer.
12      A   That's, so I mean there's a plethora of
13  ways.  I mean someone could be called, and say that
14  the person needs to be brought to location X.  There
15  could be movement passes that are generated through
16  our JMS, I mean so that's a really broad sweeping
17  question to answer.  If you have a more --
18      Q   All right.
19      A   -- succinct question.
20      Q   So the movement officer, once they take
21  possession of the prisoner of Division 2 --
22      A   Uh-huh.
23      Q   -- are they responsible for bringing them to
24  Cermak?

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 21

1       A   It would depend on where, again, because
2   your question was kind of open-ended, no offense.
3   If that's where they're going, then, yes, but you
4   said movement, so I don't know if you're saying if
5   they're going to, let's say, a visit or if they're
6   going here, so if you're saying to Cermak, then yes.
7       Q   All right.  So, my example will be directed
8   to, let's say, Division 2, dorm 2.  Let's say a
9   prisoner from Division 2, dorm 2, requires to see a
10  doctor?
11      MR. DEVORE:  Same objection, as to scope.
12  There's been, there has been no testimony that there's
13  ramps in Division 2 that are involved in this case,
14  so I'm going to, with respect to that line of
15  questioning, in Division 2, I'm going to, and it's
16  been asked several times, I'm going to direct him
17  not to answer if you continue.
18      MR. MORRISSEY:  Q  So let's assume that the
19  person has to go to the Health Care Clinic in
20  Cermak, you mentioned that the movement officer in
21  Division 2 will take him from the division, Division
22  2, let's say dorm 2, directly to Cermak, correct?
23      MR. DEVORE:  Objection as to form, confusing as
24  worded, also it relates to Division 2.

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 22

1       MR. MORRISSEY:  Q  You can answer.
2       MR. DEVORE:  And I am going to direct him not to
3   answer.
4       MR. MORRISSEY:  We'll certify the question.
5       Q   After 2016, where were you assigned to?
6       A   Jail intelligence.
7       Q   Do you still have the same rank as a
8   sergeant?
9       A   Yes.
10      Q   For how long were you in jail intelligence?
11      A   Until 2020.
12      Q   And when were you assigned to jail
13  intelligence, you didn't supervise correctional
14  officers or movement officers moving prisoners from
15  divisions to Cermak, would that be fair to say?
16      MR. DEVORE:  Objection as to what is fair, but
17  if you can answer, you can answer.
18      THE WITNESS:  Yes, I was in jail intelligence,
19  we didn't do those things.
20      MR. MORRISSEY:  Q  In 2020, did you receive a
21  promotion or did you change positions?
22      A   I was promoted to AED, Assistant Executive
23  Director.
24      Q   And for what period of time were you an

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 23

1   Assistant Executive Director?
2       A   From 2020 to the present.
3       Q   What are your responsibilities as an
4   Assistant Executive Director?
5       A   I oversee the day-to-day operations of areas
6   or individuals, depending on the will of the
7   executive director.
8       Q   Who is the executive director?
9       A   Jane Gubser.
10      Q   Jane Gubner?
11      A   Gubser.
12      Q   Do you have specific divisions that you
13  supervise on a day-to-day basis?
14      A   No, not at this time.
15      Q   At any time, as the Assistant Executive
16  Director, were you assigned specific divisions?
17      A   Yes.
18      Q   What period of time was that?
19      A   From 2020 to this year.
20      Q   What month this year?
21      A   July.
22      Q   Between 2020 and July of 2024, what
23  divisions at the jail directly reported to you?
24      A   Division 5, Division 6, Division 11, RTU,

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 6

LONNIE HOLLIS
November 18, 2024

Page 24

1  Cermak, 16, external operations, transportation.
2      Q   Okay.  As of July 2024, what are your
3  responsibilities?
4          You mentioned in July of 2024 your
5  responsibilities shifted, you no longer had these
6  divisions directly report to you?
7      A   No.
8      Q   Is that correct?
9      A   Yes.
10     Q   So what are your current responsibilities?
11     A   I do special projects for administration.
12     Q   Can you name some of the projects that you?
13     A   The Opioid Treatment Program.
14     MR. REPORTER:  I'm sorry, repeat that?
15     A   Opioid Treatment Program, OTP.  Supervisor
16  accountability, as far as rounding and staff and
17  individual in custody engagement.
18     Q   Anything else?
19     A   Oh, you said some.
20     Q   Well, what other responsibilities do you
21  have?
22     A   Quite a few.  I also work with our
23  probationary correctional officers, doing peer
24  mentoring with them.  And I do compliance audits, to

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 25

1  make sure that certain policies and procedures are
2  being held or adhered to, such as, you know, when we
3  secure the individuals in custody in their cells,
4  let them out of their cells, a lot of my work is
5  focused on compliance and auditing.
6      Q   Is there a drug treatment program at the
7  jail?
8      A   Yes.
9      Q   And are you -- do you supervise the drug
10  treatment program?
11     A   No, I do not.
12     Q   What did you do to investigate the topics 3
13  through 6, that are in Exhibit Number 1, in
14  preparing to testify today?
15     A   Investigate?
16     Q   Yeah.
17     MR. STILLMAN:  I don't understand what you're
18  asking him either, so maybe --
19     MR. MORRISSEY:  Q  All right.  Let me go back a
20  step.  When were you contacted to testify today?
21     A   Probably a few weeks back.
22     Q   And was that by one of your attorneys?
23     A   Yes.
24     Q   Was that Miss Coleman that contacted you?

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 26

1      A   No, it's an email that comes out.
2      Q   Okay.
3      A   An email notification.
4      Q   Okay.  After receiving that notice by email,
5  what have you done in preparing to testify today in
6  regards to topics 3 through 6?
7      MR. DEVORE:  Objection as to form, in terms of,
8  you know, it's pretty open-ended, but to the extent
9  you can answer, you can answer.
10     THE WITNESS:  So what is he saying, what does he
11  mean, what have I done?
12     MR. MORRISSEY:  Q  Well, you have to respond to
13  me, you can't look at your attorney.
14         So after you received the email, you
15  mentioned that you haven't looked at topics 3
16  through 6 prior to today's deposition, correct?
17     A   Yeah, you asked me if I saw the document.
18     Q   Okay.  So my question is, what have you done
19  to investigate each of those topics, since you were
20  contacted to testify by one of your attorneys?
21     MR. DEVORE:  Just the same objection, but if you
22  can answer, you can answer.
23     THE WITNESS:  I didn't know I was required to
24  investigate this.

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 27

1      MR. MORRISSEY:  Q  Did you speak with anybody,
2  prior to today's deposition?
3      A   Yes.
4      Q   Other than -- did you speak to any
5  attorneys?
6      A   These --
7      Q   These two gentlemen here?
8      A   Right.
9      Q   And you're talking about Mr. Stillman and
10  Mr. Devore?
11     A   Right.
12     Q   When did you speak with those attorneys?
13     A   It was a few days back, and then a couple
14  weeks ago.  I don't remember the exact date, sorry.
15     Q   Other than your attorneys, did you speak to
16  anybody else in regards to the topics which are
17  covered by this deposition notice?
18     A   No.
19     Q   Did you talk to any training officers --
20     MR. DEVORE:  Objection, asked and answered.
21     MR. MORRISSEY:  Q  -- at the Cook County Jail,
22  in regards to the topics that were covered 3 through
23  6 in Exhibit 1?
24     MR. DEVORE:  Objection, asked and answered.  You

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 7

LONNIE HOLLIS
November 18, 2024

Page 28

1  can answer, if you can.
2     THE WITNESS:  You say -- no.
3     MR. MORRISSEY:  Q  Did you review any policies,
4  statements of the Cook County Department of
5  Corrections, prior to testifying today?
6     MR. DEVORE:  Objection, in terms of he already
7  answered that he hadn't seen these documents, and he
8  wouldn't then be able to talk to folks about the
9  document, if he hadn't seen it.
10    MR. MORRISSEY:  Q  Well, excuse me, but we're
11 here for 30(b)(6) deposition.  He's been designated
12 by the Sheriff, I have a right to find out exactly
13 what he did in preparing for this deposition.
14    Q  So, again, did you look at any policy,
15 documents of the Cook County Sheriff in preparing
16 for today's deposition?
17    A  No.
18    Q  Did you review any procedures in regards to
19 moving prisoners that use canes, crutches or walkers
20 to and from Cermak in preparing for today's
21 deposition?
22    A  Isn't that pretty much what you just asked
23 me?  Not to be abrasive, but it sounds very similar.
24    Q  Well, it may sound similar, but I am asking

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 29

1  you specifically.
2     A  Okay.  Can you ask me one more time, because
3  it sounds like --
4     MR. MORRISSEY:  Do you want to.
5        (Question read back as requested.)
6     THE WITNESS:  No.
7     MR. MORRISSEY:  Q  Did you talk to any movement
8  officers from Division 2 specifically, in regards to
9  moving prisoners from Division 2, who use canes,
10 crutches, or walkers to Cermak?
11    MR. DEVORE:  Objection, asked and answered.  I
12 believe it's the third time you asked that question.
13    MR. MORRISSEY:  Q  You can answer?
14    A  No.
15    Q  The same question would be in regards to
16 Division 3, 6, 9, 10 and 11, did you talk to any
17 movement officers from that division, from those
18 divisions, in regards to moving prisoners with
19 canes, crutches, or walkers to and from the Cermak
20 Health Service building?
21    MR. DEVORE:  Objection as to form.  I was, I
22 was, that was confusing, as I heard it anyway.
23    MR. MORRISSEY:  Q  You can answer.
24       Do you understand the question?

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 30

1     A  No, no.  Are you asking me the same thing
2  you just asked, but about different places?
3     Q  No, I am asking you in regards to various
4  housing units at the jail.
5     A  Uh-huh.
6     Q  Moving prisoners that have alerts for either
7  canes, crutches, or walkers?
8     A  Yes.
9     Q  Did you talk to any movement officer from
10 any of the open housing divisions at Cook County
11 Jail, in regards to how they move prisoners with
12 mobility disabilities to and from Cermak Health
13 Service?
14    A  No.
15    Q  Do you believe that it would be helpful in
16 testifying, in addressing topics 3 through 6 to talk
17 to the actual movement officers to determine how
18 those movement officers accommodate prisoners that
19 are given alerts for canes, crutches, or walkers in
20 going up and down either the RTU ramp or the Cermak
21 ramp?
22    MR. DEVORE:  Objection as to form.  Calls for
23 speculation, as to what the officers may say.
24    THE WITNESS:  I am not sure I have that answer,

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 31

1  because everybody could say something different, and
2  I don't want to give a speculative answer of that.
3     MR. MORRISSEY:  Q  Would it be fair to say that,
4  for instance, in Division 9, there are prisoners in
5  Division 9 that use canes, crutches, and walkers,
6  have alerts for canes, crutches, and walkers?
7     A  I don't have that answer.  I don't wish to
8  speculate.  I don't know that to be true or untrue,
9  I haven't looked at the census over their recently.
10    Q  Do you know if there's prisoners in
11 Division 6 that use canes, crutches, and walkers?
12    MR. DEVORE:  Objection as to form and what time
13 frame.
14    MR. MORRISSEY:  During the class period, 2022 to
15 2024?
16    THE WITNESS:  Yes.
17    MR. MORRISSEY:  Q  Would it be fair to say that
18 as a designee for the Sheriff, you don't know how a
19 movement officer in Division 6, what he or she may
20 do to accommodate a person with a cane, crutch, or
21 walker going up the RTU east tunnel ramp?
22    MR. DEVORE:  Objection, mischaracterizes
23 testimony.
24    MR. MORRISSEY:  He hasn't been asked that

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 8

LONNIE HOLLIS
November 18, 2024

Page 32

```
 1   question.  So I think that the objection is not well
 2   founded.
 3       MR. DEVORE:  I think it is.
 4       MR. MORRISSEY:  Q  Well, do you understand the
 5   question?
 6       A   No.
 7       Q   Had you spoken to any movement officer from
 8   Division 6 in regards to how he or she may
 9   accommodate a person with a cane, crutch, or walker
10   alert, as far as going up the RTU east tunnel ramp?
11       MR. DEVORE:  Objection, that's the different
12   question than the one you just asked.
13       THE WITNESS:  You said did I speak to anybody?
14       MR. MORRISSEY:  Q  Right.
15       A   No.
16       Q   And you previously said that depending upon
17   the officer, they may do something different, as far
18   as accommodating a prisoner that has a cane, walker,
19   or crutch alert, in Division 6, going up the east
20   tunnel, RTU ramp, is that fair to say?
21       MR. DEVORE:  Objection as to form.
22       MR. STILLMAN:  You can answer.
23       THE WITNESS:  I did say what you just said, but
24   that's based on the fact that everybody receives and
```

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 33

```
 1   processes information differently.  So I haven't
 2   spoken to a person directly, but I can't speak for
 3   how you or he would respond to any given question,
 4   if I were to ask something.
 5       Q   Okay.  So would it be fair to say that
 6   movement officers, in different divisions, move
 7   prisoners to and from Cermak --
 8       A   Yes.
 9       Q   -- who have -- and let me finish the
10   question.
11           Movement officers throughout the jail
12   complex, move prisoners with canes, crutches,
13   walkers to and from Cermak?
14       MR. DEVORE:  Objection as to form.  It's
15   confusing as stated.
16       THE WITNESS:  Yes.
17       MR. DEVORE:  Let's take a couple of minute break
18   here.
19       MR. MORRISSEY:  Well, I'm just going to caution
20   you --
21       MR. DEVORE:  Well, he just answered the
22   question.
23       MR. MORRISSEY:  You can't talk to a witness
24   during the course of a deposition in regards to
```

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 34

```
 1   potential questions.
 2       MR. DEVORE:  We understand the rules.
 3       MR. MORRISSEY:  Okay.  You can take a break.
 4       MR. DEVORE:  Yeah.
 5       MR. MORRISSEY:  But I hope you don't violate any
 6   rules.
 7       MR. DEVORE:  So, just in terms of clarification,
 8   I mean I think that, you know, you're dancing around
 9   these --
10       MR. MORRISSEY:  We're off the record.
11       MR. DEVORE:  Off the record.
12           (Whereupon a break was taken.)
13       MR. MORRISSEY:  Back on the record.
14       Q   I'm going to show you Plaintiff's Exhibit
15   Number 6, it's Defendant's first set of Responses to
16   Productions and I would ask you to take a look at
17   paragraph 11.
18       MR. DEVORE:  Yeah.
19       MR. STILLMAN:  Yeah.
20       MR. MORRISSEY:  Q  Have you seen Plaintiff's
21   Exhibit Number 6, particular paragraph 11, prior
22   to --
23       A   Am I looking at this one or this one?
24       Q   You're looking at Exhibit 6, it's at the
```

