IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CORNELIUS WALKER,

Plaintiff,

-vs-

THOMAS DART, SHERIFF OF COOK COUNTY, and COOK COUNTY, ILLINOIS,

Defendants.

No. 20-cv-00261

Judge Mary M. Rowland
Magistrate Hon. Jeffrey Cummings

The remote deposition via videoconference of ERIC DAVIS, called by the Plaintiff for examination, pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Court pertaining to the taking of depositions for the purpose of discovery taken by KELLY ANN POTTS, REGISTERED PROFESSIONAL REPORTER, CERTIFIED SHORTHAND REPORTER, License No. 084-003558, within and for the County of Cook and State of Illinois, on the 19th day of January, 2022, at 2:01 p.m., Central Standard Time.

A P P E A R A N C E S:

THE LAW OFFICES OF THOMAS G. MORRISSEY, by
MR. THOMAS G. MORRISSEY (via Webex)
10150 South Western Avenue, Rear Suite
Chicago, Illinois 60643
(773) 233-7900
tgmorrisseylaw@gmail.com

Appeared on behalf of the Plaintiff;

JOHNSON & BELL, by
MR. JACK E. BENTLEY (via Webex)
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603
(312) 372-0770
bentleyj@jbltd.com

Appeared on behalf of the Defendants.

* * *

INDEX OF EXAMINATION

| | PAGE |
|---|---|
| ERIC DAVIS | |
| Examination by Mr. Thomas Morrissey.......... | 5 |

INDEX TO EXHIBITS

| EXHIBIT | | PAGE |
|---|---|---|
| Plaintiff's | | |
| No. 2 | Deft Ans 1st Set Interrogatories... | 20 |
| No. 4 | Drawing........................... | 92 |
| No. 8 | ADA Standards..................... | 87 |
| No. 400 | Deft Ans 2nd Set Interrogatories... | 85 |
| No. 402 | Photographs....................... | 72 |
| No. 403 | Design Drawings and Firm Names..... | 25 |
| No. 404 | Transcript - December 19, 2019..... | 16 |
| No. 406 | E-mails........................... | 46 |
| No. 407 | E-mail from Joe Merkel............ | 82 |

* * *

THE STENOGRAPHER: All parties are aware that the witness will be sworn in remotely. The parties agree not to challenge the validity of any oath administered by the Certified Stenographic Reporter, even if the Certified Stenographic Reporter is not physically present with the witness.

Here begins the remote deposition via videoconference of ERIC DAVIS in the matter of CORNELIUS WALKER versus THOMAS DART and COOK COUNTY.

Today's date is the 19th day of January, 2022, and the time is 2:01 p.m., Central Standard Time.

Beginning with the noticing party, will counsel please introduce themselves, state whom they represent, and stipulate to the swearing in of the witness remotely?

MR. THOMAS MORRISSEY: My name is Thomas Morrissey. I represent the Plaintiff in the Walker case.

MR. BENTLEY: Good afternoon.

My name is Jack Bentley. I represent the Defendants in the same litigation.

I stipulate. Thank you.
THE STENOGRAPHER: Eric, would you raise your right hand?
THE WITNESS: Sure.
(Whereupon, witness remotely sworn.)
THE STENOGRAPHER: Thank you.
MR. THOMAS MORRISSEY: This is the deposition of Eric Davis taken to two different notices. One is a Notice for Mr. Davis's appearance individually, and the other is a Notice under Rule 30(b)(6) to have him testify in regards to certain matters.
WHEREUPON:

**ERIC DAVIS**

called as a witness herein, having been first remotely duly sworn, was examined upon oral interrogatories and testified via videoconference as follows:

**EXAMINATION**

**By Mr. Thomas Morrissey:**

Q Mr. Davis, I'm showing you a document which is Exhibit 406.

Do you have that in front of you?
A 406 . . . Did you put it on the screen or . . .
Q I think that those documents have probably been e-mailed to you. They were provided to your counsel.
A Sure. I have a lot of documents. I'm not sure I can see which one is 406.
THE WITNESS: Jack, is that -- Which one is he referring to?
(No response.)
BY THE WITNESS:
A Jack seems to have dropped off.
Are you talking about the 30(b)(6) Notice?
BY MR. THOMAS MORRISSEY:
Q That's the 30(b)(6) Notice, correct.
A Okay, yeah. I have that, but it's not labe- -- it's just labeled as "NOD Cook County Representative for 2021.10.29."
Is that the one you're talking about?
Q We're going to -- Why don't we hold off a moment? I think your attorney isn't on the

line.
MR. THOMAS MORRISSEY: Jack, are you --
THE WITNESS: It looks like his name is on the screen.
MR. BENTLEY: I'm here.
THE WITNESS: Is that the 30(b)(6) Notice, Jack? He's saying Document 406 --
MR. BENTLEY: Yes.
THE WITNESS: -- I think he said. Okay.
BY THE WITNESS:
A Yeah. I have that.
BY MR. THOMAS MORRISSEY:
Q All right. So that's Exhibit No. 406.
A Okay.
Q It's three pages with exhibits. One is an exhibit -- Exhibit 1 is a Fiscal Year '18 Capital Business Case?
A Yes. I have that.
Q That's a six-page document . . .
THE STENOGRAPHER: I'm sorry, Tom.
I'm having a little bit of a hard time hearing you. And, also, I could only see the

top of your head.
(Brief pause.)
THE STENOGRAPHER: There you go.
BY MR. THOMAS MORRISSEY:
Q Included in Exhibit 406 are certain exhibits --
A Yes.
Q -- including a Capital Business Case for --
A Yes.
Q I believe that's the document that's attached.
A Right. I have that.
Q Okay. Are you being produced by Cook County to respond to any of the topics in -- in the Rule 30(b)(6) Notice?
A I believe I am.
Q Which topics are you prepared to testify on behalf of Cook County?
A I'd have to refer to counsel on that because I don't remember which ones --
MR. BENTLEY: Per our agreement, Tom, I'm presenting Mr. Davis as our 30(b)(6) designated witness for Topics No. 1, No. 5, and Nos. 7

through 11.

BY MR. THOMAS MORRISSEY:

Q What I'd like to do, before we get to those topics covered by the Rule 30(b)(6) Notice, I would like to ask you certain questions outside the scope of the -- of that notice.

A Okay.

Q First of all --

MR. BENTLEY: And just so I can make my record, anything he -- any question that's asked that he answers outside of the scope of this Notice is his answer as an individual witness in the case.

Go ahead.

MR. THOMAS MORRISSEY: Okay. When we get to my 30 (b)(6) questions which he's designated for, I'll alert Mr. Davis to that --

MR. BENTLEY: Okay.

BY THE WITNESS:

A Great.

MR. THOMAS MORRISSEY: -- so we're clear on that topic.

MR. BENTLEY: Thank you.

BY MR. THOMAS MORRISSEY:

Q Mr. Davis --

A All right. Thank you.

Yes.

Q -- can you identify your current position with Cook County?

A Sure.

I am the Deputy Director of the Cook County Department of Capital Planning and Policy.

Q How long have you held that position?

A I started in that position in April of 2017.

Q I'm going to refer you now to Exhibit No. 2 which should be on your screen there. It's Defendant Cook County's Answers to Plaintiff's First Set of Interrogatories.

A Number -- Is there an exhibit number on it?

Q It's Exhibit No. 2.

A Oh.

MR. BENTLEY: Tom, did you need me to send all of this stuff to Eric? Because there was a lot of documents you sent. I -- I didn't send him the whole set here.

MR. THOMAS MORRISSEY: Yeah. I --

MR. BENTLEY: Are you not able to share your screen?

MR. THOMAS MORRISSEY: No. I'm not able to share the screen, but I asked you to share it with your client, or Pat did, so --

BY THE WITNESS:

A I'm looking through to see if I have it.

MR. BENTLEY: Hold on. Let me just pull it up, and I'll just -- I'll just share my screen for each exhibit. It will go way easier than me just trying to send all this to you.

Just give me a minute.

THE WITNESS: Okay.

(Brief pause.)

BY MR. THOMAS MORRISSEY:

Q Before we discuss Defendant Cook County's Answers to Plaintiff's First Set of Interrogatories, let me ask you a general question.

In preparation for this deposition, what -- what did you review?

A Oh, gosh. Let's see.

For this -- I'd have to -- I'd have to qualify that by saying that I'll do my best

to -- to recall. I have another deposition next week, so if I'm confusing -- a different matter, I believe, so if I'm confusing the two, I apologize in advance.

I have -- Let's see. For this one, I had gone through -- well, the information provided by you all. I have gone through -- Let's see. Which one? Oh, that was the other one because there an e-mail search that was with BOT.

I had gone through documents of the facility, Cermak, the Cermak Health Services building. I had gone through --

Q Let me ask this --

A -- in some cases e-mails.

Q Let me -- Let me stop you.

A Okay.

Q What documents did you review in regards to the Cermak building in preparation for today's dep?

A Well, as I said, I've gone through the documents provided, you know, by you, things like, you know, meeting minutes from various meetings and various correspondence.

I've gone through drawings of the

building. I've gone through -- in some cases reprints of e-mails, that sort of thing.

Q And just to correct you, I haven't sent you any documents directly, nor has anybody else --

A Oh, I'm sorry. It would have come through Counsel. Excuse me. I know you haven't . . . Sorry.

Q In addition to the items you mentioned in regards to the Cermak building, what other documents have you reviewed in preparation for today's deposition?

A I think the things that I've been reviewing for this deposition about the Cermak building are documents about the Cermak building.

Q If --

A You know, they may have been things like, you know, minutes of a meeting that included the Cermak building, and it was -- there was a bunch of other stuff in there, for example, that kind of thing. I'm not quite sure what you're asking.

Q You've previously been deposed by my office in other ADA-related litigation, correct?

A Yes.

Q And do you recall that you were deposed on December 19th, 2019, in a case titled Spence versus Dart?

A I think -- I assume you're correct about the date, yeah. I was deposed, yeah, before.

Q Have you reviewed the transcript from that deposition in preparation for today's deposition?

A Yeah. I think that actually referred to Cermak also, so yeah. I believe -- I have not read it in its entirety, but I've skimmed through it.

Q When was the last time you reviewed your testimony that you gave on December 19th, 2019?

A Within the last few days.

Q Is there anything from your testimony on December 19th, 2019, in the deposition transcript in Spence versus Dart that you would like to change, any of your responses that you feel that, now that you reviewed it, you need to change?

A I don't think I read it with the idea of that in mind, just sort of skimming it to

refresh myself. I don't think that I reviewed it in sufficient -- you know, sufficiently specific to identify if there were things that may or may not have been, you know, better said a different way or additional information or anything like that.

Q Do you recall in the deposition on December 19, 2019, you were asked questions in regards to what we now refer to as the Cermak ramp?

A Yes.

Q And you gave certain responses whether or not it complied with the ADA?

A Okay. I don't -- I actually have that document in front of me. If you want to refer to a specific page, I can go through it with you.

Q I believe it's an exhibit to this dep. Let me see if I can find it. It's going to take me a moment. It's 90 pages, so I just, you know . . .

(Brief pause.)

BY THE WITNESS:

A There's something on, it looks like, Page 15.

