Transcript of the Testimony of
**ELLEN STONER**

**Date:** September 8, 2021

**Case:** CORNELIUS WALKER v. THOMAS DART, SHERIFF OF COOK COUNTY, ET AL.

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CORNELIUS WALKER,             )
                              )
        Plaintiff,            )
                              )
        vs.                   )  No. 20-cv-00261
                              )
THOMAS DART, SHERIFF OF       )
COOK COUNTY and COOK          )
COUNTY, ILLINOIS,             )
                              )
        Defendants.           )

        This is the deposition of ELLEN FARLOW STONER, taken via Zoom videoconferencing, called by the Plaintiff for examination, taken pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before PEGGY A. ANDERSON, a Certified Shorthand Reporter of the State of Illinois, on September 8, 2021, at 10:00 o'clock a.m.

---

Page 2

```
 1   A P P E A R A N C E S :
 2
 3           THE LAW OFFICES OF:
             THOMAS G. MORRISSEY, LTD.
 4           BY:  MR. THOMAS G. MORRISSEY
                  MR. PATRICK MORRISSEY
 5                10150 South Western Avenue
                  Rear Suite
 6                Chicago, Illinois  60643
                  (773) 238-4235
 7                tgm@morrisseylawchicago.com
                  pwm@morrisseylawchicago.com
 8
             Appeared on behalf of the
 9           Plaintiff;
10           THE LAW OFFICES OF:
             JOHNSON & BELL, LTD.
11
             BY:  MR. JACK BENTLEY
12                33 West Monroe Street
                  Suite 2700
13                Chicago, Illinois 60603-5404
                  (312) 372-0770
14                bentleyj@jbltd.com
15                Appeared on behalf of the
                  Defendants.
16
17           THE LAW OFFICES OF:
             TRIBLER ORPETT & MEYER
18           BY:  MR. MARK GALASSO
                  225 West Washington Street
19                Suite 2550
                  Chicago, Illinois 60606
20                (312) 201-6400
                  mcgalasso@tribler.com
21
             Appeared on behalf of the
22           Witness, Ellen F. Stoner.
23
24
```

---

Page 3

```
 1                    I N D E X
 2   WITNESS                              PAGE
 3   ELLEN FARLOW STONER
 4   DIRECT EXAMINATION BY
 5   MR. MORRISSEY:                      5-142
 6
 7
 8                  E X H I B I T S
 9
10   MARKED                              PAGE
11   PLAINTIFF'S EXHIBIT NO. 2           102
12   PLAINTIFF'S EXHIBIT NO. 4           116
13   PLAINTIFF'S EXHIBIT NO. 11           97
14   PLAINTIFF'S EXHIBIT NO. 100          78
15   PLAINTIFF'S EXHIBIT NO. 101         104
16   PLAINTIFF'S EXHIBIT NO. 105          85
17   PLAINTIFF'S EXHIBIT NO. 106          17
18   PLAINTIFF'S EXHIBIT NO. 200          73
19
20
21                  *******
22
23
24
```

Exhibit 6 Page 1

ELLEN STONER
September 8, 2021

Page 4

1     (WHEREUPON, the witness
2  was first duly sworn.)
3     MR. MORRISSEY:  This is the
4  deposition of Ellen Stoner.  She was served
5  with a subpoena.  The deposition is being
6  taken pursuant to the Federal Rules of
7  Civil Procedure.
8     Ms. Stoner, I'm going to be
9  asking you a series of questions today in
10 regards to your role as an architect hired
11 by the -- by Cook County.
12    I'd ask that you answer my
13 questions orally so the court reporter can
14 take down your responses.  If at any time
15 you don't understand one of my questions,
16 please stop me and I will attempt to
17 rephrase it.
18    At any time during the deposition
19 you want to take a break, just indicate and
20 we'll take a break.
21
22
23
24

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 5

1  WHEREUPON:
2     ELLEN FARLOW STONER,
3  called as a witness herein, having been first
4  duly sworn, was examined and testified as
5  follows:
6     D I R E C T   E X A M I N A T I O N
7     BY MR. THOMAS MORRISSEY:
8     Q    Please state your full name for the
9  record?
10    A    My name is Ellen Farlow Stoner.
11    Q    Where did you go to college?
12    A    I went to the University of Illinois
13 in Urbana-Champaign.
14    Q    What was your major at the University
15 of Illinois?
16    A    It was the studies of architecture.
17 Did both my bachelor's and master's degree
18 there.
19    Q    Do you have a master's in
20 architecture also from Champaign?
21    A    Yes, I do.
22    Q    Are you board certified as an
23 architect by any organization?
24    A    I'm registered with NCARB, and I'm

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 6

1  also a licensed architect in Illinois and a
2  handful of other states.
3     Q    Are you a member of the American
4  Institute of Architects?
5     A    I am, yes.
6     Q    Briefly tell me about your --
7     THE REPORTER:  Tom, can you start
8  that again?  You broke up.
9  BY MR. MORRISSEY:
10    Q    Can you tell us briefly in regards to
11 the various positions you've held as an
12 architect?
13    A    Yeah, I finished my studies in 1991
14 and I became licensed in '95.  I worked for a
15 handful of firms abroad in France and England,
16 and then I was also -- and then I came back to
17 Chicago roughly in '94, and I worked for four
18 or five different architects before I started
19 my own firm in 2003.
20    Q    What firms have you worked for prior
21 to establishing your own firm?
22    A    Yeah, I worked for Farm Associates;
23 Johnson Lasky Architects; Mitt, Braw, Kelly,
24 Bauer (phonetic).  They're now actually Bauer.

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 7

1  And Bauer Latoza Studio.
2     Q    For each of those firms, can you
3  explain what type of work you did with each of
4  the firms as far as whether it was commercial
5  industrial, residential, et cetera?
6     A    Mostly with those firms, prior to
7  Bauer Latoza, most of my work was residential
8  or commercial private work.  At Bauer Latoza, I
9  was introduced to public work and historic
10 preservation primarily.
11    Q    In 2003, you established your own
12 architectural firm?
13    A    Yes, I did.
14    Q    And at that time, did you have any
15 architects that worked with you in 2003?
16    A    When I started the firm, I started it
17 with a business partner, David Young.  We were
18 in business together for about two years and
19 then he left.  And since then, I've had a
20 series of -- and we had employees, right?  And
21 I continue to have employees.  We're a firm of
22 ten people, and we're roughly -- Well, we have
23 one business administrator.  Everyone else is
24 trained as architects, and probably about

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 2

ELLEN STONER
September 8, 2021

Page 8

1  50 percent of the firm is actually licensed.

2       Q    Can you briefly tell me what are the
3  requirements to be licensed as an architect in
4  the state of Illinois?

5       A    Well, when I became licensed, you had
6  to have a master's degree and work for a
7  minimum of two years under the supervision of
8  another architect before you could sit for the
9  exam, and that still persists today.  And then
10 sitting for the exam, we did it within a week.
11 We took it all at once.  That was customary
12 then.  Now it's transitioned into a computer
13 system where people take one exam at a time.

14      Q    During the last five years, can you
15 briefly tell me what projects your firm has
16 worked on as an architectural firm?

17      A    The last five years?  Well, so that
18 puts us back in 2016.  So we worked in about
19 six or seven different market sectors.  We work
20 in higher education, K12, which is primarily
21 CPS.  We do some consulting with other
22 architects and other K12 users.  We do some
23 hospitality related to breweries and
24 distilleries.  We do some affordable housing.

ELLEN STONER
September 8, 2021

Page 9

1  We do some work related to cultural venues and
2  all of this work is really focused around
3  renovation and historic preservation work.  We
4  are also doing, I should say, some building
5  envelope commissioning work and some Section
6  106 reviews, which is historic preservation
7  related.

8       Q    What percentage -- In the last five
9  years, what percentage of your work has been
10 with governmental entities?

11      A    I don't know that number right off
12 the top of my head.  For governmental entities,
13 I would say it's somewhere between 3 and 5
14 percent.  If you're thinking like --

15      Q    Gross billing, yes.

16      A    I mean, we do a lot of work for CPS,
17 and I find it hard whether you would consider
18 them local government or a school district, so.
19 But we do quite a bit of work for CPS.  So if
20 you include them, the percentage would be much
21 higher.

22      Q    Including CPS, what percentage of
23 your firm's gross billing in the last five
24 years has been governmental?

ELLEN STONER
September 8, 2021

Page 10

1       A    I couldn't give you an exact number,
2  but I would estimate roughly 50 percent.

3       Q    Can you briefly describe the work you
4  do and have done in the past for the Chicago
5  Public Schools?

6       A    Work I've done for Chicago Public
7  Schools?  I've worked as a design manager for
8  them under their program management and capital
9  planning where we were involved with developing
10 scope of work for renovation, and I've also
11 worked as an architect of record for them where
12 we actually execute the design work.  We're
13 currently in a role as an architect of record,
14 and we have, I think, four or five different
15 schools currently under construction.

16      Q    So the four or five schools that
17 you're (inaudible) --

18           THE REPORTER:  Tom, can you repeat
19 that question?  It broke up.

20           MR. MORRISSEY:  Sure.

21           THE REPORTER:  Tom, say it one more
22 time.  They were talking.

23 BY MR. MORRISSEY:

24      Q    You mentioned that you're currently

ELLEN STONER
September 8, 2021

Page 11

1  involved with work on four or five public
2  schools in the city of Chicago.  Is that new
3  construction or is that renovation of existing
4  buildings?

5       A    It's renovation work, and it's
6  primarily focused on building envelope, roof,
7  windows, walls, some interior finishes but
8  pretty straightforward repair and renovation.

9       Q    Approximately what percentage of your
10 work with the Chicago Public Schools involves
11 bringing the schools up to code in regards to
12 the Americans with Disability Act?

13      A    Currently, we don't have any projects
14 that are focused on accessibility.  We have one
15 project at Lovett Elementary that has some
16 minor accessibility elements as we're doing
17 work that has triggered code requirements such
18 as auditorium seating, new entrance stairs, a
19 ramp in back and some minor toilet room
20 modifications.

21      Q    Are there architectural firms that
22 specialize in design of -- designing buildings,
23 existing buildings, to comply with the ADA for
24 public spaces?

Exhibit 6 Page 3

ELLEN STONER
September 8, 2021

Page 12

1    A    Yes.  I'm sure there are.
2    Q    What percentage of your firm's
3  billing -- what percentage of your firm's
4  billing, gross billings, involve work involving
5  bringing public buildings up to ADA standards?
6    A    I wouldn't be able to give you a
7  precise number.  I don't have that information
8  at hand.
9    Q    Well, what portion of -- You
10 mentioned CPS.  Any renovations in Chicago
11 Public Schools obviously has to comply with
12 Title II and the ADA, correct?
13   A    Correct.
14   Q    Any other projects in the last five
15 years that you've worked on that involve public
16 spaces that the ADA impacts?
17       MR. GALASSO:  You're referring to the
18   CPS, Tom?
19       MR. MORRISSEY:  Other than CPS.
20 BY THE WITNESS:
21   A    That are specific ADA or --
22 BY MR. MORRISSEY:
23   Q    Well, obviously the CPS is a public
24 entity?

ELLEN STONER
September 8, 2021

Page 13

1    A    Yeah.
2    Q    Any other work in the last five years
3  that involved public entities?
4    A    Not specifically that I can recall
5  where we're the architect of record.
6    Q    You didn't -- When you say "architect
7  of record," what do you mean?
8    A    That means that we are the design
9  architect and that we are preparing design and
10 permit and construction drawings.
11   Q    Do you do other work for public
12 entities where you're not the architect of
13 record?
14   A    Yes.
15   Q    What other public entities in the
16 last five years have you worked for where
17 you're not the architect of record?
18   A    Well, there's Cook County as you
19 know.  We are under contract with STV as their
20 accessibility consultant where we apply our
21 architectural skills, but we are not an
22 architect of record.
23   Q    Can you tell me -- You mentioned
24 STV/Heery?

ELLEN STONER
September 8, 2021

Page 14

1    A    Yes.
2    Q    Can you tell me your relationship
3  with that firm?
4    A    We are a subconsultant to them under
5  the public safety portfolio for Cook County,
6  and we are on an on-call hourly contract for
7  them.
8    Q    What do you understand the public
9  safety portfolio to mean for Cook County?
10   A    My understanding, at least we've been
11 exposed to, is related to the jail facility at
12 26th and California and the various courthouses
13 throughout the county including the juvenile
14 detention.
15   Q    What is STV's relationship to Cook
16 County to your knowledge?
17   A    I'm sorry.  STV's relationship to?
18   Q    Cook County.
19   A    I believe they are the program
20 manager for the public safety portfolio.
21   Q    What does it mean -- What is your
22 understanding of what it means to be the
23 program manager for Cook County?
24   A    I don't know the details of the exact

ELLEN STONER
September 8, 2021

Page 15

1  services they are providing.  We are strictly
2  supporting them when they request our
3  assistance.
4    Q    Well, what is -- In the architectural
5  field, what is a program manager?  I'm not
6  familiar with the architectural field.  So you
7  talked about an architect of record.  You used
8  the term program manager as far as STV.  Is
9  that an architectural firm, STV?
10   A    I don't know if they provide
11 architectural services.  My understanding of a
12 program manager is that they assist the owner
13 in implementing their capital improvement
14 program, and I believe each owner defines that
15 differently depending on what their objectives
16 are.
17   Q    And STV hired you as a consultant, is
18 that --
19   A    Yes.
20   Q    In what year were you hired as a
21 consultant by STV?
22       MR. GALASSO:  If I could jump in,
23   Tom.  They hired her company.
24

Exhibit 6 Page 4

Page 16

BY MR. MORRISSEY:

Q    I'm sorry.  When I say you, you're the principal of the --

A    I am the principal of AltusWorks, and they hired our company.  Yes.

Q    In what year did STV hire your company?

A    I believe that was 2016, but we didn't actually start engaging in services until either late in 2017 or 2018.

Q    And it's your -- Who are your contact people with STV?

A    My primary contact is David Theising.

Q    David -- Can you spell the last name?

A    I believe it's T-h-e-i-s-i-n-g.

Q    And do you know what his personal background is?  Is he an architect?

A    I don't know his exact qualifications.

Q    Do you have any other contacts with STV other than David Theising?

A    Theising?

Q    Yeah.

A    Through this contract?

Page 17

Q    Yes.

A    I mean, he's the primary contact.

MR. GALASSO:  He just wants to know who else you are in contact with.

BY THE WITNESS:

A    Jan Turner because she, I believe, leads the contract on behalf of STV, and there's John -- I can't remember his last name.  Joey Tse, but he's a project manager.

Q    John Jones?

A    No.  I would have to look up John's last name.  I'm drawing a blank.

Q    If you turn to Exhibit 106.

MR. GALASSO:  Give me a second.  Tom, is it possible for you to share your screen to show the exhibit?

MR. MORRISSEY:  No.  You have the exhibits on your --

MR. GALASSO:  No, I know I have the exhibits.  I'm just asking you if you could share it so we can all see exactly what page you're looking at.

MR. MORRISSEY:  Well, I'm looking at what's Bates Stamped Walker 508 --

Page 18

MR. GALASSO:  All right.  Give me one second.

MR. MORRISSEY:  -- of 106.

MR. GALASSO:  Hold on.  Tom, what was the exhibit again?

MR. MORRISSEY:  It's Exhibit 106, Mark.

MR. GALASSO:  106 Final is what I have.

MR. MORRISSEY:  It's a monthly DOC agenda for 12/12/19.

MR. GALASSO:  Okay.  I'm there and the witness is there.

BY MR. MORRISSEY:

Q    Looking at that document, does that assist you in identifying contact people you have with STV?

A    John Kelly is the other.  The three main people that I deal with are John Kelly, Dave Theising, Jan Turner.  There are a handful of project managers that contact us related to assignments.  Joey Tse, I think T-s-e is how you say his last name.  Dan O'Brien.  Those are the main people that we deal with.

Page 19

Q    And what type of entity is -- Where is STV based?

A    I don't know.

Q    How large a firm is STV?

A    It's a very large firm from what I understand.

Q    What is their principal business as far as you know?

A    I don't know what their principal business is.

Q    What type of work have they done during the time you have been -- had a contract with them for Cook County?

A    It's my understanding that they're leading the development of projects for the capital improvement program.

Q    What is the capital improvement program for Cook County?

