IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Cuauhtemoc Hernandez, et al., ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | 23-cv-16970 |
| -*vs*- ) | |
| ) | Judge Harjani |
| Thomas Dart, Sheriff of Cook County, ) | |
| and Cook County, Illinois, ) | |
| ) | |
| ) | |
| *Defendants*. ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

The Residential Treatment Unit east tunnel ramp (RTU east tunnel ramp) and Cermak ramp are not compliant with the ADA structural standards. Defendants' retained expert, Carl Darr of Globetrotters Engineering Corporation (GEC), prepared expensive reports explaining that each ramp was required to comply with the ADA structural standards at the time of construction and that neither ramp complies with the mandatory standards.

Plaintiffs Cuautemoc Hernandez and William Mathis, class representatives, traversed the non-compliant ramps and have been harmed because of the obvious structural barriers presented by each ramp.

Plaintiffs, for the reasons stated below, request summary judgment on the following Rule 23(b)(3) issue classes:

> All Cook County Jail detainees who have been assigned a cane, crutch, or walker by a jail medical provide, for a period of more than two weeks, and traversed the Residential Treatment Unit east tunnel ramp from February 13, 2022 to the date of judgment to resolve the Rule 23(c)(4) issue of whether the RTU east ramp complied with the structural standards required by the ADA and Rehabilitation Act at that time; and

> All Cook County Jail detainees who have been assigned a cane, crutch, or walker by a jail medical provider, for a period of more than two weeks, and traversed the Cermak ramp from December 20, 2021 to the date of judgment to resolve the Rule 23(c)(4) issue of whether the Cermak ramp complied with the structural standards required by the ADA and Rehabilitation Act at that time.

**I. Facts**

    *a. The Cermak ramp*

The Cermak Health Services Facility was constructed after 1993. Plaintiffs' Statement of Facts (hereinafter "PSOF") ¶ 7. There is a pedestrian/material access tunnel serving the Cermak Health Services Facility at the basement level. *Id.* ¶ 6. The Cermak ramp connects the building to a tunnel system used at the Jail and is used by civilian and security employees to enter Cermak, to transport inmates, and to transport equipment. *Id.* ¶ 8.

The 1991 ADA Standards for Accessible Design (hereinafter the "1991 ADA Standards") were applicable when Cermak was permitted for construction.[1] PSOF ¶¶19-23, 36, 38-39. Section 4.8.2 of the ADA Standards state "[t]he maximum rise for any run shall be 30 in[ches]." Dkt. 122-12 at 2. Section 4.8.5 of the 1991 ADA Standards require handrails for a ramp with a rise greater than 6 inches of a horizontal projection greater than 72 inches. Dkt. 122-12 at 4.

Since at least 2018, Cook County has known the Cermak ramp is non-compliant

---

[1] The Rehabilitation Act's requirements for ramps are essentially the same as the ADA. *See* 28 C.F.R. § 42.522(b); *see also* Uniform Federal Accessibility Standards (UFAS) § 4.8. The Rehabilitation Act claim contains the additional requirement that the entity received federal fundings, which should not be in dispute. *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012); *Clemons v. Dart*, 168 F.Supp.3d 1060, 1065 (N.D. Ill. 2016) (holding it was undisputed the Rehabilitation Act applied to a detainee housed in Cermak); PSOF ¶ 79. Since the ADA and Rehabilitation Act are coextensive and defendants received federal financial assistance, this memorandum will refer only to the ADA going forward.

with the ADA. PSOF ¶¶ 9-18, 66-72. Ellen Stoner, an architect hired by Cook County, assessed this ramp in March of 2018 and prepared a report with recommendations to bring the ramp into compliance with the ADA. PSOF ¶¶ 11-18. Ms. Stoner recommended repouring the ramp into two sections and installing handrails. *Id.* ¶¶ 16-18.

Cook County also hired GEC to assess the Cermak ramp. *Id.* ¶ 19. GEC issued a report on December 6, 2023, finding the ramp does not comply with the ADA because the ramp has "a rise of 32.4 inches, which does not comply with the 30-inch maximum rise stated in Section 4.8.2 of the 1991 ADAAG" and that the handrails recently installed in January of 2023 do not comply with the 2010 ADA standards. PSOF ¶¶ 20-22, 67-72.

