DB

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Cuauhtemoc Hernandez and William          )
Mathis,                                   )
                                          )
              *Plaintiffs*                )
                                          )         23-cv-16970
          -*vs*-                          )
                                          )         Judge Harjani
Thomas Dart, Sheriff of Cook County,      )
et. al.,                                  )
                                          )
                                          )
              *Defendants.*               )

**FILED**

**JUL 1 6 2025**

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## VOLUME II OF EXHIBITS CITED IN PLAINTIFFS' STATEMENT OF FACTS

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Cuauhtemoc Hernandez, et al., | ) | |
| | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| -*vs*- | ) | No. 22-cv-16970 |
| | ) | |
| Thomas Dart, Sheriff of Cook County, et. al., | ) | Judge Harjani |
| | ) | |
| | ) | Magistrate Judge Holleb Hotaling |
| *Defendants.* | ) | |

## PLAINTIFF'S RULE 30(b)(6) NOTICE

Defendants Sheriff of Cook County and Cook County are hereby notified and requested pursuant to Rule 30(b)(6) of the Federal Rule of Civil Procedure to identify and designate an individual or individuals to be deposed in regard to the following matters on or before, October 14, 2024, at the office of Thomas G. Morrissey, Ltd. that will be recorded by stenography means:

1. On September 16, 2024, defendants responded to requests to admit. Cook County admitted that "the Cook County Board of Commissioners must approve the expenditure of funds to renovate the Cermak ramp," Cook County Response to Admissions ¶ 21, but denied the request that the "Book County Board of Commissioners, as of August 15, 2024, have not approved any construction contract to renovate the Cermak ramp." *Id.* at ¶ 22. Produce a designee (or designees to discuss renovation of the Cermak ramp, including:
   a. The recommendations/findings contained in the transfer package prepared by Globetrotters Engineering Corporation (GEC);

Exhibit 16 Page 1

    b. The specific steps taken to date by HDR Architects in the planning, design and development phase for the renovation of the Cermak ramp;

    c. The total project costs for the renovation of the Cermak ramp;

    d. To date, describe the steps taken by defendants for including the renovation of the Cermak ramp in the 2025 Capital Improvement Plan for Cook County;

    e. The process used to select contractors for the renovation of the Cermak ramp, including any requests for proposals (RFPs), bidding processes, approval of contract(s) by the Cook County Board and the Office of Procurement and Capital Planning;

    f. The timeline for the renovation of the Cermak ramp, including the start and completion dates.

2. On September 16, 2024, Cook County admitted that "as of August 15, 2024, the Cook County Board of Commissioners has not yet approved any funds to reconstruct the RTU east tunnel ramp to comply with the ADA." Cook County Response to Request to Admit served 9/16/2024, ¶ 39. Produce a designee (or designees) to testify regarding efforts to renovate the RTU east tunnel ramp, including:

    a. Action taken (and will be taken) to reconstruct the RTU east tunnel ramp to comply with the ADA;

    b. Action taken (and will be taken) to secure funding to reconstruct the RTU east tunnel ramp to comply with the ADA;

    c. A date (or anticipated date) when the RTU east tunnel ramp will be renovated to comply with the ADA;

    d. Action, if any, to take remedial steps to renovate parts of the RTU east tunnel ramp until the entire ramp is renovated to comply with the ADA structural standards;

3. From January 1, 2024, to the present, all accommodations offered (and provided) to individuals in custody using a walker, cane, or crutches, to traverse either the Cermak ramp and/or the RTU east tunnel ramp.

Exhibit 16 Page 2

4. The steps taken to notify the individuals in custody using canes, crutches, or walkers about the Cermak and RTU east tunnel ramps being non-compliant with the ADA and the interim measures in place to ensure access and safety.

5. The training to staff for providing accommodation to individuals in custody using canes, crutches or walkers when navigating the Cermak and RTU east tunnel ramps.

6. Documentation when an individual using a cane, crutches or walker is provided an accommodation to use either the Cermak or RTU east tunnel ramps or when the offered accommodation is refused;

/s/ Patrick W. Morrissey
    Thomas G. Morrissey, Ltd.
    10257 S. Western Ave.,
    Chicago, IL 60643
    (773)233-7901

Exhibit 16 Page 3

## CERTIFICATE OF SERVICE

I, Patrick W. Morrissey, state that I served the foregoing on the undersigned attorneys for defendants by Email on September 23, 2024, to the attorneys listed below:

Jason E. DeVore
Troy S. Radunsky
Zachary G Stillman
DeVore Radunsky, LLC
230 W. Monroe Suite 230
Chicago, IL 60606
*Attorneys for defendants*

Patrick W. Morrissey
Thomas G. Morrissey, Ltd.
10257 S. Western Ave.
Chicago, IL 60643
(773)-233-7901

Exhibit 16 Page 4

Transcript of the Testimony of
**LONNIE HOLLIS**

**Date:** November 18, 2024

**Case:** HERNANDEZ VS. DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

LONNIE HOLLIS
November 18, 2024

Page 1

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CUAUHTEMOC HERNANDEZ,      )
                           )
        Plaintiff,         )
                           )
     -vs-                  )   No. 23 CV 16970
                           )
THOMAS DART and            )
COOK COUNTY, ILLINOIS      )
                           )
        Defendants.        )

        Deposition of LONNIE HOLLIS taken before
DENNIS M. HARTNETT, CSR, pursuant to the Federal
Rules of Civil Procedure for the United States
District Courts pertaining to the taking of
depositions, at Suite 230, 230 West Monroe Street in
the City of Chicago, Cook County, Illinois,
commencing at 2:00 o'clock p.m. on the 18th day of
November A.D., 2024.

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 2

1         There were present at the taking of this
2   deposition the following counsel:
3
4
5         DEVORE RANDUNSKY
          MR. JASON E. DEVORE
6         MR. ZACHARY STILLMAN
          230 West Monroe Street
7         Suite 230
          Chicago, Illinois  60606
8         312-300-4479
          jdevore@deforeradunsky.com
9
10            on behalf of the Plaintiff;
11
12        THOMAS G. MORRISSEY, LTD.
          MR. THOMAS MORRISSEY
13        MR. PATRICK MORRISSEY
          10257 South Western Avenue
14        Chicago, Illinois  60643
          773-233-7900
15
16            on behalf of the Defendant,
              Thomas Dart;
17
18        COOK COUNTY SHERIFF'S OFFICE
          MS. KHARA COLEMAN
19        50 West Washington Street - 704
          Chicago, Illinois  60602
20        312-603-5473
          khara.coleman@ccsheriff.org.
21
22            on behalf of Defendant,
              Cook County, Illinois.
23                  - - - - -
24

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 3

1                 DEPOSITION OF
2                  LONNIE HOLLIS
3               November 18, 2024
4
5     EXAMINATION BY:                      PAGE
6   Mr. Thomas Morrissey                      4
7   Mr. Devore                              114
8   Mr. Thomas Morrissey                    118
9             * * * * * *
10
11              EXHIBITS
12                                         PAGE
12  Deposition Exhibit No.  1                 4
13  Deposition Exhibit No.  6                34
14  Deposition Exhibit No.  4                36
15  Deposition Exhibit No.  9                41
16  Deposition Exhibit No. 10                59
17  Deposition Exhibit No.  5               111
18            * * * * * *
19
20
21
22
23
24

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 1

LONNIE HOLLIS
November 18, 2024

Page 4

1          LONNIE HOLLIS,
2   called as a witness herein, having been first duly
3   sworn, was examined upon oral interrogatories and
4   testified as follows:
5                   EXAMINATION
6          by Mr. Thomas Morrissey:
7      MR. THOMAS MORRISSEY:  Q  This is a Rule
8   30(b)(6) notice that was issued on September 23rd,
9   2024.
10         Will you please state your name and spell
11  your last name for the record.
12     A   First name is Lonnie, L-o-n-n-i-e.  Last
13  name is Hollis, H-o-l-l-i-s.
14     Q   Have you been designated by the Sheriff of
15  Cook County to address certain topics in this
16  30(b)(6) notice?
17     MR. DEVORE:  Yes.  Sorry.
18     THE WITNESS:  Yes.
19     MR. MORRISSEY:  Q  I'm showing you Exhibit 1,
20  it's a 4-page document.  I ask you to take a look at
21  that document?
22         Have you seen this document before?
23     A   No.
24     Q   Have you ever been deposed before?

LONNIE HOLLIS
November 18, 2024

Page 5

1      A   No.
2      Q   So, let me give you a little background.  In
3   a deposition, I'm going to have the opportunity to
4   ask you questions, as the Sheriff's designee, you
5   have to answer orally, so the Court Reporter can
6   take down your response, otherwise, he can't take
7   down if you shake your head or nod your head or make
8   gestures.
9          If you don't understand one of my
10  questions, please ask me to rephrase it, but if you
11  respond to the question, I'm going to, I'm going to
12  consider the fact you understand my question.  If,
13  at any time, during the deposition you want to take
14  a break, when there's no question pending, please
15  let us know, and we'll accommodate your needs.
16         Going back to Exhibit Number 1.  Have you
17  -- you haven't seen this document before?
18     A   No.
19     MR. MORRISSEY:  Counsel, what topics is
20  Mr. Hollis being designated to discuss on behalf of
21  the Sheriff of Cook County?
22     MR. DEVORE:  I believe, here it is.  It's 4, 5
23  -- it's  3, 4, 5 and 6, I believe, right?
24     MR. MORRISSEY:  Okay.

LONNIE HOLLIS
November 18, 2024

Page 6

1      MR. DEVORE:  Yeah, I'm sorry.
2      MR. MORRISSEY:  Q  Would you like to take a few
3   moments to look at Exhibit 1, paragraphs 3, 4, 5 and
4   6?
5      A   Yes
6      Q   Have you had an opportunity now to review
7   Exhibit 1?
8      A   Yes.
9      Q   In particular, topics 3 through 6?
10     A   Yes, sir.
11     Q   Mr. Hollis, where are you currently
12  employed?
13     A   Cook County Sheriff's office.
14     Q   And in what department are you assigned to?
15     A   Administration.
16     Q   How long have you been with Cook County?
17     A   Since May 2001.
18     Q   Are you a sworn officer?
19     A   I was sworn, yes.
20     Q   What was your first position with the
21  Sheriff's office?
22     A   Correctional officer.
23     Q   For how long were you a correctional
24  officer?

LONNIE HOLLIS
November 18, 2024

Page 7

1      A   Until 2007.
2      Q   What divisions did you work in as a
3   correctional officer?
4      A   Division 1, 2, receiving, isn't a division,
5   and 6.
6      Q   Did you work as a tier officer in Division
7   1?
8      A   Yes.
9      Q   Any other positions in Division 1, which you
10  were assigned to as a sheriff's officer, other than
11  a tier officer?
12     A   What do you mean?
13     Q   Well, there's different positions as a
14  correctional officer in Division 1, correct?
15     A   Yes.
16     Q   Other than being assigned to a tier, did you
17  have any other assignment in Division 1?
18     A   I worked door security.
19     MR. REPORTER:  I'm sorry, repeat that.
20     THE WITNESS:  Door security.  The primary entry
21  point to the building.
22     MR. MORRISSEY:  Q  In Division 1, were there
23  movement officers?
24     A   Yes.

Exhibit 17 Page 2

LONNIE HOLLIS
November 18, 2024

Page 8

1    Q  Did you ever work as a movement officer?

2    **A  Not that I recall.  It's a long time ago.**

3    Q  In Division 2, what were your assignments?

4    **A  Living unit officer, barber shop officer,**

5 **visiting officer.**

6    Q  Does Division 2 have a movement officer?

7    **A  Yes.**

8    Q  Did you ever work as a movement officer?

9    **A  Yeah, that was a long time ago as well.**

10   Q  Did you ever move prisoners from Division 2

11 to Cermak?

12   **A  Yes.**

13   Q  In the RCDC, what were your

14 responsibilities?

15   **A  Intake officer, booking officer.**

16   Q  Any other responsibilities in the RCDC?

17   **A  Tunnel, tunnel security.**

18   Q  Did you ever work moving prisoners from the

19 RCDC to a living unit?

20   **A  Yes.**

21   Q  What living units or house units, when you

22 were working in the RCDC, did you move prisoners to?

23   **A  Division 6, Division 1, Division 9,**

24 **Division 10.**

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 9

1    Q  Did you ever move prisoners from the RCDC to

2 Cermak Health Service?

3    **A  Not that I recall.**

4    Q  Okay.  Did you receive a promotion in 2007?

5    **A  Yes.**

6    Q  What, did you become a sergeant?

7    **A  Yes.**

8    Q  And what housing unit?

9    **A  Division 9.**

10   Q  What were your responsibilities as a

11 Sergeant in Division 9?

12   **A  Oversee the activity of the officers.**

13   Q  And what years did you work in Division 9?

14   **A  Roughly from 2007 to, I think, 2012.**

15   Q  Did you ever move prisoners from Division 9

16 to Cermak --

17   **A  Yes.**

18   Q  -- while you were a sergeant?

19     Did Division 9 have movement officers?

20   **A  Yes.**

21   Q  Did you work a specific shift when you were

22 a sergeant in Division 9?

23   **A  I was assigned all three shifts.  Primarily**

24 **afternoons, but I was on all three shifts.**

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 10

1    Q  Did you supervise movement officers in

2 Division 9 who move prisoners to Cermak?

3    **A  I would have to say, yeah.  Mostly, I was**

4 **assigned to the towers, which is the living units.**

5    Q  Can you tell me, in Division 9, what were

6 the duties and responsibilities of a movement

7 officer?

8    **A  To export the individuals to and from**

9 **various places that they have to go in the building**

10 **or outside the building.**

11   Q  Would that include Cermak Health?

12   **A  Yeah, most likely.**

13   Q  When you were a sergeant, in Division 9,

14 were you responsible for training movement officers?

15   **A  No.**

16   Q  Do you know if movement officers, at that

17 time, between 2007 and 2012, received any specific

18 training in the role of a movement officer?

19   **A  No, most of the time I believe they may have**

20 **learned from each other.**

21   MR. REPORTER:  They may have what from each

22 other?

23   THE WITNESS:  Learned from each other.  So

24 someone who was previously doing it or if there was

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 11

1 a sergeant assigned specifically to that.

2     As I mentioned, I was assigned to the

3 living, supervising living units.

4   MR. MORRISSEY:  Q  In 2012, did you receive a

5 promotion to lieutenant status?

6   **A  No, I went to another area in the jail**

7 **through a bidding process.**

8   Q  All right.  What area of the jail did you go

9 to in 2012?

10   **A  Well, I went to the central kitchen, in**

11 **about 2012, then I was in 3 and 8.**

12   Q  When you say 3 and 8 --

13   **A  They were synonymous with each other, the**

14 **two buildings were joined with each other.**

15   Q  Right.  Did 3 house females at that time?

16   **A  Yes.**

17   Q  And what years did you work 3 and 8?

18   **A  It was probably just 2012, I believe, we had**

19 **a compound beginning at that point.**

20   Q  Was Division 8, at that time, was that

21 Cermak Health?

22   **A  Yes.**

23   Q  How long were you assigned to 3, Division 3

24 and 8, in 2012?

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 3

**LONNIE HOLLIS**
**November 18, 2024**

Page 12

1   **A   About a month, before I bid.**
2   Q   And after a month, where were you assigned?
3   **A   I went to Division 2.**
4   Q   In Division 2, were you a sergeant?
5   **A   Yes.**
6   Q   What shift did you work?
7   **A   11:00 to 7:00.**
8   Q   11:00 p.m. to 7:00 in the morning?
9   **A   Yes.**
10  Q   And, to your knowledge, did Division 2 have
11  movement officers?
12  **A   Yes.**
13  Q   And at times did movement officers move
14  inmates from Division 2, at times, to Cermak?
15  **A   Yes.**
16  Q   For how long were you a sergeant in
17  Division 2?
18  **A   Until 2016.**
19  Q   When you were a sergeant in Division 2, and
20  the times you supervised movement officers that move
21  prisoners from Division 2 to the Cermak Clinic,
22  correct?
23  **A   Yes.**
24  Q   Can you tell me the path of travel that the

TOOMEY REPORTING
312-853-0648

**LONNIE HOLLIS**
**November 18, 2024**

Page 13

1   prisoners would take with a movement officer in
2   Division 2?
3   **A   Have you been to the jail before?**
4   **Am I allowed to ask you questions?**
5   MR. MORRISSEY:  No.
6   MR. DEVORE:  No.
7   MR. MORRISSEY:  No.
8   THE WITNESS:  I'm trying to help him understand
9   how I get there.
10  MR. DEVORE:  Yeah, just objection as to form, in
11  terms of it's unclear in terms of where to start and
12  finish time frame.
13  MR. MORRISSEY:  Q   Well, is there one lawyer
14  defending the case.
15  MR. STILLMAN:  It's the two of us.
16  MR. MORRISSEY:  No, but only one person is
17  entitled to make objections during a deposition.
18  MR. STILLMAN:  For each Defendant.
19  MR. MORRISSEY:  No, no, no, this is --
20  MR. DEVORE:  I have been the only one objecting
21  so far.
22  MR. MORRISSEY:  All right.  So you will make all
23  the objections, that's fine.
24  Q   In Division 2, can you tell me the path of

TOOMEY REPORTING
312-853-0648

**LONNIE HOLLIS**
**November 18, 2024**

Page 14

1   travel for a movement officer moving a prisoner from
2   Division 2 to Cermak?
3   **A   Yes, there's a roadway that is**
4   **interconnected in the interior of the compound, and**
5   **they use the roadway to go to Cermak.**
6   Q   So would it be fair to say that in
7   Division 2, back at least in the year 2016, a
8   prisoner being moved by a movement officer to Cermak
9   Health, would go outside the building and go to
10  Cermak Health?
11  MR. DEVORE:  Objection, I don't see where this
12  is inside -- or it's outside the scope of the
13  notice.
14  MR. STILLMAN:  I think we have gone beyond his
15  background at this point.
16  MR. DEVORE:  I'm looking if there is something
17  in the notice that this applies to, point me to it,
18  but, otherwise, it's outside.
19  MR. MORRISSEY:  Well, it involves the training
20  of staff to accommodate individuals with
21  disabilities, canes, crutches, or walkers, number 5.
22  And the on-the-job training, which he's also
23  testified that officers train each other in regards
24  to the responsibilities of movement officers.

TOOMEY REPORTING
312-853-0648

**LONNIE HOLLIS**
**November 18, 2024**

Page 15

1   MR. DEVORE:  Well, you're talking about
2   different time frames, you're talking about, I
3   believe it was 2012, and now we're possibly talking
4   about 2016, and I believe, and your notice has
5   three, references January 1, 2024 --
6   MR. MORRISSEY:  None of your claims are relevant
7   to that time.
8   MR. DEVORE:  Let me go on.
9   MR. STILLMAN:  And it's unclear as to 4, 5, and
10  6, but I don't, this case is not in any way about
11  actions taken in 2012 or 2016.
12  MR. MORRISSEY:  Q   To your knowledge, when
13  prisoners from Division 2 are transported in the
14  period between 2023, 2022, and 2024, is the same
15  route of travel taken today as it was back in 2016?
16  MR. DEVORE:  Objection, as to scope and time
17  frame.
18  MR. MORRISSEY:  Q   You can answer.
19  MR. DEVORE:  For 2022, is that the time frame?
20  MR. MORRISSEY:  Q   Right.  2022 to 2024, can you
21  describe the path of travel for a movement officer
22  taking a prisoner from Division 2 to Cermak?
23  **A   They use the roadway.**
24  Q   When you say the roadway, what door or exit

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 4

LONNIE HOLLIS
November 18, 2024

Page 16

1  would a movement officer take from Division 2 to
2  reach the roadway?
3      MR. DEVORE:  Same objection as to scope, but you
4  can answer, if you can.
5      THE WITNESS:  Well, there, each building has two
6  doors they could possibly leave out of, so it's
7  difficult to answer.
8      MR. MORRISSEY:  Q  Okay.  But to get to Cermak,
9  you would have to physically, from Division 2, go
10  outside the building, correct?
11     **A   Yeah, there's no tunnel.**
12     Q   Okay.  And is there a point of entrance for
13  a movement officer into the Cermak building from
14  Division 2?
15     **A   One more time with the question?**
16     Q   Sure.  If a movement officer, assigned to
17  Division 2, takes a prisoner from Division 2 to
18  Cermak, is there a point of entrance for that
19  officer into the Cermak building?
20     MR. DEVORE:  Objection as to form.  In terms of
21  what time, what time frame are we talking about?
22     MR. MORRISSEY:  The class period, 2022 to 2024.
23     THE WITNESS:  They would most likely take them
24  into the RTU.

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 17

1      MR. MORRISSEY:  Q  Why would a movement officer,
2  during the class period, and when I talk about the
3  class period, I'm talking about 2022 to the present,
4  why would a movement officer from Division 2 take a
5  prisoner outside the building and then over to the
6  RTU building in order to get to Cermak?
7      MR. DEVORE:  Objection as to scope.  If there is
8  no tunnels in Division 2, then how can that be
9  within the scope of this suit?
10     MR. MORRISSEY:  Q  You can answer.
11     MR. DEVORE:  If you can.  I, and, actually, the
12  objection is as to scope, and so if there's, again,
13  that's the objection.  You can answer, if you can.
14     THE WITNESS:  What was the question again?
15     MR. MORRISSEY:  Q  So the question is this --
16     **A   He was talking, I got distracted.**
17     Q   -- during the class period, if a prisoner
18  housed in Division 2 has to go to Cermak, you say
19  they have to exit the building, itself, why do they
20  go to the RTU building, instead of going directly to
21  Cermak?
22     **A   Because the way that they set up now, they
23  would be on the exterior of the, so the interior is
24  bounded by fencing, and if they go beyond a certain**

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 18

1  **point, they would be outside the secure area of the
2  fencing, so they have to go into the building.**
3      Q   They have to go into the RTU building?
4      **A   Yes.**
5      Q   Okay.  So the Division 2 building is
6  surrounded by a security fence?
7      **A   No, the interior of the compound.  That's
8  why I was asking if you have had been there before,
9  because it's difficult to explain, if you haven't
10  been there.**
11     Q   Okay.  So, what area of the RTU would a
12  Division 2 prisoner be taken to, prior to being
13  brought to Cermak?
14     MR. DEVORE:  Same objection.  As to scope and
15  Division 2.
16     MR. STILLMAN:  You can answer.
17     THE WITNESS:  That's also difficult to answer,
18  because there's multiple entry points into the RTU
19  that someone could chose to take.
20     MR. MORRISSEY:  Q  Would the -- when a movement
21  officer, who is given the assignment to move a
22  prisoner from Division 2 to Cermak, does he or she
23  sign out for the prisoner, is there any log that
24  they sign out on?

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 19

1      MR. DEVORE:  Objection as to scope.  And I am
2  not sure what this has to do with this case.
3      MR. MORRISSEY:  Q  You can answer.
4      MR. DEVORE:  If you know.
5      THE WITNESS:  You asked what now, do they sign
6  someone out?
7      MR. MORRISSEY:  Q  Yeah.  So how does a movement
8  officer, how does the move, how does the jail
9  communicate to a movement officer in Division 2 that
10  he or she is to take a prisoner from Division 2 to
11  Cermak?
12     **A   When you, okay, I'm having trouble tracking
13  what you, so when you say communicate, how --**
14     MR. DEVORE:  Actually, and just an objection,
15  and maybe it could be, maybe it would be easier if
16  you just asked if folks traveling from Division 2 to
17  the RTU can use the east tunnel ramp, I am just not
18  sure where you're going.
19     MR. MORRISSEY:  You know, you can't testify for
20  the witness.  So, you have got to confine your
21  objections to appropriate things.
22     MR. DEVORE:  Well, we're trying to get to
23  appropriate things, it's just going a little slow
24  and it's evident that there's some difficulty with

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 5

LONNIE HOLLIS
November 18, 2024

Page 20

1  the question.
2       MR. MORRISSEY:  Well, the case is going very
3  slow because of Defense Counsel, I might add.
4       Q   Do you understand?  How does a movement
5  officer in Division 2 get the assignment to move a
6  prisoner from Division 2 to Cermak?
7       MR. DEVORE:  Same objection, as to scope.  I
8  don't believe there's been any testimony regarding
9  Division 2 having, there being movement involving
10 Division 2 on a ramp.
11      MR. MORRISSEY:  Q  You can answer.
12      A   That's, so I mean there's a plethora of
13 ways.  I mean someone could be called, and say that
14 the person needs to be brought to location X.  There
15 could be movement passes that are generated through
16 our JMS, I mean so that's a really broad sweeping
17 question to answer.  If you have a more --
18      Q   All right.
19      A   -- succinct question.
20      Q   So the movement officer, once they take
21 possession of the prisoner of Division 2 --
22      A   Uh-huh.
23      Q   -- are they responsible for bringing them to
24 Cermak?

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 21

1       A   It would depend on where, again, because
2  your question was kind of open-ended, no offense.
3  If that's where they're going, then, yes, but you
4  said movement, so I don't know if you're saying if
5  they're going to, let's say, a visit or if they're
6  going here, so if you're saying to Cermak, then yes.
7       Q   All right.  So, my example will be directed
8  to, let's say, Division 2, dorm 2.  Let's say a
9  prisoner from Division 2, dorm 2, requires to see a
10 doctor?
11      MR. DEVORE:  Same objection, as to scope.
12 There's been, there's been no testimony that there's
13 ramps in Division 2 that are involved in this case,
14 so I'm going to, with respect to that line of
15 questioning, in Division 2, I'm going to, and it's
16 been asked several times, I'm going to direct him
17 not to answer if you continue.
18      MR. MORRISSEY:  Q  So let's assume that the
19 person has to go to the Health Care Clinic in
20 Cermak, you mentioned that the movement officer in
21 Division 2 will take him from the division, Division
22 2, let's say dorm 2, directly to Cermak, correct?
23      MR. DEVORE:  Objection as to form, confusing as
24 worded, also it relates to Division 2.

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 22

1       MR. MORRISSEY:  Q  You can answer.
2       MR. DEVORE:  And I am going to direct him not to
3  answer.
4       MR. MORRISSEY:  We'll certify the question.
5       Q   After 2016, where were you assigned to?
6       A   Jail intelligence.
7       Q   Do you still have the same rank as a
8  sergeant?
9       A   Yes.
10      Q   For how long were you in jail intelligence?
11      A   Until 2020.
12      Q   And when were you assigned to jail
13 intelligence, you didn't supervise correctional
14 officers or movement officers moving prisoners from
15 divisions to Cermak, would that be fair to say?
16      MR. DEVORE:  Objection as to what is fair, but
17 if you can answer, you can answer.
18      THE WITNESS:  Yes, I was in jail intelligence,
19 we didn't do those things.
20      MR. MORRISSEY:  Q  In 2020, did you receive a
21 promotion or did you change positions?
22      A   I was promoted to AED, Assistant Executive
23 Director.
24      Q   And for what period of time were you an

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 23

1  Assistant Executive Director?
2       A   From 2020 to the present.
3       Q   What are your responsibilities as an
4  Assistant Executive Director?
5       A   I oversee the day-to-day operations of areas
6  or individuals, depending on the will of the
7  executive director.
8       Q   Who is the executive director?
9       A   Jane Gubser.
10      Q   Jane Gubner?
11      A   Gubser.
12      Q   Do you have specific divisions that you
13 supervise on a day-to-day basis?
14      A   No, not at this time.
15      Q   At any time, as the Assistant Executive
16 Director, were you assigned specific divisions?
17      A   Yes.
18      Q   What period of time was that?
19      A   From 2020 to this year.
20      Q   What month this year?
21      A   July.
22      Q   Between 2020 and July of 2024, what
23 divisions at the jail directly reported to you?
24      A   Division 5, Division 6, Division 11, RTU,

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 6

LONNIE HOLLIS
November 18, 2024

Page 24

1  Cermak, 16, external operations, transportation.
2      Q   Okay.  As of July 2024, what are your
3  responsibilities?
4          You mentioned in July of 2024 your
5  responsibilities shifted, you no longer had these
6  divisions directly report to you?
7      A   No.
8      Q   Is that correct?
9      A   Yes.
10     Q   So what are your current responsibilities?
11     A   I do special projects for administration.
12     Q   Can you name some of the projects that you?
13     A   The Opioid Treatment Program.
14     MR. REPORTER:  I'm sorry, repeat that?
15     A   Opioid Treatment Program, OTP.  Supervisor
16  accountability, as far as rounding and staff and
17  individual in custody engagement.
18     Q   Anything else?
19     A   Oh, you said some.
20     Q   Well, what other responsibilities do you
21  have?
22     A   Quite a few.  I also work with our
23  probationary correctional officers, doing peer
24  mentoring with them.  And I do compliance audits, to

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 25

1  make sure that certain policies and procedures are
2  being held or adhered to, such as, you know, when we
3  secure the individuals in custody in their cells,
4  let them out of their cells, a lot of my work is
5  focused on compliance and auditing.
6      Q   Is there a drug treatment program at the
7  jail?
8      A   Yes.
9      Q   And are you -- do you supervise the drug
10  treatment program?
11     A   No, I do not.
12     Q   What did you do to investigate the topics 3
13  through 6, that are in Exhibit Number 1, in
14  preparing to testify today?
15     A   Investigate?
16     Q   Yeah.
17     MR. STILLMAN:  I don't understand what you're
18  asking him either, so maybe --
19     MR. MORRISSEY:  Q  All right.  Let me go back a
20  step.  When were you contacted to testify today?
21     A   Probably a few weeks back.
22     Q   And was that by one of your attorneys?
23     A   Yes.
24     Q   Was that Miss Coleman that contacted you?

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 26

1      A   No, it's an email that comes out.
2      Q   Okay.
3      A   An email notification.
4      Q   Okay.  After receiving that notice by email,
5  what have you done in preparing to testify today in
6  regards to topics 3 through 6?
7      MR. DEVORE:  Objection as to form, in terms of,
8  you know, it's pretty open-ended, but to the extent
9  you can answer, you can answer.
10     THE WITNESS:  So what is he saying, what does he
11  mean, what have I done?
12     MR. MORRISSEY:  Q  Well, you have to respond to
13  me, you can't look at your attorney.
14         So after you received the email, you
15  mentioned that you haven't looked at topics 3
16  through 6 prior to today's deposition, correct?
17     A   Yeah, you asked me if I saw the document.
18     Q   Okay.  So my question is, what have you done
19  to investigate each of those topics, since you were
20  contacted to testify by one of your attorneys?
21     MR. DEVORE:  Just the same objection, but if you
22  can answer, you can answer.
23     THE WITNESS:  I didn't know I was required to
24  investigate this.

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 27

1      MR. MORRISSEY:  Q  Did you speak with anybody,
2  prior to today's deposition?
3      A   Yes.
4      Q   Other than -- did you speak to any
5  attorneys?
6      A   These --
7      Q   These two gentlemen here?
8      A   Right.
9      Q   And you're talking about Mr. Stillman and
10  Mr. Devore?
11     A   Right.
12     Q   When did you speak with those attorneys?
13     A   It was a few days back, and then a couple
14  weeks ago.  I don't remember the exact date, sorry.
15     Q   Other than your attorneys, did you speak to
16  anybody else in regards to the topics which are
17  covered by this deposition notice?
18     A   No.
19     Q   Did you talk to any training officers --
20     MR. DEVORE:  Objection, asked and answered.
21     MR. MORRISSEY:  Q  -- at the Cook County Jail,
22  in regards to the topics that were covered 3 through
23  6 in Exhibit 1?
24     MR. DEVORE:  Objection, asked and answered.  You

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 7

LONNIE HOLLIS
November 18, 2024

Page 28

1  can answer, if you can.
2      THE WITNESS: You say -- no.
3      MR. MORRISSEY:  Q  Did you review any policies,
4  statements of the Cook County Department of
5  Corrections, prior to testifying today?
6      MR. DEVORE: Objection, in terms of he already
7  answered that he hadn't seen these documents, and he
8  wouldn't then be able to talk to folks about the
9  document, if he hadn't seen it.
10     MR. MORRISSEY:  Q  Well, excuse me, but we're
11 here for 30(b)(6) deposition.  He's been designated
12 by the Sheriff, I have a right to find out exactly
13 what he did in preparing for this deposition.
14     Q   So, again, did you look at any policy,
15 documents of the Cook County Sheriff in preparing
16 for today's deposition?
17     A   No.
18     Q   Did you review any procedures in regards to
19 moving prisoners that use canes, crutches or walkers
20 to and from Cermak in preparing for today's
21 deposition?
22     **A   Isn't that pretty much what you just asked**
23 **me?  Not to be abrasive, but it sounds very similar.**
24     Q   Well, it may sound similar, but I am asking

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 29

1  you specifically.
2      **A   Okay.  Can you ask me one more time, because**
3  **it sounds like --**
4      MR. MORRISSEY:  Do you want to.
5      (Question read back as requested.)
6      THE WITNESS:  No.
7      MR. MORRISSEY:  Q  Did you talk to any movement
8  officers from Division 2 specifically, in regards to
9  moving prisoners from Division 2, who use canes,
10 crutches, or walkers to Cermak?
11     MR. DEVORE:  Objection, asked and answered.  I
12 believe it's the third time you asked that question.
13     MR. MORRISSEY:  Q  You can answer?
14     **A   No.**
15     Q   The same question would be in regards to
16 Division 3, 6, 9, 10 and 11, did you talk to any
17 movement officers from that division, from those
18 divisions, in regards to moving prisoners with
19 canes, crutches, or walkers to and from the Cermak
20 Health Service building?
21     MR. DEVORE:  Objection as to form.  I was, I
22 was, that was confusing, as I heard it anyway.
23     MR. MORRISSEY:  Q  You can answer.
24     Do you understand the question?

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 30

1      **A   No, no.  Are you asking me the same thing**
2  **you just asked, but about different places?**
3      Q   No, I am asking you in regards to various
4  housing units at the jail.
5      **A   Uh-huh.**
6      Q   Moving prisoners that have alerts for either
7  canes, crutches, or walkers?
8      **A   Yes.**
9      Q   Did you talk to any movement officer from
10 any of the open housing divisions at Cook County
11 Jail, in regards to how they move prisoners with
12 mobility disabilities to and from Cermak Health
13 Service?
14     **A   No.**
15     Q   Do you believe that it would be helpful in
16 testifying, in addressing topics 3 through 6 to talk
17 to the actual movement officers to determine how
18 those movement officers accommodate prisoners that
19 are given alerts for canes, crutches, or walkers in
20 going up and down either the RTU ramp or the Cermak
21 ramp?
22     MR. DEVORE:  Objection as to form.  Calls for
23 speculation, as to what the officers may say.
24     THE WITNESS:  I am not sure I have that answer,

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 31

1  because everybody could say something different, and
2  I don't want to give a speculative answer of that.
3      MR. MORRISSEY:  Q  Would it be fair to say that,
4  for instance, in Division 9, there are prisoners in
5  Division 9 that use canes, crutches, and walkers,
6  have alerts for canes, crutches, and walkers?
7      **A   I don't have that answer.  I don't wish to**
8  **speculate.  I don't know that to be true or untrue,**
9  **I haven't looked at the census over their recently.**
10     Q   Do you know if there's prisoners in
11 Division 6 that use canes, crutches, and walkers?
12     MR. DEVORE:  Objection as to form and what time
13 frame.
14     MR. MORRISSEY:  During the class period, 2022 to
15 2024?
16     THE WITNESS:  Yes.
17     MR. MORRISSEY:  Q  Would it be fair to say that
18 as a designee for the Sheriff, you don't know how a
19 movement officer in Division 6, what he or she may
20 do to accommodate a person with a cane, crutch, or
21 walker going up the RTU east tunnel ramp?
22     MR. DEVORE:  Objection, mischaracterizes
23 testimony.
24     MR. MORRISSEY:  He hasn't been asked that

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 8

LONNIE HOLLIS
November 18, 2024

Page 32

1 question. So I think that the objection is not well
2 founded.
3     MR. DEVORE: I think it is.
4     MR. MORRISSEY: Q Well, do you understand the
5 question?
6     **A  No.**
7     Q Had you spoken to any movement officer from
8 Division 6 in regards to how he or she may
9 accommodate a person with a cane, crutch, or walker
10 alert, as far as going up the RTU east tunnel ramp?
11     MR. DEVORE: Objection, that's the different
12 question than the one you just asked.
13     THE WITNESS: You said did I speak to anybody?
14     MR. MORRISSEY: Q Right.
15     **A  No.**
16     Q And you previously said that depending upon
17 the officer, they may do something different, as far
18 as accommodating a prisoner that has a cane, walker,
19 or crutch alert, in Division 6, going up the east
20 tunnel, RTU ramp, is that fair to say?
21     MR. DEVORE: Objection as to form.
22     MR. STILLMAN: You can answer.
23     THE WITNESS: I did say what you just said, but
24 that's based on the fact that everybody receives and

LONNIE HOLLIS
November 18, 2024

Page 33

1 processes information differently. So I haven't
2 spoken to a person directly, but I can't speak for
3 how you or he would respond to any given question,
4 if I were to ask something.
5     Q Okay. So would it be fair to say that
6 movement officers, in different divisions, move
7 prisoners to and from Cermak --
8     **A  Yes.**
9     Q -- who have -- and let me finish the
10 question.
11     Movement officers throughout the jail
12 complex, move prisoners with canes, crutches,
13 walkers to and from Cermak?
14     MR. DEVORE: Objection as to form. It's
15 confusing as stated.
16     THE WITNESS: Yes.
17     MR. DEVORE: Let's take a couple of minute break
18 here.
19     MR. MORRISSEY: Well, I'm just going to caution
20 you --
21     MR. DEVORE: Well, he just answered the
22 question.
23     MR. MORRISSEY: You can't talk to a witness
24 during the course of a deposition in regards to

LONNIE HOLLIS
November 18, 2024

Page 34

1 potential questions.
2     MR. DEVORE: We understand the rules.
3     MR. MORRISSEY: Okay. You can take a break.
4     MR. DEVORE: Yeah.
5     MR. MORRISSEY: But I hope you don't violate any
6 rules.
7     MR. DEVORE: So, just in terms of clarification,
8 I mean I think that, you know, you're dancing around
9 these --
10     MR. MORRISSEY: We're off the record.
11     MR. DEVORE: Off the record.
12     (Whereupon a break was taken.)
13     MR. MORRISSEY: Back on the record.
14     Q I'm going to show you Plaintiff's Exhibit
15 Number 6, it's Defendant's first set of Responses to
16 Productions and I would ask you to take a look at
17 paragraph 11.
18     MR. DEVORE: Yeah.
19     MR. STILLMAN: Yeah.
20     MR. MORRISSEY: Q Have you seen Plaintiff's
21 Exhibit Number 6, particular paragraph 11, prior
22 to --
23     **A  Am I looking at this one or this one?**
24     Q You're looking at Exhibit 6, it's at the

LONNIE HOLLIS
November 18, 2024

Page 35

1 bottom of the page.
2     **A  Right, this one or this one?**
3     Q Let me see. Have you seen paragraph 6, the
4 response by the Sheriff to the question, Exhibit 6,
5 paragraph 11, from December 20th, 2021 to the
6 present, documents that explain the policy and/or
7 procedure to provide an accommodation for the
8 detainee prescribed a cane, crutch, or walker
9 transverse the Cermak ramp?
10     And then the response is, with a number of
11 objections, it says without waiving and in light of
12 this objection, see procedure 704, policy 148 and
13 801. So have you seen that document before?
14     MR. DEVORE: Objection as to form. Are you
15 referring to the documents?
16     MR. MORRISSEY: I am referring to Exhibit 6,
17 paragraph 11, that's the question.
18     MR. DEVORE: You said document, so it was
19 unclear if you're referring to --
20     MR. MORRISSEY: I am referring to this
21 paragraph. Have you looked at paragraph Exhibit 6,
22 paragraph 11, before today's deposition?
23     **A  No.**
24     Q In preparing for today's deposition, did you

LONNIE HOLLIS
November 18, 2024

Page 36

1  look at any of these policies, procedure 704, policy
2  148, or 801?
3       MR. DEVORE:  Objection, as to form, and whether
4  it was actual policy and procedures or the words
5  that make up the policy and procedure.
6       THE WITNESS:  Yes, I have seen them before.
7       MR. MORRISSEY:  Q  How recent have you looked
8  at, for instance, procedure 704?
9       **A  I couldn't speculate, I am not sure.**
10      Q  Within the last two years?
11      **A  Somewhere there about.**
12      Q  Okay.  How about policy 148?
13      **A  Somewhere there about, the last two years.**
14      Q  Okay.  Policy 801?
15      **A  Somewhere about the last two years.**
16      Q  Okay.  Can you tell me, policy 148, how does
17  that --
18      **A  What is --**
19      Q  -- an accommodation for detainees, prescribe
20  a cane, crutch, or walker?
21      **A  What is policy 148?  What are we speaking**
22  **about?**
23      Q  I'm going to show you Exhibit 4.  It's
24  policy 148.

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 37

1       **A  Okay.  And now you're asking me what out of**
2  **this?**
3       Q  Well, you mentioned you have seen policy
4  104, 148 before, right?
5       **A  Previously, yeah.**
6       Q  Yeah.  Can you tell me whether policy 148
7  addresses how, how the jail, correctional officers
8  accommodate detainees prescribed a cane, crutch, or
9  walker when they transverse the Cermak ramp?
10      MR. DEVORE:  Objection, as to form.
11      MR. MORRISSEY:  Q  Do you understand the
12  question?
13      **A  No, can you clarify it?**
14      Q  Yeah, sure.  For detainees, prisoners with
15  an alert for canes, crutches, or walkers, is there
16  anything in this policy, 148, that tells a
17  correctional officer what he or she should do as far
18  as accommodating a prisoner with those types of
19  alerts when they go up or down a ramp?
20      MR. DEVORE:  I just have an objection as to
21  form.  If there's a question regarding any specific
22  portion of this document, which is 8 or 9 pages
23  long.
24      MR. MORRISSEY:  Q  Well, the policy, the heading

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 38

1  on that is communications and interaction with
2  individuals with disabilities, correct?
3       **A  Yes, that's what it says here.**
4       Q  And then it defines what a mobility
5  impairment is, correct?
6       **A  Yes.**
7       Q  Would a person who has an alert for a cane,
8  crutch, or walker fall within the definition of a
9  mobility impairment --
10      MR. DEVORE:  Objection as --
11      MR. MORRISSEY:  -- under this policy?
12      MR. DEVORE:  Objection as to form.
13           But you can answer, if you can.
14      THE WITNESS:  Yeah, I was refreshing myself with
15  the policy.  What was your question again, sir?
16      MR. MORRISSEY:  Can you read it back, Dennis.
17           (Question read back as requested.)
18      THE WITNESS:  Yeah, according to this, I believe
19  so.
20      MR. MORRISSEY:  Q  And I'm going to refer you
21  now to page 7 of this policy, 148, and specifically
22  148.9, under arrest and booking, and ask you to read
23  that to yourself for a moment.
24           Have you had an opportunity to read 148.9?

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 39

1       **A  Yes.**
2       Q  You see that 148.9, in regards to ramps,
3  there is a requirement about wheelchair bound
4  individuals being pushed up or down a ramp by the
5  Sheriff's office, do you see that under 148.9A?
6       **A  Yes.**
7       Q  And do you see that correctional officers
8  are to document any refusal of assistants by a
9  wheelchair bound individual?
10      MR. DEVORE:  Objection as to form and scope.
11      THE WITNESS:  Yes, that's the expectation.
12      MR. MORRISSEY:  Q  Is there anything in policy
13  148 that requires a correctional officer to, upon
14  request, push up a person up or down the ramp in a
15  wheelchair if the person has an alert for a cane,
16  crutch, or walker?
17      MR. DEVORE:  Same objection as to scope.
18      THE WITNESS:  Are you asking me if it's in here?
19      MR. MORRISSEY:  Q  I'm asking you in this policy
20  148?
21      **A  Okay.**
22      Q  Is there anything in this document that
23  provides information to a correctional officer how
24  to accommodate a person who has an alert for a cane,

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 10

LONNIE HOLLIS
November 18, 2024

Page 40

1 crutch, or walker, when they have to go up or down

2 either a ramp at Cook County Jail?

3     Well, you can't --

4     **A   I don't see anything about a cane, crutch,**

5 **or walker in here.**

6     Q   Is there anything in this document that

7 instructs a correctional officer that he or she has

8 to document a refusal by a person with a cane,

9 crutch, or walker in regards to assistance for going

10 up or down a ramp at the Cook County Jail?

11     MR. DEVORE:  Objection as to form, and also if

12 you're asking about a specific portion of this, of

13 this document, it would be helpful to point to it.

14     MR. MORRISSEY:  Q  You can answer the question.

15     MR. STILLMAN:  If you're able to answer it.

16     MR. DEVORE:  The same objection, I mean I, the

17 objection was as to form, and also, the objection

18 was as to form.  It's confusing as worded.

19     THE WITNESS:  You're asking about canes,

20 crutches, and walkers?

21     MR. MORRISSEY:  Q  Right.  Let me give it to you

22 a different way.

23     **A   Okay.**

24     Q   Is there anything in this policy, 148, that

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 41

1 provides any training or instruction to a

2 correctional officer in regards to accommodating a

3 person with an alert for canes, crutches, or walkers

4 when he or she goes up a ramp at the Cook County

5 Jail?

6     **A   No, I don't see it.**

7     Q   And I will show you now, we're going to look

8 at the computer, policy 801, you're going to have to

9 look at the monitor.

10     MR. DEVORE:  Do we have copies?

11     MR. MORRISSEY:  Pardon?  It's on the monitor

12 screen, and it was tendered by Defendants in

13 response to production.

14     MR. DEVORE:  One second, I need to take a look

15 at it first.  I don't know what this is.

16     MR. MORRISSEY:  It's Exhibit Number 9.   It's

17 entitled, Disability of Individuals Detained in the

18 Department of Corrections.

19     MR. DEVORE:  Can you scroll to the bottom?

20     MS. COLEMAN:  What is the Bates number on the

21 bottom?

22     MR. DEVORE:  What is the Bates on it?

23     MR. MORRISSEY:  It's Bates stamped 855 to 856,

24 it's a two-page document.

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 42

1     MS. COLEMAN:  Can you scroll down, so we can see

2 it?

3     MR. DEVORE:  Yeah, keep going a little bit

4 further.  Trying to see, go down to the bottom of

5 the second page, okay.

6     MR. STILLMAN:  Okay.

7     MR. DEVORE:  And there's highlighted portions on

8 the one on the screen, is that --

9     MR. MORRISSEY:  Those are the portions that I

10 have highlighted, in your document that you

11 produced.

12     Q   Do you want to take a few moments to read

13 that policy 801?

14     **A   Yes.**

15     Q   You can scroll down.

16     MR. STILLMAN:  He's letting us look at the

17 laptop.  Yeah, just scroll through it.

18     Anything else we should look --

19     MR. MORRISSEY:  No, he's going to read the

20 entire document, he's scrolling down.

21     Q   Have you had an opportunity to look at

22 Exhibit Number 9?

23     **A   Yeah, today, you showed it to me.**

24     Q   Okay.  Can we scroll up to the first page.

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 43

1 Let me give you this.  Thanks.

2     MR. DEVORE:  That's the same document?

3     MR. MORRISSEY:  Yeah.

4     Q   Do you know if looking at 801.3, do you know

5 whether the executive director has established any

6 procedures for transporting detainees with alerts

7 for canes, crutches, and walkers to go up and down

8 either the east tunnel ramp of the RTU or the Cermak

9 ramp?

10     MR. DEVORE:  Objection, in terms of just scope.

11 Is it for the, is it for the same 2022 to '24

12 period?

13     MR. MORRISSEY:  Correct.

14     MR. DEVORE:  And the only other, the other

15 objection is to form, as to -- well, just as to

16 form.

17     You can answer, if you can.

18     THE WITNESS:  I am not sure if I know who

19 established it, you know, I don't know if policy --

20     MR. DEVORE:  That's fine.

21     THE WITNESS:  -- did this or the executive

22 director, I can't say who.

23     MR. DEVORE:  If you don't know, that's fine.

24     MR. MORRISSEY:  Q  But my question is specific

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 11

LONNIE HOLLIS
November 18, 2024

Page 44

1   to the executive director.  To your knowledge, has
2   the executive director issued any policy or
3   procedure in regards to accommodating inmates that
4   have alerts for canes, crutches, or walkers, when
5   they go up or down the Cermak ramp or the east
6   tunnel ramp for the RTU?
7       MR. STILLMAN:  If you know.
8       MR. DEVORE:  If you can answer.
9       MR. STILLMAN:  If you don't know, that's fine
10  too.
11      THE WITNESS:  I don't know, most of the stuff we
12  get is from Lexipol.  That's where the policies come
13  from.
14      MR. MORRISSEY:  Q  Do you know if the executive
15  director or anybody under the executive director has
16  issued any policies or procedures in regards to
17  transporting detainees with alerts for canes,
18  crutches, or walkers, to and from Cermak, or going
19  up or down the east tunnel ramp of the RTU?
20      MR. DEVORE:  Objection as to form, compound.
21          If you can answer, you can answer.
22      A  **I believe it's covered in the Lexipol.**
23      Q  In this procedure?
24      A  **Or maybe this one.**

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 45

1       Q  And when you point to 148, can you show me
2   in Exhibit Number 4, policy 148, where it, there's
3   been a policy and procedure at Cook County in
4   regards to transporting inmates with alerts with
5   canes, crutches, and walkers to accommodate them
6   going up or down the Cermak or the east tunnel ramp
7   of the RTU?
8       MR. DEVORE:  Objection, as to form, and also
9   objection to the extent that there's any suggestion
10  that a policy or procedure doesn't exist based upon,
11  does or doesn't exist based upon his memory.
12      MR. MORRISSEY:  Q  Well, I'm asking, he
13  mentioned he looked at 148, I'm asking him
14  specifically in regards to 148, and he's the
15  designee for the Sheriff.
16      A  **Yeah, it doesn't say anything about the east
17  tunnel ramp.**
18      Q  Or the Cermak ramp or any ramp for people
19  with alerts for canes, crutches, or walkers; is that
20  correct?
21      MR. DEVORE:  Same objection.
22      THE WITNESS:  148.9A mentions it.
23      MR. MORRISSEY:  Q  That's in regards to people
24  with wheelchairs, correct?

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 46

1       A  **Correct.**
2       Q  There's nothing in policy 148 that deals
3   with people with alerts for canes, crutches, or
4   walkers, correct?
5       MR. DEVORE:  Objection, form, mischaracterizes
6   his testimony, and facts, and assumes facts not in
7   evidence.
8       THE WITNESS:  Well, you were asking me was there
9   anything.
10      MR. MORRISSEY:  Q  In regards to people with
11  alerts for canes, crutches or walkers, and you said
12  148.  And I am asking you, in 148, where does it
13  specify the accommodations for people with canes,
14  crutches, or walkers going up or down ramps at the
15  Cook County Jail?
16      A  **Okay.  Then it doesn't say that.**
17      Q  Okay.  Do you know of any procedure,
18  transportation procedure at the Cook County Jail,
19  for moving detainees with alerts for canes,
20  crutches, or walkers up or down ramps at the jail?
21      MR. DEVORE:  Objection, form.  If there's a
22  specific, if there's a reference to a specific
23  document, I mean I don't know if you're looking at
24  policy 148 still with respect to --

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 47

1       MR. MORRISSEY:  Excuse me, that's a speaking
2   objection.  So you can't do that.
3       MR. DEVORE:  Well, it's not a memory test, if
4   there are specific portions of a document you want
5   him to --
6       MR. MORRISSEY:  Q  The question is, as the
7   sheriff's representative, does he know of any policy
8   or procedure for transporting inmates with alerts
9   for canes, crutches, or walkers up and down the
10  ramps?
11      MR. PATRICK MORRISSEY:  The problem here is
12  Miss Coleman is marking the policy and then giving
13  it to Mr. DeVore, and then they're trying then to
14  signal to the witness about what specific portion of
15  the policy there should be reference to, and that's,
16  the time to prepare a witness for a 30(b)(6) is
17  before the deposition starts.
18      MR. DEVORE:  That's absolutely not the case.
19      MR. MORRISSEY:  Well --
20      MR. DEVORE:  And just to be clear, I mean
21  Miss Coleman is, yeah, several seats away from the
22  witness, there's no way for, there's no signaling.
23      MR. PATRICK MORRISSEY:  Mr. Devore, I'm looking
24  at the sheet, I'm seeing Miss Coleman highlight,

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 12

LONNIE HOLLIS
November 18, 2024

Page 48

1  mark the specific section of the policy that's
2  Exhibit 4, and she's pointing to you, and you're
3  trying to signal to the witness.
4       MR. STILLMAN:  For the record, I'm sitting
5  between Mr. Devore and the witness.
6       MR. PATRICK MORRISSEY:  Do you want to show us
7  that first page?
8       MR. STILLMAN:  Are we not allowed to mark up
9  papers we have in front of us.  No one is showing
10 anything to the witness, Pat.
11      MR. MORRISSEY:  Look, you're going to have a
12 chance to redirect the witness, so you can do that
13 on redirect, or on cross.
14      MR. STILLMAN:  We can mark all the documents you
15 have given us.
16      MR. MORRISSEY:  So, what question is pending?
17 Can you read back the question so we can get a
18 response from the witness.
19          (Question read back as requested.)
20      MR. DEVORE:  Objection as to form.  And if that
21 includes policy or procedure or just procedure.
22      MR. MORRISSEY:  Q  You can answer.
23      **A   Are we talking at 148 or 801?**
24      Q   It's a general question.  It's a question

LONNIE HOLLIS
November 18, 2024

Page 49

1  that involves -- I'll break it down.
2           Is there any written procedure for
3  transporting detainees with alerts for canes,
4  crutches, or walkers up or down ramps at the Cook
5  County Jail, as far as accommodating them?
6       MR. DEVORE:  Objection as to scope.  The notice,
7  I don't believe, refers to specific policies.
8           If you can direct to where, which topic
9  we're talking about, that would be helpful and.
10      MR. MORRISSEY:  Q  Well, it goes under number 5,
11 it's about the training to staff for providing
12 accommodations.  It's clearly covered by that, or
13 it's reasonably included in that.
14           You can answer the question.
15      MR. DEVORE:  Same objection, I believe it's
16 outside the scope.
17      THE WITNESS:  So the question you're asking is?
18      MR. MORRISSEY:  If you want him to repeat the
19 question.
20      **A   Yeah.**
21      Q   Repeat the question.
22      **A   A lot of cross-talking going on.**
23      Q   Pardon?
24      **A   A lot of cross-talking.**

LONNIE HOLLIS
November 18, 2024

Page 50

1       Q   I understand that.  I'm trying, forgive me
2  for, you know, this is just the way these things go
3  sometimes.
4       **A   Yeah, it's not like Law and Order.**
5       Q   No, I guess not.  I don't watch Law and
6  Order.
7           Can you repeat the question for the
8  witness?
9           (Question read back as requested.)
10      MR. DEVORE:  Q  Same objection, and just to be
11 clear, topic 5 says the training to staff for
12 providing accommodation to individuals in custody
13 using canes, crutches, or walkers when navigating
14 the Cermak and RTU east tunnel ramps.  There is no
15 reference at all to a policy or procedure anywhere
16 in this.
17      MR. MORRISSEY:  Q  You can answer the question.
18      **A   Am I allowed to ask him a question?**
19      **MR. DEVORE:  No.**
20      **MR. MORRISSEY:  No.**
21      THE WITNESS:  Then I have to say no.  It doesn't
22 include all of the other assisted devices you
23 mentioned, just the policy speaks to wheelchairs.
24      MR. MORRISSEY:  Q  And, to be clear, you're

LONNIE HOLLIS
November 18, 2024

Page 51

1  talking about the only written policies about
2  accommodating people with mobility disabilities at
3  the jail are for people with wheelchairs, and not
4  for people with canes, crutches, or walkers?
5       MR. DEVORE:  Objection as to it mischaracterizes
6  the testimony, and it also runs afoul of what is in
7  front of us, in terms of materials.
8       MR. MORRISSEY:  Q  Do you understand the
9  question?
10      **A   No, not at all.**
11      Q   Sure.  I'll make it simple.  So the only
12 written policies, as far as accommodating prisoners
13 with mobility limitations at the jail, as far as
14 going up and town ramps, are for people with alerts
15 for wheelchairs?
16      MR. DEVORE:  Objection, mischaracterizes the
17 evidence and testimony.
18      THE WITNESS:  Yeah, I am not sure how to answer
19 that, because there's other things that you
20 mentioned in there that aren't included in your
21 question.  Yeah, I am not sure how to answer that.
22      MR. MORRISSEY:  Q  Sure.  So you have testified
23 that, to the sheriff's knowledge, there's no written
24 procedure or policy in regards to accommodating

Exhibit 17 Page 13

LONNIE HOLLIS
November 18, 2024

Page 52

1  detainees who have alerts for canes, crutches, and
2  walkers going up and down ramps at Cook County
3  Jail --
4      MR. DEVORE:  Objection.
5      MR. MORRISSEY:  -- is that fair?
6      MR. DEVORE:  Objection, mischaracterizes
7  evidence.  It's also outside the scope and it's not
8  contained in the notice.
9      MR. MORRISSEY:  Q  You can answer.
10     MR. DEVORE:  You cannot answer.  It's outside
11 the scope.
12     MR. MORRISSEY:  I'm going to certify the
13 question.
14     Q  Are these policies, like 148 and policy 801,
15 are they procedures that are given to correctional
16 officers at the Cook County Jail?
17     **A  Yes.**
18     Q  And that's part of their training to read it
19 and follow through, the written policies at Cook
20 County Jail?
21     **A  The expectation is that they read and follow**
22 **it.**
23     MR. MORRISSEY:  Are you still going to stand on
24 your objection and not allow the person to answer

LONNIE HOLLIS
November 18, 2024

Page 53

1  the question?
2      MR. DEVORE:  Which part?
3      MR. MORRISSEY:  About training, written policies
4  are part of their training.
5      MR. DEVORE:  That was not articulated in the
6  notice --
7      MR. MORRISSEY:  Well --
8      MR. DEVORE:  -- in terms of --
9      MR. MORRISSEY:  -- he just testified that part
10 of the training involves the policies given to
11 correctional officers.  That's part of the training,
12 so that's included in the topic.
13     MR. DEVORE:  Well, it wasn't included in it as
14 it was defined when you sent it.
15     MR. MORRISSEY:  Well.
16     MR. DEVORE:  Can we take a five minute break.  I
17 need to use the restroom.
18     (Whereupon a break was taken.)
19     MR. MORRISSEY:  Back on the record.
20     Q  Looking at Exhibit Number 9 again, under
21 801.3, it says establishing transportation
22 procedures for moving individuals with limited
23 mobility.
24     My question, as the sheriff's designee,

LONNIE HOLLIS
November 18, 2024

Page 54

1  what does limited mobility mean?
2      MR. DEVORE:  Objection as to form and also as
3  to, you know, as to scope.  The notice talks about
4  training, it doesn't talk about policies and
5  procedures.  We didn't prepare the witness to be
6  able to identify all policies and procedures,
7  instead the Sheriff provided, produced documents in
8  the course of discovery.  We have produced the
9  policies and procedures.  So it's a very different
10 deposition if you're talking about him identifying
11 all policies and procedures, which we have produced,
12 as opposed to asking about training, which is what
13 is designated in number 5, training to staff for
14 providing accommodations.
15     MR. MORRISSEY:  Q  You can answer the question.
16     **A  Well, the way that the beginning of the**
17 **paragraph reads, it says the executive director or**
18 **the authorized designee.  I can't speak for the**
19 **executive director.**
20     Q  Well, you're being, you were designated
21 under this topic.
22     **A  Uh-huh.**
23     Q  Rule 30(b)(6), as the Sheriff's
24 representative, okay.  So, I am asking you, as the

LONNIE HOLLIS
November 18, 2024

Page 55

1  Sheriff's representative, under establishing
2  transportation procedures for moving individuals
3  with limited mobility, what is the sheriff's
4  understanding of the term limited mobility?
5      MR. DEVORE:  Objection as to, objection, as to
6  form, and as to scope, and it's beyond the scope of
7  what is contemplated in 3, 4, 5, or 6.
8      MR. MORRISSEY:  Q  You can answer.
9      MR. DEVORE:  And to the extent that you have
10 personal knowledge of it, outside of what was
11 contemplated by these topics, you can answer, but it
12 was not included, it was not included --
13     MR. MORRISSEY:  No, we're asking him, as the
14 designee for the Sheriff, what is meant by limited
15 mobility in his Exhibit Number 9.
16     MR. DEVORE:  And the same objection stands,
17 because the topics, as identified and not referenced
18 specific policies, if there had been references to
19 specific policies, then we would have objected to
20 that, because the sheriff has already provided these
21 policies and documents and they speak for themselves
22 and we provided them during the course of discovery.
23     MR. MORRISSEY:  Q  You can answer.
24     **A  I don't have an answer, because it's not**

Exhibit 17 Page 14

LONNIE HOLLIS
November 18, 2024

Page 56

1  included in the policy.
2      Q   Does the Sheriff consider a person who has
3  an alert for canes, crutches, or walkers to have,
4  fall within the definition of limited mobility?
5      MR. DEVORE:  Same objection.
6      THE WITNESS:  That would be the same response as
7  the other one.  I don't have that, it's not defined
8  by the policy.
9      MR. MORRISSEY:  Q  No, I'm asking, as the
10  Sheriff's designee, does the Sheriff consider a
11  person who has an alert for a cane, crutch or a
12  walker to be included within the term limited
13  mobility?
14      MR. DEVORE:  Same objection.
15      THE WITNESS:  I can only speak to what the
16  policy speaks to.
17      MR. MORRISSEY:  Q  We'll, if we go back to 148,
18  mobility impairment.
19      A   Right.
20      Q   It says, refers to the inability of an
21  individual to use one or more of their
22  extremities --
23      A   Yes.
24      Q   -- or lack of strength to walk, grasp, or

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 57

1  lift objects, the use of a wheelchair, crutches, or
2  walker may be utilized to aid in mobility?
3      A   Yes.
4      Q   So, is it fair to say that the Sheriff
5  considers a person who has been medically determined
6  to need an alert for a cane, crutch, or walker to
7  have limited mobility?
8      A   I can't --
9      MR. DEVORE:  Objection as to scope and form.
10  Actually, as to scope, as to not being included in
11  the topics 4, 5, and 6.
12      THE WITNESS:  I can't say that.  I can say that
13  there's a mobility impairment, because that's what
14  the policy reads.
15      MR. MORRISSEY:  Q  All right.  Going back to
16  Exhibit Number 9.
17      MR. DEVORE:  Is Exhibit 9 policy 801?
18      MR. MORRISSEY:  Correct.
19      MR. DEVORE:  Yeah.
20      MR. MORRISSEY:  Q  As the Sheriff's
21  representative, can you tell me what transportation
22  procedures have been -- let me rephrase the
23  question.
24      As the sheriff's designee, what are the

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 58

1  transportation procedures for a Division 9 movement
2  officer, when moving inmates with a cane, crutch, or
3  walker up and down ramps, such as Cermak and the RTU
4  east tunnel ramp?
5      MR. DEVORE:  Objection as to scope, in terms of
6  what is included in the topics.  Does it -- what
7  topic are you referring to?
8      MR. MORRISSEY:  I'm referring to the training
9  that's given to correctional officers who have moved
10  detainees from Division 9 up and down the RTU and
11  the Cermak ramp, who have alerts for canes,
12  crutches, and walkers.
13      MR. DEVORE:  Because it sounds like you're
14  asking questions related to policies that we, that
15  the Sheriff produced, policies and procedures that
16  the Sheriff produced, and you're trying to get
17  answers that, that speak to those specific policies
18  and procedures without having an appropriate topic
19  that identifies that.
20      MR. MORRISSEY:  The Sheriff's designee has
21  already testified that the written procedures,
22  policies are part of the training given to
23  correctional officers, and topic 5 talks about the
24  training to staff.  So, it's certainly included

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 59

1  within this topic?
2      MR. DEVORE:  Well, if it had been identified
3  that he would need to testify as to specific
4  policies and procedures, that would be a very
5  different scenario than we have right now, because
6  it just doesn't say that.
7      MR. MORRISSEY:  Well --
8      MR. DEVORE:  And just because he testified
9  regarding one aspect of training doesn't mean he's,
10  he's committed to having, knowing song and verse
11  every policy and procedure that you pull out that we
12  produced already during the course of discovery.
13      MR. MORRISSEY:  Well, what's the pending
14  question?
15      (Question read back as requested.)
16      MR. DEVORE:  Same objection, I'm going to
17  instruct the witness not to answer.
18      MR. MORRISSEY:  We'll certify the question.
19      Q   I'm showing you Exhibit Number 10.  It's a
20  declaration in this case by a Mr. Rogers, and I
21  would ask you to take a look at it, it should be on
22  your screen?
23      MR. DEVORE:  We need to look at it before.  We
24  initially, we object to questions regarding this

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 15

LONNIE HOLLIS
November 18, 2024

Page 60

1  declaration, because it has nothing to do with this
2  case, and it's outside the scope of the topics
3  referenced in 3, 4, 5, and 6 in the 30(b)(6) notice.
4      MR. MORRISSEY:  That's fine.  Can you show the
5  witness the declaration.
6      MR. STILLMAN:  Yes.
7      MR. MORRISSEY:  Let me know when you have had a
8  chance to read the whole declaration.
9      **A    After where he signs, is that the end of it?**
10     Q    Yeah, it is.
11     **A    I have read it.**
12     Q    Okay.  Do you see that Mr. Rogers was given
13 an alert for a walker by the Sheriff in this
14 declaration?
15     MR. DEVORE:  Objection, outside the scope of the
16 notice.  And unless you can articulate how it fits
17 in, I am not going to have him answer it.
18     MR. MORRISSEY:  Well, it deals with the training
19 provided by the Sheriff's office to transport
20 individuals, like Mr. Rogers, up and down the east
21 tunnel ramp and the Cermak ramp.  So that's how it
22 relates to it.  So if we can proceed without --
23     MR. DEVORE:  I just, I don't understand how
24 training would have to do with the declaration of

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 61

1  another inmate.
2      MR. STILLMAN:  The individual facts of one
3  circumstance that has nothing to do with the --
4      MR. MORRISSEY:  Listen, there can only be one
5  attorney making objections during the deposition.
6      MR. DEVORE:  So that's our objection.
7      MR. MORRISSEY:  Q  Okay.  So, do you see in the
8  declaration, Exhibit Number 10, that Mr. Rogers is in
9  Division 9 at the time he signed this declaration.
10     MR. DEVORE:  I'm going to direct him not to
11 answer that.
12     MR. MORRISSEY:  We'll certify the question.
13     Q    For an inmate, like Mr. Rogers, in
14 Division 9, can you tell me the training provided to
15 the movement officer to provide accommodations for a
16 person like Mr. Rogers who was given an alert for a
17 walker, when he was moved from Division 9 and had to
18 go up the Cermak ramp in the RTU east tunnel ramp?
19     MR. DEVORE:  Objection, as it relates to this
20 particular declaration.
21     But to the extent you can answer about
22 training, you can answer.
23     THE WITNESS:  To the best of my knowledge, the
24 officers received training based on the Lexipol

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 62

1  policies.
2      Q    And those are the written policies, correct?
3      **A    Lexipol policies, yes.**
4      Q    And when you're, you're pointing to --
5      **A    Just policies.**
6      Q    -- policy 148?
7      **A    Just policies in general in that specific
8  one.**
9      Q    All right.  Which written policies are you
10 referring to, as far as accommodating individuals,
11 like Mr. Rogers, who was in Division 9, as far as
12 accommodating him when he was transported by
13 Division 9 movement officer to and from Cermak,
14 which required him to go up and down the Cermak
15 ramp?
16     MR. DEVORE:  Objection, to the extent it
17 requests identification as to specific policies,
18 because that was not contemplated by the topics,
19 including topic 5, which specifically was related to
20 training and did not identify any indication that
21 there would be questioning regarding policies, and
22 specific policies and procedures.  And, also, to
23 the extent that it asks the witness to speak to
24 policies that are written, and have been produced in

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 63

1  the course of discovery.
2      MR. MORRISSEY:  Q  You can answer.
3      MR. DEVORE:  You can answer, if you can.
4      THE WITNESS:  I thought that was what you said
5  you objected to a little bit ago, that you directed
6  me not to answer, because he brought it back up,
7  Mr. Rogers, and the document again.
8      MR. DEVORE:  This question is to training,
9  correct?
10     MR. MORRISSEY:  Q  It's to training.  You
11 mentioned that the training that was given to
12 correctional officers in Division 9, for instance,
13 as far as moving inmates who have alerts for canes,
14 crutches, and walkers, up and down either the east
15 tunnel ramp or the Cermak ramp was based upon
16 written Lexipol policies, correct?
17     **A    Well, not so much the Cermak or the east
18 ramp, it's just generalized, it's not location
19 specific.**
20     Q    And you're referring to Lexipol written
21 policies as the training that's given to
22 correctional officers about accommodating people
23 with canes, crutches, and walkers, correct?
24     MR. DEVORE:  Objection as to, objection,

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 16

LONNIE HOLLIS
November 18, 2024

Page 64

1   mischaracterizes testimony, the testimony, I don't
2   believe, was limited to just these Lexipol policies.
3            You can answer, if you can?
4        MR. MORRISSEY:  Q  You can answer.
5        **A   So, no, I'm saying that our training is**
6   **derived from Lexipol policies.**
7        Q   So Lexipol are written policies, correct?
8        **A   Yes.**
9        Q   And the follow-up question is, what, since
10  the training that's given to officers, as far as
11  providing accommodations for inmates that have an
12  alert for canes or crutches or walkers, is, in part,
13  based upon a written policy.  My question is, what
14  written policy are you referring to?
15       MR. DEVORE:  Objection, to the extent it becomes
16  a memory test, and, also, as to scope, because there
17  were no specific policies referenced as part of the
18  questions to be asked relative to training.
19           Go ahead.
20       MR. MORRISSEY:  Q  Well, that's a speaking
21  objection.  You can answer the question.
22       **A   I don't have the answer of the specific**
23  **policy, no.**
24       Q   Do you know of any policy, as the Sheriff's

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 65

1   designee, and as the person that's been produced
2   about the training for correctional officers in
3   regards to that very topic, do you know of any
4   written policy that addresses that?
5        MR. DEVORE:  Objection as to scope, and to the
6   extent it requests information outside of training.
7        THE WITNESS:  I don't have the answer for the
8   specific policy.
9        MR. MORRISSEY:  Q  Other than a written policy,
10  do you, are you aware of any training manual
11  provided to movement officers at the Cook County
12  Jail in regards to accommodating detainees who have
13  an alert for canes, crutches, or walkers when they
14  move up or down ramps at the Cook County Jail.
15       MR. DEVORE:  Objection as to scope.  You can
16  answer.
17       THE WITNESS:  When you say manual, what do you
18  mean?
19       MR. MORRISSEY:  Q  Pardon?
20       **A   Can you clarify what you mean by when you**
21  **say manual?**
22       Q   Well, all right.  Well, are there, do
23  correctional officers receive any written training,
24  procedures, or protocols?

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 66

1        **A   They receive Lexipol.**
2        Q   Pardon?
3        **A   They receive Lexipol.**
4        Q   Other than Lexipol, are there any other
5   training documents that are given to correctional
6   officers, to let them know what their duties and
7   responsibilities are?
8        **A   Not that I am aware of.  Our training is**
9   **derived from Lexipol.**
10       Q   As the Sheriff, as the Sheriff's designee,
11  are you aware of any training given to movement
12  officers that are assigned to move people with
13  canes, crutches, and walkers up and down ramps at
14  the Cook County Jail?
15       **A   I don't provide training, that's provided by**
16  **the Academy.**
17       Q   Right.  My question is, as the Sheriff's
18  designee, are you aware of any training course given
19  to the officers that are responsible for moving
20  prisoners with canes, crutches, and walkers up and
21  down ramps, such as the east tunnel ramp or the
22  Cermak ramp?
23       MR. DEVORE:  Objection, asked and answered.  I
24  think he just answered that.  But you can answer

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 67

1   again.
2        THE WITNESS:  The training that we get is
3   derived from Lexipol.
4        MR. MORRISSEY:  Q  Okay.  The question was
5   directed toward, you mentioned that there, at the
6   Academy, there are courses given to cadets in
7   regards to fulfilling their role as a correctional
8   officer, correct?
9        **A   I didn't say that.**
10       MR. DEVORE:  Objection, mischaracterizes
11  evidence -- or testimony.
12       THE WITNESS:  I never said anything about
13  cadets.
14       MR. MORRISSEY:  Q  Do correctional officers go
15  to the training academy for in-services?
16       **A   For in-service, yes.**
17       Q   As the Sheriff's designee, are you aware of
18  any in-service given to correctional officers who
19  are responsible for moving detainees up and down
20  ramps at the jail, including, but not limited to,
21  Cermak and the east tunnel ramp and the RTU for
22  prisoners that have alerts for canes, crutches, and
23  walkers?
24       MR. DEVORE:  Objection, to the extent that it

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 17

LONNIE HOLLIS
November 18, 2024

Page 68

1  asks about, you said including, but not limited to
2  Cermak and the RTU tunnel ramps, but the topic is
3  limited to Cermak and RTU tunnels, east tunnel ramp.
4  You can answer.
5      MR. MORRISSEY:  Q  That was a misstatement of my
6  question.  You mentioned that there was in-service
7  training given to correctional officers, correct?
8      A   But you asked me, and I said yes.
9      Q   Yeah.  So as the Sheriff's designee, are you
10  aware of any in-service training given to
11  correctional officers to accommodate detainees
12  provided with alerts for canes, crutches, and
13  walkers, when they move up or down ramps?
14      MR. DEVORE:  Objection, scope.  You just said
15  ramps, and it wasn't limited to Cermak and RTU east
16  tunnel ramps.
17      MR. MORRISSEY:  Q  You can answer the question.
18      MR. DEVORE:  You can answer, if you can.
19      THE WITNESS:  The --
20      MR. MORRISSEY:  You can't tell somebody who has
21  been designated that if you can, I mean that's not
22  an appropriate objection.  It's signaling to a
23  witness that maybe you shouldn't answer the
24  question.  So I would ask you to refrain from doing

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 69

1  that.
2      MR. DEVORE:  It's not signaling anything.
3      MR. MORRISSEY:  Q  Anyway.  You can answer the
4  question.
5      A   The in-service training, to my knowledge, I
6  don't oversee training, I don't have any input with
7  training, the training is intended based on what I
8  have been exposed to is to refresh you on the
9  Lexipol policies.
10      Q   Okay.  So if the Lexipol written policies
11  don't address the movement and accommodations for
12  inmates with canes, crutches, and walkers, going up
13  and down ramps at the jail, then your answer would
14  be there is no in-service on that topic?
15      MR. DEVORE:  Objection, assumes facts not in
16  evidence, mischaracterizes testimony.
17      MR. MORRISSEY:  Q  You can answer.
18      A   I don't, but you said my answer, so I'm
19  confused as to the question.
20      Q   Okay.  Sure.  Sure.  My question is, you
21  have testified that you don't, that the Sheriff, as
22  the Sheriff's designee, you don't have any specific
23  recollection of a written Lexipol policy that
24  addresses accommodating people with alerts for

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 70

1  canes, crutches, and walkers going up and down
2  ramps; is that fair to say?
3      MR. DEVORE:  Is that a new question?
4      MR. MORRISSEY:  It's a question.
5      THE WITNESS:  Can you rephrase that or clarify
6  that again, because it sounds different than the
7  first, I'm not trying to be --
8      Q   I understand.
9      A   -- difficult, but it sounds different from
10  the first thing and then the second thing.
11      Q   So, as the Sheriff's designee --
12      A   I got that part.
13      Q   -- you can't designate any Lexipol policy
14  that addresses the issue of the responsibility of a
15  correctional officer when they move a detainee who
16  has an alert for canes, crutches, or walkers up or
17  down ramps at the jail?
18      MR. DEVORE:  Objection to form.  That was
19  really confusing.  If you understood it.
20      THE WITNESS:  Well, I don't designate any
21  policy, the policies designate themselves, because
22  their situation is specific.
23      MR. MORRISSEY:  Q  All right.  So, I'm asking
24  you, can you specifically identify a policy that

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 71

1  addresses accommodating the class here, canes,
2  crutches, and walkers, when they go up and down
3  ramps at the jail?
4      MR. DEVORE:  Objection as to scope.  It was not
5  asked in the topics to identify specific policies,
6  it only spoke to training.
7      THE WITNESS:  No, I don't have that answer for
8  you, sir.
9      MR. MORRISSEY:  Q  Okay.  And is it fair to say,
10  as the Sheriff's designee, you're not aware of any
11  specific training given to correctional officers in
12  regards to moving people with canes, crutches, and
13  walkers and accommodating them when they go up and
14  down ramps?
15      MR. DEVORE:  Same objection.
16      THE WITNESS:  You're asking if I am aware?
17      MR. MORRISSEY:  Q  As the Sheriff's designee?
18      MR. DEVORE:  Same objection as to scope, with
19  respect to lack of information regarding specific
20  policies to be identified during the course of this
21  deposition.
22      MR. MORRISSEY:  Q  Well, let me just ask you
23  straight up.  Number 5 says the training to staff
24  for providing accommodations to individuals in

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 18

LONNIE HOLLIS
November 18, 2024

Page 72

1  custody using canes, crutches, or walkers, when
2  navigating the Cermak and RTU east tunnel ramp, can
3  you explain, as the Sheriff's designee, what
4  training, training the Sheriff has?
5  **A    Our training is derived from the Lexipol**
6  **policies.**
7  Q    Anything else?
8  **A    No, our train, the Lexipol policies are**
9  **where we derive our training from.**
10  Q    And the Lexipol policies are given to the
11  correctional staff on-line, correct?
12  **A    Yes.**
13  Q    Okay.  And other than the on-line Lexipol
14  training, the Sheriff isn't aware of any other
15  training for providing accommodations to individuals
16  in custody using canes, crutches, or walkers when
17  navigating the Cermak and RTU east tunnel ramps?
18  MR. DEVORE:  Objection, mischaracterizes the
19  testimony.  To the extent that you're saying that
20  there's nothing else?  I believe that's what he
21  testified to.
22  MR. MORRISSEY:  Q  You can answer.
23  **A    He was doing something, I didn't want to**
24  **interrupt you.**

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 73

1  Q    That's okay.
2  **A    The staff are refreshed on the policies**
3  **during the course of their in-service training.**
4  Q    And are there any Lexipol training that's
5  specific to the RTU east tunnel ramp or the Cermak
6  ramp for people that are, that have an alert for
7  canes, crutches, or walkers?
8  **A    The training isn't, as I mentioned a little**
9  **bit ago, it isn't area specific, it's just**
10  **operational specific.  It's not designated to the**
11  **east tunnel ramp or to the Cermak ramp, it just**
12  **speaks to ramps or sloped walkways or things of that**
13  **nature.**
14  Q    Right.
15  **A    It doesn't say Cermak versus this tunnel or**
16  **this particular area.**
17  Q    So let's use the more general definition.
18  Is there any specific Lexipol training involving
19  people with alerts for canes, crutches, and walkers
20  when they move up or down ramps at the Cook County
21  Jail.
22  MR. DEVORE:  Objection, form.  Unclear if your
23  asking him to identify a specific policy.
24  THE WITNESS:  The policy speaks to mobility

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 74

1  impairments.
2  Q    You're referring to 148, correct?
3  **A    Yes.**
4  Q    Which is Exhibit Number 4?
5  **A    Yeah, speaks to mobility impairments, which**
6  **mentions what you discussed.**
7  Q    Okay.  But policy 148, which is Exhibit 4,
8  we looked at paragraph 48.9, which deals with
9  wheelchair people, correct?
10  **A    Uh-huh.**
11  Q    You have to answer orally.
12  **A    Yes.  Yes.**
13  Q    And it doesn't address people with alerts
14  for canes, crutches, or walkers?
15  **A    No, it says right there.**
16  Q    Where?
17  **A    The use of a wheelchair, crutches, or**
18  **walkers may be used to aid in mobility.**
19  Q    No, I understand that, but as far as moving
20  a person, as far as pushing individuals up and down
21  ramps and through corridors in the Sheriff's office
22  facilities, they're dealing with wheelchair people?
23  **A    Yeah, that's what the policy says.**
24  Q    Under 148.9?

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 75

1  **A    Right, that's where it reads that at.**
2  Q    Right.  So as far as a person who has a
3  walker, for instance, like Mr. Rogers, what
4  accommodation for a person with a walker is provided
5  under policy 148, when they have to go up or down a
6  ramp at Cook County Jail?
7  MR. DEVORE:  Objection as to scope.  Topic 5
8  refers to training, did not refer and did not
9  request delineation of specific policies that may
10  accompany training, but were not referenced in the
11  notice.
12  MR. MORRISSEY:  You can answer.
13  MR. DEVORE:  I'm directing him not to answer
14  that.
15  MR. MORRISSEY:  Certify the question.
16  Counsel, the witness has said that the
17  training stems from the policies.  The question
18  number 5 deals with training, and so when he's
19  testifying on behalf of the Sheriff, he's talking
20  about written policies encompassing the training
21  given to, to correctional officers.  So I think the
22  objection is unfounded.  So, to clarify, officer, or
23  assistant director, the training that's given to the
24  correctional staff, as far as providing

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 19

LONNIE HOLLIS
November 18, 2024

Page 76

1 accommodations to individuals who have canes,
2 crutches, or walkers, stems from the Lexipol
3 policies at the jail, which are the written
4 policies, correct?
5 **A   Lexipol is the policy format that we used**
6 **for policies, yes.**
7 Q   For training?
8 **A   Yes.**
9 Q   Based upon the Lexipol policies, can you
10 tell me how the correctional staff accommodates a
11 person with a cane, crutch, or walker when they go
12 up or down a ramp at the jail?
13 MR. DEVORE:  Objection, to the extent it's
14 outside the scope of navigating the Cermak and RTU
15 east tunnel ramps as noted in topic 5.
16 MR. MORRISSEY:  Q   You can answer?
17 MR. DEVORE:  Well, you can answer.
18 **A   So the expectation is is that the**
19 **individuals are allowed to move up and down the**
20 **sloped walkways on their own accord, as far as**
21 **crutches, walkers, and canes.  If the person were to**
22 **ask for assistance, the expectation is, according to**
23 **our policy, that we give assistance.**
24 MR. MORRISSEY:  Q   Where does it say in the

LONNIE HOLLIS
November 18, 2024

Page 77

1 Lexipol policy that a person with a cane, crutch, or
2 walker has to ask for assistance going up either the
3 Cermak or the east tunnel RTU ramp?
4 **A   Objection as to scope, relative to the**
5 **topics and also to the extent that it's a memory**
6 **test.  If you have a question regarding the**
7 **documents, I suggest you point to the specific part**
8 **of the document.**
9 MR. MORRISSEY:  Q   You can answer the question.
10 **A   I don't recall offhand, but I just believe**
11 **that to be the expectation.**
12 Q   Is there any specific training given to
13 movement -- let me, let me go back a step here.
14 There are inmates with canes, crutches, and
15 walkers housed in different housing units at the
16 Cook County Jail, correct?
17 **A   Yes.**
18 Q   That includes Division 9 and Division 6,
19 correct?
20 **A   I haven't looked at the census for 9, I**
21 **couldn't answer that.  Division 6, yes.**
22 Q   And Division 2?
23 **A   Yes.**
24 Q   How, other than the Lexipol policies that we

LONNIE HOLLIS
November 18, 2024

Page 78

1 have looked today, how does a movement officer in
2 Division 2 or Division 6 know what his or her
3 responsibility is as far as accommodating a person
4 with an alert for canes, crutches, or walkers when
5 they move up or down either the Cermak or the RTU
6 east tunnel ramp?
7 **A   Based on my experience, they would get their**
8 **expectations from the policy.**
9 Q   And by policy, you mean the written policy?
10 **A   The policies that cover the topics we're**
11 **discussing, yeah.**
12 Q   And those are the Lexipol policies?
13 **A   Yes.**
14 Q   For a person -- strike that.
15 If we go to the written policy for
16 assisting a person who has a wheelchair, under the
17 policy 148, which is Exhibit 4, that provides that
18 if a person in a wheelchair refuses assistance going
19 up or down a ramp, it has to be documented by the
20 correctional officer; is that fair to say?
21 **A   According to the policy, that's the**
22 **expectation, yes.**
23 Q   Is there any written policy that states that
24 a person who was given a -- well, let me ask a

LONNIE HOLLIS
November 18, 2024

Page 79

1 preliminary question.
2 For the movement officers in 6 and 2, that
3 move prisoners who have alerts for canes, crutches,
4 and walkers, have they been given any training in
5 regards to notifying those detainees that they have
6 a right for, to be accommodated when they go up or
7 down either the Cermak or the RTU east tunnel ramp?
8 **A   Can you ask the question again?**
9 Q   Sure.  You said that at least for, you're
10 aware that, that prisoners in 6 and 2 have alerts
11 for canes, crutches, and walkers, my question is,
12 for the movement officers in those divisions, to
13 take those prisoners to and from Cermak, what
14 direction or training are they given, as far as
15 notifying those prisoners that they can request an
16 accommodation going up either the Cermak or the RTU
17 east tunnel ramp?
18 **A   What do you mean notify, or can you explain?**
19 Q   Sure.
20 **A   Why would they notify?**
21 Q   So, how does a prisoner with a cane, crutch
22 or walker in Division 6, for example, know that they
23 can ask a correctional officer, movement officer to
24 give them an accommodation going up either the RTU

LONNIE HOLLIS
November 18, 2024

Page 80

1  east tunnel ramp or the Cermak ramp?

2      **A   How do they know.**

3      MR. DEVORE:  Objection as to scope.  It does not

4  appear that that relates to topics 3, 4, 5, or 6.

5      MR. MORRISSEY:  You will allow him to answer?

6      MR. DEVORE:  If you can articulate which topic

7  it relates to?

8      MR. MORRISSEY:  Q  Well, if you look at topic

9  number 4, the steps taken to notify individuals in

10  custody using canes, crutches, or walkers about the

11  Cermak or RTU east tunnel ramps being non-compliant

12  with the ADA and the interim measures in place to

13  ensure access and safety?

14          So, can you repeat the question for the

15  witness?

16          (Question read back as requested.)

17      MR. DEVORE:  And objection as to scope, and as

18  the steps taken to notify, it doesn't ask how

19  they're notified.

20      MR. MORRISSEY:  Q  You can answer the question.

21      **A   Previously we had signage.  So I'm not sure**

22  **if the signage is still there, I haven't been in the**

23  **tunnels in a while.**

24      Q   When you say previously you had signage --

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 81

1      **A   I'm saying previously based on when I took**

2  **that route through the tunnels.  I am not saying**

3  **anything about today or yesterday or tomorrow,**

4  **previous to now, I don't know what's in there now, I**

5  **can't answer what's in there now.**

6      Q   Other than -- so, as the Sheriff's designee,

7  you can't testify whether or not there's signage up

8  that would notify a person with a cane, crutch, or

9  walker that they can seek accommodations; is that

10  fair to say?

11      MR. DEVORE:  Objection as to scope and the

12  question in 4 relates to steps taken to notify

13  individuals in custody using canes, crutches, or

14  walkers about the Cermak and RTU east tunnel ramps

15  being noncompliant, and your question was a little

16  bit different than that.

17      MR. MORRISSEY:  Q  You can answer?

18      **A   I'm saying I can't speak to what's there**

19  **today.  That's what I said previously.**

20      Q   So, I'm asking you, as the Sheriff's

21  representative, and as the person that's been

22  designated by the Sheriff --

23      MR. DEVORE:  Same objection, I'm going to direct

24  him not to answer that.

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 82

1      MR. MORRISSEY:  Q  So, just to be clear, I am

2  asking you, as the Sheriff's designee, whether you

3  can testify that there's any signage up to, to

4  inform a person with a cane, crutch, or walker that

5  either at some location near the Cermak or the RTU

6  east tunnel ramp, and your answer is?

7      MR. DEVORE:  Objection as to form.  And as to

8  scope.  That question is confusing and it's outside

9  the scope.

10      MR. MORRISSEY:  Q  Let me make it a little bit

11  clearer.  As the Sheriff's representative, you

12  testified that you were aware that the Sheriff was

13  aware, at some point, that there was a sign up

14  either at the Cermak ramp or the RTU ramp; is that

15  correct?

16      MR. DEVORE:  Objection, mischaracterizes his

17  testimony.

18      THE WITNESS:  I said previously that there was

19  signage there.

20      MR. MORRISSEY:  Q  Where was this signage

21  posted?

22      **A   In the tunnels that lead from RTU towards**

23  **Cermak.**

24      Q   So was it at the base of the RTU ramp?

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 83

1      **A   I don't recall exactly where I saw it, I**

2  **just recall seeing it in the tunnel.  I didn't take**

3  **note that it was at a specific juncture.**

4      Q   So as the Sheriff's representative, what did

5  the sign say?

6      MR. DEVORE:  Objection, same objection.

7      MR. MORRISSEY:  Q  As the Sheriff's designee,

8  what did the sign say?

9      MR. DEVORE:  I believe he just said he didn't

10  know, but you can answer to the extent you have an

11  answer.

12      THE WITNESS:  So I don't recall what it said

13  verbatim, I just recall the spirit of the notice

14  stating that they could ask for assistance if they

15  need assistance.

16      MR. MORRISSEY:  Q  Do you know if that pertained

17  to detainees that were in a wheelchair?

18      **A   I don't want to speculate.**

19      Q   Do you know whether, as the Sheriff's

20  representative, did the sign say that a person with

21  a cane or a walker could ask for assistance?

22      MR. DEVORE:  Objection, asked and answered.  You

23  can go ahead.

24      THE WITNESS:  I believe the spirit of the

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 21

LONNIE HOLLIS
November 18, 2024

Page 84

1  signage suggested that they could ask.
2      MR. MORRISSEY:  Q  When you say the spirit, what
3  do you mean?
4      **A   I don't recall the exact language, that's**
5  **why I just said a little while ago, I didn't**
6  **remember verbatim, I just remember that the spirt of**
7  **it, the gist of the overall wording suggests that**
8  **they could ask for help.  I can't tell you word for**
9  **word what they said.**
10     Q  Do you know when the Sheriff, as the
11 Sheriff's designee, when the sign was posted?
12     **A  No.**
13     Q  Do you know where it was posted?
14     MR. DEVORE:  Objection to this questioning, and
15 he has already testified it's in relation to his
16 personal observations.
17     MR. MORRISSEY:  This is not, look, he's being
18 produced as the Sheriff's designee.
19     MR. DEVORE:  Well, ask him questions related to
20 him, his role as the Sheriff's designee --
21     MR. MORRISSEY:  Well, I'm asking him --
22     MR. DEVORE:  -- personal knowledge, which he
23 just said that his own personal knowledge, as
24 opposed to being something he observed as the

LONNIE HOLLIS
November 18, 2024

Page 85

1  Sheriff's designee and the topics dealt, are not
2  articulated in a way to signal that he should be
3  prepared in this way.
4      MR. MORRISSEY:  Q  Did you investigate the east
5  tunnel ramp or the Cermak ramp before being notified
6  that you were going to testify for the Sheriff?
7      MR. DEVORE:  Objection, form.  What time period?
8      MR. MORRISSEY:  Q  You mentioned that you were
9  notified a couple of weeks ago that you were going
10 to be asked to testify for the Sheriff in this case,
11 correct?
12     **A  Yes.**
13     Q  And after were you notified, did you go over
14 to the east tunnel ramp or the Cermak ramp?
15     **A  No.**
16     Q  Why not?
17     MR. DEVORE:  Objection, argumentative.
18     THE WITNESS:  I don't know why I would need to
19 go.
20     MR. MORRISSEY:  Q  After you were notified that
21 you were going to testify on behalf of the Sheriff,
22 did you observe inmates that were given an alert for
23 a cane, crutch, or walker going up either the Cermak
24 or the RTU east tunnel ramp?

LONNIE HOLLIS
November 18, 2024

Page 86

1      MR. DEVORE:  Objection as to relevance, scope.
2      THE WITNESS:  No.  You had asked me earlier
3  about investigating this stuff, and I told you then
4  I didn't investigate.
5      MR. MORRISSEY:  Q  As the Sheriff's
6  representative, are you aware of any person who has
7  an alert for a cane, crutch, or walker from the last
8  two years being provided an accommodation either
9  going up or down the Cermak or the RTU east tunnel
10 ramp?
11     MR. DEVORE:  Objection, scope, outside the four
12 topics.
13     THE WITNESS:  Can you clarify that?  I am not
14 tracking what you're saying.
15     MR. MORRISSEY:  Q  Sure.  As the person
16 testifying for the Sheriff --
17     **A  Right, I got that part.**
18     Q  You got that part.
19     **A  But you're asking me about somebody else.**
20     Q  As the Sheriff's designee --
21     **A  Uh-huh.**
22     Q  -- is the Sheriff aware of any person with
23 an alert for a cane, crutch, or walker that's been
24 provided any accommodation going up or down the

LONNIE HOLLIS
November 18, 2024

Page 87

1  Cermak or the east tunnel RTU ramp?
2      MR. DEVORE:  Objection to as to scope and to the
3  extent it seeks information outside of his
4  knowledge.
5      THE WITNESS:  That, I am not sure if I can
6  answer that without being speculative.
7      MR. MORRISSEY:  Q  All right.  So number 3,
8  topic 3 says, from January 1st, 2024 to the present,
9  all accommodations offered, parentheses, and
10 provided to individuals in custody using a walker,
11 cane, or crutch to transverse either the Cermak ramp
12 or the RTU east tunnel ramp.  So can you tell me the
13 accommodations during that period of time that have
14 been provided to people with alerts for walkers,
15 canes, and crutches?
16     MR. DEVORE:  Objection as to offered versus
17 provided.  Objection as to form.
18     THE WITNESS:  Can you repeat the question?
19     MR. MORRISSEY:  Q  Sure.  If you take a look at
20 Exhibit 1, it's topic number 3, that I am asking
21 about.  From January 1st, 2024 to the present, all
22 accommodations offered, and then it's in
23 parenthesize, and provided to individuals in custody
24 using a walker, cane, and crutches to transverse

LONNIE HOLLIS
November 18, 2024

Page 88

1 either the Cermak ramp and/or the RTU east tunnel
2 ramp.
3     **A    Yeah, it seems like it's missing something**
4 **here, because it says from January 1st, 2024 to the**
5 **present, all accommodations offered, so I am not,**
6 **what, exactly, are you seeking to know?**
7     Q    So we're asking just for that time period,
8 for this year, can you tell me about an example of
9 any accommodation offered to any prisoner who has a
10 walker, cane, or crutch alert, when they went up or
11 down either the Cermak ramp or the RTU east tunnel
12 ramp.
13     **A    Without reviewing the JMS, I wouldn't be**
14 **able to answer that, that would make me speculative.**
15     Q    What is JMS?
16     **A    Jail Management System.**
17     Q    Would it be fair today that you are not,
18 that the Sheriff isn't able to testify in regards to
19 that?
20     MR. DEVORE:  Objection, mischaracterizes his
21 testimony.
22     THE WITNESS:  No, I don't think it would be fair
23 that it would cause me to speculate.
24     MR. MORRISSEY:  Q  Okay.

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 89

1     **A    I can't pull the specific instance out of**
2 **the sky, I mean, have they offered or provided**
3 **accommodations?  Yes.  But I can't say today,**
4 **tomorrow, yesterday, at 4:00 o'clock, I couldn't**
5 **provide you with that, so that would make me**
6 **speculate.**
7     Q    So, as the Sheriff's person, you were told
8 you were going to come in here and testify about
9 topic number 3, correct?
10     MR. DEVORE:  Objection, to the extent it seeks
11 attorney-client privileged communications.
12     MR. MORRISSEY:  Q  So you were designated?
13     **A    Yes.**
14     Q    Somebody from the Sheriff's office says
15 you're going to speak for the Sheriff on topic
16 number 3, right?
17     **A    Okay.**
18     Q    So did you look at JMS, Jail Management
19 System, to see if anybody has been accommodated?
20     **A    No.**
21     Q    Why would you have to look at the Jail
22 Management System to determine whether or not there
23 was any instance of whether a person was
24 accommodated going up and down the Cermak ramp or

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 90

1 the RTU ramp, if they had an alert for a walker or a
2 cane or a crutch?
3     MR. DEVORE:  Objection, mischaracterizes his
4 testimony.
5     THE WITNESS:  Why does he whisper to you,
6 instead of just saying it, because I can hear what
7 he's saying, and it's distracting.
8     MR. MORRISSEY:  Q  All right.  I'm sorry, he's
9 one of the attorneys in the case.
10     **A    Okay.**
11     Q    So he can, he can scream in my ear if he
12 wants.
13     **A    No, I get that part, but I'm just not**
14 **knowing why he just doesn't just ask me.**
15     Q    It's because only one person can ask a
16 question, sir.
17     **A    Oh.  Why did I have to use the JMS?  Because**
18 **that's where the information is held.**
19     Q    Okay.  So, in order for, for you to respond
20 to the question, you would have to look at -- how --
21 let me ask a question.
22          How would the Sheriff, looking at the JMS,
23 be able to determine whether a person is
24 accommodated or not?

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 91

1     **A    When you say the Sheriff, are you talking**
2 **about --**
3     Q    I'm talking about you, as the Sheriff's
4 designee, how would you be able to determine whether
5 or not a person has been accommodated by looking at
6 the Jail Management System?
7     **A    The expectation is that they document the**
8 **request for accommodation.**
9     Q    And would that be the movement officer who
10 would document it?
11     **A    Whomever was escorting the individual.**
12     Q    And so if you looked at prisoners that had a
13 cane, crutch, or walker, let's say in the last week,
14 who went to Cermak, if they, there is no notation in
15 the Jail Management System, that they were
16 accommodated, you would be able to testify that
17 during that one-week period, there was no
18 accommodation provided to a person with a cane,
19 crutch, or walker; is that fair to say?
20     MR. DEVORE:  Objection, calls for speculation,
21 incomplete hypothetical.
22          You can answer.
23     THE WITNESS:  I don't have an answer, sir.
24     MR. MORRISSEY:  Q  Okay.

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 23

LONNIE HOLLIS
November 18, 2024

Page 92

```
 1     A   I can only go by what's in the JMS, I can't
 2  go by what's not entered in it.  So it would be my
 3  belief that it's there, that that's what was
 4  occurring.
 5     Q   So, if a movement officer accommodated a
 6  person with a cane, crutch, or walker --
 7     A   Uh-huh.
 8     Q   -- going up or down either the Cermak or the
 9  east tunnel ramp, they're responsible for
10  documenting it, correct?
11     A   For documenting what?
12     Q   For documenting if they provide an
13  accommodation to a person?
14     A   That's the expectation of the policy.
15     Q   And by the policy, you're referring to 148?
16     MR. DEVORE:  Objection, mischaracterizes
17  testimony.
18     MR. MORRISSEY:  It's a question, Mr. Devore.
19     MR. DEVORE:  He testified to this already, but
20  go ahead.
21     THE WITNESS:  The expectation is that it's
22  documented.
23     MR. MORRISSEY:  Q  If a -- and you're referring
24  to 148.9, as far as the documentation?
```

LONNIE HOLLIS
November 18, 2024

Page 93

```
 1     A   No, just in general, in Lexipol, is that
 2  they're required to document.
 3     Q   So, Lexipol requires an officer to document
 4  when they provide an accommodation for a prisoner
 5  that has a cane, crutch, or walker going up or down
 6  a ramp?
 7     MR. DEVORE:  Objection as to scope with respect
 8  to identify, identifying specific portions of
 9  specific policies that were not included in topic 5
10  or any other topic.
11     MR. MORRISSEY:  Q  You can answer the question.
12     A   Oh, I thought were you restating what I
13  said.
14     Q   No.
15     A   The expectation is in the policy, yes.
16     Q   Is the expectation that if a, is it the
17  expectation that a movement officer would have to
18  notify a person with a cane, crutch, or walker that
19  they can receive an accommodation when they go up or
20  down the Cermak or the east tunnel RTU ramp?
21     MR. DEVORE:  Objection as to seeks information
22  that may be outside the scope of his knowledge, but
23  you can answer.
24     THE WITNESS:  Can you restate that for me?
```

LONNIE HOLLIS
November 18, 2024

Page 94

```
 1     MR. MORRISSEY:  Q  Sure.  Does the movement
 2  officer have to notify a person with a cane, crutch,
 3  or walker that he has a right to have an
 4  accommodation to go up or down a ramp, such as the
 5  Cermak or the east tunnel ramp?
 6     A   There's a signage notice tunnel that would
 7  suggest that they can have an accommodation
 8  provided.
 9     Q   If a person with a cane, crutch, or walker
10  doesn't want an accommodation, does the movement
11  officer have to document that in any document, such
12  as the Jail Management System?
13     A   No, I believe the policy only speaks to
14  wheelchairs, that they have to document the
15  wheelchairs only.
16     Q   What accommodations as the Sheriff's
17  designee can or is given on a daily basis, to
18  detainees who have alerts for canes, crutches, or
19  walkers, when they go up or down the Cermak or the
20  RTU east tunnel ramp?
21     A   Can you rephrase that?
22     Q   Sure.  On a daily basis, are detainees with
23  canes, crutches, and walkers given any
24  accommodations when they go up the Cermak or the
```

LONNIE HOLLIS
November 18, 2024

Page 95

```
 1  east tunnel ramp?
 2     A   That's like the JMS question you asked.
 3     Q   Well, I'm asking, is that just a daily
 4  process that this is something that happens all the
 5  time that people with canes, crutches, and walkers
 6  are given an accommodation when they go up and down
 7  the Cermak or the east tunnel ramp?
 8     MR. DEVORE:  Objection as to the phrase, all the
 9  time, but, form.
10     THE WITNESS:  I believe I answered that already
11  by stating that when the individuals ask for
12  assistance, the expectation is that they're assisted
13  and that those assist would be documented in the
14  JMS.
15     MR. MORRISSEY:  Q  Is it the Sheriff's position
16  that on a daily basis there are numerous people with
17  canes, crutches, and walkers that are given an
18  accommodation going up the Cermak and going up and
19  down the Cermak and the RTU east tunnel ramp?
20     A   I don't understand the question.
21     Q   Sure.  Is this a matter of routine that
22  people with canes, crutches, and walkers are
23  provided an accommodation when they go up and down
24  the east tunnel ramp and the RTU, at the RTU and the
```

LONNIE HOLLIS
November 18, 2024

Page 96

1   Cermak ramp?

2       A   If they request the assistance.

3       Q   Yeah.  Does that happen every day at the

4   jail?

5       A   I would have to look at the JMS to give you

6   the best answer.

7       Q   So does it happen more than three times a

8   week, at the Cook County Jail, that people with

9   canes, crutches, and walkers are given an

10  accommodation when they go up and down these ramps?

11      MR. DEVORE:  Objection, calls for speculation.

12      THE WITNESS:  Yeah, I don't want to speculate.

13      MR. MORRISSEY:  Q  Do you have any knowledge how

14  often that happens, that people with canes,

15  crutches, and walkers are given an accommodation

16  when they go up the Cermak and the RTU ramp?

17      MR. DEVORE:  Objection as to form and outside

18  the scope.  It doesn't ask about how often.

19      MR. MORRISSEY:  Q  You can answer?

20      A   Can I?

21      MR. DEVORE:  Yeah.

22      THE WITNESS:  I don't have that answer for you.

23      MR. MORRISSEY:  Q  What type of accommodation is

24  provided to people with canes, crutches, and walkers

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 97

1   when they go up and down the Cermak and the east

2   tunnel ramp?

3       MR. DEVORE:  Objection, form.

4       THE WITNESS:  Can you parse that out a little

5   bit more when you say what kind?

6       MR. MORRISSEY:  Q  Yeah, what accommodation is

7   provided to people with canes, crutches, and walkers

8   going up and down either the Cermak or the RTU ramp?

9       A   I don't think I have that answer, because

10  it's, it is kind of speculative, because we're

11  talking about a person with a cane or walker or

12  crutch, all their needs for possible accommodations

13  could be different.  So I am not really even able to

14  give you a good answer on that.

15      Q   Okay.  For a person who has a walker, what

16  kind of accommodation is provided by the Sheriff

17  when they go up an down these ramps?

18      A   That would be based on what the person is

19  saying or asking for, it's situational.

20      Q   For the sheriff, as the sheriff, do they

21  have a wheelchair at the base of the Cermak ramp for

22  a person who requests a -- to be pushed up in a

23  wheelchair, if they have an alert for a cane,

24  crutch, or walker?

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 98

1       A   That would have to be deferred to a

2   supervisor so they could contact Cermak, Cermak

3   would make the determination if a wheelchair was

4   needed.

5       Q   So, for a prisoner that, let's say is

6   leaving the RTU building, and is proceeding up the

7   east tunnel ramp, is there a wheelchair at the base

8   of that ramp for him to be pushed up or down the RTU

9   ramp?

10      A   No, not that I recall.

11      Q   Is there any cart that's positioned at the

12  base of the east tunnel ramp, if a detainee with a

13  cane, crutch, or walker requests to be moved up the

14  ramp in a cart?

15      MR. DEVORE:  Objection, calls for speculation.

16  You can answer.

17      THE WITNESS:  That, again, is situational and

18  they can't necessarily request for a cart, because

19  the carts may or may not be available at a given

20  time, that would have to be escalated to a

21  supervisor, and they would have to work with Cermak

22  to determine how to have the person escorted over.

23      MR. MORRISSEY:  Q  So if a person who is housed

24  in the RTU, who has a cane, crutch, or walker, at

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 99

1   the point when they reach the RTU east tunnel ramp,

2   says to the officer, I am in a walker and this ramp

3   is too steep for me, is it the Sheriff's testimony

4   that the correctional officer would have to contact

5   a supervisor at that point?

6       MR. DEVORE:  Objection, calls for speculation,

7   incomplete hypothetical, assumes facts not in

8   evidence.

9       THE WITNESS:  So you're saying that the person

10  is saying that they can no longer proceed to Cermak

11  and that they need --

12      Q   They need a wheelchair, they're at the base

13  of the RTU --

14      A   -- contact the supervisor, and Cermak would

15  be contacted and a decision would be made at that

16  point.

17      Q   So the supervisor would be a sergeant?

18      A   Could be, that would be speculation, it

19  could be a lieutenant, it could be whoever is on

20  duty, depending on staff on a given day.

21      Q   And then while the person is at the base of

22  the RTU ramp, waiting to go to Cermak, if they had a

23  walker, then the correctional officer has to contact

24  the supervisor, correct, and then the supervisor has

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 25

LONNIE HOLLIS
November 18, 2024

Page 100

1   to contact Cermak to get a wheelchair, correct?
2       MR. DEVORE:  Same objection.
3       MR. MORRISSEY:  Q  Is that correct?
4       MR. DEVORE:  You can go ahead and answer.
5       THE WITNESS:  Yes.
6       MR. MORRISSEY:  Q  Okay.  Who would the
7   supervisor contact, if, again, the hypothetical is a
8   person with a walker is at the base of the RTU east
9   tunnel ramp request a wheelchair to go up, who would
10  the supervisor have to contact at Cermak in order to
11  get the wheelchair?
12      **A   They would contact the on-duty nursing**
13  **supervisor.**
14      Q   Pardon?
15      **A   The on-duty nursing supervisor.**
16      Q   As the Sheriff's representative, and the
17  same sequence would occur if a person with a cane,
18  crutch, or walker was at the top of a Cermak ramp,
19  and requested a wheelchair, the same procedure would
20  follow?
21      MR. DEVORE:  Same objection.
22      THE WITNESS:  Any time that they ask for
23  assistance, we're going to look into it and provide
24  assistance.

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 101

1       MR. MORRISSEY:  Q  But the question is, if I am,
2   if a person with a walker is at the top of the
3   Cermak ramp?
4       **A   Yes, sir.**
5       Q   And he's been moved from, let's say,
6   Division 6 or 2.
7       **A   Correct.**
8       Q   And he asks that movement officer to provide
9   him with a wheelchair, to go down into Cermak for a
10  medical appointment, the correctional officer would
11  have to contact his or her supervisor, correct?
12      **A   If they asked for assistance, we're going to**
13  **provide assistance and let the supervisor know, so**
14  **that they can work with Cermak to get the --**
15      MR. REPORTER:  I'm sorry, let the supervisor?
16      THE WITNESS:  Let the supervisor know so that
17  they can get assistance from Cermak to provide the
18  wheelchair.
19      MR. MORRISSEY:  Q  Would, in that circumstance,
20  would Cermak have to enter an order for a wheelchair
21  for that person?
22      **A   I can't answer to Cermak's processes, they**
23  **are outside of the Sheriff.**
24      Q   As the Sheriff's designee, do you know if

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 102

1   that procedure has ever happened?
2       MR. DEVORE:  Objection.
3       THE WITNESS:  I can't answer to Cermak's
4   processes.
5       MR. MORRISSEY:  Q  No, I'm asking as the
6   Sheriff's designee here today?
7       **A   Okay.**
8       Q   Do you know if any situation in the last
9   month where a person with a cane, walker, or crutch
10  has requested an accommodation of a wheelchair to
11  either go up or down these two ramps, do you know if
12  that's ever occurred where an officer has contacted
13  his or her supervisor?
14      MR. DEVORE:  Objection as to form, in terms of
15  time period.
16      THE WITNESS:  I don't know which one you're
17  asking, because you said the month and then you said
18  ever.
19      MR. MORRISSEY:  Q  Okay.  So I'm saying in the
20  last month?
21      **A   Okay.**
22      Q   As the Sheriff's designee, do you know if
23  this process where a prisoner with a cane, crutch,
24  or walker has ever requested an accommodation, do

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 103

1   you know if that's ever occurred?
2       **A   Not that I have been made aware of in the**
3   **past month, no.**
4       Q   Okay.  In the last six months, are you aware
5   of any situation where a person with a cane, crutch,
6   or walker has requested assistance to go up or down
7   either the Cermak or RTU east tunnel?
8       MR. DEVORE:  Objection, to the extent that it
9   seeks information outside the scope of the topics,
10  3, 4, 5, and 6, I don't think it's embraced by that.
11      THE WITNESS:  In the past six months, I don't
12  recall off the top of my head, no.
13      MR. MORRISSEY:  Q  In the last year, as the
14  Sheriff's designee, do you know if there's ever been
15  a situation where a prisoner with a cane, crutch, or
16  walker has requested assistance --
17      MR. DEVORE:  Same objection.
18      MR. MORRISSEY:  Q  -- to have a wheelchair go up
19  or down either the Cermak ramp or the RTU east
20  tunnel ramp?
21      MR. DEVORE:  The same objection, it's outside
22  the four, topics 3, 4, 5, and 6, in terms of what he
23  was to be prepared to proceed to answer.
24      THE WITNESS:  In the last year, I don't recall.

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 26

Page 104

1  I don't want to speculate.
2      MR. MORRISSEY:  Q  All right.  Would you have to
3  look at the jail management system to find out the
4  answer?
5      MR. DEVORE:  Objection, same, same objection.
6  Can you can answer.
7      THE WITNESS:  If there were instances of such,
8  as you described, it should be contained and the
9  expectation that would be that it should be
10 contained in the Jail Management System.
11     MR. MORRISSEY:  Q  How would you, as the
12 Assistant Director, find out by looking on the Jail
13 Management System, whether any prisoner with a cane,
14 crutch, or walker has been provided an accommodation
15 of a wheelchair to go up or down, either the Cermak
16 or the RTU east tunnel ramp?
17     MR. DEVORE:  Same objection.  I'm going to
18 instruct him not to answer.
19     MR. MORRISSEY:  Why not?  It's certainly covered
20 by number 3, topic number 3.
21     MR. DEVORE:  Maybe I misheard the question.
22     MR. MORRISSEY:  Q  From January 1st, 2024 to the
23 present, how would the Sheriff, by looking at the --
24 let me rephrase the question.

Page 105

1      From January 1st, 2024 to the present, how
2  could you search the Jail Management System to find,
3  find out whether an accommodation has been provided
4  to a person with a cane, crutch, or walker, to go up
5  or down either the Cermak or the RTU east tunnel
6  ramp?
7      MR. DEVORE:  Objection, it assumes that the
8  response is limited to the JMS.
9      You can answer.
10     THE WITNESS:  If there were such an instance, I
11 would look for the person's name and see if there
12 was an incident report entered into the JMS
13 regarding that topic.
14     MR. MORRISSEY:  I'm going to take a 5 minute
15 break.
16     (Whereupon a break was taken.)
17     MR. MORRISSEY:  Back on the record.
18     Q  You mentioned that if a person requested a
19 wheelchair, because they had an alert for a cane,
20 crutch, or walker to go up or down the two ramps,
21 that you, that the Sheriff could look in the Jail
22 Management System to see if there's an incident
23 report, correct?
24     A  Yes.

Page 106

1      Q  What is an incident report?
2      A  That's just a general term that we use to
3  document when things occur.
4      Q  If a wheelchair person is pushed up or down
5  the RTU or Cermak ramp, is there an incident report?
6      A  They're just pushed up and down of their own
7  volition or?
8      Q  Well, if a wheelchair person requests to be
9  pushed up or down either the Cermak or the RTU ramp,
10 does the officer who pushes him up the ramp or down
11 the ramp have to do an incident report?
12     MR. DEVORE:  Objection as to scope.
13     THE WITNESS:  No, because the people who are in
14 the wheelchair, we push them automatically, so
15 there's no need for a report for what we do
16 according to the policy.
17     MR. MORRISSEY:  Q  Now, are you familiar with an
18 alert for a walker long distance?
19     A  Sir?
20     Q  Are you aware of an alert at the jail for an
21 alert long distance for a walker?
22     A  Yes.
23     Q  And is there also a long distance alert for
24 a cane or a crutch?

Page 107

1      A  Yes.
2      Q  And what's the difference between having an
3  alert for a long distance walker and just an alert
4  for a walker?
5      MR. DEVORE:  Objection as to scope of the
6  notice.  I don't believe that's articulated in the
7  topics 3, 4, 5, or 6.
8      THE WITNESS:  When you say long distance, it's
9  pretty much indicative of the term, when they're
10 going, when they're going on walks or being escorted
11 for longer periods of time or longer distances, as
12 opposed to just going from their bed to the day room
13 table in the living unit.
14     MR. MORRISSEY:  Q  Are canes and crutches
15 considered potentially a weapon?
16     MR. DEVORE:  Objection as to scope.
17     THE WITNESS:  Can you rephrase that?
18     MR. MORRISSEY:  Q  Sure.  Can a cane or a crutch
19 be used as a weapon by an inmate?
20     MR. DEVORE:  Objection as to scope of the
21 notice.  It's not articulated in topics 3, 4, 5, or
22 6, whether, how a cane or crutch is discussed.
23     MR. MORRISSEY:  Q  As far as a person receiving
24 a wheelchair, if they have a cane, crutch, or

LONNIE HOLLIS
November 18, 2024

Page 108

1   walker, to go up or down the ramps, does it matter
2   whether or not the walker is a long distance alert
3   or just an alert for a walker?
4       MR. DEVORE: Objection as to scope. It's not
5   articulated, it is not articulated in topics 3, 4,
6   5, or 6.
7       THE WITNESS: Can you clarify the question?
8       MR. MORRISSEY: Q Sure, sure. You mentioned
9   that alerts can be either for long distance for
10  walker --
11      **A   You said that.  I answered your question in**
12  **response to that, I didn't say that.**
13      Q All right. Are there alerts for long
14  distance for walker?
15      **A   Yes, that's the question you asked me.**
16      Q Yeah. And there's an alert just for a
17  walker, correct?
18      **A   Yes.**
19      Q Okay. Does it matter whether a prisoner has
20  an alert just for a walker or for a long distance
21  whether or not they can request a wheelchair to go
22  up or down either the Cermak or, or east tunnel RTU
23  ramp.
24      MR. DEVORE: Objection as to scope. You can

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 109

1   answer.
2       THE WITNESS: If the individuals asks for
3   assistance, then we're going to render the
4   assistance, irrespective of what alert that they
5   have. If they're asking for assistance, then we're
6   going to, the expectation is that we're going to
7   respond to that request.
8       MR. MORRISSEY: Q Are people in Division 9
9   allowed to maintain a walker or cane or crutch in
10  the division?
11      MR. DEVORE: Objection, outside the scope of the
12  questions or of the topics delineated in 3, 4, 5,
13  and 6. And it's not, and the question is not
14  designed to address the ramps referenced in 3, 4, 5,
15  and 6, so I'm going to direct you not to answer that
16  question.
17      MR. MORRISSEY: Q You mentioned that the JMS,
18  if a person requested a wheelchair, if he or she had
19  a cane, crutch, or walker alert, that an incident
20  report would be generated by the movement officer,
21  correct?
22      MR. DEVORE: Objection, mischaracterizes
23  testimony.
24      MR. MORRISSEY: Q Let me rephrase it. When an

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 110

1   incident report is generated, because a person
2   requests a wheelchair, because they have a cane,
3   crutch, or walker going up or down the ramps, is the
4   incident report coded in any manner?
5       MR. DEVORE: Objection, I believe it
6   mischaracterizes his testimony as to when an
7   incident report is generated.
8       THE WITNESS: When you say coded, what do you
9   mean?
10      MR. MORRISSEY: Q Is there, are there, in the
11  JMS system, are there different delineations as far
12  as an incident report. For instance, is there an
13  incident report for inmate, an inmate battery?
14      MR. DEVORE: Objection, outside the scope of the
15  topics 3, 4, 5, and 6. I don't believe there's any
16  question regarding the JMS topic, covering the JMS
17      MR. MORRISSEY: Q Can you answer?
18      **A   Can you ask the question again?**
19      Q Sure. Are there codes in the JMS for
20  various incidents?
21      MR. DEVORE: Same objection. It's outside the
22  scope of the topics 3, 4, 5, and 6.
23      MR. MORRISSEY: Q Well, the topic is, on
24  number 3, is tell us between January 1st, 2024,

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 111

1   whether anybody has been accommodated. And he's
2   says, well, you got to look at the JMS. And so he
3   said there would be an incident report. So I'm
4   asking him, is there any way, based upon a code,
5   whether or not you could pull up people that were
6   provided a wheelchair?
7       MR. DEVORE: Yeah, it mischaracterizes his
8   testimony, because he didn't just limit it to JMS,
9   and he said you had to look at the ICC's name.
10      MR. MORRISSEY: I don't think he said that.
11      THE WITNESS: I did.
12      MR. MORRISSEY: Q Are you able to do
13  informational reports from the JMS?
14      MR. DEVORE: Same objection, as to scope.
15      THE WITNESS: When you say am I able to do
16  informational reports, what do you mean?
17      MR. MORRISSEY: Q Can you use the JMS to pull
18  up information that would be helpful to the
19  administration at the jails?
20      MR. DEVORE: Objection as to form.
21      MR. MORRISSEY: Q Do you understand the
22  question?
23      **A   No, you guys we're talking, so I didn't know**
24  **if you wanted to ask me something different.**

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 28

LONNIE HOLLIS
November 18, 2024

Page 112

1    Q   Okay.  Well, I'll show you Exhibit Number 5.
2    A   So what was the question?
3    Q   The question is, can you generate reports
4  from the JMS, about certain topics?
5        MR. DEVORE:  Objection as to scope, as
6  articulated before, not included in topics 3, 4, 5,
7  and 6.
8        MR. STILLMAN:  You can answer.
9        THE WITNESS:  The JMS can be used to research,
10 yes.
11       MR. MORRISSEY:  Q  Can you research, in JMS,
12 whether or not assistance is being provided to
13 wheelchair detainees?
14       MR. DEVORE:  Same objection.  And the question
15 was regarding wheelchair detainees, which is not
16 this lawsuit.
17       MR. MORRISSEY:  Q  You can answer?
18       MR. DEVORE:  And it's outside the scope of the
19 30(b)(6), so I'm not going to allow him to answer
20 that related to wheelchair detainees.
21       MR. MORRISSEY:  Q  Showing you Exhibit Number 5,
22 it's a memorandum to RTU and Cermak staff members,
23 from Sabrina Rivero-Canchola, ADA Compliance
24 Officer, subject, roll call memo, December 22nd,

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 113

1  2023.
2        MR. DEVORE:  Can we see it?
3        THE WITNESS:  You got something on there too.
4        MR. STILLMAN:  Should we just give him ours.
5        THE WITNESS:  Yeah, I don't know what that says.
6        MR. STILLMAN:  Do you have another one, Pat?
7        MR. PATRICK MORRISSEY:  Here you go.
8        MR. DEVORE:  Thanks.
9        MR. MORRISSEY:  Q  Have you had an opportunity
10 to look at Exhibit 5?
11       A   Yes.
12       Q   Exhibit 5 talks about documenting in an
13 incident report or information only report and
14 CCOMS.  IS CCOMS the Jail Management System?
15       A   Yes.
16       Q   And what is an information only report?
17       A   It's what it says, it's an information only
18 report.
19       Q   How does that differ from an incident
20 report?
21       A   It's just interchangeable terms.
22       Q   And looking at Exhibit 5, it says, pursuant,
23 it says pursuant to, and they're referring to policy
24 148, which was in front of you, which we have been

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 114

1  talking about all afternoon, which is Exhibit 4, in
2  our case, pursuant to that order, CCSO members must
3  provide assistance to wheelchair using subjects who
4  are in CCSO custody, assistance includes, but is not
5  limited to, pushing wheelchair using detainees up
6  and down ramps and through the corridors of the DOC.
7        As the Sheriff's designee, is there any
8  similar memorandum or document which imposes a duty
9  on the correctional staff to provide accommodations
10 to detainees who have an alert for canes, crutches,
11 and walkers going up and down ramps?
12       MR. DEVORE:  Objection, as to form.  Also as to
13 scope, and to the extent that it attempts to
14 transform this memo into something it's not.
15       THE WITNESS:  Not that I recall.
16       MR. MORRISSEY:  Okay.  Anything else, Pat?
17       MR. PATRICK MORRISSEY:  No.
18       MR. MORRISSEY:  All right.  I don't have any
19 further questions, thank you.
20       MR. DEVORE:  I just have a couple.
21              EXAMINATION
22              by Mr. Devore:
23       MR. DEVORE:  Q  There was some questions
24 regarding requests from folks with canes, crutches

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 115

1  and devices, I just wanted to be clear, that there
2  are, are there rules that, that the CCDOC that the
3  Sheriff has to follow with respect to
4  nondiscrimination against folks who have ADA needs?
5        A   Yes, sir.
6        Q   And is it the case that, that, well, what is
7  your understanding of those rules?
8        A   It's just it's indicative of the statement
9  you made, that we, the expectation is that we, a
10 the office, will be inclusive to them and not
11 discriminatory to them in any fashion at all
12 that we'll render assistance to them, you kn
13 they ask for it or as we, you know, as the
14       Q   And is that the case, regardless
15 something is included in the policy and
16 text or not?
17       A   Yes, we will provide assist
18 not discriminate.
19       Q   Okay.  And is it correct
20 that the Sheriff's office does
21 accommodate people, but you do
22 any specific times, based o
23 accommodation?
24       A   That's correct.

TOO

LONNIE HOLLIS
November 18, 2024

Page 116

1  Q   Okay.  And that's why you, you were
2  suggesting that you could look at some other, look
3  at a system to search for such instances, correct?
4  A   That's correct.
5  Q   Okay.  And in your experience, do
6  individuals in custody generally know that they can
7  contact Sheriff's personnel to request assistance?
8  A   Yes.
9  Q   And so is it fair to say that the Sheriff's
10 Department or the Sheriff accommodates people with
11 canes, crutches, or walkers as, pursuant to
12 requests?
13 A   Yes.
14 Q   And outside of Lexipol, what are, are there
15 some other sources of training that, that Sheriff
16 employees receive?
17 A   They receive pre-service training, which is
18 the, it's through the training academy, then they
19 receive in-service training after they graduate from
20 the academy, on a yearly basis, and we also receive
21 Lexipol updates or e-mails that are --
22 MR. REPORTER:  Or e-mails, I'm sorry?
23 THE WITNESS:  E-mails, we're responsible for
24 reviewing and acknowledging.

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 117

1  MR. DEVORE:  Q  So there is a myriad of
2  different ways that training is received from
3  written materials to on-line to in-person; is that
4  fair to say?
5  A   As well as memorandums, such as that, roll
6  call memos, that we receive at, given to the staff
7  to provide direction.
8  Q   And, just to be clear, there has been a lot
9  of questioning regarding the topics identified in
10 the Rule 30(b)(6) notice, and in particular topics
11 3, 4, 5, and 6, and there was, I believe, early on,
12 questions surrounding whether you had reviewed that
13 particular notice.  And I am going to ask it a
14 little bit differently.  Had you reviewed the topics
15 and discussed the information in the notice, prior
16 to today?
17 A   Yes.
18 Q   And, additionally, there's been some
19 questions regarding investigation, and I don't know,
20 just to make sure that there is no confusion, were
21 there steps that you took to prepare for today's
22 deposition that could be, that could constitute what
23 someone would say, investigation?
24 A   Yes, yes.

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 118

1  Q   And that would include meeting with --
2  MR. MORRISSEY:  Objection, leading.
3  MR. DEVORE:  Q  And would that, would that
4  include a meeting with your attorneys.
5  A   Yes.
6  Q   And, just to be clear, so to the extent that
7  there's something in the, any of the policies that
8  have been discussed today, including policy 148 and
9  policy 801, to the extent that something was in the
10 policy that you didn't discuss, would you defer to
11 the actual text of the policy?
12 A   Yes.
13 MR. DEVORE:  I think that's all we have.
14 MR. MORRISSEY:  I have some follow-up questions.
15             FURTHER EXAMINATION
16             by Mr. Morrissey:
17 MR. MORRISSEY:  Q  Is it correct that the
18 movement officers are the correctional staff that
19 transport prisoners with canes, crutches, and
20 walkers to Cermak?
21 A   One more time, the beginning of your
22 question that you said?
23 Q   Sure.  That in each housing division, the
24 staff that move prisoners to and from Cermak are the

TOOMEY REPORTING
312-853-0648

LONNIE HOLLIS
November 18, 2024

Page 119

1  movement officers?
2  A   They're officers.
3  Q   Whether -- there is a title called a
4  movement officer, correct?
5  A   There's an assignment that refers to them as
6  being the movement officer, however, an officer can
7  escort them.
8  Q   Okay.  But, generally, it's the movement
9  officers that escort prisoners to and from Cermak?
10 MR. DEVORE:  Objection, mischaracterizes his
11 prior testimony.
12 THE WITNESS:  Movement officer is an assignment
13 entered on our rosters.  Any officer can perform the
14 escort of an individual in custody.  So they don't
15 have to just be movement officers, any officer that
16 is on duty, depending on what is needed at a given
17 interval, can be used to escort an individual in
18 custody to wherever they needed to be escorted to.
19 It's not exclusive to just the movement officers, so
20 any officer can do it.
21 Q   All right.  But, in general, on a daily
22 basis, the officers that are assigned as movement
23 officers are the individuals that are responsible
24 for transporting detainees who have canes, crutches,

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 30

**LONNIE HOLLIS**
**November 18, 2024**

Page 120

1   and walkers to Cermak?

2       MR. DEVORE:  Objection, asked and answered.  He

3   just answered it.

4       MR. MORRISSEY:  Q  You can answer.

5       **A   I don't know how to answer your question a**

6   **different way, because any officer on duty can move**

7   **any of those individuals in custody that you**

8   **mentioned.  So it's not exclusive to just the**

9   **movement officers.**

10      Q   Okay.  You mentioned that there's in-service

11  training given to correctional officers, correct?

12      **A   Yes.**

13      Q   As the Sheriff's representative, designee,

14  can you identify any in-service training that's been

15  given in the last two years to correctional staff,

16  as far as accommodating prisoners that have an alert

17  of canes, crutches, or walkers, when they go up or

18  down the ramps at the jail?

19      MR. DEVORE:  Objection, form.  It's not a memory

20  test.

21      THE WITNESS:  The officers are given training

22  based on the Lexipol policies when they you go to

23  in-service training.

24      MR. MORRISSEY:  Q  So, to be clear, the training

**LONNIE HOLLIS**
**November 18, 2024**

Page 121

1   is based upon the written policy?

2       **A   It's a refresher.**

3       Q   Okay.  And the refresher is off of the

4   written policy?

5       MR. DEVORE:  Objection, mischaracterizes his

6   testimony.

7       THE WITNESS:  The training is based on the

8   Lexipol policies.

9       MR. MORRISSEY:  Q  Okay.  Can you provide any

10  testimony, as the Sheriff's designee, in regards to

11  the training that officers receive in the academy in

12  regards to accommodating prisoners with alerts for

13  canes, crutches, and walkers --

14      **A   I cannot.**

15      Q   -- when they go up and down the ramps of the

16  jail?

17      MR. DEVORE:  Objection, to the extent it

18  requests specific information outside of his

19  immediate control.

20      MR. MORRISSEY:  He's been designated for the

21  Sheriff, so I'm entitled to ask it.

22          Can you answer the question?

23      THE WITNESS:  I cannot, there's a different

24  entity that governs training and what's delineated

**LONNIE HOLLIS**
**November 18, 2024**

Page 122

1   at training.

2       MR. MORRISSEY:  Q  Well, the training is

3   provided by the Sheriff's office?

4       **A   The training is provided by the Sheriff's**

5   **office, however, it's not an area that I oversee.  I**

6   **don't oversee training.**

7       Q   Right.  But you're the designee for the

8   Sheriff here today.

9       **A   That's correct.**

10      Q   Right.

11      **A   For this topic, not for training.**

12      Q   Well, the topic involves training.

13      **A   It involves training, but it's not exclusive**

14  **to training.  The questions that you're asking me is**

15  **a question that is exclusive to training.**

16      Q   Is there any memo, as the Sheriff's

17  designee, that earmarks what a correctional officer

18  is to do, as far as accommodating a person who has a

19  cane, crutch, or walker?

20      MR. DEVORE:  Objection, to the extent it's

21  outside the scope, and there's no request regarding

22  specific memos, memoranda.

23      THE WITNESS:  I am not able to answer that

24  without speculating.

**LONNIE HOLLIS**
**November 18, 2024**

Page 123

1       MR. MORRISSEY:  Q  Well, your Attorney, on

2   cross, talked about memos, so I'm asking you, do you

3   know of any memo, as the Sheriff's representative,

4   about accommodating people with canes, crutches, or

5   walkers?

6       **A   Not that I recall.**

7       Q   In regards to the RTU, in regards to the

8   Cermak ramp, does the Sheriff acknowledge that it's

9   noncompliant with the ADA?

10      MR. DEVORE:  Objection.  Objection as to form.

11  Objection, outside the scope of the topics 3, 4, 5,

12  and 6.  And also seeks an opinion that's expert in

13  nature and not within the scope of this 30(b)(6)

14  notice.

15      MR. MORRISSEY:  Are you instructing him not to

16  answer?

17      MR. DEVORE:  Yes.

18      MR. MORRISSEY:  Q  Are prisoner with canes,

19  crutches, and walkers, are they notified that the

20  Cermak ramp is not compliant with the ADA?

21      MR. DEVORE:  Objection, I believe it was asked

22  and answered.  And, also, assumes facts not in

23  evidence.

24      MR. MORRISSEY:  You can answer.

Exhibit 17 Page 31

LONNIE HOLLIS
November 18, 2024

Page 124

1      MR. DEVORE:  If you can read the question back.
2          (Question read back as requested.)
3      MR. DEVORE:  Objection, as to scope.  It's not
4  within the identified topics 3, 4, 5, or 6.
5      MR. MORRISSEY:  Well, it is, if you look at
6  number 4, it says the steps taken to notify
7  individuals in custody using canes, crutches, or
8  walkers, about the Cermak and RTU east tunnel ramp
9  being noncompliant with the ADA.  How couldn't it be
10  more specific?
11      MR. DEVORE:  And the question was are they?
12  This line of questioning was absolutely covered
13  already.  Maybe, I don't know how long ago.
14      MR. MORRISSEY:  No.
15      MR. DEVORE:  An hour or two ago.
16      MR. MORRISSEY:  No, it wasn't.  The question is,
17  Are people with canes, crutches, and walkers
18  notified that the Cermak and RTU east tunnel ramps
19  are noncompliant, with the ADA?
20      MR. DEVORE:  You can answer.
21      THE WITNESS:  Not that I am aware of.
22      MR. MORRISSEY:  Q  Why not.
23      A   Because I'm not aware.
24      MR. DEVORE:  Objection, outside the scope.

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 125

1      MR. MORRISSEY:  Pardon?
2      MR. DEVORE:  Objection, outside the scope.
3      MR. MORRISSEY:  Q  Are prisoners notified of any
4  steps available to ensure safety and access to a
5  Cermak and the RTU ramps?
6      MR. DEVORE:  Objection, scope.  Objection, also,
7  asked and answered.
8      MR. MORRISSEY:  Q  Will you allow him to answer?
9      MR. DEVORE:  And it's also incomplete with
10  respect to location.
11      MR. MORRISSEY:  Q  Well, if we restate the
12  notice, it says the steps taken to notify
13  individuals in custody using canes, crutches, or
14  walkers about the Cermak and the RTU east tunnel
15  ramps being noncompliant with the ADA, and the
16  interim measures in place to ensure access and
17  safety.
18          So are prisoners with those alerts notified
19  what they're entitled to receive from the Sheriff in
20  regards to going up and down these ramps?
21      MR. DEVORE:  Objection, this goes beyond the
22  scope of the redirect, of any questions that I
23  asked.  And so it should, it's beyond what is
24  allowable on redirect.

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 126

1      MR. MORRISSEY:  Are you going to tell him not to
2  answer.
3      MR. DEVORE:  I'll instruct him not to answer.
4      MR. MORRISSEY:  All right.  Your Counsel said,
5  on cross, that the Sheriff does everything possible
6  to accommodate people that are disabled.  Does that
7  include informing the inmates that have canes,
8  crutches, and walkers, that they have a right to, to
9  having assistance going up and down the ramps?
10      MR. DEVORE:  You can answer.
11      THE WITNESS:  We discussed that a little while
12  ago with the signage.
13      MR. MORRISSEY:  Q  But you don't know whether
14  the signage is up or not.
15      A   Today.  It was there previously.
16      Q   But you don't know when?
17      A   No, it was previous.
18      MR. DEVORE:  Objection, mischaracterizes his
19  testimony.
20      MR. MORRISSEY:  Q  Pardon?  You don't know when
21  the sign was posted as the Sheriff's designee?
22      A   I do not.
23      Q   And you don't know how long the sign was
24  posted for?

TOOMEY REPORTING
312-853-0648

---

LONNIE HOLLIS
November 18, 2024

Page 127

1      A   I do not.
2      Q   And you don't know what the sign said?
3      MR. DEVORE:  Objection, mischaracterizes his
4  testimony.
5      MR. MORRISSEY:  Q  You have to answer orally?
6      MR. DEVORE:  He did testify as to --
7      MR. MORRISSEY:  Well, you can't testify for him.
8      MR. DEVORE:  I'm not.
9      MR. MORRISSEY:  You are.
10      MR. DEVORE:  You're trying to --
11      MR. MORRISSEY:  Q  How many signs were posted at
12  the Cook County Jail?
13      MR. DEVORE:  Objection, calls for speculation,
14  regarding the entire jail.
15      MR. MORRISSEY:  Q  How many signs were posted in
16  the vicinity of the Cermak or the RTU east tunnel
17  ramp?
18      MR. DEVORE:  Objection, scope.
19      THE WITNESS:  I am not able to answer that
20  because I saw at least two, but that doesn't mean
21  that there was exclusively two, those are the two
22  that I saw.
23      MR. MORRISSEY:  All right.  I have nothing
24  further.

TOOMEY REPORTING
312-853-0648

Exhibit 17 Page 32

**LONNIE HOLLIS**
**November 18, 2024**

Page 128

1  MR. DEVORE:  I think we're good.
2  MR. MORRISSEY:  Thanks for coming in.
3  THE WITNESS:  Yes, sir.
4  MR. REPORTER:  Signature?
5  MR. DEVORE:  Reserved.
6
7  - - - - - - - - - - - - - - - - - - - - - - -

TOOMEY REPORTING
312-853-0648

---

**LONNIE HOLLIS**
**November 18, 2024**

Page 129

1  STATE OF ILLINOIS  )
                      )  ss:
2  COUNTY OF C O O K  )
3
4      The within and foregoing deposition of the
5  aforementioned witness was taken before DENNIS M.
6  HARTNETT, CSR, at the place, date and time
7  aforementioned.
8      There were present during the taking of the
9  deposition the previously named counsel.
10     The said witness was first duly sworn and
11 was then examined upon oral interrogatories; the
12 questions and answers were taken down in shorthand
13 by the undersigned, acting as stenographer, and the
14 within and foregoing is a true, accurate and
15 complete record of all of the questions asked of and
16 answers made by the aforementioned witness, at the
17 time and place hereinabove referred to.
18     The signature of the witness was not
19 waived, and the deposition was submitted, pursuant
20 to Rules 30 (e) and 32 (d) of the Rules of Civil
21 Procedure for the United States District Court, to
22 the deponent per copy of the attached letter.

TOOMEY REPORTING
312-853-0648

---

**LONNIE HOLLIS**
**November 18, 2024**

Page 130

1      The undersigned is not interested in the
2  within case, nor of kin or counsel to any of the
3  parties.
4
5
6      Witness my official signature in and for
7  Cook County, Illinois on this 23rd day of December
8  A.D. 2024.
9
13 DENNIS HARTNETT
   TOOMEY REPORTING
14 200 S. Wacker Drive - 3100
   Chicago, Illinois  60606
15 Phone:  (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

**LONNIE HOLLIS**
**November 18, 2024**

Page 16970

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CUAUHTEMOC HERNANDEZ,    )
                         )
        Plaintiff,       )
                         )
    -vs-                 )  No. 23 CV
                         )
THOMAS DART and          )
COOK COUNTY, ILLINOIS    )
                         )
        Defendants.      )

    I, LONNIE HOLLIS, being first duly sworn,
on oath say that I am the deponent in the aforesaid
deposition taken on 11-18-24; that I have read the
foregoing transcript of my deposition, consisting of
pages 1 through 134 inclusive, and affix my
signature to same.

                        _____
                            LONNIE HOLLIS

SUBSCRIBED AND SWORN TO
before me this ____ day of
_____
A.D. 2024.

_____
    Notary Public

TOOMEY REPORTING
(312) 853-0648

Exhibit 17 Page 33

**LONNIE HOLLIS**
**November 18, 2024**

Page 230

TOOMEY REPORTING
200 South Wacker Drive
Suite 3100
Chicago, Illinois  60606
(312) 853-0648
December 23, 2024

DEVORE RANDUNSKY
MR. JASON E. DEVORE
 West Monroe Street
Chicago, Illinois  60606

   CASE:  Hernandez v. Dart     CASE NO.: 23 CV 16970
   DEP OF:  Lonnie Hollis       DATE TAKEN: 11-18-24

Dear Mr. Devore:

    Enclosed is your copy of the deposition
transcript, along with the original signature page
and errata sheet.

    Pursuant to the rules of court in this matter,
please have the deponent read the transcript and
sign the signature page before a notary public.

    If any corrections/changes are to be made,
please TYPE or PRINT them on the attached errata
sheet, giving the page and line number, desired
correction/change, and
reason.

    Please arrange for accomplishment of same and
transmittal of the signature page and errata sheet
back to our office within 30 days from the date of
this letter.

          Sincerely yours,

          _____
                SANDY TOOMEY
cc: Mr. Thomas Morrissey
    Mr. Patrick Morrissey
          TOOMEY REPORTING
              (312) 853-0648

**TOOMEY REPORTING**
**312-853-0648**

Exhibit 17 Page 34



**Policy**
**148**

**Cook County Department of Corrections**
Custody Manual

# Communication and Interaction with Individuals with Disabilities

### 148.1 PURPOSE AND SCOPE
This policy provides guidance to members of the Cook County Sheriff's Office when communicating and interacting with individuals with disabilities, including but not limited to those who are deaf or hearing impaired; have impaired speech; are vision impaired or blind; or have mobility disabilities.

### 148.1.1 ISSUANCE/EFFECTIVE DATE
This policy was re-issued on Nov. 2, 2020 and shall become effective upon issuance (operational/ statutory updates).

### 148.1.2 DEFINITIONS
Definitions related to this policy include:

**Auxiliary aids** - Tools used to communicate with people who have a disability or impairment. They include, but are not limited to, the use of gestures or visual aids to supplement oral communication; a notepad and pen or pencil to exchange written notes; a computer or typewriter; an assistive listening system or device to amplify sound; a teletypewriter (TTY) or videophones (video relay service or VRS); taped text; qualified readers; or a qualified interpreter.

**Disability or impairment** - A physical or mental impairment that substantially limits a major life activity, including hearing or seeing, regardless of whether the disabled person uses assistive or adaptive devices or auxiliary aids. Individuals who wear ordinary eyeglasses or contact lenses are not considered to have a disability (42 USC § 12102).

**Effective communication** - Written or spoken communication that is as clear and understandable to individuals with disabilities as it is for those without disabilities.

**Mobility impairment** - Refers to the inability of an individual to use one or more of their extremities, or a lack of strength to walk, grasp or lift objects. The use of a wheelchair, crutches or a walker may be utilized to aid in mobility.

**Qualified interpreter** - A person who is able to interpret effectively, accurately and impartially, both receptively and expressively, using any necessary specialized vocabulary. Qualified interpreters include oral interpreters, transliterators, sign language interpreters and intermediary interpreters. Qualified interpreters shall have a valid Illinois license to practice interpreting for the deaf (225 ILCS 443/15), unless they are exempt under 225 ILCS 443/25.

**Reasonable modification** - A change in a policy, practice or procedure when the change is necessary to ensure equal access to any person with a qualified disability.

**Service animal** - A dog trained to perform specific tasks for people with disabilities. When attempting to identify a service animal, sworn members are only allowed to ask two questions

Copyright Lexipol, LLC 2022/02/01, All Rights Reserved.
Published with permission by Cook County Department of Corrections

Communication and Interaction with
Individuals with Disabilities - 273

# Cook County Department of Corrections
Custody Manual

*Communication and Interaction with Individuals with Disabilities*

of dog owners. A dog owner's answers to the following questions must be taken at face value, regardless of whether the dog's service status is legitimate:

(a) Is the dog required because of a disability?

(b) What task or service has the dog been trained to do?

## 148.2 POLICY

It is the policy of the Cook County Sheriff's Office to reasonably ensure that individuals with disabilities, including but not limited to victims, witnesses, or individuals in custody, have equal access to services, programs and activities that are provided by the Sheriff's Office. Members shall make efforts to communicate effectively with individuals with disabilities and adhere to all guidelines set forth by their respective departments/units. The Sheriff's Office will not discriminate against individuals or deny them access to reasonable accommodations, services, activities or programs based upon disabilities for which they are otherwise qualified, unless there are articulable safety/security risks.

## 148.3 AMERICANS WITH DISABILITIES ACT (ADA) COORDINATOR

The responsibilities of the ADA Compliance Officer, in regard to the communication and interaction with people with disabilities, include:

(a) Developing reports or new procedures, or recommending reasonable modifications to this policy.

(b) Acting as a liaison to local disability advocacy groups or other disability groups regarding access to services, programs and activities provided by the Sheriff's Office.

(c) Developing procedures that will enable members to access auxiliary aids or services, including those concerning qualified interpreters or an approved interpretation service, and ensuring those procedures are available to all members.

(d) Ensuring required signage is posted in appropriate areas.

(e) Ensuring appropriate processes are in place to provide for the prompt and equitable response to complaints and inquiries regarding discrimination in accessing services, programs and activities that are provided by the Sheriff's Office.

## 148.4 GENERAL CONSIDERATIONS

Because the nature of any contact may vary substantially from one situation to the next, members shall consider all information reasonably available to them when determining how to communicate with an individual with a disability. Members shall carefully balance all known factors in an effort to reasonably ensure individuals with disabilities have equal access to services, programs and activities that are provided by the Sheriff's Office. These factors may include but are not limited to the following:

(a) Members should not always assume that effective communication is being achieved. The fact that an individual appears to be nodding in agreement does not always mean they completely understand the message. When there is any doubt, a member should

Copyright Lexipol, LLC 2022/02/01, All Rights Reserved.
Published with permission by Cook County Department of Corrections

## Cook County Department of Corrections
Custody Manual

*Communication and Interaction with Individuals with Disabilities*

ask the individual to communicate back or otherwise demonstrate their understanding, and properly document indications of understanding;

(b) The nature of the disability (e.g., hearing impaired vs. mobility impaired);

(c) The nature of the contact (e.g., emergency vs. non-emergency, custodial vs. consensual contact); and

(d) The availability of auxiliary aids. The fact that a particular aid is not available does not eliminate the obligation to reasonably ensure access. However, in an emergency, availability may factor into the type of aid used.

### 148.5 INITIAL AND IMMEDIATE CONSIDERATIONS

Recognizing that various encounters may be potentially volatile and/or emotionally charged, members should remain alert to the possibility of communication problems.

Members shall provide reasonable accommodations for individuals who have mobility disabilities, including individuals who require appropriate means of transportation to or from court hearings.

Members shall exercise special care in the use of all gestures and verbal and written communication. This is to minimize initial confusion and misunderstanding when dealing with any individual with known or suspected disabilities. In a non-emergency situation, and when a member knows or suspects an individual requires assistance to effectively communicate, the member shall attempt to identify the individual's choice of auxiliary aid or service. The individual's preferred communication method must be honored unless another effective method of communication exists under the circumstances (28 CFR 35.160). Factors to consider when determining whether an alternative method is effective include:

(a) The methods of communication usually used by the individual;

(b) The nature, length and complexity of the communication involved; and

(c) The context of the communication.

In emergency situations involving an imminent threat to the safety or welfare of any individual, members may use whatever auxiliary aids and services reasonably appear effective under the circumstances. This may include, for example, exchanging written notes or using the services of a person who knows sign language but is not a qualified interpreter, even if the individual who is deaf or hearing impaired would prefer a qualified sign language interpreter, or another appropriate auxiliary aid or approved interpretation service. Once the emergency has ended, the continued method of communication should be reconsidered. The member should inquire as to the individual's preference and give primary consideration to that preference.

If an individual who is deaf, hearing impaired or has impaired speech must be handcuffed while in the custody of the Sheriff's Office, consideration shall be given, safety and security permitting, to placing the handcuffs in the front of the body to facilitate communication using sign language or writing. However, certain situations may warrant removal of handcuffs to facilitate effective communication. If security and safety concerns exist, the sworn member must notify a supervisor and the concerns should be documented.

Copyright Lexipol, LLC 2022/02/01, All Rights Reserved.
Published with permission by Cook County Department of Corrections

## Cook County Department of Corrections
Custody Manual

*Communication and Interaction with Individuals with Disabilities*

Unless there are security or safety concerns, avoid taking or grabbing any visually impaired person's arm to lead them in a particular direction. If needed, members shall ask clearly and distinctly for the individual to take the arm of a member for guidance. Handcuff the individual in front unless there are security or safety concerns. If security and safety concerns exist, the member must notify a supervisor.

### 148.6 TYPES OF ASSISTANCE AVAILABLE
Members shall never refuse to assist an individual with disabilities who is requesting assistance, though it is understood that assistance may take different forms, and may not always be the preferred method of assistance for the individual with the disability. Through a variety of services, the Sheriff's Office will make every reasonable effort to provide equal access and timely assistance to individuals with disabilities. Auxiliary aids or services may include but are not limited to:

#### 148.6.1 AUDIO RECORDING AND ENLARGED PRINT
The Sheriff's Office may develop audio recordings to assist individuals who are blind or have a visual impairment to access important information. If such a recording is not available, a members may read aloud from the appropriate form (e.g., a personnel complaint form) or provide a forms with enlarged print.

#### 148.6.2 QUALIFIED INTERPRETERS
A qualified interpreter may be needed in lengthy or complex transactions (e.g., interviewing a victim, witness, individual in custody) if the individual to be interviewed normally relies on sign language or speech reading (lip-reading) to understand what others are saying.

The qualified interpreter should not be a person with an interest in the case or the investigation.

An individual providing interpretation services may be required to establish the accuracy and trustworthiness of the interpretation in a court proceeding.

Qualified interpreters should be:

(a) Available within a reasonable amount of time.

(b) Experienced in providing interpretation services related to law enforcement matters.

(c) Familiar with the use of auxiliary aids.

(d) Certified in either American Sign Language (ASL) or Signed English (SE).

(e) Able to understand and adhere to the interpreter role without deviating into other roles such as counsel or legal adviser.

(f) Knowledgeable of the ethical issues involved when providing interpretation services.

Members should use Sheriff's Office-approved procedures to request a qualified interpreter at the earliest reasonable opportunity. No individual who is disabled shall be required to provide their own interpreter (28 CFR 35.160).

Copyright Lexipol, LLC 2022/02/01, All Rights Reserved.
Published with permission by Cook County Department of Corrections

# Cook County Department of Corrections
### Custody Manual

*Communication and Interaction with Individuals with Disabilities*

### 148.6.3 AUXILIARY AIDS

In situations where an individual without a disability would have access to a telephone (e.g., booking or attorney contacts), members must also provide those who are deaf, hearing impaired or have impaired speech the opportunity to place calls using an available auxiliary aid. This will be done in accordance with any applicable guidelines specific to the member's department or unit.

Members shall provide additional time, as needed, for effective communication due to the slower nature of communications using auxiliary aids.

The Sheriff's Office will accept all calls placed by those who are deaf or hearing impaired and received via a telecommunications relay service (28 CFR 35.162). Relay services translate verbatim, so the conversation must be conducted as if speaking directly to the caller.

Members shall report any damaged or nonoperational devices to the ADA Compliance Officer via email at ccso.ada@cookcountyil.gov.

### 148.6.4 FAMILY AND FRIENDS

While family or friends may offer to assist with interpretation, members should carefully consider the circumstances before relying on such individuals. The nature of the contact and relationship between the individual with the disability and the person offering services must be carefully considered (e.g., victim/suspect).

Children shall not be relied upon except in emergency or critical situations when there is no qualified interpreter reasonably available. Adults may be relied upon when (28 CFR 35.160):

    (a)    There is an emergency or critical situation and there is no qualified interpreter reasonably available.

    (b)    The individual with the disability requests that the adult interpret or facilitate communication and the adult agrees to provide such assistance, and reliance on that adult for such assistance is reasonable under the circumstances.

### 148.7 FIELD ENFORCEMENT

Field enforcement will generally include such contacts as traffic stops, pedestrian stops, serving warrants and restraining orders, crowd/traffic control and other routine field contacts that may involve individuals with disabilities. The scope and nature of these activities and contacts will inevitably vary.

The Sheriff's Office recognizes that it would be virtually impossible to provide immediate access to complete communication services to every member of the Sheriff's Office. Members and/or supervisors must assess each situation and consider the length, complexity and importance of the communication, as well as the individual's preferred method of communication, when determining the type of resources to use and whether a qualified interpreter is needed.

Although not every situation can be addressed in this policy, it is important that members are able to effectively communicate the reason for a contact, the need for information and the meaning or consequences of any enforcement action. For example, it would be meaningless to verbally

Copyright Lexipol, LLC 2022/02/01, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

## Cook County Department of Corrections
Custody Manual

*Communication and Interaction with Individuals with Disabilities*

request consent to search if the sworn member is unable to effectively communicate with an individual who is deaf or hearing impaired and requires communications assistance.

If available, sworn members should obtain the assistance of a qualified interpreter before placing an individual with a disability under arrest. Individuals who are arrested and are assisted by service animals should be permitted to make arrangements for the care of such animals prior to transport. If no arrangements can be made, animal control shall be contacted. As appropriate, refer to the Animal Control Policy, the Service Animals Policy and/or any other applicable department directives.

Individuals with mobility disabilities who are arrested shall be permitted to maintain the use of their auxiliary aids unless safety and security are compromised. If the individual is in the custody of the Department of Corrections, Cermak shall be notified that the individual possesses an auxiliary aid in order for a medical alert to be added into the jail management system.

### 148.7.1  FIELD RESOURCES
Communication methods that may be sufficient for transactions (e.g., checking a license, giving directions to a location) or for urgent situations (e.g., responding to a violent crime in progress) may, depending on circumstances, include such simple things as:

(a)   Hand gestures or visual aids.

(b)   Exchange of written notes or communications.

(c)   Verbal communications with an individual who can speech read by facing the individual and speaking slowly and clearly.

(d)   Use of computer, word processing, personal communication device or similar device to exchange texts or notes.

(e)   Slowly and clearly speaking or reading simple terms to individuals who have a hearing, visual, speech or mental impairment.

Members should be aware that these techniques may not provide effective communication as required by law and this policy depending on the circumstances.

### 148.8  CUSTODIAL INTERROGATIONS
In an effort to ensure that the rights of individuals who are deaf, hearing impaired or have speech impairment are protected during a custodial interrogation, the Sheriff's Office should provide interpretation and/or translation assistance as outlined in the Limited English Proficiency Services Policy and/or any applicable department directive before beginning an interrogation.

If a live interpreter is not available, the use of a video remote interpreting service should be considered where appropriate. Miranda warnings shall be provided to suspects who are deaf or hearing impaired by the use of a video remote interpreting service, through a qualified interpreter or by providing a written Miranda form.

Copyright Lexipol, LLC 2022/02/01, All Rights Reserved.
Published with permission by Cook County Department of Corrections

# Cook County Department of Corrections
Custody Manual

*Communication and Interaction with Individuals with Disabilities*

In order to ensure that communications during custodial investigations are accurately documented and are admissible as evidence, interrogations should be recorded whenever reasonably possible. As appropriate, refer the applicable policies and procedures.

## 148.9 ARRESTS AND BOOKINGS

Absent specific and articulable safety or security concerns, members shall provide assistance to wheelchair-bound individuals who are in Sheriff's Office custody. This includes but is not limited to:

(a) Pushing individuals up and down ramps and through corridors in Sheriff's Office facilities; and

(b) Upon request, escorting any individual who is unable to use a provided restroom or commode chair to the nearest ADA accessible restroom.

Members shall document any refusal of assistance by a wheelchair-bound individual.

When booked, under a court remand or required to appear in court at an outlying court facility, an individual with a mobility disability who requires the use of a wheelchair shall be:

(a) Transported in a lift-equipped and ADA compliant Sheriff's Office vehicle;

(b) Safely secured within the vehicle;

(c) Placed in an accessible holding cell; and/or

(d) Placed in a holding cell with a commode chair, if the individual is able to use a commode chair.

Arrest and booking is often conducted under circumstances in which time, safety, security and other issues are a concern. When arresting or booking a person with a disability, members shall, where practicable under the circumstances, make every effort to comply with the provisions in this policy.

If an individual with a speech or hearing disability is arrested or booked, the arresting sworn member shall use Sheriff's Office-approved procedures to provide a qualified interpreter at the place of arrest or booking as soon as reasonably practicable, unless the subject indicates that they prefer a different auxiliary aid or service, or the sworn member reasonably determines another effective method of communication exists under the circumstances.

When gathering information during the booking process, members should remain alert to the impediments that often exist when communicating with those who are deaf or hearing impaired, who have impaired speech, are vision impaired or blind, or have other disabilities.

In the interests of the individual's health and welfare, the safety and security of the facility, and to protect individual rights, it is important that accurate medical screening and booking information are obtained. Any individual who is remanded to or in the custody of the Department of Corrections shall be sent to Cermak Health Services of Cook County for a medical screening as soon as practicable for verification of the individual's health condition and to ensure appropriate medical alerts are added into the jail management system.

Copyright Lexipol, LLC 2022/02/01, All Rights Reserved.
Published with permission by Cook County Department of Corrections

Communication and Interaction with
Individuals with Disabilities - 279

# Cook County Department of Corrections
Custody Manual

*Communication and Interaction with Individuals with Disabilities*

If necessary, members should seek the assistance of a qualified interpreter whenever there is concern that accurate information cannot be obtained or that booking instructions may not be properly understood by the individual.

Individuals who require and possess personally owned communication aids (e.g., hearing aids, cochlear processors) should be permitted to retain them while in custody. If an individual is having difficulty understanding or communicating, members shall seek assistance from a supervisor and/or the ADA Compliance Officer via email at ccso.ada@cookcountyil.gov.

Members shall act professionally at all times during interactions with individuals with disabilities.

Coordinating with the respective department heads, the ADA Compliance Officer shall create signs providing notice to individuals that they must inform members when they require assistance. Members must ensure these signs are posted in conspicuous areas, including but not limited to bullpens/living units; that the signs remain on the wall; and the signs are visible to individuals.

## 148.10   PUBLIC COMPLAINTS AND GRIEVANCES OF INDIVIDUALS DETAINED IN THE COOK COUNTY DEPARTMENT OF CORRECTIONS
The Sheriff's Office shall ensure that any individual with disabilities who wishes to file a public complaint or grievance regarding any Sheriff's Office member is able to do so. As appropriate, the Sheriff's Office may provide a qualified interpreter or forms in enlarged print. All public complaints and grievances received shall be forwarded to the ADA Compliance Officer.

Inquiries into such complaints shall be handled in accordance with the Sheriff's Feedback Initiative Policy and/or the Grievance Policy for individuals detained in the Department of Corrections. Qualified interpreters used during complaint inquiries should not be Sheriff's Office members.

## 148.11   TRAINING
To ensure appropriate training for members who may have contact with individuals with disabilities, the Training Academy shall provide training that includes:

(a)   Awareness and understanding of this policy and related procedures, related forms and available resources.

(b)   Procedures for accessing qualified interpreters and other available resources.

(c)   Working with in-person and telephone interpreters and related equipment.

(d)   Procedures for providing assistance to an individual with a disability.

The Executive Director of the Training Academy or authorized designee shall be responsible for ensuring new members receive training related to interacting with individuals who have disabilities, including individuals who are deaf, hard of hearing, who have impaired speech or vision, or are blind. Those who may have contact with such individuals should receive refresher training at least once every two years thereafter. The Executive Director of the Training Academy or authorized designee shall maintain records of all training provided and will retain a copy in each member's training file in accordance with established records retention schedules.

# Cook County Department of Corrections
Custody Manual

*Communication and Interaction with Individuals with Disabilities*

148.11.1  CALL-TAKER TRAINING

Emergency call-takers shall be trained in the use of auxiliary aid equipment for communicating with individuals who are deaf, hearing impaired or who have speech impairments. Such training and information should include:

(a)  The requirements of the ADA and Section 504 of the Rehabilitation Act for telephone emergency service providers.

(b)  ASL syntax and accepted abbreviations.

(c)  Practical instruction on identifying and processing calls using auxiliary aids, including the importance of recognizing silent calls, using proper syntax, abbreviations and protocol when responding to calls using auxiliary aids.

(d)  Hands-on experience in auxiliary aid communications, including identification of specialized tones.

Copyright Lexipol, LLC 2022/02/01, All Rights Reserved.
Published with permission by Cook County Department of
Corrections

**Pt. 36, App. A**                                **28 CFR Ch. I (7-1-94 Edition)**

**Appendix**

## APPENDIX

This appendix contains *materials of an advisory nature* and provides additional information that should help the reader to understand the minimum requirements of the *guidelines* or to design buildings or facilities for greater accessibility. The paragraph numbers correspond to the sections or paragraphs of the *guideline* to which the material relates and are therefore not consecutive (for example, A4.2.1 contains additional information relevant to 4.2.1). Sections *of the guidelines* for which additional material appears in this appendix have been indicated by an asterisk. *Nothing in this appendix shall in any way obviate any obligation to comply with the requirements of the guidelines itself.*

*A2.2 Equivalent Facilitation.* Specific examples of equivalent facilitation are found in the following sections:

| | |
|---|---|
| 4.1.6(3)(c) | *Elevators in Alterations* |
| 4.31.9 | *Text Telephones* |
| 7.2 | *Sales and Service Counters, Teller Windows, Information Counters* |
| 9.1.4 | *Classes of Sleeping Accommodations* |
| 9.2.2(6)(d) | *Requirements for Accessible Units, Sleeping Rooms, and Suites* |

### *A4.1.1 Application.*

*A4.1.1(3) Areas Used Only by Employees as Work Areas.* Where there are a series of individual work stations of the same type (e.g., laboratories, service counters, ticket booths), 5%, but not less than one, of each type of work station should be constructed so that an individual with disabilities can maneuver within the work stations. Rooms housing individual offices in a typical office building must meet the requirements of the guidelines concerning doors, accessible routes, etc. but do not need to allow for maneuvering space around individual desks. Modifications required to permit maneuvering within the work area may be accomplished as a reasonable accommodation to individual employees with disabilities under Title I of the ADA. Consideration should also be given to placing shelves in employee work areas at a convenient height for accessibility or

installing commercially available shelving that is adjustable so that reasonable accommodations can be made in the future.

If work stations are made accessible they should comply with the applicable provisions of 4.2 through 4.35.

### *A4.1.2 Accessible Sites and Exterior Facilities: New Construction.*

*A4.1.2(5)(e) Valet Parking.* Valet parking is not always usable by individuals with disabilities. For instance, an individual may use a type of vehicle controls that render the regular controls inoperable or the driver's seat in a van may be removed. In these situations, another person cannot park the vehicle. It is recommended that some self-parking spaces be provided at valet parking facilities for individuals whose vehicles cannot be parked by another person and that such spaces be located on an accessible route to the entrance of the facility.

### *A4.1.3 Accessible Buildings: New Construction.*

*A4.1.3(5)* Only full passenger elevators are covered by the accessibility provisions of 4.10. Materials and equipment hoists, freight elevators not intended for passenger use, dumbwaiters, and construction elevators are not covered by these guidelines. If a building is exempt from the elevator requirement, it is not necessary to provide a platform lift or other means of vertical access in lieu of an elevator.

Under Exception 4, platform lifts are allowed where existing conditions make it impractical to install a ramp or elevator. Such conditions generally occur where it is essential to provide access to small raised or lowered areas where space may not be available for a ramp. Examples include, but are not limited to, raised pharmacy platforms, commercial offices raised above a sales floor, or radio and news booths.

*A4.1.3(9)* Supervised automatic sprinkler systems have built in signals for monitoring features of the system such as the opening and closing of water control valves, the power supplies for needed pumps, water tank levels, and for indicating conditions that will impair the satisfactory operation of the sprinkler system.

A1

Exhibit 2 Page 1

Exhibit 19 Page 1

**Department of Justice**                                                    **Pt. 36, App. A**

A4.2 Space Allowances and Reach Ranges

---

*Because of these monitoring features, supervised automatic sprinkler systems have a high level of satisfactory performance and response to fire conditions.*

**A4.1.3(10)** *If an odd number of drinking fountains is provided on a floor, the requirement in 4.1.3(10)(b) may be met by rounding down the odd number to an even number and calculating 50% of the even number. When more than one drinking fountain on a floor is required to comply with 4.15, those fountains should be dispersed to allow wheelchair users convenient access. For example, in a large facility such as a convention center that has water fountains at several locations on a floor, the accessible water fountains should be located so that wheelchair users do not have to travel a greater distance than other people to use a drinking fountain.*

**A4.1.3(17)(b)** *In addition to the requirements of section 4.1.3(17)(b), the installation of additional volume controls is encouraged. Volume controls may be installed on any telephone.*

**A4.1.3(19)(a)** *Readily removable or folding seating units may be installed in lieu of providing an open space for wheelchair users. Folding seating units are usually two fixed seats that can be easily folded into a fixed center bar to allow for one or two open spaces for wheelchair users when necessary. These units are more easily adapted than removable seats which generally require the seat to be removed in advance by the facility management.*

*Either a sign or a marker placed on seating with removable or folding arm rests is required by this section. Consideration should be given for ensuring identification of such seats in a darkened theater. For example, a marker which contrasts (light on dark or dark on light) and which also reflects light could be placed on the side of such seating so as to be visible in a lighted auditorium and also to reflect light from a flashlight.*

**A4.1.6 Accessible Buildings: Alterations.**

**A4.1.6(1)(h)** *When an entrance is being altered, it is preferable that those entrances being altered be made accessible to the extent feasible.*

**A4.2 Space Allowances and Reach Ranges.**

**A4.2.1 Wheelchair Passage Width.**

(1) Space Requirements for Wheelchairs. Many persons who use wheelchairs need a 30 in (760 mm) clear opening width for doorways, gates, and the like, when the latter are entered head-on. If the person is unfamiliar with a building, if competing traffic is heavy, if sudden or frequent movements are needed, or if the wheelchair must be turned at an opening, then greater clear widths are needed. For most situations, the addition of an inch of leeway on either side is sufficient. Thus, a minimum clear width of 32 in (815 mm) will provide adequate clearance. However, when an opening or a restriction in a passageway is more than 24 in (610 mm) long, it is essentially a passageway and must be at least 36 in (915 mm) wide.

(2) Space Requirements for Use of Walking Aids. Although people who use walking aids can maneuver through clear width openings of 32 in (815 mm), they need 36 in (915 mm) wide passageways and walks for comfortable gaits. Crutch tips, often extending down at a wide angle, are a hazard in narrow passageways where they might not be seen by other pedestrians. Thus, the 36 in (915 mm) width provides a safety allowance both for the person *with a disability* and for others.

(3) Space Requirements for Passing. Able-bodied *persons* in winter clothing, walking



**Fig. A1**
**Minimum Passage Width for One Wheelchair and One Ambulatory Person**

A2

Exhibit 2 Page 2

Exhibit 19 Page 2

**28 CFR Ch. I (7-1-94 Edition)**

**A4.2 Space Allowances and Reach Ranges**



**Fig. A2**
**Space Needed for Smooth U-Turn in a Wheelchair**





NOTE: Footrests may extend further for tall people

**Fig. A3**
**Dimensions of Adult-Sized Wheelchairs**

straight ahead with arms swinging, need 32 in (815 mm) of width, which includes 2 in (50 mm) on either side for sway, and another 1 in (25 mm) tolerance on either side for clearing nearby objects or other pedestrians. Almost all wheelchair users and those who use walking aids can also manage within this 32 in (815 mm) width for short distances. Thus, two streams of traffic can pass in 64 in (1625 mm) in a comfortable flow. Sixty inches (1525 mm) provides a minimum width for a somewhat more restricted flow. If the clear width is less than 60 in (1525 mm), two wheelchair users will not be able to pass but will have to seek a wider place for passing. Forty-eight inches (1220 mm) is the minimum width needed for an ambulatory person to pass a nonambulatory or semi-ambulatory person. Within this 48 in (1220 mm) width, the ambulatory person will have to twist to pass a wheelchair user, a person with a service animal, or a



**Fig. A3 (a)**

A3

566

Exhibit 2 Page 3

Exhibit 19 Page 3

**Department of Justice**                                            **Pt. 36, App. A**

**A4.3 Accessible Route**

semi-ambulatory person. There will be little leeway for swaying or missteps (see Fig. A1).

**A4.2.3 Wheelchair Turning Space.** *These guidelines specify* a minimum space of 60 in (1525 mm) diameter *or a 60 in by 60 in (1525 mm by 1525 mm) T-shaped space* for a pivoting 180-degree turn of a wheelchair. This space is usually satisfactory for turning around, but many people will not be able to turn without repeated tries and bumping into surrounding objects. The space shown in Fig. A2 will allow most wheelchair users to complete U-turns without difficulty.

**A4.2.4 Clear Floor or Ground Space for Wheelchairs.** The wheelchair and user shown in Fig. A3 represent typical dimensions for a large adult male. The space requirements in this *guideline* are based upon maneuvering clearances that will accommodate most wheelchairs. Fig. A3 provides a uniform reference for design not covered by this *guideline*.

**A4.2.5 & A4.2.6 Reach.** *Reach ranges for persons seated in wheelchairs may be further clarified by Fig. A3(a). These drawings approximate in the plan view the information shown in Figs. 4, 5, and 6.*

**A4.3 Accessible Route.**

**A4.3.1 General.**

(1) Travel Distances. Many people with mobility impairments can move at only very slow speeds; for many, traveling 200 ft (61 m) could take about 2 minutes. This assumes a rate of about 1.5 ft/s (455 mm/s) on level ground. It also assumes that the traveler would move continuously. However, on trips over 100 ft (30 m), disabled people are apt to rest frequently, which substantially increases their trip times. Resting periods of 2 minutes for every 100 ft (30 m) can be used to estimate travel times for people with severely limited stamina. In inclement weather, slow progress and resting can greatly increase a disabled person's exposure to the elements.

(2) Sites. Level, indirect routes or those with running slopes lower than 1:20 can sometimes provide more convenience than direct routes with maximum allowable slopes or with ramps.



**Fig. A4
Cane Technique**

**A4.3.10 Egress.** Because people with disabilities may visit, be employed or be a resident in any building, emergency management plans with specific provisions to ensure their safe evacuation also play an essential role in fire safety and life safety.

**A4.3.11.3 Stairway Width.** *A 48 in (1220 mm) wide exit stairway is needed to allow assisted evacuation (e.g., carrying a person in a wheelchair) without encroaching on the exit path for ambulatory persons.*

A4

Exhibit 2 Page 4

Exhibit 19 Page 4

**Pt. 36, App. A**　　　　　　　　　　　　　**28 CFR Ch. I (7-1-94 Edition)**

**A4.5 Ground and Floor Surfaces**

---

*A4.3.11.4 Two-way Communication. It is essential that emergency communication not be dependent on voice communications alone because the safety of people with hearing or speech impairments could be jeopardized. The visible signal requirement could be satisfied with something as simple as a button in the area of rescue assistance that lights, indicating that help is on the way, when the message is answered at the point of entry.*

**A4.4 Protruding Objects.**

**A4.4.1 General.** *Service animals* are trained to recognize and avoid hazards. However, most people with severe impairments of vision use the long cane as an aid to mobility. The two principal cane techniques are the touch technique, where the cane arcs from side to side and touches points outside both shoulders; and the diagonal technique, where the cane is held in a stationary position diagonally across the body with the cane tip touching or just above the ground at a point outside one shoulder and the handle or grip extending to a point outside the other shoulder. The touch technique is used primarily in uncontrolled areas, while the diagonal technique is used primarily in certain limited, controlled, and familiar environments. Cane users are often trained to use both techniques.

Potential hazardous objects are noticed only if they fall within the detection range of canes (see Fig. A4). Visually impaired people walking toward an object can detect an overhang if its lowest surface is not higher than 27 in (685 mm). When walking alongside *protruding* objects, they cannot detect overhangs. Since proper cane and *service animal* techniques keep people away from the edge of a path or from walls, a slight overhang of no more than 4 in (100 mm) is not hazardous.

**A4.5 Ground and Floor Surfaces.**

**A4.5.1 General.** *People who have difficulty walking or* maintaining balance *or who use crutches, canes, or walkers,* and those with restricted gaits are particularly sensitive to slipping and tripping hazards. For such people, a stable and regular surface is necessary for safe walking, particularly on stairs. Wheelchairs can be propelled most easily on surfaces that are hard, stable, and regular. Soft loose surfaces such as shag carpet, loose sand or gravel, wet clay, and irregular surfaces such as cobblestones can significantly impede wheelchair movement.

Slip resistance is based on the frictional force necessary to keep a shoe heel or crutch tip from slipping on a walking surface under conditions likely to be found on the surface. *While the <u>dynamic</u> coefficient of friction during walking varies in a complex and non-uniform way, the <u>static</u> coefficient of friction, which can be measured in several ways, provides a close approximation of the slip resistance of a surface. Contrary to popular belief, some slippage is <u>necessary</u> to walking, especially for persons with restricted gaits; a truly "non-slip" surface could not be negotiated.*

*The Occupational Safety and Health Administration recommends that walking surfaces have a static coefficient of friction of 0.5. A research project sponsored by the Architectural and Transportation Barriers Compliance Board (Access Board) conducted tests with persons with disabilities and concluded that a higher coefficient of friction was needed by such persons. A static coefficient of friction of 0.6 is recommended for accessible routes and 0.8 for ramps.*

*It is recognized that the coefficient of friction varies considerably due to the presence of contaminants, water, floor finishes, and other factors not under the control of the designer or builder and not subject to design and construction guidelines and that compliance would be difficult to measure on the building site. Nevertheless, many common building materials suitable for flooring are now labeled with information on the static coefficient of friction. While it may not be possible to compare one product directly with another, or to guarantee a constant measure, builders and designers are encouraged to specify materials with appropriate values. As more products include information on slip resistance, improved uniformity in measurement and specification is likely. The Access Board's advisory guidelines on Slip Resistant Surfaces provides additional information on this subject.*

Cross slopes on walks and ground or floor surfaces can cause considerable difficulty in propelling a wheelchair in a straight line.

A5

Exhibit 2 Page 5

Exhibit 19 Page 5

**Department of Justice**                                          **Pt. 36, App. A**

**A4.6 Parking and Passenger Loading Zones**

**A4.5.3 Carpet.** Much more needs to be done in developing both quantitative and qualitative criteria for carpeting (*i.e., problems associated with texture and weave need to be studied*). However, certain functional characteristics are well established. When both carpet and padding are used, it is desirable to have minimum movement (preferably none) between the floor and the pad and the carpet which would allow the carpet to hump or warp. In heavily trafficked areas, a thick, soft (plush) pad or cushion, particularly in combination with long carpet pile, makes it difficult for individuals in wheelchairs and those with other ambulatory disabilities to get about. Firm carpeting can be achieved through proper selection and combination of pad and carpet, sometimes with the elimination of the pad or cushion, and with proper installation. *Carpeting designed with a weave that causes a zig-zag effect when wheeled across is strongly discouraged.*

**A4.6 Parking and Passenger Loading Zones.**

**A4.6.3 Parking Spaces.** *The increasing use of vans with side-mounted lifts or ramps by persons with disabilities has necessitated some revisions in specifications for parking spaces and adjacent access aisles. The typical accessible parking space is 96 in (2440 mm) wide with an adjacent 60 in (1525 mm) access aisle. However, this aisle does not permit lifts or ramps to be deployed and still leave room for a person using a wheelchair or other mobility aid to exit the lift platform or ramp. In tests conducted with actual lift/van/ wheelchair combinations, (under a Board-sponsored Accessible Parking and Loading Zones Project) researchers found that a space and aisle totaling almost 204 in (5180 mm) wide was needed to deploy a lift and exit conveniently. The "van accessible" parking space required by these guidelines provides a 96 in (2440 mm) wide space with a 96 in (2440 mm) adjacent access aisle which is just wide enough to maneuver and exit from a side mounted lift. If a 96 in (2440 mm) access aisle is placed between two spaces, two "van accessible" spaces are created. Alternatively, if the wide access aisle is provided at the end of a row (an area often unused), it may be possible to provide the wide access aisle without additional space (see Fig. A5(a)).*

*A sign is needed to alert van users to the presence of the wider aisle, but the space is not intended to be restricted only to vans.*

*"Universal" Parking Space Design. An alternative to the provision of a percentage of spaces with a wide aisle, and the associated need to include additional signage, is the use of what has been called the "universal" parking space design. Under this design, all accessible spaces are 132 in (3350 mm) wide with a 60 in (1525 mm) access aisle (see Fig. A5(b)). One advantage to this design is that*



(a)
Van Accessible Space at End Row



(b)
Universal Parking Space Design

Fig. A5
Parking Space Alternatives

A6

Exhibit 2 Page 6

Exhibit 19 Page 6

**Pt. 36, App. A**                              **28 CFR Ch. I (7-1-94 Edition)**

**A4.8 Ramps**

*no additional signage is needed because all spaces can accommodate a van with a side-mounted lift or ramp. Also, there is no competition between cars and vans for spaces since all spaces can accommodate either. Furthermore, the wider space permits vehicles to park to one side or the other within the 132 in (3350 mm) space to allow persons to exit and enter the vehicle on either the driver or passenger side, although, in some cases, this would require exiting or entering without a marked access aisle.*

*An essential consideration for any design is having the access aisle level with the parking space. Since a person with a disability, using a lift or ramp, must maneuver within the access aisle, the aisle cannot include a ramp or sloped area. The access aisle must be connected to an accessible route to the appropriate accessible entrance of a building or facility. The parking access aisle must either blend with the accessible route or have a curb ramp complying with 4.7. Such a curb ramp opening must be located within the access aisle boundaries, not within the parking space boundaries. Unfortunately, many facilities are designed with a ramp that is blocked when any vehicle parks in the accessible space. Also, the required dimensions of the access aisle cannot be restricted by planters, curbs or wheel stops.*

**A4.6.4 Signage.** Signs designating parking places for disabled people can be seen from a driver's seat if the signs are mounted high enough above the ground and located at the front of a parking space.

***A4.6.5 Vertical Clearance.*** High-top vans, which disabled people or transportation services often use, require higher clearances in parking garages than automobiles.

**A4.8 Ramps.**

**A4.8.1 General.** Ramps are essential for wheelchair users if elevators or lifts are not available to connect different levels. However, some people who use walking aids have difficulty with ramps and prefer stairs.

**A4.8.2 Slope and Rise.** *Ramp slopes between 1:16 and 1:20 are preferred.* The ability to manage an incline is related to both its slope and its length. Wheelchair users with

disabilities affecting their arms or with low stamina have serious difficulty using inclines. Most ambulatory people and most people who use wheelchairs can manage a slope of 1:16. Many people cannot manage a slope of 1:12 for 30 ft (9 m).

***A4.8.4 Landings.*** *Level landings are essential toward maintaining an aggregate slope that complies with these guidelines. A ramp landing that is not level causes individuals using wheelchairs to tip backward or bottom out when the ramp is approached.*

**A4.8.5 Handrails.** The requirements for stair and ramp handrails in this guideline are for adults. When children are principal users in a building or facility, a second set of handrails at an appropriate height can assist them and aid in preventing accidents.

***A4.9 Stairs.***

***A4.9.1 Minimum Number.*** *Only interior and exterior stairs connecting levels that are not connected by an elevator, ramp, or other accessible means of vertical access have to comply with 4.9.*

**A4.10 Elevators.**

**A4.10.6 Door Protective and Reopening Device.** The required door reopening device would hold the door open for 20 seconds if the doorway remains obstructed. After 20 seconds, the door may begin to close. However, if designed in accordance with *ASME A17.1-1990*, the door closing movement could still be stopped if a person or object exerts sufficient force at any point on the door edge.

**A4.10.7 Door and Signal Timing for Hall Calls.** This paragraph allows variation in the location of call buttons, advance time for warning signals, and the door-holding period used to meet the time requirement.

**A4.10.12 Car Controls.** Industry-wide standardization of elevator control panel design would make all elevators significantly more convenient for use by people with severe visual impairments. In many cases, it will be possible to locate the highest control on elevator panels within 48 in (1220 mm) from the floor.

A7

Exhibit 2 Page 7

Exhibit 19 Page 7

Case: 1:23-cv-16970 Document #: 122-20 Filed: 07/08/25 Page 1 of 4 PageID #:1493

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: HERNANDEZ, CUATEMAC
Patient Type:   Visit CHS
Birth Date:  7
Gender: Male

Admission Date:    2/2/2022
Discharge Date:    5/11/2023
FIN: 20220202047

MRN: 006423461c; 00118873z

CMRN: 1015119250

---

### Intake Screening CHS

*Dental comments :*  Patient has visible black areas on back lower left molar.  He reports "discomfort" when eating or with extreme temperatures.

RAYMER RN, JOSH D - 05/09/2023 21:56 CDT

*Electronically Authored On:  09-May-23 21:56*
*Electronically Signed By: RAYMER RN, JOSH D*
*Cermak - Maxim Agency RN*

*Signed On: 09-May-23 22:16*
*Associated Provider: RAYMER RN, JOSH D*
*Cermak - Maxim Agency RN*

---

### Intake 2nd Med

Document Type:
Service Date/Time:
Result Status:
Perform Information:
Sign Information:

Intake 2nd Med
2/2/2022 19:55 CST
Auth (Verified)
MARTINEZ PA-C,SALVADOR (2/2/2022 20:03 CST)
MARTINEZ PA-C,SALVADOR (2/2/2022 20:03 CST)

**INTK.- CHS Primary Care Note**

Patient:  **HERNANDEZ, CUATEMAC**       **MRN: 00118873z**       **FIN: 20220202047**
Age:  **4 years**   Sex: **Male**    DOB: **7**
Associated Diagnoses:  **None**
Author:  **MARTINEZ PA-C, SALVADOR**

**Basic Information**

**General Communication**
    Visit Type: Intake second medical.
    Language: Patient understands English.
    Documentation Reviewed: Prior Cermak records.

**Subjective**
    Problem list
        All Problems
    Hypothyroidism / SNOMED CT 68268011 / Confirmed Obesity
    C-LBP.  Chief complaint

Report Request ID:  262217109             Page 171 of 619          Facility:  CHS
                                                                   Location:  RCDC

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Hernandez v. Dart, 23-cv-16970             DR 001117          Exhibit 20 Page 1

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: HERNANDEZ, CUATEMAC
Patient Type:  Visit CHS
Birth Date: 7          5
Gender: Male

Admission Date:  2/2/2022
Discharge Date:  5/11/2023
FIN: 20220202047

MRN: 006423461c; 00118873z

CMRN: 1015119250

---

### Intake 2nd Med

**C.C:** Pt Denies any acute  C/O's-
Req. pain Rx  and thyroid Rx.

**Histories**
**Allergies:**
<u>Allergic Reactions (All)</u>
No Known Allergies
**Current Medications:**  (Selected)

**Family History:**
No family history items have been selected or recorded.
**Psychosocial History**

<u>**Social & Psychosocial Habits**</u>

**Alcohol**
02/02/2022 **Use:** Current

**Substance Abuse**
02/02/2022 **Use:** Never

**Tobacco**
02/02/2022 **Use:** 10 or more cigarettes in
**Type:** Cigarettes
.

**Objective**
**VS/Measurements**
Vital Signs

| 2/2/2022 19:28 CST | | |
|---|---|---|
| Temp Oral DegC | 36.8 DegC |
| Heart Rate | 88 |
| Respiratory Rate | 18 breaths/min |
| Systolic Blood Pressure | 128 mmHg |
| Diastolic Blood Pressure | 82 mmHg |
| Oxygen Saturation | 97 % |

, Measurements from flowsheet : Measurements

| | | |
|---|---|---|
| 2/2/2022 19:37 CST | ASCVD Risk Score | Could Not Calculate |
| 2/2/2022 19:28 CST | Estimated height in cm | 175.26 cm |
| | Estimated weight in kg | 135.5 KG |

Report Request ID:  262217109

Page 172 of 619

Facility:  CHS
Location:  RCDC

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Hernandez v. Dart, 23-cv-16970                DR 001118                **Exhibit 20 Page 2**

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

| | | | | |
|---|---|---|---|---|
| Patient Name: HERNANDEZ, CUATEMAC | | | | |
| Patient Type: Visit CHS | Admission Date: 2/2/2022 | | MRN: 006423461c; 00118873z | |
| Birth Date: | Discharge Date: 5/11/2023 | | | |
| Gender: Male | FIN: 20220202047 | | CMRN: 1015119250 | |

---

### Intake 2nd Med

---

**General**:
  Development: Normally developed.
  Nutritional status: Well nourished, Obese.
  Appearance: In no apparent distress.
**Eye**: Pupils are equal, round and reactive to light, Extraocular movements are intact, Normal conjunctiva, Normal sclera.
**HENT**: Oral mucosa is moist.
**Neck**: Supple.
**Respiratory**: Lungs are clear to auscultation, Respirations are non-labored, Breath sounds are equal, No wheezes.
**Cardiovascular**: Normal rate, Regular rhythm, No murmur, No gallop, No edema.
**Integumentary**: Warm, No pallor, No rash.
**Mental Status Exam**: Alert and oriented X 3.

**Review / Management**
  **Results Review**: No interval results.
  **Laboratory Results**
  N/A
  **Imaging Results**
  N/A

**Impression and Plan**
  **Impression and Plan**:
    Diagnosis: **1. H/O : M.Obese with chronic LBP and shoulder OA**
    **P: pt ed given- CPM/PRN with pain Rx- cane**

  **2. H/O Hypothyroidism**
  **P: pt e d given- CPM.**
    Degree of Control: N/A.
    Clinical Status: N/A.
  **Plan**
    PowerOrders
    Laboratory:
      T3 Free (Order): 2/2/2022 20:02 CST, Blood, Routine, Schedule Indicator
      TSH/T4 (Order): 2/2/2022 20:02 CST, Blood, Routine, Schedule Indicator
      Liver Profile (Order): 2/2/2022 20:02 CST, Blood, Routine, Schedule Indicator
      BMP (Order): 2/2/2022 20:02 CST, Blood, Routine, Schedule Indicator
      Urinalysis (Order): 2/2/2022 20:02 CST, Urine, Routine, Schedule Indicator
      Lipid Profile (Non Fasting) (Order): 2/2/2022 20:02 CST, Blood, Routine, Schedule Indicator
      Hemoglobin A1C (Order): 2/2/2022 20:02 CST, Blood, Routine, Schedule Indicator
    Patient Care:
      Chronic Disease Alert (Order): 2/2/2022 20:02 CST, Hypertension
      Alert CCDOC (Order): 2/2/2022 19:59 CST, Lower Bunk, Routine
      Alert CCDOC (Order): 2/2/2022 19:59 CST, Cane, Routine
    Pharmacy:

| | | |
|---|---|---|
| Report Request ID: 262217109 | Page 173 of 619 | Facility: CHS |
| | | Location: RCDC |

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Hernandez v. Dart, 23-cv-16970          DR 001119          Exhibit 20 Page 3

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: HERNANDEZ, CUATEMAC
Patient Type:  Visit CHS
Birth Date:
Gender: Male

Admission Date:   2/2/2022
Discharge Date:   5/11/2023
FIN: 20220202047

MRN: 006423461c; 00118873z

CMRN: 1015119250

---

### Intake 2nd Med

hydroCHLOROthiazide (Order): 25 MG, PO, Tab, Daily, Routine, 2/3/2022 09:00 CST, 26 WEEK, 8/3/2022 09:00 CDT

naproxen (Order): 500 MG, PO, Tab, Q 12 Hr, PRN, For Cermak Pain – ONLY CERMAK Pts, Routine, 2/2/2022 20:01 CST, 16 WEEK, 5/25/2022 20:00 CDT

methocarbamol (Order): 750 MG, PO, Tab, Q 12 Hr, Routine, 2/2/2022 21:00 CST, 2 WEEK, 2/16/2022 09:00 CST

levothyroxine (Order): 200 MCG, PO, Tab, 4AM, Instruction to Nursing: BEFORE meal, Routine, 2/3/2022 04:00 CST, 12 WEEK, 4/27/2022 04:00 CDT

Referrals:

Referral to Primary Care (Order): Routine (CHS5) 4 to 6 Weeks, 3/2/2022 00:00 CST, 3/16/2022 00:00 CDT, Once, 3/2/2022 00:00 CST.

Med Reconciliation:  (Selected)

.

**Medications**:  Medications have been reconciled.
**Education and Follow up**:  Patient has been given the opportunity to ask questions, Patient advised on how to access care upon release, Patient counseled on how to access care at CCDOC, Patient verbally acknowledges understanding of plan.
Medications: **N/A.**

*Electronically Authored On:  02-Feb-22 20:03*
*Electronically Signed By: MARTINEZ PA-C, SALVADOR*
*CHS - Med/Surg - Physician Assistant*
*Pager/Bus: 773-333-2121*

---

### Health Service Request

---

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

HERNANDEZ, CUATEMAC

006423461c; 00118873z
20220202047

**\* Auth (Verified) \***

FEB 5 '22 AM 6:50

**NON-EMERGENCY**
**HEALTH PHONE CALL REQUEST**
CERMAK HEALTH SERVICES OF COOK COUNTY

TIME STAMP WHEN
FORM ARRIVES IN
DISPENSARY

TODAY'S DATE: Feb 04-2022   LAST NAME: Hernandez   FIRST NAME: Cuahutemoc

CCDOC #: 0118873   DIVISION/TIER: 5-2-C   DATE OF BIRTH: ___

| I WOULD LIKE TO TALK TO SOMEONE FROM THE HEALTHCARE TEAM ABOUT: | DENTAL |
|---|---|
| My Health ISSUes I CAN't WALK TO FAR MEANING. Need A wheel chair when moved around for court etc. Soap I need Soap thats not state soap state soap breaks me out. Need a Knee brace or bandage Need glasses | ONLY URGENT & EMERGENT NEEDS AS DIAGNOSED BY THE DENTIST WILL BE TREATED AT THIS TIME. BASIC CLEANINGS AND ROUTINE FILLINGS ARE NOT PROVIDED DURING THE COVID-19 PANDEMIC. ☐ My tooth is loose ☐ My face is swollen ☐ I can't open my mouth |

I SHOULD LIKE TO TALK TO SOMEONE ON THE MENTAL HEALTH TEAM ABOUT:

MEDICATIONS

I want a refill of my prescribed medication(s)

Name of Medication(s):

☑ I am NOT getting my prescribed medication(s)

ALSO Not getting all prescribed meds I had in the free world

HERNANDEZ, CUATEMAC

006423461c; 00118873z
20220202047

* Auth (Verified) *



**NON-EMERGENCY**
**HEALTH PHONE CALL REQUEST**
CERMAK HEALTH SERVICES OF COOK COUNTY

FEB 24 AM 7:16

TODAY'S DATE: Feb 23-22   LAST NAME: Hernandez   FIRST NAME: Cuatemac

CCDOC #: 20220202047   DIVISION/TIER: 10-1-C   DATE OF BIRTH:
0118873

| I WOULD LIKE TO TALK TO SOMEONE FROM THE HEALTHCARE TEAM ABOUT: | DENTAL |
|---|---|
| I need to see the Doctor to got a Order. That i be transported in a wheel chair & when i go to Court etc I cant walk distances. So please call me immediately. Staff told me to direct this to medical. That ~~doctor~~ has to order this. | **ONLY URGENT & EMERGENT NEEDS AS DIAGNOSED BY THE DENTIST WILL BE TREATED AT THIS TIME.**<br><br>BASIC CLEANINGS AND ROUTINE FILLINGS ARE NOT PROVIDED DURING THE COVID-19 PANDEMIC.<br><br>☐ My tooth is loose<br>☐ My face is swollen<br>☐ I can't open my mouth |

| I WOULD LIKE TO TALK TO SOMEONE ON THE MENTAL HEALTH TEAM ABOUT: |
|---|
|  |
|  |

**MEDICATIONS**
☐ I want a refill of my prescribed medication(s)    ☐ I am NOT getting my prescribed medication(s)
Name of Medication(s):

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF ILLINOIS

3                    EASTERN DIVISION

4     _____

5     CUAUHTEMOC HERNANDEZ,

6            Plaintiff,

7        v.                              Case No.

8     THOMAS DART,                       22-cv-16970

9     Sherrif of Cook County, and

10    COOK COUNTY, ILLINOIS,

11           Defendants.

12    _____

13              VIDEOTAPED DEPOSITION OF

14                CUAUHTEMOC HERNANDEZ

15    DATE:         Thursday, September 19, 2024

16    TIME:         1:33 p.m.

17    LOCATION:     Remote Proceeding

18                  Chicago, IL

19    REPORTED BY:  Carly Hemberger

20    JOB NO.:      6902929

21

22

23

24

**Page 2**

1      A P P E A R A N C E S
2 ON BEHALF OF PLAINTIFF CUAUHTEMOC HERNANDEZ:
3     PATRICK W. MORRISSEY, ESQUIRE (by
4     videoconference)
5     Thomas G. Morrissey LTD
6     10257 South Western Avenue
7     Chicago, IL 60643
8     pwm@morrisseylawchicago.com
9     (773) 233-7900
10
11 ON BEHALF OF DEFENDANTS THOMAS DART, Sherrif of Cook
12 County, and COOK COUNTY, ILLINOIS:
13     ZACHARY STILLMAN, ESQUIRE (by videoconference)
14     DeVore Radunsky LLC
15     230 West Monroe Street, Suite 230
16     Chicago, IL 60606
17     zstillman@devoreradunsky.com
18     (312) 300-4479
19
20 ALSO PRESENT:
21     Robert Gore, Veritext Videographer (by
22     videoconference)
23     Erin Wright, Law Clerk from DeVore Radunsky (by
24     videoconference)

**Page 3**

1      I N D E X
2 EXAMINATION:             PAGE
3    By Mr. Stillman         6
4
5      E X H I B I T S
6 NO.    DESCRIPTION         PAGE
7 Exhibit 1    Plaintiff's Rule
8      26(a)(1)(A) Disclosures     18
9 Exhibit 2    US Access Board Website
10      ADA Guidelines for Ramps     41
11 Exhibit 3    Grievance 2022X02998     63
12 Exhibit 4    Non-Compliance Grievance
13      NC2203871         72
14
15
16
17
18
19
20
21
22
23
24

**Page 4**

1      P R O C E E D I N G S
2      THE REPORTER: Good afternoon. My name
3 is Carly Hemberger; I am the reporter assigned by
4 Veritext to take record of this proceeding. We are
5 now on the record at 1:33 p.m.
6      This is the deposition of Cuauhtemoc
7 Hernandez taken in the matter of Cuauhtemoc Hernandez
8 vs. Thomas Dart, Sheriff of Cook County, and Cook
9 County, Illinois, on Thursday, September 19th of 2024,
10 in Chicago, Illinois.
11      I am a notary authorized to take
12 acknowledgments and administer oaths in Illinois.
13 Parties agree that I will swear in the witness
14 remotely.
15      Additionally, absent an objection on
16 the record before the witness is sworn, all parties
17 and the witness understand and agree that any
18 certified transcript produced from the recordings of
19 this proceeding:
20      - is intended for all uses permitted
21      under applicable procedural and
22      evidentiary rules and laws in the
23      same manner as a deposition recorded
24      by stenographic means; and

**Page 5**

1      - shall constitute written stipulation
2      of such.
3      This proceeding will be recorded via
4 video technology by Robert Gore.
5      At this time will everyone in
6 attendance please identify yourself for the record.
7      MR. MORRISSEY: My name is Pat
8 Morrissey; I represent Mr. Hernandez, and I stipulate
9 to a remote deposition.
10      MR. STILLMAN: Zach --
11      MR. HERNANDEZ: My name is Cuauhtemoc
12 Hernandez.
13      MR. STILLMAN: Zachary Stillman,
14 representing Sheriff Dart and Cook County. And we do
15 not object -- stipulate.
16      THE REPORTER: Thank you. Hearing no
17 objection, I will now swear in the witness.
18      Please raise your right hand.
19 WHEREUPON,
20      CUAUHTEMOC HERNANDEZ,
21 called as a witness and having been first duly sworn
22 to tell the truth, the whole truth, and nothing but
23 the truth, was examined and testified as follows:
24      THE REPORTER: Proceed.

2 (Pages 2 - 5)

Exhibit 22 Page 2

Page 6

1      EXAMINATION
2 BY MR. STILLMAN:
3    Q   All right.  Good morning, Mr. -- well, good
4 afternoon, I guess, at this point, Mr. Hernandez.
5    A   Good afternoon.
6    Q   First of all, could you please state your
7 full name and spell it for the record?
8    A   Cuauhtemoc Hernandez.  Y'all probably got it
9 misspelled, but it's C-U-A-U-H-T-E-M-O-C, with an
10 apostrophe between the C and the O.  And then
11 Hernandez, H-E-R-N-A-N-D-E-Z, Hernandez.
12   Q   And have you ever given a deposition before?
13   A   Never.
14   Q   Okay.  So I'm sure your attorney has gone
15 over a little bit about how this will work, and also
16 the court reporter has said a couple things.  But I'll
17 just go through a couple quick ground rules here so
18 we're on the same page as we get started.
19       First of all, we have the court reporter
20 here today.  So to make life easier for her, we'll
21 just try to keep the record as clean as possible by
22 not speaking over one another.
23       If I'm asking a question, I'd ask that you
24 wait to answer, even if you're already anticipating

Page 7

1 what the answer might be, until I finish the question.
2 And I'll do my best not to interrupt any of your
3 answers before asking the next question.
4       And then second, please make sure to answer
5 all questions verbally, and refrain from gesturing or
6 pointing at things, or giving, kind of, general, like,
7 "uh-huh," responses.  Because that will be pretty,
8 like, nonclear on the record.  Do you understand?
9    A   I understand.  But I've got to make you
10 aware that I do have a speech impediment.  I stutter
11 so if I stutter that's wholly -- is beyond my control.
12   Q   Okay.  If either myself or our court
13 reporter here can't understand something you say,
14 we'll ask to clarify.
15   A   Well, I'm just letting you know, so.
16   Q   Yeah.  I appreciate that.
17   A   I won't -- I won't let you feel like I'm
18 being ignorant or, you know --
19   Q   Yeah.  No problem.
20       And then next, if you don't understand any
21 of my questions, please don't hesitate to let me know,
22 and I can try to rephrase it or ask it differently.
23 If you do answer, I'm going to assume that you
24 understood the question.

Page 8

1       And if there's something that you do not
2 recall or can't remember, don't guess.  You can just
3 answer that you don't recall or don't remember.
4    A   Okay.
5    Q   Finally, if at any point today you need to
6 take a break, that's totally fine.  I would just ask
7 that we finish the pending question, and then, you
8 know, you finish your answer, and then we could take a
9 break from there and figure out how long we need.
10   A   Okay --
11   Q   So do you understand these rules that I've
12 laid out for you?
13   A   Yes.  Yes, Sir.
14   Q   Okay.  So we can begin then.
15       And you said you've not given a deposition
16 before; correct?
17   A   No.
18   Q   When you were in jail did you go by any
19 other names?
20   A   They called me Lucky because people have a
21 hard time saying my name, my first name, Cuauhtemoc.
22       Even the staff has a hard time trying to
23 pronounce that name.  They would call me either that,
24 or the last part of my name is T-E-M-O-C; I go by that

Page 9

1 name.  My family calls me that.  Or also they call me
2 Lucky.  That's a nickname that I have for years.
3    Q   And what is your date of birth?
4    A
5    Q   Are you or have you ever been married?
6    A   No.
7       MR. STILLMAN:  And then let's go off
8 the record momentarily.
9       THE VIDEOGRAPHER:  We are off the
10 record at 1:38.
11       (Off the record.)
12       THE VIDEOGRAPHER:  We are on the record
13 at 1:39.
14 BY MR. STILLMAN:
15   Q   Did you review any documents or meet with
16 your attorney prior to this deposition today?
17   A   No.
18   Q   Did you ever meet with Pat there -- I mean,
19 before this deposition, did you meet with him and talk
20 with him at all?
21   A   No.  I spoke with him on the phone numerous
22 times.  I sent him paperwork I had.  We exchanged
23 paperwork here and there pertaining to the case at
24 hand, the matter.  That's it.  This is the first time

3 (Pages 6 - 9)

Page 10

1 we've met in person.
2 Q Today's the first time you met in person?
3 A Yes. Because -- due to my difficulties
4 trying to move around. I'm doing -- I'm getting
5 spinal injections right now, and I'm seeing doctors
6 for ortho for my knee and my shoulder. I've got sleep
7 apnea as well, that I've got to follow up on. And so
8 it's hard for me to move around.
9    I'm getting disability at this time, but
10 I -- they haven't given me nothing at all, since I've
11 been released -- or my prior to my release or my
12 reincarceration. So that's basically it.
13    My plates are expired now at this point.
14 Due to that, and basically because I failed to pass
15 that, I don't have no money to do any of that. So
16 that's why I haven't been able to go visit him or go
17 see him.
18 Q So today before this deposition, did Pat get
19 there, like, a bit of time before; did you talk at
20 all?
21 A He came here, we spoke about, you know,
22 setting up, and that is it.
23 Q Okay.
24    MR. MORRISSEY: Mr. Hernandez, he's not

Page 11

1 asking what we spoke about, about your case, but --
2    THE WITNESS: All right.
3 BY MR. STILLMAN:
4 Q Did you speak to him though, I mean, about
5 this deposition, about what might happen? I mean, I
6 don't care --
7 A We spoke about who and where I was going to
8 be asked questions; that's it.
9 Q Okay. And then do you have any documents in
10 front of you right now?
11 A No. I don't got no -- I mean, I got
12 documents that I wanted to show him as far as my
13 health's concerned that he'd never seen. I mean, I
14 got copies of the lawsuit; that's it. Other stuff --
15 Q So what are you --
16 A The questions that you had him -- that I had
17 to answer you.
18 Q Yeah. So what do you have in front of you
19 right now then; like, medical records and a copy of
20 the lawsuit?
21 A The medical records as far as you didn't
22 have, as far as my -- before I went and got
23 incarcerated, I had gotten in a bad accident. These
24 are probably the only records that you don't have.

Page 12

1 Other than that, just copies of the lawsuit that I've
2 got in front of -- in front of me; that's it.
3 Q So what copies of the lawsuit do you have in
4 front of you; can I see it?
5 A As far as the questions that you -- that are
6 concerning this. That's it.
7    MR. STILLMAN: Pat, could you tell me
8 what he has in front of him, just to speed this up.
9    MR. MORRISSEY: Mr. Hernandez, why
10 don't you read to him --
11    THE WITNESS: It's "Amended" --
12    MR. MORRISSEY: Just read to him the
13 documents you have.
14    THE WITNESS: "Plaintiff's response to
15 Sheriff's Interrogatories," "Plaintiff's Response to
16 Cook County Interrogatories," "Cook County Health
17 Hospital," you know, documents that are pertaining to
18 my health issues. That's it. And other parts of the
19 complaint. That's it.
20    MR. MORRISSEY: And he also has the
21 corridor ramp and accessibility assessment, amended
22 consolidated complaints, he's got --
23    THE WITNESS: Some of them I can barely
24 read, so.

Page 13

1    MR. MORRISSEY: -- movement history. I
2 think there's the ramps here. So that's what we have.
3 And we have pictures of the ramps. That's it.
4    MR. STILLMAN: Okay.
5    THE WITNESS: And the other ones I got
6 it from -- from the pain center, that he never got due
7 to the fact that -- this was the accident I had prior
8 from me -- not the accident.
9    I was in a second accident the day I
10 got arrested on this case, but I had a bad accident
11 before that, that I was getting treatment for that,
12 which I didn't -- the doctors there were not there the
13 whole time I was -- and that's what I was trying to
14 show him, that he don't got when he got here today.
15    That's it that I --
16 BY MR. STILLMAN:
17 Q Okay. Do you know the names of anyone who
18 might have also had issues with the Cermak and RTU
19 tunnels and ramps?
20 A I was in too much pain. I was having too
21 much issues with the staff as far as me moving around.
22    Some of the staff was helpful, some of them
23 were not. Some of them would tell me to get a
24 wheelchair permit, some of them -- some of them even

4 (Pages 10 - 13)

Page 14

1 went as far as then transporting me in a cart, because
2 they'd seen how bad I was walking.
3    Q   During your time at the Cook County Jail, or
4 after, or before, have you ever reviewed any Cook
5 County Jail policies and procedures?
6    A   I've reviewed a lot of them. I mean, I was
7 in prison for 21 years. So yes.
8    Q   The Cook County ones you've reviewed --
9    A   I've been incarcerated prior to this.
10 Twenty-one years I spent in prison prior to me
11 being -- getting released. So I'm very familiar with
12 the procedures and the process. From medical
13 agreements process -- all of that.
14    Q   And have you ever reviewed any, kind of,
15 like, ADA standards or construction guidelines?
16    A   I mean, I got into that when people kept
17 denying me -- I kept telling them to place me near --
18 put me on a medical wing or old man's deck or
19 somewhere near where I didn't have to travel so far to
20 go to court, or to Cermak, period.
21        Because I was having so much health
22 complications for my knee, my shoulder, and my back.
23 That I -- that I told them -- every time I'd seen
24 them, I told them about this since I got incarcerated.

Page 15

1    Q   Okay. Yeah. Have you ever been involved or
2 filed any other lawsuits before?
3    A   No. Not -- not -- other than this, no.
4 When I was in IDOC I filed one lawsuit in the court of
5 claims; that's it.
6        That was due to -- it had nothing to do with
7 medical. It had to -- it had to do with them losing
8 my personal property. My whole box disappeared when I
9 was transferred from Galesburg to Dixon, where I spent
10 my last six years at. That's the only lawsuit I ever
11 filed.
12    Q   So that's another lawsuit that you've filed?
13    A   That's a lawsuit -- as a matter of fact, it
14 was two.
15        There was that lawsuit, and then I filed a
16 medical pro se lawsuit as far as -- they didn't --
17 they failed to follow up medical treatment on an
18 injury I had when I had -- involved in an altercation
19 and my thumb was broken.
20        I received no medical follow-up attention
21 for that, and I filed a pro se lawsuit which they
22 denied based on the fact that I wasn't able to provide
23 a affidavit of merit and a physician report.
24        That's it. That's the only two lawsuits I

Page 16

1 ever filed. But this was in IDOC, not in Cook County.
2    Q   Okay. And you were also in Division 9,
3 while you were --
4    A   Yes. When I returned from -- I returned
5 from doing my parole time I was placed in 9. But
6 prior to that, I was in Division 10 and then 5.
7    Q   Do you know anything about any involvement
8 with any other lawsuits other than your own; as far
9 as, you know, your --
10    A   The only lawsuit I had was how I met him.
11 So far as Division 10 went to -- to shower chairs.
12    Q   So that's another -- the shower one for
13 Division 10, you were involved in as well?
14    A   Yes. But I'm not -- I'm not a class -- I'm
15 not the leading class member on that one.
16    Q   And then -- okay. But that's -- so what
17 about involvement with any lawsuits? Doesn't matter
18 if you're named or not as far class members or any
19 kind of relation --
20    A   I'm involved in a lawsuit that's going on
21 with the City as far as parking, excessive parking
22 fines and that. And that's -- that's not been settled
23 yet, due to the fact -- I don't know why.
24        But they told me they would contact me

Page 17

1 once -- I received a card, that's it, stating that
2 they would notify me if a settlement was made.
3        But to this point, I've not received
4 nothing. I haven't received no compensation, nothing,
5 for any of that, for any of the -- anything that I'm
6 involved in.
7    Q   So I'm not asking about compensation. If
8 you're involved, I'm asking just any involvements. So
9 right now we have the city parking fines one, we have
10 your IDOC lawsuit for the property, we have showers in
11 Division 10, is there anything else?
12    A   Oh. NRC, Pinckneyville. I'm suing -- I've
13 got lawsuits going on with them.
14    Q   How many do you have there?
15    A   One -- one in Stateville and one in
16 Pinckneyville. One's in NRC. Stateville and -- and
17 NRC. This was all due to this incarceration right
18 here.
19    Q   And is there anything else related to Cook
20 County Jail?
21    A   No. Not that I --
22    Q   Is there another case --
23    A   Not that I know of.
24    Q   Is there any involvement with Division 9 in

5 (Pages 14 - 17)

Exhibit 22 Page 5

Page 18

1 Rogers' case, or no?
2    A   Not that I know of.  I don't know if I'm a
3 class member or anything.  I don't know if it pertains
4 to me, or if his -- applied to that case -- that class
5 case.  I don't know.
6    Q   So is it your testimony right now that you
7 have no idea if you're a class member, if you had any
8 involvement with a case involving Division 9 in the
9 showers and toilets --
10       MR. MORRISSEY:  Mr. Hernandez, I don't
11 want you to talk about things we've talked about,
12 because that's privileged.  But if you know anything
13 outside of our conversations in response to his
14 question --
15       THE WITNESS:  No, no.  I don't know
16 anything about that -- that Rogers one.  Know nothing
17 about it.
18       MR. STILLMAN:  Okay.  I'm going to put
19 an Exhibit on the screen.  It's going to be Exhibit 1.
20       (Exhibit 1 was marked for
21       identification.)
22 BY MR. STILLMAN:
23    Q   Are you able to see that?
24    A   No.  That's so small; I can't see.

Page 19

1    Q   It's small, but I can zoom in.  Are you able
2 to see it?
3    A   No.  You've got to zoom it out -- you've got
4 to --
5    Q   No.  Okay.  I'm asking can you see the
6 document?
7    A   No, I can't.
8    Q   You don't see a document on screen?  Should
9 I --
10    A   I can see a document, but I can't read it --
11    Q   Thank you.  Thank you.  I'm going to zoom in
12 now for you.  Is that better?
13    A   I need reading glasses and I --
14    Q   Is that any better?
15    A   Can I use my -- because the only reason use
16 them is for the light.  Can I use my flashlight?
17    Q   Oh.  Shit.  Wait that just changed, hold on.
18 Sorry.  Zoomed in too much.  Back on.  Sorry.
19       Yeah.  You can put on glasses.
20    A   I mean, but I don't have none.  I told --
21 they broke.  I mean, I would have to use my -- the
22 flashlight on my -- on my cellphone if that's okay, so
23 I could read it.
24    Q   I mean, I suppose, yeah.  Whatever you need

Page 20

1 to do.
2    A   Okay.  Let me just turn my phone back on.
3       THE WITNESS:  Can I use yours?
4       MR. MORRISSEY:  Sure.
5       THE WITNESS:  All right.  I got his.
6 Go ahead.
7       All right.  Go ahead.
8 BY MR. STILLMAN:
9    Q   And can you see this document?
10    A   Yeah.  I could see it now; I could read it.
11    Q   All right.  And this says -- have you ever
12 seen this document before?
13    A   No.
14    Q   For a lawsuit entitled "Kavarian Rogers vs.
15 Thomas Dart"?
16    A   No.  Never seen --
17    Q   Never heard of that?  You heard of those
18 names?
19    A   Never.  Not --
20    Q   Never heard anything about this?
21    A   No.  Somebody tried to contact me about a
22 lawsuit, and I spoke to attorney about that; I don't
23 know if it was about this.
24       MR. MORRISSEY:  Things we've talked

Page 21

1 about, Mr. Hernandez, are privileged.  So you don't
2 have to tell Mr. Stillman about conversations we've
3 had about requests or issues with lawsuits.
4       THE WITNESS:  Okay.
5 BY MR. STILLMAN:
6    Q   This is page 2 of that Exhibit 1.  That's
7 your name under G; isn't it?
8    A   Well, can you blow -- blow this up a little
9 bit more?  Because it's a little bit small.
10    Q   Yeah.  Sorry.
11    A   You've got to lower it so I could see it
12 from the beginning.
13       You said my name's where?
14    Q   This is your name, G, "Cuauhtemoc
15 Hernandez" --
16    A   Yeah.  "Cuauhtemoc Hernandez, inmate limited
17 in the ability to move from place to place,
18 incarcerated at Cook County Jail, for a period of time
19 was assigned to Division 9.  Knowledge about the
20 inaccessible showers" --
21    Q   Does that describe you?
22    A   It describes me, yeah.  I had -- I have a
23 disability -- I wasn't been able to do a lot of things
24 in Division 9 due to the fact of my health issues.  I

6 (Pages 18 - 21)

Exhibit 22 Page 6

Page 22

1 mean, what's this got to do with anything, if I may
2 ask?
3    Q    Yeah.  Well, I'm asking if you had any
4 knowledge of your name being disclosed as a witness in
5 this case.
6         MR. MORRISSEY:  Mr. Hernandez, if it
7 relates to conversations we've had --
8         MR. STILLMAN:  Pat, this is a yes or no
9 question; it's not privileged.  He needs to answer
10 this question without you coaching him.  Thank you.
11        MR. MORRISSEY:  Mr. Stillman, if his
12 knowledge comes from conversations with counsel, I
13 think that would be privileged.
14        If you can answer the question without
15 divulging our communication, you can respond.
16        THE WITNESS:  No.  I had no knowledge
17 of this, Sir.
18 BY MR. STILLMAN:
19    Q    All right.  Thanks.  In the last ten years,
20 have you been convicted of any crimes?
21    A    The last ten years?
22    Q    Yeah.
23    A    Yes.  The gun case that I was incarcerated
24 for.

Page 23

1    Q    And what was the formal charge there?
2    A    The formal charge was habitual -- armed
3 habitual -- criminal was dropped because the judge
4 found it didn't apply to me because I didn't use it in
5 a forcible felony.  It was dropped to a possession of
6 a weapon with an enhancement of -- they enhanced it
7 due to my criminal background.  I was facing a term of
8 7 to 14.
9        That's it.  That's the only case I've got
10 prior to the last ten years.  Other than parking
11 tickets.
12        THE WITNESS:  Can I stop for a minute
13 because my leg is starting to cramp up?
14        MR. STILLMAN:  Yeah.  Go ahead.
15        MR. MORRISSEY:  Do you need to take a
16 break?
17        THE WITNESS:  Yeah.  I need to take a
18 break if possible.
19        MR. STILLMAN:  All right.  Let's do a
20 five-minute break.
21        THE VIDEOGRAPHER:  We are off the
22 record at 1:56.
23        (Off the record.)
24        THE VIDEOGRAPHER:  We are on the record

Page 24

1 at 2:03.
2 BY MR. STILLMAN:
3    Q    Do you remember what the date was that you
4 first were put into custody of Cook County Jail most
5 recently -- your most recent stay there, I mean?
6    A    I believe it was February 2, 2022, if I
7 stand correct.  As far as I recall, that's the day it
8 was.
9    Q    And where were you housed when you first
10 admitted?
11    A    Division 5.
12    Q    Where else were you housed during your time
13 at the Cook County Jail?
14    A    I went to Division 10 from there, and then I
15 stayed in Division 10 until I left; I went to do my
16 parole time.  I left to Stateville NRC, around -- I
17 don't really recall the date -- the exact date, but I
18 think it was somewhere around April 12th I believe, of
19 2022.  I don't know the exact date, but that's what I
20 recall.
21    Q    And by NRT you mean?
22    A    NRC.  Stateville NRC, the -- when they
23 process you to go back to prison.  I was there to see
24 the parole board.  And due to the parole hearing, my

Page 25

1 parole was revoked and cut in half, and I was sent
2 back to IDOC to do my remainder of my time.  That's
3 when I --
4    Q    Now -- oh.  Sorry.  Go ahead.
5    A    I went to Pinckneyville, then I returned
6 again to Cook County.  I was in Division 5 again;
7 that's when I went to Division 9 --
8    Q    So 5 -- sorry.  Go.
9    A    This was all on the same case here.
10    Q    Okay.  So 5, 10, and 9; are those the
11 divisions that you were there --
12    A    I was in Division 5, 10, and 9, and Division
13 8 RTU, until I bonded out.  And then I remained on EM
14 house arrest, which is considered a division itself.
15 I don't know what division it is, but it's considered
16 a division itself.
17        I was out on bond with the condition of EM
18 with limited movement.
19    Q    Okay.  And when you entered Cook County Jail
20 on February 2, '22, did you use mobility implement of
21 any kind at that time, using like a cane?
22    A    Yes.  They issued a cane upon my arrival.
23 The doctor seen I was bad -- I was injured and gave me
24 a cane.

7 (Pages 22 - 25)

Exhibit 22 Page 7

Page 26

1    Q   So prior to entering the jail --
2    A   Oh.  Yes, I had a cane -- I had a cane from
3  Dixon prior to my --
4    Q   Okay.  So you were using a cane?
5    A   -- prior to my release, for long distance.
6  It was only for long distance, but that all changed
7  due to my accident I had, which I was -- kept telling
8  Division 10 about before I left to prison.
9        Then I had got in another accident the day I
10  got arrested, on February 2nd, which I told them that
11  I had complications, you know?
12    Q   Okay.  And do you know when you entered --
13  or during your time at the Cook County Jail what kind
14  of use of your cane were you permitted; did you have
15  it at all times, or did you --
16    A   I was permitted -- when I was in Division 5,
17  I was permitted to have it -- they told me I couldn't
18  have it on the deck until seeing how bad I was, and
19  they let me keep it, you know?
20        It wasn't till I got to Division 9 where
21  they took it.  I was able to keep it the whole time
22  over there but they took it in Division 10 though --
23  in Division 9; I made a mistake.
24    Q   So at different times you had more use of

Page 27

1  the cane than others; right?
2    A   Yes.  I mean, I had -- I was -- I had access
3  to it all the time except for Division 9; they said I
4  couldn't have it on me.  They took it from me as soon
5  as I got there.
6        And when I was in Stateville, they took it
7  from me there too.  When I left Stateville to go to
8  Pinckneyville -- they gave me a crutch in Stateville
9  when I got there.
10        And when I left Stateville they took it from
11  me because CO Contreras [ph] -- I don't know his
12  name -- he told me that he seen me walking finely in
13  the bullpen, so he took -- he took that cane from
14  me -- the crutch from me, and said I would get one at
15  Pinckneyville, which I never got.
16    Q   Can you tell me a little bit about your
17  medical history as far as your mobility issues and
18  your need for a cane --
19    A   Okay.  My mobility issues -- my L4 and my L5
20  been bad since I was in Dixon; they were aware of
21  this.  That's where I got issued my cane first for
22  long distance.  And they placed me near -- near the
23  tower hall near medical because I couldn't walk too
24  far or stand too long.

Page 28

1    Q   So your mobility issues are fully just,
2  like, based on your back, kind of, issues?
3    A   Yeah.  Based on that and the car accidents.
4  I had two car accidents when I got released that made
5  it worse.
6        That complicated my neck, my back, and my
7  knee.  I've got a torn meniscus that I've just found
8  out about that they had me walking on the whole time I
9  was in prison and in Cook County.  And I just found
10  that out recently.
11        They can determine whether it's a new tear
12  or a old tear, but they say it was a old tear.  And I
13  know it's old, because the whole time I was in Cook
14  County, I kept complaining about it -- about that to
15  the doctors; that I needed an x-ray for them to look
16  at my knee, because something was going on with my
17  knee.  And they did nothing.
18    Q   And did any doctor either in Cook County or
19  in Cook County Jail before you entered into county
20  jail ever tell you -- or since actually -- since you
21  were released, have you ever gotten, like, a formal
22  diagnosis, or, like, has any doctor ever told you, you
23  know, like, you're formally or you're permanently
24  disabled?

Page 29

1    A   I mean, they told me that -- I know for a
2  fact that I need a cane for long distance when I got
3  released, but that all changed due to the car
4  accident.
5        I mean, now I can't barely sit or walk.  You
6  see I had to take a break just now.  I can't barely --
7  I can't stay in a position so long; it start my
8  irritating my back, my legs, and so I got to move
9  somewhere where I'm comfortable.
10    Q   So you started using the cane you said when
11  you were in Dixon?
12    A   Yes.  I was issued a cane there for long
13  distance and I was placed near a tower hall due to
14  medical reasons -- and to health care.
15        It was all close to -- I was in building --
16  I forgot what building it was.  It was right across
17  from the tower.
18        I don't know want to say what building
19  because I don't remember the exact building.  That was
20  a long time ago; I'd like to forget all that.
21    Q   So when you entered Cook County Jail with a
22  cane, did they take it from you?
23    A   They took it from me in Division 9; that was
24  it.  I was able to use it in Division 5, 10,

8 (Pages 26 - 29)

Page 30

1 everywhere.
2    Q  I mean, did they take it and, like, issue a
3 new one, or you were able to keep the one you entered
4 the jail with?
5    A  No. I got arrested. I never -- the police
6 arrested me, never offered me no medical treatment
7 when I was stopped, nothing.
8    Q  At the time you were arrested, were you
9 using a cane?
10    A  Yes. It was in my truck.
11    Q  So, I mean, when you were -- you didn't have
12 it with you when they brought you to jail though?
13    A  No. They took me without it. They wouldn't
14 even let me go back in my truck.
15    Q  Okay. But how long till they issued one in
16 jail?
17    A  As soon as I got there. The doctors -- when
18 I seen the doctor when they screened me -- when I
19 first got there, the doctor that seen me, he gave
20 me -- he prescribed me pain medication and the cane,
21 because he'd seen bad I was walking.
22     I kept telling them even at the police
23 station that my leg hurt. Even the video -- video
24 record that my attorney had showed that I was pointing

Page 31

1 at my knee -- at my leg while being interrogated about
2 this -- about the accident.
3     And initially, the stop was over a accident.
4 They searched my vehicle, they used the excuse that
5 they couldn't -- that it was non-drivable, but
6 ironically, they pursued me for, like, four, six
7 blocks -- more than that they said.
8     But it was non-drivable. They auctioned it
9 off, actually. But they towed it due to that, and due
10 to the fact that they thought I was drunk. They
11 thought I was drunk, and when I got to the police
12 station, I wasn't drunk. They did a test, and I
13 wasn't drunk.
14     They were going to release me, but then they
15 said they found something in my vehicle. The excuse
16 they used to search my vehicle was the fact that they
17 were going to tow it. And then they needed to deem
18 that it was safe enough for them to tow it -- I don't
19 know. I don't know the excuse they used.
20     But they never -- the police never offered
21 me medical treatment when they stopped me, even though
22 they knew I was in an accident; even though I
23 complained about it, that my leg was hurting; that I
24 can tell you.

Page 32

1     That I complained to them about it in Cook
2 County; that I can tell you to. You could look toward
3 my medical slips and everything the whole time I was
4 there; that will show you that I was complaining about
5 that.
6     I fell in Division 10. They got note of
7 that too.
8    Q  Okay. Mr. Hernandez, I'm going to have to
9 ask you just to try to keep your answers a little
10 shorter, just answering the questions which you can.
11 Yeah. Just -- we're going to be here all day
12 otherwise, you know?
13    A  Okay. That's fine. I'm sorry.
14    Q  Yeah. No, no problem. I just want all of
15 us to, you know, spend our time smartly.
16    A  Okay.
17    Q  So are you aware of any policies,
18 procedures, or rules at the jail regarding whether
19 someone should have been assisting you in relation to
20 your use of cane when you were transported from one
21 place to another in jail or in tiers?
22    A  I don't -- I complained about being in pain.
23 I'm not a big baby about it, but I complained about
24 being in pain when I was in the showers; I complained

Page 33

1 about them not being accessible due to my
2 complications, and I complained about that.
3     I complained about the ramp; I complained
4 about walking, period, because of my health -- I
5 couldn't -- I was in pain.
6    Q  Okay. But are you aware of any kind of
7 policies, procedures, or rules or anything at the jail
8 mandating --
9    A  I'm aware of all of that. I'm aware of all
10 of that. I'm aware of all my rights. I filed
11 numerous grievances if you look at my master file.
12    Q  How many grievances would you say you filed?
13    A  I couldn't recall. It was a lot. It was
14 numerous grievances, numerous requests I put in. I
15 can't tell you every request of what we spoke about.
16     I know I told them I was in pain in Division
17 10 when I fell. I talked to the doctors; I hurt my
18 elbow when I was there. And I told them about that.
19     They told me I was fine; that they've seen
20 that, that they don't -- that I had nothing wrong with
21 me. That's when I went back to prison to do my parole
22 time, and then I returned.
23    Q  At the beginning of this deposition, I think
24 Pat, your attorney, had mentioned that you have a

9 (Pages 30 - 33)

Page 34

1  report in front of you right now?
2      A   A what?
3          MR. STILLMAN:  Pat, you said you had
4  one of the case studies or the report from one of the
5  ramps; right?
6          MR. MORRISSEY:  I mentioned a
7  Globetrotters report.
8          MR. STILLMAN:  Yeah.  One of the
9  Globetrotters reports.
10 BY MR. STILLMAN:
11     Q   Yeah.  Do you have that in front of you?
12     A   I assume around here.
13         MR. MORRISSEY:  Do you want him to grab
14 it?  I mean, it's put away.
15         MR. STILLMAN:  I mean, he saw it, and
16 you mentioned it as one of the documents that he
17 had --
18         MR. MORRISSEY:  Right.  I mean, all the
19 papers aren't important.  Do you want him to get it?
20 It's not visible right now.
21         MR. STILLMAN:  Yes, I'd like him to
22 grab it.
23         MR. MORRISSEY:  All right.
24             I'll grab it for you.

Page 35

1          THE WITNESS:  I've got it right here.
2  BY MR. STILLMAN:
3      Q   Have you seen this document before today?
4      A   No.
5      Q   Did you look at this document today with Pat
6  here?
7      A   No.  We didn't have time to go through all
8  of this.  He showed it to me.  I mean, I looked it up;
9  I Googled the ramps.  By the ADA standards, I know
10 they ain't in compliance to it, as far as that goes.
11     Q   What did your Google research --
12     A   I saw a picture of the ramp, and it looked
13 nothing like the ramp in -- what I had to go to when I
14 was placed -- when I had to go see the doctor, whether
15 it was medical, eye doctor, or whatever.  Or when I
16 was being processed.
17     Q   Is there anything else you found on Google
18 that would suggest the ramp wasn't compliant, or?
19     A   As far as the bathroom went, they had no
20 grab bars.  I asked them to place me in a cell with
21 grab bars.
22             Then I asked them place me on the medical
23 or, you know, old man's deck.  They told me they
24 didn't have no medical wings or old man's deck.  But

Page 36

1  they said they had room.  They kept making excuses.
2          Then they sent me to RTU; that's when I
3  returned back after I did my parole time.  And that
4  was in 9, when they didn't -- they took my cane from
5  me.  That's when it got real bad, you know?
6          Then I was placed in RTU and sick.  I
7  quarantined because somebody caught the COVID
8  upstairs.  I mean, I was there for like three, four
9  days, maybe.
10     Q   So I mean, you saw on Google you said --
11 let's just get back to the question.
12     A   Okay.
13     Q   You saw on Google a picture of a ramp, and
14 it didn't look like --
15     A   Up to -- up to ADA standards.  And it
16 looked --
17     Q   Did you look up the ADA standards on Google?
18     A   No.  I didn't look up that.  I just looked
19 up the ramps specifically.  Because I wanted to know
20 what actually ADA standard ramps looked like.
21     Q   Could you explain, like, what you searched
22 into Google in this circumstance?
23     A   I just Googled -- I Googled "what's a
24 compliant ramp based on ADA standards?"  And they -- I

Page 37

1  got a picture.  I was trying to show him, but I
2  couldn't find -- I screenshot it, and I kept a picture
3  of it on my phone.  I couldn't find it around for him,
4  but if you want to see that.
5      Q   That's fine.  But what do you remember from
6  that picture that you saw, like, what features --
7      A   I remember that --
8      Q   No, I -- can you let me finish my question
9  first before you start answering?  Thank you.
10             What features of that ramp in them -- you
11 do you remember specifically thinking "oh, that
12 doesn't look like what I remember"?
13     A   I remember the grab bar was close enough to
14 grab on both sides; I know that.
15     Q   On both sides of the aisle --
16     A   The picture I'd seen, that's what it
17 appeared to be.  I don't know if I was seeing -- I
18 don't know how big it was, but the picture I'd seen
19 didn't look nothing like the picture of the ramp -- on
20 this ramp that I was going up and down.
21     Q   Okay.  And by "grab on both sides," you
22 mean, like, one person standing in the middle --
23     A   The bar -- the bar --
24     Q   I -- okay.  Let me finish.

10 (Pages 34 - 37)

Page 38

1    You mean one person standing in the middle
2  and reaching out and being able to grab both bars?
3    A   In case you were trying to balance yourself.
4  There was nothing -- we didn't have nothing to sit on;
5  nothing like that.
6    Q   Did you happen to look up if there's any
7  kind of, like, ADA guidelines or mandate on how wide,
8  like, a hallway or ramp needs to be or is able to be,
9  or --
10   A   I searched how high off the ground it's
11 supposed to be.  I don't know if this one's ADA --
12   Q   That's not what I -- Mr. Hernandez, that's
13 not what I asked you though.  I asked you did you see
14 if there's anything about the minimum wideness or
15 maximum wideness or anything about wideness of a ramp
16 as far as that would show the wingspan of a human to
17 put up the sides?
18   A   No, no.  I applied my human sense, my
19 human -- my human -- I would say just common sense.
20   Q   Okay.  Is it your -- are you saying right
21 now that you think the ADA mandates that you have to
22 be able to grab both bars on both sides?
23   A   I'm not saying that that's what it's
24 supposed to be; I'm saying that it looked like -- they

Page 39

1  looked like -- nothing like this ramp that is in Cook
2  County.
3    Q   Okay.  But I asked you what the specific
4  feature was of the ramp that you thought looked like
5  it was in violation --
6    A   Well, --
7    Q   Let me finish -- that looked --
8    A   This looked like --
9    Q   Mr. Hernandez, can you let me finish the
10 question?  I asked you what the specific feature was
11 in the image that you found that you identified as
12 probably not being like what you saw at Cook County;
13 what looked like it wasn't -- it was probably in
14 violation of the ADA, and you said the fact that you
15 couldn't grab both hand bars on both sides.
16   A   Right.
17   Q   So is it your testimony that you believe --
18   A   That's one of the --
19   Q   So you're saying that is an issue?
20   A   That's the issue I had.  I don't know if
21 it's in compliance with ADA standards.
22   Q   But that's not what I asked you.  I didn't
23 ask you about your issues; I asked you about the ADA
24 standards, and that's what you said you Googled.

Page 40

1    A   I Googled it, and it looked nothing like
2  this one.  That's what I'm telling you.  That's all I
3  could tell you.
4    Q   And was there anything other than the fact
5  that you couldn't grab both grab bars?
6    A   They said it was supposed to be so much off
7  the ground.
8    Q   Who's "they"?
9    A   I don't recall exactly how much off the
10 ground.  I could look at the phone if you want me to
11 look at it again.
12   Q   I'd like you to answer my questions a little
13 more pointedly and without rambling so much, because
14 it's hard to have a conversation with you.
15   A   Okay.  Sorry.
16   Q   First of all, who is "they," that you said
17 "they" say that they need to be off the ground?
18   A   Oh.  The thing that I read in there.  The
19 ADA standards.  I was reading some of it, and it said
20 it needed to somewhat -- certain off the ground, and
21 this don't look nothing like that.  That's what I'm
22 saying to you.
23   Q   What did it say needs to be a certain level
24 off the ground?

Page 41

1    A   The ramp.  That needs to be a certain level
2  off the ground, and I don't believe this one was --
3  complies with that at all.
4    Q   Okay.  One second.
5    A   I mean, you could probably look that up
6  yourself.
7    Q   Yeah.  We're going to look it up right now,
8  actually.
9       Here.  So I'm going to put Exhibit 2 up, I
10 guess, at this point.
11      (Exhibit 2 was marked for
12      identification.)
13      Okay.  Sorry about that; here we go.  I got
14 it working.
15      MR. STILLMAN:  Are you guys able to see
16 that?
17      THE WITNESS:  Not yet.
18      Yeah.  That's the same picture I'd
19 seen.
20 BY MR. STILLMAN:
21   Q   Oh.  So this is what you saw?
22   A   Yes.
23   Q   Okay.  And did you --
24   A   Something similar to that.  It was something

11 (Pages 38 - 41)

Page 42

1 about off the ground and how long it's supposed to be.
2 Now, you compare that to the one over there and tell
3 me if it's compliant or not. I don't know.
4    Q    So you believe this is what any ADA
5 compliant --
6    A    That's what they stated on Google. Does it
7 look like anything in that ramp? I don't know.
8    Q    We're going to find what you're talking
9 about here.
10        Do you know what a ramp is, Mr. Hernandez?
11   A    Yes, I know what a ramp is.
12   Q    I mean, as far as when you say it needs to
13 be a certain level off the ground, I mean, are you
14 saying a ramp has a certain maximum height or a
15 minimum height; what are you trying to say?
16   A    I'm saying it was too steep up and going up
17 and down, and it put pressure on my knee when I went
18 up and down that ramp I remember.
19        And the COs could tell me when I have
20 problems going up and down that ramp or this walkway,
21 because they see how I was walking.
22        I used to have to lean on the wall, and I
23 had to stop to take breaks. That I could tell you.
24   Q    Have you ever heard of Globetrotters

Page 43

1 Engineering Company?
2    A    No. No, Sir.
3    Q    So when you were in jail at the Cook County
4 Jail, how frequently would you have medical
5 appointments and have a need for --
6    A    Any time I had to go see the eye doctor,
7 physical therapy, mental health services, they're all
8 located over there in the Cermak.
9    Q    Okay. That wasn't my question. I asked how
10 frequently would you have medical appointments that
11 you would go over there for? So I mean,
12   A    Any time --
13   Q    No. So I mean timewise, you know, every
14 couple of weeks, once a month, two times a month, did
15 you have any kind of, like, quantification like that?
16   A    I don't recall how many. It was a lot. I
17 could tell you that.
18   Q    Okay. So it's frequently though? You would
19 go there frequently, quite often, multiple times a
20 month?
21   A    Multiple times, yeah -- a month, yeah. I
22 would be -- I would see maybe medical and then it was
23 in the Cermak anything they couldn't handle whether it
24 was in regard to my health, concerning my eyesight,

Page 44

1 my -- my back, my shoulder, or my knee.
2        I'd seen the eye doctor I remember over
3 there. They screened me over there, numerous times
4 upon my arrival there. Upon my arrival when I was
5 incarcerated.
6        You've got to remember I was released on
7 this, and I went back in. Then I went back and forth
8 to the penitentiary for when I did my parole time. I
9 was in this case -- in this case alone I went to
10 Division 5 twice. Once I went to 10, and once I went
11 to 9.
12   Q    Okay. When you would walk down the RTU and
13 Cermak ramps, would you use the handrails?
14   A    I would use it sometimes, but like I said, I
15 got a bad right shoulder, and we got a ramp -- we got
16 to walk on the -- on the side where my right shoulders
17 at. Depends on which way you're walking.
18        But basically, it was always you had to
19 have -- you had to grab the rail with your right hand
20 most of the time. Because remember, you've got people
21 walking on both sides of the ramp, escorts. Sometimes
22 they got escorts going -- some people going back, some
23 people are coming.
24   Q    I think you said before -- you might have

Page 45

1 stated if you complained a lot, but did you ever
2 complain --
3    A    I --
4    Q    Could you let me finish -- complain to the
5 officers that, you know, you needed anything, or you
6 were having issues with the ramps?
7    A    Yes. I complained to them about everything,
8 period, and about not being able to walk, period.
9 Because this ramp alone was -- was hard walking
10 through that.
11       Some of them are similar to that one but
12 they're not like this one per se. I thought it was,
13 like, a temporary fix; I thought they were doing
14 construction on it or something when I walked through
15 there. I didn't -- I don't know what was going on.
16       I didn't have any problems prior to me being
17 incarcerated due to the fact that I never had any
18 health complications. So I got released until I got
19 into this car accident. That I could tell you.
20       Any time I was incarcerated in Cook County
21 prior to February 2nd of 2022, when I went back on
22 this gun charge. Because I was gone for 21 years in
23 the past, prior to me being released.
24   Q    During your time -- strike that.

12 (Pages 42 - 45)

Exhibit 22 Page 12

Page 46

...you would complain and, like, you
, say, "oh, I need assistance, or I need X, Y, Z,"
3 with your issues on the ramps, did you ever receive
4 assistance?
5     A   The CO one time they took me to the PRB
6 board on the -- on the cart one time to do that for
7 the complications I had. But they were telling me
8 that "it's not going to be like this all the time, you
9 got to get a script from the medical doctor to give
10 you a wheelchair." And they would never do that; they
11 never gave me a script for a wheelchair.
12       I told them to put me close to the court.
13 Whenever I needed to go to court, put me on the
14 medical wing, or the old man's deck; that I could tell
15 you. But that never -- that never happened. They
16 kept telling me to put in for a medical and I did that
17 numerous times.
18     Q   And did they ever refuse to give you
19 assistance when you'd ask?
20     A   The COs? Like I said, some of them were
21 nice enough to help me; some of them would take me the
22 easier -- the closest route to go to get to court, or
23 wherever I had to go. But those -- that's because
24 they were being nice.

Page 47

1       Some of them took me, I believe, one time --
2 or -- Cermak on the cart I believe. Like, twice I
3 went on that cart.
4       I don't know where I went, but I know one
5 time was to the PRB board specifically. And I had to
6 go through the RTU to go see the PRB board. I had to
7 pass through -- I don't know if it was in RTU, but I
8 remember I had to go through RTU. They dropped me off
9 on the cart.
10     Q   And so, if they, like -- strike that.
11       So I mean --
12     A   They would try help me --
13     Q   No. Can you let me ask the questions
14 please? Thank you.
15     A   You could --
16     Q   Excuse me, Mr. Hernandez. There is no
17 question asked right now, so I don't know why you're
18 answering anything.
19       MR. MORRISSEY: Mr. Stillman, please
20 don't raise your voice.
21       MR. STILLMAN: If you could have your
22 client answer the questions when they're asked, I'd
23 appreciate that.
24       MR. MORRISSEY: We shouldn't be raising

Page 48

1 our voices in this.
2 BY MR. STILLMAN:
3     Q   Mr. Hernandez, the question before was, did
4 you ever have any officers refuse to assist you when
5 requested?
6     A   They told me that it wasn't going to be like
7 that all the time. That they couldn't help me all the
8 time; that I needed a medical script. I told you that
9 already.
10     Q   No. So you're telling me about the times
11 that they assisted you and told you it wasn't going to
12 be like that. I'm asking did you ever request
13 assistance, say, "oh, I'm having issues; I'm having
14 troubles" --
15     A   Yes, yes, yes. I'm going to tell you one
16 time specifically, and then I'm going to stop there,
17 because you keep asking me the same question.
18       When I was transferred from Division 5 to
19 Division 10, I actually got into it with the CO in the
20 tunnel, and he called 10-10 on me, saying I was
21 refusing to walk.
22       And I told him, "why are you calling 10-10
23 on me, telling me I'm refusing to walk? I'm not
24 refusing to walk; I'm telling you I got health

Page 49

1 complications." It was to the point where I damn near
2 called it staff assault, due to the fact that I was so
3 angered, and I would rather be saying to -- I knew I
4 wouldn't have to move anyway.
5       I'd rather do that than deal with this that
6 I was going through, Sir. And he's helping me carry
7 my property at that time, so I told him, "look, I'm
8 not denying or refusing to walk, I'm telling you I
9 cannot walk long distances without stopping, Sir. I'm
10 not refusing to do anything."
11       And due to that, that's why I would explain
12 to him every time I went -- or any time I traveled
13 anywhere, that I have problems.
14       And I could get a witness to that, too.
15 There was only two people walking that day with me.
16 And if you want to look through -- through records, it
17 was me and another inmate. I'm not going to tell you
18 his gang affiliation; he was a Satan Disciple.
19     Q   Okay. So again, you know, you keep tell
20 me these stories when they assiste
21     A   Well, you asked me that.
22     Q   No, I didn't, Mr. Hernandez. I ask
23 an officer ever refused to assist you.
24     A   Well, he refused that day.

Page 50

1    Q    You said he carried your things.
2    A    Okay.  He helped me.  He helped me.
3  Exactly.  That was after he called 10-10 on me.  He
4  called a lieutenant per se -- or a sergeant per se;
5  they don't got no lieutenants.  A white shirt is a
6  sergeant in Cook County.  They --
7    Q    You know, I don't know if it's intentional,
8  but you're making a great case for the office --
9    A    No.  I'm making --
10    Q    -- the Sheriff's office, being great
11  employees.  I don't know it seems like they helped
12  you; they're --
13    A    I mean, they helped me after I explained to
14  them that I couldn't walk.  They called 10-10 on me --
15  yes, they did help me.
16    Q    It just seems like you can't -- I mean, is
17  there any instance where they didn't help you?  It
18  seems like they're very willing to help.
19    A    That's the only time that he tried to refuse
20  to help me, but they told me they couldn't no longer
21  do that, due to the fact that I couldn't get a medical
22  script from the doctor.  And when I go and see the
23  doctor, they would not give me a wheelchair for
24  transportation to court or anywhere that was long

Page 51

1  distance.
2    Q    So whenever you used the RTU or the Cermak
3  tunnels or ramps, did you ever actually have any
4  issues getting to your final destination; your
5  appointment, your --
6    A    Yeah.  I would have to stop on my way over
7  there sometimes.  And --
8    Q    Okay.  So when I -- again, we're going to
9  get back to the answering questions a little more
10  pointedly.
11        When I say "issues," I don't mean struggles
12  with the ramp.  I mean, like, stopping the trip.
13        Did you ever struggle with the ramp, and
14  then they were, like, "all right.  You're having an
15  issue; go back, like, you're not going to make it to
16  your appointment today."  Did that ever happen, or
17  would they assist you if you were having difficulties
18  with the ramp?
19        MR. MORRISSEY:  Objection to form.
20        You can respond.
21        THE WITNESS:  They would assist me the
22  best way they could, like I said.  They could only see
23  me so far because I didn't have a medical script for a
24  wheelchair.

Page 52

1  BY MR. STILLMAN:
2    Q    Okay.  So the question was did you ever not
3  make -- like, would they ever not let you go to your
4  appointments or your services or your ultimate
5  destination during the transport and --
6    A    One time -- one time --
7    Q    Can you let me finish the question, Mr.
8  Hernandez?
9    A    Okay.
10    Q    Yeah.  Thank you.
11        Were you ever held back from getting to an
12  appointment, a service, a destination in the jail
13  based on your issues with these ramps, with your
14  issues and struggles during the journey?
15    A    Did I ever not get to my destination?  No.
16  I got there, but I had to stop during my
17  transportation.  On my way there I had to stop and
18  rest, or I would fall behind in line.
19    Q    So when times when you would have to stop
20  and rest or when you'd fall behind in line, did that
21  prevent you from getting to an appointment, to a
22  service, to a destination?
23    A    No.
24    Q    Okay.  Thank you.  So you were never

Page 53

1  actually held back from, you know, actual access from
2  an appointment, service, any kind of amenity of the
3  jail because of struggles with the ramp?
4    A    The only time -- with the ramp, no.
5  Specifically with the ramp.
6    Q    Okay.  Thank you.  And you have images of
7  the ramps there?
8    A    I've got it in my paperwork; they're
9  somewhere in there.  If you want to I -- I'll get
10  it -- I'll --
11    Q    No.  I don't really care, honestly, about
12  the ramps right now.  We're good, I think.
13    A    Excuse me; can I use the restroom real quick
14  before --
15    Q    Yeah.  That's actually good timing.  I need
16  ten minutes.  So let's do a ten-minute break.
17        THE VIDEOGRAPHER:  All right.  We are
18  off the record at 2:39.
19        (Off the record.)
20        THE VIDEOGRAPHER:  We are on the record
21  at 2:49.
22  BY MR. STILLMAN:
23    Q    In using the Cermak or the RTU ramps, were
24  you ever actually, like, formally injured, other than,

14 (Pages 50 - 53)

Exhibit 22 Page 14

Page 54

1 like, general pain?
2    A    Well, I suffered anxiety -- I suffered
3 anxiety. Every time I went there, I would have to
4 explain myself, why I couldn't walk, because they
5 never gave me a wheelchair when I requested numerous
6 times at the medical -- when the COs told me to
7 request it. They never gave me that.
8        And I would suffer pain after -- after --
9 for days after I walked -- walking through this ramp.
10 No, I can't say it was -- I could say every time I
11 walked through this ramp, I would feel pain on my
12 knee.
13       Like I said, I got a torn meniscus that I
14 just found out about that I was walking on the whole
15 time I was in prison and in Cook County.
16    Q    So just pain and anxiety then, are the only
17 things that you, kind of --
18    A    Pain -- I would feel pain afterwords when I
19 would walk through this ramp and walk, period,
20 anywhere that was long distance.
21    Q    Okay. So pain, yes. Like you said, pain
22 and then you said --
23    A    Pain for days --
24    Q    Okay, okay, okay. So like I said, we're

Page 55

1 going to try and keep the answers succinct.
2    A    Okay.
3    Q    So pain and anxiety; correct?
4    A    Pain and anxiety. Yes.
5    Q    Any other formal injuries; did you ever, you
6 know, trip and fall, did you ever scrape yourself, did
7 you ever burn your hands?
8    A    I fell in Division 10, Sir. When I was in
9 the cell -- in my cell after I came -- I don't know if
10 it was through after I came -- I know when after I
11 walked far for -- after I came back from either
12 walking far from court or a medical appointment, I
13 don't know what it was, but I was in pain for a few
14 days, and I fell in my cell -- when I was in my cell.
15       They took me to healthcare. It's noted --
16 it's noted that I went there.
17    Q    So when you'd feel pain after using the
18 ramp, would you seek treatment for that?
19    A    I'd seek treatment a lot of times, man. But
20 most of the time, I was just trying to get close to
21 the courts, close to everything that I had to go to.
22       I just wanted to be placed in a cell, and I
23 kept telling them to place me in the medical unit or
24 in the old man's deck or somewhere close to the court

Page 56

1 where I don't have to walk long distances through this
2 ramp.
3        And that's all in my file, I believe. It
4 should be in my -- in my master file. If you look
5 to --
6    Q    All right. So with regard -- are you going
7 to say something?
8    A    No. I just wanted to tell you that you
9 could look through my medical records and my medical
10 notes, every time I requested healthcare and what I
11 asked them to do, and what I was feeling, and what I
12 was asking them to do; you could look at that, if you
13 have any questions or you want to see if I'm lying or
14 not.
15    Q    Did I say you were lying?
16    A    No. I didn't say you were lying. I'm just
17 saying, you could look at that to corroborate my
18 allegations, if you want to see that.
19    Q    All right. So back to the pain. When you
20 would feel pain after using either ramp, would you
21 seek treatment from them for that pain?
22    A    I would seek pain -- but it was to the point
23 where it got -- to the point where they weren't
24 listening, man. I could tell you that much. They

Page 57

1 didn't care -- they didn't care.
2        The police even told me, "tell them to give
3 you a medical script for a wheelchair anytime you need
4 movement to go far anywhere. We cannot take you on
5 this cart all the time." They told me that. They
6 would not provide you with a wheelchair until you get
7 a medical -- I would ask them to give me a wheelchair,
8 and they would take me on a cart.
9        Sometimes -- two times I believe they told
10 me. One was PRB board, and once I believe -- I don't
11 know where I went, but I believe it was twice that I
12 went on the cart, that I recall. But I know for sure
13 it was once.
14    Q    All right. So the anxiety; did you ever
15 seek treatment about that?
16    A    I was asked to talk to mental health; I
17 spoke to them, to mental health, numerous times. I
18 think -- believe twice, two times. But they said they
19 couldn't do nothing.
20    Q    And that would have been -- you spoke to the
21 mental health people about your anxiety about --
22    A    My anxiety as far as --
23    Q    Can you let me finish my question? You
24 spoke to them about your use of the ramp; your anxiety

15 (Pages 54 - 57)

Page 58

1 related to use of the ramp, or your anxiety in
2 general?
3    A  In general.  Just being in pain in general
4 at that point in time.  Because I was in pain.  I was
5 in pain, basically -- I mean, the ramp was just one of
6 the biggest problems because it's so long.
7    Q  And would you have mentioned the ramp
8 specifically in your complaints about the anxiety?
9    A  I don't recall if I did -- I don't recall if
10 I did or not.  I know I have anxiety because I have to
11 explain myself to the CO why I couldn't keep up with
12 the line, or why I didn't have a script for a
13 wheelchair when they told me repeatedly to get it.
14    Q  And so you never received any kind of mental
15 health treatment or anything for the anxiety?
16    A  No.  No.  They would just talk to me; tell
17 me they couldn't do nothing.  They would try to get me
18 pills, but I told them "why would I take pills?
19 That's not the problem.  I'm asking you to put me in
20 the medical wing or somewhere close so I can go to
21 court and that."  It wasn't -- I'm not crazy by a
22 longshot.
23    Q  But it sounds like you just said just a
24 minute ago that you were asking to be --

Page 59

1    A  I was having anxiety.  Anxiety don't mean
2 that I'm crazy.  That's two different things between
3 crazy and having anxiety --
4    Q  Did anyone -- okay.  Again, we're going to
5 keep the answers a little more succinct.  But you just
6 said you were requesting to speak with the mental
7 health people; what do you think that would quantify
8 as?
9    A  That's because of having anxiety issues
10 based on the fact --
11    Q  But I mean --
12    A  Okay.  Can you let me finish?
13        I was having anxiety issues based on the
14 fact that they weren't doing nothing about giving me a
15 medical script to have a wheelchair.  They wouldn't do
16 nothing to place me near to the -- to the court or to
17 anywhere I needed to go; to Cermak, anywhere.
18    Q  And you think that anxiety was bad enough,
19 that it was, like, you know, debilitating?
20    A  I mean, I almost went and said one time --
21 yeah.  It was anxiety.  I had to explain myself that I
22 couldn't carry my stuff, my belongings every time I
23 moved or every time I went anywhere.
24    Q  You think you're entitled to damages for the

Page 60

1 anxiety that you suffered?
2    A  I mean, I'm not a -- I'll let the courts
3 decide that.  I'm not -- I mean --
4    Q  So other than the pain and the anxiety, you
5 never had any actual specific, definable injuries;
6 correct, from the ramp use --
7        MR. MORRISSEY:  Objection;
8 mischaracterizes testimony.
9        MR. STILLMAN:  Oh.  Okay.
10 BY MR. STILLMAN:
11    Q  Okay.  Did you ever receive any injuries
12 from the ramps?
13    A  From the ramps specifically, no.  I fell in
14 Division 10, due to the fact --
15    Q  Okay.  Is your testimony that you didn't --
16    A  No.  I never fell on the ramp.  I maybe had
17 to rest on my way over.
18    Q  All right.  So you never had any specific
19 injuries from either ramp; correct?
20        MR. MORRISSEY:  Objection, that
21 mischaracterizes testimony.
22 BY MR. STILLMAN:
23    Q  Other than the pain and the anxiety, you
24 never had any specific, definable injuries, correct,

Page 61

1 from the ramps?
2        MR. MORRISSEY:  Objection to form of
3 the question.
4        THE WITNESS:  He just objected to it,
5 so I'm not going to answer it.
6 BY MR. STILLMAN:
7    Q  You just said you never fell on the ramp;
8 you never had anything happen to you on the ramp,
9 other than general pain from use and your anxiety
10 around usage of the ramp and not getting a wheelchair;
11 is that correct?
12    A  Yes.  Or the fact that no one would listen
13 to me, yes.
14    Q  And then you're also saying right now that
15 it's your testimony that you were injured on the ramp
16 at a certain point, correct, other than that?  I mean
17 that's what you're saying; right?
18        MR. MORRISSEY:  Objection to form of
19 the question.
20        MR. STILLMAN:  I'm not -- Pat, I'm
21 having a hard time putting together your client's
22 testimony and your objections that aren't making any
23 sense, to be completely honest with you.
24        MR. MORRISSEY:  Mr. Stillman, I

16 (Pages 58 - 61)

Page 62

1 objected to the form of the question.
2          MR. STILLMAN: I understand, but before
3 that, I mean --
4          THE WITNESS: What's not making sense
5 to you, so I could --
6 BY MR. STILLMAN:
7    Q   Mr. Hernandez, was there ever any
8 specific -- can you define an injury you received
9 using either ramp, other than pain or anxiety?
10   A   I guess due to the fact that I was traveling
11 so far and complicated me and it -- it irritated my
12 injuries I already had. I told --
13   Q   And that caused you pain; correct?
14   A   Caused pain, yes. I said in Division 10 --
15   Q   Okay. So other than the pain -- I didn't
16 ask about Division 10; did I?
17   A   Okay. Sorry.
18   Q   Other than the pain and the anxiety, were
19 there any specific injuries from using the Cermak or
20 the RTU ramps?
21   A   No.
22   Q   Okay. Thank you.
23       Okay. I'm going to put Exhibit 3 on the
24 screen here.

Page 63

1          (Exhibit 3 was marked for
2          identification.)
3        And I'll zoom in, and I'll make it bigger
4 for you. But do you see this document; just tell me
5 you see it, please?
6    A   Zoom in --
7    Q   Okay. Mr. Hernandez, again, I just asked
8 you do you see a document on screen? I don't care if
9 you can read it or not.
10   A   I can see it. Yes, Sir.
11   Q   Okay. Thank you. Does it look like a
12 grievance, probably?
13   A   That's a grievance.
14   Q   Okay. Thank you. And it's one of your
15 grievances; correct?
16   A   Yes. Correct.
17   Q   And this says "control number 2022X02998";
18 correct?
19   A   Correct.
20   Q   You state here -- and I'm going to read it
21 and paraphrase slightly that --
22   A   Can you blow it up for me so I can read it
23 too, myself over here? Just a little bit.
24   Q   Yeah. Let me see how much I can zoom in.

Page 64

1        Is that better?
2    A   Yes.
3    Q   Okay. You say that you need a doctor
4 immediately, you have back, knee, shoulder pain which
5 make it difficult for you to walk distances. And it
6 was an issue when you moved from Division 5 to
7 Division 10.
8        It was an issue when you moved in Division
9 10 to go see prison review board on 2/16/22. And it
10 says COs escorted you in a cart. Is that correct so
11 far?
12   A   Yes.
13   Q   Then it states you were receiving spinal
14 injections, therapy, et cetera, recently prior to your
15 arrest.
16   A   Yes.
17   Q   In fact, arrangements were to be made for
18 surgery --
19   A   Yes.
20   Q   -- if conditions didn't improve, which they
21 have not.
22   A   Yes.
23   Q   "I also need a sleep apnea machine, so
24 please get me to see a doctor, so I can be properly

Page 65

1 housed or given a wheelchair, et cetera." Is that
2 right?
3    A   Yes. That's me.
4    Q   And that's your signature?
5    A   Yes.
6    Q   And that was -- it says date of the incident
7 2/16/22?
8    A   Yes.
9    Q   With the grievance being drafted on the 17th
10 of February 2022?
11   A   Yes, I believe. I don't know when I drafted
12 that.
13   Q   That would be -- I mean, that's the intended
14 use of this date.
15       But you wrote this date here; correct?
16   A   Yeah. I wrote everything on there.
17 Everything in my writing, yes.
18   Q   You at least started drafting it on February
19 17, 2022, probably; correct?
20   A   Yes, Sir.
21   Q   Okay. And then it states here that it was
22 picked up by jail staff on the 22nd of February '22;
23 correct?
24   A   Whatever -- whatever you got. I don't

17 (Pages 62 - 65)

Page 66

1 recall everything that I did --
2    Q   But I'm asking you -- I put this on here,
3 and I'm asking you what it says.  And --
4    A   Everything that's in my writing I wrote it.
5    Q   Okay.  So do you know what this part of the
6 grievance form is for?
7    A   Yes.
8    Q   What is this part of the grievance form for?
9    A   Where are we at?  At the bottom?
10    Q   Bottom portion.  Just Right here.
11    A   "Relief request," you mean, or what?
12    Q   No.  This very bottom portion right here
13 that I'm talking about.  Where it says,
14 "superintendent, director, designee" --
15    A   I can't see that part.  The black part --
16    Q   I'm reading it to you right now.  Mr.
17 Hernandez, it says "superintendent, director, designee
18 of a division/unit must review and sign all grievances
19 alleging staff use of force," blah blah blah, "staff
20 misconduct, emergency grievances."  I mean, it says
21 here this is where the jail staff picks up your
22 grievance and signs for it; is that correct?
23    A   Correct, correct, correct.
24    Q   Okay.  So this was picked up on February 22,

Page 67

1 2022; right?
2    A   I guess so.  I don't know.  I don't know
3 when they picked it up.  I put it in a box; that I
4 could tell you.
5    Q   But would they have written on it or signed
6 it before it was picked up or between the time they
7 picked it up and when you put it in the box?
8    A   I think the counselor brought it back to me
9 to talk to me about it.  But I proceeded with it.  But
10 I put it in the -- all I did was put it in the box.
11 The counselor spoke to me, and I put it back in there
12 after a response.
13    Q   All right.  Is the date right here on this
14 column right there, where it says "date CRW/platoon
15 counselor received," is it 2/22/22?
16    A   That's what the paper says, yeah.
17    Q   Okay.  Thank you.
18        I will zoom in on this one too.  Just give
19 me one second.
20        All right.  And this is the second page of
21 that grievance; correct?
22    A   Let's see.  Can you blow it up for me a
23 little bit?
24    Q   I can go a little more.  That's a little too

Page 68

1 much but --
2    A   That's fine right there.
3        Well, I can't read the --
4    Q   This is the second --
5    A   -- the handwriting --
6    Q   I can read --
7    A   -- the handwriting, I can't --
8    Q   Have I asked you to read the handwriting
9 yet?
10    A   Oh, no.
11    Q   Okay.  So, I mean, that's fine.
12        The top right here, this is still the same
13 grievance, it says "2022X02998"; is that correct?  I
14 know it's a little small, but --
15    A   Correct.  That's correct.
16    Q   Okay.  And this says "dear Mr. Hernandez,
17 I thank you for bringing this issue to us.  You were
18 evaluated by provider," something, "on 2/22/22 plus
19 pain management put in place.  Did not mention apnea
20 at intake."  And then "we will" -- she needs to work
21 on her handwriting, honestly, Ms. Shebel but --
22        MR. MORRISSEY:  I think it says "no
23 order for surgery noted."
24        MR. STILLMAN:  Yeah.  That sounds about

Page 69

1 right.
2 BY MR. STILLMAN:
3    Q   Is that an accurate reading, Mr. Hernandez,
4 of the response from them?
5        MR. MORRISSEY:  Well, we didn't read
6 the last sentence.
7 BY MR. STILLMAN:
8    Q   It says "you are scheduled for PCC plus,"
9 something, " for your -- I mean, did you ever see a
10 doctor after this, your PCC for your other issues,
11 after April '22?
12    A   I've seen them a lot of times.  Yeah.  I've
13 seen them after that.  It's when I got released --
14    Q   Okay.  But was that, like, a more or less
15 accurate rendition of what that response by Ms. Susan
16 Shebel who responded to your grievance on 4/5/22
17 stated?
18    A   I guess.  I mean, because -- basically, like
19 you can't read it right now, I couldn't read it.
20 Remember, I get the last copy when it's not -- barely
21 legible to read.
22    Q   But you also just said that they came and
23 talked to you about this grievance, isn't that right?
24    A   Yes.  The counselor did.

18 (Pages 66 - 69)

Exhibit 22 Page 18

Page 70

1   Q   Who did?
2   A   The counselor I believe did.
3   Q   And then here you signed that you received
4 the response; correct?
5   A   That's correct.
6   Q   And did you ever appeal this response?
7   A   I don't think I had time to, or if I did, --
8 I never had time to, because I was being transported
9 back and forth to do my parole time. And I was being
10 moved from Division 5 to Division 10 or -- just on the
11 third, you know?
12   Q   You --
13   A   I was always -- throughout the process, you
14 always get moved around. So you're always going to
15 get the responses late if you do get them.
16   Q   Okay. But you received the response on
17 April 11th, though, and you never --
18   A   Yes, but --
19   Q   Would that have been a time when you were
20 moving?
21   A   Let me see. 4/11? I went to prison on
22 4/12, Sir. So I guess I never got this grievance, no.
23   Q   Okay. Well, you did get it, because that's
24 your signature; correct?

Page 71

1   A   That's my signature, yes. But I --
2   Q   And then 4/11 is before 4/12; is it not?
3   A   I was -- I got to Stateville on -- I was
4 being transported to Stateville on 4/12, I believe.
5   Q   Okay. So on 4/12 you were being
6 transported. The day before 4/12 was 4/11. 4/11 is
7 the date that's on this form. Would you have been
8 present on 4/11?
9   A   I believe I was, yes. If I signed it, yes,
10 I was.
11   Q   And that is your signature?
12   A   Yeah, that's my signature. So if I signed
13 that; yeah, that's me. I don't recall everything I
14 did, Sir. I'm sorry, man.
15   Q   I'm not asking you to recall though; I'm
16 just asking you is that your signature and what date
17 that is next to it?
18   A   Yes, Sir. That is my signature. I did
19 receive that grievance. Did I appeal it? No, I
20 didn't have time to appeal it, Sir. I was on
21 transfer -- getting transferred, from what I recall.
22 I was being transferred to Stateville NRC.
23       I went there twice. I believe once was on
24 4/12 and one was on 5/12, if I stand correct.

Page 72

1   Q   All right. I'm going to put one more.
2 We'll call this Exhibit 4 on screen.
3       (Exhibit 4 was marked for
4       identification.)
5       Are you able to see this document that I've
6 put on the screen? Not read it, just can you see it?
7   A   You've got to blow that up for me --
8   Q   Okay. Again, this is fifth time I've done
9 this, and I've asked you the same question every time,
10 Mr. Hernandez.
11       I'm just asking if you're able to see it --
12   A   I see the document, yes. But I can't read
13 it --
14   Q   Okay. Thank you. Thank you. That's what I
15 needed you to confirm.
16   A   Okay.
17   Q   Now I can zoom in.
18       All right. This is -- I'm going to go to
19 the second page of this document.
20       This is a grievance also; correct?
21   A   Correct.
22   Q   And the control number on this grievance has
23 an "NC" in front of it; right?
24   A   Let me see. "NC, NC" -- what does "NC"

Page 73

1 mean? Oh, yeah. Yeah, I see it. It's "NE" or "NC";
2 I don't know.
3   Q   It says "NC2203871"; is that right?
4   A   Yes. That's correct.
5   Q   Do you know what an "NC" before a grievance
6 control number means?
7   A   No, I do not.
8   Q   Would you have any reason to doubt that it
9 means non-compliant?
10   A   I don't know what it means. But go ahead.
11 Go ahead, ask the next question. I've already
12 answered --
13   Q   Well, I just asked you would you have any
14 reason to doubt that it means non-compliant?
15   A   No. I don't have no reason to believe it
16 was non-compliant, but I don't know if it was or not.
17   Q   Okay. But do you have any reason sitting
18 here today to believe that I'm misleading you that it
19 isn't non-compliant?
20   A   You tell me, Sir. I don't know.
21   Q   Okay. We're going to go to the first page,
22 I guess. This says right here "non-compliant
23 grievances"; correct?
24   A   Okay. I could see it --

19 (Pages 70 - 73)

Page 74

1    Q    "Non-compliant grievance code, non-grievable
2 issue"; right?
3    A    Okay.
4    Q    "Non-compliant grievance, non-comp" -- you
5 see the word "non-compliant" all over? "NC number
6 NC20203871 [sic]." Am I reading these accurately?
7    A    Yes, you are.
8    Q    So do you have any reason to doubt that NC
9 means non-compliant?
10   A    No. I have no reason to doubt that.
11   Q    Okay. Thank you.
12        And this is another one of your grievances;
13 correct?
14   A    Let me see. Yes, Sir.
15   Q    That's the same grievance I had up just a
16 minute ago, but just it is another one that you
17 drafted; correct?
18   A    It got my name on it. Yes, Sir, it is.
19   Q    And it says here you started drafting it on
20 9/20/22; right?
21   A    Yes. Yes, Sir. I was in Division 8, right,
22 3H?
23   Q    Yeah. Well, it does say Division 8 right
24 there. So yeah.

Page 75

1    A    That's when I came back from prison. Yes,
2 Sir, that's me.
3    Q    It says here -- and I'm going to read it and
4 paraphrase a bit. "On 8/30/22, doctor cleared my cane
5 for long distance only, so I can get moved back to a
6 division with a cell setting. I repeatedly told staff
7 and have not been moved. I need to be in a cell;
8 can't sleep here. And also have bad bowel movements
9 and take milk of magnesia." Is that all right so far?
10   A    Yes, Sir. That's all right.
11   Q    At times you have to wait to use the
12 restroom; it's messing up your bowel movements more,
13 and it interfered with your medication when you take
14 milk of magnesia. You've been very patient. Please
15 move you back to a cell setting. Correct?
16   A    Correct.
17   Q    And for this one you didn't note, like, a
18 date of incident or time of incident or location or
19 aggrieved party; does that look right?
20   A    I mean, I was complaining about not being
21 able to use the restroom when I needed to, yes. I
22 was --
23   Q    Do you think maybe you could -- sorry. I
24 didn't mean to interrupt you. But could you move a

Page 76

1 little closer to the camera also? You're just like
2 getting blurry. Yeah.
3        And that's your signature right there;
4 correct?
5    A    Correct, Sir.
6    Q    Okay. And then here it states that, you
7 know, the CRWs picked it up on -- or they signed it on
8 10/3/22; correct?
9    A    Correct.
10   Q    And do you remember receiving this?
11   A    I remember speaking to the counselor,
12 Wilson. He was very ignorant, per se; I would like to
13 say that. He would say he couldn't help, that to put
14 in for medical, that he couldn't do nothing. That
15 they didn't deal with housing or that I would have to
16 talk to medical or the staff.
17        And they did contact -- the staff did
18 contact somebody about placement and then they moved
19 me to a cell setting like I requested. No matter
20 where I was, in Division 9 or anywhere. I just --
21   Q    Why would you say -- go ahead.
22   A    I wasn't -- I just requested for them to put
23 me in a cell setting, whether it was in RTU or
24 Division 9, anywhere; put me on a medical wing, or an

Page 77

1 old's man deck, something where I could better do my
2 time with the -- with the disabilities I have. That
3 was all I was asking.
4        Whether it was my milk of magnesia, my
5 stomach, or my walking, or whatever. That's all I was
6 asking.
7    Q    Why would you say that the counselor was
8 ignorant?
9    A    Because he would laugh at me. He would
10 literally, like, look at me, like -- basically, they
11 look down on you because you're a criminal; everybody,
12 because of my history and my criminal background.
13        I guess they were trying to say that I was
14 trying to manipulate the system. I'm not a coward by
15 a longshot; I'm not running from nobody. I didn't ask
16 to be placed in RTU. They placed me there because
17 they took my cane in Division 9, Sir.
18        They felt that I was trying to manipulate
19 the system. They felt everything I told them, meaning
20 my sleep apnea problems or my back problems, was a
21 lie. I mean, they never gave me no medical scripts
22 for a wheelchair or nothing, Sir.
23        And when I got to RTU, they placed me in
24 seg; I don't know why. They told me it was temporary;

20 (Pages 74 - 77)

Page 78

1 that I would get housed in a medical deck or somewhere
2 where I -- where I was requesting.
3       But then, when I was there for two weeks,
4 they started to treat me like I was there to be
5 segregated -- disciplining me like I was any other
6 inmate. They told me that I wasn't going to be
7 subject to that. And I complained about that.
8       And that's when they put me in RTU with
9 crazy people that didn't have no difficulties, Sir.
10 And that was a setting where I couldn't use the
11 bathroom, I would wake up having episodes due to my
12 sleep apnea, Sir.
13       That's why I was requesting to get back to a
14 cell setting rather with Division 9, or anywhere. I
15 was frustrated at that time. I would rather go to seg
16 at that point in time, Sir; it was so bad.
17       MR. STILLMAN: Could you read the -- I
18 don't even know what the question was there; he just
19 keeps talking. Could you tell me what the question
20 was there?
21       THE WITNESS: You told me the question
22 was --
23       MR. STILLMAN: No. I didn't ask you.
24 Thank you, Mr. Hernandez.

Page 79

1       THE WITNESS: Who are you asking, my
2 attorney or me?
3       MR. STILLMAN: Ms. Hemberger here.
4 Sorry.
5       THE WITNESS: Well, ask Ms. Hemberger
6 then --
7       MR. STILLMAN: Mr. Hernandez, there's
8 no question asked, why don't we --
9       THE WITNESS: Well --
10       MR. STILLMAN: Mr. Hernandez, I didn't
11 ask a question. Thank you.
12       THE WITNESS: When you speak to her,
13 address her --
14       MR. STILLMAN: Mr. Hernandez, thank
15 you.
16       THE WITNESS: "Mr. Hernandez, Mr.
17 Hernandez" --
18       MR. STILLMAN: Mr. Hernandez, no
19 question has been asked. There has been no question
20 asked; I'm not sure why you're speaking.
21       MR. MORRISSEY: Mr. Stillman, we can't
22 see anybody talking right now, because you have the
23 grievance on the screen, and all the participants are
24 not on the screen, so --

Page 80

1       MR. STILLMAN: Here we go.
2       MR. MORRISSEY: All right. I think
3 that was a confusion of why he wasn't able to
4 understand who you were talking to.
5       MR. STILLMAN: I don't think so. But
6 we'll move on --
7       THE WITNESS: Adress who you are
8 addressing, Sir. That's all I'm asking you to say.
9 Adress her by her name when you're speaking to her,
10 not -- like, you say "Mr. Hernandez," address her by
11 her name, Sir. That way it would be no confusion
12 here.
13       MR. MORRISSEY: All right. There's no
14 question pending, so he's going to have the court
15 reporter read back the question.
16       THE REPORTER: Okay. One moment for
17 our read back.
18       (The reporter repeated the record as
19       requested.)
20       THE REPORTER: Okay. We are back --
21       THE WITNESS: He looked at me --
22 BY MR. STILLMAN:
23    Q   Okay. No question has been asked, Mr.
24 Hernandez. That was a readback of the question. I

Page 81

1 did not say anything. Thank you.
2    A   Well, address to her, like I told you. Ask
3 her by her name.
4    Q   Oh my God, Mr. Hernandez --
5    A   "Mr. Hernandez," yes. Clarify that. Call
6 her by her name when you're asking her that question.
7 That's all I'm asking you to do so we won't have no
8 confusion, Sir. I'm sorry.
9       THE REPORTER: Would you like the
10 playback again?
11       MR. STILLMAN: No, no. You're fine.
12 Sorry. I'm just -- thank you -- looking for where I'm
13 going next.
14 BY MR. STILLMAN:
15    Q   Okay. I'm going to bring that grievance
16 back up. That's what I was on before -- non-compliant
17 grievance back up. All right. And this is Exhibit 4
18 back on the screen -- yeah. Exhibit 4.
19       So the third page of that; I'm going to zoom
20 in for you. This form says "reasons for grievance
21 non-compliance and/or action required"; correct?
22    A   Correct.
23    Q   This says "see above;
24 classification/placement are non-grievable issues,

21 (Pages 78 - 81)

Exhibit 22 Page 21

Page 82

1 however your concerns were forwarded to RCDC/DWPT";
2 correct? Or --
3     MR. MORRISSEY: No. That says --
4 BY MR. STILLMAN:
5 Q Or not DW; sorry.
6 A Superintendent.
7 Q Yeah. Superintendent. Sorry.
8 A I wrote her too, as a matter of fact. I
9 wrote her prior to me getting bonded out in November.
10 And I -- I told her the issues, and they would not
11 give me no cell setting.
12     They would tell me that the only thing --
13 and the COs used to even tell me "man, the only place
14 you're going to be able to go to a cell setting over
15 here is to you get you a CPAP. And I tried to get
16 that, and they never gave me that neither.
17     They said they needed to -- they had the
18 setting on my machine. They were waiting on medical
19 records, and I don't know how long it takes for that.
20 I don't -- I don't know. I could tell you I wasn't
21 comfortable right there. Very uncomfortable, because
22 I couldn't sleep, or use the bathroom consistently
23 when I needed to use it. I'd wake up having episodes.
24 Q And it says you received this; you signed

Page 83

1 for this non-compliant response on 10/4/22, it looks
2 like; correct?
3 A It says 10/3, I believe. 10/3/22. Or
4 10/4 --
5 Q All right. It says some date between the
6 1st and 10th; whether it's the 3rd the 4th --
7 A It says 10/3 -- it says 10/3 and then it
8 says 10/4/22. I'm sorry.
9 Q Okay. Yes. Okay. So this says 10/4/22.
10 But you agree this is your signature; you received
11 this back in October of 2022, whether it's the 4th,
12 the 3rd, whatever, it doesn't matter, but you received
13 it back; correct?
14 A Yes, Sir. I did receive it back.
15 Q Okay. Did you ever get a sleep apnea
16 machine?
17 A No, I never got that. Actually, I had to
18 get a court order when I went back in to take mine in.
19 Q And do you think you ever filed any more
20 grievances than just these regarding your issues with
21 the ramp?
22 A I think at that time I didn't -- he kept
23 telling me that it was non-compliant; it couldn't do
24 nothing for me. So no I didn't file about the ramp or

Page 84

1 anything no more.
2     I just kept putting in a medical slip and
3 then complaining about my pain until I got bonded out
4 on 11 -- before Thanksgiving.
5     I don't remember -- recall the exact date,
6 but it was before Thanksgiving, a few days before I
7 got -- I was bonded before that, but they were being
8 processed. Got out on 11 something -- 11 -- I don't
9 recall the exact date, Sir.
10     That's when I came home on EM. Because I
11 was still on EM with a bond. They -- like, 4,000 for
12 bond and I was on EM with limited movement. I
13 actually had to get permission anytime I moved
14 anywhere three days in advance I believe, if I recall
15 right.
16     It was hard for me to go to my doctor's
17 appointments or anything I had to do.
18 Q Earlier in this deposition, do you remember
19 how many grievances you said you probably filed about
20 this issue?
21 A I filed numerous grievances about not being
22 able to walk, period. I don't recall whether I
23 specifically pointed out this ramp. I asked to be
24 placed near a court or anywhere I needed to go to

Page 85

1 medical, whether it was Cermak -- but I told them that
2 this ramp was one of the main things when I spoke to
3 medical.
4     They would not give me a medical slip for
5 nothing at all, Sir. The COs told me to get a
6 medical -- they tried to help me, they were trying to
7 be nice, but there was only so much they could do.
8 And they would tell me, "it's not going to be like
9 this all the time, you need to talk to medical."
10     And then when I spoke to medical, they
11 said -- when they cleared me for the cane exactly,
12 when I went back and spoke to the doctor, she cleared
13 me for the cane, Sir. I spoke to the -- to the
14 security staff with the -- that's when I'm saying that
15 the counselor was ignorant on his part. Because he
16 knew about that.
17     He could have spoke -- basically talked to
18 me and help me try to get what I needed to get. And
19 he wouldn't do that for me. He said it was out of his
20 control. And when I spoke to medical and they cleared
21 me, they say it was up to -- to placement to move me.
22     And they spoke to placement at one point in
23 time, and they told me they were looking -- looking
24 into it. But I never got nowhere, and I found it out

22 (Pages 82 - 85)

Page 86

1 in November, before Thanksgiving. I remember that.
2      I found it out way before that, but I was
3 waiting for them to clear everything that they had to
4 do -- that my mom had to go over there and sign forms
5 for this that occurred, Sir.
6    Q   Do you know -- do you have any reason to
7 believe that you might have filed any more grievances
8 than the two I showed you about this issue?
9    A   I don't recall, Sir. I did file -- but I
10 know I complained a lot to medical, and you could look
11 towards the notes what I was complaining about.
12 Whether it was milk of magnesia, the bathroom, the not
13 being able to walk to court back and forth; they never
14 gave me a wheelchair when I requested it.
15      At this point -- they only offered me one
16 wheelchair one time when I came back, but they never
17 gave me a medical script for it; never received it in
18 black and white.
19      I never got that, never. But I requested it
20 as many times as I requested to be placed near Cermak
21 where I needed to go long distance -- anywhere I had
22 to go long distance. And they told me --
23    Q   What's your definition of numerous?
24    A   Numerous? Any time I go into court --

Page 87

1    Q   No. I'm saying what's your -- when you say
2 "numerous," I mean, can you put a number to that?
3 What's the minimum --
4    A   I'm trying to tell you --
5    Q   No. Let me finish my question, please.
6      What is the -- like, can you give me a range
7 of numbers that you would count as numerous --
8    A   Okay. Rephrase the question -- rephrase the
9 question. When I spoke to medical --
10    Q   Is one to three of an item -- would that be
11 numerous of the item, three to four?
12    A   Oh. It's more than one to three, Sir. I'm
13 sorry.
14    Q   Oh. Numerous is more than one or three?
15    A   Yes.
16    Q   So at the beginning of this deposition, when
17 I asked you how many grievances you had filed, about
18 this issue about the ramps, you said "numerous
19 grievances, numerous requests," you used the word
20 "numerous."
21    A   About the ramp specifically, no.
22    Q   No. That was the word you used though.
23    A   Well, I'm sorry. Well, I'll rephrase that
24 for you; correct that for the record, because I didn't

Page 88

1 mean to say that.
2    Q   All right. So your testimony is that
3 "numerous" would not equate to two?
4    A   Yes.
5    Q   Okay. Why didn't you ever file any
6 additional grievances about the ramp issues?
7    A   Because at this point, nobody would listen
8 to me, Sir. This was one of the little things that I
9 went through that caused me pain --
10    Q   Why did none of your --
11    A   -- that caused me pain and anxiety.
12    Q   Are you done? I'm just waiting for you to
13 finish your answer.
14    A   I'm done. I'm done.
15    Q   Oh. Okay. Thank you.
16      So you never filed any more than those two
17 grievances about any ramp or movement issues; correct?
18    A   I filed just that I was having problems
19 moving around period, because I was in pain. I spoke
20 to medical about moving up and down their ramp. I
21 could tell you that. That they made note of it, I
22 don't know. Like I said, I have numerous of this --
23 from my shoulder to my back to my knee.
24    Q   And neither of those two grievances that we

Page 89

1 looked at actually even specifically mentioned any
2 transports for, like, medical -- like, using both the
3 Cermak and RTU ramps; correct? The first one was
4 about the criminal courthouse ramp; right?
5    A   Any time I went up and down any ramps that
6 made it difficult for me to walk. Yes, Sir. That's
7 all that I wrote on the grievance.
8    Q   But your grievance never specifically
9 related to the RTU and Cermak ramps; correct?
10    A   No, no. I don't recall. If it's not on
11 black and white, no. Then I didn't point that out. I
12 spoke to medical about it; I complained to staff about
13 it on my way over, on my way back. But whether --
14    Q   So you never --
15    A   -- was filed -- filed any incident report, I
16 don't know.
17    Q   So you never filed any grievances about the
18 RTU and Cermak ramp; correct?
19    A   Correct.
20    Q   Okay.
21      And then just quick -- I already you asked
22 you this kind of, but just slightly differently. ·
23      What aspects of these ramps do you
24 specifically -- do you know or think are non-compliant

23 (Pages 86 - 89)

Page 90

1 with the ADA?
2     A   I said they look like a temporary fix.
3 They're doing -- like they were having construction
4 done on it. That's what I thought.
5         I know it caused a lot of pain. I know when
6 I -- I know when I Googled it and then it looked
7 nothing like it. I know that.
8     Q   I'm sorry. What is your answer that you
9 just gave? I'm sorry. Did you answer my question
10 right there? I didn't ask about temporary
11 construction.
12     A   That was my answer to the question. That it
13 was non-compliant as far as that I know, what I
14 learned about it later on, yes. I thought it was a
15 temporary fix. Like I said to you.
16         I asked them to put me in a -- in a cell
17 which complies with ADA standards. I know I asked
18 them, the staff. They told me I could go to medical
19 and to management; that's the advice the staff gave
20 me. Or to get a script for a wheelchair, which I
21 tried to and they never gave it -- they never gave it
22 to me.
23     Q   Just tell me what you're thinking of when
24 you're talking about temporary or permanent fixes. I

Page 91

1 didn't ask you anything about a permanent or temporary
2 fix or a fix at all. I mean, the only thing I --
3     A   I mean, when you look at the ramp, it don't
4 look -- I mean, correct me if I'm right, that's for
5 people in a wheelchair; right?
6     Q   A ramp?
7     A   Yeah. That's the purpose of that; right?
8 If you have a wheelchair; right?
9     Q   I don't know; you tell me. You're the one
10 who Googled the ADA; you tell me.
11     A   I Googled it. That's the words -- we're
12 going to speak about this, because I need to know.
13     Q   Okay. So back to my question, which I had
14 to just honestly think about to get back to, because I
15 barely even remember what I'm asking with the way you
16 were answering --
17     A   You asked me whether it was in compliance
18 with ADA standards, that's what you asked me.
19     Q   No. I asked what specific features of these
20 ramps are you thinking are non-compliant with the ADA?
21 Can you tell me what aspect of the ramp?
22         MR. MORRISSEY: Objection; that's
23 already been asked and answered.
24         You can respond.

Page 92

1         THE WITNESS: One; I mean, where could
2 you rest on, if you had a problem walking to it due to
3 all my complications I had?
4 BY MR. STILLMAN:
5     Q   All right. So you're saying a resting
6 position?
7     A   I could only lean on the wall, like I said.
8 They told me -- the COs told me would I have a problem
9 going up and down this ramp, would I want to -- they
10 asked me that once or twice.
11         And I told them if I need to stop, I just
12 need to stop on the way over there, whether with this
13 ramp or another ramp, when I was walking through
14 there -- through this ramp, which irritated my leg and
15 my back and my shoulder, and caused me anxiety when I
16 had to numerously explain myself over and over.
17     Q   So all of the pain from your use of the ramp
18 was because there was no resting spot?
19     A   No. Other than me trying to lean on the
20 wall, or they allow me to stop. They literally
21 sometimes escorted me by myself going through the
22 actual tunnels, period, by walking.
23     Q   So I'm going to ask that again. So all the
24 pain and anxiety that you say were the injuries you

Page 93

1 suffered as a result of these ramps, I mean that --
2     A   And the fact that I fell --
3     Q   Can you let me finish? Thank you.
4         That's all as a result of there not being a
5 resting spot on the ramp?
6     A   Yes. The resting spot, and the fact that it
7 was too steep and too long.
8     Q   Oh. Thank you. Those are two other ones
9 that I've had to press you with four additional
10 questions to get. Thank you, Mr. Hernandez.
11         Were there issues with any railings or
12 anything; were there any --
13     A   At one point in time, I don't believe it
14 had -- it had rails. I don't remember it having the
15 rails at one point in time when I -- when I traveled
16 through the first time.
17     Q   And would you have filed grievances or
18 complaints about any of these specific details?
19     A   Like I said, at this point in time, I -- I
20 wasn't focused on that alone, I was focused more on my
21 wellbeing traveling anywhere, because I couldn't get a
22 wheelchair, Sir.
23     Q   And why do you believe you were entitled to
24 a wheelchair?

24 (Pages 90 - 93)

Page 94

1    A   I was having problems getting anywhere,
2  walking around anywhere.  I got a back problem.
3    Remember, I had that going back prior to
4  that -- prior to my arrest.  And I got in another car
5  accident while I was arrested.  That was the reason I
6  was originally stopped for -- for this case, Sir.
7    Q   So if someone is put into a wheelchair after
8  an accident, should they always be entitled to a
9  wheelchair forever from that point?
10      MR. MORRISSEY:  Objection to form.
11      You can respond.
12      THE WITNESS:  I'm entitled to -- I
13  don't think I'm entitled to anything unless the
14  medical personnel writes the script for it.  But the
15  police told me -- the COs told me to ask them to give
16  me a wheelchair anytime I was transported long
17  distances
18  BY MR. STILLMAN:
19    Q   And doctors did see you --
20    A   They'd seen me numerous times, Sir.
21    Q   And they never gave you a wheelchair;
22  correct?
23    A   They never gave me a wheelchair.  I even
24  asked them to -- they asked me "we don't know your

Page 95

1  history, your medical -- we don't got all your medical
2  records."
3      I told them, "well, order it from Dixon; I
4  had a cane there.  And order" -- I told them, "order
5  my record from Stroger."  I told them to order my
6  medical records from the pain center that I received
7  from the first accident.  And they said they were
8  going to look into it.
9      Again, I was transferred to IDOC on April, I
10  believe, 12, when I was in Division 10.  And then I
11  returned on 8/12 I believe.
12    Q   Do you know the names of anyone else who had
13  issues with these ramps?
14    A   No.  I didn't have time for that.  I was in
15  too much pain.  I was having too much anxiety.  I
16  didn't have time to take down no names.  I wasn't
17  trying to build a case, I was just trying to get
18  medical treatment then.  You know, something.
19      Being able -- having access to a wheelchair,
20  that's all, or place me somewhere near the courts or
21  anywhere I had to go that was long distance.
22      They would go as far as taking me through
23  the shortcuts sometimes, but they would tell me "we
24  can't do this all the time; you've got to get a

Page 96

1  medical script from a doctor," which they never
2  provided me with.
3      And like I said -- like you said, the
4  non-compliance grievance is for -- due to placement.
5  They said they didn't deal with that.
6    Q   Have you ever heard -- I'm just going to
7  read you a list of names, and you're just going to
8  tell me if you've heard of these individuals or not.
9    A   Mm-hmm.
10    Q   William Mathis.
11    A   No.  Who is that; may I ask?  Is he an
12  inmate, a CO, or?
13    Q   No, you may not ask.
14      The next name is Kavarian Rogers.
15    A   I don't -- I don't know him.  I don't
16  recall.  I don't know him by name if I ever met him.
17    Q   Okay.  These are yes or no questions.  Just
18  say yes or no.  Thank you.
19      Kent Elwoods is the next name.
20    A   No.  I don't recall him neither.
21    Q   Sylvester Brinson.
22    A   No.
23    Q   Tommy Love.
24    A   No.

Page 97

1    Q   Anthony Muniz.
2    A   No.
3    Q   Antoine Pierce.
4    A   No.
5    Q   Carlos Martinez.
6    A   Carlos Martinez?  No.  I might know him --
7  like I said, I might know him by face if I encountered
8  him --
9    Q   Yeah.  I understand.
10    A   I don't ask them for their full name when I
11  meet somebody, so I'm sorry.
12    Q   Raasikh Phillips.
13    A   No.
14    Q   James Krook.
15    A   No.
16    Q   Quovotis Harris.
17    A   No.
18    Q   Joseph Smith.
19    A   No.
20    Q   Lonell Long.
21    A   No.
22    Q   Okay.
23    A   But if I met them, I might recognize them by
24  face, like I said.  Or by their -- if they went by a

25 (Pages 94 - 97)

Page 98

1 name other than that if I ever met them.
2         MR. STILLMAN:  All right.  I'm okay.
3 I'm done here, I believe.
4         Pat, do you have anything?
5         MR. MORRISSEY:  I have no questions.
6         We'll waive signature.  We're finished.
7         THE WITNESS:  I'm done if you're done.
8         THE VIDEOGRAPHER:  Okay.
9         MR. STILLMAN:  All right.  Thank you,
10 Mr. Hernandez.
11         THE VIDEOGRAPHER:  We are off the video
12 record at 2:40 p.m. [sic].  This concludes the
13 testimony given by Cuauhtemoc Hernandez.
14         The total number of media units used
15 was two and will be retained by Veritext.
16         THE REPORTER:  Okay.  And while we're
17 still on the transcript record, can I get any
18 transcript orders?
19         MR. MORRISSEY:  I don't need a copy.
20         MR. STILLMAN:  Yep.  We'll take it.
21         THE REPORTER:  Okay.  We are now off
22 the record at 3:40 p.m.
23         (Signature waived.)
24 //

Page 99

1         (Whereupon, at 3:40 p.m., the
2         proceeding was concluded.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 100

1         CERTIFICATE OF DEPOSITION OFFICER
2         I, CARLY HEMBERGER, the officer before whom
3 the foregoing proceedings were taken, do hereby
4 certify that any witness(es) in the foregoing
5 proceedings, prior to testifying, were duly sworn;
6 that the proceedings were recorded by me and
7 thereafter reduced to typewriting by a qualified
8 transcriptionist; that said digital audio recording of
9 said proceedings are a true and accurate record to the
10 best of my knowledge, skills, and ability; that I am
11 neither counsel for, related to, nor employed by any
12 of the parties to the action in which this was taken;
13 and, further, that I am not a relative or employee of
14 any counsel or attorney employed by the parties
15 hereto, nor financially or other
16 outcome of this action.          *Carly Hemberger*
17                 CARLY HEMBERGER
18             Notary Public in and for the
19                 State of Illinois
20
21
22
23
24

Page 101

1         CERTIFICATE OF TRANSCRIBER
2         I, TYLER OLSEN, do hereby certify that this
3 transcript was prepared from the digital audio
4 recording of the foregoing proceeding, that said
5 transcript is a true and accurate record of the
6 proceedings to the best of my knowledge, skills, and
7 ability; that I am neither counsel for, related to,
8 nor employed by any of the parties to the action in
9 which this was taken; and, further, that I am not a
10 relative or employee of any counsel or attorney
11 employed by the parties hereto, nor financially or
12 otherwise interested in the outcome of this action.
13
14                 TYLER OLSEN
15
16
17
18
19
20
21
22
23
24

26 (Pages 98 - 101)

Exhibit 22, Page 26

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

| | | |
|---|---|---|
| Patient Name: HERNANDEZ, CUATEMAC | | |
| Patient Type: Visit CHS | Admission Date: 2/2/2022 | MRN: 006423461c; 00118873z |
| Birth Date: | Discharge Date: 5/11/2023 | |
| Gender: Male | FIN: 20220202047 | CMRN: 1015119250 |

| Health Service Request |
|---|

Document Type:
Service Date/Time:
Result Status:
Perform Information:
Sign Information:

Health Service Request
8/18/2022 10:10 CDT
Modified
UPCHURCH,BETTY (8/18/2022 10:10 CDT)
MCCRAY RN, JEELAN M (8/18/2022 13:59 CDT);
UPCHURCH,BETTY (8/18/2022 10:10 CDT)

**Phone Call Request Entered On: 08/18/2022 10:14 CDT**
**Performed On: 08/18/2022 10:10 CDT by UPCHURCH, BETTY**

**Paper Form**
*Patient Date Listed on HSRF :* 8/17/2022 CDT
*Patient location template :* Patient Location: 09-0933A-3127-1
*Dispensary Arrival Date/Time :* 8/18/2022 09:12 CDT
*Request to Talk to Healthcare Provider :* I WOULD LIKE TO TALK TO SOMEONE FROM THE HEALTHCARE TEAM ABOUT:

UPCHURCH, BETTY - 08/18/2022 10:10 CDT

*Request to Talk to Healthcare Provider Details :* I have a cane when i got here today. C/O said i could not have it on the deck. I need my cane at all times specially when i get up in the morning Medical staff is aware of this. because i fell in my cell in div-10 I also need to be placed on a wing with a shower chair medical wing or old mans deck.

MCCRAY RN, JEELAN M - 08/18/2022 13:59 CDT
~~{ [I have a cane when i got here today. C/O said i could not have it on the deck. I need my cane at all times specially when i get up in the morning Medical staff is aware of this. because i fell in my cell in div 10 I also need to be placed on a wing with a show de chair medical wing or bid mans deck. ] previously charted by UPCHURCH, BETTY at 08/18/2022 10:10 CDT];~~

*Request to Talk to Mental Health Provider :* Not Applicable
*Dental or Not Applicable :* Not Applicable

UPCHURCH, BETTY - 08/18/2022 10:10 CDT

**Nursing**
*A phone interview was completed :* A phone interview was NOT completed.
*A phone interview was not completed because :* A Nursing Face to Face was completed
*Nursing Progress Note :* Pt seen today. He ambulated out with a noticeable staggered limp and drag of his left leg. Pt is overweight and strongly declares that he cannot get up from a standing position without a cane. Pt does have an order for a cane at all times. Div 9 will not allow pt to have his cane on the deck. Communication sent to the provider for appropriate housing. F/U prn.

MCCRAY RN, JEELAN M - 08/18/2022 13:59 CDT

Report Request ID: 262217109          Page 232 of 619          Facility: CHS
                                                                Location: RCDC

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Hernandez v. Dart, 23-cv-16970          DR 001178          Exhibit 23 Page 1

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: HERNANDEZ, CUATEMAC
Patient Type: Visit CHS
Birth Date:
Gender: Male

Admission Date: 2/2/2022
Discharge Date: 5/11/2023
FIN: 20220202047

MRN: 006423461c; 00118873z

CMRN: 1015119250

| Health Service Request |
|---|

*Electronically Authored On: 18-Aug-22 10:10*
*Electronically Signed By: UPCHURCH, BETTY*
*CHS - Nursing - Clerk*

*Signed On: 18-Aug-22 13:59*
*Associated Provider: MCCRAY RN, JEELAN M*
*CHS - Nursing - RN*

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Hernandez v. Dart, 23-cv-16970          DR 001179          Exhibit 23 Page 2

### Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: MATHIS, WILLIAM
Patient Type: Visit CHS     Admission Date: 4/7/2023     MRN: 389775f; 004521399c; 00414580z
Birth Date:     .     Discharge Date:
Gender: Male     FIN: 20230407079     CMRN: 1006656493

| **Outpt Medical CHS** |
|---|

| Z Score (Male) | 0.6 |
|---|---|
| **25-Hydroxy Vitamin D** | **15 ng/mL  LOW** |

**Impression and Plan**
  Impression and Plan:
    Diagnosis: Knee pain : ICD10-CM M25.569, Discharge DX, Medical, L Knee DJD .
    Degree of Control: Fair.
    Clinical Status: Unchanged.
  Plan
    Continue present management.  Counseling Report any increased or worsening symptoms as soon as possible. Advised
      how to access medical care if needed.

  .
  Impression and Plan:
    Diagnosis: Acromegaly : ICD10-CM E22.0, Discharge DX, Medical.
    Degree of Control: Fair.
    Clinical Status: Unchanged.
  Plan
    ENDOCRINE eConsult submitted .
      PowerOrders
      Referrals:
        Referral to Primary Care (Order): Routine (CHS5) 4 to 6 Weeks, 8/14/2023 00:00 CDT, 8/28/2023 00:00 CDT,
          Once, 8/14/2023 00:00 CDT.
    Continue present management.  Counseling Report any increased or worsening symptoms as soon as possible. Advised
      how to access medical care if needed.

  .
  **Medications:**    .

*Electronically Authored On:  17-Jul-23 11:27*
*Electronically Signed By: TRAMMELL PA-C, GLEN*
*CHS - Med/Surg - Physician Assistant*
*PAGER BUS: 312 333 4597*

Document Type:     Outpt Medical CHS
Service Date/Time:     10/16/2023 09:36 CDT
Result Status:     Auth (Verified)
Perform Information:     WILKINS PA-C,BRITTANY E (10/16/2023 09:55 CDT)
Sign Information:     WILKINS PA-C,BRITTANY E (10/16/2023 13:23 CDT)

Report Request ID:  259182620     Page 173 of 778     Facility:  CHS
                                                Location:  02D21M; M; 22

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby
notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this
communication in error, please notify the appropriate party immediately.

8A58440DEFA444E18EFE, MATHIS, 184
DR 001596
Mathis 24-cv-1127                                       Exhibit 24 Page 1

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: MATHIS, WILLIAM
Patient Type:   Visit CHS
Birth Date:  7
Gender: Male

Admission Date:     4/7/2023
Discharge Date:
FIN: 20230407079

MRN: 389775f; 004521399c; 00414580z

CMRN: 1006656493

| Outpt Medical CHS |
|---|

**Div 5 PCC**

Patient:  **MATHIS, WILLIAM**        **MRN: 00414580z**        **FIN: 20230407079**
Age:                    Sex: **Male**    DOB: **7**
Associated Diagnoses:  **None**
Author:  **WILKINS PA-C, BRITTANY E**

**Basic Information**

> Patient Location: 05-051H-17-1
> **General Communication**
>   Visit Type.
>   Language: Patient understands English.
>   History limitation: none.
>   Documentation Reviewed: Prior Cermak records, Prior other CCHHS records.

**Subjective**

**History of Present Illness**
   The patient presents with the above pmhx. Pt identified by last name and DOB. Pt is here for routine/clinic f/u.

   As the COVID-19 pandemic continues, medical provider wore surgical mask and both writer and patient were appropriately distanced in exam room.

   h/o acromegaly, followed by endorcrinology. Undergoing monthly injections. Last seen in Endo 8/9/23, note reviewed, recs appreciated. Pt denies interval changes. Has MRI scheduled for 10/30/23.  Pt denies worsening HAs, vision changes, hand/foot growth, polyuria/dipsia, or N/V/abd pain. Pt does endorse intermittent HAs, improves w/ ibuprofen/rest. No photophobia/phonophobia/vision changes/or N/V w/ headaches. Fair PO hydration.

   c/o chronic L knee pain, x-ray w/ moderate-severe tricompartmental OA. Pt denies paresthesias. No associated falls but admits to weakness. Very active while younger. Requesting cane for long distances.

   h/o prediabetes. Denies polys. Admits to exercising and no longer eating "state trays."

   Declines vaccine for HBV.

**Histories**
   **Past Medical History**
      Pt denies significant past medical histroy other than what is noted above including cardiac, pulmonary, GI, renal and
      hepatic. .
   **Allergies:**
      Allergic Reactions (All)

Report Request ID:  259182620                Page 174 of 778            Facility:  CHS
                                                                        Location:  02D21M; M; 22

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

8A58440DEFA444E18EFE, MATHIS, 185
DR 001597
Exhibit 24 Page 2

Mathis 24-cv-1127

### Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: MATHIS, WILLIAM
Patient Type: Visit CHS      Admission Date:   4/7/2023      MRN: 389775f; 004521399c; 00414580z
Birth Date: 7      Discharge Date:
Gender: Male      FIN: 20230407079      CMRN: 1006656493

| **Outpt Medical CHS** |
|---|

No Known Allergies

**Current Medications:**
**Active Orders - Medication Compliance (previous 30 days)**

| | | | | |
|---|---|---|---|---|
| 06/28/2023 14:45 | psyllium | Q 12 Hr | 58% | 7 of 12 |
| 06/28/2023 14:43 | docusate | Daily | 71% | 5 of 7 |
| 09/07/2023 11:06 | levothyroxine | 4AM | 85% | 6 of 7 |
| 09/07/2023 11:06 | cholecalciferol | Daily | 80% | 8 of 10 |
| 09/26/2023 10:34 | ergocalciferol | Q Wednesday | 66% | 2 of 3 |
| 09/26/2023 10:30 | levothyroxine | 4AM | 55% | 11 of 20 |

**Review of Systems**
See HPI

**Objective**
**VS/Measurements**
Vital Signs

| 10/16/2023 09:39 CDT | Type of Temperature Taken | Forehead |
|---|---|---|
| | Temp Forehead DegC | 36.8 DegC |
| | Heart Rate | 73 bpm |
| | Respiratory Rate | 18 breaths/min |
| | Patient Position-BP | Sitting |
| | Systolic Blood Pressure | 120 mmHg |
| | Diastolic Blood Pressure | 74 mmHg |
| | Blood Pressure Method | Automatic |
| | Oxygen Saturation | 100 % |
| | NIBP Site | Arm, Left |

, Measurements from flowsheet : Measurements(Date Range (Admission - Current): 4/7/2023 09:27 CDT - 10/16/2023 13:07 CDT)

| 10/16/2023 09:41 CDT | Height | 172.7 cm |
|---|---|---|
| | **Weight** | **134.1 KG  >HHI** |
| | Medication Dosing Weight | 134.10 KG |
| | BSA (Patient Care) | 2.5364 m2 |
| | BMI | 45 kg/m2 |
| 8/7/2023 13:50 CDT | BMI | 44 kg/m2 |
| 4/7/2023 20:49 CDT | Body Mass Index Estimated | 40 kg/m2 |

**General**:
Development: Normally developed.
Nutritional status: Well nourished.
Appearance: In no apparent distress, non-toxic appearing, non-diaphoretic, mask in place.

Report Request ID: 259182620      Page 175 of 778      Facility: CHS
Location: 02D21M; M; 22

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

8A58440DEFA444E18EFE, MATHIS, 186
DR 001598
Exhibit 24 Page 3

Mathis 24-cv-1127

Case: 1:23-cv-16970 Document #: 122-24 Filed: 07/08/25 Page 4 of 8 PageID #:1530

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: MATHIS, WILLIAM
Patient Type: Visit CHS     Admission Date:   4/7/2023     MRN: 389775f; 004521399c; 00414580z
Birth Date: 7     Discharge Date:
Gender: Male     FIN: 20230407079     CMRN: 1006656493

---

### Outpt Medical CHS

**Eye:** Pupils are equal, round and reactive to light, Extraocular movements are intact, Anicteric.
**HENT:** Prominant chin and jawline.
**Respiratory:** Lungs are clear to auscultation, Respirations are non-labored, Breath sounds are equal, No wheezes, No crackles, Good air exchange. Pt speaking in full sentences. No tripoding. No accessory muscle use. No coughing during encounter..
**Cardiovascular:** Normal rate, Regular rhythm, No edema.
**Musculoskeletal:** Grossly enlarged hands bilaterally but symmetric, Antalgic, slow gait
L knee with mild suprapatellar edema vs effusion. No jointline tenderness. Crepitus with ROM. LLE strength 4/5 compared to RLE. Pain reported with knee extension. Distal pulse 2+. Good skin perfusion. .
**Integumentary:** well healed surgical incision across frontal lobe
Scalp w/ xerosis, no plaques
Mild xerosis and hyperpigmentation of nasolabial folds. .
**Mental Status Exam:** Alert and oriented X 3.

### Review / Management
**Results Review:** Lab results

| 10/4/2023 10:32 CDT | | |
|---|---|---|
| Na | 139 mEq/L | |
| K | 4.9 mEq/L | |
| Cl | 101 mEq/L | |
| CO2 | 28 mEq/L | |
| Anion Gap | 10 | |
| Glucose serum | 91 mg/dL | |
| BUN | 14 mg/dL | |
| Creat | 1.0 mg/dL | |
| Ca | 9.6 mg/dL | |
| eGFR (CKD EPI 2021) | 98 | |
| Protein Total | 8.3 g/dL | |
| Albumin | 4.8 g/dL | |
| Bilirubin Total | 0.5 mg/dL | |
| Alk Phos | 57 U/L | |
| AST | 15 U/L | |
| ALT | 11 U/L | |
| Cholesterol | 207 mg/dL | |
| HDL Cholesterol | 48 mg/dL | |
| **Non HDL Cholesterol** | **159 mg/dL** | **HI** |
| **LDL Cholesterol** | **150 mg/dL** | **HI** |
| **Cholesterol/HDL Ratio** | **4.3** | **HI** |
| TG (Non Fasting) | 104 mg/dL | |
| HGB A1C (Glycohemoglobin) | 5.50 % | |
| **WBC** | **3.7 k/uL** | **LOW** |
| RBC | 4.80 mil/uL | |
| NRBC % Automated | 0 % | |
| NRBC # Automated | 0 | |

Report Request ID: 259182620     Page 176 of 778     Facility: CHS
Location: 02D21M; M; 22

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

8A58440DEFA444E18EFE, MATHIS, 187
DR 001599
Exhibit 24 Page 4

Mathis 24-cv-1127

### Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: MATHIS, WILLIAM
Patient Type: Visit CHS
Birth Date: 7
Gender: Male

Admission Date: 4/7/2023
Discharge Date:
FIN: 20230407079

MRN: 389775f; 004521399c; 00414580z

CMRN: 1006656493

| **Outpt Medical CHS** |
|---|

| | | |
|---|---|---|
| | HGB | 14.0 g/dL |
| | HCT | 43.1 % |
| | MCV | 89.7 fL |
| | MCH | 29.2 pg |
| | **MCHC** | **32.6 g/dL  LOW** |
| | RDW | 14.2 % |
| | PLT | 265 k/uL |
| | **Neutrophil %** | **33.7 %  LOW** |
| | **Lymphocytes %** | **52.3 %  HI** |
| | Monocytes % | 8.8 % |
| | Eosinophil % | 4.5 % |
| | Basophil % | 0.7 % |
| | **Neutrophil #** | **1.3 k/uL  LOW** |
| | Lymphocytes # | 2.0 k/uL |
| | Monocytes # | 0.3 k/uL |
| | Eosinophil # | 0.2 k/uL |
| | Basophil # | 0.0 k/uL |
| | T4 Free | 0.71 ng/dL |
| | Prolactin Level | 2.48 ng/mL |
| | **Testosteron Total** | **91 ng/dL  LOW** |
| | **Testosterone Free** | **16.6 pg/mL  LOW** |
| | **Testosteron Bioavailable** | **37.7 ng/dL  LOW** |
| | Albumin (Ref Lab) | 5.0 g/dL |
| | Sex Hormone Binding Globulin (SHBG) | 17.0 nmol/L |
| | Cortisol Serum AM | 10.70 ug/dL |
| | IGF - I (Somatomedin C) Level | 228 ng/mL |
| | Z Score (Male) | 1.1 |
| | 25-Hydroxy Vitamin D | 32 ng/mL |
| 8/17/2023 13:33 CDT | Chlamydia and Neisseria Direct | Chlamydia and Neisseria Direct |
| | Trichomonas vaginalis by PCR | Trichomonas vaginalis by PCR |
| 8/17/2023 13:26 CDT | Hepatitis B Surface Antigen | NONREACTIVE |
| | Hepatitis B Surface Antibody | NONREACTIVE |
| | Hepat B Surf Ab Concentration | 0.08 |
| | Hepatitis B CORE Total Antibody | NONREACTIVE |
| | **Hepatitis A IgG** | **REACTIVE** |
| | Hepatitis A IgM | NONREACTIVE |
| | Hepatitis C Antibody | NONREACTIVE |
| | HIV 1/2 Ab Screen | NONREACTIVE |
| | Cortisol Serum AM | 4.65 ug/dL |
| | Syphilis Screen By EIA | NON-REACTIVE |
| 6/8/2023 13:06 CDT | **Phos** | **4.9 mg/dL  HI** |
| | **Uric Acid** | **8.2 mg/dL  HI** |

Report Request ID:  259182620

Page 177 of 778

Facility:  CHS
Location:  02D21M; M; 22

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

Mathis 24-cv-1127

8A58440DEFA444E18EFE, MATHIS, 188
DR 001600
Exhibit 24 Page 5

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: MATHIS, WILLIAM
Patient Type: Visit CHS
Birth Date:
Gender: Male

Admission Date: 4/7/2023
Discharge Date:
FIN: 20230407079

MRN: 389775f; 004521399c; 00414580z

CMRN: 1006656493

---

### Outpt Medical CHS

| | |
|---|---|
| Protein Total | 7.3 g/dL |
| Albumin | 4.2 g/dL |
| Bilirubin Total | 0.4 mg/dL |
| Bilirubin Direct | 0.1 mg/dL |
| Alk Phos | 44 U/L |
| GGT | 15 U/L |
| AST | 17 U/L |
| ALT | 20 U/L |
| LDH | 109 U/L |
| Cholesterol | 151 mg/dL |
| TSH | 1.123 uIU/mL |
| T4 Free | 0.76 ng/dL |
| T3 Free | 4.03 pg/mL |
| FSH | 3.09 mIU/mL |
| LH | 0.86 mIU/mL |
| Prolactin Level | 2.36 ng/mL |
| **Testosteron Total** | **163 ng/dL  LOW** |
| **Testosterone Free** | **28.7 pg/mL  LOW** |
| **Testosteron Bioavailable** | **55.3 ng/dL  LOW** |
| Albumin (Ref Lab) | 4.2 g/dL |
| Sex Hormone Binding Globulin (SHBG) | 20.6 nmol/L |
| **25-Hydroxy Vitamin D** | **27 ng/mL  LOW** |

.
**Laboratory Results**
Reviewed labs with patient
**Imaging Results**
Reviewed report with patient, X-ray:
Reason For Exam
3-Pain

FINDINGS
POWERSCRIBE
PACS ID: 9379658
WILLIAM MATHIS
DOB: 7/19/1983

INDICATION: Pain, crepitus

COMPARISON: 12/27/2019

TECHNIQUE: Knee 3 Views Left

---

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

8A58440DEFA444E18EFE, MATHIS, 189
DR 001601
Exhibit 24 Page 6

Mathis 24-cv-1127

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: MATHIS, WILLIAM
Patient Type:   Visit CHS                    Admission Date:    4/7/2023              MRN: 389775f; 004521399c; 00414580z
Birth Date:  7                               Discharge Date:
Gender: Male                                 FIN: 20230407079                        CMRN: 1006656493

---

| Outpt Medical CHS |
|---|

IMPRESSION:

There is moderate/severe tricompartmental degenerative changes with subchondral sclerosis and joint space narrowing worse at the medial joint compartment. Marginal osteophytosis also noted. Overall findings are mildly progressed compared to prior exam from 2019.

There is a small suprapatellar joint effusion, the visualized soft tissues are otherwise unremarkable. No acute fracture or malalignment.

**Impression and Plan**
**Impression and Plan**:
Diagnosis: Acromegaly : ICD10-CM E22.0, Discharge DX, Medical, Dermatitis, seborrheic : ICD10-CM L21.9, Discharge DX, Medical, Knee pain : ICD10-CM M25.569, Discharge DX, Medical, Male hypogonadism : ICD10-CM E29.1, Discharge DX, Medical.
Degree of Control: N/A.
Clinical Status: N/A.
**Plan**

#Acromegaly/hypogonadism (fair, progressing as expected): CPM. Reviewed labs w/ patient. MRI 10/30/23, discussed how to keep appt if discharged prior to appt. Encouraged medications adhrerence. Pt declined KOP change to improve Snythroid adherence. Next injection 11/1/23. C-scope still not scheduled, will contact scheduling.

#Chronic L knee pain/OA (poor, worsening): Restart ibuprofen, take w/food, use caution. Cane for long distances. Consider PT, pt would benefit.

#Seborrheic dermatitis (poor, na): Ketoconazole shampoo/HC ointment w/ directions. Emollient for dry skin. Pt education.

#H/o prediabetes (good, resolved): Based on most recent A1C, pt no longer pre-dm. Continue lifestyle modifications. .
PowerOrders Profile (Selected)
Inpatient Orders
*Ordered*
Alert CCDOC: 04/07/23 9:32:00 CDT, COVID Vaccine Complete, Routine
Alert CCDOC: 06/08/23 9:21:00 CDT, Lower Bunk, Routine
Alert CCDOC: 10/16/23 9:48:00 CDT, Cane Long Distance Only, Routine
Chronic Disease Alert: 10/16/23 9:41:19 CDT, Obesity, Routine
Medical Classification: M2 - DXD Medical, 04/07/23 21:04:00 CDT
emollients, topical cream: 1 APP, Topical, Cream, BID kop, PRN, For Dry Skin, Application Site: Whole body, Routine, Start Dt/Tm: 10/16/23 9:47:00 CDT, 12 WEEK, Stop Dt/Tm: 01/08/24 9:46:00 CST
ergocalciferol 50,000 intl units (1.25 mg) oral capsule: 50,000 UNITS = 1 CAP, PO, Cap, Q Wednesday, Routine, Start Dt/Tm: 09/27/23 9:00:00 CDT, 12 WEEK, Stop Dt/Tm: 12/13/23 9:00:00 CST

---

Report Request ID:  259182620                 Page 179 of 778                 Facility:  CHS
                                                                              Location:  02D21M; M; 22

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

8A58440DEFA444E18EFE, MATHIS, 190
DR 001602
Mathis 24-cv-1127                                                       Exhibit 24 Page 7

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: MATHIS, WILLIAM
Patient Type: Visit CHS      Admission Date:    4/7/2023      MRN: 389775f; 004521399c; 00414580z
Birth Date: 7      Discharge Date:
Gender: Male      FIN: 20230407079      CMRN: 1006656493

| Outpt Medical CHS |
|---|

hydrocortisone 1% topical ointment: 1 APP, Topical, Oint, Q 12 hr kop, Application Site: Face, Routine, Start Dt/Tm: 10/16/23 9:46:00 CDT, 12 WEEK, Stop Dt/Tm: 01/08/24 9:00:00 CST

ibuprofen: 600 MG = 1 TAB, PO, Tab, BID, PRN, For Cermak Pain – ONLY CERMAK Pts, Routine, Start Dt/Tm: 10/02/23 15:30:00 CDT, 4 WEEK, Stop Dt/Tm: 10/30/23 15:29:00 CDT

ketoconazole 2% topical shampoo: 1 APP, Topical, Shampoo, Q 72 hr kop, Application Site: Other - See Instructions to Nursing, Routine, Start Dt/Tm: 10/16/23 9:47:00 CDT, 4 WEEK, Stop Dt/Tm: 11/12/23 9:47:00 CST

levothyroxine: 75 MCG = 3 TAB, PO, Tab, 4AM, Instruction to Nursing: BEFORE meal, Routine, Start Dt/Tm: 09/27/23 4:00:00 CDT, 12 WEEK, Stop Dt/Tm: 12/19/23 4:00:00 CST

*Future (On Hold)*

Anesthesia Colonoscopy (Endo Clinic): BMI>40, Familial/Hereditary Cancer Syndrome, 10/13/22 12:00:00 CDT, Stroger, Diagnostic Outpatient, Future Order, Primary Procedure, Sch Do you want a reminder for this appointment?, 10/13/22 12:00:00 CDT, Medicaid Manage Care

Sella Turcica MRI w/ + w/o Contrast: 10/30/23 10:00:00 CDT, Future Order, All Cermak Patients, Pituitary Mass, Pituitary Mass, acromegaly s/p TSR 2008,2009, Routine, 4581, 4581, Ambulatory, Acromegaly, Sch Do you want a reminder for this appointment?, 10/30/23 10:00:00 CDT, MG, G1004.

Med Reconciliation: meds reviewed and reconciled.
Follow up: 6-10 wks. Counseling medication ADRs:

Patient education:
-Pt was educated to take only as needed, duration of use and max daily dose. Pt also advised on NSAID adverse reactions and possible side effects
-Pt advised to stop taking NSAID if SE or AR arise
-Pt encouraged to take NSAIDS with food
-Pt denies hx of increased risk of bleeding, PUD or GIB, or kidney disease
-Pt to remain upright for 30-40 minutes after ingestion of NSAIDs,
.
Disposition: M2.
.

**Medications:** Medications have been reconciled.
**Education and Follow up**: Patient has been given the opportunity to ask questions, Patient advised on how to access care upon release, Patient counseled on how to access care at CCDOC, Pt verbally agrees to the plan noted above, and voices understanding. All questions and concerns have been addressed. Pt is instructed to notify the nurse, drop a slip, or RTC/UC if condition worsens or does not improve within the appropriate timeframe designated by provider. .

*Electronically Authored On: 16-Oct-23 13:23*
*Electronically Signed By: WILKINS PA-C, BRITTANY E*
*Physician Assistant*
*PGR: 7736747488*

Report Request ID: 259182620      Page 180 of 778      Facility: CHS
Location: 02D21M; M; 22

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

8A58440DEFA444E18EFE, MATHIS, 191
DR 001603
Exhibit 24 Page 8

Mathis 24-cv-1127

## Cook County Health and Hospitals System

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: MATHIS, WILLIAM
Patient Type: Visit CHS
Birth Date:
Gender: Male

Admission Date: 4/7/2023
Discharge Date:
FIN: 20230407079

MRN: 389775f; 004521399c; 00414580z

CMRN: 1006656493

---

| **Outpt Medical CHS** |
| --- |

---

Document Type:
Service Date/Time:
Result Status:
Perform Information:

Sign Information:

Outpt Medical CHS
11/20/2023 10:14 CST
Modified
KACZROWSKI PA-C, DANIEL J (11/20/2023 10:43 CST);
KACZROWSKI PA-C, DANIEL J (11/20/2023 10:32 CST)
KACZROWSKI PA-C, DANIEL J (11/20/2023 10:43 CST);
KACZROWSKI PA-C, DANIEL J (11/20/2023 10:32 CST)

**Addendum by KACZROWSKI PA-C, DANIEL J on November 20, 2023 10:43 CST**
Crutches provided to patient today to assist w/ ambulation as flare resolves

---

*Electronically Authored On: 20-Nov-23 10:43*
*Electronically Signed By: KACZROWSKI PA-C, DANIEL J*
*PGR:*

**Add-on Div 6**

Patient: **MATHIS, WILLIAM**    **MRN: 00414580z**    **FIN: 20230407079**
Age:    Sex: **Male**    DOB:
Associated Diagnoses: **None**
Author: **KACZROWSKI PA-C, DANIEL J**

**Patient Location:** 06-062A-6-1

**S:** Pt seen as add-on for c/o gout flare
 - reports numerous h/o community flares, denies ever taking preventative meds (such as allopurinol)
 - typically foot is affected. reports flare-up of L foot/ankle nearly 1 week now
       denies h/o colchicine or steroid use in past
 - noted elevated uric acid levels previously, "chart search" function not working to search for "gout"

**O:** WNWD, NAD. Pleasant, well-appearing. Sits comfortably
 - Hopped into exam room from wheelchair - citing painful weight bearing on L ankle
 - L ankle: mild edema compared to R ankle w/ slightly increased warmth. No erythema
       also w/ mild TTP along L dorsal foot. no wounds. L ankle ROM intact, w/ mild discomfort

**A: likely gout flare**

---

Report Request ID: 259182620     Page 181 of 778     Facility: CHS
Location: 02D21M; M; 22

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

8A58440DEFA444E18EFE, MATHIS, 192
DR 001604
Exhibit 25 Page 1

Mathis 24-cv-1127

**Cook County Health and Hospitals System**

1900 West Polk Street, Chicago, Illinois 60612

Patient Name: MATHIS, WILLIAM
Patient Type:  Visit CHS          Admission Date:   4/7/2023          MRN: 389775f; 004521399c; 00414580z
Birth Date:                       Discharge Date:
Gender: Male                      FIN: 20230407079                   CMRN: 1006656493

| **Outpt Medical CHS** |
| --- |

**P:** Counselling, reassurance
 - discussed options/mgmt. **agrees to start on allopurinol**
 - short course of indomethacin w/ instructions/caution. defer prednisone at this time

**h/o Vit D deficiency**, now WNL after loading supplementation
 - changed to daily cholecalciferol maintenance therapy

pt requests meds be KOP, since missing meds as DxD - meds changed to DxD, does not require M2 LOC

Report worsening/failure to resolve
**PCC f/u already scheduled next week - keep appt**
Pt verbalized understanding and agreement of dx and tx plan, med risks/SE vs benefits

*Electronically Authored On:  20-Nov-23 10:32*
*Electronically Signed By: KACZROWSKI PA-C, DANIEL J*
 *PGR:*

---

Document Type:                        Outpt Medical CHS
Service Date/Time:                    1/10/2024 11:27 CST
Result Status:                        Auth (Verified)
Perform Information:                  ENNIS MD,PATRICK K (1/10/2024 11:28 CST)
Sign Information:                     ENNIS MD,PATRICK K (1/10/2024 17:54 CST)

**PCC RTU 3**

Patient:  **MATHIS, WILLIAM**      **MRN: 00414580z**      **FIN: 20230407079**
Age:              Sex:  **Male**    DOB: 7
Associated Diagnoses:  **None**
Author:  **ENNIS MD, PATRICK K**

**Basic Information**

   **Patient Location:** 08-083H-D6-22
   **General Communication**
      Visit Type: Scheduled follow-up, Specialty clinic follow-up.
      Language: Patient understands English.
      History limitation: none.
      Documentation Reviewed: Prior Cermak records, Prior other CCHHS records.

**Subjective**

Report Request ID:  259182620              Page 182 of 778          Facility:  CHS
                                                                    Location:  02D21M; M; 22

CONFIDENTIAL: If the reader of this report is not the intended recipient; or the employee or agent responsible, you are hereby notified that any reading, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify the appropriate party immediately.

8A58440DEFA444E18EFE, MATHIS, 193
Mathis 24-cv-1127                                              DR 001605
                                                        Exhibit 25 Page 2

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION
3    WILLIAM MATHIS,              )
                                  )
4              Plaintiff,         )
                                  )
5      vs.                        )   No. 24-CV-1127
                                  )
6    THOMAS DART, SHERIFF OF      )
     COOK COUNTY and COOK         )
7    COUNTY, ILLINOIS,            )
                                  )
8              Defendants.        )
9         The remote deposition of WILLIAM MATHIS,
10   called by the Defendant for examination taken
11   pursuant to notice and pursuant to the Federal
12   Rules of Civil Procedure for the United States
13   District Courts pertaining to the taking of
14   depositions, taken before Patricia A. Mache, a
15   Certified Shorthand Reporter and Notary, on
16   July 25, 2024, at the hour of 11:41 o'clock a.m.
17
18
19
20
21
22
23
24

Page 2

1  APPEARANCES:
2      THOMAS G. MORRISSEY LTD.
        MR. PATRICK MORRISSEY
3      10257 South Western Avenue
        Chicago, Illinois  60643
4      773-233-7900
5        On behalf of the Plaintiff;
6      DEVORE RADUNSKY LLC
        MR. ZACHARY STILLMAN
7      MR. JASON DEVORE
        230 West Monroe
8      Suite 230
        Chicago, Illinois  60606
9      312-300-4479
10       On behalf of the Defendants.
11
     Also Present:
12
        Nicole Bratton, law clerk for Devore
13   Radunsky LLC
14
15
16
17
18
19
20
21
22
23
24

Page 3

1            I N D E X
     WITNESS                  PAGE
2
     WILLIAM MATHIS
3
     Examination by MR. STILLMAN...........5, 59
4
     Examination by MR. MORRISSEY..........54 61
5
6
7
8          E X H I B I T S
9   DEPOSITION NUMBER            PAGE
10    No. 1.....................................23
      No. 2.....................................26
11    No. 3.....................................30
      No. 4.....................................40
12    No. 5.....................................44
      No. 6.....................................46
13    No. 7.....................................47
14
15
16
17
18
19
20
21
22
23
24

Page 4

1      THE COURT REPORTER:  Before we proceed, I
2  will ask counsel to agree on the record that
3  there is no objection to this Certified
4  Shorthand Reporter administering a binding oath
5  to the witness remotely.
6      Counsel, please state your name, the party
7  you represent and your agreement on the record
8  beginning with the noticing party.
9      MR. STILLMAN: Zachary Stillman.  I represent
10 defendant Cook County and Sheriff Dart and we do
11 not object.
12     MR. MORRISSEY:  And, Zach, can you speak up
13 because it's kind of low.
14     MR. STILLMAN:  Is that better?
15     MR. MORRISSEY:  A little bit.
16     THE WITNESS:  Yeah, okay.  I can hear you a
17 little bit.
18     MR. MORRISSEY:  My name is Pat Morrissey.  I
19 represent Mr. Mathis.  I am at the jail with
20 Mr. Mathis and I consent to the remote swearing
21 in.
22         (Witness sworn.)
23
24

Page 5

1  WHEREUPON:
2            WILLIAM MATHIS,
3  called as a witness herein, having been first
4  duly sworn, was examined and testified as
5  follows:
6            EXAMINATION
7  BY MR. STILLMAN:
8    Q.  Okay, Mr. Mathis, my name is Zachary
9  Stillman.  I represent the defendants in this
10 case.
11       Have you ever given is deposition
12 before?
13   A.  No.
14   Q.  Can you hear me now a little bit right
15 now, is that better?
16   A.  It's about the same.
17   Q.  Still, still about the same?
18   A.  Yeah.  I can hear you though a little.
19   Q.  Okay.  Just let me know if you need me
20 to change anything to make it a little easier to
21 hear.
22   A.  Okay.
23   Q.  So could you please state just to start
24 your full name and spell it for the record.

2 (Pages 2 - 5)

Page 6

1    A.  William Mathis, W I L L I A M, last
2  name M A T H I S.
3    Q.  And today I'm going to be asking you a
4  series of questions.  Just to make things
5  easier, we are going to go over a couple of
6  ground rules so we are on the same page as we
7  get started.
8      First, we have a court reporter today
9  as you can see.  So to make life easier for her,
10  I just want to make sure that we both try to
11  keep the record as clean as possible by not
12  speaking over one another.  Whenever I'm asking
13  a question, I would ask that you wait before
14  giving an answer until I'm finished if you
15  are already anticipating what the answer might
16  be.  And I'll do my best to not interrupt any of
17  your answers before moving on to my next
18  question.
19    A.  Okay.
20    Q.  Next, whenever I ask any question,
21  please answer them verbally and refrain from any
22  kind of gesturing or pointing because that will
23  be not clear on the record.  Is that okay?
24    A.  Okay.

Page 7

1    Q.  And then third, if you don't understand
2  any of my questions, please let me know and I
3  can try and rephrase or ask the question
4  differently.  If you do answer, I am going to
5  assume that you understood the question.
6      And if there's something you don't
7  recall, don't guess, just the answer that you
8  don't recall is fine.
9      And finally, if at any time you need to
10  take a break today, totally fine.  Just if we
11  have a question pending, we'll finish that
12  question up and we can figure out a break and
13  take a 5-minute, 10-minute break if we need
14  that.
15      Do you understand all these rules that
16  I've laid out today?
17    A.  Yes.
18    Q.  So you said you had or you hadn't given
19  a deposition before just now?
20    A.  No.
21    Q.  Do you go by any other names in the
22  jail?
23    A.  William.
24    Q.  What else do other detainees call you?

Page 8

1    A.  That's it.
2    Q.  What is your date of birth?
3    A.
4    Q.  Happy belated birthday.
5    A.  Thank you.
6    Q.  Are you married?
7    A.  No.
8  MR. STILLMAN:  And then off the record.
9      (Whereupon, a discussion was had
10      off the record after which the
11      following proceedings were
12      reported:)
13  BY MR. STILLMAN:
14    Q.  And did you do anything to prepare for
15  this deposition today?
16    A.  Yes.  I went over the paperwork I have.
17    Q.  And what paperwork would that be?
18    A.  The declaration and admit.
19    Q.  Did you meet with anyone before the
20  deposition today?
21    A.  I can't hear you.
22    Q.  Did you meet with anyone in advance of
23  the deposition today?
24    A.  No.

Page 9

1    Q.  Did you meet with your attorney?
2    A.  Yes.
3    Q.  About how long did you meet with your
4  attorney before this deposition today?
5    A.  About 30, 40 minutes.
6    Q.  Was that a different day or was that
7  today?
8    A.  Today.
9    Q.  And have you reviewed any kind of video
10  of any incident in question or any kind of
11  reports other than what you described before?
12    A.  No, besides the ramp video.
13    Q.  Which ramp video did you review, do you
14  remember?
15    A.  The Cermak ramp.
16    Q.  Do you know what date that would have
17  been, like video would have been?
18    A.  That is 6-20-24 and 5-23-24.
19    Q.  And have you ever reviewed any ADA
20  standards or any Cook County Jail policies and
21  procedures?
22    A.  Have I what now?
23    Q.  Ever reviewed any like American with
24  Disabilities Act Standards?

3 (Pages 6 - 9)

Page 10

1   A.  No.
2   Q.  What about any Cook County Jail
3 policies and procedures?
4   A.  I'm not understanding.
5   Q.  You're at the Cook County Jail right
6 now.  They have policies and procedures that
7 kind of guide different things how staff is
8 suppose to approach situations, how they operate
9 the jail.
10       Have you ever reviewed any of those
11 policies and procedures?
12   A.  No.
13   Q.  Do you know anyone, anyone else who
14 have also used the same RTU tunnels and the
15 Cermak ramp as you that have also had issues?
16   A.  Yes.
17   Q.  Do you know the names of anyone off the
18 top of your head?
19   A.  No.
20   Q.  Have you ever filed any lawsuits
21 before?
22   A.  No.
23   Q.  Have you ever been a member of a class
24 before in a lawsuit?

Page 11

1   A.  Have I what?
2   Q.  Do you remember ever being involved in
3 another class action case regarding other
4 conduct at the jail?
5   A.  Yes.
6   Q.  And what would that have been about?
7   A.  I believe it was the strip search.
8   Q.  Do you know when that would have been?
9   A.  No.
10   Q.  Was it more or less than three years
11 ago?
12   A.  It was more than three years ago.
13   Q.  Have you ever given any written
14 statements about your issues using the Cermak
15 and RTU ramps outside of your grievances?
16   A.  No.
17   Q.  In the last ten years have you been
18 convicted of any crimes?
19   A.  In the last what now?
20   Q.  Ten years.
21   A.  Have I been?
22   Q.  Convicted of any crimes?
23   A.  Yes.
24   Q.  Why are you currently incarcerated at

Page 12

1 Cook County Jail right now?
2     MR. MORRISSEY:  I object to the extent it may
3 cause him to divulge information that's
4 protected against self-incrimination.
5       You're just asking for the charges?
6     MR. STILLMAN:  Yeah, charges are fine.
7     MR. MORRISSEY:  All right.  He just wants to
8 know what you're charged with.  I don't want you
9 to go in any details of what they're accusing
10 you of doing.
11     THE WITNESS:  Aggravated discharge.
12 BY MR. STILLMAN:
13   Q.  And how long have you been -- strike
14 that.
15       Would that be aggravated discharge of a
16 firearm?
17   A.  Yes.
18   Q.  How long have you been in Cook County
19 Jail now for those charges?
20   A.  About 16 or 17 months.
21   Q.  Do you recall the date that you arrived
22 at Cook County Jail?
23   A.  4-7-23.
24   Q.  Have you been -- where have you been

Page 13

1 housed while at the Cook County Jail?
2   A.  RC Division 8, Division 5, Division 6,
3 3 North at Cermak and Division 2, Dorm 3 and
4 Dorm 2.
5   Q.  And which has been your favorite to
6 live in?
7   A.  Excuse me?
8   Q.  Which has been your preferred housing?
9   A.  Neither one.
10   Q.  When you entered the Cook County Jail,
11 were you using a cane at that time?
12   A.  No.
13   Q.  About how long after you were admitted
14 were you given a cane, or were you prescribed a
15 cane?  If you don't remember that's fine.
16   A.  Like 11-11-23.
17   Q.  And before that when you were walking
18 around the jail, you were walking around without
19 any cane?
20   A.  Just the housing, where I was housed
21 at.
22   Q.  You had a long-distance cane before
23 that or you didn't have a long-distance cane?
24   A.  No, I didn't have a long distance.

4 (Pages 10 - 13)

Page 14

1   Q.  Can you tell me a little bit about your
2   medical history as far as your knees.  You got
3   arthritis in your left knee, right?
4       A.  Yes.  I went to Cermak and they gave me
5   a CAT scan of my leg, my knee.  And then about a
6   couple months later after I had that did, I went
7   to the doctor and he told me that my leg was --
8   my knee worse.  I got arthritis in my knee and
9   it was getting "worser".
10      Q.  Do you know how far back you've had
11  issues with the arthritis?
12      A.  I don't.  I don't know the date right
13  off hand.
14      Q.  Did you ever have any arthritis?
15      A.  Let me see how long.  This is
16  six months, 6-2-23, that's when I started making
17  the complaints.
18      Q.  Are you looking at something right now?
19      A.  Yes.
20      Q.  Can I ask what it is that you're
21  looking at?
22      A.  These are the grievance I wrote.
23      Q.  Okay.  Which grievance would that be?
24      A.  This is about my knee.

Page 15

1   Q.  Do you know what the control number is
2   top right corner?
3       A.  Which?
4       Q.  Like the year X and then some more
5   numbers.
6       A.  2023 -- no, that's my number.  Control
7   number --
8       MR. MORRISSEY:  For the record, I think he's
9   looking at a request form.
10      MR. STILLMAN:  Okay, never mind then.  That's
11  fine.
12  BY MR. STILLMAN:
13      Q.  Do you remember which doctor it was at
14  Cermak that told you about the arthritis in your
15  knee getting worse?
16      A.  I don't remember his name.
17      Q.  Was that all he told you was that the
18  arthritis was getting worse?  Did he say you
19  were disabled?  Did he say --
20      A.  He said I had to get -- he get a bottom
21  bunk permit he gave me.  He gave me the cane and
22  he said I need to have it looked at like
23  treatment and he prescribed me pain medication.
24      Q.  What kind of pain medication did he

Page 16

1   prescribe you?
2       A.  Ibuprofen and every time it flare up
3   they gave me endo, endo, I can't pronounce it.
4   Endo, endo -- I can't pronounce it.
5       Q.  That's fine.
6       A.  Endometh- --
7       Q.  Were you having knee pain issues when
8   you were admitted to Cook County Jail?
9       A.  Hold on.  I can't hear you.  They
10  moving something.
11      Q.  Were you having knee pain at the time
12  that you were admitted into Cook County Jail?
13      A.  No.
14      Q.  When did it start getting worse?
15      A.  Like a month or two after
16  incarceration.
17      Q.  You had never used a cane outside of
18  jail?
19      A.  No.
20      Q.  Since that day that you were prescribed
21  the cane, November 27, 2023, have you been using
22  it continuously since that day?
23      A.  Yes.
24      Q.  Just to clarify, so your alert is for

Page 17

1   long distance as of that day?  So you don't use
2   it transporting between areas in the jail,
3   right?
4       A.  Yes.
5       Q.  And before that you didn't have any,
6   any cane alert or you had a short distance cane
7   alert?
8       A.  I had no cane.
9       Q.  And you do not have a short distance
10  cane alert, is that correct?
11      A.  Correct.
12      Q.  So when moving around in your tier,
13  your cell dayroom, there's no cane use permitted
14  for you there, correct?
15      A.  No, I have it to go back and forth to
16  the bathroom.
17      Q.  To the bathroom, okay.  Are you aware
18  of any policies, procedures or rules at the jail
19  regarding either use of your cane or when
20  someone should be assisting you because of your
21  use of the cane when transporting between areas?
22      A.  No.
23      Q.  Have you ever heard of a company called
24  Globetrotters?

5 (Pages 14 - 17)

Page 18

1   A.  Globetrotters?  No.
2   Q.  Have you ever reviewed any
3 architectural or engineering reports?
4   A.  Excuse me?
5   Q.  Have you ever reviewed any kind of
6 architectural or engineering reports?
7   A.  What you mean by that?
8   Q.  Like a report made by like an architect
9 or an engineer about the structural or
10 mechanical details of a building or a feature of
11 a building like a ramp?
12   A.  Yes.
13   Q.  You have reviewed reports like that?
14   A.  Yes.
15   Q.  What report have you reviewed?
16   A.  The ramp, the structure of the ramp.
17   Q.  And which ramp would that be?
18   A.  It would be the Cermak ramp and the RTU
19 ramp.
20   Q.  Would that have been one report or two
21 separate reports?
22   A.  I believe it's one.
23   Q.  So you've reviewed the reports about
24 those ramps you're saying?

Page 19

1   A.  Yes.
2   Q.  And what do you recall about the Cermak
3 ramp one specifically?
4   A.  That it's too steep.
5   Q.  Anything else?
6   A.  And they suppose to be trying to fix it
7 or something.
8   Q.  What about the RTU ramp, do you
9 remember any of the details about that one?
10   A.  No.  That steep too.
11   Q.  Are you familiar with the ramps,
12 corridors and hallways under the RTU?
13   A.  Excuse me?
14   Q.  Are you familiar with the ramps,
15 corridors and hallways under the RTU?
16   A.  No, I'm not familiar with it.
17   Q.  Have you spent time, you know, the in
18 lower level of the RTU there, the tunnel, do you
19 know?  You know what I'm talking about, under
20 the RTU, there's tunnels, there's ramps?  Have
21 you been in those areas?
22   A.  I'm not sure.
23   Q.  Have you been transported through those
24 areas --

Page 20

1   A.  Which parts?  It goes --
2   Q.  Just generally, not all of them.
3 You've been in the under the -- under levels of
4 the jail.
5   A.  Yeah, I've been under the jail.  That's
6 the tunnel where they walk everybody through.
7   Q.  And you're familiar generally with that
8 area, its existence and features, correct?
9   A.  Yes.
10   Q.  How frequently would you say you've
11 been in those areas?
12   A.  I probably go up and down the ramps
13 like every three to four weeks.  I only go under
14 them kind of circumstance back and forth to the
15 hospital.
16   Q.  That was my next question.  So usually
17 just be medical visits that you would be
18 transporting through there?
19   A.  Correct.
20   Q.  What about court visits?
21   A.  No.  I go to outside.
22   Q.  Do you recall the last time you would
23 have been going through those tunnels?
24   A.  July 18th.

Page 21

1   Q.  And on that occasion were you walking
2 the tunnels yourself or were you transported via
3 cart?
4   A.  I was walking by myself with the cane
5 and the officer.  They call it transporting.
6   Q.  Do you recall there being any handrails
7 on the ramps you've used under the RTUs?
8   A.  Yes.
9   Q.  Do you utilize those handrails when you
10 traverse the ramps?
11   A.  Sometimes, sometimes not because they
12 make us walk with our food too or whatever
13 paperwork we might have so it's kind of hard for
14 me to hold my paperwork and food and the cane
15 and try to balance on the rail.
16   Q.  And that would be when you're going
17 back from the hospital you would have the food
18 and the paperwork?
19   A.  Yes.
20   Q.  On the ramps under the RTU -- the ramp
21 under the RTU leading to Cermak, have you ever
22 found the steepness to be an issue?
23   A.  Yes.
24   Q.  Did you ever complain to anyone that

6 (Pages 18 - 21)

Page 22

1 you needed either a landing or handrails to help
2 you traverse that ramp?
3    A.  Multiple times.
4    Q.  Who would you have complained to?
5    A.  The sheriff, the person on the
6 transport in the cart sometime I see them
7 because I get on there.
8    Q.  And then would you have also filed any
9 grievances about that?
10   A.  Yes.
11   Q.  Whenever you've used the east RTU ramps
12 that lead into the Cermak ramp, do you know
13 which one I'm talking about, the ramp, that east
14 RTU ramp that leads up to the Cermak ramp,
15 there's one that goes, I don't know if it goes
16 up and then down or down and then up.
17   MR. STILLMAN:  Pat, do you know?
18   MR. MORRISSEY:  If you're going from RTU to
19 Cermak, I believe the RTU ramp goes up.
20   MR. STILLMAN:  Yeah, that sounds right.
21 BY MR. STILLMAN:
22   Q.  Do you know which ramp I'm referring to
23 when I say the east ramp?
24   A.  No.

Page 23

1    Q.  I'm going to show a picture.  We'll
2 call it Exhibit 1.
3       Are you able to see this?
4    A.  Yes.
5    Q.  Does this room look familiar to you?
6    A.  Yes.
7    Q.  Would it make sense to you if I told
8 you this is was the east RTU ramp that led to
9 the Cermak area?
10   A.  Yes.
11   MR. MORRISSEY:  Are we marking this as an
12 exhibit?
13   MR. STILLMAN:  Yeah, I marked that as
14 Exhibit 1.
15 BY MR. STILLMAN:
16   Q.  So when you've used this ramp you have
17 had difficulties, correct?
18   A.  Yes.
19   Q.  And have those difficulties ever caused
20 issues getting you where you need to get to?
21   A.  Yes.  It's painful.
22   Q.  Painful.  Have you ever actually been
23 held back, though, from accessing any kind of
24 services or appointments because of issues with

Page 24

1 the ramp?
2    A.  No.
3    Q.  They've always, if you've been on the
4 ramp and experienced issues and needed to stop,
5 they've either helped you or --
6    A.  No, they --
7    MR. MORRISSEY:  Mr. Mathis, let him just
8 finish the question before you --
9    MR. STILLMAN:  Thanks, Pat.
10 BY MR. STILLMAN:
11   Q.  They've either helped you or you've
12 made it up the rest of the way.  You've never
13 been turned around and stopped from proceeding
14 because you couldn't keep going, correct?
15   A.  Correct.
16   Q.  And so this ramp to confirm, you have
17 traversed this ramp before, correct?
18   A.  Yes.
19   Q.  And is there any point on this ramp
20 specifically that you find to be the most
21 trouble or is it just kind of all?
22   A.  Going up.
23   Q.  Just going up in general is just the
24 tough part?

Page 25

1    A.  Yes.
2    Q.  So other than general pain, has using
3 this ramp caused any other actual issues or
4 injuries to you?
5    A.  Shortness of breath.  It hurts my knee
6 like going the distance up and down the ramp.
7 My knees pop in and out of place.
8    Q.  Do you know if those would be the same
9 type of issues other people would also have when
10 using that ramp when using a cane?
11   A.  I believe so.
12   Q.  Have you ever discussed those types of
13 issues are also being experienced with others?
14   A.  A couple people on the wing I been on I
15 asked did they have a hard time or did they have
16 pain going up it.
17   Q.  Do you know did any jail staff ever
18 tell you either not to use the east RTU ramp or
19 to use a different way or try to lead you a
20 different way?
21   A.  No.
22   Q.  Do you know if you ever would have used
23 this ramp and then not subsequently traversed
24 the Cermak ramp?

7 (Pages 22 - 25)

Page 26

1    A.  What do you mean by that?
2    Q.  I mean any time you would have gone
3  down this ramp, you also would have gone to
4  Cermak, correct?
5    A.  Yes.
6    Q.  You wouldn't have -- there would have
7  been nowhere that you would gone in the jail
8  that you would have taken the east RTU ramp and
9  then not gone to Cermak, right?
10    A.  Correct.
11    Q.  So I'm going to take this picture down
12  and I'm going to show another image.
13      Are you able to see that?
14    A.  Yes.
15    Q.  So this image we will mark Exhibit 2.
16  And does this ramp look familiar to you?
17    A.  That's the Cermak room.
18    Q.  That would be on the other side of the
19  ramp we were just looking at?
20    A.  Yes.
21    Q.  And you're familiar with this ramp,
22  you've traversed it?
23    A.  Yes.
24    Q.  Would you say that the issues you

Page 27

1  experience in this ramp are the same or
2  different than those that you have on the other
3  ramp?
4    A.  It's the same.
5    Q.  Same.  So the shortness of breath, the
6  pain, yeah, correct?
7    A.  Yes.
8    Q.  How frequently -- I guess it's the same
9  frequency.  So about like every one to
10  three months you would say you kind of end up
11  going to Cermak?
12    MR. MORRISSEY:  Objection.  Mischaracterizes
13  his testimony.
14      You can respond.  You can answer,
15  Mr. Mathis.
16    THE WITNESS:  Yes, I go there every month.
17  BY MR. STILLMAN:
18    Q.  Every month, sorry.  And every month
19  when you go there, other than just getting the
20  refills on the prescriptions, that's -- are you
21  getting shots when you're going?
22    A.  Yes.
23    Q.  And that was the drug that you couldn't
24  remember the pronunciation of, correct?

Page 28

1    A.  No.  The one that I can remember
2  pronunciation is the pill.  When I go to the
3  hospital, the outside hospital, I get an
4  injection.
5    Q.  So the injections are at the outside
6  hospital, okay, thank you.
7      Do you know the last time you were on
8  the Cermak ramp right here?  Would it have been
9  the same as RTU ramp on July 18?
10    A.  This is the ramp I was on July 18th.
11    Q.  Yeah, you would have been on both ramps
12  July 18th, correct?
13    A.  No, the other one, I don't see the
14  other one because I'm not housed in the RTU no
15  more.
16    Q.  So you said before the last time you
17  saw the RTU ramp was July 18th.  Would that have
18  been in reference to the Cermak ramp actually?
19    A.  Yes, the Cermak ramp I seen July 18th.
20    Q.  Do you know when you were last housed
21  in the RTU?
22    A.  No.
23    Q.  Would 2023 sound right?
24    A.  Yes.

Page 29

1    Q.  And when you've had issues with the
2  Cermak ramp, did you ever complain to anyone
3  around, any jail staff about those issues?
4    A.  Yes.
5    Q.  Did you also file grievances about
6  those issues?
7    A.  Yes.
8    Q.  And same, same thing with the RTU ramp,
9  when you've had these issues with the Cermak
10  ramp and the pain in your knees, shortness of
11  breath, have you ever actually been stopped or
12  prevented from accessing services or
13  appointments?
14    A.  No.
15    Q.  You were always able to get where you
16  need to go, correct?
17    A.  Yes.  Unless I just didn't feel like
18  going over because my knee was giving me
19  problems and I declined going over there.
20    Q.  Going to take this down now.
21      Do you remember -- so you said
22  sometimes you might have declined going down
23  there.  Do you know when you might have done
24  that?

8 (Pages 26 - 29)

Page 30

1    A.   No, not offhand.
2    Q.   Would it sound right that you might
3 have refused a visit to Cermak on October 31,
4 2023?
5    A.   I wouldn't know the date but --
6    Q.   I'll mark as Exhibit 3.  Are you able
7 to see that?
8    A.   It's so little I can't see what it's
9 saying.
10   Q.   Is that better?  Are you able to see
11 this though?  I can make it larger if needed.
12   A.   What I looking for?
13   Q.   Can you confirm that you can see it,
14 yes or no?
15   A.   I can see a little.
16   Q.   I will zoom in on the portion I want
17 you to look at.  I'm marking as Exhibit 3 this
18 incident report from October 31, 2023.
19        Does to sound right?  Does it look like
20 this is an incident report from 2023,
21 October 31st?
22   A.   Yes.
23   Q.   This states right here that they
24 received a refusal from you, correct?

Page 31

1    A.   Yep.
2    Q.   That was on October 31, 2023?
3    A.   Yes.
4    Q.   And do you know why you might have
5 refused on that day?
6    A.   It probably was due to the flare-up.  I
7 only refuse when I have a flare-up.
8    Q.   Would it sound right to you on
9 February 16, 2024, you might have also refused?
10   A.   Yes.
11   Q.   So when you've been injured using the
12 Cermak and RTU ramps, either pain in your knees,
13 shortness of breath, or any flare-ups that might
14 have happened after it, have you ever sought
15 treatment for those injuries?
16   A.   Well, I put in a request to see the
17 doctor before and that's when they prescribe me
18 the pills and every time he said I have a
19 flare-up, I could just let the nurse know.
20   Q.   And all these times that you have had
21 issues on the ramps and hurt your knees, you
22 never sought any kind of treatment from medical
23 help after the issues or use of the ramp,
24 correct?

Page 32

1    A.   Correct.
2    Q.   Like you said in relation to your
3 request about the knee pain before any of the
4 ramp stuff, Cermak has treated and they're
5 continuing to treat your knee issues and pain
6 and injuries, correct?
7    A.   They prescribe me a pill to keep it
8 down, but it's not -- it still happens.  I still
9 continue to get flare-ups and I'm still walking
10 up and down the ramp.
11   Q.   I mean as far you know, have they come
12 up with a cure for arthritis?
13   A.   No.
14   Q.   So do you think you would get any more
15 sufficient curing of your condition outside of
16 jail?
17   A.   I wouldn't know.
18   Q.   Would you consider their continued
19 treatment and prescription of pain medications
20 to be treatment of your knee?
21   A.   Yes.
22   Q.   So they've continued treating the issue
23 with your knee, correct?
24   A.   Yes.

Page 33

1    Q.   As of June, you would actually -- you
2 reported -- do you recall seeing them and
3 actually having some improvement in your knee
4 pain?
5    A.   No.
6    Q.   In the past have you ever used officers
7 for assistance when you've had issues on the
8 ramps?
9    A.   Yes.
10   Q.   And what are the results of asking for
11 assistance, do they help?
12   A.   No.
13   Q.   Has any officer ever helped?
14   A.   Once when gout was too bad when I
15 couldn't walk, they put me on a cart and took me
16 over.
17   Q.   And that was only one time?
18   A.   Yes.
19   Q.   So you've only ever been in the cart
20 one time?
21   A.   Yes.
22   Q.   Did they ever push you on a wheelchair
23 alongside the cart, did they ever try to move
24 you that way?

9 (Pages 30 - 33)

Page 34

1　A.　I believe I been in a wheelchair once
2　or twice. I'm not -- I can't remember that many
3　times, but it was all dealing with the gout,
4　when my foot swelled up.
5　　Q.　Only reason you would have refused to
6　go to your medical appointments would have been
7　your flare-ups, correct?
8　A.　Correct.
9　　Q.　To the best of your knowledge do you
10　know if other detainees regularly refuse to go
11　to their medical appointments as well?
12　A.　No, I'm not sure.
13　　Q.　Do you know any other reason someone
14　else might refuse to go to their medical
15　appointments?
16　A.　No.
17　　Q.　So do you -- strike that.
18　　　Do you know an inmate named Cavarian
19　Rogers?
20　A.　Who?
21　Q.　Cavarian Rogers?
22　A.　No.
23　Q.　What about Kent Elwoods?
24　A.　No.

Page 35

1　　Q.　Sylvester Brinson?
2　A.　Sylvester who?
3　Q.　Brinson?
4　A.　No.
5　Q.　Tommy Love?
6　A.　I know a Tommy love.
7　　Q.　How do you know Tommy love?
8　A.　I was housed with him.
9　Q.　Do you know where?
10　A.　Division 2.
11　　Q.　And how recently would that have been?
12　A.　That's recently.
13　　Q.　Would you consider him a friend?
14　A.　I know of him.
15　　Q.　Do you know Anthony Munoz?
16　A.　No.
17　Q.　What about Antoine Pierce?
18　A.　No.
19　Q.　Carlos Martinez?
20　A.　No.
21　Q.　Rosike Phillips?
22　A.　No.
23　Q.　James Cruck?
24　A.　No.

Page 36

1　　Q.　Quovotis Harris?
2　A.　No.
3　Q.　Do you know Quovotis Harris?
4　A.　No.
5　　Q.　I think I asked you this earlier but do
6　you personally know anyone, any other detainees
7　that have been injured using either the east RTU
8　or Cermak ramps?
9　A.　No.
10　　Q.　Do you know any other people who have
11　been -- who have had issues or injuries like
12　yours, more like, you know, not like caused
13　injuries but pain and shortness of breath?
14　A.　Not that I know of. I don't talk to a
15　lot of people in here.
16　　Q.　So when you've had troubles or
17　difficulty traversing either the Cermak or RTU
18　ramps, have you filed grievances with the jail
19　about those?
20　A.　Yes.
21　　Q.　Do you know how many grievances you
22　would have filed about these ramp issues?
23　A.　Quite a few. I don't have a specific
24　number, but quite a few.

Page 37

1　　Q.　Do you know whether you would have
2　filed them?
3　A.　Back to 2023 I been filing grievance.
4　　Q.　You say quite a few of them you did?
5　A.　Yes.
6　Q.　I mean more than two?
7　A.　Yes.
8　　Q.　But you wouldn't have filed any more
9　than -- any in 2024, do you think?
10　A.　I filed some in 2024.
11　Q.　You did?
12　A.　Yes.
13　　Q.　Do you know when you would have filed
14　them in 2024?
15　A.　Yes.
16　　Q.　When would that have been?
17　A.　Probably like the beginning, a couple
18　months, a couple months ago.
19　　Q.　A couple months ago you most recently
20　filed a grievance, correct?
21　A.　Correct.
22　　Q.　Do you have a copy of that grievance
23　with you?
24　A.　Let me see. Yes.

10 (Pages 34 - 37)

**Page 38**

1  Q. Do you know the control number for that
2  grievance?
3  A. 2023X18633.
4  Q. So you've got documents from 2023. I
5  was asking -- you said you filed a couple months
6  ago in 2024, though, correct?
7  A. I don't have those.
8  Q. But you think you did file it?
9  A. Yes.
10  Q. Okay. Do you have any other grievances
11  there?
12  A. About my knee and walking with the
13  cane, all these is in 2023.
14  Q. Are any of those -- so you have two or
15  three grievances there?
16  A. Excuse me?
17  Q. Right now do you have two grievances or
18  do you have three grievances in front of you?
19  A. I have two -- one, one.
20  Q. You have one grievance?
21  A. Yes.
22  Q. You don't have any noncompliant
23  grievances?
24  A. Wait, two.

**Page 39**

1  Q. Is one of them a noncompliant
2  grievance?
3  A. What you mean by noncompliant?
4  Q. That's fine, we'll get through it.
5  Strike that question.
6  So do you ever have any issues filing
7  grievances about the ramps?
8  A. No.
9  Q. Did you ever have any grievances
10  rejected?
11  A. Yes.
12  Q. Would you consider that an issue?
13  A. Yes.
14  Q. So you did have issues filing grievance
15  at any time then?
16  A. Yes.
17  Q. So in your grievances about the ramps,
18  what issues would you have complained about?
19  A. I have problems with climbing the ramp.
20  Q. Just climbing the ramp?
21  A. Yes. And I had some like with
22  transportation. I asked for help, to take a
23  transport me over there. I used to argue with
24  the guards and tell them that I have got rode

**Page 40**

1  over here on one of them carts before which they
2  told me they couldn't put inmates on them but I
3  did see them.
4  Q. Do you remember making the journey to
5  and from Cermak December 10, 2023?
6  A. No.
7  Q. I will mark this exhibit I'm putting up
8  right now as Exhibit 4. I'll make it a little
9  larger.
10  Do you see the document on the screen
11  right now?
12  A. Yes.
13  Q. And is that -- what is that document,
14  do you know?
15  A. That's the grievance I wrote.
16  Q. Do you also have this grievance in
17  front of you?
18  A. Yes.
19  Q. And this grievance, does this grievance
20  concern a trip to Cermak on December 10, 2023?
21  A. Yes.
22  Q. Looking at this grievance now, do you
23  remember that trip a little more?
24  A. Yes.

**Page 41**

1  Q. In your grievance here, I'm going to
2  summarize a little bit, you can tell me, say yes
3  or no if how I summarize this is accurate.
4  You're essentially complaining that you
5  have an issue with the ramp, the RTU Division 8
6  ramp, and you use a cane and feels hard to move
7  up and down the ramp and not to fall down, is
8  that correct?
9  A. Yes.
10  Q. You would have used the ramp on that
11  day?
12  A. Excuse me?
13  Q. You would have utilized the ramp on
14  that day to traverse the --
15  A. Yes.
16  Q. Do you think that day you were having
17  difficulties with the cane specifically, like
18  using the cane walking around?
19  A. Yes. Was around the time they first
20  gave it to me, yes.
21  Q. So you have this grievance in front of
22  you, correct?
23  A. Yes.
24  Q. What does the second page say? Do you

11 (Pages 38 - 41)

Page 42

1 have this response page?
2    A.  It say that I was observed being
3 escorted by a cart from Division 6.
4    Q.  So in light of the fact that you may
5 have been on a cart that day, do you think
6 that -- why do you think you would have filed
7 this grievance that day?
8    A.  That was the day that I came back and
9 they wouldn't give a cart.  I was on the escort
10 like I told you before one time over there due
11 to the flare-up, but when they gave me the
12 medication when I came back they had a cane for
13 me and that's when I walked back to the
14 division.
15    Q.  It says right here that detained Mathis
16 did not walk to RTU on December 10th, is that
17 right?
18    A.  Yes.
19    Q.  And first they say you're observed
20 being escorted by cart from Division 6 to
21 Cermak, correct?
22    A.  Yes.
23    Q.  And then you're evaluated and it's
24 determined that you're able to ambulate with a

Page 43

1 cane for long distances only?
2    A.  Yes.
3    Q.  And then you're escorted by cart back
4 to Division 6 to retrieve your property,
5 correct?
6    A.  Yes.
7    Q.  And then by cart again and lastly by
8 wheelchair to your new living unit, correct?
9    A.  Correct.
10    Q.  And did you appeal this grievance?
11    A.  Yes, I did.
12    Q.  And did you get a response on the
13 appeal?
14    A.  Yes, I did.
15    Q.  What was the response?
16    A.  Please see attached grievance.
17 Grievance response.
18    Q.  That would be the original response,
19 correct?
20    A.  Yes.
21    Q.  So the appeal response bottom of the
22 sheet, they just said the original reply is to
23 stand, or I think that's reply.  Original
24 something to stand, correct?

Page 44

1    A.  Correct.
2    Q.  And that's -- this is your signature on
3 here?
4    A.  Yes.
5    Q.  And you received this grievance back
6 from them?
7    A.  Yes.
8    Q.  I'm going to take this down now.  I'm
9 going to mark the next Exhibit 5.  Share the
10 screen.
11        Are you able to see this?
12    A.  Can you go to the top or something.
13    Q.  Yeah, this is a light.  This is the
14 tunnel here.  This is the east RTU tunnel, I
15 believe.
16    MR. MORRISSEY:  Is this marked as an exhibit?
17    MR. STILLMAN:  Yeah, I just marked this as
18 Exhibit 5.
19    MR. MORRISSEY:  Are you going to send me over
20 the exhibits so --
21    MR. STILLMAN:  I'll send them all right
22 after, yeah.  They all come from stuff that's
23 been raised by you guys and produced.
24    MR. MORRISSEY:  Just so we -- my request is

Page 45

1 just so we have an understanding of what's been
2 discussed in this deposition to have a copy of
3 the exhibits.  I appreciate it.
4    MR. STILLMAN:  Yeah, I'll send it out right
5 after.
6        So I'm going to start playing this
7 exhibit.
8 BY MR. STILLMAN:
9    Q.  Can you vaguely kind of recognize this
10 is that same RTU tunnel, that first picture I
11 showed you?
12    A.  Yes.
13        (Video being played.)
14 BY MR. STILLMAN:
15    Q.  Is that you?
16    A.  Yes.
17    Q.  And that would be the cart that you're
18 being transferred on, correct?
19    A.  Yes.
20    Q.  Okay.  And that -- does it make sense
21 to you, would it be accurate to say that's
22 probably the same day as the incident referred
23 to in the grievance?
24    A.  Yes.

12 (Pages 42 - 45)

Page 46

1   Q.  Mark as Exhibit 6 the next video and I
2 am going to skip ahead.  Here we go.
3         (Video being played.)
4 BY MR. STILLMAN:
5   Q.  Is that you?
6   A.  Yes.
7   Q.  In this video are sitting there on the
8 cart on that day?
9   A.  Yes.
10   Q.  And as we are going to see in a moment,
11 you're going to attempt to get up.  So you're
12 getting up there, correct?
13   A.  Yes.
14   Q.  At about 1:48 in the video that is.
15 And as this goes forward, I want you to tell me
16 do they make you walk to the RTU from here?
17   A.  They put the wheelchair close to the
18 door I believe.  He was trying.
19   Q.  Here they transferred you in a
20 wheelchair there, correct?
21   A.  Yeah.
22   Q.  So would you have anything to say as
23 far as the grievance being inaccurate or the
24 jail's response to the grievance being

Page 47

1 inaccurate that you didn't walk that day?
2   A.  No, I didn't walk that day.  I didn't
3 walk until I got back to my living unit.
4   Q.  Okay.
5   A.  And then I basically crawled.
6   Q.  Do you recall making the journey to and
7 from Cermak, and I know the specific date is
8 probably very hard to remember, but on
9 November 27, 2023?
10   A.  27th, no.
11   Q.  Do you have any grievances in front of
12 you that would have related to an incident on
13 November 27th?
14   A.  No.
15   Q.  I'm marking this as Exhibit 7.  Are you
16 able to see that grievance, Mr. Mathis?
17   A.  Yes.
18   Q.  Do you recognize this grievance?
19   A.  That's 12-13-23. I have that one, yes.
20   Q.  So yeah, as you said, date of this
21 grievance is 12-13-23, correct, but the
22 incident, or the date it says is 11-27-23,
23 right?
24   A.  Yes.

Page 48

1   Q.  And this grievance is pretty similar to
2 the last one, just issues with walking every
3 time whenever you see a doctor and with your
4 cane it's hard to get up and down, correct?
5   A.  Correct.
6   Q.  And do you have this grievance in front
7 of you or no?
8   A.  Yes.
9   Q.  Did you ever receive a response on this
10 grievance?
11   A.  Yes.
12   Q.  And what did the response from the jail
13 say about this grievance?
14   A.  It says see code above.  Grievance -- I
15 can't really read it.
16   Q.  Says grievance is a repeat submission,
17 correct?
18   A.  Yeah, it say the grievance is a repeat
19 submission of a grievance collected within the
20 last 15 calendar days.  That's what they marked
21 on it.
22   Q.  And you remember drafting this
23 grievance?
24   A.  Yes.

Page 49

1   Q.  Would you have gotten -- would that
2 have been an incident or a time when you would
3 have gone for your two shots on the day of that
4 grievance?
5   A.  Not sure.
6   Q.  Did you appeal the response --
7 actually --
8   A.  Yes.
9   Q.  And that's your signature on there that
10 you received it?
11   A.  Yes.
12   Q.  I think let's take a five-minute break
13 right now and I've only got a couple more
14 questions after that I think.
15   A.  Okay.
16         (Whereupon, a short break was
17         taken.)
18 BY MR. STILLMAN:
19   Q.  One last video we're going to look at.
20 You can see that?
21   A.  Yes.
22   Q.  Okay.  So in this video we're going to
23 move much forward.  Going to move forward now to
24 about two minutes and three seconds -- yeah, or

13 (Pages 46 - 49)

Page 50

1 two hours and three minutes. All right. I
2 believe you will come to shortly, yeah.
3     Confirm if this is you that comes in
4 the screen shortly. That is you?
5    A.   Yes.
6    Q.   And do you know what you're holding
7 there?
8    A.   Lunch tray.
9    Q.   And that would have been like what you
10 were talking about before that you sometimes
11 have to hold either your tray or --
12    A.   Paperwork, yes, tray. I had a tray.
13    Q.   And this is going upward, correct?
14    A.   Yes.
15    Q.   Was this a struggle to get up this ramp
16 this day?
17    A.   Yes.
18    Q.   Would you describe yourself as a
19 struggling in this video any more than the
20 inmate behind you?
21    A.   I actually started off in front
22 of him, but the guard told me to get in front so
23 he could slow his speed down.
24    Q.   Would that have been before you came in

Page 51

1 the frame here?
2    A.   Yes.
3    Q.   So walking here you didn't need any
4 assistance from the handrails, correct?
5    A.   I was bumping back and forth.
6    Q.   Can you see anything about what date
7 this would have been or can you see the top of
8 the screen here where it says?
9    A.   No, I can't see the dates.
10    Q.   Have you reviewed this footage before?
11    A.   Yes.
12    Q.   Would this have been some of the
13 footage you reviewed with Pat here?
14    A.   Yes.
15    Q.   And you said one of the issues you
16 complain about in your grievance is that you
17 have trouble almost falling on the ramps,
18 correct?
19    A.   Yes.
20    Q.   Did it -- does it look like you're
21 having difficulties almost falling here?
22    A.   No.
23    MR. STILLMAN: I think I have one more thing
24 and I think I might be done. One second.

Page 52

1 BY MR. STILLMAN:
2    Q.   When you were in the RTU, did you --
3 were the people on your tier mixed as far as
4 their disability alerts they might have? Were
5 there wheelchair users and cane users on the
6 same tier?
7    A.   Yes.
8    Q.   And would you guys be transported
9 together?
10    A.   Sometimes, depending if they got
11 appointment or not. We never know our
12 appointments, they just come and get us.
13    Q.   Have you ever observed another detainee
14 pushing a wheelchair, using detainee during
15 transport?
16    A.   Yes.
17    Q.   What about an officer pushing a
18 wheelchair?
19    A.   I seen officer push a wheelchair
20 before.
21    Q.   Where have you seen an officer push the
22 wheelchairs?
23    A.   Same place we looking at now.
24    Q.   Is that a regular thing you see or is

Page 53

1 that just sometimes?
2    A.   Most time I see inmates, but I don't
3 see it all the time but normally I don't go with
4 nobody besides the people that get called from
5 other tiers and some don't have wheelchairs,
6 they ones I been with.
7    Q.   And you also haven't been on --
8        (Internet connection froze.)
9    THE WITNESS: Excuse me?
10        (Whereupon, a discussion was
11        had off the record after which
12        the following proceedings were
13        reported:)
14        (The requested testimony was
15        read by the court reporter.)
16 BY MR. STILLMAN:
17    Q.   You also haven't been assigned to the
18 RTU since like 2023 now, correct?
19    A.   Correct.
20    Q.   And you would have only seen those
21 wheelchair users from the RTU about that time,
22 right, during your transports?
23    A.   During transports because they have
24 other people from other tiers they could have

14 (Pages 50 - 53)

Page 54

1 wheelchairs, but like I said, I randomly bump
2 into people with wheelchairs because they
3 different van that load them all when we go to
4 Stroger.
5    Q.   And have you ever pushed a detainee in
6 a wheelchair?
7    A.   Yes, I believe so.
8    Q.   Would that have been before or after
9 you had the cane alert assigned?
10    A.   Before I had the cane.
11    Q.   Have you pushed a detainee in a
12 wheelchair since you got your cane?
13    A.   I don't recall.
14    MR. STILLMAN:  No further questions.
15         EXAMINATION
16 BY MR. MORRISSEY:
17    Q.   Mr. Mathis, can you describe your
18 condition on December 10, 2023, and what you
19 were doing that day?
20    A.   2023?
21    Q.   Let me rephrase.  Do you remember
22 Mr. Stillman showing you videos of you being in
23 a cart?
24    A.   Yes.

Page 55

1    Q.   Can you explain what occurred that day?
2    A.   I had a flare-up.  My foot was swollen
3 and I couldn't put it on the ground.  I had a
4 gout flare-up.
5    Q.   And where were you when you had the
6 gout flare-up?
7    A.   Division 6.
8    Q.   And where were you brought on that day
9 you had the gout flare-up?
10    A.   To Cermak.
11    Q.   Mr. Stillman showed you video of using
12 the RTU ramp, do you remember that?
13    A.   Yes.
14    Q.   And he also showed the bottom of the
15 Cermak ramp, right?
16    A.   Yes.
17    Q.   Why were you using those two ramps on
18 that day?
19    A.   Because I had to get transferred from
20 one -- to Division 6 to the Cermak unit, to
21 the -- through the tunnel.
22    Q.   And describe your condition, your
23 ability to move around that day?
24    A.   It was poor.  I had a "swole" foot so I

Page 56

1 couldn't walk.  They kept trying to tell me that
2 if I could walk and make it down there, I could
3 be saved by the doctor.  But I couldn't, I
4 couldn't move.
5        So I kept telling the guards like I
6 need some, some type of transportation, a
7 wheelchair or something.  And they had a nurse
8 come see me and then they pull me out the tier
9 in a wheelchair.  Then they got me downstairs
10 and put me onto the cart and that's when we
11 drove me over to Cermak.
12    Q.   Who kept telling you to walk to go to
13 see the doctor -- to get to see the doctor?
14    A.   The officer.
15    Q.   What did you say in response when the
16 officer told you to walk so you can go see the
17 doctor?
18    A.   I said I can't do it.  I wouldn't be
19 able to do it.  And that's when he say get up,
20 try to move and balance myself.  Took it to the
21 door.  So he went and asked for a chair and they
22 brought the chair and got me.  That's you saw
23 the chair come back.
24    Q.   Prior to this day you've been to Cermak

Page 57

1 before, correct?
2    A.   Correct.
3    Q.   And you knew the route you would be
4 taking to get to Cermak?
5    A.   Correct.
6    Q.   And you knew you would have to go up
7 and down those ramps?
8    A.   Correct.
9    Q.   And were you in any condition to be
10 able to do that by walking with the cane on that
11 day?
12    A.   No.
13    Q.   Mr. Stillman also asked you whether you
14 had given statements in this case.  Do you
15 remember that question?
16    A.   Yes.
17    Q.   Do you remember you mentioned early on
18 in the deposition that you looked at a
19 declaration to prepare yourself for this
20 deposition.  Do you remember that?
21    A.   Yes.
22    Q.   And is the declaration accurate that
23 you reviewed in preparation for your deposition?
24    A.   Yes.

15 (Pages 54 - 57)

Page 58

1    Q.  What is the date that you signed the
2  declaration?  It might be on the second page.
3    A.  6-1-24.
4    Q.  Is your signature on that declaration?
5    A.  Yes, it is.
6    Q.  And Mr. Stillman also -- strike that.
7      Do you remember reviewing interrogatory
8  answers in preparation for your deposition?
9    A.  Yes.
10   Q.  And in those answers did you also make
11  statements about moving up and down the ramps?
12   A.  Yes.
13   Q.  You also looked at health service
14  request forms about your complaints of knee pain
15  and leg pain, correct?
16   A.  Correct.
17   Q.  How many health service request forms
18  did you look at in preparation for your
19  deposition?
20   A.  Two, three.
21   Q.  Do you have the health service --
22  health service request forms are different than
23  grievances, correct?
24   A.  Correct.

Page 59

1    Q.  And you have a stack of your health
2  service request forms?
3    A.  Yes.
4    Q.  Can you count how many health service
5  request forms?
6    A.  One, two, three, four, five, six,
7  seven, eight, nine.
8    Q.  Did you review all those, Mr. Mathis,
9  in preparation for your testimony?
10   A.  Yes.
11   Q.  I have nothing further.  Appreciate
12  your time, Mr. Mathis.
13   MR. STILLMAN:  Just couple more things
14  about -- one or two questions about the
15  declaration.
16      FURTHER EXAMINATION
17  BY MR. STILLMAN:
18   Q.  You have a copy of the declaration in
19  front of you right now?
20   A.  Yes.
21   Q.  Number eight of your declaration you
22  say that there are many people who use canes,
23  crutches and walkers at the jail.  In my current
24  housing unit that holds about 49 people two

Page 60

1  people use one of these devices to ambulate.  I
2  have also observed other people use canes and
3  crutches to traverse the ramp.  Is that correct?
4    A.  Correct.
5    Q.  Are those numbers correct now, are
6  there still 49 people in your tier and two of
7  them using devices to ambulate or is it any
8  different now?
9    A.  It's probably like four or five people
10  who now with canes.
11   Q.  All canes or is it crutches, walkers?
12   A.  No, the crutches, he move to another
13  tier but is canes, no walkers.
14   Q.  And in your grievance, or in your
15  declaration you essentially complain about the
16  same things in your grievance, the difficulties
17  going up the Cermak and RTU ramps, that they're
18  steep and you made requests and you haven't been
19  able to get the help, correct?
20   A.  Correct.
21   Q.  And then you mention also the one time
22  you were physically unable to walk you were
23  placed on an electric cart.  Would that have
24  been the one video we watched?

Page 61

1    A.  Correct.
2    MR. STILLMAN:  Okay.  No further questions.
3      FURTHER EXAMINATION
4  BY MR. MORRISSEY:
5    Q.  Mr. Mathis, since that time you used
6  the cart, have you made other requests to use
7  the cart to go up and down the ramps?
8    A.  I have asked the officers, but I
9  haven't been able -- but I have asked for help.
10   Q.  And what do the officers say when you
11  asked to be put on a cart to move up or down the
12  ramps?
13   A.  They say they can't use the cart.
14   Q.  Why, do they tell you why they can't
15  use the cart?
16   A.  They say inmates not suppose to be on
17  the cart.
18   Q.  Has more than one officer told you
19  that?
20   A.  Yes.
21   MR. MORRISSEY:  I have nothing further.
22   MR. STILLMAN:  I think we're good.
23   MR. MORRISSEY:  We'll waive signature.
24   THE COURT REPORTER:  Did you want to order

16 (Pages 58 - 61)

Page 62

1  the transcript at this time?
2      MR. STILLMAN:  Yes, please.
3      THE COURT REPORTER:  Copy for you, Pat?
4      MR. MORRISSEY:  I don't need a copy at the
5  moment.  Appreciate it, though.
6              (Whereupon the deposition
7              concluded at 1:04 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 63

1  STATE OF ILLINOIS     )
2                        )  SS:
3  COUNTY OF DU PAGE     )
4
5    I Patricia A. Mache, being first duly sworn,
6  on oath says that she is a court reporter doing
7  business in the City of Chicago; and that she
8  reported in shorthand the proceedings of said
9  hearing, and that the foregoing is a true and
10  correct transcript of her shorthand notes so
11  taken as aforesaid, and contains the proceedings
12  given at said hearing.
13
14        Patricia A. Mache
15        Patricia A. Mache, CSR
16        LIC. NO. 084-002229
17
18
19
20
21
22
23
24

Veritext Legal Solutions
www.veritext.com                                   888-391-3376
                                        Exhibit 26 Page 17

Case: 1:20-cv-00261 Document #: 120 Filed: 07/27/22 Page 1 of 1 PageID #:1827

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **CORNELIUS WALKER** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | **No. 20-cv-00261** |
| *-vs-* | ) | |
| | ) | **Hon. Mary M. Rowland** |
| **THOMAS DART, SHERIFF OF COOK** | ) | **Magistrate Hon. Jeffrey Cummings** |
| **and COUNTY, COOK COUNTY,** | ) | |
| **ILLINOIS,** | ) | |
| *Defendants.* | ) | |

### ORDER

IT IS HEREBY ORDERED:

Upon the parties' agreement, defendant Cook County will install hand-railings on the Cermak Ramp on or before December 31, 2022. The railings must comply with the Americans with Disabilities Act (ADA). Defendant Cook County further agrees that if Plaintiff Walker withdraws his pending motion for summary judgment limited to handrails or agrees to have it stricken, any future settlement offer will consider plaintiff's alleged damages and the costs of the entire litigation, including litigation of all issues involving the hand-railings. The parties have agreed to hold a second settlement conference in front of Magistrate Judge Cummings on October 27, 2022 to attempt to resolve these issues. In the interim, Defendant Sheriff is hereby ordered to continue its policy of assisting inmates at the Cook County Jail upon request should they require assistance traversing the Cermak Ramp.

So Ordered.

Dated: July 27, 2022

_____
Hon. Mary M. Rowland
United States District Court Judge

Exhibit 27 Page 1

Transcript of the Testimony of
**TIMOTHY TYRRELL**

**Date:** May 9, 2023

**Case:** CORNELIUS WALKER v. THOMAS DART

TOOMEY REPORTING
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

TIMOTHY TYRRELL
May 9, 2023

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
CORNELIUS WALKER,          )
                           )
           Plaintiff,      )
                           )
      vs.                  )   No. 20-cv-00261
                           )
THOMAS DART, SHERIFF OF    )
COOK COUNTY and COOK       )
COUNTY, ILLINOIS,          )
                           )
           Defendants.     )
```

This is the 30(b)(6) deposition of
TIMOTHY TYRRELL, taken via Zoom videoconferencing,
called by the Plaintiff for examination, taken
pursuant to the Federal Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken
before PEGGY A. ANDERSON, a Certified Shorthand
Reporter of the State of Illinois, on May 9th,
2023, at 11:00 o'clock a.m.

TOOMEY REPORTING
312-853-0648

---

TIMOTHY TYRRELL
May 9, 2023

Page 2

```
 1  A P P E A R A N C E S:
 2
 3          THE LAW OFFICES OF:
            THOMAS G. MORRISSEY, LTD.
 4          BY:  MR. THOMAS MORRISSEY
                 MR. PATRICK MORRISSEY
 5               10257 South Western Avenue
                 Chicago, Illinois  60643
 6               (773) 238-4235
                 tgm@morrisseylawchicago.com
 7               pwm@morrisseylawchicago.com
 8               Appeared on behalf of the
                 Plaintiff;
 9
            THE LAW OFFICES OF:
10          JOHNSON & BELL, LTD.
11          BY:  MR. SAMUEL BRANUM
                 33 West Monroe Street
12               Suite 2700
                 Chicago, Illinois 60603-5404
13               (312) 372-0770
                 branums@jbltd.com
14
                 Appeared on behalf of the
15               Defendants.
16
17
18
19
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

---

TIMOTHY TYRRELL
May 9, 2023

Page 3

```
 1              I N D E X
 2  WITNESS                          PAGE
 3  TIMOTHY TYRRELL
 4  DIRECT EXAMINATION BY
    MR. MORRISSEY:                   4-74
 5
 6
 7
 8              E X H I B I T S
 9
10  MARKED                           PAGE
11  PLAINTIFF'S EXHIBIT NO.  3        26
12  PLAINTIFF'S EXHIBIT NO.  6        48
13  PLAINTIFF'S EXHIBIT NO.  7        68
14  PLAINTIFF'S EXHIBIT NO.  8        41
15  PLAINTIFF'S EXHIBIT NO. 10        36
16  PLAINTIFF'S EXHIBIT NO. 12        32
17  PLAINTIFF'S EXHIBIT NO. 13        46
18
19              * * * * * * *
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

Exhibit 28 Page 1

TIMOTHY TYRRELL
May 9, 2023

Page 4

```
1                (WHEREUPON, the witness
2                     was first duly sworn.)
3         MR. MORRISSEY:  This is the
4    deposition of Timothy Tyrrell.
5    WHEREUPON:
6              TIMOTHY TYRRELL,
7    called as a witness herein, having been first
8    duly sworn, was examined and testified as
9    follows:
10        D I R E C T   E X A M I N A T I O N
11              BY MR. MORRISSEY:
12       Q    Mr. Tyrrell, are you being produced
13   pursuant to a Rule 30(b)(6) Notice that was
14   tendered back in 2021?
15       A    Yes.
16       Q    Are you testifying both for the
17   Sheriff and Cook County?
18         MR. BRANUM:  Tom, he is being
19     designated for the County.  I'm still in
20     the discussions with the Sheriff on our
21     path forward.
22         MR. MORRISSEY:  Mr. Tyrrell, is also
23     being produced in his individual capacity.
24
```

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 5

```
1    BY MR. MORRISSEY:
2        Q    Mr. Tyrrell, I'm going to ask you a
3    series of questions today in regards to your
4    position with Cook County.  I would ask you to
5    answer my questions orally so the court
6    reporter can take down your responses.  Is that
7    understood?
8        A    Yes.
9        Q    If you don't understand a question,
10   please stop me and I will attempt to rephrase
11   it.  Is that understood?
12       A    Yes.
13       Q    And finally, if you need a break,
14   just let us know.  If there's no question
15   pending, we can take a break.
16            Have you ever been deposed before?
17       A    No, I have not.
18       Q    Can you state your full name and
19   spell your last name?
20       A    Timothy John Tyrrell, T-y-r-r-e-l-l.
21       Q    Mr. Tyrrell, what is your position
22   with Cook County?
23       A    General manager of facilities.
24       Q    Where did you go to high school?
```

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 6

```
1        A    Marist High School.
2        Q    And what year did you graduate?
3        A    1992.
4        Q    And after graduating from Marist High
5    School on the south side, did you go further in
6    college?
7        A    Yes, but at that point, it didn't
8    work out.
9        Q    Where did you initially go to
10   college?
11       A    St. Norbert's in De Pere, Wisconsin.
12       Q    What was your major at St. Norbert's?
13       A    Communications.
14       Q    Did you receive a degree from
15   St. Norbert's?
16       A·   I did not.
17       Q    In what year did you stop going to
18   St. Norbert's?
19       A    1993.
20       Q    After stepping out of college in
21   1993, did you seek employment?
22       A    Yes, I did.
23       Q    And where were you employed?
24       A    I think at that time I went -- I was
```

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 7

```
1    testing the waters at the Board of Trade
2    downtown.
3        Q    Did you work in the construction
4    field with the Board of Trade?
5        A    No, I did not.
6        Q    How long did you work for the Board
7    of Trade?
8        A    Roughly three years.
9        Q    What did you do after working at the
10   Board of Trade?
11       A    Couple other different things before
12   I finally settled in construction.
13       Q    Anything that was involving law
14   enforcement?
15       A    I did just the training at the like
16   911 center.  That's it.  I went through their
17   training program, but then I didn't accept the
18   position.
19       Q    What municipality or state government
20   was that?
21       A    City of Chicago.
22       Q    In what year did you receive training
23   with the city of Chicago?
24       A    I'm not exactly sure what year.  It
```

TOOMEY REPORTING
312-853-0648

Exhibit 28 Page 2

TIMOTHY TYRRELL
May 9, 2023

Page 8

1  was mid '90s.
2      Q    When did you begin working in the
3  construction field?
4      A    1996 I started in the glazers' union,
5  and I did that for roughly one and a half to
6  two years before I was called to join the
7  electricians' union.
8      Q    Can you briefly tell me what type of
9  work a glazer does?
10     A    Glazer installs glass.
11     Q    After -- You were a member of the
12 glazer union?
13     A    Yes, Local 27.
14     Q    And did you go through an
15 apprenticeship period with the union?
16     A    With that one, it was a three-year
17 apprenticeship, and I was in my second year,
18 close to finishing my second year when I
19 decided to go with the electricians.
20     Q    In what year did you join the --
21 begin your work as an electrician?
22     A    1998.
23     Q    And how long is the apprenticeship
24 program for electricians?

TOOMEY REPORTING
312-853-0648

---

TIMOTHY TYRRELL
May 9, 2023

Page 9

1      A    Five years.
2      Q    Did you complete the apprentice
3  program to become an electrician?
4      A    Yes, I did.
5      Q    Are you a member of the electrician
6  union today?
7      A    I am.  I'm an instructor at the
8  school in Alsip, part time.  Sorry.
9      Q    Is that on 127th Street?
10     A    115th and Ridgeland.
11     Q    What courses do you teach there?
12     A    Solar photovoltaic systems and
13 electric vehicle charging station installation.
14     Q    Did you -- At some point in time, did
15 you go to IIT?
16     A    Yes, I did.
17     Q    And what period of time did you go to
18 IIT?
19     A    2013 to 2016.
20     Q    What did you study at IIT?
21     A    Industrial technology and management.
22     Q    Was that an undergraduate program?
23     A    It was called a co-terminal.  So it
24 was undergraduate and I got a graduate degree

TOOMEY REPORTING
312-853-0648

---

TIMOTHY TYRRELL
May 9, 2023

Page 10

1  as well.
2      Q    What was your undergraduate major?
3  Was it industrial technology and --
4      A    Industrial technology and management.
5      Q    Can you briefly tell me what that
6  consists of?
7      A    Roughly facilities maintenance,
8  construction, project management and I ended
9  up -- and then my graduate degree was
10 specialized in sustainability.
11     Q    Can you briefly tell me what
12 sustainability is?
13     A    Renewable energy, stuff along that
14 nature.
15     Q    Did you ever work as an electrician?
16     A    Yes.  I worked as an electrician
17 for -- what did I say, 1998 till 2016.
18     Q    Was that in private enterprise or was
19 that with the government?
20     A    Well, from 2008 -- Yes.  2008 I
21 started and I was working for private
22 contractors in the private sector.  And then in
23 2008, I was offered a position as an
24 electrician at the County.  So I worked as an

TOOMEY REPORTING
312-853-0648

---

TIMOTHY TYRRELL
May 9, 2023

Page 11

1  electrician at Cook County for eight years.
2  And then in January of '16, I was -- I
3  interviewed -- applied, interviewed and was
4  offered a position at -- my current position.
5      Q    Your current position is -- what's
6  the title?
7      A    General manager of facilities for the
8  department of facilities management?
9      Q    The eight years that you worked as an
10 electrician for Cook County prior to 2016,
11 where did you work as an electrician?
12     A    I would say a good portion of that
13 was at the DOC campus, but then I literally --
14 I traveled around a lot.  So I worked in
15 roughly just about every facility that we take
16 care of.  So that's all of the courts, that's,
17 yeah, every -- warehouses, just about
18 everywhere.
19     Q    And between, let's say, 1998 to 2008,
20 you mentioned you worked in private enterprise
21 as an electrician.  Was that new construction
22 or commercial?  What exactly did you do?
23     A    I guess I was fortunate enough to
24 do -- I worked with a lot of good people, and I

TOOMEY REPORTING
312-853-0648

Exhibit 28 Page 3

TIMOTHY TYRRELL
May 9, 2023

Page 12

1  was exposed to a lot of different types of the
2  industry.  So I worked in new construction,
3  mostly commercial work, not much residential.
4  Commercial work, I worked in a lot of the
5  buildings at St. Xavier back in the early
6  2000s.
7      Q    Did you work in the new Shannon
8  Center?
9      A    I just finished with Linear Electric
10 once they were finishing that up, but I did the
11 dorms, a couple of the dorms, and then did the
12 new cafeteria down in the basement of the new
13 building.  I did the Orland Park Police Station,
14 the Orland Park Library.  So I was fortunate to
15 be kind of close to home most of the time.
16     Q    So when you got on with Cook County
17 as an electrician, what department did you work
18 for?
19     A    Department of Facilities Management.
20     Q    Briefly tell me what the Department
21 of Facilities Management is for Cook County?
22     A    The department, they, I guess,
23 operate and maintain all the facilities within
24 the County portfolio.  We also do, you know,

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 13

1  some smaller construction jobs, you know, to --
2  that we have capacity to actually, you know, do
3  and do a good job on, but that's about -- you
4  know, we're focused mainly on the maintenance
5  on safe and healthy facilities.
6      Q    So does the Department of Facilities
7  Management have plumbers, electricians and
8  bricklayers that all work for the department?
9      A    Yes.  There are, I believe, 17
10 unionized trades that belong under the
11 umbrella, COUPE, that's the coalition of union --
12 I'm not even sure what the "P" and the "E"
13 stands for, but they're represented by -- under
14 the one agreement which is the COUPE agreement.
15 So, yeah, there is -- yeah, like I said, 17, I
16 think, different trades.
17     Q    Is there a head -- Let me rephrase
18 the question.  When you went into management in
19 January of 2016 with facilities management, was
20 there a person or persons that were your
21 supervisors?
22     A    Yes.
23     Q    Who -- In January of 2016, who was
24 your direct supervisor in facilities

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 14

1  management?
2      A    My direct supervisor would be Mike
3  Carberry.  He is deputy director of facilities,
4  and then it would be Bilquis Jacobs El who
5  would be my -- his boss and my ultimate.
6      Q    Can you spell that gentleman's name?
7      A    Michael Carberry, C-a-r-b-e-r-r-y.
8      Q    And the director of facilities
9  management, can you state his name again and
10 spell his name?
11     A    It's a female.  And her name is
12 Bilqis, B-i-l-q-i-s, Jacobs, J-a-c-o-b-s,
13 hyphen, E-l.
14     Q    Was Ms. Jacobs-El the director back
15 in 2016?
16     A    Yes, she was.
17     Q    And she currently is the director of
18 facilities management?
19     A    That's correct.
20     Q    And Mr. Carberry is still the deputy
21 director of facilities?
22     A    Yes, he is.
23     Q    Where do they office?
24         MR. BRANUM:  Objection to form.

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 15

1  BY MR. MORRISSEY:
2      Q    Do you know what building they work
3  out of?
4      A    Mike Carberry is stationed at the
5  DOC, and the director is at 69 West Washington.
6      Q    Is Mike Carberry's responsibility
7  primarily the DOC campus and the criminal court
8  building at 26th and California?
9          MR. BRANUM:  Objection, foundation.
10 BY MR. MORRISSEY:
11     Q    I'm sorry.  Did you hear my question?
12     A    Can you repeat that?  I'm sorry.
13     Q    Sure.  You mentioned that
14 Mr. Carberry is at -- he offices at the DOC
15 campus.
16         My question is, is his primary focus
17 as deputy director of facilities the DOC campus
18 and the Leighton Court Building at 26th and
19 California?
20         MR. BRANUM:  Objection, lack of
21 foundation, calls for speculation.
22 BY THE WITNESS:
23     A    He is the deputy director of the DOC
24 campus.  There is also another deputy director

TOOMEY REPORTING
312-853-0648

Exhibit 28 Page 4

TIMOTHY TYRRELL
May 9, 2023

Page 16

1  that handles all the outlying buildings.
2  BY MR. MORRISSEY:
3      Q    Who is the other deputy director at
4  the DOC campus?
5      A    No one.  Maybe you misunderstood.
6  He's the deputy -- There are two deputy
7  directors.  Bilquis it the director.  Two
8  deputy directors.  Mike Carberry handles the
9  DOC.  Mike Ghande handles all the outlying
10 buildings.
11     Q    Has your -- Let me ask a preliminary
12 question.  What do you do as the general
13 manager of facilities management?
14          MR. BRANUM:  Objection to form.
15 BY THE WITNESS:
16     A    Well, it's very broad.
17 BY MR. MORRISSEY:
18     Q    Let me rephrase it.  What are your
19 duties as a general manager in the facilities
20 management department?
21     A    My duties are to oversee per se the
22 skill trades.  They're not so much day-to-day
23 activities but, yes, in a way.  But manage
24 their work and their performance through the

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 17

1  work order system.  I do everything from time
2  and attendance to discipline to I work with our
3  Capital Planning department on a lot of
4  projects that we do in house.  There's probably
5  more that I will think of right after I stop
6  talking.
7      Q    How many skilled trades people do you
8  supervise?
9      A    Well, I really only communicate with
10 the foreman, and then the foreman are each
11 responsible for their own line staff.  So as I
12 said, there were 17 -- 16, 17, somewhere in
13 that area skilled trades.  So roughly, you
14 know, 15 guys that I communicate with on a
15 daily, you know, weekly basis.
16     Q    How many skilled trades people work
17 at the DOC campus?
18     A    I would say roughly a hundred.
19     Q    You mentioned -- What is the work
20 order system?
21     A    That's a computerized maintenance
22 system, and then we have a call center, work
23 order call center.  All our work goes through
24 the work order system.  Our staff will not do

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 18

1  any work without having a work order first.
2  You know, tenants have access to the work order
3  system and can place orders through the system.
4  They can call the call center to have a work
5  order generated, which then, you know, alerts
6  our trades to go and, you know, assess and make
7  repairs if needed.
8      Q    When you referred to tenants, who are
9  you referring to at the DOC?
10     A    Any -- Well, I say tenants.  Anybody
11 who occupies space at the DOC, workers but
12 then, you know, there's with the detainees,
13 they make requests as well.  So they make --
14 Typically, their requests go through the
15 sheriffs, and then the sheriffs have access to
16 the work order system as well, and they can put
17 the work orders through on their own.
18     Q    How does the sheriff put in a work
19 order, for instance, for, let's say, repair of
20 a toilet in Division 10?  What's the process?
21          MR. BRANUM:  Objection to form,
22 foundation.
23 BY THE WITNESS:
24     A    I can't speak to what the sheriff

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 19

1  really does.  But from my knowledge, if they
2  see a problem and then they have access -- They
3  have their own little, I think, work order
4  department within the Sheriff's Office, and
5  they would get a call or an alert and then they
6  would -- the work order would go through their
7  office.
8      Q    How does facilities management become
9  aware that one of your occupants at the DOC
10 requests some type of service?
11     A    Through the work order system.
12     Q    Who within the facilities management
13 receives these work order requests from
14 occupants at this DOC?
15     A    They -- The way it's set up is it
16 would be -- the work order, it's a fillable --
17 obviously a fillable form, so whatever trade it
18 would be appropriate for.  So if it was a
19 toilet per se, then the trade would -- there's
20 a drop down menu with all the different trades.
21 You know, so that would be plumbing, and then
22 it auto-populates to the foreman of that
23 specific trade or building and/or building I
24 should say, and then you would keep going with

TOOMEY REPORTING
312-853-0648

Exhibit 28 Page 5

TIMOTHY TYRRELL
May 9, 2023

Page 20

1  the request filling out fields and that's
2  basically how that operates.
3      Q    Does each housing division at the
4  jail have a foreman for each of the 16 or 17
5  trades?
6          MR. BRANUM:  Objection --
7  BY THE WITNESS:
8      A    I don't think I understand that
9  question.
10 BY MR. MORRISSEY:
11     Q    Well, you mentioned that, for
12 instance, if there was a malfunctioning toilet,
13 let's say, in the RTU building that it would go
14 to the plumbing foreman.  Would that plumbing
15 foreman be working assigned to the RTU
16 building?
17         MR. BRANUM:  Objection to form.
18 BY THE WITNESS:
19     A    There's two plumbing foremen, and so
20 it's kind of split up basically by workload.
21 So half the facilities on the DOC campus would
22 go to one of the foreman, and then the other
23 half would go to the other foreman.  And then
24 there's also -- you know, there's also

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 21

1  pre-identified areas which would raise -- as
2  well as a priority level of -- a preset
3  priority level that kind of -- you know, we
4  would have to -- whether the repair needs to be
5  made within 2 hours, 6 hours, 24 hours, 36
6  hours.  So it's a predetermined priority level
7  that somebody would put in.  Obviously it's
8  reviewed once it gets to the foreman because
9  sometimes they -- that priority level could be
10 answered in error, but we internally have some
11 of our own procedures that we follow in regards
12 to how we act on work orders, certain work
13 orders.
14     Q    You mentioned there is a priority for
15 work orders.  Is that a written document that
16 describes what -- how different requests for
17 services are to be responded to?
18         MR. BRANUM:  Objection to form.
19 BY THE WITNESS:
20     A    Not that I'm aware of.
21 BY MR. MORRISSEY:
22     Q    You mentioned there's two foremen at
23 the DOC campus.  Is one Joe Merkel?
24     A    Yes.

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 22

1      Q    And what's the name of the other
2  foreman?
3      A    Robert Farrell, F-a-r-r-e-l-l.
4      Q    If a person puts in a request that
5  appears to be plumbing related, does that work
6  order go to you at some point in time to either
7  approve or not approve the work?
8      A    No.  No, that would -- I would get
9  over -- if that was the case, I would get over
10 1500 to 2000 notifications a day.
11     Q    Do you, as the general manager, do
12 you receive work orders?
13         MR. BRANUM:  Objection to form.
14 BY THE WITNESS:
15     A    Yes.  I see work orders when I need
16 to.
17 BY MR. MORRISSEY:
18     Q    What type of work orders would reach
19 your level as the general manager at the DOC?
20     A    Really any that I needed to look
21 into.  I do say like it's actually -- maybe I'm
22 kind of slacking off a little bit on my aging
23 work order report, but I do a report that's now
24 become more quarterly than it was monthly where

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 23

1  I do an exhaustive search for each trade at the
2  DOC as far as -- you know, I will do a search
3  for all the work orders that are open in our
4  system for a predetermined time period which is
5  up to 30 days prior to that search.
6          Any open work orders, I will send
7  each of our foreman a spreadsheet of those open
8  work orders.  At that point, they are to go
9  through that spreadsheet and investigate any
10 open work order whether it can be closed out --
11 Well, they have to have some kind of
12 explanation why it's still open in the system.
13 So if it's closed, they need to close it.  And
14 that's kind of how I've found to be the best
15 way of staying on top of the guys and the
16 system as well and not having -- you know,
17 trying to have it in as real time as possible.
18 It's tough to do, but it's my intent.
19     Q    When you do this quarterly report and
20 e-mail the respective foremen for open work
21 orders that are open more than 30 days, do you
22 e-mail them with the information in regards to
23 the open work orders?
24     A    Well, I guess it's the same -- it's

TOOMEY REPORTING
312-853-0648

Exhibit 28 Page 6

TIMOTHY TYRRELL
May 9, 2023

Page 24

1 kind of a copy and paste thing because it's 15
2 or 16 e-mails that I send but, no, there's
3 basic instructions that say exactly what I
4 would like them to do and the majority of them
5 have caught on and are doing it now. Yeah,
6 it's a good process and it's work.
7      Q   How do you communicate to your
8 foremen? That's my question. Is it through an
9 e-mail?
10     A   Yeah, yeah. Typically through
11 e-mail. If they have questions, if any of them
12 have questions, then we'll call and have a
13 conversation and some aren't very computer
14 savvy, so got to walk them through some stuff;
15 but for the most part, it works.
16     Q   If there was an open work order for
17 plumbing that was open for more than 30 days,
18 that work order -- that open list would go to
19 either Mr. Farrell or Mr. Merkel?
20     A   Yes.
21     Q   If it was plumbing related?
22     A   Yeah.
23     Q   In addition to -- Would most of the
24 work orders be for basic maintenance of the DOC

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 25

1 issues that your occupants find that something
2 needs to be repaired there at the DOC?
3      MR. BRANUM: Objection to the form of
4    the question.
5 BY THE WITNESS:
6      A   The majority of work orders are
7 maintenance related, yes.
8 BY MR. MORRISSEY:
9      Q   Now, you mentioned that there are
10 times when outside trade people are brought
11 into the Cook County Jail to do work, correct?
12     A   Yes.
13     Q   Is that through the work order system
14 or is that some other process?
15     MR. BRANUM: Objection, incomplete
16    hypothetical.
17 BY THE WITNESS:
18     A   Those larger projects that we don't
19 have any involvement in, those projects would
20 be handled primarily by Capital Planning.
21 BY MR. MORRISSEY:
22     Q   When you say "larger projects," at
23 the DOC, are you referring to a dollar amount
24 of the projects?

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 26

1      A   No, not necessarily. Anything that's
2 beyond our department's capacity. So if --
3      Q   I'm -- Go ahead.
4      A   You know, if it's a large electrical
5 job then -- Well, I shouldn't say that. You
6 know, if it was a large masonry job, we
7 probably couldn't do that because we only have
8 two bricklayers. If we had to -- Some of our
9 shops are much smaller than others based on the
10 workload that is presented. So plumbing is
11 definitely a bigger responsibility, not only at
12 the DOC but just with, you know, the amount of
13 things that can go wrong. And the same thing
14 with electricians. Those are two of our
15 largest trades. You know, there's tens of
16 thousands of light fixtures and motors and
17 stuff like that that all require regular
18 maintenance.
19     Q   I'm going to show you Exhibit
20 Number 3. It's a -- what's entitled -- Do you
21 see that on your screen?
22     A   Yes.
23     Q   It's called Plaintiff's Rule 30(b)(6)
24 Notice to Defendant Cook County. My question

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 27

1 is going to be looking at Topic Number 2, have
2 you been designated by Cook County to address
3 Topic Number 2?
4      A   Yes.
5      Q   And in addition in that 30(b)(6)
6 notice to Cook County, have you also been
7 identified or designated by Cook County to
8 address the Topic Number 4?
9      A   Yes.
10     Q   In this -- Do you have a copy of the
11 Rule 30(b)(6) Notice that was directed to Cook
12 County in front of you?
13     MR. BRANUM: Counsel, you have the
14    notice on the screen.
15     MR. MORRISSEY: I'm asking him does
16    he have a printed out --
17 BY THE WITNESS:
18     A   I don't have it handy or in front of
19 me, no.
20 BY MR. MORRISSEY:
21     Q   Have you been designated for any of
22 the other topics in the Rule 30(b)(6) Notice to
23 Cook County?
24     A   No, I have not.

TOOMEY REPORTING
312-853-0648

Exhibit 28 Page 7

TIMOTHY TYRRELL
May 9, 2023

Page 28

1    Q    What have you done as the designee of
2  Cook County to research Topic Number 2 and
3  Topic Number 4?
4    A    Well, I referred to our work order
5  system because that's how all of our work is
6  documented and then we -- you know, all of our
7  work at Cook County, the work that our trades
8  and our staff perform, is done through the work
9  order system and initiated by that work order.
10       So I did refer to the work order
11  system and there's a work order that was
12  assigned to this project, and it had several
13  work orders under it that are called child work
14  orders.  The main work order 255965, I believe,
15  is the parent work order created by myself.
16       So the majority of that work or all
17  of that work was performed under that parent
18  work order, 255965.
19    Q    And can you tell me what you mean by
20  a parent work order?
21    A    It's just an easier way for us to
22  track work done on a project per se as opposed
23  to a -- just a specific like changing a light
24  bulb, like a regular maintenance work order.

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 29

1  We can -- We're able to track and separate
2  projects from maintenance doing it that way.
3    Q    So a parent work order is a
4  nonmaintenance type of work that's performed by
5  the trades at the DOC?
6    A    That's correct.  We typically only
7  use that on project work, yes.  I can't think
8  of an instance where it's been used for
9  maintenance.
10    Q    So project work at the DOC is called
11  a parent work order?
12       MR. BRANUM:  I think you're
13    mischaracterizing.  Go ahead.
14       MR. MORRISSEY:  I'm asking,
15    Mr. Branum.
16       MR. BRANUM:  Well, you're
17    mischaracterizing his testimony.
18  BY THE WITNESS:
19    A    I could probably be here for a while
20  trying to explain this, and it took me a long
21  time to learn it as well and some of our
22  foreman don't really understand the whole
23  process.  So it's -- It is confusing, but it's
24  easier to search for one work order, and then

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 30

1  it would populate all of the work orders that
2  had been assigned to it.  So you pull up one
3  work order as opposed to -- say there's 50 work
4  orders.  A project went 6 months.  There's 50
5  to 100 work orders.  So to gather all of that
6  data and documents at the end to close out a
7  project, you would have to search for all of
8  those work orders and do many, many, many
9  different searches where using the parent/child
10  function inside the work order system, you can
11  narrow that 50 to 100 searches down to one.
12    Q    So looking at Topic Number 4, which
13  states:  Identify, by month and year, when the
14  detainee showers on Cermak 3 West, Cermak 3
15  South and Cermak 3 North were renovated to
16  include fixed benches, you would have -- you
17  would look at the parent work order, which, I
18  guess, is 255965; is that correct?
19    A    Yes.
20    Q    And then that work order, using that
21  work order, it would -- there might have been
22  multiple other work orders that were put in to
23  accomplish the renovation of the fixed benches
24  at Cermak, and they would all have other work

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 31

1  order numbers that would be pulled up by using
2  the parent which is 255965?
3    A    Yes, that's correct.  I've also
4  searched through each -- actually, every tier
5  inside Cermak to see if there was any other
6  work order or any other -- and I don't know.  I
7  think that Cermak 3 South may be inaccurate.  I
8  believe that the work we did was in 3 Southeast
9  as it's shown in the work orders.  I think you
10  have --
11    Q    I'm sorry.  Which showers in Cermak
12  were renovated to provide fixed benches?  Can
13  you identify those?
14    A    Offhand, no, because I don't have it
15  right in front of me, but it was -- it was
16  3 West, 3 North, 3 Southeast and then there
17  were two tiers on the second floor that were
18  done.  And the other two are specified in the
19  work orders.  I think you have those.
20    Q    In what month and year was a fixed
21  bench installed on 3 West?
22       MR. BRANUM:  And, counsel, for the
23    record, we produced the work orders.
24       MR. MORRISSEY:  I'm just asking,

TOOMEY REPORTING
312-853-0648

Exhibit 28 Page 8

TIMOTHY TYRRELL
May 9, 2023

Page 32

1    Mr. Branum.  I have the right to do that.
2         MR. BRANUM:  Well, I just wanted to
3    put on the record that the work orders that
4    he's referring to we produced.
5    BY THE WITNESS:
6    **A     The work was done, I believe -- I**
7    **think it was July of '19 -- or '18.  '18, yeah,**
8    **July of '18, and then I think we completed at**
9    **the end of August or in September.  It was**
10   **about roughly 7 to 10 days for our work to be**
11   **completed in each of the shower areas.**
12   BY MR. MORRISSEY:
13        Q    So we're talking July of 2018 through
14   maybe September of 2018, the fixed benches were
15   put in in Cermak 3 West, 3 North, 3 Southeast
16   and two tiers on the second floor of Cermak?
17        A    Yes.
18        Q    I'm going to turn now to Exhibit 12.
19   Do you see that exhibit on your screen?  Are
20   you able to read it?
21        A    Yes, I do.
22        Q    Can you tell me what Exhibit 12
23   represents?
24        A    That's like an Excel -- It's a

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 33

1    **condensed version of all the work orders**
2    **related to that project just exported to a**
3    **condensed version in Excel.**
4         Q    So Exhibit 12 is Bates Stamped 016149
5    through 016151.  I can pull them down for you
6    so you can see each page.
7              Looking at each of those pages, pages
8    149 through 151, would that have a summary of
9    all the work orders that were put in under the
10   parent work order, which was -- you identified
11   as --
12        A    That will be up at the top, I think.
13   So the numbers -- The second column on the left
14   is the work order number, and they're in
15   descending order or ascending order.  So if you
16   go to the top, it would be the parent work
17   order.
18        Q    We'll go to the first page.
19        A    Right, first page up at the top,
20   second column from the left, 255965 and then
21   over -- a few columns over to the right under
22   SubType, and it says parent.
23        Q    Okay.  I see that.  I see that.
24        A    Yep, and so then all of those -- and

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 34

1    then actually if you slide over to the right a
2    little bit -- I can't see it because all of
3    your faces are right here on the right.  But
4    there's a column over here, I believe, says:
5    Ref number.
6         Q    Yeah.
7         A    And that would be the 255965, and it
8    should be all of those work orders the rest of
9    the pages down.
10        Q    So if you pull up the parent work
11   order, it pulls up all of these other work
12   orders that were needed to complete the task of
13   renovating the showers that -- in Cermak,
14   correct?
15        A    That's correct.  So I don't know.  I
16   mean, I guess, it's -- you can see how it's
17   easier for us to track it this way where it's
18   separated.  You can sort it easily by tier, by
19   trade, by however you want.  That's why we use
20   this parent/child option for our projects.
21        Q    Can I ask you going to the top under
22   initiated by, your name appears throughout
23   these work orders as the person that initiated
24   it.  Why is that?

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 35

1         A    So with that parent/child option,
2    since I initiated the parent, I'm the initiator
3    of the project per se.  So that's pre-populated
4    on each subsequent child work order.
5              Now, if you go over, then -- So if I
6    or our foreman, who can create work orders as
7    well, they can go and do that.  And then kind
8    of in the middle where it says assigned to,
9    that's the foreman of the trade that is two
10   columns to the left of that.
11        Q    If we go on the page that's 151, all
12   the way on the bottom.
13        A    Uh-huh.
14        Q    The last two entries were initiated
15   by Joseph Merkel, and that has a different work
16   order.
17             MR. BRANUM:  Is there a question
18        pending, Counsel?
19             MR. MORRISSEY:  Well, Mr. Branum, I'm
20        going to ask the question.  I'm just
21        referring him to the document.
22   BY MR. MORRISSEY:
23        Q    If we go all the way over to the
24   right side to the two entries at the bottom of

TOOMEY REPORTING
312-853-0648

Exhibit 28 Page 9

TIMOTHY TYRRELL
May 9, 2023

Page 36

1  Bates Stamp 151, it has reference work order,
2  and it has -- or I'm sorry.  It has comments,
3  and there's the comment:  Move ADA bench to
4  within ADA standards.  Change out grab bars to
5  ADA standard size.  And it says --
6      A    If I can recall correctly and I think
7  that we had some shipping issues with some of
8  the components for that project, specifically
9  grab bars.  So I think that they were the
10 incorrect size.  We put them in temporary as we
11 did -- were completing the project.  We went
12 back once we got the new correct grab bars, and
13 Joe went and installed those, and that's what
14 those two work orders at the bottom are.
15     Q    If we go to Exhibit Number 10, do you
16 see Exhibit Number 10?
17     A    Yes, I see it.  Sure.
18     Q    Can you explain what this document
19 is?  It's titled -- Well, it's Bates Stamped
20 01312.  And up at the top, first line it says:
21 Client:  Cook County JOC.  Name:  DOC ADA
22 adjustments for DOJ.
23         My question to begin with, what does
24 JOC stand for?

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 37

1      A    That is job order contract or
2  contractor.  I think it may be job order
3  contractor.  Yeah, something like that.  It's a
4  method that Capital Planning uses to perform
5  capital projects.  So that's -- Those are the
6  bigger projects I was kind of talking about
7  earlier.  They are done through the JOC process
8  and then --
9      Q    And --
10     A    Go ahead.
11     Q    Okay.  When a project at the DOC is
12 done through the job order contract, as the
13 general manager for Cook County, are you
14 responsible for supervising these jobs, the JOC
15 jobs?
16     A    No, no.  I'm not responsible for
17 that.  You know, some -- We typically have some
18 involvement whether we're actively
19 participating or just, you know, assisting to
20 provide access to some of these contractors
21 or -- but those are the only -- we're either
22 actively involved or inactively I guess you
23 would say.
24     Q    Well, if we look at this document,

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 38

1  Exhibit Number 10, we go down to Cermak, the
2  column which talks about Cermak, the location
3  Cermak, it appears that in September of 2023 --
4  I'm sorry -- September of 2013 that there was
5  work done in the shower areas on 3 North and
6  3 East, 3 West and then on the second floor,
7  2 North and 2 West in the showers.
8          Were you involved in that in 2013?
9      A    No, I was not.
10     Q    Were you working at -- as an
11 electrician at DOC in 2013?
12     A    I was working as an electrician.  I
13 don't know if I was at the DOC or not.
14     Q    Prior to the work order that you've
15 put in in Exhibit 12 for renovation of the
16 showers in Cermak in July of 2018, had you
17 physically been in the shower areas in the
18 Cermak building?
19     A    No, not that I can recall, but
20 there's always a chance that I changed a light
21 bulb in one of the showers there but, no, not
22 that I can recall.
23     Q    When a project is done under JOC such
24 as the installation of shower heads in Cermak

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 39

1  in September of 2013, are photographs taken and
2  maintained by Cook County government of the
3  work that is done under a JOC program?
4          MR. BRANUM:  Objection to foundation,
5      calls for speculation.
6          MR. MORRISSEY:  Well, I'm asking.
7  BY THE WITNESS:
8      A    I really wouldn't know what Capital
9  Planning was doing in 2013.
10 BY MR. MORRISSEY:
11     Q    Currently when Capital Planning does
12 a JOC program at the DOC, are photographs
13 maintained of the work that's done under the
14 JOC programs?
15         MR. BRANUM:  Objection, lack of
16     foundation, calls for speculation.
17         MR. MORRISSEY:  Well, I'm asking to
18     his knowledge, Mr. Branum.  I mean, that's
19     perfectly correct.
20         MR. BRANUM:  You still haven't
21     established --
22         MR. MORRISSEY:  You don't have to
23     telegraph to the witness the testimony.
24

TOOMEY REPORTING
312-853-0648

Exhibit 28 Page 10

TIMOTHY TYRRELL
May 9, 2023

Page 40

BY THE WITNESS:

1  BY THE WITNESS:
2      A   I believe that they do, but I'm not
3  sure, 100 percent sure, of Capital Planning's
4  process of documenting and closing out
5  projects.
6  BY MR. MORRISSEY:
7      Q   When you put in this -- When you
8  initiated the work order for the renovation of
9  the showers in Cermak in July of 2018, were you
10 aware that in 2013 that grab bars had already
11 been installed under the JOC program?
12     A   No, I did not know that.
13     Q   Do you know why in 2018 under the
14 project you initiated for renovating the
15 showers in Cermak that the project included
16 putting in grab bars?
17         MR. BRANUM:  Objection to form.
18 BY THE WITNESS:
19     A   After looking at the work orders,
20 yes, it was something that -- it was -- some of
21 the work that we did was installed grab bars,
22 new grab bars.  I don't know specifically what
23 was in there prior to our involvement, and I
24 don't really think I ever went in there to look

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 41

1  at our work after it was done.  So that's not
2  typically something I do.
3      Q   As a general manager for facilities
4  management, do you at times go to meetings with
5  the various departments at the DOJ -- DOC?
6          MR. BRANUM:  Objection to form.
7  BY THE WITNESS:
8      A   Yes, that's -- I guess that's one of
9  my duties.  The not-so-glorious part.
10 BY MR. MORRISSEY:
11     Q   I could imagine it's not so much fun.
12 I'm showing you Exhibit 8.  It's titled:
13 Implementation plan:  Accessibility Provisions
14 of Agreed Order U.S. versus Cook County,
15 Illinois.
16         In 2017, did you attend various
17 meetings in regards to renovating the Cook
18 County Jail to make it more accessible for
19 disabled detainees?
20         MR. BRANUM:  Objection to form.
21 BY THE WITNESS:
22     A   Not that I can recall, no.
23 BY MR. MORRISSEY:
24     Q   Showing you in Group Exhibit

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 42

1  Number 8 -- Hold on one moment.  I found it.  I
2  found it.
3          I'm referring you now to Page 74 of
4  Group Exhibit Number 8.  It's titled:  Project
5  Scope Summary - Final.  And it's Project:  869
6  Cermak-Renovations, ADA improvements.  And it's
7  part of a Department of Capital Planning &
8  Policy 2018 CIP Project Budget.
9          Do you see that document --
10     A   Yes.
11     Q   -- on the screen?
12     A   Uh-huh.
13     Q   I believe Page 77 discusses the
14 Cermak fixed benches.  Let me pull it up.
15         Do you see on the top of the page,
16 Page 77 of Group Exhibit 8 -- Let me ask a
17 preliminary question.
18         What is a business case to your
19 knowledge at Cook County?
20     A   A business case is developed to
21 document why, you know, a project is needed,
22 requirements or why a piece of equipment is
23 needed typically because all of this stuff --
24 and I'm not -- offhand, I don't know what the

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 43

1  dollar value is before it has to go to board,
2  but it's all obviously taxpayer money.  So it's
3  just a professional document to document why,
4  you know, a particular service is needed.
5      Q   In your position as general manager,
6  at times, do you draft business reports for
7  capital improvements?
8          MR. BRANUM:  You said business
9  reports?
10         MR. MORRISSEY:  I'm sorry.  I
11 ·misspoke, Mr. Branum.
12 BY MR. MORRISSEY:
13     Q   Is part of your function as a general
14 manager to prepare a business case -- cases for
15 capital improvements at the DOC?
16     A   If the request is coming specifically
17 from DFM, then, yes, I'll have a part in
18 developing the business case with our -- one of
19 our foreman or our foreman.  Typically, they'll
20 have the request.  If there's a piece of aging
21 equipment, if they want to put -- install a
22 shed or something then they already have the
23 ideas in their mind and then we -- I'm just the
24 pen-to-paper guy per se, so.

TOOMEY REPORTING
312-853-0648

Exhibit 28 Page 11

TIMOTHY TYRRELL
May 9, 2023

Page 44

```
 1        Q    But to your knowledge --
 2        A    In this case, this business case,
 3   though, this is developed by Capital Planning.
 4   I don't develop business cases for capital
 5   projects that are run by Capital Planning.
 6        Q    It says on this Page 77:  Also
 7   request community shower areas to be improved
 8   with slip resistant flooring and install shower
 9   benches that allow for transfer of wheelchair
10   patients.
11        My question is for the Cermak health
12   facility, did you attend any meetings that you
13   recall in 2017 where there was a discussion in
14   regards to installing shower benches in
15   Cermak's community showers?
16        A    No, not 100 percent.  No.  DFM
17   typically gets engaged at Capital's request.
18   Capital is somewhat aware of our capacity
19   limits.  So at some point, it was probably
20   brought up that DFM might be able to do this
21   project, and sometimes we can do it quicker
22   than going through all the process of bringing
23   in a contractor.  So there's a lot of different
24   variables that go into -- but at some point,
```

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 45

```
 1   yes, DFM was approached to do the work, yes.
 2        Q    So as far as the renovation in July
 3   through September of 2018, is it your
 4   understanding initially there was a business
 5   case for that type of work, and then somehow,
 6   it changed that they were going to do it
 7   internally through Department of Facilities
 8   Management?
 9        MR. BRANUM:  Objection,
10        mischaracterizes testimony, calls for
11        speculation.
12        MR. MORRISSEY:  Mr. Branum, I'm
13        asking a question.  Perhaps he knows and
14        maybe he isn't speculating.  So when you
15        try to coach, it's improper.
16        MR. BRANUM:  Tom --
17   BY MR. MORRISSEY:
18        Q    So based upon your knowledge, sir --
19        MR. BRANUM:  Tom, wait.  Hold up.
20   BY MR. MORRISSEY:
21        Q    Based upon your knowledge --
22        MR. BRANUM:  Tom, Tom, Tom, stop.  So
23        if you are going to address me like that, I
24        will stop the deposition and I will get the
```

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 46

```
 1   Court involved.  So do not make personal
 2   attacks on me during this deposition.
 3        MR. MORRISSEY:  Well, that's not a
 4        personal attack.  It's an objection to
 5        making an improper statement on the record.
 6   BY MR. MORRISSEY:
 7        Q    Mr. Tyrrell, to your knowledge, was
 8   there a business case that -- for the
 9   renovation of the Cermak shower areas prior to
10   your involvement?
11        MR. BRANUM:  Same objections.
12   BY THE WITNESS:
13        A    Yeah, I wouldn't know with any
14   certainty, no.
15   BY MR. MORRISSEY:
16        Q    I'm going to turn to Exhibit 13.
17   It's a document that was tendered last night.
18   It's a series of work orders.
19        Are these the work orders that your --
20   that were included in Group Exhibit Number 12,
21   the Excel program, to your knowledge?
22        A    Yes, it is.
23        Q    So if we turn to Work Order 313816, I
24   guess it was put in by Mr. Merkel.  I will try
```

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 47

```
 1   to find that.
 2        A    That's probably all the way at the
 3   bottom.
 4        Q    I'm showing you what's been marked, I
 5   guess, as Defendant's Exhibit -- or I'm sorry.
 6   It's been Bates Stamped 016155.  It appears to
 7   be a work order by Mr. Merkel, and it has a
 8   description of, it looks like:  ADA project -
 9   remove any existing grab bars & shower units
10   were specified by foreman.  Install new ADA
11   compliant shower unit with new grab bars and
12   ADA shower seats.  Re-route water supply to
13   shower unit as needed.
14        MR. BRANUM:  And, Counsel, that
15        exhibit that you're reading from is
16        illegible because the print is so small.
17        Is there a way to --
18        MR. MORRISSEY:  I will try to enlarge
19        it, see if I can enlarge it.
20   BY MR. MORRISSEY:
21        Q    Is that better?
22        A    One more maybe.
23        Q    Yeah.
24        A    That's better.  Yeah, I can read it.
```

TOOMEY REPORTING
312-853-0648

Exhibit 28 Page 12

TIMOTHY TYRRELL
May 9, 2023

Page 48

1    Q    That information is included on your
2  Excel program, Exhibit 12, correct?
3    A    Yes.
4         MR. BRANUM:  Objection to form.
5  BY THE WITNESS:
6    A    Yes, it is.  Everything that's on
7  that -- I shouldn't say everything, but the
8  main portions of that work order are included
9  on that -- on the spreadsheet.
10 BY MR. MORRISSEY:
11   Q    Okay.  I just wanted to -- 12 and 13
12 go hand in hand, correct?
13   A    Yes.  There's some -- every one of
14 those boxes on that work order will show up on
15 the Excel when you export it to Excel.  A lot
16 of it is very redundant.  So I'll trim that
17 spreadsheet down of unnecessary columns just so
18 I can kind of keep it on one sheet.
19   Q    I'm going to go to Exhibit 6.
20 Exhibit 6 is a series of e-mails that
21 Mr. Bentley forwarded to us during, I believe,
22 Mr. Davis' deposition.  If we go to page --
23 Well, let me ask you a preliminary question.
24        As general manager of the Department

TIMOTHY TYRRELL
May 9, 2023

Page 49

1  of Facilities Management, what involvement did
2  you have in inspecting the ramp that runs from
3  the tunnel area into the entrance of the Cermak
4  building?
5         MR. BRANUM:  Objection to form.
6  BY THE WITNESS:
7    A    I didn't have any involvement or very
8  much at all, maybe providing access for
9  somebody to walk through, but that's very, very
10 minimal.
11 BY MR. MORRISSEY:
12   Q    Did you in your position as general
13 manager do any type of measurements of what --
14 Let me start off.  When I refer to the Cermak
15 ramp, do you understand what I'm referring to?
16   A    I do understand where -- Yes.
17   Q    Can you define what the Cermak ramp
18 is, where it's located?
19   A    Well, it's a small section of the --
20 small section/extension of the main tunnel
21 system, the underground tunnel system at the
22 DOC that leads from the main tunnel to the
23 basement of Cermak hospital, and it is -- it's
24 kind of a ramp, yeah.  It's a ramp.  It's a

TIMOTHY TYRRELL
May 9, 2023

Page 50

1  ramp, yes.
2    Q    Have you ever inspected that ramp,
3  the Cermak ramp?
4    A    I have not, no.
5    Q    Have you ever taken any measurements
6  to determine whether or not it complies with
7  the ADA?
8    A    I have not personally, no.
9    Q    Did you ask Joe Merkel to measure the
10 Cermak ramp to determine whether or not it
11 complied with the ADA?
12   A    I did at the request of Capital
13 Planning.
14   Q    I'm going to turn to Page 6 of this
15 document.  Did you ever talk to an attorney by
16 the name of Zachary Pestine, P-e-s-t-i-n-e?
17        MR. BRANUM:  So you can answer that
18        question, but don't divulge any of your
19        communications.
20 BY THE WITNESS:
21   A    Not that I can recall, no.  The name
22 does not look familiar.
23 BY MR. MORRISSEY:
24   Q    I'm turning to Page 2 of the e-mail --

TIMOTHY TYRRELL
May 9, 2023

Page 51

1  I'm sorry.  I'm turning to Page 2 from Exhibit
2  Number 6, and there's an e-mail from Eric
3  Davis.  You know Mr. Davis, correct?
4    A    Yes, I do.
5    Q    And do you work with him on an
6  ongoing basis as -- in his function as being a
7  deputy in Capital Planning?
8         MR. BRANUM:  Objection to the form of
9         the question.
10 BY THE WITNESS:
11   A    We work together on -- when we have
12 an involvement in capital projects but on a
13 day-to-day basis, no.
14 BY MR. MORRISSEY:
15   Q    In March of 2021, Mr. Davis sent you
16 an e-mail, March 9th, 2021, at 3:59, it says:
17 This is the diagram that explains the
18 requirements, by the way.  Note the rise
19 limitation on the left before an intermediate
20 landing is required and it continues on the
21 next page, and it has a diagram.
22        In your position as general manager,
23 did you receive this e-mail?
24        MR. BRANUM:  Objection to form.

TOOMEY REPORTING
312-853-0648

Exhibit 28 Page 13

TIMOTHY TYRRELL
May 9, 2023

Page 52

1  BY THE WITNESS:
2      A    Yeah.  I do recall kind of seeing it.
3  Whether I knew at all what -- I probably didn't
4  put too much into it myself.  I -- There's
5  others are on that e-mail that it pertains
6  to more than me.
7  BY MR. MORRISSEY:
8      Q    Have you received -- What training in
9  your position as general manager have you
10  received in regards to the requirements under
11  the ADA for a ramp to be compliant under the
12  ADA standards?
13         MR. BRANUM:  Objection, lack of
14         foundation.
15  BY THE WITNESS:
16     A    I have no training at all.  I have
17  general knowledge of ADA guidelines and
18  standards from 25 years of being in
19  construction and facilities.  I am not an
20  expert whatsoever nor would I ever pretend to
21  be one.
22  BY MR. MORRISSEY:
23     Q    When Mr. Davis asked you to look at
24  the rise in the diagram, which is in Group

TIMOTHY TYRRELL
May 9, 2023

Page 53

1  Exhibit 6, did you understand what he meant
2  that the rise -- the maximum rise could be
3  30 inches?
4         MR. BRANUM:  I think you may be
5         mischaracterizing his testimony.
6  BY MR. MORRISSEY:
7      Q    Well, let's go back.
8      A    I know what a rise and a run is more
9  so in a stairs sense or a roof sense.  I don't
10  really think of ramps too often; but rise and
11  run, I'm thinking of stairs or a roof.
12     Q    But when Mr. Davis directed you to
13  his -- the rise limitation on the left before
14  an intermediate landing is required for the
15  ramp, did you understand what that diagram
16  intended?
17     A    Probably not because, like I said, I
18  probably wasn't really paying a whole lot of
19  attention to it because Joe Merkel was actually
20  going to take the measurements.  So this was
21  more directed at -- I would think Joe or the
22  other fella who was on there, Joey Tse.
23     Q    On the e-mail is -- Joe Merkel is on
24  the e-mail, correct?

TIMOTHY TYRRELL
May 9, 2023

Page 54

1      A    That's correct.
2      Q    Did Mr. Davis tell you to have Joe
3  Merkel go over and measure the ramp to see if
4  it was compliant?
5      A    Yes, I believe the direction came
6  from Eric Davis.
7      Q    Why was Mr. Merkel, a plumber, chosen
8  in March of 2021 to measure the Cermak ramp?
9         MR. BRANUM:  Objection to form.
10  BY THE WITNESS:
11     A    I'm not sure why he was chosen.  Joe,
12  he's very meticulous and very thorough.  He --
13  Out of all of our foreman, he probably has the
14  most involvement with ADA-type issues in a
15  specific trade.  There's a lot of them that
16  relate to -- that have a relation to plumbing.
17         So Joe, you know, has had several
18  renovations/improvements to bring stuff up to
19  ADA guidelines and stuff like that.  So, Joe,
20  he does his homework.  Maybe that's why he was
21  chosen.
22  BY MR. MORRISSEY:
23     Q    I'm referring now to Page 8 of
24  Group Exhibit 6.  There is a Mike Canaberry --

TIMOTHY TYRRELL
May 9, 2023

Page 55

1  Careberry --
2      A    Carberry.
3      Q    -- Carberry is listed but there's
4  also a person by the name of Duncan.  Who is
5  Duncan?
6      A    Duncan Smith is a construction
7  manager at the DOC.
8      Q    Do you know if he, Duncan Smith, has
9  any training or experience in regards to the
10  ADA requirements for a ramp such as Cermak?
11     A    No, but I would say most -- if I'm
12  not available to coordinate the work and I'm --
13  So us three basically sit in the office.  Mike
14  is the deputy director, and then there's Duncan
15  and I, and we kind of run the ship together.
16  So if one of us isn't available, then we kind
17  of just have people throw all of us on there so
18  they get an answer quicker.
19         My thought is that Sabrina wanted to
20  get this done, so maybe I wasn't responding
21  fast enough at the time so she included Duncan
22  and Carberry to get it moving along.
23     Q    I'm going to turn you now to Page 4
24  of Group Exhibit Number 6.  It's from you.

TIMOTHY TYRRELL
May 9, 2023

Page 56

1    It's an e-mail from you on March 9th, 2021 at
2    2:15 p.m. to Zachary Pestine and copied are
3    Sabrina Canchola and a slew of other people.
4         You say:  Good afternoon.  The
5    measurements taken were of the ramp from the
6    tunnel to the basement entrance of Cermak.
7         Is that what you are referring to as
8    the Cermak ramp?
9         A    Yeah, yeah.
10        Q    And then you go on:  With that being
11   said, I do not think that either ramp is ADA
12   compliant.  I'm adding Joe Merkel, as he is the
13   one who took the measurements.
14        What do you mean by "either ramp is
15   ADA compliant"?
16        A    Okay.  That's kind of a two-part
17   question.  So there is another ramp, right, on
18   the other side, about 25 or 30 feet down the
19   tunnel that goes into Division 8/RTU.  I'm not
20   100 percent if there were measurements taken of
21   that ramp as well, but I think the ramp in
22   question is the one from Cermak basement to the
23   tunnel.
24        Somebody might have probably told me

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 57

1    that they didn't think that the ramp is
2    compliant, and that's why I said I don't think
3    that neither because, again, I'm not an ADA
4    expert.
5         Q    Then if we're looking at Page 6 -- So
6    you asked Mr. Merkel to go over and measure the
7    ramp; is that fair to say?
8         A    Yeah.  Well, yeah, I probably asked
9    for Joe's assistance after Eric asked for our
10   assistance, yes.
11        Q    And then you e-mailed back to Sabrina
12   and the other folks the initial measurements
13   that Joe Merkel took, correct?
14        A    Yeah, that's what it looks like,
15   yeah.
16        Q    And that's on Page 6 and 7 of this
17   group exhibit.
18        A    It looks like an e-mail from Joe that
19   I copy and pasted and sent to Sabrina, yes.
20        Q    Do you know how Joe initially
21   measured the Cermak ramp?
22        A    I don't know.  No, I don't know for
23   sure.  I'm not sure if he used a laser or --
24   I'm not quite sure what he used to take

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 58

1    measurements.
2         Q    So he had these measurements:  Slope,
3    1 to 16; length, 44 feet and a half inch; total
4    rise, 2 feet 7 inches.  And 2 feet 7 inches is
5    31 inches, correct?
6         A    Yes.
7         Q    And that's -- If we look back at
8    Mr. Davis' diagram, that's over the 30 inches
9    for a rise, correct?
10        A    Well, I'm going to take your word for
11   it because when you were showing me that
12   diagram, I wasn't really paying attention to it
13   then either.
14        Q    Well, here --
15        A    Yes.  So it would be one inch over.
16   Correct, yes.
17        Q    When Mr. Merkel came back with these
18   measurements, did you then direct him to go
19   back to do a second measurement of the Cermak
20   ramp?
21        A    If I can recall correctly, I think
22   Joe did go back another time for more
23   measurements.
24        Q    At whose request did Mr. Merkel go

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 59

1    back a second time to do a measurement?
2         A    It was more than likely through Eric
3    Davis.
4         Q    Did Mr. Davis say, hey, go back and
5    check the rise because the rise that you
6    measured is 31 inches, and it has to come in at
7    30 inches.  Do you know?
8         A    No, I don't know.  I don't recall
9    exactly what Eric Davis said.
10        Q    On Page 6 of 7 it says:  I also
11   checked the ramp from the same tunnel going
12   into the basement of Division 8.  This appears
13   to be slightly out of compliance.  I could show
14   you or Sabrina this as well.
15        Was Mr. Merkel in March of 2021 asked
16   to check out the other ramp to see if it was
17   compliant?
18        A    I don't recall that he was asked to
19   check that ramp but, as I said, Joe is
20   meticulous.  Sometimes overly.
21        Q    When he went back a second time, do
22   you know where he obtained this laser?
23        A    One of our other trades had the
24   laser, I believe, and I'm not -- offhand, I

TOOMEY REPORTING
312-853-0648

Exhibit 28 Page 15

TIMOTHY TYRRELL
May 9, 2023

Page 60

1  don't know which trade it was.
2      Q   Do you know if the laser -- Let me
3  ask you a preliminary question.
4          In the trades, at times, do laser
5  beams have to be calibrated so that they're
6  accurate?
7          MR. BRANUM:  Objection, foundation.
8  BY THE WITNESS:
9      A   To my knowledge, yes, they do have --
10  require -- not very often but, yes, they do
11  require calibration.
12  BY MR. MORRISSEY:
13      Q   Do you know how a tradesperson
14  calibrates a laser?
15      A   Well, I don't.  And I have -- I
16  actually have two and I don't really know.  I'm
17  trying to think how I would calibrate my own
18  but I don't know, no.  So I don't.
19      Q   Did you go over with Mr. Merkel when
20  he used a laser on the second time of the
21  measurements that he took?
22      A   No, I didn't.  But with that said, a
23  laser is a tool that's used by many trades,
24  plumbers being one of them, yes.

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 61

1      So would I have any reason to believe
2  that Joe didn't know how to use a laser?  No, I
3  would have no reason to believe that.  Would
4  Joe be able to recognize that the laser is not
5  calibrated correctly to -- he would probably be
6  able to, you know, see that it's off a quarter
7  of an inch.  Down to a 32nd, probably not.
8          Joe is very knowledgeable and he
9  knows what he's doing.  He's not an expert.  He
10  is not an expert.
11      Q   Does it matter where he set the laser
12  on the ramp as far as determining the rise of
13  the ramp to your knowledge?
14          MR. BRANUM:  Objection to form,
15      foundation.
16  BY THE WITNESS:
17      A   I mean, I imagine it does, but I
18  don't know where he set the laser either.
19  BY MR. MORRISSEY:
20      Q   Do you have knowledge --
21      A   And these measurements were -- these
22  were all for reference.  These weren't -- None
23  of these measurements were, in my estimation,
24  were legally binding or no drawings were going

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 62

1  to be made off these.  These were just for
2  reference and were going to be, you know,
3  examined by, I believe, an ADA consultant that
4  was coming on board.
5          So this was just us getting rough
6  measurements, nothing -- nothing set in stone.
7      Q   To your knowledge, has the -- Has
8  Cook County or Capital Planning hired an
9  architectural firm to walk through the DOC to
10  determine whether or not the facility is
11  compliant with the ADA?
12          MR. BRANUM:  Objection, foundation,
13      calls for speculation.
14  BY THE WITNESS:
15      A   Capital Planning has many, many, many
16  consultants.  I don't know the roles and
17  responsibilities of all of them.  I know that,
18  yes, there have been several assessments of all
19  the buildings on the whole campus.  I've never
20  seen -- I've assisted on walkthroughs for those
21  assessments.  Have I ever seen any results from
22  any of those assessments?  No.  I don't know
23  what's in them and -- So, yes, the answer to
24  your question is yes.  There are several

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 63

1  assessments.
2      Q   In the last year, have you been
3  present during any walkthrough of the DOC with
4  members of Capital Planning or outside
5  architectural firms to assess whether or not
6  there needs to be ADA improvements at the
7  Department of Corrections?
8      A   Myself personally, no.
9      Q   Has anybody on your staff in the last
10  12 months walked through with a member or
11  members from Capital Planning and any outside
12  architectural firm to do a review of whether or
13  not the DOC premises needed to be changed to
14  comply with the ADA?
15      A   Are we talking just Cermak or the
16  entire campus?
17      Q   I'm talking about the entire campus.
18      A   Again, we may have assisted with,
19  say, badging or some access to a certain point,
20  but typically any of those -- any of those
21  visits would have to be coordinated with the
22  Sheriff's Office, escorted by the Sheriff and
23  we may be along for the -- you know, just as --
24  you know, just for specific trade knowledge if

TOOMEY REPORTING
312-853-0648

Exhibit 28 Page 16

TIMOTHY TYRRELL
May 9, 2023

Page 64

1   there is anything. But other than that, our
2   involvement would be minimum.
3       Q    Do you have any -- Do you have
4   personal knowledge that in the last year,
5   members of Capital Planning -- members of your
6   staff have walked through the DOC with outside
7   consultants to review ADA provisions at the
8   jail?
9       A    Offhand, no. But, like I said, we
10  may be along for walkthroughs, and we might not
11  be. So, like I said, our involvement is very
12  minimal.
13      Q    On Group Exhibit 6, there is an
14  e-mail from Sabrina Canchola to you, and it
15  says: I think Zach needs the measurements just
16  for the ramp outside the entrance to Cermak,
17  not the ramp in the basement of the RTU. And
18  then you respond: Good morning, Eric. There
19  is not an intermediate landing on the ramp to
20  Cermak. There are two small turns but no
21  actual landing.
22          What did you mean by that?
23      A    Well, actually that was -- that looks
24  like Sabrina's response to me.

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 65

1       Q    Oh, I'm sorry. That's correct.
2       A    But I believe that Eric was under the
3   assumption that there was some kind of landing
4   in that ramp, and I think I was just saying
5   that I didn't think there was any ramp,
6   intermediate ramp.
7       Q    What did you mean by: There are two
8   small turns. Are you referring to the Cermak
9   ramp that there's turns?
10      A    Yes.
11      Q    Where are the turns on the Cermak
12  ramp?
13      A    Well, I don't know for certain but
14  they kind of like zigzag a little bit. So
15  there's two. Instead of just going one
16  straight shot, it's kind of maybe like an "S"
17  or so but not curvy, more straight lines.
18          MR. MORRISSEY: I'm going to take a
19      five-minute break. We're kind of getting
20      to the end of this. So I just need five
21      minutes, okay?
22          THE WITNESS: All right. Me too.
23          MR. MORRISSEY: Take five minutes,
24      stretch your legs and be back in five

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 66

1       minutes.
2           MR. BRANUM: Thanks, Tom.
3               (WHEREUPON, a short
4               break was taken.)
5   BY MR. MORRISSEY:
6       Q    Turning to Exhibit 3 again, which is
7   the Plaintiff's Rule 30(b)(6) notice to Cook
8   County. Attached to it --
9           MR. BRANUM: Tom, you don't have the
10      notice on the screen.
11          MR. MORRISSEY: It is.
12          MR. BRANUM: No, that looks like
13      something else. Okay. You keep scrolling
14      up and down. It's hard to follow.
15          MR. MORRISSEY: See. Are you all
16      right, Mr. Branum?
17          MR. BRANUM: So now you have the
18      notice on the screen, but what you had on
19      the screen before was not the notice.
20          MR. MORRISSEY: Well, if you
21      listened. Let me do it again.
22  BY MR. MORRISSEY:
23      Q    Exhibit 3 includes an attachment,
24  which is the FY18 Capital Business Case.

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 67

1       Sir, did you have any involvement in
2   drafting or preparing this fiscal year capital
3   business case?
4       A    No, not myself. No.
5       Q    Have you seen this document before?
6       A    I've seen the format. I'm not too
7   certain I have seen that exact document, but it
8   looks like that was generated -- a business
9   case generated by folks at Cermak Hospital.
10      Q    And under -- On the second page of
11  this document, there is a caption: What are
12  the motivating/issues, concerns behind this
13  request?
14      A    Uh-huh.
15      Q    And in part, it says: Cook County is
16  currently in violation of the ADA code and
17  safety concerns are driving this project.
18          Did you have any input in this
19  business case in regards to whether or not Cook
20  County was violating the ADA in regards to the
21  Cermak infirmary?
22          MR. BRANUM: Objection, lack of
23      foundation, form of the question.
24

TOOMEY REPORTING
312-853-0648

Exhibit 28 Page 17

TIMOTHY TYRRELL
May 9, 2023

Page 68

1  BY THE WITNESS:
2       A    Me personally, no, I did not.
3  BY MR. MORRISSEY:
4       Q    Do you know when the renovations of
5  the Cermak shower areas were completed in the
6  fall of 2018, the exact date?
7       A    It would be in the work orders.  I
8  think I said earlier that it was end of August
9  or in September of '18.
10      Q    Could it have been as late as
11 November of 2018 when the work was entirely
12 completed?
13      A    Yes.  If you say entirely completed,
14 those bottom two work orders on that list, when
15 we received the correct grab bars that Joe went
16 and installed, yes.  But for the majority of
17 the construction, that was completed, I
18 believe, end of August, early September.
19 Again, it's in the work order.
20      Q    I'm going to show you -- I believe
21 it's Exhibit 7 -- Well, let me just ask you a
22 question before I pull that up.
23           In the fall of 2022, did you have any
24 involvement in retaining a land surveyor to

TOOMEY REPORTING
312-853-0648

---

TIMOTHY TYRRELL
May 9, 2023

Page 69

1  measure the Cermak ramp?
2       A    As I mentioned earlier, there was --
3  we -- or I assisted in badging of what, I
4  think, was an ADA consultant to look at the
5  ramp.  After the woman got her credentials, I
6  coordinated with Joe for him to escort her,
7  this woman, to the ramp to view and I don't
8  know if she took measurements or pictures.  I'm
9  not too sure, but that's my involvement with
10 that and I think that it was an ADA consultant,
11 and that's it.
12      Q    Do you know if the person -- the name
13 of the female that you badged to -- in the fall
14 of 2022 to go over to the Cermak ramp?
15      A    I don't remember the name offhand,
16 no.
17      Q    Do you know what her professional
18 position was?  Was she an architect?
19      A    An architect, yeah, I would say if I
20 try to think back to like the e-mail where --
21 you know, the exchange of her information that
22 I sent to the sheriffs, maybe she had the AIA
23 designation, but I wouldn't know for certain.
24      Q    Do you know what -- Do you have any --

TOOMEY REPORTING
312-853-0648

---

TIMOTHY TYRRELL
May 9, 2023

Page 70

1  Did you receive any feedback in regards to the
2  measurements that she took of the ramp?
3       A    I don't recall any follow-up e-mails
4  with measurements.  She may have, you know, had
5  those discussions with Eric Davis.
6       Q    Do you know if in the fall of 2022
7  whether there was a handrail installed on the
8  Cermak ramp?
9       A    Yes.  DFM, our ironworkers, they
10 installed some handrails.
11      Q    Was there a work order for the
12 handrails?
13      A    Yes, but I don't know offhand what
14 number that would be.
15      Q    In your position as general manager
16 of facilities management, would you be able to
17 pull up the work order for a handrail that was
18 installed in the fall of 2022?
19      A    Yeah.  To be perfectly honest, I
20 actually just did that for that project.  I was
21 very slow to close that project out.  So I
22 think I just did it last week, so yes.  That
23 one is pretty fresh.
24      Q    So the work order for --

TOOMEY REPORTING
312-853-0648

---

TIMOTHY TYRRELL
May 9, 2023

Page 71

1       A    However --
2       Q    I'm sorry.  I didn't mean to cut you
3  off.
4       A    Is this part of -- Is this in
5  relation to the ramp?
6       Q    Correct.  I'm referring to a handrail
7  in the ramp for Cermak.  Is that what you were
8  referring to, the railing alongside the Cermak
9  ramp?
10      A    Yes.
11      Q    That was done internally by
12 facilities management?
13      A    That's correct.
14      Q    By the ironworkers?
15      A    Actually, yes, started it at the end
16 of '22 and then completed it in the beginning
17 of '23 because of delivery and shipment issues.
18      Q    What needed to -- What materials
19 needed to be delivered in order to install the
20 handrail?  There were two handrails on both
21 sides of the ramp; is that correct?
22      A    I believe that's correct, yes.
23 Again, I never really inspected this before and
24 after.  This was actually kind of coordinated

TOOMEY REPORTING
312-853-0648

Exhibit 28 Page 18

TIMOTHY TYRRELL
May 9, 2023

Page 72

1  by Eric Davis.  The request came from him to do
2  that.  And, yeah, it was --
3      Q      Was there a specific correctional
4  material that needed to be used for the
5  handrails that were installed on the Cermak
6  ramp?
7      A      Yes.
8          MR. BRANUM:  Objection to form.
9  BY THE WITNESS:
10     A      Well, there was a specific product that
11 was identified for us to use.  I think -- and
12 most of it, I believe, was for antiligature --
13 is that the right word?  Antisuicide.  So I
14 think that's really all it was and to procure
15 that product, we had to go through Grainger to
16 a third-party vendor to get the exact product
17 that was needed.  So it took awhile.  There's
18 still supply chain issues from COVID, and the
19 wrong person ordered the material and that's
20 it.  So it was kind of a -- It wasn't very well
21 organized.
22     Q      When was the handrailing on both
23 sides of the Cermak ramp completed?
24     A      It was complete in January of '23.  I

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 73

1  think January 16th if -- that's -- That's 99
2  percent.  Like I said, I just put that closing
3  package together for that project.
4      Q      What written documents do you have --
5      A      Actually, I'm sorry.  It was.  Was
6  that Martin Luther King day, the 16th?  Then
7  that's the day it was because our ironworkers
8  worked on that Monday.
9      Q      And you have personal knowledge that
10 the ironworkers completed it on Martin Luther
11 King Day in 2023?
12     A      Correct.
13     Q      What documentation does facilities
14 management have in regards to the installation
15 of the handrails?
16     A      The work orders.
17     Q      Any other -- Were there purchase
18 orders for the railings from -- you said it was
19 Grainger?
20     A      We use Grainger when we have to go to
21 a third-party vendor to -- kind of like a pass
22 through.  There's a lot of purchasing.  It's
23 hard to make purchases sometimes.  So, yes, we
24 use Grainger as a passthrough basically.

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 74

1      Q      So would there be paperwork and
2  purchase orders for the material too?
3      A      Yes.
4      Q      So in addition to the work orders,
5  there would be purchase orders for the metal?
6      A      Correct.  Yes.
7      Q      And Facilities Management would have
8  those documents?
9      A      Yes.  Yeah.  Our business
10 department would probably have that and if
11 not -- They would.  And Capital Planning would
12 also have those.
13         MR. MORRISSEY:  I have nothing further.
14         Mr. Branum, I will make a request
15     and we'll follow it up with a production
16     request for the documents involving the
17     handrails for the Cermak ramp.  I have
18     nothing further.  Thank you for your time
19     this afternoon.
20         THE WITNESS:  Thank you.
21         MR. BRANUM:  And I have no questions.
22     We will reserve signature.  Thank you.
23
24         FURTHER DEPONENT SAITH NOT....

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 75

1        IN THE UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF ILLINOIS
                   EASTERN DIVISION
3
4  CORNELIUS WALKER,            )
                                )
5        Plaintiff,             )
                                )
6        vs.                    )   No. 20-cv-00261
                                )
7  THOMAS DART, SHERIFF OF      )
   COOK COUNTY AND COOK         )
8  COUNTY, ILLINOIS,            )
                                )
9        Defendants.            )
10         I, TIMOTHY TYRRELL, being first duly
11 sworn, on oath, say that I am the deponent in
12 the aforesaid deposition, that I have read the
13 foregoing transcript of my deposition,
14 consisting of pages 1-75 inclusive, taken at
15 the aforesaid time and place and that the
16 foregoing is a true and correct transcript of
17 my testimony so given.
18
19         _____
               TIMOTHY   TYRRELL
20
   SUBSCRIBED AND SWORN TO
21 me before this _____ day
22 of _____, A.D. 2023.
23         _____
24 Notary Public

TOOMEY REPORTING
312-853-0648

Exhibit 28 Page 19

TIMOTHY TYRRELL
May 9, 2023

Page 76

```
1    STATE OF ILLINOIS )
                      )  ss:
2    COUNTY OF C O O K )
3            I, Peggy A. Anderson, a Certified
4    Shorthand Reporter in the State of Illinois do
5    hereby certify:
6            That previous to the commencement of
7    the examination of the witness, the witness was
8    duly sworn to testify the whole truth
9    concerning the matters herein;
10           That the foregoing deposition
11   transcript was reported stenographically by me,
12   was thereafter reduced to typewriting under my
13   personal direction, and constitutes a true
14   record of the testimony given and the
15   proceedings had;
16           That the said deposition was taken
17   before me at the time and place specified;
18           That the said deposition was
19   adjourned as stated herein;
20           That I am not a relative or employee
21   or attorney or counsel, nor a relative or
22   employee of such attorney or counsel for any of
23   the parties hereto, nor interested directly or
24   indirectly in the outcome of this action.
```

TOOMEY REPORTING
312-853-0648

TIMOTHY TYRRELL
May 9, 2023

Page 77

```
1            IN WITNESS WHEREOF, I do hereunto set
2    my hand this 26th day of May, 2023.
3    .
4
5
6
7
8    Peggy A. Anderson
9    Certified Shorthand Reporter
10   License No. 084-003813
```



TOOMEY REPORTING
312-853-0648

Exhibit 28 Page 20

Case: 1:23-cv-16970 Document #: 42-7 Filed: 08/14/24 Page 1 of 1 PageID #:339

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

William Mathis, *individually and for a class*,                )
                                                                )
                                Plaintiff,                      )
                                                                )
                                -vs-                            )     24-cv-1127
                                                                )
Thomas Dart, Sheriff of Cook                                   )     Judge Tharp Jr.
County, and Cook County, Illinois,                             )
                                                                )
                                Defendants.                     )

**DECLARATION CARLOS MARTINEZ**

Under penalties of perjury as provided by law, the undersigned certifies that the following statements are true:

1. My name is Carlos Martinez. I am incarcerated at the Cook County Jail under booking number 2022-0103033.

2. I use crutches to move from place to place because of an injury.

3. I have moved up and down the Cermak ramp using crutches. It is difficult and painful to traverse this ramp because it is steep and long. The ramp also does not have an area for me to rest at the mid-point.

4. A few days ago, I believe on May 30th, I moved up and down the Cermak ramp using crutches. I asked medical and correctional staff for a wheelchair and was denied use of a wheelchair.

Dated: 6/1/24

*Carlos Martinez*
Carlos Martinez

C.M

Exhibit 7 Page 1

Exhibit 29 Page 1

Case: 1:23-cv-16970 Document #: 42-8 Filed: 08/14/24 Page 1 of 1 PageID #:340

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| William Mathis, *individually and for a class*, | ) ) ) |
| Plaintiff, | ) ) |
| -vs- | ) ) 24-cv-1127 |
| Thomas Dart, Sheriff of Cook County, and Cook County, Illinois, | ) Judge Tharp Jr. ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF TOMMY LOVE

Under penalties of perjury as provided by law, the undersigned certifies that the following statements are true:

1. My name is Tommy Love. I am incarcerated at the Cook County Jail under booking number 2024-0416135.

2. I suffer from several chronic medical conditions that substantially limit my ability to walk and move from place to place. For about three years, I have used a cane to move from place to place.

3. I am familiar with the ramp in the lower level of the RTU that is known as the east tunnel ramp that leads to Cermak and also the ramp leading to Cermak. Correctional staff has escorted me up and down both ramps.

4. Both ramps are steep and long. It is difficult for me to traverse these ramps using my cane. I have experience physical pain in my body traversing these ramps.

Dated: 6/11/24

Tommy Love

Exhibit 8 Page 1

Exhibit 30 Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Cuauhtemoc Hernandez, *individually*
*and for a class,*

          *Plaintiff,*

          -vs-

Thomas Dart, Sheriff of Cook
County, and Cook County, Illinois,

          *Defendants.*

23-cv-16970

Judge Harjani

## DECLARATION OF QUOVOTIS HARRIS

Under penalties of perjury as provided by law, the undersigned certifies that the following statements are true:

1. My name is Quovotis Harris. I am incarcerated at the Cook County Jail under booking number 2019-0709220 I have been at the Cook County Jail for about five years.

2. My right leg above the knee was amputated in 2006. This condition substantially impairs my ability to move from place to place.

3. As a detainee, I have been permitted to use a cane to move from RTU to Cermak. In approximately September of 2023, the Jail stopped allowing me to use a cane to assist with ambulating.

4. I regularly move from RTU, my housing unit, to Cermak for medical appointments.

Exhibit 14 Page 1

Exhibit 31 Page 1

Case: 1:23-cv-16970 Document #: 42-14 Filed: 08/14/24 Page 2 of 2 PageID #:403

5   Moving up and down the ramps from RTU to Cermak was painful even when the

Jail allowed me to use a cane. I now traverse the RTU and Cermak ramps without a

cane. It is very painful particularly because my protistic leg does not fit well.

6.  Each ramp is steep and there is not enough space for me to rest while moving up

or down.

Dated: 7-5-24

Quovotis Harris
Quovotis Harris

Exhibit 14 Page 2

Exhibit 31 Page 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

William Mathis, *individually and for a class*,

        Plaintiff,

        -vs-

Thomas Dart, Sheriff of Cook County, and Cook County, Illinois,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

24-cv-1127

Judge Tharp Jr.

## DECLARATION OF KAVARIAN ROGERS

Under penalties of perjury as provided by law, the undersigned certifies that the following statements are true:

1. My name is Kavarian Rogers. I am incarcerated at the Cook County Jail under booking number 2020-0402015.

2. In February of 2020 I was shot in the left side of my head. This injury substantially impacts my ability to use the right side of my body. I have limited ability to move my right hand and right leg. It is extremely difficult for me to move from place to place because of these injuries.

3. I am substantially limited in the ability to move from place to place unless I am provided an assistive device. The correctional staff generally let me use a walker when I leave Division 9 to travel to other parts of the Jail campus, including the Cermak building.

Exhibit 32 Page 1

4. I have traveled up and down the east tunnel ramp located in the lower level of the RTU and the Cermak ramp. It is painful for me to traverse these ramps using my walker. The ramps are both steep and long.

5. Over the past few months, I have traversed the Cermak ramp several times. It is very difficult for me to travel up and down this ramp using my walker. There is no place on this ramp to safely rest when I go up or down in my walker. I have requested staff to help me go up and down the ramp and even filed a grievance. Despite these requests, staff direct me to move up and down the ramp with my walker.

Dated: 6-1-24

_____
Kavarian Rogers

Exhibit 32 Page 2

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF ILLINOIS

3                      EASTERN DIVISION

4        _____

5    CUAUHTEMOC HERNANDEZ,

6            Plaintiff,

7       v.                              Case No.

8    THOMAS DART, SHERIFF OF COOK            22-cv-16970

9    COUNTY, AND COOK COUNTY,

10   ILLINOIS,

11           Defendants.

12       _____

13              VIDEOTAPED DEPOSITION OF

14                   KAVARIAN ROGERS

15   DATE:        Thursday, September 19, 2024

16   TIME:        9:34 a.m.

17   LOCATION:    Remote Proceeding

18                Cook County Department of Corrections

19                2700 South California Avenue

20                Chicago, IL 60608

21   REPORTED BY:  Carly Hemberger

22   JOB NO.:     6902808

23

24

Page 2

| | |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | ON BEHALF OF DEFENDANTS THOMAS DART, SHERIFF OF COOK |
| 3 | COUNTY, AND COOK COUNTY, ILLINOIS: |
| 4 | ZACHARY STILLMAN, ESQUIRE (by videoconference) |
| 5 | DeVore Radunsky LLC |
| 6 | 230 West Monroe Street, Suite 230 |
| 7 | Chicago, IL 60606 |
| 8 | zstillman@devoreradunsky.com |
| 9 | (312) 300-4479 |
| 10 | |
| 11 | ON BEHALF OF KAVARIAN ROGERS: |
| 12 | PATRICK W. MORRISSEY, ESQUIRE (by |
| 13 | videoconference) |
| 14 | Thomas G. Morrissey LTD |
| 15 | 10257 South Western Avenue |
| 16 | Chicago, IL 60643 |
| 17 | pwm@morrisseylawchicago.com |
| 18 | (773) 233-7900 |
| 19 | |
| 20 | ALSO PRESENT: |
| 21 | Robert "Bob" Gore, Veritext Videographer (by |
| 22 | videoconference) |
| 23 | Erin Wright, DeVore Radunsky Law Clerk (by |
| 24 | videoconference) |

Page 3

| | | | |
|---|---|---|---|
| 1 | I N D E X | | |
| 2 | EXAMINATION: | | PAGE |
| 3 | By Mr. Stillman | | 7 |
| 4 | By Mr. Morrissey | | 57 |
| 5 | | | |
| 6 | E X H I B I T S | | |
| 7 | NO. | DESCRIPTION | PAGE |
| 8 | Exhibit 1 | Grievance 202113934 | 40 |
| 9 | Exhibit 2 | Grievance 2023X18872 | 45 |
| 10 | Exhibit 3 | Declaration of Kavarian Rogers | 49 |
| 11 | Exhibit 4 | Incident Report Dated 10/12/21 | 55 |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

Page 4

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE REPORTER: Good morning. My name |
| 3 | is Carly Hemberger; I'm the reporter assigned by |
| 4 | Veritext to take record of this proceeding. We are |
| 5 | now on the record at 9:34 a.m. |
| 6 | This is the deposition of Kavarian |
| 7 | Rogers taken in the matter of Cuauhtemoc Hernandez vs. |
| 8 | Thomas Dart, Sheriff of Cook County, and Cook County, |
| 9 | Illinois on Thursday, September 19, 2024, at Cook |
| 10 | County Department of Corrections, 2700 South |
| 11 | California Avenue, Chicago, Illinois 60608. |
| 12 | I am a notary authorized to take |
| 13 | acknowledgments and administer oaths in Illinois. |
| 14 | Parties agree that I will swear in the witness |
| 15 | remotely. |
| 16 | Additionally, absent an objection on |
| 17 | the record before the witness is sworn, all parties |
| 18 | and the witness understand and agree that any |
| 19 | certified transcript produced from the recording of |
| 20 | this proceeding: |
| 21 | - is intended for all uses permitted |
| 22 | under applicable procedural and |
| 23 | evidentiary rules and laws in the |
| 24 | same manner as a deposition recorded |

Page 5

| | |
|---|---|
| 1 | by stenographic means; and |
| 2 | - shall constitute written stipulation |
| 3 | of such. |
| 4 | This proceeding will be recorded via |
| 5 | video technology by Robert Gore. |
| 6 | At this time will everyone in |
| 7 | attendance please identify yourself for the record. |
| 8 | MR. MORRISSEY: Sure. My name is Pat |
| 9 | Morrissey. I represent Mr. Rogers. I'm in person |
| 10 | with Mr. Rogers, and I agreed to the remote |
| 11 | deposition. I'm a little off screen because we're in |
| 12 | a room that doesn't have any space for me to be closer |
| 13 | to him. |
| 14 | Proceed. |
| 15 | THE REPORTER: Mr. Stillman? |
| 16 | MR. STILLMAN: Yeah. Sorry, my thing, |
| 17 | like, froze for a minute. I missed where we are right |
| 18 | now. I lost like a minute there. Not even a minute, |
| 19 | like 20 seconds there. |
| 20 | THE REPORTER: We are introducing |
| 21 | ourselves. |
| 22 | MR. STILLMAN: Okay. Yeah, Zachary |
| 23 | Stillman for Sheriff Dart and Cook County. |
| 24 | THE REPORTER: Okay. Thank you. |

2 (Pages 2 - 5)

Exhibit 33 Page 2

**Page 6**

1 Hearing no objection, I will now swear in the witness
2          Please raise your right hand.
3 Mr. Rogers?
4          MR. MORRISSEY:  I don't know if he can
5 raise --
6          MR. ROGERS:  Yeah, I can't -- my right
7 hand, like, that's my disabled side, so -- it can go,
8 like, this much though.
9          THE REPORTER:  Okay.
10 WHEREUPON,
11              KAVARIAN ROGERS,
12 called as a witness and having been first duly sworn
13 to tell the truth, the whole truth, and nothing but
14 the truth, was examined and testified as follows:
15          THE REPORTER:  Proceed.
16          MR. STILLMAN:  All right.  Good
17 morning, Mr. Rogers.
18          MR. MORRISSEY:  You can put your hand
19 down, Mr. Rogers.
20          THE WITNESS:  Good morning, sir.
21          MR. STILLMAN:  What was that, Pat?
22          MR. MORRISSEY:  I told him he could put
23 his hand down; he continued to keep holding it.
24          MR. STILLMAN:  Oh, okay, yeah.

**Page 7**

1          All right.  So this is the deposition
2 of Kavarian Rogers taken pursuant to notice.
3          EXAMINATION
4 BY MR. STILLMAN:
5      Q   Could you please state your full name and
6 spell it for the record?
7      A   My name is Kavarian Rogers, K-A-V-A-R-I-A-N
8 R-O-G-E-R-S.
9      Q   Good morning, Mr. Rogers.  My name is
10 Zachary Stillman, and I represent the defendants in
11 this case.  Have you ever given a deposition before?
12      A   -- sir.
13      Q   Was that a no?
14      A   No, sir.
15      Q   Okay.  Today I'm going to be asking you a
16 series of questions.  And just to make things easier,
17 we're going to go over a couple of ground rules before
18 we get started.
19          First, we have a court reporter here today,
20 so to make life easier for her, I'd ask that you try
21 to keep the record as clean as possible by not
22 speaking over me, and I'll do the same for you.  If I
23 ask a question, I'll wait until you finish answering
24 to ask another one, and I'll try not to interrupt any

**Page 8**

1 of your answers before asking the next question.
2          Second, please answer all questions
3 verbally, and refrain from gesturing or pointing at
4 things, because that will be unclear on the record.
5 Is that all okay?
6      A   Yes, sir.
7      Q   And then if you don't understand any of my
8 questions, please let me know, and I can try to
9 rephrase or ask the question differently.  If you do
10 answer, I'm going to assume that you understood the
11 question.
12          And if there's something that you don't
13 recall, don't guess; just saying that you don't -- you
14 don't recall is a valid answer.  And then finally, if
15 you need to take a break at any point today, that's
16 totally fine.  And I would ask that just if there's a
17 question pending, we finish that one, and then we get
18 off the record and take a break.  Is that all clear to
19 you?
20      A   Yes, sir.
21      Q   Okay.  Do you go by any other names in the
22 jail?
23      A   Lil Val.
24      Q   What was that?  Lil Val?

**Page 9**

1      A   Yeah.
2      Q   Anything else?
3      A   Kavarian -- they'll call me Kavari.
4      Q   And what is your date of birth?
5      A          .
6      Q   And are you married, or have you ever been
7 married?
8      A   [No audible response.]
9      Q   What was that?
10      A   No, sir.
11      Q   Okay.  Thank you.
12          MR. STILLMAN:  And then off the record
13 momentarily.
14          THE REPORTER:  Okay.  We are now off
15 the record at 9:40.
16          (Off the record.)
17          THE REPORTER:  We are back on the
18 record at 9:40 a.m.
19 BY MR. STILLMAN:
20      Q   Did you meet with anyone before this
21 deposition today?
22      A   Excuse me?
23      Q   Pardon?
24      A   Excuse me?

3 (Pages 6 - 9)

Page 10

1  Q  Do you need me to re-ask the question?
2  A  Yes, sir.
3  Q  Okay.  Did you meet with anyone before the
4  deposition today?
5  A  [Unintelligible response.]
6  Q  Was that a yes or no?
7  A  Yes, sir.
8  Q  And who did you meet with?
9  A  My attorney.
10  Q  And would that be Pat, who's in the room
11  with you?
12  A  Yes, sir.
13  Q  Where did you meet with him, or how?
14  A  I meet with him in the jail.
15  Q  Did you talk to him over the phone, or was
16  he there in person?
17  A  He was here in person.
18  Q  And when did that take place?
19  A  Probably about 9 -- 9 o'clock.
20  Q  That was today, before?
21  A  Yes, like, about --
22  Q  Sorry.  Did you ever talk to him before
23  that?
24  A  Yes, sir.  I talked to him multiple times

Page 11

1  over the phone, previous times, and in the jail.  Over
2  in Division 9, over there.
3  Q  And did you review any documents with him?
4  A  Yes, sir.
5  Q  This morning, I mean.  What did you review
6  with him?
7  A  We just reviewed, like, me going up and
8  down, like, stuff that was difficult for me.  Like, my
9  papers and everything that I -- that I, like, went
10  through prior to me being in here.
11  Q  So your papers, you mean, like --
12  A  Like traveling, where I been traveling to,
13  places like that, where I been held at, things like
14  that.  I'm sorry.
15  Q  Okay.  So like your transportation and,
16  like, housing, or alerts, your -- did you look at
17  grievances?
18  A  We -- we previously looked at grievance, but
19  we didn't have a chance to look at grievances today.
20  Q  Okay.  Did you look at, like, your
21  declaration in this case?
22  A  Yes, sir.
23  Q  Okay.  Have you ever reviewed any Cook
24  County Jail policies and procedures?

Page 12

1  A  Yes, sir.
2  Q  Could I ask, when you answer, can you speak
3  up a little bit?  Because I'm having trouble hearing
4  your first answer.
5  A  Oh, sorry.  Yes, sir.  Yes, sir.  Can you
6  hear me now?
7  Q  Yeah, thank you.  Do you know what the ADA
8  is?
9      You don't have to lean in so much; I know
10  it's probably not the most comfortable for you.
11      But yeah, do you know what the ADA is?
12  A  Yes -- yes, sir, I know what the ADA is.
13  Q  And what is the ADA?
14  A  It's the American with Disability Act.
15  Q  And could you tell me in your words what
16  that is?
17  A  Like -- like, in my words, I just feel like
18  it's -- prior to me, myself, and what I go through,
19  you know, probably, like, people with disabilities.
20  Like, I got a brain injury; that's part of my
21  disability.  So what was wrong with me, I have a
22  traumatic brain injury.  That was my diagnosis.  I was
23  shot in my head in 2020 of February 9th, and it left
24  me with my right side disabled, like, from -- from my

Page 13

1  head to my toe, everything over there is, like -- it's
2  limited, so --
3  Q  Okay.  And have you ever reviewed any kind
4  of ADA standards?
5  A  Can you break it down to me what it is?
6  Q  Yeah, have you ever reviewed any kind of,
7  like, construction standards or guidelines under the
8  ADA?
9  A  Oh, yes, sir.  Like, things that comply to
10  the ADA?
11  Q  Yeah, like, what about that have you
12  reviewed?
13  A  Yeah, I -- I reviewed the -- the part where,
14  like -- where -- where you supposed to be treated
15  properly, and where you supposed to be housed properly
16  and things like that.  That's what you mean?
17  Q  No.  So under the ADA, you know, there are,
18  like, guidelines and standards on, like, you know, how
19  you construct things, you know, the types of angles of
20  ramps maybe, or, like, standards for having different
21  types of accessibility features for --
22  A  Oh, yes, sir.  Yes -- yes, I have.  Yes, I
23  have.
24  Q  What kinds have you reviewed?

4 (Pages 10 - 13)

Page 14

1    A   I reviewed, like, the ramp part, and I
2 reviewed the tunnel as well, and, like, the showers
3 and things like that.
4    Q   And what do you know about ramps and tunnels
5 under the ADA?
6    A   Like -- like, the tunnels is something like
7 you have to travel to get place to place.  And --
8 and doing so, I have been one of those ones that did
9 it, but it caused me tremendous pain.  'Cause I -- I
10 have a walker -- or I had a walker before I had a
11 seizure and my walker was took from me -- so I use my
12 walker to get from place to place.  But it's hard
13 going up the Cermak ramp, and it's challenging for me,
14 'cause, like, I have no -- like, once the tunnel right
15 there, it'll get difficult for me, and things like
16 that.
17    Q   So you've had issues on the ramps and on RTU
18 tunnel and the Cermak tunnel, correct?
19    A   Yes, sir.
20    Q   So that would be, like, the RTU ramp and the
21 Cermak ramp?
22    A   That's -- that's exactly what I mean, like,
23 the Cermak ramp and the RTU tunnel.  I'm sorry about
24 that.

Page 15

1    Q   No problem, I'm just clarifying.  But you've
2 had issues on those ramps, correct?
3    A   Yes, sir.
4    Q   What kind of issues have you had on those
5 ramps?
6    A   Like, I -- like, I had struggled with issues
7 like -- 'cause I be traveling, going through there for
8 court.  Then I'll be traveling, going there, like --
9 going to Cermak, and I -- one time I fell.  Things
10 like I fell, hurt myself.  I asked the guard to give
11 me some assistance, I don't know, like -- and then
12 most of the time, I just try to get it up myself,
13 since I can't get the adequate assistance that I need.
14 Can you hear me?
15    Q   And what do you know about the features of
16 those ramps, as far as, like, how they may or may not
17 comply with the ADA?
18    A   Like, it's difficult for me to get up them,
19 and, like -- like, I -- I could've sworn ADA is, like,
20 to make you at ease, you know, like, and that doesn't
21 fit for me, like -- 'cause I use a -- the -- I be
22 requesting a cart to get to where I be trying to get
23 to, but they deny it every time.
24    Q   Do you know any others in the jail or who

Page 16

1 have now gotten out who have used those tunnels and
2 the ramps and have had similar issues to you?
3    A   Yes, sir.
4    Q   Could you name them?
5    A   I'm not -- I'm not sure, like, if they'll be
6 wanting me to say they names on this, you know, so --
7    Q   But you know names that you have in your
8 head?
9    A   Yes, sir.
10    Q   Okay.  And you said you "fell;" when did you
11 fall on the ramp?
12    A   One of -- one of my diagnoses was amnesia,
13 so, like, I got short term memory loss, so I'm -- I
14 don't remember what time I fell.  But it was probably,
15 like, couple months back, maybe a year back.
16    Q   And have you ever filed or been involved in
17 any lawsuits before?
18    A   No, sir.
19    Q   Before this one, at least?
20    A   Before this one, no, sir.
21    Q   Are you involved in any other lawsuits
22 presently?
23    A   Yes, sir.
24    Q   And what is the other lawsuit you're

Page 17

1 involved in?
2    A   Like, I got -- I got, like -- like, 'cause I
3 was just held in Division 9.  I was not supposed to be
4 housed over there.  So I mean, maybe if you talking
5 about that.  That's the only -- that's the only other
6 lawsuit I could think of that -- that I'm in.  'Cause
7 I was sent to Division 9 for two and a half, almost
8 three years.  And that's the only other lawsuit I can
9 think of, like --
10    'Cause Division 9 was real difficult for me.
11 I ended up getting sent over there prior to incidents
12 that they saying was -- occurred, but they dropped my
13 status and took my walker -- I mean, took my
14 wheelchair, and sent me over there.  So I don't have
15 no, like, handicap assessment showers over there and
16 things like that.  So that's where that lawsuit came
17 from, like, from the hardship and everything that was
18 going on over there.  That what you mean, sir?
19    Q   Yeah, thank you.  You're doing great.  Do
20 you know the date that you were first admitted to Cook
21 County Jail?
22    A   April 1, 2020.
23    Q   Where were you housed when you first entered
24 the jail?

5 (Pages 14 - 17)

Exhibit 33 Page 5

Page 18

1   A   I was housed in RTU.
2   Q   And where are you housed now?
3   A   I just made it back to RTU two months ago.
4   Q   Where else have you been at the jail?
5   A   I been in Division 9, in Division 5. Once
6  I -- once I came to Division -- once I made it to
7  Division 8. I was there for almost, like, two, three
8  months, and then they -- they sent me to Division 5 by
9  accident, because the CO told me I don't supposed to
10 be over there. And he -- and he looked at my status,
11 and he called a lieutenant, and they sent me back to
12 Division 8, 'cause I couldn't get up and down the
13 stairs.
14       They had me up and down the stairs in
15 Division 5 when I first came. And when I was over
16 there for about five months, they end up sending me
17 straight back to RTU, 'cause I couldn't come out my
18 cell and things, far as, like, to use the phone and
19 call my family.
20       So that's where I was at, Division 5,
21 Division 9, and Division 8. And Division 10 as well.
22 And Division 10 as well. I was housed in Division 10
23 for quite a long time as well, too, yeah.
24  Q   And are you in a wheelchair right now?

Page 19

1   A   Yes, sir.
2   Q   Do you currently have access to a wheelchair
3  at the jail, or were you just brought to over there in
4  the wheelchair?
5   A   This is my wheelchair now. It was provided
6  for me by Saint Anthony's because the -- Cook County
7  wouldn't give me one, and they kept taking my walker
8  and everything. So I went to Saint Anthony's when I
9  had my seizure. Recently I just had a seizure in
10 Division 9, an -- and I bust my head over here. And
11 from there, the nurse had sent me to the dispensary,
12 and dispensary sent me straight out to Saint Anthony's
13 hospital. I stayed at Saint Anthony's Hospital for
14 six days, and they cleared me to 3 North and RTU.
15  Q   And before you had that seizure, you were
16 using a walker at least for, like, long distance
17 travel, correct?
18  A   Yes, sir. I was using a walker for long
19 distance. But I'm just writing grievances and
20 everything, but they was telling me that it's
21 noncompliant with like -- 'cause I needed short
22 distance for my walker, but they saying I need long
23 distance.
24  Q   And throughout your time at Cook County

Page 20

1  Jail, have you only used a wheelchair and a walker, or
2  did you also have canes at times?
3   A   Yes, sir, I had a cane at times, times when
4  I was gaining more strength. But like, I have two
5  types of seizures; one of them is epileptic seizure,
6  and one of them is grand mal. So like, my epileptic
7  seizures, I would just lose memory and things like
8  that, and forget where I'm at. But my -- my grand mal
9  seizures are, like, it's -- it can be condition as,
10 like, so leave and go to Saint Anthony's, losing one
11 side again, which I just did from this seizure. My
12 side went back out, my right side went back out, and
13 they provide me a wheelchair.
14  Q   And when you entered the Cook County Jail
15 back on April 1, 2020, that was shortly after you had
16 been shot, correct?
17  A   Yes, sir.
18  Q   At that time, how far along in, like,
19 recovery were you?
20  A   Like, two months. 'Cause it happened
21 February 9th, so January, February, March --
22  Q   So were you walking at that time, or were
23 you, like, still being -- you're still in a wheelchair
24 then?

Page 21

1   A   Yeah, I -- no, I was using the wheelchair.
2  Then I -- I got the wheelchair took from me, they gave
3  me a cane, and I got the cane took from me and they
4  gave me a walker. So it was pretty much like here and
5  there things, but then they took it from me. I ain't
6  had nothing. I was just --
7   Q   And right now with the wheelchair, you're in
8  the RTU, correct?
9   A   Yes, sir.
10  Q   And you're able to use it for long and short
11 distance, so they never take it away from you?
12  A   No, sir. Long and short distance.
13  Q   And your memory issues related to your
14 traumatic brain injury, that started when you were
15 shot?
16  A   Yes, yes, it just started when I was shot.
17  Q   And prior to that seizure you had when you
18 got the wheelchair, you were using a walker?
19  A   Yes.
20  Q   But for long distance travel only?
21  A   Yes, yes, I was using the walker for long
22 distance only.
23  Q   Do you remember who would've prescribed or
24 assigned the walker to you at the jail?

6 (Pages 18 - 21)

Page 22

1   A   Jamie, her -- like, Jamie, like, physical
2 therapy Jamie. She gave me a walker.
3   Q   And are you aware of any kind of policies,
4 procedures, or rules at the jail regarding whether,
5 like, an officer or someone should be assisting you
6 with, you know, either when you were in the walker,
7 assisting you with that, when you're moving from one
8 location to another, or now, in the wheelchair,
9 assisting you with that?
10   A   I wasn't aware of it back then, but I'm
11 aware of it now, because I read the handout book.
12 'Cause that's only how I got aware of it, 'cause I
13 read the handout book.
14   Q   And what are you aware of?
15   A   That I'm supposed to be getting adequate
16 medical attention, and -- and I can't remember the
17 other one.
18   Q   Well, I mean, in your words, does adequate
19 medical attention include assistance with your
20 wheelchair or walker?
21   A   Yes, sir, absolutely.
22   Q   Okay. Are you usually treated medically by
23 officers at the Sheriff's office?
24       MR. MORRISSEY: Objection to form.

Page 23

1 BY MR. STILLMAN:
2   Q   Are you usually treated medically by people
3 at Cermak, or by officers from the Sheriff's office?
4   A   I'm usually treated by medical.
5   Q   And do you know if people, like, you know,
6 like a white shirt, like a sheriff's officer
7 transporting you around the jail, do you know if they
8 have the same employer as someone treating you at
9 Cermak?
10   A   No, they don't.
11   Q   And which of those two groups of people
12 would be more likely to be, like, caring for your
13 adequate medical needs?
14   A   Medical meant ADA, far as me.
15   Q   Have you ever reviewed any kind of
16 architectural or engineering reports regarding any
17 kind of features at the jail?
18   A   What is that? I'm not sure what that is.
19   Q   What'd you say?
20   A   I'm not for sure what that is. I'm sorry.
21   Q   You know, like, have you ever reviewed any
22 kind of, like, reports of, you know, like, analyzing a
23 single feature at the jail, maybe like a ramp or some
24 railings or something?

Page 24

1   A   Have I ever, like, visualized it?
2   Q   No, have you ever seen any, like, a formal,
3 like, report of any kind?
4   A   Yes.
5   Q   And what have you seen?
6   A   I seen the ramp, and I seen --
7   Q   That wasn't what I asked you, Kavarian. So
8 I asked you have you ever seen any kind of formal,
9 like, put-together, like, a written report, an
10 analysis --
11   A   Oh, no, I haven't seen -- no, I haven't seen
12 the report, like, written. But like, I've seen, like,
13 pictures, like -- like, what you mean, like that?
14   Q   No. So if the answer is no, the answer is
15 no. Have you ever seen a formal report about the ramp
16 or any features at the jail?
17   A   No.
18   Q   Okay. By the way, also, do you have any
19 images in front of you right now?
20   A   Yes, sir.
21   Q   Can I see the images you have in front of
22 you? And which ramp is that, if you know?
23   A   Right here is the Cermak ramp.
24   Q   Okay. And what's the other image you have?

Page 25

1   A   The tunnel, RTU tunnel. RTU.
2   Q   Yeah, can I see?
3   A   Sure.
4   Q   Okay. And that's the RTU one, you say?
5   A   Yes.
6   Q   And those are the ramps that we're talking
7 about right now, that we've been discussing that
8 you've had issues with, that you said you've fallen
9 on, right?
10   A   Yes, sir.
11   Q   Okay.
12   A   This is the one that was difficult for me
13 with my walker and everything, like, going up -- going
14 up and down this one with my walker and everything.
15 And I'm -- and I'm not having assistance supported
16 from my weak side. 'Cause I be really needing support
17 for my weak side, you know, 'cause this arm, it really
18 can't grab my walker. But -- but me being forced to
19 use it, I just put it on my walker, and I just -- I
20 got to move. But I ain't trying to catch no tickets,
21 but sometimes I still caught tickets.
22       MR. MORRISSEY: And for the record,
23 Mr. Rogers was holding up a picture of the Cermak
24 ramp.

7 (Pages 22 - 25)

Exhibit 33 Page 7

Page 26

BY MR. STILLMAN:

1 BY MR. STILLMAN:
2    Q   Yeah, okay.  So is it fair to say you're
3 familiar with, like, the RTU ramp and the tunnels
4 under the RTU, and the Cermak tunnels and ramp?
5    A   Yes, sir.
6    Q   How frequently do you have medical
7 appointments right now?
8    A   I have medical appointments, like -- like,
9 right now, I been filling out medical slips almost,
10 like, since I been back right here.  For almost three
11 weeks, I been filling out medical slips constantly.
12 Like, I probably got, like, seven, eight medical slips
13 that I filled out since I been back, and ain't none of
14 them getting replied to.  So -- at most, before this,
15 I be getting medical attention, like, but --
16    Q   When was the last time you were on, like,
17 the RTU tunnel ramp -- RTU ramp?
18    A   Like, June, or, like, little bit right
19 before June, I was up that ramp.  And then I was
20 recently up this ramp, like -- like, four day -- like,
21 a week -- like, a week ago, and maybe, like --
22    Q   Oh, go ahead, sorry.
23    A   And like, maybe, like, I been up this ramp
24 several times, like, a lot of times recently, too.

Page 27

1    Q   A week ago, where were you headed that you
2 used -- which ramp did you use a week ago, the RTU
3 ramp?
4    A   Yes, I was using the RTU ramp -- RTU ramp.
5    Q   And where were going when you did that?
6    A   I was going to the eye doctor.
7    Q   So you also used the Cermak ramp that day,
8 correct?
9    A   Yes, sir.
10   Q   If you used it the other day, that would've
11 been with your wheelchair, correct?
12   A   Yes, sir.
13   Q   Did you find it any easier to --
14   A   Yeah, I found it -- I found it easier,
15 'cause, like, I got assistance once, like, the -- it
16 was the sheriff.  He assisted me with this -- with
17 this one.  I just went, like -- 'cause my right side,
18 he seen it was difficult for me to get up, so he just
19 pushed me.
20   Q   And have you ever -- before when you were --
21 strike that.
22        When you still had your walker, would you
23 say, like, the angle was the hardest part, or, like,
24 the steepness of the ramp was the hardest part for

Page 28

1 you?
2    A   Yes, like, going up.  Going up, that was the
3 hardest part, traveling up the ramp with my walker.
4    Q   And did you ever complain to anyone, like
5 any officers, that you needed any assistance, or you
6 needed any, like, additional features on the ramp to
7 help you traverse it?
8    A   Oh, yeah, I complained multiple times to the
9 officers, but --
10   Q   And what would those complaints look like?
11 Would that be, like, a verbal complaint, grievances,
12 what would that be?
13   A   A verbal complaint here and grievances,
14 both.
15   Q   You did file grievances about this issue?
16   A   Yes, sir.
17   Q   How many grievances do you think you filed
18 about this?
19   A   I filed a lot of grievances.  I filed a lot.
20   Q   About this issue, or just in general?
21   A   Probably like -- probably like 10, 15
22 almost.
23   Q   Just about this issue?
24   A   About this issue, about -- about 10 -- about

Page 29

1 10, 11 almost, yeah.
2    Q   Okay.  And by "this issue" do you mean,
3 like, just in general, like, medical stuff and, you
4 know, your mobility implements, or do you mean, like,
5 these ramps, this ramp?
6    A   Like, with my medical -- I mean, as in,
7 like, ramps, 10, but with my medical and everything,
8 probably like -- probably like 70, at the most -- at
9 the least, if I'm not mistaken, like 70.
10   Q   So when you've used the RTU tunnel, the RTU
11 ramp, or the Cermak ramp, did you ever, you know, did
12 you ever struggle and have any issues, and they just,
13 instead of taking you to your destination, you know,
14 they just took you back to the tier?  Have your
15 struggles with the ramp ever kind of stopped you from
16 getting to a destination?
17   A   Not -- not stopped me from going to, like,
18 my -- my Stroger appointment.  I had a Stroger
19 appointment one time, and I couldn't get the proper
20 transportation for it, 'cause, like, my walker wasn't
21 cutting it.  And I'm telling them, like, "I'm tired.
22 I'm not trying to go until I get provided assistance"
23 So I couldn't get a cart, so I missed my --
24 appointment.  I can't remember the exact date.

8 (Pages 26 - 29)

Page 30

1    Q   But that was, like, they -- the jail had
2  administrative issues there, and, like, couldn't
3  transport you, essentially, correct?
4        MR. MORRISSEY:  Objection,
5  mischaracterizes testimony.
6           You can respond.
7  BY MR. STILLMAN:
8    Q   I mean, as far as -- let me reword it.
9       That was, like, administrative as far as,
10 you know, not having the correct transportation method
11 for you on that day, and also you never left your
12 tier, correct?
13   A   No.
14   Q   Yeah, okay.  So have you ever been, you
15 know, mid-transportation and struggled with the ramp
16 or any other feature, and then just been turned around
17 and taken back to your tier because they didn't want
18 to deal with your struggles?
19   A   Yes.
20   Q   That has happened?
21   A   Yes, that happened.
22   Q   Using the RTU and Cermak ramps?
23   A   No, sir.  No, sir, not going to use the RTU
24 ramps.  I was already housed in Division 9, and I was

Page 31

1  trying to get to my -- what's his name appointment --
2  my Stroger appointment.  And I couldn't make it,
3  'cause the transportation was -- they said my walker
4  is going to slow them up, so they don't have enough
5  time.
6        Q   So other than time with Stroger, when you
7  never left the tier, have you ever left the tier and,
8  you know, been mid-transportation, on your way to an
9  appointment or destination, and then, you know, your
10 struggles just stopped the journey?  They turned you
11 around, they said, "We're not going to help you; you
12 got to go back if you're going to struggle like this"?
13   A   No, sir.
14   Q   If you've ever struggled, like, on the
15 ramps, in the tunnels, they've -- maybe they try to
16 push you along, but they've never turned you around
17 and just told you, "Nope, if you can't make it, you're
18 not going." Right?
19   A   No, sir.
20   Q   Okay.  So you've never, like, actually been
21 held back from any appointments, services, whatever
22 else, like, offerings from the jail because of your
23 struggles with mobility on the ramp; correct?
24        MR. MORRISSEY:  Objection,

Page 32

1  mischaracterizes testimony.
2           You can respond.
3  BY MR. STILLMAN:
4    Q   Same question, does that -- have you ever
5  been held back from going to any appointment,
6  services, or any other jail destination because of
7  your struggles with the ramps?
8    A   I don't recall it.
9    Q   What was that?
10   A   I can't remember.
11   Q   Okay.  And when you say you can't remember,
12 you can't remember if you --
13   A   I can't remember the exact dates.  I can't
14 remember them days that I miss it.
15   Q   But right before that, you said it's never
16 happened that you were turned around
17 mid-transportation, so I mean --
18   A   I'm probably just getting confused a little
19 bit, like, 'cause I feel like you talking too fast,
20 like --
21   Q   Were you ever told by any staff in the jail
22 that you shouldn't be using either the RTU or Cermak
23 ramps?
24   A   No, sir.

Page 33

1    Q   In your use of the Cermak or the RTU ramps,
2  I know you said you fell one time; that was on the
3  Cermak ramp, you said; correct?  Is that correct that
4  it was on the Cermak ramp that you fell?  Mr. Rogers?
5    A   Excuse me?
6    Q   Is it correct that it was on the Cermak ramp
7  that you fell?
8    A   It's the tunnel.  I fell in the tunnel.
9    Q   Which tunnel?
10   A   I don't know the exact tunnel.  I fell in
11 the tunnel, though.
12   Q   In one of the pictures you have?
13   A   No, sir.
14   Q   Oh, it's not in one of those tunnels?  Do
15 you know where the fall was?
16   A   Like -- like, right by court.  It was right
17 by court.  I was coming -- I was actually coming from
18 court; so the day I had court, I fell in the tunnel.
19 And that's when I had my cane order.
20   Q   This is when you had a cane?
21   A   Yes, I had a cane order.
22   Q   Okay.  So I guess, on these ramps, on the
23 Cermak and RTU ramps, in those tunnels pictured right
24 in front of you, have you ever actually experienced

9 (Pages 30 - 33)

Page 34

1 any injuries on there; did you ever hurt yourself?
2    A   No, just -- no, just pain, no, not no -- not
3 no -- it was just pain, far -- far as these two
4 pictures right here, just all pain. I never fell,
5 though.
6    Q   No falls on those ramps. And have you ever
7 gotten treatment for that pain?
8    A   Like, they give me Tylenol.
9    Q   And how would you get treated for that; how
10 would you get Tylenol, for, like, a treatment for that
11 pain?
12    A   I just ask the nurse, and I get some
13 Tylenol.
14    Q   Would you tell them what the pain was from,
15 or what it was related to?
16    A   Just -- I just point out that -- that it was
17 my legs.
18    Q   Would you say, like, "Oh, my legs in
19 relation to, like, my use of the ramp," or just, "My
20 legs are hurting"?
21    A   My legs hurt.
22    Q   Okay. So that pain would just be the full
23 extent of, kind of, your injuries from the ramp;
24 correct?

Page 35

1    A   Yes, sir.
2    Q   And then, as opposed to any of the pain that
3 you've kind of gotten as a result of your use of the
4 ramp, you know, other injuries you've gotten at the
5 jail, your fall, your seizure, any kind of health
6 issues, injuries that have occurred to you, Cermak has
7 treated those; correct? Cermak or Cook County Health,
8 like, as a whole, you know, if they send you out to
9 Stroger or wherever else; correct?
10        MR. MORRISSEY: Objection to form of
11 the question.
12        You can respond.
13 BY MR. STILLMAN:
14    Q   I can reword it. Would you like me to
15 reword that?
16    A   Yes.
17    Q   So as opposed to, like, the pain from using
18 the ramp, Cook County Health and Cermak have continued
19 to treat your other medical issues, you know, your
20 non-use of the side of your body, your seizure the
21 other day; these have all been treated by Cermak and
22 Cook County Health; correct? Or they sent you out, at
23 least, to get treatment?
24    A   Yeah, they sent me out to get treatment.

Page 36

1    Q   And so you said you do ask officers for
2 assistance when you're traversing the ramp, both now
3 and before the wheelchair, correct?
4    A   Yes, sir.
5    Q   So would you request assistance when you
6 were using the walker or the cane?
7    A   I mean, I -- I done requested a couple
8 times.
9    Q   And what would it look like, or what would
10 happen when you would request assistance when you were
11 using the walker or the cane on these ramps?
12        MR. MORRISSEY: Objection, asked and
13 answered.
14        You can respond.
15        THE WITNESS: I mean, like, some of
16 them do, some of them don't.
17 BY MR. STILLMAN:
18    Q   I mean, what would assistance look like,
19 though? Would they get a wheelchair for you, drive
20 you in the cart?
21    A   Oh, yeah, they did give me a cart.
22    Q   That would happen often, they would get the
23 cart?
24    A   The two officers that did it for me. But

Page 37

1 most of them, I just got to go -- I just got to, so I
2 don't miss -- miss important stuff.
3    Q   And did any of those officers ever refuse to
4 assist you?
5    A   I mean, only -- only in 10, when I was in --
6 when I was coming from court, that -- when I fell in
7 the tunnel that one time over there at court with my
8 cane.
9    Q   So how many grievances do you have in front
10 of you right now?
11    A   I don't have no grievances right now.
12    Q   You don't have any in front of you right
13 now?
14    A   No, I left them all in the tier.
15    Q   Okay. And you said before you think you
16 filed, like, 12 grievances? Or I think the number was
17 either 8 or 12 about the ramps, correct?
18        MR. MORRISSEY: Objection,
19 mischaracterizes testimony.
20 BY MR. STILLMAN:
21    Q   You can tell me what number it was; that
22 might be wrong number.
23    A   Like 10 or 15 grievances, I felt, far as the
24 Cermak ramp and tunnel.

10 (Pages 34 - 37)

Page 38

1    Q   And do you know if you got responses on all
2  those grievances?
3    A   Yeah, I -- I got response to most of them.
4    Q   Were all of those grievances valid
5  grievances, or did they mark a lot of those
6  noncompliant about the same issues?
7    A   They would say it was noncompliant, though,
8  but they never did anything, like, to prevent it from
9  happening.
10   Q   You said they would say it was noncompliant?
11       MR. MORRISSEY:  Objection,
12  mischaracterizes testimony.
13       MR. STILLMAN:  I'm just trying to hear
14  what he said.
15  BY MR. STILLMAN:
16   Q   Could you repeat your answer?
17       MR. MORRISSEY:  Do you want to have the
18  court reporter read back his response?
19       MR. STILLMAN:  Sure.
20       THE REPORTER:  One moment.
21       MR. MORRISSEY:  Mr. Rogers, they're
22  going to read back what you said, okay?
23       THE WITNESS:  Yes, sir.
24       THE REPORTER:  Okay.

Page 39

1        MR. MORRISSEY:  I think it was about
2  grievances, about whether they were compliant or
3  noncompliant.  That was the question that I believe
4  Mr. Stillman asked to have read back.
5        THE REPORTER:  All right.  One moment.
6        (The reporter repeated the record as
7        requested.)
8        THE REPORTER:  Okay.  That was the
9  question and answer.
10       MR. MORRISSEY:  Thank you.
11       MR. STILLMAN:  Okay.  I'm sorry, I'm
12  going to ask the same question again, because I don't
13  really know what your answer was.
14       So that's kind of why I was asking,
15  Pat, to be honest.  I mean, I --
16  BY MR. STILLMAN:
17   Q   Did they mark multiple grievances of yours
18  noncompliant or not?
19   A   No.
20   Q   Okay.  Thank you.  And if I told you that
21  there weren't 10 to 15 grievances about the ramp,
22  where would you say they've gone?
23       MR. MORRISSEY:  Objection to the form
24  of the question.

Page 40

1        You can respond, Mr. Rogers.
2        THE WITNESS:  I don't know where they
3  gone.  I don't -- I don't know where they gone.
4  BY MR. STILLMAN:
5    Q   Okay.
6    A   If they ain't in the files, 'cause I turn
7  them in every time I go -- I go directly to -- and
8  turn them in in the box.  So if they ain't in the box,
9  I don't understand.
10   Q   And do you think there's any possibility
11  that maybe you could be overstating the amount of
12  grievances about this ramp, or the ramps, that you've
13  done?
14   A   No, sir.
15   Q   Okay.  We're going to look at the first
16  grievance that I'll call Exhibit 1.
17       (Exhibit 1 was marked for
18        identification.)
19       Can everyone see that?
20       MR. MORRISSEY:  Zach, you're going to
21  have to blow it up, because I'm pretty far back.
22       Mr. Rogers, can you --
23       MR. STILLMAN:  I mean, I'm zooming in.
24  But everyone can see that, just to start, yeah?

Page 41

1        MR. MORRISSEY:  Yeah, it's better.
2        Can you see it, Mr. Rogers?
3        THE WITNESS:  Yes, sir.
4  BY MR. STILLMAN:
5    Q   And this is one of your grievances, correct?
6    A   Yes, sir.
7    Q   This says control number 202113934, correct?
8    A   Yes, sir.
9    Q   13934, it's a little more legible there on
10  the second page.  So this is your grievance, correct;
11  you drafted this?
12   A   Yes, sir.
13   Q   And that's your signature on the bottom?
14   A   Yes, sir.
15   Q   Do you remember drafting this grievance?
16   A   Yes.
17   Q   And this grievance, essentially, says that
18  on October 13, 2021, Sergeant Wray came to the deck
19  and confiscated your cane which you use to walk around
20  the tier due to your limited mobility.  And you said
21  the order came from ADA Sabrina, and Nurse O., who
22  were both aware of your injury, correct?
23   A   Yes, sir.
24   Q   And the date of the incident was 10/13/21;

11 (Pages 38 - 41)

Page 42

1 that right?
2    A    Yes.
3    Q    And the names of the people you're accusing
4 here are ADA Sabrina, Nurse O., Sergeant Wray, and
5 Sergeant Bochniak, correct?
6    A    Yes, sir.
7    Q    And then shows here that your grievance was
8 picked up on 10/14, correct?
9    A    Yes, sir.
10   Q    This would be the response to your
11 grievance, correct?
12   A    Yes, sir.
13   Q    Page 2 here, and the response says that you
14 have an order for -- it says, "Dear Mr. Rogers, you
15 have a current and active order for a cane long
16 distance only," right?
17   A    Yes, sir.
18   Q    And that says that Susan Shebel responded to
19 your grievance on 11/2/21, correct?
20        MR. MORRISSEY:  My objection's you just
21 didn't read the whole response.
22        But you can respond, Mr. Rogers.
23 BY MR. STILLMAN:
24   Q    Honestly, I -- I mean, I can try and read

Page 43

1 this.  But it just says, "Dear Mr. Rogers, thank you
2 for bringing this issue to our attention.  You have a
3 current and active alert for a cane long distance
4 only, use --" and then I can't read the rest of it, to
5 be completely honest.
6        MR. MORRISSEY:  I think that says,
7 "health service request long distance for further
8 health care needs," perhaps.
9        MR. STILLMAN:  Yeah, I believe it; that
10 sounds accurate.
11 BY MR. STILLMAN:
12   Q    And it says here you declined to sign the
13 grievance when you got it back, correct?  I can zoom
14 in, if you need, more.  It says, "Detainee declined to
15 sign, 12:55 p.m. 11/8/21," correct?
16   A    I don't remember.
17   Q    Does it say that right there, "The detainee
18 declined to sign, 12:55 p.m."?
19   A    Yes, sir.
20   Q    11/8/21, it says that, correct?
21   A    Yes, sir.
22   Q    Would you have any reason to doubt that or
23 say that's probably not truthful?
24   A    I don't know why I would decline to sign a

Page 44

1 grievance, but I don't remember that.
2        MR. MORRISSEY:  We've been going about
3 an hour.  I'm going to use the bathroom, so if we have
4 a five-minute break?
5        MR. STILLMAN:  Yeah.
6        MR. MORRISSEY:  I'll have to ask the
7 officer for permission.
8        MR. STILLMAN:  That's fine.
9        MR. MORRISSEY:  Do you need to go to
10 the bathroom, Mr. Rogers?
11        THE WITNESS:  Yes, sir.
12        MR. MORRISSEY:  Is five minutes enough
13 for you to get over there?
14        THE WITNESS:  No, 'cause I got to
15 use -- I need, like, ten minutes.
16        MR. MORRISSEY:  All right.  So we'll
17 come back in ten minutes.
18        MR. STILLMAN:  Okay.  So let's call it,
19 like, 35, 36.  10:36.
20        MR. MORRISSEY:  That's fine.
21        THE REPORTER:  We are now off the
22 record for a break at 10:26 a.m.
23        (Off the record.)
24        THE REPORTER:  Okay.  We are back on

Page 45

1 the record at 10:37 a.m.
2 BY MR. STILLMAN:
3    Q    All right.  I'm sharing what we'll call
4 Exhibit 2 on screen.
5        (Exhibit 2 was marked for
6        identification.)
7        I'll zoom in momentarily, but can you see
8 this document, Mr. Rogers?  Are you able to see it?
9    A    Yes.
10   Q    Okay.  And this is another grievance from
11 you, correct?
12   A    Yes, yes.
13   Q    And this is grievance control number
14 2023X18872, correct?
15   A    Yes.
16   Q    And it says the stated date of this
17 grievance is 12/21/23, correct?
18   A    Yes.
19   Q    In this one, you say the date of the
20 incident is December 11, 2023 and ongoing, referring
21 to the location as the Cook County Criminal Court
22 Building/Cook County Department of Corrections.  And
23 you state that you attended court at the criminal
24 building, and you need a walker to your ADA

12 (Pages 42 - 45)

Page 46

1  conditions. There's a ramp there that makes it
2  difficult for you to get up and down, and it's
3  painful. Am I reading this correctly?
4      A   Yes, sir.
5      Q   It's not accessible for any IIC with ADA
6  conditions. The above names has an unconstitutional
7  policy, custom, and practice of not creating
8  conditions or accommodating conditions for IICs in
9  their custody with canes, walkers, or other ADA
10 conditions, not making the criminal court building
11 accessible for inmates with ADA conditions, and being
12 deliberately indifferent to the needs of IICs with ADA
13 conditions, and causing IICs with ADA conditions
14 unnecessary pain and embarrassment; is that correct?
15     A   Yes, sir.
16     Q   And that's the only page of this, as far as
17 the content of your grievance, here, correct? The
18 next page is the response, right?
19     A   Yes.
20     Q   And then you signed this grievance; that's
21 your signature right there?
22     A   Yes.
23     Q   And you remember drafting this?
24     A   Yes, sir.

Page 47

1      Q   And then it was picked up on 12/23/23,
2  correct?
3      A   Yes, sir.
4      Q   Do you remember getting a response on this
5  one?
6      A   Yes, sir.
7      Q   And their response there says -- well, their
8  response was dated on January 1, 2023, and it says,
9  "Upon review of available evidence, and speaking with
10 deputy who escorted you up and down the ramp, CCSO
11 policy was followed. And at no time did Rogers have
12 difficulty ambulating up or down the ramp, and at no
13 times did Rogers fell -- or -- yeah, he was having --"
14     A   Yes, sir.
15     Q   And that was from Sabrina at the Sheriff's
16 Office, correct?
17     A   Yes, sir.
18     Q   And you received that response on 1/10/24
19 and signed for it, right?
20     A   Yes, sir.
21     Q   And then you appealed it, stating that --
22 could you read your response in the appeal?
23     A   "No one escorted me, which I highly --
24 escorted me, which I highly needed to walk the ramp --

Page 48

1  walk up the ramp or any other movements due to injury
2  of my TBI they continued to neglect."
3      Q   And then their response essentially says
4  that their original response is to stand, right?
5      A   That's what most of my response say,
6  noncompliant, as far as this situation.
7      Q   You said most of your responses say
8  "noncompliant"?
9      A   Some -- well, this situation, where we -- I
10 grieved this issue numerous times, so it can't be -- I
11 can't keep grieving the same issue.
12     Q   So, Kavarian, I asked you earlier if they
13 ever marked any grievances that you filed for this
14 issue with noncompliant, and you said no, didn't you?
15     A   Yes.
16     Q   So you're saying --
17     A   Maybe I didn't understand the question when
18 you asked me.
19     Q   So have you ever received a noncompliant
20 response on a grievance filed in this issue?
21     A   And I can't reply -- I can't respond to it.
22 I can't write the same grievance multiple times.
23     Q   So I'm asking you, have you ever gotten a
24 response from the jail on any of your grievances

Page 49

1  regarding the ramps that it was noncompliant?
2      A   Not as I remember.
3      Q   A minute ago, you just said that most of the
4  responses on this issue say that they're noncompliant,
5  didn't you?
6      A   Mm-hmm.
7      Q   So have you ever received a response from
8  the jail on a grievance filed about a ramp issue
9  stating that it's noncompliant?
10     A   I don't think about this issue, no.
11     Q   All right. Putting on the screen Exhibit 3,
12 declaration.
13         (Exhibit 3 was marked for
14         identification.)
15     This is your declaration, correct?
16     A   Yes, sir.
17     Q   Did you have a part in drafting this?
18     A   Yes, sir.
19     Q   Did you personally draft this, or did you --
20 I mean, did you write it out yourself and send it to
21 your attorney?
22     A   No, sir, I just gave my attorney this
23 information. 'Cause my right side is kind of -- hard
24 for me to write certain stuff, so that's why I was --

13 (Pages 46 - 49)

Page 50

1   Q   And would you have, like, talked to him,
2   talked to your attorneys over the phone about the
3   content of this declaration?
4   A   Yeah, like -- like, my attorney come see me.
5   I let him know -- I let him know all this when he came
6   to see me.
7   Q   Okay.  And on the second page, here, that's
8   your signature, above "Kavarian Rogers" right there?
9   A   Yes, sir.
10  Q   And you signed that on June 1, 2024?
11  A   Yes, sir.
12  Q   Okay.  And it says here -- I'm going to read
13  it and somewhat paraphrase; just tell me if I'm doing
14  so correctly.  Your name's Kavarian Rogers.  You're
15  incarcerated at Cook County Jail under booking number
16  20200402015, correct?
17  A   Yes, sir.
18  Q   In February 2020, you were shot in the left
19  side of your head; that injury substantially impacts
20  your ability to use the right side of your body, and
21  you have limited ability to move your right hand and
22  right leg.  It's extremely difficult for you to move
23  from place to place because of those injuries,
24  correct?

Page 51

1   A   Yes, sir.
2   Q   You are substantially limited in the ability
3   to move from place to place, unless you are provided
4   an assistive device.  The correctional staff generally
5   let you use a walker when you leave Division 9 to
6   travel to other parts of the jail campus, including
7   the Cermak building, correct?
8   A   Yes, sir.
9   Q   And that would've been before you had your
10  seizure, correct, that would've been true, right?
11  A   [Unintelligible response.]
12  Q   Pardon?
13  A   Can you say it one more time?
14  Q   Yeah, that would've been, like, before your
15  seizure, and you were assigned a wheelchair; that
16  would've been when this number 3 would've been more
17  correct, right?
18  A   Yes, sir.
19      MR. MORRISSEY:  Objection,
20  mischaracterizes testimony.
21      MR. STILLMAN:  Well, your client just
22  said, "Yes, sir," but all right.
23  BY MR. STILLMAN:
24  Q   I mean, right now, are you using a walker to

Page 52

1   leave Division 9 to travel to other parts of the jail
2   campus?
3   A   Right now?
4   Q   Yeah, like, at present, in your time in the
5   jail right now, are you using a walker and leaving
6   from Division 9?
7   A   No, sir.
8   Q   You're in the RTU right now, correct?
9   A   Yes, sir.
10  Q   So this portion of number 3 right here would
11  generally be not as correct right now?  It was more
12  correct before your seizure; is that right?
13  A   Yes, sir.
14  Q   Okay.  Thank you.  Number 4 says you have
15  travelled up and down the east tunnel ramp located in
16  the lower level of the RTU and the Cermak ramp.  It is
17  painful for you to traverse those ramps using your
18  walker; the ramps are both steep and long, correct?
19  A   Yes, sir.
20  Q   And then finally, over the past few months,
21  you have traversed the Cermak ramp several times.  It
22  is very difficult for you to travel up and down using
23  your walker.  There is no place to safely rest when
24  you go up or down with your walker.  You have

Page 53

1   requested staff to help you go up and down the ramp,
2   and even filed a grievance.  Despite these requests,
3   staff direct me to move up and down the ramp with my
4   walker; is that right?
5   A   Yes, sir.
6   Q   And do you have any reason to dispute or
7   change anything in this declaration or say it's not
8   true anymore, other than what we already talked about
9   in number 3?
10      MR. MORRISSEY:  Objection, to the
11  extent you're suggesting it was not true when he
12  signed it.
13      MR. STILLMAN:  I'm not suggesting it's
14  not true when it was written.  I didn't say that.
15      All right.  Forget about it.
16  BY MR. STILLMAN:
17  Q   When you were still in your walker, about
18  how mobile were you at that time?  Were you able to
19  move around a little more easily than you've been able
20  to since your seizure?
21      MR. MORRISSEY:  Objection to form.
22      You can respond.
23  BY MR. STILLMAN:
24  Q   Were you able to move around a little bit

14 (Pages 50 - 53)

Page 54

1  more easily before the seizure, Kavarian?
2  A  Yeah.
3  Q  And one of your complaints in your grievance
4  was that you had a cane that was taken, correct?  Is
5  that right?
6  A  No, I think my wheelchair was taken.  Oh,
7  yeah, my cane was taken, too.
8  Q  Yeah, the first grievance we went over
9  together, that was about your cane being taken,
10  correct, confiscated?
11  A  Yeah.
12  Q  All right.  I'm putting on the screen
13  Exhibit 4.
14     Or actually, when you were using the cane,
15  Kavarian, do you think it was something you were using
16  very actively for, like, mobility purposes?
17  A  Yeah.  Yes, sir.
18  Q  Like, something you really needed to get
19  around, you couldn't make your way around the jail
20  without it?
21  A  Yes.
22  Q  Did you ever get into fights involving your
23  cane?
24  A  Like -- like, you mean, like -- like -- did

Page 55

1  I -- did I, like -- my -- use my cane?
2  Q  Yeah, did you ever use your cane in a fight?
3  A  I mean, no, sir.  I mean, I mostly used it,
4  but I never got a chance to use it.
5  Q  You never threatened to use your cane and
6  hit people with your cane?  Would there be incident
7  reports involving any kind of incidents like that?
8     MR. MORRISSEY:  Objection to form.
9     You can respond.
10     THE WITNESS:  There shouldn't be.
11  BY MR. STILLMAN:
12  Q  So I'm putting on the screen Exhibit 4.
13     (Exhibit 4 was marked for
14     identification.)
15     Are you able to see this document?
16  A  Yes, sir.
17  Q  That's an incident report, right?
18  A  Yeah.
19  Q  And it states here that, "Inmate Rogers,
20  Kavarian was walking towards inmate Jones with a cane.
21  When he got closer, Kavarian raised up his cane
22  towards Jones, Hamilton and turns Jones' direction,
23  and then both inmates grabbed each other;" is that
24  right?

Page 56

1  A  Yes, sir.
2  Q  Did that seem like a time where you were
3  using your cane in a fight?
4  A  Yes, sir.  Yeah, well, I told you I never
5  used it, though.  I never got a chance to use my cane.
6  Q  Okay.  Do you know the other plaintiff in
7  this case, William Mathis?  Or the plaintiff in this
8  case, William Mathis?
9  A  No, sir.
10  Q  Have you ever heard the name Cuauhtemoc
11  Hernandez?
12  A  No, sir.
13  Q  What about the name Kent Elwoods?
14  A  No, sir.
15  Q  Sylvestor Brinson?
16  A  No, sir.
17  Q  Tommy Love?
18  A  No, sir.
19  Q  Anthony Muniz?
20  A  No, sir.
21  Q  Antoine Pierce?
22  A  No, sir.
23  Q  What about Carlos Martinez?
24  A  No, sir.

Page 57

1  Q  Lonell Long?
2  A  No, sir.
3  Q  Joseph Smith?
4  A  No, sir.
5  Q  Quovotis Harris?
6  A  No, sir.
7  Q  James Krook?
8  A  No, sir.
9  Q  And Raasikh Phillips?
10  A  No, sir.
11     THE REPORTER:  I'm sorry, just for a
12  clear record, all those answers were no, correct?
13     THE WITNESS:  Yes, ma'am.
14     MR. STILLMAN:  All right.  I got
15  nothing else.
16     MR. MORRISSEY:  Sir, just I have a few
17  questions.  So you don't have to turn around if it's
18  too hard for your neck, okay?
19     THE WITNESS:  Yes, sir.
20     EXAMINATION
21  BY MR. MORRISSEY:
22  Q  When Mr. Stillman asked you questions, you
23  mentioned there's two types of seizures?
24  A  Yes, sir.

15 (Pages 54 - 57)

Page 58

1  Q   What's the difference between those two
2  types, to your knowledge?
3  A   Like, the grand mal seizures, like, I could
4  just space out and forget things.  And my grand mal
5  seizures, like, I could go all the way out and, like,
6  go to lose my right side, my -- my right side and go
7  to the hospital, things like that.  Wake up, don't
8  know what happened.
9  Q   What's the other type of seizure?
10 A   Epilepsy.
11 Q   And what does that mean to you?
12 A   Like, sometimes I could just space out and
13 lose memory.
14 Q   Since you've been at the jail, since 2020,
15 have you had both types of seizures?
16 A   Yes, I had lots.
17 Q   How many different types of -- I mean -- let
18 me rephrase the question.
19       Approximately how many seizures do you
20 believe you've had over the last four years?
21 A   Like, in two -- including both?
22 Q   Right.
23 A   Like 15.
24 Q   So prior to the seizure that caused you to

Page 59

1  be here a few weeks ago, you've had prior seizures?
2  A   Yes, sir.
3  Q   Now, can you explain in greater detail how
4  this gunshot wound has impacted the right side of your
5  body, pertaining to moving from place to place or
6  walking?
7  A   Like, from detail to detail?  Like, I got to
8  use my left arm and my left foot to get me place to
9  place if I'm not being, like, pushed, or have -- if I
10 don't have support from someone to push me, because,
11 like, I can't move my arm to -- it don't have motion
12 to -- to wheel it, to push the wheel forward and
13 forward, and --
14 Q   What about when you use canes or walkers?
15 A   Like, I got a -- it's hard for me, like, to
16 grab a -- grab a hold on it to use it with one hand,
17 'cause my -- my right hand don't really be allowing me
18 to grab it.
19 Q   And can you explain, when you use a cane or
20 a walker -- be able to move your right leg and your
21 right foot?
22 A   Like -- like, I would need to move my left
23 leg.  Like, my right foot, it don't really do as much,
24 'cause it's, like it's all still asleep, and none of

Page 60

1  it will wake up yet, so -- from my injuries.
2  Sometimes it -- it'll get a little bit of mobility in
3  it, but it's still haven't wake up.  So I won't be
4  able to really move my right side.
5  Q   And over the past two or three years, on
6  some days, have you been able to have better mobility
7  with your right side?
8  A   Yes, yes, I have, just a little bit.
9  Q   Does it decrease and increase?
10 A   Yeah, it -- it'll decrease sometimes, like,
11 and then it'll go back up.  It's like, the effort that
12 I put in, I try to gain a little bit, but not too much
13 come back.
14 Q   I'm sorry, I didn't mean to cut you off.
15 A   It's already been, like, four years, so
16 like -- still it ain't came back.  Like, I don't
17 really feel like too much therapy will, like, to help
18 me -- like, to get back to where I need to be.
19 Q   Have you requested therapy?
20 A   Yeah, I requested therapy a lot of times,
21 but I wasn't in the building to get therapy.  I was in
22 a different division, so I couldn't get therapy I
23 needed.
24 Q   When you were in Division 9, did you request

Page 61

1  to be moved to different buildings because of your
2  disability?
3  A   Yeah, I requested multiple times on
4  grievances, like, can I -- can I get adequate
5  placement and assistance due to my medical needs, and
6  my medical -- I -- grievances and things like that so
7  that I can get a better result, and a outcome to be
8  able to move around and get active, far as, like,
9  physical therapy.
10 Q   You mentioned in response to Mr. Stillman's
11 questions you had problems with the showers.  Can I --
12 A   Yeah, I had -- I had mostly the problem with
13 the showers in Division 9.  Like, most -- it was a
14 couple times I had to sit on the floor wash up.  But
15 some of the showers got mold in them, so I really
16 stopped sitting on the floor.  I just go to the back
17 of the alley and just wash up.
18 Q   Did you have problems using the toilet in
19 Division 9 because of your -- limitation?
20 A   Yeah, one time I -- like, 'cause I can't
21 grab a toilet, ain't no grab bars over there, so one
22 time I fell off the toilet.  And -- ain't got too many
23 assistants in Division 9, though, but I filed
24 grievances and stuff.  They -- they don't really do

16 (Pages 58 - 61)

Page 62

1 nothing.
2    Q   Now, talking about your right leg and your
3 right part of your body, do you experience foot drop?
4    A   Yes, I got drop foot in my right foot.
5    Q   And how long have you had -- what is drop
6 foot to you, Mr. Rogers?
7    A   I got a drop -- like, I -- I got to drag my
8 leg, and when -- when I move it, it just -- it do what
9 it want, like, it do whatever it want to me.  It don't
10 got no real motion to it.
11    Q   And how does that impair your ability to use
12 a cane or a walker?
13    A   'Cause, like, it's -- it's difficult to me.
14 Like, I can't really -- I can't really move with it,
15 so I got to use one side to -- bring this side to do
16 most of it, like, and take my time with everything,
17 really.
18    Q   Have you had that foot -- is it called foot
19 drop?
20    A   Yeah.
21    Q   Have you had drop foot for four years?
22    A   I had this since 2020, yeah.
23    Q   Now, during the examination, you told
24 Mr. Stillman that there was a time when you didn't go

Page 63

1 to a Stroger medical appointment because the officer
2 wouldn't move you in a cart?
3    A   Yeah, in a cart, I requested a cart.
4    Q   Can you walk us through what happened on
5 that day, explain to us what happened?
6    A   Like, really, I -- I requested a cart about
7 me bringing -- about me being in pain.  Like, I'm
8 telling them, like, "Man, I don't want to walk all the
9 way to court this time.  Like, can you give me a
10 cart?"  One officer gave it to me, and then this
11 officer -- this officer told me, like, he can't give
12 it to me 'cause it's part of protocol or something.
13 It don't be -- something like -- like they only could
14 give it to me for, like --
15    Q   And where were you when you had this
16 conversation with staff?
17    A   I was --
18        THE REPORTER:  Sorry, could you please
19 repeat?
20        THE WITNESS:  I was in the bull pen
21 downstairs of Division 9, right before I left off for
22 court.
23 BY MR. MORRISSEY:
24    Q   So when you had this conversation, you were

Page 64

1 moved from your living unit to the bull pen in the
2 basement of Division 9 to be transported?
3    A   I was already downstairs in the basement,
4 trying to get them to take me on the cart to court.
5 And I asked them, and they -- it ain't happen.
6    Q   Now, you previously said you missed a
7 Stroger appointment; was it Stroger, or was it court
8 when you asked for the cart?
9    A   It was -- it was court.
10    Q   Since your seizure a few weeks ago, has your
11 condition improved at all, your physical?
12    A   Not to -- not in my previous seizure.  It
13 just got a little, like -- I just feel better.  But
14 physical, no -- ain't nothing --
15        MR. MORRISSEY:  I have nothing further.
16        MR. STILLMAN:  I got nothing.
17        THE REPORTER:  Okay.  For transcript
18 orders?
19        MR. MORRISSEY:  We'll waive signature.
20 I don't need a copy of this right now.
21        MR. STILLMAN:  Yeah, we'll take a copy.
22        THE REPORTER:  Okay.  We are now off
23 the record at 11:05 a.m.
24        (Signature waived.)

Page 65

1        (Whereupon, at 11:05 a.m., the
2         proceeding was concluded.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

17 (Pages 62 - 65)

Page 66

1       CERTIFICATE OF DEPOSITION OFFICER
2       I, CARLY HEMBERGER, the officer before whom
3  the foregoing proceedings were taken, do hereby
4  certify that any witness(es) in the foregoing
5  proceedings, prior to testifying, were duly sworn;
6  that the proceedings were recorded by me and
7  thereafter reduced to typewriting by a qualified
8  transcriptionist; that said digital audio recording of
9  said proceedings are a true and accurate record to the
10  best of my knowledge, skills, and ability; that I am
11  neither counsel for, related to, nor employed by any
12  of the parties to the action in which this was taken;
13  and, further, that I am not a relative or employee of
14  any counsel or attorney employed by the parties
15  hereto, nor financially or otherwise interested in the
16  outcome of this action.
17       CARLY HEMBERGER
18      Notary Public in and for the
19       State of Illinois
20
21
22
23
24

Page 67

1       CERTIFICATE OF TRANSCRIBER
2       I, SARAH JOHNSON, do hereby certify that
3  this transcript was prepared from the digital audio
4  recording of the foregoing proceeding, that said
5  transcript is a true and accurate record of the
6  proceedings to the best of my knowledge, skills, and
7  ability; that I am neither counsel for, related to,
8  nor employed by any of the parties to the action in
9  which this was taken; and, further, that I am not a
10  relative or employee of any counsel or attorney
11  employed by the parties hereto, nor financially or
12  otherwise intereste           ion.
13
14
15       SARAH JOHNSON
16
17
18
19
20
21
22
23
24

18 (Pages 66 - 67)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Cuauhtemoc Hernandez and William Mathis, | ) ) ) | |
| *Plaintiffs,* | ) ) | |
| -*vs*- | ) ) | No. 23-cv-16970 |
| Thomas Dart, Sheriff of Cook County, et. al., | ) ) ) | Judge Sunil R. Harjani |
| *Defendants.* | ) ) | |

**PLAINTIFFS' LOCAL RULE 56.1(a)(2) STATEMENT**

Plaintiffs Hernandez and Mathis, by counsel, files the following Local Rule 56.1(a)(2) Statement:

1. Plaintiff Cuauhtemoc Hernandez had a medical alert to use a cane at all times at the Cook County Jail from February 2, 2022 to August 30, 2022, and from May 10, 2023 to May 11, 2023. Exhibit 1, Sheriff's Response to Admissions ¶¶ 1-2, 40; Exhibit 2, Cook County Response to Admissions ¶ 2. The Court appointed Hernandez to represent a Rule 23(b)(3) class of all Cook County Jail detainees who have been assigned a cane, crutch, or walker by a jail medical provider, for a period of more than two weeks, and traversed the Cermak ramp from December 20, 2021 to the date of judgment to resolve the Rule 23(c)(4) issue of whether the Cermak ramp complied with the structural standards required by the ADA and Rehabilitation Act at that time. Dkt. 72, Memorandum Opinion and Order at 6.

2.  Plaintiff William Mathis is a former detainee of the Cook County Jail and from October 16, 2023, until at least August 15, 2024, had a medical alert for "Cane Long Distances Only." Exhibit 1, Sheriff's Response to Admissions ¶ 44; Exhibit 3, IDOC Information for Mathis (admitted to IDOC on 8/29/2024). Plaintiff Mathis has been appointed class representative for two classes: (1) pursuant to Rule 23(b)(2), all inmates at Cook County Jail prescribed a cane, crutch, or walker by a jail medical provider for a period of more than two weeks who traversed either the Residential Treatment Unit east tunnel and/or the Cermak ramp, and (2) pursuant to Rule 23(b)(3) a class for all Cook County Jail detainees who have been assigned a cane, crutch, or walker by a jail medical provider, for a period of more than two weeks, and traversed the Residential Treatment Unit east tunnel ramp from February 13, 2022 to the date of judgment, to resolve the Rule 23(c)(4) issue of whether the east tunnel ramp complied with the structural standards required by the ADA and the Rehabilitation Act at that time. Dkt. 72, Memorandum Opinion and Order at 6.

3.  Defendant Thomas Dart, Sheriff of Cook County, has custody and control over the Cook County Jail. Dkt. 76, Sheriff Answer to Consolidated Complaint ¶ 4; 55 ILCS 5/3-6017.

4.  Defendant Cook County is an Illinois body politic that is responsible for accommodating the needs of disabled detainees remanded to the Sheriff of Cook County and also owns all buildings at the Cook County Jail. Dkt. 75, Cook County Answer to Consolidated Complaint ¶¶ 5-6.

5. This Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. §
12133 and 29 U.S.C. § 794a(a)(2) Dkt. 76, Sheriff Answer to Consolidated
Complaint ¶ 1. Venue is proper under 28 U.S.C. § 1391 because the actions giving
rise to plaintiffs' claims occurred in the Northern District of Illinois. *Id.*

6. There is a pedestrian/material access tunnel serving the Cermak Health
Services Facility at the basement level. Exhibit 2, Cook County's Response to
Admission ¶ 3.

7. The Cermak Health Services Facility was constructed after 1993. Exhibit 2,
Cook County's Response to Admission ¶ 4.

8. The Cermak ramp connects the Cermak building to the tunnel and is used
by civilian and security employees to enter Cermak, to transport inmates, and to
transport equipment. Exhibit 5, Cook County's Response to Admission ¶ 5.

9. Eric Davis has been the Deputy Director of the Cook County Department of
Capital Planning and Policy since April 2017 and a licensed architect since 1989.
Exhibit 2, Cook County's Response to Admission ¶¶ 7-8.

10. At present, Mr. Davis's duties include acting as the primary contact for
the County on the facilities aspect of accessibility and the ADA and "leading County
efforts to renovate the Cermak ramp." Exhibit 2, Cook County's Response to
Admission ¶¶ 9-10.

11. Ellen Stoner is a licensed architect and is the principal of Altus Works.
Exhibit 6, Stoner (9/8/2021) Dep 5:22-6:2,16:2-5. In about 2017, STV hired Altus

Works as an "on-call consultant for accessibility evaluations." Exhibit 6, Stoner (9/8/2021) Dep 15:17-16:10, 28:10-14.

12.      Mr. Davis believed Ms. Stoner was qualified to assess whether or not the Cermak ramp complied with the 1991 ADA standards. Exhibit 5, Davis (1/19/2022) Dep 94:1-6.

13.      Mr. Davis testified that he believed Ms. Stoner "was tasked to go and evaluate whether or not, as you say, there may be accessibility issues" with Cook County properties. Exhibit 5, Davis (1/19/2022) Dep 94:16-23.

14.      Cook County provided the following interrogatory answer in response to the role of Ms. Stoner's assignment pertaining to the Cermak ramp:

> Atlas Works was tasked by the STV/Heery joint venture to review accessibility of various locations, including the lower-level ramp in the Cermak Health Services Facility, including but not limited to those requirements from the 2010 ADA Standards that may apply to a building constructed in the late 1990s.

Exhibit 9, Cook County Answer to Second Set of Interrogatories ¶ 3.

15.      In March 2018 Ellen Stoner conducted a walkthrough of Cermak. Exhibit 6, Stoner (9/8/2021) Dep 102:16-21; Exhibit 10, Cook County Answer to Plaintiff's First Set of Interrogatories ¶ 2.

16.      Ms. Stoner made recommendations to bring the Cermak ramp "into compliance." Exhibit 6, Stoner (9/8/2021) Dep 138:12-20. Ms. Stoner wrote the following information regarding the Cermak ramp:

> Existing ramp is 47' long without a landing. Slope of the ramp is within 1:12 maximum slope requirements, however the run exceeds code requirements. Recommendations:

1. Create compliant landing 30' from top of ramp
2. Repour the remaining 17' ramp in 2 sections with another landing area at the change in ramp direction.
3. Raise door to Medical Records room B020. Extend landing into room and provide 3' wide ramp and 44" wide stair
4. Provide hand rails at both sides of ramps, continuous at landing where no door exists.
5. Provide handrails at both sides of stairs in B020

Exhibit 10, Cook County Answer to Plaintiff's First Set of Interrogatories ¶ 6; Exhibit 4 at 2; Exhibit 5, Davis (1/19/2022) Dep 93:2-13.

17.     Ellen Stoner created the drawing of the Cermak ramp attached as Exhibit 4 and also referenced in Eric Davis's deposition as Exhibit 4. Exhibit 5, Davis (1/19/2022) Dep 93:2-13.

18.     Ms. Stoner testified as follows:

Q.     In addition to the ramp not having a landing within 30 feet from the top of the ramp, you also found that the handrails were incompliant with the 2010 code, correct?

A.     Uh-huh.

Mr. Glasso (Ms. Stoner's counsel):     You have to say that verbal.

A.     Yes. Sorry.

Exhibit 6, Stoner (9/8/2021) Dep 138:22-139:6.

19.     Additionally, Cook County hired a third-party architectural/engineering firm, Globetrotters Engineering Corporation (GEC), to assess ADA compliance of the Cermak Health Services facility, starting with a report specifically on the Cermak ramp. Exhibit 2, Cook County's Response to Admission ¶ 11.

20.     On December 6, 2023, GEC submitted a Cook County Ramp Accessibility Assessment for the Cermak Health Services Facility finding that the Cermak ramp has "a rise of 32.4 inches, which does not comply with the 30-inch maximum rise stated in Section 4.8.2 of the 1991 ADAAG." Exhibit 2, Cook County's Response to Admission ¶¶ 12-13.

21.     Referring to the rise of the ramp, Carl Darr of GEC testified "If it's 2.4 inches short, it doesn't comply regardless." Exhibit 2, Cook County's Response to Admission ¶ 14.

22.     GEC also found that the current handrails on the Cermak ramp "do not extend 12" beyond the ramp and "they do not comply with the 2010 ADAAG requirements for handrail extensions." Exhibit 2, Cook County's Response to Admission ¶ 17.

23.     GEC proposed the following "[p]ossible solutions" to remedy the non-compliant Cermak ramp:

> 1. Adding an intermediate landing, to reduce the rise to less than 30 inches per run and adding railing extensions at the top and bottom of the ramp.
> *or*
> 2. Reducing the slope to less than 1:20 by extending the length of the walkway. The sloped walkway will be shallow enough to eliminate the applicability of code requirements for ramps and will not require a handrail.

Exhibit 2, Cook County's Response to Admission ¶ 18.

24.     The Residential Treatment Unit was constructed after 2010 and contains an east tunnel ramp that leads directly to the Cermak ramp and they are of comparable size. Exhibit 2, Cook County's Response to Admission ¶¶ 23, 27.

25.     In March of 2021, Timothy Tyrrell, the General Manager of Cook County's Facilities Management Department sent an e-mail acknowledging the path of travel on the RTU ramp is not compliant with the ADA. Exhibit 7, Tyrrell e-mail sent 3/8/2021 at 2:53 pm.

26.     The RTU east tunnel ramp includes two-sloped floor runs separated by an intermediate landing. Exhibit 2, Cook County's Response to Admission ¶ 25. The runs are both steeper than 1:20 and therefore are ramps as defined under the ADA. *Id.*

27.     GEC, including Mr. Darr, inspected the RTU east tunnel ramp on January 23, 2024, and again on January 25, 2024. Exhibit 2, Cook County's Response to Admission ¶ 29.

28. GEC submitted a report dated April 1, 2024 in *Westmoreland v. Dart*, 23-cv-1851, and make the following findings why the RTU east tunnel ramp does not comply with the ADA structural standards;

- **Top landing:** The Top Landing runs from the Upper Ramp to a pair of doors, leading to the adjacent tunnel, and has a length of 0.75' (9 in.). Since the landing length is less than 60 inches, the landing length is not code compliant.

  The landing is 85% short of the required length. However, this may be easily corrected by relocating the doors to the east 51", to provide the minimum required landing length.

- **Upper Ramp:** The Upper Ramp has a 25.95' horizontal run and a 1.93' vertical rise with an average slope of 1:13.4. There is a variation in slope at the very top of the ramp. The last 4.27' of the run, at the top has a rise of 4.56" for a slope of 1:11.

  The upper portion of the ramp floor surface is not code compliant; the top 16.5% of the overall length is approximately 0.64% steeper than permitted by code. Since the bottom portion of the ramp run is shallower than 1:12, it would be possible to add a floor topping which will even-out the slope make a consistent floor slope that has a 1:12 slope or shallower.

- **Intermediate Landing:** The Intermediate Landing is 4.75 feet (57 in.) in length. Since the landing length is less than 60 inches in length, the Intermediate Landing is not code compliant.

  It is 5% shorter than the required length. To correct this nonconformity, a longer level floor plane at the landing will need to be provided, extending the floor surface west. This will require the Lower Ramp to be rebuilt, along its entire length, to provide for the additional landing length and maintaining a maximum 1:12 ramp slope.

- **Lower Ramp:** The Lower Ramp has a 30.4' horizontal run and a 2.47 vertical rise, with an average slope of 1:12. There is a variation in slope at the very bottom of the ramp. The last 1 foot of the run is steeper than the rest of the ramp with a slope of approximately 1:8.5.

  The lower portion of the ramp floor surface is not code compliant; the lower 3.5% of the overall run is approximately 11.7% steeper than permitted by code. The floor surface will need to be feathered out, and the ramp length extended slightly for the Lower Ramp floor to be compliant with code requirements for ramp slope at this location.

- **Handrails:** As noted in the code requirements above, need to be located 34-38 inches above the ramp floor and need to extend a minimum of 12 inches beyond the top and bottom of each ramp. The ramp(s) have a continuous handrail on each side located. At the lower end of the Lower Ramp the handrails, where measured, is approximately 33" above the ramp floor. At other locations, the handrail height exceeds 34" above the ramp floor. Since, at some locations, handrails are less than 34" above the ramp floor they are not in compliance with requirements for handrail height.

  The handrails extend 7.4" beyond the Lower Ramp and 11.3" beyond the Upper Ramp. Since the handrail extensions are less than 12 inches, the handrails are not in compliance with code requirements for handrail extensions.

Exhibit 2, Cook County's Response to Admission ¶ 47.

29.    Mr. Darr testified in *Westmoreland v. Dart*, that "the regulations don't permit any entity to have a landing less than 60 inches." Exhibit 2, Cook County's Response to Admission ¶ 31.

30.    Mr. Darr testified that the purpose of an intermediate landing "basically gives somebody a place to stop for a moment, even turn around." Exhibit 8, Darr (4/30/2025) Dep 30:18-23.

31.    Mr. Darr testified in *Westmoreland v. Dart*, that the RTU east tunnel ramp is not in compliance with the ADA regulations. Exhibit 2, Cook County's Response to Admission ¶ 32.

32.    Mr. Darr testified in *Westmoreland v. Dart* that providing an accommodation such as pushing a wheelchair person up or down the RTU east tunnel ramp does not obviate the need of the government to comply with the ADA standards "for a required accessible route." Exhibit 2, Cook County's Response to Admission ¶ 33.

33.    GEC offered the following recommendations to bring the RTU east tunnel ramp into compliance with the ADA:



*Figure 3: Plan of Recommendations*

Exhibit 2, Cook County's Response to Admission ¶ 34.

34.     There is no projected date when the RTU east tunnel ramp will be renovated in accordance with the recommendations of GEC and, as of August 15, 2024, the Cook County Board of Commissioners have not approve any funds to reconstruct the RTU east tunnel ramp to comply with the ADA. Exhibit 2, Cook County's Response to Admission ¶¶ 36, 39.

35.     Defendants retained Carl Darr as their Rule 26(a)(2) expert in this case. Exhibit 11, Defendants' Expert Disclosure.

36.     During his deposition on April 30, 2025, Mr. Darr confirmed that the Cermak ramp and RTU east tunnel ramp, at the time of construction, did not comply with the applicable ADA standards. Exhibit 8, Darr (4/30/2025) Dep 34:3-36:10.

37.    The 1991 ADA Standards and the 2010 ADA Standards are identical in regards to certain components of ramps: (1) the rise for any ramp run shall be a maximum of 30 inches, and (2) handrails must meet specific structural requirements. *See* Exhibit 12, 1991 ADA Standards §§ 4.8.2, 4.8.5; Exhibit 13, 2010 ADA Standards §§ 405.6, 405.8.

38.    Mr. Darr testified that the ADA structural standards are "mandatory," explaining: "[i]t would have been mandatory at the time for the designer to design the ramp accordingly and for the contractor to build the ramp accordingly." Exhibit 8, Darr (4/30/2025) Dep 17:21–18:8.

39.    Mr. Darr further opines that each non-compliant ramp must be renovated to meet the mandatory ADA structural standards. *See* Exhibit 14, Cermak Report at 9–10; Exhibit 15, Residential Treatment Unit Report at 16.

40.    Lonnie Hollis was produced on November 18, 2024, as the Sheriff's Rule 30(b)(6) designee, to discuss Topics 3-6 of the Deposition Notice. Exhibit 16, Rule 30(b)(6) Deposition Notice; Exhibit 17, Hollis Dep 5:19-6:10. This Rule 30(b)(6) Notice addresses accommodations to class members to traverse the ramps. Exhibit 16, Rule 30(b)(6) Deposition Notice ¶¶ 3-6.

41.    The only written training by the Sheriff's Office regarding movement up and down ramps is from Lexipol. Exhibit 17, Hollis Dep 120:13-121:8. This Lexipol Policy, titled 148, only provides direction for correctional staff to push wheelchair users up and down ramps. Exhibit 17, Hollis Dep 39:2-11; Exhibit 18, Lexipol Policy 148 at 7.

42.    Mr. Hollis confirmed Policy 148 does not provide any information about how an officer is to accommodate a class member traversing a ramp at the Jail. Exhibit 17,

Hollis Dep 39:22-41:6. Mr. Hollis also was unable to discuss training for staff to accommodate class members when traversing the ramps. Exhibit 17, Hollis Dep 121:9-122:9.

43.      The Appendix to the 1991 ADA Standards states "[t]he ability to manage an incline is related to its slope and its length." Exhibit 19, Portion of 1991 ADA Appendix at 7, A4.8.2. The Appendix to the 1991 ADA Standards states "[l]evel landings are essential toward maintaining an aggregate slope that complies with these guidelines." Exhibit 19, Portion of 1991 ADA Appendix at 7, A4.8.4.

44.      Plaintiff Hernandez had an alert to use a cane from February 2, 2022 to August 30, 2022 and from May 10, 2023 to May 11, 2023. Exhibit 1, Sheriff's Response to Admissions ¶ 40.

45.      The medical intake for Hernandez on February 2, 2022, by PA Salvador Martinez documents "H/O: M.Obese with chronic LBP and shoulder OA" and that he was given "CPM/PRN with pain Rx -cane." Exhibit 20 at 3, Hernandez 2/2/2022 Intake Medical Record.

46.      Hernandez dated a Health Service Request Form February 4, 2022, and wrote "I cant walk to far meaning need a wheel chair when moved around for court etc." Exhibit 21 at 1, Hernandez Health Service Request Form. Hernandez submitted another Health Service Request Form dated February 23, 2022, stating "I need to see the doctor to get an order that I be transported in a wheel chair when I go to court etc. I cant walk distances so please call me immediately. Staff told me

to direct this to medical that doctor." Exhibit 21 at 2, Hernandez Health Service Request Form.

47.     At one point in time, Hernandez testified he did not believe there were handrails on the Cermak ramp. Exhibit 22, Hernandez Dep 93:11-16. When handrails were installed on the ramp, Hernandez would use the handrails "sometimes" depending on which side of the ramp he was required to walk on due to his bad right shoulder. Exhibit 22, Hernandez Dep 44:12-23.

48.     On August 18, 2022, RN Jeelan McCray made the following documentation in Hernandez's medical file:

> Pt seen today. He ambulated out with a noticeable staggered limp and drag of his left foot. Pt is overweight and strongly declares that he cannot get up from a standing position without a cane. Pt does have an order for a cane at all times. Div 9 will not allow pt to have his cane on the deck. Communication sent to the provider for appropriate housing. F/U prn.

Exhibit 23, RN McCray 8/18/2022 Record.

49.     Plaintiff Hernandez testified the Cermak ramp and RTU east tunnel ramp were "too steep and too long" and did not have adequate space to rest which exasperated pain to his leg, back, and shoulder." Exhibit 22, Hernandez Dep 92:1-16, 93:3-7.

50.     When Hernandez moved up and down the ramps he was compelled to "stop and take breaks" by trying to "lean on the wall" and he was unable to "keep up with the line" of inmates being moved. Exhibit 22, Hernandez 42:12-23, 58:7-

13, 92:5-16. Using "the ramp was just one of the biggest problems because it's so long" and caused Hernandez to be in pain. Exhibit 22, Hernandez Dep 57:23-58:6.

51.     The pain caused by using the ramp would last "for days," exasperated Hernandez's preexisting injuries, and caused him to fall inside his cell in Division 10.  Exhibit 22, Hernandez Dep 54:2-55:16, 58:3-6, 62:7-17.

52.     Hernandez reported the pain caused by using the ramp to the correctional officers and, on two occasions at most, he was transported in a cart. Exhibit 22, Hernandez Dep 44:24-45:10, 46:5-47:3. Correctional staff told Hernandez that the cart would not be used "all the time" and that he required a "medical script". Exhibit 22, Hernandez Dep 46:18-48:9, 56:19-57:8.

53.     Hernandez reported his pain caused by using the ramps to the medical staff and even requested a prescription to use a wheelchair or to be transported regularly on a cart. Exhibit 22, Hernandez Dep 50:16-51:1, 56:19-57:8.

54.     A medical record by PA Brittany Wilkins dated October 16, 2023, documents plaintiff Mathis has "acromegaly" with injections to treat this condition, along with "[c]hronic L knee pain OA (poor, worsening)" and a "low bunk" alert and "cane long distance only" alert. Exhibit 24 at 7, PA Wilkins Medical Record dated 10/16/2023.

55.     A medical record by PA Daniel Kaczrowski dated November 20, 2023, documents Mathis "reports numerous h/o community flares," that he complained of "painful weight bearing on L ankle" and "likely gout flare." Exhibit 25 at 1, PA Kaczrowski Record dated 11/20/2023.

56.     Mathis testified each ramp was "too steep" which caused pain and shortness of breath. Exhibit 26, Mathis Dep 19:2-10, 26:24-27:7.

57.     During his incarceration at the Cook County Jail, Mathis went to Cermak approximately once every three to four weeks because he would attend medical appointments at Stroger Hospital to obtain injections. Exhibit 26, Mathis Dep 27:8-28:10.

58.     Due Mathis's medical condition, going up the ramps was more challenging than descending and his injuries included knee pain and a feeling of his knee popping in and out of place. Exhibit 26, Mathis Dep 24:16-25:7.

59.     Mathis has missed medical appointments at Cermak due to pain caused by traversing the ramps and ambulating during "flare-ups" of his condition. Exhibit 26, Mathis Dep 29:15-31:10.

60.     From October 16, 2023, until at least August 15, 2024, plaintiff William Mathis had an alert to use a cane long distance only. Exhibit 1, Sheriff's Response to Admissions ¶ 44.

61.     The Sheriff's record show Mathis was housed in DIV8/RTU on the following dates: April 8, 2023 to April 12, 2023, November 1, 2023 to November 6, 2023, December 10, 2023 to February 18, 2024, and February 22, 2024 to February 29, 2024. Exhibit 1, Sheriff's Response to Admissions ¶ 46.

62.     On December 10, 2023, while assigned to Division 6, Mathis had a gout flare that caused his foot to swell up and be unable to hold any weight. Exhibit 26, Mathis Dep 54:17-55:7. The correctional officers initially told Mathis on this day

he had to walk in order to be evaluated by the doctor at Cermak. *Id.* at 55:22-56:23.

Mathis was then seen by a nurse who placed him in a wheelchair and he was

transferred into a cart and driven to Cermak. *Id.* at 56:5-11.

63.     After December 10, 2023, Mathis has requested the correctional

officers to transport him in a cart up and down the ramps, but was told "inmates

not suppose to be on the cart" and was not escorted up and the ramps using a

cart. Exhibit 26, Mathis Dep 61:5-20.

64.     Mr. Lonnie Hollis, the Sheriff's Rule 30(b)(6) designee and Assistant

Executive Director since 2020, said the use of a cart for inmates to move up or

down ramps "is situational and they can't necessarily request for a cart, because

the carts may or may not be available at a given time, that would have to be

escalated to a supervisor, and they would have to work with Cermak to determine

how to have the person escorted over." Exhibit 17, Hollis Dep 22:20-23:2, 98:11-

22.

65.     Additionally, Mr. Hollis stated that if a class member is at the base of

a ramp and seek a wheelchair to traverse the ramp, a correctional supervisor must

be contacted and supervisor would contact the on-duty nursing supervisor at

Cermak "and a decision would be made at that point" whether a wheelchair would

be permitted to move up or down the ramp. Exhibit 17, Hollis Dep 98:23-101:23.

66.     Eric Davis said the purpose of handrails under the ADA code is to

"allow someone to steady themselves, whether they're walking or in a wheelchair,

to provide stability when they're walking or in a wheelchair." Exhibit 5, Davis (1/19/2022) Dep 104:2-8.

67.     Eric Davis testified in January of 2022 that the Cermak ramp did not have handrails that comply with either the 1991 or 2010 ADA standards. Exhibit 5, Davis (1/19/2022) Dep 52:3-7.

68.     Eric Davis testified in January of 2022 that "handrails would need to be provided" to comply with the ADA structural standards. Exhibit 5, Davis (1/19/2022) Dep 52:16-22.

69.     Eric Davis said that the Cermak ramp "appears that instead of a handrail that there are hospital-style bumpers at that - - at approximately the same height off the floor." Exhibit 5, Davis (1/19/2022) Dep 106:7-14.

70.     An order was entered in *Walker v. Dart* requiring Cook County to install "hand-railings on the Cermak Ramp on or before December 31, 2022" and that the "railings must comply with the Americans with Disabilities Act (ADA)." Exhibit 27, Order in *Walker v. Dart*, 20-cv-261, Dkt. 120.

71.     Timothy Tyrrell, the general manager for the department of facilities management for Cook County, was produced for a deposition on May 9, 2023. Exhibit 28, Tyrrell Dep 5:12-23, 11:5-18. Mr. Tyrrell testified that ironworkers "installed some handrails" on the Cermak ramp in the fall of 2022. Exhibit 28, Tyrrell Dep 70:6-12.

72.     Mr. Tyrrell said the project to install hand railings on each side of the Cermak ramp was completed on January 16, 2023. Exhibit 28, Tyrrell Dep 72:22-

73:16. The project was completed at this time "because of delivery and shipment issues." Exhibit 28, Tyrrell Dep 71:6-22.

73.     Carlos Martinez signed a declaration on June 1, 2024, indicating that he used crutches to move from place to place, that it was painful to move up and down the Cermak ramp, and that he requested a wheelchair to traverse the Cermak ramp on May 30, 2024, and was denied by the medical and correctional staff. Exhibit 29, Martinez Decl ¶¶ 1-4.

74.     Tommy Love executed a declaration in June of 2024 indicating he uses a cane to move from place to place and that moving up and down the RTU east tunnel ramp and Cermak ramp causes physical pain to his body because each ramp is steep and long. Exhibit 30, Love Decl ¶¶ 1-4.

75.     Quovotis Harris was processed into the Cook County Jail in 2019 and has an amputated right leg. Exhibit 31, Harris Decl ¶¶ 1-2. Up until September 2023, Harris used a cane and a prosthetic leg to move from place to place. *Id.* ¶¶ 2-3.  Harris regularly moved from RTU to Cermak for medical appointments and experienced pain moving up and down the ramps to and from Cermak.  *Id.* ¶¶ 4-6.

76.     Kavarian Rogers was shot in the head in February of 2020 that caused a substantial impairment with the use of the right side of his body, including moving. Exhibit 32, Rogers Decl ¶ 2; Exhibit 33, Rogers Dep 50:18-51:7.

77.     Rogers has moved up and down the RTU east tunnel ramp and Cermak ramp with a walker. Exhibit 32, Rogers Decl ¶ 4. Traversing these ramps

with a walker caused Rogers to experience pain because they are both long and steep. *Id.*

78.     Rogers has requested a cart to move up and down the Cermak ramp and RTU ramp and has been denied by the staff at the Jail. Exhibit 33, Rogers Dep 14:17-15:23.

79.     The Sheriff and County have received federal funds for the benefit of inmates at the Department of Corrections. Dkt. 76, Sheriff's Answer ¶ 7; Dkt. 75, County's Answer ¶ 7.


/s/     <u>Patrick W. Morrissey</u>

Thomas G. Morrissey, Ltd.
10257 S. Western Ave.
Chicago, IL 60643
(773)233-7901
<u>pwm@morrisseylawchicago.com</u>

*an attorney for the plaintiff class*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Cuauhtemoc Hernandez and William Mathis, | ) ) ) | |
| *Plaintiffs* | ) ) ) | 23-cv-16970 |
| *-vs-* | ) ) | Judge Harjani |
| Thomas Dart, Sheriff of Cook County, et. al., | ) ) ) ) | |
| *Defendants.* | ) ) | |

**PLAINTIFFS' INDEX OF EXHIBITS**

| Exhibit | Description |
|---|---|
| 1 | Sheriff's Response to Admissions |
| 2 | Cook County's Response to Admissions |
| 3 | IDOC information for plaintiff William Mathis |
| 4 | Ellen Stoner Drawing of Cermak ramp |
| 5 | Eric Davis (1/19/2022) Deposition |
| 6 | Ellen Stoner (9/8/2021) Deposition |
| 7 | TJ Terrell e-mail sent 3/8/2021 |
| 8 | Carl Darr (4/30/2025) Deposition |
| 9 | Cook County answer to second set of interrogatories in Walker v. Dart, 20-cv-261 |
| 10 | Cook County answer to first set of interrogatories in Walker v. Dart, 20-cv-261 |
| 11 | Defendants' Rule 26(a)(2) Disclosure of Carl Darr in *Hernandez v. Dart*, 23-cv-16970 |
| 12 | Portion of 1991 ADA Standards |
| 13 | Portion of 2010 ADA Standards |
| 14 | GEC Report for Cermak Health Services |
| 15 | Tunnel Corridor Accessibility Assessment for RTU |
| 16 | Rule 30(b)(6) Deposition Notice |
| 17 | Lonnie Hollis Deposition |
| 18 | Lexipol Policy 148 |
| 19 | Portion of Appendix to 1991 ADA Standards |
| 20 | Intake medical record for plaintiff Hernandez dated 2/2/2022 |
| 21 | Plaintiff Hernandez Health Service Request Forms |
| 22 | Plaintiff Hernandez Deposition |
| 23 | RN Jeelan McCray 8/18/2022 Medical Record for plaintiff Hernandez |
| 24 | PA Brittany Wilkins record for plaintiff Mathis dated 10/16/2023 |
| 25 | PA Daniel Kaczrowski record for plaintiff Mathis dated 11/20/2023 |
| 26 | William Mathis Deposition |
| 27 | Walker v. Dart, 20-cv-261, Order |

| 28 | Timothy Tyrrell Deposition |
| 29 | Carlos Martinez Declaration |
| 30 | Tommy Love Declaration |
| 31 | Quovotis Harris Declaration |
| 32 | Kavarian Rogers Declaration |
| 33 | Kavarian Rogers Deposition |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Cuauhtemoc Hernandez, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 23-cv-16970 |
| | ) | |
| v. | ) | Honorable Jeremy C. Daniel |
| | ) | |
| Thomas Dart, Sheriff of Cook County, | ) | |
| and Cook County, Illinois | ) | |
| | ) | |
| Defendants. | ) | |

<u>**DEFENDANT SHERIFF THOMAS J. DART'S RESPONSES TO PLAINTIFF'S
FIRST AND SECOND SETS OF REQUESTS TO ADMIT**</u>

NOW COMES Defendant, SHERIFF THOMAS J. DART (hereinafter "Defendant"), by

and through his attorneys, Jason E. DeVore and Zachary G. Stillman, of DeVore Radunsky LLC,

and for his responses to Plaintiff's First Set of Requests to Admit, dated August 15, 2024 (Request

Nos. 1-46), and Second Set of Requests to Admit, dated September 3, 2024 (single request

incorporated herein as Request No. 47), pursuant to Rule 36 of the Federal Rules of Civil

Procedure, states as follows:

<u>**REQUESTS**</u>

1.  Medical staff at Cook County Jail is responsible for identifying "physically disabled"

inmates and communicating significant health needs to the correctional staff.

**RESPONSE: Defendant Sheriff Dart admits only that medical staff, employed by Cook
County, convey some IIC medical needs to correctional staff using medical alerts, which are
visible to correctional staff within CCOMS, as necessary and within the confines of health
information privacy laws.**

2.  The medical staff at Cook County Jail communicates to the correctional staff when they

determine an inmate needs to be provided a cane, crutch or walker.

Exhibit 1 Page 1

**RESPONSE:** Defendant Sheriff Dart admits only that medical staff employed by Cook County convey whether they have prescribed a canes, crutches, or walker to an IIC using medical alerts, which are visible to correctional staff within CCOMS.

3. There is a pedestrian/material access tunnel serving the Cermak Health Services Facility at the basement level.

**RESPONSE:** OBJECTION – This Request to Admit seeks information better sought from Defendant Cook County. Defendant Sheriff Dart and the Cook County Sheriff's Office do not control the Cermak Health Services Facility. Without waiving and in light of this objection, Defendant Sheriff Dart admits that access tunnels exist in the basement level of the CCDOC, including connecting to the Cermak Hospital building known as Division 8.

4. The Cermak Health Services Facility was constructed after 1993.

**RESPONSE:** OBJECTION – This Request to Admit seeks information better sought from Defendant Cook County. Defendant Sheriff Dart and the Cook County Sheriff's Office do not control the Cermak Health Services Facility. Without waiving and in light of this objection, Defendant Sheriff Dart states that after a reasonable inquiry, the information known to or readily obtainable by him is insufficient to enable him to admit or deny the allegations contained in Request No. 4.

5. The Cermak ramp connects the Cermak building to the tunnel and is used by civilian and security employees to enter Cermak, to transport inmates, and to transport equipment.

**RESPONSE:** OBJECTION – This Request to Admit in part seeks information better sought from Defendant Cook County. Defendant Sheriff Dart and the Cook County Sheriff's Office do not control the Cermak Health Services Facility. Without waiving and in light of this objection, Defendant Sheriff Dart admits "the Cermak ramp" connects the Cermak building to the tunnel and may be used by civilian and security employees to enter Cermak, to transport inmates, and to transport equipment.

6. On August 8, 2024, defendant Dart served a supplemental response to production (in response to the names and last known addresses of detainees that have been moved to the Cermak Infirmary with an active alert for a cane, crutch, or walker from December 20, 2021 to the present) and stated, in part, "Defendant Cook County Sheriff Dart is producing the total number of such detainees, rather than the requested list of names. In the requested time period, there were 993 unique booking numbers with alerts for canes, crutches, and walkers, with 631 of those detainees

2

Exhibit 1 Page 2

having transportations to Cermak on record." Exhibit 6, Sheriff Supplemental Response to Production ¶ 7.

**RESPONSE: Defendant Sheriff Dart admits only that the document reflected as Exhibit 6 was served by Defendants' Counsels upon Counsels for Plaintiff, on August 8, 2024.**

7. Eric Davis has been the Deputy Director of the Cook County Department of Capital Planning and Policy since April 2017.

**RESPONSE: OBJECTION – This Request to Admit seeks information better sought from Defendant Cook County. Eric Davis, as Deputy Director of the Cook County Department of Capital Planning and Policy, is employed by Cook County. Without waiving and in light of this objection, Defendant Sheriff Dart defers to Defendant Cook County's Response to Request to Admit No. 7.**

8. Eric Davis has been a licensed architect since 1989.

**RESPONSE: OBJECTION – This Request to Admit seeks information better sought from Defendant Cook County. Eric Davis, as Deputy Director of the Cook County Department of Capital Planning and Policy, is employed by Cook County. Without waiving and in light of this objection, upon information and belief, and pursuant to detail obtained through the Illinois Department of Financial and Professional Regulation, Defendant Sheriff Dart admits the allegations contained in Request No. 8.**

9. Mr. Davis duties included acting as the primary contact for the County on the facilities aspect of accessibility and the ADA.

**RESPONSE: OBJECTION – This Request to Admit seeks information better sought from Defendant Cook County. Eric Davis, as Deputy Director of the Cook County Department of Capital Planning and Policy, is employed by Cook County. Without waiving and in light of this objection, Defendant Sheriff Dart states that after a reasonable inquiry, the information known to or readily obtainable by him is insufficient to enable him to admit or deny the allegations contained in Request No. 9, and therefore defers to Defendant Cook County's Response to Request to Admit No. 9.**

10. Mr. Davis duties include acting as the lead person for Cook County in regard to the effort to renovate the Cermak ramp.

**RESPONSE: OBJECTION – This Request to Admit seeks information better sought from Defendant Cook County. Eric Davis, as Deputy Director of the Cook County Department of Capital Planning and Policy, is employed by Cook County. Without waiving and in light of this objection, Defendant Sheriff Dart states that after a reasonable inquiry, the information**

Exhibit 1 Page 3

known to or readily obtainable by him is insufficient to enable him to admit or deny the allegations contained in Request No. 10, and therefore defers to Defendant Cook County's Response to Request to Admit No. 10.

11. Cook County hired a third-party architectural/engineering firm, Globetrotters Engineering Corporation (GEC), to assess the ADA compliance of the Cermak Health Services facility, starting with a report specifically on the Cermak ramp.

**RESPONSE:** OBJECTION – This Request to Admit seeks information better sought from Defendant Cook County. Defendant Sheriff Dart plays no role in the County RFQ and hiring process, nor do he or the Cook County Sheriff's Office control the County or the Cermak Health Services Facility. Without waiving and in light of this objection, Defendant Sheriff Dart denies that third-party architectural/engineering firm GEC was hired by Sheriff Dart or the Cook County Sheriff's Office to assess the ADA compliance of the Cermak Health Services Facility in relation to this case.

12. GEC, on December 6, 2023, submitted to Cook County a Corridor Ramp Accessibility Assessment for the Cermak Health Services Facility.

**RESPONSE:** OBJECTION – This Request to Admit seeks information better sought from Defendant Cook County, as the alleged recipient of such assessment. Without waiving and in light of this objection, Defendant Sheriff Dart defers to Defendant Cook County's response to Request to Admit No. 12.

13. GEC made a finding that the Cermak ramp has "a rise of 32.4 inches, which does not comply with the 30-inch maximum rise stated in Section 4.8.2 of the 1991 ADAAG." *See* Dkt. 42-18 at 8.

**RESPONSE:** "Dkt. 42-18" refers to an exhibit that Plaintiff attached to Plaintiff's Motion for Class Certification. This document does not contain a bates number reflecting production and attendant discovery in the present case number. Defendant Sheriff Dart objects to Request to Admit No. 13 as improper, to the extent it seeks to solicit factual information which has not been the subject of written, expert, or deposition discovery in this consolidated case. Defendant Sheriff further objects to this Request to the extent that it seeks to selectively introduce as affirmative facts only portions of discovery taken in a separate and distinct lawsuit.

14. Referring to the rise of a ramp, Carl Darr of GEC testified "If it's 2.4 inches short, it doesn't comply regardless." Exhibit 11, Carl Darr (6/3/2024) Deposition at 47:5-8.

4

Exhibit 1 Page 4

**RESPONSE:** Defendant Sheriff Dart objects to Request to Admit No. 14 as improper, to the extent that it seeks to solicit facts and information that were not the subject of written, expert, or deposition discovery in this consolidated case. Defendant Sheriff further objects to this Request to the extent that it seeks to selectively introduce as affirmative facts only portions of discovery taken in a separate and distinct lawsuit.

15. Mr. Davis executed a declaration in *Walker v. Dart* on February 22, 2024, acknowledging GEC "conducted site visits on August 18, 2023, and September 1, 2023, to verify existing conditions related to the Cermak ramp" and that "GEC determined the rise of the ramp exceeds the ADA Accessibility Guidelines (ADAAG) by only 2.4 inches over the course of that 43.64 – foot run." Exhibit 1, Davis Decl. ¶¶ 9, 11.

**RESPONSE:** Defendant Sheriff Dart objects to Request to Admit No. 15 as improper, to the extent that it seeks to solicit facts and information that were not the subject of written, expert, or deposition discovery in this consolidated case. Defendant Sheriff further objects to this Request to Admit to the extent that it seeks to selectively introduce as affirmative facts only portions of discovery taken in a separate and distinct lawsuit.

16. One purpose of an intermediate landing on a ramp is for an individual to be able to take a break, according to Mr. Davis. Exhibit 5, Davis (3/12/2024) Dep 256: 8-257:1.

**RESPONSE:** Defendant Sheriff Dart objects to Request to Admit No. 16 as improper, to the extent that it seeks to solicit facts and information that were not the subject of written, expert, or deposition discovery in this consolidated case. Defendant Sheriff further objects to this Request to Admit to the extent that it seeks to selectively introduce as affirmative facts only portions of discovery taken in a separate and distinct lawsuit.

17. GEC also found that current handrails on the Cermak ramp "do not extend 12" beyond the ramp and "they do not comply with the 2010 ADAAG requirements for handrail extensions." *See* Dkt. 42-18 at 8.

**RESPONSE:** "Dkt. 42-18" refers to an exhibit that Plaintiff attached to Plaintiff's Motion for Class Certification. This document does not contain a bates number reflecting production and attendant discovery in the present case number. Defendant Sheriff Dart objects to Request to Admit No. 17 as improper, to the extent that it seeks to solicit facts and information which have not been the subject of written, expert, or deposition discovery in this consolidated case. Defendant Sheriff further objects to this Request to Admit to the extent that it seeks to selectively introduce as affirmative facts only portions of discovery taken in a separate and distinct lawsuit.

5

Exhibit 1 Page 5

18. GEC proposed the following "[p]ossible solutions" to remedy the non-compliant Cermak

ramp:

  1. Adding an intermediate landing, to reduce the rise to less than 30 inches per run
     and adding railing extensions at the top and bottom of the ramp.
     *or*
  2. Reducing the slope to less than 1:20 by extending the length of the walkway. The
     sloped walkway will be shallow enough to eliminate the applicability of code
     requirements for ramps and will not require a handrail.

Dkt 42-18 at 3.

**RESPONSE:** **"Dkt. 42-18" refers to an exhibit that Plaintiff attached to Plaintiff's Motion
for Class Certification. This document does not contain a bates number reflecting production
and attendant discovery in the present case number. Defendant Sheriff Dart objects to
Request to Admit No. 18 as improper, to the extent that it seeks to solicit facts and
information which have not been the subject of written, expert, or deposition discovery in
this consolidated case. Defendant Sheriff further objects to this Request to Admit to the
extent that it seeks to selective introduce as affirmative facts only portions of discovery taken
in a separate and distinct lawsuit.**

19. In 2024, more than 40 people with an alert for a cane, walker, or crutches have moved up

or down the Cermak ramp.

**RESPONSE:** **Defendant Sheriff Dart admits the allegations contained in Request No. 19.**

20. It will cost more than $150,000 to renovate the Cermak ramp.

**RESPONSE:** **OBJECTION – This Request to Admit seeks information better sought from
Defendant Cook County. Defendant Sheriff Dart plays no role in the County expenditure
process, nor do he or the Cook County Sheriff's Office control the Cermak Health Services
Facility. Without waiving and in light of this objection, Defendant Sheriff Dart states that
after a reasonable inquiry, the information known to or readily obtainable by him is
insufficient to enable him to admit or deny the allegations contained in Request to Admit No.
20, and therefore defers to Defendant Cook County's Response to Request to Admit No. 20.**

21. The Cook County Board of Commissioners must approve expenditure of funds to renovate

the Cermak ramp.

**RESPONSE:** **OBJECTION – This Request to Admit seeks information better sought from
Defendant Cook County. Defendant Sheriff Dart plays no role in the County expenditure
process, nor do he or the Cook County Sheriff's Office control the Cermak Health Services
Facility. Without waiving and in light of this objection, Defendant Sheriff Dart defers to
Defendant Cook County's Response to Request to Admit No. 21.**

Exhibit 1 Page 6

22. The Cook County Board of Commissioners, as of August 15, 2024, have not approved any

construction contract to renovate the Cermak ramp.

**RESPONSE: OBJECTION – This Request to Admit seeks information better sought from
Defendant Cook County. Defendant Sheriff Dart plays no role in the County expenditure
process, nor do he or the Cook County Sheriff's Office control the Cermak Health Services
Facility. Defendant Sheriff Dart additionally objects to this Request to Admit as improper,
to the extent that it seeks to solicit facts and information which have not been the subject of
written, expert, or deposition discovery in this consolidated case. Defendant Sheriff further
objects to this Request to Admit to the extent that it seeks to selectively introduce as
affirmative facts only portions of discovery taken in a separate and distinct lawsuit.**

23. The East RTU ramp "leads directly to the Cermak ramp and they are of comparable size."

Dkt. 42-1, Davis Decl. Fn. 2.

**RESPONSE: "Dkt. 42-1" refers to an exhibit that Plaintiff attached to Plaintiff's Motion for
Class Certification. This document does not contain a bates number reflecting production
and attendant discovery in the present case number. Defendant Sheriff Dart objects to
Request to Admit No. 23 as improper, to the extent that it seeks to solicit facts and
information which have not been the subject of written, expert, or deposition discovery in
this consolidated case. Defendant Sheriff further objects to this Request to Admit to the
extent that it seeks to selectively introduce as affirmative facts only portions of discovery
taken in a separate and distinct lawsuit.**

24. On April 1, 2024, GEC submitted to the law firm of Devore Radunsky, a Tunnel Corridor

Accessibility Assessment. In this report, GEC identifies the East RTU ramp as the East Tunnel

Corridor. Dkt. 42-19 at 1, 3.

**RESPONSE: "Dkt. 42-19" refers to an exhibit that Plaintiff attached to Plaintiff's Motion
for Class Certification. This document does not contain a bates number reflecting production
and attendant discovery in the present case number. Defendant Sheriff Dart objects to
Request to Admit No. 24 as improper, to the extent that it seeks to solicit facts and
information which have not been the subject of written, expert, or deposition discovery in
this consolidated case. Defendant Sheriff further objects to this Request to Admit to the
extent that it seeks to selectively introduce as affirmative facts only portions of discovery
taken in a separate and distinct lawsuit.**
25. The East RTU ramp includes two-sloped floor runs separated by an intermediate landing.

These runs are both steeper than 1:20 and therefore, are ramps as defined by the ADA. Dkt. 42-19

at 10.

Exhibit 1 Page 7

**RESPONSE:** "Dkt. 42-19" refers to an exhibit that Plaintiff attached to Plaintiff's Motion for Class Certification. This document does not contain a bates number reflecting production and attendant discovery in the present case number. Defendant Sheriff Dart objects to Request to Admit No. 25 as improper, to the extent that it seeks to solicit facts and information which have not been the subject of written, expert, or deposition discovery in this consolidated case. Defendant Sheriff further objects to this Request to Admit to the extent that it seeks to selectively introduce as affirmative facts only portions of discovery taken in a separate and distinct lawsuit.

26. In response to a request for a list of inmates moved to or from RTU with an alert for a cane, crutch, or walker from February 13, 2022, to the present, defendant responded, "In the requested time period, there were 717 detainees with alerts for canes, crutches, or walkers, who were assigned to Division 8/RTU, with 476 of those detainees having transportation to Cermak on Record." Exhibit 2, Response to Production ¶ 12.

**RESPONSE:** Defendant Sheriff Dart denies that this was merely his response to the specified request, but asserts that by explicit agreement of the parties, this information was tendered as responsive. Defendant admits the remaining allegations in Request No. 26.

27. The Residential Treatment Unit was constructed after 2010.

**RESPONSE:** OBJECTION – This Request to Admit seeks information better sought from Defendant Cook County. Defendant Sheriff Dart is not involved in facilities management, or capital planning issues, including construction of Cook County Department of Corrections Divisions. Without waiving and in light of this objection, Defendant Sheriff Dart admits the allegations contained in Request No. 27.

28. Carl M. Darr is vice president of architecture for GEC.

**RESPONSE:** Defendant Sheriff Dart objects to Request to Admit No. 28 as improper, to the extent that it seeks to solicit facts and information which have not been the subject of written, expert, or deposition discovery in this consolidated case. Defendant Sheriff further objects to this Request to Admit to the extent that it seeks to selectively introduce as affirmative facts only portions of discovery taken in a separate and distinct lawsuit.

29. GEC inspected the East RTU ramp on January 23, 2024, and again on January 25, 2024. Dkt. 42-19 at 6. Mr. Darr was present during each inspection.

**RESPONSE:** "Dkt. 42-19" refers to an exhibit that Plaintiff attached to Plaintiff's Motion for Class Certification. This document does not contain a bates number reflecting production and attendant discovery in the present case number. Defendant Sheriff Dart objects to

8

Exhibit 1 Page 8

**Request to Admit No. 29 as improper, to the extent that it seeks to solicit facts and information which have not been the subject of written, expert, or deposition discovery in this consolidated case. Defendant Sheriff further objects to this Request to Admit to the extent that it seeks to selectively introduce as affirmative facts only portions of discovery taken in a separate and distinct lawsuit.**

30. GEC issued a report on April 1, 2024 in *Westmoreland v. Dart*, 23-cv-1851, and make the following findings why the RTU east tunnel ramp does not comply with the ADA structural standards:

1) **Top landing:** The Top Landing runs from the Upper Ramp to a pair of doors, leading to the adjacent tunnel, and has a length of 0.75' (9 in.). Since the landing length is less than 60 inches, the landing length is not code compliant. The landing is 85% short of the required length. However, this may be easily corrected by relocating the doors to the east 51", to provide the minimum required landing length.

2) **Upper Ramp:** The Upper Ramp has a 25.95' horizontal run and a 1.93' vertical rise with an average slope of 1:13.4. There is a variation in slope at the very top of the ramp. The last 4.27' of the run, at the top has a rise of 4.56" for a slope of 1:11. The upper portion of the ramp floor surface is not code compliant; the top 16.5% of the overall length is approximately 0.64% steeper than permitted by code. Since the bottom portion of the ramp run is shallower than 1:12, it would be possible to add a floor topping which will even-out the slope make a consistent floor slope that has a 1:12 slope or shallower.

3) **Intermediate Landing:** The Intermediate Landing is 4.75 feet (57 in.) in length. Since the landing length is less than 60 inches in length, the Intermediate Landing is not code compliant. It is 5% shorter than the required length. To correct this

9

Exhibit 1 Page 9

nonconformity, a longer level floor plane at the landing will need to be provided, extending the floor surface west. This will require the Lower Ramp to be rebuilt, along its entire length, to provide for the additional landing length and maintaining a maximum 1:12 ramp slope.

4) **Lower Ramp:** The Lower Ramp has a 30.4' horizontal run and a 2.47 vertical rise, with an average slope of 1:12. There is a variation in slope at the very bottom of the ramp. The last 1 foot of the run is steeper than the rest of the ramp with a slope of approximately 1:8.5. The lower portion of the ramp floor surface is not code compliant; the lower 3.5% of the overall run is approximately 11.7% steeper than permitted by code. The floor surface will need to be feathered out, and the ramp length extended slightly for the Lower Ramp floor to be compliant with code requirements for ramp slope at this location.

5) **Handrails:** As noted in the code requirements above, handrails Carl Darr testified in *Westmoreland v. Dart*, need to be located 34-38 inches above the ramp floor and need to extend a minimum of 12 inches beyond the top and bottom of each ramp. The ramp(s) have a continuous handrail on each side located. At the lower end of the Lower Ramp the handrails, where measured, is approximately 33" above the ramp floor. At other locations, the handrail height exceeds 34" above the ramp floor. Since, at some locations, handrails are less than 34" above the ramp floor they are not in compliance with requirements for handrail height. The handrails extend 7.4" beyond the Lower Ramp and 11.3" beyond the Upper Ramp. Since the handrail extensions are less than 12 inches, the handrails are not in compliance with code requirements for handrail extensions.

10

Exhibit 1 Page 10

Dkt. 42-19 at 10-11.

**RESPONSE: "Dkt. 42-19"** refers to an exhibit that Plaintiff attached to Plaintiff's Motion for Class Certification. This document does not contain a bates number reflecting production and attendant discovery in the present case number. Defendant Sheriff Dart objects to Request to Admit No. 30 as improper, to the extent that it seeks to solicit facts and information which have not been the subject of written, expert, or deposition discovery in this consolidated case. Defendant Sheriff further objects to this Request to Admit to the extent that it seeks to selectively introduce as affirmative facts only portions of discovery taken in a separate and distinct lawsuit.

31. Carl Darr testified in *Westmoreland v. Dart*, that "the regulations don't permit any entity to have a landing less than 60 inches." Exhibit 11, Darr (6/3/2024) Dep 62:19-20.

**RESPONSE:** Defendant Sheriff Dart objects to Request to Admit No. 31 as improper, to the extent that it seeks to solicit facts and information which have not been the subject of written, expert, or deposition discovery in this consolidated case. Defendant Sheriff further objects to this Request to Admit to the extent that it seeks to selectively introduce as affirmative facts only portions of discovery taken in a separate and distinct lawsuit.

32. Carl Darr testified in *Westmoreland v. Dart*, that the East RTU ramp is not in compliance with the ADA regulations. Exhibit 11, Darr (6/3/2024) Dep 87:3-8.

**RESPONSE:** Defendant Sheriff Dart objects to Request to Admit No. 32 as improper, to the extent that it seeks to solicit facts and information which have not been the subject of written, expert, or deposition discovery in this consolidated case. Defendant Sheriff further objects to this Request to Admit to the extent that it seeks to selectively introduce as affirmative facts only portions of discovery taken in a separate and distinct lawsuit.

33. Carl Darr testified in *Westmoreland v. Dart* that providing an accommodation such as pushing a wheelchair person up or down the East RTU ramp does not obviate the need of the government to comply with the ADA standards "for a required accessible route." Exhibit 11, Darr (6/3/2024) Dep 88:18-23.

**RESPONSE:** Defendant Sheriff Dart objects to Request to Admit No. 33 as improper, to the extent that it seeks to solicit facts and information which have not been the subject of written, expert, or deposition discovery in this consolidated case. Defendant Sheriff further objects to this Request to Admit to the extent that it seeks to selectively introduce as affirmative facts only portions of discovery taken in a separate and distinct lawsuit.

Exhibit 1 Page 11

34. GEC offered the following recommendations to bring the RTU east tunnel ramp into compliance with the ADA:



*Figure 3: Plan of Recommendations*

Dkt. 42-19 at 16.

**RESPONSE**: "Dkt. 42-19" refers to an exhibit that Plaintiff attached to Plaintiff's Motion for Class Certification. This document does not contain a bates number reflecting production and attendant discovery in the present case number. Defendant Sheriff Dart objects to Request to Admit No. 34 as improper, to the extent that it seeks to solicit facts and information which have not been the subject of written, expert, or deposition discovery in this consolidated case. Defendant Sheriff further objects to this Request to Admit to the extent that it seeks to selectively introduce as affirmative facts only portions of discovery taken in a separate and distinct lawsuit.

35. More than 40 inmates with an alert for a cane, crutch, or walker moved up the RTU east tunnel ramp in 2024.

**RESPONSE**: Defendant Sheriff Dart admits the allegations contained in Request No. 35.

36. There is no projected date when the RTU east tunnel ramp will be renovated in accordance with the recommendations of GEC.

**RESPONSE**: Defendant Sheriff Dart objects to Request to Admit No. 36 as improper, to the extent that it seeks to solicit facts and information which have not been the subject of written, expert, or deposition discovery in this consolidated case. Defendant Sheriff further objects to this Request to Admit to the extent that it seeks to selectively introduce as affirmative facts only portions of discovery taken in a separate and distinct lawsuit.

12

Exhibit 1 Page 12

37. It will cost more than $150,000 to renovate the RTU east tunnel ramp.

**RESPONSE: Defendant Sheriff Dart objects to Request to Admit No. 37 as improper, to the extent that it seeks to solicit facts and information which have not been the subject of written, expert, or deposition discovery in this consolidated case. Defendant Sheriff further objects to this Request to Admit to the extent that it seeks to selectively introduce as affirmative facts only portions of discovery taken in a separate and distinct lawsuit.**

38. The Cook County Board of Commissioners must approve expenditure of funds to renovate

the RTU east tunnel ramp.

**RESPONSE: OBJECTION – This Request to Admit seeks information better sought from Defendant Cook County. Defendant Sheriff Dart plays no role in the County expenditure process. Without waiving and in light of this objection, Defendant Sheriff Dart defers to Defendant Cook County's Response to Request to Admit No. 38.**

39. The Cook County Board of Commissioners, as of August 15, 2024, have not approved any

funds to reconstruct the RTU east tunnel ramp to comply with the ADA.

**RESPONSE: Defendant Sheriff Dart objects to Request to Admit No. 39 as improper, to the extent that it seeks to solicit facts and information which have not been the subject of written, expert, or deposition discovery in this consolidated case. Without waiving and in light of this objection, Defendant Sheriff Dart defers to Defendant Cook County's Response to Request to Admit No. 39.**

40. Plaintiff Hernandez had an alert to use a cane from February 2, 2022 to August 30, 2022

and from May 10, 2023 to May 11, 2023. See DR Hernandez 000005.

**RESPONSE: Defendant Sheriff Dart admits that Plaintiff Hernandez had an alert to use a cane from February 2, 2022, to August 30, 2022, and from May 10, 2023, to May 11, 2023, but denies that this was the full extent of Plaintiff's cane permissions. Plaintiff also had an alert for Cane Long Distance Only from August 30, 2022, to May 11, 2023.**

41. The Sheriff's records identify when plaintiff Hernandez was moved to Cermak.

**RESPONSE: Defendant Sheriff Dart admits the allegations in Request No. 41.**

42. DR Hernandez 000007 shows plaintiff was transported to or from Cermak on 2/7/2022,

2/26/2022, 4/7/2022, and 8/4/2022.

13

Exhibit 1 Page 13

**RESPONSE**: Defendant Sheriff Dart admits that Plaintiff Hernandez's referenced Movement Records show that he was transported to or from Cermak for regular appointments on 2/7/2022, 2/26/2022, 4/7/2022, and 8/4/2022.

43. On August 18, 2022, RN Jeelan McCray sent an e-mail to PA-C Kevin Sims and wrote, referring to plaintiff Hernandez, "This pt just came back for IDOC on 8/4 and has a cane at all times. The provider that seen him on intake renewed the cane order from February when he was here. He is overweight and walk with a staggered, shuffled limp. He drags the left foot. He does need the cane in my opinion, but they will not allow him to have in Div 9, except for long distances. As a result, he needs appropriate housing. Please see my note." DR 00157.

**RESPONSE**: OBJECTION – Request to Admit No. 43 seeks information better sought from Defendant Cook County. Defendant Sheriff Dart and the Cook County Sheriff's Office do not control the Cermak Health Services Facility, nor do they have access to inmate medical records, employee records, or employee emails. On that basis, Defendant Sheriff cannot admit or deny the origin of emails sent by the non-employees identified in this Request. Without waiving and in light of this objection, Defendant Sheriff Dart admits only that a document produced by co-defendant Cook County as DR 001577 contains the quoted language.

44. William Mathis, as of August 15, 2024, is detained at Cook County Jail and from October 16, 2023 until at least August 15, 2024, has had an alert for a cane.

**RESPONSE**: Defendant Sheriff Dart admits that William Mathis is a detainee at Cook County Department of Corrections, and that Mathis had a medical alert that reads "Cane Long Distance Only" between October 16, 2023, and August 15, 2024.

45. William Mathis was moved to or from Cermak on 4/2/2024, 1/11/2024, 12/10/2023, 12/4/2023, 12/1/2023, and 11/1/2023. *See* Exhibit 3.

**RESPONSE**: Defendant Sheriff Dart admits that Plaintiff Mathis's referenced Movement Records show that he was transported to or from Cermak for regular appointments on 4/2/2024, 1/11/2024, 12/10/2023, 12/4/2023, 12/1/2023, and 11/1/2023.

46. The Sheriff's Records show William Mathis was housed in DIV08/RTU on the following dates: 4/8/2023 to 4/12/2023, November 1, 2023 to November 6, 2023, December 10, 2023 to February 18, 2024, and February 22, 2024 to February 29, 2024. Exhibit 4.

14

Exhibit 1 Page 14

**RESPONSE: Defendant Sheriff Dart admits the allegations contained in Request No. 46.**

47. Globetrotters Engineering Corporation submitted a report dated April 1, 2024 in *Westmoreland v. Dart*, 23-cv-1851, and make the following findings why the RTU east tunnel ramp does not comply with the ADA structural standards:

1) **Top landing:** The Top Landing runs from the Upper Ramp to a pair of doors, leading to the adjacent tunnel, and has a length of 0.75' (9 in.). Since the landing length is less than 60 inches, the landing length is not code compliant. The landing is 85% short of the required length. However, this may be easily corrected by relocating the doors to the east 51", to provide the minimum required landing length.

2) **Upper Ramp:** The Upper Ramp has a 25.95' horizontal run and a 1.93' vertical rise with an average slope of 1:13.4. There is a variation in slope at the very top of the ramp. The last 4.27' of the run, at the top has a rise of 4.56" for a slope of 1:11. The upper portion of the ramp floor surface is not code compliant; the top 16.5% of the overall length is approximately 0.64% steeper than permitted by code. Since the bottom portion of the ramp run is shallower than 1:12, it would be possible to add a floor topping which will even-out the slope make a consistent floor slope that has a 1:12 slope or shallower.

3) **Intermediate Landing:** The Intermediate Landing is 4.75 feet (57 in.) in length. Since the landing length is less than 60 inches in length, the Intermediate Landing is not code compliant. It is 5% shorter than the required length. To correct this nonconformity, a longer level floor plane at the landing will need to be provided, extending the floor surface west. This will require the Lower Ramp to be rebuilt,

15

Exhibit 1 Page 15

along its entire length, to provide for the additional landing length and maintaining a maximum 1:12 ramp slope.

4) **Lower Ramp:** The Lower Ramp has a 30.4' horizontal run and a 2.47 vertical rise, with an average slope of 1:12. There is a variation in slope at the very bottom of the ramp. The last 1 foot of the run is steeper than the rest of the ramp with a slope of approximately 1:8.5. The lower portion of the ramp floor surface is not code compliant; the lower 3.5% of the overall run is approximately 11.7% steeper than permitted by code. The floor surface will need to be feathered out, and the ramp length extended slightly for the Lower Ramp floor to be compliant with code requirements for ramp slope at this location.

5) **Handrails:** As noted in the code requirements above, need to be located 34-38 inches above the ramp floor and need to extend a minimum of 12 inches beyond the top and bottom of each ramp. The ramp(s) have a continuous handrail on each side located. At the lower end of the Lower Ramp the handrails, where measured, is approximately 33" above the ramp floor. At other locations, the handrail height exceeds 34" above the ramp floor. Since, at some locations, handrails are less than 34" above the ramp floor they are not in compliance with requirements for handrail height. The handrails extend 7.4" beyond the Lower Ramp and 11.3" beyond the Upper Ramp. Since the handrail extensions are less than 12 inches, the handrails are not in compliance with code requirements for handrail extensions.

Dkt. 42-19 at 10-11

**RESPONSE: "Dkt. 42-19"** refers to an exhibit that Plaintiff attached to Plaintiff's Motion for Class Certification. This document does not contain a bates number reflecting production and attendant discovery in the present case number. Defendant Sheriff Dart objects to Request to Admit No. 47 as improper, to the extent that it seeks to solicit facts and

16

Exhibit 1 Page 16

information which have not been the subject of written, expert, or deposition discovery in this consolidated case. Defendant Sheriff further objects to this Request to Admit to the extent that it seeks to selectively introduce as affirmative facts only portions of discovery taken in a separate and distinct lawsuit.

Respectfully submitted,

/s/ Troy S. Radunsky
Troy S. Radunsky
One of the Attorneys for Defendants

Troy S. Radunsky (tradunsky@devoreradunsky.com)
Jason E. DeVore (jdevore@devoreradunsky.com)
Zachary G. Stillman (zstillman@devoreradunsky.com)
DeVore Radunsky LLC
230 W. Monroe Ste 230
Chicago, IL 60606
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that **Defendant Sheriff Thomas J. Dart's Responses to Plaintiff's First and Second Sets of Requests to Admit** were sent via email correspondence to all below listed parties on September 16, 2024.

/s/ Zachary G. Stillman
Zachary G. Stillman
One of the Attorneys for Defendants

Service List:
Thomas G. Morrissey
Patrick Morrissey
10257 S. Western Ave
Chicago, IL 60643
773 233 7901
Pwm@morrisseylawchicago.com
tgm@morrisseylawchicago.com

17

Exhibit 1 Page 17

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Cuauhtemoc Hernandez, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 22-cv-16970 |
| | ) | |
| v. | ) | Honorable Jeremy C. Daniel |
| | ) | |
| Thomas Dart, Sheriff of Cook County, | ) | |
| and Cook County, Illinois | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT COOK COUNTY'S RESPONSES TO PLAINTIFF'S
## FIRST AND SECOND SETS OF REQUESTS TO ADMIT

NOW COMES Defendant, COOK COUNTY (hereinafter "Defendant"), by and through

its attorneys, Jason E. DeVore and Zachary G. Stillman, of DeVore Radunsky LLC, and for its

responses to Plaintiff's First Set of Requests to Admit, dated August 15, 2024 (Request Nos. 1-

46), and Second Set of Requests to Admit, dated September 3, 2024 (single request incorporated

herein as Request No. 47), pursuant to Rule 36 of the Federal Rules of Civil Procedure, states as

follows:

## REQUESTS

1. Medical staff at Cook County Jail is responsible for identifying "physically disabled"

inmates and communicating significant health needs to the correctional staff.

**RESPONSE: Defendant Cook County denies that medical staff at Cook County Jail are**
**solely responsible for identifying "physically disabled" inmates and communicating**
**significant health needs to the correctional staff. Both medical staff employed by Defendant**
**Cook County, which operates the Cook County Health System and the Cermak Health**
**Facility, and the Sheriffs' ADA Officer, assist in the identification process and**
**communication of significant health needs to correctional staff.**

2. The medical staff at Cook County Jail communicates to the correctional staff when they

determine an inmate needs to be provided a cane, crutch or walker.

Exhibit 2 Page 1

**RESPONSE**: **Defendant Cook County denies that medical staff at Cook County Jail communicates to the correctional staff when they determine an inmate needs to be provided a cane, crutch or walker. Any medical staff responsible for the specified task are employed by Defendant Cook County, which operates the Cook County Health System and the Cermak Health Facility. County medical staff work out of Cermak Health Facility, not the Cook County Department of Corrections. Additionally, Defendant denies that County medical staff personally "communicate" any information to correctional staff, beyond the occurrence of automated transmission of their findings and prescriptive alerts. Defendant admits that County medical staff with Cermak make determinations as to whether inmates need to be provided canes, crutches or walkers, as well as the extent of such need and the alerts necessary for each inmate considering the individualized facts in each instance.**

3. There is a pedestrian/material access tunnel serving the Cermak Health Services Facility at

the basement level.

**RESPONSE**: **Defendant Cook County admits that pedestrian/material access tunnels exist in the basement level of the Cermak Health Services Facility, serving the facility.**

4. The Cermak Health Services Facility was constructed after 1993.

**RESPONSE**: **Defendant Cook County admits the allegations contained in Request No. 4.**

5. The Cermak ramp connects the Cermak building to the tunnel and is used by civilian and

security employees to enter Cermak, to transport inmates, and to transport equipment.

**RESPONSE**: **Defendant Cook County admits the allegations contained in Request No. 5.**

6. On August 8, 2024, defendant Dart served a supplemental response to production (in

response to the names and last known addresses of detainees that have been moved to the Cermak

Infirmary with an active alert for a cane, crutch, or walker from December 20, 2021 to the present)

and stated, in part, "Defendant Cook County Sheriff Dart is producing the total number of such

detainees, rather than the requested list of names. In the requested time period, there were 993

unique booking numbers with alerts for canes, crutches, and walkers, with 631 of those detainees

having transportations to Cermak on record." Exhibit 6, Sheriff Supplemental Response to

Production ¶ 7.

2

Exhibit 2 Page 2

**RESPONSE: OBJECTION – This Request to Admit seeks information not in the control of Defendant Cook County, that would be better sought from Defendant Sheriff Dart. Defendant Cook County does not control the Cook County Department of Corrections, nor does it have any access to or control over inmate records and data, outside of medical related records. Without waiving and in light of this objection, Defendant Cook County states that after a reasonable inquiry, the information known to or readily obtainable by them is insufficient to enable it to admit or deny the allegations contained in Request No. 6.**

7.  Eric Davis has been the Deputy Director of the Cook County Department of Capital Planning and Policy since April 2017.

**RESPONSE: Defendant Cook County admits the allegations contained in Request No. 7.**

8.  Eric Davis has been a licensed architect since 1989.

**RESPONSE: Defendant Cook County admits the allegations contained in Request No. 8.**

9.  Mr. Davis duties included acting as the primary contact for the County on the facilities aspect of accessibility and the ADA.

**RESPONSE: Defendant Cook County admits that, at present, Eric Davis' duties include acting as the primary contact for the County on the facilities aspect of accessibility and the ADA but notes that this assignment of duty is merely by necessity as a result of the ongoing efforts to fill the vacant ADA Project Director position, to which these responsibilities would ordinarily belong.**

10. Mr. Davis duties include acting as the lead person for Cook County in regard to the effort to renovate the Cermak ramp.

**RESPONSE: OBJECTION – The term "lead person" is vague and ambiguous and does not adequately describe any existing role. Without waiving and in light of this objection, Defendant Cook County admits that, at present, Eric Davis' duties include leading County efforts to renovate the Cermak ramp, but notes that this assignment of duty is likewise merely by necessity and in the interest of the County as a result of his long running involvement in the matter, despite the assignment of a new Department of Capital Planning Lead Project Manager for the ADA assessments.**

11. Cook County hired a third-party architectural/engineering firm, Globetrotters Engineering Corporation (GEC), to assess the ADA compliance of the Cermak Health Services facility, starting with a report specifically on the Cermak ramp.

3

Exhibit 2 Page 3

**RESPONSE:** **Defendant Cook County admits that third-party architectural/engineering firm GEC was hired to assess the ADA compliance of the Cermak Health Services Facility, starting with a report specifically on the Cermak ramp.**

12. GEC, on December 6, 2023, submitted to Cook County a Corridor Ramp Accessibility Assessment for the Cermak Health Services Facility.

**RESPONSE:** **Defendant Cook County admits the allegations contained in Request No. 12 are consistent with GEC's published report.**

13. GEC made a finding that the Cermak ramp has "a rise of 32.4 inches, which does not comply with the 30-inch maximum rise stated in Section 4.8.2 of the 1991 ADAAG." *See* Dkt. 42-18 at 8.

**RESPONSE:** **Defendant Cook County admits the allegations contained in Request No. 13 are consistent with GEC's published report.**

14. Referring to the rise of a ramp, Carl Darr of GEC testified "If it's 2.4 inches short, it doesn't comply regardless." Exhibit 11, Carl Darr (6/3/2024) Deposition at 47:5-8.

**RESPONSE:** **Defendant Cook County admits that Carl Darr testified at his deposition: "If it's 2.4 inches short, it doesn't comply regardless."**

15. Mr. Davis executed a declaration in *Walker v. Dart* on February 22, 2024, acknowledging GEC "conducted site visits on August 18, 2023, and September 1, 2023, to verify existing conditions related to the Cermak ramp" and that "GEC determined the rise of the ramp exceeds the ADA Accessibility Guidelines (ADAAG) by only 2.4 inches over the course of that 43.64 – foot run." Exhibit 1, Davis Decl. ¶¶ 9, 11.

**RESPONSE:** **Defendant Cook County admits the allegations contained in Request No. 15.**

16. One purpose of an intermediate landing on a ramp is for an individual to be able to take a break, according to Mr. Davis. Exhibit 5, Davis (3/12/2024) Dep 256: 8-257:1.

4

Exhibit 2 Page 4

**RESPONSE: Defendant Cook County admits that Eric Davis testified that one purpose of an intermediate landing on a ramp is for an individual to be able to take a break.**

17. GEC also found that current handrails on the Cermak ramp "do not extend 12" beyond the ramp and "they do not comply with the 2010 ADAAG requirements for handrail extensions." *See* Dkt. 42-18 at 8.

**RESPONSE: Defendant Cook County admits the allegations contained in Request No. 17 are consistent with GEC's published report.**

18. GEC proposed the following "[p]ossible solutions" to remedy the non-compliant Cermak ramp:

> 1. Adding an intermediate landing, to reduce the rise to less than 30 inches per run and adding railing extensions at the top and bottom of the ramp.
>    *or*
> 2. Reducing the slope to less than 1:20 by extending the length of the walkway. The sloped walkway will be shallow enough to eliminate the applicability of code requirements for ramps and will not require a handrail.

Dkt 42-18 at 3.

**RESPONSE: Defendant Cook County admits the allegations contained in Request No. 18 are consistent with GEC's published report.**

19. In 2024, more than 40 people with an alert for a cane, walker, or crutches have moved up or down the Cermak ramp.

**RESPONSE: OBJECTION – This Request to Admit seeks information not in the control of Defendant Cook County, that would be better sought from Defendant Sheriff Dart. Defendant Cook County does not control the Cook County Department of Corrections, nor does it have any access to or control over inmate records and data, outside of medical related records.**

20. It will cost more than $150,000 to renovate the Cermak ramp.

**RESPONSE: Defendant Cook County admits that the monetary cost of renovating the Cermak ramp will be more than $150,000 but denies that any such individual monetary cost for this one renovation would factor in the totality of ripple-effect costs from performing the construction work out of sequence, along with any other impacts/costs as a result.**

Exhibit 2 Page 5

21. The Cook County Board of Commissioners must approve expenditure of funds to renovate the Cermak ramp.

**RESPONSE: Defendant Cook County admits that the Cook County Board of Commissioners must approve the expenditure of funds to renovate the Cermak ramp.**

22. The Cook County Board of Commissioners, as of August 15, 2024, have not approved any construction contract to renovate the Cermak ramp.

**RESPONSE: Defendant Cook County denies the allegations contained in Request No. 22.**

23. The East RTU ramp "leads directly to the Cermak ramp and they are of comparable size." Dkt. 42-1, Davis Decl. Fn. 2.

**RESPONSE: Defendant Cook County admits that Eric Davis testified in his Declaration that the East RTU ramp "leads directly to the Cermak ramp and they are of comparable size."**

24. On April 1, 2024, GEC submitted to the law firm of DeVore Radunsky, a Tunnel Corridor Accessibility Assessment. In this report, GEC identifies the East RTU ramp as the East Tunnel Corridor. Dkt. 42-19 at 1, 3.

**RESPONSE: Defendant Cook County admits the allegations contained in Request No. 24.**

25. The East RTU ramp includes two-sloped floor runs separated by an intermediate landing. These runs are both steeper than 1:20 and therefore, are ramps as defined by the ADA. Dkt. 42-19 at 10.

**RESPONSE: Defendant Cook County admits the allegations contained in Request No. 25.**

26. In response to a request for a list of inmates moved to or from RTU with an alert for a cane, crutch, or walker from February 13, 2022, to the present, defendant responded, "In the requested time period, there were 717 detainees with alerts for canes, crutches, or walkers, who were assigned to Division 8/RTU, with 476 of those detainees having transportation to Cermak on Record." Exhibit 2, Response to Production ¶ 12.

6

Exhibit 2 Page 6

**RESPONSE: OBJECTION – This Request to Admit seeks information not in the control of Defendant Cook County, that would be better sought from Defendant Sheriff Dart. Defendant Cook County does not control the Cook County Department of Corrections, nor does it have any access to or control over inmate records and data, outside of medical related records.**

27. The Residential Treatment Unit was constructed after 2010.

**RESPONSE: Defendant Cook County admits the allegations contained in Request No. 27.**

28. Carl M. Darr is vice president of architecture for GEC.

**RESPONSE: Defendant Cook County admits the allegations contained in Request No. 28.**

29. GEC inspected the East RTU ramp on January 23, 2024, and again on January 25, 2024. Dkt. 42-19 at 6. Mr. Darr was present during each inspection.

**RESPONSE: Defendant Cook County admits the allegations contained in Request No. 29.**

30. GEC issued a report on April 1, 2024 in *Westmoreland v. Dart*, 23-cv-1851, and make the following findings why the RTU east tunnel ramp does not comply with the ADA structural standards:

1) **Top landing:** The Top Landing runs from the Upper Ramp to a pair of doors, leading to the adjacent tunnel, and has a length of 0.75' (9 in.). Since the landing length is less than 60 inches, the landing length is not code compliant. The landing is 85% short of the required length. However, this may be easily corrected by relocating the doors to the east 51", to provide the minimum required landing length.

2) **Upper Ramp:** The Upper Ramp has a 25.95' horizontal run and a 1.93' vertical rise with an average slope of 1:13.4. There is a variation in slope at the very top of the ramp. The last 4.27' of the run, at the top has a rise of 4.56" for a slope of 1:11. The upper portion of the ramp floor surface is not code compliant; the top 16.5%

Exhibit 2 Page 7

of the overall length is approximately 0.64% steeper than permitted by code. Since the bottom portion of the ramp run is shallower than 1:12, it would be possible to add a floor topping which will even-out the slope make a consistent floor slope that has a 1:12 slope or shallower.

3) **Intermediate Landing:** The Intermediate Landing is 4.75 feet (57 in.) in length. Since the landing length is less than 60 inches in length, the Intermediate Landing is not code compliant. It is 5% shorter than the required length. To correct this nonconformity, a longer level floor plane at the landing will need to be provided, extending the floor surface west. This will require the Lower Ramp to be rebuilt, along its entire length, to provide for the additional landing length and maintaining a maximum 1:12 ramp slope.

4) **Lower Ramp:** The Lower Ramp has a 30.4' horizontal run and a 2.47 vertical rise, with an average slope of 1:12. There is a variation in slope at the very bottom of the ramp. The last 1 foot of the run is steeper than the rest of the ramp with a slope of approximately 1:8.5. The lower portion of the ramp floor surface is not code compliant; the lower 3.5% of the overall run is approximately 11.7% steeper than permitted by code. The floor surface will need to be feathered out, and the ramp length extended slightly for the Lower Ramp floor to be compliant with code requirements for ramp slope at this location.

5) **Handrails:** As noted in the code requirements above, handrails Carl Darr testified in *Westmoreland v. Dart*, need to be located 34-38 inches above the ramp floor and need to extend a minimum of 12 inches beyond the top and bottom of each ramp. The ramp(s) have a continuous handrail on each side located. At the lower end of

8

Exhibit 2 Page 8

the Lower Ramp the handrails, where measured, is approximately 33" above the

ramp floor. At other locations, the handrail height exceeds 34" above the ramp

floor. Since, at some locations, handrails are less than 34" above the ramp floor

they are not in compliance with requirements for handrail height. The handrails

extend 7.4" beyond the Lower Ramp and 11.3" beyond the Upper Ramp. Since the

handrail extensions are less than 12 inches, the handrails are not in compliance with

code requirements for handrail extensions.

Dkt. 42-19 at 10-11.

**RESPONSE: Defendant Cook County denies the allegations with regard to the handrails in relation to any allegations that the report incorporated the testimony of Carl Darr. Carl Darr's deposition did not occur until June 3, 2024, subsequent to the date the alleged report was issued. Additionally, Counsels for Plaintiff have notified Counsel for Defendants that the referenced portion of the request was a typo and have therefore resubmitted this Request as Request to Admit No. 47. Accordingly, Defendant Cook County Denies the allegations in Request to Admit No. 30.**

31. Carl Darr testified in *Westmoreland v. Dart*, that "the regulations don't permit any entity

to have a landing less than 60 inches." Exhibit 11, Darr (6/3/2024) Dep 62:19-20.

**RESPONSE: Defendant Cook County admits that Carl Darr testified in *Westmoreland* that "the regulations don't permit any entity to have a landing less than 60 inches."**

32. Carl Darr testified in *Westmoreland v. Dart*, that the East RTU ramp is not in compliance

with the ADA regulations. Exhibit 11, Darr (6/3/2024) Dep 87:3-8.

**RESPONSE: Defendant Cook County admits that Carl Darr testified in *Westmoreland* that the East RTU ramp is not in compliance with the ADA regulations.**

33. Carl Darr testified in *Westmoreland v. Dart* that providing an accommodation such as

pushing a wheelchair person up or down the East RTU ramp does not obviate the need of the

government to comply with the ADA standards "for a required accessible route." Exhibit 11, Darr

(6/3/2024) Dep 88:18-23.

9

Exhibit 2 Page 9

**RESPONSE:** Defendant Cook County admits that Carl Darr testified in *Westmoreland* that providing an accommodation such as pushing a wheelchair-bound person up or down the East RTU ramp does not obviate the need of the government to comply with the ADA standards "for a required accessible route."

34. GEC offered the following recommendations to bring the RTU east tunnel ramp into compliance with the ADA:



*Figure 3: Plan of Recommendations*

Dkt. 42-19 at 16.

**RESPONSE:** Defendant Cook County admits the allegations contained in Request No. 34.

35. More than 40 inmates with an alert for a cane, crutch, or walker moved up the RTU east tunnel ramp in 2024.

**RESPONSE: OBJECTION** – This Request to Admit seeks information not in the control of Defendant Cook County, that would be better sought from Defendant Sheriff Dart. Defendant Cook County does not control the Cook County Department of Corrections, nor does it have any access to or control over inmate records and data, outside of medical related records. Without waiving and in light of this objection, Defendant Cook County states that after a reasonable inquiry, the information known to or readily obtainable by them is insufficient to enable it to admit or deny the allegations contained in Request No. 35.

36. There is no projected date when the RTU east tunnel ramp will be renovated in accordance with the recommendations of GEC.

10

Exhibit 2 Page 10

**RESPONSE: Defendant Cook County admits that there is no projected date when the RTU east tunnel ramp renovation in accordance with the GEC recommendations will be complete.**

37. It will cost more than $150,000 to renovate the RTU east tunnel ramp.

**RESPONSE: Defendant Cook County denies that any formal design drawings or estimates yet exist which could possibly delineate that it will cost more than $150,000 to renovate the RTU east tunnel ramp. Additionally, any such individual monetary cost for this one renovation would not factor in the ripple-effect costs of performing the construction work out of sequence, and other impacts/costs.**

38. The Cook County Board of Commissioners must approve expenditure of funds to renovate

the RTU east tunnel ramp.

**RESPONSE: Defendant Cook County admits that the Cook County Board of Commissioners must approve the expenditure of funds to renovate the RTU east tunnel ramp.**

39. The Cook County Board of Commissioners, as of August 15, 2024, have not approved any

funds to reconstruct the RTU east tunnel ramp to comply with the ADA.

**RESPONSE: Defendant Cook County admits that, as of August 15, 2024, the Cook County Board of Commissioners has not yet approved any funds to reconstruct the RTU east tunnel ramp to comply with the ADA.**

40. Plaintiff Hernandez had an alert to use a cane from February 2, 2022 to August 30, 2022

and from May 10, 2023 to May 11, 2023. See DR Hernandez 000005.

**RESPONSE: OBJECTION – To the extent that this Request seeks information specifically related to Plaintiff's Alerts, such information is not in the control of Defendant Cook County and would be better sought from Defendant Sheriff Dart. Defendant Cook County does not control the Cook County Department of Corrections, nor does it have any access to or control over inmate records and data, outside of medical related records.**

41. The Sheriff's records identify when plaintiff Hernandez was moved to Cermak.

**RESPONSE: OBJECTION – This Request to Admit seeks information not in the control of Defendant Cook County, that would be better sought from Defendant Sheriff Dart. Defendant Cook County does not control the Cook County Department of Corrections, nor does it have any access to or control over inmate records and data, outside of medical related records.**

11

Exhibit 2 Page 11

42. DR Hernandez 000007 shows plaintiff was transported to or from Cermak on 2/7/2022, 2/26/2022, 4/7/2022, and 8/4/2022.

**RESPONSE: OBJECTION – This Request to Admit seeks information not in the control of Defendant Cook County, that would be better sought from Defendant Sheriff Dart. Defendant Cook County does not control the Cook County Department of Corrections, nor does it have any access to or control over inmate records and data, outside of medical related records.**

43. On August 18, 2022, RN Jeelan McCray sent an e-mail o PA-C Kevin Sims and wrote, referring to plaintiff Hernandez, "This pt just came back for IDOC on 8/4 and has a cane at all times. The provider that seen him on intake renewed the cane order from February when he was here. He is overweight and walk with a staggered, shuffled limp. He drags the left foot. He does need the cane in my opinion, but they will not allow him to have in Div 9, except for long distances. As a result, he needs appropriate housing. Please see my note." DR 00157.

**RESPONSE: Defendant Cook County denies that the specified email text above appears on the document produced by Defendants in *Hernandez* labelled DR 000157.**

44. William Mathis, as of August 15, 2024, is detained at Cook County Jail and from October 16, 2023 until at least August 15, 2024, has had an alert for a cane.

**RESPONSE: OBJECTION – This Request to Admit seeks information not in the control of Defendant Cook County, that would be better sought from Defendant Sheriff Dart. Defendant Cook County does not control the Cook County Department of Corrections, nor does it have any access to or control over inmate records and data, outside of medical related records.**

45. William Mathis was moved to or from Cermak on 4/2/2024, 1/11/2024, 12/10/2023, 12/4/2023, 12/1/2023, and 11/1/2023. *See* Exhibit 3.

**RESPONSE: OBJECTION – This Request to Admit seeks information not in the control of Defendant Cook County, that would be better sought from Defendant Sheriff Dart. Defendant Cook County does not control the Cook County Department of Corrections, nor does it have any access to or control over inmate records and data, outside of medical related records.**

12

Exhibit 2 Page 12

46. The Sheriff's Records show William Mathis was housed in DIV08/RTU on the following dates: 4/8/2023 to 4/12/2023, November 1, 2023 to November 6, 2023, December 10, 2023 to February 18, 2024, and February 22, 2024 to February 29, 2024. Exhibit 4.

**RESPONSE: OBJECTION – This Request to Admit seeks information not in the control of Defendant Cook County, that would be better sought from Defendant Sheriff Dart. Defendant Cook County does not control the Cook County Department of Corrections, nor does it have any access to or control over inmate records and data, outside of medical related records. Without waiving and in light of this objection, Defendant Cook County states that after a reasonable inquiry, the information known to or readily obtainable by them is insufficient to enable it to admit or deny the allegations contained in Request No. 46.**

47. Globetrotters Engineering Corporation submitted a report dated April 1, 2024 in *Westmoreland v. Dart*, 23-cv-1851, and make the following findings why the RTU east tunnel ramp does not comply with the ADA structural standards:

   1) **Top landing:** The Top Landing runs from the Upper Ramp to a pair of doors, leading to the adjacent tunnel, and has a length of 0.75' (9 in.). Since the landing length is less than 60 inches, the landing length is not code compliant. The landing is 85% short of the required length. However, this may be easily corrected by relocating the doors to the east 51", to provide the minimum required landing length.

   2) **Upper Ramp:** The Upper Ramp has a 25.95' horizontal run and a 1.93' vertical rise with an average slope of 1:13.4. There is a variation in slope at the very top of the ramp. The last 4.27' of the run, at the top has a rise of 4.56" for a slope of 1:11. The upper portion of the ramp floor surface is not code compliant; the top 16.5% of the overall length is approximately 0.64% steeper than permitted by code. Since the bottom portion of the ramp run is shallower than 1:12, it would be possible to

13

Exhibit 2 Page 13

add a floor topping which will even-out the slope make a consistent floor slope that has a 1:12 slope or shallower.

3) **Intermediate Landing:** The Intermediate Landing is 4.75 feet (57 in.) in length. Since the landing length is less than 60 inches in length, the Intermediate Landing is not code compliant. It is 5% shorter than the required length. To correct this nonconformity, a longer level floor plane at the landing will need to be provided, extending the floor surface west. This will require the Lower Ramp to be rebuilt, along its entire length, to provide for the additional landing length and maintaining a maximum 1:12 ramp slope.

4) **Lower Ramp:** The Lower Ramp has a 30.4' horizontal run and a 2.47 vertical rise, with an average slope of 1:12. There is a variation in slope at the very bottom of the ramp. The last 1 foot of the run is steeper than the rest of the ramp with a slope of approximately 1:8.5. The lower portion of the ramp floor surface is not code compliant; the lower 3.5% of the overall run is approximately 11.7% steeper than permitted by code. The floor surface will need to be feathered out, and the ramp length extended slightly for the Lower Ramp floor to be compliant with code requirements for ramp slope at this location.

5) **Handrails:** As noted in the code requirements above, need to be located 34-38 inches above the ramp floor and need to extend a minimum of 12 inches beyond the top and bottom of each ramp. The ramp(s) have a continuous handrail on each side located. At the lower end of the Lower Ramp the handrails, where measured, is approximately 33" above the ramp floor. At other locations, the handrail height exceeds 34" above the ramp floor. Since, at some locations, handrails are less than

14

Exhibit 2 Page 14

34" above the ramp floor they are not in compliance with requirements for handrail height. The handrails extend 7.4" beyond the Lower Ramp and 11.3" beyond the Upper Ramp. Since the handrail extensions are less than 12 inches, the handrails are not in compliance with code requirements for handrail extensions.

Dkt. 42-19 at 10-11

**RESPONSE:** Defendant Cook County admits the allegations contained in Request No. 47 are consistent with GEC's published report.

**Respectfully submitted,**

*/s/ Troy S. Radunsky*
Troy S. Radunsky
One of the Attorneys for Defendants

Troy S. Radunsky (tradunsky@devoreradunsky.com)
Jason E. DeVore (jdevore@devoreradunsky.com)
Zachary G. Stillman (zstillman@devoreradunsky.com)
DeVore Radunsky LLC
230 W. Monroe Ste 230
Chicago, IL 60606
*Counsel for Defendants*

### CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that **Defendant Cook County's Responses to Plaintiff's First and Second Sets of Requests to Admit** were sent via email correspondence to all below listed parties on September 16, 2024.

*/s/ Zachary G. Stillman*
Zachary G. Stillman
One of the Attorneys for Defendants

Service List:
Thomas G. Morrissey
Patrick Morrissey
10257 S. Western Ave
Chicago, IL 60643
773 233 7901
Pwm@morrisseylawchicago.com
tgm@morrisseylawchicago.com

15

Exhibit 2 Page 15

## ILLINOIS DEPARTMENT OF CORRECTIONS
### INTERNET INMATE STATUS
#### AS OF: Wednesday, July 2, 2025

 

## M37290 - MATHIS, WILLIAM J.

| | |
|---|---|
| Parent Institution: | ROBINSON CORRECTIONAL CENTER |
| Offender Status: | IN CUSTODY |
| Location: | ROBINSON |

## PHYSICAL PROFILE

| | |
|---|---|
| Date of Birth: | 07/19/1983 |
| Weight: | 300 lbs. |
| Hair: | Black |
| Sex: | Male |
| Height: | 5 ft. 10 in. |
| Race: | Black |
| Eyes: | Brown |

## MARKS, SCARS, & TATTOOS

TATTOO, CHEST - 2 skulls
TATTOO, NECK - "Will Kill"
TATTOO, ARM, RIGHT - "Katie", Tombstones X2
TATTOO, ARM, RIGHT UPPER - Grim Reaper
TATTOO, HAND, LEFT - Rosary

## ADMISSION / RELEASE / DISCHARGE INFO

| | |
|---|---|
| Admission Date: | 08/29/2024 |
| Projected Parole Date: | 08/14/2026 |
| Last Paroled Date: | |
| Projected Discharge Date: | 08/15/2027 |

## SENTENCING INFORMATION

| MITTIMUS: | 23CR0510701 |
|---|---|
| CLASS: | 1 |
| COUNT: | 1 |
| OFFENSE: | AGG DISCHARGE FIREARM/OCC VEH |
| CUSTODY DATE: | 03/21/2023 |
| SENTENCE: | 4 Years 0 Months 0 Days |
| COUNTY: | COOK |
| SENTENCE DISCHARGED?: | NO |
| | |
| MITTIMUS: | 11C66022101 |
| CLASS: | 4 |
| COUNT: | 1 |
| OFFENSE: | POSS AMT CON SUB EXCEPT(A)/(D) |
| CUSTODY DATE: | 05/24/2013 |
| SENTENCE: | 1 Years 0 Months 0 Days |
| COUNTY: | COOK |
| SENTENCE DISCHARGED?: | YES |

Exhibit 3 Page 1

The information made available on this database service is for the general public and law enforcement to promote the interest of public safety. The best effort has been made to ensure that information published is true and complete, however the information can quickly change. Accordingly, before making any assumption that said information is factual and complete, please send written correspondence to the Illinois Department of Corrections- Public Information Office, 1301 Concordia Court, P.O. Box 19277, Springfield, IL 62794-9277. Please see the Illinois Department of Corrections full disclaimer page for important information.

**conduct another search**
return to the IDOC homepage

Illinois Department of Corrections
1301 Concordia Court, PO Box 19277
Springfield, Illinois, 62794-9277
217-558-2200 | 800-546-0844 TDD

Exhibit 3 Page 2

Case: 1:23-cv-16970 Document #: 135 Filed: 07/14/25 Page 239 of 404 PageID #:1868
Case: 1:23-cv-16970 Document #: 122-4 Filed: 07/08/25 Page 1 of 2 PageID #:1283

Case: 1:20-cv-00261 Document #: 46-4 Filed: 05/20/20 Page 1 of 2 PageID #:238

3/19/2020                                     Gmail - Construction drawings for Cermak ramp

 Gmail                                    Patrick Morrissey <patrickmorrissey1920@gmail.com>

---

## Construction drawings for Cermak ramp

---

**MIGUEL LARIOS (States Attorney)** <MIGUEL.LARIOS@cookcountyil.gov>                    Fri, Aug 30, 2019 at 9:28 AM
To: Thomas Morrissey <tgmorrisseylaw@gmail.com>, "LYLE HENRETTY (States Attorney)"
<LYLE.HENRETTY@cookcountyil.gov>, "FRANCIS CATANIA (States Attorney)" <francis.catania@cookcountyil.gov>, Patrick
Morrissey <patrickmorrissey1920@gmail.com>

Tom:

I am informed that there are no Cermak ramp "construction/design drawings." Attached is the only Cermak Ramp
information Capital Planning.

        **Miguel E. Larios**

            Assistant State's Attorney, Conflicts Counsel Unit

            Cook County State's Attorney's Office

            50 W Washington St, Ste 2760, Chicago, IL 60602

            P: 312.603.1434    E: Miguel.Larios@cookcountyil.gov

This communication is private and confidential and may be subject to attorney-client and/or work product privileges.  If you have received this
message in error, please notify the sender and remove it from your system.

**From:** Thomas Morrissey [mailto:tgmorrisseylaw@gmail.com]
**Sent:** Monday, August 26, 2019 10:26 AM
**To:** MIGUEL LARIOS (States Attorney); LYLE HENRETTY (States Attorney); FRANCIS CATANIA (States Attorney);
Patrick Morrissey
**Subject:** Construction drawings for Cermak ramp

Miguel:

[Quoted text hidden]

---

📄 **CERMAK_RAMP.NOTES.From.MAR.2018.docx**
    151K

Exhibit 4 Page 1

Case: 1:20-cv-00261 Document #: 40-4 Filed: 05/20/20 Page 2 of 2 PageID #:239

COPY PASTE OF WALKTHROUGH FROM MARCH 2018; CURRENTLY IN 2019 THIS SCOPE IS AWAITING PROCESSING
OF APPENDIX 1 FOR A/E VIA PROCUREMENT /dt 08.26.19

| E: Cermak Ramp | |
|---|---|
| Cermak Ramp B019 | Existing ramp is 47' long without a landing. Slope of the ramp is within 1:12 maximum slope requirements, however the run exceeds code requirements. <br> Recommendations: <br> 1. Create compliant landing 30' from top of ramp <br> 2. Repour the remaining 17' ramp in 2 sections with another landing area at the change in ramp direction. <br> 3. Raise door to Medical Records room B020. Extend landing into room and provide 3' wide ramp and 44" wide stair <br> 4. Provide handrails at both sides of ramps, continuous at landings where no door exists. <br> 5. Provide handrails at both sides of stairs in B020. |



Exhibit 4 Page 2

1

```
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3

 4   CORNELIUS WALKER,

 5             Plaintiff,

 6       -vs-                        No. 20-cv-00261

 7   THOMAS DART, SHERIFF OF COOK    Judge Mary M. Rowland
     COUNTY, and COOK COUNTY,        Magistrate Hon.
 8   ILLINOIS,                       Jeffrey Cummings

 9             Defendants.

10

11

12           The remote deposition via

13   videoconference of ERIC DAVIS, called by the

14   Plaintiff for examination, pursuant to notice and

15   pursuant to the Federal Rules of Civil Procedure

16   for the United States District Court pertaining to

17   the taking of depositions for the purpose of

18   discovery taken by KELLY ANN POTTS, REGISTERED

19   PROFESSIONAL REPORTER, CERTIFIED SHORTHAND

20   REPORTER, License No. 084-003558, within and for

21   the County of Cook and State of Illinois, on the

22   19th day of January, 2022, at 2:01 p.m., Central

23   Standard Time.

24
```

2

```
 1   A P P E A R A N C E S:

 2

 3        THE LAW OFFICES OF THOMAS G. MORRISSEY, by
          MR. THOMAS G. MORRISSEY  (via Webex)
 4        10150 South Western Avenue, Rear Suite
          Chicago, Illinois  60643
 5        (773) 233-7900
          tgmorrisseylaw@gmail.com
 6
              Appeared on behalf of the
 7            Plaintiff;

 8

 9        JOHNSON & BELL, by
          MR. JACK E. BENTLEY  (via Webex)
10        33 West Monroe Street, Suite 2700
          Chicago, Illinois  60603
11        (312) 372-0770
          bentleyj@jbltd.com
12
              Appeared on behalf of the
13            Defendants.

14

15

16

17

18

19

20            *        *        *

21

22

23

24
```

3

```
 1                INDEX OF EXAMINATION

 2

 3                                        PAGE

 4   ERIC DAVIS

 5

 6   Examination by Mr. Thomas Morrissey......... 5

 7

 8

 9                INDEX TO EXHIBITS

10

11   EXHIBIT                               PAGE

12

13   Plaintiff's

14   No. 2    Deft Ans 1st Set Interrogatories... 20

15   No. 4    Drawing........................... 92

16   No. 8    ADA Standards..................... 87

17   No. 400  Deft Ans 2nd Set Interrogatories.. 85

18   No. 402  Photographs...................... 72

19   No. 403  Design Drawings and Firm Names..... 25

20   No. 404  Transcript - December 19, 2019..... 16

21   No. 406  E-mails........................... 46

22   No. 407  E-mail from Joe Merkel............. 82

23

24            *        *        *
```

4

```
 1           THE STENOGRAPHER:  All parties are

 2   aware that the witness will be sworn in remotely.

 3   The parties agree not to challenge the validity of

 4   any oath administered by the Certified Stenographic

 5   Reporter, even if the Certified Stenographic

 6   Reporter is not physically present with the

 7   witness.

 8           Here begins the remote deposition

 9   via videoconference of ERIC DAVIS in the matter of

10   CORNELIUS WALKER versus THOMAS DART and COOK

11   COUNTY.

12           Today's date is the 19th day of

13   January, 2022, and the time is 2:01 p.m., Central

14   Standard Time.

15           Beginning with the noticing

16   party, will counsel please introduce themselves,

17   state whom they represent, and stipulate to the

18   swearing in of the witness remotely?

19           MR. THOMAS MORRISSEY:  My name is

20   Thomas Morrissey.  I represent the Plaintiff in the

21   Walker case.

22           MR. BENTLEY:  Good afternoon.

23           My name is Jack Bentley.  I

24   represent the Defendants in the same litigation.
```

Exhibit 5 Page 1

5

1          I stipulate.  Thank you.

2          THE STENOGRAPHER:  Eric, would you

3   raise your right hand?

4          THE WITNESS:  Sure.

5              (Whereupon, witness remotely

6              sworn.)

7          THE STENOGRAPHER:  Thank you.

8          MR. THOMAS MORRISSEY:  This is the

9   deposition of Eric Davis taken to two different

10  notices.  One is a Notice for Mr. Davis's

11  appearance individually, and the other is a Notice

12  under Rule 30(b)(6) to have him testify in regards

13  to certain matters.

14  WHEREUPON:

15              **ERIC DAVIS**

16  called as a witness herein, having been first

17  remotely duly sworn, was examined upon oral

18  interrogatories and testified via videoconference

19  as follows:

20              **EXAMINATION**

21      By Mr. Thomas Morrissey:

22

23      Q    Mr. Davis, I'm showing you a document

24  which is Exhibit 406.

6

1          Do you have that in front of you?

2      A    406 . . .  Did you put it on the

3   screen or . . .

4      Q    I think that those documents have

5   probably been e-mailed to you.  They were provided

6   to your counsel.

7      A    Sure.  I have a lot of documents.  I'm

8   not sure I can see which one is 406.

9          THE WITNESS:  Jack, is that -- Which

10  one is he referring to?

11             (No response.)

12  BY THE WITNESS:

13      A    Jack seems to have dropped off.

14          Are you talking about the

15  30(b)(6) Notice?

16  BY MR. THOMAS MORRISSEY:

17      Q    That's the 30(b)(6) Notice, correct.

18      A    Okay, yeah.  I have that, but it's not

19  labe- -- it's just labeled as "NOD Cook County

20  Representative for 2021.10.29."

21          Is that the one you're talking

22  about?

23      Q    We're going to -- Why don't we hold

24  off a moment?  I think your attorney isn't on the

7

1   line.

2          MR. THOMAS MORRISSEY:  Jack, are

3   you --

4          THE WITNESS:  It looks like his name

5   is on the screen.

6          MR. BENTLEY:  I'm here.

7          THE WITNESS:  Is that the 30(b)(6)

8   Notice, Jack?  He's saying Document 406 --

9          MR. BENTLEY:  Yes.

10          THE WITNESS:  -- I think he said.

11  Okay.

12  BY THE WITNESS:

13      A    Yeah.  I have that.

14  BY MR. THOMAS MORRISSEY:

15      Q    All right.  So that's Exhibit No. 406.

16      A    Okay.

17      Q    It's three pages with exhibits.  One

18  is an exhibit -- Exhibit 1 is a Fiscal Year '18

19  Capital Business Case?

20      A    Yes.  I have that.

21      Q    That's a six-page document . . .

22          THE STENOGRAPHER:  I'm sorry, Tom.

23          I'm having a little bit of a hard

24  time hearing you.  And, also, I could only see the

8

1   top of your head.

2              (Brief pause.)

3          THE STENOGRAPHER:  There you go.

4   BY MR. THOMAS MORRISSEY:

5      Q    Included in Exhibit 406 are certain

6   exhibits --

7      A    Yes.

8      Q    -- including a Capital Business Case

9   for --

10      A    Yes.

11      Q    I believe that's the document that's

12  attached.

13      A    Right.  I have that.

14      Q    Okay.  Are you being produced by

15  Cook County to respond to any of the topics in --

16  in the Rule 30(b)(6) Notice?

17      A    I believe I am.

18      Q    Which topics are you prepared to

19  testify on behalf of Cook County?

20      A    I'd have to refer to counsel on that

21  because I don't remember which ones --

22          MR. BENTLEY:  Per our agreement, Tom,

23  I'm presenting Mr. Davis as our 30(b)(6) designated

24  witness for Topics No. 1, No. 5, and Nos. 7

Exhibit 5 Page 2

9

1   through 11.
2   BY MR. THOMAS MORRISSEY:
3        Q      What I'd like to do, before we get to
4   those topics covered by the Rule 30(b)(6) Notice, I
5   would like to ask you certain questions outside the
6   scope of the -- of that notice.
7        A      Okay.
8        Q      First of all --
9            MR. BENTLEY:  And just so I can make
10  my record, anything he -- any question that's asked
11  that he answers outside of the scope of this Notice
12  is his answer as an individual witness in the case.
13           Go ahead.
14           MR. THOMAS MORRISSEY:  Okay.  When we
15  get to my 30 (b)(6) questions which he's designated
16  for, I'll alert Mr. Davis to that --
17           MR. BENTLEY:  Okay.
18  BY THE WITNESS:
19       A      Great.
20           MR. THOMAS MORRISSEY:  -- so we're
21  clear on that topic.
22           MR. BENTLEY:  Thank you.
23  BY MR. THOMAS MORRISSEY:
24       Q      Mr. Davis --

10

1        A      All right.  Thank you.
2               Yes.
3        Q      -- can you identify your current
4   position with Cook County?
5        A      Sure.
6               I am the Deputy Director of the
7   Cook County Department of Capital Planning and
8   Policy.
9        Q      How long have you held that position?
10       A      I started in that position in April
11  of 2017.
12       Q      I'm going to refer you now to Exhibit
13  No. 2 which should be on your screen there.  It's
14  Defendant Cook County's Answers to Plaintiff's
15  First Set of Interrogatories.
16       A      Number -- Is there an exhibit number
17  on it?
18       Q      It's Exhibit No. 2.
19       A      Oh.
20           MR. BENTLEY:  Tom, did you need me to
21  send all of this stuff to Eric?  Because there was
22  a lot of documents you sent.  I.-- I didn't send
23  him the whole set here.
24           MR. THOMAS MORRISSEY:  Yeah.  I --

11

1            MR. BENTLEY:  Are you not able to
2   share your screen?
3            MR. THOMAS MORRISSEY:  No.  I'm not
4   able to share the screen, but I asked you to share
5   it with your client, or Pat did, so --
6   BY THE WITNESS:
7        A      I'm looking through to see if I have
8   it.
9            MR. BENTLEY:  Hold on.  Let me just
10  pull it up, and I'll just -- I'll just share my
11  screen for each exhibit.  It will go way easier
12  than me just trying to send all this to you.
13           Just give me a minute.
14           THE WITNESS:  Okay.
15               (Brief pause.)
16  BY MR. THOMAS MORRISSEY:
17       Q      Before we discuss Defendant
18  Cook County's Answers to Plaintiff's First Set of
19  Interrogatories, let me ask you a general question.
20           In preparation for this
21  deposition, what -- what did you review?
22       A      Oh, gosh.  Let's see.
23               For this -- I'd have to -- I'd
24  have to qualify that by saying that I'll do my best

12

1   to -- to recall.  I have another deposition next
2   week, so if I'm confusing -- a different matter, I
3   believe, so if I'm confusing the two, I apologize
4   in advance.
5               I have -- Let's see.  For this
6   one, I had gone through -- well, the information
7   provided by you all.  I have gone through -- Let's
8   see.  Which one?  Oh, that was the other one
9   because there an e-mail search that was with BOT.
10               I had gone through documents of
11  the facility, Cermak, the Cermak Health Services
12  building.  I had gone through --
13       Q      Let me ask this --
14       A      -- in some cases e-mails.
15       Q      Let me -- Let me stop you.
16       A      Okay.
17       Q      What documents did you review in
18  regards to the Cermak building in preparation for
19  today's dep?
20       A      Well, as I said, I've gone through the
21  documents provided, you know, by you, things like,
22  you know, meeting minutes from various meetings and
23  various correspondence.
24               I've gone through drawings of the

Exhibit 5 Page 3

13

1   building. I've gone through -- in some cases
2   reprints of e-mails, that sort of thing.
3       Q       And just to correct you, I haven't
4   sent you any documents directly, nor has anybody
5   else --
6       A       Oh, I'm sorry. It would have come
7   through Counsel. Excuse me. I know you
8   haven't . . . Sorry.
9       Q       In addition to the items you mentioned
10  in regards to the Cermak building, what other
11  documents have you reviewed in preparation for
12  today's deposition?
13      A       I think the things that I've been
14  reviewing for this deposition about the Cermak
15  building are documents about the Cermak building.
16      Q       If --
17      A       You know, they may have been things
18  like, you know, minutes of a meeting that included
19  the Cermak building, and it was -- there was a
20  bunch of other stuff in there, for example, that
21  kind of thing. I'm not quite sure what you're
22  asking.
23      Q       You've previously been deposed by my
24  office in other ADA-related litigation, correct?

14

1       A       Yes.
2       Q       And do you recall that you were
3   deposed on December 19th, 2019, in a case titled
4   Spence versus Dart?
5       A       I think -- I assume you're correct
6   about the date, yeah. I was deposed, yeah, before.
7       Q       Have you reviewed the transcript from
8   that deposition in preparation for today's
9   deposition?
10      A       Yeah. I think that actually referred
11  to Cermak also, so yeah. I believe -- I have not
12  read it in its entirety, but I've skimmed through
13  it.
14      Q       When was the last time you reviewed
15  your testimony that you gave on December 19th,
16  2019?
17      A       Within the last few days.
18      Q       Is there anything from your testimony
19  on December 19th, 2019, in the deposition
20  transcript in Spence versus Dart that you would
21  like to change, any of your responses that you feel
22  that, now that you reviewed it, you need to change?
23      A       I don't think I read it with the idea
24  of that in mind, just sort of skimming it to

15

1   refresh myself. I don't think that I reviewed it
2   in sufficient -- you know, sufficiently specific to
3   identify if there were things that may or may not
4   have been, you know, better said a different way or
5   additional information or anything like that.
6       Q       Do you recall in the deposition on
7   December 19, 2019, you were asked questions in
8   regards to what we now refer to as the Cermak ramp?
9       A       Yes.
10      Q       And you gave certain responses whether
11  or not it complied with the ADA?
12      A       Okay. I don't -- I actually have that
13  document in front of me. If you want to refer to a
14  specific page, I can go through it with you.
15      Q       I believe it's an exhibit to this dep.
16  Let me see if I can find it. It's going to take me
17  a moment. It's 90 pages, so I just, you know . . .
18                  (Brief pause.)
19  BY THE WITNESS:
20      A       There's something on, it looks like,
21  Page 15.
22  BY MR. THOMAS MORRISSEY:
23      Q       Let me pull it up.
24                  (Brief pause.)

16

1   BY MR. THOMAS MORRISSEY:
2       Q       If we look at Plaintiff's Exhibit
3   No. 404, I believe it's the transcript from the
4   proceeding on December 19th, 2019.
5                   (Whereupon, Plaintiff's Exhibit
6                   No. 404, previously marked, was
7                   referenced.)
8   BY THE WITNESS:
9       A       Okay. Yeah.
10  BY MR. THOMAS MORRISSEY:
11      Q       And I would -- I would call your
12  attention to -- to Page 53 when you discussed the
13  Cermak ramp drawing that was prepared by
14  Ellen Stoner.
15                  (Brief pause.)
16  BY MR. THOMAS MORRISSEY:
17      Q       That would be Page 53 --
18      A       Yeah. I see what you're saying. It's
19  53 on to 54, yeah.
20      Q       Questions 8 through -- it carries over
21  to 54 --
22      A       Correct.
23      Q       -- to the first --
24      A       Yeah.

Exhibit 5 Page 4

17

1    Q    -- first page.
2         Do you agree with that statement
3    if the ramp -- the Cermak ramp that we're
4    discussing is more than forty -- is 47-feet long
5    that there needed to be a landing?
6    A    As it says in the transcript, the
7    critical element is 30 inches of rise, and that's
8    based upon an assumption of a 1:12 slope and, as
9    you know and it says there, I'm referring to a
10   document by, I think, the AltusWorks or from Ellen,
11   that's based on the assumption of a 1:12 ramp.
12   Okay?  And so that's what that's referring to.
13        The ramp in question is shallower
14   than 1:12 slope, but I understand why they made
15   that assumption in that document -- in that
16   document that you're referring to there.
17   Q    Do you stand by the statement you made
18   on December 19th, 2019 --
19   A    Let me reread it.  I just want to make
20   sure that I'm clear about this.
21   Q    Sure.
22        (Brief pause.)
23   BY THE WITNESS:
24   A    Okay.  Relative to the first part, it

18

1    says -- and quoting my own testimony, it says,
2    "Well, assuming, as this document says, that the
3    ramp in question is a 1:12 slope, that would yield
4    a total ramp length of 47 feet."
5         That actually is -- The
6    assumption is not correct, and I'm saying that's an
7    assumption made by them, not an assumption made by
8    me, that that calculation was based upon an
9    assumption of a slope of 1:12.
10        But then if you note after that,
11   I state, "I believe the standard in place at the
12   time required there be a landing if it was more
13   than" -- and I corrected myself -- not 30 feet --
14   "30 inches of rise, which would mean" -- in other
15   words, meaning in the context of a 1:12 ramp, there
16   would more than 30 feet without an intermediate
17   landing.
18        And I'm adding or clarifying
19   that, I guess I would say, that that is -- when you
20   talk about the assumption, that is an assumption
21   that appears to have been made by Ellen and/or her
22   firm that the ramp was 1:12.
23        I can understand why she would
24   make that assumption because you're not able to --

19

1    the ramp is enclosed by walls, and so you can't
2    readily measure how high it goes.  But, in fact,
3    actually, the ramp is shallower than that.
4         So in other words, the 30 feet of
5    run is not a limitation requiring an intermediate
6    landing.  And so if the ramp is 1:12, it wouldn't
7    go more than 30 feet of rise.  But we know that the
8    ramp is shallower than 1:12, meaning that you don't
9    have to have an intermediate landing.
10        So with that said, I guess I
11   could stipulate that, yeah.  It appears that this
12   is -- what I said is -- is accurate.
13   BY MR. THOMAS MORRISSEY:
14   Q    Well, let's get back to basics.
15        Did you go out . . .
16        THE STENOGRAPHER:  I'm sorry, Tom.  I
17   can't hear you.
18   BY THE WITNESS:
19   A    I'm sorry.  You're breaking up.  It's
20   hard to hear you.
21   BY MR. THOMAS MORRISSEY:
22   Q    I'm sorry.
23        Have you ever inspected the ramp
24   that leads from Cook County Jail to the Cermak

20

1    infirmary?
2    A    I think I might have walked down it
3    once.  As far as inspecting, I couldn't say I've
4    inspected it.
5    Q    Did you ever conduct any
6    measurement of --
7    A    I did not, although I know
8    measurements have been taken, but I did not do them
9    personally.
10   Q    Well, let's look at Interrogatory --
11   I'm sorry -- Exhibit No. 2.  It's the Defendant --
12   Again, it's Defendant Cook County's Answers to
13   Plaintiff's First Set of Interrogatories.
14   A    Okay.
15        MR. BENTLEY:  I'm going to share the
16   screen.  Just give me a minute.
17        THE WITNESS:  Okay.
18        (Whereupon, Exhibit No. 2 was
19        displayed via screen-share.)
20        MR. BENTLEY:  Can everybody see?
21        THE WITNESS:  Yeah.  I can see.  Sure.
22   BY MR. THOMAS MORRISSEY:
23   Q    Were you asked to respond to these
24   Interrogatories on behalf of Cook County?

Exhibit 5 Page 5

21

```
1        A     I believe I was.  It appears that that
2   is something, yes.
3        Q     What is a horizontal projection or run
4   of a ramp?
5        A     Well, in layman's terms, it's the
6   length.
7        Q     Turning to Interrogatory No. 5,
8   "Identify" --
9        A     Okay.
10       Q     And you responded to these
11  Interrogatories on behalf of Cook County, correct?
12       A     I don't recall in which context they
13  were answered.  I would have to refer to counsel.
14       Q     Well, if you look at --
15       A     As you know, today we're talking about
16  both me speaking for the County and me speaking for
17  me, and I couldn't say off the top of my head in
18  which context I was answering on which of these.
19       Q     Well, I'm not asking --
20       A     I apologize.  I'm not an attorney.  I
21  don't, you know . . .
22       Q     All right.  I'm not asking you
23  questions in regards to the Rule 30(b)(6) --
24       A     Okay.
```

22

```
1        Q     -- Notice currently.  I'm asking
2   individually.
3              And if we look at the Answers to
4   Plaintiff's First Set of Interrogatories, No. 1 --
5        A     Yes.
6        Q     -- "Identify, by [the] name and title,
7   the individual or individuals who responded to
8   each" of these interrogatories."
9        A     Okay.
10       Q     The answer is you.
11       A     Okay.
12       Q     Okay.  So I'm --
13       A     All right.  And, again, I'm only --
14  I'm only clarifying that, Mr. Morrissey, just
15  because of the 30(b)(6), I don't entirely
16  understand, so I just want to make sure I'm
17  answering clearly.
18       Q     Now, Interrogatory No. 5 in Group
19  Exhibit 2 --
20       A     Okay.
21       Q     -- asks "Identify the 'horizontal
22  projection or run' of the ramp in the lower level
23  Cermak that is the subject of the Court's Rule
24  23(b)(2) certification order, Docket 62" --
```

23

```
1        A     Yes.
2        Q     -- "Memorandum" --
3        A     Okay.
4        Q     And the answer, "On information and
5   belief 43 feet [and] 11 inches."
6        A     Okay.
7        Q     "However, the answer to this question
8   depends on how the ramp is measured."
9        A     Right.
10       Q     How did you determine, as the person
11  responding to these interrogatories, that the
12  length of the ramp, or the run of the ramp, was
13  43 feet, 11 inches?
14       A     I believe that was from an excerpt of
15  a working drawing which is a plan view.  If you can
16  imagine a triangle in section and then there's a
17  ramp, if you're measuring on the horizontal, it
18  could be, let's say, approximately 43 feet,
19  11 inches; however, if you measured on the
20  hypotenuse, it might be 47 feet, which I think it's
21  referring to.
22              So if you're measuring it in the
23  plan drawing, the sort of horizontal projection, if
24  you will, then that would be 43 feet because that's
```

24

```
1   what it shows up in a plan.
2              If you're running a tape measure
3   down the actual run of the ramp, it might be
4   47 feet.  I'm just guessing here.  As I said, I
5   haven't taken a tape measure to it myself, but that
6   would explain why there'd be a difference between
7   the way it shows up in plan and the way it shows up
8   if you measure, you know, where the 47 feet is.
9        Q     Were you asked by Cook County to
10  measure the length or run of the ramp?
11       A     No.
12       Q     What documents did you rely on in
13  determining, in part, under one theory, that the
14  ramp -- the run of the ramp was 43 feet, 11 inches?
15       MR. BENTLEY:  Objection.  Asked and
16  answered.
17              You can answer.
18  BY THE WITNESS:
19       A     Yeah.  This is from '19, so I'd have
20  to go back and -- It probably was in response to
21  the plan drawing that was -- I think it was
22  actually -- There's a piece of it here on the
23  screen now, which I think also included a plan
24  drawing.  That probably was in relation to that.
```

Exhibit 5 Page 6

25

```
 1  BY MR. THOMAS MORRISSEY:
 2      Q    When you refer to --
 3      A    It's says "E: Cermak Ramp," and then
 4  I think there was a drawing attached to that.
 5      Q    I'd ask you -- Well, let me ask you to
 6  look and turn Exhibit 403 for a moment.
 7          MR. BENTLEY:  I'll just pull up the
 8  exhibits just going forward because I have them all
 9  here, and it's way easier to do that and share my
10  screen as long as everyone is okay with that.
11          THE WITNESS:  Yeah.  That's fine.
12              (Whereupon, Exhibit No. 403 was
13               displayed via screen-share.)
14          THE WITNESS:  I don't -- If you can
15  still hear me, my screen -- Now, I can't see the
16  people.
17              Can you hear me?  Oh, now, you're
18  back.  Okay.  That's why I went by phone.  For a
19  moment there, your pictures disappeared.
20  BY MR. THOMAS MORRISSEY:
21      Q    403 is a two-page exhibit.  The first
22  page looks like there's some design drawings.  The
23  second --
24      A    There you go.
```

26

```
 1      Q    The second page --
 2      A    Yeah.
 3      Q    -- has some names of some different
 4  firms on it.
 5          Do you see that?
 6      A    The second page --
 7      Q    It's titled --
 8      A    -- of it has the -- has the revision
 9  list, yeah.
10      Q    It has A-100B.  It's the second page.
11      A    Oh, down at the bottom, yeah.  I think
12  that's the sheet number, yeah.
13      Q    And it has -- It says, "Basement Floor
14  Plan Area B."
15      A    Yes.
16      Q    Did you, at the request of your
17  attorney, produce this document?
18      A    Yes.
19      Q    Where did you find this document?
20      A    I was able to find documents through
21  the Department of Facilities Management, which I
22  didn't realize until recently had sets of drawings
23  for the building.  And this is -- These are
24  photographs of some of the drawings of the original
```

27

```
 1  building, of the building when constructed.
 2      Q    Do you know if there was an
 3  architectural firm that was retained for the
 4  construction of the Cermak building?
 5      A    Offhand, I know Ellerbe Becket was one
 6  of the designers.  I don't remember what the other
 7  firm was.
 8      Q    Looking at --
 9      A    It's on the "Title" block.
10          THE WITNESS:  If you -- Jack, if you
11  can scroll down, there's a third image I think I
12  sent you.  I think that has the "Title" block.
13              (Scrolling.)
14  BY THE WITNESS:
15      A    Yeah.  Epstein was -- Yeah.  Okay.
16  A. Epstein & Sons and Ellerbe Becket.
17  Ellerbe Becket would have been the -- what you
18  might call colloquially the design architect, but
19  Epstein & Sons would have been the Architect of
20  Record.
21  BY MR. THOMAS MORRISSEY:
22      Q    The drawings produced --
23      A    Yes, sir.
24      Q    -- are those the actual construction
```

28

```
 1  drawings for the Cermak building?
 2      A    So -- Okay.
 3      Q    Because on -- on the second page, it's
 4  Basement Floor Plan --
 5      A    Well, I'm attempting to answer your
 6  question because --
 7          THE STENOGRAPHER:  I'm sorry.  Can I
 8  interrupt here for a second?
 9              Eric, can you just try to take a
10  pause after Tom asks the question?  Because there's
11  a lot of interrupting --
12          THE WITNESS:  Oh, I'm sorry.
13          THE STENOGRAPHER:  -- and it's just
14  going to be a choppy transcript.  That's all.  I
15  don't mean to interrupt.
16              Okay.  Go ahead.
17  BY THE WITNESS:
18      A    I wanted to respond to Tom's question
19  about construction drawings because the term
20  "construction drawings" is a bit of a misnomer.  It
21  is -- The construction drawings in the
22  architectural profession are provided to the
23  contractor to communicate the architect's intent.
24              Sometimes there are changes that
```

Exhibit 5 Page 7

29

```
1   get made during construction for any number of
2   reasons, and sometimes the contractor will generate
3   what's called shop drawings.
4            Those shop drawings for different
5   elements can be the elements that the building is
6   actually constructed from.  An example would be
7   steel.  Okay.  Let's say I'm building a steel
8   superstructure.  The architect and the structural
9   engineer communicate their intent.
10            The fabricator doesn't build it
11   from those drawings.  They actually make their own
12   shop drawings and say, "Is this what you meant?"
13   and they build them from that.
14            Now, that said, in colloquial
15   terms, are these the construction drawings?  Yes.
16   These are the construction drawings.
17   BY MR. THOMAS MORRISSEY:
18       Q     Looking at the diagram on the first
19   page of Exhibit 403, on the right-hand side, is
20   that a configuration by the designer, by the
21   architectural firm --
22       A     Yes.
23       Q     -- in the 1990s when --
24       A     Yes.
```

30

```
1       Q     -- the Cermak building ramp was built?
2       A     Right.  That appears to be, yes.
3       Q     And looking at that diagram of what --
4       A     Yes.
5       Q     Throughout this dep, we're going to
6   refer to the ramp as the "Cermak ramp."
7            And --
8       A     Yes.
9       Q     -- if I use the term, you understand
10   it's the connection between the Cook County Jail's
11   tunnel to the Cermak infirmary building at the
12   Cook County Jail?
13       A     Correct.
14       Q     Looking at that diagram of what
15   appears to be the Cermak ramp, does --
16       A     Yes, sir.
17       Q     -- it indicate the length of the ramp?
18       A     Yes.  Again, with the -- the
19   stipulation that what you're talking about is the
20   horizontal projection, it indicates a design intent
21   of 43 foot, 10 inches.
22       Q     And you mentioned that another
23   dimension, not the horizontal dimension, but a
24   different dimension would reflect that the ramp --
```

31

```
1       A     Right.
2       Q     -- was 47-feet long, correct?
3       A     And, again -- Correct.
4            And as I mentioned, I haven't --
5   I have not measured myself, but I am assuming that
6   that 47-foot dimension would have been measured
7   along the ramp itself, which would be a slightly
8   longer dimension because it's the hypotenuse of a
9   triangle.
10       Q     For purposes of the 1991 ADA
11   standards --
12       A     Yes, sir.
13       Q     -- do they use --
14       A     Yes.
15       Q     -- the horizontal measurement which
16   you say, according to this design drawing, was
17   43 feet, 10 inches, or the actual length of the
18   ramp, which you mentioned is 47 feet?
19       A     Actually, other than the exception for
20   curb ramps, it appears, from my reading recently
21   and years past of the ADA, that the stipulation was
22   not the horizontal dimension but, rather, the
23   vertical dimension.
24            In other words, the limitation,
```

32

```
1   as we discussed in the testimony previously, is
2   30 inches of rise; that if you have a section of
3   ramp that rises more than 30 inches, you're
4   required to have an intermediate landing.
5            That ramp can be of a slope in
6   between 1:12 and 1:20.  If it's shallower than
7   1:20, it's not actually even considered a ramp.
8   But if a ramp is a 1:12 pitch, which means for
9   every inch you go up, your ramp is horizontally
10   12-inches long, from that kind of a slope to a
11   1:20, for every inch you go up, it's 20-inches
12   long.  If it's a 1:12 ramp and you're rising
13   30 inches, the ramp would be 30-feet long.  If it's
14   a 1:20 slope, the ramp would be 50-feet long to
15   achieve a 1:20 pitch.
16            So a ramp to be compliant to rise
17   no more than 30 inches would need to be someplace
18   between 30-feet long and 50-feet long.  The ADA
19   does not specify that it cannot be more than X --
20   less than X or more than Y.  It is about the slope
21   of the ramp and how high it's going.
22            So to your question earlier,
23   whether it's 43 feet or 47 feet, as long as it's
24   between 30 and 50 feet, it doesn't really matter.
```

Exhibit 5 Page 8

33

```
1    What matters is, is it rising more than 30 inches
2    in one single run.
3         Q    If it does exceed a 30-inch run, does
4    that --
5         A    Yes.
6         Q    -- require a . . .
7         A    I'm sorry?
8         Q    If the rise of the ramp exceeds
9    30 inches --
10        A    Yes, sir.
11        Q    -- does that require a landing -- a
12   maximum run of the ramp to be 30 feet?
13        A    No, only if the ramp's slope is 1:12.
14   So a limitation is not a horizontal limitation.
15   It's a vertical limitation, as long as it's within
16   the slope parameters.
17        Q    Did you --
18        A    The assertion -- The assertion was
19   made earlier in the Stoner document that says if
20   it's a run longer than 30 feet horizontally, that
21   it needs to make an intermediate landing, is based
22   upon the assumption that the ramp is a 1:12 pitch.
23             This ramp is shallower than that.
24   It's allowed to be shallower than that.  The
```

34

```
1    limitation in the -- in the ADA is a rise of
2    30 inches, not a run of 30 feet, so . . .
3             And I -- And I suspect that that
4    evaluation was made by Stoner and/or her colleagues
5    because they didn't have the ability to measure the
6    rise vertically, and so they had to operate on the
7    assumption that it was 1:12.
8             Since then, and I believe counsel
9    has provided that to you, we have had done a laser
10   measurement of the ramp's height, and it is a
11   30-inch rise, meaning it does not have to have an
12   intermediate landing.
13             I would also note that the
14   drawing that you're showing --
15             THE WITNESS:  If you can scroll down
16   just a little bit, Jack, on that image --
17             (Scrolling.)
18             THE WITNESS:  No, no, just a tiny bit,
19   looking at the top . . .
20             (Scrolling.)
21             THE WITNESS:  Go up a little -- Go up
22   a little bit more.
23             (Scrolling.)
24             THE WITNESS:  There you go.  Stop.
```

35

```
1    BY THE WITNESS:
2         A    All right.  So at the bottom of the
3    ramp, you'll see a notation that says, "EL.0.17
4    CCD."  That means --
5    BY MR. THOMAS MORRISSEY:
6         Q    I don't --
7         A    At the bottom of the image he's
8    showing there.
9             But at the bottom of the ramp,
10   there's a note that says "EL.017 CCD."
11             Can you see that, Mr. Morrissey?
12        Q    I don't see that, no.
13             You're looking at the
14   configuration of the ramp --
15        A    Yes.
16        Q    -- correct?
17        A    Yeah.
18             And that is -- that is a spot
19   that is tied to the surveyor that says, "We want
20   the bottom of this ramp to be .17 CCD.  "CCD" means
21   "Chicago City Datum."  That is a standard reference
22   in the City of Chicago that traces all the way
23   back, believe it or not, to the southwest corner of
24   the -- of the Northern Trust Bank building on
```

36

```
1    LaSalle Street.  So that sets the height that you
2    want to have.
3             Then if you look at the top of
4    the ramp, you see, "EL.2.67 CCD."  That means that
5    the top of the ramp should be two and two-thirds
6    feet above the Chicago City Datum.
7             When you take 2.67 and you
8    subtract .17, you get 2.50, which is two and a half
9    feet, which is 30 inches.  That tells me, as an
10   architect, that the intent was that the rise of
11   that ramp was to be 30 inches.
12             That 30 inches is the limitation.
13   If it was higher than that, then it would need to
14   have an intermediate landing.  But because it is
15   30 inches of rise, it is required to have it as
16   long as the slope is correct, and we know the slope
17   is correct because the run of it is not longer than
18   50 feet.
19             That tells me that that from this
20   section of the ramp, it -- in fact, it doesn't have
21   to have an intermediate landing.  But as I
22   mentioned, I suspect because they didn't have the
23   ability to measure the height that they were
24   operating under the assumption -- that Stoner and
```

Exhibit 5 Page 9

37

```
1   her group were operating under the assumption that
2   it was a standard 1:12 ramp.  And, in fact, it's
3   actually shallower or easier to get up than a 1:12
4   ramp.
5        Q    You mentioned that 403 is just --
6   isn't the actual measurements of the ramp.  This is
7   something that was design- -- when designed by
8   Ellerbe Becket, you say those dimensions were on
9   the drawing, correct?
10       A    Those dimensions are on the drawings.
11  As I indicated, that's a true horizontal dimension.
12  And, again, I suspect that the -- I haven't done
13  the trigonometry, but I suspect that the 47 feet
14  would be the -- the length if you -- if you laid it
15  out.
16       Q    But Exhibit 403, the drawing of the
17  ramp, isn't an exact dimension of the current
18  physical ramp at Cermak?
19       A    I have no -- I have no reason to
20  suspect that it's materially different.
21       Q    Have you, on behalf of Cook County,
22  gone out to measure the rise of the ramp?
23       A    As I said, the only way to measure the
24  rise of the ramp is with a laser sight.  And
```

38

```
1   someone else did that, and I reviewed it.  The rise
2   of the ramp was done with a laser sight, laser
3   level, and it's 30 inches on the nose, which is
4   what the design drawings show.
5        Q    Was there somebody at your direction
6   that measured the rise of the ramp?
7        A    I don't know how the gentleman who
8   measured it did that.  I'd have to retrace and
9   figure out, you know, or contact him or whatever.
10  But that's somebody working for Cook County that
11  did it, and he uses that tool every day.
12       Q    Was it done at your direction?
13       A    I don't recall directing him to do so.
14  It may have come indirectly from me, or it may have
15  been something that, for example, the Sheriff asked
16  them to do.
17            As you know, the Sheriff operates
18  the facility, so . . .  And they are in contact
19  with DFM all the time.  They may have asked for it.
20       Q    Do you know the name of the person
21  that allegedly --
22       A    Yeah.
23       Q    -- measured the rise?
24            What is the -- He hasn't been
```

39

```
1   disclosed by -- by defense counsel.  That person
2   hasn't been disclosed by defense counsel to us.
3        A    Hang on.  Hang on.  I don't know that
4   that's true.  I want to provide you with complete
5   information here.
6            (Brief pause.)
7   BY THE WITNESS:
8        A    The person that did that measurement
9   appears to be Joe Merkel, who was a plumber
10  foreman.
11  BY MR. THOMAS MORRISSEY:
12       Q    How do you spell his last name?
13       A    M-e-r-k-e-l.
14       Q    And you say he's a plumber for the
15  Sheriff's Office?
16       A    No, for the Department of Facilities
17  Management.
18       Q    Department of Facilities Management.
19            His title is plumber?
20       A    I believe his title is plumber
21  foreman.
22       Q    And do you know when Mr. Merkel did a
23  measurement of the Cermak ramp?
24       A    On or about March 10th of this year.
```

40

```
1        Q    2021?
2        A    Correct.
3        Q    Does Mr. Merkel have a degree in
4   architecture?
5        A    I don't know if he does or not.
6        Q    Did you direct Mr. Merkel to make a
7   measurement --
8        A    No.
9        Q    -- of the Cermak ramp?
10       A    No.
11            MR. BENTLEY:  Let Tom finish the
12  question before you give the answer, Eric, even if
13  you know where he's going with it.
14            THE WITNESS:  I'm sorry.
15            MR. BENTLEY:  It's just -- It's really
16  hard with the -- With the Zoom and the court
17  reporter, we've got to just --
18            THE WITNESS:  Okay.
19            MR. BENTLEY:  -- take a pause after
20  every question.
21            THE WITNESS:  All right.  Thank you.
22  BY THE WITNESS:
23       A    I'm sorry, Mr. Morrissey.
24            Go ahead.
```

Exhibit 5 Page 10

41

```
1   BY MR. THOMAS MORRISSEY:
2       Q    My question is, at your direction, did
3   Mr. Merkel, Joe Merkel, measure the Cermak ramp to
4   determine whether it complied with the ADA
5   standards?
6       A    I did not direct Mr. Merkel, no.
7       Q    Do you know who might have directed
8   Mr. Merkel to do a measurement of the Cermak ramp
9   on March 10th, 2021?
10      A    I'm hypothesizing, but I would assume
11  he'd get direction from one of the managers from
12  the Department of Facilities Management.
13      Q    Do you know the professional
14  qualifications of Mr. Merkel in regards to the
15  Americans with Disabilities Act to measure
16  compliance with the 1991 or 2010 architectural
17  design standards?
18      A    I can't stipulate to his
19  qualifications, so I guess the short answer is no;
20  however, it appears from the information provided
21  that he is using a tool in the form of a laser
22  level that he is highly qualified to use.
23           Whether or not his evaluations of
24  the -- of the ADA, I -- I don't know if he is or
```

42

```
1   isn't, you know, sufficiently knowledgeable to make
2   any kind of conclusions.
3       Q    What is a laser level?
4       A    It's a device that's used by various
5   trades to ensure that things that are installed are
6   level.
7            In the case of a plumber foreman,
8   for example, since plumbing is intended to convey
9   water, you want to know whether pipes are level
10  when you're setting them up or if they have
11  adequate pitch to properly drain.
12           They're also used in construction
13  trades to fabricate a ceiling like the -- The
14  lay-in ceiling behind you there in your office,
15  Mr. Morrissey, is set with a laser level. So it's
16  a fairly common implement in the construction
17  trades.
18      Q    You weren't present when Mr. Merkel --
19      A    No.
20      Q    -- did these drawings?
21           Did you get a copy --
22      A    I'm sorry. I'm sorry. I interrupted
23  you. Go ahead. Finish your question.
24      Q    Did you get a copy of -- Did he do a
```

43

```
1   drawing for you or for the Department of Facilities
2   Management?
3       A    I'm sorry. I wasn't quite able to
4   hear you.
5       Q    Did he do any type of rendering or
6   drawing in regards to the Cermak ramp?
7       A    I don't know if he did a drawing or
8   not. I haven't seen anything from him. All I've
9   seen is the information relative to his laser
10  measuring.
11      Q    Did you receive a report from
12  Mr. Merkel?
13      A    He copied me on the transmission of
14  this -- of these laser measurements.
15      Q    Who else was -- Was that an e-mail, or
16  was that a --
17      A    It was an e-mail. And I apologize. I
18  want to speak to counsel.
19           THE WITNESS: I thought this was
20  material that the Plaintiff's counsel had already.
21           Jack, is this something -- I was
22  under the impression this was something they
23  already have.
24           MR. BENTLEY: I gave them photographs
```

44

```
1   of this laser measurement. I didn't get anything
2   else from you about it, though, Eric.
3           THE WITNESS: Okay.
4           MR. BENTLEY: That's all I got.
5           So if there's more -- If there's
6   more that's connected to this, then I need to get
7   it to counsel, so . . .
8           THE WITNESS: Okay.
9   BY MR. THOMAS MORRISSEY:
10      Q    What I'd like to --
11          THE WITNESS: Yeah. I thought I had
12  sent -- Those photos came from an e-mail, Jack, and
13  I thought I had sent you the e-mail as well.
14          MR. BENTLEY: No. But that's okay.
15  I'll make sure we get it as soon as we're done
16  here.
17  BY MR. THOMAS MORRISSEY:
18      Q    Well, do you have a copy of it in
19  front of you, Mr. Davis?
20      A    Yeah.
21      Q    Yeah. I'd like to -- to review that
22  document right now.
23      A    Do you want me to put it on the screen
24  for you?
```

Exhibit 5 Page 11

45

1           MR. BENTLEY: Send it to me first. I
2 need to just make sure there's nothing --
3           THE WITNESS: You sent it to me at
4 1:29, Jack.
5           MR. BENTLEY: I sent you an e-mail
6 from Joe Merkel?
7           THE WITNESS: Yeah.
8           MR. BENTLEY: At 1:29?
9           THE WITNESS: You sent me an e-mail at
10 1:29 that includes the e-mail, yeah.
11           (Brief pause.)
12           THE WITNESS: I was under the
13 impression --
14           MR. BENTLEY: Okay. Well --
15           THE WITNESS: -- that I sent it --
16           MR. BENTLEY: -- I guess I --
17           THE WITNESS: I had the impression --
18           THE STENOGRAPHER: You're talking at
19 the same time.
20           THE WITNESS: Sorry.
21           MR. BENTLEY: I will send this e-mail
22 to Mr. Morrissey right now.
23           Tom, if you want to keep going
24 with your questions, I'll get this to you

46

1 momentarily.
2           MR. THOMAS MORRISSEY: We'll take a
3 five-minute break. Can you send it to me? And
4 I'll take a look at it.
5           MR. BENTLEY: Yep.
6           (Whereupon, a brief recess
7           was had.)
8           MR. THOMAS MORRISSEY: Ms. Court
9 Reporter, we're going to go back on the record.
10           I'm going to mark a series of
11 documents that Mr. Bentley just e-mailed me as
12 Group Exhibit 406.
13           (Whereupon, Group Exhibit
14           No. 406 was marked for
15           identification.)
16 BY MR. THOMAS MORRISSEY:
17    Q    And the first page of Group 406 is an
18 e-mail from David Theising to Eric Davis --
19    A    Can you hear me okay? It cut out.
20    Q    -- drafted by Altus --
21    A    My video froze again.
22    Q    I think it was March of 2021. Is
23 there anything that says . . .
24           THE WITNESS: Kelly, can you hear me

47

1 okay?
2           THE STENOGRAPHER: Yes. I can hear
3 you.
4           THE WITNESS: Okay. Thank you.
5           (Whereupon, a discussion was
6           had off the record.)
7 BY MR. THOMAS MORRISSEY:
8    Q    Mr. Davis, looking --
9    A    Yes, sir.
10    Q    -- at that e-mail from David Theising
11 to you, David Theising is with STV, correct?
12    A    He is with the STV/CBR -- CBRE Heery
13 Joint Venture, which is our program manager for the
14 Public Safety Portfolio, yes. He's a consultant of
15 the County.
16    Q    And he's a consultant in regards to
17 projects, including the projects at Cook County
18 Jail, correct?
19    A    Correct.
20    Q    Okay. And below that appears to be
21 the -- the notes by Ellen Stoner from her
22 walkthrough on -- in March of 2019, correct?
23    A    I think it's 2018, but yes.
24    Q    And you're familiar with -- with those

48

1 notes, correct?
2    A    I'm familiar with the notes, yes.
3    Q    Do you disagree now with Sheila --
4 with Ellen Stoner's conclus on that the run exceeds
5 Code requirements?
6    A    Yes. But I think I know -- I think
7 it's because it's based on incomplete information,
8 information they did not have.
9    Q    Do you -- To your knowledge, no other
10 architect has gone out to measure for ADA
11 compliance the Cermak ramp?
12    A    I'm not aware of anybody else having
13 done that on our behalf, no.
14    Q    Why have you not gone out and looked
15 at and measured the Cermak ramp given that you're
16 being produced by the County in part as a
17 Rule 30(b)(6) deponent and are the Deputy Director
18 of Capital Planning and Policy? Why haven't you
19 gone out to examine and inspect the Cermak ramp to
20 see why it's -- to see if it's compliant or not
21 with the ADA?
22    A    Because I have no reason to suspect
23 that their measurements are wrong. My disagreement
24 with the conclusion is based upon what they write

Exhibit 5 Page 12

49

1    about the measurements.  I don't -- I don't need to
2    go put a tape measure to it to understand the
3    difference between what they're asserting and what
4    I believe to be case.
5        Q    So you don't think it's necessary to
6    formulate an opinion in regards to the compliance
7    of the Cermak --
8        A    I didn't say that.
9        Q    Well, let me --
10            MR. BENTLEY:  Let him finish.  You've
11   got to let him finish --
12            THE WITNESS:  I'm sorry.
13            MR. BENTLEY:  -- his question.
14            THE WITNESS:  I'm sorry.  I did it
15   again.
16   BY MR. THOMAS MORRISSEY:
17       Q    Let me finish --
18       A    I apologize.
19       Q    Are you offering an opinion on behalf
20   of Cook County that the Cermak ramp is compliant
21   with either the 1991 ADA architectural standards or
22   the 2010 standards under the ADA?
23            MR. BENTLEY:  I'm going --
24

50

1    BY THE WITNESS:
2        A    I'm offering --
3            MR. BENTLEY:  -- to object that this
4    is outside the scope of the 30(b)(6) Notice.
5    There's no provision in the Notice that requires
6    this witness to have an opinion as to the
7    compliance of the ramp.
8            That being said, he can testify
9    as an individual as to whether or not he has that
10   kind of an opinion.
11           Go ahead.
12   BY THE WITNESS:
13       A    It's my professional opinion that the
14   ramp, meaning the walking surface, as currently
15   constructed is compliant with the requirements that
16   were in force when the building was constructed.
17   BY MR. THOMAS MORRISSEY:
18       Q    Were there requirements under the 1991
19   standards in regards to handrails for a ramp when
20   you -- for a ramp?
21       A    Yes.
22       Q    And what are the requirements?  What
23   were the requirements in 1991 and thereafter up to
24   2010 in regards to the requirements for handrails?

51

1        A    In general, you are supposed to have
2    handrails along the ramp or stair, including a
3    minimum projection of those rails beyond the end of
4    the ramp.  In other words, you're supposed to go --
5    And I believe that the standard was in place in '91
6    as well as in the 2010 edition.
7            You're supposed to extend
8    those -- those handrails 12 inches beyond the end
9    of the ramp at the top and generally approximately
10   two feet -- it's different for a stair than a
11   ramp -- approximately two feet from the bottom of a
12   ramp.
13       Q    And are there specific standards under
14   the 1991 ADA Code regarding handrails for ramps?
15       A    Yes.
16       Q    And what do they require?
17       A    They require a handrail.  They say it
18   needs to be -- I believe the dimension is a nominal
19   inch and a half in diameter and a nominal inch and
20   a half from the surface of a wall.
21           They are to be typically
22   30 inches above the walking surface and measured
23   vertically.  They are -- There are other
24   stipulations, depending on what the side condition

52

1    of the ramp is, and you have to, then, also have
2    guardrails which don't apply in this case.
3        Q    Does the Cermak ramp have handrails
4    that comply with either the 1991 or 2010 standards?
5        A    From the photographs and my
6    recollection, they are not handrails.  They are
7    bumpers.
8        Q    So my question, then, is, does the
9    ramp -- did the Cermak ramp, when it was built in
10   1994 or 1995, comply with the ADA standards of
11   1991, when it was built?
12       A    From the in- -- If you're asking a
13   question about the ramp and the handrails, from the
14   information that I have, it appears that the
15   handrails were not compliant.
16       Q    And you haven't -- So at a minimum,
17   it's your understanding that the ramp would have to
18   be modified in order to comply with the 1991
19   standards in order to handrails -- in order to have
20   handrails, correct?
21       A    To be clear, the handrails would need
22   to be provided.  The ramp itself is fine.
23       Q    But you're basing that on -- on a
24   document you received apparently from a plumber

Exhibit 5 Page 13

53

```
1   working for Cook County, correct?
2        A     All that the documents that you're
3   referring to from the plumber does is verify the
4   information on the design drawings.  The design
5   drawings indicate a ramp that was compliant, and it
6   appears that it is constructed as such.
7        Q     Going to the next document in Group
8   Exhibit 406, and it's a document -- The next
9   document is from you to a Timothy Tyrrell,
10  facilities manager, on March 9th, 2021.
11       A     Okay.
12       Q     And its "Subject" is "Cermak ramp."
13             And who is Mr. Tyrrell?
14       A     Timothy Tyrrell is one of the managers
15  on-site there at the Department of Corrections
16  campus for the Cook County Department of Facilities
17  Management.
18       Q     And did you attach a diagram of the
19  1991 standards for a ramp?
20       A     I don't think I put that on there.  I
21  don't remember if I did --
22             THE WITNESS:  Can you pull that up?
23  BY THE WITNESS:
24       A     I don't think I put that on.  I think
```

54

```
1   someone else may have, and I was just responding to
2   it.  I don't recall.
3             (Brief pause.)
4             MR. THOMAS MORRISSEY:  Is it on the
5   screen?  Jack, are you putting that on the screen?
6             MR. BENTLEY:  I'm putting it up.  Just
7   give me a second.
8             (Whereupon, document was
9             displayed via screen-share.)
10            MR. BENTLEY:  Okay.
11  BY THE WITNESS:
12       A     Okay, yeah.  That might have been --
13  Yeah.  All right.
14  BY MR. THOMAS MORRISSEY:
15       Q     Do you recognize that diagram which
16  was --
17       A     Yes.
18       Q     -- attached apparently to your e-mail?
19       A     Yeah, I do.
20       Q     What does that diagram depict?
21       A     It's depicting a Code-compliant ramp.
22       Q     And does it have the required
23  handrails?
24       A     It appears that they are.  I can't see
```

55

```
1   the whole image in this -- in this case.  I don't
2   know if he has sufficient overrun at the bottom,
3   but it appears to, in general, have that, yes.
4        Q     Does this diagram come from the 1991
5   standards?
6        A     I think there's actually a -- It's
7   from the Access Board.  If you note at the bottom,
8   there's a URL.  I believe it's generated by the --
9   by the Access Board, which is a federal
10  interpretative agency.
11       Q     And does that reflect the standards
12  for handrails for a ramp that existed at the time
13  the Cermak building was constructed?
14       A     I believe so, yes.
15       Q     And based upon your understanding of
16  the Cermak ramp as it exists today, in 2022, the
17  ramp does not have the handrails which are
18  required, correct?
19       A     To be clear, the diagram is indicating
20  a ramp that does not have sidewalls, and the Cermak
21  ramp does.  So what this is showing is handrails
22  that also provide protection so that someone
23  doesn't fall off the sides of the ramp.
24       Q     Well, this --
```

56

```
1        A     In the case -- in the case of -- Let
2   me finish.
3              In the case of Cermak, since
4   there are walls there, all that would be required
5   is something at hand height, which is nominally
6   30 inches above the surface.
7              So is this the exact
8   configuration of what it's supposed to look like?
9   No, because there are walls on the sides of the
10  Cermak ramp.
11       Q     But are there -- To your knowledge,
12  are there handrails 30 inches from the sidewalls?
13       A     I don't believe there are, no.
14       Q     So the ADA ramp currently doesn't
15  comply with the requirements to have handrails.  Is
16  that correct?
17       A     That's what I understand, yes.
18       Q     And I'm looking at an e-mail from
19  Mr. Tyrrell to Zach Pestine on March 9th, 2021, in
20  this Group Exhibit 406, and it says, "The
21  measurements taken were of the ramp from the tunnel
22  to the basement entrance at Cermak.  It seems that
23  this is the ramp referenced in the complaint.
24             "With that being said, I do not
```

Exhibit 5 Page 14

57

1  think that either ramp is ADA compliant.
2          "I am asking -- I'm adding
3  Joe Merkel, as he is the one who took
4  measurements."
5          Do you see that?
6      A   Yes.
7      Q   Is that the same Joe Merkel you're
8  referring to?
9      A   Yes.
10     Q   And Mr. Merkel works for Mr. Tyrrell?
11     A   Correct.
12     Q   And then we have an e-mail below from
13 Sabrina Rivero Canchola on March 9th, 2021, at
14 2:00 p.m. to Eric Davis, carbon --
15     A   Yes.
16     Q   -- copy to Timothy Tyrrell, and it's
17 about the Cermak ramp.
18         And it says, "I believe the
19 litigation in question is asking about the old ramp
20 outside the Cermak basement entrance. I don't
21 believe it has any landings, but I'm not sure if
22 that was required at the time that it was built.
23 Zach, can you clarify what you need? Either way I
24 think it's good to have the measurements of the

58

1  RTU . . . ramp as well."
2          MR. BENTLEY:  I'm just going to object
3  to the -- because this was clearly privileged
4  communication.
5          But that being said, anything
6  substantive that's relevant to the case and within
7  the scope of Mr. Davis's knowledge, you can testify
8  to.
9  BY THE WITNESS:
10     A   Okay.  Is there --
11 BY MR. THOMAS MORRISSEY:
12     Q   Did you --
13     A   -- a question there?
14     Q   Did you respond to that -- that e-mail
15 from Sabrina Canchola?
16     A   I don't remember if I did or not.
17 There's a chain there.  I don't know.  Is the next
18 up one something from me?  I don't know.
19     Q   Below there -- On Page 5 of this Group
20 Exhibit 406, there's something from -- from
21 Sabrina Rivero Canchola at 2:54 to Timothy Tyrrell,
22 and you're copied on it, "Subject:  Cermak ramp."
23 "Thank you very much TJ for your assistance."
24         Do you know who she's referring

59

1  to as "TJ"?
2      A   That's how Timothy Tyrrell is referred
3  to.  Everybody calls him TJ.
4      Q   And it says, "Good afternoon.  Please
5  see below for requested measurements:  Cermak Ramp
6  Measurements, Width 10 feet slope" --
7          THE WITNESS:  Can you -- Can you
8  scroll down?  Because I think he's talking about a
9  different part of this, Jack.
10         (Scrolling.)
11         THE WITNESS:  Okay.  Keep going down.
12 I think he's talking about something earlier in the
13 chain.
14 BY MR. THOMAS MORRISSEY:
15     Q   Are these -- Are these measurements of
16 the Cermak ramp where it talks about "Width 10-feet
17 slope (measured in different locations on [the]
18 ramp) 1:16"?
19         THE WITNESS:  Scroll down just a bit
20 more, Jack.
21         (Scrolling.)
22 BY THE WITNESS:
23     A   Yeah.  That's what he's referring to.
24

60

1  BY MR. THOMAS MORRISSEY:
2      Q   Slope (measured in different
3  directions) 1:16; length of ramp 44 feet and a
4  half; total rise two feet, seven inches.
5      A   Yeah.
6      Q   What is meant by "total rise two feet,
7  seven inches"?
8      A   That's the rise.  And I think if you
9  look in the other e-mail, there's an explanation of
10 that, and it actually two feet, six inches.
11         If you look at the e-mail that
12 has the photographs with it --
13     Q   Well, this --
14     A   -- it indicates that that was -- that
15 was made by the building joints, not made actually
16 measuring with the laser level.  It's inexact.
17         MR. BENTLEY:  Just answer his
18 questions directly, Eric, and then let him --
19         THE WITNESS:  Sorry.
20         MR. BENTLEY:  -- follow up with what
21 he wants to know.
22         THE WITNESS:  Sorry.
23 BY MR. THOMAS MORRISSEY:
24     Q   This is a measurement by -- This is a

Exhibit 5 Page 15

61

1    communication from Timothy Tyrrell who's in charge
2    of Facilities Management.  Is that correct?
3         A     At the DOC, yes.
4         Q     And the measurement he's giving on
5    March 8th, 2021, at 2:54 is a rise of 31 inches,
6    correct?
7         A     Correct.
8         Q     And if the rise is 31 inches, then --
9         A     Yes.
10        Q     -- the Cermak ramp is out of
11   compliance from the ADA?
12        A     That would be correct, yes.
13        Q     Either the 1991 standards or the 2010
14   standards?
15        A     Correct.
16        Q     And, again, you haven't measured it,
17   correct?
18        A     I have not personally measured it, no.
19        Q     So if the rise is over 30 inches, then
20   the Cermak ramp is not compliant -- compliant with
21   the 1991 or 1992 -- the 1991 or the 2010 standards?
22        A     If -- and I want to emphasize "if" --
23   that were the case, then yes.  It would not be in
24   compliance.

62

1         Q     And it looks like the next e-mail is
2    from Mr. Pestine to Sabrina Canchola on March 8th
3    asking if -- if anybody's taking measurements of
4    the Cermak ramp, correct?
5         A     That appears to be the case, yes.
6         Q     On the next page, Sabrina Canchola
7    says she's adding Duncan and Mike Carberry to this
8    e-mail.
9               Who are those individuals?
10        A     Those are other managers of DFM on the
11   26th and California campus.
12        Q     Do you know what Mr. Duncan's position
13   is?  Is it --
14        A     I believe --
15        Q     -- Duncan Smith?
16        A     Duncan Smith.  He's one of the deputy
17   directors.
18        Q     Does he have an architectural
19   background?
20        A     No.
21        Q     Does Mr. --
22        A     Not that I'm aware.
23        Q     Does Mr. Tyrrell have either an
24   engineering or an architectural background?

63

1         A     I don't know if he does or not.
2         Q     Mike Careberry [sic], who is he?
3         A     Carberry.
4         Q     Carberry.
5         A     Carberry is another deputy director.
6         Q     And do you know if he has a
7    professional license as an engineer or architect?
8         A     No, I do not.
9         Q     And Joseph Tse, Joey Tse, is -- Who is
10   Joey Tse?
11        A     Oh, Joey Tse is -- he's part of the
12   STV/CBRE team.  He's a project manager, so he works
13   with David Theising.
14        Q     And then this is an earlier e-mail
15   from Mr. Pestine to Sabrina Canchola on March 5th,
16   2021, asking, "Is there anyone" -- "Is there a way
17   someone can go to the ramp and measure the length,
18   width, and slope?"
19              Do you see that?
20        A     Yes.
21        Q     Do you know a Mr. Gumm?
22        A     Michael Gumm, I believe you're
23   referring to, used to be the ADA director for the
24   County.

64

1         Q     Have you reviewed any documents that
2    Mr. Gumm did any type of review of the Cermak ramp?
3         A     I've attempted to find them.  I
4    haven't been able to locate them because -- It's an
5    issue with our e-mail system, and I'm trying to get
6    that resolved with our Bureau of Technology.
7               Mr. Gumm left the County two or
8    three years ago, and so I'm having to try to
9    identify if there were any discussions that he may
10   have had before then because I can't see the older
11   e-mails.
12        Q     So then I'm looking at an e-mail on
13   March 4th, 2021, from Sabrina Rivero Canchola,
14   11:19, to Sheila Atkins of Capital Planning, you're
15   included on this e-mail.
16              And it states, "Yes the old ramp
17   that is right outside the basement door.  I believe
18   Michael Gumm took measurements at one point."
19              Do you have any knowledge whether
20   Gumm took -- took measurements of the Cermak ramp?
21        A     I don't know if he did or not.  I
22   don't know, you know.  I do not know.
23        Q     From this Group Exhibit No. 406, which
24   was just turned over by -- by defense counsel, I

Exhibit 5 Page 16

65

```
1    don't see any -- any indication or documentation
2    that the rise of the ramp is 30 inches or less.
3                Can you point that out for me,
4    where I'm missing . . .
5        A    Certainly.
6                (Brief pause.)
7    BY THE WITNESS:
8        A    Okay.  There is -- In that e-mail,
9    there is a notation and photographs.
10                So do you have that in front of
11   you?
12   BY MR. THOMAS MORRISSEY:
13       Q    I have the entirety.
14       A    There's --
15       Q    I think I went through the entirety of
16   Group Exhibit 406.
17       A    Okay.  So there's the e-mail from
18   Mr. Merkel to TJ and Zach and me and Sabrina dated
19   March 10th, 2021, at 12:54 p.m.
20                Do you see that?
21       Q    I don't have that.
22       A    That's in that e-mail --
23       Q    What --
24       A    -- at the very top.
```

66

```
1                (Scrolling.)
2                THE WITNESS:  It's not that one, Jack.
3    It's the other one.  It's the one that has the
4    pictures, not that one.
5                (Scrolling.)
6                THE WITNESS:  Yeah.  It's not in that
7    one.
8    BY MR. THOMAS MORRISSEY:
9        Q    So it's not in Exhibit 406, which we
10   just --
11       A    Actually, Mr. -- I believe it is.
12                If you look at the e-mail, do you
13   see an e-mail from Joe Merkel dated March 19, 2021?
14   It was on the screen earlier, and I think that's
15   what he sent you.
16       Q    I have an e-mail on March 10, 2021,
17   from David Theising -- to to you at 4:02.
18       A    No.  That's not -- That's not what I'm
19   referring to.
20       Q    Then there's another one from Joey Tse
21   to David Thistle [sic] at 2:15 or March 10th.
22       A    I saw --
23                MR. BENTLEY:  The bottom line is, the
24   question was, was there anything in the e-mails
```

67

```
1    that we just reviewed in Exhibit 406 that indicated
2    that the ramp is 30 inches in terms of rise,
3    correct?  That's the question.
4                THE WITNESS:  Yes.
5                MR. BENTLEY:  Okay.  So what's the
6    answer to that question?
7    BY THE WITNESS:
8        A    So the answer to that question is --
9    And, again, I'm referring to measurements taken by
10   Mr. Merkel, and he says, "The total rise changed
11   from approximately 31 inches to 30 inches.  I had
12   originally had approximately 31 going off a mortar
13   joint."
14                And then he indicates that he --
15   he used the laser to get the exact measurement for
16   the total rise of the ramp and rechecked the
17   measurements of the ramp, and he indicated the math
18   involved, basically from 2 and 5/16ths inches to
19   32 and 5/16th inches indicating it is spot-on a
20   30-inch rise.
21                And then following that text of
22   that e-mail is our images with the laser level
23   confirming the bottom and top dimensions of the
24   ramp which confirms that, in fact, the rise of the
```

68

```
1    ramp as constructed is 30 inches, not 31 inches.
2        Q    Point me to that document in Group
3    Exhibit 406.
4        A    Are you asking me or Jack?
5        Q    I'm asking either one.
6                (Brief pause.)
7                MR. BENTLEY:  So what are we doing
8    right now?
9                MR. THOMAS MORRISSEY:  Well, we're
10   waiting --
11                THE WITNESS:  I thought you were
12   looking --
13                MR. THOMAS MORRISSEY:  -- for the
14   deponent to point out where on Group Exhibit 406
15   the document is what he just said.
16   BY THE WITNESS:
17       A    Oh, I thought -- I'm sorry.  Were you
18   waiting for me?  I thought you were waiting for
19   Jack.  I was talking --
20                THE WITNESS:  Because, Jack, I saw the
21   image on the screen earlier of the e-mail I'm
22   referring to, and I thought that was something --
23                MR. BENTLEY:  Do I need to share the
24   screen?  I need to share the screen again.  That's
```

Exhibit 5 Page 17

69

1    what you're asking me?  Okay.  Got it.
2              THE WITNESS:  Because I thought that's
3    what you sent to Mr. Morrissey is 406.  And if I'm
4    misunderstanding, I apologize.
5              (Brief pause.)
6              (Whereupon, Plaintiff's Exhibit
7              No. 406 was displayed via
8              screen-share.)
9              MR. BENTLEY:  Okay.  406 is back up.
10             THE WITNESS:  Oh, no.  That's not the
11   one.
12             MR. BENTLEY:  Well, this is what I
13   sent.
14             THE WITNESS:  Maybe it's in -- Maybe
15   it's in there, so go down.  Is this March 9th?  No.
16   This is from March 10th.  What I'm talking about is
17   from March 10th.
18             (Scrolling.)
19             THE WITNESS:  This is all older,
20   unless it's at the bottom.
21             (Scrolling.)
22             MR. BENTLEY:  This is what we just
23   went through.
24             So what are you looking at, Eric?

70

1              THE WITNESS:  I'm looking at an e-mail
2    from Joe to TJ on March 10th that actually I -- it
3    originally was an e-mail from me to Joe and TJ that
4    same day.
5              MR. BENTLEY:  Okay.  So don't -- Don't
6    read from your -- any more e-mails from your
7    computer.
8              THE WITNESS:  Okay.
9              MR. BENTLEY:  Read them from the
10   exhibit.
11             THE WITNESS:  Okay.
12             MR. BENTLEY:  But now that you've read
13   that into the record, now I have to produce it.  So
14   please forward it to me.  I'm going to look at it
15   and make a determination if I can produce it.
16             I've already produced this e-mail
17   with several privileged communications.  I'm going
18   to try to do avoid doing that this time.
19             THE WITNESS:  Okay.  I've done that.
20             MR. THOMAS MORRISSEY:  We'll go off
21   the record for --
22             How long do you need, Jack?
23             MR. BENTLEY:  Just two minutes.
24             MR. THOMAS MORRISSEY:  All right.

71

1    We'll come back at 3:30.
2              MR. BENTLEY:  Okay.
3              MR. THOMAS MORRISSEY:  And if you can
4    send it to me in the interim, that would be good.
5              MR. BENTLEY:  All right, yeah.  I'm
6    doing it.
7              (Whereupon, a brief recess
8              was had.)
9              MR. BENTLEY:  Just for the record, I
10   am trying to extract -- Because there's one e-mail
11   in this that is between the witness and counsel
12   that is privileged information, I'm trying to
13   extract that e-mail and send the rest.  But the
14   e-mail from Joseph Merkel that Mr. Davis just read
15   into the record, I'm going to get that to you as
16   soon as I can figure it out, including the
17   photographs that were in that e-mail that have
18   already been produced.
19   BY MR. THOMAS MORRISSEY:
20        Q    I'm going to ask you to turn to Group
21   Exhibit, it looks like, 402.  There's some
22   photographs.
23             MR. BENTLEY:  Well, I can't do two
24   things at once.  I can't share exhibits and try to

72

1    extract this e-mail, so . . .  Maybe you could
2    learn how to share your screen while we're waiting,
3    Tom.
4              MR. THOMAS MORRISSEY:  We sent the
5    documents to you to send to your clients, so . . .
6              MR. BENTLEY:  Okay.  Let me see if
7    this works.  All right.  I'm just pasting the text
8    of the e-mail.  I'll get you a cleaner copy of that
9    later; but for now, this will give you what you
10   need to move on with the dep.
11             MR. THOMAS MORRISSEY:  Can you send it
12   to Pat, Jack?
13             Can you turn to Exhibit 402 while
14   we're printing what you just sent me, Jack, and put
15   402 on the screen?
16             (Brief pause.)
17             MR. THOMAS MORRISSEY:  Do you have the
18   photographs, Jack, in 402?
19             MR. BENTLEY:  Yep.
20             MR. THOMAS MORRISSEY:  Are they being
21   shared with Mr. Davis.
22             (Whereupon, Exhibit No. 402,
23             previously marked, displayed
24             via screen-share.)

Exhibit 5 Page 18

73

```
1              MR. BENTLEY:  They're up.
2    BY MR. THOMAS MORRISSEY:
3         Q    Mr. Davis, I'm showing you a group
4    exhibit.  They were produced by -- by the County.
5    It's Bates stamped 016108 through -- 016114.
6              Do you recognize these
7    photographs?
8              MR. BENTLEY:  Eric, are you there?
9              THE WITNESS:  Sorry.  I had it muted.
10   BY THE WITNESS:
11        A    Are you talking about the ones that
12   are on the screen now?
13   BY MR. THOMAS MORRISSEY:
14        Q    That's correct.
15        A    Yes.
16        Q    Do you know --
17        A    I recognize those.
18        Q    Do you know who took the photographs?
19        A    If you scroll up, I believe they were
20   taken by Joe Merkel.
21        Q    Do you know when Mr. Merkel took the
22   photographs?
23        A    I believe on or about the 10th of
24   March, 2021.
```

74

```
1         Q    Were you present when the photographs
2    were taken?
3         A    No.
4         Q    Do you believe these photographs are a
5    fair and accurate depiction of the Cermak ramp in
6    March of 2021?
7         A    Yes.
8         Q    To your knowledge, has the Cermak ramp
9    been altered since March of 2021?
10        A    No.
11        Q    Can you tell me, looking at the
12   picture depicted on 016108, what that depicts?
13        A    If that's the image that's on the
14   screen, this is the bottom of the ramp.
15        Q    If we look at the --
16        A    I think that's the bottom.
17        Q    And that would be for the entrance to
18   the Cermak infirmary, correct, the bottom of the
19   ramp?
20        A    I believe so, yeah.
21        Q    If we look at --
22        A    Yeah.  I believe so, yes.
23        Q    If we look at the next photograph,
24   it's Photograph 016109, do you know what that
```

75

```
1    photograph depicts?
2         A    That depicts the laser level tape
3    measure indicating a dimension of approximately
4    32 feet -- excuse me -- 32 and 5/16ths inches.
5         Q    Do you know who -- Do you have
6    personal knowledge who -- who was using the tape --
7    who put the tape measure in the -- in the diagram
8    or the picture?
9         A    I don't know.  It's my assumption that
10   it was Joe Merkel or someone at Joe's direction.
11        Q    And what area of the ramp is -- is the
12   measurement of 32 and -- 32 inches and a half being
13   depicted in Photograph --
14        A    If you scroll down, I believe -- If
15   you scroll down, I believe the caption is that it's
16   at the bottom of the ramp.  No.
17             It's at the bottom of the ramp.
18        Q    How do you know that?
19        A    Well, it's described in Mr. Merkel's
20   e-mail as such.  So in other words, that's the
21   offset from the bottom of the ramp to the elevation
22   of the laser at the top of the ramp.
23        Q    And would that indicate that the ramp
24   is -- the rise of the ramp is greater than
```

76

```
1    30 inches?
2         A    No.
3         Q    What would it indicate in regards --
4    Would it have any -- any bearing on whether or not
5    the rise of the ramp was 30 inches or more?
6              THE WITNESS:  Can you scroll to the
7    other image of the laser on the tape, Jack?
8              (Scrolling.)
9              THE WITNESS:  That one.
10   BY THE WITNESS:
11        A    Okay.  That is the second measurement.
12             Can you see that, Mr. Morrissey?
13   BY MR. THOMAS MORRISSEY:
14        Q    And that's -- You're referring to the
15   picture that's Bates stamped 06111, correct?
16        A    Correct.
17        Q    Okay.
18        A    Right.  That's a --
19        Q    Do you know if that's --
20        A    That's a --
21             MR. BENTLEY:  Eric, let him ask the
22   questions.
23             THE WITNESS:  I know.  I know.  I'm
24   trying to.
```

Exhibit 5 Page 19

77

```
 1   BY MR. THOMAS MORRISSEY:
 2        Q      It looks like (Webex feed
 3   interruption) . . .
 4             THE WITNESS:  My video is paused or
 5   maybe his is paused.
 6   BY THE WITNESS:
 7        A      Can you hear me?
 8             MR. BENTLEY:  No, I lost -- Now I lost
 9   Tom.  It looks like we lost Tom.
10             THE STENOGRAPHER:  He's back.
11   BY THE WITNESS:
12        A      I'm sorry, Tom.
13             Could you reask your question?
14   BY MR. THOMAS MORRISSEY:
15        Q      Sure.
16             Do you know if you could take a
17   measuring stick --
18        A      Yes.
19        Q      -- and determine the rise of the
20   Cermak ramp?
21        A      No.  I don't believe you could.
22        Q      Why not?
23        A      Because you can't measure the side of
24   the ramp because there are walls on the side of the
```

78

```
 1   ramp.
 2        Q      Okay.
 3        A      If you think about -- if you think
 4   about -- Let me finish my answer.
 5             If you think about the diagram
 6   that you saw -- that you saw earlier that had the
 7   ramp and had an open handrail, that one you could
 8   measure the height of the ramp with a measuring
 9   stick because you could see the side of it, right,
10   and -- because it's open on the sides, and that's
11   why the handrail has additional rails.
12             But in this case, the walls on
13   the side of the Cermak ramp don't allow you to use
14   a measuring stick from the top of the ramp to the
15   bottom of the ramp.
16        Q      Have you ever attempted to do that?
17        A      It would be physically impossible.
18        Q      Do you know what angle the -- the tape
19   measure is at which is depicted in 06111?
20        A      It appears to be vertical or nominally
21   vertical.
22        Q      How do you know that from looking at
23   the picture?
24        A      Because the bottom of the tape measure
```

79

```
 1   has a right angle clip on it.
 2        Q      Do you know whether or not the tape --
 3   the angle on the bottom of the tape measure is
 4   accurate or whether or not it's -- it's square,
 5   flush?
 6        A      I think it's nominally square, yes.
 7        Q      Have you ever examined the
 8   tape measure to determine whether or not it -- it's
 9   accurate?
10        A      No.
11        Q      And looking at this photograph, do you
12   know what portion of the ramp it allegedly is
13   measuring?
14        A      It is measuring the distance from the
15   top of the ramp to the height of the laser itself
16   in a laser level, which is depicted in another one
17   of the photographs.
18        Q      You didn't participate in taking the
19   photograph, correct?
20        A      That's correct.
21        Q      So you have no personal knowledge
22   whether or not --
23        A      When it was transmitted, it was
24   captioned as such.
```

80

```
 1        Q      Well, let me -- Let me complete my
 2   question.
 3             You have no personal knowledge
 4   whether or not the tape measure that was used by
 5   Mr. Merkel on -- on or about March 10, 2021, was
 6   accurate?
 7        A      I have not examined the tape measure
 8   in question, no.  I don't know --
 9        Q      Do you have any personal knowledge
10   whether the laser used by Mr. Merkel was calibrated
11   to ensure that it was accurate?
12        A      No.
13        Q      Do you know what type of laser -- Do
14   you know the brand and the -- and the make of the
15   laser that was used by Mr. Merkel?
16        A      No.
17        Q      And you don't have any personal
18   knowledge exactly what is depicted in -- in this
19   document, this Photograph 06111, as far as where
20   that measuring tape is physically located on the
21   Cermak ramp?
22        A      I only have the information as it was
23   reported to me.
24        Q      Are there any other photographs that
```

Exhibit 5 Page 20

81

1    Mr. Merkel provided to you which depict a
2    measurement of the Cermak ramp?
3        A    I think in this group of photographs
4    that Zach [sic] has on his screen, there is another
5    image of the laser level itself.
6        Q    There are seven photographs.
7             Can you tell me which -- which
8    photograph you're referring to?
9        A    Oh, sorry about that.
10           THE WITNESS:  Go back up to the top.
11               (Scrolling.)
12   BY THE WITNESS:
13       A    That one -- Not that one.
14               (Scrolling.)
15           THE WITNESS:  That one.
16   BY MR. THOMAS MORRISSEY:
17       Q    It's Photograph 3 out of 7, correct?
18       A    Right.
19       Q    The one that's --
20       A    016110, yeah.
21       Q    Are there any other photographs which
22   depict where the laser was placed in relation to
23   the Cermak ramp for the photographs which are 1
24   through 7 of Group Exhibit 6 -- Group Exhibit --

82

1        A    That's the only photograph I'm aware
2    of.
3        Q    Group Exhibit 402.
4        A    Sorry.  That's the only photograph of
5    the laser level I'm aware of.
6             MR. THOMAS MORRISSEY:  Jack, you sent
7    me some document now.
8             Calling your attention to what
9    now will be marked as 407, it's an e-mail from
10   Joe Merkel dated March 10, 2021, at 12:54 to
11   Timothy Tyrrell and Eric Davis is included in the
12   e-mail.
13           Give me a moment.
14               (Whereupon, Plaintiff's Exhibit
15               No. 407 was marked for
16               identification.)
17   BY THE WITNESS:
18       A    Yes.
19   BY MR. THOMAS MORRISSEY:
20       Q    So you've had an opportunity to read
21   Mr. Forman's [sic] e-mail, correct?
22       A    Mr. Merkel, yes.
23       Q    I'm sorry, Mr. Merkel.
24           And he acknowledges, based upon

83

1    his understanding of an Illinois Accessibility Code
2    1997, that it lacked the required handrails,
3    correct?
4        A    That's what his e-mail says, yes.
5        Q    And you would agree that under the
6    1991 ADA standards that a handrail -- handrails
7    were required for the Cermak ramp?
8        A    I would say that it appears that
9    that's the case; however, Mr. Merkel's e-mail
10   notes -- And I would tend to agree with him.  I'd
11   have to investigate this further and possibly some
12   other people.
13           There may be an exception if
14   there is a life safety issue that doesn't allow it.
15   That's, I think, what he's referring to there.
16           In a normal ramp, I would say
17   yes.  Realizing that this is a corrections
18   facility, there may be an exception that allows
19   them not to be used.  I'm just speculating here.  I
20   cannot say one way or the other.  But in general,
21   yes, but there may be an exception because of the
22   context.
23       Q    To your knowledge, has anybody, since
24   March 10, 2021, from Cook County gone out and

84

1    measured the Cermak ramp to determine whether it's
2    compliant with the -- either the 1991 ADA standards
3    or the 2010 standards?
4        A    I'm not aware if they have or they
5    haven't.  This provides a lot of good information,
6    and I wouldn't know why we would need to do that,
7    but not that I'm aware of.
8        Q    After receiving this e-mail on
9    March 10th, 2021, did the County take any further
10   steps to alter either the handrails or the landing
11   area for the Cermak ramp to comply with the 2010
12   standards or the 1991 standards?
13       A    Yes.
14       Q    Why?
15       A    Because this area is a part of an
16   attempt that we are doing right now to hire an
17   Architect of Record to design -- to identify and
18   design whatever remediations or changes may be
19   necessary to provide compliance based, in part,
20   upon some of the recommendations or other outlines
21   from the Ellen Stoner report and things like this.
22           So yes.  We are in the process of
23   trying to hire an architect to definitively address
24   this question and design, and this way we can

Exhibit 5 Page 21

85

```
1    construct any changes that need to be made.  We've
2    been working on that for a long time, and I know
3    that we've been working on it since March 10th.
4         Q    So in your capacity as deputy director
5    of Capital Planning and Policy, have you advised
6    Cook County and your department that there is no
7    need for a landing area on -- landing area for the
8    Cermak ramp because it's in compliance with either
9    the 1991 or 2010 standards?
10        A    That's not for me to say on a
11   definitive basis, which is why we are hiring an
12   Architect of Record to do that.  It appears that
13   it's not required in my case, but we need to hire
14   someone to make that definitive determination and
15   to design any remediations accordingly.
16        Q    Let's go to Exhibit 400.  It's
17   Defendant Cook County Answer to Plaintiff's Second
18   Set of Interrogatories.
19        A    I don't know which one that is.
20        MR. BENTLEY:  I'm opening it up.  Just
21   give me a minute.
22        THE WITNESS:  Okay.  Thank you, Jack.
23                    (Whereupon, Exhibit No. 400 was
24                     displayed via screen-share.)
```

86

```
1              MR. BENTLEY:  Okay.  I'm sharing my
2    screen, Exhibit 400.
3         THE WITNESS:  Okay.
4    BY MR. THOMAS MORRISSEY:
5         Q    Did you, at the request of the
6    attorney for Cook County, respond to these
7    Interrogatories?
8         A    Yes.
9         Q    And how do you know the construction
10   commenced for the Cermak building in 1996?
11        A    Because the drawings issued for permit
12   were the subject of multiple revisions in 1996 that
13   are the kinds of indications that you have when a
14   project like that is being constructed.
15              The construction drawings were
16   complete, submitted to the City.  They were getting
17   permit comments, and so it appears the construction
18   began in '96 at that point.  That was on the screen
19   earlier.  We had the images of the construction
20   drawings.
21        Q    And Interrogatory No. 3 asks whether
22   Ellen Stoner was directed by STV to review the
23   Cermak ramp to determine whether it complied with
24   the 2010 ADA standards for accessibility design.
```

87

```
1              And you responded that her firm
2    was tasked with that job, correct?
3         A    She was tasked to review the
4    accessibility, yes.  That's my understanding from
5    the information we have.
6         Q    You reviewed her notes from March
7    of 2019?
8         A    2018, you mean?
9         Q    2019, March of 2019.  Was it '18?
10             Do you know whether or not it
11   was in March of 2018 or March of 2019 that
12   Ellen Stoner --
13        A    I believe it was -- I believe it was
14   March of 2018.
15        Q    I'm going to turn to the -- Exhibit
16   No. 8.  Let me know when you get there.
17        A    I believe Jack is bringing it up on
18   the screen.
19                    (Whereupon, document was
20                     displayed via screen-share.)
21        MR. BENTLEY:  No.  Wrong one.  Hold
22   on.
23                    (Whereupon, Exhibit No. 8 was
24                     displayed via screen-share.)
```

88

```
1              MR. BENTLEY:  Okay.
2    BY MR. THOMAS MORRISSEY:
3         Q    I'd ask you to turn to -- Let me ask
4    an initial question:  Are you familiar with the ADA
5    standards that are -- that were in effect at the
6    time of the Cermak ramp being constructed?
7         A    Yes.  In general, yes.
8         Q    And does Exhibit 8 reflect the ADA
9    standards for accessible design that were in effect
10   at the time the Cermak ramp was -- was built in
11   1995 or 1996?
12        A    Relative to what's being shown on the
13   screen, which is the 1991 ADA -- Actually, no.
14   This appears to be the 2010 ADA, so they would not
15   have been -- It's not clear to me if this was the
16   '91 or the 2010.
17             If it was the '91, then yes.  It
18   would have been in effect.  There's a box on the
19   screen here that indicates it references the 2010
20   standards.  So I assume this is the '91, but I'm
21   not sure.
22        THE WITNESS:  Can you scroll down a
23   little bit, Jack?
24                    (Scrolling.)
```

Exhibit 5 Page 22

89

```
1   BY THE WITNESS:
2        A      Yeah. This looks like the '91. Okay.
3               So this was in effect -- The
4   answer to your question, this was in effect. As
5   noted elsewhere, there was a State level -- the
6   Illinois Accessibility Code, which I believe was
7   published in '97, which would have been after this
8   building was permitted and may or may not have
9   provisions that apply.
10              But the ADA itself, the '91 that
11  you're showing on the screen now, is something that
12  would have been -- would have been applicable when
13  the building was permitted for construction.
14  BY MR. THOMAS MORRISSEY:
15       Q      From Group Exhibit 8, I'd ask you to
16  turn to Section 4.8, which involves --
17       A      The ramp section, yeah. It's on
18  Page 27 or something like that.
19              (Scrolling.)
20              MR. BENTLEY: Okay.
21  BY MR. THOMAS MORRISSEY:
22       Q      Tell me when --
23       A      The bottom of Page 27, yeah.
24       Q      And I'd ask you to maybe turn to the
```

90

```
1   top of 28 too.
2               (Scrolling.)
3   BY MR. THOMAS MORRISSEY:
4        Q      Well, let's start on Page 27, the
5   bottom.
6               MR. THOMAS MORRISSEY: I'm going to
7   have to move because we have somebody that's
8   inspecting my roof. So I'm going to take a
9   two-minute break.
10              (Whereupon, a brief recess
11              was had.)
12  BY MR. THOMAS MORRISSEY:
13       Q      Looking at 4.8.2, you agree that for
14  the Cermak ramp, in order to comply with the ADA,
15  the maximum rise for any run shall be 30 inches?
16       A      Yes.
17       Q      And if the measurement of the ramp is
18  over 30 inches, then there had to be a landing
19  within --
20       A      That's correct.
21       Q      And the landing -- there must be a
22  landing -- If we look at the next page, there's a
23  diagram. It says a 1:12 slope less than 1:16,
24  30-inch rise with a maximum of 30 feet, correct?
```

91

```
1        A      That's for a 1:12 slope, yes.
2        Q      And Ms. Stoner measured it as a
3   1:12 slope, right?
4        A      No. She assumed it was 1:12.
5        Q      Well, what her --
6        A      Nothing in her report indicates that
7   she measured the slope itself, only the -- on the
8   horizontal dimension, horizontal or angle
9   dimensions.
10       Q      Well, her measurement -- If we look at
11  Exhibit 4, there is a diagram of her inspection in
12  March of 2018, correct?
13       A      I think I'm remembering the same
14  diagram you're referring to, yes.
15              MR. BENTLEY: I'll pull up Exhibit 4.
16  Just give me a second.
17              (Brief pause.)
18              MR. THOMAS MORRISSEY: It could be
19  much easier if you followed the protocol we use
20  with your office and gave the documents to the
21  deponent.
22              MR. BENTLEY: I did not know that was
23  the protocol. I've never done that in any
24  deposition with you or anyone else. So I'm sorry
```

92

```
1   that I didn't realize that was the protocol, but
2   I'm doing my best here.
3               MR. THOMAS MORRISSEY: Well, can you
4   e-mail them now?
5               MR. BENTLEY: All those attachments,
6   that would take, like, five different e-mails at
7   least.
8               What would be really easy would
9   be if -- Hold on. I'll just e-mail this one for
10  now.
11              (Brief pause.)
12              MR. BENTLEY: I just sent Exhibit 4 to
13  Eric.
14              Eric, check your e-mail.
15              (Brief pause.)
16              THE WITNESS: I haven't received it
17  yet.
18              (Brief pause.)
19              THE WITNESS: There it is.
20              MR. BENTLEY: Got it?
21              THE WITNESS: Yep.
22              (Whereupon, Plaintiff's Exhibit
23              No. 4 was provided to the
24              witness electronically.)
```

Exhibit 5 Page 23

93

BY MR. THOMAS MORRISSEY:

1  Q       The diagram -- First of all, do you
2  recognize the drawing which is depicted in
3  Exhibit 4?
4  A       Yes.
5  Q       And STV's ADA consultant,
6  Ellen Stoner, is the one that created this
7  drawing, correct?
8  A       Mm-hmm.
9  Q       You have to answer "yes" or "no."
10 MR. BENTLEY:  "Yes"?
11 BY THE WITNESS:
12 A       I'm sorry.  Yes.
13 BY MR. THOMAS MORRISSEY:
14 Q       And the notes under "E:  Cermak ramp"
15 are the notes that were prepared by Ellen Stoner?
16 A       I believe so, yes.
17 Q       And do you have any knowledge about
18 her professional background?
19 A       She is a consultant on accessibility
20 and historic preservation issues.
21 Q       Do you know whether or not she is a
22 licensed architect?
23 A       I believe she is.

94

1  Q       And do you believe that she is
2  qualified to assess whether or not the Cermak ramp
3  complied with the ADA standards in 1991 and/or
4  2010?
5  A       I think she's qualified to assess,
6  yes.
7  Q       And under the notes that she made
8  here, under "E:  Cermak ramp," she says, "The
9  existing ramp is 47-feet long without a landing."
10         And that's one way of measuring
11 the ramp, like you testified earlier, correct?
12 A       Correct.
13 Q       And she says the slope of the ramp is
14 within 1:12 maximum slope requirements; however,
15 the run exceed Code requirements.
16         Now, to your knowledge, was she
17 tasked with the job of going out and inspecting
18 various Cook County properties to determine whether
19 or not there may be an accessibility problem under
20 the ADA?
21 A       I believe that she was tasked to go
22 and evaluate whether or not, as you say, there may
23 be accessibility issues.
24 Q       And she made certain recommendations,

95

1  correct?
2  A       Yes.  I believe she made certain
3  recommendations.
4  Q       And one of the recommendations is to
5  create a landing 30 feet from the top of the ramp?
6  A       Mm-hmm.
7  Q       Is that correct?
8  A       That's what this says.
9  Q       And under the 1991 standards, if the
10 rise exceeded 30 inches, then there was a
11 requirement for a landing within -- at 30 feet or
12 more, correct?
13 A       Under the standard that you were just
14 going through, if there is a rise -- the maximum
15 rise for any run is 30 inches.
16 Q       So if it was 30 inches and a half, the
17 requirement under the 1991 ADA standards would
18 require a landing at 30 feet, correct?
19 A       Correct.
20 Q       If there was a rise of 30 inches and a
21 quarter, there's a requirement under the 1991 ADA
22 standards for a landing within 30 feet, correct?
23 A       I would have to check because I
24 believe that the standards also include

96

1  construction tolerances, and I don't know if a
2  quarter of an inch is considered to be within a
3  construction tolerance or not.
4  Q       Do you know if Joe Merkel measured the
5  rise on the right side of the ramp going up?
6  A       It appears that he measured from the
7  middle of the ramp.
8  Q       Do you know what the rise is on the
9  right side of the ramp going up?
10 A       I would assume that the ramp is level,
11 and so the rise would be the same on all sides --
12 Q       Do you have any basis --
13 A       -- the left side, the right side, and
14 down the middle.
15 Q       Do you have any basis for your
16 statement that the ramp is level?
17 A       The photographs that you showed
18 previously suggest that it's level, and I don't
19 remember it being unlevel at any time that I would
20 have walked it.
21 Q       When was the last time you walked up
22 and down the Cermak ramp?
23 A       Probably at least three years ago.
24 Q       And at that time did you take any

Exhibit 5 Page 24

97

1  measurements to see whether or not the rise of the
2  ramp on the right side going up was 30 inches or
3  below?
4       A     As I mentioned before, when I walked
5  it -- again, I believe that I did a long time ago.
6  But as I said before, I didn't take any
7  measurements of it one way or the other.
8       Q     Do you know if Mr. Merkel took any
9  measurements on the right side of the ramp going
10 up?
11      A     From the photographs that we've seen
12 in his discussion, it appears that he measured down
13 the middle of the ramp.
14      Q     Do you know whether or not he took any
15 measurements on the left side of the ramp going up?
16      A     From the images that we have, it
17 appears that he took the measurement down the
18 middle of the ramp.
19      Q     And you don't know whether or not --
20 You have no measurements to determine whether or
21 not the ramp, as one proceeds up, is level
22 consistently, correct?
23      A     I don't have any measurements to show
24 that it is or it is not.

98

1       Q     If a ramp is 31 and a quarter inches
2  on the left side going up, under the 1991 ADA
3  standards, would that comply with the ADA?
4       A     If that were the case -- and I have no
5  information that it is or it is not -- then that
6  would not be compliant.
7       Q     If the ramp on the right side was
8  30 inches and a half going up, would that comply
9  with the 1991 ADA standards?
10      A     With the stipulation I made before
11 about construction tolerances, if that did not
12 mitigate that, I believe that would not comply.
13      Q     Where does it -- Where in the 1991 ADA
14 standards for ramps does it have a tolerance level
15 that would allow a ramp that was 91 [sic] and a
16 quarter on the left side of the ramp going up to be
17 greater than 30 inches and not require a landing
18 within 30 feet?
19      A     Excuse me.  I think you said "91."
20 You meant "31"?
21      Q     Let me rephrase the question.
22            Under the 1991 ADA standards,
23 assuming the rise on the left side of the ramp
24 going up was 31 and one quarter inches, point me in

99

1  Group Exhibit 8 where the 1991 standards permit a
2  rise of 31 and a quarter for a ramp that exceeds
3  30 feet in length without a -- without a landing.
4       A     It doesn't indicate that that I'm
5  aware of.
6       Q     Is that within the tolerance -- Where
7  in the 1991 ADA standards does it provide a
8  tolerance level if the rise of the ramp on one side
9  is 31 and a quarter inches?
10      A     I don't know if that's in there or
11 not, but it should be pointed out that the ADA
12 itself alone is not the only part of the standard.
13 I believe that what I'm referring to in the
14 construction standards were supplemental
15 instructions provided by the Department of Justice
16 in the ADAAG -- that's spelled -- it's an
17 abbreviation, A-D-A-A-G -- [continuing] which is a
18 series of clarifications they did after the ADA was
19 issued, and I think that that's where the
20 stipulations about construction standards reside.
21            So in other words, it's not in
22 the base document.  It is in information provided
23 as clarification after the issuance of the '91.
24 And, again, that's from memory.  I'd have to

100

1  research --
2       Q     All right.  So your --
3       A     -- and determine where it resides
4  exactly.
5       Q     So is it your understanding as a
6  licensed architect that if the rise on the left
7  side of the ramp was 31 and a quarter inches going
8  up, based upon the ADA standards in effect in 1994
9  and 1995, that would comply with the ADA, if there
10 wasn't a landing --
11      A     No.
12      Q     -- within 30 feet?
13      A     No.  If it was 31 and a quarter inches
14 of a rise, that would be too -- that would be too
15 much.  It would require an intermediate landing.
16      Q     And if the rise on the right side of
17 the ramp was 30 inches and a half going up on the
18 right side, would that be in compliance with the
19 ADA in 1991 -- in the 1991 standards when the
20 Cermak ramp was built in 1994 and 1995?
21      A     Following your hypothetical, I would
22 assume not, that it would not comply.
23      Q     And in Group Exhibit 8, are there
24 requirements under the 1991 code in regards to

Exhibit 5 Page 25

101

```
1   handrails for a ramp, such as the Cermak ramp, that
2   was built in 1994 and 1995?
3       A       Just to clarify, is Exhibit 8 the ADA
4   itself, or is that the document that includes the
5   Stoner diagram?
6       Q       Exhibit 8 are the ADA standards that
7   were in effect in 1991.
8       A       Yes.  There are handrail standards in
9   the '91 ADA, yes.
10      Q       Can you point -- point me to those?
11      A       Give me just a moment.
12                      (Brief pause.)
13  BY THE WITNESS:
14      A       Let's see.  That is -- They begin on
15  Page 50 of the document, which is Page 541 in the
16  copy that I have here, Page 50 of the document
17  under Section 4.26, "Handrails, Grab Rails" --
18  "Grab Bars, and Tub and Shower Seats."
19  BY MR. THOMAS MORRISSEY:
20      Q       Give me a moment.
21                      (Brief pause.)
22  BY MR. THOMAS MORRISSEY:
23      Q       Do you know what section you're
24  referring to?
```

102

```
1       A       As I said, it's 4.26.  On the PDF that
2   I have, it says Page 50, and then it also says, for
3   some reason, 541.  I don't know what that's -- That
4   may be a CFR Page 541.
5       Q       You're looking at 4.26?
6       A       Correct.
7       Q       This 4.26, does that apply to
8   handrails for a ramp?
9       A       To be clear, 4.26 is specifying if
10  there are requirements for handrails, then this is
11  how handrails are to be configured.
12      Q       Is there a requirement for ramps with
13  a rise greater than six inches to have handrails
14  complying with 505?
15      A       With 505 . . .  I'm not finding -- I'm
16  not familiar with 505.
17              What are you referring to with
18  505?  I'm not familiar with what you're referring
19  to, sir.
20      Q       Well, you agree that the rise of the
21  Cermak ramp is greater than six inches?
22      A       Yes.
23      Q       And, therefore, under the 1991 ADA
24  standards, it's required to have handrails?
```

103

```
1       A       Yes.  And I would also put an asterisk
2   there, that there may or may not be life safety
3   exceptions to that.  But, in general, yes.
4               And I only point that out to say
5   you know, the First Amendment says we have Freedom
6   of Speech, but you can't yell "Fire" in a crowded
7   movie theater.  So sometimes there are exceptions
8   for life safety.  That's the only reason I'm
9   hesitating.
10      Q       Can you point -- Can you point me to
11  where in the 1991 standards there's an exception
12  for a ramp in a correctional facility in regards to
13  handrails?
14      A       I'm not aware if there are.  I'm only
15  stipulating that there may be.  I'm not stipulating
16  that there are.
17      Q       And would it be correct that the 1991
18  ADA standards would require handrails to be on both
19  sides of the ramp?
20      A       Correct.  That's what it says in
21  Section 4.8.5.
22      Q       And the handrails would have to be
23  contiguous from the bottom of the ramp all the way
24  to the top of the ramp?
```

104

```
1       A       Continuous, yes.
2       Q       What are the -- What is your
3   understanding of the purpose for handrails under
4   the ADA code involving a ramp?
5       A       They are in general there to allow
6   someone to steady themselves, whether they're
7   walking or in a wheelchair, to provide stability
8   when they're walking or in a wheelchair.
9               I would note that a wheelchair in
10  a correctional facility is different than on a
11  sidewalk or at a public building.
12      Q       Do you -- Do you understand what's
13  referred to as the "gripping surface" of a
14  handrail?
15      A       Yes, sir.
16      Q       What is the gripping surface of a
17  handrail?
18      A       I would go back to Page 50 in the
19  document because it makes explicit -- The gripping
20  surface of the handrail is the bar, if you will,
21  which is to be a nominal one and a half inches in
22  diameter, spaced roughly one and half inches away
23  from the surface.
24      Q       What -- What's the section number
```

Exhibit 5 Page 26

105

```
1    you're looking at?
2         A    Again, I'm on Page -- in this case,
3    Page 51.  There's a diagram that shows that.
4    It's --
5         Q    Which --
6         A    -- Figure 39 in the ADA.
7              It says "or shall provide an
8    equivalent gripping surface" in the standard in
9    4.6.2 -- 4.26.2.
10        Q    And is the requirement in regards
11   to -- to the minimum height of the railings being
12   34 inches?
13        A    I believe -- Yeah, I believe
14   34 inches.  I think that's correct.
15        Q    And the top of the rail, 38 inches?
16        A    Between -- Generally, it's in the
17   range of 32 to 38, but the -- the standard is
18   34 inches.
19        Q    And it should be contiguous along the
20   walking surface of the ramp?
21        A    Correct, continuous, yes.
22        Q    And the handrails should be of
23   consistent height above the walking surface.  Is
24   that correct?
```

106

```
1         A    Correct.  That's correct.
2         Q    And by "the walking surface," we're
3    meaning -- we mean the length of the ramp, correct?
4         A    Correct.  And extend -- There are
5    requirements that it extend beyond the inclined or
6    sloped surface as well.
7         Q    Now, based upon your personal
8    knowledge, are there handrails on both the left and
9    right side of the ramp that are 34 inches above the
10   ground and at a consistent height along the walking
11   surface of the ramp?
12        A    It appears that instead of a handrail
13   that there are hospital-style bumpers at that -- at
14   approximately that same height off the floor.
15        Q    Are they compliant with the 1991 ADA
16   standards in regards to handrails?
17        A    Again, with the stipulation that there
18   may or may not be an exception for an environment
19   like this, no.  In general, that's not compliant
20   with them.
21        Q    And in regards to the rise of a ramp
22   under the 2010 standards, are they the same as the
23   1991 ADA standards?
24        A    I'd have to reference it.  I believe
```

107

```
1    that the landing requirements are somewhat
2    different in 2010, but I'd have to check.  I have
3    not reviewed it recently in the context of this
4    action.
5         Q    Do you know whether or not -- if the
6    rise of the ramp exceeds 30 inches whether or not
7    there must be a landing if the ramp exceeds
8    30 feet?
9         A    Well, the 30 feet is -- assumes a
10   1:12 slope for 30 inches, so it can be longer and I
11   believe the standard says of -- of any length if
12   the rise is 30 inches.
13        Q    I'm talking about a rise that exceeds
14   30 inches.
15             Does there have to be a landing
16   under the 2010 --
17        A    I believe 2010 also requires a landing
18   for a 30-inch rise, yeah.
19        Q    And does the 2010 standards require
20   handrails on the left and right side of the ramp at
21   a continuous height going up and down?
22        A    I believe it does, yes.
23        Q    And the bumpers on -- or curbs along
24   the current configuration of the bumpers, as you
```

108

```
1    describe them, on the Cermak ramp are not in
2    compliance with the 2010 standards or the 1991 ADA
3    standards?
4         A    Again, with the stipulation that there
5    may or may not be applicable exceptions for
6    detention facilities, no.  It doesn't appear that
7    they are.
8         Q    Do you know if the bumper rails -- the
9    measurement of the bumper rails are at 29 and a
10   quarter inches?  I'm sorry.
11             Do you know whether or not along
12   the sides of the left and right walls of the ramp
13   that the bumper -- bumper rails are at a height of
14   between 29 and a quarter inches and 29 and a half
15   inches?
16        A    I don't know offhand what the
17   dimension of them is off of the -- the walking
18   surface, no, offhand.
19        Q    Do you know if the bumper rails are
20   grippable as defined by the ADA?
21        A    I don't know; but from the
22   photographs, it appears that they are not.
23        Q    Why is there a requirement under he
24   1991 and 2010 standards to have a handrail
```

Exhibit 5 Page 27

109

1    grippable?
2         A    As I said, they are an assist device
3    that allows an individual, either someone in a
4    wheelchair or someone who has difficulty walking,
5    to steady themselves as they go up or down the
6    ramp.
7         Q    So the current bumper rails, as you
8    describe them, for the Cermak ramp do not assist
9    a -- either a wheelchair-bound detainee or a person
10   on crutches to go up or down the Cermak ramp?
11        A    It appears that they do not.  I
12   haven't tried it myself.
13        Q    You're aware that -- going back to
14   Exhibit No. 4 now, the notes by Ellen Stoner as a
15   consultant for STV on ADA accessibility -- that she
16   made certain recommendations, correct?
17        A    She made recommendations that -- Yes.
18   She made recommendations.
19        Q    Can you tell me, after March of 2018,
20   what Cook County did in order to -- Let me rephrase
21   the question.
22             You acknowledge, in part at
23   least, that at the time Ms. Stoner inspected the
24   ramp in March of 2018, it was not in compliance

110

1    with the 2010 or the 1991 ADA standards?
2         A    Again, with the stipulation about the
3    potential of exemptions for detention requirements
4    and recognizing that the building -- when the
5    building was built, the 2010 standards did not
6    apply, yeah.  In general, I do.
7         Q    And between March of 2018 and that
8    e-mail that this plumbing foreman gave defense
9    counsel, measurements in March of 2021, you're not
10   aware of any other County or Sheriff employee that
11   measured the Cermak ramp to determine measurements
12   as far as the rise of the ramp or the handrails?
13        A    I'm not aware if there were or there
14   weren't.
15        Q    And since this plumbing foreman in
16   March of 2021 to the present, has there been
17   anybody else that was retained by Cook County, to
18   your knowledge, that measured the Cermak ramp to
19   determine whether it's compliant with the ADA --
20        A    Not that I'm aware of, no.
21        Q    -- 1991 standards or the 2010
22   standards?
23        A    Oh, they wouldn't have measured them
24   for the 2010 standards, but not the -- not that I'm

111

1    aware of, no.
2         Q    In March of 2021, after this plumbing
3    foreman made certain measurements in regards to the
4    ramp, why didn't -- why didn't Cook County go back
5    to Ellen Stoner and ask her to reexamine that ramp
6    under her contract with STV and Cook County?
7         A    Well, first of all, there may have
8    been discussion of that.  I haven't reviewed all
9    the e-mails applicable to that.  They may have been
10   asked to do that.
11             I would note that Mr. Merkel's
12   e-mail was on March 10th of 2021.  Seven days
13   later, Cook County went into lockdown because of
14   the pandemic, and that changed everything.
15        Q    The pandemic, my recollection --
16        A    I'm sorry.  '21.  Excuse me.  I'm
17   sorry, '21.  We were on the -- I'm sorry.  I'm
18   incorrect.  I'm thinking of 2020.  Excuse me.
19        Q    Yeah.  In March of 2020 --
20        A    Yeah, 2020, because we went -- we
21   went under March 17th.  I remember it was
22   Saint Patrick's Day, no.
23             In March of '21, no.  I mean, we
24   may or may not have been -- I don't remember if we

112

1    were in a prohibition period or not.  We've had a
2    couple of periods during that time when we haven't
3    been allowed to go into the jail because it's been
4    a COVID hotspot.  In fact, we're under that
5    condition right now.  So as far as getting out
6    there to make investigations, I'm not sure we could
7    have even sent her out there.
8         Q    After Stoner gave her recommendations
9    as a consultant for STV and Cook County on --
10        A    Yes.
11        Q    -- accessibility in March of 2019 --
12        A    Yes.
13        Q    -- did you attend any meetings with
14   her with representatives from the Sheriff's Office
15   and Cook County where the Cermak ramp was
16   discussed?
17        A    I believe so.
18        Q    And can you tell me who participated
19   in those meetings for the Capital Planning and
20   Policy group?
21        A    We have monthly meetings with the
22   Sheriff and with their various representatives,
23   sometimes including Sabrina, who is their ADA
24   representative, sometimes not, other members of the

Exhibit 5 Page 28

113

1  Sheriff, to go through various projects.
2             We have well over 100 projects
3  going on with the Department of Corrections or with
4  the Sheriff at any moment in time. We meet with
5  them to go through the status of the various
6  projects. I know that multiple times she's
7  attended those meetings.
8     Q     There was a -- In addition to yourself
9  at those planning meetings with stakeholders and
10 the Sheriff and the County on accessibility issues,
11 was there a former employee by name of
12 Sheila Atkins that attended?
13    A     Yes.
14    Q     And what was --
15    A     I believe Sheila was there, yes.
16    Q     What was her role as a member of the
17 Capital Planning and Policy group in regards to ADA
18 accessibility at the Cook County Jail?
19    A     Sheila, for many years, was one of our
20 project directors. And during my time here, since
21 I joined the County in April of '17, she's been the
22 project director for the vast majority of projects
23 working with the Sheriff and at the jail.
24             She's been the project director

114

1  working directly with the consultants working with
2  the Sheriff, directing those projects.
3     Q     When she -- She retired from
4  Cook County employment last year. Is that --
5     A     That's correct.
6     Q     All right. Who took her place as the
7  project director for public safety issues at the
8  Cook County Jail?
9     A     We have an interim project director.
10 We're actually about -- we have -- We've made an
11 offer to an individual and are expecting to be
12 bringing somebody on-board to be the permanent
13 person to take the role that she had on project --
14 capital projects for public safety. We're bringing
15 another project director on to replace her.
16    Q     In addition to Sabrina Canchola
17 Rivero, are there members of the Sheriff's Office
18 that attended these monthly stakeholder meetings in
19 regards to --
20    A     Yeah.
21    Q     -- ADA issues?
22    A     A variety of different members from
23 the Sheriff's Department, yes, Sheriff's Office.
24 Excuse me.

115

1     Q     Now, at these planning meetings after
2  April of -- March or April of 2018, was there a
3  discussion with regards to proceeding with a
4  renovation of the Cermak ramp to make it
5  accessible?
6     A     I know that that's been a topic at
7  multiple meetings over the course of the
8  intervening period.
9     Q     Was there ever a -- I'm sorry.
10             Do you know an Andrea [sic]
11 Morales?
12    A     Adriana, Chief Morales, yes.
13    Q     Does she work for Cook County?
14    A     She is a deputy -- a chief of some
15 designation -- I don't know her exact title -- with
16 the Cook County Sheriff's Office.
17    Q     Have you had contact with her in
18 regards to ADA issues at the Cook County Jail?
19    A     I believe she's been in multiple
20 meetings about it.
21             Could I ask you to pause for just
22 a moment?
23    Q     Sure.
24    A     Okay. Thank you.

116

1     Q     How much time do you want?
2     A     Just like 60 seconds.
3             (Brief pause.)
4             THE WITNESS: Okay. I'm back. Thank
5  you. I had another meeting that was supposed to
6  start at 4:30, and I had to let them know I wasn't
7  going to be there.
8             MR. THOMAS MORRISSEY: Do you need to
9  attend that meeting? Because we have just gotten
10 certain documents from defense counsel which were
11 not turned over prior to this dep.
12             If you'd like to reschedule so
13 you could go to your meeting . . . We're going to
14 be another three hours or more with this
15 deposition. We haven't even touched on the real
16 30(b)(6) Notice, so . . .
17             THE WITNESS: I'll defer to
18 Zach [sic].
19             MR. BENTLEY: Jack.
20             THE WITNESS: Or, Jack, rather.
21 Excuse. That's counsel on another case.
22             I guess I would prefer to -- Are
23 we on the record or off the record?
24             MR. BENTLEY: Let's go off.

Exhibit 5 Page 29

117

```
1              MR. THOMAS MORRISSEY:  Off the record.
2                  (Whereupon, a discussion was
3              had off the record.)
4
5                  (Whereupon, the remote
6              deposition was continued to
7              Monday, January 24, 2022, at
8              2:00 p.m., Central Standard
9              Time.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

118

```
1    STATE OF ILLINOIS )
2                     ) SS:
3    COUNTY OF C O O K )
4
5
6              I, KELLY ANN POTTS, Registered
7    Professional Reporter, Certified Shorthand Reporter
8    in and for the County of Cook, State of Illinois,
9    do hereby certify that on January 19, 2022, the
10   remote deposition via videoconference of the
11   witness, ERIC DAVIS, was taken by me, reported
12   stenographically and was thereafter reduced to
13   typewriting under my direction, and there were
14   present counsel as previously set forth.
15             The said witness, ERIC DAVIS, was first
16   remotely duly sworn to tell the truth, the whole
17   truth, and nothing but the truth, and was then
18   examined upon oral interrogatories.
19             I further certify that the foregoing is
20   a true, accurate, and complete record of the
21   questions asked of and answers made by said
22   witness, ERIC DAVIS, at the time hereinabove
23   referred to.
24             The undersigned is not interested in the
```

119

```
1    within case, nor of kin or counsel to any of the
2    parties.
3              WHEREUPON, I set my hand pursuant to the
4    Illinois Shorthand Reporters Act of 1984 on this
5    23rd day of January, A.D., 2022.
6
7
8                      _____
9                      KELLY ANN POTTS, CSR
10                     CSR No. 084-003558
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Exhibit 5 Page 30

Transcript of the Testimony of
**ELLEN STONER**

**Date:** September 8, 2021

**Case:** CORNELIUS WALKER v. THOMAS DART, SHERIFF OF COOK COUNTY, ET AL.

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

ELLEN STONER
September 8, 2021

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CORNELIUS WALKER,          )
                           )
          Plaintiff,       )
                           )
     vs.                   )   No. 20-cv-00261
                           )
THOMAS DART, SHERIFF OF    )
COOK COUNTY and COOK       )
COUNTY, ILLINOIS,          )
                           )
          Defendants.      )

     This is the deposition of ELLEN FARLOW STONER, taken via Zoom videoconferencing, called by the Plaintiff for examination, taken pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before PEGGY A. ANDERSON, a Certified Shorthand Reporter of the State of Illinois, on September 8, 2021, at 10:00 o'clock a.m.

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 2

 1  A P P E A R A N C E S:
 2
 3      THE LAW OFFICES OF:
        THOMAS G. MORRISSEY, LTD.
 4      BY:  MR. THOMAS G. MORRISSEY
             MR. PATRICK MORRISSEY
 5           10150 South Western Avenue
             Rear Suite
 6           Chicago, Illinois  60643
             (773) 238-4235
 7           tgm@morrisseylawchicago.com
             pwm@morrisseylawchicago.com
 8
             Appeared on behalf of the
 9           Plaintiff;
10      THE LAW OFFICES OF:
        JOHNSON & BELL, LTD.
11
12      BY:  MR. JACK BENTLEY
             33 West Monroe Street
13           Suite 2700
             Chicago, Illinois 60603-5404
14           (312) 372-0770
             bentleyj@jbltd.com
15           Appeared on behalf of the
             Defendants.
16
17      THE LAW OFFICES OF:
        TRIBLER ORPETT & MEYER
18      BY:  MR. MARK GALASSO
             225 West Washington Street
19           Suite 2550
             Chicago, Illinois 60606
20           (312) 201-6400
             mcgalasso@tribler.com
21
             Appeared on behalf of the
22           Witness, Ellen F. Stoner.
23
24

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 3

 1              I N D E X
 2  WITNESS                          PAGE
 3  ELLEN FARLOW STONER
 4  DIRECT EXAMINATION BY
    MR. MORRISSEY:                   5-142
 5
 6
 7
 8              E X H I B I T S
 9
10  MARKED                           PAGE
11  PLAINTIFF'S EXHIBIT NO. 2        102
12  PLAINTIFF'S EXHIBIT NO. 4        116
13  PLAINTIFF'S EXHIBIT NO. 11        97
14  PLAINTIFF'S EXHIBIT NO. 100       78
15  PLAINTIFF'S EXHIBIT NO. 101      104
16  PLAINTIFF'S EXHIBIT NO. 105       85
17  PLAINTIFF'S EXHIBIT NO. 106       17
18  PLAINTIFF'S EXHIBIT NO. 200       73
19
20
21              *******
22
23
24

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 1

ELLEN STONER
September 8, 2021

Page 4

1    (WHEREUPON, the witness
2    was first duly sworn.)
3  MR. MORRISSEY:  This is the
4 deposition of Ellen Stoner.  She was served
5 with a subpoena.  The deposition is being
6 taken pursuant to the Federal Rules of
7 Civil Procedure.
8    Ms. Stoner, I'm going to be
9 asking you a series of questions today in
10 regards to your role as an architect hired
11 by the -- by Cook County.
12    I'd ask that you answer my
13 questions orally so the court reporter can
14 take down your responses.  If at any time
15 you don't understand one of my questions,
16 please stop me and I will attempt to
17 rephrase it.
18    At any time during the deposition
19 you want to take a break, just indicate and
20 we'll take a break.
21
22
23
24

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 5

1 WHEREUPON:
2    ELLEN FARLOW STONER,
3 called as a witness herein, having been first
4 duly sworn, was examined and testified as
5 follows:
6  D I R E C T   E X A M I N A T I O N
7   BY MR. THOMAS MORRISSEY:
8  Q Please state your full name for the
9 record?
10  A My name is Ellen Farlow Stoner.
11  Q Where did you go to college?
12  A I went to the University of Illinois
13 in Urbana-Champaign.
14  Q What was your major at the University
15 of Illinois?
16  A It was the studies of architecture.
17 Did both my bachelor's and master's degree
18 there.
19  Q Do you have a master's in
20 architecture also from Champaign?
21  A Yes, I do.
22  Q Are you board certified as an
23 architect by any organization?
24  A I'm registered with NCARB, and I'm

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 6

1 also a licensed architect in Illinois and a
2 handful of other states.
3  Q Are you a member of the American
4 Institute of Architects?
5  A I am, yes.
6  Q Briefly tell me about your --
7  THE REPORTER:  Tom, can you start
8 that again?  You broke up.
9 BY MR. MORRISSEY:
10  Q Can you tell us briefly in regards to
11 the various positions you've held as an
12 architect?
13  A Yeah, I finished my studies in 1991
14 and I became licensed in '95.  I worked for a
15 handful of firms abroad in France and England,
16 and then I was also -- and then I came back to
17 Chicago roughly in '94, and I worked for four
18 or five different architects before I started
19 my own firm in 2003.
20  Q What firms have you worked for prior
21 to establishing your own firm?
22  A Yeah, I worked for Farm Associates;
23 Johnson Lasky Architects; Mitt, Braw, Kelly,
24 Bauer (phonetic).  They're now actually Bauer.

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 7

1 And Bauer Latoza Studio.
2  Q For each of those firms, can you
3 explain what type of work you did with each of
4 the firms as far as whether it was commercial
5 industrial, residential, et cetera?
6  A Mostly with those firms, prior to
7 Bauer Latoza, most of my work was residential
8 or commercial private work.  At Bauer Latoza, I
9 was introduced to public work and historic
10 preservation primarily.
11  Q In 2003, you established your own
12 architectural firm?
13  A Yes, I did.
14  Q And at that time, did you have any
15 architects that worked with you in 2003?
16  A When I started the firm, I started it
17 with a business partner, David Young.  We were
18 in business together for about two years and
19 then he left.  And since then, I've had a
20 series of -- and we had employees, right?  And
21 I continue to have employees.  We're a firm of
22 ten people, and we're roughly -- Well, we have
23 one business administrator.  Everyone else is
24 trained as architects, and probably about

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 2

ELLEN STONER
September 8, 2021

Page 8

1  50 percent of the firm is actually licensed.
2     Q   Can you briefly tell me what are the
3 requirements to be licensed as an architect in
4 the state of Illinois?
5     A   Well, when I became licensed, you had
6 to have a master's degree and work for a
7 minimum of two years under the supervision of
8 another architect before you could sit for the
9 exam, and that still persists today.  And then
10 sitting for the exam, we did it within a week.
11 We took it all at once.  That was customary
12 then.  Now it's transitioned into a computer
13 system where people take one exam at a time.
14     Q   During the last five years, can you
15 briefly tell me what projects your firm has
16 worked on as an architectural team?
17     A   The last five years?  Well, so that
18 puts us back in 2016.  So we worked in about
19 six or seven different market sectors.  We work
20 in higher education, K12, which is primarily
21 CPS.  We do some consulting with other
22 architects and other K12 users.  We do some
23 hospitality related to breweries and
24 distilleries.  We do some affordable housing.

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 9

1 We do some work related to cultural venues and
2 all of this work is really focused around
3 renovation and historic preservation work.  We
4 are also doing, I should say, some building
5 envelope commissioning work and some Section
6 106 reviews, which is historic preservation
7 related.
8     Q   What percentage -- In the last five
9 years, what percentage of your work has been
10 with governmental entities?
11     A   I don't know that number right off
12 the top of my head.  For governmental entities,
13 I would say it's somewhere between 3 and 5
14 percent.  If you're thinking like --
15     Q   Gross billing, yes.
16     A   I mean, we do a lot of work for CPS,
17 and I find it hard whether you would consider
18 them local government or a school district, so.
19 But we do quite a bit of work for CPS.  So if
20 you include them, the percentage would be much
21 higher.
22     Q   Including CPS, what percentage of
23 your firm's gross billing in the last five
24 years has been governmental?

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 10

1     A   I couldn't give you an exact number,
2 but I would estimate roughly 50 percent.
3     Q   Can you briefly describe the work you
4 do and have done in the past for the Chicago
5 Public Schools?
6     A   Work I've done for Chicago Public
7 Schools?  I've worked as a design manager for
8 them under their program management and capital
9 planning where we were involved with developing
10 scope of work for renovation, and I've also
11 worked as an architect of record for them where
12 we actually execute the design work.  We're
13 currently in a role as an architect of record,
14 and we have, I think, four or five different
15 schools currently under construction.
16     Q   So the four or five schools that
17 you're (inaudible) --
18        THE REPORTER:  Tom, can you repeat
19    that question?  It broke up.
20        MR. MORRISSEY:  Sure.
21        THE REPORTER:  Tom, say it one more
22    time.  They were talking.
23 BY MR. MORRISSEY:
24     Q   You mentioned that you're currently

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 11

1 involved with work on four or five public
2 schools in the city of Chicago.  Is that new
3 construction or is that renovation of existing
4 buildings?
5     A   It's renovation work, and it's
6 primarily focused on building envelope, roof,
7 windows, walls, some interior finishes but
8 pretty straightforward repair and renovation.
9     Q   Approximately what percentage of your
10 work with the Chicago Public Schools involves
11 bringing the schools up to code in regards to
12 the Americans with Disability Act?
13     A   Currently, we don't have any projects
14 that are focused on accessibility.  We have one
15 project at Lovett Elementary that has some
16 minor accessibility elements as we're doing
17 work that has triggered code requirements such
18 as auditorium seating, new entrance stairs, a
19 ramp in back and some minor toilet room
20 modifications.
21     Q   Are there architectural firms that
22 specialize in design of -- designing buildings,
23 existing buildings, to comply with the ADA for
24 public spaces?

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 3

ELLEN STONER
September 8, 2021

Page 12

1    A    Yes.  I'm sure there are.
2    Q    What percentage of your firm's
3 billing -- what percentage of your firm's
4 billing, gross billings, involve work involving
5 bringing public buildings up to ADA standards?
6    A    I wouldn't be able to give you a
7 precise number.  I don't have that information
8 at hand.
9    Q    Well, what portion of -- You
10 mentioned CPS.  Any renovations in Chicago
11 Public Schools obviously has to comply with
12 Title II and the ADA, correct?
13    A    Correct.
14    Q    Any other projects in the last five
15 years that you've worked on that involve public
16 spaces that the ADA impacts?
17        MR. GALASSO:  You're referring to the
18    CPS, Tom?
19        MR. MORRISSEY:  Other than CPS.
20 BY THE WITNESS:
21    A    That are specific ADA or --
22 BY MR. MORRISSEY:
23    Q    Well, obviously the CPS is a public
24 entity?

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 13

1    A    Yeah.
2    Q    Any other work in the last five years
3 that involved public entities?
4    A    Not specifically that I can recall
5 where we're the architect of record.
6    Q    You didn't -- When you say "architect
7 of record," what do you mean?
8    A    That means that we are the design
9 architect and that we are preparing design and
10 permit and construction drawings.
11    Q    Do you do other work for public
12 entities where you're not the architect of
13 record?
14    A    Yes.
15    Q    What other public entities in the
16 last five years have you worked for where
17 you're not the architect of record?
18    A    Well, there's Cook County as you
19 know.  We are under contract with STV as their
20 accessibility consultant where we apply our
21 architectural skills, but we are not an
22 architect of record.
23    Q    Can you tell me -- You mentioned
24 STV/Heery?

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 14

1    A    Yes.
2    Q    Can you tell me your relationship
3 with that firm?
4    A    We are a subconsultant to them under
5 the public safety portfolio for Cook County,
6 and we are on an on-call hourly contract for
7 them.
8    Q    What do you understand the public
9 safety portfolio to mean for Cook County?
10    A    My understanding, at least we've been
11 exposed to, is related to the jail facility at
12 26th and California and the various courthouses
13 throughout the county including the juvenile
14 detention.
15    Q    What is STV's relationship to Cook
16 County to your knowledge?
17    A    I'm sorry.  STV's relationship to?
18    Q    Cook County.
19    A    I believe they are the program
20 manager for the public safety portfolio.
21    Q    What does it mean -- What is your
22 understanding of what it means to be the
23 program manager for Cook County?
24    A    I don't know the details of the exact

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 15

1 services they are providing.  We are strictly
2 supporting them when they request our
3 assistance.
4    Q    Well, what is -- In the architectural
5 field, what is a program manager?  I'm not
6 familiar with the architectural field.  So you
7 talked about an architect of record.  You used
8 the term program manager as far as STV.  Is
9 that an architectural firm, STV?
10    A    I don't know if they provide
11 architectural services.  My understanding of a
12 program manager is that they assist the owner
13 in implementing their capital improvement
14 program, and I believe each owner defines that
15 differently depending on what their objectives
16 are.
17    Q    And STV hired you as a consultant, is
18 that --
19    A    Yes.
20    Q    In what year were you hired as a
21 consultant by STV?
22        MR. GALASSO:  If I could jump in,
23    Tom.  They hired her company.
24

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 4

ELLEN STONER
September 8, 2021

Page 16

BY MR. MORRISSEY:

1 Q    I'm sorry.  When I say you, you're

2 the principal of the --

3 A    I am the principal of AltusWorks, and

4 they hired our company.  Yes.

5 Q    In what year did STV hire your

6 company?

7 A    I believe that was 2016, but we

8 didn't actually start engaging in services

9 until either late in 2017 or 2018.

10 Q    And it's your -- Who are your contact

11 people with STV?

12 A    My primary contact is David Theising.

13 Q    David -- Can you spell the last name?

14 A    I believe it's T-h-e-i-s-i-n-g.

15 Q    And do you know what his personal

16 background is?  Is he an architect?

17 A    I don't know his exact

18 qualifications.

19 Q    Do you have any other contacts with

20 STV other than David Theising?

21 A    Theising?

22 Q    Yeah.

23 A    Through this contract?

---

ELLEN STONER
September 8, 2021

Page 17

1 Q    Yes.

2 A    I mean, he's the primary contact.

3 MR. GALASSO:  He just wants to know

4 who else you are in contact with.

5 BY THE WITNESS:

6 A    Jan Turner because she, I believe,

7 leads the contract on behalf of STV, and

8 there's John -- I can't remember his last name.

9 Joey Tse, but he's a project manager.

10 Q    John Jones?

11 A    No.  I would have to look up John's

12 last name.  I'm drawing a blank.

13 Q    If you turn to Exhibit 106.

14 MR. GALASSO:  Give me a second.  Tom,

15 is it possible for you to share your screen

16 to show the exhibit?

17 MR. MORRISSEY:  No.  You have the

18 exhibits on your --

19 MR. GALASSO:  No, I know I have the

20 exhibits.  I'm just asking you if you could

21 share it so we can all see exactly what

22 page you're looking at.

23 MR. MORRISSEY:  Well, I'm looking at

24 what's Bates Stamped Walker 508 --

---

ELLEN STONER
September 8, 2021

Page 18

1 MR. GALASSO:  All right.  Give me one

2 second.

3 MR. MORRISSEY:  -- of 106.

4 MR. GALASSO:  Hold on.  Tom, what was

5 the exhibit again?

6 MR. MORRISSEY:  It's Exhibit 106,

7 Mark.

8 MR. GALASSO:  106 Final is what I

9 have.

10 MR. MORRISSEY:  It's a monthly DOC

11 agenda for 12/12/19.

12 MR. GALASSO:  Okay.  I'm there and

13 the witness is there.

14 BY MR. MORRISSEY:

15 Q    Looking at that document, does that

16 assist you in identifying contact people you

17 have with STV?

18 A    John Kelly is the other.  The three

19 main people that I deal with are John Kelly,

20 Dave Theising, Jan Turner.  There are a handful

21 of project managers that contact us related to

22 assignments.  Joey Tse, I think T-s-e is how

23 you say his last name.  Dan O'Brien.  Those are

24 the main people that we deal with.

---

ELLEN STONER
September 8, 2021

Page 19

1 Q    And what type of entity is -- Where

2 is STV based?

3 A    I don't know.

4 Q    How large a firm is STV?

5 A    It's a very large firm from what I

6 understand.

7 Q    What is their principal business as

8 far as you know?

9 A    I don't know what their principal

10 business is.

11 Q    What type of work have they done

12 during the time you have been -- had a contract

13 with them for Cook County?

14 A    It's my understanding that they're

15 leading the development of projects for the

16 capital improvement program.

17 Q    What is the capital improvement

18 program for Cook County?

19 A    Yes.

20 MR. GALASSO:  No, no.  The question

21 he asked you is:  What is the capital

22 improvement program for Cook County?

23 Is that the question, Tom?

24 MR. MORRISSEY:  Yes.

Exhibit 6 Page 5

ELLEN STONER
September 8, 2021

Page 20

```
 1  BY THE WITNESS:
 2      A    What is the capital improvement
 3  program?
 4  BY MR. MORRISSEY:
 5      Q    Yeah.
 6      A    I don't know if I can answer all the
 7  details of that program.  It's a publicly
 8  published document of prints that they've
 9  identified for their facilities.
10      Q    Is it limited to the courthouses and
11  the Cook County Jail, the capital improvement
12  program for Cook County?
13      A    I'm sure the -- No, I believe the
14  County's program incorporates all of their
15  portfolios.  STV's contract is focused on the
16  public safety.
17      Q    Other than the courthouses and the
18  Cook County Jail, are there other capital
19  improvement programs that you're aware of that
20  deal with public safety for Cook County?
21      A    Not that I'm aware of.
22      Q    Were you approached in -- Strike
23  that.
24           Do you know what David Theising's
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 21

```
 1  position is with STV?
 2      A    I don't know his exact title.  I
 3  believe he's actually employed by CBRE.
 4      Q    CRBE?
 5      A    CBRE.  I don't know what that stands
 6  for.  It's something real estate.
 7      Q    Is that a national real estate firm
 8  to your knowledge?
 9      A    I'm not terribly familiar with that
10  firm.  I know it's a very large real estate
11  firm.
12      Q    And STV, to your knowledge, is that a
13  part of CBRE?
14      A    No.  I believe they formed a
15  partnership or potentially a joint venture for
16  this delivery.
17      Q    Do you know whether or not STV is
18  engaged in any other work other than the
19  capital improvement program with Cook County?
20      A    No, not that I'm aware of.
21      Q    So to your knowledge, STV was formed
22  by some entity to work on capital improvement
23  programs for Cook County?
24      A    No.  STV was an existing firm.  They
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 22

```
 1  teamed up with Heery to provide these services,
 2  and then Heery was bought out by CBRE, but they
 3  remained either, you know, a partner or a joint
 4  venture.  I don't know their legal structure,
 5  but the two companies are working together to
 6  deliver these services.
 7      Q    By "services," you mean services to
 8  Cook County?
 9      A    Yeah, whatever their -- I don't know
10  what their -- I don't recall the details of
11  their contract.
12      Q    Do you have contact with individuals
13  from Heery?
14           MR. GALASSO:  I'm sorry.  Can you
15      repeat that question?
16           MR. MORRISSEY:  Yeah.
17  BY MR. MORRISSEY:
18      Q    Do you have -- Your role as a
19  consultant for STV, do you have contact with
20  employees from Heery also?
21      A    Well, Heery was purchased by CBRE
22  after the contract was executed.  So I'm not
23  overly familiar with which individuals work for
24  which company, but I just really respond to
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 23

```
 1  their requests.
 2      Q    Do you have -- In your role in
 3  providing services for STV, do you have contact
 4  with employees of CBRE?
 5           MR. GALASSO:  To be fair here, Tom,
 6      she's identified David Theising as an
 7      employee of CBRE as someone who is her main
 8      contact.
 9  BY MR. MORRISSEY:
10      Q    But my understanding was Mr. Theising
11  is -- worked for STV; is that correct?
12      A    I believe Dave Theising was
13  originally an employee of Heery, and he is now
14  an employee of CBRE since that firm was
15  purchased.
16      Q    So was STV also purchased by CBRE to
17  your knowledge?
18           MR. GALASSO:  Hold on one second.
19      Tom, I think the confusion here is she
20      mentioned there was a joint venture, and
21      she's not entirely familiar with all of the
22      details regarding that.
23           MR. MORRISSEY:  Well, she's the one
24      that's testifying.
```

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 6

ELLEN STONER
September 8, 2021

Page 24

```
 1          MR. GALASSO:  I understand that.
 2     Just let me finish.  I'm trying to help.
 3     If you look at the e-mail that she used as
 4     Exhibit 106, I think you can actually see
 5     in the e-mail addresses some that identify
 6     as CBRE and some that identify as other
 7     entities.
 8  BY MR. MORRISSEY:
 9     Q    Are there any other individuals
10  either from CBRE or STV or Heery that you have
11  had contact with in the last three years in
12  regards to your involvement with the
13  renovations or assessments of the Cook County
14  Jail and/or the Cook County courthouses?
15          MR. GALASSO:  I'm going to object as
16     to form and a mischaracterization of prior
17     testimony.  You can answer.
18  BY THE WITNESS:
19     A    I don't know if I know everyone's
20  names because --
21  BY MR. MORRISSEY:
22     Q    Well, let me rephrase the question.
23     A    Okay.
24     Q    CBRE, STV or Heery, are there any
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 25

```
 1  other individuals that you have been involved
 2  with in regards to your role with -- your role
 3  with the Cook County courthouse or the Cook
 4  County Jail that --
 5     A    Well, I think I named the main people
 6  that I have been dealing with.  There's also
 7  this Matt -- I'm not sure how you say his last
 8  name -- Guarnery.
 9     Q    G-u-a-r-n-e-r-y?
10     A    Yes.
11     Q    And what involvement have you had
12  with Mr. Matt Guarnery?
13     A    He, again, is one of the project
14  managers that is assigned projects within their
15  structure and then contacts us to do our site
16  assessment work.
17     Q    So going back to 2016 --
18     A    Uh-huh.
19     Q    -- you were hired by STV as a
20  consultant?
21     A    Yes.
22     Q    Is that correct?
23     A    (Indicating.)
24     Q    And since 2016 to the present, have
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 26

```
 1  you had a contractual relationship with Cook
 2  County or the sheriff of Cook County?
 3     A    Well, we had -- aside of this
 4  contract with STV?
 5          MR. GALASSO:  He wants to know if you
 6     have a direct contract with Cook County or
 7     not or is it just with STV/Heery?
 8  BY THE WITNESS:
 9     A    Well, I don't recall if we have an
10  executed contract with Cook County.  We are
11  preapproved with them for architectural
12  services.  We have not been successful in
13  winning any direct work with the County.  So my
14  only active contract right now with the County
15  is through STV/Heery.
16     Q    What is -- Can you tell me how an
17  architectural firm becomes preapproved with
18  Cook County?
19     A    The County issues an RFQ, a Request
20  for Qualifications.  They had issued this many
21  years ago and requesting that architects submit
22  their qualifications so that they would be
23  preapproved to respond to invitations or
24  specific requests for proposals.
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 27

```
 1     Q    But your firm hasn't received any
 2  monetary compensation from --
 3     A    No, no.
 4          MR. GALASSO:  Stop.  Let him finish
 5     the question before you give an answer
 6     because you don't know what he's asking
 7     until he's finished with the question.
 8  BY THE WITNESS:
 9     A    I'm sorry, Tom.  Could you repeat the
10  question?
11  BY MR. MORRISSEY:
12     Q    As of today, your firm hasn't
13  received any direct monetary compensation from
14  Cook County?
15     A    No, not that I recall.  No.
16     Q    Have you put in bids to do work for
17  Cook County in the last five years?
18     A    I believe we responded to two of
19  their requests for proposals, and we were not
20  successful.
21     Q    What requests did you put in to do
22  work for Cook County?  What projects were they?
23     A    We are preapproved through their
24  corporate portfolio, and we have responded to
```

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 7

ELLEN STONER
September 8, 2021

Page 28

1   an RFP for some renovation work at the 69 West
2   Washington. That's the one I specifically
3   remember. I don't recall the details of the
4   other.
5       Q    Can you tell me the nature of your
6   contract in --
7           THE REPORTER:  Tom, what was the
8       year?  It broke up.
9   BY MR. MORRISSEY:
10      Q    In 2016, can you tell me what
11  services you contracted with STV to provide in
12  relation to Cook County?
13      A    We are an on-call consultant for
14  accessibility evaluations, I guess.
15      Q    And does your firm get compensated on
16  an hourly rate for the services you provide
17  under that contract?
18      A    Yes.
19      Q    And have you had subsequent -- After
20  2016, did you enter into any additional
21  contracts with STV, CBRE or Heery in regards to
22  Cook County?
23      A    We received two or three extensions
24  to our current contract, but there was no

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 29

1   change in scope.
2       Q    When did you first -- When was your
3   firm first engaged in providing any
4   accessibility evaluations for Cook County?
5       A    I'm sorry.  Specifically for Cook
6   County?
7       Q    Yes.  Well, let me rephrase the
8   question.
9           Under your contract with STV, when
10  was the first time they requested you to do an
11  accessibility evaluation for either the Cook
12  County court buildings or the Cook County Jail?
13      A    I don't recall the specific date; but
14  as I said, we were under contract sometime in
15  2016, and we were engaged in services late in
16  2017 or early 2018.
17      Q    What members of your firm worked on
18  the initial assessments under the contract with
19  STV?
20      A    That would have been Scott Utter,
21  Joyce Ramos and Caroline Isaacson and, of
22  course, myself.
23      Q    Are all three individuals still with
24  the firm?

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 30

1       A    No.
2       Q    Who no longer is with your firm?
3       A    Scott Utter is no longer with us and
4   Joyce Ramos is no longer with us.
5       Q    Are all three of those individuals
6   licensed architects?
7       A    Two of the three are licensed.
8       Q    Who isn't a licensed architect?
9       A    Caroline Isaacson is not yet
10  licensed.
11      Q    Are Joyce Utter and -- I'm sorry.
12  Are Scott Utter and Joyce Ramos still working
13  in the Chicago area as architects?
14      A    Scott Utter relocated to Wisconsin
15  earlier this year, and Joyce Ramos is working
16  for the City of Chicago, Department of
17  Landmarks.  I don't believe she's practicing as
18  an architect.
19      Q    What was the first building or
20  buildings in which your firm did an evaluation
21  for STV under that contract?
22      A    I don't recall which exact building.
23  We initially looked at a couple of buildings at
24  the 26th and California location.

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 31

1       Q    What buildings at 26th and California
2   did your firm initially evaluate?
3       A    I'm sorry.  Did we issue documents
4   for?
5       Q    No, no, no.  Not documents.  Which --
6   You mentioned that at 26th and California,
7   which I assume you're referring to the Cook
8   County Jail or are we talking about the court
9   building at 26th and California?
10      A    Both.  We looked at both.
11      Q    And that was in 2017 or early 2018?
12      A    Yes, yes.
13      Q    Initially, who went with you to do
14  the evaluations in regards to the Criminal
15  Court Building at 26th and California and the
16  Cook County Jail from your firm?
17      A    Well, it was primarily Scott Utter
18  and myself.  Joyce Ramos was looking at the
19  juvenile detention facility.
20      Q    When you initially went over there,
21  did you have a contact person at the Cook
22  County Jail or the Criminal Court Building to
23  provide escort services for you?
24      A    Yes.  We had one person that provided

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 8

ELLEN STONER
September 8, 2021

Page 32

1  escort. That was Scott Achterhof.
2          THE REPORTER: Scott what?
3          THE WITNESS: Achterhof I believe his
4      last name is.
5  BY MR. MORRISSEY:
6      Q    Was he with the Sheriff of Cook
7  County?
8      A    Yes.
9      Q    Is he also referred to as Andrew
10 Achterhof?
11     A    Yes. His e-mail is Andrew Achterhof,
12 but he goes by Scott.
13     Q    Do you know if he's still employed by
14 the Sheriff of Cook County?
15     A    I have not heard of any changes to
16 his status.
17     Q    What was his -- Was he -- What was
18 his position with the Sheriff of Cook County?
19     A    I don't recall his exact title.
20     Q    Do you know if he had an
21 architectural background?
22     A    No, I believe he came out of the
23 construction industry.
24     Q    Any other -- Besides Scott Achterhof,

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 33

1  yourself and Scott Utter, were there any other
2  individuals with you when you did your initial
3  evaluation of Cook County Jail or the Criminal
4  Court Building?
5      A    I believe Scott had brought in
6  another gentleman to help with the escorts.
7  His name was Brian, but I don't recall his last
8  name.
9      Q    Was he a sworn correction officer or
10 sworn Sheriff's officer to your knowledge?
11     A    No, no, I don't believe he was. I
12 believe he was -- I don't know what his exact
13 position was, but he seemed to have worked
14 closely with Scott.
15     Q    Did you do the evaluation of the
16 Criminal Court Building and the Cook County
17 Jail on the same day?
18     A    No. No, they were separate
19 assignments at different times.
20         MR. GALASSO: Did you get the last
21     part?
22             (WHEREUPON, the record
23             was read as requested.)
24

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 34

1  BY MR. MORRISSEY:
2      Q    Now, you say "assignments." Prior to
3  going out to 26th and California, did you
4  receive any type of communication from STV,
5  CBRE or Heery or the Sheriff or the chief
6  judge, judge's office, in regards to what areas
7  you were to evaluate at 26th and California?
8      A    All of our assignments came directly
9  from STV, and they were very specific on what
10 we were to go out and look at.
11     Q    And was there more than one
12 individual at STV that would give you your
13 specific assignments for 26th and California?
14     A    All of our assignments -- I believe
15 all of our assignments came from David
16 Theising. They might have been distributed to
17 us through the project managers, but David was
18 the one who would initiate those assignments.
19     Q    Would you receive e-mails from David
20 Theising in regards to where you were to do the
21 assignments?
22         MR. GALASSO: I'm sorry. Can you
23     have that question read back? You cut off.
24         MR. MORRISSEY: Let me rephrase it.

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 35

1  BY MR. MORRISSEY:
2      Q    When you received an assignment from
3  David, would it be in writing?
4      A    In general, yes.
5      Q    And how -- What form of communication --
6  How was it communicated to you, through an
7  e-mail or through the mail?
8      A    No, I believe most, if not all, of
9  our communication was through e-mail.
10     Q    How many individuals would be
11 included in the e-mail in regards to the
12 assignments you received from David at STV?
13     A    I don't know. He would generally --
14 He would craft those and copy people that he
15 felt -- I guess he felt was appropriate to
16 include.
17     Q    And do you have an e-mail account at
18 your firm?
19     A    I'm sorry?
20     Q    Do you have an e-mail account at your
21 firm, an e-mail address?
22     A    Each employee has their own
23 individual e-mail.
24     Q    And to the best of your recollection,

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 9

ELLEN STONER
September 8, 2021

Page 36

1  what was the first assignment that you received
2  through an e-mail from David from STV in
3  relationship to -- in relation to the 26th and
4  California complex?
5          MR. GALASSO:  Objection that it's
6      been asked and answered.  Go ahead.
7  BY THE WITNESS:
8      A    I don't know exactly what the first
9  assignment was.  I'm trying to recall.  We
10 looked at several things between the Cermak
11 building, the Cook County Court -- CCB that
12 they refer to and what's the third thing?  I
13 think it was what they referred to as the
14 bridge.
15 BY MR. MORRISSEY:
16     Q    So when you would receive an
17 assignment, approximately how many assignments
18 have you received from STV in regards to
19 reviewing and evaluating various court
20 buildings and the Cook County Jail from STV?
21     A    I don't know exactly how many we've
22 been asked, but it's probably been between one
23 and two dozen.  Some of them are larger in
24 scale than others.

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 37

1      Q    In regards to the bridge, can you
2  describe -- when you -- You did receive an
3  assignment in regards to the bridge at 26th and
4  California, correct?
5      A    Yes.  We were asked to do a peer
6  review of design documents that were being
7  executed by an architect at the bridge.  And
8  the bridge area is where the inmates are
9  brought and kind of transferred between the
10 housing to the court facility.
11     Q    Now, when you received the e-mail
12 from David, for example, in regards to the
13 bridge, did it outline the scope of what STV
14 was asking you to evaluate?  For instance, on
15 the bridge, there are multiple holding cells,
16 correct?
17     A    Uh-huh.
18     Q    You have to answer yes or no.
19     A    Yes.  I believe there is -- There are
20 multiple holding cells.
21     Q    And there's a ramp -- two ramps that
22 connect the north and south side of the CB --
23 in the Criminal Court Building, correct?
24     A    Correct.

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 38

1      Q    Are there any additional structures
2  on the bridge other than holding cells and the
3  ramps that involve the bridge area?
4      A    Not that I observed.
5      Q    When you were -- When you would
6  receive an assignment, for instance, for the
7  bridge, how specific -- how specific was the
8  assignment given to you.  Was it go down there
9  and walk around or you mentioned that in
10 regards to renovation work at the bridge, you
11 were asked to do a peer review?
12         MR. GALASSO:  Objection as to form.
13     You can answer if you understood it.
14 BY THE WITNESS:
15     A    I think I understood it.  We were
16 brought on to review the design architect's
17 solution to a nonconforming condition that they
18 were hired to rectify.  So we assisted on
19 behalf of the County as a third-party reviewer
20 to give our opinion and comments on the design
21 solution presented as it relates to, you know,
22 ADA compliance.
23     Q    And in that -- What firm did you
24 review their work, the peer review, what design

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 39

1  work?
2      A    This that was Primera.  Primera
3  Engineering was the architect.
4      Q    And were the design drawings focused
5  on the two ramps that connect the Cook County
6  Jail to the Criminal Court Building?
7      A    It was the two ramps and some
8  additional -- additional ramp work to bring
9  those into compliance, yes.
10     Q    What additional ramp work were you
11 asked to look at in addition to the two ramps
12 that connect the Cook County Jail to
13 Criminal Court Building?
14         MR. GALASSO:  Are you asking her
15     relative to the bridge?  Because your
16     question is very general otherwise.
17         MR. MORRISSEY:  She mentioned that
18     she was asked to review Primera's
19     engineering drawings in regards to the two
20     ramps that connect the jail to the Criminal
21     Court Building, but she also indicated
22     there were two additional ramps.
23 BY MR. MORRISSEY:
24     Q    My question is what additional ramps

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 10

ELLEN STONER
September 8, 2021

Page 40

1  were you asked to look at and evaluate?
2      A    Well, related to the bridge design
3  documents, in order for the two ramps to become
4  compliant, they had to raise the landing and
5  reduce the slope which required the addition of
6  a third ramp.  So we reviewed that design
7  solution to make sure it was in compliance with
8  ADA requirements.
9      Q    And were you required to give a
10  formal architectural opinion in regards to this
11  peer review of Primera's design drawings for
12  the renovation of the ramps connecting the jail
13  to the Criminal Court Building?
14      MR. GALASSO:  Objection as to form.
15  BY THE WITNESS:
16      A    We provided written comments on the
17  drawings as well as in a -- I believe in a
18  matrix that would record the comments that we
19  had so the architect could respond to them.
20  It's a very standard format for this type of
21  peer review.
22  BY MR. MORRISSEY:
23      Q    When you say that there's a standard
24  format for a peer review of the line drawings,

ELLEN STONER
September 8, 2021

Page 41

1  what are you referring to?
2      MR. GALASSO:  Objection as to form.
3  BY THE WITNESS:
4      A    Well, that generally is an Excel
5  spreadsheet which indicates the specific
6  comments and what aspect of the drawing you're
7  referring to, and then it leaves a spot for the
8  architect to respond with comments either that
9  they agree with your comments or that they have
10  an alternate solution that they would like to
11  propose.
12  BY MR. MORRISSEY:
13      Q    So when you did this evaluation of
14  Primera's design drawings for the bridge, to
15  whom did you provide your comments?
16      A    Our comments were provided to Joey
17  Tse who was the project manager for that
18  specific project.  He was part of the STV/Heery
19  team.
20      Q    Joey Tse worked for STV, correct?
21      A    Either them or Heery or CBRE.  I'm
22  not sure who he's employed by.
23      Q    How did you communicate your comments
24  in regards to your valuation of Primera's

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 42

1  design drawings for the bridge?
2      A    Our communication was through e-mail.
3      Q    Who was included in the -- Were you
4  the principal person that sent the e-mail?
5      A    I would have -- I believe I was the
6  person who responded to Joey Tse's e-mails.
7  Joey at STV was the one who would have
8  contacted us with the specifics of the peer
9  review.  He provided us with the documents, and
10  our communication was back to him.  And if he
11  had included others on that e-mail, we would
12  have replied all.  I can't tell you at this
13  point who all was on that communication.
14      Q    But the -- Other than yourself and
15  your firm, were there any other individuals
16  that evaluated it with you, the bridge?
17      A    From my firm?
18      Q    Yes.
19      A    I don't recall.
20      Q    Were members of the Sheriff's Office
21  included in your comments to Joey Tse at either
22  STV or CBRE?
23      A    I'm sorry, the members of who?
24      Q    The Sheriff's Office.  Did you

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 43

1  include the individuals from the Sheriff's
2  Office?
3      A    I don't recall.  I don't recall.
4  That would have been up to Joey in having those
5  communications.
6      Q    For instance, do you know a Sabrina
7  Rivero-Canchola?
8      A    Yes.  I know Sabrina.
9      Q    And did you provide Ms. Canchola with
10  your comments in regards to your evaluation of
11  the design drawings by Primera for the bridge?
12      A    I would have only communicated
13  directly with Joey and whoever else he had
14  included on that e-mail.  I would not -- I
15  did -- would not have, but I don't believe I
16  did initiate any e-mail to Sabrina.
17      Q    When you went out to evaluate the
18  bridge, were there other members of the
19  Sheriff's Office that were present during your
20  evaluation?
21      A    We would have had an escort.  I don't
22  recall who that was, if it was Brian or Scott,
23  but we had an escort.
24      Q    Any other assignments in the year

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 11

ELLEN STONER
September 8, 2021

Page 44

1  2018 and thereafter in regards to the Criminal
2  Court Building at 26th and California?
3      **A      We were asked to look at the bond**
4  **court renovation.  We had done an assessment of**
5  **the courthouse, the courtrooms on the upper**
6  **floors.  Those are the main assignments that I**
7  **recall.**
8      Q    Did you do an assessment of the
9  holding areas behind the courtrooms at 26th and
10 California?
11     **A      I don't recall if we did that behind**
12 **the courtrooms.  The only -- We had focused on**
13 **the bond court, and there were some holding**
14 **rooms associated to that, I believe.**
15     Q    Now, when you did your evaluation of
16 Primera's design drawings for the bridge, to
17 your knowledge, was the bridge constructed and
18 the ramps constructed prior to the passage of
19 the ADA?
20     **A      I don't know when that bridge was**
21 **constructed.**
22     Q    When you reviewed the design drawings
23 for the ramps on the bridge, was it your
24 understanding that they had to comply with the

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 45

1  2010 design standards?
2      **A    Yes.**
3      Q    Why is that?
4      **A      The 2010 ADA design standards, yes, I**
5  **believe that's -- that was the governing codes**
6  **at the time.**
7      Q    And when you evaluated Primera's
8  design drawings for the bridge, were they in
9  compliance with the 2010 ADA standards?
10     **A    Yes, they were.**
11     Q    Do you know whether or not the ramps
12 on the bridge were ever constructed or
13 renovated based upon Primera's design drawings?
14     **A      I believe that work has been**
15 **completed.**
16     Q    Were you subsequently asked to review
17 the renovation of the ramps between the jail and
18 the Cook County Court Building at 26th Street
19 to see whether or not the renovated ramps
20 complied with the 2010 ADA standards?
21     **A    No.  We were not asked to go back and**
22 **confirm or review any of the built conditions.**
23     Q    Now, under your contract with STV,
24 have you done any evaluations or review at the

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 46

1  request of the Cook County Jail?
2          MR. GALASSO:  Sorry.  What's the
3      question?
4  BY MR. MORRISSEY:
5      Q    Under your contract with STV, have
6  you done any work at the Cook County Jail?
7      **A      At the Cook County Jail, the only**
8  **assignments that we have been given have been**
9  **related to accessibility evaluation and scope**
10 **development.**
11     Q    When was the first time you were
12 given an assignment at STV -- Let me rephrase
13 my question.
14         Other than through STV, have you
15 received any work from any other entity in
16 regards to assessing the facilities there
17 whether or not they were compliant with the
18 ADA?
19         MR. GALASSO:  Objection to form.
20     When you say "there," are you referring to
21     the jail?
22 BY MR. MORRISSEY:
23     Q    My question is:  Other than through
24 an STV, have you received any other assignments

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 47

1  for the Cook County Jail?
2      **A    No.  All of our assignments come**
3  **through our single contract with STV.  They are**
4  **the ones that provide that assignment.**
5      Q    When was the -- To the best of your
6  recollection, when was the first assignment
7  that you received from STV for the Cook County
8  Jail?
9          MR. GALASSO:  Objection, asked and
10     answered.  Go ahead.
11 BY THE WITNESS:
12     **A      As I said before, sometime late 2017,**
13 **early 2018.**
14 BY MR. MORRISSEY:
15     Q    Prior to today's deposition, did you
16 look at any documents in preparation for your
17 testimony today?
18     **A    Yes, I did.**
19     Q    Can you briefly tell me what
20 documents you reviewed in preparation for your
21 testimony today?
22     **A      Well, I released those to my attorney**
23 **who had been in contact with STV's and the**
24 **County's attorneys.  We have not been able to**

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 12

ELLEN STONER
September 8, 2021

Page 48

1  release those because of the confidentiality
2  requirements of my contract.
3      Q   I'm not getting into that.  I'm
4  asking you to respond to my questions.
5          What documents have you reviewed in
6  preparation for today's deposition?
7      A   They were the ones --
8      MR. GALASSO:  You can tell him what
9      the documents were that you saw or that you
10     reviewed.
11 BY THE WITNESS:
12     A   Well, spreadsheets and e-mails,
13 reports, the things that were listed in the
14 subpoena.  We went through and compiled that
15 information and reviewed it.  It did not extend
16 to our entire contract with STV.  It was very
17 focused on the request around the Cermak ramp.
18 BY MR. MORRISSEY:
19     Q   When you mentioned that in
20 preparation for today's testimony you looked at
21 spreadsheets, what type of spreadsheets did you
22 look at?
23     A   Well, peer review comments, I guess,
24 and -- I don't know.

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 49

1      MR. GALASSO:  If you don't recall,
2      say you don't recall.
3  BY THE WITNESS:
4      A   Okay.  I can't recall the details of
5  that.
6      MR. MORRISSEY:  Well, you can't prep
7      or suggest to your witness that she doesn't
8      recall.  So I hope that doesn't occur again
9      in the future.
10     MR. GALASSO:  Just for the record,
11     you saw she was shaking her head.
12     MR. MORRISSEY:  I didn't see her
13     shake her head because I wasn't looking.
14     MR. GALASSO:  It's on the video.
15     MR. MORRISSEY:  I wasn't looking at
16     the video when I asked her.
17     MR. GALASSO:  Let's take a quick
18     break for a second.  I need to use the
19     restroom.
20     MR. BENTLEY:  Give us five minutes?
21     MR. MORRISSEY:  Sure.
22     MR. BENTLEY:  Okay.
23          (WHEREUPON, a short
24          break was taken.)

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 50

1  BY MR. MORRISSEY:
2      Q   You received a subpoena with an
3  Exhibit A in this -- in regards to this matter,
4  correct?
5      A   Yes, I did.
6      Q   And when you received Exhibit A,
7  which asked you to produce certain documents,
8  what did you do to investigate to see whether
9  or not you or your firm had those documents?
10     A   I asked one of my assistants to go
11 through and gather the relevant information
12 based on the parameters outlined in the
13 subpoena.
14     Q   Do you know how your -- Who was the
15 name of your assistant that gathered the
16 information?
17     A   That was Caroline Isaacson.
18     Q   Do you know what she had to do in
19 order to investigate and see whether you had
20 any responsive documents to the subpoena?
21     A   She searched through my e-mail and
22 she looked through the files on our server.
23     Q   And to your knowledge, was Caroline
24 able to retrieve any e-mails from your --

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 51

1  e-mails that were responsive to the Exhibit A
2  attached to the subpoena?
3      A   Yes, I believe she did.
4      Q   Do you recall approximately how many
5  e-mails that were responsive to the subpoena
6  that were retrieved by Caroline?
7      MR. BENTLEY:  I'm going to object to
8      relevance on that and outside the scope of
9      the agreed subpoena limitation.  You can
10     answer.
11 BY THE WITNESS:
12     A   I didn't count the number of e-mails.
13     MR. GALASSO:  And just for the
14     record, Tom, I had -- I know you were on a
15     couple of conversations; but in my
16     discussions with Patrick, there's an
17     agreement to limit those requests to
18     relative to the Cermak ramp after that
19     subpoena was issued, and there's a written
20     confirmation of that.  That was subsequent
21     to the subpoena when I brought up the
22     issues with the confidentiality clause in
23     the contract with STV and the involvement
24     of Cook County relative to the

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 13

ELLEN STONER
September 8, 2021

Page 52

1  confidentiality issues that we were trying
2  to address prior to the deposition
3  proceeding.
4      MR. MORRISSEY:  My understanding, and
5  I wasn't privy to all the conversations,
6  there was an agreement that they would be
7  produced.  And based upon that
8  understanding, I think Patrick agreed to
9  limit the scope of the requested documents
10  since your firm apparently failed to go
11  along with the agreement.
12      MR. GALASSO:  So when you're
13  finished, let me know.
14      MR. MORRISSEY:  Sure.  You can go
15  ahead.
16      MR. GALASSO:  That is not accurate.
17  It's partially accurate.  A discussion was
18  had.  You were on one or two of these
19  calls, and discussions were had with
20  Patrick that there was a confidentiality
21  clause in the contract and that STV is
22  required to waive its confidentiality
23  clause before the documents could be
24  produced as well as -- and STV had

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 53

1  indicated that Cook County had to be
2  involved in this relative to producing
3  these documents.  I advised Patrick, I
4  believe, and yourself regarding these
5  issues and that they would not be able to
6  produced or likely be able to be produced
7  prior to the deposition proceeding, and I
8  suggested that the deposition be continued
9  until we could respond to that.
10      And my conversations with Patrick
11  subsequent to that is that I had not
12  received authorization or the required
13  waivers prior to producing it, and I did
14  not think that I would get that by this
15  deposition.  And I was advised to try to
16  get what we could before the deposition
17  would proceed and that the decision was to
18  proceed with this deposition anyways with
19  the understanding that we would still
20  produce these documents after the
21  deposition, and that I would bring back
22  Ellen again, if necessary, after I was able
23  to get the waiver from Cook County and from
24  STV, which STV based its decision on

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 54

1  whether or not Cook County would agree.
2      Yesterday, I had a conversation
3  with Patrick wherein I advised that Cook
4  County still had not given me a waiver,
5  that they could not get me one prior to the
6  deposition.  I advised.
7      Patrick had indicated that he was
8  looking to see if there was any drawings or
9  blueprints.  I told them that there was, in
10  fact, a drawing of what appeared to be
11  existing conditions but not contractual or
12  design drawings that I had previously
13  redacted.  And I was asking Cook County to
14  provide authorization to produce, and I was
15  unable to get that authorization for a
16  waiver relative to that document as Cook
17  County wasn't able to do so.
18      So prior to this deposition
19  proceeding, it was already understood that
20  I could not produce any documents.  It was
21  already understood that I requested that
22  the deposition be continued and the plan
23  was, at that point, is that you wanted to
24  proceed with this deposition with the

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 55

1  understanding that I would still work with
2  Cook County and STV on producing the
3  necessary documents but there was a process
4  that I had to go through relative to
5  getting waivers relative to Cook County and
6  STV.
7      MR. MORRISSEY:  The bottom line on
8  all this, Mark, is that you're willing to
9  bring back the deponent after we work out
10  the logistics of the production of --
11      MR. GALASSO:  Certainly, and I said
12  that.  But, you know, when we discussed
13  this, this deposition and the request was
14  going to be limited to the Cermak ramp.
15  And I believe, while I'm not involved in
16  this litigation, I believe the litigation
17  is related to the Cermak ramp but now
18  you're asking questions about the bridge.
19  And I can understand, you may want to ask
20  specific questions about the bridge
21  relative to her experience and relationship
22  with Cook County and STV.  But some of the
23  questions in terms of whether those
24  particular areas are in compliance or not I

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 14

ELLEN STONER
September 8, 2021

Page 56

1 don't believe are relevant or reasonably
2 calculated to lead to relevant information
3 regarding this litigation.  To a certain
4 extent, I have to rely on Cook County
5 because they are involved in this
6 litigation as to what would be relevant or
7 not.  But certainly we're here to answer
8 the questions.
9        I know you have documentation
10 that you're aware of relative to Ms. Stoner's
11 involvement in a walkthrough relative to
12 the ramp, and she's here to answer those
13 questions, which may alleviate the amount
14 of documents or what documents that you
15 want.
16    MR. PATRICK MORRISSEY:  Mark, just to
17 clarify, a couple of weeks ago, we spoke
18 and I offered to bring it to the Court's
19 attention and you told me that you were
20 trying to work it out with attorneys from
21 Johnson and Bell and the County so we
22 didn't have to get the Court involved.
23        So, you know, we've been working
24 cooperatively, and I agreed to limit the

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 57

1 request so that we could move forward with
2 this deposition and expeditiously resolve
3 this matter.  So, you know, it's my
4 understanding -- If you gave even the
5 limited information I requested yesterday, the
6 diagram, and Jack Bentley wouldn't agree to
7 produce it for the County.
8        So, I mean, I have bent over
9 backwards to try and facilitate this, and
10 we worked together, but it's not your fault
11 and it's not our fault that the County
12 hasn't agreed to release this information.
13 And, apparently, some of the documents I
14 gave you yesterday were part of the
15 documents your client identified that the
16 County still won't agree to produce or
17 release them, so.
18    MR. GALASSO:  Yeah, so I don't want
19 to speak for Jack.  I don't think he said
20 he wouldn't.  I think what he told me was
21 he couldn't at this time.
22        I will tell you that we -- I
23 talked to you about a process that we were
24 trying to put into place so that there was

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 58

1 not an issue with my client breaching its
2 contract with STV given it's
3 confidentiality clause.  I did advise that
4 the clause allows for a court order for us
5 to produce those documents via court order,
6 and it was my hope -- Strike that.  I used
7 the wrong word.
8        It was my understanding that we
9 were going to attempt to get you the
10 documents we could, but the first step in
11 that was a waiver from Cook County, and
12 my -- strike that -- a waiver from STV and
13 then a waiver from Cook County, but we were
14 unable to obtain a waiver from Cook County
15 prior to the deposition proceeding.
16        But 100 percent, the spirit of
17 this has been in a cooperative manner, and
18 the only reason I'm on the record talking
19 about that is that Tom was suggesting
20 otherwise and was pointing the finger, and
21 the point has always been from our
22 perspective to aid and assist in providing
23 whatever documents are required of us to be
24 provided under the constraints that

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 59

1 Ms. Stoner's company has a contract with
2 STV that has a confidentiality clause.
3    MR. PATRICK MORRISSEY:  The case also
4 has to deal with Cermak, the building, too
5 and accessibility for Mr. Walker.  So it's
6 not just about the ramp.  There are
7 allegations that Mr. Walker was housed in
8 Cermak and the place didn't have compliant
9 shower facilities during the time he was
10 there, so.
11 BY MR. MORRISSEY:
12    Q    So to wrap this up, I just want to go
13 to the investigation, either she or her firm
14 took to gather information, and we'll deal with
15 the production of the documents at a later
16 date.  Can I proceed?
17    MR. BENTLEY:  Yep.
18    MR. GALASSO:  Yes, please do.
19 BY MR. MORRISSEY:
20    Q    In regards to the actual notice,
21 approximately how many e-mails did Caroline
22 accumulate from your account?
23    A    I don't know.  I did not count the
24 number of e-mails.

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 15

ELLEN STONER
September 8, 2021

Page 60

1    Q    Was it more than 20 or 30 e-mails
2  that were responsive?
3    A    **I don't recall.**
4    Q    Did you review the e-mails?
5    A    **I glanced at them.**
6    Q    How recently did you look at the
7  e-mails?
8    A    **A couple of weeks ago, yesterday.**
9    Q    And you referred to she did a search
10 of your server at your firm.  Did she find
11 responsive documents in your server?
12   A    **I'm sorry.  Did she find --**
13   Q    Responsive documents that were
14 responsive to the Exhibit A of the subpoena in
15 your company's server?
16   A    **Yeah, she found documents related to**
17 **the Cermak ramp that were requested in the**
18 **subpoena.**
19   Q    Did she also find documents in your
20 server that were responsive to the Division 8
21 Cermak building?
22   A    **We -- No.  I don't recall.  We were**
23 **not searching for those.  We were focused on**
24 **issues around the Cermak ramp.**

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 61

1    Q    In regards to e-mails, were any
2  e-mails retrieved that involved the Cermak
3  Division 8 housing -- or infirmary?
4        THE REPORTER:  I'm sorry, Tom.  What
5  was the last part, that involved the Cermak
6  Division...
7        MR. MORRISSEY:  I'm sorry.
8  BY MR. MORRISSEY:
9    Q    Were any e-mails discovered during
10 the search that involved the Cermak building?
11   A    **I don't recall.  It's not something**
12 **we were looking for.**
13   Q    You also mentioned that there were
14 spreadsheets that Caroline was able to retrieve
15 from your server.  What type of spreadsheets
16 were there?
17   A    **I don't recall.  There was a series**
18 **of them, and I don't recall the content.**
19   Q    And additionally, you said that there
20 were peer-reviewed comments that were retrieved
21 that were responsive to the subpoena production
22 request.
23   A    **Well, I was mistaken with that.**
24        MR. GALASSO:  I'm going to object as

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 62

1    to that's a mischaracterization.  The
2    question is a mischaracterization but she
3    can answer.
4  BY THE WITNESS:
5    A    **Yeah, I was mistaken to that because**
6  **we didn't do peer reviews related to Cermak.**
7  **So there were -- There were a series of**
8  **documents related to our assessment but not**
9  **pertaining to peer review.  So I don't recall**
10 **the full details.**
11 BY MR. MORRISSEY:
12   Q    Can you tell me what assignments
13 you've received from STV in regards to the
14 Cermak facility at the Cook County Jail?
15   A    **We've received several, but I don't**
16 **recall the details of them for this deposition.**
17   Q    Did you receive an assignment, for
18 instance, to review any of the housing units in
19 Cermak such as the second and third floor from
20 STV?
21        MR. BENTLEY:  Objection to relevance,
22   outside the agreed-to scope of the
23   deposition.
24        MR. GALASSO:  Based upon Jack's

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 63

1    objection, I will (inaudible) --
2        THE REPORTER:  I'm sorry.  What did
3    you say?  Based upon Jack's objection...
4        MR. GALASSO:  Yeah, so I'm not
5    involved in the litigation, so I don't know
6    the full scope of the litigation.  But
7    relative to the relevancy and that it's not
8    reasonably calculated to lead to
9    discoverable information, I would join in
10   that objection.  Patrick, you're on mute.
11       MR. PATRICK MORRISSEY:  Right.  Jack,
12   we never talked about the scope of the
13   deposition.
14       MR. BENTLEY:  I was under the
15   impression that you and counsel for
16   Ms. Stoner had agreed to limit the scope of
17   the deposition to the Cermak ramp, and it's
18   on that basis I'm making the objection.
19       MR. PATRICK MORRISSEY:  We never
20   talked about limiting the scope.
21       MR. GALASSO:  Patrick, I'll handle
22   that.  In fact, we talked about -- The
23   discussions that Patrick and I had was
24   relative to the -- relative to the

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 16

ELLEN STONER
September 8, 2021

Page 64

1    documents and limit the scope of the
2    request for the production in the subpoena.
3                Patrick is correct. We did not
4    have a discussion about limiting the scope
5    of this deposition. I would hope, however,
6    that the deposition would be limited to
7    those relevant inquiries.
8        MR. BENTLEY: I made my objection for
9    the record. I'm not going to interfere
10   with the witness answering the question.
11       MR. GALASSO: Right, and I'm joining
12   in your objection as to the relevancy. I
13   don't know if Ellen can remember the
14   question.
15       MR. MORRISSEY: Peggy, can you repeat
16   the question?
17                (WHEREUPON, the record
18                was read as requested.)
19   BY THE WITNESS:
20       **A    I don't recall all the detail of the**
21   **various assignments we received.**
22   BY MR. MORRISSEY:
23       Q    Tell me to the best of your
24   recollection what assignments you were given in

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 65

1    regards to Cermak.
2        **A    I don't recall.**
3        Q    Do you recall any of your
4    assignments?
5        **A    I recall that we had a handful of**
6    **specific things we were asked to look at, but I**
7    **don't recall exactly what those were.**
8        Q    I'm going to refer you to a document
9    maybe to refresh your memory, Exhibit 106.
10       MR. GALASSO: Give me one moment to
11   get to it. That's the one you previously
12   put up or the document you previously
13   referred to, Tom?
14       MR. MORRISSEY: It's -- It is, yes,
15   but it's a group exhibit. It's Bates
16   Stamped 508 through 524.
17       MR. GALASSO: Okay. All right. I
18   have it up. Do you have it up?
19       THE WITNESS: Uh-huh.
20       MR. GALASSO: Yeah, let me -- For the
21   record, you can ask her about this, but
22   she's got some eye issues. So she has to --
23   It takes her a little bit more time to read
24   the exhibits. So pardon us the time

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 66

1    required.
2                So she's got the exhibit pulled
3    up now. To explain it to you from my
4    perspective, she has to expand so it
5    magnifies a particular area. So she's not
6    able to look at one whole page at a time,
7    only sections at a time.
8                So if you could direct her to
9    where you want her to look, it might be
10   helpful relative to her condition.
11   BY MR. MORRISSEY:
12       Q    Sure. The initial question is are
13   you aware of these monthly agenda lists that
14   are prepared by STV?
15       **A    Yes, I'm familiar with them.**
16       Q    Can you explain what monthly
17   docket agenda is to your understanding?
18       **A    To my understanding, it's a list of**
19   **the ongoing projects that the County is**
20   **undergoing with STV.**
21       Q    And for what period of time had you
22   received these monthly docket agendas from, I
23   gather, is it usually from David Theising?
24       **A    Yes. David distributes them on a**

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 67

1    **monthly basis.**
2        Q    When did you first start receiving
3    the items?
4        **A    Roughly the same time we started**
5    **services, at the end of 2017, early 2018.**
6        Q    And that would -- Included in that
7    monthly agenda would be various projects that
8    your firm was working on, correct?
9        **A    Yeah, correct.**
10       Q    So would looking at the monthly
11   document refresh your memory in regards to some
12   of the projects you worked on at Cermak and at
13   the various court buildings throughout Cook
14   County?
15       **A    Possibly.**
16       Q    All right. If we look at Page 2 of
17   Group Exhibit 106, which is Bates Stamped 509,
18   the first entry is an item in parenthesis, Has
19   ADA Scope, end of parenthesis. Barriers
20   Reports Inquiry & Related Building Review.
21               Can you take a look at that agenda
22   item? Tell me when you've had an opportunity
23   to review that agenda item. It's Agenda Item 1.
24       **A    Yes, I see it.**

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 17

Case: 1:23-cv-16970 Document #: 122-6 Filed: 07/08/25 Page 18 of 37 PageID #:1332

ELLEN STONER
September 8, 2021

Page 68

```
1        Q    Have you had an opportunity to review
2   it?
3        A    Yes.
4        Q    And it starts off with MTG Notes from
5   11/14/19.
6             Did you actually meet in November of
7   2019?
8        A    I don't recall, but I presume his
9   meeting record is accurate.
10       Q    Prior to COVID, did you have actual
11  meetings with various, quote, unquote,
12  stakeholders in regards to the monthly docket
13  agenda?
14            MR. GALASSO:  Patrick, are you --
15       Tom, are you asking her if she had
16       in-person meetings prior to COVID?
17            MR. MORRISSEY:  Yes.
18  BY THE WITNESS:
19       A    Yes, we attended the monthly meeting.
20  BY MR. MORRISSEY:
21       Q    Where would those meetings be held?
22       A    They were on campus.  I think they
23  were two different locations we met at, at 26th
24  and California.
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 69

```
1        Q    Was one of the locations in the
2   Sheriff's Office building at about maybe 29th
3   and California?
4        A    It may have been.  I don't know the
5   name of the building.
6        Q    And there were -- The in-person
7   meetings were all held on the campus at 26th
8   and California.  Is that fair to say?
9        A    Yes.
10       Q    And to the best of your recollection,
11  when you had in-person meetings, who
12  participated in the monthly docket agenda
13  meetings?
14       A    I don't recall.  There were a variety
15  of people.
16       Q    The first page of Group Exhibit 106,
17  Page 508 lists a variety of people.  One is
18  Andrew Achterhof.  Was he usually present at
19  the meetings?
20       A    I believe he was, yes.
21       Q    There is a --
22            MR. GALASSO:  I believe he goes by a
23       different first name.  It's been
24       established previously.
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 70

```
1   BY MR. MORRISSEY:
2        Q    He is also known as Scott.  Was
3   Sabrina Rivero-Canchola generally at the
4   monthly docket agenda meetings?
5        A    I don't recall if she was physically
6   present.
7        Q    Mike Gandhi, was he present at the
8   meetings?
9        A    Gandhi?
10       Q    Gandhi.
11       A    I'm not familiar with a Gandhi.
12       Q    Sheila Atkins from capital planning?
13       A    Yes, I do recall Sheila would attend.
14       Q    Sandy Hardesty?
15       A    I don't know that person.
16       Q    Joey Tse from CBRE?
17       A    Yes.  I believe Joey generally
18  attended.
19       Q    Eric Davis from capital planning, did
20  Eric normally attend?
21       A    Yes, I believe he did.
22       Q    John Kelly from STV, would he
23  normally be in attendance?
24       A    I don't recall John being present.
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 71

```
1        Q    Who would chair those meetings, the
2   monthly docket agenda meetings?
3        A    David Theising.
4        Q    Would you receive the agenda docket
5   prior to the meetings?
6        A    Yes.
7        Q    What would transpire during the
8   meeting?  Would you talk about ongoing projects
9   during these meetings?
10            MR. BENTLEY:  I will just raise the
11       objection in that it may call for a
12       deliberative process privilege.  I'm not
13       going to interfere, once again, with the
14       witness' answering of the question.
15  BY THE WITNESS:
16       A    I don't recall the specifics of each
17  discussion.
18  BY MR. MORRISSEY:
19       Q    Do you recall -- At some point, in
20  time you evaluated the ramp that connects the
21  Cook County Jail to the Cermak facility,
22  correct?
23       A    Is that the ramp we've been talking
24  as the Cermak ramp?
```

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 18

ELLEN STONER
September 8, 2021

Page 72

1    Q    I'm referring to the ramp that
2  provides an entry to the Cermak building.
3    A    **If it's the ramp in question that**
4  **you're referring to, then, yes, we did evaluate**
5  **that.**
6         THE REPORTER:  Then what?  I'm sorry.
7  BY THE WITNESS:
8    A    **Yes, we did evaluate that.**
9         MR. GALASSO:  The answer that she
10        said was:  If it's the ramp in question.  I
11        think that's the first part of her answer.
12        MR. MORRISSEY:  Sure.
13  BY MR. MORRISSEY:
14   Q    The ramp that I'm referring to is
15  the -- Let me find the document.
16        MR. GALASSO:  I might have what
17        you're looking for.  You're looking for the
18        exhibit that you sent to me -- or that
19        Patrick sent to me yesterday.
20             I will take a quick break while
21        you're looking for that document.
22        MR. MORRISSEY:  Sure.
23  BY MR. MORRISSEY:
24   Q    I would ask you to pull up Exhibit

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 73

1  200, 201 and 202 and take a few moments.
2         MR. GALASSO:  So you want --
3         MR. MORRISSEY:  Let me rephrase it,
4    Mark.
5  BY MR. MORRISSEY:
6    Q    If we could pull up Exhibit 200 on
7  her screen, please?
8         MR. GALASSO:  Okay.  She is getting
9    it.
10  BY MR. MORRISSEY:
11   Q    Are you able to pull up Exhibit 200,
12  the video?
13        MR. GALASSO:  The video is up and
14    it's playing but it's still playing?
15  BY MR. MORRISSEY:
16   Q    Let me know when you've reviewed it.
17        MR. GALASSO:  The witness reviewed
18    the video.
19  BY MR. MORRISSEY:
20   Q    Have you had an opportunity to review
21  the video, which is Exhibit 200?
22   A    Yes.
23   Q    Do you recognize what the video
24  depicts?

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 74

1    A    **It appears to depict the Cermak ramp.**
2    Q    Does it fairly and accurately depict
3  the Cermak ramp?
4    A    **Yes, I believe it does.**
5    Q    Is that the only ramp, to your
6  knowledge, that connects the other portions of
7  the jail with the Cermak infirmary building?
8    A    **I am not aware of others.**
9    Q    For purposes of this deposition, can
10  we refer to that as the Cermak ramp?
11   A    **Yes.**
12   Q    Is that okay?
13        MR. GALASSO:  She said yes.  I don't
14    know if you heard her.
15        MR. MORRISSEY:  I didn't hear.
16  BY THE WITNESS:
17   A    **Yes.**
18  BY MR. MORRISSEY:
19   Q    Going back to the second page of
20  Group Exhibit 106, the monthly docket agenda
21  dated 12/12/19 under Item Number 1, under
22  Status and it says:  11/14/19 minute [sic]
23  notes, and under "A," it says:  There are 8 site
24  visits completed by AWI that are ready for an

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 75

1  A/E and are targeted to be procured via the
2  under 25K delivery method when approved.
3         When they say "AWI," is that your
4  firm?
5    A    **Yes.  That is a reference to**
6  **AltusWorks.**
7    Q    As of November 14, 2019, to the best
8  of your recollection, when you refer to 8 site
9  visits, where were those site visits completed?
10   A    **Oh, I don't recall.  It's an agenda**
11  **item.**
12   Q    Did that include the Cermak building
13  at the jail?
14   A    **I don't recall.**
15   Q    B, it says:  The DOC campus divisions
16  RFP is targeted to be uploaded the week of
17  11/18.  And C, Cermak and RTU are uploaded;
18  awaiting buyer and page turn.
19         What is meant by those meetings notes
20  to the best of your knowledge?
21   A    **I don't know.  That's outside our**
22  **scope of work.**
23   Q    And on the right side of the first
24  item, there's notes and it says:  ADA-related

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 19

ELLEN STONER
September 8, 2021

Page 76

1  scope.  03 project evaluation.  Would a project --
2  is that a code, 03?
3       A    I don't know what that stands for.
4       Q    Project evaluation, would that
5  include your firm, AWI?
6       A    I don't know from this information.
7  I don't know.
8       Q    What is meant by project planning in
9  relation to the department of capital planning
10 and policy?
11      A    I can't knowledgeably respond to
12 that.
13      Q    As far as 11, project procurement,
14 referring to the department of capital planning
15 and policy, what does it mean to be a
16 procurement?
17      A    I don't know.  That's outside our
18 scope of services.
19      Q    And under 09, project design and
20 construction, again, in regards to Capital
21 Planning and Policy, what does it mean to be in
22 design and construction?
23      A    I don't know.  Again, that's outside
24 our scope of services.

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 77

1       Q    And it says:  09, projects completed
2  and 44 projects with ADA-related scope, pe
3  11/30/19.
4            All are under the heading ADA-related
5  scope.  Would it be fair to say to the best of
6  your knowledge when STV was involved in ADA-
7  related projects for Cook County that you were
8  the consultant they used to do the evaluations?
9       A    Not necessarily.  I believe every
10 aspect was brought to our attention, but I
11 can't knowledgeably say that.
12      Q    Can you briefly tell me what projects
13 that you worked under STV to evaluate
14 compliance with the ADA for Cook County?
15           MR. GALASSO:  Objection, asked and
16      answered multiple times.  You can answer.
17 BY THE WITNESS:
18      A    I don't recall exactly.  We had a
19 whole series of assignments.
20 BY MR. MORRISSEY:
21      Q    Did you review, for instance, the RTU
22 building at the jail in regards to shower
23 enclosures as part of the work that you did for
24 STV?

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 78

1       A    I don't know.
2            MR. BENTLEY:  Objection to relevance.
3  BY MR. MORRISSEY:
4       Q    Did you review any proposed Cermak
5  renovations as part of your STV contract?
6       A    I don't recall.
7       Q    Do you have any recollection that you
8  reviewed ADA improvements or proposed
9  improvements in the Cermak building in the
10 lower basement area?
11           MR. GALASSO:  Objection as to form.
12 BY THE WITNESS:
13      A    I don't recall.
14 BY MR. MORRISSEY:
15      Q    Anything refresh your memory in
16 regards to improvements, ADA improvements at
17 the Cermak building?
18      A    I'm sorry.  Refresh my memory.  What?
19      Q    In regards to work you did in regards
20 to ADA issues in the Cermak building.
21      A    I don't recall specifics.
22      Q    Well, let's look at Exhibit 100 for a
23 moment.
24           MR. GALASSO:  That's a different

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 79

1  exhibit.  And before we get into this
2  exhibit, I do want to address this.  The
3  subpoena that was issued for this witness
4  had an exhibit on it with a list of
5  documents requested that were focusing on
6  the Cermak ramp, and she is here to testify
7  and she is prepared to testify relative to
8  the Cermak ramp.  And I do believe it's
9  disingenuous -- Well, certainly you are
10 entitled to ask whatever questions you
11 want, but I believe you're going outside
12 the scope of what was intended relative to
13 this deposition, into areas that are not
14 relevant or reasonably calculated to lead
15 to discoverable information.
16           MR. MORRISSEY:  Well, the subpoena
17 was for the deponent to appear.  It doesn't
18 say the nature of the questions that are
19 going to be asked.  And, you know, I don't
20 think you're the person to object to that.
21 And certainly it's within the scope of her
22 involvement at Cook County and at the Cook
23 County Jail.
24           So I think it's certainly

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 20

ELLEN STONER
September 8, 2021

Page 80

```
1    pertinent to her involvement in this case
2    which involves, I might add, the housing
3    facilities at Cermak are one with the ramp
4    because that's part of the claim that
5    Mr. Walker brings against Cook County and
6    the Sheriff.
7         MR. GALASSO:  Certainly, but I'm
8    not -- The point that I'm making as well is
9    that you have a predetermined amount of
10   time that you have with this witness.  I
11   have agreed to bring her back if necessary
12   relative to documents that I was unable to
13   produce without the waivers that were
14   necessary.  However, if you choose to spend
15   your time asking questions that are not
16   related to the Cermak ramp and you run out
17   of time, I'm not going to agree to bring
18   her back if you extinguish all of the time
19   on other issues not related to that ramp.
20        MR. MORRISSEY:  Well, as I say --
21        MR. GALASSO:  I will be as fair as
22   possible.
23        MR. MORRISSEY:  Right.
24        MR. GALASSO:  But I'm saying I'm
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 81

```
1    asking the same from you.
2         MR. MORRISSEY:  Right.  I understand
3    but the case involves the Cermak building
4    and the ramp because our client was
5    wheelchair-assisted, and he didn't have
6    access to certain facilities at the Cermak
7    building including the ramp.
8         MR. GALASSO:  Right.  What I'm saying
9    is, is that the exhibit that provides
10   notice to the witness as to what the
11   subject matter of the request all refer to
12   Cermak and ramp with the exception there's
13   a mention of showers and Division 8.  I'll
14   leave it at that.
15        MR. MORRISSEY:  Okay.
16        MR. GALASSO:  You made your point.
17        MR. MORRISSEY:  Sure.
18   BY MR. MORRISSEY:
19        Q    Will you please turn to Exhibit 100.
20        MR. GALASSO:  We are both there.
21   BY MR. MORRISSEY:
22        Q    Okay.  And it's a letter from Scott
23   Utter who works for you to Scott Achterhof and
24   there's various people that are copied
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 82

```
1    including yourself, and it says:  Scott, Ellen
2    mentioned at the meeting needing to get back
3    into Cermak.  You mentioned taking a look at
4    the receiving area on Cermak as well.  The
5    intent will be to hit.  And it goes on, the RTU
6    first floor holding area.  2, Cermak, and then
7    it has various rooms on the third floor.
8    Cermak receiving area, parenthesis, ramp.
9    Stairs and new enclosures at removed building.
10        Does that refresh your memory in
11   regards to part of the scope of the review you
12   did at Cermak?
13        MR. BENTLEY:  Object to the form of
14   the question and relevance.
15        MR. GALASSO:  Sorry.  Can I have that
16   question read back?  I kind of missed it
17   with the objection.
18        THE REPORTER:  Tom, do you think that
19   you could just repeat it?  You were reading
20   from it.  So it would be easier.
21   BY MR. MORRISSEY:
22        Q    Looking at Exhibit 100, does that
23   refresh your memory in regards to some of the
24   assignments you had from STV to evaluate ADA
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 83

```
1    issues at Cermak?
2         A    Yes, those are familiar.
3         Q    Did you also view the lower level of
4    Cermak?
5         MR. BENTLEY:  Objection, relevance.
6         MR. GALASSO:  You can answer.
7    BY THE WITNESS:
8         A    I don't recall specifically.
9    BY MR. MORRISSEY:
10        Q    Well, on the lower level of Cermak,
11   is there an urgent care clinic?
12        MR. BENTLEY:  Same objection.
13        THE WITNESS:  Answer it?
14        MR. GALASSO:  You can answer it, yes.
15   Sorry.  My apologies.  Go ahead and answer.
16   BY THE WITNESS:
17        A    I'm not overly familiar with all the
18   functions in the building.  I know it's also
19   considered a hospital.
20   BY MR. MORRISSEY:
21        Q    Did you consider or review or
22   evaluate the holding cells on the lower floor
23   of Cermak and make a recommendation that at
24   least one of them be enlarged to accommodate
```

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 21

ELLEN STONER
September 8, 2021

Page 84

1  disabled inmates under the ADA?
2      A    I don't recall that.
3           MR. BENTLEY:  Same objection.
4  BY MR. MORRISSEY:
5      Q    If you made an evaluation of the
6  lower level of Cermak, would you have provided
7  your comments to STV?
8           MR. BENTLEY:  Same objection, also
9      speculation.
10  BY MR. MORRISSEY:
11     Q    I would refer you to -- Would
12  anything refresh your memory in regards to
13  recommendations you made to STV in regards to
14  the lower level of Cermak?
15     A    I --
16          MR. GALASSO:  You can answer.
17  BY THE WITNESS:
18     A    Would something refresh my memory; is
19  that the question?
20          MR. GALASSO:  That's the question.
21  BY THE WITNESS:
22     A    I'm not sure what would.
23  BY MR. MORRISSEY:
24     Q    Okay. I would ask you to pull up

ELLEN STONER
September 8, 2021

Page 85

1  Exhibit 105.
2      A    Okay.
3           MR. GALASSO:  Can you let us know
4      where you want her to look?
5           MR. MORRISSEY:  Sure.
6  BY MR. MORRISSEY:
7      Q    Have you seen this document before,
8  which is dated March 8th, 2018.  It's minutes,
9  and it was -- It's minutes of a meeting that
10  was held in the Department of Corrections South
11  Campus on the second floor conference room,
12  which I believe is the Sheriff's conference
13  room.
14     A    Uh-huh.
15     Q    Do you recall that meeting?
16     A    Not that one specifically.
17     Q    Was that the first meeting that you
18  held that you were present on the 26th Street
19  and California campus?
20          MR. GALASSO:  Objection to form.  Go
21     ahead.
22  BY THE WITNESS:
23     A    I don't know if that was the first
24  meeting.  I don't recall.

ELLEN STONER
September 8, 2021

Page 86

1  BY MR. MORRISSEY:
2      Q    The subject under Number 1 is
3  STV/Heery ADA Consultant AltusWorks, Inc.
4  AWI Introductions.  Do you remember attending
5  that meeting?
6      A    I remember being introduced to the
7  County folks, yeah.
8      Q    And if we turn to the third page of
9  the document, under A, it states:  AWI informed
10  the dimensions on drawings by JOC contractor
11  are unclear but graphically one cell appears
12  too small.  If so, the quantity of 10 may have
13  to go to 9.
14          Did that refer to the -- enlarging
15  one of the courtrooms -- Strike that.
16          Did that refer to enlarging one of
17  the holding cells in the lower level of Cermak
18  to accommodate disabled detainees?
19     A    I don't recall.
20     Q    Do you recall any work or evaluation
21  by your firm in regards to the lower level of
22  Cermak as far as ADA issues?
23     A    No, I don't recall.
24     Q    When you do an evaluation of, let's

ELLEN STONER
September 8, 2021

Page 87

1  say, the Cermak building, what documents does
2  your firm prepare?
3           MR. GALASSO:  Objection as to form,
4      and I think it's a mischaracterization to
5      say that she's done a full evaluation of a
6      building as opposed to individual requests,
7      but you can answer.
8           MR. MORRISSEY:  Well, let me rephrase
9      the question.
10  BY MR. MORRISSEY:
11     Q    When you're given an assignment to
12  review a part of the Cermak building, that's
13  generally an e-mail that's sent to your firm,
14  correct, and to you?
15     A    Yes.  Generally, yes.
16     Q    And if you were asked through an
17  e-mail to do an evaluation of the lower level
18  of Cermak and you did the evaluation, what type
19  of paperwork or documents would you generate
20  for STV?
21     A    In general, when we do an
22  accessibility evaluation, we would put together
23  a written summary of our findings, which may
24  include photographs or other illustrations to

ELLEN STONER
September 8, 2021

Page 88

1  clarify our findings.
2      Q    Before you conduct your evaluation of
3  part of, let's say, the Cermak building, are
4  you given any documents such as diagrams of the
5  facility to assist you in doing your work?
6      A    We generally like to start with some
7  sort of document or diagram that illustrates
8  the configuration of the building.  If the
9  owners have them, they provide them.
10     Q    If you were given a diagram of the
11 Cermak building by STV, would you maintain that
12 on your server at work?
13     A    Yes.  We would continue to hold
14 documents that we received, yes.
15     Q    In your work that you did for the
16 courthouses and the Criminal Court Building, at
17 times, did you receive design drawings and
18 blueprints directly from Cook County or the
19 Sheriff?
20     A    No.  We would generally just receive
21 existing -- I don't want to say existing
22 conditions or the full diagrams of the
23 configuration of the building.  We never
24 received construction documents from the

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 89

1  construction of the building.
2      Q    When you do these reports back to
3  STV, do you title it your observation note?
4      A    I'm not sure what we actually -- I
5  don't recall what our specific titling --
6      Q    Well --
7           THE REPORTER:  What our specific
8  titling -- I'm sorry.  I didn't hear the
9  last part.
10          MR. MORRISSEY:  Let me rephrase the
11 question.
12          THE REPORTER:  No, I didn't hear the
13 last part of her answer.
14          MR. GALASSO:  She said she didn't
15 recall whatever the titling may have been.
16          THE WITNESS:  Uh-huh.
17 BY MR. MORRISSEY:
18     Q    But you do a --
19          MR. GALASSO:  Just one second, Tom.
20 I just want to instruct her just briefly.
21 So when the court asks you what you just
22 said, say exactly what you just said.
23 Don't explain it.  She is not asking for an
24 explanation.  She wants to know exactly

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 90

1      what you said.
2           THE WITNESS:  Yes.  I understand.
3  BY MR. MORRISSEY:
4      Q    When you get an assignment for STV,
5  do you usually e-mail back to them asking for
6  certain documents before you actually do a site
7  inspection?
8      A    Depending on what the assignment is,
9  yes, we will make inquiries into additional
10 support documentation.
11     Q    For instance, if you were given an
12 assignment to review whether or not the
13 bathroom facilities were accessible in the
14 lower level of Cermak, would you ask for design
15 drawings or the blueprints for that area of the
16 building?
17     A    In general, we would ask if they had
18 any existing conditions of the area they want
19 us to look at.
20     Q    Why would you do that?
21     A    That just helps -- That assists us in
22 understanding the configuration of the
23 building.
24     Q    In regards to the assignments you

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 91

1  have received from STV, when you've requested
2  either the blueprints or the design drawings
3  for the area you have been asked to evaluate by
4  STV, have you normally received documents,
5  those documents back?
6           MR. GALASSO:  I'm going to object as
7  it is a mischaracterization of the previous
8  testimony.  She's never testified that
9  she's asked for design drawings?
10          MR. BENTLEY:  Join.
11          MR. MORRISSEY:  Well, let me rephrase
12 the question.
13 BY MR. MORRISSEY:
14     Q    Before doing -- After you received an
15 assignment to view a court building for an area
16 at the Cook County Jail, do you ask for the
17 blueprints of the building or the facility?
18     A    We generally request existing
19 conditions so we can understand the
20 configuration of the building.  We have not
21 requested design or previous construction
22 documents.
23     Q    What type of documents would be
24 included in existing conditions that you would

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 23

ELLEN STONER
September 8, 2021

Page 92

```
 1    be requesting?
 2         A    In general, we're looking for an
 3    illustrated floor plan that shows us the
 4    configuration of the building.
 5         Q    And generally, what type of document
 6    would show the illustrated floor plan for an
 7    area that you've been requested to evaluate?
 8         A    I think that depends on what the
 9    County has on hand and is willing to release to
10    us.
11         Q    Can you provide examples of what
12    would be included in this notion of illustrated
13    floor plans?  Would that include blueprints for
14    the building?
15         A    I'm not sure what you mean by
16    blueprints.
17         Q    What type of -- In response to your
18    request for illustrated floor plans, what type
19    of documents have you received from STV prior
20    to doing your evaluations?
21         MR. BENTLEY:  Objection, asked and
22         answered.  Go ahead.
23    BY THE WITNESS:
24         A    General illustrations of the
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 93

```
 1    configuration of the building.
 2    BY MR. MORRISSEY:
 3         Q    What do you call those?
 4         MR. GALASSO:  Objection, asked and
 5         answered.  I believe she's testified to the
 6         term existing conditions.  You can answer
 7         the question.
 8    BY THE WITNESS:
 9         A    Yeah.  So they're generally an
10    existing-condition drawing that the County
11    provides.
12    BY MR. MORRISSEY:
13         Q    Is that a technical term?  Can you
14    tell me what it is in a layperson's language?
15         A    It's a simple line drawing of the
16    building.  So it shows you what rooms are where
17    and how they relate to each other.
18         Q    Are those line drawings usually done
19    by engineers or architectural firms?
20         A    I don't know who would have prepared
21    them.
22         Q    Are they done by someone that -- Are
23    they done to scale?
24         A    Some.  Some of them.  Good ones are.
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 94

```
 1         Q    All right.  How do you know if they
 2    are to scale or not?  And how do you know who
 3    actually does the simple line drawings?
 4         A    Well, it may be indicated on the
 5    title block.  Otherwise, we wouldn't know who
 6    had prepared them.
 7         Q    Does your contract require you to do
 8    a formal report after you do your evaluation?
 9         A    I don't recall if the contract
10    requires that.  I think it depends on the
11    assignment.
12         Q    What is the practice of your firm
13    after you complete your assignment with STV in
14    evaluating a building or a facility under your
15    contract?
16         MR. GALASSO:  I'm just going to
17         object.  You're asking -- I don't think
18         she's ever testified that she evaluated any
19         building or facility.  I believe she's
20         testified she has individual assignments
21         that she completes.
22         That being stated that it's a
23         mischaracterization, she can answer the
24         question.
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 95

```
 1    BY THE WITNESS:
 2         A    I'm sorry.  Could you repeat the
 3    question?
 4    BY MR. MORRISSEY:
 5         Q    Well, let me rephrase the question.
 6    Have you ever done an evaluation -- There's
 7    some disturbance.
 8         Have you ever done an evaluation of
 9    an entire court building such as 727 East 111th
10    Street?
11         A    I'm not familiar with that address.
12         Q    The Branch 35 and 38 court building?
13         A    I don't recall, no.
14         Q    Tell me what the practice of the firm
15    is when you do a -- when you complete your
16    evaluation of an assignment for STV?
17         MR. GALASSO:  Can I hear that
18         question -- You kind of got jumbled there.
19         MR. MORRISSEY:  Sure.
20    BY MR. MORRISSEY:
21         Q    Can you tell me what the practice of
22    your firm is in responding and completing your
23    evaluation for STV with an assignment of either
24    a court building or an area of the Cook County
```

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 24

ELLEN STONER
September 8, 2021

Page 96

```
1   Jail?  How do you --
2          MR. GALASSO:  Objection.
3          THE REPORTER:  How do you what?  I'm
4      sorry, Tom.
5   BY MR. MORRISSEY:
6      Q    How do you respond to them in regards
7   to your findings and evaluations?
8          MR. GALASSO:  Objection as to form,
9      and I believe that question has been asked
10     and answered.  Go ahead.
11         MR. BENTLEY:  Join the objection.
12         MR. GALASSO:  Do you understand the
13     question?
14         THE WITNESS:  I think I understand
15     the question.
16  BY THE WITNESS:
17     A    We generally respond in writing with
18  our findings supported by photographs and
19  potentially illustrations or, you know,
20  excerpts from the existing conditions that we
21  were provided by the County.
22         MR. MORRISSEY:  Can we take a
23     one-minute break?
24
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 97

```
1          (WHEREUPON, a short
2          break was taken.)
3   BY MR. MORRISSEY:
4      Q    We sent you an Exhibit 11.
5          MR. GALASSO:  Not ready to go yet
6      though.  I didn't see that.  I haven't
7      looked at my computer.  Just give me a
8      second.  I'm reviewing it with the witness
9      right now.  Tom, is this something that
10     Cook County produced?
11         MR. MORRISSEY:  No.  It's a public
12     document.
13         MR. GALASSO:  I'm just asking where
14     it came from.  I haven't seen it before.
15         MR. MORRISSEY:  It's a public
16     document.
17         THE WITNESS:  Can you e-mail it to
18     me?
19         MR. GALASSO:  Give me one second.
20     I'm going to e-mail it to her so she can
21     look at it on her computer.
22  BY MR. MORRISSEY:
23     Q    Let me know when you've had a chance
24  to review it.
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 98

```
1          MR. GALASSO:  Okay.  All right.  I
2      just sent it to you.
3   BY MR. MORRISSEY:
4      Q    Have you had an opportunity to review
5   Exhibit 11?
6      A    Yes.
7          MR. GALASSO:  Did you see the color
8      part too?
9          THE WITNESS:  Oh, no.
10         MR. GALASSO:  Hold on.  She's still --
11     It's kind of like she's using a flashlight
12     to look at the documents.
13         MR. MORRISSEY:  That's fine.
14         MR. GALASSO:  She can only see little
15     parts at a time.  So, Tom, there's a part
16     of this exhibit that's Picture Number 1,
17     but it's completely black.
18         MR. MORRISSEY:  That's correct.
19         MR. GALASSO:  All right.
20         MR. MORRISSEY:  We didn't get the --
21     It was redacted.
22         MR. GALASSO:  Okay.
23  BY THE WITNESS:
24     A    I have reviewed it, uh-huh.
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 99

```
1   BY MR. MORRISSEY:
2      Q    Showing you Exhibit 11, do you
3   recognize this document?
4      A    No, I do not.
5      Q    Is this a -- the form that you use
6   after your firm evaluates a facility under your
7   contract with STV?
8      A    It's not a format that I am familiar
9   with.
10         MR. GALASSO:  Hold on.  He didn't ask
11     you if it was your format.  He asked you if
12     it's a form that you use.
13  BY THE WITNESS:
14     A    Oh, no.  It's not a form.  No, it's
15  not a form that we use.
16  BY MR. MORRISSEY:
17     Q    To the best of your knowledge, was
18  this document produced by your firm?
19     A    To the best of my knowledge, it was
20  not produced by my firm.
21     Q    Did your firm do an evaluation of the
22  court building at 111th Street?
23     A    Not that I recall, no.
24     Q    What type of information generally is
```

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 25

ELLEN STONER
September 8, 2021

Page 100

1  in the -- Let me rephrase that.
2          After you do an evaluation of a
3  facility or an area for STV, what type of
4  document or report do you provide STV?
5          MR. GALASSO:  So that question --
6      Well, objection, asked and answered.  I
7      believe that question has been asked many,
8      many times already.  You can answer it
9      again.
10 BY THE WITNESS:
11     A    Uh-huh.  We provide a written
12 document of our findings possibly supported by
13 photographs and an illustration.
14 BY MR. MORRISSEY:
15     Q    Do you know whether or not you did
16 such --
17         THE REPORTER:  I'm sorry, Tom.
18 BY MR. MORRISSEY:
19     Q    Do you know if you did such an
20 evaluation or report for STV concerning the
21 Cermak ramp?
22     A    I believe we did.  I believe it was
23 part of the exhibits that we're reviewing
24 today.

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 101

1      Q    What would have been the heading or
2  title of that report that you did in regards to
3  the Cermak ramp?
4      A    I don't recall the actual title.
5      Q    How soon after doing your evaluation
6  typically does your firm provide STV with a
7  report?
8      A    We try to be as prompt as possible in
9  formulating our report and providing it to STV.
10 So it would depend.  Within a couple of weeks
11 of the visit.
12     Q    Do you do that through an e-mail to
13 STV?
14     A    Yes.
15     Q    Do you know if you also include any
16 other individuals or entities when you complete
17 an assignment for STV, for instance, for the
18 Cermak ramp?
19         MR. GALASSO:  Objection as to form
20     and asked and answered.
21 BY THE WITNESS:
22     A    In general, we respond to the e-mail
23 that we received with the assignment.
24

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 102

1  BY MR. MORRISSEY:
2      Q    And is it generally when you --
3  Generally, when you -- I'm sorry.
4          Generally when you receive an
5  assignment through STV under your contract in
6  regards to the Cook County Jail or the court
7  buildings, are there other governmental
8  employees that are included in the e-mail?
9      A    I don't recall.
10     Q    Turning to Exhibit 2, which is the
11 Defendant Cook County's Answer to Plaintiff's
12 First Set of Interrogatories.
13         MR. GALASSO:  Okay.  It's up for both
14     of us.
15 BY MR. MORRISSEY:
16     Q    In March of 2018, did you conduct a
17 walkthrough of the Cermak building including
18 the area depicted on Page 2 of Exhibit 2?
19     A    I don't recall the extent of the
20 walkthrough, but I do recall that we looked at
21 the ramp.
22     Q    Other than yourself and Scott Utter
23 from your firm, did anybody else -- was anybody
24 else included in the walkthrough in March of

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 103

1  2018?
2      A    I believe it was Scott Achterhof as
3  he was our escort through the facility.
4      Q    Now, there's a diagram on Exhibit 2,
5  Page 2 at the top of the page.
6      A    Uh-huh.
7      Q    Do you see that document?
8      A    Yes.
9      Q    Did you create that diagram?
10     A    We created the bubbles in and around
11 the areas in order to describe what we
12 observed.
13     Q    But below there, there is a diagram
14 of the Cermak ramp; is that correct?
15     A    There is.
16         MR. GALASSO:  That was what she was
17     referring to.
18 BY THE WITNESS:
19     A    Yeah.  We did not draw the -- We did
20 not prepare the drawing.  We did an overlay on
21 top of it in order to identify the areas that
22 we were discussing.
23 BY MR. MORRISSEY:
24     Q    In the -- At the top of the page, it

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 26

ELLEN STONER
September 8, 2021

Page 104

1    looks like -- It says:  Copy paste of
2    walkthrough from March 2028 [sic].  Currently
3    in 2019, this scope is awaiting processing of
4    Appendix 1 for AV [sic] VIA procurement 8/26/19.
5    And then below that, it has E, Cermak ramp.
6              Is your -- the information that's in
7    the box is prepared by you?
8         A    Correct.
9         Q    Was that part of a larger document
10   that you provided STV or Cook County as a
11   result of your walkthrough in March of 2018?
12        A    That I don't recall.
13        Q    Do you know the significance of
14   E, Cermak Ramp?  Would that indicate that there
15   were other areas during your walkthrough in
16   March of 2018 that you included in a report?
17        A    I don't recall.
18        Q    On the top of that, the heading that
19   I read, copy paste, it refers to an Appendix 1.
20   Do you see that?
21        A    Yes.  I see that.
22        Q    I'm going to ask you to look at
23   another document, 101, Exhibit 101.
24        A    Uh-huh.

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 105

1              MR. MORRISSEY:  Do you have that up
2         on the screen, Mark?
3              MR. GALASSO:  Yeah, she has it up on
4         hers, and I have it up on mine.
5    BY MR. MORRISSEY:
6         Q    And on the Page 7 of 7, on the second
7    page of Exhibit 101, which is Bates Stamped 242
8    under 5.1 it says:  Additional scope request.
9    A, the Cermak ramp, which is included in the
10   RFQ write-up in Appendix 1.  Do you see that?
11        A    I do.
12        Q    What is meant by that RFQ?
13        A    RFQ is an abbreviation for a Request
14   for Qualification.
15        Q    Qualifications for what?  In your
16   field of work, what does a request for
17   qualification mean?
18        A    In general, it's looking for
19   qualifications for a professional.
20        Q    Professional to renovate the ramp or
21   to do design drawings or...
22        A    I don't know what context he wanted --
23   he put this in for the RFQ.
24        Q    If we look at Exhibit 101, the third

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 106

1    page of that group exhibit, it's Bates Stamped
2    243.  It's titled:  869 Cermak Renovations, ADA
3    Improvements, and then it has Appendix 1.  Do
4    you see that, Scope of Services?
5         A    Oh, yes.  Uh-huh.
6              MR. GALASSO:  She's still scrolling
7         to get there.  She saw it on mine, and now
8         she is trying to get it in her line of
9         sight.
10   BY THE WITNESS:
11        A    Yes, I see it.
12   BY MR. MORRISSEY:
13        Q    In Exhibit Number 2 on the second
14   page in the box that was filled in by your firm
15   in a bubble.  It says Appendix 1.
16              Is this the Appendix 1 that you're
17   referring to?
18              MR. GALASSO:  So it hasn't been
19         established that that's her language --
20         THE WITNESS:  Correct.
21              MR. GALASSO:  -- on the top.  You
22         only asked her what was in the box.
23              MR. MORRISSEY:  Okay.
24              MR. GALASSO:  On top of the box.

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 107

1    BY MR. MORRISSEY:
2         Q    Above the box on Page 2 of Exhibit 2,
3    there's a heading that I previously read:  Copy
4    paste of walkthrough from March 2018, and then
5    it refers to Appendix 1.  Awaiting processing
6    of Appendix 1.
7              Is this Appendix 1 that's referred to
8    in Exhibit 2, Page 2?
9         A    I don't know because I did not
10   prepare the appendix.  So I don't know how
11   these documents relate to one another.
12        Q    Well, if we turn to -- In Exhibit 101
13   under the Appendix 1, the fourth page -- Let's
14   look at Appendix 1, Page 2.
15              MR. GALASSO:  So this is 101 you're
16         still on?
17              MR. MORRISSEY:  I'm on page -- I'm on
18         Exhibit 101, the document that's Bates
19         Stamped 244.
20              MR. GALASSO:  Okay.  Are you there?
21         THE WITNESS:  Yeah.
22              MR. GALASSO:  All right.  She's
23         there.
24

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 27

ELLEN STONER
September 8, 2021

Page 108

```
1   BY MR. MORRISSEY:
2       Q    Under General Requirements, A, were
3   you involved in working on (inaudible) projects
4   for STV?
5           MR. GALASSO:  I'm sorry.  Can you --
6       You broke up.
7           THE REPORTER:  Tom, can you say that
8       again?
9   BY MR. MORRISSEY:
10      Q    Under the Agenda 1 on Page 2 of Group
11  Exhibit 101, it has various projects under
12  General Requirements.
13          MR. GALASSO:  Hold on.  You changed
14      your question and focus.  We have to --
15      Your on page?
16          MR. MORRISSEY:  I'm on Page 2 of
17      Agenda 1, Bates Stamped 244.
18          THE REPORTER:  I'm sorry, Tom.  Say
19      that once more.  You're on page 2?
20          MR. GALASSO:  All right.  Go ahead.
21          THE REPORTER:  No, say it again, Tom.
22      Tom, can you say it again?  You're on page
23      2 of what?
24
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 109

```
1   BY MR. MORRISSEY:
2       Q    Of Agenda 1, which is part of Group
3   Exhibit 101, and under A, General Requirements.
4           My question is:  Have you
5   participated as a contractor for STV in these
6   various projects?
7       A    I'm not sure how to answer that.
8           MR. GALASSO:  Well, what projects are
9       you referring to?
10          THE WITNESS:  Yeah.
11  BY MR. MORRISSEY:
12      Q    Well, the projects at the Cook County
13  Courts, Department of Facilities Management.
14          MR. GALASSO:  Where are you looking
15      at?  Are you looking at the list of the
16      hollow bullet points?
17          MR. MORRISSEY:  Let me take a minute
18      break.
19          MR. GALASSO:  Okay.
20              (WHEREUPON, a short
21              break was taken.)
22          MR. MORRISSEY:  Can we go back on the
23      record?
24          THE REPORTER:  Sure.
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 110

```
1           MR. MORRISSEY:  Can I rephrase my
2       question to revise the question?
3   BY MR. MORRISSEY:
4       Q    On Page 4 of Agenda 1, which is part
5   of, again, Exhibit 101, there's a list of areas
6   in the Cook County Jail that are part of
7   projects for repair work that appears to be
8   under some type of contract with STV.
9           Looking at that list of items:  The
10  work shall generally incorporate the following
11  spaces but is not limited to these spaces.  I'm
12  referring to the Cook County Jail.  Pharmacy
13  dispensary, physical therapy room, holding
14  cells in lower level.
15          MR. GALASSO:  Can you --
16          THE WITNESS:  Page 4.
17          MR. GALASSO:  I'm sorry.  Could you
18      give us the Bates Stamp?
19          MR. MORRISSEY:  It's Bates Stamped
20      246.
21          MR. GALASSO:  246, okay.
22          THE WITNESS:  The green text.
23          MR. GALASSO:  You're referring to the
24      green text on 246?
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 111

```
1           MR. MORRISSEY:  Well, it's not green
2       on my sheet.
3   BY MR. MORRISSEY:
4       Q    But there is a list of items and
5   areas that are included in the areas -- spaces
6   that were to be evaluated.
7           MR. GALASSO:  Yes.
8   BY MR. MORRISSEY:
9       Q    It's either -- Again, it's
10  highlighted in green:  Pharmacy dispensary,
11  physical therapy room, holding cells in lower
12  level, restrooms to the south of holding cells
13  and lower level, x-ray rooms, x-ray/treating
14  rooms, dialysis rooms, visitation rooms on the
15  first floor, isolation cells in the upper
16  levels, group holding rooms in upper levels,
17  shower rooms, dayroom, other areas including
18  detainee toilets and showers not covered
19  elsewhere; Cermak tunnel ramp, even if over
20  100 feet away from building footprint;
21  safety/security stations, dayrooms, sitz bath,
22  stairways, path of egress, interior and
23  exterior, doors and hardware, elevator lobbies
24  signage.
```

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 28

ELLEN STONER
September 8, 2021

Page 112

1    My question is: Are those some of
2 the spaces at the jail and at Cermak in
3 particular that your firm was given an
4 assignment to evaluate for ADA compliance by
5 STV?
6    A    I don't recall how many of those were
7 assigned to us.
8    Q    Which ones do you recall specifically
9 doing an evaluation for STV?
10    A    I don't recall any specifics on any
11 of these.
12    Q    The records that you reviewed prior
13 to today's deposition which were part of the
14 subpoena, Exhibit A, did any of those documents
15 include any of these areas within Cermak?
16    A    My preparation for today was focused
17 around the Cermak ramp.  I didn't review any
18 documents outside of that.
19    Q    Do you have any recollection at all --
20 Let me revise that question.
21    Other than -- When you were given an
22 assignment to evaluate Cermak to determine
23 whether or not there were ADA issues, did you
24 normally physically go over and inspect the

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 113

1 areas that STV asked you to evaluate?
2    A    I -- Depending on the assignment, we
3 would review the conditions we were asked to
4 review.
5    Q    So my question is: When your firm is
6 given an assignment to evaluate areas within
7 the Cermak building, did you participate
8 personally in doing an inspection --
9 inspections of those areas?
10    A    I don't recall.
11    Q    Other than yourself, in your firm,
12 who else would have inspected areas which were
13 assigned to you by STV?
14    A    I don't recall.
15    Q    Anything refresh your memory?
16    A    No.
17    Q    If your firm did receive an
18 assignment -- If your firm received an
19 assignment from STV to examine any of the areas
20 that are listed on Page 246 it would have been
21 your practice and policy to provide a written
22 report to STV after doing an inspection; is
23 that fair to say?
24    MR. GALASSO:  Objection,

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 114

1    mischaracterization and form.  You can
2    answer.
3 BY THE WITNESS:
4    A    Yes.  We would provide them with a
5 document, a written document, summarizing our
6 findings with photos and an illustration if
7 needed.
8 BY MR. MORRISSEY:
9    Q    On Page 246 where it mentions Cermak
10 tunnel ramp, that's the tunnel that we've --
11 that's the ramp you were referring to in
12 regards to the Cermak ramp, correct?
13    A    Yes.  I believe so, uh-huh.
14    Q    And prior to doing that evaluation,
15 you would have requested STV to provide you
16 with some type of illustrated floor plan of the
17 ramp?
18    MR. GALASSO:  Objection, asked and
19    answered.
20 BY THE WITNESS:
21    A    Yes.  I believe we've looked at that
22 together.
23 BY MR. MORRISSEY:
24    Q    And on -- In Exhibit Number 2 on

TOOMEY REPORTING
312-853-0648

---

ELLEN STONER
September 8, 2021

Page 115

1 Page 2, the diagram of the ramp is a document
2 that you would have received prior to your
3 inspection of the that ramp.  It would be an
4 illustrated floor plan?
5    MR. GALASSO:  So to be fair, what
6    you're showing her is not a document.  It's
7    actually titled as copy paste of
8    walkthrough from March 2018.
9    So I don't think that's a fair
10    question for her.
11    MR. MORRISSEY:  Well, what's depicted --
12    and, Mark, you're correct.  What we have
13    here is probably only a part of what
14    consisted of a walkthrough in March of 2018
15    by the deponent's firm.
16 BY MR. MORRISSEY:
17    Q    But what's depicted here on Page 2 of
18 Exhibit 2, is that an example of an illustrated
19 floor plan, in this case, of the ramp, the
20 Cermak ramp?
21    MR. GALASSO:  So if I can, and I'm
22    not trying to be obstructive or difficult,
23    but she testified and there's a color
24    version of this in Exhibit 4 or something

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 29

ELLEN STONER
September 8, 2021

Page 116

```
 1    close that, and what she's testified to is
 2    she's given the drawing that is an existing
 3    conditions drawing, and then she put
 4    bubbles over them.  And if you had this in
 5    color, you would actually see the red in
 6    the bubbles where it says work area -- It's
 7    blurry here, but I think it says:  Work
 8    Area E, and then there's a work area.
 9         You might have a better example
10    of this in Exhibit 4.  She would have had
11    an entire drawing of that floor, which
12    bubbles would have been placed in, that she
13    placed the bubbles in.
14    BY MR. MORRISSEY:
15      Q    Okay.  Looking at the diagram that's
16    on Page 2 -- Let me revise that.  If we could
17    turn to Exhibit 4, Page 2.
18         MR. GALASSO:  That's what I was
19      referring to, the color version.
20         MR. MORRISSEY:  Okay.
21    BY MR. MORRISSEY:
22      Q    So my question is:  What's on Page 2
23    of Exhibit 4, is that an example of a document
24    which you would consider an illustrated floor
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 117

```
 1    plan?
 2         MR. GALASSO:  So the same objection.
 3      I don't know that this is actually a
 4      document but a cutout of a document.  And I
 5      think that's what -- Again, this is the
 6      same exact thing that you were showing her
 7      in the other exhibit except this one is in
 8      color and shows the red bubbling.
 9         MR. MORRISSEY:  Right.  Correct.  It
10      is in color.
11    BY MR. MORRISSEY:
12      Q    My question again is:  Is this an
13    example of a document you would have received
14    before doing your walkthrough of the Cermak
15    ramp?
16         MR. GALASSO:  Same objections, go
17      ahead.
18    BY THE WITNESS:
19      A    The underlying drawing is
20    representative of the type of existing
21    conditions we were provided.
22    BY MR. MORRISSEY:
23      Q    When you did this walkthrough in
24    March of 2018, do you know whether or not you
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 118

```
 1    had this drawing which is on Page 2 of Exhibit 4?
 2    BY THE WITNESS:
 3      A    I don't recall.  We are not always
 4    prepared with existing conditions when we did
 5    our site visits.
 6    BY MR. MORRISSEY:
 7      Q    At some point either before or after
 8    the walkthrough in March of 2018 of the Cermak
 9    ramp area, did you receive this drawing?
10      A    Yes.
11      Q    There's two work areas that are
12    indicated in this drawing.  There's a Work
13    Area E with an arrow pointing to the Cermak --
14    the corridor ramp it's called.  Do you see
15    that?
16         MR. GALASSO:  So can you -- Ms. Reporter,
17      can you read back that question?  I missed
18      what he called those areas.
19         (WHEREUPON, the record
20              was read as requested.)
21    BY THE WITNESS:
22      A    Yes.  But it's not a work area, but I
23    see it.
24
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 119

```
 1    BY MR. MORRISSEY:
 2      Q    Did you or did your firm put the box
 3    in where it says:  Work Area E?  Is that
 4    something that you would have drawn in or your
 5    firm would have drawn in?
 6      A    Yes.
 7      Q    Why would you have drawn in, in a box
 8    Work Area E in this illustration?
 9      A    It was simply to help identify what
10    area we had assessed.
11      Q    And everything that's in red on this
12    diagram to Exhibit 4 was inserted by your firm?
13      A    Yes.  I believe it was.
14      Q    Going back to Exhibit 2, Page 2, in
15    the box at the top, you have:  E, Cermak Ramp,
16    correct?
17      A    Yes.
18      Q    So that refers to the other areas
19    that you inspected in your walkthrough in March
20    of 2018?
21      A    It's intended to tie the text to the
22    illustration.
23      Q    And then in addition to Work Area E,
24    you or some member of your firm have another
```

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 30

ELLEN STONER
September 8, 2021

Page 120

1   box, Work Area D, correct?
2       **A   Yes.**
3       Q     And there was a line that's drawn to
4   the detainee toilet?
5       **A   Yes.**
6       Q     Does that indicate that your firm
7   during the walkthrough in March of 2018 did an
8   evaluation, an ADA evaluation of the detainee
9   toilet in the lower level of the Cermak
10  building?
11      **A   I don't recall because our**
12  **assignments were very specific.  So I can't say**
13  **to what that -- what the scope of that**
14  **assignment was.**
15      Q     Was there one report that you
16  prepared for STV that included Work Area D and
17  Work Area E?
18      **A   I don't recall if they were in the**
19  **same report.**
20      Q     Would it have been a fair assumption
21  that the report that you prepared to STV after
22  your walkthrough in 2018 included Work Areas A
23  through at least Work Areas E?
24          MR. GALASSO:  Objection as to form

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 121

1           and speculation.  Go ahead.
2   BY THE WITNESS:
3       **A   It's possible.  I don't recall.**
4   BY MR. MORRISSEY:
5       Q     Was there an introduction to your
6   report prepared to STV from your walkthrough in
7   March of 2018?
8       **A   An introduction?**
9       Q     Well, let me rephrase the question.
10  You did the walkthrough in March of 2018.  It
11  would have been your practice and policy to do
12  a report for STV?
13      **A   We would have summarized our findings**
14  **in a written report, yes.**
15      Q     Prior to this deposition, did you
16  review a report that included your walkthrough
17  in March of 2018?
18      **A   I reviewed information pertaining to**
19  **the Cermak ramp.**
20      Q     And did that include a report that
21  you provided STV in regards to your walkthrough
22  in March of 2018?
23      **A   I don't recall a comprehensive**
24  **report.**

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 122

1       Q     On the diagram in exhibit -- on Page 2
2   of Exhibit 4, inside the -- for instance, the
3   corridor ramp, there is a Number B0119 [sic].
4   Do you know what that refers to?
5       **A   I believe that's a room numbering**
6   **nomenclature that the County uses.**
7           MR. MORRISSEY:  I'm going to take a
8       moment.
9   BY MR. MORRISSEY:
10      Q     Looking at the illustrative floor
11  plan on Page 2 of Exhibit 4, the area below, is
12  that the lower level of the Cermak building?
13      **A   One would presume.**
14      Q     Have you ever been in, as the
15  contractor for STV, the lower level of the
16  Cermak building?
17      **A   A contractor, no.  I have never been**
18  **a contractor.**
19      Q     As part of your services for STV,
20  have you ever been in the lower level of the
21  Cermak infirmary?
22      **A   Yes, yes.**
23      Q     Why have you been in the lower level
24  of the Cermak infirmary?

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 123

1       **A   I was in the lower level to review**
2   **assignments given to me by STV.**
3       Q     All right.  What assignments were you
4   given in regard --
5       **A   I don't recall the specifics.**
6       Q     Well, let me finish my question.  To
7   the best of your knowledge, did you have an
8   assignment from STV in regards to holding cells
9   in the lower level of the Cermak infirmary?
10      **A   I don't recall.**
11      Q     Would anything refresh your memory
12  about that?
13      **A   No.**
14      Q     Would an assignment, an e-mail from
15  STV refresh your memory if you were given an
16  assignment to review whether or not holding
17  cells in the lower level of Cermak were
18  accessible?
19          MR. GALASSO:  Tom, you broke up
20      there.
21  BY MR. MORRISSEY:
22      Q     Would reviewing an e-mail of an
23  assignment by STV refresh your memory in
24  regards to evaluating whether the holding cells

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 31

ELLEN STONER
September 8, 2021

Page 124

1  in the lower level of Cermak were accessible?
2      **A**    **Maybe.  I don't --**
3      Q    Same question.  Would an assignment
4  from STV through an e-mail to you or to your
5  firm refresh your memory possibly about
6  reviewing whether or not there were any
7  accessible detainee toilets in the lower level
8  of the Cermak building?
9      **A**    **Possibly.**
10     Q    In the Cermak building, were you ever
11 given an assignment to assess whether the
12 toilet facilities in the building were
13 accessible for detainees?
14     **A**    **I don't recall.**
15     Q    Were you given an assignment from STV
16 in regards to the shower facilities in the
17 Cermak infirmary being accessible or not
18 accessible to detainees?
19     **A**    **That I don't recall.**
20     Q    Turning to the information that -- on
21 Page 2 of Exhibit 4 that's in -- under E, Cermak
22 Ramp.
23     When you did your walkthrough of the
24 Cermak ramp in March of 2018, did you -- did

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 125

1  you have any instruments with you such as a
2  tape measure or any instrument to measure the
3  ramp area?
4      **A**    **Yeah, because we took measurements.**
5  **I believe we had a laser measure as well as a**
6  **slope level -- I don't recall -- to determine**
7  **the slope of the ramp.**
8      Q    When you say "we," who are you
9  referring to?
10     **A**    **Well, as we've established, it was**
11 **myself, Scott Utter and Scott Achterhof.**
12     Q    And when you measured the length of
13 the landing, where did you -- it says:
14 Existing ramp is 47 feet long without a
15 landing.
16     Can you tell me how you conducted --
17 how you took that measurement?
18     **A**    **How I took the measurement?**
19     Q    Yes.  From where did you start --
20 From what point of the ramp did you start until
21 the finish to determine --
22     **A**    **I don't recall exactly how we took**
23 **that measurement.**
24     Q    Were you the person that actually

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 126

1  used a laser beam to measure the length of the
2  ramp?
3      **A**    **I don't recall if it was me or Scott.**
4      Q    How did you determine that the slope
5  of the ramp was 1 to 12?
6      MR. GALASSO:  You cut out there, Tom.
7  BY MR. MORRISSEY:
8      Q    How did you measure the slope of the
9  ramp?
10     **A**    **Well, as I indicated, we have a**
11 **slope-o-meter I believe it's called.  It's a**
12 **2-foot level that has an electronic ability to**
13 **measure the percentage of incline of a ramp.**
14     Q    What ADA standards did you use to
15 consider whether or not the Cermak ramp was
16 accessible or not accessible?
17     **A**    **We were looking at the 2010 ADA**
18 **requirements.**
19     Q    Do you know in what year the Cermak
20 building was built?
21     **A**    **No, I do not.**
22     Q    Were you ever provided that
23 information by Cook County or the Sheriff?
24     **A**    **Not that I recall.**

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 127

1      Q    Why did you use the 2010 standards to
2  determine whether or not the ramp was compliant
3  with the ADA?
4      **A**    **Because we were asked to evaluate**
5  **that condition against that standard.**
6      Q    Who asked you to evaluate it based
7  upon the 2010 standards?
8      **A**    **This was part of our assignment from**
9  **STV was to review built conditions against the**
10 **current standards.**
11     Q    Were you given that assignment in
12 regards to the ramp that -- the Cermak ramp
13 that you were to evaluate it under the 2010 ADA
14 standards?
15     **A**    **Yes.**
16     Q    And that would have been by David
17 Theising?
18     **A**    **That was a general requirement of our**
19 **contract.**
20     Q    Did anybody -- Were you ever informed
21 by STV, Cook County or the Sheriff that Cermak
22 was constructed in the year 1998?
23     **A**    **Not that I recall.**
24     Q    Did that have any -- Did the year in

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 32

ELLEN STONER
September 8, 2021

Page 128

1  which the building was constructed, did that
2  have any -- did that influence your opinion
3  whether or not it complied with the ADA?
4      A.   No.
5      Q.   If it was built in 1998, to what
6  degree would the 1991 ADA standards apply?
7      A.   I don't know if I can answer that
8  without further evaluation of the codes.
9      Q.   Are you familiar with the 1991 ADA
10  standards in regards to ramps?
11      A.   Somewhat, yes.
12      Q.   When you say "somewhat," what do you
13  mean by that?
14      A.   In a general sense, I am familiar
15  with them.
16      Q.   Prior to your receiving this contract
17  with STV, had you ever been asked or contracted
18  by a government entity to determine whether or
19  not a building or facility was accessible?
20      A.   Yes.  I did quite a bit of work with
21  Chicago Public Schools.
22      Q.   Are you aware that the 1991
23  standard (inaudible) --
24          THE REPORTER:  Tom, you broke up.

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 129

1      Can you start over?
2  BY MR. MORRISSEY:
3      Q.   Are you aware that the 1991 ADA
4  standards were applicable for buildings built
5  after 1991 up to March of 2012?
6      A.   Yes.
7      Q.   In your evaluation of the Cermak ramp
8  in March of 2018, did it comply with the ADA
9  1991 standards?
10      A.   I believe our summary stated that it
11  did not comply with the 2010 standards against
12  which we were measuring it.
13      Q.   Why didn't you consider the 1991
14  standards?
15      A.   Because that was not our assignment.
16      Q.   Were the standards in regards to the
17  rise of a ramp the same under the 2010
18  standards and the 1991 standards?
19      A.   Yes, I believe they are the same.
20      Q.   Are the -- Were the standards under
21  the 1991 standards and the 2010 ADA standards
22  the same in regards to the handrails?
23      A.   I don't recall because I believe
24  there were changes.  I would have to compare

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 130

1  the two.
2      Q.   Were the standards the same in
3  regards to -- Let me rephrase the question.
4          Did you conclude that -- Under the
5  2010 standards, did you measure the rise of the
6  ramp?
7      A.   Yes.  We took a general slope of the
8  ramp.
9      Q.   What was the rise of the ramp?
10      A.   Well, as it says in the document, it
11  fit within the parameters of the 1 to 12.
12      Q.   What is the difference between a rise
13  and a slope in the architectural field?  Can
14  you describe what the slope means?
15      A.   A slope would be, you know, either
16  percentage or, you know, one inch per 12 inches.
17  One inch rise for 12 inches of run would give
18  you the slope of the ramp.
19      Q.   And is it true that under the 1991
20  standards that if the length of the ramp
21  exceeded 43 feet, then -- and if the rise
22  exceeded the maximum of 30 inches, that the
23  maximum run of the slope to be compliant would
24  be 30 feet?

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 131

1      MR. GALASSO:  I will object as to
2  form.  I think there's multiple questions
3  within there, and she's already testified
4  that she doesn't have specific knowledge of
5  the '91 requirements.  She can answer with
6  those -- under those objections?
7      MR. BENTLEY:  Join in the objection.
8  BY THE WITNESS:
9      A.   So --
10  BY MR. MORRISSEY:
11      Q.   Well, let me ask you a preliminary
12  question.  Did the rise of the ramp exceed
13  30 inches based upon your evaluation in March
14  of 2018?
15      A.   I don't believe we actually
16  calculated the overall rise.  Our observation
17  was that the length exceeded the requirements,
18  but the slope was compliant.
19      Q.   Under the 2010 standards, if the rise
20  exceeded 30 inches, would that be compliant
21  with the ramp -- would the ramp be compliant
22  with the ADA?
23      A.   I don't believe it would be, no.
24      Q.   And if the rise exceeded 30 inches, was

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 33

ELLEN STONER
September 8, 2021

Page 132

```
 1   the ramp compliant if the ramp was 47 inches --
 2   47 feet long?
 3          MR. GALASSO:  You're referring to the
 4      2010 --
 5   BY MR. MORRISSEY:
 6      Q    Under the 2010 standards, if the rise
 7   exceeded 30 inches and the ramp as you measured
 8   it had a length of 47 feet long, would that
 9   comply with the ADA standards under the 2010
10   standards?
11      A    No.  I thought we had established
12   that.  The run of the ramp cannot exceed
13   30 feet without a landing.
14      Q    As an architect, why is it significant
15   if the rise was over 30 inches and the length
16   of the ramp was 47 feet long?  Why does that
17   have significance in regards to it being
18   accessible for a disabled person under the ADA?
19          MR. GALASSO:  Object as to
20      foundation, form and ambiguous.
21          MR. BENTLEY:  Join.
22          MR. GALASSO:  What do you mean by
23      "significance"?
24
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 133

```
 1   BY MR. MORRISSEY:
 2      Q    Based upon your understanding of the
 3   2010 standards, why did you find that they
 4   needed to create a ramp with a landing at
 5   30 feet from the top of the ramp?
 6      A    Because that's how --
 7          MR. GALASSO:  Stop.  Stop.  Go ahead.
 8      Sorry.  I was --
 9          MR. MORRISSEY:  Let me rephrase the
10      question.
11          MR. GALASSO:  Yeah, I was going to
12      object, but...
13   BY MR. MORRISSEY:
14      Q    The recommendation you made -- One of
15   the recommendations you made was create a
16   compliant landing 30 feet from the top of the
17   ramp.  Why did you make that recommendation?
18      A    We were suggesting a solution to
19   rectify the noncompliant nature of the ramp.
20      Q    If the ramp was 47 feet long under
21   the 2010 standards, did it require a landing
22   30 feet from the top of the ramp in order to be
23   compliant?
24          MR. GALASSO:  Object to the
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 134

```
 1      misleading nature of that question.  She's
 2      already testified that she recommended that
 3      the ramp not be 47 feet long.
 4          THE WITNESS:  Correct.
 5          MR. BENTLEY:  Join.
 6          MR. GALASSO:  But I don't know if you
 7      can answer.
 8   BY MR. MORRISSEY:
 9      Q    Well, let me rephrase the question.
10      A    I'm not sure what the question was.
11      Q    Why did you recommend a landing
12   30 feet from the top of the ramp in order to be
13   compliant under the 2010 code?
14      A    The recommendation -- The goal of the
15   recommendation was to reduce the continuous run
16   of the ramp to not exceed 30 feet in order to
17   become compliant.
18      Q    Based upon your understanding of the
19   2010 ADA standards, for what purpose does the
20   code require a landing at 30 feet for a ramp?
21          MR. GALASSO:  I'm going to object as
22      to foundation relative to what purpose for
23      which the ADA created its requirements.
24          MR. MORRISSEY:  I'm asking her in her
```

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 135

```
 1      field as an architect.
 2   BY MR. MORRISSEY:
 3      Q    Can you give me a reason why --
 4          MR. GALASSO:  I think it's fair for
 5      you to ask what the requirements are, but
 6      as to how the ADA came up with those
 7      requirements, that's speculating unless she
 8      was part of the ADA or a part of the
 9      committees to create those requirements or
10      the changes therein.  But you can answer
11      the question because I'm not telling her
12      not to answer it but those are my
13      objections.
14   BY MR. MORRISSEY:
15      Q    Do you know the reason behind
16   requiring a ramp 30 feet from one portion of
17   the start of the ramp?
18      A    No, I don't know why.  My job as an
19   architect is to interpret and apply those
20   requirements.
21      Q    And you informed the County that
22   under your understanding of the existing law at
23   the time that they needed to have a ramp at
24   least 30 feet from the top of the -- Strike
```

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 34

ELLEN STONER
September 8, 2021

Page 136

1  that.
2       You notified STV and Scott Achterhof
3  that there was a need for a landing 30 feet
4  from the top of the ramp; is that fair to say?
5       A    **We notified STV that the length of**
6  **the ramp exceeded requirements.  Our**
7  **recommendation was to put in a landing 30 feet**
8  **from the top.**
9       Q    Did you inform Scott Achterhof during
10 the walkthrough that your understanding of the
11 law that the landing was required 30 feet from
12 the top of the ramp?
13      MR. GALASSO:  Hold on.  Are you
14      asking about her understanding of the ADA
15      or the law in general?
16      MR. MORRISSEY:  I'm asking her did
17      she inform Scott Achterhof of her finding
18      that there was a need for a landing 30 feet
19      from the top of the ramp.
20      MR. GALASSO:  You're asking if this
21      occurred during the walkthrough itself?
22      MR. MORRISSEY:  Correct.
23 BY THE WITNESS:
24      A    **I don't recall if we conveyed that to**

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 137

1  **him.**
2  BY MR. MORRISSEY:
3       Q    Did you ever convey to Scott
4  Achterhof or any member of Cook County
5  government that there was a need to have a
6  landing 30 feet from the top of the ramp?
7       A    **My communication was strictly with**
8  **STV and those that gave me the assignment.**
9       Q    But you also attended the --
10      MR. GALASSO:  Hold on.  She wasn't
11      finished.
12      MR. MORRISSEY:  I'm sorry.
13      MR. GALASSO:  Go ahead.
14 BY THE WITNESS:
15      A    **In responding to the e-mail**
16 **assignment, if others were copied on it, then**
17 **they were included in our response.  But if**
18 **they were not, we did not add people or change**
19 **who the communication was going to in our**
20 **response.**
21 BY MR. MORRISSEY:
22      Q    You attended agenda meetings in 2018
23 and 2019 with individuals from the Sheriff's
24 Office and Cook County; is that fair to say?

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 138

1       A    **Yes, it is --**
2       Q    During --
3       A    **-- fair to say.**
4       Q    I didn't mean to interrupt you.
5  During those agenda meetings with
6  representatives from the Sheriff and Cook
7  County, did you discuss your ADA findings in
8  regards to your walkthrough in March of 2018?
9       A    **I don't recall that we did that.**
10 **Those meetings were in general about status and**
11 **not about specifics.**
12      Q    When you say that meetings were about
13 status, if the agendas reflected that you and --
14 You or STV had made recommendations for
15 renovating the Cermak ramp to make it compliant
16 under the ADA code; is that fair to say?
17      MR. GALASSO:  Objection as to form.
18 BY THE WITNESS:
19      A    **Yes.  We made recommendations of how**
20 **they could bring things into compliance.**
21 BY MR. MORRISSEY:
22      Q    In addition to the ramp not having a
23 landing within 30 feet from the top of the
24 ramp, you also found that the handrails were

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 139

1  incompliant with the 2010 code, correct?
2       A    **Uh-huh.**
3       MR. GALASSO:  You have to say that
4       verbal.
5  BY THE WITNESS:
6       A    **Yes.  Sorry.**
7  BY MR. MORRISSEY:
8       Q    Why did you -- How did you determine
9  that the handrails were not compliant under the
10 2010 code?
11      A    **I don't recall the specifics of why**
12 **they were deficient.**
13      Q    In regards to the Cermak ramp, did
14 you in your report to STV, did you make
15 recommendations in regards to how the County
16 could make the handrails compliant under the
17 2010 code?
18      A    **Beyond what is in this exhibit, no.**
19      Q    To your knowledge, did the handrails
20 that you inspected in March of 2018, did they
21 comply with the 1991 ADA standards?
22      A    **I don't know.  We did not evaluate**
23 **them in that -- in that filter.**
24      Q    After doing a walkthrough in March of

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 35

ELLEN STONER
September 8, 2021

Page 140

1  2018, do you know what steps, if any, were
2  taken by STV in regards to the Cermak ramps?
3      A   No.  I can't comment on what their
4  activities were.
5      Q   Can you tell me what -- Based upon
6  your understanding of how renovations proceed
7  in Cook County, what additional steps after
8  your evaluation in March of 2018 of the Cermak
9  ramp needed to take place in order for your
10 recommendations to be carried out?
11     A   I don't know.  I was not involved in
12 those processes, so I can't comment.
13     Q   Well, the agenda meetings that you
14 attended document the various stages of
15 renovation projects; isn't that fair to say?
16     A   Yes.
17     Q   So you have a general understanding,
18 I presume, as to how a project is initiated and
19 the various steps that are followed by Cook
20 County in seeking funding, design drawings and
21 the completion of a project such as your
22 recommendations you made for the Cermak ramp;
23 is that fair to say?
24     A   They were very broad procedures that

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 141

1  were discussed.  I don't know the details of
2  how those things progressed or who was
3  responsible for what.  I can't speak to it with
4  any certainty or knowledge.
5      Q   Do you know if any steps were taken
6  after your walkthrough in March of 2018 to make --
7  to renovate the Cermak ramp so that it would be
8  compliant with either the 1991 code or the 2010
9  standards?
10     A   All I know is that our recommendations
11 were rolled into the Appendix 1.  I don't know
12 where it went from there.
13     Q   By "Appendix 1," you're referring to
14 the document we looked at in Exhibit 101?
15     A   No.
16         MR. GALASSO:  So the meeting minutes
17     have attached to them an appendix, but it's
18     not known -- I don't think it's clear if
19     that's the actual appendix that was created
20     or a draft of them.
21         THE WITNESS:  Right.
22 BY MR. MORRISSEY:
23     Q   Is there a -- Did you review in
24 preparation for today's deposition a different

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 142

1  Appendix 1 from what's attached to Exhibit 101?
2         MR. GALASSO:  To be fair, you've
3     never established that she looked at any
4     Appendix 1.
5         MR. MORRISSEY:  Well, I mean, she just
6     mentioned that it was part of Appendix 1.
7         MR. GALASSO:  I'm sorry.  What?
8         MR. MORRISSEY:  She just said that --
9     she just -- Peggy, you can read it back.
10        MR. GALASSO:  I'm sorry.  I could
11     stop you there.  Certainly she said it was
12     rolled into Appendix 1.  But whether or not
13     the final Appendix 1 that's attached to any
14     particular single document, that is not
15     something within her purview.  She provides
16     information.  And this is what her
17     testimony has been and what you can glean
18     from the documents even in your exhibits.
19        MR. MORRISSEY:  Can we take a
20     two-minute break?
21        MR. GALASSO:  Sure.  And if you want,
22     I'm happy to have a conversation with you
23     off the record but on Zoom, so I can
24     perhaps help.

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 143

1         MR. MORRISSEY:  Okay.  Well, let's
2     take a ten-minute break.
3         MR. GALASSO:  All right.  So we're
4     off the record?
5         THE REPORTER:  Yes.
6         MR. MORRISSEY:  We're off the record.
7             (WHEREUPON, a discussion
8              off the record was held.)
9         MR. MORRISSEY:  So off the record,
10     the attorneys had a discussion in regards
11     to the documents which were subpoenaed for
12     today's date.  My understanding is we're
13     going to try to work out between STV and
14     Cook County some arrangement where certain
15     documents can be turned over.  And when
16     that's done, we're going to -- after those
17     are turned over, we're going to set a date
18     to continue this deposition.
19        MR. GALASSO:  That's correct.  And I
20     will add that this was a consideration and
21     an event that I discussed was a distinct
22     possibility given the fact that Altus
23     needed prior authorization to produce the
24     documents and that Cook County wanted to

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 36

ELLEN STONER
September 8, 2021

Page 144

1   review them prior to production, given the
2   nature of the documents themselves.
3       MR. MORRISSEY:  All right.  Thanks,
4   everybody.

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 145

1   STATE OF ILLINOIS )
                      )  ss:
2   COUNTY OF C O O K )
3       I, Peggy A. Anderson, a Certified
4   Shorthand Reporter in the State of Illinois do
5   hereby certify:
6       That previous to the commencement of
7   the examination of the witness, the witness was
8   duly sworn to testify the whole truth
9   concerning the matters herein;
10      That the foregoing deposition
11  transcript was reported stenographically by me,
12  was thereafter reduced to typewriting under my
13  personal direction, and constitutes a true
14  record of the testimony given and the
15  proceedings had;
16      That the said deposition was taken
17  before me at the time and place specified;
18      That the said deposition was
19  adjourned as stated herein;
20      That I am not a relative or employee
21  or attorney or counsel, nor a relative or
22  employee of such attorney or counsel for any of
23  the parties hereto, nor interested directly or
24  indirectly in the outcome of this action.

TOOMEY REPORTING
312-853-0648

ELLEN STONER
September 8, 2021

Page 146

1       IN WITNESS WHEREOF, I do hereunto set
2   my hand this 11th day of October, 2021.
3
4
5
6

7   Peggy A. Anderson
8   Certified Shorthand Reporter
9   License No. 084-003813

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 37

Case: 1:23-cv-16970 Document #: 135 Filed: 07/14/25 Page 311 of 404 PageID #:1940
Case: 1:23-cv-16970 Document #: 122-7 Filed: 07/08/25 Page 1 of 2 PageID #:1352


Office: (312) 603-0355| Mobile: (312) 599-2877
Cook County Government Facebook | Twitter | Instagram
Toni Preckwinkle Facebook | Twitter | Instagram

This message may contain confidential information and is intended only for the individual(s) addressed in the message. If you are not the named addressee, you should not disseminate, distribute, or copy this e-mail. If you are not the intended recipient, you are notified that disclosing, distributing, or copying this e-mail is strictly prohibited. All content, attachments, or comments are deemed to be in draft or preliminary form unless noted otherwise. This message may contain confidential information that may also be defined as government export controlled technical data and is intended only for the individual(s) or entity/ies named. It may also be attorney-client privileged or otherwise protected as attorney work product. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses.

**From:** Zachary A. Pestine [mailto:pestinez@jbltd.com]
**Sent:** Monday, March 8, 2021 3:13 PM
**To:** Sabrina RiveroCanchola (Sheriff) <Sabrina.RiveroCanchola@cookcountyil.gov>;
Timothy Tyrrell (Facilities Management) <Timothy.Tyrrell@cookcountyil.gov>
**Cc:** Sheila Atkins (Capital Planning) <sheila.atkins@cookcountyil.gov>; Duncan Smith
(Facilities Management) <Duncan.Smith@cookcountyil.gov>; Michael Carberry
(Facilities Management) <Michael.Carberry@cookcountyil.gov>; Tse, Joey @ CHICAGO
<Joey.Tse@cbre.com>; Eric Davis (Capital Planning) <Eric.Davis@cookcountyil.gov>
**Subject:** RE: Cermak ramp *Privileged communication*

Thank you TJ.

**From:** Sabrina RiveroCanchola (Sheriff) <Sabrina.RiveroCanchola@cookcountyil.gov>
**Sent:** Monday, March 8, 2021 2:54 PM
**To:** Timothy Tyrrell (Facilities Management) <Timothy.Tyrrell@cookcountyil.gov>
**Cc:** Zachary A. Pestine <pestinez@jbltd.com>; Sheila Atkins (Capital Planning)
<sheila.atkins@cookcountyil.gov>; Duncan Smith (Facilities Management)
<Duncan.Smith@cookcountyil.gov>; Michael Carberry (Facilities Management)
<Michael.Carberry@cookcountyil.gov>; Tse, Joey @ CHICAGO <Joey.Tse@cbre.com>;
Eric Davis (Capital Planning) <Eric.Davis@cookcountyil.gov>
**Subject:** Re: Cermak ramp *Privileged communication*

Thank you very much TJ for your assistance

Sent from my iPhone

> On Mar 8, 2021, at 2:53 PM, Timothy Tyrrell (Facilities Management)
> <Timothy.Tyrrell@cookcountyil.gov> wrote:

> Good afternoon-

> Please see below for requested measurements:
> • Cermak Ramp Measurements:

>     Width=10'

6

Exhibit 7 Page 1

Slope (measured in different locations on ramp)= 1:16
Length (ramp length) = 44'-0 1/2"
Total Rise= Appx 2'- 7"

Also, I checked the ramp from the same tunnel going into the basement of Division 8- this appears to be slightly out of compliance. I can show you or Sabrina this as well. Looks to be like whomever did the concrete work is to blame for this. Might want to add this one in as well if county is having someone make these ADA Compliant. Let me know if you need anything further.

Thank you,

TJ Tyrrell

General Manager

Department of Facilities Management

P: 773.674.7756

M: 312.898.6967

F: 773.674.3935

E: timothy.tyrrell@cookcountyil.gov

<Outlook-1484935843.png>

**From:** Zachary A. Pestine <pestinez@jbltd.com>
**Sent:** Monday, March 8, 2021 11:18 AM
**To:** Sabrina RiveroCanchola (Sheriff) <Sabrina.RiveroCanchola@cookcountyil.gov>; Sheila Atkins (Capital Planning) <sheila.atkins@cookcountyil.gov>; Duncan Smith (Facilities Management) <Duncan.Smith@cookcountyil.gov>; Michael Carberry (Facilities Management) <Michael.Carberry@cookcountyil.gov>
**Cc:** Tse, Joey @ CHICAGO <Joey.Tse@cbre.com>; Eric Davis (Capital Planning) <Eric.Davis@cookcountyil.gov>; Timothy Tyrrell (Facilities Management) <Timothy.Tyrrell@cookcountyil.gov>
**Subject:** RE: Cermak ramp *Privileged communication*

Exhibit 7 Page 2

Transcript of the Testimony of
**CARL DARR**

**Date:** April 30, 2025

**Case:** HERNANDEZ VS. DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

CARL DARR
April 30, 2025

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CUAUHTEMOC HERNANDEZ,      )
                          )
          Plaintiff,      )
                          )
     -vs-                 ) No. 23-CV-16970
                          )
THOMAS DART, SHERIFF OF COOK )
COUNTY, and COOK COUNTY,  )
ILLINOIS,                 )
                          )
          Defendants.     )

          Deposition of CARL DARR, taken before SHAHERA
ALI, C.S.R., and Notary Public, pursuant to the
Federal Rules of Civil Procedure for the United
States District Courts pertaining to the taking of
depositions, at Suite 230, 230 West Monroe Street,
Chicago, Illinois, commencing at 2:00 o'clock p.m.,
on the 30th day of April, 2025.

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 2

1        There were present at the taking of this
2   deposition the following counsel:
3        THOMAS G. MORRISSEY, LTD. by
         MR. THOMAS G. MORRISSEY
4        MR. PATRICK W. MORRISSEY
         10257 South Western Avenue
5        Chicago, Illinois  60643
         (773) 233-7901
6        tgm@morrisseylawchicago.com
         pwm@morrisseylawchicago.com
7
              on behalf of the Plaintiff;
8
9   DEVORE RADUNSKY by
    MR. JASON E. DEVORE
10   230 West Monroe Street
    Suite 230
11   Chicago, Illinois 60606
    (312) 300-4479
12   jdevore@devoreradunsky.com
13           on behalf of the Defendants.
14                * * * * * *
15
16
17
18
19
20
21
22
23
24

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 3

1              DEPOSITION OF
                 CARL DARR
2           taken April 30, 2025
3   EXAMINATION BY                          PAGE
    MR. THOMAS G. MORRISSEY                  4
4
5                EXHIBITS
6
                                            PAGE
7
    Group Exhibit No. 4                      5
8   (Corridor Ramp Accessibility Assessment.)
9
    Group Exhibit 8                         12
10   (ADA 1991 Standards.)
11   Exhibit No. 5                          34
    (Tunnel Corridor Accessibility Assessment.)
12
13   (All Exhibits Retained by Counsel.)
14
15                * * * * * *
16
17
18
19
20
21
22
23
24

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 1

CARL DARR
April 30, 2025

Page 4

```
1    CARL DARR,
2  called as a witness herein, having been first duly
3  sworn, was examined upon oral interrogatories and
4  testified as follows:
5                    EXAMINATION
6    By Mr. Morrissey:
7        This is the deposition of Carl Darr
8  disclosed by the defendants in this case as their
9  expert witness in regards to the Cermak ramp which I
10 think in your December 6th, 2023, report you
11 identified as the Corridor Ramp Accessibility
12 Assessment, is that correct?
13   A   I believe so, yes.
14   Q   And the other ramp that we're going to be
15 discussing today is the east corridor ramp otherwise,
16 for purposes of this deposition, called the RTU ramp
17 which was included in your Tunnel Corridor Assessment
18 report dated April 1st, 2024, is that fair to say?
19   A   Yes.
20   Q   Will you state your full name and spell it
21 for the court reporter.
22   A   Carl Magnus Darr.
23 THE REPORTER:  How do you spell the middle name?
24 THE WITNESS:  M-a-g-n-u-s.
```

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 5

```
1  MR. MORRISSEY:  Q  Since December 6th, 2023, have
2  you done a further assessment of what we call the
3  Cermak ramp which is the ramp that leads to the
4  Cermak Health Service Facility which is included --
5  actually is part of your December 6th, 2023, report?
6    A   I have not.
7    Q   Have you done any type of investigation in
8  regards to the Cermak ramp since that date?
9  MR. DEVORE:  Objection, form.  You can answer.
10 THE WITNESS:  A  No.
11 MR. MORRISSEY:  Q  Have you looked at any
12 documents since December 6th, 2023, in regards to the
13 Cermak ramp?
14   A   I've looked at my own report.
15   Q   By report, you're referring to Group Exhibit
16 4?  And I'll show you that.  Group Exhibit 4 is the
17 report dated December 6th, 2023.  Is that the report
18 you're referring to?
19   A   Yes.
20   Q   Have you received any compensation from the
21 defendants, Cook County, Cook County Sheriff or the
22 firm of DeVore Radunsky in regards to your testimony
23 today in regards to the Cermak ramp?
24   A   I'm sorry.  I need to understand the
```

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 6

```
1  question.
2    Q   Sure.
3    A   Are you asking if I've received money for
4  today's testimony?
5    Q   Let me rephrase the question.  Has the firm
6  that you work for, Globetrotters Engineering
7  Corporation, received any compensation to testify
8  today in regards to either the Cermak ramp or the RTU
9  ramp?
10 MR. DEVORE:  Objection to form.  You can answer.
11 THE WITNESS:  A  If I understand correctly, no,
12 we have not received compensation yet.
13 MR. MORRISSEY:  Q  From being disclosed an expert
14 in the Hernandez case, have you received -- when I
15 say you, I'm including Globetrotters.  Has
16 Globetrotters received any compensation?
17   A   As I understand the question, no.
18   Q   Did you review your prior deposition in the
19 Westmoreland vs. Dart case which was given on June
20 3rd, 2024?
21   A   Yes.
22   Q   And when did you review that deposition
23 testimony?
24   A   This morning.
```

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 7

```
1    Q   Was that with counsel, with your attorney?
2    A   No.
3    Q   After reviewing your deposition testimony
4  this morning in regards to the Westmoreland case
5  given on June 3rd, 2024, are there any questions that
6  you now feel you didn't fully understand?
7    A   Questions from today?
8    Q   No.  From your deposition in the Westmoreland
9  case, June 3rd, 2024.  Were there any questions or
10 answers that you provided in that deposition that you
11 felt were incorrect?
12 MR. DEVORE:  Object as to form.  You can answer.
13 THE WITNESS:  A  No.
14 MR. MORRISSEY:  Q  Is there anything, as you sit
15 here today from your deposition testimony on June
16 3rd, 2024, you would like to change or amend?
17   A   No.
18   Q   I'm showing you Group Exhibit No. 4.  It's
19 the December 6th, 2023, report that Globetrotters
20 provided in regards to the Cermak ramp.  I ask you to
21 turn to page five of your report.
22       Is it your understanding, as the defendants'
23 expert in this case, that the Cermak ramp was built
24 in or around 1998?
```

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 2

CARL DARR
April 30, 2025

Page 8

1    A   That's my understanding.

2    Q   Now, if a building, a public building, was

3 built in 1998, such as the Cermak ramp and the Cermak

4 Health Facility, was it required to conform or adhere

5 to any ADA Codes or Standards?

6    A   The ADA Codes in effect at the time would

7 apply.

8    Q   I'm going to ask you to turn to page 11 of

9 your report.  In your report you have titled

10 Historically Applicable Codes and Standards.  Do you

11 agree that the Cermak ramp was required to comply

12 with the Americans with Disability Act Accessibility

13 Guidelines (ADAAG) 1991 Standards?

14    A   Those standards as far -- To my knowledge,

15 those standards were required at that time in

16 Chicago.

17    Q   In addition to those standards in your

18 report, you list four other building codes, correct?

19    A   Correct.

20    Q   But as far as the ADA was concerned, it was

21 the ADAAG 1991 Standards that defendants were

22 required to comply with in constructing the Cermak

23 ramp?

24    A   Yes, unless another more recent ADA version

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 9

1 was in effect at the time.

2    Q   Now, in your report you have the permit date

3 for the Cermak Health Service Facility building as

4 January 19th, 1996, as being permitted on that date?

5    A   That's what the report says.

6    Q   And can you tell me where you obtained that

7 information?

8    A   I don't remember specifically, but we

9 probably would have looked it up online.  Building

10 Permit has a website where violations and permits

11 generally are -- can be accessed.

12    Q   What website are you referring to?

13    A   It's a City of Chicago.  I generally Google

14 building violations and it will come up.  I don't

15 know what the specific name is.

16    Q   At the time you were investigating the Cermak

17 ramp in the fall of 2023, did you have contact with a

18 gentleman by the name of Eric Davis within the

19 Capital Planning section of Cook County government?

20    A   I'm sorry.  Can you repeat that.

21    Q   Yes.  In preparing this report on December

22 6th, 2023, regarding the Cermak ramp, had you had any

23 prior contact with a gentleman by the name of Eric

24 Davis?

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 10

1    MR. DEVORE:  Objection, form.  You can answer.

2    THE WITNESS:  A   I have to jog my memory, but I

3 don't think I had any conversation with Eric specific

4 to this report.  I did have conversations and I

5 believe he was at the site for the Cermak ADA

6 Assessment that this was -- we were doing at the same

7 time.

8    MR. MORRISSEY:  Q   You're an architect, correct?

9    A   Correct.

10    Q   And you're in charge of the architectural

11 component of Globetrotters?

12    A   Yes.

13    Q   Is it customary that the construction plans

14 will have the date of the permit on the construction

15 drawings?

16    A   Often they have the issue for permit date

17 which is not necessarily the date of the permit

18 application.

19    Q   What is the difference?

20    A   The issue for permit is when the architect

21 will basically release them for the permit

22 application.  The city will normally go by the

23 date of the -- not the date -- well, there's the date

24 that you commence permit, the application date, and

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 11

1 that's the date the city will look to when

2 applying -- I'm sorry.  Let me rephrase that.

3          That's the date that the city generally

4 will use to determine which codes apply.

5    Q   So if the construction drawings reflect a

6 permit date of 1989, it's your understanding that the

7 City of Chicago will apply that date in regards to

8 what codes apply?

9    MR. DEVORE:  Objection.  It calls for

10 speculation.  You can answer.

11    THE WITNESS:  A   That's my understanding, yes.

12    MR. MORRISSEY:  Q   And is that your understanding

13 that that process is common in the architectural

14 field that when the government puts a date --

15 issuance date for a permit, that that's the effective

16 date for the various codes that the project has to

17 comply with?

18    MR. DEVORE:  Objection, form.  You can answer.

19    THE WITNESS:  A   That's my understanding.

20    MR. MORRISSEY:  Q   And is that why on this

21 document here, on Group Exhibit No. 4, you put the

22 permit date of January 19th, 1996, on your assessment

23 report because that's the date in which the City of

24 Chicago would follow in regards to the applicable

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 3

CARL DARR
April 30, 2025

Page 12

1   building codes?

2       **A   It would be a significant date, yes.**

3       Q   Okay.

4       **A   And that's why we put it in the report.**

5       Q   Now, I'm going to refer you to Exhibit 8.

6   Can we take a moment.

7           (Off the record.)

8       MR. MORRISSEY:  Q   Group Exhibit 8 are the -- Let

9   me ask you a question.  Looking at Group Exhibit No.

10  8, are those the 1991 ADAAG Standards?

11      MR. DEVORE:  Objection, form.

12      THE WITNESS:  A   I would have to look through it.

13      MR. MORRISSEY:  Q   Well, you want to take a few

14  moments to look at it.  And I can scroll through it

15  for you.

16      **A   I'm sorry.  What was the question?**

17      MR. MORRISSEY:  Read back the question, please.

18      (The last question read back as requested.)

19      THE WITNESS:  A   It could be.  I don't see the

20  date on here.  It says revised 1990 -- revised July

21  1st, 1994.

22      MR. MORRISSEY:  Q   Are these the standards that

23  you refer to in your report on page 11 under the

24  Americans with Disability Accessibility Guidelines

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 13

1   ADAAG 1991?

2       **A   Well, it would have been the 1991 copy that**

3   **we had on our computers at the time when I was doing**

4   **the report.**

5       Q   Okay.  The first one you have is for Section

6   4.8.  I'm going to scroll down to 4.8 for you.

7           I'm looking at 4.8.1.  Did you quote from

8   the language in Group Exhibit No. 8 on page 11 in

9   your report, 4.8.1 in regards to the general

10  requirements?

11      MR. DEVORE:  Is this Exhibit 8?

12      MR. MORRISSEY:  Yes.

13      **A   Well, the language is the same as number one**

14  **in my report and on page 11 as is 4.8.1 on the**

15  **document in front of me.**

16      Q   And is that true in your document on page 11,

17  you have number two 4.8.2 slope and rise.  Is that

18  the same language that you quoted?

19      **A   Part of it.  I left out the first sentence in**

20  **the document in front of me.  It's not included in**

21  **what I say.**

22      Q   And your language quoting 4.8.3, is that the

23  same language that's in Group Exhibit 8?

24      **A   Without the matrix alternate measurement,**

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 14

1   **yes, it is the same language.**

2       Q   And would the same be true in regards to

3   handrails?  I'm sorry.  4.8.5 which you have on page

4   11 in your report?

5       **A   So for 4.8.5 subsection two, it's generally**

6   **the same.  I didn't include everything that's in the**

7   **document in front of me including the matrix**

8   **measurements.**

9       Q   And 4.8.5, the language that you're quoting

10  on page 11, does that come from Group Exhibit No. --

11      **A   Well, for subsection five, again, it's the**

12  **same thing.  The language in my report matches part**

13  **of the language of the section in that document.  Not**

14  **everything in the document is included in the line in**

15  **my report.**

16      Q   To summarize it then, under Section 4.8 ramps

17  on your report on page 11, the quotes that you took

18  for each of those sections, one through five, were

19  verbatim from Group Exhibit No. 8?

20      MR. DEVORE:  Objection, form, mischaracterizes

21  his testimony.  You can answer.

22      THE WITNESS:  A   Generally, yes.

23      MR. MORRISSEY:  Q   Is there anything on page

24  11 under Section 4.8 ramps states the following

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 15

1   requirements relevant to the corridor ramps, is there

2   any language in one through five that isn't verbatim

3   from Group Exhibit 8?

4       **A   No.  What's said on page 11 is included in**

5   **page 29 on this document that's in front of me.**

6       Q   I'm going to turn to page 493 of Group

7   Exhibit 8.  Do you see under general terminology

8   where it has various definitions for words?

9       **A   Yes.**

10      Q   And under shall it says, denotes a mandatory

11  specification or requirement.  What do you understand

12  that to mean --

13      MR. DEVORE:  Objection.

14      MR. MORRISSEY:  Q   -- in relation to the Section

15  4.8 ramps?

16      MR. DEVORE:  Objection, calls for legal

17  conclusion but to the extent you can answer you can.

18      THE WITNESS:  A   My understanding is that it's a

19  requirement that facilities would need to comply

20  with.

21      MR. MORRISSEY:  Q   And it's mandatory?

22      **A   Yeah.**

23      Q   Turning to page three of your report.

24  Looking at the second paragraph, your company

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 4

CARL DARR
April 30, 2025

Page 16

1  measured the slope as slightly shallower than one to
2  16, correct?
3       **A   Correct.**
4       Q    What does that mean in layman's terms?
5       **A   For every 16 inches of horizontal run,**
6  **there's basically one inch of rise on the ramp slope.**
7       Q    And if we look at paragraph two, again on
8  page three, you say the corridor ramp to be
9  approximately 43.64 feet in length and approximately
10 2.7 feet in height.
11           My question is, in relation to the Cermak
12 ramp, what do you mean by height?
13      **A   From the bottom landing to the top landing.**
14      Q    And do you use the word height and rise to
15 mean the same in your report?
16      **A   Height is the same as overall rise.**
17      Q    So for purposes of your report, the term
18 height and rise are interchangeable, is that fair to
19 say?
20      MR. DEVORE:  Objection, form.  You can go ahead.
21      THE WITNESS:  A  In this paragraph, yes.
22      MR. MORRISSEY:  Q  Now, in the third paragraph,
23 the last sentence under number one, it says the
24 existing ramp rise is approximately 2.7 feet which is

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 17

1  32.4 inches.  Do you see that?
2       **A   I see it.**
3       Q    And was that a precise measurement that
4  Globetrotters arrived at in measuring the Cermak
5  ramp?
6       **A   Yeah.  I mean, there would have been minimal**
7  **tolerance with the measurement device we were using.**
8       Q    What do you mean by minimum tolerance?
9       **A   So we used the lighter scanner device for**
10 **looking at this ramp.  I don't remember exactly, but**
11 **I believe that one had a tolerance of a quarter inch**
12 **every 30 feet.**
13      Q    Now, on page 11 you refer to this corridor
14 ramp as being classified as a ramp, considered a ramp
15 under the 1991 Standards, correct?
16      **A   Correct.**
17      Q    Why does the Cermak ramp fall under the
18 category as a ramp under the 1991 Standards?
19      **A   The floor plane has a slope greater than or**
20 **steeper than one and 20.**
21      Q    And due to the fact that the slope is steeper
22 than a one to 20, does that mean that it has to
23 follow the requirements for a ramp under the 1991
24 Standards?

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 18

1       **A   It means it shall follow the requirements for**
2  **a ramp under the standards, yes.**
3       Q    And when you use the word shall, that means
4  it's mandatory that they follow the code requirements
5  under the 1991 ADAAG Standards, correct?
6       **A   It would have been mandatory at the time for**
7  **the designer to design the ramp accordingly and for**
8  **the contractor to build the ramp accordingly, yes.**
9       Q    You also analyzed the Cermak ramp under the
10 2010 Standards, correct?
11      **A   Yes.**
12      Q    Under the 2010 ADAAG Standards, does the
13 Cermak ramp fall under the category of a ramp?  Let
14 me rephrase the question.
15           Under the 2010 Accessibility Standards, is
16 the Cermak corridor classified as a ramp under the
17 code?
18      **A   The slope floor section of that corridor is a**
19 **ramp under that code.**
20      Q    When the Cermak ramp was constructed after
21 1996, what was the maximum rise permitted under the
22 1991 ADAAG Standards?
23      **A   Thirty inches maximum.**
24      Q    Under the 2010 Standards provided under

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 19

1  ADAAG, what is the maximum rise for a ramp?
2       **A   Thirty inches.**
3       Q    Turn to Exhibit 4, page 15.  On page 15 of
4  your report, there's two charts, correct?
5       **A   Correct.**
6       Q    Why in preparing this report did you prepare
7  these two charts?
8       **A   I believe at the time we were asked to look**
9  **at historical codes as well as the current code.**
10      Q    Now, on page 15, the charts on page 15 follow
11 the 1991 ADAAG Standards which applied when the
12 Cermak ramp was constructed after 1996, correct?
13      MR. DEVORE:  Objection, form.  You can answer.
14      THE WITNESS:  A  One of the columns does list the
15 requirements -- the applicable requirements of the
16 ADAAG 1991 Standards.  That would have applied at the
17 time of construction.
18      MR. MORRISSEY:  Q  And if we look at the top
19 column, there's a column for describing different
20 features of the ramp, components of the ramp,
21 correct?
22      **A   Do you mean the different rows?**
23      Q    Yes.  The first column on the top chart has
24 various components of the ramp, correct?

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 5

CARL DARR
April 30, 2025

Page 20

1    A   It has characteristics of the ramp
2  corresponding to the description on the left, yes.
3    Q   And one of the characteristics listed is the
4  ramp rise, correct?
5    A   Correct.
6    Q   And if we go to the top of the chart, there's
7  a box saying existing, correct?
8    A   Correct.
9    Q   And then it has the 1991 ADA Standards, the
10  ADAAG 1991 Standards, is that correct?
11   A   That's the next column.
12   Q   And those are the mandatory requirements for
13  a ramp that was built after 1991 and prior to 2010,
14  correct?
15   A   Yeah.  Those are the requirements for
16  applicable under that code for when it was adopted
17  until the next code was adopted, yes.
18   Q   Okay.  And as far as the ADA is concerned, if
19  the -- as you report in your assessment, if the
20  Cermak ramp was permitted after 1996 and before 2011,
21  it was required to follow the ADAAG 1991 Standards?
22   A   Correct.
23   Q   And for the ramp rise, the maximum rise for a
24  ramp to comply with the 1991 Standards was 30 inches,

CARL DARR
April 30, 2025

Page 21

1  correct?
2    A   Correct.
3    Q   And your report reflects the ramp rise was
4  32.4 inches, correct?
5    A   My report reflects that the ramp rise was 2.4
6  inches greater than 30 inches, yes.
7    Q   Okay.  And therefore the Cermak ramp does not
8  comply with the 1991 ADA Standards?
9    A   As my report outlines, the Cermak ramp for
10  ramp rise has never complied with any of the
11  applicable ADA Codes.
12   Q   And if we look at the lower chart on page 15,
13  you have under ADA 1991 compliance, as far as the
14  ramp rise, you have noncompliant, correct?
15   A   That's listed under every column on that
16  chart for ramp rise, yes.
17   Q   So not only does the rise of the Cermak ramp
18  not comply with the ADAAG 1991 Standards, it also
19  doesn't comply with ANSI 1992 compliance, correct?
20   A   Correct.
21   Q   What is ANSI?
22   A   ANSI, American National Standards Institute.
23  They basically have some of the ADAAG, some agencies
24  use it.  It has a lot of the building block

CARL DARR
April 30, 2025

Page 22

1  components that ADA also lists.  It's just another
2  code.
3    Q   And are those standards that generally, an
4  architect like you and your firm, comply with in
5  constructing new construction?
6    A   Right.  So certain governmental buildings,
7  for instance, will use ANSI instead of ADAAG so we'll
8  look at both of those.
9    Q   The next column over on the lower chart is
10  CBC 1992.  What is CBC 1992?
11   A   Chicago Building Code 1992, 1993, 1998
12  versions.
13   Q   And under ramp rise, the Cermak ramp that was
14  built after 1996 doesn't comply with the city code,
15  correct?
16   A   No, because the city code would have adopted
17  the 1991 Code and restated it.
18   Q   In the next column over is IAC 1997
19  compliance.  What is IAC?
20   A   Illinois Accessibility Code.
21   Q   And again for the ramp rise, the rise of 32.4
22  inches is not compliant with the Illinois
23  Accessibility Code, correct --
24   A   Correct.

CARL DARR
April 30, 2025

Page 23

1    Q   -- but it was built?
2        The final one is ANSI 1998 compliance.  Is
3  that an updated version of the 1992 ANSI?
4    A   It is but the requirement of 30 inches is the
5  same for all of these codes and in all cases the
6  existing condition was built 2.4 inches greater than
7  that.
8    Q   So there's no standard that you looked at,
9  building standard that you looked at, in doing your
10  report that the rise of the Cermak ramp complied
11  with, is that fair to say?
12   A   That's fair to say.
13   Q   In addition, you looked at the 2010
14  Standards, correct?
15   A   Correct.
16   Q   I believe it's on page seven that you
17  discussed the 2010 Standards.
18   A   Page seven or page nine?
19   Q   I think it's page seven and page nine and
20  page three.  I think three, seven and nine.  If we
21  can look at page three first, I guess.
22       All right.  Looking at page three under the
23  third paragraph, number one, your report says, per
24  Section 405.6 of the 2010 Americans with Disabilities

Exhibit 8 Page 6

CARL DARR
April 30, 2025

Page 24

1  Act Accessibility Guidelines (ADAAG) and the 2009
2  American National Standards Institute, ANSI,
3  Standards A117.1, the rise for any ramp shall be a
4  maximum of 30 inches.  Again, they use the word shall
5  which means mandatory, correct?
6      **A  Correct.**
7      Q   The existing ramp is approximately 2.7 feet,
8  which is 32.4 inches.  Based upon that, it doesn't
9  comply with the 2010 Standards, correct?
10     **A  Correct.**
11     Q   And you also state that on page seven of your
12  report in regards to the rise in relation to the 2010
13  Standards, correct?
14     **A  I'm looking here at number four.  The rise**
15  **for any ramp run shall be 30 inches maximum.  Is that**
16  **what you are referring to?**
17     Q   That's correct.  And then we can look at your
18  chart which is on page nine.  And the chart says
19  basement corridor ramp assessment matrix per current
20  applicable codes and guidelines.
21             When you say per current applicable codes
22  and guidelines, what did you mean?
23     **A  The codes and guidelines enforced at the time**
24  **I was writing this report.  So I think this was 2023.**

CARL DARR
April 30, 2025

Page 25

1      Q   '24 or is it '23?
2      **A  '23.**
3      Q   So at the time you were doing your report,
4  you looked at the 2010 ADAAG Standards, correct?
5      **A  Yes, I did.**
6      Q   And those 2010 Standards, ADA Standards, are
7  still applicable to the present time?
8      **A  Generally.  There may have been some**
9  **revisions but these specific requirements, as far as**
10  **I know, are still current.**
11     Q   Okay.  So in regards to the 2010 ADAAG
12  Standards, the Cermak ramp, the rise of the Cermak
13  ramp doesn't comply?
14     **A  That's correct.**
15     Q   Now, in addition to the height or the rise of
16  the Cermak ramp, you also analyzed the handrail,
17  correct?
18     **A  I did analyze the handrail.**
19     Q   In doing your investigation in the fall of
20  2023, did you talk to any of the County or Sheriff's
21  employees in regards to when that handrail was
22  installed?
23     **A  I don't remember.  I really don't.**
24     Q   Okay.  In your report, you say something

CARL DARR
April 30, 2025

Page 26

1  about that they didn't fabricate the last 12 inches
2  correctly?
3      **A  Well, I think --**
4      Q   I think you mentioned that they stopped short
5  of providing the 12-inch extension for the top and
6  the bottom handrail?
7      MR. DEVORE:  What page?  Exhibit 4, page 11, is
8  that what it is?
9      THE WITNESS:  A  I have no idea.
10     MR. MORRISSEY:  Q  I think if we look at page 14,
11  there's a discussion on handrails.  The last
12  paragraph on page 14.  You see the last sentence
13  there?
14     **A  Was that a question?**
15     Q   Yes.  Do you see the last sentence there?
16  Because the current corridor ramp handrails are not
17  continuous and do not extend beyond the ramp, they do
18  not comply with the applicable codes.
19     **A  I see that.**
20     Q   Now, by the applicable codes, you're
21  referring to both the 1991 ADAAG Standards and the
22  2010 Standards, correct?
23     **A  Well, this section specifically references**
24  **the historical standards so it would have been those**

CARL DARR
April 30, 2025

Page 27

1  **standards that this is contemplating referencing.**
2      Q   What did you mean when you say that the
3  handrails are not continuous from the ramp?
4      **A  I believe they have a slope section and**
5  **there's a gap and the slope section returns to the**
6  **wall and then there's another section.  I would have**
7  **to reference the photos again.**
8      Q   You can take a moment.
9      **A  I believe the ramp turns a corner slightly**
10 **and so instead of having a continuous handrail around**
11 **the corner, there's one section attached to one wall**
12 **plane and another section attached to another wall**
13 **plane.  I'm trying to see from my diagram.**
14             **That's not it.  That's just that they stop**
15 **but there also was a point -- Let's see.  Let me see**
16 **if I show that.  They would require continuous**
17 **12-inch extensions around the corner of the wall.  So**
18 **that's what I mean when I refer to they're not**
19 **continuous.  So they just stop short at the corner.**
20     Q   If we look at under the 1991 Standards, what
21  you said on page 11, you found that because there
22  aren't handrails that extend 12 inches beyond the
23  ramp, both the top and the bottom of the ramp, the
24  ramp is not compliant with the 1991 ADA Standards, is

CARL DARR
April 30, 2025

Page 28

1 that fair to say?

2     **A   Well, the handrail specifically are not**

3 **compliant. But, yes, that would extend to the ramp**

4 **in general.**

5     Q   Okay. And based upon the design of the ramp,

6 the Cermak ramp, it was mandatory for the defendants

7 to have 12-inch extensions beyond the ramp both at

8 the top and the bottom under the 1991?

9     **A   It would have been mandatory for the ramp to**

10 **be designed in that manner. It would be mandatory**

11 **for the contractor to build it in that manner, yes.**

12     Q   And is it fair to say that when you inspected

13 it in the fall of 2023, the fact that it didn't have

14 the extension of the 12-inch handrails beyond the

15 ramp, both the top and the bottom, the ramp didn't

16 comply with the 1991 ADAAG Standards?

17     **A   That's fair to say.**

18     Q   And because the rise when you inspected it in

19 the fall of 2023 in preparing this report, because

20 the rise of the ramp was greater than 30 inches, the

21 ramp in the fall of 2023 did not comply with the 1991

22 Standards?

23     **A   I need to correct my answer on the last one.**

24     Q   Sure.

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 29

1     **A   That assumes that the handrails that are**

2 **there now were in place at the time it was**

3 **constructed.**

4     Q   Okay. When you reviewed it in the fall of

5 2023 --

6     **A   Yes.**

7     Q   -- did the lack -- did the ramp have 12-inch

8 handrails that extended beyond the ramp at the bottom

9 and the top?

10     **A   It did not have 12-inch extensions at the top**

11 **and the bottom.**

12     Q   And because it didn't have the 12-inch

13 extensions beyond the bottom and the top of the ramp

14 for handrails, it didn't comply at that time in the

15 fall of 2023 with the 1991 ADAAG Standards?

16     **A   The configuration that's out there right now**

17 **would not have complied with the 1991 Standards.**

18     Q   And in addition the configuration that's

19 present with the Cermak ramp in regards to handrails

20 not extending 12 inches beyond the ramp, that doesn't

21 comply with the 2010 Accessibility Standards either?

22     **A   That does not comply -- that is noncompliant**

23 **with the 2010 Standards.**

24     Q   And both the 1991 ADA Standards and the 2010

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 30

1 Standards require for the Cermak ramp to have

2 handrails that extend 12 inches beyond the top and

3 the bottom of the ramp?

4     **A   That's correct.**

5     Q   When you inspected the ramp in the fall of

6 2023, did the ramp have an intermediate landing?

7     **A   Let me make sure I don't get my ramps mixed**

8 **up. No. This ramp does not have an intermediate**

9 **landing.**

10     Q   And given the fact that the rise of the

11 Cermak ramp exceeded the mandatory rise of 30 inches,

12 was a intermediate landing required when it was

13 built --

14     MR. DEVORE: Objection, form. You can answer.

15     MR. MORRISSEY: -- in 1996?

16     **A   That's one solution that could make it**

17 **compliant.**

18     Q   So what is an intermediate landing?

19     **A   When you have a ramp run and then you have a**

20 **horizontal surface which leads to another ramp run,**

21 **basically gives somebody a place to stop for a**

22 **moment, even turn around, that horizontal portion of**

23 **the ramp is an intermediate landing.**

24     Q   And there's a specification under the 1991

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 31

1 ADA Standards and the 2010 Standards in regards to

2 the dimensions of the intermediate landing?

3     **A   There is.**

4     Q   And it's mandatory that it would be at least

5 60 inches?

6     **A   That is the measurement that is specified,**

7 **yes.**

8     Q   Do you know when handrails were installed on

9 the Cermak ramp?

10     **A   No.**

11     Q   Do you know if the handrails were installed

12 after 2010?

13     **A   I do not know.**

14     Q   If handrails were installed after 2010, would

15 that require the Cermak ramp to comply with the 2010

16 Standards?

17     **A   It would.**

18     Q   Why?

19     **A   It would require the handrails to comply with**

20 **the 2010 Standards because that's the point in time**

21 **where they were installed. Assuming they were**

22 **permitted, that would be -- I'm assuming that's when**

23 **they were permitted when the code was enforced.**

24     Q   If handrails were installed after, let's say,

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 8

CARL DARR
April 30, 2025

Page 32

1  2011 on the Cermak ramp, would that require the
2  government to comply with the 2010 Standards for the
3  ramp?
4      MR. DEVORE:  Objection, form.  You can answer.
5      THE WITNESS:  A  If the handrails were installed
6  in 2011 or later, the 2010 ADA Standards for
7  handrails would have been applicable at the time and
8  it should have been installed accordingly.
9      MR. MORRISSEY:  Q  What about the other
10  components of the ramp.  Assuming that one component
11  of the ramp or handrails, correct -- Let me rephrase
12  the question.
13          If they put in the handrails after 2012,
14  would the ramp be compliant with the 2010 Standards
15  if the rise was 32.4 inches?
16      MR. DEVORE:  Objection, form.  You can answer.
17      THE WITNESS:  A  As I understand the question --
18      MR. MORRISSEY:  Q  Let me rephrase it.  I think
19  it's a bad question.
20          If you alter one aspect, one component of
21  a ramp for the purpose of trying to make the ramp
22  accessible, i.e., if they altered and they put in
23  handrails after 2012, does that require the building
24  owner or user to bring the entire ramp up to the 2010

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 33

1  Standards?
2      A  There's a code requirement in the rehab
3  section of the Existing Building Code when the amount
4  of renovations is greater than, I believe, 20 percent
5  of the estimated original building cost, you have to
6  bring everything into compliance, otherwise that is a
7  conversation with the building inspector.
8          It's kind of speculative because, first of
9  all, you're assuming that the person installing or
10  designing the handrail is actually aware that the
11  ramp rise is not compliant which, I guess, that would
12  be the first thing to identify.
13      Q  Well, let's assume, for argument sake, that
14  the County and the Sheriff knew when they put in
15  handrails in -- I believe it was 2022 or 2023, that
16  the rise of the ramp exceeded the mandatory 30 inches
17  and they put in handrails, were they required to make
18  the entire ramp accessible under the 2010 Standards?
19      MR. DEVORE:  Objection, incomplete hypothetical,
20  assumes facts not in evidence, but you can answer if
21  you can.
22      MR. MORRISSEY:  Q  We'll withdraw the question.
23          Let's take a five minute break.  I don't
24  think we have more than a half hour left.

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 34

1      MR. DEVORE:  Okay.
2  (Break.)
3      MR. MORRISSEY:  In regards to your report on
4  December 6th, 2023, in regards to the Cermak ramp, I
5  have two final questions.  First question is, since
6  the Cermak ramp was built on or about 1996 or
7  thereafter, was it required to comply with the 1991
8  ADAAG Standards?
9      A  At that time, it would have been required.
10  The ADAAG Standards would have been applicable to
11  that construction and so those requirements would be
12  required.
13      Q  The second question is, currently does the
14  Cermak ramp comply with the 1991 Standards for a
15  ramp?
16      A  No.  It is not fully compliant.
17      Q  Now, I'm going to ask you a few questions
18  about your report from April 1st, 2024.  It's Exhibit
19  No. 5.  We'll hand it to you.
20          On page four of your report dated April
21  1st, 2024, you state that the east tunnel ramp was
22  built on or after 2011, is that fair to say?
23      A  That's fair to say.
24      Q  And if the east tunnel ramp was built in 2011

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 35

1  or thereafter, was it required to comply with the
2  2010 ADAAG Standards?
3      A  I don't know if I have the exact date when
4  those standards were adopted but probably.
5      Q  As currently in use, the east tunnel ramp,
6  which for purposes of this deposition we're going to
7  refer to as the RTU ramp, is that fair to say?
8      A  I'm good with that.
9      Q  Does the RTU ramp currently comply with
10  either the 2010 ADAAG Standards or the 1991 ADAAG
11  Standards?
12      MR. DEVORE:  Objection, calls for speculation
13  regarding the exact date, but you can answer.
14      THE WITNESS:  A  It is not fully compliant with
15  those standards.
16      MR. MORRISSEY:  Q  Why not?
17      A  There are several noncompliant conditions.
18  The landing at the top is too short.  The
19  intermediate landing is too short, the handrails do
20  not have 12-inch extensions, one has approximately 11
21  some inch plus extension, the other I think has a
22  seven and a half extension at the bottom or top, and
23  then also both the top ramp has a section about four
24  feet long that's slightly too steep and the bottom

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 9

CARL DARR
April 30, 2025

Page 36

1  ramp, if I remember correctly, has a section
2  approximately one foot long. That's too steep.
3      Q   Okay.
4      A   That's why not.
5      Q   So based upon that statement you just gave,
6  the RTU ramp as currently in use doesn't comply with
7  either the 1991 ADAAG Standards or the 2010 ADAAG
8  Standards?
9      A   Based on its existing condition today, the
10 ramp does not comply with either of those standards.
11     Q   The RTU ramp starts off in the basement of
12 the RTU building, correct? If you look at page four
13 of your report.
14     A   It starts off at or just outside the basement
15 of the RTU building.
16     Q   And if you start at the basement of the RTU
17 building and walk, you would ascend up the RTU ramp,
18 correct?
19     A   Walking out of the basement of the RTU
20 building, there's a pair of double doors, then
21 there's a short -- there's a run of horizontal
22 corridor and then you start to ascend up the lower
23 section of the RTU ramp.
24     Q   And when you progress -- when you reach the

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 37

1  upper area of the RTU ramp, you can access the Cermak
2  Health Service Building by going down the Cermak
3  ramp, is that fair to say?
4      A   That's fair to say.
5      Q   So a person that's disabled and uses a cane,
6  crutch, or walker and is housed in the RTU housing
7  unit, one way to go to the Cermak Health Service
8  Building is to start off in the basement of the RTU
9  building and go up the RTU ramp and then walk through
10 a hallway and descend down the Cermak ramp into the
11 Cermak building, is that fair to say?
12     MR. DEVORE:  Objection, form.  That was
13 confusing.  You can answer.
14     THE WITNESS:  A   That's one way to get between
15 the RTU building and the Cermak building.  I'm not
16 sure what other ways in the tunnel or at other levels
17 there may be to get from between those two buildings.
18     MR. MORRISSEY:  Q   So to summarize my question,
19 one of the path of travel for a person using a cane,
20 crutch, or walker who's housed in the RTU building is
21 to start off at the basement of the RTU and go up the
22 RTU ramp and then descend down the Cermak ramp into
23 the Cermak building, is that fair to say?
24     MR. DEVORE:  Objection, form.  You can answer.

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 38

1      THE WITNESS:  A   There's a horizontal section of
2  corridor between the two ramps, if I remember
3  correctly.  I don't remember the distances of its
4  length but otherwise that's fair to say.
5      MR. MORRISSEY:  Q   Now, in preparing your expert
6  report for the RTU ramp on page six, you list the
7  applicable codes and standards, correct?
8      A   There is a section titled Applicable Codes
9  and Standards.
10     Q   And number one that you list here is the
11 American with Disabilities Act Accessibility
12 Guidelines, ADAAG, 2010, correct?
13     A   Correct.
14     Q   So in preparing this report, this expert
15 report, you considered the 2010 ADAAG Standards,
16 correct?
17     A   Correct.
18     Q   And those are the standards as an expert you
19 thought were applicable to the RTU ramp?
20     MR. DEVORE:  Objection, form.  You can answer.
21     THE WITNESS:  A   At the time I would have, to the
22 extent possible, verified what standards was
23 applicable, and I determined the 2010 for this report
24 was applicable.

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 39

1      MR. MORRISSEY:  Q   Now, on page ten of your
2  report, you broke down the RTU ramp or otherwise
3  called the east tunnel corridor based upon the
4  accessibility of various components of the ramp,
5  correct?
6      A   Starting on page ten and continuing to page
7  11, I do list the individual components of the ramp
8  and summarize their conditions.  And I do bring up,
9  at least in one case, whether or not it's code
10 compliant.
11     Q   Okay.  And the areas you considered for code
12 compliance were the following:  Top landing, upper
13 ramp, intermediate landing, lower ramp, bottom
14 landing and handrails, correct?
15     A   Those are the items listed, yes.
16     Q   And for the top landing, you determined that
17 the top landing was not code compliant because the
18 landing length is less than 60 inches, correct?
19     A   Right.  Now, I think we also covered this in
20 my last deposition.  But, yes, that report states the
21 landing length is less than 60 inches.
22     Q   And for a landing, the length of a landing,
23 the mandatory length of a landing needs to be at
24 least 60 inches, correct?

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 10

CARL DARR
April 30, 2025

Page 40

1      A    The minimum of 60 inches is the code
2  requirement for a landing length.
3      Q    And the top landing that you assessed for the
4  RTU was only nine inches, correct?
5      A    It's approximately nine inches between the
6  top of the ramp and the door frames.  The doors are
7  generally open.  But, yes, that's the length -- the
8  official length of the landing at that location.
9      Q    And the component that you discuss is upper
10 ramp also was not fully code compliant with the 2010
11 ADA Standards, correct?
12     A    Correct.  The slope of that ramp plane is not
13 consistent and in one location for about four feet
14 three inches, it is steeper than one and 12.  Instead
15 of one and 12, it is approximately one and 11 slope.
16     Q    And also another component was intermediate
17 landing, correct?
18     A    Correct.
19     Q    And the intermediate landing, the mandatory
20 length of an intermediate landing is 60 inches or
21 greater, correct?
22     A    Correct.  And this landing is approximately
23 three inches short of that.
24     Q    And therefore the RTU intermediate landing is

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 41

1  not code compliant with the 2010 Code, correct?
2      A    The RTU ramp intermediate landing is not code
3  compliant with the ramp, minimum required ramp
4  length.
5      Q    The top landing and the intermediate landing
6  are also if -- Let me rephrase that.
7          If the 1991 ADAAG Standards were applicable
8  when the RTU ramp was constructed, the top landing
9  and the intermediate landing would not be code
10 compliant with the 1991 Standards?
11     A    The requirements for landing length in both
12 codes is the same so neither the top landing, nor the
13 intermediate landing would be compliant with either
14 code.
15     Q    The lower ramp portion is also not compliant
16 with either the 2010 Standards or the 1991 Standards
17 because it's 11.7 percent steeper than permitted by
18 either code, is that fair to say?  It's on page 11,
19 number four.
20     MR. DEVORE:  Objection, form.  You can answer.
21     THE WITNESS:  A  Yes.  So the last one foot
22 approximately of the run is steeper than one and 12.
23 It drops off to approximately one and 8.5 for that
24 bottom section of the lower ramp.

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 42

1      MR. MORRISSEY:  Q  And the handrails on the RTU
2  ramp are not compliant with either the 1991 ADAAG
3  Standards or the 2010 ADAAG Standards in part because
4  the handrail extension at the lower portion of the
5  ramp is less than 12 inches?
6      MR. DEVORE:  Objection, form.  You can answer.
7      MR. MORRISSEY:  Q  I'm sorry.  What you have in
8  your report is the handrail extensions at the lower
9  ramp of the RTU ramp is only seven foot four inches,
10 correct?  And the upper portion, the handrail
11 extensions are 11.3 inches beyond the upper ramp,
12 correct?  Under both the 1991 and the 2010 Standards,
13 the handrail extensions are not compliant with either
14 of the 1991 Standards or the 2010 Standards, is that
15 correct?
16     A    So the requirements in both codes are the
17 handrails extend 12 inches beyond the ramp and the
18 lower ramp is approximately four and a half inches
19 short.
20          The handrails at the bottom of the lower
21 ramp and at the top of the upper ramp, the handrail
22 extensions are approximately .7 inches short of that
23 requirement.
24     Q    So based upon your expert report that was

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 43

1  tendered on April 1st, 2024, the RTU ramp fails to
2  comply with either of the 1991 ADAAG Standards or the
3  2010 ADAAG Standards, is that fair to say?
4      MR. DEVORE:  Objection, form.  You can answer.
5      THE WITNESS:  A  Elements of the ramp will not be
6  compliant with either the 1991, nor the 2010 ADAAG
7  Code requirements.
8      MR. MORRISSEY:  Q  And on page 11 there's a chart
9  which summarizes the noncompliance of the RTU ramp,
10 correct; the various components that are noncompliant
11 with either the 1991 Standards or the 2010 Standards,
12 is that fair to say?
13     A    There is a matrix at the bottom of page 11
14 that summarizes or compares the existing conditions
15 to code requirements for the elements discussed, the
16 ramp elements discussed.
17     Q    Since tendering this assessment of the RTU
18 ramp on April 1st, 2024, have you or anybody in your
19 firm done any further investigation of the RTU ramp?
20     A    I don't believe so.
21     Q    Have you or Globetrotters been retained by
22 Capital Planning or Cook County or the Sheriff to
23 review any components on the Cook County Department
24 of Corrections facility in regards to whether or not

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 11

CARL DARR
April 30, 2025

Page 44

1  the buildings are accessible under the ADA?

2     MR. DEVORE:  Objection, form.  You can answer.

3     THE WITNESS:  A  I'm not sure I understand the

4  question.

5     MR. MORRISSEY:  Q  Sure.  When you were deposed

6  last time in June of 2024, there was a discussion in

7  regards to whether or not Cook County or the Sheriff

8  were going to renovate the RTU ramp.  Do you recall

9  that discussion?

10     **A  Vaguely.**

11     Q  Okay.  And there was a discussion that the

12  County and the Sheriff were going to do an overall

13  assessment of the Cook County Department of

14  Corrections entire campus to determine whether or not

15  certain buildings or other areas of the campus were

16  in compliance with the ADA.  Do you recall that?

17     **A  Yes.**

18     Q  Has your firm been contracted to do any type

19  of further assessment of the Cook County Department

20  of Corrections other than the two assessments that

21  we've looked at today, Exhibit 4 or Exhibit 5?

22     **A  We're assessing Leighton Courthouse.  I don't**

23  **know if you consider that part of the campus but**

24  **otherwise, no.**

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 45

1     Q  Okay.  What type of assessment are you

2  conducting for the Leighton Courthouse?

3     MR. DEVORE:  Objection, outside of the scope of

4  this deposition, but you can answer to the extent you

5  can.

6     **A  Globetrotters is conducting a ADA assessment**

7  **at the Leighton Courthouse.**

8     Q  Is there any other firm that's doing the

9  assessment with you?

10     MR. DEVORE:  Same objection.

11     THE WITNESS:  A  We have one sub-consultant firm

12  to help satisfy our WVE requirements.

13     MR. MORRISSEY:  Q  Is that LCN or is it --

14     **A  No.**

15     Q  What's the name of the firm?

16     **A  HUS, H-U-S, Architecture.**

17     Q  What is the dollar value of that

18  assessment --

19     MR. DEVORE:  Objection, outside the scope of this

20  deposition.

21     THE WITNESS:  A  I don't know.

22     MR. MORRISSEY:  Well, it would be within the

23  scope of an expert how he's being compensated by the

24  defendants.

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 46

1     MR. DEVORE:  It has no relation to this lawsuit.

2     MR. MORRISSEY:  Well, it certainly goes to

3  compensation of the experts.

4     MR. DEVORE:  Not for any report done in relation

5  to this lawsuit.

6     MR. MORRISSEY:  Q  How extensive is that ADA

7  assessment of the Leighton court building?

8     MR. DEVORE:  Objection, outside the scope of this

9  deposition.

10     THE WITNESS:  A  I'm not really involved in that

11  project or I'm minimally involved in that project,

12  but my understanding is it's for the entirety of the

13  building.

14     MR. MORRISSEY:  Q  Okay.  When did Globetrotters

15  begin working on that assessment?

16     MR. DEVORE:  Same objection.  You can answer.

17     THE WITNESS:  A  I believe last year.  I'm not

18  quite certain.

19     MR. MORRISSEY:  Q  Have any reports been prepared

20  for Cook County?

21     MR. DEVORE:  Same objection.

22     THE WITNESS:  I don't believe the reports are

23  completed yet.

24     MR. MORRISSEY:  Q  What governmental entity

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 47

1  hired Globetrotters?

2     MR. DEVORE:  Objection, calls for speculation,

3  scope.  Go ahead.

4     THE WITNESS:  A  I don't know what entity

5  exactly.  I believe it's part of a task order

6  contract, umbrella contract, we have with the County.

7     MR. MORRISSEY:  Q  Was there any bid process for

8  that work?

9     MR. DEVORE:  Objection.  Same objection.  It has

10  nothing to do with this case.

11     THE WITNESS:  A  I believe it would have been

12  negotiated if it was a task order, negotiated fee.

13     MR. MORRISSEY:  Q  Did Globetrotters submit a bid

14  to assess -- do an assessment, an ADA assessment, of

15  the Cook County Department of Correction campus?

16     MR. DEVORE:  Objection, form.  You can answer.

17     THE WITNESS:  A  I'm not sure what you mean by

18  bid.

19     MR. MORRISSEY:  Q  Well, was there a request for

20  qualification that was issued by Cook County or the

21  Sheriff in regards to doing an assessment of the Cook

22  County Department of Correction campus?

23     MR. DEVORE:  Objection, form.  It's after this

24  case.

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 12

CARL DARR
April 30, 2025

Page 48

1    THE WITNESS:  A  I believe there was, but I was

2   not involved in it.

3    MR. MORRISSEY:  Q  Did Globetrotters participate

4   in submitting a request for qualifications?

5    **A   I believe they did, but I'm not very familiar**

6   **with it.**

7    Q   Was Globetrotters awarded or determined to be

8   qualified to proceed with the request to --

9    **A   I'm sorry?**

10    Q   Was there a winning architecture or

11   engineering firm for the bid put out by Cook County

12   to do an assessment of the Cook County Department of

13   Correction campus?

14    MR. DEVORE:  Objection, calls for speculation.

15   You can answer.

16    THE WITNESS:  A  I do not know.

17    MR. MORRISSEY:  Q  Who within your firm would

18   have more knowledge in regards to any type of bid put

19   in by Globetrotters in regards to doing an assessment

20   of Cook County Department of Correction campus?

21    **A   The person running the Leighton County**

22   **Courthouse project, I believe, was involved in**

23   **submitting qualifications.**

24    Q   And what's that person's name?

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 49

1    **A   Frances, F-r-a-n-c-e-s, Rovituso,**

2   **R-o-v-i-t-u-s-o hyphen Strange, S-t-r-a-n-g-e.**

3    Q   Do you know if there was three separate

4   requests for qualifications that were issued by the

5   County for that work?

6    **A   I don't know.**

7    Q   Okay.  All right.  Let's take a few minutes

8   break.  We're almost done.

9   (Break.)

10    MR. MORRISSEY:  Q  In regards to the Cermak ramp,

11   did Globetrotters make a recommendation to the County

12   and the Sheriff in regards to what steps are

13   necessary to bring the Cermak ramp into compliance

14   with either the 1991 and 2010 Code?

15    **A   Our report has a recommendation for a**

16   **proposed solution to make that section of the**

17   **corridor code compliant.**

18    Q   And what is the recommendation?

19    **A   To rebuild the ramp and increase its length**

20   **so that the slope is less than one and 20, at which**

21   **point it no longer is considered a ramp.  And we do**

22   **not have the requirements for handrails for**

23   **intermediate landings, et cetera, et cetera.**

24    Q   Do you know if the Cook County or the Sheriff

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 50

1   has done anything to follow Globetrotters'

2   recommendations?

3    MR. DEVORE:  Objection, speculation.  You can

4   answer.

5    THE WITNESS:  A  I do not.

6    MR. MORRISSEY:  Q  When I refer to Globetrotters,

7   I'm also referring to you, do you understand that?

8    **A   I do.**

9    Q   Okay.  In regards to Globetrotters and

10   yourself in regards -- the same question in regards

11   to the RTU ramp.  After issuing your opinion on April

12   1st, 2024, did you make any recommendations to bring

13   the east tunnel ramp or otherwise called the RTU ramp

14   into compliance with the ADA Code?

15    **A   Our report contains recommendations that**

16   **would make that tunnel ramp or section of the tunnel**

17   **ramp compliant with the current code.**

18    Q   Okay.  I have nothing further.  Thank you for

19   your time.

20    MR. DEVORE:  I have nothing.  We'll reserve.

21    MR. MORRISSEY:  Thanks a lot.

22    THE WITNESS:  Okay.  Thank you.

23    MR. MORRISSEY:  We're ordering regular.

24    MR. DEVORE:  I'll take a copy.

TOOMEY REPORTING
312-853-0648

---

CARL DARR
April 30, 2025

Page 51

1    (Whereupon, the deposition concluded at

2   3:39 p.m.).

3         *  *  *  *  *  *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 13

CARL DARR
April 30, 2025

Page 52

```
1   STATE OF ILLINOIS    )
                         ) ss:
2   COUNTY OF C O O K    )

4        The within and foregoing deposition of the
5   aforementioned witness was taken before SHAHERA ALI,
6   C.S.R., and Notary Public, at the place, date, and time
7   aforementioned.
8        There were present during the taking of the
9   deposition the previously named counsel.
10       The said witness was first duly sworn and was then
11  examined upon oral interrogatories; the questions and
12  answers were taken down in shorthand by the undersigned,
13  acting as stenographer and Notary Public; and the within
14  and foregoing is a true, accurate, and complete record of
15  all of the questions asked of and answers made by the
16  aforementioned witness, at the time and place hereinabove
17  referred to.
18       The signature of the witness was not waived, and
19  the deposition was submitted, pursuant to Rules 30(e) and
20  32(d) of the Rules of Civil Procedure for the United
21  States District Court, to the deponent per copy of the
22  attached letter.
23       The undersigned is not interested in the within
24  case, nor of kin or counsel to any of the parties.
```

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 53

```
1        Witness my official signature and seal as Notary
2   Public in and for Cook County, Illinois, on this 15th day
3   of May, A.D. 2025.

7   SHAHERA ALI, C.S.R.
    License No. 084-002666
8   Notary Public
    200 South Wacker Drive
9   Suite 3100
    Chicago, Illinois 60606
10  Phone:  (312) 853-0648
```

TOOMEY REPORTING
312-853-0648

CARL DARR
April 30, 2025

Page 54

```
1        IN THE DISTRICT COURT OF THE UNITED STATES
2          FOR THE NORTHERN DISTRICT OF ILLINOIS
                   EASTERN DIVISION
3
4   CUAUHTEMOC HERNANDEZ, )
                          )
5         Plaintiff,      )
                          )
6      -vs-               )  No. 23-cv-16970
                          )
7   THOMAS DART, SHERIFF   )
    OF COOK COUNTY, and    )
8   COOK COUNTY, ILLINOIS, )
9        Defendants.
10       I, CARL DARR, being first duly sworn, on oath
11  say that I am the deponent in the aforesaid deposition
12  taken on April 30, 2025; that I have read the foregoing
13  transcript of my deposition, consisting of Pages 1
14  through 53, inclusive, and affix my signature to same.
15
16              _____
                        CARL DARR
17
18  Subscribed and sworn to
    before me this _____ day
19  of _____, _____.
20
21  _____
    Notary Public
22
23
24
```

TOOMEY REPORTING
312-853-0648

Exhibit 8 Page 14

Case: 1:23-cv-16970 Document #: 122-9 Filed: 07/08/25 Page 1 of 3 PageID #:1368

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CORNELIUS WALKER | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 20-cv-00261 |
| *-vs-* | ) | |
| THOMAS DART, SHERIFF OF COOK | ) | Judge Mary M. Rowland |
| COUNTY, and COOK COUNTY, | ) | Magistrate Hon. Jeffrey Cummings |
| ILLINOIS, | ) | |
| *Defendants.* | ) | |

## DEFENDANT, COOK COUNTY, ILLINOIS' ANSWER
## TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

NOW COMES the Defendant, COOK COUNTY, ILLINOIS, by and through its attorneys,

JOHNSON & BELL, LTD., and for its Answer to Plaintiff's Second Set of Interrogatories, states

as follows:

1.      Identify, by name and title, the individual or individuals who responded to each
interrogatory.

**ANSWER:    Eric Davis, Deputy Director of Cook County Department of Capital
Planning and Policy.**

2.      Identify, by month and year, when construction commenced on the Cermak
Health Facility located at 2800 S. California, Chicago, Illinois.

**ANSWER:    Construction commenced in 1996.  Drawings were issued for bid to
the market in October 1995.**

3.      Was Ellen Stoner directed by STV to review the Cermak Ramp to determine
whether it complied with the 2010 ADA Standards for Accessible Design?

**ANSWER:    Altus Works was tasked by the STV/Heery joint venture to review
accessibility of various locations, including the lower level ramp in the Cermak Health
Services Facility, including but not limited to those requirements from the 2010 ADA
Standards that may apply to a building constructed in the late 1990s.**

4.      In March 2018, was the length of the Cermak Ramp more than 43 feet?

**ANSWER:    Unknown to this Defendant.  The original drawings of the ramp
indicate a design length of 43 feet and 10 inches.**

Exhibit 9 Page 1

5.     As of December 5, 2021, is the length of the Cermak Ramp more than 43 feet?

**<u>ANSWER:</u>**   **Unknown to this Defendant.**

6.     From January 1, 2021 to the present, has Cook County hired an Architect of Record to develop a complete scope documents, including drawings and specifications, for the Cermak Ramp?

**<u>ANSWER:</u>**   **The procurement process for professional architecture and engineering services to assess accessibility at Cermak and to design any modifications to the ramp that may be required has not yet been completed. However, Defendant Cook County has developed the draft "Request for Qualifications (RFQ)," which includes such services and intends to issue it to the market in the first quarter of 2022, with the further intent to issue a recommendation for award to the Board of Commissioners in the second quarter of 2022.**

KIMBERLY M. FOXX
State's Attorney of Cook County

*/s/ Jack E. Bentley*
Special Assistant State's Attorney

Brian P. Gainer (gainerb@jbltd.com)
Monica Burkoth (burkothm@jbltd.com)
Jack E. Bentley (bentleyj@jbltd.com)
Lisa M. McElroy (mcelroyl@jbltd.com)
Samuel D. Branum (branums@jbltd.com)
JOHNSON & BELL, LTD.
33 West Monroe Street, Suite 2700
Chicago, IL 60603
Tel: (312) 372-0770
Fax: (312) 372-9818

Exhibit 9 Page 2

## **CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I caused to be served the foregoing document on the

attorneys listed below by email on January 14, 2022.


Patrick W. Morrissey (pwm@morrisseylawchicago.com)
Thomas Gerald Morrissey (tgm@morrisseylawchicago.com)
Thomas G. Morrissey, Ltd.
10150 S. Western Ave., Suite Rear
Chicago, IL 60643
Tel: (773) 233-7901
*Attorneys for Plaintiff, Cornelius Walker*


/s/ *Jack E. Bentley*
One of the Attorneys for Defendants,
THOMAS DART, SHERIFF OF COOK COUNTY,
and COOK COUNTY, ILLINOIS

Brian P. Gainer (gainerb@jbltd.com)
Monica Burkoth (burkothm@jbltd.com)
Jack E. Bentley (bentleyj@jbltd.com)
Lisa M. McElroy (mcelroyl@jbltd.com)
Samuel D. Branum (branums@jbltd.com)
JOHNSON & BELL, LTD.
33 West Monroe Street, Suite 2700
Chicago, IL 60603
Tel: (312) 372-0770
Fax: (312) 372-9818

3

Exhibit 9 Page 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CORNELIUS WALKER** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | **No. 20-cv-00261** |
| *-vs-* | ) | |
| **THOMAS DART, SHERIFF OF COOK** | ) | **Judge Mary M. Rowland** |
| **and COUNTY, COOK COUNTY,** | ) | **Magistrate Hon. Jeffrey Cummings** |
| **ILLINOIS,** | ) | |
| *Defendants.* | ) | |

**DEFENDANT COOK COUNTY'S ANSWER TO PLAINTIFF'S FIRST SET OF
INTERROGATORIES**

NOW COMES Defendant, COOK COUNTY, by and through their attorneys, JOHNSON & BELL, LTD., and for their answer to Plaintiff's First Set of Interrogatories, states as follows:

1. Identify, by name and title, the individual or individuals who responded to each interrogatory.

**ANSWER:** **Eric Davis, AIA, Deputy Director of Capital Planning and Policy for Cook County.**

2. On August 30, 2019, Cook County's attorney, ASA Miguel Larios, sent an e-mail that "I am informed that there are no Cermak ramp 'construction/design drawings.' Attached is the only Cermak Ramp information Capital Planning." See Exhibit 4 at 1. Attached to this e-mail ASA Larios produced a document titled "CERMAK RAMP.NOTES.From.MAR.2018.docx." *Id.* at 1-2. This document is reproduced below:

1

Exhibit 10 Page 1

COPY PASTE OF WALKTHROUGH FROM MARCH 2018; CURRENTLY IN 2019 THIS SCOPE IS AWAITING PROCESSING OF APPENDIX 1 FOR A/E VIA PROCUREMENT At 08.26.19

| E: Cermak Ramp | |
|---|---|
| Cermak Ramp B019 | Existing ramp is 47' long without a landing. Slope of the ramp is within 1:12 maximum slope requirements, however the run exceeds code requirements. |
| | Recommendations: |
| | 1. Create compliant landing 30' from top of ramp |
| | 2. Repave the remaining 17' ramp in 2 sections with another landing area at the change in ramp direction. |
| | 3. Raise door to Medical Records room B020. Extend landing into room and provide 3' wide ramp and 44" wide stair |
| | 4. Provide handrails at both sides of ramps, continuous at landings where no door exists. |
| | 5. Provide handrails at both sides of stairs in B020. |



Identify, by name and title, the individuals who attended the walkthrough in March 2018 of the Cermak ramp.

**ANSWER:** Ellen Stoner, Principal at Altusworks, Inc., and Scott Utter, Associate Architect at Altusworks, Inc.

2

Exhibit 10 Page 2

3. Identify the year when the Cermak ramp, identified as "Cermak Ramp B019" in the diagram shown above, was constructed.

**ANSWER: In or before 1998.**

4. Identify the slope of the ramp in the lower level of Cermak that is the subject of the Court's Rule 23(b)(2) certification order, Dkt. 62, Memorandum Opinion and Order.

**ANSWER: On information and belief, the slope is approximately 1/18.**

5. Identify the "horizontal projection or run" of the ramp in the lower level of Cermak that is the subject of the Court's Rule 23(b)(2) certification order, Dkt. 62, Memorandum Opinion and Order.

**ANSWER: On information and belief, 43 feet, 11 inches. However, the answer to this question depends on how the ramp is measured.**

6. Identify, by name and title, the individual or individuals who wrote the following information regarding the Cermak ramp:

| E: Cermak Ramp | |
|---|---|
| Cermak Ramp B019 | Existing ramp is 47' long without a landing. Slope of the ramp is within 1:12 maximum slope requirements, however the run exceeds code requirements.<br>**Recommendations:**<br>1. Create compliant landing 30' from top of ramp<br>2. Repour the remaining 17' ramp in 2 sections with another landing area at the change in ramp direction.<br>3. Raise door to Medical Records room B020. Extend landing into room and provide 3' wide ramp and 44" wide stair.<br>4. Provide handrails at both sides of ramps, continuous at landings where no door exists.<br>5. Provide handrails at both sides of stairs in B020. |

**ANSWER: Ellen Stoner, Principal at Altusworks, Inc.**

3

Exhibit 10 Page 3

7.      Eric Davis testified on December 19, 2019 that after the board of commissioners denied a "task order" that "we have had to try to procure projects like this through alternative means." *See* Dkt. 40-6 at 10, Davis Dep 12/19/2019 at 36:1-8. Describe the steps taken by Cook County to procure the Cermak ramp project "through alternative means."

**ANSWER: Such means included drafting a request for proposal to procure AE services from a prequalified pool of vendors, as part of an RFP that also addressed other ADA design services needs.**

8.      Eric Davis testified on December 19, 2019 that the County Board did not approve a "task order" to procure NE services for the Cermak ramp. Explain why Cook County did not approve this "task order."

**ANSWER: This task order was deferred by a vote of the Commissioners because it was considered an atypical form of procurement.**

9.      Is Cook County in possession of a "business case" that led to a scope walk in March 2018 for the Cermak ramp?

**ANSWER: After a search for this document, no such responsive materials were discovered.**

Respectfully Submitted,

JOHNSON & BELL, LTD.

*/s/ Zachary Pestine*
One of the Attorneys on behalf of Defendant

Brian P. Gainer (gainerb@jbltd.com)
Monica Burkoth (burkothm@jbltd.com)

4

Exhibit 10 Page 4

Zachary A. Pestine (pestinez@jbltd.com)
JOHNSON & BELL, LTD.
33 W. Monroe Street
Suite 2700
Chicago, IL 60603
Tel: (312) 372-0770
Fax: (312) 372-9818

5

Exhibit 10 Page 5

## <u>VERIFICATION</u>

I, Eric Davis, state under penalty of perjury, the foregoing response to Plaintiff Cornelius Walker's First Set of Interrogatories are to the best of my knowledge true and correct.

Date: May 4, 2021

_____

Eric Davis

Exhibit 10 Page 6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CORNELIUS WALKER | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 20-cv-00261 |
| -vs- | ) | |
| THOMAS DART, SHERIFF OF COOK | ) | Judge Mary M. Rowland |
| and COUNTY, COOK COUNTY, | ) | Magistrate Hon. Jeffrey Cummings |
| ILLINOIS, | ) | |
| *Defendants.* | ) | |

## CERTIFICATE OF SERVICE

TO:     Patrick Morrissey
          Thomas Gerald Morrissey
          Thomas G. Morrissey, Ltd.
          10150 South Western Ave.
          Suite Rear
          Chicago, IL 60643

         The undersigned, a non-attorney, first being duly sworn on oath, deposes and states that
she has served:

- **Defendant Cook County's Answer to Plaintiff's First Set of Interrogatories**

                              By:     */s/ Rebecca Milton*
to Plaintiff's counsel Thomas G. Morrissey and Patrick W. Morrissey by email to
patrickmorrissey1920@gmail.com and tgmorriseylaw@gmail.com, before 5:00 p.m. on **May 5,
2021.**

Brian P. Gainer (gainerb@jbltd.com)
Monica Burkoth (burkothm@jbltd.com)
Zachary A. Pestine (pestinez@jbltd.com)
JOHNSON & BELL, LTD.
33 West Monroe Street, Suite 2700
Chicago, IL 60603
Tel: (312) 372-0770

Exhibit 10 Page 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Cuauhtemoc Hernandez and<br>William Mathis, | ) | |
| | ) | |
| | ) | Case No. 23-cv-16970 |
| Plaintiffs, | ) | |
| | ) | Honorable Sunil R. Harjani |
| v. | ) | |
| | ) | |
| Thomas Dart, Sheriff of Cook County, | ) | |
| and Cook County, Illinois | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RULE 26(a)(2)(B) DISCLOSURES**

NOW COME Defendants, Cook County, and Thomas J. Dart, (collectively "Defendants"),

by and through their attorneys, DeVore Radunsky LLC, and pursuant to Fed. R. Civ. P. 26(a)(2)(B)

and consistent with FRE 702, 703 and 705 make the following disclosures:

**DISCLOSURES**

**Rule 26(a)(2)(B)**

    (i)     A complete statement of all opinions the witness will express and the basis and
reason for them;

**ANSWER: See attached Globetrotters Reports dated April 1, 2024 (RTU East**

**Tunnel Ramp) and December 6, 2023 (Cermak Corridor Ramp).**

    (ii)    The facts or data considered by the witness in forming them;

**ANSWER: Mr. Darr's opinions are based on the records and depositions noted in**

**his attached reports as well as his experience, training and expertise in the field of**

**architecture**

    (iii)   Any exhibits that will be used to summarize or support them;

**ANSWER:  Mr. Darr may use demonstrative evidence or other exhibits noted in**

**his report.**

Exhibit 11 Page 1

(iv)     The witness's qualifications, including a list of all publications authored in the previous 10 years;

**ANSWER: Mr. Darr's CV is attached.**

(v)      A list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

**ANSWER:  See attached list.**

(vi)     A statement of the compensation to be paid for the study and testimony in the case.

**ANSWER: Invoice for services will provided upon receipt.**

Respectfully submitted,

*/s/ Troy S. Radunsky*
One of the Attorneys for Defendants

Jason DeVore (ARDC: 6242782)
Troy Radunsky (ARDC: 6269281)
DeVore Radunsky LLC
230 W. Monroe, Suite 230
Chicago, IL 60606

Exhibit 11 Page 2

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the above **Defendants' Rule 26(a)(2)(B) Disclosures** were served on plaintiff's counsel listed below via email on March 28, 2025.

/s/ *Troy S. Radunsky*
Troy S. Radunsky, One of the
Attorneys for Defendants

**Service List**
Thomas G. Morrissey Ltd.,
10257 S. Western Ave. Chicago, IL 60643
773 233 7900
Thomas Morrissey – tgm@morrisseylawchicago.com
Patrick Morrissey – pwm@morrisseylawchicago.com

Exhibit 11 Page 3



## code of federal regulations

reprint

## Department of Justice

The 1991 Standards were in effect for new construction and alterations until March 14, 2012. The Department's **2010 ADA Standards for Accessible Design** were published September 15, 2010 and became effective on March 15, 2012.

## 28 CFR Part 36

**Revised as of July 1, 1994**

Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities

Excerpt from 28 CFR Part 36:

## ADA Standards for Accessible Design



Exhibit 12 Page 1

**Pt. 36, App. A**  **28 CFR Ch. I (7-1-94 Edition)**

**4.8 Ramps**



**Fig. 11**
**Measurement of Curb Ramp Slopes**

**(a)**
**Flared Sides**

*If X is less than 48 in, then the slope of the flared side shall not exceed 1:12.*

**(b)**
**Returned Curb**

**Fig. 12**
**Sides of Curb Ramps**

**4.7.11 Islands.** Any raised islands in crossings shall be cut through level with the street or have curb ramps at both sides and a level area at least 48 in (1220 mm) long between the curb ramps in the part of the island intersected by the crossings (see Fig. 15(a) and (b)).

**4.8 Ramps.**

**4.8.1\* General.** Any part of an accessible route with a slope greater than 1:20 shall be considered a ramp and shall comply with 4.8.

**4.8.2\* Slope and Rise.** The least possible slope shall be used for any ramp. The maximum slope of a ramp in new construction shall be 1:12. The maximum rise for any run shall be 30 in (760 mm) (see Fig. 16). Curb ramps and



**Fig. 13**
**Built-Up Curb Ramp**

ramps to be constructed on existing sites or in existing buildings or facilities may have slopes and rises as *allowed in 4.1.6(3)(a)* if space limitations prohibit the use of a 1:12 slope or less.

27

Exhibit 12 Page 2

**Department of Justice**                                       **Pt. 36, App. A**

**4.8 Ramps**



**Fig. 15
Curb Ramps at Marked Crossings**

28

Exhibit 12 Page 3

**Pt. 36, App. A**  **28 CFR Ch. I (7-1-94 Edition)**
**4.8 Ramps**



**Fig. 16
Components of a Single Ramp Run and Sample Ramp Dimensions**

**4.8.3 Clear Width.** The minimum clear width of a ramp shall be 36 in (915 mm).

**4.8.4\* Landings.** Ramps shall have level landings at bottom and top of each ramp and each ramp run. Landings shall have the following features:

(1) The landing shall be at least as wide as the ramp run leading to it.

(2) The landing length shall be a minimum of 60 in (1525 mm) clear.

(3) If ramps change direction at landings, the minimum landing size shall be 60 in by 60 in (1525 mm by 1525 mm).

(4) If a doorway is located at a landing, then the area in front of the doorway shall comply with 4.13.6.

**4.8.5\* Handrails.** If a ramp run has a rise greater than 6 in (150 mm) or a horizontal projection greater than 72 in (1830 mm), then it shall have handrails on both sides. Handrails are not required on curb ramps or *adjacent to seating in assembly areas.* Handrails shall comply with 4.26 and shall have the following features:

(1) Handrails shall be provided along both sides of ramp segments. The inside handrail on switchback or dogleg ramps shall always be continuous.

(2) If handrails are not continuous, they shall extend at least 12 in (305 mm) beyond the top and bottom of the ramp segment and shall be parallel with the floor or ground surface (see Fig. 17).

(3) The clear space between the handrail and the wall shall be 1 - 1/2 in (38 mm).

(4) Gripping surfaces shall be continuous.

*(5) Top of handrail gripping surfaces shall be mounted between 34 in and 38 in (865 mm and 965 mm) above ramp surfaces.*

*(6) Ends of handrails shall be either rounded or returned smoothly to floor, wall, or post.*

*(7) Handrails shall not rotate within their fittings.*

**4.8.6 Cross Slope and Surfaces.** The cross slope of ramp surfaces shall be no greater than 1:50. Ramp surfaces shall comply with 4.5.

29

Exhibit 12 Page 4

**Department of Justice**      **Pt. 36, App. A**

4.9 Stairs

---

**4.8.7 Edge Protection.** Ramps and landings with drop-offs shall have curbs, walls, railings, or projecting surfaces that prevent people from slipping off the ramp. Curbs shall be a minimum of 2 in (50 mm) high (see Fig. 17).

**4.8.8 Outdoor Conditions.** Outdoor ramps and their approaches shall be designed so that water will not accumulate on walking surfaces.

## 4.9 Stairs.

**4.9.1\* Minimum Number.** *Stairs required to be accessible by 4.1 shall comply with 4.9.*

**4.9.2 Treads and Risers.** On any given flight of stairs, all steps shall have uniform riser heights and uniform tread widths. Stair treads shall be no less than 11 in (280 mm) wide, measured from riser to riser (see Fig. 18(a)). *Open risers are not permitted.*

**4.9.3 Nosings.** The undersides of nosings shall not be abrupt. The radius of curvature at the leading edge of the tread shall be no greater than 1/2 in (13 mm). Risers shall be sloped or the underside of the nosing shall have an angle not less than 60 degrees from the horizontal. Nosings shall project no more than 1-1/2 in (38 mm) (see Fig. 18).

**4.9.4 Handrails.** Stairways shall have handrails at both sides of all stairs. Handrails shall comply with 4.26 and shall have the following features:

   (1) Handrails shall be continuous along both sides of stairs. The inside handrail on switchback or dogleg stairs shall always be continuous (see Fig. 19(a) and (b)).

   (2) If handrails are not continuous, they shall extend at least 12 in (305 mm) beyond the top riser and at least 12 in (305 mm) plus the width of one tread beyond the bottom riser. At the top, the extension shall be parallel with the floor or ground surface. At the bottom, the handrail shall continue to slope for a distance of the width of one tread from the bottom riser; the remainder of the extension shall be horizontal (see Fig. 19(c) and (d)). Handrail extensions shall comply with 4.4.

   (3) The clear space between handrails and wall shall be 1-1/2 in (38 mm).

   (4) Gripping surfaces shall be uninterrupted by newel posts, other construction elements, or obstructions.

   *(5) Top of handrail gripping surface shall be mounted between 34 in and 38 in (865 mm and 965 mm) above stair nosings.*

   *(6) Ends of handrails shall be either rounded or returned smoothly to floor, wall or post.*

   *(7) Handrails shall not rotate within their fittings.*

**4.9.5 Detectable Warnings at Stairs.** (Reserved).

**4.9.6 Outdoor Conditions.** Outdoor stairs and their approaches shall be designed so that water will not accumulate on walking surfaces.

## 4.10 Elevators.

**4.10.1 General.** *Accessible* elevators shall be on an accessible route and shall comply with 4.10 and with the *ASME A17.1-1990,* Safety Code for Elevators and Escalators. *Freight elevators shall not be considered as meeting the requirements of this section unless the only elevators provided are used as combination passenger and freight elevators for the public and employees.*

**4.10.2 Automatic Operation.** Elevator operation shall be automatic. Each car shall be equipped with a self-leveling feature that will automatically bring the car to floor landings within a tolerance of 1/2 in (13 mm) under rated loading to zero loading conditions. This self-leveling feature shall be automatic and independent of the operating device and shall correct the overtravel or undertravel.

**4.10.3 Hall Call Buttons.** Call buttons in elevator lobbies and halls shall be centered at 42 in (1065 mm) above the floor. Such call buttons shall have visual signals to indicate when each call is registered and when each call is answered. Call buttons shall be a minimum of 3/4 in (19 mm) in the smallest dimension. The button designating the up direction shall be on top. (See Fig. 20.) *Buttons shall be raised or flush. Objects mounted beneath hall call buttons shall not project into the elevator lobby more than 4 in (100 mm).*

30

Exhibit 12 Page 5

**Pt. 36, App. A**                                   **28 CFR Ch. I (7-1-94 Edition)**

**4.10 Elevators**



**Fig. 17**
**Examples of Edge Protection and Handrail Extensions**

**Fig. 18**
**Usable Tread Width and Examples of Acceptable Nosings**

31

Exhibit 12 Page 6



Figure 307.2
of Protruding Objects

# 2010 ADA Standards for Accessible Design

Figure 703.2.5
Height of Raised Character

**Department of Justice**

September 15, 2010

Exhibit 13 Page 1

by reference, see "Referenced Standards" in Chapter 1). Low-energy and power-assisted doors shall comply with ANSI/BHMA A156.19 (1997 or 2002 edition) (incorporated by reference, see "Referenced Standards" in Chapter 1).

**404.3.1 Clear Width.** Doorways shall provide a clear opening of 32 inches (815 mm) minimum in power-on and power-off mode. The minimum clear width for automatic door systems in a doorway shall be based on the clear opening provided by all leaves in the open position.

**404.3.2 Maneuvering Clearance.** Clearances at power-assisted doors and gates shall comply with 404.2.4. Clearances at automatic doors and gates without standby power and serving an *accessible means of egress* shall comply with 404.2.4.
    **EXCEPTION:** Where automatic doors and gates remain open in the power-off condition, compliance with 404.2.4 shall not be required.

**404.3.3 Thresholds.** Thresholds and changes in level at doorways shall comply with 404.2.5.

**404.3.4 Doors in Series and Gates in Series.** Doors in series and gates in series shall comply with 404.2.6.

**404.3.5 Controls.** Manually operated controls shall comply with 309. The clear floor *space* adjacent to the control shall be located beyond the arc of the door swing.

**404.3.6 Break Out Opening.** Where doors and gates without standby power are a part of a means of egress, the clear break out opening at swinging or sliding doors and gates shall be 32 inches (815 mm) minimum when operated in emergency mode.
    **EXCEPTION:** Where manual swinging doors and gates comply with 404.2 and serve the same means of egress compliance with 404.3.6 shall not be required.

**404.3.7 Revolving Doors, Revolving Gates, and Turnstiles.** Revolving doors, revolving gates, and turnstiles shall not be part of an *accessible* route.

## 405 Ramps

**405.1 General.** *Ramps* on *accessible* routes shall comply with 405.
    **EXCEPTION:** In *assembly areas*, aisle *ramps* adjacent to seating and not serving *elements* required to be on an *accessible* route shall not be required to comply with 405.

**405.2 Slope.** *Ramp* runs shall have a *running slope* not steeper than 1:12.
    **EXCEPTION:** In existing *sites, buildings,* and *facilities, ramps* shall be permitted to have *running slopes* steeper than 1:12 complying with Table 405.2 where such slopes are necessary due to *space* limitations.

Exhibit 13 Page 2

**TECHNICAL**                                                      **CHAPTER 4: ACCESSIBLE ROUTES**

### Table 405.2 Maximum Ramp Slope and Rise for Existing Sites, Buildings, and Facilities

| Slope[1] | Maximum Rise |
|---|---|
| Steeper than 1:10 but not steeper than 1:8 | 3 inches (75 mm) |
| Steeper than 1:12 but not steeper than 1:10 | 6 inches (150 mm) |

1. A slope steeper than 1:8 is prohibited.

> **Advisory 405.2 Slope.** To accommodate the widest range of users, provide ramps with the least possible running slope and, wherever possible, accompany ramps with stairs for use by those individuals for whom distance presents a greater barrier than steps, e.g., people with heart disease or limited stamina.

**405.3 Cross Slope.** *Cross slope* of *ramp* runs shall not be steeper than 1:48.

> **Advisory 405.3 Cross Slope.** Cross slope is the slope of the surface perpendicular to the direction of travel. Cross slope is measured the same way as slope is measured (i.e., the rise over the run).

**405.4 Floor or Ground Surfaces.** Floor or ground surfaces of *ramp* runs shall comply with 302. Changes in level other than the *running slope* and *cross slope* are not permitted on *ramp* runs.

**405.5 Clear Width.** The clear width of a *ramp* run and, where handrails are provided, the clear width between handrails shall be 36 inches (915 mm) minimum.
    **EXCEPTION:** Within *employee work area*s, the required clear width of *ramps* that are a part of *common use circulation path*s shall be permitted to be decreased by *work area equipment* provided that the decrease is essential to the function of the work being performed.

**405.6 Rise.** The rise for any *ramp* run shall be 30 inches (760 mm) maximum.

**405.7 Landings.** *Ramps* shall have landings at the top and the bottom of each *ramp* run. Landings shall comply with 405.7.

> **Advisory 405.7 Landings.** Ramps that do not have level landings at changes in direction can create a compound slope that will not meet the requirements of this document. Circular or curved ramps continually change direction. Curvilinear ramps with small radii also can create compound cross slopes and cannot, by their nature, meet the requirements for accessible routes. A level landing is needed at the accessible door to permit maneuvering and simultaneously door operation.

**CHAPTER 4: ACCESSIBLE ROUTES**                                    **TECHNICAL**



**(a)**
**straight**

**(b)**
**change in direction**

**Figure 405.7**
**Ramp Landings**

**405.7.1 Slope.** Landings shall comply with 302. Changes in level are not permitted.
 **EXCEPTION:** Slopes not steeper than 1:48 shall be permitted.

**405.7.2 Width.** The landing clear width shall be at least as wide as the widest *ramp* run leading to the landing.

**405.7.3 Length.** The landing clear length shall be 60 inches (1525 mm) long minimum.

**405.7.4 Change in Direction.** *Ramps* that change direction between runs at landings shall have a clear landing 60 inches (1525 mm) minimum by 60 inches (1525 mm) minimum.

**405.7.5 Doorways.** Where doorways are located adjacent to a *ramp* landing, maneuvering clearances required by 404.2.4 and 404.3.2 shall be permitted to overlap the required landing area.

**405.8 Handrails.** *Ramp* runs with a rise greater than 6 inches (150 mm) shall have handrails complying with 505.
 **EXCEPTION:** Within *employee work area*s, handrails shall not be required where *ramps* that are part of *common use circulation path*s are designed to permit the installation of handrails complying with 505. *Ramps* not subject to the exception to 405.5 shall be designed to maintain a 36 inch (915 mm) minimum clear width when handrails are installed.

**405.9 Edge Protection.** Edge protection complying with 405.9.1 or 405.9.2 shall be provided on each side of *ramp* runs and at each side of *ramp* landings.

Exhibit 13 Page 4

**EXCEPTIONS:  1.**  Edge protection shall not be required on *ramps* that are not required to have handrails and have sides complying with 406.3.
**2.**  Edge protection shall not be required on the sides of *ramp* landings serving an adjoining *ramp* run or stairway.
**3.**  Edge protection shall not be required on the sides of *ramp* landings having a vertical drop-off of ½ inch (13 mm) maximum within 10 inches (255 mm) horizontally of the minimum landing area specified in 405.7.

**405.9.1 Extended Floor or Ground Surface.**  The floor or ground surface of the *ramp* run or landing shall extend 12 inches (305 mm) minimum beyond the inside face of a handrail complying with 505.

> **Advisory 405.9.1 Extended Floor or Ground Surface.**  The extended surface prevents wheelchair casters and crutch tips from slipping off the ramp surface.



**Figure 405.9.1**
**Extended Floor or Ground Surface Edge Protection**

**405.9.2 Curb or Barrier.**  A curb or barrier shall be provided that prevents the passage of a 4 inch (100 mm) diameter sphere, where any portion of the sphere is within 4 inches (100 mm) of the finish floor or ground surface.



**Figure 405.9.2**
**Curb or Barrier Edge Protection**

**405.10 Wet Conditions.**  Landings subject to wet conditions shall be designed to prevent the accumulation of water.

## 406 Curb Ramps

**406.1 General.**  *Curb ramps* on *accessible* routes shall comply with 406, 405.2 through 405.5, and 405.10.

**406.2 Counter Slope.**  Counter slopes of adjoining gutters and road surfaces immediately adjacent to the *curb ramp* shall not be steeper than 1:20.  The adjacent surfaces at transitions at *curb ramps* to *walks*, gutters, and streets shall be at the same level.



**Figure 406.2**
**Counter Slope of Surfaces Adjacent to Curb Ramps**

**406.3 Sides of Curb Ramps.**  Where provided, *curb ramp* flares shall not be steeper than 1:10.



**Figure 406.3**
**Sides of Curb Ramps**

**406.4 Landings.**  Landings shall be provided at the tops of *curb ramp*s. The landing clear length shall be 36 inches (915 mm) minimum.  The landing clear width shall be at least as wide as the *curb ramp*, excluding flared sides, leading to the landing.
    **EXCEPTION:**  In *alterations*, where there is no landing at the top of *curb ramps*, *curb ramp* flares shall be provided and shall not be steeper than 1:12.

Exhibit 13 Page 6



**Figure 406.4**
**Landings at the Top of Curb Ramps**

**406.5 Location.** *Curb ramps* and the flared sides of *curb ramps* shall be located so that they do not project into vehicular traffic lanes, parking *spaces,* or parking access aisles. *Curb ramps* at *marked crossings* shall be wholly contained within the markings, excluding any flared sides.

**406.6 Diagonal Curb Ramps.** Diagonal or corner type *curb ramps* with returned curbs or other well-defined edges shall have the edges parallel to the direction of pedestrian flow. The bottom of diagonal *curb ramps* shall have a clear *space* 48 inches (1220 mm) minimum outside active traffic lanes of the roadway. Diagonal *curb ramps* provided at *marked crossings* shall provide the 48 inches (1220 mm) minimum clear *space* within the markings. Diagonal *curb ramps* with flared sides shall have a segment of curb 24 inches (610 mm) long minimum located on each side of the *curb ramp* and within the *marked crossing*.



**Figure 406.6**
**Diagonal or Corner Type Curb Ramps**

Exhibit 13 Page 7

**406.7 Islands.**  Raised islands in crossings shall be cut through level with the street or have *curb ramps* at both sides.  Each *curb ramp* shall have a level area 48 inches (1220 mm) long minimum by 36 inches (915 mm) wide minimum at the top of the *curb ramp* in the part of the island intersected by the crossings. Each 48 inch (1220 mm) minimum by 36 inch (915 mm) minimum area shall be oriented so that the 48 inch (1220 mm) minimum length is in the direction of the *running slope* of the *curb ramp* it serves.  The 48 inch (1220 mm) minimum by 36 inch (915 mm) minimum areas and the *accessible* route shall be permitted to overlap.



(a)
cut through at island

(b)
curb ramp at island

**Figure 406.7**
**Islands in Crossings**

## 407 Elevators

**407.1 General.**  Elevators shall comply with 407 and with ASME A17.1 (incorporated by reference, see "Referenced Standards" in Chapter 1).  They shall be passenger elevators as classified by ASME A17.1. Elevator operation shall be automatic.

> **Advisory 407.1 General.**  The ADA and other Federal civil rights laws require that accessible features be maintained in working order so that they are accessible to and usable by those people they are intended to benefit.  Building owners should note that the ASME Safety Code for Elevators and Escalators requires routine maintenance and inspections.  Isolated or temporary interruptions in service due to maintenance or repairs may be unavoidable; however, failure to take prompt action to effect repairs could constitute a violation of Federal laws and these requirements.

**407.2 Elevator Landing Requirements.**  Elevator landings shall comply with 407.2.

Exhibit 13 Page 8

# CORRIDOR RAMP

# ACCESSIBILITY ASSESSMENT

## Cermak Health Services Facility

*Date Submitted:* December 6, 2023

*Submitted To:* Cook County

*Submitted By:*



300 S. Wacker Drive, Suite 400
Chicago, Illinois 60606
312.922.6400
Marketing@gec-group.com

Exhibit 14 Page 1

## Table of Contents

Executive Summary...................................................................................................................3

**PART 1: Assessment per Current Applicable Codes**..........................................................................**5**

Introduction .........................................................................................................................5

Background and Scope...........................................................................................................5

Data Collecting and Measurement ........................................................................................6

Applicable Codes and Standards............................................................................................7

Summary of Findings per Current Applicable Codes and Guidelines ....................................9

Recommendations ................................................................................................................9

**PART 2: Assessment per Historically Applicable Codes** ....................................................**11**

Historically Applicable Codes and Standards........................................................................11

Summary of Findings per Historically Applicable Codes and Guidelines..............................14

**Appendix of Images: Cermak Health Services Facility Corridor Ramp** ..................................**16**

Exhibit 14 Page 2

300 South Wacker Drive, Suite 400 ■ Chicago, Illinois 60606 USA ■ T 312.922.6400 ■ F 312.922.2953 ■ marketing@gec-group.com

**CORRIDOR RAMP ACCESSIBILITY ASSESSMENT**                                   Page 3 of 21
CERMAK HEALTH SERVICES FACILITY

## Executive Summary

The Cermak Health Services Facility is connected to other buildings at the Cook Couty Department of Corrections Campus via an underground tunnel system. From the building's lower level, a connecting sloped walkway leads to the larger tunnel network. The sloped walkway is identified on the original building drawings as **Corridor Ramp B019** and, for the purposes of this report, will be referred to as the Corridor Ramp.

GEC measured the Corridor Ramp to be approximately 43.64 feet in length and approximately 2.7 feet in height, resulting in a slope slightly shallower than 1:16. With a steepness greater than 1:20, applicable code requirements for Ramps apply to this sloped walkway.

While the slope and cross-slope are compliant with applicable code requirements, other aspects of the Corridor Ramp do not comply with current code requirements. Non-compliant conditions include:

1. Per Section 405.6 of the 2010 Americans with Disabilities Act Accessibility Guidelines (ADAAG) and the 2009 American National Standards Institute (ANSI) Standard A117.1, the rise for any ramp shall be a maximum of 30-inches. The existing ramp rise is approximately 2.7 feet, which is 32.4 inches.
2. Per Section 505 of the 2010 ADAAG and the 2009 ANSI Standard A117.1, ramp handrails shall be continuous along the full length of the ramp and shall extend horizontally a minimum of 12 inches beyond the top and bottom of the ramp. Since the original construction, anti-ligature handrails have been added to each side of the ramp incline. However, at the top and bottom of the ramp the handrails do not extend a minimum of 12 inches beyond the ramp, and the handrails are not continuous.

Possible solutions, to bring the Corridor Ramp into compliance, include:

1. Adding an intermediate landing, to reduce the ramp rise to less than 30 inches per run and adding railing extensions at the top and bottom of the ramp.
   *or*
2. Reducing the slope to less than 1:20 by extending the length of the walkway. The sloped walkway will be shallow enough to eliminate the applicability of code requirements for ramps and will not require a handrail.

Considerations that will impact the viability and practicability of any solution include:

1. The Owner has expressed a desire to go beyond the minimum code requirements and, where possible, achieve Universal Design.
2. Anti-ligature handrails are needed in this facility and require continuous attachment to the wall to avoid conditions where cords, or similar elements, may be looped around the handrail.
3. Extension of the handrails at each end are complicated by the wall configurations at the top and bottom of the incline. The walls angle 45 degrees at each location. To provide a continuous rail, this condition will require having a 45-degree handrail bend at each wall corner. This type of fitting, based on cursory research and discussions with the client, is not available for anti-ligature handrails.
4. Both solutions mentioned above will require modification of the concrete floor.

Exhibit 14 Page 3

**CORRIDOR RAMP ACCESSIBILITY ASSESSMENT**                                    Page 4 of 21
CERMAK HEALTH SERVICES FACILITY

Weighing the factors listed above, GEC recommends reducing the floor slope to less than 1:20 and eliminating the applicability of code requirements for ramps. With a slope less than 1:20, handrails will no longer be required and can be removed from the walls.

This work will require removing the concrete slab, regrading, reinstallation of the concrete slabs, and adjustments to adjacent doorways. Pouring concrete over the existing ramp is another potential method to reduce the slope, which will require partial removal of the concrete slab, adjustments to adjacent doorways, and may require additional slab reinforcement. Both methods will likely require the proposed sloped walkway to extend into the building hallway.

Since the Corridor Ramp is the primary access to bring individuals in custody in and out of the Cermak Health Services Facility, special coordination and arrangements will need to be made to maintain access while the work takes place.

**CORRIDOR RAMP ACCESSIBILITY ASSESSMENT**                                                Page 5 of 21
CERMAK HEALTH SERVICES FACILITY

<h2 style="text-align:center">PART 1: Assessment per Current Applicable Codes</h2>

## Introduction

Pursuant to RFQ No. 2215-02221, Globetrotters Engineering Corporation (GEC) was retained by Cook County Department of Capital Planning and Policy to provide an ADA Compliance Assessment and Schematic Design for the Cook County Department of Corrections Cermak Health Services Facility, located at 2800 South California Avenue, Chicago, Illinois.

As part of the project scope, Cook County requested GEC provide an accelerated review and assessment for the connecting lower-level walkway, identified on the original building drawings as **Corridor Ramp B019**, between Cermak Health Services building and the campus's underground tunnel system. The Corridor Ramp review and assessment are provided herein.

## Background and Scope

The Cermak Health Services Facility is a secure non-major healthcare facility located on the Cook County Jail campus. Constructed circa 1998, the building is 3-stories high (plus penthouse) and has a full basement. At the west side, the basement area extends beyond the footprint of the first floor above. The area outside of the first-floor footprint includes a mechanical space, a Corridor Ramp connecting the building to a tunnel network, and a storage room.

Three county departments are involved with the operation of Cermak Health Facility. The facility is owned and maintained by Cook County. Health services are provided by Cook County Department of Health, and individuals in custody are secured by the Department of Corrections staff. The building within the DOC campus complex is in a secured, fenced area and has limited daytime working hours and no on-site vehicle parking for staff or visitors.

300 South Wacker Drive, Suite 400 ■ Chicago, Illinois 60606 USA ■ T 312.922.6400  ■ F 312.922.2953 ■ marketing@gec-group.com

Exhibit 14 Page 5

**CORRIDOR RAMP ACCESSIBILITY ASSESSMENT**                                          Page 6 of 21
CERMAK HEALTH SERVICES FACILITY



Corridor Ramp

*Figure 1: Cermak Health Services Facility Basement Level Floor Plan.*
*The area described is outlined in a red, dashed line.*

## Data Collecting and Measurement

Site visits were conducted, to verify existing conditions related to the Corridor Ramp, on August 18, 2023, and again on September 1, 2023. GEC personnel that participated in the field site visits included:

- o   Matthew Defty, Senior Architect, and code reviewer
- o   Michael Nelson, Senior Architect, and code reviewer
- o   Max Lux, Architectural Professional
- o   Rajani Chowdary, Architectural Professional
- o   Daham Marapane, Architectural Professional

Additionally, GEC personnel were escorted through the building by Cook County Sheriff ADA Compliance Officer, Sabrina Rivero-Canchola.

GEC personnel conducted a supervised walk-through of the Corridor Ramp and available adjacent spaces to identify physical conditions as they relate to compliance with accessibility requirements. Equipment used to collect information and measurements included tape measures, laser measures, a measuring

**CORRIDOR RAMP ACCESSIBILITY ASSESSMENT**                                    Page 7 of 21
CERMAK HEALTH SERVICES FACILITY

wheel, a level, a door weight scale, and a LiDAR scanner. Measurements with the LiDAR scanner have a tolerance of +/- 6 millimeters.

## Applicable Codes and Standards

Applicable Codes and Standards that apply to current conditions, and were considered for the evaluation of the Corridor Ramp, include:

1. Americans with Disabilities Act Accessibility Guidelines (ADAAG) (2010)
2. American National Standards Institute (ANSI) Standard A117.1 (2009 version as referenced by the 2019 Chicago Building Code)
3. Chicago Building Code (CBC) (2019)
4. Illinois Accessibility Code (IAC) (2018)

### Americans with Disabilities Act Accessibility Guidelines (ADAAG), 2010

The Americans with Disabilities Act (ADA) Standards for Accessible Design, revised in 2010, are still in use as of 2023. The ADAAG are incorporated into the Department of Justice ADA regulations and are enforceable under titles II and III of the ADA. Section 405 Ramps states the following requirements:

1. 405.2 Slope: "Ramp runs shall have a running slope not steeper than 1:12."
2. Section 405.5 Clear Width: "The clear width of a ramp run and, where handrails are provided, the clear width between handrails shall be 36 inches minimum."
3. 405.3 Cross Slope: "Cross slope of ramp runs shall not be steeper than 1:48."
4. 405.6 Rise: "The rise for any ramp run shall be 30 inches maximum."
5. 405.8 Handrails: "Ramp runs with a rise greater than 6 inches shall have handrails complying with Section 505."
6. 505.3 Continuity: "Handrails shall be continuous within the full length of each stair flight or ramp run."
7. 505.4 Height: "Top of gripping surfaces of handrails shall be 34 inches minimum and 38 inches maximum vertically above [ramp surface]."
8. 505.10.1 Top and Bottom Extensions at Ramps: "Ramp handrails shall extend horizontally above the landing 12 inches minimum beyond the top and bottom of ramp runs" (Figure 2).



*Figure 2: Top and Bottom Handrail Extension at Ramps (2010 ADAAG, Fig. 505.10.1)*

300 South Wacker Drive, Suite 400 ▪ Chicago, Illinois 60606 USA ▪ T 312.922.6400  ▪ F 312.922.2953 ▪ marketing@gec-group.com

Exhibit 14 Page 7

**CORRIDOR RAMP ACCESSIBILITY ASSESSMENT**                                              Page 8 of 21
CERMAK HEALTH SERVICES FACILITY

The current Corridor Ramp's slope of 1:16 and clear width of 10 feet both comply with the 2010 ADAAG. GEC measured a ramp rise of 32.4 inches, which does not comply with the 30-inch maximum. The vertical rise exceeds 30 inches on both sides of the ramp, regardless of cross slope. The current handrail height of 36 inches is compliant, but because the handrails do not extend 12" beyond the ramp, they do not comply with the 2010 ADAAG requirements for handrail extensions.

**American National Standards Institute (ANSI) Standard 117.1, 2009**

Although there are 2017 ANSI standards, the current 2019 CBC references the 2009 ANSI Standard A117.1. The 2009 ANSI 117.1 ramp requirements align with the 2010 ADAAG and state the following:

1. 405.2 Slope: "Ramp runs shall have a running slope greater than 1:20 and not steeper than 1:12."
2. 405.5 Clear Width: "The clear width of a ramp run shall be 36 inches minimum."
3. 405.6 Rise: "The rise for any ramp run shall be 30 inches maximum."
4. 405.8 Handrails: "Ramp runs with a rise greater than 6 inches shall have handrails complying with Section 505."
5. Section 505.3 Continuity: "Handrails shall be continuous within the full length of each stair flight or ramp run."
6. 505.4 Height: "Top of gripping surfaces of handrails shall be 34 inches minimum and 38 inches maximum vertically above [ramp surface]."
7. 505.10.1 Top and Bottom Extensions at Ramps: "Ramp handrails shall extend horizontally above the landing 12 inches minimum beyond the top and bottom of ramp runs."

As with the 2010 ADAAG, the current Corridor Ramp's slope and clear width comply with the 2009 ANSI 117.1 standards. The ramp's rise of 32.4 inches does not comply with the 2009 ANSI 117.1. The current handrail height of 36" above the finished floor complies with the standard. But because the handrails do not extend 12" beyond the ramp, they do not meet the requirements for handrail extensions.

**Chicago Building Code, 2019**

The 2019 Chicago Building Code (CBC) is the current prevailing code that applies to construction in the city of Chicago. The 2019 CBC adopts the 2009 ANSI 117.1 standards and states the same requirements as outlined above. These same requirements can be found in the 2019 CBC Section 405 Ramps. As stated above, the current Corridor Ramp's slope, clear width, and handrail height comply with 2009 ANSI 1171.1 standards and the 2019 CBC. The ramp's rise and handrail extensions do not comply with the 2009 ANSI standards or the 2019 CBC.

**Illinois Accessibility Code, 2018**

The 2018 Illinois Accessibility Code (IAC) is the current accessibility code for the state of Illinois. The AIC also aligns almost exactly with the 2010 ADAAG and the 2009 ANSI Standard 117.1 outlined above, with

300 South Wacker Drive, Suite 400 ▪ Chicago, Illinois 60606 USA ▪ T 312.922.6400 ▪ F 312.922.2953 ▪ marketing@gec-group.com

Exhibit 14 Page 8

**CORRIDOR RAMP ACCESSIBILITY ASSESSMENT**                                    Page 9 of 21
CERMAK HEALTH SERVICES FACILITY

the same section references and requirements. The corridor ramp compares to the current IAC in the same way it compares with the 2010 ADDAG and 2009 ANSI Standard 117.1.

## Summary of Findings per Current Applicable Codes and Guidelines

This Part 1 assessment focuses on how the existing conditions observed at GEC's August and September 2023 site evaluations compare to currently applicable accessibility requirements. GEC found that the current basement Corridor Ramp slope qualifies it to be considered a ramp and is therefore limited to a maximum rise of 30-inches per section 405.6 of the 2010 ADA guidelines, the 2009 ANSI Standard 117.1, and the 2018 IAC. The ramp was found to have a rise of 32.4 inches, which is not compliant with the 30-inch maximum set by all three standards. The Corridor Ramp has a width of 10 feet, which complies with section 405.5 of the 2010 ADA guidelines, 2009 ANSI 117.1 Standard, and 2018 IAC.

The existing ramp handrails on both sides are not continuous with 12-inch extensions. Therefore, they are not compliant with section 505.10.1 of the 2010 ADAAG, the 2009 ANSI 117.1 Accessibility Standard, nor the 2018 IAC. The existing handrails are located 36 inches above the floor, which complies with all three standards.

**Basement Corridor Ramp Assessment Matrix per Current Applicable Codes and Guidelines**

| Item | | Existing Condition | Code Requirement | Compliance |
|------|---|--------------------|------------------|------------|
| Ramp Slope | | 1:16 | 1:16 to 1:20 | Compliant |
| Ramp Width | | 10' | 3' minimum | Compliant |
| Ramp Vertical Rise | | 32.4" | 30" maximum | Not compliant |
| Handrail Height | | 36" | Between 34" and 38" | Compliant |
| Handrail Extensions | | No extensions | 12" minimum | Not compliant |

## Recommendations

GEC recommends extending the length of the floor incline at the bottom of the existing ramp to reduce the slope to less than 1:20 so that it is no longer considered a ramp and therefore will not be held to a maximum rise. This solution will likely require the proposed sloped walkway to extend into the building hallway. GEC also recommends removing the existing handrails. If the walkway is no longer considered a ramp, handrails will not be required. See Figure 3 for an annotated floor plan of the recommendations.

**CORRIDOR RAMP ACCESSIBILITY ASSESSMENT**                    Page 10 of 21
CERMAK HEALTH SERVICES FACILITY



*Figure 3: Plan of Recommendations*

## PART 2: Assessment per Historically Applicable Codes

As part of this report, Cook County requested GEC to provide an assessment of the existing Corridor Ramp related to historically applicable standards. This analysis is based on GEC's observations from August and September 2023. GEC does not have a record of actual site conditions before our assessment and cannot infer compliance at any previous time in the building's history. Additionally, this assessment is based on information at the time the report was made. If more information is made available, these findings may change.

### Historically Applicable Codes and Standards

The Cermak Health Services Facility drawings were issued for permit on January 19, 1996, and construction was completed in 1998. The following codes and guidelines would have been applicable during ramp design, permitting, and construction:

1. Americans with Disabilities Act Accessibility Guidelines (ADAAG) (1991)
2. Code of Federal Regulations (CFR) (1998)
3. American National Standards Institute (ANSI) Standard A117.1 (1992, 1998)
4. Chicago Building Code (CBC) (1993, 1996, 1998)
5. Illinois Accessibility Code (IAC) (1997)

**Americans with Disabilities Act Accessibility Guidelines (ADAAG), 1991**

The 1991 ADAAG were the first and only ADA Accessibility Guidelines before the 2010 version. In 1991 the Department of Justice implemented title II and title III requiring newly constructed or altered public and commercial facilities to comply with the 1991 ADA Standards. The 1991 ADA guidelines would have applied at the time of permitting and construction of the Cermak Health Services Facility.

Section 4.8 Ramps states the following requirements relevant to the Corridor Ramp:

1. 4.8.1 General: "Any part of an accessible route with a slope greater than 1:20 shall be considered a ramp."
2. 4.8.2 Slope and Rise: "The maximum slope of a ramp in a new construction shall be 1:12. The maximum rise for any run shall be 30 inches."
3. 4.8.3 Clear Width: "The minimum clear width of a ramp shall be 36 inches."
4. 4.8.5 Handrails: "(2) If handrails are not continuous, they shall extend at least 12 inches beyond the top and bottom of the ramp."
5. 4.8.5 Handrails: "(5) Top of handrail gripping surfaces shall be mounted between 34 inches and 38 inches above ramp surfaces."

The current Corridor Ramp has a width of 10 feet and handrails that are mounted at 36 inches from the finished floor, both of which are compliant with the 1991 ADAAG requirements. However, the current handrails are not continuous and do not extend 12 inches beyond the ramp, which is not compliant. The

**CORRIDOR RAMP ACCESSIBILITY ASSESSMENT**                                   Page 12 of 21
CERMAK HEALTH SERVICES FACILITY

Corridor Ramp also has a rise of 32.4 inches, which does not comply with the 30-inch maximum rise stated in Section 4.8.2 of the 1991 ADAAG. Section 4.8.2 further identifies through a referenced figure a maximum horizontal run of 40 feet. The referenced figure's title suggests these as "sample ramp dimensions" and a maximum horizontal run is not otherwise identified in the document.

**American National Standards Institute (ANSI) Standard 117.1, 1992 and 1998**

The 1992 and 1998 ANSI Standard 117.1 outline similar requirements but use different numbering systems. Below is a table of the 1992 and 1998 ANSI 117.1 sections and requirements relevant to the current corridor ramp.

| ANSI 117.1 Standard, **1992** | ANSI 117.1 Standard, **1998** | Requirement |
|---|---|---|
| Section 4.8.1 | Section 405.1 | A slope steeper than 1:20 shall be considered a ramp |
| Section 4.8.2 Slope and Rise | 405.6 Rise | The rise for any ramp run shall be 30 inches maximum. In the 1992 standard, this section references a figure that lists the horizontal run for a ramp between 1:16 and 1:19 being 40 feet maximum. The 1998 standard no longer has this reference. |
| Section 4.8.3 Clear Width | 405.5 Clear Width | The clear width of a ramp shall be 36 inches minimum |
| Section 4.3.11 Handrails Extensions, #1 | 505.10.1 Top and Bottom Extensions at Ramps | Ramp handrails shall extend horizontally 12 inch minimum beyond the top and bottom of ramp runs |
| Section 4.3.10 Handrails, #4 | 505.4 Height | Top of gripping surfaces of handrails shall be 34 inch minimum and 38 inch maximum vertically above [ramp surface] |

The current Corridor Ramp's width of 10 feet and handrail height of 36 inches both comply with the 1992 and 1998 ANSI 117.1 standards. However, the ramp's rise of 32.4 inches exceeds the maximum rise outlined in both the 1992 and the 1998 ANSI 117.1 standards. Additionally, the ramp's handrails are not continuous and do not extend 12 inches beyond the top and bottom of the ramp, as required by both standards.

The applicable difference between the two versions of the ANSI 117.1 is that the 1992 standard limits ramps with slopes between 1:16 and 1:19 to a maximum horizontal run of 40 feet, and the 1998 standard does not set this limitation. The current Corridor Ramp has a horizontal run of 43.64 feet, which exceeds the 1992 ANSI 117.1 maximum run of 40 feet. Because the 1998 standard does not set a maximum run, the Corridor Ramp is compliant with this standard.

**CORRIDOR RAMP ACCESSIBILITY ASSESSMENT**                                          Page 13 of 21
CERMAK HEALTH SERVICES FACILITY

**Chicago Building Code (CBC), 1993, 1996, 1998**

The 1993, 1996, and 1998 versions of the Chicago Building Code (CBC) would have been applicable to
the Cermak Health Services Facility during design, permitting, and construction. The CBC's language
around ramp requirements remains consistent throughout all three of these versions of the code. The
following ramp requirements were passed on June 6, 1973, and remained in place through at least the
1998 version of the code. The requirements can be found under "Exterior and Interior Ramps for
Handicapped" Section (13-160-470) of the 1993, 1996, and 1998 CBC:

1. 13-160-470 Exterior and Interior Ramps for Handicapped: "Exterior and interior ramps for the
   handicapped in the route of travel shall comply with the following regulations:
   a) The surface of any ramp shall be made of a non-skid material.
   b) The width of the ramp shall be at least 36 inches.
   c) The top and bottom of the ramp shall provide for a level surface containing at least 25
      square feet in area with a minimum dimension of four feet six inches in width.
   d) There shall be intermediate level platforms of a minimum of four feet six inches every
      30 feet of ramp length.
   e) All major turns in ramps shall be equipped with a level intermediate platform at the turn
      of no less than four feet six inches in width.
   f) There shall be provided at least one handrail, 32 to 34 inches high, along one side of
      each ramp that provides for any change in vertical elevation that exceeds eight inches in
      height, extending horizontally one foot beyond the top and the bottom of the ramp."

The current Corridor Ramp's width of 10 feet complies with the CBC required minimum width of 36
inches. However, with an uninterrupted length of 43.64 feet, the current ramp does not follow the CBC's
requirement of an intermediate level platform located every 30 feet of ramp length. Additionally, the
current handrails are mounted at 36" above the finished floor. There is not at least one handrail with a
height of 32 to 34 inches and neither handrail extends one foot beyond the top and bottom of the ramp.
Therefore, the current ramp handrails do not meet CBC requirements from 1993, 1996, or 1998.

**Illinois Accessibility Code, 1997**

The 1997 Illinois Accessibility Code (IAC) states the following applicable requirements in Section 400.310
(e) for Ramps:

1. Section 400.310-e-2 Slope and Rise: "The maximum rise for any run shall be 30 inches."
2. Section 400.310-e-3 Clear Width: "The minimum clear width of a ramp shall be 36 inches."
3. Section 400.310-e-5-B Handrails: "If handrails are not continuous, they shall extend at least 12
   inches beyond the top and bottom of the ramp."
4. Section 400.310-e-5-E Handrails: "Top of handrail gripping surfaces shall be mounted between
   34 inches and 38 inches above ramp surface."

**CORRIDOR RAMP ACCESSIBILITY ASSESSMENT**                                    Page 14 of 21
CERMAK HEALTH SERVICES FACILITY

The current Corridor Ramp's width of 10 feet and handrail height of 36 inches both meet the
requirements stated in the 1997 IAC. However, the ramp's rise of 32.4 inches and run of 43.64 feet both
exceed the maximums stated in the 1997 IAC. Additionally, the handrails do not extend at least 12
inches beyond the ramp and do not meet IAC requirements.

## Summary of Findings per Historically Applicable Codes and Guidelines

This Part 2 assessment focuses on the existing conditions of the basement Corridor Ramp in relation to
past accessibility requirements applicable during the life of the building. From the time of the Cermak
Health Facility's construction, the Corridor Ramp slope has met the parameters to be considered a
"ramp." The current Corridor Ramp has a slope of 1:16 and a width of 10 feet, therefore complying with
all historically applicable codes. However, the ramp is limited to a maximum rise of 30 inches by the
1991 ADAAG, the 1992 and 1998 ANSI 117.1, the 1993 through 1998 versions of the CBC, and the 1997
IAC. This makes the current ramp rise noncompliant with the historically applicable codes. The current
ramp length of 43.64 feet exceeds the maximum set by the 1993, 1996, or 1998 CBC requirement for an
intermediate platform every 30 feet of ramp length.

The Corridor Ramp's handrails are mounted at 36 inches on both sides of the ramp, which complies with
each historically applicable code except for the 1993, 1996, and 1998 CBC requirement to provide a
handrail on at least one side between 32 and 34 inches. Each historically applicable code requires that if
the handrails are not continuous, they must extend 12 inches beyond the top and bottom of the ramp.
Because the current Corridor Ramp handrails are not continuous and do not extend beyond the ramp,
they do not comply with applicable codes.

300 South Wacker Drive, Suite 400 ■ Chicago, Illinois 60606 USA ■ T 312.922.6400  ■ F 312.922.2953 ■ marketing@gec-group.com

Exhibit 14 Page 14

**CORRIDOR RAMP ACCESSIBILITY ASSESSMENT**                    Page 15 of 21
CERMAK HEALTH SERVICES FACILITY

### Basement Corridor Ramp Matrix of Historically Applicable Codes and Guidelines

|  | Existing | ADAAG 1991 | ANSI 1992 | CBC 1993, 1996, 1998 | IAC 1997 | ANSI 1998 |
|---|---|---|---|---|---|---|
| Ramp Slope | 1:16 | 1:12 to 1:20 | 1:12 to 1:20 | 1:12 max. | 1:12 to 1:20 | 1:12 to 1:20 |
| Ramp Width | 10' | 3' min. | 3' min. | 3' min. | 3' min. | 3' min. |
| Ramp Rise | 32.4" | 30" max. | 30" max. | 30" max. | 30" max. | 30" max. |
| Ramp Length | 43.64' | No reference | 40' max. | 30' max. | No reference | No reference |
| Handrail Height | 36" on both sides | 34" to 38" | 34" to 38" | 32" to 34" on one side | 34" to 38" | 34" to 38" |
| Handrail Extensions | No extensions | 12" min. | 12" min. | 12" min. | 12" min. | 12" min. |

### Basement Corridor Ramp Compliance Matrix per Historically Applicable Codes and Guidelines

|  | Existing | ADAAG 1991 Compliance | ANSI 1992 Compliance | CBC 1992, 1993, 1998 Compliance | IAC 1997 Compliance | ANSI 1998 Compliance |
|---|---|---|---|---|---|---|
| Ramp Slope | 1:16 | Compliant | Compliant | Compliant | Compliant | Compliant |
| Ramp Width | 10' | Compliant | Compliant | Compliant | Compliant | Compliant |
| Ramp Rise | 32.4" | Not compliant | Not compliant | Not compliant | Not compliant | Not compliant |
| Ramp Length | 43.64' | Compliant | Not compliant | Not compliant | Compliant | Compliant |
| Handrail Height | 36" | Compliant | Compliant | Not compliant | Compliant | Compliant |
| Handrail Extensions | No extensions | Not compliant | Not compliant | Not compliant | Not compliant | Not compliant |

**CORRIDOR RAMP ACCESSIBILITY ASSESSMENT**                              Page 16 of 21
CERMAK HEALTH SERVICES FACILITY

## Appendix of Images:
## Cermak Health Services Facility Corridor Ramp

1) Cook County Ramp Survey (11/01/22)
2) Rm. B170 – Corridor Ramp Lidar scan (9/27/23)
3) Rm. B170 – Corridor Ramp corner condition (06/03/22)
4) Rm. B170 – Corridor Ramp handrail extension at top of ramp (09/01/23)
5) Rm. B170 – Corridor Ramp handrail height at top of ramp (09/01/23)
6) Rm. B170 – Corridor Ramp handrail width (09/01/23)

Images:



1) Cook County Ramp Survey by others (November 2022)

**CORRIDOR RAMP ACCESSIBILITY ASSESSMENT**                                    Page 17 of 21
CERMAK HEALTH SERVICES FACILITY



2) Corridor Ramp Lidar scan – shows 43.64' (+/- 6mm) long ramp with 2.7' (+/- 6mm) height change (9/27/2023)

300 South Wacker Drive, Suite 400 ■ Chicago, Illinois 60606 USA ■ T 312.922.6400 ■ F 312.922.2953 ■ marketing@gec-group.com

Exhibit 14 Page 17

**CORRIDOR RAMP ACCESSIBILITY ASSESSMENT**                    Page 18 of 21
CERMAK HEALTH SERVICES FACILITY



3)   Corridor Ramp corner condition by others (June 2022)

**CORRIDOR RAMP ACCESSIBILITY ASSESSMENT**                                    Page 19 of 21
CERMAK HEALTH SERVICES FACILITY



4)    Handrail at top of Corridor Ramp – Required 12" extension missing (9/1/2023)

**CORRIDOR RAMP ACCESSIBILITY ASSESSMENT**                                    Page 20 of 21
CERMAK HEALTH SERVICES FACILITY



5)   Corridor Ramp handrail height at top of ramp (9/1/2023)

**CORRIDOR RAMP ACCESSIBILITY ASSESSMENT**                                    Page 21 of 21
CERMAK HEALTH SERVICES FACILITY



6)   Basement Corridor Ramp handrail width (9/1/2023)

300 South Wacker Drive, Suite 400 ▪ Chicago, Illinois 60606 USA ▪ T 312.922.6400 ▪ F 312.922.2953 ▪ marketing@gec-group.com

Exhibit 14 Page 21

# TUNNEL CORRIDOR

# ACCESSIBILITY ASSESSMENT

## Cook County Department of Corrections Campus

**Date Submitted:**
April 01, 2024

**Prepared For:**
Troy Radunsky
DeVore Radunsky, LLC

**Prepared By:**
Carl Darr, AIA



300 S. Wacker Drive, Suite 400
Chicago, Illinois 60606
312.922.6400
Marketing@gec-group.com

Exhibit 15 Page 1

## Table of Contents

Executive Summary..................................................................................................................................... 3

**ASSESSMENT REPORT** ...............................................................................................................................**4**

Introduction ................................................................................................................................................ 4

Background and Scope................................................................................................................................. 4

Data Collecting and Measurement ............................................................................................................. 6

Applicable Codes and Standards................................................................................................................. 6

North Tunnel Corridor................................................................................................................................. 8

East Tunnel Corridor ................................................................................................................................... 8

East Tunnel Corridorecommendations ..................................................................................................... 12

**Appendix A - Resouces** ............................................................................................................................**17**

Exhibit 15 Page 2

## Executive Summary

The Cook County Corrections Residential Transfer Unit (RTU) facility and associated North and East Tunnel Corridors opened circa 2011. Correction's staff utilize the Tunnels to travel between buildings located on the Department of Corrections Campus. Correction's staff also use the tunnels to shuttle detainees between buildings.

GEC was engaged to review the above referenced North and East Tunnels, which have sloped floors, for compliance with accessibility-related code requirements related to ramps. GEC used laser imaging scanners and other equipment to obtain critical measurements of the spaces.

### North Tunnel Corridor

The North Tunnel Corridor is compliant with applicable accessibility codes. As shown in the following report, the slope of the tunnel floor is shallow and falls below the minimum threshold that would require compliance with accessibility requirements, such as adding handrails and intermittent landings, for ramps.

### East Tunnel Corridor

The East Tunnel floor is steeper and, by code, meets the definition of a ramp. Accessibility requirements for ramps are applicable to the East Tunnel Corridor. Code violations related to maximum permitted ramp slope, handrail height and extension, and landing length are present at the East Tunnel ramp.

Relatively speaking, except the lack of a landing at the top of the ramp, the violations are minor and include the following:

- At two locations there is a deviation in the ramp floor that creates, for a short distance, a slope greater than 1:12.
- The intermediate landing is 5% short of the required length of five feet.
- Handrail extensions are shorter than the required 12" but in all cases are longer than 7.25."
- At some locations, the handrails are up to ½" lower than the minimum required height.

The lack of a landing, more than 9" long, at the top of the ramp is significant but this can easily be corrected since there is room to move the doors, at the far side of the landing, away from the ramp to create a five-foot landing.

Since transfer of detainees through the corridors always involves an escort, assistance would be available in cases where the ramp configuration is a prohibitive physical barrier. Additionally, during our site visits, it was observed Correction's staff at times shuttled detainees through the corridors on electric utility vehicles, which is another means available to in cases where the ramp is a prohibitive physical barrier.

GEC recommends that code violations are corrected, and drawings and specifications be prepared to identify the specifics of those repairs.

Exhibit 15 Page 3

## Assessment Report

### Introduction

Pursuant to a request on or about December 27, 2023, Globetrotters Engineering Corporation (GEC) was retained by DeVore Radunsky, LLC, an attorney representing Cook County, to provide an Accessibility and Code Compliance Assessment of two tunnel corridors that have sloped floor surfaces and are part of the Cook County Department of Corrections Campus (Cook County Jail), located at 2600-3000 blocks of South California Avenue, Chicago, Illinois.

Globetrotters Engineering Corporation is a multi-disciplinary Architectural and Engineering firm in Chicago with experience in accessibility reviews of existing facilities.

### Background and Scope

Cook County Department of Corrections Campus is a single-site jail facility in Chicago, in the eight-block area bounded by 26th Street (to the north), 31st Street, Sacramento Avenue, and California Avenue. Cook County Criminal Court buildings occupy the Northeast corner, and a vacant parcel is located at the Northwest corner of this area. The Department of Corrections Center Campus, with over thirty building structures, occupies the remaining ninety-six acres of this eight-block area.

The Corrections Center Campus includes a below-grade tunnel system for pedestrian access between buildings. The tunnels connect campus buildings to each other. Correction's staff utilize the tunnels for travel between buildings and use the tunnels to shuttle detainees between buildings. When in the tunnels Correction's staff escort the detainees, they are never in the tunnels unescorted. Usually, Correction's staff escort detainees on foot. At times, however, detainees may be shuttled through the tunnels on electric utility vehicles.

The subject Corridors are part of this tunnel system and serve as connections to the Residential Treatment Unit (RTU) facility which is located at the center of the campus site (see next page). Both Corridors were built circa 2011, at the same time the RTU facility was built. For this report, the corridor areas are identified as the North Corridor and the East Corridor.

The North Corridor connects the RTU basement level with the Division V building directly to the north. The East Corridor connects the RTU basement level to another tunnel, running north/south, which leads to other campus buildings.

Exhibit 15 Page 4



*Figure 1 – Areial view of Site Bounded by 26th Street to the North, 31st Street to the South, Sacramento Avenue North, and California Avenue East.*

Exhibit 15 Page 5

## Data Collecting and Measurement

GEC conducted site visits to verify existing conditions related to the subject areas, on January 23, 2024, and again on January 25, 2024. GEC personnel that participated in the field site visits included:
- o   Carl Darr, Vice President of Architecture
- o   Max Lux, Architectural Professional

GEC personnel conducted a supervised walk-through of each of the corridors and available adjacent spaces to identify physical conditions as they relate to compliance with accessibility requirements. Equipment used to collect information and measurements included a tape measure, a laser level, and a LiDAR scanner.

LiDAR is an acronym for Light Detection and Ranging. LiDAR scanners have high resolution mapping capabilities that utilize laser imaging to create three dimensional models of spaces. The LiDAR scanner utilized for this assessment is accurate to a tolerance of four millimeters (-1/8") per 30 feet of measurement.

## Applicable Codes and Standards

Applicable Codes and Standards that apply to current conditions, and that were used for the evaluation of the Corridor areas, include:
1. Americans with Disabilities Act Accessibility Guidelines (ADAAG) (2010)
2. American National Standards Institute (ANSI) Standard A117.1 (2009 version as referenced by the 2019 Chicago Building Code)
3. Chicago Building Code (CBC) (2019)
4. Illinois Accessibility Code (IAC) (2018)

### Americans with Disabilities Act Accessibility Guidelines (ADAAG), 2010

The Americans with Disabilities Act (ADA) Standards for Accessible Design, revised in 2010, are still in use in the City of Chicago as of 2023. The Americans with Disabilities Act Accessibility Guidelines (ADAAG) are incorporated into the Department of Justice ADA regulations and are enforceable under titles II and III of the ADA. For this matter, applicable excerpts of the ADA regulations include the following:
1. 106.5 Defined Terms:
   **Ramp.**      A walking surface that has a running slope steeper than 1:20.
2. Section 405 Ramps includes the following requirements:
   a. 405.2 Slope: "Ramp runs shall have a running slope not steeper than 1:12."
   b. Section 405.5 Clear Width: "The clear width of a ramp run and, where handrails are provided, the clear width between handrails shall be 36 inches minimum."
   c. 405.3 Cross Slope: "Cross slope of ramp runs shall not be steeper than 1:48."
   d. 405.6 Rise: "The rise for any ramp run shall be 30 inches maximum."

Exhibit 15 Page 6

     e. 405.7 Landings: "Ramps shall have landings at the top and bottom of each ramp run. Landings shall comply with 405.7."

     f. 405.7.3 Length: "The landing clear length shall be 60 inches (1525 mm) long minimum."

     g. 405.8 Handrails: "Ramp runs with a rise greater than 6 inches shall have handrails complying with Section 505."

3. Section 505 Handrails includes the following requirements:

     a. 505.3 Continuity: "Handrails shall be continuous within the full length of each stair flight or ramp run."

     b. 505.4 Height: "Top of gripping surfaces of handrails shall be 34 inches minimum and 38 inches maximum vertically above [ramp surface]."

     c. 505.10.1 Top and Bottom Extensions at Ramps: "Ramp handrails shall extend horizontally above the landing 12 inches minimum beyond the top and bottom of ramp runs" (Figure 2).



*Figure 2: Top and Bottom Handrail Extension at Ramps (2010 ADAAG, Fig. 505.10.1)*

## American National Standards Institute (ANSI) Standard 117.1, 2009

Although there are 2017 ANSI standards, the current 2019 CBC references the 2009 ANSI Standard A117.1. The 2009 ANSI 117.1 ramp requirements align with the 2010 ADAAG and state the following:

1. 106.5 Defined Terms:
   **Ramp:** A walking surface that has a running slope steeper than 1:20.

2. 405.2 Slope: "Ramp runs shall have a running slope greater than 1:20 and not steeper than 1:12."

3. 405.5 Clear Width: "The clear width of a ramp run shall be 36 inches (915 mm) minimum."

4. 405.6 Rise: "The rise for any ramp run shall be 30 inches (760 mm) maximum."

5. 405.7 Landings: "Ramps shall have landings at the top and bottom of each ramp run. Landings shall comply with 405.7."

6. 405.7.3 Length: "The landing clear length shall be 60 inches (1525 mm) long minimum."

7. 405.8 Handrails: "Ramp runs with a rise greater than 6 inches (150 mm) shall have handrails complying with Section 505."

8. Section 505.3 Continuity: "Handrails shall be continuous within the full length of each stair flight or ramp run."

Exhibit 15 Page 7

9. 505.4 Height: "Top of gripping surfaces of handrails shall be 34 inches (865 mm) minimum and 38 inches (965 mm) maximum vertically above [ramp surfaces]."
10. 505.10.1 Top and Bottom Extensions at Ramps: "Ramp handrails shall extend horizontally above the landing 12 inches (305 mm) minimum beyond the top and bottom of ramp runs."

**Chicago Building Code, 2019**

The 2019 Chicago Building Code (CBC) is the current prevailing code that applies to construction in the city of Chicago. The 2019 CBC adopts the 2009 ANSI 117.1 standards and states the same requirements as outlined above.

**Illinois Accessibility Code, 2018**

The 2018 Illinois Accessibility Code (IAC) is the current accessibility code for the state of Illinois. The AIC also aligns closely with the 2010 ADAAG and the 2009 ANSI Standard 117.1 outlined above, with the same section references and requirements. The tunnel ramps compare to the current IAC in the same way they compare with the 2010 ADDAG and 2009 ANSI Standard 117.1.

## North Tunnel Corridor

The North Tunnel Corridor has a slope floor surface (approximately 84 feet in length) which runs, at the low end, from the RTU basement exterior wall to a landing at the top. At the other side of the landing is a pair of vestibule doors that lead to the Division V Building north of the RTU. There is no door at the bottom of the ramp and the Corridor is uninterrupted between the sloped floor area and the level RTU basement.

LiDAR scans were taken from the RTU basement floor, immediately south of the ramp the top landing. Six scans were taken at average intervals of 18.5 feet. Based on the intervals of measurement, the maximum possible tolerance, overall, will be within 12.3 mm.

The slope floor surface at the North Corridor has an 83.9 feet horizontal run and a 2.7-foot vertical rise. The inclined floor surface is less than (shallower) 1:31 slope overall.

From the ADA regulations excerpts listed above the applicable excerpt is line-item no. 1. By definition, a ramp is a walking surface that has a running slope steeper than 1:20. Since the Corridor floor surface has less than a 1:20 slope, it is not a ramp. Consequently, ADAAG regulations related to ramps do not apply here.

The North Corridor Tunnel <u>is in compliance</u> with ADA and other code requirements for accessibility.

Exhibit 15 Page 8

**RTU North Tunnel Corridor – LiDAR Scan Images**



Length: approx. 84'        Rise: approx. 2.7' (32.33")        Slope: approx. 1:31



Width: approx. 10'

Exhibit 15 Page 9

East Tunnel Corridor

The East Tunnel Corridor includes two sloped-floor runs separated by an intermediate landing. These runs are both steeper than 1:20 and, therefore, are ramps as defined by the ADA and ANSI A117.1 codes. For this report, the lower sloped-floor surface is identified as the Lower Ramp, the upper sloped-floor surface the Upper Ramp.

GEC reviewed the following East Tunnel Corridor components for accessibility compliance:
- Top Landing (at top of Upper Ramp),
- Upper Ramp,
- Intermediate Landing,
- Lower Ramp,
- Bottom Landing (at bottom of Lower Ramp),
- Handrails.

LiDAR scans were taken at the top and bottom landings, and at two locations between, with the maximum interval at approximately 22.5 feet. Based on the intervals of measurement, the maximum possible tolerance, overall, will be within 8.3 mm.

1. **Top Landing:** The Top Landing runs from the Upper Ramp to a pair of doors, leading to the adjacent tunnel, and has a length of 0.75' (9 in.). Since the landing length is less than 60 inches, the landing length is not code compliant.

   The landing is 85% short of the required length. However, this may be easily corrected by relocating the doors to the east 51", to provide the minimum required landing length.

2. **Upper Ramp:** The Upper Ramp has a 25.95' horizontal run and a 1.93' vertical rise with an average slope of 1:13.4. There is a variation in slope at the very top of the ramp. The last 4.27' of the run, at the top has a rise of 4.56" for a slope of 1:11.

   The upper portion of the ramp floor surface is not code compliant; the top 16.5% of the overall length is approximately 0.64% steeper than permitted by code. Since the bottom portion of the ramp run is shallower than 1:12, it would be possible to add a floor topping which will even-out the slope make a consistent floor slope that has a 1:12 slope or shallower.

3. **Intermediate Landing:** The Intermediate Landing is 4.75 feet (57 in.) in length. Since the landing length is less than 60 inches in length, the Intermediate Landing is not code compliant.

   It is 5% shorter than the required length. To correct this nonconformity, a longer level floor plane at the landing will need to be provided, extending the floor surface west. This will require the Lower Ramp to be rebuilt, along its entire length, to provide for the additional landing length and maintaining a maximum 1:12 ramp slope.

Exhibit 15 Page 10

4. **Lower Ramp:** The Lower Ramp has a 30.4' horizontal run and a 2.47 vertical rise, with an average slope of 1:12. There is a variation in slope at the very bottom of the ramp. The last 1 foot of the run is steeper than the rest of the ramp with a slope of approximately 1:8.5.

   The lower portion of the ramp floor surface is not code compliant; the lower 3.5% of the overall run is approximately 11.7% steeper than permitted by code. The floor surface will need to be feathered out, and the ramp length extended slightly for the Lower Ramp floor to be compliant with code requirements for ramp slope at this location.

5. **Bottom Landing:** The Bottom Landing runs from the end of the Lower Ramp uninterrupted to the RTU Basement floor. Since there is a continuous floor surface (with no change in corridor width) that exceeds 60" the bottom landing is compliant with required codes.

6. **Handrails:** As noted in the code requirements above, handrails need to be located 34-38 inches above the ramp floor and need to extend a minimum of 12 inches beyond the top and bottom of each ramp. The ramp(s) have a continuous handrail on each side located. At the lower end of the Lower Ramp the handrail, where measured, is approximately 33" above the ramp floor. At other locations, the handrail height exceeded 34" above the ramp floor. Since, at some locations, handrails are less than 34" above the ramp floor they are not in compliance with requirements for handrail height.

   The handrails extend 7.4" beyond the Lower Ramp and 11.3" beyond the Upper Ramp. Since the handrail extensions are less than 12 inches, the handrails are not in compliance with code requirements for handrail extensions.

**Basement Corridor Ramp Assessment Matrix per Current Applicable Codes and Guidelines**

| Item | Existing Condition | Code Requirement |
|---|---|---|
| Top Landing Length | 9" | 60" minimum |
| Upper Ramp Slope | Varies from 1:11 to 1:13.4 | 1:12 maximum |
| Intermediate Landing | 57" | 60" maximum |
| Lower Ramp Slope | Varies from 1:12 to 1:8.5 | 1:12 maximum |
| Bottom Landing Length | >60" | 60" minimum |
| Handrail Extensions | Varies from 7.4" to 11.3" | 12" minimum |

Exhibit 15 Page 11

**RTU East Tunnel Corridor – LiDAR Scan Images**



Top run length: approx. 25.95'          Rise: approx. 1.93' (23.16")          Slope: approx. 1:13.4



Steep slope at ramp top length: approx. 4.27'          Rise: approx. 4.56"          Slope: approx. 1:11

Exhibit 15 Page 12



Landing length: approx. 4.75'



Ramp width: approx. 10.'

Exhibit 15 Page 13



Bottom run length: approx. 30.5'        Rise: approx. 2.47' (29.7")        Slope: approx. 1:12



Steep slope at ramp bottom length: approx. 1'        Rise: approx. 1.42"        Slope: approx. 1:8.5

Exhibit 15 Page 14



Ramp bottom handrail extensions: approx. 11.3"    Height: approx. 33.2."



Ramp top handrails do not extend full length of ramp, no extensions.
Top landing length: approx. 7.4"

Exhibit 15 Page 15

## East Tunnel Corridor Recommendations

GEC recommends the following to bring the ramp into code compliance:

1. At Top Landing, move doors to adjacent tunnel east +/-52" as needed to provide a 60" landing.
2. Rework the slope of the Upper Ramp with topping materials to be maximum 1:12 at all locations.
3. Pour over the existing floor slab to shift the Lower Ramp East and extend the length of the Intermediate Landing to a minimum of 60".
4. In conjunction with item no. 3., above, provide a maximum 1:12 slope at all portions of the Lower Ramp.
5. Replace existing handrails with anti-ligature handrails. Install between 34 and 38" t all locations and with correct extensions.



*Figure 3: Plan of Recommendations*

Exhibit 15 Page 16

## APPENDIX A - Resources

CODES AND REFERENCES

Americans with Disabilities Act Accessibility Guidelines (ADAAG) (2010):
https://archive.ada.gov/regs2010/2010ADAStandards/2010ADAStandards.pdf and
https://www.ada.gov/law-and-regs/design-standards/2010-stds/
American National Standards Institute (ANSI) Standard A117.1 (2009 version as referenced by the
2019 Chicago Building Code): https://codes.iccsafe.org/content/icca117-12017P4
Chicago Building Code (CBC) (2019): https://codes.iccsafe.org/content/CHIBC2019P5
Illinois Accessibility Code (IAC) (2018):
https://cdb.illinois.gov/business/codes/illinoisaccessibilitycode.html


MISCELLANEOUS
Campus Plan_Google Earth Pro

FILES PROVIDED BY DeVORE RADUNSKY, LLC

08.04.23 Cook County Amended Answers to Interrogatories #3-5 (FINAL).pdf
08.04.23 Cook County Amended Response to RFP #7-8 (FINAL).pdf
11.15.23 Westmoreland  First Request to Admit.pdf
11.3.23 Expert Obervations Ramp.pdf
12.14.23 Cook Co Ans to Pls Req to Admit (FINAL).pdf
12.14.23 Darts Ans to Pl Req to Admit (FINAL).pdf
12.15.23 Cook Co Supp Ans to Pls Req to Admit 3-4,10-11,13-14 (FINAL.2).pdf
12.15.23 Darts Amended Ans to Pl Req to Admit #9 (FINAL.2).pdf
7.21.23 FINAL Cook County Answers to Interrogatories.pdf
7.21.23 FINAL Cook County Response to RFP.pdf
Bates 002201 (D8_RTU Lower Level_Arch_CROPPED) (CONFIDENTIAL).pdf
Bates 002219 (lower level Div 8 RTU north tunnel structural plan and sections) (CONFIDENTIAL).pdf
Bates 002220 (lower level Div 8 RTU east tunnel structural plan and sections) (CONFIDENTIAL).pdf
Bates 002221 (lower level Div 8 RTU structural plan) (CONFIDENTIAL).pdf
Bates 002222 (lower level Div 8 RTU west plan) (CONFIDENTIAL).pdf
Bates 002223 (North Tunnel) (CONFIDENTIAL).pdf
Bates 002224 (East Ramp) (CONFIDENTIAL).pdf
Bates 002225 - 002236 (11.8.23 Westmoreland 12x County Architectural Drawings)
(CONFIDENTIAL).pdf
3.24.23 [FILED].pdf

Exhibit 15 Page 17

DAVIS, ERIC - CONDENSED DEP.pdf
MVI_3801.mp4
RTU Tunnel Assessment Lidar Scans.docx
RTU Tunnel West Ramp Assessment Lidar Scans.pdf
Westmoreland Expert Inspection Pics.pdf
Westmoreland Rule 30b6_.docx

NORTH RAMP LiDAR SCREENSHOTS

Length Height.jpg
Width.jpg
West Ramp FinalizeReport.pdf

NORTH RAMP LiDAR SUPPORT & E57 FILES

| | | |
|---|---|---|
| 02/02/2024 03:38 PM | 52,570 | 082976d8-5755-4148-afeb-bb7489366edb-map.md |
| 02/02/2024 03:38 PM | 45,084 | 082976d8-5755-4148-afeb-bb7489366edb-map.png |
| 02/02/2024 03:41 PM | 2,368,230 | 082976d8-5755-4148-afeb-bb7489366edb-preview.rch |
| 02/02/2024 03:38 PM | 5,404 | 082976d8-5755-4148-afeb-bb7489366edb.pf |
| 02/02/2024 03:41 PM | 11,409,559 | 082976d8-5755-4148-afeb-bb7489366edb.rch |
| 02/02/2024 03:40 PM | 51,894,000 | 082976d8-5755-4148-afeb-bb7489366edb.sgp |
| 02/02/2024 03:38 PM | 424,200 | 082976d8-5755-4148-afeb-bb7489366edb_1.clstr |
| 02/02/2024 03:38 PM | 2,784,940 | 082976d8-5755-4148-afeb-bb7489366edb_3.clstr |
| 02/02/2024 12:55 PM | 69,751 | 314421c7-ad02-4f7c-8591-249a6567d9fe-map.md |
| 02/02/2024 12:55 PM | 51,440 | 314421c7-ad02-4f7c-8591-249a6567d9fe-map.png |
| 02/05/2024 12:29 PM | 1,442,182 | 314421c7-ad02-4f7c-8591-249a6567d9fe-preview.rch |
| 02/02/2024 12:55 PM | 6,364 | 314421c7-ad02-4f7c-8591-249a6567d9fe.pf |
| 02/05/2024 12:29 PM | 21,784,852 | 314421c7-ad02-4f7c-8591-249a6567d9fe.rch |
| 02/02/2024 01:02 PM | 108,020,964 | 314421c7-ad02-4f7c-8591-249a6567d9fe.sgp |
| 02/02/2024 12:55 PM | 936,328 | 314421c7-ad02-4f7c-8591-249a6567d9fe_1.clstr |
| 02/02/2024 12:55 PM | 2,792,588 | 314421c7-ad02-4f7c-8591-249a6567d9fe_3.clstr |
| 03/28/2024 03:17 PM | 154,975 | 3b18bfca-0518-44a1-b958-0197208e4088.md |
| 03/28/2024 03:17 PM | 124,465 | 3b18bfca-0518-44a1-b958-0197208e4088.png |
| 02/02/2024 02:23 PM | 111,120 | 3f3bcc49-6fdf-48f1-8e50-8c7e563004cb-map.md |
| 02/02/2024 02:23 PM | 84,720 | 3f3bcc49-6fdf-48f1-8e50-8c7e563004cb-map.png |
| 02/02/2024 02:39 PM | 2,372,153 | 3f3bcc49-6fdf-48f1-8e50-8c7e563004cb-preview.rch |
| 02/02/2024 02:23 PM | 5,420 | 3f3bcc49-6fdf-48f1-8e50-8c7e563004cb.pf |
| 02/02/2024 02:39 PM | 35,684,369 | 3f3bcc49-6fdf-48f1-8e50-8c7e563004cb.rch |

Exhibit 15 Page 18

| | | | |
|---|---|---|---|
| 02/02/2024 | 02:33 PM | 202,540,800 | 3f3bcc49-6fdf-48f1-8e50-8c7e563004cb.sgp |
| 02/02/2024 | 02:23 PM | 1,146,888 | 3f3bcc49-6fdf-48f1-8e50-8c7e563004cb_1.clstr |
| 02/02/2024 | 02:23 PM | 3,109,340 | 3f3bcc49-6fdf-48f1-8e50-8c7e563004cb_3.clstr |
| 03/28/2024 | 03:02 PM | 2,307,580 | 4980edc4-46d1-4f61-8886-b155e7792362.png |
| 02/02/2024 | 01:49 PM | 40,897 | a06f1623-4711-46c2-b3e9-c4d7442e53ca-map.md |
| 02/02/2024 | 01:49 PM | 37,311 | a06f1623-4711-46c2-b3e9-c4d7442e53ca-map.png |
| 02/02/2024 | 01:53 PM | 40,853 | a06f1623-4711-46c2-b3e9-c4d7442e53ca-preview.rch |
| 02/02/2024 | 01:49 PM | 1,260 | a06f1623-4711-46c2-b3e9-c4d7442e53ca.pf |
| 02/02/2024 | 01:53 PM | 619,811 | a06f1623-4711-46c2-b3e9-c4d7442e53ca.rch |
| 02/02/2024 | 01:51 PM | 1,551,520 | a06f1623-4711-46c2-b3e9-c4d7442e53ca.sgp |
| 02/02/2024 | 01:49 PM | 49,928 | a06f1623-4711-46c2-b3e9-c4d7442e53ca_1.clstr |
| 02/02/2024 | 01:49 PM | 4,941,332 | a06f1623-4711-46c2-b3e9-c4d7442e53ca_3.clstr |
| 02/02/2024 | 02:41 PM | 91,459 | b5c3afe4-7055-480b-875c-390dd9c9fa42-map.md |
| 02/02/2024 | 02:41 PM | 69,805 | b5c3afe4-7055-480b-875c-390dd9c9fa42-map.png |
| 02/02/2024 | 02:52 PM | 1,224,704 | b5c3afe4-7055-480b-875c-390dd9c9fa42-preview.rch |
| 02/02/2024 | 02:41 PM | 4,812 | b5c3afe4-7055-480b-875c-390dd9c9fa42.pf |
| 02/02/2024 | 02:53 PM | 4,747,264 | b5c3afe4-7055-480b-875c-390dd9c9fa42.rch |
| 02/02/2024 | 02:52 PM | 200,699,924 | b5c3afe4-7055-480b-875c-390dd9c9fa42.sgp |
| 02/02/2024 | 02:53 PM | 69,632 | b5c3afe4-7055-480b-875c-390dd9c9fa42.tmp |
| 02/02/2024 | 02:41 PM | 1,137,672 | b5c3afe4-7055-480b-875c-390dd9c9fa42_1.clstr |
| 02/02/2024 | 02:41 PM | 3,193,748 | b5c3afe4-7055-480b-875c-390dd9c9fa42_3.clstr |
| 02/01/2024 | 09:39 AM | 11,511,965,389 | Backup_West Ramp_2024-01-31_150513.faf |
| 02/02/2024 | 03:32 PM | 56,588 | d51f7a1c-bdfb-47a9-a09f-12bbe805cd6f-map.md |
| 02/02/2024 | 03:32 PM | 44,801 | d51f7a1c-bdfb-47a9-a09f-12bbe805cd6f-map.png |
| 02/02/2024 | 03:37 PM | 2,138,583 | d51f7a1c-bdfb-47a9-a09f-12bbe805cd6f-preview.rch |
| 02/02/2024 | 03:32 PM | 4,748 | d51f7a1c-bdfb-47a9-a09f-12bbe805cd6f.pf |
| 02/02/2024 | 03:37 PM | 10,478,047 | d51f7a1c-bdfb-47a9-a09f-12bbe805cd6f.rch |
| 02/02/2024 | 03:36 PM | 53,099,904 | d51f7a1c-bdfb-47a9-a09f-12bbe805cd6f.sgp |
| 02/02/2024 | 03:32 PM | 460,808 | d51f7a1c-bdfb-47a9-a09f-12bbe805cd6f_1.clstr |
| 02/02/2024 | 03:32 PM | 3,053,500 | d51f7a1c-bdfb-47a9-a09f-12bbe805cd6f_3.clstr |
| 02/02/2024 | 03:28 PM | 43,948 | d6c51106-660a-4cf4-b1d6-cb1216292b47-map.md |
| 02/02/2024 | 03:28 PM | 36,458 | d6c51106-660a-4cf4-b1d6-cb1216292b47-map.png |
| 02/02/2024 | 03:38 PM | 1,245,124 | d6c51106-660a-4cf4-b1d6-cb1216292b47-preview.rch |
| 02/02/2024 | 03:28 PM | 4,604 | d6c51106-660a-4cf4-b1d6-cb1216292b47.pf |
| 02/02/2024 | 03:38 PM | 19,091,797 | d6c51106-660a-4cf4-b1d6-cb1216292b47.rch |
| 02/02/2024 | 03:35 PM | 103,530,608 | d6c51106-660a-4cf4-b1d6-cb1216292b47.sgp |
| 02/02/2024 | 03:28 PM | 824,840 | d6c51106-660a-4cf4-b1d6-cb1216292b47_1.clstr |
| 02/02/2024 | 03:28 PM | 2,901,900 | d6c51106-660a-4cf4-b1d6-cb1216292b47_3.clstr |
| 03/28/2024 | 03:19 PM | 361,979 | RTU West Ramp.rcp |

Exhibit 15 Page 19

| | | | |
|---|---|---|---|
| 02/07/2024 | 10:47 AM | 296,182 | RTU West Ramp.rcp.bk1 |
| 02/07/2024 | 11:15 AM | 1,877,773 | RTU West Ramp.rcp.bk2 |
| 02/07/2024 | 11:20 AM | 1,727,079 | RTU West Ramp.rcp.bk3 |
| 02/01/2024 | 03:19 PM | 729,434,112 | RTU West Ramp0.e57 |
| 02/01/2024 | 03:21 PM | 733,816,832 | RTU West Ramp1.e57 |
| 02/01/2024 | 03:23 PM | 731,710,464 | RTU West Ramp2.e57 |
| 02/01/2024 | 03:24 PM | 733,328,384 | RTU West Ramp3.e57 |
| 02/01/2024 | 03:26 PM | 730,603,520 | RTU West Ramp4.e57 |
| 02/01/2024 | 03:27 PM | 179,544,064 | RTU West Ramp5.e57 |
| 02/01/2024 | 03:27 PM | 176,067,584 | RTU West Ramp6.e57 |
| 02/02/2024 | 12:52 PM | 405,863,700 | West Ramp- Setup 001.diff |
| 02/02/2024 | 12:52 PM | 524,288 | West Ramp- Setup 001.llt |
| 02/02/2024 | 12:35 PM | 121,540,493 | West Ramp- Setup 001.rcc |
| 03/28/2024 | 03:17 PM | 223,837,717 | West Ramp- Setup 001.rcs |
| 02/02/2024 | 12:52 PM | 217,696 | West Ramp- Setup 001.thumbnail |
| 02/02/2024 | 01:46 PM | 1,026,729,400 | West Ramp- Setup 002.diff |
| 02/02/2024 | 01:46 PM | 524,288 | West Ramp- Setup 002.llt |
| 02/02/2024 | 01:06 PM | 2,349,945 | West Ramp- Setup 002.rcc |
| 03/28/2024 | 03:18 PM | 112,155,471 | West Ramp- Setup 002.rcs |
| 02/02/2024 | 01:46 PM | 145,310 | West Ramp- Setup 002.thumbnail |
| 02/02/2024 | 02:22 PM | 124,619,772 | West Ramp- Setup 003.diff |
| 02/02/2024 | 02:22 PM | 524,288 | West Ramp- Setup 003.llt |
| 02/02/2024 | 02:17 PM | 183,177,161 | West Ramp- Setup 003.rcc |
| 03/28/2024 | 03:18 PM | 185,789,463 | West Ramp- Setup 003.rcs |
| 02/02/2024 | 02:22 PM | 172,602 | West Ramp- Setup 003.thumbnail |
| 02/02/2024 | 02:39 PM | 129,754,804 | West Ramp- Setup 004.diff |
| 02/02/2024 | 02:39 PM | 524,288 | West Ramp- Setup 004.llt |
| 02/02/2024 | 02:33 PM | 182,794,990 | West Ramp- Setup 004.rcc |
| 03/28/2024 | 03:18 PM | 182,198,873 | West Ramp- Setup 004.rcs |
| 02/02/2024 | 02:39 PM | 171,582 | West Ramp- Setup 004.thumbnail |
| 02/02/2024 | 03:24 PM | 417,337,344 | West Ramp- Setup 005.diff |
| 02/02/2024 | 03:24 PM | 524,288 | West Ramp- Setup 005.llt |
| 02/02/2024 | 03:05 PM | 111,297,262 | West Ramp- Setup 005.rcc |
| 03/28/2024 | 03:18 PM | 145,483,839 | West Ramp- Setup 005.rcs |
| 02/02/2024 | 03:24 PM | 190,772 | West Ramp- Setup 005.thumbnail |
| 02/02/2024 | 03:31 PM | 14,357,368 | West Ramp- Setup 006.diff |
| 02/02/2024 | 03:31 PM | 524,288 | West Ramp- Setup 006.llt |
| 02/02/2024 | 03:31 PM | 50,015,355 | West Ramp- Setup 006.rcc |
| 03/28/2024 | 03:18 PM | 97,892,789 | West Ramp- Setup 006.rcs |

Exhibit 15 Page 20

```
02/02/2024  03:31 PM       194,504 West Ramp- Setup 006.thumbnail
02/02/2024  03:36 PM    13,126,600 West Ramp- Setup 007.diff
02/02/2024  03:36 PM       524,288 West Ramp- Setup 007.llt
02/02/2024  03:36 PM    52,691,561 West Ramp- Setup 007.rcc
03/28/2024  03:18 PM    96,135,077 West Ramp- Setup 007.rcs
02/02/2024  03:36 PM       217,943 West Ramp- Setup 007.thumbnail
```

EAST RAMP LiDAR SCREENSHOTS
  Bottom Handrail Extensions.jpg
  Landing Length.jpg
  Landing.jpg
  Ramp Bottom Steep Slope.jpg
  Run 1.jpg
  Run 2 Length-Height.png
  Run 2.jpg
  Steep Slope at Bottom - Zoomed.png
  Steep Slope Top.jpg
  Top Landing and Handrails.jpg
  Width.jpg


EAST RAMP LiDAR SUPPORT & E57 FILES

```
03/28/2024  10:50 AM       947,417 00fc2dbf-0348-4b94-9ca5-ebb367881053.png
02/02/2024  04:22 PM        97,273 1606de87-b9f0-4783-9bfe-9b9467aa628d-map.md
02/02/2024  04:22 PM        74,636 1606de87-b9f0-4783-9bfe-9b9467aa628d-map.png
02/02/2024  04:37 PM     2,508,767 1606de87-b9f0-4783-9bfe-9b9467aa628d-preview.rch
02/02/2024  04:22 PM         5,676 1606de87-b9f0-4783-9bfe-9b9467aa628d.pf
02/02/2024  04:37 PM    38,742,959 1606de87-b9f0-4783-9bfe-9b9467aa628d.rch
02/02/2024  04:32 PM   196,462,752 1606de87-b9f0-4783-9bfe-9b9467aa628d.sgp
02/02/2024  04:22 PM     1,356,808 1606de87-b9f0-4783-9bfe-9b9467aa628d_1.clstr
02/02/2024  04:22 PM     3,436,868 1606de87-b9f0-4783-9bfe-9b9467aa628d_3.clstr
02/02/2024  04:46 PM        86,183 32827533-2d89-49ac-8e20-3a34dac20d1d-map.md
02/02/2024  04:46 PM        63,608 32827533-2d89-49ac-8e20-3a34dac20d1d-map.png
02/02/2024  04:56 PM     1,381,824 32827533-2d89-49ac-8e20-3a34dac20d1d-preview.rch
02/02/2024  04:46 PM         5,356 32827533-2d89-49ac-8e20-3a34dac20d1d.pf
02/02/2024  04:56 PM    21,082,493 32827533-2d89-49ac-8e20-3a34dac20d1d.rch
02/02/2024  04:52 PM   113,484,640 32827533-2d89-49ac-8e20-3a34dac20d1d.sgp
02/02/2024  04:46 PM     1,008,776 32827533-2d89-49ac-8e20-3a34dac20d1d_1.clstr
02/02/2024  04:46 PM     2,949,324 32827533-2d89-49ac-8e20-3a34dac20d1d_3.clstr
```

Exhibit 15 Page 21

| 02/02/2024 | 05:29 PM | 96,697 | 6183f208-4bc1-425e-acb6-50ab44e7fd2e-map.md |
|---|---|---|---|
| 02/02/2024 | 05:29 PM | 68,446 | 6183f208-4bc1-425e-acb6-50ab44e7fd2e-map.png |
| 02/02/2024 | 05:39 PM | 1,257,038 | 6183f208-4bc1-425e-acb6-50ab44e7fd2e-preview.rch |
| 02/02/2024 | 05:29 PM | 5,596 | 6183f208-4bc1-425e-acb6-50ab44e7fd2e.pf |
| 02/02/2024 | 05:39 PM | 19,532,204 | 6183f208-4bc1-425e-acb6-50ab44e7fd2e.rch |
| 02/02/2024 | 05:36 PM | 104,460,728 | 6183f208-4bc1-425e-acb6-50ab44e7fd2e.sgp |
| 02/02/2024 | 05:29 PM | 962,696 | 6183f208-4bc1-425e-acb6-50ab44e7fd2e_1.clstr |
| 02/02/2024 | 05:29 PM | 2,912,028 | 6183f208-4bc1-425e-acb6-50ab44e7fd2e_3.clstr |
| 03/28/2024 | 10:34 AM | 947,432 | 87288997-4c1c-487b-8723-19c3950d543d.png |
| 02/02/2024 | 04:04 PM | 48,633 | a738b187-f3ee-4fb7-93f4-ada9ceb50c16-map.md |
| 02/02/2024 | 04:04 PM | 37,230 | a738b187-f3ee-4fb7-93f4-ada9ceb50c16-map.png |
| 02/02/2024 | 04:22 PM | 2,640,171 | a738b187-f3ee-4fb7-93f4-ada9ceb50c16-preview.rch |
| 02/02/2024 | 04:04 PM | 6,348 | a738b187-f3ee-4fb7-93f4-ada9ceb50c16.pf |
| 02/02/2024 | 04:22 PM | 42,286,665 | a738b187-f3ee-4fb7-93f4-ada9ceb50c16.rch |
| 02/02/2024 | 04:15 PM | 200,146,116 | a738b187-f3ee-4fb7-93f4-ada9ceb50c16.sgp |
| 02/02/2024 | 04:04 PM | 1,152,264 | a738b187-f3ee-4fb7-93f4-ada9ceb50c16_1.clstr |
| 02/02/2024 | 04:04 PM | 3,106,116 | a738b187-f3ee-4fb7-93f4-ada9ceb50c16_3.clstr |
| 02/01/2024 | 10:45 AM | 10,186,880,450 | Backup_East Ramp_2024-01-31_151940.faf |
| 03/28/2024 | 02:15 PM | 0 | e0ad4849-a42e-4164-ad8d-438ae4a8026d.dt |
| 03/28/2024 | 02:15 PM | 947,364 | e0ad4849-a42e-4164-ad8d-438ae4a8026d.png |
| 03/28/2024 | 11:04 AM | 144,987 | e5d41925-06ed-4587-bcaf-ffe9620f6476.md |
| 03/28/2024 | 11:04 AM | 120,358 | e5d41925-06ed-4587-bcaf-ffe9620f6476.png |
| 02/02/2024 | 04:03 PM | 126,181,472 | East Ramp- Setup 001.diff |
| 02/02/2024 | 04:03 PM | 524,288 | East Ramp- Setup 001.llt |
| 02/02/2024 | 03:58 PM | 196,839,238 | East Ramp- Setup 001.rcc |
| 03/28/2024 | 10:35 AM | 172,076,725 | East Ramp- Setup 001.rcs |
| 02/02/2024 | 04:03 PM | 217,866 | East Ramp- Setup 001.thumbnail |
| 02/02/2024 | 04:20 PM | 123,698,376 | East Ramp- Setup 002.diff |
| 02/02/2024 | 04:20 PM | 524,288 | East Ramp- Setup 002.llt |
| 02/02/2024 | 04:15 PM | 190,772,353 | East Ramp- Setup 002.rcc |
| 03/28/2024 | 10:35 AM | 189,746,046 | East Ramp- Setup 002.rcs |
| 02/02/2024 | 04:20 PM | 207,983 | East Ramp- Setup 002.thumbnail |
| 02/02/2024 | 04:44 PM | 377,471,644 | East Ramp- Setup 003.diff |
| 02/02/2024 | 04:44 PM | 524,288 | East Ramp- Setup 003.llt |
| 02/02/2024 | 04:30 PM | 120,961,636 | East Ramp- Setup 003.rcc |
| 03/28/2024 | 10:36 AM | 180,699,838 | East Ramp- Setup 003.rcs |
| 02/02/2024 | 04:44 PM | 182,583 | East Ramp- Setup 003.thumbnail |
| 02/02/2024 | 05:27 PM | 402,875,568 | East Ramp- Setup 006.diff |
| 02/02/2024 | 05:27 PM | 524,288 | East Ramp- Setup 006.llt |

Exhibit 15 Page 22

| | | | |
|---|---|---|---|
| 02/02/2024 | 05:10 PM | 112,682,083 | East Ramp- Setup 006.rcc |
| 03/28/2024 | 10:36 AM | 181,593,911 | East Ramp- Setup 006.rcs |
| 02/02/2024 | 05:27 PM | 197,118 | East Ramp- Setup 006.thumbnail |
| 02/05/2024 | 10:21 AM | 962,239,716 | East Ramp- Setup 007.diff |
| 02/05/2024 | 10:21 AM | 524,288 | East Ramp- Setup 007.llt |
| 02/05/2024 | 09:45 AM | 10,935,870 | East Ramp- Setup 007.rcc |
| 03/28/2024 | 10:36 AM | 130,957,186 | East Ramp- Setup 007.rcs |
| 02/05/2024 | 10:21 AM | 175,706 | East Ramp- Setup 007.thumbnail |
| 02/05/2024 | 10:42 AM | 119,122,728 | East Ramp- Setup 008.diff |
| 02/05/2024 | 10:42 AM | 524,288 | East Ramp- Setup 008.llt |
| 02/05/2024 | 10:38 AM | 192,376,326 | East Ramp- Setup 008.rcc |
| 03/28/2024 | 10:36 AM | 179,063,358 | East Ramp- Setup 008.rcs |
| 02/05/2024 | 10:42 AM | 232,057 | East Ramp- Setup 008.thumbnail |
| 02/05/2024 | 10:24 AM | 64,939 | f86b6fd3-019d-4507-8637-f6308e83a8e2-map.md |
| 02/05/2024 | 10:24 AM | 57,068 | f86b6fd3-019d-4507-8637-f6308e83a8e2-map.png |
| 02/05/2024 | 10:28 AM | 142,781 | f86b6fd3-019d-4507-8637-f6308e83a8e2-preview.rch |
| 02/05/2024 | 10:24 AM | 3,740 | f86b6fd3-019d-4507-8637-f6308e83a8e2.pf |
| 02/05/2024 | 10:28 AM | 2,096,481 | f86b6fd3-019d-4507-8637-f6308e83a8e2.rch |
| 02/05/2024 | 10:26 AM | 9,369,132 | f86b6fd3-019d-4507-8637-f6308e83a8e2.sgp |
| 02/05/2024 | 10:24 AM | 192,648 | f86b6fd3-019d-4507-8637-f6308e83a8e2_1.clstr |
| 02/05/2024 | 10:24 AM | 16,795,628 | f86b6fd3-019d-4507-8637-f6308e83a8e2_3.clstr |
| 02/05/2024 | 10:44 AM | 83,361 | f87df965-e3ac-432d-898c-bc35e047d564-map.md |
| 02/05/2024 | 10:44 AM | 76,348 | f87df965-e3ac-432d-898c-bc35e047d564-map.png |
| 02/05/2024 | 10:58 AM | 2,554,276 | f87df965-e3ac-432d-898c-bc35e047d564-preview.rch |
| 02/05/2024 | 10:44 AM | 4,988 | f87df965-e3ac-432d-898c-bc35e047d564.pf |
| 02/05/2024 | 10:58 AM | 37,985,174 | f87df965-e3ac-432d-898c-bc35e047d564.rch |
| 02/05/2024 | 10:52 AM | 195,366,400 | f87df965-e3ac-432d-898c-bc35e047d564.sgp |
| 02/05/2024 | 10:44 AM | 1,355,400 | f87df965-e3ac-432d-898c-bc35e047d564_1.clstr |
| 02/05/2024 | 10:44 AM | 3,529,188 | f87df965-e3ac-432d-898c-bc35e047d564_3.clstr |
| 03/28/2024 | 11:04 AM | 65,019 | RTU East Ramp.rcp |
| 02/07/2024 | 12:28 PM | 1,856,668 | RTU East Ramp.rcp.bk1 |
| 02/07/2024 | 02:32 PM | 4,881,084 | RTU East Ramp.rcp.bk2 |
| 03/28/2024 | 10:36 AM | 226,781 | RTU East Ramp.rcp.bk3 |
| 02/01/2024 | 03:53 PM | 729,820,160 | RTU East Ramp0.e57 |
| 02/01/2024 | 03:51 PM | 4,348,336,128 | RTU East Ramp1.e57 |
| 02/01/2024 | 03:56 PM | 730,333,184 | RTU East Ramp2.e57 |
| 02/01/2024 | 03:58 PM | 721,327,104 | RTU East Ramp3.e57 |
| 02/01/2024 | 04:00 PM | 727,062,528 | RTU East Ramp4.e57 |
| 02/01/2024 | 04:01 PM | 715,081,728 | RTU East Ramp5.e57 |

Exhibit 15 Page 23