**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CUAUHTEMOC HERNANDEZ and WILLIAM MATHIS, | ) ) ) | |
| *Plaintiffs,* | ) ) | Case No. 23-cv-16970 |
| *-vs-* | ) ) | Judge Sunil R. Harjani |
| THOMAS DART, Sheriff of Cook County, and COOK COUNTY, ILLINOIS, | ) ) ) | Magistrate Judge Keri L. Holleb Hotaling |
| *Defendants.* | ) ) | |

## DEFENDANTS' STATEMENT OF ADDITIONAL FACTS

Defendants, THOMAS DART, in his official capacity as Sheriff of Cook County, and COOK COUNTY, ILLINOIS, by their attorney, EILEEN O'NEILL BURKE, State's Attorney of Cook County, through her Special Assistant State's Attorneys, JOHNSON & BELL, LTD., submit the following statement of additional facts in support of their motion for summary judgment and in response to Plaintiff's motion for partial summary judgment:

**I.      Retention of Globetrotters to Assess Accessibility.**

1.      As part of a comprehensive, multi-contract program to assess all of Cook County's public safety facilities (approximately 11 million square feet) and their overall accessibility and compliance under the Americans with Disabilities Act (ADA), Cook County hired a third-party architectural/engineering firm, Globetrotters Engineering Corporation (GEC). (Ex. A, Davis Decl. ¶ 7.)

1

II.     **Cermak Ramp Measurements.**

2.      Cook County owns the Cermak Health Services Facility, located at 2800 S. California, Chicago. (Ex. A, Davis Decl. ¶ 4.) The building is used to provide health services for detainees on the Cook County Department of Corrections (CCDOC) campus. (*Id.*)

3.      The Cermak building has a pedestrian and material access tunnel serving the facility at the basement level. (*Id.*) Located within the tunnel is an access ramp ("Cermak ramp"). (*Id.*)

4.      The original design plans for the Cermak ramp from 1996 show that the rise of the Cermak ramp was intended to be 30 inches. (*Id.* ¶ 5.)

5.      In November 2022, Cook County commissioned a surveyor to assess the grade of the ramp using a laser level. (*Id.*) The survey showed the ramp to be exactly 30 inches down the middle of the ramp. (*Id.*)

6.      GEC was hired to assess the ADA compliance of the Cermak Health Services facility, and it started with a report specifically on the Cermak ramp. (*Id.*)

7.      In 2023, the GEC team conducted site visits to verify existing conditions related to the Cermak ramp. (*Id.* ¶ 9.)

8.      The GEC team utilized a LIDAR system, advanced technology which Cook County does not possess, to document the physical conditions of the Cermak ramp in three-dimensional form. (*Id.* ¶ 10.) The three-dimensional imagery captured the top and bottom of the ramp as well as the landings. (*Id.*)

9.      The report on the Cermak ramp was authored on December 6, 2023. (Pl.'s Ex. 14, GEC Report, at 1, ECF No. 122-14.)

10. The three-dimensional imagery of GEC's LIDAR system, which captured the entire space (ramp and landings), indicated that the ramp is 43.64 feet long with a vertical rise of 32.4 inches (slightly over two-and-half feet). (*Id.* at 15.)

11. Due to the slight continuing slope of the landings at the top and bottom of the ramp, GEC's LIDAR system measured the ramp to be 2.4 inches higher in rise compared to the 30 inches measured by the surveyor. (Ex. A, Davis Decl. ¶ 11.)

12. GEC determined the rise of the ramp exceeds the ADA Accessibility Guidelines (ADAAG) by only 2.4 inches over the course of that 43.64-foot run. (*Id.*)

13. GEC documented the Cermak ramp has handrails mounted the full length of the ramp that are compliant with the 1991 ADAAG requirements. (*Id.* ¶ 12.)

14. However, because of obstructions with adjacent doors, the handrails do not "extend 12 inches beyond the ramp," and GEC determined this aspect of the handrails is not compliant. (*Id.*) GEC pointed out the complicated wall configurations at the top and bottom of the ramp require a special type of fitting, which "is not available for anti-ligature handrails." (Pl.'s Ex. 14, GEC Report, at 3, ECF No. 122-14.)

15. Anti-ligature handrails are a necessary safety precaution in a jail setting. (Ex. A, Davis Decl. ¶ 13.)

## II. Residential Treatment Unit (RTU) East Tunnel Ramp Measurements.

16. Cook County Residential Transfer Unit (RTU) Ramp starts off outside the basement of the RTU building (Pl.'s Ex. 8, Darr's Dep. 36:11–15.)

17. Correctional staff utilize the tunnels to travel between buildings located on the Department of Corrections campus and also use the tunnels to shuttle detainees between buildings. (Pl.'s Ex. 15, GEC Report, at 3, ECF No. 122-15.)

18.    GEC was hired in December 2023 to assess the ADA compliance of the RTU facility and associated North and East Tunnel Corridors. (*Id.* at 3–4.)

19.    In January 2024, the GEC team conducted site visits twice to verify existing conditions related to the RTU ramp. (*Id.* at 6.)

