IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Cuauhtemoc Hernandez and William Mathis, | ) ) ) | |
| *Plaintiffs,* | ) ) ) | |
| -*vs*- | ) ) | No. 23-cv-16970 |
| Thomas Dart, Sheriff of Cook County, et. al., | ) ) ) ) | Judge Sunil R. Harjani |
| *Defendants.* | ) | |

**PLAINTIFFS' LOCAL RULE 56.1(b)(3)(B) STATEMENT**

Plaintiffs Hernandez and Mathis, by counsel, files the following Local Rule 56.1(b)(3)(B) Statement:

**I.     Retention of Globetrotters to Assess Accessibility.**

1.     As part of a comprehensive, multi-contract program to assess all of Cook County's public safety facilities (approximately 11 million square feet) and their overall accessibility and compliance under the Americans with Disabilities Act (ADA), Cook County hired a third-party architectural/engineering firm, Globetrotters Engineering Corporation (GEC). (Ex. A, Davis Decl. ¶ 7.)

**Response:**     Disputed. The cited record, Mr. Davis's declaration dated February 22, 2024, is contradicted by Mr. Davis's deposition recorded on October 23, 2024, in this case.  Mr. Davis testified that Cook County issued a RFQ and that "we are going to hire up to probably three – up to three firms to handle different areas of the jail campus" and that "we are in the process of developing the documentation to bring those contracts to the Board of Commissioners for approval to hire a firm to assess not just the RTU east ramp, not just the north ramp, but the entire campus, including the area of ramp itself." Exhibit

1, Davis (10/23/2024) 88:18-89:20.

## II. Cermak Ramp Measurements.

2. Cook County owns the Cermak Health Services Facility, located at 2800 S. California, Chicago. (Ex. A, Davis Decl. ¶ 4.) The building is used to provide health services for detainees on the Cook County Department of Corrections (CCDOC) campus. (*Id.*)

**Response:** Undisputed.

3. The Cermak building has a pedestrian and material access tunnel serving the facility at the basement level. (*Id.*) Located within the tunnel is an access ramp ("Cermak ramp"). (*Id.*)

**Response:** Undisputed.

4. The original design plans for the Cermak ramp from 1996 show that the rise of the Cermak ramp was intended to be 30 inches. (*Id.* ¶ 5.)

**Response:** Undisputed with the clarification Deputy Director Davis referenced the "initial architect's design drawings" prior to construction. Exhibit 2, Davis (3/12/2024) Dep 36:5-37:5.

5. [a] In November 2022, Cook County commissioned a surveyor to assess the grade of the ramp using a laser level. (*Id.*) [b] The survey showed the ramp to be exactly 30 inches down the middle of the ramp. (*Id.*)

**Response:** [a] Undisputed.

[b] Objection, this survey is not admissible. During a hearing before Judge Rowland on March 23, 2023, in *Walker v. Dart*, 20-cv-261, Brian Gainer, the lead attorney for defendants from Johnson and Bell, Ltd., discussed the "surveyor report" of the Cermak ramp. Exhibit 3,Transcript from *Walker v. Dart*, 20-cv-261, Hearing on 3/23/2023 at 9:12-19. Mr. Gainer acknowledge the surveyor report is not from an "architectural person" and when asked by the Court whether this survey could be defended in front of a jury, he stated "[n]o, I think we need an expert." *Id.* at 12:12-16,

18:16-19:1. During the hearing Judge Rowland stated the plat survey "is not going to fly with a jury" and that Mr. Gainer "agree[d] with the [Court's statement]." *Id.* 19:4-6.

      6.     GEC was hired to assess the ADA compliance of the Cermak Health Services facility, and it started with a report specifically on the Cermak ramp. (*Id.*)

      **Response:** Undispued.

      7.     In 2023, the GEC team conducted site visits to verify existing conditions related to the Cermak ramp. (*Id.* ¶ 9.)

