Transcript of the Testimony of
**ERIC DAVIS**

**Date:** October 23, 2024

**Case:** HERNANDEZ VS. DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

ERIC DAVIS
October 23, 2024

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CUAUHTEMOC HERNANDEZ and      )
WILLIAM MATHIS,               )
                              )
          Plaintiffs,         )
                              )
     vs.                      ) No. 23-cv-16970
                              )
THOMAS DART, SHERIFF OF COOK  )
COUNTY, and COOK COUNTY,      )
ILLINOIS,                     )
                              )
          Defendants.         )

        This is the Zoom deposition of ERIC
DAVIS, called by the Plaintiffs for examination,
taken pursuant to the Federal Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken
before Megan M. Reed, a Certified Shorthand
Reporter of said state, on October 23, 2024, at
2:30 o'clock p.m.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 2

1  A P P E A R A N C E S :
2
3      THE LAW OFFICES OF:
       THOMAS MORRISSEY, LTD.
4      BY:  MR. THOMAS G. MORRISSEY
            10257 South Western Avenue
5           Chicago, Illinois 60643
            (773) 238-4235
6
            Appeared on behalf of the
7           Plaintiff;
8
       THE LAW OFFICES OF:
9      DeVORE RADUNSKY
10     BY:  MR. JASON E. DeVORE
            MR. ZACHARY G. STILLMAN
11          230 West Monroe Street
            Suite 230
12          Chicago, Illinois 60606
            (312) 300-4479
13
            Appeared on behalf of the
14          Defendants.
15
16
17
18
19
20
21
22
23
24

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 3

1                  I N D E X
2  WITNESS                              PAGE
3  ERIC DAVIS
4  EXAMINATION BY:
   MR. MORRISSEY                         4
5
6
7
8
9              E X H I B I T S
10
11 MARKED                               PAGE
12
13 Exhibit No. 2                         10
   Exhibit No. 3                         86
14 Exhibit No. 6                         30
   Exhibit No. 7                         107
15
16
17
18     **** Exhibits not marked by reporter.
       **** Exhibits retained by counsel.
19
20
21
22                 *******
23
24

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 1

ERIC DAVIS
October 23, 2024

Page 4

1    (WHEREUPON, the witness was
2         first duly sworn.)
3         MR. MORRISSEY:  This is the Rule
4    30(b)(6) notice taken pursuant to notice
5    and continued by agreement by the parties.
6         (WHEREUPON, Exhibit No. 1
7              was marked for
8              identification.)
9    WHEREUPON:
10        ERIC DAVIS,
11   called as a witness herein, having been first
12   duly sworn, was examined and testified as
13   follows:
14        E X A M I N A T I O N
15   BY MR. MORRISSEY:
16        Q    Mr. Davis, I am showing you Exhibit 1,
17   which is Plaintiff's Rule 30(b)(6) notice.  Have
18   you had an opportunity to look at that exhibit?
19        **A    Yes.**
20        Q    And are you -- were you designated by
21   Cook County to respond to the topics that are
22   listed in that notice?
23        **A    For the ones relative to Cook County,**
24   **yes.  Some of them are relative to the sheriff,**

---

ERIC DAVIS
October 23, 2024

Page 5

1    **but yes.**
2         Q    Which ones are you -- which ones have
3    you been designated by Cook County to respond to?
4         **A    Let me look through here.  The first**
5    **one, the second one, and I think that's it.  I**
6    **think the other ones are all operational.  So**
7    **they are all the sheriff.  One and two.**
8         Q    Are you going to testify for the
9    sheriff in regards to topics one and two?
10        **A    No.**
11        Q    Do you know who's going to testify on
12   behalf of the sheriff for those --
13        **A    I don't.**
14        Q    What have you done to prepare to
15   testify in regards to topic one and topic two of
16   Plaintiff's Exhibit No. 1?
17        **A    I had one or more calls with counsel to**
18   **review this 30(b)(6) notice and then since they**
19   **are ongoing projects -- nothing specific that I**
20   **can think of offhand for the relative questions**
21   **or in response to the questions, but I have**
22   **been -- now those are projects that are ongoing**
23   **but specifically just reviewing them with**
24   **counsel.**

---

ERIC DAVIS
October 23, 2024

Page 6

1         Q    By counsel, who do you mean?
2         **A    The DeVore Radunsky folks.**
3         Q    What attorneys at that firm?
4         **A    I know I spoke with Zach.  I think I**
5    **also spoke with Jason.  I don't remember if I**
6    **have spoken with others.**
7         Q    What documents have you reviewed in
8    preparation for today's deposition?
9         **A    I don't remember taking the time out to**
10   **review any specific documents other than the**
11   **stuff in the notice itself.  As you are aware,**
12   **this is familiar ground.  So I don't recall**
13   **taking the time to look at anything else specific**
14   **other than reviewing points one -- questions one**
15   **and two.  I guess you call them questions.**
16        Q    In regards to topic one (a), the
17   recommendations, slash, findings contained in the
18   transfer package prepared by Globetrotters
19   Engineering Corporation, GEC, in regards to the
20   Cermak ramp, have you reviewed a transfer package
21   by Globetrotter?
22        **A    I note -- yes.  I know I have looked at**
23   **the transfer package, yeah.**
24        Q    And does the transfer package refer to

---

ERIC DAVIS
October 23, 2024

Page 7

1    the Cermak ramp?
2         **A    Yeah, it does, yeah.**
3         Q    We asked for the production of the
4    relevant documents in regards to the Cermak ramp,
5    which would include the transfer package.  We
6    haven't received it.  So I would ask you to
7    produce that document --
8         **A    Okay.**
9         Q    Not you, but I am asking the attorneys
10   that represent Cook County that they have an
11   obligation to produce --
12        **A    If I could, now that you mention it, I**
13   **believe in this case -- because, as you know, we**
14   **have a lot of ADA work going on, I believe in**
15   **this case, we went straight from there -- when**
16   **you say the transfer package, we went straight**
17   **from their report to the architect of record.  If**
18   **I recall, the direction was to just -- that we**
19   **ended up providing was to just go straight to HDR**
20   **without waiting for the transfer package because**
21   **the report had enough information that could get**
22   **going.  I would have to check, Tom.  As I said,**
23   **we have lots going on; but I believe in this case**
24   **that we didn't wait for a transfer package.  When**

Exhibit 1 Page 2

ERIC DAVIS
October 23, 2024

Page 8

1  I say transfer package, I am referring to the
2  information that is sort of directions.  So I
3  think in that case, now that I think of it, we
4  went straight from the report -- the assessment,
5  if you will, to the transfer package.  I believe
6  you have the assessment already; is that right,
7  Tom?
8      Q    This isn't my deposition.  Did
9  Globetrotters Engineering Corporation prepare a
10 transfer package that included the Cermak ramp?
11     A    You know, I would have to check.  As I
12 said, I think -- now that I think of it, I think
13 we went straight from the report.  They may have
14 subsequent.  Honestly, I would have to check.  I
15 don't recall.  I think we went straight from the
16 assessment to the architect of record for this
17 one, for the sake of expediency.  If we did have
18 one, I have no problem sending it to you; but I
19 believe -- I think in that case, we didn't -- I
20 will have to check, Tom.  I apologize.  I would
21 have to check.
22     Q    Topic one (b), the specific steps taken
23 to date by HDR Architects in the planning,
24 design, and development phase for the renovation

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 9

1  of the Cermak ramp --
2      A    Okay --
3      Q    -- so my first question is, did you
4  review any documents in regards to that topic?
5      A    Yes.
6      Q    What documents did you review?
7      A    I believe the most recent documents
8  that I have reviewed are 60 percent complete
9  drawings that are the development of the
10 construction permit drawings in process.  I think
11 60 percent is the most recent set that I have
12 looked at.
13     Q    What other documents have you reviewed
14 from HDR in regards to their work in designing
15 the Cermak ramp?
16     A    I seem to recall in this case they
17 issued a -- when they looked over the assessment,
18 they issued an initial response that may have had
19 some questions.  Again, I don't -- I don't
20 recall.  I think they developed an initial
21 feedback.  In other words, we gave them the
22 assessment.  If memory serves me, we gave them
23 the assessment from Globetrotters.  They looked
24 at it.  They generated some questions, and then

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 10

1  they preceded to develop the drawings based upon
2  our response to the questions.  There may be
3  other incidental documents.  Nothing comes to
4  mind.  That's it, yeah.
5               (WHEREUPON, Exhibit No. 2
6               was marked for
7               identification.)
8  BY MR. MORRISSEY:
9      Q    I am showing you Plaintiff's Exhibit
10 No. 2.  It says:  Cook County Government Cermak
11 Tunnel Renovation Program Analysis Report,
12 August 2nd, 2024.  Have you seen this document?
13     A    That's the one I was mentioning that I
14 believe I looked at, yeah.  This is their
15 response to the initial assessment by
16 Globetrotters, yeah.
17     Q    If we look at this document, there is a
18 schedule on the document; correct?
19     A    Probably.  I don't have it in front of
20 me.  Yeah, that looks right --
21     Q    Well, I am showing you.
22     A    That's it.
23     Q    Looking at -- I believe it is under
24 schedule by -- the report by HDR Architects, it

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 11

1  has various tasks that HDR was going to
2  accomplish during the design drawing for the
3  ramp; correct?
4      A    Yeah.  Yeah, that is their proposed
5  schedule, yeah.
6      Q    Now on July 22nd, 2024 -- I will strike
7  that question.
8           Have you had any meetings with HDR
9  in regards to the Cermak ramp?
10     A    I have attended a couple or a few of
11 the project progress meetings on this, yeah.  I
12 have attended some meetings about it.  We had a
13 team work on this.  It is not just me.  We have a
14 team working on it.
15     Q    To your knowledge, who else from Cook
16 County participated in meetings with HDR?
17     A    As far as Cook County employees, I
18 think the only other employee of our department
19 is Bradley DeRoo.  He is our project director for
20 this one.  I am trying to think of anybody else.
21 We would have had someone from the department of
22 facilities management involved in some of the
23 discussions with them.  I don't remember if it
24 was TJ or who it was specifically from DFM.  As

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 3

ERIC DAVIS
October 23, 2024

Page 12

1  far as other Cook County employees, I can't think
2  of others offhand.
3      Q   Now if we look at the schedule, it
4  says, under number four, item number four, it
5  says:  Develop program analysis report.  Can you
6  tell me what a program analysis report is in
7  relation to the work that a firm like HDR would
8  do?
9      A   Well, the program analysis report is
10  the document that you are showing me.
11      Q   So that's Exhibit No. 2?
12      A   Yeah.
13      Q   And did you review this report then --
14      A   Yes.
15      Q   -- or somebody underneath you?
16      A   Both.
17      Q   Under number six, it says:  Meeting
18  number three, program analysis report.  That has
19  August 9th, 2024.  Did you participate in the
20  meeting on that date?
21      A   I would have to check my calendar.
22  Probably, but I would have to check to be sure;
23  and I don't know.  This is a proposed schedule.
24  I don't know recall if it was on August 9th, on

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 13

1  or about.  So I would have to check my calendar.
2  Probably I did.
3      Q   I am looking at the top of this
4  schedule; and it has different headings, task
5  name, duration, start, and finish.
6      A   Yeah.
7      Q   So under each of these items, does it
8  indicate that the firm, HDR, completed each task?
9      A   No.  Sometimes you do schedules.  This
10  is generated in a program like Primavera or
11  Microsoft Project; and in the program, you may or
12  may not include the actual dates as opposed to
13  the planned dates to see how you are doing.  As
14  you can see, this is a snapshot of a PDF.  So I
15  don't believe -- this particular one we are
16  looking at doesn't have an actual versus
17  projected dates.  I don't know offhand if they
18  developed a version of that that way, or they
19  just worked the schedule and kept going.  I don't
20  know offhand if they produced -- generated a
21  schedule that shows actuals as well as projected
22  dates.
23      Q   Now under task number eight, it says:
24  Schematic design documentation --

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 14

1      A   Yeah.
2      Q   -- that has a date of Monday,
3  August 12th, 2024.  To your knowledge, did the
4  County receive schematic design documents for the
5  Cermak ramp?
6      A   I would have to go back through and
7  check.  I would assume so since we are at
8  60 percent.  I think they actually labeled them
9  30 percent complete drawings.  I think we did
10  30 percent and 60 percent; but I would have to
11  check, Tom.
12      Q   You have been designated as the
13  County's designee in regards to these topics --
14      A   Yeah.
15      Q   -- are you not prepared to testify
16  today in regards to the topics that are listed
17  under number one in regards to whether or not the
18  County, for instance, received schematic design
19  documentation?
20      A   I reviewed the questions in the
21  30(b)(6) notice, and I can outline the steps.
22  You have the information here.  It is a fair
23  amount of information.  We have hundreds of
24  projects underway, Tom.  So --

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 15

1      Q   Well, I don't --
2      A   -- I am not sure -- in answering your
3  question, am I prepared to testify about what is
4  going on on the project based upon the things in
5  your notice, yeah, I can testify about those,
6  absolutely; but understand that a project like
7  this, like any project, has a lot of people
8  involved.  There is a lot of documentation, and
9  we have a lot of projects.  So you know, to
10  suggest that I am not prepared to speak about the
11  project would be inaccurate; but to suggest that
12  I am able to speak to every single element and
13  detail it would not be accurate either.
14      Q   Well, the plaintiff issued a 30(b)(6)
15  notice; and it's incumbent upon the designee of
16  Cook County to prepare for the deposition and,
17  there was a production request that asked for
18  these various documents.  I followed it up a few
19  days ago with defense counsel asking whether
20  there were documents in regards to the design of
21  the Cermak ramp.  So I am entitled to those --
22  that information when I sit down and take the
23  County's designee, that the person has the
24  documents, the documents have been turned over,

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 4

ERIC DAVIS
October 23, 2024

Page 16

```
1   and the person is prepared to testify.  So as you
2   sit here today, do you know whether or not
3   schematic design documents have been reviewed by
4   Cook County?
5        A    I believe so.  I don't know if I am
6   allowed to check in the computer while I am
7   talking to you.  I understand that I am not; but
8   typically that kind of information, you would
9   have it and, if asked, could check the
10  information.  I can't tell you offhand.  I
11  believe so --
12       Q    So you are not prepared without looking
13  at some documents, is that correct --
14       A    Are you prepared without looking at
15  documents, Tom?  No.  We have a lot of
16  information, and your questions are -- at times,
17  cover lots and lots of ground and, at times, are
18  very specific.  There is a lot of information
19  here.  I think your notion of not prepared is a
20  mischaracterization.
21       Q    I am asking a specific question --
22       A    Okay.
23       Q    -- and the specific question involves
24  has Cook County reviewed and approved schematic
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 17

```
1   design drawings?
2        A    I am going to have to tell you I
3   believe so, but I will have to check.  I am
4   pretty sure we have given all the documents that
5   we received unless something came in while I was
6   out.
7        Q    The only -- what documents should I
8   have received at this stage of the design and
9   developing phase for the Cermak ramp?
10       A    I can't answer that question without
11  going back and looking at what you asked for.
12       Q    Mr. Davis, I am asking you, at this
13  stage of HDR's work, what documents have been
14  tendered by HDR to Cook County?
15       A    As I said, I believe the most recent is
16  the 60 percent complete drawings, which would be
17  akin to design development.  Sometimes engineers
18  and architects refer to them by different terms.
19  So I believe you are looking at line sixteen, the
20  design development.  I believe we received that
21  document, for example.  I think that is -- yeah,
22  I think --
23       Q    Do you have that document in your
24  computer?
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 18

```
1        A    I would have to look for it.  Again, as
2   I said, I don't know if I am allowed to do so --
3        Q    We will take five minutes, and you can
4   look for that document and provide it to me so I
5   can ask you questions about it.  If I don't have
6   the documents, I obviously can't ask you
7   intelligent questions; and this information
8   should have been turned over prior to the
9   deposition.  So we will take five minutes --
10       A    Why don't you ask me what you are
11  looking for?
12       Q    I am asking for the documents that Cook
13  County received from HDR involving the planning,
14  design, and development for the Cermak ramp --
15       A    Again, I will go look for them.  We
16  will get back in five minutes.  I would note that
17  the schedule is a proposed one.  I can't testify
18  to whether or not it was met to the exact date or
19  not, but I can go look.
20            MR. MORRISSEY:  We will come back at
21       2:55.
22            (WHEREUPON, a short break
23             was had from 2:49 p.m. to 2:54 p.m.)
24            MR. MORRISSEY:  We are back on the
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 19

