**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| EUGENE WESTMORELAND, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| -*vs*- | ) | Case No. 21-cv-4330 |
| | ) | |
| THOMAS DART, Sheriff of Cook County, | ) | Judge Matthew F. Kennelly |
| COOK COUNTY, ILLINOIS, OFFICER | ) | Magistrate Judge Heather K. McShain |
| E. ARREGUIN, and NURSE JEFFERSON, | ) | |
| | ) | |
| *Defendants.* | ) | |

**<u>DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS</u>**

Defendants, THOMAS DART, Sheriff of Cook County, COOK COUNTY, ILLINOIS, OFFICER E. ARREGUIN, and NURSE JEFFERSON, by their attorney, KIMBERLY M. FOXX, State's Attorney of Cook County, through her Special Assistant State's Attorneys, JOHNSON & BELL, LTD., submit the following response to Plaintiff's statement of facts:

1.      Thomas Dart, the Sheriff Cook County, is a defendant and under Illinois law, "has certain responsibilities for detainees within its custody, which may include making reasonable modifications to its policies, practices, or procedures to accommodate physically disabled detainees, pursuant to federal law." Dkt. 41, Dart Answer to Amended Complaint ¶ 3.

**RESPONSE:** Undisputed that this is a general statement of the law, but Defendants dispute that they violated the law.

2.      Defendant Cook County, in collaboration with the Sheriff, "has certain responsibilities for detainees within the custody of the Sheriff of Cook County, which may include accommodating the needs of disabled prisoners remanded to the Sheriff of Cook County, providing accessible living units to physically disabled detainees at Cook County Jail, or making physical

1

Exhibit 13 Page 1

modifications to the Cook County Jail." Dkt. 41, Dart Answer to Amended Complaint ¶ 4; Dkt. 40, Cook County Answer to Amended Complaint ¶ 4.

    **RESPONSE:** Undisputed that this is a general statement of the law, but Defendants dispute that they violated the law.

    3.    **[a]** Jerry Bauer, M.D., defendants' retained expert, saw plaintiff on December 12, 2022 for an "independent medical evaluation." Exhibit 1, Bauer Report at 1. **[b]** Prior to this evaluation, Dr. Bauer reviewed "a huge number of medical records and depositions" sent by defense counsel and **[c]** summarized the records from pages 9 through 35 of his report. Exhibit 2, Bauer Dep 19:15-21, 23:23-24:19; Exhibit 1, Bauer Report at 9-35. **[d]** The first record reviewed by Dr. Bauer is from January 2, 2011. Exhibit 2, Bauer Dep 20:11-18; Exhibit 1, Bauer Report at 9.

    **RESPONSE: [a]** Undisputed. **[b]** Undisputed that this is Dr. Bauer's testimony. **[c]** Defendants dispute that a summary of depositions is contained in pages 9 through 35 of Dr. Bauer's report, but Defendants do not dispute that a summary of medical records is contained in pages 9 through 35 of Dr. Bauer's report. (Ex. 1, Bauer Report, at 9–35.) **[d]** Defendants dispute that the first record Dr. Bauer reviewed is from January 2, 2011, but Defendants do not dispute that the first record contained in Dr. Bauer's report under the "Review of Medical Records" section is from January 2, 2011. (Ex. 1, Bauer Report, at 9; Ex. 2, Bauer Dep. 20:11–18.)

    4.    **[a]** When Dr. Bauer evaluated plaintiff on December 12, 2022, it was "[v]ery obvious" plaintiff's lower left extremity was weaker than his right lower extremity. Exhibit 2, Bauer Dep 51:5-10. **[b]** Dr. Bauer did not feel that plaintiff "was steady enough to stand" during this evaluation and **[c]** "thought his leg was profoundly weak." Exhibit 2, Bauer Dep 67:15-68:2.

Exhibit 13 Page 2

**RESPONSE: [a]** Undisputed that this is Dr. Bauer's testimony. **[b]** Defendants object that this statement takes Dr. Bauer's testimony out of context. Dr. Bauer testified that Plaintiff was standing during the evaluation for less than a minute, but Dr. Bauer did not want to take a chance of Plaintiff falling, so Dr. Bauer did not challenge him. (Ex. 2, Bauer Dep. 65:4–66:4, 67:10–68:2.) **[c]** Defendants object that this statement takes Dr. Bauer's testimony out of context. Although Plaintiff's left leg was profoundly weak due to polio, Plaintiff had full strength in his right leg. (Ex. 1, Bauer Report, at 38; Ex. 2, Bauer Dep. 41:21–42:8, 68:3–6, 82:1–11.)

5.      Dr. Bauer opines plaintiff is "disabled because of dramatic weakness and atrophy and lack of growth in his left leg due to polio." Exhibit 2, Bauer Dep 103:18-104:10. Dr. Bauer elaborated plaintiff "was at risk of falling both before his fall at the jail and after the fall at the jail and he, unfortunately, had a significant disability." Exhibit 2, Bauer Dep 107:7-22.

**RESPONSE:** Undisputed that this is Dr. Bauer's testimony with a clarification. Dr. Bauer testified that Plaintiff's left leg weakness is not related to his fall in November 2019. (Ex. 2, Bauer Dep. 103:18–104:10.)

6.      **[a]** Plaintiff was processed into the Cook County Jail on October 30, 2019, and was assigned booking number 2019-1030026. Dkt. 51, Dart Answer to Amended Complaint ¶ 8. **[b]** From October 30, 2019 until about 10:00 a.m. on November 7, 2019, plaintiff was assigned to Division 8 RTU, Tier 3F. Dkt. 41, Sheriff Answer to Amended Complaint ¶ 10. **[c]** The RTU "opened to wheelchair users in August 2014" and "was required to comply with the 2010 ADA Standards for Accessible Design." *Flora v. Dart*, 2017 WL 2152392 at *4 (N.D. Ill. 2017) (Kennelly, J.) (vacated by agreement of the parties). **[d]** When initially assigned to Tier 3F plaintiff had an "accessible bed" meaning there was space for a wheelchair to approach the bed without obstacles. Exhibit 3, Westmoreland Dep 164:12-165:18.

Exhibit 13 Page 3

**RESPONSE: [a]** Undisputed. **[b]** Undisputed with the clarification that Plaintiff was assigned to Division **08**, not Division **8**, which refers to a different division at the Jail. (Deft. Sheriff's Ans. to Am. Compl. ¶ 10, ECF No. 41.) **[c]** Defendants object that this statement contains non-material facts. Plaintiff's housing conditions in the Residential Treatment Unit (RTU) are immaterial because Plaintiff alleges that he was harmed "because of his assignment to a top bunk in Division 10," not in the RTU. (Pl.'s Am. Compl. ¶ 24, ECF No. 26.) Defendants also object that "a vacated judgment is of no further force or effect," *see United States v. Williams*, 904 F.2d 7, 8 (7th Cir. 1990), and "a vacated judgment and the associated factual findings are 'a nullity.'" *Brisco v. Stinar*, No. 19-cv-7233, 2020 U.S. Dist. LEXIS 223084, at *19 (N.D. Ill. Nov. 30, 2020) (citing *Simpson v. Motorists Mut. Ins. Co.*, 494 F.2d 850, 854–55 (7th Cir. 1974)). **[d]** Defendants object that Plaintiff is not qualified to offer an opinion on the 2010 ADA Standards for Accessible Design or the meaning of "accessibility." Defendants also object that this statement contains non-material facts. Plaintiff's housing conditions in the RTU are immaterial because Plaintiff alleges that he was harmed "because of his assignment to a top bunk in Division 10," not in the RTU. (Pl.'s Am. Compl. ¶ 24.) Defendants further object that Plaintiff's testimony is taken out of context. Plaintiff was not in a wheelchair when he was initially assigned to Tier 3F. (Ex. 3, Pl.'s Dep. 165:19–24.) Plaintiff testified that he selected the bed in Tier 3F because it was his first time at Jail and he wanted to be close to the officer, not because it was "accessible." (Ex. 3, Pl.'s Dep. 166:1–22.)

7.      **[a]** Gregory Haman, M.D., worked as a physician for Cermak Health Services from approximately July 2018 to June 2020. Exhibit 4, Haman Dep 6:19-21. **[b]** When Dr. Haman started working for Cermak Health Services he was trained for about one month, which included training on Policy G-2.10, titled "Identification of Patients With Disabilities At Intake." Exhibit 4, Haman Dep 10:16-11:20.

