# Transcript of the Testimony of
# **ERIC DAVIS**

**Date:** March 5, 2026

**Case:** WESTMORELAND VS. DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

Exhibit 1 Page 1

**ERIC DAVIS**
**March 5, 2026**

Page 1

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


EUGENE WESTMORELAND, )
                     )
       Plaintiff, ) Case No. 23-cv-1851
                     )
       vs.         )
                     )
THOMAS DART, SHERIFF )
of COOK COUNTY, )
ILLINOIS and COOK )
COUNTY, ILLINOIS, )
                     )
       Defendants. )


Deposition of ERIC DAVIS, taken before ROBBIN M. OCHENKOWSKI, C.S.R., pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, commencing at 1:15 p.m., on the 5th day of March, A.D., 2026

There were present at the taking of this deposition the following counsel:

**ERIC DAVIS**
**March 5, 2026**

Page 2

A P P E A R A N C E S:


        THOMAS G. MORRISSEY, LTD.
        by MR. PATRICK W. MORRISSEY
           MR. THOMAS G. MORRISSEY (telephonically)
        10257 South Western Avenue
        Chicago, Illinois 60643
        (773) 233-7901
        tgm@morrisseylawchicago.com
        pwm@morrisseylawchicago.com

            on behalf of the Plaintiff;

        JOHNSON & BELL
        by MR. ADNAN SHAFI
           MR. SAMUEL D. BRANUM
           MS. KAITLYN MC CASKILL
        100 West Randolph Street
        33 West Monroe Street
        Suite 2700
        Chicago, Illinois 60603
        (312) 984-0272
        shafia@jbltd.com
        branums@jbltd.com

            on behalf of the Defendants.




                        - - - - -

**ERIC DAVIS**
**March 5, 2026**

Page 3

I N D E X

DEPOSITION OF ERIC DAVIS
MARCH 5, 2026

Examination by

Mr. Patrick Morrissey                                    4

E X H I B I T S

FIRST REFERENCED

Exhibit 2                                               13
(declaration)

(Exhibit 2 was retained by counsel.)

- - - - -

**TOOMEY REPORTING**
**312-853-0648**

Exhibit 1 Page 4

**ERIC DAVIS**
**March 5, 2026**

Page 4

(Witness first duly sworn.)

ERIC DAVIS,

called as a witness herein, having been first duly

sworn, was examined upon oral interrogatories and

testified as follows:

EXAMINATION

BY MR. MORRISSEY:

Q   My name is Pat Morrissey.  I represent the

plaintiff.

**A   I think we met before.**

Q   Tom Morrissey is on the phone.

**A   Okay.**

Q   Mr. Davis, what did you do to prepare for your

deposition today in Westmoreland?

**A   Let's see.  Because we're talking about a number**

**of matters today, are you asking what I did specifically**

**in terms of today or what I've done in terms of**

**Westmoreland generally?**

Q   I'm asking what you did to prepare yourself

today to testify about Westmoreland and the RTU east

tunnel ramp.

**A   Well, I conferred with my attorneys.**

**And I apologize.  It is difficult to parse**

**because you're asking about multiple things so I want to**

ERIC DAVIS
March 5, 2026

Page 5

make sure that I'm speaking specifically just to that.

I don't -- Other than conferring with the attorneys because we've had litigation about this incident or this instance before, I'm not remembering off the top of my head anything additionally other than reading the information that was sent, I think, by you all, reviewing that and conferring with counsel.

Q   What attorneys did you meet with?

A   One -- The gentlemen from Johnson & Bell.  I think I met with -- I think I met with Sam on that one.

Q   Just Sam?

A   It may have met with Adnan also.

I'm -- And as I said, they kind of blur because we've got multiple things going on at the same time so I apologize if I'm not able to be precise on each of the matters.

Q   How many times did you prepare with your counsel to discuss just the Westmoreland case?

A   Probably, at least, a couple.

Q   When did you start preparing?

A   I don't recall offhand.

Q   Would anything refresh your memory?

A   Probably shortly after receiving information about something that you were asking for.  It's -- If we

ERIC DAVIS
March 5, 2026

Page 6

get something from you or counsel gives me something, then I'll go over usually talking with them at the time when it first arrives and usually do some kind of discussion before a deposition like this.

Q   So approximately when did you start preparing?

A   I don't recall.  I'd have to check when -- when stuff came on those particular requests.  I don't know.

Q   You mentioned you looked at documents?

A   Probably the documents that were sent by -- I assume by you all, the complaint or something, I don't know.

Q   I didn't send --

A   I'm sorry?

Q   I didn't send any documents.

A   I -- As I said, I don't know if -- if it was something that you sent or maybe something counsel sent that said here's the thing that they're asking for.  That's usually how these start.

Q   How --

A   So maybe -- maybe it's this case where, well, we have something coming up on this one, to refresh your memory, here's the previous information, it might have been that, something that you sent previously.

Q   Now, you signed a declaration recently in the

**ERIC DAVIS**
**March 5, 2026**

Page 7

Westmoreland case, right?

    **A   I believe so, yes.**

    Q   And did you type out that declaration?

    **A   No.**

     **Counsel did.**

    Q   Did you edit it?

    **A   I'm certain that I read it and reviewed it.  I may have given comments on -- on what was presented.  I usually do, I have a comment on wording, something like that.**

    Q   And when you prepared that declaration, how long did you spend reviewing and editting it before you added your signature?

    **A   I can't speak specifically to the time, but, typically, when I -- I'll review it, write up feedback if I have any, send it to counsel, then they send it back to me and say, hey, is this right, does this capture what you're trying to say, yes.**

     **So I mean, are you asking me in terms of hours, what -- what --**

     **I don't know how to answer your question, Pat.**

    Q   Okay.  Was it over the course of a few days that you were reviewing and editing your statements recently in the Westmoreland?

ERIC DAVIS
March 5, 2026

Page 8

A   I typically am able to respond either the day that I get it or within a day or so.

Q   So the date that you signed it, is that the date that you finalized it?

A   That's usually the date, yeah, right around the time, if I get it then, yes, it's usually that day, yeah.

Q   Now, you signed it on February 4th, 20126, right?

A   Okay.

Q   Did you review that in preparation for coming here today to testify?

A   I believe I did, yeah.

Q   And is it a statement you reviewed with counsel to prepare for testifying today?

A   Yeah.  Yeah, that's what -- Yes, typically, that's what we'll do.

Q   And was there anything inaccurate about the declaration or anything that you'd like to clarify about your declaration in Westmoreland?

A   I don't recall anything from --
    I mean, even in terms of the final version that I signed or in terms of the original version that would have been sent?

**ERIC DAVIS**
**March 5, 2026**

Page 9

Q   In terms of the final version you signed on --

A   I don't recall having any hesitancy, but, yeah, it's usually -- usually, what you say is, I mean I'm not an attorney, to the best of my knowledge, this is true kind of thing, you know.

Q   So when you signed that to verify the declaration, were you aware that Judge Harjani had found that day the RTU east ramp is noncompliant with the ADA?

A   I don't know if he did or didn't on that date or whatever.  I don't know what you're referring to.

Q   Well --

A   Are you saying that there was a ruling made by a judge the same day I signed the declaration?

Q   Right.

A   That doesn't -- I don't think I remember that, no.

Q   Have you ever seen Judge Harjani's order in Hernandez versus Dart finding the RTU east tunnel ramp does not comply with the ADA?

A   I may have in another matter.  You guys have sued us multiple times so I can't say which matter it would be, but from prior information, I do understand that the condition specific to the ramp, itself, is not compliant.  That's -- I think that's pretty clear.

**ERIC DAVIS**
**March 5, 2026**

Page 10

Q    Why is it pretty clear?

A    As I recall, the information that was gained by a LiDAR survey that was commissioned by counsel, I don't think it was the same matter or a prior matter, indicated things like the intermediate landing wasn't long enough, that sort of thing, and that really is sort of, you know, in propending -- in propound if there's -- if there's an element that's noncompliant, then it's noncompliant.

So, yes, I'm aware that -- I don't know if it was from that order or from a prior case, that it's pretty clear that the ramp as constructed or as sitting there now, unless it's been altered and I don't know about it, is -- is noncompliant.

Q    So that ramp -- that report you're talking with the LiDAR, that was issued on April 1st, 2024, right?

A    If you say so.  I --

Q    That's?

A    -- don't recall the specific date.

Q    I want to show you to refresh your memory, if you looked at the report by GEC, would that refresh your memory?

A    Well, if you do say it was April 4th, then I have no reason not to believe you.

**TOOMEY REPORTING**
**312-853-0648**

Exhibit 1 Page 11

**ERIC DAVIS**
**March 5, 2026**

Page 11

Q   Well, I'm going to refresh your memory. Document 132-7, it's been called.

**A   I know what it looks like, yeah.**

Q   So showing you, Mr. Davis, the GEC report --

**A   Yes.**

Q   -- does it say April 1st, 2024?

**A   Yes, it does.  April Fools Day, yes.**

Q   And so April 1st, 2024, you understood that the RTU east tunnel ramp was noncompliant with the ADA?

**A   Or shortly after this because, as I recall, this was commissioned by counsel, and so I don't know if I got it on the 1st.  I might have gotten it later.**

**I probably did get it later because if the county didn't commission, this is commissioned by counsel --**

THE REPORTER:  Commissioned by counsel --

THE WITNESS:  -- that was hired by the State's Attorney's Office.

BY MR. MORRISSEY:

Q   And do you have any reason to dispute that report and survey and assessment?

**A   None that I can think of.**

Q   How soon after the report was prepared did you become aware of it?

**ERIC DAVIS**
**March 5, 2026**

Page 12

A   I couldn't say.  Probably within a month or two. I'm just speculating.

Q   Now, is it --

Let me rephrase the question.

On February 4th, 2026 --

A   Okay.  This year, yes.

Q   -- this year, about a month ago --

A   Uh-huh.

Q   -- the federal judge found that ramp violates the ADA.

A   Okay.

Q   Did you have -- Do you have any knowledge of that judicial order?

A   I may.  I don't --

MR. SHAFI:  I'll object to relevance.

THE WITNESS:  I don't know.  I don't know offhand.

I probably -- I might have gotten information from counsel.  I don't know.

BY MR. MORRISSEY:

Q   Have you ever seen the federal judge's order finding that the RTU east tunnel ramp does not comply with the ADA?

A   I may have.  I don't -- I can't recall offhand one way or the other.

**ERIC DAVIS**
**March 5, 2026**

Page 13

Q    Now, in your declaration you signed, you state you're the deputy director of the Department of Capital Planning & Policy for Cook County, right?

A    I am the deputy director of Capital Planning & Policy for the public safety portfolio, yes.

Q    I'm going to show you Exhibit 2, which is your declaration in the Westmoreland case.

A    Okay.

Q    Does this document look familiar, Mr. Davis?

A    Yeah.  Yes.  Yeah.  Yeah, it does.

Q    And you've held that position, deputy director of Department of Capital Planning & Policy since April of 2017, right?

A    I want to be absolutely clear because I told this lady that I would give all of the information.

Somewhere, and I want to say it's within the last year, I can't recall, they changed my title to make it specific to the public safety portfolio.  When I started, I was the deputy director of Capital Planning. I'm now the Deputy Director - Public Safety & Capital Planning.  But there was no other change but the title change over the course -- I think, in the course of the past year.

Q    So your responsibilities are the same?

ERIC DAVIS
March 5, 2026

Page 14

A    Correct.

Q    Now --

A    Well, I should say, I'm -- relative to the public safety portfolio are the same.

Q    What about your responsibilities in general as a county employee?

A    Well, when I started this job there I was the deputy director of capital planning.  Now I am a deputy director of capital planning.  We have three portfolios; our public safety portfolio, our health and hospitals portfolio and our corporation facilities portfolio.  When I started, I oversaw all three of those.  We since have hired two to other deputy directors who oversee the health and hospitals portfolio and the capital planning -- the corporate facilities portfolio.

Q    Is there an ADA compliance director underneath you these days?

A    Yes.

Q    And when was that person hired?

A    I can't -- A little over a year.  I want to say a little over a year ago.

Q    And who is that person?

A    His name is Ander Hav, H-a-v.

Q    Is he an architect?

ERIC DAVIS
March 5, 2026

Page 15

A    Yes.

Q    Paragraph 2 of your declaration talks about your duties.

Do you see that?

A    Yes.

**Okay.  Let's see.  I'm sorry.  I'm in the wrong one.**

**Okay.  Yes, uh-huh.**

Q    Is that accurate?

A    Yes.

Q    Now, what are the responsibilities of the ADA compliance director that's underneath you?

A    **I don't see the ADA compliance director mentioned in the document that you're referring to.**

Q    I'm asking you a question.

A    Yes.

Q    What are his responsibilities?

MR. SHAFI:  I would object to that sort of questioning because that comes out of the scope of this deposition.  This deposition is only about RTU ramps, and I don't know what it has to do with any other person who works underneath him.

You may answer it though.

THE WITNESS:  So, in general, the title is Lead ADA

**ERIC DAVIS**
**March 5, 2026**

Page 16

compliance -- it's Lead ADA Compliance Project Manager.

His general duties are to answer to two areas of responsibility.  One is serving as the project manager for projects that are primarily about accessibility.  The other is to serve as a resource on other projects that may have an ADA element to it.

And I distinguish that in terms of a project manager because he is one of several people that have the lead project manager title who report to me so I am one of his direct reports.

BY MR. MORRISSEY:

Q   Does that person have any role in renovating the RTU east tunnel ramp?

A   I don't understand what you're asking because we're not currently renovating.

Q   Why not?

A   How much time do you have, Pat?

I've given you this answer at lease twice before.  So let's repeat it, okay?

By the way, I don't appreciate your tone.  You and I have talked several times, and you're being very aggressive this afternoon.  I think we could be a little more collegial when we talk.

As you know, the RTU ramp which has been

ERIC DAVIS
March 5, 2026

Page 17

identified as not being compliant is not the only way to enter the RTU. You can also enter and exit the RTU from a walkway on the north side of the building at the same level.

And as you know, we are working to retain a firm to assess -- actually multiple firms to assess the entire jail campus because you cannot look at the RTU east tunnel access in isolation because you can get in one way or another.

I can't tell you sitting here right now if that is the optimal way for someone who is disabled to enter the building or not. It depends, for example, on which direction someone is coming from.

And so we have -- we are hiring someone to look at the entire area holistically to evaluate whether or not we need to modify the ramp.

That report may say, for example, and I'm speculating here, but that report may say, you know what, since you can enter the building from the north side, we recognize the ramp is noncompliant, but if you have somebody that's disabled, they can enter the other way with the sheriff's help. I don't know what's going to be said in that report. And that's why we're hiring someone objectively outside to look at the situation.

ERIC DAVIS
March 5, 2026

Page 18

It is a complex situation that cannot being looked at individually, and I've told you this on at least two other occasions, Pat.

Q   When the RTU east tunnel ramp was constructed, was it is required to comply with the ADA standards?

A   Yes.

Q   Why?

A   Because it was constructed after the ADA went into effect.

Q   So if --

A   It clearly was constructed wrong.

Q   Well, how do you know that?

A   Because of the LiDAR survey that was commissioned by counsel that indicated that the ramp in terms of its physical configuration doesn't comply.

Q   So why that you know the ramp was constructed incorrectly and it had to comply with the ADA when the building was built, why aren't you taking steps to repair that ramp immediately?

A   Asked and answered.

Because I don't know that it does need to -- if it turns out that it's actually okay to enter the building on the north side.  That's why we're having someone look at the whole picture.

**ERIC DAVIS**
**March 5, 2026**

Page 19

Q   Did GEC recommend that that ramp be renovated?

**A   They may have.  I would expect, if they looked at the situation, and they would say something along -- and I'd have consult the report, they would say something along the lines of this isn't compliant, and if you want to make it compliant, here are the things that you need to do.**

Q   So you talked about this comprehensive multi-contract program to assess the overall ADA accessibility --

**A   That is correct.**

Q   -- compliance?

**A   That's correct.**

Q   And that's in Paragraph 3 of your declaration?

**A   It sounds right.**

Q   The first page --

**A   Yes.**

Q   -- Paragraph 3?

**A   Yes, uh-huh.**

Q   Are there any documents that you're aware of that can identify when this multi-contract program to assess the ADA accessibility compliance -- when that started?

**A   It hasn't started yet.  We're still -- We're**

**ERIC DAVIS**
**March 5, 2026**

Page 20

still in the procurement phase of those services.

Q   When to your knowledge did the county start requesting that there be a contract to assess overall ADA accessibility at the Department of Corrections?

A   I think it was sometime in '24.

Q   How do you know that?

A   I'm remembering from a couple of years ago, but we submitted a request for qualifications to the procurement office which then issued for endorsement based upon a timeline to do procurements and such.  I suspect it might have been more towards the end of '24.

Q   And do you have any documents about this request for a multi-contract program?

A   Well, they're publicly available through the procurement website.

Q   How do I find those?

A   You go to -- You Google county procurement, and you go to their website.  It's through a platform that used to be called Bonfire.  I think that they renamed it, and it's called Euna or something.  And if you search for ADA, it will probably come up.

Q   Have you given any of those documents to your counsel?

A   No.  I don't -- I don't think so.  No.

ERIC DAVIS
March 5, 2026

Page 21

I may have directed him to look at them, but I don't think so.  Maybe.

Q   Do you have to have a password to access that information or a user name?

A   It's -- The RFQ is a public document.

Q   So what is the state of this RFQ?

A   We're in procurement.

Q   Which means what?

