IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CORNELIUS WALKER,                    )  Docket No. 20 C 261
                                     )
              Plaintiff,             )  Chicago, Illinois
                                     )  March 23, 2023
         v.                          )  10:33 a.m.
                                     )
THOMAS DART, Sheriff of Cook         )
County, and COOK COUNTY,             )
ILLINOIS,                            )
                                     )
              Defendants.            )

TRANSCRIPT OF PROCEEDINGS - Motion Hearing
BEFORE THE HONORABLE MARY M. ROWLAND

APPEARANCES:

For the Plaintiff:    MR. PATRICK W. MORRISSEY
                      Thomas G. Morrissey Ltd.
                      10257 S. Western Avenue
                      Chicago, IL 60643

For the Defendants:   MR. BRIAN P. GAINER
                      MR. JACK E. BENTLEY
                      Johnson & Bell Ltd.
                      33 W. Monroe Street
                      Suite 2700
                      Chicago, IL 60603

Court Reporter:       LAURA R. RENKE, CSR, RDR, CRR
                      Official Court Reporter
                      219 S. Dearborn Street, Room 1224
                      Chicago, IL 60604
                      312.435.6053
                      laura_renke@ilnd.uscourts.gov

(In open court.)

THE CLERK:  All rise.

THE COURT:  Good morning.

THE CLERK:  This court resumes in session.

(Call to order.)

THE CLERK:  20 C 261, Walker v. Dart.

THE COURT:  Good morning.

MR. BENTLEY:  Good morning, your Honor.

MR. MORRISSEY:  Good morning, your Honor.  Patrick Morrissey on behalf of the plaintiff class.

THE COURT:  Good morning.

MR. GAINER:  Good morning, your Honor.  Brian Gainer, here by request on behalf of the defendants.

THE COURT:  Mr. Gainer.

MR. BENTLEY:  Good morning, your Honor.  Jack Bentley, B-E-N-T-L-E-Y, also on behalf of defendants.

THE COURT:  Okay.

So, Mr. Gainer, nice to see you.

MR. GAINER:  Thank you.  It's nice to see you.  It's been a while.

THE COURT:  Yeah, been a long time.

MR. GAINER:  I'd rather be here when not ordered to be here, but here I am.

THE COURT:  Always nice to see you.

So, Mr. Gainer, I asked you to come because I felt the

case was getting a bit off the rails, and I thought your wise counsel could get us back on track.  With respect to Mr. Bentley -- I don't mean any disrespect to you -- but I wanted to get this case back on track.

MR. GAINER:  I'll do my best.

THE COURT:  Okay.  So we have a motion for sanctions, and we have a motion about this report.  And I'm a little confused about the report.

So I understand -- I know, because I've reread the transcripts from the case.  So there are four of them.  I don't know if you've had a chance to look at them.  They're all ordered, and they're all on the docket.

MR. GAINER:  I've seen some of them.

THE COURT:  Okay.  So back -- it was more than a year ago, I think, the County was going to hire an architectural firm.  And they were going to do this for ADA compliance, not related to this case even, but they were going to hire an architectural firm.  And I am well aware of the County -- you know, the County, let's say they're not the fastest-moving operation in the country.

So -- but they were going to hire an architectural firm.  They were going to go around, figure out if they had any ADA issues at all.  That was going to happen quite some time ago, I think over a year ago.  Am I right about that?

MR. MORRISSEY:  Yes, your Honor.  The County's

30(b)(6) designee, Eric Davis, who is an architect for the County, testified in January of 2022 that this report by an architect of record was going to be obtained within a year and he was going to rely on that information to formulate how the County is going to move forward with this ramp.

THE COURT:  Okay.  But the ramp and other things.  But the ramp is what we care about.

MR. MORRISSEY:  Right.  For this case it is, your Honor.

THE COURT:  Okay.  So then we took a -- so I don't know what's happened with the architect firm.  That's what we're here on today.

But then we took a break to try to settle the case.  As you know, Mr. Gainer, I'm a big proponent of that.  Always happy to take a break in a case.  Always happy for people to not spend money on a case if they can get it resolved.  I love lawyers running their own case.  They tell me back off on any kind of deadlines, I do it because you know I was a magistrate judge and I loved settling cases.  I think you and I settled --

MR. GAINER:  Quite a few.

THE COURT:  Okay.  Good.

But at some point if it doesn't settle, we've got to get back on the case.  And it didn't.  I don't know why.  I wasn't there.  But it didn't.  So I lifted the stay of discovery because it was time to get back on track.

Exhibit 2 Page 1

5

And what I feel has happened is the County has kind of said, "Well, Judge, we're not going to participate in discovery." And maybe I'm misunderstanding the County's position. But what I'm understanding is the County is saying, "We're not going to participate in discovery until" -- because the plaintiffs got too aggressive and filed this motion because, you know, I had allowed a (b)(2) class but not a (b)(3) class.

