Transcript of the Testimony of
**ERIC DAVIS**

**Date:** June 5, 2024

**Case:** WESTMORELAND VS. DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

ERIC DAVIS
June 5, 2024

Page 130

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EUGENE WESTMORELAND,          )
                              )
          Plaintiff,          )
                              )
              vs.             )   No. 23-cv-1851
                              )
COOK COUNTY SHERIFF           )   Day 2
THOMAS DART, et al.,          )
                              )
          Defendants.         )

        This is Day 2 of the deposition of ERIC DAVIS, taken via Zoom videoconferencing, called by the Plaintiff for examination, taken pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before PEGGY A. ANDERSON, a Certified Shorthand Reporter of the State of Illinois, on June 5, 2024, at 2:00 p.m.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 131

A P P E A R A N C E S:

            THE LAW OFFICES OF:
            THOMAS G. MORRISSEY

            BY:  MR. THOMAS G. MORRISSEY
                 MR. PATRICK MORRISSEY
                 10257 South Western Avenue
                 Chicago, Illinois  60643
                 (773) 233-7901
                 tgm@morrisseylawchicago.com
                 pwm@morrisseylawchicago.com

                 Appeared on behalf of the
                 Plaintiff;

            THE LAW OFFICES OF:
            DEVORE RADUNSKY
            BY:  MR. ZACHARY STILLMAN
                 MR. JASON DEVORE
                 230 West Monroe Street
                 Suite 230
                 Chicago, Illinois 60606
                 (312) 300-4479
                 jdevore@devoreradunsky.com
                 zstillman@devoreradunsky.com

                 Appeared on behalf of the
                 Defendants.

ALSO PRESENT:
Ms. Hannah Cohen, Law Clerk

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 132

            I N D E X
WITNESS                              PAGE

ERIC DAVIS

DIRECT EXAMINATION BY
MR. MORRISSEY:                       133
CROSS-EXAMINATION BY
MR. STILLMAN:                        251

REDIRECT EXAMINATION BY
MR. MORRISSEY:                       254


            E X H I B I T S

MARKED                               PAGE
PLAINTIFF'S EXHIBIT NO. 1            142
PLAINTIFF'S EXHIBIT NO. 8            162


            *******

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 1

ERIC DAVIS
June 5, 2024

Page 133

(WHEREUPON, the witness was first duly sworn.)

WHEREUPON:

ERIC DAVIS, called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MORRISSEY:

Q    Good afternoon.  Mr. Davis, I believe I didn't ask you this, but can you tell me a little bit about your license as an architect, your licensure?

A    I am an Illinois licensed architect.

Q    And when did you become licensed as an architect?

A    1989.

Q    And did you previously work for Globetrotters?

A    In 1998, I believe it was, yes, 20 -- or whatever that is, 26 years ago, yeah.

Q    Did you ever provide architectural services in the private sector for public entities?

ERIC DAVIS
June 5, 2024

Page 134

A    Most of my career has been architectural services in the private sector for public entities.

Q    Do you consider -- are you qualified -- Let me rephrase the question.

What are your qualifications in regards to an understanding of the 1991 and the 2010 ADA standards?

A    Well, there is no separate certification or licensure specific to ADA, but my qualifications about the ADA and understanding of it are -- include licensure which is the location where the ADA is exercised and enforced.

In addition, I have taken, I believe it was, an eight-part course through continuing education specifically about the Americans with Disabilities Act.  I have -- I also took another one.  There was a course I took recently in interpreting the 2010 CIP -- or ADA rather specific to that.  I have also taught aspects of the Americans with Disabilities Act to graduate architecture students at the School of the Art Institute of Chicago.

ERIC DAVIS
June 5, 2024

Page 135

So both in terms of my professional licensure in general and in specific education, I have a fair degree of understanding of the ADA and have for some time.

THE REPORTER:  Tom, can you give me just one moment?

(WHEREUPON, the record was read as requested.)

BY MR. MORRISSEY:

Q    So would you rate your understanding of the ADA to be very strong?

A    Yes.

Q    In regards to this east corridor ramp that's the part of the Westmoreland case, can you tell me your understanding of how the 2010 standards define what is a ramp?

A    Well, you have it on your screen there, but a ramp is -- as it notes, is a walking surface with the slope steeper than 1 in 20.

Q    And would you agree that in regards to this east corridor ramp, east corridor passageway, that it would fall within the definition of a ramp because it is steeper than

ERIC DAVIS
June 5, 2024

Page 136

1 to 20?

A    Yes.  The east corridor, yes.

Q    And because it's defined as a ramp, does that mean it has to -- the slope of the ramp has to be less than 1 to 12 -- I'm sorry.  Let me ask the next question.

Under Section 405, it says:  Ramps have the following requirements.  Under "A" it says:  405.2, Slope.  Ramp's run shall have a running slope not steeper than 1 to 12 inches.

A    Yes.

Q    Do you agree that that's the standard for a slope for a run?

A    That is the limitation.

Q    When you say a "limitation," what do you mean in regards to the 2010 standards?

A    So a ramp under the ADA could be anywhere between a slope of 1 in 12 and a slope -- generally 1 in 12 and 1 in 20.

In other words, if you had a section of walkway that had a slope that was 1 in 16, that's still a ramp.  It's not required to be as steep as 1 in 12, but if it's steeper than 1 in 20, it's treated as a ramp.

Exhibit 1 Page 2

ERIC DAVIS
June 5, 2024

Page 137

So any sloping walking surface between a slope of 1 in 20 and 1 in 12 is considered a ramp in general under the ADA.

Q    And if a ramp has a run that's steeper than 1 to 12, that would be violating the 2010 standards?

A    That's correct.  For an area of walkway that is steeper than 1 to 12, yes, that would not be considered to be compliant, if a compliant ramp is called for in that location.

Q    And if the steepness was 1 to 10, would that be a significant steepness in regards to the 2010 standards in regards to a slope?

A    As far as characterizing it as significant, I think that's a subjective term. It would not be compliant.

Q    Well, I'm not -- when you say something is not compliant, that means it violates the 2010 ADA code, correct?

A    And/or any other applicable codes, yeah.

Q    Is there anything in the 2010 standards or the 1991 standards that provide

ERIC DAVIS
June 5, 2024

Page 138

for a -- less than a 1 to 12 steepness for a ramp, ramp run?

A    So to be clear, if you're asking if such things are allowed in buildings, that's one question.  If you are asking are there ramps like that that are considered compliant with the ADA codes, that's another matter.  And I say that because it is feasible within buildings to have sections of walkways that are -- and I want to be clear and complete, that's why I'm saying this.

There may be situations in buildings that have walkways that are steeper than 1 in 12.  But because they are not designated as an accessible route, they may be allowed to be steeper.  But if there are areas in the path of travel that are considered to be or need to be accessible and you have an area that's steeper than that, then, no, it would not be allowed.

In other words, you can have areas steeper, like in a building, but not on what's called an accessible route.

Q    Is the RTU east corridor considered a path of travel for detainees at the Cook County

ERIC DAVIS
June 5, 2024

Page 139

Jail?

A    It's considered an accessible route, yes, and it is a path of travel, yes.

Q    So if the path of travel had a run -- Let me rephrase it.

If the east corridor ramp has a run which is steeper than 1 to 12, that would violate the 1991 and the 2010 ADA standards for it?

MR. MORRISSEY:  Was there a response, Peggy?

THE REPORTER:  I didn't hear one.

BY THE WITNESS:

A    I said correct, yeah.

BY MR. MORRISSEY:

Q    I didn't hear you, Mr. Davis.  I'm sorry.

A    Okay.

Q    Going down to Number D -- or I'm sorry -- Number B under Section 405, it says: 405.5.

For a ramp, are handrails required?

A    In general, yes.

Q    And if we look at -- I'm sorry.  I

ERIC DAVIS
June 5, 2024

Page 140

had the wrong section.

Section 505 --

A    Right.

Q    -- for handrails.  Under 505.4, as far as heights, it says:  The top of the gripping surface of the handrail shall be 34 inches minimum and 38 inches maximum vertically above ramp surface.

Now, as an ADA expert, when it says the gripping surface of a handrail shall be 34 inches minimum, if it's less than 34 inches minimum from the ramp -- vertically from the ramp's surface, would that be a violation of the 2010 ADA code?

A    Yes.

Q    Why does the -- Can you provide an explanation for me why the ADA 2010 code requires a gripping surface for a handrail shall be at minimum 34 inches vertically above the ramp's surface?

A    So standards like this, when they are developed and refined, can address a variety of needs.  I would have to do some investigation on the specific history of this particular

Exhibit 1 Page 3

ERIC DAVIS
June 5, 2024

Page 141

item; however, I expect that that standard was developed by the experts with the Department of Justice in response to the specific dimensional requirements of people in wheelchairs, people using walkers, people using canes.

I suspect it is intended to address -- to get the optimal location relative to a variety of needs.

Q    So it's your understanding that for all of these code requirements under -- for a ramp, there's a reason behind it?

A    Yes.

Q    And the reasons are to -- are to provide a universal standards so that disabled people with many varieties of needs can utilize, for instance, a ramp to go up and down.

Is that fair to say?

A    I'm not sure it's always possible to be universal, which is the term that you used, but I think it's optimal, is probably a better way to characterize.  But in general, yes.

Q    And if we look at the 505-10.1, Top and Bottom Extensions at Ramps, it says:

ERIC DAVIS
June 5, 2024

Page 142

Ramp handrails shall extend horizontally above the landing for 12 inches minimum beyond the top and bottom of the ramps -- ramp runs.  And then there is a configuration right below it. And it's included in Globetrotters' report, which is Exhibit Number 1.

A    Uh-huh.

Q    Can you explain why for the top of a ramp, why there is a need for a 12-inch minimum extension of the handrail?

A    So -- and I'm not someone who is typically using a wheelchair or a ramp or a cane -- I mean, a wheel or a cane, but in general, when you approach a ramp, you sort of need to prepare to go up it or down it.  If you need to use it in part to help steady yourself, the idea is to get yourself able to be steady before you proceed onto the ramp.

I suspect that that's an element that was calculated as providing sufficient opportunity for somebody in a wheelchair or with a walker or with a cane to steady themselves before going up or down a ramp.

I would note that in the case of a

ERIC DAVIS
June 5, 2024

Page 143

stair, this has been altered from the '91 ADA. At the bottom in the case of a stair, there used to be a requirement for an extension past the end of the stair and an additional distance. So it would end up being like a 1 foot 11 inches, and they changed it, I believe in the 2010 ADA, to be just the 12 inches.

So it's based on the evaluation of the need to steady one's self going up or down a ramp or flight of stairs.

Q    And the reason for the -- your understanding of why the 2010 ADA standards require a 12-inch extension of the handrails at the top and bottom of the ramp is to provide the optimal opportunity for a variety of wheelchair, walkers, or cane users to be able to access a ramp.

Is that fair to say?

A    That's a fair paraphrasing of what I said, yes.

Q    Did I misstate that?

A    No.

Q    Or can you perhaps state it in a more professional manner than I did?

ERIC DAVIS
June 5, 2024

Page 144

A    I believe I said so before.  So I'm fine with your characterization of it.

Q    And if the extension of a handrail, let's say at the bottom of a ramp, is less than the minimum of 12 inches, let's say it was 11 inches, that would be in violation of the ADA 2010 standards.

Is that fair to say?

A    Yes.

Q    To your understanding of the ADA 2010 code, does it provide any wiggle room for a public entity built -- for a building built after 2010 to have an extension, handrail extension, of less than 12 inches at either the top or the bottom of the ramps?

A    Allowing for possible variations due to construction tolerances, which I don't know if they would apply in this case, I would say in general, no, that it's supposed to be 12 inches.

Q    As an architect, when you were in private practice, I guess -- well, as the deputy of Capital Planning with responsibility for overseeing -- oversight of design and

Exhibit 1 Page 4

construction of work at the Cook County Jail and the courthouses, would you advise contractors for Cook County to install a handrail that was less than -- that didn't have a 12-inch extension of a handrail at the bottom of a ramp?

A   Unless there was some kind of obstruction, which sometimes happens, or some other physical condition that prevented that from being constructed that way, no. I would say that they would need -- if there was -- let's say the wall turned and there was no way to do that without creating another obstruction or it would block a door or things like, absent those kind of conditions, if it was just a standard run, I would say no, it needs to be 12 inches.

Q   Are there avenues for contractors and architects and engineers to seek approval of an exception when designing a public building that includes a ramp if there's -- if there are physical obstructions that preclude the strict compliance under the 2010 standards for a ramp?

A   So let's use this particular location

as an example. Now, to be clear, I wasn't working at the County when this was constructed, but it would have applied in this case because of the timeline of when it's constructed.

The licensed architect designing the ramp should be indicating that the handrail should extend 12 inches beyond. If there was a variance or something precluding that, you know, they would bring that to their attention.

If I was an owner, if I were in this position and the architect said in the course of developing or presenting the drawings, hey, I understand that there's supposed to be 12 inches, there is this condition over here, I as an architect consider it to be compliant or allowable to have an exception in this case. As the owner, I'm not taking a licensure responsibility, I have an oversight, but the licensure is really the architect of record.

The other piece of it is that the drawings that the architect does, would in this case go to the city of Chicago and the mayor's office of people with disabilities during the

permitting process and they would review that.

They may have a question and say, for example, hey, I'm looking at this floor plan. It's showing a handrail extension is less than 12 inches. What's going on? That's a fairly common circumstance in the profession. The plan reviewer may have a question. The licensed architect may make their case; and then in that case, the city of Chicago, which in that case would be the authority having jurisdiction, may make a ruling to say we consider this to be consistent with the applicable laws. That's how these things go.

Q   Well, my question wasn't about the city of Chicago. It was about the federal government.

The federal government enforces ADA standards, correct?

A   The federal government sets the standards, yes. They establish the laws.

Q   So my question really was directed to is there any agency with the federal government that during the design phase of a building, an architect of record can seek out an exception

from one of the requirements for a ramp if there is some physical obstruction that precludes strict compliance under the 2010 standards?

A   There is a mechanism that the Department of Justice has where they have technical advisors where a practicing architect can call them and ask them for their interpretation, but usually when you do that -- and I have done that in private practice on other projects. You can ask and say, here is an area that I don't understand. My interpretation is this. Do you think I'm interpreting this correctly?

The Department of Justice or technical representative may say, yes, I think it is a reasonable variation or, no, it's not. However, in almost every case, I believe, legally -- and you're the lawyer, I'm not -- in that case they delegate the enforcement responsibility to the local agency having jurisdiction, just as there may be federal laws, but Chicago police may arrest someone.

So it's a situation where they

Exhibit 1 Page 5

ERIC DAVIS
June 5, 2024

Page 149

delegate that, but then similarly the city of Chicago may turn around and consult the DOJ also.

But, yes, there is a mechanism, an ADA help line that they have that allows architects to seek guidance from the Department of Justice. It's not very typical. It's usually only very unusual situations. The normal situation is for that to be handled by the local permitting authority.

Q   Now, you have had an opportunity to review the blueprints or drawings for this east corridor ramp?

A   Yes.

Q   Mr. Davis, have you reviewed the construction drawings for the east corridor ramp?

A   Yes, I have.

Q   Do you know if the construction -- would you call them construction drawings or the permitted drawings? How do you describe the final drawings for a project such as the RTAs?

A   This is an ongoing source of -- I

ERIC DAVIS
June 5, 2024

Page 150

have discussed this several times. Colloquially in the profession they are referred to as construction documents. The reality is because contractors often produce something that are called shop drawings, and those shop drawings are actually the basis for what physically gets constructed.

They get called construction documents. I prefer to call them contract documents, but, yeah, they're colloquially referred to as construction documents.

Q   So you have reviewed what you would confirm are the contract documents for the construction of the east corridor ramp?

A   It was a few months ago, but, yes, I believe I have, yeah.

Q   For the top landing --

(WHEREUPON, an interruption in the proceedings occurred.)

THE WITNESS: Jason, you need to mute yourself. Thank you.

I'm sorry, Tom.

ERIC DAVIS
June 5, 2024

Page 151

BY MR. MORRISSEY:

Q   For the top landing --

A   Yes.

Q   -- for the east corridor ramp --

A   Yes.

Q   -- for the construction drawings or contract drawings, did it have a top landing of 9 inches?

A   I don't know if it was -- if the document showed 9 inches. I believe that the -- my recollection from reviewing it was that there was a variance between the top and bottom elevation numbers that were provided in the architectural drawings from the top and bottom elevation drawings that were provided in the structural drawings. I think there was some variance there.

Typically in an element like this that was constructed out of reinforced concrete, you would follow the structure drawings.

My recollection is that there was a variance in the drawings between what the architectural plans were showing for the

ERIC DAVIS
June 5, 2024

Page 152

elevations and what the structural drawings were showing for the elevations. I don't recall the 9-inch dimension that was revealed in the Globetrotters' report as having been a dimension that was specified. I don't think that -- I can't imagine that they would stipulate 9 inches.

I can only speculate that the actual offset turned out to be different from what they thought was out there and they may have extended it or, in connecting the dots, may have needed to make the ramp at the top longer than they had expected to do. I don't know.

As I said, when I looked at the drawings, there was some variance in the elevations, but I don't know the construction history of that part of the building.

Q   The top landing for the east corridor ramp is 85 percent short of the required -- the minimum required element for a landing. The landing has to be 60 inches minimum, correct?

A   I believe we discussed this yesterday. Yes, that's approximately -- yeah. I don't know if it was 85 percent, but that

Exhibit 1 Page 6

Page 153

sounds about right.

Q   Well, if we look at Page 10 of the report, I think Globetrotters calculated it as 85 percent short.

Do you see where it talks about the top landing being 85 percent short of the required length?  That would be 85 percent short of the minimum required length for the top landing, correct?

A   I don't know if I have the same version that you do.  I need to check with -- because as I said, this was commissioned by counsel.  The version that I have doesn't include -- doesn't coincide with what you have on the screen here.

Q   All right.  Well, this is the document that was filed initially.

A   Okay.  I mean, I believe you.  I'm just saying -- I'm looking at the version of it that I have, and it's different than that.

Q   What document do you have?

A   It must have been an earlier version. I don't know.

Q   Well, can you tell me exactly when

Page 154

you received the earlier version?

A   Oh, it is a draft.  I'm sorry.  This is an earlier version.  I don't know when I got it.

Q   What is the date of the draft?

A   I think this draft is maybe in March. It's not clear to me.  What is the date on the cover of yours?

Q   My date is April 1st.  It was filed --

A   Oh, no, this is -- yeah, I have one March 25th.  So I have the wrong one.  Okay.

Q   It was filed on April 6th, 2024.

MR. STILLMAN:  Eric, the one in your -- there's the version of it that's attached to your Declaration that we sent you.

THE WITNESS:  Oh, is that the final one?  Okay.  I'm sorry.

MR. STILLMAN:  Yeah.

THE WITNESS:  I had just pulled up the regular version that I had.  Let me look in here so I'm following the right thing.

Page 155

Yeah.  Okay.  I have got the -- April Fools' Day.  Okay.  Okay.  I was looking at the wrong one.  I'm sorry, Tom. Can you ask your question again?

BY MR. MORRISSEY:

Q   Sure.  What Globetrotters found based upon their LIDAR -- use of the LIDAR was that the upper ramp, the landing is 85 percent short of the required length for the top landing, the minimum required length for the top landing.

A   Right.

Q   Wouldn't that -- wouldn't an architect of record have been aware of that deficiency when the project was completed?

A   I would expect that to be the case, yeah.  I am at a loss to understand why it would have been constructed this way.  I simply don't know.

Q   And when a project of the -- the magnitude of the RTU building and the east corridor ramp was a project publicly stated to be in excess of $84 million, my understanding having litigated this issue in previous years.

Can you explain to me the normal

Page 156

process for Cook County to approve the construction of a project at the completion to make sure that it complies with all requirements, code requirements, including the 2010 ADA standards?

A   So typical process, which I assume would have been followed at this time, would have been to have the architect of record review the conditions as constructed, and there's a process called final acceptance that typically the architect of record would sign off on saying that the building as constructed is consistent with the intent of the drawings.

There are sometimes variations in construction that occur because of what are called means and methods; but as long as they are following the intent, the architect would typically sign off.

So I can only suspect that the architect of record may have gone through and approved it and hadn't checked this particular element.  I'm only speculating.  But typically the architect of record would go through to verify for the owner, in this case the County,

Exhibit 1 Page 7

ERIC DAVIS
June 5, 2024

Page 157

that the building that is constructed was consistent with their drawings and with their intent.

Q    Going down a little further here for the intermediate landing.  Now, I don't think we discussed this before, but for a ramp that has a rise above -- I'm sorry.  Let me rephrase the question.

By going back to Page 6 of Globetrotters' report, defines the requirements for a ramp.  In "D" it talks about, under 405.6, Rise:  The rise for any ramp run shall be 30 inches, and then it uses the word maximum.

A    Yes.

Q    Can you tell me -- first of all, explain what a rise is in relation to a ramp.

A    It's the vertical distance measured between the bottom of the area of the ramp and the top.  And when I say that, the distance between the part where the ramp starts to slope up and the part where the ramp stops sloping up.

Q    In reviewing Globetrotters' report,

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 158

would you agree that the east corridor ramp, the rise of the east corridor ramp, greatly exceeds 30 inches?

A    You mean the ramp overall or do you mean the sections of the ramp as identified here as upper and lower?

Q    I mean starting at the bottom of the ramp to the top of the east corridor ramp, that rise exceeds -- that run exceeds 30 inches?

A    So if you're asking is the rise between the bottom landing of the ramp and the top landing of the ramp greater than 30 inches, yes, the rise is greater which would necessitate an intermediate landing, which is I think what you're asking.

Q    So in regards to an intermediate landing, if we go to Page 10.

For a ramp that requires an intermediate landing, the length of the landing has to be a minimum of 60 inches; is that correct?

A    Yes.

Q    Why does the 2010 standard, and also I believe the 1991 ADA standard, require a

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 159

minimum of a 60-inch length for an intermediate landing?

A    So it's my understanding that the purpose of the intermediate landing is to provide a place of rest or relief for an individual that is attempting to negotiate or go up or down the ramp over a certain distance.  But beyond that, there is -- and, again, this is a compromise worked out with individuals that are disabled and the Department of Justice and architects, et cetera, in the construction of the law.

It is needed to provide a place of rest between going up or down one section and the next.  I believe it is also related to having a place -- let's say you are coming down a ramp and you are in a wheelchair.  If the ramp was continuous, it might accelerate too much and really create a hazardous condition and just sort of facilitate one's ability to stop and not end up rolling all the way down the ramp.

There is a need for that in stairs, and I believe it's a similar need in ramps.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 160

But it's basically to provide a place of respite.  And if the person, let's say, in the wheelchair needs to adjust the direction they are going, they can do it on a stable level platform rather than having to try and do that in the middle of a ramp.

Q    I was going to mention that Mr. Darr, the Globetrotters' lead architect, mentioned that for a person that is wheelchair-assisted, if they were going up the east corridor ramp and got to the intermediate landing and decided, well, maybe I have to go back into my housing unit, the intermediate landing ought to give them enough clear space to be able to turn around and change the direction and go back down the ramp.

Is that fair to say?

A    That's also true and that relates, Tom, to what you were going through yesterday in terms of the 60-inch minimum turning area in toilet stalls and other areas like that.  It's a relatively standard dimension that allows people in wheelchairs to maneuver.  And as you are relating from Mr. Darr's statement that,

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 8

ERIC DAVIS
June 5, 2024

Page 161

yes, it would allow somebody also to turn around, yes.

Q    So when we're talking about 60 inches being the minimum length for an intermediate landing, the reason that that code requirement under the 2010 standard is there, based upon your understanding, is to provide, again, an optimal length for the intermediate landing -- I'm sorry.  Let me rephrase the question.

The reason for at least the minimum of a 60-inch length for an intermediate landing is to have a standard that optimizes the opportunity for a whole variety of disabled individuals, be they need a wheelchair or a walker or a cane, to be able to navigate this ramp without difficulty.

Is that fair to say?

A    I wouldn't use the word optimizes because optimally it may be longer than that. I believe the 60 inches is considered to be a minimum.  In other words, you would need at least 60 inches.  You could have a landing that's 72 inches.  That might be seen as more optimal.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 162

You used the word optimal, Tom, and I think maybe if we said that it needs at least 60 inches is a better way to characterize it.

Q    Well, yeah, I think I misspoke.  What I was referring to, and I think you agree with me, that the 60-inch minimum standard for a landing is there to provide at least a minimal standard for a whole host of people that have mobility disabilities --

A    I would agree with that.

Q    -- would you agree?

A    Yeah, I would agree with that, yes.

Q    And anything less than a 60-inch minimum intermediate landing would -- would be -- would not accomplish the same opportunity for people in wheelchairs, walkers and canes to be able to navigate a corridor which is defined under the ADA as a ramp?

A    I agree with what you're saying.

