Transcript of the Testimony of
# ERIC DAVIS

**Date:** December 19, 2019

**Case:** JASON SHAUGHNESSY v. THOMAS DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JASON SHAUGHNESSY, )
)
Plaintiff, )
)
vs. ) No. 18 cv 6803
)
THOMAS DART, SHERIFF OF )
COOK COUNTY, and COOK )
COUNTY, ILLINOIS, )
)
Defendants. )
and
JAMES DANIEL JOHNSON, )
)
Plaintiff, )
)
vs. ) No. 16 cv 4074
)
THOMAS DART, SHERIFF )
OF COOK COUNTY, and )
COOK COUNTY, )
)
Defendants. )
and
ERICK COLEMAN, )
)
Plaintiff, )
)
vs. ) No. 18 cv 4480
)
THOMAS DART, Sheriff of )
Cook County, Illinois, )
)
Defendant. )

and

**TOOMEY REPORTING**
**312-853-0648**

---

Page 2

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DEONTRA SPENCE, )
)
Plaintiff, )
)
vs. ) No. 18 cv 4258
)
THOMAS DART, Sheriff of )
Cook County, and )
COOK COUNTY, ILLINOIS, )
)
Defendants. )

This is the deposition of ERIC DAVIS, called by the Plaintiff for examination, taken pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before PEGGY A. ANDERSON, a Certified Shorthand Reporter of the State of Illinois, at 10150 South Western Avenue, Chicago, Illinois, on December 19, 2019, at 11:30 a.m.

**TOOMEY REPORTING**
**312-853-0648**

---

Page 3

A P P E A R A N C E S:

THE LAW OFFICES OF:
THOMAS G. MORRISSEY, LTD.

BY: MR. PATRICK W. MORRISSEY
10150 South Western Avenue
Rear Suite
Chicago, Illinois 60643
(773) 238-4235
patrickmorrissey1920@gmail.com

Appeared on behalf of the
Plaintiff;

THE LAW OFFICES OF:
JOHNSON & BELL, LTD.

BY: MR. MICHAEL R. SHERER
33 West Monroe Street
Suite 2700
Chicago, Illinois 60603-5404
(312) 984-6655
shererm@jbltd.com

Appeared on behalf of the
Defendants.

**TOOMEY REPORTING**
**312-853-0648**

Exhibit 2 Page 1

**ERIC DAVIS**
**December 19, 2019**

Page 4

I N D E X

WITNESS                                          PAGE

ERIC DAVIS

DIRECT EXAMINATION BY
MR. MORRISSEY:                                   5-94
CROSS-EXAMINATION BY
MR. SHERER:                                      95-101

REDIRECT EXAMINATION BY
MR. MORRISSEY:                                   102-104

E X H I B I T S

MARKED                                           PAGE
PLAINTIFF'S EXHIBIT NO. 1                         64
PLAINTIFF'S EXHIBIT NO. 2                         11
PLAINTIFF'S EXHIBIT NO. 3                         48
PLAINTIFF'S EXHIBIT NO. 5                         73
PLAINTIFF'S EXHIBIT NO. 7                         24
PLAINTIFF'S EXHIBIT NO. 8                         76
PLAINTIFF'S EXHIBIT NO. 10                        83
PLAINTIFF'S EXHIBIT NO. 11                        59

*******

---

**ERIC DAVIS**
**December 19, 2019**

Page 5

(WHEREUPON, the witness was first duly sworn.)

MR. MORRISSEY: This is the deposition in Shaughnessy versus Dart taken pursuant to notice and continued to this date. We're also going to cover Johnson versus Dart, Coleman versus Dart and Spence versus Dart.

MR. SHERER: Got them all in?

MR. MORRISSEY: I think so.

WHEREUPON:

ERIC DAVIS, called as a witness herein, having been first duly sworn, was examined and testified as follows:

D I R E C T   E X A M I N A T I O N

BY MR. MORRISSEY:

Q   Can you please state your name?

A   Eric Davis.

Q   Mr. Davis, what is your title?

A   I am the Deputy Director of the Cook County Department of Capital Planning and Policy.

Q   Have you worked in that capacity

---

**ERIC DAVIS**
**December 19, 2019**

Page 6

since April 10th of 2017?

A   I believe that's the date I started, yes.

Q   In your career, have you taught building codes?

A   Yes.

Q   And you've taught about the Americans with Disabilities Act?

A   That's correct.

Q   Explain to me where you taught about the ADA.

A   I was a lecturer in the Department of Architecture, Interior Architecture and Design Objects at the school of the Art Institute of Chicago. I taught courses to undergraduates and graduates. My graduate courses included a course that covered building codes and the Americans with Disabilities Act among other things.

Q   When did you teach that graduate-level course about building codes and the ADA?

A   I believe I started in either 2013 or 2014, and I taught that course multiple times. I believe I taught it three times.

---

**ERIC DAVIS**
**December 19, 2019**

Page 7

Q   Are you familiar with the Rehabilitation Act of 1973?

A   Yes.

Q   In your graduate-level course, did you teach about the Rehabilitation Act?

A   Given the variety of subjects to cover in that professional practice class, we focused on the ADA mostly and didn't really get drilled down to all the connected documents and regulations. We did some of them, but we didn't, by any means, do all of them.

Q   To your knowledge, does the Rehabilitation Act have any standards for toilets and sinks?

A   I don't remember. I would assume so, but I don't remember.

Q   Have you ever heard of the term UFAS?

A   Yes. I believe it stands for Uniform Facility Access Standards or Accessibility Standards.

Q   To your knowledge, does the Rehabilitation Act cover entities that receive federal financial assistance?

MR. SHERER: I'm just going to object

Exhibit 2 Page 2

ERIC DAVIS
December 19, 2019

Page 8

for the record to the extent that this question calls for a legal conclusion, but if you understand.

BY THE WITNESS:

A    I don't.  I don't know that specifically.

BY MR. MORRISSEY:

Q    Have you ever studied the regulations pertaining to the Rehabilitation Act and construction of buildings or alteration of buildings after March 7th, 1988?

A    Perhaps.  I don't remember specifically that element of the regulations.

Q    Do you know whether the UFAS requires an accessible toilet to have grab bars mounted near the toilet?

MR. SHERER:  Same objection, but you can answer.

BY THE WITNESS:

A    I don't know.  It wouldn't surprise me, but I'm more familiar with more recent laws.

BY MR. MORRISSEY:

Q    Which more recent laws are you

ERIC DAVIS
December 19, 2019

Page 9

familiar with?

A    The Americans with Disabilities Act, the Illinois Accessibility Code.  Those are the main ones and the similar elements of local regulations.

Q    For a building that's constructed in 2012, a public building, does the ADA, to your knowledge, require a grab bar near the toilet for an accessible toilet?

MR. SHERER:  Same objection, calls for a legal conclusion.  You can answer.

BY THE WITNESS:

A    I believe that it does.

MR. SHERER:  And I will just put a standing objection on the record in terms of requirements of the ADA.

BY MR. MORRISSEY:

Q    Michael Gumm was the ADA coordinator for the part of Capital Planning and Policy; is that true?

A    He was for a time, yes.

Q    Presently, is there anybody who works in that capacity?

A    That position has not been filled

ERIC DAVIS
December 19, 2019

Page 10

since he vacated it.  In the interim, I'm the subject matter attorney for the County.

Q    What documents did you review prior to coming here today to testify?

A    What documents did I review?

Q    Correct, to prepare yourself to come here today to testify.

A    I don't know if I can give you a full accounting of that.  I think I looked at things that I said in the past, you know.

Q    Did you review your deposition transcript from Bennett versus Dart that was taken on March 28th, 2019?

A    Briefly.

Q    And when you testified on March 28, 2019, you were working to fill the position of the ADA coordinator for the DCPP?

A    I was serving as the interim subject matter expert.  I was not in that position.

Q    Do you have any date when you expect to have an ADA coordinator?

A    The search is ongoing.  This is a very competitive job market.  It's difficult to find suitably-qualified people in this job

ERIC DAVIS
December 19, 2019

Page 11

market, but we are continuing to look.

Q    Are you directly involved in implementing and developing ADA program policies and procedures and guidelines for Cook County facilities?

A    When you say "directly involved," what do you mean?

Q    Well, do you remember in your prior deposition we reviewed your report from the Roberts case?

A    Okay.

Q    Would you like a copy of it?

A    Sure.

Q    Showing you what I'm going to mark as Exhibit 2.  It's a report of Eric Davis that we discussed in your prior deposition.

(WHEREUPON, Plaintiff's Exhibit No. 2 was marked for identification.)

BY MR. MORRISSEY:

Q    Do you remember reviewing this document or going over it?

A    I believe I did look it over at some point, yes.  Yes, I did look it over at some

Exhibit 2 Page 3

ERIC DAVIS
December 19, 2019

Page 12

point.

Q    The last paragraph of the first page --

A    Okay, yeah.  "Participating in," yeah.

Q    What do you mean by you're directly involved in developing, implementing ADA program policies, procedures and guidelines for Cook County facilities?

A    I want to make sure that I speak clearly.  The annual capital improvement plan budget includes projects that have an ADA component to them.

We are involved in continuing the effort to address a wide variety of ADA concerns in the county's 19 million square feet.

To that end, I helped put together the capital improvement plan that addresses those; and on a project-by-project basis, I'm often consulted on ADA questions.

Q    How were you consulted on ADA questions?

A    All of our projects are managed by project directors and our projects are for

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 13

individual user agencies.  We undertake a development of the scope of a project; and as it's implemented, depending on how it's implemented, there may be other questions that come up on a project, depending on the delivery method.

