Transcript of the Testimony of
**ERIC DAVIS**

**Date:** March 12, 2024

**Case:** WALKER VS. DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

ERIC DAVIS
March 12, 2024

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CORNELIUS WALKER,           )
                            )
        Plaintiff,          )
                            )
            vs.             )  No. 20-cv-00261
                            )
THOMAS DART, SHERIFF OF     )
COOK COUNTY and COOK        )
COUNTY, ILLINOIS,           )
                            )
        Defendants.         )

        This is the deposition of ERIC DAVIS, taken via Zoom videoconferencing, called by the Plaintiff for examination, taken pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before PEGGY A. ANDERSON, a Certified Shorthand Reporter of the State of Illinois, on March 12th, 2024, at 1:00 o'clock p.m.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 2

A P P E A R A N C E S:

        THE LAW OFFICES OF:
        THOMAS G. MORRISSEY, LTD.

        BY:  MR. THOMAS MORRISSEY
             10257 South Western Avenue
             Chicago, Illinois  60643
             (773) 238-4235
             tgm@morrisseylawchicago.com

             Appeared on behalf of the
             Plaintiff;

        THE LAW OFFICES OF:
        JOHNSON & BELL, LTD.

        BY:  MR. SAMUEL BRANUM
             33 West Monroe Street
             Suite 2700
             Chicago, Illinois 60603-5404
             (312) 372-0770
             branums@jbltd.com

             Appeared on behalf of the
             Defendants.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 3

                I N D E X
WITNESS                                    PAGE
ERIC DAVIS
DIRECT EXAMINATION BY
MR. MORRISSEY:                                4

CROSS-EXAMINATION BY
MR. BRANUM:                                 228
REDIRECT EXAMINATION BY
MR. MORRISSEY:                              246


                E X H I B I T S
MARKED                                     PAGE
PLAINTIFF'S EXHIBIT NO. 1                     7
PLAINTIFF'S EXHIBIT NO. 3                    55
PLAINTIFF'S EXHIBIT NO. 4                   145
PLAINTIFF'S EXHIBIT NO. 7                    49
PLAINTIFF'S EXHIBIT NO. 103                 214

        C E R T I F I E D   Q U E S T I O N S
LINE                                       PAGE
11                                          22
5                                           26
3                                           27
17                                          82

                *******

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 1

ERIC DAVIS
March 12, 2024

Page 4

(WHEREUPON, the witness was first duly sworn.)

MR. MORRISSEY: This is the deposition of Eric Davis taken pursuant to the Court's order and set for today's date.

WHEREUPON:

ERIC DAVIS, called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MORRISSEY:

Q Mr. Davis, I'm going to ask you a series of questions in regards to the Walker case in which you provided a Declaration in response to a motion for a permanent injunction.

Have you looked at -- you were previously deposed on two days in the Walker case, correct?

A I don't recall specifics, but if you say so.

Q On January 19th, 2022, do you recall being deposed?

ERIC DAVIS
March 12, 2024

Page 5

A I would have to check my calendar, but I assume the date you are talking about is correct.

Q And you were also deposed on January 24th, 2022 in the Walker case?

A I don't know if it was in the same case, but okay.

Q Did you have an opportunity since those dates to review your deposition transcript?

A I think so. Honestly, I looked at a lot of things in connection with a lot of cases. So I'm not -- I would assume so, but I can't recall specifically.

Q Is there anything in the depositions in January of 2022 that were incorrect or inaccurate which you would like to change today?

MR. BRANUM: Objection to the form of the question.

THE WITNESS: Am I supposed to answer, Sam?

MR. BRANUM: I mean, I guess the answer to that is it depends. I objected

ERIC DAVIS
March 12, 2024

Page 6

to the form of the question.

If you are -- if you can answer it, then answer it but I thought it was a poor question.

BY THE WITNESS:

A I don't recall from a review any item that may or may not have been accurate. I think I'm usually pretty good at those things, but I don't recall any specifics.

MR. BRANUM: And just for the record, Tom, you're not talking about any inaccurate statements that you make in these depositions because I think the witness would say that he -- I don't think the witness is subscribing to any of your statements made during the deposition.

So my objection to the form of the question was you didn't distinguish between his testimony or your statements or what in the deposition that you think he found inaccurate, if anything.

But go ahead and ask your next question. That's my objection.

ERIC DAVIS
March 12, 2024

Page 7

BY MR. MORRISSEY:

Q Can you turn to -- let me see. Turn to Exhibit 1.

MR. BRANUM: You are going to have to share your screen.

BY MR. MORRISSEY:

Q What documents prior to today's deposition have you reviewed in order to testify today?

A I think primarily -- well, I know if this is the right one -- it looks like it is. I did review this Declaration that you're showing on the screen now.

Q When did you review the Declaration?

A Within the past few days.

Q Did you review any other documents in preparation for today's deposition?

A Not that I recall. I mean, I -- as the Declaration states, there's work ongoing that involves the area in question in this case. So I may have looked at documents relative to that ongoing project or projects that relate to what's in here. I can't say specifically -- it's not clear what you're, you

Exhibit 5 Page 2

ERIC DAVIS
March 12, 2024

Page 8

know, asking for.

Q    What documents did you review in regards to what you call an ongoing project involving the Cermak ramp?

A    I mean, I would have to go back and check because it's -- as I said, it's an active project.  There's work going on to, as it's stated in the Declaration, to bring an architect on board and bring a contractor on board.  So I wouldn't be able to give you a complete answer to that question without looking into it.

Q    Since the date of your Declaration, which was executed on February 22nd, 2024, are there any documents that have been executed by the defendants either the Sheriff or Cook County in regards to -- that would be relevant to your Declaration?

MR. BRANUM:  Objection to form.

BY THE WITNESS:

A    I can't speak to anything that the Sheriff would or would not have executed.  I have no way to know that, and it's not clear to me, Tom, what constitutes executed.  I don't

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 9

know what that means in this context.  I mean, a contract is executed but, I mean, I don't know what you're referring to when you say documents that were executed in the period. It's not clear to me what you're asking.

BY MR. MORRISSEY:

Q    What contract are you referring to?

A    Well, as it's noted in this Declaration and -- let's see.  I'm not finding it offhand.  Give me just a moment.  Yeah, it's noted in the Declaration we have assigned one of our task order architects to design the replacement of the ramp.  So, you know, they have a master agreement, and this is an assignment under that agreement.

Q    What documents were executed to assign this design --

A    Again, I don't --

Q    -- ramp to an architectural firm?

A    So, again, it's not clear to me what you mean by executed.  The process of executing the assignment for an architect for this involves a development as it says I think in Item 16 in this document of a task order, and

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 10

the development of a task order is a multistep process.  That process is under way, but it's not completed yet.  So we don't have anything executed.  We're working out the specific terms of the assignment with the vendor.

Q    What is the name of the vendor?

A    As it says in Item 16, it's HDR Architecture.

Q    Looking at Paragraph Number 7 of your Declaration.

A    Okay.

Q    Let me pull it up on the screen.  Do you have your Declaration in front of you?

A    I do.

Q    Okay.

A    Yes, I do.

Q    Were you involved in hiring the firm of Globetrotter [sic] Engineering?

A    Yes.

Q    Tell me what your involvement -- let me ask a first question.

When did you first become involved in retaining a third-party architectural engineering firm to assess the ADA compliance

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 11

of the Cermak Health Service facility?

MR. BRANUM:  Objection to the form of the question.

Go ahead.

BY THE WITNESS:

A    I would have to look back at my records.  As it says in here somewhere -- well, anyway, so the County is -- has retained or is in the process of retaining firms to assess, as it says in Number 7, the entire public safety portfolio.  It's seven contracts, I believe five of which have been executed as of today. And the process of developing those requests for qualification is a lengthy one.  So I would say the process that led to hiring Globetrotters is well over a year ago.  I would have to look up the specific date.  I expect the process was sometime in 2022.

Q    When did you personally become involved in trying on behalf of the Capital Planning Department to hire a firm to assess the ADA compliance involving the Cermak ramp?

MR. BRANUM:  Objection to form.

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 3

ERIC DAVIS
March 12, 2024

Page 12

BY THE WITNESS:

A   I can look.  It's been a long process to get that -- to get that procurement completed.  I think it probably -- I'm pretty sure it started sometime in 2022 or earlier than that.

BY MR. MORRISSEY:

Q   Would it be fair to say that it began after Ellen Stoner issued her report for STV in regards to the noncompliance of the ADA ramp?

MR. BRANUM:  Objection to the form of the question.  Misstates the record.

BY THE WITNESS:

A   I don't recall offhand, Tom, the date of that document.  So I can't really speak one way or the other.  I don't know.

BY MR. MORRISSEY:

Q   Do you recall Ellen Stoner's firm doing an assessment of the Cermak ramp?

A   I recall her issuing an opinion that included an illustration, yes.

Q   And the firm that she works for or is a subcontractor for was STV Henry [sic]?

A   Heery.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 13

Q   Heery.  Is that correct?

A   STV Heery.  Heery is spelled H-e-e-r-y, STV Heery.  Yes, she was --

MR. BRANUM:  And, Counsel, these questions have already been asked in previous depositions.  So you need to stick with the Declaration per the Court's order.

BY MR. MORRISSEY:

Q   And her report, her assessment of the Cermak ramp, was in March of 2018, correct?

A   I can't confirm or deny that.  I would have to look it up, but I don't know which item in the Declaration is that related to?  I'm not following.

Q   After the issuance of Ellen Stoner's report on the Cermak ramp in 2018, did you personally take any steps to hire an architectural firm to assess whether the ramp was accessible?

MR. BRANUM:  You mean outside of what he just testified to?  I think we're -- this has been asked and answered.  So you're going around in circles.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 14

BY THE WITNESS:

A   I think what he may be referring to -- and, Tom, again, I would have to qualify saying I would have to check my notes and records.  But as I know that you know from other litigation or maybe it's this case and some other part of this case.  I don't know.  The County attempted to hire the first time a batch of firms to do work on a task order basis.  The approach to Cermak would have been probably -- the Cermak ramp would have probably been handled under that.

But, as you know, in approximately 2019, the Board of Commissioners declined that request to execute those contracts; and so we tried again and reshaped and reissued a solicitation, and that's what ended up with Globetrotters.  But, as you know, we tried to obtain task order engineering services initially in around 2019.

So, again, assuming that the date you're saying for Ellen's report is accurate, I would expect that the information would confirm that it was expected.  We would address the

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 15

ramp with an architect through that vehicle which, as I said, we weren't able to do.

Q   The first step in the actual retention of Globetrotter Engineering was in the year 2020, in February of 2020, when a request for qualifications was being drafted by either your department or procurement?

A   That may be right, yeah.  We generally draft them, yeah.  That may be correct.  I don't know.  I would have to go check my records.

Q   And when did you finally get approval to issue a request for qualifications?

A   It's a multistep process.  I would have to go check.

Q   Was it more than two or three years ago?

MR. BRANUM:  Asked and answered.

BY THE WITNESS:

A   I would have to go check.  I can't answer one way or the other.  It took awhile.  Let's put it that way.

BY MR. MORRISSEY:

Q   Did that require the procurement

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 4

ERIC DAVIS
March 12, 2024

Page 16

office to approve the request --

A    Yes.

Q    -- for qualifications?  Did it also require the procurement office eventually to approve a request for a proposal from an architectural firm?

MR. BRANUM:  Objection to form, foundation.

BY THE WITNESS:

A    In this case, we did not -- the County did not issue a request for proposal. It issued a request for qualifications.  It's a slightly different process.  The intent is to identify the most qualified firm and then to negotiate with that firm in terms of their fee. It's a standard practice in what's called qualifications-based solicitation, and the reason that we went to a request for qualifications in this case rather than a request for proposal that includes a price up front was because some or -- we expect that some or all of the work either on this project or other projects in terms of ADA work may receive federal funding.  In fact, we had one

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 17

that did receive federal funding.

And so by going to a qualifications-based procurement, it is compliant with the what's called the Brooks Act, which is a federal requirement for qualifications-based contracting of professional services in projects that receive federal funding.

So it was done as an RFQ instead of an RFP in order to allow at some point in the future if there was federal funding to support the eventual work, and that process took a while.

Q    In order to put through a request for qualifications, did that have to be included in the Capital Improvement Plan for the County Board?

A    The line item for a project for ADA upgrades, yes, is included in the capital plan, and I think that item number is in -- yeah, Item 8 in this Declaration.

Q    So before you can hire Globetrotter, you had to get approval from the County Board to have the funds included in the Capital

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 18

Improvement Plan for fiscal year 2023; is that fair to say?

A    We tried to be as efficient as possible.  Since the encumbrance of a contract is not something that one does until the end of a process, again, I would have to check my records, but sometimes we will go ahead and put in the request for a project at the beginning of the year, and then go ahead and develop the solicitation with the expectation that the project would be approved later in the year, and that would allow us to sign the contract sooner relative to the date that the project was approved in the capital plan.  But I would have to refer to the notes and records to be able to identify the timing both of the contract for Globetrotters and the timing of the development of the project that was included in the capital plan.

Q    Did you participate at all with reviewing the contract for -- with Globetrotters to assess whether or not the Cermak ramp complied with the ADA?

A    Yes.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 19

MR. BRANUM:  Objection, form, compound question.

BY THE WITNESS:

A    I participated, yes.

BY MR. MORRISSEY:

Q    When did you first have contact with Globetrotter in regards to assessing the Cermak ramp?

MR. BRANUM:  Objection to form.

BY THE WITNESS:

A    I don't -- you know, I couldn't say offhand.

BY MR. MORRISSEY:

Q    Is it more than two years ago?

A    Again, I would have to check.

Q    Was it less than two years ago?

A    I would have to check.

MR. BRANUM:  Objection.

BY THE WITNESS:

A    We have -- as I said, we have five of these contracts already executed and two more in process.  So I would have to go back and look at the specifics because we're working on several of these all at the same time.

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 5

ERIC DAVIS
March 12, 2024

Page 20

BY MR. MORRISSEY:

Q   Who was your contact person when you were negotiating the contract with Globetrotter to assess the Cermak ramp?

A   Do you mean the contract from -- the contact from Globetrotters or the contact from our procurement office?

Q   Globetrotters.

A   I don't -- I couldn't say definitively.  It would be one of two -- three or four people.  I can't remember who it was specifically because we talked to some people during the contract negotiations initially, so it would have been one of several different people.

Q   Did you personally have contact with Globetrotter in negotiating the contract to assess the Cermak ramp?

A   I participated in meetings discussing with Globetrotters and with the office of the chief procurement officer.

Q   Who from the office of chief procurement office was involved in the negotiations with Globetrotters?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 21

A   I can't say definitively.  It would have been one of two, possibly three people.

Q   Who were those individuals?

A   It could have been Michael Sheevy who is no longer with the procurement office.  It could have been Robert Stewart who's a deputy CPO.  It could have been Adriaan Jelks-Brown who also is involved in the project as well, but I don't know which meeting you're talking about because there were several meetings in the course of negotiations on this.

Q   Were there meetings with the Sheriff's Office in negotiating the contract with Globetrotter?

A   I don't recall.  I don't think they were involved in the specific scope negotiations -- or I'm sorry -- fee negotiations.  I don't -- they may or may not have been in those meetings.  I don't recall if they were or they weren't.  I don't think we met with them separately, but I don't know if they were in the conversations with Globetrotters and the CPO's office or not.

Q   When you were negotiating with

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 22

Globetrotters, I would assume it was in 2022 or 2023, correct?

A   I would assume it's somewhere in that range, yes.

Q   Did you discuss the scope of the work that you were asking Globetrotters to complete --

A   Yes.

Q   -- per the contract?

A   Yes.

Q   **** Did the scope of the work with Globetrotters when you talked to them in 2022 or 2023 include any other assessments at the Cook County Jail other than specifically the Cermak ramp?

MR. BRANUM:  So don't answer that question.

THE WITNESS:  Okay.

MR. BRANUM:  The Court's order is limited to asking him questions about his Declaration, and his Declaration doesn't go outside of Globetrotters' involvement with Cermak Health Services.

So in order to enforce a court

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 23

order, I'm directing the witness not to answer the question.

MR. MORRISSEY:  We'll certify that question.

BY MR. MORRISSEY:

Q   You mentioned that at some point in time, Globetrotters was hired, correct?

A   Yes.

Q   In what year was Globetrotters hired?

A   I believe that the contract was executed by the Board sometime in 2023.

Q   By "the Board," you mean the Cook County Board?

A   That's correct.

Q   Why did Cook County Board have to execute a contract for Globetrotters to assess the Cermak ramp for compliance under the ADA?

A   Actually, I want to clarify.  Initially, they were hired under the direct authority of the chief procurement officer.  There was a clerical error that caused -- and so, actually, it was supposed to go to the Board.  So it has subsequently gone to Board.

The initial engagement I'm pretty

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 6

ERIC DAVIS
March 12, 2024

Page 24

sure was done just on -- because there's a threshold fee, and the initial executed contract was a portion of the scope that was below that threshold. So the chief procurement officer approved it himself, and then it was discovered that there was an error requiring it to go to the Board.

So it was approved by the Board, again, I believe, in 2023, but they were initially engaged, you know, earlier in the year.

Q When you say there was a threshold for payment for design services, is the threshold $150,000 or more?

A Yes.

Q So the fee that was paid to Globetrotters to assess the Cermak ramp exceeded $150,000?

MR. BRANUM: Objection to the extent you're mischaracterizing the testimony, but you can answer.

BY THE WITNESS:

A No, because you say the amount paid. Globetrotters bills as the project goes on. I

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 25

couldn't tell you offhand whether or not as of the day that we're talking if they billed more or less than $150,000 yet. They have a contract for that value over 150,000, but I can't tell you whether or not they have been paid, which was the word you used, more than 150,000 or not as of March 13.

Q What was the scope? You say that Globetrotters was hired under a contract approved by the Cook County Board?

A Yes.

Q What was the scope of that contract?

A To assess the entire Cermak Health Services facility including the ramp and to provide a preliminary design, what's called a transfer package of the intended -- of the resulting approved modifications such that then they could be approved by an architect of record to pull permit for construction.

Q So the contract for -- were there more than one contracts issued to Globetrotters in 2022 or 2023?

MR. BRANUM: Objection to form.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 26

BY THE WITNESS:

A This contract was just a single contract.

BY MR. MORRISSEY:

Q **** My question was did Globetrotters receive, to your knowledge, receive more than one contract in 2022 or 2023?

MR. BRANUM: Again, same objection and direction not to answer.

To the extent -- I don't know exactly what you're asking, Tom, but if you're asking for contracts outside of Cermak Health Services, then I would direct the witness not to answer the question to enforce the Court's order.

To the extent you're asking about other contracts related to Cermak Health Services, he can answer that question.

MR. MORRISSEY: I will certify the question if you don't want to allow him to answer, Mr. Branum, because it's relevant to the permanent injection.

MR. BRANUM: Well, if you want to clarify your question first, I could

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 27

reassess because your question was unclear.

BY MR. MORRISSEY:

Q **** Has Globetrotters provided any other assessments of buildings at the Cook County Jail since 2022 as far as compliance under the ADA?

MR. BRANUM: And with that clarification, I'm directing the witness not to answer to enforce a court order.

His Declaration does not go into details about any other building or facility at the jail outside of Cermak Health Services facility.

The Court ordered that your questioning in this deposition be limited to his Declaration. And so because other facilities are not in his Declaration, your question falls outside of the scope of the Court's order.

BY MR. MORRISSEY:

Q Under Paragraph Number 8, you say the ADA renovations for Cermak Health Service facilities was included in the fiscal year 2023 capital plan, Project Number 23280. The

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 7

ERIC DAVIS
March 12, 2024

Page 28

Globetrotters' contract and subsequent construction is funded under that item in the County budget, Project 23280 and carried over and is in the fiscal year 2024 CIP as well.

So my question is what was included in Project Number 23280?

A    For the engagement of Globetrotters and is only the Globetrotters' work, there is a difference between a project and a contract. It is not uncommon for us to have a project that includes contracts both for design and construction.

At this time, because we're in design phase, the funding in the budget is only for design. It is expected that when we get to construction documents and need to get to construction itself, that we will need to increase the funding on Project 23280 to include the funds necessary as estimated for the construction. But since we don't know what that number is at this time, the only element in the budget for 23280 is the funding for the design fees.

Q    When you say "design fees," what do

ERIC DAVIS
March 12, 2024

Page 29

you mean by design fees?

A    Architectural engineering work.

Q    In 23280, did that include any funds for design fees or architectural engineering work other than the Cermak ramp?

A    No.

MR. BRANUM:  Objection to the form of the question.

BY THE WITNESS:

A    My answer was no, not at this time.

BY MR. MORRISSEY:

Q    And you say that -- you draw a distinction between design work and construction drawings, is that correct, under 23280?

A    In this case, the assignment for -- and I think it says this. The assignment for Globetrotters is to assess the facility and to develop preliminary design work to indicate the recommendations. The intent -- and that's what's called a transfer package. They will be generating a transfer package which articulates the scope in detail that is necessary to achieve the approved modifications to the

ERIC DAVIS
March 12, 2024

Page 30

building.

The County will then hire a second firm to -- what's called the architect of record that will execute those -- the transfer package as drawings for permit. It's a fairly common arrangement. Chicago Public Schools does it all the time, and it allows us to budget more accurately. We can budget for the subsequent fees based on a transfer package and not just recommendations. So it's something that we do sometimes to -- both to ensure full information, but also it helps with making sure that we're doing a good job in terms of estimating the project.

Q    Under the Globetrotter contract, has the transfer package been provided by Globetrotter under Project Number 23280?

A    They are not done with it yet, no.

Q    What does the transfer package include?

A    Generally, it's a set of drawings and a set of specifications.

Q    When did -- to your knowledge, did you supervise or were you -- let me strike

ERIC DAVIS
March 12, 2024

Page 31

that.

Tell me your involvement after negotiating a contract with Globetrotters to assess the Cermak ramp. What additional involvement have you had with Globetrotters?

MR. BRANUM:  Objection to form.

BY THE WITNESS:

A    Well, I have been in most of the meetings. I can't say categorically all, but I have been in most of the meetings with Globetrotters' staff as a part of their assessment of the facility and reviews of their draft assessments as they were developed.

So I have been in several meetings with them along with our project director and project manager and ADA expert, et cetera, and I should say members of the Sheriff's Office have also been participating in the reviews of the draft assessment as that's been developed.

Q    In the year 2023, tell me specifically what involvement you've had with Globetrotters in relation to the Cermak ramp?

MR. BRANUM:  Objection, asked and answered.

Exhibit 5 Page 8

ERIC DAVIS
March 12, 2024

Page 32

BY THE WITNESS:

A    Yeah, that's what I just said.

BY MR. MORRISSEY:

Q    Well, your report, I believe, mentions -- let me see here.  On Number 9:  The Globetrotter team conducted the site visit on August 18th, 2023 and September 1st, 2023 to verify existing conditions relating to the Cermak ramp.

Prior to August 18th, 2023, did you have any conversations or meetings with Globetrotter in regards to the Cermak ramp?

A    Globally, I can't tell you what date they were on offhand without checking the records, but I believe we had one or more conversations with their team prior to them going to the site.

Q    When you say "we," who do you include?

A    Myself, my project director, the consulting construction manager.  As I mentioned, usually someone from the Sheriff's Office is there.

In the initial meeting when we first

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 33

contacted them after the contract is signed, usually someone is there from the Office of the Chief Procurement Officer, so it's multiple folks from the County.

Q    You mentioned a construction manager?

A    Yes.

Q    Prior to April -- August 18th, 2023, there was a meeting which you participated with Globetrotter where there was also a construction manager present.  Who was that person?

A    I would have to check my records.  I don't recall who was there.

Q    Is that a County person, someone who works for the County?

A    That's a consultant.

Q    And would this consultant be STV Henry?

A    No.

Q    Who was the consultant?

A    In 2022 -- I believe it was 2022 -- the prior contract with STV Heery expired, and the County contracted with a different team, which is called Ardmore Roderick Arcadis, which

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 34

is the construction management firm overseeing the public safety portfolio, which includes this facility.

So if there was a meeting between the time that the contract was executed on August 18th, which I believe there was one or more, it would have been someone from that consulting team because they took over the portfolio for STV Heery who then was no longer the construction manager for this portfolio.

Q    So would Ardmore be the construction firm that would be retained by Cook County to renovate the Cermak ramp?

A    No.

Q    What would their involvement be in renovating the Cermak ramp?

A    So I would refer you to -- let's see.  Where is it?  I know it's here somewhere.

So as mentioned in Item 17 in the Declaration, the actual construction for the ramp will be done -- will be constructed by one of our job order contracting companies.  Okay?  These are the people actually doing the construction.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 35

As I mentioned, the Ardmore Roderick Arcadis team is a construction management firm.  They help the County manage the construction.  They will not be doing the construction.  They help us manage the construction.

Q    By "manage," do you mean that they oversee the construction by their outside contractor to make sure that it is done correctly?

A    Generally -- and you're getting into an area of law that gives architects nightmares.  Generally, what they do is they observe the construction; and if there are elements that appear to be incorrect, they will work with the County and with the architect.  They'll say, hey, it looks like the contractor is constructing this part of it incorrectly, and they may ask the architect of record to go to the site and observe.  And if the architect of record says, oh, yes, they're building that wrong, then the Ardmore team would help us issue direction to the contractor to make corrections.

So in other words, they are not

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 9

ERIC DAVIS
March 12, 2024

Page 36

directing trades in the field, but they are observing and helping us identify issues that may appear to be not in compliance with the design.

Q   So let's go to Number 5 of your Declaration.  Can you pull that up?

A   Yes.  It's on the screen.

Q   You say in the first paragraph:  Per the original design plans for the Cermak ramp from 1996, the drawing showed the rise of the Cermak ramp was intended to be 30 inches.

A   Correct.

Q   What you're referring to there are the initial architect's design drawings, correct?

A   That's correct.

Q   And Cook County, after it was constructed, it would have been a construction manager either for Cook County or their outside consultant that would have measured the ramp to ensure that it was done per the design plans by the architect, correct?

MR. BRANUM:  Objection, foundation, calls for speculation.

ERIC DAVIS
March 12, 2024

Page 37

BY THE WITNESS:

A   Yeah, I couldn't say one way or the other.  I didn't work at the County.  I can't stipulate as to what processes the County did or did not use at the time.

BY MR. MORRISSEY:

Q   What is the relevance then of Number 5?  Isn't it true that the architect's initial design drawings may be quite different from the finished product?

Would you agree with that?

MR. BRANUM:  Objection, incomplete hypothetical.

BY THE WITNESS:

A   Yeah, I don't -- generally owners want to make sure that they're getting what's been specified.  I don't know if that's answering your question or not.

BY MR. MORRISSEY:

Q   So to your knowledge, after the Cermak was built sometime after the design drawings were done in 1996, to your knowledge, did anybody from Cook County inspect it after construction to see if it was in conformance

ERIC DAVIS
March 12, 2024

Page 38

with the design drawings that showed the --

MR. BRANUM:  Objection, foundation.

BY MR. MORRISSEY:

Q   -- rise of less than 30 inches?

MR. BRANUM:  Objection, foundation.

BY THE WITNESS:

A   So I couldn't say whether they inspected it immediately after construction or three years after construction or ten years after construction.  I don't know what you're asking.

BY MR. MORRISSEY:

Q   Well, my question is did -- to your knowledge, did anybody verify after the ramp was constructed that the rise of the Cermak ramp was less than 30 inches?

MR. BRANUM:  Objection, foundation.

BY THE WITNESS:

A   If what you're asking is relatively -- is whether relatively soon after construction was completed someone from the County verified the rise of the ramp, I couldn't say one way or the other.  I don't know.  What someone may have done in 1998, 1999, I couldn't say.

ERIC DAVIS
March 12, 2024

Page 39

BY MR. MORRISSEY:

Q   Assuming there is a renovation of the Cermak ramp, would this firm -- would your construction manager now, Ardmore, be charged with the job of making sure that the renovated Cermak ramp complied with the 2010 ADA standards?

A   Well, given how much fun we've had talking with you about this, we will probably employ some form of verification of the final construction after the modifications are made.  I can't say if that would be another LIDAR scan or a survey or whatever, but it would seem prudent for us to make sure that that is -- that compliance with the -- the design for the modifications was, in fact, achieved.

I can tell you that on another instance, there was a ramp that was to be constructed elsewhere in the County complex that was constructed wrongly and had to be chopped out and reconstructed.

So we will make sure that what is built -- we will have an independent verification one way or the other that what

Exhibit 5 Page 10

ERIC DAVIS
March 12, 2024

Page 40

gets built is compliant with the design plans that would be compliant with the applicable portions of the 2010 ADA and all other applicable regulations.

Q   The intent by the architect for the Cermak ramp in 1996 was to make it -- make the rise less than 30 inches for the Cermak ramp.

Would you agree with that?

MR. BRANUM:  Objection --

BY THE WITNESS:

A   I would say that the design plan showed that the intent was that it would be exactly 30 inches.

BY MR. MORRISSEY:

Q   And you just used a word that you would "probably" hire a firm now if the Cermak ramp is renovated to make sure that it complies with the 2010 ADA standards.

Was that correct?  Did I hear that correct?

MR. BRANUM:  Just object to the extent you're mischaracterizing his previous testimony, but go ahead.  You can answer.

ERIC DAVIS
March 12, 2024

Page 41

BY THE WITNESS:

A   Yeah, I would -- I would say that it would be generally the department's intent to hire someone to verify that.

As I mentioned, this department doesn't have sole discretion over who does or doesn't get hired for such things.  The Office of the Chief Procurement Officer has to approve it and, in some cases, the County Board has to approve it.  I don't know how we're going to achieve it.  I think it would be our intent to do so, and that's why I used the term "probably."  But I can't give you a guarantee because that's an act in the future to be done by people that -- outside the department.

Q   Would you as the deputy in Capital Planning be responsible, assuming the Cermak ramp is renovated, to ensure that it complies with the 2010 standards?

MR. BRANUM:  Objection to form.

BY THE WITNESS:

A   I don't know what you mean by "to ensure."  The architects that we hire as architect of record are contracted to design a

ERIC DAVIS
March 12, 2024

Page 42

ramp that would be compliant with applicable code.  They have a responsibility for that.  The contractor who constructs the replacement of the ramp has a responsibility to execute the drawings.

So I don't know how -- you know, they have responsibilities, and so I don't know how to completely answer your question.

Q   Who within Cook County's government would be responsible to ensure that the Cermak ramp, if it's renovated, will comply with the 2010 standards?

MR. BRANUM:  Objection to the form of the question.  Your question has a false premise or it's based on an assumption that hasn't been established.  So it's a question that can't be answered.

BY THE WITNESS:

A   I don't know what you mean by "ensure."

BY MR. MORRISSEY:

Q   By ensure, I mean that if the County goes forward with the renovation of the Cermak ramp, how will the Court know that the ramp

ERIC DAVIS
March 12, 2024

Page 43

complies with the 2010 ADA standards?

A   Well, again, as you know, first of all, the 2010-ADA is not the sum total of applicable regulations.  So let's first note that there are other requirements that may be involved, you know, like accessibility code or city of Chicago code may have additional elements.

That said, as I mentioned, it is our intent to obtain objective documentation of the physical form of the final reconstructed ramp that would reflect that it was compliant with the design, that the architect of record has a responsibility for it to be compliant with the applicable laws and codes.

Q   When you say "intent," what verification will be provided by your office or Cook County that the Cermak ramp after it's renovated will comply with the federal ADA standards?

MR. BRANUM:  Yeah, I believe he's asked that question a couple of times, but maybe it's because I don't understand your question but --

Exhibit 5 Page 11

BY THE WITNESS:

A   Yeah, I don't know how it's different from things I've already said.

BY MR. MORRISSEY:

Q   Can you respond to it?

A   If I'm understanding your question correctly, our intent is to provide objective documentation of the physical form of the final reconstructed ramp and to compare that documentation with design drawings.

Q   You're aware that there was -- let me -- I'm going to turn to Exhibit 7.

A   I don't know if I have Exhibit 7.  I only have 1 and 2.

MR. BRANUM:  Well, he's referencing exhibits that he's using.  You don't have those.

THE WITNESS:  Okay.

MR. BRANUM:  And he will share it on the screen.

THE WITNESS:  Okay.

BY MR. MORRISSEY:

Q   Showing you Exhibit Number 7.  Do you have Number 7 on your screen?

A   I see an Order on the screen.

Q   And it's an order by Judge Rowland issued on July 27, 2022.

A   Okay.

Q   Are you familiar with this order?

A   Generally, yes.

Q   When did you first become aware that there was an order entered regarding the Cermak ramp?

A   I would have to check my records about when I received a copy of this.

Q   The first line is:  Upon the parties' agreement, defendant Cook County will install handrails --

A   Hand-railings.

Q   -- on the Cermak ramp on or before December 31st, 2022.

A   Yeah.

Q   Railings must comply with the Americans with Disability [sic] Act (ADA)?

A   Okay.

Q   What was your participation in -- let me go back a step.

When did you first become aware that

the County entered into an agreement to install handrails on the Cermak ramp?

A   So I'm not clear on which item of the Declaration this is in reference to.

Q   That's not --

MR. BRANUM:  Yeah, Tom, if you could tell us what paragraph of the Declaration your questions are directed to.

BY MR. MORRISSEY:

Q   That's not the question, sir.

MR. BRANUM:  Then we'll stop the deposition.  We'll get the Court involved if you don't want to cooperate.  There is no reason for you to not provide that information.  It's information that we need to assess whether the scope of your deposition is within the Court's order, and the Court's order stated that the deposition is limited to Eric Davis' Declaration.

So all we're asking is that you explain what part of the Declaration these questions are directed at.

BY MR. MORRISSEY:

Q   Well, Declaration Number 12 specifically refers to the handrails.

A   Okay.  All right.  Thank you.

MR. BRANUM:  And, Eric, if you need time to review that paragraph.

THE WITNESS:  Yeah, that's what I'm looking at now.

BY THE WITNESS:

A   Okay.  Yada, yada.  Okay.  Yeah, I think it also impacts Number 13.

But go ahead.

MR. MORRISSEY:  Peggy, can you read back the question?

(WHEREUPON, the record was read as requested.)

BY THE WITNESS:

A   Okay.  So the handrails of the Cermak ramp, as I believe counsel knows from prior action, were actually installed by the County's Department of Facilities Management.

So as far as a contract to install them, they were actually done by -- installed by County forces.

Exhibit 5 Page 12

ERIC DAVIS
March 12, 2024

Page 48

Q    My question was directed to your knowledge that the County was going to go forth with handrails.

A    Yeah.

MR. BRANUM:  Well, I'll object to the form of the question.  It's confusing.

BY THE WITNESS:

A    So you're asking when I knew we were going to do handrails?

BY MR. MORRISSEY:

Q    Correct.

A    I would have to check.  I can't tell you offhand.

Q    Was that sometime in August of 2022?

A    Perhaps.  That may be.  I know -- Tom, I know you and I have talked about this several times.  That sounds right, but I couldn't stipulate, you know, yes or no.  That may be the case.

Q    When you became aware that the County was going to install handrails pursuant to the Court's order, what did you do as the capital planning deputy director?

MR. BRANUM:  So, first, I will object

ERIC DAVIS
March 12, 2024

Page 49

that you're misstating the Court's order.  It states:  Upon the parties' agreement.  So the premise of your question -- or strike that.

Your question has a false premise, so it's an unanswerable question.

BY MR. MORRISSEY:

Q    You can answer, Mr. Davis.

MR. BRANUM:  It's an unanswerable question, so -- because the premise of your question is false.

So if you want to ask a clean question without inserting your spin on what the order that you have marked Exhibit 7 shows, he can answer a clean question, but he's not going to answer a question with your interpretation of the Court's order in it.

MR. MORRISSEY:  Peggy, will you repeat the question?

MR. BRANUM:  She can repeat it, but it's going to be the same objection.  I think it would be easier if you just ask a clean question.

ERIC DAVIS
March 12, 2024

Page 50

THE WITNESS:  I'm okay if Peggy rereads it.

(WHEREUPON, the record was read as requested.)

MR. BRANUM:  So don't answer that first part that has plaintiff's counsel's incorrect characterization included in the question, but you can answer the second part, which what he's asking is what did you do?

So just answer what did you do, but you're not adopting plaintiff's characterization.

BY THE WITNESS:

A    So first of all, these things are -- you know, it's a process.  It's multiple steps.  I know that we -- I don't know.  I believe we were involved in the effort to put in handrails in the ramp before this order.

As far as when the specific direction got made, if I remember correctly, it took us quite awhile to obtain the handrails because it's a relatively specialized piece that had to be ordered.

ERIC DAVIS
March 12, 2024

Page 51

So the process of starting to say, hey, we need to replace the handrails on the ramp, I'm pretty sure happened before this order.

As far as when the specifics of when it was going to be constructed, as I recall, let's see, would it have been October?  I'm not -- I don't -- something like that.  A year and a half ago when the construction started, and I remember that we had difficulty, as I think it says in the Declaration, had difficulty acquiring the end pieces that would have resolved the installation.  But I believe the main handrails went in sometime between -- I want to say it was around October, December, in that area.  I would have to go back and check.

BY MR. MORRISSEY:

Q    When you say "we," who are you including in the Cook County government?

A    Well, as I said earlier, the people installing it was the County's Department of Facilities Management.  I'm in Capital Planning, which is a part of the Bureau of

Exhibit 5 Page 13

ERIC DAVIS
March 12, 2024

Page 52

Asset Management, and Facilities Management is also part of the bureau. So those folks are in the same bureau with me.

Q  Would it be fair to say as far as Cook County's government is concerned, you were the -- you have been the lead person in regards to the Cermak ramp since at least the issuance by Ellen Stoner's report in March of 2018?

MR. BRANUM: Objection to the form of the question.

BY THE WITNESS:

A  I have served as the primary contact for the County on the facilities aspect of accessibility and the ADA for quite sometime, including the period when Ellen Stoner issued her opinion.

BY MR. MORRISSEY:

Q  And when you say "the primary contact," you have been the primary contact for Cook County's government in regards to the Cermak ramp.

Is that fair to say?

MR. BRANUM: Objection to form.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 53

BY THE WITNESS:

A  To the facilities aspects of it. I have nothing to do with the operations of the ramp.

BY MR. MORRISSEY:

Q  Well, what do you mean by "the facilities" as opposed to the operations of the ramp?

A  To oversimplify, the difference between the floor and the person who walks on it. We work with the floor, not the people that walk on it.

Q  So for Cook County, you have been the person, the lead person, in regards to this effort to renovate the Cermak ramp?

A  I think that's fair to say, yes.

Q  So you are aware that the County had agreed to install handrails that complied with the Americans for [sic] Disabilities Act, correct?

A  As of July 27th, that was our intent to do so, yes.

Q  When did you become aware for the first time that the handrails did not comply

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 54

with the ADA?

A  I couldn't tell you offhand. I believe it was during the course of arranging for the Department of Facilities Management to purchase the handrails and materials, but I don't -- I couldn't tell you offhand when that happened just that I remember that getting the end pieces became a challenge.

We looked at -- I should also say we looked into a lot of different options to try to achieve handrails in the way that, as it notes here, GEC has observed including things like exploring the feasibility of cutting and beveling sections of the handrail. There were some geometric reasons why that wouldn't work. The ability to simply bend them, the material would not allow us to do that.

So we looked at different ways to possibly try to achieve the ends of the handrails adequately, but we weren't able to figure out a way to make that happen.

Q  And as the Cook County's representative, you are aware that the handrails -- well, let me ask a preliminary

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 55

question.

Let's turn to Globetrotters' report.

MR. BRANUM: You are going to have to show the exhibit on the screen.

BY MR. MORRISSEY:

Q  Do you have a copy of Globetrotters' report?

MR. BRANUM: What Exhibit Number is it?

MR. MORRISSEY: It's Exhibit Number 3.

MR. BRANUM: And that's what you're showing on the screen?

MR. MORRISSEY: That's correct.

BY THE WITNESS:

A  Okay. I don't know if this is a draft or the final. I would have to check. But go ahead.

BY MR. MORRISSEY:

Q  How many -- when did you first receive a draft of Globetrotters' Corridor Ramp Accessibility Assessment?

A  I don't know offhand. I would have to check.

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 14

ERIC DAVIS
March 12, 2024

Page 56

Q   Would that have been shortly after the inspection in August or September of 2023?

A   Shortly?  I don't know what that means.

Q   Well, is it within one month of their doing the inspection were you told that the Cermak ramp -- the rise of the Cermak ramp exceeded 30 inches?

MR. BRANUM:  Objection to form.

BY THE WITNESS:

A   I don't know when I was notified of that.  I would have to check.  I don't know.

BY MR. MORRISSEY:

Q   Were you aware that Globetrotters was coming out in August of 2023 to inspect the Cermak ramp?

A   I attended one or the other of the -- I believe one or the other of those walkthroughs that you referred to earlier in August or September.  I can't remember offhand which one of them.  I did walk the building at least once with them.

Q   And when you walked the building, were they conducting measurements of the Cermak

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 57

ramp?

A   Not on the one that I went on, no.

Q   Did you attend any meetings in August or September with Globetrotters' representatives in regards to the Cermak ramp?

A   I'm pretty sure that I did.  I couldn't tell you the exact dates, but I'm pretty sure that I did.  They might well have been Zoom meetings, but yeah.

Q   Who was present during the meetings?

A   I couldn't tell you without checking. I have given a partial answer to that question before, Tom.

Q   And after they inspected the ramp in August or early September, you had at least one meeting with Globetrotters?

A   Yes.

Q   Did you have multiple meetings with Globetrotters after they inspect the -- after they conducted the two inspections?

A   I believe so, yes.

Q   Between September -- let me get the exact date.  Let me get the exact date.  All right.  Here it is.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 58

After -- the Cermak ramp, according to the ramp on Page 6, and I'll pull it up.  Do you see on Globetrotters' report they say that they did site inspections on August 18th and September 1st of 2023?

A   Okay.

Q   You were present during one of those site inspections, correct?

A   I think I was present on one or the other, but it may have been another meeting.  I know they have been to the site several times. I know I have walked the building at least once with them.  I don't know if it's the specific ones they are referring to here, but it would have been around the same time.

Q   After September 1st, 2023 up until today's date, how many meetings have you had with Globetrotter?

A   I couldn't tell you offhand.

Q   More than five?

A   I couldn't tell you offhand.

Q   More than two?

A   Probably, yes.

Q   Do you have e-mails that would

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 59

indicate how many meetings you had with Globetrotters?

A   I don't know if I would have e-mails. I might have calendar appointments, although unfortunately our system sometimes removes things after meetings have happened, so I'd have to -- I can go check and try and find out, but I know we have been in multiple meetings with them.

Q   In September of 2023, were you aware that the -- Cermak had a concern about the handrails not being compliant with the 2010 standards?

MR. BRANUM:  Objection to form.

BY THE WITNESS:

A   I couldn't say when they informed us of their opinion of that or not.  I can't tell you when that specific, you know, notice might have been.

BY MR. MORRISSEY:

Q   In September of 2023, were you made aware of the fact that the rise of the Cermak ramp exceeded 30 inches?

A   I don't know offhand when they

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 15

ERIC DAVIS
March 12, 2024

Page 60

provided that information to us.

Q    Did they provide a draft of their assessment report prior to December 6th, 2023 to you?

A    I would say probably.  I couldn't tell you the date offhand.

Q    When did -- to the best of your recollection, in the fall of 2023 after Globetrotter did their inspection on August 18th and September 1st, when did you become aware that Globetrotters had determined that the rise was over 30 inches?

MR. BRANUM:  Didn't you just ask that question?

BY THE WITNESS:

A    Yeah, I think I just answered that.

BY MR. MORRISSEY:

Q    Was it prior to November of 2023?

MR. BRANUM:  Objection, asked and answered.

BY THE WITNESS:

A    Again, I would have to check, Tom.  You know, somewhere in that -- somewhere in the fall, but I couldn't tell you specifically

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 61

when.

BY MR. MORRISSEY:

Q    And did you -- turning to Page 9 of Globetrotters' report, looking at the Summary of Findings Per Current Applicable Code and Guidelines.  Calling your attention to the second paragraph, it states, in part:  The existing ramp handrails on both sides are not continuous with the 12-inch extension.  Therefore, they are not compliant with section 505.10.1 of the 2010 ADAAG, the 2009 ANSI 117.1 Accessibility Standards, nor the 2018 IAC.

Do you see that in your report?

A    Yes.

Q    In your report, in your Declaration -- give me a moment.  On Page 15 of your Declaration -- can you turn to your Declaration, Page 15?

A    Item 15?

Q    Yes.

A    Yes.

Q    You say:  The County has accepted GES's [sic] recommendations to remove the existing concrete ramp and re-pour it with a

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 62

slope of 1 to 20 or shallower, therefore making that area by code no longer a ramp but rather a walking surface, which does not require a landing, handrails, et cetera to transverse.

A    Yeah.

Q    When you use the term "the County has accepted GEC's recommendation," who do you mean by "the County"?

A    The Department of Capital Planning and specifically yours truly as the primary representative on this project.

Q    Do you mean Cook County government?

MR. BRANUM:  Objection to the form of the question.  I don't know what you're asking.

MR. MORRISSEY:  Well, let me rephrase it.

BY MR. MORRISSEY:

Q    Do you mean the Cook County Board has agreed with Globetrotters' recommendations in the report dated December 6th, 2023?

MR. BRANUM:  Objection to form.

BY THE WITNESS:

A    No.  The County Board doesn't -- this

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 63

is the Department of Capital Planning, which has been -- is the agency that is charged with dealing directly with the facilities, so -- but meaning -- the County in this case means the Department of Capital Planning.

Q    Does the Department of Capital Planning have the legal authority to bind Cook County in regards to committing the County to renovating the Cermak ramp?

MR. BRANUM:  Objection, calls for a legal conclusion, incomplete hypothetical, calls for speculation.

BY THE WITNESS:

A    Yeah, I don't know how to answer your question, Tom.

BY MR. MORRISSEY:

Q    Well, in your Declaration -- throughout your Declaration, you use the words "we intend" to renovate the ramp.  "We intend" to hire design architects.  "We intend" to hire a construction firm.  "We intend" to complete it within two years.

MR. BRANUM:  Well, now --

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 16

ERIC DAVIS
March 12, 2024

Page 64

BY MR. MORRISSEY:

Q   When you use these terms, who do you mean "intend"?  Is it the Cook County government or is it Eric Davis who intended in the year 2018 to do it a different way?

MR. BRANUM:  Counsel, if you're going to make representations like that, you have to have a sufficient factual basis to make those representations under Rule 11.

So I'd ask maybe you might want to rethink the question you just asked and ask it based on factual information and not imaginary information.

BY MR. MORRISSEY:

Q   Well, by your Declaration, do you intend to bind Cook County to construct the ramp within two years, to renovate it within two years in compliance with the recommendations by Globetrotters?

MR. BRANUM:  Objection to the extent it calls for a legal conclusion.

You can answer the question factually.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 65

BY THE WITNESS:

A   So as the designated representative of the County on this project for the design and construction portion, yes, it is the intent of the County to accept the recommendation of the consultant, GEC, and to proceed with the design and construction of the replacement of the ramp.

As I mentioned before in a previous answer, contracts are approved by either the Board of Commissioners or the chief procurement officer or both depending on the size of the contracts.

We have vendors under contract right now to deliver the architectural engineering scope.  We are in the process of working out that specific item.  We have a construction company under contract right now that is able to be tasked once the design is to a sufficient point to begin pricing and then construction of the project.

The specific assignment for the contract or construction, once the contractor has identified the price still has to be

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 66

reviewed by the Office of the Chief Procurement Officer.  Okay?  So they will have to approve the specific proposal, but it is our intent to use the contracts that we have to deliver the replacement of the Cermak ramp.

Q   Who is in charge of the procurement department?

A   Raffi Sarafian.

Q   Can you spell that person's name?

A   His first name is R-a-f-f-i.  His last name is Sarafian.  I believe it's S-a-r-a-f-i-a-n.  In fact, I believe he's in a meeting with others from my office as I'm talking with you right now.

Q   What is his position with Cook County government?

A   Chief procurement officer.

Q   So is one of the steps before proceeding with the construction or design of a renovation of the Cermak ramp require the approval of the chief procurement officer for Cook County?

MR. BRANUM:  Objection --

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 67

BY THE WITNESS:

A   Yes.

MR. BRANUM:  -- to form.

BY THE WITNESS:

A   His job is to approve the specifics of all of the proposals under the job-order-contracting process because there are other elements of compliance that are required to be verified before an assignment like that can be approved.

BY MR. MORRISSEY:

Q   What are the requirements before it can go to the procurement officer?

A   How much time do you have?

Q   We have at least seven hours.  Can you please tell me the time period that it will take for you just to get the project to the chief procurement officer?

A   The project construction, or I should say the project delivery method, as I mentioned, is the job-order-contracting method.  That is a construction procurement mechanism.  On average, when we have a complete package from the contractor and have the pricing and

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 17

ERIC DAVIS
March 12, 2024

Page 68

all of that, it takes approximately 90 days for the chief procurement officer to issue what's called a Notice of Proposal Acceptance or a NOPA that allows us to issue the Notice to Proceed to the contractor to proceed with the construction.

Q    Before that, there is a step -- there's many steps before that, correct, Mr. Davis?

A    There are many steps before that, yes.  It's a process we use quite often, and the process of procuring the construction is included in the estimate of the duration to achieve the project that is included in this Declaration.

Q    When -- after doing their site visit on September 1st of 2023, when did Globetrotters begin the process of -- you said that they had to do a transfer package, correct?

A    Yeah.

Q    When was Globetrotters given permission to prepare a transfer package by Capital Planning or Cook County?

A    I would have to look it up and find

ERIC DAVIS
March 12, 2024

Page 69

out.  The transfer package is the drawings and specifications -- or preliminary drawings and specifications to stipulate the elements of the design that are to be constructed.  Because we are doing an assessment ahead of time, we needed to have clarity on the assessment before we started the transfer package.

So I couldn't tell you when -- offhand when they started the development of the transfer package.

Q    It was known to Cook County's contractor, Globetrotter, on September 1st, 2023 that the ramp was not in compliance for two reasons:  One, the rise was too steep, was too high.  It was over 30 inches.  And two, the handrails didn't include the extension, correct?

MR. BRANUM:  Objection to your characterization of the report.

BY THE WITNESS:

A    I don't think so, Tom, because I think their -- the document that you're showing indicates that they had done site visits.  I don't know whether or not they had internally

ERIC DAVIS
March 12, 2024

Page 70

made the conclusion about the compliance or not at that time or if they made them a week later, two weeks later or whatever.  All we know is that the document that you have in front of us which, I believe, is dated in December of 2023; and as I said, I don't know if what we're looking at is the final report or not.  I would have to check and see if that is.

As to when they decided that they felt it was out of compliance, I couldn't tell you.

Q    When was the County notified that it was out of compliance by Globetrotter?

MR. BRANUM:  Asked and answered.

BY THE WITNESS:

A    Asked and answered.

MR. BRANUM:  It's in the transcript.

MR. MORRISSEY:  Well, it is not.

BY MR. MORRISSEY:

Q    It was sometime after September 1st, 2023, correct?

MR. BRANUM:  You've already been over this line of questioning.

ERIC DAVIS
March 12, 2024

Page 71

BY THE WITNESS:

A    It's, I believe, sometime in the fall.  I couldn't tell you specifically when.

BY MR. MORRISSEY:

Q    To your knowledge, was there any delay in Globetrotters' beginning the process of doing the transfer package?

A    As I just said, the transfer package is dependent -- is a series of drawings that stipulate the specific modifications to be made.  Until we've had a chance to go over their assessment and understand all of the things and in some cases they may have made a recommendation.  As it says at the bottom of the page, they recommended that the ramp -- in December, they recommended that the ramp be reconstructed.  So they would not have started the drawings of a reconstruction until they had approval for that to be in the scope.

Q    Now, you mentioned this project delivery method?

A    Yes.  That's construction I'm referring to.

Q    You are aware that -- your report,

Exhibit 5 Page 18

ERIC DAVIS
March 12, 2024

Page 72

your Declaration, talks about a survey, correct?

A    Yeah.

Q    Well, isn't that correct?  In your Declaration, you talk about a survey?

MR. BRANUM:  What paragraph?

BY THE WITNESS:

A    That's up in --

BY MR. MORRISSEY:

Q    It's Paragraph 6, correct?

A    Yeah, and I think it's actually in 5.

Q    When did you become aware that a surveyor was employed by Cook County to measure the Cermak ramp?

A    We contracted the surveyor, the department did.

Q    When you say "we," does that mean you?

A    The Department of Capital Planning contracted for a survey.

Q    Were you involved in contracting the surveyor?

A    Yes.

Q    What was your involvement?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 73

A    I would have to go back and check specifically, but this may have been -- I don't remember if this was with STV or if Ardmore had taken it over at that point.

I would have to go back and check the specific contract vehicle, but a surveyor was arranged for or contracted by the department.

Q    And that was sometime in 2022, correct?

A    I believe so, yes.

Q    And the surveyor's report came back that the rise on the right and left side of the ramp exceeded 30 inches, correct?

MR. BRANUM:  Objection to form.

BY THE WITNESS:

A    The survey indicated what you say. The survey also indicated that the rise down the middle of the ramp was exactly the 30 inches in the design drawings.

BY MR. MORRISSEY:

Q    And as a professional architect, you're aware that if the rise on either the right or left side of the ramp exceeded 30 inches, then the ramp did not comply with

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 74

the ADA?

MR. BRANUM:  Objection, calls for a legal conclusion.

BY THE WITNESS:

A    As, I believe I have said in a prior deposition, either on this case or others, it was our understanding that the variances under what's called a cross-slope allows some variation with the 30-inch standard.

BY MR. MORRISSEY:

Q    Do you recall in your deposition in January of 2022 being asked questions in regards to the rise of the ramp being -- exceeding 30 inches on the right or left side of the ramp?

A    I can't stipulate whether it was January 2022; but, yes, I recall you asking multiple questions about that whole circumstance.

Q    And do you need me to point it out to you where you said that if the rise on either side of the ramp exceeded 30 inches, then the ramp did not comply with the ADA?

A    I don't believe I said that.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 75

MR. BRANUM:  Objection to the extent it mischaracterizes previous testimony.

MR. MORRISSEY:  We will take a five-minute break -- or ten.  We will take a ten-minute break, okay?

MR. BRANUM:  Eric, will ten minutes be enough for you?

THE WITNESS:  Yes, that's fine.  I was going to ask for a break anyway.

MR. BRANUM:  Okay.  We will be back in ten.

(WHEREUPON, a short break was had.)

BY MR. MORRISSEY:

Q    You mentioned in your Declaration that you hired a surveyor in November of 2022, correct?

A    Sounds right.

Q    And what was the name of the surveyor?

A    I don't recall.  I would have to check.  I think you probably have it in a prior deposition.

Q    Well, if I had it in a prior

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 19

ERIC DAVIS
March 12, 2024

Page 76

deposition, I wouldn't ask you.

A    I would have to look it up.

Q    Do you have a record of who the surveyor was?

A    I'm sure we do.

Q    Was he a licensed surveyor?

A    Yes.

Q    Were you present when they did the survey?

A    No.

Q    Did you talk to the surveyor after it was done?

A    I may have spoken to the surveyor or it may have been by e-mail.  I don't recall.

Q    Why did you contract with a surveyor?

A    Because, as you recall from prior action, there was a question of whether or not the rise of the ramp was 30 inches or not.  And so after consulting with the drawings that you have as a part of this Declaration -- I think it was after the drawings -- we decided that there was a need to verify.

You may recall from a prior deposition that the County used a laser level

ERIC DAVIS
March 12, 2024

Page 77

which indicated that the rise was 30 inches, but we -- in order to be certain because, among other things, you all felt that that was insufficient.  We commissioned a surveyor to go and provide a survey of that vertical rise from the middle of the ramp as indicated in the design drawing.

Q    Well, the surveyor didn't just do from the middle of the ramp, correct?

A    Correct.

Q    He did the right side and the left side, correct?

A    Yes.

Q    And what was the rise on the right side of the ramp?

A    Let's see.  You say the right side. If you're standing at the bottom of the ramp looking up, do you want to say the right side or if you're standing on the ramp --

Q    Yes, if you're at the bottom of ramp.

A    At the bottom of the ramp looking up, the rise is indicated to be 2.52 feet.

Q    How many inches was the rise on the right side?

ERIC DAVIS
March 12, 2024

Page 78

A    That would be 30 inches plus a fraction.  I don't know the fraction offhand.

Q    It would exceed 30 inches, correct?

A    Yes.

Q    And on the left side of the ramp, based upon the surveyor's measurement, what was the left side of the ramp?

A    It would be 2.58 feet.  So a little less than -- probably a little less than 31 inches.

Q    So it exceeded 30 inches, correct?

A    Yes.

Q    And for a ramp between 30 and 50 feet, if the rise is greater -- exceeds 30 inches, there is a requirement for a landing, correct, an intermediate landing?

A    I don't believe that the length of the ramp is a requirement in that stipulation. I think it's the notion of a ramp rising more than 30 inches requiring an intermediate landing.

Q    And the Cermak corridor is a ramp, correct?

A    Yes.

ERIC DAVIS
March 12, 2024

Page 79

Q    And when you talked to Globetrotters before they went out to do the inspection, you knew that the surveyor, it used a laser to indicate the right and the left side exceeded 30 inches, the rise exceeded 30 inches?

A    Yes.

Q    Did you provide that information to Globetrotters?

A    I'm pretty sure we did.

Q    Why did you provide it to Globetrotters?

A    Because we wanted them to have complete information.

Q    And did you say that it was your professional opinion as an architect that there was some variance in the ramp that allowed Cook County to exceed 30 inches on the right and left side of the ramp?

MR. BRANUM:  Objection to form.

BY THE WITNESS:

A    I probably communicated to them that it's my understanding that things like construction tolerances and cross-slope may allow a rise greater than 30 inches but that

Exhibit 5 Page 20

ERIC DAVIS
March 12, 2024

Page 80

part of the reason for bringing them on is to get a third-party evaluation of that.

Q    But you are aware at least in 2022 that there was a clear possibility that the ramp did not comply with the ADA standards, correct?

MR. BRANUM:  Objection, misstates testimony.

BY THE WITNESS:

A    What do you mean by "clear possibility"?

BY MR. MORRISSEY:

Q    Well, let me rephrase the question. After receiving the surveyor's survey in November of 2022, what did you do to determine whether or not the rise, that there was some exemption as far as the Cermak ramp from the ADA requirement that an intermediate landing was required?

A    Somewhere in the range of that time is probably when we started the development of the RFQ for an architect to come in and do an independent assessment which led eventually to the hiring of Globetrotters.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 81

I don't know if we started the writing of that RFQ before November of '22 or after November of '22.  I would have to check. But I believe that around that time, we made that -- we moved forward with that.

We were going to do the building anyway as a part of the program that I mentioned, but I believe that's when we started the Cermak one, was somewhere around the end of '22, beginning of '23 to begin to obtain that independent evaluation.  And as I mentioned, the Globetrotters' contract was signed sometime in '23.

Q    In your Declaration on page -- Paragraph 5 and 6, why didn't you put into the Declaration that in November of 2022 that the survey you received indicated that on the right and left side of the ramp, that it exceeded 30 inches?

A    I'm not denying that that's the case.

Q    No, my question is why wasn't that included in your Declaration?

A    In part because the ADA is silent on where the measurements are taken.  There are

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 82

elements that aren't specified; and, as I said, the drawings all indicate and the standards all talk about the slope with an arrow down the middle of the ramp.  Down the middle of the ramp, it was 30 inches.

Q    You knew that the architect's design drawings were not verified after construction, correct, when you did --

MR. BRANUM:  Objection.  That mischaracterizes his testimony.

BY THE WITNESS:

A    No, we already went through this.  I don't know what they did or did not do in terms of verification shortly after the work was completed.

BY MR. MORRISSEY:

Q    **** But you didn't think it was necessary in doing this Declaration for full disclosure to include in there that the survey indicated that the ramp, at least some portions of the ramp, exceeded the 30-inch rise; is that fair to say?

MR. BRANUM:  Wait.  Wait.  Before you answer that question, I'm going to assert a

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 83

privilege.  It's the work product doctrine.

So your mental impressions in preparation for litigation purposes such as in drafting this Declaration is protected. So if you want to re-ask your question that gets away from the work product.

MR. MORRISSEY:  We'll certify the question because it isn't work product. This is his Declaration.

MR. BRANUM:  You can ask him about his Declaration, but if you're getting into his mental processes for preparing this Declaration, it's privileged.

So just to be clear, I'm not saying you can't ask questions about this. You just can't ask questions about his mental impressions as he was preparing the Declaration and communications with counsel.

BY MR. MORRISSEY:

Q    Why didn't you just direct Globetrotters to measure it down the middle if you were convinced when you did this Declaration that the only measurement was down

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 21

the middle for the surveyor to --

A    I didn't want to constrain their work. I wanted their third-party opinion, Tom. And in Item 5, at the end of Item 5, after the statement of being 30 inches down the middle of the ramp, it refers to the ramp survey, which indicates the other measurements on the side that you're referring to.

So I have to say I object to any assertion that there was any intent to do anything but get to the heart of the matter objectively and to remedy any situation that needed to be remedied.

Your questions suggest that there was some kind of intent to hide or shield information when that clearly is not the case because immediately after that statement is the ramp survey that included the data that you've just been quizzing me on.

I have to say I'm very -- I take great exception to any suggestion that the County is anything but committed to providing the accessibility or going beyond it because of the various measures that we've talked about,

the program of assessment, hiring architects, developing scopes. We are doing the best that we can to try to remediate this situation, and there's no -- I mean, you're implying that there's some kind of shielding when the information is right there in the sentence and in the document right after it.

Q    In 2019 or 2020, you attempted to hire a design firm to design a renovation of the Cermak ramp; isn't that fair to say?

A    I believe that the effort was in 2019 with the Task Order A/Es is what you're referring to, and that would have been, I just said, back in 2019.

Q    And it was not accepted by the procurement office. They wouldn't allow it back in 2019?

A    I believe it was the Board of Commissioners that didn't allow that contract. It may have been that procurement pulled it. I can't remember if they pulled it or -- honestly I don't remember if they did. Regardless, it didn't -- those contracts didn't get approved.

Q    And do you recall in your deposition

from before, you said that the procurement office pulled it back in 2019?

A    Honestly, I don't remember if they -- it was a very -- I don't remember if they pulled it at the last minute or there was a vote of the Board. It didn't make it to a Board vote. It didn't get approved by the Board either way. Honestly, I don't remember if it was procurement pulling it or if it was that they -- I don't remember.

Q    In order for the renovation of the Cermak ramp to proceed, again, under your current -- let me rephrase the question.

Under the plan proposed in your Declaration dated February of 2024, you intended to do it through the project delivery method, correct?

A    We intend to construct the ramp replacement through the job order contracting delivery method. That's the construction portion, yes.

Q    And it's called the job order methodology, correct?

A    Job order contracting or JOC, J-O-C.

It's at the beginning of Item 17.

Q    And before a contract to construct the ramp is issued, it has to go to the procurement office, correct?

A    To be clear, the contractors all already have a contract. There's a difference between contracting and funding. The funding is under the project I mentioned before, 23280. The contractor submits a price, and that package is submitted to procurement to make sure that it is compliant with the applicable rules and regulations for County purchasing. That's their job.

Q    And you mentioned the name of the director of that department, Mr. Raffi Sarvan [sic].

A    Sarafian, yes.

Q    The chief procurement officer --

A    Yes.

Q    -- he has to approve of all contracts under the job order or JOC?

A    He issues what's called a Notice of Proposal of Acceptance, NOPA.

Q    And that has not been issued yet?

Exhibit 5 Page 22

ERIC DAVIS
March 12, 2024

Page 88

A    Correct.  Because the design isn't done.

Q    And before, it was the chief of procurement that vetoed the plan back in 2019 for the design work, correct?

MR. BRANUM:  Objection to form.

BY THE WITNESS:

A    As I said, I can't recall if it was, at the last minute, if it was procurement deciding to pull the item or if it was something that the Board decided not to vote on or pass.  I don't remember the specifics.  Either way, it ended up -- the contracts ended up not getting approved.  It had to do with the language in the specific presentation.  And if memory serves, the term task order was not included in the document and, because of that, it was seen as being outside of the contract, and so they didn't approve it.  And it is included in the contract for HDR.

Q    Who was the -- I might have asked this before.  Who is your superior?

A    His name is Earl Manning.  He's the director of Capital Planning and Policy.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 89

Q    Do you serve at his will?  Can he replace you?

A    I am an appointee of the president of the Board of Commissioners.  I serve at the pleasure of the president.

Q    Can the president of the County Board terminate you?

A    Toni Preckwinkle.

Q    My question is can you be terminated by the president of the County Board?

A    President of the County Board, yes.

Q    Can Earl Manning terminate you?

A    I don't know the specifics.  I believe he can either do -- I believe he can recommend it.  I don't know.  It's a multistep process, so I don't know the specifics.  Well, actually I do know.  It is a multistep processes, but I don't know the specifics for my position.

Q    To your knowledge, has Earl Manning agreed with the recommendation of Globetrotter?

A    I believe that I have outlined the general direction relative to the need to replace the ramp, and there has been no

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 90

objection on his part at all.

Q    So can you say that Mr. Manning as the director of Capital Planning has accepted Globetrotters' recommendations?

A    In that he has designated me to manage this project, yes.

Q    Do you know if the County Board has received Globetrotters' recommendations?

A    I don't believe they have, no.

Q    Has the County Board accepted Globetrotters' recommendations?

A    I don't believe it's been provided to them.

Q    Has the president of the County Board accepted Globetrotters' recommendations?

A    I don't believe it's been provided to her.  I should note that we do an annual report on ADA matters to the Board of Commissioners and things like this since -- it's about that time of year we would be summarizing the status of this in our report to the Board.

Q    Can the County Board change the job order or JOC program?

MR. BRANUM:  Objection to form.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 91

BY THE WITNESS:

A    I don't know what you mean by changing the program.

BY MR. MORRISSEY:

Q    Well, could the County Board terminate the JOC program?

MR. BRANUM:  Objection to form.

BY THE WITNESS:

A    They can vote to cancel a contract, yes.

BY MR. MORRISSEY:

Q    Can the County Board require any renovation of the Cermak ramp to be part of the Capital Improvement Plan?

MR. BRANUM:  Objection to form.

BY THE WITNESS:

A    The County Board reviews and approves the Capital Improvement Plan on an annual basis which includes, as mentioned, Project 23280, which are the ADA renovations of the Cermak Health Services facility.  They are reviewed every year.

Q    Just because the County Board approved -- just because the County Board

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 23

ERIC DAVIS
March 12, 2024

Page 92

approved the capital plan which you say is 23280, to your knowledge, can the County Board terminate that project number?

MR. BRANUM: Objection to form.

BY THE WITNESS:

A To my knowledge, the County Board can -- has the ability to rescind a project or a contract subject to the terms of that project or contract.

BY MR. MORRISSEY:

Q And can the -- when a project is made part of a Capital Improvement Plan, that doesn't necessarily mean the project is going to be completed in the year 2023 such as Project Number 23280, which was part of the Capital Improvement Plan in 2023?

MR. BRANUM: Objection to form, incomplete hypothetical, compound question.

BY THE WITNESS:

A I'm not clear on what you're asking, Tom.

BY MR. MORRISSEY:

Q Sure. Was Project Number 23280 completed in fiscal year 2023?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 93

A No.

Q In order for it to be carried over to the following year, does the County Board have to vote on it?

A Yes. Well, they vote on the Capital Improvement Plan. They are at liberty to add or subtract an item from the submitted Capital Improvement Plan at their discretion.

This is the ninth Capital Improvement Plan year that I've been involved in. I'm not aware of them cancelling any project specific to the CIP in my time here.

Q But for fiscal year 2025, which is coming up in November, the County Board has the ability to cancel Project Number 23280 and not carry it over to fiscal year 2025?

MR. BRANUM: Counsel, he just answered that question.

BY THE WITNESS:

A I just answered it. If they chose to, they could do so, yes.

BY MR. MORRISSEY:

Q And prior to the expenditure of money under Project Number 23280, can the -- does the

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 94

County Board have to approve an implementation plan?

A I'm sorry. I didn't hear the end of your question.

Q An implementation plan, do they have to vote on the expenditure of the money?

MR. BRANUM: Objection to form, incomplete hypothetical.

BY THE WITNESS:

A So they approve a plan that includes a budget level estimate of the project. That is what's in the budget. As I mentioned before, at the current time and the current plan, we're expecting to be doing design work in '23 and '24. That's why the funds that are allocated in the CIP for this year only reflect design expenditures.

As I mentioned before, when we get to construction, when CREA Construction submits their proposal and we're going to actually be moving to construction and actually expending funds, we will expand the allocation in that budget year, which I expect to be in fiscal year 2025 which starts at the end of November.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 95

Then we will increase the expenditure in order to fund the construction of the ramp in 2025. That will be what's in the submittal for the fiscal year 2025 CIP.

BY MR. MORRISSEY:

Q So in the current fund of 23280, which was carried over from fiscal year 2023, there is no money set aside in that fund for construction of any renovation of the Cermak ramp?

A That's correct.

MR. BRANUM: Objection to form.

BY THE WITNESS:

A Well, but that's correct. And to do otherwise would be irresponsible.

BY MR. MORRISSEY:

Q And assuming capital planning -- let me go back a step.

Normally, would the Sheriff's Office put in a business case to Capital Planning to fund the construction of the renovation of the Cermak ramp?

A They put in --

MR. BRANUM: Objection to form.

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 24

ERIC DAVIS
March 12, 2024

Page 96

THE REPORTER: I'm sorry, Eric. Can you start that over?

MR. BRANUM: Objection to form.

THE REPORTER: No, Eric's answer. Thank you.

BY THE WITNESS:

A The users, in this case, the Sheriff submit business cases to the department for projects that they wish to see occur. It is up to us to figure out the specifics of what that would involve. Sometimes there are projects that they would want to do that involve simply furniture. Maybe the County has salvaged furniture, and we go ahead and have that, and we go ahead and install it. Sometimes it may involve new construction. Sometimes it may involve renovation. It's up to us. But they don't specifically -- in other words, after they've requested the project and if the project has been approved, then we execute the project and we don't need a further business case from the Sheriff. They don't have to come back to us and say, okay, now we would like you to put in the funding to construct it. They

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 97

don't have to do that. We take care of that.

Q For fiscal year 2025, has the Sheriff put in a business case to construct --

A They don't need to --

Q Let me finish my question. Have they put in a business case to construct the renovation of the Cermak ramp?

MR. BRANUM: Counsel, he answered that question.

BY MR. MORRISSEY:

Q You can answer it now.

MR. BRANUM: Well, he already answered it, and the form of your question -- the premise is incorrect because it relies on a false assumption.

BY MR. MORRISSEY:

Q Can you answer the question, please?

MR. BRANUM: He can provide his response.

THE WITNESS: Maybe, Peggy, can you re-ask the question he just asked?

(WHEREUPON, the record was read as requested.)

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 98

BY THE WITNESS:

A The answer is they've already put in a business case to, I believe -- I believe their business case was for the ADA upgrades in the facility generally, although I'd have to go back and check because, as you know, this was sometime ago; but I believe their request was for the whole facility, not just the ramp. But regardless, since we have adopted this as a project, there isn't a need for them to re-request the construction. And, in fact, actually we meet with the Sheriff's Office on a monthly basis to review well over 100 individual projects that are going on at any given time that they are involved with one way or another.

So there is no need for them to issue or submit another business case because they already know that the project is underway.

Q For fiscal year 2025, when does Capital Planning put in their recommendation to the president's office?

A The development of the Capital Improvement Plan is a very lengthy process that takes the majority of our fiscal year. The

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 99

process starts early in the fiscal year and, in fact, has already started with the conducting of a series of meetings with our various user agencies, over 30 different agencies, that have projects and -- in the Capital Improvement Plan, and we meet with them and we tell -- update them up on the progress of projects for them that are underway. And we also start the conversation about the coming fiscal year.

We've already done a couple of those for some of our agencies this year. I think I have three or four of them next week and about eight of them the week after that. Generally, in the month of April, we intake requests for new projects and projects involving furniture and real estate acquisition and the re-allocation of space. It's a multipart process.

Once we've achieved those -- received those recommendations, we spend roughly from the beginning of the month of May through the middle of the month of August digesting, categorizing, reviewing, pricing, arranging the projects to get to a draft budget that is

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 25

ERIC DAVIS
March 12, 2024

Page 100

submitted to the budget department in the middle of August.

Between the middle of August and sometime in the next couple of months, it is submitted formally to the president's office. The president makes her recommendation generally to the Board of Commissioners in the month of October. That is to acquaint them with the general intent of the budget. The Capital Improvement Plan is part of the budget.

During the month generally the rest of October and the beginning of November, there are various consultations with the Board of Commissioners and it goes to the County Board which does or does not approve the County budget generally in their meeting in the month of November.

So you have a process that starts in roughly February and isn't finalized until November and then is the annual cycle of ending the prior year's books and opening the budget for the new year. So it's a lengthy process.

Generally, we submit the recommendation in draft form to the president

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 101

in the middle of August, and it goes in her recommendation to the Board for the October board meeting.

Q    Is one of the projects that you are discussing with the Sheriff the construction and renovation of the Cermak ramp?

A    Yes.

Q    How many other projects are you discussing with the Sheriff's Office in regards to fiscal year 2023's CIP, Capital Improvement Project?

A    We're in fiscal year '24. Is that what you're asking about?

Q    Well, I'm asking you in regards to fiscal year 2025 in regards to the proposal to be submitted to the president's office.

A    Okay. So the public safety portfolio overall, which includes projects for all of our public safety stakeholders is approximately 300 projects in fiscal year 2024.

Those include projects at the jail, at our courthouses and at various other public safety facilities: The Rockwell warehouse, for example, where the Sheriff maintains their

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 102

vehicles.

Of those 300 projects, more than half of those are either requested by the Sheriff or the Sheriff is directly involved, so I want to say in the range of 150 projects at various stages at any given time. We issue to them an implementation plan. We indicate which projects are going to be starting at the beginning of fiscal year, which ones are going to start in the second quarter, third quarter or fourth quarter, and we usually meet with them again after -- their submittal is in April -- in the period around July sort of, June, July to make sure that we understand their request properly and to give them an indication of where we're going with the draft fiscal year.

Q    For the fiscal year 2024, it's going to end, what, in November of '24?

A    November 30th, 2024, yes.

Q    Have you met with the Sheriff in regards to implementing the construction of the renovation of the Cermak ramp in fiscal year 2024?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 103

A    I know that we -- I know that the Cermak ramp has been one of the efforts discussed in our regular monthly meetings for the past, gosh, several months, if not years. It's one that we have talked about with them for quite sometime.

Q    But for implementation, meaning expenditure of money in 2024 for the construction of the renovation of the Cermak ramp, have you discussed that with the Sheriff as far as moving forward and implementing construction in the fiscal year 2024?

A    To be clear, you confused two different things. For the spending of money, which includes the spending of money on architects, which is an activity that's currently underway, yes, we have discussed that with them.

In the course of meetings with the project team for the assessment of Cermak, I believe we've discussed specifically the intent to construct the -- to construct the replacement ramp through our job order contracting process.

Q    Who is on the assessment team with

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 26

ERIC DAVIS
March 12, 2024

Page 104

the Sheriff?

A    I believe the primary person is Sabrina Canchola-Rivero [sic].

Q    You mentioned that for construction of the renovation of the Cermak ramp, that's going to be put into the Capital Improvement Plan for 2025; is that correct?

A    That will be put into the draft budget that's submitted to the president's office in August.

Q    In the 2023 Capital Improvement Plan, was there an approval of funds for the construction of the renovation of the Cermak ramp?

MR. BRANUM:  Objection to form.

MR. MORRISSEY:  Let me rephrase the question.

BY MR. MORRISSEY:

Q    In the fiscal year 2023 Capital Improvement Plan, were there funds approved by the Cook County Board for the actual construction of the renovation of the Cermak ramp?

A    No.  And to do so would have been

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 105

irresponsible.

Q    In the fiscal year 2024, was there a -- was the Capital Improvement Plan that was passed by the Cook County Board in 2024, did it include money or funds for the construction of the renovation of the Cermak ramp?

A    Our expectation is that the design activities for the renovation of the ramp and implementation of other renovations at the Cermak facility that the design will take the bulk of the year of fiscal year 2024 and that the construction, the NOPA that I mentioned before, would not be issued until fiscal year 2025.

Q    So my question is specifically in the 2024 fiscal CPI, and that was -- in regards to the Cermak ramp, that was a carryover from the CPI from 2023; is that correct?

MR. BRANUM:  Objection to form.

BY THE WITNESS:

A    The renovation of Cermak, which includes the ramp, was part of the, I believe -- I can't remember the exact wording but I note the project, bringing the facility

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 106

up to compliance, was included in the 2024 CIP and, yes, that was a carryover from the 2023 CIP?

BY MR. MORRISSEY:

Q    So we're looking at Paragraph 8 of your Declaration.

A    Okay.

Q    It's Project Number 23280 in fiscal year 2023, correct?

A    Yes.

Q    And then for fiscal year 2024 when the funds weren't expended in 2023, they carried it over to fiscal year 2024 under the CIP; is that correct?

A    That's correct.

Q    And that was for basically design services of Globetrotters to do the assessment?

A    Yes.

Q    Now, in order to construct, go forward on the construction of the renovation on the Cermak ramp, your office is going to have to include in your proposal for the CIP that funds be earmarked for the construction and renovation of the Cermak ramp?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 107

MR. BRANUM:  Objection to form.

BY THE WITNESS:

A    But it's correct.  Yes.

BY MR. MORRISSEY:

Q    And your office, the Capital Planning office, is going to have to submit that first to the budget office, correct?

A    Correct.

Q    And the budget office has a say whether or not it's included in the CIP for fiscal year 2025, correct?

A    Yes.

Q    Who is --

A    I should note that in my time here, other than very large purchases of property, I can't recall any project in the draft CIP that the budget office has taken exception to for capital construction.  But go ahead.

Q    Who is in charge of the budget office?

A    Budget office is under the Bureau of Finance, and the Bureau of Finance is under our chief financial officer.

Q    And that person's name is?

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 27

ERIC DAVIS
March 12, 2024

Page 108

A    Tanya.

Q    I'm sorry.  Can I have the full name?

A    Honestly, I can't remember her last name right now.  I just refer to her as Tanya, but she's the CFO.

Q    Can you spell that?

A    T-a-n-y-a.

Q    So assuming --

A    Excuse me.  Tanya Anthony.

Q    Assuming -- and Mr. Manning is responsible as the commissioner of Capital Planning for sending over the recommendations by his office in regards to items to be entered into the CIP for fiscal year 2025, correct?

A    He's the director.  To be clear, he's the director of Capital Planning, not the commissioner.

Q    Well, as the director of Capital Planning, it's up to his discretion, Mr. Manning's discretion, to include the construction of the renovation -- strike that.

It's up to Mr. Manning's discretion as the director of Capital Planning to include funding in fiscal year 2025 in the year

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 109

proposed CIP; is that correct?

A    That's correct.

MR. BRANUM:  Objection to form.

BY THE WITNESS:

A    No, that's true.  He approves -- by ordinance, he is in charge of that -- those expenditures, of authorizing --

BY MR. MORRISSEY:

Q    By ordinance --

THE REPORTER:  Mr. Davis, I didn't hear the last part.

BY THE WITNESS:

A    Of authorizing those expenditures. The actual expenditures are approved by the Board, but he is the specific person delegated for that, yes.

BY MR. MORRISSEY:

Q    And Ms. Anthony, as the director of finance, has a say in whether or not funding for the alteration or renovation of the Cermak ramp will be sent to the president's office as a package for the CIP for fiscal year 2025?

A    Honestly, I don't know whether -- I don't know about the specifics of her

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 110

responsibility in this regard.  And I say that because I believe that the ordinance says that the director of Capital Planning is the responsible party for submitting the capital plans.

So I don't know -- she may be able to decide about specifics of funding levels, but I believe the authority, as far as what goes in the plan or not, I believe that actually is the director -- I could be mistaken, but I believe it's actually the director of Capital Planning. That said, I don't recall Tanya having taken exception to an item, again, other than some very large purchases like the helicopter and purchase of land and things like that.  I don't recall her weighing in against any project in my years here.

Q    The director of Capital Planning, Mr. Manning, after sending it to the budget office then has to submit it to the president of the County Board as far as any funding for construction of the Cermak ramp to be included in the CIP for fiscal year 2025, correct?

A    I believe that it is the CFO that

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 111

transmits the CIP to the president's office.

Q    CFO stands for, what, chief financial officer?

A    Chief Financial Officer Tanya Anthony.

Q    So that's Ms. Anthony.  That's her position?

A    Yes.

Q    And the president of the Cook County Board, once she receives from Ms. Anthony the Capital Planning's CIP proposals for 2025, then it's up to the discretion of the president of the County Board to make her recommendations for fiscal year 2025 to the elected County Board members, correct?

MR. BRANUM:  Objection to the form of the question.  It's a compound question.

BY THE WITNESS:

A    I'm not quite clear what you're asking.

BY MR. MORRISSEY:

Q    Okay.  The proposal that -- for 2025 -- let me rephrase it.

Any proposal for altering the Cermak

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 28

ERIC DAVIS
March 12, 2024

Page 112

ramp as far as construction has to go to the president of the County Board to be included in the package for CIP fiscal year 2025 to be approved by the County Board?

A    It's a line item in the budget that is approved by the Board.

Q    And there has to be a recommendation prior to approval by the County Board from the president to the County Board?

A    The president makes that recommendation, yes.

Q    So the president of the County Board in November of 2025 -- strike that.

The president of the County Board in November of 2024 has the discretion either to recommend funding in the CPI -- CIP for fiscal year 2025 to include construction of the renovation of the Cermak ramp or to exclude it, correct?

MR. BRANUM:  Objection to form.

BY THE WITNESS:

A    And I think I've already answered it. She makes the recommendation, technically.  She makes the recommendation based upon

---

ERIC DAVIS
March 12, 2024

Page 113

consultations with the CFO and with anybody else that she questions on.

Q    And then the full County Board in November of 2024 would have to vote on in their CIP bill whether to include construction money for the alteration of the Cermak ramp.

Is that fair to say?

A    They would include the -- yeah, they would include the CIP as a part of their budget.  It's generally in what's called Volume 1 of the budget.

Q    My question is that any funding for construction of the Cermak ramp in the year -- fiscal year 2025 would have to be included in and voted on and approved by the County Board?

A    The projects are approved.  The chief financial officer has the discretion to make re-allocations within the budget along certain guidelines.

So you used the term "any."  She has discretion to make adjustments if they are, in her mind, properly justified during the course of the fiscal year.

So when you use the term "any," there

---

ERIC DAVIS
March 12, 2024

Page 114

are alterations that the Board allows -- you know, the Board allows the chief financial officer to make, again, following rather stringent guidelines.

Q    I think we're not -- you don't understand my question.

MR. BRANUM:  Well, I understood his answer.

BY THE WITNESS:

A    Why don't you ask me what you want to ask me, Tom?

BY MR. MORRISSEY:

Q    Yeah.  For construction of the Cermak ramp, for funds to construct the Cermak ramp, it has to be included in the fiscal year 2025 CIP?

A    No, no.  There is a mechanism for -- you're making absolute questions.

Q    All right.  Let me rephrase it.  Let me rephrase the question, okay?

Your intention is to include in your proposed Capital Improvement package for fiscal year 2025 funding for the construction of the Cermak ramp?

---

ERIC DAVIS
March 12, 2024

Page 115

A    Yes.  That is the department's intent, yes.

Q    And the County Board ultimately has to vote on the CIP for fiscal year 2025?

A    That's correct.  And they have communicated several times both as a group and individually that accessibility and ADA compliance is a priority for them.

Q    When did they first communicate to your knowledge that accessibility is a priority?

A    Oh, it could easily be before I worked at the County.

Q    Did they provide you with that information back in 2019 when you asked for money to -- design money for the Cermak ramp that it was a priority to do this project?

A    As I said, the 2019 task order contracts, I don't recall whether or not we stipulated this project in the list.  There was some, I want to say, 80 projects, something like that, that were intended to go forward.  I don't recall if this one was in there or not. I expect that it was, but I don't know

Exhibit 5 Page 29

ERIC DAVIS
March 12, 2024

Page 116

specifically that it was or not. But it has been something that has been important for some time, which is why for the last few years we've issued an annual report to the Board of Commissioners about the status of our efforts for ADA.

Q    Now, you say after -- if the County Board approves a CIP for fiscal year 2025, it's always up to the discretion of the chief financial officer whether or not to expend funding for the projects that are included in the CIP.

MR. BRANUM:  All right.  Tom, we're going around in circles.  You're just re-looping back to the top of your list of questions.  You're asking these same questions over and over again.

So I've allowed you a lot of leeway to get the questions you want in, but now you're just repeating yourself and now we're getting to the point where you are harassing the witness.

BY MR. MORRISSEY:

Q    You can answer the question.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 117

MR. BRANUM:  No, he can't.

MR. MORRISSEY:  You are not going to allow him to answer the question after the County Board -- assuming the County Board includes the construction -- let me rephrase the question.

BY MR. MORRISSEY:

Q    Assuming the County passes a CIP for fiscal year 2025, which includes funding for construction of the renovation for the Cermak ramp, can the CFO for Cook County, Ms. Anthony, still stop the funding for --

MR. BRANUM:  Objection to form.

BY MR. MORRISSEY:

Q    -- for the Cermak ramp?

A    Honestly, I don't know if she has the authority to do that or not.  If she did, I know she would have to stipulate a pretty good reason for it, but I don't know whether or not she has -- I don't know the specifics of whether she has the ability.

Once it's been approved in the CIP, unless there's some violation of the law or something really untoward, I don't know under

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 118

what circumstances she would even do that or be able to justify doing that.  I don't understand how that would happen.

Q    Just because a project is included in a CIP for a fiscal year, let's say, 2025, does that necessarily mean that the County will proceed and expend the money for that project in fiscal year 2025?

A    There are any number of things that might happen between the passage of a budget and the completion of a funded project.

You may recall that we had a pandemic.  That disrupted design and construction activities to an extreme degree. There are any number of things that could come along to -- between the approval of a budgeted item and its execution or completion that might alter that happening.  I can't predict and neither can you.

Q    To your knowledge, were there -- for the Capital Improvement Projects that were included and passed for the 2024 fiscal year, approximately what percentage of those projects will move forward in the year 2024?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 119

A    I'm sorry.  I missed the end.  Will move forward in '25?  You mean be carried over?

Q    No, I'm referring to the current 2024 CIP.

A    So are you asking --

Q    There are projects that were approved by the County Board for Capital Improvement Projects for fiscal year 2024, correct?

MR. BRANUM:  Objection to form.

BY THE WITNESS:

A    So are you asking whether projects would carry over or not or are you asking -- I'm not clear on what you're asking.

MR. BRANUM:  Yeah, Tom, the witness is seeking clarification.

MR. MORRISSEY:  Sure.

BY MR. MORRISSEY:

Q    There were programs and projects that were included in the fiscal year 2024 Capital Improvement Projects, correct?

A    There are Capital Improvement Projects in the Capital Improvement Plan for fiscal year 2024, yes.

Q    My question is in this fiscal year

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 30

Page 120

between November of 2023 and November of 2024, what percentage of those projects will be completed in the year 2024?

A    That's a good question with a very complicated answer because, as I mentioned and in the case of the improvements to Cermak, which are under a project number, we're expecting the design work for that project to be completed in 2024.

We're expecting construction work to be executed and contracts underway and constructed in 2025, maybe in the beginning of 2026.

If the architects that are contracted under '24 complete their work in '24 but the project continues because now it has construction funding, does that mean that the project ended in '24 or the project carries over in terms of your question?  What are you asking?

Q    All right.  You're familiar that there was funding for renovation of the Leighton court building many years ago, correct?

Page 121

A    There was a project for renovations to the holding cell areas in the Leighton courthouse years ago, yes.

Q    And that project has been carried over for many years, correct, under the CIPs?

A    I'm sorry.  Did I refer to that in the -- I might have missed it.  Did I refer to that in the Declaration?  Did we talk about Leighton in the Declaration?  I'm not sure.

MR. BRANUM:  Yeah, Tom, why don't you keep your questions within the scope of the Court's order.

MR. MORRISSEY:  Well, it is.  It's in regards to whether or not a project --

BY MR. MORRISSEY:

Q    Just because a project is approved in the CIP for a fiscal year doesn't necessarily mean that funds will be expended in that fiscal year.

Is that a fair statement?

MR. BRANUM:  Objection, incomplete hypothetical.

BY THE WITNESS:

A    But there are circumstances where --

Page 122

but there are definitely circumstances that arise where a project that is budgeted and projected to have funds expended on it in a given fiscal year for any number of different reasons may not go forward in that fiscal year.  As I mentioned, you know, the pandemic but there are other circumstances that may come up.

If your real question is does the County intend to construct the replacement of the ramp from the standpoint of the Department of Capital Planning and Policy and, as I mentioned that I outlined to our director, the answer to that is yes.  It is our intent to construct it using design and construction firms that are already under contract.

It is our intent to submit the construction funding for fiscal year 2025 because that's when we expect the proposal for construction to be executed by the chief procurement officer.  It is our definite intent to accomplish this project.

Further, if you consult the County's budget, and I will refer you to the published public budget, Page 175 in the development of

Page 123

the capital plan, even though in fiscal '24 there were projects we are not able to go forward with, ADA projects are specifically identified as a priority in the capital plan.

So if you want to ask me could something occur to make it not constructed, yeah, I suppose hypothetically it could occur, but it is our intent to carry through per this Declaration to get the replacement of the ramp designed because that's the recommendation of our consultant and to have it constructed by people that are already contracted.  That's what we intend to do.

Could there be extenuating circumstances?  Certainly.  But at this point in time, that's our intent, and it's an established process.  We execute dozens if not hundreds of projects every year that way.

Q    Is it your opinion that because the rise of the ramp is only, I think, 2.4 -- exceeds 30 by 2.4 inches that that's a slight variance and this project -- let me rephrase the question.

To your knowledge, does Cook County

Exhibit 5 Page 31

ERIC DAVIS
March 12, 2024

Page 124

dispute that the rise of the ramp doesn't comply with the ADA?

MR. BRANUM: So don't -- wait. If you're asking his mental impressions of this case and litigation, that's protected by the work product.

So if you want to rephrase your question to not ask it in that way, it might be better.

BY THE WITNESS:

A I'm sorry, Tom, did you -- I think -- I was waiting for you to rephrase the question.

BY MR. MORRISSEY:

Q Well, let's go back for a moment to Globetrotters' report. Give me one moment.

Going back to Globetrotters' recommendations on Page 9, in particular about the existing ramp handrails.

A Uh-huh.

Q When you participated in the installation of the handrails, you are aware that the handrails that were installed by the Department of Facilities Management did not comply with the requirements for the ADA,

ERIC DAVIS
March 12, 2024

Page 125

correct?

MR. BRANUM: Objection to form.

BY THE WITNESS:

A If you are asking did I know during the course of their installation that the finished product was not complete and completely compliant, yes, I was aware of that because we were not able to obtain the pieces to accomplish the ends, as I think I mentioned previously in this deposition.

BY MR. MORRISSEY:

Q You are aware that there had been a court order in July of 2022 --

A Yes.

Q -- that the ramp was supposed to comply with the ADA?

MR. BRANUM: And I just object to your characterization of the order.

BY MR. MORRISSEY:

Q Is that fair to say? You are aware that the handrails are required to be installed in compliance with the ADA?

A Yeah. As mentioned in the deposition, there were doors that made it

ERIC DAVIS
March 12, 2024

Page 126

impossible to simply extend the handrail, and so the handrails themselves were not able to be completed with the layout of that area as it currently exits.

Q My question was more focused. You were aware that it did not comply strictly with the requirements that both sides of the handrails had to be continuous with 12-inch extensions?

A Yes.

MR. BRANUM: I will just object to the extent you're picking out isolated parts of the ADA and not reading the ADA as a whole. So that's my objection.

And we reserve all rights to make those arguments to provide the additional context that you're leaving out.

BY THE WITNESS:

A Yes. I was aware that we were not able to finish the work. The bulk of it was, but we were not able to finish the ends. Yes, I was aware of that.

BY MR. MORRISSEY:

Q And so the County didn't comply with

ERIC DAVIS
March 12, 2024

Page 127

the Court's order of July of 2022, correct?

MR. BRANUM: Stop. Don't answer. So that's a legal conclusion and his mental impressions and conclusions about this litigation is protected by the work product doctrine.

So I'm directing the witness not to answer on the basis of privilege.

BY MR. MORRISSEY:

Q I'm asking you as an architect --

MR. BRANUM: I don't care how you're asking him. It's still privileged.

MR. MORRISSEY: How can that be privileged? I'm asking did Cook County -- was Cook County aware that the installation of the handrails in 2022 and in January of '23 did not comply with the ADA standards.

MR. BRANUM: So, one, I don't know what you mean did Cook County know. If you want to ask him if he knows specific facts, you can ask him that. But if you're asking for his conclusions and legal theories about this litigation, that's what's protected by the work product. So, I mean,

Exhibit 5 Page 32

ERIC DAVIS
March 12, 2024

Page 128

it's not a categorical direction not to answer the questions, but your questions aren't fact based, so.

BY MR. MORRISSEY:

Q   Well, it's a fact that the handrails that were installed in 2022 by the Department of Facilities Management were not continuous for 12 inches at the end and the top of the ramps, correct?

MR. BRANUM:  Objection to form, but you can answer that question.

BY THE WITNESS:

A   You had an order up earlier that had a date.  I think it was end of '22 that it was supposed to be completed by.  Is that the -- do you still have that?

BY MR. MORRISSEY:

Q   Sure.  Do you want me to put that up for you?

A   Sure.  Would you put that up?

Q   Sure.  I think it's Number 7.  Do you see there was a court order dated July 27th, 2022?

ERIC DAVIS
March 12, 2024

Page 129

A   Yes, okay.  Thank you.

MR. BRANUM:  And just for the record, it states:  Upon the parties' agreement.

MR. MORRISSEY:  So, Peggy, can you repeat the question, please?  Is there a question pending?

MR. BRANUM:  Well, I think the witness asked you to share the exhibit.

MR. MORRISSEY:  Okay.

BY MR. MORRISSEY:

Q   So you see the exhibit now which is the court order from July 27th, 2022, correct, which is Exhibit Number 7?

A   So to answer your earlier question, Tom, around this time, and I can't say without checking whether it was before December 31st or after, as you noted, we, we being the Bureau of the Department of Facilities Management, installed the handrails on the ramp, and we were not able to obtain what we needed to finish the ends of the handrails.

Around that time, as you noted also in this discussion this afternoon, that was around the time that we initiated the project

ERIC DAVIS
March 12, 2024

Page 130

to -- or the RFQ rather to hire what became Globetrotters to look at the whole facility.  I can't characterize specifics, but I think it's fair to say that a part of the motivation to make sure we were going forward with the assessment of the whole facility by a third party included a recognition that we were not finding a way to resolve everything that needed to be resolved the way we were doing it.  So that's why we brought somebody else in to, first of all, look objectively at the questions that you've asked about the ramp and the rise of the ramp and to give us their objective evaluation of that, but then further to identify what measures would make the area accessible, right?  If we were not able to provide accessibility because we were thwarted in our ability to get the handrails finished, we had to find another way.  And that way that we pursued was to get this third party contracted to look at the facility as a whole and to make their recommendations for how to bring the facility into compliance.

That's what we've done.  We've done

ERIC DAVIS
March 12, 2024

Page 131

it in a fairly efficient way.  We are moving forward vigilantly and consistently to do that.  And if you're saying, you know, did we recognize that we haven't pulled it off, at some point along the line, yeah, I think it was pretty clear that we weren't able to complete it.  We've done most of it but hadn't been able to complete all of it, and so we had to find another way.  And that's what led to the assessment, and that's what's leading to the removal of the ramp.

And as you note, and as we note in here, the removal of the handrails.  We are trying to get -- we're trying to make this facility as accessible as it needs to be.  We tried one way.  That didn't work.  We're trying another way.

Q   Well, in your Declaration and in Mr. Branum's response to the permanent injunction, you talk about a slight -- the rise of the ramp is slightly off by 2.4 inches, correct?

MR. BRANUM:  What paragraph are you referring to?

Exhibit 5 Page 33

ERIC DAVIS
March 12, 2024

Page 132

MR. MORRISSEY:  Well, you can look at Paragraph 11.

BY MR. MORRISSEY:

Q    You say:  Slightly over two-and-a-half feet.  You used the word slight.

MR. BRANUM:  And your slightly is under Paragraph 11.  All I'm asking is the paragraph number.  So go ahead.

BY MR. MORRISSEY:

Q    You used the term slightly over two-and-a-half inches [sic].

MR. BRANUM:  Well, that misstates the Declaration.

MR. MORRISSEY:  Well, that's what it says.

MR. BRANUM:  No.  You misread it.

MR. MORRISSEY:  The word is slightly over two and a half --

BY THE WITNESS:

A    **It does say slightly over two-and-a-half feet.**

MR. BRANUM:  Yeah, you said "two-and-a-half inches."

MR. MORRISSEY:  I'm sorry.

ERIC DAVIS
March 12, 2024

Page 133

BY MR. MORRISSEY:

Q    It's slightly over two-and-a-half feet which is 32.4 inches, correct?

A    **The rise as indicated by the LIDAR from GEC indicates that it has a vertical rise of 32.4 inches, which is slightly over two-and-a-half feet.**

Q    So by using the term "slightly," is it your -- in your Declaration, do you consider that to be de minimus that it really doesn't matter that it's only 2 inches -- 2.4 inches exceeding the rise that's required under the ADA?

MR. BRANUM:  So don't answer that.  Again, this is protected by work product.  It's a legal conclusion.  The term de minimus is a legal conclusion.

So if you want to ask him factual questions, you can ask him that.  Our arguments in a brief making legal arguments is not something that you can question the witness on.

BY MR. MORRISSEY:

Q    Well, I'm asking you about your

ERIC DAVIS
March 12, 2024

Page 134

Declaration.  And your Declaration uses the term when referring to the ramp and the rise, you used the term slightly over two-and-a-half feet.

A    Yeah.

Q    The vertical rise is 32.4 inches.

A    Yeah.

Q    Mr. Davis, what is required in regards to the Cermak ramp as far as the rise?

A    **As discussed before in this deposition and other actions, it is supposed to be 30 inches before you introduce an intermediate landing.  There are qualifications to that that I have mentioned before in terms of the construction tolerances, the material and the allowances for a cross-slope.**

**So there are, to our understanding, minor variations from that 30-inch standard that are allowable.  That said, we wanted a third-party view of this.  And the third party said you need to change the ramp, and so that's what we're doing.**

Q    Based upon what you just said, what -- in regards to the Cermak ramp, tell me

ERIC DAVIS
March 12, 2024

Page 135

specifically why it was permissible for Cook County and the Sheriff to exceed a rise of 30 inches for the Cermak ramp?

MR. BRANUM:  Again, Counsel, you're getting into legal conclusions.  You can ask him facts, and he's already answered your questions factually, but you're asking for a legal conclusion.

BY MR. MORRISSEY:

Q    As a factual matter, does the fact that the rise is 2.2 inches and 4 -- let me rephrase it.

As a factual matter, does it matter that the rise of the Cermak ramp is 32.4 inches in regards to complying with the ADA requirements for the Cermak ramp?

MR. BRANUM:  So just pause.  So just by putting in the beginning of your sentence "factual matter" but then you end with "complying with the ADA," you can't change a question asking for a legal conclusion just by throwing the word factual in a sentence.  So it doesn't work that way.

Exhibit 5 Page 34

ERIC DAVIS
March 12, 2024

Page 136

So re-ask a question where you are not asking a legal conclusion that's protected by the work product doctrine.

BY MR. MORRISSEY:

Q    **** Did the cross-slope apply to the Cermak ramp which gave permission in your opinion for the rise to exceed 30 inches?

MR. BRANUM:  So, Counsel, you're asking legal conclusions, legal opinions related to this litigation that goes to the heart of this litigation, which is whether the ramp complies with the ADA.  His mental impressions, his conclusions, his legal theories on whether the ramp complies with the ADA are all protected by the work product doctrine.

So I'd ask you to not ask those questions because they are privileged.  If you continue to ask those questions, I will object and direct the witness not to answer based on the work product doctrine.

MR. MORRISSEY:  Mr. Branum, you're totally off base.  I'm going to certify the question.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 137

MR. BRANUM:  And you don't have to make personal comments.  Let's keep this professional.  Let's keep it on the merits and not make -- throw personal barbs at each other.

BY MR. MORRISSEY:

Q    Mr. Davis --

A    If I understand your question --

MR. BRANUM:  Well, no, there's no question pending.

BY MR. MORRISSEY:

Q    **** I have a question, Mr. Davis. In your Declaration, were you uncertain after Helen Stoner issued her assessment in March of 2018 up until December of 2024 whether or not the Cermak ramp complied with the ADA standards?

MR. BRANUM:  Objection to form and, again, his uncertainty, his conclusions and mental impressions on whether this ramp complied with the law goes to the heart of this litigation and is protected by the work product doctrine.  So --

MR. MORRISSEY:  We'll certify the

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 138

question if you're not going to allow him to answer, Mr. Branum.

MR. BRANUM:  Yes, certify it.  But we're asserting a privilege.

BY MR. MORRISSEY:

Q    Well, in Paragraph 5, you make various statements, Mr. Davis.  In Paragraph 5 you say that the intent was to have it -- the rise be 30 inches or less, correct?

A    What I say was that the design drawing showed the intent of 30 inches, yes.

Q    And then you say the surveyor showed that at least one part of the ramp was exactly 30 inches, correct?

A    Yes.

Q    And why did you put those in the Declaration when you knew, for instance, that the surveyor also said that the right and left side of the ramp were -- exceeded 30 inches?

MR. BRANUM:  So, again, don't answer that question.  That's protected by the work product doctrine.  His mental impressions related to this litigation is not discoverable.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 139

So his mental impressions on why he included something in a court document in a Declaration is his mental impression and it's protected.

BY MR. MORRISSEY:

Q    In 2018, as the person in charge of reviewing Ellen Stoner's report, did you intend that the Cermak ramp should be renovated?

A    On reading the element that you're referring to, it was not clear to me that her conclusion was taking into account all of the facts because she was making assumptions about the slope of the ramp that were incorrect.  She was making assumptions based upon it being a 1 in 12 slope, and it clearly was not.  She was making assumptions about the offset and how high that was, but it was based upon the block coursing, which is an inexact way of determining that offset.

So I felt that in reviewing her documents that she didn't have all of the information.

Q    And in 2000 -- between 2020 and November of 2022, you still aren't convinced

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 35

ERIC DAVIS
March 12, 2024

Page 140

that the ramp was not in compliance with the ADA, correct?

MR. BRANUM: Objection to the form of the question.

BY THE WITNESS:

A   Well, in 2022, that's why we wanted to have a surveyor verify it. That's why we asked him to do a survey because we had had a laser level done. You questioned that. We thought fine. Let's have a surveyor come in and do that and take a look at it but, yeah, it was our impression that the ramp was compliant.

Now, as we also note in here, we hadn't done a LIDAR evaluation which GEC did, which revealed more information than we knew at the time. But, yeah, it was our impression and our -- and I should say my evaluation that the ramp was compliant based upon construction tolerances and cross-slope and what we were seeing at the time.

We got more information. The greater information provided the 2.4 inches that you referenced earlier, and that was enough to be convincing to say we need to look at this

ERIC DAVIS
March 12, 2024

Page 141

again. We need to address the situation.

Q   And with the handrails that were installed by Cook County in 2022 and early '23, were you unconvinced that the handrails didn't comply with the ADA?

MR. BRANUM: Objection to the form of the question.

MR. MORRISSEY: Let me rephrase it.

BY MR. MORRISSEY:

Q   When the handrails were put in in December and January of 2022, was it the County's position that they were in compliance with the ADA?

MR. BRANUM: Don't answer that question. It's a legal conclusion protected by the work product doctrine.

BY MR. MORRISSEY:

Q   If the Court -- if the Court wasn't alerted to the fact that the handrails were not in compliance with the ADA, was it your position to remedy that, the handrails?

MR. BRANUM: Objection, incomplete hypothetical. It calls for speculation. It's counterfactual.

ERIC DAVIS
March 12, 2024

Page 142

MR. MORRISSEY: Well, let me rephrase it.

BY MR. MORRISSEY:

Q   You were aware when the handrails were put in that they weren't compliant, correct?

MR. BRANUM: Don't answer the question.

BY MR. MORRISSEY:

Q   (Inaudible) 20 inches -- 12 inches --

MR. BRANUM: Don't --

BY MR. MORRISSEY:

Q   -- on the end?

(Simultaneous speaking.)

MR. BRANUM: If you want to ask him if --

THE REPORTER: I'm sorry, Tom. I couldn't hear the question. It was --

MR. MORRISSEY: All right, because Sam was interjecting himself.

MR. BRANUM: Well, you paused, so I put what was starting my objection and then you started your question back up, but I will let you get your question out again.

ERIC DAVIS
March 12, 2024

Page 143

MR. MORRISSEY: I would appreciate that, and I would appreciate some cooperation here.

BY MR. MORRISSEY:

Q   In 2022 and 2023, what did you do as the responsible person for Cook County to ensure that the handrails were properly installed pursuant to the ADA?

A   So if I'm understanding your question correctly, the installation of the handrails that were put in was incomplete.

And as I said around the time that we determined that we weren't going to be able to achieve complete compliance that way was around the time that we initiated the process to retain the firm which became Globetrotters to get a dispassionate third-party view of the circumstance and make a recommendation.

Q   If we look at Paragraph 13, it talks about the handrails, and it talks about anti-ligature handrails, correct?

A   Yes.

Q   I'm going to show you -- to your knowledge, since 2010 to the present, has Cook

Exhibit 5 Page 36

ERIC DAVIS
March 12, 2024

Page 144

County or the Sheriff installed handrails for ramps that do not have anti-ligature handrails?

MR. BRANUM: Objection to form, foundation. You can answer it to the extent of your knowledge.

MR. MORRISSEY: Let me rephrase it.

BY MR. MORRISSEY:

Q To your knowledge, are there other areas of the Cook County Jail that have handrails that are not anti-ligature?

MR. BRANUM: Objection, foundation.

BY THE WITNESS:

A I don't know. I can't give you a definitive answer.

BY MR. MORRISSEY:

Q Do you know if the RTU handrails are anti-ligature?

A Not offhand, no.

Q Do you know if the -- in Division 4 whether the handrails are anti-ligature?

A No, I don't.

Q Is there a requirement under the ADA that the handrails be anti-ligature to your knowledge?

ERIC DAVIS
March 12, 2024

Page 145

A My understanding of the applicable standards is that because it is a custody environment, the -- and I believe it's -- I don't think it's in ADA. I think it's in ADAAG. I'm not sure. I have to look it up that a sheriff is able to make -- or law enforcement is able to make adjustments for safety which is what the anti-ligature handrails are for because it's a custody environment.

I can't speak to anything that was done before 2017 because I didn't work for the County before 2017, and I didn't work on the RTU.

Q Showing you the picture in Group Exhibit 4, it's a picture that's been Bates Stamped IMG_3765.JPG.

Looking at that photograph, which is -- I will tell you it's the RTU ramp. Is that an anti-ligature handrail?

A I can't tell from this angle.

Q What would you need to look at to see the angle of the handrail?

A I would need to look at the end, look

ERIC DAVIS
March 12, 2024

Page 146

at it from the end.

Q Showing you Group Exhibit 4 Photograph 3765 -- I'm sorry. It's 3807.

By looking at that photograph, do you recognize that as the handrail installed in the RTU ramp? And I think if we look further, I think you'll see Mr. Branum in the picture.

MR. MORRISSEY: Is that right, Mr. Branum?

MR. BRANUM: Just ask your question to the witness.

MR. MORRISSEY: Are you with us, Mr. Branum?

MR. BRANUM: Just ask your question. There's no -- so we've already been going for three hours on what should have been a two-hour-or-less deposition. I've allowed you a lot of leeway to explore a lot of topics outside his Declaration, but we need to wrap this up.

BY MR. MORRISSEY:

Q Looking at the photograph, the end of the -- do you recognize that as the Cermak ramp area?

ERIC DAVIS
March 12, 2024

Page 147

A No, because --

Q I'm sorry. The RTU ramp area.

A No, I don't but if you stipulate that it is, okay. I can't say one way or the other. The tunnel has lots of doors and it's an extensive system.

Q We will stipulate for the moment it's the RTU handrail for the ramp that leads from the RTU to Cermak.

A Yeah.

Q Looking at that handrail, do you consider that to be anti-ligature?

A From the shadow line underneath it, it doesn't appear that it is.

Q Do you know if there are any handrails at the Cook County Department of Corrections that are anti-ligature?

A Yes.

Q Which handrails?

A I don't recall offhand, but I know I've seen some recently that are. I could probably -- I remember seeing some recently that are. I don't remember specifically where they are. They may be in -- they may be in

Exhibit 5 Page 37

ERIC DAVIS
March 12, 2024

Page 148

Cermak itself or -- I did see some recently on the campus. I think it was in the holding cells perhaps. I don't remember. Somewhere. I do remember seeing some recently.

Q     For any ramp at the Cook County Jail, do you know if any ramp at the Cook County Jail currently has anti-ligature?

A     I would have to go through and look. I don't know offhand, no, one way or the other.

Q     When the -- when you oversaw the installation of the handrails in the fall of 2022, what steps did you take to secure an extension, the 12-inch extension having been fabricated so you could have a 12-inch extension for the handrail?

A     I talked to the manufacturer that we ended up ordering them from. And we looked at a couple of different ways to possibly do it. We looked at potentially taking a straight section and then miter cutting them on an angle because it had to navigate that 45-degree turn at the corner. And the problem there was the geometries of the handrail itself and the section that connects back to the wall, it

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 149

wouldn't align properly and would create an area that you bumped your hand. So that wasn't going to work.

We also looked at the possibility of scoring and mending the straight section to make that turn, and that wouldn't work. So we looked at -- and the only other way to do it would be to create a custom-cast piece for the area for that specific geometric situation which would be a very time-consuming undertaking. It might be something that's doable, but it's very time consuming.

And as I said, that's around the time that we said, you know what, let's look at the whole thing. Let's bring somebody in here. Let's look at how to address the situation as a whole.

Q     So whether it's costly or not, it's feasible to custom extend the railing that was put in in Cermak and extend each side 12 inches?

A     For some of those areas, yes. In others not. As noted there, as you see in your photographs, there's a door at the bottom of the ramp on one side so that if you extended

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 150

the handrail and turned the corner 12 inches, you would be blocking the door. There would also be no way to attach the end of the handrail because the door is there. So that would be not feasible.

Q     For portions of the handrail for the Cermak ramp, it was feasible to extend it 12 inches if the piece was individually fabricated, correct?

A     My recollection is that I think it's two out of four of the ends of the two handrails. You could do it with a custom extension, and I think there was an obstruction in the other two cases but I would have to review it.

Q     So the County made a decision based upon cost for two of the handrails not to extend it, correct?

A     No, no. The County did not make the decision based on cost. The County made the decision to make the best possible accommodation. The decision was not based on cost. The decision was based on making the best possible accommodation, and that's why we

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 151

needed to go get somebody to take a look at the whole thing.

Q     For two of the handrails, ends of the handrails, it was feasible to fabricate an extension of 12 inches.

Is that fair to say?

A     Possibly. That would require further investigation and working directly with the vendor over the period of months, if not, you know, a better part of a year.

Q     And that wasn't done. I'm going to ask you now some questions.

MR. MORRISSEY: We could take a five-minute break. I need to use the washroom.

(WHEREUPON, a short break was had.)

BY MR. MORRISSEY:

Q     Looking at your Declaration -- can you pull your Declaration up for a second?

A     Yep. I got it.

Q     On Number 6, you say: Based upon the original design plans from 1996 and survey that the County commissioned, the County's belief

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 38

ERIC DAVIS
March 12, 2024

Page 152

and understanding was that the vertical rise in the Cermak ramp was compliant with applicable accessibility laws, codes and requirements.

A    Yes.

Q    Is it your position up till September of 2024 that the ramp was compliant, fully compliant; that was your belief?

A    September of 2024 is six months from now.  What do you mean?

Q    I'm sorry.  As of September -- from 2018, March of 2018 --

A    What you're asking is when we got the LIDAR from the GEC; is that what you're saying?

Q    No.  My question is from March of 2018 when you received Ellen Stoner's assessment up through September of 2023, was it your belief that the Cermak ramp was fully compliant with the ADA?

A    Number 6, it speaks specifically to the vertical rise.  Assuming your question is about that part of it, then I would say, yes, it was my impression that the ramp was compliant within applicable laws, codes and requirements including the tolerances for

ERIC DAVIS
March 12, 2024

Page 153

things like construction variability and cross-slope, which I mentioned previously.

Q    Well, tell me what caused you to believe that up until September of 2023, the tolerance under the ADA would provide some kind of excuse for Cook County to have a rise of over 30 inches for the ramp?

MR. BRANUM:  So he's already answered this question.  It's been asked and answered.  He already talked about cross-slopes earlier in the deposition.

MR. MORRISSEY:  He has not.

BY MR. MORRISSEY:

Q    Can you answer the question?

MR. BRANUM:  Well, he has.  I mean, he can answer it again, but then we need to move on so we're not repeating questions.

BY THE WITNESS:

A    The information that we had indicated that it was 30 inches right down the middle of the ramp, right like the drawing says and that the variances, if I'm using your legal term correctly, were de minimus.

ERIC DAVIS
March 12, 2024

Page 154

BY MR. MORRISSEY:

Q    Do you think that having a rise that's 32 inches .4 is de minimus as far as --

A    No.

Q    -- for an intermediate landing?

A    No, but that's information we had after that.

Q    Is it de minimus if the rise was 30 inches and a quarter?

MR. BRANUM:  Again, I'm going to stop you.

BY MR. MORRISSEY:

Q    In regards to --

MR. BRANUM:  Your use of the term de minimus is a legal conclusion.

MR. MORRISSEY:  The witness used the word de minimus.

BY THE WITNESS:

A    You need to say acceptable.  I think that's what you're getting at; is that right, Tom?

BY MR. MORRISSEY:

Q    No.  I'm saying as an architect, is it de minimus --

ERIC DAVIS
March 12, 2024

Page 155

A    Are you --

Q    -- that the rise --

(Simultaneous speaking.)

THE REPORTER:  I'm sorry.  I need you to speak one at a time.  Tom, can you start over?

BY MR. MORRISSEY:

Q    **** Mr. Davis, as an architect, if the rise of the ramp was 30 inches and a quarter, is that de minimus in regards to the requirement to have an intermediate landing?

MR. BRANUM:  Again, don't answer that question.  It's a legal conclusion.

MR. MORRISSEY:  He used the word "de minimus," Mr. Branum.  I'm asking the question.  I expect him to answer it.

MR. BRANUM:  No.  You're asking him a legal conclusion that's protected under the work product doctrine.

MR. MORRISSEY:  We will certify the question, Mr. Branum, because it isn't.

BY THE WITNESS:

A    Tom, I'm going to substitute the word acceptable --

Exhibit 5 Page 39

ERIC DAVIS
March 12, 2024

Page 156

MR. BRANUM: Well, no. There's no question pending.

BY MR. MORRISSEY:

Q All right. We'll use your term then. As an architect, if the rise of the Cermak ramp was 30 inches and a quarter, is that acceptable as an architect?

A As I said before, it's my -- it was my --

MR. BRANUM: No. Just stop. Again, these are getting to the witness' mental impressions, conclusions related to this litigation, and it's protected by the work product doctrine.

BY MR. MORRISSEY:

Q Is it acceptable that the ramp, the Cermak ramp will remain unrenovated in the year 2024?

MR. BRANUM: Again, you're asking for his mental impressions, his conclusions and opinions related to this litigation and that's protected by the work product doctrine.

MR. MORRISSEY: Work product involves

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 157

an attorney's mental thoughts and impressions, not a person that's a witness in a case, Mr. Branum.

MR. BRANUM: Well, I'm not going to debate the law with you.

MR. MORRISSEY: I would appreciate you not providing these spurious objections.

MR. BRANUM: I'm not going to --

MR. MORRISSEY: If you won't allow him to answer the question, we'll bring it to the Court.

MR. BRANUM: I'm not going to debate the law with you, but you're incorrect that the work product doctrine only applies to attorneys, and that's the privilege we're asserting.

BY MR. MORRISSEY:

Q Going to Paragraph 16 now, you referred to the Cermak ramp renovation as a small project, correct?

MR. BRANUM: Objection to form. Are you referencing a specific paragraph in the Declaration?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 158

THE WITNESS: He said Number 16.

BY THE WITNESS:

A Smaller project, yes, in the scheme of things and the projects that we do, the removal and replacement of a single ramp, concrete ramp, is a smaller project, yes.

BY MR. MORRISSEY:

Q As an architect -- how long have you been an architect, sir?

A I first got my license in the state of Illinois in 1989. So if my math is correct, that makes it 35 years.

Q As an architect, have you been involved with the installation of any ramps in any buildings that you've designed?

A Yes.

Q Approximately how many ramps have you overseen as an architect in 35 years?

A I can't answer that because a ramp is something that comes up fairly often. I have been involved in the replacement of ramps in connection with schools. I have been involved in the replacement of ramps in connection with park facilities. I have been involved with the

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 159

replacement of a ramp in a courthouse. I have been involved in several over the years.

Q For a small project, the Cermak renovation as you described as a small project, how long would it take to demolish the ramp, to break it up?

MR. BRANUM: Objection to the form of the question. Are you talking about this ramp? Are you talking about -- what ramp are you talking about?

BY MR. MORRISSEY:

Q I'm talking about the Cermak ramp. If you were to hire a construction firm tomorrow to demolish the exiting Cermak ramp, how long would that take?

A So I believe that's answered in terms of the total projected duration of the project. The issue in the case of the Cermak ramp is that the ramp, which is approximately 10 feet wide, has to at least continue to allow access to and from the Cermak facility during the course of construction.

As that is the case, it's going to have to be a two-stage project. We're going to

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 40

ERIC DAVIS
March 12, 2024

Page 160

have to cut out half of it and rebuild half of it, put up a temporary partition while the other half remains as is. And then once the first half is complete, we're going to have to open that side and then take out the other side. So we will not be replacing the ramp all at once.

And I want to clarify something earlier. In Item 16, the architectural engineering firm on the smaller projects, that's in terms of the budget of the architectural fees, not the cost of construction.

Q Is the cost of construction in excess of $2 million that you previously testified to?

A I could see that that's around what it ends up being, yeah, something like that. I could see that being the case, 1 to 2. I really don't know.

The problem is we don't know what we're going to find when we take the ramp out.

Q So assuming that this is a ramp not being used by -- at Cook County Jail, how long would it take physically for a construction

ERIC DAVIS
March 12, 2024

Page 161

firm, based upon your background and experience, to tear up that ramp?

A If it was a single ramp and there was no -- and there were no unforeseen subsoil conditions, I would think they could take it out and replace it.

Now, if you mean just in terms of the concrete work, it would have to be done at a certain time of year because we live in Chicago and you can't pour concrete in December, but let's assume you're talking the summertime. I would expect it would take place -- the concrete work could take place -- the demolition concrete work in a matter of months. On the range of, let's say, three to six months.

Q So for just demolition, if you were the general contractor on the project and you had -- you hired a subcontractor to demolish the ramp, tear up the concrete, would that take more than a month to physically take jackhammers and break up the concrete?

A Are you asking about a speculative ramp out in the open or are you asking about

ERIC DAVIS
March 12, 2024

Page 162

this ramp?

Q Well, I'm asking about this ramp. If you --

A Okay. This ramp --

Q -- hired a bunch of -- a subcontractor -- a contractor -- well, let me rephrase it.

If you hired a concrete contractor and you said to the concrete contractor I'm going to task you with the job of just breaking up the concrete on that ramp, how long would you expect it to take just to remove the concrete?

A With the understanding that I'm speculating with somewhat incomplete information, I would note that in the case of this ramp, you are going to have to saw cut the ramp out rather than simply busting it out with jackhammers.

The reason we have to do that is, as I mentioned, on the one side, you're going to have to have a nice clean edge that you can build a wall with to wall off the remaining ramp. And on the other side, you're going to

ERIC DAVIS
March 12, 2024

Page 163

have the existing concrete wall and you don't want to destroy the wall.

So you're going to have to saw cut that. And you can imagine taking a saw up against an existing concrete wall like that, it's going to take awhile. You know, you can't get the blade flat parallel to the wall, right? There's no saw that I know of -- you're going to put the saw right up against the -- so you're going to have to cut it out, and you're probably going to have to hand cut the rest of it.

So, yeah, the demolition in this case is going to take awhile because it has to be relatively precise. It's not just two guys with a jackhammer. It's going to be much more involved.

Q But concrete companies do this all the time, correct? There are concrete companies that saw cut existing ramps.

Is that fair to say?

A There are companies that cut out ramps all the time. I don't know how many of them do it in a jail environment where their

Exhibit 5 Page 41

Page 164

operations are limited. They can't -- one of the problems that you have in working in the jail, every contractor that comes in has to provide what's called a tool list. They have to list every single day for every single person anything that's being brought into and out of the jail, and that gets down to a level of screws and fasteners. It is a very time-consuming effort to get people and material and demolished material in and out of a jail. It's not like a regular construction site.

So are there companies that can do the demolition? Absolutely. Is it going to take longer doing it in the jail? Absolutely.

Q Assuming it wasn't in a jail and you hired --

MR. BRANUM: Well, no. That's not relevant.

MR. MORRISSEY: Well, let me ask the question.

BY MR. MORRISSEY:

Q Assuming the ramp was not in a jail facility, how long would you expect to -- for a

Page 165

general -- for a concrete subcontractor to demolish the ramp, the existing ramp at Cermak?

MR. BRANUM: Calls for speculation. It's an incomplete hypothetical. How long is the ramp? How high is the ramp? How wide is the ramp? What is the ramp made out of? Where is the ramp located? Is it the winter? Is it the summer?

MR. MORRISSEY: Mr. Branum --

MR. BRANUM: How do you expect the witness to answer a question like this?

MR. MORRISSEY: Mr. Branum, the witness, if he doesn't understand the question, I will rephrase it.

BY THE WITNESS:

A For the record, I was just about to ask all of the questions he just asked: How big? How wide? Where? What's the substrate? What time of year? I was going to ask all of those questions.

BY MR. MORRISSEY:

Q All right. Assuming it's a ramp that's 43 feet long and has a rise now of 32 inches .4, and it's similar to the Cermak

Page 166

ramp, give me your best estimate how long it would take a subcontractor to remove the concrete, the existing ramp?

MR. BRANUM: Asked and answered.

BY THE WITNESS:

A Again, is it outside or is it inside a building? If it's in a park and it's 43 feet long, it's going to be easy. If it's inside any other building, it's still going to take awhile.

BY MR. MORRISSEY:

Q You mentioned that it would -- you guesstimate that it would take three to six months for a contractor to remove the concrete and pour the new ramp, correct?

A I think I was answering on the shorter -- I think I was answering the question with the three to six months was if it was an open and unencumbered ramp and we didn't have to cut it in half like we do with this one. I think that was the figure, if it was a ramp in a building, not in a jail and you could take it all out at once and replace it.

Q Assuming you had the funds today --

Page 167

A Yeah.

Q -- how long would it take for a contractor at the jail to remove the concrete and pour new concrete pursuant to a recommendation by Globetrotter?

A I think that's included in the roughly two-year time frame.

Q Well, we're going to get to the two-year time frame that you have here, Mr. Davis.

I'm asking you how long for a small project like this would you expect that it would take the contractor to do the work?

MR. BRANUM: Objection to form.

BY THE WITNESS:

A I think it's going to take -- well, it's certainly going to take longer to demolish it there than in a building that's not a jail. It's going to take longer to demolish a ramp inside a building than one that's not inside a building. I mean, that's why I'm giving you those types of figures. It's a more complicated endeavor.

Exhibit 5 Page 42

ERIC DAVIS
March 12, 2024

Page 168

BY MR. MORRISSEY:

Q   I'm asking for your guesstimate.

A   So are you asking just the demolition portion or demolition and pouring?

Q   Assuming Cook County -- the Cook County Board approves in fiscal year 2025 --

A   Yeah.

Q   -- demolition and construction of the Cermak ramp, how long will the demolition take and how long will the construction take?

A   So I think I said before assuming that we complete the design work sometime in the course of fiscal year '24 and get the pricing underway and we get the Notice of Proposal of Acceptance around the beginning of '25, I would expect that the demolition and construction, the phased demolition and construction of the ramp and the conversion to a walking surface would be accomplished during the course of fiscal year '25 and may extend into the beginning of '26.  So on the order of maybe 12 to 15 months overall but, again, that has to do with -- that's making assumptions about what we do or don't find underneath it.

ERIC DAVIS
March 12, 2024

Page 169

That's making assumptions upon the availability of the space and how long it's going to take in the custody environment.

Q   Now, your Declaration is silent about this transfer package by Globetrotter, correct?  Is there anything in your Declaration where you talk about this transfer package?

A   I don't know.  I don't think I mentioned the transfer package in this.  Yeah, actually, in the case of -- okay.  So in the case of the ramp, HDR is going to serve as the architect of record.  They already have the report that you have about the ramp.  They already know what the scope of that is going to be and what the responsibility -- in fact, we are negotiating the pricing of that right now, about what their proposal is going to be for the design services to serve as architect of record.  So they already have a jump on it.

Q   You didn't answer my question.

A   Okay.

MR. BRANUM:  Yes, he did.  He just answered it.

ERIC DAVIS
March 12, 2024

Page 170

BY MR. MORRISSEY:

Q   I asked you about Globetrotter and the transfer package.

A   Right.

Q   When did they begin the transfer package?

A   I would have to check.

Q   I asked you in the Declaration, is there anything in your Declaration -- well, let me ask you a preliminary question.

Did you include all the steps that Cook County is going to need to take in your Declaration statement?

A   No.  A lot of the process we described have lots and lots of different steps.

Q   You didn't include in your Declaration statement the need for the County Board to include in fiscal year 2025 funds for the construction?

MR. BRANUM:  Objection to form.

BY THE WITNESS:

A   I'm looking up -- I'm looking at my statement here because I believe that -- yeah,

ERIC DAVIS
March 12, 2024

Page 171

we indicated that the subsequent construction will be funded under the same line item, and it will be funded in the same line item in the future CIP, but we're talking about the design right now.

BY MR. MORRISSEY:

Q   So there is nothing in your Declaration in regards to the construction being included in the CIP for 2025 or 2026, correct?

A   I don't know that that was a requirement of what you were asking.  I don't know if it was necessary or not.

Q   Okay.

A   It was an attempt to communicate what's going on.

Q   In your Declaration, there's no indication that a transfer package needed to be completed by Globetrotters before it would go to HDR, correct?

A   No, that's not true.  They are not going to need it in this case.  That's why we brought them on now.

Q   You mentioned that Globetrotters has

Exhibit 5 Page 43

ERIC DAVIS
March 12, 2024

Page 172

not completed the transfer package.

A    Because they're doing the whole facility.  They are assessing the entire Cermak facility, not just the ramp.  But they don't need -- we have their detailed report.  We have the drawings.  We're bringing on HDR because in the case of the ramp, we don't think that it's necessary and just go ahead and do it.  We have the recommendation to replace it.  That's already there, but they're going to need to -- Globetrotters is going to have to do a transfer package for the rest of the building.  They're hired for the whole facility.

Q    Okay.

A    The whole facility.

Q    So part of the holdup is Globetrotter providing a transfer package?

A    No, that is not a holdup.  That is not correct.  That is not a holdup.

Q    So as of September 1st, 2024, Cook County knew or shortly after --

A    You mean '23?

Q    I'm sorry.  I keep confusing years because it's been six years for this project,

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 173

correct?

Would that be fair to say?

MR. BRANUM:  We don't need your commentary, Tom.

BY MR. MORRISSEY:

Q    Well, you have been working on the Cermak ramp for six years; is that correct?

MR. BRANUM:  Objection to the form of the question.

BY MR. MORRISSEY:

Q    You can answer it.

MR. BRANUM:  Well, the -- if you can.  I mean, working on the Cermak ramp, what does that mean?

MR. MORRISSEY:  Let me rephrase the question.

BY MR. MORRISSEY:

Q    Since March of 2018 to the present, whether or not the Cermak ramp was accessible or not has been on your radar.

Is that fair to say?

MR. BRANUM:  Objection to the form of the question.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 174

BY THE WITNESS:

A    We have been proceeding based on the information that we had at each step of the way.

BY MR. MORRISSEY:

Q    So we're into year six.

A    As to the Ellen Stoner report, which you insist on going back to, which is her opinion, based on reading her opinion, we knew she didn't have the full information, and it was -- it seemed at the time that we could remedy the situation by fixing the handrails.

MR. BRANUM:  And just for the record, counsel is laughing.

MR. MORRISSEY:  That's not true, Mr. Branum.

BY THE WITNESS:

A    And that we could fix -- we could bring this ramp into compliance by fixing the handrails, so we did that.  Well, that turned out not to work.

We got more information in each step like getting the LIDAR from Globetrotters.  That revealed information that we didn't have.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 175

So we've had to change course.

It is a complicated circumstance, Counselor.  And so by saying you've been working on it for six years, it implies we've been sitting on our hands, and we have not.

MR. BRANUM:  I'd ask if you ask a question that you respect the witness and the witness' answer and not put your microphone on mute so you can laugh.

BY MR. MORRISSEY:

Q    Is it true that on an emergency basis, certain projects go forth quicker at the Cook County?

A    Yes.

Q    And that's for safety.  When safety is involved, correct, that Capital Planning proceeds on programs that impact safety of citizens, correct?

A    The definition of what does or does not constitute an emergency procurement is at the discretion of the chief procurement officer.

Q    So it's feasible that Cook County, if they were directed by a judge to proceed on an

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 44

ERIC DAVIS
March 12, 2024

Page 176

emergency basis to renovate the Cook County Cermak ramp, there would be a different timetable for the project.

Is that fair to say?

A    No, at this point.  No.  As of today?  No.  We're proceeding the most expeditious way possible.  We already have an architect engaged.  We already have a contractor engaged.  We have a facility that needs to remain open 24/7 365, and we still, even in an emergency procurement, have to do work that is compliant, that is approved for a building permit.

Q    Since September of 2023 when the site inspection was done by Globetrotter, tell me when the first time that Cook County contracted HDR to proceed with design drawings.  When was HDR initially contacted in regards to the Cermak ramp?

MR. BRANUM:  Tom, you might be misconstruing the facts.  So I will object to the form of your question.

BY THE WITNESS:

A    I don't know offhand, Tom.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 177

BY MR. MORRISSEY:

Q    So in Number 16, you say that HDR has been approached to do design documents for the Cermak ramp?

A    Correct.

Q    Was that last month?  Was it in 2023?

A    I don't know when they were identified as the firm we wanted to use.  The task order process is still fairly new and so I can't say -- I can't tell you offhand when specifically they were -- they were identified -- well, obviously they were identified by whenever this was, February 22nd.  But as far as when before that we identified that they would be the one that we would use, I can't tell you when that happened before that day.

Q    When you say that the task process is relatively new, what do you mean?  Was it within the last year?

A    Yes.

Q    In the last -- the last year --

A    Within the last -- the task order contracts were approved last year.  Because of the budget turnover period, the County

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 178

basically goes dark in terms of procurements for a month every year in around mid December to January in order to clean out the year's books and to get into the new books.

But as far as the process of assigning a firm, confirming the scope, getting their proposal, getting their proposal approved, et cetera, that takes awhile.  We've only just recently started getting -- in fact, I just had one today, one of the very first ones today that was actually finally approved by procurement.  We've identified this one as a priority.  The HDR knows it's a priority.  As I said, we're not going to wait for a transfer package for -- from Globetrotters to get HDR going on the architect of record because they understand the assignment.  We're going about as quickly as we can, Tom.

Q    You said that the first project under the task process has just been completed, correct?

A    One of the -- the first ones have only been -- as far as approving the actual projects, once we identify it, define the

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 179

scope, get the architect's proposal, get that proposal approved and issue the Notice to Proceed, yeah, we've only recently gotten the first of those here in the last month or so.

Q    What was that project for?

A    I don't know offhand.

Q    And how long did it take?

A    The first one took longer because we had more steps.  We've cut out a lot of steps to make the process go more quickly.  So I want to say the second, third and fourth ones are faster, and we've got about ten more coming, including this one, that are going to be faster than that.  So it's much quicker than going out to the street for an RFQ, much quicker.

Q    To the best of your recollection, you've had one project that's gone through the task process for design work, correct, and been approved by procurement, correct?

A    No.  No, there's -- I believe there's -- in fact, I had to miss our every-other-week meeting with procurement for this deposition.  So I don't know the latest.  I know that there were ten or so in process.  I

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 45

ERIC DAVIS
March 12, 2024

Page 180

don't know where they are.  If I wasn't in this deposition, I would have a better answer for you because we literally met with them for an update this afternoon.

Q    So the task process has only been implemented by Cook County in the last year, correct?

A    I'm sorry.  I didn't hear the end. Implemented what?

Q    The task process that you're going to attempt to proceed on the Cermak ramp renovation has only been in place for less than a year.

Is that fair to say?

A    Yes.

Q    And there's only been one project that you're aware of that's gone through this task process?

A    No.  I just said, I believe it's approximately four so far, and there may be more depending on the result of the meeting today.

Q    So --

A    This project is in the batch that's

ERIC DAVIS
March 12, 2024

Page 181

currently -- that we're working on.  We are going to be bringing them.

Q    So can you tell me exactly when HDR was contracted to do design work for the Cermak ramp?

MR. BRANUM:  Asked and answered.
BY THE WITNESS:

A    Mischaracterization of the relationship.  They have a contract right now. They've had a -- it's an assignment under a contract.
BY MR. MORRISSEY:

Q    When was HDR first given the assignment to do design work for the Cermak ramp?

A    I would have to check.  I don't know when my first contact with them was.

Q    Was it in September of last year or was it just at the time this Declaration was drafted?

A    No, we've identified them beforehand. I -- I had an initial conversation with them about it and, honestly, I can't remember when it was, sometime in the -- I want to say

ERIC DAVIS
March 12, 2024

Page 182

sometime around the 1st of the year, but I can't remember exactly.

The lead architect is someone that we used to work with on one of our construction management teams, So he's someone that I know and trust.  He's one of the top justice architects in the country, and that's why I wanted them on this project because of the sensitive nature of it, but I can't remember when I talked to him first.

Q    Has HDR given a proposal as far as the architectural fees?

A    We are negotiating that right now. We are working with them on that right now.

Q    When did you first contact HDR to find out what their price would be for this project?

MR. BRANUM:  Tom, you're asking the same question over and over again.
BY THE WITNESS:

A    I've already answered that.
BY MR. MORRISSEY:

Q    Well, your Declaration was on February 22nd, 2024, and you said you were

ERIC DAVIS
March 12, 2024

Page 183

negotiating HDR's architectural fees?

A    Yeah.  It takes awhile.

Q    How long is it going to take just to negotiate the start point for HDR to start designing?

A    They have to get their arms around -- I expect it will be consummated here pretty soon.  They have to get their arms around the specifics of the requirements.  I don't think they have been to the site yet.  Matt has been there before, but I can't remember -- I don't think they have done their site walk yet.  What we want to do is rather than doing it in a two-step process, Tom, we want to take the contractor, as I mentioned here, and have them go ahead and walk it with the architects so the contractor can start getting familiar with it so they can start understanding it from the standpoint of pricing.  So rather than doing things sequentially, we are trying to accomplish things simultaneously.  I don't think they've done their site walk yet with the contractor.

Q    So you've known since September of

Exhibit 5 Page 46

ERIC DAVIS
March 12, 2024

Page 184

2023 definitively --

A    No, no, no.  September -- no, no, no, no.  That's not true.  What you said -- you're referring to when GEC went to the site, okay, by your own discussion earlier and you put up the two dates that GEC went and walked the site.

It was only after that that we made a determination that we needed to do this.  So September is your characterization.  I don't know when we got the LIDAR back.  I would have to check.  I don't know when we made a determination, yeah, okay, we're going to have to take it out.  We're going to have to get somebody.  That's your characterization.

Q    Well, let's just put it this way: Six months after the final site check by Globetrotter, the firm that you hoped to negotiate a fee with, HDR, still has not gone out to the site to see the Cermak ramp.

Is that fair to say?

A    We didn't know they were going to need to necessarily in September.

Q    But is it fair to say that since the

ERIC DAVIS
March 12, 2024

Page 185

final site inspection by Globetrotter on September 1st, 2023 up until today, the architectural firm that you intend to negotiate a fee with still has not been out to the site?

MR. BRANUM:  Tom, you're asking a loaded question and you're baking an assumption into your question that you're asking the witness to adopt, and the witness has already told you he doesn't adopt your assumption.  And he's clarified exactly what's wrong with your question, so he's provided a response to it.

MR. MORRISSEY:  Mr. Branum, that's a speaking objection.

BY MR. MORRISSEY:

Q    Do you understand --

MR. BRANUM:  No, it's not about -- yes, he understands your question and he understands that your question contains a false premise.  He has already explained the false premise that you baked into your question.  So he's telling you he's not adopting the way you're characterizing it.

MR. MORRISSEY:  Okay.  Let me

ERIC DAVIS
March 12, 2024

Page 186

rephrase the question.

BY MR. MORRISSEY:

Q    Is there any doubt in your mind, Mr. Davis, that the final site inspection by Globetrotters was on September 1st, 2023, which is in their report?

A    You say final?  I don't know if they did or didn't go out to the site after that.  They may have.

Q    As of March 13th, 2024, you're not aware of HDR going out to the jail to inspect the Cermak ramp?

A    That's correct.

Q    And prior to bidding on a price for doing the design work for the renovation of the Cermak ramp, HDR is going to have to do a site visit?

A    Yes.

Q    To your knowledge, has a date been set with members from HDR to go out and do a site inspection?

A    I've directed our project director to set that up.  I don't know if it's been set up yet.

ERIC DAVIS
March 12, 2024

Page 187

Q    Do you anticipate in the next week that there will be a site inspection by HDR?

A    Yes.

Q    What has been the holdup for HDR to do a site inspection?

MR. BRANUM:  Objection to your characterization.

BY THE WITNESS:

A    Holdup?  I don't know -- I don't accept holdup.

BY MR. MORRISSEY:

Q    All right.  So did you contact HDR in January of 2024 about this Cermak ramp?

A    I don't remember when I contacted them first.

Q    Pardon?

A    I don't remember when I spoke to them first about it.  I honestly don't.  I don't remember when I talked to them first about it, but it wouldn't make any sense.  They're reviewing the documents, the report that you have, which was from December, right?  The report was -- the conclusion wasn't until December.  So they're reviewing that document.

Exhibit 5 Page 47

ERIC DAVIS
March 12, 2024

Page 188

They're reviewing the information like the original design plans. In fact, one of the things they are doing now is arranging to get ahold of the original design plans for the building. They want to have those plans in hand before they go out to the site, right? I mean, they would want to have the original drawings before you go out and look at it.

So they're already making arrangements to get the drawings from the Department of Facilities Management so that they have the information before they go out to the site, and I totally expect them to be out there within the course of approximately a week, yes.

You don't want to -- you know, if the starting gun was December, and let's just assume that it. As I said, I don't know if that's the final report that we're looking at. But if the starting gun was December, they need to get the information. They need to review it. We need to figure out -- you know, it's -- we're moving as quickly as we can.

Q    So who is responsible for Cook County

ERIC DAVIS
March 12, 2024

Page 189

to negotiate a fee agreement with HDR?

A    Our department reviews the fee proposals, and then submits them to the chief procurement officer for their review.

Q    My question is who from Capital Planning would receive the fee request from HDR?

MR. BRANUM:  Well, you said my question was, and then you completely changed your question.  So it's a new question.

But go ahead.

BY THE WITNESS:

A    So the initial proposal will probably come to me and to our project director and to our -- the project manager from our construction manager at the same time.

I would expect that our construction manager will first review it based upon their understanding of the level of effort required, and the project director will then make a recommendation to me to say, hey, I'm the head of the portfolio.  You know, hey, this looks like this is good.  Can we finalize this and

ERIC DAVIS
March 12, 2024

Page 190

send this to procurement?  Okay.  It goes over. If everything checks out and they are following the applicable requirements, they issue the Notice to Proceed to the vendor.  I'm sorry.  They issue the proposal approval to the vendor.  We issue the Notice to Proceed.

BY MR. MORRISSEY:

Q    Who is the construction manager for Cook County?

MR. BRANUM:  Asked and answered.

BY THE WITNESS:

A    The Department of Capital Planning and Policy.

BY MR. MORRISSEY:

Q    Right.  You mentioned that somebody under you would review the request by HDR --

A    Yes.

Q    -- for their fees?

A    It will probably be the design manager for our construction management team which are consultants.

Q    And who is that person?

A    His name is Michael Goss.  He's a licensed architect.  He's going to look at it

ERIC DAVIS
March 12, 2024

Page 191

and then Brad DeRoo who is our Cook County Department of Capital Planning project director who is also a licensed architect is going to look at it.  They are going to make a recommendation to me, and then we are going to advance it from there.

Q    When do you reasonably expect that HDR will provide you with a fee request for doing the design work for the Cermak ramp?

A    Fairly quickly.

Q    Well, by "fairly quickly," do you mean two months?

A    Oh, no.  No.  Less than a month.

Q    That's after they do the site visit, correct?

A    Yeah, less than a month.

Q    Have they told you --

A    Probably on the order of two weeks.

Q    Have you gotten a representation from anybody from HDR that they will give you their price for doing the work prior to April 1st, 2024?

A    I don't think they made a representation one way or the other, but that

Exhibit 5 Page 48

ERIC DAVIS
March 12, 2024

Page 192

sounds about right.  Let's assume that they go in the next week or so, so that would be about the 20th.  Early April, yeah, I think that's probably reasonable.

Q    Has HDR told you that they are willing to do this project --

A    Yes.

Q    -- for Cook County?

A    Yes.

Q    They haven't provided a fee to Cook County for doing their design work, correct?

A    They already have a contract.  Their contract is for $2 million in fee.  This project fee is less than $150,000.  They are perfectly comfortable doing the work.

Q    How do you know that when HDR gives you their -- you say you're negotiating. Suppose HDR says it's going to cost $160,000 to design this project.  Does that get accepted by you or do you negotiate?

A    I don't think it's going to take that much.

Q    Well, suppose that it does.  Suppose that it's 160,000.

ERIC DAVIS
March 12, 2024

Page 193

MR. BRANUM:  Well, Counsel, if you're just making up facts now.

He's answered the question.  He said it's not going to be 160,000, so that's your answer.

BY MR. MORRISSEY:

Q    You say that -- in your Declaration, you make the affirmative statement that you're currently negotiating with HDR (inaudible) --

A    Yeah.

(Simultaneous speaking.)

THE REPORTER:  I'm sorry, Tom.  I didn't hear the last part.

BY MR. MORRISSEY:

Q    You say in your Declaration that the County is currently negotiating with HDR architectural (inaudible) --

A    Yeah.

THE REPORTER:  Tom, I'm sorry.  I didn't hear it again.  Mr. Davis, if you can just hold back your --

BY MR. MORRISSEY:

Q    Sure.  Your statement says under Paragraph 16:  The County is currently

ERIC DAVIS
March 12, 2024

Page 194

negotiating with HDR Architects -- Architecture's fees.

You have not received any requests from HDR as far as moving forward with the design work?

Is that fair to say?

MR. BRANUM:  Objection to form. Mischaracterizes previous testimony.

BY THE WITNESS:

A    You have to have the information in order to submit a fee.

BY MR. MORRISSEY:

Q    They have not submitted a fee to you, correct?

A    Correct.  They have not submitted a fee.

Q    So there hasn't been -- at this stage in your relationship with HDR, there has not been any negotiations as of yet in regards to their fee for this project?

MR. BRANUM:  Objection, mischaracterizes --

(Simultaneous speaking.)

ERIC DAVIS
March 12, 2024

Page 195

BY THE WITNESS:

A    It is the gathering of information to be part of negotiating the fee.

THE REPORTER:  I'm sorry.  Can you say it one more time, Mr. Davis?

BY THE WITNESS:

A    I consider their gathering information to be part of the fee negotiation. We've identified an assignment for them.  They are evaluating what they are going to need. They're gathering information so they can present a fee.

I think what you are getting at here is to undermine that -- the characterization of the overall timeline for the project.  I think that's incorrect.  We stand by our estimate of how long this project overall is going to take.

BY MR. MORRISSEY:

Q    You say it's under the task order basis, correct?

A    Yes.

Q    Is HDR, for whatever reason, free to say, Mr. Davis, we're swamped with work and we prefer not to bid on this job?  Under the task,

Exhibit 5 Page 49

ERIC DAVIS
March 12, 2024

Page 196

can they -- can they decline to bid on it?

MR. BRANUM: Objection to form.

BY MR. MORRISSEY:

Q    Yes or no?

A    Do they have the ability to decline the project?  Yes, they do.  Does the person involved, the principal in charge, understand the importance of this assignment?  Yes, he does.  Does that person have my trust?  Absolutely.

Q    And then it says under that same sentence:  The County is currently negotiating with HDR architect fees and will issue a Notice to Proceed with design after negotiations are complete.

What is a Notice to Proceed?

A    When a proposal has been reviewed by procurement, they notify us that it's the Notice of Proposal of Acceptance, NOPA, which I mentioned before.  They issue that to the department, us.  They say the proposal is acceptable.  There are a couple of things that are minor, specific, replacing a line on an insurance form, a couple of things like that

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 197

that have to happen and then you -- because the final amount has to be in there.  And then you issue -- the department issues the Notice to Proceed and says you can start work.

Now, in this case, because they understand, they will probably be digging in a little more already anyway because, as I said, they're already under contract.  So I don't expect that to be a lengthy period but the department issues the Notice to Proceed.

Q    So in order -- before HDR can put pen to paper or use a computer nowadays to design the ramp, the procurement office has to issue a Notice to Proceed?

A    No.  The procurement office issues the Notice of Proposal Acceptance.  The Department of Capital Planning issues the Notice to Proceed.

Q    You said Notice of...

A    Proposal acceptance, NOPA.

Q    So before HDR can begin designing the renovation of the ramp, there has to be a Notice of -- is it Proposal?

MR. BRANUM: Counsel, he just

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 198

answered that.  If you can't understand his answer, that's not the purpose of the deposition.  He just told you what it was.  So you can't just repeat it over and over again just because you don't understand it.  He's answered the question.

BY MR. MORRISSEY:

Q    My question is in order for HDR to begin work, the procurement office has to approve it, correct?

MR. BRANUM: Counsel, you just misstated what his testimony was, and he's already told you the requirements.

BY MR. MORRISSEY:

Q    You can answer the question.

MR. BRANUM: Well, it's been asked and answered.  You can answer it again, but then we need to move on.

BY THE WITNESS:

A    The reality of the circumstance, Tom, is that in the course of reviewing the scope of the project, we've already talked through with them the possible scenarios for implementing what Globetrotters has recommended in terms of

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 199

extending the ramp.  We've talked about the specific configurations with them.  We've talked about whether or not we should be -- the geometry of -- there's a turn involved at the bottom of the ramp when it becomes a corridor.  We've talked to them about the need to raise the door that is inhibiting us from doing the handrail extensions.

So we've already talked to them about significant elements of the design work that needs to happen.

So if you want to say they're not going to start work until they start doing stuff in the computer, okay.  But the reality is they've already started thinking about it, and they have to do that in order to give an adequate extension of the fee because they have to understand what they're going to have to do.

We've already talked about the salient issues in this project with them.  They understand that already.  They're already working on a solution even though they don't have that to figure out how to -- the specifics of the assignment.

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 50

ERIC DAVIS
March 12, 2024

Page 200

BY MR. MORRISSEY:

Q  My question, from a County procedure, it has to go through the procurement office?

A  Correct.

Q  And that hasn't been done yet, correct?

A  Correct.  But that doesn't mean they haven't started looking at it.

Q  How long after -- how long again do you anticipate negotiating with HDR in order --

A  As I said, I expect that to be done within a month.

Q  So we're into May now, May 2024.

A  No.

MR. BRANUM:  Well, you're mischaracterizing his testimony.

BY THE WITNESS:

A  No, no.  The negotiations are before the proposal approval.  The negotiations are now.

BY MR. MORRISSEY:

Q  You haven't received one iota from HDR in terms of how much they are going to charge as far as a fee for this project?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 201

MR. BRANUM:  Can you define "iota"?

BY THE WITNESS:

A  Have we received their initial proposal for the time it's going to take them?  No, we have not.  Have they started work figuring that out?  Yes.

BY MR. MORRISSEY:

Q  How do you know that?

A  What?  Because I've had conversations with them about it.  They ask questions.

Q  Now, in Number 17, you state:  To expedite construction.  Is there any other -- you consider this the most efficient way to move this project forward, through the JOC program.

Is that fair to say?

A  Absolutely.  That's why you do job order contracting.  It's whole sales premise is that it's a faster way for government to acquire construction.  That's why they're in business.

Q  So CREA is a construction firm, correct?

A  That's correct.  That's one of our

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 202

contractors.

Q  And they have not done a site inspection?

A  They have not.  As I said, I'm trying to get that set up too.

Q  They haven't provided any pricing to Cook County in regards to renovating the ramp, correct?

A  No, they have not yet.  That's a part of the process.  That's in the timeline, included in the timetable.

Q  CREA Construction is free to bid on it or not bid on it, correct?

MR. BRANUM:  Objection to form.

BY MR. MORRISSEY:

Q  Under the JOC program, they don't have to bid on doing the ramp at the Cook County Jail, correct?

A  First of all, it's not a bid.  It's a slightly different way of approaching construction procurement.

So when you use the word "bid," Have they bid yet?  It's not a bid.  They're not competing on a price basis against somebody

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 203

else.  So that's one thing.

Can they say, yeah, we don't want to build the ramp?  They could.  I would be very surprised if they did, but they could.  It would be highly unusual if they did.

Q  Now, under the JOC program, you mentioned that this project could exceed 1 million or $2 million to renovate the Cermak ramp.  You just don't know, correct?

A  Correct.

Q  And part of -- the funding for this would come from the CIP for 2025 or 2026, the million dollars that it will cost?

A  It will be included in the 2025 CIP recommendation that we forwarded to the president.

Q  At present, you don't know how much, whether it's a million dollars or $2 million for this project?

A  Correct.

Q  It could be $3 million, correct?

A  I would be very surprised if it was that much.

Q  Now, since September of 2023, have

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 51

ERIC DAVIS
March 12, 2024

Page 204

you sat down with the Sheriff's Office in regards to this project?

A    What do you mean have I sat down with the Sheriff?

Q    Well, since September of 2023 after the site inspections were done by Globetrotter, have you or anybody under you sat down with representatives from the Office of the Sheriff?

A    We have -- as I said before, we have had meetings with them on an ongoing basis as a part of the Globetrotters' work.  They are in most, if not all, of the calls with them between, as you say, September and the report that was issued in December.

So have we been -- have we -- does that constitute sitting down with them as you're referring to?  Are you talking about a separate meeting away from Globetrotters?  Because they have been involved in multiple meetings in this assessment during that period.

We also include mention of it in our monthly meeting with the Sheriff's Office.  So the Sheriff's Office has been contacted multiple times in that period about this

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 205

project.

Q    During the monthly meeting with -- what do you call the monthly meeting with the Sheriff in regards to Capital Improvement Projects?

A    We call it the monthly meeting with the Sheriff on capital projects.

Q    Is the Cermak Health facility included in those meetings?

A    Yes.

Q    Is the Department of Facilities Management included?

A    They're in those meetings too, yes.

Q    Who else is included in the monthly meetings?

A    We oftentimes also cover projects for the Office of the Chief Judge in that same meeting.  So sometimes we'll do the OCJ stuff at the beginning of the meeting, and then we'll talk with the Sheriff for the balance of the time.  But it's Capital Planning.  It is -- it's Capital Planning.  It's Facilities Management.  It's the Sheriff.  Sometimes it's real estate if there's a project involving a

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 206

purchaser or lease of real estate for them, you know, or if it's modifications of office space, that kind of thing, real estate will be in that.  So it's multiple departments.

Q    Now --

A    And the reason that I know that you know about these is that you put a page from the minutes of one of those meetings in front of me in a prior deposition.  So I know that you know about those meetings, Tom.  Let's not kid ourselves.

Q    So from 2018 to the present, in the monthly meetings with the Sheriff and Cermak and Facilities Management, have you been discussing the renovation of the Cermak ramp?

A    Yes.

Q    And in regards to -- you've testified that you have no input in regards to the operations at Cermak nor at the jail.  You are not in charge of operations there?

A    That's correct.

Q    Have you discussed with the Sheriff or Cermak personnel using other -- some other entrance to the Cermak building other than this

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 207

ramp during the course of construction?

A    That would be highly impractical.  It would require taking detainees outside in the rain or snow.  I couldn't imagine advocating that they do that.

Q    My question is have you discussed with the Sheriff's Office the possibility of during the renovation of the ramp using other entrances to Cermak?

MR. BRANUM:  Asked and answered.  You can answer again.

BY THE WITNESS:

A    Other than -- I don't think we've, for example, have said to them, hey, would it be okay if we just had you bring everybody in the front door.  That seems so wildly impractical.  I can't understand why we would ask them that.  Might it have come up in a conversation?  Possibly.  But I couldn't see us recommending that because of the weather.

Q    Well, are you aware that Cermak has loading docks where prisoners are brought in and out of Cermak all the time?

A    Yes.

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 52

ERIC DAVIS
March 12, 2024

Page 208

Q    That happens on a daily basis?

A    Yes.

Q    Inmates come in and out of the Cermak building through the lower loading dock area or the sally ports?

A    You mean the ground floor loading area?

Q    Right.

A    Yeah.  So they come from other jurisdictions.  They come from Division 11 because they have to get driven there across the street.  But they are not driven there from Division 5, and they are not driven there from Division 4, and they're not driven there from the RTU.  So I'm not sure what you're asking.

Q    Well, they do come from Division 11, correct?

A    That's across the street.

Q    Right.  So do you know if it's -- have you explored with the Sheriff whether it's feasible to bring -- for inmates that need to go to Cermak Health Service that they can be brought in from either -- some other entrance to the building?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 209

A    It seems wildly impractical on the face of it, but I can't recall having a conversation about that option.

Q    Have you discussed with HDR whether it's feasible to construct the alteration of the Cermak ramp in two phases, one side of the ramp at a time --

A    Yes.

Q    -- while allowing a pedestrian access?

A    You mean constructing one side while the other side is still open?  Yes.  We talked about that specifically with them, yes.

Q    Do you know whether or not that's feasible or not before design work is done?

A    On the face of it, it is feasible.

Q    My question is before -- you mentioned in here, barring any unforeseen conditions, that it may take more than you say 56 weeks or 24 months.  I don't know what -- what you say in Number 19, but is it conceivable that the -- you cannot construct it one side at a time?

MR. BRANUM:  So hold up.  You're

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 210

misrepresenting his Declaration.  So you just combined the construction of the ramp in two phase, two sides, with the unforeseen conditions language and those are in separate paragraphs, talking about separate things.  So you completely misrepresented the Declaration.

If you want to ask a clean question that doesn't misrepresent the document.

MR. MORRISSEY:  Mr. Branum, I'm going to move on.  I'm not going to comment about you.

BY MR. MORRISSEY:

Q    In Paragraph 9 [sic] you say: Barring any unforeseen conditions that may arise during demolition or removal of the exiting ramp.

MR. BRANUM:  You said Paragraph 9?

MR. MORRISSEY:  19.

MR. BRANUM:  Oh, 19.

BY MR. MORRISSEY:

Q    So is it an unknown whether or not you can construct and alter the Cermak ramp one

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 211

side at a time at this stage of the process?

A    I don't know anything that would preclude that.  The unforeseen conditions reference is about the feasibility of constructing the new, not about removing the old.

So if we get down there, for example, and let's say that there's been water getting in there, and it has eroded away the soil underneath the existing Cermak ramp and there's a void down there.  Well, that would require us to get in, do some geological testing, probably bring in additional fill, do what's called engineered fill before you can come back and pour the rest of the ramp or it might be fine. We have no idea.

Q    So let's assume that there's a void. Let's assume that the ramp is -- there's a void underneath the ramp --

A    Yeah.

Q    -- and it's not possible to do it piecemeal.  That's an unforeseen condition?

A    I didn't say that.  The void would just mean that it would take longer to build

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 53

ERIC DAVIS
March 12, 2024

Page 212

that side.

Q   In Paragraph 19, you say:  The County expects the design work to be completed, to obtain the permit and begin removal and replacement of the ramp this year.

Now, based upon -- you mentioned that you were involved in another ramp at the Cook County Jail, correct?

A   There was a replacement of a ramp from the tunnel into the Leighton courthouse that occurred while I was here.  I wasn't really directly involved in that one.

Q   How long did that take?

A   As I said --

MR. BRANUM:  Objection --

BY THE WITNESS:

A   -- I wasn't directly involved.  I don't recall.

BY MR. MORRISSEY:

Q   During that period of time, was the ramp closed off to your knowledge?

A   To my knowledge, they did it exactly the way we are talking about this one.  They built half of it, and then they built the other

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 213

half.

Q   By "half," there's two ramps actually to the Leighton court building, correct?

MR. BRANUM:  Objection to form.

BY THE WITNESS:

A   There's the main ramp into the building, and then the ramp splits and goes like this (indicating).  So the configuration is a little different.

BY MR. MORRISSEY:

Q   And you have no knowledge how long that ramp took?

A   Not offhand.  Although I do know that our construction management team that helped us assemble the estimate of the duration for the project did consult with people that were involved in that project when they came up with this number.

Q   In regards to Globetrotters, why did it take almost two years to -- from the point of asking for a request for a proposal -- I'm sorry.

From the time that there was a request for a qualification, I believe that was

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 214

in early 2021 or '20 until the Globetrotters' report was finally tendered in December of 2024, why did it take so long just to get an assessment by Globetrotters?

A   I don't think your starting time is correct.  I will have to look but I don't -- that doesn't sound right.

Q   Well, give me a moment.  I will find out specifically what it was.

MR. BRANUM:  Well, I've got to take a short break.

MR. MORRISSEY:  All right.  We will take a five-minute break, and I will come back with the (audio muted).

(WHEREUPON, a short break was had.)

BY MR. MORRISSEY:

Q   All right.  We are going to show you an exhibit in regards to when Cook County initially started an RFQ for design services.

MR. BRANUM:  And what Exhibit Number is this?

MR. MORRISSEY:  It's 103.

Exhibit 103.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 215

MR. BRANUM:  I don't have that exhibit.

MR. MORRISSEY:  Well, it should be coming to you momentarily.

BY MR. MORRISSEY:

Q   Mr. Davis --

MR. BRANUM:  Well, hold up.  I don't have the exhibit yet.

BY MR. MORRISSEY:

Q   Do you see that on the screen --

A   No.

Q   -- Exhibit 103?

A   No.

Q   Now do you see this document which is Exhibit 103, Exhibit 103, Cook County Government --

A   Yes.

Q   -- Office of Chief Procurement Officer.  My question is in January of 2020, did you begin the process of seeking out architects to do an assessment of the Cermak ramp to see whether or not it complied with the ADA standards?

MR. BRANUM:  And before you answer

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 54

ERIC DAVIS
March 12, 2024

Page 216

that question, has this exhibit been produced in the case?

MR. MORRISSEY: Yeah, it was in his first deposition, Mr. Branum.

MR. BRANUM: Okay. Continue. I just wanted to make sure. Continue.

BY MR. MORRISSEY:

Q    Do you understand the question?

A    No. I'm sorry. I didn't pick up on the question. I just --

Q    Okay. So the question is in January of 2020, did you begin the process of trying to obtain an assessment of the Cook County Cermak ramp?

A    So what you're putting on the screen appears to be the cover page from an RFP, and I think it's significant to say RFP, for what is listed as improvements of the DOC campus. I don't know if this -- hold on. Go to Page 3 there.

Q    All right. I will you scroll down.

A    Keep going. Right there. Okay. Now, let me see. Oh, yeah. This was long ago. Yeah, this was long ago. Okay. Yeah.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 217

Q    So my question is back in January of 2020 --

A    Yeah.

Q    -- did you, as the person in charge of this renovation of the Cermak ramp, did you begin this process of seeking out or getting approval to hire an architect to assess whether or not the RTU -- RT -- the Cermak ramp complied with the ADA?

A    So a couple of things to note. This is a request for proposal. And if you look in the first paragraph there, this is a proposal to prequalified firms.

And if you look at RFP Number 1855, that was a pool of architects and engineers that were identified by the County and then it's called a prequalified pool to do this work.

Between the time that this document which is a request for proposal was developed, it's my recollection that somewhere in that period after this was issued, a determination was made by the procurement office that they wanted, first of all, not to use the pool

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 218

anymore because it was taking too long; second of all to -- instead of doing a request for proposal to do a request for qualification.

We did not at the time -- this was after, Tom, you may recall, the inability to achieve the Cermak ramp, and Cermak specifically, through the task orders in 2019.

So this was an attempt to procure these services in 2020 through the prequalified pool on a proposal basis.

And somewhere along the line, the procurement office decided that they wanted to go to an RFQ format, which was different than an RFP. And so we had to -- this procurement never made it to market. We never got proposals on it. This never got consummated as a contract, and I also --

Q    Did you --

MR. BRANUM: Hey, Tom. Don't interrupt him.

BY MR. MORRISSEY:

Q    I was just going to ask you --

MR. BRANUM: Tom, no. Don't interrupt him.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 219

BY THE WITNESS:

A    I would also note that the first sentence is for ADA improvements at the DOC campus. I believe, if my memory serves correctly, this was for the design for ADA improvements across the entire campus and not specific to Cermak.

Now, maybe it was. I don't think this was broken out just for Cermak. My recollection was that we were looking at wanting to do the whole campus which is a much larger undertaking.

Somewhere along the line the determination was made that we weren't going to secure the services this way, and that's why we went for the RFQ specific to Cermak, which is how Globetrotters was hired.

So somewhere in that period after this was developed and the dates that you saw were on there, the determination was made to not pursue and obtain the services this way.

BY MR. MORRISSEY:

Q    On this Document 103, on Page 7, Scope of Services --

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 55

ERIC DAVIS
March 12, 2024

Page 220

A    Yes.

Q    -- does it include the Cermak Health Service building?

A    It's one of them, yes.  But as you notice, that's one of seven packages assessing almost the entire campus, which is a very large undertaking.

Q    All right.  So part of this package --

A    Yes.

Q    -- in January of 2020 included Cermak in and the Cermak ramp.

Is that fair to say?

A    Yes.

Q    And you hit a roadblock then.  The procurement office said we are not going to do this, correct?

MR. BRANUM:  Objection to your characterization.

BY THE WITNESS:

A    That's my recollection of how -- of -- that they decided they wanted to go to an RFQ format and not use the prequalified pool.  What you're showing is a void.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 221

BY MR. MORRISSEY:

Q    In 2019, the task method was rejected either by the procurement office or the County Board or both, correct --

A    Yeah.

Q    -- in order to renovate the ramp?

A    Weren't able to do it through the task orders in '19.  Weren't able to do it through the pool in 2020 or '21.

Q    So finally in April of 2022, you tried to do it and you successfully did it through a request for qualifications, correct?

A    Correct.

Q    And that took how long before you got approval of allowing Globetrotter to bid on assessing the Cermak ramp?

A    My recollection is that procurement took over a year.  So that would have put the completion of the contract in the middle of '23 at that point before they actually had an approved Notice to Proceed.

Q    So it took from April of 2022 to mid 2023 before you could even negotiate with Globetrotter on a price to do the assessment of

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 222

the Cermak ramp.

Is that fair to say?

A    No.  By the middle of '23, we had -- I think whenever that was.  I want to say it was around June.  It may have been later.  You know, we were going to do the whole building once, right?  So -- but their fee was already in that by -- that period includes their fee negotiations.

Q    Okay.  And would it be fair to say to wrap this up that you've done your best efforts through the task program, through the proposal program and now through the request for qualification to get an assessment of the Cermak ramp, whether it's successful or not, correct?

A    Understanding that the situation and parameters evolved over that time, yes.

Q    And during that three- or four-year period, you had expectations that this process would take a shorter period of time, correct?

MR. BRANUM:  Objection to form.

BY THE WITNESS:

A    Are you asking me if it turns out

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 223

that bureaucracy takes time?

BY MR. MORRISSEY:

Q    Well, I'm asking you that you gave projections --

A    Yeah.

Q    -- previously that turned out to be false in regards to your ability to get Globetrotter or a firm on hand to do the assessment of the Cermak ramp, correct?

MR. BRANUM:  Objection to the form of the question, misstates previous testimony.

BY THE WITNESS:

A    Which is also why we've gone and successfully obtained the task order architects of which HDR is one, and we're using the JOC process, which is a faster way of constructing it.  So did it take a long time?  Yes.  Have we undertaken measures to expedite and increase the certainty that we would actually get the work done?  Yes.

Q    So your previous expectations or timetable that you've given in several depositions in this case have not panned out.

Is that fair to say?

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 56

ERIC DAVIS
March 12, 2024

Page 224

MR. BRANUM:  Objection to the form of the question.

BY THE WITNESS:

A    You would have to tell me specific cases and depositions, Tom.  You guys sue us all the time.  I have trouble remembering which deposition in which case.

BY MR. MORRISSEY:

Q    Now, it's your testimony today that you, individually, are fully invested in following through with Globetrotters' recommendations to make the Cermak ramp comply with the ADA, correct?

A    It is my 100 percent commitment to work diligently, consistently and as fervently as I can to achieve that recommendation which I would note converts it from being a ramp to being a walkway, but I'm absolutely committed to trying to make that happen as expeditiously as possible.

Q    And in your capacity as an employee of Cook County, you're not in a policy position where you can commit Cook County to any timetable for completion of the renovation of

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 225

the Cermak ramp?

MR. BRANUM:  Objection to the form of the question.

BY THE WITNESS:

A    So the first part of your question asks if I'm in a policy position, and the answer to that question is yes.

So if you want to rephrase the second part of your question.  To be able to achieve things in time, I think I've indicated that there are still unknowns in this project that may alter the timetable.

However, as I also mentioned, we have endeavored to develop and achieve ways like the task order contracts that we have now through which HDR has been hired, and he is working on their fee, to increase the certainty likelihood and decrease the duration of achieving the project.

BY MR. MORRISSEY:

Q    You mentioned that there's certain unknowns about your ability.  Even though you're personally committed, and I appreciate that, what are the unknowns as far as

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 226

projecting a commitment from Cook County to do this project, renovating the Cermak ramp?

MR. BRANUM:  Objection.  You're misstating his testimony.

BY THE WITNESS:

A    Well, but if I understand your -- as you've covered in the course of this deposition, the Cook County Board approves the Capital Improvement Plan.  While I have never seen any instance of them cancelling a project through that process, do they have that right and opportunity?  Yes, they do.  I can't control that.  I think it's highly unlikely, but I can't control that.

Is there a possibility, which you've asked before in this deposition that the procurement office could reject either the construction or the design proposals when they come to them?  I suppose it is but that will be a first.

You know, so as far as uncertainty is concerned, can I absolutely guarantee it?  No.  Are we setting -- am I involved in setting up the policies to expedite it?  Yes, absolutely.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 227

BY MR. MORRISSEY:

Q    If a -- are you open to assistance to expedite this process to get it through the County Board in an expeditious manner?

MR. BRANUM:  Objection to the form of the question.

BY THE WITNESS:

A    Expedite getting it through the Board?  I mean --

BY MR. MORRISSEY:

Q    Well, let me rephrase the question.

A    Most people that try to do that end up in prison, Tom.  I wouldn't recommend it.

Q    Give me one moment.  I thank you for your time today, and I'm sure we'll meet again soon, I think, about the RTU and Globetrotters' report, but that's coming soon, I assume, on your radar --

MR. BRANUM:  All right.  I've got a few questions.

BY MR. MORRISSEY:

Q    -- would that be fair to say?

MR. BRANUM:  Well, he is not going to talk about that.  So I have got a few

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 57

ERIC DAVIS
March 12, 2024

Page 228

questions.

C R O S S - E X A M I N A T I O N

BY MR. BRANUM:

Q   Earlier counsel was asking you about the decision to renovate the Cermak ramp, and I know the word intent came up a few times as far as what the County intended to do, and I just want to be clear.

Renovating the Cermak ramp is more than an intent because there's steps that have already been taken toward that goal, correct?

A   Yes.

MR. MORRISSEY:  Mr. Branum, I'm going to object.  It's leading and you're trying to put words in the deponent's mouth.  So it's an improper question.

BY MR. BRANUM:

Q   Isn't it true, Mr. Davis, that it's more than an intent?

MR. MORRISSEY:  Mr. Branum, I think that's leading and it's improper.

BY THE WITNESS:

A   If you're asking have there been steps taken to make the outcome more likely,

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 229

absolutely.  You know, the intent in that case is a shorthand for that's the direction that we're going.  So, yes, absolutely there have been additional steps taken.

BY MR. BRANUM:

Q   Right.  That's the direction it's going, and that's the steps that are being taken.

What I was trying to say it's not an intent as if we're going to do it, but we haven't decided yet?

A   Yeah, I think that's fair to say.  We are doing it, yes.  If you want to say that, you know, at the time of the -- that we have an intent, you know, yes.  But I don't want to over-characterize and say -- you know, as I said, because of those qualifications.  I can't 100 percent say we are, but, yeah, that's where we're going.

Q   Let me share my screen.  Give me one second.  And I have got your Declaration on the screen.  It's Exhibit 1.  We will go to Paragraph 15.  It says:  The County has accepted GEC's recommendation to remove the

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 230

existing concrete ramp and re-pour it.

So the decision has already been made to renovate the Cermak ramp?

MR. MORRISSEY:  Objection, leading.

BY THE WITNESS:

A   Has that decision been made?  Yes.  Because I've said the County has accepted the recommendation.  That is the recommendation.  We have proceeded as I mentioned with getting a proposal from the task order architect to implement that recommendation.  We are making arrangements with the contractor to construct that recommendation.  So, yes, we are going forward with that.

Q   Plaintiff's counsel also asked you questions about the procurement process.  Is the procurement process a necessary step to renovate the Cermak ramp?

A   Yes.

Q   And why are you going through this, the procurement process?

A   There is a large lengthy and complicated body of laws around how governments are and are not allowed to spend money.  These

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 231

laws include things like fair competition, open processes, in some cases the participation of minority women-owned firms, any number of other legal requirements around it.

It is a complex -- it is a complicated enough process that you can get a master's degree in government procurement.  It is a complicated endeavor.  University of Dayton.

Q   And so to renovate the Cermak ramp and also stay in compliance with the laws, the procurement process is a necessary function of staying in compliance with the laws?

A   Absolutely.

Q   What about the transfer package?  There was testimony and questions about the transfer package.  Is the transfer package a necessary step in renovating the Cermak ramp?

A   No, it's not.  It's a step for a combination of expediency and consistency.  And as I mentioned, we are expediting that part of it in the case of the ramp itself and going ahead and engaging the architect of record.  For the work for the rest of the building, they

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 58

ERIC DAVIS
March 12, 2024

Page 232

will complete the transfer package, and then an architect of record will be engaged for the rest of the building. But HDR is doing the ramp, just the ramp.

Q And is the reason for having the transfer package put together is to renovate the ramp, like that's the purpose of putting this in place?

A We are doing transfer packages in most of the other ADA procurements. That's to achieve a balance between, you know, the consistency of treatment and the requirements for open procurement. In other words, so that multiple firms have opportunities to participate in the program. The procurement office has asked us to provide opportunities for as many different firms to participate as possible, and the transfer package is a methodology for us to offer a wider range of firms the ability to participate in the process while, nevertheless, keeping a firm with a good level of expertise like Globetrotters at the front end to provide their expertise.

It takes longer to do that, to do a

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 233

transfer-package version because then you have a second procurement for the architect of record.

In this case, we're doing -- the architect of record, they've already been procured. So the ramp, we are expediting; but the larger work, yeah, we're going to have to go out on the street for an architect of record for the rest of the building.

Q So it's not necessary but the transfer package is being put together to expedite?

A Well, it's being put together for the balance of the building, Sam. We're -- as I said, we are jumping over that a little bit with the ramp because the recommendation is fairly straightforward. So we can expedite that part of it.

Q Right. That part of it is being expedited.

A Right. So the ramp can be expedited.

Q What about submitting this information to be placed on the budget, is that a necessary part to renovate the Cermak ramp?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 234

A Yes. As I said, right now, the budget in this the CIP only includes monies for design. In order to include the larger monies for construction, that's in the current budget formulation cycle that we are in now for fiscal year 2025, and that will be a larger number.

So that's a necessary requirement to be dealing with the budget over multiple fiscal years, yes.

Q And what about submitting the budget to the Board, is that a necessary step in order to renovate the ramp?

A 100 percent.

Q And what about the other steps that are outlined in your Declaration such as getting the architect, doing the design plans, getting the construction company, negotiating the fees, are all of these necessary steps in the process of renovating the Cermak ramp?

A Yes. To the greatest extent possible, if there are faster ways, we're open to suggestions but this is the fastest way we know how to do. And as I said --

Q And if you can't -- yeah, go ahead.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 235

A If they came to us tomorrow and said do it faster on an emergency basis, honestly, I can't think of a faster way to it. Given the requirements that we have, I can't think of a faster way. Right now, today, I can't think of a faster way to accomplish it.

Q And is part of that reason because you cannot just skip over --

MR. MORRISSEY: Objection, leading.

MR. BRANUM: Tom, I'm asking a question.

MR. MORRISSEY: No, it's leading, Mr. Branum, because you're going to put this in a response and say it's his statement. It's your statement. It's leading.

MR. BRANUM: I'm asking a question.

BY MR. BRANUM:

Q I want to know if part of the --

MR. MORRISSEY: Make sure it's not leading.

MR. BRANUM: Well, can I --

MR. MORRISSEY: Don't have it leading, Mr. Branum.

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 59

ERIC DAVIS
March 12, 2024

Page 236

MR. BRANUM: Let me ask a question.

MR. MORRISSEY: I'm just asking.

BY MR. BRANUM:

Q Part of the reason this cannot be done faster, if I understand you correctly, because you just testified that these are necessary steps: Procurement, submitting the budget, submitting the budget to the Board. Can you skip over any of these steps to renovate the Cermak ramp faster?

MR. MORRISSEY: Leading. Objection, leading.

BY THE WITNESS:

A I can't think of a way given what has to get done between now and when it would open. I can't think of a way unless there was an especially egregious -- egregiously expensive alternative to -- you know, I don't know of an extra detention-grade health facility out there that you can move everybody to, to allow us to do this faster. I can't think of a faster way to do it. It takes time. It really does.

BY MR. BRANUM:

Q Like, you cannot decide not to go

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 237

through procurement so that you can do this faster?

A Correct. And as I said, I don't think it would qualify as an emergency. Even if it was a court order, I still don't think we could do it faster.

Q And you can't decide not to submit it into the budget because you want to do it faster?

MR. MORRISSEY: Objection, leading.

BY THE WITNESS:

A I don't know of a faster way to get to -- like, if you're asking is there a faster way to get the construction funds in the budget, there may be but we're not going to need -- we need to have the design first. We've got to have the design first. You can't price anything until you have the design, which we're working on getting right now. So I can't think of anything that would even suggest that we try to jump the line on construction funding.

BY MR. BRANUM:

Q Now for a project such as renovating

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 238

the Cermak ramp, are the steps that you outlined, for instance, procurement, budget, design, architect, construction company, negotiating fees, all of those steps, are those normal steps in a project like this?

A No. I think we've tried to accelerate that process, and I say that because, as I mentioned, if we were doing this as a matter of course for the whole building, we would have waited and gone out to the street for a whole separate architect of record to execute Globetrotters' plan for the whole building.

Instead, we're breaking it out and having a task order and starting the design now, instead of a year now, and getting one of the JOC contractors going as soon as we can. We've accelerated it I think as much as we can at this point.

Q And plaintiff's counsel tried to paint a picture as if going through all of these different steps it means the ramp is not going to be renovated.

Do you agree with that assessment,

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 239

that the fact that you have to go through these necessary steps, that that means the ramp is not going to be renovated?

A Well, I don't want to -- to use your -- I don't want to characterize Tom's thought process but, yeah, I don't -- as I said, to the extent that we can be certain that this is actually going to go forward, this is actually going to go forward. Not only is it going to go forward, it is going to go forward. So we're doing it as fast as we can.

There are -- I mean, there are -- if I understand, capital construction is subject to a couple of things. One of them is, as I mentioned, the County does zero-based budgeting.

So at the beginning of the year, they wipe everything -- they close out the books. They wipe everything out and they construct the budget. It's a zero-based budget.

Second thing to understand is this is capital construction. It's funded by municipal bonds. Those municipal bonds come with limitations imposed by the Internal Revenue

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 60

ERIC DAVIS
March 12, 2024

Page 240

Service on bonds sold on the open market.

So there are things we can and cannot do in terms of the construction that are part and parcel of the fact that we are building with money that comes from sale of municipal bonds.

We've gotten pretty good at dealing with that, but there are some limitations. It does take time.

Q   Now, if we go back to Exhibit 1, your Declaration, if we can go to Paragraph 19. This paragraph has the estimated time where it states:  The County estimates it will take approximately 56 weeks, right, and I think it says 14 months, but that should be what?

A   I think it should be 60 weeks.  I'll double check.  It's a variance of a month or so but, obviously, 14 months is not equal to 56 weeks.

Q   So either 56 weeks to 14 months?

A   Yeah, something in that range, 13 or 14 months.

Q   To reach substantial completion on the project.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 241

Is that still true today?  Is that still in line with your expectations of when substantial completion will be met?

A   Yes.

Q   And then, in total, the estimate is that the removal and replacement of the ramp will be completed within 24 months, and is that estimate still accurate as of today?

A   Yes, I would expect it to be done around the 1st of the year in '26, maybe January, something like that, February, something like that, depending on what we find.

Q   Counsel asked you if you could have included in the budget construction of the ramp.

Do you remember those questions?

A   Yes.

Q   I believe it's -- you know, a few times, you said if we were to do that, it would be irresponsible.

A   Yeah.

Q   Can you just explain what you mean?

A   So we have to put together a Capital Improvement Plan that is an estimate of the

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 242

monies that we expect to spend or plan to spend in a given fiscal year.

As I said, the expectation is we will be doing design for most, if not all, of '24. If we -- let's say that the ramp cost $2 million to construct.  If the fiscal 2024 CIP included the $2 million for construction, that would be $2 million that we can't use during the year because we know we are not going to spend it until 2025.

So we would tie up $2 million in funding capacity for work that we know that we are not going to do in this fiscal year.  It would be irresponsible.

We need to try to get as much work done in the physical year as we can and give as honest and clear as possible an estimate of what we can accomplish during the year.

If we put the construction money in there, we would be identifying capacity that we know would -- we know up front we are not going to need.  2024, because of the start of the Task Order A/E process, we know we are going to be doing a lot of design work in '24.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 243

We've got over 100 projects identified for the Task Order A/E process. They are accelerating.  They are happening fast.  We are going to be doing a lot of design work in '24.  That's going to lead to lots of construction money in '25.  But if we put all of that construction money in '25, in '24, we'd be asking the Board for permission to do a bunch of things we know we're not going to do. To me, that would be irresponsible.  That's my opinion.  To me, it would be irresponsible.

Q   You mean in that budget year?

A   We wouldn't get it done because of the zero-based budget because we start fresh each year.  Now --

Q   If we go to -- go ahead.

A   We do projections of what we think the future year expenditures are going to be in what are called the out years, but that's not an encumbrance.  That's not a commitment.  We are only giving them a heads-up to say, hey, this is where we think this is going.  There's a lot more work to get done before we get to '25, '26, '27, '28.  We are just giving them an

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 61

ERIC DAVIS
March 12, 2024

Page 244

indication what we think the future holds. But we do -- we know we are going to be doing a lot of construction work in '25 because we are doing all of this design work in '24, but we're not going to encumber the monies for the construction work now because we're not going to be there yet in '24.

Q    If you go to your Declaration, Exhibit 1, if we go to Paragraph 12, this is where you discuss GEC documented the Cermak ramp has handrails mounted the full length of the ramp that are compliant, but because of the obstructions with the adjacent doors, the handrails do not extend 12 inches beyond the ramp, and GEC determined that that aspect of the handrails is not compliant.

A    Yes.

Q    And then, you know, the next paragraph, 13, goes into the handrails and the walls angling 45 degrees, and then the information about types of fittings and anti-ligature handrails.

And earlier counsel was asking you a lot of questions about the installation of the

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 245

current handrails on the Cermak ramp and some of the obstacles that you ran up against in being able to obtain the necessary components to --

A    To finish.

Q    Yeah, to finish the installation of the handrails.

Is there anything that you could have done beyond what you did to bring the handrail component of the Cermak ramp into compliance?

A    Not that I can think of, no. I'm thinking about -- if memory serves, the installation of the handrails was the fall of 2022 by which time from the exhibit that Tom was showing us earlier, we were already underway hiring the design firm to look at the whole building.

So I guess it's fair to say that if there were additional measures, the hope was that the architects would be on the Board. We'd be looking at the whole building before those things could be achieved.

Q    And now that we -- a report from Globetrotters in December gave the

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 246

recommendation.

A    Yeah.

Q    Their recommendation is that actually the handrails can be removed?

A    When the ramp has been removed and the new, I guess you'd say, sloped walkway has been constructed, at that point, it would not be steep enough to be characterized as a ramp by the ADA; and as such, a hallway doesn't need handrails. It's essentially a hallway, and a hallway doesn't need handrails.

MR. BRANUM:  I have no further questions. Thank you for your time.

MR. MORRISSEY:  I have some follow-up questions, Mr. Branum, based upon your --

THE WITNESS:  Imagine my surprise.

MR. MORRISSEY:  I would like to have a clear record here, Mr. Davis.

R E D I R E C T   E X A M I N A T I O N

BY MR. MORRISSEY:

Q    In July of 2022, there was an agreed court order to put in handrails that were compliant with the ADA. We've looked at that exhibit, correct? And that work, because there

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 247

was a court order, was done within six months or less, correct?

MR. BRANUM:  I will just object to your characterization of the Court's order.

BY THE WITNESS:

A    Approximately, yeah, okay.

BY MR. MORRISSEY:

Q    And that work was expedited due to the fact that there was a court order, correct?

A    That's why we had DFM buy the handrail directly and install it themselves was the fastest way to get it done.

Q    That was based upon you had to do it because there was a court order, correct?

MR. BRANUM:  Objection to your characterization of the order.

BY THE WITNESS:

A    I think it's -- well, I mean, we want to try to get things done as expeditiously as possible in any circumstance. So it's probably just a case of what's the fastest way to accomplish it.

BY MR. MORRISSEY:

Q    That was after the court ordered you

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 62

ERIC DAVIS
March 12, 2024

Page 248

to do it, correct?

MR. BRANUM: Again, I object to your characterization of the Court's order.

BY THE WITNESS:

A As I mentioned, it was our opinion that everything was all right going in. But then, yeah, if you say we've got to change out the handrails, then, okay, we've got to change out the handrails. That was the fastest way to accomplish it.

BY MR. MORRISSEY:

Q Was it your department's opinion that in 2022 the ramp complied, even though it didn't have handrails? Is that what you're saying?

A Yeah, because it was our understanding -- it was our understanding that at the time that, because the Sheriff had discretion in -- so, again, I'm reconstructing from before. It's my recollection that when we looked into it, that there was a provision that if the area is considered, I want to say, a path of work, if you will, for Sheriff's deputies and if Sheriff deputies have to be

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 249

physically fit and if the policy is if you are on the ramp, you're getting pushed in a wheelchair, that it was our understanding that there was -- that it was feasible to say the Sheriff doesn't want handrails. It's okay with bumpers because they're pushing people up and down the ramp, that that's the information we had, and that's -- but as I said, we learn things over time about it. And the decision was made, yeah, okay, fine. We'll put handrails in.

But my recollection is that initially our expectation was that it was that -- that it was -- that the Sheriff's discretion in a security environment was such that if was a workplace for sheriffs and those are the people that are using the ramp that you're allowed to not do that.

Now, I can't say whether that's -- you know, turned out to be the case or not because that's operations. We don't do operations.

Q Now, you mentioned that you're in contact with Sabrina Canchola-Rivero [sic] on a

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 250

monthly basis, correct?

A Yeah, fairly regularly. Yes.

Q And Sabrina Canchola-Rivero put in a business case in regards to the Cermak ramp. You recall that?

A I think they put in a business case for Cermak. I don't remember if it was just the ramp or not.

Q But in that business case report, she acknowledged that the ramp was being used for both employee passage and inmate passageway, correct? So it wasn't specifically utilized for workers at the jail, correct, employees?

A I believe that those people that needed assistance were there to follow the sign that says if you need assistance ask for a sheriff.

Q That wasn't the question. Will you please answer the question?

MR. BRANUM: He did answer the question.

MR. MORRISSEY: No.

BY MR. MORRISSEY:

Q You're aware that the Cermak ramp is

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 251

utilized both by employees and by inmates at the Cook County Jail to access the infirmary, correct?

MR. BRANUM: Objection to form.

BY THE WITNESS:

A Right. But if you're asking does that mean that we thought that they, therefore, needed handrails, again, I referred to you earlier the initial impression was that if there is a detainee that they had to be escorted, I don't think they had people walking -- maybe they did, and maybe during the course of this we learned -- I seem to recall some video that you might have had of somebody walking up and down. I don't know. But initially I think -- and, again, timetable line, you asked a question earlier about timetable. At one point, yeah, I think we thought that it was all right. And then decided -- and then figured out that it wasn't.

Q Well --

A But that was our understanding of what they were doing.

Q All right. Now you know definitively

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 63

ERIC DAVIS
March 12, 2024

Page 252

that that ramp doesn't comply with the ADA?

A    I'm sorry.  I missed the beginning of your --

Q    You know definitively that ramp doesn't comply with the ADA?

A    We know more now because of the LIDAR scan, yes, that the ramp either was constructed wrong or should have been constructed with a landing.  We know that now because of the LIDAR scan.

Q    And you also know without the LIDAR scan that it needs handrails, correct, to be compliant with the ADA?

MR. BRANUM:  Objection to the form of the question.

BY THE WITNESS:

A    I believe that -- I think that was in -- I think GEC concluded that they needed them.  I seem to recall that they said they concluded that they needed them.  We put them in -- as you know, we tried to put them in anyway.

Q    And when you put in the handrails, there was no monitoring by the Court to make

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 253

sure that the handrails were properly installed pursuant to the ADA, correct?

MR. BRANUM:  Objection to the form of the question.

BY THE WITNESS:

A    I'm not an attorney, Tom.  I think that -- I thought that the order that you're talking about constituted monitoring by the Court.  I don't know what you're getting at.

BY MR. MORRISSEY:

Q    I'm getting at after the handrails were installed, do you know if the Court approved the installation of the handrails that were done under the order pursuant to the ADA?  It was in compliance with the ADA?

A    I don't know what the Court did or didn't do.

Q    Now, you're projecting that the ramp will remain noncompliant for the next couple of years, correct?

MR. BRANUM:  Objection, form.

BY THE WITNESS:

A    It's our projection that -- and I think it's in the testimony that in the

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 254

meantime, they'll be pushing people up and down the ramp.

Q    My question -- can you answer the question?  Between now and the substantial completion of the ramp --

A    Yeah.

Q    -- it will remain noncompliant with the ADA?

MR. BRANUM:  Objection to the form of the question.

BY THE WITNESS:

A    Yes.  I think that's fair to say.  Otherwise, we wouldn't be replacing it.

BY MR. MORRISSEY:

Q    And people that are disabled for the next two years will have to go up and down the ramp with a noncompliant -- with noncompliance by the defendants under the ADA?

A    Which is why they have to be -- they need assistance, which is why there are signs at the top and bottom of the ramp saying if you need assistance, ask the sheriff for it.  I don't understand what you're getting at.  I mean, in the meantime, if they need to go up

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 255

and down the ramp, they are supposed to ask for help.

Q    Well, let me ask you, as an architect and a person who has some knowledge of the ADA, is the purpose of the ADA to allow a disabled person to independently utilize facilities such as the toilet and a ramp so that they don't have to reach out to somebody for assistance just to go up and access an infirmary or healthcare facility?

A    There are a wide --

MR. BRANUM:  You're asking him about the -- go ahead.

BY THE WITNESS:

A    There are a wide range of accommodations and circumstances that may require somebody to get assistance.  There are also circumstances where a facility can be designed and be perfectly compliant with the requirements of the ADA and still not address the needs of an individual who may need different accommodations.

The range of people and what they need and whatever varies widely and, you know,

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 64

ERIC DAVIS
March 12, 2024

Page 256

are there circumstances where somebody needs to be lifted into a shower seat? Absolutely. I mean, there are all kinds of situations where someone may need assistance in terms of accessing facilities. I mean, the ADA is dealing with a very wide spectrum of needs and accommodations.

Q And the reason why the rise limitation in this case is 30 inches under the ADA is to give a wide range of people the opportunity to have an intermediate landing for a ramp such as Cermak that is over -- with a rise over 32 inches?

MR. BRANUM: Objection to the extent you are asking about the purpose of the ADA.

But go ahead.

BY THE WITNESS:

A I can tell you that the intent of the establishment of an intermediate landing is for any kind of ramp in any kind of circumstance, right? You've got a ramp, and it's out in the middle of a yard, and it's going in and you have it, and somebody needs to be able to take

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 257

a break.

In a situation like this where, operationally, they're directed to provide assistance, then somebody doesn't need a break because they're getting pushed.

Q Well, let me ask you. This building was required under -- it was built after the passage of the ADA, correct, in 1996 or 1997?

A Okay. All right.

Q And it was required to have a ramp that complied with the --

A I thought it was before '93.

Q Pardon?

A I thought it was -- I don't remember the date. I don't remember the date.

Q The ramp was built after 1992, correct?

A I think that's right.

Q And you previously said you're not an operations person and you don't dictate what the Sheriff may or may not do as far as moving people up and down a ramp?

A Yeah. So as we have been through in great detail, Tom, when we hired a surveyor to

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 258

tell us what the slope of the ramp was, it appeared that it was compliant, okay?

When we found out through the LIDAR that not only was there a slight variance at the top or bottom of the ramp, but it was a significant variance as you characterized it, the 2.4 inches.

We said wait a minute. This is going to -- we agreed with Globetrotters' recommendation, and it's got to come out. Before then, we thought we were able to work with the ramp that's there.

Q So it was --

A We looked at things like can we grind down the top of it. Can we -- you know, so when we learned that it was that far out of compliance, yes, absolutely, we will try to fix it.

Q So you agree it's significantly out of compliance as far as the requirement for the rise and the requirement for an intermediate landing?

MR. BRANUM: No. He said that's how you characterized it.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 259

MR. MORRISSEY: Mr. Branum, I would appreciate you not --

BY THE WITNESS:

A At this point, it's --

MR. BRANUM: Well, don't put words in his mouth.

BY THE WITNESS:

A At this point, the variation is such that it seems prudent and in the best interest of the citizenry and the people occupying the facility to go ahead and replace it. The offset is greater than we thought it was.

BY MR. MORRISSEY:

Q So can you explain to me how the -- for the next two years people that are disabled, people that are in wheelchairs or with crutches or with walkers are going to be accommodated as far as going up and down that ramp if it is not in compliance with the ADA?

MR. BRANUM: Objection, lack of foundation.

BY THE WITNESS:

A Again, that's why they have signs saying if you need assistance, ask for it.

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 65

ERIC DAVIS
March 12, 2024

Page 260

BY MR. MORRISSEY:

Q  If it's built after 1992, does a person -- is the requirement that the Sheriff and the County had to make it accessible so a person could independently just have the same -- on the same basis as an able-body person move up and down that ramp to the best of their ability or does a disabled person have to be reliant and dependent upon other people to ask for assistance when the government builds a building after 1992 and it's not compliant?

So can you tell me why for the next two years, people that are disabled are going to have to go up this ramp because the County can't do it faster?

MR. BRANUM:  That's not even a question.  That's a soliloquy.

BY THE WITNESS:

A  Is there a question in there?

MR. BRANUM:  Are you done, Tom?  I think we have reached the end.

MR. MORRISSEY:  No, no, no.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 261

BY MR. MORRISSEY:

Q  There is a question.  The question is you don't provide operational support to the Sheriff --

MR. BRANUM:  Asked and answered.

BY MR. MORRISSEY:

Q  -- in regards to the ADA, correct?

A  That's correct.

THE REPORTER:  I'm sorry, Tom.  What was the last part of your question?  You don't provide operational.

MR. MORRISSEY:  Operational assistance in regards to the ADA to the Sheriff.

BY MR. MORRISSEY:

Q  And can you point me to any portion of the regs for the ADA where the government can build a structure after 1992 and leave it up to a citizen to ask for assistance, why is that permissible under the ADA?

MR. BRANUM:  Objection to the extent you're mischaracterizing the facts.

BY THE WITNESS:

A  Well, I think it's fair to say, Tom,

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 262

that we're talking about a custody environment, right, that the people in there are not just random citizens walking by, that they are people in custody.  Is that fair to say?  Would you agree that somebody in the jail that's not a sheriff is someone in custody using that?

If they're in custody, then they are in the custody of the Sheriff and there are -- it only seems logical to me that there are different requirements or allowances for safety, for security, because it's a custody environment.  I don't understand -- it's not like somebody just walking by on the sidewalk out on California Avenue.  These people are -- where they go, what they do is subject to the approval of the Sheriff or operations largely for security and safety reasons.

So I don't understand why you're getting on your horse about, you know, denying the public accommodations when they're in an environment where, you know, unfortunately, their liberty, their mobility is subject to the approval of the Sheriff.

Q  So their ability to seek medical

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 263

care --

MR. BRANUM:  Tom, we're getting --

BY MR. MORRISSEY:

Q  -- if a person --

MR. BRANUM:  No, no, no, no, no.  We are getting way off track here.  We are not getting into medical rights and 14th Amendment rights here.  We are getting way off base.  So you're just having -- right now, you're having an argument with the witness about trying to convince him of your view on the world, and he's already answered your question.  You just -- this is not productive.  You're not -- this isn't even permissible.  It's becoming harassing.

BY MR. MORRISSEY:

Q  Well, let me ask you this.  You mentioned on Mr. Branum's testimony, and I would say it's testimony, characterize it as testimony, that the County currently has over 100 projects in the design phase, correct?

MR. BRANUM:  Wait.  You said my -- I got way confused there.  You said my

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 66

ERIC DAVIS
March 12, 2024

Page 264

testimony was that 100 projects -- what did you just ask? It made no sense.

BY THE WITNESS:

A I think what you're referring to is the earlier discussion of the meetings with the Sheriff where we have over 100 projects that are in various stages, whether it's planning, design, construction, closeout, procurement in various stages, active projects.

BY MR. MORRISSEY:

Q I think you mentioned on Mr. Branum's cross-examination that there are 100 projects that Capital Improvement has supervision over in regards -- in the design stage in the year 2024.

A We have over 100 projects that we are hoping to achieve the design for through the task order contracts, yes.

Q And those projects after the design is completed would be filtered into the Capital Improvement Projects -- I'm sorry -- Capital Improvement Program for 2025 or 2026, correct?

A They would move to construction phase, yes.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 265

Q And then the County, after passing the Capital Improvement Program, has to prioritize in 2025 what projects are going to go forward and which ones aren't?

A Yes.

Q And that decision is made by who?

A That recommendation comes from the department to the president. I can tell you that it is our policy and has been stated in the budget book that if we have a project underway that is an active carryover, in other words, the project has been started and work has been carried over, that those are the first projects that we include in the plan for the next year to ensure that they are continued. This is an active project.

It is in the first -- when we assemble the '25 CIP, it is in the first group of projects that we will include in 2025.

Q The renovation of the Cermak ramp, when you say it's an active project --

A Yes.

Q -- there's still -- the first step is going to be for the architectural firm, HDR, to

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 266

do design drawings. That hasn't been done yet, correct?

MR. BRANUM: Well, no. Object to your characterization as "the first step."

BY THE WITNESS:

A Yeah. No, if it's in design, that's an active project. We are expending funds. We are encumbering Capital Improvement dollars by having GEC do work. It's an active project right now.

Just because the construction isn't underway, it's an active project. And by our processes, it will be carried over into the fiscal '25 CIP doubly because it's an ADA project. It will be in the -- if I could pick one project, it might be this one that's going to be in the fiscal year '25 CIP. If they said, Eric, you can only do one, honest to God, I think it might be this project.

BY MR. MORRISSEY:

Q Eric, when there is a ground breaking for the ramp, will you invite me over for a cup of coffee?

MR. BRANUM: And you don't have to

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 267

answer that, Eric.

BY THE WITNESS:

A You're an Irishman, Tom. So I'm going to assume you're going to have something stronger than coffee.

BY MR. MORRISSEY:

Q Let me ask. So has one penny been given to HDR presently to design the renovation of the Cermak ramp?

MR. BRANUM: Objection to the form of the question.

BY THE WITNESS:

A That's not how it works.

BY MR. MORRISSEY:

Q Well, I'm just asking. Has $1 been expended to HDR?

A HDR, no. They will be once we get their proposal approved and they do their work and they invoice it, it will be.

Q You mentioned several qualifications that perhaps can be barriers for you in completing the Cermak ramp eventually, correct?

MR. BRANUM: Objection --

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 67

ERIC DAVIS
March 12, 2024

Page 268

BY THE WITNESS:

A    "Barriers" is your word.

BY MR. MORRISSEY:

Q    It's an appropriate word because we're talking about the ADA.

A    There are a lot of regulations involved, Tom.  So barriers is your word.

Q    All right.  Well, let's use impediments, potential impediments, correct?

MR. BRANUM:  Objection.  Just ask your question.  He doesn't have to subscribe to your language.

MR. MORRISSEY:  Give me one more minute and we'll wrap this up.

I have no further questions. Maybe I will next week but not today.

MR. BRANUM:  And I don't have any other questions.

Mr. Davis, thank you so much for your time.  We will reserve.

THE WITNESS:  Hold on just a moment. I just want to check something.

MR. MORRISSEY:  The deposition is concluded.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 269

THE REPORTER:  We are off the record?

MR. MORRISSEY:  We are off the record.

THE REPORTER:  Okay.

FURTHER DEPONENT SAITH NOT....

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 270

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CORNELIUS WALKER,          )
                          )
          Plaintiff,       )
                          )
          vs.              )  No. 20-cv-00261
                          )
THOMAS DART, SHERIFF OF    )
COOK COUNTY and COOK       )
COUNTY, ILLINOIS,          )
                          )
          Defendants.      )

I, ERIC DAVIS, being first duly sworn, on oath, say that I am the deponent in the aforesaid deposition, that I have read the foregoing transcript of my deposition, consisting of pages 1-170 inclusive, taken at the aforesaid time and place and that the foregoing is a true and correct transcript of my testimony so given.

_____
                    ERIC DAVIS

SUBSCRIBED AND SWORN TO
me before this _____ day
of _____, A.D. 2024.

_____
Notary Public

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 271

STATE OF ILLINOIS )
                  )  ss:
COUNTY OF C O O K )

I, Peggy A. Anderson, a Certified Shorthand Reporter in the State of Illinois do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction, and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That the said deposition was adjourned as stated herein;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 68

**ERIC DAVIS**
**March 12, 2024**

Page 272

IN WITNESS WHEREOF, I do hereunto set my hand this 19th day of March, 2024.

Peggy A. Anderson
Certified Shorthand Reporter
License No. 084-003813

TOOMEY REPORTING
312-853-0648

---

**ERIC DAVIS**
**March 12, 2024**

Page 1

| A | | | | | |
|---|---|---|---|---|---|
| **A.D** 270:22 | 238:7 | **accommod...** | **acquisition** | 133:13 | 54:20 |
| **A/E** 242:23 | **accelerated** | 150:22,24 | 99:16 | 135:15,20 | **adjacent** |
| 243:2 | 238:18 | **accommod...** | **act** 17:5 | 136:12,15 | 244:13 |
| **A/Es** 85:12 | **accelerating** | 255:16,22 | 41:14 45:20 | 137:16 | **adjourned** |
| **ability** 54:16 | 243:3 | 256:7 | 53:19 | 140:2 141:5 | 271:19 |
| 92:7 93:15 | **accept** 65:5 | 262:20 | **action** 47:20 | 141:13,20 | **adjustments** |
| 117:21 | 187:10 | **accomplish** | 76:17 | 143:8 | 113:21 |
| 130:18 | **acceptable** | 122:21 | 271:24 | 144:22 | 145:7 |
| 196:5 223:7 | 154:19 | 125:9 | **actions** | 145:4 | **adopt** 185:8 |
| 225:22 | 155:24 | 183:21 | 134:11 | 152:18 | 185:10 |
| 232:20 | 156:6,16 | 235:6 | 264:9 | 153:5 | **adopted** 98:9 |
| 260:8 | 196:22 | 242:18 | 265:11,16 | 215:23 | **adopting** |
| 262:24 | **acceptance** | 247:22 | 266:7,9,12 | 217:9 219:3 | 50:12 |
| **able** 8:10 | 68:3 87:23 | 248:10 | **activities** | 219:5 | 185:23 |
| 15:2 18:16 | 168:15 | **accomplish...** | 105:8 | 224:13 | **Adriaan** 21:7 |
| 54:20 65:18 | 196:19 | 168:19 | 118:14 | 232:10 | **advance** |
| 110:6 118:2 | 197:16,20 | **account** | **activity** | 246:9,23 | 191:6 |
| 123:2 125:8 | **accepted** | 139:11 | 103:16 | 252:1,5,13 | **advocating** |
| 126:2,20,21 | 61:22 62:7 | **accurate** 6:7 | **actual** 15:3 | 253:2,14,15 | 207:4 |
| 129:20 | 85:15 90:3 | 14:22 241:8 | 34:20 | 254:8,18 | **affirmative** |
| 130:16 | 90:10,15 | **accurately** | 104:21 | 255:4,5,20 | 193:8 |
| 131:6,7 | 192:19 | 30:8 | 109:14 | 256:5,10,16 | **aforesaid** |
| 143:13 | 229:24 | **achieve** 29:24 | 178:23 | 257:8 | 270:12,15 |
| 145:6,7 | 230:7 | 41:11 54:11 | **ADA** 10:24 | 259:19 | **afternoon** |
| 221:7,8 | **access** 159:20 | 54:19 68:14 | 11:22 12:10 | 261:7,13,17 | 129:23 |
| 225:9 245:3 | 209:10 | 143:14 | 16:23 17:18 | 261:20 | 180:4 |
| 256:24 | **accessibility** | 218:6 | 18:23 23:17 | 266:14 | **agencies** 99:4 |
| 258:11 | 43:6 52:14 | 224:16 | 27:6,22 | 268:5 | 99:4,11 |
| **able-body** | 55:22 61:12 | 225:9,14 | 31:16 39:6 | **ADAAG** | **agency** 63:2 |
| 260:6 | 84:23 115:7 | 232:11 | 40:3,18 | 61:11 145:5 | 15:17 19:14 |
| **absolute** | 115:10 | 264:17 | 43:1,19 | **add** 93:6 | 19:16 51:9 |
| 114:18 | 130:17 | **achieved** | 45:20 52:14 | **additional** | 98:7 120:23 |
| **absolutely** | 152:3 | 39:16 99:19 | 54:1 74:1 | 31:4 43:7 | 121:3 |
| 164:14,15 | **accessible** | 245:22 | 74:23 80:5 | 126:16 | 216:23,24 |
| 196:10 | 13:19 | **achieving** | 80:18 81:23 | 211:13 | **agree** 37:11 |
| 201:17 | 130:16 | 225:18 | 90:18 91:20 | 229:4 | 40:8 238:24 |
| 224:18 | 131:15 | **acknowled...** | 98:4 115:7 | 245:19 | **agreed** 53:18 |
| 226:22,24 | 173:19 | 250:10 | 116:6 123:3 | 258:19 | 62:20 89:21 |
| 229:1,3 | 260:4 | **acquaint** | 124:2,24 | **address** | 246:21 |
| 231:14 | **accessing** | 100:8 | 125:16,22 | 14:24 141:1 | 258:9 |
| 256:2 | 256:5 | **acquire** | 126:13,13 | 149:16 | **agreement** |
| 258:17 | **accommod...** | 201:20 | 127:17 | 255:20 | |
| **accelerate** | 259:18 | **acquiring** | | **adequate** | |
| | | 51:12 | | 199:17 | |
| | | | | **adequately** | |

TOOMEY REPORTING
312-853-0648

---

**ERIC DAVIS**
**March 12, 2024**

Page 2

| | | | | | |
|---|---|---|---|---|---|
| 9:14,15 | 146:17 | 24:21 26:9 | 97:8,13 | 252:22 | 262:16,23 |
| 45:13 46:1 | 230:24 | 26:14,18,21 | 112:22 | **appear** 35:14 | **approve** 16:1 |
| 49:2 129:3 | 249:17 | 27:9 29:10 | 135:6 153:8 | 36:3 147:14 | 16:5 41:8 |
| 189:1 | **allowing** | 40:24 42:8 | 153:10 | 41:10 66:2 | |
| **ahead** 6:22 | 209:9 | 49:8,15,16 | 159:16 | **appeared** 2:7 | 67:5 87:20 |
| 11:4 18:7,9 | 221:15 | 50:5,8,11 | 166:4 | 2:13 258:2 | 88:19 94:1 |
| 40:23 47:12 | **allows** 30:7 | 57:12 63:14 | 169:23 | **appears** | 94:10 |
| 55:18 69:5 | 68:4 74:8 | 64:22 65:10 | 181:6 | 216:16 | 100:15 |
| 96:14,15 | 114:1,2 | 82:24 96:4 | 182:21 | **applicable** | 198:10 |
| 107:18 | **alter** 118:18 | 97:11,17 | 190:10 | 40:2,4 42:1 | **approved** |
| 132:8 172:8 | 210:24 | 98:2 114:8 | 193:3 198:1 | 43:4,15 | 18:11,14 |
| 183:16 | 225:12 | 116:24 | 198:6,17 | 61:5 87:11 | 24:5,8 |
| 189:12 | **alteration** | 117:3 120:5 | 207:10 | 145:1 152:2 | 25:10,17,18 |
| 231:23 | 109:20 | 122:13 | 261:5 | 152:23 | 29:24 65:10 |
| 234:24 | 113:6 209:5 | 127:2,8 | 263:13 | 190:3 | 67:10 85:23 |
| 243:16 | **alterations** | 128:2,11 | **applies** | **appoinee** | 86:7 88:14 |
| 255:13 | 114:1 | 129:14 | 157:15 | 89:3 | 91:24 92:1 |
| 256:17 | **altering** | 133:14 | **apply** 136:5 | **appointme...** | 96:20 |
| 259:11 | 111:24 | 136:20 | 166:16,17 | 59:4 | 104:20 |
| **ahold** 188:4 | **alternative** | 138:2,20 | **Anthony** | **appreciate** | 109:14 |
| **alerted** | 236:18 | 141:14 | 108:9 | 143:1,2 | 112:4,6 |
| 141:19 | 263:8 | 142:7 144:4 | 109:18 | 157:6 | 113:15,16 |
| **align** 149:1 | **Americans** | 144:14 | 111:5,6,10 | 225:23 | 117:22 |
| **allocated** | 45:20 53:19 | 153:14,16 | 117:11 | 259:2 | 119:6 |
| 94:16 | **amount** | 155:12,16 | **anti-ligature** | **approach** | 121:16 |
| **allocation** | 24:23 197:2 | 157:11 | 143:21 | 14:10 | 176:12 |
| 94:22 | **Anderson** | 158:19 | 144:2,10,17 | **approached** | 177:23 |
| **allow** 17:10 | 1:16 271:3 | 165:11 | 144:20,23 | 177:3 | 178:8,11 |
| 18:12 26:20 | 272:7 | 169:20 | 145:8,20 | **approaching** | 179:2,19 |
| 54:17 79:24 | **angle** 145:21 | 173:11 | 147:12,17 | 202:20 | 221:21 |
| 85:16,19 | 145:23 | 175:8 180:2 | 148:7 | **anticipate** | 253:13 |
| 117:3 138:1 | 148:20 | 193:5 198:2 | 244:22 | 187:1 | 267:19 |
| 157:10 | **angling** | 198:15,17 | **anybody** | 200:10 | **approves** |
| 159:20 | 244:20 | 207:11 | 187:1 | **appropriate** | 268:4 |
| 236:20 | **annual** 90:17 | 215:24 | 200:10 | 268:4 | 91:17 109:5 |
| 255:5 | 91:18 | 225:7 | **anybody** | **approval** | 116:8 168:6 |
| **allowable** | 100:20 | 250:19,20 | 37:23 38:14 | 15:12 17:23 | 226:8 |
| 134:19 | 116:4 | 254:3 267:1 | 113:1 | 66:21 71:19 | **approving** |
| **allowances** | **answered** | | 191:20 | 104:12 | 178:23 |
| 134:16 | 13:22 15:18 | **anymore** | 204:7 | 112:8 | **approxima...** |
| 262:10 | 31:24 42:17 | 218:1 | 261:5 | 118:16 | 14:13 68:1 |
| **allowed** | 5:24 6:2,3 | 60:16,20 | **anyway** 11:8 | 190:5 | 101:19 |
| 79:16 | 8:11 15:21 | 70:14,16 | 75:9 81:7 | 200:19 | 118:23 |
| 116:18 | 22:16 23:2 | 93:18,20 | 197:7 | 217:7 | 158:17 |
| | | | | 221:15 | 159:19 |

TOOMEY REPORTING
312-853-0648

---

**ERIC DAVIS**
**March 12, 2024**

Page 3

| | | | | | |
|---|---|---|---|---|---|
| 180:20 | 9:12 35:11 | 126:16 | 50:9 62:15 | 213:15 | **Asset** 52:1 |
| 188:14 | 41:23 63:20 | 133:20,20 | 74:17 92:20 | 265:18 | **assign** 9:17 |
| 240:14 | 85:1 103:16 | **arms** 183:6,8 | 101:13,14 | **assert** 82:24 | **assigned** 9:11 |
| 247:6 | 120:14 | **arranged** | 111:20 | **asserting** | **assigning** |
| **April** 33:7 | 182:7 | 73:7 | 116:16 | 138:4 | 178:6 |
| 99:14 | 183:16 | **arrangement** | 119:5,11,12 | 157:17 | **assignment** |
| 102:13 | 194:1 | 30:6 | 119:13 | **assertion** | 9:15,22 |
| 191:21 | 215:21 | **arrangeme...** | 120:20 | 84:10 | 10:5 29:16 |
| 192:3 | 217:15 | 188:10 | 124:4 125:4 | **assess** 10:24 | 29:17 65:22 |
| 221:10,22 | 223:14 | 230:12 | 127:10,12 | 11:9,21 | 67:9 178:17 |
| **Arcadis** | 245:20 | **arranging** | 127:14,21 | 13:18 18:22 | 181:10,14 |
| 33:24 35:2 | **architectural** | 54:3 99:23 | 132:7 | 20:4,18 | 195:9 196:8 |
| **architect** 8:9 | 9:19 10:23 | 188:3 | 133:24 | 23:16 24:17 | 199:24 |
| 9:22 15:1 | 13:18 16:6 | **arrow** 82:3 | 135:7,21 | 25:13 29:18 | **assistance** |
| 25:18 30:3 | 29:2,4 | **articulates** | 136:2,9 | 31:4 46:16 | 227:2 |
| 35:15,18,19 | 65:15 160:9 | 29:22 | 155:15,17 | 217:7 | 250:15,16 |
| 36:22 40:5 | 160:12 | **aside** 95:8 | 156:19 | **assessing** | 254:20,22 |
| 41:24 43:13 | 182:12 | **asked** 13:5,22 | 161:23,24 | 19:7 172:3 | 255:8,17 |
| 73:21 79:15 | 183:1 185:3 | 15:18 31:23 | 162:2 | 220:5 | 256:4 257:4 |
| 80:22 | 193:17 | 43:22 60:19 | 167:11 | 221:16 | 259:24 |
| 127:10 | 265:24 | 64:11 70:14 | 168:2,3 | **assessment** | 260:10 |
| 154:23 | **Architecture** | 70:16 74:12 | 171:12 | 12:19 13:9 | 261:13,19 |
| 155:8 156:5 | 10:8 | 88:21 97:21 | 182:18 | 31:12,19 | **assume** 5:2 |
| 156:7 158:8 | **Architectu...** | 115:15 | 185:5,8 | 55:22 60:3 | 5:13 22:1,3 |
| 158:9,13,18 | 194:2 | 129:8 | 208:15 | 69:5,6 | 161:11 |
| 169:12,18 | **Ardmore** | 130:12 | 71:12 80:23 | 71:12 80:23 | 188:18 |
| 176:7 | 33:24 34:11 | 140:8 153:9 | 213:21 | 85:1 103:20 | 192:1 |
| 178:16 | 35:1,21 | 165:17 | 222:24 | 103:24 | 211:17,18 |
| 182:3 | 39:4 73:3 | 166:4 170:2 | 223:3 228:4 | 106:17 | 227:1 |
| 190:24 | 35:11 51:16 | 170:8 181:6 | 228:23 | 130:6 | 267:5 |
| 191:3 | 62:2 126:3 | 190:10 | 235:10,17 | 131:10 | **assuming** |
| 196:13 | 130:15 | 198:16 | 236:2 | 137:14 | 14:21 39:2 |
| 217:7 | 146:24 | 207:10 | 237:13 | 152:16 | 41:17 95:17 |
| 230:10 | 147:2 149:2 | 226:16 | 243:8 | 204:20 | 108:8,10 |
| 231:23 | 149:9 208:4 | 230:15 | 244:23 | 214:4 | 117:4,8 |
| 232:2 233:2 | 208:7 | 232:16 | 251:6 | 215:21 | 152:20 |
| 233:5,8 | 248:22 | 241:13 | 255:12 | 216:13 | 160:22 |
| 234:16 | 251:17 | 251:17 | 256:15 | 221:24 | 164:16,23 |
| 238:3,11 | **areas** 121:2 | 261:5 | 267:16 | 222:14 | 165:22 |
| 255:3 | 144:9 | **asking** 8:1 | **asks** 225:6 | 223:9 | 166:24 |
| **architect's** | 149:21 | 9:5 22:6,20 | **aspect** 52:13 | 238:24 | 168:5,11 |
| 36:14 37:8 | **argument** | 26:11,12,16 | 244:15 | **assessments** | **assumption** |
| 82:6 179:1 | 263:10 | 38:11,19 | **aspects** 53:2 | 22:13 27:4 | 42:15 97:15 |
| **architects** | **arguments** | 46:21 48:8 | **assemble** | 31:13 | 185:7,10 |

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 69

ERIC DAVIS
March 12, 2024

Page 4

assumptions
139:12,14
139:16
168:23
169:1
attach 150:3
attempt
171:15
180:11
218:8
attempted
14:8 85:8
attend 57:3
attended
56:17
attention
61:6
attorney
253:6
271:21,22
attorney's
157:1
attorneys
157:16
audio 214:14
August 32:7
32:10 33:7
34:6 48:14
56:2,15,20
57:3,15
58:4 60:10
99:22 100:2
100:3 101:1
104:10
authority
23:20 63:7
110:8
117:17
authorizing
109:7,13
availability
169:1
Avenue 2:4
262:14

average
67:23
aware 44:11
45:7,24
48:20 53:17
53:23 54:23
56:14 59:10
59:22 60:11
71:24 72:12
73:22 80:3
93:11
124:21
125:7,12,20
126:6,19,22
127:15
142:4
180:17
186:11
207:21
250:24
awhile 15:21
50:22 163:6
163:14
166:10
178:8 183:2
___B___
B 3:10
back 8:5 11:6
19:22 45:23
47:14 51:16
73:1,5,11
75:10 85:14
85:17 86:2
88:4 95:18
96:23 98:6
115:15
116:15
124:14,16
142:23
148:24
174:8
184:11
193:21

211:14
214:14
217:1
240:10
background
161:1
baked 185:21
baking 185:6
balance
205:20
232:11
233:14
barbs 137:4
barriers
267:22
268:2,7
barring
209:18
210:16
base 136:23
263:9
based 30:9
42:15 64:12
78:6 112:24
128:3
134:23
136:21
139:14,17
140:18
150:16,20
150:22,23
151:22
161:1 174:2
174:9
189:19
212:6
246:15
247:13
basically
106:16
178:1
basis 14:10
64:8 91:18
98:13 127:8

175:12
176:1
195:20
202:24
204:10
208:1
218:10
235:2 250:1
260:6
batch 14:9
180:24
Bates 145:16
becoming
263:15
began 12:8
beginning
18:8 71:6
81:10 87:1
99:21
100:12
102:9
120:12
135:18
168:15,21
205:19
239:17
252:2
behalf 2:7,13
11:20
belief 151:24
152:7,17
believe 11:11
23:10 24:9
32:4,15
33:21 34:6
43:21 47:19
50:17 51:13
54:3 56:18
57:21 66:11
66:12 70:5
71:2 73:10
74:5,24
78:17 81:4
81:8 85:11

85:18 89:14
89:14,22
90:9,12,16
98:3,3,7
103:21
104:2
105:23
110:2,8,9
110:10,24
145:3 153:4
159:16
170:24
179:20
180:19
213:24
219:4
241:18
250:14
252:17
BELL 2:9
bend 54:16
best 6:7
85:2 150:21
150:24
166:1
179:16
222:11
259:9 260:7
bid 195:24
196:1
202:12,13
202:17,19
202:22,23
202:23
221:15
bidding

186:14
big 165:18
bill 113:5
billed 25:2
bills 24:24
bind 63:7
64:16
bit 233:15
blade 163:7
block 139:17
blocking
150:2
board 8:9,10
14:14 17:17
17:23 23:11
23:12,13,15
23:23,23
24:7,8
25:10 41:9
65:11 85:18
86:6,7,8
88:11 89:4
89:6,10,11
90:7,10,14
90:18,21,22
91:5,12,17
91:23,24
92:2,6 93:3
93:14 94:1
100:7,13,14
101:2,3
104:21
105:4
109:15
110:21
111:10,13
111:15
112:2,4,6,8
112:9,12,14
113:3,15
114:1,2
115:3 116:4
116:8 117:4

ERIC DAVIS
March 12, 2024

Page 5

117:4 119:7
168:6
170:19
221:4 226:8
227:4,9
234:11
236:8 243:8
245:20
body 230:23
bonds 239:23
239:23
240:1,6
book 265:10
books 100:21
178:4,4
239:18
bottom 71:14
77:17,20,21
149:23
199:5
254:21
258:5
Brad 191:1
Branum 2:10
3:6 5:19,23
6:10 7:4
8:19 11:2
11:23 12:11
13:4,20
15:18 16:7
19:1,9,18
22:16,19
24:19 25:23
26:8,21,23
27:7 29:7
31:6,23
36:23 37:12
38:2,5,17
40:9,21
41:20 42:13
43:21 44:15
44:19 46:6
46:11 47:5
48:5,24

49:9,21
50:5 52:9
52:23 55:3
55:8,12
56:9 59:14
60:13,19
62:13,22
63:10,23
64:6,20
66:23 67:3
69:18 70:14
72:6 73:14
74:2 75:1,6
75:10 79:19
80:7 82:9
82:23 83:10
88:6 90:24
91:7,15
92:4,17
93:17 94:7
96:3 97:8
97:12,18
104:15
105:19
107:1 109:3
111:16
112:20
114:7
116:13
117:1,13
119:9,14
121:10,21
124:3 125:2
125:17
126:11
127:2,11,18
128:10
129:2,7
131:23
132:6,12,16
132:22
133:14

135:4,17
136:8,22
137:1,9,18
138:2,3,20
140:3 141:6
141:14,22
142:21
144:3,11
146:7,9,10
146:13,14
153:8,15
154:10,14
155:12,15
155:17,21
156:1,10,19
157:3,4,9
157:13,22
159:7
163:4,18
165:3,9,10
165:12
166:4
167:14
169:22
170:21
173:3,8,12
173:22
174:13,16
175:6
176:19
181:6
182:18
185:5,13,17
187:6 189:8
190:10
193:1 194:7
194:21
196:2
197:24
198:11,16
200:15
201:1
202:14

207:10
209:24
210:11,19
210:21
212:15
213:4
214:10,21
215:1,7,24
216:4,5
218:19,23
220:18
222:22
223:10
224:1 225:2
226:3 227:5
227:19,23
228:3,13,17
228:20
229:5
230:10,13
235:17,18
235:22,24
236:1,3,23
237:23
246:12,15
247:3,15
248:2
250:20
251:4
252:14
253:3,21
254:9
255:12
256:14
258:23
259:1,5,20
260:17,21
261:5,21
263:2,5,23
266:3,24
267:11,24
268:10,17
Branum's
131:19

263:19
264:11
branums@...
2:12
break 75:4,5
75:9,13
151:14,17
159:6
161:22
214:11,13
214:16
257:1,4
breaking
162:10
238:14
266:21
brief 133:20
bring 8:8,9
130:23
149:15
157:11
174:19
207:15
208:21
211:13
245:9
bringing 80:1
105:24
172:6 181:2
broken 219:9
Brooks 17:4
brought
130:10
164:6
171:23
207:22
208:23
budget 28:3
28:14,22
30:8,8
94:11,12,23
99:24 100:1
100:9,10,16
100:21

104:9 107:7
107:9,17,19
107:21
110:19
112:5
113:10,11
113:18
118:10
122:23,24
160:11
177:24
233:23
234:2,4,8
234:10
236:8,8
237:8,15
238:2
239:20,20
241:14
243:12,14
265:10
budgeted
118:16
122:2
budgeting
239:16
build 162:23
203:3
211:24
261:18
building
27:11 30:1
35:20 56:21
56:23 58:12
81:6 120:23
166:7,9,22
167:18,20
167:21
172:12
176:12
188:5
206:24
208:4,24
213:3,7

ERIC DAVIS
March 12, 2024

Page 6

220:3 222:6
231:24
232:3 233:9
233:14
238:9,13
240:4
245:17,21
257:6
260:11
buildings
27:4 158:15
builds 260:11
built 37:21
39:23 40:1
212:24,24
257:7,16
260:2
bulk 105:11
126:20
bumped
149:2
bumpers
249:6
bunch 162:5
243:9
bureau 51:24
52:2,3
107:21,22
129:17
bureaucracy
223:1
business
95:20 96:8
96:21 97:3
97:6 98:3,4
98:17
201:21
250:4,6,9
busting
162:18
buy 247:10
___C___
C 2:1 3:16

4:11 228:2
246:19
271:2
calendar 5:1
59:4
California
262:14
call 8:3 205:3
205:6
called 1:11
4:8 16:16
17:4 25:15
29:21 30:3
33:24 68:3
74:8 86:22
87:22
113:10
164:4
211:13
217:17
243:19
Calling 61:6
calls 36:24
63:10,12
64:21 74:2
141:23
165:3
204:12
campus
148:2
216:18
219:4,6,11
220:6
cancel 91:9
93:15
cancelling
93:11
226:10
Canchola-...
104:3
249:24
250:3
capacity
224:21

242:12,20
capital 11:20
17:16,19,24
18:14,19
27:24 41:16
48:22 51:23
62:9 63:1,5
63:6 68:23
72:19 88:24
90:3 91:14
91:18 92:1
92:12,16
93:5,7,9
95:17,20
98:20,22
99:5 100:10
101:10
104:6,11,19
105:3 107:5
107:18
108:11,16
108:18,23
110:3,4,11
110:18
111:11
114:22
118:21
119:7,19,21
119:22
122:11
123:1,4
175:16
189:5
190:12
191:2
197:17
205:4,7,21
205:22
226:9
239:13,22
241:23
264:13,20
264:21
265:2 266:8

care 97:1
127:11
carried 28:3
93:2 95:7
106:13
119:2 121:4
265:13
266:13
carries
120:18
carry 93:16
119:12
123:8
carryover
105:17
106:2
case 4:15,20
5:5,7 7:21
16:4,7
16:10,19
29:16 48:19
63:4 74:6
81:20 84:16
95:20 96:7
96:22 97:3
97:6 98:3,4
98:17 120:6
124:5 157:3
159:18,23
160:18
162:16
163:13
169:10,11
171:22
172:7 197:5
216:2
223:23
224:7 229:1
231:22
233:4
247:21
249:20

250:4,6,9
256:9
cases 5:13
41:9 71:13
96:8 150:14
224:5 231:2
categorical
128:1
categorically
31:9
categorizing
99:23
caused 23:21
153:3
cell 121:2
cells 148:3
Cermak 8:4
11:1,22
12:19 13:10
13:16 14:10
14:11 18:23
19:7 20:4
20:18 22:15
22:23 23:17
24:17 25:13
26:13,17
27:12,22
29:5 31:4
31:22 32:9
32:12 34:13
34:16 36:9
36:11 37:21
38:15 39:3
39:6 40:6,7
40:16 41:17
42:10,23
43:18 45:8
45:16 46:2
47:18 52:7
52:21 53:15
56:7,7,16
56:24 57:5
58:1 59:11
59:22 63:9

66:5,20
72:14 78:22
80:17 81:9
85:10 86:12
91:13,20
95:9,22
97:7 101:6
102:23
103:2,9,20
104:5,13,22
105:6,10,17
105:21
106:21,24
109:20
110:22
111:24
112:18
113:6,13
114:13,14
114:24
115:16
117:10,15
120:6 134:9
134:24
135:3,14,16
136:6
137:16
139:8
146:23
147:9 148:1
149:20
150:7 152:2
152:17
156:5,17
157:20
159:3,12,14
159:18,21
165:2,24
168:9 172:3
173:7,13,19
176:2,18
177:4
180:11
181:4,14

ERIC DAVIS
March 12, 2024

Page 7

184:20
186:12,16
187:13
191:9 203:8
205:8
206:13,15
206:19,23
206:24
207:9,21,23
208:3,22
209:6
210:24
211:10
215:21
216:13
217:5,8
218:6,6
219:7,9,16
220:2,11,12
221:16
222:1,15
223:9
224:12
225:1 226:2
228:5,9
230:3,18
231:10,18
233:24
234:19
236:10
238:1
244:10
245:1,10
250:4,7,24
256:12
265:20
267:10,23
certain 77:2
113:18
161:9
175:12
225:21
239:7
certainly

123:15
167:17
certainty
223:19
225:17
Certified
1:16 271:3
272:8
certify 23:3
26:19 83:7
136:23
137:24
138:3
155:20
271:5
cetera 31:16
62:4 178:8
CFO 108:5
110:24
111:2 113:1
117:11
challenge
54:8
225:1 226:2
chance 71:11
change 5:17
90:22
134:21
135:21
175:1 248:7
248:8
changed
189:10
changing
91:3
characteriz...
50:7,13
69:19
125:18
184:10,15
187:7
195:14
220:19
247:4,16
248:3 266:4

characterize
130:3 239:5
263:20
characteriz...
246:8 258:6
258:24
characteriz...
185:23
charge 66:6
107:19
109:6 139:6
196:7
200:24
206:20
217:4
charged 39:4
63:2
check 5:1 8:6
14:4 15:11
15:15,20
18:6 19:15
19:17 33:12
45:10 48:12
51:17 55:17
55:24 56:12
59:7 60:22
70:8 73:1,5
75:22 81:3
98:6 170:7
181:16
184:12,17
240:17
268:22
checking
32:14 57:11
129:16
checks 190:2
Chicago 2:5
2:11 30:6
43:7 161:9
chief 20:21
20:22 23:20
24:4 33:3
41:8 65:11

66:1,17,21
67:18 68:2
87:18 88:3
107:23
111:2,4
113:16
114:2 116:9
115:8
205:17
215:18
citizen
261:19
citizenry
259:10
citizens
175:18
262:3
city 43:7
Civil 1:13
clarification
27:8 119:15
clarified
185:10
clarify 23:18
26:24 160:8
clarity 69:6
clean 49:12
49:15,24
162:22
178:3 210:8
clear 7:24
8:23 9:5,20
46:3 80:4
80:10 83:14
87:5 92:20
103:13
108:15
111:19
119:13
131:6
139:10
179:12
215:4
227:17

175:2
198:20
247:20
256:21
circumstan...
2:12
118:1
121:24
122:1,7
123:15
255:16,18
256:1
citation... 
261:19
citizenry
259:10
179:12
215:4
227:17

246:18
clearly 84:16
139:15
clerical 23:21
close 239:18
closed 212:21
closeout
264:8
code 42:2
43:6,7 61:5
62:2
codes 43:15
152:3,23
coffee 266:23
267:6
combination
231:20
combined
210:2
come 80:22
96:22
118:15
122:7
140:10
189:15
203:12
207:18
208:3,9,10
208:16
211:14
214:13
226:19
239:23
comes 158:20
164:3 240:5
265:7
comfortable
192:15
coming 56:15
93:14 99:9
179:12
215:4
227:17

Exhibit 5 Page 70

| | | | | | |
|---|---|---|---|---|---|
| commence... | 65:18 | 39:19 231:5 | 18:23 39:6 | 268:24 | 213:8 |
| 271:6 | 234:17 | **compliance** | 53:18 | **conclusion** | **configurati...** |
| **comment** | 238:3 | 10:24 11:22 | 137:16,21 | 63:11 64:21 | 199:2 |
| 210:12 | **compare** 44:9 | 23:17 27:5 | 215:22 | 70:1 74:3 | **confirm** |
| **commentary** | **competing** | 36:3 39:15 | 217:9 | 127:3 | 13:11 14:23 |
| 173:4 | 202:24 | 64:18 67:8 | 248:13 | 133:16,17 | **confirming** |
| **comments** | **competition** | 69:13 70:1 | 257:11 | 135:8,22 | 178:6 |
| 137:2 | 231:1 | 70:10,13 | **complies** | 136:2 | **conformance** |
| **commission...** | **complete** | 106:1 115:8 | 40:17 41:18 | 139:11 | 37:24 |
| 77:4 151:24 | 8:11 22:7 | 125:22 | 43:1 136:12 | 141:15 | **confused** |
| **commissio...** | 63:21 67:23 | 130:23 | 136:14 | 154:15 | 103:13 |
| 108:11,17 | 79:13 | 140:1 | **comply** 42:11 | 155:13,18 | 263:24 |
| **Commissio...** | 120:15 | 141:12,20 | 43:19 45:19 | 187:23 | **confusing** |
| 14:14 65:11 | 125:6 131:6 | 143:14 | 53:24 73:24 | **conclusions** | 48:6 172:23 |
| 85:19 89:4 | 131:8 | 174:19 | 74:23 80:5 | 127:4,22 | **connection** |
| 90:18 100:7 | 143:14 | 231:11,13 | 124:2,24 | 135:5 136:9 | 5:12 158:22 |
| 100:14 | 160:4 | 245:10 | 125:16 | 136:13 | 158:23 |
| 116:5 | 168:12 | 253:15 | 126:6,24 | 137:19 | **connects** |
| **commit** | 196:15 | 258:17,20 | 127:17 | 156:12,20 | 148:24 |
| 224:23 | 232:1 | 259:19 | 141:5 | **concrete** | **consider** |
| **commitment** | **completed** | **compliant** | 224:12 | 61:24 158:6 | 133:9 |
| 224:14 | 10:3 12:4 | 17:4 40:1,2 | 252:1,5 | 161:8,10,13 | 147:12 |
| 226:1 | 38:21 82:15 | 42:1 43:12 | **complying** | 161:14,20 | 195:7 |
| 243:20 | 92:14,24 | 43:14 59:12 | 135:15,20 | 161:22 | 201:13 |
| **committed** | 120:3,9 | 61:10 87:11 | **component** | 162:8,9,11 | **considered** |
| 84:22 | 126:3 | 125:7 | 245:10 | 162:13 | 248:22 |
| 224:18 | 128:15 | 140:12,18 | **components** | 163:1,5,18 | **consistency** |
| 225:23 | 171:19 | 142:5 152:2 | 245:3 | 163:19 | 231:20 |
| **committing** | 172:1 | 152:6,7,18 | **compound** | 165:1 166:3 | 232:12 |
| 63:8 | 178:20 | 152:23 | 19:2 92:18 | 166:14 | **consistently** |
| **common** 30:6 | 212:3 241:7 | 176:11 | 111:17 | 167:3,4 | 131:2 |
| **communica...** | 264:20 | 244:12,16 | **computer** | 230:1 | 224:15 |
| 115:9 | **completely** | 246:23 | 197:12 | **condition** | **consisting** |
| 171:15 | 42:8 125:7 | 252:13 | 199:14 | 211:22 | 270:14 |
| **communica...** | 189:9 210:6 | 255:19 | **conceivable** | **conditions** | **constitute** |
| 79:21 115:6 | **completing** | 258:2 | 209:22 | 32:8 161:5 | 175:20 |
| **communica...** | 267:23 | 260:12 | **concern** | 209:19 | 204:16 |
| 83:18 | **completion** | **complicated** | 59:11 | 210:4,16 | **constituted** |
| **companies** | 118:11,17 | 120:5 | **concerned** | 211:3 | 253:8 |
| 34:22 | 221:19 | 167:23 | 52:5 226:22 | **conducted** | **constitutes** |
| 163:18,20 | 224:24 | 175:2 | **concerning** | 32:6 57:20 | 8:24 271:13 |
| 163:22 | 240:23 | 230:23 | 271:9 | **conducting** | **constrain** |
| 164:13 | 241:3 254:5 | 231:6,8 | **concluded** | 56:24 99:2 | 84:2 |
| **company** | **complex** | **complied** | 252:18,20 | **configurati...** | **construct** |

| | | | | | |
|---|---|---|---|---|---|
| 64:16 86:18 | 79:23 82:7 | 238:3 | **context** 9:1 | 130:21 | 209:3 |
| 87:2 96:24 | 86:20 94:19 | 239:13,22 | 126:17 | 176:15 | **conversatio...** |
| 97:3,6 | 94:19,21 | 240:3 | **continue** | 181:4 | 21:22 32:11 |
| 103:22,22 | 95:2,9,21 | 241:14 | 136:19 | **contracting** | 32:16 201:9 |
| 106:19 | 96:16 98:11 | 242:7,19 | 159:20 | 17:6 34:22 | **conversion** |
| 114:14 | 101:5 | 243:6,7 | 216:5,6 | 72:21 86:19 | 168:18 |
| 122:9,14 | 102:22 | 244:3,8 | **continued** | 86:24 87:7 | **converts** |
| 209:5,22 | 103:9,12 | 264:8,23 | 265:15 | 103:23 | 224:17 |
| 210:24 | 104:4,13,22 | 266:11 | **continues** | 201:18 | **convince** |
| 230:12 | 105:5,12 | **constructs** | 120:16 | **contractor** | 263:11 |
| 239:19 | 106:20,23 | 42:3 | **continuous** | 8:9 35:8,16 | **convinced** |
| 242:6 | 107:18 | **consult** | 61:9 126:8 | 35:22 42:3 | 83:23 |
| **constructed** | 108:21 | 122:22 | 128:7 | 65:23 67:24 | 139:24 |
| 34:21 36:18 | 110:22 | 213:16 | **contract** 9:2 | 68:5 69:12 | **convincing** |
| 38:15 39:19 | 112:1,17 | **consultant** | 9:7 18:4,12 | 87:9 161:18 | 140:24 |
| 39:20 51:6 | 113:5,13 | 33:16,17,20 | 18:17,21 | 162:6,8,9 | **Cook** 1:7,7 |
| 69:4 120:12 | 114:13,23 | 36:20 65:6 | 20:3,5,13 | 164:3 | 8:16 22:14 |
| 123:6,11 | 117:5,10 | 123:11 | 20:17 21:13 | 166:14 | 23:12,15 |
| 246:7 252:7 | 118:14 | **consultants** | 22:9 23:10 | 167:3,13 | 25:10 27:4 |
| 252:8 | 120:10,17 | 190:21 | 25:4,9,12 | 176:8 | 34:12 36:17 |
| **constructing** | 120:14,17 | 23:16 24:3 | 25:20 26:2 | 183:15,17 | 36:19 37:23 |
| 35:17 | 122:19 | **consultations** | 26:3,7 28:1 | 183:23 | 42:9 43:18 |
| 209:11 | 134:15 | 100:13 | 28:9 30:15 | 230:12 | 45:13 51:20 |
| 211:5 | 140:18 | 113:1 | 31:3 33:1 | **contractors** | 52:5,20 |
| 223:16 | 153:1 | **consulting** | 33:22 34:5 | 87:5 202:1 | 53:13 54:22 |
| **construction** | 159:13,22 | 32:21 34:8 | 47:22 65:14 | 238:17 | 62:12,19 |
| 25:19 28:2 | 160:13,14 | 76:19 | 65:18,23 | **contracts** | 63:7 64:3 |
| 28:12,16,17 | 160:24 | **consuming** | 73:6 76:15 | 11:11 14:15 | 64:16 66:15 |
| 28:20 29:14 | 164:11 | 149:12 | 81:12 85:19 | 19:21 25:21 | 66:22 68:23 |
| 32:21 33:5 | 168:8,10,17 | **consummat...** | 87:2,6 | 26:12,17 | 69:11 72:13 |
| 33:10 34:1 | 168:18 | 183:7 | 88:18,20 | 28:11 65:10 | 79:16 |
| 34:10,11,20 | 170:20 | 218:16 | 91:9 92:8,9 | 65:13 66:4 | 104:21 |
| 34:24 35:2 | 171:1,8 | **contact** 19:6 | 122:15 | 85:23 87:20 | 105:4 111:9 |
| 35:3,4,5,7 | 182:4 | 20:2,6,6,16 | 181:9,11 | 88:13 | 117:11 |
| 35:13 36:18 | 189:16,18 | 52:12,19,19 | 192:12,13 | 115:19 | 123:24 |
| 37:24 38:8 | 190:8,20 | 181:17 | 197:8 | 120:11 | 127:14,15 |
| 38:9,10,20 | 201:12,20 | 182:15 | 218:17 | 177:23 | 127:19 |
| 39:4,11 | 201:22 | 187:12 | 221:19 | 225:15 | 135:1 141:3 |
| 51:9 63:21 | 202:12,21 | 218:17 | **contracted** | 264:18 | 143:6,24 |
| 65:4,7,17 | 207:1 210:2 | 221:19 | 33:23 41:24 | **control** | 144:9 |
| 65:20,23 | 213:14 | **contacted** | 72:15,20 | 226:13,14 | 147:16 |
| 66:19 67:19 | 226:18 | 33:1 176:17 | 73:7 120:14 | **conversation** | 148:5,6 |
| 67:22 68:6 | 234:4,17 | 187:14 | 123:12 | 99:9 181:22 | 153:6 |
| 68:12 71:22 | 237:14,21 | 204:23 | | 207:19 | 160:23 |
| | | **contains** | | | |
| | | 185:19 | | | |

| | | | | | |
|---|---|---|---|---|---|
| 170:12 | 78:23 80:6 | 195:20 | 199:5 | 38:21 39:19 | 144:9 |
| 172:20 | 82:8 86:17 | 198:10 | **cost** 150:17 | 41:9 42:22 | 145:13 |
| 175:13,23 | 86:23 87:4 | 200:4,6,7 | 150:20,23 | 43:18 45:13 | 147:16 |
| 176:1,15 | 88:1,5 | 201:23,24 | 160:12,14 | 46:1 47:24 | 148:5,6 |
| 180:6 | 95:11,14 | 202:8,13,18 | 192:18 | 48:2,20 | 150:16,19 |
| 188:24 | 104:7 | 203:9,10,20 | 203:13 | 51:20 52:13 | 150:20 |
| 190:9 191:1 | 105:18 | 203:21 | 242:5 | 53:13,17 | 151:24 |
| 192:8,10 | 106:9,14,15 | 206:21 | **costly** 149:18 | 61:22 62:6 | 153:6 |
| 202:7,17 | 107:3,7,8 | 208:17 | **counsel** 13:4 | 62:8,12,19 | 160:23 |
| 212:7 | 107:11 | 212:8 213:3 | 47:19 64:6 | 62:24 63:4 | 168:5,6 |
| 214:19 | 108:14 | 214:6 | 83:19 93:17 | 63:8,8 64:3 | 170:12,18 |
| 215:15 | 109:1,2 | 220:17 | 97:8 135:4 | 64:16 65:3 | 172:21 |
| 216:13 | 110:23 | 221:4,12,13 | 136:8 | 65:5 66:15 | 175:13,23 |
| 224:22,23 | 111:15 | 222:16,21 | 174:14 | 66:22 68:23 | 176:1,15 |
| 226:1,8 | 112:19 | 223:9 | 193:1 | 70:12 72:13 | 177:24 |
| 251:2 270:7 | 115:5 119:8 | 224:13 | 197:24 | 76:24 79:17 | 180:6 |
| 270:7 | 119:20 | 228:11 | 198:11 | 84:22 87:12 | 188:24 |
| **cooperate** | 120:24 | 237:3 | 228:4 | 89:6,10,11 | 190:9 191:1 |
| 46:13 | 121:5 125:1 | 246:24 | 230:15 | 90:7,10,14 | 192:8,11 |
| **cooperation** | 127:1 128:9 | 247:2,9,14 | 238:20 | 90:22 91:5 | 193:16,24 |
| 143:3 | 129:12 | 248:1 250:1 | 241:13 | 91:12,17,23 | 196:12 |
| **copy** 45:11 | 131:22 | 250:12,13 | 244:23 | 91:24 92:2 | 200:2 202:7 |
| 55:6 | 133:3 138:9 | 251:3 | 271:21,22 | 92:6 93:3 | 202:18 |
| **CORNELI...** | 138:14 | 252:12 | **counsel's** | 93:14 94:1 | 212:2,8 |
| 1:3 270:3 | 140:2 142:6 | 253:2,20 | 50:6 | 96:13 | 214:19 |
| **corner** | 143:21 | 257:8,17 | **Counselor** | 100:14,15 | 215:15 |
| 148:22 | 150:9,18 | 261:7,8 | 175:3 | 104:21 | 216:13 |
| 150:1 | 157:21 | 263:22 | **counterfact...** | 105:4 | 217:16 |
| **correct** 4:20 | 158:11 | 264:22 | 141:24 | 110:21 | 221:3 |
| 5:3 13:1,10 | 163:19 | 266:2 | **country** | 111:9,13,14 | 224:22,23 |
| 15:10 22:2 | 166:15 | 267:23 | 182:7 | 112:2,4,8,9 | 226:1,8 |
| 23:7,14 | 169:5 | 268:9 | **County** 1:7,7 | 112:12,14 | 227:4 228:7 |
| 29:14 36:12 | 171:10,20 | 270:16 | 8:17 11:8 | 113:3,15 | 229:23 |
| 36:15,16,22 | 172:19 | **corrections** | 14:8 16:11 | 115:3,13 | 230:7 |
| 40:19,20 | 173:1,7 | 35:23 | 17:16,23 | 116:7 117:4 | 239:15 |
| 48:11 53:20 | 175:16,18 | 147:17 | 22:14 23:13 | 117:4,8,11 | 240:13 |
| 55:14 58:8 | 177:5 | **correctly** | 23:15 25:10 | 118:6 119:7 | 251:2 260:4 |
| 68:8,19 | 178:21 | 35:9 44:7 | 27:5 28:3 | 122:9 | 260:15 |
| 69:17 70:21 | 179:18,19 | 50:21 | 30:2 33:4 | 123:24 | 263:21 |
| 72:2,4,10 | 180:7 | 143:10 | 33:14,15,23 | 126:24 | 265:1 270:7 |
| 73:9,13 | 186:13 | 153:23 | 34:12 35:3 | 127:14,15 | 270:7 271:2 |
| 75:17 77:9 | 191:15 | 219:5 236:5 | 35:15 36:17 | 127:19 | |
| 77:10,12 | 192:11 | **corridor** | 36:19 37:3 | 135:2 141:3 | |
| 78:3,11,16 | 194:14,15 | 55:21 78:22 | 37:4,23 | 143:6 144:1 | |

| | | | | | |
|---|---|---|---|---|---|
| 52:20 54:22 | **Court's** 4:4 | 94:13 95:6 | 58:17 60:6 | 157:13 | 46:22 47:2 |
| 69:11 | 13:7 22:19 | 119:3 234:4 | 128:14 | **December** | 51:11 61:15 |
| 122:22 | 26:15 27:19 | 245:1 | 186:19 | 45:17 51:15 | 61:17,17 |
| 141:12 | 46:17,18 | **currently** | 257:15,15 | 60:3 62:21 | 63:17,18 |
| 151:24 | 48:22 49:1 | 103:17 | **dated** 62:21 | 70:5 71:16 | 64:15 68:15 |
| **couple** 43:22 | 49:17 | 126:4 148:7 | 70:5 86:15 | 129:16 | 72:1,5 |
| 99:10 100:4 | 121:12 | 181:1 193:9 | 128:22 | 137:15 | 75:15 76:20 |
| 148:18 | 127:1 247:4 | 193:16,24 | 137:15 | 141:11 | 81:14,16,22 |
| 196:22,24 | 248:3 | 196:12 | 141:11 | 161:10 | 82:18 83:4 |
| 217:10 | **courthouse** | 263:21 | 161:10 | 178:2 | 83:9,11,13 |
| 239:14 | 121:3 159:1 | **custody** | 178:2 | 187:22,24 | 83:18,24 |
| 253:19 | 212:10 | 145:2,9 | 219:19 | 188:17,20 | 86:15 106:6 |
| **course** 21:11 | **courthouses** | 169:3 262:1 | **Davis** 1:10 | 204:14 | 121:8,9 |
| 54:3 103:19 | 101:22 | 262:4,6,7,8 | 3:3 4:4,7,13 | 214:2 | 123:9 |
| 113:22 | **Courts** 1:14 | 262:11 | 49:8 64:4 | 245:24 | 131:18 |
| 125:5 | **cover** 205:16 | **custom** | 68:9 109:10 | **decide** 110:7 | 132:13 |
| 159:22 | 216:16 | 149:19 | 134:8 137:7 | 236:24 | 133:9 134:1 |
| 168:13,20 | **covered** | 150:12 | 137:12 | 237:7 | 134:1 |
| 175:1 | 226:7 | **custom-cast** | 138:7 155:8 | **decided** 70:9 | 137:13 |
| 188:14 | **CPI** 105:16 | 149:8 | 167:10 | 76:21 88:11 | 138:17 |
| 198:21 | 105:18 | **cut** 160:1 | 186:4 | 218:12 | 139:3 |
| 207:1 226:7 | 112:16 | 162:17 | 193:20 | 220:22 | 146:19 |
| 238:9 | **CPO** 21:7 | 163:3,10,11 | 195:5,23 | 229:11 | 151:19,20 |
| 251:13 | **CPO's** 21:23 | 163:20,22 | 215:6 | 251:20 | 157:24 |
| **coursing** | **CREA** 94:19 | 166:20 | 228:18 | **deciding** | 169:4,6 |
| 139:18 | 201:22 | 270:10,19 | 246:18 | 88:10 | 170:8,9,13 |
| **court** 1:1 | 202:12 | **cutting** 54:13 | 268:19 | **decision** | 170:18 |
| 22:24 27:9 | **create** 149:1 | 148:20 | 270:10,19 | 150:16,20 | 171:8,17 |
| 27:14 42:24 | 149:8 | **cycle** 100:20 | **Davis'** 46:19 | 150:21,22 | 181:19 |
| 46:12 | **cross-exam...** | 234:5 | **day** 25:2 | 150:23 | 182:23 |
| 120:23 | 3:5 264:12 | | 164:5 | 228:5 230:2 | 193:7,15 |
| 125:13 | **cross-slope** | **— D —** | 177:16 | 230:6 249:9 | 210:1,7 |
| 128:22 | 74:8 79:23 | **D** 3:1,16 4:11 | 270:21 | 265:6 | 229:21 |
| 129:12 | 134:16 | 246:19 | 272:2 | **Declaration** | 234:15 |
| 139:2 | 136:5 | **daily** 208:1 | **days** 4:19 | 4:15 7:12 | 240:11 |
| 141:18,18 | 140:19 | **dark** 178:1 | 7:15 68:1 | 7:14,19 8:8 | 244:8 |
| 157:12 | 153:2 | **DART** 1:6 | **Dayton** 231:9 | 8:13,18 9:9 | **decline** 196:1 |
| 213:3 237:5 | **cross-slopes** | 270:6 | **de** 133:10,17 | 9:11 10:10 | 196:5 |
| 246:22 | 153:11 | **data** 84:18 | 153:23 | 10:13 13:7 | **declined** |
| 247:1,9,14 | **crutches** | **date** 4:5 5:2 | 154:3,8,15 | 13:13 17:21 | 14:14 |
| 247:24 | 259:17 | 8:13 11:17 | 154:17,24 | 22:21,21 | **decrease** |
| 252:24 | **cup** 266:22 | 12:14 14:21 | 155:10,14 | 27:10,16,17 | 225:18 |
| 253:9,12,16 | **current** 61:5 | 18:13 32:13 | **dealing** 63:3 | 34:20 36:6 | **defendant** |
| 270:1 | 86:13 94:13 | 57:23,23 | 234:8 240:7 | 46:4,7,20 | 45:13 |
| | | | 256:6 | | |
| | | | **debate** 157:5 | | |

Exhibit 5 Page 71

ERIC DAVIS
March 12, 2024

Page 12

defendants 168:16,17 1:8 2:14 8:16 254:18 270:8
define 178:24 201:1
definite 122:20
definitely 122:1
definition 175:19
definitive 144:14
definitively 20:10 21:1 184:1 251:24 252:4
degree 118:14 231:7
degrees 244:20
delay 71:6
delegated 109:15
deliver 65:15 66:4
delivery 67:20 71:21 86:16,20
demolish 159:5,14 161:19 165:2 167:17,19
demolished 164:10
demolition 161:14,17 163:13 164:14 168:3,4,8,9

deponent's 228:15
deposed 4:19 4:24 5:4
deposition 1:10 4:3 5:9 6:16,20 7:8 7:17 27:15 46:12,17,19 74:6,11 75:23 76:1 76:24 85:24 125:10,24 134:11 146:17 153:11 179:23 180:2 198:3 206:9 216:4 224:7 226:8 226:16 268:23 270:12,13 271:10,16 271:18
depositions 1:15 5:15 6:13 13:6 223:23 224:5
deputies 248:24,24
deputy 21:6 41:16 48:23 DeRoo 191:1
described 159:4 170:15
design 9:12 9:17 24:13 25:15 28:11 28:13,15,23 28:24 29:1 29:4,13,19

department's 210:17
denying 81:20 262:19
department 11:21 15:7 41:5,15 47:21 51:22 54:4 62:9 63:1,5,6 66:7 72:16 72:19 73:7 87:15 96:8 100:1 122:10 124:23 128:6 129:18 147:16 188:11 189:2 190:12 191:2 196:21 197:3,10,17 205:11 265:8
departments 206:4
dependent 71:9 260:9
depending 65:12 180:21
depends 5:24
deponent 269:6 270:11

deny 13:11
denoting...
deponent's 228:15

237:18 238:3,15 242:4,24 243:4 244:4 245:16 263:22 264:8,14,17 264:19 266:1,6 267:9
designated 65:2 90:5
designed 123:10 158:15 255:19
designing 183:5 197:21
destroy 163:2
detail 29:23 257:24
detailed 172:5
details 27:11
detainee 251:10
detainees 207:3
detention-g... 236:19
determinat... 184:9,13 217:22 219:14,20
determine 80:15 199:10
determined 60:11 143:13 244:15
determining 139:19
develop 18:9

29:19 225:14
developed 31:13,19 217:20 219:19
developing 11:13 85:2
development 9:23 10:1 18:18 69:9 80:21 98:22 122:24 DFM 247:10
dictate 257:20
difference 28:9 53:9 87:6
different 16:13 20:14 33:23 37:9 44:2 54:10 54:18 64:5 99:4 103:14 122:4 148:18 170:15 176:2 202:20 213:9 218:13 232:17 238:22 255:22 262:10
difficulty 51:10,12
digesting 99:22
digging 197:6
diligently 224:15
direct 3:4

ERIC DAVIS
March 12, 2024

Page 13

23:19 26:13 83:21 136:20
directed 46:8 46:23 48:1 175:24 186:22 257:3
directing 23:1 27:8 36:1 127:7
direction 26:9 35:22 50:20 89:23 128:1 229:2 229:6 271:13
directly 63:3 102:4 151:8 212:12,17 247:11 271:23
director 31:15 32:20 48:23 87:15 88:24 90:3 108:15,16 108:18,23 109:18 110:3,10,11 110:18 122:12 186:22 189:15,21 191:2
Disabilities 53:19
Disability 45:20
disabled 254:15 255:5 259:16 260:8,14

disclosure 82:19
discoverable 138:24
discovered 24:6
discretion 149:12
disclosure 41:6 93:8 108:19,20 108:22 111:12 113:17,21 116:9 175:21 248:19 249:14
discuss 22:5 244:10
discussed 103:3,10,17 103:21 134:10 206:22 207:6 209:4
discussing 20:19 101:5 101:9 206:15
discussion 129:23 184:5 264:5 44:10
documenta... 43:10 44:8
dispassiona... 143:17
dispute 124:1
disrupted 118:13
distinction 29:13
distinguish 6:18
District 1:1,1 1:14 270:1 270:1

Division 1:2 144:19 208:10,13 208:14,16 270:2
doable 164:15
DOC 216:18 219:3 183:13,19 186:15 188:3 191:9
doctrine 83:1 127:6 136:3 136:16,21 137:23 138:22 229:13 232:3,9 233:4 234:16 238:8 239:11 242:4,24 243:4 244:2 244:4 251:23
dollars 203:13,18 266:8
door 149:23 150:2,4 199:7 207:16
doors 125:24 147:5 244:13
double 240:17
doubly 266:14
doubt 186:3
dozens 123:17
doing 12:19 30:13 34:23

31:13,19 55:17,21 60:2 99:24 100:24 102:16 104:8 107:16
drafted 15:6 181:20
drafting 83:4
draw 29:12
drawing 36:10 77:7 138:11 153:21
drawings 29:14 30:5 30:21 36:14 37:9,22 38:1 42:5 44:10 69:1 69:2 71:9 71:18 73:19 76:19,21 82:2,7 172:6 176:16 188:8,10 266:1
driven 208:11,12 208:13,14
due 247:8
duly 4:2,9 270:10 271:8
duration 68:13 159:17 213:15 225:18

E

E 2:1,1 3:1,10

3:16,16,16 4:11,11 228:2 246:19,19 246:19
e-mail 76:14
e-mails 58:24 59:3
Earl 88:23 89:12,20
earlier 12:5 24:10 51:21 56:19 128:13 129:14 140:23 153:11 160:9 184:5 228:4 244:23 245:15 251:9,17 264:5
early 57:15 99:1 141:3 192:3 214:1
earmarked 106:23
easier 49:23
easily 115:12
EASTERN 1:2 270:2
easy 166:8
edge 162:22
efficient 18:3 131:1 201:13
effort 50:18 53:15 85:11 164:9 189:20
efforts 103:2 116:5 222:11

ERIC DAVIS
March 12, 2024

Page 14

egregious 236:17
egregiously 236:17
eight 99:13
either 8:16 15:7 16:22 36:19 65:10 73:22 74:6 74:21 86:8 88:13 89:14 102:3 112:15 208:23 221:3 226:17 240:20 252:7
elected 111:14
element 28:21 139:9
elements 35:14 43:8 67:8 69:3 82:1 199:10
Ellen 12:9,18 13:15 52:8 52:15 139:7 152:15 174:7
Ellen's 14:22
emergency 175:11,20 176:1,10 235:2 237:4
employ 39:10
employed 72:13
employee 224:21 250:11 271:20,22
employees

250:13 251:1 233:6
encumber 244:5
encumbering 266:8
encumbran... 266:8
encumbran... 265:15
endeavor 167:23
endeavored 225:14
ended 14:17 88:13,13 120:18 148:17
ends 54:19 125:9 126:21 129:21 150:11 151:3 160:17
enforce 22:24 26:15 27:9
enforcement 145:7
engaged 24:10 176:8 176:8 232:2
engagement 23:24 28:7
engaging 231:23
engineered 211:14
engineering 10:18,24 14:19 15:4 29:2,4 65:15 160:10
engineers

217:15
ensure 30:11 36:21 41:18 41:23 42:10 42:20,22 143:7 265:15
entered 45:8 46:1 108:13
entire 11:10 25:13 172:3 219:6 220:6
entrance 206:24 208:23
entrances 207:9
environment 145:3,10 163:24 169:3 249:15 262:1,12,21
equal 240:18
Eric 1:10 3:3 4:4,7 46:19 47:5 64:4 75:6 96:1 266:18,21 267:1 270:10,19
Eric's 96:4
eroded 211:9
error 23:21 24:6
escorted 251:11
especially 236:17
essentially 246:10
established 42:16 123:17

establishm... 256:20
estate 99:16 205:24 206:1,3
examination 1:12 3:4,7 271:7
examined 4:9
example 101:24 207:14 211:7
exceed 78:3 79:17 135:2 136:7 203:7
exceeded 24:18 56:8 59:23 73:13 73:23 74:22 78:11 79:4 79:5 81:18 82:21
exceeding 74:14 133:12
exceeds 78:14 123:21
exception 84:21 107:17 110:13
excess 160:14
exclude 112:18
excuse 108:9
evolved 222:18
exact 57:7,23 57:23 105:23
exactly 26:11 40:13 73:18

138:13 181:3 182:2 185:11 212:22
examination 1:12 3:4,7 271:7
examined 4:9
example 101:24 207:14 211:7
exceed 78:3 79:17 135:2 136:7 203:7
exceeded 24:18 56:8 59:23 73:13 73:23 74:22 78:11 79:4 79:5 81:18 82:21
exceeding 74:14 133:12
exceeds 78:14 123:21
exception 84:21 107:17 110:13
excess 160:14
exclude 112:18
excuse 108:9
153:6
execute 14:15 23:16 30:4 42:4 96:20 123:17 238:12
executed 8:14 8:15,22,24

9:2,4,16,21 10:4 11:12 19:21 23:11 24:2 34:5 120:11 122:19
executing 9:21
execution 118:17
exemption 80:17
exhibit 3:12 3:12,13,13 3:14 7:3 44:12,13,23 49:14 55:4 55:8,10 129:8,11,13 145:16 146:2 214:19,21 214:24 215:2,8,12 215:15,15 216:1 229:22 240:10 244:9 245:14 246:24
exhibits 44:16
existing 32:8 61:8,24 124:18 163:1,5,20 165:2 166:3 211:10 230:1
exiting 159:14
exits 126:4

ERIC DAVIS
March 12, 2024

Page 15

expand 94:22
expect 11:17 14:23 16:21 94:23 115:24 122:18 155:16 161:12 162:12 164:24 165:10 167:12 168:16 183:7 188:13 189:18 191:7 197:9 200:11 241:9 242:1
expectation 18:10 105:7 242:3 249:13
expectations 222:20 223:21 241:2
expected 14:24 28:15
expecting 94:14 120:8 120:10
expects 212:3
expediency 231:20
expedite 201:12 223:18 226:24 227:3,8 233:12,17 247:8

expediting 231:21
extend 126:1 149:19,20 150:7,18 168:20 244:14
extended 149:24
extending 199:1
extension 61:9 69:16 148:13,13 148:15 150:13 151:5 199:17
extensions 126:9 199:8
expenditure 93:23 94:6 95:1 103:8
expenditures 94:17 109:7 109:13,14 243:18
expensive 236:17
experience 161:2 256:14 261:21
expertise 232:22,23
expired 33:22
explain 46:22 241:22 259:14
explained 185:20
explore 146:18
explored 208:20
exploring

54:13 233:6
extend 126:1 149:19,20 150:7,18 168:20 244:14
47:21 51:23 52:1,13 53:2,7 54:4 63:3 101:23 124:23 128:7 129:18 158:24 188:11 205:11,22 255:6 256:5 256:6 150:13 151:5 199:17
extensive 147:6
extent 24:19 26:10,16 40:22 64:20 75:1 126:12 164:24 172:3,4,13 172:15 176:9 205:8 236:19 255:10,18 259:11
extenuating 123:14
extra 236:19
extreme 118:14

F

F 3:16
fabricate 151:4
fabricated 148:14 150:9
face 209:2,16

facts 127:20 135:6 139:12 176:20 193:2 261:22
factual 64:8 64:12 133:18 135:10,13 135:19,23
factually 64:23 135:7
fair 12:8 18:2 52:4,22 53:16 82:22 85:10 113:7 121:20 125:20 130:4 151:6 163:21 173:2,21 176:4 180:14 184:21,24 194:6 201:16 220:13 222:2,10 223:24 227:22 229:12 231:1 245:18 254:12 261:24 262:4
fairly 30:5 131:1 158:20 177:9 191:10,11 233:17 250:2

fall 60:8,24 71:3 148:11 245:13
falls 27:18
false 42:14 49:5,11 97:15 185:20,21 223:7
familiar 45:5 120:21 183:17
far 27:5 47:22 50:20 51:5 52:4 80:17 103:11 110:8,21 112:1 134:9 154:3 177:13 178:5,23 180:20 182:11 194:4 200:24 225:24 226:21 228:6 257:21 258:16,20 259:18
fast 239:11 243:4
fasteners 164:8
faster 179:12 179:13 201:19 223:16 234:21 235:2,3,5,6 236:5,10,21 236:21

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 72

---

ERIC DAVIS
March 12, 2024

Page 16

|   |   |   |   |   |   |
|---|---|---|---|---|---|
| 237:2,6,9 | fees 28:23,24 | 197:2 | 11:21 12:18 | 182:10,15 | 122:4,5,17 |
| 237:12,13 | 29:1,4 30:9 | finalize | 12:22 13:18 | 187:15,18 | 123:1 168:6 |
| 260:16 | 160:12 | 189:24 | 16:6,14,15 | 187:19 | 168:13,20 |
| fastest | 182:12 | finalized | 30:3 34:1 | 189:19 | 170:19 |
| 234:22 | 183:1 | 100:19 | 34:12 35:2 | 202:19 | 234:5,8 |
| 247:12,21 | 190:18 | finally 15:12 | 39:3 40:16 | 216:4 | 242:2,6,13 |
| 248:9 | 194:2 | 178:11 | 63:21 85:9 | 217:12,24 | 266:14,17 |
| feasibility | 196:13 | 214:2 | 143:16 | 219:2 225:5 | fit 249:1 |
| 54:13 211:4 | 234:18 | 221:10 | 159:13 | 226:20 | fittings |
| feasible | 238:4 | finance | 160:10 | 237:16,17 | 244:21 |
| 149:19 | feet 77:22 | 107:22,22 | 161:1 177:8 | 265:13,17 | five 11:12 |
| 150:5,7 | 78:8,14 | 109:19 | 178:6 | 265:18,23 | 19:20 58:20 |
| 151:4 | 132:5,21 | financial | 184:18 | 266:4 | five-minute |
| 175:23 | 133:3,7 | 107:23 | 185:3 | 270:10 | 75:4 151:14 |
| 208:21 | 134:4 | 111:2,4 | 201:22 | fiscal 18:1 | 214:13 |
| 209:5,15,16 | 159:19 | 113:17 | 223:8 | 27:23 28:4 | fix 174:18 |
| 249:4 | 165:23 | 114:2 | 232:21 | 92:24 93:13 | fixing 174:12 |
| February | 166:7 | 116:10 | 245:16 | 93:16 94:23 | 174:19 |
| 8:14 15:5 | felt 70:10 | 265:24 | 265:24 | 95:4,7 97:2 | flat 163:7 |
| 86:15 | 77:3 139:20 | find 59:7 | firms 11:9 | 98:19,24 | floor 53:10 |
| 100:19 | fervently | 68:24 | 14:9 122:15 | 99:1,9 | 53:11 208:6 |
| 177:13 | 224:15 | 130:19 | 217:13 | 101:10,12 | focused |
| 182:24 | field 36:1 | 131:8 | 231:3 | 101:15,20 | 126:5 |
| 241:11 | figure 54:21 | 160:21 | 232:14,17 | 102:9,17,18 | folks 33:4 |
| federal 1:13 | 96:10 | 168:24 | 232:20 | 102:23 | 52:2 |
| 16:24 17:1 | 166:21 | 182:16 | first 4:2,8 | 103:12 | follow 250:15 |
| 17:5,7,11 | 188:22 | 214:8 | 10:21,22 | 104:19 | follow-up |
| 43:19 | 199:23 | 241:12 | 14:8 15:3 | 105:2,11,13 | 246:14 |
| fee 16:15 | figured | finding 9:9 | 19:6 26:24 | 105:16 | following |
| 21:17 24:2 | 251:20 | 130:8 | 32:24 36:8 | 106:8,11,13 | 13:14 93:3 |
| 24:16 | figures | Findings | 43:2,4 45:7 | 107:11 | 114:3 190:3 |
| 184:19 | 167:22 | 61:5 | 45:12,24 | 108:14,24 | 224:11 |
| 185:4 189:1 | figuring | fine 75:8 | 48:24 50:6 | 109:22 | follows 4:10 |
| 189:2,6 | 201:6 | 140:10 | 50:15 53:24 | 110:23 | forces 47:24 |
| 191:8 | fill 211:13,14 | 211:15 | 55:20 66:10 | 111:14 | foregoing |
| 192:10,13 | filtered | 249:10 | 107:6 115:9 | 112:3,16 | 270:13,16 |
| 192:14 | 264:20 | finish 97:5 | 130:11 | 113:14,23 | 271:10 |
| 194:11,13 | final 39:10 | 126:20,21 | 158:10 | 114:15,22 | form 5:19 6:1 |
| 194:16,20 | 43:11 44:8 | 129:21 | 160:4 | 115:4 116:8 | 6:17 8:19 |
| 195:3,8,12 | 55:17 70:7 | 245:5,6 | 176:15 | 117:9 118:5 | 11:2,23 |
| 199:17 | 184:17 | finished 37:9 | 178:10,19 | 118:8,22 | 12:11 16:7 |
| 200:24 | 185:1 186:4 | 125:6 | 178:22 | 119:8,19,23 | 19:1,9 |
| 222:7,8 | 186:7 | 130:18 | 179:4,8 | 119:24 | 25:23 29:7 |
| 225:17 | 188:19 | firm 9:19 | 181:13,17 | 121:17,18 |  |
|  |  | 10:17,24 |  |  |  |

---

ERIC DAVIS
March 12, 2024

Page 17

|   |   |   |   |   |   |
|---|---|---|---|---|---|
| 31:6 39:10 | formally | 167:9 | 242:12 | 100:9 | 263:2,6,7,8 |
| 41:20 42:13 | 100:5 | free 195:22 | funds 17:24 | 161:18 | give 8:10 |
| 43:11 44:8 | format | 202:12 | 28:19 29:3 | 165:1 | 9:10 41:13 |
| 48:6 52:9 | 218:13 | 218:13 | 94:15,22 | generally | 61:16 |
| 52:23 56:9 | 220:23 | 220:23 | 104:12,20 | 15:9 30:21 | 102:15 |
| 59:14 62:13 | formulation | fresh 243:14 | 105:5 | 35:10,12 | 124:15 |
| 62:22 67:3 | 234:5 | front 10:13 | 106:12,23 | 37:15 41:3 | 10:13 |
| 73:14 79:19 | forth 48:2 | 16:21 70:4 | 114:14 | 45:6 98:5 | 144:13 |
| 88:6 90:24 | 175:12 | 206:8 | 121:18 | 99:13 100:7 | 166:1 |
| 91:7,15 | forward | 207:16 | 122:3 | 100:11,16 | 191:20 |
| 92:4,17 | 42:23 81:5 | 232:23 | 166:24 | 100:23 | 199:16 |
| 94:7 95:12 | 103:11 | 242:21 | 170:19 | generating | 214:8 |
| 95:24 96:3 | 106:20 | full 30:11 | 237:14 | 29:22 | 227:14 |
| 97:13 | 115:22 | 82:18 108:2 | 266:7 | geological | 229:20 |
| 100:24 | 118:24 | 113:3 | furniture | 211:12 | 242:16 |
| 104:15 | 119:2 122:5 | 174:10 | 96:13,14 | geometric | 256:10 |
| 105:19 | 123:3 130:5 | 244:11 | 99:15 | 54:15 149:9 | 268:13 |
| 107:1 109:3 | 131:2 194:4 | fully 152:6,17 | further 96:21 | geometries | given 39:8 |
| 111:16 | 201:14 | 224:10 | 122:22 | 148:23 | 57:12 68:21 |
| 112:20 | 230:14 | 99:15 | 130:14 | geometry | 98:14 102:6 |
| 117:13 | 239:8,9,10 | fun 39:8 | 146:6 151:7 | 199:4 | 122:4 |
| 119:9 125:2 | 239:10 | function | 246:12 | GES's 61:23 | 181:13 |
| 128:10 | 265:4 | 231:12 | 268:15 | getting 35:10 | 182:11 |
| 137:18 | forwarded | 130:14 | 269:6 | 37:16 54:7 | 223:22 |
| 140:3 141:6 | 203:15 | fund 95:2,6,8 | future 17:11 | 83:11 88:14 | 235:3 |
| 144:3 | found 6:21 | 95:21 | 41:14 171:4 | 116:21 | 236:14 |
| 157:22 | 258:3 | funded 28:2 | 243:18 | 135:5 | 242:2 267:9 |
| 159:7 | foundation | 118:11 | 244:1 | 154:20 | 270:17 |
| 167:14 | 16:8 36:23 | 171:2,3 | **G** | 156:11 | 271:14 |
| 170:21 | 38:2,5,17 | 239:22 | G 2:3 | 174:23 | gives 35:11 |
| 173:8,22 | 144:4,11 | funding | gathering | 178:6,7,9 | 192:16 |
| 176:21 | 259:21 | 16:24 17:1 | 195:2,7,11 | 183:17 | giving 167:21 |
| 194:7 196:2 | four 20:11 | 17:8,11 | GEC 54:12 | 195:13 | 243:21,24 |
| 196:24 | 99:12 | 28:14,18,22 | 65:6 133:5 | 211:8 217:6 | Globally |
| 202:14 | 150:11 | 87:7,7 | 140:14 | 227:8 230:9 | 32:13 |
| 213:4 | 180:20 | 96:24 | 152:13 | 234:16,17 | Globetrotter |
| 222:22 | four-year | 108:24 | 184:4,6 | 237:19 | 10:18 15:4 |
| 223:10 | 222:19 | 109:19 | 244:10,15 | 238:16 | 17:22 19:7 |
| 224:1 225:2 | fourth | 110:7,21 | 252:18 | 249:2 253:9 | 20:3,17 |
| 227:5 251:4 | 102:11 | 112:16 | 266:9 | 253:11 | 30:17 32:6 |
| 252:14 | 179:11 | 113:12 | GEC's 62:7 | 254:23 | 32:12 33:9 |
| 253:3,21 | fraction 78:2 | 114:23 | 229:24 | 257:5 | 58:18 60:9 |
| 254:9 | 78:2 | 116:11 | general 89:23 | 262:19 | 69:12 70:13 |
| 267:11 | frame 167:7 | 117:9,12 |  |  |  |
|  |  | 120:17,22 |  |  |  |
|  |  | 122:17 |  |  |  |
|  |  | 203:11 |  |  |  |
|  |  | 237:22 |  |  |  |

---

ERIC DAVIS
March 12, 2024

Page 18

|   |   |   |   |   |   |
|---|---|---|---|---|---|
| 89:21 167:5 | 55:2,6,21 | 192:1 200:3 | 102:8,9,16 | 186:11,16 | 117:18 |
| 169:5 170:2 | 57:4 58:3 | 208:22 | 102:18 | 190:24 | 120:4 |
| 172:16 | 61:4 62:20 | 216:19 | 104:6 | 191:3,4,5 | 189:24 |
| 176:14 | 71:6 81:12 | 218:13 | 106:21 | 192:18,21 | 232:21 |
| 184:18 | 90:4,8,11 | 220:22 | 107:6 | 193:4 | 240:7 |
| 185:1 204:6 | 90:15 | 229:22 | 116:14 | 195:10,17 | gosh 103:4 |
| 221:15,24 | 124:15,16 | 233:8 | 117:2 | 199:13,18 | Goss 190:23 |
| 223:8 | 204:11 | 234:24 | 124:16 | 200:23 | gotten 179:3 |
| Globetrotte... | 214:1 | 236:24 | 130:5 | 201:4 | 191:19 |
| 11:16 14:18 | 224:11 | 239:1,8,9 | 136:23 | 210:11,12 | 240:7 |
| 18:17,22 | 227:16 | 239:10,10 | 143:13,23 | 214:18 | government |
| 20:6,8,20 | 238:12 | 240:10,11 | 146:15 | 216:22 | 42:9 51:20 |
| 20:24 21:23 | 258:9 | 243:16,16 | 149:3 | 218:22 | 52:5,20 |
| 22:1,6,12 | go 6:22 8:5 | 244:8,9 | 151:11 | 219:14 | 62:12 64:4 |
| 23:7,9,16 | 11:4 15:10 | 254:16,24 | 154:10 | 220:16 | 66:16 |
| 24:17,24 | 15:15,20 | 255:9,13 | 155:23 | 222:6 | 201:19 |
| 25:9,21 | 18:7,9 | 256:17 | 157:4,9,13 | 227:23 | 215:16 |
| 26:6 27:3 | 19:22 22:21 | 259:11 | 157:19 | 228:13 | 231:7 |
| 28:7 29:18 | 23:22 24:7 | 260:15 | 159:23,24 | 229:3,7,10 | 260:10 |
| 31:3,5,22 | 27:10 35:18 | 262:15 | 160:4,21 | 229:19 | 261:17 |
| 56:14 57:16 | 36:5 40:23 | 265:4 | 162:10,17 | 230:13,20 | governments |
| 57:19 59:2 | 45:23 47:12 | goal 228:11 | 162:21,24 | 231:22 | 230:23 |
| 60:11 64:19 | 48:2 51:16 | God 266:18 | 163:3,6,8 | 233:7 | great 84:21 |
| 68:17,21 | 55:18 59:7 | goes 24:24 | 163:10,11 | 235:13 | 257:24 |
| 79:1,8,11 | 67:13 71:11 | 42:23 | 163:14,16 | 237:15 | greater 78:14 |
| 80:24 83:22 | 73:1,5 77:4 | 100:14 | 164:14 | 238:17,21 | 79:24 |
| 106:17 | 87:3 95:18 | 101:1 110:8 | 165:19 | 238:23 | 140:21 |
| 130:2 | 96:14,15 | 136:10 | 166:8,9 | 239:3,8,9 | 259:12 |
| 143:16 | 98:5 106:19 | 137:21 | 167:8,16,17 | 239:10,10 | greatest |
| 171:19,24 | 107:18 | 178:1 190:1 | 167:19 | 242:9,13,21 | 234:20 |
| 172:11 | 112:1 | 213:7 | 169:2,11,14 | 242:23 | grind 258:14 |
| 174:23 | 115:22 | 244:19 | 169:17 | 243:4,5,9 | ground 208:6 |
| 178:15 | 122:5 123:2 | going 4:13 | 171:16,22 | 243:18,22 | 266:21 |
| 186:5 | 124:14 | 7:4 8:7 | 172:10,11 | 244:2,5,6 | group 115:6 |
| 198:24 | 132:8 148:8 | 13:23 17:2 | 174:8 | 248:6 | 145:15 |
| 204:18 | 151:1 | 32:17 41:10 | 178:14,16 | 256:23 | 146:2 |
| 213:19 | 171:19 | 44:12 48:2 | 179:13,14 | 258:8 | 265:18 |
| 214:4 | 172:8 | 48:9,21 | 180:10 | 259:17,18 | guarantee |
| 219:17 | 175:12 | 49:16,22 | 181:2 183:3 | 260:14 | 41:13 |
| 232:22 | 179:10 | 51:6 55:3 | 184:13,14 | 265:3,24 | 226:22 |
| 245:24 | 183:16 | 64:6 75:9 | 184:22 | 266:16 | guess 5:23 |
| Globetrotte... | 186:8,20 | 81:6 82:24 |  | 267:5,5 | 245:18 |
| 22:22 28:1 | 188:6,8,12 | 84:23 92:13 |  | good 6:8 | 246:6 |
| 28:8 31:11 | 189:12 | 94:20 98:14 |  | 30:13 | guesstimate |

---

ERIC DAVIS
March 12, 2024

Page 19

|   |   |   |   |   |   |
|---|---|---|---|---|---|
| 166:13 | 50:18,22 | 197:1 | 265:24 | 207:14 | 187:4,9,10 |
| 168:2 | 51:2,14 | 199:11 | 267:9,17,18 | 218:19 | honest |
| guidelines | 53:18,24 | 224:19 | HDR's 183:1 | hide 84:15 | 242:17 |
| 61:6 113:19 | 54:5,11,20 | happened | head 189:22 | high 69:15 | 266:18 |
| 114:4 | 54:24 59:12 | 51:3 54:7 | heads-up | 139:17 | honestly 5:11 |
| gun 188:17 | 61:8 62:4 | 59:6 177:16 | 243:21 | 165:5 | 85:21 86:3 |
| 188:20 | 69:16 | 243:21 | health 11:1 | highly 203:5 | 86:8 108:3 |
| guys 163:15 | 124:18,21 | happening | 22:23 25:13 | 207:2 | 109:23 |
| 224:5 | 124:22 | 118:18 | 26:13,17 | 226:13 | 117:16 |
| **H** | 125:21 | 22:23 25:13 | 27:13,22 | hire 11:21 | 181:23 |
| H 3:10 | 126:2,8 | 243:3 | 91:21 205:8 | 13:17 14:8 | 187:18 |
| H-e-e-r-y | 127:16 | happens | 208:22 | 17:22 30:2 | 235:2 |
| 13:3 | 128:5 | 208:1 | 220:2 | 40:16 41:4 | hope 245:19 |
| half 51:9 | 129:19,21 | harassing | 236:19 | 41:23 63:20 | hoped 184:18 |
| 102:1 | 130:18 | 116:22 | healthcare | 63:20 85:9 | hoping |
| 132:18 | 131:13 | 263:16 | 255:10 | hired 23:7,9 | 264:17 |
| 160:1,1,3,4 | 141:2,4,10 | HDR 10:7 | hear 40:19 | 23:19 25:9 | horse 262:19 |
| 166:20 | 141:19,21 | 88:20 | 94:3 109:11 | 41:7 75:16 | hours 67:15 |
| 212:24 | 142:4 143:7 | 169:11 | 142:18 | hiring 10:17 | 146:16 |
| 213:1,2 | 143:10,20 | 171:20 | 180:8 | 11:15 80:24 | hundreds |
| hallway | 143:21 | 172:6 | 193:13,20 | 85:1 245:16 | 123:18 |
| 246:9,10,11 | 144:1,2,10 | 176:16,17 | heart 84:11 | hit 220:15 | hypothetical |
| hand 149:2 | 144:16,20 | 177:2 | 136:11 | hold 193:21 | 37:13 63:11 |
| 163:11 | 145:9 | 178:13,15 | 137:21 | 209:24 | 92:18 94:8 |
| 188:6 223:8 | 147:16,19 | 181:3,13 | Heery 12:24 | 215:7 | 121:22 |
| 272:2 | 148:11 | 182:11,15 | 13:1,2,2,3 | 216:19 | 141:23 |
| Hand-raili... | 150:12,17 | 183:4 | 33:22 34:9 | 268:21 | 165:4 |
| 45:15 | 151:3,4 | 184:19 | Helen 137:14 | holding | hypothetic... |
| handled | 174:12,20 | 186:11,16 | helicopter | 121:2 148:2 | 123:7 |
| 14:12 | 244:11,14 | 186:20 | 110:14 | holds 244:1 | **I** |
| handrail | 244:16,19 | 187:2,4,12 | help 35:3,5 | holdup | IAC 61:12 |
| 54:14 126:1 | 244:22 | 189:1,7 | 35:21 255:2 | 172:16,18 | idea 211:16 |
| 145:20,23 | 245:1,7,13 | 190:16 | helped | 172:19 | identified |
| 146:5 147:8 | 246:4,10,11 | 191:8,20 | 213:14 |  | 65:24 123:4 |
| 147:11 | 246:22 | 192:5,16,18 | helping 36:2 |  | 177:7,11,12 |
| 148:15,23 | 248:8,9,14 | 193:9,16 | helps 30:12 |  | 177:14 |
| 150:1,4,6 | 249:5,11 | 194:1,4,18 | Henry 12:23 |  | 178:12 |
| 199:8 245:9 | 251:8 | 195:22 | 33:18 |  | 181:21 |
| 247:11 | 252:12,23 | 196:13 | hereto 271:23 |  | 195:9 |
| handrails | 253:1,11,13 | 197:11,21 | hereunto |  | 217:16 |
| 45:14 46:2 | hands 175:5 | 198:8 | 272:1 |  | 243:2 |
| 47:3,18 | happen 54:21 | 200:10,23 | hey 35:16 |  | identify |
| 48:3,9,21 | 118:3,10 | 209:4 | 51:2 189:22 |  | 16:14 18:16 |
|  |  | 223:15 | 189:23 |  |  |
|  |  | 225:16 |  |  |  |
|  |  | 232:3 |  |  |  |

ERIC DAVIS
March 12, 2024

Page 20

| | | | | | |
|---|---|---|---|---|---|
| 178:24 | imposed | 216:18 | 244:14 | 242:6 | 79:4 82:2 |
| identifying | 239:24 | 219:3,6 | 256:9,13 | includes | 102:7 |
| 242:20 | impossible | inability | 258:7 | 16:20 28:11 | indicated |
| Illinois 1:1,7 | 126:1 | 218:5 | include 22:13 | 34:2 91:19 | 73:16,17 |
| 1:17 2:5,11 | impractical | inaccurate | 28:19 29:3 | 94:10 | 77:1,6,22 |
| 158:11 | 207:2,17 | 5:17 6:12 | 30:20 32:19 | 101:18 | 81:17 82:20 |
| 270:1,7 | 209:1 | 6:21 | 69:16 82:19 | 103:15 | 133:4 |
| 271:1,4 | impression | inaudible | 101:21 | 105:22 | 153:19 |
| illustration | 139:3 | 142:10 | 105:5 | 117:5,9 | 171:1 |
| 12:21 | 140:12,16 | 193:9,17 | 106:22 | 222:8 234:2 | 225:10 |
| imaginary | 152:22 | inches 36:11 | 108:20,23 | including | indicates |
| 64:13 | 251:9 | 38:4,16 | 112:17 | 25:14 51:20 | 69:23 84:7 |
| imagine | impressions | 40:7,13 | 113:5,8,9 | 52:15 54:12 | 135:5 |
| 163:4 207:4 | 83:2,17 | 56:8 59:23 | 114:21 | 152:24 | indicating |
| 246:16 | 124:4 127:4 | 60:12 69:15 | 170:11,17 | 179:13 | 213:8 |
| IMG_3765.... | 136:13 | 73:13,18,24 | 170:19 | inclusive | indication |
| 145:17 | 137:20 | 74:14,22 | 204:21 | 270:14 | 102:16 |
| immediately | 138:23 | 76:18 77:1 | 220:2 231:1 | incomplete | 171:18 |
| 38:8 84:17 | 139:1 | 77:23 78:1 | 234:3 | 37:12 63:11 | 244:1 |
| impact | 156:12,20 | 78:3,10,11 | 265:14,19 | 92:18 94:8 | indirectly |
| 175:17 | 157:2 | 78:15,20 | included | 121:21 | 271:24 |
| impacts | improper | 79:5,5,17 | 12:21 17:15 | 141:22 | individual |
| 47:11 | 228:16,21 | 79:24 81:19 | 17:19,24 | 143:11 | 98:13 |
| impediments | Improveme... | 82:5 84:5 | 18:19 27:23 | 162:15 | 255:21 |
| 268:9,9 | 17:16 18:1 | 123:21 | 28:5 50:7 | 165:4 | individually |
| implement | 91:14,18 | 128:8 | 68:13,14 | incorrect | 115:7 150:8 |
| 230:11 | 92:12,16 | 131:21 | 81:22 84:18 | 5:16 35:14 | 224:10 |
| implement... | 93:6,8,9 | 132:11,23 | 88:17,20 | 50:7 97:14 | individuals |
| 94:1,5 | 98:23 99:5 | 133:3,6,11 | 106:1 | 139:13 | 21:3 |
| 102:7 103:7 | 100:10 | 133:11 | 107:10 | 157:14 | inexact |
| 105:9 | 101:10 | 134:6,12 | 110:22 | 195:16 | 139:18 |
| implemented | 104:6,11,20 | 135:3,11,14 | 112:2 | incorrectly | infirmary |
| 180:6,9 | 105:3 | 136:7 138:9 | 113:14 | 35:17 | 251:2 255:9 |
| implementi... | 114:22 | 138:11,14 | 114:15 | 114:15 | information |
| 102:22 | 118:21 | 138:19 | 116:11 | increase | 14:23 30:12 |
| 103:11 | 119:7,20,21 | 140:22 | 118:4,22 | 28:18 95:1 | 46:15,15 |
| 198:23 | 119:22 | 142:10,10 | 119:19 | 223:18 | 60:1 64:12 |
| implies 175:4 | 205:4 226:9 | 149:20 | 130:7 139:2 | 225:17 | 64:13 79:7 |
| implying | 241:24 | 150:1,8 | 167:6 171:9 | independent | 79:13 84:16 |
| 85:4 | 264:13,21 | 151:5 153:7 | 202:11 | 39:23 80:23 | 85:6 115:15 |
| importance | 264:22 | 153:20 | 203:14 | 81:11 | 139:22 |
| 196:8 | 265:2 266:8 | 154:3,9 | 205:9,12,14 | independe... | 140:15,21 |
| important | improveme... | 155:9 156:6 | 220:11 | 255:6 260:5 | 140:22 |
| 116:2 | 120:6 | 165:24 | 241:14 | indicate | 153:19 |
| | | | | 29:19 59:1 | |

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 21

| | | | | | |
|---|---|---|---|---|---|
| 154:6 | 167:20,20 | instance | 142:20 | 213:17 | 87:22 197:3 |
| 162:16 | insist 174:8 | 39:18 | intermediate | 226:23 | 197:10,15 |
| 174:3,10,22 | inspect 37:23 | 138:17 | 78:16,20 | 268:7 | 197:17 |
| 174:24 | 56:15 57:19 | 226:10 | 80:18 | involvement | 199:20 |
| 188:1,12,21 | 186:11 | 238:2 | 134:13 | 10:20 22:22 | issuing 12:20 |
| 194:10 | inspected | insufficient | 154:5 | 31:2,5,21 | item 6:6 9:24 |
| 195:2,8,11 | 38:8 57:14 | 77:4 | 155:11 | 34:15 72:24 | 10:7 13:13 |
| 233:23 | inspection | insurance | 256:11,20 | involves 7:20 | 17:18,20,21 |
| 244:21 | 56:2,6 60:9 | 196:24 | 258:21 | 9:23 156:24 | 28:2 34:19 |
| 249:7 | 79:2 176:14 | intake 99:14 | Internal | involving 8:4 | 46:3 61:19 |
| informed | 185:1 186:4 | intend 63:19 | 239:24 | 11:22 99:15 | 65:17 84:4 |
| 59:16 | 186:21 | 63:19,20,21 | internally | 205:24 | 84:4 87:1 |
| inhibiting | 187:2,5 | 64:3,16 | 69:24 | iota 200:22 | 88:10 93:7 |
| 199:7 | 202:3 | 86:18 122:9 | interpretat... | 201:1 | 110:13 |
| initial 23:24 | inspections | 123:13 | 49:17 | Irishman | 112:5 |
| 24:2 32:24 | 57:20 58:4 | 139:7 185:3 | interrupt | 267:4 | 118:17 |
| 36:14 37:8 | 58:8 204:6 | intended | 218:20,24 | irresponsible | 160:9 171:2 |
| 181:22 | install 45:13 | 25:16 36:11 | introduce | 95:15 105:1 | 171:3 |
| 189:14 | 46:1 47:22 | 64:4 86:16 | 134:12 | 241:20 | items 108:13 |
| 201:3 251:9 | 48:21 53:18 | 115:22 | invested | 242:14 | |
| initially | 96:15 | 228:7 | 224:10 | 243:10,11 | ___ J ___ |
| 14:20 20:13 | 247:11 | intent 16:13 | investigation | isolated | J-O-C 86:24 |
| 23:19 24:10 | installation | 29:20 40:5 | 151:8 | 126:12 | jackhammer |
| 176:17 | 51:13 | 40:12 41:3 | invite 266:22 | issuance | 163:16 |
| 214:20 | 124:21 | 41:11 43:10 | invoice | 13:15 52:7 | jackhamm... |
| 249:12 | 125:5 | 43:16 44:7 | 267:20 | issue 15:13 | 161:22 |
| 251:16 | 127:15 | 53:21 65:4 | involve 96:11 | 16:11 35:22 | 162:19 |
| initiated | 143:10 | 66:3 84:10 | 96:12,16,17 | 68:2,4 | jail 22:14 |
| 129:24 | 148:11 | 84:15 100:9 | involved | 98:16 102:6 | 27:5,12 |
| 143:15 | 158:14 | 103:21 | 10:17,22 | 159:18 | 101:21 |
| injection | 244:24 | 115:2 | 11:20 20:23 | 179:2 190:4 | 144:9 148:5 |
| 26:22 | 245:6,13 | 122:13,16 | 21:8,16 | 190:5,6 | 148:6 |
| injunction | 253:13 | 122:20 | 43:6 46:12 | 196:13,20 | 160:23 |
| 4:17 131:20 | installed | 123:8,16 | 50:18 72:21 | 197:3,13 | 163:24 |
| inmate | 47:20,23 | 138:8,11 | 93:10 98:15 | issued 12:9 | 164:3,7,11 |
| 250:11 | 124:22 | 228:6,10,19 | 102:4 | 16:12 25:21 | 164:15,16 |
| inmates | 125:21 | 229:1,10,15 | 158:14,21 | 45:3 52:15 | 164:23 |
| 208:3,21 | 128:6 | 158:22,24 | 159:2 | 87:3,24 | 166:22 |
| 251:1 | 129:19 | 159:2 | intention | 105:13 | 167:3,18 |
| input 206:18 | 114:21 | 163:17 | 114:21 | 116:4 | 186:11 |
| inserting | 144:1 146:5 | 175:16 | interest 259:9 | 137:14 | 202:18 |
| 49:13 | 253:1,12 | interested | 196:7 199:4 | 204:14 | 206:19 |
| inside 166:6 | installing | 271:23 | 204:19 | 217:22 | 212:8 |
| 166:8 | 51:22 | interjecting | 212:7,12,17 | issues 36:2 | 250:13 |

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 22

| | | | | | |
|---|---|---|---|---|---|
| 251:2 262:5 | 128:22 | 26:10 28:20 | 177:7 179:6 | 262:19,21 | 233:7 234:3 |
| January 4:23 | 129:12 | 34:18 37:17 | 179:23,24 | knowledge | 234:6 |
| 5:5,16 | 246:21 | 38:10,23 | 180:1 | 26:6 30:23 | laser 76:24 |
| 74:12,17 | jump 169:19 | 41:10,22 | 181:16 | 37:20,22 | 79:3 140:9 |
| 127:16 | 237:21 | 42:6,6,7,19 | 182:5 | 38:14 48:2 | latest 179:23 |
| 141:11 | jumping | 42:24 43:2 | 184:11,12 | 71:5 89:20 | laugh 175:9 |
| 178:3 | 233:15 | 43:6 44:2 | 184:22 | 92:2,6 | laughing |
| 187:13 | June 102:14 | 44:13 48:15 | 186:7,23 | 115:10 | 174:14 |
| 215:19 | 222:5 | 48:16,18 | 187:9 | 118:20 | law 2:2,8 |
| 216:11 | jurisdictions | 50:16,17,17 | 188:16,18 | 123:24 | 35:11 |
| 217:1 | 208:10 | 55:16,23 | 188:22 | 143:24 | 117:23 |
| 220:11 | justice 182:6 | 56:3,11,12 | 189:23 | 144:5,8,24 | 137:21 |
| 241:11 | justified | 58:11,12,13 | 192:16 | 186:19 | 145:6 157:5 |
| Jelks-Brown | 113:22 | 59:3,8,18 | 201:8 203:9 | 212:21,22 | 157:14 |
| 21:7 | justify 118:2 | 59:24 60:23 | 203:17 | 213:11 | laws 43:15 |
| job 30:13 | | 62:14 63:14 | 206:2,6,7,9 | 255:4 | 152:3,23 |
| 34:22 39:5 | ___ K ___ | 69:24 70:3 | 206:10 | known 69:11 | 230:23 |
| 67:5 86:19 | K 271:2 | 70:6 78:2 | 208:19 | 183:24 | 231:1,11,13 |
| 86:22,24 | keep 121:11 | 81:1 82:13 | 209:14,20 | knows 47:19 | layout 126:3 |
| 87:13,21 | 137:2,3 | 89:13,15,16 | 211:2 | 127:20 | lead 52:6 |
| 90:22 | 172:23 | 89:17,18 | 216:19 | 178:13 | 53:14 182:3 |
| 103:23 | 216:22 | 90:7 91:2 | 222:6 | | 243:5 |
| 162:10 | keeping | 98:6,18 | 226:21 | ___ L ___ | leading |
| 195:24 | 232:21 | 103:1,1 | 228:6 229:1 | lack 259:20 | 131:10 |
| 201:17 | kid 206:11 | 109:23,24 | 229:14,15 | land 110:15 | 228:14,21 |
| job-order-c... | kind 84:15 | 110:6 114:2 | 229:16 | landing 62:4 | 230:4 235:9 |
| 67:7,21 | 85:5 153:5 | 115:24 | 232:11 | 78:15,16,21 | 235:12,16 |
| JOC 86:24 | 206:3 | 117:16,18 | 234:23 | 80:18 | 235:21,24 |
| 87:21 90:23 | 256:21,21 | 117:19,20 | 235:19 | 134:13 | 236:11,12 |
| 91:6 201:14 | kinds 256:3 | 117:24 | 236:18,18 | 154:5 | 237:10 |
| 202:16 | knew 48:8 | 122:6 125:4 | 237:12 | 155:11 | leads 147:8 |
| 203:6 | 79:3 82:6 | 127:18,19 | 241:18 | 252:9 | learn 249:8 |
| 223:15 | 138:17 | 131:3 | 242:9,12,21 | 256:11,20 | learned |
| 238:17 | 140:15 | 144:13,16 | 242:21,23 | 258:22 | 251:13 |
| JOHNSON | 172:21 | 144:19 | 243:9 244:2 | language | 258:16 |
| 2:9 | 174:9 | 147:15,20 | 244:18 | 88:15 210:4 | lease 206:1 |
| judge 45:2 | know 5:6 | 148:6,9 | 249:20 | 268:12 | leave 261:18 |
| 175:24 | 7:10 8:1,23 | 149:14 | 251:15,24 | large 107:15 | leaving |
| 205:17 | 9:1,3,13 | 151:10 | 252:4,6,9 | 110:14 | 126:17 |
| July 45:3 | 12:16 13:12 | 160:19,20 | 252:11,21 | 220:6 | led 11:15 |
| 53:21 | 14:5,5,7,13 | 163:6,8,23 | 253:9,12,16 | 230:22 | 80:23 131:9 |
| 102:13,14 | 14:18 15:10 | 169:8,14 | 255:24 | largely | leeway |
| 125:13 | 19:11 21:9 | 171:11,13 | 258:15 | 262:16 | 116:19 |
| 127:1 | 21:21 24:10 | 176:23 | | larger 219:12 | 146:18 |

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 23

| | | | | | |
|---|---|---|---|---|---|
| left 73:12,23 | 206:10 | 219:13 | 214:3 | 147:11 | 230:11 |
| 74:14 77:11 | 211:8,17,18 | 237:21 | 216:23,24 | 151:19 | manage 35:3 |
| 78:5,7 79:4 | 242:5 268:8 | 241:2 | 218:1 | 170:23,23 | 35:5,6 90:6 |
| 79:18 81:18 | level 76:24 | 251:17 | 221:14 | 188:19 | management |
| 138:18 | 94:11 140:9 | list 115:20 | 223:17 | 200:8 | 34:1 35:2 |
| legal 63:7,11 | 164:7 | 116:15 | longer 21:5 | 219:10 | 47:21 51:23 |
| 64:21 74:3 | 189:20 | 164:4,5 | 34:9 62:2 | 245:21 | 52:1,1 54:4 |
| 127:3,22 | 232:22 | listed 216:18 | 164:15 | looks 5:11 | 124:23 |
| 133:16,17 | levels 110:7 | literally | 167:17,19 | 35:16 | 128:7 |
| 133:20 | liberty 93:6 | 180:3 | 179:8 | 189:23 | 129:18 |
| 135:5,8,21 | license | 179:8 | litigation | lot 5:12,12 | 182:5 |
| 136:2,9,9 | 158:10 | 211:24 | 14:6 83:3 | 54:10 | 188:11 |
| 136:13 | 272:9 | 232:24 | 124:5 127:5 | 116:18 | 190:20 |
| 141:15 | licensed 76:6 | look 11:6,17 | 127:23 | 146:18,18 | 205:12,23 |
| 153:22 | 190:24 | 12:2 13:12 | 136:10,11 | 170:14 | 206:14 |
| 154:15 | 191:3 | 19:23 68:24 | 137:22 | 179:9 | 213:14 |
| 155:13,18 | LIDAR | 76:2 130:2 | 138:23 | 242:24 | manager |
| 231:4 | 39:12 133:4 | 130:11,21 | 132:1 | 243:4,23 | 31:16 32:21 |
| Leighton | 140:14 | 197:7 213:9 | 156:13,21 | 244:2,24 | 33:5,10 |
| 120:23 | 152:13 | 233:15 | 110:4,11,24 | 268:6 | 34:10 36:19 |
| 121:2,9 | 174:23 | 233:15 | 143:19 | little 78:8,9 | 39:4 189:16 |
| 212:10 | 184:11 | live 161:9 | 145:5,22,24 | 140:11,24 | 189:17,19 |
| 213:3 | 252:6,9,11 | loaded 185:6 | 145:24 | 143:19 | 190:8,20 |
| length 78:17 | 258:3 | loading | 146:6 148:8 | 146:6 148:8 | manner |
| 244:11 | lifted 256:2 | 207:22 | 149:14,16 | 149:14,16 | 227:4 |
| lengthy 11:14 | likelihood | located 165:7 | 151:1 188:8 | 151:1 188:8 | Manning |
| 98:23 | 225:17 | logical 262:9 | 191:4 214:6 | 243:5 | 88:23 89:12 |
| 100:22 | limitation | long 12:2 | 217:11,14 | lower 208:4 | 89:20 90:2 |
| 197:9 | 256:9 | 158:8 159:5 | 245:16 | ___ M ___ | 108:10 |
| 230:22 | limitations | 158:8 159:5 | 237:10 | M 4:11 228:2 | 110:19 |
| let's 9:9 | 239:24 | leads 147:8 | looked 4:18 | 246:19 | Manning's |
| 15:22 34:17 | 240:8 | 160:23 | 5:11 7:21 | main 51:14 | 108:20,22 |
| 36:5 43:4 | limited 22:20 | 162:11 | 54:9,10,18 | 213:6 | manufactu... |
| 51:7 55:2 | 27:15 46:19 | 164:24 | 148:17,19 | maintains | 148:16 |
| 77:16 118:5 | 164:1 | 165:4,23 | 149:4,7 | 101:24 | March 1:17 |
| 124:14 | line 3:17 | 166:1,8 | 246:23 | majority | 13:10 25:7 |
| 137:2,3 | 17:18 45:12 | 167:2,11 | 248:21 | 98:24 | 52:8 137:14 |
| 140:10 | 70:23 112:5 | 168:9,10 | looking 8:12 | making | 152:11,14 |
| 149:14,15 | 131:5 | 169:2 179:7 | 10:9 47:8 | 30:12 39:5 | 173:18 |
| 149:16 | 147:13 | 183:3 | 61:4 70:7 | 62:1 114:18 | 186:10 |
| 161:11,15 | 171:2,3 | 195:17 | 77:18,21 | 133:20 | 272:2 |
| 184:16 | 196:23 | 200:9,9 | 106:5 | 139:12,14 | marked 3:11 |
| 188:17 | 218:11 | 212:13 | 145:18 | 139:16 | 49:14 |
| 192:1 | | 213:11 | 146:4,22 | 150:23 | market |
| | | | | 168:23 | |
| | | | | 169:1 188:9 | |
| | | | | 193:2 | |

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 74

ERIC DAVIS
March 12, 2024

Page 24

| | | | | | |
|---|---|---|---|---|---|
| 218:15 | 188:7 | 32:24 33:8 | 23:6 32:22 | 86:17,20 | minutes 75:6 |
| 240:1 | 191:12 | 34:4 57:16 | 33:5 34:19 | 221:2 | 206:8 |
| master 9:14 | 200:7 204:3 | 58:10 66:13 | 35:1 41:5 | methodology | Mischaract... |
| master's | 208:6 | 100:16 | 43:9 65:9 | 86:23 | 181:8 |
| 231:7 | 209:11 | 101:3 | 67:21 71:20 | 232:19 | mischaract... |
| material | 211:24 | 179:22 | 75:15 81:8 | Michael 21:4 | 75:2 82:10 |
| 54:16 | 227:9 | 180:21 | 81:11 87:8 | 190:23 | 194:8,22 |
| 134:15 | 239:12 | 204:18,22 | 87:14 91:19 | microphone | mischaract... |
| 164:10,10 | 241:22 | 205:2,3,6 | 94:12,18 | 175:9 | 24:20 40:22 |
| materials | 243:12 | 205:18,19 | 104:4 | mid 178:2 | 200:16 |
| 54:5 | 247:18 | meetings | 105:12 | 221:22 | 261:22 |
| math 158:11 | 251:7 | 20:19 21:10 | 120:5 122:6 | middle 73:18 | misconstru... |
| Matt 183:10 | 254:24 | 21:12,19 | 122:12 | 77:6,9 82:4 | 176:20 |
| matter 84:11 | 256:3,5 | 31:9,10,14 | 125:9,23 | 82:4 83:22 | misread |
| 133:11 | meaning 63:4 | 32:11 57:3 | 134:14 | 84:1,5 | 132:16 |
| 135:10,13 | 103:7 | 57:9,10,18 | 153:2 | 99:22 100:2 | misrepresent |
| 135:13,19 | means 9:1 | 58:17 59:1 | 162:21 | 100:3 101:1 | 210:9 |
| 161:14 | 56:4 63:4 | 59:6,8 99:3 | 166:12 | 153:20 | misreprese... |
| 238:9 | 238:22 | 103:3,19 | 169:9 | 221:19 | 210:7 |
| matters | 239:2 | 204:10,20 | 171:24 | 222:3 | misreprese... |
| 90:18 271:9 | measure | 205:9,13,15 | 183:15 | 256:23 | 210:1 |
| mean 5:23 | 72:13 83:22 | 206:8,10,13 | 190:15 | million | missed 119:1 |
| 7:18 8:5 9:1 | measured | 264:5 | 196:20 | 160:15 | 121:7 252:2 |
| 9:2,21 | 36:20 | members | 203:7 | 192:13 | misstated |
| 13:20 20:5 | measureme... | 31:17 | 209:18 | 203:8,8,13 | 198:12 |
| 23:12 29:1 | 78:6 83:24 | 111:15 | 212:6 | 203:18,18 | misstates |
| 35:6 41:22 | measureme... | 186:20 | 225:13,21 | 203:21 | 12:12 80:7 |
| 42:19,22 | 56:24 81:24 | memory | 230:9 | 242:5,7,8 | 132:12 |
| 53:6 62:7 | 84:7 | 88:16 219:4 | 231:21 | 242:11 | 223:11 |
| 62:12,19 | measures | 245:12 | 238:8 | mind 113:22 | misstating |
| 64:3 72:17 | 84:24 | mending | 239:15 | 186:3 | 49:1 226:4 |
| 80:10 85:4 | 130:15 | 149:5 | 248:5 | minimus | mistaken |
| 91:2 92:13 | 223:18 | mental 83:2 | 249:23 | 133:10,17 | 110:10 |
| 118:6 119:2 | 245:19 | 83:12,17 | 263:19 | 153:23 | miter 148:20 |
| 120:17 | mechanism | 124:4 127:3 | 264:11 | 154:3,8,15 | mobility |
| 121:18 | 67:22 | 136:12 | 267:21 | 154:17,24 | 262:22 |
| 127:19,24 | 114:17 | 137:20 | mentions | 155:10,15 | modificatio... |
| 152:9 | medical | 138:22 | 32:5 | minor 134:18 | 25:17 29:24 |
| 153:15 | 262:24 | 139:1,3 | merits 137:3 | 196:23 | 39:11,16 |
| 161:7 | 263:7 | 156:11,20 | met 21:21 | minority | 71:10 206:2 |
| 167:21 | meet 98:12 | 157:1 | 102:21 | 231:3 | moment 9:10 |
| 172:22 | 99:6 102:11 | mention | 180:3 241:3 | minute 86:5 | 61:16 |
| 173:13,14 | 227:15 | 204:21 | method 67:20 | 88:9 258:8 | 124:14,15 |
| 177:18 | meeting 21:9 | mentioned | 67:21 71:21 | 268:14 | 147:7 214:8 |

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 25

| | | | | | |
|---|---|---|---|---|---|
| 227:14 | 191:12 | 111:21 | 177:1 | 260:1,23 | 89:15,17 |
| 268:21 | 209:20 | 114:12 | 181:12 | 261:1,6,12 | municipal |
| momentarily | 240:15,18 | 116:23 | 182:22 | 261:15 | 239:22,23 |
| 215:4 | 240:20,22 | 117:2,7,14 | 185:13,15 | 263:3,17 | 240:5 |
| money 93:23 | 241:7 247:1 | 119:16,17 | 185:24 | 264:10 | mute 175:9 |
| 94:6 95:8 | MORRISS... | 121:13,15 | 186:2 | 266:20 | muted 214:14 |
| 103:8,14,15 | 2:3,4 3:4,7 | 124:13 | 187:11 | 267:7,15 | N |
| 105:5 113:5 | 4:3,12 7:1,6 | 125:11,19 | 190:7,14 | 268:3,13,23 | N 2:1 3:1,16 |
| 115:16,16 | 9:6 12:7,17 | 126:23 | 193:6,14,22 | 269:2 | 4:11,11 |
| 118:7 | 13:8 15:23 | 127:9,13 | 194:12 | motion 4:16 | 228:2,2 |
| 230:24 | 19:5,13 | 128:4,17 | 195:18 | motivation | 246:19,19 |
| 240:5 | 20:1 23:3,5 | 129:4,9,10 | 196:3 198:7 | 130:4 | name 10:6 |
| 242:19 | 26:4,19 | 132:1,3,9 | 198:14 | mounted | 66:9,10,11 |
| 243:6,7 | 27:2,20 | 132:14,17 | 200:1,21 | 244:11 | 75:19 87:14 |
| monies 234:2 | 29:11 32:3 | 132:24 | 201:7 | mouth | 88:23 |
| 234:3 242:1 | 37:6,19 | 133:1,23 | 202:15 | 228:15 | 107:24 |
| 244:5 | 38:3,12 | 135:9 136:4 | 210:11,14 | 259:6 | 108:2,4 |
| monitoring | 39:1 40:14 | 136:22 | 210:20,22 | move 118:24 | 190:23 |
| 252:24 | 42:21 44:4 | 137:6,11,24 | 212:19 | 119:2 | nature 182:9 |
| 253:8 | 44:22 46:9 | 138:5 139:5 | 213:10 | 153:17 | navigate |
| Monroe 2:10 | 47:1,13 | 141:8,9,17 | 214:12,17 | 198:18 | 148:21 |
| month 56:5 | 48:10 49:7 | 142:1,3,9 | 214:23 | 201:14 | necessarily |
| 99:14,21,22 | 49:19 51:18 | 142:12,19 | 215:3,5,9 | 210:12 | 92:13 118:6 |
| 100:8,11,16 | 52:17 53:5 | 143:1,4 | 216:3,7 | 236:20 | 121:17 |
| 161:21 | 55:5,10,14 | 144:6,7,15 | 218:21 | 260:7 | 184:23 |
| 177:6 178:2 | 55:19 56:13 | 146:8,12,21 | 219:22 | 264:23 | necessary |
| 179:4 | 59:20 60:17 | 151:13,18 | 221:1 223:2 | moved 81:5 | 28:19 29:23 |
| 191:13,16 | 61:2 62:16 | 153:12,13 | 224:8 | moving 94:21 | 82:18 |
| 200:12 | 62:18 63:16 | 154:1,12,16 | 225:20 | 103:11 | 171:13 |
| 240:17 | 64:1,14 | 154:22 | 227:1,10,21 | 131:1 | 172:8 |
| monthly | 67:11 70:18 | 155:7,14,20 | 228:13,20 | 188:23 | 230:17 |
| 98:13 103:3 | 70:19 71:4 | 156:3,15,24 | 230:4 235:9 | 194:4 | 231:12,18 |
| 204:22 | 72:9 73:20 | 157:6,10,18 | 235:12,20 | 257:21 | 233:10,24 |
| 205:2,3,6 | 74:10 75:3 | 158:7 | 235:23 | multipart | 234:7,11,18 |
| 205:14 | 75:14 80:12 | 159:11 | 236:2,11 | 99:17 | 236:7 239:2 |
| 206:13 | 82:16 83:7 | 164:20,22 | 237:10 | multiple 33:3 | 245:3 |
| 250:1 | 83:20 91:4 | 165:9,12,21 | 246:14,17 | 50:16 57:18 | need 13:6 |
| months 100:4 | 91:11 92:10 | 166:11 | 246:20 | 59:8 74:18 | 28:16,17 |
| 103:4 151:9 | 92:22 93:22 | 168:1 170:1 | 247:7,23 | 204:19,24 | 46:15 47:5 |
| 152:8 | 97:10,16 | 171:6 173:5 | 248:1 | 206:4 | 51:2 74:20 |
| 161:14,16 | 104:16,18 | 173:10,15 | 250:22,23 | 232:14 | 76:22 89:23 |
| 166:14,18 | 106:4 107:4 | 173:17 | 253:10 | 234:8 | 96:21 97:4 |
| 168:22 | 109:8,17 | 174:5,15 | 254:14 | multistep | 98:10,16 |
| 184:17 | | 175:10 | 259:1,13 | 10:1 15:14 | |

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 26

| | | | | | |
|---|---|---|---|---|---|
| 134:21 | negotiate | nice 162:22 | 196:19 | 201:11 | 79:19 80:7 |
| 140:24 | 16:15 183:4 | nightmares | 197:3,10,14 | 209:21 | 82:9 88:6 |
| 141:1 | 184:19 | 35:12 | 197:16,18 | 213:18 | 90:1,24 |
| 145:22,24 | 185:3 189:1 | ninth 93:9 | 197:19,23 | 214:21 | 91:7,15 |
| 146:19 | 192:20 | noncompli... | 220:5 | 217:14 | 92:4,17 |
| 151:14 | 221:23 | 12:10 | 221:21 | 231:3 234:6 | 94:7 95:12 |
| 153:16 | negotiating | 254:17 | notified | | 95:24 96:3 |
| 154:19 | 20:3,17 | noncompli... | 56:11 70:12 | O | 104:15 |
| 155:4 | 21:13,24 | 253:19 | notify 196:18 | O 3:16 4:11 | 105:19 |
| 170:12,18 | 31:3 169:16 | 254:7,17 | notion 78:19 | 228:2,2 | 107:1 109:3 |
| 171:22 | 182:13 | NOPA 68:4 | November | 246:19 | 111:16 |
| 172:5,10 | 183:1 | 87:23 | 60:18 75:16 | 271:2,2 | 112:20 |
| 173:3 | 192:17 | 105:12 | 80:15 81:2 | o'clock 1:18 | 117:13 |
| 184:23 | 193:9,16 | 196:19 | 81:3,16 | oath 270:11 | 119:9 |
| 188:20,21 | 194:1 195:3 | 197:20 | 93:14 94:24 | object 40:21 | 121:21 |
| 188:22 | 196:12 | normal 238:5 | 100:12,17 | 48:5,24 | 125:2 |
| 195:10 | 200:10 | Normally | 100:20 | 84:9 125:17 | 126:14 |
| 198:18 | 234:17 | 95:19 | 102:19,20 | 126:11 | 128:10 |
| 199:6 | 238:4 | NORTHE... | 112:13,15 | 136:20 | 137:18 |
| 208:21 | negotiation | 1:1 270:1 | 113:4 120:1 | 176:20 | 140:3 141:6 |
| 237:16,16 | 195:8 | Notary | 120:1 | 228:14 | 141:22 |
| 242:15,22 | negotiations | 270:23 | 139:24 | 247:3 248:2 | 142:22 |
| 246:9,11 | 20:13,24 | note 43:4 | nowadays | 266:3 | 144:3,11 |
| 250:16 | 21:11,17,18 | 90:17 | 197:12 | objected 5:24 | 157:22 |
| 254:20,22 | 194:19 | 105:24 | number 10:9 | objection | 159:7 |
| 254:24 | 196:14 | 107:14 | 11:10 17:20 | 5:19 6:17 | 167:14 |
| 255:21,24 | 200:18,19 | 131:12,12 | 27:21,24 | 6:23 8:19 | 170:21 |
| 256:4 257:4 | 222:9 | 140:13 | 28:6,21 | 11:2,23 | 173:8,22 |
| 259:24 | neither | 162:16 | 30:17 32:5 | 12:11 16:7 | 185:14 |
| needed 69:6 | 118:19 | 217:10 | 36:5 37:7 | 19:1,9,18 | 187:6 194:7 |
| 84:13 | never 218:15 | 219:2 | 44:23,24 | 24:19 25:23 | 194:21 |
| 129:20 | 218:15,16 | 224:17 | 47:2,11 | 26:8 29:7 | 196:2 |
| 130:8 151:1 | 226:9 | noted 9:8,11 | 55:8,10 | 31:6,23 | 202:14 |
| 171:18 | nevertheless | 129:17,22 | 92:3,15,23 | 36:23 37:12 | 212:15 |
| 184:9 | 232:21 | 149:22 | 93:15,24 | 38:2,5,17 | 213:4 |
| 250:15 | new 96:16 | notes 14:4 | 106:8 118:9 | 40:9 41:20 | 220:18 |
| 251:8 | 99:15 | 18:15 54:12 | 118:15 | 42:13 49:22 | 222:22 |
| 252:18,20 | 100:22 | notice 59:18 | 120:7 122:4 | 52:9,23 | 223:10 |
| needs 131:15 | 166:15 | 68:3,4 | 128:21 | 56:9 59:14 | 224:1 225:2 |
| 176:9 | 167:4 177:9 | 87:22 | 129:13 | 60:19 62:13 | 226:3 227:5 |
| 199:11 | 177:18 | 168:14 | 132:8 | 62:22 63:10 | 230:4 235:9 |
| 252:17 | 178:4 | 179:2 190:4 | 151:22 | 64:20 66:23 | 236:11 |
| 255:21 | 189:10 | 190:6 | 152:19 | 69:18 73:14 | 237:10 |
| 256:1,6,24 | 211:5 246:6 | 196:13,16 | 158:1 177:2 | 74:2 75:1 | 247:15 |

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 27

| | | | | | |
|---|---|---|---|---|---|
| 251:4 | occur 96:9 | 110:20 | 10:11,15 | 179:11 | opposed 53:7 |
| 252:14 | 123:6,7 | 111:1 | 22:18 34:22 | 265:4 | option 209:3 |
| 253:3,21 | occurred | 197:13,15 | 44:18,21 | ongoing 7:19 | options 54:10 |
| 254:9 | 212:11 | 198:9 200:3 | 45:4,21 | 7:22 8:3 | order 4:5 7:8 |
| 256:14 | OCJ 205:18 | 204:1,8,22 | 47:4,10,10 | 204:10 | 9:12,24 |
| 259:20 | October 51:7 | 204:23 | 47:18 50:1 | 10:1 13:7 | |
| 261:21 | 51:15 100:8 | 205:17 | 55:16 58:6 | 161:24 | 14:9,19 |
| 267:11,24 | 100:12 | 206:2 207:7 | 66:2 75:5 | 166:19 | 17:10,14 |
| 268:10 | 101:2 | 215:18 | 75:10 96:23 | 176:9 | 22:19,24 |
| objections | offer 232:19 | 217:23 | 101:17 | 209:12 | 23:1 26:15 |
| 157:8 | offhand 9:10 | 218:12 | 106:7 | 227:2 231:1 | 27:9,19 |
| objective | 12:14 19:12 | 220:16 | 111:2 | 232:13 | 34:22 45:1 |
| 43:10 44:7 | 25:1 32:14 | 221:3 | 114:20 | 234:21 | 45:2,5,8 |
| 130:13 | 48:13 54:2 | 226:17 | 129:1,9 | 236:15 | 46:17,18 |
| objectively | 54:6 55:23 | 232:16 | 147:4 162:4 | 240:1 | 48:22 49:1 |
| 84:12 | 56:20 58:19 | officer 20:21 | 169:10,21 | opening | 49:14,17 |
| 130:11 | 58:21 59:24 | 23:20 24:5 | 171:14 | 100:21 | 50:19 51:4 |
| observe | 78:2 144:18 | 33:3 41:8 | 172:14 | operational | 77:2 85:12 |
| 35:13,19 | 147:20 | 65:12 66:2 | 184:4,13 | 261:3,11,12 | 86:11,19,22 |
| observed | 148:9 | 66:17,21 | 185:24 | operationally | 86:24 87:21 |
| 54:12 | 176:23 | 67:13,18 | 190:1 | 257:3 | 88:16 90:23 |
| observing | 177:10 | 68:2 87:18 | 199:14 | operations | 93:2 95:1 |
| 36:2 | 179:6 | 107:23 | 207:15 | 53:3,7 | 103:23 |
| obstacles | 213:13 | 111:3,4 | 216:5,11,22 | 164:1 | 106:19 |
| 245:2 | office 16:1,4 | 113:17 | 216:24 | 206:19,20 | 115:18 |
| obstruction | 20:7,20,22 | 114:3 | 222:10 | 249:21,22 | 121:12 |
| 150:13 | 20:23 21:5 | 116:10 | 247:6 248:8 | 257:20 | 125:13,18 |
| obstructions | 21:13,23 | 122:20 | 249:5,10 | 262:16 | 127:1 |
| 244:13 | 175:22 | 175:22 | 257:9 258:2 | opinion | 128:13,22 |
| obtain 14:19 | 31:17 32:23 | 189:4 | 269:4 | 12:20 52:16 | 129:12 |
| 43:10 50:22 | 33:2 41:7 | 215:19 | old 211:6 | 59:17 79:15 | 168:21 |
| 81:10 125:8 | 43:17 66:1 | OFFICES | once 56:22 | 84:3 123:19 | 177:8,22 |
| 129:20 | 66:13 85:16 | 2:2,8 | 58:12 65:19 | 136:7 174:9 | 178:3 |
| 212:4 | 86:2 87:4 | offset 139:16 | 65:23 99:19 | 174:9 | 191:18 |
| 216:13 | 95:19 98:12 | 139:19 | 111:10 | 243:11 | 194:11 |
| 219:21 | 98:21 100:5 | 259:12 | 117:22 | 248:5,12 | 195:19 |
| 245:3 | 101:9,16 | oftentimes | 160:3,7 | 197:11 | 197:11 |
| obtained | 104:10 | 205:16 | 166:23 | opinions | 198:8 |
| 223:14 | 106:21 | oh 35:20 | 178:24 | 136:9 | 199:16 |
| obviously | 107:5,6,7,9 | 115:12 | 222:7 | 156:11 | 200:10 |
| 177:12 | 107:17,20 | 191:13 | 267:18 | opportuniti... | 201:18 |
| 240:18 | 107:21 | 210:21 | ones 58:14 | 232:14,16 | 221:6 |
| occupying | 108:13 | 216:23 | 102:9 | opportunity | 223:14 |
| 259:10 | 109:21 | okay 5:7 | 178:11,22 | 5:8 226:12 | 225:15 |
| | | | | 256:11 | |

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 75

230:10
234:3,11
237:5
238:15
242:23
243:2
246:22
247:1,4,9
247:14,16
248:3 253:7
253:14
264:18
**ordered**
27:14 50:24
247:24
**ordering**
148:17
**orders** 218:7
221:8
**ordinance**
109:6,9
110:2
**original** 36:9
151:23
188:2,4,7
**outcome**
228:24
271:24
**outlined**
89:22
122:12
234:15
238:2
**outside** 13:20
22:22 26:12
27:12,18
35:7 36:19
41:15 88:18
146:19
166:6 207:3
**over-chara...**
229:16
**overall**
101:18

168:22
195:15,17
**oversaw**
148:10
**oversee** 35:7
**overseeing**
34:1
**overseen**
158:18
**oversimplify**
53:9
**owners** 37:15

—— **P** ——
**P** 2:1,1
**p.m** 1:18
**package**
25:16 29:21
29:22 30:5
30:9,16,19
67:23 68:19
68:22 69:1
69:7,10
71:7,8
87:10
109:22
112:3
114:22
169:5,7,9
170:3,6
171:18
172:1,12,17
178:15
220:9
231:15,17
231:17
232:1,6,18
233:11
**packages**
220:5 232:9
**page** 3:2,11
3:17 58:2
61:3,16,18
71:15 81:14

122:24
124:17
206:7
216:16,19
219:23
**pages** 270:14
**paid** 24:16,23
25:6
**paint** 238:21
**pandemic**
118:13
122:6
**panned**
223:23
**paper** 197:12
**paragraph**
10:9 27:21
36:8 46:7
47:6 61:7
72:6,10
81:15 106:5
131:23
132:2,7,8
138:6,7
143:19
157:19,23
193:24
210:15,19
212:2
217:12
229:23
240:11,12
244:9,19
**paragraphs**
210:5
**parallel**
163:7
**parameters**
222:18
**parcel** 240:4
**Pardon**
187:16
257:13
**park** 158:24

166:7
**part** 14:7
31:11 35:17
46:22 50:6
50:9 51:24
52:2 61:7
76:20 80:1
81:7,23
90:1 91:13
92:12,15
100:10
105:22
109:11
113:9 130:4
138:13
151:10
152:21
172:16
193:13
195:3,8
202:9
203:11
204:11
220:8 225:5
225:9
231:21
233:18,19
233:24
235:7,19
236:4 240:3
261:10
**partial** 57:12
**participate**
18:20
232:15,17
232:20
**participated**
19:4 20:19
33:8 124:20
**participating**
31:18
**participation**
45:22 231:2
**particular**

124:17
**parties**
271:23
**parties'**
45:12 49:2
129:3
**partition**
160:2
**parts** 126:13
**party** 110:4
130:7,20
134:20
**pass** 88:12
**passage**
118:10
250:11
257:8
**passageway**
250:11
**passed** 105:4
118:22
**passes** 117:8
**passing** 265:1
**path** 248:23
**pause** 135:17
**paused**
142:21
**payment**
24:13
**pedestrian**
209:9
**Peggy** 1:15
47:13 49:19
50:1 97:20
129:4 271:3
272:7
**pen** 197:11
**pending**
129:6
137:10
156:2
**penny** 267:8
**people** 20:11
20:12,15

21:2 34:23
41:15 51:21
53:11
123:12
164:9
213:16
227:12
249:6,16
250:14
251:11
254:1,15
255:23
256:10
257:22
259:10,15
259:16
260:9,14
262:2,4,14
**percent**
224:14
229:18
234:13
**percentage**
118:23
120:2
**perfectly**
192:15
255:19
**period** 9:4
52:15 67:16
102:13
151:9
177:24
197:9
204:20,24
212:20
217:22
219:18
222:8,20,21
**permanent**
4:16 26:22
131:19
**permissible**
135:1

261:20
263:15
**permission**
68:22 136:6
243:8
**permit** 25:19
30:5 176:12
212:4
**person** 20:2
33:11,14
52:6 53:10
53:14,14
104:2
109:15
139:6 143:6
157:2 164:6
190:22
196:6,9
217:4 255:4
255:6
257:20
260:3,5,7,8
263:4
**person's** 66:9
107:24
**personal**
137:2,4
271:13
**personally**
11:19 13:17
20:16
225:23
**personnel**
206:23
**pertaining**
1:14
**phase** 28:14
210:3
263:22
264:24
**phased**
168:17
**phases** 209:6
**photograph**

145:18
146:3,4,22
**photographs**
149:23
**physical**
43:11 44:8
242:16
**physically**
160:24
161:21
249:1
**pick** 216:9
266:15
**picking**
126:12
**picture**
145:15,16
146:7
238:21
**piece** 50:23
149:8 150:8
**piecemeal**
211:22
**pieces** 51:12
54:8 125:8
**place** 161:12
161:13
180:12
232:8
270:15
271:17
**placed**
233:23
**Plaintiff** 1:4
1:12 2:7
270:4
**plaintiff's**
3:12,12,13
3:13,14
50:6,12
230:15
238:20
**plan** 17:16,19
18:1,14,19

27:24 40:11
86:14 88:4
91:14,18
92:1,12,16
93:6,8,10
94:2,5,10
94:14 98:23
99:6 100:10
102:7 104:7
104:11,20
105:3 110:9
119:22
123:1,4
226:9
238:12
241:24
242:1
265:14
**planning**
11:21 41:17
48:23 51:24
62:9 63:1,5
63:7 68:23
72:19 88:24
90:3 95:17
95:20 98:20
107:5
108:12,16
108:19,23
110:3,11,18
122:11
175:16
189:6
190:12
191:2
197:17
205:21,22
264:7
**Planning's**
111:11
230:15
238:20
**plans** 36:9,21
40:1 110:5
151:23
188:2,4,5

234:16
**please** 67:16
97:17 129:5
250:19
**pleasure** 89:5
**plus** 78:1
**point** 17:10
23:6 65:20
73:4 74:20
116:21
123:15
131:5 176:5
183:4
213:20
221:20
238:19
246:7
251:18
259:4,8
261:16
**policies**
226:24
**policy** 88:24
122:11
190:13
224:22
225:6
265:9
**pool** 217:15
217:17,24
218:10
220:23
221:9
**poor** 6:4
167:4
211:15
**portfolio**
11:11 34:2
34:9,10
101:1
189:23
**portion** 24:3
65:4 86:21
168:4
261:16
**portions** 40:3

82:20 150:6
**ports** 208:5
**position**
66:15 89:19
111:7
141:12,21
152:5
224:22
225:6
**possibility**
80:4,11
149:4 207:7
226:15
**possible** 18:4
150:21,24
176:7
198:23
211:21
224:20
232:18
234:21
242:17
247:20
**possibly** 21:2
54:19
148:18
151:7
207:19
**potential**
268:9
**potentially**
148:19
221:9
**pour** 161:10
166:15
167:4
211:15
**pouring**
168:4
**practice**
16:16
**precise**
163:15
**Preckwinkle**
89:8

**preclude**
211:3
**predict**
118:18
**prefer** 195:24
**preliminary**
25:15 29:19
54:24 69:2
170:10
**premise**
42:15 49:3
49:6,10
97:14
185:20,21
201:18
**preparation**
7:17 83:3
**prepare**
68:22
**preparing**
83:12,17
**prequalified**
217:13,17
218:9
220:23
**present** 33:10
57:10 58:7
58:9 76:8
143:24
173:18
195:12
203:17
206:12
**presentation**
88:15
**presently**
267:9
**president**
89:3,5,6,10
89:11 90:14
100:6,24
110:20
111:9,12
112:2,9,10

112:12,14
203:16
265:8
**president's**
98:21 100:5
101:16
104:9
109:21
111:1
**pretty** 6:8
12:4 23:24
51:3 57:6,8
79:9 117:18
131:6 183:7
240:7
**previous** 13:6
40:23 65:9
75:2 194:8
223:11,21
271:6
**previously**
4:19 125:10
153:2
160:15
223:6
257:19
**price** 16:20
65:24 87:9
182:16
186:14
191:21
202:24
221:24
237:18
**pricing** 65:20
67:24 99:23
168:14
169:16
183:19
202:6
**primarily**
7:10
**primary**
52:12,18,19

62:10 104:2
**principal**
196:7
**prior** 7:7
32:10,16
33:7,22
47:19 60:3
60:18 74:5
75:22,24
76:16,23
93:23
100:21
112:8
186:14
191:21
206:9
**prioritize**
265:3
**priority**
115:8,11,17
123:4
178:13,13
**prison**
227:13
**prisoners**
207:22
**privilege**
83:1 127:8
138:4
157:16
**privileged**
83:13
127:12,14
136:18
**probably**
12:4 14:11
14:11 39:9
40:16 41:13
58:23 60:5
75:22 78:9
79:21 80:21
147:22
163:11
189:14

190:19
191:18
192:4 197:6
211:12
247:20
**problem**
148:22
160:20
**problems**
164:2
**procedure**
1:13 200:2
**proceed** 65:6
68:5,5
86:12 118:7
175:24
176:16
179:3
180:11
190:4,6
196:14,16
197:4,10,14
197:18
221:21
**proceeded**
230:9
**proceeding**
66:19 174:2
176:6
**proceedings**
271:15
**proceeds**
175:17
**process** 9:21
10:2,2 11:9
11:13,15,18
12:2 15:14
16:13 17:12
18:6 19:22
50:16 51:1
65:16 67:7
68:11,12,18
71:6 89:16
98:23 99:1

99:18
100:18,22
103:23
123:17
143:15
170:14
177:9,17
178:5,20
179:10,18
179:24
180:5,10,18
183:14
202:10
211:1
215:20
216:12
217:6
222:20
223:16
226:11
227:3
230:16,17
230:21
231:6,12
232:20
234:19
238:7 239:6
242:23
243:2
**processes**
37:4 83:12
89:18 231:2
266:13
**procure**
218:8
**procured**
233:6
**procurement**
12:3 15:7
15:24 16:4
17:3 20:7
20:21,23
21:5 23:20
24:4 33:3

41:8 65:11
66:1,6,17
66:21 67:13
67:18,22
68:2 85:16
85:20 86:1
86:9 87:4
87:10,18
88:4,9
122:20
175:20,21
176:11
178:12
179:19,22
189:4 190:1
196:18
197:13,15
198:9 200:3
202:21
202:16
203:6
217:23
218:12,14
220:16
221:3,17
226:17
230:16,21
230:21
231:7,12
232:13,15
233:2 236:7
237:1 238:2
264:8
**procureme...**
178:1
232:10
**procuring**
68:12
**produced**
216:2
**product**
37:10 83:1
83:6,8
124:6 125:6
127:5,24

133:15
136:3,16,21
137:23
138:22
141:16
155:19
156:14,22
156:24
157:15
**productive**
263:14
**professional**
17:6 73:21
79:15 137:3
**program**
81:7 85:1
90:23 91:3
91:6 201:15
202:16
203:6
222:12,13
232:15
264:22
265:2
**programs**
119:18
175:17
**progress** 99:7
**project** 7:22
8:3,7 16:22
17:18 18:8
18:11,13,18
21:8 24:24
27:24 28:3
28:6,9,10
28:18 30:14
30:17 31:15
31:16 32:20
62:11 65:3
65:21 67:17
67:19,20
68:14 71:20
86:16 87:8
90:6 91:19

92:3,7,8,11
92:13,15,23
93:11,15,24
94:11 96:19
96:20,21
98:10,18
101:11
103:20
105:24
106:8
107:16
110:16
115:17,20
118:4,7,11
120:7,8,16
120:18,18
121:1,4,14
121:16
122:2,21
123:22
129:24
157:21
158:3,6
159:3,4,17
159:24
161:18
167:12
172:24
176:3
178:19
179:5,17
180:16,24
182:8,17
186:22
189:15,16
189:21
191:2 192:6
192:14,19
194:20
195:15,17
196:6
198:22
199:20
200:24

201:14
203:7,19
204:2 205:1
205:24
213:16,17
225:11,19
226:2,10
237:24
238:5
240:24
265:10,12
265:16,21
266:7,9,20
266:15,16
266:19
**projected**
122:3
159:17
**projecting**
226:1
253:18
**projection**
253:23
**projections**
223:4
243:17
**projects** 7:22
16:23 17:7
96:9,11
98:14 99:5
99:7,15,15
99:24 101:4
101:8,18,20
102:2,5,8
113:16
115:21
116:11
119:6,8,11
119:18,20
119:22
120:2 123:2
123:3,18

158:4
160:10
175:12
178:24
205:5,7,16
243:1
263:22
264:1,6,9
264:12,16
264:19,21
265:10,12
265:16,21
266:7,9,12
266:15,16
266:19
**properly**
102:15
113:22
143:7 149:1
253:1
**property**
107:15
**proposal**
16:5,11,20
66:3 68:3
87:23 94:20
101:15
106:22
111:22,24
122:18
168:15
169:17
130:17
153:5 164:4
191:8
232:16,23
257:3 261:3
261:11
**provided**
4:15 27:3
30:16 43:17
60:1 90:12
90:16
140:22
185:12
192:10
202:6
213:21
222:12

230:10
267:19
**proposals**
67:6 111:11
189:3
218:16
226:18
**proposed**
86:14 109:1
114:22
**protected**
83:4 124:5
127:5,24
133:15
136:3,15
137:22
138:21
139:4
141:16
155:18
156:13,22
**provide**
25:15 44:7
46:14 60:2
77:5 79:7
79:10 97:18
115:14
126:16
130:17
153:5 164:4
191:8
232:16,23
257:3 261:3
261:11
**provided**
4:15 27:3
30:16 43:17
60:1 90:12
90:16
140:22
185:12
192:10
202:6
213:21
217:11,12
217:20
218:3,10
222:12

84:22 157:7
172:17
**provision**
248:21
**prudent**
39:14 259:9
**public** 11:10
30:6 34:2
101:17,19
101:22
122:24
262:20
270:23
**published**
122:23
**pull** 10:12
25:19 36:6
58:2 88:10
151:20
**pulled** 85:20
85:21 86:2
86:5 131:4
**pulling** 86:9
**purchase**
54:5 110:15
**purchaser**
206:1
**purchases**
107:15
110:14
**purchasing**
87:12
**purpose**
198:2 232:7
255:5
256:15
**purposes**
83:3
**pursuant**
1:12 4:4
48:21 143:8
167:4 253:2
253:14

219:21
211:3
**pursued**
130:20
**pushed** 249:2
257:5
**pushing**
249:6 254:1
**put** 15:22
17:14 18:7
50:18 81:15
95:20,23
96:24 97:3
97:6 98:2
98:20 104:6
104:8
128:18,20
138:16
141:10
142:5,22
143:11
149:20
160:2 163:9
175:8 184:5
184:16
197:11
206:7
221:18
228:15
232:6
233:11,13
235:13
241:23
242:19
243:6
246:22
249:10
250:3,6
252:20,21
252:23
259:5
**putting**
135:18
216:15
232:7

Exhibit 5 Page 76

ERIC DAVIS
March 12, 2024

Page 32

| Q | | | | | |
|---|---|---|---|---|---|
| **qualification** | 49:6,10,11 | 155:21 | 268:11 | 111:19 | 50:19 51:3 |
| 11:14 | 49:13,15,16 | 156:2 | **questioned** | **quizzing** | 52:7,21 |
| 213:24 | 49:20,24 | 157:11 | 140:9 | 84:19 | 53:4,8,15 |
| 218:3 | 50:8 52:10 | 159:8 | **questioning** | R | 55:21 56:7 |
| 222:14 | 55:1 57:12 | 164:21 | 27:15 70:23 | | 56:7,16 |
| **qualificatio...** | 60:14 62:14 | 165:11,14 | **questions** | **R** 2:1 3:16 | 57:1,5,14 |
| 15:6,13 | 63:15 64:11 | 166:17 | 4:14 13:5 | 4:11 228:2 | 58:1,2 |
| 16:3,12,19 | 80:13 81:21 | 169:20 | 22:20 46:8 | 246:19,19 | 59:23 61:8 |
| 17:15 | 82:24 83:5 | 170:10 | 46:23 74:12 | **R-a-f-f-i** | 61:24 62:2 |
| 134:13 | 83:8 86:13 | 173:9,16,23 | 74:18 83:15 | 66:10 | 63:9,19 |
| 221:12 | 89:9 92:18 | 175:7 | 83:16 84:14 | **radar** 173:20 | 64:17 65:8 |
| 229:17 | 93:18 94:4 | 176:21 | 113:2 | **Raffi** 66:8 | 66:5,20 |
| 267:21 | 97:5,9,14 | 182:19 | 114:18 | 87:15 | 69:13 71:15 |
| **qualificatio...** | 97:17,21 | 185:6,7,11 | 116:16,17 | **railing** | 71:16 72:14 |
| 16:17 17:3 | 104:17 | 185:18,19 | 116:19 | 149:19 | 73:13,18,23 |
| 17:6 | 105:15 | 185:22 | 121:11 | **Railings** | 73:24 74:13 |
| **qualified** | 111:17,17 | 186:1 189:5 | 128:2,2 | 45:19 | 74:15,22,23 |
| 16:14 | 113:12 | 189:9,10,11 | 130:11 | **rain** 207:4 | 76:18 77:6 |
| **qualify** 14:3 | 114:6,20 | 193:3 198:6 | 133:19 | **raise** 199:6 | 77:9,15,17 |
| 237:4 | 116:24 | 198:8,15 | 135:7 | **ramp** 8:4 | 77:19,20,21 |
| **quarter** | 117:3,6 | 200:2 207:6 | 136:18,19 | 9:13,19 | 78:5,7,13 |
| 102:10,10 | 119:24 | 209:17 | 151:12 | 11:22 12:10 | 79:16,18 |
| 102:11 | 120:4,19 | 210:9 | 153:17 | 12:19 13:10 | 80:5,17 |
| 154:9 | 122:8 | 215:19 | 165:17,20 | 13:16,18 | 81:18 82:4 |
| 155:10 | 123:23 | 216:1,8,10 | 201:10 | 14:11 15:1 | 82:5,20,21 |
| 156:6 | 124:8,12 | 216:11 | 227:20 | 18:23 19:8 | 84:6,6,18 |
| **question** 5:20 | 126:5 | 217:1 | 228:1 | 20:4,18 | 85:10 86:12 |
| 6:1,4,18,23 | 128:11 | 223:11 | 230:16 | 22:15 23:17 | 86:18 87:3 |
| 7:20 8:11 | 129:5,6,14 | 224:2 225:3 | 231:16 | 24:17 25:14 | 89:24 91:13 |
| 10:21 11:3 | 133:21 | 225:5,7,9 | 241:16 | 29:5 31:4 | 95:2,10,22 |
| 12:12 19:2 | 135:21 | 227:6,11 | 244:24 | 31:22 32:9 | 97:7 98:8 |
| 22:17 23:2 | 136:1,24 | 228:16 | 246:13,15 | 32:12 34:13 | 101:6 |
| 23:4 26:5 | 137:8,10,12 | 235:11,17 | 268:15,18 | 34:16,21 | 102:23 |
| 26:14,18,20 | 138:1,21 | 236:1 | **quicker** | 36:9,11,20 | 103:2,10,23 |
| 26:24 27:1 | 140:4 141:7 | 250:18,19 | 175:12 | 38:14,16,22 | 104:5,14,23 |
| 27:18 28:5 | 141:15 | 250:21 | 179:14,15 | 39:3,6,18 | 105:6,8,17 |
| 29:8 37:18 | 142:8,18,23 | 251:17 | **quickly** | 40:6,7,17 | 105:22 |
| 38:13 42:8 | 142:24 | 252:15 | 178:18 | 41:18 42:1 | 106:21,24 |
| 42:14,14,17 | 143:9 | 253:4 254:3 | 179:10 | 42:4,11,24 | 109:21 |
| 43:22,24 | 146:10,14 | 254:4,10 | 188:23 | 42:24 43:11 | 110:22 |
| 44:6 46:10 | 152:14,20 | 260:18,20 | 191:10,11 | 43:18 44:9 | 112:1,18 |
| 47:14 48:1 | 153:9,14 | 261:2,2,10 | **quite** 37:9 | 45:9,16 | 113:6,13 |
| 48:6 49:3,5 | 155:13,16 | 263:13 | 50:22 52:14 | 46:2 47:19 | 114:14,14 |
| | | 267:12 | 68:11 103:6 | | |

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 33

| | | | | | |
|---|---|---|---|---|---|
| 114:24 | 166:19,21 | 233:24 | 255:15,23 | 256:8 | **receiving** |
| 115:16 | 167:19 | 234:12,19 | 256:10 | **reasonable** | 80:14 |
| 117:11,15 | 168:9,18 | 236:10 | **re-allocation** | 192:4 | **recognition** |
| 122:10 | 169:11,13 | 238:1,22 | 99:17 | **reasonably** | 130:7 |
| 123:9,20 | 172:4,7 | 239:2 241:6 | **re-allocatio...** | 191:7 | **recognize** |
| 124:1,18 | 173:7,13,19 | 241:15 | 113:18 | **reasons** | 131:4 146:5 |
| 125:15 | 174:19 | 242:5 | **re-ask** 83:5 | 54:15 69:14 | 146:23 |
| 129:19 | 176:2,18 | 244:11,12 | 97:21 136:1 | 122:5 | **recollection** |
| 130:12,13 | 177:4 | 244:15 | **re-looping** | 262:17 | 60:8 150:10 |
| 131:11,21 | 180:11 | 245:1,10 | 116:15 | **reassess** 27:1 | 179:16 |
| 134:2,9,21 | 181:5,15 | 246:5,8 | **re-pour** | **rebuild** 160:1 | 217:21 |
| 134:24 | 184:20 | 248:13 | 61:24 230:1 | **recall** 4:21,23 | 219:10 |
| 135:3,14,16 | 186:12,16 | 249:2,7,17 | **re-request** | 5:14 6:6,9 | 220:21 |
| 136:6,12,14 | 187:13 | 250:4,8,10 | 98:11 | 7:18 12:14 | 221:17 |
| 137:16,20 | 191:9 | 250:24 | **reach** 240:23 | 12:18,20 | 248:20 |
| 138:13,19 | 197:13,22 | 252:1,4,7 | 255:8 | 21:15,19 | 249:12 |
| 139:8,13 | 199:1,5 | 253:18 | **reached** | 33:13 51:6 | **recommend** |
| 140:1,12,18 | 202:7,17 | 254:2,5,17 | 260:22 | 74:11,17 | 89:15 |
| 145:19 | 203:3,9 | 254:21 | **read** 47:13,16 | 75:21 76:14 | 112:16 |
| 146:6,23 | 206:15 | 255:1,7 | 50:4 97:23 | 76:16,23 | 227:13 |
| 147:2,8 | 207:1,8 | 256:12,21 | 270:12 | 85:24 88:8 | **recommen...** |
| 148:5,6 | 209:6,7 | 256:22 | **reading** | 107:16 | 62:7 65:5 |
| 149:24 | 210:2,18,24 | 257:10,16 | 126:13 | 110:12,16 | 71:14 89:21 |
| 150:7 152:2 | 211:10,15 | 257:22 | 139:9 174:9 | 115:19,23 | 98:20 100:6 |
| 152:6,17,22 | 211:18,19 | 258:1,5,11 | **real** 99:16 | 118:12 | 100:24 |
| 153:7,21 | 212:5,7,9 | 259:19 | 122:8 | 147:20 | 101:2 112:7 |
| 155:9 156:5 | 212:21 | 260:7,15 | 205:24 | 209:2 | 112:11,23 |
| 156:16,17 | 213:6,7,12 | 265:20 | 206:1,3 | 212:18 | 112:24 |
| 157:20 | 215:22 | 266:22 | **reality** | 218:5 250:5 | 123:10 |
| 158:5,6,19 | 216:14 | 267:10,23 | 198:20 | 251:13 | 143:18 |
| 159:1,5,9,9 | 217:5,8 | **ramps** 128:9 | 199:14 | 252:19 | 167:5 172:9 |
| 159:12,14 | 218:6 | 144:2 | **really** 12:15 | **receive** 16:24 | 189:22 |
| 159:18,19 | 220:12 | 158:14,17 | 117:24 | 17:1,7 26:6 | 191:5 |
| 160:6,21,22 | 221:6,16 | 158:21,23 | 133:10 | 26:7 55:21 | 203:15 |
| 161:2,3,20 | 222:1,15 | 163:20,23 | 160:19 | 189:6 | 224:16 |
| 161:24 | 223:9 | 213:2 | 212:12 | **received** | 229:24 |
| 162:1,2,4 | 224:12,17 | **ran** 245:2 | 236:22 | 45:11 81:17 | 230:8,8,11 |
| 162:11,17 | 225:1 226:2 | **random** | **reason** 16:18 | 90:8 99:19 | 230:13 |
| 162:18,24 | 228:5,9 | 262:3 | 46:14 80:1 | 152:15 | 233:16 |
| 164:23 | 230:1,3,18 | **range** 22:4 | 117:19 | 194:3 | 246:1,3 |
| 165:2,2,5,5 | 231:10,18 | 80:20 102:5 | 162:20 | 200:22 | 258:9 265:7 |
| 165:6,6,7 | 231:22 | 161:15 | 195:22 | 201:3 | **recommen...** |
| 165:22 | 232:4,4,7 | 232:19 | 206:6 232:5 | **receives** | 29:20 30:10 |
| 166:1,3,15 | 233:6,16,21 | 240:21 | 235:7 236:4 | 111:10 | 61:23 62:20 |

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 34

| | | | | | |
|---|---|---|---|---|---|
| 64:19 90:4 | 3:7 | 74:13 101:9 | 181:9 | 181:23 | 202:7 226:2 |
| 90:8,11,15 | **reduced** | 101:14,15 | 194:18 | 182:2,9 | 228:9 |
| 99:20 | 271:12 | 102:22 | 183:11 | 183:11 | 231:18 |
| 108:12 | **refer** 18:15 | 105:16 | **relative** 7:22 | 187:14,17 | 234:19 |
| 111:13 | 34:17 108:4 | 108:13 | 18:13 89:23 | 187:19 | 237:24 |
| 124:17 | 121:6,7 | 121:14 | 271:20,21 | 241:16 | **renovation** |
| 130:22 | 122:23 | 134:9,24 | **relatively** | 250:7 | 39:2 42:23 |
| 224:12 | **reference** | 135:15 | 38:19,20 | 257:14,15 | 66:20 85:9 |
| **recommen...** | 46:4 211:4 | 154:13 | 50:23 | **rememberi...** | 86:11 91:13 |
| 71:15,16 | **referenced** | 155:10 | 163:15 | 224:6 | 95:9,21 |
| 198:24 | 140:23 | 171:8 | 177:18 | **removal** | 96:17 97:7 |
| **recommen...** | **referencing** | 176:17 | **relevance** | 131:11,13 | 101:6 |
| 207:20 | 44:15 | 194:19 | 37:7 | 158:5 | 102:23 |
| **reconstruct...** | 157:23 | 202:7 204:2 | **relevant** 8:17 | 210:17 | 103:9 104:5 |
| 39:21 43:11 | **referred** | 205:4 | 26:21 | 212:4 241:6 | 104:13,22 |
| 44:9 71:17 | 56:19 | 206:17,18 | 164:19 | **remove** 61:23 | 105:6,8,21 |
| **reconstruct...** | 157:20 | 213:19 | **reliant** 260:9 | 162:12 | 106:20,24 |
| 248:19 | 251:8 | 214:19 | **relies** 97:15 | 166:2,14 | 108:21 |
| **reconstruct...** | **referring** 9:3 | 223:7 250:4 | **remain** | 167:3 | 109:20 |
| 71:18 | 9:7 14:2 | 261:7,13 | 156:17 | 229:24 | 112:18 |
| **record** 6:10 | 36:13 58:14 | 264:14 | 176:9 | **removed** | 117:10 |
| 12:12 25:19 | 71:23 84:8 | **regs** 261:17 | 253:19 | 246:4,5 | 120:22 |
| 30:4 35:18 | 85:13 119:3 | **regular** 103:3 | 254:7 | **removes** 59:5 | 157:20 |
| 35:20 41:24 | 131:24 | 164:11 | **remaining** | **removing** | 159:4 |
| 43:13 47:15 | 134:2 | **representa1** | 162:23 | 211:5 | 180:12 |
| 50:3 76:3 | 139:10 | 250:2 | **remains** | **renovate** | 186:15 |
| 97:22 129:2 | 184:4 | **regulations** | 160:3 | 34:13 53:15 | 197:22 |
| 165:16 | 204:17 | 40:4 43:4 | **remediate** | 63:19 64:17 | 206:15 |
| 169:12,19 | 264:4 | 87:12 268:6 | 85:3 | 176:1 203:8 | 207:8 217:5 |
| 174:13 | **refers** 47:3 | **reissued** | **remedied** | 221:6 228:5 | 224:24 |
| 178:16 | 84:6 | 14:16 | 84:13 | 230:3,18 | 265:20 |
| 231:23 | **reflect** 43:12 | **reject** 226:17 | **remedy** 84:12 | 231:10 | 267:9 |
| 232:2 233:3 | 94:16 | **rejected** | 141:21 | 232:6 | **renovations** |
| 233:5,8 | **regard** 110:1 | 221:2 | 174:12 | 233:24 | 27:22 91:20 |
| 238:11 | **regarding** | **relate** 7:23 | **remember** | 234:12 | 105:9 121:1 |
| 246:18 | 45:8 | **related** 13:13 | 20:11 50:21 | 236:10 | **repeat** 49:20 |
| 269:1,3 | **regardless** | 26:17 | 51:10 54:7 | **renovated** | 49:21 129:5 |
| 271:14 | 85:22 98:9 | 136:10 | 56:20 73:3 | 39:5 40:17 | 198:4 |
| **records** 11:7 | **regards** 4:14 | 138:23 | 85:21,22 | 41:18 42:11 | **repeating** |
| 14:5 15:11 | 8:3,17 | 156:12,21 | 88:12 | 43:19 139:8 | 116:20 |
| 18:7,15 | 12:10 19:7 | **relating** 32:8 | 105:23 | 238:23 | 153:17 |
| 32:15 33:12 | 32:12 52:6 | **relation** | 108:3 | 239:3 | **rephrase** |
| 45:10 | 52:20 53:14 | 31:22 | 147:22,23 | **renovating** | 62:16 80:13 |
| **REDIRECT** | 57:5 63:8 | **relationship** | 148:3,4 | 34:16 63:9 | 86:13 |

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 35

| | | | | | |
|---|---|---|---|---|---|
| 104:16 | 169:13 | **requested** | **rereads** 50:2 | **rethink** 64:11 | 75:18 77:11 |
| 111:23 | 172:5 174:7 | 47:16 50:4 | **rescind** 92:7 | **revealed** | 77:14,16,18 |
| 114:19,20 | 186:6 | 96:19 97:23 | **reserve** | 140:15 | 77:24 79:4 |
| 117:6 | 187:21,23 | 102:3 | 126:15 | 174:24 | 79:17 81:17 |
| 123:22 | 188:19 | 268:20 | 268:20 | **Revenue** | 85:6,7 |
| 124:7,12 | 204:13 | **requests** | **reshaped** | 239:24 | 108:4 |
| 135:12 | 214:2 | 11:13 99:14 | 14:16 | **review** 5:9 | 114:19 |
| 141:8 142:1 | 227:17 | 194:3 | **resolve** 130:8 | 6:6 7:12,14 | 116:13 |
| 144:6 162:7 | 245:23 | **require** 15:24 | 16:4 62:3 | 7:16 8:2 | 120:21 |
| 165:14 | 250:9 | 16:4 62:3 | 66:20 91:12 | 47:6 98:13 | 130:16 |
| 173:15 | **reported** | 66:20 91:12 | 151:7 207:3 | 150:15 | 138:18 |
| 186:1 225:8 | 151:7 207:3 | 151:7 207:3 | 211:11 | 151:7 | 142:19 |
| 227:11 | 271:11 | 211:11 | 255:17 | 188:21 | 146:8 |
| **replace** 51:2 | **Reporter** | **required** | **response** | 189:4,19 | 153:20,21 |
| 89:2,24 | 1:16 96:1,4 | 67:8 80:19 | 4:16 97:19 | 190:16 | 154:20 |
| 161:6 | 109:10 | 131:19 | 131:19 | **reviewed** 7:8 | 156:4 163:7 |
| 166:23 | 142:17 | 125:21 | 185:12 | 66:1 91:21 | 163:9 |
| 172:9 | 155:4 | 133:12 | 235:14 | 196:17 | 165:22 |
| 259:11 | 193:12,19 | 134:8 | **responsibil...** | **reviewing** | 169:16 |
| | 195:4 261:9 | 189:20 | 42:7 | 18:21 99:23 | 170:4 171:5 |
| **replacement** | 269:1,4 | 257:7,10 | **responsibil...** | 139:7,20 | 181:9 |
| 9:13 42:3 | 271:4 272:8 | **requirement** | 42:2,4 | 187:21,24 | 182:13,14 |
| 65:7 66:5 | **representat...** | 17:5 78:15 | 43:14 110:1 | 188:1 | 187:12,22 |
| 86:19 | 191:19,24 | 78:18 80:18 | 169:15 | 198:21 | 188:6 |
| 103:22 | **representat...** | 144:22 | **responsible** | **reviews** | 190:15 |
| 122:9 123:9 | 64:7,9 | 155:11 | 41:17 42:10 | 31:12,18 | 192:1 208:8 |
| 158:5,21,23 | **representat...** | 77:12 | 108:11 | 91:17 199:2 | 208:19 |
| 159:1 212:5 | 54:23 62:11 | 234:7 | 110:4 143:6 | **RFP** 17:10 | 214:7,12,18 |
| 212:9 241:6 | 65:2 | 258:20,21 | 188:24 | 216:16,17 | 216:21,22 |
| **replacing** | **representat...** | 260:3 | **rest** 100:11 | 217:14 | 220:8 222:7 |
| 160:6 | 57:4 204:8 | **requireme...** | 163:11 | 218:14 | 226:11 |
| 196:23 | **request** 14:15 | 43:5 67:12 | 172:12 | **RFQ** 17:9 | 227:19 |
| 254:13 | 15:6,13 | 124:24 | 211:15 | 80:22 81:2 | 229:6 |
| **report** 12:9 | 16:1,5,11 | 126:7 | 231:24 | 130:1 | 233:19,21 |
| 13:9,16 | 16:12,18,20 | 135:16 | 232:3 233:9 | 179:15 | 234:1 235:5 |
| 14:22 32:4 | 17:14 18:8 | 152:3,24 | 183:9 190:3 | 214:20 | 237:19 |
| 52:8 55:2,7 | 98:7 102:15 | 183:9 190:3 | 198:13 | 218:13 | 240:14 |
| 58:3 60:3 | 189:6 | 198:13 | 231:4 | 219:16 | 248:6 251:6 |
| 61:4,13,15 | 190:16 | 231:4 | 232:12 | 220:23 | 251:19,24 |
| 62:21 69:19 | 191:8 | 232:12 | 235:4 | **right** 7:11 | 256:22 |
| 70:7 71:24 | 213:21,24 | 235:4 | 255:20 | 15:8 47:4 | 257:9,18 |
| 73:11 90:17 | 217:11,20 | 255:20 | **retain** 143:16 | 48:17 57:24 | 262:2 263:9 |
| 90:21 116:4 | 218:2,3 | **retaining** | **retained** 11:8 | 65:14,18 | 266:10 |
| 124:15 | 221:12 | 10:23 11:9 | 34:12 | 66:14 73:12 | 268:8 |
| 139:7 | 222:13 | **requiring** | **retention** | 73:23 74:14 | |
| | | 24:6 78:20 | 15:4 | | |

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 77

ERIC DAVIS
March 12, 2024

Page 36

rights 126:15 263:7,8
rise 36:10 38:4,15,22 40:7 56:7 59:22 60:12 69:14 73:12 73:17,22 74:13,21 76:18 77:1 77:5,14,22 77:23 78:14 79:5,24 80:16 82:21 123:20 124:1 130:12 131:20 133:4,5,12 134:2,6,9 135:2,11,14 136:7 138:9 152:1,20 153:6 154:2 154:8 155:2 155:9 156:5 165:23 256:8,13 258:21
rising 78:19
roadblock 220:15
Robert 21:6
Rockwell 101:23
Roderick 33:24 35:1
roughly 99:20 100:19 167:7
Rowland 45:2
RT 217:8
RTU 144:16 145:14,19 146:6 147:2 147:8,9 208:15 217:8 227:16
Rule 64:9
rules 1:13 87:12

S

S 2:1 3:10,16 3:16 228:2 228:2
S-a-r-a-f-i-... 66:12
Sabrina 104:3 249:24 250:3
safety 11:10 34:2 101:17 101:19,23 145:8 175:15,15 175:17 262:11,17
SAITH 269:6
sale 240:5
sales 201:18
salient 199:20
sally 208:5
salvaged 96:13
Sam 5:22 142:20 233:14
SAMUEL 2:10
Sarafian 66:8 66:11 87:17
Sarvan 87:16
sat 204:1,3,7
saw 162:17
163:3,4,8,9 163:20 219:19
saying 14:4 14:22 83:15 131:3 152:13 154:23 175:3 248:15 254:21 259:24
says 9:23 10:7 11:7 11:10 29:17 35:20 51:11 71:14 110:2 132:15 153:21 192:18 193:23 196:11 197:4 229:23 240:15 250:16
scan 39:12 252:7,10,12
scenarios 198:23
scheme 158:3
schools 30:6 158:22
scope 21:16 22:5,11 24:3 25:8 25:12 27:18 29:23 46:16 65:16 71:19 121:11 169:14 178:6 179:1
scopes 85:2
scoring 149:5
screen 7:5,13 10:12 36:7 44:20,24 45:1 55:4 55:13 215:10 216:15 229:20,22
screws 164:8
scroll 216:21
seat 256:2
second 30:2 50:8 61:7 102:10 151:20 179:11 218:1 225:8 229:21 233:2 239:21
section 61:10 148:20,24 149:5
sections 54:14
secure 148:12 219:15
security 249:15 262:11,17
see 7:2 9:9 32:5 34:17 37:24 45:1 51:7 58:3 61:13 70:8 77:16 96:9 128:22 129:11 145:22 146:7 148:1
149:22 160:16,18 184:20 207:19 215:10,14 215:22 216:23
seeing 140:20 147:22 148:4
seek 262:24
seeking 119:15 215:20 217:6
seen 88:18 147:21 226:10
send 190:1
sending 108:12 110:19
sense 187:20 264:2
sensitive 182:9
sent 109:21
sentence 85:6 135:19,23 196:12 219:3
separate 204:18 210:5,6 238:11
separately 21:21
September 32:7 56:2 56:20 57:4 57:15,22 58:5,16 59:10,21 60:10 68:17
69:12 70:20 152:5,8,10 152:16 153:4 172:20 176:13 181:18 183:24 184:2,10,23 185:2 186:5 203:24 204:5,13 205:4,13
sequentially 183:20
series 4:14 71:9 99:3
serve 89:1,4 169:11,18
served 52:12
serves 88:16 219:4 245:12
Service 11:1 27:22 208:22 220:3 240:1
services 14:19 17:7 22:23 24:13 25:14 26:13 26:18 27:13 91:21 106:17 169:18 214:20 218:9 219:15,21 219:24 230:12 95:8 186:20,23 186:23 202:5 272:1
setting

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 37

226:23,23
seven 11:11 67:15 220:5
shadow 147:13
shallower 62:1
share 7:5 44:19 129:8 229:20
Sheevy 21:4
sheriff 1:16 8:16,22 96:7,22 97:2 101:5 101:24 102:3,4,21 103:10 104:1 135:2 144:1 145:6 204:4,8 205:4,7,20 205:23 206:13,22 208:20 248:18,24 249:5 250:17 254:22 257:21 260:3 261:4 261:14 262:6,8,16 262:23 264:6 270:6
Sheriff's 21:13 31:17 32:22 95:19 98:12 101:9 204:1,22,23 207:7 248:23 249:14
sheriffs
249:16
shield 84:15
shielding 85:5
short 75:12 151:16 214:11,15
shorter 166:17 222:21
shorthand 1:16 229:2 271:4 272:8
shortly 56:1 56:3 82:14 172:21
show 55:4 143:23 214:18
showed 36:10 38:1 40:12 138:11,12
shower 256:2
showing 7:13 44:23 55:13 69:22
similar 145:15 146:2 220:24 245:15
sic 10:18 12:23 45:20 53:19 61:23 87:16 104:3 132:11 210:15 249:24
side 73:12,23 74:14,22 77:11,12,15 77:16,18,24 78:5,7 79:4 79:18 81:18
84:7 138:19 149:20,24 160:5,6 162:21,24 209:6,11,12 209:23 211:1 212:1 211:2 212:1 210:3 216:7 126:7 210:3 222:21 262:13 250:15 191:14 202:2 204:6 172:21 199:10 216:17 258:6 258:19 259:23 257:2 256:3
58:8,11 68:16 69:23 164:12 176:13 183:10,12 183:22 184:4,7,17 184:20 185:1,4 186:4,8,16 186:21 187:2,5 188:6,13 191:14 202:2 204:6 81:12
significant 199:10 216:17 258:6
significantly 258:19
signs 254:20 259:23
silent 81:23 169:4
similar 145:15 146:2 220:24 245:15
simply 54:16 96:12 126:1 161:15 166:13,18 173:7 174:6 175:4 184:17 247:1
simultaneo... 183:21
single 26:2 158:5 161:3 164:5,5 132:5 258:4
sir 46:10 158:9
site 32:6,17 35:19 58:4
133:2,6,8 134:3 202:20 slope 62:1 82:3 139:13 139:15 258:1
sloped 246:6 small 157:21 159:3,4 167:11 158:6 158:3 158:6 160:10 207:4 240:1 41:6 14:17 16:17 18:10
snow soil 211:9 sold sole solicitation
sound 214:7 sounds 48:17 soliloquy 260:18 solution 199:22 somebody 130:10 149:15 151:1 184:15 190:15 202:24 251:14 255:8,17 256:1,24 257:4 262:5 262:13 somewhat 162:15 soon 38:20 183:8 227:16,17 238:17 258:1
sorry 21:17 94:3 96:1 108:2 119:1 121:6 124:11 132:24 142:17 146:3 147:2 152:10 155:4 172:23 180:8 190:5 193:12,19 195:4 213:22 216:9 252:2 261:9 264:21 sort 102:13 223:14 146:5 152:19 50:23 11:17 21:16 50:20 58:13 59:18 65:17 65:22 66:3
soil 211:9 situation 84:12 85:3 141:1 149:9 149:16 174:12 222:17
sitting 175:5 204:16 situations 256:3 six 152:8 161:15 166:13,18 skip 235:8 236:9 slight 123:21 131:20 132:5 258:4 slightly 16:13 131:21 132:4,6,10 132:17,20
space 99:17 169:2 206:2 speak 8:21 12:15 145:11 155:5 speaking 142:14 155:3 185:14 193:11 194:23 speaks 152:19 specialized 50:23 specific 10:4 11:17 21:16 50:20 58:13 59:18 65:17 65:22 66:3

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 38

71:10 73:6 88:15 93:11 109:15 127:20 149:9 157:23 196:23 199:2 219:7 219:16 224:4
specifically 5:14 7:24 20:12 22:14 31:21 47:3 60:24 62:10 71:3 73:2 96:18 103:21 105:15 116:1 123:3 135:1 147:23 152:19 177:10 209:13 214:9 218:7 250:12
specificatio... 30:22 69:2 69:3
specifics 4:21 6:9 19:23 51:5 67:5 88:12 89:13 89:16,18 96:10 109:24 110:7 117:20 130:3 183:9 199:23
specified 37:17 82:1 271:17
spectrum 256:6
speculating 162:15
speculation 36:24 63:12 141:23 165:3
speculative 161:23
spell 66:9 108:6
spelled 13:2
spend 99:20 230:24 242:1,1,9
spending 103:14,15
spin 49:13
splits 213:7
spoke 187:17
spoken 76:13
spurious 157:7
ss 271:1
staff 31:11
stage 194:17 211:1 264:14
stages 102:6 264:7,9
stakeholders 101:19
Stamped 145:17
stand 195:16
standard 16:16 74:9 134:18
standards 39:7 40:18 41:19 42:12 43:1,20 59:13 61:12
80:5 82:2 127:17 137:17 145:2 215:23
standing 77:17,19
standpoint 122:10 183:19
stands 111:2
start 96:2 99:8 102:10 155:5 183:4 183:4,17,18 197:4 199:13,13 242:22 243:14
started 12:5 51:9 69:7,9 71:17 80:21 81:1,8 99:2 142:23 178:9 199:15 200:8 201:5 214:20 265:12
starting 51:11 102:8 142:22 188:17,20 214:5 238:15
starts 94:24 99:1 100:18
state 1:17 158:10 201:11 271:1,4
stated 8:8 46:18 265:9 271:19
statement 84:5,17 121:20 170:13,18 170:24 193:8,23 235:15,15
statements 6:12,16,19 138:7
states 1:1,14 7:19 49:2 61:7 129:3 240:13 270:1
status 90:20 116:5
stay 231:11
staying 231:13
steep 69:14
stenograph... 271:11
step 15:3 18:20 95:18 174:3 174:22 230:17 231:18,19 234:11 265:23 266:4
steps 13:17 50:16 66:18 68:8,10 148:12 170:11,16 179:9,9 228:10,24 229:4,7 236:7,9 238:1,4,5
238:22 239:2
Stewart 21:6
stick 13:6
stipulate 37:4 48:18 69:3 71:10 74:16 117:18 147:3,7
stipulated 115:20
stipulation 78:18
Stoner 12:9 52:15 137:14 174:7
Stoner's 12:18 13:15 52:8 139:7 152:15
stop 46:11 117:12 127:2 154:10 156:10
straight 148:19 149:5
straightfor... 233:17
street 2:10 179:15 208:12,18 233:8 238:10
strictly 126:6 170:11,16 179:9,9 228:10,24 229:4,7 236:7,9 238:1,4,5
stringent 114:4
stronger 267:6
structure 261:18
stuff 199:14 205:18
STV 12:9,23 13:2,3 33:17,22 34:9 73:3
subcontrac... 12:23 161:19 162:6 165:1 166:2
subject 92:8 239:13 262:15,22
submit 96:8 98:17 100:23 107:6 110:20 122:16 194:11 237:7
submits 87:9 94:19 189:3
submittal 95:3 102:12
submitted 87:10 93:7 100:1,5 101:16 104:9 194:13,15
submitting 110:4 233:22 234:10 236:7,8
subscribe 268:12
SUBSCRI... 270:20
subscribing

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 39

6:15
subsequent 28:1 30:9 171:1
subsequently 23:23
subsoil 161:4
substantial 240:23 241:3 254:4
substitute 155:23
substrate 165:18
subtract 93:7
successful 222:15
successfully 221:11 223:14
sue 224:5
sufficient 64:8 65:19
suggest 84:14 237:20
suggestion 84:21
suggestions 234:22
Suite 2:11
sum 43:3
summarizing 90:20
Summary 61:4
summer 165:8
summertime 161:11
superior 88:22
supervise 30:24
supervision
264:13
support
17:11 261:3
suppose
123:7
surveyor
72:13,15,22
192:18,23
226:19
supposed
5:21 23:22
125:15
128:15
134:11
255:1
sure 12:5
24:1 30:12
35:8 37:16
40:17 51:3
57:6,8 76:5
79:9 87:11
92:23
102:14
119:16
121:9
128:18,20
128:21
130:5 145:5
193:23
208:15
216:6
227:15
235:20
253:1
surface 62:3
168:19
surprise
246:16
surprised
203:4,22
survey 39:13
72:1,5,20
73:16,17
76:9 77:5
80:14 81:17
82:19 84:6
84:18 140:8
151:23
166:2,9,13
167:2,13,16
167:17,19
168:9,10
169:2
170:12
179:7 183:3
183:14
184:14
192:21
195:17
201:4
209:19
211:24
212:13
213:20
214:3,10,13
223:17
240:9,13
256:24
taken 1:11,12
1:15 4:4
73:4 81:24
107:17
110:12
228:11,24
229:4,8
270:14
271:16
takes 68:1
98:24 178:8
183:2 223:1
232:24
236:22
talk 72:5
76:11 82:3
121:8
131:20
169:7
162:12
163:6,14
164:15
166:2,9,13
176:13
183:10,12
195:23
talking 5:2
6:11 21:9
25:2 39:9
66:14 159:8
159:9,10,12
161:11
171:4
204:17
210:5
212:23
253:8 262:1
268:5
talks 72:1
143:19,20
Tanya 108:1
108:4,9
110:12
111:4
task 9:12,24
10:1 14:9
14:19 85:12
88:16
115:18
162:10
177:8,17,22
178:20
179:18
180:5,10,18
195:19,24
218:7 221:2
205:20
227:24
talked 20:12
22:12 48:16
79:1 84:24
103:5
148:16
153:10
182:10
187:19
198:22
199:1,3,6,9
199:19
209:12
221:8
222:12
223:14
225:15
230:10
238:15
242:23
243:2
264:18
tasked 65:19
66:2,16
33:23 34:8
35:2,21
103:20,24
190:20
213:14
teams 182:5
tear 161:2,20
technically
112:23
tell 10:20
25:1,5 31:2
31:20 32:13
39:17 46:7
48:12 54:2
54:6 57:7
57:11 58:19
58:21 59:17
60:6,24
67:16 69:8
70:10 71:3
99:6 134:24
145:19,21
153:3
176:14
177:10,15
181:3 224:4
256:19
258:1
260:13
265:8
telling 185:22
temporary
160:2

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 78

ERIC DAVIS
March 12, 2024

Page 40

75:6,11 179:12,24 **ten-minute** 75:5 **tendered** 214:2 **term** 41:12 62:6 88:16 113:20,24 132:10 133:8,16 134:2,3 153:22 154:14 156:4 **terminate** 89:7,12 91:6 92:3 **terminated** 89:9 **terms** 10:4 16:15,23 30:13 64:2 82:13 92:8 120:19 134:14 159:16 160:11 161:7 178:1 198:24 200:23 240:3 256:4 **testified** 4:9 13:21 160:15 206:17 236:6 **testify** 7:9 271:8 **testimony** 6:19 24:20 40:23 75:2 80:8 82:10 194:8

198:12 200:16 223:11 224:9 226:4 231:16 253:24 263:19,20 263:21 264:1 270:17 271:14 **testing** 211:12 tgm@morr... 2:6 **thank** 47:4 96:5 129:1 227:14 246:13 268:19 **theories** 127:22 136:14 **thing** 149:15 151:2 203:1 206:3 239:21 **things** 5:12 6:8 41:7 44:3 50:15 54:12 59:6 71:13 77:3 79:22 90:19 103:14 110:15 118:9,15 153:1 158:4 183:20,21 188:3 196:22,24 210:6 217:10 225:10 231:1

239:14 240:2 243:9 245:22 247:19 249:9 258:14 **think** 5:11 6:8,13,14 6:20 7:10 9:23 12:4 13:21 14:2 17:20 21:15 21:20 29:17 41:11 47:11 49:23 51:11 53:16 58:9 60:16 69:21 69:22 72:11 75:22 76:20 78:19 82:17 99:11 112:22 114:5 123:20 124:11 125:9 128:14,21 129:7 130:3 131:5 145:4 145:4 146:6 146:7 148:2 150:10,13 154:2,19 161:5 166:16,17 166:21 167:6,16 168:11 169:8 172:7 183:9,12,22 191:23 192:3,21 195:13,15 207:13

214:5 216:17 219:8 222:4 225:10 226:13 227:16 228:20 229:12 235:3,4,5 236:14,16 236:21 237:4,5,20 238:6,18 240:14,16 243:17,22 244:1 245:11 247:18 250:6 251:11,16 251:18 252:17,18 253:6,24 254:12 257:18 260:22 261:24 264:4,11 266:19 **thinking** 199:15 245:12 **third** 102:10 130:6,20 134:20 179:11 **third-party** 10:23 80:2 84:3 134:20 143:17 **THOMAS** 1:6 2:3,4 270:6 **thought** 6:3

140:10 239:6 251:7 251:19 253:7 257:12,14 258:11 259:12 **thoughts** 157:1 **three** 15:16 20:10 21:2 38:9 99:12 146:16 161:15 166:13,18 **three-** 222:19 **threshold** 24:2,4,12 24:14 **throw** 137:4 **throwing** 135:22 **thwarted** 130:17 **tie** 242:11 **till** 152:5 **time** 14:8 19:24 23:7 28:13,21 29:10 30:7 34:5 37:5 47:6 53:24 58:15 67:14 67:16 69:5 70:2 80:20 81:4 90:20 93:12 94:13 98:14 102:6 107:14 116:3 123:16 129:15,22 129:24 140:16,20

143:12,15 149:12,13 155:5 161:9 163:19,23 165:19 167:7,9 174:11 176:15 181:19 189:17 195:5 201:4 205:21 207:23 209:7,23 211:1 212:20 213:23 214:5 217:19 218:4 222:18,21 223:1,17 224:6 225:10 227:15 229:14 236:22 240:9,12 245:14 246:13 248:18 249:9 268:20 270:15 271:17 **time-consu...** 164:9 **timeline** 195:15 202:10 **times** 43:22 48:17 58:11 115:6

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 41

204:24 228:6 241:19 **timetable** 176:3 202:11 223:22 224:24 225:12 251:16,18 **timing** 18:16 18:17 **today** 5:18 7:9 11:12 166:24 176:5 178:10,11 180:22 185:22 224:9 227:15 235:5 241:1 241:8 268:16 **today's** 4:5 7:7,17 58:17 **toilet** 255:7 **told** 56:6 185:9 191:17 192:5 198:3 198:13 **tolerance** 153:5 **tolerances** 79:23 134:15 140:19 152:24 **Tom** 6:11 8:24 12:14 14:3 26:11 46:6 48:16 57:13 60:22

63:15 69:21 84:3 92:21 114:11 116:13 119:14 121:10 124:11 129:15 142:17 154:21 155:5,23 155:12,19 176:19,23 178:18 182:18 183:14 185:5 193:12,19 198:20 206:10 218:5,19,23 224:5 227:13 235:10 245:14 253:6 257:24 260:21 261:9,24 263:2 267:4 268:7 **Tom's** 239:5 **tomorrow** 159:14 235:1 **Toni** 89:8 **tool** 164:4 **top** 116:15 128:8 182:6 234:21 258:5,15 **topics** 146:19 **total** 43:3 159:17

241:5 **totally** 136:23 188:13 119:14 121:10 124:11 129:15 142:17 154:21 155:5,23 **transfer** 25:16 29:21 29:22 30:4 30:9,16,19 68:19,22 69:1,7,10 71:7,8 169:5,7,9 170:3,5 171:18 172:1,11,17 178:14 231:15,17 231:17 232:1,6,9 232:18 233:11 260:21 **transfer-pa...** 233:1 **transmits** 111:1 **transverse** 62:4 **treatment** 148:21 **tried** 14:16 14:18 18:3 116:15 128:8 182:6 221:11 238:6,20 252:21 **trouble** 224:6 **true** 37:8 109:5

171:21 174:15 175:11 184:3 228:18 241:1 270:16 271:13 **truly** 62:10 **trust** 182:6 196:9 **truth** 271:8 59:7 85:3 227:12 237:21 242:15 247:19 258:17 177:18 183:20 202:4 216:12 224:19 228:14 229:9 263:11 **tunnel** 147:5 212:10 **turn** 7:2,2 44:12 55:2 61:17 149:6 199:4 **turned** 150:1 174:20 223:6 249:20 **turning** 61:3 **turnover** 177:24 **turns** 222:24

two 4:19 15:16 19:14 19:16,21 20:10 21:2 57:20 58:22 63:22 64:17 64:18 69:14 69:15 70:3 103:13 132:18 150:11,11 150:14,17 151:3 163:15 184:6 191:12,18 209:6 210:3 210:3 213:2 213:20 254:16 259:15 260:14 **two-and-a-...** 132:5,11,21 132:23 133:2,7 **two-hour-o...** 146:17 **two-stage** 159:24 **two-step** 183:14 **two-year** 167:7,9 **types** 167:22 244:21 **typewriting** 271:12

U

U 3:16 **Uh-huh** 124:19 **ultimately** 115:3 **unanswera...** 49:6,9 **uncertain** 137:13 **uncertainty** 137:19 226:21 **unclear** 27:1 **uncommon** 28:10 **unconvinced** 141:4 **undermine** 195:14 **underneath** 147:13 168:24 211:10,19 **understand** 43:23 71:12 102:14 114:6 118:2 137:8 165:13 178:17 185:16 196:7 197:6 198:1,5 199:18,21 207:17 216:8 226:6 236:5 239:13,21 254:23 262:12,18 **understand...** 44:6 74:7 79:22 134:17 143:9 145:1 152:1 162:14

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 42

183:18 189:20 222:17 248:17,17 249:3 251:22 **understands** 185:18,19 **understood** 114:7 **undertaken** 223:18 **undertaking** 149:11 219:12 220:7 **underway** 98:18 99:8 103:17 120:11 168:14 245:16 265:11 266:12 **unencumb...** 166:19 **unforeseen** 161:4 209:18 210:4,16 211:3,22 **unfortunat...** 59:5 262:21 **United** 1:1,14 270:1 **University** 231:8 **unknown** 210:23 **unknowns** 225:11,22 225:24 **unrenovated** 156:17

**untoward** 117:24 **unusual** 203:5 **update** 99:7 180:4 **upgrades** 17:19 98:4 **use** 37:5 62:6 63:18 64:2 66:4 68:11 113:24 151:14 154:14 156:4 177:8 177:15 197:12 202:22 217:24 220:23 239:4 242:8 268:8 **user** 99:3 **users** 96:7 **uses** 134:1 **usually** 6:8 32:22 33:2 102:11 **utilize** 255:6 **utilized** 250:12 251:1

V

**value** 25:4 **variability** 153:1 **variance** 79:16 123:22 240:17 258:4,6 **variances** 74:7 153:22

**variation** 74:9 259:8 **variations** 134:18 **varies** 255:24 **various** 84:24 99:3 100:13 101:22 102:5 138:7 264:7,9 **vehicle** 15:1 73:6 **vehicles** 102:1 **vendor** 10:5 10:6 151:9 190:4,6 **vendors** 65:14 **verification** 39:10,24 43:17 82:14 **verified** 38:21 67:9 82:7 **verify** 32:8 38:14 41:4 76:22 140:7 **version** 233:1 **vertical** 77:5 133:5 134:6 152:1,20 **vetoed** 88:4 **video** 251:14 **videoconfe...** 1:11 **view** 134:20 143:17 263:12 **vigilantly** 131:2 **violation** 117:23 **visit** 32:6

68:16 186:17 191:14 **visits** 69:23 **void** 211:11 211:17,18 211:23 220:24 **Volume** 113:11 **vote** 86:6,7 88:11 91:9 93:4,5 94:6 113:4 115:4 **voted** 113:15 **vs** 1:5 270:5

W

**wait** 82:23,23 124:3 178:14 258:8 263:23 **waited** 238:10 **waiting** 124:12 **walk** 53:12 56:21 183:12,16 183:22 **walked** 56:23 58:12 184:6 **Walker** 1:3 4:14,19 5:5 270:3 **walkers** 259:17 **walking** 62:3 168:19 251:12,15 262:3,13 **walks** 53:10 **walkthrou...**

56:19 **walkway** 224:18 246:6 **wall** 148:24 162:23,23 163:1,2,5,7 **walls** 244:20 **want** 23:18 26:20,23 37:16 46:13 49:12 51:15 64:10 77:18 83:5 84:2 96:12 102:4 114:10 115:21 116:19 123:5 124:7 127:20 128:18 133:18 142:15 160:8 163:2 179:10 181:24 183:13,14 188:5,7,16 199:12 203:2 210:8 222:4 225:8 228:8 229:13,15 235:19 237:8 239:4 239:5 247:18 248:22 249:5 268:22 **wanted** 79:12 84:3 134:19 140:6 177:8 182:8 216:6

217:24 218:12 220:22 **wanting** 219:11 **warehouse** 101:23 **washroom** 151:15 **wasn't** 81:21 141:18 149:2 151:11 164:16 180:1 187:23 212:11,17 250:12,18 251:20 **water** 211:8 **way** 8:23 10:2 12:16 15:21,22 37:2 38:22 39:24 54:11 54:21 64:5 86:8 88:13 98:15 124:8 130:8 130:9,19,19 131:1,9,16 131:17 135:24 139:18 143:14 147:4 148:9 149:7 150:3 174:4 176:6 184:16 185:23 191:24 201:13,19 202:20

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 43

212:23 219:15,21 223:16 234:22 235:3,5,6 236:14,16 236:21 237:12,14 247:12,21 248:9 263:6 263:8,24 **ways** 54:18 148:18 225:14 234:21 **we'll** 23:3 46:11,12 83:7 137:24 156:4 157:11 205:18,19 227:15 249:10 268:14 **we're** 10:4 13:21 19:23 25:2 28:13 30:13 41:10 46:21 70:6 94:14,20 101:12 102:16 106:5 114:5 116:13,21 120:7,10 131:14,16 134:22 138:4 153:17 157:16 159:24 160:4,21 167:8 171:4 172:6 174:6

176:6 178:14,17 181:1 184:13,14 188:19,23 195:23 200:13 223:15 229:3,10,19 233:4,7,14 234:21 237:15,19 238:14 239:11 243:9 244:4 244:6 262:1 263:2 268:5 **we've** 39:8 71:11 84:24 99:10,19 103:21 116:3 130:24,24 131:7 146:15 175:1,4 178:8,12 179:3,9,12 179:21 195:9 198:22 199:1,2,6,9 199:19 207:13 223:13 237:17 238:6,18 240:7 243:1 246:23 248:7,8 **weather** 207:20 **week** 70:2 99:12,13

187:1 188:15 192:2 268:16 **weeks** 70:3 191:18 209:20 240:14,16 240:19,20 **weighing** 110:16 **went** 16:18 51:14 57:2 79:2 82:12 184:4,6 **weren't** 15:2 21:20 54:20 106:12 131:6 142:5 143:13 219:14 221:7,8 **West** 2:10 56:10 59:15 **Western** 2:4 **wheelchair** 249:3 **wheelchairs** 259:16 **WHEREOF** 272:1 **wide** 159:20 165:6,18 255:11,15 256:6,10 237:17 238:6,18 240:7 243:1 246:23 248:7,8 **wider** 232:19 246:23 248:7,8 209:1 **willing** 192:6 **winter** 165:8 **wipe** 239:18 239:19

wish 96:9 **witness** 3:2 4:1,8 5:21 6:5,14,15 8:20 11:5 12:1,13 14:1 15:19 16:9 19:3 19:10,19 22:18 23:1 24:22 26:1 29:9 31:7 32:1 37:1 37:14 38:6 38:18 40:10 41:1,21 42:18 44:1 44:18,21 47:7,9,17 48:7 50:1 50:14 52:11 53:1 55:15 60:15,21 62:23 63:13 65:1 67:1,4 69:20 70:15 71:1 72:7 73:15 74:4 75:8 79:20 80:9 82:11 88:7 91:1,8 92:19 93:19 94:9 95:13 96:6 97:20 98:1 105:20 107:2 109:4 109:12 111:18 112:21 114:9 116:22

119:10,14 121:23 124:10 125:3 126:18 127:7 128:12 129:8 132:19 133:22 136:20 140:5 144:12 146:11 153:18 154:16,18 155:22 157:2 158:1 158:2 165:11,13 165:15 166:5 167:15 170:22 174:1,17 175:7 176:22 181:7 182:20 185:8,9 187:8 189:13 190:11 194:9 195:1 195:6 198:19 200:17 201:2 207:12 212:16 213:5 219:1 220:20 222:23 223:12

224:3 225:4 226:5 227:7 228:22 230:5 236:13 237:11 246:16 247:5,17 248:4 251:5 252:16 253:5,22 254:11 255:14 256:18 259:3,7,22 260:19 261:23 263:11 264:3 266:5 267:3,13 268:1,21 271:7,7 272:1 **witness'** 156:11 175:8 **women-ow...** 231:3 **word** 25:6 40:15 132:5 132:17 135:22 154:17 155:14,23 202:22 228:6 268:2 268:4,7 **wording** 105:23 **words** 35:24 63:18 96:18 228:15 232:13 259:5

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 79

ERIC DAVIS
March 12, 2024

Page 44

265:12
work 7:19
8:7 14:9
16:22,23
17:12 22:5
22:11 28:8
29:2,5,13
29:19 35:15
37:3 53:11
54:15 82:14
83:1,6,8
84:3 88:5
94:14 120:8
120:10,15
124:6
126:20
127:5,24
131:16
133:15
135:23
136:3,15,21
137:23
138:22
141:16
145:12,13
149:3,6
155:19
156:13,22
156:24
157:15
161:8,13,14
167:13
168:12
174:21
176:11
179:18
181:4,14
182:4
186:15
191:9,21
192:11,15
194:5
195:23
197:4 198:9

199:10,13
201:5
204:11
209:15
212:3
217:18
223:20
224:15
231:24
233:7
242:12,15
242:24
243:5,23
244:3,4,6
246:24
247:8
248:23
258:11
265:12
266:9
267:19
worked
115:13
workers
250:13
working 10:4
19:23 65:16
151:8 164:2
173:6,13
175:4 181:1
182:14
199:22
225:16
237:19
workplace
249:16
works 12:22
33:15
267:14
world 263:12
wouldn't
8:10 54:15
76:1 85:16
149:1,6

187:20
227:13
243:13
254:13
wrap 146:20
222:11
268:14
writing 81:2
wrong 35:21
185:11
252:8
wrongly
39:20

_____ X _____
X 3:1,10 4:11
228:2
246:19

_____ Y _____
yada 47:10
47:10
yard 256:23
yeah 9:10
15:8,9
17:20 32:2
37:2,15
41:2 43:21
44:2 45:18
46:6 47:7
47:10 48:4
57:9 60:16
62:5 63:14
68:20 72:3
72:11 113:8
114:13
119:14
121:10
123:7
125:23
131:5
132:22
134:5,7
140:11,16

147:10
160:17
163:13
167:1 168:7
169:9
170:24
179:3 183:2
184:13
191:16
192:3
193:10,18
203:2 208:9
211:20
216:3,23,24
216:24
217:3 221:5
223:5
229:12,18
233:7
234:24
239:6
240:21
241:21
245:6 246:2
247:6 248:7
248:16
249:10
250:2
251:18
254:6
257:23
266:6
year 11:16
15:5 18:1,9
18:11 23:9
24:11 27:23
28:4 31:20
51:8 64:5
90:20 91:22
92:14,24
93:3,10,13
93:16 94:16
94:23,24
95:4,7 97:2

98:19,24
99:1,9,11
100:22
101:10,12
101:15,20
102:9,17,18
102:23
103:12
104:19
105:2,11,11
105:13
106:9,11,13
107:11
108:14,24
108:24
109:22
110:23
111:14
112:3,17
113:13,14
113:23
114:15,23
115:4 116:8
117:9 118:5
118:8,22,24
119:8,19,23
119:24
120:3
121:17,19
122:4,5,17
123:18
151:10
156:17
161:9
165:19
168:6,13,20
170:19
174:6
177:19,21
177:23
178:2 180:6
180:13
181:18
182:1 212:5

221:18
234:6
238:16
239:17
241:10
242:2,8,13
242:16,18
243:12,15
243:18
264:14
265:15
266:17
year's 100:21
178:3
years 15:16
19:14,16
38:9,9
63:22 64:17
64:18 103:4
110:17
116:3
120:23
121:3,5
158:12,18
159:2
172:23,24
173:7 175:4
213:20
234:9
243:19
253:20
254:16
259:15
260:14
Yep 151:21

_____ Z _____
zero-based
239:15,20
243:14
Zoom 1:11
57:9

_____ 0 _____

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 45

084-003813
272:9

_____ 1 _____
1 3:12 7:3
44:14 62:1
113:11
139:15
160:18
203:8
229:22
240:10
244:9
267:16
1-170 270:14
1:00 1:18
10 159:19
100 98:13
224:14
229:18
234:13
243:1
263:22
264:1,6,12
264:16
10257 2:4
103 3:14
214:23,24
215:12,15
215:15
219:23
11 3:18 64:9
132:2,7
208:10,16
117.1 61:11
12 47:2 128:8
139:15
142:10
149:20
150:1,8
151:5
168:22
244:9,14
12-inch 61:9

126:8
148:13,14
257:8
12th 1:17
13 25:7 47:11
143:19
240:21
244:19
13th 186:10
14 240:15,18
240:20,22
145 3:13
14th 263:7
15 61:16,18
61:19
168:22
229:23
150 102:5
150,000
24:14,18
25:3,4,7
192:14
16 9:24 10:7
157:19
158:1 160:9
177:2
193:24
160,000
192:18,24
193:4
17 3:19 34:19
87:1 201:11
175 122:24
1855 217:14
18th 32:7,10
2.52 77:22
2.58 78:8
58:4 60:10
33:7 34:6
142:10
214:1
210:20,21
212:2 221:8
240:11
1989 158:11
1992 257:16
260:2,11
261:18

1996 36:10
37:22 40:6
151:23
143:24
1997 257:8
1998 38:24
1999 38:24
2017 145:12
145:13
2018 13:10
13:16 52:8
137:15
139:6
152:11,11
152:15
173:18
206:12
241:10
2019 14:14
14:20 85:8
85:11,14,17
86:2 88:4
115:15,18
218:7 221:2
2020 15:5,5
85:8 139:23
215:19
216:12
217:2 218:9
220:11
221:9
2021 214:1
2022 4:23 5:5
5:16 11:18
12:5 22:1
22:12 25:22
26:7 27:5
33:21,21
45:3,17
48:14 73:8
74:12,17
75:16 80:3
80:15 81:16
125:13
127:1,16
101:20

41:19 42:12
43:1 59:12
61:11
128:6,23
129:12
139:24
140:6 141:3
141:11
143:5
148:12
221:10,22
245:14
246:21
248:13
18:1
22:2,13
23:11 24:9
25:22 26:7
27:23 31:20
32:7,7,10
33:7 56:2
56:15 58:5
58:16 59:10
59:21 60:3
60:8,18
62:21 68:17
69:13 70:5
70:21 92:14
92:16,24
95:7 104:11
104:19
105:18
106:2,9,12
120:1 143:5
152:16
153:4
176:13
177:6 184:1
185:2 186:5
203:24
204:5
221:23
2023's 101:10
2024 1:17
8:14 28:4
86:15
101:20

102:18,20
102:24
103:8,12
105:2,4,11
105:16
106:1,11,13
112:15
113:4
118:22,24
119:3,8,19
119:23
120:1,3,9
137:15
152:6,8
156:18
172:20
182:24
186:10
187:13
191:22
200:13
214:3 242:6
242:22
264:15
270:22
272:2
2025 93:13
93:16 94:24
95:2,4 97:2
98:19
101:15
104:7
105:14
107:11
108:14,24
109:22
110:23
111:11,14
111:23
112:3,13,17
113:14
114:15,23
115:4 116:8
117:9 118:5

_____ 2 _____
2 44:14
133:11
160:15,18
192:13
203:8,18
242:5,7,8
242:11
2.2 135:11
2.4 123:20,21
131:21
133:11
140:22
258:7
20 62:1
142:10
214:1
20-cv-00261
1:5 270:5
2000 139:23
2009 61:11
2010 39:6
40:3,18
128:6,23
1:00 1:18

128:6,23
126:8

2023 18:1

128:6,23

2010-ADA
43:3

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 46

118:8
120:12
122:17
168:6
170:19
171:9
203:12,14
234:6
242:10
264:22
265:3,19
2026 120:13
171:9
203:12
264:22
20th 192:3
21 221:9
214 3:14
22 3:18 81:2
81:3,10
128:14
228 3:6
22nd 8:14
177:13
182:24
23 81:10,13
94:15
127:17
141:3
172:22
221:19
222:3
23280 27:24
28:3,6,18
28:22 29:3
29:15 30:17
87:8 91:19
92:2,15,23
93:15,24
95:6 106:8
238-4235 2:5
24 94:15
101:12
102:19

120:15,15
120:18
123:1
168:13
209:20
241:7 242:4
242:24
243:5,7
244:4,7
24/7 176:10
246 3:7
24th 5:5
25 119:2
168:16,20
243:6,7,24
244:3
265:18
266:14,17
26 3:18
168:21
241:10
243:24
27 3:19 45:3
243:24
2700 2:11
27th 53:21
128:22
129:12
28 243:24

_____ 3 _____
3 3:12,19
55:11
203:21
216:19
30 36:11 38:4
38:16 40:7
40:13 56:8
59:23 60:12
69:15 73:13
73:18,24
74:14,22
76:18 77:1
78:1,3,11

78:13,14,20
79:5,5,17
79:24 81:19
82:5 84:5
99:4 123:21
134:12
135:3 136:7
138:9,11,14
138:19
153:7,20
154:9 155:9
156:6 256:9
30-inch 74:9
82:21
134:18
300 101:19
102:2
30th 102:20
31 78:10
312 2:12
31st 45:17
129:16
32 154:3
165:24
256:13
32.4 133:3,6
134:6
135:14
33 2:10
35 158:12,18
365 176:10
372-0770
2:12
3765 146:3
3807 146:3

_____ 4 _____
4 3:4,13
135:11
144:19
145:16
146:2 154:3
165:24
208:14

43 165:23
166:7
45 244:20
45-degree
148:21
49 3:13

_____ 5 _____
5 3:18 36:5
37:7 72:11
81:15 84:4
84:4 138:6
138:7
208:13
50 78:13
505.10.1
61:11
55 3:12
56 209:20
240:14,19
240:20

_____ 6 _____
6 58:2 72:10
81:15
151:22
152:19
60 240:16
60603-5404
2:11
60643 2:5
6th 60:3
62:21

_____ 7 _____
7 3:12,13
10:9 11:10
44:12,13,23
44:24 49:14
128:21
129:13
219:23
773 2:5

_____ 8 _____

8 17:21 27:21
106:5
80 115:21
82 3:19

_____ 9 _____
9 32:5 61:3
124:17
210:15,19
90 68:1
93 257:12

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 80