Transcript of the Testimony of
**CARL M. DARR**

**Date:** June 3, 2024

**Case:** WESTMORELAND VS. DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

Page 1

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EUGENE WESTMORELAND, )
                                    )
            Plaintiff, ) Case No. 23-cv-1851
                                    )
        vs.                    )
                                    )
COOK COUNTY SHERIFF, )
THOMAS DART,           )
et. al.,                       )
                                    )
            Defendants. )

Deposition of CARL M. DARR, taken before ROBBIN M. OCHENKOWSKI, C.S.R., pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of Zoom depositions, commencing at 1:30 P.m., on the 3rd day of June's, A.D., 2024.

There were present at the taking of this deposition the following counsel:

TOOMEY REPORTING
312-853-0648

---

Page 2

A P P E A R A N C E S:

THOMAS G. MORRISSEY, LTD.
by MR. THOMAS G. MORRISSEY
    MR. PATRICK W. MORRISSEY
10257 South Western Avenue
Chicago, Illinois 60643
(773) 233-7901
tgmmorrisseylawchicago.com
pwm@morrisseylawchicago.com

        on behalf of the Plaintiff;

DE VORE, RADUNSKY LLC
by MR. TROY S. RADUNSKY
    MR. JASON E. DE VORE
    MR. ZACHARY G. STILLMAN
230 West Monroe Street
Suite 230
Chicago, Illinois 60606
(312) 300-4479
tradunsky@devoreradunsky.com

        on behalf of the Defendants;

ALSO PRESENT:
MS. NICOLE BRITTON.

                - - - - -

TOOMEY REPORTING
312-853-0648

---

Page 3

            I N D E X

Examination by
Mr. Morrissey                           4
Mr. Radunsky                           99
Mr. Morrissey                         107
Mr. Radunsky                         112
Mr. Morrissey                         113

            E X H I B I T S

                                    FIRST REFERENCED
Group Exhibit 1                         7
(Mr. Carl Darr's 4-1-24 multipage report)

Exhibit 7                              11
(12-6-23 Corridor Ramp Accessibility Assessment)

Exhibit 8                              29
(eight-page declaration of Eric Davis)

Exhibit 10                             10
(4-22-22 GEC response to request for qualifications)

Exhibit 11                             25
(7-15-22 Cook County Government Office of Chief
 Procurement RFQ, Architectural Engineering
 Services for the Leighton Courthouse Target Market)

CERTIFIED QUESTION                     89

        (All exhibits were retained by counsel.)

                - - - - -

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 1

CARL M. DARR
June 3, 2024

Page 4

MR. MORRISSEY: Ready?

(Witness first duly sworn.)

CARL M. DARR,

called as a witness herein, having been first duly sworn, was examined upon oral interrogatories and testified as follows:

MR. MORRISSEY: This is a deposition of Carl Darr taken pursuant to notice and continued to today's date.

EXAMINATION

BY MR. MORRISSEY:

Q Mr. Darr, I'm going to ask you a series of questions this afternoon. If at any time you don't understand one of my questions, please stop me, and I'll attempt to rephrase it. Otherwise, I'll assume that you understand the question.

If at any time you want to take a break and there's no question pending, just let me know, and we'll take a break.

Can you state your full name and spell your last name, please?

A My full name is Carl Magnus Darr, D-a-r-r.

THE REPORTER: What is the middle name?

THE WITNESS: Magnus, M-a-g-n-u-s.

THE REPORTER: Thank you.

CARL M. DARR
June 3, 2024

Page 5

BY MR. MORRISSEY:

Q In preparing for today's deposition, what documents did you look at?

A I looked at my report. I looked at documents given to me by DeVore, Radunsky.

Q And what documents were those?

A I think there were some plans, as -- what I call as-built plans of the building. There was a deposition from Eric Davis, Mr. Kuzlik, Mr. Kuz --

Is that how you pronounce it?

Q Kezlik.

A -- Kezlik's report.

And I think there was a declaration by Eric Davis. Those documents.

Q Okay. Prior to the deposition, did you meet with any -- anybody from the county or attorneys for the county or sheriff?

A I'm sorry. Can you repeat that?

Q Sure.

Prior to this afternoon, have you met with any attorneys to prepare for the deposition?

A I met with DeVore, Radunsky on Friday via Zoom.

Q When you say DeVore, Radunsky --

A I think Troy was on and I believe Zach was on

CARL M. DARR
June 3, 2024

Page 6

the call.

Q How long did you spend with the attorneys?

A About an hour and a half.

Q In preparing for the deposition --

Was that the only time you met with them concerning today's deposition?

A Concerning today's deposition specifically, yes, that was the only time.

Q All right. Prior to preparing your report, did you talk with them or exchange any notes, documents?

A Prior to preparing our report, I did speak with Troy briefly, I believe, to arrange a site visit.

At some point we received copies of the building plans. I do not recall if that was before or after we went out to the site the first time.

Q After you --

You did an inspection in January of 2024, correct?

A I believe --

Can I look at my report --

Q Sure.

A -- for that, those dates?

Q Sure.

Let me show you your report. I'm going to show

CARL M. DARR
June 3, 2024

Page 7

you Group Exhibit No. -- I show you Group Exhibit No. 1. It's a multipage report. I think it's 23 pages.

Is that the report you're referring to?

A Yes.

Q Prior to issuing that report on April 1st, 2024, did you provide any drafts to the attorneys for the sheriff and county?

A No.

Q Now, the firm of Globetrotters, has the firm of Globetrotters done any work at the department of corrections prior to January of 2023?

A We're involved on an 88th assessment and schematic design project for the Cermak facility. I believe that started last year.

Q Was there -- To your knowledge --

Well, let me go back one step.

What is your position with Globetrotters?

A I'm vice-president of architecture. I'm the head of the architecture department.

Q Is there a separate vice-president for engineering?

A There is.

Q And what's that person's name?

A Hynek Dvorak.

Exhibit 4 Page 2

CARL M. DARR
June 3, 2024

Page 8

Q   Can I have a spelling for that name?

A   H-y-n-e-k, Dvorak, D-v-o-r-a-k.

Q   Now, as the head of architecture for GEC, what are your responsibilities?

A   I have multiple responsibilities.  I have to make sure staff stay busy and occupied.  I have to oversee projects.  I have to deal with clients.  I have to look at project schedules and budgets and work with people to make sure we have that.  I am involved in some projects as project manager as well.

Q   When you say that you have to oversee projects, is that all projects that GEC is contracted for?

A   All projects that involve the architectural department that GEC is contracted for, correct.

We also have ongoing projects for permanent review with the city.  We also have projects involved at the airport that I'm involved with as well, both airports, Midway and O'Hare.

Q   Are you aware of a request for qualifications for --

You mentioned that there was an ongoing project for the Cermak building, correct?

A   I believe it started last year.  I believe we're complete or near completion with the assessment report,

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 9

and I believe we're supposed to start schematic design imminently.

Q   When you -- When GEC undertook the assessment task for the Cermak building, did they have to submit a request for qualifications with the county?

A   We would have either submitted a response to a request for qualifications or we would have submitted a response to a request for proposal.  I'm not sure if this was a task order contract or a stand-alone contract.  I don't remember.

Q   What did the -- When was the contract entered into between GEC and Cook County for the Cermak building to the best of your recollection?

A   I don't know.  The project would have come to me after the contract was entered into.

Q   Are there four other projects with Cook County that GEC is currently involved with?

A   There's a project at Cook County Hospital Professional building for a new lobby entrance, and we're in negotiations for a new project at -- for Cook County Hospital for a build-out of the Harrison Square office space.  There may be other projects I'm not aware of.  I couldn't tell you.

Q   Are you current --

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 10

(Discussion had off the record.)

BY MR. MORRISSEY:

Q   Well, I'm showing you Exhibit No. 10.

Can you see it on the screen?

A   No, not --

Q   Is it up?

Showing you Exhibit No. 10, is that on your screen, Mr. Darr?

A   It is.

Q   Is this the request for qualifications that was responded to by GEC on April 22nd, 2022?

A   Can you scroll down?

MR. RADUNSKY:  Can you scroll down, Tom, just so we can take a look?

MR. PATRICK MORRISSEY:  (Indicating.)

BY MR. MORRISSEY:

Q   Let me rephrase the question.

Was GEC retained by Cook County and the sheriff of Cook County pursuant to this request for qualifications?

A   I assume this is the request for qualifications.  It's been so long.

MR. RADUNSKY:  You don't have to guess if you don't know.

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 11

THE WITNESS:  Yeah, I mean, if this is a request for qualifications, we do have a contract.

MR. RADUNSKY:  Do you have anything signed; Guys?  That would be helpful.

BY MR. MORRISSEY:

Q   If you look at --

You're familiar with the fact that Cermak -- I'm sorry -- that GEC issued a report in December of 2023 for the Cermak ramp?

A   I'm -- I am familiar that at some point we issued an abbreviated report for the basement ramp that's adjacent to the Cermak facility, yes.

Q   Showing you what's marked as Plaintiff's Exhibit No. 7 --

MR. RADUNSKY:  Oh, that's what that is.  I'm sorry.  Okay.

BY MR. MORRISSEY:

Q   It's a document, and it states:  Corridor Ramp Accessibility Assessment dated December 6th, 2023.

Can you look at that report?

A   Yeah.

This is our -- one of our reports.

Q   And if we look at Page 5 of Group Exhibit No. 7, does it have the assessment per current applicable codes

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 3

CARL M. DARR
June 3, 2024

Page 12

introduction pursuant to RFQ Number 2215-0221?

A   Yes.

Q   And is that the same request for qualifications that's identified in Exhibit No. 10?

A   Yes.

Q   And in Exhibit No. 10, would it reflect the scope of the --

MR. RADUNSKY:  Exhibit 7 or 10?

MR. MORRISSEY:  Exhibit 7 is the report that was done by GEC.

MR. RADUNSKY:  Okay.  What was 10?

MR. MORRISSEY:  Exhibit No. 10 --

THE WITNESS:  This is it.

MR. MORRISSEY:  -- is the request for qualifications.

MR. RADUNSKY:  I'm sorry.

BY MR. MORRISSEY:

Q   Would the request for qualifications outline what areas of the Cook County Government would be assessed?

A   I would have to go back and read the entirety of the request for qualifications.

Q   If we look at Page 8 of Exhibit No. 10, does that indicate the scope of the services to be provided

---

CARL M. DARR
June 3, 2024

Page 13

by GEC?

A   I can only see up to the 2.2.

MR. PATRICK MORRISSEY:  (Indicating.)

THE WITNESS:  It's a general review of the scope.

BY MR. MORRISSEY:

Q   And that's for the Cermak Health Services facility, correct?

A   Correct.

Q   And Exhibit 7 that is the corridor ramp accessibility assessment, that was part of this request for qualifications by GEC?

A   Yes, as part of that project.

Q   Has the --

And if we look at Exhibit No. 10, it talks about a transfer package?

A   Correct.

Q   Has GEC completed the assessment on the Cermak Health Services facility?

A   Are you referring to the assessment or the transfer package?

Q   I'm referring to the assessment.

A   I believe we -- we've -- I believe we've completed the assessment but we're still waiting for client acceptance if I'm not mistaken.

---

CARL M. DARR
June 3, 2024

Page 14

Q   When you say client acceptance, who are you referring to?

A   Cook County.

Q   Does that include the sheriff of Cook County?

A   They have some members attend the meeting.

I'm not sure.  I don't remember who the required approval comes from.

Q   How many meetings have you participated in with either the sheriff's office or representatives from Cook County's Government from, let's say, January of 2022 to the present?

A   Myself, several.

But I'm not at every meeting.

Q   All right.  What -- When you say several, is that more than three or four?

A   If it is, it's no more than five or six.

Q   And what -- do these meetings have a title or --

A   They're generally biweekly review meetings.  There were meetings at the site.  I don't know that they have a specific title.

Q   Do representatives like Sabrina Canchola from the Sheriff's Office attend?

A   She's been at, at least, a couple of the meetings.

---

CARL M. DARR
June 3, 2024

Page 15

Q   Has Eric Davis?

You know Eric Davis, correct?

A   I do.

Q   Has he attended these meetings?

A   He's attended at least one of them.

Q   Any other representatives from GEC that twice a month attend these meetings?

A   Sure.

Generally, the project manager, Amber Eisan.

Q   How do spell that?

Is that the person --

A   A-m-b-e-r.  Last name is Eisan, E-i-s-a-n.

Q   Is that a male or a female?

A   Female.

Q   Is she an architect?

A   Yes.

Q   And she's under your direct --

A   Yes.

Q   She reports to you?

A   Correct.

Other staff members will attend depending on what's going on at the time of the project.

