Transcript of the Testimony of
**ERIC DAVIS**

**Date:** January 24, 2022

**Case:** WALKER VS. DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

Page 120

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
CORNELIUS WALKER,              )
                               )
          Plaintiff,           )
                               )
     -vs-                      ) No. 20-cv-00261
                               )
THOMAS DART, SHERIFF OF COOK   ) Judge Mary M. Rowland
COUNTY, and COOK COUNTY,       ) Magistrate Hon.
ILLINOIS,                      ) Jeffrey Cummings
                               )
          Defendants.          )
                               )
```

The remote continued deposition via videoconference of ERIC DAVIS, called by the Plaintiff for examination, pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Court pertaining to the taking of depositions for the purpose of discovery taken by KELLY ANN POTTS, REGISTERED PROFESSIONAL REPORTER, CERTIFIED SHORTHAND REPORTER, License No. 084-003558, within and for the County of Cook and State of Illinois, on the 24th day of January, 2022, at 2:03 p.m., Central Standard Time.

---

Page 121

APPEARANCES:

THE LAW OFFICES OF THOMAS G. MORRISSEY, by
MR. THOMAS G. MORRISSEY  (via Webex)
10150 South Western Avenue, Rear Suite
Chicago, Illinois  60643
(773) 233-7900
tgmorrisseylaw@gmail.com

          Appeared on behalf of the
          Plaintiff;

JOHNSON & BELL, by
MR. JACK E. BENTLEY  (via Webex)
33 West Monroe Street, Suite 2700
Chicago, Illinois  60603
(312) 372-0770
bentleyj@jbltd.com

          Appeared on behalf of the
          Defendants.

                *         *         *

---

Page 122

                INDEX OF EXAMINATION

                                              PAGE
     ERIC DAVIS

Exam (Cont'd) by Mr. Thomas Morrissey.......124


                INDEX TO EXHIBITS

EXHIBIT                                       PAGE

No. 200    Video............................286
No. 300    Unidentified Documents-779 Pages..125
No. 402    Photographs......................248
No. 407    Photographs......................251
No. 500    Photgraphs.......................248


                *         *         *

Exhibit 13 Page 1

ERIC DAVIS
January 24, 2022

Page 123

THE STENOGRAPHER: All parties are aware that the witness will be sworn in remotely. The parties agree not to challenge the validity of any oath administered by the Certified Stenographic Reporter, even if the Certified Stenographic Reporter is not physically present with the witness.

Here begins the remote continued deposition via videoconference of ERIC DAVIS in the matter of WALKER versus THOMAS J. DART.

Today's date is the 24th day of January, 2022, and the time is 2:03 p.m., Central Standard Time.

Beginning with the noticing party, will counsel please introduce themselves, state whom they represent, and stipulate to the swearing in of the witness remotely?

MR. THOMAS MORRISSEY: Thomas Morrissey. I'm the attorney for the Class.

I stipulate to the remote deposition.

MR. BENTLEY: Good afternoon.

My name is Jack Bentley, and I'm the attorney for the Defendants.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 124

And I also stipulate.

THE STENOGRAPHER: Eric, would you raise your right hand?

(Whereupon, witness remotely sworn.)

THE STENOGRAPHER: Thank you.

WHEREUPON:

ERIC DAVIS
called as a witness herein, having been first remotely duly sworn, was examined upon oral interrogatories and testified via videoconference as follows:

EXAMINATION (Continued)
By Mr. Thomas Morrissey:

Q    Mr. Davis, I'm going to turn your attention now to Davis Exhibit No. 300 on Page 288.

A    All right. While I look that up, Tom, could you tilt your camera down so I could see you more easily?

Q    Sure.

(Brief pause.)

BY MR. THOMAS MORRISSEY:

Q    Is that better?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 125

A    Yes.

And what was the exhibit number?

Q    It's Exhibit 300, Page 288.

A    Okay. Give me just a moment. The document is opening. It's still opening.

(Brief pause.)

BY THE WITNESS:

A    I don't understand why it's not opening. Come on.

I'm endeavoring to opening -- open it, and I have a PDF -- I can see it on my screen -- but for some reason, it's not opening this afternoon.

Let me try and open it some other way.

(Brief pause.)

BY THE WITNESS:

A    Oh, there it is. Okay. Now it's open.

(Whereupon, Exhibit No. 300 was provided to the witness electronically.)

BY THE WITNESS:

A    Sorry about that.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 126

BY MR. THOMAS MORRISSEY:

Q    Okay.

A    And I'm sorry. Which page are you talking about here?

Q    Exhibit 300, Page 288. It's a group exhibit, apparently 779 pages.

A    288, yes. Okay.

(Brief pause.)

BY THE WITNESS:

A    All right. I'm looking at 286, 287. 288 says at the top "Edited For Critical Issues Meeting."

Is that the one you're looking for?

BY MR. THOMAS MORRISSEY:

Q    That's correct.

What is a Critical Issue Meeting?

A    It's a meeting in this case that we have with the Sheriff every month where we bring items to their attention, outline the projects; and if there are items where we need feedback from them or information we need to communicate to them, we do it in that meeting.

Q    In general, do you normally attend

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 2

ERIC DAVIS
January 24, 2022

Page 127

with a couple other people from Capital Planning?

A    I would say generally, yes.  I would say we endeavor to always have -- I'm hesitant to actually say "always," but we like to always have at least one person from Capital Planning.  Usually it's me, but not always.

Q    And sometimes it's Sheila Atkins who now is retired, correct?

A    That's correct.  Sheila has been at some of these, most of these, actually, when she was there.

Q    And there's usually representatives from the Cook County Sheriff's Office?

A    Yes.

Q    And in the year 2018, who do you recall attending these monthly Critical Issues Meetings?

A    You mean from the Sheriff or in general?

Q    Yeah, from the Sheriff.

A    Okay.  Generally, at this time, Scot Achterhof was at these, sometimes Chief -- you know, Chief Johnson or someone else from leadership would be there, but sometimes not.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 128

Sometimes people that are directly involved with a specific facility would be there, various other leadership members.  I would say often, if not always, Sabrina would be there.

Yeah, from the Sheriff, that's -- you know, they would have a lot of different people, not always the same.  Scot was generally -- I would say almost always at every one of these.

Q    From the Department of Facilities Management, who normally would attend?

A    Again, varies; sometimes Mike Carberry, sometimes TJ Tyrrell.  Let's see.  At this point who else would have been there?  Oh, what was the gentleman's name?  He retired.  I'm sorry.  I'm not recalling his name right now, Eddie something.  He was there, sometimes trade -- trade people.  It varied, but there was -- almost always, I would tend to say always there was someone from the DFM there.

Q    And who in addition from Cook County would be present other than the members from Capital Planning?

A    As I said, Capital Planning, Facilities Management, sometimes there would be

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 129

people from the hospital there or the Cermak Health Services building there.

I'm trying to think who -- From Capital Planning specifically as -- in terms of our staff, you know, our project managers would sometimes be there.  You mentioned Sheila Atkins before.  I'm trying to think if there's anybody else.

Mike Boyce used to be at these.  Sometimes members of our consulting team, they're not County employees, but they would be there.

Q    So that would be representatives from STV?

A    STV/Heery, yes.

Q    The gentlemen -- The principal people from STV that would show up at these Critical Planning Meetings would be who?

A    Usually, Dave Theising and/or one or more of the -- the project managers, so Joey Tse or a guy name Dan O'Bara (phonetic) who isn't with them anymore at this point.  Let's see.  Who else would be there at this?  Yeah, a lot of different -- There are various project managers that might be there on a given project, yeah --

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 130

Q    And then --

A    -- if that's on the agenda.

Q    -- STV's subcontractor, AltusWorks, would Ellen Stoner be at these meetings?

A    Sometimes, yeah.

Q    And who else from AltusWorks would be present at the meetings?

A    They've had different people over the years.  I know Joyce Ramos used to go to these, but she works for the City now, different people that they had, if they had a particular issue or particular project going on.

Q    All right.  So if we look at Page 288 in this Critical Issues Meeting on August 16th, 2018 --

A    Okay.

Q    -- No. 1, it starts off at CCSO.

Is that the Cook County Sheriff?

A    Yes.

Q    And then it -- Scot, is that Scot Achterhof?

A    Scot Achterhof.  His first name is actually Andrew, but he went by Scot.

Q    All right.  It appears that there's

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 3

ERIC DAVIS
January 24, 2022

Page 131

several complaints by Scot in regards to noncompliant facilities that were built or altered at the Cook County Jail.

Is that fair to say?

A    That's correct. In this case, they're referring to a ramp involved with Divisions 3 and 17, which had been demolished, and a ramp had to get put in as a part of finishing up that project at the tunnel level.

Q    So when it was constructed, was it noncompliant with the ADA?

A    My recollection is, as is noted here, that it was poured wrong, and they needed to have it replaced.

Q    To your knowledge, was it replaced?

A    Yes.

Q    And then it goes on and it's saying, "That said, what happens is the ramp is open. They got sued. The next day, CCSO, no one else gets sued, unless they want the" -- I can't read it. The --

A    They want the letter to point to during litigation. I assume they're referring to you all.

ERIC DAVIS
January 24, 2022

Page 132

Q    Any other issues that were raised? Apparently there were noncompliant toilet -- toilet accommodations on that date?

A    I'd have to go back and look into it, if there was any issues about -- anything else in that scope.

Q    Would this -- I guess these were notes from -- from the meeting.

Do you know who would have prepared these notes?

A    Let's see. I'm just looking at the document. This would have been by -- I don't know if Dave did these. He didn't sign in at the sign-in, but he probably was at this. If he didn't do it, then someone else from STV probably took these notes.

Q    Would this --

A    I'm guessing. I don't see any attribution on this. It looks like something that someone from STV would have done.

Q    So throughout this -- these notes from the meeting, it appears that the representative from the Sheriff is pointing to the fact that a number of projects do not come in that are

ERIC DAVIS
January 24, 2022

Page 133

compliant with the ADA, and there was a -- Was there a feeling of frustration by the Sheriff that -- that these projects take place, and then they are not in compliance with the ADA and then they get stuck with a lawsuit?

Is that a general impression of that meeting that you recall?

A    I can't stipulate to how someone from the Sheriff felt about it or didn't feel about it other than as is noted here.

Q    Was that the first time, to your awareness, that the Sheriff representatives at these meetings voiced concerns about their facilities not being ADA-compliant?

A    I can't say one way or the other.

Q    Was the -- Going back to Mr. Merkel, back in March of 2011, there was an e-mail --

A    You're referring -- Excuse me.

You're referring to Joe Merkel, the plumber foreman, that we spoke of at the --

Q    That's correct.

A    Okay. Thank you.

Q    There was a communication from Sabrina Canchola --

ERIC DAVIS
January 24, 2022

Page 134

A    Okay.

Q    -- that she was requesting not only that Merkel look at the ramp connecting Cermak with the jail, but also a ramp for the RTU.

Do you recall that?

A    That sounds familiar.

Q    And do you know if Mr. Merkel -- What was the concern about the RTU ramp?

A    I can't speak to that unless I dug into it a little further. I've been focusing on the Cermak ramp. I'd have to go and do some research.

Q    Do you know if Mr. Merkel took measurements of the RTU?

A    I don't know if he did or he didn't.

Q    Can you describe the RTU ramp that Ms. Sabrina Canchola was referring to?

A    In general, it's a ramp similar to the one in question here in Cermak; in other words, it is a way of getting from the tunnel level up into the building.

The RTU is newer, constructed in the middle part of the previous decade, and so it looks a little bit different, but the function is

Exhibit 13 Page 4

ERIC DAVIS
January 24, 2022

Page 135

basically the same.

Q     So the RTU lower level is lower than the tunnels that connect all the different housing units at the jail?

A     I don't happen to remember offhand if it's -- if it's lower than them or higher than that.  I'd have to look at the drawings or look -- or, you know, walk it again.

Q     And the RTU building was built after the 2010 ADA standards were issued, correct?

A     That's correct, yes.

Q     And do you know if there's been any -- any effort to make the -- Let me rephrase it.

Do you know whether or not STV through one of their subcontractors has gone out to evaluate whether or not the RTU ramp is compliant under the ADA?

A     I'd have to look into it.  I don't happen to know offhand.  Like I said, I've been focused on the Cermak situation.

Q     Where would you look to determine if there has been a report by -- by STV or a subcontractor to determine --

A     Well, I would start by contacting the

ERIC DAVIS
January 24, 2022

Page 136

STV management team, probably starting with Dave, to go -- dig into that and see . . .  You know, they generally know who's involved in each of these issues and could find that out fairly readily.

Q     Now, I believe we discussed Ellen Stoner did a walkthrough.

Was it in March of 2018?

A     Yes, sir.

Q     And during that walkthrough, she went up what's now referred to as the Cermak ramp and then also inspected the Cermak facility, correct?

A     I believe she also looked at the building.  I think they looked at it all.  I don't know if they did it the same day, you know, but I believe they looked at the rest of the facility as well, yeah.

Q     If we look in Group Exhibit 300 --

A     Okay.

Q     -- I believe there was a discussion in regards to the lower level of Cermak.

A     Okay.

Q     Let me tell you the page.  It will take me a moment.

A     All I see is a discussion of "AOR Task

ERIC DAVIS
January 24, 2022

Page 137

Order" on what looks like Page 294.

I don't know which page you're referring to, Tom.

Q     I'm looking.  Let me scroll down here.

(Brief pause.)

BY THE WITNESS:

A     It's a 700-page document, so . . .

BY MR. THOMAS MORRISSEY:

Q     I'm going to try to get through it.

(Brief pause.)

BY MR. THOMAS MORRISSEY:

Q     Well --

A     There's a note that I see on Page 333 from -- but then that's from May.  That's more recent.  That's not what you're referring to.

BY MR. THOMAS MORRISSEY:

Q     No.  I'm referring to notes from -- from March of 2018.

A     Right.

Q     Let me -- Let me find the -- I think we have it somewhere else.

A     Okay, yeah.  It might be in here somewhere.

(Brief pause.)

ERIC DAVIS
January 24, 2022

Page 138

BY THE WITNESS:

A     Yeah.  That's in the --

BY MR. THOMAS MORRISSEY:

Q     Is it 303?  Is it Exhibit 303?

A     Well, I see it on starting on 233.

Q     I'm sorry.  Let me -- 233?

A     Yeah.

Q     I'm looking at, I think -- Let me look.

(Brief pause.)

BY MR. THOMAS MORRISSEY:

Q     Yeah.

I think if we -- we start at Page 13 of Group Exhibit 300, and it looks like --

A     13.  Hold on a second here.

Q     -- Ellen Stoner's notes from her walkthrough of both the ramp and the Cermak building.

A     Yeah.  It looks like a duplicate.  It looks like, yeah, 13 is a duplication of what's down at 233 or whatever, so yeah.

Q     All right.  So she's at the basement level.  And --

A     Okay.

Exhibit 13 Page 5

ERIC DAVIS
January 24, 2022

Page 139

Q -- if we look at Page 14 under "B220," does that refer to an area or location at Cermak?

A It says "Detainee Waiting Room." I don't have the plans. I don't know which space they're referring to.

Q Now, in a waiting room, would there have to be an accessible bench and clear floor space for a wheelchair adjacent to the accessible bench?

A I'd have to look at the floor plan to be able to give you an answer to that.

Q But apparently part of her notes or recommendation is to provide an accessible bench and clear floor space for wheelchairs adjacent to the accessible bench?

A Right. She's identifying an issue that an Architect of Record would need to verify, yes.

Q Okay. And it also -- No. 1 under the "Recommendations," "Modify bench to accommodate relocate" -- "relocated wall and out swinging door."

Do you know if either one of those recommendations for the area B220 has been

---

ERIC DAVIS
January 24, 2022

Page 140

done?

A I don't have a plan of the building, and I don't know the room offhand based on the designation. I'd have to look into it.

Q Have you participated in any Capital Planning projects to renovate the lower level of the Cermak building?

A In terms of, when you say "participated in," I mean, we've --

Q Well, have --

A As you know, we've been developing things for some time to try to --

Q Let me -- Let me --

A -- get some renovations, so . . .

Q Let me -- Have you been involved in any projects, either hiring an Architect of Record or hiring a contractor to renovate the lower -- renovate or alter the basement area of Cermak since March of 2018?

A As you know from prior testimony, we have tried multiple different ways to retain an Architect of Record to provide the kind of professional design services that are needed to in order to have construction modification, so yes.

---

ERIC DAVIS
January 24, 2022

Page 141

We've been -- we've tried -- I've been involved in trying multiple different ways to get that done, yes.

Q So that includes areas in the basement of Cermak that were pointed out in these notes by Ellen Stoner in March of 2018?

A It would be my expectation that we would include all of this in the scope of an architect to be hired, that this would be part of what we would provide to them to render their professional opinion.

Q Okay. There are some issues she's pointing out to -- in regards to the physical therapy room, and she has Recommendations 1 through 7 --

A Uh-huh.

Q -- in regards to making the physical therapy room accessible.

Is that true, that you're not aware of any alterations since March of 2018 in regards to the physical therapy room?

A I'm not aware one way or the other if there have or there haven't been. There may have been modifications made by others. I don't know.

---

ERIC DAVIS
January 24, 2022

Page 142

Q If we go to the next page, "Holding Cell Toilet Room and adjacent spaces as needed," and it's on Page 15 of the group exhibit, "Detainee Toilets B0114 [sic] and B0115 [sic]."

A Yeah.

Q And is she pointing out, Ellen Stoner, that there are no accessible toilet areas in the lower-level basement area of Cermak?

A I don't think that's what she's saying. I think what she's saying is that in this particular room, the combo unit is inaccessible, and it says, "Only when toilet room is required by code to be accessible, the Sheriff has requested that both . . . be made compliant."

I don't know because this was on the lower level. There may be other accessible toilets someplace else on the floor. I don't know. I can't say definitively one way or the other.

Q Do you know if Rooms B0114 [sic] and B015 have accessible toilet-sink combinations?

A It appears from these notes that the combo unit is not accessible. That's inferring from the context of this -- this note here.

Q And so back in March of 2018,

Exhibit 13 Page 6

ERIC DAVIS
January 24, 2022

Page 143

Ellen Stoner made certain recommendations in regards to the holding cell toilets in the basement of Cermak to make --

A    That's -- That's --

Q    -- it accessible for the detainee?

A    Right.  That's what this is -- seems to be indicating, yes.

Q    And she also made an inspection of the women's detainee toilets in the basement of Cermak, and she found that the wheelchair -- I'm sorry -- that the "toilet and sink do not meet maneuvering clearance.  Sink is in toilet maneuvering area."

So, again, she's finding that there's an ADA violation in regards to the toilet for women in the -- in B105, correct?

A    Yeah.  She's identifying it as an area to be investigated further by an Architect of Record, yeah.

Q    And to make it clear, the RTU is -- or, I'm sorry -- Cermak was built after the passage of the ADA and, therefore, it would have -- the standards when it was built would have required accessible toilets in the basement of Cermak?

A    Generally, I would assume so.  I would

ERIC DAVIS
January 24, 2022

Page 144

need to do a case-by-case investigation, but that seems to be her recommendation in this case.

Q    Now, after March of 2018, were there any steps taken to make the living units in Cermak on 2N and the third floor involving 3N, 3 South, et cetera, accessible for detainees with disabilities?

A    Again, as I've stipulated in other testimony, the Department of Capital Planning has endeavored multiple times to secure professional services to review and make affirmative decisions one way or the other on any requirements that would be needed in the building.

The scope of what we've been trying to procure was not limited to the ramp but to the building itself in general, so the areas you're talking about would most likely have been included in the scope for such work, and we tried --

Q    So --

A    We've tried multiple times, as you know.

Q    So one of the claims by Mr. Walker in this case involves the showers either on the

ERIC DAVIS
January 24, 2022

Page 145

second- or third-floor housing units.

A    Okay.

Q    He complained about not having an accessible bench in the shower.

A    Okay.

Q    Based upon your knowledge, at the time Cermak was built, what type of bench was required in a shower area?

A    I'd have to go back and research it. I know that sometimes the specifics change with the different editions of the ADA, and obviously it's modified by the Illinois Accessibility Code and other applicable laws.

So I can't give you a definitive answer.  I can tell you that, in general, you would say, yes, there should be an accessible shower seat.  I couldn't say, you know, in every cell or in every room.  I don't know those specific requirements offhand.  I'd have to research it.

Q    All right.  Well, let's go to -- Ellen Stoner went through each of the living units --

A    Okay..

Q    -- apparently on the second and third

ERIC DAVIS
January 24, 2022

Page 146

floors of Cermak.

And let's go to 3N, which is one of the living units that Mr. Walker occupied during this lawsuit, was housed in.

A    And 3N, is that what starts on what appears to be Page 25?

Q    It does.  And I'd like to turn to the portion of Ms. Stoner's report in regards to the ganged showers.  I think it's on Page 26, and it's under "3NC Ganged Shower Room 3241."

A    Got it.

Q    Now, it seems to reference that certain work was done in the ganged shower  areas?

A    Okay.

Q    Well, it says, "A new lower shower head was installed at the northwest corner of the shower room along with grab bars."

A    Okay.

Q    Do you recall that project?

A    No, sir.

Q    Do you see under her observation, "There is no shower bench or fixed seat."

Now --

A    I see that, yeah.

Exhibit 13 Page 7

ERIC DAVIS
January 24, 2022

Page 147

Q    Now, if there were certain steps taken during an alteration, for instance, of a shower area --

A    Yes.

Q    -- it looks like a major portion of the shower area in March of 2018 was altered to comply with the -- either the 1991 standards or the 2010 standards.

Do you see that?  There's a shower head that was put in.

A    I see she refers to that, yes.

Q    And there's controls that are mounted at a certain height.

And I assume those heights are to make -- make the controls accessible?

A    Yes.  That's what she's referring to, yeah.

Q    And there's also a reference to horizontal grab bars.

A    Yes.

Q    I assume that's for accessibility purposes under --

A    That's --

Q    -- apparently --

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 148

A    Yeah.

Q    -- the 2010 code, correct?

A    It might have been also required in '91.  I don't know.  I'd have to look at the drawings and research the Code --

Q    All right.

A    -- and then check the circumstance myself.

Q    There's a 21-inch vertical grab bar that's mounted to . . .

I assume that was also for -- to make the shower accessible, correct, for a disabled person?

A    There are -- There have been standards that have required vertical bars as well.

Q    All right.  The final note is, "There's no shower bench or fixed seat."

A    Okay.

Q    Do you see that?

A    Yes.

Q    Now, if they took steps -- It looks like they took maybe five separate steps -- by "they," I mean the County -- to make the ganged shower room in 3241 accessible.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 149

Do you --

A    Okay.

Q    Do you acknowledge that?

A    It appears that there have been some alterations to the shower since it was originally constructed.  I couldn't stipulate as to when.

Q    So if the shower was altered after 2010, but they failed -- and let's assume for -- for instance, that there was a requirement under the ADA for a shower bench or fixed seat --

A    Yes.

Q    -- for a disabled person, if they -- were it to that extent --

A    Yeah.

Q    -- was the County or the Sheriff required to also put in a fixed bench or a shower bench under the ADA, either the 1991 standards or the 2010 standards?

A    Again, I'd have to research that.  I would note that there are some circumstances where you're allowed to bring a bench into a shower.  I would also note that this is a correctional environment, and it might be logical that they would want to bring a bench in for a detainee

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 150

rather than affixing it to the wall because someone who wasn't disabled might wrench it off, use it as a weapon or something like that, and the Sheriff may determine that that was not an acceptable security risk.

Again, I'm speculating here, but I could see a scenario where --

Q    Well --

A    -- there was a portable bench rather a fixed one.

Q    -- under the two thousand --

A    I'd have to look into it some more, yeah.

Q    All right.  Under the 2010 Code, there are specific standards for a correctional institution, correct?

A    The correctional institution standards generally apply to the number of accessible cells in a -- in a jail or prison.  That's where -- Most of the elements that are at variance for correctional environments center around how many accessible units you're supposed to have.  And I would assume that it would go to how many accessible showers, but, again, I'd have to

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 8

ERIC DAVIS
January 24, 2022

Page 151

research it specifically.

Q     But would you agree that you're aware that under the 2010 standards, there is a Section K for Detention Facilities?

A     I'm sorry.  Section what?

Q     Section K of the 2010 standards have a -- have a portion that specifically deal with just detention facilities.

A     I don't know if it's -- offhand if it's Section K, but I know there are multiple different sections for correctional facilities, detention facilities, those sorts of environments.

Q     Do you know if, under 28 CFR 35.151, New Construction and Alterations, whether there is any exception under portion K in regards to shower benches or a fixed seat when there is a substantial alteration of a shower area?

A     I'd have to look into it.  I don't happen to know it offhand.

Q     Where would you -- Where would you look at the 2010 standards to determine that?

A     Well, it's -- as you know, the ADA is complicated and interdependent document.  I'd look a variety of different places.  I'd do a word

ERIC DAVIS
January 24, 2022

Page 152

search for "correction," for example.  I'd do a word search for "shower" and things like that and try to identify all the different areas that would be applicable to showers.

But there are also sort of general also provisions that -- that appear to -- to impact what you're allowed to do and not to do, but I would -- and I would research it.

Q     You're aware that Mr. Walker -- one of the allegations by Mr. Walker is that he fell in the shower and there wasn't a fixed bench -- fixed seat or a bench?

A     If you say so.  I don't know offhand. I may have the Complaint someplace.  I don't happen to remember offhand if that was part of this complaint.

Q     If we keep scrolling down in Ms. Stoner's report, I believe there's -- there's some notes about the Cermak ramp report,  correct?

A     I believe so, yeah.  I know they're in here somewhere.

Can you point me to a particular page?

Q     I'm trying to find it.  Let me look at

ERIC DAVIS
January 24, 2022

Page 153

my printed notes.

(Brief pause.)

BY THE WITNESS:

A     I think what you're referring to might be on Page 38.  Is that right?  No.  It's not 38.

BY MR. THOMAS MORRISSEY:

Q     There was a Note E --

A     It's --

MR. BENTLEY:  Eric, just let Tom look for it.  It will go faster.

THE WITNESS:  Okay.

MR. BENTLEY:  He knows where things are.  He just needs a minute to look.

THE WITNESS:  Okay.

BY MR. THOMAS MORRISSEY:

Q     Well, if you can find it --

A     That would be helpful.

Q     -- Mr. Davis, it will move this along, but I'm certain it's in here.

(Brief pause.)

THE WITNESS:  Am I doing okay this time, Kelly?  I'm trying not to talk over Tom.

THE STENOGRAPHER:  You're doing better.

ERIC DAVIS
January 24, 2022

Page 154

THE WITNESS:  Thank you.

BY MR. THOMAS MORRISSEY:

Q     The thing is freezing up.

Well, you recall that -- that Ms. Stoner did a report after her inspection in March of 2018, correct?

A     I have seen that report, yes.

Q     And from your recollection, her report included her notes that we've looked at before in regards to the Cermak ramp?

A     That's correct, yes.

Q     Now, after -- after she did the inspection and included in her notes discussion about the detainee holding areas in the basement, the toilets in the basement of Cermak, and the showers in the residential portion of Cermak requiring either a fixed bench -- a bench or a fixed seat --

A     Okay.

Q     -- was there any action taken, to your knowledge, by Cook County or the Sheriff to make those alterations?

A     I don't know if there have or haven't been.  I'm just relying on her note when she uses

Exhibit 13 Page 9

ERIC DAVIS
January 24, 2022

Page 155

the word "new."

Q    Well, you mentioned, I think, before in your deposition in Spence and recently in Mendoza that there was a project that you undertook to get the -- get certain projects expedited at Cook County Jail through a task system?

A    Task order, yeah.  There was an effort to -- to secure the professional services through what's called a task order contract, yes.

Q    And when -- You participated in that process?

A    Yes, I did.

Q    What stakeholders were on-board in regards to doing a task order to take care of certain ADA projects at the Cook County Jail?

A    Well, in any project like that, we obviously would have had people involved from the Sheriff's Office as well as, in the case of Cermak, we would have had someone from Cermak Health Services.  We would have had someone from Department of Facilities Management, or DFM.

Q    So from the Sheriff's Office, would that have been Scot Achterhof?

A    I believe he was still with the

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 156

Sheriff at the time, yes.

Q    And from Cermak, from the Health Services portion of the jail, would that be Connie Mennella?

A    Either Dr. Mennella or . . . I'm forgetting the woman's name -- she was terrific.  She left for Los- -- went to Los Angeles -- who was also involved.

Q    Feldman, Dr. Feldman?

A    No, no.  I'd have to look up her name.  We generally work with one -- Connie or this other lady whose name is escaping me at the moment.

Q    Not Linda Follenweider?

A    That's it.  Linda Follenweider, yes.

Q    And from DFS [sic] who would have participated?

A    DFM, for that effort -- Well, as far as procuring the services, probably only the director, Bilgis Jacobs-El.  We would have notified here.  We wouldn't have needed to really involve staff directly because of the -- where the project was at that time.

So we might have run it by her or by run it by someone else, you know, Carberry or

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 157

someone else at the -- that works at the jail.  But they would have been, you know, at a higher level at that point because in terms of hiring architectural services, that's really just us and the users.

Q    Did this effort have a title or a name other than a task order?

A    I couldn't give you the exact title off the top of my head.  I could look into it and find it for you, I suppose.  But, again, it was a draft.  It never got made official because they didn't approve it, but yeah.  You could find it with a task order.  That's how we referred to --

Q    Included in the task order was an effort to hire Architects of Record --

A    Yes.

Q    -- to do the design drawings.

Is that fair --

A    That's correct.

Q    -- to say?

A    That's correct.

Q    And there were specific items that were earmarked for having -- if the project went through, for having Architects of Record work on,

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 158

correct?

A    Yes.

Q    And one of the projects --

A    I would -- I want to finish.

Yes.  But one of the features of a task order is a certain flexibility.  So if there were other things needed, we would have issued them a task order.

Q    One of the projects involved the Cermak ramp that was identified by Ellen Stoner?

A    I believe that's correct, yes.

Q    And another task item would have included items in the Cermak building identified by Ellen Stoner in March of 2018?

A    I would assume we would have gotten to most or all of them one way or the other through that -- Depending on the size of it, the task order is generally for smaller assignments.  You wouldn't assign somebody to renovate an entire building under what's supposed to be a small contract.

So my expectation is, we would have identified or prioritized or broken it out into a series of task orders.  You could eventually get there, but we would want to do a larger, you

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 10

ERIC DAVIS
January 24, 2022

Page 159

know, renovation for the whole building.

Q    Do you know if the fixed benches or chairs -- I'm sorry -- benches and/or fixed bench for the showers in the residential housing areas of Cermak were included in the task order?

A    I don't recall if they were or they weren't.  I'd have to -- I'd have to look into it.

Q    At some point in time after Ellen Stoner went through Cermak --

A    Yes.

Q    -- did Cook County actually install, to your knowledge, a fixed bench or -- fixed chair or bench in the residential housing areas in Cermak?

A    I don't remember offhand if they did or didn't.  It wouldn't have been necessarily -- It might have been from DFM.  I don't know offhand.

Q    To your knowledge, did DFM do renovations in the showers on the second and third floor of Cermak to make them accessible for people with a disability?

A    I'd have to research, Tom.  I don't -- I don't remember offhand if they would have or not and not -- they might have done something and not

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 160

even let us know about it.  I don't know.

Q    Can you take me through the steps that were followed in -- prior to presenting this task order system to hire Architects of Record?  What did Capital Planning do or the other stakeholders do?

A    You mean in terms of the --

Q    Submittal of a project to Cook County.

A    Well, as you know, there are -- as you know from prior testimony, there are -- well, there's the task order effort which we were bringing forward as a -- as a specific item.

In general, renovations to County facilities are done through our Capital Improvement Plan.  And as I've mentioned before, we have a process where users identify elements that they want to have us develop as a project.  We work with them to identify what those are, scope them out.

They're assembled and presented to the Board of Commissioners, reviewed, and then the Capital Improvement Plan is -- is approved.  Once the Capital Improvement Plan, or what we call the CIP, is approved, then we proceed toward the implementation of those projects.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 161

And once they're in our accounting system, then they get developed individually, depending upon the delivery method for a given project.

If we develop a project, and let's just take the renovations at Cermak.  Let's say -- Let's say we did a traditional project and hired somebody to renovate the entire building, and we've gone ahead and issued an RFP -- initially an RFP and then later an RFQ, hired somebody, come to terms.  That contract would go to the Board of Commissioners.  If they approved the contract, then it would be executed, and the architect would proceed.

Q    Okay.

A    There's a budgeting part of it, and then there's an implementation part of it.

Q    All right.  Let's go through the traditional manner for capital projects.

A    Okay.

Q    One is, there's a -- You say the elements of the project are put together by the department requesting it, correct?

A    Yes.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 162

Q    So in this case, at the Cook County Jail, the entity that would request a project would be the Sheriff, correct, or perhaps Connie Mennella in Cermak Health Services, correct?

A    We could initiate projects at the jail from a variety of different directions.  We have had elements at the jail, for example, that have been generated by DFM where they've observed something in the building systems or the roof or whatever that the users might not normally go to.

So we've had projects generate and actually we've done a lot of roof work, and that didn't come from the users.  That came from DFM.

Sometimes there would be things from us, that -- in Capital Planning that we would, you know, know in the case of, you know, assessments and things like that we need to do, and we would initiate a project.

So it could come from the Sheriff, it could come from Cermak, it could come from DFM, it could come from us.  It could come from the State's Attorney.  It could come from a variety of places.  So . . .

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 11

ERIC DAVIS
January 24, 2022

Page 163

Q    But in general at the jail, the primary method for a project to be identified is through the Sheriff through a -- what's called a Business Case?

A    That's correct.

Q    The Business Case, then, is forwarded to a team member employee of Capital Improvement. Would that be fair to say?

A    Capital Planning, yeah.

Q    Capital Planning?

A    Right.

Q    And then the -- Generally, in the past, it was Sheila Atkins that would work with the Sheriff's Office to scope out the project. Is that fair to say?

A    At two different times, we do it two different ways. And the budgeting part, if we had a Business Case that came in and it was a request, Capital Planning, I or -- you know, or sometimes with Sheila, but our Capital Planning team would evaluate all the business cases, assemble them.

If there were questions about what it was that they were seeking, we would engage with the user, and usually the project director

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 164

would be involved in that, to get a better idea of what exactly are you asking for so that we could make evaluations to say, you know, "Yes, this makes sense," or "No, we can't do this right now," or "This is duplicated with another project," those kinds of things, assembled into a draft, which is then reviewed by Budget, which then goes to the President's Office, which then goes to the Board of Commissioners for their -- their eventual approval.

But it would generally start with our -- our CIP team, which we would involve the project director like Sheila, but, really, at the budgeting stage, only if we had a question about what the item was.

When that project would go to implementation, then we would involve the project director more directly.

Q    Okay. So before the CIP being issued, Capital Improvement would forward the project to the Budget Office?

A    Correct. Capital Planning develops and the Bureau puts together the draft CIP, and it is presented to the Budget Office for their evaluation.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 165

Q    And the Board of Commissioners -- The County Board reviews a plan once a year. Is that fair to say?

A    That's correct.

Q    And what month is that usually in?

A    Usually, the -- what's called the "President's Recommendation" is presented to the Commissioners at the October Board meeting or before the October Board meeting so the Commissioners all could see it ahead of time.

It's presented in October, and questions are asked. They have to -- The Commissioners generally held hearings, at the conclusion of which they vote on it. And once the Commissioners have voted on it, then that becomes the adopted budget of the County. It starts as a recommendation from the Board president.

Q    At some point in time in a fiscal year, the Board passes what's called a Capital Improvement. Is that fair to say?

A    Capital Improvement Plan, that's correct.

I would note that the

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 166

Capital Improvement Plan includes our work, but it also includes, for example, from our Highways Department, which also does capital improvements. It's outside what Capital Planning and Policy does. They're also part of the CIP.

Q    So it's not uncommon for a project that's in the Capital Improvement Plan not to be implemented for three to five years up, correct?

A    It -- The answer is, it depends. Some of them we're able to jump -- jump on right away. Some of them are what are called carryovers. And they're in the Capital Improvement Plan, but they're already underway.

The answer is, it depends. Sometimes it takes a long time, depending upon the scope, depending upon the regulatory requirements, depending -- sometimes Project A is dependent upon Project B having been finished first.

So the answer is, it depends.

Q    So by "a long time," how frequently is there a project that carries over for more than five years?

A    How frequently? Not often, but it does happen. You know, there have been some very

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 12

ERIC DAVIS
January 24, 2022

Page 167

large and complicated projects that turned out to involve a lot more than was originally expected, and so that may take longer.

There may be issues with funding, but not usually. There's not usually issues with funding, but yeah. Sometimes there are interdependencies that cause a project to have to wait -- we have to wait, again, like I said, for Project A before -- you know, we have to wait until Project B is completed. Sometimes we have that.

