IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CUAUHTEMOC HERNANDEZ and WILLIAM MATHIS, ) Case No. 23 C 16970
Plaintiffs,
v.
THOMAS DART, SHERIFF OF COOK COUNTY, and COOK COUNTY, ILLINOIS, ) Chicago, Illinois
) August 18, 2026
Defendants. ) 8:32 a.m.

EXCERPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE SUNIL R. HARJANI

APPEARANCES:

For the Plaintiffs: THOMAS G. MORRISSEY LTD.
BY: MR. THOMAS G. MORRISSEY
MR. PATRICK W. MORRISSEY
10257 S. Western Avenue
Chicago, Illinois 60643

For the Defendants: JOHNSON & BELL LTD.
BY: MR. SAMUEL BRANUM
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603

COOK COUNTY STATE'S ATTORNEY'S OFFICE
BY: MR. MACEO DILLARD III
MR. JORDAN YURCHICH
50 West Washington Street, Suite 500
Chicago, Illinois 60602

Court Reporter: VICKI L. D'ANTONIO, CSR, RPR, FCRR
Official Court Reporter
219 S. Dearborn Street, Room 1928
Chicago, Illinois 60604

(NOTE: This is an excerpt of proceedings. Page numbering will not correspond to any complete trial transcript that may be prepared.)

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury in:)

THE COURT: Plaintiff, you may call your next witness.

MR. P. MORRISSEY: We call Mr. Hernandez.

THE COURT: Mr. Hernandez, you can make your way up here.

THE CLERK: Please raise your right hand.

THE WITNESS: Can I raise this one?

THE CLERK: That's fine.

(Witness sworn.)

THE WITNESS: Yes.

THE COURT: You may take a seat. Please speak into the microphone, okay?

Proceed.

CUAUHTEMOC HERNANDEZ, PLAINTIFF HEREIN, SWORN

DIRECT EXAMINATION

BY MR. P. MORRISSEY:

Q. Please introduce yourself to us.

A. My name is Cuauhtemoc Hernandez.

Q. How old are?

A. I'm 51.

Q. Where do you live, Mr. Hernandez?

A. With my mother. 2854 South Harding Avenue, Chicago, Illinois 60623.

Q. I want to draw your attention --

THE COURT: You have to slow down.

THE WITNESS: Okay.
THE COURT: And you have to speak clearly.
THE WITNESS: No, because I've got a speech impediment.
THE COURT: Yeah, I hear you. So if you slow down, that will help everybody. Okay. Just pull your seat a little closer too. And speak into the microphone.
All right. Let's do that. Thank you.
BY MR. P. MORRISSEY:
Q. Mr. Hernandez, I want to bring you back to 2002, okay?
A. 2002.
Q. Excuse me, 2022. In February of 2022, did you enter the Cook County jail?
A. Yes.
Q. Do you remember about what date you went through the Cook County jail in 2022?
A. February 2nd, I believe it was.
Q. And tell us, Mr. Hernandez, tell us about your physical condition.
A. I got a lot of --
Q. I'm sorry, Mr. Hernandez. When you entered the jail in February of 2022, explain to us your physical condition.
A. I had a bad right shoulder. I've got a bad back. I had a torn meniscus that I wasn't aware of, that I kept complaining about. And that amongst blood pressure, thyroid issues.

Q. And you mentioned you had a damaged meniscus. What leg was damaged?
A. The right one.
Q. And in February of 2022, about how much did you weigh?
A. I'd say I was 275, 280-90, around there.
Q. And during the time you entered the jail, how did you get around?
A. It was kind of hard in the beginning because I didn't move around a lot when I was out here, you know.
Q. Did you have any devices to help you --
A. I had a cane. I had a cane at the time.
Q. And when you entered the jail, did you have your cane?
A. Yes. They -- they issued me a cane when I got there.
Q. Mr. Hernandez, after you entered the jail on February 2, 2022, tell us what happened next. Did you go to a housing division?
A. I went to Division 5 first. And then from Division 5, I went to 10.
Q. Explain to us, Mr. Hernandez, where is Division 5?
A. It's probably at the entrance. I think it's on California when you first come in on the front.
Q. And during the time you were processed into the jail on February 2nd to your location in Division 5 for your bed assignment, how did you get there from the processing area at the jail to your housing division?

A. I had to walk. I had to walk.
Q. And how long or how far was that for you to get there?
A. It depends on where I went. If I went to court, it was a long distance. It was actually closer from Division 5. When I went to 10, it was a lot farther.
Q. So we're talking just right now about the processing area to Division 5 where you were first housed. Can you tell us about how far or how long it took you to get there?
A. It took me a long time because they wanted me to drag my mattress, carry my bag, and I kept -- somebody helped me with my mattress one time. And then the last time when I got moved to 10, I didn't have one. They said we're going to get you one when we get there.
Q. Now, Mr. Hernandez, when you were in Division 5, can you explain just briefly what the layout was?
A. It was just people there, it was like COVID intake, they would leave you there for 14 days, and then they'll move you to where you were going to go.
Q. So it was just a temporary place for you to stay initially during your admission?
A. Yeah.
Q. Now, Mr. Hernandez, when you were at the jail in Division 5 the first few days, did you start asking for assistance or help?
A. Yeah.

Q. How would you do that at the jail?
A. I would drop in the request forms, medical request forms.
Q. Can you explain to us what a medical request form is?
A. Something that you fill out and you drop in a box when you got issues that you want to address, medical issues.
Q. Mr. Hernandez, I'm going to show you what's been marked as Plaintiffs' Exhibit 57, page 5.
MR. P. MORRISSEY: May I show it to the witness, please?
Thank you.
BY MR. P. MORRISSEY:
Q. Mr. Hernandez, do you see on the bottom it says PX57, page 7?
A. Yes.
MR. BRANUM: Objection, Your Honor, improper refreshing.
THE COURT: Improper refreshing? I think he's laying foundation to introduce, right?
MR. P. MORRISSEY: Yes, Your Honor.
THE COURT: Yeah. Overruled.
BY MR. P. MORRISSEY:
Q. Now, Mr. Hernandez, do you recognize this form?
A. That is a request form that I filled out when I first got there. It was February 4th.
Q. And what date did you complete this form?

A. On the 4th of February.
Q. And does the form -- on the form, did you identify where you were housed?
A. Division 5.
MR. P. MORRISSEY: Your Honor, may I admit Plaintiffs' Exhibit 57, page 7, into evidence?
THE COURT: Any objection?
MR. BRANUM: Can we go to a sidebar?
THE COURT: No. Do you have an objection?
MR. BRANUM: No objection.
THE COURT: Without objection, Plaintiffs' Exhibit 57 --
MR. P. MORRISSEY: 57, page 7, Your Honor.
THE COURT: 57, page 7, is admitted. You may publish.
(Plaintiffs' Exhibit No. 57 was received in evidence.)
BY MR. P. MORRISSEY:
Q. Mr. Hernandez, can you tell us why you filled out this form on February 4, 2022?
A. The main reason was because I couldn't -- I couldn't walk or function like they expected me to. Like when I had to move or go somewhere, so they would tell me, too, that I had to get a scrip for a chair.
Q. And so looking at this form, what are you asking for?
A. I'm asking for a wheelchair when I move around to go to court. I'm asking for a brace for my knee, too, as well. I

had -- they weren't letting us go to the commissary, and I'd break out and I was asking them about that too.
Q. And after you completed this form, what did you do with it?
A. You put it in a box.
Q. And after that what generally occurred?
A. The nurse comes and she speaks to you. And then she lets you know if you're going to see the doctor soon.
Q. Now, Mr. Hernandez, soon after you submitted this health service request form, did you have to leave from your housing division, Division 5?
A. Yeah, after the --
Q. I'm sorry, Mr. Hernandez, can you just take a pause before?
So after you completed this form, Mr. Hernandez, did you have an occasion to go over to Cermak shortly after?
A. I think I went to Cermak before I left Division 5.
Q. And tell us, from Division 5, tell us how you would get to the Cermak building.
A. I mean, you would walk -- you wouldn't walk too far, but you would always have to go to the ramp, though, to get there.
Q. Are you talk- -- what ramp are you referring to?
A. Cermak ramp.
Q. Mr. Hernandez, I'm going to show you what's already been introduced into evidence, Plaintiffs' Exhibit 1, page 18.
MR. P. MORRISSEY: And it's introduced -- it's admitted, Your Honor. May I continue to publish it?

THE COURT: Yes.

BY MR. P. MORRISSEY:

Q. Mr. Hernandez, I'm showing you what's been admitted into evidence, Plaintiffs' Exhibit 1, page 18, saying the corridor ramp, June of 2022. Does this photograph, Mr. Hernandez, appear how the Cermak ramp looked when you traveled it after entering the jail in February of 2022?

A. Yes.

Q. And so on that day when you went to Cermak shortly after your admission to the jail, how were you physically getting yourself over there?

A. I was walking. I was walking.

Q. Describe how you'd walk to us.

A. Well, on the way down, I felt like I was unbalanced, like, you know, so I had to lean on the wall at times and stay close to the wall.

Q. Can we take a step back, though, before you got to the ramp. Before you got to the ramp, Mr. Hernandez, you had to leave your housing unit, right?

A. Yeah.

Q. And after you left your housing unit in Division 5, where would you go?

A. It depends how -- you go through tunnels. That's it. That's how it is in there, there's tunnels.

Q. Do you enter the tunnels through the basements of your

housing division? Or do you remember?
A. We had to go all the way down to the first floor. I know that.
Q. And when you got to the first floor --
A. To the basement actually.
Q. And when you got to the basement, tell us what you'd have to do to reach that -- the top of that Cermak ramp.
A. I had to walk.
Q. And were you with other people? Was there an officer with you?
A. At times. At times it was one or two people or maybe -- most of the time, I was -- I was with -- I asked for a CO because they can't walk more than four people at a time.
Q. And during that first time that you went to Cermak, shortly after your admission, describe the feelings you had when you were going to Cermak that first time and descending the ramp.
A. When I was going down the ramp or up the ramp?
Q. We're talking about going down the ramp.
A. Okay. I would feel like unbalanced, like I was going to fall, and I had to stay close to the wall. That's all I used to do.
Q. Why would you stay close to the wall, Mr. Hernandez?
A. In case I fell I'd lean on the wall to stop me from falling because I had a cane on my left hand.
Q. Now, after, when you went to Cermak that first time, do you

remember why you went to see the doctor?
A. I believe I went to see him about the issues I had with me trying to get close to everything where I had to go like either medical or court or stuff like that, you know. They wouldn't listen to me about the scrip or the wheelchair, so I started requesting -- I started requesting as well that they move close.
Q. Why were you requesting to be moved closer to various places at the jail?
A. Because I couldn't make it. It was painful, you know, for me to move around like that.
Q. Was it painful for you just to walk on a flat surface?
A. Not as much as it was on this.
Q. So after you saw the medical people in Cermak, Mr. Hernandez, would you have to go back up this ramp to get back to Division 5?
A. Yeah.
Q. And describe how it would feel for you to travel up that ramp.
A. I felt like -- I knew I was going to have to stop because my back tightens up when I start walking, and my knee, like I said, I had a torn meniscus I wasn't aware of, and I was walking on it the whole time. And I used to complain about it, and they never sent me out. They did X-rays.
Q. Did you make any complaints to the staff that you were

with?
A. I made repeated complaints about my knee, I remember that.
Q. Tell us what you would tell staff about your -- the pain you'd experience when you were going up that ramp.
A. I'd tell them that my knee feels like it was out of place and my feet would start clinching as I went up. As my back would turn, my toes would start clinching and like gouging at the soles of my shoes. I even showed them the holes in my shoe, in the insoles.
Q. Now, compare going up the ramp versus going down, which one was more --
A. Going up. Going up.
Q. Why was going up that Cermak ramp, what do you mean going up the Cermak ramp?
A. It was just long, just too high.
Q. And did that cause you more -- was it more painful?
A. More painful, caused more pain in my knee and my back.
Q. Now, you started off talking about being in Division 5 for just a short time period?
A. Yeah, they did a -- that -- it was a quarantine thing, supposedly.
Q. So after staying in Division 5 for some period of time, where were you moved to next?
A. I went to 10.
Q. And can you tell us where Division 10 is in relation to