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 35

```
 1   bottom of the page.
 2       A   Right, this one or this one?
 3       Q   Let me see.  Have you seen paragraph 6, the
 4   response by the Sheriff to the question, Exhibit 6,
 5   paragraph 11, from December 20th, 2021 to the
 6   present, documents that explain the policy and/or
 7   procedure to provide an accommodation for the
 8   detainee prescribed a cane, crutch, or walker
 9   transverse the Cermak ramp?
10           And then the response is, with a number of
11   objections, it says without waiving and in light of
12   this objection, see procedure 704, policy 148 and
13   801.  So have you seen that document before?
14       MR. DEVORE:  Objection as to form.  Are you
15   referring to the documents?
16       MR. MORRISSEY:  I am referring to Exhibit 6,
17   paragraph 11, that's the question.
18       MR. DEVORE:  You said document, so it was
19   unclear if you're referring to --
20       MR. MORRISSEY:  I am referring to this
21   paragraph.  Have you looked at paragraph Exhibit 6,
22   paragraph 11, before today's deposition?
23       A   No.
24       Q   In preparing for today's deposition, did you
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 9

LONNIE HOLLIS
November 18, 2024

Page 36

```
 1   look at any of these policies, procedure 704, policy
 2   148, or 801?
 3       MR. DEVORE:  Objection, as to form, and whether
 4   it was actual policy and procedures or the words
 5   that make up the policy and procedure.
 6       THE WITNESS:  Yes, I have seen them before.
 7       MR. MORRISSEY:  Q  How recent have you looked
 8   at, for instance, procedure 704?
 9       A   I couldn't speculate, I am not sure.
10       Q   Within the last two years?
11       A   Somewhere there about.
12       Q   Okay.  How about policy 148?
13       A   Somewhere there about, the last two years.
14       Q   Okay.  Policy 801?
15       A   Somewhere about the last two years.
16       Q   Okay.  Can you tell me, policy 148, how does
17   that --
18       A   What is --
19       Q   -- an accommodation for detainees, prescribe
20   a cane, crutch, or walker?
21       A   What is policy 148?  What are we speaking
22   about?
23       Q   I'm going to show you Exhibit 4.  It's
24   policy 148.
```

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 37

```
 1       A   Okay.  And now you're asking me what out of
 2   this?
 3       Q   Well, you mentioned you have seen policy
 4   104, 148 before, right?
 5       A   Previously, yeah.
 6       Q   Yeah.  Can you tell me whether policy 148
 7   addresses how, how the jail, correctional officers
 8   accommodate detainees prescribed a cane, crutch, or
 9   walker when they transverse the Cermak ramp?
10       MR. DEVORE:  Objection, as to form.
11       MR. MORRISSEY:  Q  Do you understand the
12   question?
13       A   No, can you clarify it?
14       Q   Yeah, sure.  For detainees, prisoners with
15   an alert for canes, crutches, or walkers, is there
16   anything in this policy, 148, that tells a
17   correctional officer what he or she should do as far
18   as accommodating a prisoner with those types of
19   alerts when they go up or down a ramp?
20       MR. DEVORE:  I just have an objection as to
21   form.  If there's a question regarding any specific
22   portion of this document, which is 8 or 9 pages
23   long.
24       MR. MORRISSEY:  Q  Well, the policy, the heading
```

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 38

```
 1   on that is communications and interaction with
 2   individuals with disabilities, correct?
 3       A   Yes, that's what it says here.
 4       Q   And then it defines what a mobility
 5   impairment is, correct?
 6       A   Yes.
 7       Q   Would a person who has an alert for a cane,
 8   crutch, or walker fall within the definition of a
 9   mobility impairment --
10       MR. DEVORE:  Objection as --
11       MR. MORRISSEY:  -- under this policy?
12       MR. DEVORE:  Objection as to form.
13           But you can answer, if you can.
14       THE WITNESS:  Yeah, I was refreshing myself with
15   the policy.  What was your question again, sir?
16       MR. MORRISSEY:  Can you read it back, Dennis.
17           (Question read back as requested.)
18       THE WITNESS:  Yeah, according to this, I believe
19   so.
20       MR. MORRISSEY:  Q  And I'm going to refer you
21   now to page 7 of this policy, 148, and specifically
22   148.9, under arrest and booking, and ask you to read
23   that to yourself for a moment.
24           Have you had an opportunity to read 148.9?
```

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 39

```
 1       A   Yes.
 2       Q   You see that 148.9, in regards to ramps,
 3   there is a requirement about wheelchair bound
 4   individuals being pushed up or down a ramp by the
 5   Sheriff's office, do you see that under 148.9A?
 6       A   Yes.
 7       Q   And do you see that correctional officers
 8   are to document any refusal of assistants by a
 9   wheelchair bound individual?
10       MR. DEVORE:  Objection as to form and scope.
11       THE WITNESS:  Yes, that's the expectation.
12       MR. MORRISSEY:  Q  Is there anything in policy
13   148 that requires a correctional officer to, upon
14   request, push up a person up or down the ramp in a
15   wheelchair if the person has an alert for a cane,
16   crutch, or walker?
17       MR. DEVORE:  Same objection as to scope.
18       THE WITNESS:  Are you asking me if it's in here?
19       MR. MORRISSEY:  Q  I'm asking you in this policy
20   148?
21       A   Okay.
22       Q   Is there anything in this document that
23   provides information to a correctional officer how
24   to accommodate a person who has an alert for a cane,
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 10

LONNIE HOLLIS
November 18, 2024

Page 40

1  crutch, or walker, when they have to go up or down
2  either a ramp at Cook County Jail?
3      Well, you can't --
4      **A   I don't see anything about a cane, crutch,**
5  **or walker in here.**
6      Q   Is there anything in this document that
7  instructs a correctional officer that he or she has
8  to document a refusal by a person with a cane,
9  crutch, or walker in regards to assistance for going
10 up or down a ramp at the Cook County Jail?
11     MR. DEVORE:  Objection as to form, and also if
12 you're asking about a specific portion of this, of
13 this document, it would be helpful to point to it.
14     MR. MORRISSEY:  Q  You can answer the question.
15     MR. STILLMAN:  If you're able to answer it.
16     MR. DEVORE:  The same objection, I mean I, the
17 objection was as to form, and also, the objection
18 was as to form.  It's confusing as worded.
19     THE WITNESS:  You're asking about canes,
20 crutches, and walkers?
21     MR. MORRISSEY:  Q  Right.  Let me give it to you
22 a different way.
23     **A   Okay.**
24     Q   Is there anything in this policy, 148, that

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 41

1  provides any training or instruction to a
2  correctional officer in regards to accommodating a
3  person with an alert for canes, crutches, or walkers
4  when he or she goes up a ramp at the Cook County
5  Jail?
6      **A   No, I don't see it.**
7      Q   And I will show you now, we're going to look
8  at the computer, policy 801, you're going to have to
9  look at the monitor.
10     MR. DEVORE:  Do we have copies?
11     MR. MORRISSEY:  Pardon?  It's on the monitor
12 screen, and it was tendered by Defendants in
13 response to production.
14     MR. DEVORE:  One second, I need to take a look
15 at it first.  I don't know what this is.
16     MR. MORRISSEY:  It's Exhibit Number 9.   It's
17 entitled, Disability of Individuals Detained in the
18 Department of Corrections.
19     MR. DEVORE:  Can you scroll to the bottom?
20     MS. COLEMAN:  What is the Bates number on the
21 bottom?
22     MR. DEVORE:  What is the Bates on it?
23     MR. MORRISSEY:  It's Bates stamped 855 to 856,
24 it's a two-page document.

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 42

1      MS. COLEMAN:  Can you scroll down, so we can see
2  it?
3      MR. DEVORE:  Yeah, keep going a little bit
4  further.  Trying to see, go down to the bottom of
5  the second page, okay.
6      MR. STILLMAN:  Okay.
7      MR. DEVORE:  And there's highlighted portions on
8  the one on the screen, is that --
9      MR. MORRISSEY:  Those are the portions that I
10 have highlighted, in your document that you
11 produced.
12     Q   Do you want to take a few moments to read
13 that policy 801?
14     **A   Yes.**
15     Q   You can scroll down.
16     MR. STILLMAN:  He's letting us look at the
17 laptop.  Yeah, just scroll through it.
18         Anything else we should look --
19     MR. MORRISSEY:  No, he's going to read the
20 entire document, he's scrolling down.
21     Q   Have you had an opportunity to look at
22 Exhibit Number 9?
23     **A   Yeah, today, you showed it to me.**
24     Q   Okay.  Can we scroll up to the first page.

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 43

1  Let me give you this.  Thanks.
2      MR. DEVORE:  That's the same document?
3      MR. MORRISSEY:  Yeah.
4      Q   Do you know if looking at 801.3, do you know
5  whether the executive director has established any
6  procedures for transporting detainees with alerts
7  for canes, crutches, and walkers to go up and down
8  either the east tunnel ramp of the RTU or the Cermak
9  ramp?
10     MR. DEVORE:  Objection, in terms of just scope.
11 Is it for the, is it for the same 2022 to '24
12 period?
13     MR. MORRISSEY:  Correct.
14     MR. DEVORE:  And the only other, the other
15 objection is to form, as to -- well, just as to
16 form.
17         You can answer, if you can.
18     THE WITNESS:  I am not sure if I know who
19 established it, you know, I don't know if policy --
20     MR. DEVORE:  That's fine.
21     THE WITNESS:  -- did this or the executive
22 director, I can't say who.
23     MR. DEVORE:  If you don't know, that's fine.
24     MR. MORRISSEY:  Q  But my question is specific

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 11

LONNIE HOLLIS
November 18, 2024

Page 44

1  to the executive director.  To your knowledge, has
2  the executive director issued any policy or
3  procedure in regards to accommodating inmates that
4  have alerts for canes, crutches, or walkers, when
5  they go up or down the Cermak ramp or the east
6  tunnel ramp for the RTU?
7      MR. STILLMAN:  If you know.
8      MR. DEVORE:  If you can answer.
9      MR. STILLMAN:  If you don't know, that's fine
10 too.
11     THE WITNESS:  I don't know, most of the stuff we
12 get is from Lexipol.  That's where the policies come
13 from.
14     MR. MORRISSEY:  Q  Do you know if the executive
15 director or anybody under the executive director has
16 issued any policies or procedures in regards to
17 transporting detainees with alerts for canes,
18 crutches, or walkers, to and from Cermak, or going
19 up or down the east tunnel ramp of the RTU?
20     MR. DEVORE:  Objection as to form, compound.
21         If you can answer, you can answer.
22     A  I believe it's covered in the Lexipol.
23     Q  In this procedure?
24     A  Or maybe this one.

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 45

1      Q  And when you point to 148, can you show me
2  in Exhibit Number 4, policy 148, where it, there's
3  been a policy and procedure at Cook County in
4  regards to transporting inmates with alerts with
5  canes, crutches, and walkers to accommodate them
6  going up or down the Cermak or the east tunnel ramp
7  of the RTU?
8      MR. DEVORE:  Objection, as to form, and also
9  objection to the extent that there's any suggestion
10 that a policy or procedure doesn't exist based upon,
11 does or doesn't exist based upon his memory.
12     MR. MORRISSEY:  Q  Well, I'm asking, he
13 mentioned he looked at 148, I'm asking him
14 specifically in regards to 148, and he's the
15 designee for the Sheriff.
16     A  Yeah, it doesn't say anything about the east
17 tunnel ramp.
18     Q  Or the Cermak ramp or any ramp for people
19 with alerts for canes, crutches, or walkers; is that
20 correct?
21     MR. DEVORE:  Same objection.
22     THE WITNESS:  148.9A mentions it.
23     MR. MORRISSEY:  Q  That's in regards to people
24 with wheelchairs, correct?

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 46

1      A  Correct.
2      Q  There's nothing in policy 148 that deals
3  with people with alerts for canes, crutches, or
4  walkers, correct?
5      MR. DEVORE:  Objection, form, mischaracterizes
6  his testimony, and facts, and assumes facts not in
7  evidence.
8      THE WITNESS:  Well, you were asking me was there
9  anything.
10     MR. MORRISSEY:  Q  In regards to people with
11 alerts for canes, crutches or walkers, and you said
12 148.  And I am asking you, in 148, where does it
13 specify the accommodations for people with canes,
14 crutches, or walkers going up or down ramps at the
15 Cook County Jail?
16     A  Okay.  Then it doesn't say that.
17     Q  Okay.  Do you know of any procedure,
18 transportation procedure at the Cook County Jail,
19 for moving detainees with alerts for canes,
20 crutches, or walkers up or down ramps at the jail?
21     MR. DEVORE:  Objection, form.  If there's a
22 specific, if there's a reference to a specific
23 document, I mean I don't know if you're looking at
24 policy 148 still with respect to --

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 47

1      MR. MORRISSEY:  Excuse me, that's a speaking
2  objection.  So you can't do that.
3      MR. DEVORE:  Well, it's not a memory test, if
4  there are specific portions of a document you want
5  him to --
6      MR. MORRISSEY:  Q  The question is, as the
7  sheriff's representative, does he know of any policy
8  or procedure for transporting inmates with alerts
9  for canes, crutches, or walkers up and down the
10 ramps?
11     MR. PATRICK MORRISSEY:  The problem here is
12 Miss Coleman is marking the policy and then giving
13 it to Mr. DeVore, and then they're trying then to
14 signal to the witness about what specific portion of
15 the policy there should be reference to, and that's,
16 the time to prepare a witness for a 30(b)(6) is
17 before the deposition starts.
18     MR. DEVORE:  That's absolutely not the case.
19     MR. MORRISSEY:  Well --
20     MR. DEVORE:  And just to be clear, I mean
21 Miss Coleman is, yeah, several seats away from the
22 witness, there's no way for, there's no signaling.
23     MR. PATRICK MORRISSEY:  Mr. Devore, I'm looking
24 at the sheet, I'm seeing Miss Coleman highlight,

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 12

LONNIE HOLLIS
November 18, 2024

Page 48

1  mark the specific section of the policy that's
2  Exhibit 4, and she's pointing to you, and you're
3  trying to signal to the witness.
4      MR. STILLMAN:  For the record, I'm sitting
5  between Mr. Devore and the witness.
6      MR. PATRICK MORRISSEY:  Do you want to show us
7  that first page?
8      MR. STILLMAN:  Are we not allowed to mark up
9  papers we have in front of us.  No one is showing
10 anything to the witness, Pat.
11     MR. MORRISSEY:  Look, you're going to have a
12 chance to redirect the witness, so you can do that
13 on redirect, or on cross.
14     MR. STILLMAN:  We can mark all the documents you
15 have given us.
16     MR. MORRISSEY:  So, what question is pending?
17 Can you read back the question so we can get a
18 response from the witness.
19         (Question read back as requested.)
20     MR. DEVORE:  Objection as to form.  And if that
21 includes policy or procedure or just procedure.
22     MR. MORRISSEY:  Q  You can answer.
23     A  Are we talking at 148 or 801?
24     Q  It's a general question.  It's a question

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 49

1  that involves -- I'll break it down.
2      Is there any written procedure for
3  transporting detainees with alerts for canes,
4  crutches, or walkers up or down ramps at the Cook
5  County Jail, as far as accommodating them?
6      MR. DEVORE:  Objection as to scope.  The notice,
7  I don't believe, refers to specific policies.
8      If you can direct to where, which topic
9  we're talking about, that would be helpful and.
10     MR. MORRISSEY:  Q  Well, it goes under number 5,
11 it's about the training to staff for providing
12 accommodations.  It's clearly covered by that, or
13 it's reasonably included in that.
14     You can answer the question.
15     MR. DEVORE:  Same objection, I believe it's
16 outside the scope.
17     THE WITNESS:  So the question you're asking is?
18     MR. MORRISSEY:  If you want him to repeat the
19 question.
20     A  Yeah.
21     Q  Repeat the question.
22     A  A lot of cross-talking going on.
23     Q  Pardon?
24     A  A lot of cross-talking.