BY MR. THOMAS MORRISSEY:

Q Let me pull it up.

(Brief pause.)

BY MR. THOMAS MORRISSEY:

Q If we look at Plaintiff's Exhibit No. 404, I believe it's the transcript from the proceeding on December 19th, 2019.

(Whereupon, Plaintiff's Exhibit No. 404, previously marked, was referenced.)

BY THE WITNESS:

A Okay. Yeah.

BY MR. THOMAS MORRISSEY:

Q And I would -- I would call your attention to -- to Page 53 when you discussed the Cermak ramp drawing that was prepared by Ellen Stoner.

(Brief pause.)

BY MR. THOMAS MORRISSEY:

Q That would be Page 53 --

A Yeah. I see what you're saying. It's 53 on to 54, yeah.

Q Questions 8 through -- it carries over to 54 --

A Correct.

Q -- to the first --

A Yeah.

Q -- first page.

Do you agree with that statement if the ramp -- the Cermak ramp that we're discussing is more than forty -- is 47-feet long that there needed to be a landing?

A As it says in the transcript, the critical element is 30 inches of rise, and that's based upon an assumption of a 1:12 slope and, as you know and it says there, I'm referring to a document by, I think, the AltusWorks or from Ellen, that's based on the assumption of a 1:12 ramp. Okay? And so that's what that's referring to.

The ramp in question is shallower than 1:12 slope, but I understand why they made that assumption in that document -- in that document that you're referring to there.

Q Do you stand by the statement you made on December 19th, 2019 --

A Let me reread it. I just want to make sure that I'm clear about this.

Q Sure.

(Brief pause.)

BY THE WITNESS:

A Okay. Relative to the first part, it

says -- and quoting my own testimony, it says, "Well, assuming, as this document says, that the ramp in question is a 1:12 slope, that would yield a total ramp length of 47 feet."

That actually is -- The assumption is not correct, and I'm saying that's an assumption made by them, not an assumption made by me, that that calculation was based upon an assumption of a slope of 1:12.

But then if you note after that, I state, "I believe the standard in place at the time required there be a landing if it was more than" -- and I corrected myself -- not 30 feet -- "30 inches of rise, which would mean" -- in other words, meaning in the context of a 1:12 ramp, there would more than 30 feet without an intermediate landing.

And I'm adding or clarifying that, I guess I would say, that that is -- when you talk about the assumption, that is an assumption that appears to have been made by Ellen and/or her firm that the ramp was 1:12.

I can understand why she would make that assumption because you're not able to --

the ramp is enclosed by walls, and so you can't readily measure how high it goes. But, in fact, actually, the ramp is shallower than that.

So in other words, the 30 feet of run is not a limitation requiring an intermediate landing. And so if the ramp is 1:12, it wouldn't go more than 30 feet of rise. But we know that the ramp is shallower than 1:12, meaning that you don't have to have an intermediate landing.

So with that said, I guess I could stipulate that, yeah. It appears that this is -- what I said is -- is accurate.

BY MR. THOMAS MORRISSEY:

Q Well, let's get back to basics.

Did you go out . . .

THE STENOGRAPHER: I'm sorry, Tom. I can't hear you.

BY THE WITNESS:

A I'm sorry. You're breaking up. It's hard to hear you.

BY MR. THOMAS MORRISSEY:

Q I'm sorry.

Have you ever inspected the ramp that leads from Cook County Jail to the Cermak

infirmary?

A I think I might have walked down it once. As far as inspecting, I couldn't say I've inspected it.

Q Did you ever conduct any measurement of --

A I did not, although I know measurements have been taken, but I did not do them personally.

Q Well, let's look at Interrogatory -- I'm sorry -- Exhibit No. 2. It's the Defendant -- Again, it's Defendant Cook County's Answers to Plaintiff's First Set of Interrogatories.

A Okay.

MR. BENTLEY: I'm going to share the screen. Just give me a minute.

THE WITNESS: Okay.

(Whereupon, Exhibit No. 2 was displayed via screen-share.)

MR. BENTLEY: Can everybody see?

THE WITNESS: Yeah. I can see. Sure.

BY MR. THOMAS MORRISSEY:

Q Were you asked to respond to these Interrogatories on behalf of Cook County?

A I believe I was. It appears that that is something, yes.

Q What is a horizontal projection or run of a ramp?

A Well, in layman's terms, it's the length.

Q Turning to Interrogatory No. 5, "Identify" --

A Okay.

Q And you responded to these Interrogatories on behalf of Cook County, correct?

A I don't recall in which context they were answered. I would have to refer to counsel.

Q Well, if you look at --

A As you know, today we're talking about both me speaking for the County and me speaking for me, and I couldn't say off the top of my head in which context I was answering on which of these.

Q Well, I'm not asking --

A I apologize. I'm not an attorney. I don't, you know . . .

Q All right. I'm not asking you questions in regards to the Rule 30(b)(6) --

A Okay.

Q -- Notice currently. I'm asking individually.

And if we look at the Answers to Plaintiff's First Set of Interrogatories, No. 1 --

A Yes.

Q -- "Identify, by [the] name and title, the individual or individuals who responded to each" of these interrogatories."

A Okay.

Q The answer is you.

A Okay.

Q Okay. So I'm --

A All right. And, again, I'm only -- I'm only clarifying that, Mr. Morrissey, just because of the 30(b)(6), I don't entirely understand, so I just want to make sure I'm answering clearly.

Q Now, Interrogatory No. 5 in Group Exhibit 2 --

A Okay.

Q -- asks "Identify the 'horizontal projection or run' of the ramp in the lower level Cermak that is the subject of the Court's Rule 23(b)(2) certification order, Docket 62" --

A Yes.

Q -- "Memorandum" --

A Okay.

Q And the answer, "On information and belief 43 feet [and] 11 inches."

A Okay.

Q "However, the answer to this question depends on how the ramp is measured."

A Right.

Q How did you determine, as the person responding to these interrogatories, that the length of the ramp, or the run of the ramp, was 43 feet, 11 inches?

A I believe that was from an excerpt of a working drawing which is a plan view. If you can imagine a triangle in section and then there's a ramp, if you're measuring on the horizontal, it could be, let's say, approximately 43 feet, 11 inches; however, if you measured on the hypotenuse, it might be 47 feet, which I think it's referring to.

So if you're measuring it in the plan drawing, the sort of horizontal projection, if you will, then that would be 43 feet because that's

what it shows up in a plan.

If you're running a tape measure down the actual run of the ramp, it might be 47 feet. I'm just guessing here. As I said, I haven't taken a tape measure to it myself, but that would explain why there'd be a difference between the way it shows up in plan and the way it shows up if you measure, you know, where the 47 feet is.

Q Were you asked by Cook County to measure the length or run of the ramp?

A No.

Q What documents did you rely on in determining, in part, under one theory, that the ramp -- the run of the ramp was 43 feet, 11 inches?

MR. BENTLEY: Objection. Asked and answered.

You can answer.

BY THE WITNESS:

A Yeah. This is from '19, so I'd have to go back and -- It probably was in response to the plan drawing that was -- I think it was actually -- There's a piece of it here on the screen now, which I think also included a plan drawing. That probably was in relation to that.

BY MR. THOMAS MORRISSEY:

Q When you refer to --

A It's says "E: Cermak Ramp," and then I think there was a drawing attached to that.

Q I'd ask you -- Well, let me ask you to look and turn Exhibit 403 for a moment.

MR. BENTLEY: I'll just pull up the exhibits just going forward because I have them all here, and it's way easier to do that and share my screen as long as everyone is okay with that.

THE WITNESS: Yeah. That's fine.

(Whereupon, Exhibit No. 403 was displayed via screen-share.)

THE WITNESS: I don't -- If you can still hear me, my screen -- Now, I can't see the people.

Can you hear me? Oh, now, you're back. Okay. That's why I went by phone. For a moment there, your pictures disappeared.

BY MR. THOMAS MORRISSEY:

Q 403 is a two-page exhibit. The first page looks like there's some design drawings. The second --

A There you go.

Q The second page --

A Yeah.

Q -- has some names of some different firms on it.

Do you see that?

A The second page --

Q It's titled --

A -- of it has the -- has the revision list, yeah.

Q It has A-100B. It's the second page.

A Oh, down at the bottom, yeah. I think that's the sheet number, yeah.

Q And it has -- It says, "Basement Floor Plan Area B."

A Yes.

Q Did you, at the request of your attorney, produce this document?

A Yes.

Q Where did you find this document?

A I was able to find documents through the Department of Facilities Management, which I didn't realize until recently had sets of drawings for the building. And this is -- These are photographs of some of the drawings of the original

building, of the building when constructed.

Q Do you know if there was an architectural firm that was retained for the construction of the Cermak building?

A Offhand, I know Ellerbe Becket was one of the designers. I don't remember what the other firm was.

Q Looking at --

A It's on the "Title" block.

THE WITNESS: If you -- Jack, if you can scroll down, there's a third image I think I sent you. I think that has the "Title" block.

(Scrolling.)

BY THE WITNESS:

A Yeah. Epstein was -- Yeah. Okay. A. Epstein & Sons and Ellerbe Becket. Ellerbe Becket would have been the -- what you might call colloquially the design architect, but Epstein & Sons would have been the Architect of Record.

BY MR. THOMAS MORRISSEY:

Q The drawings produced --

A Yes, sir.

Q -- are those the actual construction

drawings for the Cermak building?

A So -- Okay.

Q Because on -- on the second page, it's Basement Floor Plan --

A Well, I'm attempting to answer your question because --

THE STENOGRAPHER: I'm sorry. Can I interrupt here for a second?

Eric, can you just try to take a pause after Tom asks the question? Because there's a lot of interrupting --

THE WITNESS: Oh, I'm sorry.

THE STENOGRAPHER: -- and it's just going to be a choppy transcript. That's all. I don't mean to interrupt.

Okay. Go ahead.

BY THE WITNESS:

A I wanted to respond to Tom's question about construction drawings because the term "construction drawings" is a bit of a misnomer. It is -- The construction drawings in the architectural profession are provided to the contractor to communicate the architect's intent.

Sometimes there are changes that

get made during construction for any number of reasons, and sometimes the contractor will generate what's called shop drawings.

Those shop drawings for different elements can be the elements that the building is actually constructed from. An example would be steel. Okay. Let's say I'm building a steel superstructure. The architect and the structural engineer communicate their intent.

The fabricator doesn't build it from those drawings. They actually make their own shop drawings and say, "Is this what you meant?" and they build them from that.

Now, that said, in colloquial terms, are these the construction drawings? Yes. These are the construction drawings.

BY MR. THOMAS MORRISSEY:

Q Looking at the diagram on the first page of Exhibit 403, on the right-hand side, is that a configuration by the designer, by the architectural firm --

A Yes.

Q -- in the 1990s when --

A Yes.

Q -- the Cermak building ramp was built?

A Right. That appears to be, yes.

Q And looking at that diagram of what --

A Yes.

Q Throughout this dep, we're going to refer to the ramp as the "Cermak ramp."

And --

A Yes.

Q -- if I use the term, you understand it's the connection between the Cook County Jail's tunnel to the Cermak infirmary building at the Cook County Jail?

A Correct.

Q Looking at that diagram of what appears to be the Cermak ramp, does --

A Yes, sir.