A    Yes.

MR. GALASSO:  No, no.  The question he asked you is:  What is the capital improvement program for Cook County?

Is that the question, Tom?

MR. MORRISSEY:  Yes.

Exhibit 6 Page 5

ELLEN STONER
September 8, 2021

Page 20

1  BY THE WITNESS:
2      A    What is the capital improvement
3  program?
4  BY MR. MORRISSEY:
5      Q    Yeah.
6      A    I don't know if I can answer all the
7  details of that program.  It's a publicly
8  published document of prints that they've
9  identified for their facilities.
10     Q    Is it limited to the courthouses and
11 the Cook County Jail, the capital improvement
12 program for Cook County?
13     A    I'm sure the -- No, I believe the
14 County's program incorporates all of their
15 portfolios.  STV's contract is focused on the
16 public safety.
17     Q    Other than the courthouses and the
18 Cook County Jail, are there other capital
19 improvement programs that you're aware of that
20 deal with public safety for Cook County?
21     A    Not that I'm aware of.
22     Q    Were you approached in -- Strike
23 that.
24          Do you know what David Theising's

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 21

1  position is with STV?
2      A    I don't know his exact title.  I
3  believe he's actually employed by CBRE.
4      Q    CRBE?
5      A    CBRE.  I don't know what that stands
6  for.  It's something real estate.
7      Q    Is that a national real estate firm
8  to your knowledge?
9      A    I'm not terribly familiar with that
10 firm.  I know it's a very large real estate
11 firm.
12     Q    And STV, to your knowledge, is that a
13 part of CBRE?
14     A    No.  I believe they formed a
15 partnership or potentially a joint venture for
16 this delivery.
17     Q    Do you know whether or not STV is
18 engaged in any other work other than the
19 capital improvement program with Cook County?
20     A    No, not that I'm aware of.
21     Q    So to your knowledge, STV was formed
22 by some entity to work on capital improvement
23 programs for Cook County?
24     A    No.  STV was an existing firm.  They

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 22

1  teamed up with Heery to provide these services,
2  and then Heery was bought out by CBRE, but they
3  remained either, you know, a partner or a joint
4  venture.  I don't know their legal structure,
5  but the two companies are working together to
6  deliver these services.
7      Q    By "services," you mean services to
8  Cook County?
9      A    Yeah, whatever their -- I don't know
10 what their -- I don't recall the details of
11 their contract.
12     Q    Do you have contact with individuals
13 from Heery?
14          MR. GALASSO:  I'm sorry.  Can you
15      repeat that question?
16          MR. MORRISSEY:  Yeah.
17 BY MR. MORRISSEY:
18     Q    Do you have -- Your role as a
19 consultant for STV, do you have contact with
20 employees from Heery also?
21     A    Well, Heery was purchased by CBRE
22 after the contract was executed.  So I'm not
23 overly familiar with which individuals work for
24 which company, but I just really respond to

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 23

1  their requests.
2      Q    Do you have -- In your role in
3  providing services for STV, do you have contact
4  with employees of CBRE?
5          MR. GALASSO:  To be fair here, Tom,
6      she's identified David Theising as an
7      employee of CBRE as someone who is her main
8      contact.
9  BY MR. MORRISSEY:
10     Q    But my understanding was Mr. Theising
11 is -- worked for STV; is that correct?
12     A    I believe Dave Theising was
13 originally an employee of Heery, and he is now
14 an employee of CBRE since that firm was
15 purchased.
16     Q    So was STV also purchased by CBRE to
17 your knowledge?
18          MR. GALASSO:  Hold on one second.
19      Tom, I think the confusion here is she
20      mentioned there was a joint venture, and
21      she's not entirely familiar with all of the
22      details regarding that.
23          MR. MORRISSEY:  Well, she's the one
24      that's testifying.

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 6

ELLEN STONER
September 8, 2021

Page 24

1  MR. GALASSO:  I understand that.
2  Just let me finish.  I'm trying to help.
3  If you look at the e-mail that she used as
4  Exhibit 106, I think you can actually see
5  in the e-mail addresses some that identify
6  as CBRE and some that identify as other
7  entities.
8  BY MR. MORRISSEY:
9  Q  Are there any other individuals
10  either from CBRE or STV or Heery that you have
11  had contact with in the last three years in
12  regards to your involvement with the
13  renovations or assessments of the Cook County
14  Jail and/or the Cook County courthouses?
15  MR. GALASSO:  I'm going to object as
16  to form and a mischaracterization of prior
17  testimony.  You can answer.
18  BY THE WITNESS:
19  A  I don't know if I know everyone's
20  names because --
21  BY MR. MORRISSEY:
22  Q  Well, let me rephrase the question.
23  A  Okay.
24  Q  CBRE, STV or Heery, are there any

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 25

1  other individuals that you have been involved
2  with in regards to your role with -- your role
3  with the Cook County courthouse or the Cook
4  County Jail that --
5  A  Well, I think I named the main people
6  that I have been dealing with.  There's also
7  this Matt -- I'm not sure how you say his last
8  name -- Guarnery.
9  Q  G-u-a-r-n-e-r-y?
10  A  Yes.
11  Q  And what involvement have you had
12  with Mr. Matt Guarnery?
13  A  He, again, is one of the project
14  managers that is assigned projects within their
15  structure and then contacts us to do our site
16  assessment work.
17  Q  So going back to 2016 --
18  A  Uh-huh.
19  Q  -- you were hired by STV as a
20  consultant?
21  A  Yes.
22  Q  Is that correct?
23  A  (Indicating.)
24  Q  And since 2016 to the present, have

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 26

1  you had a contractual relationship with Cook
2  County or the sheriff of Cook County?
3  A  Well, we had -- aside of this
4  contract with STV?
5  MR. GALASSO:  He wants to know if you
6  have a direct contract with Cook County or
7  not or is it just with STV/Heery?
8  BY THE WITNESS:
9  A  Well, I don't recall if we have an
10  executed contract with Cook County.  We are
11  preapproved with them for architectural
12  services.  We have not been successful in
13  winning any direct work with the County.  So my
14  only active contract right now with the County
15  is through STV/Heery.
16  Q  What is -- Can you tell me how an
17  architectural firm becomes preapproved with
18  Cook County?
19  A  The County issues an RFQ, a Request
20  for Qualifications.  They had issued this many
21  years ago and requesting that architects submit
22  their qualifications so that they would be
23  preapproved to respond to invitations or
24  specific requests for proposals.

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 27

1  Q  But your firm hasn't received any
2  monetary compensation from --
3  A  No, no.
4  MR. GALASSO:  Stop.  Let him finish
5  the question before you give an answer
6  because you don't know what he's asking
7  until he's finished with the question.
8  BY THE WITNESS:
9  A  I'm sorry, Tom.  Could you repeat the
10  question?
11  BY MR. MORRISSEY:
12  Q  As of today, your firm hasn't
13  received any direct monetary compensation from
14  Cook County?
15  A  No, not that I recall.  No.
16  Q  Have you put in bids to do work for
17  Cook County in the last five years?
18  A  I believe we responded to two of
19  their requests for proposals, and we were not
20  successful.
21  Q  What requests did you put in to do
22  work for Cook County?  What projects were they?
23  A  We are preapproved through their
24  corporate portfolio, and we have responded to

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 7

ELLEN STONER
September 8, 2021

Page 28

1  an RFP for some renovation work at the 69 West
2  Washington.  That's the one I specifically
3  remember.  I don't recall the details of the
4  other.
5       Q    Can you tell me the nature of your
6  contract in --
7       THE REPORTER:  Tom, what was the
8     year?  It broke up.
9  BY MR. MORRISSEY:
10     Q    In 2016, can you tell me what
11  services you contracted with STV to provide in
12  relation to Cook County?
13     A    We are an on-call consultant for
14  accessibility evaluations, I guess.
15     Q    And does your firm get compensated on
16  an hourly rate for the services you provide
17  under that contract?
18     A    Yes.
19     Q    And have you had subsequent -- After
20  2016, did you enter into any additional
21  contracts with STV, CBRE or Heery in regards to
22  Cook County?
23     A    We received two or three extensions
24  to our current contract, but there was no

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 29

1  change in scope.
2     Q    When did you first -- When was your
3  firm first engaged in providing any
4  accessibility evaluations for Cook County?
5     A    I'm sorry.  Specifically for Cook
6  County?
7     Q    Yes.  Well, let me rephrase the
8  question.
9     Under your contract with STV, when
10  was the first time they requested you to do an
11  accessibility evaluation for either the Cook
12  County court buildings or the Cook County Jail?
13     A    I don't recall the specific date; but
14  as I said, we were under contract sometime in
15  2016, and we were engaged in services late in
16  2017 or early 2018.
17     Q    What members of your firm worked on
18  the initial assessments under the contract with
19  STV?
20     A    That would have been Scott Utter,
21  Joyce Ramos and Caroline Isaacson and, of
22  course, myself.
23     Q    Are all three individuals still with
24  the firm?

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 30

1     A    No.
2     Q    Who no longer is with your firm?
3     A    Scott Utter is no longer with us and
4  Joyce Ramos is no longer with us.
5     Q    Are all three of those individuals
6  licensed architects?
7     A    Two of the three are licensed.
8     Q    Who isn't a licensed architect?
9     A    Caroline Isaacson is not yet
10  licensed.
11     Q    Are Joyce Utter and -- I'm sorry.
12  Are Scott Utter and Joyce Ramos still working
13  in the Chicago area as architects?
14     A    Scott Utter relocated to Wisconsin
15  earlier this year, and Joyce Ramos is working
16  for the City of Chicago, Department of
17  Landmarks.  I don't believe she's practicing as
18  an architect.
19     Q    What was the first building or
20  buildings in which your firm did an evaluation
21  for STV under that contract?
22     A    I don't recall which exact building.
23  We initially looked at a couple of buildings at
24  the 26th and California location.

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 31

1     Q    What buildings at 26th and California
2  did your firm initially evaluate?
3     A    I'm sorry.  Did we issue documents
4  for?
5     Q    No, no, no.  Not documents.  Which --
6  You mentioned that at 26th and California,
7  which I assume you're referring to the Cook
8  County Jail or are we talking about the court
9  building at 26th and California?
10    A    Both.  We looked at both.
11    Q    And that was in 2017 or early 2018?
12    A    Yes, yes.
13    Q    Initially, who went with you to do
14  the evaluations in regards to the Criminal
15  Court Building at 26th and California and the
16  Cook County Jail from your firm?
17    A    Well, it was primarily Scott Utter
18  and myself.  Joyce Ramos was looking at the
19  juvenile detention facility.
20    Q    When you initially went over there,
21  did you have a contact person at the Cook
22  County Jail or the Criminal Court Building to
23  provide escort services for you?
24    A    Yes.  We had one person that provided

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 8

ELLEN STONER
September 8, 2021

Page 32

```
1   escort.  That was Scott Achterhof.
2            THE REPORTER:   Scott what?
3            THE WITNESS:   Achterhof I believe his
4        last name is.
5   BY MR. MORRISSEY:
6        Q    Was he with the Sheriff of Cook
7   County?
8        A    Yes.
9        Q    Is he also referred to as Andrew
10  Achterhof?
11       A    Yes.  His e-mail is Andrew Achterhof,
12  but he goes by Scott.
13       Q    Do you know if he's still employed by
14  the Sheriff of Cook County?
15       A    I have not heard of any changes to
16  his status.
17       Q    What was his -- Was he -- What was
18  his position with the Sheriff of Cook County?
19       A    I don't recall his exact title.
20       Q    Do you know if he had an
21  architectural background?
22       A    No, I believe he came out of the
23  construction industry.
24       Q    Any other -- Besides Scott Achterhof,
```

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 33

```
1   yourself and Scott Utter, were there any other
2   individuals with you when you did your initial
3   evaluation of Cook County Jail or the Criminal
4   Court Building?
5        A    I believe Scott had brought in
6   another gentleman to help with the escorts.
7   His name was Brian, but I don't recall his last
8   name.
9        Q    Was he a sworn correction officer or
10  sworn Sheriff's officer to your knowledge?
11       A    No, no, I don't believe he was.  I
12  believe he was -- I don't know what his exact
13  position was, but he seemed to have worked
14  closely with Scott.
15       Q    Did you do the evaluation of the
16  Criminal Court Building and the Cook County
17  Jail on the same day?
18       A    No.  No, they were separate
19  assignments at different times.
20            MR. GALASSO:  Did you get the last
21       part?
22                  (WHEREUPON, the record
23                  was read as requested.)
24
```

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 34

```
1   BY MR. MORRISSEY:
2        Q    Now, you say "assignments."  Prior to
3   going out to 26th and California, did you
4   receive any type of communication from STV,
5   CBRE or Heery or the Sheriff or the chief
6   judge, judge's office, in regards to what areas
7   you were to evaluate at 26th and California?
8        A    All of our assignments came directly
9   from STV, and they were very specific on what
10  we were to go out and look at.
11       Q    And was there more than one
12  individual at STV that would give you your
13  specific assignments for 26th and California?
14       A    All of our assignments -- I believe
15  all of our assignments came from David
16  Theising.  They might have been distributed to
17  us through the project managers, but David was
18  the one who would initiate those assignments.
19       Q    Would you receive e-mails from David
20  Theising in regards to where you were to do the
21  assignments?
22            MR. GALASSO:  I'm sorry.  Can you
23       have that question read back?  You cut off.
24            MR. MORRISSEY:  Let me rephrase it.
```

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 35

```
1   BY MR. MORRISSEY:
2        Q    When you received an assignment from
3   David, would it be in writing?
4        A    In general, yes.
5        Q    And how -- What form of communication --
6   How was it communicated to you, through an
7   e-mail or through the mail?
8        A    No, I believe most, if not all, of
9   our communication was through e-mail.
10       Q    How many individuals would be
11  included in the e-mail in regards to the
12  assignments you received from David at STV?
13       A    I don't know.  He would generally --
14  He would craft those and copy people that he
15  felt -- I guess he felt was appropriate to
16  include.
17       Q    And do you have an e-mail account at
18  your firm?
19       A    I'm sorry?
20       Q    Do you have an e-mail account at your
21  firm, an e-mail address?
22       A    Each employee has their own
23  individual e-mail.
24       Q    And to the best of your recollection,
```

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 9

ELLEN STONER
September 8, 2021

Page 36

1  what was the first assignment that you received
2  through an e-mail from David from STV in
3  relationship to -- in relation to the 26th and
4  California complex?
5          MR. GALASSO:  Objection that it's
6  been asked and answered.  Go ahead.
7  BY THE WITNESS:
8      **A   I don't know exactly what the first
9  assignment was.  I'm trying to recall.  We
10  looked at several things between the Cermak
11  building, the Cook County Court -- CCB that
12  they refer to and what's the third thing?  I
13  think it was what they referred to as the
14  bridge.**
15  BY MR. MORRISSEY:
16      Q   So when you would receive an
17  assignment, approximately how many assignments
18  have you received from STV in regards to
19  reviewing and evaluating various court
20  buildings and the Cook County Jail from STV?
21      **A   I don't know exactly how many we've
22  been asked, but it's probably been between one
23  and two dozen.  Some of them are larger in
24  scale than others.**

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 37

1      Q   In regards to the bridge, can you
2  describe -- when you -- You did receive an
3  assignment in regards to the bridge at 26th and
4  California, correct?
5      **A   Yes.  We were asked to do a peer
6  review of design documents that were being
7  executed by an architect at the bridge.  And
8  the bridge area is where the inmates are
9  brought and kind of transferred between the
10  housing to the court facility.**
11      Q   Now, when you received the e-mail
12  from David, for example, in regards to the
13  bridge, did it outline the scope of what STV
14  was asking you to evaluate?  For instance, on
15  the bridge, there are multiple holding cells,
16  correct?
17      **A   Uh-huh.**
18      Q   You have to answer yes or no.
19      **A   Yes.  I believe there is -- There are
20  multiple holding cells.**
21      Q   And there's a ramp -- two ramps that
22  connect the north and south side of the CB --
23  in the Criminal Court Building, correct?
24      **A   Correct.**

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 38

1      Q   Are there any additional structures
2  on the bridge other than holding cells and the
3  ramps that involve the bridge area?
4      **A   Not that I observed.**
5      Q   When you were -- When you would
6  receive an assignment, for instance, for the
7  bridge, how specific -- how specific was the
8  assignment given to you.  Was it go down there
9  and walk around or you mentioned that in
10  regards to renovation work at the bridge, you
11  were asked to do a peer review?
12          MR. GALASSO:  Objection as to form.
13  You can answer if you understood it.
14  BY THE WITNESS:
15      **A   I think I understood it.  We were
16  brought on to review the design architect's
17  solution to a nonconforming condition that they
18  were hired to rectify.  So we assisted on
19  behalf of the County as a third-party reviewer
20  to give our opinion and comments on the design
21  solution presented as it relates to, you know,
22  ADA compliance.**
23      Q   And in that -- What firm did you
24  review their work, the peer review, what design

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 39

1  work?
2      **A   This that was Primera.  Primera
3  Engineering was the architect.**
4      Q   And were the design drawings focused
5  on the two ramps that connect the Cook County
6  Jail to the Criminal Court Building?
7      **A   It was the two ramps and some
8  additional -- additional ramp work to bring
9  those into compliance, yes.**
10      Q   What additional ramp work were you
11  asked to look at in addition to the two ramps
12  that connect the Cook County Jail to the
13  Criminal Court Building?
14          MR. GALASSO:  Are you asking her
15      relative to the bridge?  Because your
16      question is very general otherwise.
17          MR. MORRISSEY:  She mentioned that
18      she was asked to review Primera's
19      engineering drawings in regards to the two
20      ramps that connect the jail to the Criminal
21      Court Building, but she also indicated
22      there were two additional ramps.
23  BY MR. MORRISSEY:
24      Q   My question is what additional ramps

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 10

ELLEN STONER
September 8, 2021

Page 40

1  were you asked to look at and evaluate?