GEC's December 2023 report proposes two solutions to remedy the non-compliant Cermak ramp. PSOF ¶ 23. The two proposals include:

> 1. Adding an intermediate landing, to reduce the rise to less than 30 inches per run and adding railing extensions at the top and bottom of the ramp.
>
> or
>
> 2. Reducing the slope to less than 1:20 by extending the length of the walkway. The sloped walkway will be shallow enough to eliminate the applicability of code requirements for ramps and will not require a handrail.

PSOF ¶ 23. Mr. Darr stated these ADA standards are "mandatory" meaning that "[i]t would have been mandatory for the designer to design the ramp accordingly and for the contractor to build the ramp accordingly." *Id.* ¶ 38. He also opined that this ramp (and also the RTU east tunnel ramp) must be renovated to comply with the mandatory ADA standards. *Id.* ¶ 39.

### b. *The RTU east tunnel ramp*

The RTU was constructed after 2010 and contains an east tunnel ramp that leads directly to the Cermak ramp. *Id.* ¶ 24. In March of 2021, Timothy Tyrrell, the General Manager of Cook County's Facilities Management Department, sent an e-mail stating the RTU ramp is not compliant with the ADA standards. *Id.* ¶ 25. The east tunnel ramp includes two-sloped floor runs separated by an intermediate landing. *Id.* ¶ 26.

Mr. Darr and his team from GEC inspected the east tunnel ramp two times in January 2024 and prepared a report dated April 1, 2024, finding that this ramp has several violations of the ADA standards. PSOF ¶¶ 27-28. Specifically, the report identified the following violations:

- **Top landing:** The Top Landing runs from the Upper Ramp to a pair of doors, leading to the adjacent tunnel, and has a length of 0.75' (9 in.). Since the landing length is less than 60 inches, the landing length is not code compliant.

    The landing is 85% short of the required length. However, this may be easily corrected by relocating the doors to the east 51", to provide the minimum required landing length.

- **Upper Ramp:** The Upper Ramp has a 25.95' horizontal run and a 1.93' vertical rise with an average slope of 1:13.4. There is a variation in slope at the very top of the ramp. The last 4.27' of the run, at the top has a rise of 4.56" for a slope of 1:11.

    The upper portion of the ramp floor surface is not code compliant; the top 16.5% of the overall length is approximately 0.64% steeper than permitted by code. Since the bottom portion of the ramp run is shallower than 1:12, it would be possible to add a floor topping which will even-out the slope make a consistent floor slope that has a 1:12 slope or shallower.

- **Intermediate Landing:** The Intermediate Landing is 4.75 feet (57 in.) in length. Since the landing length is less than 60 inches in length, the Intermediate Landing is not code compliant.

    It is 5% shorter than the required length. To correct this nonconformity, a longer level floor plane at the landing will need to be provided, extending

> the floor surface west. This will require the Lower Ramp to be rebuilt, along its entire length, to provide for the additional landing length and maintaining a maximum 1:12 ramp slope.
>
> - **Lower Ramp:** The Lower Ramp has a 30.4' horizontal run and a 2.47 vertical rise, with an average slope of 1:12. There is a variation in slope at the very bottom of the ramp. The last 1 foot of the run is steeper than the rest of the ramp with a slope of approximately 1:8.5.
>
>   The lower portion of the ramp floor surface is not code compliant; the lower 3.5% of the overall run is approximately 11.7% steeper than permitted by code. The floor surface will need to be feathered out, and the ramp length extended slightly for the Lower Ramp floor to be compliant with code requirements for ramp slope at this location.
>
> - **Handrails:** As noted in the code requirements above, need to be located 34-38 inches above the ramp floor and need to extend a minimum of 12 inches beyond the top and bottom of each ramp. The ramp(s) have a continuous handrail on each side located. At the lower end of the Lower Ramp the handrails, where measured, is approximately 33" above the ramp floor. At other locations, the handrail height exceeds 34" above the ramp floor. Since, at some locations, handrails are less than 34" above the ramp floor they are not in compliance with requirements for handrail height.
>
>   The handrails extend 7.4" beyond the Lower Ramp and 11.3" beyond the Upper Ramp. Since the handrail extensions are less than 12 inches, the handrails are not in compliance with code requirements for handrail extensions.