20.    The report on RTU ramp was authored on April 1, 2024. (*Id.* at 1.)

21.    The GEC team utilized a LIDAR system, advanced technology which Cook County does not possess, to document the physical conditions of the RTU ramp in three-dimensional form. (*Id.* at 3, 6.)

22.    GEC documented the following "minor" violations: a slope greater than 1:12 for a short distance, intermediate landing 5% short of the required length, handrail extensions between 7.25 and 12 inches long, and handrails up to ½ inch lower than required only at some locations. (*Id.* at 3.) GEC also documented that the bottom landing is compliant, while the top landing is less than sixty inches. (*Id.* at 10–11.)

23.    The two deviations in slope were only for "a short distance." (*Id.*) The vertical rise of the Upper Ramp deviated only 1.93 inches over the span of a 25.95-foot horizontal run, resulting in a slope deviation less than 1% (0.64%). (*Id.* at 10.) The vertical rise of the Lower Ramp deviated only 2.47 inches over the span of a 30.4-foot horizontal run, resulting in a slope deviation of only 3.5% of the overall run. (*Id.* at 11.)

## III.    Assistance to Individuals Who Use Canes, Crutches, and Walkers.

24.    Pursuant to Sheriff's Office policy, individuals with disabilities have equal access to services, programs and activities that are provided by the Sheriff's Office. (Pl.'s Ex. 18, Lexipol Policy, at 2.)

25.     Lonnie Hollis, an administrator at the Sheriff's Office testified that according to the Lexipol Policies the correctional staff allows persons with canes, crutches and walkers to move up and down on their own accord. (Pl.'s Ex. 17, Hollis Dep. 76:9–23.)

26.     Hollis testified that any time that an inmate with a cane, crutch, or walker requested assistance, the correctional staff would "look into it and provide assistance." (*Id.* at 100:16–24.)

27.     Hollis further testified that if a cart was not available for use when an inmate requested it, it was common practice for correctional officers to provide alternative forms of assistance to inmates, such as transportation via wheelchair. (*Id.*)

28.     A sign is posted at the end of the Cermak and RTU ramps that provide notice to detainees with cane, crutches or walkers that they can ask for help. (*Id.* at 82:20–84:9.)

**IV.     Plaintiffs' Access to Services, Programs, and Activities.**

29.     Plaintiff Hernandez testified that his pain was caused by walking long distances generally, not due to traveling on the ramps, specifically. (Pl.'s SOF, Ex. 22, Hernandez Dep. 50:16–51:1, 54:18–20.)

30.     Plaintiff Hernandez testified that walking on the ramps merely "irritated" his leg, back, and shoulder, not that it caused a distinct injury or denied him access to any facility or service. (Pl.'s Ex. 22, Hernandez Dep. 92:11–16.)

31.     Plaintiff Hernandez stated that he was, in fact, able to rest on the ramp. (Pl.'s Ex. 22, Hernandez Dep. 92:5–10.)

32.     Plaintiff Hernandez stated that he could remember two occasions which he used a cart, not that these were the only times he was able to utilize it. (Pl.'s Ex. 22, Hernandez Dep. 46:18–47:9, 56:19–57:13.)

33.     Plaintiff Hernandez further testified that officers told him that he needed a "medical script" for a wheelchair to travel long distances because they would not be able to take him in the cart all the time, not that they would refuse to transport him in the cart if he did not have a "medical script." (*Id.* at 56:19–57:13.)

34.     Plaintiff Hernandez stated that the officers assisted him in the best way they could to get to his destination.  (*Id.* at 51:2–24.)

35.     Plaintiff Hernandez testified that he was never prevented from reaching an appointment, service, or destination. (*Id.* at 52:2–18.) Even on occasions when he needed to stop and rest, he was still able to complete the trip and access the appointment or service. (*Id.* at 52:19–23.)

36.     Plaintiff Mathis admitted that the Cermak ramp never actually stopped or prevented him from accessing services or attending appointments. (Pl.'s Ex. 26, Mathis Dep. 29:8–14.)

37.     Plaintiff Mathis stated that he was always able to get where he wanted to go, unless he "didn't feel like going over" due to his general knee pain. (*Id.* at 29:15–19.)

38.     Plaintiff Mathis testified that he told the correctional officers that he was experiencing pain in his foot, to which the officers suggested that he go to the doctor to be treated, once Mathis told the officers that he was unable to complete the walk to the doctors the officers arranged for Mathis to be transported. (*Id.* 55:22–56:23.)

39.     Plaintiff Mathis testified that officers escorted him on a cart once when his gout was bad and in a wheelchair once or twice when his foot was swollen.  (*Id*. at 33:13–34:8.)

Respectfully submitted,

EILEEN O'NEILL BURKE
State's Attorney of Cook County

Dated: August 18, 2025

/s/ Adnan Shafi
Special Assistant State's Attorney

Monica Burkoth (burkothm@jbltd.com)
Samuel D. Branum (branums@jbltd.com)
Adnan Shafi (shafia@jbltd.com)
Nelson A. Aydelotte (aydelotten@jbltd.com)
Johnson & Bell, Ltd.
33 W. Monroe, Ste. 2700
Chicago, Illinois 60603
(312) 372-0770