      **Response:** Undisputed.

      8.     The GEC team utilized a LIDAR system, advanced technology which Cook County does not possess, to document the physical conditions of the Cermak ramp in three-dimensional form. (*Id.* ¶ 10.) The three-dimensional imagery captured the top and bottom of the ramp as well as the landings. (*Id.*)

      **Response:** Undisputed.

      9.     The report on the Cermak ramp was authored on December 6, 2023. (Pl.'s Ex. 14, GEC Report, at 1, ECF No. 122-14.)

      **Response:** Undisputed.

      10.    [a] The three-dimensional imagery of GEC's LIDAR system, which captured the entire space (ramp and landings), indicated that the ramp is 43.64 feet long with a vertical rise of 32.4 inches [b] (slightly over two-and-half feet). (*Id.* at 15.)

      **Response:** [a]    Undisputed.

                     [b]    Objection, this characterization is not supported by the cited document.

      11.    Due to the slight continuing slope of the landings at the top and bottom of the ramp, GEC's LIDAR system measured the ramp to be 2.4 inches higher in rise compared to the 30 inches measured by the surveyor. (Ex. A, Davis Decl. ¶ 11.)

      **Response:** Objection, mischaracterizes Deputy Director Davis's testimony regarding the non-compliant ramp suggesting the 2.4 inches was "slight." He testified as

follows:
> When we found out through the LIDAR that not only was there a slight variance at the top or bottom of the ramp, but it was a significant variance as you characterized it, the 2.4 inches.
>
> We said wait a minute. This is going to - - we agreed with Globetrotters' recommendation, and it's got to come out. Before then, we thought we were able to work with the ramp that's there.

Exhibit 2, Daivs (3/12/2024) Dep 258:3-12. Undisputed the ramp is 2.4 inches higher than 30 inches.

    12.    GEC determined the rise of the ramp exceeds the ADA Accessibility Guidelines (ADAAG) by only 2.4 inches over the course of that 43.64-foot run. (*Id.*)

    **Response:**    Objection to the extent defendants seek to introduce this statement to suggest this measurement is insignificant by stating "only 2.4 inches." Mr. Darr said a ramp with a rise of 32.4 inches, rather than 30 inches, is not compliant with the ADA. Exhibit 4, Darr (6/3/2024) Dep 47:5-9. The ADA "sets forth minimum requirements that are supposed to be followed for accessibility" and structural elements "either comply or do not comply with the ADA Code." *Id.* at 46:5-10, 62:21-63:1. Undisputed, however, the ramp's rise exceeds the minimum requirements of the ADA by 2.4 inches.

    13.    GEC documented the Cermak ramp has handrails mounted the full length of the ramp that are compliant with the 1991 ADAAG requirements. (*Id.* ¶ 12.)

    **Response:** Objection, mischaracterizes the record. GEC documented that "[s]ince the original construction, anti-ligature handrails have been added to each side of the ramp incline." Dkt. 122-14, GEC Report at 3. Disputed the handrails are compliant with the ADA. GEC wrote "at the top and bottom of the ramp the handrails do not extend a minimum of 12 inches beyond the ramp, and the handrails are not continuous." *Id.* Indeed, Carl Darr, the vice president of architecture for GEC, testified the handrails are not compliant with the ADA. Exhibit 4, Darr Dep 7:17-19, 65:24-66:7.

14. [a] However, because of obstructions with adjacent doors, the handrails do not "extend 12 inches beyond the ramp," and GEC determined this aspect of the handrails is not compliant. (*Id.*) GEC pointed out the complicated wall configurations at the top and bottom of the ramp require a special type of fitting, [b] which "is not available for anti-ligature handrails." (Pl.'s Ex. 14, GEC Report, at 3, ECF No. 122-14.)

**Response:** [a] Undisputed.

[b] Objection, mischaracterizes the entire sentence that reads "This type of fitting, based on *cursory research* and discussion with the client, is not available for anti-ligature handrails." Dkt. 122-14, GEC Report at 3 (emphasis supplied). Disputed, in part. Deputy Director Davis said it was feasible to extend the handrails on "two of the four ends" of the handrails with "a custom extension." Exhibit 2, Davis (3/12/2024) Dep 150:6-15.