```
1   record.
2   BY MR. MORRISSEY:
3        Q    Mr. Davis, have you had an opportunity
4   to look at your computer to see --
5        A    Yes.
6        Q    -- what documents were tendered by HDR?
7        A    Yes.
8        Q    And what documents were tendered by
9   HDR?
10       A    In terms of what I looked at earlier
11  this month, I was asked by counsel in terms of
12  providing -- to provide the documents that we
13  had.  At the time, the only thing we had was the
14  Cermak -- was the program analysis report that
15  you were showing later.  Since then, more
16  recently than that inquiry, we received the
17  design development drawings; but those are
18  preliminary.  We haven't had the meeting yet that
19  was scheduled on the 18th to -- per that schedule
20  to look at the DDD drawings yet.  We --
21       Q    So you received these --
22       A    Yeah, we received the meeting -- the
23  meeting five design development drawings.  We
24  haven't had the meeting to go through them with
```

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 5

ERIC DAVIS
October 23, 2024

Page 20

1  the architect yet.  So they are preliminary.
2  They are not final.  They are not final DD
3  drawings.  So that meeting that was projected on
4  10/4 hasn't occurred yet, as best I can tell.  I
5  just looked at my calendar.  I didn't see it on
6  the schedule yet.
7      Q    What about the schematic design
8  drawings, which is item number twelve?
9      A    I looked; and in the time that we had,
10  I didn't find those.  I can keep looking.  We may
11  have gone straight to DD.
12      Q    So in order to address what documents
13  have been received by Cook County from HDR, you
14  have to do a further review of your work papers
15  to see what Cook County received from HDR?
16      A    Let's see here, looking through to see
17  what I pulled up.  I have the DD set.  Let's see
18  here --
19      Q    Mr. Davis, can you tell me what
20  documents -- where are you searching now?  In
21  your computer database for documents that Cook
22  County has received from HDR Architects --
23      A    I am looking for documents that were
24  sent to me.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 21

1      Q    By whom?
2      A    Usually either by our ADA consultant,
3  Kate Susmilch, or by the project director, Brad
4  DeRoo.
5      Q    So ADA consultant, and what is the name
6  of that firm?
7      A    LCR (sic) Architects.
8      Q    Pardon?
9      A    LCR Architects --
10      Q    What is the name of the ADA --
11      A    It is L, as in loud, C as in cloud, M.
12      Q    What is their role in designing and
13  planning the development phase for the Cermak
14  ramp?
15      A    Their firm is part of the construction
16  management team, which is assisting the County in
17  the management of the design and construction
18  projects in the public safety portfolios.
19  Specifically, LCM Architects have expertise in
20  accessibility, ADA, et cetera, and so --
21      Q    Have you -- in preparation for today's
22  deposition, have you talked to LCM Architect to
23  find out specific steps taken by HDR Architects
24  in the planning, design, and development phase

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 22

1  for the renovation of the Cermak --
2      A    I did not review the 30(b)(6) question
3  that you just repeated with LCM Architects.
4      Q    Okay --
5      A    I don't know if I am allowed to do
6  that.  I am not a lawyer.  No, I don't know.
7      Q    What person or persons at LCM
8  Architects would you talk to or consult in order
9  to find out what steps have been taken by HDR
10  Architects in the planning, design, and
11  development phase for the renovation of the
12  Cermak --
13      A    The person you are asking about is a
14  woman named Kate Susmilch.  It is
15  S-u-s-m-i-l-c-h.  She is an architect at LCM, and
16  she is serving as the project manager from the
17  ARA Construction management team supporting
18  County staff on the Cermak ramp project.
19      Q    But you haven't talked to her about the
20  Cermak ramp project?
21      A    I have talked to her many times about
22  the Cermak ramp project.  I haven't talked to her
23  specifically in advance of this deposition.
24      Q    What topics have you talked to her

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 23

1  about in regards to the Cermak ramp?
2      A    I couldn't even begin to answer that
3  because we have talked about a lot for a long
4  time over a long period of time, Tom.  Could you
5  be more specific?
6      Q    What I am concerned about here,
7  Mr. Davis, are the topics in the notice that is
8  Exhibit No. 1.  For example, the total project
9  costs for the Cermak ramp.  Have you talked to
10  her?
11      A    I have talked to her about the process
12  of developing the project cost.  The contractor,
13  at this point in the process, is actually
14  developing the pricing package.  So we don't have
15  a total cost projected on the work at this point;
16  but I have talked to her about the project costs,
17  yes.
18      Q    And what is the estimated project costs
19  for the Cermak ramp based upon your preparation
20  for today's deposition?
21      A    The only thing that I can tell you so
22  far is that the current budget for the 2025 and
23  the construction is approximately $600,000.  That
24  is an estimate; and this is the kind of thing

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 6

Page 24

1  where, because it is a requirement -- in other
2  words, as you know, Tom, the ADA is a law.  It is
3  not an ordinance.  We will construct whatever is
4  needed to be constructed, and so we can put an
5  approximate number in there; but whatever it is
6  going to turn out to be, whatever it takes, is
7  what we are going to allocate for it.
8      Q    Do you have any documentation to
9  support the expenditure of $600,000 for the
10 renovation of the Cermak ramp?
11     A    Your question is unclear.  There is a
12 difference between allocation and expenditure.
13 Are you asking about how much we budgeted or
14 funds expended to date?
15     Q    My question is you mentioned that you
16 budgeted $600,000 --
17     A    Yes.
18     Q    -- for the construction of the Cermak
19 ramp?
20     A    Yes.
21     Q    Do you have any documentation to
22 support that budget estimate?
23     A    As I recall, that was generated based
24 upon an evaluation of the cost of the work on the

Page 25

1  Leighton bridge, just on a rare -- on a rough per
2  square foot basis.  By the nature of this
3  project, since it is done underground and in a
4  secure environment, it is difficult to project
5  the costs until you have actually sat down with
6  the documents and priced it out.  So we put in a
7  preliminary budget estimate with the
8  understanding in this case that it could be
9  significantly more or less, not really knowing
10 because there are a lot of unknowns in this
11 project.  It involves excavating the existing
12 ramp structure.  We don't know what is underneath
13 it.  We don't know the condition of the soils,
14 et cetera.  So we are going to have to wait until
15 we can do some investigation to find out
16 everything as far as the cost.  So we can only go
17 by the information we have, which is an
18 approximation based upon what the cost was to do
19 the ramps and the bridge in the Leighton
20 courthouse.
21     Q    I am concerned initially here in
22 regards to what documents you are basing your
23 testimony on today.  Now you have mentioned that
24 there is a preliminary budget estimate of

Page 26

1  $600,000.  What document is that figure
2  memorialized in?
3      A    I would have to check.  I know that we
4  asked a team to look into it.  I couldn't tell
5  you the specifics offhand.  I know that we put a
6  document -- we put a number in there -- the team
7  put a number in there based upon what they found
8  out when they talked to the team that built the
9  Leighton courthouse.  As to what the --
10     Q    Let me ask you --
11     A    -- specific documents are, I can't tell
12 you --
13     Q    You are saying you put that number in
14 some document --
15     A    Yeah.
16     Q    -- my question is very specific.  What
17 document did you enter a preliminary budget
18 amount of $600,000 for the Cermak ramp?
19     A    That was entered in the draft capital
20 improvement plan for fiscal year 2025, which has
21 been presented by, I believe, actually -- it is
22 being presented tomorrow by the board president
23 of the Board of Commissioners for their
24 consideration and subsequent vote at the November

Page 27

1  meeting.  So it was provided to the budget
2  department as a part of the overall County
3  budget.
4      Q    Is it specific to --
5      A    Yes.
6      Q    -- the Cermak ramp?
7      A    Yes.
8      Q    Okay.  I don't have that document.  We
9  requested that type of information in production,
10 and I would ask that document be turned over
11 promptly --
12     A    Okay and so --
13     Q    -- what other --
14     A    I am sorry.  To deal with the
15 insinuation that we are hiding something from
16 you, I am sorry.  It is a confidential draft
17 document.  It is not official until it has been
18 presented by the president of the Board of
19 Commissioners.  If you would like to look at it
20 once she presents it on Thursday, it is available
21 to the public --
22     Q    Mr. Davis --
23     A    -- until then, it is a draft and
24 confidential document; and we don't release it.

Exhibit 1 Page 7

ERIC DAVIS
October 23, 2024

Page 28

```
 1      Q      Mr. Davis, in all due respect, this is
 2  litigation.  We asked for these documents to be
 3  produced prior to the 30(b)(6) designee's
 4  deposition --
 5      A      With all due respect --
 6      MR. STILLMAN:  Objection.  It is
 7  argumentative.
 8  BY MR. MORRISSEY:
 9      Q      -- so I can intelligently as questions
10  in regards to the progress of the renovation of
11  the Cermak ramp --
12      A      With all due respect, Tom, I can't give
13  you that document until it has been released to
14  the public.
15      Q      Please don't interrupt me.
16      A      Then don't interrupt me.
17      Q      A production request was tendered to
18  defense counsel, and we asked as recently as
19  yesterday whether there were any documents; and
20  we were told there weren't any documents.  What
21  other documents are there in regards to the
22  Cermak ramp that were tendered by HDR or this
23  outside consulting firm, LCM?
24      A      Let me try to answer the questions that
```

ERIC DAVIS
October 23, 2024

Page 29

```
 1  you have asked.  To the one that you were just
 2  asking about, the provision of the information
 3  about the budget in the capital improvement plan,
 4  I am not authorized to release that information.
 5  It is drafted in confidential until it has been
 6  released to the public by the president.  So even
 7  though the information has been developed, it is
 8  not official.  We are not hiding it from anyone.
 9  We are not failing to produce it.  I am not
10  allowed to produce it until it becomes public.
11  It becomes public I believe tomorrow --
12      Q      Mr. Davis --
13      A      -- your other question --
14      Q      -- let me --
15      A      I am sorry, Tom.  You asked me to wait.
16  I am going to ask you to wait.  To your other
17  question about producing other documentation, as
18  I said, we have a preliminary version of the
19  design development documents, which we are going
20  to have a meeting and go and review.  At the time
21  that counsel asked me about it, I didn't have
22  that yet, okay.  So this continued insinuation
23  that we are hiding things from you is simply
24  inaccurate, but what do you want to know?  Are we
```

ERIC DAVIS
October 23, 2024

Page 30

```
 1  going to build it?  Yes, we are going to build
 2  it.  Has HDR been assigned to design it?  Yes,
 3  they have been assigned to design it.  Do we have
 4  a contractor under contract to construct it?
 5  Yes, they are going to construct it.
 6      Q      Mr. Davis, you just told me that it was
 7  a confidential document.  The executive budget
 8  recommendation is a confidential document.  I
 9  would ask you to pull up the -- from the website,
10  the Cook County Board --
11      A      They may have posted it in advance of
12  the board meeting.  I don't work for the board.
13  They may have posted it --
14      Q      So I am going to show now the document,
15  which you say your counsel couldn't turn over to
16  me.  It is the 2025 capital improvement project,
17  and if we look at -- we are going to mark this as
18  exhibit -- we will mark it as Exhibit 6.  It is
19  the capital improvement documents, page 288 of
20  333.
21                  (WHEREUPON, Exhibit No. 6
22                  was marked for
23                  identification.)
24
```

ERIC DAVIS
October 23, 2024

Page 31

```
 1  BY MR. MORRISSEY:
 2      Q      If we look at this document, does it
 3  have any --
 4      A      Okay.  So they posted it.  All right.
 5  I don't get to do that.  They get to do that.
 6      Q      But you didn't -- this document wasn't
 7  tendered to us prior to today's deposition --
 8      A      I wasn't aware it was able to be
 9  tendered, Tom, until you showed it to me just
10  now.
11      Q      What other documents are there from HDR
12  Architects in regards to the plan, design,
13  development phase, which you haven't testified to
14  so far?
15      A      I am not sure I understand your
16  question because what I have told you already is
17  that we received the program analysis report.  We
18  have reviewed that.  We received -- after counsel
19  asked me about documents and I said we didn't
20  have anything at the time, we received the
21  preliminary design development documents, which
22  we haven't had a chance to go through with HDR.
23  That is the -- I can look for the schematic
24  design documents.  They may have been tendered,
```

Exhibit 1 Page 8

ERIC DAVIS
October 23, 2024

Page 32

1  or we may have gone straight to DD.  Offhand, I
2  just don't recall whether we have.  What is
3  important is where we are right now; and we are
4  going to go over the DD drawings, which are
5  approximately 60 percent the final drawings.
6      Q   Do you have the preliminary design
7  drawings?
8      A   I have the draft.
9      Q   Okay.  I would -- we asked for all
10 documents to be produced.  We don't have them.
11 So are there any other documents that have been
12 tendered by HDR Architects --
13     A   My understanding is until a document
14 has been official, that we don't have to go
15 through all the drafts with you, Tom.  It is a
16 draft.  We haven't had a chance to look at it yet
17 with them.  It is a draft.
18     Q   Well, Mr. Davis, the request was made
19 to your counsel whether or not there are any
20 documents; and we don't have those documents.  So
21 I can't intelligently depose you as the designee
22 for Cook County --
23     A   Tom, I can't be responsible for your
24 ignorance of the design process.  A set of

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 33

1  documents like that are produced on an ongoing
2  basis.  They are developed incrementally over
3  time with a series of drafts; and they are
4  incomplete until you reach a major milestone,
5  which is what a DD document is, okay.  I mean,
6  they exist; but they are in draft form.  That is
7  why we say draft.  They are not -- they are not
8  done.  So are we supposed to have the architect
9  print where they are every single day and send it
10 to you?  Is that what you are asking, Tom,
11 because that would be the only way to achieve
12 what you are talking about.  Have them stop at
13 the end of the day and PDF everything that they
14 have so that every single increment of the draft
15 was produced to you.  Otherwise, we have to do
16 the major milestones, which is what we are doing.
17 When we have had a chance to go through the DD
18 documents, we will provide them to you; but your
19 ignorance of the design project is not helpful --
20     Q   Mr. Davis, it doesn't help for you to
21 be argumentative.  I am trying to --
22     A   It doesn't help for you to be
23 argumentative either, Tom.
24     Q   I am asking you questions that you have

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 34

1  been designated by Cook County to answer.  I am
2  trying to find out exactly the timetable for the
3  renovation of the Cermak ramp, and I would
4  appreciate you to address the topics that are in
5  number one.  Now under the schedule, it reflects
6  design development phase; and that was
7  September 9th, 2024.  Now you --
8      A   The start of it.
9      Q   -- told me that you are now just
10 initiating a review of the design development
11 documents --
12     A   No.  What you just said is incorrect,
13 Tom.  No.  If you look at the schedule that is on
14 your screen, September 9th is the beginning of
15 the design development phase.  It was projected
16 to be completed on October 4th.  It is completed
17 later than that, but it was projected on -- so
18 when you say -- when you say oh, it was projected
19 September 9th but you are only getting it now,
20 you are implying that it is over a month late;
21 and it is not.  You are not understanding the
22 information clearly.
23     Q   Well, the design development phase is
24 complete.  Is that what you are telling me?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 35

1      A   They have submitted a draft for us to
2  review, and if you notice on item sixteen on the
3  thing that is on your screen is a meeting to
4  review the design development documents.  What I
5  am telling you is we have not had that meeting
6  yet, not that I am aware of.  I don't recall
7  having gone through the specifics.  I can check.
8  I just checked my calendar.  I don't remember
9  having a meeting to go through the DD documents.
10     Q   Do you know whether or not the
11 schematic design review has been done by Cook
12 County?
13     A   Asked and answered.  I don't know
14 offhand.  I know that we are in DD right now.
15     Q   You go to the schematic design --
16     A   If there was --
17     Q   Let me rephrase the question.  How can
18 you go to the design development phase if you
19 don't even know whether or not the schematic
20 design review has been done by Cook County?
21     A   In a project like this that has a
22 relatively defined scope, there are times when
23 you can accelerate the schedule.  Again, I will
24 have to go look.  I don't recall offhand.  I

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 9

ERIC DAVIS
October 23, 2024

Page 36

1   looked.  I didn't find an SD package; but given
2   the fact that the information in the program
3   report was fairly specific, this report that you
4   are looking at here is fairly specific.  There
5   are elements in this report that I would frankly
6   characterize as schematic design elements.  I
7   would have to check with my team.  It may be a
8   case we decided to go ahead and move to DD in the
9   interest of expediency.
10      Q   I am going to move on to topic two
11  because you are not -- from what I can gather,
12  you haven't reviewed whatever documents have been
13  tendered by HDR Architects.  Therefore, you are
14  not competent today to testify to those topics.
15  So I am going to ask that somebody be reproduced
16  by Cook County to address topic one because I
17  don't want to go and ask questions where there is
18  documents outstanding, which have not been
19  produced, and where the witness is not prepared
20  to address the critical stages that were outlined
21  by HDR.  So we will go to topic number two --
22      MR. STILLMAN:  Tom, I think he is
23  addressing your questions pretty clearly --
24

---

ERIC DAVIS
October 23, 2024

Page 37

1   BY THE WITNESS:
2       A   I reject your characterization that I
3   am not competent to discuss it, Tom.  What do you
4   want to talk about?  You want to talk about
5   the --
6   BY MR. MORRISSEY:
7       Q   I disagree because I --
8       A   -- clearance in front of the doors?  Do
9   you want to talk about the phasing plan that is
10  in the DD set?  I have gone over them, but we
11  haven't had a chance to sit down and talk about
12  it with the architects.  I have reviewed the
13  drawings.  I have looked at them.  What questions
14  do you have?  I just haven't gone through it with
15  the architect.
16      Q   You have looked at the schematic
17  drawings?
18      A   I have looked at the DD drawings.  I am
19  looking at the DD drawings, the draft they
20  provided.
21      Q   They haven't been tendered to --
22      A   Okay.  Once again, because they are a
23  draft.  They are not official yet.
24      Q   Well, I can't --

---

ERIC DAVIS
October 23, 2024

Page 38

1       A   When they are official, you can have
2   them.
3       Q   Mr. Davis, in all due respect --
4       A   Yes, Tom.
5       Q   -- the documents that I need to
6   intelligently depose somebody from Cook County in
7   regards to topic one have not been turned over in
8   production, and I have asked for those documents;
9   and so I am going to respectfully move on to
10  topic two, and we will readdress those issues at
11  a later date.  Now topic two --
12      MR. DeVORE:  I think this is going to
13  be your one chance to do this --
14  BY THE WITNESS:
15      A   You want to talk about item (e), for
16  example, the process of selecting the contractors
17  and proposals and all that in question one, I am
18  happy to talk about that.
19      MR. STILLMAN:  What you are asking
20  for are documents that don't yet exist and
21  aren't yet ready to be shared.  You
22  can't -- if you want to take this to a
23  motion to compel, you are welcome to; but
24  this is the place to discuss that.  I think

---

ERIC DAVIS
October 23, 2024

Page 39

1   you can still --
2       MR. MORRISSEY:  Jason, the witness
3   clearly is not prepared to talk about topic
4   one --
5       THE WITNESS:  That is your
6   interpretation.
7       MR. STILLMAN:  To suggest Mr. Davis
8   is not prepared to talk about any of these
9   topics is a wild --
10      THE WITNESS:  That is your
11  interpretation.  Just because I am not
12  giving you answers that you like, Tom,
13  doesn't mean I am not prepared to talk
14  about it.
15      MR. DeVORE:  Significant difference.
16  The witness has just said he is prepared to
17  talk about this.  You know he is prepared,
18  and you just don't like the fact that you
19  haven't received a draft document that he
20  has repeatedly said is confidential.  So --
21      MR. MORRISSEY:  He said --
22      THE COURT REPORTER:  Tom, you are
23  muted.
24

Exhibit 1 Page 10

ERIC DAVIS
October 23, 2024

Page 40