Exhibit 13 Page 4

**RESPONSE:** **[a]** Undisputed. **[b]** Defendants object that the cited testimony does not support this statement. Dr. Haman testified, "I have no recollection of a specific form of training other than, after having reviewed this document, I do know that we reviewed many policies and were expected to have a familiarity with them." (Ex. 4, Haman Dep. 11:22–12:9.)

8.     When Dr. Haman identified a detainee with a mobility disability at intake "there were orders that we could place in the computer regarding their housing and/or if they needed assistive devices for a deficit." Exhibit 4, Haman Dep 12:23-13:9.

**RESPONSE:** Undisputed that this is Dr. Haman's testimony with a clarification. Dr. Haman testified that some detainees who have a mobility disability could be housed anywhere at the Jail. (Ex. 4, Haman Dep. 13:11–23.)

9.     In October and November of 2019, Dr. Haman was aware there were accessible living units in "Cermak and RTU-3." Exhibit 4, Haman Dep 21:23-22:4.

**RESPONSE:** Defendants object that Dr. Haman is not qualified to offer an opinion on which living units at the Jail are "accessible" under the Americans with Disabilities Act. Defendants also object that this statement contains non-material facts. Whether there were "accessible" living units in Cermak and RTU-3 is immaterial because Plaintiff alleges that he was harmed "because of his assignment to a top bunk in Division 10," not in Cermak or RTU-3. (Pl.'s Am. Compl. ¶ 24.) Defendants further object that Dr. Haman's testimony is taken out of context. Dr. Haman testified that some detainees who have a mobility disability could be housed anywhere at the Jail. (Ex. 4, Haman Dep. 13:11–23.)

10.    In a FY 19 Business Case dated 4/3/2018, the Sheriff's ADA Compliance Officer, Sabrina Rivero-Canchola, wrote:

> Division10 is a maximum security division with no ADA compliant
> housing. Detainees with mobility disabilities that require auxiliary

Exhibit 13 Page 5

aids, but do not require medical housing, are housed in divisions 2, 4, 6, 9 and 10. The only ADA housing (housing that complies with 2010 design standards) that currently exists for detainees with mobility impairments is the RTU and Cermak. The ADA requires us to house detainees in the most integrated setting. Having no ADA compliant housing other than divisions 8 and 08, severely restricts are [sic] ability to house detainees in the most integrated setting while making sure they have access to accessible cells, toilets and showers. This creates difficulties with bed control, and also leads to litigation.

Exhibit 5, FY19 Business Case at 1-2; Dkt. 41, Dart Answer to Amended Complaint ¶ 21.

**RESPONSE:** Defendants object that this paragraph contains non-material facts. Whether Division 10 had accessible cells, toilets, or showers is immaterial because Plaintiff does not allege he was denied access to cells, toilets, or showers. (Pl.'s Am. Compl.) Rather, Plaintiff alleges only that he was denied the benefits of the program or activity of sleeping because he was assigned to a top bunk instead of a lower bunk in Division 10. (*Id.* ¶¶ 15, 23–24.) Whether Division 10 had "ADA compliant housing" is also immaterial because physical construction of Division 10 commenced prior to July 26, 1992. (Ex. 23, Davis Aff. ¶¶ 8–16.) Therefore, Division 10 was not required to comply with the 1991 ADA Standards for Accessible Design. *See* 28 C.F.R. § 35.151(c)(1) (stating that "[i]f physical construction or alterations commence after July 26, 1992, but prior to September 15, 2010, then new construction and alterations subject to this section must comply with either UFAS or the 1991 Standards").

11. Dr. Haman evaluated plaintiff on October 30, 2019, and captured the following history: "Patient reports diagnosed with polio at one year old and has had LLE weakness since. Reports that he has difficulty standing for long periods of time (5-10 minutes) due to discomfort in back." Exhibit 6, Haman (10/30/2019) Record at 2. The history also notes "[r]eports 12-13 mechanical falls per month but will catch himself and has never needed to go to the hospital for this. Several days ago had mechanical fall in apartment, fell forward when L leg collapsed." *Id.*

Exhibit 13 Page 6

**RESPONSE:** Undisputed that Dr. Haman documented this in Plaintiff's medical records, although, for completeness, Dr. Haman also documented, "[Plaintiff] is independent for all ADLs, will shower for short periods of time. Does regular see a primary care doctor and PT prior to incarceration, does not use assistive device. Says PT advised a cane at some point but he was not interested in this." (Ex. 6, Pl.'s Med. Rs., at 143.)

12.      **[a]** Dr. Haman documented on October 30, 2019, "given severity of deficit on exam, will house M3 given fall risk." Exhibit 6, Haman (10/30/2019) Record at 3. **[b]** He identified plaintiff as a fall risk during this evaluation. Exhibit 4, Haman Dep 41:7-12.

**RESPONSE: [a]** Undisputed that Dr. Haman documented this in Plaintiff's medical records, although, for completeness, Dr. Haman also documented, "If at follow up no falls can consider downgrade." (Ex. 6, Pl.'s Med. Rs., at 144.) **[b]** Defendants object that the unstated assumption behind this statement is that Dr. Haman objectively assessed Plaintiff to be a fall risk, but the cited testimony does not support this assumption. Dr. Haman testified that he considered Plaintiff to be a fall risk based solely on Plaintiff self-reporting twelve to thirteen mechanical falls per month. (Ex. 4, Haman Dep. 41:13–20, 58:6–16, 60:2–12.) Based on Dr. Haman's examination of Plaintiff, Dr. Haman could not identify whether Plaintiff was a fall risk. (*Id.* at 60:2–12.) Dr. Haman testified that another patient who had the same examination findings "could fall never, could fall as often, [or] could fall more frequently" than twelve to thirteen times per month. (*Id.*)

13.      M3 means – "Medical Intermediate – Patients [sic] is recommended for housing with 24/7 nursing and access to special accommodations but does not need M4 Special Care Unit level of care (Residential Treatment Unit – RTU- see Bed Control key." Exhibit 7, Cermak Health Services Policy # A-08, Appendix A titled "A Quick Guide to Health Alerts for Correctional Officers" at 6.

7

Exhibit 13 Page 7

**RESPONSE:** Undisputed that this information is contained in an appendix to a policy of Cermak Health Services.

14.     In 2010, an Agreed Order was entered in *U.S. v. Cook County, Illinois et al.*, 10-cv-2946 (N.D. Ill.), which requires "that Cook County Department of Corrections house inmates with disabilities in appropriate housing." *See* Exhibit 8, Implementation Plan: Accessibility Provisions of Agreed Order at 1.

**RESPONSE:** Undisputed.

15.     "Cermak Health Services communicates health needs of jail patients to the Department of Corrections through a system of health alerts, which are posted in the CCDOC CCOMS information system. This listing, a companion document to Cermak Policy A-08, specifies the action taken by correctional staff for each alert." Exhibit 7 at 4, Appendix A to Cermak Policy A-08 titled "A Quick Guide to Health Alerts for Correctional Officers."

**RESPONSE:** Undisputed that the language in quotation marks is contained in an appendix to a policy of Cermak Health Services.

16.     There is an alert for "Cane/Cane LDO (Long Distance Only)" in Appendix A to Cermak Policy A-08. Exhibit 7 at 4. This alert provides notice to correctional officers that a patient is allowed to use a cane and "[p]atients with this alert should also be handled as Lower Bunk." Exhibit 7 at 4, Cermak Policy # A-08, Appendix A titled "A Quick Guide to Health Alerts for Correctional Officers."

**RESPONSE:** Undisputed that the language in quotation marks is contained in an appendix to a policy of Cermak Health Services.

17.     Andrew DeFuniak, M.D. has been employed by Cermak Health Services since 2003. Exhibit 9, DeFuniak Dep 5:1-8. Dr. DeFuniak said, based on experience, if he enters an alert

8

Exhibit 13 Page 8

for a detainee to have a cane in the Department of Correction's system that the patient will be provided with a lower bunk. Exhibit 9, DeFuniak Dep 25:13-18.