A   We are in the process of obtaining contracts to deliver those services.

Q   And when do you expect to have a contract?

A   I can't predict.  I would assume sometime in -- hopefully, within the next, I don't know, three to six months, something like that.

It is a complicated solicitation.

Q   Why is it complicated?

A   Because you're asking someone to identify how much it's going to cost to assess 60 buildings and a hundred or so acres of land.  It's a very complex operation, and it takes a lot of -- it's going to take a lot of time.

The vendors typically will tell us, here's what we think it will take to do that, and we look it and say, well, wait a second, and we go back and forth.  So

ERIC DAVIS
March 5, 2026

Page 22

there's an extensive period of negotiations.  It's a large undertaking.

Q   Now, you previously signed a declaration a few years ago, and you expected the contract to already have been entered into, correct?

A   I think you're referring to 2025?

Q   I think I'm referring 2024.

A   Okay.

     If you say so.

Q   I mean, do you remember signing a nearly identical declaration some paragraphs a few years before where you --

A   Honestly, Pat, you've sued us so many times, I can't remember which so I couldn't tell you specifically You'd have to show me the document and say at a certain time.

Q   Now, for part of this RFQ, are there three packages?

A   There is one package.

     The RFQ stipulates that there will be three awards.  What we are doing is dividing up the jail area into three sections because it is so large, and one firm will do the north section west of California, one firm will do the south section west of California, and

**ERIC DAVIS**
**March 5, 2026**

Page 23

another firm will do the portion of the jail campus east of California.  So there are three areas, and there will be three contracts.

And this is all in the publicly available RFQ and stipulated, including a plan indicating what those areas are.

Q   And how much money is it expected to cost?

A   That's what we're doing in the negotiations right now.

Q   Is there anything publicly available that says how much --

A   No.

Q   -- it's expected cost?

A   No.

Q   Has the county board allocated any money for this?

A   Okay.  Let's do this again.

The county board only authorizes funds on an annual basis.  The county practices what are -- what is called zero-based budgeting.

And so when we have projects, the county only authorizes so that they can provide appropriate level of control over the finances.  They only authorize money on a year-over-year basis.

ERIC DAVIS
March 5, 2026

Page 24

A project like this that's going to be large and probably the contract -- most certainly, the contract will be multiple millions of dollars, we will not spend all of that money in a given year. So we are not authorized to spend more than a certain amount in a given year. And that doesn't mean that we're not expecting to spend it all, that doesn't mean that's not the county's intent.

So when you ask has the board authorized all of the money for the contract, the answer is no because we don't work that way.

I wish it were more straightforward. That's the rules we have to follow.

Q   So the contract that you're hoping to enter into in a few months, will that just be to assess the entire jail campus for ADA compliance?

A   No.

The intent is to do assessment. In order to do things more expeditiously, the intent is that the vendors will assess, design and provide services during construction. We have obtained approval to do that. Rather than doing an assessment and then doing a second procurement, which would take you even longer to higher someone to do the actual design, we are going to be

ERIC DAVIS
March 5, 2026

Page 25

retaining to do -- it is a -- I would say approximately a four-to-six year endeavor for a project of that size.

Q   Now, when did the county to your knowledge first come up with the idea of conducting this assessment of the jail campus?

A   It has been something that we've been working on for a long time.

As you know, there was previously a report by the Department of Justice, I believe it was in 2015, that identified some 200 things that needed to be fixed. Many, if not most of those elements, have already been addressed, but there were a lot of them that were done.

As I recall, and I think you cited in multiple other actions, the sheriff had asked us to assess certain things so we started -- that's the famous business case.  We realized that it was important not just to look at buildings in isolation but to look at the campus holistically, and that's when we went from -- and I think, I'm going to just speculate, I think the initial request was for Divisions 2, 4, 6, 9 and 10, I want to say, and we realized that that -- when they put that request in, we realized that the only way for it to truly be successful was to look at the jail campus holistically.

ERIC DAVIS
March 5, 2026

Page 26

And, actually, the RTU is a perfect case in point. We can look at the RTU in isolation, and we can look at the Cermak facility in isolation, and we can look at Division 5 in isolation, but unless we look at all three of those and the tunnel areas and the ground areas to identify all of the different ways that people come and go from those buildings and understand what their needs are, only if we look at things holistically can we get a true picture of all of the needs.

And so we expanded from the original request to look at the entire jail campus. That process took a while.

Q   So this goes back more than ten years?

A   Yea.

Oh, well, there have been -- I don't know when the Department of Justice started. I wasn't at the county. I believe the report was in 2015.

But, yeah, it's been something that's been -- been a need for quite some time, yeah.

Q   And this has been in the annual appropriation bill that's been proved by the county board for more than ten years?

A   I can't speak to what happened before I was here.

ERIC DAVIS
March 5, 2026

Page 27

Q    But you --

A    I've only been here nine years.  I can't speak to that period of time.

Q    Well, as the deputy director --

A    Yeah.

Q    -- you look at the county board annual appropriation?

A    Correct.

Q    And you participate in generating that?

A    So answering your question, if I may, and I'm sorry for interrupting you, there have been elements involved with accessibility in I believe every version of the capital plan since I've been here.  It's been something we've been working on for a long time, yes.

Q    And it was in the plan before you arrived?

A    No.

As I said, the previous direction, both from the -- our justice and sheriff was idealistic so there were ADA elements in there, but as far as the comprehensive approach that we're talking about that we're pursuing under this contract, that happened more recently.

Q    When you say more recently, are you talking 2017?

ERIC DAVIS
March 5, 2026

Page 28

A    Oh, no.

Much more recently than that when we -- No.  I want to say, yeah, more like '19, more like 2019, something like that when it became clear that we needed to take -- somewhere in the 2017-2019 range, it became clear that just doing the individual buildings wasn't going to get done what we needed to get done.

Q    And who made that decision?

A    My director and me.

And that's when we started the process of -- of developing solicitations for -- to look at the jail more holistically.

You have to understand, this effort that we're talking about is quite literally unprecedented.  The Cook County Jail is the second largest contiguous jail in the United States, and to my understanding no one has done this before.  So it's taken a while to figure out a lot of these things.

Q    And since 2019 in the annual appropriation bill, is it fair to say the amount of money that it's projected to cost to perform this assessment has increased almost every year?

A    I'd have to go back and look through the individual CIP's, but that wouldn't surprise me if

ERIC DAVIS
March 5, 2026

Page 29

that's the case.

Typically, what we do, as I mentioned, we give the commissioners the requests for a given year, and in the same document we also indicated what we think the projections are going to be for nine additional years so we give them a look ahead for a total of ten years.

But I expect that the amounts relative to ADA improvements in those out-year projections have increased over time, but it may easily be nonlinear.

Q   So, presently, is it about 120 million that is set aside that you're --

A   I'd have to check.  I couldn't answer you offhand.

Q   How would I find that out?

A   You'd Google Cook County Budget Fiscal Year 2026, and you'll get the document.  It's in Volume 1.  I believe the budget is a three-volume book.  You get in Volume 1, and it has the capital planning that had the projection in it.

Q   And that would include this assessment that you're talking about in your declaration in Paragraph 3?

A   Yes.

And I believe, because of the way we contract things, I don't recall offhand if '26 has that.  When we

**ERIC DAVIS**
**March 5, 2026**

Page 30

did that initially, it was in a single contract.  I believe for '26 we actually broke it out as three different items, but I can't recall.  I'd have to check.

Q   And you haven't --

A   Regardless, the intent is to do all three at the same time.

Q   And you haven't given this to your counsel, the 2026 Annual Appropriation Bill Volume 1?

A   It only came out in November.  So I mean, it's publicly -- if they asked me for it, I would have given it to them.  It's publicly available.

Q   Okay.  And that's what you were talking about in Paragraph 3, the comprehensive multi-contract?

A   Yeah.  Yeah.  Uh-huh.  Right.

Q   That's yes?

A   Yes.

Q   And we can just go to the county website and pull it up for us, Mr. Davis, and --

MR. BRANUM:  I don't know that this is --

MR. SHAFI:  This that has not been disclosed before.

THE WITNESS:  It's a public website.

MR. MORRISSEY:  It's a public website.

THE WITNESS:  It just cut out, Pat.

MR. MORRISSEY:  Yeah.  I'm sorry.

**ERIC DAVIS**
**March 5, 2026**

Page 31

I'm having computer problems.  Give me a second.

MR. BRANUM:  Let's take one minute.

MR. SHAFI:  Let's just take a minute.

THE WITNESS:  Yeah.

(Break taken.)

MR. MORRISSEY:  All right.  I got it.  All right. We're back.

Everybody ready?

THE WITNESS:  Yeah.

I don't know who this is.

MR. SHAFI:  I would like to object to --

THE REPORTER:  I'm sorry.  I can't hear you.

MR. SHAFI:  I would like to object to this document being used in the deposition.  We have not reviewed these documents.  This has never come up before.

This, even though these are publicly available information, but we have not reviewed them yet so this cannot be used in the deposition.

MR. MORRISSEY:  Well, Counsel, I -- it's about his declaration.  I asked you for these, for documents, and I never received any response.

MR. SHAFI:  I understand.

As it was just said, there were no documents

**ERIC DAVIS**
**March 5, 2026**

Page 32

for me to provide you and that these are not the documents that I have reviewed yet.

So these cannot be used in the deposition.

MR. MORRISSEY: Well, why can't they be used?

Your witness just told me I can look at them on the government website and know what he references in the declaration that you filed in support of your motion for summary judgment.

MR. SHAFI: I understand.

But these are not a document that have been reviewed.

MR. MORRISSEY: Well, let me --

BY MR. MORRISSEY:

Q   Mr. Davis, have you reviewed the capital improvement plan?

**A   In great detail.**

Q   And you actually helped prepare it, right?

**A   Correct.**

Q   And you're intimately involved in the capital improvement plan for public safety?

**A   Yes.**

Q   And if you'll look at the capital -- we're looking at the capital improvement plan to help you understand how much money you believe this

**TOOMEY REPORTING**
**312-853-0648**

Exhibit 1 Page 33

ERIC DAVIS
March 5, 2026

Page 33

multi-contract comprehensive ADA compliance would cost?

A   Uh-huh.

Q   Is that a yes?

A   Well, would cost.  See, that's the problem.

The request, which is what this comes from, is as I said, in terms of what we're expecting to be spending in the given fiscal year, and the other is projections.  It's not a contract.

Q   How did you come up with these numbers for -- or how did the county to your understanding come up with these numbers for this comprehensive never-been-done-before assessment of a jail campus like Cook County?

A   As you may or may not be aware, we are also assessing the rest of the public safety portfolio which includes ten courthouses.  We are doing other similar assessments for those buildings.

And so what we did just on a raw basis is looked at the amount of square footage involved at the jail and looked at the amount that we actually have assessments underway at courthouses, and we looked at what the fees are working out to be for those, what those fees turned out to be on a fair square footage basis, take that figure and multiply it by the square

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 34

ERIC DAVIS
March 5, 2026

Page 34

footage that we're looking at at the jail campus and come up with what's called an ROM, or rough order of magnitude, of costs.

I expect, and I'd have to go through it, the way that budget is a little unusual so this can be a very hard document to read, but I expect that the totals projected are reflected with that understanding of what it costs to do the courthouses.

Now, that's just a -- an overall budgeting tool, and it's reasonable to expect that the assessment of a courthouse may be not -- may be more difficult or less difficult than assessing a jail, I couldn't say, because as I said, we haven't done this before, but we have to hang our hat on something, and we used -- I believe if I remember correctly, we used the per square footage fees for the courthouses to figure out what we think it's going to take for the jail.

Q   So the jail, you think right now it's going to be about 123,500.000?

MR. SHAFI:   I would object to this questioning. This -- This deposition -- This question comes out of the scope of this deposition.  This deposition is specifically strictly only relevant for RTU.  I see this line of questioning where you're asking for every other

**ERIC DAVIS**
**March 5, 2026**

Page 35

part of the jail and courthouses and what else.  Your deposition notice specifically asked for RTU.  And I don't understand the relevance of this.

MR. MORRISSEY:  Well, Counsel, I'm asking about the declaration that you filed in the Westmoreland case.

I also asked you before we started this dep that I wanted to start off with the Enriquez case because I told you it's going to take more time for me to go through Enriquez and Johnson because we have to go through these documents, and you objected strenuously saying there's no way I could start with asking about Enriquez or Johnson.  You insisted we have to do Westmoreland.

MR. SHAFI:  Oh, I understand.

THE COURT:  So I'm telling you, Counsel, that's why this is taking a little longer.  I'm asking about documents that you had Mr. Davis sign in the Westmoreland case.

MR. SHAFI:  I understand.

And I stick to my objections.  This -- This deposition was scheduled for Westmoreland first, and that's how we're proceeding.

However, I would like to remind you, Counsel, that I don't -- it doesn't -- it does not matter what

ERIC DAVIS
March 5, 2026

Page 36

other cases you have depositions -- you have depositions for with Mr. Eric Davis, however, the scope of this deposition is strictly only for RTU ramps.

MR. MORRISSEY: Right.

And we're talking about Paragraph 3 where Mr. Davis is talking about the comprehensive multi-contract program to assist the overall ADA accessibility compliance of all of its public safety facilities --

MR. SHAFI: Okay.

MR. MORRISSEY: -- approximately 11 million square feet.

Counsel representing -- representing the county potential treatment unit RTU hired a third-party architectural class engineering firm Globetrotters Engineering Corporation to assess the ADA compliance, basically, the level tunnel basement level access to the RTU ramps north tunnel, corridor and east tunnel corridor.

Your declaration by Mr. Davis talks about this -- this is not a standalone reconstruction project for the RTU, and they talk about this Solicitation Number 2415-02093, which I believe is the whole contract Mr. Davis was mentioning.

**ERIC DAVIS**
**March 5, 2026**

Page 37

So this is entirely relevant with this declaration that the county decided to put in the Westmoreland case.

MR. SHAFI: And, Counsel, I would like to renew my objection that this is a -- the scope of this deposition is strictly for RTU cases, and the line of questioning, if deviated from that, is -- goes beyond the scope of this deposition.

MR. MORRISSEY: All right. Let me ask a question.

BY MR. MORRISSEY:

Q Mr. Davis, this Solicitation Number 2415-02093, Paragraph 6 of your declaration that you signed on February 4th, 2026, is that that comprehensive evaluation to look at the whole county jail?

A Yes.

Q And you put that statement in your Westmoreland declaration?

A Yes.

Q And so that Solicitation Number 2415-02093, that relates to this thing in your professional experience that's never been done before to access a whole jail campus?

A That's correct.

Q And so that solicitation number correlates

**ERIC DAVIS**
**March 5, 2026**

Page 38

somehow to the FY 2026 appropriation bill that's on your screen if you'll look at --

A    Tell me what I'm looking at.

Q    -- 269, 123,500,000, correct?

A    Now, to be clear --

MR. BRANUM:  Well, wait a second.

MR. SHAFI:  I'm going to object again.

This -- we have not reviewed these documents before, and to use it -- certain documents that have not been produced, I would object to being used in this -- in the deposition right now.

MR. BRANUM:  And I think it's more of an objection you can't use them.

MR. SHAFI:  Right.  Absolutely not.

BY MR. MORRISSEY:

Q    Can you respond, Mr. Davis?

MR. SHAFI:  I would advise Mr. Davis that anything that we have not been used -- that has not been produced to us and has -- and we have not reviewed, that should not be discussed in this deposition.

MR. MORRISSEY:  Counsel, these are your client's documents.  Mr. Davis is the one that helped prepared this.

And you didn't respond to me weeks ago asking

ERIC DAVIS
March 5, 2026

Page 39

for these documents.

MR. SHAFI:  And, Counsel, as -- as I stated before at the start of the deposition, I was not in possession of these documents.

MR. MORRISSEY:  Well, Counsel, it's not whether you're in possession.  It's whether your client is, and you're producing the witness here that you had signed the declaration in this case, and they weren't given to me, and they're publicly available.

MR. SHAFI:  And if they're publicly available, you can go ahead and figure it out yourself publicly available documents.

But all I'm trying to say is that, if something has not been produced to us in this or had not been produced to you can't be used in this deposition. That's our take on this.

MR. MORRISSEY:  Okay.

BY MR. MORRISSEY:

Q   Mr. Davis, can you -- the solicitation that you reference in your declaration 2415-02093 --

A   Yes.

Is there a question?

Q   -- is there an amount of money that you believe the county board has appropriated for that solicitation?

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 40

**ERIC DAVIS**
**March 5, 2026**

Page 40

A    This took a while to understand so I'm going to take a second to explain it to you.

There is a difference between a contract and funding.  The Item 2415-0293 is the number that will ultimately be the contract for the firm to do this work.

What you're looking at here is the budget, which is --

MR. SHAFI:  Let's not -- I would advise my client not to --

MR. MORRISSEY:  You can't -- You can't tell the witness not to answer.

And I think you're totally off-base saying that Mr. Davis can't reference a document that's publicly available that he's intimately familiar with that is incorporated in his declaration.

MR. SHAFI:  Again, I will review, and I will ask my client not to discuss any documents that were not produced in this case today in this deposition.

MR. MORRISSEY:  Well, Counsel, why weren't -- why didn't your client produce it to me?

MR. SHAFI:  Again, you never issued any interrogatories regarding these documents.  There was an understanding that you sent us an e-mail, but you scheduled this deposition, and then those -- that e-mail

**TOOMEY REPORTING**
**312-853-0648**

Exhibit 1 Page 41

**ERIC DAVIS**
**March 5, 2026**

Page 41

was forwarded to Mr. Davis, but if I don't have those documents, I cannot just come in and agree any sort of documents that are given to you.