The Seventh Circuit has weighed in on that issue since that time. Am I right about that?

MR. MORRISSEY: Yes, your Honor.

THE COURT: So that's important to me.

MR. MORRISSEY: Of course.

THE COURT: Because I think they reversed my friend down the hall here, Judge Blakey. So I've got to take that into account. And they -- plaintiffs have now brought that to my attention, and that's obviously impacting my thinking on the matter.

And I can't have the County coming in and saying, "Well, we're not going to -- you've listed the stay, but we're not going to participate in discovery until you rule on the class, which is really focused on damages. So we're not going to participate in liability discovery."

Well, that's not how it works here, of course. If I lift the stay, I lift the stay.

6

And then there's this issue about where is the darn report. So, you know, when I said, "Produce the report," the response was "What's the hurry?"

MR. GAINER: I saw that.

THE COURT: And we have been waiting a year.

MR. GAINER: I saw that.

THE COURT: And then there was some comment about blowing smoke. And I understand lawyers get exasperated because, boy, have I been exasperated as a lawyer and as a judge.

So if we could just move forward. We've got to produce a report. It's not possible -- it's not credible to me that there is not a report. If you tell me there isn't, I will try to believe you. But I'm struggling to believe that the County would pay an architectural firm and there would not be something written down.

MR. GAINER: Can I address a couple of the issues you've just raised --

THE COURT: Please.

MR. GAINER: -- including that one.

THE COURT: Please.

MR. GAINER: So, first of all, I am very cognizant of the fact that it's in everyone's best interests to not only move the ball forward but try to resolve this case. I think it's probably a good idea for everyone.

7

As you know just based on your history with this case, we jumped the line -- I don't know how, but we managed to, with Cook County as our client, jump the line and get the handrails installed on this problem ramp before all of these other projects were going to be done. I still to this day feel this is -- it's one of our best achievements while representing the County to get them to do that. So -- and that was to help resolve one aspect of this case.

THE COURT: Right.

MR. GAINER: So I'm very aware of that. We are very aware of that.

And I think, ultimately, it's in everyone's best interests to talk resolution. The settlement conference was scuttled in this case by the plaintiffs because of that ruling in *Bennett* that you just referred to by the Seventh Circuit.

THE COURT: Right.

MR. GAINER: I don't think it's as simple as Mr. Morrissey would have the Court believe in his motion, that while *Bennett* is the same, the Seventh Circuit overruled *Bennett*, so we have to do the same here. I do understand there are some common issues and that you have to take those into account. But I think it's a little more nuanced.

THE COURT: Right. And I didn't just read *Bennett* and say -- and issue a one-sentence opinion saying, "Okay. I'm reversing myself."

8

MR. GAINER: Right.

THE COURT: "We have a class here." I mean, I understand I have to take it into -- but I do have to revisit it.

MR. GAINER: Of course. Of course you do, right. And it takes time to do that. I get that too.

THE COURT: But they weren't out of line to file that motion.

MR. GAINER: Not at all. I agree 100 percent with you.

I just think we can wear some of the jacket for scuttling the settlement conference because we were also involved in *Bennett*, and that ruling came down in *Bennett*. But I don't think we should wear most of the jacket, because we were ready to go to a conference.

It's just where we are now.

THE COURT: I have no doubt.

MR. GAINER: Right.

THE COURT: I have no doubt. They got a win in the Seventh Circuit, and they said, "Hey, we want to ride this train."

MR. GAINER: Here we are.

So also it's very important that the Court knows that if the Court -- when the Court issued an order to lift the stay, it was certainly not our position, not implicitly or

Exhibit 2 Page 2

Case: 1:23-cv-16970 Document #: 198-2 Filed: 07/07/26 Page 3 of 10 PageID #:2902

Case: 1:20-cv-00261 Document #: 149 Filed: 03/27/23 Page 9 of 37 PageID #:1921

9

explicitly, that we are not going to engage in discovery. It was your order. We have to follow your order. We understand that. And if we want to try to stay discovery again, we should file a motion.

That being said -- I said all the nice things now -- I am going to respond to your comments about the report. There is no architect's report at this time. The architect bidding process and the actual retention of the architect that's going to do all of the things that were talked about in January of '22 and have been talked about since, the bidding process just ended. They've just named the architect.

What we did, in an attempt to get information to the other side without the benefit of an architect's report, is produce a surveyor's diagram or survey that you've seen --

THE COURT: I saw.

MR. GAINER: -- that has the measurements of this ramp because ultimately the main issue as I see it in this case is what are the measurements of this ramp. Does it comply with the ADA or not?

THE COURT: Right.