Q    Going back to the handrails -- Let me go back to your Declaration which is Exhibit 8 for a moment.

Now, part of your responsibilities -- Your Declaration in this case is Exhibit 8.  Do

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 163

you have that in front of you?

A    Yes.

Q    In Paragraph 2 you say:  In part, my duties and responsibilities also include the overseeing, development and implementation of Cook County's Capital Improvement Plan which involves engaging both architects and contractors to perform that work and working with our user groups to make sure that we are accomplishing their needs within the resources available.

My question is on an ongoing basis in regards to the Department of Corrections, your responsibilities include working with the Sheriff's Office to improve the accessibility at the Cook County Jail.

Is that fair to say?

A    Yes.

Q    And part of your responsibilities, when you're notified of a violation -- well, let me go back a step.

At the Cook County Department of Corrections campus, there are a few buildings that were built after the 1991 ADA standards

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 164

were in effect, correct?

A    Yes.

Q    And those buildings would include the RTU building?

A    Yes.

Q    The Cermak Health Service facility?

A    Yes.

Q    Are there any other buildings on the campus of the -- the jail campus that were built after the 2000 -- after 1991?

A    Yes.

Q    What other buildings were built after 1991, to your knowledge?

A    Two of them that come to mind are entry posts.  There is an entry post at post -- I believe it's Post 5 on the east side.  That is a place where the public and staff enter the DOC campus.

There is a similar kind on the entry post on the west side, on the Sacramento side, that is of the same vintage.  I believe they were designed by the same architect.  They were done before I came to the County.  But they are clearly post 1991.

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 9

ERIC DAVIS
June 5, 2024

Page 165

I would have to check. There may be one or more other structures on the campus that were constructed after that point. I would have to go through the records.

Q So you identify in Exhibit 8 that there are approximately 60 buildings that encompass -- that are within the confines of the Cook County Jail campus, correct?

A That's correct.

Q And other than the four facilities that you just mentioned, there are -- those buildings were all pre-passage of the ADA, correct?

A I would have to go back and look. I don't know the vintage of -- offhand the vintage of divisions -- well, actually no. Division 11 was built after '91, I believe. So that's another one that would be post '91.

I don't know about the vintage of Divisions 9 and 10. They are around that same time, but I don't recall offhand whether they were before or after '91.

So there are -- there are housing units as well as the RTU as well as the entry

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 166

posts, that sort of thing. I would need to go back to the records and check.

Q Are there known -- well, let me ask a preliminary question.

Under the 1991 -- under the -- when the ADA was passed in 19 -- I believe it was 1990, did Congress provide different requirements, code requirements, under the 1991 ADA standards for buildings that were built prior to 1991 and those buildings that were built after 1991 for public entities such as Cook County?

A I believe the Department of Justice issued guidance to agencies about how to address pre- and post-ADA buildings. It would be logical for them to have done so.

Q Based upon your general understanding of the ADA for buildings that were built prior to the passage of the ADA, public entities still have to provide reasonable accommodations for the public when using those facilities, correct?

A We can get into what you mean by "reasonable," but there are some requirements

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 167

for all buildings, regardless of their vintage, and then there are other requirements for buildings based upon when they were constructed.

In some cases, as you know, if they were construct -- building was constructed prior to the ADA that receive federal funding, there may have been, you know, UFAS requirements, other things. So there are different requirements for different kinds of buildings.

Q Well, that's correct. So if a public entity like Cook County received federal funding for, like, Division 10 that was built prior to 1991 but between, let's say, 1988 and 1991, they still would have to follow UFAS standards in regards to building construction.

Is that what you are saying?

A I would have to go back and research, but that's the kind of example I'm referring to. I can't speak to the specifics of the Division 10 example without investigating it.

Q But in general, if the Rehab Act -- in general, if a public entity had not received

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 168

federal funding prior to 1991, the public entity would still have to provide reasonable accommodations for the general public when they're using a public facility, correct?

A Again, each case is specific. Another -- it's not the example that you are referring to, but sometimes the answers to how public accommodation is to be accomplished may be impacted if there are historic preservation concerns or if there are existing structural conditions that would inhibit a particular accommodation. It's really specific to the location and time and configuration and things like that.

But in general, you know, yes, there are certain minimum requirements that they try to achieve. It's not necessarily feasible in 100 percent of the cases, which is why you have a review process.

But, yeah, in general, there are sort of minimum standards that you are supposed to achieve or try to achieve, and there are other caveats and qualifications on that as well.

Q For new construction after 1991,

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 10

ERIC DAVIS
June 5, 2024

Page 169

under the ADA, newly constructed public buildings were required to comply with the 1991 ADX [sic] standards, correct?

A   1991 ADA, I think is what you meant to say, yes.

Q   Yeah.  And for a public building that was built after 2010, the 2010 ADA standards would apply?

A   I don't recall what the specific date of enactment is or the date it took effect. The effective date of the 2010 standards may have been in 2011, for example.  But in general, yes.

If there was a new building built in, let's say, 2013, then, yes, it should be compliant with the 2010 standards.

Q   And clearly in regards to the RTU and the RTU corridor, Globetrotters reported that that they were required to comply with the 2010 standards?

A   Yes.

Q   And to your knowledge, the RTU doesn't fall into any exemptions such as historical preservation or any other exception

ERIC DAVIS
June 5, 2024

Page 170

to the 2010 standards?

A   I'm not aware of it.  It certainty wouldn't fall under historic preservation exception.  I believe there may be exceptions of a specific nature that have to do with security requirements, security operations requirements, but I can't speak to those on an individual basis.  I don't know what -- if there are any exemptions relative to how the facilities operated.  I can only tell you about its physical condition.

And like I said, there are some circumstances where because of the needs of safety and security of the detainees that there may be -- and I emphasize may be exemptions allowed.  But in general, no, it's supposed to be compliant.

Q   In regards to when a ramp, because the rise exceeds 30 inches, requires an intermediate landing --

A   Yes.

Q   -- with a minimum length of 60 inches, to your knowledge, does the 2010 ADA standards allow a government to have

ERIC DAVIS
June 5, 2024

Page 171

intermediate landing which, let's say, is 57 inches in length instead of the minimum of 60 inches by providing a reasonable accommodation by pushing wheelchair members of the public up or down the ramp?

A   To simplify matters, should the intermediate landing be 60 inches?  Yes.  Is 57 inches the same as 60?  No.

Q   So my question is more focused.  For a building that doesn't have to comply with the Rehab Act or was built before 1991, a public entity may provide a reasonable accommodation when an intermediate landing for a ramp is less than the 60 inches in length.

Is that fair to say?

A   I'm not sure I understand your question.  Are you asking if an intermediate landing on something constructed is -- we will use the 57 inches -- that the public agency is supposed to provide an accommodation such as having somebody in a wheelchair always be escorted or provide assistance to that person?

Is that the kind of thing that you are asking?  It's not clear.

ERIC DAVIS
June 5, 2024

Page 172

Q   My question is assuming that, let's say, a building on the Cook County correction campus was built in 1980 and had a ramp that was -- that the rise was greater than 30 inches which required an intermediate landing and also that intermediate landing was, let's say, 57 inches in length, would it be permissible under the ADA code in 1991 for the public entity to provide a reasonable accommodation for a wheelchair person going up or down the ramp?

A   I have to investigate the specific condition, Tom.  I can't give you an answer about -- that specific about how or what sort of accommodations would be allowable for a building of that vintage under the '91 version of the ADA.  I would need to research that a little bit.

Q   Okay.  Well, let's say the building instead was built in 2012 and was required under the 2010 standards to have an intermediate landing because the rise exceeded 30 inches.  And let's also assume that the intermediate landing length was only 57 inches.

Exhibit 1 Page 11

ERIC DAVIS
June 5, 2024

Page 173

The question that I have is, does the 2010 ADA code permit the public entity to an exception to the requirement for 60 inches for a minimum length because the public entity has a procedure to provide assistance for a wheelchair person going up and down the ramp?

A   I don't believe so, but, again, what you are talking about is an operational question, so I don't know if the operational provision of assistance provides an allowable exception.

I would say in terms of the facility, it's not compliant. But I don't know if that operational accommodation is such that it would provide an allowable exception. I don't know.

Q   Do you know if the 2010 ADA code has a specific provision that allows a public entity, such as the sheriff in this case, to have an intermediate landing that's less than 60 inches in length where an intermediate landing is required because the rise is -- exceeds 30 inches? Do you know if there is any provision that provides an operational exception for the Sheriff in the ADA 2010

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 174

standards?

A   I think I just answered. The answer is, no, I don't know if there is or is not.

Q   Where would you look to try to find the answer to that question?

A   So -- well, first of all, operationally what I would do is I would start by consulting our consultant -- if there was a question like that, I would start by consulting with our -- the team's ADA advisor, which I believe you mentioned yesterday in deposition is the firm of LCM, and then specifically Kate Susmilch from there.

If I was looking for something like that, realistically I -- because I'm the deputy director, I probably wouldn't take the time to look it up myself; I would have somebody else do that.

However, if I was asked to do that specifically, I would start by going through the ADA itself, and then I probably would also consult -- there are a series of guidances that the DOJ provides through their Website that can provide -- there are, you know, FAQ sheets.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 175

There are technical consultants. I probably would consult a variety of sources to see if there was something that was deemed to be permissible in terms of an operational accommodation.

Q   Has the Cook County Sheriff's office ever requested you or your department in Capital Planning to review whether or not there's an operational exception for an intermediate landing for a corridor ramp that's less than 60 inches in length where an intermediate landing is required because the ramp has a rise of over 30 inches?

A   I'm not aware of a request like that coming from the Sheriff. That may have occurred, but I'm not aware of it, no. I'm not aware of any requests like that.

Q   Has Cook County government, to your knowledge, ever sought a legal opinion in regards to whether or not assisting a wheelchair person up and down a ramp is permissible when the ramp itself was built after 2011 and did not comply with the 60-inch minimum length for an intermediate landing?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 176

A   I'm not aware of them asking whether or not that's allowable. No, I'm not aware of them asking for that. I think that the -- if I remember correctly, and I'm not an expert on their operations, the desire is to maintain security so that an individual would automatically be escorted; but I don't know if that's -- I'm not aware of a request or an inquiry about whether or not that complies. I'm not aware of that kind of question having been asked.

Q   To your knowledge, has -- have you or the Department of Capital Planning or anybody to your knowledge in the Cook County government ever been requested by the Sheriff's Office to opine whether pushing wheelchair detainees up and down the Cermak ramp is an exception from the requirement for the Cermak ramp to be a minimum of 60 inches in length?

A   I think this is the same question that you have asked a couple of times. I'm not aware of them asking a question like this about the operational side, whether or not that's allowable. I'm not aware of them asking that

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 12

ERIC DAVIS
June 5, 2024

Page 177

one way or the other.

Q   You're the person for Cook County that provides advice to users such as the Sheriff in regards to complying with the ADA requirements under the 2010 and the 1991 standards.

Is that fair to say?

A   Only regarding the facilities themselves.  I don't provide advice to the Sheriff on operations.

Q   So in regards -- you have thoroughly reviewed Globetrotters' April 1st, 2024 report in regards to the east corridor.

Is that fair to say?

A   I don't know how one would define "thoroughly."  Have I gone through and reviewed it?  Yes, I have.  I have reviewed it. Thoroughly is a different question.  I don't know how you would characterize that.

Q   As the representative for Capital Planning in regards to accessibility issues, do you agree with the Globetrotters' findings that the top landing violates the 2010 code because the length of the landing is less than

ERIC DAVIS
June 5, 2024

Page 178

60 inches?

A   I don't disagree with their assertion.

Q   And do you agree with the assertion of Globetrotters or the recommendation or the assessment -- Let me go back a step.

Exhibit 8 -- I'm sorry.  Exhibit Number 1, which is the -- is titled Tunnel Corridor Accessibility Assessment.  As the deputy of Capital Planning, is it your opinion that Globetrotters did a thorough and professional assessment of the east corridor ramp for Cook County?

A   I would say in general that their report seems to be pretty comprehensive, yeah. I mean, I can't stipulate as to perfection. But I would say it seems to be pretty thorough and professional.

Q   As a person that's well versed in the ADA, is there any -- anything in their report that's Exhibit 1 that you disagree with in regards to their findings in regards to the areas where the east corridor ramp is out of compliance with the 2010 ADA code?

ERIC DAVIS
June 5, 2024

Page 179

A   In terms of their citation of elements that are not compliant, yes, I would say -- I'm not aware of anything that I might take issue with in terms of their analysis of whether things are or are not compliant.

Q   What do you mean by the term "element"?

A   There are a series of things that they identify.  There's a whole group of -- they look at -- as you say, they look at the landing, they look at the ramp, they look at the landing, they look at the handrails, you know, all of those elements.

Q   As an architect, what other elements of the east corridor ramp would you expect a firm like Globetrotters to have reviewed in doing an assessment of the east corridor ramp to determine whether it complied with the ADA standards?

A   I'm not aware of them having missed any aspect in terms of assessing the accessibility of the east tunnel corridor ramp. I'm not aware of anything that they're missing in terms of having assessed whether or not it

ERIC DAVIS
June 5, 2024

Page 180

is accessible.

Q   Including six elements for the east corridor ramp, Globetrotters made certain findings whether or not -- for each element whether the ramp was in compliance or out of compliance with the ADA.

Is that fair to say?

A   They listed the six components in their report, yes.

Q   If, hypothetically, the Globetrotters found only one element to be out of compliance, let's say the 12-inch extension of the handrails at the top and bottom to the ramp, would the ramp be out of compliance with the ADA 2010 standards?

A   I hesitate to use -- Well, okay.  I would say yes, if there was only one element and they only looked at one thing and the element in question was not compliant with the standard that the ramp would not be considered accessible, yes.

Q   Assuming that, hypothetically, Globetrotters looked at the six elements that they did on Page 10 and 11 and found only that

Exhibit 1 Page 13

ERIC DAVIS
June 5, 2024

Page 181

the bottom length -- the bottom handrail extension and the top handrail extensions were out of compliance with the minimum of 12 inches per extension, would the east corridor ramp still be out of compliance with the current 2010 standards?

A   Yes.

Q   I didn't hear it.

A   Yes.

Q   It's one of the --

A   Yes.

Q   One of the problems I find is as somebody that's litigated for 45 years, being on Zoom, that sometimes you don't pick up a response, and probably the deponent probably doesn't hear the question.  But you answered affirmatively?

A   I answered in the affirmative, yes.

Q   In this case, Globetrotters, you would agree, did a professional job in assessing the east corridor ramp.

Is that fair to say?

A   That's fair to say.

Q   And they found that the top landing

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 182

was in violation of the code.

They found the upper ramp was not in compliance with the code because the last 4.27 feet of the run at the top has a rise of 4.56 for a slope of 1 to 11.

Three, they found the intermediate landing was not in compliance with the minimum 60-inch requirement for the length because it was only 57 inches, and the lower portion of the floor surface is not compliant because the lower 3 1/2 percent of the overall run is 11.7 percent steeper than permitted by the code and had a slope of, I believe, 1 to 8.5 and the handrails were not compliant with the ADA 2010 standards because the handrails, the bottom of the lower -- Let me rephrase it.

The handrails were approximately 33 inches above the floor ramp at certain locations which was less than the required 34 inches.

And finally, as you previously said, the handrail extensions didn't meet the code requirement of 12 inches minimum.

Is that a fair assessment by

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 183

Globetrotters of the violations they found with the -- violations of the 2010 code standards under the ADA for the east corridor ramp?

A   I think that's a fair summary of their analysis, yes.

Q   So as the deputy director for the Cook County Capital Planning with responsibilities for oversight under the ADA, would you agree that the east corridor ramp is -- violates the 2010 code standards under the ADA?

A   I would say, yes, it is correct to say it's not in compliance.  That's correct, yes.

Q   As the -- in your position, have you provided any guidance to the Sheriff of Cook County in regards to coming into compliance with the 2010 ADA standards in regards to the east corridor ramp?

A   Have I provided them with what?  I'm sorry.  I didn't quite hear everything.

Q   Sure.  To your knowledge, have you provided any direction to the Sheriff of Cook County in regards to the east corridor ramp not

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 184

being in compliance with the 2010 ADA standards?

A   I -- we talked about so many different accessibility issues.  If you're asking have I told them, hey, that RTU ramp is not compliant, I don't think we've actually issued any kind of, like, information or anything like that.

In this case, I don't know -- as there's litigation about it, I don't know -- you know, what would have been shared or not shared.  I know that the counsel commissioned this report.

So I don't recall telling them specifically, hey, we have this study that says it's out of compliance.  I don't know why I would, because we deal with the buildings, and they deal with operations.  But I don't remember, like, specifically, if you want to characterize it that way, you know, warning them or anything.  I don't think we have done anything along those lines.

Q   Would you agree that for a wheelchair user housed in the RTU that has an

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 14

ERIC DAVIS
June 5, 2024

Page 185

appointment -- Let me rephrase the question.

A    Actually, Tom, if you don't mind, could we take a brief break?  I need to use the restroom.

Q    Sure.  Do you want to come back at 3:30?

A    Sure.

Q    That's great.  We'll see you.

A    Thanks.

                    (WHEREUPON, a short
                    break was had.)

BY MR. MORRISSEY:

Q    The Exhibit 1, the tunnel corridor report by Globetrotters, does the east tunnel corridor provide a path of travel for detainees that are wheelchair bound and housed in the RTU building?

MR. STILLMAN:  I'm going to object to asked and answered.

        Go ahead.  You can answer, Eric.

BY THE WITNESS:

A    It is a path of travel.

BY MR. MORRISSEY:

Q    For wheelchair and other disabled

---

ERIC DAVIS
June 5, 2024

Page 186

prisoners that are housed in the RTU.

        Is that fair to say?

A    It is a path of travel for detainees, yes.

Q    And the RTU building houses, to your understanding, people that are wheelchair-assisted, use walkers and canes.

        Is that fair to say also?

A    It's my understanding that individuals with those disabilities, yes, are housed there.  Not necessarily all, but that there are people that have disabilities there.

Q    Are there people that have disabilities, mobility disabilities such as wheelchair, walkers and canes, do any of those individuals on a daily basis use the east corridor ramp to go to the Cermak infirmary?

A    I don't know because I haven't observed them myself.  My understanding is that, yes, it is a route from the RTU to Cermak.

Q    And there is a -- there is a short tunnel between the east corridor ramp and the Cermak corridor ramp.

---

ERIC DAVIS
June 5, 2024

Page 187

        Is that fair to say?

A    Yes.

Q    Approximately how long is that -- the length of that tunnel between the top of the east corridor ramp and the top of the Cermak corridor ramp?

A    I don't know offhand.  I would have to look on -- I would have to look into drawings.

Q    Is it less than 60 feet?

A    I would say probably, yeah.

Q    I believe Globetrotters, you testified yesterday, found that the Cermak corridor ramp violated the 2000 -- violated the ADA 1991 standards because the intermediate ramp was less -- the length of the intermediate ramp was less than 60 inches.

        Is that fair to say?

A    I believe your question just now was about Cermak, or is it about what the intermediate ramp landing, what --

Q    I'm sorry.  My question is directed to the recommendations and findings by Globetrotters in regards to the Cermak corridor

---

ERIC DAVIS
June 5, 2024

Page 188

ramp.  And the question is, it's your understanding that Globetrotters found that the Cermak corridor ramp also violated the 1991 ADA standards?

        MR. STILLMAN:  Objection, relevance.  You can answer.

BY THE WITNESS:

A    Yeah.  Yes, I'm aware that that was their assessment.  Yes.

BY MR. MORRISSEY:

Q    And you testified yesterday that Cook County is in the process of renovating the Cermak corridor ramp.

        Is that fair to say?

A    Yes.  Yes.  For some reason when I just say yes, it doesn't seem to come through.  I don't know what the deal is there, but yes.

Q    Your Declaration, Exhibit Number 8, discusses a timetable for addressing ADA violations -- Well, let me rephrase the question.

        Your Declaration in this case -- Westmoreland, which is Exhibit Number 8, discusses assessing the entire Cook County

Exhibit 1 Page 15

Page 189

corrections campus to determine whether there are any ADA violations.

Is that fair to say?

A    That's correct, yes.

Q    And part of -- and Phase I -- Well, let me rephrase it.

That request for qualifications is broken down into three discrete parts for the Cook County campus?

A    Yes, that's correct.

Q    What parts of the Cook County corrections department campus is included within Phase I?

A    To be clear, it's not a phase. It's packages. Phase suggests that we might do one before the other.

But if you are referring to Package 1 as is stipulated in the RFQ, essentially from a line that runs south of the existing Cermak facility, south of the RTU, north of the dorms and north of Division 6, yeah.

So the RTU and Cermak and Division 5 and the connecting tunnels between Cermak, Division 5 and the RTU would be included in

Page 190

Package 1.

Q    In Package 1, would the RTU building be included?

A    I believe that's what I just said, yes.

Q    And are there known ADA violations presently in regards to the RTU building?

A    I believe that's what we are discussing here.

Q    Well, other than the east corridor ramp, are there other known ADA violations in the RTU housing building?

A    I have no idea, Tom, that's why we were putting out the RFQ to have people look at it comprehensively.

Q    Is the RFQ for Part 1 or Package 1 including the east corridor ramp?

A    Yes.

Q    Pardon?

A    Yes, sir. Yes, it is.

Q    So Cook County is going to expend more money to assess the east corridor ramp a second time when Globetrotters has already done a thorough analysis for the Sheriff of Cook

Page 191

County?

A    We will include the information from Globetrotters' assessment in the information that is provided to the successful vendor for Package 1 as is outlined in my remarks. The intent is to look at -- in this case, to look at the east RTU ramp in the context of its surroundings, both in the context as you have been asking about, about a route from the RTU to Cermak via the ramp, also about the route from the RTU to the north on the corridor to Division 5.

The intent is to look at it comprehensively. We would expect that they would review Globetrotters' report and probably include it as an attachment or some kind of reference. I would expect that the extent to which they would duplicate the effort of the Globetrotters' review would, however, be limited to reviewing what Globetrotters has done.

We are not asking the firm to conduct a full assessment a second time in this case, simply to take this information and incorporate

Page 192

it into a broader analysis of the various paths of travel and the various elements that they find in the surrounding context.

Q    Does the Package 1 RFQ also involve reviewing the accessibility of the Cermak corridor ramp?

A    Yes. We will ask them to look at that report as well, yeah.

Q    Does the RFQ that was issued by Cook County and now is -- the bid is -- or the date for responding now is, what, today?

A    Today. In the meeting immediately before this meeting, Tom, it was confirmed to us by the procurement department that the period of submittals -- actually it's after 3:00 o'clock -- has ended, that they have received submittals for that and that the period, as I have said -- and I believe that the response period ended at 3:00 o'clock, so about 45 minutes ago.

Q    Did the RFQ specifically say that -- for Package 1 that the architectural/engineering firm would be assessing the east corridor ramp, the Cermak

Exhibit 1 Page 16

ERIC DAVIS
June 5, 2024

Page 193

corridor ramp and the north corridor passageway for the RTU?

A    It didn't specifically stipulate those because it's a request for qualifications.  We are looking for the qualifications of the firm.

As the RFQ stipulates, once we have identified the most qualified team for the assignment for Package 1, we will share with them all of the information that we have available about the entire campus, building floor plans, anything -- and things like the analysis of the Cermak ramp and the analysis of the RTU ramp, we'll provide all of that information to them.

In the interest of brevity and clarity, we are looking at this stage in the process to identify the most qualified firm to do that.  We are not giving them a complete laundry list of every single document that we would provide to them.  We are simply indicating the areas so that they can understand what the need is and submit their response to suggest why they would be the most

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 194

qualified firm.

Q    Digressing for a moment.  Yesterday you said LCM.  You were going to call them this morning to see whether or not the top landing -- doors at the top landing could be moved so that there would be a minimum of 60 inches length for the top landing of the east corridor ramp.  Did you call LCM?

A    I looked at -- I realized that Kate was the woman -- I found out this morning that Kate, the woman from LCM that is our lead on this project, is off on PTO today.  I believe she's in Washington at the AIA convention or some other conference.  I will talk to her when I get back.  I didn't realize she would be out, but apparently she's out today.

Q    Now the RFQ, did that ask people to bid on specific packages?

A    No, it indicated we'll look at the submittals and evaluate which team or firm seems to make the most sense for which of the packages.

Q    So why if -- Well, let me go back a step.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 195

The notice to proceed to HDR for design work of the Cermak corridor ramp has not been issued?

MR. STILLMAN:  Objection, relevance.  You can answer.

BY THE WITNESS:

A    We talked about it yesterday.  In the meeting, as I mentioned today that we had with procurement, I spoke specifically about that issue to the procurement folks, and I have been assured that they will be issuing the PO within the next couple of days.

BY MR. MORRISSEY:

Q    Okay.

A    I can't stipulate as which day it will happen, but I did ask and I stressed the importance of getting that out, and so we are looking to have that issued here very shortly.