Q    Is it fair to say that you're not involved in the operations of the Department of Corrections?

A    That's correct.  I have nothing to do with the operations of the Department of Corrections.

Q    What is your understanding of "operations"?

MR. SHERER:  Object to the form.

BY THE WITNESS:

A    What do you mean?

MR. SHERER:  Yeah, if you understand it, you can answer, but.

BY THE WITNESS:

A    You don't have time for the entire operations of the jail.  What are you asking me about?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 14

BY MR. MORRISSEY:

Q    Well --

A    No, I'm not being flippant.  The jail is an incredibly complicated endeavor involving thousands of people.  So what are you asking about?

Q    Is it fair to say you have never given any guidance to the Sheriff's Office how to formulate a policy or procedure to assist inmates shower?

A    That is correct.  I have nothing to do with their operational policy.

Q    Is it fair to say you have never given any guidance to the Sheriff's Office how to formulate a policy or procedure to assist inmates use the toilet in Division 10?

A    I don't believe I have given any guidance in that area at all.

Q    Is there a reason why you haven't?

A    Because the Sheriff is in charge of operations.

Q    Now, you know that there is a ramp, two ramps, leading up to the Leighton courthouse?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 15

A    Two?  I think you are talking about the bridge.

Q    The bridge, correct.

A    Yeah, yeah.

Q    Is it fair to say that in your capacity as the deputy director for Cook County Department of Capital Planning and Policy, you have not given any guidance to the Sheriff's Office to assist inmates move up and down that ramp?

A    That's correct.  I don't have anything to do with how they operate that.

Q    Is there a ramp in the tunnels of the jail leading to the Cermak building?

A    I believe there is.

Q    Is it fair to say as the Deputy Director of Capital Planning and Policy, you haven't given any guidance to the Sheriff's Office to formulate a policy, procedure to help inmates move up and down that ramp?

A    That's correct.  That's their operations.

Q    The last page of the report, which is Exhibit 2, talks about in April of 2014, a

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 4

Page 16

policy and procedure was put in place to bring detainees in wheelchairs to public ADA restrooms at the courthouse, if necessary.

A    Uh-huh.  It notes that that is information I obtained from the Department of Corrections.

Q    After you became the deputy director in 2017, do you have any knowledge whether any wheelchair user was ever brought to an ADA restroom at the Leighton Courthouse?

A    I haven't witnessed that.

Q    Has anybody told you that it happened?

A    Probably.  I couldn't cite a specific example though.

Q    Have you ever given any feedback or comments to the Sheriff's Office regarding that specific policy or procedure?

A    I'm sorry.  Regarding which specific policy?

Q    The policy and procedure to bring detainees in wheelchairs to ADA restrooms.

A    That's operations.  They do that.

Q    The question is:  Have you ever given

Page 17

any comments or guidance about that specific policy of the Sheriff's Office?

A    No, not that I remember.

Q    The second page of your report, the first full paragraph on that page --

A    Uh-huh.

Q    -- talks about reviewing some material that was dated February of 2011 relating to ADA compliance and compliance with the Rehabilitation Act; do you see that?

A    Uh-huh.

Q    That's a yes?

A    Yes.

Q    What is your understanding of what is required of the CCDOC pertaining to compliance with the Rehabilitation Act of 1973?

MR. SHERER:  Object, calls for a legal conclusion.  You can answer, if you understand.

BY THE WITNESS:

A    It is a very complicated area, and I can't give a point-by-point specific answer to your question.

Page 18

BY MR. MORRISSEY:

Q    Why do you say it's a complicated area?

A    Because the laws change.

Q    To your knowledge, how has the law changed pertaining only to the Rehabilitation Act of 1973?

A    I haven't reviewed the Rehabilitation Act specifically but, in general, my experience has been that the laws related to the ADA are interdependent.  I can't say specifically which provisions are or are not still in force or may have been superceded by subsequent law.  I am not an attorney.

Q    Was the ADA, to your knowledge, passed by Congress in 1990?

A    I thought it was '91, but okay.  It may be the date of the document.  Around that time, yeah.  It was either '90 or it might have been signed -- I don't remember the exact dates.  I know that it was around '90, '91.

Q    Prior to 1990, to your knowledge, was there any federal requirement for the DOC to provide toilets that met some federal

Page 19

structural standard for disabled people?

MR. SHERER:  Objection, asked and answered.  Objection, calls for a legal conclusion.  You can answer.

BY THE WITNESS:

A    I can't say.  I don't know.

BY MR. MORRISSEY:

Q    Presently, does the County receive federal financial assistance, to your knowledge?

A    What do you mean by "financial assistance"?

Q    Do they receive money from the federal government?

A    Sometimes.

Q    How do you know?

A    I only know about the funding that directly affects capital projects.  Whether they receive money for other programs, I don't know.

Q    How are you made aware that there is, at times, federal funding for capital projects?

A    Since I've been there, when we create the capital improvement plan, there have been

Exhibit 2 Page 5

ERIC DAVIS
December 19, 2019

Page 20

one or two instances where we have sought or received federal funding for capital projects. Those are generally in the area of security, period. Almost the entire capital plan is bond funds. There may one or two projects in a given year that have some federal funding component, but almost the entire rest of it is municipal bond funds.

Q What security projects have you been made aware of that have been funded in part with federal assistance?

A I'm not certain I'm allowed to answer because some of them deal with homeland security. I'm not 100 percent certain I'm allowed to get into that other than what's been publicly published.

Q What is publicly published relating --

A What's published in the budget book every year.

Q Does it explain which project is funded with federal funds?

A I don't believe so.

Q Does it relate to the DOC?

A Not that I'm aware of, certainly not

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 21

to capital projects at the DOC at the jail campus.

Q Do you know when Cermak was constructed?

A I believe it was around '98.

Q How do you know that?

A I have a handwritten graph on my wall that indicates approximate dates. I don't have any documentation of it. Someone wrote down dates of when these things were constructed. That's the only reference I have to when these things were constructed. It's an old Xerox. I don't know who did it.

Q Does the handwritten graph identify that Division 10 was constructed in 1992?

A That may -- I can't remember if that's the exact date, but I believe it has a date for that building, yeah.

Q Do you know approximately the date?

A That's about right.

Q Now, in your report, you talk about in 2014 Cermak met the requirements for accessible rooms according to the Americans with Disabilities Act for the 1990 version of

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 22

the ADA?

A I'm sorry. Which paragraph are you looking at?

Q The second full paragraph.

MR. SHERER: On Page 2?

MR. MORRISSEY: Yes.

BY THE WITNESS:

A I believe I said it appears that it met the requirements.

BY MR. MORRISSEY:

Q And you're referring to 2014?

A Correct.

Q Do you have any reason now to comment on whether that is correct?

A I haven't done an analysis of accessibility so I can't really give you any details beyond a general impression.

Q And you're the person in charge of ADA accessibility for all county facilities?

A Uh-huh, 19 million square feet. To be clear, in charge of the ADA is an overstatement. I provide insight.

Q When Cermak was constructed in 1998, to your knowledge, was there a requirement for

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 23

the shower areas to satisfy any structural standards?

A What do you mean by "structural standards"?

Q Relating to a fixed bench.

A There would have been, yeah.

Q How do you know there would have been no standard for the shower area pertaining to a fixed bench?

A The requirements for an accessible shower are stipulated in the 1990 or '91 ADA and are also covered in the Illinois Accessibility Code, which I believe was the version which was also active at that time.

Q When you became the deputy director in April of 2017, do you know whether there was any fixed bench in any of the shower areas in Cermak?

A No, I don't.

Q Are you aware in the last few years a fixed bench has been installed in some of the shower areas?

A A fixed bench? I believe so. I believe so. I don't remember. I think so,

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 6

ERIC DAVIS
December 19, 2019

Page 24

yes. I don't know if there actually were or not. I don't know. I have not been through them recently.

Q To your knowledge, in the last year, has there been a renovation to a tunnel from Division 10 to Cermak?

A Division 10?

Q Correct.

A I don't remember a project about the tunnel in Division 10 other than work done in that area when, I believe it was, Division 17 was taken down.

Q What is your understanding of the work done when Division 17 was taken down?

A That was simply a case of closing things off to provide a secure weather-tight enclosure for the tunnel when the building above it was removed.

(WHEREUPON, Plaintiff's Exhibit No. 7 was marked for identification.)

BY MR. MORRISSEY:

Q I'm showing you what's been marked as Exhibit 7.

ERIC DAVIS
December 19, 2019

Page 25

MR. SHERER: Is this the document you sent me?

MR. MORRISSEY: It is.

MR. SHERER: Just for the record, I'm going to make a Rule 26 objection. I don't believe this has been shared by either party in discovery.

MR. MORRISSEY: It's your client's document though.

MR. SHERER: Well, I mean, you got to include it in a Rule 26 disclosure. So that's my objection for the record.

MR. MORRISSEY: It wasn't my document to disclose. It was the County's document.

BY MR. MORRISSEY:

Q Mr. Davis, going back to the document, have you seen this document before?

A Yes.

Q What is this document?

A It looks like a copy of an excerpt of a report or scope document, something like that; but I don't know where it comes from and I don't know who created it.

Q What report is this an excerpt of?

ERIC DAVIS
December 19, 2019

Page 26

A As I said, I don't know where it comes from.

Q Prior to Monday, have you seen this document before?

A I don't -- No, I don't believe I have.

Q Do you recognize what this document is depicting?

A Yes.

Q What is it?