Q   Okay.  During these joint meetings between --

Other than GES -- GEC, are there any outside

Exhibit 4 Page 4

CARL M. DARR
June 3, 2024

Page 16

contractors to your knowledge that attend these meetings?

A   We have one sub-consultant on that project, I believe.

I don't believe they actually attend the meetings.

Q   Has an architect by the name of Ellen Stoner attended the meetings?

A   I'm not familiar with Ellen Stoner.

Oh, I'm sorry.  We --

You're speaking on behalf of GEC, right?

Q   I'm speaking -- There's a firm called AltusWorks.

Are you familiar with them?

A   They are our sub-consultant.

Q   They're a consultant to GEC?

A   Yes.

Q   For how long has Altus been a consultant to GEC?

A   On this project?

I think they were part of the original contract award.

Q   Is Ellen Stoner still with the firm or the principal of the firm?

A   I don't know.

CARL M. DARR
June 3, 2024

Page 17

I didn't have direct involvement with Altus.

Q   So as a consultant, does your firm pay Altus for work done on the project?

A   Yes.

Q   And what type of work has the Altus firm done on the Cermak project?

A   I believe their portion -- they were responsible for the site work and report -- contributing to the report for the exterior approach to the building.

Q   As an overview, can you tell me what work that was done by GEC at the Cermak Health facility in addition to the corridor ramp to assess whether it was compliant with the ADA?

MR. RADUNSKY:  I just want to object.

I mean, if you're talking about the Cermak ramp case and Walker case, you know, he's here to testify about the ramps in this case and not in that case, but I mean, you know, I think it's not fair to him because he didn't come in to answer questions about that case, but I can't stop him from answering.

But all of these questions have been unrelated to the ramps that we're talking about here today, and I hope you're not using this dep, Tom, as like a way to circumvent having his -- the lawyers in the Walker case

CARL M. DARR
June 3, 2024

Page 18

be here since he's an expert in that case as well and it's not fair to them.

So subject to that, you can answer.

THE WITNESS:  Can you repeat the question?

MR. MORRISSEY:  Robbin, can you repeat the question?

(Question read.)

(Discussion had off the record.)

THE WITNESS:  As an overview, the entirety of the building except select areas such as the top fourth floor, which is the maintenance rooms or, you know, back of the house spaces.

BY MR. MORRISSEY:

Q   Okay.  Exhibit 10 refers to a transfer package.

What is -- What is a transfer package in relation to this Contract 2215-0221, what does it consist of?

A   It's the package of drawings and other documents we would provide that would at a later time be completed by another consultant.

Q   What -- Do you know was -- whether or not Cook County has retained another consultant architectural or engineering firm to prepare additional drawings to bring the Cermak Health facility up to code?

A   No.

CARL M. DARR
June 3, 2024

Page 19

Q   No, they have not?

A   No, I do not know.

Q   Would the drawings that would -- that GEC --

Let me rephrase it.

Would the transfer package that GEC is going to prepare for Cook County include drawings for the renovation of the corridor ramp?

A   Yes.

Q   You mentioned that the --

A   I believe.  I believe.

I'm sorry.

Q   I'm sorry?

A   Yeah, I believe so.

Q   You mentioned that GEC is still in discussions with some member or members of Cook County prior to undertaking doing this transfer package?

A   Correct.

Q   Who -- To your knowledge who within your firm is in contact with representatives from Cook County?

A   Amber Eisan handles the day-to-day communications for that project.

Q   Do you know whether Ms. Eisan has been in contact with Eric Davis in regards to outstanding issues in regards to the Cermak facility?

Exhibit 4 Page 5

CARL M. DARR
June 3, 2024

Page 20

A   I do not know.

Q   Do you know who Ms. Eisan normally contacts at Cook County in regard to issues in regards to this contract?

A   She normally deals with, I forget the person's name off the top of my head, but it's Cook County -- the project representative for Cook County who works for LCM.

Q   Do you know what LCM stands for?

A   Three names.  I don't remember what they are.

Q   Is that another outside consulting firm?

A   They're -- They're an architect.  I believe they're an architectural firm.

Q   Are they a minority architectural firm?

A   I don't know.

Q   To your knowledge does Ms. Eisan communicate with anybody -- any member of capital -- Cook County's capital planning office?

A   I would have to know which members are in Cook County's planning office.

Q   All right.  Do you know if Ms. Eisan is in contact with Eric Davis at all in regards to the facilities at Cermak as far as your firm's assessment of it?

---

CARL M. DARR
June 3, 2024

Page 21

A   I know she's spoken with them or been involved in discussions that have included him on occasion, but beyond that, I do not know.

Q   Is it your understanding that GEC will do an overall assessment report similar to Exhibit 7 for the physical building at Cermak?

A   That is my understanding.

Q   When has that report been prepared?

MR. RADUNSKY:  Again, I'm going to object to all these lines of questions about the Walker case and the Cermak ramp and the attempt to just get all this information without the other lawyers here.  I mean, you haven't asked him one question about this case, not one, I mean.

So I'm going to let him do this, but I mean, if you're going to depose him in the Walker case, then we're going to terminate the deposition and take this transcript to the judge and let the judge decide if this is a relevant form of inquiry.  We didn't bring Carl here to talk about the Cermak ramp.

So subject to that, you can answer.

THE WITNESS:  I mentioned earlier, I believe our -- our assessment report is largely complete but hasn't been accepted yet by the client.

---

CARL M. DARR
June 3, 2024

Page 22

BY MR. MORRISSEY:

Q   After the assessment report is completed and accepted by Cook County, how long will it take your firm to prepare a transfer package?

MR. RADUNSKY:  Objection; speculation.

THE WITNESS:  Yeah, I -- that -- there's a lot of variables that go into that, staffing, clients' access, clients' reviews, so I really couldn't venture other than to say maybe less than a year.

BY MR. MORRISSEY:

Q   Why would it take you almost a year to do a transfer package for -- under the RFQ 2215-0221?

A   Any number of variables come into play that can not allow us to complete the transfer package at what I would say we would -- the time it would take if we were able just to start and finish it.

There's all kinds of intermediate reviews, submittals to the client that we have to wait for them to review it.  It's just a process.

Q   Will GEC be bidding on doing the final drawings to cause the Cermak infirmary building to be up to the ADA Code?

A   I do not know.

Q   Similarly, will GEC be doing design drawings for

---

CARL M. DARR
June 3, 2024

Page 23

the corridor ramp that provides accessibility to --

A   I do not know.

Q   How much approximately has GEC been paid in regards to the assessment under Proposal 2215-0221?

A   I do not know.

Q   Would that be in excess of $50,000?

MR. RADUNSKY:  Objection; asked and answered.

THE WITNESS:  Yeah, I do not know.

BY MR. MORRISSEY:

Q   Other than the assessment for the corridor ramp and the Cermak Health Services facility, has GEC done any other work at the Cook County Department of Corrections?

A   In what time frame?

Q   Between 2019 to the present.

A   I believe we had a chiller replacement project in the past, recent past.  I don't know the dates.

Q   In regards to the Leighton Court building at 26th and California, is GEC involved with any contract to do any design or engineering or assessment work for the Leighton Court building?

A   Yes.

Q   When -- How did GEC become involved in the -- as a contractor for the Leighton Court building?

Exhibit 4 Page 6

CARL M. DARR
June 3, 2024

Page 24

A   There was an arc -- either arc -- probably an RFQ or maybe an RFP, it depends on the agency and the nature of the procurement, and we submitted a proposal, and we were selected.

Q   Do you know in what year GEC was selected for the Leighton Court building?

A   I actually did a lot of the proposal, but I don't -- I really do not remember when it was.

Q   Was it within the last year?

A   I think the proposal was submitted over a year ago, but I could be mistaken.

Q   After the proposal -- Was that a propos -- Was that a contract --

Strike that.

Is there a contract to do an overall assessment under the ADA for the Leighton Court building?

A   I'm not familiar with the particulars of whether there's a contract in place or not.  I believe there is.

I do not believe we received an NTP or ATP.

Q   What is an ATP?

A   Authorization to proceed.

Q   Do you know if that's required to be approved by the county board?

A   I do not know.

CARL M. DARR
June 3, 2024

Page 25

Q   So would it refresh your memory that it might have been in 2022 that --

I'm going to show you what now will be marked as Plaintiff's Exhibit No. 11.

It's a document that says Cook County Government Office of Chief Procurement RFQ Architectural Engineering Services for the Leighton Courthouse Target Market, and it's dated July 15th, 2022.

Does that refresh your memory about the timing for this RFQ?

A   Vaguely.

It -- Obviously, the dates speak for themselves.  When we actually -- When we had to respond to it by, if there was an extension or not, I don't -- I don't remember, but as I said, I thought the proposal was made more than one year ago from today.

Q   All right.  And what's your understanding -- your proposal, GEC's proposal was accepted by the procurement officer, is that fair to say?

A   I'm not involved in that aspect of the contract award.

Q   Do you know whether or not the proposal has to go before the county board before your firm can actually actively become engaged in assessing the Leighton Court

CARL M. DARR
June 3, 2024

Page 26

building?

A   I'm not familiar with the procurement process and especially --

Q   As of --

A   -- what's involved with the county.

Q   I'm sorry.

As of today --

Well, let me go back.

The proposal includes doing an ADA assessment of the entire court building, is that fair to say?

A   Yes.

Q   And the Leighton Court building is accessible --

Let me rephrase it.

The Leighton Court building is connected to the Cook County Department of Corrections through a tunnel and a ramp, correct?

A   I do not know.

Q   Have you physically inspected the Leighton Court building?

MR. RADUNSKY:  I'd just object to relevant.

BY MR. MORRISSEY:

Q   Or gone through the Leighton Court building?

MR. RADUNSKY:  Same objection to relevance.

THE WITNESS:  Only for jury duty 20 years ago.

CARL M. DARR
June 3, 2024

Page 27

MR. RADUNSKY:  Hold on one second.

It has absolutely nothing to do --

Let me get my objection out.

My objection to relevance is it has nothing to do with the issues in this case or the ramps, none of it.

Subject to that, you can answer.

THE WITNESS:  The only time I've been in Leighton is for jury duty like over 20 years ago.

BY MR. MORRISSEY:

Q   As a vice-president of GEC, will you be -- will your firm, once you get the go-ahead, be assessing whether or not the holding cells at the Leighton Courthouse are accessible?

A   I'm not even aware that there are holding cells at Leighton Courthouse.

Q   Okay.  Do you have any projection when, if ever, your firm will start working on assessing?

A   Well, at the beginning of this year, I was told we'd be working on it by the end of February this year.

Q   Who told you that?

Eric Davis?

A   Yes.

Q   And since February of 2024, has Eric Davis given

Exhibit 4 Page 7

CARL M. DARR
June 3, 2024

Page 28

you a reason why your firm hasn't proceeded to do an ADA assessment at the Leighton Court building?

MR. RADUNSKY: Just objection again on relevance, scope.

THE WITNESS: I know the contract or the -- I know there's things happening with getting us started, but I haven't spoken to Eric Davis since the beginning of the year at least about that.

BY MR. MORRISSEY:

Q If GEC was given the green light by Eric Davis, when would be the time for your firm to start working on reviewing whether or not the building is accessible or not?

MR. RADUNSKY: Objection to form, foundation speculation.

You can answer.

THE WITNESS: The time to start?

MR. RADUNSKY: And relevance.

THE WITNESS: Normally we would look at our staffing and figure out when we could start.

BY MR. MORRISSEY:

Q Okay. Have you reviewed in preparing for today's deposition Eric Davis' declaration that was included in the defendant's response to our motion,

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 29

plaintiff's motion for a permanent injunction?

A I skimmed it.

Q Showing you Plaintiff's Exhibit No. 8, it's an eight-page document that is headed by declaration of Eric Davis, is that the document that you reviewed prior to today's deposition?

A I reviewed it for about 15 minutes before we came down here, yes.

Q Turning to -- Turning back to Exhibit 1, which is the tunnel corridor assessability assessment for the Cook County Department of Corrections campus, this is the report that was prepared by you at the request of defendant's counsel?

A Is that a question?

Q Yes.

A Yes, that's correct.

Q Can you tell me what you individually did in preparing this assessment of the East -- I think you call it the east corridor, east tunnel corridor which is adjacent to the RTU building?

A Well, I was present at two site visits, one of which we -- myself and another person took the Lidar scans.

MR. RADUNSKY: L-i-d-a-r.

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 30

THE REPORTER: Thanks.

THE WITNESS: Then I had staff member develop the scans and the photos, worked with them to collect the data and wrote the report.

BY MR. MORRISSEY:

Q Going back a bit, where did you go to college?