Q So the Capital Improvement Plan is usually approved in the November or December County Board meeting. Is that --

A Correct. So, generally, the second half of the month of November.

Q And then in order for the next step, after something is on the Capital Improvement Plan --

A Mm-hmm.

Q -- let's say it was on the Capital -- a project that was on the Capital Improvement Plan for the year twenty-twenty -- We're in the year 2022 now, correct?

A We're in fiscal year 2022. But

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 168

believe it or not, we've already started the process of formulating the fiscal year 2023 Capital Improvement Plan.

Q Before a project that's identified on the 2022 CIP plan --

A Yes.

Q -- could move forward, there has to be implementation, correct? There has --

A Yes. Generally, we develop an implementation plan, yes.

Q What is an implementation plan?

A As you can imagine, if you look at the most recently published edition of the budget, we have over 500 capital projects, and staff is not infinite.

And so we look at implementation generally by quarter such that we project the ability to at least initiate each of the projects in the course of a fiscal year, and then the question is where it -- where it lands within the fiscal year. Obviously, if we have projects that are already underway, we continue with those and those go first.

Q Okay. In the Capital Planning budget

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 169

for 2021, how many projects were in the 2021 budget, approximately? I don't know need to know --

A I'd have to -- It was over 300 projects. We had an accounting change, so the project total is up for '22. But it's well over 300 projects in our portion of the CIP.

Q Of the 300 projects that were in the 2021 CIP --

A Yes?

Q -- how many were started in the year 2021?

A Well, to be clear, 2021 starts in -- at the end of '20, so I'd have -- I'd have to go and research how many actually end up getting initiated.

By "initiated," it's what we call "evaluation," to identify what the parameters are of a project, are there any impediments to moving forward with it, how is it being delivered, all those kind of things.

But, generally, our goal is to try to be -- is to try to have all the projects at least underway at some level, even if it's just

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 170

scope development in the course of the fiscal year.

Q Okay. So, again, if a project was on the 2021 Capital -- CIP, what does an evaluation consist of?

A It depends. Again, we have a wide variety of projects. In some cases, it is, as I said, reviewing the statement of what the project is, "Okay. We're going to actually do this one now. It's been approved. Are there elements we need to know, other information we need to gather?"

Sometimes that may impact how the project starts. You know, as I said, we research those different parameters that may impact a given project and then apply that to the workload that we have for both our staff and our consultants to see where it lands in terms of the order of implementing projects.

Q How many staff persons does Capital Planning have to evaluate something on the CIP? To evaluate -- Do you need an architect to evaluate the project?

A So in terms of evaluation, evaluation, we -- A lot of the evaluation work is done by our consultant teams, including, in the case of the

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 13

ERIC DAVIS
January 24, 2022

Page 171

public safety portfolio, the STV/Heery team and their project managers.

The various projects will be -- We'll look for a report generally on each of them to say, you know, this comes out and says, "Well, okay. We can start this project. We have this other one, we're going to have to wait for the blah, blah, to be delivered" or whatever and get an idea of how -- how those projects can flow.

They're assigned to project managers. And then depending upon, you know, the level of complexity, who all's involved. Generally, it used to be most of the projects for public safety were -- they would roll up to Sheila Atkins. She was the project director for the majority of projects involving safety, certainly the vast majority of the projects at the jail.

So, effectively, the project team is what -- is what you might call "staff augmentation." And so we would work with the project team, with the project director, with the user to evaluate, project-by-project, and find out where they are, what needs to be done, which

ERIC DAVIS
January 24, 2022

Page 172

projects need designers, all those kinds of things.

Q    So for the Cermak ramp, assuming the Cermak ramp became part of the 2023 Capital Improvement, would there be a need for the design services of an architect?

A    I can tell you, actually, the Cermak ramp is part of an RFQ that is currently being evaluated by the Office of the Chief Procurement Officer. It is for wraparound ADA services at -- at the Department of Corrections.

And so when they have put -- We're expecting that one to be on the street in 2022, and so it would show up in 2023 only as a continuation because, hopefully, we would have the architect engaged, and they would be in the process of performing their work.

We're expecting to be having an architect under contract to be addressing accessibility areas, including the Cermak ramp, in the course of fiscal year 2022.

Q    Generally, those kind of services would have to be part of the CIP, correct?

A    Yes.

Q    And do you have -- And what do you

ERIC DAVIS
January 24, 2022

Page 173

call this wraparound project?

A    I'd have to look into the CIP itself and see which -- which project it fell under. And, mind you, we're in a point of transition because of some requirements with the Comptroller's Office.

Elements like the Cermak ramp would generally be under a collective larger project that might involve multiple structures. The Comptroller recently -- actually last year -- told us that they need to break those up, and so they were assigning capital expenditures to a given asset, to a given building.

So in other words, where we used to operate by saying, "Okay. We want to hire ADA services for the jail," they say, "No, no, no. You have to have somebody assigned to Building A, somebody assigned to Building B, and break up their services that way. So I'd have to look up and see whether or not --

THE STENOGRAPHER: Hold on one second. Hold on. Hold on. I think he's gone.

THE WITNESS: Did we lose Tom? It looks like we lost Tom. I'm probably boring him with the arcana of the Capital Improvement Plan.

ERIC DAVIS
January 24, 2022

Page 174

(Whereupon, there was a brief interruption.)

THE STENOGRAPHER: Oh, there he is.

THE WITNESS: There he is.

MR. THOMAS MORRISSEY: So I missed the last --

THE WITNESS: Sorry about that. It looks like you had a connectivity issue.

MR. THOMAS MORRISSEY: All right. Ms. Court Reporter, can you read back the last question?

(Whereupon, the record was read as requested.)

MR. THOMAS MORRISSEY: Was there was a response?

THE STENOGRAPHER: Yes, a really long response.

(Whereupon, the record was read as requested.)

BY MR. THOMAS MORRISSEY:

Q    Well, let's go back.

Is this wraparound program -- Define what the wraparound program consists of.

A    Okay. So in order to -- In order to

Exhibit 13 Page 14

Page 175

make sure that we're catching or attempting to catch everything, we are procuring services for a comprehensive assessment of the entire jail campus.

Now, the jail campus is some 60 buildings. So as you can imagine, that's quite a significant endeavor. We have divided that up into -- are looking to divide that into multiple categories or multiple buildings, but they will roll up under the same procurement.

So we're looking to do a comprehensive assessment rather than area-by-area, building-by-building to get a wraparound assessment of the entire jail campus that not only includes assessment but also includes design services.

So the contract would also include the specific design for construction for any remediations that were identified as required.

Q Well, didn't STV, through Ellen Stoner and AltusWorks, back in March 2018 do an assessment of the Cermak ramp to determine if it was accessible or not and also the Cermak building?

A They did an assessment, but you have to understand that the assessment that we have a consultant in that case do is -- the purpose of

Page 176

that is to find out the questions that we need to ask an architect before we hire them to ask them, to get an idea of the extent of things that they need to look into.

There may be elements that were not identified that they feel needs to be in there, or the person that's going to be the Architect of Record may -- they may disagree or they may have a reason with the Code to say, "Well, they said A, but, in fact, it's actually B that's required."

They need to assess as well, and that's why we would -- That's why the title of that project would include "assessment." It's a relatively brief process, but that's why we're including design services with it.

Ellen's rendering a professional opinion and -- a detailed professional opinion. Those are really recommendations so that we know what services to ask for.

Q What is the monetary requirement to hire an architectural firm to do an assessment and design services for the Cook County Jail? How much will it cost?

A Oh, gosh. It's quite substantial.

Page 177

Q "Quite substantial" --

A Hundreds of thousands of dollars.

Q Under the CIP, the CIP that was issued in November or December of 2021 doesn't include funding for this wraparound program?

A Yes, it does.

Q It authorized the expenditure of County money?

A Yes.

Q How much money was authorized?

A I'm looking that up for you.

(Brief pause.)

BY THE WITNESS:

A Let's see. How do I do this? Just a moment here. I would note that the information I'm looking at is all publicly available.

Yeah. We have in one project, it's -- Let's see. That's different. Let me filter by location. Hold on just a moment. Let's see.

All in all for -- Let me just filter for -- And again, I'll just say these are all available at -- publicly available. Give me just a moment.

Page 178

(Brief pause.)

BY THE WITNESS:

A So let's see here. Let's see.

We have a hundred and fifty and we have 100,000 on another one, and we have 150,000 on another one and . . . Let's see.

So we have in excess of $300,000 identified for design services at -- in projects at the Cook County Jail in fiscal -- Yeah, and actually -- Yeah. In excess of $300,000 design services just for fiscal year 2021 which, as I say, would be assessment and design.

BY MR. THOMAS MORRISSEY:

Q So --

A I would expect -- I would expect that the design services for something that large would roll into FY23, so there may be well over that projected for -- I'd have to look at what we projected the out years.

Q So let's go back there.

The CIP, you're talking about the year 2021. That's over, correct, the CIP for --

A Fiscal year -- fiscal year '21 ended on November 30th, 2021.

Exhibit 13 Page 15

ERIC DAVIS
January 24, 2022

Page 179

Q      And in the 2021 fiscal CIP, there was hundreds of thousands of dollars allocated --

A      I was -- I was looking in '22.  Sorry.  You were asking about '22, so I was looking in '22.

Q      All right.  For 2022, there's a line item in this overall CIP program.

A      Actually, there are -- there are at least three projects that, in combination, would yield over $300,000 in funds for assessment and design services at the DOC campus.

Q      What are the three projects?

A      Oh, gosh.  I just closed that.

I know that one of them is actually specific to Cermak.  It might have been the holding cells.

(Brief pause.)

BY THE WITNESS:

A      I apologize.  It's taking a moment to open.

(Brief pause.)

BY THE WITNESS:

A      This is taking a long time to open.  There we go.  Let's just do this.  Bear with me here.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 180

(Brief pause.)

BY THE WITNESS:

A      All right.  Okay.  There was a project -- Oh, that's the Daley Center.  Excuse me.

Let's look here.  I better filter this some more.  I apologize.  When it has 500 projects, it takes a while to drill down to the specifics.

(Brief pause.)

BY THE WITNESS:

A      All right.  Gee whiz . . .  RTU, okay.

So one of the projects is for -- specific to the housing units at Cermak, and that's 100,000 -- $150,000.

BY MR. THOMAS MORRISSEY:

Q      What housing unit?

A      Oh, that's the -- in the Cermak -- you know, the places where detainees are --

Q      Okay.

A      -- in the building, that's that project.

And let me go to the next one.  Again, this is all public information, so I'm not --

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 181

(Brief pause.)

BY THE WITNESS:

A      There's a project at the criminal courthouse, Division 8, $100,000 with Division 8, which is the RTU countywide, one hundred and fifty.  That's a security project.

BY MR. THOMAS MORRISSEY:

Q      By "countywide" --

A      Yeah.  That's -- So yeah.

So there's a project that's for the assessments and improvements that's $150,000.

Q      When you say "countywide," do you mean --

A      It's a term that we use to encompass multiple buildings.  In this case, it's countywide for the DOC.

ADA assessment improvements, assessment and design services, $150,000.  That's part of the wraparound.  I mentioned Cermak before.  Let's see.

Q      Where in the budget in this Capital Improvement Plan can this document be located?

A      It's in the -- It's in the CIP in the budget book, which is available online.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 182

Q      Right.

But where exactly -- What line item in the CIP is this?

A      Okay.  Hold on just a moment, and I can go look for it.

Again, I would underscore that this is available to everyone in the book because it's . . .  Let's see.  Let's go into the approved budget, and let's look here.  You can download this document on the County website, if you want.

(Brief pause.)

BY THE WITNESS:

A      I apologize.  I have so many exhibits open in my computer, it's taking a while to open the -- the PDF.

(Brief pause.)

BY THE WITNESS:

A      Okay.  So this is what's called "Volume 1" of the budget -- let's see -- and that's going to be at . . .  165, okay.  I don't want to tour.  Here we go.  Okay.

(Brief pause.)

BY THE WITNESS:

A      Hospitals, that's DOC, but that's

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 16

ERIC DAVIS
January 24, 2022

Page 183

not -- Okay. Here we go.

THE STENOGRAPHER: Eric?

THE WITNESS: Yes?

THE STENOGRAPHER: Unless you want all that on the record -- I'm writing everything you're saying.

THE WITNESS: Sorry about that.

BY THE WITNESS:

A    So that is at the top of Page 195 in the Annual Appropriation Bill, Volume 1, and lists the CIP for 2022 of $150,000 for Cermak, Subtitle, Renovation, ADA Improvements, fixture installation, and replacements. It is projecting that amount for 2022.

I would note that, in 2023, we are asking for $1.1 million and, in 2024, another 950,000. That's with an expectation that the construction would happen in '23 and '24 of approximately $2 million.

So 150,000 or so in design fees and 2 million in construction for Cermak relative to ADA in the next three fiscal years.

BY MR. THOMAS MORRISSEY:

Q    Okay. So the Capital Improvement Plan

---

ERIC DAVIS
January 24, 2022

Page 184

has in there --

A    Yes.

Q    -- over $2 million for construction --

A    Correct.

Q    -- of ADA facilities for Cermak.

A    Yes.

Q    Is that right?

A    That's correct.

Q    And before any of those projects, ADA projects at Cermak, can -- can go out to bid for a contractor, the County Board has to approve the expenditure?

A    That's correct. They do that on an annual basis, and that's why we give them a ten-year projection. We say, "This is what we're looking for in 2022, and here's a heads-up of the kinds of things we're going to be coming back and asking for in '23, '24," et cetera.

Q    So assuming, for instance, that the design services for the Cermak ramp were expended in 2022 --

A    Mm-hmm.

Q    -- any type of Architect of Record . . .

---

ERIC DAVIS
January 24, 2022

Page 185

A    I'm sorry, Tom. I think you froze there for a moment.

THE STENOGRAPHER: Yes.

MR. THOMAS MORRISSEY: I'm sorry.

BY MR. THOMAS MORRISSEY:

Q    Assuming that there were design -- Assuming that in 2022 an architect was retained by Cook County and did drawings with regards to renovating the Cermak ramp --

A    Yes.

Q    -- prior to any type of bid . . .

A    I'm sorry. You froze again, Tom. We lost you again.

Q    I'm sorry. Am I -- Am I there?

A    Your connection is cutting out. You said "prior to" --

Q    Let me start over.

Assuming that there's $150,000 in the CIP in the 2022 appropriation, does any further action need to be done by the Cook County Board prior to it spending that $150,000 for an Architect of Record?

A    Yes.

Q    What has to be done by the Cook County

---

ERIC DAVIS
January 24, 2022

Page 186

Board? What action has to be taken by the Cook County Board before an Architect of Record can be retained to do an evaluation and design drawings for an alteration of the Cermak ramp?

A    So as I -- I think I outlined earlier in this deposition, once the funds have been -- has been identified and authorized, if you will, by the Board and we develop that into a request for proposal, a request for qualifications, we identify a firm, we come to an agreement on their price, in order to enter into a contractual obligation with -- between the County and the design firm, that contract generally goes to the Board of Commissioners.

So the Commissioners would also have oversight on individual design contracts in excess of $150,000, and that's -- that's a key threshold. It has to do with procurement rules.

It would either be approved by the chief procurement officer, if it's a smaller contract. But one like this could easily be -- it can even be more than a one hundred and fifty, as I mentioned, because it may turn out it's going to take longer than a year. And I so expect that it

Exhibit 13 Page 17

ERIC DAVIS
January 24, 2022

Page 187

would need to go before the Board of Commissioners for approval once we've come to agreement with the designer.

This is typical in all government, whether you're talking about County, City. The federal government does this.

THE STENOGRAPHER: Could you slow down a little bit?

THE WITNESS: Yes.

BY THE WITNESS:

A The federal government does this, the the County does this, the City does this. They authorize the funds and then we draw up a contract, and then they approve the contract. So it's actually two -- two elements. They have budget authorization and contract authorization.

BY MR. THOMAS MORRISSEY:

Q Has there been a budget authorization to retain an Architect of Record to design -- to evaluate and design the Cermak ramp?

A Yes. That was the project that I mentioned earlier.

Q That's the CIP?

A That's correct.

ERIC DAVIS
January 24, 2022

Page 188

Q Has there been a contract authorization --

A Not yet.

Q Well, let me finish my question.

A Sorry.

Q Has there been a contract authorization to hire an Architect of Record to design and evaluate the Cermak ramp?

A Not yet.

Q Has there been a contractor hired -- Let me rephrase that.

Is there a budget authorization to hire a contractor to renovate the Cermak ramp to make it ADA-accessible?

A Not yet.

Q Has there been a contract authorization to hire a contractor to renovate the Cermak ramp to make it ADA-compliant?

A As you noted before in a prior question, we have to do the design work first. And as we discussed when I was going through the budget allocation for that, it's our expectation that the contract for a contractor to implement, construct the alterations would occur in fiscal year '23

ERIC DAVIS
January 24, 2022

Page 189

and/or '24.

Q Okay. You're familiar with the -- the design drawings that were done to -- to make the -- Strike that.

You're familiar with the -- with design drawings done in the last five years in regards to the Leighton Courthouse?

A The Leighton Courthouse?

Q Leighton.

A There have been drawings in development. There have been none issued for bid yet. Well, actually, that's not true. They did the bridge, so portions of it, yes.

Q But there have in the past been engineering and/or architectural drawings to renovate the holding areas in the Leighton court building behind the courtrooms?

A That's correct.

Q And the County has expended upwards or more than a million dollars for those design drawings, correct, for the Leighton holding cells?

A The expenditures to date have been for the courthouse as a whole, so the lower level, which is called colloquially "the bridge," as well

ERIC DAVIS
January 24, 2022

Page 190

as the lower-level holding cells as well as the six floors of courthouses throughout the building for the holding cell areas throughout the courthouse as a whole. So that million dollars covers a great deal of a large building.

Q And when were the design drawings done for the low- -- When you refer to the lower-level holding cells in the Leighton court building, what floors are you referring to?

A The lower level.

Q The Leighton court building has, what, six floors?

A It has six floors and it has two lower -- two below-grade levels.

Q And what floors are we referring to when we say "the lower level"?

A What would colloquially be referred to as the basement. When you come into the courthouse, if you went on a stair and you went down, you're going to the lower level of the courthouse.

Q And there's courtrooms on the lower level of --

A No.

Exhibit 13 Page 18

ERIC DAVIS
January 24, 2022

Page 191

Q    When were design drawings done for the lower level of the Leighton court building?

A    To be clear, preliminary design drawings for the lower level were done some time ago.

Q    By "some time ago," are we referring to five or six years ago?

A    I don't think it was -- No.  I believe it was more like, I want to say, 2018, 2019, when they were completed.  That project was underway when I started in 2017, but they were not issued for construction.

Q    And the upper levels of the Leighton court building, the holding cell areas, there have been design drawings done for that area too?

A    There have been design drawings that haven't been completed and issued for bid, but yes.

Q    Okay.  And when you say they've "been completed," an Architect of Record has done design drawings for the upper-level holding areas at Leighton, correct?

A    That's correct.

Q    And those were done probably in the -- prior to your joining the County in 2017-2018?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 192

A    My recollection is they weren't completed yet when I started, but they were completed not too long after.  So, like I said, '17, '18, maybe, something like that.

Q    Would it be fair to say that Cook County expended over a million dollars for those design drawings?

A    I'd have to look into it.  I don't know if it was -- Maybe, somewhere in that range.

Q    What was -- What was the name of the Architect of Record for those design drawings?

A    It was Primera, P-r-i-m-e-r-a.

Q    And after those -- When were those design drawings complete?

A    As I mentioned, they were not complete.  There was an issue with phasing that came up in terms of implementing it, so the drawings were never completed and issued for permit or construction.

Q    And isn't it true that if the County moves forward with renovating the lower and upper holding areas at the Leighton court building, they'll have to redo the design drawings?

A    Not necessarily, no.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 193

Q    Well, there will be no additional bid for architectural services to design the holding areas at the Leighton court building.

Is that what you're saying?

A    What I'm saying is that if -- Well, so the Leighton Courthouse, as you know, has not just holding cells, but also has courtrooms, and the issue that we've been having is how to accomplish the work and yet not impact the functioning of the courthouse while that work is under -- is being undertaken.

And so there's been a lot of effort back and forth about in what order to do things and how much of the courthouse we could or couldn't take offline to do them.

And so an Architect of Record hired would take those drawings, and I would say on the order of 95 percent of the work that would be done would simply be reincorporated into new drawings, possibly with changes to scope that might have arisen because of Code changes in the interim, but I would say on the order of 95 percent of that would be -- would still be considered usable for those areas.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 194

The other question is, are they going to actually upgrade the courtrooms themselves, and that's actually probably what's going to happen, and --

Q    So --

A    -- that will required additional design.

Q    So we're talking about four years after Cook County expended over a million dollars for design services and nothing has been done to -- to hire a contractor to do the work.

Is that fair to say?

A    No.

Q    As far as the Leighton court building, the upper holding area, there's --

A    For the upper floors, no.  But you said no work has been done.  We have done the first piece that needed to be done.  As you well know, because of other litigation, we have undertaken and renovated the bridge, which is the connection point between the tunnels into the courthouse, much like the Cermak ramp.

That was a large project that took a long time because of the phasing operations

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 19

ERIC DAVIS
January 24, 2022

Page 195

of the jail, and that is a project that needed to be accomplished first before you could do anything else because if it's going to remain a functioning courthouse, you have to still be able to get detainees in and out of the building, and that was the first thing to be done. So that project has occurred, it's been completed, and is done and is in operation.

Second, we are working with the Sheriff currently to begin implementing improvements to the lower-level holding cells areas themselves. Again, that has to be done on a phased basis.

But the scope of that work in the bridge and in the holding cells was part of the work that was developed, as you have cited several times, approximately a million dollars worth of fees.

So there has been important and initial work undertaken prior to working on the upper -- or the courtroom floors of the building itself. So to say that there's nothing been done in four or five years is a mischaracterization.

Q    Well, to -- What is an RFP?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 196

A    Request for Proposal.

Q    What does that mean?

A    Well, it is what, in procurement speak, they refer to as a solicitation, advertising for a proposal. It's a contracting method that government agencies and private companies use.

Q    Is it true that the procurement process for architects has changed in the last six months?

A    In the last six months?

Q    In the last year, has the procurement process --

A    Year to two years, yes. We've been working for the better part of a year to adapt what were -- previously what's called RFPs into what are called RFQs, Request for Qualification, so we've been on that -- at that process for some time.

Q    How long have you been on that process?

A    I'd have to go back to my notes and see when that change occurred.

Q    More than a year?

A    Yes.

Q    And the change is from a Request For

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 197

Qualifications to a new nomenclature, Request to Proposal?

A    It's the other way around. They were RFPs, and we have transitioned to RFQs. To explain, the County used to have what are called prequalified firms and so that requests for design services went to them as a proposal because they were prequalified.

That was done under a prior administration. That has sunset. And so to obtain services, we are following what's called a Request for Qualification method where we identify the most qualified firm and then negotiate with them individually. That's what we're doing now.

Q    When was the first Request For Qualification issued by Cook County?

A    I couldn't say offhand. I'd have to -- I'd have to go back and look.

Q    Do you have any --

A    A year ago, if -- Well, I don't know. I'd have to check. Honestly, Tom, I'd have to go back and see when which ones moved forward.

Q    Have any Requests For Qualifications been issued since the procurement process has

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 198

changed?

A    Yes.

Q    How many?

A    I'd have to go -- go look and see. I would say several. You know, mind you, we have, like I said, had in excess of 300 projects, some which were already underway.

Q    And how much -- What is the level of difficulty in changing over from the Request for Proposal to Request for Qualifications?

A    The first one is very time-consuming. The rest of them after that are relatively straightforward.

Q    The first Request for Qualification is very difficult?

A    Yes.

Q    Why is that?

A    Present company included, I would say because of lawyers.

Q    Tell me the process to issue a Request For Qualifications.

A    Currently, if there's a Request for Qualifications, our -- in the public safety portfolio -- I'll use that as an example -- we

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 20

ERIC DAVIS
January 24, 2022

Page 199

develop the scope for a project and generate a package, which includes all the various documentation that a respondent would need, and write it up, general go over it with someone from procurement initially.

Then it gets formally submitted and we receive what's called a requisition or an REQ. It gets in their system. And then we work with an individual buyer, and it is finalized and the dates are identified.

The tie to the Capital Improvement Plan is identified. The schedule for what the process will -- how it will go, when it will start, when it will go out to bid, et cetera, is identified.

The questions of site walkthroughs are worked through because, as you can imagine, that's been very much changed in the recent year and a half because of the pandemic.

And so we go through all the various elements that are necessary, and then it's advertised for bid.

Q    How long does it take -- Let me cut to the chase.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 200

Has a scoping of the project for Request For Qualifications, specifically for the Cermak ramp, been ironed out between Capital Planning and Procurement?

A    It's in the process of it right now. We're working -- It's one of those that we're working with them on. We're in the process of finalizing it with them right now. We're expecting to be putting that out to the street next month, in February.

Q    When did the scope of the project for the Cermak ramp begin?

A    As I mentioned, because of some rules, we've had to change whether or not we were including it all within a countywide into making it specific.

So when it began -- It began for Cermak some time ago, as you know, because we initially -- As you know from prior depositions, we tried to advance this through a traditional procurement. Then we tried to advance it through task orders and -- or traditional procurement with an RFP. Then we tried to advance it through task orders, and that wasn't successful either.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 201

And now we've been trying to advance it through an RFQ, and I'm reasonably confident we're actually going to get it accomplished and get the -- get the firm hired --

Q    Well --

A    -- and get the building underway.

Q    Well, let me ask you this: When did -- Is this under your direction, the RFQ?

A    I'm one of the people -- I'm one of the people that gives direction to it, yes.

Q    Who else is in charge in Capital Planning for the RFQ for the Cermak ramp?

A    Well, as my title suggests, I'm the deputy director, and so all of our procurements go out through the director. But I have primary oversight on the public safety portfolio and am the lead on most procurements for design services.

Q    So when did you start working -- Is the RFQ solely for the Cermak ramp?

A    Tom, I'd have to check. I think -- I'd have to check. I think we're actually trying to include this one in a package with other buildings, so I think it's a compon- -- as I recall, it's a component.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 202

Like, we have -- go out for an RFQ and we say, you know, "Here are three buildings that we want you to do the assessment and design services for," and I believe it's one of those packages. We were issuing multiple pack- -- multiple packages to the marketplace.

Q    Who's working on it in Capital Planning, the RFQ, in part for the Cermak ramp?

A    David Theising from STV is the lead on their side. He's working with me. He previously was working with Sheila. Now he's working with Tim Ozog, who is the interim and is about to be -- Sheila's replacement is due to come online here in the next month or so.

Q    What documents have been generated by David Theising at STV --

A    "THY-ZING."

Q    -- in regards to the RFQ for the Cermak ramp and three other buildings at the jail?

A    As I said, that's an approximation. I'd have to check. But a draft of those, which was reviewed by me, which was included and signed off and submitted to the Office of the Chief Procurement Officer in draft form, it's -- It

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 21

ERIC DAVIS
January 24, 2022

Page 203

remains in draft form until it's issued to the street. It's preliminary and, quite frankly, confidential until it's issued to the street.

Q    What is it called?

A    I'd have to check. Hold on just a moment. Let me see here. Let me look because that one originally went a while ago. Let's see. I'm going to have to -- Give me just a moment.

THE WITNESS: And, yes, Kelly, I'll try to be quiet.

(Brief pause.)

BY THE WITNESS:

A    Boy, I'm really having trouble opening PDFs. Hold on.

(Brief pause.)

BY THE WITNESS:

A    Wow, okay. Let's try again.

(Brief pause.)

BY THE WITNESS:

A    I apologize. For some reason, I'm having trouble opening this. I can give you the requisition number, if you want it.

BY MR. THOMAS MORRISSEY:

Q    Yeah. Give me the requisition number.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 204

That would be good.

A    Hold on just a second here.

So this package -- Here we go, yeah.

So it's originally Requisition No. 1, and then there's zeros, 107267. That was a Req that was put in earlier last year.

Q    What date --

A    The title of it --

Q    What date last year was it put in?

A    It was put in initially -- As I mentioned, it's a multistage sort of back-and-forth. It was put in initially on the 24th of February.

Q    2/24/2021?

A    No, 2020. Excuse me.

Q    2020?

A    Initially in 2020, initially, yeah. And let's see. Hold on.

Q    Was there any feedback -- And "put in," you mean to the Procurement Office?

A    Yeah, oh, yeah.

Q    Okay.

A    So it --

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 205

Q    Was there feedback from Procurement after February 24, 2020?

A    Absolutely.

Q    All right. When did you receive feedback?

A    It's been the subject of a lot of discussion back and forth. We have some 30 active procurements with them right now.

Q    Are all 30 procurements that you're trying to get through in the Procurement Office going to be issued in the next month?

A    No. But we expect this one will be based upon our most-recent meetings with the -- with the Procurement Office.

Q    Why not? Why won't the 30 --

A    Because they don't have enough -- Because they don't have enough buyers. They've only recently hired additional buyers. It's been a challenge to be able to get the -- the projects to the street because, for a time, they only had one buyer for us.

Q    What do you mean? "Buyers," what do you mean?

A    That's the person -- the procurement

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 206

officer assigned to a specific procurement.

Q    So the Procurement Office does not have enough employees --

A    Correct.

Q    -- who can push this --

A    Now they have -- I would say we've been very happy because recently they've -- First of all, they replaced one employee with another one who's been more productive.

They've hired a Deputy Chief Procurement Officer, and they've recently assigned two other procurement officers, new hires, to us. So that's why I say I'm optimistic in 2022 we'll get a lot more of these out the door.

Q    So specifically how many communications -- Are these communications between David Theising, STV, and you and somebody in the Procurement Office?

A    Yes.

Q    Who has been your contact in the Procurement Office in regards to Requisition 1000107267?

A    It used to be William Kelly. He doesn't work for them anymore. We've also --

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 22

ERIC DAVIS
January 24, 2022

Page 207

Recently, we have -- Let's see. Who's that one? That's with the new -- It's now with the new Deputy Chief Procurement Officer, a guy named Robert Stuart.

Q    When was the last -- And it's usually by e-mail?

A    We have meetings with them also where we go through things.

Q    Okay. Are there agenda items, minutes of the --

A    Yeah.

Q    -- meetings?
     And what are those --

A    Are they minutes? No. We don't issue minutes. We go through issues on individual projects.

Q    But is there an agenda for the meetings?

A    Yes.

Q    And what is the agenda called?

A    The agenda.

Q    Okay. And who attends the meetings between STV, Capital Planning, and Procurement?

A    Short answer, it depends. Sometimes

ERIC DAVIS
January 24, 2022

Page 208

the Chief Procurement Officer is there. Sometimes recently his deputy is there. Usually, one or more of the buyers are there, as well as yours truly, as well as Dave Theising, depending on who's there. You know, Sheila used to go to these when she was there. Her replacement will go to these. Sometimes Earl Manning is there. Sometimes other people from the STV team are there. It depends.

Q    Who is the Chief Procurement Officer currently?

A    His name is Raffi Sarrafian.

Q    Can you spell his last name?

A    Yes. I don't want to get it wrong. Hold on just a moment.

          (Brief pause.)
BY THE WITNESS:

A    His last name is spelled S-a-r-r-a-f-i-a-n. His first name is Raffi, R-a-f-f-i.
BY MR. THOMAS MORRISSEY:

Q    And do you keep copies of these agenda meetings with the Procurement Office?

A    Generally, although it's a live document on our SharePoint system so it's updated

ERIC DAVIS
January 24, 2022

Page 209

on an ongoing basis, and we don't always keep a copy of, you know, a prior month. It's simply edited on a monthly -- you know, on a monthly basis, actually two weeks.

Q    When was the last time this was on an agenda meeting between Procurement, STV, and your office, the Requisition 1000107267?

A    It was Wednesday, January 19th, 2022.

Q    And what projects are included in this requisition?

A    Several projects.
     What are you asking about specifically? We have projects across --

Q    I'm --

A    -- three portfolios and 300 projects.
     What are you specifically asking?

Q    Well, I'm asking about the project for the Cermak ramp and the other two or three buildings that are part of that requisition?

A    It was actually seven packages. I looked it up.

Q    Seven separate packages?

A    Seven packages within one RFQ. So one of the packages -- There are packages for --

ERIC DAVIS
January 24, 2022

Page 210

Division 2, Division 4, Division 6, Division 8, Division 10, Cermak, and the RTU are all different packages that we're advancing at the same time.
     So the ideas would be advertised, people would submit for one or more of the packages, and we would issue multiple contracts out of a single solicitation, rather than doing a solicitation for every single one. We are trying to achieve some efficiencies.

Q    So prior to it going out -- prior to -- You call it advertising.
     It's -- It goes out to the world of architects. Is that correct?

A    It is advertised on the County's Procurement website. So if you go to Cook County Procurement, you can see open solicitations on the website. They do a really good job, and they recently upgraded their system.

Q    But are all eligible architects -- Strike that.
     Are all architects eligible to submit an RFQ?

A    The answer is, it depends. But it -- There are various criteria that are needed. You

Exhibit 13 Page 23

ERIC DAVIS
January 24, 2022

Page 211

know, in some cases -- You know, in most cases, we require an Illinois arch- -- Illinois license, but it depends. Generally, yeah, pretty much anybody can.

There are sometimes when we do what we call "target market" where we attempt to engage smaller firms, primarily minority- and women-owned firms to provide some opportunities. So sometimes it's a subset, but generally it's the open marketplace.

Q    Has the Chief Procurement Officer approved an advertisement for RFQ for this requisition that includes the Cermak ramp?

A    As I said previously, not yet. We are in the process of finalizing that with them.

Q    Is there a time period procedurally after an RFQ is published for architectural firms to submit their qualifications?

A    We like to give them a month, depending on the -- the type of project that it is. There's a lot of information that has to be gathered, so we generally try to give them a month to submit.

It depends upon the complexity of

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 212

the project, but given this one and given that it's an RFQ, a month should be sufficient.

Q    Well, you said that wrapped up in this RFQ are projects in Division 2, Division 6, Division 8, Division 10, in addition to the Cermak ramp, correct?

A    Correct.

Q    Now, do the architects have an opportunity to walk through and observe what they're being asked to submit their qualifications for?

A    Not at this stage, no. And that's one of the reason we are -- we are doing the Request for Qualification approach. We ask them to submit their qualifications. There's a series of criteria.

Those criteria are evaluated by what's called an evaluation committee. They identify what's called a most-qualified respondent for a given solicitation.

Once we've identified that most-qualified respondent, then we take that firm with us, in this case to -- it would be to Cermak, have them walk the facility, and working with them,

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 213

negotiate and develop their costs, and draft a contract for approval by the Board of Commissioners.

One of the reasons that we do that is, you can imagine for a complex as large as this having every possible firm that might be interested in this tour the Cook County Jail, particularly under a procurement situation, would be prohibitive in the extreme.

Q    Who's on the evaluation committee?

A    It depends. I usually am on them.

Q    Who else?

A    I don't know yet because we haven't identified those teams. As we say, we have some 30 projects in procurement, so it would be assigned. Generally, we would have someone from Capital Planning. We may have someone from the Sheriff, depending what the project is, we may have someone form Facilities Management. It's a project-by-project basis.

Q    Okay. So --

A    That hasn't been set yet because we want to be as efficient as possible. We don't want to make those assignments until they actually

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 214

appear.

Q    So would it be fair to say under the RFQ method of procurement, in the past, there hasn't been a need for an evaluation committee yet?

A    Correct.

Q    Because this is a new process --

A    Newer. As I've said, we've had some procurements this way, so it's not new, but it's newer.

Q    Well, in the last six months, have any projects been issued under an RFQ?

A    Yes.

Q    How many?

A    I would estimate at least a half a dozen in the last six months, but I don't know. I'd have to check. I would say less than a half-dozen.

Q    In those half-dozen instances, who was on the evaluation committee?

A    It depends if they were -- if they were issued recently. I've been on them. Members of our staff have been on them. Members of STV have been on them. Members of the Department of Facilities Management have been on them.

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 24

ERIC DAVIS
January 24, 2022

Page 215

It depends. It depends on the specific scope and who's involved in a given project. So there's no standing evaluation committee that looks at all of them. We -- We tailor it to the specific solicitation.

Q So best-case scenario, by the end of the first quarter, by the end of -- by April, you would have an advertisement out for an RFQ?

A We're actually hoping to get this advertised for Cer- -- that includes Cermak next month. We're in the final approach.

Q And you have documents prepared for that?

A Correct.

Q Again, we're going to make a request to see those documents.

A Okay. And I'll let you know ahead of time, you may not be able to get them, and the reason is, the laws around public procurement don't necessarily allow the release of documents for an open solicitation.

So they may turn you down, Tom. I mean, you're welcome to ask, but --

MR. BENTLEY: Well, he'll go through

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 216

me. He'll go through me, and we'll figure it out that way.

BY THE WITNESS:

A Yeah. I'm just letting you know it may not be something you're allowed to have under the State law.