Division 5?
A. Well, it's far. It's at the other end.
Q. Other end of what?
A. I mean, you got to pass the other divisions, like 6, 8, 9, then you get to 10.
Q. And do you know how long it would take you to travel from Division 5 to Division 10?
A. Depends which way the CO's went. I mean, it was all up to them. You know, they had different routes they do. Sometimes they would try to take us through the -- through the outside, like outside -- I mean outside, meaning like walking outside, literally walking outside going around. That's the only other way we used to go over there.
Q. Do you remember about how long you were housed in Division 10?
A. I think I was in Division 10 for about two, three months.
MR. P. MORRISSEY: Your Honor, may I stop sharing?
THE COURT: Yes.
BY MR. P. MORRISSEY:
Q. Mr. Hernandez, I'm going to show you another document marked Plaintiffs' Exhibit 57, page 6. Do you see that marking on the bottom, Mr. Hernandez?
A. Yes.
Q. On the top of this page, do you recognize this form?
A. Yes.

Q. What is it?
A. It's another medical request form.
Q. Did you complete this form?
A. Yes.
Q. And what date did you label the form?
A. 15, February.
Q. Does this form identify where you were housed?
A. Yeah, Division 10.

MR. P. MORRISSEY: Your Honor, we move to admit Plaintiffs' Exhibit 57, page 6, into evidence.

THE COURT: Any objection?

MR. BRANUM: No objection.

THE COURT: Without objection that exhibit will be admitted.

(Plaintiffs' Exhibit No. 57, page 6 was received in evidence.)

MR. P. MORRISSEY: May I publish?

THE COURT: Yes.

BY MR. P. MORRISSEY:
Q. Mr. Hernandez, what do you complain about in this form?
A. That I needed to see a doctor to see if I could be housed closer to the courts, you know, and places I had to go. And I was also requesting -- because I got sleep apnea, and they wouldn't give me a machine when I was there.
Q. In the form did you also write: "I cannot walk long

distances"?
A. Yes.
Q. Can you explain to us what you meant when you wrote that on your form?
A. I mean I can't -- I got history of that. That's why I got this cane, you know, it was initially issued for long distance, but then got in a car accident, and that kind of messed me up more, a lot more. And after that I had to use it everywhere I went.
Q. Now, the bottom sentence of this form -- let me read it to you. It reads: "I almost got disciplined for not being able to walk to 10 from 5." Did I read that correctly?
A. Yes.
Q. Can you explain to us why you put that on this form?
A. Because it was the truth. I mean, when we were on our way over there, they expect you to keep up like everybody else. And I told them I can't walk no more. And he called in saying I was refusing to walk. He didn't say I couldn't walk. He said I refused to, you know.
Q. When you're talking about "he" --
A. A CO that was an escort that day.
Q. So what did you ask the CO for?
A. I told him, man, I couldn't walk, I need a cart, I need a wheelchair or something, you know. I can't make it all the way over there. Because I had to carry my stuff too.

Q. Did they give you a cart to be transported in the underground system?
A. No. Me and him started exchanging words because I told him why are you saying I'm refusing? I said I'm not refusing, you know, I'm telling you I can't walk.
Q. Did they offer you any cart?
A. No. He said we're going to let them figure it out. Then I told him, well, if you could help me with my stuff, and if I got to stop, I'll walk. He grabbed my stuff, he helped me with my stuff, and I was walking, and every time I needed to stop, he would let me stop. But at first he was -- he wasn't trying to be helpful at all. Because if they say you refuse, they're going to come and they're going -- man, they're going to handle you the wrong way, I'll tell you that.
MR. P. MORRISSEY: I'm going to stop sharing this exhibit.
BY MR. P. MORRISSEY:
Q. Mr. Hernandez, I'm going to show you another document marked Plaintiffs' Exhibit 57, page 5. You see the bottom of the form? Mr. Hernandez?
A. Yes.
Q. And do you see the top of the form, do you recognize the top?
A. Yes.
Q. And tell us how you recognize the top of that form.

A. I'm the one that put the form in.
Q. And when did you date this form?
A. On February 23.
Q. And does the form identify where you were housed?
A. I was housed in Division 10.
MR. P. MORRISSEY: May I admit this Exhibit 57, page 5, into evidence?
THE COURT: Any objection?
MR. BRANUM: No objection.
THE COURT: Without objection that's admitted.
(Plaintiffs' Exhibit No. 57, page 5 was received in evidence.)
MR. P. MORRISSEY: May I publish?
THE COURT: Yes.
BY MR. P. MORRISSEY:
Q. Mr. Hernandez, this form is a request by you, right, to the medical staff; is that true?
A. Yeah.
Q. Can you tell us what you're seeking when you completed this form on February 23, 2022?
A. Asking that I could see a doctor concerning a wheelchair when I go to court or go long distances from the unit.
Q. Let me ask you a preliminary question. Is going from Division 10 over to Cermak a long distance for you?
A. I could barely walk a block right now, probably half a

block.
Q. How about going from Division 10 over to the court building, where was that?
A. That was far too.
Q. So, and where were you going to court at this time?
A. We were going to court in the gym. It was a Zoom. I was doing Zoom.
Q. And was that in Division 4?
A. The gym? I don't remember exactly where it was at. But I think it's towards around Division 5, I believe around there.
Q. Is that -- is the court building that you attended court at, was it kind of close in proximity to that Cermak ramp?
A. It was around there, around there.
Q. Your form says that, "I can't walk distances, so please call me immediately. Staff told me to direct this to medical."
Why did you write that?
A. Because they did. I mean, they would see sometimes that I had issues, and they would even try to help me, like transport me in the cart. So they transported me like once or twice in the cart.
Q. Let's talk about that.
A. But they told me to get a wheelchair.
Q. When do you remember being transported in a cart?
A. Went to the PRB, I know the PRB board, one time I wanted to see a PR, I know for sure I went on the cart that day.

Q. Was that around this time?
A. The PRB board, it was around -- I seen them around -- I'd say -- no, about February, I believe.
Q. And what happened on that day?
A. I seen the -- this was -- this was not the board, the prison board, it was the one in Cook County, the one you see two people with.
Q. So on that day, were you -- did you have to move from your housing unit to a different building?
A. I had to go over there, and he took me on a cart as far as he could, and he dropped me off, then I had to walk.
Q. Why were you using a cart that day?
A. I couldn't -- I was bad that day. I couldn't walk. I couldn't move.
Q. Now, soon after you completed this health service request form, on February 23, 2022, did you continue having to go to Cermak for medical appointments?
A. They sent me over there for eye doctor, for I think physical therapy one time. And I believe I seen the doctor there once or twice over there.
Q. And during those times you went to Cermak after you completed these forms, were you ever given any help getting there?
A. Oh, help, no. After the times I -- the one time -- I'll tell you one time I believe I was taken there, that's it.

Q. And so after you completed this form, did they ever drive you in a cart to Cermak?
A. I don't think so. I don't think so. I don't recall that. But like I said, I only got drove once, I believe, to Cermak. The PRB I know for sure because I remember that.
Q. So, Mr. Hernandez, after this date, how much longer did you stay in the Cook County jail?
A. After February 23?
Q. Right.
A. I left April 12.
Q. And tell us where you went on April 12th of 2022?
A. NRC to go see the parole board.
Q. And at some point did you come back to Cook County jail after April 12th of 2022?
A. I did -- August, I came back in August, I believe it was around the 4th of August.
Q. And how long did you stay at Cook County jail on this second stay?
A. I think I left in November, somewhere around November.
Q. If I said November 22, 2022?
A. It was right before Thanksgiving I believe, right before that, like a week before.
Q. So you were transported from state prison back to Cook County jail in August of 2022; is that right?
A. Yeah.

Q. And when you returned to Cook County jail, did you still use a cane to get around?
A. Yes.
Q. Describe your condition when you came back in August of 2022.
A. It was bad. I mean, I had gotten real bad from my knee. And when I was there, I wouldn't even go to the actual chow after I went to the store, to the commissary. I thought I wasn't even going to make it back.
Q. And when you came back to Cook County jail that second time, during the first few days did you go back to Cermak?
A. Yeah.
Q. And describe to us how it felt when you were going down that ramp to go see the doctors at Cermak upon your second admission to the jail.
A. I mean, I think the same thing, you know, off balance, but I was a lot worse though. It was times when I get really bad, though, you know. And that was one of the times when I was real bad when I was coming back.
Q. And why were you --
A. My back -- I don't know, my back started acting up real bad, and I was -- I would incline. I remember I would walk like this now because they took my cane there. When I was there, they took my cane.
Q. When you came back to Cook County jail, you had a cane,

right?
A. Yeah.
Q. And so after you saw the medical provider at Cermak on your second admission, you had to go back up the ramp to get back to your housing unit?
A. Yeah.
MR. BRANUM: Objection, leading.
THE COURT: I'll allow that but ask more open-ended questions next time.
Overruled.
BY MR. P. MORRISSEY:
Q. After you saw the doctor in Cermak that second admission, did you have to leave Cermak?
A. Yeah.
Q. And when you went up the ramp, describe to us how it felt.
A. Painful. Just a lot of pain.
Q. Can you elaborate more about why you had pain?
A. Like I said, I had a torn meniscus, and my back was acting up real bad to the point where I couldn't walk at times.
Q. What did you use for stability when you went up the ramp?
A. Stability, the cane. The cane they gave me. I was leaning on the wall and stayed close to the wall and just went with my cane.
Q. Why were you having to lean on the wall at that time in August of 2022?