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 50

1      Q  I understand that.  I'm trying, forgive me
2  for, you know, this is just the way these things go
3  sometimes.
4      A  Yeah, it's not like Law and Order.
5      Q  No, I guess not.  I don't watch Law and
6  Order.
7      Can you repeat the question for the
8  witness?
9         (Question read back as requested.)
10     MR. DEVORE:  Q  Same objection, and just to be
11 clear, topic 5 says the training to staff for
12 providing accommodation to individuals in custody
13 using canes, crutches, or walkers when navigating
14 the Cermak and RTU east tunnel ramps.  There is no
15 reference at all to a policy or procedure anywhere
16 in this.
17     MR. MORRISSEY:  Q  You can answer the question.
18     A  Am I allowed to ask him a question?
19     MR. DEVORE:  No.
20     MR. MORRISSEY:  No.
21     THE WITNESS:  Then I have to say no.  It doesn't
22 include all of the other assisted devices you
23 mentioned, just the policy speaks to wheelchairs.
24     MR. MORRISSEY:  Q  And, to be clear, you're

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 51

1  talking about the only written policies about
2  accommodating people with mobility disabilities at
3  the jail are for people with wheelchairs, and not
4  for people with canes, crutches, or walkers?
5      MR. DEVORE:  Objection as to it mischaracterizes
6  the testimony, and it also runs afoul of what is in
7  front of us, in terms of materials.
8      MR. MORRISSEY:  Q  Do you understand the
9  question?
10     A  No, not at all.
11     Q  Sure.  I'll make it simple.  So the only
12 written policies, as far as accommodating prisoners
13 with mobility limitations at the jail, as far as
14 going up and town ramps, are for people with alerts
15 for wheelchairs?
16     MR. DEVORE:  Objection, mischaracterizes the
17 evidence and testimony.
18     THE WITNESS:  Yeah, I am not sure how to answer
19 that, because there's other things that you
20 mentioned in there that aren't included in your
21 question, Yeah, I am not sure how to answer that.
22     MR. MORRISSEY:  Q  Sure.  So you have testified
23 that, to the sheriff's knowledge, there's no written
24 procedure or policy in regards to accommodating

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 13

LONNIE HOLLIS
November 18, 2024

Page 52

1 detainees who have alerts for canes, crutches, and
2 walkers going up and down ramps at Cook County
3 Jail --
4     MR. DEVORE:  Objection.
5     MR. MORRISSEY:  -- is that fair?
6     MR. DEVORE:  Objection, mischaracterizes
7 evidence.  It's also outside the scope and it's not
8 contained in the notice.
9     MR. MORRISSEY:  Q  You can answer.
10     MR. DEVORE:  You cannot answer.  It's outside
11 the scope.
12     MR. MORRISSEY:  I'm going to certify the
13 question.
14     Q  Are these policies, like 148 and policy 801,
15 are they procedures that are given to correctional
16 officers at the Cook County Jail?
17     A  **Yes.**
18     Q  And that's part of their training to read it
19 and follow through, the written policies at Cook
20 County Jail?
21     A  **The expectation is that they read and follow**
22 **it.**
23     MR. MORRISSEY:  Are you still going to stand on
24 your objection and not allow the person to answer

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 53

1 the question?
2     MR. DEVORE:  Which part?
3     MR. MORRISSEY:  About training, written policies
4 are part of their training.
5     MR. DEVORE:  That was not articulated in the
6 notice --
7     MR. MORRISSEY:  Well --
8     MR. DEVORE:  -- in terms of --
9     MR. MORRISSEY:  -- he just testified that part
10 of the training involves the policies given to
11 correctional officers.  That's part of the training,
12 so that's included in the topic.
13     MR. DEVORE:  Well, it wasn't included in it as
14 it was defined when you sent it.
15     MR. MORRISSEY:  Well.
16     MR. DEVORE:  Can we take a five minute break.  I
17 need to use the restroom.
18     (Whereupon a break was taken.)
19     MR. MORRISSEY:  Back on the record.
20     Q  Looking at Exhibit Number 9 again, under
21 801.3, it says establishing transportation
22 procedures for moving individuals with limited
23 mobility.
24         My question, as the sheriff's designee,

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 54

1 what does limited mobility mean?
2     MR. DEVORE:  Objection as to form and also as
3 to, you know, as to scope.  The notice talks about
4 training, it doesn't talk about policies and
5 procedures.  We didn't prepare the witness to be
6 able to identify all policies and procedures,
7 instead the Sheriff provided, produced documents in
8 the course of discovery.  We have produced the
9 policies and procedures.  So it's a very different
10 deposition if you're talking about him identifying
11 all policies and procedures, which we have produced,
12 as opposed to asking about training, which is what
13 is designated in number 5, training to staff for
14 providing accommodations.
15     MR. MORRISSEY:  Q  You can answer the question.
16     A  **Well, the way that the beginning of the**
17 **paragraph reads, it says the executive director or**
18 **the authorized designee.  I can't speak for the**
19 **executive director.**
20     Q  Well, you're being, you were designated
21 under this topic.
22     A  **Uh-huh.**
23     Q  Rule 30(b)(6), as the Sheriff's
24 representative, okay.  So, I am asking you, as the

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 55

1 Sheriff's representative, under establishing
2 transportation procedures for moving individuals
3 with limited mobility, what is the sheriff's
4 understanding of the term limited mobility?
5     MR. DEVORE:  Objection as to, objection, as to
6 form, and as to scope, and it's beyond the scope of
7 what is contemplated in 3, 4, 5, or 6.
8     MR. DEVORE:  Q  You can answer.
9     MR. DEVORE:  And to the extent that you have
10 personal knowledge of it, outside of what was
11 contemplated by these topics, you can answer, but it
12 was not included, it was not included --
13     MR. MORRISSEY:  No, we're asking him, as the
14 designee for the Sheriff, what is meant by limited
15 mobility in his Exhibit Number 9.
16     MR. DEVORE:  And the same objection stands,
17 because the topics, as identified and not referenced
18 specific policies, if there had been references to
19 specific policies, then we would have objected to
20 that, because the sheriff has already provided these
21 policies and documents and they speak for themselves
22 and we provided them during the course of discovery.
23     MR. MORRISSEY:  Q  You can answer.
24     A  **I don't have an answer, because it's not**

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 14

Page 56

1  included in the policy.

2    Q   Does the Sheriff consider a person who has

3  an alert for canes, crutches, or walkers to have,

4  fall within the definition of limited mobility?

5    MR. DEVORE:  Same objection.

6    THE WITNESS:  That would be the same response as

7  the other one.  I don't have that, it's not defined

8  by the policy.

9    MR. MORRISSEY:  Q   No, I'm asking, as the

10  Sheriff's designee, does the Sheriff consider a

11  person who has an alert for a cane, crutch or a

12  walker to be included within the term limited

13  mobility?

14    MR. DEVORE:  Same objection.

15    THE WITNESS:  I can only speak to what the

16  policy speaks to.

17    MR. MORRISSEY:  Q   We'll, if we go back to 148,

18  mobility impairment?

19    A   Right.

20    Q   It says, refers to the inability of an

21  individual to use one or more of their

22  extremities --

23    A   Yes.

24    Q   -- or lack of strength to walk, grasp, or

Page 57

1  lift objects, the use of a wheelchair, crutches, or

2  walker may be utilized to aid in mobility?

3    A   Yes.

4    Q   So, is it fair to say that the Sheriff

5  considers a person who has been medically determined

6  to need an alert for a cane, crutch, or walker to

7  have limited mobility?

8    A   I can't --

9    MR. DEVORE:  Objection as to scope and form.

10  Actually, as to scope, as to not being included in

11  the topics 4, 5, and 6.

12    THE WITNESS:  I can't say that.  I can say that

13  there's a mobility impairment, because that's what

14  the policy reads.

15    MR. MORRISSEY:  Q   All right.  Going back to

16  Exhibit Number 9.

17    MR. DEVORE:  Is Exhibit 9 policy 801?

18    MR. MORRISSEY:  Correct.

19    MR. DEVORE:  Yeah.

20    MR. MORRISSEY:  Q   As the Sheriff's

21  representative, can you tell me what transportation

22  procedures have been -- let me rephrase the

23  question.

24      As the sheriff's designee, what are the

Page 58

1  transportation procedures for a Division 9 movement

2  officer, when moving inmates with a cane, crutch, or

3  walker up and down ramps, such as Cermak and the RTU

4  east tunnel ramp?

5    MR. DEVORE:  Objection as to scope, in terms of

6  what is included in the topics.  Does it -- what

7  topic are you referring to?

8    MR. MORRISSEY:  I'm referring to the training

9  that's given to correctional officers who have moved

10  detainees from Division 9 up and down the RTU and

11  the Cermak ramp, who have alerts for canes,

12  crutches, and walkers.

13    MR. DEVORE:  Because it sounds like you're

14  asking questions related to policies that we, that

15  the Sheriff produced, policies and procedures that

16  the Sheriff produced, and you're trying to get

17  answers that, that speak to those specific policies

18  and procedures without having an appropriate topic

19  that identifies that.

20    MR. MORRISSEY:  The Sheriff's designee has

21  already testified that the written procedures,

22  policies are part of the training given to

23  correctional officers, and topic 5 talks about the

24  training to staff.  So, it's certainly included

Page 59

1  within this topic?

2    MR. DEVORE:  Well, if it had been identified

3  that he would need to testify as to specific

4  policies and procedures, that would be a very

5  different scenario than we have right now, because

6  it just doesn't say that.

7    MR. MORRISSEY:  Well --

8    MR. DEVORE:  And just because he testified

9  regarding one aspect of training doesn't mean he's,

10  he's committed to having, knowing song and verse

11  every policy and procedure that you pull out that we

12  produced already during the course of discovery.

13    MR. MORRISSEY:  Well, what's the pending

14  question?

15      (Question read back as requested.)

16    MR. DEVORE:  Same objection, I'm going to

17  instruct the witness not to answer.

18    MR. MORRISSEY:  We'll certify the question.

19    Q   I'm showing you Exhibit Number 10.  It's a

20  declaration in this case by a Mr. Rogers, and I

21  would ask you to take a look at it, it should be on

22  your screen?

23    MR. DEVORE:  We need to look at it before.  We

24  initially, we object to questions regarding this

Exhibit 11 Page 15

LONNIE HOLLIS
November 18, 2024

Page 60

1  declaration, because it has nothing to do with this
2  case, and it's outside the scope of the topics
3  referenced in 3, 4, 5, and 6 in the 30(b)(6) notice.
4      MR. MORRISSEY:  That's fine.  Can you show the
5  witness the declaration.
6      MR. STILLMAN:  Yes.
7      MR. MORRISSEY:  Let me know when you have had a
8  chance to read the whole declaration.
9      **A   After where he signs, is that the end of it?**
10     Q   Yeah, it is.
11     **A   I have read it.**
12     Q   Okay.  Do you see that Mr. Rogers was given
13  an alert for a walker by the Sheriff in this
14  declaration?
15     MR. DEVORE:  Objection, outside the scope of the
16  notice.  And unless you can articulate how it fits
17  in, I am not going to have him answer it.
18     MR. MORRISSEY:  Well, it deals with the training
19  provided by the Sheriff's office to transport
20  individuals, like Mr. Rogers, up and down the east
21  tunnel ramp and the Cermak ramp.  So that's how it
22  relates to it.  So if we can proceed without --
23     MR. DEVORE:  I just, I don't understand how
24  training would have to do with the declaration of

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 61

1  another inmate.
2      MR. STILLMAN:  The individual facts of one
3  circumstance that has nothing to do with the --
4      MR. MORRISSEY:  Listen, there can only be one
5  attorney making objections during the deposition.
6      MR. DEVORE:  So that's our objection.
7      MR. MORRISSEY:  Q  Okay.  So, do you see in the
8  declaration, Exhibit Number 10, Mr. Rogers is in
9  Division 9 at the time he signed this declaration.
10     MR. DEVORE:  I'm going to direct him not to
11  answer that.
12     MR. MORRISSEY:  We'll certify the question.
13     Q   For an inmate, like Mr. Rogers, in
14  Division 9, can you tell me the training provided to
15  the movement officer to provide accommodations for a
16  person like Mr. Rogers who was given an alert for a
17  walker, when he was moved from Division 9 and had to
18  go up the Cermak ramp in the RTU east tunnel ramp?
19     MR. DEVORE:  Objection, as it relates to this
20  particular declaration.
21     But to the extent you can answer about
22  training, you can answer.
23     THE WITNESS:  To the best of my knowledge, the
24  officers received training based on the Lexipol