Q -- it indicate the length of the ramp?

A Yes. Again, with the -- the stipulation that what you're talking about is the horizontal projection, it indicates a design intent of 43 foot, 10 inches.

Q And you mentioned that another dimension, not the horizontal dimension, but a different dimension would reflect that the ramp --

A Right.

Q -- was 47-feet long, correct?

A And, again -- Correct.

And as I mentioned, I haven't -- I have not measured myself, but I am assuming that that 47-foot dimension would have been measured along the ramp itself, which would be a slightly longer dimension because it's the hypotenuse of a triangle.

Q For purposes of the 1991 ADA standards --

A Yes, sir.

Q -- do they use --

A Yes.

Q -- the horizontal measurement which you say, according to this design drawing, was 43 feet, 10 inches, or the actual length of the ramp, which you mentioned is 47 feet?

A Actually, other than the exception for curb ramps, it appears, from my reading recently and years past of the ADA, that the stipulation was not the horizontal dimension but, rather, the vertical dimension.

In other words, the limitation,

as we discussed in the testimony previously, is 30 inches of rise; that if you have a section of ramp that rises more than 30 inches, you're required to have an intermediate landing.

That ramp can be of a slope in between 1:12 and 1:20. If it's shallower than 1:20, it's not actually even considered a ramp. But if a ramp is a 1:12 pitch, which means for every inch you go up, your ramp is horizontally 12-inches long, from that kind of a slope to a 1:20, for every inch you go up, it's 20-inches long. If it's a 1:12 ramp and you're rising 30 inches, the ramp would be 30-feet long. If it's a 1:20 slope, the ramp would be 50-feet long to achieve a 1:20 pitch.

So a ramp to be compliant to rise no more than 30 inches would need to be someplace between 30-feet long and 50-feet long. The ADA does not specify that it cannot be more than X -- less than X or more than Y. It is about the slope of the ramp and how high it's going.

So to your question earlier, whether it's 43 feet or 47 feet, as long as it's between 30 and 50 feet, it doesn't really matter.

What matters is, is it rising more than 30 inches in one single run.

Q If it does exceed a 30-inch run, does that --

A Yes.

Q -- require a . . .

A I'm sorry?

Q If the rise of the ramp exceeds 30 inches --

A Yes, sir.

Q -- does that require a landing -- a maximum run of the ramp to be 30 feet?

A No, only if the ramp's slope is 1:12. So a limitation is not a horizontal limitation. It's a vertical limitation, as long as it's within the slope parameters.

Q Did you --

A The assertion -- The assertion was made earlier in the Stoner document that says if it's a run longer than 30 feet horizontally, that it needs to make an intermediate landing, is based upon the assumption that the ramp is a 1:12 pitch.

This ramp is shallower than that. It's allowed to be shallower than that. The

limitation in the -- in the ADA is a rise of 30 inches, not a run of 30 feet, so . . .

And I -- And I suspect that that evaluation was made by Stoner and/or her colleagues because they didn't have the ability to measure the rise vertically, and so they had to operate on the assumption that it was 1:12.

Since then, and I believe counsel has provided that to you, we have had done a laser measurement of the ramp's height, and it is a 30-inch rise, meaning it does not have to have an intermediate landing.

I would also note that the drawing that you're showing --

THE WITNESS: If you can scroll down just a little bit, Jack, on that image --

(Scrolling.)

THE WITNESS: No, no, just a tiny bit, looking at the top . . .

(Scrolling.)

THE WITNESS: Go up a little -- Go up a little bit more.

(Scrolling.)

THE WITNESS: There you go. Stop.

BY THE WITNESS:

A All right. So at the bottom of the ramp, you'll see a notation that says, "EL.0.17 CCD." That means --

BY MR. THOMAS MORRISSEY:

Q I don't --

A At the bottom of the image he's showing there.

But at the bottom of the ramp, there's a note that says "EL.017 CCD."

Can you see that, Mr. Morrissey?

Q I don't see that, no.

You're looking at the configuration of the ramp --

A Yes.

Q -- correct?

A Yeah.

And that is -- that is a spot that is tied to the surveyor that says, "We want the bottom of this ramp to be .17 CCD. "CCD" means "Chicago City Datum." That is a standard reference in the City of Chicago that traces all the way back, believe it or not, to the southwest corner of the -- of the Northern Trust Bank building on

LaSalle Street. So that sets the height that you want to have.

Then if you look at the top of the ramp, you see, "EL.2.67 CCD." That means that the top of the ramp should be two and two-thirds feet above the Chicago City Datum.

When you take 2.67 and you subtract .17, you get 2.50, which is two and a half feet, which is 30 inches. That tells me, as an architect, that the intent was that the rise of that ramp was to be 30 inches.

That 30 inches is the limitation. If it was higher than that, then it would need to have an intermediate landing. But because it is 30 inches of rise, it is required to have it as long as the slope is correct, and we know the slope is correct because the run of it is not longer than 50 feet.

That tells me that that from this section of the ramp, it -- in fact, it doesn't have to have an intermediate landing. But as I mentioned, I suspect because they didn't have the ability to measure the height that they were operating under the assumption -- that Stoner and

her group were operating under the assumption that it was a standard 1:12 ramp. And, in fact, it's actually shallower or easier to get up than a 1:12 ramp.

Q You mentioned that 403 is just -- isn't the actual measurements of the ramp. This is something that was design- -- when designed by Ellerbe Becket, you say those dimensions were on the drawing, correct?

A Those dimensions are on the drawings. As I indicated, that's a true horizontal dimension. And, again, I suspect that the -- I haven't done the trigonometry, but I suspect that the 47 feet would be the -- the length if you -- if you laid it out.

Q But Exhibit 403, the drawing of the ramp, isn't an exact dimension of the current physical ramp at Cermak?

A I have no -- I have no reason to suspect that it's materially different.

Q Have you, on behalf of Cook County, gone out to measure the rise of the ramp?

A As I said, the only way to measure the rise of the ramp is with a laser sight. And

someone else did that, and I reviewed it. The rise of the ramp was done with a laser sight, laser level, and it's 30 inches on the nose, which is what the design drawings show.

Q Was there somebody at your direction that measured the rise of the ramp?

A I don't know how the gentleman who measured it did that. I'd have to retrace and figure out, you know, or contact him or whatever. But that's somebody working for Cook County that did it, and he uses that tool every day.

Q Was it done at your direction?

A I don't recall directing him to do so. It may have come indirectly from me, or it may have been something that, for example, the Sheriff asked them to do.

As you know, the Sheriff operates the facility, so . . . And they are in contact with DFM all the time. They may have asked for it.

Q Do you know the name of the person that allegedly --

A Yeah.

Q -- measured the rise?

What is the -- He hasn't been

disclosed by -- by defense counsel. That person hasn't been disclosed by defense counsel to us.

A Hang on. Hang on. I don't know that that's true. I want to provide you with complete information here.

(Brief pause.)

BY THE WITNESS:

A The person that did that measurement appears to be Joe Merkel, who was a plumber foreman.

BY MR. THOMAS MORRISSEY:

Q How do you spell his last name?

A M-e-r-k-e-l.

Q And you say he's a plumber for the Sheriff's Office?

A No, for the Department of Facilities Management.

Q Department of Facilities Management.

His title is plumber?

A I believe his title is plumber foreman.

Q And do you know when Mr. Merkel did a measurement of the Cermak ramp?

A On or about March 10th of this year.

Q 2021?

A Correct.

Q Does Mr. Merkel have a degree in architecture?

A I don't know if he does or not.

Q Did you direct Mr. Merkel to make a measurement --

A No.

Q -- of the Cermak ramp?

A No.

MR. BENTLEY: Let Tom finish the question before you give the answer, Eric, even if you know where he's going with it.

THE WITNESS: I'm sorry.

MR. BENTLEY: It's just -- It's really hard with the -- With the Zoom and the court reporter, we've got to just --

THE WITNESS: Okay.

MR. BENTLEY: -- take a pause after every question.

THE WITNESS: All right. Thank you.

BY THE WITNESS:

A I'm sorry, Mr. Morrissey.

Go ahead.

BY MR. THOMAS MORRISSEY:

Q My question is, at your direction, did Mr. Merkel, Joe Merkel, measure the Cermak ramp to determine whether it complied with the ADA standards?

A I did not direct Mr. Merkel, no.

Q Do you know who might have directed Mr. Merkel to do a measurement of the Cermak ramp on March 10th, 2021?

A I'm hypothesizing, but I would assume he'd get direction from one of the managers from the Department of Facilities Management.

Q Do you know the professional qualifications of Mr. Merkel in regards to the Americans with Disabilities Act to measure compliance with the 1991 or 2010 architectural design standards?

A I can't stipulate to his qualifications, so I guess the short answer is no; however, it appears from the information provided that he is using a tool in the form of a laser level that he is highly qualified to use.

Whether or not his evaluations of the -- of the ADA, I -- I don't know if he is or

isn't, you know, sufficiently knowledgeable to make any kind of conclusions.

Q What is a laser level?

A It's a device that's used by various trades to ensure that things that are installed are level.

In the case of a plumber foreman, for example, since plumbing is intended to convey water, you want to know whether pipes are level when you're setting them up or if they have adequate pitch to properly drain.

They're also used in construction trades to fabricate a ceiling like the -- The lay-in ceiling behind you there in your office, Mr. Morrissey, is set with a laser level. So it's a fairly common implement in the construction trades.

Q You weren't present when Mr. Merkel --

A No.

Q -- did these drawings?

Did you get a copy --

A I'm sorry. I'm sorry. I interrupted you. Go ahead. Finish your question.

Q Did you get a copy of -- Did he do a

drawing for you or for the Department of Facilities Management?

A I'm sorry. I wasn't quite able to hear you.

Q Did he do any type of rendering or drawing in regards to the Cermak ramp?

A I don't know if he did a drawing or not. I haven't seen anything from him. All I've seen is the information relative to his laser measuring.

Q Did you receive a report from Mr. Merkel?

A He copied me on the transmission of this -- of these laser measurements.

Q Who else was -- Was that an e-mail, or was that a --

A It was an e-mail. And I apologize. I want to speak to counsel.

THE WITNESS: I thought this was material that the Plaintiff's counsel had already.

Jack, is this something -- I was under the impression this was something they already have.

MR. BENTLEY: I gave them photographs

of this laser measurement. I didn't get anything else from you about it, though, Eric.

THE WITNESS: Okay.

MR. BENTLEY: That's all I got.

So if there's more -- If there's more that's connected to this, then I need to get it to counsel, so . . .

THE WITNESS: Okay.

BY MR. THOMAS MORRISSEY:

Q What I'd like to --

THE WITNESS: Yeah. I thought I had sent -- Those photos came from an e-mail, Jack, and I thought I had sent you the e-mail as well.

MR. BENTLEY: No. But that's okay. I'll make sure we get it as soon as we're done here.

BY MR. THOMAS MORRISSEY:

Q Well, do you have a copy of it in front of you, Mr. Davis?

A Yeah.

Q Yeah. I'd like to -- to review that document right now.

A Do you want me to put it on the screen for you?