2       A    Well, related to the bridge design

3  documents, in order for the two ramps to become

4  compliant, they had to raise the landing and

5  reduce the slope which required the addition of

6  a third ramp.  So we reviewed that design

7  solution to make sure it was in compliance with

8  ADA requirements.

9       Q    And were you required to give a

10  formal architectural opinion in regards to this

11  peer review of Primera's design drawings for

12  the renovation of the ramps connecting the jail

13  to the Criminal Court Building?

14           MR. GALASSO:  Objection as to form.

15  BY THE WITNESS:

16       A    We provided written comments on the

17  drawings as well as in a -- I believe in a

18  matrix that would record the comments that we

19  had so the architect could respond to them.

20  It's a very standard format for this type of

21  peer review.

22  BY MR. MORRISSEY:

23       Q    When you say that there's a standard

24  format for a peer review of the line drawings,

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 41

1  what are you referring to?

2           MR. GALASSO:  Objection as to form.

3  BY THE WITNESS:

4       A    Well, that generally is an Excel

5  spreadsheet which indicates the specific

6  comments and what aspect of the drawing you're

7  referring to, and then it leaves a spot for the

8  architect to respond with comments either that

9  they agree with your comments or that they have

10  an alternate solution that they would like to

11  propose.

12  BY MR. MORRISSEY:

13       Q    So when you did this evaluation of

14  Primera's design drawings for the bridge, to

15  whom did you provide your comments?

16       A    Our comments were provided to Joey

17  Tse who was the project manager for that

18  specific project.  He was part of the STV/Heery

19  team.

20       Q    Joey Tse worked for STV, correct?

21       A    Either them or Heery or CBRE.  I'm

22  not sure who he's employed by.

23       Q    How did you communicate your comments

24  in regards to your valuation of Primera's

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 42

1  design drawings for the bridge?

2       A    Our communication was through e-mail.

3       Q    Who was included in the -- Were you

4  the principal person that sent the e-mail?

5       A    I would have -- I believe I was the

6  person who responded to Joey Tse's e-mails.

7  Joey at STV was the one who would have

8  contacted us with the specifics of the peer

9  review.  He provided us with the documents, and

10  our communication was back to him.  And if he

11  had included others on that e-mail, we would

12  have replied all.  I can't tell you at this

13  point who all was on that communication.

14       Q    But the -- Other than yourself and

15  your firm, were there any other individuals

16  that evaluated it with you, the bridge?

17       A    From my firm?

18       Q    Yes.

19       A    I don't recall.

20       Q    Were members of the Sheriff's Office

21  included in your comments to Joey Tse at either

22  STV or CBRE?

23       A    I'm sorry, the members of who?

24       Q    The Sheriff's Office.  Did you

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 43

1  include the individuals from the Sheriff's

2  Office?

3       A    I don't recall.  I don't recall.

4  That would have been up to Joey in having those

5  communications.

6       Q    For instance, do you know a Sabrina

7  Rivero-Canchola?

8       A    Yes.  I know Sabrina.

9       Q    And did you provide Ms. Canchola with

10  your comments in regards to your evaluation of

11  the design drawings by Primera for the bridge?

12       A    I would have only communicated

13  directly with Joey and whoever else he had

14  included on that e-mail.  I would not -- I

15  did -- would not have, but I don't believe I

16  did initiate any e-mail to Sabrina.

17       Q    When you went out to evaluate the

18  bridge, were there other members of the

19  Sheriff's Office that were present during your

20  evaluation?

21       A    We would have had an escort.  I don't

22  recall who that was, if it was Brian or Scott,

23  but we had an escort.

24       Q    Any other assignments in the year

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 11

ELLEN STONER
September 8, 2021

Page 44

1  2018 and thereafter in regards to the Criminal
2  Court Building at 26th and California?
3      A    We were asked to look at the bond
4  court renovation.  We had done an assessment of
5  the courthouse, the courtrooms on the upper
6  floors.  Those are the main assignments that I
7  recall.
8      Q    Did you do an assessment of the
9  holding areas behind the courtrooms at 26th and
10  California?
11      A    I don't recall if we did that behind
12  the courtrooms.  The only -- We had focused on
13  the bond court, and there were some holding
14  rooms associated to that, I believe.
15      Q    Now, when you did your evaluation of
16  Primera's design drawings for the bridge, to
17  your knowledge, was the bridge constructed and
18  the ramps constructed prior to the passage of
19  the ADA?
20      A    I don't know when that bridge was
21  constructed.
22      Q    When you reviewed the design drawings
23  for the ramps on the bridge, was it your
24  understanding that they had to comply with the

ELLEN STONER
September 8, 2021

Page 45

1  2010 design standards?
2      A    Yes.
3      Q    Why is that?
4      A    The 2010 ADA design standards, yes, I
5  believe that's -- that was the governing codes
6  at the time.
7      Q    And when you evaluated Primera's
8  design drawings for the bridge, were they in
9  compliance with the 2010 ADA standards?
10      A    Yes, they were.
11      Q    Do you know whether or not the ramps
12  on the bridge were ever constructed or
13  renovated based upon Primera's design drawings?
14      A    I believe that work has been
15  completed.
16      Q    Were you subsequently asked to review
17  the renovation of the ramps between the jail and
18  the Cook County Court Building at 26th Street
19  to see whether or not the renovated ramps
20  complied with the 2010 ADA standards?
21      A    No.  We were not asked to go back and
22  confirm or review any of the built conditions.
23      Q    Now, under your contract with STV,
24  have you done any evaluations or review at the

ELLEN STONER
September 8, 2021

Page 46

1  request of the Cook County Jail?
2          MR. GALASSO:  Sorry.  What's the
3      question?
4  BY MR. MORRISSEY:
5      Q    Under your contract with STV, have
6  you done any work at the Cook County Jail?
7      A    At the Cook County Jail, the only
8  assignments that we have been given have been
9  related to accessibility evaluation and scope
10  development.
11      Q    When was the first time you were
12  given an assignment at STV -- Let me rephrase
13  my question.
14          Other than through STV, have you
15  received any work from any other entity in
16  regards to assessing the facilities there
17  whether or not they were compliant with the
18  ADA?
19          MR. GALASSO:  Objection to form.
20      When you say "there," are you referring to
21      the jail?
22  BY MR. MORRISSEY:
23      Q    My question is:  Other than through
24  an STV, have you received any other assignments

ELLEN STONER
September 8, 2021

Page 47

1  for the Cook County Jail?
2      A    No.  All of our assignments come
3  through our single contract with STV.  They are
4  the ones that provide that assignment.
5      Q    When was the -- To the best of your
6  recollection, when was the first assignment
7  that you received from STV for the Cook County
8  Jail?
9          MR. GALASSO:  Objection, asked and
10      answered.  Go ahead.
11  BY THE WITNESS:
12      A    As I said before, sometime late 2017,
13  early 2018.
14  BY MR. MORRISSEY:
15      Q    Prior to today's deposition, did you
16  look at any documents in preparation for your
17  testimony today?
18      A    Yes, I did.
19      Q    Can you briefly tell me what
20  documents you reviewed in preparation for your
21  testimony today?
22      A    Well, I released those to my attorney
23  who had been in contact with STV's and the
24  County's attorneys.  We have not been able to

Exhibit 6 Page 12

ELLEN STONER
September 8, 2021

Page 48

1  release those because of the confidentiality
2  requirements of my contract.
3      Q   I'm not getting into that.  I'm
4  asking you to respond to my questions.
5          What documents have you reviewed in
6  preparation for today's deposition?
7      A   They were the ones --
8          MR. GALASSO:  You can tell him what
9  the documents were that you saw or that you
10  reviewed.
11  BY THE WITNESS:
12      A   Well, spreadsheets and e-mails,
13  reports, the things that were listed in the
14  subpoena.  We went through and compiled that
15  information and reviewed it.  It did not extend
16  to our entire contract with STV.  It was very
17  focused on the request around the Cermak ramp.
18  BY MR. MORRISSEY:
19      Q   When you mentioned that in
20  preparation for today's testimony you looked at
21  spreadsheets, what type of spreadsheets did you
22  look at?
23      A   Well, peer review comments, I guess,
24  and -- I don't know.

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 49

1          MR. GALASSO:  If you don't recall,
2  say you don't recall.
3  BY THE WITNESS:
4      A   Okay.  I can't recall the details of
5  that.
6          MR. MORRISSEY:  Well, you can't prep
7  or suggest to your witness that she doesn't
8  recall.  So I hope that doesn't occur again
9  in the future.
10          MR. GALASSO:  Just for the record,
11  you saw she was shaking her head.
12          MR. MORRISSEY:  I didn't see her
13  shake her head because I wasn't looking.
14          MR. GALASSO:  It's on the video.
15          MR. MORRISSEY:  I wasn't looking at
16  the video when I asked her.
17          MR. GALASSO:  Let's take a quick
18  break for a second.  I need to use the
19  restroom.
20          MR. BENTLEY:  Give us five minutes?
21          MR. MORRISSEY:  Sure.
22          MR. BENTLEY:  Okay.
23              (WHEREUPON, a short
24              break was taken.)

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 50

1  BY MR. MORRISSEY:
2      Q   You received a subpoena with an
3  Exhibit A in this -- in regards to this matter,
4  correct?
5      A   Yes, I did.
6      Q   And when you received Exhibit A,
7  which asked you to produce certain documents,
8  what did you do to investigate to see whether
9  or not you or your firm had those documents?
10      A   I asked one of my assistants to go
11  through and gather the relevant information
12  based on the parameters outlined in the
13  subpoena.
14      Q   Do you know how your -- Who was the
15  name of your assistant that gathered the
16  information?
17      A   That was Caroline Isaacson.
18      Q   Do you know what she had to do in
19  order to investigate and see whether you had
20  any responsive documents to the subpoena?
21      A   She searched through my e-mail and
22  she looked through the files on our server.
23      Q   And to your knowledge, was Caroline
24  able to retrieve any e-mails from your --

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 51

1  e-mails that were responsive to the Exhibit A
2  attached to the subpoena?
3      A   Yes, I believe she did.
4      Q   Do you recall approximately how many
5  e-mails that were responsive to the subpoena
6  that were retrieved by Caroline?
7          MR. BENTLEY:  I'm going to object to
8  relevance on that and outside the scope of
9  the agreed subpoena limitation.  You can
10  answer.
11  BY THE WITNESS:
12      A   I didn't count the number of e-mails.
13          MR. GALASSO:  And just for the
14  record, Tom, I had -- I know you were on a
15  couple of conversations; but in my
16  discussions with Patrick, there's an
17  agreement to limit those requests to
18  relative to the Cermak ramp after that
19  subpoena was issued, and there's a written
20  confirmation of that.  That was subsequent
21  to the subpoena when I brought up the
22  issues with the confidentiality clause in
23  the contract with STV and the involvement
24  of Cook County relative to the

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 13

ELLEN STONER
September 8, 2021

Page 52

1  confidentiality issues that we were trying
2  to address prior to the deposition
3  proceeding.
4       MR. MORRISSEY:  My understanding, and
5  I wasn't privy to all the conversations,
6  there was an agreement that they would be
7  produced.  And based upon that
8  understanding, I think Patrick agreed to
9  limit the scope of the requested documents
10 since your firm apparently failed to go
11 along with the agreement.
12      MR. GALASSO:  So when you're
13 finished, let me know.
14      MR. MORRISSEY:  Sure.  You can go
15 ahead.
16      MR. GALASSO:  That is not accurate.
17 It's partially accurate.  A discussion was
18 had.  You were on one or two of these
19 calls, and discussions were had with
20 Patrick that there was a confidentiality
21 clause in the contract and that STV is
22 required to waive its confidentiality
23 clause before the documents could be
24 produced as well as -- and STV had

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 53

1  indicated that Cook County had to be
2  involved in this relative to producing
3  these documents.  I advised Patrick, I
4  believe, and yourself regarding these
5  issues and that they would not be able to
6  produced or likely be able to be produced
7  prior to the deposition proceeding, and I
8  suggested that the deposition be continued
9  until we could respond to that.
10      And my conversations with Patrick
11 subsequent to that is that I had not
12 received authorization or the required
13 waivers prior to producing it, and I did
14 not think that I would get that by this
15 deposition.  And I was advised to try to
16 get what we could before the deposition
17 would proceed and that the decision was to
18 proceed with this deposition anyways with
19 the understanding that we would still
20 produce these documents after the
21 deposition, and that I would bring back
22 Ellen again, if necessary, after I was able
23 to get the waiver from Cook County and from
24 STV, which STV based its decision on

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 54

1  whether or not Cook County would agree.
2       Yesterday, I had a conversation
3  with Patrick wherein I advised that Cook
4  County still had not given me a waiver,
5  that they could not get me one prior to the
6  deposition.  I advised.
7       Patrick had indicated that he was
8  looking to see if there was any drawings or
9  blueprints.  I told them that there was, in
10 fact, a drawing of what appeared to be
11 existing conditions but not contractual or
12 design drawings that I had previously
13 redacted.  And I was asking Cook County to
14 provide authorization to produce, and I was
15 unable to get that authorization for a
16 waiver relative to that document as Cook
17 County wasn't able to do so.
18      So prior to this deposition
19 proceeding, it was already understood that
20 I could not produce any documents.  It was
21 already understood that I requested that
22 the deposition be continued and the plan
23 was, at that point, is that you wanted to
24 proceed with this deposition with the

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 55

1  understanding that I would still work with
2  Cook County and STV on producing the
3  necessary documents but there was a process
4  that I had to go through relative to
5  getting waivers relative to Cook County and
6  STV.
7       MR. MORRISSEY:  The bottom line on
8  all this, Mark, is that you're willing to
9  bring back the deponent after we work out
10 the logistics of the production of --
11      MR. GALASSO:  Certainly, and I said
12 that.  But, you know, when we discussed
13 this, this deposition and the request was
14 going to be limited to the Cermak ramp.
15 And I believe, while I'm not involved in
16 this litigation, I believe the litigation
17 is related to the Cermak ramp but now
18 you're asking questions about the bridge.
19 And I can understand, you may want to ask
20 specific questions about the bridge
21 relative to her experience and relationship
22 with Cook County and STV.  But some of the
23 questions in terms of whether those
24 particular areas are in compliance or not I

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 14

ELLEN STONER
September 8, 2021

Page 56

1  don't believe are relevant or reasonably
2  calculated to lead to relevant information
3  regarding this litigation. To a certain
4  extent, I have to rely on Cook County
5  because they are involved in this
6  litigation as to what would be relevant or
7  not. But certainly we're here to answer
8  the questions.
9       I know you have documentation
10 that you're aware of relative to Ms. Stoner's
11 involvement in a walkthrough relative to
12 the ramp, and she's here to answer those
13 questions, which may alleviate the amount
14 of documents or what documents that you
15 want.
16      MR. PATRICK MORRISSEY: Mark, just to
17 clarify, a couple of weeks ago, we spoke
18 and I offered to bring it to the Court's
19 attention and you told me that you were
20 trying to work it out with attorneys from
21 Johnson and Bell and the County so we
22 didn't have to get the Court involved.
23      So, you know, we've been working
24 cooperatively, and I agreed to limit the