PSOF ¶ 28.

Similar to the Cermak ramp, Mr. Darr opines the east tunnel ramp must be corrected to address the structural noncompliance and offered specific solutions so that this ramp would comply with the mandatory standards. PSOF ¶¶ 29-33, 35-39. Cook County has not approved any funds to remedy the noncompliant east tunnel ramp and there is no projected date when the ramp will be corrected. *Id.* ¶ 34.

### c. *No policy or practice to help class members move up or down the ramps*

The Sheriff's Office has no written policy to assist class members up and down the non-compliant Cermak and RTU east tunnel ramps. *Id.* ¶¶ 40-42. The only written policy regarding movement up and down ramps is Policy 148, mandating that correctional staff push wheelchair-users up and down ramps. *Id.* ¶ 41. Mr. Lonnie Hollis, the Sheriff's Rule 30(b)(6) designee and Assistant Executive Director, was unable to discuss training for correctional staff to accommodate class members moving up or down ramps. *Id.* ¶¶ 40-42.

While a cart is available, at times, to move a person up or down a non-compliant ramp, Mr. Hollis said use of a cart "is situational" and would require communication with a correctional supervisor and a member of the Cermak staff to determine whether to use a cart. *Id.* ¶ 64. Similarly, Mr. Hollis said if a class member is at the base of a ramp and requests to use a wheelchair, a correctional supervisor must be contacted, and this individual must consult with an on-duty nursing supervisor to determine whether to permit that individual to use a wheelchair to move up or down the ramp. *Id.* ¶ 65.

### d. *Plaintiff Hernandez*

Plaintiff Hernandez was permitted to use a cane at all times from February 2, 2022 to August 30, 2022 and May 10, 2023 to May 11, 2023. PSOF ¶ 44. During his medical intake evaluation on February 2, 2022, records show that Hernandez was morbidly obese with chronic lower back pain. *Id.* ¶ 45. A nursing record dated August 18, 2022, documents Hernandez walks with a "noticeable staggered limp and drag of his left foot." *Id.* ¶ 48.

Traversing the east tunnel ramp and Cermak ramp exasperated Hernandez's preexisting conditions because the ramps were long and steep. *Id.* ¶ 49. Traversing the ramps caused Hernandez significant pain which lasted for days. *Id.* ¶¶ 49-51. He complained to correctional staff that he required an accommodation to traverse the ramps and was told that he needed to obtain a prescription from a doctor to use a wheelchair. *Id.* ¶¶ 52-53. Medical records show that on two occasions in February of 2022, Hernandez submitted Health Service Request Forms seeking a wheelchair to travel long distances due to pain. *Id.* ¶ 46.

Only on a few times, at most two, Hernandez was transported in a cart and was warned by correctional staff that a cart would not be used "all the time" because he required a "medical script" for an accommodation. *Id.* ¶ 52. And during the first part of Hernandez's detention in 2022, the Cermak ramp did not have handrails, a feature he would use depending on which side of the ramp he was walking. *Id.* ¶ 47. Hernandez also avers he fell in his cell after using the ramps due to his pain. *Id.* ¶ 51.

### e. Plaintiff Mathis

Plaintiff Mathis suffers from acromegaly that requires injections every three to four weeks and also has chronic left knee pain and gout flair-ups. PSOF ¶¶ 54-55, 57. From October 16, 2023 until at least August 15, 2024, Mathis was permitted to use a cane when he traveled long distances. PSOF ¶ 60.

Mathis said the Cermak ramp and RTU east tunnel ramp were too steep and traversing the ramps caused pain and shortness of breath. PSOF ¶ 56. Moving up the ramps was more challenging for Mathis than descending and caused knee pain and also a feeling of his knee popping in and out of place. PSOF ¶ 58.