15. Anti-ligature handrails are a necessary safety precaution in a jail setting. (Ex. A, Davis Decl. ¶ 13.)

**Response:** Disputed. Deputy Director Davis testified other ramps at the Cook County Jail, for example the Residential Treatment Unit (RTU) east tunnel corridor adjacent to the Cermak ramp, do not have anti-ligature handrails. Exhibit 2, Davis (3/12/2024) Dep 147:7-14. Additionally, Deputy Director Davis testified he has no personal knowledge whether other ramps at the Jail have anti-ligature handrails. Exhibit 2, Davis (3/12/2024) Dep 148:5-9.

A photograph of the RTU east tunnel ramp's handrail is shown on Exhibit 5. There is another railing in the lower level of Division 4 that is not anti-ligature. *See* Exhibit 6. These pictures were taken during a joint inspection of ramps at the Jail in this case and *Westmoreland v. Dart*, 23-cv-1851, on August 14, 2023. Exhibit 7, Inspection Agreement for *Westmoreland.*

Additionally, Division 9 does not have anti-ligature handrails in the living units toured by Gary Keclik, an architect, on February 20, 2025. Exhibit 9, Keclik Decl. ¶ 13.

Additionally, Mr. Keclik toured Division 11 at the Department of Corrections on August 27, 2025, *Id.* ¶ 3. Living Unit AA in Division 11 did not have anti-ligature handrails to reach the second floor of the living unit and the railing around the perimeter. *Id.* ¶ 7.

**II. Residential Treatment Unit (RTU) East Tunnel Ramp Measurements.**

16. Cook County Residential Transfer Unit (RTU) Ramp starts off outside the basement of the RTU building (Pl.'s Ex. 8, Darr's Dep. 36:11–15.)

**Response:** Undisputed with the clarification the building is called the Residential Treatment Unit not the "Residential Transfer Unit."

17. Correctional staff utilize the tunnels to travel between buildings located on the Department of Corrections campus and also use the tunnels to shuttle detainees between buildings. (Pl.'s Ex. 15, GEC Report, at 3, ECF No. 122-15.)

**Response:** Undisputed.

18. GEC was hired in December 2023 to assess the ADA compliance of the RTU facility and associated North and East Tunnel Corridors. (*Id.* at 3–4.)

**Response:** Undisputed, with the clarification GEC was hired by "DeVore Radunsky, LLC, an attorney representing Cook County," Dkt. 122-15, GEC Report at 4 pursuant to a Rule 26(a)(2)(B) disclosure in *Westmoreland v. Dart*, 23-cv-1851. Exhibit 8, Defendants' Rule 26(a)(2)(B) Disclosure in *Westmoreland v. Dart*, 23-cv-1851.

19. In January 2024, the GEC team conducted site visits twice to verify existing conditions related to the RTU ramp. (*Id.* at 6.)

**Response:** Undisputed.

20. The report on RTU ramp was authored on April 1, 2024. (*Id.* at 1.)

**Response:** Undisputed with the clarification this report was prepared for defense counsel in *Westmoreland v. Dart*, 23-cv-1851. Dkt. 122-15, GEC Report at 4; Exhibit 8, Defendants' Rule 26(a)(2)(B) Disclosure in *Westmoreland v. Dart*, 23-cv-1851.

21. The GEC team utilized a LIDAR system, advanced technology which Cook

County does not possess, to document the physical conditions of the RTU ramp in three-dimensional form. (*Id.* at 3, 6.)

**Response:** Undispued.

22. [a] GEC documented the following "minor" violations: a slope greater than 1:12 for a short distance, intermediate landing 5% short of the required length, handrail extensions between 7.25 and 12 inches long, and handrails up to ½ inch lower than required only at some locations. (*Id.* at 3.) GEC also documented that the bottom landing is compliant, [b] while the top landing is less than sixty inches. (*Id.* at 10–11.)