```
 1              (WHEREUPON, a discussion off
 2         the record was held.)
 3         MR. MORRISSEY:  The witness
 4    previously testified, for instance, that
 5    the budget document where they have
 6    estimated $600,000 for the renovation of
 7    the ramp was not a public document and was,
 8    therefore, not turned over to us before the
 9    deposition.  That apparently is inaccurate
10    as the witness now admits.  That should
11    have been turned over.
12         MR. DeVORE:  As of today --
13         MR. MORRISSEY:  Number two, he says
14    that there are other documents such as the
15    DD design documents that he has in his
16    possession, which were not turned over
17    prior to --
18         THE WITNESS:  Because they are not
19    done.
20         MR. MORRISSEY:  They are in
21    possession of the defendant.  I would like
22    to take a two-minute break.
23              (WHEREUPON, a short break
24              was had from 3:18 p.m. to 3:22 p.m.)
```

ERIC DAVIS
October 23, 2024

Page 41

```
 1         MR. MORRISSEY:  We are back on the
 2    record.
 3    BY MR. MORRISSEY:
 4    Q    Going back to Exhibit 2, the schedule?
 5    A    Yes.
 6    Q    Are you there, Mr. Davis?
 7    A    Yes, I am here.  I can hear you.
 8    Q    Looking at Exhibit 2, the schedule, is
 9    this considered a critical phase schedule?
10    A    I think you could characterize it as
11    such.
12    Q    What is a critical phase schedule in
13    the architectural field?
14    A    I am not familiar with that specific
15    term as an official milestone; but based upon the
16    phrase itself, it would be a schedule --
17    projected schedule for the project.  In this
18    case, design construction.
19    Q    When the schedule is altered or not
20    completed on time, is there a revision of the
21    schedule so that all the participants are aware
22    of the stage project is in?
23    A    Usually.  It depends on the scope and
24    size of the project; but usually, yeah.  That
```

ERIC DAVIS
October 23, 2024

Page 42

```
 1    might happen at major milestones.  In larger,
 2    more complex projects, you will have a schedule
 3    review at every single project progress meeting,
 4    typically during more construction than design.
 5    You won't typically have day-to-day meetings that
 6    would have that; but when you are doing
 7    construction, you know, generally, you could have
 8    a weekly construction meeting.  You will do an
 9    update to the construction each time you meet.
10    In the design phase, which is what we are in now,
11    an update of the schedule at a major milestone is
12    more common.
13    Q    If we look at the schedule, for
14    instance, item number one, it says:  Meeting
15    number one, project kickoff; and then if we go
16    all the way over to the column after finished,
17    there is a line; and then it drops down to the
18    next item.  Do you see that?
19    A    Yeah --
20    Q    Does that mean that part of the
21    critical phase has been completed?
22    A    In that case, I believe so, yes.  That
23    is fair to say.
24    Q    Why?  Looking at this document, why
```

ERIC DAVIS
October 23, 2024

Page 43

```
 1    does that tell us that critical phase has been
 2    completed?
 3    A    Well, in this particular schedule, if
 4    you look at the green bars on the left-hand side,
 5    you have the light green and dark green.  The
 6    dark green bars are what some people refer to as
 7    a roll up bar.  In other words, let's take
 8    assessment phase, which is the next one.  The
 9    assessment phase indicates in the dark green bar
10    that it runs from -- is projected to run from
11    July 22nd through August 9th; and then below
12    that, you have the sub tasks.  The first sub task
13    starts on July 22nd, and the last sub task ends
14    on August 9th.  So the roll up for that phase
15    would run from July 22nd to August 9th.  In the
16    elements before the assessment phase, there isn't
17    a roll up on this particular schedule.  So there
18    isn't a dark green bar, but the darker green --
19    the dark green bars in the task list, which
20    correspond to the green project bars in the
21    schedule to the right, are roll ups of the sub
22    tasks that happen beneath them.
23    Q    If we look at that --
24    A    By the way, Tom, I have a piece of
```

Exhibit 1 Page 11

ERIC DAVIS
October 23, 2024

Page 44

```
 1   additional information I would like to share with
 2   you, if that's all right --
 3       Q   We will come to that --
 4       A   It is answering an earlier question --
 5       Q   I will come back to that.
 6       A   So you don't want the information?
 7   Okay.
 8       Q   If we look at the schedule, there is a
 9   long vertical line that is right under --
10       A   Yeah.
11       Q   What does that indicate, that line?
12       A   That is a common feature in project
13   scheduling software, an indication of the date
14   when this particular snapshot of the schedule was
15   made.  So from this, based upon the milestone
16   dates in between, it looks to me like this
17   particular schedule was PDF'd and exported around
18   the end of July, probably around the 24th or
19   25th.  That is the date that this particular
20   schedule was memorialized, if you will.
21       Q   HDR could do a snapshot of where the
22   project is currently, correct?
23       A   Yeah.  I would imagine that they would,
24   yes.  I would imagine when they --
```

ERIC DAVIS
October 23, 2024

Page 45

```
 1       Q   Well, this --
 2       A   -- to finish answering your question,
 3   at the completion of the design development
 4   phase, in addition to the drawings, they would
 5   issue a revised schedule.  I don't know if they
 6   provided it yet or not.  As I said, I have seen
 7   the drawings.  I haven't seen if they have an
 8   updated schedule.  They may provide that at the
 9   meeting.
10       Q   After July 24th, 2024, has HDR provided
11   Cook County with an update of their schedule?
12       A   They may have.
13       Q   That is a critical document that should
14   have been provided through discovery, and we
15   don't have that.  Can you --
16       A   In your opinion.
17       Q   Can you look in your computer and see
18   whether or not there is an updated schedule --
19       MR. STILLMAN:  I am going to object
20   to looking through here.  He produced what
21   he produced before this.  If you need
22   something else, you can issue a further
23   request to produce.  We have kept up our
24   obligation to continue producing official
```

ERIC DAVIS
October 23, 2024

Page 46

```
 1   versions of documents.
 2       MR. MORRISSEY:  The production
 3   request is required to be supplemented.  I
 4   reached out to Mr. Stillman yesterday to
 5   ask whether or not there have been any
 6   additional documents from HDR Architects;
 7   and this is something that is critical for
 8   this deposition to know exactly where HDR
 9   is as far as the planning, design, and
10   development phase; and apparently this
11   document would provide relevant information
12   in regards to the critical phase of their
13   undertaking.  So I would ask that you
14   produce that document so that we can
15   intelligently ask questions in regards to
16   these topics --
17       THE WITNESS:  When it is complete and
18   official, I will be happy to send it to
19   you.
20       MR. MORRISSEY:  -- so we are going to
21   ask that topic be revisited at another time
22   with a designee from Cook County --
23       THE WITNESS:  Tom, I need --
24       MR. STILLMAN:  This won't be
```

ERIC DAVIS
October 23, 2024

Page 47

```
 1   happening again, Tom.  So you had better
 2   get your questions in --
 3   BY THE WITNESS:
 4       A   I need to say something relative to
 5   this, Tom.  In the interest of fairness and
 6   openness, in the time when we took a break and I
 7   looked at the schedule, I looked at meetings that
 8   happened prior to today about this project; and I
 9   did not see and did not find that we held the
10   design development meeting.  After that, when you
11   took a break just now, I looked.  The design
12   development meeting is tomorrow.  We haven't had
13   it yet.  It is tomorrow.  I don't have -- I
14   haven't checked my e-mail.  I have been at
15   meetings.  They may have sent additional
16   information in preparation of that meeting.  I
17   don't know, but I can tell you that the design
18   development meeting that was supposed to be on
19   10/4 is going to be on 10/24.  It is tomorrow.
20   As of today, the documents that they have sent
21   are not official because we haven't gone through
22   them with them.
23   BY MR. MORRISSEY:
24       Q   So at this stage of the design,
```

Exhibit 1 Page 12

ERIC DAVIS
October 23, 2024

Page 48

1   planning, and development phase for the Cermak
2   ramp, this schedule is at least twenty days off,
3   if we now assume that the meeting is going to
4   happen tomorrow.  Would you agree to that?
5       **A    I didn't catch all that.  I am sorry.**
6       Q    The schedule that was previously -- the
7   critical phase schedule that was -- you say was
8   released on July 24th provided for the meeting --
9   the design development meeting with Cook County
10  was supposed to happen on October 4th, 2024.  You
11  now tell us conveniently that it is going to
12  occur tomorrow on August -- on October 24th --
13      **A    I take exception to the sarcasm and the**
14  **use of your term conveniently there, Tom.**
15  Q    I only say that, Mr. Davis -- and I
16  want to remind you that you are under oath --
17  that repeatedly during depositions involving Cook
18  County, you always tell us it is something going
19  to happen tomorrow conveniently.  So I might be a
20  little bit skeptical, but in any event --
21      MR. DeVORE:  Objection.
22      Mischaracterizes the testimony in this
23      case.  Facts not in evidence --
24

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 49

1   BY MR. MORRISSEY:
2       Q    According to you now, that design
3   meeting is going to happen tomorrow; correct?
4       **A    That's correct.  It is scheduled for**
5   **tomorrow.**
6       Q    Who will be participating in that
7   design development meeting?
8       **A    That will be me.  That will be my**
9   **project director, Bradley DeRoo.  That will be**
10  **Kate Susmilch from the construction management**
11  **team.  That will be one or more architects from**
12  **the design team.  That will be one or more**
13  **people from the constructor, from the contractor,**
14  **because the contractor has -- to one of the**
15  **questions that you haven't gotten to yet in part**
16  **one is already working on pricing the project.**
17  **So the contractor will be there as well.**
18      Q    What documents will you have to prepare
19  for that meeting tomorrow?
20      **A    I already answered that question, Tom.**
21  **As I said, they may have -- typically, you would**
22  **send the day before.  I haven't checked my**
23  **e-mail.  I have been out most of the day today.**
24  **They may have sent additional documents.  I don't**

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 50

1   **know offhand, but they may have sent it in**
2   **advance of the meeting.**
3       Q    We will take a two-minute break so you
4   can check your e-mail to see what documents
5   were --
6       MR. STILLMAN:  Objection.
7   BY MR. MORRISSEY:
8       Q    -- provided to you for the meeting
9   tomorrow because that perhaps would indicate the
10  projected -- the critical phase design phase for
11  this project.  So we will take --
12      **A    They may not have, and anything**
13  **additionally will be gone through at the meeting.**
14  **Well, we will take a couple minutes --**
15      MR. DeVORE:  We will object to any
16      breaks.
17      MR. STILLMAN:  I don't think we need
18      another break right now.
19      MR. DeVORE:  Let's move on.  If you
20      have questions, ask him.
21      MR. MORRISSEY:  Look, I mean, we have
22      asked for these documents.  I asked you
23      yesterday both in writing and by phone
24      whether there were any documents.  I

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 51

1   assumed that you would check with your
2   designee to see whether or not there were
3   updates to HDR's planning, design, and
4   development phase of this project; and I
5   didn't receive anything.  I spoke to you
6   today, and you didn't indicate there were
7   any documents --
8       MR. STILLMAN:  I didn't have
9   anything.
10      MR. MORRISSEY:  Apparently there are
11  some documents --
12      THE WITNESS:  No, there aren't.
13      MR. STILLMAN:  There are no
14  documents, Tom.  They are confidential
15  drafts --
16      MR. DeVORE:  Mischaracterizes prior
17  testimony.  Absolutely not what was
18  testified to, and you have just as many
19  documents today or as you had yesterday
20  absent one that was just publicly made
21  available; and we know it has been made
22  available at least as of today.  It
23  wasn't -- we had no indication it was made
24  publicly available prior to today.

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 13

ERIC DAVIS
October 23, 2024

Page 52

```
1        MR. MORRISSEY:  Here's the problem.
2   There should be one person defending the
3   deposition.  From what I can gather -- I
4   know this is on Zoom, and I really don't
5   like Zoom depositions because it would be
6   much easier to sit down with Mr. Davis and
7   do this in person so we could have a
8   meaningful exchange; but from what I
9   gather, there are two defense lawyers
10  making objections; and I would ask that
11  cease.  I will give you a minute or so for
12  Mr. -- a couple minutes, whatever time you
13  need, for Mr. Davis --
14       THE WITNESS:  We are not going to do
15  that right now.
16       MR. MORRISSEY:  -- to see whether
17  there were any additional documents in
18  regards to --
19       THE WITNESS:  Tom, I am not able to
20  do that because I can't tell you to an
21  absolute certainty and take time to go
22  through everything to be absolutely certain
23  that whether or not -- if I don't find it
24  right away, that doesn't mean I haven't
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 53

```
1   received it.  It might have been sent by
2   somebody different.  It might have been
3   sent on a different day.  I don't know.  I
4   can't give you an exact answer in a
5   deposition like this in five minutes; and
6   also, by the way, if we were meeting in
7   person, I wouldn't be able to go in and
8   check the documents because I wouldn't be
9   at my computer.  So you say it would be
10  easier in person.  By your own remarks, it
11  wouldn't be easier in person.
12       MR. MORRISSEY:  Respectfully, the
13  County designated you to testify; and the
14  expectation is that you would have reviewed
15  all this material, the topics that were
16  going to be -- you were going to be asked
17  to be deposed and be able to provide a
18  timeline for the renovation of the Cermak
19  ramp; and apparently, there are documents
20  that you have not yet had a chance to
21  review from HDR Architects, which may
22  provide meaningful discoverable information
23  in regards to the timeline for the
24  renovation of the Cermak ramp; and that is
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 54

```
1   why I am not certain that you are prepared
2   to testify to that topic because you
3   haven't spent the time necessary to talk to
4   HDR, LCS, and perhaps your project manager,
5   Mr. DeRoo, to find out exactly where this
6   project stands.  So --
7        THE WITNESS:  I take exception to
8   several things you just said.
9        MR. STILLMAN:  I am going to object.
10  It mischaracterizes testimony.
11  BY MR. MORRISSEY:
12       Q   Can you under oath tell me whether or
13  not there is any foundation for this capital
14  planning submittal of $600,000 for the renovation
15  of the Cermak ramp?  What validation do you have
16  for that expenditure of $600,000 --
17       A   I believe that number was developed --
18  as I said before, I believe that number was
19  developed by the construction management team in
20  consultation with project managers that were
21  involved in the prior project -- prior similar
22  project in the Leighton courthouse.  I believe
23  that is where they come up with the number, and
24  so they provided a number; and they said yeah,
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 55

```
1   that is what we think it is.  If there is -- if
2   they have done calculations or if they have done
3   other things on that, I don't know that I ever
4   saw them.  You know, they gave a number.  I said
5   this is where we think -- I believe at the time
6   they said yeah, we think that is a reasonable
7   number; but as far as underlying documentation, I
8   don't have time for that, no.  On every single
9   project, that is why you have a team like that.
10  I ask them a question, how much do you think it's
11  going to cost; and they come up with an answer.
12       Q   What firm gave a number of $600,000
13  without the validation or estimate --
14       A   I reject your characterization without
15  validation, but the firm is Ardmore
16  Roderick Arcadis --
17       Q   Let me --
18       A   -- it's a joint venture that is the
19  construction management for the public safety
20  portfolios --
21       Q   All right --
22       A   -- I mentioned before in this
23  deposition.
24       Q   Can you slowly give me that firm's
```

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 14

Page 56

1  name?
2       A    Ardmore Roderick.  A-r-d-m-o-r-e,
3  Roderick, R-o-d-e-r-i-c-k.  Arcadis,
4  A-r-c-a-d-i-s.  It is a joint venture of two
5  companies, Ardmore Roderick and Arcadis.
6       Q    Have they provided Cook County with a
7  bid to renovate the Cermak ramp?
8       A    That is not their job.  A bid?  A bid
9  suggests it is a price from a contractor for
10  construction.  They haven't provided a bid.  They
11  provided an estimate.  That is the $600,000, but
12  they haven't provided a bid.
13       Q    Have they been selected to renovate the
14  Cermak rack?
15       A    No.  That is not their job.  They are
16  construction managers.  They help us with the
17  contractors that do the construction in the
18  portfolio.  Their job is to help us in the
19  process of obtaining prices and then to manage
20  and verify that the contractor is doing what they
21  are supposed to do.  That is what a construction
22  manager does.
23       Q    So would it be fair to say at this
24  stage of this critical phase in regards to the

Page 57

1  renovation of the Cermak ramp, Cook County does
2  not have a bid from any contractor to do the work
3  involving the Cermak ramp?
4       A    Let's go through this again.  The
5  contractor from our job order contracting system
6  is developing prices based upon the drawings from
7  HDR as they are developed.  Until HDR drawings
8  are completely finished, which, in this case, on
9  your screen, would be step seventeen,
10  construction documentation, until they get to
11  that point, the contractor cannot give a final
12  price, okay.  He cannot give a final price, but
13  they can give estimates at that point.  They can
14  help us with honing in and understanding better
15  what the cost is most likely going to ultimately
16  be.  So they will be providing what is called a
17  job order contract package that will include a
18  price.  Those are predetermined prices out of
19  what is called a construction task catalog or a
20  CTC based upon the configuration and quantities
21  in the documents that HDR provides to them.  Now
22  one of the advantages of going ahead and having
23  the construction company -- which, by the way, is
24  F.H. Paschen.  By having F.H. Paschen involved at

Page 58

1  design development, the contractor can ask
2  questions of the architect and help the architect
3  refine their designs in ways that may make more
4  sense in terms of contractibility or the
5  availability of materials or any number of other
6  things.  It is an advantage to have the
7  contractor involved right now, even though they
8  are not in a position to give us the final price
9  because, one, the ultimate design will be more
10  efficient and easier to build; and two, their
11  pricing task at the end will be shorter because
12  they are already familiar with the project.
13       Q    Mr. Davis, has your contractor provided
14  any documents in regards to their cost estimate?
15       A    I don't believe -- Paschen, I don't
16  believe Paschen has, although they may be taking
17  out -- I will check with the team tomorrow.  They
18  may be at a point where they can take the DD
19  documents that have enough level of specificity
20  and develop an updated price based on that.
21       Q    So is there a certainty that Paschen
22  would be the contractor that Cook County would
23  retain to renovate the Cermak ramp?
24       A    They have been assigned as the