**RESPONSE:** Undisputed that this is Dr. DeFuniak's testimony.

18.    **[a]** Physical Therapist Jamie Crothers evaluated plaintiff on November 4, 2019. Exhibit 10, Crothers 11/4/2019 Note at 1-2. **[b]** During this evaluation, plaintiff reported a baseline "ambulating in the community without an assistive device, inconsistent use of an orthoses, but he also reported having consistent falls at his community baseline." Exhibit 11, Crothers Dep 44:22-45:8. PT Crothers noted plaintiff has "an obvious limp." Exhibit 11, Crothers Dep 125:13-21. **[c]** She also noted "patient self-reported a high fall frequency when in the community" and reported falling in the community greater than 10 times a month. Exhibit 10, Crothers 11/4/2019 Note at 1-2.

**RESPONSE: [a]** Undisputed. **[b]** Undisputed that this is PT Crothers' testimony. **[c]** Undisputed that PT Crothers documented this in Plaintiff's medical records.

19.    On November 4, 2019, PT Crothers understood plaintiff's baseline included constant falls because "he felt unsteady." Exhibit 11, Crothers Dep 45:5-22.

**RESPONSE:** Undisputed that this is PT Crothers' testimony.

20.    According to PT Crothers, plaintiff "was ambulating independently" on November 4, 2019. Exhibit 11, Crothers Dep 43:2-45:8.

**RESPONSE:** Undisputed that this is PT Crothers' testimony.

21.    PT Crothers willingly issued a cane on November 4, 2019, because plaintiff "reported feeling unsteady in his unfamiliar environment compared to his home where he had his home set up where he felt comfortable walking unassisted" and PT Crothers "did not think it was unreasonable to issue him a cane based on his request." Exhibit 11, Crothers Dep 46:3-47:11

Exhibit 13 Page 9

**RESPONSE:** Undisputed that this is PT Crothers' testimony.

22.     On November 5, 2019, Dr. Haman wrote the following note in plaintiff's medical records: "discussed with PT, have co-signed order for cane" and "[n]o falls since arrival, appropriate for GP [meaning general population]." Exhibit 12, Dr. Haman 11/5/2019 Record.

**RESPONSE:** Undisputed that Dr. Haman documented this in Plaintiff's medical records.

23.     When Dr. Haman determined it would be medically appropriate for plaintiff to be housed in general population, he did not assess whether plaintiff had strength to reach a top bunk because "the cane order that was in place in our directives to DOC means that a patient with a cane order should be housed on a lower bunk. So for me to assess if he could – could or could not go up to a high bunk was, I'd say, medically unnecessary." Exhibit 4, Haman Dep 69:10-70:10.

**RESPONSE:** Undisputed that this is Dr. Haman's testimony.

24.     According to Dr. Haman, "because the cane order, per our documentation of understanding with DOC, implies that a patient – not implies, but explicitly says that patients with canes should be housed in lower bunks because he had a cane and the order was in place." Exhibit 4, Haman Dep 70:20-71:4.

**RESPONSE:** Undisputed that this is Dr. Haman's testimony.

25.     It was Dr. Haman's understanding when plaintiff's status was changed from M3 to general population, the Department of Corrections would place plaintiff on a lower bunk because "patients who had canes would be assigned to lower bunks in those divisions that had bunks." Exhibit 4, Haman Dep 77:2-19. Dr. Haman said Cermak Policy A-08 formed the basis for this understanding. Exhibit 4, Haman Dep 78:14-79:18.

**RESPONSE:** Undisputed that this is Dr. Haman's testimony.

Exhibit 13 Page 10

26.     On November 7, 2019, plaintiff was transferred from Division 8 to Division 10 and escorted by Officer William Richard. Dkt. 41, Sheriff Answer to Amended Complaint ¶ 11; Exhibit 13, Richard Dep 33:7-18, 64:13-17; Exhibit 14, Westmoreland Decl. ¶¶ 1-2; Exhibit 36, video from Tunnel-CAM 0.108 CMK to RTU West 10:01:22 a.m. to 10:02:12 a.m.

**RESPONSE:** Undisputed with the clarification that Plaintiff was transferred from Division **08**, not from Division **8**, which refers to a different division at the Jail.

27.     While plaintiff was walking up a ramp he stumbled at about 10:01:45 a.m. Exhibit 14, Westmoreland Decl. ¶¶ 1-2; Exhibit 36, video from Tunnel-CAM 0.108 CMK to RTU West at 10:01:45 a.m. Plaintiff arrived in Division 10, Tier 2A at approximately 10:30 a.m. Dkt. 41, Sheriff Answer to Amended Complaint ¶ 13.

**RESPONSE:** Undisputed.

28.     **[a]** Officer Carlos Castaneda has been assigned to Division 10 since at least 2014 and on November 7, 2019 was present in the dayroom as a backup officer when Nurse Jefferson and defendant Officer Arreguin approached plaintiff's cell. Exhibit 15, Castaneda Dep 4:23-5:9, 68:11-22, 72:4-7. **[b]** He has never been given training from Cermak about what it means when a detainee has a medical alert for a cane. Exhibit 15, Castaneda Dep 11:12-16.

**RESPONSE: [a]** Undisputed. **[b]** Defendants object that this statement contains non-material facts. It is immaterial whether Officer Castaneda received training from Cermak Health Services as Officer Castaneda is employed by the Cook County Sheriff's Office, not Cermak Health Services. (Ex. 15, Castaneda Dep. 4:17–22.) This statement is also disputed. When Officer Castaneda was transferred to Division 10, he received on-the-job training from other officers on what it means when a detainee has a medical alert for a cane. (*Id.* at 44:10–18.)

11

Exhibit 13 Page 11

29.     Officer Castaneda has never seen the document titled "A Quick Guide to Health Alerts for Correctional Officers" prior to preparing for his May 23, 2022 deposition. Exhibit 15, Castaneda Dep 18:4-19.

**RESPONSE:** Undisputed that this is Officer Castaneda's testimony.

30.     Nobody from the Sheriff's Officer nor Cermak Health Services trained Officer Castaneda that a detainee with a cane should have a lower bunk. Exhibit 15, Castaneda Dep 19:24-20-7.

**RESPONSE:** Defendants object that this statement contains non-material facts. It is immaterial whether Officer Castaneda was trained on who should have a lower bunk because Classification is the department that determines a detainee's bed assignment. (Ex. 15, Castaneda Dep. 36:16–37:7.) Notwithstanding and without waiving said objections, it is undisputed that Officer Castaneda testified that nobody from the Sheriff's Officer or Cermak Health Services trained him that a detainee with a cane should have a lower bunk. Officer Castaneda testified that Classification is the department that determines a detainee's bed assignment. (*Id.*)

31.     Officer Castaneda said doctors are "the ones that make that decision whether the detainee has to be in a bottom bunk." Exhibit 15, Castaneda Dep 51:11-52:12.

**RESPONSE:** Undisputed that this is Officer Castaneda's testimony.

32.     Defendant Esteban Arreguin was assigned to be the tier officer in Division 10, Tier 2A on November 7, 2019 from 7:00 a.m. to 3:00 p.m. Dkt. 32, Defendant Arreguin Answer to Amended Complaint ¶ 6; Dkt. 41, Sheriff Answer to Amended Complaint ¶ 6.

**RESPONSE:** Undisputed.

33.     **[a]** Defendant Arreguin has no recollection of training to interact with disabled individuals as a Sheriff's employee and **[b]** does not recall receipt of the "quick guide to health

12

Exhibit 13 Page 12

alerts for correctional officers" that is Appendix A to Cermak Policy A-08. Exhibit 16, Arreguin Dep 37:1-19, 52:2-55:24.

**RESPONSE: [a]** Undisputed that Officer Arreguin testified he did not recall during his deposition training to interact with disabled individuals. However, Defendants dispute that Officer Arreguin did not receive such training, as Officer Arreguin received training related to the Americans with Disabilities Act on February 7, 2018, training on the Sheriff's Office policies and procedures on February 11, 2019, training on discrimination, harassment, and retaliation on June 10, 2019, and various other training during his time as a correctional officer. (Ex. A, Arreguin Training File, at 38, 41.) **[b]** Undisputed that this is Officer Arreguin's testimony.

34.    Defendant Arreguin does not remember ever seeing a document titled a quick guide to health alerts for correctional officers or guidance that a detainee with a cane alert should be given a lower bunk. Exhibit 16, Arreguin Dep 52:2-55:24.