MR. MORRISSEY:  So my e-mail asking you to give me documents that relate to this declaration were given to Mr. Davis, and Mr. Davis just didn't respond?

MR. SHAFI:  I --

MR. BRANUM:  Okay.  Wait.

MR. SHAFI:  Wait.

(Discussion had off the record.)

MR. SHAFI:  Counsel, I will be asserting attorney-client privilege on any communication that was between me and my client about this case.

Today you proceeded with this deposition without -- you know, if you wanted these documents so bad, you know, you could have asked for it and not proceeded with this deposition today.

The fact that there were no documents produced to you is because I don't have them in my possession. And the fact that this deposition is going without you, you know, pressing this issue or when you began this deposition without these deposition -- without these documents, we cannot use any of the documents that were not produced in this deposition today.

**ERIC DAVIS**
**March 5, 2026**

Page 42

And I would ask my client not to reference to any documents that had not been produced in this case today.

MR. MORRISSEY:  Didn't I ask for these documents in discovery years ago, and we talked about this with the magistrate judge before you guys came on board and there were agreements to produce documents if there were any documents about the ramp?

MR. SHAFI:  Yeah.  Well, I can speak for when we start -- we began, came on to this case, and we have resolved any interrogatories that were -- you were asked -- for any documents that were asked in that fashion, however, if there was an e-mail that was sent to you -- sent by you to me for anything and if you don't have those documents and you voluntarily want to still proceed with these -- with this deposition today, that's not on me.

MR. MORRISSEY:  Well, do you want to stop this deposition and resume it at a different time?

MR. SHAFI:  This is your deposition.

MR. MORRISSEY:  All right.  Why don't we resume -- We can resume this after you find the documents we need, and we could -- if I need more time to respond to summary judgments with Judge Tharp, I can ask for more

**ERIC DAVIS**
**March 5, 2026**

Page 43

time.

These are documents that are your client's, and you're bringing -- you had somebody sign a declaration who is intimately familiar with all of these things. He's the deputy director.

MR. SHAFI: And it's --

MR. BRANUM: Eric Davis --

MR. MORRISSEY: There's only one attorney.

MR. BRANUM: Well, I'm going to say something.

Eric Davis is here, it's your notice, he's here, depose him. If you want to cancel the dep, that's on you, but he's not going to be re-presented.

MR. MORRISSEY: Well, then we'll bring it to the court.

And I think it's totally unfair, Mr. Branum. Why didn't you guys give me these documents?

MR. BRANUM: I just made a statement. That's all.

MR. MORRISSEY: Well, there shouldn't be two people defending Mr. Davis. Now I've got three lawyers here.

MR. BRANUM: I made a statement.

MR. MORRISSEY: All right.

BY MR. MORRISSEY:

Q   So, Mr. Davis, can you explain how a number arrived in the hundreds of millions -- at least a

**ERIC DAVIS**
**March 5, 2026**

Page 44

hundred million for this multi-comprehensive study of the jail accessibility that's never been done before?

    A    **Without commenting on any documents not produced for this, I'd like to answer your question.**

    Q    But, Mr. Davis --

    A    **I want to answer your question.  You asked me a question.  Do I not get to answer?**

    Q    You can't limit your testimony about -- Your acknowledge is based on your knowledge so you can't limit your testimony excluding documents you have knowledge of.

    A    **I'm relying on my counselor.  I'm responding to what they -- what counsel has said.**

         **I think, you know, we tried to be as forthcoming as possible in information, and I'm responding to the question that you asked, Pat, which is about the amount of monies intended to be spent when assessed, you asked me about the process of developing the capital plan, and I explained to you how we arrived at what we think is the cost projection for this work.**

         **My question is --**

         **Oh, I don't get to ask questions.  Sorry.**

         **So I've described how we go about estimating something like this in an area where we have relatively**

**ERIC DAVIS**
**March 5, 2026**

Page 45

**limited information.  We have done that.  That's been presented to the board.  It was included and approved in the capital plan.  We fully intend to go forward with this as soon as we can get to contract to get underway.**

MR. BRANUM:  Just give me one -- just one minute.

(Discussion had off the record.)

MR. SHAFI:  Before we resume this deposition --

MR. BRANUM:  You want this on the record?

MR. SHAFI:  Yeah.  Oh, yeah, actually, I want this on the record.

So there's a screen which is facing my client right now, and this screen has some documents that has been not reviewed before this deposition, and I would like to move the screen and against my client and face towards the plaintiff's counsel because these are the documents that plaintiff's counsel is referring to that we have not reviewed before this deposition and cannot be used in this deposition, and you may ask my client any other questions you want.

MR. MORRISSEY:  I disagree with your understanding about how depositions move forward, but I'll continue.

MR. SHAFI:  Okay.

BY MR. MORRISSEY:

Q   Mr. Davis, you talk in your declaration about

ERIC DAVIS
March 5, 2026

Page 46

the county board has approved funding for the assessments as part of the FY 2025 capital improvement plan?

A    Yes.

Q    And it's under Project 2412.

 Do you see that?

A    Yes, I do.

Q    What is Project 2412?

**A    As I mentioned earlier, there's a difference between contracting and funding.**

**The number 2415-02093 is in reference to the contract.  That is an agreement.  And I'm assuming that, as an attorney, you're aware what a contract is.**

**24112, however, is a number from the county's accounting system, it's the Oracle EBS accounting system, and that is the -- the term we use is the EBS number.  So that references the specific product -- project.**

**Funding is applied to projects.  Projects in order to be executed may require contracts to deliver those services.**

**Now, 24112 is a preference to funding which is authorized by the county board as I mentioned on a year-over-year basis for the specific project, the**

ERIC DAVIS
March 5, 2026

Page 47

larger assessment of the -- of the DOC campus.

Q   So where would we find out how much funding has been approved by the county board in the FY 2025 capital improvement for Project Number 24112?

A   Actually, you can find -- you can also find the 2026 capital improvement plan which is now active, I believe.  I believe it was approved at the November -- I don't remember what board meeting.  So we're now fiscal year 2026.

But the -- the project is still in the budget, and that is the multi-year, and I can't remember the exact name because it's been around -- I think that's the one that is -- references all the way back to the original project request by the sheriff, which is something like ADA improvements Divisions 2, 4, 6, 9 and 10 or something like that, that's the official name.

The problem is, once we put the name in the system, it has to stay that way, we can't change it over time.  So the contract actually has the original name from the original request, but that is -- that is the project that we're referring to here.

I believe 4-20-26, because we have those three zones, that that has since been divided into three founding lines, but they all roll up under the same

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 48

ERIC DAVIS
March 5, 2026

Page 48

contract.

Q   Is that the funding for 2026, FY 2026, that's about 120 million?

A   I don't recall the number roughly offhand, exactly offhand.  I know it's a very large number.

Now, let's be -- let's be clear again.  The number that you're -- that you're referencing is a reference for the entire project as projected over a ten-year period.  So even though the name of the project may say assessment, and, again, once we do that, we have to leave it in there, the monies for construction are also estimated in there.  So the amount of fee for the architects is in that number, a hundred million or whatever the actual number is, but also the estimate of construction dollars.  So we're not proposing a hundred million dollar design contract to architects. That includes -- Because it all applies to the project, it includes all -- it includes both design and construction money.

Q   So if I showed you the FY 2026 capital improvement plan that was approved by the county board, a public document, would that refresh your memory about how much money?

MR. SHAFI:  I would -- I would object to using any

**ERIC DAVIS**
**March 5, 2026**

Page 49

sort of documents that were not produced before this deposition during this deposition.

THE WITNESS: It would help me if you would tell me what you're actually asking, Pat.

BY MR. MORRISSEY:

Q   Well, I'm trying to understand your statement in the Westmoreland declaration --

**A   Okay.**

Q   -- where you're referencing the FY 2025 capital improvement plan Project 24112, and you state that the board of commissioners has approved funding.

**A   Okay. And if you look at the end of the paragraph, it says: Upon approval of the architectural contract, those funds carried over to fiscal year 2026 will be used for ADA design and renovation planning.**

**That's -- So the work continues. It's a multi-year project. So I don't understand what additional information you would -- you would get by showing me the plan. I'm not understanding what you're trying to find out.**

Q   Well, is it right now the projection that has been told to the county board, it's in the neighborhood of a hundred million dollars?

**A   It's in that range somewhere.**

**ERIC DAVIS**
**March 5, 2026**

Page 50

And that, I believe, again, until we've done the assessment, we really don't know what it's going to take. They may turn around and say, hey, you know what, you're in better shape than you thought you were, or they may say, oh, no, there's a lot more you have to do there. That's why we have an assessment; to identify the scope of it. So we can make our best estimate, but, again, it is an estimate, and it's outside of the year for the -- for the particular funding.

Q   And so --

A   What are you trying to figure out? What do you want to know?

Q   Is this one of the bigger projects you're working on?

A   It's one of the bigger ones, yeah.

Q   And so if we trace back the capital improvement plan over the years, and --

A   Yeah.

Q   -- they're all available publicly on the county board website, right?

A   Yes.

Q   And they go back to --

A   Well, I don't know -- I don't know if the county board website has an archive of all the previous years.

**ERIC DAVIS**
**March 5, 2026**

Page 51

It may or may not.

It wouldn't surprise me if it does. I don't know. I can't stipulate whether it does or doesn't.

Q So if we go back through the years, assuming they're on the county board archives --

A Yes, you can probably find them, yeah.

Q And if we look at the DOC site, the ADA assessment improvements Divisions 2, 4, 6, 9 and 10, that would be the --

A Yes.

Q -- originating source of these requests?

A When we started digging into the problem, yes.

Obviously, the DOJ report in 2015 started the conversation.

Q So they started digging into the problem by that line item in the --

A Well, as has been stipulated in a prior matter that you asked for documents on, that was the result of a business case created by the sheriff, I believe if memory serves, in 2019 or something like that, and that was the title at the time.

They wrote the time. I didn't write it.

Q And that was the -- Ms. Sabrina Riviera FY 19 business case that she prepared?

ERIC DAVIS
March 5, 2026

Page 52

A    That sounds like it, yeah, yeah, which I figured you're going to put in front of me at some point, yeah.

Q    So why -- you've been involved with including line items on the cap -- line items in the appropriations bill for other ADA modifications at the DOC, for example, the Cermak tunnel?

MR. SHAFI:  Objection.  This -- This deposition is specifically only for RTU.  Any line of questioning which talks about any other ramps, any other divisions is out of scope for this deposition.

MR. MORRISSEY:  Counsel, that's why I wanted to start off with Enriquez or the other case where there's more -- more room.

You said no.  You said we have to go first with Westmoreland.

And so I'm trying to understand why -- why Mr. Davis hasn't included a line item similar to the Cermak ramp to fix the RTU ramp.

MR. SHAFI:  Counsel, I am following the rules, I am following the motion that you filed in this case where you specifically said this motion -- specifically for RTU ramps, this deposition, and that's the scope of this deposition.

I have nothing to do with any other cases in

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 53

**ERIC DAVIS**
**March 5, 2026**

Page 53

this so I would just please ask you that; to have your questions very narrow to only RTU ramp because that's the scope of the deposition.

BY MR. MORRISSEY:

Q   Well, Mr. Davis, can you -- in addition to the way this has been laid out in your declaration about going about repairing or assessing the RTU east tunnel ramp, there's other ways in February of 2026 the county could go forward with repairing this RTU ramp, right?

A   **No.**

Q   There's no --

A   **What are you --**

Q   I'm trying --

The current proposal, Mr. Davis, is going to take years --

A   **Yes.**

Q   -- to assess?

A   **Yes.**

**And I want to finish this stuff.  And you know something?  I want to do this more passionately than you understand.**

**And if I have to carve up this assessment into 75 pieces based upon which element you decide to sue us over, it's going to take five times as long.**

**ERIC DAVIS**
**March 5, 2026**

Page 54

We're trying to get this done as fast as possible, and if we have to stop every time you sue us over something and do this piece over here or this piece over there without looking at the big picture, it will never get done. And I am sick and tired of you impugning my integrity or my intent or my commitment to addressing this.

So if you say why it hasn't been included specific to the RTU and if I tell you that's because we need to leak at the whole picture and we need to assess the whole thing and you come back with a question like that, why haven't you included the RTU, and I've answered it, all you're doing is slowing us down.

Is that your intent, or do you actually want to get this stuff done because, if you actually want to get this stuff done, you'd listen to the answer that I've given you more than once?

MR. BRANUM: I need to take a five-minute break.

(Break taken.)

MR. MORRISSEY: Is everybody ready?

MR. SHAFI: Yes, whenever you are.

BY MR. MORRISSEY:

Q So, Mr. Davis, based on this declaration, when do you -- do you expect the RTU east tunnel ramp to be

**ERIC DAVIS**
**March 5, 2026**

Page 55

assessed in the year 2026?

 A   I certainly hope so.  I certainly hope it will be, yes.

 It's a large area, and when we hire someone, they will come up with a plan and the sequence of when to go about assessing things by -- hopefully, they would get to it in '26.

 As far as when the report will be done that says what the assessment is, that's not going '26 because they have -- well, all three consultants have do the whole thing so the report won't be complete in '26.

 Q   Will the -- So we're going to be waiting for the whole report for the entire 100 acres at the Department of Corrections campus?

 MR. SHAFI:  Asked and answered.

 THE WITNESS:  I --

 Are you done with your question?

BY MR. MORRISSEY:

 Q   Yeah.

 I'm trying to get a timeline for when there could be some change, structural change to that RTU east tunnel ramp.

 MR. SHAFI:  Objection; asked and answered.

BY MR. MORRISSEY:

**ERIC DAVIS**
**March 5, 2026**

Page 56

Q   So you mentioned there has to be a report by an architect or several architects, right?

A   Uh-huh.

Q   That's a yes?

A   Yes.

Q   And that report is not going to come -- be prepared and published to the county in the year 2026, right?

A   It may.  I don't know.  Maybe in 20 -- They may finish it that quickly.  I don't know.  I don't know.  It may be in '26.  It may be in '27.  I don't know.

Q   Is it possible it could be in 2028 for the architectural report to be submitted to the county?

A   I wouldn't think it would take that long, no, no.

Q   Now --

A   We don't have that kind of time.  We're trying to get this done as quick as possible and yet be comprehensive and accurate and complete.

Q   So when you signed your declaration in 2024 --

A   Okay.

Q   -- it was your expectation that this report would be issued --

Let me get the --

**ERIC DAVIS**
**March 5, 2026**

Page 57

-- the time frame said two years ago?

A    Uh-huh.

Q    Well, let me rephrase.  Let me strike that question.

Back when you signed your first declaration in this case in May of 2024 --

A    Okay.

Q    -- was your intent with this architectural assessment the same as it is today of the entire campus and there being a report about ADA compliance and accessibility?

A    Yeah, I believe so, yeah.

I mean, I would -- I would say, most likely, and the reason that I say that is because the solicitation is a '24 solicitation.

Q    And --

A    So, yeah, I would assume so, yeah.

Q    So back in May of 2024, you were given a conservative completion estimate about 24 to 28 months for this assessment, right?

A    Conservative is your word.

Q    Well, it's what you used back in your declaration.

A    Okay.  If I did say that, yeah, I mean, I think

**ERIC DAVIS**
**March 5, 2026**

Page 58

we try to not -- we're trying to get this done as quickly as possible without setting unrealistic expectations so it's a balancing act.

But, yes, it's, as I said, a large, complicated and in many ways unprecedented endeavor so we do the best we can.

Q   So your conservative estimate in May of 2024 regarding this didn't play out as you expected?

A   No, it did not.

Q   And what is your conservative estimate now for this assessment to be completed by?

MR. SHAFI:  Objection; asked and answered.

You may answer.

THE WITNESS:  Yeah, I -- it would be nice if it could be completed in '26, but I -- I would expect it probably would be completed more in '27, although I want to add that, one of the reasons that the contract includes having the firms do the assessment and provide design services and provide services during construction, one of the advantages of doing it that way is that the assessment report doesn't have to be as, I guess you might say, polished or complete because it's not a document that then is going to be handed off to another firm to do the design work.

**ERIC DAVIS**
**March 5, 2026**

Page 59

So some of the times and some of the elements for preparation of a document that large can be shorter because it's a document for themselves as opposed to something they're providing to somebody else who then has to review it, analyze it and that sort of thing.

So, hopefully, it will go more quickly in assessing than in those cases where we have done -- for example, we have done assessments at courthouses to then turn them over to another firm. It may not take as long because the same firm is going to the assessment and construction services. That is one of the reasons we -- we got -- asked for and got the permission for them to do the services all the way through construction administration.

BY MR. MORRISSEY:

Q   And is that what you originally try to do in other projects?

A   No.

**Originally, we thought we were going to have to do -- just do assessment and stop and have somebody else do it.**

Q   Now, the whole point to this project that you're seeking is for a comprehensive assessment?

A   Correct.

ERIC DAVIS
March 5, 2026

Page 60

Q    Before individual elements are altered because you need to take a look at it comprehensively?

A    Yes.  Yeah.

It's a -- It's a fluid situation, and as I mentioned, we are making every best effort to get the elements into compliance as soon as possible.

It is possible, for example, and I'm just speculating, that relatively soon into the assessment period, the consultants may come back and say, hey, here are a basket of things that are smaller and localized and easier to do and maybe you can go ahead and advance them, or they may not.  I don't know.