MR. GAINER: So this ramp has now been -- in the context of this case, this ramp has now been measured four times -- three or four times -- I think four times -- by the Morrisseys, by people affiliated with us. And, you know, granted, there are hundredths-of-an-inch differences in some of

Case: 1:20-cv-00261 Document #: 149 Filed: 03/27/23 Page 10 of 37 PageID #:1922

10

these measurements.

But I think that there is ample evidence about what the ramp measurements are. Unfortunately, they're not in the form of an architect's report, which is the issue of the motion for sanctions.

We talked to -- via e-mail -- the director of capital planning, the person that Mr. Morrissey just identified as Eric Davis, two days ago to confirm that there is no architect's report on this issue. And he confirmed that there is no architect's report on this issue.

So that's true that he gave a 30(b)(6) deposition in January of 2020 and said, "I'm going to rely on an architect's report in order to come up with whatever I need to come up with to make these alterations." It just hasn't happened. There isn't a report.

So if Mr. Morrissey feels -- and it's clear that he feels this way based on the motion for sanctions -- that we're hiding the ball on the architect's report, that everything I've said here to you today is untrue, he should issue us a request to admit that will be binding on us, asking us if there's an architect's report, and we will respond no.

So I understand given the amount of time that has passed that that is difficult for the Court to believe, as you said. It's clearly difficult for Mr. Morrissey to believe based on his motion.

Case: 1:20-cv-00261 Document #: 149 Filed: 03/27/23 Page 11 of 37 PageID #:1923

11

But all I can do is represent to you based on the information that we have right now, verified as of two days ago, that there is no architect's report on this issue or -- and I'm not using "on this issue" to trick anybody -- on any issue, like, related to this ramp: the length, the slope, any of it. That's why we produced the surveyor report.

THE COURT: Okay. I know you had somebody go in and measure. Did they do a report?

MR. MORRISSEY: Your Honor, they wrote us a letter. And the measurements that our architect came up with were consistent with who the County originally hired, an architect named Ms. Stoner, who was -- she was deposed.

THE COURT: Right.

MR. MORRISSEY: And so, yes, your Honor, we have measurements. There's a dispute of fact about the measurement of this ramp.

THE COURT: Right.

MR. MORRISSEY: And based on the new measurements that the County took with this land surveyor, we would like to go in and also measure this with the land surveyor so that we can put this dispute to rest, because if the ramp complies with the structural standards, then that's a part of the litigation that can be resolved.

But this issue's been outstanding for years.

THE COURT: Okay. So your person wrote a letter. And

Case: 1:20-cv-00261 Document #: 149 Filed: 03/27/23 Page 12 of 37 PageID #:1924

12

did Stoner -- because Stoner was hired by the County.

MR. MORRISSEY: Right.

THE COURT: Did Stoner write a letter or -- I know Stoner, Ms. Stoner, was deposed. Did she prepare something in writing?

MR. MORRISSEY: She did. She prepared a report on behalf of -- for the County.

THE COURT: Okay. And you have that?

MR. MORRISSEY: We have that, your Honor.

THE COURT: Okay. And does that say that the ramp is compliant with the ADA?

MR. MORRISSEY: No. It says the ramp is about a half -- an inch or a half inch too high and it must have a landing area because of the length of the ramp.

THE COURT: Okay. And then you have this surveyor, which is not your architectural person.

MR. GAINER: Correct.

THE COURT: You're going to get another person.

MR. GAINER: So they've just approved -- I don't understand exactly how the budget approval process works.

THE COURT: Right.

MR. GAINER: But they've just approved a contract with an architectural firm to work on many aspects throughout --

THE COURT: Right.

MR. GAINER: -- the Cook County Jail, including this

Exhibit 2 Page 3

13

ramp.

THE COURT: I get it.

MR. GAINER: I could never, and I would never, stand here in front of you and tell you that I know when any of that is going to happen. But that's what they've just approved.

THE COURT: Okay. But if plaintiff's person says it's not compliant and if Stoner says it's not compliant, I mean, aren't I near liability?

MR. GAINER: I don't think it's as simple as Stoner saying --

THE COURT: Because I've got a 2020 case here.

MR. GAINER: Right. I don't think --

THE COURT: So they're going to move for summary judgment.

MR. GAINER: Well, and I invite them to do so if they're going to do so based on what they think Ms. Stoner said.

THE COURT: Okay.

MR. GAINER: Because I don't think that that accurately describes what she said. And I think that there's at least some evidence that the measurements that were done by Ms. Stoner weren't entirely accurate. So -- which is why we have this surveyor information with different -- or slightly different -- I mean, we're talking fractions of an inch, but slightly different measurements.

14

THE COURT: Okay.