Q    So as of today, the HDR has not been given the green light to begin drawings.

A    That's correct.

Q    Is that fair to say?

A    That's correct.

Q    And has there been any amendment to

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 196

the contract to Globetrotters due to the fact that they will not be providing preliminary drawings under their contract for the east corridor -- I'm sorry.  Let me rephrase the question.

Under the transfer package, Globetrotters is contractually required to provide preliminary drawings for the renovation of the Cermak corridor ramp.

Is that fair to say?

A    Yes, and I can tell you, Tom, that I also spoke with procurement today about that specific item and, in fact, I actually mentioned what you put on the screen in our deposition yesterday to underscore the urgency of this.  And similarly, I have been assured -- they had a question regarding the amount of board action, et cetera, and I have been assured that they are going to be issuing that contract modification to Globetrotters, again in the next couple of days, so that they should be able to proceed with the development of the transfer package.  So we expect to have the notice to proceed for Globetrotters here in the

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 17

ERIC DAVIS
June 5, 2024

Page 197

next couple of days.

Q Why is there suddenly an urgency -- first of all, who have you spoken to from procurement in regards to the HDR notice to proceed?

A Deputy Chief Procurement Officer Robert Stuart.

Q And that was this morning?

A That was this afternoon actually, immediately before this -- immediately before this meeting.

Q Okay.

A And I should note -- to be clear, it is our regular meeting that we have with them every two weeks. It happened to be this afternoon at 1:00 o'clock.

Q Robert Stuart is -- As of today, Globetrotters has not been advised that their transfer package will not include the preliminary drawings for the Cermak corridor renovation.

Is that what you're saying?

A No. You're talking about two different things. You're talking about --

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 198

Q Well, let me -- On March 12th, 2024, you were deposed in Walker.

A Yeah.

Q And you made this statement in regards to the Globetrotters transfer package: It is the drawings and specifications -- or preliminary drawings and specifications --

(Reporter clarification.)

MR. MORRISSEY: I'm sorry. I was talking away from the microphone. All right.

BY MR. MORRISSEY:

Q On March 12th, 2024, you made this statement in your deposition in regards to Globetrotters transfer package: The transfer package is the drawings and specifications -- or preliminary drawings and specifications to stipulate the elements of the design that are to be constructed. Because we are doing an assessment ahead of time, we need to have clarity on the assessment before we start the transfer package. So I couldn't tell you when, offhand, when they started the development of the transfer package.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 199

Did you -- Do you recall making that statement in regards to the duties and responsibilities of Globetrotters under their contract for the Cermak corridor ramp?

MR. STILLMAN: Just objection, relevance.

You can answer.

BY THE WITNESS:

A I believe you that you're reading my transcript correctly.

BY MR. MORRISSEY:

Q In March you said that it was necessary for Globetrotters to do the preliminary drawings, which would make up about 30 percent or more of the actual drawings to go to permit for the Cermak corridor ramp. Why is that no longer the case now?

MR. STILLMAN: Objection, relevance.

BY THE WITNESS:

A I don't -- What do you mean it's no longer the case? I'm not understanding.

BY MR. MORRISSEY:

Q Is Globetrotters still -- do they still have the assignment to do the drawings

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 200

and specifications --

MR. STILLMAN: Objection, relevance.

BY MR. MORRISSEY:

Q -- for the Cermak corridor ramp?

A Tom, as I believe we discussed in yesterday's deposition, because there have been -- there has been a relatively straightforward approach delineated in their assessment relative to the ramp itself, we have chosen to accelerate that portion of the scope of the Cermak upgrades and proceed to the architect of record services.

If what you're asking is are we going to then have to wait until the transfer package drawings of the ramp part of Cermak are complete before HDR can begin, the answer is no. We feel that the drawings that they've provided so far, that are in the assessment report, are sufficient for HDR as the architect of record for the assignment for the Cermak ramp to go ahead and proceed to construction documents without waiting for that portion of the transfer package for Cermak that would be specific to the ramp.

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 18

ERIC DAVIS
June 5, 2024

Page 201

We feel that it's not necessary for them to include that. We are moving ahead with that.

I believe that that intent has been communicated to the Globetrotters team, and they are simply waiting for the contract modification to be executed, to be transmitted to them so that they know that they, in fact, have the contract for finishing the whole work before they proceed to execute the transfer package drawings and specifications.

Q    Just to be clear, is Globetrotters being paid for doing the preliminary drawings for the Cermak corridor ramp?

MR. STILLMAN:  Objection, relevance.

BY THE WITNESS:

A    Define what you mean by "preliminary drawings."  They include preliminary drawings in their assessment.  Do you mean the transfer package drawings?

BY MR. MORRISSEY:

Q    That's correct.  The transfer package you said would include drawings and specifications -- or preliminary drawings and

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 202

specifications to -- and specifications to stipulate the elements of the design that are to be constructed.

A    I believe --

Q    Are they still required to do that under the contract?

MR. STILLMAN:  Objection, relevance.
Go ahead.

BY THE WITNESS:

A    As I tried to explain just a moment ago, the drawing and specifications for the ramp portion of their assignment for Cermak in the transfer package, we are not going to require them to go take that additional step because that would delay implementation.

We are -- they will provide drawings and specifications for the balance of the upgrades that they recommend for the transfer package for the entire building, and, yes, technically the production of the transfer package drawings and specs for the ramp itself remain in their scope of work.

What we are saying is that they don't have to complete that part of the assessment

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 203

for the transfer package.  They can do it for the rest of the building.  They don't need to do it for the other because we are moving to architect of record.

BY MR. MORRISSEY:

Q    So the architect of record, HDR, when they receive this notice to proceed --

A    Yes.

Q    -- they will do drawings not only for the Cermak corridor ramp but also to correct the violations that were noted by Globetrotters in their assessment of the Cermak facility?

A    No.

MR. STILLMAN:  Objection, relevance.

BY THE WITNESS:

A    No, just the ramp.  Their assignment in the task order is the architect of record services just for the ramp.  The rest of it is proceeding in our regular process for Globetrotters to complete the transfer package, and that will go to an architect of record firm.

BY MR. MORRISSEY:

Q    So will the permit drawings for the

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 204

Cermak corridor ramp be issued in -- by the end of 2024 and demolition beginning on the Cermak corridor ramp?

MR. STILLMAN:  Objection, relevance.

BY THE WITNESS:

A    That is our hope and expectation.  I should note in a case like this, because the scope is relatively clearly defined for the ramp, one of the options we are going to look at is the ability of HDR to do what is called self-certification, which is an accelerated permit process which allows architects for projects of relatively confined scope to go ahead and conduct the permitting process themself and to certify to the city that their work is compliant.

We are hopeful that they will be able to do that, but we need HDR to do their evaluation first.  We are going to try to get it done by self-certification which would eliminate the need for a permit for the rest of the work -- or the -- yeah, for the rest of the drawings.

MR. STILLMAN:  Tom, how much longer

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 19

Page 205

do you think you're going to need?

MR. MORRISSEY: At least another hour.

MR. STILLMAN: Of course. Of that hour, do you think most of those questions will be about the Westmoreland case or you'll just keep asking about Cermak?

BY MR. MORRISSEY:

Q   Looking at your Declaration, which is Exhibit 8, Number 7, you make a statement: Given the enormous size and scope of the project, a holistic approach must be considered in the design and construction of the project including the ADA design throughout the project. The sequence of work on a project of this size requires careful consideration and planning of each element or location in the context of its surrounding areas and their accessibility requirements so that the project addresses the need for access seamlessly and that the work can be constructed in the most expeditious, cost-effective, efficient and safe manner.

Number 8, it says: The path of

Page 206

travel throughout the campus that might require ADA compliance is vast and not just limited to the east RTU ramp. The County's goal is to ensure the entire project complies with the ADA standards, not just the ramps.

Can you explain -- you previously said that a path of travel for a wheelchair person housed in the RTU headed to the infirmary includes the east corridor ramp and the Cermak corridor ramp.

Can you explain why it's efficient and cost-effective to complete the Cermak corridor ramp within the next two years and hold off on assessing and addressing the east corridor ramp?

MR. STILLMAN: Objection, relevance.

BY THE WITNESS:

A   We have not held off assessing the east corridor ramp. The report from Globetrotters, the assessment that's attached to that document, is the assessment of the east corridor ramp. We haven't held off on that at all. So I don't understand your question.

Page 207

BY MR. MORRISSEY:

Q   My question is assuming just for the moment that in the next year Cook County is going to renovate the Cermak corridor ramp to bring it into compliance with the 1991 ADA code, why doesn't Cook County at the same time proceed to renovate the east corridor ramp to bring it into compliance with the 2010 code?

A   I believe I answered that elsewhere in --

MR. STILLMAN: Objection, asked and answered.

Sorry. Go ahead.

BY THE WITNESS:

A   Yeah, I think I answered that elsewhere, among other places, in element -- in Item 10 in the same report. I think the answer to your question is right there.

BY MR. MORRISSEY:

Q   Well, why don't you tell me what the answer is. I'm asking in a deposition, not something that was drafted. Perhaps --

A   You are asking in a deposition that includes what I said.

Page 208

Q   Well, what I'm asking you specifically. Why don't -- well, let me ask you --

(Reporter clarification.)

MR. MORRISSEY: I'm sorry. I'm sorry.

BY MR. MORRISSEY:

Q   Can you explain -- Let me ask some preliminary questions. Cook County knows --

A   You said preliminary?

Q   Cook County knows for certain that the east corridor ramp violates the 2010 ADA standards.

Is that clear to you?

A   Yes.

Q   And it's known by Cook County and the Sheriff that on a daily basis wheelchair detainees are moving from the RTU building up the east corridor ramp and going down the Cermak tunnel ramp to go to medical appointments in the Cermak Health Service building, correct?

A   I believe that's one of the routes that's available to them. Whether they use it

Exhibit 1 Page 20

ERIC DAVIS
June 5, 2024

Page 209

or not, I don't know. I assume that they do, but, yes. Okay. Sure.

Q So on a daily basis, Cook County and the Sheriff know, based upon Globetrotters' assessment, that the east corridor ramp violates the ADA 2000 [sic] standards for a host of reasons, at least five or six violations of the 2010 standards, correct?

A We are aware that there are a series of uncomplied elements, yes.

Q And give me your projection, your best-case projection, when the east corridor RTU ramp will be renovated completely to comply with the 2010 accessibility standards.

A So I'm going to give your answer, Tom, in a way that maybe saves you the trouble of some other questions.

The assertion that we make in this testimony is that it is more efficient and actually quicker to take the comprehensive approach toward the ADA upgrades on the Department of Corrections campus through the comprehensive, and if you want to use the term wraparound approach, from the RFQ to do the

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 210

entire campus in a holistic manner. And the reason for that is you.

The reason for that is if we had to stop and do individual procurements for each element that was determined to be uncompliant, it would take 50 years. We want to address this in a comprehensive way. Because if we stopped and broke out the east ramp also, you would move on someplace else and we would have to stop and do a design and construction for that one.

We are looking to hire a firm to assess and design and actually follow through in construction for the work of the entire campus. That's also in this statement. Okay? We manage to get procurement to understand that it was quicker, more efficient and more cost-effective to do a wraparound approach like this and to not do the preliminary design and transfer package and architect of record approach which we're doing at Cermak, but rather to hire firms that analyze the whole area and do drawings for the whole area and stick around to be our architect during

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 211

construction for all of the renovations.

If we broke them out individually, like what you are talking about in the case of the RTU, we would be doing a disservice to everyone else in the rest of the campus because each piece individually, if approached and designed individually, would take a lot longer, as you know, to procure the design services and the construction services.

We are trying to our best to be efficient and cost-effective, and so that's why we want to include the east tunnel ramp in the assessment, design and construction of the necessary upgrades for the entire campus.

Now, if we did what you are talking about, Tom, we would have to stop -- and you're already complaining about how long it takes HDR to be under contract for the Cermak ramp. You would find yourself in a similar situation in the time it takes on an individual assignment for the RTU ramp. You would then complain about how long it took to get a contractor on board to construct it.

We are attempting to be complete and

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 212

efficient and effective and cost-effective. It is a judgment call, but it is about -- we have to look at the whole situation, not just about what you happen to be suing us about on a Wednesday. Okay? That's why.

Q First and foremost, what other known violations are there at the Cook County Department of Corrections that had been assessed by an architectural or engineering firm?

A I am not aware of -- I'm trying to think. I'm not aware of any others other than elements as mentioned previously that have been the subject of a specific assessment of the holding cell areas within the Leighton Courthouse. I don't know if there had been any other specific assessment of the elements.

I do know that in 2015 the Department of Justice issued its barriers report that cited a number of areas, most of which -- I think perhaps all of which had been addressed at this point, but there may be other -- there were other buildings that they didn't cover. So I'm not aware of any other assessments.

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 21

ERIC DAVIS
June 5, 2024

Page 213

We're trying to take care of a large problem in a comprehensive and efficient way.

Q   Has the Sheriff notified Capital Planning or you that Division 10 is not accessible for mobilely disabled prisoners?

A   I know that there are some issues.  I believe it's with the showers in that case.  There's some issues there.

Again, we're trying to get -- that would be the kind of thing that we would have dealt with in a comprehensive way, just like we are having Globetrotters do for Cermak.

Q   In Division 9, there are mobilely disabled prisoners in Division 9 and there are no handrails in the showers?

A   I don't recall if it's Division 9 or which one it is.  I would have to look.

MR. STILLMAN:  Objection, relevance on that.  Yeah.

BY MR. MORRISSEY:

Q   Are you aware that there are no benches in Division 9 for mobilely disabled prisoners?

MR. STILLMAN:  Objection, relevance.

ERIC DAVIS
June 5, 2024

Page 214

BY THE WITNESS:

A   There may have been -- you say no.  I mean, I don't know who makes an evaluation like that.  Because your question earlier was about having an architect assess it.  I don't know who made that evaluation or, if so, when that was done.

BY MR. MORRISSEY:

Q   Do you know if the showers in Division 11 have mounted seats?

MR. STILLMAN:  Objection, relevance.

BY THE WITNESS:

A   I don't recall.  I would have to look.

BY MR. MORRISSEY:

Q   Assuming that the RTU in the dormitories do not have mounted, fixed seats in the shower, will Cook County do an assessment to determine that?

A   We will be assessing the RTU as a part of the comprehensive assessment that the responses were received for today in a solicitation.  The RTU -- the rest of the building will be included in that assess -- in

ERIC DAVIS
June 5, 2024

Page 215

the assessment.

Q   It's known -- would you agree that Globetrotters has provided detailed reports for Cook County in regards to the east corridor ramp and also Cermak?

A   Yes.

Q   And both reports reflect that the -- both ramps are noncompliant under the ADA code, correct?

A   Yes.

Q   And the Sheriff and Cook County are aware of the fact that the -- both ramps, Cermak and the RTU east corridor ramp, are used on a daily basis by mobilely disabled prisoners such as wheelchair prisoners, prisoners in walkers and using canes.  And they are going to proceed to wait in regards to one ramp, the east corridor ramp, until there's a full assessment of the entire Cook County Department of Corrections campus before addressing the east corridor ramp.

And on the other hand, because the Walker case, there's a motion for a permanent injunction, Cook County is going to proceed to

ERIC DAVIS
June 5, 2024

Page 216

remedy the east -- the Cermak corridor ramp within the next two years.

Is that fair to say?

A   First of all, I don't know if there's been a ruling on the motion that you are referring to.  I can't testify about what the Sheriff does or doesn't know.

And as far as whether or not they are aware of the determination to assess the entire campus, yes, they are aware of that, and they're aware that we are accelerating the process by having the assessment occur comprehensively in through design and through construction.  So they're aware of the process overall, yeah.

They know that we're attempting to get our arms around the extent of upgrades that are needed in a comprehensive way.  But as far as specifically what they know or don't know or what one person or another or the Sheriff knows, I can't testify to that.

Q   For the year -- in the year 2024, to your knowledge, Cook County government has no plans to do design drawings for the east

Exhibit 1 Page 22

ERIC DAVIS
June 5, 2024

Page 217

corridor ramp to be renovated to make it in compliance with the ADA 2010 standards; is that correct?

A    I think we just went through the fact that we have plans to generate those drawings.

Q    My question is specific to the east corridor ramp.

A    Yeah.

Q    In this year, 2024, are there any plans or intentions to hire an architectural firm to proceed to do design drawings for the east corridor ramp?

A    Yes.  As I said --

Q    When --

A    As I said.

Q    When will those --

A    Excuse me.  Excuse me.  You want to ask -- as I said, the firms that are being hired under the RFQ for which solicitations were submitted today, those firms will be -- whatever firm that is, they will be doing the design drawings for the east tunnel ramp as a part of their scope.

We are hiring a firm.  We are

ERIC DAVIS
June 5, 2024

Page 218

expecting to have their contract this year, yes, for an assignment that includes producing the drawings, the construction drawings, for these -- that will be a part of their assignment.  So yes, we are hiring a firm to do that with the expectations they will be hired in 2024.

Q    The question is will there be construction drawings in the year 2024 for the east corridor ramp?

A    I would expect probably not, but even if we stopped and made it instead as a task order and did the approval of that, I wouldn't think their drawings would be done by the end of this year anyway.  And, again, we think that would be an inefficient way to go about this.

Q    For the Cermak ramp, you, as the deputy director of Capital Planning, have the ability to hire HDR to do construction drawings for the Cermak ramp, correct?

A    To be clear, and as I have testified before, they are already hired.  We are just making an assignment under their contract.

Q    Let me rephrase the question.  Cook

ERIC DAVIS
June 5, 2024

Page 219

County can assign a contractor such as HDR this summer to begin doing construction drawings to make -- to design renovations for the east corridor ramp to come into compliance with the 2010 ADA standards.

A    I'm not hearing a question.  Sorry. I'm hearing a statement, not a question.

Q    The question is can Capital Planning or Cook County hire an architectural firm to begin doing construction drawings specifically for the east corridor ramp this year similar to what HDR is undertaking for the Cermak corridor ramp?

A    When we give them that assignment, we could give them that assignment, yes.  Then we would have to then remove that scope from the assignment that we just took the solicitations for.

Q    Who would make that decision in Cook County's government to -- within the near term under your task program to hire an architectural firm such as HDR to do construction drawings for the east corridor ramp?  Who makes that decision in Cook County?

ERIC DAVIS
June 5, 2024

Page 220

A    We have a standardized process for all of the project, which are over 100 projects, under the task order assignment mechanism whereby the project is scoped out. The firm intended is consulted about what their needs are in order to perform the assignment. That proposal is then reviewed by our consultant team.  They make a recommendation to the portfolio lead, which is me.  That then goes to our department director who then submits it to procurement.

So the decision is made by the department in consultation with the procurement department.  Capital Planning -- so it's multiple people.  It's not one person; it's multiple people.

Q    And the group that you just described has undertaken a task to perhaps hire or to retain HDR to prepare construction drawings this year for the east -- for the Cermak corridor ramp; is that correct?

A    I would say the expectation is that, yes, HDR would be able to complete those drawings this year.

Exhibit 1 Page 23

ERIC DAVIS
June 5, 2024

Page 221

Q    How much will it cost HDR to provide construction drawings this year for the Cermak corridor ramp?

A    I don't know offhand.

Q    Is it within $100,000?

A    I don't know offhand.  The contract at HDR as 1 of 16 firms has -- is a total contract of $2 million.  Generally we like to keep the assignments to 150,000 or lower, but if they need to be a little bit more, we are allowed to go above that threshold.  The intent, as the procurement name suggests, is for smaller projects.

So is the fee probably in the 1, $200,000 range?  Probably something in that range.  I don't happen to know offhand what the fee is for that project.

Q    So as of this date, June 5th, 2024, you, as the deputy director of Capital Planning, does not know the fee that HDR will charge to do design drawings for the Cermak ramp?

A    It would -- I would have to look at it.  I may have that.  They may have submitted

ERIC DAVIS
June 5, 2024

Page 222

that to me for review previously.  I would have to double-check.

Q    In your Declaration in the Walker case on February 24th -- I'm sorry -- at the end of February of 2024, you represented under oath that you were in negotiations with HDR in regards to the fee that they would charge for renovating the Cermak ramp.  Have those negotiations been ongoing?

A    Yes.

Q    So in March, April, May and June, you have been negotiating with HDR in regards to the amount of money they are going to charge to design the Cermak renovation of the tunnel -- the Cermak tunnel -- the Cermak corridor?

A    The ramp you mean.

Q    Well, let's use the -- let me rephrase it.

So for the last three months, you personally have been in negotiation with HDR to determine a price they will charge for design work for the Cermak ramp.

Is that fair to say?

A    No, the department has been.  When I

ERIC DAVIS
June 5, 2024

Page 223

said "we," that's the department.  I can tell you that I have looked it up and, as I said yesterday, in the deposition yesterday, Tom, there was an issue with HDR with one of their subcontractors.

So when we spoke about this in March, at that time it was my expectation that we were close to conclusion.  Evidently there was an issue after that that had to get resolved.  My understanding is that has been resolved.

And as I'm talking to you here, I was able to determine that the fee for the Cermak ramp has been agreed to.  It's approximately $100,000.  And as soon as we can get the documents that I mentioned earlier today from procurement, in a meeting they will be issued a notice to proceed.  So yes --

(Simultaneous speaking.)
BY MR. MORRISSEY:

Q    Do you consider that fee to be reasonable, $100,000 to design the Cermak ramp by HDR?

A    For the architectural and structural and other evaluations that they need to do,

ERIC DAVIS
June 5, 2024

Page 224

yes, I would consider that to be a reasonable fee.

Q    Would that be a reasonable fee for an architectural firm to design the east corridor ramp?

A    I would expect it would be in a similar order of magnitude, yes.

Q    How much will it cost to construct the -- let me rephrase the question.

What is the projected cost of the entire project to renovate the Cermak ramp?

A    As I think I have discussed before, I don't know the specific costs for that.  The only thing -- because this is somewhat singular work, the only example we have to go by in the case of Cermak is the bridge into Leighton.  But as you know, the configuration is very different.

So we can identify an approximate, but I can't tell you right now what the cost is.  What I can tell you is that -- that part of the assignment for HDR will be to develop a cost estimate that we will review, and as I think I also mentioned, we are intending to

Exhibit 1 Page 24

ERIC DAVIS
June 5, 2024

Page 225

deliver the replacement of the Cermak ramp by our job order contracting or project or process which would be relatively straightforward. They will work with HDR during the course of design to finalize the design and start the pricing process for construction.

Q    Has the contract -- contractor begun work as far as developing a price for the Cermak ramp yet?

A    No, they don't have anything to go by. HDR has to do some of their work before a contractor can do that.

Q    How long will it take for HDR to provide information to a construction firm to provide a cost estimate to Cook County?

A    I can't answer that for you at this time. When we have the kickoff meeting, they will present us with a projected schedule for their work, but I can't answer that for you today.

Q    Will your kickoff meeting for HDR be in July of 2024?

A    No, hopefully it will be next week.

Q    Who will be present during the

ERIC DAVIS
June 5, 2024

Page 226

kickoff meeting?

A    I would expect, depending on the day and time, one or more representatives from HDR, one or more representatives from their subcontractor, if there is a structural engineer, for example, would be there. We would have our -- probably Kate from LCM would be there. My project director should be back from Washington, so he would be there. I may or may not be at the kickoff. There would also be somebody from our job order contracting, a manager, the Gordian firm, they would be there as well probably for coordination sake. So yes, so roughly a half dozen to a dozen people.

Q    Wouldn't it be advisable to have Mr. Darr from Globetrotters present?

A    Not necessarily.

Q    Well, they did the assessment. Apparently the representation by you in March was that you were waiting for that transfer package. I would think you would want Globetrotters there.

A    As we said before, Tom, and I'm not quite sure why you're covering this ground

ERIC DAVIS
June 5, 2024

Page 227

multiple times, we are going ahead with the report as presented. I don't necessarily -- I mean, it may be reasonable to have them there or we may simply provide them with Globetrotters' phone number to say if you have any questions, here is Carl's number, you can call him or the firm and they can answer questions.

I don't necessarily know that it would be required for Globetrotters to be there since they had given us their assessment, but I don't know why -- I mean, I don't know why it would be necessarily -- I mean, necessary for them to be at the kickoff for somebody else's work like that, since they provided the assessment.

Q    Now, Globetrotters provided the assessment for the east corridor ramp. Would it be reasonable to hire a firm like HDR to begin the design work for the ramp that is in violation of the 2010 ADA standards?

A    I have to express exasperation because this is at least the third time you've asked that question.

ERIC DAVIS
June 5, 2024

Page 228

Q    Well, do you have an estimate or a guesstimate in regards to when the east corridor ramp will be constructed to make it in compliance with the 2010 ADA standards?

A    Asked and answered.

Q    Was that you, Mr. Davis?

A    That was me. Asked and answered.

MR. STILLMAN: Okay. I will parrot, I guess, yeah. I mean, you keep asking the same things, Tom.