A It is a plan drawing of an area of the tunnel ramp into -- into Cermak Health Services facility. Yeah, that's what it is.

Q Have you ever walked in that tunnel area?

A I don't believe I have.

Q The top of this document talks about a walk-through from March of 2018?

A Uh-huh.

Q Is that correct?

A That's what it says.

Q Do you know whether there was a walk-through of this area in March of 2018 with anybody that you supervise?

ERIC DAVIS
December 19, 2019

Page 27

A I believe there was a scope -- what we call a scope walk for a project to do some work in this area.

Q What is a scope walk?

A Before we issue instructions to a design firm in this case -- and I would note that the document says "for A/E via procurement." When we issue things to a design firm, we want to make sure that our instructions and expectations are clear and so it is helpful to -- for someone from capital to walk, in this case, with the user agency, which would be the Department of Corrections to verify that the scope that's being asked for by the design firm complies with the client's expectations.

Q Have you ever conducted a scope walk?

A I have been part of them. I generally -- If I go on them, it's with another project director usually.

Q Would a project director work in your office?

A Yes.

Q Who are the project directors that

Exhibit 2 Page 7

ERIC DAVIS
December 19, 2019

Page 28

work at the DOC?

A    The project director for most of our capital projects at the DOC is Sheila Atkins. There are project directors who have done -- who have been the PD on other capital projects there, but she is the project director for most every one of the projects there at the campus.

Q    In order for a scope walk to occur, is there generally a business case by a user to initiate this process?

A    Yes.

Q    Do you know whether there was a business case pertaining to the Cermak ramp?

A    I don't recall if there was one specific to this.  We had multiple projects at different stages involved with the AD and the campus.  So I don't recall if there was one specific to this or whether it was included within a larger project.

Q    What do you mean "a larger project"?

A    Sometimes we have what are called county-wide projects that include multiple sites because, at the time of the budget formulation, it's not clear which elements for

ERIC DAVIS
December 19, 2019

Page 29

whatever reason would move forward or not move forward during that fiscal year.  And so it's making sure that we have the ability to move forward with what we think is going to be able to be achieved in that year.

Q    If it was derived from a larger project, does a larger project start with a business case?

A    Yes.

Q    So would it be your expectation that a business case would address the Cermak ramp to initiate the scope walk?

A    I would assume so.  In some cases, business cases are generated years before and carried over.  Sometimes they're new.

Q    And when a scope walk occurs, is it just with the user agency and a member of your office?

A    Sometimes, depending upon the delivery method, it may have be done with someone from facilities management if DFM is doing a part of the work.  Generally, there's a scope walk with the user beforehand; and then when it's assigned to someone, they do a

ERIC DAVIS
December 19, 2019

Page 30

subsequent walk with the designer or the contractor.

Q    Wouldn't the designer or contractor be involved in the scope walk?

A    They would eventually walk -- I don't know if this is from the walk with the designer.  I would assume not since it says for procurement.  So I would assume this is before a designer was engaged for the project.

Q    And then after a scope walk, what are the people that you supervise supposed to do? What is a project director supposed to do after a scope walk?

A    The project director in this case works with our public safety consulting team to develop the scope into something that can be -- into a document that can be the basis of a procurement either for the services or construction that is provided to our procurement department who advertises for services.

Q    Who would be involved in this public safety consulting team?

A    We have a large team.

ERIC DAVIS
December 19, 2019

Page 31

Q    Do they work for you?

A    They work for the department.

Q    Do you supervise them?

A    I help supervise them.

Q    Who else supervises them?

A    They are also supervised by the project director in this case.  They are also supervised by the director of capital planning. Some elements of what they do are supervised by the director of financial controls in terms of invoices.  So it's not a single point of -- There are multiple points of oversight to their activities, depending on the subject.

Q    Are there any members of the public safety consulting team that generally work at the DOC or relating to DOC projects?

A    Uh-huh.

Q    Who are they?

A    I don't know if I'm able to give you a complete list of who they are.  We have multiple project managers from that team that support our project director on various projects.

Q    So, generally, after a walk-through,

Exhibit 2 Page 8

Page 32

would the project director coordinate with the public safety consulting team to type up a document?

A    Uh-huh.

Q    Is that correct?

A    Yes.

Q    Would it tend to look like Exhibit 7, a portion of Exhibit 7?

A    It might be.  This might be included or it might be redrawn.  You know, it varies.

Q    And then after -- Strike that.  Would you agree generally there's some report that's generated after the scope walk with the project director and the members of the public safety consulting team?

A    When you say a report, other than the document for procurement, what are you referring to?

Q    Well, is Exhibit 7 part of the document that would go to the procurement team?

A    We might have documents like this, yeah.  It says it's for procurement.  So this kind of thing would be substantially what's part of a procurement package.

Page 33

Q    And what does procurement do after they receive a package?

A    A great deal.  I don't know if you have time to get into the specifics of all that they do.  I suspect not.  There are a lot of regulations that procurement is required to follow that can be complicated and time consuming to execute.

Q    Based on your experience, can it take a long time for the procurement department to finalize the bid documents?

A    Yes, a very long time.

Q    Based on your knowledge, what is required for a ramp under the ADA?

A    Currently?

Q    Well, if the ramp was constructed in 1998.

A    Whatever laws were in place in '98.  I don't think I can give a succinct answer because there are a lot of elements.

Q    Well, if the ramp was built in 1998 at a public building, would it be required to have a handrail?

A    The answer, I believe, is it depends.

Page 34

I believe that there are instances -- Well, I should say:  There are instances where a ramp could be built without a handrail.  It would depend upon the specific configuration.  The curb ramp that you go on from the street to the sidewalk every day is not required to have a ramp -- or handrail, but it's a ramp.

Q    So which ramps if it was built in 1998 would have to have a handrail, based on your understanding?

A    Whatever the threshold was in effect in '98 for the minimum rise that would require a handrail.

Q    Looking at Exhibit 7, it talks about the "Exiting ramp is 47 feet long without a landing"?

A    Correct.

Q    "The scope of the ramp is within 1:12 maximum slop requirements, however the run exceeds code requirements."

A    Uh-huh.

Q    Do you have any understanding, why it says "the run exceeds code requirements"?

A    I believe what it's asserting is that

Page 35

a ramp longer than 30 feet, which would provide a rise of 30 inches is required to have an intermediate landing or, I believe, was required to have an intermediate landing.  I don't know in '98 if it was.  I suspect it was.  I would have to go back and research it.

Q    Did the people within your department have a recommendation relating to the Cermak ramp?

A    I'm sorry?

Q    Did the people at work within your office have a recommendation pertaining to the Cermak ramp as reflected in this document?

A    This appears to be summarizing the scope recommendations for renovations to that ramp.

Q    Do you have any knowledge whether this proposal was adopted by procurement?

A    Oh, I know that it was not.

Q    Why not?

A    This, I believe, was a project where it was the County's intent to procure those A/E services through what's called a task order.  There were a number of projects where in order

Exhibit 2 Page 9

ERIC DAVIS
December 19, 2019

Page 36

to expedite execution of projects, we sought to group projects together to make it easier and faster to procure. We based a lot of our planning for 2019 around doing it that way.

That request was denied by the board of commissioners, and so we have had to try to procure projects like this through alternate means.

Q Do you know why it was denied by the board of commissioners?

A Do I know why it was denied? There were multiple concerns that one or more commissioners had about procuring these services that way through the board. So, I mean, more than one commissioner raised concerns about it, and we didn't proceed because of their objections.

Q So what is the procedure to move forward with the work?

A There are multiple other ways to try to get these procured. What we are doing now is working with procurement to establish a standard that would allow us to go forward. We're still in negotiations with them to

ERIC DAVIS
December 19, 2019

Page 37

identify a way to do that that meets their requirements.

Once that's complete, we expect to move forward with many projects including projects like this.

Q Why do you intend to move forward with this project?

A That's an interesting question. Why do I -- I believe this is scope of work that was included in what we intended to procure in 2019. Assuming that that is, in fact, the case, we want to accomplish those projects as expeditiously as possible.

So if this was one expected to be done in 2019 and was delayed because of that procurement challenge, we would want to try to execute it as soon as we are able to do so.

Q But why is there a need to do some work on the ramp?

A I would have to go back and look into what generated the specific request. I assume it was a request from the DOC, but it may have been from -- anecdotal. I don't know how it -- I don't know how it came to be in a business

ERIC DAVIS
December 19, 2019

Page 38

case that was the subject of the scope. I would have to go back and research why. As you said, I only got this document on Monday, so I don't --

Q Is there a priority level for this project?

MR. SHERER: Object to the form of the question. You can answer, if you understand it.

BY THE WITNESS:

A Yeah, priority from what standpoint?

BY MR. MORRISSEY:

Q You mentioned the DOC --

A Yes.

Q -- initiated this project, correct?

A I said I think it may have been one of those generated by them. I'm not stipulating that I know for certain that they are the ones that generated it.

Q So earlier you mentioned this was a task order?

A It was intended to be included in a -- in a task order contract with architects and engineers for various projects.

ERIC DAVIS
December 19, 2019

Page 39

Q What is a task order?

A Governments at multiple levels have contracted with firms to provide multiple projects that aren't necessarily completely defined at the time of contracting; and so, for example, the federal government does indefinite delivery, indefinite quantity work called IDIQ contracts because they know they are going to need services in a certain area. They don't know what they are specifically. So they hire someone with certain parameters, and then they assign them projects under that contract. This was essentially a version of that. So we were following a procurement method that many agencies use in an attempt to move the project forward.