A University of Illinois in Champaign.

Q What was your major there?

A Bachelor of science and architecture.

Q Did you have any advanced degrees in architecture?

A I received my master's in architecture from University of Illinois in Chicago.

Q What year was that?

A That would have been 1985.

Q Since then have you --

The ADA past in, what 1990, 1991?

A Roughly, yeah.

Q Have you gone to any continuing education courses on the ADA?

A No.

Q Can you briefly describe your experience as an architect with the requirements of the ADA?

A You've -- My experience with requirements to the

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 31

IDA -- ADA, excuse me, is primarily through projects. For instance, I've worked on probably 15 projects for the Chicago Housing Authority that involved upgrading the buildings, usually mid-rise and high-rise buildings to be ADA-compliant, other projects as well.

Virtually every project we do requires an analysis and requires compliance with the Americans with Disability Guidelines.

And I've been involved with permanent reviews and meetings to discuss the ADA. I've read the ADA Code multiple times.

Q Would you hold yourself out as an expert in regards to, at least, Title II, the ADA requirements for public buildings?

A And Title II is?

Q Title II is the ADA --

A Yes.

Q -- as it applies to public buildings.

A In terms of requirements for building elements accessible routes, yes, I would consider myself an expert.

Q Thank you.

Now, prior -- you did an inspection in January -- two inspections in January of 2024 of the

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 8

CARL M. DARR
June 3, 2024

Page 32

east corridor ramp which was adjacent to the RTU building, correct?

A    We did two inspections, correct.

Q    Who was the other person that was with you from GEC?

A    On the day of the Lidar scans, it was Max Lux, who was a junior architect at the time, and for the first review, if I remember correctly, I believe Max was with me as well, along with another person Catherine Ayres.

THE REPORTER:  Spelling?

BY MR. MORRISSEY:

Q    Is Ms. Ayres an architect also?

A    She just recently graduated as an arc -- in architecture.

THE WITNESS:  A-y-r-e-s.

THE REPORTER:  Thank you.

BY MR. MORRISSEY:

Q    Prior to doing the physical inspection of the east corridor ramp, did you review any blueprints of the RTU building?

A    At least, before our second visit at least, we did.  I do not recall if we had that in hand at the time of our first visit.

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 33

Q    And in preparing your report, you had access to the blueprints for the RTU building, correct?

A    We had access to limited prints.  I think they're listed at the end of the report.

Q    To your knowledge having reviewed the blueprints, the RTU building was built after 2011, correct?

A    If I remember correctly, the drawings were dated 2010, and then so, yeah, they probably would have been constructed circuit 2011.

Q    And the applicable ADA Code are the 2010 Standards, correct, for this east corridor?

A    If they were adopted by the City of Chicago at the time, yes, they would be.  They probably would be anyways.

Q    Well, irregardless of whether or not the City of Chicago adopted the 2010 Standards for a public building such as the RTU, Cook County was required to follow up with 2010 Standards, correct?

A    Without being there at the time and understanding what dates the actual ADA took effect, I would say probably.

Q    Your report reflects that it was built in 2011, correct?

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 34

A    Yes, circuit 2011.

Q    When you initially looked at the blueprints, specifically in regards to the east corridor, did the blueprints reflect any mechanical systems that were underneath the concrete corridor for the east ramp?

A    From the blueprints we had in our possession, no, I don't believe they did.  I do not believe we had mechanical drawings for that area.

Q    Did the blue --

      By mechanical, are you referring to electrical, plumbing?

A    Plumbing/HVAC.

Q    Okay.  To your knowledge do you have any knowledge that there are any mechanical systems that are underneath the east corridor ramp?

A    I don't know.

Q    All right.  Would you expect as an architect that there are electrical, plumbing and mechanical -- other mechanical units --

A    Elements?

Q    -- elements, elements, that's the word, elements --

A    I'm sorry.

Q    -- thank you -- that would be buried underneath

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 35

the east corridor ramp that are not displayed on a blueprint?

A    It's total speculation, but it wouldn't surprise me if there were.

Q    Okay.  And would that be also true with the Cermak ramp, Cermak corridor ramp?

MR. RADUNSKY:  Object to relevance.

      You can answer.

THE WITNESS:  I would answer the same.  It would be total speculation, but it wouldn't surprise me if there were.

BY MR. MORRISSEY:

Q    Okay.  As an architect, what would you need to do to determine whether or not there were electrical, plumbing or other mechanical HVAC systems that were impacting any renovation of the east corridor ramp?

A    Well, there are a number of ways we obtain information about existing conditions for buildings.

      The first easiest and actually one of the most certain is to refer to as-built drawings, but, obviously, it's important that those drawings are complete and show all work, not just the building work, and maybe say, for instance, site work, utility work that was done in the past.

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 9

CARL M. DARR
June 3, 2024

Page 36

Beyond that, you can have utility finding services checked, but that's rarely done unless you have reason to suspect something like that. Otherwise, you just discover it as a discovered condition during construction.

Q   Do you know whether --

You would assume that a building of the nature of the RTU, which cost in excess of $84 million of taxpayer dollars, would have as-built drawings?

MR. RADUNSKY:  Objection to speculation, form, foundation.

You can answer.

THE WITNESS:  I would assume the county would have drawings of that building that were done for the construction of that building at the time.

Whether they have drawings of other work that was done before or after, I don't know.

BY MR. MORRISSEY:

Q   And, generally, to your knowledge as an architect, if a building such as the RTU is put up in 2000 -- between near 2011 or thereafter, at the time the building was completed, there should have been an assessment by an architectural firm whether or not the work that was done by the general contractor conforms to

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 37

the -- to the drawings?

A   Normally, in one form or another, that would be part of the construction administration and close-out process for -- for -- for the building.

Q   And as an architect, what do you call that final step to make sure that a building -- that the drawings -- that the construction is in conformity to the drawings?

A   There's a punch list review.  That's kind of an informal term.

Q   And the punch list review, would that be the architect of record that would do the punch list review?

A   Well, based on Standard A Contract documents, normally the contractor is supposed to do the punch list and we're supposed to verify it.  It doesn't always happen that way.

Q   But they, the firm that -- the architectural firm that reviews the contractors' work would be the architect of record?

MR. RADUNSKY:  When you say the architect of record, you mean for the project?

MR. MORRISSEY:  For the project.

MR. RADUNSKY:  Yeah, okay.

You can answer.

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 38

THE WITNESS:  There could be multiple arrangements, but that would be the normal -- that would be the normal relationship.

BY MR. MORRISSEY:

Q   Is the architect of record generally the firm that submits the drawings to the city or the county to get approval for the permitting process?

A   Normally, yes.

Q   Do you know who, what firm was the architect of record for the RTU?

A   I looked at it at the time, but I don't remember what it was.

Q   Would one of the items back in 2011 or thereafter that the architect of record would have looked at is to make sure that the contractor complied with the ADA in building the east corridor ramp?

A   Well --

MR. RADUNSKY:  Foundation, speculation.

You can answer.

THE WITNESS:  They should have looked at the work and compared to the drawings to make sure that it -- it matched what the drawings showed to be built.

BY MR. MORRISSEY:

Q   Is the architect of record Roula Architects,

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 39

R-o-u-l-a?

A   I don't remember offhand if that was the name in the title on the drawings.

Q   Now, looking at your report Exhibit 1, Page -- I think it begins on Page 2 or Page 3, it says, executive summary.

Did you prepare that summary for this report?

A   I did.

Q   And then that just provides the highlights.

You broke it down.  You broke the east corridor ramp down into various subsections, correct?

A   I broke down the areas we reviewed into subsections, north tunnel, east tunnel, yes.

Q   If we go back to Exhibit No. 8, Eric Davis' declaration, on Page 7, there's a footnote, and the statement by -- at the end by Eric Davis is the RTU ramp leads directly to the Cermak ramp and they are comparable size.

Is that consistent with your knowledge involving the relation between the RTU ramp and the Cermak ramp being of comparable size?

A   I would have to go back and look at my report for Cermak to see.  I, mean it -- I mean, I did that -- I don't know, remember when.  They're both ramps.

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 10

**CARL M. DARR**
**June 3, 2024**

Page 40

Q   Okay.  Exhibit 7 is the --

MR. RADUNSKY:  I was going to say, do you know how long it is?  Maybe we can make it easier for him.

BY MR. MORRISSEY:

Q   I believe the report, Exhibit No. 7, looks like the Cermak ramp, I think, as being 43 feet point 7 -- I'm sorry -- 43.64 feet in length.

MR. RADUNSKY:  What page are you looking at, Tom?

MR. MORRISSEY:  I'm looking at Page 3 of 21.

MR. RADUNSKY:  Okay.

So Exhibit 7, Page 3.

BY MR. MORRISSEY:

Q   It's like the second -- It's the executive summary, the second paragraph.

MR. RADUNSKY:  Yeah, he saw it.

THE WITNESS:  If I remember correctly, the east RTU ramp is considerably longer. I thought it was 80-something feet with the two sections.

BY MR. MORRISSEY:

Q   Okay.  All right.  Mr. Davis also says that --

A   Oh, we're back at that.  Okay.

Q   We're back at his footnote on Page 7.

Your understanding is that the RTU building residential treatment unit houses detainees that are

TOOMEY REPORTING
312-853-0648

---

**CARL M. DARR**
**June 3, 2024**

Page 41

wheelchair-assisted?

A   My familiarity with it is it houses detainees. I did see some wheelchair users going through the tunnels when we were there.  Nobody ever explained to me anything else.

Q   And each time that you were physically present on the east corridor ramp, you were there each time about how many hours?

A   The first time maybe an hour, and then the second time one to two hours.

Q   Okay.  And what time of the day were you there on each?

A   I believe they were morning to late morning.

Q   And while you were -- who was -- who accompanied you from the sheriff's office on each day?

A   Khara.

Is that --

Q   Khara Coleman?

A   I believe so, yes.

THE REPORTER:  C-a-r-a?

THE WITNESS:  K --

MR. RADUNSKY:  K-h-a-r-a.

THE REPORTER:  Thanks.

THE WITNESS:  It's an unusual spelling.

TOOMEY REPORTING
312-853-0648

---

**CARL M. DARR**
**June 3, 2024**

Page 42

Then there was a security guard as well, but I don't know his name.

BY MR. MORRISSEY:

Q   Was Mr. Davis present at either --

A   No.

Q   -- inspection?

A   No.

I'm sorry.  I didn't mean to cut you off.

Q   Anybody from capital planning there?

A   No.

Q   Anybody from capital planning or from the sheriff's office other than the correctional office?

A   No.

Q   Now, while you were at the site on --

What dates do we have down here?

On Page 6 it says that you were at the -- physically inspected it on January 23rd again on January 25th?

A   On --

Q   Page 6 of Exhibit No. 1.

A   Oh, we changed.  Okay.

MR. RADUNSKY:  We're back to your report.

THE WITNESS:  Page 6?

I'm sorry.  Can you repeat that?

TOOMEY REPORTING
312-853-0648

---

**CARL M. DARR**
**June 3, 2024**

Page 43

BY MR. MORRISSEY:

Q   It's on Page 6 of your report on Exhibit 1.

It says that you did the inspection on January 23rd and January 25th, 2024?

A   Yep.

Q   Each day you were there, you saw detainees in wheelchairs going up and down the east tunnel corridor, is that fair to say?

A   On at least one of those dates, yeah, we did observe that.

Q   And each day you saw detainees that were using walkers go up and down the east corridor ramp?

A   Probably.  I don't have a specific recollection of that.

Q   Did you also see detainees that used canes or crutches going up and down the east corridor ramp?

A   I believe I saw people using canes or crutches.

Q   And each time you saw a detainee who was disabled, no mobility, disabled, they were accompanied by a correctional person?

A   Generally -- Well, in general, there was a correctional person accompanying them, accompanying all the detainees that traveled through the corridor.

Whether they were there with one -- Whether

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 11

CARL M. DARR
June 3, 2024

Page 44

there was -- Yeah, generally, there's a correctional officer accompanying any detainee going through the corridor. Generally, there were groups of people and there were one or more correctional officers with them.

Q Now, as an expert in the ADA, for buildings that are -- were built prior to 1991, a public entity has to provide reasonable accommodations, is that fair to say?

A They're supposed to.

Q Okay. And for a building that's built after 1991, the ADA required specific adherence to the ADA Code in regards to the physical structures, correct?

A Yes.

The requirements include -- The ADA includes requirements with regard to physical structure.

Q And the purpose of the ADA is to allow --

Okay. What is the purpose of the ADA Standards, structural standards in regards to mobility disabled --

A Provide --

I'm sorry. I didn't mean to cut tell you off.

Q Go ahead.