BY MR. THOMAS MORRISSEY:

Q How long do you anticipate it will require -- How many bids do you think you'll have --

A For this? I have no idea.

Q If you have more than three or four, will it take longer to evaluate the bids?

A I wouldn't say it would be excessively long, no.

Q And at what stage, if everything aligned, would you be in a position to award a contract to an Attorney [sic] of Record? Let me rephrase that.

At what stage would you be in a position to go to the County Board and ask for funding for an Architect of Record?

A To be clear, as I mentioned earlier, we actually have the funding. You're talking about

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 217

approval of the contract.

I would expect that we're probably looking at summer of this year. I couldn't tell you which specific Board meeting we'd look to, but we're -- You know, hopefully, if it goes out in February, we should have submittals in in March, maybe April, depending on how -- how long it goes, the evaluations, so yeah. I would expect retaining an architect over the course of the summer, and they should be underway -- they should be underway by fall.

Q So, again, before the selected qualified architectural firm is hired, the County Board has to approve a contract. Is that correct?

A Correct.

Q Now, when you had the task program --

A Mm-hmm.

Q -- you were seeking to hire architects, correct?

A Correct.

Q And you were turned down by the County?

A Correct.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 218

Q So it's not uncommon that after -- Strike that.

How long -- Since this is a multibuilding project under the Request For Qualifications, how many months do you anticipate it will take an architectural firm to actually have drawings that are suitable to be sent out for bid by a contract -- by a contractor?

A Generally, it depends upon the way that the project is delivered, so . . . But I would say anywhere between six to twelve months. So if we get them under contract at the end of the summer, we may be done with some of the packages by the end of the year; otherwise, they'd be done in fiscal year '23.

Q So by "done," you mean, by the end of fiscal year 2023, you may have a design drawing for the Cermak ramp --

A No.

Q -- which would be --

A No. That's not what I said.

They would be done -- The drawings might be done during fiscal year 2023.

Q Okay.

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 25

ERIC DAVIS
January 24, 2022

Page 219

A    Probably in the first quarter or two. It wouldn't take much longer than that.

Q    Well, you don't know because the package -- the number of buildings that are being designed is still in the works, correct?

A    Well, that's why we're breaking them into -- That's why we're breaking them into multiple packages. I would contemplate that we might -- we might -- Depending on how many submittals we get, we might assign, you know, a firm to a package, or we might assign two firms to -- two packages to a firm.

So I would not expect we would assign all the packages to a single firm. I would expect we would assign them to multiple firms, so we're not going to have to wait until they've designed everything at, you know, Division 10 to start the work on Cermak, no. We wouldn't do it that way.

Q    Well, assuming that a design package was submitted by the Architect of Record in June of 2023, does STV or Capital Planning have to go to the County Board prior to submitting those design drawings to contractors?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 220

A    No.

Q    No.

What is the proc- -- What is the requirements for Board approval prior to submitting the design drawings by an Architect of Record to a contractor?

A    Once the architect is hired, there's no County approval until a contractor has submitted a bid.

Q    For a County project for alteration or construction of a building at the jail, is there a requirement for public bid?

A    Yes. Everything is competitively procured.

Q    And who's responsible for putting together that bid package?

A    That's the process we've been discussing earlier in this deposition. We are the user agency. We draft it. We go over it with the Procurement Office.

Once it's met all the various requirements that they have with them, with contract compliance, with risk management, we -- they are then issued to the market.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 221

Q    How long, in your experience, after you have design drawings by an Architect of Record does it take for Capital Planning and the Procurement Office and Risk Management and administration -- the administrators within Cook County to put together a package to be advertised for public bidding by contractors?

A    Again, it depends upon the procurement method, and I say that because if it's issued to the street, it's one thing. If it's constructed or delivered through our -- what's called our Job Order Contracting process, it's a different -- it's a different way. So the time -- the time period varies.

Q    Is there a maximum expenditure under the Job Order Contract form?

A    Generally, no, but we like to do smaller projects through that.

Q    By "smaller projects," how much --

A    Under a million dollars, for the Job Order Contract project.

I would note what we were discussing earlier relative to the bridge at the Department of Corrections at the -- I'm sorry -- at

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 222

the Leighton Courthouse, the bridge project was delivered through our Job Order Contracting process.

So you can have larger projects, but we can -- it depends on how -- what makes the most sense, what's the most expeditious way to deliver the project.

Q    If it goes -- the bid goes out to the street, how long does it take?

A    Again, it depends. We generally would give them a month to six weeks to submit the -- to submit a bid. In a project like that, we would -- we would obviously walk them through the site as well as issuing drawings, so that would be a -- you know, a month to six weeks after they hit the street.

Q    And after proposals come back from contractors, is there an evaluation process before there is a decision --

A    There's -- In the case --

Q    -- which --

A    In the case of -- I'm sorry. Go ahead and finish.

Q    -- [continuing] which contractor to

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 26

ERIC DAVIS
January 24, 2022

Page 223

award the contract to?

A    Generally, in what's called a Standard Issue For Bid, the County hires what is usually referred to as the lowest responsible bidder.  So there may be elements that the bidders have to submit, like, a bidder performance bond, for example, or there may be licenses that are necessary for some of their subcontractors that have to get submitted.  Procurement receives the bids and they evaluate, did they provide all the bits and pieces that are needed.

But in the case of an issue for bid, it's relatively straightforward.  They have to identify, yes, they have everything in here, and they have all their documentation.  This is the lowest responsible bid, and that one -- that's the one that goes to the Board.

Q    And before a contractor is hired, it has to go to the Board --

A    Correct.

Q    -- to be issued to the street?

A    Correct.

Q    There are a number of projects that are on the Capital Improvement Plan that have

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 224

carried over year after year after year that are waiting to be submitted to an architectural firm and/or a contractor to implement the project?

A    As we've discussed in this deposition and otherwise, yes.  There are -- it is a -- It can be a lengthy process to retain a firm for design.  As I mentioned, we've tried different methods and, for various reasons -- administrative, legal, and others -- we've had to make some changes, and so it's taken a while.

But as I also said, we have something like 30 projects now that are in various stages working with Procurement, and we're very optimistic to be hiring lots of design firms in fiscal year 2022.

Q    Under the Job Order program --

A    Yes.

Q    -- are there a number of -- Well, under the Job Orders program, does a project have to be part of the CIP?

A    Yes.

Q    And how many current projects have been approved under 2022 CIP or previous ones going back three or four years?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 225

A    I'm not understanding what you're asking.

Q    Sure.

A    How many projects are approved?  What --

Q    No, no, no, no.

My question is, let's say over the last five CIP --

A    Mm-hmm.

Q    -- budgets --

A    Yes.

Q    -- so back to 2017 to the present --

A    Yes.

Q    -- how many projects that were part of the CIP are eligible to have a contract awarded under the Job Order Contract methodology?

A    Are eligible -- Eligible could be quite a lot.  I think what you're asking is, how many projects have we actually delivered through that method, and it's been on the order of anywhere from 30 to 60 projects a year delivered through that.

Mind you, the Job Order, or JOC program, is a procurement method.  They receive a

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 226

contract.  Let's say I get a contract for, you know, $5 million, and it's a two- or three-year term.  Then I am assigned a project under that.  I price that project.  Because their contract has already been approved, there's not a second approval necessary with the Board, so that's -- It is a widely used procurement method to streamline process for projects that are smaller, generally confined to a smaller number of trades.  It's a -- It's a standard vehicle that many government agencies use to procure.

So that -- So once the master contract has been -- has been approved by the Board, we don't have to submit individual projects.  That was -- You know, that is the way that that method accomplishes construction.

Q    Okay.  How many construction firms are -- have been awarded job orders under -- under the Job Order method?

A    I believe in the current contract, approximately 18.  We have a solicitation that is live right now for replacement for those contracts because the current JOC contracts expire at the end of May.

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 27

ERIC DAVIS
January 24, 2022

Page 227

And so we're in the open procurement period right now for new JOC contracts. We're looking to hire 31 firms. The project -- The program has been successful, and we want to have more opportunity.

So we currently have, I believe it's 18, under contract now. We're looking to expand that to 31, and we're hopeful to be bringing that to the Board approximately April of this year, so we would have some 30 firms in -- in a variety of categories.

Q    So you mentioned that the current Job Order method expired in May of 2021?

A    Under the current -- Under the current contracts, yes.

Q    And under the current contract, Job Order Contract --

A    Yes.

Q    -- has there been an expenditure for letting a different construction project out to the 18 firms that are part of the Job Order --

A    Yes. On the order of 30 to 60 of those projects every year, the last five years.

Q    So, currently, the -- Well, let me --

ERIC DAVIS
January 24, 2022

Page 228

Let me ask you.

There was -- In May of 2021, the Job Order program expired.

Is that fair to say?

A    May of '22.

Q    May of 2022.

And how much money was allotted to that program?

A    I'd have to look it up. I want to say that the most-recent contracts totaled . . . Honestly, I don't remember, on the order of anywhere between fifty and $100,000,000 between all the different contracts.

And then, mind you, those were three-year agreements extended too, so they totaled -- that's over the course of, I want to say, five -- four or -- no, four years, I believe, under the current JOC contractors, so that's spread out over four years.

Q    That amount of money that expires in May of 2022 is --

A    Correct.

Q    -- currently allotted to different projects.

ERIC DAVIS
January 24, 2022

Page 229

Is that fair to say?

A    At this point we are not developing any new additional packages under the JOC program because the contractors' work will not be complete before the contract expires.

That's why we're -- That's why we're going ahead and advancing to get new contractors online so they can start right after the current ones expire.

Q    But in order to proceed, if -- if a determination was made by Cook County to proceed under the Job Order program --

A    Yes.

Q    -- for an alteration of the Cermak ramp --

A    Yes.

Q    -- the amount of money that was allocated for the current Job Order program will expire in May of 2022, and the funds are not there for any additional projects, such as the Cermak ramp?

A    That's not true. You're mis- -- And it's okay, Tom, because it took me a good year and a half to understand all this stuff, so I

ERIC DAVIS
January 24, 2022

Page 230

understand why it's hard to ask questions about it.

No. The authorization is for the projects. All right. So in the case -- Let's take Cermak ramp. We have a dollar amount identified for funding -- for funding the design. We have another dollar amount, as I mentioned, identified over the next two years for construction.

If hypothetically we decided it was in the County's and public's best interest to deliver that project through the JOC program, we would assign that project to the job vendor under their, what's called an umbrella contract. All right? And we would -- they would work -- In this case they would work with the designer to identify what their price is and wrap it up and it would begin.

So it's a very complicated process in identifying what the specific prices are, but those are what are called prepriced items. And so once that's assembled, construction begins very quickly. It is a -- It is a way of expediting the procurement of construction services.

We a), for example, decide to being the designer in to work with the contractor

Exhibit 13 Page 28

ERIC DAVIS
January 24, 2022

Page 231

before the drawings are done. The contractor may say, "Hey, you know what? Let me take a look at this and see if I could figure out a less expensive way to do it." We may involve them in the project before the architect's drawings are done. That's one of the options that we have, depending on the complexity of the project.

Q     How much money is in the 2022 CIP specifically for altering the Cermak ramp?

A     As I mentioned before in this deposition, we have $150,000 identified in fiscal '22 for design work. We have approximately $2 million identified in fiscal '23, '24 generally for the construction of that work.

Q     Well, that isn't earmarked specifically --

A     Yes.

Q     -- for designing the --

A     Yes.

Q     -- Cermak ramp?

A     Yes. It's in --

Q     $150,000 will be expended to design the Cermak ramp?

A     To design the ADA renovations for

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 232

Cer- -- for the Cermak building.

Q     And $2 million is --

A     Is an estimate for construction costs.

Q     For construction cost -- ADA improvements to the Cermak building in the 2022 CIP?

A     As I said, those are funds identified for '23 and '24. The problem that we have, Tom, is we're -- the County practices what's called zero-based budgeting. And so the Board of Commissioners only idenif- -- only authorizes the money on a year-by-year basis. So all we can ask them for for this year is all we expect to be expending this year.

So if we're going to do the design work, then, that would be done this year. And we would tell them we're expecting to come to you next year for the additional construction funds.

MR. THOMAS MORRISSEY: Let's take a five-minute break.

MR. BENTLEY: Okay. Back in five.

(Whereupon, a brief recess was had.)

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 233

MR. THOMAS MORRISSEY: Back on the record.

BY MR. THOMAS MORRISSEY:

Q     Last week we talked about an e-mail from a Joseph Merkel --

A     Yes.

Q     -- to Timothy Tyrrell on March 10th, 2021, where he -- Mr. Merkel purported to take some measurements of what's called the Cermak ramp.

Do you recall that?

A     Yes.

Q     And the measurements that he -- the instrument that he used was a laser level, correct?

A     Correct.

Q     What is a laser level?

A     Well, as the name suggests, it is a device commonly used in construction to identify or delineate a level plane, if you will. The laser covers an area and, because of the -- of the level in it, is able to define and say everything on this plane is going to be at the same level.

As I mentioned in the deposition, last week, Tom, the ceiling in your office behind you was probably set with a laser level by the

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 234

contractors when they built it.

Q     I wouldn't be --

MR. THOMAS MORRISSEY: This is off the record.

(Whereupon, a discussion was had off the record.)

MR. THOMAS MORRISSEY: Back on the record.

BY MR. THOMAS MORRISSEY:

Q     Do you know the manufacturer of the laser level that --

A     No.

Q     -- Mr. Merkel used?

A     No.

Q     Are there different manufacturers of laser levels?

A     I assume so.

Q     Are there some that are better than others?

A     I don't know. I assume that they -- that there are some that are for different levels of service. I don't know.

Q     Do you know the level of service of the laser level that Mr. Merkel used?

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 29

ERIC DAVIS
January 24, 2022

Page 235

A       No, I don't.

Q       Since the beginning of your deposition last week, have you had an opportunity to go over to Cermak and view the Cermak ramp?

A       No.

Q       Have you taken any measurements since your last -- the first part of this deposition to determine whether or not Mr. Merkel properly measured the rise of the Cermak ramp?

A       I have not been over to take additional measurements, but I have no reason to believe that Mr. Merkel's measurements were not accurate.

Q       Have you talked to Mr. Merkel since -- since he took these measurements allegedly in March of 2021?

A       No.

Q       Do you know Mr. Merkel?

A       I've spoken to him on the phone.  I can't tell you when.  I don't know him personally, no.

Q       Okay.  Do you know if -- Do you have personal knowledge of the -- how frequently Mr. Merkel uses a laser level to measure the rise

ERIC DAVIS
January 24, 2022

Page 236

of a ramp to determine whether it's ADA-accessible or not?

A       I couldn't say how often he uses it for that purpose; however, I would note that using a laser level is a regular part of his job as a plumber.  I want to take a moment, Tom, to explain this to -- to why I say that.

If you're talking about a ceiling, you want something that's level; however, a plumber needs to know the angle of something.  And that's because, for colloquial terms, that which goes into a toilet flows downhill.

And so a plumber needs to set what's called a waste line.  It is a -- It's a pipe.  And it needs to go from the point where that material is deposited in the system down to a drain.

So unlike when you're setting drywall, a plumber needs to know not just what is level but also the slope of something, because it's called pitch in that case.  They need to know that the pipes along the waste run are constantly sloping slightly down.

And so when he uses that device

ERIC DAVIS
January 24, 2022

Page 237

to measure a long horizontal distance -- in this case, the length of a ramp -- and then uses that same device to calculate the rise -- in this case, a ramp, but it could just as easily be a pipe -- that's something he does every day.  And I would note that Mr. Merkel is a plumber foreman, not just a regular plumber, so he's likely been doing it for at least a decade.

I think we need to stipulate that Mr. Merkel is an expert in the use of a laser level because it is -- it is a fundamental part of that job.

Q       Well, Plaintiffs aren't stipulating to that, obviously.

A       Okay.  I'm going to stipulate.  I'm an architect.  I was licensed first in 1989.  I've been licensed for over 30 years.  I can tell you a plumber foreman knows how to use a laser level.

Q       What is the pendulum in a laser level?

A       A pendulum in sum is indicating the angle that the laser level would be located at.  Sometimes these days that's done digitally rather than with a mechanical level.

Q       Can a pendulum become inaccurate if

ERIC DAVIS
January 24, 2022

Page 238

it's dropped or bounced around on a jobsite?

A       I couldn't say, maybe.

Q       Do you know if the level -- the laser level that Mr. Merkel used is capable of locking the pendulum between --

A       I don't know.

Q       -- use?

A       I don't know if it was or it wasn't.

Q       Do you know when the last time -- Strike that.

Do you know when the laser level was acquired by Cook County?

A       I don't.

Q       Have you inspected the laser level that was used by Mr. Merkel in March of 2021?

A       I have not.

Q       As an architect, at times, do you have to calibrate a pendu- -- a laser level prior to using it?

A       No.  I don't do that.

Q       Why not?

A       Because I'm the designer, not the constructor.

Q       Do you know if people who use laser

Exhibit 13 Page 30

ERIC DAVIS
January 24, 2022

Page 239

levels calibrate them to -- prior to taking measurements?

A    I would assume that there are guidelines for that, depending upon the technology.

Q    Do you know if the laser level -- Why don't we look at the record --

THE WITNESS:  Off the record.

BY THE WITNESS:

A    This bugs the hell out of you. Doesn't it?  I can tell.

THE WITNESS:  Okay.  We can go back on the record.

BY MR. THOMAS MORRISSEY:

Q    No.  This is a serious matter.

How would you -- Do you know how you would calibrate a laser level?

A    No.

Q    If a laser level -- I'm sorry.

If a laser level is placed on an unlevel surface and is turned on, will it project an accurate level?

A    My expectation of it -- and, again, it depends upon the technology of the specific level -- is that there's either a mechanical or a

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 240

digital basis for indicating whether or not the surface it's being placed on is level.

It would be reasonable to assume that it is regularly placed on surfaces that are not level, and so there would need to be something in the device to indicate what is, in fact, level.

Q    When was the last --

A    Whether it's the bubble level or a digital scale or whatever.

Q    When was the last time you, as an architect, have used a laser level?

A    I haven't used a laser level.  I've used a conventional level.

Q    By "a conventional level," do you mean an electronic level?

A    No.  I'm talking about a good old-fashioned -- it's a long ruler that has three little -- generally three little tubes full of oil that indicates whether or not something, in fact, is level.

It's calibrated with a line and allows you to determine whether or not a surface is level. I don't know if the specific laser level uses that technology or if it used some digital

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 241

technology.

Q    So would it be fair to say you're not qualified to comment on how to calibrate a laser level?

A    I am not qualified to comment on how to calibrate a laser level.  That's true.

Q    And you're not qualified to comment on whether a laser level may become inaccurate if it falls or bounce -- bounces around?

A    That's correct.

Q    And you're not competent to testify whether a laser level needs to be calibrated prior to each use?

A    That's correct.

Q    And you're not competent to testify whether a laser level, when placed on an unlevel surface, will give an accurate reading?

A    I have to assume that it does, but I'm not qualified to comment definitively.

Q    Other than reviewing Mr. Merkel's e-mail in March of 2021, have you done anything additional as the person who's Deputy of Capital Planning to determine whether or not the rise of the Cermak ramp is 30 inches or less?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 242

A    I'm limited to be able -- able to do things electronically because, as we're talking today, the jail is not allowing visitors over a certain -- a very minimal number.  So if I wanted to go over and eyeball it myself, I would not be allowed to by the Sheriff.  It's -- They are on limitation because of the pandemic.

Q    So since March of '21 to the present, you've been precluded as the Deputy of Capital Planning from inspecting the Cermak ramp?

A    There have been periods where that was feasible, but I didn't go over during that -- during any of those periods, but I couldn't -- you asked -- You asked have I done it since we talked last week, and no, I haven't, because I couldn't at this point in time.

Q    Since March of 2018 when Ellen Stoner came out with her findings that the rise of the Cermak ramp was too steep under the ADA guidelines, have you done anything to verify her findings?

A    Yes.  That's why -- That's why we have been trying to hire a design firm to take her recommendations and turn it into action and, as a part of the course of that, they would conduct

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 31

ERIC DAVIS
January 24, 2022

Page 243

further investigation.

Yes. I have been working to try to get -- The situation has been recommended to us, and we have been working to try to retain design services to address it. So to say I've done nothing would be inaccurate.

Q Okay. And going back to 2018, it was your understanding, and apparently the gentleman, Mr. Tyrrell's, understanding that the rise of the ramp was too steep to be compliant with the ADA.

Is that fair to say?

A No, not that it was too steep. I don't think anybody's ever -- Too steep would have been steeper than 1:12. I haven't seen anything that says it's steeper than 1:12.

Q Well, let me rephrase it.

If the rise of the Cermak ramp exceeded 30 inches, that -- the ramp would not be in compliance with either the 1991 or the 2010 standards?

A That's correct.

Q And that was Ellen Stoner's conclusion, correct?

A That was her assertion. As I've said

---

ERIC DAVIS
January 24, 2022

Page 244

previously, she was not in a position to measure the rise, and so her recommendation was based on assumptions.

Q Why was she not --

A That's why we wanted to hire an architect, to --

Q All right. As an architect --

A Mm-hmm?

Q As an architect, what would you need to do to measure the rise of the ramp?

A I'd get a plumber foreman and get a laser level out there.

Q Is that the only way an architect could measure the rise of a ramp?

A Pretty much, yeah. That's the -- that's the best technology -- using a laser level is -- Since we can't drill through the walls or anything like that, that would be the best technology to determine whether or not it actually was over 30 inches or not because, as I said in our deposition last week, we have design drawings that show that the design intent was for it to be a rise of 30 inches, not 31, but 30.

Q Can he use a measuring tape --

---

ERIC DAVIS
January 24, 2022

Page 245

A No.

Q -- to measure the rise -- let me -- Let me ask the question.

A Sorry.

Q Could you use a measuring tape to measure the rise of the ramp?

A I wouldn't say you could do it with any degree of accuracy because it's -- you'd need to find out if something is level, and that's why I would want to use a laser level.

Q Can you use a level to determine if the ramp is level?

A It would have to be 40-feet long.

Q Well, can you use a level to determine the slope of a ramp?

A That's pretty difficult. It's better done -- It's better done by calculation.

Q What type of calculation would you use to measure the slope of a ramp?

A The definition of slope is rise over run.

Q And is there a mathematical calculation?

A Division. If the rise is 30 inches,

---

ERIC DAVIS
January 24, 2022

Page 246

whatever the run is, you divide the rise over the run, and that determines the slope.

Q As an architect, have you ever measured the rise of a slope?

A For the Cermak ramp, no.

Q No. I'm just asking, as an architect, have you ever measured a rise of a slope?

A I think the only time I've ever done that is on a curb ramp. Curb ramps are shorter, and you could do it visually because the -- it's -- The length of a standard tape measure would allow you to do that fairly readily. I seem to recall I did a curb ramp at one point.

Q Were you provided pictures today by your attorney of the Cermak ramp?

A I was provided pictures for today, yes. I think that was in all the documents that you sent earlier, the whole shebang, yeah.

Q I'm showing you what's being marked as Plaintiffs' Exhibit -- Group Exhibit 500. There's a series of photographs identified as 21/2018 through 22/17.

Do you have those available?

A I would ask Jack.

Exhibit 13 Page 32

ERIC DAVIS
January 24, 2022

Page 247

THE WITNESS: Are those among the exhibits that were transferred recently that we got together?

MR. BENTLEY: You have everything. You have everything, yep --

THE WITNESS: Okay.

MR. BENTLEY: -- from last week and the new stuff that they just sent us a few days ago. You have it all.

THE WITNESS: Okay. So I have exhibits through 406. So it's through the subsequent ones, that big dump of photos?

MR. BENTLEY: Yeah. That would be 407 is what we -- what Plaintiffs' counsel indicated it was.

THE WITNESS: Oh, okay.

BY THE WITNESS:

A      All right. Give me just a moment. Let's see here.

(Brief pause.)

BY THE WITNESS:

A      Okay. I have a lot of images.

Which ones are you referring to? The image numbers is all I have.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 248

(Whereupon, Exhibit No. 500 was provided to the witness electronically.)

BY MR. THOMAS MORRISSEY:

Q      Group Exhibit 500 are images from 21 -- I'm sorry -- Images 2118 through 2217.

A      I think I have -- I don't think I have 2217. I have from 2173 various and sundry through 2200 through to 2216 and then 2218. I don't have 2217.

Q      Well, let me -- let me go back a step. Do you have a photograph -- If we look at Exhibit 402 . . .

A      Okay. Give me just a moment. Let's see.

(Whereupon, Exhibit No. 402 was provided to the witness electronically.)

BY THE WITNESS:

A      Okay. 402.

BY MR. THOMAS MORRISSEY:

Q      That's a picture that you believe fairly and accurately depicts the Cermak ramp?

A      That's correct.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 249

Q      The upper portion of the Cermak ramp?

A      I believe this is taken at the top of the -- No. This is -- I believe this is the lower portion.

Q      By "the lower portion," the first picture on the left is the lower portion of the --

A      It says "108" and the image number --

Q      Yeah. It says 16108.

A      Yeah. Oh, I'm sorry. That is the top, you're right, because it's going down. I think that's -- Yeah. I believe it is -- No, well, yeah. It's going down, yeah.

Anyway, go ahead.

Q      And the other picture that's in Group 402 is 016109, which has a tape measure?

A      Yes.

Q      I'm going to ask you now to -- If you'd turn to, in Group Exhibit 500, Picture 2150?

A      2150, 2-1-5-0?

Q      Yeah.

A      Okay. Give me just a moment.

(Brief pause.)

BY THE WITNESS:

A      I don't think I have 2150. Mine start

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 250

at 2173 that I have.

MR. THOMAS MORRISSEY: Jack, can you send him the totality of the pictures that we sent you today?

MR. BENTLEY: I sent everything.

THE WITNESS: Jack may have -- Let me check my e-mail. It may be in an e-mail from Jack, Tom. Sorry about that. It may be -- I'm looking at stuff that was -- I had downloaded previously, so . . . Let's see.

(Brief pause.)

BY THE WITNESS:

A      Okay. No. It's not in that one.

MR. BENTLEY: I don't see an Exhibit 500 in what -- in what we -- what I got from you guys, Tom.

BY MR. THOMAS MORRISSEY:

Q      I'm -- I've marked orally all the photographs that we sent over to Jack as 500.

MR. BENTLEY: I have a -- Okay. I have a huge set of photographs that is labeled as Exhibit 407.

MR. THOMAS MORRISSEY: Okay. We'll use the -- We'll remark them as 407.

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 33

ERIC DAVIS
January 24, 2022

Page 251

MR. BENTLEY: Okay. I just don't have -- I don't see -- The problem is, I don't see any numbers on them, and you're identifying by number of pictures.

MR. THOMAS MORRISSEY: I get it.

MR. BENTLEY: Okay.

BY MR. THOMAS MORRISSEY:

Q So the photographs that were sent by your attorney are a group of photographs there we're marking as Exhibit 407.

(Whereupon, Exhibit No. 407 was provided to the witness electronically.)

BY THE WITNESS:

A Okay.

BY MR. THOMAS MORRISSEY:

Q And --

THE WITNESS: How large is the file, Jack?

MR. BENTLEY: The one I'm looking at is 97 photographs.

THE WITNESS: It's probably too large for you to e-mail to me.

MR. BENTLEY: Yep. But we sent it --

ERIC DAVIS
January 24, 2022

Page 252

we sent it to you through the link that we got from --

THE WITNESS: Oh.

MR. BENTLEY: -- Plaintiff's counsel.

THE WITNESS: Okay. Would that have been your colleague that sent that?

MR. BENTLEY: Yeah. And --

THE WITNESS: What's her name?

MR. BENTLEY: Debbie. She was going to -- She sent you the link. You were supposed to -- She said that you said that you downloaded everything.

THE WITNESS: Yeah. I -- Let me go back.

What's her last name?

MR. BENTLEY: Burger.

THE WITNESS: With an "e," B-e-r-g-e-r?

MR. BENTLEY: Yeah, like a hamburger.

THE WITNESS: Oh, B-u-r-g-e-r. Okay. Let's see.

(Brief pause.)

THE WITNESS: Oh, I see why it is. Sorry about that. That's why I can't find it.

ERIC DAVIS
January 24, 2022

Page 253

There it is. Okay. She sent -- Yeah. That one came this morning, yeah. It's a group exhibit, yeah. So I went in -- Oh, yeah. I thought I downloaded everything.

Here we go. It looks like -- Okay. Oh, for some reason, the download didn't go through all the way. Hold on just a moment.

BY THE WITNESS:

A Which one are you asking about, Jack? Or Tom, rather.

BY MR. THOMAS MORRISSEY:

Q Well, I'm asking --

A I could look at it right now. Just tell me which one, 21- --

Q Let's look at 2162.

A 2162, okay.

All right. And I apologize. I don't know why, when I downloaded everything, I thought I had gotten everything. Obviously, I didn't.

Okay. 2162 looks like a digital level.

Q And do you see the reading on that is .4?

ERIC DAVIS
January 24, 2022

Page 254

A Yes.

Q And it appears to be at the top of the ramp, the Cermak ramp?

A Correct.

Q Now, if we move the level forward and toward -- declining on the ramp, won't it create a grid or an angle?

A Yes.

Q So that point -- you would expect the .4 to increase in --

A Yes.

Q Now, if we look at Photograph 2167 and 2168 . . .

A Supposedly, it's downloading.

(Brief pause.)

BY THE WITNESS:

A Okay. So -67 is opening. Sorry about that.

BY MR. THOMAS MORRISSEY:

Q Sure.

A Okay. -67 is on the floor, and it looks like it has a reading of .6 and has someone's shoe in the corner.

Q That's correct.

Exhibit 13 Page 34

ERIC DAVIS
January 24, 2022

Page 255

And if we look at 2168, it's kind of a blown-up picture of the same reading.

Do you see that?

A        For some reason now, I'm not -- Come on.  It's not allowing me to download it now.  I can't . . .

(Brief pause.)

BY THE WITNESS:

A        There we go.

Okay, yes.  It says 0.6, yes.

BY MR. THOMAS MORRISSEY:

Q        Okay.  And if we go back to the prior one, 2167, it appears that there's -- there was a crack on the floor, correct?

A        Okay.

Q        Do you see the crack on the floor?

A        Yes, yeah.

Q        And to the left -- And 2167 also has a gentleman's shoe in the upper --

A        Yes.

Q        -- left-hand corner.

Now, if we look at Mr. Merkel's picture in Group Exhibit 402 on Photograph 016110, we see a crack on the floor in the upper portion of

ERIC DAVIS
January 24, 2022

Page 256

the ramp adjacent to where the level is, correct?

A        Give me just a moment.  I'm sorry.  I have to juggle between files here.

(Brief pause.)

BY THE WITNESS:

A        And this is in 402, you said?

BY MR. THOMAS MORRISSEY:

Q        Yes.

A        Okay.

(Brief pause.)

BY THE WITNESS:

A        I see the crack in 402.

Which image in that batch are you talking about?

BY MR. THOMAS MORRISSEY:

Q        I'm looking at the photograph that has this laser level.

A        Okay, 016110.

Q        016110.

A        Yeah.

Q        And it also appears to be the same vicinity as the photograph that I -- that I showed you previously, 2167, correct?

A        That's next to a crack that looks

ERIC DAVIS
January 24, 2022

Page 257

similar to the one in the prior image, yes.

Q        And if we move that level, which is at .6 currently, which is maybe -- you would estimate maybe a foot and a half from where the -- the top of the ramp to where the ramp is painted gray, if we move it forward --

A        Okay.  Yeah.

Q        -- kind of in the vicinity where Mr. Merkel placed his laser level, you would anticipate that the level would increase from .6 to become a greater area of being unlevel, correct?

A        Yes.

Q        So if we place the level where Mr. Merkel placed his laser level, which is depicted in Group Exhibit 402, Picture 16110, and the surface there where he placed the level was not level, would you project that it would provide an accurate reading?

A        At that point in the ramp, yes.

Q        Why?

A        Because the laser level is designed to determine a level plane, and so it includes in it, depending on which configuration it is, various technologies intended to identify what is a level

ERIC DAVIS
January 24, 2022

Page 258

plane, regardless of what it's sitting on.

Q        So when was the last time you used a laser level?

A        As I said, I am not expert in the use of a laser level.

Q        And --

A        I have observed them being used, but I have not used one myself.  I've seen them sitting on the top of a ladder.  I've seen them affixed to the side of a wall.  I've seen them affixed to glass.  I've seen them in various locations in construction sites affixed to any number of elements, and I know that their function is to determine what is level at a particular elevation --

Q        So --

A        -- as recently as six months ago.

Q        Do you know whether or not the laser level used by Mr. Merkel in March of 2020 -- '21 for the Cermak ramp was dead level before it shot the picture that -- the tape measure that's depicted in the Group Exhibit 402?

A        My assumption is that it was.

Q        But you -- you have no personal

Exhibit 13 Page 35

ERIC DAVIS
January 24, 2022

Page 259

knowledge of that?

A    I was not there at the time, nor have I inspected the level in question. I am assuming, based upon his professional qualifications, that he was using a device to indicate something that is level.

Q    If the surface is resting on a pitch down, wouldn't it be true that the laser beam will pitch down and not be level?

A    I don't believe it would.

Q    Why not?

A    As I said -- And, again, I have not inspected the laser in question, but it would be logical and appropriate that there would be a gimbal or some other means to determine what is actually level regardless of the surface that it's sitting on.

Q    But you don't -- You have no personal knowledge in regards --

A    At that particular level, no, but that would be my assumption; otherwise, it wouldn't be worth very much.

Q    If the surface where Mr. Merkel placed the level was pitched upward, it would have -- it

ERIC DAVIS
January 24, 2022

Page 260

would shoot a laser beam that goes up that's not level?

A    I would assume it would hit the ramp at some point. If he -- If he turned the laser -- He's at the bottom of the ramp and he set it on an -- and shot it at an angle and the ramp was pitching up, I would assume that the laser would intersect with the ramp at some point.

Q    Does a laser beam disperse or get wider as it gets further away from the unit?

A    Generally, no, unless it's designed to sweep an area, which is what you would do with a laser level. A laser beam itself generally -- And I do know this. A laser beam itself does not disperse -- if it's fixed, does not disperse over a great distance. You can shoot a laser on the moon, and it's within a couple of millimeters of the diameter that it's on on the Earth.

Q    Now, Mr. Merkel apparently used a measuring tape -- Strike that.

Do you know how Mr. Merkel conducted his measurement of the ramp?

A    What I know about his measurement is based upon his description of it in the e-mail,

ERIC DAVIS
January 24, 2022

Page 261

which, I believe, Counsel -- I believe that you have, Counselor.

Q    Do you know if he did that himself, or did he have anybody accompanying him?

A    I assume he either did it himself or someone did it at his direction.

Q    Would it matter whether or not the tape measure that's depicted in Group Exhibit 402 was pitched forward?

A    That would depend upon the angle. If it was at a 45 degree angle, it would alter it significantly. If it was pitched forward a few degrees, it wouldn't matter much at all because of the trigonometry.

Q    Well, if the measuring instrument, in this case, a tape measure, is less than vertical, can it make the reading of the laser level meaningless?

A    Meaningless, no.

Q    Does the tape measure that's depicted in Group 402 have to be vertical in order for the measurement to be accurate?

A    Nominally, yes.

Q    What do you mean by "nominal"?

ERIC DAVIS
January 24, 2022

Page 262

If it's off -- If it's pitched forward, what will that cause the laser --

A    As I said, if it's pitched forward a little bit, a few degrees, then the math says that it doesn't materially impact the measurement.

If it's pitched on the order of, you know, 30 degrees, 45 degrees, then yes, it would, because the math says so.

Q    If the tape was pitched forward, the reading would be shorter than the actual height, correct?

A    Within the tolerance of a measuring device which is calibrated to a sixteen of an inch, I doubt if it would show up at all.

Q    Well, to what degree, if the measuring stick is pitched forward, would it diminish the -- the rise of the ramp?

A    As I said, it's trigonometry. So the degree to which it varies increases as -- with -- as a function of the angle.

Q    You don't know what angle that measuring stick was at when Mr. Merkel took the measurement in March of 2021?

A    Correct. I do not.

Exhibit 13 Page 36

ERIC DAVIS
January 24, 2022

Page 263

Q    And the accuracy of his reading would depend upon the angle in which the measuring device was on the ramp?

A    This photograph shows me what appears to be a tape measure being held nominally vertically, and I say "nominally" to the extent that it varied a few degrees, it wouldn't matter. It wouldn't materially impact the measurement.

Q    Well, assuming that tape were pitched backward, would that give a reading that was higher for the rise of the ramp?

A    No.  The maximum would be at complete 90 degrees, and any variance a few degrees one way or the other would be a slight -- and I emphasize "slight" -- diminution below that reading.

Q    Would it be necessary to use a metal yardstick held perfectly level to get an accurate reading of the rise of the ramp using a laser light?