A. I was having bad times. You know, the chronic issues I got, you know, overall. You know, my thyroid when that goes off balance or my blood pressure, you know, I start breathing harder and harder every time I get -- soon as I start walking I feel pain, my breathing, my blood pressure just shoots up.
Q. Let's assume that ramp had a place for you to rest halfway through, how would that have been any benefit to you?
A. Well, it would have been nice, I mean, but to be honest with you, I don't think that happens a lot.
Q. What I'm saying, Mr. Hernandez, if there was an area --
A. Okay.
Q. -- for you to rest halfway up that ramp --
A. Yeah, that would have been a lot more -- you know, it would have been a lot more easier for me to be able to, you know, to have to know -- even if I needed it real bad, you know, it's there, you know.
Q. When you were going up that ramp, did you have -- did you stop at all?
A. I wouldn't -- I tried to stop one time, but I didn't feel comfortable.
Q. What do you mean by saying you weren't comfortable?
A. I felt like -- like I stopped a little bit past the middle of the ramp, and I'd feel like I was still off balance, you know, and I said if I fall, I don't want to fall in the middle. So I kept walking until I got to the top, and then I stopped

when I got...
Q. Now, Mr. Hernandez, you mentioned you left the jail around Thanksgiving time in November of 2022?
A. Yeah.
Q. At some point after that time, did you reenter the jail?
A. Yeah, I reentered May -- sometime after May the 10th.
Q. And around that time, how long did you stay in the jail during that third admission?
A. Well, I went to Cook County for one day. I stayed one night, and they sent me to prison the next day.
Q. At that point, Mr. Hernandez, you pled guilty to a felony offense, right?
A. Yeah.
Q. And was the felony a felon in possession of a firearm?
A. Yes.
Q. And were you sentenced to three years in prison in May of 2023?
A. Yes.
Q. Prior to that time period, in February of 2001, you were convicted of a murder charge, right?
A. Yeah.
Q. And you were sentenced, Mr. Hernandez, at that time to 44 years in prison?
A. Yes.
Q. Now, that final stay at the jail, in May of 2023, where

were you housed during that stay?
A. I was housed in NRC.
Q. I'm talking about the Cook County jail.
A. Oh, the Cook -- you said in February of what?
Q. So when you returned to the jail, Cook County jail, in May of 2023 --
A. Oh, I was housed in the -- in the medical unit. I don't know -- what do they call that? It's all medical because I wanted -- I went in there with my -- I had doctor's orders and court orders that I bring any sleep apnea machine, any medical equipment that I needed.
Q. And if I said you were housed in the Cermak building, would that refresh your memory about the specific location?
A. I mean, I know it was medical. It was where they're all kept like if you're bad.
Q. And during that third incarceration, Mr. Hernandez, you had a chance to go up and down that ramp?
A. Yeah.
Q. And at that point was it different?
A. I mean, I think the only difference was that I know what to expect, you know, but it still was painful. You know, it wouldn't -- it didn't take away the pain, I knew what to expect, and I knew I had to brace myself.
Q. Why were you still in pain when you used the ramp in May of 2023?

A. Because I still had a torn -- the meniscus was still torn. That was still torn. I didn't get that operated until -- it got operated in 2024, I believe.
Q. And so can you explain the pain you would have in May of 2023 when you used -- went up that ramp that one time?
A. My knee would just move, you know, it would pop.
Q. Can you explain --
A. It would pop a lot. I mean that was it. I mean, and I could feel -- I knew something was wrong because every time I bent my leg, I couldn't bend it. It was real tight.
MR. P. MORRISSEY: May I have one moment, Your Honor?
THE COURT: Sure.
MR. P. MORRISSEY: Nothing further, Your Honor.
THE COURT: Thank you.
Cross-examination.

CROSS-EXAMINATION

BY MR. BRANUM:
Q. Good morning, Mr. Hernandez. Can you see what's on your screen?
A. No. I don't see nothing. It's just the eagle.
MR. BRANUM: Can we share...
THE COURT: Do you see it, Mr. Hernandez?
THE WITNESS: Yeah, I see it.
BY MR. BRANUM:
Q. And do you recognize this document as your conviction?

A. Yeah.
Q. And Count 1 is murder, intent to kill/injure?
A. I had two counts, I had attempt murder -- I had attempt murder, and I had a murder, but it was the same incident. Well, they called it one act, one crime, technical terms, I guess.
Q. Let me just ask the question. Does Count 1 state: "Murder/intent to kill/injure"?
A. Yes.
Q. And does Count 4 state: "Attempt first degree murder"?
A. Yes.
Q. And you pled guilty to both counts?
A. No. I got found guilty.
Q. Found guilty. And you were sentenced for the first count 44 years?
A. Yes.
Q. And for Count 4, six years?
A. Yes.

MR. BRANUM: At this time I move to admit Exhibit 34 into evidence.

MR. P. MORRISSEY: Objection, it's cumulative. 403.

THE COURT: Yeah, pursuant to my ruling, I ruled that you can ask him about it, I didn't mention anything about exhibits. And so I'm going to deny admission pursuant to Rule 403.

BY MR. BRANUM:
Q. And you were sentenced to 44 years on February 7, 2001, right?
A. Yes.
Q. You were also sentenced on May 8, 2023, for three years?
A. Yes.
Q. And did you plead guilty to that count?
A. Yes, I pled guilty.
Q. And was that count for felon, possession use of a firearm?
A. Yes.
Q. And both of those convictions were for a felony?
A. Yes.
Q. Now, you entered Cook County jail on February 2, 2022?
A. Yes.
Q. And then you left on April 12, 2022?
A. Yes.
Q. And then came back on August 4, 2022?
A. Yes.
Q. And then you left on November 22, 2022?
A. I don't remember the exact date I left, but it was right before, like I said, Thanksgiving. I think it was a few days, I don't know, or a week prior to that.
Q. And you came back on May 10th?
A. May 10th, yeah.
Q. And you --

A. I came back to do the rest of the time on the gun charge. I had three months to do.
Q. And you were housed inside the Cermak building?
A. Yeah, because I came in there with a sleep apnea machine.
Q. And so your housing unit was inside the Cermak building?
A. Yeah, for one day though. For one day.
Q. For one day in May 2023. And so you could access appointments within that building?
A. You said what?
Q. You could access medical appointments within the Cermak building because that's where you were housed, right?
A. You got a lot more access to the nurses and that, but the doctor, you got to catch them when they comes in.
MR. BRANUM: Your Honor, can I get an answer to the question?
THE COURT: You got an answer.
But you go there for medical appointments, correct?
THE WITNESS: No, but I'm trying -- he's saying if I got more access to it.
Didn't you say that?
MR. BRANUM: I can rephrase.
THE COURT: Yeah, ask the question again.
BY MR. BRANUM:
Q. When you were housed inside the Cermak building, you would go to the same building -- strike that.

When you were housed in the Cermak building, your medical appointments were in that same building, correct?
A. Yes.
Q. And so you did not need to use the ramp because you were housed in the same building as the medical appointments in May of 2023, correct; isn't that true?
A. It's two parts though. It's Division 8 is medical, but it's not -- it's not -- where I was at, the other part is where the people that are real bad are at, like people that got gunshot wounds or they just came from the hospital. They had me there because I had the machine because they couldn't put me anywhere else with the machine. Like I said, I was only there for a day, one day.
Q. Are you familiar with Cermak 3 West?
A. Cermak 3 West. I couldn't -- I couldn't -- I just know when I went in, they took me to a medical wing. That's all I could tell you. I was only there for one day, like I said.
Q. Do you know where you were housed in that one day in May 2023?
A. I can't tell you, man. I would be -- I don't recall, but I know I was on medical deck though.
Q. But you don't --
A. It was only three -- it was four people to a cell, and they all had medical issues ranging from gunshot wounds to surgeries to -- it was people that were bad, you know, not people that

were walking around in dorms, if that's what you're referring to when I was in 8.

Q. So I just want to know, do you recall what building you were housed in, in May of 2023?

A. When I came in for that one day?

Q. In May 2023?

A. In May of 2023?

Q. For the one day, correct.

A. Cermak, I believe, is medical, no? I don't know.

Q. Are you asking me?

A. They call it Cermak -- they call it -- they got a specific name for it, but I -- like I said, I only was there once and for one day. And that was at nighttime. I left the next day.

Q. So you were somewhere once, but you don't recall what building it was, correct?

A. I don't remember the building, the exact building. But I'm pretty sure files would show it. I mean, I can't -- if I say something I'd be lying if I said --

THE COURT: So here's how it goes quicker. Just testify to what you remember. And if you don't remember, the answer is "I don't remember."

THE WITNESS: I don't remember.

BY MR. BRANUM:

Q. And because you don't recall what housing unit you were in on that day in May 2023, isn't it fair to say you also don't

recall if you were using the Cermak ramp on that one day in May of 2023?

A. I don't know if I -- I don't know, I don't think I went through there that day. I don't know. I'm going to be honest with you, I don't know. I don't know if I went through there that day. I just know that I was there one day. I came in in the afternoon, and I left that -- that morning, I left.

Q. So tell us what you did that day.

A. What do you mean what I did?

Q. On the day in May 2023, when you came back to the jail, what did you do that day?

A. I came home -- I came home.

I came in, I called my family, let them know I was in, and that I would call tomorrow. And next day I was gone, I was in prison the next day. I believe they put me on a bus because of the court orders, that's what I believe.

Q. So we can agree that on May 10th, 11th, 2023, you did not use the Cermak ramp, correct?

A. I don't recall. I can't say yes or no.

Q. Mr. Hernandez, you were incarcerated in the Illinois Department of Corrections prior to February 2022 when you entered Cook County jail, right?

A. Yes.

Q. And during your time in the IDOC, you developed chronic lower back pain that affected your L4 and L5 vertebrae,

correct?
A. Yes.
Q. And IDOC issued a cane for long distance walking because of that condition, right?
A. Yes.
Q. And you also injured your shoulder?
A. Yes.
Q. And before entering Cook County jail in February of 2022, you were involved in a car accident, right?
A. I was involved --
Q. I just -- it's a yes-or-no. I just need to know if you were involved in a car accident.
A. Yes. Yes.
Q. Okay. Thank you. And that car accident caused additional injuries to your neck, back, and knee, right?
A. Yes.
Q. And you were involved in a second car accident on the day you were arrested, February 2, 2022; isn't that true?
A. That's true.
Q. And the second accident also caused you pain in your leg, right?
A. Yeah, that's what I kept complaining about.
Q. And you have a torn meniscus in your knee that you believe is an old tear, right?
A. No, I got documents --

Q. I just need to know if you -- do you have a torn meniscus in your knee that you believe is an old tear, yes or no?
A. Yeah, it is an old tear, that's what the doctor said.
Q. And during the time at Cook County jail, you didn't know you had a torn meniscus, right?
A. No, I didn't know. I kept complaining, they wouldn't send me out. They did X-rays, they did an X-ray, but they kept saying that I wouldn't be able to walk on it if I had a torn... And as soon as I got out of County, I went -- or I don't know -- yeah, as soon as I got out of County, I went to see the doctor, and he determined I had an old tear. They operated in 2024. They scoped it. They didn't operate it. They scoped it.
MR. BRANUM: Can I -- I'm going to strike that answer as nonresponsive.
THE COURT: You can't strike anything. Only I can.
MR. BRANUM: I'm sorry, I move -- I move to strike. I ask Your Honor to strike the answer because it was nonresponsive.
THE COURT: So, look, I'm going to strike that answer.
Here's your job. You're going to listen to his question, and you're going to answer only the question he asked you.
THE WITNESS: All right.
THE COURT: Can you do that for me?