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 62

1  policies.
2      Q   And those are the written policies, correct?
3      **A   Lexipol policies, yes.**
4      Q   And when you're, you're pointing to --
5      **A   Just policies.**
6      Q   -- policy 148?
7      **A   Just policies in general in that specific**
8  **one.**
9      Q   All right.  Which written policies are you
10  referring to, as far as accommodating individuals,
11  like Mr. Rogers, who was in Division 9, as far as
12  accommodating him when he was transported by
13  Division 9 movement officer to and from Cermak,
14  which required him to go up and down the Cermak
15  ramp?
16     MR. DEVORE:  Objection, to the extent it
17  requests identification as to specific policies,
18  because that was not contemplated by the topics,
19  including topic 5, which specifically was related to
20  training and did not identify any indication that
21  there would be questioning regarding policies, and
22  specific policies and procedures.  And, also, to
23  the extent that it asks the witness to speak to
24  policies that are written, and have been produced in

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 63

1  the course of discovery.
2      MR. MORRISSEY:  Q  You can answer.
3      MR. DEVORE:  You can answer, if you can.
4      THE WITNESS:  I thought that was what you said
5  you objected to a little bit ago, that you directed
6  me not to answer, because he brought it back up,
7  Mr. Rogers, and the document again.
8      MR. DEVORE:  This question is to training,
9  correct?
10     MR. MORRISSEY:  Q  It's to training.  You
11  mentioned that the training that was given to
12  correctional officers in Division 9, for instance,
13  as far as moving inmates who have alerts for canes,
14  crutches, and walkers, up and down either the east
15  tunnel ramp or the Cermak ramp was based upon
16  written Lexipol policies, correct?
17     **A   Well, not so much the Cermak or the east**
18  **ramp, it's just generalized, it's not location**
19  **specific.**
20     Q   And you're referring to Lexipol written
21  policies as the training that's given to
22  correctional officers about accommodating people
23  with canes, crutches, and walkers, correct?
24     MR. DEVORE:  Objection as to, objection,

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 16

Page 64

1  mischaracterizes testimony, the testimony, I don't
2  believe, was limited to just these Lexipol policies.
3       You can answer, if you can?
4       MR. MORRISSEY:  Q  You can answer.
5       A  So, no, I'm saying that our training is
6  derived from Lexipol policies.
7       Q  So Lexipol are written policies, correct?
8       A  Yes.
9       Q  And the follow-up question is, what, since
10 the training that's given to officers, as far as
11 providing accommodations for inmates that have an
12 alert for canes or crutches or walkers, is, in part,
13 based upon a written policy.  My question is, what
14 written policy are you referring to?
15      MR. DEVORE:  Objection, to the extent it becomes
16 a memory test, and, also, as to scope, because there
17 were no specific policies referenced as part of the
18 questions to be asked relative to training.
19      Go ahead.
20      MR. MORRISSEY:  Q  Well, that's a speaking
21 objection.  You can answer the question.
22      A  I don't have the answer of the specific
23 policy, no.
24      Q  Do you know of any policy, as the Sheriff's

Page 65

1  designee, and as the person that's been produced
2  about the training for correctional officers in
3  regards to that very topic, do you know of any
4  written policy that addresses that?
5       MR. DEVORE:  Objection as to scope, and to the
6  extent it requests information outside of training.
7       THE WITNESS:  I don't have the answer for the
8  specific policy.
9       MR. MORRISSEY:  Q  Other than a written policy,
10 do you, are you aware of any training manual
11 provided to movement officers at the Cook County
12 Jail in regards to accommodating detainees who have
13 an alert for canes, crutches, or walkers when they
14 move up or down ramps at the Cook County Jail.
15      MR. DEVORE:  Objection as to scope.  You can
16 answer.
17      THE WITNESS:  When you say manual, what do you
18 mean?
19      MR. MORRISSEY:  Q  Pardon.
20      A  Can you clarify what you mean by when you
21 say manual?
22      Q  Well, all right.  Well, are there, do
23 correctional officers receive any written training,
24 procedures, or protocols?

Page 66

1       A  They receive Lexipol.
2       Q  Pardon?
3       A  They receive Lexipol.
4       Q  Other than Lexipol, are there any other
5  training documents that are given to correctional
6  officers, to let them know what their duties and
7  responsibilities are?
8       A  Not that I am aware of.  Our training is
9  derived from Lexipol.
10      Q  As the Sheriff, as the Sheriff's designee,
11 are you aware of any training given to movement
12 officers that are assigned to move people with
13 canes, crutches, and walkers up and down ramps at
14 the Cook County Jail?
15      A  I don't provide training, that's provided by
16 the Academy.
17      Q  Right.  My question is, as the Sheriff's
18 designee, are you aware of any training course given
19 to the officers that are responsible for moving
20 prisoners with canes, crutches, and walkers up and
21 down ramps, such as the east tunnel ramp or the
22 Cermak ramp?
23      MR. DEVORE:  Objection, asked and answered.  I
24 think he just answered that.  But you can answer

Page 67

1  again.
2       THE WITNESS:  The training that we get is
3  derived from Lexipol.
4       MR. MORRISSEY:  Q  Okay.  The question was
5  directed toward, you mentioned that there, at the
6  Academy, there are courses given to cadets in
7  regards to fulfilling their role as a correctional
8  officer, correct?
9       A  I didn't say that.
10      MR. DEVORE:  Objection, mischaracterizes
11 evidence -- or testimony.
12      THE WITNESS:  I never said anything about
13 cadets.
14      MR. MORRISSEY:  Q  Do correctional officers go
15 to the training academy for in-services?
16      A  For in-service, yes.
17      Q  As the Sheriff's designee, are you aware of
18 any in-service given to correctional officers who
19 are responsible for moving detainees up and down
20 ramps at the jail, including, but not limited to,
21 Cermak and the east tunnel ramp and the RTU for
22 prisoners that have alerts for canes, crutches, and
23 walkers?
24      MR. DEVORE:  Objection, to the extent that it

Exhibit 11 Page 17

LONNIE HOLLIS
November 18, 2024

Page 68

1   asks about, you said including, but not limited to
2   Cermak and the RTU tunnel ramps, but the topic is
3   limited to Cermak and RTU tunnels, east tunnel ramp.
4   You can answer.
5       MR. MORRISSEY:  Q  That was a misstatement of my
6   question.  You mentioned that there was in-service
7   training given to correctional officers, correct?
8       A  But you asked me, and I said yes.
9       Q  Yeah.  So as the Sheriff's designee, are you
10  aware of any in-service training given to
11  correctional officers to accommodate detainees
12  provided with alerts for canes, crutches, and
13  walkers, when they move up or down ramps?
14      MR. DEVORE:  Objection, scope.  You just said
15  ramps, and it wasn't limited to Cermak and RTU east
16  tunnel ramps.
17      MR. MORRISSEY:  Q  You can answer the question.
18      MR. DEVORE:  You can answer, if you can.
19      THE WITNESS:  The --
20      MR. MORRISSEY:  You can't tell somebody who has
21  been designated that if you can, I mean that's not
22  an appropriate objection.  It's signaling to a
23  witness that maybe you shouldn't answer the
24  question.  So I would ask you to refrain from doing

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 69

1   that.
2       MR. DEVORE:  It's not signaling anything.
3       MR. MORRISSEY:  Q  Anyway.  You can answer the
4   question.
5       A  The in-service training, to my knowledge, I
6   don't oversee training, I don't have any input with
7   training, the training is intended based on what I
8   have been exposed to is to refresh you on the
9   Lexipol policies.
10      Q  Okay.  So if the Lexipol written policies
11  don't address the movement and accommodations for
12  inmates with canes, crutches, and walkers, going up
13  and down ramps at the jail, then your answer would
14  be there is no in-service on that topic?
15      MR. DEVORE:  Objection, assumes facts not in
16  evidence, mischaracterizes testimony.
17      MR. MORRISSEY:  Q  You can answer.
18      A  I don't, but you said my answer, so I'm
19  confused as to the question.
20      Q  Okay.  Sure.  Sure.  My question is, you
21  have testified that you don't, that the Sheriff, as
22  the Sheriff's designee, you don't have any specific
23  recollection of a written Lexipol policy that
24  addresses accommodating people with alerts for

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 70

1   canes, crutches, and walkers going up and down
2   ramps; is that fair to say?
3       MR. DEVORE:  Is that a new question?
4       MR. MORRISSEY:  It's a question.
5       THE WITNESS:  Can you rephrase that or clarify
6   that again, because it sounds different than the
7   first, I'm not trying to be --
8       Q  I understand.
9       A  -- difficult, but it sounds different from
10  the first thing and then the second thing.
11      Q  So, as the Sheriff's designee --
12      A  I got that part.
13      Q  -- you can't designate any Lexipol policy
14  that addresses the issue of the responsibility of a
15  correctional officer when they move a detainee who
16  has an alert for canes, crutches, or walkers up or
17  down ramps at the jail?
18      MR. DEVORE:  Objection as to form.  That was
19  really confusing.  If you understood it.
20      THE WITNESS:  Well, I don't designate any
21  policy, the policies designate themselves, because
22  their situation is specific.
23      MR. MORRISSEY:  Q  All right.  So, I'm asking
24  you, can you specifically identify a policy that

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 71

1   addresses accommodating the class here, canes,
2   crutches, and walkers, when they go up and down
3   ramps at the jail?
4       MR. DEVORE:  Objection as to scope.  It was not
5   asked in the topics to identify specific policies,
6   it only spoke to training.
7       THE WITNESS:  No, I don't have that answer for
8   you, sir.
9       MR. MORRISSEY:  Q  Okay.  And is it fair to say,
10  as the Sheriff's designee, you're not aware of any
11  specific training given to correctional officers in
12  regards to moving people with canes, crutches, and
13  walkers and accommodating them when they go up and
14  down ramps?
15      MR. DEVORE:  Same objection.
16      THE WITNESS:  You're asking if I am aware?
17      MR. MORRISSEY:  Q  As the Sheriff's designee?
18      MR. DEVORE:  Same objection as to scope, with
19  respect to lack of information regarding specific
20  policies to be identified during the course of this
21  deposition.
22      MR. MORRISSEY:  Q  Well, let me just ask you
23  straight up.  Number 5 says the training to staff
24  for providing accommodations to individuals in

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 18

LONNIE HOLLIS
November 18, 2024

Page 72

```
 1   custody using canes, crutches, or walkers, when
 2   navigating the Cermak and RTU east tunnel ramp, can
 3   you explain, as the Sheriff's designee, what
 4   training, training the Sheriff has?
 5       A   Our training is derived from the Lexipol
 6   policies.
 7       Q   Anything else?
 8       A   No, our train, the Lexipol policies are
 9   where we derive our training from.
10       Q   And the Lexipol policies are given to the
11   correctional staff on-line, correct?
12       A   Yes.
13       Q   Okay.  And other than the on-line Lexipol
14   training, the Sheriff isn't aware of any other
15   training for providing accommodations to individuals
16   in custody using canes, crutches, or walkers when
17   navigating the Cermak and RTU east tunnel ramps?
18       MR. DEVORE:  Objection, mischaracterizes the
19   testimony.  To the extent that you're saying that
20   there's nothing else?  I believe that's what he
21   testified to.
22       MR. MORRISSEY:  Q  You can answer.
23       A   He was doing something, I didn't want to
24   interrupt you.
```

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 73

```
 1       Q   That's okay.
 2       A   The staff are refreshed on the policies
 3   during the course of their in-service training.
 4       Q   And are there any Lexipol training that's
 5   specific to the RTU east tunnel ramp or the Cermak
 6   ramp for people that are, that have an alert for
 7   canes, crutches, or walkers?
 8       A   The training isn't, as I mentioned a little
 9   bit ago, it isn't area specific, it's just
10   operational specific.  It's not designated to the
11   east tunnel ramp or to the Cermak ramp, it just
12   speaks to ramps or sloped walkways or things of that
13   nature.
14       Q   Right.
15       A   It doesn't say Cermak versus this tunnel or
16   this particular area.
17       Q   So let's use the more general definition.
18   Is there any specific Lexipol training involving
19   people with alerts for canes, crutches, and walkers
20   when they move up or down ramps at the Cook County
21   Jail.
22       MR. DEVORE:  Objection, form.  Unclear if your
23   asking him to identify a specific policy.
24       THE WITNESS:  The policy speaks to mobility
```

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 74

```
 1   impairments.
 2       Q   You're referring to 148, correct?
 3       A   Yes.
 4       Q   Which is Exhibit Number 4?
 5       A   Yeah, speaks to mobility impairments, which
 6   mentions what you discussed.
 7       Q   Okay.  But policy 148, which is Exhibit 4,
 8   we looked at paragraph 48.9, which deals with
 9   wheelchair people, correct?
10       A   Uh-huh.
11       Q   You have to answer orally.
12       A   Yes.  Yes.
13       Q   And it doesn't address people with alerts
14   for canes, crutches, or walkers?
15       A   No, it says right there.
16       Q   Where?
17       A   The use of a wheelchair, crutches, or
18   walkers may be used to aid in mobility.
19       Q   No, I understand that, but as far as moving
20   a person, as far as pushing individuals up and down
21   ramps and through corridors in the Sheriff's office
22   facilities, they're dealing with wheelchair people?
23       A   Yeah, that's what the policy says.
24       Q   Under 148.9?
```