MR. BENTLEY: Send it to me first. I need to just make sure there's nothing --
THE WITNESS: You sent it to me at 1:29, Jack.
MR. BENTLEY: I sent you an e-mail from Joe Merkel?
THE WITNESS: Yeah.
MR. BENTLEY: At 1:29?
THE WITNESS: You sent me an e-mail at 1:29 that includes the e-mail, yeah.
(Brief pause.)
THE WITNESS: I was under the impression --
MR. BENTLEY: Okay. Well --
THE WITNESS: -- that I sent it --
MR. BENTLEY: -- I guess I --
THE WITNESS: I had the impression --
THE STENOGRAPHER: You're talking at the same time.
THE WITNESS: Sorry.
MR. BENTLEY: I will send this e-mail to Mr. Morrissey right now.
Tom, if you want to keep going with your questions, I'll get this to you

momentarily.
MR. THOMAS MORRISSEY: We'll take a five-minute break. Can you send it to me? And I'll take a look at it.
MR. BENTLEY: Yep.
(Whereupon, a brief recess was had.)
MR. THOMAS MORRISSEY: Ms. Court Reporter, we're going to go back on the record.
I'm going to mark a series of documents that Mr. Bentley just e-mailed me as Group Exhibit 406.
(Whereupon, Group Exhibit No. 406 was marked for identification.)
BY MR. THOMAS MORRISSEY:
Q And the first page of Group 406 is an e-mail from David Theising to Eric Davis --
A Can you hear me okay? It cut out.
Q -- drafted by Altus --
A My video froze again.
Q I think it was March of 2021. Is there anything that says . . .
THE WITNESS: Kelly, can you hear me

okay?
THE STENOGRAPHER: Yes. I can hear you.
THE WITNESS: Okay. Thank you.
(Whereupon, a discussion was had off the record.)
BY MR. THOMAS MORRISSEY:
Q Mr. Davis, looking --
A Yes, sir.
Q -- at that e-mail from David Theising to you, David Theising is with STV, correct?
A He is with the STV/CBR -- CBRE Heery Joint Venture, which is our program manager for the Public Safety Portfolio, yes. He's a consultant of the County.
Q And he's a consultant in regards to projects, including the projects at Cook County Jail, correct?
A Correct.
Q Okay. And below that appears to be the -- the notes by Ellen Stoner from her walkthrough on -- in March of 2019, correct?
A I think it's 2018, but yes.
Q And you're familiar with -- with those

notes, correct?
A I'm familiar with the notes, yes.
Q Do you disagree now with Sheila -- with Ellen Stoner's conclusion that the run exceeds Code requirements?
A Yes. But I think I know -- I think it's because it's based on incomplete information, information they did not have.
Q Do you -- To your knowledge, no other architect has gone out to measure for ADA compliance the Cermak ramp?
A I'm not aware of anybody else having done that on our behalf, no.
Q Why have you not gone out and looked at and measured the Cermak ramp given that you're being produced by the County in part as a Rule 30(b)(6) deponent and are the Deputy Director of Capital Planning and Policy? Why haven't you gone out to examine and inspect the Cermak ramp to see why it's -- to see if it's compliant or not with the ADA?
A Because I have no reason to suspect that their measurements are wrong. My disagreement with the conclusion is based upon what they write

about the measurements. I don't -- I don't need to go put a tape measure to it to understand the difference between what they're asserting and what I believe to be case.

Q So you don't think it's necessary to formulate an opinion in regards to the compliance of the Cermak --

A I didn't say that.

Q Well, let me --

MR. BENTLEY: Let him finish. You've got to let him finish --

THE WITNESS: I'm sorry.

MR. BENTLEY: -- his question.

THE WITNESS: I'm sorry. I did it again.

BY MR. THOMAS MORRISSEY:

Q Let me finish --

A I apologize.

Q Are you offering an opinion on behalf of Cook County that the Cermak ramp is compliant with either the 1991 ADA architectural standards or the 2010 standards under the ADA?

MR. BENTLEY: I'm going --

BY THE WITNESS:

A I'm offering --

MR. BENTLEY: -- to object that this is outside the scope of the 30(b)(6) Notice. There's no provision in the Notice that requires this witness to have an opinion as to the compliance of the ramp.

That being said, he can testify as an individual as to whether or not he has that kind of an opinion.

Go ahead.

BY THE WITNESS:

A It's my professional opinion that the ramp, meaning the walking surface, as currently constructed is compliant with the requirements that were in force when the building was constructed.

BY MR. THOMAS MORRISSEY:

Q Were there requirements under the 1991 standards in regards to handrails for a ramp when you -- for a ramp?

A Yes.

Q And what are the requirements? What were the requirements in 1991 and thereafter up to 2010 in regards to the requirements for handrails?

A In general, you are supposed to have handrails along the ramp or stair, including a minimum projection of those rails beyond the end of the ramp. In other words, you're supposed to go -- And I believe that the standard was in place in '91 as well as in the 2010 edition.

You're supposed to extend those -- those handrails 12 inches beyond the end of the ramp at the top and generally approximately two feet -- it's different for a stair than a ramp -- approximately two feet from the bottom of a ramp.

Q And are there specific standards under the 1991 ADA Code regarding handrails for ramps?

A Yes.

Q And what do they require?

A They require a handrail. They say it needs to be -- I believe the dimension is a nominal inch and a half in diameter and a nominal inch and a half from the surface of a wall.

They are to be typically 30 inches above the walking surface and measured vertically. They are -- There are other stipulations, depending on what the side condition

of the ramp is, and you have to, then, also have guardrails which don't apply in this case.

Q Does the Cermak ramp have handrails that comply with either the 1991 or 2010 standards?

A From the photographs and my recollection, they are not handrails. They are bumpers.

Q So my question, then, is, does the ramp -- did the Cermak ramp, when it was built in 1994 or 1995, comply with the ADA standards of 1991, when it was built?

A From the in- -- If you're asking a question about the ramp and the handrails, from the information that I have, it appears that the handrails were not compliant.

Q And you haven't -- So at a minimum, it's your understanding that the ramp would have to be modified in order to comply with the 1991 standards in order to handrails -- in order to have handrails, correct?

A To be clear, the handrails would need to be provided. The ramp itself is fine.

Q But you're basing that on -- on a document you received apparently from a plumber

working for Cook County, correct?

A All that the documents that you're referring to from the plumber does is verify the information on the design drawings. The design drawings indicate a ramp that was compliant, and it appears that it is constructed as such.

Q Going to the next document in Group Exhibit 406, and it's a document -- The next document is from you to a Timothy Tyrrell, facilities manager, on March 9th, 2021.

A Okay.

Q And its "Subject" is "Cermak ramp."

And who is Mr. Tyrrell?

A Timothy Tyrrell is one of the managers on-site there at the Department of Corrections campus for the Cook County Department of Facilities Management.

Q And did you attach a diagram of the 1991 standards for a ramp?

A I don't think I put that on there. I don't remember if I did --

THE WITNESS: Can you pull that up?

BY THE WITNESS:

A I don't think I put that on. I think

someone else may have, and I was just responding to it. I don't recall.

(Brief pause.)

MR. THOMAS MORRISSEY: Is it on the screen? Jack, are you putting that on the screen?

MR. BENTLEY: I'm putting it up. Just give me a second.

(Whereupon, document was displayed via screen-share.)

MR. BENTLEY: Okay.

BY THE WITNESS:

A Okay, yeah. That might have been -- Yeah. All right.

BY MR. THOMAS MORRISSEY:

Q Do you recognize that diagram which was --

A Yes.

Q -- attached apparently to your e-mail?

A Yeah, I do.

Q What does that diagram depict?

A It's depicting a Code-compliant ramp.

Q And does it have the required handrails?

A It appears that they are. I can't see

the whole image in this -- in this case. I don't know if he has sufficient overrun at the bottom, but it appears to, in general, have that, yes.

Q Does this diagram come from the 1991 standards?

A I think there's actually a -- It's from the Access Board. If you note at the bottom, there's a URL. I believe it's generated by the -- by the Access Board, which is a federal interpretative agency.

Q And does that reflect the standards for handrails for a ramp that existed at the time the Cermak building was constructed?

A I believe so, yes.

Q And based upon your understanding of the Cermak ramp as it exists today, in 2022, the ramp does not have the handrails which are required, correct?

A To be clear, the diagram is indicating a ramp that does not have sidewalls, and the Cermak ramp does. So what this is showing is handrails that also provide protection so that someone doesn't fall off the sides of the ramp.

Q Well, this --

A In the case -- in the case of -- Let me finish.

In the case of Cermak, since there are walls there, all that would be required is something at hand height, which is nominally 30 inches above the surface.

So is this the exact configuration of what it's supposed to look like? No, because there are walls on the sides of the Cermak ramp.

Q But are there -- To your knowledge, are there handrails 30 inches from the sidewalls?

A I don't believe there are, no.

Q So the ADA ramp currently doesn't comply with the requirements to have handrails. Is that correct?

A That's what I understand, yes.

Q And I'm looking at an e-mail from Mr. Tyrrell to Zach Pestine on March 9th, 2021, in this Group Exhibit 406, and it says, "The measurements taken were of the ramp from the tunnel to the basement entrance at Cermak. It seems that this is the ramp referenced in the complaint.

"With that being said, I do not

think that either ramp is ADA compliant.

"I am asking -- I'm adding Joe Merkel, as he is the one who took measurements."

Do you see that?

A Yes.

Q Is that the same Joe Merkel you're referring to?

A Yes.

Q And Mr. Merkel works for Mr. Tyrrell?

A Correct.

Q And then we have an e-mail below from Sabrina Rivero Canchola on March 9th, 2021, at 2:00 p.m. to Eric Davis, carbon --

A Yes.

Q -- copy to Timothy Tyrrell, and it's about the Cermak ramp.

And it says, "I believe the litigation in question is asking about the old ramp outside the Cermak basement entrance. I don't believe it has any landings, but I'm not sure if that was required at the time that it was built. Zach, can you clarify what you need? Either way I think it's good to have the measurements of the

RTU . . . ramp as well."

MR. BENTLEY: I'm just going to object to the -- because this was clearly privileged communication.

But that being said, anything substantive that's relevant to the case and within the scope of Mr. Davis's knowledge, you can testify to.

BY THE WITNESS:

A Okay. Is there --

BY MR. THOMAS MORRISSEY:

Q Did you --

A -- a question there?

Q Did you respond to that -- that e-mail from Sabrina Canchola?

A I don't remember if I did or not. There's a chain there. I don't know. Is the next up one something from me? I don't know.

Q Below there -- On Page 5 of this Group Exhibit 406, there's something from -- from Sabrina Rivero Canchola at 2:54 to Timothy Tyrrell, and you're copied on it, "Subject: Cermak ramp." "Thank you very much TJ for your assistance."

Do you know who she's referring

to as "TJ"?

A That's how Timothy Tyrrell is referred to. Everybody calls him TJ.

Q And it says, "Good afternoon. Please see below for requested measurements: Cermak Ramp Measurements, Width 10 feet slope" --

THE WITNESS: Can you -- Can you scroll down? Because I think he's talking to a different part of this, Jack.

(Scrolling.)

THE WITNESS: Okay. Keep going down. I think he's talking about something earlier in the chain.