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 57

1  request so that we could move forward with
2  this deposition and expeditiously resolve
3  this matter. So, you know, it's my
4  understanding -- If you gave even the
5  limited document I requested yesterday, the
6  diagram, and Jack Bentley wouldn't agree to
7  produce it for the County.
8       So, I mean, I have bent over
9  backwards to try and facilitate this, and
10 we worked together, but it's not your fault
11 and it's not our fault that the County
12 hasn't agreed to release this information.
13 And, apparently, some of the documents I
14 gave you yesterday were part of the
15 documents your client identified that the
16 County still won't agree to produce or
17 release them, so.
18      MR. GALASSO: Yeah, so I don't want
19 to speak for Jack. I don't think he said
20 he wouldn't. I think what he told me was
21 he couldn't at this time.
22      I will tell you that we -- I
23 talked to you about a process that we were
24 trying to put into place so that there was

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 58

1  not an issue with my client breaching its
2  contract with STV given it's
3  confidentiality clause. I did advise that
4  the clause allows for a court order for us
5  to produce those documents via court order,
6  and it was my hope -- Strike that. I used
7  the wrong word.
8       It was my understanding that we
9  were going to attempt to get you the
10 documents we could, but the first step in
11 that was a waiver from Cook County, and
12 my -- strike that -- a waiver from STV and
13 then a waiver from Cook County, but we were
14 unable to obtain a waiver from Cook County
15 prior to the deposition proceeding.
16      But 100 percent, the spirit of
17 this has been in a cooperative manner, and
18 the only reason I'm on the record talking
19 about that is that Tom was suggesting
20 otherwise and was pointing the finger, and
21 the point has always been from our
22 perspective to aid and assist in providing
23 whatever documents are required of us to be
24 provided under the constraints that

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 59

1  Ms. Stoner's company has a contract with
2  STV that has a confidentiality clause.
3       MR. PATRICK MORRISSEY: The case also
4  has to deal with Cermak, the building, too
5  and accessibility for Mr. Walker. So it's
6  not just about the ramp. There are
7  allegations that Mr. Walker was housed in
8  Cermak and the place didn't have compliant
9  shower facilities during the time he was
10 there, so.
11 BY MR. MORRISSEY:
12     Q    So to wrap this up, I just want to go
13 to the investigation, either she or her firm
14 took to gather information, and we'll deal with
15 the production of the documents at a later
16 date. Can I proceed?
17     MR. BENTLEY: Yep.
18     MR. GALASSO: Yes, please do.
19 BY MR. MORRISSEY:
20     Q    In regards to the actual notice,
21 approximately how many e-mails did Caroline
22 accumulate from your account?
23     A    I don't know. I did not count the
24 number of e-mails.

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 15

ELLEN STONER
September 8, 2021

Page 60

1    Q    Was it more than 20 or 30 e-mails
2  that were responsive?
3    A    I don't recall.
4    Q    Did you review the e-mails?
5    A    I glanced at them.
6    Q    How recently did you look at the
7  e-mails?
8    A    A couple of weeks ago, yesterday.
9    Q    And you referred to she did a search
10 of your server at your firm.  Did she find
11 responsive documents in your server?
12   A    I'm sorry.  Did she find --
13   Q    Responsive documents that were
14 responsive to the Exhibit A of the subpoena in
15 your company's server?
16   A    Yeah, she found documents related to
17 the Cermak ramp that were requested in the
18 subpoena.
19   Q    Did she also find documents in your
20 server that were responsive to the Division 8
21 Cermak building?
22   A    We -- No.  I don't recall.  We were
23 not searching for those.  We were focused on
24 issues around the Cermak ramp.

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 61

1    Q    In regards to e-mails, were any
2  e-mails retrieved that involved the Cermak
3  Division 8 housing -- or infirmary?
4        THE REPORTER:  I'm sorry, Tom.  What
5        was the last part, that involved the Cermak
6        Division...
7        MR. MORRISSEY:  I'm sorry.
8  BY MR. MORRISSEY:
9    Q    Were any e-mails discovered during
10 the search that involved the Cermak building?
11   A    I don't recall.  It's not something
12 we were looking for.
13   Q    You also mentioned that there were
14 spreadsheets that Caroline was able to retrieve
15 from your server.  What type of spreadsheets
16 were there?
17   A    I don't recall.  There was a series
18 of them, and I don't recall the content.
19   Q    And additionally, you said that there
20 were peer-reviewed comments that were retrieved
21 that were responsive to the subpoena production
22 request.
23   A    Well, I was mistaken with that.
24       MR. GALASSO:  I'm going to object as

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 62

1        to that's a mischaracterization.  The
2        question is a mischaracterization but she
3        can answer.
4  BY THE WITNESS:
5    A    Yeah, I was mistaken to that because
6  we didn't do peer reviews related to Cermak.
7  So there were -- There were a series of
8  documents related to our assessment but not
9  pertaining to peer review.  So I don't recall
10 the full details.
11 BY MR. MORRISSEY:
12   Q    Can you tell me what assignments
13 you've received from STV in regards to the
14 Cermak facility at the Cook County Jail?
15   A    We've received several, but I don't
16 recall the details of them for this deposition.
17   Q    Did you receive an assignment, for
18 instance, to review any of the housing units in
19 Cermak such as the second and third floor from
20 STV?
21       MR. BENTLEY:  Objection to relevance,
22       outside the agreed-to scope of the
23       deposition.
24       MR. GALASSO:  Based upon Jack's

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 63

1        objection, I will (inaudible) --
2        THE REPORTER:  I'm sorry.  What did
3        you say?  Based upon Jack's objection...
4        MR. GALASSO:  Yeah, so I'm not
5        involved in the litigation, so I don't know
6        the full scope of the litigation.  But
7        relative to the relevancy and that it's not
8        reasonably calculated to lead to
9        discoverable information, I would join in
10       that objection.  Patrick, you're on mute.
11       MR. PATRICK MORRISSEY:  Right.  Jack,
12       we never talked about the scope of the
13       deposition.
14       MR. BENTLEY:  I was under the
15       impression that you and counsel for
16       Ms. Stoner had agreed to limit the scope of
17       the deposition to the Cermak ramp, and it's
18       on that basis I'm making the objection.
19       MR. PATRICK MORRISSEY:  We never
20       talked about limiting the scope.
21       MR. GALASSO:  Patrick, I'll handle
22       that.  In fact, we talked about -- The
23       discussions that Patrick and I had was
24       relative to the -- relative to the

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 16

Page 64

1  documents and limit the scope of the
2  request for the production in the subpoena.
3      Patrick is correct.  We did not
4  have a discussion about limiting the scope
5  of this deposition.  I would hope, however,
6  that the deposition would be limited to
7  those relevant inquiries.
8      MR. BENTLEY:  I made my objection for
9  the record.  I'm not going to interfere
10  with the witness answering the question.
11      MR. GALASSO:  Right, and I'm joining
12  in your objection as to the relevancy.  I
13  don't know if Ellen can remember the
14  question.
15      MR. MORRISSEY:  Peggy, can you repeat
16  the question?
17          (WHEREUPON, the record
18          was read as requested.)
19  BY THE WITNESS:
20      A   I don't recall all the detail of the
21  various assignments we received.
22  BY MR. MORRISSEY:
23      Q   Tell me to the best of your
24  recollection what assignments you were given in

Page 65

1  regards to Cermak.
2      A   I don't recall.
3      Q   Do you recall any of your
4  assignments?
5      A   I recall that we had a handful of
6  specific things we were asked to look at, but I
7  don't recall exactly what those were.
8      Q   I'm going to refer you to a document
9  maybe to refresh your memory, Exhibit 106.
10      MR. GALASSO:  Give me one moment to
11  get to it.  That's the one you previously
12  put up or the document you previously
13  referred to, Tom?
14      MR. MORRISSEY:  It's -- It is, yes,
15  but it's a group exhibit.  It's Bates
16  Stamped 508 through 524.
17      MR. GALASSO:  Okay.  All right.  I
18  have it up.  Do you have it up?
19      THE WITNESS:  Uh-huh.
20      MR. GALASSO:  Yeah, let me -- For the
21  record, and you can ask her about this, but
22  she's got some eye issues.  So she has to --
23  It takes her a little bit more time to read
24  the exhibits.  So pardon us the time

Page 66

1  required.
2      So she's got the exhibit pulled
3  up now.  To explain it to you from my
4  perspective, she has to expand so it
5  magnifies a particular area.  So she's not
6  able to look at one whole page at a time,
7  only sections at a time.
8      So if you could direct her to
9  where you want her to look, it might be
10  helpful relative to her condition.
11  BY MR. MORRISSEY:
12      Q   Sure.  The initial question is are
13  you aware of these monthly agenda lists that
14  are prepared by STV?
15      A   Yes, I'm familiar with them.
16      Q   Can you explain what monthly
17  docket agenda is to your understanding?
18      A   To my understanding, it's a list of
19  the ongoing projects that the County is
20  undergoing with STV.
21      Q   And for what period of time had you
22  received these monthly docket agendas from, I
23  gather, is it usually from David Theising?
24      A   Yes.  David distributes them on a

Page 67

1  monthly basis.
2      Q   When did you first start receiving
3  the items?
4      A   Roughly the same time we started
5  services, at the end of 2017, early 2018.
6      Q   And that would -- Included in that
7  monthly agenda would be various projects that
8  your firm was working on, correct?
9      A   Yeah, correct.
10      Q   So would looking at the monthly
11  document refresh your memory in regards to some
12  of the projects you worked on at Cermak and at
13  the various court buildings throughout Cook
14  County?
15      A   Possibly.
16      Q   All right.  If we look at Page 2 of
17  Group Exhibit 106, which is Bates Stamped 509,
18  the first entry is an item in parenthesis, Has
19  ADA Scope, end of parenthesis.  Barriers
20  Reports Inquiry & Related Building Review.
21      Can you take a look at that agenda
22  item?  Tell me when you've had an opportunity
23  to review that agenda item.  It's Agenda Item 1.
24      A   Yes, I see it.

Exhibit 6 Page 17

ELLEN STONER
September 8, 2021

Page 68

1  Q   Have you had an opportunity to review
2  it?
3  A   Yes.
4  Q   And it starts off with MTG Notes from
5  11/14/19.
6       Did you actually meet in November of
7  2019?
8  A   I don't recall, but I presume his
9  meeting record is accurate.
10 Q   Prior to COVID, did you have actual
11 meetings with various, quote, unquote,
12 stakeholders in regards to the monthly docket
13 agenda?
14      MR. GALASSO:  Patrick, are you --
15      Tom, are you asking her if she had
16      in-person meetings prior to COVID?
17      MR. MORRISSEY:  Yes.
18 BY THE WITNESS:
19 A   Yes, we attended the monthly meeting.
20 BY MR. MORRISSEY:
21 Q   Where would those meetings be held?
22 A   They were on campus.  I think they
23 were two different locations we met at, at 26th
24 and California.

---

ELLEN STONER
September 8, 2021

Page 69

1  Q   Was one of the locations in the
2  Sheriff's Office building at about maybe 29th
3  and California?
4  A   It may have been.  I don't know the
5  name of the building.
6  Q   And there were -- The in-person
7  meetings were all held on the campus at 26th
8  and California.  Is that fair to say?
9  A   Yes.
10 Q   And to the best of your recollection,
11 when you had in-person meetings, who
12 participated in the monthly docket agenda
13 meetings?
14 A   I don't recall.  There were a variety
15 of people.
16 Q   The first page of Group Exhibit 106,
17 Page 508 lists a variety of people.  One is
18 Andrew Achterhof.  Was he usually present at
19 the meetings?
20 A   I believe he was, yes.
21 Q   There is a --
22      MR. GALASSO:  I believe he goes by a
23      different first name.  It's been
24      established previously.

---

ELLEN STONER
September 8, 2021

Page 70

1  BY MR. MORRISSEY:
2  Q   He is also known as Scott.  Was
3  Sabrina Rivero-Canchola generally at the
4  monthly docket agenda meetings?
5  A   I don't recall if she was physically
6  present.
7  Q   Mike Gandhi, was he present at the
8  meetings?
9  A   Gandhi?
10 Q   Gandhi.
11 A   I'm not familiar with a Gandhi.
12 Q   Sheila Atkins from capital planning?
13 A   Yes, I do recall Sheila would attend.
14 Q   Sandy Hardesty?
15 A   I don't know that person.
16 Q   Joey Tse from CBRE?
17 A   Yes.  I believe Joey generally
18 attended.
19 Q   Eric Davis from capital planning, did
20 Eric normally attend?
21 A   Yes, I believe he did.
22 Q   John Kelly from STV, would he
23 normally be in attendance?
24 A   I don't recall John being present.

---

ELLEN STONER
September 8, 2021

Page 71

1  Q   Who would chair those meetings, the
2  monthly docket agenda meetings?
3  A   David Theising.
4  Q   Would you receive the agenda docket
5  prior to the meetings?
6  A   Yes.
7  Q   What would transpire during the
8  meeting?  Would you talk about ongoing projects
9  during these meetings?
10      MR. BENTLEY:  I will just raise the
11      objection in that it may call for a
12      deliberative process privilege.  I'm not
13      going to interfere, once again, with the
14      witness' answering of the question.
15 BY THE WITNESS:
16 A   I don't recall the specifics of each
17 discussion.
18 BY MR. MORRISSEY:
19 Q   Do you recall -- At some point, in
20 time you evaluated the ramp that connects the
21 Cook County Jail to the Cermak facility,
22 correct?
23 A   Is that the ramp we've been talking
24 as the Cermak ramp?