Mathis has missed medical appointments at Cermak due to pain caused by traversing the ramps and ambulating during "flare-ups" of his condition. PSOF ¶ 59. On only one occasion, during a flare-up on December 10, 2023, Mathis was moved to Cermak in cart after the correctional staff contacted the nursing staff for permission to use a cart to transport Mathis. PSOF ¶ 62. On other occasions when Mathis requested to be transported in a cart up and down the ramps, he was told "inmates are not suppose to be on the cart" and had to traverse the ramps without an accommodation. PSOF ¶ 63.

## II. Statutory Framework

Under Illinois law, "the sheriff shall . . . be responsible for the hiring and training of all personnel necessary to operate and maintain the jail." *See* 730 Ill. Comp. Stat. 125/3; *Moy v. Cty. of Cook*, 640 N.E.2d 926, 929 (Ill. 1994); *see DeGenova v. Sheriff of DuPage Cty.*, 209 F.3d 973, 976 (7th Cir. 2000) ("Illinois sheriffs have final policymaking authority over jail operations."); *see* 730 Ill. Comp. Stat. 125/2. Cook County and Sheriff Dart are jointly responsible for accommodating disabled detainees at the jail. PSOF ¶ 3.

Title II of the ADA, 42 U.S.C. §§12131-12165 *et seq.*, applies to prisons and jails, *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998), and requires that these "public entities" accommodate the needs of prisoners with disabilities.[2] When a public entity constructs a building after 1992, structural accessibility standards adopted by the DOJ apply so that disabled people do not face structural barriers to access otherwise available public services. *Lacy v. Cook County*, 897 F.3d 847, 853-54 (7th Cir. 2018). "If a facility

---

[2] The ADA defines "public entity" to include "any State or local government" and "any department, agency . . . or other instrumentality of a State," 42 U.S.C. § 12131(1).

complies with the structural accessibility standards, a defendant has satisfied their obligation to provide reasonable access and cannot be said to have denied access to programs or services." *Craig v. Hughes*, 2025 WL 1826099, at *5 (N.D. Ill. 2025) (Harjani, J.) (internal citations omitted). "The ADA also permits departures from particular requirements of the federal accessibility standards by use of other methods . . . when it is clearly evident that equivalent access to the facility or part of the facility is thereby provided." *Craig*, 2025 WL 1826099, at *5; 28 C.F.R. § 35.151(c)(1).

The class issues in this case relate to the denial of the benefits of the services, programs, or activities of a public entity – namely, whether individuals prescribed a cane, crutch, or walker were denied access to movement to and from Cermak and the RTU on the same basis as non-disabled detainees because defendants provided non-ADA-compliant ramps at each building. Movement up and down ramps is a program or activity of a public entity. *See Lacy*, 897 F.3d at 854-863, 869 (vacating grant of injunction requiring Sheriff employees to push wheelchair users up and down a ramp constructed before 1992 and remanding for new trial). The Seventh Circuit has recognized that "[p]erhaps the most obvious example of such discrimination is when structural barriers prevent people with disabilities from accessing otherwise available public services." 897 F.3d at 853.

### III. Cermak ramp must comply with ADA structural standards; there is no dispute this ramp violates these standards

There is no dispute that the Cermak ramp was constructed after 1993 and that defendants were required to adhere to the mandatory structural standards set by the 1991 ADA for ramps. Even Mr. Darr, defendants' retained expert, agrees the 1991 ADA standards apply and that this ramp presently does not adhere to the mandatory structural

standards. Defendants, according to their retained expert, must take steps to renovate this ramp so that it complies with the ADA structural standards.

The federal accessibility standards "state requirements as precise as they are thorough, and the difference between compliance and noncompliance with the standard of full and equal enjoyment established by the ADA is often a matter of inches." *Kirola v. City and County of San Francisco*, 860 F.3d 1164, 1178 (9th Cir. 2017) (internal citation omitted); *See Lacy*, 897 F.3d at 867-69 (affirming permanent injunction to move a toilet's privacy screen 1.5 inches because it violated the ADA's clear-floor-space requirements).