**Response:** [a] Undisputed the GEC Report said some of the violations "[r]elatively speaking" are "minor."

[b] Disputed this violation is "minor." *See* Dkt. 122-15, GEC Report at 3, 10. The top "landing is 85% short of the required length." *Id.* at 10.

23. [a] The two deviations in slope were only for "a short distance." (*Id.*) [b] The vertical rise of the Upper Ramp deviated only 1.93 inches over the span of a 25.95-foot horizontal run, resulting in a slope deviation less than 1% (0.64%). (*Id.* at 10.) The vertical rise of the Lower Ramp deviated only 2.47 inches over the span of a 30.4-foot horizontal run, resulting in a slope deviation of only 3.5% of the overall run. (*Id.* at 11.)

**Response:** [a] Objection, the citation (pages 10-11 of the GEC Report) does not state these violations are only for "a short distance." Dkt. 122-15, GEC Report at 10-11.

[b] Undisputed these are some of the violations in the GEC Report.

### III. Assistance to Individuals Who Use Canes, Crutches, and Walkers.

24. Pursuant to Sheriff's Office policy, individuals with disabilities have equal access to services, programs and activities that are provided by the Sheriff's Office. (Pl.'s

Ex. 18, Lexipol Policy, at 2.)

**Response:** Undisputed this is stated in Sheriff's Office written policy.

25. Lonnie Hollis, an administrator at the Sheriff's Office testified that according to the Lexipol Policies the correctional staff allows persons with canes, crutches and walkers to move up and down on their own accord. (Pl.'s Ex. 17, Hollis Dep. 76:9–23.)

**Response:** Undisputed.

26. Hollis testified that any time that an inmate with a cane, crutch, or walker requested assistance, the correctional staff would "look into it and provide assistance." (*Id.* at 100:16–24.)

**Response:** Objection, lack of personal knowledge. In response to a question whether class members were accommodated up or down either the Cermak or RTU east tunnel ramp, Mr. Hollis said "[t]hat, I am not sure if I can answer that without being speculative." Dkt. 122-17, Hollis (Sheriff 30(b)(6) Designee) Dep 86:5-87:6. Mr. Hollis said he would have to review the Sheriff's electronic database, called the Jail Management System (JMS), to see if staff documented assistance. *Id.* at 88:7-23. The Sheriff's expectation is that an employee who is escorting a class member would "document the request for accommodation" and any accommodation in JMS because "[t]hat's the expectation of the policy." *Id.* at 89:21-92:14. Mr. Hollis had no knowledge whether any person with a cane, crutch, or walker requested an accommodation or was even provided an accommodation in the year before his deposition and said "[i]f there were instances of such [accommodations], as you described, it should be contained and the expectation that would be that it should be contained in the Jail Management System." *Id.* 102:8-104:10. Prior to his deposition, Mr. Hollis did not look at JMS to see if anybody with a cane, crutch, or walker was accommodated up or down the Cermak or RTU east tunnel ramps. *Id.* at 87:7-89:20.

27. Hollis further testified that if a cart was not available for use when an inmate requested it, it was common practice for correctional officers to provide

alternative forms of assistance to inmates, such as transportation via wheelchair. (*Id.*)

**Response:** Objection, lack of personal knowledge. Mr. Hollis had no information and did not "want to speculate" whether class members were accommodated, such as in a wheelchair, in the year prior to his November 18, 2024 deposition. Dkt. 122-17, Hollis (Sheriff 30(b)(6) Designee) Dep 103:13-104:1. The Sheriff's expectation is that an employee who is escorting a class member would "document the request for accommodation" and any accommodation in JMS because "[t]hat's the expectation of the policy." *Id.* at 89:21-92:14. Prior to his deposition, Mr. Hollis did not look at JMS to see if anybody with a cane, crutch, or walker was accommodated up or down the Cermak or RTU east tunnel ramps. *Id.* at 87:7-89:20.