Page 59

1  contractor under the job order contracting
2  program --
3       Q    So to answer my question --
4       A    Tom, I am attempting to answer your
5  question --
6       Q    It is a very direct question.  The
7  direct question is --
8       A    No.  It is a simplistic question that
9  reflects a misunderstanding of the process.  So I
10  am going to try to explain it to you.  F.H.
11  Paschen has a contract for a capped value of
12  construction work; and let's just say, for
13  example, I believe their contract may be 9
14  million dollars in a particular category.  Under
15  that program, we give them assignments in the job
16  order contracting mechanism.  They look at a
17  project.  They develop a price.  They develop the
18  quantities based upon the construction catalog.
19  They develop a package.  That package is reviewed
20  by our procurement department.  It is approved,
21  and they are issued a purchase order for that
22  amount.  Now they have a contract.  So if you ask
23  me do we have a contractor under contract for the
24  project?  The answer is yes.  If you ask me do we

Exhibit 1 Page 15

ERIC DAVIS
October 23, 2024

Page 60

1   have a price for that contractor yet?  The answer
2   is no.  If you ask me are they in the process of
3   developing a price?  The answer is yes, but I
4   don't have anything preliminary.  I would expect
5   to have something like that either tomorrow or as
6   a result of tomorrow.
7        Q    The simple question is if the Cermak
8   ramp is renovated, will Paschen be the contractor
9   that does the work?
10       A    That is -- they have been assigned to
11  be the contractor for that, yes.  For example, if
12  they give a pricing package that is outrageous, we
13  theoretically we may need to change and have a
14  different contractor do it; but it is my
15  expectation right now, since they are under
16  contract and working with the architects, that
17  they will be the firm constructing the project,
18  yes.
19       Q    Has the Cook County board approved the
20  allocation of $600,000 for the renovation of the
21  Cermak ramp?
22       A    No.  You just put it on the screen.  It
23  is in the recommendation for the October board
24  meeting.  The board will consider it.  Their

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 61

1   staff will evaluate it.  We will meet with them
2   to discuss any questions they have.  The Board of
3   Commissioners will vote on the capital
4   improvement plan, which includes the Cermak ramp,
5   at their November board meeting.  Now if --
6        Q    Isn't it fair --
7        A    Let me finish my answer.  If it turns
8   out that the cost of the ramp is greater than
9   $600,000 and we find that cost over $600,000 to
10  be reasonable, between the chief procurement
11  officer and the director of capital planning, we
12  have the authorization to make adjustments within
13  the overall budget to construct sufficient funds
14  to construct the work.  So if it turns out that
15  it is going to cost more than $600,000, we do not
16  have to go back to the board and ask for more
17  money.  It doesn't work that way.  We don't have
18  to do that.  They approve the complete amount.
19  We say this is what we think we are going to do.
20  If things change, there are guidelines about how
21  they can be changed for the procurement officer,
22  for the department of capital planning; and we
23  will make those adjustments at that time.
24       Q    Mr. Davis, just because an item is

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 62

1   approved by the Cook County board on the capital
2   improvement plan doesn't mean that is an
3   authorization by the County board to expend money
4   for all those projects.  Is that fair to say?
5        A    No.  That is exactly what it is.
6        Q    So every item that is on the capital
7   improvement plan, which is Exhibit 6, if it is
8   approved by the Cook County board in November,
9   there is authorization to move forward and expend
10  that money in the year 2025.  Is that what you
11  are saying?
12       A    That is correct.  However, I want to
13  give a complete answer because the oath that I
14  took was the entire truth.  There are guidelines
15  to allow changes to be made during the fiscal
16  year, okay.  That is why you call it a plan.  If
17  there are adjustments to be made, there are
18  procedures and processes that the County board
19  has authorized if there are adjustments that need
20  to be made.  So --
21       Q    So the chief financial officer --
22       A    Yes.
23       Q    -- has the discretion to reallocate the
24  budget in regards to certain guidelines, is that

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 63

1   correct?
2        A    That's correct.
3        Q    So the chief financial officer can
4   decide in the year 2025 not to move forward in
5   regards to the Cermak ramp if it is part of the
6   capital improvement plan?
7        A    I don't think that is within her
8   purview.  I think that is in the purview of the
9   director of the department of capital planning.
10  The decision to pull the funds on a project, that
11  is unprecedented.  I have never heard of that.
12       Q    Do you have a number 22 as a
13  projected -- 23, bid and permit, 50 days; and it
14  has December 2nd, 2024.  Do you know from HDR
15  whether or not they will be in a position to seek
16  permits for the renovation of the Cermak ramp on
17  December 2nd, 2024?
18            MR. STILLMAN:  Objection.  Asked and
19        answered about any of these dates and
20        holding these dates.  You have already
21        asked that, Tom.
22  BY MR. MORRISSEY:
23       Q    You can answer.
24       A    I am sorry.  Can you ask your question

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 16

ERIC DAVIS
October 23, 2024

Page 64

1  again?

2     Q   Sure.  Is there a -- are you aware of

3  any timeline for pulling a permit for the

4  renovation of the Cermak ramp?

5     A   Well, the process and timeline, the

6  projected -- and noted at the top of the screen,

7  it actually says projected and projected as of

8  last July.  As of last July, it was projected

9  that the bid and permit set would be ready around

10  the end of November, beginning December.

11     Q   Now in October, as of October 23rd,

12  2024, has there been an update in regards to that

13  critical step for the bid and permitting process

14  for the renovation of the Cermak ramp?

15     A   I can answer that question better after

16  tomorrow's meeting.

17     Q   Well, perhaps this deposition, in

18  regards to a timetable for the renovation of the

19  Cermak ramp, would be best answered after you

20  have your meeting with HDR.  I am going to now

21  move on to --

22     A   Since you are going to keep suing us,

23  do you want me to send the schedule?

24     Q   I certainly would like a copy of --

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 65

1  pursuant to production of the schedule --

2     A   Sure, no problem.

3     Q   -- the renovation --

4     A   I am happy to send you -- once we have

5  reviewed the design and development drawings and

6  we are comfortable with those to be released, I

7  am happy to send you the DD set, happy to send

8  you an updated schedule.  When the contractor

9  comes back with their pricing package, if you

10  want to have a wrap-up of that -- it

11  unfortunately contains some proprietary

12  information.  I can't share all of it.  I can

13  give you the roll up and what their estimate on

14  the costs are.  Happy to send you all that stuff

15  as it comes along.

16     Q   Okay.  When you are in a position to

17  answer the topics that are in number one, I am

18  going to ask that you be -- it be produced or

19  somebody from Cook County to be produced --

20     A   Have I not answered --

21     MR. STILLMAN:  Objection about

22  reproducing.  I have already said we are

23  not reproducing Eric Davis or anyone from

24  County for 30(b)(6) depositions again after

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 66

1  this.  This is your one chance.

2     MR. MORRISSEY:  How can it be my one

3  chance when the witness just said that he

4  will know when he meets with HDR tomorrow

5  what the current timetable will be for the

6  planning, design, and development phase for

7  the ramp and the --

8     MR. STILLMAN:  There are other

9  discovery --

10     MR. MORRISSEY:  -- permit phase for

11  the project.  So I will respectfully

12  disagree --

13     MR. STILLMAN:  Tom, there are other

14  avenues of discovery.  You have called out

15  Eric once.  You could have waited.  You did

16  not have any actual deadline you needed to

17  meet.  You wanted to do this now.  You

18  could have moved this dep to another date

19  if you wanted more documents.  I told you

20  we didn't have any at the time.  When

21  things are ready, we can give them to you.

22  We have done nothing wrong.  We have not

23  produced anything that we are not

24  authorized yet to produce.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 67

1  BY MR. MORRISSEY:

2     Q   As of today, have you talked to HDR

3  with respect -- in regards to a revised timeline

4  for the renovation of the Cermak bridge?

5     A   I am planning on talking to them

6  tomorrow, Tom.

7     Q   When was the last time you talked to

8  HDR in regards to a timetable for the renovation

9  of the Cermak ramp which would be an update to

10  their schedule that you say was issued at the end

11  of July of 2024?

12     A   It is on your screen.  So it is not me

13  saying this.  It is the document that is in front

14  of you.  As far as a conversation with HDR, that

15  is not my job.  My job is to -- I am a deputy

16  director.  We have 300 projects in this

17  portfolio.  I have project directors and

18  construction managers that have those

19  conversations with the architects.  If we get to

20  major milestones like we are doing tomorrow, then

21  I will see the information that they have at that

22  point --

23     Q   Why did --

24     A   -- there are several people -- if you

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 17

ERIC DAVIS
October 23, 2024

Page 68

1  are asking for an individual in a project like
2  this, there are lots of different people
3  involved.  So if you are asking for an individual
4  who has the greatest purview on this project
5  overall, that would be me.  Do I have the
6  knowledge of all of the specifics drilled all the
7  way down?  No, because it is a whole team; but I
8  still have not heard a question from you that
9  isn't -- we have talked through A, B, C, D, E,
10 and F.  We have touched on all of those topics in
11 number one.  So I don't understand -- if you want
12 to explain to me, I don't understand what you are
13 not getting in item one because we have talked
14 about the transfer package from -- whether or not
15 there was a transfer package from Globetrotters,
16 what Globetrotters produced.  We have talked
17 about the development by HDR and their program
18 report and their design development in item (b).
19 We talked about how the costs have been developed
20 at an estimated level and now being developed by
21 the contractor in item (c).  We have talked about
22 the development of the capital plan for the ramp
23 and what ended up in the capital improvement plan
24 that was published by the board -- I don't

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 69

1  know -- today, yesterday, three days ago.  I
2  don't know.  We have talked about the process of
3  selecting contractors because it is a job
4  program.  So we have talked about item (e).  We
5  talked about the timeline for the ramp.  It is on
6  the screen.  What are we not talking to you
7  about?  I don't understand.
8      Q    Since the notice was tendered on
9  September 23rd, 2024, have you talked to HDR in
10 regards to the timeline for the renovation of the
11 Cermak ramp?
12     A    I don't remember talking to them about
13 the timeline since we went through the program
14 analysis report.  By the way, I have to -- when
15 you asked me to look, I did look at one other
16 thing.  I need to add some additional
17 information --
18     Q    Let me --
19     A    -- it was a schematic design --
20     Q    Mr. Davis, I will ask you a follow-up
21 question before you get to your --
22     A    You want me to give the whole answer.
23 There was a schematic design review.  It was on
24 September 20th.  I was in England.  I wasn't

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 70

1  here.  So my team conducted it.  I wasn't here.
2      Q    So the schematic design drawings were
3  given to Cook County.  Is that fair to say?
4      A    Evidently.  I can't find them.  My team
5  must have them.  They went over them.  They must
6  have felt comfortable with it.  I may have had
7  Brad look at it.  We may have discussed it.  I
8  don't know.  There was apparently a meeting while
9  I was out of the country.
10     Q    Were you prepared -- did you prepare
11 today to discuss that meeting about the schematic
12 drawings for the renovation of the Cermak ramp?
13     A    I don't understand your question.
14     Q    My question is you now tell me that
15 there was a meeting involving the schematic
16 drawings --
17     A    Yeah.
18     Q    -- for the Cermak ramp.  What did you
19 do in preparation for this deposition to discuss
20 the meeting in regards to the schematic design
21 phase?
22     A    I looked at the schedule that is on
23 your screen.
24     Q    Going back, the schedule that is on the

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 71

1  screen was given at the end of July of 2024 --
2      A    Yeah.
3      Q    -- since that time, have you discussed
4  with HDR or done anything to inquire from HDR
5  Architects in regards to their current timetable
6  for the plan, design, and development phase for
7  the renovation of the Cermak ramp?
8      A    My team has been talking to them; but I
9  haven't spoken to them specifically, no.
10     Q    So you are not aware of -- in preparing
11 for today's deposition, you are not aware of the
12 timetable for HDR Architects in the planning,
13 design, and development phase for the renovation
14 of the Cermak ramp?
15     A    What are you talking about --
16          MR. STILLMAN:  Objection.  Misstates
17     testimony.
18 BY THE WITNESS:
19     A    -- we are looking at a schedule, which
20 is exactly what you just asked me about.  We are
21 looking at a schedule of the planning, design,
22 and construction of the project from HDR --
23 BY MR. MORRISSEY:
24     Q    Mr. Davis, that schedule was, as you

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 18

ERIC DAVIS
October 23, 2024

Page 72

1  say, issued in July of 2024. I am asking you
2  currently, are you prepared today to testify in
3  regards to whether that schedule is being adhered
4  to or has been changed by HDR Architects?
5      A    I think I have already answered the
6  fact that we are looking at a design development
7  meeting. So we know that there is some schedule
8  slippage.
9      Q    But you are not prepared to discuss
10 whether or not that schedule has been revised by
11 HDR Architects --
12     A    I would expect that it has --
13          MR. STILLMAN: Objection. Asked and
14     answered.
15          THE WITNESS: Asked and answered
16     several times.
17 BY MR. MORRISSEY:
18     Q    Do you have a definitive date when
19 construction will begin -- let me ask you a
20 preliminary question. As the designee for Cook
21 County, can you testify under oath that the Cook
22 County board will approve funding for the
23 construction of the renovation of the Cook
24 County -- the Cermak ramp --

---

ERIC DAVIS
October 23, 2024

Page 73

1      MR. STILLMAN: Objection to form and
2      mischaracterizes testimony and
3      argumentative.
4  BY THE WITNESS:
5      A    That is the purview of the Board of
6  Commissioners. As you have pointed out during
7  the deposition, they have been provided with the
8  capital improvement plan, the president's
9  recommendation. They will be spending the period
10 from tomorrow through the November board meeting
11 looking at that budget, which includes the CIP,
12 asking questions of various departments and
13 refining their answers. They will vote on it.
14 All I can tell you about, Tom, is this is the
15 ninth capital improvement plan cycle that I have
16 been involved in; and the board has never not
17 passed the CIP. I cannot tell you what the board
18 will do a month from now. That is their purview.
19 So can I tell you definitively that they will?
20 No. That is not my decision. That is their
21 decision. All I can tell you is that through
22 nine budget cycles, they have always approved it
23 on the October, November schedule like this year.
24

---

ERIC DAVIS
October 23, 2024

Page 74

1  BY MR. MORRISSEY:
2      Q    Going back to the CIP, which I believe
3  is the proposed CIP, which is Exhibit 6, are
4  there carryovers on the proposed CIP for 2025
5  from the prior year, 2024 capital improvement
6  plan projects?
7      A    I am going to give you an answer that
8  is as complete as I can tell you, Tom. I can
9  tell you right off the bat that it is not a
10 simple answer. The County follows -- I have told
11 you this in a prior deposition. The County
12 follows zero-based budgeting. At the end of the
13 fiscal year, all the remaining incumbrances are
14 either cancelled or -- reissued or cancelled. So
15 each year, the bucket of funds is refilled
16 through the CIP. The funds that are there are
17 only allocated on a year-by-year basis. That
18 said, in many cases, because construction
19 projects often take more than a year or overlap
20 from one fiscal year to the next, the majority of
21 the projects in the capital improvement plan are
22 carryover projects. However, technically the
23 funds end just like Cinderella at midnight. They
24 end at the end of the fiscal year, and they have

---

ERIC DAVIS
October 23, 2024

Page 75

1  to be replenished with the new fiscal year. So
2  the project, the project as defined in our
3  accounting system, may continue year over year;
4  but the purchase order for that has to be
5  reissued on an annual basis because the funds are
6  only valid for a fiscal year. So is there Cermak
7  work in the fiscal year 2024 CIP? I believe we
8  have covered that already; and yes, there is. Do
9  the funds that are allocated right now in '24
10 carry over to 2025? In some cases, they do. In
11 some cases, they don't. So let's say they
12 approve the $600,000 and say for the sake of
13 discussion that the project is $600,000 or less.
14 If it turns out that it takes more than a year to
15 construct that ramp -- and I believe the schedule
16 shows that it does -- then at the end of fiscal
17 year 2025, they will cancel all the purchase
18 orders; and they will reissue new ones with
19 fiscal year 2026 funds.
20     Q    Exhibit No. 6, which is page --
21     A    It looks like last year.
22     Q    If we look at -- it is actually Cook
23 County fiscal year 2025 --
24     A    Okay. This has transportation. This

Exhibit 1 Page 19

ERIC DAVIS
October 23, 2024

Page 76

1  has some other stuff.  This has solar, okay.
2      Q   So it states at the top the County's
3  proposed fiscal year 2025 capital budget is $653
4  million -- $653.4 million in capital investments
5  and includes --
6      A   Are you talking?  I can't hear you.
7      Q   If we look at it, it says 250 million
8  dollars; and then in parentheses, $19 million
9  new, and $231 million carryover for the capital
10  improvement plan for County facilities.  So if we
11  look at this document, the $250 million that is
12  being included in the capital improvement plan,
13  $231 million was carried over from the $224
14  capital improvement plan; is that correct --
15      A   No.  I think you need to go back and
16  read the entire discussion and definition of the
17  term carryover in this case.
18      Q   All right, but it does say that $231
19  million are being carried over --
20      A   Yeah, but I don't know if they are
21  talking about revenue or they are talking about
22  expenditures.  You need to read the definition
23  and why they are using the term carryover because
24  carryover means different things in different

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 77

1  contexts.
2      Q   Can you state under oath, Mr. Davis,
3  that construction will occur in 2025 --
4      A   I am sorry.  You broke up there, Tom.
5  What are you asking?
6      Q   Can you state, as the designee for Cook
7  County, that for certain, the construction for
8  the renovation of the Cermak ramp will begin in
9  the year 2025?
10      A   I can tell you it is planned to begin
11  in 2025.
12      Q   But by plan, that doesn't mean that it
13  will actually certainly happen.  Is that fair to
14  say?
15      A   Tom, we had hundreds of projects that
16  were planned to happen in fiscal year 2020; and
17  there was a pandemic, and we had to change
18  things.  I cannot with absolute certainty 100
19  percent tell you.  You ask absolute questions.  I
20  cannot give you an absolute answer.
21      Q   Now in regards to the renovation of the
22  Cermak ramp, can you explain why that project is
23  going to proceed in the year 2025; and the other
24  ramp, the east tunnel ramp, the RTU, will not --