**RESPONSE:** Defendants object that this paragraph contains non-material facts. It is immaterial whether Officer Arreguin received guidance on who should have a lower bunk because Classification is the unit that determines a detainee's bed assignment. (Ex. 16, Arreguin Dep. 42:4–44:6.) Notwithstanding and without waiving said objections, it is undisputed that Officer Arreguin testified he does not remember ever seeing Cermak Policy A-08 titled a "quick guide to health alerts for correctional officers" or that anyone has told him or that he has received anything in writing that a detainee with a cane alert should be given a lower bunk. Officer Arreguin testified that Classification is the unit that determines a detainee's bed assignment. (*Id.*)

35.    Defendant Arreguin has no recollection of November 7, 2019, including whether he had conversations with plaintiff. Exhibit 16, Arreguin Dep 112:24-113:4, 115:10-23.

Exhibit 13 Page 13

**RESPONSE:** Undisputed that Officer Arreguin testified he did not recall during his deposition the events of November 7, 2019.

36.     Defendant Arreguin has never been instructed that a detainee with a cane alert should be given a lower bed. Exhibit 16, Arreguin Dep 52:14-56:6.

**RESPONSE:** Defendants object that this paragraph contains non-material facts. It is immaterial whether Officer Arreguin received instruction on who should have a lower bunk because Classification is the unit that determines a detainee's bed assignment. (Ex. 16, Arreguin Dep. 42:4–44:6.) Notwithstanding and without waiving said objections, it is undisputed that Officer Arreguin testified that he has never been instructed that a detainee with a cane alert should be given a lower bed. Officer Arreguin testified that Classification is the unit that determines a detainee's bed assignment. (*Id.*)

37.     **[a]** Defendant Arreguin said detainees "usually decide amongst themselves" who sleeps on the upper and lower bed. Exhibit 16, Arreguin Dep 43:21-44:6, 45:9-46:7. **[b]** Over the past three years defendant Arreguin has only been involved in a cell bed assignment when it involves a detainee with a lower bunk permit. Exhibit 16, Arreguin Dep 46:4-47:8.

**RESPONSE: [a]** Defendants object that the cited testimony is taken out of context. Officer Arreguin testified that detainees cannot decide who sleeps on the upper and lower bed if one of the detainees has a lower bunk permit. (Ex. 16, Arreguin Dep. 46:16–47:1.) Officer Arreguin also testified that the Classification unit assigns detainees to either a top or bottom bed. (*Id.* at 43:21–44:6.) **[b]** Defendants object that the cited testimony does not support this statement. Officer Arreguin did not testify that he was involved in determining a detainee's bed assignment. Officer Arreguin testified that Classification is the unit that determines a detainee's bed assignment. (*Id.* at 42:4–44:6.) Officer Arreguin testified that when an incoming detainee had a lower bunk permit,

14

Exhibit 13 Page 14

he would advise the detainee who was already in the cell that he would have to move to the top bed. (*Id.* at 46:16–47:1.)

38.    **[a]** When plaintiff arrived on Tier 2A he observed the living unit was not accessible, including the toilets and showers, and **[b]** made a request to the tier officer (defendant Arreguin) to be "transferred out of this place because of my condition, I fall a lot" and was told that a request form would be provided, which never occurred. Exhibit 3, Westmoreland Dep 198:15-201:7, 206:21-207:7.

**RESPONSE: [a]** Defendants object that this statement contains non-material facts. Whether Tier 2A had accessible toilets or showers is immaterial because Plaintiff does not allege he was denied access to toilets or showers. (Pl.'s Am. Compl.) Rather, Plaintiff alleges only that he was denied the benefits of the program or activity of sleeping because he was assigned to a top bunk instead of a lower bunk in Division 10. (*Id.* ¶¶ 15, 23–24.) **[b]** Defendants object that this statement contains non-material facts. Plaintiff alleges only that he was denied the benefits of the program or activity of sleeping because he was assigned to a top bunk instead of a lower bunk in Division 10 (*Id.*) However, Plaintiff's testimony that he told the tier officer to be transferred occurred before Plaintiff had even been in his cell so it is impossible for Plaintiff to have informed the tier officer at this time that he could not be assigned to a top bunk and needed a lower bunk. (Ex. 3, Pl.'s Dep. 203:15–204:21.) Defendants also object that Plaintiff's testimony regarding his concern about falling at this time was due to the way the benches were designed and the way the tables were put together and not because of any condition within his cell. (*Id.* at 199:11–20.) Notwithstanding and without waiving said objections, it is undisputed that this is Plaintiff's testimony.

Exhibit 13 Page 15

39.    **[a]** At 11:00:28 a.m. plaintiff enters Cell 2107 because of a medical emergency on the tier. Exhibit 3, Westmoreland Dep 210:1-12, 212:2-12; Exhibit 14, Westmoreland Decl. ¶ 3; Exhibit 50, video from DIV 10-CAM 2.054 Tier 2A Front from 10:52:12 a.m. to 11:08:04 a.m. **[b]** Upon entering the cell plaintiff is told by the tier officer, defendant Arreguin, that he was assigned to the upper bunk because the other detainee assigned to the cell had an order for a lower bunk. Exhibit 3, Westmoreland Dep 210:1-23, 213:2-16.

**RESPONSE: [a]** Undisputed. **[b]** Disputed. Plaintiff testified that he did not have any conversation with Officer Arreguin when he entered the cell the first time around 11:00:28 a.m. because Officer Arreguin "was kind of busy taking care of the medical part, the emergency." (Ex. 3, Pl.'s Dep. 214:13–19.)

40.    **[a]** Leron Wade and plaintiff were assigned to Division 10, Tier 2A, Cell 2107, on November 7, 2019. Exhibit 17, Wade Bed Assignment; Exhibit 18, Plaintiff Bed Assignment. **[b]** Leron Wade had an active alert for "Lower Bunk" from July 18, 2019 to February 20, 2020. Exhibit 19, Wade Inmate Alerts.

**RESPONSE: [a]** Undisputed with the clarification that Leron Wade was assigned to Division 10, Tier 2A, Cell 2107 on July 18, 2019, and Plaintiff was assigned to Division 10, Tier 2A, Cell 2107 on November 7, 2019, at 10:30 a.m., three hours before the alleged incident around 1:30 p.m. (Ex. 17, Wade Bed Assignment; Ex. 18, Pl. Bed Assignment.) **[b]** Undisputed.

41.    **[a]** Video shows plaintiff left Cell 2107 at 11:06:51 a.m. and **[b]** communicate with defendant Arreguin. Exhibit 14, Westmoreland Decl. ¶ 3; Exhibit 50, video from DIV 10-CAM 2.054 Tier 2A Front at 11:06:51 a.m.

**RESPONSE: [a]** Undisputed. **[b]** Disputed. Officer Arreguin is not the officer who is depicted in the video as being present on the tier around 11:06:51 a.m. (Ex. 16, Arreguin Dep.

16

Exhibit 13 Page 16

132:5–7 (testifying that he is depicted in the video around 1:45 p.m. leaving the dayroom); Ex. 24, Video from DIV 10-CAM 2.054 Tier 2A Front, at 1:45:42 (showing Officer Arreguin leaving the dayroom); Ex. 50, Video from DIV 10-CAM 2.054 Tier 2A Front, at 11:04:41–11:06:51 a.m. (showing a different officer).).

42. Exhibit 50 is video that shows plaintiff walk from Cell 2107 to the front of Tier 2A from 11:07:02 a.m. to 11:07:47 a.m. Exhibit 14, Westmoreland Decl. ¶ 3; Exhibit 50, video from DIV 10-CAM 2.054 Tier 2A Front from 11:07:02 a.m. to 11:07:47 a.m.

**RESPONSE:** Undisputed. However, Defendants object that this statement of fact says the video shows Plaintiff "walk" to the front of the tier, but Plaintiff's memorandum in support of his motion for summary judgment argues that the video shows Plaintiff "limp" to the front of the tier. As such, the statement of fact in this paragraph does not support Plaintiff's argument.

43. Plaintiff testified after he was let out of Cell 2107 he approached the tier officer and requested a lower bunk because sleeping on the top bunk was dangers due to his disability. Exhibit 3, Westmoreland Dep 216:20-217:13.

**RESPONSE:** Disputed. Officer Arreguin testified that this conversation did not take place. (Ex. 16, Arreguin Dep. 159:23–163:24.)

44. Defendant Arreguin does not know why, on November 7, 2019, a detainee with a prescription for a cane would use the top bunk. Exhibit 16, Arreguin Dep 150:12-16.

**RESPONSE:** Defendants object that this paragraph contains non-material facts. It is immaterial whether Officer Arreguin knows why a detainee with a prescription for a cane would use a top bunk. Notwithstanding and without waiving said objections, it is undisputed that this is Officer Arreguin's testimony.