One of the reasons that we have somebody outside that is that we don't want -- to use the expression, we don't want to put our thumb on the scale, we don't want to be in a situation where, you know, we're making decisions about prioritization.  We want to -- We want an objective look at this and what makes the most sense.

And so how this goes down, I -- all I can do is speculate at this point because, honestly, we haven't undertaken anything of this size, but we're going to make every best effort to try to advance to get moving on making improvements.

ERIC DAVIS
March 5, 2026

Page 61

Probably -- By the way, probably we will not have one large master contract for a contractor to do everything in one contract.  We may divide it into subzones, or we may -- the consultant may say, you know what, it's better to do this kind of improvement with one contract and this kind of improvement under another contract.  I don't know.  That's why we need them to look at the big picture and tell us what the best way is to go forward with this, but we're going to try to do -- we're going and break it down and do as much as we can as soon as we can.  But it needs to make sense holistically.  Otherwise, we're wasting our time and the taxpayers' money.

     Q   Are you looking for the architect to tell you how to do it holistically?

     A   Yes.

     Q   Now, let's say the architect says that the RTU ramp, let's assume the architect agrees with Globetrotters, agrees with Judge Harjani, who found the ramp is not compliant.

          How long would you expect it to take to renovate that way?

     A   So without buying into your attempt, once again, to isolate the element by itself, let's assume, for

ERIC DAVIS
March 5, 2026

Page 62

example, that the -- that the consultant comes along and says -- and, again, I'm just speculating, if they come along and say, we've looked -- we've done the analysis about how you move all around this thing and we think you should go ahead and do the ramp.  Then we're going to go ahead and do the ramp.

If, on the other hand -- But I don't know until they look at it.  They might say don't waste your money on the ramp, they can in the north side.

I don't know the answer to that, Pat, and I told you that several times.  I don't know.

So but they may, they may come back and say, we've looked at this, and we think you should go ahead and reconstruct the ramp.  They may say that.  And like I said, they may say you don't need to spend the money. I don't know.

Q   So you may know, opinion or assessment, whether there's a need to renovate the RTU tunnel ramp, you're waiting for an architect to tell you?

A   I'm waiting for somebody to do the analysis of the entire area there and tell me what's necessary under the applicable laws and codes.

To give you an idea, there is a concept in accessibility called upon a path of travel.  Path of

ERIC DAVIS
March 5, 2026

Page 63

travel in a -- in regular buildings is I go to a courthouse, I park my car, I'm a disabled person, I park in an ADA space, I get out of my van or my car, I go across the parking lot, I go up a curb ramp, I go on the sidewalk, I come in the front door of the courthouse, and I come through the security, I come to the courthouse, and I go and I sit down, and along the way, I may need to go to the bathroom so I go to the bathroom.

The way the ADA is written, if you have somebody that you know, the public is -- remember the public is -- needs accommodation, you need to provide accessibility along that path of travel.

In something like a jail, which is subject to, for example, security concerns and things like, in normal circumstances, the person in a wheelchair would just do it themselves, but because it's in a jail, they're with a deputy, it may be different. I don't know. I need somebody to look into it and tell us what makes the most sense of the path because you have people in custody, you have staff, you have contractors, right, somebody building something on the jail campus may need to walk through, and their path of travel may be different, and so I need someone to look at all of the

ERIC DAVIS
March 5, 2026

Page 64

applicable paths of travel because it's just not about the detainees, and tell us, do we need to change out the ramp or not. And until they've done that, I don't have any justification for the money because they may come back and say, you've got an accessible corridor on the north side of the building, what the heck are you doing spending the rebuilding the ramp, and I don't know the answer to that question.

Q But you know the ramp had to be accessible when it was built?

A I know that it was designed to have been accessible.

Q And somebody --

A I know that the ramp was designed to have been accessible.

Q And somebody why -- somebody didn't comply with the federal standards --

A Correct.

Q -- when the place was built?

A That's much -- That much has been demonstrated, yeah.

Q And that's obvious at this point?

A Correct.

Q And so constructing this ramp to be compliant

**ERIC DAVIS**
**March 5, 2026**

Page 65

with the ADA, let's say a third-party architect tells you it's something that should be done, how long do you think that would take?

A    I can't answer you definitively because one of the -- one of the issues is how are we going to deliver the construction, am I going to do that as part of a larger package, am I going to do that in an element where -- you know, giving a contract specifically for that area, is -- are county trades going to be a part of the picture.  We have to analyze and understand what the most efficient and expeditious way is of actually doing the projects.

So until we understand what the scope is, which the architects will help us find, what the scope is, until we -- until we have that, I can't tell you how we're going to deliver the construction of that.  Yeah, I can't tell you.

Q    So it could be two years until the RTU east tunnel ramp is brought into compliance with the applicable code?

A    If it's determined that we need to spend the money to do that, you know, that seems like a reasonable timeframe.

Q    Now, your declaration talks about -- in

**ERIC DAVIS**
**March 5, 2026**

Page 66

Paragraph 5, you mention how the RTU --

A    I'm sorry.  Are you talking about for the one from '26 or the one from '24 that you referenced about earlier?

Q    '26.

A    Okay.

Q    You talk about the RTU ramp leads directly to the Cermak ramp and they are of comparable size?

A    Yeah.

Q    Why didn't you put that in your declaration?

MR. SHAFI:  I would object to this question, and once again, again, we are here only to discuss RTU ramp. Any comparison, any other ramp is beyond the scope of this deposition.

I don't understand how many times do I need to make that clear?

MR. MORRISSEY:  Excuse me, Counsel.  I'm asking him about the declaration that I asked that to depose him on, and I'm asking him word for word Paragraph 5, the first sentence.

So either you or your client decided this was a an appropriate thing to put in to get a declaration the day you filed your response in your motion for summary judgment.

**ERIC DAVIS**
**March 5, 2026**

Page 67

MR. SHAFI: Absolutely.

But, you know, your motion specifically says that you want to depose him to talk about RTU ramp.

MR. MORRISSEY: Didn't I -- Doesn't it say the declaration that you disclosed the day you filed your motion?

I'm pretty sure. I haven't studied up on the motion, but I'm pretty sure the reason for deposing Mr. Eric Davis is to discuss the statement that I just received, and I'm asking him word for word why he included this in his declaration.

THE WITNESS: Well, I'm just speculating, Pat, but I suspect it's because you would attempt to analogize the RTU with the Cermak ramp, and that's why the sentence is immediately followed by a stipulation that, unlike Cermak, there is another way.

BY MR. MORRISSEY:

Q   Okay.

**A   Am I wrong?**

**I think I'm not.**

Q   Well, how is -- the top of the RTU east tunnel ramp, is it within 15 feet of the start of the Cermak ramp?

**A   That sounds about right.**

**ERIC DAVIS**
**March 5, 2026**

Page 68

Q   And using that RTU east tunnel ramp, is that the quickest way for somebody to move from the RTU over to Cermak?

A   I can't answer that.

I don't -- I don't use a wheelchair.  I can't answer.  It may be quicker to go through the north.  I would expect it would be slower to go up a ramp than on a walkway.

So as far as how quickly you can get into the RTU, I can't speculate as to whether or not it's faster to go in that way or from the north.

Q   Well, if you -- if you drop down to the lower level of the building --

A   Yeah.

Q   -- and you take the north -- the north --

A   Corridor.

Q   -- side --

A   Yeah, the corridor.

Q   -- tell me how you get to Cermak.

MR. SHAFI:  Objection.  Again, Counsel, I just revised -- just reviewed your motion for this deposition, and your motion specifically says that you want to discuss his declaration to discuss the current efforts to renovate the RTU east tunnel ramp and the

**ERIC DAVIS**
**March 5, 2026**

Page 69

current use of this ramp to move the class members to the campuses as well as your e-mail discusses that you want to specifically ask him for his knowledge in complete for completion of the RTU east tunnel ramp.

There's no discussion of your Cermak ramp or any other divisions, any other ramps in the scope of this deposition.

MR. MORRISSEY: You just said we're talking about movement.

MR. SHAFI: On the ramp.

MR. MORRISSEY: Right.

MR. SHAFI: We're not talking about movement from there to any other ramps. We're just specifically talking about the completion and the movement on this ramp.

MR. MORRISSEY: I'm not following you.

Let's finish this up because I think we're almost done with this case.

MR. SHAFI: Sure.

BY MR. MORRISSEY:

Q So, Mr. Davis, can you walk me through your declaration talks about you could use the north corridor?

A Uh-huh.

ERIC DAVIS
March 5, 2026

Page 70

Q   Correct?

A   Uh-huh.

Q   And that's a yes?

A   Yes.

Q   And can you tell me how you could avoid the RTU east tunnel ramp and use the north corridor to get to Cermak?

A   You walk out the north corridor ramp, and you turn right, and you go to the tunnel, and you connect, and then you turn right, and then you're there presented if you need to go that way --

I mean, it depends on -- Again, this is why you have to do a holistic --

Where are you going?  If you're in the RTU and you're going to court, you're going to the courthouse, then you're going to the north, in which case why not go north and go -- then turn right and connect to the walkway and then turn left and go north to the courthouse?

Are you going to -- Are you going to Cermak for medical care?  Now, if you're going to Cermak for medical care, I'm going assuming somebody is pushing you in a wheelchair, but if they're not, you know, if you're going to Cermak, it may be better to go out the north

ERIC DAVIS
March 5, 2026

Page 71

corridor, it may be better to go on the ramp.  It -- I don't -- It may -- It may be easier to go out a level or relatively level corridor than to go up or down a ramp. I think you could understand that.  And it would take longer to go up or down a ramp than to go on a corridor where you're not going up or down.

So what's better?  That's an operational decision.  So, yeah, yeah, again, if they turn out and they say, you know what, we really would like to avoid ramps entirely, let's just take people out the north entrance from now on.  That's the sheriff's decision. They may decide to do that.  I have no idea.  That may make the most sense or it may not.  That's why I need somebody to look comprehensively where are people going.

This is why I brought in the notion of path of travel.  They're going to have to look at all of the paths of travel and understand what makes the most sense.

And I can't answer that question for you right now.  And if I can't answer that question right now that says, yeah, we really need to use the RTU ramp, that's the most important thing, until somebody tells us that, and, yes, we need to fix that, I'm not sure I can justify ripping out the -- ripping out the ramp and

**ERIC DAVIS**
**March 5, 2026**

Page 72

rebuilding.  That's a lot of money.

Q    How much?

A    And that's why we need a professional to look at the situation and advise us.

Q    How much?

A    I think, I want to say that when, we did the one for Cermak, it's around 8 or $900,000 or something like that.  That's a fair amount of money.

Now, I don't know what the solution -- again, I don't know what the solution is in that case because no one has designed a replacement to that.

Are they going to have to rip it out?  Could they pour in a topping slab?  I don't know how they can do it.  It may have be relatively easy, or you may have to rip the whole bloody thing out.  So but either way it's going to be a fair amount of money.

Q    And isn't the RTU east ramp longer?

A    I don't recall.  Offhand, I don't recall.

Q    So do you know what the sheriff's office does moving people up and down the RTU east tunnel ramp?

A    I do buildings.  I don't do operations.

Q    Have you ever reached out to the sheriff's office to advise them that it might not be -- it might not be a good idea to use the RTU east tunnel ramp

**ERIC DAVIS**
**March 5, 2026**

Page 73

because, more than a year ago, you found out it was not compliant with the ADA?

A   We don't advise on operations, and I can't tell you that it makes a difference if someone is being pushed in a wheelchair.  I don't know if the concerns about accessibility are -- are as great or not.  I mean, I can't advise them about that, Pat.  I don't know.

Q   Why haven't you told them?

A   I'm sorry.  Why haven't what?

Q   Why haven't you told the sheriff's office that this ramp --

Let me rephrase the question.

Have you told the sheriff's office that this ramp at a building that the county owns is not compliant with the federal standards?

A   I don't know that -- I would assume that the sheriff had access to the information in the case where the -- where the Globetrotters report that you provided here was produced, and I would assume they got this, and that's by way of communicating whether or not it's accessible, and as you know, it was provided to the sheriff's ADA person so if that's notification, then they got notification.

Q   Well, why wouldn't you reach out to your

**ERIC DAVIS**
**March 5, 2026**

Page 74

partners at the sheriff's office and tell them that this ramp is a barrier for people because it doesn't comply with these minimum standards that are set by the federal law?

   A   Because I can't tell the -- I can't tell you whether or not it operationally is in fact a barrier because the standards all contemplate an individual moving themselves; I'm in a wheelchair, and I'm trying to navigate a ramp.

        It doesn't speak to, on the other hand, if someone is pushing you, yeah, we don't care about this. I have no idea.

        So I can't tell them that it actually constitutes a barrier if it's somebody that's being pushed in a wheelchair or not.

   Q   Well --

   A   That's an -- That's an operational.

        Now, you can ask me four different ways.  I don't advise the sheriff on operations.

   Q   But Judge Harjani found that equivalent access --

        Let me rephrase the question.

        Do you have any understanding of equivalent access?

**ERIC DAVIS**
**March 5, 2026**

Page 75

A    In general.

Q    And have you ever read any court opinions in the last three months that have come out explaining equivalent access in the context of ADA standards in buildings noncompliant with these minimum standards?

A    I have not.  I have not.

I have other things to do.  I'm sorry.  I have 300 projects, Pat.

Q    So you mentioned pushing a wheelchair might satisfy --

A    I don't know if it does or it doesn't.  I can't speculate.  It's not my area.

Q    Have you ever talked to the sheriff about operationally pushing wheelchairs up and down ramps?

A    No.

MR. SHAFI:  Objection; asked and answered several times at this point.

THE WITNESS:  No.

I don't -- We don't do operations.  They do operations.

BY MR. MORRISSEY:

Q    But as a partner, can't you give them advice?

A    No.

I don't know about operations.  They do

**ERIC DAVIS**
**March 5, 2026**

Page 76

operations.

Q   But as a deputy director for capital planning and somebody who is -- who is in charge, oversees development and implementing the capital improvement plan and oversees design and construction at the county jail, don't you have the ability to give them advice about --

A   No.

It says, oversight of the design and construction.  It doesn't say the design, construction and operations.

Q   So you mention in your declaration wheelchair users are not required to use the RTU east tunnel ramp.

Do you have any personal knowledge when people in wheelchairs go up and down the RTU east tunnel ramp?

A   I have no idea.  Maybe different times of day. I have no idea.

Q   Do inmates have the ability to decide whether they go up the RTU east tunnel ramp in a wheelchair or up the north corridor?

A   I have no idea.

Q   Have you ever done anything to investigate what circumstances a person in a wheelchair would go up the RTU east tunnel ramp compared to the north corridor?

**ERIC DAVIS**
**March 5, 2026**

Page 77

**A    I have no expertise that would allow me to make that evaluation because it's an operation question.**

Q    So is it fair to say you don't know when a wheelchair user is required to go up the RTU east tunnel ramp or not?

**A    Yeah, I have no idea.**

Q    And why did you but that in your declaration if you have no idea operationally when the sheriff tells wheelchair people to go up and down the east tunnel ramp?

**A    Tell me what language you're referring to.**

Q    You say in Paragraph 5:  Wheelchair users are not required to use the east RTU ramp --

**A    Uh-huh.**

Q    -- as the RTU includes an alternative north side basement pedestrian access tunnel that is not governed by ADA ramp standards and provides independent ingress and egress.

**A    And what does the next sentence say?**

Q    Whether a detainee is moved through the east or north access point is a custodial and operational decision of the sheriff, not Cook County.

**A    So what's your question?**

Q    So why do you say a wheelchair user is not

ERIC DAVIS
March 5, 2026

Page 78

required to use the east tunnel ramp?

A    Because it also includes an alternative north side basement access that's not governed by the ADA ramp standards that provides independent ingress and egress.

Q    But you have no knowledge --

A    The choice is whether -- whichever one they do, whether they go through the east or north is a custodial --

I don't understand the question.  I've answered it right there.

Q    So you have no knowledge of what -- operationally when the sheriff tells wheelchair people to go up and down the east tunnel ramp compared to the north ramp?

A    I don't even know if they tell the wheelchair people or if they only move people in wheelchairs with a sheriff's deputy.  I don't know.  Maybe -- Maybe they -- they -- they only -- people only go up and down ramps when they're escorted by a deputy or pushed by a deputy. I don't know.  That's an operational question.  I don't know.

Q    So if wheelchair user in the RTU and is going to court, is it possible the sheriff deputies may escort the wheelchair user up the RTU east tunnel ramp?

**ERIC DAVIS**
**March 5, 2026**

Page 79

A    It's possible, yeah.

Q    Why would they do that?

A    That's their decision.  It's physically possible.

Q    Do you know whether it's the practice that when people --

A    No idea.

Q    -- go to court --

MR. SHAFI:  Objection.  It has been answered so many times.

THE WITNESS:  I predicted four.  I think he's on five now.

BY MR. MORRISSEY

Q    And so it's your understanding as a county employee that there's no need to even use the RTU east tunnel ramp?

A    I didn't say that.

Q    Let me ask you --

A    I didn't say --

I said that you have a choice.  The choice is an operational one.  And I cannot tell you if it's necessary to -- if it's required to go that way overall because of operational issues or because of the configuration or because of path of travel.

**ERIC DAVIS**
**March 5, 2026**

Page 80

Q   Would you advise the sheriff not to use the RTU east tunnel ramp for people in wheelchairs?

**A   That's an operation.  We don't give advice to the sheriff about how to operate the jail.**

MR. MORRISSEY:  I have nothing further.