MR. GAINER: So if the Court --

THE COURT: So --

MR. GAINER: I'm sorry. I didn't mean to --

THE COURT: No, no. Because I'm trying to -- you know, I hear you about the County, and I hear that, you know, this -- I'm thrilled that the County is actually going to bring somebody in and, like, look at the whole jail if that's what they're going to do and try to get into ADA compliance. And we all know that might take five years. I mean, let's be realistic. And they might find bigger problems that they want to front-load, so good for them.

You know, and that's not my area. That might be other lawsuits. There might be other lawsuits that are pending that might be impacted by that.

But what am I doing in 20 CV 261? Am I waiting for all that to happen? I don't like the sound of that. So am I saying, "Okay" -- who is -- the defendant here is Thomas Dart. "Okay, Thomas Dart. You have an expert report due on July 1st. So you either get one or you don't have one"?

I mean, I've got to move the case. So I can't wait -- I love that they're going to go in and do the whole building. Like, I think that's just brilliant idea. But what does that mean for my little case here, Mr. Walker, you know?

So you want to resolve the case, and I don't know what

15

that means. I know the damages thing is what's getting -- obviously, Mr. Bentley got very agitated about that. But, you know, is that -- can we resolve the case and then I keep a consent decree so that we -- you know, we make sure the ramp gets resolved in this big thing? I'm happy to do that.

Or I say we're going to trial on this case because there's a dispute of fact about the ramp. And you've got to bring in some other expert who is not part of this big thing because that's going to take too long and give your position about the ramp, because they've got an expert saying it's not compliant, and we've just got this little piece.

And I don't want to waste money. I don't want you getting another expert if you don't need to. But I can't have a lawyer coming in here and saying, "Well, we don't have a report. And we don't have a report, and we're not producing a report." I just -- I can't have that because it's irresponsible of me.

So what are we going to do? You guys work together a lot, so I know we can work this out. But I'm going to start setting some dates.

MR. GAINER: I'd like to make a suggestion about that.

THE COURT: Okay.

MR. GAINER: So, I mean, obviously, I'm here dealing with one of the 15 sanctions motions that the Morrissey firm has filed against our firm. I can't imagine why anybody would

16

want to practice like that, but that's why I'm here today. So I have that issue to deal with. Just based on the fact that we've been talking to you now for about ten minutes about the dispute of fact with the ramp, I think that shows just how unwarranted this sanctions motion is.

I think the -- I think it's been conclusively established by all the measurements and all of the back-and-forth between us that there is a factual dispute about this ramp. We have depositions that we are trying to complete between now and the end of April. I'm not suggesting that those have anything to do with the ramp. I'm just saying that there's discovery that needs to be done between now and April.

THE COURT: Right. Right, right. Sure.

MR. GAINER: If your Honor sets a discovery schedule for after fact discovery closes, of course -- I'm sorry -- an expert discovery schedule --

THE COURT: Right, right.

MR. GAINER: -- before fact discovery closes, of course we're going to follow that.

I would like to very much -- without yet the blessing from my client, I would like to very much approach my client about trying to resolve the case because I think it should be resolved. The hang-up is --

THE COURT: The ramp.

MR. GAINER: -- we need to have willing participants

Exhibit 2 Page 4

because of the issue with *Bennett* -- and I'm not suggesting it's taken too long or -- I'm just saying there's this issue hanging out there that's making it hard for us to get together and talk about resolution. That's why the conference was scuttled in the first place.

So because we can't do that, because we can't have these discussions about settlement, I think we move forward. I think we have an issue about the ramp. If they feel like they need something more from us about those measurements --

THE COURT: Well, they want to go and measure the ramp. I mean, I'm not seeing this sanctions motion as any big deal, so I don't -- I'm not dealing with that.

But they want to verify the handrailings comply with the ADA, and they want to measure the ramp again with an architect or land surveyor to assess whether data taken is accurate. Well, I don't care if they're assessing your data, but you want to go back in there.

MR. MORRISSEY: Right.

THE COURT: So what's the big deal with that?

MR. GAINER: Well, the only significant deal with that would be the disruption to the operations of this jail, which wouldn't necessarily be a concern of yours, except this has been done four times. I mean, so we're going to get a fifth set of measurements. And if we do, and if they're different, we still don't have a resolution of this issue. And we will

have disrupted the operations of the Cook County Jail in the process.

So, I mean, I can't while representing the Sheriff tell you we're okay with an inspection.

THE COURT: Right.

MR. GAINER: If you tell me that I have to have one, then we'll try to set one up.

THE COURT: Right.

MR. GAINER: I mean, we will set one up because you'll order me to do it.

THE COURT: Right.

MR. GAINER: But my point is I just think this is an issue we have a ton of data on on both sides. It's clearly not something anyone's going to give up on, even if we get measurements that say this complies with the ADA.

THE COURT: Right. But let me just say this before -- I mean, and I'm going to get *Daubert* motions, I'm sure. But the plat thing, is that going to -- are you going to be able to defend that on a *Daubert* motion?