BY MR. MORRISSEY:

Q    How long will the east corridor ramp remain not in compliance with the ADA for wheelchair users at the Cook County Department of Corrections?

A    I can't give you an answer to that until the firm that we're hiring to assess and design the ADA renovations gives us a schedule. So I can't answer that question right now.

Q    If a federal judge ordered you to begin design work for renovating the east corridor ramp, would Cook County comply with the federal judge's order?

A    If other cases are any example, I

Exhibit 1 Page 25

ERIC DAVIS
June 5, 2024

Page 229

would assume if you made a petition to ask that and at such point as the County has had an opportunity to respond to that petition and if upon reviewing that petition there was a determination made by the judge -- because we have given the reasons not to in the deposition that you have in front of you. We've given our reasons why we think that's not a good idea. But if the federal judge said, okay, I have read your objections, Cook County, nevertheless, I want you to go ahead and proceed with this, we would follow the law. We would follow the ruling of a federal judge.

However, I believe we have made a cogent case for why that would not be in the best interest of the County or the taxpayers or anybody involved.

Q    Do you understand that there is a law passed by the state of Illinois that provides compensation for individuals that are disabled, that they can be compensated $4,000 for a violation of the ADA? Are you aware of that?

A    That's why you have a business model, Tom, yes.

ERIC DAVIS
June 5, 2024

Page 230

Q    And how did you become aware of the passage of the Restoration Act by the state of Illinois?

A    I think I read it in the Sun-Times. I don't know. I think I read an article about it in the paper. It may have been something communicated. It may have been something that Kate brought to my attention. I remember reading something about it somewhere.

Q    So Cook County is aware that for each person that goes up or down the east corridor ramp and is in a wheelchair, walker or cane, potentially Cook County and the Sheriff could be liable for violating the Act and be required to pay damages of $4,000?

MR. STILLMAN: Just objection, calls for a legal opinion.

You can answer.

BY THE WITNESS:

A    Yeah, I'm not a lawyer, Tom. But my recollection is that some form of harm has to be demonstrated. But yeah. I mean, okay.

BY MR. MORRISSEY:

Q    To your knowledge, does the ADA --

ERIC DAVIS
June 5, 2024

Page 231

does the purpose of the ADA state that one of the purposes is to provide equal access for able-bodied and disable-bodied people to public buildings?

A    I think it's fair to characterize that that's one of the fundamental motivations of the Americans with Disabilities Act, specifically Title II.

Q    And Title II provides that the ADA 2010 standards and the 1991 standards are intended to provide the independence to mobilely disabled individuals so that they can have access to public buildings just like able-bodied people or similar to able-bodied people?

A    Yes, I think that that premise that you are talking about there, Tom, is enormously important. It is clearly something -- I mean, the ADA is civil rights law. It is about fairness. It is about access. It is an extremely important part. To me, it goes to the American character, the need to provide everybody with access to the same benefits of public functions, to access to our justice

ERIC DAVIS
June 5, 2024

Page 232

system.

It's a very important principle and a very important element of civil rights law. It's something very important to me. It's something that occupies a large part of my professional work.

So, yes, I think -- so I'm aware of it. It's an extremely important principle.

Q    And the 2010 ADA standards and the 1991 ADA standards are written to allow mobilely disabled individuals and other disabled individuals to independently access public buildings?

A    To access buildings, period. It's about the ability to interact with -- for individuals to interact on an equal basis with their environment.

It's why when I teach about the ADA, one of things that I do in most classes is I ask the young students to raise their hand if they don't plan on getting old. And I say for those people that didn't raise your hands, the ADA is about you. It's about everybody. It's not something that is just about those people

Exhibit 1 Page 26

ERIC DAVIS
June 5, 2024

Page 233

or a subsection. It's something that is for elderly, for people with disabilities, for people that have been in accidents.

It is a really important series of laws and one that I'm committed to implementing in as complete a manner as possible, in some cases even beyond what the ADA requires.

One of the things that is in the RFQ is the stipulation that if one of our consultants identifies something that they consider that should be done that may be above and beyond the ADA, something that sometimes gets referred to as universal design, the County wants them to bring those elements to our attention so that we can consider the feasibility of elements that may be beyond the letter of the law. Because this is about fairness. This is about access. This is about an equal footing.

One of the reasons that we do not want to pull the east tunnel ramp out is that it slows everything else down. We want to do all of it. We want to do it in as an efficient way as possible and as comprehensive a way as

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 234

possible.

I will say again, pulling out the east tunnel ramp as another separate project, there is quickly a point of diminishing returns where it slows everything else down. We are trying to deal with all of it. Okay?

Q    Let me ask you, the ADA is about independence.

Isn't that fair to say?

A    That's fair to say, yes.

Q    Independence for disabled individuals.

A    I think --

Q    And the disabled individual, under the ADA, should not have to depend upon another person to push them up or down a ramp that is required under the 2010 or 1991 ADA standards to be compliant with the code.

Is that fair to say?

A    I think it's fair to say that the ADA and the interpretations of the ADA by the profession and by the Department of Justice realizes that there are situations where having assistance may be a benefit to the individuals.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 235

I can only speak to the physical facility elements of it, but I am aware that there -- there is a recognition that there are some instances where someone may require physical assistance in addition to what the building or facility provides.

Q    Well, the east corridor ramp was required to comply with the 2010 standards.

Isn't that fair to say?

A    That's fair to say. And it's also fair to say that the assessment we got indicates that it doesn't. So we need to find a way to remedy that.

Q    And pushing a person up or down the ramp doesn't comply with the 2010 or 1991 standards on its own, correct?

A    I can't speak to whether or not operationally that makes a difference or provides an exception. I honestly don't know. I know about the building parts.

Q    Well, the building aspect of it is, it's still in violation of the ADA if it doesn't comply with the 2010 or 1991 ADA standards, correct?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 236

A    The building either complies or it doesn't. I think we have established in the case of the east RTU ramp that it doesn't comply.

Q    And you are not aware of any exception under the 2010 or 1991 standards that would provide an exception for Cook County or the Sheriff to remedy the violations for the east corridor ramp by simply saying, well, we're just going to push wheelchair detainees up and down the east corridor ramp?

A    I'm not aware if there is or if there isn't. My recollection is that in the course of investigating the circumstances around the Cermak ramp that there was an allowance, in a secure environment, for a law enforcement agency, in this case the Sheriff, to operationally -- and, again, it's up to them -- to operationally require that individuals going up and down the ramp be not only pushed up and down but escorted.

I don't know whether they do that or not in every instance, I can't speak to that, but my recollection is that there was some

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 27

ERIC DAVIS
June 5, 2024

Page 237

**provision in some guideline in a secure environment for them to provide or require that kind of escort.**

Q    LCM was involved in the barriers report?

**A    I believe they were, yes.**

Q    And were they involved in the renovation of the bridge ramp?

MR. STILLMAN:  Objection, relevance.

BY THE WITNESS:

**A    I don't remember if they were or not, Tom.  I don't recall.**

BY MR. MORRISSEY:

Q    Was LCM involved in the limited Cermak renovations in 2022?

MR. STILLMAN:  Objection, relevance.

BY MR. MORRISSEY:

Q    I'm sorry.  2018?

MR. STILLMAN:  Objection, relevance.

BY THE WITNESS:

**A    What are you referring to.**

BY MR. MORRISSEY:

Q    Well, weren't some of the showers in the Cermak building renovated in the year 2018?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 238

MR. STILLMAN:  Objection, relevance.  I think the showers just have nothing to do with Westmoreland.

Go ahead.

BY THE WITNESS:

**A    I don't think they were involved in any work in the showers at all.  I could tell you that they weren't under contract in their current role at that time.  I don't believe they were -- I don't believe they were.  But I can't -- I can't say whether they were or they weren't.  I don't think they were in anything relative to the showers back in 2018.  I'm not aware of that.**

BY MR. MORRISSEY:

Q    You were provided with the plans for renovation of the Leighton court building, correct, after you became employed by Cook County?

**A    You mean the renovation of the holding cell areas?  Yes.**

Q    And those plans were done by an architectural or engineering firm?

**A    I believe they were done by Primera.**

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 239

Q    And Primera is an architectural or engineering firm?

**A    Yes.**

Q    And approximate cost for those plans was over seven figures?

**A    You said that the other day.  It happened -- the contract was before I came to the County, but if you looked it up, I'm not prepared to dispute that.**

Q    And you started with the County when?

**A    April of 2017.**

Q    And as of June of 2024 -- let me ask an initial question.

Primera identified that there were accessibility issues for wheelchair people in the holding areas at the Leighton Courthouse?

MR. STILLMAN:  Objection, relevance.  Go ahead.

BY THE WITNESS:

**A    It was the subject of the drawings that they provided, yes.**

BY MR. MORRISSEY:

Q    And at least from -- at least up until today's date, even though the County is

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 240

aware that the -- let me rephrase the question.

Even though Primera provided construction drawings for the holding cells at Leighton five or six years ago, the holding cells still have not been renovated, correct?

MR. STILLMAN:  Objection, relevance.

BY THE WITNESS:

**A    We went through all of this yesterday, Tom.  I answered this question yesterday.**

BY MR. MORRISSEY:

Q    Well, isn't that true, there still hasn't been any renovation to make the holding cells at Leighton accessible by Cook County?

**A    I would refer you to my remarks yesterday, yes.**

MR. STILLMAN:  Tom, we're focused back on the affidavit --

(Simultaneous speaking.)

BY MR. MORRISSEY:

Q    Given the fact that Cook County history or practice in the past has been to spend upwards of a million dollars or more to make the Leighton court building accessible for

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 28

ERIC DAVIS
June 5, 2024

Page 241

wheelchair detainees --

MR. STILLMAN: Objection, relevance.

BY MR. MORRISSEY:

Q -- can you explain why there should be any credence that Cook County is going to proceed in renovating the RTU corridor ramp in the next three years?

A Okay. Let's unpack that a little bit.

MR. STILLMAN: Object to form. Because I don't really understand what you asked. That was a long question.

MR. MORRISSEY: I will ask the question distinctly.

BY MR. MORRISSEY:

Q Will Cook County prioritize renovating the east corridor ramp within the next two years to make it compliant with the 2010 ADA code?

A As I said before, the intent is to develop the assessment, design drawings and construct the upgrades necessary for the Department of Corrections campus in a comprehensive and thorough and holistic way

ERIC DAVIS
June 5, 2024

Page 242

along the lines of what has been outlined in the RFQ and in the discussions that we have had about this.

As I have said, we consider it to be inefficient to pluck out individual elements at this point because of the size of the effort that it also misses potentially other elements that may impact a specific situation, whether it's the mechanical systems as were mentioned in my deposition or whether it is elements of alternate paths of travel or all of the other areas of the campus that need to be addressed. It's a large problem. We're attempting to be holistic and complete.

To speak to your earlier question, and I object to the characterization that there is any lack of motivation to do this work. I object to any characterization that we are not operating in good faith. I object to the notion that we somehow don't care or don't intend to follow through.

I work in the Department of Capital Planning. Okay? Our effort is to spend the money that the taxpayers entrust with us in as

ERIC DAVIS
June 5, 2024

Page 243

effective and efficient a manner as possible.

So any suggestion that we're not going to go forward with this, I can't support that assertion in any way relative to your comment about the work that was done previously to assess the holding cells area.

As I said yesterday, it is also inefficient to take a courtroom offline to repair or renovate the back stage areas without also looking at the courtrooms itself.

Unfortunately, that decision was made before I got here, before my director got here. It was clearly identified as being in the best interest of the taxpayers to only close the courtroom once and do the courtroom and the holding areas and do it in a comprehensive way.

In order to do that, Tom, in the criminal courthouse, in one of the largest jurisdictions in the United States, it is a very careful process of phasing the work. It doesn't happen overnight. We are trying to do it once. We are trying to do it as efficiently and effectively as possible. But any characterization of that effort that suggests

ERIC DAVIS
June 5, 2024

Page 244

that somehow we don't care or that it's not important to us, I reject completely.

Q My question is, and you didn't answer it, will the east corridor ramp be completed and renovated within a two-year period of time?

MR. STILLMAN: Objection, asked and answered. Maybe, maybe not.

BY MR. MORRISSEY:

Q And what is the total cost of the renovations for the ADA violations at the Cook County Department of Corrections?

A I have absolutely no idea. That is why we are hiring firms to assess the situation. It is likely in the tens of millions of dollars, if not more.

Q And any decision to go forth with correcting the violations, the ADA violations at the Cook County Department of Corrections, will be up to the Cook County Board of Commissioners.

Is that fair to say?

A The Cook County Board of Commissioners approves any contracts that we undertake. They rely on the professional

Exhibit 1 Page 29

ERIC DAVIS
June 5, 2024

Page 245

expertise of the department, but ultimately they make a decision about the hiring of both design and construction firms. They will review and hopefully approve the contracts for the ADA assessment that are the subject of the RFQ.

They will also approved the contracts for construction of the work. One of the things that we will look at once we have the assessment, once we know the landscape of the need across the campus, we may -- and that's why my earlier answer was maybe, Tom, once we have a feel for what the magnitude of the challenge is, we may break out the actual construction of some of the elements on a more localized and expedient basis.

I can't answer that question for you right now because I don't know the whole picture. But that's --

Q   So --

(Simultaneous speaking.)

BY THE WITNESS:

A   Excuse me. That's one of the reasons for doing it this way, to be as efficient -- it

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 246

may be better to do one giant construction contract, it may be better to break it up into a series of smaller contracts, it may be better to do a combination of the two, I don't know. That's why we are hiring the firms to help us with this challenge.

BY MR. MORRISSEY:

Q   To break this down, Mr. Davis, you have issued an RFQ for qualifications of --

A   Yes.

Q   -- architects and engineers?

A   Yes.

Q   Any contract to proceed on Package 1, 2 or 3 for architectural or engineering services will have to be approved by the Cook County Board?

A   That's correct.

Q   And does that become part of a Capital Improvement Plan?

A   Yes.

Q   And that may or may not be approved by the Cook County Board?

A   I have been involved in nine budget cycles, Tom. The next -- I'm answering your

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 247

question. I have been involved in nine budget cycles. Okay? At least seven of which have been CIP's that have been submitted to the board of commissioners. The next time the commissioners strike a project from the Capital Improvement Plan and tell us not to go forward will be the first. Can I say they won't do it? No, that's their prerogative. But in seven CIP's submitted to board, I haven't seen it.

Q   You said that the renovation of the east corridor ramp may or may not be completed in two or three years.

Is that fair to say?

A   No. Your question was two years. But yeah, two or three years it may or may not. I don't know.

Q   Could we say that it may or may not be completed in four years?

A   It may or may not. I can't say one way or the other right now. As I said, we will know sooner than that because we will have the assessments and will understand better of a best way to go forward with implementing the necessary upgrades.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 248

Q   So assuming that the east corridor ramp will not be renovated in the next four years, wheelchair detainees on a daily basis will be going up and down the east corridor ramp to go to medical appointments at the Cermak Health facility.

Is that your understanding?

A   No, that's your assumption about four years. I said it may or may not be.

Q   But during that period of time, until Cook County decides to renovate the east corridor ramp, one of the paths of travel for wheelchair detainees will be the east corridor ramp to go to medical appointments at Cermak.

Is that fair to say?

A   Yes. That will be one of the paths of travel, yes.

Q   Why is Cermak's corridor ramp renovation more important than the east corridor ramp?

A   I think more important is your term. I don't agree with that characterization.

Q   Are they equally important, renovating the Cermak corridor ramp and the RTU

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 30

ERIC DAVIS
June 5, 2024

Page 249

east corridor ramp?

A    I don't know how to answer that question.

Q    Well, the east corridor ramp, as you have testified today, has multiple ADA violations, correct?

A    Yes.

Q    And why then --

(Reporter clarification.)

BY MR. MORRISSEY:

Q    And why is Cook County prioritizing the Cermak renovation of the ramp over the east corridor ramp?

A    I reject your characterization that we are prioritizing over it.  It's just the one that we are doing first.

Q    You would -- for a wheelchair person going up either the east corridor ramp or going up the Cermak ramp, would you agree that both of them provide the same level of difficulty to navigate either ramp?

A    I haven't taken either ramp in a wheelchair, Tom.  I'm not in a position to assess whether one or the other is more

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 250

difficult.

MR. MORRISSEY:  We will take a minute, and then we might be wrapping up.

(WHEREUPON, a short break was had.)

BY MR. MORRISSEY:

Q    During your deposition in March of 2024 --

A    Are we back on?

Q    We are back on.

A    Okay.  Thank you.

Q    In March of 2024, you represented that renovating the Cermak ramp was one of the most important projects that you were supervising at the Cook County Jail.  Is that still your position?

A    I don't know if I used the term, but it's definitely an important project.

Q    And would you say renovating in the east corridor ramp would have equal importance to you as a director at the Department of Capital Planning?

A    All ADA projects are important to me.

Q    Well, which ones do you prioritize?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 251

Do you prioritize the Cermak ramp over the RTU ramp?

A    I don't know how to answer that, Tom.

MR. STILLMAN:  Objection, asked and answered.

BY THE WITNESS:

A    No, I don't know how to answer that because if -- you know, you might ask, well, which is more important, renovating Cermak or renovating the courthouse.  They are both important.  They are all important.

MR. MORRISSEY:  I have nothing further.  Have a good evening.

MR. STILLMAN:  I have a couple of questions.  Just one or two.  Sorry to -- it should not take too long.

C R O S S - E X A M I N A T I O N
BY MR. STILLMAN:

Q    So, Eric, the Declaration, you had said before that you didn't write it.  We had written it kind of in conjunction with you; is that right?

A    Yes.

Q    But none of the words in there were

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 252

anything that you didn't 100 percent agree with or identify as true, correct?

A    I reviewed all of the elements and, as we discussed yesterday, it appears that there was a slight variation in one of the footnotes.  But, yeah, I reviewed all this, and in some cases suggested alternate ways of saying things.

Q    And then there was another -- there was a line of questioning Tom was asking you yesterday about whether it would make sense to -- after we were talking about the movements of the doors for the upper landing area, he was asking if it would make sense to implement that Recommendation Number 2 for using a floor surface material to kind of stabilize the surface.

Do you remember that, the slope?

A    Yes.

Q    Would it make any sense to implement that Recommendation Number 2 with the floor surface material to change the slope before going through with any of the rest of the remediation efforts?

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 31

ERIC DAVIS
June 5, 2024

Page 253

A   I'm not quite understanding your question, Zach.  Would it make sense to do that?  I mean, ultimately we would do all of it.

Q   As far as you know, with all of these other efforts where we discussed about the path of -- the path of travel and, you know, holistically considering the rest of the different things needed in remediation, would it make any sense to go out of the way, put on that surface topper for the upper portion of the ramp only, for that east RTU ramp, and then go and do the rest of it, or would it make sense to consider it along with the rest of the project we're talked about doing?

A   Yeah, we would want to look at the whole thing.  I do want to point out one thing though, just to update Tom on something.

When we did discuss this yesterday and you brought up the notion of moving the doors at the top of the ramp -- or, I'm sorry, at the -- yeah, at the bottom of the ramp rather -- I'm sorry.  You know, excuse me.  At the top of the ramp.  At the east end of the

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 254

ramp, you talked about the notion.

I did look into that, Tom, since we spoke yesterday.  It probably isn't feasible to simply move those doors because there is a fire door into a stairway that those doors might block.  So I'm going to have to have an architect look into it.

So the ability to just simply direct somebody to move those doors, I did look into it, but it looks likes there might be an obstruction with a fire door and -- a door to a fire exit stair.  So I can't just immediately move on it.  You know, we did look -- I did look into that.

MR. STILLMAN:  I have nothing else.

R E D I R E C T   E X A M I N A T I O N

BY MR. MORRISSEY:

Q   In regards to that -- the top landing that is only 9 inches --

A   Because the door mullion is in the way, yes.

Q   Globetrotters and Mr. Darr testified that it can be easily corrected by relocating the doors to the east.  Assuming that it can be

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 255

done, will Cook County proceed to do that or do we have to wait three or four years until the overall assessment and plan is put out?

A   I reject your sarcastic comment, but if you would like to flip to Page 16 of the Globetrotters report that is a part of my testimony, that has the diagram.

Q   All right.  I'm on Page 16.

A   Do you see the drawing of the ramp?

Q   I do.

A   Okay.  On the right-hand side where it says top landing and it shows -- and it has a note that says:  Move doors east to create a 60-inch-long landing.

Do you see that?

Q   I do.

A   Do you see where the red doors, that would be the relocated doors, where those are in the drawing?

Q   I don't.

A   Okay.  There's the black line doors of the drawing -- drawing of the doors on the left -- to the left on the top landing, and then to the right there is red lines that

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 256

indicate where the doors would be moved to.

Do you see that?

Q   I don't.  I don't have a color form here.

A   I'm sorry.  So if you don't mind, I will go ahead and share it on my screen.

Do you see this right here?  I can make that larger if you want.  Do you see this area right here?

Q   There's a screen there, Eric.  I can't -- would you mind putting that back up on the screen there?

A   I'm going to reshare.  Hold on a second.  I got -- hand on.  I got to figure out how to do this.  Hold on.  Okay.  Let me do this.  Let me try this again.  Okay.

Yes, here we go, Declaration.  Here it is.  This thing.  There's the document.  Can you see this?

MR. STILLMAN:  Yeah.

BY THE WITNESS:

A   Do you see that, Tom?

BY MR. MORRISSEY:

Q   I'm an attorney.  So you can testify

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 32

ERIC DAVIS
June 5, 2024

Page 257

to what you --

A    So this is a drawing of the ramp from the Globetrotters report.  It says:  Figure 3 Plan of Recommendations.  It indicates the bottom landing, the lower ramp, the intermediate landing, the upper and the top landing.

In the area where it says the top landing, there are two sets of three doors indicated.  In each case there is a set of double doors and a single door.  The doors on the left are rendered in black lines, and that's the existing doors.  And the set of doors on the right are indicated in red, and that's the proposed -- Globetrotters' proposed new doors of moving those.

Do you see where this arrow that says:  Move doors east to create a 60-inch-long landing, and there are two arrows indicating the two sets of doors?

Do you see that.

Q    Yes, but this isn't my deposition, Mr. Davis.

A    No, no.  Okay.  Well, I want to tell

ERIC DAVIS
June 5, 2024

Page 258

you something.

MR. STILLMAN:  Tom, you asked him to put it up.

BY THE WITNESS:

A    No, no.  I just want to tell you something.  What I found out since we spoke yesterday, this set of doors on the right where the arrow is pointing to this set of doors, I have learned that right there is a door, that's a fire stair.

So while Globetrotters looked to the end of the ramp here, they didn't continue their investigation into the rest of the tunnel and learned that, in fact, actually there is a door right here that is a fire door into a stair.  So they cannot simply slide the doors to the east to create a 60-inch landing without creating a fire hazard.

And if I look at the drawing here and I see a regular wall that's uninterrupted, that looks fine.  Upon investigation, I learned that moving the doors there would create a fire hazard.

ERIC DAVIS
June 5, 2024

Page 259

BY MR. MORRISSEY:

Q    You have the ability under the task program to independently hire an architect now that there's been assessment by Globetrotters to renovate the east corridor ramp.

Is that fair to say?

A    I have the ability to do so, and as I have said multiple times, I don't think it's -- we don't think it's wise.  I have talked with the director about this.  We don't think it's wise.  We think it's wise to pursue this as part of the larger assessment in renovation of the campus.

Q    And is the current proposal by HDR, $102,000 to design drawings for the Cermak ramp?

A    Yes.

MR. STILLMAN:  Objection, relevance.

BY THE WITNESS:

A    It is.

MR. MORRISSEY:  I have nothing further.

MR. STILLMAN:  All right.

ERIC DAVIS
June 5, 2024

Page 260

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EUGENE WESTMORELAND,          )
                              )
         Plaintiff,           )
                              )
              vs.             )   No. 23-cv-1851
                              )
COOK COUNTY Sheriff           )   Day 2
THOMAS DART, et al.,          )
                              )
         Defendants.          )

I, ERIC DAVIS, being first duly sworn, on oath, say that I am the deponent in the aforesaid deposition, that I have read the foregoing transcripts of my deposition, Day 1, June 4, 2024; and Day 2, June 5, 2024, consisting of pages 1-260 inclusive, taken at the aforesaid time and place and that the foregoing are a true and correct transcripts of my testimony so given.

_____
                ERIC DAVIS

SUBSCRIBED AND SWORN TO
me before this _____ day
of _____, A.D. 2024.
_____, Notary Public

Exhibit 1 Page 33

ERIC DAVIS
June 5, 2024

Page 261

STATE OF ILLINOIS )
) ss:
COUNTY OF C O O K )

I, Peggy A. Anderson, a Certified Shorthand Reporter in the State of Illinois do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction, and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That the said deposition was adjourned as stated herein;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 262

IN WITNESS WHEREOF, I do hereunto set my hand this 12th day of June, 2024.