Q Have you ever used that procurement method before?

A Not with the County.

Q Whose idea was it to attempt to use this --

A It was actually suggested to us by procurement.

Q To your knowledge, did you believe

Exhibit 2 Page 10

ERIC DAVIS
December 19, 2019

Page 40

the task order procurement method would cause a project to be expedited?

A  Yes.

Q  What other projects were included in this task order?

A  Several.  I can't give you a comprehensive list off the top of my head.

Q  Can you give me an incomplete list?

A  Generally, the intent was to do projects that are smaller that are of a focused nature that involve fewer trades or are within the same area.  For example, we might hire a mechanical engineer to do a series of mechanical engineering projects on a task-order basis.

Q  Specifically, other than the Cermak ramp, was there anything else that you are aware of that was included in this task order?

A  Yes, lots of things.

Q  What else?

A  I can't give you a comprehensive list off the top of my head.  There are many.  We have been trying to get these things procured.  They have been broken up into different

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 41

categories to try to get them done.  So I can't honestly remember right off the top of my head this "X" project was definitively on it.  I would have to go look it up.  I don't know.

Q  Was there an expected budget for the task order?

A  The task order contracts that were put forward to the board were on the order of a million dollars in fee per year for, I believe it was, six firms to handle a variety of projects.

Q  So each firm would have $1 million?

A  Up to.

Q  Was anything pertaining to Division 10 in this task order?

A  Possibly.  I don't remember.  I would have to look.

Q  How would you find out?

A  To be clear, it was all preliminary documents.  They're preliminary until the board approves them.  So we can make requests, but they are not official until they are approved.

Q  Was there a section of the county board that considered the task order?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 42

A  Most of the things that we do go through the asset management committee, and then to the full board.

Q  When did the task order -- when was that presented to the asset management committee?

A  I can't remember.  I would have to go look.  I would have to check the board calendar.  I don't remember.  It was at some point in 2019.  I don't remember when.

Q  Did the committee approve it?

A  I don't usually go to those.  The director does.  I don't remember if it was at that or -- Honestly, I don't remember whether it was that or the full board level.  I believe it was the committee level, but I don't remember.

Q  So you believe it was struck down at the committee level?

A  It was pulled.

Q  Was this an open meeting?

A  Yes.

Q  Were you told why the committee members -- some of them didn't agree with this?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 43

A  The committee members' testimony is a matter of public record.  You can look it up.  They stated it.  I don't know.

Q  Do you have any recollection of what they stated?

A  I don't want to misattribute remarks to one commissioner or another.  You should look it up.

Q  How would I look it up?

A  You can look things up through the County Website.  You can look up agendas.  They have videos.  They have -- I don't know if they have transcriptions.  I believe they do.  I've never looked them up individually myself.

Q  Was it in the summer of 2019 that you spoke to the committee?

A  Sounds right, yeah.

Q  Do you remember which month?

A  No, I don't, not offhand.

Q  Was there anything pertaining to the Leighton Courthouse in this task order that was proposed to the committee?

A  I don't remember one at Leighton.  No, I don't remember one.  Leighton, as I know

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 11

ERIC DAVIS
December 19, 2019

Page 44

that you know, is the subject of a larger other project. So I don't know if there was anything besides that that was on task orders.

Q   So what is the present status of the Cermak ramp renovation?

A   We are attempting to procure the services. As I said, it's in line waiting for approval of the alternate form of procurement. Once that form of procurement is approved by the procurement officer, we intend to issue a number of other requests for proposal for services like what's in this document.

Q   Do you have an idea of the expected budget for the renovation?

A   Not offhand, no.

Q   Is it under a million dollars?

A   I don't remember. That's a threshold because of the way that our pre-qualified firms are structured.

Q   From looking at Exhibit 7, is it your understanding the recommendations are to comply with some ADA standards?

MR. SHERER: Object to the form, calls for speculation, foundation. You can

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 45

answer.
BY THE WITNESS:

A   We always try to do things that are compliant. So I would assume, you know, yes. Again, I don't know. This is a copy of something, so I don't know. It looks like it.

Q   Is it fair to say you would have access to a business case that pertains to the Cermak ramp?

A   Yes.

Q   And would you agree it wouldn't be very difficult to produce it?

A   It wouldn't be difficult to produce a business case that might include this. I can't say for this one specifically, but I would assume I should be able to find it readily, yes.

Q   When was the last time you walked through Division 10?

A   I don't remember. It was sometime ago.

Q   You mentioned that you sat for a deposition in March of 2019 in the Bennett case?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 46

A   Uh-huh.

Q   After that date, did you tour Division 10?

A   I don't remember if it was before or after.

Q   What do you remember about your tour in Division 10?

A   I believe I have only been through -- at the facility twice. Once was to go up on the roof, but we didn't go through any detention areas; and once was a brief tour of one of the housing units.

Q   Which housing unit did you tour?

A   I don't remember which one. I believe it was the one that has the detainees that wear special uniforms.

Q   And why did you tour that unit?

A   I don't remember what occasion that -- I don't believe it was specific to a project, though. I try to visit the housing units, if I can but time is limited. There's 5 million square feet.

Q   So in your office, you have a blueprint of Division 10?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 47

A   Yes.

Q   And the blueprint identifies the date it was constructed?

A   Yeah. I'm sure we have that documentation, yeah.

Q   How hard would it be for you to identify the date it was constructed?

A   How hard?

Q   Yeah.

A   I don't know. I would have to identify the documentation that's available, and I couldn't say. I don't know how to say how hard it would be.

Q   On the blueprint -- Strike that. As an architect, you're familiar with how to interpret blueprints?

A   Yes.

Q   And blueprints generally have to be approved by building committees?

A   Yes.

Q   And when --

A   Authorities having jurisdiction, yes.

Q   When the jurisdictions review blueprints, would the jurisdiction be able to

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 12

ERIC DAVIS
December 19, 2019

Page 48

identify whether a toilet has a grab bar around it?

A    Yes.

Q    How would a jurisdiction be able to identify that in a blueprint?

A    Typically, the building permit drawings would include plans and elevations of such areas, and it would be reviewed -- in the case of the jail, it would be reviewed by the Mayor's Office of People with Disabilities. I don't know if the Mayor's Office of People with Disabilities existed in 1998. I think it did, but I'm not certain.

(WHEREUPON, Plaintiff's Exhibit No. 3 was marked for identification.)

BY MR. MORRISSEY:

Q    I'm going to show you what is going to be marked as Exhibit 3, which is the County's Answers to Plaintiff's First Set of Interrogatories in Johnson.

Mr. Davis, why don't you take a moment to look at this. Have you seen this before?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 49

A    I don't know if I have seen it specifically. It appears to reference things that I said or attested to elsewhere. I don't know if I saw this document or not. I do note that it includes my affidavit on the back. That one, I probably have seen before, but I don't know if the front document is something that I've seen before.

Q    Paragraph 2 talks about the public bathrooms for the men and women in the Division 10 lobby; do you see that?

A    Number 2, yes.

Q    As an architect and the Deputy Director for Capital Planning and Policy, how could you identify whether the public bathrooms were installed with grab bars when the place was built?

A    I'm not sure it would be possible to determine simply from visual inspection whether any grab bars were there -- were installed when it was built or whether they were installed subsequently.

Q    Are there any documents you could review to obtain that information?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 50

A    If I needed to find that out, I would simply go -- well, not simply. I would go through the documentation that I was able to find either electronic or physical.

Q    Have you ever looked at the blueprint in your office to see whether the public bathrooms in the Division 10 lobby had grab bars in the original blueprints?

A    I think we looked into this at one earlier point, and I honestly don't remember what we looked at at that time. I don't know what was looked at at that time. I believe there was some kind of case about the public area, but I don't remember in the case of that whether I consulted the drawings or not.

Q    Do you know whether grab bars were installed in the Division 10 public bathrooms when the building was constructed in '92?

A    I'm sorry. I was distracted. My son texted me something. Can you repeat the question?

Q    You mentioned that you believed Division 10 was constructed around 1992?

A    That sounds right, yeah.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 51

Q    Do you know whether when the building opened whether there were grab bars around the public toilets in the lobby?

A    My assumption is that the building would have been designed to comply with the regulations in force at the time.

Q    So do you know whether the regulations would have addressed grab bars around the public bathrooms in the lobby?

MR. SHERER:  Objection, calls for a legal conclusion. You can answer.

BY THE WITNESS:

A    I don't specifically, and it's because of the date of '92. As I recall, the -- and I don't remember the legal term for it. Basically, the date when the ADA took effect. I don't know how that applied to this specific project. I know that there were projects that were constructed after the law was passed that weren't subject to it. So I don't -- because, at the time of its design and permitting, I don't know the gap -- I don't know when this project was permitted. I believe that the law allows entities to design

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 13

ERIC DAVIS
December 19, 2019

Page 52

things that are to the laws that are in effect at the time of permit, and they don't require you to go back and change things if something gets passed after you've received a building permit; but I don't know in this specific case.

Q    Are you talking about the ADA?

A    Yes.

MR. MORRISSEY:  Why don't we take a few-minute break.

MR. SHERER:  Okay.

(WHEREUPON, a short break was had.)

MR. MORRISSEY:  Back on the record.

BY MR. MORRISSEY:

Q    Mr. Davis, going back to that Cermak ramp.

A    Okay.

MR. SHERER:  Are you talking about Exhibit 7?

MR. MORRISSEY:  Exhibit 7.

BY THE WITNESS:

A    Uh-huh.