A Provide reasonably equal access for all users.

Q And is it also the intent and purpose of the ADA 1991 and the 2010 Standards to provide a universal

CARL M. DARR
June 3, 2024

Page 45

standard to maximize the ability of disabled people to independently move up and down structures like ramps?

A Well, it doesn't necessarily require universal design.

Q Okay. Let me rephrase the question.

Is it correct that the ADA Code provides minimal standards for public entities to allow mobility disabled individuals to independently, for instance, move up and down ramps?

A The ADA has requirements that set forth minimal standards for people to travel, navigate the accessible route.

Q And to allow mobility disabled individuals to independently move up and down ramps without the need for reasonable accommodations?

A Without the need for --

Q Let me -- Let me rephrase that.

A I thought it was contradictory.

Q Let me rephrase it.

The ADA Code provides minimal standards to allow disabled individuals to independently move up and down ramps without assistance?

A Yes.

Q Now, a public entity can provide greater

CARL M. DARR
June 3, 2024

Page 46

structural elements to assist mobility disabled individuals to move up and down ramps, they're not limited by the ADA Code, correct?

A Correct.

Q But a public entity is required at minimum to follow the standards for a ramp that are required by the ADA Code?

A For the construction of buildings, the ADA Code sets forth minimum requirements that are supposed to be followed for accessibility.

Q Turn to Page 10 of your report.

Let's turn to --

And I'm looking at, I think it's, the second paragraph. It says: GEC reviewed the following east corridor -- corridor components for accessibility compliance.

And you broke it down into six discrete elements, correct?

A Correct.

Q Top landing, upper ramp, intermediate landing, lower ramp, bottom landing and handrails, correct?

A Correct.

Q And specifically in regards to the top landing, the top of a ramp requires a 60-inch landing, is that

CARL M. DARR
June 3, 2024

Page 47

correct?

A That's correct.

Q And a minimum of 60 inches, correct?

A Correct.

Q If a ramp is off by two inches point four, it does not comply with the ADA Code if the building was built after 1991, correct?

A If it's 2.4 inches short, it doesn't comply regardless.

Q In regards to the top landing for the east tunnel corridor, it's only nine inches long, correct?

A That's correct.

Q So that's a -- that violated -- you found that it violated, violates the 2010 Standards, correct?

A It's not in compliance with the 2010 Standards, correct.

Q And you did a measurement that it's 85 percent short of the required length, correct?

A Correct.

Q Did it matter whether or not it was ten percent short of the required length or 85 percent short of the required length in order to be a violation of the ADA 2010 Standards?

A Either one is a violation.

Exhibit 4 Page 12

Page 48

Q   And would you agree that, even if the top landing was only five percent short of the 60-inch requirement, that a public entity, if they knew about it, would be required to remedy it if the structure was built after 2010?

A   Well, during construction, if someone knew about it, they would be required to rectify it.

Q   Is there any section of the ADA Standards which would permit a government entity such as Cook County, if they knew that the top landing of a corridor ramp was five percent short of the required 60 inches for a landing, to be in compliance with the ADA Code?

A   I'm sorry.  Can you repeat?

MR. RADUNSKY:  Yeah.  That's not a good question.

Object to form.

BY MR. MORRISSEY:

Q   Now, in your report you say the top landing can easily be corrected, is that correct?

MR. RADUNSKY:  East, Tom?

MR. MORRISSEY:  The east.

MR. RADUNSKY:  Okay.

BY MR. MORRISSEY:

Q   The east tunnel corridor top landing can easily be corrected by Cook County?

Page 49

A   I'm not sure I'd say easily, but, yes, the wall with the doors, there is space to shift it, I guess, eastward is the correct direction so that you would have a five-foot -- a 60-inch clear area after the top of the upper ramp.

Q   As an architect, how difficult would it be for Cook County to move, relocate the doors to the east 51 inches to provide the minimum required landing length?

A   So in that specific case, normally, not difficult.

However, there is a large heating pipe that would also have to be -- the work would have to be coordinated with it.  It comes out in an awkward location.  I'm not sure if you can just -- So that's a consideration that would complicate it a little bit at least, maybe more.

I don't remember what the height of that pipe is above the floor so that would be a consideration because you have to have head room or put hand detection under it, and then, also, you have to make sure that you can firestop everything.

Q   You don't put that in your report?

A   No.  I -- No.

Page 50

I was just verbalizing, articulating kind of the considerations involved in moving that wall.

Q   In your report there's no consideration that moving that pipe would be an obstacle to making the top landing compliant?

A   If I went into the detail of all the obstacles involved with each and every specific recommendation here, it would be a much more lengthy report.

Q   But in completing -- in preparing this report, you wanted to be thorough, correct, and --

A   Right.

Q   -- consider all the elements that may or may not impact the -- whether or not the east corridor ramp was compliant with the ADA Code, correct?

MR. RADUNSKY:  Object to form.  It's argumentative, too.

You can answer.

THE WITNESS:  It is thorough for the report, but normally those considerations would occur at the next phase of the work, which would be, you know, the design.

BY MR. MORRISSEY:

Q   So without going to the next step, as an architect, you don't have an opinion whether or not it's feasible or not to move the doors 51 inches east to make

Page 51

the top landing compliant with the 60-inch requirement.

MR. RADUNSKY:  Object to form when you say feasible.

You can answer.

THE WITNESS:  No, I do have an opinion.

It is feasible, but you also may be moving pipes at the same time.

BY MR. MORRISSEY:

Q   The next element that you looked at was the upper ramp, correct?

A   Correct.

And that's the next element in my report.

MR. RADUNSKY:  Just for the record, we're talking east.

MR. MORRISSEY:  I understand.

MR. RADUNSKY:  Okay.

MR. MORRISSEY:  All these questions are directed to the east tunnel.

MR. RADUNSKY:  Perfect.

Thank you.

BY MR. MORRISSEY:

Q   You also looked at another tunnel which was the north tunnel, correct?

A   Correct.

Q   And your opinion was the north tunnel was

Exhibit 4 Page 13

CARL M. DARR
June 3, 2024

Page 52

compliant because it -- the slope was greater than one to 20, correct, was less than one to --

A   It was shallower than one to 20, yes.

Q   Yes.

Looking at -- Can you define what you consider the upper ramp under Number 2 on Page 10?

A   It's the section between the top landing and the intermediate landing.  It's the highest slope section of the tunnel floor.

Q   From the bottom landing to the top landing, did you measure the rise of that corridor ramp?

A   Well, we have that data from the Lidar scan so we would, I believe -- I don't know if I -- I don't know if I actually somewhere stated an overall length, but I do have --

MR. RADUNSKY:  (Indicating.)

THE WITNESS:  Right.  The staples are coming apart. It's kind of falling apart here.

MR. RADUNSKY:  Tom, your question was slope from top to bottom, right?

MR. MORRISSEY:  No.

Rise.

MR. RADUNSKY:  Rise.

THE WITNESS:  Overall rise?

CARL M. DARR
June 3, 2024

Page 53

MR. RADUNSKY:  Yes.

THE WITNESS:  I know I have it in these photos here.

The bottom run is 29.7 inches.

Oh, wait.  There's a page missing.

And the top run is 23.16 inches.

So I can add them together if you want.

BY MR. MORRISSEY:

Q   So that be a total of 53 inches, the rise?

A   Give or take.

Q   Okay.  And --

A   Can I --

These are all out of --

Q   If a ramp it has a rise of 53 inches that requires intermediate landing under the ADA Code --

A   This ramp requires an intermediate landing, yes. There's no disagreement on that.

Q   Your Number 2 element is the upper ramp, and you say the last 4.27 feet of the run has a rise of 4.56 inches and a slope of one to 11?

A   That's correct.

Q   And --

A   Oh, I'm sorry.

Q   -- that isn't compliant with the ADA Code, a slope of one to 11, correct?

CARL M. DARR
June 3, 2024

Page 54

A   A slope of one to 11 is steeper than a slope of one to 12, which is the max -- maximum permitted, and so it is not compliant.

Q   Can you explain to me why a slope of -- with the steepness of one to 11 would be difficult for a wheelchair person to go up the ramp?

A   Well, I mean, the steeper -- the steeper a slope is, the more difficult it is.  A one to 11 slope is permitted in certain short runs of ramp lengths.

In this case it's a short run, but it's attached continuous with a longer run, and so you'd have to take the overall length, and so that portion which is one to 11 is too steep and it's not permitted; whereas, the remainder of the top run, which I think had one to 12 or slightly shallower slope, is compliant.

Q   So if an individual is self-propelling in a wheelchair up the ramp, the upper 4.5 inches of that ramp is steeper than permitted by the code, correct?

A   Correct.

Q   And for some individuals in a wheelchair, that would make it more difficult for them to reach the top of the landing?

A   It would make it more difficult for all individuals in a wheelchair.  Whether or not it's beyond

CARL M. DARR
June 3, 2024

Page 55

their ability so to speak is a matter of what their ability is.

Q   Now, you say it would be possible to add a floor topping which will even out the slope, make a consistent floor slope that has a one to 12 slope or shallower.

Can you explain how as an architect you would provide that design?

A   Yeah.  I think, again, I could have been a little bit more explicit here.

The -- Because the ramp is going at a shallow angle and a steeper angle, actually, you would have to chop off a portion of that -- that upper four and a half feet, let's say, and then put a floor topping on to make it smooth but reconfigure it to be consistent with the lower portion of the ramp which would be one and 12.

Q   So would your -- if you were the architect of record, one recommendation you would make is to saw cut the upper 4.56 inches at the upper ramp and smooth out the surface to eliminate that slope of one to 11?

A   Yeah, whether you had to saw cut it out or just jackhammer out a top portion, which would require further investigation, but, basically, yes, remove a section that's too steep and somehow either replace it or top it out with materials that would have the correct

Exhibit 4 Page 14

CARL M. DARR
June 3, 2024

Page 56

slope.

Q   And as an architect, it's your opinion that would be feasible?

A   Yes.

Q   Going to the next one, the intermediate landing, you reviewed Mr. Kepka's, who is an architect, findings in regards to the length of the intermediate landing?

A   I did.

Q   And his findings, I think, were that the length was 38 inches or so, and you have it quite different, you have it being like 56 inches or a little -- 55 inches?

A   I thought it was -- I thought we said 57 in the report.

Q   I'm sorry.  57, approximately 57?

A   Yes.

Q   Thank you.

Can you explain why two architects would come up with a different measurement for the intermediate --

A   Well, the only thing I saw in his report was a very blurry photo, but I'd say the reason is that he made a mistake.

We show the measurement for the ramp in one of these photos.  It's on the top of Page 13.

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 57

And I know the Type 3, but when you're on a computer, you can blow it up and see where the arrow starts and ends.  That measurement is roughly 4.7-something.

MR. RADUNSKY:  You're looking at the top photo of Page 13 of your report?

THE WITNESS:  Yeah.

MR. RADUNSKY:  Okay.

BY MR. MORRISSEY:

Q   I'm going to pull that up in a second.

The -- There isn't a clear break point between the intermediate landing and the upper ramp, is there, for the east tunnel corridor?

A   Each -- Each transition between a landing and a ramp in this corridor is not a distinct line.  They're curved transitions so there is a little bit of variation, not much, but a little bit of variation that you can find between how -- where one person would start and stop their measurement.

Q   So one architect might find it to be 52 inches depending on where you measure the intermediate landing?

A   Yeah.

Q   Another might say it's 57?

A   Hopefully, not that much of a variance, but,

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 58

yes, the general idea is it's --

Q   And when I refer to a breakpoint, there's not a clear cut (indicating) where the lower ramp stops and --

A   I don't think she can capture your motions.  I'm just saying.

(Discussion had off the record.)

BY MR. MORRISSEY:

Q   There isn't a straight breakpoint --

A   No, there's no --

Q   -- between --

A   There's no distinct plane as there would be between the intersections of two -- there's no straight line, straight and distinct line as there would be between the intersections of two planes, straight planes.  This is -- They curve at the top and bottom of each ramp.

Q   As a person who's an expert on the ADA Code, why does the ADA Code require a minimum of 60 inches in length for an intermediate landing?

A   Well, 60 inches is a common minimum, although it's going to change soon, it's a common minimum dimension used for being able to turn around in a wheelchair.

Q   So --

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 59

A   So say --

I'm sorry.

Q   That would be similar to the turning radius for a toilet?

A   Yeah.

Q   So that's a standard element under the ADA for -- to allow a person in a wheelchair at minimum to have 60 inches, correct?

A   To be able to turn around, yes.

Q   Now, you alluded to that there may be some change, perspective change in the ADA Code in regards to --

A   I know -- I haven't -- I've dealt with it on one project, but, yeah, there's an increase -- I believe some of the turning radiuses in toilet stalls are actually going to increase.