A    Define what --

Q    Laser level.

A    -- you mean by "accurate."

Q    I mean, whether it's 30 and a quarter or 30 inches, the rise.

ERIC DAVIS
January 24, 2022

Page 264

A    I can't imagine -- and I would be happy to do whatever calculations you'd want -- that it would get anywhere close to changing the measurement by as much as a quarter unless it was approximately 60, 70 degrees, rather than 90.  It would have to be significantly out of plumb to change it that much.

Q    To be clear, you have no knowledge how the measuring instrument used by Mr. Merkel was held vertically?

A    That's correct.  I only know what I see in the photographs and his description thereof.

Q    Did he ever measure a ramp similar to the Cermak ramp to determine the rise of the slope?

A    I believe you asked me that already, but the answer is no.

Q    Do you know if this plumber, Merkel, has ever measured the rise of a ramp?

A    As I said before, I don't know if he's measured the rise of a ramp.  His measurement of rising and falling or slopes is a normal function of his job.

Q    I'm going to show you Group Exhibit 407.  Picture 2218, I will ask you to turn

ERIC DAVIS
January 24, 2022

Page 265

to that.

A    Okay.  Let me get that one.

Q    The first picture -- I'm sorry.

A    Okay.

(Brief pause.)

BY THE WITNESS:

A    22 -- I'm sorry.  2218 or 2118?

BY MR. THOMAS MORRISSEY:

Q    2218.

A    Okay, sir.  I have that open.

Q    Do you see that a measuring tape is being used to measure --

A    Yes.

Q    -- from the top of the ramp up to where the -- the cinder block gray meets the white cinder block?

A    Yes.

Q    And in your experience as an architect, do masons, when they pour a cinder block wall -- do they use an instrument to make sure that their wall is level?

A    Yes.

Q    What kind of instrument would a mason use to ensure --

ERIC DAVIS
January 24, 2022

Page 266

A    They would use --

Q    Let me finish the question.

A    I'm sorry.

Q    What type of instrument would a mason use to ensure that a wall constructed of cinder blocks was -- was level?

A    To do what's called truing up masonry joints in construction, standard practice is either to use a laser level or to use a string.  These strings are very tight, and it's a specialized tool, which generally is set to allow a mason to strike the joints at a proper elevation to make sure that their bed joints are all aligned.

Q    When a mason either uses a laser level or a tape, generally, for a commercial project like the Cermak building, would that be inspected by the foreman?

A    Yes.

Q    So it's very important when a mason constructs a masonry wall constructed of a block that his or her measurements are accurate?

A    Yes.

Q    And would that be reviewed by the project manager also to make sure that the mason is

Exhibit 13 Page 37

ERIC DAVIS
January 24, 2022

Page 267

putting up the block level?

A    Yes.

Q    And would it also, on a project like Cermak, be calibrated or measured by the Architect of Record?

A    No.

Q    Who would be responsible to supervise the mason to make sure that the block was laid level?

A    Generally, the job superintendent of the general contractor or of the masonry subcontractor.

Q    If we turn to Picture 2218 . . .

A    Yes.

Q    I'm sorry, 2219 -- [continuing], do you see that the measurement at the top of the ramp on the left side is 24 inches -- I'm sorry -- 24 feet, 6 inches?

A    2219?

Q    2218.

A    Oh, sorry.

Q    I'm sorry, 2219.  I'm sorry.

A    2219 is indicating a dimension of 24 inches.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 268

Q    Well, where the gray block -- between the gray block and the white block, is it 24 -- 24 feet, six inches?

A    No.  It's 24 and a half inches nominally.  I would expect it's actually closer to 24 and 5/8ths.

Q    So you would put it at 24 and 5/8ths?

A    From the looks of this -- Let's see. 24.  Well, I'd say the joint is -- it's on the order of -- it looks like the base -- Let me explain.

What you're looking at is a bed joint, so the bottom -- the part of the gray and then the gray in the middle is -- the main part of the gray is the block itself.  Then what you're seeing in the sort of discoloration is the grout, or the mortar, if you will, that has been painted. Okay?

And then the paint stops at it looks like the next block above, so it looks like the bottom of the upper block is at approximately 24 and a half inches by this measurement.

Q    Okay.  So you would agree, it's 24 feet, 6 inches"?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 269

A    No, no.  This was inches -- this is -- It's 24 inches or 2 feet.

Q    I'm sorry.

It would be 24 -- 2 feet, 6 inches?

A    No.  It looks like it's -- It looks like it's 2 feet -- I'm sorry.

Q    2 and a half feet?

A    It's not 2 and a half feet.  It's 24 and a half inches.  2 and a half feet would be 30 inches.

Q    If we took the measurement of the block which is depicted in 2219 at the top of the ramp --

A    Okay.

Q    -- and we then took a measurement on the left side of the ramp at the foot of the ramp --

A    Okay.

Q    -- and then subtracted the measurement at the foot of the ramp where the gray block is separated from the white block --

A    Okay.

Q    -- against the measurement on the

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 270

left-hand side of the upper portion of the ramp --

A    Okay.

Q    -- would we be able to calculate the rise of the ramp?

A    You would be able to estimate it.  I would say it would be less accurate than if you used a laser level.

Q    You haven't used a measuring stick to determine what the measurement of the rise of the Cermak ramp is on the left-hand side of the ramp?

A    That's correct.  I have not.  I'm commenting on construction technology.

Q    And you haven't measured the rise of the ramp on the right-hand side of the ramp either?

A    Not by the method that you're talking about with the -- with the joints in the adjacent masonry.

Q    Would you agree that an architect would be more likely to be able to form a professional opinion in regards to the rise for the Cermak ramp than a plumber?

A    No.

Q    Do you know if the ramp -- the rise of the ramp on the left side of the ramp is the same

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 38

ERIC DAVIS
January 24, 2022

Page 271

as the rise on the right side of the ramp?

A    Nominally, yes, because there are limitations about the variation of slope and what's called a cross slope in the ramp.  That's a part of the ADA.

Q    Do you know if Mr. Merkel took any measurements of the rise of the ramp on the left-hand side of the ramp?

A    No, I don't.

Q    Do you know if the ramp as poured was level?

A    You mean as far as the cross slope?  I would expect that it would be measured level up the slope, yes.

Q    But do you know?

A    No.

Q    If Mr. Merkel, hypothetically, took a measure of the rise from the top center of the ramp to the center of the ramp and came up with 30 inches, does that necessarily mean that the rise on the left-hand side of the ramp was also 30 inches or less?

A    Not automatically, no; but it would be -- it would vary a very small amount.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 272

Q    Could it vary a half-an-inch?

A    I would be very surprised if it varied that much across a ramp.  But could it?  Yes.  Does it?  I have not measured it, but I would be surprised.

Q    If the right-hand side of the ramp was 31.25 -- 31 inches -- 31 and a quarter inches, could the rise measured by Mr. Merkel vary that much if he --

A    No.

Q    -- measured the center from the right?

A    No.  You would perceive it.  Walking up and down it, you would perceive that there's a slope.  That would be too steep.

Q    Have you looked -- taken a level on the ramp to see whether or not the ramp is even?

A    I don't need to.  You did.  You have a photograph of your level on it.

Q    If we look at some of the photographs of the level, would that perhaps change your opinion?

A    Give me an example.

Q    Sure.  I'm getting there.

(Brief pause.)

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 273

BY MR. THOMAS MORRISSEY:

Q    Giving you an example of 2160 where it shows a dimension of .7 . . .

A    So less than 1 degree.  That's .7 degrees.

Q    Okay.

A    That's less than 1 degree.

Q    That wouldn't be -- If it was level, it would be zero, correct?

A    Correct.

Q    If we look at 2145, again, it's at .7  The area measured at this point of the ramp is .7.

A    Okay.

Q    Do you see that?

A    2145?

Q    Yes.

A    0.7 degrees, yes.

Q    And if we look at 2160, it reflects a level of .7, correct?

A    That's what it appears to, yes.

Q    Why didn't you call Mr. Merkel to determine precisely how he measured the Cermak ramp in March of 2021?

A    I didn't think I needed to.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 274

Q    Is that because you knew that the ramp wasn't compliant with the ADA because it had no handrails?

A    Absolutely not, no.

Q    After Ms. Stoner did her measurements of the ramp, you proceeded to put in a task order to hire an Architect of Record, correct?

A    Correct, yes.

Q    And that was because, in part, you wanted to have an architect evaluate whether or not the rise of the ramp complied with the ADA?

A    I wanted to hire an architect based upon her recommendations to a), verify if they agreed with it; and b) develop drawings, if necessary, to provide whatever remediations that licensed architect felt were necessary.

Q    And after March of '21, 2021, when you received Mr. Merkel's measurements --

A    Yes.

Q    -- did you suspend every attempt by the County to hire an Architect of Record to determine whether the ramp was compliant with the ADA in 1991 or 2010?

A    Not at all.  As I mentioned, we

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 39

ERIC DAVIS
January 24, 2022

Page 275

continued to pursue those services.

Q    Why if you came to the conclusion that the Cermak ramp is in compliance with the 1991 standards and the 2010 standards, would -- would the County, with you as Deputy Director of Capital Planning and Improvements, proceed to hire an architect if you knew for a fact that the ramp was ADA-compliant?

A    Your question is illogical. We have a recommendation to make changes, and we would ask an Architect of Record to evaluate that assessment, make their own determination, and proceed accordingly for remediation based upon what they -- what they determined.

Q    So as you sit here, you're not relying on Joe Merkel, a plumber for the Department of Facilities Management, to make an assessment whether or not the Cermak ramp is compliant or not with the 1991 or the 2010 standards?

A    I'm not entirely understanding your question because, as I just said, we have information from Ellen Stoner that suggests that it is not, and we have information from Mr. Merkel that suggests that it is.

ERIC DAVIS
January 24, 2022

Page 276

And so I would want to find out definitively, and I would note Mr. Merkel is a plumber foreman, not just a plumber.

Q    So just because the plumber foreman came up with a measurement of the Cermak ramp using a laser level beam, which you don't know whether or not was calibrated before he used it, you're not confident that the rise of the ramp is 30 inches or less.

Is that fair to say?

A    I would want to hire someone, as I said before, an architect, to determine that definitively, and it probably would involve a more rigorous investigation, probably using a laser level.

We have one piece of information that says it's compliant and another piece of information that suggests that it's not. I want to know the answer, and I'm not going to slow down because of Mr. Merkel's report. I want to find out what's going on.

Q    Well, Ms. Stoner is a contractor for STV, correct?

A    She is a member of a firm that it is a

ERIC DAVIS
January 24, 2022

Page 277

subcontractor for STV. I believe she's also herself a licensed architect.

Q    All right. And STV is involved in -- in this procurement process for design services for the Cermak ramp, correct?

A    Correct.

Q    And Ms. Stoner's firm is still under contract with STV, to your knowledge?

A    Yes.

Q    Why wouldn't STV, on behalf of the County, go back to Ms. Stoner, who has qualifications, I assume, in regards to the ADA, and ask her to do a more rigorous examination of the Cermak ramp?

A    It would actually be more expeditious for us to proceed as we are doing and hire an Architect of Record to proceed to evaluate the information and to begin the process of designing whatever remediations were necessary.

Q    Well --

A    If I took the time to go back and ask Ellen to check again, I'm just delaying getting an architect out there, a design firm out there, to do construction drawings.

ERIC DAVIS
January 24, 2022

Page 278

Q    Well, Ms. Stoner did this work in March of 2018.

A    Yes.

Q    You proceeded to ask the County Board elected officials to authorize the expenditure of money to hire an architectural firm --

A    Yes.

Q    -- to, in part, determine whether or not the ramp was compliant.

Is that fair to say?

A    In part, yes.

Q    Why wouldn't you, in the last four years, have gone back -- you or STV gone back to Ms. Stoner and asked her to spend an hour or two hours to go out and measure the ramp to see if it's compliant with the ADA?

A    Her job is to find out the questions we need to ask and hire an Architect of Record to determine the answer to. It would be duplicative of her existing effort.

She's identified a concern, we've noted the concern, and we're proceeding to retain professional services to a), determine the bottom line; and b), design a remediation if one is called

Exhibit 13 Page 40

ERIC DAVIS
January 24, 2022

Page 279

for.

Q    Okay.  Well, is it fair to say that -- we went over this last time -- that the ramp doesn't have handrails on the left- and right-hand side?

A    The ramp appears to have bumpers, yes.

Q    And those aren't in compliance with the 1991 or 2010 standards.

Is that fair to say?

A    Not necessarily.  As I said before, there may be, and it turns out that there are, reasons why that wouldn't necessarily be required.

Q    Did you put handrails -- When you spent time and effort hiring an architectural design firm, did you put the handrails on the Leighton ramp, the ramp leading from the jail to the criminal court building?

A    I honestly can't remember one way or another.  Perhaps, I don't know.  I'd have to go back and -- I have not actually walked the ramp since it was constructed.  As I said, it was completed during the pandemic, so I haven't been down there.

Q    Let's -- Given that we were there a

ERIC DAVIS
January 24, 2022

Page 280

week ago and there are handrails, does that indicate --

A    Wait.  Hang on.  You're saying you've been in the building a week ago?

Q    Well, a lawyer from my office has been in the Cook County Leighton court building and has gone up and down the Leighton ramp --

A    Okay.

Q    -- and there are handrails.

A    Okay.

Q    Given that, do you know of any exception that would preclude -- which would allow for a hospital facility, the Cook County Jail, to exclude handrails on a ramp such as Cermak?

A    Yes.

Q    Where in the 1991 or 2010 standards is that exception?

A    That is in -- just a moment here -- 4- -- excuse me.  Here we go.

That is in Section 405.8 -- I'm just citing the 2010.  It's in Section 405.8 of the Americans with Disabilities Act 2010.  There is an exception and it says, "Within employee work areas, handrails shall not be required where ramps that

ERIC DAVIS
January 24, 2022

Page 281

are part of a common use circulation path are designed to permit the installation of handrails complying with 505."

In other words, you can put them in, but they are not required if it's what's called an employee work area.  The only people -- And I have verified this with the Sheriff since I spoke with you.

The only people that are allowed to be in the -- in the ramp when a detainee is there is a Sheriff's officer, and people that come up and down the ramp are escorted by members of the Sheriff's Office.

That is their common -- That is their employee work area, and so -- And I have consulted with the Access Board about this.  And so because it is part of their employee work area and because the general public is not allowed there, as it says in 405.8, the exception, "Handrails shall not be required."

They can put them in, but they're not required.  That's the most-recent and most-detailed interpretation that I have on this situation, and I would -- I would note -- I would

ERIC DAVIS
January 24, 2022

Page 282

ask an architect hired for this circumstance to evaluate that, make a peer review, make their determination if that interpretation is correct, but that's --

Q    Do you have --

A    -- in the 2010 ADA.

Q    Do you have a ruling from the Access Board in regards to this --

A    The Access Board does not do rulings.

Q    And who did you speak to at the Access Board in regards --

A    His name is Randall Duchesneau.  He is a technical adviser with the Access Board.

Q    And as a public entity, are you entitled to rely on -- on an employee of the Access Board's communication to you?

A    As I believe you know, the Access Board is authorized by the Department of Justice to provide technical assistance to questions, in this case, from architects.

Q    But did you get -- You didn't get any type of written ruling from the Access Board?

A    I didn't ask for a ruling.  As I said, they don't make rulings.  You ask questions.  And

Exhibit 13 Page 41

ERIC DAVIS
January 24, 2022

Page 283

he provided -- He provided me with a section of the ADA that he believes may be applicable, and I investigated it and it appears to me that it is applicable.

Q      What did you -- What information did you provide him? You said it may be applicable, so there's a certain uncertainty to your answer.

A      I described the situation. I described that it is within a corrections or detention facility. I described the physical configuration, and I asked specifically about the requirement for handrails, and this was a section of the ADA that he cited that he feels may apply, and I feel that it does. But I'm going to rely on the Architect of Record that we hire to make a definitive determination.

Q      Did you --

A      And so, again, we have conflicting information, and I want to know what the truth is.

Q      Did you inform Randall from the Access Board that inmates in wheelchairs are -- at times go up and down the ramp without assistance?

A      I checked with Sabrina, and she told me that they don't.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 284

Q      So you rely --

A      That doesn't mean that there's not -- That doesn't mean that there's not a deputy with them. I'm not aware of detainees going up and down there by themselves. They may push the chair themselves, but my understanding -- and, again, we don't do operations; we just do the building.

It's my understanding that the operations is that a Sheriff's deputy is always with an individual when they're going up and down the ramp.

Q      Did -- Have you looked at any films of inmates going up and down the ramp in wheelchairs?

A      I have not.

Q      Have you looked at any films of inmates on canes or crutches going up or down the ramp at Cermak?

A      I have not.

Q      How would a person with a cane or crutch get up the Cermak ramp, according to your information?

A      Are you referring to an employee or a detainee?

Q      I'm talking about a detainee.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 285

A      I would assume that, with crutches, they would navigate it themselves with a Sheriff's deputy close by.

Q      Why would it matter if a -- if a Sheriff's deputy was close by if a person -- Well, let me ask you a question.

If a detainee in a wheelchair is descending the Cermak ramp from the jail to enter into -- into the Cermak infirmary, as the wheelchair progresses downhill, will it -- will the movement increase in velocity?

A      As a function of gravity, I would assume it would accelerate.

Q      And as the wheelchair descends from the top of the slope downward, that would put greater strain on the detainee to slow it down.

Would that be a fair assessment --

A      I --

Q      -- if the person was in a wheelchair?

A      I couldn't say one way or the other and, of course, it would depend upon whether or not they were being directly assisted by a deputy or not. I don't know if a deputy would be pushing or

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 286

holding on to the wheelchair or not, so I can't comment on the specific situation.

Q      I'll show you Exhibit 200 for a moment. You'll be able determine whether Sabrina accurately told you that detainees are assisted up and down the ramp.

(Whereupon, Exhibit No. 200 was provided to the witness electronically.)

(Brief pause.)

BY THE WITNESS:

A      Okay. I can see that. I've watched the video.

BY MR. THOMAS MORRISSEY:

Q      I'm sorry.

In the video, which is Exhibit No. 200, do you see any Department of Correction employee pushing that gentleman up the ramp?

A      I do not.

Q      I'm sorry. It was going down the ramp.

A      I do not. I don't know if -- He seems to be talking to somebody. I don't know if there's somebody out of frame there that was at the bottom

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 42

ERIC DAVIS
January 24, 2022

Page 287

of the ramp. I don't know.

Q And if we take a moment, I believe that there will be another person ambulating going either up or down the ramp.

(Brief pause.)

BY THE WITNESS:

A I'm seeing somebody -- I'm seeing what looks like a deputy walking right next to someone with a walker.

BY MR. THOMAS MORRISSEY:

Q Is the person being helped with a walker?

A It appears to me that the deputy is next to them.

Q Well, the picture I'm looking at, the deputy appears to be four or five feet ahead of the gentleman.

A Mm-hmm.

Q Is that correct?

A That's -- Approximately, and he catches up to her.

Q And do you see it's with some difficulty the gentleman is going up with a walker?

A I can't --

ERIC DAVIS
January 24, 2022

Page 288

Q I'm sorry. Down.

A I can't speak to whether it's difficult for him or not.

Q Can you see from the photograph that he's slowly going down the ramp; and as he goes down the ramp, the officer is maybe five or ten feet ahead of him.

A Okay.

Q Is that true?

A That appears to be, yes.

Q And is the purpose of -- To your knowledge, is that consistent in which the operation of the ramp is used as far as wheelchair people and people in walkers?

A As I said before, I don't -- We're not in charge of operations, so I can't say what their standard procedure is or is not or what their operations are or are not.

Q What is the purpose under the ADA for a ramp to have a handrail?

A It appears that the video has stopped. Sorry.

The purpose of the handrail in that case is to provide assistance.

ERIC DAVIS
January 24, 2022

Page 289

Q Why is it -- Why is a handrail included in the 1991 and the 2010 ADA standards for people who are disabled?

A To make it easier for people to get up and down ramps and stairs.

Q Is there any other technology available to a disabled prisoner to go up or down the Cermak ramp either in a wheelchair, a walker, or a cane, other than a handrail?

A You could have a motorized lift.

Q Anything other than a motorized lift?

A Perhaps. Nothing come to mind.

Q Now, given Ms. Stoner's recommendation in March of 2018 and given your hesitancy now -- All right. Let me -- Let me rephrase the question.

You're familiar with the Leighton ramp that connects the jail with the Leighton Courthouse?

A Generally, yes.

Q And when was the last time -- What is your familiarity with the Leighton ramp?

A I don't think I've been up and down the ramp since the bridge was constructed.

Q Would you consider that employees of

ERIC DAVIS
January 24, 2022

Page 290

the Sheriff go up and down the Leighton ramp also?

A Yes.

Q And the public, the general public, don't go up and down the Leighton ramp that connects the jail to the courthouse. Is that correct?

A No.

Q So it's the same thing as the Cermak ramp as far as the use, the operation, of the Cermak ramp and the Leighton ramp. Both ramps are used to transport detainees either to the infirmary or, in the case of Leighton ramp, to court. Isn't that true?

A Yes.

Q So why did the County proceed to renovate the Leighton ramp at a considerable cost if the ADA didn't require it and put a railing in?

A As I said, in the standard, there may be a difference between what is or is not required and what is desirable. There's nothing to prevent us from going above the standard. There's a -- There's a principle called "universal design"; and even if it isn't required, it may be something we want to do.

Exhibit 13 Page 43

ERIC DAVIS
January 24, 2022

Page 291

In this case, as I've said before, with the Cermak ramp, that's why we're hiring an architect. If the architect says, "You know, you really ought to put a handrail in there," then we're going to put a handrail in there.

But what I'm saying, from my investigation, it appears that, when constructed, that a handrail may not have been required, and I can't can make a definitive determination, but it occurs that -- it appears that it may not have been required when constructed. If we were touching it today, I would -- I would do it any way.

Q    Do you consider the Leighton ramp to be a work area for employees?

A    I'm sorry. To be what?

Q    To be a work space for employees.

A    Yes, mm-hmm.

Q    Even though it's used to transport detainees from the jail to the court building?

A    Yes.

Q    And because it's a work space, a common work space, the Leighton ramp didn't have to comply with the ADA?

A    It's my interpretation, based upon the

ERIC DAVIS
January 24, 2022

Page 292

passage that we -- that we read, that it might not have been specifically required, that there may have been a possible exception but that the decision was made to do it anyway.

Q    And it's also your opinion that even though -- Assuming for a moment that Ellen Stoner is right --

A    Okay.

Q    -- that the Cermak ramp doesn't comply with the ADA because there's no -- a) no handrail, and the rise is too steep, assuming Stoner is right, is it your position as a deputy of Capital Planning and Policy that it is not necessary for Cook County to proceed to alter the ramp to make it compliant with the ADA?

A    As I said before, that's why we're endeavoring to hire an Architect of Record so that they can make that specific determination. It is not my responsibility to be the design architect, and it is not Ellen's responsibility to be the design architect.

She's a consultant. She made a recommendation. We're going to hire somebody to determine definitively whether we should or we

ERIC DAVIS
January 24, 2022

Page 293

shouldn't, and we will proceed accordingly.

I have insight, but it's not my position to be making the determination because I'm not stamping the drawings.

Q    So in your position, then, you're disputing the Plaintiffs' position --

A    No.

Q    -- that the ADA --

A    I'm identifying a possible variation, and I want to know what the answer is.

MR. BENTLEY: You've got to let him finish the question, Eric.

THE WITNESS: Okay.

MR. BENTLEY: Would you reask it, please, Tom?

MR. THOMAS MORRISSEY: Sure.
BY MR. THOMAS MORRISSEY:

Q    It's your position that Stoner may be wrong and that the ADA requirements do not apply to the Cermak ramp when it was built in 1995 or 1996?

A    It's my position that there may have been a variation from what should have been installed, and I'm going to hire somebody to find out what we need to do today.

ERIC DAVIS
January 24, 2022

Page 294

I can't determine definitively one way or another. I'm simply identifying that there's a question, and that's why we're going to hire somebody to give us an answer.

MR. THOMAS MORRISSEY: We're going to take a five-minute break.

MR. BENTLEY: All right. Back in five.

(Whereupon, a brief recess was had.)
BY MR. THOMAS MORRISSEY:

Q    What priority --

MR. BENTLEY: Are we back on the record?

MR. THOMAS MORRISSEY: We're back on the record.
BY MR. THOMAS MORRISSEY:

Q    What priority does the president of the Cook County Board give to renovating and altering the Cermak ramp to make it fully compliant with either the 1991 standards or the 2010 standards?

A    I don't know how I can answer your question, Tom. I honestly don't know how to answer

Exhibit 13 Page 44

ERIC DAVIS
January 24, 2022

Page 295

your question.

Q    What priority does the Cook County president give to making Cook County facilities accessible under the 2010 and 1991 standards?

A    Increasing accessibility in County facilities is an ongoing priority and task for the Bureau of Asset Management.  It is part of the president's policies.

It is an ongoing goal both for -- both for the president and for our bureau.  It is an important consideration and a priority for our -- our bureau.

Q    What priority does the Cook County Board give to making Cook County buildings accessible under the 2010 and the two thousand -- and the 1991 standards?

A    Again, I would -- I would expect -- I can't speak for the Board of Commissioners, but it's my impression that it is a significant priority.  We know that multiple commissioners have spoken on it on multiple occasions.  It's an important issue for the Board.

Q    What priority does Cook County -- Cook County's Office of Capital Planning and

ERIC DAVIS
January 24, 2022

Page 296

Improvement give to renovating the Cermak ramp to install a -- grab bars on the left and right side of the ramp and handrails on the left and right side of the ramp and to create a landing 30 feet from the top for a disabled person to rest as he or she descends the ramp or goes up the ramp?

A    Let me answer your question in parts.

Relative to the handrails, I fully expect that we -- that the recommendation of the Architect of Record that we will hire for this will include that in the scope that they feel is required.  At which point, we will do that.

As far as the determination of whether or not an intermediate landing is -- is required, as we have said at great length today and previously, it appears that there is information to suggest that the ramp does not require an intermediate landing, and there's information to suggest that may require an intermediate landing.

That's why we are going to hire somebody to determinatively identify what is the case, put their professional seal on it, and we will follow those -- that direction.

Q    How much would it have cost to hire

ERIC DAVIS
January 24, 2022

Page 297

Ellen Stoner or another architect to do a measurement of the Cermak ramp to determine whether a landing is required?

A    As I have mentioned many times, the procurement of professional services has been a time-consuming effort of ours and, as you also know, as far as determining the rise of the ramp, the more-recent information from Mr. Merkel is -- I take as pretty darn accurate, but I want to get a determinative -- a definite determination.

We struggle to retain professional services.  It has been an going challenge, but we currently have at least a half-a-dozen projects in development with the Procurement Office.  All are about ADA.

So it is a significant priority. It is important to us as a -- as a department, and I want to state for the record, it is important to me personally and professionally, and I take exception to anyone who wants to suggest that it is not an important priority for yours truly as an architect and as an employee of the County.

We are trying our level best on an ongoing basis and have been for some time to get

ERIC DAVIS
January 24, 2022

Page 298

the right answer and to get this addressed.

Q    How many architects work for Planning and Improvement?

A    As best I can tell, only two at this time; as far as County employees, two.

Q    Turning to the Rule 30(B)(6) Notice, do you have that in front of you?

A    I do.

Q    The first question is, "Identify by month and year when construction commenced on the Cermak Health facility located at 2800 South California Avenue, Chicago, Illinois."

And before you answer --

MR. THOMAS MORRISSEY:  Jack, Cook County has designated Mr. Davis to respond to 1, 5, 7 through 11.  Is that correct?

MR. BENTLEY:  That is correct.

MR. THOMAS MORRISSEY:  And part of 6. Is that correct?

MR. BENTLEY:  Yes.  6 within -- Yes. He may not be able to testify to 6 exhaustively, but that which he can testify to is within the scope of the your Rule 30(B)(6).

Exhibit 13 Page 45

Page 299

BY MR. THOMAS MORRISSEY:

Q     So what is your response to Topic No. 1?

A     "The information to the best of my awareness is that the construction for the Cermak Health Services facility began in 1996 and appears to have been completed in 1998."

Q     No. 5, "From January 1st, 2017, to the present, action taken to renovate the Cermak ramp to accommodate wheelchair users."

THE WITNESS:  Okay.  Jack, I provided a written answer to this previously.

Do you want to go from that, or how -- what -- How should I proceed?

MR. BENTLEY:  When you say you "provided a written answer to this," what do you mean?

THE WITNESS:  I think I provided a draft response to these questions.

MR. BENTLEY:  You filled out interrogatories.

THE WITNESS:  Yeah.  I think that's what I'm talking about, yeah.

MR. BENTLEY:  Yeah, no.  This is --

Page 300

You have to testify.  It's not -- It's a different -- It's a different thing.

THE WITNESS:  Okay.

BY THE WITNESS:

A     All right.  In general, in answer to No. 5, the County has undertaken multiple efforts over the intervening years to a), identify the need; and b) obtain professional design services in order to contract a construction firm to make whatever remediations are necessary.

Those efforts over the years have included having a consultant from our public safety team, as noted previously in my deposition in 2018, undertake an evaluation and make recommendations.

Based upon that -- the recommendations, in part, efforts were undertaken to develop a capital project, to hire an architect to address the circumstances, including the Cermak ramp and others.

The initial effort to do so was done as a Request For Proposal under prior Procurement rules and regulations.  That changed over time, and so we made a second effort under what's called a task order agreement where we

Page 301

endeavored to bring a contract to the Board of Commissioners to hire architects to address groups of issues, including the Cermak ramp.

That effort was denied by the Board of Commissioners because it was not -- I believe the specific limitation was, it wasn't considered to be within the corners of the Procurement Code to allow them to do that.

Subsequent to that, we have been endeavoring to provide architectural and engineering services through a Request for Qualification method, and, as I've also mentioned today in this deposition, that RFQ is currently being finalized with the Office of the Chief Procurement Officer.

It is our expectation that will go to the street next month, being February 2022, with a goal of getting design service completed either in '22 or early '23 with construction of any remediations to commence in 2023.

BY MR. THOMAS MORRISSEY:

Q     When -- Describe the efforts through the Request For Proposal to renovate the Cermak ramp.

Page 302

A     And I'm sorry.  I'm going to ask, Counsel, is this -- are we still -- Is this part of the 30(b)(6), or is this something separate?

Q     It is.

You mentioned that in response to No. 5 --

A     Okay.

Q     -- that initially, you did -- you proceeded under a process called a Request For Proposal to architectural firms.

Describe in detail what Cook County did to request a proposal from an architectural firm.

MR. BENTLEY:  And just going forward, Eric, he is permitted to ask follow-up questions --

THE WITNESS:  Okay.

MR. BENTLEY:  -- that are still under the umbrella topics in the Notice and --

THE WITNESS:  Okay.

MR. BENTLEY:  -- it's still part of the 30(b)(6) Notice.  If he veers off of that, I will -- I will object and say no.

But for now, go ahead.

THE WITNESS:  Thank you.  Because I'm

Exhibit 13 Page 46

ERIC DAVIS
January 24, 2022

Page 303

just not clear with the legal mechanism.

BY THE WITNESS:

A        So you're asking, Tom, about the process of developing an RFP, which was the first efforts.  Is that correct?

BY MR. THOMAS MORRISSEY:

Q        That's correct.

A        Okay.  So our consultant team, the -- referred to colloquially as "the STV/Heery team," working with our project director and others, developed a preliminary Request For Proposal that included the scope of the Cermak ramp.  I don't recall offhand whether or not at that time it was bundled within another project or was a standalone.

That attempt was under a prior procurement officer which changed, and the requirements of the Office of the Chief Procurement Officer meant that we needed to reengineer that procurement.

Q        When did STV -- And the project manager was Sheila Atkins?

A        Sheila Atkins works for Cook County -- or worked for Cook County as a project director.  STV is our consultant.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 304

Q        Right.

Do you remember what period of time did STV and your project director, Sheila Atkins, work toward a Request For Proposal?

A        In general, during 2018 and 2019.

Q        So for two years, they sought to hire -- to get a proposal from an architect to do design drawings, in part, for the Cermak ramp?

A        No.  I believe it was closer to a year, but just overlapping.  I think it -- I can go back and probably check, but I suspect it was roughly midyear 2018 through midyear beginning of the year in 2019.

Actually, yeah.  I think it was, yeah, around -- shorter than that, so it would have been less than a year in total, just overlapping between 2018 and 2019.

Q        Are there any documents that reflect that effort?

A        I expect that we have somewhere a draft of -- of that version of the RFP.

Q        I believe we've made a request for those type of documents.

And those would be in your

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 305

office?

A        Those would either be in -- on our server or on the ShareDrive, yeah, probably stored only electronically.

Q        And was there a conclusion or denial by the Procurement -- Procurement Office that they would not proceed with this Request For Proposal, in part, to design the Cermak ramp?

A        To be clear -- and I'm reconstructing from memory -- I believe that it was in 2019 that a determination was made that the RFP format was not consistent with the direction of the Chief Procurement Officer.  It may have been before that.  It may have been in the end of 2018.

I don't specifically recall when that transition took place, but the Chief Procurement Officer decided -- and their counsel decided to revisit the -- all of the procurements that we were doing at the time.

Q        So was there a denial specifically in regards to an RFP to move forward with renovating the Cermak ramp?

A        I'm not aware of a denial specifically about Cermak, just a blanket change that, "Hey, we

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 306

need to not do it this way anymore.  We need to do it this other way," or -- that one and a number of others that were in development at the time.

Q        For what period of time did Cook County proceed using a task method to procure design drawings to renovate the Cermak ramp, among other projects?

A        My recollection is that the bulk of that effort was during 2019 when we put together a package for award based upon, at the time, prequalified firms, and that was denied.

And I'm sorry.  Did you hear the -- I meant to add it was denied because of the requirements of the Procurement Code, not any specific reflection about whether or not a project or projects were ADA-related.  It had to do with the technicalities in Procurement.

Q        Were there any documents that were generated by Cook County in regards to renovating the ramp pursuant to this task process?

A        I believe that the information in the -- which you referred to as "the Stoner report" was likely included in the scope of work for one of those projected assignments.  That would have been

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 47

ERIC DAVIS
January 24, 2022

Page 307

our standard practice, so that's -- that would have been in there.

Q      Are there -- Are there documents in your office that reflect this effort to proceed with renovating the Cermak ramp through the task method?

A      I believe it was included in the list of projects projected for the task order contracts. I couldn't tell you which of several contracts it was attached to.

I believe it was included in that list of some 60 or 80 projects. I think it was in there on that list. I don't remember which contract it was going to be assigned to.

Q      Was this a -- Was this list of projects earmarked by Capital Planning and Improvement to the County Board -- was it included in any public document?

A      I believe it was provided in materials provided to the Board of Commissioners when the item was submitted for the agenda.

Q      And would that have been a public document?

A      I believe so.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 308

Q      Do you have a copy of those projects and the documents that were submitted to the County Board seeking approval for this task method?

A      I have some of the documents. I believe some of the documents submitted were actually developed by the Office of the Chief Procurement Officer. I don't know if I have all of the documents, but I'm pretty sure I have the list.

Q      Between -- And the County Board rejected this task method of procuring --

A      To be clear, they pulled it from the agenda. It did not come to a vote. They did not vote not to do it. It was pulled from the agenda.

Q      And what month was it pulled?

A      I can't remember.

Q      In what month and what year?

A      In 2019. I can't remember what month.

Q      Between the time it was pulled from the agenda for the -- for the County Board subcommittee until now, what -- identify the steps that have been taken by Cook County and the Sheriff to renovate the Cermak ramp.

A      To be clear, the renovations are the purview of the Bureau of Asset Management,

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 309

specifically the Department of Capital Planning and Policy.

Upon rejection of that procurement method, we worked with the Chief Procurement Officer to develop the Request for Qualification format. That took a long time to negotiate because of legal concerns about how that procurement method would be articulated in the scope of a contract.

Once that basic, what we call, "template" was approved, we endeavored to advance that project as an RFQ as one of among several and, as I mentioned before, several other that include many ADA projects as well.

As I said, that RFQ process has resulted in documentation that is currently being worked out with the Office of the Chief Procurement Officer with expectation that it will go to market March in February of 2022.

Q      So that time period that you were talking about is sometime in 2019 to the present?

A      Correct.

Q      Referring to Topic No. 6, it states, "Ellen Stoner was produced for a deposition on

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 310

September 8, 2021. Ms. Stoner testified she worked as a consultant for STV/Heery to assess the Cermak ramp," period. "Explain the scope of the contract for STV/Heery to assess the Cermak ramp, the action STV/Heery has taken pertaining to the Cermak ramp (including whether STV/Heery has completed the requested work) and identify the documents shared between Cook County and STV/Heery (including the SVT [sic]/Heery contractors) pertaining to the Cermak ramp."

What can you testify to in regard to No. 6?

THE WITNESS: So I'm going to refer to counsel and ask, which portion of that -- I'm assuming I would start at the word "explain," Jack?