THE WITNESS: All right.
THE COURT: All right. Thank you.
Go ahead.
BY MR. BRANUM:
Q. So during the time at Cook County jail, when you didn't realized you had a torn meniscus, you were walking on that torn meniscus, right?
A. Yes.
Q. And then you were walking on that torn meniscus the entire time that you were at Cook County jail, right?
A. Yes.
Q. And you've had chronic knee pain since before entering the jail, right?
A. Yes.
Q. And you've had chronic shoulder pain since before entering the jail?
A. Yes.
Q. Yes?
A. Yes.
Q. And you've had chronic lower back pain since your time in IDOC, right?
A. L4-L5, yeah. The rest of them was all right.
Q. And none of those conditions were caused by the Cermak ramp, correct?
A. No.

Q. And none of those conditions -- strike that.
Now, you never missed a medical appointment because of the ramps, right?
A. No.
Q. And you always reached your final destination at the jail, correct?
A. Yes.
Q. And you were able to get to Cermak every time you needed medical care, right?
A. Yes.
Q. And you attended eye doctor appointments at Cermak, correct?
A. Yes.
Q. You attended physical therapy appointments at Cermak, correct?
A. I think I went to see the physical -- I never made it because I went back to IDOC. I never went to physical therapy. I seen the lady one time and she was supposed to call me back.
Q. So you didn't have any physical therapy at the jail, right?
A. No. They seen me one time. Like I said, they were supposed to call me back in for the eye doctor or not, but I left on I think 4/12.
Q. So you did see the physical therapist once at Cook County jail?
A. She was seeing --

Q. Is that true?
A. -- what she could do as far as the cane was concerned --
THE COURT: Stop. Remember my instructions?
THE WITNESS: Yes.
THE COURT: Did you see the physical therapist one time? Yes.
Is that your answer?
THE WITNESS: Yes.
THE COURT: Just like that, okay? All right. Thank you.
BY MR. BRANUM:
Q. And you attended mental health services at Cermak, correct?
A. Yes.
Q. And you went to Cermak multiple times for a month during your incarceration, right? Is that a yes?
A. I went about five, five times.
Q. So is that a yes?
A. Yes.
Q. And you were never turned back from a medical appointment because you couldn't walk up or down the ramp; isn't that true?
A. No. No, what did you say?
Q. You were never turned back or turned away from a medical appointment because you were unable to walk on the ramp, correct?
A. I mean, I have to wait and stop walking. They had to wait

until a CO had to take me, walk me over there.
Q. So my question is --
A. I made it --
Q. I didn't ask the question. And I'm going to rephrase the question.
You were able to go to every medical appointment at the jail, and the ramp did not prevent you from doing that, right?
A. Yes, I was able to go every appointment. Yes.
Q. Yes, you were able to go to every medical appointment?
A. Yes.
Q. It has to be verbal responses for the court reporter --
A. I said yes. I said yes.
Q. I didn't hear that. I saw you nod your head.
A. Yes.
Q. And you were never prevented from going to court because of the ramp; isn't that true?
A. That's true.
Q. You were never denied access to any jail service because of the ramp, right?
A. No.
Q. No, you were never denied a service?
A. No.
Q. And sometimes you had to stop and rest while walking, correct?

A. All the time, not sometimes.
Q. But stopping to rest didn't prevent you from reaching your destination, did it?
A. Well, I had to explain myself a lot, you know, to the CO.
Q. That's not my question.
A. I was just telling you what happened.
Q. I don't need to know what happened. I just need to know if stopping to rest prevented you from reaching your destination?
A. No, not at all.
Q. And you were always able to get to your destination at the jail, correct?
A. Yes.
Q. Now, correctional officers transported you on a cart on at least two occasions?
A. I believe it was two. One I was going to court, and the other one when I was going to the PRB board.
Q. And some correctional officers helped you by taking you the closest route to court or other destinations, right?
A. Some of them -- like once or twice, maybe like three times, it wasn't that often though. But they would tell me, though, we're not going to do this all the time. You need to get a medical scrip for a wheelchair.
Q. So my question was some correctional officers helped you by taking you the closest route to court or other destinations, right?

A. Yeah, about three times, yeah, they helped me about three times.
Q. And you described some correctional officers as nice enough to help you, right? Is that a yes?
A. Yes.
Q. And staff would try to help you, correct?
A. Yeah, because it was obvious I was bad.
Q. And after an incident in the tunnel when you complained about walking difficulties, a correctional officer helped carry your property, right?
A. I asked him to.
Q. But he did help you carry your property, correct?
A. Yes.
Q. And the officer ultimately assisted you after you explained your condition, right?
A. No, he did that after me and him had some words because he kept saying I was refusing. He said -- he called it in and said I refused to walk; he didn't say that I couldn't walk.
Q. Well, you just testified that he helped carry your property?
A. Yeah, but that was afterwards, after he called it in. First he said -- he called it in, he said I refused to walk though. Then I told him, "Man, why are you saying I refuse? They're going to come over here, and then they're going to throw me in seg" because he's saying I refused to walk.

Q. But after the officer received the information about your condition, you were provided assistance, right?
A. Yeah, I mean, I guess so. I mean, I guess I did talk -- I asked him, "Can you help me with my bags at least? And I'm walking, if I got to stop, I'll stop."
THE COURT: So he helped you, correct?
THE WITNESS: Yeah.
THE COURT: Okay. Let's move on.
BY MR. BRANUM:
Q. So you were given a cane by medical staff in February of 2022, right?
A. At Cook County, yeah.
Q. Is that yes?
A. Yes.
Q. And in August 2022, medical staff changed the prescription to a cane for only long distances, right?
A. When was that?
Q. In August of 2022?
A. August of 2022. I don't know. I had requested it because they put me in a dorm. And I wasn't supposed to be there in the dorm. It was temporary. They housed me in seg, and they kept trying to treat me like I was in seg being disciplined.
Q. My question is about a cane.
A. Okay.
Q. So when you came into the jail, you were given a cane by

medical staff, correct?
A. Correct.
Q. And then later in August of 2022, medical staff changed the prescription from a cane to a cane only for long distances, right?
A. Yeah.
Q. And you had access to medical staff throughout your incarcerations, correct?
A. Yes.
Q. You never fell in the Cermak ramp?
A. I fell in my cell. I didn't fall over there.
THE COURT: What was that?
THE WITNESS: I said I didn't fall -- I didn't in Cermak. I said when I came back in my cell one time I fell.
BY MR. BRANUM:
Q. So you've fallen in your cell, but you've never fallen in the Cermak ramp?
A. Right, but that was after coming back.
Q. Isn't that true?
A. Yeah, I never fell on the Cermak ramp.
Q. So you never fell on the Cermak ramp, right?
A. No.
Q. And your attorneys did not file a claim for the RTU east tunnel ramp, right?
A. I was just concerned about Cermak.

THE COURT: How much more, ballpark?

MR. BRANUM: 20 minutes.

THE COURT: Okay. Let's take our lunch break at this time. Ladies and gentlemen of the jury, it is 12:10. We will be back at 1:10 sharp.

Here's my recommendation for summertime juries. Go outside, take a long walk. You've been sitting a long time. It really does help with the afternoon session. Okay, so that's my suggestion.

I'll see you back here 1:10 sharp. Thank you.

THE CLERK: All rise.

Court's in recess.

(Jury out at 12:11 p.m.)

THE COURT: Mr. Hernandez, you are still under oath, which means you cannot discuss the substance of your testimony with anybody including the lawyers. Do you understand that?

Okay. On the break I want you to regroup. And I'm being patient, but you need to answer the question that's asked specifically. Okay?

THE WITNESS: I apologize.

THE COURT: All right. Thank you. I'll see you at 1:10. Thank you.

(Recess at 12:12 p.m., until 1:10 p.m.)

THE CLERK: All rise.

(Jury in at 1:10 p.m.)

THE COURT: Please be seated.

Ladies and gentlemen of the jury, we're going to continue with our examination of Mr. Hernandez. I hope you had a good lunch. Please pay -- give your attention to the witness as we continue our work. Thank you.

You may proceed.

BY MR. BRANUM:

Q. Mr. Hernandez, you're currently out of custody; isn't that true?
A. Yes.
Q. And you did not come to court in a wheelchair, correct?
A. No.
Q. And the only injuries you claim are for pain and anxiety?
A. I believe pain and I believe I was treated real poorly by the medical staff every time I made a request.
Q. But the only injuries you're exclaiming is pain and anxiety?
A. Yeah.
Q. And you testified the pain that you felt was in your knee, back, and shoulder, right?
A. And my -- between my shoulder blade and my back, I used to get a sharp pain like I was getting stabbed or something when I used to walk.
Q. And those are the same body parts that hurt before you ever went up the Cermak ramp, right?

A. They hurt but not like that, not like they were -- they were more aggravated like that, like it bothered them more due to the terrain that I had to go through, basically.
Q. But it's the same body parts I just referred to, your knee, your back, and shoulder, right?
A. Yeah.
Q. And you fell in your cell in Division 10, not on the ramp, right?
A. Yeah, Division 10.
Q. It was in your cell?
A. Right.
Q. Not the ramp?
A. No, not the ramp.
Q. And that fall in your cell occurred after you walked a long distance from court or a medical appointment, right?
A. I was going some- -- I don't know where -- I don't recall where I went, but I know I had more than one call pass within them days, and that's when I got real bad and I fell in my cell.
Q. Because you walked a long distance?
A. Yeah.
Q. And it's true that you felt pain for days after walking?
A. When I used to walk, yes.
Q. Yeah, I mean you felt pain for days after walking any long distance, right?

A. Not as much as I would feel when I used to walk through -- my knees hurt a lot when I used to walk through the ramp going up.
Q. My question is, you would feel pain for days after walking anywhere long distances, right; isn't that true?
A. Yeah. I mean --
Q. Is that true?
A. That's true. That's true.
Q. And walking long distance caused you pain whether or not a ramp was involved or not?
A. I mean, it got worse. I'd say that. I mean, I felt pain regardless.
Q. Right, regardless of whether you're using a ramp or not, you felt pain?
A. Right.
Q. And you were seeing doctors for orthopedic issues with your knee and shoulder even after your release?
A. No, I seen them because I knew there was something wrong with my knee because I -- they didn't listen to me while I was in there. So as soon as I got out, I got an MRI, and that's when the doctor, he let me know I had a torn knee. I was already being seen for my shoulder, and when I went in, I told him that something was wrong with my knee, if you could do an MRI. And he did an MRI and it was torn, he said I had an old tear.

Q. And that was after you were released from the Cook County jail?
A. Soon as I got released.
Q. So you were still having issues after you left the jail?
A. I mean, I believe it healed, but it healed wrong due to the fact where I was walking on it, and the fact that the ramp was like this. And I literally would feel the tension in my knee, it would all go to my knee when I was going up the ramp.
Q. That wasn't my question. My question was after you were released from jail, you still had issues with your knee?
A. Yeah, that's when I got it operated.
Q. Okay. Thank you. Now, you have a bad shoulder, right?
A. Yeah.
Q. Is it the right shoulder?
A. The right one.
Q. And your bad shoulder prevented you from using handrails with one hand and a cane in the other hand, right?
A. You said what -- can you repeat that?
Q. So you had a bad right shoulder and your cane in the left hand, and the bad right shoulder prevented you from using handrails, right?
A. It prevented me from using the handrail, but if I had to use it if I was falling, I would rather fall on my shoulder. I'd say that much. I wouldn't use it --
Q. There's no question pending.