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 75

```
 1       A   Right, that's where it reads that at.
 2       Q   Right.  So as far as a person who has a
 3   walker, for instance, like Mr. Rogers, what
 4   accommodation for a person with a walker is provided
 5   under policy 148, when they have to go up or down a
 6   ramp at Cook County Jail?
 7       MR. DEVORE:  Objection as to scope.  Topic 5
 8   refers to training, did not refer and did not
 9   request delineation of specific policies that may
10   accompany training, but were not referenced in the
11   notice.
12       MR. MORRISSEY:  You can answer.
13       MR. DEVORE:  I'm directing him not to answer
14   that.
15       MR. MORRISSEY:  Certify the question.
16           Counsel, the witness has said that the
17   training stems from the policies.  The question
18   number 5 deals with training, and so when he's
19   testifying on behalf of the Sheriff, he's talking
20   about written policies encompassing the training
21   given to, to correctional officers.  So I think the
22   objection is unfounded.  So, to clarify, officer, or
23   assistant director, the training that's given to the
24   correctional staff, as far as providing
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 19

Page 76

1    accommodations to individuals who have canes,
2    crutches, or walkers, stems from the Lexipol
3    policies at the east RTU, which are the written
4    policies, correct?
5        A    Lexipol is the policy format that we used
6    for policies, yes.
7        Q    For training?
8        A    Yes.
9        Q    Based upon the Lexipol policies, can you
10   tell me how the correctional staff accommodates a
11   person with a cane, crutch, or walker when they go
12   up or down a ramp at the jail?
13       MR. DEVORE:  Objection, to the extent it's
14   outside the scope of navigating the Cermak and RTU
15   east tunnel ramps as noted in topic 5.
16       MR. MORRISSEY:  Q  You can answer?
17       MR. DEVORE:  Well, you can answer.
18       A    So the expectation is is that the
19   individuals are allowed to move up and down the
20   sloped walkways on their own accord, as far as
21   crutches, walkers, and canes.  If the person were to
22   ask for assistance, the expectation is, according to
23   our policy, that we give assistance.
24       MR. MORRISSEY:  Q  Where does it say in the

Page 77

1    Lexipol policy that a person with a cane, crutch, or
2    walker has to ask for assistance going up either the
3    Cermak or the east tunnel RTU ramp?
4        A    Objection as to scope, relative to the
5    topics and also to the extent that it's a memory
6    test.  If you have a question regarding the
7    documents, I suggest you point to the specific part
8    of the document.
9        MR. MORRISSEY:  Q  You can answer the question.
10       A    I don't recall offhand, but I just believe
11   that to be the expectation.
12       Q    Is there any specific training given to
13   movement -- let me, let me go back a step here.
14           There are inmates with canes, crutches, and
15   walkers housed in different housing units at the
16   Cook County Jail, correct?
17       A    Yes.
18       Q    That includes Division 9 and Division 6,
19   correct?
20       A    I haven't looked at the census for 9, I
21   couldn't answer that.  Division 6, yes.
22       Q    And Division 2?
23       A    Yes.
24       Q    How, other than the Lexipol policies that we

Page 78

1    have looked today, how does a movement officer in
2    Division 2 or Division 6 know what his or her
3    responsibility is as far as accommodating a person
4    with an alert for canes, crutches, or walkers when
5    they move up or down either the Cermak or the RTU
6    east tunnel ramp?
7        A    Based on my experience, they would get their
8    expectations from the policy.
9        Q    And by policy, you mean the written policy?
10       A    The policies that cover the topics we're
11   discussing, yeah.
12       Q    And those are the Lexipol policies?
13       A    Yes.
14       Q    For a person -- strike that.
15           If we go to the written policy for
16   assisting a person who has a wheelchair, under the
17   policy 148, which is Exhibit 4, that provides that
18   if a person in a wheelchair refuses assistance going
19   up or down a ramp, it has to be documented by the
20   correctional officer; is that fair to say?
21       A    According to the policy, that's the
22   expectation, yes.
23       Q    Is there any written policy that states that
24   a person who was given a -- well, let me ask a

Page 79

1    preliminary question.
2            For the movement officers in 6 and 2, that
3    move prisoners who have alerts for canes, crutches,
4    and walkers, have they been given any training in
5    regards to notifying those detainees that they have
6    a right for, to be accommodated when they go up or
7    down either the Cermak or the RTU east tunnel ramp?
8        A    Can you ask the question again?
9        Q    Sure.  You said that at least for, you're
10   aware that, that prisoners in 6 and 2 have alerts
11   for canes, crutches, and walkers, my question is,
12   for the movement officers in those divisions, to
13   take those prisoners to and from Cermak, what
14   direction or training are they given, as far as
15   notifying those prisoners that they can request an
16   accommodation going up either the Cermak or the RTU
17   east tunnel ramp?
18       A    What do you mean notify, or can you explain?
19       Q    Sure.
20       A    Why would they notify?
21       Q    So, how does a prisoner with a cane, crutch
22   or walker in Division 6, for example, know that they
23   can ask a correctional officer, movement officer to
24   give them an accommodation going up either the RTU

Exhibit 11 Page 20

LONNIE HOLLIS
November 18, 2024

Page 80

```
 1   east tunnel ramp or the Cermak ramp?
 2       A   How do they know.
 3       MR. DEVORE:  Objection as to scope.  It does not
 4   appear that that relates to topics 3, 4, 5, or 6.
 5       MR. MORRISSEY:  You will allow him to answer?
 6       MR. DEVORE:  If you can articulate which topic
 7   it relates to?
 8       MR. MORRISSEY:  Q   Well, if you look at topic
 9   number 4, the steps taken to notify individuals in
10   custody using canes, crutches, or walkers about the
11   Cermak or RTU east tunnel ramps being non-compliant
12   with the ADA and the interim measures in place to
13   ensure access and safety?
14       So, can you repeat the question for the
15   witness?
16       (Question read back as requested.)
17       MR. DEVORE:  And objection as to scope, and as
18   the steps taken to notify, it doesn't ask how
19   they're notified.
20       MR. MORRISSEY:  Q   You can answer the question.
21       A   Previously we had signage.  So I'm not sure
22   if the signage is still there, I haven't been in the
23   tunnels in a while.
24       Q   When you say previously you had signage --
```

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 81

```
 1       A   I'm saying previously based on when I took
 2   that route through the tunnels.  I am not saying
 3   anything about today or yesterday or tomorrow,
 4   previous to now, I don't know what's in there now, I
 5   can't answer what's in there now.
 6       Q   Other than -- so, as the Sheriff's designee,
 7   you can't testify whether or not there's signage up
 8   that would notify a person with a cane, crutch, or
 9   walker that they can seek accommodations; is that
10   fair to say?
11       MR. DEVORE:  Objection as to scope and the
12   question in 4 relates to steps taken to notify
13   individuals in custody using canes, crutches, or
14   walkers about the Cermak and RTU east tunnel ramps
15   being noncompliant, and your question was a little
16   bit different than that.
17       MR. MORRISSEY:  Q   You can answer?
18       A   I'm saying I can't speak to what's there
19   today.  That's what I said previously.
20       Q   So, I'm asking you, as the Sheriff's
21   representative, and as the person that's been
22   designated by the Sheriff --
23       MR. DEVORE:  Same objection, I'm going to direct
24   him not to answer that.
```

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 82

```
 1       MR. MORRISSEY:  Q   So, just to be clear, I am
 2   asking you, as the Sheriff's designee, whether you
 3   can testify that there's any signage up to, to
 4   inform a person with a cane, crutch, or walker that
 5   either at some location near the Cermak or the RTU
 6   east tunnel ramp, and your answer is?
 7       MR. DEVORE:  Objection as to form.  And as to
 8   scope.  That question is confusing and it's outside
 9   the scope.
10       MR. MORRISSEY:  Q   Let me make it a little bit
11   clearer.  As the Sheriff's representative, you
12   testified that you were aware that the Sheriff was
13   aware, at some point, that there was a sign up
14   either at the Cermak ramp or the RTU ramp; is that
15   correct?
16       MR. DEVORE:  Objection, mischaracterizes his
17   testimony.
18       THE WITNESS:  I said previously that there was
19   signage there.
20       MR. MORRISSEY:  Q   Where was this signage
21   posted?
22       A   In the tunnels that lead from RTU towards
23   Cermak.
24       Q   So was it at the base of the RTU ramp?
```

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 83

```
 1       A   I don't recall exactly where I saw it, I
 2   just recall seeing it in the tunnel.  I didn't take
 3   note that it was at a specific juncture.
 4       Q   So as the Sheriff's representative, what did
 5   the sign say?
 6       MR. DEVORE:  Objection, same objection.
 7       MR. MORRISSEY:  Q   As the Sheriff's designee,
 8   what did the sign say?
 9       MR. DEVORE:  I believe he just said he didn't
10   know, but you can answer to the extent you have an
11   answer.
12       THE WITNESS:  So I don't recall what it said
13   verbatim, I just recall the spirit of the notice
14   stating that they could ask for assistance if they
15   need assistance.
16       MR. MORRISSEY:  Q   Do you know if that pertained
17   to detainees that were in a wheelchair?
18       A   I don't want to speculate.
19       Q   Do you know whether, as the Sheriff's
20   representative, did the sign say that a person with
21   a cane or a walker could ask for assistance?
22       MR. DEVORE:  Objection, asked and answered.  You
23   can go ahead.
24       THE WITNESS:  I believe the spirit of the
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 21

LONNIE HOLLIS
November 18, 2024

Page 84

```
 1   signage suggested that they could ask.
 2       MR. MORRISSEY:  Q  When you say the spirit, what
 3   do you mean?
 4       A   I don't recall the exact language, that's
 5   why I just said a little while ago, I didn't
 6   remember verbatim, I just remember that the spirt of
 7   it, the gist of the overall wording suggests that
 8   they could ask for help.  I can't tell you word for
 9   word what they said.
10       Q   Do you know when the Sheriff, as the
11   Sheriff's designee, when the sign was posted?
12       A   No.
13       Q   Do you know where it was posted?
14       MR. DEVORE:  Objection to this questioning, and
15   he has already testified it's in relation to his
16   personal observations.
17       MR. MORRISSEY:  This is not, look, he's being
18   produced as the Sheriff's designee.
19       MR. DEVORE:  Well, ask him questions related to
20   him, his role as the Sheriff's designee --
21       MR. MORRISSEY:  Well, I'm asking him --
22       MR. DEVORE:  -- personal knowledge, which he
23   just said that his own personal knowledge, as
24   opposed to being something he observed as the
```

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 85

```
 1   Sheriff's designee and the topics dealt, are not
 2   articulated in a way to signal that he should be
 3   prepared in this way.
 4       MR. MORRISSEY:  Q  Did you investigate the east
 5   tunnel ramp or the Cermak ramp before being notified
 6   that you were going to testify for the Sheriff?
 7       MR. DEVORE:  Objection, form.  What time period?
 8       MR. MORRISSEY:  Q  You mentioned that you were
 9   notified a couple of weeks ago that you were going
10   to be asked to testify for the Sheriff in this case,
11   correct?
12       A   Yes.
13       Q   And after were you notified, did you go over
14   to the east tunnel ramp or the Cermak ramp?
15       A   No.
16       Q   Why not?
17       MR. DEVORE:  Objection, argumentative.
18       THE WITNESS:  I don't know why I would need to
19   go.
20       MR. MORRISSEY:  Q  After you were notified that
21   you were going to testify on behalf of the Sheriff,
22   did you observe inmates that were given an alert for
23   a cane, crutch, or walker going up either the Cermak
24   or the RTU east tunnel ramp?
```

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 86

```
 1       MR. DEVORE:  Objection as to relevance, scope.
 2       THE WITNESS:  No.  You had asked me earlier
 3   about investigating this stuff, and I told you then
 4   I didn't investigate.
 5       MR. MORRISSEY:  Q  As the Sheriff's
 6   representative, are you aware of any person who has
 7   an alert for a cane, crutch, or walker from the last
 8   two years being provided an accommodation either
 9   going up or down the Cermak or the RTU east tunnel
10   ramp?
11       MR. DEVORE:  Objection, scope, outside the four
12   topics.
13       THE WITNESS:  Can you clarify that?  I am not
14   tracking what you're saying.
15       MR. MORRISSEY:  Q  Sure.  As the person
16   testifying for the Sheriff --
17       A   Right, I got that part.
18       Q   You got that part.
19       A   But you're asking me about somebody else.
20       Q   As the Sheriff's designee --
21       A   Uh-huh.
22       Q   -- is the Sheriff aware of any person with
23   an alert for a cane, crutch, or walker that's been
24   provided any accommodation going up or down the
```