BY MR. THOMAS MORRISSEY:

Q Are these -- Are these measurements of the Cermak ramp where it talks about "Width 10-feet slope (measured in different locations on [the] ramp) 1:16"?

THE WITNESS: Scroll down just a bit more, Jack.

(Scrolling.)

BY THE WITNESS:

A Yeah. That's what he's referring to.

BY MR. THOMAS MORRISSEY:

Q Slope (measured in different directions) 1:16; length of ramp 44 feet and a half; total rise two feet, seven inches.

A Yeah.

Q What is meant by "total rise two feet, seven inches"?

A That's the rise. And I think if you look in the other e-mail, there's an explanation of that, and it actually is two feet, six inches.

If you look at the e-mail that has the photographs with it --

Q Well, this --

A -- it indicates that that was -- that was made by the building joints, not made actually measuring with the laser level. It's inexact.

MR. BENTLEY: Just answer his questions directly, Eric, and then let him --

THE WITNESS: Sorry.

MR. BENTLEY: -- follow up with what he wants to know.

THE WITNESS: Sorry.

BY MR. THOMAS MORRISSEY:

Q This is a measurement by -- This is a

communication from Timothy Tyrrell who's in charge of Facilities Management. Is that correct?

A At the DOC, yes.

Q And the measurement he's giving on March 8th, 2021, at 2:54 is a rise of 31 inches, correct?

A Correct.

Q And if the rise is 31 inches, then --

A Yes.

Q -- the Cermak ramp is out of compliance from the ADA?

A That would be correct, yes.

Q Either the 1991 standards or the 2010 standards?

A Correct.

Q And, again, you haven't measured it, correct?

A I have not personally measured it, no.

Q So if the rise is over 30 inches, then the Cermak ramp is not compliant -- compliant with the 1991 or 1992 -- the 1991 or the 2010 standards?

A If -- and I want to emphasize "if" -- that were the case, then yes. It would not be in compliance.

Q And it looks like the next e-mail is from Mr. Pestine to Sabrina Canchola on March 8th asking if -- if anybody's taking measurements of the Cermak ramp, correct?

A That appears to be the case, yes.

Q On the next page, Sabrina Canchola says she's adding Duncan and Mike Carberry to this e-mail.

Who are those individuals?

A Those are other managers of DFM on the 26th and California campus.

Q Do you know what Mr. Duncan's position is? Is it --

A I believe --

Q -- Duncan Smith?

A Duncan Smith. He's one of the deputy directors.

Q Does he have an architectural background?

A No.

Q Does Mr. --

A Not that I'm aware.

Q Does Mr. Tyrrell have either an engineering or an architectural background?

A I don't know if he does or not.

Q Mike Careberry [sic], who is he?

A Carberry.

Q Carberry.

A Carberry is another deputy director.

Q And do you know if he has a professional license as an engineer or architect?

A No, I do not.

Q And Joseph Tse, Joey Tse, is -- Who is Joey Tse?

A Oh, Joey Tse is -- he's part of the STV/CBRE team. He's a project manager, so he works with David Theising.

Q And then this is an earlier e-mail from Mr. Pestine to Sabrina Canchola on March 5th, 2021, asking, "Is there anyone" -- "Is there a way someone can go to the ramp and measure the length, width, and slope?"

Do you see that?

A Yes.

Q Do you know a Mr. Gumm?

A Michael Gumm, I believe you're referring to, used to be the ADA director for the County.

Q Have you reviewed any documents that Mr. Gumm did any type of review of the Cermak ramp?

A I've attempted to find them. I haven't been able to locate them because -- It's an issue with our e-mail system, and I'm trying to get that resolved with our Bureau of Technology.

Mr. Gumm left the County two or three years ago, and so I'm having to try to identify if there were any discussions that he may have had before then because I can't see the older e-mails.

Q So then I'm looking at an e-mail on March 4th, 2021, from Sabrina Rivero Canchola, 11:19, to Sheila Atkins of Capital Planning, you're included on this e-mail.

And it states, "Yes the old ramp that is right outside the basement door. I believe Michael Gumm took measurements at one point."

Do you have any knowledge whether Gumm took -- took measurements of the Cermak ramp?

A I don't know if he did or not. I don't know, you know. I do not know.

Q From this Group Exhibit No. 406, which was just turned over by -- by defense counsel, I



don't see any -- any indication or documentation that the rise of the ramp is 30 inches or less.
Can you point that out for me, where I'm missing . . .
A Certainly.
(Brief pause.)
BY THE WITNESS:
A Okay. There is -- In that e-mail, there is a notation and photographs.
So do you have that in front of you?
BY MR. THOMAS MORRISSEY:
Q I have the entirety.
A There's --
Q I think I went through the entirety of Group Exhibit 406.
A Okay. So there's the e-mail from Mr. Merkel to TJ and Zach and me and Sabrina dated March 10th, 2021, at 12:54 p.m.
Do you see that?
Q I don't have that.
A That's in that e-mail --
Q What --
A -- at the very top.

(Scrolling.)
THE WITNESS: It's not that one, Jack. It's the other one. It's the one that has the pictures, not that one.
(Scrolling.)
THE WITNESS: Yeah. It's not in that one.
BY MR. THOMAS MORRISSEY:
Q So it's not in Exhibit 406, which we just --
A Actually, Mr. -- I believe it is.
If you look at the e-mail, do you see an e-mail from Joe Merkel dated March 19, 2021? It was on the screen earlier, and I think that's what he sent you.
Q I have an e-mail on March 10, 2021, from David Theising -- to to you at 4:02.
A No. That's not -- That's not what I'm referring to.
Q Then there's another one from Joey Tse to David Thistle [sic] at 2:15 or March 10th.
A I saw --
MR. BENTLEY: The bottom line is, the question was, was there anything in the e-mails

that we just reviewed in Exhibit 406 that indicated that the ramp is 30 inches in terms of rise, correct? That's the question.
THE WITNESS: Yes.
MR. BENTLEY: Okay. So what's the answer to that question?
BY THE WITNESS:
A So the answer to that question is -- And, again, I'm referring to measurements taken by Mr. Merkel, and he says, "The total rise changed from approximately 31 inches to 30 inches. I had originally had approximately 31 going off a mortar joint."
And then he indicates that he -- he used the laser to get the exact measurement for the total rise of the ramp and rechecked the measurements of the ramp, and he indicated the math involved, basically from 2 and 5/16ths inches to 32 and 5/16th inches indicating it is spot-on a 30-inch rise.
And then following that text of that e-mail is our images with the laser level confirming the bottom and top dimensions of the ramp which confirms that, in fact, the rise of the

ramp as constructed is 30 inches, not 31 inches.
Q Point me to that document in Group Exhibit 406.
A Are you asking me or Jack?
Q I'm asking either one.
(Brief pause.)
MR. BENTLEY: So what are we doing right now?
MR. THOMAS MORRISSEY: Well, we're waiting --
THE WITNESS: I thought you were looking --
MR. THOMAS MORRISSEY: -- for the deponent to point out where on Group Exhibit 406 the document is what he just said.
BY THE WITNESS:
A Oh, I thought -- I'm sorry. Were you waiting for me? I thought you were waiting for Jack. I was talking --
THE WITNESS: Because, Jack, I saw the image on the screen earlier of the e-mail I'm referring to, and I thought that was something --
MR. BENTLEY: Do I need to share the screen? I need to share the screen again. That's

what you're asking me? Okay. Got it.

THE WITNESS: Because I thought that's what you sent to Mr. Morrissey is 406. And if I'm misunderstanding, I apologize.

(Brief pause.)

(Whereupon, Plaintiff's Exhibit No. 406 was displayed via screen-share.)

MR. BENTLEY: Okay. 406 is back up.

THE WITNESS: Oh, no. That's not the one.

MR. BENTLEY: Well, this is what I sent.

THE WITNESS: Maybe it's in -- Maybe it's in there, so go down. Is this March 9th? No. This is from March 10th. What I'm talking about is from March 10th.

(Scrolling.)

THE WITNESS: This is all older, unless it's at the bottom.

(Scrolling.)

MR. BENTLEY: This is what we just went through.

So what are you looking at, Eric?

THE WITNESS: I'm looking at an e-mail from Joe to TJ on March 10th that actually I -- it originally was an e-mail from me to Joe and TJ that same day.

MR. BENTLEY: Okay. So don't -- Don't read from your -- any more e-mails from your computer.

THE WITNESS: Okay.

MR. BENTLEY: Read them from the exhibit.

THE WITNESS: Okay.

MR. BENTLEY: But now that you've read that into the record, now I have to produce it. So please forward it to me. I'm going to look at it and make a determination if I can produce it.

I've already produced this e-mail with several privileged communications. I'm going to try to do avoid doing that this time.

THE WITNESS: Okay. I've done that.

MR. THOMAS MORRISSEY: We'll go off the record for --

How long do you need, Jack?

MR. BENTLEY: Just two minutes.

MR. THOMAS MORRISSEY: All right.

We'll come back at 3:30.

MR. BENTLEY: Okay.

MR. THOMAS MORRISSEY: And if you can send it to me in the interim, that would be good.

MR. BENTLEY: All right, yeah. I'm doing it.

(Whereupon, a brief recess was had.)

MR. BENTLEY: Just for the record, I am trying to extract -- Because there's one e-mail in this that is between the witness and counsel that is privileged information, I'm trying to extract that e-mail and send the rest. But the e-mail from Joseph Merkel that Mr. Davis just read into the record, I'm going to get that to you as soon as I can figure it out, including the photographs that were in that e-mail that have already been produced.

BY MR. THOMAS MORRISSEY:

Q I'm going to ask you to turn to Group Exhibit, it looks like, 402. There's some photographs.

MR. BENTLEY: Well, I can't do two things at once. I can't share exhibits and try to

extract this e-mail, so . . . Maybe you could learn how to share your screen while we're waiting, Tom.

MR. THOMAS MORRISSEY: We sent the documents to you to send to your clients, so . . .

MR. BENTLEY: Okay. Let me see if this works. All right. I'm just pasting the text of the e-mail. I'll get you a cleaner copy of that later; but for now, this will give you what you need to move on with the dep.

MR. THOMAS MORRISSEY: Can you send it to Pat, Jack?

Can you turn to Exhibit 402 while we're printing what you just sent me, Jack, and put 402 on the screen?

(Brief pause.)

MR. THOMAS MORRISSEY: Do you have the photographs, Jack, in 402?

MR. BENTLEY: Yep.

MR. THOMAS MORRISSEY: Are they being shared with Mr. Davis.

(Whereupon, Exhibit No. 402, previously marked, displayed via screen-share.)

MR. BENTLEY: They're up.
BY MR. THOMAS MORRISSEY:
Q Mr. Davis, I'm showing you a group exhibit. They were produced by -- by the County. It's Bates stamped 016108 through 016114.
Do you recognize these photographs?
MR. BENTLEY: Eric, are you there?
THE WITNESS: Sorry. I had it muted.
BY THE WITNESS:
A Are you talking about the ones that are on the screen now?
BY MR. THOMAS MORRISSEY:
Q That's correct.
A Yes.
Q Do you know --
A I recognize those.
Q Do you know who took the photographs?
A If you scroll up, I believe they were taken by Joe Merkel.
Q Do you know when Mr. Merkel took the photographs?
A I believe on or about the 10th of March, 2021.