Exhibit 6 Page 18

ELLEN STONER
September 8, 2021

Page 72

```
 1        Q    I'm referring to the ramp that
 2   provides an entry to the Cermak building.
 3        A    If it's the ramp in question that
 4   you're referring to, then, yes, we did evaluate
 5   that.
 6             THE REPORTER:  Then what?  I'm sorry.
 7   BY THE WITNESS:
 8        A    Yes, we did evaluate that.
 9             MR. GALASSO:  The answer that she
10        said was:  If it's the ramp in question.  I
11        think that's the first part of her answer.
12             MR. MORRISSEY:  Sure.
13   BY MR. MORRISSEY:
14        Q    The ramp that I'm referring to is
15   the -- Let me find the document.
16             MR. GALASSO:  I might have what
17        you're looking for.  You're looking for the
18        exhibit that you sent to me -- or that
19        Patrick sent to me yesterday.
20             I will take a quick break while
21        you're looking for that document.
22             MR. MORRISSEY:  Sure.
23   BY MR. MORRISSEY:
24        Q    I would ask you to pull up Exhibit
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 73

```
 1   200, 201 and 202 and take a few moments.
 2             MR. GALASSO:  So you want --
 3             MR. MORRISSEY:  Let me rephrase it,
 4        Mark.
 5   BY MR. MORRISSEY:
 6        Q    If we could pull up Exhibit 200 on
 7   her screen, please?
 8             MR. GALASSO:  Okay.  She is getting
 9        it.
10   BY MR. MORRISSEY:
11        Q    Are you able to pull up Exhibit 200,
12   the video?
13             MR. GALASSO:  The video is up and
14        it's playing but it's still playing?
15   BY MR. MORRISSEY:
16        Q    Let me know when you've reviewed it.
17             MR. GALASSO:  The witness reviewed
18        the video.
19   BY MR. MORRISSEY:
20        Q    Have you had an opportunity to review
21   the video, which is Exhibit 200?
22        A    Yes.
23        Q    Do you recognize what the video
24   depicts?
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 74

```
 1        A    It appears to depict the Cermak ramp.
 2        Q    Does it fairly and accurately depict
 3   the Cermak ramp?
 4        A    Yes, I believe it does.
 5        Q    Is that the only ramp, to your
 6   knowledge, that connects the other portions of
 7   the jail with the Cermak infirmary building?
 8        A    I am not aware of others.
 9        Q    For purposes of this deposition, can
10   we refer to that as the Cermak ramp?
11        A    Yes.
12        Q    Is that okay?
13             MR. GALASSO:  She said yes.  I don't
14        know if you heard her.
15             MR. MORRISSEY:  I didn't hear.
16   BY THE WITNESS:
17        A    Yes.
18   BY MR. MORRISSEY:
19        Q    Going back to the second page of
20   Group Exhibit 106, the monthly docket agenda
21   dated 12/12/19 under Item Number 1, under
22   Status and it says:  11/14/19 minute [sic]
23   notes, and under "A," it says:  There are 8 site
24   visits completed by AWI that are ready for an
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 75