In *Kirola*, the Ninth Circuit explained "[o]bedience to the spirit of the ADA does not excuse noncompliance with [] ADAAG's requirements." *Kirola*, 860 F.3d at 1178 (internal citation omitted). And when the Ninth Circuit reviewed *Kirola* again in 2023 it held the "district court abused its discretion in denying relief for the ADAAG violations," *Kirola v. City and County of San Franscico,* 2023 WL 2851368, at *2 (9th Cir. 2023), which prompted the district court, on remand, to grant injunctive relief directing the local government to correct ADAAG violations such as "a missing grab bar in one of the accessible restrooms in the ballpark area in violation of ADAAG § 4.17.3" and "[t]he doorway to the video booth in the Deaf Services Center has too little clear opening width in violation of ADAAG § 4.13.5." *Kirola v. City and County of San Francisco*, 2024 WL 1354414, *2-3 (N.D. Cal. March 28, 2024).

The record evidence is that plaintiffs and members of the classes have been unable to traverse the ramps on the same basis as non-disabled inmates because of the structural non-compliance. *See* PSOF ¶¶ 44-63, 73-78. Plaintiff Mathis has even been unable to attend a medical appointment at Cermak because he was in so much pain,

unable to ambulate from his housing unit to Cermak, and the staff did not provide accommodations. PSOF ¶¶ 59, 63

Accordingly, summary judgment should be granted in favor of the Rule 23(b)(3) issue class relating to the Cermak ramp. *See* Dkt. 72, Memorandum Opinion and Order at 6.

## IV. RTU east tunnel ramp must comply with ADA structural standards; there is no dispute this ramp violates these standards

The RTU east tunnel ramp was constructed after 2010. PSOF ¶ 24. This ramp, at the time of construction, was required to be designed and built in accordance with the ADA structural standards. PSOF ¶¶ 37-38.

There is no dispute that this ramp violates the applicable ADA structural standards for multiple reasons; several landings are too small, portions of this ramp are too steep, and the ramp lacks compliant handrails. PSOF ¶¶ 28, 33, 39. Even defendants' retained expert, Mr. Darr, agrees this ramp violates the mandatory structural standards and that defendants must reconstruct the ramp to bring it into code. PSOF ¶¶ 38-39

Accordingly, summary judgment should be granted in favor of the Rule 23(b)(3) class relating to the RTU east tunnel ramp. *See* Dkt. 72, Memorandum Opinion and Order at 6.

## V. Departures from ADA structural standards are not permitted; defendants are unable to show clear evidence that class members have equivalent access to the facilities

Plaintiffs and the classes have standing because "the ADAAG establishes the technical standards required for 'full and equal enjoyment,' if a barrier violating these standards relates to a plaintiff's disability, it will impair the plaintiff's full and equal access, which constitutes 'discrimination' under the ADA" and "[t]hat discrimination

satisfies the 'injury-in-fact' element of *Lujan* [*v. Defenders of Wildlife*, 504 U.S. 555 (1992)]." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 947 (9th Cir. 2011). As recognized by the Ninth Circuit "once a disabled plaintiff has encountered a barrier violating the ADA, that plaintiff will have a personal stake in the outcome of the controversy so long as his or her suit is limited to barriers related to that person's particular disability." *Id.* (internal citations omitted); *See, e.g., Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1044 n. 7 (9th Cir. 2008) (stating that a wheelchair-using plaintiff cannot challenge all accessibility barriers, but "only those barriers that might reasonably affect a wheelchair user's full enjoyment of the store"); *accord Steger v. Franco, Inc.*, 228 F.3d 889, 893 (8th Cir. 2000) (finding that a disabled plaintiff who was blind "is not 'among the injured' with regard to ADA violations in the building that do not affect the blind," and that he therefore did not have standing as to those violations).

Defendants may argue that staff has a practice of escorting class members in carts or wheelchairs up and down the non-compliant ramps and therefore there is no obligation under the ADA to provide ramps that comply with the ADA structural standards. This type of argument should be rejected for the following reasons.