28. A sign is posted at the end of the Cermak and RTU ramps that provide notice to detainees with cane, crutches or walkers that they can ask for help. (*Id*. at 82:20–84:9.)

**Response:** Objection, lack of personal knowledge. Mr. Hollis said "I'm not sure if the signage is still there, I haven't been in the tunnels in a while." Dkt. 122-17, Hollis (Sheriff 30(b)(6) Designee) Dep 80:21-23. In response to a question whether this sign pertained to detainees in wheelchairs, Mr. Hollis said "I don't want to speculate." *Id.* at 83:16-18. Mr. Hollis had no knowledge when this sign was posted and stated "I don't recall the exact language, that's why I just stated a little while ago, I didn't remember verbatim, I just remember that the spirit of it, the gist of the overall working suggests that they could ask for help. I can't tell you word for word that they said." *Id.* at 84:2-12.

**IV. Plaintiffs' Access to Services, Programs, and Activities.**

29. Plaintiff Hernandez testified that his pain was caused by walking long distances generally, not due to traveling on the ramps, specifically. (Pl.'s SOF, Ex. 22, Hernandez Dep.50:16–51:1, 54:18–20.)

**Response:** Objection, mischaracterizes Hernandez's testimony. He stated "I was in pain, basically - - I mean, the ramp was just one of the biggest problems because it's

so long." Dkt. 122-22, Hernandez Dep 58:3-6. He also said the Cermak ramp and RTU east tunnel ramp were "too steep and too long" and did not have adequate space to rest which exasperated pain to his leg, back, and shoulder. *Id.* at 92:1-10, 93:3-7. Additionally, Hernandez said the pain from using the ramp would last "for days," and exasperated his preexisting injuries and led to a fall inside his cell. *Id.* at 54:2-55:16, 58:3-6, 62:7-17.

30. Plaintiff Hernandez testified that walking on the ramps merely "irritated" his leg, back, and shoulder, not that it caused a distinct injury or denied him access to any facility or service. (Pl.'s Ex. 22, Hernandez Dep. 92:11–16.)

**Response:** Objection, mischaracterizes Hernandez's testimony. He stated "I was in pain, basically - - I mean, the ramp was just one of the biggest problems because it's so long." Dkt. 122-22, Hernandez Dep 58:3-6. Hernandez agreed, in response to defense counsel's question, that he had pain from using the ramp and anxiety around using the ramp and not provided a wheelchair and that "no one would listen" to him. *Id.* at 61:7-13. He also said the Cermak ramp and RTU east tunnel ramp were "too steep and too long" and did not have adequate space to rest which exasperated pain to his leg, back, and shoulder. *Id.* at 92:1-10, 93:3-7. Additionally, Hernandez said the pain from using the ramp would last "for days," and exasperated his preexisting injuries and led to a fall inside his cell. *Id.* at 54:2-55:16, 58:3-6, 62:7-17.

31. Plaintiff Hernandez stated that he was, in fact, able to rest on the ramp. (Pl.'s Ex. 22, Hernandez Dep. 92:5–10.)

**Response:** Objection, mischaracterizes the testimony. The complete testimony is as follows:

> Q. No. I asked you what specific features of the ramps are you thinking are non-compliant with the ADA? Can you tell me what aspect of the ramp?
>
> > Mr. Morrissey: Objection; that's already been asked and answered. You can respond.
>
> A. One, I mean, where could you rest on, if you had a problem walking to it due to all my complications I had?

> Q. All right. So you're saying a resting position?
>
> A. I could only lean on the wall, like I said. They told me - - the COs told me would I have a problem going up and down this ramp, would I want to – they asked me that once or twice.

Dkt. 122-22, Hernandez Dep 91:19-92:10.

Additionally, Hernandez confirmed the pain he experienced using the ramp, in part, came from the absence of a safe resting place:

> Q. So I'm going to ask that again. So all the pain and anxiety that you say were the injuries you suffered as a result of these ramps, I mean that –
>
> A. And the fact that I fell –
>
> Q. Can you let me finish? Thank you.
> That's all as a result of there not being a resting spot on the ramp?
>
> A. Yes. The resting spot and the fact that it was too steep and too long.