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 78

1  is not part of the capital improvement plan for
2  2025?
3      A   Let's take those as two different
4  questions --
5      Q   Let me rephrase it because I don't know
6  if that was a good question.
7      A   Okay.
8      Q   Is it your position that the renovation
9  of the Cermak ramp can proceed in the year 2025
10  separate and apart from any other projects
11  involving ADA compliance at the Cook County
12  Department of Corrections?
13      A   Separate and apart from any other ADA
14  projects that we are in various stages on, yes,
15  it is my expectation that the construction of the
16  conversion of what is now a ramp in Cermak and
17  turning it into a walkway that is no longer a
18  ramp will begin in fiscal year 205, yes, that is
19  my expectation.
20      Q   Why can the Cermak ramp renovation
21  proceed in isolation from other structural ADA
22  improvements at the Cook County Department of
23  Corrections?
24      A   Part of the answer is because we have

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 79

1  begun to understand just how extensive an issue
2  accessibility is in the jail that was constructed
3  over the last fifty years.  It has become clear
4  that we need to take a more strategic approach to
5  accessibility.  That is why we have undertaken an
6  assessment of the entire campus.
7          In the case of the Cermak ramp,
8  because it was brought to our attention that
9  there was an issue, we have done a bunch of
10  things; and we said fine, we will go ahead; and
11  we will address the Cermak ramp now.  Let's go
12  ahead and do that.  You may recall -- because we
13  have had one or two or ten or twenty
14  conversations about this.  So we have gone ahead
15  and advanced that one; but the smart thing, the
16  strategic thing, the efficient thing, is to do a
17  wraparound assessment of the entire campus
18  because accessibility is an inherently holistic
19  situation because of things like path of travel,
20  which go from this building to that building,
21  et cetera.  It is better to look at the entire
22  campus as a whole.  So I mean, I think it would
23  be prudent for us to learn the lessons in looking
24  at the questions in this case to say oh, we have

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 20

ERIC DAVIS
October 23, 2024

Page 80

1  looked at the Cermak ramp.  Yes, there are some
2  issue; but you know what, there are other issues
3  at the bottom of the ramp and at the top of the
4  ramp.  We need to look at the whole picture.
5           So as I have testified in other
6  cases for your esteemed firm, we have undertaken
7  a process to assess the entire campus.  One of
8  the areas in the campus is the -- are the two
9  entrances to the RTU.  One, the walkway to the
10 north; and one, the ramp on the east side.  It
11 has become clear that we need to look
12 holistically at the acceptability requirements
13 for the campus before undertaking to renovate or
14 do any changes to any ramps involved in the RTU
15 because in that case, as I just said, there are
16 two ways in and out of the building at the tunnel
17 level.  We don't know if they necessarily both
18 make sense.  We don't know whether or not one or
19 the other makes more sense from the standpoint of
20 accessibility.  We want to look at the whole
21 situation.  So the answer to your question, why
22 are we doing the Cermak ramp now but we are not
23 doing the RTU ramp now, is that we are taking
24 this broader, more strategic, more efficient

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 81

1  approach to the entire issue of accessibility on
2  the DOC campus.
3      Q    The fact that the Cermak ramp has been
4  the subject of an injunctive summary judgment
5  motion in the Walker versus Dart case is one of
6  the reasons why Cook County is moving forward
7  with the renovation of the Cermak ramp.  Is
8  that --
9           MR. STILLMAN:  Objection.  Calls for
10      legal testimony.
11 BY THE WITNESS:
12      A    Yeah, I am not a lawyer; but I can tell
13 you the motion you are talking about happened
14 much longer after we decided to go forward with
15 the ramp.  The motion didn't cause us to suddenly
16 decide to do the ramp, no.
17 BY MR. MORRISSEY:
18      Q    What caused Cook County to renovate or
19 plan on renovating the Cermak ramp and not, for
20 instance, the east tunnel ramp for the RTU?
21      A    I would have to go back and research in
22 answer to that question.  That is not in things
23 you asked in the discovery document, but I would
24 have to go back and see.  I would expect or

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 82

1  assume the fact that we were getting sued over it
2  required us to take a greater look at the
3  situation.  I think that is fair to say.
4      Q    Now --
5      A    That doesn't mean that every time you
6  sue us about something we should drop everything
7  and address that.  We need to try to be smart
8  about this.  I know you are looking forward to
9  the results of those assessments, Tom; and your
10 grandchildren, I am sure, will benefit from the
11 profits of suing us over all kinds of things in
12 there; but we are going to take that broader,
13 strategic approach.  We are going to try to be
14 smart about this, and we are going to try to
15 upgrade the accessibility of the entire campus in
16 an intelligent, coordinated, and efficient way.
17      Q    I will give you an aside.  A federal
18 magistrate today made the same comments that my
19 grandchildren will benefit for the renovation of
20 the facilities, 31 facilities, at the IDOC but
21 putting that aside for the moment --
22      A    Was he speculating one of your
23 grandchildren might end up in the custody of the
24 IDOC?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 83

1  Q    I think he thought there would be
2  another group of Morrisseys that would take --
3  pick up the pledge of diligently --
4      A    Somebody else --
5      Q    -- to cause the County and the State
6  to --
7      A    Someone will pick up the banner of
8  petulant and annoying litigation, okay.
9      Q    If you believe in the ADA, which you
10 profess, you will have to concede that litigation
11 does move government to comply with the federal
12 standards for accessibility of disabled people;
13 but anyway, moving on from that, let's go to
14 topic two --
15      A    You are throwing that out there.  That
16 is not why I am doing this.  I am doing it
17 because it is the right thing.
18      Q    Okay.
19      A    As you said, I believe in
20 accessibility.  I am doing it because it is about
21 equity, but it only slows us down --
22      Q    Well --
23      A    -- so any notion that it is speeding
24 things up I think is subject to debate.

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 21

Page 84

1    Q    Mr. Davis, has anything been done since
2  March for the 111th Street courthouse?  I don't
3  think so.  So let's move on from there.  It has
4  been sitting there for --
5    A    If you want to depose us about the
6  111th Street courthouse, that is your
7  prerogative, Tom --
8    Q    Well, let's go --
9    A    -- we have assessments on 11 million
10 square feet going on right now, okay.
11   Q    Let's go to topic two here.
12   A    Okay.
13   Q    Topic two, you have looked at that.
14 What have you done to prepare to testify in
15 regards to topic two?
16   A    I believe what I did was I went back,
17 and I reviewed the things that we discussed when
18 we talked about the RTU tunnel in either this
19 case or a prior case just to refresh my memory;
20 and I didn't find anything newer than what I have
21 testified to in various depositions before, which
22 is what I outlined earlier in this deposition,
23 which is there are two entrances to the building
24 to the north and to the east.  The one to the

Page 85

1  east is a tunnel -- is a ramp, excuse me, that is
2  going to have some issues we are going to have to
3  look at before -- addressing that before
4  expending the money.  We need to look at the
5  whole picture, and so that is what we are going
6  to do.  So I refreshed my memory; but as I
7  mentioned, we are in the process of assessing the
8  whole DOC.
9    Q    Have you had an opportunity as the
10 County's designee to review Globetrotters' expert
11 report in the Westmoreland case --
12   A    I think --
13   Q    -- in regards to the RTU east tunnel?
14   A    I think you are referring to the report
15 that was commissioned by the law firm.  I just
16 want to be clear.  It wasn't a report that was
17 commissioned by us.  It was commissioned by the
18 law firm.  Yeah, I believe I looked at that; and
19 I seem to recall it indicated some deficiencies.
20   Q    What deficiencies specifically did it
21 indicate?  It wasn't just one deficiency.  It was
22 a multitude of deficiencies, correct?
23   A    I seem to recall that is the case,
24 yeah.  There was an issue with the -- I believe

Page 86

1  it was the intermediate landing or the landing at
2  the bottom of the ramp.  There was an issue --
3  let's see, was it the width of the ramp?  There
4  are a couple of things that appeared to be -- in
5  their findings that need to be done on that one.
6  There was also an issue I think of the length of
7  it, if I recall.  Yeah, I think it is fair to say
8  there were multiple deficiencies; and I refreshed
9  my memory that we are going to have to do
10 something about that at some point, yes.
11             (WHEREUPON, Exhibit No. 3
12              was marked for
13              identification.)
14 BY MR. MORRISSEY:
15   Q    I am showing you Plaintiff's Exhibit
16 No. 3 now, submissions by Cook County in regards
17 to Globetrotter Engineering Corporation's report
18 that was submitted April 1st, 2024?
19   A    It is not on the screen yet.
20   Q    Do you see --
21   A    Yeah, I can see it.
22   Q    Do you see paragraph 47?
23   A    Yeah.  This looks familiar.
24   Q    Does that refresh your memory --

Page 87

1    A    Yes.
2    Q    -- about the multiple issues --
3    A    I just mentioned the intermediate
4  landing.  There is the intermediate landing on
5  the scene.  I just mentioned that, yeah.  This is
6  the --
7    Q    It is the top landing that there was a
8  problem with also.
9    A    I believe both of them are on the list
10 that you just showed.
11   Q    The handrails are deficient, correct?
12   A    I believe that is your -- that is the
13 conclusion in the report, yeah.
14   Q    Globetrotters was retained by Cook
15 County to review the Cermak ramp, correct?
16   A    They were retained to do the Cermak
17 ramp, yes.
18   Q    So Globetrotters is a credible firm in
19 regards to doing assessments of facilities
20 operated by Cook County.  Is that fair to say?
21   A    We consider them to be qualified to
22 deliver an analysis on accessibility issues, yes.
23   Q    And did HDR adopt the assessment by
24 Globetrotters in regards to the Cermak ramp?

Exhibit 1 Page 22

ERIC DAVIS
October 23, 2024

Page 88

1    A    If you go through the program analysis
2 report, Tom, I believe there were a couple of
3 areas where HDR indicated they thought some
4 additional things needed to be done.  They varied
5 somewhat.  I believe there was a question about
6 the clearance at one of the doors at the bottom
7 landing.  So there were a couple of minor areas
8 where HDR identified that there were some
9 additional changes that needed to be made; but
10 generally, yeah, they adopted what Globetrotters
11 had come up with.
12    Q    You would agree that in regards to the
13 east tunnel ramp to the RTU, that Globetrotters
14 found more violations with that ramp than the
15 ramp that Globetrotters assessed for the Cermak
16 ramp; correct?
17    A    I would say numerically, yes.
18    Q    Can you tell me what action has been
19 taken or will be taken in the immediate future to
20 make the RTU east tunnel ramp compliant with the
21 ADA?
22    A    So the County has issued a request for
23 qualifications for teams to assess the entire
24 jail campus.  That RFQ was issued to the public

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 89

1 and includes the stipulation that we are going to
2 hire up to probably three -- up to three firms to
3 handle different areas of the jail campus.  Those
4 submittals have been received.  They have been
5 evaluated; and we are in the process of
6 developing the documentation to bring those
7 contracts to the Board of Commissioners for
8 approval to hire a firm to assess not just the
9 RTU east ramp, not just the north ramp, but the
10 entire campus, including the area of the ramp
11 itself.  So we are in the process of -- as I
12 said, we have received the submittals.  We have
13 made the evaluations.  We are in the process of
14 preparing the documentation to bring to the board
15 the -- the chief procurement office would do
16 that, bring to the board a request for
17 authorization for a contract for the assessment
18 of -- the assessment, design, and construction
19 administration services for the entire DOC
20 campus.
21    Q    Wasn't the capital improvement plan for
22 2024, wasn't that included in the 2024 capital
23 improvement plan?
24    A    If I understood your question

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 90

1 correctly, you are asking was the 2024 capital
2 improvement plan included in 2024 capital
3 improvement plan --
4    Q    That is not what I said.  What I said
5 was the assessment for the entire Cook County
6 Corrections Department campus, was that project
7 included in the capital improvement plan for the
8 year 2024?
9    A    I am almost entirely sure the answer to
10 that question is yes.  I don't recall offhand
11 whether we projected that we were going to have
12 it under contract in '24 or whether we didn't
13 think we would have it under contract in '25.  I
14 can't tell you offhand if we had projected the
15 entire expense for the contract in this fiscal
16 year, which ends in a little over a month, or
17 whether or not we were planning on encumbering
18 those funds for fiscal '25 --
19    Q    So --
20    A    -- I can tell you it is our intent to
21 encumber those funds in fiscal '25, yes.
22    Q    So in 2024, it was included in the
23 capital improvement plan; but funds are not
24 expended in the fiscal year 2024 for an

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 91

1 assessment of the entire Cook County Department
2 of Corrections campus.  Is that fair to say --
3    A    I would have to check -- there may have
4 been some expenditures based on -- let's see,
5 that is something else.
6    Q    So the request for qualifications, I
7 believe you previously testified --
8    A    Yeah.
9    Q    -- went out in probably of April '24
10 for this grand overall assessment of the Cook
11 County Department of Correction campus.  Is that
12 fair to say?
13    A    I would have to check when it went out
14 offhand, Tom.  I can't tell you right off the
15 bat.  We have dozens of procurements going on.
16 So I would have to check when that one was
17 released.
18    Q    So are you prepared today to testify in
19 regards to the status of renovation efforts to
20 bring this noncompliant RTU east tunnel ramp into
21 compliance with the law --
22    A    I did --
23       MR. STILLMAN:  Just objection.
24       Argumentative.  Misstates testimony.  He

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 23

ERIC DAVIS
October 23, 2024

Page 92

1    never said he wasn't prepared.
2  BY THE WITNESS:
3       A.   No.  I just told you where we are.  We
4  are about to hire a firm to do the assessment for
5  the whole campus, including the east ramp.  I
6  just told you that.
7  BY MR. MORRISSEY:
8       Q.   You just said the cost of renovating
9  the RTU east tunnel ramp will be similar to the
10 cost to repair the Cermak ramp?
11      A.   I think it is fair to say that we would
12 expect it to be in a similar order of magnitude,
13 yes.
14      Q.   You estimate that it will take 24 to 28
15 months in order to do this overall assessment of
16 the Cook County Department of Corrections campus
17 in regards to the facility compliance with the
18 ADA?
19      A.   That sounds about right.
20      Q.   And after that assessment was done in
21 two or two and a half years, is it then the
22 intent of Cook County to begin hiring design
23 firms like HDR to bring various components of
24 Cook County Department of Corrections buildings

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 93

1  into compliance with the ADA?
2       A.   Well, I would note that what we are
3  talking about in this case is literally
4  unprecedented.  So my ability to -- my ability to
5  project how the exact work is going to be
6  delivered on an individual basis is difficult to
7  project.  I would want to say that -- again, this
8  is just in terms of looking at project planning.
9  They will develop -- as I said, we are hiring
10 them to do assessment, design, and construction
11 phase services.  It would seem to be prudent --
12 and when we sit down with them and go through it
13 and they have had a chance to look at it, we will
14 consult with them; and we will get their opinion,
15 and we will get our construction manager's
16 opinion.  It would probably seem prudent for us
17 to triage some of the things that they find once
18 they get to the assessment phase even though they
19 haven't done design.  We may decide it is in the
20 best interest for accessibility to pull portions
21 of it out and do portions on an accelerated
22 basis.  I can't tell you that until they have
23 done the assessment, but it wouldn't surprise me
24 if some low hanging fruit might get done sooner

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 94

1  rather than treating it as one entire project.  I
2  can tell you that it is highly unlikely that if
3  they do an assessment and a design for each of
4  the thirds of the campus, it is unlikely we would
5  contract for all of those upgrades in one
6  contract.  We probably will break it out into
7  multiple contracts.  Now those multiple contracts
8  will be identified or which project or areas go
9  into which, I couldn't speculate; but it wouldn't
10 surprise me if we end up prioritizing or triaging
11 once we got done with the assessment phase of the
12 campus so we know how large of a problem it is.
13 Right now, I can't tell you how big of a problem
14 it is.  We can only speculate.  If they come back
15 and they say gee, you are actually in pretty good
16 shape and here's a handful of minor things and go
17 ahead and do them, we may approach it one way.
18 If they say no, no, no, you have whole buildings
19 here and they are really out of whack and there
20 is a lot of major construction, we may approach
21 it a different way.  So am I prepared to give a
22 timeline for when the RTU construction will
23 happen, no, because there are just too many
24 variables involved.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 95

1       Q.   So let's talk about where you are
2  currently.  You said that the request for
3  qualifications went out in April, and you are
4  just now in the process of reviewing those
5  requests for qualifications --
6       A.   Actually, you said April.  I haven't
7  had a chance to check whether it is April or not.
8       Q.   Is it fair to say that the capital
9  planning department is currently reviewing
10 requests for qualifications for this grand
11 overall assessment of the Cook County Department
12 of Corrections?
13      A.   No, that is not what I am saying.  We
14 have completed our review.  We are in the process
15 of making our recommendation to the office of the
16 chief procurement officer and the development of
17 contracts to be presented to the board.  We have
18 done our review of the submittals.
19      Q.   So a contractor or contractors have
20 been selected to do the assessment.  Is that fair
21 to say?
22      A.   We have identified firms -- the
23 publicly available RFQ indicates three zones of
24 the jail campus.  We have identified the firms

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 24

ERIC DAVIS
October 23, 2024

Page 96

```
 1   that we feel are most qualified for each of those
 2   zones and are preparing the documentation for
 3   them -- for procurement to now negotiate the fees
 4   based on what that is.  We have got a long way to
 5   go.  We are not going to be submitting this to
 6   the board in January.  We have got a long way to
 7   go to get to the price because each of the firms
 8   that we identified as the most qualified firm
 9   then has to crawl all over the jail and get a
10   better idea of what the specific task is for
11   their area of the jail.  So it is going to take a
12   while, yeah, to procure that and take it to the
13   board.  That said, as I said before, I fully
14   expect we will be bringing the contract for those
15   assessments in '25; and they'll be starting their
16   work in '25.
17       Q    Let's talk about the zone which the
18   east tunnel ramp is in for the RTU.  What zone is
19   that?
20       A    You probably have the document, Tom.
21   You can pull it up, or if you want me to pull it
22   up.
23       Q    I don't have the document.
24       A    I am stunned.
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 97