17

Exhibit 13 Page 17

45.     Plaintiff told the tier officer, defendant Arreguin, he could not be assigned to the top bunk "[b]ecause of my disability, my disability." Exhibit 3, Westmoreland Dep 230:13-24. Plaintiff elaborated that there was no ladder to climb to the top bunk and that he was not capable of climbing to the top bunk because of left leg weakness. Exhibit 3, Westmoreland Dep 231:1-232:2.

**RESPONSE:** Defendants object that the cited testimony does not support the statement in this paragraph. Plaintiff did not testify that he told Officer Arreguin the statements contained in this paragraph. Rather, Plaintiff was testifying to his state of mind. (Ex. 3, Pl.'s Dep. 230:13–232:2.) This paragraph is also disputed. Officer Arreguin testified that this conversation did not take place. (Ex. 16, Arreguin Dep. 159:23–163:24.)

46.     In response to plaintiff's request to have his bed assignment changed, plaintiff was told by the tier officer, defendant Arreguin, to fill out a form. Exhibit 3, Westmoreland Dep 234:14-235:4.

**RESPONSE:** Disputed. Officer Arreguin testified that this conversation did not take place. (Ex. 16, Arreguin Dep. 159:23–163:24.)

47.     Plaintiff said the "long trip from Division 8 to Division 10" caused him to be "[t]ired, exhausted." Exhibit 3, Westmoreland Dep 239:12-16, 243:14-24.

**RESPONSE:** Disputed. The video footage of Plaintiff does not show any signs that Plaintiff was tired or exhausted. (Ex. 50, Video from DIV 10-CAM 2.054 Tier 2A Front.)

48.     Dr. Bauer opines a person with plaintiff's disability would tire easier than an otherwise healthy 60-year-old man because "[h]e has to put more effort into walking." Exhibit 2, Bauer Dep 41:11-20.

Exhibit 13 Page 18

**RESPONSE:** Defendants object that this is not an opinion formulated by Dr. Bauer after a review of facts or data. Rather, Dr. Bauer testified only that he "would expect" a person with Plaintiff's disability would tire easier than an otherwise health 60-year-old man.

49.     **[a]** During lockup time plaintiff was in the cell sitting on a stool and "actually started nodding off because I was tired from my long trip from Division 8 to Division 10" so **[b]** he "just took a chance and climbed up to the top bunk." Exhibit 3, Westmoreland Dep 239:8-16, 240:3-9. **[c]** Plaintiff said the upper bunk "was the only place I had to go, so I wanted to rest like everyone else was resting." Exhibit 3, Westmoreland Dep 241:1-8.

**RESPONSE: [a]** Disputed. The video footage of Plaintiff does not show any signs that Plaintiff was tired or exhausted. (Ex. 50, Video from DIV 10-CAM 2.054 Tier 2A Front.) **[b]** Undisputed that Plaintiff testified he "took a chance" by attempting to climb into the top bunk that he knew beforehand was dangerous for him to do and that he was not capable of doing because the weakness in his left leg prevents him from climbing into a top bunk. (Ex. 3, Pl.'s Dep. 230:13–231:18, 233:4–24.) **[c]** Disputed. Sgt. Darryl Houston testified that Plaintiff did not have to climb into the top bunk that afternoon if he did not feel that he was able to climb into the top bunk because of a lack of strength. (Ex. 22, Houston Dep. 85:18–86:11.) Sgt. Houston testified that many inmates temporarily pull their mattresses on the floor to sleep until they are able to see a doctor to obtain a lower bunk permit. (*Id.* at 86:12–87:8.) This would allow the process to continue because it is not possible for a detainee to instantaneously get a lower bunk permit. (*Id.* at 120:23–121:18.)

50.     Video of Cell 2107 is depicted in Exhibits 51, 52, and 53. Exhibit 14, Westmoreland Decl. ¶¶ 1,4; Exhibits 51-53, video of the cell produced by defendants; See Dkt. 54, Joint Status at 3 (defendants agreeing to produce video of the cell).

Exhibit 13 Page 19

**RESPONSE:** Undisputed.

51. Plaintiff "got halfway up" the bunk bed and testified "the minute I got up to the point where I had to get my left leg inside the bed, I slipped and fell." Exhibit 3, Westmoreland Dep 245:4-17. Plaintiff believes he "landed on a metal desk that was right next to the bed" with his neck hitting the edge of the desk. Exhibit 3, Westmoreland Dep 260:24-261:16.

**RESPONSE:** Undisputed that this is Plaintiff's testimony.

52. **[a]** Plaintiff recalls the tier officer and two nurses approach him on the floor of the cell. Exhibit 3, Westmoreland Dep 264:18-265:14. **[b]** Video shows staff members approached the cell at approximately 1:31:59 p.m. Exhibit 24, video from DIV 10-CAM 2.054 Tier 2A Front.

**RESPONSE: [a]** Undisputed that this is Plaintiff's testimony. **[b]** Undisputed.

53. Plaintiff was unable to move to a wheelchair per the request of a nurse and was told by a nurse "if you can't make it in this wheelchair, you refuse medical attention." Exhibit 3, Westmoreland Dep 264:23-265:19.

**RESPONSE:** Disputed. The nurse documented that Plaintiff refused medical treatment on November 7, 2019. (Ex. 1, Bauer Report, at 20, 11/7/19 note by Nurse Jefferson.)

54. Plaintiff testified the tier officer "was yelling, my shift is about to end. I don't want to do any paperwork, get up off that floor." Exhibit 3, Westmoreland Dep 265:20-266:15.

**RESPONSE:** Disputed. Officer Arreguin's shift did not end until 3:00 p.m. that day. (Ex. 16, Arreguin Dep. 10:18–24, 171:17–21.) In addition, Officer Arreguin completed paperwork regarding Plaintiff being on the floor in his cell. (Ex. B, Tier Log, at 3.)

55. **[a]** Dr. Bauer does not believe plaintiff had the ability to get up from the floor unassisted on November 7, 2019 and elaborated "I think he would have had difficulty getting up from the floor whether he fell or not." Exhibit 2, Bauer Dep 101:4-17. **[b]** Dr. Bauer also opines

Exhibit 13 Page 20

that during the December 12 examination plaintiff would not be able to get off the floor without assistance because "he had an impairment using his left leg, and he would have been challenged getting up." Exhibit 2, Bauer Dep 101:18-102:4.

**RESPONSE: [a]** Undisputed that this is Dr. Bauer's testimony. **[b]** Defendants object that the cited testimony does not support this statement. The hypothetical question posed to Dr. Bauer during the deposition included the hypothetical conditions that Plaintiff "was on the floor of the examination room without being able to lean on his wheelchair or the wall or the examination table." (Ex. 2, Bauer Dep. 101:18–24.)

56.     Plaintiff remained on the cell for about two hours until shift change when a new officer arrived around 3:30 p.m. Exhibit 3, Westmoreland Dep 275:24-276:7. Two inmates then assisted plaintiff out of the cell. Exhibit 3, Westmoreland Dep 278:2-10. Exhibit 54 is video showing two inmates escort plaintiff to the front of Tier 2A from 3:52:49 p.m. to 3:53:44 p.m. Exhibit 54, video from DIV 10-CAM 2.054 Tier 2A.

**RESPONSE: [a]** Undisputed that this is Plaintiff's testimony. **[b]** Undisputed with the clarification that the video shows Plaintiff walking out of the cell and not being carried out of the cell by the two inmates.

57.     Plaintiff was hospitalized at Stroger from November 7, 2019 to November 26, 2019. Exhibit 18, Westmoreland Bed Assignments; Exhibit 1, Bauer Report at 35 (explaining plaintiff was at Stroger until November 26, 2019). While at Stroger, "Dr. Diane Sierens performed a cervical discectomy and fusion at C3-4 and C4-5 to relieve the spinal cord compression." Exhibit 1, Bauer Report at 23, 35.

**RESPONSE:** Undisputed.

Exhibit 13 Page 21

58.      **[a]** Prior to the November 7, 2019 fall, Dr. Bauer opines plaintiff did not require ACDF surgery because plaintiff "didn't have signs of spinal cord compression." Exhibit 2, Bauer Dep 97:19-98:1. **[b]** Dr. Bauer opines the ACDF surgery was required due to the fall in Division 10. Exhibit 2, Bauer Dep 100:5-10.