MR. SHAFI:  Just a minute.

MR. BRANUM:  Yeah.

(Discussion had off the record.)

MR. SHAFI:  I have nothing on this so we can go to the other deposition.

MR. BRANUM:  Yeah.

Let's go off the record.

(Discussion had off the record.)

(Whereupon, the deposition in the above-entitled cause concluded at 2:50 p.m.)

- - - - -

**TOOMEY REPORTING**
**312-853-0648**

Exhibit 1 Page 81

**ERIC DAVIS**
**March 5, 2026**

Page 81

STATE OF ILLINOIS    )
                     )
COUNTY OF C O O K     )

The within and foregoing deposition of the aforementioned witness was taken before ROBBIN M. OCHENKOWSKI, C.S.R., at the time and date and place aforementioned.

There were present during the taking of the deposition the previously named counsel.

The said witness was first duly sworn and was then examined upon oral interrogatories; the questions and answers were taken down in shorthand by the undersigned, acting as stenographer; and the within and foregoing is a true, accurate and complete record of all of the questions asked of and answers made by the aforementioned witness, at the time and date and place hereinabove referred to.

The signature of the witness was not waived, and the deposition was submitted, pursuant to the Rules of the Supreme Court of Illinois.

The undersigned is not interested in the within case, nor of kin or counsel to any of the parties.

**ERIC DAVIS**
**March 5, 2026**

Page 82

Witness my official signature in and for Cook County, Illinois, on this 17th day of March, A.D., 2026.

_____
ROBBIN M. OCHENKOWSKI, C.S.R.
CSR License No. 084-002522

**ERIC DAVIS**
**March 5, 2026**

Page 83

WITNESS CERTIFICATION

I hereby certify that I have read the foregoing transcript of my deposition consisting of Pages 1 through 83 inclusive.  Subject to the changes set forth on the preceding pages, the foregoing is a true and correct transcript of my deposition taken on the 5th day of March, 2026

_____
ERIC DAVIS

SUBSCRIBED AND SWORN to before me this _____day of _____, A.D., 2026.

_____
Notary Public

ERIC DAVIS
March 5, 2026

Page 1

**A**

**A.D** 1:16 82:2 83:21
**ability** 76:6 76:18
**able** 5:15 8:1
**above-entit...** 80:15
**absolutely** 13:14 38:14 67:1
**access** 17:8 21:3 36:18 37:21 73:17 74:21,24 75:4 77:16 77:21 78:3
**accessibility** 16:5 19:10 19:22 20:4 27:12 36:8 44:2 57:11 62:24 63:13 73:6
**accessible** 64:5,9,12 64:15 73:21
**accommod...** 63:12
**accounting** 46:15,15
**accurate** 15:9 56:19 81:15
**acknowledge** 44:9
**acres** 21:19 55:13
**act** 58:3
**acting** 81:14
**actions** 25:14
**active** 47:6
**actual** 24:24 48:14
**ADA** 9:8,19

11:9 12:10 12:22 14:16 15:11,13,24 16:1,6 18:5 18:8,17 19:9,22 20:4,21 24:16 27:19 29:7 33:1 36:7,16 47:15 49:15 51:7 52:5 57:10 63:3 63:10 65:1 73:2,22 75:4 77:17 78:3
**add** 58:17
**added** 7:12
**addition** 53:5
**additional** 29:5 49:18
**additionally** 5:5
**addressed** 25:12
**addressing** 54:7
**administra...** 59:14
**Adnan** 2:9 5:12
**advance** 60:11,23
**advantages** 58:20
**advice** 75:22 76:6 80:3
**advise** 38:17 40:8 72:4 72:23 73:3 73:7 74:19 80:1
**aforementi...**

81:6,8,17
**afternoon** 16:22
**aggressive** 16:22
**ago** 12:7 14:21 20:7 22:4 38:24 42:5 57:1 73:1
**agree** 41:2
**agreement** 46:12
**agreements** 42:7
**agrees** 61:18 61:19
**ahead** 29:6 39:11 60:11 62:5,6,13
**allocated** 23:15
**allow** 77:1
**altered** 10:13 60:1
**alternative** 77:15 78:2
**amount** 24:5 28:20 33:19 33:20 39:23 44:17 48:12 72:8,16
**amounts** 29:7
**analogize** 67:13
**analysis** 62:3 62:20
**analyze** 59:5 65:10
**Ander** 14:23
**annual** 23:19 26:20 27:6 28:19 30:8
**answer** 7:21

15:23 16:2 16:18 24:10 29:12 40:11 44:4,6,7 54:16 58:13 62:10 64:8 65:4 68:4,6 71:19,20
**answered** 18:20 54:13 55:15,23 58:12 75:16 78:9 79:9
**answering** 27:10
**answers** 81:13,16
**apologize** 4:23 5:15
**applicable** 62:22 64:1 65:20
**applied** 46:19
**applies** 48:17
**appreciate** 16:20
**approach** 27:20
**appropriate** 23:22 66:22
**appropriated** 39:24
**appropriat...** 26:20 27:7 28:19 30:8 38:1
**appropriat...** 52:5
**approval** 24:21 49:13
**approved** 45:2 46:1 47:3,7 48:21 49:11

**approxima...** 6:5 25:1 36:11
**April** 10:16 10:23 11:6 11:7,8 13:12
**architect** 14:24 56:2 61:14,17,18 62:19 65:1
**architects** 48:13,16 56:2 65:14
**architectural** 36:15 49:13 56:13 57:8
**archive** 50:24
**archives** 51:5
**area** 17:15 22:21 44:24 55:4 62:21 65:9 75:12
**areas** 16:2 23:2,6 26:5 26:6
**arrived** 27:15 43:24 44:19
**arrives** 6:3
**aside** 29:11
**asked** 18:20 25:14 30:10 31:21 35:2 35:6 41:16 42:12,12 44:6,16,18 51:18 55:15 55:23 58:12 59:12 66:18 75:16 81:16
**asking** 4:16 4:19,24 5:24 6:17 7:19 15:15

16:14 21:17 34:24 35:4 35:11,16 38:24 41:4 49:4 66:17 66:19 67:10
**asserting** 41:11
**assess** 17:6,6 19:9,22 20:3 21:18 24:15,20 25:14 36:16 53:17 54:10
**assessed** 44:18 55:1
**assessing** 33:15 34:12 53:7 55:6 59:7
**assessment** 11:21 24:18 24:22 25:4 28:21 29:20 33:12 34:10 47:1 48:10 50:2,6 51:8 53:22 55:9 57:9,20 58:11,18,21 59:10,20,23 60:8 62:17
**assessments** 33:17,21 46:2 59:8
**assist** 36:7
**assume** 6:10 21:12 57:17 61:18,24 73:16,19
**assuming** 46:12 51:4 70:22
**attempt**

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 85

ERIC DAVIS
March 5, 2026

61:23 67:13
**attorney** 9:4 43:8 46:13
**Attorney's** 11:18
**attorney-cl...** 41:12
**attorneys** 4:22 5:3,8
**authorize** 23:23
**authorized** 24:5,9 46:23
**authorizes** 23:18,22
**available** 20:14 23:4 23:10 30:11 31:17 39:9 39:10,12 40:14 50:19
**Avenue** 2:4
**avoid** 70:5 71:9
**awards** 22:21
**aware** 9:7 10:10 11:24 19:20 33:14 46:13

**B**

**B** 3:8
**back** 7:17 21:24 26:13 28:23 31:8 47:13 50:16 50:22 51:4 54:11 57:5 57:18,22 60:9 62:12 64:5
**bad** 41:16
**balancing**

58:3
**barrier** 74:2 74:6,14
**based** 20:10 44:9 53:23 54:23
**basement** 36:17 77:16 78:3
**basically** 36:17
**basis** 23:19 23:24 33:18 33:24 46:24
**basket** 60:10
**bathroom** 63:8,9
**began** 41:21 42:10
**behalf** 2:7,14
**believe** 7:2 8:13 10:24 25:9 26:17 27:12 29:17 29:23 30:2 32:24 34:15 36:23 39:23 47:7,7,22 50:1 51:19 57:12
**Bell** 2:8 5:9
**best** 9:4 50:7 58:6 60:5 60:23 61:8
**better** 50:4 61:5 70:24 71:1,7
**beyond** 37:7 66:13
**big** 54:4 61:8
**bigger** 50:13 50:15
**bill** 26:21 28:19 30:8

38:1 52:5
**bloody** 72:15
**blur** 5:13
**board** 23:15 23:18 24:9 26:21 27:6 39:24 42:6 45:2 46:1 46:23 47:3 47:8 48:21 49:11,22 50:20,24 51:5
**Bonfire** 20:19
**book** 29:17
**Branum** 2:9 30:19 31:3 38:6,12 41:8 43:7,9 43:15,17,20 45:5,8 54:18 80:7 80:11
**branums@...** 2:13
**break** 31:6 54:18,19 61:10
**bring** 43:13
**bringing** 43:3
**broke** 30:2
**brought** 65:19 71:15
**budget** 29:15 29:17 34:5 40:6 47:10
**budgeting** 23:20 34:9
**building** 17:3 17:12,19 18:18,23 63:22 64:6 68:13 73:14

**buildings** 21:18 25:17 26:7 28:6 33:17 63:1 72:21 75:5
**built** 18:18 64:10,19
**business** 25:16 51:19 51:24
**buying** 61:23

**C**

**C** 2:1 81:2
**C.S.R** 1:13 81:7 82:7
**California** 22:23,24 23:2
**called** 4:3 11:2 20:19 20:20 23:20 34:2 62:24
**campus** 17:7 23:1 24:16 25:5,18,23 26:11 33:12 34:1 37:22 47:1 55:14 57:9 63:22
**campuses** 69:2
**cancel** 43:11
**cap** 52:4
**capital** 13:2,4 13:12,19,20 14:8,9,14 27:13 29:18 32:14,19,22 32:23 44:19 45:3 46:2 47:3,6 48:20 49:9 50:16 76:2

76:4
**capture** 7:18
**car** 63:2,3
**care** 70:21,22 74:11
**carried** 49:14
**carve** 53:22
**case** 1:5 5:18 6:20 7:1 10:11 13:7 25:16 26:1 29:1 35:5,7 35:18 37:3 39:8 40:18 41:13 42:2 42:10 51:19 51:24 52:12 52:20 57:6 69:18 70:16 72:10 73:17 81:23
**cases** 36:1 37:6 52:24 59:7
**CASKILL** 2:10
**cause** 80:15
**Cermak** 26:3 52:6,18 66:8 67:14 67:16,22 68:3,19 69:5 70:7 70:20,21,24 72:7
**certain** 7:7 22:15 24:5 25:15 38:9
**certainly** 24:2 55:2,2
**CERTIFIC...** 83:1
**certify** 83:4
**change** 13:21

13:22 47:18
55:21,21
64:2
**changed** 13:17
**changes** 83:6
**charge** 76:3
**check** 6:6 29:12 30:3
**Chicago** 2:5 2:12
**choice** 78:6 79:20,20
**CIP's** 28:24
**circumstan...** 63:16 76:23
**cited** 25:13
**Civil** 1:14
**clarify** 8:19
**class** 36:15 69:1
**clear** 9:24 10:1,12 13:14 28:4 28:6 38:5 48:6 66:16
**clearly** 18:11
**client** 39:6 40:8,17,20 41:13 42:1 45:11,14,18 66:21
**client's** 38:21 43:2
**code** 65:20
**codes** 62:22
**collegial** 16:23
**come** 20:21 25:4 26:7 31:16 33:9 33:10 34:2 41:2 54:11 55:5 56:6

ERIC DAVIS
March 5, 2026

60:9 62:2 62:12 63:5 63:6,6 64:4 75:3
**comes** 15:19 33:5 34:21 62:1
**coming** 6:21 8:11 17:13
**commencing** 1:15
**comment** 7:9
**commenting** 44:3
**comments** 7:8
**commission** 11:14
**commissio...** 10:3 11:11 11:14,16 18:14
**commissio...** 29:3 49:11
**commitment** 54:6
**communica...** 73:20
**communica...** 41:12
**comparable** 66:8
**compared** 76:24 78:13
**comparison** 66:13
**complaint** 6:10
**complete** 55:11 56:19 58:22 69:4 81:15
**completed** 58:11,15,16

**completion** 57:19 69:4 69:14
**complex** 18:1 21:19
**compliance** 14:16 15:12 15:13 16:1 16:1 19:12 19:22 24:16 33:1 36:8 36:17 57:10 60:6 65:19
**compliant** 9:24 17:1 19:5,6 61:20 64:24 73:2,14
**complicated** 21:15,16 58:4
**comply** 9:19 12:21 18:5 18:15,17 64:16 74:2
**comprehen...** 19:8 27:20 30:13 33:1 33:11 36:6 37:13 56:19 59:23
**comprehen...** 60:2 71:14
**computer** 31:1
**concept** 62:23
**concerns** 63:15 73:5
**concluded** 80:15
**condition** 9:23
**conducting**

25:4
**conferred** 4:22
**conferring** 5:2,7
**configurati...** 18:15 79:24
**connect** 70:9 70:17
**conservative** 57:19,21 58:7,10
**consisting** 83:5
**constitutes** 74:14
**constructed** 10:12 18:4 18:8,11,16
**constructing** 64:24
**construction** 24:21 48:11 48:15,19 58:20 59:11 59:13 65:6 65:16 76:5 76:10,10
**consult** 19:4
**consultant** 61:4 62:1
**consultants** 55:10 60:9
**contemplate** 74:7
**context** 75:4
**contiguous** 28:15
**continue** 45:21
**continues** 49:16
**contract** 20:3 21:11 22:4

24:2,3,10 24:14 27:21 29:23 30:1 33:8 36:24 40:3,5 45:4 46:12,13 47:19 48:1 48:16 49:14 58:17 61:2 61:3,6,7 65:8
**contracting** 46:10
**contractor** 61:2
**contractors** 63:21
**contracts** 21:9 23:3 46:20
**control** 23:23
**conversation** 51:14
**Cook** 1:7,8 13:3 28:15 29:15 33:13 77:22 82:2
**corporate** 14:15
**corporation** 14:11 36:16
**correct** 14:1 19:11,13 22:5 27:8 32:18 37:23 38:4 59:24 64:18,23 70:1 83:8
**Corrections** 20:4 55:14
**correctly** 34:15
**correlates** 37:24

**corridor** 36:18,19 64:5 68:16 68:18 69:23 70:6,8 71:1 71:3,5 76:20,24
**cost** 21:18 23:7,13 28:21 33:1 33:4 44:20
**costs** 34:3,8 46:10
**counsel** 1:18 3:22 5:7,17 6:1,16 7:5 7:16 8:14 10:3 11:11 11:15,16 12:18 18:14 20:23 30:7 31:20 35:4 35:15,23 36:13 37:4 38:21 39:2 39:5 40:19 41:11 44:13 45:15,16 52:11,19 66:17 68:20 81:10,23
**counselor** 44:12
**county** 1:7,8 11:14 13:3 14:6 20:2 20:17 23:15 23:18,19,21 25:3 26:17 26:21 27:6 28:15 29:15 30:17 33:10 33:13 36:13 37:2,14 39:24 46:1

46:23 47:3 48:21 49:22 50:19,23 51:5 53:8 56:7,13 65:9 73:14 76:5 77:22 79:14 81:2 82:2
**county's** 24:8 46:14
**couple** 5:19 20:7
**course** 7:22 13:22,22
**court** 1:1 35:15 43:14 70:15 75:2 78:23 79:8 81:21
**courthouse** 34:11 63:2 63:5,7 70:15,19
**courthouses** 33:16,21 34:8,16 35:1 59:8
**Courts** 1:14
**created** 51:19
**CSR** 82:8
**curb** 63:4
**current** 53:14 68:23 69:1
**currently** 16:15
**custodial** 77:21 78:8
**custody** 63:21
**cut** 30:23

___

**D**

**D** 2:9 3:1

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 87

ERIC DAVIS
March 5, 2026

**Dart** 1:7 9:18
**date** 8:3,3,5
9:9 10:19
81:7,17
**Davis** 1:12
3:2 4:2,13
11:4 13:9
30:18 32:14
35:17 36:2
36:6,20,24
37:11 38:16
38:17,22
39:19 40:13
41:1,6,6
43:7,10,19
43:23 44:5
45:24 52:17
53:5,14
54:23 67:9
69:21 83:15
**day** 1:16 8:1
8:2,6 9:8,13
11:7 66:23
67:5 76:16
82:2 83:9
83:20
**days** 7:22
14:17
**decide** 53:23
71:12 76:18
**decided** 37:2
66:21
**decision** 28:8
71:8,11
77:22 79:3
**decisions**
60:17
**declaration**
3:11 6:24
7:3,11 8:19
8:20 9:7,13
13:1,7 15:2
19:14 22:3
22:11 29:21

31:21 32:7
35:5 36:20
37:2,12,17
39:8,20
40:15 41:5
43:3 45:24
49:7 53:6
54:23 56:20
57:5,23
65:24 66:10
66:18,22
67:5,11
68:23 69:22
76:12 77:7
**Defendants**
1:9 2:14
**defending**
43:19
**definitively**
65:4
**deliver** 21:10
46:20 65:5
65:16
**demonstrat...**
64:20
**dep** 35:6
43:11
**Department**
13:2,12
20:4 25:9
26:16 55:13
**depends**
17:12 70:12
**depose** 43:11
66:18 67:3
**deposing**
67:8
**deposition**
1:12,17 3:2
4:14 6:4
15:20,20
31:15,19
32:3 34:21
34:22,22