MR. GAINER: The plat thing. You mean what we've produced?

THE COURT: Yeah.

MR. GAINER: Defend it --

THE COURT: Like, if we're in front of a jury.

MR. GAINER: No, I think we need an expert. It's not

just that.

THE COURT: Okay. Okay.

MR. GAINER: There's -- I don't think we can say --

THE COURT: Because this is not going to fly with a jury.

MR. GAINER: I agree with you.

THE COURT: Okay.

MR. GAINER: But I think --

THE COURT: Okay. So we don't have that. When you say we have disputed facts as to whether or not the ramp complies, we don't really have that in terms of what we're going to give to a jury. We don't have the plat used by a plumber that -- okay. So we don't have that.

So we have the plaintiff's expert, and we have Stoner that you're basically telling me gives contradictory testimony or something. I don't know what she says. But she's a problem.

MR. GAINER: Yes, Stoner is a problem for us.

THE COURT: Okay.

MR. GAINER: We get it, I mean, you know. She's a problem to rely on factual --

THE COURT: So is she coming in to testify, or is she a problem like a *Daubert* problem?

MR. GAINER: Well, whether or not she comes in to testify -- I mean, I imagine the plaintiffs will try to call

her.

THE COURT: I see.

MR. GAINER: I think that -- I'd have to give more thought to the *Daubert* issue.

But I understand the Court's point, which is we only have some stuff. We need more.

THE COURT: I'm thinking -- you're telling me we have a disputed fact. I'm thinking, okay. Well, I've got to get this case to trial eventually if we're not going to settle it on liability. I'm not even at the (b)(3). I'm not at the (b)(3) problem --

MR. GAINER: Right.

THE COURT: -- which I know is what's stopping you from settling. That's a different problem. I'm just -- are we trying this case, or are we -- you know, is it -- is there liability? You know, am I granting a motion for summary judgment on liability? That's a different issue.

MR. GAINER: I see this as a summary judgment case if we're not going to try to settle it. And I don't mean I see this as a grant of summary judgment for the plaintiff.

THE COURT: Right. You think of it as a grant of summary judgment --

MR. GAINER: But I think that's where it's headed. And I think that ultimately the Court is going to find there are multiple issues of fact.

21

But I'm certain the plaintiffs are going to file a summary judgment motion. I mean, I can't say a hundred percent, but I'm pretty sure.

So those are my thoughts on it.

THE COURT: And you are too?

MR. GAINER: At this stage, I don't know that we can.

THE COURT: Okay. And then what about complying -- the handrailing complying with the ADA? Somebody's got to verify that.

MR. GAINER: Yeah. I don't know that we have any measurements.

THE COURT: I mean, I know you've sent a photo, so, like, they know the handrailing is there. But they've got to verify that to dismiss that claim. I don't know if they dismiss it, but they've got to walk away from it in some way, and they have to verify it for their clients. So you've got to work out how to do that.

So that's all I see this sanctions motion as. I'm not awarding fees or anything. It seems like it's part of the case.

MR. GAINER: The issue? You mean the issue with the --

THE COURT: The handrail.

MR. GAINER: The handrail. All right.

THE COURT: Like, I appreciate that you got that done.

22

But then there has to be a check and balance, which is they have to verify that it's -- that it works or that it's the right height or the right inches. You know, it's -- we didn't just have the plumber go and install that, because I know there's always cost cutting and -- you know, I understand that.

MR. GAINER: Yeah, right.

THE COURT: But that's how we get ramps that aren't quite the right size, although I'm sure this ramp -- I don't know -- well, I know there's a lot of issue about when the ramp was installed because we still have those requests to admit to go back to. There's an issue about the date.

MR. GAINER: I read about that recently.

THE COURT: Yeah. Early on we had that issue.

MR. GAINER: Yeah.

THE COURT: That was a painful status.

MR. GAINER: I imagine that it was.

THE COURT: Okay. But we all are learning.

MR. GAINER: Right. Of course we are, every day.

THE COURT: Okay. Okay.

So I'm -- I appreciate the motion for sanctions because I think it helped me focus on the case. I'm looking for a little guidance as to whether or not it would be helpful -- I have a big due date at the end of March on motions that applies to all federal judges, which is why this motion for reconsideration of the class has not gotten to the top of

23

my pile.

Would it be helpful for me to rule on the class motion sooner rather than later in terms of settlement? So if I were to be persuaded that the Seventh Circuit opinion means I have to reverse my holding on the class motion, would that be helpful for you guys to have in terms of, okay. We can get this resolved, meaning if I reverse myself, is that going to completely derail you?