_____
Peggy A. Anderson
Certified Shorthand Reporter
License No. 084-003813

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 1

A
A.D 260:22
ability
  159:20
  204:10
  218:19
  232:15
  254:8 259:2
  259:7
able 142:17
  143:16
  160:14
  161:15
  162:17
  196:22
  204:17
  220:23
  223:12
able-bodied
  231:3,14,14
absent
  145:14
absolutely
  244:12
accelerate
  159:18
  200:10
accelerated
  204:11
accelerating
  216:11
acceptance
  156:10
access 143:17
  205:20
  231:2,13,20
  231:23,24
  232:12,14
  233:18
accessibility
  163:15
  177:21
  178:9
  179:22

184:4 192:5
205:19
209:14
239:15
accessible
  138:15,18
  138:22
  139:2 180:1
  180:21
  213:5
  240:14,24
accidents
  233:3
accommod...
  168:8,12
  171:4,12,20
  172:9
  173:14
  175:5
accommod...
  166:20
  168:3
  172:15
accomplish
  162:15
accomplish...
  168:8
accomplish...
  163:10
achieve
  168:17,22
  168:22
Act 134:18
  134:22
  167:23
  171:11
  230:2,14
  231:7
action 196:18
  261:24
actual 152:8
  199:15
  245:14
ADA 134:8

134:10,11
134:13,20
135:4,11
136:17
137:3,20
138:7 139:8
140:9,14,17
143:1,6,12
144:7,10
147:17
149:5 156:5
158:24
162:18
163:24
165:12
166:6,9,18
166:19
167:7 169:1
169:4,7
170:23
172:8,17
173:1,16,24
174:10,21
177:4
178:20,24
179:18
180:6,15
182:14
183:3,8,11
183:18
184:1
187:15
188:3,19
189:2 190:6
190:11
205:14
206:2,4
207:5
208:12
209:6,21
215:8 217:2
219:5
227:21
228:4,13,18

229:22
230:24
231:1,9,19
232:9,10,18
232:23
233:7,12
234:7,15,17
234:20,21
235:22,23
241:19
244:10,17
245:5 249:5
250:23
addition
  134:15
  197:9,16
  235:5
additional
  143:4
  202:14
address
  140:22
  141:7
  166:15
  210:6
addressed
  212:21
  242:12
addresses
  205:20
addressing
  188:19
  206:14
  215:20
adjourned
  261:19
adjust 160:3
advice 177:3
  177:9
advisable
  226:15
advise 145:2
advised
  197:18
advisor

174:10
advisors
  148:7
ADX 169:3
affidavit
  240:18
affirmative
  181:18
affirmatively
  181:17
aforesaid
  260:12,16
afternoon
  133:10
agencies
  166:14
agency
  147:22
  148:21
  171:19
  236:17
ago 133:21
  150:15
  192:20
  202:11
  240:4
agree 135:21
  136:12
  158:1 162:5
  162:10,11
  162:12,19
  177:22
  178:4
  181:20
  183:9
  184:23
  215:2
  248:22
  249:19
  252:1
agreed
  223:13
ahead 185:20

198:20
200:21
201:2 202:8
204:14
207:13
227:1
229:11
238:4
239:18
256:6
AIA 194:13
al 130:7
260:7
allow 161:1
  170:24
  232:10
allowable
  146:17
  172:15
  173:10,15
  176:2,24
allowance
  236:15
allowed
  138:4,15,19
  170:16
  221:11
Allowing
  144:16
allows 149:5
  160:22
  173:17
  204:12
altered 143:1
alternate
  242:11
  252:7
amendment
  195:24
American
  231:22
Americans
  134:17,22
  231:7

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 2

amount
  196:17
  222:13
analysis
  179:4 183:5
  190:24
  192:1
  193:13,13
analyze
  210:22
And/or
  137:21
Anderson
  130:16
  261:3 262:7
answer
  172:13
  174:2,5
  185:20
  188:6 195:5
  199:7
  200:16
  207:17,21
  209:15
  225:16,19
  227:7
  228:16,19
  230:18
  244:3
  245:12,17
  249:2 251:3
  251:7
answered
  174:2
  181:16,18
  185:19
  207:9,12,15
  228:5,7
  240:9 244:7
  251:5
answering
  246:24
answers
  168:7

anybody
  176:13
  229:17
anyway
  218:15
apparently
  187:3
  194:16
  226:19
Appeared
  131:8,16
appears
  252:4
applicable
  137:21
  147:13
applied 146:3
  133:16
apply 144:18
  169:8
appointment
  185:1
appointme...
  208:21
  248:5,14
approach
  142:14
  200:8
  205:12
  209:21,24
approached
  211:6
approval
  145:19
  218:13
approve
  156:1 245:4
approved
  156:21
  246:15,21
approves
  244:23
approximate
  224:19

239:4
approxima...
  152:23
  165:6
  182:17
  187:3
  223:13
April 154:9
  154:13
  155:2
  177:12
  222:11
  239:11
architect
  133:12,14
  133:16
  144:21
  146:6,12,16
  146:20,22
  147:8,24
  148:7
  155:13
  156:8,11,17
  156:20,23
  160:8
  164:22
  179:14
  200:12,19
  203:4,6,17
  203:21
  210:20,24
  214:5 254:7
  259:3
architects
  145:19
  149:6
  159:11
  163:7
  204:12
  246:11
architectural
  133:22
  134:2
  151:14,24

212:9
217:10
219:9,22
223:23
224:4
238:23
239:1
246:14
154:13
192:23
176:24
architecture
  134:23
  184:5 191:9
  191:22
  200:13
  205:7
  207:21,23
  208:1 228:9
  252:10,14
aspect 179:21
  235:21
aspects
  134:22
assertion
  178:3,4
  209:18
  243:4
assess 190:22
  210:13
  214:5,24
  216:9
  228:17
  243:6
  244:13
  249:24
assessed
  179:24
  212:9
assessing
  179:21
  181:21
  188:24
  192:24
  206:14,18
  214:20

227:24
228:5,7
241:12
244:6 251:4
258:2
asking 138:3
  138:5
  158:10,15
  171:17,24
  176:1,3,22
  191:22
  200:13
  205:7
  207:21,23
  208:1 228:9
  252:10,14
architectur...
  192:23
architecture
area 137:7
  138:18
  148:12
  157:19
  160:20
  210:23,23
  243:6
  252:13
  256:9 257:8
areas 138:16
  138:20
  160:21
  178:23
  193:22
  205:18
  212:15,20
  214:5,24
  216:9
  228:17
  243:6
  244:13
  249:24
arms 216:17
arrest 148:23
arrow 257:17
  258:8
arrows
  257:19
Art 134:24
article 230:5
asked 174:19

assessment
  178:6,9,12
  182:24
  188:9 191:3
  191:23
  198:20,21
  201:19
  202:24
  206:20,21
  209:5
  211:13
  212:14,17
  215:1,19
  216:12
  226:18
  227:11,16
  227:18
  235:11
  241:21
  245:5,10
  255:3 259:4
  259:12
assessments
  212:24
  247:22
assign 219:1
assignment
  193:9
  199:24
  200:20
  202:12
  203:16
  211:20
  218:2,5,23
  219:14,15
  219:17
  220:3,6
  224:22
assignments
  221:9

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 34

---

**ERIC DAVIS**
**June 5, 2024**

Page 3

assistance 171:22 173:5,10 234:24 235:5
assisting 175:20
assume 156:6 172:23 209:1 229:1
assuming 172:1 180:22 207:2 214:16 248:1 254:24
assumption 248:8
assured 195:11 196:16,19
attached 154:16 206:20
attachment 191:16
attempting 159:6 211:24 216:16 242:13
attention 146:10 230:8 233:15
attorney 256:24 261:21,22
authority 147:10 149:10
automatica... 176:7

available 163:11 193:11 208:24
Avenue 131:5 202:17
balance 202:17
barriers 212:19
aware 155:13 170:2 175:14,16 175:17 176:1,2,8 176:10,22 176:24 179:3,20,23 188:8 209:9 212:11,12 212:24 213:21 215:12 216:9,10,11 216:14 229:22 230:1,10 232:7 235:2 236:5,12 238:14 240:1
**B**
B 132:10 139:20
back 157:9 160:12,15 162:20,21 163:21 165:14 166:2 167:19 178:6 185:5 194:15,23 226:8 238:13

240:18 243:9 250:9 250:10 256:11 237:4 259:4
based 143:8 155:6 161:6 166:17 167:3 209:4
basically 160:1
basis 150:6 163:12 170:8 186:16 208:17 209:3 215:14 232:16 245:16 248:3
beginning 204:2
begun 225:7
behalf 131:8 131:16
believe 133:10,20 134:15 143:6 144:1 148:18 150:16 151:10 152:22 153:18 158:24 159:15,24 161:20 164:16,21 165:17

166:6,13 170:4 173:7 174:11 182:13 187:12,19 190:4,8 192:18 194:12 199:9 200:5 201:4 202:4 207:9 208:23 213:7 229:14 237:6 238:9 238:10,24
benches 213:22
benefit 234:24
benefits 231:23
best 211:10 229:16
best-case 209:12
better 141:21 162:3 246:1 246:2,3 247:22
beyond 142:2 146:8 159:8 233:7,12,16
bid 192:10 194:18
bit 133:12 172:18 221:10 241:9
black 255:21 257:12
block 145:14

254:6
blueprints 149:12
board 196:18 211:23 244:19,22 246:16,22 247:4,9
bottom 141:24 142:3 143:2 143:14 144:4,15 145:5 151:13,15 157:19 158:7,11 180:13 181:1,1 182:15 253:22 257:5
bound 185:16
break 185:3 185:11 245:14 246:2,8 250:5
brevity 193:16
bridge 224:16 237:8
brief 185:3
bring 146:10 207:5,8
broader 209:12
broke 210:8 211:2
broken 189:8
brought

230:8 253:20
budget 246:23 247:1
building 138:21 144:12 145:20 147:23 152:17 155:20 156:12 157:1 164:4 167:6,17 169:6,14 171:10 172:2,16,19 185:17 186:5 190:2 190:7,12 193:11 202:19 203:2 208:18,22 214:24 235:5,20,21 236:1 237:24 238:17 240:24
buildings 138:4,9,12 163:23 164:3,8,12 165:6,12 166:9,10,15 166:18 167:1,3,11 169:2 184:17 212:23 231:4,13 232:13,14

---

**ERIC DAVIS**
**June 5, 2024**

Page 4

built 144:12 144:12 163:24 164:10,12 165:17 166:9,11,18 167:14 169:7,14 171:11 172:3,20 175:22
business 229:23
**C**
C 131:1 133:8 251:17 254:16 261:2
calculated 142:20 153:3
call 148:8 149:20 150:9 194:3 194:8 212:2 227:7
called 130:12 133:5 137:10 138:22 150:5,8 156:10,16 204:10
calls 230:16
campus 163:23 164:9,9,18 165:2,8 172:3 189:1 189:9,12 193:11 206:1

209:22 210:1,15 211:5,14 215:20 216:10 241:23 242:12 245:11 259:13
cane 142:13 142:13,22 143:16 161:15 230:12
canes 141:5 162:16 186:7,15 215:16
Capital 144:23 163:6 175:8 176:13 177:20 178:10 183:7 213:3 218:18 219:8 220:14 221:19 242:22 246:19 247:5 250:22
care 213:1 242:20 244:1
Cermak 164:6 176:17,18 186:17,21 187:5,13,20 187:24 188:3,13 189:19,22 189:23 191:10

144:18 146:4,17,23 147:8,9,10 148:18,20 155:15 156:24 162:24 168:5 173:18 181:19 184:9 188:22 191:6,23 199:17,21 204:7 205:6 208:20,21 210:21 211:18 213:12 215:5,13 218:17,20 219:12 220:20 221:2,21 222:8,14,15 222:15,22 223:12,21 224:11,16 225:1,9 237:15,24 248:6,14,24 249:14 250:13 251:1,9 259:15
Cermak's 248:18
career 134:1 205:16
careful
Carl's 227:6
case 135:14 142:24 143:2

cases 167:5 168:18 228:24 233:7 252:7
caveats 168:23
cell 212:15
cells 240:3,5 240:14 243:6
certain 159:7 160:3 182:18 208:11
certainty

192:5,24 193:13 195:2 196:9 197:20 199:4,16 200:4,11,15 200:20,23 201:14 202:12 203:10,12 204:1,2 205:7 206:10,12 207:4 208:20,21 210:21 211:18 213:12 215:5,13 218:17,20 219:12 220:20 221:2,21 222:15,22 223:12,21 224:11,16 225:1,9 237:15,24 248:6,14,24 249:14 250:13 251:1,9 259:15
certification 134:10
Certified 130:16 261:3 262:8
certify 204:15 261:5
cetera 159:11 196:18
challenge 245:14 246:6
change 160:15 252:22
changed 143:6
character 231:22
characteriz... 144:2 242:16,18 243:24 248:22 249:14
characterize 141:22 162:3 177:19 184:20 231:5
characteriz... 137:15
charge 221:21 222:7,13,21
check 153:11 165:1 166:2
checked 156:21
Chicago 131:6,14
certainty

170:2
134:24 146:23 147:9,15 148:23 149:2
Chief 197:6
chosen 200:10
CIP 134:20
CIP's 247:3,9
circumstance 147:6
circumstan... 170:13 236:14
citation 179:1
cited 212:20
city 146:23 147:9,15 149:1 204:15
civil 130:13 231:19 232:3
clarification 198:8 208:4 249:9
clarity 193:17 198:21
classes 232:19
clear 138:3 138:10 146:1 154:7 160:14 171:24 189:14 197:13 201:12 208:14 218:21
clearly

---

**ERIC DAVIS**
**June 5, 2024**

Page 5

164:24 169:17 204:8 231:18 243:13
Clerk 131:19
close 223:8 243:14
code 137:20 140:14,17 141:10 144:11 156:4 161:5 166:8 172:8 173:2,16 177:23 178:24 182:1,3,12 182:22 183:2,10 207:6,8 215:8 234:18 241:19
codes 137:21 138:7
cogent 229:15
Cohen 131:19
coincide 153:14
colloquially 150:2,10
color 256:3
combination 246:4
come 164:14 185:5 188:16 219:4
coming 159:16 175:15

183:17
commence... 261:6
comment 243:5 255:4
commissio... 153:12 184:12
commissio... 244:20,23 247:4,5
committed 233:5
common 147:6
communica... 201:5 230:7
compensated 229:21
compensati... 229:20
complain 211:21
complaining 211:17
complete 138:10 193:19 200:16 202:24 203:20 206:12 211:24 220:23 233:6 242:14
completed 155:14 244:4 247:11,18
completely 209:13 244:2
completion

156:2
compliance 145:23 148:3 178:24 180:5,6,11 180:14 181:3,5 182:3,7 183:13,17 184:1,16 206:2 207:5 207:8 217:2 219:4 228:4 228:13
compliant 137:9,10,17 137:19 138:6 146:16 169:16 170:17 173:13 179:2,5 180:19 182:10,14 184:6 204:16 234:18 241:18
complied 179:18
complies 156:3 176:9 206:4 236:1
comply 169:2 169:19 171:10 175:23 209:13 228:22 235:8,15,23 236:4
complying

177:4
components 180:8
comprehen... 178:15 209:20,23 210:7 213:2 213:11 214:21 216:18 233:24 241:24 243:16
comprehen... 190:15 191:14 216:13
compromise 159:9
concerning 261:9
concerns 168:10
conclusion 223:8
concrete 151:20
condition 145:9 146:15 159:19 170:11 172:13
conditions 145:15 156:9 168:11
conduct 191:22 204:14
conference 194:14
configurati... 142:4

168:13 224:17
confined 204:13
confines 165:7
confirm 150:13
confirmed 192:13
Congress 166:7
conjunction 251:21
connecting 152:11 189:23
consider 134:4 146:16 147:12 223:20
considerati... 205:16
considered 137:3,9 138:6,17,23 139:2 161:20 180:20 205:12
considering 253:8
consistent 147:12 156:13 157:2
consisting 260:15
constitutes

261:13
construct 167:6 211:23 224:8 241:22
constructed 145:10 146:3,5 150:7 151:19 155:17 156:9,12 157:1 165:3 167:4,6 169:1 171:18 198:19 202:3 205:21 228:3
construction 144:17 145:1 149:16,19 149:20 150:3,8,11 150:14 151:6 152:16 156:2,15 159:11 167:17 168:24 200:21 205:13 210:10,14 211:1,9,13 216:14 218:3,9,19 219:2,10,23 220:19 221:2 225:6 225:14

---

**ERIC DAVIS**
**June 5, 2024**

Page 6

240:3 245:3 245:8,15 246:1
consult 149:2 174:22 175:2
consultant 174:8 220:8
consultants 175:1 233:10
consultation 220:13
consulted 220:5
consulting 174:8,9
context 191:7 191:8 192:3 205:18
continue 258:12
continuing 134:16
continuous 159:18
contract 150:9,13 151:7 196:1 196:3,20 199:4 201:6 201:9 202:6 211:18 218:1,23 221:6,8 225:7 238:8 239:7 246:2 246:13
contracting 225:2 226:11
contractor 211:22 219:1 225:7

225:12
contractors 145:3,18 150:4 163:8
contracts 244:23 245:4,7 246:3
contractually 196:7
convention 194:13
Cook 130:6 138:24 145:1,3 156:1 163:16 163:16,22 165:8 166:12 167:13 172:2 175:6 175:18 176:14 177:2 178:13 183:7,16,23 188:11,24 189:9,11 190:21,24 192:9 207:3 207:6 208:9 208:11,16 209:3 212:7 214:18 215:4,11,19 215:24 218:23 218:24 219:9,19,24 225:15 228:14,22 230:10,13 236:7

238:18
240:14,21 241:5,16 244:10,18 244:19,22 246:15,22 248:11 249:11 250:15 255:1 260:6
coordination 226:13
correct 137:7 137:20 139:14 147:18 152:21 153:9 158:21 164:1 165:8 165:9,13 166:22 167:12 168:4 169:3 183:12,13 189:4,10 195:21,23 201:22 203:10 208:22 209:8 215:9 217:3 218:20 220:21 235:16,24 238:18 240:5 246:17 249:6 252:2 260:17
corrected 254:23
correcting 244:17

correction 172:2
corrections 163:13,23 189:1,12 209:22 212:8 215:20 228:15 241:23 244:11,18
correctly 148:14 176:4 199:10 204:1,3 206:9,10,13 206:15,19 206:22 207:4,7 208:12,19 209:5,12 215:21
corridor 135:13,22 135:22 136:2 138:23 139:6 149:13,16 150:14 151:4 152:18 158:1,2,8 160:10 162:17 169:18 170:17 171:13 178:9,12,23 179:15,17 179:22 180:3 181:4 181:21 183:3,9,19 183:24 185:13,15 186:17,23 186:24 187:5,6,14 187:24

188:3,13
190:10,17 190:22 191:11 192:6,24 193:1,1 194:8 195:2 196:4,9 197:20 199:4,16 200:4 201:14 203:10 204:1,3 206:9,10,13 206:15,19 206:22 207:4,7 208:12,19 209:5,12 215:21 216:1 217:1 217:7,12 218:10 219:4,11,12 219:23 220:21 221:3 222:15 224:4 227:18 228:3,12,22 230:11 235:7 236:9 236:11 241:6,17 244:4 247:11 248:1,4,12 248:13,18 248:20,24 249:1,4,13 249:18

250:20 259:5
cost 221:1 224:8,10,20 224:23 225:15 239:4 244:9
cost-effective 205:22 206:12 210:18 211:11 212:1
costs 224:13
counsel 153:13 184:12 261:21,22
County 130:6 138:24 145:1,3 146:2 156:1 156:24 163:16,22 164:23 165:8 166:12 167:13 172:2 175:6 175:18 176:14 177:2 178:13 183:7,17,24 188:12,24 189:9,11 190:21 191:1 197:1 207:3,6 208:9,11,16 209:3 212:7 214:18 215:4,11,19

## ERIC DAVIS — June 5, 2024 — Page 7

215:24
216:23
219:1,9,24
225:15
228:14,22
229:2,10,16
230:10,13
233:14
236:7
238:19
239:8,10,24
240:14,21
241:5,16
244:11,18
244:19,22
246:16,22
248:11
249:11
250:15
255:1 260:6
261:2
**County's**
163:6 206:3
219:20
**couple**
176:21
195:12
196:21
197:1
251:14
**course**
134:16,19
146:12
205:4 225:4
236:13
**court** 130:1
238:17
240:24
260:1
**courthouse**
212:16
239:16
243:18
251:10
**courthouses**
145:2
**courtroom**
243:8,15,15
**courtrooms**
243:10
**Courts**
130:14
**cover** 154:8
212:23
**covering**
226:24
**create** 159:19
255:13
257:18
258:17,22
**creating**
145:13
258:18
**credence**
241:5
**criminal**
243:18
**CROSS-E...**
132:5
**current** 181:5
238:9
259:14
**cycles** 246:24
247:2

**___D___**

**D** 132:1
133:8
139:19
157:11
254:16
**daily** 186:16
208:17
209:3
215:14
248:3
**damages**
230:15
**Darr** 160:7
226:16
254:22
**Darr's**
160:24
**DART** 130:7
260:7
**date** 154:5,7
154:9 169:9
169:10,11
192:10
221:18
239:24
**Davis** 130:11
132:2 133:4
133:10
139:16
149:15
228:6 246:8
257:23
260:10,19
**day** 130:6,10
155:2
195:15
226:2 239:6
260:6,13,14
260:21
262:2
**days** 195:12
196:21
197:1
**deal** 184:17
184:18
188:17
234:6
**dealt** 213:11
**decided**
160:12
**decides**
248:11
**decision**
219:19,24
220:12
243:11
244:16
245:2
**Declaration**
154:16
162:21,24
188:18,22
205:9 222:3
256:17
**deemed**
175:3
**Defendants**
130:8
131:17
260:8
**deficiency**
155:14
**define** 135:16
177:15
201:17
**defined** 136:3
162:17
204:8
**defines**
157:10
**definitely**
250:18
**definition**
135:24
196:21
197:1
**degree** 135:3
**delay** 202:15
**delegate**
148:20
149:1
**delineated**
200:8
**deliver** 225:1
**demolition**
204:2
**demonstrat...**
230:22
**department**
141:2 148:6
148:15
149:6
159:10
163:13,22
166:13
175:7
176:13
189:12
192:14
209:22
212:8,18
215:19
220:10,13
220:14
222:24
223:1
228:14
234:22
241:23
242:22
244:11,18
245:1
250:21
**depend**
234:15
**depending**
226:2
**deponent**
181:15
260:11
**deposed**
198:2
**deposition**
130:10
174:11
196:15
198:14
200:6
207:21,23
223:3 229:6
242:10
250:7
257:22
260:12,13
261:10,16
261:18
**depositions**
130:15
**deputy**
144:23
174:15
178:10
183:6 197:6
218:18
221:19
**describe**
149:21
**described**
220:17
**design**
144:24
147:23
195:2
198:18
202:2
205:13,14
210:10,13
210:19
211:8,13
216:13,24
217:11,22
219:3
221:21
222:14,21
223:21
224:4 225:5
225:5
227:20
228:18,21
233:13
241:21
245:3
259:15
**designated**
138:14
**designed**
164:22
211:7
**designing**