BY MR. MORRISSEY:

Q    Do you know whether there are any

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 53

violations of the ADA pertaining to that ramp?

MR. SHERER:  Objection, calls for a legal conclusion, calls for speculation, form, foundation.

BY THE WITNESS:

A    I haven't looked at it myself.

BY MR. MORRISSEY:

Q    If a ramp is 47 feet long, based on your understanding of the 1990 or 1991 ADA structural standards, is there a requirement for the run?

MR. SHERER:  Objection, calls for a legal conclusion, form, incomplete hypothetical.  You can answer.

BY THE WITNESS:

A    Well, assuming, as this document says, that the ramp in question is a 1:12 slope, that would yield a total ramp length of 47 feet.

I believe the standard in place at the time required there to be a landing if it was more than 30 feet of -- 30 inches of rise, which would mean you couldn't go more than 30 feet with a section of ramp without an

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 54

intermediate landing.

BY MR. MORRISSEY:

Q    Does the document in front of you, Exhibit 7, identify a way to remedy?

A    No.

Q    Why not?

A    Why not?

Q    Does it explain how to -- Does it explain a recommendation for the Cermak ramp?

MR. SHERER:  Objection, form, calls for speculation, foundation, calls for a legal conclusion.  You can answer.

BY THE WITNESS:

A    I would note that the document under Item 2 talks about pouring the ramp in two sections with a landing.

BY MR. MORRISSEY:

Q    Would that address the run?

MR. SHERER:  Same objection.

BY THE WITNESS:

A    That would seem to do that, yes.

BY MR. MORRISSEY:

Q    Is there any timeline when you expect the Cermak ramp to be renovated?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 55

MR. SHERER:  Objection, asked and answered.  You can answer again.

BY THE WITNESS:

A    We're endeavoring to procure the design services.  Once those have been procured and the design work has been done, we will pursue construction by the delivery method that seems to make the most sense in terms of getting the work done; but as to when that would result in it being finished, I couldn't speculate right now.  It could vary a great deal based on factors that are out of my control.

Q    Could it take more than a year?

A    Yes.

Q    Are there ways for your office to facilitate projects on an emergency basis?

A    They are very limited, but yes.

Q    Why are they limited?

A    In some cases, and we have to take our guidance in this from the procurement department, there are limitations that they will allow in terms of their decision of whether or not something qualifies as an

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 14

ERIC DAVIS
December 19, 2019

Page 56

emergency or not.

I couldn't give you an exhaustive list of the factors that they would consider in making that determination. Otherwise, as you could understand, every project would be an emergency. So, clearly, they need to follow standards that impact whether or not the project is allowed to be moved forward with that method of procurement.

Q   What standards have you been told qualify for an emergency?

A   Direct threat to safety. Sometimes they're related to schedule needs of elements that are outside of our control. That's generally health, safety and welfare. I can't characterize the language of what they would -- how they would phrase it.

Q   Have you ever moved forward with a project that you determined was an emergency as approved by procurement?

A   Yes.

Q   How many?

A   Less than five. I think perhaps three. They are very limited.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 57

Q   Did one involve a lift for a judge at the courthouse?

A   Yes.

Q   Why was that an emergency?

A   Well, I should be clear. I don't believe that one was ultimately procured as an emergency. It's -- you know, I don't believe that one was -- There was one that, I believe, we investigated the feasibility of it, but I think, in the end, that was not one that was officially deemed an emergency by procurement. I don't believe in the end that that was one that when it went forward was actually executed as an emergency procurement. I don't -- I'm pretty sure it was not in the end. I think we looked into it at one point, but I don't believe it was ultimately done that way.

Q   You're aware of the Maywood courthouse order about the two privacy screens, correct?

A   Yes. That's where I saw you last.

Q   Was that determined an emergency?

A   When you say "determined an emergency," by -- in what way?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 58

Q   By procurement.

A   Do you mean direction to move forward with the elements that were a part of the agreement or are you talking about work in that area? What are you asking about it?

Q   Well, you're aware that the Court of Appeals affirmed a lower Court's ruling that the County has to move the two privacy screens, correct?

A   Yes.

Q   And that occurred about a year -- more than a year ago, correct?

A   The determination requirement was just a few months ago. You were there.

Q   No, no. The Seventh Circuit in July of 2018 said the County had to do that work.

A   If you say so. I don't remember that specifically. I don't remember.

Q   Do you know --

A   I only remember the more recent discussion.

Q   Do you know when that work will be completed?

A   No. We're trying to get that

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 59

accomplished now because, as you know, the decision to do that was very recent. I want to make sure we get it right the first time.

Q   Before we took a break, we were talking about Division 10.

A   Okay.

Q   And requirements of the ADA, I believe. I'm going to show you a document that I'm going to mark as Exhibit 11, which is an order from Polletta versus Dart, and I have one question about this document.

(WHEREUPON, Plaintiff's Exhibit No. 11 was marked for identification.)

BY MR. MORRISSEY:

Q   This is an order from a district court judge in Polletta versus Dart. Do you see the top of the page?

A   Yeah, okay.

Q   I'm going to draw your attention to page 4, the bottom of page 4.

A   Okay.

Q   Where it says "Regarding grab bars and shower seat requirements, the Court adopts

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 15

ERIC DAVIS
December 19, 2019

Page 60

the following instruction: 'Under the Rehabilitation Act, an accessible toilet for individuals with disabilities in a facility built after 1988 must have grab bars near the toilet, and an accessible shower must have a mounted shower seat.'"

Is that your understanding of the requirements of the Rehabilitation Act?

A    Let me reread this. I'm sorry. Could you ask your question again?

Q    Is it your understanding that "under the Rehabilitation Act, an accessible toilet for individuals with disabilities in a facility built after 1988 must have grab bars near the toilet and an accessible shower must have a mounted shower seat" as identified in the order that's in front of you?

A    I don't know whether the requirement comes from the Rehab Act or from the ADA itself, but I believe that that's the standard, yes.

Q    For a facility built after 1988?

A    Then that must -- the ADA suggests that it was simply the Rehab Act.

ERIC DAVIS
December 19, 2019

Page 61

Q    Well, is your understanding of the Rehabilitation Act pertaining to an accessible -- pertaining to a building built after 1998 (sic) that it must have grab bars near the toilet and an accessible shower must have a mounted shower seat; is that your understanding?

A    I'm sorry. You said '98. This is '88.

MR. SHERER: Yeah, sorry. I'm going to object to this whole line of question. It calls for a legal conclusion. Go ahead. You can answer.

BY MR. MORRISSEY:

Q    Mr. Davis, I'm just asking you whether your understanding is --

A    No, I'm attempting to answer you. Just you asked about '98, and the part that you mentioned here says '88, so.

Q    Going to Exhibit 11, page 4.

A    Yes.

Q    It says, "The Court adopts the following instruction: 'Under the Rehabilitation Act, an accessible toilet for individuals with disabilities in a facility

ERIC DAVIS
December 19, 2019

Page 62

built after 1988 must have grab bars near the toilet, and an accessible shower must have a mounted shower seat;'" is that your understanding?

MR. SHERER: Objection, calls for a legal conclusion, speculation. You can answer.

BY THE WITNESS:

A    I'm not clear about the language where it says "in a facility built after 1988" because I don't know -- I don't remember when the Rehab Act itself was in force.

Assuming that the Rehab Act was in force at that time, I would expect that these requirements are, in fact, as noted here.

BY MR. MORRISSEY:

Q    But in your report that we talked about when this deposition started --

MR. SHERER: Exhibit 2.

MR. MORRISSEY: Thanks.

BY MR. MORRISSEY:

Q    You mentioned that the Rehabilitation Act --

A    I'm sorry. Which exhibit are you

ERIC DAVIS
December 19, 2019

Page 63

looking at again?

Q    We're looking at Exhibit 2. In your report that we talked about, the second page --

A    Okay.

Q    -- the first full paragraph, you mentioned about compliance of the Rehabilitation Act of 1973, correct?

A    There we go, yes. Uh-huh.

Q    So it's your understanding that the Rehabilitation Act --

A    In effect at that time, yeah.

Q    In 1973, correct?

A    Correct, yes.

Q    And then for a building built after 1988, it's your understanding that the Rehabilitation Act requires grab bars near the toilet, and an accessible shower must have a mounted shower seat?

A    That's sounds right.

MR. SHERER: Same objection.

BY THE WITNESS:

A    That sounds right, though, yeah.

BY MR. MORRISSEY:

Q    Going back to the interrogatories

Exhibit 2 Page 16

ERIC DAVIS
December 19, 2019

Page 64

from the Johnson case, Exhibit 3.

A    Okay.

Q    Paragraph 9 talks about a business case marked 394 to 400.

A    Okay.

Q    Do you see that?

A    Yes.

Q    And I will give you a copy of that business case.  It's going to be marked as Exhibit 1.

(WHEREUPON, Plaintiff's Exhibit No. 1 was marked for identification.)

BY MR. MORRISSEY:

Q    The County's Answer to Interrogatory Number 9 says, "The project identified above is currently in the procurement phase"?

A    Uh-huh.

Q    Correct?

A    What's the date of this document, by the way, Exhibit 3?

Q    You signed the affidavit on August 5th.

A    That's not what I'm asking.  I'm asking about the part that wasn't my affidavit,

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 65

this part, the front part, when was this?

MR. SHERER:  Do you have the certificate of service?

MR. MORRISSEY:  I don't because it wasn't attached.  I think it was a separate document.

MR. SHERER:  Okay.  That would tell us when, but.

BY THE WITNESS:

A    I'm sorry.  Go ahead.