Q   So that would be under the Department of Justice ADA Code?

A   I believe so, yeah.

Q   So is there a proposed regulation that you've reviewed as an architect?

A   There -- I think that that's actually in an active regulation, I'd have to go back and look, but we ran into with one suburban's municipalities where we had

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 15

CARL M. DARR
June 3, 2024

Page 60

to increase the toilet stalls for the design.

Q   What project are you referring to?

A   It's -- It's a Pace bus transfer facility out in Schaumburg.

Q   So as an architect why is the ADA Code increasing the minimum area for intermediate landing or accessibility for a turning space for a wheelchair person to use a toilet facility?

MR. RADUNSKY:  Just object to any remedial measures.

You can answer.

THE WITNESS:  That would be speculative on my part, but I assume in their wisdom they've determined that to turn around in a toilet stall requires more space -- to turn around comfortably in a toilet stall requires additional space.

BY MR. MORRISSEY:

Q   So you have a recommendation as far as a remedial recommendation for remedying this violation for the intermediate ramp --

Can you explain that?

-- intermediate landing.  I'm sorry.

A   Yeah.  Let me look at my report.

Basically, to shift the lower ramp section westward so that you can increase the length of the

---

CARL M. DARR
June 3, 2024

Page 61

intermediate landing to be at least 60 inches, and, yeah, so just to shift the whole lower section westward so that you end up with a longer intermediate landing.

So you basically have to rebuild the entirety of the lower ramp section.

Q   Now, you mentioned just a few moments ago that, depending upon where you -- where an architect decides to measure the intermediate landing, it could vary between, let's say, 52 inches to 57 inches in length.

Where in the ADA 2010 Standards does it say such a variance from the 60 minimum requirement is minor?

A   Well, I don't think I said that.  I think you did.

I think I said that, if somebody is measuring where the landing starts and stops, there's -- depending on how accurate they are, you could -- you could end up with some variance.

But, technically, it would be only where the curve starts going up and where the curve starts going down so just the horizontal flat area would be the landing, not any portion of the sloped curve.

Q   My question goes back to your executive summary when you talk about the -- refer to the intermediate

---

CARL M. DARR
June 3, 2024

Page 62

landing as being a minor violation.

My question specifically is; where does it provide a public entity liberty to have a structural element such as an intermediate landing less than 60 inches?

A   I'm sorry.  Can you repeat that?

MR. MORRISSEY:  Can you repeat?

(Question read.)

THE WITNESS:  Where does what --

BY MR. MORRISSEY:

Q   So my question is; you say that certain violations with the exception of the -- the landing at the top of the ramp are, quote-unquote, minor, and my question to you as a person who is well-versed in the ADA Code 2010 Standards is, where in the 2010 Standards does it permit a public entity for an intermediate landing, which is required, to have a landing that's less than 60 inches?

A   The regulations don't permit any entity to have a landing less than 60 inches.

Q   And that's true also as far as the upper ramp and the lower ramp; they either comply or they don't comply with the ADA Code?

A   For those elements, yes, they either comply or

---

CARL M. DARR
June 3, 2024

Page 63

do not comply with the ADA Code.

Q   And we're going to walk through the lower ramp which is Number 4 which is on Page 11.

Just like the upper ramp, you mentioned that the bottom of the lower ramp has a slope which is too steep, correct?

A   It's much shorter, it's only one foot in length, but, yes, there's a section that's too steep.

Q   So the slope is one to 8.5, correct, which the requirement is, at least, one to 12 or greater, correct?

A   For the first part, yes, that's what we measured.

And for the second part of your question, the requirement is one to 12 or shallower, not greater.

Q   The bottom landing has a sufficient 60-inch landing, correct, so that's --

A   Correct.

Q   -- that's in compliance with the ADA?

Now, the handrails you point out in Number 6 are required to be 12 inches at both the top and the bottom of the ramps -- of the east corridor ramp, correct?

A   Correct.

Q   And that would be the handrails on both sides of

Exhibit 4 Page 16

CARL M. DARR
June 3, 2024

Page 64

the ramp, correct?

A   Correct.

Q   And in this case there are only -- they're off by four and a half inches, correct?

A   At the bottom of the ramp, they're off by four and a half inches.  At the top of the ramp, they're off by .7 inches.

Q   Okay.  And why -- why does the 2010 Code and the 1991 EDAC Code require handrail extensions of 12 inches, what purpose does that serve?

A   Well, the code, itself, does not state a purpose for requiring it.  It just states that they're required.

I mean, the logical understanding is that, if somebody is approaching a ramp or getting off a ramp, they still might need to have something to hold onto.

Q   Initially, we have not only the bottom ramps being only 7.4 --

Let me rephrase the question.

The handrails at the bottom of the corridor are only 7.4 inches in length, coupled with the fact that the initial lower ramp is too steep, correct?

A   That's correct.

Q   So that that -- that, in this particular case, handrails that extend 12 inches may benefit some

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 65

wheelchair users in initially moving up the ramp, is that fair to say?

A   I wouldn't disagree with that.

Q   And replacing or putting accessible handrails that are 12 inches for the east corridor ramp, it's doable, correct, it's feasible?

A   Yes.

Q   And you also mentioned that the handrails -- that some portion of the handrails, they're not at the required height of 30 -- minimum of 34 inches, correct?

A   Generally, they're at -- Generally, they're at the minimum required height, but they're not consistent across the length of the ramp, and at times, yes, they are too low.

Q   Now, have you inspected other ramps at the Cook County Jail other than the Cermak ramp in regards to whether or not they have handrails?

A   Well, we inspected the north ramp.

Q   Right.

And did they have the non-ligature handrails on the north ramp?

A   They don't have handrails on the north ramp.

Q   That's correct.  I forgot.

My question is; to your knowledge are there any

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 66

ramps at Cook County Jail which have the non-ligature handrails?

A   I believe the Cermak ramp does.

Q   And that currently isn't in compliance because it doesn't have the extent -- the 12-inch extensions, correct?

A   Correct.

Q   Are there --

MR. MORRISSEY:  Can we take -- Let's see.  You want to take a five-minute break?

MR. RADUNSKY:  Yeah.

MR. MORRISSEY:  We'll take ten minutes.

MR. RADUNSKY:  Sure.

(Break taken.)

MR. MORRISSEY:  Go back on the record.

BY MR. MORRISSEY:

Q   Earlier in the dep, you said that you were waiting for acceptance by your client Cook County in regards to the Cermak assessment you did, is that correct?

A   Correct.

Q   And am I correct that, similar to the corridor ramp accessibility assessment, a report has been tendered to Cook County, a written report has been

TOOMEY REPORTING
312-853-0648

---

CARL M. DARR
June 3, 2024

Page 67

tendered to Cook County?

A   That's my understanding, yes.

Q   And what individual or individuals within Cook County have to accept the report by GEC before doing the transfer package?

A   I'm not sure specifically, but we deal with, oh, Kate Sumplet, I think at LCM, so she's their project manager.

I think the nature of in terms of acceptance or not is what we listed for recommendations and how they would go about that.  I think they wanted to review that.

Q   You mentioned LCM.

Is that the private outside consultant for Cook County?

A   Yeah, it's -- it's -- they use -- they're using LCM as the project manager on their side of this project.

Q   And what is the role of Altus in regards to the Cermak assessment?

A   Altus?

Q   Altus, yeah.

A   Altus is our consultant.

Q   And what role do they play in regards to the

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 17

CARL M. DARR
June 3, 2024

Page 68

corridor ramp for Cermak and the Cermak Health Services building?

A    As I said earlier, they were -- are or were responsible for the site review and contributing portions of the report for the exterior approach to the building.

Q    Okay.  So the RFQ that you began your work for the Cermak corridor ramp and the Cermak Health building began sometime in the year 2022 according to Exhibit 7, Page 5, is that fair to say?

A    Which one is Exhibit 7?

Q    Exhibit 7 --

A    Oh, here.

     Page 5?

Q    Page 5.

A    Was that a question?

Q    Yes.

     It's Exhibit 1.  It's Exhibit 1, Page 5.

     I'm sorry.

A    Wait.  Not Exhibit 7?

Q    It's Exhibit 1.

MR. RADUNSKY:  Exhibit 1, your report, right there, your report.

THE WITNESS:  Oh, you're talking about the tunnel

CARL M. DARR
June 3, 2024

Page 69

assessment?

BY MR. MORRISSEY:

Q    Yes.

A    Because I thought you said the Cermak assessment.

Q    Well, my question is; the Cermak corridor ramp and the Cermak Health Services facility assessment was done pursuant to this RFQ Number 2215-0221?

A    I'm sorry.  I'm confused because then you referenced Exhibit 1, which is the corridor assessment for the RTU corridor.

Q    No.

     What am I doing?

     I'm sorry.

MR. RADUNSKY:  Exhibit 7?

BY MR. MORRISSEY:

Q    Let's go back.

     It's Exhibit 7, Page 5.

A    Okay.

Q    So Exhibit 7, Page 5, references this RFQ Number 2215-0221, and pursuant to that RFQ, GEC did an assessment of both the corridor ramp and the Cermak Health Services facility?

A    Yes.

CARL M. DARR
June 3, 2024

Page 70

     I don't know if we started that in 2022, but we submitted it on December 6th of 2023.

Q    And those reports have been tendered to the project manager for Cook County, LCM, and you're waiting for their approval of the recommendations, is that fair to say?

A    Yeah, their, yeah, acceptance or approval of the recommendations, yes.

Q    And once they approve the recommendations for the corridor ramp for Cermak and the Cermak building, then your firm will proceed to do a transfer package?

A    Right, which will include drawings and I believe specifications up to 30 percent complete.

Q    The transfer package will include drawings for both the Cermak building and the Cermak corridor ramp, is that fair to say?

A    I believe so, yes.

     I haven't --

Q    And the -- And that could take up to a year to do the transfer package for Cook County?

MR. RADUNSKY:  Just object to the relevance of Exhibit 7 and of the Cermak ramp in the Walker case.

     You can answer.

THE WITNESS:  It's speculation, but, yeah, it could

CARL M. DARR
June 3, 2024

Page 71

take a year or less.

BY MR. MORRISSEY:

Q    And are you -- And once those the transfer package is tendered to Cook County, are you familiar with a firm called HDR Architects?

A    No.  I may have come across them, but I don't --

Q    Can you --

     HDR Architects was identified by Eric Davis as the prospective architect of record for the Cermak corridor ramp.

     My question is; your firm under the transfer package is going to do 30 percent of the schematic drawings for the Cermak corridor ramp as part of the transfer package?

MR. RADUNSKY:  Same objection; relevance.

     You can answer.

THE WITNESS:  We do documents that take the design to 30 percent of completion.  It's referenced going from start of design to having bid documents.  We take it to 30 percent, which typically is schematic design.

BY MR. MORRISSEY:

Q    As a layperson, why wouldn't the county say to GEC do the final drawings that we can send out for permitting for the Cermak ramp, why have two firms do

Exhibit 4 Page 18

CARL M. DARR
June 3, 2024

Page 72

the same work?

A   Don't know.  That's just the way the RFQ is structured.

Q   After your firm completes as part of the transfer package the schematic drawings for the Cermak corridor ramp, how long would you speculate it would talk an architectural firm to complete the drawings as an architect of record?

MR. RADUNSKY:  Same objection; relevance.

You can answer.

THE WITNESS:  I really don't have an understanding of that, you know.  That could vary quite a bit.

BY MR. MORRISSEY:

Q   If we go back to Eric Davis' declaration in this case, it's Exhibit 8.

A   Uh-huh.

Q   Let me find the spot.

If we look at Page 7, Paragraph 18 if you want to take a look at it, in regards to this east corridor ramp for the RTU, Eric Davis states that the repair or renovation of the Cermak corridor ramp will cost similar to the cost of making the RTU corridor ramp compliant under the ADA, and he estimates it at several hundred thousands of dollars.

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 73

Do you agree with that statement?

A   Not specifically.

But I do believe that they both will cost in the neighborhood of several hundred thousand.  One might be quite a bit more than the other.

Q   As the architectural firm that did the assessment, which one would cost more, the Cermak corridor ramp or the RTU east corridor ramp?

A   Well, although they're --

MR. RADUNSKY:  Objection; speculation.

You can answer.

THE WITNESS:  Yeah, speculation.

Although, you know, what you run into once you start the design can vary, but, generally, the RTU ramp is considered a bit larger, there's more things to fix, and you're replacing that whole lower section of the ramp.  So I would say that probably would be more expensive.

But on the other hand, there's considerations in the Cermak ramp about being able to encroach kind of in that doorway and resolving that landing area, and we haven't ever been able to get in on the other side of that door.