MR. BENTLEY: I really can't advise you on that, Eric. You have to understand the question based on how it's asked.

THE WITNESS: Okay. Okay.

All right. I'm just -- And to be clear, I'm just asking if there are different things that have different implications.

BY THE WITNESS:

A      So STV/Heery and their subcontractor,

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 48

ERIC DAVIS
January 24, 2022

Page 311

AltusWorks, which Ellen Stoner works for, were hired to serve as a program manager for our public safety portfolio, including the Cermak Health Services building.

As a part of that work, they help us develop projects for implementation, develop the Capital Improvement Plan, develop documents, and then help us hire professional services and contractors.

I do not have a copy of the subcontract between STV/Heery and AltusWorks, but they were hired as a subcontractor for STV/Heery with the purpose, as I've said before, to help us assess the situation and identify what, if any, actions are needed to be taken to address any evaluated variations from accessibility requirements, both for the Cermak ramp, for the Cermak building generally, and other Cook County facilities.

As a part of the Cermak ramp and Ellen's evaluation, or assessment rather, she provided the report that we've discussed multiple times in the course of this matter. So -- And as I said, because we started by looking to procure

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 312

architectural services in 2019, I would -- I'm sorry -- as fiscal year 2019, based upon, in part, her report, STV/Heery helped us work with her to identify the scope and, as I mentioned, we've tried -- we're on our third different way of trying to procure the services to address the conditions at the Cermak ramp.

So there are documents relative to the initial effort of an RFP, there are documents relative to it being on the list, as mentioned in an earlier question here about projects projected to be procured through the task order method, and there is information that is included in the current RFQ that we are pursuing with the Office of the Chief Procurement Officer.

BY MR. THOMAS MORRISSEY:

Q    So as to STV/Heery --

A    Yeah.

Q    -- can you basically summarize, from 2018 to present, what STV/Heery has been doing in regards to either assessing the Cermak ramp or putting -- putting together a package to proceed with the renovation of the Cermak ramp?

A    I'm sorry, Tom. I couldn't hear the

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 313

very beginning of your question. Did you say '18, from when to when?

Q    From the time -- Let me make it easy. Ellen Stoner and AltusWorks, since March of 2018 to the present, what has AltusWorks' involvement been in assessing and renovating and proceeding to renovate the Cermak ramp to accommodate wheelchair users?

A    Well, as I said, other than the report, which we've looked at and discussed on the particular item, as a part of her larger report, I expect that she was perhaps asked questions by other people from STV as the various drafts of RFPs and RFQs have been produced: "Does this seem right?" "Are we doing it?" that sort of thing.

I don't -- I can't stipulate to any specific communication that they might have had, but it would be normal practice if there was a question for them to perhaps have asked, but they might have just picked up the phone. I don't know.

Q    And as far as STV and Heery are concerned, their role in the various stages, the RFP, the task, and the current attempt to secure a procurement through procurement to secure a

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 314

proposal to ask for a bid from a Request for Qualifications, can you briefly explain their role in relation to Capital Planning, the Sheriff, Cook County, if it's facilitating those three processes?

A    Generally --

THE WITNESS: I'm sorry. What, Jack?

MR. BENTLEY: (Indicating).

BY THE WITNESS:

A    In general, their role is to support our staff and provide technical assistance, draft things, investigate things, provide us with answers and evaluations. They, in this -- in the case of this, would have helped us draft the scope of work for a project that -- either a standalone or the Cermak ramp work as part of a larger package.

They would have generated those drafts. Those drafts would have been something that we, in this case, would probably have simply taken care of ourselves. I don't think -- You know, it was something where we notified on a regular basis, as you've seen from other documentation, and communicated that it was something -- to the Sheriff, it's something we're

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 49

ERIC DAVIS
January 24, 2022

Page 315

pursuing, but since it's really an architectural element, there isn't a lot of back-and-forth with the Sheriff, specifically, mostly between STV/Heery and us, meaning County staff, to develop the various iterations of these procurement attempts.

BY MR. THOMAS MORRISSEY:

Q      Briefly, No. 7 says, "Identify by name and title individuals from Cook County who received a copy of Ellen Stoner's notes generated from her walkthrough in March of 2018.  Notes by Ms. Stoner are attached to this Notice as Exhibit 4."

To the best of your knowledge, who received notice of Ms. Stoner's findings from her walkthrough in March of 2018 for the ramp?

A      I'm by no means attempting to be exhaustive because I can't testify who may have received things by forward.

In general, the process would have been for the notes to have gone to STV and to our project director, Sheila Atkins, because at that point, it was an investigation prior to developing a scope of work.

So I would assume that the two of them -- I don't know if others from STV, I don't

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 316

recall getting it myself.  I might have received indirectly by a forward.  I don't think -- I don't remember if she forwarded it to me specifically, but it would have gone, most likely, to STV and to our project director.

Q      No. 8 is a copy of the note that Ms. Stoner attached to her report, her notes, and Topic A under 8 says, "Whether Cook County adopted Stoner's observation regarding the state of the Cermak ramp."

A      Is that -- Are you asking me?

Q      Yes.

Well, as the County -- You're now testifying on behalf of --

A      Right.

Q      -- Cook County.

A      No.  I didn't know if there was another question.

So the term "adopted" is -- Cook County, either us directly or through our agent, STV, received her observations.  As I've mentioned, that doesn't mean we took them to be the definitive or last word regarding those issues, but we did receive them and, as I've mentioned

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 317

elsewhere in this deposition, we are in the process of hiring an Architect of Record to make a definitive determination.

Once we have someone's stamp on drawings that says, "This is what you need to do," then once we put them out for bid, we will have adopted them.

Q      B, "If Cook County did not adopt the observations, the grounds for disagreeing with Ms. Stoner's observations."

A      We neither agree or disagree.  We got her recommendations and have used those as the basis for hiring professional services to make a determination of a -- of a licensed Architect of Record how to proceed.  She -- Her role is to help us identify the questions.

Q      C, "Whether Cook County adopted Ms. Stoner's recommendation regarding the Cermak ramp."

I guess that's specific to the ramp.

A      I don't understand the difference between C and A, but . . .

Q      Would your -- your response be the

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 318

same?

A      Yeah.

Q      D, "If Cook County did not adopt the recommendations, the grounds for objections to Ms. Stoner's recommendations."

A      As I said, we're not adopting -- we -- She's notified us of an issue.  We're not objecting or saying "No, you're wrong."  We're, in fact, actually in the process of procuring an Architect of Record to make a determinative -- a definitive determination and proceed to remediation.

Q      E, "The actions taken by Cook County after receiving Ms. Stoner's observations and recommendations to alter the Cermak ramp."

Is that the same as your answer to the previous 30(b)(6) questions?

A      Yes.

Q      No. 8, "Eric Davis testified on December 19, 2019, that after the Board of Commissioners denied a task order that we've had to try to procure projects like this through alternate means."

Then it has a citation to your

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 50

ERIC DAVIS
January 24, 2022

Page 319

deposition.

A    Yes.

Q    Explain why Cook County requested funds to procure the Cermak ramp budget.

A    To be clear, what we have requested is, the Department of Capital Planning has requested funds in the Capital Improvement Plan to procure design services, professional design services, for the Cermak ramp.

That's what we are in the process of doing and, as I mentioned earlier in this deposition, outside of the 30(b)(6), we are -- we have achieved -- We have obtained approval by the Board of Commissioners for the design services, and we have projected construction of approximately $2 million beyond that point for the --

Q    No. 10 --

A    -- Cermak building generally.

Q    No. 10, again, refers to your testimony on December 19th, 2019, and asked, "From December 19, 2019, to the present, describe the steps taken by Cook County to procure the Cermak ramp project."

In your response to the 30(b)(6)

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 320

Notice previously, do you have anything to add to your response, or would you adopt your prior testimony?

A    No.  Other than to restate that this is important to us, and we really want to get it done.

Q    No. 11, "Describe with reasonable particularity all documents that are available concerning Cook County's efforts to renovate the Cermak ramp from January 1st, 2017, to the present. This includes material concerning the hiring of an architect to do construction drawings and material focused on construction."

So briefly identify since 2017, January, what documents are available concerning Cook County's efforts to renovate the Cermak ramp.

A    So I'd have to qualify my answer on any documents between January 1st, 2017, and I believe it was April 10th, 2017, when I started with Cook County.  I'd have to refer to the information available archivally.

The rest of my answer is -- is as we discussed, including the assessment that Ellen Stoner did, including our efforts to

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 321

translate that to an RFP, including our efforts to translate that into a task order, including our efforts to translate that into an RFQ, which, again, we are very hopeful to get that hiring to happen here during the course of 2022.

MR. THOMAS MORRISSEY:  Okay.  Give me about two minutes.  I think we're pretty much wrapped up.

MR. BENTLEY:  Okay.  Very good.

(Brief pause.)

MR. THOMAS MORRISSEY:  I have no further questions.

MR. BENTLEY:  And I don't have anything.

So if you guys are good, we'll waive signature.

THE WITNESS:  Are we off the record?

THE STENOGRAPHER:  Is that for the first half as well, Jack?

MR. BENTLEY:  Yes, it is.  Thank you.

THE STENOGRAPHER:  Okay.  Thank you.

(FURTHER DEPONENT SAITH NOT.)

(Remote deposition concluded at 6:16 p.m.)

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 322

STATE OF ILLINOIS )
                  ) SS:
COUNTY OF C O O K )

I, KELLY ANN POTTS, Registered Professional Reporter, Certified Shorthand Reporter in and for the County of Cook, State of Illinois, do hereby certify that on January 24, 2022, the remote continued deposition via videoconference of the witness, ERIC DAVIS, was taken by me, reported stenographically and was thereafter reduced to typewriting under my direction, and there were present counsel as previously set forth.

The said witness, ERIC DAVIS, was first remotely duly sworn to tell the truth, the whole truth, and nothing but the truth, and was then examined upon oral interrogatories.

I further certify that the foregoing is a true, accurate, and complete record of the questions asked of and answers made by said witness, ERIC DAVIS, at the time hereinabove referred to.

The signature of the witness, ERIC DAVIS, was waived by agreement of the parties.

The undersigned is not interested in the

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 51

ERIC DAVIS
January 24, 2022

Page 323

within case, nor of kin or counsel to any of the parties.

WHEREUPON, I set my hand pursuant to the Illinois Shorthand Reporters Act of 1984 on this 3rd day of February, A.D., 2022.



KELLY ANN POTTS, CSR

CSR No. 084-003558

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 1

| A | | acquired | | administra... | 220:19 |
|---|---|---|---|---|---|
| **A.D** 323:5 | 150:24 | 238:12 | 309:14 | 221:5 | agenda 130:2 |
| **ability** | 159:20 | **Act** 280:22 | **ADA-acces...** | **adopt** 317:8 | 207:9,17,20 |
| 168:18 | 175:21 | 323:4 | 188:14 | 318:3 320:2 | 207:21 |
| **able** 139:11 | 295:4,15 | 236:1 | **ADA-comp...** | **adopted** | 208:21 |
| 166:10 | **accommod...** | **action** 154:20 | 133:14 | 165:16 | 209:6 |
| 195:4 | 139:20 | 185:20 | 188:18 | 316:8,19 | 307:21 |
| 205:19 | 299:10 | 186:1 | 275:8 | 317:7,17 | 308:12,13 |
| 215:18 | 313:8 | 242:23 | **ADA-related** | **adopting** | 308:19 |
| 233:20 | **accommod...** | 299:9 310:4 | 306:16 | 318:6 | **agent** 316:21 |
| 242:1,1 | 132:3 | **actions** | **adapt** 196:14 | **advance** | **ago** 191:5,6,7 |
| 270:3,5,19 | **accompany...** | 311:15 | **add** 306:13 | 200:20,21 | 197:20 |
| 286:4 | 261:4 | 318:13 | 320:1 | 200:23 | 200:18 |
| 298:21 | **accomplish** | **active** 205:7 | **addition** | 201:2 | 203:7 247:9 |
| **Absolutely** | 193:8 | **actual** 262:10 | 128:20 | 309:11 | 258:17 |
| 205:3 274:4 | **accomplish...** | **ADA** 131:11 | 212:5 | **advancing** | 280:1,4 |
| **accelerate** | 195:2 201:4 | 133:1,4 | **additional** | 210:3 229:7 | **agree** 123:3 |
| 285:13 | 135:10,17 | 143:14,21 | 193:1 194:6 | **advertised** | 151:2 |
| **acceptable** | 226:16 | 145:11 | 205:18 | 199:22 | 268:23 |
| 150:4 | **accounting** | 149:10,17 | 229:3,20 | 210:4,14 | 270:18 |
| **Access** | 161:2 169:5 | 151:22 | 232:18 | 215:10 | 317:11 |
| 281:16 | **accuracy** | 155:15 | 235:11 | 221:7 | **agreed** |
| 282:7,9,11 | 245:8 263:1 | 172:9 | 241:22 | **advertisem...** | 274:14 |
| 282:13,16 | **accurate** | 173:14 | **address** | 211:12 | **agreement** |
| 282:18,22 | 235:13 | 181:17 | 243:5 | 215:8 | 186:10 |
| 283:21 | 239:21 | 183:12,22 | 300:18 | **advertising** | 187:2 |
| **accessibility** | 241:17 | 184:5,9 | 301:2 | 196:4 | 300:24 |
| 145:12 | 257:18 | 231:24 | 311:15 | 210:11 | 322:23 |
| 147:21 | 261:22 | 232:4 | 312:6 | **advise** 310:16 | **agreements** |
| 172:19 | 263:17,22 | **addressed** | **adviser** | 228:15 |
| 295:5 | 266:21 | 243:10 | 298:1 | 282:13 | **ahead** 161:9 |
| 311:16 | 270:6 297:9 | 271:5 274:2 | **addressing** | **affirmative** | 165:10 |
| **accessible** | 322:18 | 274:11,23 | 172:18 | 144:11 | 215:17 |
| 139:7,8,13 | **accurately** | 277:12 | **adjacent** | **affixed** 258:9 | 222:22 |
| 139:15 | 248:23 | 282:6 283:2 | 139:8,14 | 258:10,12 | 229:7 |
| 141:18 | 286:5 | 283:13 | 142:2 256:1 | **affixing** | 249:13 |
| 142:7,13,16 | **achieve** 210:9 | 288:19 | 270:16 | 150:1 | 287:16 |
| 142:20,22 | **achieved** | 289:2 | **administered** | **afternoon** | 288:7 |
| 143:5,23 | 319:13 | 290:17 | 123:4 | 123:22 | 302:23 |
| 144:6 145:4 | **Achterhof** | 291:23 | **administra...** | 125:13 | **aligned** |
| 145:16 | 127:22 | 292:10,15 | 197:10 | **agencies** | 216:17 |
| 147:15 | 130:21,22 | 293:8,19 | 221:5 | 196:6 | 266:13 |
| 148:12,24 | 155:23 | 297:15 | **administra...** | 226:11 | **all's** 171:12 |
| 150:18,22 | **acknowledge** | | 224:8 | **agency** | **allegations** |
| | 149:3 | | | | |

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 2

| 152:10 | **alternate** | 210:23 | 260:19 | 157:12 | 185:7,22 |
|---|---|---|---|---|---|
| **allegedly** | 318:22 | 264:16 | **appear** 152:6 | 184:11 | 186:2 |
| 235:15 | **AltusWorks** | 276:19 | 214:1 | 187:14 | 187:19 |
| **allocated** | 130:3,6 | 278:19 | **Appeared** | 217:14 | 188:7 |
| 179:2 | 175:19 | 283:7 | 121:6,12 | **approved** | 191:19 |
| 229:18 | 311:1,11 | 293:10 | **appears** | 160:21,23 | 192:11 |
| **allocation** | 313:4 | 294:4,23,24 | 130:24 | 161:12 | 193:16 |
| 188:22 | **AltusWorks'** | 296:7 298:1 | 132:22 | 167:12 | 216:22 |
| **allotted** | 313:6 | 298:13 | 142:21 | 170:9 182:8 | 217:9 |
| 228:7,23 | **ambulating** | 299:12,16 | 146:6 149:4 | 186:19 | 219:21 |
| **allow** 215:20 | 287:3 | 300:5 | 254:2 | 211:12 | 220:5,7 |
| 246:11 | **Americans** | 318:16 | 255:13 | 224:23 | 221:2 |
| 266:11 | 280:22 | 320:17,22 | 256:21 | 225:4 226:5 | 237:16 |
| 280:12 | **amount** | **answers** | 263:4 | 226:13 | 238:17 |
| 301:8 | 183:13 | 314:12 | 273:20 | 309:11 | 240:11 |
| **allowed** | 228:20 | 322:19 | 279:6 283:3 | **approxima...** | 244:6,7,9 |
| 149:21 | 229:17 | **anticipate** | 287:13,16 | 169:2 | 244:13 |
| 152:7 216:5 | 230:4,6 | 216:8 218:5 | 288:10,21 | 183:19 | 246:3,6 |
| 242:6 281:9 | 271:24 | 257:10 | 291:7,10 | 195:17 | 265:19 |
| 281:18 | **and/or** | **anybody** | 296:16 | 226:21 | 267:5 |
| **allowing** | 129:18 | 129:7 211:3 | 299:6 | 227:9 | 270:18 |
| 242:3 255:5 | 159:3 189:1 | 261:4 | 231:12 | 274:7,10,12 |
| **allows** 240:22 | 189:15 | **anybody's** | 145:13 | 264:5 | 274:16,21 |
| **alter** 140:18 | 224:3 | 243:13 | 152:4 283:2 | 268:21 | 275:7,11 |
| 261:11 | **Andrew** | **anymore** | 283:4,6 | 287:20 | 276:12 |
| 292:14 | 130:23 | 129:21 | **apply** 150:18 | 319:15 | 277:2,17,23 |
| 318:15 | **Angeles** | 206:24 | 170:14 | **approxima...** | 278:18 |
| **alteration** | 156:7 | 306:1 | 283:13 | 202:20 | 282:1 |
| 147:2 | **angle** 236:10 | **anyway** | 293:19 | **April** 215:7 | 283:15 |
| 151:17 | 237:21 | 249:13 | **approach** | 217:7 227:9 | 291:3,3 |
| 186:4 | 254:7 260:6 | 292:4 | 212:14 | 320:19 | 292:17,19 |
| 220:10 | 261:10,11 | **AOR** 136:24 | 215:11 | **arcana** | 292:21 |
| 229:14 | 262:20,21 | **apologize** | **appropriate** | 173:24 | 296:10 |
| **alterations** | 263:2 | 179:18 | 259:14 | **arch-** 211:2 | 297:1,22 |
| 141:20 | **ANN** 120:18 | 180:6 | **appropriat...** | **architect** | 300:17 |
| 149:5 | 322:4 323:9 | 182:13 | 183:10 | 139:17 | 304:7 317:2 |
| 151:14 | **annual** | 203:20 | 185:19 | 140:16,22 | 317:14 |
| 154:22 | 183:10 | 253:17 | **approval** | 141:9 | 318:10 |
| 188:24 | 184:14 | **apparently** | 164:9 187:2 | 161:13 | 320:12 |
| **altered** 131:2 | **answer** | 126:6 132:2 | 213:2 217:1 | **architect's** |
| 147:6 149:7 | 139:11 | 139:12 | 220:4,8 | 231:5 |
| **altering** | 145:15 | 145:24 | 226:6 308:3 | **architects** |
| 231:9 | 166:9,14,19 | 147:24 | 319:13 | 172:5,15,18 | 157:15,24 |
| 294:20 | 207:24 | 243:8 | **approve** | 176:2,7 | 160:4 196:8 |

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 3

| 210:21 | 172:19 | **assessing** | **assisted** | 211:6 | **authorizes** |
|---|---|---|---|---|---|
| 212:8 | 189:16 | 312:21 | 285:23 | 274:20 | 232:11 |
| 217:20 | 190:3 | 313:6 | 286:5 | 303:15 | **automatica...** |
| 282:20 | 191:14,20 | **assessment** | **assume** | 313:23 | 271:23 |
| 298:2 301:2 | 192:22 | 175:3,11,12 | 131:23 | **attempting** | **available** |
| **architectural** | 193:3,24 | 175:14,19 | 143:24 | 175:1 | 177:16,23 |
| 157:4 | 195:11 | 175:22,23 | 147:14,21 | 315:15 | 177:23 |
| 176:21 | 280:23 | 176:13,21 | 148:11 | **attempts** | 181:24 |
| 189:15 | **arisen** 193:21 | 178:12 | 149:8 | 315:5 | 182:7 |
| 193:2 | **articulated** | 179:9 | 150:23 | **attend** | 246:23 |
| 211:11 | 309:8 | 181:17,18 | 158:15 | 126:24 | 289:7 320:8 |
| 217:13 | **asked** 165:12 | 202:3 | 234:17,20 | 128:10 | 320:15,21 |
| 218:6 224:2 | 212:10 | 275:11,17 | 239:3 240:3 | **attending** | **Avenue** |
| 278:6 | 242:14,14 | 285:18 | 241:18 | 127:16 | 121:4 |
| 279:14 | 264:15 | 311:21 | 260:3,7 | **attends** | 298:12 |
| 301:10 | 278:14 | 320:23 | 261:5 | 207:22 | **award** |
| 302:10,13 | 283:11 | **assessments** | 277:12 | **attention** | 216:17 |
| 312:1 315:1 | 310:18 | 162:18 | 285:1,13 | 124:17 | 223:1 |
| **archivally** | 313:12,19 | 181:11 | 315:23 | 126:20 | 306:10 |
| 320:21 | 319:20 | **asset** 173:12 | **assuming** | **attorney** | **awarded** |
| **area** 139:2,24 | 322:19 | 295:7 | 172:2 | 123:19,24 | 225:15 |
| 140:18 | 322:19 | 308:24 | 184:19 | 162:23 | 226:18 |
| 142:8 | **asking** 164:2 | **assign** 158:19 | 185:6,7,18 | 216:18 | **aware** 123:2 |
| 143:12,16 | 179:4 | 219:10,11 | 219:14,15 | 246:15 | 141:20,22 |
| 145:8 147:3 | 183:16 | 219:14,15 | 292:6,11 | 251:9 | 151:2 152:9 |
| 147:6 | 184:18 | 230:11 | 310:21 | **attribution** | 284:4 |
| 151:17 | 209:12,16 | **assigned** | | 132:19 | 305:23 |
| 191:15 | 209:17 | 171:10 | **assumption** | **augmentati...** | **awareness** |
| 194:15 | 225:2,18 | 173:16,17 | 258:23 | 171:2 | 133:12 |
| 233:19 | 246:6 253:9 | 206:1,11 | 259:21 | **August** | 299:5 |
| 257:11 | 253:12 | 213:15 | **assumptions** | 130:14 | |
| 260:12 | 303:3 | 226:3 | 244:3 | **authorizati...** | **B** |
| 273:12 | 310:21 | 307:14 | **Atkins** 127:7 | 187:16,16 | **b** 166:18 |
| 281:6,15,17 | 316:11 | **assemble** | 129:6 | 187:18 | 167:10 |
| 291:14 | 163:21 | **assigning** | 163:13 | 188:2,7,12 | 173:17 |
| **area-by-area** | **assembled** | 173:11 | 171:15 | 188:17 | 176:10 |
| 175:11 | 160:19 | **assignments** | 303:21,22 | 230:2 | 274:14 |
| **areas** 141:4 | 164:6 | 158:18 | 304:4 | **authorize** | 278:24 |
| 142:7 | 230:20 | 213:24 | 306:24 | 187:13 | 300:8 317:8 |
| 144:16 | **assertion** | **assistance** | 315:20 | 278:5 | **B-e-r-g-e-r** |
| 146:13 | 243:24 | 282:19 | **attached** | **authorized** | 252:18 |
| 152:3 | **assess** 176:11 | 283:22 | 307:10 | 177:9 | **B-u-r-g-e-r** |
| 154:14 | 310:2,4 | 288:24 | 315:11 | 186:7 | 252:20 |
| 159:4,13 | 311:14 | 314:11 | 316:7 | 282:18 | **B0114** 142:4 |
| | | | **attempt** | | |

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 52

ERIC DAVIS
January 24, 2022

Page 4

142:19 | based 140:3 | 123:14 | 139:20 | 215:6 | 269:13,21
B0115 142:4 | 145:6 | 235:2 | 145:4,7 | better 124:24 | 269:22
B015 142:20 | 205:13 | 304:12 | 146:22 | 153:24 | blocks 266:6
B105 143:15 | 244:2 259:4 | 313:1 | 148:17 | 164:1 180:5 | blown-up
B220 139:1 | 260:24 | begins 123:8 | 149:10,16 | 196:14 | 255:2
139:24 | 274:12 | 230:20 | 149:17,21 | 234:18 | Board 160:20
back 132:4 | 275:13 | behalf 121:6 | 149:24 | 245:16,17 | 161:11
133:16,17 | 291:24 | 121:12 | 150:9 | beyond | 164:8 165:1
142:24 | 300:15 | 277:10 | 152:11,12 | 319:16 | 165:2,8,9
145:9 | 306:10 | 316:14 | 154:17,17 | bid 184:10 | 165:17,19
174:10,21 | 310:18 | believe 136:5 | 159:3,12,13 | 185:11 | 167:13
175:19 | 312:2 | 136:12,15 | benches | 189:11 | 184:11
178:20 | basement | 136:19 | 151:16 | 191:17 | 185:20
184:17 | 138:22 | 152:18,20 | 159:2,3 | 193:1 | 186:1,2,8
193:13 | 140:18 | 155:24 | Bentley | 199:14,22 | 186:13
196:20 | 141:4 142:8 | 158:11 | 121:9 | 218:7 220:9 | 187:1 213:2
197:18,22 | 143:2,9,23 | 168:1 191:8 | 123:22,23 | 220:12,16 | 216:21
205:7 | 154:14,15 | 202:4 | 153:9,12 | 222:8,12 | 217:4,14
222:17 | 190:18 | 226:20 | 215:24 | 223:3,13,16 | 219:23
224:24 | basic 309:10 | 227:6 | 232:22 | 314:1 317:6 | 220:4
225:12 | basically | 228:17 | 247:4,7,13 | bidder 223:4 | 223:17,19
232:22 | 135:1 | 235:12 | 250:5,14,20 | 223:6 | 226:6,14
233:1 234:7 | 312:19 | 248:22 | 251:1,6,20 | bidders | 227:9
239:11 | basis 184:14 | 249:2,3,11 | 251:24 | 223:5 | 232:10
243:7 | 195:13 | 259:10 | 252:4,7,9 | bidding | 278:4
248:11 | 209:1,4 | 261:1,1 | 252:16,19 | 221:7 | 281:16
252:14 | 213:20 | 264:15 | 293:11,14 | bids 216:9,13 | 282:8,9,11
255:12 | 232:12 | 277:1 | 294:7,13 | 223:10 | 282:13,18
277:11,21 | 240:1 | 282:17 | 298:17,20 | big 247:12 | 282:22
278:13,13 | 297:24 | 287:2 301:6 | 299:15,20 | Bilgis 156:19 | 283:21
279:20 | 314:22 | 304:9,22 | 299:24 | Bill 183:10 | 294:19
294:7,13,15 | 317:13 | 305:10 | 302:14,17 | bit 134:24 | 295:14,18
304:11 | batch 256:13 | 306:21 | 304:20 | 187:8 262:4 | 295:22
back-and-f... | beam 259:8 | 307:7,11,19 | 310:16 | bits 223:11 | 301:1,5
204:13 | 260:1,9,13 | 307:24 | 314:8 321:9 | blah 171:8,8 | 307:17,20
315:2 | 260:14 | 308:5 | 321:13,20 | blanket | 308:3,9,19
backward | 276:6 | 320:19 | bentleyj@j... | 305:24 | 318:20
263:10 | bed 266:13 | believes | 121:11 | block 265:15 | 319:14
bar 148:9 | 268:12 | 283:2 | best 230:9 | 265:16,19 | Board's
bars 146:17 | began 200:17 | BELL 121:9 | 244:16,18 | 266:20 | 282:16
147:19 | 200:17 | below-grade | 297:23 | 267:1,8 | bond 223:6
148:15 | 299:6 | 190:14 | 298:4 299:4 | 268:1,2,2 | book 181:24
296:2 | beginning | bench 139:7 | 315:12 | 268:15,20 | 182:7
base 268:10 | | 139:9,13,15 | best-case | 268:21 | boring

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 5

173:23 | 247:20 | 134:21 | 145:7 234:1 | 298:12 | 238:4
bottom 260:5 | 249:22 | 135:9 | 293:20 | call 160:22 | capital 127:1
268:13,21 | 250:11 | 136:13 | bulk 306:8 | 169:17 | 127:5
278:23 | 252:22 | 138:18 | bumpers | 171:20 | 128:22,23
286:24 | 254:15 | 140:2,7 | 279:6 | 173:1 | 129:4 140:6
bounce 241:9 | 255:7 256:4 | 144:13,16 | bundled | 210:11 | 144:9 160:5
bounced | 256:10 | 158:13,19 | 303:14 | 211:6 | 160:14,21
238:1 | 265:5 | 159:1 161:8 | bureau | 273:21 | 160:22
bounces | 272:24 | 162:9 | 164:22 | 309:10 | 161:19
241:9 | 286:10 | 173:12,16 | 295:7,10,12 | called 120:13 | 162:16
Boy 203:13 | 287:5 294:9 | 173:17 | 308:24 | 124:9 155:9 | 163:7,9,10
Boyce 129:9 | 321:10 | 175:21 | Burger | 163:3 165:6 | 163:19,20
break 173:10 | 315:7 | 180:20 | 252:16 | 165:19 | 164:19,21
173:17 | 320:14 | 189:17 | business | 166:11 | 165:20,22
232:21 | bring 126:19 | 190:2,5,8 | 163:4,6,18 | 182:18 | 166:1,3,4,7
294:6 | breaking | 190:11 | 163:21 | 189:24 | 166:12
breaking | 149:21,24 | 191:2,14 | buyer 199:9 | 196:15,16 | 167:11,17
219:6,7 | 301:1 | 192:22 | 205:21 | 197:5,11 | 167:20,21
bridge | bringing | 193:3 | buyers | 199:7 203:4 | 168:2,14,24
189:13,24 | 160:12 | 194:14 | 205:17,18 | 207:20 | 170:3,19
194:20 | 227:8 | 195:5,21 | 205:22 | 212:18,19 | 172:3
195:15 | broken | 201:6 | 208:3 | 221:11 | 173:11,24
221:23 | 158:22 | 220:11 | | 223:2 | 181:21
222:1 | bubble 240:8 | 232:1,5 | ___ C ___ | 230:12,19 | 183:24
289:23 | budget 164:7 | 266:16 | C 121:1 | 232:9 233:9 | 199:11
brief 124:22 | 164:20,23 | 279:17 | 317:17,23 | 236:14,21 | 200:4
125:6,16 | 165:16 | 280:4,6 | 322:2 | 266:7 271:4 | 201:12
126:8 137:5 | 168:13,24 | 284:7 | calculate | 278:24 | 202:7
137:10,24 | 169:2 | 291:19 | 237:3 270:3 | 281:5 | 207:23
138:10 | 181:21,24 | 311:4,18 | calculation | 290:22 | 213:17
153:2,20 | 182:9,19 | 319:18 | 245:17,18 | 300:24 | 219:22
174:1 | 187:15,18 | building-b... | 245:23 | 302:9 | 221:3
176:14 | 188:12,21 | 175:12 | calculations | camera | 223:24
177:12 | 319:4 | buildings | 264:2 | 124:19 | 241:23
178:1 | budgeting | 175:5,8 | calibrate | campus | 242:10
179:16,20 | 161:16 | 181:15 | 238:18 | 175:3,4,13 | 275:6
180:1,9 | 163:17 | 201:23 | 239:1,16 | 179:10 | 292:13
181:1 | 164:13 | 202:2,19 | 241:3,6 | Canchola | 295:24
182:11,16 | 232:10 | 209:19 | calibrated | 133:24 | 300:17
182:22 | budgets | 219:4 | 240:21 | 134:17 | 307:16
203:11,15 | 225:10 | 295:14 | 241:12 | cane 284:19 | 309:1 311:7
203:18 | bugs 239:9 | built 131:2 | 262:13 | 289:9 | 314:3 319:6
208:15 | building | 135:9 | 267:4 276:7 | canes 284:16 | 319:7
232:23 | 129:2 | 143:20,22 | California | capable | Carberry

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 6

128:12 | 227:11 | 154:10,15 | 258:20 | 155:5,15 | chase 199:24
156:24 | cause 167:7 | 154:16 | 264:14 | 158:6 242:4 | check 148:7
care 155:14 | 262:2 | 155:18,19 | 266:16 | 283:7 | 197:21
314:20 | CCSO | 156:2 | 267:4 | certainly | 201:20,21
carried 224:1 | 130:17 | 158:10,13 | 270:10,21 | 171:17 | 202:21
carries | 131:19 | 159:5,9,14 | 273:22 | Certified | 203:5
166:21 | ceiling | 159:20 | 275:3,18 | 120:19 | 214:16
carryovers | 233:23 | 161:6 162:4 | 276:5 277:5 | 123:4,5 | 250:7
166:11 | 236:9 | 162:21 | 277:14 | 322:5 | 277:22
case 126:18 | cell 142:2 | 172:2,3,6 | 280:14 | certify 322:7 | 304:11
131:5 144:2 | 143:2 | 172:19 | 284:17,20 | 322:17 | checked
144:24 | 145:17 | 173:6 | 285:8,9 | cetera 144:6 | 283:23
155:18 | 190:3 | 175:20,21 | 289:8 290:8 | 184:18 | Chicago
162:1,17 | 191:14 | 179:14 | 290:10 | 199:14 | 121:4,10
163:4,6,18 | cells 150:18 | 180:13,17 | 291:2 292:9 | CFR 151:13 | 298:12
170:24 | 179:15 | 181:19 | 293:20 | chair 159:12 | chief 127:22
175:24 | 189:21 | 183:11,21 | 294:20 | 284:5 | 127:23
181:15 | 190:1,8 | 184:5,10,20 | 296:1 297:2 | chairs 159:3 | 172:8
212:23 | 193:7 | 185:9 186:4 | 298:11 | challenge | 186:20
222:20,22 | 195:11,15 | 187:20 | 299:5,9 | 123:3 | 202:23
223:12 | center 150:21 | 188:8,13,18 | 300:18 | 205:19 | 206:10
230:3,14 | 180:4 | 194:22 | 301:3,23 | 297:13 | 207:3 208:1
236:21 | 271:18,19 | 200:3,12,18 | 303:12 | change | 208:9
237:2,3 | 272:11 | 201:11,19 | 304:8 305:8 | 145:10 | 211:11
261:16 | Central | 202:8,19 | 305:22,24 | 169:5 | 301:14
282:20 | 120:23 | 209:18 | 306:6 307:5 | 196:21,24 | 303:17
288:24 | 123:13 | 210:2 | 308:22 | 200:14 | 305:12,17
290:12 | Cer- 215:10 | 211:13 | 310:2,4,5 | 264:7 | 308:6 309:5
291:1 | 232:1 | 212:5,23 | 310:10 | 272:20 | 309:17
296:22 | Cermak | 215:10 | 311:3,17,18 | 305:24 | 312:15
314:13,19 | 129:1 134:3 | 218:18 | 311:20 | cinder
323:1 | 134:11,19 | 219:18 | 312:7,21,23 | changed | 265:15,16
case-by-case | 135:20 | 229:14,20 | 313:7 | 196:8 198:1 | 265:19
144:1 | 136:10,11 | 230:4 231:9 | 314:16 | 199:18 | 266:5
cases 163:21 | 136:20 | 231:20,23 | 316:10 | 300:22 | CIP 160:23
170:6 211:1 | 138:17 | 232:1,5 | 317:18 | 303:16 | 164:11,18
211:1 | 139:2 140:7 | 233:9 235:4 | 318:15 | changes | 164:22
catch 175:2 | 140:18 | 235:4,9 | 319:4,9,18 | 193:20,21 | 166:5 168:5
catches | 141:5 142:8 | 241:24 | 319:22 | 224:9 | 169:7,9
287:21 | 143:3,9,20 | 242:10,19 | 320:10,16 | 275:10 | 170:3,20
catching | 143:23 | 243:17 | certain 143:1 | changing | 172:22
175:1 | 144:4 145:7 | 246:5,15 | 146:13 | 198:9 264:3 | 173:2 177:3
categories | 146:1 | 248:23 | 147:1,13 | charge | 177:3
175:8 | 152:19 | 249:1 254:3 | 153:19 | 201:11 | 178:21,22
| | | | 288:16 |

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 7

179:1,6 | code 142:13 | commence | communica... | 135:16 | conclusion
181:23 | 145:12 | 301:20 | 206:16,16 | 142:14 | 165:14
182:3 | 148:2,5 | commenced | companies | 243:10 | 243:23
183:11 | 150:14 | 298:10 | 196:6 | 274:2,22 | 275:2 305:5
185:19 | 176:9 | comment | company | 275:18 | conditions
187:23 | 193:21 | 241:3,5,7 | 198:18 | 276:17 | 312:6
224:20,23 | 301:8 | 241:19 | 241:11,15 | 292:15 | conduct
225:8,15 | 306:14 | 286:2 | 294:20 | 294:20 | 242:24
231:8 232:6 | colleague | commenting | competent | complicated | conducted
circulation | 252:6 | 270:12 | 241:1,1 | 151:23 | 260:22
281:1 | collective | commercial | competitive... | 167:1 | confident
circumstance | 173:7 | 266:15 | 220:13 | 230:17 | 201:3 276:8
148:7 282:1 | colloquial | commissio... | complained | complied | confidential
circumstan... | 236:11 | 160:20 | 145:3 | 274:11 | 203:3
149:20 | colloquially | 161:12 | complaint | 291:23 | configurati...