And are you familiar with the grievance process at Cook County jail?
A. Yeah.
Q. And isn't it true that you never filed a grievance on handrails; isn't that true?
A. I don't believe I filed specifically handrails alone, no.
Q. And isn't it true that you weren't focused on the handrails because you were focused on traveling anywhere at Cook County jail not just the ramp?
A. I was focused more on it was traveling anywhere, and as the terrain, it's similar slopes like that throughout the whole tunnels. It's not just that one, but that was the worst one though, the ramp.
Q. Well, you submitted the health service request form?
A. Yeah, I submitted...
Q. And you were asking for a wheelchair?
A. Yeah, I was asking for a wheelchair. Well, you say --
Q. Well, that's the question, you were asking for a wheelchair, right?
A. It went from a grievance to a request form though.
Q. Well, I don't want to argue with you. I just want to ask questions.
A. I'm just trying to, you know, answer stuff correctly, that's all.
Q. So you'd agree that your focus at Cook County jail when you

were submitting grievances and health service request forms was your general movement throughout the jail, and that's why you were asking for a wheelchair, right?
A. Yes.
Q. But a doctor never determined that you needed a wheelchair, right?
A. According to them I didn't have a torn meniscus, nothing was wrong with me.
Q. And the doctor at the jail never prescribed you a wheelchair, right?
A. Never.
Q. And you're not in a wheelchair now?
A. I'm not in a wheelchair now. But I don't move around like I had to then. I don't got to carry my stuff nowhere. I don't got to hurry up. I get up in the morning, I move at my own pace when I'm out here, you know.
Q. You were able to rest on the ramp?
A. Rest, there was nowhere to rest, nowhere to hold yourself up. I mean, if I was still -- like I said earlier, if I was stopped -- I stopped in the middle one time, and I didn't feel comfortable, so I kept -- I stopped for a minute and I kept walking. Then I stopped at the beginning of the ramp, you know. Like I said, it was balance and I didn't want to fall, you know.
Q. So do you disagree that you were able to rest on the ramp?

A. Unless you sit on the floor, if that's what you call a resting spot. I mean, the only thing you can do is sit on the floor if you really want to rest. I used to lean on the wall, I mean, but like I said, I didn't feel comfortable because when I got tired, I got tired towards the middle of the ramp. And I didn't feel comfortable stopping there. I mean...
Q. So you only got tired on the middle of the ramp, not the top of the ramp?
A. Oh, I got tired -- I said when I had to stop and rest, it's like in the middle of the ramp.
Q. So you were able to stop and rest?
A. I guess you could say that.
Q. And there were also occasions when you went up and down the ramp on a motorized cart?
A. Once, I believe.
Q. And officers assisted you in the best way they could to get you to your destination; isn't that true?
A. They would but they weren't -- they weren't too -- they didn't want to do it as much, though, they were more directing me to tell medical staff. They were always telling me, every time they had to do something for me, that I had to tell medical staff to get that straightened out with the chair.
Q. And you said once medical staff got involved, they determined that you did not need a wheelchair?
A. Yes.

Q. And you were never prevented from reaching an appointment, a service, court, any destination at the jail because of the ramps?

MR. T. MORRISSEY: Asked and answer.

THE COURT: Asked and answered. Sustained.

BY MR. BRANUM:

Q. And even on occasions when you needed to stop and rest, you were still able to complete the trip and access the appointment or service?

A. (No audible response.)

Q. Is that a yes?

A. Yes.

MR. BRANUM: No further questions.

THE COURT: Thank you.

Redirect.

MR. P. MORRISSEY: Your Honor, we have nothing further.

THE COURT: Mr. Hernandez, thank you. You are excused. Make your way off your stand.

(Witness excused.)

THE COURT: Plaintiff, you may call your next witness.

MR. T. MORRISSEY: Plaintiffs will call the plaintiff William Mathis.

THE CLERK: Will you raise your right hand, please.

(Witness sworn.)

THE WITNESS: Yes.

THE COURT: Please be seated. Pull your chair a little closer and speak into the microphone. Thank you.

You may proceed.

MR. T. MORRISSEY: Thank you, Your Honor.

WILLIAM MATHIS, PLAINTIFF HEREIN, SWORN

DIRECT EXAMINATION

BY MR. T. MORRISSEY:

Q. Mr. Mathis, will you please state your full name for the jury?

A. William Mathis.

Q. Mr. Mathis, how old are you currently?

A. 43.

Q. What was your medical condition in your 20s, can you explain that?

A. I suffered with a brain tumor.

Q. Can you tell us a little bit about the brain tumor you had when, in your early 20s?

A. It's in my pituitary gland. It's called acromegaly. It's caused me to gain weight. It enhanced my feet size from a 9 to a 13, my hands got larger, and my jaw structure in my face.

Q. What did the doctor -- where did you go for treatment for that condition?

A. John Stroger.

Q. What did the doctors over at John Stroger Hospital do for

you?
A. They did surgery on it.
Q. Did you have -- how many surgeries did you need for this condition on your pituitary gland?
A. Two. One in '05 and then one again in '07.
Q. After you had that surgery, did you talk to your doctors about your -- any continuing care you needed?
A. Yes, I take two injections, testosterone and Sandostatin.
Q. How often do you have to go in for those injections?
A. Every three weeks.
Q. So for the last, roughly, 20 years, you've been going back to the same hospital in the same clinic to get these injections?
A. Yes.
Q. And what clinic do you go to over at Stroger?
A. Fantus Clinic.
Q. And is there a particular department that you go to?
A. That is the department, Fantus Clinic.
Q. Is it called -- what is the department called?
A. Endocrine...
Q. Now, calling your attention, before you got into the jail, did you have any other medical conditions before April of 2023?
A. Yes.
Q. What other medical conditions did you have?
A. I suffer with gout and I have arthritis in my left knee.

Q. Now, when did you start experiencing symptoms with gout?
A. 15 years ago, somewhere like that.
Q. Generally, what happens when you get an attack of the gout?
A. If I eat too much red meat or too much salt in the food, I have a flare-up. Like in between the toes or around the ankle, feet swell, I can't put my shoe on, cause me to crawl.
Q. What type of treatment do you seek to address the -- when you have these flare-ups of the gout?
A. It's called endomethatine *[sic]*. It's pills. And allopurinol. That's a pill.
Q. Now, when you came into the jail in April of 2023, did you have any issues once you got into the jail with either the gout or the arthritic condition in your left knee?
A. Yes.
Q. What did you do in regards to your knee condition when you came into the jail?
A. I put in medical slips to try to see the doctor.
Q. I'm going to show you what's been marked as a group exhibit.
MR. T. MORRISSEY: It's Exhibit 98, Counsel, pages 4 through 9.
BY MR. T. MORRISSEY:
Q. I'm going to show you what's marked as Exhibit No. 98, page 9. Do you see that document in front of you?
A. Yes.

Q. Do you know, do you recognize who wrote that document?
A. Me.
Q. When did you write the document?
A. 6/2/23.
Q. And is -- why would you fill out that form?
A. I wanted to get my left knee looked at. I wanted an X-ray.
Q. And is --

MR. T. MORRISSEY: Your Honor, I would ask to move that into evidence.

THE COURT: Any objection?

MR. BRANUM: What page numbers?

MR. T. MORRISSEY: It's actually pages 4 through 9.

MR. BRANUM: No objection.

THE COURT: Without objection, those exhibits are admitted.

MR. T. MORRISSEY: Thank you.

(Plaintiffs' Exhibit No. 98, pages 4 through 9 were received in evidence.)

BY MR. T. MORRISSEY:
Q. Did you put in another health service request in the summer of 2023?
A. Yes.
Q. I'm showing you one on 8/21/23. Why did you put it in on August 21, 2023?
A. I thought that I had arthritis, and I needed a cane to get

around.

MR. T. MORRISSEY: Your Honor, can I publish page 9?

THE COURT: Yes.

MR. T. MORRISSEY: In the Group Exhibit 98?

THE COURT: Yes.

MR. T. MORRISSEY: As we go along.

THE COURT: Yes.

MR. T. MORRISSEY: Thank you.

BY MR. T. MORRISSEY:

Q. What were you seeking in August of 2023?

A. A cane.

Q. Why did you feel you needed a cane?

A. Because I had arthritis in my knee, and it hurt badly to walk.

Q. Did you put another one in a few days later on August 29th?

A. Yes.

Q. And was it basically the same type of request?

A. Yes, I need a cane.

Q. Again on September 3, 2023, did you put in another request?

A. Yes.

Q. Same request for a cane?

A. Yes.

Q. On September 25, 2023, did you put in another request?

A. Yes.

Q. What did you fill out on that day?

A. I need to have a cane to get around. I need to see the doctor. I have a bad knee.
Q. And then you put in one final one on October 6, '23. What did you say on October 6, '23?
A. I have had an X-ray done on my knee, and I have bad arthritis in my left knee. I need a cane bad so I can get around for everything they call me for.
Q. Now, you mentioned that since you were in your early 20s, every three weeks you would have to go over to the Fantus clinic, the Stroger clinic?
A. Correct.
Q. When you were in the jail, did they allow you to go out to the Stroger clinic for treatment?
A. Yes.
Q. Can you tell us, you were in the jail from -- how long were you in the jail, from April 7, 2023, until August of 2024?
A. Yes.
Q. August 29th?
A. Yes.
Q. Tell us how frequently during that period you would go out to Stroger.
A. At least about 20 times.
Q. And that would be roughly every three weeks you would go to Stroger?
A. Every three weeks.

Q. Now, when you were at the jail, there's different housing units at the jail, correct?
A. Yes.
Q. Tell us which different housing units you were in during that roughly 16-, 18-month period.
A. 2, 5, 8 which is RTU, and 6.
Q. Now, if we look back on the request that you put in, the initial request you put in in June of 2023, does it reflect what division you were in?
A. Yes. Division 2.
Q. And did you remain -- if we look at the request you put in on 9/25, were you still in Division 2 at that time?
A. That's Division 5.
Q. Oh, you were in Division 5 on 9/25?
A. Uh-huh.
Q. Can you tell us to the best of your recollection where Housing Unit No. 2 is at the jail, Division 2?
A. It's across from RTU. It's the dorms.
Q. When you would be allowed to go out to Stroger, can you tell us the path of travel you would take to get to Stroger Hospital each time you were in Division 2?
A. Yes. Go through the bottom of the RTU building and down through on Cermak.
Q. How would you get transported to Stroger?
A. By bus.

Q. By bus?
A. Yeah.
Q. And how long each time you went to Stroger would it take to get treated at the Stroger Hospital?
A. Probably about sometime like three, four hours.
Q. And then after you had your medical appointment in the summer and fall of 2023, how would you be transported back to the jail?
A. To another bus.
Q. Where would they take you?
A. To the RTU building. First we go through Cermak.
Q. And Cermak is what, the hospital at the jail?
A. Yes.
Q. Now, did you ever file any grievances in regards to the times you went out to Stroger?
A. Yes.
Q. I'm going to show you what's been marked as Defendants' Exhibit No. 23, page 19, and ask you for identification purposes, is that --
THE COURT: Unpublish, Lynette.
MR. T. MORRISSEY: Pardon?
THE COURT: It's not been admitted, correct?
MR. T. MORRISSEY: That's correct.
THE COURT: Okay.