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 87

```
 1   Cermak or the east tunnel RTU ramp?
 2       MR. DEVORE:  Objection as to scope and to the
 3   extent it seeks information outside of his
 4   knowledge.
 5       THE WITNESS:  That, I am not sure if I can
 6   answer that without being speculative.
 7       MR. MORRISSEY:  Q  All right.  So number 3,
 8   topic 3 says, from January 1st, 2024 to the present,
 9   all accommodations offered, parentheses, and
10   provided to individuals in custody using a walker,
11   cane, or crutch to transverse either the Cermak ramp
12   or the RTU east tunnel ramp.  So can you tell me the
13   accommodations during that period of time that have
14   been provided to people with alerts for walkers,
15   canes, and crutches?
16       MR. DEVORE:  Objection as to offered versus
17   provided.  Objection as to form.
18       THE WITNESS:  Can you repeat the question?
19       MR. MORRISSEY:  Q  Sure.  If you take a look at
20   Exhibit 1, it's topic number 3, that I am asking
21   about.  From January 1st, 2024 to the present, all
22   accommodations offered, and then it's in
23   parenthesize, and provided to individuals in custody
24   using a walker, cane, and crutches to transverse
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 22

LONNIE HOLLIS
November 18, 2024

Page 88

1   either the Cermak ramp and/or the RTU east tunnel
2   ramp.
3       A   Yeah, it seems like it's missing something
4   here, because it says from January 1st, 2024 to the
5   present, all accommodations offered, so I am not,
6   what, exactly, are you seeking to know?
7       Q   So we're asking just for that time period,
8   for this year, can you tell me about an example of
9   any accommodation offered to any prisoner who has a
10  walker, cane, or crutch alert, when they went up or
11  down either the Cermak ramp or the RTU east tunnel
12  ramp.
13      A   Without reviewing the JMS, I wouldn't be
14  able to answer that, that would make me speculative.
15      Q   What is JMS?
16      A   Jail Management System.
17      Q   Would it be fair today that you are not,
18  that the Sheriff isn't able to testify in regards to
19  that?
20      MR. DEVORE:  Objection, mischaracterizes his
21  testimony.
22      THE WITNESS:  No, I don't think it would be fair
23  that it would cause me to speculate.
24      MR. MORRISSEY:  Q   Okay.

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 89

1       A   I can't pull the specific instance out of
2   the sky, I mean, have they offered or provided
3   accommodations?  Yes.  But I can't say today,
4   tomorrow, yesterday, at 4:00 o'clock, I couldn't
5   provide you with that, so that would make me
6   speculate.
7       Q   So, as the Sheriff's person, you were told
8   you were going to come in here and testify about
9   topic number 3, correct?
10      MR. DEVORE:  Objection, to the extent it seeks
11  attorney-client privileged communications.
12      MR. MORRISSEY:  Q   So you were designated?
13      A   Yes.
14      Q   Somebody from the Sheriff's office says
15  you're going to speak for the Sheriff on topic
16  number 3, right?
17      A   Okay.
18      Q   So did you look at JMS, Jail Management
19  System, to see if anybody has been accommodated?
20      A   No.
21      Q   Why would you have to look at the Jail
22  Management System to determine whether or not there
23  was any instance of whether a person was
24  accommodated going up and down the Cermak ramp or

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 90

1   the RTU ramp, if they had an alert for a walker or a
2   cane or a crutch?
3       MR. DEVORE:  Objection, mischaracterizes his
4   testimony.
5       THE WITNESS:  Why does he whisper to you,
6   instead of just saying it, because I can hear what
7   he's saying, that's distracting.
8       MR. MORRISSEY:  Q   All right.  I'm sorry, he's
9   one of the attorneys in the case.
10      A   Okay.
11      Q   So he can, he can scream in my ear if he
12  wants.
13      A   No, I get that part, but I'm just not
14  knowing why he just doesn't just ask me.
15      Q   It's because only one person can ask a
16  question, sir.
17      A   Oh.  Why did I have to use the JMS?  Because
18  that's where the information is held.
19      Q   Okay.  So, in order for, for you to respond
20  to the question, you would have to look at -- how --
21  let me ask a question.
22          How would the Sheriff, looking at the JMS,
23  be able to determine whether a person is
24  accommodated or not?

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 91

1       A   When you say the Sheriff, are you talking
2   about --
3       Q   I'm talking about you, as the Sheriff's
4   designee, how would you be able to determine whether
5   or not a person has been accommodated by looking at
6   the Jail Management System?
7       A   The expectation is that they document the
8   request for accommodation.
9       Q   And would that be the movement officer who
10  would document it?
11      A   Whomever was escorting the individual.
12      Q   And so if you looked at prisoners that had a
13  cane, crutch, or walker, let's say in the last week,
14  who went to Cermak, if they, there is no notation in
15  the Jail Management System, that they were
16  accommodated, you would be able to testify that
17  during that one-week period, there was no
18  accommodation provided to a person with a cane,
19  crutch, or walker; is that fair to say?
20      MR. DEVORE:  Objection, calls for speculation,
21  incomplete hypothetical.
22          You can answer.
23      THE WITNESS:  I don't have an answer, sir.
24      MR. MORRISSEY:  Q   Okay.

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 23

Page 92

1    A   I can only go by what's in the JMS, I can't
2  go by what's not entered in it.  So it would be my
3  believe that it's there, that that's what was
4  occurring.
5    Q   So, if a movement officer accommodated a
6  person with a cane, crutch, or walker --
7    A   Uh-huh.
8    Q   -- going up or down either the Cermak or the
9  east tunnel ramp, they're responsible for
10 documenting it, correct?
11   A   For documenting what?
12   Q   For documenting if they provide an
13 accommodation to a person?
14   A   That's the expectation of the policy.
15   Q   And by the policy, you're referring to 148?
16   MR. DEVORE:  Objection, mischaracterizes
17 testimony.
18   MR. MORRISSEY:  It's a question, Mr. Devore.
19   MR. DEVORE:  He testified to this already, but
20 go ahead.
21   THE WITNESS:  The expectation is that it's
22 documented.
23   MR. MORRISSEY:  Q  If a -- and you're referring
24 to 148.9, as far as the documentation?

Page 93

1    A   No, just in general, in Lexipol, is that
2  they're required to document.
3    Q   So, Lexipol requires an officer to document
4  when they provide an accommodation for a prisoner
5  that has a cane, crutch, or walker going up or down
6  a ramp?
7    MR. DEVORE:  Objection as to scope with respect
8  to identify, identifying specific portions of
9  specific policies that were not included in topic 5
10 or any other topic.
11   MR. MORRISSEY:  Q  You can answer the question.
12   A   Oh, I thought were you restating what I
13 said.
14   Q   No.
15   A   The expectation is in the policy, yes.
16   Q   Is the expectation that if a, is it the
17 expectation that a movement officer would have to
18 notify a person with a cane, crutch, or walker that
19 they can receive an accommodation when they go up or
20 down the Cermak or the east tunnel RTU ramp?
21   MR. DEVORE:  Objection as to seeks information
22 that may be outside the scope of his knowledge, but
23 you can answer.
24   THE WITNESS:  Can you restate that for me?

Page 94

1    MR. MORRISSEY:  Q  Sure.  Does the movement
2  officer have to notify a person with a cane, crutch,
3  or walker that he has a right to have an
4  accommodation to go up or down a ramp, such as the
5  Cermak or the east tunnel ramp?
6    A   There's a signage notice tunnel that would
7  suggest that they can have an accommodation
8  provided.
9    Q   If a person with a cane, crutch, or walker
10 doesn't want an accommodation, does the movement
11 officer have to document that in any document, such
12 as the Jail Management System?
13   A   No, I believe the policy only speaks to
14 wheelchairs, that they have to document the
15 wheelchairs only.
16   Q   What accommodations as the Sheriff's
17 designee can or is given on a daily basis, to
18 detainees who have alerts for canes, crutches, or
19 walkers, when they go up or down the Cermak or the
20 RTU east tunnel ramp?
21   A   Can you rephrase that?
22   Q   Sure.  On a daily basis, are detainees with
23 canes, crutches, and walkers given any
24 accommodations when they go up the Cermak or the

Page 95

1  east tunnel ramp?
2    A   That's like the JMS question you asked.
3    Q   Well, I'm asking, is that just a daily
4  process that this is something that happens all the
5  time that people with canes, crutches, and walkers
6  are given an accommodation when they go up and down
7  the Cermak or the east tunnel ramp?
8    MR. DEVORE:  Objection as to the phrase, all the
9  time, but, form.
10   THE WITNESS:  I believe I answered that already
11 by stating that when the individuals ask for
12 assistance, the expectation is that they're assisted
13 and that those assist would be documented in the
14 JMS.
15   MR. MORRISSEY:  Q  Is it the Sheriff's position
16 that on a daily basis there are numerous people with
17 canes, crutches, and walkers that are given an
18 accommodation going up the Cermak and going up and
19 down the Cermak and the RTU east tunnel ramp?
20   A   I don't understand the question.
21   Q   Sure.  Is this a matter of routine that
22 people with canes, crutches, and walkers are
23 provided an accommodation when they go up and down
24 the east tunnel ramp and the RTU, at the RTU and the

Exhibit 11 Page 24

Page 96

1  Cermak ramp?
2      A   If they request the assistance.
3      Q   Yeah.  Does that happen every day at the
4  jail?
5      A   I would have to look at the JMS to give you
6  the best answer.
7      Q   So does it happen more than three times a
8  week, at the Cook County Jail, that people with
9  canes, crutches, and walkers are given an
10 accommodation when they go up and down these ramps?
11     MR. DEVORE:  Objection, calls for speculation.
12     THE WITNESS:  Yeah, I don't want to speculate.
13     MR. MORRISSEY:  Q  Do you have any knowledge how
14 often that happens, that people with canes,
15 crutches, and walkers are given an accommodation
16 when they go up the Cermak and the RTU ramp?
17     MR. DEVORE:  Objection as to form and outside
18 the scope.  It doesn't ask how often.
19     MR. MORRISSEY:  Q  You can answer?
20     A   Can I?
21     MR. DEVORE:  Yeah.
22     THE WITNESS:  I don't have that answer for you.
23     MR. MORRISSEY:  Q  What type of accommodation is
24 provided to people with canes, crutches, and walkers

Page 97

1  when they go up and down the Cermak and the east
2  tunnel ramp?
3      MR. DEVORE:  Objection, form.
4      THE WITNESS:  Can you parse that out a little
5  bit more when you say what kind?
6      MR. MORRISSEY:  Q  Yeah, what accommodation is
7  provided to people with canes, crutches, and walkers
8  going up and down either the Cermak or the RTU ramp?
9      A   I don't think I have that answer, because
10 it's, it is kind of speculative, because we're
11 talking about a person with a cane or walker or
12 crutch, all their needs for possible accommodations
13 could be different.  So I am not really even able to
14 give you a good answer on that.
15     Q   Okay.  For a person who has a walker, what
16 kind of accommodation is provided by the Sheriff
17 when they go up an down these ramps?
18     A   That would be based on what the person is
19 saying or asking for, it's situational.
20     Q   For the sheriff, as the sheriff, do they
21 have a wheelchair at the base of the Cermak ramp for
22 a person who requests a -- to be pushed up in a
23 wheelchair, if they have an alert for a cane,
24 crutch, or walker?

Page 98

1      A   That would have to be deferred to a
2  supervisor so they could contact Cermak, Cermak
3  would make the determination if a wheelchair was
4  needed.
5      Q   So, for a prisoner that, let's say is
6  leaving the RTU building, and is proceeding up the
7  east tunnel ramp, is there a wheelchair at the base
8  of that ramp for him to be pushed up or down the RTU
9  ramp?
10     A   No, not that I recall.
11     Q   Is there any cart that's positioned at the
12 base of the east tunnel ramp, if a detainee with a
13 cane, crutch, or walker requests to be moved up the
14 ramp in a cart?
15     MR. DEVORE:  Objection, calls for speculation.
16 You can answer.
17     THE WITNESS:  That, again, is situational and
18 they can't necessarily request for a cart, because
19 the carts may or may not be available at a given
20 time, that would have to be escalated to a
21 supervisor, and they would have to work with Cermak
22 to determine how to have the person escorted over.
23     MR. MORRISSEY:  Q  So if a person who is housed
24 in the RTU, who has a cane, crutch, or walker, at

Page 99

1  the point when they reach the RTU east tunnel ramp,
2  says to the officer, I am in a walker and this ramp
3  is too steep for me, is it the Sheriff's testimony
4  that the correctional officer would have to contact
5  a supervisor at that point?
6      MR. DEVORE:  Objection, calls for speculation,
7  incomplete hypothetical, assumes facts not in
8  evidence.
9      THE WITNESS:  So you're saying that the person
10 is saying that they can no longer proceed to Cermak
11 and that they need --
12     Q   They need a wheelchair, they're at the base
13 of the RTU --
14     A   -- contact the supervisor, and Cermak would
15 be contacted and a decision would be made at that
16 point.
17     Q   So the supervisor would be a sergeant?
18     A   Could be, that would be speculation, it
19 could be a lieutenant, it could be whoever is on
20 duty, depending on staff on a given day.
21     Q   And then while the person is at the base of
22 the RTU ramp, waiting to go to Cermak, if they had a
23 walker, then the correctional officer has to contact
24 the supervisor, correct, and then the supervisor has

Exhibit 11 Page 25

LONNIE HOLLIS
November 18, 2024

Page 100

1  to contact Cermak to get a wheelchair, correct?
2      MR. DEVORE:  Same objection.
3      MR. MORRISSEY:  Q  Is that correct?
4      MR. DEVORE:  You can go ahead and answer.
5      THE WITNESS:  Yes.
6      MR. MORRISSEY:  Q  Okay.  Who would the
7  supervisor contact, if, again, the hypothetical is a
8  person with a walker is at the base of the RTU east
9  tunnel ramp request a wheelchair to go up, who would
10 the supervisor have to contact at Cermak, in order to
11 get the wheelchair?
12     **A    They would contact the on-duty nursing**
13 **supervisor.**
14     Q    Pardon?
15     **A    The on-duty nursing supervisor.**
16     Q    As the Sheriff's representative, and the
17 same sequence would occur if a person with a cane,
18 crutch, or walker was at the top of a Cermak ramp,
19 and requested a wheelchair, the same procedure would
20 follow?
21     MR. DEVORE:  Same objection.
22     THE WITNESS:  Any time that they ask for
23 assistance, we're going to look into it and provide
24 assistance.

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 101

1      MR. MORRISSEY:  Q  But the question is, if I am,
2  if a person with a walker is at the top of the
3  Cermak ramp?
4      **A    Yes, sir.**
5      Q    And he's been moved from, let's say,
6  Division 6 or 2.
7      **A    Correct.**
8      Q    And he asks that movement officer to provide
9  him with a wheelchair, to go down into Cermak for a
10 medical appointment, the correctional officer would
11 have to contact his or her supervisor, correct?
12     **A    If asked for assistance, we're going to**
13 **provide assistance and let the supervisor know, so**
14 **that they can work with Cermak to get the --**
15     MR. REPORTER:  I'm sorry, let the supervisor?
16     THE WITNESS:  Let the supervisor know so that
17 they can get assistance from Cermak to provide the
18 wheelchair.
19     MR. MORRISSEY:  Q  Would, in that circumstance,
20 would Cermak have to enter an order for a wheelchair
21 for that person?
22     **A    I can't answer to Cermak's processes, they**
23 **are outside of the Sheriff.**
24     Q    As the Sheriff's designee, do you know if

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 102

1  that procedure has ever happened?
2      MR. DEVORE:  Objection.
3      THE WITNESS:  I can't answer to Cermak's
4  processes.
5      MR. MORRISSEY:  Q  No, I'm asking as the
6  Sheriff's designee here today?
7      **A    Okay.**
8      Q    Do you know if any situation in the last
9  month where a person with a cane, walker, or crutch
10 has requested an accommodation of a wheelchair to
11 either go up or down these two ramps, do you know if
12 that's ever occurred where an officer has contacted
13 his or her supervisor?
14     MR. DEVORE:  Objection as to form, in terms of
15 time period.
16     THE WITNESS:  I don't know which one you're
17 asking, because you said the month and then you said
18 ever.
19     MR. MORRISSEY:  Q  Okay.  So I'm saying in the
20 last month?
21     **A    Okay.**
22     Q    As the Sheriff's designee, do you know if
23 this process where a prisoner with a cane, crutch,
24 or walker has ever requested an accommodation, do

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 103

1  you know if that's ever occurred?
2      **A    Not that I have been made aware of in the**
3  **past month, no.**
4      Q    Okay.  In the last six months, are you aware
5  of any situation where a person with a cane, crutch,
6  or walker has requested assistance to go up or down
7  either the Cermak or RTU east tunnel?
8      MR. DEVORE:  Objection, to the extent that it
9  seeks information outside the scope of the topics,
10 3, 4, 5, and 6, I don't think it's embraced by that.
11     THE WITNESS:  In the past six months, I don't
12 recall off the top of my head, no.
13     MR. MORRISSEY:  Q  In the last year, as the
14 Sheriff's designee, do you know if there's ever been
15 a situation where a prisoner with a cane, crutch, or
16 walker has requested assistance --
17     MR. DEVORE:  Same objection.
18     MR. MORRISSEY:  Q  -- to have a wheelchair go up
19 or down either the Cermak ramp or the RTU east
20 tunnel ramp?
21     MR. DEVORE:  The same objection, it's outside
22 the four, topics 3, 4, 5, and 6, in terms of what he
23 was to be prepared to proceed to answer.
24     THE WITNESS:  In the last year, I don't recall.

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 26

LONNIE HOLLIS
November 18, 2024

Page 104

1    I don't want to speculate.
2        MR. MORRISSEY:  Q  All right.  Would you have to
3    look at the jail management system to find out the
4    answer?
5        MR. DEVORE:  Objection, same, same objection.
6    Can you can answer.
7        THE WITNESS:  If there were instances of such,
8    as you described, it should be contained and the
9    expectation that would be that it should be
10   contained in the Jail Management System.
11       MR. MORRISSEY:  Q  How would you, as the
12   Assistant Director, find out by looking on the Jail
13   Management System, whether any prisoner with a cane,
14   crutch, or walker has been provided an accommodation
15   of a wheelchair to go up or down, either the Cermak
16   or the RTU east tunnel ramp?
17       MR. DEVORE:  Same objection.  I'm going to
18   instruct him not to answer.
19       MR. MORRISSEY:  Why not?  It's certainly covered
20   by number 3, topic number 3.
21       MR. DEVORE:  Maybe I misheard the question.
22       MR. MORRISSEY:  Q  From January 1st, 2024 to the
23   present, how would the Sheriff, by looking at the --
24   let me rephrase the question.

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 105

1        From January 1st, 2024 to the present, how
2    could you search the Jail Management System to find,
3    find out whether an accommodation has been provided
4    to a person with a cane, crutch, or walker, to go up
5    or down either the Cermak or the RTU east tunnel
6    ramp?
7        MR. DEVORE:  Objection, it assumes that the
8    response is limited to the JMS.
9        You can answer.
10       THE WITNESS:  If there were such an instance, I
11   would look for the person's name and see if there
12   was an incident report entered into the JMS
13   regarding that topic.
14       MR. MORRISSEY:  I'm going to take a 5 minute
15   break.
16       (Whereupon a break was taken.)
17       MR. MORRISSEY:  Back on the record.
18       Q  You mentioned that if a person requested a
19   wheelchair, because they had an alert for a cane,
20   crutch, or walker to go up or down the two ramps,
21   that you, that the Sheriff could look in the Jail
22   Management System to see if there's an incident
23   report, correct?
24       A  Yes.

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 106

1        Q  What is an incident report?
2        A  That's just a general term that we use to
3    document when things occur.
4        Q  If a wheelchair person is pushed up or down
5    the RTU or Cermak ramp, is there an incident report?
6        A  They're just pushed up and down of their own
7    volition or?
8        Q  Well, if a wheelchair person requests to be
9    pushed up or down either the Cermak or the RTU ramp,
10   does the officer who pushes him up the ramp or down
11   the ramp have to do an incident report?
12       MR. DEVORE:  Objection as to scope.
13       THE WITNESS:  No, because the people who are in
14   the wheelchair, we push them automatically, so
15   there's no need for a report for what we do
16   according to the policy.
17       MR. MORRISSEY:  Q  Now, are you familiar with an
18   alert for a walker long distance?
19       A  Sir?
20       Q  Are you aware of an alert at the jail for an
21   alert long distance for a walker?
22       A  Yes.
23       Q  And is there also a long distance alert for
24   a cane or a crutch?

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 107

1        A  Yes.
2        Q  And what's the difference between having an
3    alert for a long distance walker and just an alert
4    for a walker?
5        MR. DEVORE:  Objection as to scope of the
6    notice.  I don't believe that's articulated in the
7    topics 3, 4, 5, or 6.
8        THE WITNESS:  When you say long distance, it's
9    pretty much indicative of the term, when they're
10   going, when they're going on walks or being escorted
11   for longer periods of time or longer distances, as
12   opposed to just going from their bed to the day room
13   table in the living unit.
14       MR. MORRISSEY:  Q  Are canes and crutches
15   considered potentially a weapon?
16       MR. DEVORE:  Objection as to scope.
17       THE WITNESS:  Can you rephrase that?
18       MR. MORRISSEY:  Q  Sure.  Can a cane or a crutch
19   be used as a weapon by an inmate?
20       MR. DEVORE:  Objection as to scope of the
21   notice.  It's not articulated in topics 3, 4, 5, or
22   6, whether, how a cane or crutch is discussed.
23       MR. MORRISSEY:  Q  As far as a person receiving
24   a wheelchair, if they have a cane, crutch, or

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 27

Page 108