Q Were you present when the photographs were taken?
A No.
Q Do you believe these photographs are a fair and accurate depiction of the Cermak ramp in March of 2021?
A Yes.
Q To your knowledge, has the Cermak ramp been altered since March of 2021?
A No.
Q Can you tell me, looking at the picture depicted on 016108, what that depicts?
A If that's the image that's on the screen, this is the bottom of the ramp.
Q If we look at the --
A I think that's the bottom.
Q And that would be for the entrance to the Cermak infirmary, correct, the bottom of the ramp?
A I believe so, yeah.
Q If we look at --
A Yeah. I believe so, yes.
Q If we look at the next photograph, it's Photograph 016109, do you know what that

photograph depicts?
A That depicts the laser level tape measure indicating a dimension of approximately 32 feet -- excuse me -- 32 and 5/16ths inches.
Q Do you know who -- Do you have personal knowledge who -- who was using the tape -- who put the tape measure in the -- in the diagram or the picture?
A I don't know. It's my assumption that it was Joe Merkel or someone at Joe's direction.
Q And what area of the ramp is -- is the measurement of 32 and -- 32 inches and a half being depicted in Photograph --
A If you scroll down, I believe -- If you scroll down, I believe the caption is that it's at the bottom of the ramp. No.
It's at the bottom of the ramp.
Q How do you know that?
A Well, it's described in Mr. Merkel's e-mail as such. So in other words, that's the offset from the bottom of the ramp to the elevation of the laser at the top of the ramp.
Q And would that indicate that the ramp is -- the rise of the ramp is greater than

30 inches?
A No.
Q What would it indicate in regards -- Would it have any -- any bearing on whether or not the rise of the ramp was 30 inches or more?
THE WITNESS: Can you scroll to the other image of the laser on the tape, Jack?
(Scrolling.)
THE WITNESS: That one.
BY THE WITNESS:
A Okay. That is the second measurement.
Can you see that, Mr. Morrissey?
BY MR. THOMAS MORRISSEY:
Q And that's -- You're referring to the picture that's Bates stamped 06111, correct?
A Correct.
Q Okay.
A Right. That's a --
Q Do you know if that's --
A That's a --
MR. BENTLEY: Eric, let him ask the questions.
THE WITNESS: I know. I know. I'm trying to.

BY MR. THOMAS MORRISSEY:
Q It looks like (Webex feed interruption) . . .
THE WITNESS: My video is paused or maybe his is paused.
BY THE WITNESS:
A Can you hear me?
MR. BENTLEY: No, I lost -- Now I lost Tom. It looks like we lost Tom.
THE STENOGRAPHER: He's back.
BY THE WITNESS:
A I'm sorry, Tom.
Could you reask your question?
BY MR. THOMAS MORRISSEY:
Q Sure.
Do you know if you could take a measuring stick --
A Yes.
Q -- and determine the rise of the Cermak ramp?
A No. I don't believe you could.
Q Why not?
A Because you can't measure the side of the ramp because there are walls on the side of the ramp.

Q Okay.
A If you think about -- if you think about -- Let me finish my answer.
If you think about the diagram that you saw -- that you saw earlier that had the ramp and had an open handrail, that one you could measure the height of the ramp with a measuring stick because you could see the side of it, right, and -- because it's open on the sides, and that's why the handrail has additional rails.
But in this case, the walls on the side of the Cermak ramp don't allow you to use a measuring stick from the top of the ramp to the bottom of the ramp.
Q Have you ever attempted to do that?
A It would be physically impossible.
Q Do you know what angle the -- the tape measure is at which is depicted in 06111?
A It appears to be vertical or nominally vertical.
Q How do you know that from looking at the picture?
A Because the bottom of the tape measure has a right angle clip on it.

Q Do you know whether or not the tape -- the angle on the bottom of the tape measure is accurate or whether or not it's -- it's square, flush?
A I think it's nominally square, yes.
Q Have you ever examined the tape measure to determine whether or not it -- it's accurate?
A No.
Q And looking at this photograph, do you know what portion of the ramp it allegedly is measuring?
A It is measuring the distance from the top of the ramp to the height of the laser itself in a laser level, which is depicted in another one of the photographs.
Q You didn't participate in taking the photograph, correct?
A That's correct.
Q So you have no personal knowledge whether or not --
A When it was transmitted, it was captioned as such.

Q Well, let me -- Let me complete my question.
You have no personal knowledge whether or not the tape measure that was used by Mr. Merkel on -- on or about March 10, 2021, was accurate?
A I have not examined the tape measure in question, no. I don't know --
Q Do you have any personal knowledge whether the laser used by Mr. Merkel was calibrated to ensure that it was accurate?
A No.
Q Do you know what type of laser -- Do you know the brand and the -- and the make of the laser that was used by Mr. Merkel?
A No.
Q And you don't have any personal knowledge exactly what is depicted in -- in this document, this Photograph 06111, as far as where that measuring tape is physically located on the Cermak ramp?
A I only have the information as it was reported to me.
Q Are there any other photographs that

Mr. Merkel provided to you which depict a measurement of the Cermak ramp?

A I think in this group of photographs that Zach [sic] has on his screen, there is another image of the laser level itself.

Q There are seven photographs.

Can you tell me which -- which photograph you're referring to?

A Oh, sorry about that.

THE WITNESS: Go back up to the top.

(Scrolling.)

BY THE WITNESS:

A That one -- Not that one.

(Scrolling.)

THE WITNESS: That one.

BY MR. THOMAS MORRISSEY:

Q It's Photograph 3 out of 7, correct?

A Right.

Q The one that's --

A 016110, yeah.

Q Are there any other photographs which depict where the laser was placed in relation to the Cermak ramp for the photographs which are 1 through 7 of Group Exhibit 6 -- Group Exhibit --

A That's the only photograph I'm aware of.

Q Group Exhibit 402.

A Sorry. That's the only photograph of the laser level I'm aware of.

MR. THOMAS MORRISSEY: Jack, you sent me some document now.

Calling your attention to what now will be marked as 407, it's an e-mail from Joe Merkel dated March 10, 2021, at 12:54 to Timothy Tyrrell and Eric Davis is included in the e-mail.

Give me a moment.

(Whereupon, Plaintiff's Exhibit No. 407 was marked for identification.)

BY THE WITNESS:

A Yes.

BY MR. THOMAS MORRISSEY:

Q So you've had an opportunity to read Mr. Forman's [sic] e-mail, correct?

A Mr. Merkel, yes.

Q I'm sorry, Mr. Merkel.

And he acknowledges, based upon

his understanding of an Illinois Accessibility Code 1997, that it lacked the required handrails, correct?

A That's what his e-mail says, yes.

Q And you would agree that under the 1991 ADA standards that a handrail -- handrails were required for the Cermak ramp?

A I would say that it appears that that's the case; however, Mr. Merkel's e-mail notes -- And I would tend to agree with him. I'd have to investigate this further and possibly some other people.

There may be an exception if there is a life safety issue that doesn't allow it. That's, I think, what he's referring to there.

In a normal ramp, I would say yes. Realizing that this is a corrections facility, there may be an exception that allows them not to be used. I'm just speculating here. I cannot say one way or the other. But in general, yes, but there may be an exception because of the context.

Q To your knowledge, has anybody, since March 10, 2021, from Cook County gone out and

measured the Cermak ramp to determine whether it's compliant with the -- either the 1991 ADA standards or the 2010 standards?

A I'm not aware if they have or they haven't. This provides a lot of good information, and I wouldn't know why we would need to do that, but not that I'm aware of.

Q After receiving this e-mail on March 10th, 2021, did the County take any further steps to alter either the handrails or the landing area for the Cermak ramp to comply with the 2010 standards or the 1991 standards?

A Yes.

Q Why?

A Because this area is a part of an attempt that we are doing right now to hire an Architect of Record to design -- to identify and design whatever remediations or changes may be necessary to provide compliance based, in part, upon some of the recommendations or other outlines from the Ellen Stoner report and things like this.

So yes. We are in the process of trying to hire an architect to definitively address this question and design, and this way we can

construct any changes that need to be made. We've been working on that for a long time, and I know that we've been working on it since March 10th.

Q So in your capacity as deputy director of Capital Planning and Policy, have you advised Cook County and your department that there is no need for a landing area on -- landing area for the Cermak ramp because it's in compliance with either the 1991 or 2010 standards?

A That's not for me to say on a definitive basis, which is why we are hiring an Architect of Record to do that. It appears that it's not required in my case, but we need to hire someone to make that definitive determination and to design any remediations accordingly.

Q Let's go to Exhibit 400. It's Defendant Cook County Answer to Plaintiff's Second Set of Interrogatories.

A I don't know which one that is.

MR. BENTLEY: I'm opening it up. Just give me a minute.

THE WITNESS: Okay. Thank you, Jack.

(Whereupon, Exhibit No. 400 was displayed via screen-share.)

MR. BENTLEY: Okay. I'm sharing my screen, Exhibit 400.

THE WITNESS: Okay.

BY MR. THOMAS MORRISSEY:

Q Did you, at the request of the attorney for Cook County, respond to these Interrogatories?

A Yes.

Q And how do you know the construction commenced for the Cermak building in 1996?

A Because the drawings issued for permit were the subject of multiple revisions in 1996 that are the kinds of indications that you have when a project like that is being constructed.

The construction drawings were complete, submitted to the City. They were getting permit comments, and so it appears the construction began in '96 at that point. That was on the screen earlier. We had the images of the construction drawings.

Q And Interrogatory No. 3 asks whether Ellen Stoner was directed by STV to review the Cermak ramp to determine whether it complied with the 2010 ADA standards for accessibility design.

And you responded that her firm was tasked with that job, correct?

A She was tasked to review the accessibility, yes. That's my understanding from the information we have.

Q You reviewed her notes from March of 2019?

A 2018, you mean?

Q 2019, March of 2019. Was it '18?

Do you know whether or not it was in March of 2018 or March of 2019 that Ellen Stoner --

A I believe it was -- I believe it was March of 2018.

Q I'm going to turn to the -- Exhibit No. 8. Let me know when you get there.

A I believe Jack is bringing it up on the screen.

(Whereupon, document was displayed via screen-share.)

MR. BENTLEY: No. Wrong one. Hold on.

(Whereupon, Exhibit No. 8 was displayed via screen-share.)

MR. BENTLEY: Okay.

BY MR. THOMAS MORRISSEY:

Q I'd ask you to turn to -- Let me ask an initial question: Are you familiar with the ADA standards that are -- that were in effect at the time of the Cermak ramp being constructed?

A Yes. In general, yes.

Q And does Exhibit 8 reflect the ADA standards for accessible design that were in effect at the time the Cermak ramp was -- was built in 1995 or 1996?

A Relative to what's being shown on the screen, which is the 1991 ADA -- Actually, no. This appears to be the 2010 ADA, so they would not have been -- It's not clear to me if this was the '91 or the 2010.

If it was the '91, then yes. It would have been in effect. There's a box on the screen here that indicates it references the 2010 standards. So I assume this is the '91, but I'm not sure.

THE WITNESS: Can you scroll down a little bit, Jack?

(Scrolling.)