```
 1   A/E and are targeted to be procured via the
 2   under 25K delivery method when approved.
 3             When they say "AWI," is that your
 4   firm?
 5        A    Yes.  That is a reference to
 6   AltusWorks.
 7        Q    As of November 14, 2019, to the best
 8   of your recollection, when you refer to 8 site
 9   visits, where were those site visits completed?
10        A    Oh, I don't recall.  It's an agenda
11   item.
12        Q    Did that include the Cermak building
13   at the jail?
14        A    I don't recall.
15        Q    B, it says:  The DOC campus divisions
16   RFP is targeted to be uploaded the week of
17   11/18.  And C, Cermak and RTU are uploaded;
18   awaiting buyer and page turn.
19             What is meant by those meetings notes
20   to the best of your knowledge?
21        A    I don't know.  That's outside our
22   scope of work.
23        Q    And on the right side of the first
24   item, there's notes and it says:  ADA-related
```

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 19

ELLEN STONER
September 8, 2021

Page 76

1  scope. 03 project evaluation. Would a project --
2  is that a code, 03?
3      A   I don't know what that stands for.
4      Q   Project evaluation, would that
5  include your firm, AWI?
6      A   I don't know from this information.
7  I don't know.
8      Q   What is meant by project planning in
9  relation to the department of capital planning
10 and policy?
11     A   I can't knowledgeably respond to
12 that.
13     Q   As far as 11, project procurement,
14 referring to the department of capital planning
15 and policy, what does it mean to be a
16 procurement?
17     A   I don't know. That's outside our
18 scope of services.
19     Q   And under 09, project design and
20 construction, again, in regards to Capital
21 Planning and Policy, what does it mean to be in
22 design and construction?
23     A   I don't know. Again, that's outside
24 our scope of services.

ELLEN STONER
September 8, 2021

Page 77

1      Q   And it says: 09, projects completed
2  and 44 projects with ADA-related scope, pe
3  11/30/19.
4          All are under the heading ADA-related
5  scope. Would it be fair to say to the best of
6  your knowledge when STV was involved in ADA-
7  related projects for Cook County that you were
8  the consultant they used to do the evaluations?
9      A   Not necessarily. I believe every
10 aspect was brought to our attention, but I
11 can't knowledgeably say that.
12     Q   Can you briefly tell me what projects
13 that you worked under STV to evaluate
14 compliance with the ADA for Cook County?
15     MR. GALASSO: Objection, asked and
16     answered multiple times. You can answer.
17 BY THE WITNESS:
18     A   I don't recall exactly. We had a
19 whole series of assignments.
20 BY MR. MORRISSEY:
21     Q   Did you review, for instance, the RTU
22 building at the jail in regards to shower
23 enclosures as part of the work that you did for
24 STV?

ELLEN STONER
September 8, 2021

Page 78

1      A   I don't know.
2      MR. BENTLEY: Objection to relevance.
3  BY MR. MORRISSEY:
4      Q   Did you review any proposed Cermak
5  renovations as part of your STV contract?
6      A   I don't recall.
7      Q   Do you have any recollection that you
8  reviewed ADA improvements or proposed
9  improvements in the Cermak building in the
10 lower basement area?
11     MR. GALASSO: Objection as to form.
12 BY THE WITNESS:
13     A   I don't recall.
14 BY MR. MORRISSEY:
15     Q   Anything refresh your memory in
16 regards to improvements, ADA improvements at
17 the Cermak building?
18     A   I'm sorry. Refresh my memory. What?
19     Q   In regards to work you did in regards
20 to ADA issues in the Cermak building.
21     A   I don't recall specifics.
22     Q   Well, let's look at Exhibit 100 for a
23 moment.
24     MR. GALASSO: That's a different

ELLEN STONER
September 8, 2021

Page 79

1  exhibit. And before we get into this
2  exhibit, I do want to address this. The
3  subpoena that was issued for this witness
4  had an exhibit on it with a list of
5  documents requested that were focusing on
6  the Cermak ramp, and she is here to testify
7  and she is prepared to testify relative to
8  the Cermak ramp. And I do believe it's
9  disingenuous -- Well, certainly you are
10 entitled to ask whatever questions you
11 want, but I believe you're going outside
12 the scope of what was intended relative to
13 this deposition, into areas that are not
14 relevant or reasonably calculated to lead
15 to discoverable information.
16     MR. MORRISSEY: Well, the subpoena
17 was for the deponent to appear. It doesn't
18 say the nature of the questions that are
19 going to be asked. And, you know, I don't
20 think you're the person to object to that.
21 And certainly it's within the scope of her
22 involvement at Cook County and at the Cook
23 County Jail.
24     So I think it's certainly

Exhibit 6 Page 20

ELLEN STONER
September 8, 2021

Page 80

1  pertinent to her involvement in this case
2  which involves, I might add, the housing
3  facilities at Cermak are one with the ramp
4  because that's part of the claim that
5  Mr. Walker brings against Cook County and
6  the Sheriff.
7      MR. GALASSO:  Certainly, but I'm
8  not -- The point that I'm making as well is
9  that you have a predetermined amount of
10 time that you have with this witness.  I
11 have agreed to bring her back if necessary
12 relative to documents that I was unable to
13 produce without the waivers that were
14 necessary.  However, if you choose to spend
15 your time asking questions that are not
16 related to the Cermak ramp and you run out
17 of time, I'm not going to agree to bring
18 her back if you extinguish all of the time
19 on other issues not related to that ramp.
20     MR. MORRISSEY:  Well, as I say --
21     MR. GALASSO:  I will be as fair as
22 possible.
23     MR. MORRISSEY:  Right.
24     MR. GALASSO:  But I'm saying I'm

ELLEN STONER
September 8, 2021

Page 81

1  asking the same from you.
2      MR. MORRISSEY:  Right.  I understand
3  but the case involves the Cermak building
4  and the ramp because our client was
5  wheelchair-assisted, and he didn't have
6  access to certain facilities at the Cermak
7  building including the ramp.
8      MR. GALASSO:  Right.  What I'm saying
9  is, is that the exhibit that provides
10 notice to the witness as to what the
11 subject matter of the request all refer to
12 Cermak and ramp with the exception there's
13 a mention of showers and Division 8.  I'll
14 leave it at that.
15     MR. MORRISSEY:  Okay.
16     MR. GALASSO:  You made your point.
17     MR. MORRISSEY:  Sure.
18 BY MR. MORRISSEY:
19     Q    Will you please turn to Exhibit 100.
20     MR. GALASSO:  We are both there.
21 BY MR. MORRISSEY:
22     Q    Okay.  And it's a letter from Scott
23 Utter who works for you to Scott Achterhof and
24 there's various people that are copied

ELLEN STONER
September 8, 2021

Page 82

1  including yourself, and it says:  Scott, Ellen
2  mentioned at the meeting needing to get back
3  into Cermak.  You mentioned taking a look at
4  the receiving area on Cermak as well.  The
5  intent will be to hit.  And it goes on, the RTU
6  first floor holding area.  2, Cermak, and then
7  it has various rooms on the third floor.
8  Cermak receiving area, parenthesis, ramp.
9  Stairs and new enclosures at removed building.
10     Does that refresh your memory in
11 regards to part of the scope of the review you
12 did at Cermak?
13     MR. BENTLEY:  Object to the form of
14     the question and relevance.
15     MR. GALASSO:  Sorry.  Can I have that
16     question read back?  I kind of missed it
17     with the objection.
18     THE REPORTER:  Tom, do you think that
19     you could just repeat it?  You were reading
20     from it.  So it would be easier.
21 BY MR. MORRISSEY:
22     Q    Looking at Exhibit 100, does that
23 refresh your memory in regards to some of the
24 assignments you had from STV to evaluate ADA

ELLEN STONER
September 8, 2021

Page 83

1  issues at Cermak?
2      A    Yes, those are familiar.
3      Q    Did you also view the lower level of
4  Cermak?
5      MR. BENTLEY:  Objection, relevance.
6      MR. GALASSO:  You can answer.
7  BY THE WITNESS:
8      A    I don't recall specifically.
9  BY MR. MORRISSEY:
10     Q    Well, on the lower level of Cermak,
11 is there an urgent care clinic?
12     MR. BENTLEY:  Same objection.
13     THE WITNESS:  Answer it?
14     MR. GALASSO:  You can answer it, yes.
15     Sorry.  My apologies.  Go ahead and answer.
16 BY THE WITNESS:
17     A    I'm not overly familiar with all the
18 functions in the building.  I know it's also
19 considered a hospital.
20 BY MR. MORRISSEY:
21     Q    Did you consider or review or
22 evaluate the holding cells on the lower floor
23 of Cermak and make a recommendation that at
24 least one of them be enlarged to accommodate

Exhibit 6 Page 21

ELLEN STONER
September 8, 2021

Page 84

1  disabled inmates under the ADA?
2     **A    I don't recall that.**
3        MR. BENTLEY:  Same objection.
4  BY MR. MORRISSEY:
5     Q    If you made an evaluation of the
6  lower level of Cermak, would you have provided
7  your comments to STV?
8        MR. BENTLEY:  Same objection, also
9     speculation.
10 BY MR. MORRISSEY:
11    Q    I would refer you to -- Would
12 anything refresh your memory in regards to
13 recommendations you made to STV in regards to
14 the lower level of Cermak?
15    **A    I --**
16       MR. GALASSO:  You can answer.
17 BY THE WITNESS:
18    **A    Would something refresh my memory; is**
19 **that the question?**
20       MR. GALASSO:  That's the question.
21 BY THE WITNESS:
22    **A    I'm not sure what would.**
23 BY MR. MORRISSEY:
24    Q    Okay. I would ask you to pull up

ELLEN STONER
September 8, 2021

Page 85

1  Exhibit 105.
2     **A    Okay.**
3        MR. GALASSO:  Can you let us know
4     where you want her to look?
5        MR. MORRISSEY:  Sure.
6  BY MR. MORRISSEY:
7     Q    Have you seen this document before,
8  which is dated March 8th, 2018.  It's minutes,
9  and it was -- It's minutes of a meeting that
10 was held in the Department of Corrections South
11 Campus on the second floor conference room,
12 which I believe is the Sheriff's conference
13 room.
14    **A    Uh-huh.**
15    Q    Do you recall that meeting?
16    **A    Not that one specifically.**
17    Q    Was that the first meeting that you
18 held that you were present on the 26th Street
19 and California campus?
20       MR. GALASSO:  Objection to form.  Go
21    ahead.
22 BY THE WITNESS:
23    **A    I don't know if that was the first**
24 **meeting.  I don't recall.**

ELLEN STONER
September 8, 2021

Page 86

1  BY MR. MORRISSEY:
2     Q    The subject under Number 1 is
3  STV/Heery ADA Consultant AltusWorks, Inc.
4  AWI Introductions.  Do you remember attending
5  that meeting?
6     **A    I remember being introduced to the**
7  **County folks, yeah.**
8     Q    And if we turn to the third page of
9  the document, under A, it states:  AWI informed
10 the dimensions on drawings by JOC contractor
11 are unclear but graphically one cell appears
12 too small.  If so, the quantity of 10 may have
13 to go to 9.
14       Did that refer to the -- enlarging
15 one of the courtrooms -- Strike that.
16       Did that refer to enlarging one of
17 the holding cells in the lower level of Cermak
18 to accommodate disabled detainees?
19    **A    I don't recall.**
20    Q    Do you recall any work or evaluation
21 by your firm in regards to the lower level of
22 Cermak as far as ADA issues?
23    **A    No, I don't recall.**
24    Q    When you do an evaluation of, let's

ELLEN STONER
September 8, 2021

Page 87

1  say, the Cermak building, what documents does
2  your firm prepare?
3        MR. GALASSO:  Objection as to form,
4     and I think it's a mischaracterization to
5     say that she's done a full evaluation of a
6     building as opposed to individual requests,
7     but you can answer.
8        MR. MORRISSEY:  Well, let me rephrase
9     the question.
10 BY MR. MORRISSEY:
11    Q    When you're given an assignment to
12 review a part of the Cermak building, that's
13 generally an e-mail that's sent to your firm,
14 correct, and to you?
15    **A    Yes.  Generally, yes.**
16    Q    And if you were asked through an
17 e-mail to do an evaluation of the lower level
18 of Cermak and you did the evaluation, what type
19 of paperwork or documents would you generate
20 for STV?
21    **A    In general, when we do an**
22 **accessibility evaluation, we would put together**
23 **a written summary of our findings, which may**
24 **include photographs or other illustrations to**

Exhibit 6 Page 22

ELLEN STONER
September 8, 2021

Page 88

1   clarify our findings.
2        Q   Before you conduct your evaluation of
3   part of, let's say, the Cermak building, are
4   you given any documents such as diagrams of the
5   facility to assist you in doing your work?
6        A   We generally like to start with some
7   sort of document or diagram that illustrates
8   the configuration of the building.  If the
9   owners have them, they provide them.
10       Q   If you were given a diagram of the
11  Cermak building by STV, would you maintain that
12  on your server at work?
13       A   Yes.  We would continue to hold
14  documents that we received, yes.
15       Q   In your work that you did for the
16  courthouses and the Criminal Court Building, at
17  times, did you receive design drawings and
18  blueprints directly from Cook County or the
19  Sheriff?
20       A   No.  We would generally just receive
21  existing -- I don't want to say existing
22  conditions or the full diagrams of the
23  configuration of the building.  We never
24  received construction documents from the

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 89

1   construction of the building.
2        Q   When you do these reports back to
3   STV, do you title it your observation note?
4        A   I'm not sure what we actually -- I
5   don't recall what our specific titling --
6        Q   Well --
7        THE REPORTER:  What our specific
8   titling -- I'm sorry.  I didn't hear the
9   last part.
10       MR. MORRISSEY:  Let me rephrase the
11  question.
12       THE REPORTER:  No, I didn't hear the
13  last part of her answer.
14       MR. GALASSO:  She said she didn't
15  recall whatever the titling may have been.
16       THE WITNESS:  Uh-huh.
17  BY MR. MORRISSEY:
18       Q   But you do a --
19       MR. GALASSO:  Just one second, Tom.
20  I just want to instruct her just briefly.
21  So when the court asks you what you just
22  said, say exactly what you just said.
23  Don't explain it.  She is not asking for an
24  explanation.  She wants to know exactly

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 90

1        what you said.
2        THE WITNESS:  Yes.  I understand.
3   BY MR. MORRISSEY:
4        Q   When you get an assignment for STV,
5   do you usually e-mail back to them asking for
6   certain documents before you actually do a site
7   inspection?
8        A   Depending on what the assignment is,
9   yes, we will make inquiries into additional
10  support documentation.
11       Q   For instance, if you were given an
12  assignment to review whether or not the
13  bathroom facilities were accessible in the
14  lower level of Cermak, would you ask for design
15  drawings or the blueprints for that area of the
16  building?
17       A   In general, we would ask if they had
18  any existing conditions of the area they want
19  us to look at.
20       Q   Why would you do that?
21       A   That just helps -- That assists us in
22  understanding the configuration of the
23  building.
24       Q   In regards to the assignments you

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 91

1   have received from STV, when you've requested
2   either the blueprints or the design drawings
3   for the area you have been asked to evaluate by
4   STV, have you normally received documents,
5   those documents back?
6        MR. GALASSO:  I'm going to object as
7   it is a mischaracterization of the previous
8   testimony.  She's never testified that
9   she's asked for design drawings?
10       MR. BENTLEY:  Join.
11       MR. MORRISSEY:  Well, let me rephrase
12  the question.
13  BY MR. MORRISSEY:
14       Q   Before doing -- After you received an
15  assignment to view a court building for an area
16  at the Cook County Jail, do you ask for the
17  blueprints of the building or the facility?
18       A   We generally request existing
19  conditions so we can understand the
20  configuration of the building.  We have not
21  requested design or previous construction
22  documents.
23       Q   What type of documents would be
24  included in existing conditions that you would

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 23

ELLEN STONER
September 8, 2021

Page 92

1   be requesting?
2        A    In general, we're looking for an
3   illustrated floor plan that shows us the
4   configuration of the building.
5        Q    And generally, what type of document
6   would show the illustrated floor plan for an
7   area that you've been requested to evaluate?
8        A    I think that depends on what the
9   County has on hand and is willing to release to
10  us.
11       Q    Can you provide examples of what
12  would be included in this notion of illustrated
13  floor plans?  Would that include blueprints for
14  the building?
15       A    I'm not sure what you mean by
16  blueprints.
17       Q    What type of -- In response to your
18  request for illustrated floor plans, what type
19  of documents have you received from STV prior
20  to doing your evaluations?
21           MR. BENTLEY:  Objection, asked and
22       answered.  Go ahead.
23  BY THE WITNESS:
24       A    General illustrations of the

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 93

1   configuration of the building.
2   BY MR. MORRISSEY:
3        Q    What do you call those?
4            MR. GALASSO:  Objection, asked and
5       answered.  I believe she's testified to the
6       term existing conditions.  You can answer
7       the question.
8   BY THE WITNESS:
9        A    Yeah.  So they're generally an
10  existing-condition drawing that the County
11  provides.
12  BY MR. MORRISSEY:
13       Q    Is that a technical term?  Can you
14  tell me what it is in a layperson's language?
15       A    It's a simple line drawing of the
16  building.  So it shows you what rooms are where
17  and how they relate to each other.
18       Q    Are those line drawings usually done
19  by engineers or architectural firms?
20       A    I don't know who would have prepared
21  them.
22       Q    Are they done by someone that -- Are
23  they done to scale?
24       A    Some.  Some of them.  Good ones are.

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 94

1        Q    All right.  How do you know if they
2   are to scale or not?  And how do you know who
3   actually does the simple line drawings?
4        A    Well, it may be indicated on the
5   title block.  Otherwise, we wouldn't know who
6   had prepared them.
7        Q    Does your contract require you to do
8   a formal report after you do your evaluation?
9        A    I don't recall if the contract
10  requires that.  I think it depends on the
11  assignment.
12       Q    What is the practice of your firm
13  after you complete your assignment with STV in
14  evaluating a building or a facility under your
15  contract?
16           MR. GALASSO:  I'm just going to
17       object.  You're asking -- I don't think
18       she's ever testified that she evaluated any
19       building or facility.  I believe she's
20       testified she has individual assignments
21       that she completes.
22           That being stated that it's a
23       mischaracterization, she can answer the
24       question.

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 95

1   BY THE WITNESS:
2        A    I'm sorry.  Could you repeat the
3   question?
4   BY MR. MORRISSEY:
5        Q    Well, let me rephrase the question.
6   Have you ever done an evaluation -- There's
7   some disturbance.
8            Have you ever done an evaluation of
9   an entire court building such as 727 East 111th
10  Street?
11       A    I'm not familiar with that address.
12       Q    The Branch 35 and 38 court building?
13       A    I don't recall, no.
14       Q    Tell me what the practice of the firm
15  is when you do a -- when you complete your
16  evaluation of an assignment for STV?
17           MR. GALASSO:  Can I hear that
18       question -- You kind of got jumbled there.
19           MR. MORRISSEY:  Sure.
20  BY MR. MORRISSEY:
21       Q    Can you tell me what the practice of
22  your firm is in responding and completing your
23  evaluation for STV with an assignment of either
24  a court building or an area of the Cook County

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 24

ELLEN STONER
September 8, 2021

Page 96

1   Jail?  How do you --
2           MR. GALASSO:  Objection.
3           THE REPORTER:  How do you what?  I'm
4       sorry, Tom.
5   BY MR. MORRISSEY:
6       Q    How do you respond to them in regards
7   to your findings and evaluations?
8           MR. GALASSO:  Objection as to form,
9       and I believe that question has been asked
10      and answered.  Go ahead.
11          MR. BENTLEY:  Join the objection.
12          MR. GALASSO:  Do you understand the
13      question?
14          THE WITNESS:  I think I understand
15      the question.
16  BY THE WITNESS:
17      A    We generally respond in writing with
18  our findings supported by photographs and
19  potentially illustrations or, you know,
20  excerpts from the existing conditions that we
21  were provided by the County.
22          MR. MORRISSEY:  Can we take a
23      one-minute break?
24

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 97

1           (WHEREUPON, a short
2               break was taken.)
3   BY MR. MORRISSEY:
4       Q    We sent you an Exhibit 11.
5           MR. GALASSO:  Not ready to go yet
6       though.  I didn't see that.  I haven't
7       looked at my computer.  Just give me a
8       second.  I'm reviewing it with the witness
9       right now.  Tom, is this something that
10      Cook County produced?
11          MR. MORRISSEY:  No.  It's a public
12      document.
13          MR. GALASSO:  I'm just asking where
14      it came from.  I haven't seen it before.
15          MR. MORRISSEY:  It's a public
16      document.
17          THE WITNESS:  Can you e-mail it to
18      me?
19          MR. GALASSO:  Give me one second.
20      I'm going to e-mail it to her so she can
21      look at it on her computer.
22  BY MR. MORRISSEY:
23      Q    Let me know when you've had a chance
24  to review it.

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 98

1           MR. GALASSO:  Okay.  All right.  I
2       just sent it to you.
3   BY MR. MORRISSEY:
4       Q    Have you had an opportunity to review
5   Exhibit 11?
6       A    Yes.
7           MR. GALASSO:  Did you see the color
8       part too?
9           THE WITNESS:  Oh, no.
10          MR. GALASSO:  Hold on.  She's still --
11      It's kind of like she's using a flashlight
12      to look at the documents.
13          MR. MORRISSEY:  That's fine.
14          MR. GALASSO:  She can only see little
15      parts at a time.  So, Tom, there's a part
16      of this exhibit that's Picture Number 1,
17      but it's completely black.
18          MR. MORRISSEY:  That's correct.
19          MR. GALASSO:  All right.
20          MR. MORRISSEY:  We didn't get the --
21      It was redacted.
22          MR. GALASSO:  Okay.
23  BY THE WITNESS:
24      A    I have reviewed it, uh-huh.

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 99

1   BY MR. MORRISSEY:
2       Q    Showing you Exhibit 11, do you
3   recognize this document?
4       A    No, I do not.
5       Q    Is this a -- the form that you use
6   after your firm evaluates a facility under your
7   contract with STV?
8       A    It's not a format that I am familiar
9   with.
10          MR. GALASSO:  Hold on.  He didn't ask
11      you if it was your format.  He asked you if
12      it's a form that you use.
13  BY THE WITNESS:
14      A    Oh, no.  It's not a form.  No, it's
15  not a form that we use.
16  BY MR. MORRISSEY:
17      Q    To the best of your knowledge, was
18  this document produced by your firm?
19      A    To the best of my knowledge, it was
20  not produced by my firm.
21      Q    Did your firm do an evaluation of the
22  court building at 111th Street?
23      A    Not that I recall, no.
24      Q    What type of information generally is

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 25

ELLEN STONER
September 8, 2021

Page 100

1  in the -- Let me rephrase that.
2          After you do an evaluation of a
3  facility or an area for STV, what type of
4  document or report do you provide STV?
5          MR. GALASSO:  So that question --
6      Well, objection, asked and answered.  I
7      believe that question has been asked many,
8      many times already.  You can answer it
9      again.
10 BY THE WITNESS:
11     A    Uh-huh.  We provide a written
12 document of our findings possibly supported by
13 photographs and an illustration.
14 BY MR. MORRISSEY:
15     Q    Do you know whether or not you did
16 such --
17          THE REPORTER:  I'm sorry, Tom.
18 BY MR. MORRISSEY:
19     Q    Do you know if you did such an
20 evaluation or report for STV concerning the
21 Cermak ramp?
22     A    I believe we did.  I believe it was
23 part of the exhibits that we're reviewing
24 today.

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 101

1      Q    What would have been the heading or
2  title of that report that you did in regards to
3  the Cermak ramp?
4      A    I don't recall the actual title.
5      Q    How soon after doing your evaluation
6  typically does your firm provide STV with a
7  report?
8      A    We try to be as prompt as possible in
9  formulating our report and providing it to STV.
10 So it would depend.  Within a couple of weeks
11 of the visit.
12     Q    Do you do that through an e-mail to
13 STV?
14     A    Yes.
15     Q    Do you know if you also include any
16 other individuals or entities when you complete
17 an assignment for STV, for instance, for the
18 Cermak ramp?
19          MR. GALASSO:  Objection as to form
20      and asked and answered.
21 BY THE WITNESS:
22     A    In general, we respond to the e-mail
23 that we received with the assignment.
24

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 102

1  BY MR. MORRISSEY:
2      Q    And is it generally when you --
3  Generally, when you -- I'm sorry.
4          Generally when you receive an
5  assignment through STV under your contract in
6  regards to the Cook County Jail or the court
7  buildings, are there other governmental
8  employees that are included in the e-mail?
9      A    I don't recall.
10     Q    Turning to Exhibit 2, which is the
11 Defendant Cook County's Answer to Plaintiff's
12 First Set of Interrogatories.
13          MR. GALASSO:  Okay.  It's up for both
14      of us.
15 BY MR. MORRISSEY:
16     Q    In March of 2018, did you conduct a
17 walkthrough of the Cermak building including
18 the area depicted on Page 2 of Exhibit 2?
19     A    I don't recall the extent of the
20 walkthrough, but I do recall that we looked at
21 the ramp.
22     Q    Other than yourself and Scott Utter
23 from your firm, did anybody else -- was anybody
24 else included in the walkthrough in March of

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 103

1  2018?
2      A    I believe it was Scott Achterhof as
3  he was our escort through the facility.
4      Q    Now, there's a diagram on Exhibit 2,
5  Page 2 at the top of the page.
6      A    Uh-huh.
7      Q    Do you see that document?
8      A    Yes.
9      Q    Did you create that diagram?
10     A    We created the bubbles in and around
11 the areas in order to describe what we
12 observed.
13     Q    But below there, there is a diagram
14 of the Cermak ramp; is that correct?
15     A    There is.
16          MR. GALASSO:  That was what she was
17      referring to.
18 BY THE WITNESS:
19     A    Yeah.  We did not draw the -- We did
20 not prepare the drawing.  We did an overlay on
21 top of it in order to identify the areas that
22 we were discussing.
23 BY MR. MORRISSEY:
24     Q    In the -- At the top of the page, it

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 26

ELLEN STONER
September 8, 2021

Page 104

1  looks like -- It says:  Copy paste of
2  walkthrough from March 2028 [sic].  Currently
3  in 2019, this scope is awaiting processing of
4  Appendix 1 for AV [sic] VIA procurement 8/26/19.
5  And then below that, it has E, Cermak ramp.
6         Is your -- the information that's in
7  the box is prepared by you?
8      A   Correct.
9      Q   Was that part of a larger document
10 that you provided STV or Cook County as a
11 result of your walkthrough in March of 2018?
12     A   That I don't recall.
13     Q   Do you know the significance of
14 E, Cermak Ramp?  Would that indicate that there
15 were other areas during your walkthrough in
16 March of 2018 that you included in a report?
17     A   I don't recall.
18     Q   On the top of that, the heading that
19 I read, copy paste, it refers to an Appendix 1.
20 Do you see that?
21     A   Yes.  I see that.
22     Q   I'm going to ask you to look at
23 another document, 101, Exhibit 101.
24     A   Uh-huh.

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 105

1         MR. MORRISSEY:  Do you have that up
2      on the screen, Mark?
3         MR. GALASSO:  Yeah, she has it up on
4      hers, and I have it up on mine.
5  BY MR. MORRISSEY:
6      Q   And on the Page 7 of 7, on the second
7  page of Exhibit 101, which is Bates Stamped 242
8  under 5.1 it says:  Additional scope request.
9  A, the Cermak ramp, which is included in the
10 RFQ write-up in Appendix 1.  Do you see that?
11     A   I do.
12     Q   What is meant by that RFQ?
13     A   RFQ is an abbreviation for a Request
14 for Qualification.
15     Q   Qualifications for what?  In your
16 field of work, what does a request for
17 qualification mean?
18     A   In general, it's looking for
19 qualifications for a professional.
20     Q   Professional to renovate the ramp or
21 to do design drawings or...
22     A   I don't know what context he wanted --
23 he put this in for the RFQ.
24     Q   If we look at Exhibit 101, the third

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 106

1  page of that group exhibit, it's Bates Stamped
2  243.  It's titled:  869 Cermak Renovations, ADA
3  Improvements, and then it has Appendix 1.  Do
4  you see that, Scope of Services?
5      A   Oh, yes.  Uh-huh.
6         MR. GALASSO:  She's still scrolling
7      to get there.  She saw it on mine, and now
8      she is trying to get it in her line of
9      sight.
10 BY THE WITNESS:
11     A   Yes, I see it.
12 BY MR. MORRISSEY:
13     Q   In Exhibit Number 2 on the second
14 page in the box that was filled in by your firm
15 in a bubble.  It says Appendix 1.
16         Is this the Appendix 1 that you're
17 referring to?
18         MR. GALASSO:  So it hasn't been
19     established that that's her language --
20         THE WITNESS:  Correct.
21         MR. GALASSO:  -- on the top.  You
22     only asked her what was in the box.
23         MR. MORRISSEY:  Okay.
24         MR. GALASSO:  On top of the box.

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 107

1  BY MR. MORRISSEY:
2      Q   Above the box on Page 2 of Exhibit 2,
3  there's a heading that I previously read:  Copy
4  paste of walkthrough from March 2018, and then
5  it refers to Appendix 1.  Awaiting processing
6  of Appendix 1.
7         Is this Appendix 1 that's referred to
8  in Exhibit 2, Page 2?
9      A   I don't know because I did not
10 prepare the appendix.  So I don't know how
11 these documents relate to one another.
12     Q   Well, if we turn to -- In Exhibit 101
13 under the Appendix 1, the fourth page -- Let's
14 look at Appendix 1, Page 2.
15         MR. GALASSO:  So this is 101 you're
16     still on?
17         MR. MORRISSEY:  I'm on page -- I'm on
18     Exhibit 101, the document that's Bates
19     Stamped 244.
20         MR. GALASSO:  Okay.  Are you there?
21         THE WITNESS:  Yeah.
22         MR. GALASSO:  All right.  She's
23     there.
24

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 27

ELLEN STONER
September 8, 2021

Page 108

BY MR. MORRISSEY:

1  BY MR. MORRISSEY:
2      Q    Under General Requirements, A, were
3  you involved in working on (inaudible) projects
4  for STV?
5          MR. GALASSO:  I'm sorry.  Can you --
6      You broke up.
7          THE REPORTER:  Tom, can you say that
8      again?
9  BY MR. MORRISSEY:
10     Q    Under the Agenda 1 on Page 2 of Group
11 Exhibit 101, it has various projects under
12 General Requirements.
13         MR. GALASSO:  Hold on.  You changed
14     your question and focus.  We have to --
15     Your on page?
16         MR. MORRISSEY:  I'm on Page 2 of
17     Agenda 1, Bates Stamped 244.
18         THE REPORTER:  I'm sorry, Tom.  Say
19     that once more.  You're on page 2?
20         MR. GALASSO:  All right.  Go ahead.
21         THE REPORTER:  No, say it again, Tom.
22     Tom, can you say it again?  You're on page
23     2 of what?
24

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 109

1  BY MR. MORRISSEY:
2      Q    Of Agenda 1, which is part of Group
3  Exhibit 101, and under A, General Requirements.
4          My question is:  Have you
5  participated as a contractor for STV in these
6  various projects?
7      A    I'm not sure how to answer that.
8          MR. GALASSO:  Well, what projects are
9      you referring to?
10         THE WITNESS:  Yeah.
11 BY MR. MORRISSEY:
12     Q    Well, the projects at the Cook County
13 Courts, Department of Facilities Management.
14         MR. GALASSO:  Where are you looking
15     at?  Are you looking at the list of the
16     hollow bullet points?
17         MR. MORRISSEY:  Let me take a minute
18     break.
19         MR. GALASSO:  Okay.
20             (WHEREUPON, a short
21              break was taken.)
22         MR. MORRISSEY:  Can we go back on the
23     record?
24         THE REPORTER:  Sure.

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 110

1          MR. MORRISSEY:  Can I rephrase my
2      question to revise the question?
3  BY MR. MORRISSEY:
4      Q    On Page 4 of Agenda 1, which is part
5  of, again, Exhibit 101, there's a list of areas
6  in the Cook County Jail that are part of
7  projects for repair work that appears to be
8  under some type of contract with STV.
9          Looking at that list of items:  The
10 work shall generally incorporate the following
11 spaces but is not limited to these spaces.  I'm
12 referring to the Cook County Jail.  Pharmacy
13 dispensary, physical therapy room, holding
14 cells in lower level.
15         MR. GALASSO:  Can you --
16         THE WITNESS:  Page 4.
17         MR. GALASSO:  I'm sorry.  Could you
18     give us the Bates Stamp?
19         MR. MORRISSEY:  It's Bates Stamped
20     246.
21         MR. GALASSO:  246, okay.
22         THE WITNESS:  The green text.
23         MR. GALASSO:  You're referring to the
24     green text on 246?

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 111

1          MR. MORRISSEY:  Well, it's not green
2      on my sheet.
3  BY MR. MORRISSEY:
4      Q    But there is a list of items and
5  areas that are included in the areas -- spaces
6  that were to be evaluated.
7          MR. GALASSO:  Yes.
8  BY MR. MORRISSEY:
9      Q    It's either -- Again, it's
10 highlighted in green:  Pharmacy dispensary,
11 physical therapy room, holding cells in lower
12 level, restrooms to the south of holding cells
13 and lower level, x-ray rooms, x-ray/treating
14 rooms, dialysis rooms, visitation rooms on the
15 first floor, isolation cells in the upper
16 levels, group holding rooms in upper levels,
17 shower rooms, dayroom, other areas including
18 detainee toilets and showers not covered
19 elsewhere; Cermak tunnel ramp, even if over
20 100 feet away from building footprint;
21 safety/security stations, dayrooms, sitz bath,
22 stairways, path of egress, interior and
23 exterior, doors and hardware, elevator lobbies
24 signage.

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 28

ELLEN STONER
September 8, 2021

Page 112