In *Clemons v. Dart,* 168 F.Supp.3d 1060, 1066-67 (N.D. Ill. 2016) (Tharp, J.), the court found this regulation "makes clear that the purpose of the equivalent facilitation provision is to allow for flexibility in **design** for unique and special circumstances and to facilitate the application of new disability accommodating **technologies,** but makes no mention of **services**." (citing 28 C.F.R. Pt. 36, App. B, ¶ 103) (emphasis in original). The *Clemons* court held this provision provides "no comparable license to substitute requests for personal assistance for the architectural standards required for new construction after

1991." *Clemons*, 168 F.Supp.3d at 1067. The court's reasoning in *Clemons* was adopted in *Crockwell v. Dart,* 15 C 825, 2016 WL 4493456, at *3 (N.D. Ill. Aug. 26, 2016) (Shah, J.). Any argument the "equivalent facilitations" provision applies here, for a ramp constructed after 1992, is without merit. *See Roberts v. Dart*, 2018 WL 1184735, at *4 (N.D. Ill. 2018) (Lee, J.) (citing *Clemons* and holding a policy or procedure requiring a disabled individual to request permission from jail staff to use an accessible toilet is not "equivalent access").

Second, even if the "equivalent facilitation" provision is applicable here, defendants, who have the "burden of persuasion," cannot show class members had "equivalent access to the facility." 28 C.F.R. § 35.151(c)(1). The evidence shows that staff at the Jail do not have a pattern or practice of assisting class members up and down the non-compliant ramps, either in carts or wheelchairs. *See* PSOF ¶¶ 46, 52-53, 63, 64-65, 73, 76-78. The Sheriff's Rule 30(b)(6) designee said it is situational whether a cart will be offered to a class member. *Id.* ¶ 64. And this designee testified that a class member's request to use a wheelchair on the ramp would require a correctional supervisor to call the on-duty nursing supervisor to decide whether to permit a wheelchair. *Id.* ¶ 65.

A nearly identical equivalent facilitation argument was rejected by the district court in *Spence v. Dart*. 2020 WL 4677053 (N.D. Ill. 2020) (Kennelly, J.). In that case, an individual prescribed crutches alleged moving up and down the Cermak ramp violated his rights under the ADA. *Id.* at *2. The defendants argued that Spence had "equivalent access to Cermak because wheelchairs were located throughout the Jail complex and were available upon request to the inmate." *Id.* at *4. This defense was rejected by the

district court because "[e]quivalent access entails more than simple physical access – it requires that the alternative method offers an individual with a disability the same degree independence that a structural accommodation would provide." *Id* at *5 (cleaned up).

Here, the plaintiff class has more evidence than the plaintiff in *Spence* in the form of the Sheriff's Rule 30(b)(6) designee who confirmed there is no training to staff to accommodate class members up and down the non-compliant ramps, that use of a cart "is situational" that requires escalation to a "supervisor" who must then "work with Cermak" to determine if the individual is entitled to be escorted on a cart. PSOF ¶ 64. There is a similar cumbersome process if a class member requests a wheelchair (as an accommodation) to traverse a ramp. PSOF ¶ 65. Indeed, Mr. Darr, defendants' expert, opines that pushing wheelchair-users up and down the non-compliant RTU east tunnel ramp does not obviate the need for government to comply with the ADA structural standards "for a required accessible route." PSOF ¶ 32. Defendants, therefore, cannot meet their burden that class members have "the same degree of independence that a structural accommodation would provide." *Spence*, 2020 WL 4677052, at *5. As stated above, the "availability of staff assistance does not constitute equivalent access under the applicable regulation," *Clemons*, 168 F.Supp.3d at 1069, and defendants' purported policy of providing a wheelchair or cart is not clearly equivalent access to traverse the structurally non-compliant ramps.

Third, the record evidence is that plaintiffs Hernandez and Mathis along with members of the plaintiff classes have requested and been denied accommodations to move up and down the ramps. PSOF ¶¶ 46, 52-53, 63, 73, 76-78. Defendants, therefore, have not met their burden to show it is "clearly evident" that offering a wheelchair or cart

to a class member provides "equivalent access to the facility." 28 C.F.R. § 35.151(c)(1).

**VI.     Conclusion**

It is therefore respectfully requested that the Court grant summary judgment in favor of the two Rule 23(b)(3) issue classes.

Respectfully submitted,

/s/   Patrick W. Morrissey
Thomas G. Morrissey
Patrick W. Morrissey
10257 S. Western Ave.
Chicago, IL. 60643
(773) 233-7901
*Attorneys for the plaintiff class*