Dkt. 122-22, Hernandez Dep 92:23-93:7.

32. [a] Plaintiff Hernandez stated that he could remember two occasions which he used a cart, [b] not that these were the only times he was able to utilize it. (Pl.'s Ex. 22, Hernandez Dep. 46:18–47:9, 56:19–57:13.)

**Response:** [a] Undisputed.

[b] Objection, misstates Hernandez's testimony. He stated "I believe it was twice that I went on the cart, that I recall. But I know for sure it was once." Dkt. 122-22, Hernandez Dep 57:9-13.

33. [a] Plaintiff Hernandez further testified that officers told him that he needed a "medical script" for a wheelchair to travel long distances because they would not be able to take him in the cart all the time, [b] not that they would refuse to transport him in the cart if he did not have a "medical script." (*Id.* at 56:19–57:13.)

**Response:** [a] Undisputed.

[b] Objection, the cited record does not support this statement. The record is as follows:

> Q. All right. So back to the pain. When you would feel pain after using either ramp, would you seek treatment from them for that pain?
>
> A. I would seek pain – but it was to the point where it got – to the point where they weren't listening, man. I could tell you that much. They didn't care – they didn't care.
> The police even told me, "tell them to give you a medical script for a wheelchair anytime you need movement to go far anywhere. We cannot take you on this cart all the time." They told me that. They would not provide you with a wheelchair until you got a medical - - I would ask them to give me a wheelchair, and they would take me on a cart.
> Sometimes - - two times I believe they told me. One was PRB board, and once I believe – I don't know where I went, but I believe it was twice that I went on the cart, that I recall. But I know for sure it was once."

Dkt. 122-22, Hernandez Dep 56:19-57:13.

Additionally, this statement is disputed. Hernandez was told by staff "that 'it's not going to be like this all the time, you got to get a script from the medical doctor to use a wheelchair'" during one occasion when the correctional staff escorted Hernandez to the Prisoner Review Board with a cart. Dkt. 122-22, Hernandez Dep 46:1-11.

34. Plaintiff Hernandez stated that the officers assisted him in the best way they could to get to his destination. (*Id.* at 51:2–24.)

**Response:** Objection, misstates Hernandez's testimony. Prior to this statement, Hernandez explained correctional staff did not provide assistance:

> Q. Mr. Hernandez, the question before was, did you ever have any officers refuse to assist you when requested?
>
> A. They told me that it wasn't going to be like that all the time. That they couldn't help me all the time; that I needed a medical script. I told you that already.
>
> Q. No. So you're telling me about the times that they assisted you and told you it wasn't going to be like that. I'm asking did you ever request assistance, say "oh, I'm having issues; I'm having troubles" –

> A. Yes, yes, yes. I'm going to tell you one time specifically, and then I'm going to stop there, because you keep asking me the same question.
>
> When I was transferred from Division 5 to Division 10, I actually got into it with the CO in the tunnel, and he called 10-10 on me, saying I was refusing to walk.
>
> And I told him, "why are you calling 10-10 on me, telling me I'm refusing to walk? I'm not refusing to walk; I'm telling you I got health complications." It was to the point where I damn near called it staff assault, due to the fact that I was so angered, and I would rather be saying to – I knew I wouldn't have to move anyway.
>
> I'd rather do that than deal with this that I was going through, Sir. And he's helping me carry my property at that time, so I told him, "look, I'm not denying or refusing to walk, I'm telling you I cannot walk long distances without stopping, Sir. I'm not refusing to do anything."
>
> And do to that, that's why I would explain to him every time I went – or any time I traveled anywhere, that I have problems.

Dkt. 122-22, Hernandez Dep 48:3-49:13.

35. Plaintiff Hernandez testified that he was never prevented from reaching an appointment, service, or destination. (*Id.* at 52:2–18.) Even on occasions when he needed to stop and rest, he was still able to complete the trip and access the appointment or service. (*Id.* at 52:19–23.)