```
 1       Q    I assume that you reviewed it in
 2   preparation for today's deposition to talk about
 3   this topic?
 4       A    I don't believe that you asked me to be
 5   preparing to talk about the assessment of the
 6   entire DOC in your interrogatory there --
 7       Q    Well, it's --
 8       A    -- I missed that.  Was that in there?
 9   I don't think it was.
10       Q    Well, look at topic (a), action taken
11   or will be taken to reconstruct the RTU east
12   tunnel ramp to comply with the ADA.
13       A    I have described that.
14       Q    I think that would include this initial
15   step to do an assessment --
16       A    I have described that.
17       Q    Yes, but I am asking you what firm has
18   been selected to assess the RTU east tunnel ramp?
19       A    I cannot tell you.
20       Q    How many firms have been selected under
21   this --
22       A    We have identified a firm for each of
23   the three package areas that are in the RFQ.
24       Q    And you mentioned that the firms
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 98

```
 1   selected then have to gain access to the campus
 2   of the Cook County Jail --
 3       A    That's correct.
 4       Q    -- to walk through the facility to
 5   gauge how much they would have to bid in order to
 6   do the work --
 7       A    That's correct; and we will also be
 8   providing them with whatever existing building
 9   drawings they need in order to identify how much
10   square footage they are talking about, the
11   configuration of the buildings, how difficult
12   they are going to be, the level of documentation
13   that we have.  In other words, are they going to
14   have go through and do a lot of existing building
15   measuring or do we already have that
16   documentation?  So yeah, they are going to go
17   through; and they are going to figure out.  Based
18   on that, they are going to give us -- we will
19   negotiate a price with that most qualified firm
20   to identify what their fee is going to be for
21   each of the zones in question.
22       Q    Has the firm that has been selected to
23   do an assessment of the RTU east tunnel ramp been
24   provided with the record architectural drawings
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 99

```
 1   for that ramp?
 2       A    Not yet.
 3       Q    When will Cook County provide the
 4   selected firm with the existing recorded drawing
 5   for the RTU east tunnel ramp?
 6       A    I would expect be --
 7       Q    So that firm could begin preparing the
 8   bid to --
 9       A    I expect we will be doing that in the
10   next month or two.  There are other steps that
11   have to happen before that starts, but I expect
12   we would be providing that in the next month or
13   two.
14       Q    Would it be fair to say that the
15   negotiations with each assessment firm will take
16   several months --
17       A    Yeah.
18       Q    -- for Cook County to complete?
19       A    I think so, yeah.  I would expect we
20   will be there by the spring.
21       Q    So we are looking at six months from
22   now until Cook County is in a position to request
23   the Cook County board to authorize funding for
24   these architectural, slash, engineering firms to
```

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 25

Page 100

1  do assessments of each zone. Is that fair to
2  say?
3      A   Again, to give an exact response, we
4  will be asking them to authorize the contract.
5  The contract is different than the funding. The
6  funding is included in the capital improvement
7  plan; but yes, we will be -- we expect to be
8  bringing contracts to the board probably in the
9  second quarter of next year for the DOC campus,
10 yes. As I said, for the assessment, design, and
11 construction administrative services from an
12 architectural and engineering firm.
13     Q   How much do you anticipate the capital
14 planning department will request the Cook County
15 Board to approve for this -- for each zone?
16     A   I think they will be large contracts.
17 In the millions of dollars.
18     Q   By in the millions of dollars, how much
19 are you saying?
20     A   I couldn't begin to speculate because,
21 Tom, as I said, I have no idea the order of
22 magnitude of the difficulty of what they have to
23 do. They could come back and say this is going
24 to be pretty easy, and it is a low fee. They

Page 101

1  could come back and say oh, my gosh. This is
2  incredibly complicated. It is going to be a
3  large fee. I couldn't really tell you. That is
4  why we are hiring them to find out the answers to
5  questions like that.
6      Q   So the amount of money to be expended
7  for the grand assessment of the Cook County Jail
8  complex has not been included in the capital
9  improvement plan for 2025?
10         MR. STILLMAN: Objection. Misstates
11     testimony.
12 BY THE WITNESS:
13     A   Yeah. We just looked at the plan. I
14 am at a loss.
15 BY MR. MORRISSEY:
16     Q   My question is in the proposed 2025
17 capital improvement plan, is there a number of
18 how much this is going to cost Cook County
19 taxpayers to do an assessment of Cook County
20 Jail?
21     A   I think the draft has a number in it.
22 I don't know if that number has been updated; but
23 yeah, I am pretty sure it has a number in there
24 somewhere.

Page 102

1      Q   Would the number, the amount of
2  $23 million, be somewhat accurate?
3      A   You are giving me a specific number.
4  So I am assuming you are referring to something
5  in particular.
6      Q   Well, Exhibit No. 6, the capital
7  improvement plan for 2025 --
8      A   Yeah.
9      Q   -- I believe you have that figure in
10 there. Would that have come from under your
11 direction, that figure that --
12     A   Let me look at the document that you
13 are referring to, the number that you are
14 referring to. That sounds like a -- I don't know
15 if you're looking at the ten-year -- I don't know
16 which one you are looking at here.
17     Q   I am looking at page 289 of the
18 proposed capital improvement plan --
19     A   Yeah.
20     Q   -- it has a number DOC --
21     A   That is not ADA. That is mechanical,
22 electrical, plumbing systems. That is not ADA.
23     Q   So is it in the capital improvement
24 plan for 2025?

Page 103

1      A   I am looking right now. I am sure it
2  is. Let's see here, I am sorry, because it is a
3  large and complex document.
4          I am having trouble tracking it
5  down. Here we go. It should have --
6  BY MR. MORRISSEY:
7      Q   What page are you looking at?
8      A   Let's see, this is broken up. It has a
9  million dollars right now, but it is going to be
10 more than that.
11     Q   What page are you looking at?
12     A   I am not. I am looking where we
13 submitted to budget. I am not looking at the
14 documents you have got.
15     Q   So it is not actually even in the
16 capital improvement plan for --
17     A   No, it is in there. It is just in a
18 different form. Everything that you are looking
19 at came from a document submitted by this
20 department. It is easier -- I can't search --
21 you are looking at a PDF. It is hard to search
22 the PDF than it is to actually search the
23 document itself.
24

Exhibit 1 Page 26

Page 104

```
 1              (WHEREUPON, a discussion off
 2              the record was held.)
 3   BY THE WITNESS:
 4       A    What page are you on, Tom?
 5   BY MR. MORRISSEY:
 6       Q    I am on page 289.
 7       A    You are farther down.  Let me look for
 8   it.  In previous years, the budget department has
 9   subdivided the CIP as is presented in the
10   document by major project category; and I am
11   trying to determine if they did that this time
12   around.  It looks like they did.  So information
13   on a given facility might be in different
14   sections here.  I am only saying this -- as I
15   said, I wasn't aware they had made this public
16   until you showed it in this deposition.  I have
17   always been told you can't talk about the CIP
18   until the president presents it to the board.
19   That is why I didn't know it was there.  Let's
20   see here, so yeah, if you go to page 272, Tom.
21       Q    Give me a second.  All right.  I have
22   turned to 272 of Exhibit 6.
23       A    This is appendix (d).  I am in volume
24   one.  Are you in volume one, executive budget
```

Page 105

```
 1   recommendation, volume one?
 2       Q    I am in volume one.
 3       A    Go to 272.  Do you see where it says:
 4   DOC site; and this is a project that was actually
 5   established years ago, but it is actually the
 6   project for the entire campus.  The project that
 7   has the weird sounding title:  616 DOC ADA
 8   Assessment and Improvements, divisions 2, 4, 6,
 9   that is actually the entire campus.  The project
10   name was established, I want to say, five years
11   ago in response to an initial request from the
12   sheriff's office; and that was the only divisions
13   they named.  That is why we decided to go do a
14   comprehensive one.  My point is that project you
15   will see -- if you scroll up a little bit, so we
16   are allocating a million dollars in fiscal year
17   2025; and we are looking at an additional $2.2 in
18   2026.  That means we are expecting to be having a
19   contract for this of $3.2 -- I said a million.
20   $3.2 million in fees for the assessment.  Now it
21   may turn out to be more than that.  As I
22   mentioned, if it is, we will reallocate along the
23   lines of the rules that we are allowed to do; but
24   we have a million dollars allocating for --
```

Page 106

```
 1   expecting to be expended based upon work actually
 2   done in fiscal '25.  So even if we only start in
 3   the spring and get them under contract, let's say
 4   they start in June, we are still expecting they
 5   will have done a million dollars' worth of work
 6   already by the end of fiscal 2025.
 7       Q    So let me ask you:  This project began,
 8   we will say, five years ago based upon a business
 9   request from the sheriff; correct?
10       A    And I believe, Tom, you have produced
11   that in a prior deposition.  I think that is
12   where it came from.  Now that was pre-pandemic.
13   Now a lot has happened in there, and my five
14   years is an estimate.  I can't say off the top of
15   my head.  You and I have had long conversations
16   about business cases and all that kind of stuff.
17   They submitted one at some point.  I believe this
18   is the title from that business case; and as I
19   said, since then, we have decided rather than
20   doing individual buildings, we are going to do
21   the whole campus.  So there was a strategic
22   decision made.
23       Q    In the capital improvement plan, going
24   back four or five years, there has been an
```

Page 107

```
 1   allocation of spending, for the assessment of
 2   divisions two, four, six, nine, and ten, based
 3   upon a business case submitted by Sabrina
 4   Canchola.  Is that fair to say?
 5       A    I don't think Sabrina was with the
 6   sheriff at the time --
 7       Q    I think she was.
 8       A    I think it was Scott or someone else.
 9       Q    It was Sabrina Canchola.  I can find
10   the document --
11       A    I believe you.  If it was Sabrina, it
12   was probably more like three years ago.
13       Q    We will pull up the document.
14       A    I know you have it.  You have put it on
15   the screen in other depositions.
16              (WHEREUPON, a discussion off
17              the record was held.)
18              (WHEREUPON, Exhibit No. 7
19              was marked for
20              identification.)
21   BY MR. MORRISSEY:
22       Q    I am showing you Exhibit No. 7.
23   Perhaps it will refresh your recollection.
24       A    There we go.
```

Exhibit 1 Page 27

ERIC DAVIS
October 23, 2024

Page 108

1   Q    You see it's fiscal year '19, business
2   case; and it is for divisions two, four, six,
3   nine, and ten.  So going back to 2019, there
4   is --
5       A    Hang on a second.  Let's note this
6   actually came from -- I told you it came from
7   Scott.
8       Q    It actually was prepared by Sabrina --
9       A    Maybe she produced it; but you see
10  contact name, Andrew Scott Achterhof, he was her
11  predecessor.
12      Q    It is dated April 3rd, 2018?
13      A    Yeah, that was Scott.
14      Q    Okay.  In any event, the capital
15  improvement plan has included funds for the
16  assessment of two, four, six, nine, and ten going
17  back to fiscal year 2019 --
18      A    No.  Let's be clear.  You asked me to
19  give, the oath says, the whole truth.  This is a
20  business case --
21      Q    I hope you are telling the truth.
22      A    I am, and I am trying to --
23      Q    Well, if you were running for
24  president, I would be skeptical --

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 109

1       A    This is a business case.  This is a
2   request.  The actual CIP comes from the business
3   cases, but just because someone has put in a
4   business case to request it doesn't automatically
5   mean all of it goes into the CIP.  We have been
6   through that process several times.  That said,
7   yeah, I am sure there was something that went
8   into the 2019 CIP for this; but I don't know the
9   scope of what was included.  I can't remember
10  offhand.  It is, as you pointed out, six years
11  ago, five years ago.  So yeah, I am sure there
12  was a project that came from this request in the
13  CIP.  It probably wasn't anywhere as ambitious as
14  the project that we are doing now because they
15  are just talking about five buildings, and there
16  are sixty buildings on the DOC campus.  So we are
17  looking at a lot more than what is in this
18  business case --
19      Q    So if the fiscal year capital
20  improvement plan provided for $800,000 for these
21  five divisions at Cook County Jail, was that
22  money expended since it was in the capital
23  improvement plan going back five or six years?
24      A    I would have to go back and look

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 110

1   because I expect the information would reveal
2   that there was one or more spot improvements,
3   maybe something that DFM did on a localized
4   basis; or there was stuff done at the RTU.  I
5   would have to go back and reconstruct it.  It is
6   kind of a Rubik's jail.  So I would have to go
7   back --
8       Q    It goes back to my questioning before.
9   Just because an item appears in the capital
10  improvement plan -- for instance, this fiscal
11  year '19 business case, which should have
12  generated perhaps an entry in the capital
13  improvement plan for 2019 -- doesn't necessarily
14  mean those funds were expended in the year 2019?
15      A    That's correct.
16      Q    Okay, and now -- moving forward six
17  years now, you are again putting in an entry for
18  this assessment in the 2025 capital planning --
19  capital improvement plan, is that correct?
20      A    The way you are phrasing it suggests
21  that we are just trying over.  As I just
22  mentioned, this is a request for assessment
23  relative to five buildings.  The program that I
24  have outlined for you involves approximately

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 111

1   sixty buildings.  It is not as though we have
2   just been resubmitting or sitting around.  We
3   have been trying to take a strategic approach to
4   the entire campus.
5           (WHEREUPON, a discussion off
6            the record was held.)
7   BY MR. MORRISSEY:
8       Q    So if we go back to Exhibit 6, the ADA
9   assessment improvement to program in this plan
10  that goes to the County board has the same
11  divisions two, four, six, nine, and ten.  It
12  doesn't have anything else --
13      A    Okay, and as I said before -- yes.  I
14  am going to give you the complete answer to your
15  question, which is not a simple yes, no answer.
16  The title that is in there comes out of our
17  Oracle EDS computer system.  When we create a
18  project in the system, it takes the project name.
19  That is the project name as long as the project
20  exists.  As I said, this project has undergone
21  several evolutions; but because it is in the
22  system recorded with that name, we simply retain
23  that name; but that doesn't mean that the scope
24  of that project hasn't evolved over time, which

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 28

ERIC DAVIS
October 23, 2024

Page 112

1   is what it has.  It has been in, as you note, the
2   capital improvement plan for some time.  As the
3   scope has evolved, rather than creating a whole
4   new project, which is a whole new process to get
5   a whole new number in the EBS system, we retain
6   the original EBS number, which, in this case, has
7   the title that is less inclusive than that which
8   we are contracting and that which we have put in
9   our RFQ on the street for, which is the entire
10  campus.
11       Q    But if I am a commissioner for the Cook
12  County government and you ask me to approve
13  funding for assessments of five buildings, I
14  assume that capital planning is accurately
15  telling me what those funds are going to be
16  earmarked for; and apparently what you are
17  telling me, this document isn't accurate --
18       A    No --
19       Q    -- it doesn't fully explain the
20  additional portions of the Cook County Jail that
21  are included in this funding --
22       A    No, you are wrong.  It is not
23  inaccurate.  It is not all the documentation on
24  all of the projects.  This is a summary of a lot

ERIC DAVIS
October 23, 2024

Page 113

1   more information about that project, including a
2   description of the project at some length which
3   is provided to the budget department as a part of
4   that.  The budget -- the description is not
5   subject to the must remain unchanged requirements
6   that we see here with the two, four, six, nine,
7   and ten on there.  So we provided a lot more
8   information.  This also doesn't say, for example,
9   what the specific allocation is; but the budget
10  document, the much larger document, the complete
11  story of this project, includes the allocation by
12  project type.  When you have a project -- let's
13  say in this case you have a project that is
14  design.  The full budget document that is
15  provided to the budget department that this is a
16  subset of would say oh, it is under task 2.1.  It
17  is design.  For other projects, it may be in
18  construction.  It is under task 3.2, or it may
19  have design and construction money in it.  All of
20  that additional detail isn't included there; but
21  to characterize this as inaccurate, it is
22  accurate.  It is just not the whole story.
23       Q    Would the amount of $750,000 for the
24  capital improvement plan for 2019 sound right to

ERIC DAVIS
October 23, 2024

Page 114

1   the amounts for the assessing those five
2   divisions at the jail -- and I am going to pull
3   up the 2019 document to show you.
4            MR. STILLMAN:  Just objection.  I
5       think the document speaks for itself, but
6       go ahead.
7   BY THE WITNESS:
8       A    Yes, $750 -- there you go.
9   BY MR. MORRISSEY:
10       Q    This is the 2019 capital improvement
11  plan document, page 176.  Does it reflect that
12  for the ADA assessment and improvement, divisions
13  two, four, six, nine, and ten, there was an
14  allocation of $750,000?
15       A    That is what the document shows, yes.
16       Q    It shows going over the $750,000 was
17  supposed to be spent in that year?
18       A    It does.  It also only stipulates
19  funding for that budget year, and the total that
20  was budgeted at the time is $750 as opposed to
21  the $3.2 overall that we have budgeted now.
22       Q    And as the designee, you don't know if
23  this money was ever expended by Cook County to --
24       A    I don't believe all of it was.  Some of

ERIC DAVIS
October 23, 2024

Page 115

1   it may have been.  There may have been some
2   projects that I am not aware of offhand that were
3   executed under it.  I can't say offhand if that
4   is the case.  I would have to dig into the
5   accounting system to get that answer.
6       Q    So would it be fair to say that you
7   would hope that by June of 2025, that an
8   architect, slash, engineer firm would be able to
9   be retained to assess the zone in which the RTU
10  east tunnel ramp is in --
11       A    That is my expectation, yes, based upon
12  other processes that we have done because now we
13  have done -- I want to say I think we have seven
14  other assessments -- no.  We have five other
15  assessment contracts.  This will be six and
16  seven.  So based upon how the procurement that is
17  gone over, the other five that are under
18  contract, I would say that is a pretty reasonable
19  expectation, yeah.
20       Q    So I understand this process, the
21  engineering architectural firm such as
22  Globetrotters would analyze all the space for the
23  zone in which they are contracted to provide
24  services; correct?

Exhibit 1 Page 29

ERIC DAVIS
October 23, 2024

Page 116

1    A    Yes.

2    Q    And how long would that process -- do
3    you estimate that would take in order to do an
4    assessment similar to what Globetrotters provided
5    Cook County for the Cermak ramp?

6    A    I think you already stipulated from
7    before and asked me that question.

8    Q    I am asking you.

9    A    On the order of a year and a half to
10   two years.  I don't know.  Something around one
11   and a half, two, two and a half years, something
12   like that.  As I said, there is a lot for them to
13   do; and it is going to take them a while.

14   Q    So we are looking at January of 2027
15   when the architectural or engineering firm would
16   have completed their assessment of the zone which
17   includes the RTU east tunnel ramp.  Is that fair
18   to say?

19   A    As I said earlier, we may decide --
20   based upon the initial findings, we may decide to
21   triage it and advance certain portions of it; but
22   generally, yeah.  For the work overall, yeah --

23   Q    And --

24   A    -- that is probably about right.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 117

1    Q    After they provide an assessment report
2    to Cook County in regards to whether or not
3    certain buildings or structures within their zone
4    are in compliance with the ADA, then it would be
5    up to Cook County to hire them to do drawings for
6    the buildings that were found not to be in
7    compliance?

8    A    No.

9         MR. STILLMAN:  Objection.  Misstates
10   testimony.

11   BY THE WITNESS:

12   A    No.  As I said earlier in this case, we
13   are actually hiring the firms to do the
14   assessment, design, and to provide construction
15   administration services.  So they are eight-year
16   agreements.  They are intended for the
17   architects -- one of the things we have learned
18   is dividing it up, it's taking longer because of
19   procurement cycles, et cetera.  We got permission
20   from the chief procurement officer to do these.
21   The DOC has -- in other words, they are going to
22   do the assessment.  They are going to do the
23   design, and they are going to do construction
24   phase services.  They are going to give us fees

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 118

1    for all three parts of the project.  We are not
2    going to do assessment and then turn it over to
3    somebody else who's going to do the design
4    drawings and go forward from there.  Whoever
5    these firms are are going to be continuing from
6    the assessment all the way through construction.

7    BY MR. MORRISSEY:

8    Q    So after the assessment and the design
9    drawings for a particular zone that the RTU east
10   ramp is in complete, then Cook County would
11   have to decide whether or not they are going to
12   go forward with construction of the structure
13   such as the RTU east ramp; correct?

14   A    As I said, we will probably look at the
15   circumstances at the assessment phase.  We won't
16   wait until the drawings are done to make
17   determinations like that, and I would use the
18   Cermak ramp itself as an example where we have
19   the architectural firm working on the drawings.
20   They are only just now getting to the design and
21   development phase, but the contractor in this
22   case has already been identified and is already
23   working with the architect.  There isn't a need
24   for a second procurement process, and I would

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 119

1    expect we would break it up into a series of
2    packages just like that; and we would go ahead
3    and start involving them during the design phase.
4    That is -- rather than waiting for all the
5    drawings on all the buildings to be done before
6    we start, I expect we will break it out, triage
7    and prioritize, and start the construction
8    packages much sooner.

9    Q    Well, let's take that a little bit
10   slower.  Let's assume, just for argument's sake,
11   that in October of 2025, the firm that --
12   engineering architectural firm that has been
13   hired and under contract in June of 2025 to do an
14   assessment comes back and says Mr. Davis, we
15   found that the RTU east tunnel ramp is not in
16   compliance with the ADA.  They give you that
17   assessment in October of 2025.  Would it be fair
18   to say that your department would have to request
19   to include the capital improvement plan for 2026
20   funds to renovate the RTU east tunnel ramp?

21   A    First of all, as I said before, in the
22   case of the east tunnel ramp at the RTU, if they
23   came back and said there were deficiencies in the
24   tunnel there, which, as you pointed out, we

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 30

ERIC DAVIS
October 23, 2024

Page 120

1   already know, I would turn around and ask them
2   have they done the path of travel study for the
3   entire area to determine if that is the best way
4   to provide access to the building.  If the answer
5   at that point is yes and we have the
6   architectural study to prove it, then yeah, we
7   probably would advance it; and we would assign it
8   to a contractor to start working on pricing.
9        Q   My question was would it have to be --
10  would the funding for the construction and
11  renovation of the east tunnel ramp have to be
12  included in the capital improvement plan for
13  2026?
14       A   I would expect that we would include
15  funds for ADA work at the DOC.  Probably given
16  the time that it takes to create the budget
17  versus the time that it takes to have it approved
18  and circumstances change, I would expect we would
19  have a general allocation for '26 that would
20  include construction moneys, basically what we
21  would expect we might amend.  That may include
22  the RTU ramp.  It may include other projects.  So
23  yeah, we would put construction moneys in
24  starting in 2026.  As to what we would be

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 121

1   covering in '26, I can't answer that.
2        Q   So if these contractors for this
3   assessment are not under contract until June of
4   2025 -- and that is what you said you expect,
5   given a perfect world, it might be in June of
6   2025 -- what is the time period for the capital
7   planning department to submit information to the
8   budget office for inclusion in the 2026 capital
9   improvement plan?
10       A   Generally we would turn the 2026 plan
11  in around early to mid-August.
12       Q   So wouldn't it be fair to say that if
13  Globetrotters, for instance, was hired to assess
14  the zone in which the RTU east tunnel is in, that
15  it would be unreasonable for them to provide you
16  with an assessment of that ramp by August of
17  2025 -- let me rephrase the question.
18            Because we already know
19  Globetrotters has provided a report but -- let me
20  ask you a preliminary question.  Has
21  Globetrotters been selected to do the assessment
22  of the zone in which the RTU east tunnel ramp is
23  in?
24       A   I don't know how to answer that

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 122

1   question.
2        Q   Why not?
3        A   Because I would end up in prison, Tom.
4        Q   Okay.  In the State of Illinois --
5        A   I am being very serious.  When you
6   do --
7        Q   -- it might be accessible --
8        A   Excuse me.  When you do a procurement
9   like this, it is a public procurement.  It is
10  under strict rules; and one of the things that
11  you do when you are on the evaluation committee
12  is that you sign a form that says that you
13  acknowledge that if you reveal information about
14  procurements like this, you are subject to felony
15  prosecution.  I am not kidding.  I can't tell
16  you, Tom.
17       Q   Well, you have been designated by Cook
18  County to provide information in regards to the
19  potential renovation of the RTU east tunnel ramp;
20  and part of that process includes you tell us the
21  selection of an architecture or engineering firm
22  that would analyze that ramp.
23       A   I have told you we are in the process
24  of developing the contract to bring to the board

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 123

1   for that, firm or firms; and that is where we
2   are.  It is an open procurement.  We are in the
3   procurement process now.
4        Q   All right.  So is it possible that
5   Globetrotters would not be hired for the zone in
6   which the RTU east tunneling ramp is in?
7        A   I am not comfortable answering yes or
8   no to that question.
9        Q   Okay.  So again, the question -- it
10  begs the question, if a firm is finally under
11  contract to do an assessment of the zone in which
12  the RTU east tunnel ramp is in in June, July of
13  2025 and your office has to provide information
14  to the budget department by August of that year
15  in order to submit the capital improvement plan,
16  is it fair to say it is unlikely that funding for
17  the renovation of the east tunnel ramp may not be
18  included in the 2026 capital improvement plan?
19       A   No.  I will tell you why.  We provide
20  them -- do you remember what we were talking
21  about, the design development documents; and I
22  indicated they were a draft.  We send the budget
23  office a draft of the budget in August of the
24  year for the fiscal year.  They have various

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 31

ERIC DAVIS
October 23, 2024

Page 124