**RESPONSE: [a]** Undisputed. **[b]** Undisputed with a clarification. After Plaintiff received ACDF surgery, he fully recovered from surgery without any residual loss of function. (Ex. 1, Bauer Report, at 36.) After Plaintiff received ACDF surgery, he returned to his baseline level of function that existed prior to the November 7, 2019 incident. (*Id.* at 36.) Plaintiff's current disability, to the extent he has one, is a result of polio as a child and not related to the November 7, 2019 incident. (*Id.* at 38.)

59.      **[a]** Dr. Bauer agrees with plaintiff's retained expert, Dr. Richard Lazar, that plaintiff's disability is permanent and no further recovery is anticipated even if intensive rehabilitation efforts are deployed. Exhibit 2, Bauer Dep 81:6-19; Exhibit 20, Lazar Report at 6. **[b]** Dr. Lazar opines plaintiff will require a full-time medical attendant for the remainder of his life. Exhibit 20, Lazar Report at 6.

**RESPONSE: [a]** Defendants object that this statement contains non-material facts. Plaintiff is not moving for summary judgment on the issue of damages. (Pl.'s Memo., at 14, ECF No. 88.) Notwithstanding and without waiving said objections, this statement is disputed to the extent Plaintiff is suggesting that his current disability or being in a wheelchair is related to a spinal cord injury as opposed to his polio. Dr. Bauer testified, "So what I said [in my report] is that Mr. Westmoreland has a gait impairment [currently], and I felt that his gait impairment was related to his polio and not a spinal cord injury. And to whatever extent he had a gait impairment, it was the same impairment he had prior to the fall of November 7th, 2019." (Ex. 2, Bauer Dep. 81:20–

Exhibit 13 Page 22

82:11.) Dr. Bauer testified that he "would concur with Dr. Lazar's opinion but do[es] not believe that Mr. Westmoreland's current disability is related to the incident on November 7th, 2019." (*Id.* at 82:19–83:7.) **[b]** Defendants object that this statement contains non-material facts. Plaintiff is not moving for summary judgment on the issue of damages. (Pl.'s Memo., at 14.) Notwithstanding and without waiving said objections, this statement is disputed to the extent Plaintiff is suggesting that he requires a full-time medical attendant for the remainder of his life because of a spinal cord injury as opposed to his polio. Dr. Bauer testified that he "would concur with Dr. Lazar's opinion but do[es] not believe that Mr. Westmoreland's current disability is related to the incident on November 7th, 2019." (Ex. 2, Bauer Dep. 82:19–83:7.)

60.     When Dr. Bauer's [*sic*] does an independent medical examination, he normally has the patient stand and walk to determine the patient's gait. Exhibit 2, Bauer Dep 62:9-16. During his examination of plaintiff on December 12, 2022, Dr. Bauer did not have plaintiff walk because he felt that he was a fall risk. Exhibit 2, Bauer Dep 62:17-63:7.

**RESPONSE:** Defendants object that this statement contains non-material facts. Plaintiff is not moving for summary judgment on the issue of damages. (Pl.'s Memo., at 14.) Notwithstanding and without waiving said objections, this statement is disputed to the extent Plaintiff is suggesting that he is a fall risk because of a spinal cord injury as opposed to his polio. Dr. Bauer testified, "So what I said [in my report] is that Mr. Westmoreland has a gait impairment [currently], and I felt that his gait impairment was related to his polio and not a spinal cord injury. And to whatever extent he had a gait impairment, it was the same impairment he had prior to the fall of November 7th, 2019." (Ex. 2, Bauer Dep. 81:20–82:11.)

61.     According to Dr. Bauer, plaintiff was able to stand holding on to the exam table for less than a minute. Exhibit 2, Bauer Dep 67:10-14. Dr. Bauer testified "I didn't feel that his - he

23

Exhibit 13 Page 23

was steady enough to stand, and I didn't want to take a chance of him falling in my office. So I didn't – didn't want to put him at risk of falling. I thought his left leg was profoundly weak, and I didn't want to have him take – have him take a chance of falling." *Id.* at 67:10-68:2.

**RESPONSE:** Defendants object that this statement contains non-material facts. Plaintiff is not moving for summary judgment on the issue of damages. (Pl.'s Memo., at 14.) Notwithstanding and without waiving said objections, this statement is disputed to the extent Plaintiff is suggesting that he is a fall risk because of a spinal cord injury as opposed to his polio. Dr. Bauer testified, "So what I said [in my report] is that Mr. Westmoreland has a gait impairment [currently], and I felt that his gait impairment was related to his polio and not a spinal cord injury. And to whatever extent he had a gait impairment, it was the same impairment he had prior to the fall of November 7th, 2019." (Ex. 2, Bauer Dep. 81:20–82:11.)

62.     Lieutenant Gunn conducted an "administrative assessment" concerning the November 7, 2019, incident, document that plaintiff's cellmate, Leron Wade, was interviewed and that "Inmate Wade stated his cellmate stated he needed a bottom bunk, but that his cellmate Wade has the bottom bunk order." Exhibit 21, Incident Report.

**RESPONSE:** Undisputed.

63.     **[a]** Darryl Houston has been a sergeant assigned to the 3:00 p.m. to 11:00 p.m. shift in Division 10 for the past seven years. Exhibit 22, Houston Dep 4:15-5:8. **[b]** He was called to Tier 2A on November 7, 2019, during his shift, but **[c]** said he "do[esn't] have any recollection of any of this." Exhibit 22, Houston Dep 22:13-23:23. 261-11.

**RESPONSE: [a]** Undisputed. **[b]** Undisputed. **[c]** Defendants object that this statement is vague and ambiguous. Notwithstanding and without waiving said objections, it is undisputed that in response to the question, "Do you have any recollection of what you witnessed or heard when

Exhibit 13 Page 24

you entered the tier?," Sgt. Houston testified that he "do[esn't] have any recollection of any of this." (Ex. 22, Houston Dep. 26:1–11.)

64.    Sergeant Houston said "[m]edical always decides whether any inmate gets a lower bunk" because "they put an alert on their bed assignment" indicating "[l]ower bunk." Exhibit 22, Houston Dep 18:24-19:8.

**RESPONSE:** Undisputed that this is Sgt. Houston's testimony.

65.    Sergeant Houston said "[m]edical is the only one that could assign a lower bunk" and that in November of 2019 a correctional officer could not take steps to provide a detainee a lower because "[b]ecause that does not fall on our end because we are not medical. We don't know what his cane for, none of that. That strictly falls on medical." Exhibit 22, Houston Dep 50:7-24.

**RESPONSE:** Defendants object that Plaintiff takes Sgt. Houston's testimony out of context. Sgt. Houston was testifying in the context of who makes the decision whether a detainee needs a lower bunk. (Ex. 22, Houston Dep. 50:1–6.) Defendants dispute that a correctional officer cannot take any steps to facilitate the process of getting a detainee a lower bunk permit. Sgt. Houston testified that if a detainee was supposed to have a lower bunk but a lower bunk order was not entered, he will "go to the medical staff and ask [the detainee] to be re-evaluated" or "make sure they get to the doctor so they can see the doctor." (*Id.* at 91:13–92:22.) Officer Castaneda testified that if a detainee says he needs a lower bunk but a lower bunk order was not entered, he will "call the nurse in the dispensary," and the nurse will schedule him to be seen by a doctor. (Ex. 15, Castaneda Dep. 51:7–52:3.) Based on Officer Castaneda's experience in Division 10, he has "seen detainees go right away" to see a doctor, and he has "seen detainees wait a couple of hours and then go." (*Id.* at 52:13–21.)

Exhibit 13 Page 25

66.     Sergeant Houston said Cermak Health Services has never told him (either verbally or in writing) a detainee with a cane alert should be provided a lower bunk. Exhibit 22, Houston Dep 51:1-11.

**RESPONSE:** Defendants object that this statement contains non-material facts. It is immaterial whether Cermak Health Services told Sgt. Houston that a detainee with a cane alert should be provided a lower bunk because Classification is the department that determines a detainee's bed assignment. (Ex. 22, Houston Dep. 20:18–21:22.) Sgt. Houston testified that the guidance he received from his supervisors is that "medical decides whether they get a bottom bunk, and classification decides where they go." (*Id.* at 49:1–11.) Notwithstanding and without waiving said objections, it is undisputed that Sgt. Houston testified that Cermak Health Services has never told him (either verbally or in writing) a detainee with a cane alert should be provided a lower bunk. Sgt. Houston testified that Classification is the department that determines a detainee's bed assignment. (*Id.* at 20:18–21:22.)