35:2,21
36:3 37:5,8
38:11,20
39:3,15
40:18,24
41:14,17,20
41:22,22,24
42:16,19,20
45:7,13,17
45:18 49:2
49:2 52:7
52:10,22,23
53:3 66:14
68:22 69:7
80:10,14
81:5,10,20
83:5,8
**depositions**
1:15 36:1,1
45:21
**deputies**
78:23
**deputy** 13:2,4
13:11,19,20
14:8,8,13
27:4 43:5
63:18 76:2
78:17,19,19
**described**
44:23
**design** 24:20
24:24 48:16
48:18 49:15
58:19,24
76:5,9,10
**designed**
64:11,14
72:11
**detail** 32:16
**detainee**
77:20
**detainees**
64:2
**determined**

65:21
**developing**
28:11 44:18
**development**
76:4
**deviated** 37:7
**difference**
40:3 46:9
73:4
**different**
26:6 30:3
42:19 63:18
63:24 74:18
76:16
**difficult** 4:23
34:11,12
**digging** 51:12
51:15
**direct** 16:10
**directed** 21:1
**direction**
17:13 27:17
**directly** 66:7
**director** 13:2
13:4,11,19
13:20 14:8
14:9,16
15:12,13
27:4 28:9
43:5 76:2
**directors**
14:13
**disabled**
17:11,21
63:2
**disagree**
45:20
**disclosed**
30:20 67:5
**discovery**
42:5
**discuss** 5:18
40:17 66:12
67:9 68:23

68:23
**discussed**
38:20
**discusses**
69:2
**discussion**
6:4 41:10
45:6 69:5
80:8,13
**dispute** 11:20
**distinguish**
16:7
**District** 1:1,1
1:14
**divide** 61:3
**divided** 47:23
**dividing**
22:21
**Division** 1:2
26:4
**divisions**
25:20 47:15
51:8 52:9
69:6
**DOC** 47:1
51:7 52:6
**document**
11:2 13:9
15:14 21:5
22:15 29:4
29:16 31:14
32:10 34:6
40:13 48:22
58:23 59:2
59:3
**documents**
6:8,9,14
19:20 20:12
20:22 31:16
31:21,24
32:2 35:10
35:17 38:8
38:9,22
39:1,4,12

40:17,22
41:2,3,5,15
41:18,23,23
42:2,4,7,8
42:12,15,22
43:2,16
44:3,10
45:12,16
49:1 51:18
**doing** 22:21
23:8 24:22
24:22 28:6
33:16 54:13
58:20 64:6
65:11
**DOJ** 51:13
**dollar** 48:16
**dollars** 24:3
48:15 49:23
**door** 63:5
**drop** 68:12
**duly** 4:1,3
81:11
**duties** 15:3
16:2

───────
E
───────

**E** 2:1,1 3:1,8
**e-mail** 40:23
40:24 41:4
42:13 69:2
**earlier** 46:9
66:4
**easier** 60:11
71:2
**easily** 29:9
**east** 4:20 9:8
9:18 11:9
12:21 16:13
17:8 18:4
23:1 36:18
53:7 54:24
55:21 65:18
67:21 68:1

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 88

ERIC DAVIS
March 5, 2026

68:24 69:4 70:6 72:17 72:20,24 76:13,15,19 76:24 77:4 77:9,13,20 78:1,7,13 78:24 79:15 80:2
**EASTERN** 1:2
**easy** 72:14
**EBS** 46:15,17
**edit** 7:6
**editting** 7:12 7:23
**effect** 18:9
**efficient** 65:11
**effort** 28:13 60:5,23
**efforts** 68:24
**egress** 77:18 78:4
**either** 8:1 66:21 72:15
**element** 10:8 16:6 53:23 61:24 65:7
**elements** 25:11 27:11 27:19 59:1 60:1,6
**employee** 14:6 79:15
**endeavor** 25:2 58:5
**endorsement** 20:9
**engineering** 36:15,16
**Enriquez** 35:7,9,12 52:12

**enter** 17:2,2 17:11,19,21 18:22 24:14
**entered** 22:5
**entire** 17:7 17:15 24:15 26:11 48:8 55:13 57:9 62:21
**entirely** 37:1 71:10
**entrance** 71:11
**equivalent** 74:20,23 75:4
**Eric** 1:12 3:2 4:2 36:2 43:7,10 67:9 83:15
**escort** 78:23
**escorted** 78:19
**estimate** 48:14 50:7 50:8 57:19 58:7,10
**estimated** 48:12
**estimating** 44:23
**EUGENE** 1:4
**Euna** 20:20
**evaluate** 17:15
**evaluation** 37:14 77:2
**everybody** 31:9 54:20
**exact** 47:12
**exactly** 48:5
**Examination** 3:5 4:6

**examined** 4:4 81:12
**example** 17:12,17 52:6 59:8 60:7 62:1 63:15
**excluding** 44:10
**Excuse** 66:17
**executed** 46:20
**Exhibit** 3:11 3:22 13:6
**exit** 17:2
**expanded** 26:10
**expect** 19:2 21:11 29:7 34:4,6,10 54:24 58:15 61:21 68:7
**expectation** 56:22
**expectations** 58:3
**expected** 22:4 23:7,13 58:8
**expecting** 24:7 33:6
**expeditious** 65:11
**expeditiously** 24:19
**experience** 37:20
**expertise** 77:1
**explain** 40:2 43:23
**explained** 44:19
**explaining**

75:3
**expression** 60:15
**extensive** 22:1

———————
**F**
**face** 45:14
**facilities** 14:11,15 36:9
**facility** 26:3
**facing** 45:11
**fact** 41:18,20 74:6
**fair** 28:20 33:23 72:8 72:16 77:3
**familiar** 13:9 40:14 43:4
**famous** 25:15
**far** 27:19 55:8 68:9
**fashion** 42:13
**fast** 54:1
**faster** 68:10
**February** 8:8 12:5 37:13 53:8
**federal** 1:13 12:9,20 64:17 73:15 74:3
**fee** 48:12
**feedback** 7:15
**fees** 33:22,23 34:16
**feet** 36:12 67:22
**figure** 28:17 33:24 34:16 39:11 50:11
**figured** 52:1

**filed** 32:7 35:5 52:20 66:23 67:5
**final** 8:22 9:1
**finalized** 8:4
**finances** 23:23
**find** 20:16 29:14 42:22 47:2,5,5 49:20 51:6 65:14
**finding** 9:18 12:21
**finish** 53:19 56:10 69:17
**firm** 17:6 22:22,23 23:1 36:15 40:5 58:24 59:9,10
**firms** 17:6 58:18
**first** 3:10 4:1 4:3 6:3 19:16 25:3 35:21 52:14 57:5 66:20 81:11
**fiscal** 29:15 33:7 47:8 49:14
**five** 53:24 79:12
**five-minute** 54:18
**fix** 52:18 71:23
**fixed** 25:10
**fluid** 60:4
**follow** 24:13
**followed** 67:15
**following**

1:18 52:19 52:20 69:16
**follows** 4:5
**Fools** 11:7
**footage** 33:19 33:23 34:1 34:16
**foregoing** 81:5,14 83:4,7
**forth** 21:24 83:6
**forthcoming** 44:15
**forward** 45:3 45:21 53:9 61:9
**forwarded** 41:1
**found** 9:7 12:9 61:19 73:1 74:20
**founding** 47:24
**four** 74:18 79:11
**four-to-six** 25:2
**frame** 57:1
**front** 52:2 63:5
**fully** 45:3
**funding** 40:4 46:1,10,19 46:22 47:2 48:2 49:11 50:9
**funds** 23:18 49:14
**further** 80:5
**FY** 38:1 46:2 47:3 48:2 48:20 49:9 51:23

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 89

ERIC DAVIS
March 5, 2026

**G**

G 2:3,4
gained 10:2
GEC 10:21
  11:4 19:1
general 14:5
  15:24 16:2
  75:1
generally
  4:18
generating
  27:9
gentlemen
  5:9
give 13:15
  29:2,6 31:1
  41:4 43:16
  45:5 62:23
  75:22 76:6
  80:3
given 7:8
  16:18 20:22
  24:4,6 29:3
  30:7,10
  33:7 39:8
  41:3,5
  54:17 57:18
gives 6:1
giving 65:8
Globetrotte...
  36:16 61:19
  73:18
go 6:2 20:17
  20:18 21:24
  26:7 28:23
  30:17 34:4
  35:9,9
  39:11 44:23
  45:3 50:22
  51:4 52:14
  53:9 55:6
  59:6 60:11
  61:9 62:5,6
  62:13 63:1

63:3,4,4,7,8
63:8 68:6,7
68:11 70:9
70:11,16,17
70:18,24
71:1,2,3,5,5
76:15,19,23
77:4,9 78:7
78:13,18
79:8,22
80:9,12
goes 26:13
  37:7 60:20
going 5:14
  11:1 13:6
  17:22 21:18
  21:20 24:1
  24:24 25:19
  28:7 29:5
  34:17,18
  35:8 38:7
  40:1 41:20
  43:9,12
  50:2 52:2
  53:7,14,24
  55:9,12
  56:6 58:23
  59:10,19
  60:22 61:9
  61:10 62:5
  65:5,6,7,9
  65:16 70:14
  70:15,15,16
  70:20,20,21
  70:22,24
  71:6,14,16
  72:12,16
  78:22
good 72:24
Google 20:17
  29:15
gotten 11:12
  12:17
governed

77:16 78:3
government
  32:6
great 32:16
  73:6
ground 26:5
guess 58:22
guys 9:20
  42:6 43:16

**H**

H 3:8
H-a-v 14:23
hand 62:7
  74:10
handed 58:23
hang 34:14
happened
  26:23 27:21
hard 34:6
Harjani 9:7
  61:19 74:20
Harjani's
  9:17
hat 34:14
Hav 14:23
head 5:5
health 14:10
  14:14
hear 31:13
heck 64:6
held 13:11
help 17:22
  32:23 49:3
  65:14
helped 32:17
  38:22
hereinabove
  81:18
Hernandez
  9:18
hesitancy 9:2
hey 7:17 50:3
  60:9

higher 24:23
hire 55:4
hired 11:17
  14:13,19
  36:14
hiring 17:14
  17:23
holistic 70:13
holistically
  17:15 25:18
  25:24 26:8
  28:12 61:12
  61:15
honestly
  22:13 60:21
hope 55:2,2
hopefully
  21:13 55:6
  59:6
hoping 24:14
hospitals
  14:10,14
hours 7:19
hundred
  21:19 44:1
  48:13,16
  49:23
hundreds
  43:24

**I**

idea 25:4
  62:23 71:12
  72:24 74:12
  76:16,17,21
  77:6,8 79:7
idealistic
  27:18
identical
  22:11
identified
  17:1 25:10
identify
  19:21 21:17

26:6 50:6
Illinois 1:1,8
  1:8 2:5,12
  81:1,21
  82:2
immediately
  18:19 67:15
implementi...
  76:4
important
  25:16 71:22
improveme...
  32:15,20,23
  46:2 47:4,6
  48:21 49:10
  50:16 61:5
  61:6 76:4
improveme...
  29:8 47:15
  51:8 60:24
impugning
  54:6
inaccurate
  8:18
incident 5:4
include 29:20
included 45:2
  52:17 54:8
  54:12 67:11
includes
  33:16 48:17
  48:18,18
  58:18 77:15
  78:2
including
  23:5 52:3
inclusive
  83:6
incorporated
  40:15
incorrectly
  18:17
increased
  28:22 29:9

independent
  77:17 78:4
indicated
  10:5 18:14
  29:4
indicating
  23:5
individual
  28:6,24
  60:1 74:7
individually
  18:2
information
  5:6,23 6:22
  9:22 10:2
  12:17 13:15
  21:4 31:18
  44:15 45:1
  49:18 73:17
ingress 77:17
  78:4
initial 25:20
initially 30:1
inmates
  76:18
insisted
  35:12
instance 5:4
integrity 54:6
intend 45:3
intended
  44:17
intent 24:8
  24:18,19
  30:5 54:6
  54:14 57:8
interested
  81:22
intermediate
  10:5
interrogato...
  4:4 40:22
  42:11 81:12
interrupting

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 90

**ERIC DAVIS**
**March 5, 2026**

Page 7

27:11
**intimately**
32:19 40:14
43:4
**investigate**
76:22
**involved**
27:12 32:19
33:19 52:3
**isolate** 61:24
**isolation** 17:8
25:17 26:2
26:3,4
**issue** 41:21
**issued** 10:16
20:9 40:21
56:23
**issues** 65:5
79:23
**item** 40:4
51:16 52:17
**items** 30:3
52:4,4

**J**

**jail** 17:7
22:21 23:1
24:16 25:5
25:23 26:11
28:11,15,15
33:12,20
34:1,12,17
34:18 35:1
37:14,21
44:2 63:14
63:17,22
76:6 80:4
**job** 14:7
**Johnson** 2:8
5:9 35:9,12
**judge** 9:7,13
9:17 12:9
42:6,24
61:19 74:20

**judge's** 12:20
**judgment**
32:8 66:24
**judgments**
42:24
**judicial**
12:13
**justice** 25:9
26:16 27:18
**justification**
64:4
**justify** 71:24

**K**

**K** 81:2
**KAITLYN**
2:10
**kin** 81:23
**kind** 5:13 6:3
9:5 56:17
61:5,6
**know** 6:7,11
6:15 7:21
9:5,9,10
10:7,10,13
11:3,11
12:16,16,18
15:21 16:24
17:5,18,22
18:12,16,21
20:6 21:13
25:8 26:15
30:19 31:11
32:6 41:15
41:16,21
44:14 48:5
50:2,3,12
50:23,23
51:3 53:19
56:9,10,10
56:11 60:12
60:16 61:4
61:7 62:7
62:10,11,16

62:17 63:11
63:19 64:7
64:9,11,14
65:8,22
67:2 70:23
71:9 72:9
72:10,13,19
73:5,7,16
73:21 75:11
75:24 77:3
78:15,17,20
78:21 79:5
**knowledge**
9:4 12:12
20:2 25:3
44:9,11
69:3 76:14
78:5,11

**L**

**lady** 13:15
**laid** 53:6
**land** 21:19
**landing** 10:5
**language**
77:11
**large** 22:2,22
24:1 48:5
55:4 58:4
59:2 61:2
**larger** 47:1
65:7
**largest** 28:15
**law** 74:4
**laws** 62:22
**lawyers**
43:19
**lead** 15:24
16:1,9
**leads** 66:7
**leak** 54:10
**lease** 16:18
**leave** 48:11
**left** 70:18

**let's** 4:15
15:6 16:19
23:17 31:3
31:4 40:8
48:6,6
61:17,18,24
65:1 69:17
71:10 80:12
**level** 17:4
23:22 36:17
36:17 68:13
71:2,3
**License** 82:8
**LiDAR** 10:3
10:16 18:13
**limit** 44:8,10
**limited** 45:1
**line** 34:24
37:6 51:16
52:4,4,8,17
**lines** 19:5
47:24
**listen** 54:16
**literally**
28:14
**litigation** 5:3
**little** 14:20,21
16:22 34:5
35:16
**localized**
60:10
**long** 7:11
10:6 25:7
27:14 53:24
56:14 59:10
61:21 65:2
**longer** 24:23
35:16 71:5
72:17
**look** 13:9
17:7,14,24
18:24 21:1
21:23 25:17
25:17,23

26:2,3,4,4,8
26:11 27:6
28:11,23
29:6 32:5
32:22 37:14
38:2 49:12
51:7 60:2
60:18 61:8
62:8 63:19
63:24 71:14
71:16 72:3
**looked** 6:8
10:21 18:2
19:2 33:19
33:20,21
62:3,13
**looking** 32:23
34:1 38:3
40:6 54:4
61:14
**looks** 11:3
**lot** 21:20,21
25:12 28:18
50:5 63:4
72:1
**lower** 68:12

**M**

**M** 1:12 81:6
82:7
**magistrate**
42:6
**magnitude**
34:3
**making** 60:5
60:17,24
**manager**
16:1,4,8,9
**March** 1:16
3:2 82:2
83:9
**master** 61:2
**matter** 9:20
9:21 10:4,4

35:24 51:17
**matters** 4:16
5:16
**MC** 2:10
**mean** 7:19
8:22 9:3
22:10 24:6
24:7 30:9
57:13,24
70:12 73:6
**means** 21:8
**medical**
70:21,22
**meet** 5:8
**meeting** 47:8
**members**
69:1
**memory** 5:22
6:22 10:20
10:22 11:1
48:22 51:20
**mention** 66:1
76:12
**mentioned**
6:8 15:14
29:2 46:9
46:23 56:1
60:5 75:9
**mentioning**
36:24
**met** 4:10 5:10
5:10,12
**million** 29:10
36:11 44:1
48:3,13,16
49:23
**millions** 24:3
43:24
**minimum**
74:3 75:5
**minute** 31:3
31:4 45:5
80:6
**modificatio...**