And I honestly haven't looked at it except to read the Seventh Circuit opinion. But I will tell you, in that Seventh Circuit opinion, the Court reprimanded the district court judge for taking too long. So that caught my attention. So it's on my list, believe me, because I don't want to get that same smack.

MR. GAINER: Understood. From my perspective, when it comes to resolution, I'm sure you would agree -- or I think you would agree -- any uncertainty as to kind of where the case is headed doesn't help.

So if the Court were to -- were to rule on that, it would at least let us know where we stand. I can't make any promises that any ruling from you -- well, I mean, I think it would be silly for me to say that if you denied the motion, then we wouldn't be in a good place to resolve the case. I think we would.

THE COURT: Right, yeah.

24

MR. GAINER: But, you know, with regard to what happens if you grant it, I don't know. But I just feel like it -- you know, it seems like that was the reason the settlement conference broke down to begin with. So that's what it seems like to me.

THE COURT: So I'll tell you this. I will put it -- I've got to get through March, and I've got an early trial in -- an early April trial. But I will put it on, so you'll get a ruling sometime in April. Okay? So that will at least move that along. Okay? So I'll do my part in that.

And then you have to the end of April you're doing deps, right? Is that right?

MR. GAINER: April 23rd I think is the date.

THE COURT: Okay. So can we wrap up fact discovery by the end of April?

MR. MORRISSEY: I hope so, your Honor. We filed a status report a few weeks ago -- I think March 9th -- with deposition dates. And the plaintiff was supposed to go on Tuesday, and that now is -- has been canceled.

So I'm a little concerned about meeting the deadline. I want to reschedule Mr. Walker as soon as possible and to adhere to the schedule. But there's uncertainty.

THE COURT: Okay. Yeah, I see. You've got quite a few -- well, five or six -- here to do. Seven, yeah.

So, well, I'm going to close fact discovery on 4/30.

Exhibit 2 Page 6

Okay? You can get Mr. Walker in again before then, can't you? Is he still at the county jail?

MR. MORRISSEY: He's in the IDOC. And I can produce him anytime subject to the IDOC's availability. I believe defense counsel requested it to be canceled.

THE COURT: Okay. Is he by video then?

MR. MORRISSEY: They do it by video, your Honor.

THE COURT: Okay. Great. Okay.

Okay. So then can I leave it to you to work out the measurements -- this doesn't have to be done I don't think by fact discovery close, but to work out verifying that the handrail is compliant? Or is that -- how are we going to do that? Because I'd like to be able to enter an order of some sort or a stipulation of some sort that this part of the case is resolved, right?

And then if we do get to summary judgment and/or we get to experts, which we're going to do, we know we're not paying experts to go in there and figure that out. It's no longer a contested issue.

MR. GAINER: I suggest that Mr. Morrissey and I have a discussion about -- and I haven't talked with him about this -- about how to -- the most efficient way possible -- get to the bottom of that issue. Are these handrails that were installed ADA-compliant?

THE COURT: Yes.

MR. GAINER: Which is -- I agree is an issue that needs to be verified.

THE COURT: I mean, maybe you do a 30(b)(6) of the person who installed them.

MR. MORRISSEY: Your Honor, it needs to be an architect. And --

THE COURT: I mean, maybe that's what happens. And then instead of going to see them and interrupting operations, you're actually talking to the person who installed them. And you say, "How do you comply with the ADA? What did you do? What did you measure?" Blah, blah, blah, blah, blah.

MR. GAINER: I think that that's certainly an option. I'm happy to talk about it with Mr. Morrissey.

The issue with the architect, which, you know, was just raised again, like, we can't make an architect who has just had its bid approved by the County do what we want it to do for right now. I mean, if they want to hire an expert at some point to go out there and see if the rails are compliant, they can do that.

THE COURT: Right.

MR. GAINER: But it seems to me like we could probably solve that problem before that.

So I'm happy to talk with him about solutions. As I said before, I hope the solution is something less than having to go out there again. But if that's what it is, then we'll

just have to deal with it. That's just --

THE COURT: Well, that's -- so that's a pending issue. And what I'd like to avoid -- what I think you guys would like to avoid is having expert testimony on that because I think you can probably stip to it. But it has to be verified.

MR. MORRISSEY: Your Honor, the easiest and most efficient way I see this happening is to have our architect look at it and verify it. And if our expert concludes -- and I have all reason to believe he would -- if it was compliant with the ADA, that would resolve the issue.

And it would also be important during this time to take measurements of the ramp. And I don't think they would take very long. The video from the land surveyor taking this measurement I think was about 25 minutes.

THE COURT: Okay. And has -- is that the person who would remeasure the ramp? Because haven't they already measured the ramp?

MR. MORRISSEY: Our architect measured it by hand with a tape measure. And that's how he measured it. I believe that's the same way that Ms. Stoner measured the ramp, maybe in 2018.