## ERIC DAVIS — June 5, 2024 — Page 8

145:20
146:6
**desire** 176:5
**detailed**
215:3
**detainees**
138:24
170:14
176:16
185:15
186:3
208:18
236:10
241:1 248:3
248:13
**determinat...**
216:9 229:5
**determine**
179:18
189:1
214:19
222:21
223:12
**determined**
210:5
**develop**
224:22
241:21
**developed**
140:22
141:2
**developing**
146:13
225:8
**development**
163:5
196:22
198:23
**DEVORE**
131:11,12
**diagram**
255:7
**difference**
235:18
**different**
152:9
153:20
166:7
167:10,10
177:18
184:4
197:24
224:18
253:9
**difficult**
250:1
**difficulty**
161:13
185:24
249:20
**Digressing**
194:2
**dimension**
152:3,5
160:22
**dimensional**
141:3
**diminishing**
234:4
**direct** 132:3
254:8
**directed**
147:21
**direction**
160:3,15
183:23
261:13
**directly**
261:23
**director**
174:16
183:6
218:18
220:10
221:19
226:8
243:12
250:21
259:10
**disabilities**
134:18,22
146:24
162:9
186:10,12
186:14,14
231:7 233:2
**disable-bo...**
231:3
**disabled**
141:14
159:10
161:13
185:24
215:14
229:20
231:12
232:11,12
234:11,14
**disagree**
178:2,21
**discrete**
189:8
193:20
**discuss**
253:19
256:18
**discussed**
187:22
150:1
152:22
157:6 200:5
224:12
**discusses**
188:19,24
201:13
**discussing**
190:9
**discussions**
242:2
219:2,10
221:19
226:8
157:18,20
159:7
**distinctly**
241:14
**District** 130:1
130:1,14
260:1,1
**Division**
130:2
165:17
167:14,22
189:21,22
189:24
191:12
213:4,13,14
213:16,22
214:10
260:2
**divisions**
165:16,20
216:20
**DOC** 164:18
**document**
151:10
153:17,21
193:20
206:21
256:18
**documents**
150:3,9,10
150:11,13
200:22
223:15
252:4 253:6
**doing** 179:17
198:19
201:13
210:21
211:4
217:21
219:2,10
245:24
249:16
253:15
**DOJ** 149:2
174:23
**dollars**
240:23
244:15
**door** 145:14
254:5,11,11
254:20
257:11
258:9,15,15
**doors** 194:5
252:13
253:21
254:4,5,9
254:24
255:13,17
255:18,21
255:22
256:1 257:9
257:11,11
257:13,14
257:16,18
257:20
258:7,8,16
258:22
**dormitories**
214:17
**dorms** 189:20
**dots** 152:11
**double**
257:11
**double-check**
222:2
**dozen** 226:14
220:19,24
**draft** 154:2,5
154:6
**drafted**
207:22
**drawing**
202:11
255:9,19,22
255:22
257:2
258:19
**drawings**
146:13,22
149:12,16
149:20,21
150:5,6
151:6,7,14
151:15,16
151:21,23
152:1,15
156:13
157:2 187:9
195:20
196:3,8
197:20
198:6,7,16
198:17
199:14,15
199:24
200:15,17
201:11,13
201:18,18
201:20,23
201:24
202:16,21
203:9,24
204:23
210:23
216:24
217:5,11,22
218:3,3,9
218:14,19
219:2,10,23
220:19,24
221:2,21
239:20
240:3
241:21
246:1
**due** 144:16
196:1
**duly** 133:2,6
260:10
261:8
**duplicate**

## ERIC DAVIS — June 5, 2024 — Page 9

191:18
**duties** 163:4
199:2

**___E___**

**E** 131:1,1
132:1,10
133:8,8
251:17
254:16,16
254:16
**earlier**
153:23
154:1,3
214:4
223:15
242:15
245:12
**easily** 254:23
**east** 135:13
135:22,22
136:2
138:23
139:6
149:12,16
150:14
151:4
152:18
155:20
158:1,2,8
160:10
164:16
177:13
178:12,23
179:15,17
179:22
180:2 181:4
181:21
183:3,9,19
183:24
185:14
186:16,23
187:5
190:10,17
190:22
191:7
192:24
194:8 196:3
206:3,9,14
206:19,21
207:7
208:12,19
209:5,12
210:8
211:12
215:4,13,18
215:21
216:1,24
217:6,12,22
218:10
219:3,11,23
220:20
224:4
227:18
228:2,12,21
230:11
233:21
234:3 235:7
236:3,9,11
241:17
244:4
247:11
248:1,4,11
248:13,19
249:1,4,12
249:18
250:20
253:12,24
254:24
255:13
257:18
258:17
259:5
**EASTERN**
130:2 260:2
**education**
134:17
135:2
**effect** 164:1
169:10
192:2
**effective**
169:11
212:1 243:1
**effectively**
243:23
**efficient**
205:22
206:11
209:19
210:17
211:11
212:1 213:2
233:23
243:1
245:24
**efficiently**
243:22
**effort** 191:18
242:6,23
243:24
**efforts**
252:24
253:6
**eight-part**
134:16
**either** 144:14
236:1
249:18,21
249:22
**elderly** 233:2
**element**
142:19
151:18
152:20
156:22
179:7 180:4
180:11,12
180:19
205:17
207:16
210:5 232:3
**elements**
179:2,13,14
180:2,23
192:2
198:18
202:2
209:10
212:13,17
233:14,16
235:2 242:5
242:7,10
245:15
252:3
**elevation**
151:13,15
**elevations**
152:1,2,16
**eliminate**
204:21
**else's** 227:14
**emphasize**
170:15
**employed**
238:18
**employee**
261:20,22
**enactment**
169:10
**encompass**
165:7
**ended** 192:16
192:19
**enforced**
134:14
**enforcement**
148:20
236:16
**enforces**
147:17
**engaging**
163:7
**engineer**
226:6
**engineering**
212:9
238:23
239:2
246:14
**engineers**
145:19
246:11
**enormous**
205:11
**enormously**
231:17
**ensure** 206:4
**enter** 164:17
**entire** 188:24
193:11
202:19
206:4 210:1
210:14
211:14
215:19
216:9
224:11
**entities**
133:24
134:3
166:11,19
**entity** 144:12
167:13,24
168:2
171:12
172:9 173:2
173:4,18
**entrust**
242:24
**entry** 164:15
164:15,19
165:24
**environment**
232:17
236:16
237:2
**equal** 231:2
232:16
233:19
250:20
**equally**
248:23
**Eric** 130:11
132:2 133:4
154:14
185:20
251:19
256:10
260:10,19
**escort** 237:3
**escorted**
171:22
176:7
236:21
**essentially**
189:18
**establish**
147:20
**established**
236:2
**estimate**
224:23
225:15
228:1
**et** 130:7
159:11
196:18
260:7
**EUGENE**
130:3 260:3
**evaluate**
194:20
**evaluation**
143:8
204:19
214:3,6
**evaluations**
223:24
**evening**
251:13
**everybody**
231:23
232:23
**Evidently**

## ERIC DAVIS — June 5, 2024 — Page 10

**exactly**
153:24
**examination**
130:12
132:3,6
261:7
**examined**
133:6
**example**
146:1 147:3
167:20,22
168:6
169:12
224:15
226:6
228:24
**exasperation**
227:22
**exceeded**
172:22
**exceeds** 158:3
158:9,9
170:19
173:22
**exception**
145:20
146:17
147:24
169:24
170:4 173:2
173:11,15
173:24
175:9
176:17
235:19
236:6,7
**exceptions**
170:4
**excess** 155:22
**excuse**
217:17,17
245:23
253:23
**execute**
201:10
**executed**
201:7
**exemptions**
169:23
170:9,15
**exercised**
134:14
**Exhibit**
132:13,14
142:6
162:21,24
165:5 178:7
178:7,21
185:13
188:18,23
205:10
**existing**
168:10
189:19
257:13
**exit** 254:12
**expect** 141:1
155:15
179:15
191:14,17
196:23
218:11
224:6 226:2
**expectation**
204:6
220:22
223:7
**expectations**
218:6
**expected**
152:13
**expecting**
218:1
**expedient**
245:16
**expeditious**
205:22
**expend**
190:21
**expert** 140:9
176:4
**expertise**
245:1
**experts** 141:2
170:9,15
**explain** 142:8
155:24
157:17
202:10
206:6,11
208:8 241:4
**explanation**
140:17
**express**
227:22
141:18
205:10
**extend** 142:1
146:8
**extended**
152:11
161:17
**extension**
142:10
143:3,13
144:3,13,14
145:5 147:4
180:12
181:22,23
182:24
183:4 186:2
186:8 187:1
187:18
188:14
189:3
195:22
196:10
216:3
222:23
231:21
232:8

**___F___**

**facilitate**
159:20
**facilities**
165:10
166:21
170:10
177:8
**facility** 164:6
168:4
173:12
189:20
203:12
235:1,6
248:6
**fact** 196:1,13
201:8
215:12
217:4
225:8 253:5
240:21
258:14
**fair** 135:3
141:18
143:18,19
144:8
160:17
161:17
163:17
171:15
177:7,14
181:22,23
182:24
183:4 186:2
186:8 187:1
187:18
188:14
189:3
195:22
196:10
216:3
222:23
231:5 234:9
234:10,19
234:20
235:9,10,11
244:21
247:13
248:15
259:6
**fairly** 147:5
**fairness**
231:20
233:18
**faith** 242:19
**fall** 135:23
169:23
170:3
**FAQ** 174:24
**far** 137:15
140:5
200:18
216:8,18
225:8 253:5
**feasibility**
233:16
**feasible**
138:8
168:17
254:3
**February**
222:4,5
**federal**
130:13
147:15,17
147:19,22
148:22
167:7,13
168:1
228:20,23
229:9,13
**fee** 221:14,17
221:20
222:7
223:12,20
224:2,3
**feel** 200:17
201:1
245:13
**feet** 182:4
187:10
**figure** 256:14
257:3
**figures** 239:5
**filed** 153:17
154:10,13
**final** 149:22
154:18
156:10
**finalize** 225:5
**finally**
182:21
**find** 174:4
181:12
192:3
211:19
235:12
**findings**
177:12
178:22
180:4
187:23
**fine** 144:2
258:21
**finishing**
201:9
**fire** 254:4,11
254:12
258:10,15
258:18,22
**firm** 174:12
179:16
191:22
192:23
193:6,18
194:1,20
203:22
210:12
217:11,21
217:24
218:5 219:9
219:22
220:5 224:4
225:14
226:12
227:7,19
228:17
238:23

**ERIC DAVIS**
**June 5, 2024**

Page 11

| | | | | | |
|---|---|---|---|---|---|
| 239:2 | 252:6 | 137:3 | 185:14 | 186:17 | 205:1 207:4 |
| **firms** 210:22 | **foregoing** | 139:23 | 187:12,24 | 194:23 | 208:19 |
| 217:18,20 | 260:13,17 | 141:22 | 188:2 | 199:15 | 209:15 |
| 221:7 | 261:10 | 142:14 | 190:23 | 200:21 | 215:16,24 |
| 244:13 | **foremost** | 144:19 | 191:20 | 202:8,14 | 222:13 |
| 245:3 246:5 | 212:6 | 166:17 | 196:1,7,20 | 203:21 | 227:1 |
| **first** 133:2,5 | **form** 230:21 | 167:23,24 | 196:24 | 204:13 | 236:10,19 |
| 157:16 | 241:10 | 168:3,15,20 | 197:18 | 207:13 | 241:5 243:3 |
| 174:6 197:3 | 256:3 | 169:13 | 198:5,15 | 208:20 | 248:4 |
| 204:19 | **forth** 244:16 | 170:16 | 199:3,13,23 | 218:16 | 249:18,18 |
| 212:6 216:4 | **forward** | 178:14 | 201:5,12 | 221:11 | 252:23 |
| 247:7 | 243:3 247:6 | **generally** | 203:11,20 | 224:15 | 254:6 |
| 249:16 | 247:23 | 136:19 | 206:20 | 225:10 | 256:13 |
| 260:10 | **found** 155:6 | 221:8 | 213:12 | 229:11 | **good** 133:10 |
| **five** 209:7 | 180:11,24 | **generate** | 215:3 | 238:4 | 229:8 |
| 240:4 | 181:24 | 217:5 | 226:16,22 | 239:18 | 242:19 |
| **fixed** 214:17 | 182:2,6 | **getting** | 227:10,17 | 243:3 | 251:13 |
| **flight** 143:10 | 183:1 | 195:17 | 254:22 | 244:16 | **Gordian** |
| **flip** 255:5 | 187:13 | 232:21 | 255:6 257:3 | 247:6,23 | 226:12 |
| **floor** 147:3 | 188:2 | **giant** 246:1 | 258:11 | 248:5,14 | **government** |
| 182:10,18 | 194:10 | **give** 135:5 | 259:4 | 253:10,13 | 147:16,17 |
| 193:12 | 258:6 | 160:14 | **Globetrotte...** | 256:6,17 | 147:19,22 |
| 252:15,21 | **four** 165:10 | 172:13 | 142:5 152:4 | **goal** 206:3 | 170:24 |
| **focused** | 247:18 | 209:11,15 | 157:10,24 | **goes** 220:10 | 175:18 |
| 171:9 | 248:2,8 | 219:14,15 | 160:8 | 230:11 | 176:14 |
| 240:17 | 255:2 | 228:16 | 177:12,22 | 231:21 | 216:23 |
| **folks** 163:1 | **front** 163:1 | **given** 195:20 | 191:3,15,19 | **going** 139:19 | 219:20 |
| **follow** 151:20 | 229:7 | 205:11 | 209:4 227:5 | 142:23 | **graduate** |
| 167:16 | **full** 191:23 | 227:11 | 257:15 | 143:9 147:5 | 134:23 |
| 210:13 | 215:18 | 229:6,7 | **go** 141:16 | 157:4,9 | **great** 185:8 |
| 229:12,13 | **functions** | 240:21 | 142:15 | 159:14 | **greater** |
| 242:21 | 231:24 | 260:18 | 146:23 | 160:4,7,10 | 158:12,13 |
| **followed** | **fundamental** | 261:14 | 147:13 | 160:19 | 172:4 |
| 156:7 | 231:6 | **gives** 228:18 | 156:23 | 162:20 | **greatly** 158:2 |
| **following** | **funding** | **giving** 193:19 | 158:17 | 172:10 | **green** 195:20 |
| 136:8 | 167:7,14 | **Globetrotte...** | 159:7 | 173:6 | **gripping** |
| 154:23 | 168:1 | 133:19 | 160:12,15 | 174:20 | 140:6,10,18 |
| 156:17 | **further** 157:4 | 153:3 155:6 | 162:21 | 185:18 | **ground** |
| **follows** 133:7 | 251:13 | 169:18 | 163:21 | 190:21 | 226:24 |
| **Fools'** 155:2 | 259:22 | 178:5,11 | 165:4,14 | 194:3 | **group** 179:9 |
| **foot** 143:5 | | 179:16 | 166:1 | 196:19 | 220:17 |
| **footing** | **G** | 180:3,10,23 | 167:19 | 200:13 | **groups** 163:9 |
| 233:19 | **G** 131:3,4 | 181:19 | 178:6 | 202:13 | **guess** 144:22 |
| **footnotes** | **general** 135:2 | 183:1 | 185:20 | 204:9,19 | 228:9 |

**TOOMEY REPORTING**
**312-853-0648**

**ERIC DAVIS**
**June 5, 2024**

Page 12

| | | | | | |
|---|---|---|---|---|---|
| **guesstimate** | 221:16 | **help** 142:16 | 241:24 | 224:19 | 247:6 |
| 228:2 | 243:21 | 149:5 246:5 | 242:14 | 252:2 | **inches** 136:10 |
| **guidance** | **happened** | **hereto** 261:23 | **holistically** | 255:24 | 140:7,7,11 |
| 149:6 | 197:15 | **hereunto** | 253:8 | 257:12 | 140:11,19 |
| 166:14 | 239:7 | 262:1 | **honestly** | **II** 231:8,9 | 142:2 143:5 |
| 183:16 | **happens** | **hesitate** | 235:19 | **Illinois** 130:1 | 143:7 144:5 |
| **guidances** | 145:8 | 180:16 | **hope** 204:6 | 130:17 | 144:6,14,20 |
| 174:22 | **harm** 230:21 | **hey** 146:13 | **hopeful** | 131:6,14 | 145:17 |
| **guideline** | **hazard** | 147:3 184:5 | 230:3 260:1 | 133:14 | 146:8,15 |
| 237:1 | 258:18,23 | 184:15 | 261:1,4 | 229:19 | 147:5 151:8 |
| | 184:15 | **hire** 210:12 | **hopefully** | 230:3 260:1 | 151:10 |
| **H** | **hazardous** | 210:22 | 225:23 | 261:1,4 | 152:7,21 |
| **H** 132:10 | 159:19 | 217:10 | 245:4 | **imagine** | 157:13 |
| **half** 226:14 | 195:19 | 218:19 | **horizontally** | 152:6 | 158:3,9,12 |
| **hand** 215:22 | 197:4 | 219:9,21 | 142:1 | **immediately** | 158:20 |
| 232:20 | 200:16,19 | 220:18 | **host** 162:8 | 192:12 | 161:3,20,22 |
| 256:14 | 203:6 | 227:19 | 209:7 | 197:10,10 | 161:23 |
| 262:2 | 204:10,18 | 259:3 | **hour** 205:3,5 | 254:12 | 162:3 |
| **handled** | 211:17 | **hired** 217:19 | **housed** | **impact** 242:8 | 170:19,23 |
| 149:9 | 218:19 | 218:6,22 | 184:24 | 161:23 | 171:2,3,7,8 |
| **handrail** | 219:1,12,22 | 219:1,12,22 | 185:16 | **impacted** | 171:14,19 |
| 140:6,10,18 | 220:19,23 | **hiring** 217:24 | 186:1,11 | 168:9 | 172:4,7,23 |
| 142:10 | 221:1,7,20 | 218:5 | 206:8 | **implement** | 172:24 |
| 144:3,13 | 222:6,12,20 | 228:17 | **houses** 186:5 | 252:14,20 | 173:3,20,22 |
| 145:4,5 | 223:4,22 | 244:13 | **housing** | **implement...** | 175:11,13 |
| 146:7 147:4 | 224:22 | 245:2 246:5 | 160:13 | 163:5 | 176:19 |
| 181:1,2 | 225:4,11,13 | **historic** | 165:23 | 202:15 | 178:1 181:3 |
| 182:22 | 225:21 | 168:9 170:3 | 190:12 | **implementi...** | 182:9,18,20 |
| **handrails** | 226:3 | **historical** | **hypothetic...** | 233:5 | 182:23 |
| 139:22 | 227:19 | 169:24 | 180:10,22 | 247:23 | 187:17 |
| 140:4 142:1 | 259:14 | **history** | | **importance** | 194:7 |
| 143:13 | **headed** 206:8 | 140:24 | **I** | 195:17 | 254:19 |
| 162:20 | **Health** 164:6 | 152:17 | **idea** 142:17 | 250:20 | **include** |
| 179:12 | 208:21 | 240:22 | 190:13 | **important** | 134:12 |
| 180:13 | 248:6 | **hold** 206:14 | 229:8 | 231:18,21 | 153:14 |
| 182:14,15 | **hear** 139:12 | 256:13,15 | 244:12 | 232:2,3,4,8 | 163:4,14 |
| 182:17 | 139:16 | **holding** | **identified** | 233:4 244:2 | 164:3 191:2 |
| 213:15 | 181:8,16 | 212:15 | 158:5 193:8 | 248:19,21 | 197:19 |
| **hands** 232:22 | 183:21 | 238:21 | 239:14 | 248:23 | 201:2,18,23 |
| **Hannah** | **hearing** | 239:16 | 243:13 | 250:14,18 | 211:12 |
| 131:19 | 219:6,7 | 240:3,4,13 | **identifies** | 250:23 | **included** |
| **happen** | **heights** 140:5 | 243:6,16 | 233:10 | 251:9,11,11 | 142:5 |
| 195:16 | **held** 206:18 | **holistic** | **identify** | **improve** | 189:12,24 |
| 212:4 | 206:22 | 205:12 | 165:5 179:9 | 163:15 | |
| | | 210:1 | 193:18 | **Improveme...** | |
| | | | | 246:19 | |

**TOOMEY REPORTING**
**312-853-0648**

**ERIC DAVIS**
**June 5, 2024**

Page 13

| | | | | | |
|---|---|---|---|---|---|
| 190:3 | 159:9 | 156:17 | 150:18 | 164:9 165:8 | 225:17,21 |
| 214:24 | 161:14 | 157:3 191:6 | **investigate** | 250:15 | 226:1,10 |
| **includes** | 186:10,16 | 191:13 | 172:12 | **Jason** 131:12 | 227:14 |
| 145:21 | 229:20 | 201:4 | **investigating** | 150:21 | **kind** 145:7,15 |
| 206:9 | 231:12 | 221:12 | 167:22 | 164:19 | 164:19 |
| 207:24 | 232:11,12 | 241:20 | 236:14 | 167:20 | 167:20 |
| 218:2 | 232:16 | **intentions** | **investigation** | 171:23 | 171:23 |
| **including** | 234:12,24 | 217:10 | 140:23 | 176:10 | 176:10 |
| 156:4 180:2 | 236:19 | **interact** | 258:13,21 | 184:7 | 184:7 |
| 190:17 | **inefficient** | 232:15,16 | **involve** 192:4 | 191:16 | 191:16 |
| 205:14 | 218:16 | **interest** | **involved** | 213:10 | 213:10 |
| **inclusive** | 242:5 243:8 | 193:16 | 229:17 | 237:3 | 237:3 |
| 260:15 | **infirmary** | 229:16 | 237:4,7,14 | 251:21 | 251:21 |
| **incorporate** | 186:17 | 243:14 | 238:6 | 252:16 | 252:16 |
| 191:24 | 206:9 | **interested** | 246:23 | **kinds** 167:10 | **kinds** 167:10 |
| **independe...** | **information** | 261:23 | 247:1 | **July** 225:22 | **know** 144:17 |
| 231:11 | 184:7 191:2 | **intermediate** | **involves** | **June** 130:17 | 146:10 |
| 234:8,11 | 191:3,24 | 157:5 | 221:18 | 221:18 | 149:19 |
| **independe...** | 193:10,15 | 158:14,16 | 222:11 | 222:11 | 151:9 |
| 232:12 | 225:14 | 158:19 | 239:12 | 239:12 | 152:13,16 |
| 259:3 | **inhibit** | 159:1,4 | 260:14,14 | 260:14,14 | 152:24 |
| **indicate** | 168:11 | 160:11,13 | 262:2 | 262:2 | 153:10,23 |
| 256:1 | **initial** 239:13 | 161:4,8,11 | **issued** 166:14 | **jurisdiction** | 154:3 |
| **indicated** | **initially** | 162:14 | 184:7 192:9 | 147:11 | 155:18 |
| 194:19 | 153:17 | 170:20 | 195:3,18 | 148:22 | 165:15,19 |
| 257:10,14 | **injunction** | 171:1,7,13 | 204:1 | **jurisdictions** | 167:5,8 |
| **indicates** | 215:24 | 171:17 | 212:19 | 243:19 | 168:15 |
| 235:12 | **inquiry** 176:9 | 172:5,6,22 | 223:16 | **justice** 141:3 | 170:8 173:9 |
| 257:4 | **install** 145:3 | 172:24 | 246:9 | 148:6,15 | 173:13,15 |
| **indicating** | **instance** | 173:19,20 | **issues** 177:21 | 149:7 | 173:16,22 |
| 146:7 | 141:16 | 175:10,12 | 184:4 213:6 | 159:10 | 174:3,24 |
| 193:22 | 236:23 | 175:24 | 213:8 | 166:13 | 176:7 |
| 257:19 | **instances** | 182:6 | 239:15 | 212:19 | 177:15,19 |
| **indirectly** | 235:4 | 187:15,16 | **issuing** | 231:24 | 179:13 |
| 261:24 | **Institute** | 187:21 | 195:11 | 234:22 | 184:9,10,11 |
| **individual** | 134:24 | 257:6 | 196:19 | | 184:12,16 |
| 159:6 170:8 | **intend** | **interpretat...** | **item** 141:1 | **K** | 184:20 |
| 176:6 210:4 | 242:21 | 148:9,13 | 196:13 | **K** 261:2 | 186:18 |
| 211:20 | **intended** | **interpretat...** | 207:17 | **Kate** 174:12 | 187:7 |
| 234:14 | 141:6 220:5 | 234:21 | | 194:9,11 | 188:17 |
| 242:5 | 231:11 | **interpreting** | **J** | 226:7 230:8 | 201:8 209:1 |
| **individually** | **intending** | 134:20 | **jail** 139:1 | **keep** 205:7 | 209:4 211:8 |
| 211:2,6,7 | 224:24 | 148:14 | 145:1 | 221:9 228:9 | 212:16,18 |
| **individuals** | **intent** 156:13 | **interruption** | 163:16 | **kickoff** | 213:6 214:3 |