BY MR. MORRISSEY:

Q    Do you know what the status of the FY19 Business Case that's in front of you as Exhibit 1, what the status is presently?

A    Yes.

Q    What is it?

A    It's in procurement.  It is one of those projects that was intended to be procured through the task order methodology.  It was intended to be procured during fiscal year '19 and was inhibited from being procured by the board's decision not to allow the task order methodology, and so we are attempting to move forward with frankly slower and more

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 66

traditional procurement methods.  So it's in procurement.

Q    What stage of procurement is it?

A    As I mentioned to you previously, it's among those that we are negotiating with procurement to -- as to the form of the documentation that we provide to them; and then once they've approved and agreed to that, there are several that we're expecting to go forward with, which would include one or more that might include things under this particular business case.

Q    To your knowledge, has the county board already set aside 750,000 for this business case?

A    I would have to consult the capital improvement plan and see what's in effect in fiscal year '20.  I suspect something on that order is in there.  I can't recall that specific one.  We have over 300 projects, so I can't remember off the top of my head the amount for this particular one.

Q    And this business case is just to hire a consultant to study certain divisions at

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 67

the jail?

A    It is -- Well, yes, as you say, it is to hire a consultant to do the assessment to identify the scope of work that we need to be doing on a project-by-project basis.

Q    Do you know whether there was a scoping meeting that occurred pertaining to this business case?

A    There may have been a meeting preparatory to -- including this among the requests for task orders or perhaps not.  The scope that would be required at that point is much simpler and shorter than what it would be if it was simply put out on the street in an RFP.  It's one of the advantages of the task order approach.

Q    But based on your knowledge, the task order approach has never been used by the County?

A    No, that's not true.  Other divisions and departments have done it.  They just didn't want us to do it.

Q    Do you have any expectation when the RFP will be put out?

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 17

ERIC DAVIS
December 19, 2019

Page 68

A    I believe we're going to try and get it out the first quarter this fiscal year, which started December 1st and I believe ends February 28th.  Whether we are able to get it out by then or not is subject to things outside of our control because it's procurement.

Q    Based on your experience, there is nothing more your office can do to expedite this project?

A    I think we have gone through the different avenues that are open to us and this is the most expeditious way for us to get the work done.

Q    If you look at Exhibit 1, the FY19 Business Case, Page 3, half way down, it talks about "If you're requesting more than one allocation, what is the priority project?"  Do you see that?

A    Yes.

Q    What does that question generally mean to your office?

A    For some of our users, they have many different requests, and so it's an attempt to help us to understand how a particular request

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 69

fits in with the full spectrum of elements that are being requested from a given user.

Q    So does your office request the user to prioritize the projects?

A    We want to get an understanding of how the project aligns with their needs and goals.

Q    So in response to that question, Sheriff's Office writes, "DOC Bridge, CCB and RTU corrections"?

A    Yes.

Q    How does your office interpret that response by the user?

A    As you know, the DOC bridge, the bridge from the tunnel into the Leighton Courthouse, is an important project and I believe that that's the user communicating to us that they wouldn't want us to do anything to delay that project.  Similarly with the CCB and the RTU projects that, in other words, they're saying, yes, we want to do this, but we don't want to do things that are going to slow these other projects down.

Q    So the DOC bridge was identified by

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 70

the user as the priority project?

A    As a priority.  As you note, there are three that they identify.

Q    So how is the DOC bridge project coming along?

A    I believe we're in implementation phase of that project.  I don't honestly remember where that one is right now.  I believe it's under contract for construction.

Q    Do you have any expectation when that DOC bridge project will be completed?

A    I would have to consult the project director and the program management team.  They provide a schedule.

Q    Do you have an expectation it will be done in the year 2020?

A    I think it is supposed to be done this year.  I believe that it is.

Q    You mean 2020?

A    Yes.  When I say "this year," sitting here now, we're in fiscal year 2020.  So I think in terms of fiscal years.

Q    What is the status of the CCB project?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 71

A    As you know, they are related.  The bridge project has to be completed first before the -- any other work in the courthouse goes forward because it is a narrowing of the travel of staff and detainees.  It's an enabling project for the larger project.

Q    Has the county board already set aside money for the DOC bridge?

A    Yes.

Q    How much is that?

A    I don't recall what the number is.  It is technically part of the larger project, except, I think in '20, we might have broken it out.  I don't remember.  I don't remember if in '20 we broke out the bridge as a separate project or if it's still contained within the larger Leighton project.

Q    What is the status of the CCB project?

A    It is a large and very complicated project because of phasing because of a requirement by the chief judge that we keep all the courtrooms open, and that complicates the phasing.  So we are working to resolve the

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 18

ERIC DAVIS
December 19, 2019

Page 72

phasing questions because it's very challenging, which is why we broke out the bridge because that's important, and we can get that done right now.

Q    So after phasing, what's the next step with the project?

A    We would have to finalize the documentations for bid and go out to bid and then contract and start that work.

Q    Do you expect the CCB project to be complete in 2020?

A    No.

Q    How about 2021?

A    No.

Q    2022?

A    No.

Q    2023?

A    Perhaps.  As I said, it is a very complicated project.  It involves moving lots of staff and judges and their support operations, and the Court has to continue operation.  And so we're very limited in terms of the hours when we can work in the courthouse.  So this project is going to take a

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 73

long time.

Q    Is it one of the more complicated projects you have worked on as a county employee?

A    Yes.

Q    I'm going to show you some documents that have been produced by the County in this case.  I'm going to mark them Exhibit 5.

(WHEREUPON, Plaintiff's Exhibit No. 5 was marked for identification.)

BY MR. MORRISSEY:

Q    Take a moment to look at them.

MR. MORRISSEY:  I'm going to use the bathroom.

(WHEREUPON, a short break was had.)

BY MR. MORRISSEY:

Q    Mr. Davis, I'm showing you Exhibit 5, which is a group of documents that's been produced by the County's lawyers in this case.  Have you seen these documents before?

A    No.

Q    Have you had a chance to look at the

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 74

documents?

A    Only briefly when you gave it to me a few minutes ago.

Q    Do you have any idea what these are?

A    It looks like some of the documents are from a close-out report on a project that was completed in 2009.

Q    Do you have any information about that 2009 project?

A    Not other than what I have here.  No, not that I'm -- I don't have anything.  County may have documentation back at the office, but I don't have any other information about this one.

Q    Do you see in the group exhibit there's a Certificate of Occupancy?

A    Correct.

Q    Do you know what the scope of work that was completed in Division 10 was that related to this certificate?

A    No.  This refers to per plans, and the plans aren't here.  So I don't know that.

Q    From looking at any documents, do you know whether there are any toilets in Division 10

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 75

that are ADA compliant for detainees?

A    You mean from looking at these documents?

Q    Just in general.

MR. SHERER:  I'm going to object, calls for a legal conclusion but you can answer.

BY THE WITNESS:

A    Can you re-ask your question because I'm not clear on what you're asking.

BY MR. MORRISSEY:

Q    Sure.  Do you know whether there are any toilets in any of the Division 10 living units that have grab bars near them?

A    I would expect that there are.  I believe so.  I don't remember.  The only time I've been there, I don't remember going in a bathroom, so I don't know.

Q    Do you know whether any of the shower areas for inmates in Division 10 have a fixed bench?

A    I don't remember, no.  I don't remember.  Maybe, I don't know.  I would expect that they would be somewhere, but I don't know.

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 19

ERIC DAVIS
December 19, 2019

Page 76

I don't know what the requirements are applicable to that specific situation.

Q   Have you ever toured Division 6?

A   No.

Q   Is it fair to say you have never been in Division 6?

A   I don't believe I have.

Q   Are you familiar with the program called WestCare?

A   WestCare, no.

Q   Prior to coming here today to testify, did you review any documents relating to upgrades of any bathroom facility in Division 10 -- Strike that -- Division 6?

A   I think I might have looked at a copy of what you have there.

Q   I'm showing you what has been produced by the County. I'm going to mark it as Exhibit 8. It's a three-page document.

(WHEREUPON, Plaintiff's Exhibit No. 8 was marked for identification.)

BY MR. MORRISSEY:

Q   I'm going to direct your attention to

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 77

the last page.

A   Sure.

Q   Have you seen this document before, Mr. Davis, that's --

A   This looks like a document that I have reviewed in the last few days, but I only saw it recently.

Q   The top right of the document says Job Order Contract?

A   Yes.

Q   What is a Job Order Contract?

A   The County uses the job order contract or JOC procurement method for projects. It is a method used by government agencies to accelerate procurement of generally construction projects because it is based upon a pre-agreed upon cost structure, and so it speeds up the estimating process because contractors in the program agree to a cost book that documents how much things cost.

Q   Presently, what is the amount of money that the Job Order Contract can encompass?

A   When you say "presently," do you mean

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 78

under contracts currently available or what we're doing this year?

Q   In the last year, is there a limit?

A   Well, the limit is established by the contracts with the individual job -- JOC contractors. So we went for renewal recently. I don't remember off the top of my head what the breakdown is for those.

Q   Do you have an estimate about how much it is?

A   Again, are you asking about the program in general or about that which a specific contractor can do? Because it's a series of contracts with individual contractors.

Q   Well, we talked about the Cermak ramp, right?

A   Yes.

Q   Based upon your knowledge, can your department use a JOC to move forward with that project?

A   That is one of the delivery methods open to us once the project has been designed. JOC is focused on construction, not on

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 79

procuring design services. The holdup on the Cermak ramp is getting an architect hired to do the construction drawings.