BY MR. MORRISSEY:

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 74

Q   For the Cermak corridor ramp, as an architect, what would you estimate the time for construction of the Cermak corridor ramp?

MR. RADUNSKY:  Objection to relevance.

You can answer.

THE WITNESS:  For the Cermak ramp, did you say?

BY MR. MORRISSEY:

Q   Yeah.

MR. RADUNSKY:  Same objections to relevance and speculation.

THE WITNESS:  Again, there are so many variables in terms of how agencies work, how contractors work, and you also have the complication of being in a secure facility, you know.

My guesstimate, you know, it could take four months.

BY MR. MORRISSEY:

Q   And what would your estimate as far as the construction time for the RTU east corridor ramp be?

A   Again, there's a lot of variables, including whether or not you can dedicate that space solely to the construction and somehow move the detainees along different routes, but, generally, I mean, as a wild unscientific estimate, I'd say six to eight months.

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 75

MR. RADUNSKY:  How much more time are you thinking?

MR. MORRISSEY:  Not too much.

BY MR. MORRISSEY:

Q   Going to Exhibit 9 now, it's electronic, it's the request for qualifications that went out on -- it's the request for qualifications which is RFQ Number 2415-2093.

Do you have that up on your screen?

A   I see part of the page, yeah.

Q   All right.  You mentioned that your firm is bidding on this contract?

A   Which contract?

Q   It's a -- the contract that is to do an overall assessment of the Cook County Department of Corrections.

A   I don't think I said we're bidding on it.

Q   Well, I'm sorry, not bidding.

You're providing -- You're submitting your qualifications to Cook County?

A   I don't think I said that.

Q   I'm sorry.  Let me ask you.

Is GEC responding to this request for qualifications?

A   I'm aware that we received it, and I imagine we will.  It's hard to imagine we won't.

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 19

CARL M. DARR
June 3, 2024

Page 76

I saw something via e-mail the other day that included it, but I haven't heard anything yet.

Q   What is your understanding about this request for qualification that's 2415-02093 as far as the extent of it?

A   The only thing I know is, I believe it's for the entire campus, I believe it's broken down into three parts, I believe there will be three separate firms, no firm will get more than one part, it will be -- it will likely be a very substantial and involved project since there's so many buildings.

Q   Now, for the Cermak building, it's taken at least a year and a half to get to the point where you've submitted your assessments of the corridor and the Cermak building, and you're still waiting for LCM to accept your recommendations, correct?

A   Yeah.

I think -- Well, I'm not sure if it's been a full year and a half, but I thought I saw in here on Page 6, well, this is a corridor ramp, and it talks about us visiting it on August 18th, 2023.

I think we actually started the project for the Cermak building a couple months before that, maybe May, June 2023.  So it's taken about a year.

CARL M. DARR
June 3, 2024

Page 77

Q   Okay.

A   I would -- I think that would probably be more accurate.

Q   And in Mr. Davis' declaration, which is Exhibit 8, he talks about the campus having upwards of 60 buildings to be assessed, I think.

Let me look and find it exactly.

It's on Paragraph 5:  50 structures totaling 3.5 million square feet as well as the land, outdoor recreation area, gardens, drives, sidewalks, parking areas, around not over 100 acres of county-owned property.

Now, it's taken, at least -- would you say at least a year for the Cermak assessment, and your understanding is they'll break this down into three separate architectural firms, correct?

A   That's my understanding, yes.

Q   How long do you think, if your firm was awarded a portion of it, a third of a portion of it, how long do you think it would take your firm to do such a comprehensive assessment of one phase of the project?

MR. RADUNSKY:  Just relevance.

THE WITNESS:  Again, that's so -- that's very speculative, you know, and depending on what -- I

CARL M. DARR
June 3, 2024

Page 78

haven't seen the specifics of the RFQ, but, yeah, depending on the specifics of the RFQ and depending on how the county handles it, and I think on the one hand Cermak in a lot of ways was just kind of a guinea pig for other assessments they want to do.

You know, maybe one year, maybe two years, maybe three years, maybe five years.

BY MR. MORRISSEY:

Q   Okay.  Just your firm doing one-third of the project --

A   Correct.

Q   -- between one and five years?

And then after -- is that with the transfer package or without a transfer package?

A   So I believe, one other thing, my understanding of this RFQ is that it involves one firm start to finish so there's no transfer package is my understanding of the RFQ.

Q   Okay.

A   That goes through the construction to the end.

Q   So if your firm is awarded one-third of the assessment process, that would not include doing a transfer package?

A   No, because --

CARL M. DARR
June 3, 2024

Page 79

I'm sorry.  I'll do it this way.

The -- It would not include it because we wouldn't be awarded just the assessment, we'd be awarded the full scope from assessment through design through bid documents through bidding through construction administration.

Q   Do you know why that they didn't -- why Cook County didn't follow the same format for the Cermak plus for qualifications?

MR. RADUNSKY:  Objection to speculation, relevance.

You can answer.

THE WITNESS:  I have absolutely no idea.

BY MR. MORRISSEY:

Q   So a project of this scope could take upwards of five years to complete?

MR. RADUNSKY:  Objection.  I think that misstates his testimony.

BY MR. MORRISSEY:

Q   At best.

MR. RADUNSKY:  You can answer.

Also, speculation.

You can answer.

THE WITNESS:  So a project of this type, I mean, from start to finish, it could take five years or

Exhibit 4 Page 20

CARL M. DARR
June 3, 2024

Page 80

longer.

But you have to realize that, you know, the first part of it is we -- going to become a master plan of -- of the entirety of the facilities, and, you know, it depends, are they going to do one building at a time, are they going to do multiple buildings at a time, are they going to all the buildings at a time, are they going to do all three packages at a time.

I mean, it's -- yeah, I really couldn't offer any even wild guess about that.

BY MR. MORRISSEY:

Q   Now, as an architect, you've worked on public buildings that have renovated structures to be compliant with the ADA Standards on an expedited basis such as your work for the McCormick Place, correct?

A   We've done multiple projects at McCormick Place. I'm not sure which one you're referring to.

Q   I believe in your c.v, you mentioned --

A   I believe that was a Metra Station, the one I did.

Q   Yeah.  Yeah.

So explain how that was expedited for the Metra Station, which I guess is the South Shore Line?

A   Yes.

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 81

Jogging my memory a bit because it's been a few years, but I actually was -- yeah, there was a time frame they wanted it, I don't remember exactly why, but, you know, there was -- there were quick decisions made on -- for the design, I remember that because I did it, we did kind of accelerate as best we could the drawings, and there was a lot of coordination that occurred with the win bidder to try to get the construction done as quickly as possible.

Q   In considering GEC's relationship with Cook County, GEC has been accepted for doing an assessment of the Leighton Court building, is that fair to say?

A   Yes.

Q   But your -- And that was in 2022, I think you stated?

A   No, I don't think I stated that.

I don't know when we were awarded that.  I was just involved in the narrative for the proposal, and I don't remember when I did that.

Q   I believe the RFQ came on in 2022.

A   Yes.

Q   My question is; you're still -- your firm is still waiting for Cook County to give your firm the

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 82

go-ahead to do an assessment on the Leighton Court building?

A   They made a recent addition to that contract so I think that's the last thing to be worked out.

Q   Do you have any guesstimate when and what year Cook County will do an assessment or have your firm do an assessment, ADA assessment of Leighton?

MR. RADUNSKY:  Speculation objection.

You can answer.

THE WITNESS:  Well, on my own projections, which take into account any -- our understanding of the nature of Cook County is not always moving as quickly as they hope, I am projecting that we will be starting and having staff put time towards that project next month.

BY MR. MORRISSEY:

Q   Did the staff require county board approval?

A   I'm not -- I'm not sure if the award of the contract -- Well, I'm not sure what state the award of the contract is in offhand.  I know it's fairly close for -- to us getting ATP.  I'm not sure if any of it requires county board approval.

Q   Are you aware that several years ago another architectural or engineering firm reviewed the accessibility of the Leighton Court building?

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 83

A   No.

Q   That there were plans?

A   No.

Q   And that millions of dollars were expended by Cook County to renovate and make it fully accessible for prisoners and they never did anything?

MR. RADUNSKY:  Just object to form and foundation, assumes facts not in evidence.

MR. MORRISSEY:  You were shown those --

MR. RADUNSKY:  Go ahead.

Those drawings.

MR. RADUNSKY:  It has nothing to do with our case.

THE WITNESS:  I just worked on the proposal.  I haven't seen any drawings.

MR. RADUNSKY:  How much more time do we have?

MR. MORRISSEY:  We're getting there.

MR. RADUNSKY:  None of this is like really about our case.  I mean, none of it is.  This is a fishing expedition about other cases.

MR. MORRISSEY:  It's all in Eric Davis' declaration.

MR. RADUNSKY:  Then depose Eric Davis on it.  He didn't write Eric Davis' declaration.  If you want to talk to Eric about that over seven hours, that's different, but I mean, this is not fair to Carl.  Carl

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 21

CARL M. DARR
June 3, 2024

Page 84

has got his opinions, and that's it. You're trying to, you know, get him to testify to other matters.

BY MR. MORRISSEY:

Q Has Cook County provided you with a guesstimate --

Let me rephrase the question.

Has Eric Davis communicated to you or anybody else at GEC when he expects to proceed on renovating the Cermak corridor ramp to make it fully accessible for mobility disabled inmates?

MR. RADUNSKY: Objection; relevance, scope. We're not here to testify about the Cermak case or the Walker case or the Walker ramp or the Cermak ramp.

You can answer.

THE WITNESS: I haven't had any discussions whatsoever with Eric about time frame for when they plan do construction on Cermak ramp.

BY MR. MORRISSEY:

Q Have you had any discussions with any members, any employees or officials from Cook County in regards to a timetable for renovating the Cermak corridor ramp?

MR. RADUNSKY: Objection to relevance.

I mean, I'm going to let you ask like two more questions on Cermak ramp.

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 85

I mean, this is not what we're here for, and you're trying to take his deposition, Tom, without the Cermak lawyers present in the Walker case, and it's just totally unfair to the witness to do this, you know, especially under a dep notice for the Westmoreland case.

You can answer the question.

I mean, this isn't going much further, or I'm going to terminate the dep.

THE WITNESS: What was the question?

MR. RADUNSKY: Also, speculative.

You can answer.

THE WITNESS: I don't remember the question.

(From the record above, the Reporter read the following:

"Q Have you had any discussions with any members, any employees or officials from Cook County in regards to a timetable for renovating the Cermak corridor ramp?")

THE WITNESS: No, I have not.

BY MR. MORRISSEY:

Q Have you had any discussions with any --

The same question in regards to the east corridor ramp for the RTU. Have you had any discussions with Eric Davis or any other official from Cook County

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 86

in regards to a timetable to renovate the east corridor ramp to make it compliant with the ADA?

A No, I have not.

Q You mention in your report that, at least during one of your inspections, you observed some disabled inmate being transported up the east corridor ramp in a cart.

Is that fair to say?

A I observed, at least, actually a couple times, inmates being transported on a cart. I don't know if they were disabled or not.

Q Under your report for the east corridor ramp, it concludes that the ramp for multiple reasons was not in compliance with the 2010 ADA Standards, is that fair to say?

MR. RADUNSKY: Objection; asked and answered.

You can answer.

THE WITNESS: Correct.

BY MR. MORRISSEY:

Q And that would also -- not only the 2010, but also the 1991 ADA Standards, the east corridor ramp is not in compliance with those standards either?

MR. RADUNSKY: Same objection; asked and answered.

You can answer again.

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 87

THE WITNESS: Correct.

BY MR. MORRISSEY:

Q Given that the east corridor ramp was completed or begun in 2011, based upon your understanding and opinion, Cook County currently is in violation of the ADA in regards to the -- that structure?

A They're not in compliance with the ADA in regards to that structure, that's correct.

Q And have you communicated that to officials within the Cook County Government or your company, your -- GEC, have they communicated that it's not in compliance?

A No.

In this case, my client is DeVore, Radunsky, and I've given my report to them. I haven't spoken to anyone else but them.

Q Given your opinion in conclusion that the east corridor ramp is noncompliant under the -- either the 1991 or the 2010 ADA Standards, is it permissible for the Sheriff in Cook County to avoid renovating the ramp by providing a correctional officer to push a wheelchair person up and down the ramp?

A I'm sorry. Can you repeat that?

Q I'll make it shorter.

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 22

CARL M. DARR
June 3, 2024

Page 88

Under the 1991 or 2010 Standards, would the Sheriff and Cook County be in compliance with those standards if they merely assisted a wheelchair person up and down the ramp by pushing it?