300:18 | 189:24 | 164:9 165:1 | 152:14,16 | 292:9 | 257:23
citation | 190:17 | 165:8,10,13 | complaints | comply 147:7 | 283:11
318:24 | 303:9 | 165:15 | 131:1 | 291:23 | confined
cited 195:16 | combination | 186:14,15 | complete | complying | 226:9
283:13 | 179:8 | 187:1 213:3 | 192:14,16 | 281:3 | conflicting
citing 280:21 | combinatio... | 232:11 | 229:4 | compon- | 283:18
City 130:10 | 142:20 | 295:18,20 | 263:12 | 201:23 | connect
187:6,12 | combo | completed | 322:18 | component | 135:3
Civil 120:15 | 142:11,22 | 301:2,5 | 167:10 | 201:24 | connecting
claims 144:23 | come 125:9 | 307:20 | 191:10,17 | comprehen... | 134:3
Class 123:19 | 132:24 | 318:21 | 191:19 | 175:3,11 | connection
clear 139:7 | 161:10 | committee | 192:3,18 | 195:7 | 185:15
139:14 | 162:13,20 | 212:18 | 195:7 | Comptroller | 194:20
143:19 | 162:21,21 | 213:10 | 279:22 | 173:9 | connectivity
169:13 | 162:22,22 | 214:4,19 | 299:7 | Comptrolle... | 174:8
191:3 | 162:23 | 215:4 | 301:18 | 173:5 | connects
216:23 | 186:10 | common | 310:6 | computer | 289:17
264:8 303:1 | 187:2 | 281:1,14 | complex | 182:14 | 290:5
305:9 | 190:18 | 291:22 | 213:5 | concern | Connie 156:4
308:11,23 | 202:13 | commonly | complexity | 134:8 | 156:11
310:21 | 222:17 | 233:17 | 171:12 | 278:21,22 | 162:3
319:5 | 232:17 | communica... | 211:24 | concerned | consider
clearance | 255:4 | 126:22 | 231:7 | 313:22 | 289:24
143:12 | 281:11 | communica... | compliance | concerning | 291:13
close 264:3 | 289:12 | 133:4 | 133:4 | 320:9,11,15 | considerable
285:3,5 | 308:12 | 314:23 | 220:13 | concerns | 290:16
closed 179:12 | communica... | 243:19 | 133:13 | considerati...
closer 268:5 | coming | 133:23 | 275:3 279:7 | 309:7 | 295:11
304:9 | 184:17 | 282:16 | 313:17 | compliant | concluded | considered
| | | | 133:1 | 321:24 |

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 53

ERIC DAVIS
January 24, 2022

Page 8

193:23
301:7
consist 170:4
consistent
288:12
305:12
consists
174:23
292:22
236:22
construct
188:23
constructed
131:10
134:22
149:6
221:10
266:5,20
279:21
289:23
291:7,11
construction
140:24
151:14
175:16
183:18,21
184:3
191:12
192:19
220:11
226:16,17
227:20
230:7,20,22
231:14
232:3,4,18
233:17
258:12
266:8
270:12
277:24
298:10
299:5 300:9
301:19
319:15

320:12,13
constructor
238:23
constructs
187:16
266:20
consultant
170:24
175:24
292:22
300:12
310:2
consultants
170:15
281:16
consulting
129:10
Cont'd 122:6
contact
206:20
contacting
135:24
contemplate
219:8
context
142:23
continuation
172:14
continue
168:22
continued
120:12
123:8
124:13
275:1 322:8
continuing
222:24
267:15
contract
155:9
158:20
161:11,12
172:18

175:15
186:13,21
187:13,14
188:1,6,16
188:23
213:2
216:18
217:1,14
218:8,12
220:23
221:16,21
223:1
225:15,16
226:1,1,4
226:13,20
227:7,16,17
229:5
230:12
277:8 300:9
301:1
307:14
309:9 310:3
contracting
196:5
221:12
222:2
contractor
140:17
184:11
188:10,13
188:17,23
194:11
218:8 220:6
220:8
222:24
223:18
224:3
230:24
231:1
267:11
276:22
contractors
219:24

221:7
222:18
228:18
229:8 234:1
310:9 311:9
contractors'
229:4
contracts
186:16
210:6
226:22,23
227:2,15
228:10,13
307:8,9
contractual
186:11
controls
147:12,15
conventional
240:13,14
120:21
127:13
128:20
130:18
131:3
154:21
155:6,15
159:11
160:8 162:1
176:22
178:9 185:8
185:20,24
186:2 192:6
194:9
197:16
210:15
213:7 221:6
229:11
238:12
280:6,13
292:14
294:19
295:2,3,13

295:14,23
295:24
298:15
302:12
303:22,23
306:5,19
308:21
310:8
311:18
314:4 315:8
316:8,16,20
317:8,17
318:3,13
319:3,22
320:9,16,20
322:6
copies 208:21
copy 209:2
308:1
311:10
315:9 316:6
120:4
corner
146:16
254:23
255:21
corners 301:7
correct
126:16
127:8,9
131:5
133:21
135:10,11
136:11
143:15
148:2,12
150:16
152:19
154:6,11
157:19,21
161:23
162:3,4

163:5
164:21
165:4,23
166:8
167:14,23
168:8
172:22
178:22
184:4,8,13
187:24
189:18,21
191:21,22
206:4
210:13
212:6,7
214:5
215:14
217:15,16
217:20,21
217:24
219:5
223:20,22
228:22
233:13,14
241:10,14
243:21,23
248:24
254:4,24
255:14
256:1,23
257:11
262:11,24
264:11
270:11
273:9,10,19
274:7,8
276:23
277:5,6
282:3
287:19
290:6
298:16,17
298:19
303:5,7

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 9

309:22
correction
152:1
286:17
correctional
149:22
150:15,17
150:21
151:11
corrections
172:10
221:24
283:9
cost 176:23
232:4
290:16
296:24
costs 213:1
232:3
counsel
123:15
247:14
252:4 261:1
302:2
305:18
310:14
322:12
323:1
Counselor
261:2
County 120:7
120:7,21
127:13
128:20
129:11
130:18
131:3
148:23
149:15
154:21
155:6,15
159:11
160:8,13
162:1 165:2

165:16
167:13
176:22
177:8 178:9
182:10
184:11
185:8,20,24
186:2,12
187:5,12
189:19
191:24
192:6,20
194:9 197:5
197:16
210:15
213:7
190:22
217:14,23
219:23
220:8,10
221:6 223:3
229:11
232:9
238:12
274:21
275:5
277:11
278:4 280:6
280:13
290:15
292:14
294:19
295:2,3,5
295:23
297:22
298:5,15
300:6
302:12
303:22,23
306:5,19
307:17
308:3,9,19
308:21

310:8
311:18
314:4 315:4
315:8 316:8
316:13,16
316:20
317:8,17
318:3,13
319:3,22
320:20
322:2,6
County's
210:14
230:9
295:24
320:9,16
countywide
181:5,8,12
181:15
200:15
couple 127:1
260:17
course
168:19
170:1
172:20
217:9
228:16
242:24
285:22
311:23
321:5
court 120:1
120:16
174:10
189:16
190:8,11
191:2,14
192:22
193:3
194:14
279:17
280:6
290:12

291:19
courthouse
181:4 189:7
189:8,23
190:3,19,21
193:6,10,14
195:4 221:1
289:18
290:5
courthouses
190:2
courtroom
195:21
courtrooms
189:17
190:22
193:7 194:2
covers 190:4
crack 255:14
255:16,24
256:12,24
create 254:6
296:4
criminal
181:3
279:17
criteria
210:24
212:16,17
Critical
126:11,17
127:16
129:16
130:14
cross 271:4
271:12
crutch
284:20
193:3
crutches
284:16
280:6
290:12

323:10
Cummings
120:8
curb 246:9,9
246:13
current
224:22
226:20,23
227:12,14
227:14,16
228:18
229:9,18
312:14
313:23
currently
172:7
195:10
198:22
208:10
227:6,24
228:23
257:3
297:13
301:13
309:16
cut 199:23
cutting
185:15

———— D ————

D 318:3
Daley 180:4
Dan 129:20
darn 297:9
DART 120:7
123:10
date 123:11
132:3
189:22
204:8,10
dates 199:10
Dave 129:18
132:13
136:1 208:4

David 202:9
202:16
206:17
Davis 120:13
122:4 123:9
124:8,16,17
153:18
298:15
318:19
322:9,13,20
322:23
day 120:22
123:11
131:19
136:14
237:5 323:5
days 237:22
247:8
dead 258:20
deal 151:7
190:5
Debbie 252:9
decade
134:23
237:8
December
167:12
177:4
318:20
319:20,21
decide
230:23
decided
230:8
305:17,18
decision
222:19
292:4
decisions
144:11
declining
254:6
Defendants
120:9

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 10

121:13
123:24
define 174:23
233:20
263:20
definite
297:10
definition
245:20
definitive
145:11
283:16
291:9
316:23
317:3
318:11
definitively
142:18
241:19
276:2,13
292:24
294:1
degree 245:8
261:11
262:15,19
273:4,7
degrees
261:13
262:4,7,7
263:7,13,13
264:5 273:5
273:17
delaying
277:22
delineate
233:18
deliver 222:7
230:10
delivered
169:20
171:8
218:10
221:11
222:2

225:19,21
delivery
161:3
demolished
131:7
denial 305:5
305:20,23
denied 301:4
306:11,13
318:21
department
128:9 144:9
155:21
161:23
166:3
172:10
214:23
221:24
275:16
282:18
286:17
297:17
309:1 319:6
depend
261:10
263:2
285:22
dependent
166:17
depending
158:17
161:3
166:15,16
166:17
171:11
208:4
211:20
213:18
217:7 219:9
231:6 239:4
257:23
depositions
120:17
200:19
deputy
201:14
206:10

207:24
208:8
210:23
211:3,24
213:11
214:20
215:1,1
218:9 221:8
222:5,10
239:23
depicted
257:15
258:22
261:8,20
269:13
depicts
248:23
DEPONENT
321:22
deposited
236:16
deposition
120:12
123:9,21
155:3 186:6
220:18
224:4
231:11
233:22
235:2,7
244:21
300:13
301:13
309:24
317:1 319:1
319:12
321:24
322:8

207:3 208:2
241:22
242:9 275:5
284:3,9
285:3,5,23
285:24
287:8,13,16
292:12
descending
285:8
descends
285:14
296:6
describe
134:16
301:22
302:11
319:21
320:7
described
283:8,9,10
description
260:24
264:12
design
140:23
157:17
172:4
175:14,16
176:15,22
178:8,10,12
178:16
179:10
181:18
183:20
184:20
185:6 186:3
186:12,16
187:19,20
188:8,20
189:3,6,20
190:6 191:1
191:3,15,16
191:19

192:7,11,14
192:23
193:2 194:7
194:10
197:6
201:17
202:3
218:17
219:20,23
220:5 221:2
224:6,14
230:5
231:12,22
231:24
232:16
242:22
243:4
244:21,22
277:4,23
278:24
279:15
290:22
292:19,21
300:8
301:18
304:8 305:8
306:6 319:8
319:8,14
designated
298:15
designation
140:4
designed
219:5,17
257:21
260:11
281:2
designer
187:3
230:14,24
238:22
designers
172:1
designing

231:18
277:18
desirable
290:20
detail 302:11
detailed
176:17
detainee
139:3 142:3
143:5,9
149:24
154:14
281:10
284:23,24
285:7,16
detainees
144:6
180:18
195:5 284:4
286:5
290:11
291:19
detention
151:4,8,12
283:10
determinat...
229:11
275:12
282:3
283:16
291:9
292:18
293:3
296:13
297:10
305:11
317:3,14
318:11
determinat...
297:10
318:10
determinat...
296:21
determine

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 11

135:21,23
150:4
151:21
175:20
235:8 236:1
240:22
241:23
244:19
245:11,14
257:22
258:14
259:15
264:14
270:9
273:22
274:22
276:12
278:8,19,23
286:4
292:24
294:1 297:2
determined
275:14
determines
246:2
determining
297:7
develop
160:17
161:5 168:9
186:8 199:1
213:1
274:14
300:17
309:5 311:6
311:6,7
315:4
developed
161:2
195:16
303:11
308:6
developing
140:11

229:2 303:4
315:22
development
170:1
189:11
297:14
306:3
develops
164:21
device 233:17
236:24
237:3 240:6
259:5
262:13
263:2
DFM 128:19
155:21
156:17
159:17,18
162:8,14,22
DFS 156:15
diameter
260:18
difference
290:19
317:22
different
128:6
129:23
130:8,10
134:24
135:3
140:21
141:2
145:11
151:11,24
152:3 162:6
diagnose
163:24
227:20

228:13,23
234:15,21
300:2,2
310:21,22
312:5
297:14
difficult
198:15
detailed
202:3
218:17
descending
220:5 221:2
224:6,14
230:5
231:12,22
difficulty
198:9
287:23
digital 240:1
240:9,24
digitally
237:22
dimension
267:23
273:3
diminish
262:16
diminution
263:15
direction
201:8,10
261:6
296:23
305:12
322:11
directions
162:6
directly
128:2
156:21
164:17
285:23
316:20
director
156:19
163:24
164:12,17
171:15,22

201:14,15
275:5
303:10,23
304:3
315:20
316:5
disabilities
144:7
280:22
disability
159:21
disabled
148:12
149:12
150:2 289:3
289:7 296:5
disagree
176:8
317:11
disagreeing
317:9
discoloration
268:16
discovery
120:18
discussed
136:5
188:21
224:4
311:22
313:10
320:23
discussing
220:18
221:23
discussion
136:19,24
154:13
205:7 234:5
disperse
260:9,15,15
303:3
308:4,5,8
310:7 311:7
312:8,10

237:1
260:16
Documents...
122:15
District 120:1
120:1,16
246:1
divide 175:7
divided 175:6
Division
120:2 181:4
181:4 210:1
210:1,1,1,2
212:4,4,5,5
219:17
245:24
Divisions
131:6
DOC 179:10
181:16
182:24
document
125:5
132:12
137:7
151:23
181:22
182:10
208:24
307:18,23
documenta...
199:3
223:15
309:16
314:23
documents
202:15
215:12,16
215:20
246:17
304:18,23
306:18
307:3 308:2
308:4,5,8
310:7 311:7
312:8,10

320:8,15,18
Documents...
122:15
doing 153:21
153:23
155:14
197:14
210:7
212:13
237:7
277:16
305:19
312:20
313:15
319:11
dollar 230:4
230:6
dollars 177:2
179:2
189:20
190:4 192:6
194:9
195:17
221:20
door 139:22
206:14
doubt 262:14
downhill
236:12
285:10
download
182:9 253:6
255:5
downloaded
250:9
252:11
253:4,18
downloading
254:14
downward
285:15
dozen 214:15
Dr 156:5,9
draft 157:11

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 54

ERIC DAVIS
January 24, 2022

Page 12

202:21,24
203:1 213:1
220:19
299:19
304:21
314:11,14
drafts 313:13
314:18,18
drain 236:17
draw 187:13
drawing
218:17
drawings
135:7 148:5
157:17
185:8 186:3
189:3,6,10
189:15,21
190:6 191:1
191:4,15,16
191:20
192:7,11,14
192:18,23
193:17,20
218:7,23
219:24
220:5 221:2
222:14
231:1,5
244:21
274:14
277:24
293:4 304:8
306:6 317:5
320:12
drill 180:7
244:17
dropped
238:1
drywall
236:19
Duchesneau
282:12
due 202:13

dug 134:9
duly 124:10
322:14
dump 247:12
duplicate
138:19
duplicated
164:5
duplication
138:20
duplicative
278:19

___ E ___
e 121:1,1,9
153:7
252:17
318:13
e-mail 133:17
207:6 233:4
241:21
250:7,7
251:23
260:24
Earl 208:7
earlier 186:5
187:22
204:7
216:23
220:18
221:23
246:18
312:11
319:11
early 301:19
earmarked
157:23
231:15
307:16
Earth 260:18
easier 289:4
easily 124:20
186:21
237:4

EASTERN
120:2
easy 313:3
Eddie 128:15
edited 126:11
209:3
edition
168:13
editions
145:11
effectively
171:19
efficiencies
210:9
efficient
213:23
effort 135:13
155:7
156:17
157:6,15
160:11
193:13
278:20
279:14
297:6
300:20,23
301:4
304:19
306:9 307:4
312:9
efforts 300:6
300:11,16
301:22
303:5 320:9
320:16,24
321:1,3
either 139:23
140:16
144:24
147:7
149:17
154:17
156:5
186:19

200:24
239:24
243:19
261:5 266:8
266:14
270:14
287:4 289:8
290:11
294:21
301:19
305:2
312:21
314:15
316:20
elected 278:5
electronic
240:15
electronica...
125:22
242:2 248:3
248:18
251:13
286:9 305:4
element
315:2
elements
150:20
160:16
161:22
162:7 170:9
173:6 176:5
187:15
199:21
223:5
258:13
elevation
258:15
266:12
eligible
210:19,21
225:15,17
225:17
Ellen 130:4
136:6

138:16
141:6 142:6
143:1
145:21
158:10,14
159:9
175:18
242:17
243:22
275:22
277:22
292:6 297:1
309:24
311:1 313:4
315:9
320:24
enter 186:11
285:8
entire 158:19
161:8 175:3
175:13
entirely
275:20
entitled
282:15
entity 162:2
282:14
environment
149:23
environme...
150:21
151:12
Eric 120:13
122:4 123:9
124:2,8
153:9 183:2
293:12
302:15
310:17
318:19
322:9,13,20
322:23
escaping
156:12

endeavoring
125:10
292:17
301:10
ended 178:23
engage
163:23
211:7
engaged
172:15
engineering
189:15
301:11
ensure
265:24
266:5
emphasize
263:14
employee
163:7 206:8
280:23
281:6,15,17
282:15
284:22
286:18
297:22
employees
129:11
206:3
289:24
291:14,16
298:5
encompass
181:14
endeavor
127:3 175:6
endeavored
144:10
301:1
309:11

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 13

escorted
281:12
estimate
214:14
232:3 257:4
270:5
et 144:6
184:18
199:14
evaluate
135:16
163:21
170:19,20
170:21
171:23
187:20
188:8
216:13
223:10
274:10
275:11
277:17
282:2
evaluated
172:8
212:17
311:16
evaluation
164:24
169:18
170:3,22,22
170:23
186:3
212:18
213:10
214:4,19
215:3
222:18
300:14
311:21
evaluations
164:3 217:8
314:13
eventual

164:9
eventually
158:23
exact 157:8
exactly 164:2
182:2
Exam 122:6
examination
120:14
122:1
124:13
126:5,6
136:17
examined
124:10
322:16
example
152:1 162:7
166:2
198:24
223:7
230:23
272:22
273:2
exceeded
243:18
exception
151:15
280:12,17
280:23
exhibits
122:10
182:13
247:2,11
178:10
186:17
198:6
excessively
216:14
exclude
280:14
excuse
133:18
180:4
204:16

280:19
executed
161:13
315:16
exhaustive
315:16
exhaustively
298:21
exhibit
122:12
124:17
125:2,3,20
301:16
309:18
138:4,14
142:3
246:20,20
248:1,5,13
248:16
249:18
250:15,22
251:10,11
253:2
255:23
257:15
258:22
261:8
264:24
286:3,7,16
315:11
exhibits
122:10
192:6 194:9
231:22
expending
232:14
existing
278:20
expand 227:8
expect 178:15
178:15
227:19
278:5
205:12
217:2,8
219:13,15
232:13
254:9 268:5

271:13
295:17
296:9
304:20
313:12
experience
221:1
265:18
expert 237:10
258:4
229:9,19
expire 226:23
expired
227:13
228:3
expires
228:20
229:5
explain 197:5
236:6
268:11
310:3,15
314:2 319:3
extended
228:15
extent 149:13
176:3 263:6
extreme
213:9
eyeball 242:5

___ F ___
facilitating
314:4
facilities
128:9,24
131:2
133:14
151:4,8,11
151:12
155:21
160:14
184:5
213:19
214:24
275:17
295:3,6
311:19
facility 128:2

136:11,15
212:24
280:13
283:10
298:11
299:6
fact 132:23
176:10
240:6,19
275:7 318:8
failed 149:8
fair 131:4
157:18
163:8,15
165:3,21
192:5
194:12
214:2 228:4
229:1 241:2
243:11
276:10
278:10
279:2,9
285:17
fairly 136:4
246:12
248:23
fall 217:11
falling
264:21
falls 241:9
familiar
134:6 189:2
189:5
289:16
familiarity
289:21
far 156:17
194:14
271:12
288:13
290:9
296:13
297:7 298:5

expectation
141:7
158:21
183:17
188:22
239:22
301:16
309:18
expected
167:2
expecting
172:12,17
200:8
232:17
expedited
155:5
expediting
230:21
expeditious
222:6
277:15
expended
184:20
189:19
expending
232:14
expenditure
177:7
184:12
221:15
227:19
278:5
expenditures
173:11
189:22
expensive
231:3

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 14

313:21
faster 153:10
feasible
242:12
features
158:5
February
200:10
204:14
205:2 217:6
301:17
309:19
323:5
federal
120:15
187:6,11
feedback
126:21
204:20
205:1,5
feel 133:9
176:6
283:14
296:11
feeling 133:2
feels 283:13
fees 183:20
195:18
feet 267:18
268:3,24
269:2,4,7,8
269:9,10
287:16
288:7 296:4
Feldman
156:9,9
fell 152:10
173:3
felt 133:9
274:16
fifty 178:4
181:5
186:22
228:12

figure 216:1
231:3
file 251:18
files 256:3
filled 299:20
films 284:12
284:15
filter 177:19
177:22
180:5
final 148:16
215:11
finalized
199:9
301:14
finalizing
200:8
211:15
find 136:4
137:20
152:24
153:16
157:10,12
171:23
176:1 245:9
252:24
276:1,20
278:17
293:23
finding
143:13
findings
242:18,20
315:13
finish 158:4
188:4
222:23
266:2
293:12
finished
166:18
finishing
131:8
firm 176:21

186:10,12
197:13
201:4
212:22
213:6
217:13
218:6
219:11,12
219:14
224:2,6
242:22
276:24
277:7,23
278:6
279:15
300:9
302:13
firms 197:6
211:7,8,17
219:11,15
225:8
224:10
226:17
227:3,10,21
302:10
306:11
first 124:9
130:22
133:11
166:18
168:23
188:20
194:17
195:2,6
197:15
198:11,14
206:7
208:18
215:7 219:1
235:7
237:16
249:5 265:3
298:9 303:4
321:19
322:13

fiscal 165:18
167:24
168:2,19,21
170:1
172:20
178:9,11,23
178:23
179:1
183:22
188:24
218:15,17
218:23
224:15
231:12,13
312:2
five 148:22
166:8,22
189:6 191:7
195:23
225:8
227:23
228:17
232:22
287:16
288:6 294:8
five-minute
232:21
294:6
fixed 146:22
148:17
149:10,16
150:10
151:16
152:11,11
154:17,18
159:2,3,12
159:12
260:15
fixture
183:12
flexibility
158:6
floor 139:7
139:10,14

142:17
144:5
159:20
254:21
255:14,16
255:24
floors 146:1
190:2,9,12
190:13,15
194:16
195:21
flow 171:9
flows 236:12
focused
135:20
320:13
focusing
134:10
306:19
314:17
Follenweider
156:13,14
follow 296:23
follow-up
302:15
followed
160:3
following
197:11
follows
124:12
foot 257:4
269:17,21
foregoing
322:17
foreman
133:20
237:6,18
244:11
266:17
276:3,4
forgetting
156:6
form 202:24
203:1
213:19

221:16
270:19
formally
199:6
format
305:11
309:6
formulating
168:2
forth 193:13
205:7
322:12
forward
160:12
164:19
168:7
169:20
192:21
197:22
254:5 257:6
261:9,12
262:2,3,9
262:16
302:14
305:21
315:17
316:2
forwarded
163:6 316:3
found 143:10
269:17,21
four 194:8
195:23
216:12
224:24
228:17,17
228:19
278:12
287:16
frame 286:24
frankly 203:2
freezing
154:3
frequently
166:20,23

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 15

235:23
front 298:7
froze 185:1
185:12
frustration
133:2
full 240:18
fully 294:20
296:9
function
134:24
258:13
262:20
264:21
285:12
functioning
193:9 195:3
fundamental
237:11
funding
167:4,6
177:5
216:22,24
230:5,5
funds 179:9
186:6
187:13
229:19
232:7,19
319:4,7
further
134:10
143:17
185:19
243:1
260:10
321:12,22
322:17
FY23 178:17

___ G ___
G 121:3,3
ganged 146:9
146:10,13

148:23
gather
170:10
gathered
211:22
260:11,13
266:11,15
267:10
289:19
311:18
314:6
319:18
general
126:24
127:19
133:6
134:18
144:16
145:15
152:6
160:13
163:1 199:4
267:11
281:18
306:19
290:3 300:5
304:5
314:10
315:18
generally
127:2,21
287:17,23
128:7 136:3
143:24
150:18
156:11
158:18
163:12
164:10
165:13
167:14
168:9,17
169:22
171:4,13
172:21
173:7
186:13
208:23
211:3,9,22
213:16
218:9
221:17

222:10
223:2 226:8
231:13
222:11
241:17
247:18
248:14
249:21
256:2
263:10
272:22
294:4,19
generate
162:11
199:1
generated
162:8
170:13
173:11,12
212:1,1,20
215:2
279:24
280:11
306:19
314:17
315:9
gentleman
243:8
286:18
289:13,14
gives 201:10
Giving 273:2
glass 258:11
go 130:9
132:4
134:11
136:2 142:1
145:9,20
146:2
150:23
153:10
161:11,18
162:10
164:15
168:23
169:14
174:21
178:20
179:23
180:22
182:5,8,21
183:1

203:8,21,24
211:19,22
222:11
241:17
247:18
248:14
249:21
256:2
263:10
272:22
294:4,19
295:3,14
296:1 321:6
295:3,14
216:1,21
219:22
220:19
222:22
223:19
235:3
236:15
239:11
242:5,12
248:11
249:13
252:13
253:5,6
255:9,12
277:11,21
278:15
279:19
280:19
283:22
289:7 290:1
290:4
299:13
301:17
302:23
304:10
309:18
getting
134:20
169:15
272:23
301:18
316:1
gimbal
168:23
169:14
178:20
179:23
180:22
182:5,8,21
183:1

184:10
187:1
196:20
197:18,21
198:4,4
199:4,13,14
199:2
201:14
202:1 204:3
207:8,15
208:5,6
210:15
215:24
216:1,21
219:22
222:22
223:19
235:3
236:15
239:11
242:5,12
248:11
249:13
252:13
253:5,6
255:9,12
277:11,21
278:15
279:19
280:19
283:22
289:7 290:1
290:4
299:13
301:17
276:19,21
283:14
284:4,10,13
284:16
286:20
287:3,23
288:5
290:21
291:5

186:13
210:12
217:6,8
222:8,8
223:17
236:12
260:1 288:5
296:6
going 124:16
130:12
133:16
137:9 170:8
171:7 176:7
182:20
184:17
186:23
188:21
190:20
194:2,4
195:3 201:3
203:8
205:11
210:10
215:15
219:16
224:23
229:7
232:15
233:21
237:15
243:7
249:10,12
249:17
252:9
264:23
given 129:24
161:4
170:13
173:11,12
215:2
216:1,21
goal 169:22
295:9
goes 131:17
164:7,8

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 55

### ERIC DAVIS — January 24, 2022 — Page 16

292:23 293:23 294:3,5 296:20 297:12 302:1,14 307:14 310:13
**good** 123:22 204:1 210:17 229:23 240:16 321:9,15
**gosh** 176:24 179:12
**gotten** 158:15 253:19
**government** 187:5,6,11 196:6 226:10
**grab** 146:17 147:19 148:9 296:2
**gravity** 285:12
**gray** 257:6 265:15 268:1,2,13 268:14,15 269:21
**great** 190:4 260:16 296:15
**greater** 257:11 285:16
**grid** 254:7
**grounds** 317:9 318:4
**group** 126:5 136:17 138:14 142:3 246:20 248:5 249:15,18 251:9 253:2 255:23 257:15 258:22 261:8,21 264:23
**groups** 301:2
**grout** 268:16
**guess** 132:7 317:20
**guessing** 132:18
**guidelines** 239:4 242:19
**guy** 129:20 207:3
**guys** 250:16 321:15

**—— H ——**

**half** 167:15 199:19 214:14 229:24 257:4 268:4 268:22 269:8,9,10 269:10 321:19
**half-a-dozen** 297:14
**half-an-inch** 272:1
**half-dozen** 214:17,18
**hamburger** 252:19
**hand** 124:3 323:3
**handrail** 288:20,23 289:1,9 291:4,5,8 292:10
**handrails** 274:3 279:4 279:13,15 280:1,9,14 280:24 281:2,19 283:12 296:3,8
**Hang** 280:3
**happen** 135:5 135:19 151:19 152:14 166:24 183:18 194:4 321:5
**happens** 131:18
**happy** 206:7 264:2
**hard** 230:1
**he'll** 215:24 216:1
**head** 146:16 147:10 157:9
**heads-up** 184:16
**Health** 129:1 155:19 156:2 162:4 298:11 299:6 311:3
**hear** 306:12 312:24
**hearings** 165:13
**Heery** 313:21
**height** 147:13 262:10
**heights** 147:14
**held** 165:13 263:5,17 264:10
**help** 311:5,8 311:13 317:15
**helped** 287:11 312:3 314:14
**helpful** 153:17
**hereinabove** 322:20
**hesitancy** 289:14
**hesitant** 127:3
**Hey** 231:2 305:24
**higher** 135:6 157:2 263:10
**Highways** 166:2
**hire** 157:15 160:4 173:14 176:2,21 188:7,13,17 194:11 217:19 227:3 242:22 244:5 274:7 274:12,21 275:6 276:11 277:16 278:6,18 283:15 292:17,23 293:23 294:4 296:10,20 296:24 300:17 301:2 304:7 311:8
**hired** 141:9 161:8,10 188:10 193:17 201:4 205:18 206:10 217:13 220:7 282:1 311:2 311:12
**hires** 206:12 223:3
**hiring** 140:16 140:17 157:3 224:14 279:14 291:3 317:2 317:13 320:11 321:4
**hit** 222:15 260:3
**Hold** 138:15 173:20,21 173:21 177:19 182:4 203:5 203:14 204:2,19 208:14 253:7
**holding** 142:1 143:2 154:14 179:15 189:16,21 190:1,3,8 191:14,20 192:22 193:2,7 194:15 195:11,15 286:1
**Hon** 120:7
**honestly** 197:21 228:11 279:18 294:24
**hopeful** 227:8 321:4
**hopefully** 172:14 217:5
**hoping** 215:9
**horizontal** 147:19 237:1
**hospital** 129:1 280:13
**Hospitals** 182:24
**hour** 278:14
**hours** 278:15
**housed** 146:4
**housing** 135:3 145:1 159:4,13 180:13,16
**huge** 250:21
**hundred** 178:4 181:5 186:22
**hundreds** 177:2 179:2

### ERIC DAVIS — January 24, 2022 — Page 17

**hypothetic...** 230:8 271:17

**—— I ——**

**idea** 164:1 171:9 176:3 216:11
**ideas** 210:4
**idenif-** 232:11
**identified** 158:10,13 158:22 163:2 168:4 175:17 176:6 178:8 186:7 199:10,12 199:15 212:21 213:14 230:4,6 231:11,13 232:7 246:21 278:21
**identify** 152:3 160:16,18 169:18 186:9 197:12 212:19 223:14 230:14 233:17 257:24 296:21 298:9 300:7 308:20 310:7 311:14 312:4 315:7 317:16 320:14
**identifying** 139:16 143:16 230:18
**Illinois** 120:1 120:8,21 121:4,10 145:12 211:2,2 298:12 322:1,6 323:4
**illogical** 275:9
**image** 247:24 249:7 256:13 257:1
**images** 247:22 248:5,6
**imagine** 168:12 175:5 199:18 213:5 264:1
**impact** 152:7 170:11,13 193:9 262:5 263:8
**impediments** 169:19
**implement** 188:23 224:3
**implement...** 160:24 161:17 164:16 168:8,10,11 168:16 311:6
**implemented** 166:8
**implementi...** 170:17 192:17 195:10
**implications** 310:22
**important** 195:19 266:19 295:11,12 297:17,18 297:21
**impression** 133:6 295:19
**Improveme...** 160:14,21 160:22 163:7 164:19 201:22 296:11 166:1,7,12 309:13
**include** 141:8 175:16 176:13 177:4
**included** 144:18 154:9,13 157:14 158:13 159:5 198:18 209:9 289:2 300:12 303:12 314:8
**includes** 141:4 166:1 166:2
**inaccessible** 142:11
**inaccurate** 237:24 241:8 243:6
**inch** 262:13
**inches** 241:24 243:18 244:20,23 245:24 263:24 267:17,18 267:24 268:3,4,22 268:24 269:1,2,5 269:10,11 271:20,22 272:7,7 276:8
**including** 170:24 172:19 176:15 200:15
**indicate** 240:6 259:5 280:2
**indicated** 247:14
**indicates** 240:19
**indicating** 143:7 237:20 240:1 267:23 314:8
**indirectly** 316:2
**individual** 186:16 199:9 175:13,14 199:2 211:13 215:10 257:22 320:11 301:3 310:6 310:8 311:3 320:23,24 321:1,2
**increase** 254:10 257:10
**increases** 262:19
**Increasing** 295:5
**INDEX** 122:1,10
**individually** 161:3 197:14 315:8
**inferring** 142:22
**infinite** 168:15
**infirmary** 285:9 290:11
**inform** 283:20
**information** 126:22 170:10 177:15 180:23 211:21 275:22,23 276:16,18 277:18 283:5,19 284:21 296:16,18 297:8 299:4 306:21 312:13 320:21 207:15 226:14 284:10
**initial** 195:20 300:20 312:9
**initially** 161:9 199:5 200:19 204:11,13 204:18,18 302:8
**initiate** 162:5 162:19

### ERIC DAVIS — January 24, 2022 — Page 18

168:18
**initiated** 169:16,17
**inmates** 283:21 284:13,16
**insight** 293:2
**inspected** 136:11 238:14 259:3,13 266:16
**inspecting** 242:10
**inspection** 143:8 154:5 154:13
**install** 159:11 296:2
**installation** 183:12 281:2
**installed** 146:16 293:23
**instance** 147:2 149:9 184:19
**instances** 214:18
**institution** 150:16,17
**instrument** 233:13 261:15 264:9 265:20,23 266:4
**intended** 257:24
**intent** 244:22
**interdepen...** 167:7
**interdepen...** 151:23
**interest** 230:9
**interested** 213:7 322:24
**interim** 193:21 202:12
**intermediate** 296:14,18 296:19
**interpretat...** 281:23 282:3 291:24
**interrogato...** 124:11 299:21 322:16
**interruption** 174:2
**intersect** 260:8
**intervening** 300:7
**introduce** 123:15
**investigate** 314:12
**investigated** 143:17 283:3
**investigation** 144:1 243:1 276:14 291:7 315:21
**involve** 156:20 164:11,16 167:2 173:8 231:4 276:13
**involved** 128:2 131:6 136:3 140:15 141:1 155:17 156:8 158:9 164:1 171:12 215:2 277:3
**involvement** 313:6
**involves** 144:24
**involving** 144:5 171:16
**ironed** 200:3
**issue** 126:17 130:11 139:16 174:8 192:16 193:8 198:20 207:14 210:6 223:3 223:12 295:22 318:7
**issued** 135:10 158:7 161:9 164:18 177:3 189:11 191:11,17 192:18 197:16,24 203:1,3 205:11 214:11,21 220:24 221:9 223:21
**issues** 126:11 127:16 130:14 132:1,5 136:4 141:12 167:4,5 207:15 301:3 316:23
**issuing** 202:5 222:14
**item** 158:12 160:12 164:14 179:6 182:3 307:21 313:11
**items** 126:20 126:21 157:22 158:13 207:9 230:19
**iterations** 315:5

**—— J ——**

**J** 123:10 295:22 316:21
**Jack** 121:9 123:23 246:24 250:2,6,7 250:19 251:19 253:9 298:14 299:11 310:15 314:7 321:19
**Jacobs-El** 156:19
**jail** 131:3 134:4 135:4 150:19 155:6,15 156:3 157:1 162:2,5,7 163:1 171:18 173:15 175:3,4,13 176:22 178:9 195:1 202:19 213:7 220:11 242:3 279:16 280:13 285:8 289:17 290:5 291:19
**January** 120:22 123:12 209:8 299:8 320:10,15 320:18,20 322:7
**Jeffrey** 120:8
**job** 210:17 221:12,16 221:20 222:2 224:16,19 225:16,23 226:18,19 227:13,16 227:21 228:3 229:12,18 230:11 236:5 237:12 264:22 267:10
**jobsite** 238:1
**JOC** 225:23 226:23 227:2 228:18 229:3 229:13 230:10
**Joe** 133:19 275:16
**Joey** 129:19
**Johnson** 121:9 127:23
**joining** 191:24
**joint** 268:9 268:13
**joints** 266:8 266:12,13 270:16
**Joseph** 233:5
**Joyce** 130:9
**Judge** 120:7
**juggle** 256:3
**jump** 166:10 166:10
**June** 219:21
**Justice** 282:19

**—— K ——**

**K** 151:3,6,10 151:15 322:2
**keep** 152:17 208:21 209:1
**Kelly** 120:18 153:22 203:9 206:23 237:12 264:22 322:4 323:9
**key** 186:17

### ERIC DAVIS — January 24, 2022 — Page 19

**kin** 323:1
**kind** 140:22 169:21 172:21 255:1 257:8 265:23
**kinds** 164:6 172:1 184:17
**knew** 274:1 275:7
**know** 127:23 128:6 129:5 130:9 132:9 132:12 134:7,13,15 135:8,12,14 135:19 136:2,3,14 136:14 137:2 139:4 139:23 140:3,11,20 141:24 142:15,17 142:19 144:22 145:10,17 145:18 148:4 151:9 151:10,13 151:19,22 152:13,20 154:23 156:24 157:2 159:1 159:2,17 160:1,1,9 160:10 162:17,17 162:17 163:19 164:3 166:24 167:9 169:2 169:3 170:10,12 171:5,11 176:18 179:13 180:18 192:9 193:6 194:18 197:20 200:18,19 202:2 208:5 209:2,3 211:1,1 213:13 214:15 215:17 216:4 217:5 219:3,10,17 222:15 226:2,15 231:2 234:10,20 234:22,23 235:18,20 235:22 236:10,19 236:21 238:3,6,8,9 238:11,24 239:5,15 240:23 253:18 258:13,18 260:14,21 260:23 261:3 262:7 262:21 264:11,17 264:19 270:23 271:6,10,15 276:6,19 279:19 280:11 282:17 283:19 285:24 286:22,23 287:1 291:4 293:10 294:23,24 295:20 297:7 308:7 313:20 314:21 315:24 316:17
**knowledge** 131:15 145:6 154:21 159:12,18 235:23 259:1,19 264:8 277:8 288:12 315:12
**knows** 153:12 237:18

**—— L ——**

**labeled** 250:21
**ladder** 258:9
**lady** 156:12
**laid** 267:8
**landing** 296:4,14,18 296:19
**lands** 168:20 170:16
**large** 167:1 178:16 190:5 194:23 213:5 251:18,22
**larger** 158:24 173:7 222:4 313:11 314:16
**laser** 233:13 233:15,18 233:24 234:11,16 234:24 235:24 236:5 237:10,18 237:19,21 238:3,11,14 238:18,24 239:5,16,18 239:19 240:11,12 240:23 241:3,6,8 241:12,16 244:12,16 245:10 256:17 257:9,14,21 258:3,5,18 259:8,13 260:1,4,7,9 260:13,13 260:14,16 261:17 262:2 263:18,21 266:9,14 270:7 276:6 276:14
**law** 121:3 216:6
**laws** 145:13 215:19
**lawsuit** 133:5 146:4 213:5
**lawyer** 280:5
**lawyers** 198:19 202:9
**lead** 201:17 202:9
**leadership** 127:23 128:3 174:21 177:14,18 177:19 178:3,3,6 178:20 179:23 180:5 181:20 182:8,8,9 182:19 203:7,17 204:19 207:1 225:7 226:1 230:3 232:20 247:19 248:14 250:10 252:21 253:15 268:8 279:24
**leading** 279:16
**left** 156:7 249:6 255:18 267:17 270:24 296:2,3
**left-** 279:4
**left-hand** 255:21 270:1,10 271:8,21
**legal** 224:8 303:1 309:7
**Leighton** 189:7,8,9 189:16,21 190:8,11 191:2,13,21 192:22 193:3,6 194:14 222:1 279:16 280:6,7 289:16,17 289:21 290:1,4,10 290:12,16 291:13,22 296:15
**length** 237:2 246:11 296:15
**lengthy** 224:6
**let's** 128:12 129:21 132:11 145:20 146:2 149:8 161:6,6,7 161:18 167:20
**letter** 131:22
**letting** 216:4 227:20
**level** 131:9 134:20 135:2 136:20 138:23 140:7 142:16 157:2 169:24 171:12

Exhibit 13 Page 56