BY MR. T. MORRISSEY:
Q. Do you recall filling out a grievance in December -- on December 13, 2023?
A. Yes.
Q. Why did you fill out that grievance?
A. Because I needed -- I can't see -- "I have a problem with the walking to and from Cermak. Every time I have seen the doc over there, I'm forced to walk up and down a ramp with my medical issue. I walk with a cane, and it's hard to get up and down the ramp and not fall, but I need to make my visits because I get two shots every three weeks that will throw my body off if I don't get them, so I'm forced to go there."
Q. Now, did you -- I'm going to show you what's been marked as Plaintiffs' Exhibit No. 34. Can you tell me what that -- did you fill out another grievance?
A. Yes.
Q. And what date did you fill that grievance out?
A. 12/10/23.
Q. And do you recognize the writing on this grievance?
A. Yeah, it's mine.
Q. And why did you fill out that grievance?
A. "I have a issue with the ramps in RTU Division 8 downstairs. When going and coming out of RTU, I use" --
THE COURT: Hang on a second. What are you doing?
MR. T. MORRISSEY: I'd move to admit Exhibit 34.

THE COURT: Okay. And then what about 33?

MR. T. MORRISSEY: 33 was the Defendants' Exhibit, Your Honor.

THE COURT: I see. Okay.

MR. T. MORRISSEY: If there's no objection, I'd move to admit Defendants' Exhibit No. 33 too.

MR. BRANUM: No objection if the full grievance and response is admitted under 106.

THE COURT: All right. So Defendants' Exhibit 23 is admitted.

(Defendants' Exhibit No. 23 was received in evidence.)

THE COURT: Plaintiffs' Exhibit 34, any objection, Defense?

MR. BRANUM: No, Your Honor.

THE COURT: Okay. That will be admitted as well.

(Plaintiffs' Exhibit No. 34 was received in evidence.)

MR. T. MORRISSEY: May I publish Defendants' Exhibit No. 23?

THE COURT: 23?

MR. T. MORRISSEY: I'm sorry, Defendants' Exhibit 23, Your Honor.

THE COURT: You may.

MR. T. MORRISSEY: Thank you.

MR. BRANUM: I believe it's only certain pages of this exhibit.

MR. T. MORRISSEY: It's -- it looks like a two-page exhibit.

THE COURT: All right. What's the objection?

MR. BRANUM: I don't believe he's -- I don't believe his intention is to move in the entire 20 pages of Exhibit 23. I don't think that's his intention.

THE COURT: Okay. So this is defendants' or plaintiffs' exhibit?

MR. P. MORRISSEY: It's Defendants' Exhibit 23, which they --

THE COURT: Are you moving the entire exhibit --

MR. T. MORRISSEY: I'm just introducing pages 19 and 20, Your Honor.

THE COURT: Pages 19 and 20 only. You good, Defense?

MR. BRANUM: For 19 and 20, that -- there's also pages 12, 13, and 14 that he just moved into evidence.

MR. T. MORRISSEY: I'm moving in Defendants' Exhibit 23, pages 19 and 20, Your Honor.

THE COURT: That's what he's moving in. What's the problem?

MR. BRANUM: The other exhibit, the December 10, 2023, that I saw on the screen.

THE COURT: Can you two go and figure out what you guys are doing? Thanks.

(Pause.)

MR. T. MORRISSEY: I think we've resolved our problem, Judge.

MR. BRANUM: You're referring to Plaintiffs' Exhibit 34.

MR. T. MORRISSEY: I'm -- the first one we're talking about is Defendants' Exhibit 23, which is Grievance 12 -- it's the grievance he put in on 11/27/23.

MR. BRANUM: I understand what he did. They were all in Defendants' Exhibits, but he also has it on Plaintiffs' Exhibit, that's where I got confused. So I know where he's at now.

THE COURT: Okay.

MR. T. MORRISSEY: So can we publish first Defendants' Exhibit No. 23? It's two pages, 19 and 20.

THE COURT: Okay. We will admit and publish that.

Go ahead.

(Defendants' Exhibit No. 23, pages 19 and 20 were received in evidence.)

BY MR. T. MORRISSEY:

Q. On the second page of that document, do you see, was that grievance accepted by the sheriff?

A. Yes.

Q. What was their comment?

A. "See code above. The grievance issue is a repeat submission of a grievance collected within the last 15 calendar

days."
Q. So they didn't accept your grievance because you had put in other grievances about the same issue?
A. Yes.
Q. So you kept complaining about the fact that you were having difficulty using these two ramps; is that fair to say?
A. Yes.
Q. And I'm showing you what's been admitted into evidence as Plaintiffs' Exhibit No. 34.
MR. T. MORRISSEY: Can we publish that one to the jury?
THE COURT: Yes. It's on the screen.
MR. T. MORRISSEY: Okay.
BY MR. T. MORRISSEY:
Q. That one is the one from December 10th?
A. Yes.
Q. And on page 3 of that exhibit, Exhibit 34, did they -- did you -- was it denied?
A. Yes.
Q. And did you appeal it?
A. Yes.
Q. What did you say?
A. "I still have the issue every time I go out of RTU to see the outside doctor because of the ramp."
MR. T. MORRISSEY: May I remove the exhibit, Your

Honor?

THE COURT: Yes, unpublish.

MR. T. MORRISSEY: Thank you.

BY MR. T. MORRISSEY:

Q. Now, can you -- when you would go over every three weeks to Stroger, and you left the jail, where would you leave the jail from?

A. When I leave the jail from Cermak?

Q. No, when you -- before you would go out to Stroger for your treatments every three weeks, where did they pick you up to go?

A. RTU.

Q. And the RTU, are there holding cells in the RTU?

A. Yes.

Q. And where are the holding cells located?

A. The first floor, the basement.

Q. You mentioned that after four or five hours, you would come back to the Cermak building?

A. Yes.

Q. Why would you return to the Cermak building, if you know?

A. To turn in my medical papers and make sure I get cleared by the doctor.

Q. Now I'm going to show you what is marked as Plaintiffs' Exhibit 1, page 18, that's in evidence. Do you recognize that photograph?

A. Yes.

Q. And what is that photograph?
A. The Cermak ramp.
Q. And after returning to the jail, you would be in the Cermak building in the basement, correct?
A. Yes.
Q. And can you describe to a person with your condition the Cermak ramp? Describe what it was like.
A. It is long, steep, and I had a hard time climbing it, shortness of breath. I got arthritis in my knee so it pops, and it like -- the bones grind and a lot of pain.
Q. Now, were some days better than others?
A. Yes.
Q. On the worst day how bad did it feel?
A. Like a 7.
Q. And when you weren't -- did it depend upon how much walking you had to do that day?
A. Yes.
Q. Now, how long would it take you to go up the ramp, generally?
A. Maybe about three, four minutes.
Q. Were there -- when you were there, did you ever notice any wheelchairs at the base of the Cermak ramp for people like you to use?
A. No.
Q. Did any correctional officer ever offer you assistance to

go up the ramp?
A. No.
Q. Was there -- did you notice any sign at the bottom of the Cermak ramp?
A. No.
Q. In the employee handbook or in the -- is there a handbook for people in the jail that you receive when you come into the jail?
A. Yes.
Q. Was there anything in the handbook that would inform you that you could ask a correctional officer for help?
A. No.
Q. Now, when you got to the top of the ramp -- I'm showing you what's already in evidence as Plaintiffs' Exhibit 102.
MR. T. MORRISSEY: Can I publish that to the jury and take down the Plaintiffs' Exhibit 1, Your Honor?
THE COURT: That's an admitted exhibit?
MR. T. MORRISSEY: It is, Your Honor.
THE COURT: You may publish, please.
MR. T. MORRISSEY: Can we switch to the -- thanks.
BY MR. T. MORRISSEY:
Q. Mr. Mathis, do you see Plaintiffs' Exhibit 102 on your screen?
A. Yes.
Q. Can you describe after you get up the hill or ramp, the

Cermak ramp, can you tell me how you would walk over to the RTU ramp, how far a walk is it?
A. It's long. It's long.
Q. I'm talking approximately how far from the Cermak ramp is the RTU ramp? Is there a hallway?
A. Yes.
Q. And showing you 102, Plaintiffs' Exhibit No. 102, describe what that is.
A. The RTU ramp.
Q. And in order to get back to the holding cell at the jail, would you have to go down that ramp?
A. Yes.
Q. Describe how -- how it felt when you went down the ramp.
A. It was long. It's like when you turn and hold yourself up, and you got a pop your knee in and out of place, it's like you finna to fall, but you not, and the pain is unbearable.
Q. Is it less painful than going up?
A. It's less painful going up. It's less painful going down.
Q. Why is it less painful for you going down the RTU ramp than going up the Cermak ramp?
A. Because I'm a heavy guy and, plus, my knee is bad, it pops in and out of place. I have swelling sometimes, not all the time, but when I did used to go and I had to suffer with gout, it put too much pressure on my foot.
Q. Now, at times when you went -- when you were in let's say

the RTU, or Division 5, when you were in Division 5, did you have to -- when you went to court, would you have to go up this RTU ramp?
A. Yes.
Q. And why is that?
A. To get to the holding cells.
Q. So to go to court, if you were in Division 5, at times you'd have to go up this ramp?
A. Yes.
Q. And you were also in Division 6, correct?
A. Yes.
Q. And where was Division 6 located?
A. Through the tunnels all the way in the back. I'm not quite sure exactly where it's at.
Q. Now, in December of 2023, do you recall having an attack of the gout?
A. Yes.
Q. Where were you housed when you had an attack of the gout?
A. 6.
Q. And tell us about what happened on December 10th.
A. I came out the cell because I wasn't getting no medical attention. For about three days I was having a flare-up with the gout and I couldn't get no help, so I came out the cell during count and laid on the thing and asked for a wheelchair.
Q. What is count?

A. When they switch shift.
Q. So when they switch shifts, are you required to go back in your cell?
A. Yes.
Q. And what did you do that day?
A. I refused.
Q. And what happened then?
A. They called the guards over there and asked what was the problem, and I told them I'm having a flare-up and I need help, medical attention. He went to go get the nurse, and that's when they came back and looked at me and then went and got a wheelchair.
Q. Is that the only day that you were given a wheelchair or a cart while you were at the jail?
A. Yes.
Q. I'm going to show you Exhibit 100 and ask you to take a look at it for a moment.
MR. T. MORRISSEY: It's admitted into evidence. Can we publish it to the jury?
THE COURT: Yes. Plaintiffs' Exhibit 100 may be published.
MR. T. MORRISSEY: Thank you, Your Honor.
(Video played in open court.)
BY MR. T. MORRISSEY:
Q. Mr. Mathis, can you explain what you're trying to do in the

video?
A. Get inside and see the doctor, but I couldn't move so I asked the guard could he get me a wheelchair or something because I can't -- I can't make it.
Q. And that's the day you had the flare-up where they actually provided you with a cart to go to Cermak?
A. Yes.
Q. Were you able to put any pressure on your leg that day, your foot?
A. No.
Q. And you were treated that day over at Cermak?
A. Yes.
Q. And that's the only time when you went for medical attention that they provided any type of assistance for you?
A. Yes.
Q. Now, when you were in the RTU at times -- what is the RTU building?
A. That's where they housed people that take medication and stuff.
Q. And after you had the gout flare-up up on December 10th, do you recall that you went -- you were assigned to that building, the RTU?
A. Yes.
Q. And when you're in the RTU and you seek medical attention, do you have to go up the RTU ramp?