```
 1   walker, to go up or down the ramps, does it matter
 2   whether or not the walker is a long distance alert
 3   or just an alert for a walker?
 4       MR. DEVORE:  Objection as to scope.  It's not
 5   articulated, it is not articulated in topics 3, 4,
 6   5, or 6.
 7       THE WITNESS:  Can you clarify the question?
 8       MR. MORRISSEY:  Q  Sure, sure.  You mentioned
 9   that alerts can be either for long distance for
10   walker --
11       A  You said that.  I answered your question in
12   response to that, I didn't say that.
13       Q  All right.  Are there alerts for long
14   distance for walker?
15       A  Yes, that's the question you asked me.
16       Q  Yeah.  And there's an alert just for a
17   walker, correct?
18       A  Yes.
19       Q  Okay.  Does it matter whether a prisoner has
20   an alert just for a walker or for a long distance
21   whether or not they can request a wheelchair to go
22   up or down either the Cermak or, or east tunnel RTU
23   ramp.
24       MR. DEVORE:  Objection as to scope.  You can
```

Page 109

```
 1   answer.
 2       THE WITNESS:  If the individuals asks for
 3   assistance, then we're going to render the
 4   assistance, irrespective of what alert that they
 5   have.  If they're asking for assistance, then we're
 6   going to, the expectation is that we're going to
 7   respond to that request.
 8       MR. MORRISSEY:  Q  Are people in Division 9
 9   allowed to maintain a walker or cane or crutch in
10   the division?
11       MR. DEVORE:  Objection, outside the scope of the
12   questions or of the topics delineated in 3, 4, 5,
13   and 6.  And it's not, and the question is not
14   designed to address the ramps referenced in 3, 4, 5,
15   and 6, so I'm going to direct you not to answer that
16   question.
17       MR. MORRISSEY:  Q  You mentioned that the JMS,
18   if a person requested a wheelchair, if he or she had
19   a cane, crutch, or walker alert, that an incident
20   report would be generated by the movement officer,
21   correct?
22       MR. DEVORE:  Objection, mischaracterizes
23   testimony.
24       MR. MORRISSEY:  Q  Let me rephrase it.  When an
```

Page 110

```
 1   incident report is generated, because a person
 2   requests a wheelchair, because they have a cane,
 3   crutch, or walker going up or down the ramps, is the
 4   incident report coded in any manner?
 5       MR. DEVORE:  Objection, I believe it
 6   mischaracterizes his testimony as to when an
 7   incident report is generated.
 8       THE WITNESS:  When you say coded, what do you
 9   mean?
10       MR. MORRISSEY:  Q  Is there, are there, in the
11   JMS system, are there different delineations as far
12   as an incident report.  For instance, is there an
13   incident report for inmate, an inmate battery?
14       MR. DEVORE:  Objection, outside the scope of the
15   topics 3, 4, 5, and 6.  I don't believe there's any
16   question regarding the JMS topic, covering the JMS
17       MR. MORRISSEY:  Q  You can answer?
18       A  Can you ask the question again?
19       Q  Sure.  Are there codes in the JMS for
20   various incidents?
21       MR. DEVORE:  Same objection.  It's outside the
22   scope of the topics 3, 4, 5, and 6.
23       MR. MORRISSEY:  Q  Well, the topic is, on
24   number 3, is tell us between January 1st, 2024,
```

Page 111

```
 1   whether anybody has been accommodated.  And he's
 2   says, well, you got to look at the JMS.  And so he
 3   said there would be an incident report.  So I'm
 4   asking him, is there any way, based upon a code,
 5   whether or not you could pull up people that were
 6   provided a wheelchair?
 7       MR. DEVORE:  Yeah, it mischaracterizes his
 8   testimony, because he didn't just limit it to JMS,
 9   and he said you had to look at the ICC's name.
10       MR. MORRISSEY:  I don't think he said that.
11       THE WITNESS:  I did.
12       MR. MORRISSEY:  Q  Are you able to do
13   informational reports from the JMS?
14       MR. DEVORE:  Same objection, as to scope.
15       THE WITNESS:  When you say am I able to do
16   informational reports, what do you mean?
17       MR. MORRISSEY:  Q  Can you use the JMS to pull
18   up information that would be helpful for the
19   administration at the jails?
20       MR. DEVORE:  Objection as to form.
21       MR. MORRISSEY:  Q  Do you understand the
22   question?
23       A  No, you guys we're talking, so I didn't know
24   if you wanted to ask me something different.
```

Exhibit 11 Page 28

Page 112

1   Q  Okay. Well, I'll show you Exhibit Number 5.

2   A  So what was the question?

3   Q  The question is, can you generate reports

4 from the JMS, about certain topics?

5   MR. DEVORE: Objection as to scope, as

6 articulated before, not included in topics 3, 4, 5,

7 and 6.

8   MR. STILLMAN: You can answer.

9   THE WITNESS: The JMS can be used to research,

10 yes.

11   MR. MORRISSEY: Q Can you research, in JMS,

12 whether or not assistance is being provided to

13 wheelchair detainees?

14   MR. DEVORE: Same objection. And the question

15 was regarding wheelchair detainees, which is not

16 this lawsuit.

17   MR. MORRISSEY: Q You can answer?

18   MR. DEVORE: And it's outside the scope of the

19 30(b)(6), so I'm not going to allow him to answer

20 that related to wheelchair detainees.

21   MR. MORRISSEY: Q Showing you Exhibit Number 5,

22 it's a memorandum to RTU and Cermak staff members,

23 from Sabrina Rivero-Canchola, ADA Compliance

24 Officer, subject, roll call memo, December 22nd,

Page 113

1 2023.

2   MR. DEVORE: Can we see it?

3   THE WITNESS: You got something on there too.

4   MR. STILLMAN: Should we just give him ours.

5   THE WITNESS: Yeah, I don't know what that says.

6   MR. STILLMAN: Do you have another one, Pat?

7   MR. PATRICK MORRISSEY: Here you go.

8   MR. DEVORE: Thanks.

9   MR. MORRISSEY: Q Have you had an opportunity

10 to look at Exhibit 5?

11   A  Yes.

12   Q  Exhibit 5 talks about documenting in an

13 incident report or information only report and

14 CCOMS. IS CCOMS the Jail Management System?

15   A  Yes.

16   Q  And what is an information only report?

17   A  It's what it says, it's an information only

18 report.

19   Q  How does that differ from an incident

20 report?

21   A  It's just interchangeable terms.

22   Q  And looking at Exhibit 5, it says, pursuant,

23 it says pursuant to, and they're referring to policy

24 148, which was in front of you, which we have been

Page 114

1 talking about all afternoon, which is Exhibit 4, in

2 our case, pursuant to that order, CCSO members must

3 provide assistance to wheelchair using subjects who

4 are in CCSO custody, assistance includes, but is not

5 limited to, pushing wheelchair using detainees up

6 and down ramps and through the corridors of the DOC.

7   As the Sheriff's designee, is there any

8 similar memorandum or document which imposes a duty

9 on the correctional staff to provide accommodations

10 to detainees who have an alert for canes, crutches,

11 and walkers going up and down ramps?

12   MR. DEVORE: Objection, as to form. Also as to

13 scope, and to the extent that it attempts to

14 transform this memo into something it's not.

15   THE WITNESS: Not that I recall.

16   MR. MORRISSEY: Okay. Anything else, Pat?

17   MR. PATRICK MORRISSEY: No.

18   MR. MORRISSEY: All right. I don't have any

19 further questions, thank you.

20   MR. DEVORE: I just have a couple.

21        EXAMINATION

22       by Mr. Devore:

23   MR. DEVORE: Q There was some questions

24 regarding requests from folks with canes, crutches

Page 115

1 and devices, I just wanted to be clear, that there

2 are, are there rules that, that the CCDOC that the

3 Sheriff has to follow with respect to

4 nondiscrimination against folks who have ADA needs?

5   A  Yes, sir.

6   Q  And is it the case that, that, well, what is

7 your understanding of those rules?

8   A  It's just it's indicative of the statements

9 you made, that we, the expectation is that we, as

10 the office, will be inclusive to them and not

11 discriminatory to them in any fashion at all and

12 that we'll render assistance to them, you know, when

13 they ask for it or as we, you know, as they need it.

14   Q  And is that the case, regardless of whether

15 something is included in the policy and with exact

16 text or not?

17   A  Yes, we will provide assistance and we will

18 not discriminate.

19   Q  Okay. And is it correct that you testified

20 that the Sheriff's office does accommodate, does

21 accommodate people, but you just couldn't identify

22 any specific times, based on your recollection of

23 accommodation?

24   A  That's correct.

Exhibit 11 Page 29

LONNIE HOLLIS
November 18, 2024

Page 116

1    Q   Okay.  And that's why you, you were
2   suggesting that you could look at some other, look
3   at a system to search for such instances, correct?
4    A   That's correct.
5    Q   Okay.  And in your experience, do
6   individuals in custody generally know that they can
7   contact Sheriff's personnel to request assistance?
8    A   Yes.
9    Q   And so is it fair to say that the Sheriff's
10  Department or the Sheriff accommodates people with
11  canes, crutches, or walkers as, pursuant to
12  requests?
13   A   Yes.
14   Q   And outside of Lexipol, what are, are there
15  some other sources of training that, that Sheriff
16  employees receive?
17   A   They receive pre-service training, which is
18  the, it's through the training academy, then they
19  receive in-service training after they graduate from
20  the academy, on a yearly basis, and we also receive
21  Lexipol updates or e-mails that are --
22   MR. REPORTER:  Or e-mails, I'm sorry?
23   THE WITNESS:  E-mails, we're responsible for
24  reviewing and acknowledging.

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 117

1    MR. DEVORE:  Q  So there is a myriad of
2   different ways that training is received from
3   written materials to on-line to in-person; is that
4   fair to say?
5    A   As well as memorandums, such as that, roll
6   call memos, that we receive at, given to the staff
7   to provide direction.
8    Q   And, just to be clear, there has been a lot
9   of questioning regarding the topics identified in
10  the Rule 30(b)(6) notice, and in particular topics
11  3, 4, 5, and 6, and there was, I believe, early on,
12  questions surrounding whether you had reviewed that
13  particular notice.  And I am going to ask it a
14  little bit differently.  Had you reviewed the topics
15  and discussed the information in the notice, prior
16  to today?
17   A   Yes.
18   Q   And, additionally, there's been some
19  questions regarding investigation, and I don't know,
20  just to make sure that there is no confusion, were
21  there steps that you took to prepare for today's
22  deposition that could be, that could constitute what
23  someone would say, investigation?
24   A   Yes, yes.

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 118

1    Q   And that would include meeting with --
2    MR. MORRISSEY:  Objection, leading.
3    MR. DEVORE:  Q  And would that, would that
4   include a meeting with your attorneys.
5    A   Yes.
6    Q   And, just to be clear, so to the extent that
7   there's something in the, any of the policies that
8   have been discussed today, including policy 148 and
9   policy 801, to the extent that something was in the
10  policy that you didn't discuss, would you defer to
11  the actual text of the policy?
12   A   Yes.
13   MR. DEVORE:  I think that's all we have.
14   MR. MORRISSEY:  I have some follow-up questions.
15            FURTHER EXAMINATION
16         by Mr. Morrissey:
17   MR. MORRISSEY:  Q  Is it correct that the
18  movement officers are the correctional staff that
19  transport prisoners with canes, crutches, and
20  walkers to Cermak?
21   A   One more time, the beginning of your
22  question that you said?
23   Q   Sure.  That in each housing division, the
24  staff that move prisoners to and from Cermak are the

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 119

1   movement officers?
2    A   They're officers.
3    Q   Whether -- there is a title called a
4   movement officer, correct?
5    A   There's an assignment that refers to them as
6   being the movement officer, however, an officer can
7   escort them.
8    Q   Okay.  But, generally, it's the movement
9   officers that escort prisoners to and from Cermak?
10   MR. DEVORE:  Objection, mischaracterizes his
11  prior testimony.
12   THE WITNESS:  Movement officer is an assignment
13  entered on our rosters.  Any officer can perform the
14  escort of an individual in custody.  So they don't
15  have to just be movement officers, any officer that
16  is on duty, depending on what is needed at a given
17  interval, can be used to escort an individual in
18  custody to wherever they needed to be escorted to.
19  It's not exclusive to just the movement officers, so
20  any officer can do it.
21   Q   All right.  But, in general, on a daily
22  basis, the officers that are assigned as movement
23  officers are the individuals that are responsible
24  for transporting detainees who have canes, crutches,

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 30

LONNIE HOLLIS
November 18, 2024

Page 120