BY THE WITNESS:
A Yeah. This looks like the '91. Okay.
So this was in effect -- The answer to your question, this was in effect. As noted elsewhere, there was a State level -- the Illinois Accessibility Code, which I believe was published in '97, which would have been after this building was permitted and may or may not have provisions that apply.
But the ADA itself, the '91 that you're showing on the screen now, is something that would have been -- would have been applicable when the building was permitted for construction.
BY MR. THOMAS MORRISSEY:
Q From Group Exhibit 8, I'd ask you to turn to Section 4.8, which involves --
A The ramp section, yeah. It's on Page 27 or something like that.
(Scrolling.)
MR. BENTLEY: Okay.
BY MR. THOMAS MORRISSEY:
Q Tell me when --
A The bottom of Page 27, yeah.
Q And I'd ask you to maybe turn to the top of 28 too.
(Scrolling.)
BY MR. THOMAS MORRISSEY:
Q Well, let's start on Page 27, the bottom.
MR. THOMAS MORRISSEY: I'm going to have to move because we have somebody that's inspecting my roof. So I'm going to take a two-minute break.
(Whereupon, a brief recess was had.)
BY MR. THOMAS MORRISSEY:
Q Looking at 4.8.2, you agree that for the Cermak ramp, in order to comply with the ADA, the maximum rise for any run shall be 30 inches?
A Yes.
Q And if the measurement of the ramp is over 30 inches, then there had to be a landing within --
A That's correct.
Q And the landing -- there must be a landing -- If we look at the next page, there's a diagram. It says a 1:12 slope less than 1:16, 30-inch rise with a maximum of 30 feet, correct?





A That's for a 1:12 slope, yes.
Q And Ms. Stoner measured it as a 1:12 slope, right?
A No. She assumed it was 1:12.
Q Well, what her --
A Nothing in her report indicates that she measured the slope itself, only the -- on the horizontal dimension, horizontal or angle dimensions.
Q Well, her measurement -- If we look at Exhibit 4, there is a diagram of her inspection in March of 2018, correct?
A I think I'm remembering the same diagram you're referring to, yes.
MR. BENTLEY: I'll pull up Exhibit 4. Just give me a second.
(Brief pause.)
MR. THOMAS MORRISSEY: It could be much easier if you followed the protocol we use with your office and gave the documents to the deponent.
MR. BENTLEY: I did not know that was the protocol. I've never done that in any deposition with you or anyone else. So I'm sorry that I didn't realize that was the protocol, but I'm doing my best here.
MR. THOMAS MORRISSEY: Well, can you e-mail them now?
MR. BENTLEY: All those attachments, that would take, like, five different e-mails at least.
What would be really easy would be if -- Hold on. I'll just e-mail this one for now.
(Brief pause.)
MR. BENTLEY: I just sent Exhibit 4 to Eric.
Eric, check your e-mail.
(Brief pause.)
THE WITNESS: I haven't received it yet.
(Brief pause.)
THE WITNESS: There it is.
MR. BENTLEY: Got it?
THE WITNESS: Yep.
(Whereupon, Plaintiff's Exhibit No. 4 was provided to the witness electronically.)

BY MR. THOMAS MORRISSEY:

Q The diagram -- First of all, do you recognize the drawing which is depicted in Exhibit 4?

A Yes.

Q And STV's ADA consultant, Ellen Stoner, is the one that created this drawing, correct?

A Mm-hmm.

Q You have to answer "yes" or "no."

MR. BENTLEY: "Yes"?

BY THE WITNESS:

A I'm sorry. Yes.

BY MR. THOMAS MORRISSEY:

Q And the notes under "E: Cermak ramp" are the notes that were prepared by Ellen Stoner?

A I believe so, yes.

Q And do you have any knowledge about her professional background?

A She is a consultant on accessibility and historic preservation issues.

Q Do you know whether or not she is a licensed architect?

A I believe she is.

Q And do you believe that she is qualified to assess whether or not the Cermak ramp complied with the ADA standards in 1991 and/or 2010?

A I think she's qualified to assess, yes.

Q And under the notes that she made here, under "E: Cermak ramp," she says, "The existing ramp is 47-feet long without a landing."

And that's one way of measuring the ramp, like you testified earlier, correct?

A Correct.

Q And she says the slope of the ramp is within 1:12 maximum slope requirements; however, the run exceed Code requirements.

Now, to your knowledge, was she tasked with the job of going out and inspecting various Cook County properties to determine whether or not there may be an accessibility problem under the ADA?

A I believe that she was tasked to go and evaluate whether or not, as you say, there may be accessibility issues.

Q And she made certain recommendations,

correct?

A Yes. I believe she made certain recommendations.

Q And one of the recommendations is to create a landing 30 feet from the top of the ramp?

A Mm-hmm.

Q Is that correct?

A That's what this says.

Q And under the 1991 standards, if the rise exceeded 30 inches, then there was a requirement for a landing within -- at 30 feet or more, correct?

A Under the standard that you were just going through, if there is a rise -- the maximum rise for any run is 30 inches.

Q So if it was 30 inches and a half, the requirement under the 1991 ADA standards would require a landing at 30 feet, correct?

A Correct.

Q If there was a rise of 30 inches and a quarter, there's a requirement under the 1991 ADA standards for a landing within 30 feet, correct?

A I would have to check because I believe that the standards also include

construction tolerances, and I don't know if a quarter of an inch is considered to be within a construction tolerance or not.

Q Do you know if Joe Merkel measured the rise on the right side of the ramp going up?

A It appears that he measured from the middle of the ramp.

Q Do you know what the rise is on the right side of the ramp going up?

A I would assume that the ramp is level, and so the rise would be the same on all sides --

Q Do you have any basis --

A -- the left side, the right side, and down the middle.

Q Do you have any basis for your statement that the ramp is level?

A The photographs that you showed previously suggest that it's level, and I don't remember it being unlevel at any time that I would have walked it.

Q When was the last time you walked up and down the Cermak ramp?

A Probably at least three years ago.

Q And at that time did you take any

measurements to see whether or not the rise of the ramp on the right side going up was 30 inches or below?

A As I mentioned before, when I walked it -- again, I believe that I did a long time ago. But as I said before, I didn't take any measurements of it one way or the other.

Q Do you know if Mr. Merkel took any measurements on the right side of the ramp going up?

A From the photographs that we've seen in his discussion, it appears that he measured down the middle of the ramp.

Q Do you know whether or not he took any measurements on the left side of the ramp going up?

A From the images that we have, it appears that he took the measurement down the middle of the ramp.

Q And you don't know whether or not -- You have no measurements to determine whether or not the ramp, as one proceeds up, is level consistently, correct?

A I don't have any measurements to show that it is or it is not.

Q If a ramp is 31 and a quarter inches on the left side going up, under the 1991 ADA standards, would that comply with the ADA?

A If that were the case -- and I have no information that it is or it is not -- then that would not be compliant.

Q If the ramp on the right side was 30 inches and a half going up, would that comply with the 1991 ADA standards?

A With the stipulation I made before about construction tolerances, if that did not mitigate that, I believe that would not comply.

Q Where does it -- Where in the 1991 ADA standards for ramps does it have a tolerance level that would allow a ramp that was 91 [sic] and a quarter on the left side of the ramp going up to be greater than 30 inches and not require a landing within 30 feet?

A Excuse me. I think you said "91." You meant "31"?

Q Let me rephrase the question.

Under the 1991 ADA standards, assuming the rise on the left side of the ramp going up was 31 and one quarter inches, point me in

Group Exhibit 8 where the 1991 standards permit a rise of 31 and a quarter for a ramp that exceeds 30 feet in length without a -- without a landing.

A It doesn't indicate that that I'm aware of.

Q Is that within the tolerance -- Where in the 1991 ADA standards does it provide a tolerance level if the rise of the ramp on one side is 31 and a quarter inches?

A I don't know if that's in there or not, but it should be pointed out that the ADA itself alone is not the only part of the standard. I believe that what I'm referring to in the construction standards were supplemental instructions provided by the Department of Justice in the ADAAG -- that's spelled -- it's an abbreviation, A-D-A-A-G -- [continuing] which is a series of clarifications they did after the ADA was issued, and I think that that's where the stipulations about construction standards reside.

So in other words, it's not in the base document. It is in information provided as clarification after the issuance of the '91. And, again, that's from memory. I'd have to

research --

Q All right. So your --

A -- and determine where it resides exactly.

Q So is it your understanding as a licensed architect that if the rise on the left side of the ramp was 31 and a quarter inches going up, based upon the ADA standards in effect in 1994 and 1995, that would comply with the ADA, if there wasn't a landing --

A No.

Q -- within 30 feet?

A No. If it was 31 and a quarter inches of a rise, that would be too -- that would be too much. It would require an intermediate landing.

Q And if the rise on the right side of the ramp was 30 inches and a half going up on the right side, would that be in compliance with the ADA in 1991 -- in the 1991 standards when the Cermak ramp was built in 1994 and 1995?

A Following your hypothetical, I would assume not, that it would not comply.

Q And in Group Exhibit 8, are there requirements under the 1991 code in regards to

handrails for a ramp, such as the Cermak ramp, that was built in 1994 and 1995?

A Just to clarify, is Exhibit 8 the ADA itself, or is that the document that includes the Stoner diagram?

Q Exhibit 8 are the ADA standards that were in effect in 1991.

A Yes. There are handrail standards in the '91 ADA, yes.

Q Can you point -- point me to those?

A Give me just a moment.

(Brief pause.)

BY THE WITNESS:

A Let's see. That is -- They begin on Page 50 of the document, which is Page 541 in the copy that I have here, Page 50 of the document under Section 4.26, "Handrails, Grab Rails" -- "Grab Bars, and Tub and Shower Seats."

BY MR. THOMAS MORRISSEY:

Q Give me a moment.

(Brief pause.)

BY MR. THOMAS MORRISSEY:

Q Do you know what section you're referring to?

A As I said, it's 4.26. On the PDF that I have, it says Page 50, and then it also says, for some reason, 541. I don't know what that's -- That may be a CFR Page 541.

Q You're looking at 4.26?

A Correct.

Q This 4.26, does that apply to handrails for a ramp?

A To be clear, 4.26 is specifying if there are requirements for handrails, then this is how handrails are to be configured.

Q Is there a requirement for ramps with a rise greater than six inches to have handrails complying with 505?

A With 505 . . . I'm not finding -- I'm not familiar with 505.

What are you referring to with 505? I'm not familiar with what you're referring to, sir.

Q Well, you agree that the rise of the Cermak ramp is greater than six inches?

A Yes.

Q And, therefore, under the 1991 ADA standards, it's required to have handrails?

A Yes. And I would also put an asterisk there, that there may or may not be life safety exceptions to that. But, in general, yes.

And I only point that out to say you know, the First Amendment says we have Freedom of Speech, but you can't yell "Fire" in a crowded movie theater. So sometimes there are exceptions for life safety. That's the only reason I'm hesitating.

Q Can you point -- Can you point me to where in the 1991 standards there's an exception for a ramp in a correctional facility in regards to handrails?

A I'm not aware if there are. I'm only stipulating that there may be. I'm not stipulating that there are.

Q And would it be correct that the 1991 ADA standards would require handrails to be on both sides of the ramp?