```
1        My question is:  Are those some of
2    the spaces at the jail and at Cermak in
3    particular that your firm was given an
4    assignment to evaluate for ADA compliance by
5    STV?
6        A    I don't recall how many of those were
7    assigned to us.
8        Q    Which ones do you recall specifically
9    doing an evaluation for STV?
10       A    I don't recall any specifics on any
11   of these.
12       Q    The records that you reviewed prior
13   to today's deposition which were part of the
14   subpoena, Exhibit A, did any of those documents
15   include any of these areas within Cermak?
16       A    My preparation for today was focused
17   around the Cermak ramp.  I didn't review any
18   documents outside of that.
19       Q    Do you have any recollection at all --
20   Let me revise that question.
21            Other than -- When you were given an
22   assignment to evaluate Cermak to determine
23   whether or not there were ADA issues, did you
24   normally physically go over and inspect the
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 113

```
1    areas that STV asked you to evaluate?
2        A    I -- Depending on the assignment, we
3    would review the conditions we were asked to
4    review.
5        Q    So my question is:  When your firm is
6    given an assignment to evaluate areas within
7    the Cermak building, did you participate
8    personally in doing an inspection --
9    inspections of those areas?
10       A    I don't recall.
11       Q    Other than yourself, in your firm,
12   who else would have inspected areas which were
13   assigned to you by STV?
14       A    I don't recall.
15       Q    Anything refresh your memory?
16       A    No.
17       Q    If your firm did receive an
18   assignment -- If your firm received an
19   assignment from STV to examine any of the areas
20   that are listed on Page 246 it would have been
21   your practice and policy to provide a written
22   report to STV after doing an inspection; is
23   that fair to say?
24            MR. GALASSO:  Objection,
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 114

```
1    mischaracterization and form.  You can
2    answer.
3    BY THE WITNESS:
4        A    Yes.  We would provide them with a
5    document, a written document, summarizing our
6    findings with photos and an illustration if
7    needed.
8    BY MR. MORRISSEY:
9        Q    On Page 246 where it mentions Cermak
10   tunnel ramp, that's the tunnel that we've --
11   that's the ramp you were referring to in
12   regards to the Cermak ramp, correct?
13       A    Yes.  I believe so, uh-huh.
14       Q    And prior to doing that evaluation,
15   you would have requested STV to provide you
16   with some type of illustrated floor plan of the
17   ramp?
18            MR. GALASSO:  Objection, asked and
19   answered.
20   BY THE WITNESS:
21       A    Yes.  I believe we've looked at that
22   together.
23   BY MR. MORRISSEY:
24       Q    And on -- In Exhibit Number 2 on
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 115

```
1    Page 2, the diagram of the ramp is a document
2    that you would have received prior to your
3    inspection of the that ramp.  It would be an
4    illustrated floor plan?
5            MR. GALASSO:  So to be fair, what
6        you're showing her is not a document.  It's
7        actually titled as copy paste of
8        walkthrough from March 2018.
9            So I don't think that's a fair
10       question for her.
11           MR. MORRISSEY:  Well, what's depicted --
12       and, Mark, you're correct.  What we have
13       here is probably only a part of what
14       consisted of a walkthrough in March of 2018
15       by the deponent's firm.
16   BY MR. MORRISSEY:
17       Q    But what's depicted here on Page 2 of
18   Exhibit 2, is that an example of an illustrated
19   floor plan, in this case, of the ramp, the
20   Cermak ramp?
21           MR. GALASSO:  So if I can, and I'm
22       not trying to be obstructive or difficult,
23       but she testified and there's a color
24       version of this in Exhibit 4 or something
```

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 29

ELLEN STONER
September 8, 2021

Page 116

```
 1   close that, and what she's testified is
 2   she's given the drawing that is an existing
 3   conditions drawing, and then she put
 4   bubbles over them.  And if you had this in
 5   color, you would actually see the red in
 6   the bubbles where it says work area -- It's
 7   blurry here, but I think it says:  Work
 8   Area E, and then there's a work area.
 9           You might have a better example
10   of this in Exhibit 4.  She would have had
11   an entire drawing of that floor, which
12   bubbles have been placed in, that she
13   placed the bubbles in.
14   BY MR. MORRISSEY:
15       Q   Okay.  Looking at the diagram that's
16   on Page 2 -- Let me revise that.  If we could
17   turn to Exhibit 4, Page 2.
18           MR. GALASSO:  That's what I was
19       referring to, the color version.
20           MR. MORRISSEY:  Okay.
21   BY MR. MORRISSEY:
22       Q   So my question is:  What's on Page 2
23   of Exhibit 4, is that an example of a document
24   which you would consider an illustrated floor
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 117

```
 1   plan?
 2           MR. GALASSO:  So the same objection.
 3       I don't know that this is actually a
 4       document but a cutout of a document.  And I
 5       think that's what -- Again, this is the
 6       same exact thing that you were showing her
 7       in the other exhibit except this one is in
 8       color and shows the red bubbling.
 9           MR. MORRISSEY:  Right.  Correct.  It
10       is in color.
11   BY MR. MORRISSEY:
12       Q   My question again is:  Is this an
13   example of a document you would have received
14   before doing your walkthrough of the Cermak
15   ramp?
16           MR. GALASSO:  Same objections, go
17       ahead.
18   BY THE WITNESS:
19       A   The underlying drawing is
20   representative of the type of existing
21   conditions we were provided.
22   BY MR. MORRISSEY:
23       Q   When you did this walkthrough in
24   March of 2018, do you know whether or not you
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 118

```
 1   had this drawing which is on Page 2 of Exhibit 4?
 2   BY THE WITNESS:
 3       A   I don't recall.  We are not always
 4   prepared with existing conditions when we did
 5   our site visits.
 6   BY MR. MORRISSEY:
 7       Q   At some point either before or after
 8   the walkthrough in March of 2018 of the Cermak
 9   ramp area, did you receive this drawing?
10       A   Yes.
11       Q   There's two work areas that are
12   indicated in this drawing.  There's a Work
13   Area E with an arrow pointing to the Cermak --
14   the corridor ramp it's called.  Do you see
15   that?
16           MR. GALASSO:  So can you -- Ms. Reporter,
17       can you read back that question?  I missed
18       what he called those areas.
19           (WHEREUPON, the record
20                       was read as requested.)
21   BY THE WITNESS:
22       A   Yes.  But it's not a work area, but I
23   see it.
24
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 119