**Response:** Undisputed.

36. Plaintiff Mathis admitted that the Cermak ramp never actually stopped or prevented him from accessing services or attending appointments. (Pl.'s Ex. 26, Mathis Dep. 29:8–14.)

**Response:** Objection, mischaracterizes the entire line of questioning where Mathis explains he did not attend appointments because he was in too much pain to travel to Cermak:

> Q. And same, same thing with the RTU ramp, when you've had these issues with the Cermak ramp and the pain in your knees, shortness of breath, have you ever actually been stopped or prevented from accessing services or

appointments?

A. No.

Q. You were always able to get where you need to go, correct?

A. Yes. Unless I just didn't feel like going over because my knee was giving me problems and I declined going over there.

Q. Going to take this down now.
Do you remember – you said sometimes you might have declined going down there. Do you know when you might have done that?

A. No, not offhand.

Q. Would it sound right that you might have refused a visit to Cermak on October 31, 2023?

A. I wouldn't know the date but –

Q. I'll mark as Exhibit 3. Are you able to see that?

A. It's so little I can't see what it's saying.

Q. Is that better? Are you able to see this though? I can make it larger if needed.

A. What I looking for?

Q. Can you confirm that you can see it, yes or no?

A. I can see a little.

Q. I will zoom in on the portion I want you to look at. I'm marking as Exhibit 3 this incident report from October 31, 2023.

Does it sound right? Does it look like this is an incident report from 2023, October 31st?

A. Yes.

Q. This states right here that they received a refusal from you, correct?

    A.    Yep.

    Q.    That was on October 31, 2023?

    A.    Yes.

    Q.    And do you know why you might have refused that day?

    A.    It probably was due to the flare-up. I only refuse when I have a flare-up.

    Q.    Would it sound right to you on February 16, 2024, you might have also refused?

    A.    Yes.

Dkt. 122-26, Mathis Dep 29:8-31:10.

    37.    Plaintiff Mathis stated that he was always able to get where he wanted to go, unless he "didn't feel like going over" due to his general knee pain. (*Id.* at 29:15–19.)

    **Response:**    Disputed. Mathis stated "I only refuse [to move to Cermak] when I have a flare-up." Dkt. 122-26, Mathis Dep 31:4-7. Based on defense counsel's examination, Mathis testified that he likely had a flare-up on October 31, 2023 and February 16, 2024, that caused him to "decline going over there" due to pain. Dkt. 122-26, Mathis Dep 29:8-31:10.

    38.    [a] Plaintiff Mathis testified that he told the correctional officers that he was experiencing pain in his foot, [b] to which the officers suggested that he go to the doctor to be treated, once Mathis told the officers that he was unable to complete the walk to the doctors the [c] officers arranged for Mathis to be transported. (*Id.* 55:22–56:23.)

    **Response:**    [a]    Undisputed.

        [b]    Objection that the officers "suggested" that Mathis go to the doctor. Mathis said the officers "kept trying to tell me that if I could walk and make it down there, I could be saved by the doctor. But I couldn't, I couldn't move." Dkt. 122-26, Mathis Dep 56:1-4. Mathis kept "telling the

guards that I needed some type of transportation, a wheelchair or something." *Id.* at 56:5-7.

[c]    Disputed.  The nurses arrived and arranged for Mathis to be transported to Cermak on this day. Dkt. 122-26, Mathis Dep 56:5-11.

39.    Plaintiff Mathis testified that officers escorted him on a cart once when his gout was bad and in a wheelchair once or twice when his foot was swollen.  (*Id*. at 33:13–34:8.)

**Response:**  Undisputed.

/s/    <u>Patrick W. Morrissey</u>

Thomas G. Morrissey, Ltd.
10257 S. Western Ave.
Chicago, IL 60643
(773)233-7901
pwm@morrisseylawchicago.com

*an attorney for the plaintiff class*