```
 1   processes and things that they need to do.  The
 2   president's recommendation that you are showing
 3   on the screen for fiscal year 2025 is subject to
 4   an amendment.  We typically will do amendments to
 5   make adjustments, usually minor, usually no more
 6   than a few percentage of the overall CIP; but we
 7   will make adjustments.  There is an opportunity
 8   to do that the month of October.  That is what we
 9   are working on now.  That would be going to the
10   final that would be voted on at the end of
11   November.  So there is an amendment process.  So
12   it is entirely likely that if they start in June,
13   by October, we would have a better idea of the
14   relative level of effort we are going to see in
15   the following fiscal year and be able to plan.
16   We are, after all, the department of capital
17   planning; and so if we have more information by
18   October, they start in June, yeah, I think it is
19   reasonable we might have more information from
20   them and be able to make an adjustment and make a
21   better estimate of how much of the work that they
22   are going to do going into '26.
23        Q    You mentioned for the Cermak ramp it is
24   going to take a year or two, a year and a half,
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 125

```
 1   to construct.  Is that fair to say?
 2        A    Sounds about -- I believe that is what
 3   was in the original schedule.  I know I will know
 4   more shortly.
 5        Q    So would you anticipate that after the
 6   design drawings are complete and a contract is
 7   tendered and accepted by the County and the
 8   contractor, that it will take a year and a half
 9   after that for the completion of the renovation
10   of the RTU east tunnel ramp?
11        A    I am sorry.  Can you ask the beginning
12   of your question -- ask the beginning of your
13   question again?
14        Q    Sure.  After a contract is entered into
15   between the County and a contractor for
16   renovation of the RTU east tunnel ramp, is it
17   fair to say it will take a year to a year and a
18   half before it is complete?
19        A    I want to qualify this around your use
20   of the word contract.  Depending upon the way it
21   is delivered -- if the RTU ramp is delivered
22   through our JOC system, which I expect, frankly,
23   it might be, then it will really be -- I am
24   blanking on the term.  It is not really a
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 126

```
 1   contract.  It is an approved proposal because the
 2   contractor in question will already have a
 3   contract.  So it is actually an approved proposal
 4   under that, just to be exact about it.  It
 5   also -- I also don't know if -- like I said, if
 6   it will bring them in earlier in the picture.  So
 7   they may start their proposal while there is
 8   design work going on.  So when you say when they
 9   start the construction, it may actually take less
10   time because they are onboard much earlier.  I can't
11   give you an exact answer at this point.  There is
12   too much to look into.
13        Q    All right.  So can you give me a
14   confirmation that the renovation of the RTU east
15   tunnel ramp will be completed by December of
16   2027?
17        A    I can't tell you that one way or
18   another until the assessments are at least
19   underway.  I don't know the answer to the path of
20   travel question, Tom.  That is a critical element
21   to look into.  So I can't tell you until we get a
22   little farther into it.  I am not prepared to
23   submit to a time for that specific project when
24   we are taking a more holistic look at it.  I
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
October 23, 2024

Page 127

```
 1   can't say yes or no on that.  That is your
 2   speculation.
 3        Q    So could it take three years from today
 4   for the renovation of the Cermak -- of the east
 5   tunnel ramp?
 6        A    It could take that amount of time.  It
 7   could take two years.  It could be something --
 8   maybe there is something else to be done.  Maybe
 9   there is a different way to solve the issue of
10   access into the RTU that we don't know about yet.
11   It is speculation.
12        Q    So it is pure speculation, as you sit
13   here today as a designee for Cook County --
14        A    Such a jerk.
15        Q    -- an anticipated date for the RTU east
16   tunnel ramp is purely speculative --
17             MR. STILLMAN:  Just objection.
18        Argumentative.
19   BY THE WITNESS:
20        A    I cannot answer with a high degree of
21   certainty one way or the other.  As I said, it is
22   part of a larger question.
23   BY MR. MORRISSEY:
24        Q    Is there any portion of the
```

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 32

Page 128

1  Globetrotters' April 1, 2024 report that Cook
2  County disagreed with as far as the accessibility
3  of that RTU east tunnel ramp?
4       A    Are you referring to the analysis that
5  was commissioned by counsel?
6       Q    I am referring to the Globetrotters
7  report of April of 2024 in regards to the RTU
8  east tunnel ramp --
9       A    Oh, yeah, okay.
10      Q    -- that you have reviewed --
11      A    Yes.
12      Q    -- as the designee for Cook County.  Is
13  there anything in that report that you dispute
14  with regards to the accessibility of that ramp?
15      A    I can't really give you an answer, Tom.
16  All I can tell you, with the example of the
17  Cermak ramp, there were elements in Globetrotters
18  initial analysis of the ramp at Cermak that the
19  architects of record, HDR, thought needed to be
20  handled somewhat differently; and they made
21  changes based on that.  They are the architects
22  of record.  So I can't say -- we would accept it.
23  We would look into it.  We would provide it to
24  whoever is hired to look at the entire campus.

Page 129

1  We would provide that to them, but then they
2  would need to look at -- they may turn around and
3  say oh, wait a second.  They missed this.  I
4  don't know.  That is why we are hiring somebody
5  to assess the entire campus.  They would take
6  that, and then they would look at the bigger
7  picture; and they would tell us if, in their
8  professional opinion, they agree with it or not.
9       Q    Has the Cook County board been provided
10  with the evaluation by Globetrotters of the east
11  tunnel ramp?
12      A    I don't believe so.  We do provide them
13  with an update of the ADA efforts of the
14  department more broadly, but I think it is really
15  just a summary.  I don't think we -- we
16  probably -- I believe that the presentation of
17  the most recent ADA report was specific to the
18  overall assessment of the campus, which we are
19  doing.  I don't think --
20      Q    What is that ADA report called?
21      A    I believe the title is ADA report.  It
22  is provided to the board on an annual basis I
23  think -- I believe they are in the process of
24  evaluating the most recent one now.  My director

Page 130

1  is handling that conversation with the board --
2       Q    That is an annual report by capital
3  planning --
4       A    Generally unless a pandemic happens.
5  Generally we do it every year.
6       Q    Does that include issues in regards to
7  the Cook County Jail?
8       A    It includes all of the various efforts.
9  We are taking in all portfolios.  It is a summary
10  document.  It is an overview of all that we are
11  doing in all of our portfolios about
12  accessibility.
13      Q    And is that a public document, the ADA
14  report --
15      A    I would have to assume that it is.
16      Q    Each year that report is prepared,
17  correct?
18      A    Roughly speaking, yes.  The calendars
19  change, but yes.
20      Q    As the director of capital planning,
21  you review it each year; correct?
22      A    Yes.
23      Q    To your knowledge, was the Cermak ramp
24  included in the report for -- that was entered in

Page 131

1  2023?
2       A    In '23?
3       Q    Yeah.
4       A    I don't know offhand.
5       Q    At that time, you had the
6  Globetrotters' report though; correct?
7       A    Yeah, but I can't tell you definitively
8  one way or the other, Tom, without checking.
9       Q    In the 2024 report, would the
10  noncompliance of the east tunnel ramp be included
11  in this ADA report to the Cook County board?
12      A    Give me just a minute.  I would assume
13  it is because -- I know that Cermak was mentioned
14  more broadly because, as you know, we are doing
15  an assessment of the entire building.  It
16  probably was touched upon in sort of a summary
17  basis.  I don't know offhand if it was
18  continued -- included through the whole thing.
19      Q    Would this April 1st, 2024 report be
20  attached --
21      A    No.
22      Q    -- to the Cook County board --
23      A    No.
24      Q    -- annual ADA report?

Exhibit 1 Page 33

Page 132

1    A    No.
2    Q    Why not?
3    A    Too much information.
4    Q    Too much information for Cook County
5    commissioners in regards to a noncompliant
6    feature at the Cook County Jail.  Is that your
7    testimony?
8    A    Tom, we have -- in the CIP that is on
9    your screen right now, we have 500 projects.  Do
10   you really expect us to give them the backup for
11   all 500 projects?
12   Q    Let's go to topic (b).  Topic (c), date
13   or anticipated date when the RTU east tunnel ramp
14   will be renovated to comply with the ADA, it is
15   fair to say that as you as sit here today, you
16   can't give me a definitive date.  Is that fair to
17   say --
18   A    For the reasons that I have testified
19   to before, I cannot give you an accurate date at
20   this time for the reasons that I have gone into
21   previously in this deposition.
22   Q    And number (b), action taken or will be
23   taken to reconstruct the RTU east tunnel ramp to
24   comply with the ADA, is it fair to say that you

Page 133

1    can't testify today in regards to what action, if
2    any, will be taken --
3    A    I have already testified as to the
4    process by which we are going to identify work on
5    the ADA in the campus to include the ramp at some
6    point.  I have already testified as far as how we
7    are planning on doing this, and I would note that
8    action taken to hire architects to develop the
9    assessment is action taken or in the process of
10   being taken; and then based upon that, as we have
11   discussed in this deposition, we will identify
12   funds as we get more information that will be
13   submitted and included in future CIPs.
14   Q    Number (d) is action, if any, to take
15   remedial steps to renovate parts of the RTU east
16   tunnel ramp until the entire ramp is renovated to
17   comply with ADA structural standards.  Can you
18   testify as the designee for Cook County what
19   current --
20   A    I am sorry.  Are you reading item (b)
21   from the --
22   Q    I am reading item (d) that is under two
23   on the topic that you were designated to talk
24   about.  So item (d) states:  Action, if any, to

Page 134

1    take remedial steps to renovate parts of the RTU
2    east tunnel ramp --
3    A    Are you talking about (b) as in --
4    Q    (d) as in dog.
5    A    I thought you were saying (b) as in
6    boy.  Let me look at (d).  Let's see, for the
7    reasons discussed previously, we want to look at
8    the whole picture.  We don't want to do stopgap,
9    and we can't do stopgap work in this case.
10   Q    Well, turning now to Exhibit 3, which
11   were the interrogatory -- the responses to
12   plaintiff's first and second set of requests to
13   admit, it deals with -- paragraph 47 deals with
14   the Globetrotters report.
15   A    Okay.
16   Q    It lists various parts of the structure
17   of that ramp, which are noncompliant; correct?
18   A    That is what their analysis indicates.
19   Q    Now as the designee for Cook County,
20   you were aware that on a daily basis, detainees
21   with mobility disabilities go up and down this
22   ramp to go to the Cermak health facility?
23   A    Is that a question?
24   Q    Yeah, that is a question.