67.     Sergeant Houston has never told correctional officers under his command that inmates with a cane alert should be handled as a lower bunk "[b]ecause I'm not medical. If they don't have a lower bunk permit, they don't get a lower bunk." Exhibit 22, Houston Dep 53:19-54:3.

**RESPONSE:** Defendants object that this statement contains non-material facts. It is immaterial whether Sgt. Houston has told correctional officers under his command that inmates with a cane alert should be handled as a lower bunk because Classification is the department that determines a detainee's bed assignment. (Ex. 22, Houston Dep. 20:18–21:22.) Sgt. Houston testified that the guidance he received from his supervisors is that "medical decides whether they get a bottom bunk, and classification decides where they go." (*Id.* at 49:1–11.) Notwithstanding

26

Exhibit 13 Page 26

and without waiving said objections, it is undisputed that Sgt. Houston testified he has never told correctional officers under his command that inmates with a cane alert should be handled as a lower bunk because medical staff determines if a detainee needs a lower bunk. Sgt. Houston testified that Classification is the department that determines a detainee's bed assignment. (*Id.* at 20:18–21:22.)

68. Sergeant Houston said a correctional officer is not responsible for notifying the medical staff if an inmate complains of needing a lower bunk because "[i]t's up to the medical staff. He puts in a medical slip, the medical staff will see him when they get to him and they'll make that decision." Exhibit 22, Houston Dep 74:5-19. Sergeant Houston made plain "[i]f he does not have a lower bunk permit, he's not going to get a lower bunk" and "[t]here's nothing an officer can do about getting him a lower bunk permit." Exhibit 22, Houston Dep 75:5-21.

**RESPONSE:** Defendants object that Plaintiff takes Sgt. Houston's testimony out of context. Sgt. Houston was explaining that medical staff makes the decision of whether a detainee needs a lower bunk because correctional officers "can't tell if they're disabled or what's wrong with them." (Ex. 22, Houston Dep. 73:6–11.) Defendants dispute that a correctional officer cannot take any steps to facilitate the process of getting a detainee a lower bunk permit. Sgt. Houston testified that if a detainee was supposed to have a lower bunk but a lower bunk order was not entered, he will "go to the medical staff and ask [the detainee] to be re-evaluated" or "make sure they get to the doctor so they can see the doctor." (*Id.* at 91:13–92:22.) Officer Castaneda testified that if a detainee says he needs a lower bunk but a lower bunk order was not entered, he will "call the nurse in the dispensary," and the nurse will schedule him to be seen by a doctor. (Ex. 15, Castaneda Dep. 51:7–52:3.) Based on Officer Castaneda's experience in Division 10, he has "seen

Exhibit 13 Page 27

detainees go right away" to see a doctor, and he has "seen detainees wait a couple of hours and then go." (*Id.* at 52:13–21.)

69.     Sergeant Houston said if an inmate has a cane alert, but does not have a lower bunk alert, the officer will not call classification seeking to move the inmate "because classification going to tell us he does not have a lower bunk order, I cannot move him" and that this occurs "[a]ll the time" and the only way for the inmate to use a lower bunk is for medical staff to write an order for a lower bunk or he is located in a cell with no cellmate so he can use the lower bunk. Exhibit 22, Houston Dep 77:8-78:5.

**RESPONSE:** Defendants object that Plaintiff takes Sgt. Houston's testimony out of context. Sgt. Houston was explaining that medical staff makes the decision of whether a detainee needs a lower bunk because correctional officers "can't tell if they're disabled or what's wrong with them." (Ex. 22, Houston Dep. 73:6–11.) Defendants dispute that a correctional officer cannot take any steps to facilitate the process of getting a detainee a lower bunk permit. Sgt. Houston testified that if a detainee was supposed to have a lower bunk but a lower bunk order was not entered, he will "go to the medical staff and ask [the detainee] to be re-evaluated" or "make sure they get to the doctor so they can see the doctor." (*Id.* at 91:13–92:22.) Officer Castaneda testified that if a detainee says he needs a lower bunk but a lower bunk order was not entered, he will "call the nurse in the dispensary," and the nurse will schedule him to be seen by a doctor. (Ex. 15, Castaneda Dep. 51:7–52:3.) Based on Officer Castaneda's experience in Division 10, he has "seen detainees go right away" to see a doctor, and he has "seen detainees wait a couple of hours and then go." (*Id.* at 52:13–21.)

70.     Sergeant Houston said "[i]f everyone that has a cane gets a lower bunk in Division 10, how would they sleep?" and explained there would not be enough lower bunks:

Exhibit 13 Page 28

Q.     Why do you say that, Sergeant?

A.     Because you just said that. You just said what they said was, if they have a cane, it's an automatic lower bunk.

       Do you know how many people we have on 2A or B tiers that have canes? They would never be able to sleep because they all have to have lower bunks.

Q.     So is there not enough space, Sergeant?

A.     There would never be enough space if everybody that got canes get a lower bunk.

Q.     Why not?

A.     Where would you put them at?

Exhibit 22, Houston Dep 115:19-116:13.

**RESPONSE:** Undisputed that this is Sgt. Houston's testimony.

71.     **[a]** Sergeant Houston has no knowledge how long the process would take for an inmate to obtain a lower bunk permit from the medical staff. Exhibit 22, Houston Dep 121:13-122:15. **[b]** There are no doctors present on Sergeant Houston's shift in Division 10. Exhibit 22, Houston Dep 118:22-24.

**RESPONSE: [a]** Undisputed that this is Sgt. Houston's testimony. However, Officer Castaneda testified that if a detainee says he needs a lower bunk but a lower bunk order was not entered, he will "call the nurse in the dispensary," and the nurse will schedule him to be seen by a doctor. (Ex. 15, Castaneda Dep. 51:7–52:3.) Based on Officer Castaneda's experience in Division 10, he has "seen detainees go right away" to see a doctor, and he has "seen detainees wait a couple of hours and then go." (*Id.* at 52:13–21.) **[b]** Defendants object that this paragraph contains non-material facts. Sgt. Houston is assigned to the 3:00 p.m. to 11:00 p.m. shift in Division 10, but Plaintiff alleges that he fell around 1:30 p.m. (Pl.'s Am. Compl. ¶ 16.) Notwithstanding and

Exhibit 13 Page 29

without waiving said objections, this statement is disputed. Sgt. Houston testified that during his shift, detainees are sent to Cermak to see a doctor. (Ex. 22, Houston Dep. 118:22–119:2.) Pursuant to Cermak Health Services Policy E-07, Cermak Urgent Care is an "onsite care center that operates 24 hours daily and is staffed by physician, mental health, nursing, and emergency response technician staff." (Ex. C, Policy E-07, at 1.)

72.    Division 10 was under construction in 1991 and opened in December 1992. Exhibit 23, Davis Affidavit ¶¶ 11-13; Exhibit 25, Print from Sheriff's webpage titled "Cook County Jail Division" at 3, available at https://www.cookcountysheriff.org/departments/cook-county-department-of-corrections/divisions-of-jail/ (last visited Feb. 8, 2023).

**RESPONSE:** Defendants object that this paragraph contains non-material facts. Whether Division 10 was "under construction" in 1991 or "opened" in December 1992 is immaterial because the relevant regulations refer to the date construction or alterations "commence." *See* 28 C.F.R. § 35.151(c)(1) (stating that "[i]f physical construction or alterations commence after July 26, 1992, but prior to September 15, 2010, then new construction and alterations subject to this section must comply with either UFAS or the 1991 Standards"). Physical construction of Division 10 commenced prior to July 26, 1992. (Ex. 23, Davis Aff. ¶¶ 8–16.) Therefore, Division 10 was not required to comply with the 1991 ADA Standards for Accessible Design. *See* 28 C.F.R. § 35.151(c)(1). This paragraph is also immaterial because Plaintiff does not allege that the structural components of Division 10 caused him to be denied the benefits of any program or activity. (Pl.'s Am. Compl.) Rather, Plaintiff alleges only that he was denied the benefits of the program or activity of sleeping because he was assigned to a top bunk instead of a lower bunk in Division 10. (*Id.* ¶¶ 15, 23–24.)