ERIC DAVIS
March 5, 2026

Page 8

| | | | | | |
|---|---|---|---|---|---|
| **modify** 17:16 | 80:5 | 26:19 42:22 | 76:24 77:15 | 24:21 | **operate** 80:4 |
| **money** 23:7 | **motion** 32:7 | 42:23 54:10 | 77:21 78:2 | **obtaining** | **operation** |
| 23:15,23 | 52:20,21 | 54:10,18 | 78:7,14 | 21:9 | 21:20 77:2 |
| 24:4,10 | 66:23 67:2 | 60:2 61:7 | **NORTHE...** | **obvious** | 80:3 |
| 28:20 32:24 | 67:6,8 | 62:15,18 | 1:1 | 64:22 | **operational** |
| 39:23 48:19 | 68:21,22 | 63:8,12,19 | **Notary** 83:24 | **Obviously** | 71:7 74:17 |
| 48:23 61:13 | **move** 45:14 | 63:22,24 | **notice** 35:2 | 51:13 | 77:21 78:20 |
| 62:8,15 | 45:21 62:4 | 64:2 65:21 | 43:10 | **occasions** | 79:21,23 |
| 64:4 65:22 | 68:2 69:1 | 66:15 70:11 | **notification** | 18:3 | **operationally** |
| 72:1,8,16 | 78:16 | 71:13,21,23 | 73:22,23 | **OCHENK...** | 74:6 75:14 |
| **monies** 44:17 | **moved** 77:20 | 72:3 79:15 | **notion** 71:15 | 1:13 81:7 | 77:8 78:12 |
| 48:11 | **movement** | **needed** 25:10 | **November** | 82:7 | **operations** |
| **Monroe** 2:11 | 69:9,12,14 | 28:4,7 | 30:9 47:7 | **off-base** | 72:21 73:3 |
| **month** 12:1,7 | **moving** 60:23 | **needs** 26:8,9 | **number** 4:15 | 40:12 | 74:19 75:19 |
| **months** 21:14 | 72:20 74:8 | 61:11 63:12 | 36:23 37:11 | **offhand** 5:21 | 75:20,24 |
| 24:15 57:19 | **multi-comp...** | **negotiations** | 37:19,24 | 12:16,23 | 76:1,11 |
| 75:3 | 44:1 | 22:1 23:8 | 40:4 43:23 | 29:13,24 | **opinion** |
| **Morrissey** | **multi-contr...** | **neighborho...** | 46:11,14,17 | 48:4,5 | 62:17 |
| 2:3,3,4 3:6 | 19:9,21 | 49:22 | 47:4 48:4,5 | 72:18 | **opinions** 75:2 |
| 4:7,8,11 | 20:13 30:13 | **never** 31:16 | 48:7,13,14 | **office** 11:18 | **opposed** 59:3 |
| 11:19 12:19 | 33:1 36:7 | 31:22 37:21 | **numbers** | 20:9 72:19 | **optimal** |
| 16:11 30:22 | **multi-year** | 40:21 44:2 | 33:9,11 | 72:23 73:10 | 17:11 |
| 30:24 31:7 | 47:11 49:17 | 54:5 | | 73:13 74:1 | **Oracle** 46:15 |
| 31:20 32:4 | **multiple** 4:24 | **never-been...** | **———— O ————** | **official** 47:16 | **oral** 4:4 |
| 32:12,13 | 5:14 9:21 | 33:12 | **O** 81:2,2 | 82:1 | 81:12 |
| 35:4 36:4 | 17:6 24:3 | **nice** 58:14 | **object** 12:15 | **oh** 26:15 28:1 | **order** 9:17 |
| 36:11 37:9 | 25:13 | **nine** 27:2 | 15:18 31:12 | 35:14 44:22 | 10:11 12:13 |
| 37:10 38:15 | **multiply** | 29:5 | 31:14 34:20 | 45:9 50:5 | 12:20 24:18 |
| 38:21 39:5 | 33:24 | **noncompli...** | 38:7,10 | **okay** 4:12 | 34:2 46:20 |
| 39:17,18 | | 9:8 10:8,9 | 48:24 66:11 | 7:22 8:10 | **original** 8:23 |
| 40:10,19 | **———— N ————** | 10:14 11:9 | **objected** | 12:6,11 | 26:10 47:14 |
| 41:4 42:4 | **N** 2:1 3:1 | 17:20 75:5 | 35:10 | 13:8 15:6,8 | 47:19,20 |
| 42:18,21 | **name** 4:8 | **nonlinear** | **objection** | 16:19 18:22 | **originally** |
| 43:8,13,18 | 14:23 21:4 | 29:9 | 37:5 38:12 | 22:8 23:17 | 59:16,19 |
| 43:21,22 | 47:12,16,17 | **normal** 63:16 | 52:7 55:23 | 30:12 36:10 | **originating** |
| 45:20,23 | 47:19 48:9 | **north** 17:3,19 | 58:12 68:20 | 39:17 41:8 | 51:11 |
| 49:5 52:11 | **named** 81:10 | 18:23 22:23 | 75:16 79:9 | 45:22 49:8 | **out-year** 29:8 |
| 53:4 54:20 | **narrow** 53:2 | 36:18 62:9 | **objections** | 49:12 56:21 | **outside** 17:24 |
| 54:22 55:18 | **navigate** 74:9 | 64:6 68:6 | 35:20 | 57:7,24 | 50:8 60:14 |
| 55:24 59:15 | **nearly** 22:10 | 68:11,15,15 | **objective** | 66:6 67:18 | **overall** 19:9 |
| 66:17 67:4 | **necessary** | 69:22 70:6 | 60:18 | **once** 47:17 | 20:3 34:9 |
| 67:17 69:8 | 62:21 79:22 | 70:8,16,17 | **objectively** | 48:10 54:17 | 36:7 79:22 |
| 69:11,16,20 | **need** 17:16 | 70:18,24 | 17:24 | 61:23 66:12 | **oversaw** |
| 75:21 79:13 | 18:21 19:7 | 71:10 76:20 | **obtained** | **ones** 50:15 | 14:12 |

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 92

ERIC DAVIS
March 5, 2026

Page 9

oversee 14:13
oversees 76:3
  76:5
oversight
  76:9
owns 73:14

_____
**P**
_____

P 2:1,1
p.m 1:16
  80:16
package
  22:19 65:7
packages
  22:18
page 19:16
pages 83:5,7
paragraph
  15:2 19:14
  19:18 29:21
  30:13 36:5
  37:12 49:13
  66:1,19
  77:12
paragraphs
  22:11
park 63:2,2
parking 63:4
parse 4:23
part 22:17
  35:1 46:2
  65:6,9
participate
  27:9
particular
  6:7 50:9
parties 81:23
partner
  75:22
partners 74:1
passionately
  53:20
password
  21:3

Pat 4:8 7:21
  16:17 18:3
  22:13 30:23
  44:16 49:4
  62:10 67:12
  73:7 75:8
path 62:24,24
  63:13,20,23
  71:15 79:24
paths 64:1
  71:17
Patrick 2:3
  3:6
pedestrian
  77:16
people 16:8
  26:6 43:18
  63:20 71:10
  71:14 72:20
  74:2 76:14
  77:9 78:12
  78:16,16,18
  79:6 80:2
perfect 26:1
perform
  28:21
period 22:1
  27:3 48:9
  60:9
permission
  59:12
person 14:19
  14:22 15:21
  16:12 63:2
  63:16 73:22
  76:23
personal
  76:14
pertaining
  1:15
phase 20:1
phone 4:11
physical
  18:15

physically
  79:3
picture 18:24
  26:9 54:4
  54:10 61:8
  65:10
piece 54:3,3
pieces 53:23
place 64:19
  81:7,17
plaintiff 1:5
  2:7 4:9
plaintiff's
  45:15,16
plan 23:5
  27:13,15
  32:15,20,23
  44:19 45:3
  46:3 47:6
  48:21 49:10
  49:19 50:17
  55:5 76:5
planning
  13:3,4,12
  13:19,21
  14:8,9,15
  29:18 49:15
  76:2
platform
  20:18
play 58:8
please 53:1
point 26:2
  52:2 59:22
  60:21 64:22
  75:17 77:21
Policy 13:3,5
  13:12
polished
  58:22
portfolio
  13:5,18
  14:4,10,11
  14:11,14,15

33:15
portfolios
  14:9
portion 23:1
position
  13:11
possession
  39:3,6
  41:19
possible
  44:15 54:2
  56:12,18
  58:2 60:6,7
  78:23 79:1
  79:4
potential
  36:14
pour 72:13
practice 79:5
practices
  23:19
preceding
  83:7
precise 5:15
predict 21:12
predicted
  79:11
preference
  46:22
preparation
  8:11 59:2
prepare 4:13
  4:19 5:17
  8:15 32:17
prepared
  7:11 11:23
  38:22 51:24
  56:7
preparing
  5:20 6:5
present 1:17
  81:9
presented 7:8
  45:2 70:10

presently
  29:10
pressing
  41:21
pretty 9:24
  10:1,12
  67:7,8
previous 6:22
  27:17 50:24
previously
  6:23 22:3
  25:8 81:10
primarily
  16:4
prior 9:22
  10:4,11
  51:17
prioritizati...
  60:17
privilege
  41:12
probably
  5:19,23 6:9
  11:13 12:1
  12:17 20:21
  24:2 51:6
  58:16 61:1
  61:1
problem 33:4
  47:17 51:12
  51:15
problems
  31:1
Procedure
  1:14
proceed
  42:16
proceeded
  41:14,17
proceeding
  35:22
process 21:9
  26:11 28:10
  44:18

procurement
  20:1,9,15
  20:17 21:7
  24:23
procureme...
  20:10
produce
  40:20 42:7
produced
  38:10,18
  39:14,15
  40:18 41:18
  41:24 42:2
  44:3 49:1
  73:19
producing
  39:7
product
  46:17
professional
  37:20 72:3
program
  19:9,21
  20:13 36:7
project 16:1
  16:3,7,9
  24:1 25:2
  36:21 46:5
  46:8,18,24
  47:4,10,14
  47:21 48:8
  48:9,17
  49:10,17
  59:22
projected
  28:21 34:7
  48:8
projection
  29:19 44:20
  49:21
projections
  29:5,8 33:8
projects 16:4
  16:6 23:21

ERIC DAVIS
March 5, 2026

46:19,19 50:13 59:17 65:12 75:8

**propending** 10:7

**proposal** 53:14

**proposing** 48:15

**propound** 10:7

**proved** 26:21

**provide** 23:22 24:20 32:1 58:18 58:19 63:12

**provided** 73:18,21

**provides** 77:17 78:4

**providing** 59:4

**public** 13:5 13:18,20 14:4,10 21:5 30:21 30:22 32:20 33:15 36:8 48:22 63:11 63:12 83:24

**publicly** 20:14 23:4 23:10 30:10 30:11 31:17 39:9,10,11 40:13 50:19

**published** 56:7

**pull** 30:18

**pursuant** 1:13 81:20

**pursuing** 27:21

**pushed** 73:5

74:15 78:19

**pushing** 70:22 74:11 75:9,14

**put** 25:21 37:2,16 47:17 52:2 60:15 66:10 66:22

**pwm@mor...** 2:6

**Q**

**qualificatio...** 20:8

**question** 7:21 12:4 15:15 27:10 34:21 37:9 39:22 44:4,6,7,16 44:21 54:11 55:17 57:4 64:8 66:11 71:19,20 73:12 74:22 77:2,23 78:9,20

**questioning** 15:19 34:20 34:24 37:6 52:8

**questions** 44:22 45:19 53:2 81:12 81:16

**quick** 56:18

**quicker** 68:6

**quickest** 68:2

**quickly** 56:10 58:2 59:6 68:9

**quite** 26:19 28:14

**R**

**R** 2:1

**ramp** 4:21 9:8,18,23 10:12,15 11:9 12:9 12:21 16:13 16:24 17:16 17:20 18:4 18:14,16,19 19:1 42:8 52:18,18 53:2,8,9 54:24 55:22 61:18,20 62:5,6,9,14 62:18 63:4 64:3,7,9,14 64:24 65:19 66:7,8,12 66:13 67:3 67:14,22,23 68:1,7,24 69:1,4,5,10 69:15 70:6 70:8 71:1,3 71:5,21,24 72:17,20,24 73:11,14 74:2,9 76:13,15,19 76:24 77:5 77:10,13,17 78:1,3,13 78:14,24 79:16 80:2

**ramps** 15:20 36:3,18 52:9,22 69:6,13 71:10 75:14 78:18

**Randolph** 2:10

**range** 28:5 49:24

**raw** 33:18

**re-presented** 43:12

**reach** 73:24

**reached** 72:22

**read** 7:7 34:6 75:2 83:4

**reading** 5:6

**ready** 31:9 54:20

**realized** 25:16,21,22

**really** 10:6 50:2 71:9 71:21

**reason** 10:24 11:20 57:14 67:8

**reasonable** 34:10 65:22

**reasons** 58:17 59:11 60:13

**rebuilding** 64:7 72:1

**recall** 5:21 6:6 8:21 9:2 10:2,19 11:10 12:23 13:17 25:13 29:24 30:3 48:4 72:18 72:18

**received** 31:22 67:10

**receiving** 5:23

**recognize** 17:20

**recommend** 19:1

**reconstruct** 62:14

**reconstruct...** 36:21

**record** 41:10 45:6,8,10 80:8,12,13 81:15

**reference** 39:20 40:13 42:1 46:11 48:8

**referenced** 3:10 66:3

**references** 32:6 46:17 47:13

**referencing** 48:7 49:9

**referred** 81:18

**referring** 9:10 15:14 22:6,7 45:16 47:21 77:11

**reflected** 34:7

**refresh** 5:22 6:21 10:20 10:21 11:1 48:22

**regarding** 40:22 58:8

**Regardless** 30:5

**regular** 63:1

**relate** 41:5

**relates** 37:20

**relative** 14:3 29:7

**relatively** 44:24 60:8 71:3 72:14

**relevance**

12:15 35:3

**relevant** 34:23 37:1

**relying** 44:12

**remember** 9:15 22:10 22:14 34:15 47:8,11 63:11

**rememberi...** 5:4 20:7

**remind** 35:23

**renamed** 20:19

**renew** 37:4

**renovate** 61:22 62:18 68:24

**renovated** 19:1

**renovating** 16:12,15

**renovation** 49:15

**repair** 18:19

**repairing** 53:7,9

**repeat** 16:19

**rephrase** 12:4 57:3 73:12 74:22

**replacement** 72:11

**report** 10:15 10:21 11:4 11:21,23 16:9 17:17 17:18,23 19:4 25:8 26:17 51:13 55:8,11,13 56:1,6,13 56:22 57:10 58:21 73:18

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 94

ERIC DAVIS
March 5, 2026

Page 11

| | | | | | |
|---|---|---|---|---|---|
| **REPORTER** 11:16 31:13 | review 7:15 8:11 40:16 59:5 | room 52:13 | **SAMUEL** 2:9 | 71:13,18 | 2:13 |
| reports 16:10 | reviewed 7:7 | rough 34:2 | satisfy 75:10 | sent 5:6 6:9 | shape 50:4 |
| represent 4:8 | 8:14 31:15 | roughly 48:4 | saying 9:12 | 6:16,16,23 | sheriff 1:7 |
| representing 36:13,13 | 31:18 32:2 | RTU 4:20 9:8 | 35:11 40:12 | 8:24 40:23 | 25:14 27:18 |
| request 20:8 | 32:11,14 | 9:18 11:9 | says 23:10 | 42:13,14 | 47:14 51:19 |
| 20:12 25:20 | 38:8,19 | 12:21 15:20 | 49:13 55:9 | sentence | 73:17 74:19 |
| 25:22 26:10 | 45:13,17 | 16:13,24 | 61:17 62:2 | 66:20 67:14 | 75:13 77:8 |
| 33:5 47:14 | 68:21 | 17:2,2,7 | 67:2 68:22 | 77:19 | 77:22 78:12 |
| 47:20 | reviewing 5:7 | 18:4 26:1,2 | 71:21 76:9 | sequence | 78:23 80:1 |
| requesting 20:3 | 7:12,23 | 34:23 35:2 | scale 60:15 | 55:5 | 80:4 |
| requests 6:7 | revised 68:21 | 36:3,14,18 | scheduled | serve 16:5 | sheriff's |
| 29:3 51:11 | RFQ 21:5,6 | 36:22 37:6 | 35:21 40:24 | serves 51:20 | 17:22 71:11 |
| require 46:20 | 22:17,20 | 52:8,18,22 | scope 15:19 | services 20:1 | 72:19,22 |
| required | 23:4 | 53:2,7,9 | 34:22 36:2 | 21:10 24:20 | 73:10,13,22 |
| 18:5 76:13 | right 7:1,17 | 54:9,12,24 | 37:5,7 50:7 | 46:21 58:19 | 74:1 78:17 |
| 77:4,13 | 8:5,9 9:14 | 55:21 61:17 | 52:10,22 | 58:19 59:11 | shorter 59:2 |
| 78:1 79:22 | 10:16 13:3 | 62:18 65:18 | 53:3 65:13 | 59:13 | shorthand |
| resolved | 13:13 17:10 | 66:1,7,12 | 65:14 66:13 | serving 16:3 | 81:13 |
| 42:11 | 19:15 23:9 | 67:3,14,21 | 69:6 | set 29:11 74:3 | shortly 5:23 |
| resource 16:5 | 30:14 31:7 | 68:1,2,10 | screen 38:2 | 83:6 | 11:10 |
| respond 8:1 | 31:7 32:17 | 68:24 69:4 | 45:11,12,14 | setting 58:2 | show 10:20 |
| 38:16,24 | 34:18 36:4 | 70:5,14 | search 20:21 | **SHAFI** 2:9 | 13:6 22:15 |
| 41:6 42:23 | 37:9 38:11 | 71:21 72:17 | second 21:24 | 12:15 15:18 | showed 48:20 |
| responding | 38:14 42:21 | 72:20,24 | 24:22 28:15 | 30:20 31:4 | showing 11:4 |
| 44:12,16 | 43:21 45:12 | 76:13,15,19 | 31:2 38:6 | 31:12,14,23 | 49:19 |
| response | 49:21 50:20 | 76:24 77:4 | 40:2 | 32:9 34:20 | sick 54:5 |
| 31:22 66:23 | 53:9 56:2,8 | 77:13,15 | section 22:23 | 35:14,19 | side 17:3,20 |
| responsibil... | 57:20 63:21 | 78:22,24 | 22:24 | 36:10 37:4 | 18:23 62:9 |
| 13:24 14:5 | 67:24 69:11 | 79:15 80:1 | sections | 38:7,14,17 | 64:6 68:17 |
| 15:11,17 | 70:9,10,17 | rules 1:13 | 22:22 | 39:2,10 | 77:15 78:3 |
| responsibil... | 71:19,20 | 24:13 52:19 | security 63:6 | 40:8,16,21 | sidewalk |
| 16:3 | 78:10 | 81:20 | 63:15 | 41:7,9,11 | 63:5 |
| rest 33:15 | rip 72:12,15 | ruling 9:12 | see 4:15 15:4 | 42:9,20 | sign 35:17 |
| result 51:18 | ripping 71:24 | | 15:6,13 | 43:6 45:7,9 | 43:3 |
| resume 42:19 | 71:24 | **S** | 33:4 34:23 | 45:22 48:24 | signature |
| 42:21,22 | Riviera 51:23 | S 2:1 3:8 | 46:6 | 52:7,19 | 7:13 81:19 |
| 45:7 | **ROBBIN** | Sabrina | seeking 59:23 | 54:21 55:15 | 82:1 |
| retain 17:5 | 1:12 81:6 | 51:23 | seen 9:17 | 55:23 58:12 | signed 6:24 |
| retained 3:22 | 82:7 | safety 13:5 | 12:20 | 66:11 67:1 | 8:3,8,23 9:1 |
| retaining | role 16:12 | 13:18,20 | send 6:12,14 | 68:20 69:10 | 9:6,13 13:1 |
| 25:1 | roll 47:24 | 14:4,10 | 7:16,16 | 69:12,19 | 22:3 37:12 |
| | ROM 34:2 | 32:20 33:15 | sense 60:19 | 75:16 79:9 | 39:7 56:20 |
| | | 36:8 | 61:11 63:20 | 80:6,9 | 57:5 |
| | | Sam 5:10,11 | | shafia@jbl... | signing 22:10 |