And I would like to have the ability to remeasure the ramp with the land surveyor with my architect just to verify and see where we are because it's the central dispute that we have.

THE COURT: To have -- I'm sorry. I lost you. To have him remeasure it how?

MR. MORRISSEY: With a land surveyor.

THE COURT: So you're talking about your expert bringing a land surveyor with him or her.

MR. MORRISSEY: Right.

THE COURT: Uh-huh. Okay.

MR. MORRISSEY: To use a -- I believe they had a laser beam.

THE COURT: So that's how you're going to present your expert.

MR. MORRISSEY: Right.

THE COURT: Okay. So that's going to happen during expert discovery anyway. So it's like the expert discovery is going to be being done for the ramp, and at the same time, that person is going to verify that the handrail is compliant. That doesn't seem unreasonable to me, as cumbersome as it is. And then they'll produce their expert report.

MR. GAINER: I agree with you. I think that if there's no way for us to resolve this issue short of having that happen, then --

THE COURT: But that's going to happen anyway, the expert report, because he's going to -- he's not going to rely on the letter that he has from the tape measure.

MR. GAINER: Right. That's right.

Exhibit 2 Page 7

29

THE COURT: You know, because then you're going to come in to the jury and say, "Well, this was a tape measure, so it's garbage. So there's no liability."

MR. GAINER: Right. I was specifically speaking to the issue about the railings as opposed to the measurements. I agree that the measurements --

THE COURT: They'll kill two birds with one stone.

MR. GAINER: Right. The measurements are going to happen no matter what, no doubt.

THE COURT: Okay. Okay. So we're going to set then an expert discovery schedule. The question is can the case be resolved prior to that, meaning without that.

So end of April, we're going to come back. You'll have a ruling on the class. You'll be done with fact discovery. And we'll talk about, if there's a damages class, is there still a way to resolve liability without the experts, you know, still a way to resolve the case. And then, you know, we have a damages class if we do and, if we don't have a damages class, then, you know, a way to resolve the case.

If there's not a way to resolve the case, whether we have a damages class or not, then we'll set an expert discovery. Okay?

MR. GAINER: That sounds like a plan.

THE COURT: Okay.

MR. MORRISSEY: I have two comments, your Honor. One,

30

the settlement conference with Judge Cummings was very helpful. It helped the parties reach an agreement --

THE COURT: I have no doubt.

MR. MORRISSEY: -- about the railing.

And the idea that we didn't want to pursue settlement because of the *Bennett* decision isn't true because we offered to have that part of the settlement negotiation. So the idea that we have no interest or are not meaningfully here to try and resolve the case I don't believe is true.

THE COURT: Okay.

MR. MORRISSEY: Second, the Court set a deadline for the defendants to respond to outstanding written discovery, and it was the 16th of March. And they provided interrogatories, but they were not verified. So that's one issue that we need to address in the next few weeks before discovery closes.

And, second, the Court directed admissions to be responded to by the 16th. It was part of our status report we filed in December. And we still don't have those.

THE COURT: What were those last ones?

MR. MORRISSEY: The requests to admit.

THE COURT: Oh, requests to admit, yeah. Were those way from a long time ago?

MR. MORRISSEY: Your Honor, they were back in 2021, I believe.

THE COURT: Yeah, okay. Okay. So can we set those

31

for earlier in April than the last day because if they need to move to compel.

MR. GAINER: Whatever date you give us, Judge.

THE COURT: Okay. So I would say how about -- I know you've got to get them verified, so that's obviously the legal department over with the Sheriff. So how about April 7th.

MR. GAINER: Okay.

THE COURT: So that's ten days, two weeks.

And then they'll have a couple of weeks to file a motion to compel if that -- and if you file a motion to compel, it's okay that you do it a little short of the 30 days, before the close of discovery. But hopefully that won't be necessary.

Okay. So, Dawn, a status in let's say early May.

THE CLERK: How is May 4th.

MR. GAINER: That's fine with me.

THE COURT: Okay.

MR. MORRISSEY: And, your Honor, perhaps we could file a status report in a few weeks, just if there's any adjustments with these depositions that we've -- that were in the report on March 9th, just so the parties are on track to meet the deadline.

THE COURT: Okay. First of all, we're going to have a status -- what time do you want to do that, Dawn? Can we do it at 10:00 live?

THE CLERK: 10:00 we have, like --

32

THE COURT: That's okay. We'll do this, and then we'll do the plea.

THE CLERK: No. We have status hearings, criminal status hearings. Do you see that?

THE COURT: I don't know what day you're on. I guess I'm not looking at the right day.

THE CLERK: May 4th, Thursday.

THE COURT: May 4th.

THE CLERK: We have four criminal status hearings. We can do --

THE COURT: Okay. Can we do this at 10:15?

THE CLERK: Yeah.

THE COURT: Okay.