**TOOMEY REPORTING**
**312-853-0648**

**ERIC DAVIS**
**June 5, 2024**

Page 14

| | | | | | |
|---|---|---|---|---|---|
| 214:5,9 | 155:8,9,10 | 159:12 | 175:11,24 | 252:10 | 204:24 |
| 216:4,7,16 | 157:5 | 229:12,18 | 176:19 | 255:21 | 211:7 |
| 216:19,19 | 158:11,12 | 231:19 | 177:24 | **lines** 134:22 | **look** 139:24 |
| 221:4,6,16 | 158:14,17 | 232:3 | 181:1 182:8 | 242:1 | 141:23 |
| 221:20 | 158:19,19 | 233:17 | 187:4,16 | 255:24 | 153:2 |
| 224:13,17 | 159:2,4 | 236:16 | 194:7 | 257:12 | 154:23 |
| 227:9,12,12 | 160:11,13 | **laws** 147:13 | **let's** 144:4,5 | **list** 193:20 | 165:14 |
| 230:5 | 161:5,8,11 | 147:20 | 145:12,24 | **listed** 180:8 | 174:4,17 |
| 235:19,20 | 161:22 | 148:23 | 159:16 | 155:23 | 179:10,10 |
| 236:22 | 162:7,14 | 233:5 | 160:2 | 181:13 | 179:11,11 |
| 245:10,18 | 170:20 | **lawyer** | 167:15 | **litigation** | 179:12 |
| 246:4 | 171:1,7,13 | 148:19 | 169:15 | 184:10 | 187:8,8 |
| 247:16,21 | 171:18 | 230:20 | 171:1 172:1 | 190:14 | 190:14 |
| 249:2 | 172:5,6,22 | **LCM** 174:12 | 172:6,19,23 | **little** 133:12 | 191:6,6,13 |
| 250:17 | 172:24 | 194:3,8,11 | 180:12 | 157:4 | 192:7 |
| 251:3,7,8 | 173:19,21 | 226:7 237:4 | 242:17 | 172:18 | 194:19 |
| 253:5,7,23 | 175:10,12 | 237:14 | 241:8 | 221:10 | 204:9 212:3 |
| 254:13 | 175:24 | **lead** 160:8 | **letter** 233:17 | 241:8 | 213:17 |
| **knowledge** | **learned** | 194:11 | **level** 160:4 | **local** 148:21 | 214:14 |
| 164:13 | 258:9,14,21 | 220:9 | 249:20 | 149:10 | 221:23 |
| 169:22 | **left** 255:23,23 | **liable** 230:14 | **localized** | 245:9 |
| 170:23 | 181:24 | 257:12 | **license** | 245:16 | 253:16 |
| 175:19 | 182:7 | 262:9 | 133:12 | **location** | 254:2,7,9 |
| 176:12,14 | 187:21 | **legal** 175:19 | 133:12 | 134:13 | 254:13,14 |
| 183:22 | 194:5,5,7 | 230:17 | 262:9 | 137:10 | 258:19 |
| 216:23 | 252:13 | 255:12,14 | **legally** | 141:7 | **looked** |
| 230:24 | 254:18 | 255:23 | 146:6 147:8 | 145:24 | 152:14 |
| **known** 166:3 | 255:12,14 | **licensed** | 148:19 | 168:13 | 180:18,23 |
| 190:6,11 | 255:23 | 133:13 | **Leighton** | 135:2 | 194:9 223:2 |
| 208:16 | 257:5,6,7,9 | 212:15 | 133:13 | 146:18,20 | 239:8 |
| 212:6 215:2 | 257:19 | 224:16 | 134:10,12 | **locations** | 258:11 |
| **knows** 208:9 | 258:17 | 238:17 | 135:2 | 182:19 | **looking** 147:3 |
| 208:11 | **landscape** | 239:16 | 146:18,20 | **logical** | 153:19 |
| 216:21 | 245:10 | **LIDAR** | **landscape** | 166:16 | 155:3 |
| | **large** 213:1 | 155:7,7 | 245:10 | 187:3 | 174:14 |
| **L** | 240:4,14,24 | 232:5 | **large** 213:1 | 211:17,22 | 193:5,17 |
| **lack** 242:17 | 242:13 | **length** 153:7 | 240:4,14,24 | 225:13 | 195:18 |
| **landing** | **larger** 256:8 | 153:8 155:9 | 242:13 | 228:12 | 205:9 |
| 142:2 | 259:12 | **likes** 254:10 | **larger** 256:8 | 241:12 | 210:12 |
| 150:17 | **largest** | **light** 195:20 | 259:12 | 251:16 | 243:10 |
| 151:2,7 | 243:18 | **limitation** | **largest** | **longer** | **looks** 254:10 |
| 152:18,20 | 170:22 | 136:14,15 | 243:18 | 152:12 | 258:21 |
| 152:21 | 171:2,14 | **limited** | 170:22 | 161:19 | **loss** 155:16 |
| 153:6,9 | 172:7,24 | 191:20 | 206:2 | 199:17,21 | **lot** 211:7 |
| | **law** 131:3,10 | 206:2 | 237:14 | 251:16 | |
| | 131:19 | 173:4,20 | **line** 149:5 | | |
| | | | 189:19 | | |

**TOOMEY REPORTING**
**312-853-0648**

Exhibit 1 Page 37

ERIC DAVIS
June 5, 2024

Page 15

lower 158:6
182:9,11,16
221:9 257:5

— M —
M 133:8
251:17
254:16
magnitude
155:20
224:7
245:13
maintain
176:5
making
199:1
218:23
manage
210:16
manager
226:12
maneuver
160:23
manner
143:24
205:23
210:1 233:6
243:1
March 154:6
154:12
198:1,13
199:12
222:11
223:6
226:19
250:7,12
MARKED
132:12
material
252:16,22
matter 138:7
matters
171:6 261:9
maximum

140:7
157:14
mayor's
146:23
mean 136:4
136:16
142:13
153:18
158:4,5,7
166:23
178:16
179:6
199:20
201:17,19
214:3
222:16
227:3,12,13
228:9
230:22
231:18
238:20
253:3
means 137:19
156:16
meant 169:4
measured
157:18
mechanical
242:9
mechanism
148:5 149:4
220:4
medical
208:20
248:5,14
meet 182:22
meeting
192:12,13
195:8
197:11,14
223:16
225:17,21
226:1
members

171:4
mention
160:7
mentioned
146:23
mean 160:8
165:11
174:11
195:8
196:14
212:13
223:15
224:24
242:9
methods
156:16
microphone
198:10
middle 160:6
million
155:22
221:8
240:23
millions
244:15
mind 164:14
185:2 256:5
256:11
minimal
162:7
minimum
140:7,11,12
140:19
142:2,9
144:5
152:20,21
153:8
155:10
158:20
159:1
160:20
161:4,10,21
162:6,14
168:16,21
170:22

171:2 173:3
175:24
176:19
181:3 182:7
182:23
194:6
minute 250:3
minutes
192:20
missed
179:20
misses 242:7
missing
179:23
misspoke
162:4
misstate
143:21
mobilely
213:5,13,22
215:14
231:12
232:11
mobility
162:9
186:14
model 229:23
modification
196:20
201:7
moment
135:6
162:22
194:2
202:10
207:3
money
190:22
222:13
242:24
Monroe
131:13
months
150:15

222:19
morning
194:4,10
197:8
MORRISS...
131:3,4,5
132:4,7
133:9 135:9
139:10,15
151:1 155:5
185:12,23
188:10
195:13
198:9,12
199:11,22
200:3
201:21
203:5,23
205:2,8
207:1,19
208:5,7
213:20
214:8,15
223:19
228:11
230:23
237:13,17
237:22
238:15
239:22
240:11,20
241:3,13,15
244:8 246:7
249:10
250:2,6
251:12
254:17
256:23
259:1,21
motion
215:23
216:5
motivation
242:17

motivations
231:6
mounted
214:10,17
move 210:9
254:4,9,13
255:13
257:18
moved 194:6
256:1
movements
252:12
moving 201:2
203:3
208:18
253:20
257:16
258:22
mullion
254:20
multiple
220:15,16
227:1 249:5
259:8
mute 150:21

— N —
N 131:1
132:1 133:8
133:8
251:17,17
254:16,16
name 221:12
nature 170:5
navigate
161:15
162:17
249:21
near 219:20
necessarily
168:17
186:11
226:17
227:2,9,13

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 16

necessary
199:13
201:1
211:14
227:13
241:22
247:24
necessitate
158:14
need 138:17
142:9,15,16
143:9
145:11
150:21
153:11
159:23,24
161:14,21
166:1
172:17
185:3
193:23
198:20
203:2
204:18,21
205:1,20
221:10
223:24
231:22
235:12
242:12
245:11
needed
152:12
159:13
216:18
253:9
needs 140:23
141:8,15
145:16
160:3 162:2
163:10
170:13
220:6
negotiate

159:6
negotiating
222:12
negotiation
222:20
negotiations
222:6,9
nevertheless
229:11
new 168:24
169:14
257:16
newly 169:1
nine 246:23
247:1
noncompli...
215:8
normal 149:9
155:24
north 189:20
189:21
191:11
193:1
NORTHE...
130:1 260:1
Notary
260:23
note 142:24
197:13
204:7
255:13
noted 203:11
notes 135:18
notice 195:1
196:24
197:4 203:7
223:17
notified
163:20
213:3
notion
242:20
253:20
254:1

number
139:19,20
142:6 178:8
188:18,23
205:10,24
212:20
227:5,6
252:15,21
numbers
151:13

— O —
O 133:8
251:17,17
254:16
261:2,2
o'clock
192:16,19
197:16
oath 222:6
260:11
object 185:18
241:10
242:16,18
objection
188:5 195:4
199:5,18
200:2
201:15
202:7
203:14
204:4
206:16
207:11
213:18,24
214:11
230:16
237:9,16,19
238:1
239:17
240:6 241:2
244:6 251:4
259:18

objections
229:9
230:22
234:6 241:8
242:23
247:2
250:11
255:11,21
256:15,16
257:24
obstructions
145:22
occupies
232:5
occur 156:15
216:12
occurred
150:20
175:16
offhand
165:15,21
187:7
198:23
221:4,6,16
242:19
175:6
176:15
173:23
175:4,9
176:23
operationally
174:7
235:18
236:18,19
operations
170:6 176:5
177:10
184:18
opine 176:16
opinion
175:19
178:10
230:17
opportunity
142:21

229:9
230:22
234:6 241:8
242:23
247:2
250:11
255:11,21
256:15,16
old 232:21
once 193:7
243:15,22
245:9,10,12
159:20
ones 250:24
ongoing
149:24
163:12
operated
170:10
operating
242:19
operational
173:8,9,14
opine 176:16
opinion
175:19
178:10
230:17
opportunity
142:21

143:15
149:11
161:13
162:15
229:3
optimal
141:7,21
143:15
161:8,24
162:1
optimally
161:19
optimizes
161:12,18
options 204:9
order 203:17
218:13
220:3,6
224:7 225:2
226:11
228:23
243:17
ordered
228:20
ought 160:13
outcome
261:24
outlined
191:5 242:1
overall 158:4
182:11
216:15
255:3
overnight
243:21
overseeing
144:24
163:5
oversight
144:24
146:19
183:8
owner 146:11
146:18

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 17

156:24

— P —
P 131:1,1
p.m 130:18
package
189:17
190:1,2,16
191:5 194:2
192:22
193:9 196:6
196:23
197:19
198:5,15,16
198:22,24
200:14,23
201:11,20
201:22
202:13,19
202:21
203:1,20
210:20
226:21
246:13
packages
189:15
194:18,22
Page 132:1
132:12
153:2 157:9
158:17
180:24
255:5,8
pages 260:15
paid 201:13
paper 230:6
Paragraph
163:3
paraphrasi...
143:19
Pardon
190:19
parrot 228:8
part 135:14

142:16
152:17
157:21,22
162:23
163:3,19
189:5
190:16
200:15
202:24
214:21
217:23
218:4
224:21
231:21
232:5
246:18
255:6
259:12
particular
140:24
145:24
156:21
168:11
parties
261:23
parts 189:8
189:11
235:20
passage
166:19
230:2
passageway
135:23
193:1
passed 166:6
229:19
path 138:16
138:24
139:3,4
185:15,22
186:3
205:24
206:7 253:6
253:7

paths 192:1
242:11
248:12,16
PATRICK
131:5
pay 230:15
Peggy 130:16
139:11
261:3 262:7
people 141:4
141:4,5,15
146:24
160:23
162:8,16
186:6,12,13
190:14
194:17
220:15,16
226:14
231:3,14,15
232:22,24
233:2,3
239:15
percent
152:19,24
153:4,6,7
155:8
168:18
182:11,12
199:15
252:1
perfection
178:16
perform
163:8 220:6
period
192:15,18
192:19
232:14
244:5
248:10
permanent
215:23
permissible

172:7 175:4
175:22
permit 173:2
199:16
203:24
204:12,21
permitted
149:21
182:12
permitting
147:1
149:10
204:14
person 160:2
160:9
171:22
172:10
173:6
175:21
177:2
177:19
206:8
216:20
220:15
230:11
234:16
235:14
249:17
personal
261:13
personally
222:20
pertaining
130:15
petition
229:1,3,4
205:17
phase 147:23
189:5,13,14
189:15
phasing
243:20
phone 227:5
physical
145:9,22

148:2
170:11
235:1,4
physically
150:7
pick 181:14
picture
245:19
piece 146:21
211:6
place 159:5
159:13,16
160:1
164:17
260:16
261:17
places 207:16
Plaintiff
130:4,12
131:9 260:4
PLAINTIF...
132:13,14
plan 147:3,7
163:6
232:21
246:19
247:6 255:3
257:4
planning
144:23
175:8
176:13
177:21
178:10
183:7
205:17
164:20,24
165:18
post-ADA
166:15
posts 164:15
166:1
potentially
230:13

193:12
216:24
217:5,10
238:16,22
239:4
platform
160:5
pluck 242:5
PO 195:11
point 165:3
212:22
229:2 234:4
242:6
253:17
pointing
252:8
police 148:23
portfolio
220:9
portion 182:9
200:10,22
202:12
253:11
position
146:12
183:15
249:23
250:16
possible
141:19
144:16
233:6,24
234:1 243:1
243:23
post 164:15
164:15,16

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 18

242:7
practice
144:22
148:10
240:22
practicing
148:7
pre- 166:15
pre-passage
165:12
preclude
145:22
precludes
148:3
precluding
146:9
prefer 150:9
preliminary
166:4 196:2
196:8
197:20
198:7,17
199:14
201:13,17
201:18,24
208:9,10
210:19
premise
231:16
prepare
142:15
220:19
prepared
239:9
prerogative
247:8
present
131:18
225:18,24
226:16
presented
227:2
presenting
146:13

presently
190:7
preservation
168:9
169:24
170:3
pretty 178:15
178:17
previous
155:23
261:6
previously
133:18
182:21
206:6
212:13
242:13
price 222:21
225:8
pricing 225:6
Primera
238:24
239:1,14
240:2
principle
232:2,8
197:5
prior 166:11
166:18
167:7,15
168:1
prioritize
241:16
250:24
251:1
prioritizing
249:11,15
prisoners
186:1 213:5
213:14,23
215:14,15
215:15
private

133:23
134:2
144:22
148:10
169:24
probably
141:21
174:16,21
175:1
181:15,15
187:11
191:15
218:11
221:14,15
226:7,13
254:3
problem
213:2
242:13
problems
181:12
220:11,13
221:12
223:16
procure...
192:14
195:9,10
196:12
197:4,6
210:16
220:11,13
221:12
223:16
procedure
130:14
173:5
210:4
produce
150:4
195:1
producing
218:2
production
202:20
200:11,21
201:10
203:7 207:7
215:17,24
234:22
professional
135:1
143:1
178:12,18
181:20
232:6
244:24
proceeding
203:19
proceedings
150:19
259:3
project
149:22

156:1,6,10
168:19
188:12
193:18
203:19
204:12,14
216:12,14
205:19
206:4 220:2
220:4
221:17
224:11
225:2 226:8
234:3 247:5
250:18
253:15
problem
213:2
242:13
progressed
224:10
225:18
projection
209:11,12
projects
148:11
204:13
220:3
221:13
250:14,23
proposal
220:7
259:14
proposed
257:15,15
provide
133:22
137:24
140:16
141:14
143:14
144:11
159:5,13
160:1 161:7
162:7 166:7
166:20
168:2
171:12,20

155:14,19
155:21
156:2
194:12
205:12,13
205:15,15
205:19
206:4 220:2
220:4
221:17
224:11
225:2 226:8
231:11,22
236:7 237:2
249:20
provided
151:13,15
183:16,20
183:23
191:4
200:18
215:3
227:15,17
238:16
239:21
240:2
provides
173:10,23
174:23
177:3
229:19
231:9 235:6
235:19
providing
142:20
171:3 196:2
provision
173:10,17
237:1
PTO 194:12
public 133:23
134:3
144:12

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 38

ERIC DAVIS
June 5, 2024

Page 19

145:20
164:17
166:11,19
166:21
167:12,24
168:1,3,4,8
169:1,6
171:5,11,19
172:8 173:2
173:4,17
231:3,13,24
232:13
260:23
**publicly**
155:21
**pull** 233:21
**pulled** 154:21
**pulling** 234:2
**purpose**
159:4 231:1
**purposes**
231:2
**pursuant**
130:13
**pursue**
259:11
**push** 234:16
236:10
**pushed**
236:20
**pushing**
171:4
176:16
235:14
**put** 196:14
253:10
255:3 258:3
**putting**
190:14
256:11
**pwm@mor...**
131:7

**Q**

**qualificatio...**
134:6,11
168:23
189:7 193:5
193:6 246:9
**qualified**
134:5 193:8
194:1
**question**
134:5 136:6
138:5 147:2
147:7,14,21
155:4 157:8
161:9
163:12
166:4 171:9
171:17
172:1 173:1
173:9 174:5
174:9
176:10,20
176:22
177:18
180:19
181:16
185:1
187:19,22
188:1,21
196:5,17
206:23
207:2,18
214:4 217:6
218:8,24
219:6,7,8
224:9
227:24
228:19
239:13
240:1,9
241:12,14
242:15
244:3
245:17

**qualificatio...**
247:1,14
249:3 253:2
**questioning**
252:10
**questions**
205:5 208:9
209:17
227:6,8
251:15
**quicker**
209:20
210:17
**quickly** 234:4
**quite** 183:21
226:24
253:1

**R**

**R** 131:1
133:8
251:17
254:16,16
**RADUNSKY**
131:11
**raise** 232:20
232:22
**ramp** 135:13
135:16,18
135:22,24
136:3,5,17
136:22,24
137:3,4,10
138:2,2
139:6,22
140:8,12
141:11,16
142:1,3,9
142:12,14
142:18,23
143:10,14
143:17
144:4 145:6
145:21,23
146:7 148:1

149:13,17
150:14
151:4
152:12,19
155:8,21
157:6,11,12
157:17,19
157:21,22
158:1,2,4,5
158:8,8,11
158:12,18
159:7,17,18
159:22
160:6,10,16
161:16
162:18
170:18
171:5,13
172:3,11
173:6
175:10,13
175:21,22
176:17,18
178:13,23
179:11,15
179:17,22
180:3,5,13
180:14,20
181:4,21
182:2,18
183:3,9,19
183:24
184:5
186:17,23
186:24
187:5,6,14
187:16,17
187:21
188:1,3,13
190:11,17
190:22
191:7,10
192:6,24
193:1,13,14

194:8 195:2
196:9 199:4
199:16
200:4,9,15
200:21,24
201:14
202:12,21
203:10,16
203:18
204:1,3,9
206:3,9,10
206:13,15
206:19,22
207:4,7
208:12,19
208:20
209:5,13
210:8
211:12,18
211:21
215:5,13,17
215:18,21
216:1 217:1
217:7,12,22
218:10,17
218:20
219:4,11,13
219:24
220:21
221:3,22
222:8,16,22
223:13,21
224:5,11
225:1,9
227:18,20
228:3,12,22
230:12
233:21
234:3,16
235:7,15
236:3,9,11
236:15,20
237:8 241:6
241:17

244:1
247:11
248:2,5,12
248:14,18
248:20,24
249:1,4,12
249:13,18
249:19,21
249:22
250:13,20
251:1,2
253:12,12
253:21,22
253:24
254:1 255:9
257:2,5
258:12
259:5,16
**ramp's** 136:9
140:13,20
**ramps** 136:7
138:6
141:24
142:3
144:15
159:24
206:5 215:8
215:12
**range** 221:15
221:16
**rate** 135:10
**read** 135:8
229:10
230:4,5
260:12
**reading**
199:9 230:9
**realistically**
174:15
**reality** 150:4
**realize**
194:15
**realized**
194:9

---

ERIC DAVIS
June 5, 2024

Page 20

**realizes**
234:23
**really** 146:20
147:21
159:19
168:12
233:4
241:11
**reason**
141:11
143:11
161:5,10
188:15
210:2,3
**reasonable**
148:17
166:20,24
168:2 171:3
171:12
172:9
223:21
224:1,3
227:3,19
**reasons**
141:13
209:7 229:6
229:8
233:20
245:23
**recall** 152:3
165:21
169:9
184:14
199:1
213:16
214:13
237:12
**receive** 167:7
203:7
**received**
154:1
167:13,24
192:17
214:22

**recognition**
235:3
**recollection**
151:11,22
140:22
230:21
236:13,24
**recommend**
177:8
202:18
**recommen...**
178:5 220:8
252:15,21
**recommen...**
187:23
257:4
**record** 135:7
146:20
147:24
155:13
156:8,11,20
156:23
200:12,20
203:4,6,17
203:21
210:20
183:17,18
183:24
166:2
257:14
**REDIRECT**
132:6
**reduced**
261:12
**refer** 240:15
**reference**
191:17
**referred**
150:3,11
233:13
**referring**
162:5
167:20
168:7
189:17

216:6
237:21
**refined**
140:22
230:21
236:13,24
**regarding**
177:8
196:17
**regardless**
167:1
252:15,21
**regards**
134:7
135:13,21
136:16
137:13,13
158:16
163:13
167:17
169:17
170:18
175:20
177:4,11,13
177:21
178:22,22
183:24
187:24
190:7 197:4
198:5,14
199:2 215:4
215:17
222:7,12
228:2
254:18
**regular**
154:22
197:14
203:19
258:20
**Rehab**
167:23
171:11
151:19

**reject** 244:2
249:14
255:4
**related**
159:15
**relates**
160:18
**relating**
160:24
**relation**
157:17
**relative** 141:7
170:9 200:9
238:13
243:4
261:20,21
**relatively**
160:22
200:7 204:8
204:13
225:3
**relevance**
188:5 195:4
199:6,18
200:2
201:15
202:7
203:14
204:4
206:16
213:18,24
214:11
237:9,16,19
238:1
239:17
240:6 241:2
259:18
**relief** 159:5
**relocated**
242:6
**relocating**
254:23
**relocation**
196:8
197:21

202:22
228:13
**remarks**
191:5
240:15
**remediation**
252:24
253:9
**remedy** 216:1
235:13
236:8
**remember**
176:4
184:19
230:8
237:11
252:18
**remove**
219:16
**rendered**
257:12
**renovate**
207:4,7
224:11
243:9
248:11
259:5
**renovated**
209:13
217:1
237:24
240:5 244:5
248:2
**renovating**
188:12
222:8
228:21
241:6,17
248:24
250:13,19
251:9,10
**renovation**
196:8
197:21

222:14
237:8
238:17,20
240:13
247:10
248:19
249:12
259:12
**renovations**
211:1 219:3
228:18
237:15
244:10
**repair** 243:9
**rephrase**
134:5 139:5
157:9 161:9
182:16
185:1
188:20
189:6 196:4
218:24
222:18
224:9 240:1
**replacement**
225:1
**report** 142:5
152:4 153:3
157:10,24
177:12
178:15,20
180:9
184:13
185:14
191:15
192:8
200:19
206:19
207:17
212:19
227:2 237:5
255:6 257:3
**reported**
169:18

---

ERIC DAVIS
June 5, 2024

Page 21

261:11
**Reporter**
130:17
135:5
139:12
198:8 208:4
249:9 261:4
262:8
**reports** 215:3
215:7
**representat...**
226:19
**representat...**
148:16
177:20
**representat...**
226:3,4
**represented**
222:5
250:12
**request**
175:14
176:8 189:7
193:4
**requested**
135:8 175:7
176:15
**requests**
175:17
**require**
143:13
158:24
202:14
206:1 235:4
236:19
237:2
**required**
136:22
139:22
152:19,20
153:7,8
155:9,10
169:2,19
172:5,20

173:21
175:12
182:19
196:7 202:5
227:10
230:14
234:17
235:8
**requirement**
143:3 161:5
173:3
176:18
182:8,23
**requireme...**
136:8 141:4
141:10
148:1 156:4
156:4
157:10
166:8,24
167:2,9,10
168:16
170:6,7
177:5
205:19
**requires**
140:18
158:18
170:19
205:16
233:7
**research**
167:19
172:17
**reshare**
256:13
**resolved**
223:9,10
**resources**
163:10
**respite** 160:2
**respond**
229:3
**responding**

192:11
**response**
139:10
141:3
181:15
192:19
193:24
**responses**
214:22
**responsibil...**
162:23
163:4,14,19
183:8 199:3
**responsibil...**
144:23
146:19
148:21
**rest** 159:5,14
203:2,18
204:21,22
211:5
214:23
252:23
253:8,13,14
258:13
**Restoration**
230:2
**restroom**
185:4
**retain** 220:19
**returns** 234:4
**revealed**
152:3
**review** 147:1
149:12
156:9
168:19
175:8
191:15,19
222:1
224:23
245:4
**reviewed**
149:15

150:12
177:12,16
177:17
179:16
220:7 252:3
252:6
**reviewer**
147:1
**reviewing**
151:11
157:24
191:20
192:5 229:4
**RFQ** 189:18
190:14,16
192:4,9,21
193:7
194:17
209:24
217:19
233:8 242:2
245:6 246:9
**right** 140:3
142:4 153:1
153:16
154:23
155:11
198:11
207:18
224:20
228:19
245:18
247:20
251:22
255:8,24
256:7,9
257:14
258:7,9,15
259:23
**right-hand**
255:11
**rights** 231:19
232:3
**rise** 157:7,12