Once that's done, we'll look at the different methodologies for achieving it and decide which is the most expeditious, but the bottleneck right now is getting the bloody things designed.

Q   So the Job Order Contract is dated February 26, 2014?

A   That's what it says.

Q   And does this relate to the shower in Division 6?

A   I believe that's what the scope of this is about, yeah. Just to be clear, there's an element in this page at the top that is black that is an area where it says what this document is. There are different documents during the job order process, and so it's not clear to me which one this is. I can't read it from the copy I have here.

MR. MORRISSEY:  I think that's the way it was produced to me, right?

MR. SHERER:  I mean --

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 20

ERIC DAVIS
December 19, 2019

Page 80

BY THE WITNESS:

A   We have scope of work documents and then we have --

MR. SHERER:  Yours is a little worse. I think it says Detailed Scope of Work.

BY THE WITNESS:

A   Oh, it's a DSOW, okay, yeah.  All right.  Go ahead.  So this is a DSOW, not a -- okay.

THE REPORTER:  DS what?

THE WITNESS:  DSOW, detailed scope of work.

BY MR. MORRISSEY:

Q   To your knowledge, what were the ADA accessibility requirements for a shower that was constructed in February of 2014?

MR. SHERER:  Objection, calls for a legal conclusion.  You can answer.

BY THE WITNESS:

A   To be clear, this is the scoping. This is not the contract for construction. This is a document that is used to ask the contractor to assemble the bid.  So I don't know what the time delay was between this scope

ERIC DAVIS
December 19, 2019

Page 81

of work and when the final package was approved for construction.  That said, showers needed to be -- As it says it here, must meet -- one shower location must meet ADA accessibility requirements, so.  I don't know also whether or not this is -- was accompanied by an architect's drawings or not.  Given a brief review of the document here, it's not clear to me whether this scope can be achieved without a permit.  If it needed a permit, it needed to have an architect.  So I don't know what the status of that is relative to contracting for this work.

Q   Would you expect there to be additional documents relating to this proposed project?

A   Yeah, there would be.  Yes.

Q   And you would expect there might be an architect's drawings?

A   As I said, it's not clear to me from looking at this whether or not this scope is sufficient to trigger the requirement or whether this could be done simply as replacing in kind, which sometimes the city allows you to

ERIC DAVIS
December 19, 2019

Page 82

do without a permit.

Q   Based on your understanding as being an architect, if a public entity alters a facility, is it generally required to bring them into compliance with the latest accessibility standards?

A   Yes.

Q   How do you know that?

A   How do I know that?

Q   Yeah.

A   Tied to the ADA.

Q   And is it your understanding that if an alteration occurred after March of 2012, the public entity must comply with the latest accessibility standards and the 2010 ADA standards for accessible design?

A   Yes, I believe so.

Q   Is it your understanding that the 2010 ADA standards for accessible design require a shower area to have a fixed bench?

A   I don't recall whether or not a movable bench is allowed or not.  I don't know whether that is -- I would have to go check and see if that was allowed or not or whether that

ERIC DAVIS
December 19, 2019

Page 83

was an exception the city made.  I don't know the specifics of whether it's fixed or movable.

MR. SHERER:  I'm just going to object to the last line of questions.  It calls for a legal conclusion.

BY MR. MORRISSEY:

Q   I'm going to show you a series of pictures I'm going to mark as Exhibit 10.  They were taken during an inspection.

(WHEREUPON, Plaintiff's Exhibit No. 10 was marked for identification.)

BY MR. MORRISSEY:

Q   Mr. Davis, I'm showing you what is marked as Exhibit 10.  Can you look at the third page?

A   Sure.

Q   There's a photograph of a shower area.

A   Uh-huh.

Q   And this was in Division 6 that counsel and I inspected.

A   Uh-huh.

Q   From looking at this photograph --

Exhibit 2 Page 21

ERIC DAVIS
December 19, 2019

Page 84

MR. SHERER: Hang on, Pat. I'm just going to object to your characterization of this photograph as the photograph of the shower area.

MR. MORRISSEY: Well, it is.

BY THE WITNESS:

A But I have no way of knowing where this is.

BY MR. MORRISSEY:

A I'm representing to you that I was there, along with your attorney, and the Sheriff let us inspect Division 6, Tier 2-A. This was a photograph that was taken by an expert. Based on your review --

MR. SHERER: We're on which page?

MR. MORRISSEY: We are on the third page.

MR. SHERER: Oh, okay. Sorry. I thought you were talking about the first page. All right.

THE WITNESS: Okay.

BY MR. MORRISSEY:

Q Based on your review of this photograph, Mr. Davis, does that photograph

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 85

depict a shower area that complies with the 2010 ADA standards?

MR. SHERER: Objection, calls for a legal conclusion. You can answer.

BY THE WITNESS:

A It doesn't appear to.

BY MR. MORRISSEY:

Q Why not?

A Realizing that the ADA standards treat multiple -- locations where there are multiple showers differently from individual showers, in other words, if there are three or four in a row, it may be that one needs to be accessible and the rest do not.

I don't know from this photograph whether if I turned to the right I would see one that is fully accessible or not. That said, if this turns out to be the one that is supposed to be accessible, no, there is no shower seat here of any kind.

Q Looking at the next page, the last page of Group Exhibit 10, do you see -- and this was a photograph taken of the Division 10 officers' locker room?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 86

A I'm sorry. Division 10 what?

Q The officers' locker room.

A Officers' locker room. This is not in the detention area.

Q No, this is the officers' locker room.

A All right.

Q From looking at this photograph, do you see a fixed bench?

A I see something that looks like one in the back of the photograph, but I can't tell because of what appears to be a box of rocks.

Q From looking at the photograph, does it appear to have grab bars?

A It does have two grab bars.

Q What structural elements do you see in this photograph that would make it accessible?

MR. SHERER: Objection, calls for a legal conclusion. You can answer.

BY THE WITNESS:

A Well, grab bars are a part of the equation. If that is, in fact, a seat, it's not clear to me what its dimensions are. So I

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 87

can't tell if that's a compliant seat or not.

The temperature control appears to be an accessible fixture. It looks to me like the soap dish is too high. I don't know.

BY MR. MORRISSEY:

Q Does it appear to have a nozzle that's movable?

A Yes.

Q Do you have any personal knowledge whether Division 4 had any inmate toilets with grab bars near the toilet?

A I don't remember if they have or not. I don't think I have been through the housing block portion of Division 4.

MR. MORRISSEY: Do you want to take about a ten-minute break? We're almost finished.

MR. SHERER: Sure, yeah.

(WHEREUPON, a short break was had.)

BY MR. MORRISSEY:

Q At the start of the deposition today, we talked about your teaching, correct?

A Yes.

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 22

ERIC DAVIS
December 19, 2019

Page 88

Q    When you teach undergraduate- or graduate-level courses, do you ever teach your students about what "disability" means?

A    Yes.

Q    What do you teach your students?

A    I try to lay out a broader understanding of disability so that the students understand the context of the ADA. Typically, what I'll do is I'll ask them which of them doesn't plan on getting old. So, in other words, nobody will raise their hand, and then I say, well, then the ADA is going to apply to you in the course of your life, that the ADA is not something that is peripheral or for a subset for "those people," quote, unquote, "those people" but something that is intended to make life easier for a broad range of people, which at some point, if they are older and have limited mobility will include them.

It is an attempt to have them understand that it is a fundamental aspect of the responsibilities of architects and not an inconvenience.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 89

Q    When you mentioned these people, what are you referring to?

A    Sometimes designers, particularly younger designers, think in rarified air. If you are younger and inexperienced, they don't understand the challenges of people with disabilities because they don't have a disability or maybe they don't have someone in their family that does. So it doesn't occur to them. So they tend to think that sometimes -- sometimes they tend to think that those things are for -- are not -- are for a subset of the population that they may or may not need to deal with and that that's particularly true in the case of public buildings.

Q    Do you have to be in a wheelchair to be disabled?

A    No.

Q    Why not?

A    Disability comes in many forms. There are visual disabilities, for example, that perfectly ambulatory individuals may have and the ADA addresses issues that someone that has limited vision might have. So there are

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 90

any number of things. There are people that can walk but need to walk with a cane. So they can't navigate regular flat surfaces -- or, I'm sorry, stairs and such. So they need assistance climbing stairs or doing that sort of thing, and they're not in a wheelchair but they're of more limited mobility. So it's not a requirement that they're in a wheelchair.

MR. SHERER: And, again, I will just object for the record, calls for a legal conclusion as to the definition of disability. Go ahead.

BY THE WITNESS:

A    And I'm speaking generally.

BY MR. MORRISSEY:

Q    When you teach your students, do you teach them how to identify people with disabilities?

A    No, not really. No. It's not -- No.

Q    In your undergraduate- or graduate-level courses --

A    To be clear, I'm not teaching anymore. I ended teaching in 2017.

Q    When you did teach --

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 91

A    Yes.

Q    -- did you ever teach any provision of the ADA regarding reasonable modifications?

A    I don't recall if we got into that much detail.

Q    Are you familiar with the reasonable modification provision of the ADA?

A    (Indicating.)

Q    What is your understanding of that provision?

A    There are elements that are discretionary that allow for less than 100 percent compliance in all locations with every provision. Sometimes it's because of a subset of the population, and there's not a need to do everything everywhere. Sometimes there are issues of cost or structural feasibility, right?

So there are elements that make it objectively excessively difficult to comply in a particular instance.