MR. RADUNSKY: Same --

Objection to form.

You can answer if you understand.

THE WITNESS: Well, I think, in terms of compliance, it would matter whether there was another alternate route available to be used.

I'm not fully familiar with the tunnel system to know that if there is an alternate ramp they can use.

In terms of the idea that having to use an electric cart to get people from the one level to another, that is not something contemplated by the ADA Code.

BY MR. MORRISSEY:

Q Is pushing a wheelchair person up or down the east corridor contemplated permissible under the ADA Code in 1991 or 2010 to alleviate, obviate the need of a government to make the ramp compliant?

A **For a required accessible route, no, it is not.**

Q Have you communicated that to Cook County?

A **With regards to this ramp, I have given my**

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 89

report to DeVore, Radunsky, and that's it.

Q In regards to the Cermak corridor ramp, have you communicated to Cook County, Eric Davis or any other official with Cook County or the Sheriff's Office that by assisting a wheelchair person up and down the Cermak corridor ramp that obviates the need for Cook County to renovate the ramp to make it compliant under the 1991 and/or 2010 ADA Standards?

MR. RADUNSKY: I'm just objecting again. I mean, this is all related to the Cermak and the Walker ramp, which is not relevant, and you should not answer these questions.

I'm going to tell him to stop answering these questions about the Cermak ramp because they have no relevance, and I think the Court is going to agree, and, you know, I'm instructing him not to answer.

MR. MORRISSEY: Okay. We'll certify the question.

BY MR. MORRISSEY:

Q Have you as an ADA consultant for Cook County, which you are on the Cermak corridor ramp and having provided an opinion in this case for the east corridor ramp, have you ever advised Cook County or the Sheriff that merely assisting a wheelchair person up and down either ramp by pushing them obviates the need for the

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 90

requirement under the ADA to renovate the ramp to make it compliant with the codes?

MR. RADUNSKY: Asked and answered multiple times, like three times in the last ten minutes.

You can answer it again.

THE WITNESS: I don't think I've ever had discussions with Cook County staff about pushing inmates up and down a ramp.

BY MR. MORRISSEY:

Q All right. Give me a few minutes.

Given your opinion that the east corridor ramp is not compliant under the ADA Standards, is it your recommendation that Cook County should defer renovating that ramp for two or three years?

A **I don't think whether they should renovate it now or in two or three years is really related to my recommendations about we're just looking at the ramp in terms of it being compliant or not compliant.**

Q Given GEC's involvement and assessment on both the Cermak ramp and the RTU east corridor ramp --

Let me ask another question.

It's your understanding that for wheelchair assisted detainees being transported to the Cermak Health facility that the detainees go up the east

TOOMEY REPORTING
312-853-0648

CARL M. DARR
June 3, 2024

Page 91

corridor ramp and then descend down into the Cermak building through the Cermak corridor ramp?

A **It's my understanding that certain detainees, if -- to my knowledge, detainees coming, for instance, from the RTU that we were discussing, I think it's RTUA, normally would go down, typically go down -- up the east corridor ramp and then back down the Cermak ramp.**

MR. RADUNSKY: How much more do we have, Tom? How many more questions is Pat going to type for you to ask? How many more?

How much longer are we going to go, Pat?

MR. PATRICK MORRISSEY: I don't know.

MR. RADUNSKY: How much longer? You both have been saying it's not going to be very much longer, and that was over an hour and 15 minutes ago. Can you just give me some idea?

MR. MORRISSEY: I would say we'll wrapping up in 15 minutes or less.

MR. RADUNSKY: Perfect. I appreciate it.

THE WITNESS: Can I have another water?

MR. PATRICK MORRISSEY: You want another water?

THE WITNESS: Yeah.

(Discussion had off the record.)

MR. MORRISSEY: Can I proceed, or do you want to --

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 23

CARL M. DARR
June 3, 2024

Page 92

MR. RADUNSKY: Yeah, go ahead.

MR. MORRISSEY: Can I proceed?

MR. RADUNSKY: Go ahead. Yes, yes, yes.

BY MR. RADUNSKY:

Q Given that the path of travel to the Cermak Health facility for a detainee housed in the RTU involves going up the corridor ramp and descending down the Cermak corridor ramp, does it make any sense as an architect and as an ADA expert for Cook County to defer for several years delaying the first ramp; i.e.; the east corridor ramp, and then immediately now repairing the -- and renovating the Cermak ramp?

MR. RADUNSKY: Objection to form and foundation.

BY MR. RADUNSKY:

Q Do you understand the question?

A No.

Q The question is --

MR. RADUNSKY: Go ahead.

BY MR. MORRISSEY:

Q -- as a person who's well-versed in the ADA, would you recommend to a client who wants to become compliant with the structural elements of the ADA to only renovate the -- one of the ramps, either the RTU corridor ramp or the Cermak ramp, for detainees that are

CARL M. DARR
June 3, 2024

Page 93

housed in the RTU?

MR. RADUNSKY: Object to form, foundation, speculation.

You can answer.

THE WITNESS: It's very speculative.

I mean, it depends what other considerations there are, what money they have.

I mean, the one ramp leads to the Cermak ramp but also leads to other places is my understanding.

You know, I think there's a difference between renovating it out of an intent to try to make this as accessible as possible, but, also, there's a difference between that and being forced -- well, yeah, and, you know, I just don't know how to answer that, I guess.

BY MR. MORRISSEY:

Q Well, let's deal with just the east corridor ramp.

A Uh-huh.

Q You testified or your report indicates that it's an easy fix to cure the upper landing, in your report you say that --

A Yes.

Q -- it's an easy fix?

A I wouldn't disagree with that.

CARL M. DARR
June 3, 2024

Page 94

Q Assuming that there's -- there are other portions of the ramp that take longer to fix, does it make any sense not to go ahead and move the doors that are adjacent to the upper ramp to make an ADA-accessible landing at the upper landing?

MR. RADUNSKY: Object to the form.

You can answer.

THE WITNESS: Assuming they have the resources to do that, and, you know, I guess it would involve the corrections department function, why wouldn't they?

BY MR. MORRISSEY:

Q The same question in regards to the handrails.

Putting in handrails can be done relatively soon, it wouldn't take two or three years to correct the handrails so that they're at the minimum height of 34 inches, correct, and extending 12 inches from either the top -- both, the top and the bottom, landings, correct?

A That, in itself, wouldn't require much.

However, if you later have to enlarge an intermediate landing, you're going to have to replace those railings again and basically throw out what you've just done.

Q But it could be done?

CARL M. DARR
June 3, 2024

Page 95

A It could be done.

Q Right now, well, within this year, it could be done?

A It could be done this year.

Q And we also talked about the upper ramp area, that that's off, the slope is too steep?

A Yes.

Q We talked about maybe saw-cutting out a portion of it to make the upper portion of the ramp less steep?

A Correct.

Q Could that be done this year?

A That's -- That's more involved than moving the doors and more involved than extending the handrails and would impact, I think, it seems like, the functions and -- of the Corrections Department and moving detainees through there?

So if -- if the space is empty and available and they have the funding, yes, it could be done this year, but I don't know in terms of the other variables if that's possible.

Q If the upper ramp landing was renovated within the next six months, would that increase the accessibility for a person in a wheelchair going up and down a ramp?

Exhibit 4 Page 24

CARL M. DARR
June 3, 2024

Page 96

A    Maybe.  Maybe not.

So right now the -- yes, the doors are there, but every time I've been there, they've been open, in fact, I think one is broken so it can't even close, so effectively, yes, they -- the door is in a place it shouldn't be, but you can easily travel through the door and be in a space -- you can travel through the door uninhibited and be in a space that has a 60-inch flat surface.

Q    So by doing that this year, it would enhance the accessibility of an otherwise non-accessible east corridor, right?

A    It would make it more compliant with the code requirements.

Q    And by changing the handrails this year to be the right height and extension, that also would increase the accessibility in the immediate future of the east corridor ramp?

A    It would make it more compliant with the code requirements.

Q    And the same would be true in regards to the upper ramp, the steepness of the upper ramp?

A    Correcting that overly steep part of the upper ramp slope would make it more compliant with the code

CARL M. DARR
June 3, 2024

Page 97

requirements.

Q    If the current proposal -- If GEC was chosen as one of the three architect engineering firms to do an assessment of the Cook County campus, how would your firm go about pinpointing what areas of the Cook County Jail system need to be renovated first, how do you make that determination?

A    I'm not sure what you're asking on that.

Q    I guess the question is; how do you -- for a campus that's as large as the Cook County Jail is, how does -- how do you as an architect advise a client like Cook County to prioritize making accessibility improvements?

A    That's a very complicated question.

The -- I mean, obviously, we would talk to the client and see what priorities they have.

Our assessment would probably identify aspects of noncompliance that are more critical or -- or larger in magnitude or have more impact upon the users than others, and, generally, in those cases, we would encourage them to prioritize, but it's all tied in with other systems often and other work they may have -- that may have to be done to make those things complicated so, you know, it does happen that we do prioritize things,

CARL M. DARR
June 3, 2024

Page 98

but there's a lot of considerations to go into that formula basically, and it really just isn't a simple formula, you know, or problem that we resolve.

You know, obviously, buildings with large number -- or spaces with large number of users, you know, might be more priority than places that get just occasional use.  You know, there's just a lot of variables and a lot of considerations.

But the first thing we would do is, work with the client to do our assessment of all the buildings and spaces on the exterior grounds so that we can, at least, have a handle on what the problems are.

Q    Okay.  Given that the RTU and Cermak house disabled prisoners, I mean, Cermak has people that are in the infirmary because they're sick or they're mobility challenged, RTU has detainees that have -- that are assisted by canes, crutches, wheelchairs, given -- given that, would it be appropriate for Cook County to prioritize the path of travel for detainees housed in the RTU to go to the infirmary at Cermak by making the east corridor ramp and the Cermak corridor ramp accessible under the ADA Code?

A    Well, I don't -- I don't have full knowledge of what other priorities Cook County may have at that

CARL M. DARR
June 3, 2024

Page 99

facility, but to the extent that there's a lot of users that are unable to easily navigate that path, yeah, it may make sense.

Q    And by using, you're talking about wheelchair people using walkers and canes?

A    Blind people, yes, everybody.

MR. MORRISSEY:  Okay.  I have nothing further.

MR. RADUNSKY:  I've got some questions.

EXAMINATION

BY MR. RADUNSKY:

Q    Why did you look at the 2018 Building Code and the 2018 Accessibility Code, and can you explain the 20 percent rule?

A    So you're talking about the Rehab Code?

Q    Uh-huh.

A    Well, those -- those are codes for, I think it's, 305.7 if I remember correctly.  There's a code provision that would require the county to make improvements to a ramp if other improvements are being made to that area or other spaces that ramp serves.

Q    And in this case, I mean, how does that apply to your opinions?

A    Well, it would be good to make everything fully accessible as soon as possible, but in terms of the

Exhibit 4 Page 25

CARL M. DARR
June 3, 2024

Page 100

city's requirements, they would not necessarily require correction of an existing noncompliant building until other work is being done, and in that case the improvements to accessibility under 305.7, I think it is, state that the overall amount of the project cost dedicated to upgrading accessibility or correct -- making accessibility corrections does not need to be more than 20 percent of the overall cost.

Q   All right.

With respect to the east ramp, the lower -- the lower ramp, the top landing, the upper ramp and the intermediate landing you said didn't comply with the ADA Code, correct?

A   Yeah, I believe that's -- as long as you didn't say the lower landing.

Q   I did not.  I did not say the bottom landing.

A   Okay.  Yes, that's correct.

Q   Okay.  And I guess what I want to know, when it comes to the rise over run with respect to the upper ramp slope, what is the difference in the slope angle between compliance and noncompliance?

A   It's fairly minimal.

Q   I mean --

Go ahead.

CARL M. DARR
June 3, 2024

Page 101

A   I would have to get my calculator out, but it's -- it's, I believe, a fraction of -- of one percent difference in terms of slope.

Q   I mean, can you tell me like what the difference in the angle is?  Is it like a difference between a 30-degree angle and a 50-degree angle between compliance and noncompliance, or are we talking about just several degrees?

A   It's not even several degrees.

Q   It's not even several degrees.

And those several degrees, for instance, if we're talking about the upper ramp slope on the east ramp, how many feet does that noncompliance go for?

A   Approximately four -- it was 4.27 feet, like four and a quarter.

Q   Okay.  And what about the lower ramp slope?  Can you tell me what the angle of that slope would be between ADA compliance and noncompliance?

A   That's -- Again, that's -- that's a little steeper than the -- part of the upper ramp, but it's much shorter, it's only a foot long.