## ERIC DAVIS — January 24, 2022 — Page 20

189:23
190:10,16
190:20,23
191:2,4
198:8
233:13,15
233:18,19
233:21,24
234:11,23
234:24
235:24
236:5,9,20
237:10,18
237:19,21
237:23
238:3,4,11
238:14,18
239:5,16,18
239:19,21
239:24
240:2,5,6,8
240:11,12
240:13,14
240:15,20
240:23,23
241:4,6,8
241:12,16
244:12,16
245:9,10,11
245:12,14
253:22
254:5 256:1
256:17
257:2,9,10
257:13,14
257:16,17
257:21,22
257:24
258:3,5,14
258:19,20
259:3,6,9
259:16,20
259:24
260:2,13
261:17
263:17,21
265:21
266:6,9,14
267:1,9
270:7
271:11,13
272:15,18
272:20
273:8,19
276:6,15
297:23
**levels** 190:14
191:13
234:16,21
239:1
**license**
120:20
211:2
**licensed**
237:16,17
274:16
277:2
317:14
**licenses**
223:7
**lift** 289:10,11
**light** 263:19
**limitation**
149:23
242:7 301:6
**limitations**
271:3
**limited**
144:15
242:1
**Linda** 156:13
156:14
**line** 179:5
182:2
236:14
240:21
278:24
**link** 252:1,10
**list** 307:7,12
307:13,15
308:8
312:10
**lists** 183:19
**litigation**
131:23
194:19
**little** 134:10
134:24
187:8
240:18,18
262:4
**live** 208:23
226:22
**living** 144:4
145:21
146:3
**located**
181:22
237:21
**location**
139:2
177:19
**locations**
258:11
**locking** 238:4
**logical**
149:23
259:14
**long** 166:15
166:20
174:16
179:22
192:3
194:24
196:18
199:23
216:8,15
217:7 218:3
221:1 222:9
237:1
240:17
245:13
309:6
**longer** 167:3
186:24
216:13
219:2
**look** 124:18
130:13
132:4 134:3
135:7,7,18
135:21
136:17
138:9 139:1
139:10
140:4 148:4
150:12
151:18,21
151:23
152:24
153:9,13
156:10
157:9 159:7
168:12,16
171:4 173:2
173:18
176:4
178:18
180:5 182:5
182:9 192:8
197:18
198:4 203:6
217:5 228:9
231:2 239:6
248:13
253:13,15
254:12
255:1,22
272:19
273:11,18
**looked**
136:12,13
136:15
154:9
209:21
272:15
284:12,15
313:10
**looking**
126:10,13
132:11
137:4 138:8
175:7,10
177:11,16
179:3,4
184:16
217:3 227:3
227:7 250:8
251:20
256:16
268:12
287:15
311:24
**looks** 132:19
134:24
137:1
138:14,19
138:20
147:5
148:21
173:23
174:8 215:4
253:5,21
254:22
256:24
268:8,10,20
268:20
269:6,6
287:8
**Los** 156:7
**Los-** 156:7
**lose** 173:22
**lost** 173:23
185:13
**lot** 128:6
129:22
162:12
167:2
170:23
193:12
205:6
206:14
211:21
225:18
247:22
315:2
**lots** 224:14
**low-** 190:7
**lower** 135:2,2
135:6
136:20
140:6,17
142:16
146:15
189:23
190:10,14
190:16,20
190:20
191:2,4
192:21
249:3,5,6
**lower-level**
142:8 190:1
190:7
195:11
**lowest** 223:4
223:16

**M**

**M** 120:7
**Magistrate**
120:7
**main** 268:14
**major** 147:5
**majority**
171:16,17
**making**
141:17
200:15
293:3 295:3
295:14
**management**
128:10,24
136:1

## ERIC DAVIS — January 24, 2022 — Page 21

155:21
213:19
214:24
220:23
221:4
275:17
295:7
**manager**
266:24
303:21
311:2
**managers**
129:5,19,23
171:2,11
**maneuvering**
143:11,12
**manner**
161:19
**Manning**
208:7
**manufactu...**
234:10
**manufactu...**
234:15
**March**
133:17
136:7
137:18
140:19
141:6,20
142:24
144:3 147:6
154:6
158:14
175:19
217:7 233:7
235:15
238:15
241:21
242:8,17
258:19
262:23
273:23
274:17
278:2
289:14
309:19
313:5
315:10,14
**marked**
246:19
250:18
**market** 211:6
220:24
309:18
**marketplace**
202:6
211:10
**marking**
251:10
**Mary** 120:7
**mason**
265:23
271:12,20
266:4,11,14
266:19,24
267:8
**masonry**
266:7,20
267:11
270:17
**masons**
265:19
**master**
226:12
**material**
236:16
320:11,12
**materially**
262:5 263:8
**materials**
307:19
**math** 262:4,8
**mathemati...**
245:22
**matter**
123:10
239:14
261:7,13
263:7 285:4
311:23
**maximum**
221:15
263:12
**mean** 127:18
140:9
148:23
160:7
181:13
196:2
204:21
205:22,23
215:23
218:16
240:14
261:24
263:22,23
269:12,16
284:2,3
299:17
316:22
**meaning**
315:4
**meaningless**
261:18,19
**means** 259:15
315:15
**meant** 303:18
306:13
**measure**
235:24
237:1 244:1
244:10,14
245:2,6,19
249:15
258:21
261:8,16,20
263:5
264:13
265:12
271:18
278:15
**measured**
235:9 246:4
246:7
264:18,20
267:4
270:13
271:13
272:4,8,11
273:12,22
**measureme...**
260:22,23
261:22
262:5,23
263:8 264:4
264:20
267:16
268:22
269:12,16
269:20,24
270:9 276:5
297:2
**measureme...**
134:14
233:9,12
235:6,11,12
235:15
266:21
271:7 274:5
274:18
**measuring**
244:24
245:5
260:20
261:15
262:12,15
262:22
263:2 264:9
265:11
270:8
**mechanical**
237:23
239:24
**mechanism**
303:1
**meet** 143:11
**meeting**
126:12,17
126:18,23
130:14
132:8,22
133:7 165:8
165:9
167:13
209:6 217:4
**meetings**
127:17
129:17
130:4,7
133:13
205:13
207:7,12,18
207:22
208:22
**meets** 265:15
**member**
163:7
276:24
**members**
128:3,21
129:10
214:21,22
214:23
281:12
**memory**
305:10
**Mendoza**
155:4
**Mennella**
156:4,5
162:3
**mentioned**
129:6 155:2
160:15
181:19
186:23
187:22
192:15
200:13
204:12
216:23
224:7
227:12
230:6
231:10
233:22
274:24
297:4
301:12
302:5
309:13
312:4,11
316:22,24
319:11
**Merkel**
133:16,19
134:3,7,13
233:5,8
234:13,24
235:8,14,18
235:24
237:6,10
238:4,15
257:9,14
258:19
259:23
260:19,21
262:22
264:9,17
271:6,17
272:8
273:21
275:16,23
276:2 297:8
**Merkel's**
235:12
241:20
255:22
274:18
276:20

## ERIC DAVIS — January 24, 2022 — Page 22

**met** 220:21
**metal** 263:16
**method** 161:3
163:2 196:5
197:12
214:3 221:9
225:20,24
226:7,16,19
227:13
270:15
301:12
306:5 307:6
308:3,10
309:4,8
312:13
**methodology**
225:16
**methods**
224:7
**middle**
134:23
268:14
**midyear**
304:12,12
**Mike** 128:11
129:9
**millimeters**
260:17
**million**
183:16,19
183:21
184:3
189:20
190:4 192:6
194:9
195:17
221:20
226:2
231:13
232:2
319:16
**mind** 173:4
198:5
225:23
228:14
289:12
**Mine** 249:24
**minimal**
242:4
**minority-**
211:7
**minute**
153:13
**minutes**
207:9,14,15
321:7
**mis-** 229:22
**mischaract...**
195:23
**missed** 174:5
**mm-hmm**
167:19
184:22
217:18
225:9 244:8
287:18
291:17
**modification**
140:24
**modificatio...**
141:24
**modified**
145:12
**Modify**
139:20
**moment**
125:4
136:23
156:12
177:15,19
177:24
179:18
182:4 185:2
203:6,8
208:14
236:6
247:18
248:14
249:21
253:7 256:2
280:18
286:4 287:2
292:6
**monetary**
176:20
177:10
228:7,20
229:17
231:8
232:12
278:6
**Monroe**
121:10
**month**
126:19
165:5
167:15
200:9
202:14
205:11
209:2
211:19,22
212:2
215:11
222:11,15
298:10
301:17
308:14,16
308:17
**monthly**
127:16
209:3,3
**months** 196:9
196:10
214:10,15
218:5,11
258:17
**moon** 260:16
**more-recent**
297:8
**morning**
253:2
**Morrissey**
121:3,3
122:6
123:18,19
124:14,23
126:1,15
137:8,11,16
138:3,11
153:6,15
154:2 174:5
174:9,14,20
178:13
180:15
181:7
183:23
185:4,5
187:17
203:23
208:20
216:7
232:20
233:1,3
234:3,7,9
239:13
248:4,21
250:2,17,23
251:5,7,16
253:11
254:19
255:11
256:7,15
265:8 273:1
286:14
287:10
293:16,17
294:5,11,15
294:17
298:14,18
299:1
301:21
302:6
302:16
315:6 321:6
321:11
**mortar**
268:17
**most-detail...**
281:23
**most-qualif...**
212:19,22
**most-recent**
205:13
228:10
281:22
**motorized**
289:10,11
**mounted**
147:12
148:10
**move** 153:18
168:7 254:5
257:2,6
305:21
**moved**
197:22
**movement**
285:11
**moves** 192:21
**moving**
169:19
**multibuildi...**
218:4
**multiple**
140:21
141:2
144:10,21
151:10
173:8 175:7
175:8
181:15
202:5,6
210:6 219:8
219:15
295:20,21
300:6
311:22
**multistage**
204:12

**N**

**N** 121:1
**name** 123:23
128:14,15
129:20
130:22
156:6,10,12
157:6
192:10
208:11,12
208:17,18
233:16
252:8,15
282:12
315:7
**named** 207:3
**navigate**
285:2
**necessarily**
159:16
192:24
215:20
271:20
279:10,12
**necessary**
199:21
223:8 226:6
263:16
274:15,16
277:19
292:14
300:10
**need** 126:21
126:22
139:17
144:1
162:18
169:2
170:10,10
170:20
172:1,4
173:10

## ERIC DAVIS — January 24, 2022 — Page 23

176:1,4,11
185:20
187:1 199:3
214:4
236:21
237:9 240:5
244:9 245:8
272:17
278:18
293:24
300:8 306:1
306:1 317:5
**needed**
131:13
140:23
142:2
144:13
156:20
158:7
194:18
195:1
210:24
223:11
273:24
303:18
311:15
**needs** 153:13
171:24
176:6
236:10,13
236:15,19
241:12
**negotiate**
197:13
213:1 309:7
**neither**
317:11
**never** 157:11
192:18
**new** 146:15
151:14
155:1
193:19
197:1
206:12
207:2,2
214:6,8
227:2 229:3
229:7 247:8
**newer** 134:22
214:7,9
**nomenclat...**
197:1
**nominal**
261:24
**noncompli...**
131:2,11
132:2
**normal**
264:21
313:18
**normally**
126:24
128:10
162:10
**NORTHE...**
120:1
**northwest**
146:16
**note** 137:13
142:23
148:16
149:20,22
153:7
154:24
165:24
177:15
183:15
236:4 237:6
276:2
281:24
316:6
**noted** 131:12
133:10
188:19
278:22
300:13
**notes** 132:7
132:10,16
132:21
137:17
138:16
139:12
141:5
142:21
152:19
153:1 154:9
154:13
196:20
315:9,10,19
316:7
**notice** 120:14
298:6
302:18,21
315:11,13
320:1
**noticing**
123:14
**notified**
156:19
314:21
318:7
**November**
167:12,15
177:4
178:24
**number**
125:2
132:24
150:18
203:22,24
219:4
223:23
224:18
226:9 242:4
249:7 251:4
258:12
306:2
**numbers**
247:24
251:3

**O**

**O** 322:2,2
**O'Bara**
129:20
**oath** 123:4
**object** 302:22
**objecting**
318:7
**objections**
318:4
**obligation**
186:11
**observation**
146:21
316:9
**observations**
316:21
317:9,10
318:14
**observe**
212:9
**observed**
162:8 258:7
**obtain**
197:10
**obtained**
319:13
**obviously**
145:11
155:17
168:21
222:13
237:14
253:19
**occasions**
295:21
**occupied**
146:3
**occur** 188:24
**occurred**
195:7
196:21
**occurs**
291:10
**October**
165:8,9,11
301:15
**offhand**
135:5,19
140:3
145:19
151:9,19
152:13,15
159:15,17
159:23
197:17
303:13
**office** 127:13
155:18,22
163:14
164:8,20,23
172:8 173:5
202:23
204:21
205:10,14
206:2,18,21
208:22
209:7
220:20
221:4
233:23
280:5
281:13
295:24
297:15
301:14
303:17
305:1,6
307:4 308:6
309:17
312:15
**officer** 172:9
186:20
202:24
206:1,11
207:3 208:1
208:9
211:11
281:11
288:6
301:15
303:16,18
305:13,17
308:7 309:5
309:18
312:15
**officers**
206:12
**OFFICES**
121:3
**official**
157:11
**officials**
278:5
**offline**
193:15
**oh** 125:18
128:13
174:3
176:24
179:12
180:4,17
204:22
247:16
249:9 252:3
252:20,23
253:3,6
267:21
**oil** 240:18
**okay** 125:4
125:18
126:2,7
127:21
130:16
133:22
134:1
136:18,21

Exhibit 13 Page 57

ERIC DAVIS
January 24, 2022

Page 24

137:22 138:24 139:19 141:12 145:2,5,23 146:14,18 148:18 149:2 153:11,14 153:21 154:19 161:15,20 164:18 168:24 170:2,8 171:6 173:14 174:24 180:3,11,19 182:4,18,20 182:21 183:1,24 189:2 191:18 203:17 204:23 207:9,22 213:21 215:17 218:24 226:17 229:23 232:22 235:22 237:15 239:11 243:7 247:6 247:10,16 247:22 248:14,20 249:21 250:13,20 250:23 251:1,6,15

252:5,20 253:1,6,16 253:21 254:17,21 255:10,12 255:15 256:9,18 257:7 265:2 265:4,10 268:18,23 269:15,19 269:23 270:2 273:6 273:13 279:2 280:8 280:10 286:12 288:8 292:8 293:13 299:11 300:3 302:7 302:16,19 303:8 310:19,19 321:6,9,21 **old-fashion...** 240:17 **on-board** 155:13 **once** 160:22 161:1 165:2 165:14 **opinion** 141:11 176:17,17 220:7,21 226:12 230:20 309:10 317:4,6 **ones** 197:22 224:23 229:9 247:12,23 **optimistic** 206:13 **ongoing**

209:1 295:6 295:9 297:24 **online** 181:24 202:13 229:8 **open** 125:11 125:14,19 131:18 179:19,22 182:14,14 210:16 211:10 215:21 227:1 265:10 **opening** 125:5,5,9 125:10,12 203:13,21 254:17 **operate** 173:14 **operation** 195:8 288:13 290:9 **operations** 194:24 284:7,9 288:16,18 **opportuniti...** 211:8 **opportunity** 212:9 227:5 235:3

224:14 **options** 231:6 **oral** 124:10 322:16 **orally** 250:18 **order** 137:1 140:24 155:7,9,14 157:7,13,14 158:6,8,17 159:5 160:4 160:11 167:16 170:16 174:24,24 186:11 193:13,18 193:22 221:12,16 221:21 222:2 224:16 225:16,20 225:23 226:19 227:13,17 227:21,22 228:3,11 229:10,12 229:18 261:21 262:6 268:10 274:6 300:9 300:24 307:8 312:13 318:21 321:2 **orders** 158:23 200:22,24 224:19 226:18

229:3 **page** 122:3 122:12 124:17 125:3 126:3 126:5 130:13 136:22 137:1,2,13 138:14 139:1 142:1 142:3 146:6 146:9 152:23 153:5 183:9 **pages** 122:15 126:6 **paint** 268:19 **painted** 257:5 268:17 **pandemic** 199:19 242:7 279:22 **parameters** 169:18 170:13 **part** 131:8 134:23 139:12 141:9 152:15 161:16,17 163:17 166:5 172:3 172:7,22 181:19 195:15 196:14 202:8 209:19 224:20 225:14

**originally** 149:5 167:2 203:7 204:5 **ought** 291:4 **outline** 126:20 **outlined** 186:5 **outside** 166:4 319:12 **overall** 179:6 **overlapping** 304:10,16 **oversight** 186:16 201:16 **Ozog** 202:12

**— P —**

**P** 121:1,1 **P-r-i-m-e-r-a** 192:12 **p.m** 120:22 123:12 321:24 **pack-** 202:5 **package** 199:2 201:22 204:3 219:4 219:11,20 220:16 221:6 306:10 312:22 314:16 **packages** 202:5,6 209:20,22 209:23,24 209:24 210:3,6 218:13 219:8,12,14

---

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 25

227:21 235:7 236:5 237:11 242:24 268:13,14 271:4 274:9 278:8,11 281:1,17 295:7 298:18 300:16 302:2,20 304:8 305:8 311:5,20 312:2 313:11 314:16 **participated** 140:5,9 155:10 156:16 **particular** 130:11,12 142:11 152:22 258:14 259:20 313:11 **particularity** 320:8 **particularly** 213:8 **parties** 123:1 123:3 322:21 323:2 **parts** 296:7 **party** 123:15 **passage** 143:20 292:1 **passes** 165:19 **path** 281:1 **pause** 124:22

125:6,16 126:8 137:5 137:10,24 138:10 153:2,20 177:12 178:1 179:16,20 180:1,9 181:1 182:11,16 182:22 203:11,15 203:18 208:15 247:20 249:22 250:11 252:22 254:15 255:7 256:4 256:10 265:5 272:24 286:10 287:5 321:10 **PDF** 125:11 182:15 **PDFs** 203:14 202:2 **pendu-** 238:18 **pendulum** 237:19,20 237:24 238:5 **people** 127:1 128:1,17,17 129:1,15 130:8,10 155:17 159:20 201:9,10

208:8 210:5 238:24 281:6,9,11 288:14,14 289:3,4 313:13 **perceive** 272:12,13 **percent** 193:18,22 **perfectly** 263:17 **performance** 223:6 **performing** 172:16 **period** 211:16 221:14 227:2 304:2 306:4 309:20 310:3 **periods** 242:11,13 263:4 **permit** 192:18 281:2 **permitted** 246:21 **person** 127:5 148:13 149:12 176:7 205:24 241:22 284:19 285:5,20 287:3,11 296:5 **personal** 235:23 258:24 259:18

**personally** 235:20 297:19 **persons** 170:18 **pertaining** 120:16 **phased** 195:12 **phasing** 192:16 194:24 **phone** 235:19 313:20 **phonetic** 129:20 **Photographs** 122:18 **photograph** 248:12 254:12 255:23 256:16,22 272:18 288:4 **photographs** 122:16,17 246:21 250:19,21 251:8,9,21 264:12 272:19 **photos** 247:12 284:19 **physical** 141:13,17 141:21 283:10 **physically** 123:6 **Plaintiff** 120:5,14 121:7

**picture** 248:22 249:6,14,18 255:2,23 257:15 258:21 264:24 265:3 267:13 287:15 **pictures** 246:14,16 250:3 251:4 **piece** 194:18 276:16,17 **pieces** 223:11 **pipe** 236:15 237:4 **pipes** 236:22 **pitch** 236:21 259:7,9 **pitched** 259:24 261:9,12 262:1,3,6,9 262:16 263:9 **pitching** 260:7 **place** 133:3 257:13 305:16 **placed** 239:19 240:2,4 241:16 257:9,14,16 259:23 **places** 151:24 162:24 180:18 200:4 201:12 202:8

**Plaintiff's** 252:4 **Plaintiffs** 237:13 **Plaintiffs'** 246:20 247:14 293:6 **plan** 139:10 140:2 160:15,21 160:22 165:2,22 166:1,7,12 167:11,18 167:21 168:3,5,10 168:11 173:24 181:24 183:24 199:12 223:24 311:7 319:7 **plane** 233:18 233:21 257:22 258:1 **Planning** 127:1,5 128:22,23 129:4,17 140:6 144:9 160:5 162:16 163:9,10,19 163:20 164:21 166:4 168:24 170:19 200:4 201:12 202:8

---

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 26

207:23 213:17 219:22 221:3 241:23 242:10 275:6 292:13 295:24 298:2 307:16 309:1 314:3 319:6 **plans** 139:4 **please** 123:15 293:15 **plumb** 264:6 **plumber** 133:20 236:6,10,13 236:19 237:6,7,18 244:11 264:17 270:21 275:16 276:3,3,4 **point** 128:13 129:21 131:22 152:22 157:3 159:8 165:18 173:4 194:20 229:2 236:15 242:16 246:13 254:9 257:19 260:4,8 273:12 296:12

315:21 319:16 **pointed** 141:5 **pointing** 132:23 141:13 142:6 **policies** 295:8 **Policy** 166:4 292:13 309:2 **portable** 150:9 **portfolio** 171:1 198:24 201:16 311:3 **portfolios** 209:15 **portion** 146:8 147:5 151:7 151:15 154:16 156:3 169:7 249:1,4,5,6 255:24 270:1 310:14 **portions** 189:13 **position** 216:17,21 244:1 292:12 293:3,5,6 293:18,21 320:10 322:12 292:3 293:9 **possibly** 193:20 **POTTS**

120:18 322:4 323:9 **pour** 265:19 **poured** 131:13 271:10 **practice** 266:8 307:1 313:18 **practices** 232:9 **precisely** 273:22 **preclude** 280:12 **precluded** 242:9 **preliminary** 191:3 203:2 303:11 **prepared** 132:10 215:12 **prepriced** 230:19 **prequalified** 197:6,8 306:11 **present** 123:6 128:21 130:7 198:18 225:12 242:8 299:9 309:21 312:20 313:5 319:21 320:10 322:12 **presented** 160:19 164:23 165:7,11

**presenting** 160:3 165:17 294:18 295:3,10 **president** 164:8 165:7 295:8 **president's** 295:8 **pretty** 211:3 244:15 245:16 297:9 308:8 321:7 **prevent** 290:20 **previous** 134:23 224:23 318:17 **previously** 196:15 202:10 211:14 244:1 250:9 256:23 296:16 299:12 300:13 320:1 322:12 **price** 186:10 226:4 230:15 **prices** 230:18 **primarily** 211:7 **primary** 163:2 201:15 **Primera** 192:12 **principal** 129:15

**principle** 290:22 **printed** 153:1 **prior** 140:20 160:3,10 185:11,16 185:21 188:19 191:24 195:20 197:9 200:19 209:2 210:10,10 219:23 220:4 238:18 239:1 241:12 255:12 257:1 300:21 303:15 315:21 320:2 **prioritized** 158:22 299:12 **priority** 294:12,18 295:2,6,11 295:13,20 295:23 297:16,21 **prison** 150:19 **prisoner** 289:7 **private** 196:6 **probably** 132:14,15 136:1 156:18 173:23 191:23

194:3 217:3 219:1 233:24 251:22 276:13,14 304:11 305:3 314:19 **problem** 232:8 251:2 **proc-** 220:3 **procedurally** 211:16 **procedure** 120:15 219:23 161:14 229:10,11 275:6,12 277:16,17 290:15 292:14 293:1 299:14 305:7 306:5 307:4 312:22 317:15 318:11 **proceeded** 274:6 278:4 302:9 **proceeding** 278:22 313:7 **process** 155:11 160:16 168:2 172:15 176:14 196:8,12,17

---

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 27

196:19 197:24 198:20 199:13 200:5,7 211:15 214:6 220:17 221:12 222:3,18 224:6 226:8 230:18 277:4,18 302:9 303:4 306:20 309:15 315:18 317:1 318:9 319:10 **processes** 314:5 **procure** 144:15 226:11 306:5 311:24 312:6 318:22 319:4,8,22 **procured** 220:14 312:12 **procurement** 172:8 175:9 186:18,20 196:3,7,11 197:24 199:5 200:4 200:21,22 202:24 204:21 205:1,10,14 205:24 206:1,2,11

206:12,18 206:21 206:9 207:3,23 208:1,9,22 209:6 210:15,16 211:11 213:8,15 214:3 215:19 220:20 221:4,8 223:9 224:13 225:24 226:7 227:2 230:22 277:4 297:5 297:15 300:22 301:8,15 303:16,17 303:19 305:6,6,13 305:17 306:14,17 308:7 309:4 309:5,8,17 313:24,24 315:5 **procureme...** 201:14,17 205:8,9 214:8 305:19 156:18 175:2 308:10 318:9 **produced** 309:24 313:14

**productive** 206:9 **professional** 162:2,19 120:19 140:23 141:11 144:10 155:8 176:16,17 259:4 267:1 270:20 278:23 296:22 297:5,12 300:8 311:8 317:13 319:8 322:5 **professiona...** 297:19 **program** 174:22,23 180:4,21 177:5 179:6 217:17 224:16,19 225:24 227:4 228:3 228:8 229:3 229:12,18 230:10 311:2 **progresses** 285:10 **prohibitive** 213:9 **project** 129:5 129:19,23 129:24 130:12 131:8 146:19 155:4,16 156:21 157:23 160:8,17

161:4,5,7 161:22 163:2,14,24 164:5,12,15 164:16,19 166:6,17,18 167:7,9,10 167:21 168:4,17 169:6,19 170:2,7,12 170:14,21 171:2,6,10 171:15,19 171:22,22 173:1,3,8 176:13 177:17 177:5 179:6 181:3,6,10 187:21 191:10 194:23 195:1,6 199:1 200:1 200:11 209:17 211:20 212:1 213:18 215:3 218:4 218:10 220:10 221:21 222:1,7,12 224:3,19 226:3,4 227:3,20 230:10,11 231:4,7 239:14 257:17

266:15,24 267:3 300:17 303:10,14 303:20,23 304:3 306:15 309:12 314:15 315:20 316:5 319:23 **project-by-...** 171:23 213:20 **projected** 178:18,19 306:24 307:8 312:12 319:15 **projecting** 183:13 **projection** 184:15 **projects** 126:20 132:24 133:3 140:6 140:16 155:5,15 158:3,9 160:24 161:19 162:5,11 167:1 168:14,18 168:21 169:1,5,7,8 169:23 170:6,17 171:3,9,13 171:16,17 172:1 178:8

179:8,11 180:7,12 184:9,10 198:6 205:19 207:16 209:9,11,13 209:15 212:4 213:15 214:11 221:18,19 222:4 223:23 224:12,22 225:4,14,19 225:21 226:8,14 227:23 228:24 229:20 230:3 297:14 306:7,16 307:8,12,16 308:1 309:14 311:6 312:16 318:22 **proper** 266:12 **properly** 235:8 **proposal** 186:9 196:1 196:5 197:2 197:7 198:10 300:21 301:23 302:10,12 303:11 304:4,7

---

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 58

ERIC DAVIS
January 24, 2022

Page 28

305:7 314:1
proposals
222:17
provide
139:13
140:22
141:10
211:8
223:10
257:17
274:15
282:19
283:6
288:24
301:10
314:11,12
provided
125:21
246:14,16
248:2,17
251:12
283:1,1
286:8
299:11,16
299:18
307:19,20
311:22
provisions
152:6
public 171:1
171:14
180:23
198:23
201:16
215:19
220:12
221:7
281:18
282:14
290:3,3
300:12
307:18,22
311:2
public's

230:9
publicly
281:4,21
285:15
290:17
291:4,5
296:22
306:9 317:6
puts 164:22
putting 200:9
220:15
267:1
312:22,22

Q
Qualification
196:16
197:12,16
198:14
212:14
301:12
309:6
qualificatio...
186:9 197:1
197:23
198:10,21
198:23
200:2
211:18
212:10,15
218:5 259:4
277:12
314:2
qualified
197:13
217:13
241:3,5,7
241:19
qualify
230:21
quarter
168:17
215:7 219:1
263:23
264:4 272:7

177:16,23
published
168:13
211:17
pulled 308:11
308:13,14
308:18
purported
233:8
purpose
120:17
175:24
236:4
288:11,19
288:23
311:13
purposes
147:22
pursuant
120:14,15
306:20
323:3
pursue 275:1
pursuing
312:14
315:1
purview
308:24
push 206:5
284:5
pushing
285:24
286:18
put 131:8
147:10
149:16
161:22
172:11
204:7,10,11
204:13,20
221:6 268:7
274:6

279:13,15
281:4,21
285:15
290:17
291:4,5
296:22
306:9 317:6

question
134:19
164:13
168:20
174:11
188:4,20
194:1 225:7
245:3 259:3
259:13
266:2 275:9
275:21
285:6
289:15
293:12
294:3,24
295:1 296:7
298:9
310:18
312:11
313:1,19
316:18
questions
163:22
165:12
176:1
199:16
230:1
278:17
282:20,24
299:19
302:15
313:12
317:16
318:17
322:10
322:19
quickly
230:21
quiet 203:10
quite 175:5
176:24
177:1 203:2
225:18

R
R 121:1
R-a-f-f-i
208:19
Raffi 208:11
208:18
railing
290:17
raise 124:3
raised 132:1
Ramos 130:9
ramp 131:6,7
131:18
134:3,4,8
134:11,16
134:18
135:16
136:10
138:17
144:15
152:19
154:10
158:10
172:2,3,7
172:19
173:6
175:20
184:20
185:9 186:4
187:20
188:8,13,18
194:22
200:3,12
201:12,19
202:8,19
209:18
211:13
212:6
218:18
229:15,21
230:4 231:9
231:20,23
233:9 235:4
235:9 236:1

237:2,4
241:24
242:10,19
243:10,17
243:18
244:10,14
245:6,12,15
245:19
246:5,9,13
246:15
248:23
249:1 254:3
254:3,6
256:1 257:5
257:5,19
258:7
260:3,5,6,8
260:22
262:17
263:3,11,18
264:13,14
264:18,20
265:14
267:16
269:14,17
269:18,21
270:1,4,10
270:10,14
270:14,21
270:23,24
270:24
271:1,4,7,8
271:10,18
271:19,21
272:3,6,16
272:16
273:12,22
274:1,6,11
274:22
275:3,7,18
276:5,8
277:5,14
278:9,15
279:3,6,16

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 29

279:16,20
280:7,14
281:10,12
283:22
284:11,13
284:17,20
285:8 286:6
286:18,21
287:1,4
288:5,6,13
288:20
289:8,17,21
289:23
290:1,4,9
290:10,10
290:12,16
291:2,13,22
292:9,15
293:20
294:20
296:1,3,4,6
296:6,17
297:2,7
299:9
300:19
301:3,24
303:12
304:8 305:8
305:22
306:6,20
307:5
308:22
310:3,4,5
310:10
311:17,20
312:7,21,23
313:8
314:16
315:14
316:10
317:19,21
318:15
319:4,9,23
320:10,16

ramps 246:9
280:24
289:5
reasonably
201:2
Randall
282:12
279:12
range 192:9
read 131:20
133:7 134:5
146:19
174:10,13
174:19
292:1
readily 136:4
246:12
reading
241:17
253:23
254:22
255:2
257:18
261:17
263:1,10,15
263:18
really 156:20
157:4
164:12
174:16
176:18
203:13
210:17
291:4
310:16
315:1 320:5
Rear 121:4
reask 293:14
reason
125:12
176:9
203:20
212:13
215:19
235:11
253:6 255:4

reasonable
240:3 320:7
reasonably
reasons
213:4 224:8
143:1
176:18
242:23
274:13
300:14,16
317:12
318:4,5,15
233:10
246:12
303:13
305:15
316:1
recalling
128:15
receive 199:7
205:4
225:24
316:24
received
274:18
315:8,13,17
316:1,21
receives
223:9
receiving
318:14
recess 232:23
294:9
recollection
219:21
220:5 221:2
233:2 234:4
234:6,8
239:6,7,12
267:5 274:7
274:21
275:10
278:18

292:23
296:9
317:18
recommen...
139:20,24
141:14
143:1
176:18
242:23
274:13
300:14,16
317:12
318:4,5,15
recommen...
243:3
reconstruct...
305:9
record
139:17
140:16,22
143:18
157:15,24
160:4
174:12,18
176:8 183:5
184:24
185:22
186:2
187:19
188:7
191:19
192:11
193:16
216:18,22
219:21
220:5 221:2
233:2 234:4
239:6,7,12
267:5 274:7
274:21
275:11
277:17
278:18

283:15
292:17
294:14,16
296:10
297:18
317:2,15
318:10
321:17
322:18
redo 192:23
reduced
322:10
reengineer
303:18
refer 139:2
190:7 196:4
310:13
320:20
reference
146:12
147:18
referred
136:10
157:13
190:17
223:4 303:9
306:22
322:21
referring
131:6,23
133:18,19
134:17
137:3,15,17
139:5
147:16
153:4 190:9
190:15
191:6
247:23
284:22
309:23
refers 147:11
319:19
reflect 304:18

307:4
reflection
306:15
reflects
273:18
regard
310:11
regarding
316:9,23
317:18
regardless
258:1
259:16
regards
131:1
136:20
141:13,17
141:21
143:2,14
146:8
151:15
154:10
155:14
185:8 189:7
202:18
206:21
259:19
270:20
277:12
282:8,11
305:21
306:19
312:21
Registered
120:18
322:4
regular 236:5
237:7
314:22
regularly
240:4
regulations
300:22
regulatory

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 30

166:16
reincorpor...
193:19
rejected
308:10
rejection
309:3
relation
314:3
relative
183:21
221:23
296:8 312:8
312:10
relatively
176:14
198:12
223:13
release
215:20
relocate
139:21
relocated
139:21
rely 282:15
283:14
284:1
relying
154:24
275:15
remain 195:3
remains
203:1
remark
250:24
remediation
275:13
278:24
318:12
remediations
175:17
274:15
277:19
300:10

301:20
remember
135:5
152:15
159:15,23
228:11
279:18
304:2
307:13
308:15,17
316:3
remote
120:12
123:8,20
321:24
322:8
remotely
123:2,17
124:4,10
322:14
render
141:10
rendering
176:16
renovate
140:6,17,18
158:19
161:8
188:13,17
189:16
290:16
299:9
301:23
306:6
308:22
313:7 320:9
320:16
renovated
194:20
renovating
185:9
192:21
294:19
296:1

305:21
306:19
307:5 313:7
322:5,5
renovation
159:1
183:12
312:23
renovations
140:14
159:19
160:13
161:6
231:24
308:23
rephrase
135:13
188:11
216:19
243:16
289:15
replaced
131:14,15
206:8
replacement
202:13
208:6
226:22
replacements
183:13
189:16
report 135:22
146:8
152:18,19
154:5,7,8
171:4
276:20
306:22
311:22
312:3
313:10,11
316:7
reported
322:9
Reporter
120:19,20

123:5,6
174:10
322:5,5
Reporters
323:4
represent
123:16
representat...
132:22
representat...