A. Yes.
Q. Why is that?
A. It is the only way to get to the building.
Q. To get to the hospital?
A. Yes.
Q. So you would have to have gone up the RTU ramp and then down the Cermak ramp to get into the hospital?
A. Correct.
Q. Approximately, how many times do you recall in the year and a half that you had to go up the RTU ramp?
A. About 20, 20 times. 15, 20 times.
Q. And sometimes when you returned from court, would you have to go up the Cermak ramp --
A. Yes.
Q. -- or the RTU ramp?
A. Yes.
Q. Did it depend upon -- you always came back to the receiving -- to the RTU building after either court or your medical appointments at Stroger?
A. Yes.
Q. And did it depend upon where you were housed whether or not you had to go up the RTU ramp?
A. Yes.
Q. Was it as hard to go up the RTU ramp as the Cermak ramp?
A. Yeah, one longer than the other one.

Q. Was the RTU ramp longer than the Cermak ramp?
A. Yes.
Q. And you would have the same -- what -- how would you feel when you were going up the RTU ramp?
A. A lot of pain. A lot of pain. My knee was popping, the bones like -- what I have, the arthritis, the bones touch. And so when I'm bending my leg and trying to walk, you could hear the popping. Just a lot of pain.
Q. Had the doctors at the jail ever talked about a diagnosis of crepitus, have you ever heard that term?
A. Yes.
Q. What is that? And you were diagnosed with that?
A. Yes.
Q. What is crepitus?
A. A form of arthritis where the bones rub and touch together.
Q. In August of 2023, the end of August, were you convicted of aggravated discharge of a firearm?
A. Yes.
Q. And that was a felony, correct?
A. Yes.
MR. T. MORRISSEY: If I could have a moment?
THE COURT: Sure.
BY MR. T. MORRISSEY:
Q. I'm sorry, I think I had the wrong date for you. It was August of 2024 that you were convicted of the charge of

aggravated discharge of a firearm; is that correct?
A. Yes.
MR. T. MORRISSEY: I have nothing further, Your Honor.
THE COURT: Thank you.
Cross-examination.

CROSS-EXAMINATION

BY MR. BRANUM:
Q. Good afternoon, Mr. Mathis. How are you doing?
A. Good afternoon.
Q. So you entered Cook County jail on April 8, 2023?
A. Yes.
Q. And then you left Cook County jail on August 29, 2024?
A. Yes.
Q. And during the time that you were at Cook County jail, you were detained on the charges that plaintiffs' counsel just asked you about?
A. Yes.
Q. And that was aggravated discharge of a firearm?
A. Correct.
Q. And you were sentenced to four years?
A. Yes.
Q. Now, you've never reviewed the Americans with Disabilities Act standards yourself, have you?
A. No.
Q. And you've never reviewed any of Cook County jail policies

or procedures regarding accommodation of inmates with mobility aids; is that true?
A. No.
Q. And during your time at Cook County jail, you did not conduct any investigation into whether the ramps complied with the accessibility standards, right?
A. No.
Q. Now, when you entered Cook County jail in April 2023, you were not using a cane at that time, were you?
A. No.
Q. In fact, you didn't receive a cane until around November 2023; isn't that true?
A. Correct.
Q. And that's approximately seven months after you were admitted to the jail, right?
A. Yes.
Q. And so during those months, during those seven months when you were first at the jail, you walked around the jail without any cane, right?
A. Yes.
Q. And when you received a cane around November 2023, the doctor prescribed the cane only for long distances?
A. Yes.
Q. Your knee pain started about a month or two after you were incarcerated?

A. I had a little pain before that.
Q. But not enough pain to have a cane?
A. No.
Q. And you've never used a cane outside of jail, had you, prior to going into Cook County jail?
A. No.
Q. The doctor at Cermak told you that you have arthritis in your knee?
A. Yes.
Q. And did the doctor also tell you that the arthritis in your knee was getting worse?
A. It was already very -- it's worse as it could get. He told me I had to have a knee replacement.
Q. And the doctor prescribed you pain medication?
A. Yes.
Q. And when you had flare-ups, the medical staff gave you additional medication, right?
A. Yes.
Q. You also suffer from gout?
A. Yes.
Q. When your gout was bad, your foot would swell up?
A. Yes.
Q. At times the gout was so bad that you couldn't walk at all?
A. Correct.
Q. And the pain that you experienced in your knee and the

shortness of breath that I think you testified to as well, those symptoms were caused by your arthritis and gout, right?
A. The shortness of breath?
Q. The knee and shortness of breath -- the knee pain and the shortness of breath, were those symptoms caused by arthritis and gout?
A. No.
Q. So you didn't have any symptoms from your arthritis and gout?
A. I have pain from arthritis and gout. My shortness of breath came from -- with the brain tumor and gaining the weight, and when I move around I get shortness of breath.
Q. And you never sought treatment for any injuries caused by the ramps?
A. No.
Q. And the Cermak ramp never stopped or prevented you from accessing services or attending appointments, right?
A. No, just caused pain after a long day and going back and forth up and down the ramp. With my conditions it caused pain; my leg would swell up when I get back to the room.
Q. But you'd agree that the ramp never stopped or prevented you from accessing services or attending appointments?
A. No.
Q. Isn't the same true for the RTU ramp, you were never stopped or prevented from accessing services or attending

appointments because of the RTU ramp, right?
A. No.
Q. In fact, you were always able to get where you needed to go, right?
A. Yes.
Q. Now, the only times you didn't go to a scheduled appointment were when you declined to go because your knee was bothering you?
A. Yes.
Q. And that was your choice?
A. Yes.
Q. Now, on October 31, 2023, didn't you refuse a visit to Cermak?
A. Did I refuse a visit? I don't remember refusing it.
Q. Do you ever recall refusing because you had a flare-up of your knee?
A. Yes.
Q. And do you also recall refusing a visit to Cermak on February 16, 2024?
A. Yes.
Q. And that refusal was also due to a flare-up on your knee?
A. Yes.
Q. Now, the jail staff didn't prevent you from going to those appointments; you chose not to go?
A. Yes, because they wouldn't give me no transportation. I

asked for a wheelchair. I was asking for a wheelchair for the longest. I suffered with the gout for like almost a week before I even got help. It caused me to go against being locked up, and I came out, and I crawled to the steps and refused lockup. And that's when they got the wheelchair over there. And that's why I missed my appointments.
Q. I just mentioned two dates where you refused the visit to Cermak?
A. That's what they called it. When you deny going somewhere, they will say refused, but I never refused, I just couldn't move. I asked for help. They put it in they paperwork that I refused.
Q. Do you recall giving a deposition in this case?
A. Yes.
Q. And do you recall being placed under oath when you gave that deposition?
A. Yes.
Q. And did you understand that it was important to testify truthfully under oath?
A. Yes.
Q. And was it your testimony just now that you never refused an appointment?
A. I never refused the appointment. They -- they signed -- they bring the papers and make you sign the refusal. They tell you, you gots to sign it.

MR. BRANUM: Can I show my screen to the witness?
THE COURT: Yes.
BY MR. BRANUM:
Q. I'm just going to read the questions. Do you see that on your screen?
A. Yes.
Q. Okay. "Question: This states right here that they received a refusal from you, correct?
"Answer: Yep.
"Question: That was on October 31, 2023?
"Answer: Yes.
"Question: And do you know why you might have refused on that day?
"Answer: It probably was due to the flare-up. I only refuse when I have a flare-up.
"Question: Would it sound right to you, on February 16, 2024, you might have also refused?
"Answer: Yes."
Did I read those questions and answers correctly?
A. Yes.
MR. T. MORRISSEY: Objection --
THE WITNESS: I didn't understand.
THE COURT: Hang on a second.
MR. T. MORRISSEY: It's not impeaching.
THE COURT: Overruled. It's close enough.

BY MR. BRANUM:
Q. So do you agree on at least two occasions you refused appointments to Cermak?
A. Yeah.
Q. Now, you've never missed a medical appointment because the jail refused to accommodate you, have you?
A. Yes.
Q. Yes, that you've never -- you've never missed a medical appointment -- so it's correct that you've never missed a medical appointment?
A. I missed one because they wouldn't give me no wheelchair to get there. And that was the only time I ever missed was when I had that one flare-up.
Q. So is it your testimony you were never able to go where you needed to go?
A. No, I was able to go where I needed to go. Just that one flare-up, I had needed transportation. That was the only incident as far as me asking for the wheelchair and needing to get somewhere. Other than that I got where I needed to go.
Q. And so is it your testimony that it's because jail staff refused to provide you transportation, and that's why you were unable to go to your appointment?
A. Yes.
Q. Do you see the deposition transcript of the testimony that you gave in this case? And this is on page 29, line 15, and

I'll just read the question and answer.

THE COURT: What exhibit?

MR. BRANUM: This is a deposition transcript.

THE COURT: I know. What exhibit number?

MR. BRANUM: It's not marked as an exhibit.

THE COURT: Is it marked anything?

MR. BRANUM: It's the transcript for impeachment.

THE COURT: It's your record. Go ahead.

BY MR. BRANUM:

Q. So this is the deposition transcript that took place on July 25, 2025, in this case with plaintiff William Mathis. Page 29. All right.

"Question: You were always able to get where you need to go, correct?

"Answer: Yes. Unless I just didn't feel like going over because my knee was giving me problems and I declined going over there."

Did I read that question and answer correctly?

A. Yes.

MR. BRANUM: You can stop sharing the screen.

BY MR. BRANUM:

Q. Mr. Mathis, when your gout was too bad and you couldn't walk, the officers put you on a cart and took you to Cermak, didn't they?

A. Yes.

Q. And you've been transported in a wheelchair at least once or twice, haven't you?
A. Yes.
Q. And those wheelchair transports were also when your foot swelled up from gout, correct?
A. Correct.
Q. So when you had severe symptoms and couldn't walk, the staff transported you, didn't they?
A. Yes.
Q. And on December 10, 2023, you filed a grievance complaining about difficulty using the ramp, didn't you?
A. Yes.
MR. BRANUM: And I have exhibit -- Plaintiffs' Exhibit 34 on the screen. It's been admitted in evidence. May I publish to the jury?
THE COURT: You may.
BY MR. BRANUM:
Q. And, Mr. Mathis, is this the grievance that you submitted regarding an incident on December 10, 2023?
A. Yes.
Q. And is -- could you just explain to the jury why you submitted this grievance?
A. Because I was having an issue with the ramp. It said, "I have an issue with the ramp in RTU Division 8 downstairs when going and coming out of RTU. I use a cane and I feel that it's

hard to move up and down the ramp with me having a cane and not fall down."
Q. And so you're complaining of difficulty using a cane up the ramp on December 10, 2023; isn't that true?
A. Yes.
Q. And did you receive a response to your grievance?
A. Yes.
Q. And it states, "Please see attached grievance response"?
A. Yes.
Q. And the response was issued on December 26, 2023, and it states, "Upon review of available evidence, Detainee Mathis is observed being escorted by cart from Division 6 to Cermak for medical attention. Medical evaluates Detainee Mathis and determines he is able to ambulate with a cane for long distances only. Mathis is then escorted by cart back to Division 6 to retrieve his property. Mathis is then escorted by cart and lastly by wheelchair up to his new living unit in RTU. Detainee Mathis did not walk to RTU on December 10th. Detainee Mathis' grievance is without merit."
MR. BRANUM: And I could stop publishing to the jury.
BY MR. BRANUM:
Q. So isn't it true that on December 10, 2023, you did not walk up and down either the Cermak ramp or the RTU ramp using your cane, correct?
A. Correct.