```
1    and walkers to Cermak?
2         MR. DEVORE:  Objection, asked and answered.  He
3    just answered it.
4         MR. MORRISSEY:  Q  You can answer.
5         A    I don't know how to answer your question a
6    different way, because any officer on duty can move
7    any of those individuals in custody that you
8    mentioned.  So it's not exclusive to just the
9    movement officers.
10        Q    Okay.  You mentioned that there's in-service
11   training given to correctional officers, correct?
12        A    Yes.
13        Q    As the Sheriff's representative, designee,
14   can you identify any in-service training that's been
15   given in the last two years to correctional staff,
16   as far as accommodating prisoners that have an alert
17   of canes, crutches, or walkers, when they go up or
18   down the ramps at the jail?
19        MR. DEVORE:  Objection, form.  It's not a memory
20   test.
21        THE WITNESS:  The officers are given training
22   based on the Lexipol policies when they you go to
23   in-service training.
24        MR. MORRISSEY:  Q  So, to be clear, the training
```

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 121

```
1    is based upon the written policy?
2         A    It's a refresher.
3         Q    Okay.  And the refresher is off of the
4    written policy?
5         MR. DEVORE:  Objection, mischaracterizes his
6    testimony.
7         THE WITNESS:  The training is based on the
8    Lexipol policies.
9         MR. MORRISSEY:  Q  Okay.  Can you provide any
10   testimony, as the Sheriff's designee, in regards to
11   the training that officers receive in the academy in
12   regards to accommodating prisoners with alerts for
13   canes, crutches, and walkers --
14        A    I cannot.
15        Q    -- when they go up and down the ramps of the
16   jail?
17        MR. DEVORE:  Objection, to the extent it
18   requests specific information outside of his
19   immediate control.
20        MR. MORRISSEY:  He's been designated for the
21   Sheriff, so I'm entitled to ask it.
22             Can you answer the question?
23        THE WITNESS:  I cannot, there's a different
24   entity that governs training and what's delineated
```

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 122

```
1    at training.
2         MR. MORRISSEY:  Q  Well, the training is
3    provided by the Sheriff's office?
4         A    The training is provided by the Sheriff's
5    office, however, it's not an area that I oversee.  I
6    don't oversee training.
7         Q    Right.  But you're the designee for the
8    Sheriff here today.
9         A    That's correct.
10        Q    Right.
11        A    For this topic, not for training.
12        Q    Well, the topic involves training.
13        A    It involves training, but it's not exclusive
14   to training.  The questions that you're asking me is
15   a question that is exclusive to training.
16        Q    Is there any memo, as the Sheriff's
17   designee, that earmarks what a correctional officer
18   is to do, as far as accommodating a person who has a
19   cane, crutch, or walker?
20        MR. DEVORE:  Objection, to the extent it's
21   outside the scope, and there's no request regarding
22   specific memos, memoranda.
23        THE WITNESS:  I am not able to answer that
24   without speculating.
```

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 123

```
1         MR. MORRISSEY:  Q  Well, your Attorney, on
2    cross, talked about memos, so I'm asking you, do you
3    know of any memo, as the Sheriff's representative,
4    about accommodating people with canes, crutches, or
5    walkers?
6         A    Not that I recall.
7         Q    In regards to the RTU, in regards to the
8    Cermak ramp, does the Sheriff acknowledge that it's
9    noncompliant with the ADA?
10        MR. DEVORE:  Objection.  Objection as to form.
11   Objection, outside the scope of the topics 3, 4, 5,
12   and 6.  And also seeks an opinion that's expert in
13   nature and not within the scope of this 30(b)(6)
14   notice.
15        MR. MORRISSEY:  Are you instructing him not to
16   answer?
17        MR. DEVORE:  Yes.
18        MR. MORRISSEY:  Q  Are prisoner with canes,
19   crutches, and walkers, are they notified that the
20   Cermak ramp is not compliant with the ADA?
21        MR. DEVORE:  Objection, I believe it was asked
22   and answered.  And, also, assumes facts not in
23   evidence.
24        MR. MORRISSEY:  You can answer.
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 31

Page 124

```
1    MR. DEVORE:  If you can read the question back.
2        (Question read back as requested.)
3    MR. DEVORE:  Objection, as to scope.  It's not
4  within the identified topics 3, 4, 5, or 6.
5    MR. MORRISSEY:  Q  Well, it is, if you look at
6  number 4, it says the steps taken to notify
7  individuals in custody using canes, crutches, or
8  walkers, about the Cermak and RTU east tunnel ramp
9  being noncompliant with the ADA.  How couldn't it be
10  more specific?
11    MR. DEVORE:  And the question was are they?
12  This line of questioning was absolutely covered
13  already.  Maybe, I don't know how long ago.
14    MR. MORRISSEY:  No.
15    MR. DEVORE:  An hour or two ago.
16    MR. MORRISSEY:  No, it wasn't.  The question is,
17  Are people with canes, crutches, and walkers
18  notified that the Cermak and RTU east tunnel ramps
19  are noncompliant, with the ADA?
20    MR. DEVORE:  You can answer.
21    THE WITNESS:  Not that I am aware of.
22    MR. MORRISSEY:  Q  Why not.
23    A  Because I'm not aware.
24    MR. DEVORE:  Objection, outside the scope.
```

Page 125

```
1    MR. MORRISSEY:  Pardon?
2    MR. DEVORE:  Objection, outside the scope.
3    MR. MORRISSEY:  Q  Are prisoners notified of any
4  steps available to ensure safety and access to a
5  Cermak and the RTU ramps?
6    MR. DEVORE:  Objection, scope.  Objection, also,
7  asked and answered.
8    MR. MORRISSEY:  Q  Will you allow him to answer?
9    MR. DEVORE:  And it's also incomplete with
10  respect to location.
11    MR. MORRISSEY:  Q  Well, if we restate the
12  notice, it says the steps taken to notify
13  individuals in custody using canes, crutches, or
14  walkers about the Cermak and the RTU east tunnel
15  ramps being noncompliant with the ADA, and the
16  interim measures in place to ensure access and
17  safety.
18        So are prisoners with those alerts notified
19  what they're entitled to receive from the Sheriff in
20  regards to going up and down these ramps?
21    MR. DEVORE:  Objection, this goes beyond the
22  scope of the redirect, of any questions that I
23  asked.  And so it should, it's beyond what is
24  allowable on redirect.
```

Page 126

```
1    MR. MORRISSEY:  Are you going to tell him not to
2  answer.
3    MR. DEVORE:  I'll instruct him not to answer.
4    MR. MORRISSEY:  All right.  Your Counsel said,
5  on cross, that the Sheriff does everything possible
6  to accommodate people that are disabled.  Does that
7  include informing the inmates that have canes,
8  crutches, and walkers, that they have a right to, to
9  having assistance going up and down the ramps?
10    MR. DEVORE:  You can answer.
11    THE WITNESS:  We discussed that a little while
12  ago with the signage.
13    MR. MORRISSEY:  Q  But you don't know whether
14  the signage is up or not.
15    A  Today.  It was there previously.
16    Q  But you don't know when?
17    A  No, it was previous.
18    MR. DEVORE:  Objection, mischaracterizes his
19  testimony.
20    MR. MORRISSEY:  Q  Pardon?  You don't know when
21  the sign was posted as the Sheriff's designee?
22    A  I do not.
23    Q  And you don't know how long the sign was
24  posted for?
```

Page 127

```
1    A  I do not.
2    Q  And you don't know what the sign said?
3    MR. DEVORE:  Objection, mischaracterizes his
4  testimony.
5    MR. MORRISSEY:  Q  You have to answer orally?
6    MR. DEVORE:  He did testify as to --
7    MR. MORRISSEY:  Well, you can't testify for him.
8    MR. DEVORE:  I'm not.
9    MR. MORRISSEY:  You are.
10    MR. DEVORE:  You're trying to --
11    MR. MORRISSEY:  Q  How many signs were posted at
12  the Cook County Jail?
13    MR. DEVORE:  Objection, calls for speculation,
14  regarding the entire jail.
15    MR. MORRISSEY:  Q  How many signs were posted in
16  the vicinity of the Cermak or the RTU east tunnel
17  ramp?
18    MR. DEVORE:  Objection, scope.
19    THE WITNESS:  I am not able to answer that
20  because I saw at least two, but that doesn't mean
21  that there was exclusively two, those are the two
22  that I saw.
23    MR. MORRISSEY:  All right.  I have nothing
24  further.
```

Exhibit 11 Page 32

**LONNIE HOLLIS**
**November 18, 2024**

Page 128

```
 1    MR. DEVORE:  I think we're good.
 2    MR. MORRISSEY:  Thanks for coming in.
 3    THE WITNESS:  Yes, sir.
 4    MR. REPORTER:  Signature?
 5    MR. DEVORE:  Reserved.
 6
 7    - - - - - - - - - - - - - - - - - - - - - - - - -
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

**LONNIE HOLLIS**
**November 18, 2024**

Page 129

```
 1    STATE OF ILLINOIS  )
                         )  ss:
 2    COUNTY OF C O O K  )
 3
 4         The within and foregoing deposition of the
 5    aforementioned witness was taken before DENNIS M.
 6    HARTNETT, CSR, at the place, date and time
 7    aforementioned.
 8         There were present during the taking of the
 9    deposition the previously named counsel.
10         The said witness was first duly sworn and
11    was then examined upon oral interrogatories; the
12    questions and answers were taken down in shorthand
13    by the undersigned, acting as stenographer, and the
14    within and foregoing is a true, accurate and
15    complete record of all of the questions asked of and
16    answers made by the aforementioned witness, at the
17    time and place hereinabove referred to.
18         The signature of the witness was not
19    waived, and the deposition was submitted, pursuant
20    to Rules 30 (e) and 32 (d) of the Rules of Civil
21    Procedure for the United States District Court, to
22    the deponent per copy of the attached letter.
23
24
```

TOOMEY REPORTING
312-853-0648

**LONNIE HOLLIS**
**November 18, 2024**

Page 130

```
 1         The undersigned is not interested in the
 2    within case, nor of kin or counsel to any of the
 3    parties.
 4
 5
 6         Witness my official signature in and for
 7    Cook County, Illinois on this 23rd day of December
 8    A.D. 2024.
 9
10
11
12
13    DENNIS HARTNETT
      TOOMEY REPORTING
14    200 S. Wacker Drive - 3100
      Chicago, Illinois  60606
15    Phone:  (312) 853-0648
16
17
18
19
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

**LONNIE HOLLIS**
**November 18, 2024**

Page 16970

```
      IN THE DISTRICT COURT OF THE UNITED STATES
        FOR THE NORTHERN DISTRICT OF ILLINOIS
                 EASTERN DIVISION

CUAUHTEMOC HERNANDEZ,    )
                         )
          Plaintiff,     )
                         )
     -vs-                )  No. 23 CV
                         )
THOMAS DART and          )
COOK COUNTY, ILLINOIS    )
                         )
          Defendants.    )


         I, LONNIE HOLLIS, being first duly sworn,
on oath say that I am the deponent in the aforesaid
deposition taken on 11-18-24; that I have read the
foregoing transcript of my deposition, consisting of
pages 1 through 134 inclusive, and affix my
signature to same.


                      _____
                           LONNIE HOLLIS


SUBSCRIBED AND SWORN TO
before me this ____ day of
_____
A.D. 2024.

_____
      Notary Public
```

TOOMEY REPORTING
(312) 853-0648

Exhibit 11 Page 33

LONNIE HOLLIS
November 18, 2024

Page 230

```
                 TOOMEY REPORTING
              200 South Wacker Drive
                   Suite 3100
              Chicago, Illinois  60606
                 (312) 853-0648
               December 23, 2024
```

DEVORE RANDUNSKY
MR. JASON E. DEVORE
 West Monroe Street
Chicago, Illinois  60606

   CASE:  Hernandez v. Dart     CASE NO.: 23 CV 16970
   DEP OF:  Lonnie Hollis       DATE TAKEN: 11-18-24

Dear Mr. Devore:

     Enclosed is your copy of the deposition
transcript, along with the original signature page
and errata sheet.

     Pursuant to the rules of court in this matter,
please have the deponent read the transcript and
sign the signature page before a notary public.

     If any corrections/changes are to be made,
please TYPE or PRINT them on the attached errata
sheet, giving the page and line number, desired
correction/change, and
reason.

     Please arrange for accomplishment of same and
transmittal of the signature page and errata sheet
back to our office within 30 days from the date of
this letter.


              Sincerely yours,


              _____
                    SANDY TOOMEY

cc: Mr. Thomas Morrissey
    Mr. Patrick Morrissey
              TOOMEY REPORTING
                 (312) 853-0648
```

TOOMEY REPORTING
312-853-0648

Exhibit 11 Page 34