A Correct. That's what it says in Section 4.8.5.

Q And the handrails would have to be contiguous from the bottom of the ramp all the way to the top of the ramp?

A Continuous, yes.

Q What are the -- What is your understanding of the purpose for handrails under the ADA code involving a ramp?

A They are in general there to allow someone to steady themselves, whether they're walking or in a wheelchair, to provide stability when they're walking or in a wheelchair.

I would note that a wheelchair in a correctional facility is different than on a sidewalk or at a public building.

Q Do you -- Do you understand what's referred to as the "gripping surface" of a handrail?

A Yes, sir.

Q What is the gripping surface of a handrail?

A I would go back to Page 50 in the document because it makes explicit -- The gripping surface of the handrail is the bar, if you will, which is to be a nominal one and a half inches in diameter, spaced roughly one and half inches away from the surface.

Q What -- What's the section number

you're looking at?

A Again, I'm on Page -- in this case, Page 51. There's a diagram that shows that. It's --

Q Which --

A -- Figure 39 in the ADA.

It says "or shall provide an equivalent gripping surface" in the standard in 4.6.2 -- 4.26.2.

Q And is the requirement in regards to -- to the minimum height of the railings being 34 inches?

A I believe -- Yeah, I believe 34 inches. I think that's correct.

Q And the top of the rail, 38 inches?

A Between -- Generally, it's in the range of 32 to 38, but the -- the standard is 34 inches.

Q And it should be contiguous along the walking surface of the ramp?

A Correct, continuous, yes.

Q And the handrails should be of consistent height above the walking surface. Is that correct?

A Correct. That's correct.

Q And by "the walking surface," we're meaning -- we mean the length of the ramp, correct?

A Correct. And extend -- There are requirements that it extend beyond the inclined or sloped surface as well.

Q Now, based upon your personal knowledge, are there handrails on both the left and right side of the ramp that are 34 inches above the ground and at a consistent height along the walking surface of the ramp?

A It appears that instead of a handrail that there are hospital-style bumpers at that -- at approximately that same height off the floor.

Q Are they compliant with the 1991 ADA standards in regards to handrails?

A Again, with the stipulation that there may or may not be an exception for an environment like this, no. In general, that's not compliant with them.

Q And in regards to the rise of a ramp under the 2010 standards, are they the same as the 1991 ADA standards?

A I'd have to reference it. I believe

that the landing requirements are somewhat different in 2010, but I'd have to check. I have not reviewed it recently in the context of this action.

Q Do you know whether or not -- if the rise of the ramp exceeds 30 inches whether or not there must be a landing if the ramp exceeds 30 feet?

A Well, the 30 feet is -- assumes a 1:12 slope for 30 inches, so it can be longer and I believe the standard says of -- of any length if the rise is 30 inches.

Q I'm talking about a rise that exceeds 30 inches.

Does there have to be a landing under the 2010 --

A I believe 2010 also requires a landing for a 30-inch rise, yeah.

Q And does the 2010 standards require handrails on the left and right side of the ramp at a continuous height going up and down?

A I believe it does, yes.

Q And the bumpers on -- or curbs along the current configuration of the bumpers, as you

describe them, on the Cermak ramp are not in compliance with the 2010 standards or the 1991 ADA standards?

A Again, with the stipulation that there may or may not be applicable exceptions for detention facilities, no. It doesn't appear that they are.

Q Do you know if the bumper rails -- the measurement of the bumper rails are at 29 and a quarter inches? I'm sorry.

Do you know whether or not along the sides of the left and right walls of the ramp that the bumper -- bumper rails are at a height of between 29 and a quarter inches and 29 and a half inches?

A I don't know offhand what the dimension of them is off of the -- the walking surface, no, offhand.

Q Do you know if the bumper rails are grippable as defined by the ADA?

A I don't know; but from the photographs, it appears that they are not.

Q Why is there a requirement under he 1991 and 2010 standards to have a handrail

grippable?
A As I said, they are an assist device that allows an individual, either someone in a wheelchair or someone who has difficulty walking, to steady themselves as they go up or down the ramp.
Q So the current bumper rails, as you describe them, for the Cermak ramp do not assist a -- either a wheelchair-bound detainee or a person on crutches to go up or down the Cermak ramp?
A It appears that they do not. I haven't tried it myself.
Q You're aware that -- going back to Exhibit No. 4 now, the notes by Ellen Stoner as a consultant for STV on ADA accessibility -- that she made certain recommendations, correct?
A She made recommendations that -- Yes. She made recommendations.
Q Can you tell me, after March of 2018, what Cook County did in order to -- Let me rephrase the question.
You acknowledge, in part at least, that at the time Ms. Stoner inspected the ramp in March of 2018, it was not in compliance

with the 2010 or the 1991 ADA standards?
A Again, with the stipulation about the potential of exemptions for detention requirements and recognizing that the building -- when the building was built, the 2010 standards did not apply, yeah. In general, I do.
Q And between March of 2018 and that e-mail that this plumbing foreman gave defense counsel, measurements in March of 2021, you're not aware of any other County or Sheriff employee that measured the Cermak ramp to determine measurements as far as the rise of the ramp or the handrails?
A I'm not aware if there were or there weren't.
Q And since this plumbing foreman in March of 2021 to the present, has there been anybody else that was retained by Cook County, to your knowledge, that measured the Cermak ramp to determine whether it's compliant with the ADA --
A Not that I'm aware of, no.
Q -- 1991 standards or the 2010 standards?
A Oh, they wouldn't have measured them for the 2010 standards, but not the -- not that I'm

aware of, no.
Q In March of 2021, after this plumbing foreman made certain measurements in regards to the ramp, why didn't -- why didn't Cook County go back to Ellen Stoner and ask her to reexamine that ramp under her contract with STV and Cook County?
A Well, first of all, there may have been discussion of that. I haven't reviewed all the e-mails applicable to that. They may have been asked to do that.
I would note that Mr. Merkel's e-mail was on March 10th of 2021. Seven days later, Cook County went into lockdown because of the pandemic, and that changed everything.
Q The pandemic, my recollection --
A I'm sorry. '21. Excuse me. I'm sorry, '21. We were on the -- I'm sorry. I'm incorrect. I'm thinking of 2020. Excuse me.
Q Yeah. In March of 2020 --
A Yeah, 2020, because we went -- we went under March 17th. I remember it was Saint Patrick's Day, no.
In March of '21, no. I mean, we may or may not have been -- I don't remember if we

were in a prohibition period or not. We've had a couple of periods during that time when we haven't been allowed to go into the jail because it's been a COVID hotspot. In fact, we're under that condition right now. So as far as getting out there to make investigations, I'm not sure we could have even sent her out there.
Q After Stoner gave her recommendations as a consultant for STV and Cook County on --
A Yes.
Q -- accessibility in March of 2019 --
A Yes.
Q -- did you attend any meetings with her with representatives from the Sheriff's Office and Cook County where the Cermak ramp was discussed?
A I believe so.
Q And can you tell me who participated in those meetings for the Capital Planning and Policy group?
A We have monthly meetings with the Sheriff and with their various representatives, sometimes including Sabrina, who is their ADA representative, sometimes not, other members of the

Sheriff, to go through various projects.

We have well over 100 projects going on with the Department of Corrections or with the Sheriff at any moment in time. We meet with them to go through the status of the various projects. I know that multiple times she's attended those meetings.

Q There was a -- In addition to yourself at those planning meetings with stakeholders and the Sheriff and the County on accessibility issues, was there a former employee by name of Sheila Atkins that attended?

A Yes.

Q And what was --

A I believe Sheila was there, yes.

Q What was her role as a member of the Capital Planning and Policy group in regards to ADA accessibility at the Cook County Jail?

A Sheila, for many years, was one of our project directors. And during my time here, since I joined the County in April of '17, she's been the project director for the vast majority of projects working with the Sheriff and at the jail.

She's been the project director

working directly with the consultants working with the Sheriff, directing those projects.

Q When she -- She retired from Cook County employment last year. Is that --

A That's correct.

Q All right. Who took her place as the project director for public safety issues at the Cook County Jail?

A We have an interim project director. We're actually about -- we have -- We've made an offer to an individual and are expecting to be bringing somebody on-board to be the permanent person to take the role that she had on project -- capital projects for public safety. We're bringing another project director on to replace her.

Q In addition to Sabrina Canchola Rivero, are there members of the Sheriff's Office that attended these monthly stakeholder meetings in regards to --

A Yeah.

Q -- ADA issues?

A A variety of different members from the Sheriff's Department, yes, Sheriff's Office. Excuse me.

Q Now, at these planning meetings after April of -- March or April of 2018, was there a discussion with regards to proceeding with a renovation of the Cermak ramp to make it accessible?

A I know that that's been a topic at multiple meetings over the course of the intervening period.

Q Was there ever a -- I'm sorry.

Do you know an Andrea [sic] Morales?

A Adriana, Chief Morales, yes.

Q Does she work for Cook County?

A She is a deputy -- a chief of some designation -- I don't know her exact title -- with the Cook County Sheriff's Office.

Q Have you had contact with her in regards to ADA issues at the Cook County Jail?

A I believe she's been in multiple meetings about it.

Could I ask you to pause for just a moment?

Q Sure.

A Okay. Thank you.

Q How much time do you want?

A Just like 60 seconds.

(Brief pause.)

THE WITNESS: Okay. I'm back. Thank you. I had another meeting that was supposed to start at 4:30, and I had to let them know I wasn't going to be there.

MR. THOMAS MORRISSEY: Do you need to attend that meeting? Because we have just gotten certain documents from defense counsel which were not turned over prior to this dep.

If you'd like to reschedule so you could go to your meeting . . . We're going to be another three hours or more with this deposition. We haven't even touched on the real 30(b)(6) Notice, so . . .

THE WITNESS: I'll defer to Zach [sic].

MR. BENTLEY: Jack.

THE WITNESS: Or, Jack, rather. Excuse. That's counsel on another case.

I guess I would prefer to -- Are we on the record or off the record?

MR. BENTLEY: Let's go off.

MR. THOMAS MORRISSEY: Off the record.

(Whereupon, a discussion was had off the record.)

(Whereupon, the remote deposition was continued to Monday, January 24, 2022, at 2:00 p.m., Central Standard Time.)

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, KELLY ANN POTTS, Registered Professional Reporter, Certified Shorthand Reporter in and for the County of Cook, State of Illinois, do hereby certify that on January 19, 2022, the remote deposition via videoconference of the witness, ERIC DAVIS, was taken by me, reported stenographically and was thereafter reduced to typewriting under my direction, and there were present counsel as previously set forth.

The said witness, ERIC DAVIS, was first remotely duly sworn to tell the truth, the whole truth, and nothing but the truth, and was then examined upon oral interrogatories.

I further certify that the foregoing is a true, accurate, and complete record of the questions asked of and answers made by said witness, ERIC DAVIS, at the time hereinabove referred to.

The undersigned is not interested in the

within case, nor of kin or counsel to any of the parties.

WHEREUPON, I set my hand pursuant to the Illinois Shorthand Reporters Act of 1984 on this 23rd day of January, A.D., 2022.

_______________________

KELLY ANN POTTS, CSR
CSR No. 084-003558