```
 1   BY MR. MORRISSEY:
 2       Q   Did you or did your firm put the box
 3   in where it says:  Work Area E?  Is that
 4   something that you would have drawn in or your
 5   firm would have drawn in?
 6       A   Yes.
 7       Q   Why would you have drawn in, in a box
 8   Work Area E in this illustration?
 9       A   It was simply to help identify what
10   area we had assessed.
11       Q   And everything that's in red on this
12   diagram to Exhibit 4 was inserted by your firm?
13       A   Yes.  I believe it was.
14       Q   Going back to Exhibit 2, Page 2, in
15   the box at the top, you have:  E, Cermak Ramp,
16   correct?
17       A   Yes.
18       Q   So that refers to the other areas
19   that you inspected in your walkthrough in March
20   of 2018?
21       A   It's intended to tie the text to the
22   illustration.
23       Q   And then in addition to Work Area E,
24   you or some member of your firm have another
```

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 30

ELLEN STONER
September 8, 2021

Page 120

1   box, Work Area D, correct?
2       A    Yes.
3       Q    And there was a line that's drawn to
4   the detainee toilet?
5       A    Yes.
6       Q    Does that indicate that your firm
7   during the walkthrough in March of 2018 did an
8   evaluation, an ADA evaluation of the detainee
9   toilet in the lower level of the Cermak
10  building?
11      A    I don't recall because our
12  assignments were very specific.  So I can't say
13  to what that -- what the scope of that
14  assignment was.
15      Q    Was there one report that you
16  prepared for STV that included Work Area D and
17  Work Area E?
18      A    I don't recall if they were in the
19  same report.
20      Q    Would it have been a fair assumption
21  that the report that you prepared to STV after
22  your walkthrough in 2018 included Work Areas A
23  through at least Work Areas E?
24           MR. GALASSO:  Objection as to form

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 121

1   and speculation.  Go ahead.
2   BY THE WITNESS:
3       A    It's possible.  I don't recall.
4   BY MR. MORRISSEY:
5       Q    Was there an introduction to your
6   report prepared to STV from your walkthrough in
7   March of 2018?
8       A    An introduction?
9       Q    Well, let me rephrase the question.
10  You did the walkthrough in March of 2018.  It
11  would have been your practice and policy to do
12  a report for STV?
13      A    We would have summarized our findings
14  in a written report, yes.
15      Q    Prior to this deposition, did you
16  review a report that included your walkthrough
17  in March of 2018?
18      A    I reviewed information pertaining to
19  the Cermak ramp.
20      Q    And did that include a report that
21  you provided STV in regards to your walkthrough
22  in March of 2018?
23      A    I don't recall a comprehensive
24  report.

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 122

1       Q    On the diagram in exhibit -- on Page 2
2   of Exhibit 4, inside the -- for instance, the
3   corridor ramp, there is a Number B0119 [sic].
4   Do you know what that refers to?
5       A    I believe that's a room numbering
6   nomenclature that the County uses.
7            MR. MORRISSEY:  I'm going to take a
8       moment.
9   BY MR. MORRISSEY:
10      Q    Looking at the illustrative floor
11  plan on Page 2 of Exhibit 4, the area below, is
12  that the lower level of the Cermak building?
13      A    One would presume.
14      Q    Have you ever been in, as the
15  contractor for STV, the lower level of the
16  Cermak building?
17      A    A contractor, no.  I have never been
18  a contractor.
19      Q    As part of your services for STV,
20  have you ever been in the lower level of the
21  Cermak infirmary?
22      A    Yes, yes.
23      Q    Why have you been in the lower level
24  of the Cermak infirmary?

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 123

1       A    I was in the lower level to review
2   assignments given to me by STV.
3       Q    All right.  What assignments were you
4   given in regard --
5       A    I don't recall the specifics.
6       Q    Well, let me finish my question.  To
7   the best of your knowledge, did you have an
8   assignment from STV in regards to holding cells
9   in the lower level of the Cermak infirmary?
10      A    I don't recall.
11      Q    Would anything refresh your memory
12  about that?
13      A    No.
14      Q    Would an assignment, an e-mail from
15  STV refresh your memory if you were given an
16  assignment to review whether or not holding
17  cells in the lower level of Cermak were
18  accessible?
19           MR. GALASSO:  Tom, you broke up
20      there.
21  BY MR. MORRISSEY:
22      Q    Would reviewing an e-mail of an
23  assignment by STV refresh your memory in
24  regards to evaluating whether the holding cells

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 31

ELLEN STONER
September 8, 2021

Page 124

1  in the lower level of Cermak were accessible?

2     A   Maybe.  I don't --

3     Q   Same question.  Would an assignment

4  from STV through an e-mail to you or to your

5  firm refresh your memory possibly about

6  reviewing whether or not there were any

7  accessible detainee toilets in the lower level

8  of the Cermak building?

9     A   Possibly.

10     Q   In the Cermak building, were you ever

11  given an assignment to assess whether the

12  toilet facilities in the building were

13  accessible for detainees?

14     A   I don't recall.

15     Q   Were you given an assignment from STV

16  in regards to the shower facilities in the

17  Cermak infirmary being accessible or not

18  accessible to detainees?

19     A   That I don't recall.

20     Q   Turning to the information that -- on

21  Page 2 of Exhibit 4 that's in -- under E, Cermak

22  Ramp.

23     When you did your walkthrough of the

24  Cermak ramp in March of 2018, did you -- did

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 125

1  you have any instruments with you such as a

2  tape measure or any instrument to measure the

3  ramp area?

4     A   Yeah, because we took measurements.

5  I believe we had a laser measure as well as a

6  slope level -- I don't recall -- to determine

7  the slope of the ramp.

8     Q   When you say "we," who are you

9  referring to?

10     A   Well, as we've established, it was

11  myself, Scott Utter and Scott Achterhof.

12     Q   And when you measured the length of

13  the landing, where did you -- it says:

14  Existing ramp is 47 feet long without a

15  landing.

16     Can you tell me how you conducted --

17  how you took that measurement?

18     A   How I took the measurement?

19     Q   Yes.  From where did you start --

20  From what point of the ramp did you start until

21  the finish to determine --

22     A   I don't recall exactly how we took

23  that measurement.

24     Q   Were you the person that actually

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 126

1  used a laser beam to measure the length of the

2  ramp?

3     A   I don't recall if it was me or Scott.

4     Q   How did you determine that the slope

5  of the ramp was 1 to 12?

6     MR. GALASSO:  You cut out there, Tom.

7  BY MR. MORRISSEY:

8     Q   How did you measure the slope of the

9  ramp?

10     A   Well, as I indicated, we have a

11  slope-o-meter I believe it's called.  It's a

12  2-foot level that has an electronic ability to

13  measure the percentage of incline of a ramp.

14     Q   What ADA standards did you use to

15  consider whether or not the Cermak ramp was

16  accessible or not accessible?

17     A   We were looking at the 2010 ADA

18  requirements.

19     Q   Do you know in what year the Cermak

20  building was built?

21     A   No, I do not.

22     Q   Were you ever provided that

23  information by Cook County or the Sheriff?

24     A   Not that I recall.

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 127

1     Q   Why did you use the 2010 standards to

2  determine whether or not the ramp was compliant

3  with the ADA?

4     A   Because we were asked to evaluate

5  that condition against that standard.

6     Q   Who asked you to evaluate it based

7  upon the 2010 standards?

8     A   This was part of our assignment from

9  STV was to review built conditions against the

10  current standards.

11     Q   Were you given that assignment in

12  regards to the ramp that -- the Cermak ramp

13  that you were to evaluate it under the 2010 ADA

14  standards?

15     A   Yes.

16     Q   And that would have been by David

17  Theising?

18     A   That was a general requirement of our

19  contract.

20     Q   Did anybody -- Were you ever informed

21  by STV, Cook County or the Sheriff that Cermak

22  was constructed in the year 1998?

23     A   Not that I recall.

24     Q   Did that have any -- Did the year in

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 32

ELLEN STONER
September 8, 2021

Page 128

1  which the building was constructed, did that
2  have any -- did that influence your opinion
3  whether or not it complied with the ADA?
4      A    No.
5      Q    If it was built in 1998, to what
6  degree would the 1991 ADA standards apply?
7      A    I don't know if I can answer that
8  without further evaluation of the codes.
9      Q    Are you familiar with the 1991 ADA
10 standards in regards to ramps?
11     A    Somewhat, yes.
12     Q    When you say "somewhat," what do you
13 mean by that?
14     A    In a general sense, I am familiar
15 with them.
16     Q    Prior to your receiving this contract
17 with STV, had you ever been asked or contracted
18 by a government entity to determine whether or
19 not a building or facility was accessible?
20     A    Yes.  I did quite a bit of work with
21 Chicago Public Schools.
22     Q    Are you aware that the 1991
23 standard (inaudible) --
24          THE REPORTER:  Tom, you broke up.

ELLEN STONER
September 8, 2021

Page 129

1      Can you start over?
2  BY MR. MORRISSEY:
3      Q    Are you aware that the 1991 ADA
4  standards were applicable for buildings built
5  after 1991 up to March of 2012?
6      A    Yes.
7      Q    In your evaluation of the Cermak ramp
8  in March of 2018, did it comply with the ADA
9  1991 standards?
10     A    I believe our summary stated that it
11 did not comply with the 2010 standards against
12 which we were measuring it.
13     Q    Why didn't you consider the 1991
14 standards?
15     A    Because that was not our assignment.
16     Q    Were the standards in regards to the
17 rise of a ramp the same under the 2010
18 standards and the 1991 standards?
19     A    Yes, I believe they are the same.
20     Q    Are the -- Were the standards under
21 the 1991 standards and the 2010 ADA standards
22 the same in regards to the handrails?
23     A    I don't recall because I believe
24 there were changes.  I would have to compare

ELLEN STONER
September 8, 2021

Page 130

1  the two.
2      Q    Were the standards the same in
3  regards to -- Let me rephrase the question.
4          Did you conclude that -- Under the
5  2010 standards, did you measure the rise of the
6  ramp?
7      A    Yes.  We took a general slope of the
8  ramp.
9      Q    What was the rise of the ramp?
10     A    Well, as it says in the document, it
11 fit within the parameters of the 1 to 12.
12     Q    What is the difference between a rise
13 and a slope in the architectural field?  Can
14 you describe what the slope means?
15     A    A slope would be, you know, either
16 percentage or, you know, one inch per 12 inches.
17 One inch rise for 12 inches of run would give
18 you the slope of the ramp.
19     Q    And is it true that under the 1991
20 standards that if the length of the ramp
21 exceeded 43 feet, then -- and if the rise
22 exceeded the maximum of 30 inches, that the
23 maximum run of the slope to be compliant would
24 be 30 feet?

ELLEN STONER
September 8, 2021

Page 131

1          MR. GALASSO:  I will object as to
2      form.  I think there's multiple questions
3      within there, and she's already testified
4      that she doesn't have specific knowledge of
5      the '91 requirements.  She can answer with
6      those -- under those objections?
7          MR. BENTLEY:  Join in the objection.
8  BY THE WITNESS:
9      A    So --
10 BY MR. MORRISSEY:
11     Q    Well, let me ask you a preliminary
12 question.  Did the rise of the ramp exceed
13 30 inches based upon your evaluation in March
14 of 2018?
15     A    I don't believe we actually
16 calculated the overall rise.  Our observation
17 was that the length exceeded the requirements,
18 but the slope was compliant.
19     Q    Under the 2010 standards, if the rise
20 exceeded 30 inches, would that be compliant
21 with the ramp -- would the ramp be compliant
22 with the ADA?
23     A    I don't believe it would be, no.
24     Q    And if the rise exceeded 30 inches, was

Exhibit 6 Page 33

Page 132

1  the ramp compliant if the ramp was 47 inches --
2  47 feet long?
3       MR. GALASSO:  You're referring to the
4  2010 --
5  BY MR. MORRISSEY:
6       Q   Under the 2010 standards, if the rise
7  exceeded 30 inches and the ramp as you measured
8  it had a length of 47 feet long, would that
9  comply with the ADA standards under the 2010
10  standards?
11       **A   No.  I thought we had established**
12  **that.  The run of the ramp cannot exceed**
13  **30 feet without a landing.**
14       Q   As an architect, why is it significant
15  if the rise was over 30 inches and the length
16  of the ramp was 47 feet long?  Why does that
17  have significance in regards to it being
18  accessible for a disabled person under the ADA?
19       MR. GALASSO:  Object as to
20  foundation, form and ambiguous.
21       MR. BENTLEY:  Join.
22       MR. GALASSO:  What do you mean by
23  "significance"?
24

Page 133

1  BY MR. MORRISSEY:
2       Q   Based upon your understanding of the
3  2010 standards, why did you find that they
4  needed to create a ramp with a landing at
5  30 feet from the top of the ramp?
6       **A   Because that's how --**
7       MR. GALASSO:  Stop.  Stop.  Go ahead.
8  Sorry.  I was --
9       MR. MORRISSEY:  Let me rephrase the
10  question.
11       MR. GALASSO:  Yeah, I was going to
12  object, but...
13  BY MR. MORRISSEY:
14       Q   The recommendation you made -- One of
15  the recommendations you made was create a
16  compliant landing 30 feet from the top of the
17  ramp.  Why did you make that recommendation?
18       **A   We were suggesting a solution to**
19  **rectify the noncompliant nature of the ramp.**
20       Q   If the ramp was 47 feet long under
21  the 2010 standards, did it require a landing
22  30 feet from the top of the ramp in order to be
23  compliant?
24       MR. GALASSO:  Object to the

Page 134

1  misleading nature of that question.  She's
2  already testified that she recommended that
3  the ramp not be 47 feet long.
4       THE WITNESS:  Correct.
5       MR. BENTLEY:  Join.
6       MR. GALASSO:  But I don't know if you
7  can answer.
8  BY MR. MORRISSEY:
9       Q   Well, let me rephrase the question.
10       **A   I'm not sure what the question was.**
11       Q   Why did you recommend a landing
12  30 feet from the top of the ramp in order to be
13  compliant under the 2010 code?
14       **A   The recommendation -- The goal of the**
15  **recommendation was to reduce the continuous run**
16  **of the ramp to not exceed 30 feet in order to**
17  **become compliant.**
18       Q   Based upon your understanding of the
19  2010 ADA standards, for what purpose does the
20  code require a landing at 30 feet for a ramp?
21       MR. GALASSO:  I'm going to object as
22  to foundation relative to what purpose for
23  which the ADA created its requirements.
24       MR. MORRISSEY:  I'm asking her in her

Page 135

1  field as an architect.
2  BY MR. MORRISSEY:
3       Q   Can you give me a reason why --
4       MR. GALASSO:  I think it's fair for
5  you to ask what the requirements are, but
6  as to how the ADA came up with those
7  requirements, that's speculating unless she
8  was part of the ADA or a part of the
9  committees to create those requirements or
10  the changes therein.  But you can answer
11  the question because I'm not telling her
12  not to answer it but those are my
13  objections.
14  BY MR. MORRISSEY:
15       Q   Do you know the reason behind
16  requiring a ramp 30 feet from one portion of
17  the start of the ramp?
18       **A   No, I don't know why.  My job as an**
19  **architect is to interpret and apply those**
20  **requirements.**
21       Q   And you informed the County that
22  under your understanding of the existing law at
23  the time that they needed to have a ramp at
24  least 30 feet from the top of the -- Strike

Exhibit 6 Page 34

Page 136

1  that.
2          You notified STV and Scott Achterhof
3  that there was a need for a landing 30 feet
4  from the top of the ramp; is that fair to say?
5      A   We notified STV that the length of
6  the ramp exceeded requirements.  Our
7  recommendation was to put in a landing 30 feet
8  from the top.
9      Q   Did you inform Scott Achterhof during
10 the walkthrough that your understanding of the
11 law that the landing was required 30 feet from
12 the top of the ramp?
13         MR. GALASSO:  Hold on.  Are you
14     asking about her understanding of the ADA
15     or the law in general?
16         MR. MORRISSEY:  I'm asking her did
17     she inform Scott Achterhof of her finding
18     that there was a need for a landing 30 feet
19     from the top of the ramp.
20         MR. GALASSO:  You're asking if this
21     occurred during the walkthrough itself?
22         MR. MORRISSEY:  Correct.
23 BY THE WITNESS:
24     A   I don't recall if we conveyed that to

Page 137

1  him.
2  BY MR. MORRISSEY:
3      Q   Did you ever convey to Scott
4  Achterhof or any member of Cook County
5  government that there was a need to have a
6  landing 30 feet from the top of the ramp?
7      A   My communication was strictly with
8  STV and those that gave me the assignment.
9      Q   But you also attended the --
10         MR. GALASSO:  Hold on.  She wasn't
11     finished.
12         MR. MORRISSEY:  I'm sorry.
13         MR. GALASSO:  Go ahead.
14 BY THE WITNESS:
15     A   In responding to the e-mail
16 assignment, if others were copied on it, then
17 they were included in our response.  But if
18 they were not, we did not add people or change
19 who the communication was going to in our
20 response.
21 BY MR. MORRISSEY:
22     Q   You attended agenda meetings in 2018
23 and 2019 with individuals from the Sheriff's
24 Office and Cook County; is that fair to say?

Page 138

1      A   Yes, it is --
2      Q   During --
3      A   -- fair to say.
4      Q   I didn't mean to interrupt you.
5  During those agenda meetings with
6  representatives from the Sheriff and Cook
7  County, did you discuss your ADA findings in
8  regards to your walkthrough in March of 2018?
9      A   I don't recall that we did that.
10 Those meetings were in general about status and
11 not about specifics.
12     Q   When you say that meetings were about
13 status, if the agendas reflected that you and --
14 You or STV had made recommendations for
15 renovating the Cermak ramp to make it compliant
16 under the ADA code; is that fair to say?
17         MR. GALASSO:  Objection as to form.
18 BY THE WITNESS:
19     A   Yes.  We made recommendations of how
20 they could bring things into compliance.
21 BY MR. MORRISSEY:
22     Q   In addition to the ramp not having a
23 landing within 30 feet from the top of the
24 ramp, you also found that the handrails were

Page 139

1  incompliant with the 2010 code, correct?
2      A   Uh-huh.
3          MR. GALASSO:  You have to say that
4      verbal.
5  BY THE WITNESS:
6      A   Yes.  Sorry.
7  BY MR. MORRISSEY:
8      Q   Why did you -- How did you determine
9  that the handrails were not compliant under the
10 2010 code?
11     A   I don't recall the specifics of why
12 they were deficient.
13     Q   In regards to the Cermak ramp, did
14 you in your report to STV, did you make
15 recommendations in regards to how the County
16 could make the handrails compliant under the
17 2010 code?
18     A   Beyond what is in this exhibit, no.
19     Q   To your knowledge, did the handrails
20 that you inspected in March of 2018, did they
21 comply with the 1991 ADA standards?
22     A   I don't know.  We did not evaluate
23 them in that -- in that filter.
24     Q   After doing a walkthrough in March of

Page 140

1 2018, do you know what steps, if any, were
2 taken by STV in regards to the Cermak ramps?
3     **A.  No.  I can't comment on what their**
4 **activities were.**
5     Q  Can you tell me what -- Based upon
6 your understanding of how renovations proceed
7 in Cook County, what additional steps after
8 your evaluation in March of 2018 of the Cermak
9 ramp needed to take place in order for your
10 recommendations to be carried out?
11     **A.  I don't know.  I was not involved in**
12 **those processes, so I can't comment.**
13     Q  Well, the agenda meetings that you
14 attended document the various stages of
15 renovation projects; isn't that fair to say?
16     **A  Yes.**
17     Q  So you have a general understanding,
18 I presume, as to how a project is initiated and
19 the various steps that are followed by Cook
20 County in seeking funding, design drawings and
21 the completion of a project such as your
22 recommendations you made for the Cermak ramp;
23 is that fair to say?
24     **A  They were very broad procedures that**

Page 141

1 **were discussed.  I don't know the details of**
2 **how those things progressed or who was**
3 **responsible for what.  I can't speak to it with**
4 **any certainty or knowledge.**
5     Q  Do you know if any steps were taken
6 after your walkthrough in March of 2018 to make --
7 to renovate the Cermak ramp so that it would be
8 compliant with either the 1991 code or the 2010
9 standards?
10     **A  All I know is that our recommendations**
11 **were rolled into the Appendix 1.  I don't know**
12 **where it went from there.**
13     Q  By "Appendix 1," you're referring to
14 the document we looked at in Exhibit 101?
15     **A  No.**
16     MR. GALASSO:  So the meeting minutes
17     have attached to them an appendix, but it's
18     not known -- I don't think it's clear if
19     that's the actual appendix that was created
20     or a draft of them.
21     THE WITNESS:  Right.
22 BY MR. MORRISSEY:
23     Q  Is there a -- Did you review in
24 preparation for today's deposition a different

Page 142

1 Appendix 1 from what's attached to Exhibit 101?
2     MR. GALASSO:  To be fair, you've
3     never established that she looked at any
4     Appendix 1.
5     MR. MORRISSEY:  Well, I mean, she just
6     mentioned that it was part of Appendix 1.
7     MR. GALASSO:  I'm sorry.  What?
8     MR. MORRISSEY:  She just said that --
9     she just -- Peggy, you can read it back.
10     MR. GALASSO:  I'm sorry.  I could
11     stop you there.  Certainly she said it was
12     rolled into Appendix 1.  But whether or not
13     the final Appendix 1 that's attached to any
14     particular scope document, that is not
15     something within her purview.  She provides
16     information.  And this is what her
17     testimony has been and what you can glean
18     from the documents even in your exhibits.
19     MR. MORRISSEY:  Can we take a
20     two-minute break?
21     MR. GALASSO:  Sure.  And if you want,
22     I'm happy to have a conversation with you
23     off the record but on Zoom, so I can
24     perhaps help.

Page 143

1     MR. MORRISSEY:  Okay.  Well, let's
2     take a ten-minute break.
3     MR. GALASSO:  All right.  So we're
4     off the record?
5     THE REPORTER:  Yes.
6     MR. MORRISSEY:  We're off the record.
7     (WHEREUPON, a discussion
8     off the record was held.)
9     MR. MORRISSEY:  So off the record,
10     the attorneys had a discussion in regards
11     to the documents which were subpoenaed for
12     today's date.  My understanding is we're
13     going to try to work out between STV and
14     Cook County some arrangement where certain
15     documents can be turned over.  And when
16     that's done, we're going to -- after those
17     are turned over, we're going to set a date
18     to continue this deposition.
19     MR. GALASSO:  That's correct.  And I
20     will add that this was a consideration and
21     an event that I discussed was a distinct
22     possibility given the fact that Altus
23     needed prior authorization to produce the
24     documents and that Cook County wanted to

Exhibit 6 Page 36

ELLEN STONER
September 8, 2021

Page 144

```
 1    review them prior to production, given the
 2    nature of the documents themselves.
 3         MR. MORRISSEY:  All right.  Thanks,
 4    everybody.
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 145

```
 1    STATE OF ILLINOIS )
 2                     ) ss:
      COUNTY OF C O O K )
 3         I, Peggy A. Anderson, a Certified
 4    Shorthand Reporter in the State of Illinois do
 5    hereby certify:
 6         That previous to the commencement of
 7    the examination of the witness, the witness was
 8    duly sworn to testify the whole truth
 9    concerning the matters herein;
10         That the foregoing deposition
11    transcript was reported stenographically by me,
12    was thereafter reduced to typewriting under my
13    personal direction, and constitutes a true
14    record of the testimony given and the
15    proceedings had;
16         That the said deposition was taken
17    before me at the time and place specified;
18         That the said deposition was
19    adjourned as stated herein;
20         That I am not a relative or employee
21    or attorney or counsel, nor a relative or
22    employee of such attorney or counsel for any of
23    the parties hereto, nor interested directly or
24    indirectly in the outcome of this action.
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 146

```
 1         IN WITNESS WHEREOF, I do hereunto set
 2    my hand this 11th day of October, 2021.
 3
 4
 5
 6
 7    Peggy A. Anderson
 8    Certified Shorthand Reporter
 9    License No. 084-003813
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 37