Page 135

1    A    Well, it is an operational -- you are
2    asking me an operational question --
3    Q    It is not operational.  I am asking as
4    the representative for Cook County --
5    A    Yeah.
6    Q    -- is Cook County aware that this RTU
7    east tunnel ramp is used by people with mobility
8    disabilities to move up and down to go to the
9    Cermak health facility?
10   A    I can only assume that is the case, or
11   they may bring them in from the north.  I
12   can't -- it is just an assumption.
13   Q    And as far as the Cermak health
14   facility, there is an entrance to the Cermak
15   health facility other than through the tunnel
16   system; correct?
17   A    There is an entrance to the Cermak
18   health at grade -- yes.
19   Q    So it would be feasible to bring
20   prisoners, detainees, to the Cermak health
21   facility via a different path of travel other
22   than going up and down the Cermak ramp; correct?
23   A    That's correct.
24   Q    Given that the Cermak ramp has been

Exhibit 1 Page 34

ERIC DAVIS
October 23, 2024

Page 136

1  found to be noncompliant --
2      A    Yeah.
3      Q    -- why doesn't the jail transport
4  people with mobility disabilities through the
5  grade level entrance to the buildings?
6      A    You are asking me another operational
7  question.  I can't answer -- I can't answer that,
8  why the sheriff does it that way.  I can tell you
9  that it is feasible for them to -- for a
10 sheriff's deputy to push or to assist someone up
11 and down the ramp in the meantime; but that is an
12 operational decision for them, not for capital
13 planning.
14     Q    Looking at Exhibit No. 3, it references
15 the Globetrotter report in regards to the top
16 landing; correct?
17     A    Yes.
18     Q    And Globetrotters made a recommendation
19 that in a finding -- Globetrotters made a finding
20 that the landing is less than 60 inches, correct?
21     A    I believe that is what it says.
22     Q    And that's an ADA violation that
23 Globetrotters found, correct?
24     A    That is their common collusion.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 137

1      Q    One of the findings -- and
2  Globetrotters, again, is a credible engineering
3  firm that has previously been retained by Cook
4  County to review the Cermak ramp, correct?
5      A    That's correct.
6      Q    And the report made a recommendation
7  that it may be easily corrected by relocating the
8  doors to the east 51 inches to provide the
9  minimum required landing, correct?
10     A    That's correct.
11     Q    Why then in order to remedy the
12 landing, the top landing -- let me rephrase the
13 question.
14          Why doesn't Cook County take the
15 remedial step suggested by Globetrotters to make
16 the landing at least 60 inches for the top
17 landing?
18     MR. STILLMAN:  Objection.  Asked and
19     answered.
20 BY THE WITNESS:
21     A    Actually, it hasn't.  I want to answer
22 that.  There are two answers to your question,
23 Tom.  One is the door that they are referring to,
24 I don't know from this study -- and they haven't

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 138

1  indicated what is on the other side of the door.
2  It may or may not be the case that moving the
3  doors to 51 inches creates other barriers on the
4  other side of the door.  I don't know because I
5  don't believe they have looked into that
6  question.
7          The second reason is this.  If we
8  are going to make changes and you are going to
9  ask me things like other elements of this, why
10 can't we do this, the rules of the funding that
11 we do in capital planning trace back to the
12 underlying municipal bonds.  Those municipal
13 bonds come with restrictions from the Internal
14 Revenue Service.  One of those is that the
15 expenditures need to be what is called
16 capitalizable.  If we went in and made any of the
17 modifications that are on this list now -- and I
18 think it would be fair to say that it is our
19 expectation that if we are going to make changes
20 to the RTU, we would do them in less than five
21 years.  If we do a modification now, knowing that
22 it could easily be changed in five years, that is
23 not capitalizable.  It is a violation of the IRS
24 rules, and we can't do it.  We can only do

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 139

1  capital construction if we are reasonably
2  confident that what we are doing is going to
3  remain in place for a minimum of five years, and
4  why is that?
5          The answer to that question is
6  from the Cermak ramp.  The Cermak ramp had
7  various deficiencies in it.  For example, on the
8  screen, you showed handrails.  Well, if you are
9  going to later come back, Tom, and cleverly ask
10 me why don't you go ahead and replace the
11 handrails, the answer is the Cermak ramp --
12 because we put in, as you know, handrails that
13 were ultimately -- there were larger changes it
14 turned out that needed to be made, and we had to
15 take the handrails out.  We didn't know that at
16 the time we put the handrails in, but we thought
17 we were okay.  Turns out we were not.  So we had
18 to take them out.  Well, if we put in -- if we
19 went ahead and made changes to handrails now and
20 used capital money to pay for it, we know we are
21 going to make changes in five years; and we may
22 have a solution similar to Cermak.  The architect
23 of record may come back and say the best thing to
24 do is to make this a shallower ramp, just like we

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 35

ERIC DAVIS
October 23, 2024

Page 140

1  are doing in the Cermak ramp; and it wouldn't
2  need handrails. So there are technical reasons
3  why we are not going in and moving the door that
4  have to do with the broader analysis, and there
5  are legal reasons related to the funding why we
6  can't make these kinds of changes now because we
7  know that in less than five years, we are going
8  to be back.
9  BY MR. MORRISSEY:
10      Q   So for a person that has a cane,
11  walker, or crutch and needs an intermediate
12  landing at the top of the RTU east tunnel ramp,
13  they are going to have to continue to move up and
14  down that ramp because Cook County is unwilling
15  or unable to do the remedial -- the simple
16  remedial step of relocating the doors?
17      A   Tom, you are asking me an operational
18  question. I don't know what the operational
19  implications are for somebody with a hypothetical
20  cane, for example. I don't know if the sheriff
21  says oh, okay, you have a cane. We are going to
22  walk you, or we are going to put you in a
23  wheelchair; and we are going to wheel you up and
24  down the ramp. You are asking me a question. I

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 141

1  can't give you an answer to that question. That
2  is a question for the sheriffs.
3      Q   In regards to the upper ramp,
4  Globetrotters found that the upper ramp is not
5  code compliant because the top 16.5 percent of
6  the overall length is approximately 64 -- .64
7  percent steeper than permitted by code. Is that
8  a fair reading of the Globetrotters finding --
9          MR. STILLMAN: Objection. The
10      document speaks for itself.
11  BY THE WITNESS:
12      A   Yeah, I believe that is what the
13  document says.
14  BY MR. MORRISSEY:
15      Q   Globetrotters makes a recommendation
16  that sets the bottom portion of the ramp is
17  shallower than 1 to 12. It would be possible to
18  add a floor topping, which will even out the
19  slope, make a consistent --
20      A   I am sorry. Can you scroll down a
21  little bit so I can follow along with what you
22  are reading?
23      Q   Let me repeat it. Since the bottom
24  portion of the ramp is shallower than 1 to 12, it

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 142

1  would be possible to add a floor topping, which
2  will even out the slope, make it a consistent
3  floor slope that has a 1 to 12 slope or shelf.
4  If that was done, the upper ramp would be
5  compliant with the ADA; correct?
6      A   If that were done, and I have indicated
7  the reasons why that may or may not be something
8  we are in a position to do; but go ahead.
9      Q   That would make it compliant with the
10  ADA, correct?
11      A   That would make that element of it
12  compliant with the ADA. The entire ramp itself,
13  as you point out, has other deficiencies. There
14  is no such thing as, if you excuse the
15  expression, being a little bit pregnant. It is
16  either compliant or it is not; and if there are
17  other elements that are not compliant, even if
18  you fix those things, the ramp is -- we would
19  have to do the entire thing. We can't piecemeal
20  this because that doesn't achieve access
21  according to the requirements.
22      Q   But Cook County -- as the Cook County
23  designee, Cook County is not willing to take the
24  remedial steps recommended by Globetrotters for

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 143

1  the upper ramp. Is that fair to say?
2      A   I disagree with that characterization.
3          MR. STILLMAN: Yeah, objection.
4      Mischaracterizes testimony.
5  BY MR. MORRISSEY:
6      Q   Is --
7      A   You are using the term unwilling, Tom;
8  and we very much want to fix the situation, but
9  we have to follow the rules.
10      Q   So Cook County, as the designee, cannot
11  take the remedial step in the immediate future of
12  renovating the upper ramp of the east tunnel
13  ramp --
14      A   For the reasons already stipulated. It
15  either is potentially an uncompleted step or is
16  something that violates the funding rules that we
17  have for capital funds.
18      Q   In regards to --
19      A   If you have a problem with that, take
20  it up with the IRS.
21      Q   Well, so the IRS -- as the designee for
22  Cook County, it is Cook County's position that
23  taking remedial steps to renovate the RTU east
24  ramp would -- is not possible because of the IRS

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 36

ERIC DAVIS
October 23, 2024

Page 144

```
 1   regulation.  Is that what you are testifying to?
 2       A    That is a part of it.  As I said, that
 3   is a part of it because as we said, we expect to
 4   be making -- if there are larger changes needed
 5   in less than five years, we cannot reasonably say
 6   that the -- let's say in this case the topping
 7   slab, we can't say with any kind of certainty we
 8   are not going to come back in three years and rip
 9   that floor topping out, which means that we have
10   just violated the rule for capital construction.
11       Q    Let's look at the simple matter of
12   handrails.  Again, Globetrotters found that the
13   RTU east tunnel ramp is not in compliance;
14   correct?
15       A    How many times have you asked me that?
16   They said it is not compliant, yes.
17       Q    Is it your testimony that Cook County
18   is unwilling to take remedial steps to change the
19   handrails to make them compliant?
20       A    I object to the term unwilling, Tom.
21   We want to fix it.  We have to follow the rules.
22       Q    By following the rules, you say that
23   the -- in following the rules, Cook County can
24   renovate the Cermak ramp within the next two
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 145

```
 1   years.  Is that fair to say -- let me rephrase
 2   the question.
 3       A    Yeah.
 4       Q    There is nothing that bars Cook County
 5   from renovating the Cermak ramp over the next two
 6   years.  Is that fair to say?
 7       A    No, for the reason I just told you.  If
 8   we are doing it using capital funds, those funds
 9   are subject to IRS constraints.  It is called
10   whether or not it is capitalizable or not.  You
11   make representations to the bond holders of the
12   kinds of things that you are going to do and the
13   impact of those renovations on the material value
14   of the asset; and if it is an improvement that is
15   not going to last five years, it is not
16   considered capitalizable.
17       Q    I am asking about the Cermak ramp.
18   That Cermak was built in 2008 --
19       A    Okay, I am sorry.  I thought you were
20   asking me about --
21       Q    I am asking about Cermak.  Are you
22   aware of any bonding indenture that precludes the
23   Cermak ramp from being renovated in the next two
24   years?
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 146

```
 1       A    No, because we are obviously much
 2   farther along than Cermak.  No.
 3       Q    In regards to the RTU east tunnel ramp,
 4   is there any preclusion -- is there any reason
 5   why -- let me rephrase the question.
 6            Is there any IRS regulation which
 7   would preclude Cermak -- let me rephrase it.
 8            Is there any IRS regulation that
 9   would preclude Cook County from renovating the
10   RTU east tunnel ramp to bring it into compliance
11   with the ADA in the next two years?
12       A    I just answered that question in some
13   length, Tom.
14       MR. STILLMAN:  Objection.  Asked and
15   answered.
16   BY MR. MORRISSEY:
17       Q    No.  Eric, the question is, is there
18   any federal IRS regulation that would prevent
19   Cook County from taking the recommendations of
20   Globetrotters and renovating the entirety of the
21   RTU east tunnel ramp?
22       MR. STILLMAN:  Yeah, objection.
23       Asked and answered.
24
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
October 23, 2024

Page 147

```
 1   BY THE WITNESS:
 2       A    Yes.  Just what I went through with
 3   you.  With what money?  The money comes with
 4   constraints.  I have outlined to you what those
 5   constraints are.
 6   BY MR. MORRISSEY:
 7       Q    Do you understand my question?
 8       A    So you are saying why can't the County
 9   just go ahead and do it and renovate the RTU east
10   ramp along the lines of the Globetrotters'
11   analysis in the course of the next two years, and
12   I have given you two reasons why the answer is
13   no.
14       Q    Okay.  You are saying for one, that if
15   the RTU east tunnel ramp was changed to make it
16   compliant with the ADA, that would violate your
17   understanding of the bonding restrictions with --
18   under the requirements of the IRS that are --
19       A    Because we cannot tell you with a
20   straight face that we know for certain it is
21   going to stay -- what we are doing is going to
22   stay in place for five years, and we won't know
23   that until the assessments are done.  No, we
24   can't do that.  It is not capitalizable.  We
```

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 37

Page 148

1  cannot use the money that we have from the bonds
2  for those purposes if we are not certain it is
3  going to stay -- reasonably certain it is going
4  to stay in place for five years. They may --
5      Q   And --
6      A   I am not done yet, Tom. They may come
7  back and say, we really don't even need the east
8  tunnel ramp anymore. We want you to take -- the
9  assessment may say take it out and have everybody
10 come into the RTU from the pedestrian tunnel on
11 the north. I can't tell you if that is the case
12 or not. They may say it is too onerous and too
13 much of a pain to go up and down two ramps. When
14 they come up and down, we want you to -- I don't
15 know the answer to that question. We are going
16 to pay somebody to look into that.
17     Q   So unless there is a court order, it is
18 your assumption or belief that any renovation to
19 the RTU east tunnel ramp will have to wait
20 upwards of five years to be done. Is that fair
21 to say?
22     A   No, because by the timeline that you
23 talked about earlier, if we turn around -- you
24 are probably looking on the horizon of three to

Page 149

1  four years through the process of the assessment.
2  If you do the assessment and it says yeah, we
3  want to do this and this is going to make sense
4  and it ties into the path of travel around the
5  whole area, yeah, go ahead and do it, it is
6  probably three to four years based on the
7  timeline that you outlined earlier in this
8  deposition.
9      Q   So has Cook County told the Sheriff of
10 Cook County that the RTU east tunnel ramp is not
11 compliant with the ADA?
12     A   I assume Sabrina has a copy of the
13 Globetrotters report. I would have to defer to
14 counsel. I don't know.
15     Q   Has Cook County told the sheriff that
16 for detainees that have mobility disabilities,
17 that they should look into an alternate path of
18 travel so that detainees who are disabled do not
19 have to -- do not have to go up and down the
20 noncompliant ramp?
21     A   I am not -- we are not in a position to
22 tell the sheriff how to operate the jail. It is
23 my understanding that the sheriff has the option
24 of bringing people up and down any ramp in a

Page 150

1  wheelchair, right. Once a deputy is bringing
2  somebody up, then they don't have the issues --
3  the limitations of ADA. They could operate or
4  not. That is up to them.
5      Q   So Cook County knows that this ramp,
6  east tunnel ramp, is noncompliant. That is fair
7  to say, isn't it?
8          MR. STILLMAN: Objection. Asked and
9      answered many times.
10 BY MR. MORRISSEY:
11     Q   Is it fair to say that Cook County is
12 aware of the fact that Globetrotters found it
13 noncompliant?
14     A   Yes --
15         MR. STILLMAN: Asked and answered
16     many times. Go ahead.
17 BY MR. MORRISSEY:
18     Q   And Cook County has done nothing
19 operationally to inform the sheriff that this
20 ramp shouldn't be used by -- used to transport
21 detainees with mobility disabilities?
22     A   We are not in a position to tell them
23 should or should not. As far as whether or not
24 we have provided the information about its

Page 151

1  condition relative to the ADA from this analysis,
2  I expect that the sheriff has been provided with
3  this. I can't say that I have done it myself
4  directly, but it wouldn't surprise me if they
5  have that information already.
6      Q   So if I --
7      A   As far as telling them don't take
8  people up and down the ramp, that is not our
9  call. That is an operational question for the
10 sheriff.
11     Q   So if I am a mobility disabled prisoner
12 and I need a walker to go up and down the ramp,
13 for the next -- I am housed in the RTU and the
14 sheriff tells me that I have to go up this ramp,
15 that is fine with Cook County?
16     A   The County is not prepared to comment
17 on operations. That is their purview. That is
18 not ours.
19     Q   But Cook County knows it is not
20 compliant and knows that the jail continues to
21 use it for disabled people to be transported --
22     A   As I said, I don't know that they do or
23 they don't. You keep asking me the same
24 questions.

Exhibit 1 Page 38

ERIC DAVIS
October 23, 2024

Page 152

1   Q    So Cook County -- the designee for Cook
2   County doesn't know if this ramp is used to
3   transport disabled prisoners to and from Cermak.
4   Is that your testimony?
5         MR. STILLMAN:  Objection.  Misstates
6   testimony.
7   BY THE WITNESS:
8   **A    I suspect they probably do.  For**
9   **example, the sheriff, of their own volition, may**
10  **decide if somebody needs to go up and down in a**
11  **wheelchair, we will do that; but if they are**
12  **going in a walker, we are going to put them in a**
13  **wheelchair.  I don't know.  That is up to them.**
14        MR. MORRISSEY:  We are going to
15        continue this deposition because the
16        topic -- specifically for topic number one,
17        apparently the information was not
18        available to the designee to sit and
19        testify today to respond to the topics.
20        So --
21        MR. STILLMAN:  We would object to --
22        I think any information that you needed you
23        had.
24        MR. MORRISSEY:  In addition, we

ERIC DAVIS
October 23, 2024

Page 153

1   haven't been provided the documents that
2   apparently are in the possession of Cook
3   County.
4         MR. STILLMAN:  We are not --
5         THE WITNESS:  As had been noted are
6   not ready to be released, Tom.  We have
7   been through all this --
8         MR. MORRISSEY:  Ready to be released?
9   If they are requested in a litigation, I
10  don't think Cook County can decide whether
11  or not they are going to release them or
12  not.  They can go to court and ask for a
13  protective order; but if they are in
14  possession of documents that are relevant
15  to the topics in this Rule 30(b)(6) that
16  have been requested in discovery, I think
17  that is a specious objection; but I don't
18  have any further questions at this time.
19        MR. STILLMAN:  It is just the first
20  topic that you think you need to reconvene
21  on you are saying?
22        MR. MORRISSEY:  That is true.
23        MR. STILLMAN:  Okay.  We would
24  object.

ERIC DAVIS
October 23, 2024

Page 154

1   STATE OF ILLINOIS )
2                     )  SS:
    COUNTY OF C O O K )
3         I, Megan M. Reed, a Certified Shorthand
4   Reporter of said state, do hereby certify:
5         That previous to the commencement of
6   the examination of the witness, the witness was
7   duly sworn to testify the whole truth concerning
8   the matters herein;
9         That the foregoing deposition
10  transcript was reported stenographically by me,
11  was thereafter reduced to typewriting under my
12  personal direction, and constitutes a true record
13  of the testimony given and the proceedings had;
14        That the said deposition was taken
15  before me at the time and place specified;
16        That the said deposition was adjourned
17  as stated herein;
18        That I am not a relative or employee or
19  attorney or counsel, nor a relative or employee
20  of such attorney or counsel for any of the
21  parties hereto, nor interested directly or
22  indirectly in the outcome of this action.
23
24

ERIC DAVIS
October 23, 2024

Page 155

1         IN WITNESS WHEREOF, I do hereunto set
2   my hand and affix my seal of office at Chicago,
3   Illinois, this 22nd day of November, 2024.
4
5
6
7
8
9   _Megan Reed-Pahlke_
10  Megan M. Reed
11  License No.084-004499
12
13
14
15
16
17
18
19
20
21
22
23
24

Exhibit 1 Page 39