Exhibit 13 Page 30

73.     In response to an allegation Dart and Cook County have received federal financial assistance since 1988, defendants "admit it has received federal financial assistance "but lack[] knowledge as to the dates." Dkt. 40, Cook County Answer to Amended Complaint ¶ 5; Dkt. 41, Dart Answer to Amended Complaint ¶ 5

**RESPONSE:** Undisputed.

74.     Cook County's Program Narratives for the 1992 Annual Appropriation Bill for the fiscal year 1992 approved and adopted November 27, 1991 identifies the following achievements in 1991:

> a.   "Implemented the three (3) year federal grant to enhance AIDS education and related services at an annual amount of $227,500.00" for inmates in the custody of the Cook County Department of Corrections. Exhibit 26 at 1, 3; and

> b.   "Successfully recruited five (5) physicians through our federal designation by the National Health Services Corp."

*Id.*

**RESPONSE:** Undisputed.

75.     Jeffrey Johnsen held the title of Superintendent of Receiving on September 16, 2015. Exhibit 27, Johnsen Dep 4:12-5:5. In this capacity, he oversaw "the intake process of all inmates coming in and going out of the CCDOC," including classification. Exhibit 27, Johnsen Dep 5:6-11.

**RESPONSE:** Defendants object that this paragraph contains non-material facts. Plaintiff cites to the deposition transcript of Jeffrey Johnsen from 2015 in an unrelated case that involved the Cermak and Residential Treatment Unit (RTU) housing units. (Ex. 27, Johnsen Dep. 82:3–10.) This case, however, involves Plaintiffs time in the Division 10 housing unit on November 7, 2019.

Exhibit 13 Page 31

(Pl.'s Am. Compl. ¶¶ 11–15.) Notwithstanding and without waiving said objections, it is undisputed that this was Supt. Johnsen's testimony in a separate and unconnected lawsuit.

76.    Superintendent Johnsen said he likely created the document titled Individuals with Mobility Issues Divisional Housing Options that lists Division 10, so that his staff could understand the possibilities for housing individuals. Exhibit 27, Johnsen Dep 50:10-51:17; Exhibit 28, Document titled "Individuals with Mobility Issues Divisional Housing Options."

**RESPONSE:** Defendants object that this paragraph contains non-material facts. Plaintiff cites to the deposition transcript of Jeffrey Johnsen from 2015 in an unrelated case that involved the Cermak and Residential Treatment Unit (RTU) housing units. (Ex. 27, Johnsen Dep. 82:3–10.) This case, however, involves Plaintiffs time in the Division 10 housing unit on November 7, 2019. (Pl.'s Am. Compl. ¶¶ 11–15.) Notwithstanding and without waiving said objections, it is undisputed that this was Supt. Johnsen's testimony in a separate and unconnected lawsuit.

77.    **[a]** Hugh Walsh was produced for a deposition on April 4, 2019 and, at this time, held the position of Superintendent of Division 10. Exhibit 29, Walsh Dep 1, 4:23-5:4. **[b]** He held the position of Division 10 superintendent since 2015 and from 2005 until January 2007 worked as lieutenant in Division 10. Exhibit 29, Walsh Dep 5:5-13. **[c]** Superintendent Walsh is not aware of training to Division 10 staff to accommodate detainees with an alert for canes, crutches or walkers. Exhibit 29, Walsh Dep 17:9-21.

**RESPONSE: [a]** Undisputed. **[b]** Undisputed. **[c]** Undisputed that this is Supt. Walsh's testimony. However, Defendants dispute that officers in Division 10 do not receive such training. Officer Arreguin received training related to the Americans with Disabilities Act on February 7, 2018, training on the Sheriff's Office policies and procedures on February 11, 2019, training on discrimination, harassment, and retaliation on June 10, 2019, and various other training during his

32

Exhibit 13 Page 32

time as a correctional officer. (Ex. A, Arreguin Training File, at 38, 41.) Officer Castaneda received on-the-job training on what it means when a detainee has a medical alert for a cane. (Ex. 15, Castaneda Dep. 44:10–18.)

78.    Superintendent Walsh said none of the cells in Division 10 had grab bars. Exhibit 29, Walsh Dep 7:23-8:9.

**RESPONSE:** Defendants object that this paragraph contains non-material facts. Whether any of the cells in Division 10 had grab bars is immaterial because Plaintiff does not allege that he was denied the benefits of any program or activity because of the lack of grab bars in his cell. (Pl.'s Am. Compl.) Rather, Plaintiff alleges only that he was denied the benefits of the program or activity of sleeping because he was assigned to a top bunk instead of a lower bunk in Division 10. (*Id.* ¶¶ 15, 23–24.) Notwithstanding and without waiving said objections, it is undisputed that this is Supt. Walsh's testimony.

79.    Superintendent Walsh testified none of the living units had grab bars around the showers nor fixed benches. Exhibit 26, Walsh Dep 10:20-11:6; Exhibit 30, Defendants' Response to Local Rule 56.1(a)(3) Statement in *Bennett v. Dart*, 18-cv-4268, filed March 3, 2020, ¶ 10 (representing it is "undisputed" that Division 10's shower facilities do not have grab bars or a fixed bench); Exhibit 31, Minute entry in *Bennett v. Dart*, 18-cv-4268, acknowledging "Defendants previously conceded that 'Division 10's shower facilities do not have grab bars or a fixed bench.'"

**RESPONSE:** Defendants object that this paragraph contains non-material facts. Whether any of the living units in Division 10 had grab bars around the showers or fixed benches is immaterial because Plaintiff does not allege that he was denied the benefits of any program or activity because of the lack of grab bars around the showers or fixed benches in his living unit. (Pl.'s Am. Compl.) Rather, Plaintiff alleges only that he was denied the benefits of the program or

Exhibit 13 Page 33

activity of sleeping because he was assigned to a top bunk instead of a lower bunk in Division 10. (*Id.* ¶¶ 15, 23–24.) Notwithstanding and without waiving said objections, it is undisputed that this is Supt. Walsh's testimony.

80. **[a]** Gary Keclik is a licensed architect and prepared a report, at the request of plaintiff, regarding Cell 2107 on Division 10, Tier 2A. Exhibit 32, Keclik CV at 1; Exhibit 33, Keclik Report at 1. **[b]** Mr. Keclik found the width of the door for Cell 2107 was not compliant with the ADA because it was only 29 inches wide rather than 32 inches, **[c]** that the toilet did not have any grab bars, and **[d]** that having a disabled inmate climb to an upper bed is not acceptable under ADA standards. Exhibit 33, Keclik Report at 4.

**RESPONSE: [a]** Undisputed for purposes of summary judgment, but Defendants reserve the right to move to bar the opinions of Mr. Keclik. **[b]** Defendants object that this statement contains non-material facts. Whether the width of the door for Cell 2107 was not compliant with the ADA is immaterial because Plaintiff does not allege that he was denied the benefits of any program or activity because of the width of the door. (Pl.'s Am. Compl.) Rather, Plaintiff alleges only that he was denied the benefits of the program or activity of sleeping because he was assigned to a top bunk instead of a lower bunk in Division 10. (*Id.* ¶¶ 15, 23–24.) **[c]** Defendants object that this statement contains non-material facts. Whether the toilet did not have any grab bars is immaterial because Plaintiff does not allege that he was denied the benefits of any program or activity because of the lack of grab bars around the toilet. (Pl.'s Am. Compl.) Rather, Plaintiff alleges only that he was denied the benefits of the program or activity of sleeping because he was assigned to a top bunk instead of a lower bunk in Division 10. (*Id.* ¶¶ 15, 23–24.) **[d]** Defendants object that the cited report does not support this statement. Mr. Keclik does not write in his report that having a disabled inmate climb to an upper bed is not acceptable under ADA standards. (Ex.

Exhibit 13 Page 34

33, Keclik Report, at 4.) Rather, Mr. Keclik states only that the ADA standards are silent on this

matter. (*Id.*)

                                                 Respectfully submitted,

                                                 KIMBERLY M. FOXX
                                                 State's Attorney of Cook County

Dated: March 15, 2023                      */s/ Samuel D. Branum*
                                                 Special Assistant State's Attorney

Monica Burkoth (burkothm@jbtld.com)
Lisa M. McElroy (mcelroyl@jbltd.com)
Samuel D. Branum (branums@jbltd.com)
Nancy Dueñez (duenezn@jbltd.com)
JOHNSON & BELL, LTD.
33 W. Monroe, Ste. 2700
Chicago, Illinois 60603
Tel: (312) 372 0770

Exhibit 13 Page 35