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 95

ERIC DAVIS
March 5, 2026

Page 12

similar 33:16 52:17
single 30:1
sit 63:7
site 51:7
sitting 10:12 17:10
situation 17:24 18:1 19:3 60:4 60:16 72:4
six 21:13
size 25:2 60:22 66:8
slab 72:13
slower 68:7
slowing 54:13
smaller 60:10
solicitation 21:15 36:23 37:11,19,24 39:19,24 57:15,15
solicitations 28:11
solution 72:9 72:10
somebody 17:21 43:3 59:4,20 60:13 62:20 63:11,19,22 64:13,16,16 68:2 70:22 71:14,22 74:14 76:3
soon 11:23 45:4 60:6,8 61:11
sorry 6:13 15:6 27:11 30:24 31:13 44:22 66:2

73:9 75:7
sort 10:6,6 15:18 41:2 49:1 59:5
sounds 19:15 52:1 67:24
source 51:11
south 2:4 22:24
space 63:3
speak 7:14 26:23 27:2 42:9 74:10
speaking 5:1
specific 9:23 10:19 13:18 46:17,24 54:9
specifically 4:16 5:1 7:14 22:14 34:23 35:2 52:8,21,21 65:8 67:2 68:22 69:3 69:13
speculate 25:19 60:21 68:10 75:12
speculating 12:2 17:18 60:8 62:2 67:12
spend 7:12 24:4,5,7 62:15 65:21
spending 33:7 64:7
spent 44:17
square 33:19 33:23,24 34:15 36:11
staff 63:21
standalone

36:21
standards 18:5 64:17 73:15 74:3 74:7 75:4,5 77:17 78:4
start 5:20 6:5 6:18 20:2 35:7,11 39:3 42:10 52:12 67:22
started 13:19 14:7,12 19:23,24 25:15 26:16 28:10 35:6 51:12,13,15
state 13:1 21:6 49:10 81:1
State's 11:17
stated 39:2
statement 8:14 37:16 43:17,20 49:6 67:9
statements 7:23
States 1:1,14 28:16
stay 47:18
stenographer 81:14
steps 18:18
stick 35:20
stipulate 51:3
stipulated 23:5 51:17
stipulates 22:20
stipulation 67:15
stop 42:18 54:2 59:20

straightfor... 24:12
Street 2:10 2:11
strenuously 35:10
strictly 34:23 36:3 37:6
strike 57:3
structural 55:21
studied 67:7
study 44:1
stuff 6:7 53:19 54:15 54:16
subject 63:14 83:6
submitted 20:8 56:13 81:20
SUBSCRI... 83:19
subzones 61:4
successful 25:23
sue 53:23 54:2
sued 9:21 22:13
Suite 2:11
summary 32:8 42:24 66:23
support 32:7
Supreme 81:21
sure 5:1 67:7 67:8 69:19 71:23
surprise 28:24 51:2
survey 10:3

11:21 18:13
suspect 20:11 67:13
sworn 4:1,4 81:11 83:19
system 46:15 46:16 47:18

———— T ————

T 3:8
take 21:20,23 24:23 28:5 31:3,4 33:24 34:17 35:8 39:16 40:2 50:3 53:15,24 54:18 56:14 59:9 60:2 61:21 65:3 68:15 71:4 71:10
taken 1:12 28:17 31:6 54:19 81:6 81:13 83:8
takes 21:20
talk 16:23 36:22 45:24 66:7 67:3
talked 16:21 19:8 42:5 75:13
talking 4:15 6:2 10:15 27:20,23 28:14 29:21 30:12 36:5 36:6 66:2 69:8,12,14
talks 15:2 36:20 52:9 65:24 69:22
taxpayers'

61:13
telephonica... 2:4
tell 17:10 21:22 22:14 38:3 40:10 49:3 54:9 61:8,14 62:19,21 63:19 64:2 65:15,17 68:19 70:5 73:3 74:1,5 74:5,13 77:11 78:15 79:21
telling 35:15
tells 65:1 71:22 77:8 78:12
ten 26:13,22 29:6 33:16
ten-year 48:9
term 46:16
terms 4:17,17 7:19 8:22 8:23 9:1 16:7 18:15 33:6
testified 4:5
testify 4:20 8:12
testifying 8:15
testimony 44:8,10
tgm@morr... 2:6
Tharp 42:24
thing 6:17 9:5 10:6 37:20 54:11 55:11 59:5 62:4 66:22

**ERIC DAVIS**
**March 5, 2026**

Page 13

| | | | | | |
|---|---|---|---|---|---|
| 71:22 72:15 | **thumb** 60:15 | **topping** 72:13 | 76:24 77:4 | 71:4,17 78:9 | 21:22 24:20 |
| **things** 4:24 5:14 10:5 19:6 24:19 25:10,15 26:8 28:18 29:24 43:4 55:6 60:10 63:15 75:7 | **time** 5:14 6:2 7:14 8:6 16:17 21:21 22:16 25:7 26:19 27:3 27:14 29:9 30:6 35:8 42:19,23 43:1 47:19 | **total** 29:6 **totally** 40:12 43:15 **totals** 34:6 **trace** 50:16 **trades** 65:9 **transcript** 83:5,8 | 77:9,16 78:1,13,24 79:16 80:2 **turn** 50:3 59:9 70:9 70:10,17,18 71:8 **turned** 33:23 | **understand...** 28:16 33:10 34:7 40:23 45:20 49:19 74:23 79:14 **understood** 11:8 **undertaken** 60:22 | **verify** 9:6 **version** 8:22 8:23 9:1 27:12 **versus** 9:18 **violates** 12:9 **Volume** 29:16,18 30:8 |
| **think** 4:10 5:6,10,10 9:15,24 10:4 11:22 13:22 16:22 20:5,19,24 21:2,23 22:6,7 25:13,19,19 29:4 34:17 34:18 38:12 40:12 43:15 44:14,20 47:12 56:14 57:24 62:4 62:13 65:3 67:20 69:17 71:4 72:6 79:11 | 51:21,22 54:2 56:17 57:1 61:12 81:7,17 **timeframe** 65:23 **timeline** 20:10 55:20 **times** 5:17 9:21 16:21 22:13 53:24 59:1 62:11 66:15 75:17 76:16 79:10 **tired** 54:5 **title** 13:17,21 15:24 16:9 51:21 | **travel** 62:24 63:1,13,23 64:1 71:16 71:17 79:24 **treatment** 36:14 **tried** 44:14 **true** 9:4 26:9 81:15 83:7 **truly** 25:23 **try** 58:1 59:16 60:23 61:9 **trying** 7:18 39:13 49:6 49:20 50:11 52:16 53:13 54:1 55:20 56:17 58:1 74:8 | **turns** 18:22 **twice** 16:18 **two** 12:1 14:13 16:2 18:3 43:18 57:1 65:18 **type** 7:3 **typically** 7:15 8:1,16 21:22 29:2 | **undertaking** 22:2 **underway** 33:21 45:4 **unfair** 43:15 **unit** 36:14 **United** 1:1,14 28:16 **unprecede...** 28:14 58:5 **unrealistic** 58:2 **unusual** 34:5 **use** 38:9,13 41:23 46:16 | **voluntarily** 42:15 **vs** 1:6 |
| **third-party** 36:14 65:1 **THOMAS** 1:7 2:3,4 **thought** 50:4 59:19 **three** 14:9,12 21:13 22:17 22:20,22 23:2,3 26:5 30:2,5 43:19 47:22 47:23 55:10 75:3 **three-volume** 29:17 | **today** 4:14,16 4:17,20 8:12,15 40:18 41:14 41:17,24 42:3,16 57:9 **told** 13:14 18:2 32:5 35:8 49:22 62:11 73:8 73:10,13 **Tom** 4:11 **tone** 16:20 **tool** 34:10 **top** 5:5 67:21 | **tunnel** 4:21 9:18 11:9 12:21 16:13 17:8 18:4 26:5 36:17 36:18,19 52:6 53:7 54:24 55:22 62:18 65:19 67:21 68:1 68:24 69:4 70:6,9 72:20,24 76:13,15,19 |  | 60:14 68:5 69:1,22 70:6 71:21 72:24 76:13 77:13 78:1 79:15 80:1 **user** 21:4 77:4,24 78:22,24 **users** 76:13 77:12 **usually** 6:2,3 6:18 7:9 8:5 8:6 9:3,3 | **W** 2:3 **wait** 21:24 38:6 41:8,9 **waiting** 55:12 62:19,20 **waived** 81:19 **walk** 63:23 69:21 70:8 **walkway** 17:3 68:8 70:18 **want** 4:24 10:20 13:14 13:16 14:20 19:6 25:21 28:3 42:15 42:18 43:11 44:6 45:8,9 45:19 50:12 53:19,20 54:14,15 58:16 60:14 60:15,16,17 60:18 67:3 68:23 69:3 72:6 |

| U |
|---|
| **uh-huh** 12:8 15:8 19:19 30:14 33:2 56:3 57:2 69:24 70:2 77:14 |
| **ultimately** 40:5 |
| **underneath** 14:16 15:12 15:22 |
| **undersigned** 81:13,22 |
| **understand** 9:22 16:14 26:7 28:13 31:23 32:9 32:24 35:3 35:14,19 40:1 49:6 49:17 52:16 53:21 65:10 65:13 66:15 |

| V |
|---|
| **van** 63:3 |
| **vendors** |

**wanted** 35:7 41:15 52:11 **wasn't** 10:5

**TOOMEY REPORTING**
**312-853-0648**

Exhibit 1 Page 97

**ERIC DAVIS**
**March 5, 2026**

Page 14

26:16 28:6
**waste** 62:8
**wasting**
61:12
**way** 12:24
16:20 17:1
17:9,11,22
24:11 25:22
29:23 34:5
35:11 47:13
47:18 53:6
58:20 59:13
61:1,8,22
63:7,10
65:11 67:16
68:2,11
70:11 72:15
73:20 79:22
**ways** 26:6
53:8 58:5
74:18
**we'll** 8:17
43:13
**we're** 4:15
16:15 17:23
18:23 19:24
19:24 21:7
23:8 24:6
27:20,21
28:13 31:8
32:22 33:6
34:1 35:22
36:5 47:8
47:21 48:15
54:1 55:12
56:17 58:1
60:17,22
61:9,10,12
62:5 65:16
69:8,12,13
69:17
**we've** 5:3,14
25:6 27:14
50:1 62:3,3

62:13
**website** 20:15
20:18 30:17
30:21,22
32:6 50:20
50:24
**weeks** 38:24
**went** 18:8
25:18
**weren't** 39:8
40:19
**west** 2:10,11
22:23,24
**Western** 2:4
**Westmorel...**
1:4 4:14,18
4:20 5:18
7:1,24 8:20
13:7 35:5
35:13,18,21
37:3,16
49:7 52:15
**wheelchair**
63:16 68:5
70:23 73:5
74:8,15
75:9 76:12
76:19,23
77:4,9,12
77:24 78:12
78:15,22,24
**wheelchairs**
75:14 76:15
78:16 80:2
**whichever**
78:6
**wish** 24:12
**witness** 4:1,3
11:17 12:16
15:24 30:21
30:23 31:5
31:10 32:5
39:7 40:11
49:3 55:16

58:14 67:12
75:18 79:11
81:6,11,17
81:19 82:1
83:1
**word** 57:21
66:19,19
67:10,10
**wording** 7:9
**work** 24:11
40:5 44:20
49:16 58:24
**working** 17:5
25:6 27:14
33:22 50:14
**works** 15:22
**wouldn't**
28:24 51:2
56:14 73:24
**write** 7:15
51:22
**written** 63:10
**wrong** 15:6
18:11 67:19
**wrote** 51:22

————————
**X**
————————
**X** 3:1,8

————————
**Y**
————————
**Yea** 26:14
**yeah** 8:5,7,13
8:16,16 9:2
11:3 13:10
13:10,10
26:18,19
27:5 28:3
30:14,14,24
31:5,10
42:9 45:9,9
50:15,18
51:6 52:1,1
52:2 55:19
57:12,12,17

57:17,24
58:14 60:3
64:21 65:16
66:9 68:14
68:18 71:8
71:8,21
74:11 77:6
79:1 80:7
80:11
**year** 12:6,7
13:17,23
14:20,21
24:4,6 25:2
28:22 29:3
29:15 33:7
47:9 49:14
50:8 55:1
56:7 73:1
**year-over-y...**
23:24 46:24
**years** 20:7
22:4,11
26:13,22
27:2 29:5,6
42:5 50:17
50:24 51:4
53:15 57:1
65:18

————————
**Z**
————————
**zero-based**
23:20
**zones** 47:23

————————
**0**
————————
**084-002522**
82:8

————————
**1**
————————
**1** 29:16,18
30:8 83:5
**1:15** 1:16
**10** 25:20
47:16 51:8

**100** 2:10
55:13
**10257** 2:4
**11** 36:11
**120** 29:10
48:3
**123,500,000**
38:4
**123,500.000**
34:19
**13** 3:11
**132-7** 11:2
**15** 67:22
**17th** 82:2
**19** 28:3 51:23
**1st** 10:16
11:6,8,12

————————
**2**
————————
**2** 3:11,22
13:6 15:2
25:20 47:15
51:8
**2:50** 80:16
**20** 56:9
**200** 25:10
**20126** 8:8
**2015** 25:9
26:17 51:13
**2017** 13:13
27:24
**2017-2019**
28:5
**2019** 28:3,19
51:20
**2024** 10:16
11:6,8 22:7
56:20 57:6
57:18 58:7
**2025** 22:6
46:2 47:3
49:9
**2026** 1:16 3:2
12:5 29:16

30:8 37:13
38:1 47:6,9
48:2,2,20
49:14 53:8
55:1 56:7
82:3 83:9
83:21
**2028** 56:12
**23-cv-1851**
1:5
**233-7901** 2:5
**24** 20:5,11
57:15,19
66:3
**24112** 46:14
46:22 47:4
49:10
**2412** 46:5,8
**2415-02093**
36:23 37:11
37:19 39:20
46:11
**2415-0293**
40:4
**26** 29:24 30:2
55:7,9,11
56:11 58:15
66:3,5
**269** 38:4
**27** 56:11
58:16
**2700** 2:11
**28** 57:19

————————
**3**
————————
**3** 19:14,18
29:21 30:13
36:5
**300** 75:8
**312** 2:12
**33** 2:11

————————
**4**
————————
**4** 3:6 25:20

**ERIC DAVIS**
**March 5, 2026**

47:15 51:8
**4-20-26** 47:22
**4th** 8:8 10:23
12:5 37:13

---
**5**
---
**5** 3:2 26:4
66:1,19
77:12
**5th** 1:16 83:9

---
**6**
---
**6** 25:20 37:12
47:15 51:8
**60** 21:18
**60603** 2:12
**60643** 2:5

---
**7**
---
**75** 53:23
**773** 2:5

---
**8**
---
**8** 72:7
**83** 83:6

---
**9**
---
**9** 25:20 47:15
51:8
**900,000** 72:7
**984-0272**
2:12

**TOOMEY REPORTING**
**312-853-0648**

Exhibit 1 Page 99