MR. GAINER: That works.

THE COURT: Okay. Thanks.

All right. Now, what were you saying?

MR. MORRISSEY: Your Honor, there's --

THE COURT: You want to file a status report.

MR. MORRISSEY: Status report to provide an update about the depositions.

THE COURT: Okay. I mean, you don't have to, but if you want to.

Do you want to file a status report?

MR. GAINER: No. I mean, I --

THE COURT: What's that going to get you?

Exhibit 2 Page 8



33

MR. MORRISSEY: My concern is all these depositions may be -- may not move forward as scheduled.

THE COURT: Okay. Well, you have until April 30th to get the depositions done. I'm not extending that date. It's a 2020 case. So do you understand you've got to get the deps done?

MR. GAINER: Yes.

MR. MORRISSEY: Because my concern is Mr. Bentley is leaving the office, and this --

THE COURT: Where are you going?

MR. BENTLEY: I'm actually going to join a friend of mine who is a solo practitioner doing something completely different.

THE COURT: Oh. Well, good luck to you.

MR. BENTLEY: Thank you.

THE COURT: I hope you have good success.

MR. BENTLEY: Thank you, Judge.

THE COURT: So you've got to put somebody else on this.

MR. GAINER: Yes. We're working on that now. I mean, there are people in house. We're not -- we don't --

THE COURT: Yeah, yeah, yeah, yeah. So do you have enough -- I'm sure you're thinking this through. You can get this done by the end of April?

MR. GAINER: Yes. We are going to move heaven and

34

earth to get this done by the end of April.

THE COURT: Well, I don't need you to move heaven and earth.

MR. GAINER: Well, maybe just heaven then.

THE COURT: I'm not that powerful.

Would you like until mid-May?

MR. GAINER: I think given sort of the restructuring of this case that any additional time you're willing to give would be best.

THE COURT: I'm going to give him until the end of May.

MR. GAINER: Thank you.

THE COURT: So -- because I see these dates are locked in.

MR. GAINER: The dep dates, yes.

THE COURT: Yeah.

MR. GAINER: And we did -- as Mr. Morrissey said, we did ask to move the plaintiff's deposition because of a coverage issue. But we understand that we have to get this deposition done. Thankfully, it can be done via video from IDOC, so it's a little easier.

THE COURT: Yeah.

MR. GAINER: So, I mean, we understand the Court's order to get this done. We understand Mr. Morrissey's desire to get this done. So if you can give us to mid-May, that would

35

be very helpful.

THE COURT: Okay. So I'm going to close fact discovery May 30th.

MR. GAINER: Great.

THE COURT: And then I'm going to move that status. And then we'll come back, and I'll have ruled on the class cert, and then we'll see kind of where we're at.

And you may not get to go back to Judge Cummings. That's the problem.

MR. GAINER: Right.

THE COURT: We lost Judge Cummings.

But, you know, I do occasional settlements. I mean, I'd be happy to talk through a settlement if that's something we can do because I love that you're getting an ADA person in there.

MR. GAINER: Right.

THE COURT: And hopefully it can -- it might put you out of business.

MR. GAINER: Oh, I wouldn't worry about that.

THE COURT: Dawn, I need a new date. Early June, I guess.

THE CLERK: One second.

THE COURT: How about June 7th.

THE CLERK: Looks like we're on trial. I don't know.

THE COURT: Yeah, that's not a good day.

36

Have you been back on trial?

MR. GAINER: So I just finished one in the Daley Center. I haven't been back in here, though. I had a trial with Judge Shah that ended two days before COVID, and I haven't been on trial here since.

THE COURT: Well, we're back. It's nice to be back.

MR. GAINER: I heard.

THE COURT: It's nice to be back.

Oh, David Martin. He's not going to go. How about -- how about that Thursday.

THE CLERK: The 15th? No.

THE COURT: Oh, my God. We're really moving things up, aren't we.

THE CLERK: We can do --

THE COURT: You want to say June 9th, 9:00?

THE CLERK: Sure.

THE COURT: Okay.

MR. GAINER: That works.

THE COURT: June 9th, 9:00.

MR. GAINER: Thank you, Judge.

THE COURT: Yep. In person.

MR. MORRISSEY: Thank you for your time, your Honor.

THE COURT: Thanks. Have a great day.

MR. GAINER: Everybody have a good day. Thanks.

MR. BENTLEY: Thank you.

Exhibit 2 Page 9

37

THE COURT:  Good luck, Mr. Bentley.

MR. BENTLEY:  Thank you, Judge.

THE CLERK:  Court is adjourned.

(Concluded at 11:12 a.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

_/s/ LAURA R. RENKE_                    _March 27, 2023_
LAURA R. RENKE, CSR, RDR, CRR
Official Court Reporter

Exhibit 2 Page 10