157:12,17
158:2,9,10
158:13
170:19
172:4,22
173:21
175:13
182:4
**Rules** 130:13
**ruling** 147:11
216:5
229:13
**run** 136:9,13
137:4 138:2
139:4,6
145:16
157:12
158:9 182:4
182:11
**running**
136:10
**runs** 142:3
189:19

**S**

**S** 131:1
132:10
251:17,17
155:20
164:4
165:24
169:17,18
169:22
184:5,24
185:16
186:1,5,20
189:20,22
189:24
190:2,7,12
191:7,9,11
193:2,14
206:3,8
208:18
209:13
211:4,21
214:16,20
214:23
215:13

236:3 241:6
248:24
251:1
253:12
**Rules** 130:13
**ruling** 147:11
216:5
229:13
**Robert** 197:7
197:17
**role** 238:9
**rolling**
159:21
**room** 144:11
**roughly**
226:14
**route** 138:15
138:22
139:2
186:20
191:9,10
**routes** 208:23
**RTAs** 149:23
**RTU** 138:23
155:20
164:4
165:24
169:17,18
169:22
184:5,24
185:16
186:1,5,20
189:20,22
189:24
190:2,7,12
191:7,9,11
193:2,14
206:3,8
208:18
209:13
211:4,21
214:16,20
214:23
215:13

---

ERIC DAVIS
June 5, 2024

Page 22

141:24
184:15
205:24
255:12,13
257:3,8,18
**schedule**
225:18
228:18
**School**
134:23
**scope** 200:10
202:22
204:8,13
205:11
217:23
219:16
**scoped** 220:4
**screen** 135:17
153:15
196:14
256:6,10,12
**seamlessly**
205:20
**seats** 214:10
214:17
**second**
190:23
191:23
256:14
**section** 136:7
136:20
139:20
140:1,2
159:14
**sections**
138:9 158:5
246:15
**sector** 133:23
134:2
**secure** 236:16
237:1
**security**
170:6,6,14
176:6
**see** 153:5

175:2 185:8
194:4 255:9
255:15,17
256:2,7,8
256:19,22
257:17,21
258:20
258:18
**seek** 145:19
147:24
149:6
**seen** 161:23
247:9
**self** 143:9
**self-certific...**
204:11,20
**sense** 194:21
252:11,14
252:20
253:2,10,14
260:6
**sent** 154:16
176:15
**separate**
134:9 234:3
**sequence**
205:15
**series** 174:22
179:8 209:9
233:4 246:3
**Service** 164:6
200:21
**services**
133:23
134:2
200:12
203:18
211:8,9
**set** 257:10,13
258:7,8
**sets** 147:19
257:9,20
**seven** 239:5
247:2,8
**share** 193:9

256:6
151:24
152:2
**shows** 255:12
**sheets** 174:24
**sheriff** 130:6
173:18,24
175:15
177:4,10
176:23
183:16,23
190:24
208:17
209:4 213:3
**shop** 150:5,6
**short** 152:19
153:4,6,8
155:8
185:10
186:22
250:4
**Shorthand**
130:16
261:4 262:8
**shortly**
195:18
**showed**
151:10
**shower**
214:18
**showers**
213:7,15
214:9
237:23
238:2,7,13
**showing**
147:4

151:24
152:2
209:6
164:16
164:20,20
176:23
255:11
156:18
209:4 213:3
215:11
216:7,20
230:13
236:8,17
260:6
219:11
224:7
231:14
149:1
196:16
171:6
155:17
191:24
193:21
201:6 227:4
236:9 254:4
254:8
258:16
**Simultaneo...**
223:18
240:19
245:21
**single** 193:20
257:11
**singular**
224:14
237:23
238:2,7,13
**sir** 190:20
**situation**
148:24

149:9
211:19
212:3 242:8
244:14
**situations**
138:12
149:8
234:23
**six** 180:2,8,23
209:7 240:4
**size** 205:11
205:16
242:6
155:3 157:7
**slide** 258:16
**slight** 252:5
**slope** 135:19
136:4,9,10
136:13,18
136:19,21
137:2,14
157:21
182:5,13
252:18,22
253:21,23
256:5
**slows** 233:22
234:5
**smaller**
221:13
246:3
**solicitation**
214:23
**solicitations**
217:19
219:17
**somebody**
142:21
161:1
171:21
174:17
181:13
226:11
227:14
254:9

**someplace**
210:9
**somewhat**
224:14
**soon** 223:14
**sooner**
247:21
**sorry** 136:5
139:17,20
139:24
150:23
154:2,19
155:3 157:7
161:9 178:7
183:21
187:22
196:4 198:9
207:13
208:5,6
219:6 222:4
237:18
251:15
253:21,23
256:5
**sort** 142:14
159:20
166:1
168:20
172:14
**sought**
175:19
**sounds** 153:1
**source**
149:24
**sources** 175:2
**south** 131:5
189:19,20
**space** 160:14
**speak** 167:21
170:7 235:1
235:17
236:23
242:15
**speaking**

---

TOOMEY REPORTING
312-853-0648

Exhibit 1 Page 39

ERIC DAVIS
June 5, 2024

Page 23

223:18
240:19
245:21
**specific**
134:10,21
135:2
140:24
141:3 168:5
168:12
169:9 170:5
172:12,14
173:17
194:18
196:13
200:24
212:14,17
217:6
224:13
242:8
**specifically**
134:17
174:12,20
184:15,19
192:21
193:3 195:9
208:2
216:19
219:10
231:8
**specificatio...**
198:6,7,16
198:17
200:1
201:11,24
202:1,1,11
202:17
**specifics**
167:21
**specified**
152:5
261:17
**specs** 202:21
**speculate**
152:8

**speculating**
156:22
**spend** 240:23
242:23
**spoke** 195:9
196:12
223:6 254:3
258:6
**spoken** 197:3
**ss** 261:1
**stabilize**
252:16
**stable** 160:4
**staff** 164:17
**stage** 193:17
243:9
**stair** 143:1,2
143:4
254:12
258:10,16
**stairs** 143:10
159:23
**stairway**
254:5
**stalls** 160:21
**standard**
136:12
141:1
145:16
158:23,24
160:22
161:6,12
162:6,8
180:20
**standardized**
220:1
**standards**
134:8
135:16
136:16
137:6,13,24
137:24
139:8
140:21

141:14
143:12
144:7
145:23
147:18,20
148:4 156:5
163:24
166:9
167:17
168:21
169:3,7,11
169:16,20
170:1,24
172:21
174:1 177:6
179:19
180:15
181:6
182:15
183:2,10,18
184:2
187:15
188:4 206:5
208:13
209:6,8,14
217:2 219:5
227:21
228:4
231:10,10
232:9,10
234:17
235:8,16,24
236:6
**start** 174:7,9
174:20
198:21
225:5
**started**
198:23
239:10
**starting**
158:7
**starts** 157:21
**state** 130:17

143:23
229:19
230:2 231:1
261:1,4
**stated** 155:21
261:19
**statement**
160:24
198:4,14
199:2
205:10
219:7
**States** 130:1
130:14
243:19
260:1
**steady**
142:16,17
142:22
143:9
**steep** 136:23
**steeper**
135:19,24
136:10,23
137:5,8
138:13,16
138:18,21
139:7
182:12
**steepness**
137:11,12
138:1
**stenograph...**
261:11
**step** 163:21
178:6
194:24
202:14
**stick** 210:24
**STILLMAN**
131:12
132:5
154:14,20

185:18
188:5 195:4
199:5,18
200:2
201:15
202:7
203:14
204:4,24
205:4
206:16
207:11
213:18,24
214:11
228:8
230:16
237:9,16,19
238:1
239:17
240:6,17
241:2,10
244:6 251:4
251:14,18
254:15
256:20
258:2
259:18,23
**stipulate**
152:7
178:16
193:3
195:15
198:18
202:2
**stipulated**
189:18
**stipulates**
193:7
**stipulation**
233:9
**stop** 159:21
210:4,10
211:16
**stopped**
210:8

218:12
**stops** 157:22
**straightfor...**
200:8 225:3
**Street** 131:13
**stressed**
195:16
**strict** 145:22
148:3
**strike** 247:5
**strong**
135:11
**structural**
151:16
152:1
168:10
223:23
226:5
**structure**
151:20
**structures**
165:2
**Stuart** 197:7
197:17
**students**
134:23
232:20
**study** 184:15
**subcontrac...**
226:5
**subcontrac...**
223:5
**subject**
212:14
239:20
245:5
**subjective**
137:16
**submit**
193:23
**submits**
220:11
**submittals**
192:15,17

ERIC DAVIS
June 5, 2024

Page 24

**submitted**
217:20
221:24
247:3,9
**SUBSCRI...**
260:20
**subsection**
233:1
**successful**
191:4
**suddenly**
197:2
**sufficient**
142:20
200:19
**suggest**
193:24
**suggested**
252:7
**suggestion**
243:2
**suggests**
189:15
221:12
243:24
**suing** 212:4
**Suite** 131:13
**summary**
183:4
**summer**
219:2
**Sun-Times**
230:4
**supervising**
250:15
**support**
243:3
**supposed**
144:19
146:14
168:21
170:16
171:20
**sure** 141:19

155:6 156:3
163:9
171:16
183:22
185:5,7
209:2
226:24
**surface**
135:19
137:1 140:6
140:8,10,13
140:18,20
182:10
252:16
252:22
253:11
**surrounding**
192:3
205:18
**surroundin...**
191:8
**Susmilch**
174:13
**suspect** 141:6
142:19
156:19
**sworn** 133:2
133:6
260:11,20
261:8
**system** 232:1
**systems**
242:9
———
**T**
**T** 132:10
133:8,8
251:17
254:16,16
**take** 174:16
179:4 185:3
191:24
202:14
209:20

210:6 211:7
213:1
225:13
243:8 250:2
251:16
**taken** 130:11
130:12,15
134:15
153:24
260:15
261:16
**takes** 211:17
211:20
**talk** 194:14
**talked** 184:3
195:7
**talking** 161:3
173:8
197:23,24
198:10
211:3,15
223:11
231:17
252:12
**talks** 153:5
157:11
**task** 203:17
218:12
219:21
220:3,18
259:2
**taught**
133:6
**taxpayers**
229:16
242:24
243:14
**teach** 232:18
**team** 193:8
194:20
201:5 220:8

174:10
**technical**
148:7,16
175:1
**technically**
202:20
**tell** 133:11
135:15
157:16
170:10
196:11
198:22
207:20
223:1
224:20,21
238:7 247:6
257:24
258:5
**telling** 184:14
197:23,24
**term** 137:16
141:20
179:6
209:23
219:20
250:17
**terms** 135:1
160:20
173:12
220:3,18
259:2
**testified**
133:6
187:13
188:11
218:21
249:5
254:22
**testify** 216:6
216:21
256:24
261:8

**testimony**
209:19
255:7
260:18
261:14
**tgm@morr...**
131:7
**Thank**
150:22
250:11
**Thanks**
196:11
**themself**
204:15
**thing** 154:24
166:1
171:23
180:18
213:10
224:14
253:17,17
256:18
**things** 138:4
145:14
147:13
167:9
168:13
179:5,8
193:12
197:24
228:10
232:19
233:8 245:9
252:8 253:9
**think** 137:16
141:21
148:13,16
151:16
152:5 153:3
154:6 157:5
158:15
162:2,4,5
169:4 174:2
176:3,20

183:4 184:6
184:21
205:1,5
207:15,17
212:12,21
217:4
218:14,15
224:12,24
226:21
229:8 230:4
230:5 231:5
231:16
232:7
234:13,20
236:2 238:2
238:6,12
248:21
259:8,9,10
259:11
**third** 227:23
**THOMAS**
130:7 131:3
131:4 260:7
**thorough**
178:11,17
190:24
241:24
**thoroughly**
177:11,16
177:18
**thought**
152:10
**three** 182:6
189:8
222:19
241:7
247:12,15
255:2 257:9
**threshold**
221:11
**time** 135:4
156:7
165:21
168:13

ERIC DAVIS
June 5, 2024

Page 25

174:16
190:23
191:23
198:20
207:6
211:20
223:7
225:17
226:3
227:23
238:9 244:5
247:4
248:10
260:16
261:17
**timeline**
146:4
**times** 150:1
176:21
227:1 259:8
**timetable**
188:19
**Title** 231:8,9
**titled** 178:8
**today** 192:11
192:12
194:12,16
195:8,19
196:12
197:17
214:22
217:20
223:15
225:20
249:5
**today's**
239:24
**toilet** 160:21
**told** 184:5
**tolerances**
144:17
**Tom** 135:5
150:23
155:3

160:19
162:1
172:13
185:2
190:13
192:13
196:11
200:5
204:24
209:16
211:16
223:3
226:23
228:10
229:24
230:20
231:17
237:12
240:9,17
243:17
245:12
246:24
249:23
251:3
252:10
253:18
254:2
256:22
258:2
**top** 140:5
141:24
142:3,8
143:14
144:15
150:17
151:2,7,12
151:14
152:12,18
153:6,9
155:9,10
157:20
158:8,12
177:23
180:13

181:2,24
182:4 187:4
187:5 194:4
194:5,7
253:21,24
254:18
255:12,23
257:6,8
**topper**
253:11
**total** 221:7
244:9
**transcript**
199:10
261:11
**transcripts**
260:13,17
**transfer**
196:6,23
197:19
198:5,15,15
198:22,24
200:14,23
201:10,19
201:22
202:13,18
202:20
203:1,20
210:20
226:20
**transmitted**
201:7
**travel** 138:17
138:24
139:3,4
185:15,22
186:3 192:2
206:1,7
242:11
248:12,17
253:7
**treated**
136:24
**tried** 202:10

**trouble**
209:16
**true** 160:18
240:12
252:2
260:17
261:13
**truth** 261:8
**try** 160:5
168:16,22
174:4
204:19
256:16
**trying** 211:10
212:11
213:1,9
234:6
234:21,22
**tunnel** 178:8
179:22
185:13,14
186:23
187:4
208:20
211:12
217:22
222:14,15
233:21
234:3
258:13
**tunnels**
189:23
**turn** 149:2
160:14
161:1
**turned**
145:12
152:9
**turning**
160:20
**two** 164:14
197:15,23
206:13
216:2

241:18
246:4
247:12,14
247:15
251:15
257:9,19,20
261:13
**two-year**
244:5
**typewriting**
261:12
**typical** 149:7
156:6
**typically**
142:12
151:18
156:11,18
156:22
———
**U**
**UFAS** 167:8
167:16
**Uh-huh**
142:7
**ultimately**
245:1 253:3
**uncompliant**
210:5
**uncomplied**
209:10
**underscore**
196:15
**understand**
146:14
148:12
155:16
171:16
193:23
206:23
210:16
229:18
241:11
247:22
**understand...**
134:7,12

135:3,10,15
141:9
143:12
144:10
155:22
159:3 161:7
166:17
186:6,9,19
188:2
199:21
223:10
248:7 253:1
**undertake**
244:24
**undertaken**
220:18
**undertaking**
219:12
**Unfortunat...**
243:11
**uninterrup...**
258:20
**unit** 160:13
**United** 130:1
130:14
243:19
260:1
**units** 165:24
**universal**
141:14,20
233:13
**unpack** 241:8
**unusual**
149:8
**update**
253:18
**upgrades**
200:11
202:18
209:21
211:14
216:17
241:22
247:24

ERIC DAVIS
June 5, 2024

Page 26

**upper** 155:8
158:6 182:2
252:13
253:11
257:6
**upwards**
240:23
**urgency**
196:15
197:2
**use** 142:16
145:24
155:7
161:18
171:19
180:16
185:3 186:7
186:16
208:24
209:23
222:17
**user** 163:9
184:24
**users** 143:16
177:3
228:14
**uses** 157:13
**usually** 148:9
149:8
**utilize** 141:16
———
**V**
**variance**
146:9
151:12,17
151:23
152:15
**variation**
148:17
252:5
**variations**
144:16
156:14
**varieties**

141:15
**variety**
140:22
141:8
143:15
161:13
175:2
**various** 192:1
192:2
**vast** 206:2
**vendor** 191:4
**verify** 156:24
**versed**
178:19
**version**
153:11,13
153:19,22
154:1,3,15
154:22
172:16
**vertical**
157:18
**vertically**
140:8,12,19
**videoconfe...**
130:11
**vintage**
164:21
165:15,16
165:19
167:1
172:16
**violate** 139:8
**violated**
187:14,14
188:3
**violates**
137:20
177:23
183:10
208:12
209:6
**violating**
137:5

230:14
**violation**
140:13
144:6
163:20
182:1
227:21
229:22
235:22
**violations**
183:1,2
188:20
189:2 190:6
190:11
203:11
209:8 212:7
236:8
244:10,17
244:17
249:6
**vs** 130:5
260:5
———
**W**
**wait** 200:14
215:17
255:2
**waiting**
200:22
201:6
226:20
**walker**
142:22
161:15
198:2
215:23
222:3
230:12
**walkers**
141:5
143:16
162:16
186:7,15
215:16

**walking**
135:19
137:1
**walkway**
136:21
137:8
**walkways**
138:9,13
258:20
**wall** 145:12
258:20
**want** 138:10
184:19
185:5
209:23
210:6
211:12
217:17
226:21
229:11
233:21,22
253:16,17
256:8
257:24
258:5
**wants** 233:14
**warning**
184:20
**Washington**
194:13
226:9
**wasn't** 146:1
147:14
**way** 141:22
145:10,12
155:17
159:21
162:3 177:1
184:20
209:16
210:7 213:2
213:11
216:18
218:16

233:24,24
235:13
241:24
243:4,16
245:24
247:20,23
253:10
254:21
**ways** 252:7
**we'll** 185:8
193:14
194:19
**we're** 161:3
210:21
213:1,9
216:16
228:17
236:10
240:17
242:13
242:3
253:15
**we've** 184:6
229:7
**Website**
174:23
**Wednesday**
212:5
**week** 225:23
**weeks** 197:15
**went** 217:4
240:8
**weren't**
237:23
238:8,12
**west** 131:13
164:20
**Western**
131:5
**Westmorel...**
130:3
135:14
188:23
205:6 238:3

260:3
**wheel** 142:13
**wheelchair**
142:12,21
143:16
159:17
160:3
161:14
171:4,21
172:10
173:6
175:21
176:16
184:23
185:16,24
186:15
206:7
208:17
215:15
228:14
230:12
236:10
239:15
241:1 248:3
248:13
249:17,23
**wheelchair...**
160:9 186:7
**wheelchairs**
141:4
160:23
162:16
**WHEREOF**
262:1
**wiggle**
144:11
**wise** 259:9,11
259:11
**witness** 132:1
133:1,5
139:13
150:21
154:18,21
185:21

ERIC DAVIS
June 5, 2024

Page 27

188:7 195:6
199:8,19
201:16
202:9
203:15
204:5
206:17
207:14
214:1,12
230:19
237:10,20
238:5
239:19
240:7
245:22
251:6
256:21
258:4
259:19
261:7,7
262:1
**woman**
194:10,11
**word** 157:13
161:18
162:1
**words** 136:20
138:20
161:21
251:24
**work** 133:18
145:1 163:8
195:2 201:9
202:22
204:16,22
205:15,21
210:14
222:22
224:15
225:4,8,11
225:19
227:15,20
228:21
232:6 238:7

242:17,22
243:5,20
245:8
**worked**
159:9
**working**
146:2 163:8
163:14
**wouldn't**
155:12,12
161:18
170:3
174:16
218:13
226:15
**wraparound**
209:24
210:18
**wrapping**
250:3
**write** 251:20
**written**
232:10
251:21
**wrong** 140:1
154:12
155:3

**X**

**X** 132:1,10
133:8
251:17
254:16

**Y**

**yeah** 133:21
137:22
139:14
150:10,16
152:23
154:11,20
155:1,16
162:4,12
168:20

169:6
178:15
187:11
188:8
189:21
192:8 198:3
204:22
207:15
213:19
216:15
217:8 228:9
230:20,22
247:15
252:6
253:16,22
256:20
**year** 207:3
216:22,22
217:9 218:1
218:9,15
219:11
220:20,24
221:2
237:24
**years** 133:21
155:23
181:13
206:13
210:6 216:2
240:4 241:7
241:18
247:12,14
247:15,18
248:3,9
255:2
**yesterday**
152:23
160:19
174:11
187:13
188:11
194:2 195:7
196:15
223:3,3

240:9,10,16
243:7 252:4
252:11
253:19
254:3 258:7
**yesterday's**
200:6
**young** 232:20

**Z**

**Zach** 253:2
**ZACHARY**
131:12
**Zoom** 130:11
181:14
**zstillman@...**
131:15

**0**

084-003813
262:9

**1**

1 132:13
135:20
136:1,5,10
136:18,19
136:19,21
136:23,24
137:2,2,5,8
137:11
138:1,13
139:7 142:6
143:5 178:8
178:21
182:5,13
185:13
189:17
190:1,2,16
190:16
191:5 192:4
192:22
193:9 221:7
221:14

246:13
260:13
**1-260** 260:15
**1/2** 182:11
**1:00** 197:16
**10** 137:11
153:2
158:17
165:20
167:14,22
180:24
207:17
213:4
**100** 168:18
220:3 252:1
**100,000**
221:5
223:14,21
**102,000**
259:15
**10257** 131:5
**11** 143:5
144:6
165:17
180:24
182:5
214:10
**11.7** 182:12
**12** 136:5,10
136:18,19
136:23
137:2,5,8
138:1,14
139:7 142:2
143:7 144:5
144:14,20
145:17
146:8,15
147:5 181:3
182:23
**12-inch** 142:9
143:13
145:5
180:12

**12th** 198:1,13
262:2
**133** 132:4
**142** 132:13
**150,000**
221:9
**16** 136:21
221:7 255:5
255:8
**162** 132:14
**19** 166:6
**1980** 172:3
**1988** 167:15
**1989** 133:17
**1990** 166:7
**1991** 134:7
137:24
139:8
158:24
163:24
164:10,13
164:24
166:5,8,10
166:11
167:15,16
168:1,24
169:2,4
171:11
172:8 177:5
187:15
188:3 207:5
231:10
232:10
234:17
235:15,23
236:6
**1998** 133:20
**1st** 154:9
177:12

**2**

2 130:6,10
163:3 221:8
246:14

Page 28

252:15,21
260:6,14
20 133:20
135:20
136:1,19,24
137:2
**200,000**
221:15
**2000** 164:10
187:14
209:6
**2010** 134:8
134:20
135:15
136:16
137:6,13,20
137:23
139:8
140:14,17
143:6,12
144:7,10,13
145:23
148:3 156:5
158:23
161:6 169:7
169:7,11,16
169:19
170:1,23
172:21
173:1,16,24
177:5,23
178:24
180:15
181:6
182:14
183:2,10,18
184:1 207:8
208:12
209:8,14
217:2 219:5
227:21
228:4
231:10

232:9
234:17
235:8,15,23
236:6
241:19
175:23
2011 169:12
2012 172:20
2013 169:15
2015 212:18
2017 239:11
2018 237:18
237:24
238:13
2022 237:15
131:14
2024 130:18
154:13
177:12
198:1,13
204:2
216:22
217:9 218:7
218:9
221:18
222:5
225:22
239:12
250:8,12
260:14,14
260:22
262:2
23-cv-1851
130:5 260:5
230 131:13
131:13
233-7901
131:6
24th 222:4
251 132:5
254 132:7
25th 154:12
260:14
26 133:21

**3**

3 182:11
246:14
257:3
3:00 192:16
192:19
3:30 185:6
30 157:13
158:3,9,12
170:19
172:4,23
173:22
175:13
199:15
300-4479
131:14
312 131:14
33 182:18
34 140:7,11
140:11,19
182:20
38 140:7

**4**

4 260:14
4,000 229:21
230:15
4.27 182:3
4.56 182:4
405 136:7
139:20
405.2 136:9
405.5 139:21
405.6 157:12
45 181:13
192:20

**5**

5 130:17
164:16
189:22,24
191:12
260:14
50 210:6
505 140:2

505-10.1
141:23
505.4 140:4
57 171:2,8,19
172:7,24
182:9
5th 221:18

**6**

6 157:9
189:21
60 152:21
158:20
161:3,20,22
162:3 165:6
170:23
171:3,7,8
171:14
173:3,20
175:11
176:19
178:1
187:10,17
194:7
60-inch 159:1
160:20
161:11
162:6,13
175:23
182:8
258:17
60-inch-long
255:14
257:18
60606 131:14
60643 131:6
6th 154:13

**7**

7 205:10
72 161:23
773 131:6

**8**

8 132:14
162:21,24
165:5 178:7
188:18,23
205:10,24
8.5 182:13
84 155:22
85 152:19,24
153:4,6,7
155:8

**9**

9 151:8,10
152:7
165:20
213:13,14
213:16,22
254:19
9-inch 152:3
91 143:1
165:17,18
165:22
172:16

Exhibit 1 Page 41