Q    Do you provide any professional services to the Sheriff about the reasonable modification provision of the ADA? I'm talking

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 23

ERIC DAVIS
December 19, 2019

Page 92

about the Sheriff's Office.

A    When you say do I provide professional services, I'm not clear what you're asking.

Q    In your capacity as director --

A    Yeah.

Q    -- do you consult with the Sheriff's Office regarding any reasonable modifications provision of the ADA?

A    I don't recall if I have discussed with them or provided an opinion about whether or not a specific element does or doesn't constitute a reasonable modification.

I tend to speak with them more broadly.  So I don't remember an instance of saying, in this particular location, you should do "X."

Q    Are you aware of any accommodation or modification the Sheriff's Office has for disabled people to move up or down the Leighton ramps?

A    Accommodations is operational.  So that's on them.  That's not a capital issue. Modifications at the facility would be either

ERIC DAVIS
December 19, 2019

Page 93

on us or DFM, Department of Facilities Management.

Q    Do you know how disabled people move up and down the Leighton ramp now?

A    I have been told that they use a chair, a wheeled chair, that is operated by the sheriffs.  I have never seen that, but that's what I have been told.

Q    Have you ever given any advice about that procedure?

A    No, not that I -- I don't remember. No.

Q    Do you know what accommodations are provided by the Sheriff's Office for people that use a wheelchair at all times to move up or down the Leighton ramps?

A    Only other than what they tell me anecdotally.

Q    Do you have any first-hand testimony about what they do?

A    As I said, I don't believe I have ever seen them do it.

Q    Earlier, we talked about a procedure for people who are in wheelchairs and use a

ERIC DAVIS
December 19, 2019

Page 94

public ADA bathroom upon request at Leighton?

A    That sounds familiar.

Q    Do you have any opinion whether that's a reasonable modification?

A    That wouldn't be a modification. That would be an accommodation, and an accommodation is operational.

Q    So you have no opinion whether that accommodation is reasonable under the ADA?

A    Correct.

Q    Is it fair to say you have no opinion about the accommodations provided by the Sheriff's Office to disabled people at the Cook County Jail?

A    That's correct.  I don't know the extent of their accommodations, so I'm not in a position to have an opinion one way or the other.

MR. MORRISSEY:  I have nothing further.  Thanks for your time.

MR. SHERER:  I just have a couple of quick questions here.

THE WITNESS:  Okay.  Do you want these back?  I don't need them.

ERIC DAVIS
December 19, 2019

Page 95

MR. SHERER:  Yeah, we're going to go through just a couple of them.

THE WITNESS:  Okay.

C R O S S - E X A M I N A T I O N

BY MR. SHERER:

Q    So first, I want to just turn your attention to Exhibit 8.

A    Okay.

Q    We talked a little bit about this, and Mr. Morrissey asked you some questions about it.

A    Okay.

Q    And I believe you testified that it was a DSOW or a Job Order Contract that was authored by the Cook County Office of Planning and Policy; is that right?

A    Yes.

Q    And did you have a chance to review the -- this scope of work narrative that's contained in the document?

A    Yes.

Q    Was there anything within that scope of work narrative that referenced any modifications or alterations to toilets?

Exhibit 2 Page 24

ERIC DAVIS
December 19, 2019

Page 96

A    I didn't see any.

Q    Was there anything that you can tell from this document as a whole that referenced any modifications or alterations to toilets?

A    There doesn't appear to be any in the document here.  By the way, I would note that this isn't signed, so I don't even know if this was ever actually adopted as presented here.

Q    So based on your understanding and on your education, training and experience as an architect and someone who has taught classes on ADA, would performing alterations or modifications to showers trigger any requirement to also make toilets that are in a separate room ADA compliant?

A    I would need to research it in detail but, generally, no, that wouldn't necessarily trigger a requirement for the -- for toilet rooms in another -- for toilets in another room.

Q    Okay.  And then if we could go to Exhibit 7, which I think we talked about right at the beginning.  Counsel asked you some questions about it.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 97

A    Okay.

Q    Prior to Monday, had you ever seen this document before?

A    I don't remember seeing it, no.

Q    Do you know who authored this document?

A    I don't know for certain who did, no.

Q    And so when you testified on what the document purports to show, that's based upon your understanding of what it indicates, correct?

A    Just looking at the piece of paper.

Q    Okay.  And have you ever been down to the ramp leading up to Cermak Hospital that we have discussed at length here in this deposition today?

A    I don't believe I ever have been down there.  The times that I have been to Cermak, I entered on the ground floor and went through the security checkpoint accessible from grade.  So I don't think I have been into the -- I may have been, but I don't remember being in -- entering the building or leaving it this way.

Q    Okay.  Have you ever -- Do you have

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 98

any memory of ever performing any measurements or determination of specifications in terms of the ramp structurally that we have talked about here today?

A    No.

Q    So everything that you testified here to today regarding what is purportedly the ramp is based upon the information that you're reading from this document; is that correct?

A    Yeah, that's correct.  Yeah, yeah, yeah.

MR. MORRISSEY:  Well, I object to the extent it mischaracterizes testimony about the county board process.

MR. SHERER:  Okay.  You can object to that, sure.

THE WITNESS:  Okay.

BY MR. SHERER:

Q    And you said this document that's Exhibit 7 -- You testified that it may be a piece of a document that was included in a task order?

A    I think that this includes information about a scope of work that is or

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 99

would have been included in a task order, one of the task order projects that we had intended to go forward with.

Q    But you as you sit here today, you can't be 100 percent sure?

A    Correct.

Q    And then there was a lot of testimony about the date a certain building, I believe it was Division 10, was constructed.  A lot of times we use the term colloquially that it was constructed sometime around 1992; do you remember that?

A    Yes.

Q    So when we use the term "constructed," what does that mean to you?

A    Well, constructed could mean when you start a construction.  It could mean when you end a construction.  It could mean when the building was completed and occupied.  It could mean when the contract was signed, but they didn't start work right away.  So it could encompass a lot of different points in the process.

Q    And if a building -- Strike that.  So

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 25

ERIC DAVIS
December 19, 2019

Page 100

when you say that the building was constructed in approximately 1992, it could encompass a number of different things; is that fair to say?

A    That could be indicative of a number of different points in the process.

Q    Okay.

A    I would suspect that a building of that size would take more than a calendar year to construct.  So I don't know if that indicates when construction started or when construction was completed.

Q    Okay.  And if construction started before 1992, are you aware if that building would have to comply with the structural requirements of the Americans with Disabilities Act?

A    As I explained to our friend here, it depends -- I believe the standard is when the project is permitted for construction.  I think that's the standard of when the compliance is required to be -- to -- when that takes effect.

So, in other words, if it was permitted for construction in 1990 before the

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 101

ADA was adopted but construction started in '91 and completed in '92, it might be that it was permitted before -- I don't know.  I haven't checked with the city -- It might have been it was permitted before the act was in effect.  I have no idea.

Q    And if we could turn to what's been marked as Exhibit 11, it's the Order from the Nicholas Polletta case.  Do you remember when counsel asked you some questions about that?

A    Yes.

Q    And I believe he asked you questions about the last bullet point on page 4 leading into page 5?

A    Right.

Q    You didn't author that statement, correct?

A    No.

MR. SHERER:  I think that's all I have, Pat.  Do you have anything else?

MR. MORRISSEY:  I have a few follow-ups.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 102

R E D I R E C T   E X A M I N A T I O N

BY MR. MORRISSEY:

Q    Mr. Davis, do you know how far Division 6 is from the RTU?

A    I can't give you a distance, no, not offhand.

Q    Do you agree they're separate buildings?

A    Yes.

Q    If a wheelchair user is brought to Division 6 for a drug treatment program for several hours and needs to use the bathroom, do you think it's a reasonable accommodation that the Sheriff has a policy to bring the person from Division 6 to his cell in the RTU to use the toilet?

MR. SHERER:  Objection, incomplete hypothetical, calls for a legal conclusion.

BY THE WITNESS:

A    I can't speculate on the Sheriff's operations or on reasonable accommodations or not.

BY MR. MORRISSEY:

Q    And why can't you comment about

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 103

whether an accommodation is a reasonable accommodation?

A    Because it's not my area of expertise.  I deal with the building.

Q    When you taught, did you discuss reasonable accommodations to your students?

A    I don't remember using that term.

Q    Did you use a similar term to discuss the general concept?

A    I don't think we really talked about operational.  We talked about sticks and bricks, the physical structures.

Q    When counsel mentioned -- referred to Exhibit 7, you said there should be some additional documents that pertain to the Cermak ramp project?

A    Is that a question?

Q    Is that fair to say?

A    Well, it looks like it's an excerpt from a larger document.  It does say "copy paste," so I would assume that this is a page of a larger document.

Q    Is it fair to say you have personal knowledge that this Cermak ramp project was

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 26

ERIC DAVIS
December 19, 2019

Page 104

part of the task order that went before a committee of the county board?

A    I believe that this was among the projects that was intended to be -- have the design services procured that way.

MR. MORRISSEY:  I have nothing further.  I appreciate it.

MR. SHERER:  All right.  We'll waive.

FURTHER DEPONENT SAITH NOT....

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 105

STATE OF ILLINOIS )
                  )  ss:
COUNTY OF C O O K )

I, Peggy A. Anderson, a Certified Shorthand Reporter in the State of Illinois do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction, and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That the said deposition was adjourned as stated herein;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 106

IN WITNESS WHEREOF, I do hereunto set my hand this 30th day of December, 2019.

_____
Peggy A. Anderson
Certified Shorthand Reporter
License No. 084-003813

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 27