Q   Okay.  And is there any way to tell us how steep the angle is when it complies versus when it didn't comply here?

CARL M. DARR
June 3, 2024

Page 102

A   I could with a calculator.

Q   Okay.  I mean, can you give me a range or an estimate as we're sitting here?

And if you can't, I don't want you to do it without a calculator but --

A   I did look at it one time.  I thought it was like in the seven to eight percent range.

Q   Okay.  Seven to eight percent.

And how many feet would that be over in terms of noncompliance for the lower ramp slope?

A   One foot.

Q   Now, the handrails as we talked about in one area, and I can't remember if it was the top or bottom, it was .7 of an inch of noncompliance, that was away from noncompliance, is that right?

A   I believe that's at the top ramp?

Q   Yeah.

A   Yes.

Q   Okay.

A   I believe.

Q   And the other -- the other -- I believe the bottom portion was just several inches, right, I think it was like three to four inches?

A   Four and a half inches.

CARL M. DARR
June 3, 2024

Page 103

Q   Okay.  So total noncompliance of the handrail is about four to five inches?

A   It's -- It's a few inches short on one end and less than an inch short on the other end.

Q   Okay.  Now, can you tell me what did you mean when you said that these were minor deviations?  Can you explain that?

A   Yeah.

I think the -- you know, the -- it appears the -- the deviations of the concrete were sloppy formwork and for very short lengths, I would say the upper landing, in the case if the doors are ever closed, that would be more egregious, but the doors are generally very open, but, you know, that should be corrected.

The intermediate landing is a few inches difference.  There's still room for someone to get to that landing, stop and rest before they navigate the upper landing even though there may not be enough for them to turn around 360 degrees or 180 degrees if they want to change direction.

But, you know, in the ADA, the typical resting place for a wheelchair is 30 by 36 inches.

Q   So when you said that these are minor

Exhibit 4 Page 26

CARL M. DARR
June 3, 2024

Page 104

deviations, I mean, what you meant is that these are not substantial or significant deviations compared to what you've seen while inspecting other things for ADA compliance?

MR. MORRISSEY: Objection; leading.

BY MR. RADUNSKY:

Q You can answer.

A Yeah, in the -- I would say these are --

Can you repeat the question?

Q Sure.

What I'm trying to figure out is what you meant -- when you said that they were minor deviations, I'm assuming that that's based on your experience of having inspected other ramps or other facilities for ADA compliance and seen that those are significantly or substantially noncompliant?

A Correct.

I mean, I think, you know, the ADA -- well, while everything should be compliant, the ADA sets forth minimum requirements, but if you're a hair over one of those requirements or a hair under one of those requirements, that's a minor deviation.

Is it legal? No. Is it going to keep somebody from necessarily being able to use the ramp? You know,

CARL M. DARR
June 3, 2024

Page 105

that's a totally different question.

Q And as we've pointed out, the east ramp did have handrails?

A It does.

Q Okay. And you don't --

Well, strike that.

Is it fair to say that, as the architect, when there's a mass construction project like there is on the -- on the Cook County campus, on the jail campus here, that, typically, the sequence of the work, the scheduling of the work, the coordination of the work is going to be done by the general contractor?

A That's correct.

Q All right. And that can done in coordination with the owner?

A That's correct.

Q All right. And in this case with Cook County, they have a capital planning department, correct?

A Correct.

Q All right. Would it make sense to you that capital planning would work with a general contractor to sequence and properly schedule the work, whether it's improvement to the ramp or anything else on the project?

A Well, I think they'll typically bid out to a

CARL M. DARR
June 3, 2024

Page 106

general contractor, but they have other consultants they work with to help them plan projects and other consultants they hire to help them plan projects.

And I think they would work -- they would typically try to approach that holistically so that -- so that, you know, they're going to do things in a way that's efficient, economical and where they won't have to do one project now and then somehow modify it because they didn't think about other projects that they were also going to need to do.

Q Have you ever seen large projects in your experience where work is done out of sequence and it ends up being less efficient, really costly and delays the project?

A Well, I've seen projects where owners end up redoing recently completed work because they didn't understand about other projects that were about to take place.

Q All right. And sometime even when you begin a project, you don't know what some -- there may be un --

Strike that.

When you're doing projects, there may be unforeseen obstacles or difficulties that were not initially discussed in the scope of work?

CARL M. DARR
June 3, 2024

Page 107

A When you do projects, you often run into and discover conditions. You try hard to avoid that, but because, when you do, they typically cost more money and time.

Q And that's what change orders are for?

A Yes, that's what change orders are for.

Q Right.

MR. RADUNSKY: All right. I've got nothing else.

MR. MORRISSEY: I have some follow-up questions.

FURTHER EXAMINATION

BY MR. MORRISSEY:

Q You mentioned the 2018 Code when your attorney asked you questions.

Is that a city code you're referring to?

A I think Troy mentioned a 2018 Code.

I believe we looked at --

I have to check the code date for what codes are included.

MR. RADUNSKY: It's on Page 6 of your report.

THE WITNESS: We looked at the 2019 Building Code to compare it to the current code.

BY MR. MORRISSEY:

Q The building code you're referring to is the City of Chicago, correct?

Exhibit 4 Page 27

CARL M. DARR
June 3, 2024

Page 108

A   Correct.

Q   It's not the Federal ADA Code, which is --

A   Correct.

I'm sorry.  I didn't mean to interrupt.

Q   Troy asked you some questions about the violations that you noted in your report for the east corridor ramp.

Is it your opinion that based upon your accessibility report that it's permissible for Cook County not to renovate the east corridor ramp because, quote-unquote, the violations under the ADA Code are minor?

A   **Whether they're minor or major, it makes no difference in terms of whether it's compliant or not.**

**But the City Code has specific requirements under the Rehab Code for when an owner has to upgrade noncompliant accessibility provisions.**

Q   But the City Code doesn't trump the Federal ADA Code because it's a public entity and they have to comply with the law, federal law, the Supremacy Act?

I know you're not a lawyer.

MR. RADUNSKY:  Right out of law school.  Right out of law school.  That was your third year.

THE WITNESS:  Well, it depends what you mean by

CARL M. DARR
June 3, 2024

Page 109

trump.

MR. RADUNSKY:  Objection.  Let's not go there.

MR. MORRISSEY:  That's a bad word.

THE WITNESS:  But at the time it was built, no, it would -- it would not have been, but it -- you know, it was approved by the city, it's existing, it doesn't matter if it's existing from 2.10, or the Rehab Code says that if you modi -- rehab that space or spaces that serves, you have to include upgrade corrections to those noncompliant issues at that time.

BY MR. MORRISSEY:

Q   Right.

And my question is; the current existing conditions for the east corridor ramp, they're not in compliance as you say with the ADA --

A   Correct.

Q   -- Standards, they're in violation?

And, therefore, based upon your finding that there's multiple violations in regards to the east corridor ramp, it's your recommendation and opinion that Cook County is required to renovate it under the ADA Code?

MR. RADUNSKY:  Asked and answered.

You can answer again.

CARL M. DARR
June 3, 2024

Page 110

THE WITNESS:  There's violations pretty much in every building everywhere, including ADA violations.

Typically, agencies try to make improvements to stay in compliance with the code, but in terms of when they're required to do so, I think that's a different matter.

BY MR. MORRISSEY:

Q   You're not giving an opinion to Cook County that they don't have to proceed to renovate the east corridor ramp, is that fair to say?

A   I'm sorry?

Q   You're not providing an opinion to Cook County or in this case that they're not required under the ADA to renovate the code violations under the ADA?

MR. RADUNSKY:  (Indicating.)

THE WITNESS:  I haven't given an opinion --

Oh, I'm sorry.

MR. RADUNSKY:  No. that's okay.

Just asked and answered.  That's fine.  You can answer.

THE WITNESS:  I haven't given an opinion that they're required or not required to renovate.

BY MR. MORRISSEY:

Q   Troy asked you some questions about what he

CARL M. DARR
June 3, 2024

Page 111

classified as minor violations, and there's a slew of minor -- what you consider minor violations for the east corridor ramp.

Are you making an assessment as a member of the medical community or a physical therapist in regards to whether or not a variation in the steepness of the upper ramp would or would not provide a hindrance for a wheelchair person to proceed up that ramp?

A   **What is the medical community?**

Q   Well --

MR. RADUNSKY:  Not you.

BY MR. MORRISSEY:

Q   You're not a member of the medical --

You have no medical or physical therapy or any other training, professional training, correct?

A   Correct.

Q   And you can't opine that being off between two and four inches for the intermediate ramp would or would not cause difficulty for some mobility disabled individuals?

A   **Well, I can -- I can opine that being off two or four inches is -- presents less difficulty than being off two or four feet.**

Q   Yeah.  All right.  If you want to put it on that

Exhibit 4 Page 28

CARL M. DARR
June 3, 2024

Page 112

scale.

But you can't provide an opinion that being off two or four inches for the intermediate landing may cause some mobility disabled individuals to have greater difficulty going up or down the ramp?

A   **Well, I would -- I would say that being too steep or too shallow even minor amounts make it more difficult for any wheelchair user, but it doesn't necessarily mean that they can't make it up or down.**

MR. MORRISSEY:  Okay.  I have nothing further.

Thanks.  Thanks a lot for your time.

FURTHER EXAMINATION

BY MR. RADUNSKY:

Q   I just have one thing that I wanted to ask about and I forgot to do this before.

What is a certificate of occupancy?

A   **A certificate of occupancy is what an owner will receive from the building department after they have -- after the building department has conducted their final inspections and approved the building generally accepted as -- or basically agreeing that it complies with the code requirements and the project requirements.**

Q   Would the two ramps that we're talking about here today, the east ramp and the north ramp, would they

CARL M. DARR
June 3, 2024

Page 113

have had to undergone that level of scrutiny that you were just talking about before, they could be given a certificate of occupancy so that they can be used?

A   **All public buildings of this size would undergo an inspection for certificate of occupancy.**

Q   Who does that?  Who does the inspection, do you know?

A   **The city's building department.  They have -- And I don't know what they did in 2010 specifically, but they have several levels of enforcement and review.**

Q   When you say the city, is it -- I mean, this is Cook County so I mean, it would do still be the City of Chicago or would it be county or do you know?

A   **This would be normally the City of Chicago Building Department.**

Q   It would be.

MR. RADUNSKY:  Okay.  Thanks nothing else.

FURTHER EXAMINATION

BY MR. MORRISSEY:

Q   You have no personal knowledge whether the City of Chicago issued an occupancy permit for the RTU building?

A   **No, I have not seen a certificate of occupancy.**

Q   You don't know what type of review was done

CARL M. DARR
June 3, 2024

Page 114

after the RTU east corridor ramp was completed by the City of Chicago to determine whether or not it complied with the ADA?

A   **No.**

**I was not there at the time.**

MR. MORRISSEY:  I don't have anything further.

MR. RADUNSKY:  We're going to reserve.

Are you okay with reserving?

THE WITNESS:  Let's reserve.

MR. RADUNSKY:  Reserved.

(Whereupon, the deposition in the above-entitled cause concluded at 4:56 p.m.)

- - - - -

CARL M. DARR
June 3, 2024

Page 115

STATE OF ILLINOIS   )
                    )
COUNTY OF C O O K    )


The within and foregoing deposition of the aforementioned witness was taken before ROBBIN M. OCHENKOWSKI, C.S.R., at the date and time aforementioned.

There were present during the taking of the deposition the previously named counsel.

The said witness was first duly sworn and was then examined upon oral interrogatories; the questions and answers were taken down in shorthand by the undersigned, acting as stenographer; and the within and foregoing is a true, accurate and complete record of all of the questions asked of and answers made by the aforementioned witness, at the time and place hereinabove referred to.

The signature of the witness was not waived, and the deposition was submitted, pursuant to the Rules of the Supreme Court of Illinois.

The undersigned is not interested in the within case, nor of kin or counsel to any of the parties.

Exhibit 4 Page 29

**CARL M. DARR**
**June 3, 2024**

Page 116

Witness my official signature in and for Cook County, Illinois, on this 14th day of June, A.D., 2024.

_____
ROBBIN M. OCHENKOWSKI, C.S.R.
CSR License No. 084-002522

**CARL M. DARR**
**June 3, 2024**

Page 117

WITNESS CERTIFICATION

I hereby certify that I have read the foregoing transcript of my deposition consisting of Pages 1 through 117 inclusive.  Subject to the changes set forth on the preceding pages, the foregoing is a true and correct transcript of my deposition taken on June 3, 2024.

_____
                    CARL M. DARR

SUBSCRIBED AND SWORN to before me this _____day of _____, A.D., 2024.

_____
Notary Public

Exhibit 4 Page 30