127:12
129:12
133:12
Req 199:8
204:7
request 162:2
163:18
186:8,9
196:1,16,24
197:1,11,15
198:9,10,14
198:20,22
200:2
212:13
215:15
218:4
300:21
301:11,23
302:9,12
303:11
304:4,22
305:7 309:5
314:1
requested
142:13
174:13,19
310:7 319:3
319:5,7
requesting
134:2
161:23
requests
197:6,23
require 211:2

216:9
290:17
296:17,19
required
142:12
143:22
145:7 148:3
148:15
149:16
175:17
176:10
194:6
279:12
280:24
281:5,20,22
290:19,23
291:8,11
292:2
296:12,15
297:3
requirement
149:9
176:20
220:12
283:12
requireme...
144:12
145:19
301:11,23
302:9,12
303:11
304:4,22
293:19
303:17
306:14
311:17
requiring
154:17
requisition
199:7
203:22,24
204:5
206:21
209:7,10,19
211:13

research
134:12
290:17
296:17,19
148:5
149:19
151:1 152:8
159:22
169:15
170:12
residential
154:16
159:4,13
respond
298:15
respondent
199:3
212:19,22
response
174:15,17
299:2,19
302:5
317:24
319:24
320:2
responsibil...
292:19,20
responsible
220:15
223:4,16
267:7
rest 136:15
198:12
296:5
320:22
restate 320:4
resting 259:7
resulted
309:16
retain 140:21
187:19
224:6 243:4
278:22
297:11
retained

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 31

retaining
217:9
retired 127:8
128:14
review
144:11
282:2
reviewed
160:20
164:7
202:22
266:23
reviewing
170:7
241:20
reviews
165:2
revisit 305:18
RFP 161:9,10
195:24
200:23
303:4
304:21
305:11,21
312:9
313:23
321:1
RFPs 196:15
197:4
313:13
RFQ 161:10
172:7 201:2
201:8,12,19
202:2,8,18
209:23
210:22
211:12,17
212:2,4
214:3,11
215:8
301:13
309:12,15
312:14
321:3

RFQs 196:16
197:4
313:14
right 124:3
124:18
126:10
128:15
130:13,24
137:19
138:22
139:16
143:6
145:20
148:6,16
150:14
153:5
161:18
163:11
164:4
166:10
174:9 179:5
180:3,11
182:1 184:7
205:4,8
226:22
227:2 229:8
230:3,13
244:7
247:18
249:10
253:13,17
271:1
272:11
277:3 287:8
289:15
292:7,12
294:7 296:2
296:3 298:1
300:5 304:1
310:20
316:15
right-hand

270:14
272:6 279:4
rigorous
276:14
277:13
rise 235:9,24
237:3
241:24
242:18
243:9,17
244:2,10,14
244:22
245:2,6,20
245:24
246:1,4,7
262:17
263:11,18
263:24
264:14,18
264:20
270:4,9,13
270:20,23
271:1,7,18
271:20
272:8
274:11
276:8
292:11
297:7
rising 264:21
risk 150:5
220:23
221:4
Robert 207:4
role 313:22
314:2,10
317:15
roll 171:14
175:9
178:17
roof 162:9,12
room 139:3,6
140:3
141:14,18

141:21
142:2,11,12
145:18
146:10,17
148:24
Rooms
142:19
roughly
304:12
Rowland
120:7
RTU 134:4,8
134:14,16
134:22
135:2,9,16
143:19
180:11
181:5 210:2
Rule 298:6
298:23
ruler 240:17
rules 120:15
186:18
200:13
300:22
ruling 282:7
282:22,23
rulings 282:9
282:24
run 156:23
156:24
236:22
245:21
246:1,2
S
S 121:1
S-a-r-r-a-f-...
208:18
Sabrina
128:4
133:24
134:17
283:23

286:4
safety 171:1
171:14,16
198:23
201:16
300:12
311:3
SAITH
321:22
Sarrafian
208:11
saying
131:17
142:10,10
173:14
183:6 193:4
193:5 280:3
291:6 318:8
says 126:11
139:3
142:12
146:15
171:5
243:15
249:7,8
255:10
262:4,8
276:17
280:23
281:19
291:3 315:7
316:8 317:5
scale 240:9
scenario
150:7 215:6
schedule
199:12
scope 132:6
141:8
144:14,18
160:18
163:14
166:16
170:1

193:20
195:14
199:1
200:11
215:2
296:11
298:23
303:12
306:23
309:9 310:3
312:4
314:14
315:22
scoping
200:1
Scot 127:22
128:7
130:20,21
130:22,23
131:1
155:23
screen 125:12
scroll 137:4
scrolling
152:17
seal 296:22
search 152:1
152:2
seat 145:17
146:22
148:17
149:10
151:16
152:12
154:18
second
138:15
145:24
159:19
167:14
173:20
195:9 204:2
226:5
300:23

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 59

ERIC DAVIS
January 24, 2022

Page 32

second- 145:1
section 151:3
151:5,6,10
280:20,21
283:1,12
sections
151:11
secure 144:10
155:8
313:23,24
security
150:5 181:6
see 124:19
125:11
128:12
129:21
132:11,18
136:2,24
137:13
138:5
146:21,24
147:9,11
148:19
150:7
165:10
170:15
173:3,18
177:14,18
177:20
178:3,3,6
181:20
182:8,19
196:21
197:22
198:4 203:6
203:7
204:19
207:1
210:16
215:16
231:3
247:19
248:15

250:10,14
251:2,2
252:21,23
253:23
255:3,16,24
256:12
264:12
265:11
267:16
268:8
272:16
273:14
278:15
286:12,17
287:22
288:4
seeing 268:16
287:7,7
seeking
163:23
217:19
308:3
seen 154:7
243:14
258:8,9,10
258:11
314:22
selected
217:12
send 250:3
sense 164:4
222:6
sent 218:7
246:18
247:8 250:3
250:5,19
251:8,24
252:1,6,10
253:1
separate
148:22
209:22
302:3
separated

269:22
September
310:1
series 158:23
212:15
246:21
serious
239:14
serve 311:2
server 305:3
service
234:22,23
301:18
services
129:2
140:23
144:11
155:8,20
156:3,18
157:4 162:4
172:5,9,21
173:15,18
175:2,14
176:15,19
176:22
178:8,11,16
179:10
181:18
184:20
193:2
194:10
197:7,11
201:17
202:4
230:22
243:5 275:1
277:4
278:23
297:5,12
299:6 300:8
301:11
311:4,8
312:1,6
317:13

319:8,9,14
set 213:22
233:24
236:13
250:21
260:5
266:11
322:12
323:3
setting
236:18
seven 209:20
209:22,23
shared 113:2
ShareDrive
305:3
SharePoint
208:24
shebang
246:18
Sheila 127:7
127:9 129:6
163:13,20
164:12
171:15
202:11
208:5
303:21,22
304:4
315:20
Sheila's
202:13
Sheriff 120:7
126:19
127:18,20
128:5
130:18
132:23
133:2,9,12
142:13
149:15
150:3
154:21
156:1 162:3

162:21
163:3
195:10
213:18
242:6 281:7
290:1
308:21
314:3,24
315:3
Sheriff's
127:13
155:18,22
163:14
281:11,13
284:9 285:2
285:5
shoe 254:23
255:19
shoot 260:1
260:16
Short 207:24
shorter 246:9
262:10
304:15
Shorthand
120:19
322:5 323:4
shot 258:20
260:6
show 129:16
172:13
244:22
262:14
264:23
286:3
showed
256:22
shower 145:4
145:8,16
146:10,13
146:15,17
146:22
147:2,6,10
148:12,17

148:24
149:5,7,10
149:16,21
151:15,17
152:2,11
showers
144:24
146:9
150:24
152:4
154:16
159:4,19
showing
246:19
shows 263:4
273:3
sic 142:4,4,19
156:15
216:18
sic]/Heery
310:9
side 202:10
258:10
267:17
269:17
270:1,10,14
270:24
271:1,8,21
272:6 279:5
296:2,4
sign 132:13
sign-in
132:14
signature
321:16
322:22
signed
202:22
significant
175:6
295:19
297:16
significantly
261:12

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 33

264:6
similar
134:18
257:1
264:13
simply
193:19
209:2 294:2
314:19
single 210:7,8
219:14
sink 143:11
143:12
sir 136:8
146:20
265:10
sit 275:15
site 199:16
222:13
sites 258:12
sitting 258:1
258:8
259:17
situation
135:20
213:8 243:3
281:24
283:8 286:2
311:14
six 190:1,12
190:13
191:7 196:8
196:10
214:10,15
218:11
222:11,15
258:17
268:3
sixteen
262:13
size 158:17
slight 263:14
263:15
slightly

236:23
slope 236:20
245:15,19
245:20
246:2,4,7
264:14
271:3,4,12
271:14
272:14
285:15
slopes 264:21
sloping
143:10,20
236:23
slow 187:7
276:19
285:16
slowly 288:5
small 158:20
271:24
smaller
158:18
186:20
211:7
221:18,19
226:8,9
256:2 265:3
solely 201:19
265:7 266:3
267:15,17
267:21,22
267:22
269:3,7
286:15,20
288:1,22
291:15
210:16
306:12
312:2,24
314:7
sort 152:5
204:12
268:16
313:15
sorts 151:12
sought 304:6
sounds 134:6

296:21
someone's
254:22
317:4
246:2,4,7
someplace
142:17
152:14
sorry 125:24
126:3
128:15
138:6
143:10,20
151:5 159:3
174:7 179:3
183:7 185:1
185:4,12,14
188:5
221:24
222:22
239:18
245:4 248:6
249:9 250:8
252:24
254:17
256:2 265:3
265:7 266:3
267:15,17
230:18
239:23
240:23
282:6
292:18
301:6
306:15
313:17
317:20
specifically
129:4 151:1
151:7 200:2
206:15
209:13,16
231:9,16
283:11
292:2
305:15,20

South 121:4
144:5
298:11
space 139:4,8
139:14
291:16,21
291:22
spaces 142:2
speak 134:9
196:4
282:10
288:2
295:18
specialized
266:10
specific 128:2
145:18
150:15
157:22
160:12
175:16
179:14
180:13
200:16
206:1 215:2
215:5 217:4
230:18
239:23
240:23
286:2
292:18
301:6
306:15
313:17
317:20
specifically
129:4 151:1
151:7 200:2
206:15
209:13,16
231:9,16
283:11
292:2
305:15,20

305:23
309:1 315:3
316:3
specifics
145:10
180:8
speculating
150:6
spell 208:12
208:17
Spence 155:3
295:18
spend 278:14
spending
185:21
spent 279:14
281:7
spoke 133:20
spoken
235:19
295:21
spread
228:18
SS 322:1
staff 129:5
156:21
168:14
170:15,18
171:20
214:22
314:11
315:4
stage 164:13
212:12
216:16,20
stages 224:13
313:22
stair 190:19
stairs 289:5
stakeholders
155:13
160:5
stamp 317:4
stamping

293:4
standalone
303:14
314:15
standard
120:23
123:13
223:2
226:10
246:11
266:8
288:17
290:18,21
307:1
standards
135:10
143:22
147:7,8
148:14
149:17,18
150:15,17
151:3,6,21
243:20
275:4,4,19
279:8
280:16
289:2
294:21,22
295:4,16
standing
215:3
start 135:24
138:13
164:10
171:6
185:17
199:14
201:18
219:18
229:8
249:24
310:15
started 168:1
169:11

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 34

191:11
192:2
311:24
320:19
starting
136:1 138:5
starts 130:17
146:5
165:16
169:13
170:12
state 120:21
123:16,20
216:6
297:18
316:9 322:1
322:6
State's
162:23
statement
170:7
states 120:1
120:16
309:23
steep 242:19
243:10,12
243:13
272:14
292:11
steeper
243:14,15
STENOGR...
123:1 124:2
124:6
153:23
173:20
174:3,16
183:2,4
185:3 187:7
321:18,21
Stenographic
123:4,5
stenograph...
322:10

step 167:16
248:11
Stoner's
138:16
147:1
148:21,22
160:2
308:20
319:22
stick 262:16
262:22
270:8
stipulate
123:16,20
124:1 133:8
149:6 237:9
237:15
313:16
stipulated
144:8
stipulating
237:13
Stoner 130:4
136:6 141:6
142:6 143:1
145:21
154:5
158:10,14
159:9
175:18
242:17
274:5
275:22
276:22
277:11
278:1,14
292:6,11
293:18
297:1
306:22
309:24
310:1 311:1
313:4
315:10
316:7

320:24
Stoner's
138:16
146:8
152:18
243:22
277:7
289:13
315:9,13
316:9
317:10,18
318:5,14
stopped
288:21
stops 268:19
stored 305:3
straightfor...
198:13
223:13
strain 285:16
streamline
226:7
street 121:10
172:12
200:9 203:2
203:3
205:20
221:10
222:9,16
223:21
301:17
strike 189:4
210:20
218:2
238:10
260:20
266:12
string 266:9
strings
266:10
structures
173:8
315:10
struggle
297:11

Stuart 207:4
stuck 133:5
stuff 229:24
247:8 250:9
STV 129:13
129:16
132:15,20
135:14,22
136:1
175:18
202:9,16
206:17
207:23
208:8 209:6
214:22
219:22
276:23
277:1,3,8
277:10
278:13
303:20,24
304:3
313:13,21
315:19,24
316:4,21
STV's 130:3
STV/Heery
129:14
171:7 303:9
310:2,4,5,6
310:8,24
311:11,12
312:3,17,20
315:3
subcommit...
308:20
subcontract
311:11
subcontrac...
130:3
135:23
267:12
277:1
310:24

311:12
subcontrac...
135:15
223:8
subject 205:6
submit 210:5
210:22
211:18,23
212:10,14
223:6
226:14
Submittal
160:8
submittals
217:6
219:10
submitted
199:6
202:23
219:21
220:8 223:9
224:2
307:21
308:2,5
submitting
219:23
220:4
subsequent
247:12
301:9
subset 211:9
substantial
151:16
176:24
177:1
Subtitle
183:11
subtracted
269:20
successful
200:24
227:4
sued 131:19

311:12
subcontrac...
135:15
212:2
suggest
296:17,19
297:20
suggests
201:13
233:16
275:22,24
276:18
suitable
218:7
Suite 121:4
121:10
sum 237:20
summarize
312:19
summer
217:3,10
218:13
sundry 248:8
sunset 197:10
superinten...
267:10
supervise
267:7
support
314:10
suppose
157:10
supposed
150:22
158:20
252:10
Supposedly
254:14
sure 124:21
175:1 225:3
254:20
265:20
266:13,24
267:8
272:23

131:20
sufficient
212:2

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
January 24, 2022

Page 35

293:16
308:8
surface
239:20
240:2,22
241:17
257:16
259:7,16,23
surfaces
240:4
surprised
272:2,5
suspect
304:11
suspend
274:20
SVT 310:9
swearing
123:17
sweep 260:12
swinging
139:21
sworn 123:2
124:5,10
322:14
system 155:6
160:4 161:2
199:8
208:24
210:18
236:16
systems
162:9

_____
T
tailor 215:5
take 133:3
136:23
155:14
160:2 161:6
167:3
186:24
193:15,17
199:23

212:22
216:13
218:6 219:2
221:3 222:9
230:3 231:2
232:20
233:8
235:10
236:6
242:22
287:2 294:6
297:9,19
taken 120:18
144:4 147:1
154:20
186:1
224:10
235:6 249:2
272:15
299:9
308:21
310:5
311:15
314:20
318:13
319:22
322:9
takes 166:15
180:7
talk 153:22
talked 233:4
235:14
242:14
talking 126:4
144:17
178:21
187:5 194:8
216:24
236:8
240:16
242:2
256:14
270:15
284:24

286:23
299:23
314:11
318:19
tape 244:24
245:5
246:11
249:15
258:21
260:20
261:8,16,20
262:9 263:5
263:9
265:11
266:15
target 211:6
task 136:24
155:6,7,9
157:7,13,14
158:6,8,12
159:5 160:3
160:11
200:22,23
217:17
274:6 295:6
300:24
306:5,20
307:5,8
308:3,10
312:12
313:23
318:21
team 129:10
136:1 163:7
163:20
164:11
171:1,19,22
208:8
300:13
teams 170:24
213:14

technical
282:13,19
314:11
technicalities
306:17
technologies
257:24
technology
239:4,23
240:24
241:1
244:16,19
270:12
289:6
tell 136:22
145:15
172:6
198:20
217:4
232:17
235:20
237:17
239:10
253:14
298:4 307:9
322:14
template
309:11
ten 288:6
308:3,10
312:12
313:23
318:21
term 181:14
226:3
321:2
terms 129:4
140:8 157:3
160:7
161:11
170:16,22
192:17
236:11
terrific 156:6
testified

124:11
310:1
318:19
testify 241:11
241:15
298:21,22
300:1
310:11
315:16
testifying
316:14
testimony
140:20
144:9
160:10
319:20
320:3
tgmorrisse...
121:5
Thank 124:6
133:22
154:1
302:24
321:20,21
Theising
129:18
202:9,16
206:17
208:4
therapy
141:14,18
141:21
thereof
264:12
they'd 218:14
they'd 218:14
thing 154:3
195:6
221:10
290:8 300:2
313:15
things 140:12
152:2
153:12
158:7

162:15,18
164:6
169:21
172:1 176:3
184:17
193:14
207:8 242:2
310:22
314:12,12
315:17
think 129:3,7
136:13
137:20
138:8,13
142:9,10
146:9 153:4
155:2
173:21
185:1 186:5
191:8
201:20,21
201:23
216:9
225:18
237:9
243:13
246:8,17
248:7,7
249:11,24
273:24
289:22
299:18,22
304:10,14
307:12
314:20
316:2 321:7
third 144:5
145:24
159:19
312:5
third-floor
145:1
Thomas
120:7 121:3

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 60

ERIC DAVIS
January 24, 2022

Page 36

121:3 122:6
123:10,18
123:18
124:14,23
126:1,15
137:8,11,16
138:3,11
153:6,15
154:2 174:5
174:9,14,20
178:13
180:15
181:7
183:23
185:4,5
187:17
203:23
208:20
216:7
232:20
233:1,3
234:3,7,9
239:13
248:4,21
250:2,17,23
251:5,7,16
253:11
254:19
255:11
256:7,15
265:8 273:1
286:14
287:10
293:16,17
294:5,11,15
294:17
298:14,18
299:1
301:21
303:6
312:16
315:6 321:6
321:11
**thought**

253:3,19
**thousand**
150:11
295:15
**thousands**
177:2 179:2
**three** 166:8
179:8,11
183:22
202:2,19
209:15,18
216:12
224:24
240:17,18
314:4
**three-year**
226:2
228:15
**threshold**
186:18
**THY-ZING**
202:17
**tie** 199:11
**tight** 266:10
**tilt** 124:19
**Tim** 202:12
**time** 120:23
123:12,13
127:21
133:11
140:12
145:6
153:22
156:1,22
159:8
165:10,18
166:15,20
179:22
191:4,6
194:24
196:17
200:18
205:20
209:5 210:3

211:16
215:18
221:13,13
238:9
240:10
242:16
246:8 258:2
259:2
277:21
279:3,14
289:20
297:24
298:5
300:23
303:13
304:3
305:19
306:3,4,10
308:18
309:6,20
313:3
**time-consu...**
198:11
297:6
**times** 144:10
144:21
163:16
195:17
238:17
283:22
297:4
311:23
**Timothy**
233:7
**title** 157:6,8
176:12
201:13
204:9 315:8
**TJ** 128:12
**today** 242:3
246:14,16
250:4
291:12

293:24
296:15
301:13
**Today's**
123:11
**toilet** 132:2,2
142:2,7,12
143:11,12
143:14
236:12
**toilet-sink**
142:20
**toilets** 142:4
142:17
143:2,9,23
154:15
**told** 173:10
283:23
286:5
**tolerance**
262:12
**Tom** 124:18
137:3 153:9
153:22
159:22
173:22,23
185:1,12
197:21
201:20
215:22
229:23
232:8
233:23
236:6 250:8
250:16
253:10
293:15
294:24
303:3
312:24
**tool** 266:11
**top** 126:11
157:9 183:9
249:2,10

254:2 257:5
258:9
265:14
267:16
269:13
271:18
285:15
296:5
**Topic** 299:2
309:23
316:8
**topics** 302:18
**total** 169:6
304:16
**totaled**
228:10,16
**totality** 250:3
**touching**
291:11
**tour** 182:21
213:7
**trade** 128:16
128:16
**trades** 226:9
**traditional**
161:7,19
200:20,22
**transferred**
247:2
**transition**
173:4
305:16
**transitioned**
197:4
**translate**
321:1,2,3
**transport**
290:11
291:18
**tried** 140:21
141:1
144:19,21
200:20,21
200:23

224:7 312:5
**trigonometry**
261:14
262:18
**trouble**
203:13,21
**true** 141:19
189:12
192:20
196:7
229:22
241:6 259:8
288:9
290:13
322:18
**truing** 266:7
**truly** 208:3
297:21
**truth** 283:19
322:14,15
322:15
**try** 125:14
137:9
140:12
152:3
169:23,23
203:10,17
211:22
243:2,4
318:22
**trying** 129:3
129:7 141:2
144:15
152:24
153:22
201:1,21
205:10
210:8
242:22
297:23
312:5
**Tse** 129:19
**tubes** 240:18
**tunnel** 131:9

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 37

134:20
**tunnels** 135:3
194:21
**turn** 124:16
146:7
186:23
215:22
242:23
249:18
264:24
267:13
**turned** 167:1
217:22
239:20
260:4
**Turning**
298:6
**turns** 279:11
**twelve**
218:11
**twenty-twe...**
167:22
**two** 150:11
163:16,16
187:15,15
190:13,14
196:13
206:12
209:4,18
219:1,11,12
230:7
278:14
295:15
298:4,5
304:6
315:23
321:7
**two-** 226:2
**type** 145:7
184:23
185:11
211:20
245:18
266:4

282:22
304:23
**typewriting**
322:11
**typical** 187:4
**Tyrrell**
128:12
233:7
**Tyrrell's**
243:9

_____ U _____
**Uh-huh**
141:16
**umbrella**
230:12
302:18
**uncertainty**
283:7
**uncommon**
166:6 218:1
**underscore**
182:6
**undersigned**
322:24
**understand**
125:8
175:23
229:24
230:1
310:17
317:22
**understand...**
225:1 243:8
243:9
275:20
284:6,8
**undertake**
266:14
300:14
**undertaken**
193:11
194:19
195:20
300:6,16

**undertook**
155:4
**underway**
166:13
168:22
169:24
191:10
198:7 201:6
217:10,11
**Unidentified**
122:15
**unit** 142:11
142:22
180:16
260:10
**United** 120:1
120:16
**units** 135:4
144:4 145:1
145:22
146:3
150:22
180:13
**universal**
290:22
**unlevel**
239:20
241:16
257:11
**updated**
208:24
**upgrade**
194:2
**upgraded**
210:18
236:3,24
**upper** 191:13
192:21
194:15,16
195:21
249:1
255:19,24
268:21
270:1
**upper-level**

191:20
**upward**
259:24
**upwards**
189:19
**usable**
193:23
**use** 150:2
181:14
196:6
198:24
226:11
237:10,18
238:7,24
241:13
244:24
245:5,10,11
245:14,18
250:24
258:4
263:16
265:20,24
266:1,5,9,9
281:1 290:9
**user** 163:24
171:23
220:19
**users** 157:5
160:16
162:10,13
299:10
313:8
**uses** 154:24
235:24
237:2
240:24
266:14
**usually** 127:5
127:12
129:18
163:24
165:5,6
167:5,5,12

207:5 208:2
213:11
223:3

_____ V _____
**validity**
123:3
**variance**
150:20
263:13
**variation**
271:3 293:9
293:22
**variations**
311:16
**varied**
128:17
263:7 272:2
221:14
262:19
**variety**
151:24
162:6,24
170:6
227:10
**various** 128:3
129:23
171:3 199:2
199:21
210:24
220:21
224:8,12
248:8
257:23
258:11
313:13,22
315:5
**vary** 271:24
272:1,8
129:18
163:24
**vast** 171:17
**veers** 302:21
**vehicle**
226:10

**velocity**
285:11
**vendor**
230:11
**verified**
281:7
**verify** 139:17
242:20
274:13
**version**
304:21
**versus**
123:10
**vertical** 148:9
148:15
261:16,21
**vertically**
263:6
264:10
**vicinity**
256:22
257:8
**video** 122:14
286:13,16
288:21
**videoconfe...**
120:13
123:9
124:11
322:8
**view** 235:4
**violation**
143:14
**visitors** 242:3
**visually**
246:10
**voiced**
133:13
**Volume**
182:19
183:10
**vote** 165:14
308:12,13
**voted** 165:15

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 38

**vs-** 120:6

_____ W _____
**wait** 167:8,8
167:9 171:7
219:16
280:3
**waiting** 139:3
139:6 224:2
**waive** 321:16
**waived**
322:23
**walk** 135:8
212:9,24
222:13
**walked**
279:20
**walker** 120:4
123:10
144:23
146:3 152:9
299:13
320:5
287:9,12,23
289:8
**walkers**
288:14
**walking**
272:12
287:8
**walkthrough**
136:6,9
138:17
315:10,14
**walkthrou...**
199:17
**wall** 139:21
150:1
258:10
265:20,21
266:5,20
**walls** 244:17
**want** 131:20
131:22
149:24

158:4,24
160:17
173:14
182:10,20
183:4 191:9
202:3
203:22
208:13
213:23,23
227:4 228:9
228:16
236:6,9
245:10
264:2 276:1
276:11,18
276:20
283:19
290:24
293:10
297:9,18
299:13
320:5
**wanted** 242:4
244:5
274:10,12
**wants** 297:20
**wasn't** 150:2
152:11
200:24
238:8 274:2
301:6
**waste** 236:14
236:22
**watched**
286:12
**way** 125:15
133:15
134:20
141:22
142:18
144:12
158:16
173:18
197:3 214:8

216:2 218:9
219:19
221:13
222:6
226:15
230:21
231:4
244:13
253:7
263:13
279:18
285:21
291:12
294:2 306:1
306:2 312:5
**ways** 140:21
141:2
163:17
**we'll** 171:4
206:13
216:1
250:23,24
321:15
**we're** 166:10
167:22,24
170:8 171:7
172:12,17
173:4 175:1
175:10
176:14
184:15,17
194:8
197:14
200:6,6,7,8
201:3,21
210:3 215:9
215:11,15
217:2,5
219:6,7,16
224:13
227:1,3,7,8
229:6,7
232:9,15,17
242:2

251:10
278:22
288:15
291:2,5
292:16,23
294:3,5,15
312:5
314:24
318:6,7,8
321:7
**we've** 140:9
140:11
141:1,1
144:14,21
154:9 161:9
162:11,12
168:1 187:2
193:8
196:13,16
200:14
201:1 206:6
206:24
212:21
214:7
220:17
224:7,9
278:21
304:22
311:22
312:4
313:10
318:21
**weapon**
150:3
**Webex** 121:3
121:9
**website**
182:10
210:15,17
**Wednesday**
209:8
**week** 233:4
233:23
235:3

242:15
244:21
247:7 280:1
280:4
**weeks** 209:4
222:11,15
125:23
**welcome**
215:23
**went** 130:23
136:9
145:21
156:7
157:23
159:9
190:19,19
197:7 203:7
253:3 279:3
**weren't**
159:7 192:1
**West** 121:10
**Western**
121:4
**wheelchair**
139:8
143:10
285:7,10,14
285:20
286:1
288:13
289:8
299:10
313:8
**wheelchairs**
139:14
283:21
284:13
**white** 265:15
268:2
265:16,17
253:8
254:16
**whiz** 180:11
**wide** 170:5
**widely** 226:7
**wider** 260:10
**William**

206:23
**witness** 123:2
123:7,17
124:4,9
125:7,17,21
125:23
126:9 137:6
138:1 153:3
153:11,14
153:21
154:1
173:22
174:4,7
177:13
178:2
179:17,21
180:2,10
181:2
182:12,17
182:23
183:3,7,8
187:9,10
203:9,12,16
203:19
208:16
216:3 239:7
239:8,11
247:1,6,10
247:16,17
247:21
248:2,17,19
249:23
250:6,12
251:12,14
251:18,22
252:3,5,8
252:13,17
252:20,23
253:8
254:16
255:8 256:5
256:11
265:6 286:8
286:11

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
January 24, 2022

Page 39

287:6
293:13
299:11,18
299:22
300:3,4
302:16,19
302:24
303:2
310:13,19
310:23
314:7,9
321:17
322:9,13,20
322:22
**woman's**
156:6
**women**
143:15
**women's**
143:9
**women-ow...**
211:8
**word** 151:24
152:2 155:1
310:15
316:23
**words** 134:19
173:13
281:4
**work** 144:18
146:13
156:11
157:24
160:17
162:12
163:13
166:1
170:23
171:21
172:16
188:20
193:9,10,18
194:11,17
195:14,16

195:20
199:8
206:24
219:18
229:4
230:13,14
230:24
231:12,14
232:16
278:1
280:23
281:6,15,17
291:14,16
291:21,22
298:2 304:4
306:23
310:7 311:5
312:3
314:14,16
315:22
**worked**
199:17
303:23
309:4,17
310:1
**working**
195:9,20
196:14
200:6,7
201:18
202:7,10,11
202:11
212:24
224:13
243:2,4
303:10
**workload**
170:14
**works** 130:10
157:1 219:5
303:22
311:1
**world** 210:12
**worth** 195:17

259:22
**wouldn't**
156:20
158:18
159:16
216:14
219:2,18
234:2 245:7
259:8,21
261:13
263:7,8
273:8
277:10
278:12
279:12
**Wow** 203:17
**wrap** 230:15
**wraparound**
172:9 173:1
174:22,23
175:12
177:5
181:19
**wrapped**
212:3 321:8
**wrench** 150:2
**write** 199:4
217:8
244:15
246:18
247:13
299:12,16
**wrong**
131:13
283:21
293:19
318:8
**X**
**Y**
**yardstick**
263:17
**yeah** 127:20
128:5

129:22,24
130:5
136:16
137:22
138:2,7,12
138:19,20
138:21
142:5
143:16,18
146:24
147:17
148:1
149:14
150:13
152:20
155:7
157:12
163:9 167:6
177:17
178:9,10
181:9,9
203:24
204:4,18,22
204:22
207:11
211:3 216:4
217:8
244:15
246:18
247:13
249:8,9,11
249:12,12
249:20
252:7,13,19
253:1,2,3,3
255:17
256:20
257:7
299:22,23
304:14,15
305:3
312:18
318:2

**year** 127:15
165:2,19
167:22,22
167:24
168:2,19,21
169:11
170:1
172:20
173:9
178:11,22
178:23,23
186:24
188:24
196:11,13
196:14,22
197:20
199:19
204:7,10
217:3
218:14,15
218:17,23
224:1,1,1
224:15
225:21
227:9,23
229:23
232:13,14
232:16,18
298:10
304:10,13
304:16
308:16
312:2
**year-by-year**
232:12
**years** 130:9
166:8,22
178:19
183:22
189:6 191:7
194:8
195:23
196:13
224:24

227:23
228:17,19
230:7
237:17
278:13
300:7,11
304:6
**yep** 247:5
251:24
**yield** 179:9

_____ Z _____
**zero** 273:9
**zero-based**
232:10
**zeros** 204:6

**0**
**0.6** 255:10
**0.7** 273:17
**016109**
249:15
**016110**
255:23
256:18,19
**084-003558**
120:20
323:10

**1**
**1** 130:17
139:19
141:14
182:19
183:10
204:6 273:4
273:7
298:16
299:3
**1.1** 183:16
**1:12** 243:14
243:15
**10** 210:2
212:5

TOOMEY REPORTING
312-853-0648

Exhibit 13 Page 61

**ERIC DAVIS**
**January 24, 2022**

Page 40

219:17
319:17,19
**100,000**
178:5
180:14
181:4
**100,000,000**
228:12
**1000107267**
206:22
209:7
**10150** 121:4
**107267** 204:6
**108** 249:7
**10th** 233:7
320:19
**11** 298:16
320:7
**124** 122:6
**125** 122:15
**13** 138:14,15
138:20
**14** 139:1
**15** 142:3
**150,000**
178:5
180:14
181:11,18
183:11,20
185:18,21
186:17
231:11,22
**16108** 249:8
**16110** 257:15
**165** 182:20
**16th** 130:14
**17** 131:7
192:4
**18** 192:4
226:21
227:7,21
313:1
**19** 318:20
319:21

**195** 183:9
**1984** 323:4
**1989** 237:16
**1991** 147:7
149:17
243:19
274:23
275:3,19
279:8
280:16
289:2
294:21
295:4,16
**1995** 293:20
**1996** 293:20
299:6
**1998** 299:7
**19th** 209:8
319:20
**1st** 299:8
320:10,18

_____ **2** _____

**2** 183:19,21
184:3 210:1
212:4
231:13
232:2 269:2
269:4,7,8,9
269:10
319:16
**2-1-5-0**
249:19
**2/24/2021**
204:15
**2:03** 120:22
123:12
**20** 169:14
**20-cv-00261**
120:6
**200** 122:14
286:3,7,17
**2010** 135:10
147:8 148:2

149:8,18
150:14
151:3,6,21
243:19
274:23
275:4,19
279:8
280:16,21
280:22
282:6 289:2
294:21
295:4,15
**2011** 133:17
**2017** 191:11
225:12
299:8
320:10,14
320:18,19
**2017-2018**
130:15
136:7
137:18
140:19
141:6,20
142:24
144:3 147:6
154:6
158:14
175:19
191:9
242:17
243:7 278:2
289:14
300:13
304:5,12,17
305:14
312:20
313:5
315:10,14
**2019** 191:9
304:5,13,17
305:10

306:9
308:17
309:21
312:1,2
318:20
319:20,21
**2020** 204:16
204:17,18
205:2
258:19
274:17
**2021** 169:1,1
169:9,12,13
170:3 177:4
178:11,22
178:24
179:1
227:13
228:2 233:8
235:16
238:15
241:21
262:23
273:23
274:17
310:1
**2022** 120:22
123:12
167:23,24
168:5
172:13,20
179:5
183:11,14
184:16,21
185:7,19
206:13
209:8
224:15,23
228:6,21
229:19
231:8 232:5
301:17
309:19
321:5 322:7
323:5

**2023** 168:2
172:3,13
183:15
218:17,23
219:22
301:20
**2024** 183:16
204:17,18
242:8 248:6
258:19
274:17
**21-** 253:14
**21-inch** 148:9
**21/2018**
246:21
**2118** 248:6
265:7
**2145** 273:11
273:15
**2150** 249:18
249:19,24
**2160** 273:2
273:18
**2162** 253:15
253:16,21
267:24
**2167** 254:12
255:13,18
256:23
**2168** 254:13
255:1
**2173** 248:8
250:1
**22** 169:6
179:3,4,4
228:5
231:12
265:7
301:19
**22/17** 246:22
**2200** 248:9
**2216** 248:9
**2217** 248:6,8
248:10
**2218** 248:9

264:24
265:7,9
267:13,20
**2219** 267:15
267:19,22
267:23
269:13
**23** 183:18
184:18
188:24
218:15
231:13
232:8
301:19
**233** 138:5,6
138:21
**233-7900**
121:5
**24** 183:18
184:18
189:1 205:2
231:13
232:8
267:17,17
267:24
268:2,3,4,6
268:7,9,22
268:23
269:2,4,9
322:7
**248** 122:16
122:18
**24th** 120:22
123:11
204:14
**25** 146:6
**251** 122:17
**2700** 121:10
**28** 151:13
**2800** 298:11
**286** 122:14
126:10
**287** 126:10

**ERIC DAVIS**
**January 24, 2022**

Page 41

**288** 124:17
125:3 126:5
126:7,11
130:13
**294** 137:1
**2N** 144:5

_____ **3** _____

**3** 131:6 144:5
**30** 205:7,9,15
213:14
224:12
225:21
227:10,22
237:17
241:24
243:18
244:20,23
244:23
245:24
262:7
263:23,24
269:11
271:20,22
276:8 296:4
**30(b)(6)**
298:6,23
302:3,21
318:17
319:12,24
**300** 122:15
124:17
125:3,20
126:5
136:17
138:14
169:4,7,8
198:6
209:15
**300,000**
178:7,10
179:9
**303** 138:4,4
**30th** 178:24

**31** 227:3,8
244:23
272:7,7
**31.25** 272:7
**312** 121:11
**3241** 146:10
148:24
**33** 121:10
**333** 137:13
**35.151**
151:13
**372-0770**
121:11
**38** 153:5,5
**3N** 144:5
146:2,5
**3NC** 146:10
**3rd** 323:5

_____ **4** _____

**4** 210:1
253:24
254:10
315:11
**4-** 280:19
**40-feet**
245:13
**402** 122:16
248:13,16
248:20
249:15
255:23
256:6,12
257:15
258:22
261:8,21
**405.8** 280:20
280:21
281:19
**406** 247:11
**407** 122:17
247:13
250:22,24
251:10,11

264:24
**45** 261:11
262:7

_____ **5** _____

**5** 226:2
298:16
299:8 300:6
302:6
**5/8ths** 268:6
268:7
**500** 122:18
168:14
180:6
246:20
248:1,5
249:18
250:15,19
**505** 281:3

_____ **6** _____

**6** 210:1 212:4
254:22
257:3,10
267:18
268:24
269:4
298:18,20
298:21
309:23
310:12
**6:16** 321:24
**60** 175:4
225:21
227:22
264:5
307:12
**60603** 121:10
**60643** 121:4
**67** 254:17,21

_____ **7** _____

**7** 141:15
273:3,5,11

273:12,19
298:16
315:7
**70** 264:5
**700-page**
137:7
**773** 121:5
**779** 126:6

_____ **8** _____

**8** 181:4,4
210:1 212:5
310:1 316:6
316:8
318:19
**80** 307:12

_____ **9** _____

**90** 263:13
264:5
**91** 148:4
**95** 193:18,22
**950,000**
183:17
**97** 251:21

Exhibit 13 Page 62