Q. And as we just read in the response, you were actually transported by cart?
A. Correct.
MR. BRANUM: And I have Defendants' Exhibit 145 on my screen that's previously been admitted into evidence. May I publish to the jury?
THE COURT: Yes.
BY MR. BRANUM:
Q. Mr. Mathis, can you just describe what this image shows?
A. One of the ramps.
Q. Do you recall which ramp this is?
A. That's the -- that's the Cermak ramp.
Q. And is that you on the cart?
A. Yes.
Q. And this video shows you being transported down the ramp with a cart?
A. Yes.
MR. BRANUM: If I could stop publishing while I switch exhibits?
And if I could, this is Defendants' Exhibit 129 on the screen. May I publish?
THE COURT: Yes.
BY MR. BRANUM:
Q. Mr. Mathis, what is in this image?
A. The ramp.

Q. Do you recall which ramp this is?
A. Cermak.
Q. And does that show you going down the Cermak ramp?
A. Yes.
Q. And this was on December 10, 2023?
A. Yes.
MR. BRANUM: If I could stop publishing and go to Defendants' Exhibit 120 that's previously been admitted into evidence. May I publish?
THE COURT: Yes.
THE CLERK: To the jury?
MR. BRANUM: Yes, that's my request.
BY MR. BRANUM:
Q. And, Mr. Mathis, can you describe what is shown in this video?
A. That's still Cermak.
Q. And what are through those double doors?
A. The medical.
Q. Would that be the Cermak Health Services building?
A. Yes.
Q. And this shows you in a cart being transported into Cermak Health Services; is that fair to say?
A. Yes.
MR. BRANUM: I could stop publishing to the jury.

BY MR. BRANUM:

Q. And then later you were transported in a wheelchair to get to your cell, or to your living unit?

A. Yes.

Q. And so the officers did provide assistance to you on December 10, 2023?

A. Yes.

Q. But you still filed a grievance on December 10, 2023, correct?

A. Yes.

Q. Now, you've been able to traverse the Cermak ramp without using the handrails, haven't you?

A. Have I been able to what?

Q. You've been able to walk up and down the Cermak ramp without using the handrails, right?

A. Yes.

Q. And you've walked up the Cermak ramp actually while carrying a lunch tray at times?

A. Yes.

Q. And you were able to walk up the ramp while holding that lunch tray, right?

A. Yes.

Q. Same thing with paperwork, you were able to walk up the Cermak ramp while carrying paperwork?

A. Yes.

Q. And you were also able to walk up the RTU ramp with a launch tray and paperwork?
A. Yes.
Q. And you've never fallen on either the Cermak ramp or the RTU ramp, have you?
A. No.
Q. Now, when you walk up and down the ramps, the issue that you complain about is pain, it's not -- you're not complaining about not being able to go all the way to the top or all the way to the bottom to get to your appointment?
A. It's the distance. It's the distance and going up and down the ramp at an angle. That's what hurts. That's where the pain happened with my knee.
Q. And are you attributing your pain to how steep the ramp is?
A. Yes. Some days I was okay, I could walk, hold my lunch, but some days it's very bad.
Q. So some days you were able to go up and down the ramps without any problems?
A. Yes.
Q. Now, when you were at Cook County jail, you weren't housed in the RTU since around 2023; is that true?
A. What?
Q. That you were -- when you were at the jail after -- since around 2023, you were not housed in the RTU?
A. Yes.

Q. And the last time that you used the RTU ramp was in 2023, right?
A. I'm not sure. Probably. We go through the -- it could be the last time. I got moved around so many times.
Q. Do you recall the deposition in this case --
MR. BRANUM: Or can I share my screen with the witness?
THE COURT: Yes.
BY MR. BRANUM:
Q. And, Mr. Mathis, would your deposition testimony refresh your memory about when you were housed in the RTU?
A. (No audible response.)
Q. And do you see the question where it states --
A. "Do you know," yeah.
Q. "Do you know when you were last housed in the RTU?
"No.
"Question: Would 2023 sound right?
"Answer: Yes."
Does that refresh your recollection of when you were last housed in the RTU?
A. Yes.
Q. And do you see the question and answer about the last time you were on the Cermak ramp, would it have been the same as the RTU ramp on July 18?
Your answer is: "This is the ramp I was on July 18th.

"Question: Yeah, you would have been on both ramps July 18, correct?"

THE COURT: So what are you doing? You're not impeaching, and you can't read the question and answers while you're refreshing, so what are you doing?

MR. BRANUM: I can have him read it to himself and see if that refreshes his recollection first.

THE COURT: Thank you.

BY MR. BRANUM:

Q. So, Mr. Mathis, if you could just read the testimony on your screen and let me know if that refreshes your recollection of when the last time you used the RTU ramp was?

A. Yes.

Q. And when was the last time that you used the RTU ramp?

A. July 18.

Q. So I'd like to impeach. You're stating that the last time you used the RTU ramp was July 18th?

A. Yes.

MR. BRANUM: So this is page 28, line --

THE COURT: July 18, 2023, is that your testimony?

THE WITNESS: That's what it says right here, July 18, 2023.

THE COURT: What is your memory, sir? When is the last time you used the ramp, RTU?

THE WITNESS: Um, in -- it had to be 2024 because

that's when -- that was right before I took my time and left.

I take shots every three weeks, so it couldn't have been delayed.

THE COURT: So his testimony is 2024.

Go ahead. Is the date important to you?

MR. BRANUM: Yes, Your Honor.

THE COURT: Counsel, do you want to stipulate to the date?

MR. T. MORRISSEY: Your Honor, I have his housing history here.

THE COURT: Sorry?

MR. T. MORRISSEY: I have the sheriff's record shows when he was housed.

THE COURT: The last date when he was housed?

MR. T. MORRISSEY: Yes.

THE COURT: Why don't you hand it to him. We can speed this up.

MR. BRANUM: Will you just stipulate to that?

MR. T. MORRISSEY: Pardon?

MR. BRANUM: Will you just stipulate to that?

MR. T. MORRISSEY: I'm not going to stipulate --

THE COURT: All right. He's going to continue with his testimony then.

MR. T. MORRISSEY: I'll stipulate that he was in the RTU as of February 29, 2024, according to the sheriff's record.

He was there from 12/10/23 to 2/18/24, again on 2/22/24 to 2/29/24.

MR. BRANUM: So the last day that --

THE COURT: He's stipulating.

So stipulated, Counsel?

MR. T. MORRISSEY: We're going to stipulate. I mean, the records are the records.

THE COURT: Give him a second.

Are you stipulating?

MR. BRANUM: Yes.

BY MR. BRANUM:

Q. So according to your jail records, you were last housed in the RTU February 29, 2024; is that correct?

A. Correct.

Q. And you would only use the RTU ramp when you were in the RTU, right?

A. Correct.

Q. So the last date you would have used the RTU ramp was February 29, 2024, correct?

A. Correct.

Q. And the ramps never -- strike that.

MR. BRANUM: I don't have any further questions.

THE COURT: Okay. Thank you.

Redirect.

MR. T. MORRISSEY: Yes.

REDIRECT EXAMINATION

BY MR. T. MORRISSEY:

Q. I think you might be confused by counsel. Each time you went out to Stroger Hospital, where did you leave the jail from?

A. From RTU.

Q. And when you came back to the jail -- let me ask you, is the RTU the receiving area of the jail?

A. Yes.

Q. Is that where they have the holding cells?

A. Yes.

Q. Is that where every time you leave the campus of the jail, you have to come back eventually to the receiving room?

A. Yes.

MR. BRANUM: Objection.

THE COURT: Sorry. What's the objection?

MR. BRANUM: Leading.

THE COURT: It's a bit leading. I'll give you a little leeway to direct the witness to move it along. So I'll overrule that. But it is redirect.

Go ahead.

BY MR. T. MORRISSEY:

Q. After having your medical appointment at Stroger, where would they bring you back to the jail initially?

A. Cermak.

Q. And then after having the doctors look at your paperwork, would you then have to go back to the receiving?
A. Yes.
Q. In order to get back to the receiving, would you have to go up the Cermak ramp?
A. Yes.
Q. And then down the RTU ramp?
A. Yes.
Q. And that was -- you did that -- approximately, how many times did you go out to Stroger in 2024?
A. Like 15, 20 times.
Q. And you weren't only housed in the RTU where you used the RTU, you were also in other housing divisions, correct?
MR. BRANUM: Objection, leading.
THE COURT: Overruled. I'll allowed that.
BY MR. T. MORRISSEY:
Q. You were in Division 5 at times?
A. Yes.
Q. And you went out to court at times too?
A. Yes.
Q. And at times when you went to court, would you have to go back to the receiving?
A. Yes.
Q. And to go back would you have to utilize the RTU ramp?
A. Yes.

Q. So every time you either go to court or to Stroger, you got to go use the RTU ramp?
A. Yes.
MR. T. MORRISSEY: I have nothing further.
THE COURT: Anything else, Counsel?
MR. BRANUM: No further questions.
THE COURT: Okay. Mr. Mathis, thank you. You may step off the stand. You're excused for now.

(End of excerpt.)

* * * * *

I certify that the foregoing is a correct excerpt of proceedings in the above-entitled matter.

*/s/ Vicki L. D'Antonio* ________ *October 23, 2026*
*Vicki L. D'Antonio, CSR, RPR, FCRR* *Date*
*Official Court Reporter*

# I N D E X


| WITNESSES | PAGE |
| --- | --- |
| CUAUHTEMOC HERNANDEZ | |
| Direct Examination by Mr. P. Morrissey | 2 |
| Cross-Examination by Mr. Branum | 26 |
| WILLIAM MATHIS | |
| Direct Examination by Mr. T. Morrissey | 52 |
| Cross-Examination by Mr. Branum | 74 |
| Redirect Examination by Mr. T. Morrissey | 93 |

| PLAINTIFFS' EXHIBIT | RECEIVED |
| --- | --- |
| No. 34 | 61 |
| No. 57 | 7 |
| No. 57, page 6 | 14 |
| No. 57, page 5 | 17 |
| No. 98, pages 4 through 9 | 55 |

| DEFENDANTS' EXHIBIT | RECEIVED |
| --- | --- |
| No. 23 | 61 |
| No. 23, pages 19 and 20 | 63 |